UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| HELEN HUDSON, Individually and on Behalf of All Others Similarly Situated, ) | Case No. |
| ) | |
| Plaintiff, ) | CLASS ACTION |
| ) | |
| vs. ) | |
| ) | |
| GOHEALTH, INC., CLINTON P. JONES, ) BRANDON M. CRUZ, TRAVIS J. ) MATTHIESEN, NVX HOLDINGS, INC., ) CENTERBRIDGE PARTNERS, L.P., CCP III ) AIV VII HOLDINGS, L.P., CB BLIZZARD ) CO-INVEST HOLDINGS, L.P., BLIZZARD ) AGGREGATOR, LLC, CENTERBRIDGE ) ASSOCIATES III, L.P., CCP III CAYMAN ) GP LTD., GOLDMAN SACHS & CO. LLC, ) BOFA SECURITIES, INC. and MORGAN ) STANLEY & CO. LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933**

Plaintiff Helen Hudson ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public Securities and Exchange Commission ("SEC") filings of GoHealth, Inc. ("GoHealth" or the "Company"), Company press releases, conference call transcripts, investor presentations, and analyst and media reports and other public reports and information regarding the Company. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of GoHealth Class A common stock pursuant and/or traceable to the registration statement issued in connection with GoHealth's July 2020 initial public offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act") against GoHealth, certain of GoHealth's officers and directors, the private equity sponsor of the IPO and its affiliates, and the IPO's underwriters.

2. GoHealth provides an end-to-end health insurance marketplace that purportedly specializes in matching consumers with Medicare Advantage plans. Based in Chicago, Illinois, GoHealth is organized as a holding company, with GoHealth Holdings, LLC ("GHH") as the Company's principal asset, which houses Company operations. GHH was formerly known as Blizzard Parent, LLC ("Blizzard"), until it was acquired by the private equity firm Centerbridge (defined below) in September 2019 for $1.1 billion in equity and cash (the "Acquisition"). In connection with the Acquisition, Centerbridge also agreed to pay the Company's selling shareholders up to $275 million worth of additional contingent consideration, to be paid in the

form of common and senior preferred earnout units, if the Company achieved certain earnings targets in late 2019 and 2020.

3.    Immediately following the Acquisition, GoHealth reported tremendous growth. From September 13, 2019 through December 31, 2019, GoHealth purportedly generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019.   Thus, GoHealth stated that it had generated substantially more revenues in the three-and-a-half months following the Acquisition than in the eight-and-a-half months preceding the Acquisition.  Indeed, GoHealth claimed to have generated more revenues in the three-and-a-half months following the Acquisition than it did during the Company's entire 2018 fiscal year.

4.    GoHealth also represented that its business model was highly profitable, offering the best life time value of commissions ("LTV") per consumer acquisition cost ("CAC") of any of its peers.   LTV refers to the commission revenues that GoHealth expected to receive from insurance carriers in connection with an approved submission for an insurance policy by a new consumer over time, factoring in a variety of variables such as contracted commission rates, carrier mix, policy persistency and the number of expected submissions.   CAC refers to the cost to GoHealth of acquiring its consumers.   Thus, LTV/CAC is a type of profitability metric that generally refers to how much of a return GoHealth expects on its consumer acquisition investments.  GoHealth represented that its LTV/CAC ratio for its Medicare Internal segment (the Company's largest and most profitable segment) was 3.9x and 2.7x for 2019 and its first quarter 2020, respectively, significantly higher than the 1.7x LTV/CAC ratio the Company stated it had achieved during the first quarter of 2019 and, by some estimates, roughly double GoHealth's peers.

5.    Although GoHealth generated net losses in 2019, the Company claimed that this was because it was in growth mode and seeking to expand its presence as a dominant force in the

Medicare insurance marketplace. The Company's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") – a metric tailored by management ostensibly to show the Company's core profitability by excluding certain costs – increased considerably in the lead-up to the IPO. GoHealth claimed that its adjusted EBITDA had grown by 388% year over year to $170 million during its pro forma 2019 and by 394% year over year to $35 million during the first quarter of 2020. As a result of its apparently exceptional earnings growth, GoHealth incurred $75 million in contingent consideration liability from the close of the Acquisition through the end of the first quarter of 2020 to be paid out to the Company's prior owners.

6.      Unlike many competitors, the Company focused its business on just two insurance carriers, Humana and Anthem. In the first quarter of 2020, 74% of GoHealth's entire net revenues were derived from just these two carriers. This carrier concentration was even higher for GoHealth's all-important Medicare segments at roughly 85% of all segment revenues – despite the fact that Humana and Anthem were estimated to account for just 23% of total Medicare Advantage market-wide enrollment.

7.      GoHealth considers insurance carriers to be its primary customers, rather than consumers, because the carriers are responsible for paying commissions to GoHealth in exchange for GoHealth reliably placing policies in compliance with applicable regulations and carrier-specific requirements. The Company does not receive any revenues directly from consumers. The carriers utilize GoHealth as a scalable means of acquiring customers that can be more cost effective than developing internal acquisition capabilities. According to GoHealth, the Company's high LTV/CAC ratio was primarily the result of the Company's unique competitive advantages in the services it provides to its insurance carrier partners. As described by the Company, GoHealth's "Best-in-Class Medicare LTV/CAC Ratio" is "Driven by Proprietary Technology, Business Processes, Data and Highly Skilled Agents."

8.     On June 19, 2020 – just nine months after the Acquisition – GoHealth filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on July 14, 2020 (the "Registration Statement").  On July 16, 2020, GoHealth filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.  The Registration Statement was used to sell to the investing public 43.5 million shares of GoHealth Class A common stock at $21 per share, for total gross proceeds of $913.5 million.  Proceeds from the IPO were used primarily for the purpose of paying Company insiders and Centerbridge and consummating financial obligations which had arisen from the Acquisition.

9.     The Registration Statement for the IPO was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.  Specifically, the Registration Statement failed to disclose that at the time of the IPO: (i) the Medicare insurance industry was undergoing a period of elevated churn, which had begun in the first half of 2020; (ii) GoHealth suffered from a higher risk of customer churn as a result of its unique business model and limited carrier base; (iii) GoHealth suffered from degradations in customer persistency and retention as a result of elevated industry churn, vulnerabilities that arose from the Company's concentrated carrier business model, and GoHealth's efforts to expand into new geographies, develop new carrier partnerships and worsening product mix; (iv) GoHealth had entered into materially less favorable revenue sharing arrangements with its external sales agents; and (v) these adverse financial and operational trends were internally projected by GoHealth to continue and worsen following the IPO.

10.     Shortly after the IPO, the price of GoHealth Class A common stock suffered significant price declines, and by September 15, 2020, GoHealth Class A common stock closed at just $12.53 per share – ***over 40% below*** the $21 per share price investors paid for the stock in the IPO less than two months previously.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o].  This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act.

12.     This Court has personal jurisdiction over each of defendants and venue is proper in this District.  GoHealth is headquartered in this District.

## PARTIES

13.     Plaintiff Helen Hudson purchased GoHealth Class A common stock pursuant and/or traceable to the Registration Statement, as reflected in the attached Certification incorporated herein by reference, and has been damaged thereby.

14.     Defendant GoHealth, Inc. operates a health insurance marketplace.  The Company is headquartered in Chicago, Illinois, and its Class A common stock trades on the NASDAQ under the ticker symbol "GOCO."

15.     Defendant Clinton P. Jones ("Jones") is a co-founder of GoHealth, its Chief Executive Officer ("CEO"), and Co-Chair of GoHealth's Board of Directors (the "Board").

16.     Defendant Brandon M. Cruz ("Cruz") is a co-founder of GoHealth, its Chief Strategy Officer, a Special Advisor to the Executive Team, and Co-Chair of the Board.

17.     Defendant Travis J. Matthiesen ("Matthiesen") is GoHealth's Chief Financial Officer.

18.     The defendants identified in ¶¶15-17 above are referred to herein as the "Individual Defendants."  All of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of GoHealth.

19.     Defendant NVX Holdings, Inc. ("NVX Holdings") is a Chicago-based investment vehicle created for the benefit of defendants Cruz and Jones to house their ownership of GoHealth Class A and Class B stock.  Defendant Cruz served as President of NVX Holdings and defendant Jones served as its CEO.

20.     Defendant Centerbridge Partners, L.P. ("Centerbridge Partners") is a New York-based private equity firm.

21.     Defendants CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., and Blizzard Aggregator, LLC are investment vehicles created for the benefit of Centerbridge Partners to house its ownership of GoHealth Class A and Class B stock.

22.     Defendant Centerbridge Associates III, L.P. is the general partner of defendants CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P.

23.     Defendant CCP III Cayman GP Ltd. is the general partner of defendant Centerbridge Associates III, L.P. and the sole manager of defendant Blizzard Aggregator, LLC.

24.     The defendants identified in ¶¶20-23 above are referred to herein as "Centerbridge."  Defendant Centerbridge was a controlling shareholder and primary beneficiary of the IPO, as well as its private equity sponsor, as detailed herein.

25.     Defendants Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC (the "Underwriter Defendants") served as underwriters and lead underwriter

representatives for the IPO. Together with the underwriting syndicate, they sold 43.5 million GoHealth shares in the IPO at $21 per share and shared $50.2 million in underwriting discounts and commissions. The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

**GoHealth's Business**

26.    Based in Chicago, Illinois, GoHealth operates a health insurance marketplace that matches consumers with health insurance carrier plans. The Company was founded in 2001 by defendants Cruz and Jones.

27.    GoHealth maintains a proprietary technology platform designed to gather and leverage insurance behavioral data in order to better match consumers with health plans that meet their needs. The Company operates a vertically-integrated customer acquisition platform that includes omni-channel marketing efforts and trained and licensed health insurance agents. It does not receive any fees directly from consumers. Rather, the Company is paid a commission by insurance carriers for successfully enrolling consumers in the carriers' plans and additional recurring commissions so long as those consumers retain their health insurance plans.

28.    GoHealth divides its operations into four operating segments: (i) Medicare – Internal; (ii) Medicare – External; (iii) Individual and Family Plans ("IFP") and Other – Internal; and (iv) IFP and Other – External. "Internal" refers to commission revenues generated by GoHealth-employed agents, whereas "External" refers to commission revenues generated by an independent, national network of agents that use the GoHealth platform. The majority of the Company's revenues and profits are generated in its Medicare Internal and External segments. For

the first quarter of 2020, the Medicare Internal segment accounted for 68% of GoHealth's total revenues, and the Medicare External segment accounted for an additional 21% of revenues.

29. Medicare Advantage products generate the majority of net revenues in GoHealth's Medicare segments, accounting for 75% of net revenues for its Medicare Internal segment and 95% of net revenues for its Medicare External segment during the first quarter of 2020. Somewhat uniquely among its peers, the Company generates the substantial majority of its revenues from just two carriers: Humana and Anthem. Combined, these two carriers accounted for 74% of GoHealth's total revenues for the first quarter of 2020, up from 43% of the Company's total revenues in the first quarter of 2019. The concentration was even higher in GoHealth's critical Medicare segments, in which these two carriers accounted for roughly 85% of segment revenues for the first quarter of 2020.

30. In September 2019, GoHealth was acquired by defendant Centerbridge for $808 million in cash, $306 million in equity, and up to $275 million in contingent consideration to be paid to the selling shareholders in the event certain earnings thresholds were subsequently achieved by the Company in late 2019 and 2020.

31. Following the Acquisition, GoHealth stated that it had achieved extraordinary growth, as Centerbridge prepared to take the Company public. From September 13, 2019 through December 31, 2019, GoHealth purportedly generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019. As a result, GoHealth claimed to have generated 33% more revenues in the three-and-a-half month period following the Acquisition than in the eight-and-a-half month period preceding the Acquisition. GoHealth also claimed to have generated 36% more revenues in the short period at the end of 2019 following the Acquisition than in the Company's *entire 2018 fiscal year*, when it generated $226 million in net revenues.

32. GoHealth represented that its business model was highly profitable, offering the highest LTV/CAC ratio of any of its peers. GoHealth claimed that its LTV/CAC ratio for its Medicare Internal segment was 3.9x and 2.7x for 2019 and the first quarter of 2020, respectively, far higher than the 1.7x LTV/CAC ratio the Company stated it had achieved during the first quarter of 2019 and, by some estimates, roughly double GoHealth's competitors.

33. Although GoHealth generated net losses in 2019, it represented that this was because the Company was in growth mode and seeking to expand its presence as a dominant force in the Medicare insurance marketplace. GoHealth reassured investors that its core profitability was intact and substantially increasing at the time of the IPO. For example, GoHealth claimed that its adjusted EBITDA had grown by 388% year over year to $170 million during its pro forma 2019 and by 394% year over year to $35 million during the first quarter of 2020.

34. On June 19, 2020, GoHealth filed the Registration Statement with the SEC, which, after two amendments, was declared effective on July 14, 2020. On July 16, 2020, GoHealth filed the prospectus for the IPO with the SEC, which incorporated and formed part of the Registration Statement. The Registration Statement was used to sell 43.5 million shares of GoHealth Class A common stock to the investing public at a price of $21 per share, generating $913.5 million in gross offering proceeds.

**The Materially False and Misleading Registration Statement**

35. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

36. For example, the Registration Statement emphasized "GoHealth's track record of significant growth in net revenues in the Medicare space in the past five years" and stated that

- 9 -

GoHealth was expected to "continue to be one of the top choices for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make." The Registration Statement similarly stated that GoHealth had a "19-year history of consistent revenue growth and entering new market segments of insurance products," which was due to the Company's "strong customer engagement dynamics." The Registration Statement specified this purportedly strong growth rate as follows:

> Specifically, *net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020* compared to $69.1 million for the three months ended March 31, 2019 *and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019* compared to $226.2 million for the year ended December 31, 2018. *Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020* compared to $7.1 million for the three months ended March 31, 2019 *and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019* from $34.9 million for the year ended December 31, 2018.[1]

37.     The Registration Statement particularly highlighted GoHealth's exceptional growth in the Company's Medicare segments, stating in pertinent part as follows:

> *Total revenues generated in the Medicare segments grew to $124.2 million for the three months ended March 31, 2020 from $41.2 million for the three months ended March 31, 2019, representing a 201.5% increase, and to $432.7 million for the Pro Forma Fiscal Year 2019 from $112.2 million for the year ended December 31, 2018, representing a 285.7% increase*. In the Medicare segments, our total Submitted Policies grew to over 132,000 Medicare policies for the three months ended March 31, 2020, as compared to over 43,200 Medicare policies the three months ended March 31, 2019 and over 427,000 Medicare policies for the year ended December 31, 2019, as compared to over 118,000 Medicare policies for the year ended December 31, 2018.

38.     The Registration Statement represented that the reasons for the increased revenues from GoHealth's Medicare segments included improved marketing strategies, increased agent efficiencies, technological upgrades and hiring and onboarding of additional internal and external agents. It stated in pertinent part:

---

[1]     Emphasis has been added unless otherwise noted.

*Commission Revenues*

Commission revenues were $112.5 million for the three months ended March 31, 2020 compared to $51.2 million for the three months ended March 31, 2019, an increase of 119.7%, which was primarily attributable to increases in commission revenues from (i) the Medicare – Internal segment of $74.4 million ***driven by a 291.6% increase in Medicare commissionable Approved Submissions due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents*** and (ii) the Medicare – External segment of $8.6 million ***driven by a 68.9% increase in Medicare commissionable Approved Submissions due to our ability to recruit and onboard additional external agencies*** to enroll consumers in Medicare plans using our technology and platform.

39.     The Registration Statement further stated that GoHealth was expected to continue its rapid-fire growth as it increased market share in an expanding addressable market.  The Registration Statement stated that GoHealth had "capitalize[d]" on and was expected to continue to capitalize on the following favorable trends: (i) "strong demographic trends, with Medicare enrollment expected to grow from approximately 61 million individuals in 2019 to approximately 77 million individuals by 2028"; (ii) "the increasing proportion of the Medicare-eligible population that is choosing commercial insurance solutions, with . . . an increase of approximately 1.5 million people from 2018 to 2019; and (iii) "an antiquated traditional field agent driven sales process . . . ripe for disruption by digitally-enabled and technology-driven marketplaces like our platform." The Registration Statement further claimed that "these trends will drive a larger market in the coming years that, when taken together with our other product and plan offerings, will result in an even larger addressable market."  As a result, GoHealth was purportedly "poised to benefit from market share gains in what has traditionally been a highly fragmented market."

40.     Moreover, the Registration Statement highlighted the Company's data-rich proprietary technologies, which purportedly allowed it to increase consumer conversions and improved consumer engagement.  According to the Registration Statement, the "differentiated

value of [GoHealth's] data science-driven, fully-integrated platform has facilitated [its] rapid growth." The Registration Statement further stated in pertinent part:

> As a result of our Marketplace technology and increasingly robust data and insights, *our qualified prospect to Submitted Policy conversion rate increased from 20.7% for the three months ended March 31, 2019 to 24.3% for the three months ended March 31, 2020, and from 20.6% in 2018 to 23.2% in 2019 for the multi-carrier sales outlet of the Medicare – Internal segment. An increase in the conversion rate of qualified prospects to Submitted Policies generally results in greater commissionable Approved Submissions*.

41.     The Registration Statement also provided preliminary financial results for the Company's second quarter of 2020, which had closed prior to the IPO. The Registration Statement stated that GoHealth had continued its exceptional growth during this period due in part to further improved market efficiencies and consumer engagement, stating in pertinent part:

> - *Net revenues are expected to be between $118.0 million and $130.0 million, an increase of 66.4% at the midpoint of this range*, as compared to $74.5 million for the three months ended June 30, 2019. The estimated increase in net revenues compared to the corresponding period in 2019 is primarily due to an increase in net revenues in the Medicare – Internal segment *driven by higher Medicare-Internal commissionable Approved Submissions for Medicare Advantage products due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents*.
>
> - *Total segment profit is expected to be between $30.0 million and $36.0 million, an increase of 65.0% at the midpoint of this range*, as compared to total segment profit of $20.0 million for the three months ended June 30, 2019. The estimated increase in total segment profit compared to the corresponding period in 2019 is *primarily due to the increase in Medicare-Internal commissionable Approved Submissions for Medicare Advantage products for the same reasons mentioned above*.

42.     The Registration Statement characterized the Company's relationships with Humana and Anthem as a foundation for GoHealth's recent success and profitable growth. It stated in pertinent part:

> *We maintain longstanding, deeply integrated relationships with leading carriers in the United States, who have some of the industry's most widely recognizable brands*. For the year ended December 31, 2019 and the three month

period ended March 31, 2020, the primary carriers that we served in the Medicare segments were carriers owned by Humana and Anthem, the primary carriers that we served in the IFP and Other segments were carriers owned by UnitedHealth Group. These high-quality relationships have resulted in strong carrier retention rates; since our inception, we have never had a carrier terminate for performance. We typically enter into contractual agency relationships with carriers that are non-exclusive and terminable on short notice by either party for any reason. Carriers often have the ability to terminate or amend our agreements unilaterally on short notice, including provisions in our agreements relating to our commission rates.

43. The statements in ¶¶36-42 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the IPO:

(a)    the Medicare insurance industry had undergone a period of elevated churn in the first half of 2020 as a result of increased competition, the growth of direct-to-consumer insurance brokers and the occurrence of a special enrollment period;

(b)    GoHealth suffered from a higher risk of customer churn as a result of its unique business model and limited carrier base;

(c)    GoHealth suffered from degradations in customer persistency and retention as a result of elevated industry churn, vulnerabilities that arose from the Company's concentrated carrier business model, and GoHealth's efforts to expand into new geographies, develop new carrier partnerships and worsening product mix;

(d)    GoHealth had entered into agreements with its external sales agents that provided for a materially worse revenue sharing percentage as compared to historical arrangements (*i.e.*, a 90% level in 2020 versus a relatively low level in 2019), which had substantially decreased the profits that could be generated in the Company's Medicare External segment; and

(e)    these adverse financial and operational trends were internally projected by GoHealth to continue and worsen following the IPO.

- 13 -

44.     The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties and risks that required disclosure in the Registration Statement.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, required the Company to disclose "any known trends or uncertainties that have had or that [GoHealth] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105, required disclosure in the Registration Statement of "the most significant factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how the risk affect[ed] [GoHealth] or the securities being offered."  The Registration Statement failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company.  Indeed, the purported risk disclosures provided in the Registration Statement, to the extent they were relevant at all, were themselves materially misleading because they failed to disclose the true facts impacting GoHealth's business, operations and financial results and/or characterized materially adverse facts that had *already* materialized as contingent possibilities that *could* impact GoHealth in the future.

45.     On July 23, 2020, executives for eHealth Inc. ("eHealth") – a major GoHealth competitor – stated during an earnings call that the Medicare brokerage industry had been suffering from elevated churn during the first half of 2020.  Although certain of the issues were specific to eHealth, others were not and impacted the entire industry, including GoHealth.  On the call, eHealth's CEO stated that, "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations."  He continued in pertinent part:

> On the macro side, consumers are faced with broader plan choice and multiple enrollment opportunities throughout the year, which is benefiting the broader MA [Medicare Advantage] market and increasing the market share of MA plans.  At the same time, *these dynamics have also led to more shopping and more switching by MA members*.

46.     On August 19, 2020, GoHealth announced its financial results for the second quarter ended June 30, 2020 – the quarter immediately *prior* to the IPO.  That same day, defendants Jones and Matthiesen hosted a conference call with analysts and investors to discuss the results. These defendants were repeatedly asked whether GoHealth was suffering from elevated churn at the time of the IPO, yet they failed to provide a direct answer.  For example, when asked directly whether churn "was up or down on a like-for-like basis" by an analyst, defendant Matthiesen demurred and instead pointed investors to the Company's LTVs and cash flows.

47.     During the earnings call, defendants Jones and Matthiesen also repeatedly stated that churn was within the Company's "expectations."  Furthermore, they pointed to a variety of factors that were negatively impacting the Company's churn and were expected to continue to negatively impact the Company's churn going forward, including, *inter alia*: (i) the Company's expansion into new geographies, with lower customer persistency; (ii) the Company's expansion of business with additional carriers, which presented a learning curve for the Company's agents and higher disenrollment rates; and (iii) the Company's changing product mix, such as its expansion of its Medicare Special Needs Plans business, which had a higher churn rate than Medicare Advantage plans.  These Company-specific factors were in addition to the undisclosed industry-wide factors that were negatively impacting GoHealth's business leading up to the IPO. Thus, management's acknowledgement that churn matched internal "expectations" confirmed that churn *was increasing as internally expected* prior to and at the time of the IPO, despite the fact that this elevated churn and the ongoing negative impacts to GoHealth's business, operations and prospects had not been accurately and fulsomely disclosed to investors in the Registration Statement.

48.     GoHealth's stock price has declined significantly subsequent to the IPO.  By September 15, 2020, GoHealth Class common A stock closed at just $12.53 per share – *over 40%*

- 15 -

*below* the $21 per share price investors paid for the stock in the IPO less than two months previously.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action on behalf of all purchasers of GoHealth Class A common stock pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are defendants and their families; the officers, directors and affiliates of defendants and members of their immediate families; the legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any defendant has or had a controlling interest.

50.     The members of the Class are so numerous that joinder is impracticable. GoHealth Class A common stock is actively traded on the NASDAQ and millions of shares were sold in the IPO. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through discovery, plaintiff believes there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

51.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)     whether defendants violated the 1933 Act, as alleged herein;

(b)     whether the Registration Statement misrepresented and/or omitted material information in violation of the 1933 Act; and

(c)     whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

52.     Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by defendants' conduct.

53.     Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

55.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

56.     This Count is brought under §11 of the 1933 Act [15 U.S.C. §77k], on behalf of the Class, against all defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

57.     The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

58.     GoHealth is the registrant for the IPO.  Defendants were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement on his behalf.  Defendant Centerbridge was the sponsor for the IPO and signed the Registration Statement through its

director appointees to the Board. The Underwriter Defendants marketed and underwrote the IPO and sold the GoHealth stock issued in the IPO to plaintiff and the Class.

59.     As the issuer of the shares, GoHealth is strictly liable to plaintiff and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to plaintiff and the Class for such material misstatements and omissions. None of the defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

60.     By reason of the conduct alleged herein, defendants violated §11 of the 1933 Act. Plaintiff and Class members purchased GoHealth Class A common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to defendants' violations. At the time of their purchases, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

61.     Less than one year has elapsed from the time that plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that plaintiff filed this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this action.

**COUNT II**

**For Violation of §15 of the 1933 Act**
**Against GoHealth, Centerbridge, NVX Holdings and the Individual Defendants**

62.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

63.     This Count is brought under §15 of the 1933 Act [15 U.S.C. §77o], against defendants GoHealth, Centerbridge, NVX Holdings and the Individual Defendants. This Count

- 18 -

does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

64. As detailed herein, each of defendants committed primary violations of the 1933 Act by engaging in conduct in contravention of §§11 of the 1933 Act.

65. The Individual Defendants were each control persons of GoHealth by virtue of their positions as directors, senior officers and/or significant shareholders of the Company. They each had direct and/or indirect business and/or personal relationships with other directors, officers and/or major shareholders of the Company. The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all of its employees. Centerbridge, the owner of the Company and the private equity sponsor of the IPO, controlled the Company and its Board appointees.

66. Defendants Cruz, Jones and Centerbridge took additional steps to cement their control over the Company and its affairs. For example, these defendants created a dual class voting structure and caused the Company to enter into a variety of shareholder agreements to ensure that public investors would effectively have no say over the management of GoHealth and that the Company would not be subject to independent oversight. Following the IPO, defendant Centerbridge and defendants Cruz and Jones (through their ownership and control over defendant NVX Holdings) in combination possessed over 68% of the voting power of the Company as a result of their ownership of Class A and Class B shares. Because Class B shares entitled their holders to an additional one vote per share, these defendants possessed majority voting control over the Company out of proportion with their economic stake. In addition, pursuant to a stockholders agreement, defendant Centerbridge and defendants Cruz and Jones were collectively entitled to nominate up to eight members of the Board and had signed an agreement amongst each other requiring them to support each other's nominations, allowing these defendants to dominate

the Board and its actions. These defendants also entered into various agreements in connection with the Acquisition and the IPO that allowed them to funnel millions of dollars from the IPO proceeds and GoHealth's revenues into their own pockets and the pockets of their affiliates.

67. By reason of the conduct alleged herein, these defendants violated §15 of the 1933 Act, and plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D. Granting such other, further and/or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: September 21, 2020        ROBBINS GELLER RUDMAN
       & DOWD LLP
BRIAN E. COCHRAN (IL Bar # 6329016)

*s/ Brian E. Cochran*
BRIAN E. COCHRAN

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

Attorneys for Plaintiff

- 21 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

HELEN HUDSON ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>19</u>___ day of September, 2020.

DocuSigned by:

*Helen Hudson*

7BD88412119444F5

_____

HELEN HUDSON

GOHEALTH

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/15/2020 | 200 | $24.30 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/24/2020 | 35 | $14.80 |
| 08/24/2020 | 1 | $14.80 |
| 08/24/2020 | 64 | $14.80 |
| 08/27/2020 | 98 | $13.50 |
| 08/27/2020 | 1 | $13.50 |

Prices listed are rounded up to two decimal places.