# <u>Appendix – Unpublished Cases</u>

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

2018 WL 3141814
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Leonard SOKOLOW, Plaintiff,

v.

LJM FUNDS MANAGEMENT, LTD., Defendants.
Stanley Bennet, Plaintiff,

v.

LJM Funds Management, Ltd., Defendants.
James Nosewicz, Plaintiff,

v.

LJM Funds Management, Ltd., Defendants.

Case No. 18-cv-01039, Case No. 18-
cv-01312, Case No. 18-cv-01589
|
Signed 06/26/2018

**Attorneys and Law Firms**

Brian M. Hogan, William Henry London, Michael Jerry Freed, Freed Kanner London & Millen, LLC, Bannockburn, IL, Lindsey Caryn Grossman, Michael Elliot Criden, Criden & Love, P.A., South Miami, FL, Rhiana L. Swartz, Thomas L. Laughlin, IV, Scott+Scott, Attorneys at Law, LLP, New York, NY, for Plaintiff.

Peter G. Rush, Jeffry Mark Henderson, Steven Marc Malina, Todd Edward Pentecost, Kyle L. Flynn, Greenberg Traurig LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

 *1  This is a securities class action against LJM Funds Management, Ltd.; Two Roads Shared Trust; Northern Lights Distributors, LLC; Andrew Rogers; Mark Gertsen; Mark Garbin; Neil Kaufman; Anita Krug; James Colantino; Anish Parvataneni; and Anthony Caine. Seven movants requested that the Court consolidate the above-captioned cases and sought appointment as lead plaintiff in this matter: (1) Paragon National, LP [47], (2) Lynda Godkin [52], (3) High Country Capital Management [57], (4) Tradition Capital Management LLC, and SRS Capital Advisors, Inc. (together, the "Investment Advisor Group") [61], (5) Donn Glander,

Charles Irvine, Gustav Swanson and Pell Limited Liability Company (together, the "Glander Group") [67], (6) Justin and Jenny Kaufman, Joseph N. Wilson and Dr. Larry and Marilyn Cohen (collectively, the "Kaufman Group") [71], (7) MWH Investments, LLC, Personal CFO Solutions, LLC, John W. Kapouch, and James Frugé (collectively, the "MWH Group") [75]. Subsequently, the Investment Advisor Group and the Kaufman Group (together, the "Combined Group") asked that they be appointed lead plaintiff together. [97.] All other movants except the MWH Group and Lynda Godkin either support or do not oppose appointing the Combined Group as lead plaintiff in this action.

To the extent that the motions [47; 52; 57; 61; 67; 71; 75] request consolidation of the above-captioned cases, they [47; 52; 57; 61; 67; 71; 75] are denied as moot because the Court already has consolidated the above-captioned cases. [See 78.] For the reasons set forth below, the Court grants in part the motions of the Investment Advisor Group [61] and the Kaufman Group [71] and approves the selection of Robbins Geller Rudman & Dowd and Labaton Sucharow LLP as co-lead counsel. The Court denies the remaining motions [47; 52; 57; 67; 75] in full. The case is set for further status on July 17, 2018 at 10:15 a.m.

**I. Background**
The above-captioned actions arise from alleged violations of the Securities Act of 1933 (the "Securities Act") by LJM Funds Management, Ltd. ("LJM"), Two Roads Shared Trust, Northern Lights Distributors, LLC, and several individual defendants (collectively, the "Defendants"). LJM Preservation & Growth Fund (the "Fund") is a mutual fund traded under the symbol ("LJMIX"). Plaintiffs allege that Defendants caused the Fund's publically traded share price to be artificially inflated by making false and/or misleading statements related to the Fund and/or failing to disclose that (i) the Fund was not focused on capital preservation, (ii) did not take appropriate steps to preserve capital in down markets, and (iii) left investors exposed to an unacceptably high risk of catastrophic losses. Plaintiffs further allege that when the fraud was revealed to the investing public, the market value of the Fund's shares declined precipitously, damaging class members. Seven movants originally sought to be appointed lead plaintiff. Only the Combined Group, the MWH Group, and Lynda Godkin continue to seek appointment as lead plaintiff. Currently pending before the court are the motions for appointment as lead plaintiff filed by the remaining three movants.

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

## II. Legal Standard

**\*2** The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides guidelines for the appointment of a lead plaintiff in a securities class action case. The PSLRA requires that the Court "appoint as a lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members[.]" 15 U.S.C. § 78u–4(a)(3)(B)(i). The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the "person or group of persons" who "has either filed the complaint or made a motion in response to a notice," "has the largest financial interest in the relief sought by the class," and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. 78u–4(a)(3)(B)(iii)(I)(aa); (bb); and (cc). This presumption may be rebutted, however, if a member of the purported class establishes that the "presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). The PSRLA further provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(b)(v).

## III. Analysis

### A. Timing of Motions

By statute, any motions for lead plaintiff of a class action brought under the PSLRA must be made within 60 days of the Early Notice. See 15 U.S.C. § 77z-1(a)(3)(A)(i)(II). The Investment Advisor Group and the Kaufman Group modified their initial proposals and submitted a joint response brief asking that they be appointed lead plaintiff together, with their respective attorneys serving as co-lead counsel. [See 97.] Although the Combined Group filed its joint amended proposal after the 60-day deadline in the PSLRA, courts have permitted amended motions by groups that were combined after the 60-day deadline as long as each member of the amended group previously filed a timely motion for appointment as lead plaintiff. See *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2012 WL 1339678, at \*3 (N.D. Ill. Apr. 18, 2012) (citing *Peters v. Jinkosolar Holding Co., Ltd.*, 2012 WL 946875, at \*10 (S.D.N.Y. March 19, 2012) ). Because the Investment Advisor Group and the Kaufman Group each filed timely motions,

the Court concludes that the amended proposal also is timely. Thus, all of the remaining movants have satisfied 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa).

### B. Financial Interest

The PSLRA presumes that the most adequate plaintiff is the plaintiff who—in addition to satisfying other requirements—has the largest financial interest in the relief sought by the class. "The largest financial interest provision seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff.' The PSLRA, however, does not specify how courts should measure the largest financial interest in the relief sought by the class." *Hospira, Inc.*, 2012 WL 1339678, at \*3 (internal citations and quotations omitted).

Most courts consider: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered." *Hospira, Inc.*, 2012 WL 1339678, at \*4 (citing *Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, at \*5 (N.D. Ill. Aug. 11, 1997) ); see also *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001) ("[W]e agree with the many district courts that have held that courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." (citations omitted) ). While courts differ on the precise weight to apply to each factor, most courts agree that fourth factor—the approximate losses suffered—is the most salient factor in assessing the lead plaintiff. See *In re CMED Sec. Litig.*, 2012 WL 1118302, at \*3 (S.D.N.Y. April 2, 2012) ("In giving weight to the four factors, courts in this District, as others, place the most emphasis on the last of the four factors: the approximate losses suffered by the movant above any weight accorded to net shares purchased and net expenditures." (citations and quotations omitted) ); *In re Diamond Foods, Inc. Sec. Litig.*, 281 F.R.D. 405, 408 (N.D. Cal. Mar. 20, 2012) (concluding that

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

the "fourth factor, 'approximate loss,' is generally considered the most important factor"); *Canson v. WebMD Health Corp.*, 2011 WL 5331712, at *2 (S.D.N.Y. Nov. 7, 2011) (concluding that "[t]he fourth factor, loss suffered, weighs most heavily in the court's analysis" (citation omitted) ).

**\*3** The movants still being considered for appointment as lead plaintiff claim the following losses:

| Movant | Claimed Financial Interest [1] |
|---|---|
| Combined Group | $8,623,635 |
| MWH Group | $8,270,160 |
| Lynda Godkin | $188,000 |

Although the Combined Group claims the largest sum of financial losses, the other movants argue that the Court should not allow all of the members of the Combined Group to aggregate their losses to establish the largest financial interest in the relief sought by the class.

The Seventh Circuit has not yet addressed whether and to what extent the claims of class members can be aggregated for the purposes of determining which movant has the largest financial interest in the relief sought by the class. Although some courts have held that a group of investors must have a preexisting relationship to serve together as lead plaintiffs, see, *e.g.,* *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845 (S.D. Ind. 1999), "the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships." See *Bang v. Acura Pharm., Inc.*, 2011 WL 91099, at *2 (N.D. Ill. Jan. 11, 2011) (citing *Sabbagh v. Cell Therapeutics, Inc.*, 2010 WL 3064427 at *4-5 (W.D. Wash. Aug. 2, 2010) ). Furthermore, as the Supreme Court recently recognized, 80 percent "of securities class actions in post-PSLRA data sample had two or more co-lead counsel firms[.]" *China Agritech, Inc. v. Resh*, 2018 WL 2767565, at *7 n.3 (U.S. June 11, 2018) (citing Choi & Thompson, Securities Litigation and Its Lawyers: Changes During the First Decade After the PSLRA, 106 Colum. L. Rev. 1489, 1507, 1521, 1530 (2006) ).

This trend is consistent with the Third Circuit's decision *In re Cendant Corporation Litigation*, which held that small groups of investors can aggregate their losses in computing the total loss amount and act as lead plaintiff even if they did not have any pre-existing relationship. 264 F.3d 201, 266-67 (3rd Cir. 2001). In reaching this conclusion, the Third Circuit reasoned that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner[.]" See *id.* at 266.

Still, "to enjoy the rebuttable presumption that the [PSLRA] statute confers, there must be some evidence that the members of the group will act collectively and separately from their lawyers." *In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at * 2 (S.D.N.Y. Dec. 6, 2007). In addition, "[a]t some point, a group may become too large for its members to operate effectively as a unit." *Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at *11 (D.N.J. Apr. 25, 2018) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) ). "Such unwieldiness would vitiate the PSLRA's purpose of having active and engaged plaintiffs supervise the conduct of the litigation * * * [T]he larger [the size of a proposed lead plaintiff group], the greater the dilution of control that [the members of that group] can maintain over the conduct of the putative class action." *Id.* (internal citations and quotations omitted); see also *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 815-16 (N.D. Ohio 1999) ("The greater the number of persons comprising the group, the more difficult it is for those persons to communicate with each other, and to speak with a single, coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation.").

**\*4** Courts should consider the extent of the prior relationships between the parties as part of its analysis of whether the movant will adequately represent the interests of the class, but the parties' prior relationships alone should not be dispositive. *In re Cendant Corp. Litig.*, 264 F.3d at 266-67. Courts also should consider other factors, such as the efforts of lawyers in creating a movant group to determine whether the resulting group could "be counted on

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

to monitor counsel in a sufficient manner[,]" *id.* at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001) ), and the size of the movant group to determine whether that group can fairly and adequately represent the class. *Id.* at 267; see also *Sabbagh*, 2010 WL 3064427 at *5 (recognizing a group of investors should be "small and cohesive enough such that it can adequately control and oversee litigation") (citing *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *8 (N.D. Cal. Aug. 22, 2008) ).

"[C]ourts should generally presume that groups with more than five members are too large to work effectively." See *Cendant*, 264 F.3d at 267. However, there is no "hard-and-fast-rule" regarding the maximum number of parties that can serve as lead plaintiffs in a securities class action. *Id.* Whether a group can serve as lead plaintiff together should be determined on a case-by-case basis. *Id.* Groups including more than five members have been appointed lead plaintiff when the specific facts of the case indicated that the group could act collectively and separately from their lawyers. See, e.g., *Barnet v. Elan Corp.*, 236 F.R.D. 158, 162 (S.D.N.Y. 2005) (group of six "not too unwieldy a number to effectively manage the litigation"); *Weltz v. Lee*, 199 F.R.D. 129, 133 (S.D.N.Y. 2001) (group of seven "does not present a group so cumbersome as to deliver the control of the litigation into the hands of the lawyers"); *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 352-53 (S.D. Cal. 1998) (approving six-member lead plaintiff group).

Based on all of the available information, the Court concludes that the Combined Group can adequately represent the interests of the class in this case. Although the Combined Group has more than five members, each member of the combined group has a significant financial interest in the relief sought by the class. In fact, out of the remaining movants, the Combined Group includes both the individual investor and the institutional investor claiming the greatest losses. Traditional Capital Management LLC (one of the investment advisors in the Combined Group) claims $5,925,856.45 in losses [63-2, at 28], which is significantly more than the claimed losses of the each investment advisor in the MWH Group. [94-1, at 44.] Mr. Wilson (one of the individual investors in the Combined Group) claims over $1.1 million in losses [103, at 6], which is more than the $908,059.23 claimed by the James Frugé (the individual investor in the MWH

Group) [94-1, at 44] and the $188,000 in losses claimed by Ms. Godkin. Given the significant losses claimed by each member of the Combined Group, each member of the group can be counted on to monitor counsel in a sufficient manner. Thus, appointment of the Combined Group as lead plaintiff in this matter is consistent with the primary purpose of the PSLRA, which is to curtail the influence of professional, figurehead plaintiffs by transferring "primary control of private securities litigation from lawyers to investors." S. REP. 104-98, 6, 1995 U.S.C.C.A.N. 679, 685.

Furthermore, the Combined Group is sufficiently small and cohesive to adequately control and oversee litigation. Although the Combined Group includes seven members, the individual investors in the Combined Group had pre-litigation relationships. Justin Kaufman is married to Jenny Kaufman, and Dr. Larry Cohen and Marilyn Cohen are his in-laws. [97-1, at 4.] Furthermore, Mr. Kaufman avers that he has known Joseph Wilson for more than three years. *Id.* Although these individuals do not have any pre-litigation relationship with the two investment advisors in the Combined Group,[2] the joint declaration submitted by the Combined Group in support of their motion for appointment as lead plaintiff explains how and why the Kaufman Group and the Investment Advisor Group made the decision jointly to seek appointment as lead plaintiff in this matter. *Id.* at 5-7. Specifically, as part of an effort to resolve the competing motions for appointment as lead plaintiff, the Kaufman Group and the Investment Advisor Group concluded that it made sense to combine resources to ensure that the class achieves the best results. *Id.* at 6-7. This combination was supported by movants High Country Capital Management and Paragon National LP and was not opposed by movant Glander Group. [97, at 8 n.3.]

**\*5** The combination of institutional and individual investors with a significant financial interest in this case serves to protect the interests of the class. To begin, the PSLRA was enacted "to increase the likelihood that institutional investors will serve as lead plaintiffs" because institutional investors and other class members with large amounts at stake "will represent the interests of the plaintiff class more effectively than class members with small amounts at stake." H.R. Conf. Rep. No. 104-369, at 34 (1995) ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions."). Thus, the PSLRA reflects a "presumption that institutional investors be appointed lead

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)
2018 WL 3141814

plaintiff." *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63 (D. Mass. 1996). In this case, the only institutional investors seeking appointment as lead plaintiff are investment advisors. Ms. Godkin argues that the investment advisors may have conflicts of interest with others in the class. As discussed below, nothing before the Court at this time reveals the contours of any present conflict of interest. However, appointing a lead plaintiff group including both investment advisors and individual investors helps ensure that there is a check on the investment advisors while respecting the PSLRA's preference for institutional investors. Indeed, other courts have recognized that more diverse groups can better serve the interests of class members in securities class actions. See *Hospira*, 2012 WL 1339678, at *8; see also *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing two competing movants as co-lead plaintiffs in view of the desirability of having both institutional investors and individual investors as lead plaintiffs "since each may bring a unique perspective to the litigation"); *In re Oxford Health Plans*, 182 F.R.D. 42, 45 (S.D.N.Y. 1998) (appointing three competing movants as co-lead plaintiffs that "all suffered significant losses" on the grounds that such a structure "provides the proposed class with the substantial benefits of joint decision-making" and is otherwise consistent with the PSLRA).

The MWH Group asks that—in the event the Kaufman Group and the Investment Advisor Group are permitted to combine—the Court permit the MWH Group to file an amended lead plaintiff motion on behalf of itself and the Glander Group. [105, at 16.] However, there is no evidence that **any** of the eight members of that proposed group had any pre-litigation relationship with each other. Moreover, allowing unrelated movants to continuously amend their lead plaintiff motions for the apparent purpose of adding class members to obtain lead plaintiff status is both impractical and contrary to the purposes of the PSLRA. [3]

Ms. Godkin also argues that the Combined Group's losses are overstated because its claimed losses include—according to Ms. Godkin—losses associated with claims that the investment advisors in the Combined Group lack standing to bring. Specifically, Ms. Godkin argues that the investment advisors lack standing to pursue claims on behalf of the investors they advised, citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, which held that an investment advisor must submit evidence that its clients transferred ownership of or title to their claims in order to have Article III standing. 549 F.3d 100, 109 (2d Cir. 2008).

However, the Court in *Huff* recognized that standing could be established by showing that the claims asserted were assigned to the investment advisor seeking to bring claims on behalf of its clients. 549 F.3d at 108 ("[A]n assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact.' "); see also *Lowry v. Baltimore & Ohio R. Co.*, 707 F.2d 721, 729 (3d Cir. 1983) ("[T]he availability of such Rule 10b-5 actions should be limited to those investors who themselves have been defrauded, or who are express assignees of defrauded parties."). Courts therefore have allowed investment advisors to serve as lead plaintiffs when their clients assigned legal title to the investment advisors *before* the investment advisors filed their motions for appointment as lead plaintiff. See, *e.g., City of Taylor Police & Fire Ret. Sys. v. W. Union Co.*, 2014 WL 4799659, at *5 (D. Colo. Sept. 26, 2014); *Markette v. XOMA Corp.*, 2016 WL 2902286, at *4 (N.D. Cal. May 13, 2016) ("As an initial matter, post-complaint assignments of litigation rights have been found valid in circumstances analogous to those here.") (citing *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 779 F.3d 1036, 1044, 1048 (9th Cir. 2015) ); *cf. In re Bard Assocs., Inc.*, 2009 WL 4350780, at *2 (10th Cir. Dec. 2, 2009) (indicating that assignments must be obtained prior to the 60-day deadline for filing lead plaintiff motions set forth in the PSLRA); *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116 (S.D.N.Y. 2009) (holding investment advisor lacked standing to bring claims assigned after it was appointed lead plaintiff). [4]

**\*6** In fact, Ms. Godkin appears to recognize that the investment advisors would have standing if their clients assigned their claims to the investment advisors, but argues that "it is virtually impossible to verify the validity of the hundreds of assignments" obtained by the investment advisors without more information identifying the beneficial owners of the accounts. [95, at 10 n.2.] As discussed below, the Court has no reason to question the validity of the assignments or the accuracy of the affidavits provided by the investment advisors in the Combined Group. Accordingly, the Court sees no reason to exclude losses associated with claims assigned to the investment advisors in the Combined Group from the Combined Group's claimed losses. The Combined

2018 WL 3141814

Group therefore is the movant with the largest financial interest in the relief sought by the class and satisfies 15 U.S.C. § 78u–4(a)(3)(B)(iii)(bb).

### C. Rule 23 Requirements

The PSLRA further provides that the lead plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u4(a)(3)(B)(I)(cc). Rule 23(a) provides that a party may serve as a class representative "only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The typicality and adequacy elements are the relevant factors to the appointment of a lead plaintiff. *Hospira*, 2012 WL 1339678, at *8. The Combined Group has satisfied its burden by making a preliminary showing that it satisfies the requirements of Rule 23.

Under Rule 23(a), a plaintiff's claims are typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). Here, for purposes of selecting the lead plaintiff, the Combined Group's claims are based on the same legal theories and arise from the same events and course of conduct giving rise to the claims of the other class members in this case. As such, it meets the typicality requirement of Rule 23(a). See *Johnson v. Tellabs*, 214 F.R.D. 225, 228 (N.D. Ill. 2002).

The Combined Group also meets the adequacy requirement in Rule 23(a). "A lead plaintiff meets the adequacy requirement if (1) its claims are not antagonistic or in conflict with those of the class; (2) it has sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) it is represented by competent, experienced counsel who be able to prosecute the litigation vigorously." *Hospira, Inc.*, 2012 WL 1339678, at *8 (citing *Tellabs*, 214 F.R.D. at 228-29). There is no indication that the Combined Group's claims conflict with those of the class, as both the lead Plaintiff group and the class include both institutional and individual investors. [5] Given the Combined Group's alleged losses, it has a substantial interest in the outcome of this case. Finally, the Combined Group is represented by competent, experienced counsel. Thus, the Combined Group satisfies 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc) and is presumed the "most adequate plaintiff" under the PSLRA.

### D. Rebuttable Presumption

The presumption established by the PSLRA "may rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C.A. § 78u-4 (a)(3)(B)(iii)(II). Ms. Godkin argues, however, that the Combined Group is subject to unique defenses that make it an improper lead plaintiff. When a member of the purported plaintiff class argues that the presumptive most adequate plaintiff is subject to unique defenses that render in incapable of representing the class, a court does "not have to determine that the defense is likely to succeed," but "ask simply whether [movant] is likely to be 'subject to' the unique defense" to find that an otherwise adequate lead plaintiff has been rebutted, because "the time and attention [a plaintiff] would be required to devote to the * * * issue * * * would distract it from the claims of the rest of the class." *In re Bally Total Fitness Sec. Litig.*, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005).

**\*7** Ms. Godkin argues that the Combined Group cannot serve as lead plaintiff because the investment advisors in the group are subject to debilitating conflicts of interest and unique defenses stemming from possible liability to their clients. "In support of this argument, Ms. Godkin submitted an affidavit asserting that "[b]ased on her years of legal experience, [she believes] that clients of investment advisors, who recommended purchasing shares in the LJM Preservation and Growth Fund during the Class Period * * * potentially have valid legal claims against their investment advisors related to those purchases." [96, at ¶ 3.] Ms. Godkin does not, however, provide much support for that assertion, citing in her brief a single comment from an analyst opining that the Fund "should never have been marketed to fund shareholders as a tool for capital preservation." [95, at 13.] Although Ms. Godkin's counsel cites a case granting summary judgment against investment advisors who committed securities fraud, the investment advisors in that case misrepresented facts and omitted information about a conflict of interest. *Hollerich v. Acri*, 259

Case: 1:20-cv-05593 Document #: 41-7 Filed: 11/20/20 Page 8 of 44 PageID #:365

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

F. Supp. 3d 806, 812 (N.D. Ill. 2017). Based on the materials before the Court, there is no indication that the investment advisors in the Combined Group engaged in such conduct. Accordingly, it would be improper to disregard the Combined Group's presumptive lead plaintiff status on the basis of the information currently before the Court. See, *e.g., Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2015 WL 1311073, at *9 (S.D.N.Y. Mar. 23, 2015) ("[M]ere allegations of wrongdoing, without a finding established on the record, are insufficient to rebut [the] presumption of adequacy.").

Ms. Godkin also argues that the Combined Group should not be appointed lead plaintiff because there are serious questions about the validity and propriety of some of the assignments obtained by the investment advisors in the Combined Group. [104, at 11-13.] In making this argument, Ms. Godkin challenges just 5 of over 200 assignments on the grounds that they were illegibly signed by an anonymous signatory, signed by the same signatory, and/ or left a second signature line blank. *Id.* But Ms. Godkin does not explain how these perceived deficiencies make the assignments invalid. Each assignment provided by the investment advisors in the Combined Group clearly identifies the entity assigning the claims. [97-3.] Furthermore, Michael C. Provine (Member and Chief Compliance Officer of Traditional Capital Management LLC) and Michael P. Riordan (Managing Director of SRS Capital Advisors, Inc.) submitted a joint affidavit representing that the investment advisors have received assignments from their clients. [63-3.]

Based on the materials before the Court, the Court has no reason to conclude that the assignments were forged or signed by unauthorized persons. To the contrary, the Combined Group has explained in some detail how it secured assignments and recognized its potential discovery-related obligations in connection with those assignments. [See 103, at 13-15.]. Accordingly, the Court does not see any basis for denying the Combined Group of its presumptive lead plaintiff status based on these challenges. [6] *Roofers' Pension Fund v. Papa*, 2017 WL 1536222, at *5 (D.N.J. Apr. 27, 2017) ("Nor does he provide any substantiated allegation or reason to believe that the Perrigo Group executives' sworn declaration attesting to their ownership is incorrect or false. He has therefore not established a probability that the Perrigo Group would focus much, if any, time during the litigation establishing standing; or that such time would be spent at the expense of issues that are common and controlling for the rest of the class."). Because no party has raised a challenge to the adequacy of the Combined Group group beyond mere speculation, the Combined Group's motion for appointment as lead plaintiff is granted. All other motions for appointment as lead plaintiff in this matter are denied.

**\*8** The Court notes, however, that the Combined Group has a responsibility under the PSLRA to continue to monitor whether its members are capable of adequately protecting the interests of class members. *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) ("Courts have interpreted their lead plaintiff responsibilities under the PSLRA to encompass a continuing 'duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members.' " (quoting *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004) ) ). Thus, a lead plaintiff has the "responsibility to propose their own withdrawal and substitution should it be discovered that they may no longer adequately represent the interests of the purported plaintiff class." *Id.* (citing *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 3015304, at *1 (S.D.N.Y. Dec. 27, 2004) ). If any lead plaintiff fails to do so, "a member of the purported class will be allowed to endeavor to protect its own interests and the interests of its fellow class members by similarly moving the court to have a lead plaintiff removed upon good cause shown." *Id.* Given the many qualified potential lead plaintiffs and counsel who have come forward at this initial stage of the case to offer their services, the Court feels comfortable that lead plaintiffs and counsel will be carefully monitored going forward, both externally and by the Court itself, to ensure that no unaddressed conflicts arise. The Court is not, however, persuaded to disregard the presumption established by the PSLRA based on unsupported conjecture.

**E. Lead Counsel**

Counsel representing the parties who moved for lead plaintiff in this case are highly skilled and have extensive experience in the area of securities litigation. "The PSLRA provides that the lead plaintiffs shall, subject to Court approval, select and retain counsel to represent the class they seek to represent." *Hospira, Inc.*, 2012 WL 1339678, at *9 (citing 15 U.S.C. § 78u–4(a)(3)(B)(v) ).

The Combined Group has selected Robbins Geller Rudman & Dowd and Labaton Sucharow LLP to serve as co-lead counsel. Given the extensive experience both of these firms have in the area of securities law, the Court approves them as co-lead counsel in this case. The Court recognizes, of course,

Case: 1:20-cv-05593 Document #: 41-7 Filed: 11/20/20 Page 9 of 44 PageID #:366

Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 3141814

its responsibility to carefully scrutinize any fee award sought in this case by co-lead counsel. See 15 U.S.C. § 78u–4(a)(6) (limiting the total award of attorneys' fees and expenses to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); see also *Hospira*, 2012 WL 1339678, at *9 ("The parties are on notice, however, that the Court will carefully scrutinize any proposed fee award and will not hesitate to reject such an award if it proves to be unreasonable, especially given that two counsel are being appointed as lead counsel." (citations omitted) );

🚩 *In re Sprint Corp. Sec. Litig.*, 164 F. Supp. 2d 1240, 1244 (D. Kan. 2001) ("Co-lead counsel are hereby on notice that the court will not approve any possible award of fees and expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the two firms.").

## IV. Conclusion

To the extent the motions [47; 52; 57; 61; 67; 71; 75] request that the Court consolidate the above-captioned cases, the motions [47; 52; 57; 61; 67; 71; 75] are denied as moot because the Court has already consolidated the above-captioned cases. [See 78.] For the foregoing reasons, the Court grants in part the motions of the Investment Advisor Group [61] and the Kaufman Group [71] and appoints the Combined Group as lead plaintiff. The Court approves the selection of Robbins Geller Rudman & Dowd and Labaton Sucharow LLP as co-lead counsel. The Court denies the remaining motions [47; 52; 57; 67; 75] in full. The case is set for further status on July 17, 2018 at 10:15 a.m.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3141814

## Footnotes

1   The parties in this case have quantified their respective financial interests in terms of their approximate losses suffered. Although the MWH Group also quantified its losses in terms of the other factors sometimes considered by courts, the MWH Group recognizes that "most courts simply determine which potential lead plaintiff has suffered the greatest total losses" to measure each movant's respective financial interest. [105, at 8 (citing Takara Tr. v. Molex Inc., 229 F.R.D. 577, 579 (N.D. Ill. 2005); *Hospira*, 2012 WL 1339678, at *4).] Absent reason for focusing on the other factors considered by courts, the Court uses the approximate losses claimed by each of the remaining movants as the measure of each movant's respective financial interest.

2   The two investment advisors in the Investment Advisor Group also had a pre-litigation relationship and submitted an affidavit indicating that they independently decided to join together to file a motion for appointment as lead plaintiff. [63-3.]

3   MWH Group attempts to distinguish *Hospira* and other cases involving post-deadline combinations by arguing that the lead plaintiff appointed in those cases included the movant with the greatest financial losses, which indicated that the combination was not solely for the purpose of obtaining lead plaintiff status. As discussed already, out of the remaining movants, the Combined Group has the individual investor and institutional investor claiming the most in losses. Furthermore, as discussed above, the Combined Group has explained how and why they now seek appointment as lead plaintiff together and how such a combination will better serve the interests of the class.

4   Ms. Godkin also argues that the investment advisors are improperly grouping hundreds of clients' claims. [104, at 9-11.] However, the investment advisors are seeking to recover losses for clients that assigned legal title of their claims to their respective investment advisors. Because the clients assigned their claims, the investment advisors are the real parties in interest. 🚩 *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) (holding that assignees with legal title to claims are real parties in interest authorized to sue on the assigned claims in federal court). Ms. Godkin argues that the investment advisors are aggregating claims of dozens or even hundreds of investors for no apparent reason other than to manufacture the largest loss. But the investment advisors have only been assigned claims of their clients—not claims of entirely

**Sokolow v. LJM Funds Management, Ltd., Not Reported in Fed. Supp. (2018)**

2018 WL 3141814

unrelated parties. Given that the PSLRA favors institutional investors, there is nothing improper with an investment advisor pursuing claims it holds title to in order to recover money for its clients. This is not the kind

of lawyer-driven aggregation prohibited in the cases cited by Ms. Godkin. *Cf.* 🚩*In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 783 (N.D. Ill. 2000) ("Indeed, any choice that was based on the number of shares held by such an assemblage of small holders would really subvert the purposes of the Reform Act by maximizing the prospect that the lawsuit would truly be run by the lawyers and not by the client class members (none of whom might have a sufficient amount at stake to justify the necessary investment of time and effort to exercise meaningful control of the litigation).").

5       The Court assumes that being subject to a unique defense is not part of the initial 🚩Rule 23(a) threshold requirement, but part of the rebuttal analysis contemplated by the PSLRA, as other courts have done. See,

        *e.g.,* 🚩*In re Bally Total Fitness Sec. Litig.*, 2005 WL 627960, at *5 n.7 (N.D. Ill. Mar. 15, 2005).

6       Ms. Godkin also argues that Jarr Equities LLC—an entity that assigned its claims to Traditional Capital LLC ("Traditional")—cannot serve as lead plaintiff because of numerous unrelated lawsuits involving its principals. [104, at 12.] However, Jarr Equities LLC has not moved to be appointed lead plaintiff in this matter; Traditional has. Ms. Godkin has not identified any misconduct on the part of principals of Tradition that undermine its

        ability to serve as a fiduciary. *Cf.* 🚩*In re Surebeam Corp. Sec. Litig.*, 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004) ("On more than one occasion courts have found that an individual is an inadequate lead plaintiff due to unrelated misconduct which implicates the individual's ability to serve as a fiduciary.").

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 1543524

2001 WL 1543524
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Jeffrey DOLLENS and Jeff Vukovich, derivatively
on behalf of Westell Technologies, Inc., Plaintiff,
v.
Marc ZIONTS, J. William Nelson, Howard
Kirby, Jr., Thomas A. Reynolds, Robert C.
Penny, III and Melvin J. Simon, Defendants.
and
WESTELL TECHNOLOGIES,
INC., Nominal Defendant.
THE CEYDA FOUNDATION TRUST,
Dated 12/17/96, derivatively on behalf
of Westell Technologies, Inc., Plaintiff,
v.
Marc ZIONTS, J. William Nelson, Howard
Kirby, Jr., Thomas A. Reynolds, Robert C.
Penny, III and Melvin J. Simon, Defendants.
and
WESTELL TECHNOLOGIES,
INC., Nominal Defendant.

Nos. 01 C 5931, 01 C 2826.
|
Dec. 4, 2001.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.

**\*1** The captioned cases are shareholder derivative actions filed by shareholders of Westell Technologies, Inc. ("Westell") claiming breach of fiduciary duty for alleged actions of various officers and directors of Westell. Westell is a Delaware corporation with its principal place of business within the Northern District of Illinois. None of the plaintiffs is alleged to be a citizen of Delaware. Therefore, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The motions before the court concern consolidation of the derivative actions and appointment of lead plaintiff and lead counsel. For reasons set out below, the actions will be consolidated and the court will appoint Jeffrey Dollens ("Dollens") and Jeff Vukovich's ("Vukovich") as

co-lead plaintiffs, Schiffrin & Barroway, LLP ("Schiffrin & Barroway") and Garwin, Bronzaft, Gerstein, & Fisher, LLP ("Garwin Bronzaft"), as co-lead counsel and Robert D. Allison & Associates as liaison counsel.

FACTS AND PROCEDURAL HISTORY

On or about January 26, 2001, plaintiff Vukovich, by his attorneys Schiffrin & Barroway, filed a derivative action in Delaware claiming breach of fiduciary duty for various alleged actions of and statements by defendants, Marc Zionts, J. William Nelson, Howard L. Kirby, Jr., Thomas A. Reynolds, Robert C. Penny, III, and Melvin J. Simon (collectively "defendants") and Westell as nominal defendant. On December 4, 2000, Dollens, by his attorneys Garwin Bronzaft, filed a similar derivative suit in Delaware. On April 20, 2001, Ceyda, by its attorneys Hedlund, Hanley, Koenigsknecht, Trafelet ("Hedlund Hanley"), filed a similar derivative action in the Northern District of Illinois. On June 28, 2001, the Court of Chancery for the State of Delaware, deferring to this forum, stayed proceedings in *Dollens* and *Vukovich,* and on August 2, 2001, Dollens and Vukovich jointly refiled in this court, with the expectation that the Delaware actions would be dismissed. On November 27, 2001, after having been granted leave to intervene, Joseph B. Rothchild ("Rothchild") filed a third shareholder derivative action in this court, thereby substituting it for an action then pending in the Circuit Court for the Sixteenth Judicial Circuit (Kane County) of Illinois. [1] A related securities fraud putative class action, having withstood a motion to dismiss, is also pending. Ceyda's counsel advises, "[T]here remains the potential for more." (Ceyda's Mot. ¶ 4.)

Although all the plaintiffs agree that their derivative actions and any future shareholder derivative actions that arise from the same or substantially the same set of facts should be consolidated, each seeks to be appointed, with their respective attorneys, as lead plaintiff and counsel, and Dollens [2] and Rothchild further request additional attorneys be appointed liaison or local counsel if needed. Ceyda, in opposition, contends that representation of plaintiffs by Schiffrin & Barroway and Robert D. Allison & Associates, both attorneys for Dollens, presents a conflict of interest.

DISCUSSION

2001 WL 1543524

A. *Consolidation of the Derivative Actions*

**\*2** The court already indicated on the record its willingness to consolidate the actions. A court may consolidate separate cases before it under Fed.R.Civ.P. 42(a), which states:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such proceedings therein as may tend to avoid unnecessary costs or delay.

See Johnson v. Celotex Corp., 899 F.2d 1281, 1284 (2d Cir.1990) ("Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay."); Ikerd v. Lapworth, 435 F.2d 197, 204 (7 th Cir.1970); United States v. Knauer, 149 F.2d 519, 520 (7 th Cir.1945), *aff'd on other grounds,* Knauer v. United States, 329 U.S. 818, 67 S.Ct. 25, 91 L.Ed. 697 (1946). A court has discretion to consolidate related cases, which involve common questions of fact and law under Fed.R.Civ.P. 42(a), "under the policy that considerations of judicial economy strongly favor simultaneous resolution of all claims growing out of one event." Ikerd, 435 F.2d at 204; *In Re Nuveen Fund Litig.,* No. 94 C 0360, 1994 U.S. Dist. LEXIS 13098 (N.D.Ill. Sept. 9, 1994), at [*] 4-5. A court, however, should not consolidate actions when consolidation will prejudice a party. *In Re Nuveen Fund Litig.,* 1994 U.S. Dist. LEXIS, at [*] 4-5.

Plaintiffs allege against the same director defendants that, from approximately June to September 2000, the director defendants intentionally breached their fiduciary duty to Westell and its shareholders in order to garner personal gain through misappropriation of information and insider trading. The *Ceyda* complaint also alleges negligent breach of fiduciary duty. The cases involve common questions of law and fact. No party argues here that it will be prejudiced by consolidation. As such, consolidation of *Ceyda, Dollens, Rothchild* and any future shareholder derivative actions based on the same or similar set of facts and law into one action is appropriate.

B. *Appointment of Lead Plaintiff and Lead Counsel*
Under Fed. R. Civ. P 23.1, "[t]he derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders ... similarly situated in enforcing the right of the corporation or association." At this time, each plaintiff appears to fairly and adequately represent the interests of shareholders because each held shares during the time period in question, each is represented by able and experienced counsel, and no party appears subject to a unique defense that might make the party's status as lead plaintiff problematic. Thus, it becomes necessary to choose among them based on more or less marginal factors that tend to indicate that one plaintiff is likely to benefit the plaintiffs *most.*

**\*3** At the threshold, Hedlund Hanley raises the issue that attorneys at Schiffrin & Barroway (namely Robert B. Weiser) and Robert D. Allison & Associates (namely Robert D. Allison) for Dollens have a conflict of interest in seeking to represent the derivative plaintiffs because they previously represented plaintiffs in the securities fraud class action.

Pertaining to conflicts of interests, this court's Local Rule 83.51.9 provides,

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after disclosure.

> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

> > (1) whose interests are materially adverse to that person, and

> > (2) about whom the lawyer had acquired information protected by L.R. 83.51.6L.R. 83.51.6 and LR83.51.9(c) that is material to the matter;

> unless the former client consents after disclosure.

Dollens v. Zionts, Not Reported in F.Supp.2d (2001)

2001 WL 1543524

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as LR83.51.6 or LR83.53.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as LR83.51.6 or LR83.53.3 would permit or require with respect to a client.

In support of its position, Hedlund Hanley cites the court's own decision, *Wittenborn v. Pauly,* No. 87 C 5814, 1988 WL 33723, at *3 (N.D.Ill. Apr. 1, 1988). In *Wittenborn,* this court disqualified defendant's counsel in a multi-count complaint that included a shareholder derivative suit from *simultaneously* representing both the defendant closely-held corporation and the individual defendants on the basis that the interests of the corporation and the individual defendants were materially adverse. Unlike *Wittenborn,* the pending case deals with whether counsel who previously represented plaintiffs in the related class action, after having withdrawn from that representation, may represent the derivative plaintiffs. Plaintiffs call the alleged conflict of interest based on prior representation of plaintiffs in the securities fraud class action a "surface duality" because the proof in both cases rests on the same nucleus of facts. *See In re Dayco Corp. Sec. Litig.,* 102 F.R.D. 624, 630-31 (S.D.Ohio 1984). [3]

Under the governing local rule LR 83.51.9, both subparagraphs (a) and (b) permit the former client to consent to the representation after disclosure. It is apparent that the class plaintiffs both know the situation and do not object to it. This appears to resolve the matter. [4] Neither is it apparent either than the interests of the two sets of plaintiffs are materially adverse under subparagraph (b)(2) and Ceyda does not explain how the parties are *materially* adverse. The plaintiffs in both cases need to prove the malfeasance of the same individual defendants based on the same set of facts. Although recovery in the derivative suit could require individual directors to return money to the corporation itself, while recovery in the class action would require the individual defendants and the corporation to compensate the plaintiffs directly, the source of the recovery

is the same, and the shareholders benefit from either result. To the extent their interests diverge, the plaintiffs are now represented by separate counsel. See *In re Continental Illinois Sec. Litig.,* 750 F.Supp. 868, 875 (N.D.Ill.1990), *rev'd on other grounds,* 962 F.2d 566 (7 th Cir.1992) (court referred to its earlier ruling that potential conflict existed preventing class plaintiffs and derivative plaintiffs from being jointly represented by counsel, particularly in the area of settlement negotiations where the two kinds of plaintiffs might be competing for limited funds and noting that, in fact, the respective plaintiffs' interest did diverge in regard to liability insurance coverage on the defendant bank officers). Therefore, the court concludes that plaintiffs' counsel are not disqualified by a conflict of interest.

**\*4** Turning now to the central issue of appointment of lead plaintiff and counsel, the first question is what standard to apply. Dollens argues that this court must apply the law of Delaware to determine who will be lead plaintiff, citing a reference in *In re Continental Illinois Securities Litigation* to the applicability of Delaware law to considerations of whether it was in the corporation's best interest to dismiss various derivative claims. 732 F.2d 1302, 1304 (7 th Cir.1984). In an action based on diversity jurisdiction, a federal court will apply the Federal Rules of Civil Procedure unless the issue rests on substantive state law. *See, e.g., Erie R. Co. v. Tompkins,* 304 U.S. 64, 77-80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 426-431, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Although Delaware law applied in *In re Continental Illinois Securities Litigation* to the issue of best interest of the corporation, the issue for decision in that opinion-whether a special litigation committee report concluding that dismissal was in the corporation's interest must be disclosed to the media-was decided under federal law. *See id.* at 1302-10. Lacking any more persuasive authority for a rule that Delaware law applies, and intuitively discerning that questions surrounding leadership of the litigation are essentially ones of case management, the court will apply factors it believes valid in light of the collective wisdom of other state and federal judges. [5]

Dollens relies on *TCW Technology Limited Partnership v. Intermedia Communications, Inc.,* which recites the following criteria: (1) "the quality of the pleading that appears best able to represent the interests of the ... derivative plaintiffs"; (2) "the shareholder plaintiff that has the greatest economic interest in the action"; and (3) "whether

2001 WL 1543524

a particular litigant has prosecuted its lawsuit with greater energy, enthusiasm or vigor than have other similarly situated litigants." No. 00 C 18336, 2000 Del. Ch. LEXIS 147, at [*]10-11 (Del. Ch. Oct. 17, 2000) [hereinafter *TCW* ]. Ceyda urges the court to adopt the criteria set out in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S .C. § 78u-4, [6] for fraud actions filed under the Securities Exchange Act of 1934 and the Securities Act of 1933 on the grounds that a number of federal cases have done so in derivative actions. *See, e.g., In re Conseco, Inc. Sec. Litig. and* *In re Conseco, Inc. Derivative Litig.,* 120 F.Supp.2d 729, 733 (S.D.Ind.2000) [hereinafter *Conseco* ]. As set out in the margin, the PSLRA directs the court to adopt a presumption that the most adequate plaintiff is the one with the largest financial interest in the relief sought by the class. The presumption may be rebutted only on proof that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B).

**\*5** In addition, Congress expressed its desire for institutional investors to take control of private class action securities litigation through the lead plaintiff provisions. S. Rep. 104-98, 1995 U.S.C.C.A.N. 679, 689; H.R. Conf. Rep. 104-369. In large part, this is due to the fact that institutional investors are most likely to have the largest financial interest in the case. In favoring institutional investors, Congress believed such investors were more likely to carry out the stated purpose of the PSLRA, which was in part to prevent lawyers from creating a lawsuit and then seeking a representative plaintiff. *See* Congressional Reports, *supra.* "According to one representative of institutional investors [who testified before Congress], 'As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation." ' *See* Congressional Reports, *supra.* The court in *TCW* opined that Congress enacted the largest financial interest provision and indicated a preference for institutional investors under this provision so that courts would not appoint lead plaintiffs simply based on who was first to file a derivative action. 2000 Del. Ch. LEXIS 147, at [*]3 (determining that there is no special status for plaintiffs who were first to file complaint). Because the *TCW* factors and the PSLRA factors are all relevant to the decision, the court addresses each (as well as one additional factor), although it will not apply the PSLRA's rebuttable presumption in favor of the largest investor but rather consider it along with other factors in weighing the best interest of the plaintiffs.

### 1. The largest financial interest
The holdings of the various plaintiffs and the intervenor are represented to be as follows; Vukovich, 350 shares; Dollens, 2,000 shares; Ceyda, 2,000 shares; and Rothchild, 66,000 shares. Prior to Rothchild's intervention, Ceyda and Dollens each claimed the largest financial interest, but neither has a particularly large financial stake compared to Rothchild's 66,000. [7] Clearly, Rothchild is the plaintiff with the largest financial interest.

### 2. Institutional investor preference
Only Ceyda qualifies here, but the policy considerations that favor institutional investors do not readily fit where Ceyda is concerned. It is not a large institutional investor, nor have any facts been proffered that would suggest that Ceyda has any greater incentive to litigate this case than any other plaintiff who seeks to lead.

### 3. The quality of the pleading
The court finds the pleadings in each action of high quality. The court does take note of Dollens' displeasure that Ceyda filed its complaint five months later and appears to have merely reworked Dollens' complaint. Ceyda does not respond to this allegation in any of its corresponding briefs, so an inference that this occurred is appropriate and suggests that Ceyda at least believes that Dollens' lawyers crafted a quality complaint. Rothchild's complaint is nearly the same as that of Dollens.

### 4. Vigorousness of prosecution of the lawsuits
**\*6** Dollens and Vukovich raise this factor to indicate that they have pursued this litigation more vigorously than Ceyda and Rothchild. According to Dollens, they not only filed the derivative action five months before Ceyda filed but also Dollens has filed numerous discovery requests as opposed to Ceyda's none. Although it appears that the firms representing *Dollens, Ceyda,* and *Rothchild* are all capable of vigorously representing the derivative litigants, the court agrees with Dollens that they have been more vigorous in prosecuting the case.

### 5. Attorneys' fees

2001 WL 1543524

The court requested the attorneys for the *Dollens* and the *Ceyda* plaintiffs to submit a letter concerning their anticipated fees. Both have expressed a willingness to accept the court's decision concerning a reasonable fee. The court has not used differences in the submissions as a basis for its decision to appoint lead plaintiff and counsel other than to caution lead plaintiffs' counsel, which in this case turns out to be three sets of lawyers, that it will look closely at duplication of effort and may require considerable detail in considering fees should plaintiffs prevail.

CONCLUSION

Based on all of the factors on which the parties have relied, the court concludes that Dollens and Vukovich should be co-lead plaintiffs. They have, in fact, been the leaders of the litigation. Although Ceyda is an institutional investor, as indicated above, in this instance, the court is not swayed by that factor. The court is not inclined to appoint Rothchild as lead plaintiff, even though he has the largest financial interest, where he has simply adopted the complaint of Dollens and has not otherwise demonstrated his ability to prosecute the case any more vigorously than other plaintiffs. Inasmuch as the co-lead plaintiffs, absent extraordinary circumstances, should be able to select their own counsel, the court will appoint Schiffrin & Barroway and Garwin Bronzaft as co-lead counsel. Robert A. Allison & Associates is appointed to serve as liaison counsel in order to avoid unnecessary expense resulting from lead counsels' distance from the forum.

ORDER

For reasons set forth above, the court GRANTS plaintiffs' motion to consolidate the derivative actions, Case No. 01 C 2826 and Case No. 01 C 5931, and any shareholder derivative actions that are similar in fact and law, including Rothchild's derivative complaint pursuant to its Order of November 27, 2001. [Case No. 00 C 6735 [# 35-1]], [Case No. 01 C 2826 [# 0-1] [# 11-1]], [Case No. 01 C 5931 [# 0-1]]. For administrative purposes, all pleadings and papers for the derivative actions will hereafter be filed under the lower case number, which is Case No. 01 C 2826. Furthermore, the court GRANTS Dollens' and Vukovich's motion to appoint them as co-lead plaintiffs, Schiffrin & Barroway and Garwin Bronzaft as co-lead counsel and Robert D. Allison and Associates as liaison counsel. [Case No. 01 C 2826 [# 11-2]], [Case No. 01 C 5931 [# 0-2]]. The court DENIES Ceyda's motion for the court to appoint Ceyda as lead plaintiff and Hedlund Hanley as lead counsel, [Case No. 00 C 6735 [# 35-1] [# 35-2]], [Case No. 01 C 2826 [# 0-2] [# 0-3]], [Case No. 01 C 5931 [# 0-2] [# 0-3]], and DENIES Rothchild's motion for the court to appoint him as lead plaintiff, Cauley Geller Bowman & Coates as lead counsel and David B. Kahn & Associates, Ltd. as local counsel, [Case No. 01 C 2826 [# 18-1]].

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1543524

**Footnotes**

1    *Rothchild v. Zionts, et al.,* No. 01-LK-159, filed May 31, 2001. The plaintiff represented that this action has been stayed and once the federal case was filed he would dismiss the Illinois court action.

2    For convenience, the captioned complaint of Dollens and Vukovich will be referred to as *"Dollens"* unless otherwise specified. Messrs, Dollens and Vukovich will be referred to collectively as Dollens.

3    The court in *In re Dayco Corp. Sec. Litig.,* wrote,

    Nearly twenty years ago, Judge Marvin Frankel rejected the position advanced by Defendant[, in which he stated,] "As to the role of plaintiffs as both 'friend' and 'enemy' to the corporation, this surface duality is in fact a routine matter in the courts."... *Heilbrunn v. Hanover Equities Corp.,* 259 F.Supp. 936, 939 (S.D.N.Y.1966). Most courts have followed Judge Frankel's emphasis on the "surface duality" of joining individual and derivative actions, and held that the "theoretical conflict of interest" does notjustify a per se test prohibiting joinder of such actions. These same courts have added that a different result might [be] obtain[ed] if the potential conflict of interest ripens into an actual conflict. *See, In Re Transocean*

Dollens v. Zionts, Not Reported in F.Supp.2d (2001)

2001 WL 1543524

*Tender Offer Securities Litigation,* 455 F.Supp. 999, 1014 (N.D.Ill.1978) (relying on *Bertozzi v. King Louis International, Inc.,* 420 F.Supp. 1166, 1179-80 (D.R.I.1976))....

[The theoretical distinction] is just that, a theoretical one, not rooted in the realities of most individual and derivative suits, which usually are "equally contingent upon the proof of the same nucleus of facts." *Bertozzi,* F.Supp. at 1180.

🚩 102 F.R.D. 624, 630-31 (S.D.Ohio 1984).

4 It further distinguishes the situation presented in *Wittenborn* which involved a corporation, whose principals were also defendants. Whether a corporation could consent in such a situation is questionable.

5 There is some conflicting secondary authority pertaining to whether or not a federal court must apply state law to determine who is lead plaintiff in a derivative action. *See* Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 1833 (stating "in making the determination whether a particular shareholder meets the adequacy of representation requirement, federal law will govern."); BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURTSURTS § 16.6 ("While state substantive law governs the typical derivative claim, the court whose jurisdiction is invoked generally will apply its own procedural law. Whether an issue is substantive or procedural is not always readily apparent."); *but see* SECURITIES AND FEDERAL CORPORATE LAW LAW § 22:43 ("In a derivative action brought in federal court based upon diversity of citizenship, state 'procedural' requirements relating to derivative actions (such as posting security for costs) are substantive for *Erie R. Co. v. Tompkins* purposes and are, therefore, applicable to the federal courts."). Two of these secondary authorities rely, in part, on *Cohen v. Beneficial Industrial Loan Corporation,* to support

their conflicting positions. 🚩 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Cohen* held that a federal court sitting in diversity in a shareholder derivative suit must apply state law to the question whether the plaintiff was obligated under a statutory procedure by which the corporate defendant is entitled to a bond of

indemnity from the plaintiff. 🚩 *Id.* at 554-56. In making its decision, the Court reasoned, "[The New Jersey law] creates a new liability where none existed before, for it makes a stockholder who institutes a derivative action liable for the expense to which he puts the corporation and other defendants, if he does not make good his claims. Such liability is not usual and it goes beyond payment of what we know as 'costs.' If all the Act did

was to create this liability, it would clearly be substantive." 🚩 *Id.* at 555-56. Because the questions of lead plaintiff and lead counsel do not create any additional liabilities, this is a question of federal procedure.

6 Ceyda specifically relies on 15 U.S.C. § 78u-4(a)(3)(B) for appointment of lead plaintiff, which states:

(B) Appointment of lead plaintiff

(i) In general

Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court ... shall appoint as lead plaintiff the member or members of the purported class that the court determines to be the most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

(iii) Rebuttable presumption

(I) In general

Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that ——

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of 🚩 Rule 23 of the Federal Rules of Civil Procedure.

(II) Rebuttal evidence

The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff-

> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class....
>
> (v) Selection of lead counsel
>
> The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.
>
> The court recognizes that 15 U.S.C. § 77z-1(a)(3)(B) also stands for the same proposition.

7 Courts are split over whether individual investors may aggregate their shares to claim the lead plaintiff prize.

*See, e.g ., See, e.g., In re Conseco, Inc. Sec. Litig. and*  *In re Conseco, Inc. Derivative Litig.,* 120 F.Supp.2d 729, 733 (S.D.Ind.2000) (in appointing institutional investor as lead plaintiff in securities action and not group of investors, court determined that "[w]hile a lead plaintiff 'group' may be permissible, this District Court has stressed that aggregating parties 'that have nothing in common with one another beyond their investment

is not an appropriate interpretation of the term "group" in the PSLRA." ') (citation omitted); *but see* *In re Cendant Corp. Litig.,* 264 F.3d 201, 267 (3d Cir.2001) [hereinafter *Cendant* ]. In *Cendant,* the Third Circuit stated:

> The [PSLRA] contains no requirement mandating that the members of a proper group be "related" in some manner; it requires only that any such group "fairly and adequately protect the interests of the class." We do not intimate that the extent of the prior relationships and/or connection between the members of a movant group should not properly enter into the calculus of whether that group would "fairly and adequately protect the interests of the class," but it is this test, not one of relatedness, with which courts should be concerned.

264 F.3d at 267. This court agrees with *Cendant'* s reasoning.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Hedick v. Kraft Heinz Company, Slip Copy (2019)

2019 WL 4958238

2019 WL 4958238
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

George A. HEDICK, Jr., et al., Plaintiffs,

v.

The KRAFT HEINZ COMPANY, et al., Defendants.
Iron Workers District Council
(Philadelphia and Vicinity) Retirement
and Pension Plan, et al., Plaintiffs,

v.

The Kraft Heinz Company, et al., Defendants.
Timber Hill LLC, Plaintiff,

v.

The Kraft Heinz Company, et al., Defendants.

Case No. 19-cv-1339, Case No. 19-
cv-1845, Case No. 19-cv-2807
|
Signed 10/08/2019

**Attorneys and Law Firms**

Gerald P. Meyer, Megan Cunniff Church, Steven Francis Molo, MoloLamken LLP, Chicago, IL, for Plaintiff George A. Hedick, Jr.

Sharan Nirmul, Kessler Topaz Meltzer Check, Radnor, PA, John Michael Robinson, Jonathan Christian Bunge, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, for Plaintiff Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan.

Andrew J. Entwistle, Entwistle & Cappucci, LLP, Austin, TX, Andrew Mitchell Sher, Pro Hac Vice, Robert N. Cappucci, Pro Hac Vice, Sean Michael Riegert, Pro Hac Vice, Entwistle and Cappucci LLP, New York, NY, Claire Gorman Kenny, Michael H. Moirano, Moirano Gorman Kenny, LLC, Chicago, IL, for Plaintiff Timber Hill LLC.

Daniel J. Kramer, Andrew Ehrlich, Pro Hac Vice, William A. Clareman, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, Dean Nicholas Panos, Gabriel Gillett, Howard Steven Suskin, Jenner & Block LLP, Chicago, IL, for Defendant the Kraft Heinz Company.

Andrew Ehrlich, Daniel J. Kramer, William A. Clareman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York,

NY, Dean Nicholas Panos, Gabriel Gillett, Howard Steven Suskin, Jenner & Block LLP, Chicago, IL, for Defendants Bernardo Hees, Paulo Basilio, David H. Knopf.

## MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

**\*1** This is a securities class action against The Kraft Heinz Company, Bernardo Hees, Paulo Basilio, and David H. Knopf. Six movants requested that the Court consolidate the above-captioned cases and sought appointment as lead plaintiff in this matter: (1) Michael Guzzi, Cam Hung Diep, and James Tarsy [40]; (2) The New York City Fund (the "NYC Fund") [46]; (3) Earl Chesson, The Chesson Limited Partnership, and Earl G. Chesson Revocable Tryst U/A DTD 4/11/2017 (together, the "Chesson Group") [49]; (4) Arca Investments and Krupa Global Investments (together, the "Arca/Krupa Group") [52]; (5) Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union") (together, the "AP7/Union Group") [57]; and (6) Timber Hill LLC ("Timber Hill") [61]. The motion by movants Michael Guzzi, Cam Hung Diep, and James Tarsy was terminated as moot after they filed a motion to withdraw. [See 80.] Before the Court are the remaining lead plaintiff motions [46; 49; 52; 57; 61]. Also before the Court are the AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief, the NYC Fund's motion [130] to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019, and various motions to seal [103; 112; 117; 125; 129; 134].

For the reasons set forth below, the Court consolidates the above-captioned cases. The Court further grants the lead plaintiff motion of the AP7/Union Group [57] and approves the selection of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as co-lead counsel. The Court denies the remaining lead plaintiff motions [46; 49; 52; 61] in full. The AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply, and the NYC Fund's motion [130] to take judicial notice are denied as moot. The motions to seal [103; 112; 117; 125; 129; 134] will be referred to the assigned magistrate judge for disposition. The case is set for further status hearing on October 22, 2019 at 9:00 a.m.

## I. Background

The above-captioned actions arise from alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act") and related rules and regulations by The Kraft Heinz Company ("Kraft-Heinz" or the "Company"), Bernardo Hees, Paulo Basilio, and David H. Knopf (collectively, the "Defendants"). Defendant Kraft Heinz manufactures and markets food and beverage products in the United States, Canada, Europe, and internationally. [1, at ¶ 7.] Kraft Heinz is a Delaware corporation maintaining its co-headquarters in Chicago, Illinois. [*Id.*]. Kraft Heinz's securities trade on the NASDAQ under the ticker symbol "KHC." [*Id.*]

On July 2, 2015, Kraft Heinz was formed through the merger of Kraft and Heinz. [*Id.* at ¶ 28.] Prior to the merger, Kraft was a publicly-traded company and Heinz was jointly owned by Berkshire Hathaway Inc. and 3G Global Food Holdings, L.P., a subsidiary of 3G, a Brazilian-American multibillion-dollar investment firm. [*Id.*] According to the complaint in the *Iron Workers* action, in conjunction with the formation of Kraft Heinz, on April 10, 2015, Heinz filed a preliminary registration statement and prospectus on Form S-4 with the SEC, with respect to the shares of Heinz common stock to be issued to Kraft shareholders pursuant to the merger agreement. [Case No. 19-cv-01845, Dkt. 1, at ¶ 3.] The Form S-4 praised the merger, stating that the benefits included "enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas * * * and the potential to realize, according to Heinz management, an estimated $1.5 billion in annual cost savings from the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017." [*Id.*] Moreover, the Form S-4 highlighted "3G Capital's strong track record in achieving significant cost reduction and margin improvement in companies under its management." [*Id.*].

 **\*2** Under the terms of the merger, each share of outstanding Kraft common stock was converted into the right to receive one share of common stock of Kraft Heinz common stock. [*Id.* at ¶ 32.] Additionally, Kraft declared a special cash dividend equal to $16.50 per share of Kraft common stock to shareholders of Kraft. [*Id.*] The aggregate special dividend payment of approximately $10 billion was funded by an equity contribution by Berkshire and 3G. [*Id.*] Over the next several years, Kraft Heinz continually touted its cost cutting initiatives while simultaneously indicating its plans to grow overall revenue numbers. [*Id.* at ¶ 4.] At no time between 2015 and late 2018 did Kraft Heinz suggest its brands were impaired in a material way. [*Id.*]

On February 21, 2019, after the market closed, Kraft Heinz announced its earnings for the fourth quarter of 2018. [1 at ¶ 34.] The Company announced an impairment charge of $15.4 billion, stating, in relevant part:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts. ***As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the Kraft and Oscar Mayer trademarks.*** These charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

[*Id.*] That same day, Kraft Heinz disclosed that it had received a subpoena from the Securities and Exchange Commission in October 2018 in connection with the Company's procurement function, stating in relevant part:

> ***The Company received a subpoena in October 2018 from the U.S. Securities and Exchange Commission (the "SEC") associated with an investigation into the Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors.***

Following this initial SEC document request, the Company together with external counsel launched an investigation into the procurement area. In the fourth quarter of 2018, as a result of findings from the investigation, the Company

**Hedick v. Kraft Heinz Company, Slip Copy (2019)**

2019 WL 4958238

recorded a $25 million increase to costs of products sold as an out of period correction as the Company determined the amounts were immaterial to the fourth quarter of 2018 and its previously reported 2018 and 2017 interim and year to date periods. Additionally, the Company is in the process of implementing certain improvements to its internal controls to mitigate the likelihood of this occurring in the future and has taken other remedial measures. The Company continues to cooperate fully with the U.S. Securities and Exchange Commission.

[*Id.* at ¶ 35.] Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Kraft securities publicly traded on NASDAQ during the class period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. [*Id.* at ¶ 39.] Six movants originally sought to be appointed lead plaintiff. Currently pending before the Court are the remaining motions for appointment as lead plaintiff and various other related motions.

## II. Legal Standard

The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides guidelines for the appointment of a lead plaintiff in a securities class action case. The PSLRA requires that the Court "appoint as a lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members[.]" 15 U.S.C. § 78u–4(a)(3)(B)(i). The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the "person or group of persons" who "has either filed the complaint or made a motion in response to a notice," "has the largest financial interest in the relief sought by the class," and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. 78u–4(a)(3)(B)(iii)(I)(aa); (bb); and (cc). This presumption may be rebutted, however, if a member of the purported class establishes that the "presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa) and (bb). The PSRLA further provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(b)(v).

## III. Analysis

### A. Consolidation

**\*3** All movants initially moved to consolidate the above-captioned actions under Federal Rule of Civil Procedure 42(a). Under that rule, "[i]f actions before the court involve a common question of law or fact, the court may * * * consolidate the actions[.]" Fed. R. Civ. P. 42(a)(2). "By far the best means of avoiding wasteful overlap when related suits are pending in the same court is to consolidate all before a single judge." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999). Furthermore, the PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed," courts shall not appoint a lead plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u-4(a)(3)(B)(ii). "In securities actions where the complaints are based on the same public statements and reports, consolidation is appropriate if there are common questions of law and fact and the parties will not be prejudiced." *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (citation omitted); see also *Taubenfeld v. Career Educ. Corp.*, 2004 WL 554810, at \*1 (N.D. Ill. Mar. 19, 2004) ("The court agrees that consolidation is appropriate for the six related cases insofar as each involves class action claims on behalf of purchasers of CEC stock and each asserts similar if not overlapping claims for relief.").

After initially asking that the above-captioned cases be consolidated, in its opposition brief, Timber Hill asks that the Court not consolidate the *Timber Hill* class action with the *Hedick* and *Iron Workers* common stock and notes class actions. Instead, Timber Hill contends that the cases only should be coordinated for discovery and pretrial purposes. To the extent that Timber Hill's motion [61] asks that the Court consolidate the above-captioned cases, the motion is withdrawn. Still, the remaining movants also have moved for consolidation. And Timber Hill fails entirely to explain why consolidation is inappropriate under the governing standards addressed above. The complaints here are based on the same challenged conduct and there are common questions of law and fact. Furthermore, no party has identified any prejudice that would result from consolidating these actions. Accordingly, the Court grants the pending motions [46; 49; 52; 57] to consolidate the above-captioned cases.

### B. Presumptive Most Adequate Plaintiff

Hedick v. Kraft Heinz Company, Slip Copy (2019)
2019 WL 4958238

Movants the NYC Fund, the Arca/Krupa Group, and the AP7/Union Group seek to be appointed lead plaintiff in the above-captioned cases. [1] The PSLRA presumes that the most adequate plaintiff is the plaintiff who—in addition to satisfying other requirements—has the largest financial interest in the relief sought by the class. "The largest financial interest provision seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the most adequate plaintiff. The PSLRA, however, does not specify how courts should measure the largest financial interest in the relief sought by the class." *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2012 WL 1339678, at *1 (N.D. Ill. Apr. 18, 2012) (internal citation and quotation marks omitted).

Most courts consider: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered." *Hospira, Inc.*, 2012 WL 1339678, at *4 (citing *Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11,

1997)); see also *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001) ("[W]e agree with the many district courts that have held that courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." (citations omitted)). While courts differ on the precise weight to apply to each factor, most courts agree that fourth factor—the approximate losses suffered—is the most salient factor in selecting the lead plaintiff. See *In re CMED Sec. Litig.*, 2012 WL 1118302, at *3 (S.D.N.Y. April 2, 2012) ("In giving weight to the four factors, courts in this District, as others, place the most emphasis on the last of the four factors: the approximate losses suffered by the movant above any weight accorded to net shares purchased and net expenditures." (citations and quotations omitted)); *In re Diamond Foods, Inc. Sec. Litig.*, 281 F.R.D. 405, 408 (N.D. Cal. Mar. 20, 2012) (concluding that the "fourth factor, 'approximate loss,' is generally considered the most important factor"); *Canson v. WebMD Health Corp.*, 2011 WL 5331712, at *2 (S.D.N.Y. Nov. 7, 2011) (concluding that "[t]he fourth factor, loss suffered, weighs most heavily in the court's analysis" (citation omitted)).

**\*4** The movants still being considered for appointment as lead plaintiff claim the following losses during the Class Period:

| Movant | Claimed Financial Interest [2] |
|---|---|
| NYC Fund | $59,257,707.77 |
| Arca/Krupa Group | $22,839,506.00 |
| AP7/Union Group | Tens of Millions |

Although the NYC Fund claims the largest sum of financial losses, other movants argue that its financial interests are overstated.

Specifically, the Arca/Krupa and the AP7/Union Groups argue that the shares of Kraft Heinz that the NYC Fund acquired in the merger of Kraft and Heinz in July 2015 are not properly part of this case. The Arca/Krupa and the AP7/Union Groups argue that merger shares should be excluded because they do not fall within the scope of the Class Period, which starts on July 6, 2015 for the purposes of these motions. According to these movants, the NYC Fund acquired the merger shares on July 2, 2015, not on

July 6, 2015. The NYC Fund responds by asserting that "it is hornbook law that shares acquired in a merger are considered a "purchase" under Section 10(b) of the Exchange Act." [99, at 16 (citations omitted).] However, that argument begs the question. The Court recognizes that "[w]hen an exchange of shares facilitates the merger of two separate and distinct corporate entities, that exchange constitutes a 'purchase or sale' for purposes of bringing a Rule 10b-5 action." *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999); see also *Davidson v. Belcor, Inc.*, 933 F.2d 603, 606 (7th Cir. 1991) ("It is well-established that the exchange of shares during a merger transaction constitutes the purchase

2019 WL 4958238

or sale of securities for the purposes of Section 10(b) and Rule 10b-5." (citations omitted)); *Gelles v. TDA Industries, Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) ("[T]he simple exchange of shares in a merger qualifies as a purchase or sale when shareholders become shareholders in a new company as a result of * * * deception[.]" (citations and quotations omitted)). But the issue is not whether the acquisition of merger shares constitutes a purchase under federal securities law. Rather, the issue is whether the purchase occurred *within the Class Period.*

Given the impact that this issue may have on the relevant loss calculations, the Court requested supplemental briefing on the issue. Instead of addressing when the "purchase" of shares occurred, as requested by the Court, the NYC Fund notes that Kraft Heinz did not deliver the merger shares until July 6, 2015. [145, at 10.] Although investors may not have acquired stock in the newly formed Kraft Heinz until July 6, 2015, the NYC Fund admits that the effective date of the merger was July 2, 2015. [*Id.*] The NYC Fund further admits that "typically shares exchanges pursuant to a merger are considered 'purchased' on the effective day of the merger[.]" [145, at 10.] This position is supported by binding Seventh Circuit authority. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 370 (7th Cir. 1987) (concluding that sale occurred when the merger closed). Still, the NYC Fund argues that the facts of this case are unique because the shares were not delivered to investors until July 6, 2015. While that certainly appears to be the case—at least with respect to the investors before the Court—the NYC Fund fails to explain why that fact changes the Court's analysis.

**\*5** The NYC Fund makes much of the fact that other movants, including the AP7/Union Group, included merger shares on their certifications. The AP7/Union Group responds that the PSLRA required that the AP7/Union Group disclose the fact that it received their shares from the merger on July 6, 2015, even if the shares were not purchased on that date. The PLSRA provides—in relevant part—that movants "set[ ] forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv). Although the Court questions whether the receipt of shares—versus the actual purchase of shares—qualifies as a transaction that must be disclosed under the PLSRA, the Court credits the AP7/Union Group's representation. In any event, without any basis for concluding that the date investors receive shares is the relevant date for calculating losses under

the PLSRA, the Court concludes that the merger shares were purchased on July 2, 2015, the date the merger closed.

The NYC Fund also suggests that determining what constitutes the purchase date may necessitate the evaluation of subsequent discovery and expert opinions. [3] [145, at 11.] The NYC Fund therefore asserts that—for the purposes of determining the investor with the largest financial interest under the PSLRA—the Court should start the Class Period on July 2, 2015 to give effect to the intent of the *Iron Workers* complaint. For the purpose of calculating losses in determining the proper lead plaintiff in securities class actions, courts use the most inclusive class period. See *Hom v. Vale, S.A.*, 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016) (finding "that the use of [a] longer, more inclusive class period is proper * * * because the longer class period encompasses more potential class members and damages" and collecting cases); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012) (finding the most inclusive class period proper in analyzing lead plaintiff selection). Recognizing this legal standard, all remaining movants initially recognized that —based on the pleadings before the Court—the Class Period began on July 6, 2015.

The NYC Fund now takes the position that—if the Court were to conclude that the merger shares were purchased on July 2, 2015—the Court simply could expand the Class Period to begin on that date because the operative complaint (*i.e.*, the *Iron Workers* complaint) intended to include merger shares in the class definition. The Court questions whether it is clear that the *Iron Workers* complaint intended to include merger shares. The *Iron Workers* complaint only references one possible misrepresentation that occurred before the merger closed—statements made by in the April 10, 2015 preliminary registration statement and prospectus Form S-4 that Heinz filed with the SEC with respect to the shares of Heinz common stock to be issued to Kraft shareholders pursuant to the merger agreement. [4] [See Case No. 19-cv-1845, Dkt. 1 (*Iron Workers* Compl.), at ¶ 43.] However, the *Iron Workers* complaint makes clear that it is bringing claims based on purported "false and misleading misrepresentations and omissions during the Class Period." [*Id.* at ¶ 26.] And the Iron Workers complaint expressly identified July 6, 2015 as the start of the Class Period. [*Id.* at ¶ 1.] Indeed, under the operative pleadings before the Court, all remaining movants initially concluded that the Class Period began on July 6, 2015.

Hedick v. Kraft Heinz Company, Slip Copy (2019)
2019 WL 4958238

The NYC Fund argues that the Court has broad authority to modify the Class Period under Rule 23. While that certainly may be true as the case progresses, for the present purpose of calculating losses of competing lead plaintiffs the Class Period cannot be altered or corrected after the expiration of the 60-day notice period under the PSLRA. "The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed after the sixty (60) day window has closed." *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 619 (S.D.N.Y. 2015) (quoting *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)) (internal quotation marks omitted). The Court therefore lacks authority to expand the Class Period to July 2, 2015 for the purposes of this motion and excludes merger shares from the relevant loss calculations. [5]

**\*6** The next question is whether the Court will consider losses associated with shares sold before the alleged fraud was revealed. This issue relates primarily to calculating the losses of the AP7/Union Group. AP7 and Union are each made up of numerous separate funds. A number of Union's funds sold their Kraft Heinz positions before the disclosures alleged in the complaints. The Court agrees that these claimed losses properly are excluded from the AP7/Union Group's claimed losses. "[T]hose class members who sold their * * * common stock before * * * the first corrective price decline[ ] cannot be said to have suffered economic loss caused by [the] alleged fraud." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864-65 (7th Cir. 2014); see also *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[If] the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."); *Ullah Group. Alexandre Pelletier v. Endo International PLC*, 2018 WL 3035745, at *2 (E.D. Pa. June 19, 2018) (holding that losses incurred before any disclosure could not have been caused by the any disclosures and should not be included in the " 'largest financial interest' calculus"); *Galmi v. Teva Pharm. Indus. Ltd.*, 302 F. Supp. 3d 485 (D. Conn. 2017) (reducing claimed losses to exclude losses not plausibly tied to any partial disclosure); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("Therefore, when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures." (collecting cases)).

Finally, the Court must consider whether the AP7/Union Group can aggregate their losses for the purposes of the lead plaintiff analysis. The NYC Fund and the Arca/Krupa Group argue that the AP7/Union Group should not be permitted to aggregate its losses because it is an artificial group. The NYC Fund further argues that the AP7/Union Group is not structured in an efficient manner to allow maximum recovery for the Class. Specifically, the NYC Fund challenges the fact that the AP7/Union Group "consists of two funds, eight declarants/signatories, and two law firms (Bernstein Litowitz and Kessler Topaz), across five cities and three countries (New York, Chicago, Radnor (Pennsylvania), Frankfurt, and Stockholm)." [88, at 14 (footnotes omitted).]

The Seventh Circuit has not yet addressed whether and to what extent the claims of class members can be aggregated for the purposes of determining which movant has the largest financial interest in the relief sought by the class. Although some courts have held that a group of investors must have a preexisting relationship to serve together as lead plaintiffs, see, *e.g.*, *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845 (S.D. Ind. 1999), "the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships." See *Bang v. Acura Pharm., Inc.*, 2011 WL 91099, at *2 (N.D. Ill. Jan. 11, 2011) (citing *Sabbagh v. Cell Therapeutics, Inc.*, 2010 WL 3064427 at *4-5 (W.D. Wash. Aug. 2, 2010)). Furthermore, as the Supreme Court recently recognized, 80 percent "of securities class actions in post-PSLRA data sample had two or more co-lead counsel firms[.]" *China Agritech, Inc. v. Resh*, 2018 WL 2767565, at *7 n.3 (U.S. June 11, 2018) (citing Choi & Thompson, *Securities Litigation and Its Lawyers: Changes During the First Decade After the PSLRA*, 106 Colum. L. Rev. 1489, 1507, 1521, 1530 (2006)).

This trend is consistent with the Third Circuit's decision *In re Cendant Corporation Litigation*, which held that small groups of investors can aggregate their losses in computing the total loss amount and act as lead plaintiff even if they did not have any pre-existing relationship. 264 F.3d 201, 266-67 (3rd Cir. 2001). In reaching this conclusion, the Third Circuit reasoned that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner[.]" See *id.* at 266. This Court therefore has concluded that—under the PSLRA—investors without a preexisting relationship can aggregate their claims for

the purposes of determining which movant has the largest financial interest in the relief sought by the class. *Sokolow v. LJM Funds Management, Ltd.*, 2018 WL 3141814, at \*3 (N.D. Ill. June 26, 2018).

**\*7** Still, as the Court noted in *Sokolow*, "to enjoy the rebuttable presumption that the [PSLRA] statute confers, there must be some evidence that the members of the group will act collectively and separately from their lawyers." *In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at \* 2 (S.D.N.Y. Dec. 6, 2007). In addition, "[a]t some point, a group may become too large for its members to operate effectively as a unit." *Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at \*11 (D.N.J. Apr. 25, 2018) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001)). "Such unwieldiness would vitiate the PSLRA's purpose of having active and engaged plaintiffs supervise the conduct of the litigation \* \* \* [T]he larger [the size of a proposed lead plaintiff group], the greater the dilution of control that [the members of that group] can maintain over the conduct of the putative class action." *Id.* (internal citations and quotations omitted); see also *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 815-16 (N.D. Ohio 1999) ("The greater the number of persons comprising the group, the more difficult it is for those persons to communicate with each other, and to speak with a single, coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation.").

Courts consider the extent of the prior relationships between the parties as part of its analysis of whether the movant will adequately represent the interests of the class, but the parties' prior relationships alone should not be dispositive. *Cendant*, 264 F.3d at 266-67. Courts also look to other factors, such as the efforts of lawyers in creating a movant group to determine whether the resulting group could "be counted on to monitor counsel in a sufficient manner[,]"

*id.* at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001)), and the size of the movant group to determine whether that group can fairly and adequately represent the class. *Id.* at 267; see also *Sabbagh*, 2010 WL 3064427 at \*5 (recognizing a group of investors should be "small and cohesive enough such that it can adequately control and oversee litigation") (citing *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at \*8 (N.D. Cal. Aug. 22, 2008)). Whether a group can serve as lead plaintiff together should be determined on a case-by-case basis. *Cendant*, 264 F.3d at 267.

Based on all of the available information, the Court concludes that the AP7/Union Group is sufficiently cohesive to represent the interests of the class. To begin, the AP7/Union Group contains only two institutional investors who previously have worked together as co-lead plaintiffs in *In re Allergan Generic Drug Pricing Securities Litigation*, Case No. 16-cv-9449 (D.N.J.). There is no indication that these sophisticated institutional investors will be unable to operate effectively as a unit. See *Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at \*11 (D.N.J. Apr. 25, 2018) (concluding that group of three investors was "too small" to raise unwieldiness concerns). Furthermore, given the claimed losses by each of these investors, the Court concludes that each of these institutional investors can be counted on to monitor counsel in a sufficient matter. Accordingly, the Court will consider the aggregate losses of the Arca/Krupa Group in determining each of the movants' losses. [6]

**\*8** Excluding claimed losses associated with merger shares and/or shares sold before the alleged fraud was revealed, the remaining lead plaintiff movants have the following financial losses: [7]

| Movant | Financial Interest |
| --- | --- |
| NYC Fund | $2,988,660.00-$5,128,987.00 [8] |
| Arca/Krupa Group | $22,839,506.00 |
| AP7/Union Group | $24,789,508.00 |

[86, at 5.] The Court therefore concludes that the AP7/Union group has the largest financial interest in the relief sought by the class.

### C. Rule 23 Requirements

The PSLRA further provides that the lead plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u4(a)(3)(B)(I)(cc). Rule 23(a) provides that a party may serve as a class representative "only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The typicality and adequacy elements are the relevant factors to the appointment of a lead plaintiff. *Hospira*, 2012 WL 1339678, at *8. The AP7/Union Group has satisfied its burden by making a preliminary showing that it satisfies the requirements of Rule 23.

**\*9** Under Rule 23(a), a plaintiff's claims are typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). Here, for purposes of selecting the lead plaintiff, the AP7/Union Group's claims are based on the same legal theories and arise from the same events and course of conduct giving rise to the claims of the other class members in this case. As such, it meets the typicality requirement of Rule 23(a). See *Johnson v. Tellabs*, 214 F.R.D. 225, 228 (N.D. Ill. 2002).

The AP7/Union Group also meets the adequacy requirement in Rule 23(a). "A lead plaintiff meets the adequacy requirement if (1) its claims are not antagonistic or in conflict with those of the class; (2) it has sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) it is represented by competent, experienced counsel who [will] be able to prosecute the litigation vigorously." *Hospira, Inc.*, 2012 WL 1339678, at *8 (citing *Tellabs*, 214 F.R.D. at 228-29). Movants Timber Hill and the Chesson Group argue that the AP7/Union Group—and any other movant with claims based on common stock purchasers—cannot adequately represent class members with claims based on

investments in the derivatives market. Thus, both Timber Hill and the Chesson Group both independently seek appointment as co-lead plaintiff to represent the interests of investors in the derivatives market.

According to Timber Hill and the Chesson Group, although the Remaining Movants may have a greater financial interest in the relief sought be the class, the Remaining Movants will not adequately represent the interests of investors in the derivatives market. In so arguing, Timber Hill and the Chesson Group note that stocks and derivatives are valued differently and may require separate expert analysis to determine damages. They further note that derivatives investors may have to take on substantive fights that stock investors do not and will have to present different proof to support their claims. Movant Timber Hill also notes that the damages cap imposed by Section 20A creates a fundamental conflict between common stock investors and derivatives investors, because common stock investors will have the incentive to downplay the damages of derivative investors to preserve more of the limited pool of damages for common stock investors.

Although movants Timber Hill and the Chesson Group identify potential conflicts of interest, these conflicts are merely speculative and hypothetical at this stage of the case. This case therefore is unlike *In re Allergan, Inc. Proxy Violation Derivatives Litigation*, in which the court appointed Timber Hill as lead plaintiff for a derivates class in a separate derivatives class action. [Case No. 2:17-cv-04776 (C.D. Cal. Aug. 13, 2018), Dkt. 63.] In that case, counsel conceded that they were forfeiting arguments available to investors in the derivatives market to benefit common-stock lead plaintiffs. [See 92-4.] However, any conflict of interest in this case remains speculative and therefore does not justify separate representation. See *Smith v. State Farm Mut. Auto. Ins. Co.*, 301 F.R.D. 284, 290 (N.D. Ill. 2014); see also *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1151 (N.D. Cal. 1999) ("[T]he existence of different pleading standards does not create the need for a separate lead plaintiff.").

The Court notes, however, that the AP7/Union Group has a responsibility under the PSLRA to continue to monitor whether its members are capable of adequately protecting the interests of class members. *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) ("Courts have interpreted their lead plaintiff responsibilities under the PSLRA to encompass a continuing 'duty to monitor

whether lead plaintiffs are capable of adequately protecting the interests of the class members.' " (quoting *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004))). Thus, a lead plaintiff has the "responsibility to propose their own withdrawal and substitution should it be discovered that they may no longer adequately represent the interests of the purported plaintiff class." *Id.* (citing *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 3015304, at *1 (S.D.N.Y. Dec. 27, 2004)). If any lead plaintiff fails to do so, "a member of the purported class will be allowed to endeavor to protect its own interests and the interests of its fellow class members by similarly moving the court to have a lead plaintiff removed upon good cause shown." *Id.*; see also *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 541 (S.D.N.Y. 2015) ("If pre-trial discovery reveals rifts within the class that require subclasses, the issue will be addressed at that time." (citations omitted)). Given the many qualified potential lead plaintiffs and counsel who have come forward at this initial stage of the case to offer their services, lead plaintiff and counsel undoubtedly will be carefully monitored going forward, both externally and by the Court itself, to ensure that no unaddressed conflicts arise. The Court is not, however, persuaded to disregard the presumption established by the PSLRA based on speculative future conflicts. The Court therefore concludes that the AP7/Union Group alone is presumed the most adequate plaintiff under the PSLRA.

**D. Rebuttable Presumption**

 **\*10** The presumption established by the PSLRA "may rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C.A. § 78u-4(a)(3)(B)(iii)(II). The NYC Fund argues that the AP7/Union Group already has failed to exercise appropriate oversight over their counsel, demonstrating that they will not fairly and adequately protect the interests of the class. In support of that assertion, the NYC Fund cites to the fact that attorneys for the AP7/Union Group announced to the Court that they were going to seek appointment as co-lead plaintiffs with the Arca/Krupa Group, but then changed course before filing its opposition brief. However, the Court sees no problem with movants attempting to resolve competing lead plaintiff motions.[9] See *Sokolow, 2018 WL 3141814, at *3* (appointing co-lead plaintiffs

who initially moved separately for appointment as lead plaintiff). Representatives of AP7 and Union submitted a joint declaration outlining their existing relationship and representing that they "each independently determined to seek joint appointment as Lead Plaintiff." [60-2.] The joint declaration also outlines their ability to monitor counsel and their incentive to maximize recovery for the class. [*Id.*] The representatives also submitted a supplemental declaration indicating that discussions to combine with the Arca/Krupa Group were done under their oversight. [98-1.] Based on the representations in these declarations, the Court has no reason to question the AP7/Union Group's ability to fairly and adequately protect the interests of the class.

The NYC Fund also argues that the AP7/Union Group is presumptively barred from becoming lead plaintiff. The PSLRA's "professional plaintiff" provision provides:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

15 U.S.C. § 78u-4(a)(3)(B)(vi) (the "5-in-3 provision"). The NYC Fund argues that the AP7/Union Group violates this prohibition because its members have been appointed lead plaintiff in eight securities actions in the last three years, with Union alone having been appointed lead plaintiff in seven class actions in the last three years. [60-1, at 5, ¶ 6.]

The AP7/Union Group responds that the 5-in-3 provision does not apply to institutional investors and therefore does not preclude its members from acting as co-lead plaintiffs. Although the 5-in-3 provision does not expressly exclude institutional investors from its scope, it gives the Court discretion to waive the provision when "consistent with the purposes of [the PSLRA]." 15 U.S.C. § 78u-4(a)(3)(B)(vi). The text of the statute thus allows the Court to make exceptions to the 5-in-3 provision consistent with the purposes of the PSLRA. As many courts have noted, that provision "was largely directed at private individuals" and courts thus "have routinely waived the restriction in the case

**Hedick v. Kraft Heinz Company, Slip Copy (2019)**

2019 WL 4958238

of qualified institutional investors." *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (collecting cases). In short, the PSLRA reflects a "presumption that institutional investors be appointed lead plaintiff." *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63 (D. Mass. 1996).

Regardless of whether institutional investors categorically are excluded from the 5-in-3 provision, the Court concludes that allowing the AP7/Union Group to serve as lead Plaintiff is consistent with the purposes of the PSLRA in this case. To begin, as discussed above, the AP7/Union Group has the largest financial interest in the relief sought by the class. Although other movants are institutional investors, the Court has concerns regarding the adequacy of these movants to fairly and adequately protect the interests of the class. With respect to the NYC Fund, its claimed financial interest in the relief sought by the class is overstated because it improperly includes merger shares and is actually much lower than the relief sought by the AP7/Union Group.

**\*11** The NYC Fund has raised concerns about the Arca/Krupa Group's ability to serve as lead plaintiff. Specifically, the Czech National Bank ("CNB") denied a request by Pavol Krupa—the Arca Krupa Group's current principal and signatory of the certification in this case—to be appointed a member of the Board of Directors of Arca Capital CEE. [See 88-6.] In denying the request, the CNB concluded that it "does not have a reason to expect that [Mr. Krupa] could duly exercise the office of an executive of a self-governed investment fund and to properly comply with all the duties of such an executive arising from the valid legal regulations." [*Id.* at 10.] This conclusion was based on Mr. Krupa's role in conduct leading to sanctions against Arca Capital Global Equity, a.s., and Arca Investments, a.s. [*Id.*] Although there is no indication that the errors leading to sanctions benefitted Mr. Krupa, the CNB concluded that Mr. Krupa personally was responsible for the errors. [*Id.* at 8.] The CNB also questioned Mr. Krupa credibility because he "provided false information by failing to provide information" information about a sanction as requested in a questionnaire. [*Id.* at 9-10.]

The Arca/Krupa Group attempts to explain this omission as a good faith mistake, but that is not how the CNB saw it. Even cases cited by the Arca/Krupa group recognize that "honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate fiduciary for a class[.]" See *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 416 (S.D.N.Y. 2004) (citing *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)); see also *Searcy v. eFunds Corp.*, 2010 WL 1337684, at \*4 (N.D. Ill. Mar. 31, 2010) ("The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.' ") (quoting *Roe v. Bridgestone Corp.*, 257 F.R.D. 159, 168 (S.D. Ind. 2009)); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) ("A plaintiff's honesty and integrity are important considerations in allowing him to represent a class.") (citing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549 (1949); *Armour v. City of Anniston*, 89 F.R.D. 331, 332 (N.D. Ala. 1980)). Given this history, appointing the ARCA/Krupa Group's as lead plaintiff over the AP7/Union Group is not consistent with the purposes of this PSLRA.

**E. Lead Counsel**

"The PSLRA provides that the lead plaintiffs shall, subject to Court approval, select and retain counsel to represent the class they seek to represent." *Hospira, Inc.*, 2012 WL 1339678, at \*9 (citing 15 U.S.C. § 78u–4(a)(3)(B)(v)); see also *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015) ("The PSLRA vests authority in the lead plaintiff to select lead counsel, subject to approval by the Court." (citing 15 U.S.C.A. § 78u-4(a)(3))). The AP7/Union Group has selected and retained Kessler Topaz and Bernstein Litowitz to serve as lead counsel.

The NYC Fund challenges the AP7/Union Group's choice of co-lead counsel, arguing that the choice of two law firms to serve as co-lead counsel inevitably will lead to duplication of work and excess fees. "[T]he Court should not disturb the lead plaintiff's choice of class counsel unless 'necessary to protect the interests of the class.' " *Id.* (quoting *In re Nortel Networks Corp.*, 2002 WL 1492116, at \*1 (S.D.N.Y. Feb. 4, 2002) (internal quotation marks omitted)). Although courts have rejected requests to appoint more than one law firm to act as lead counsel when doing so was necessary to protect the interests of the class, see, e.g., *id.* (rejecting request to appoint co-lead counsel where the lead plaintiff initially determined that one law firm was sufficient and there

2019 WL 4958238

was no reason to disturb that initial assessment at the risk of additional costs); *Weltz v. Lee*, 199 F.R.D. 129, 134 (S.D.N.Y. 2001) (rejecting proposal to appoint one law firm as lead counsel and chair of an executive committee, other law firms to serve as members of the executive committee (with one of those firms also serving as liaison counsel) and fifteen other law firms as proposed executive committee members). Here, there is no indication that rejection of the AP7/Union Group's choice of co-lead counsel is necessary to protect the interests of the class in this case. Even the cases cited by the NYC Fund note that more complex legal representation might be appropriate in more complex cases. *Weltz*, 199 F.R.D. at 134 ("The instant action, in contrast [to cases approving more complex counsel appointments], involves a single misrepresentation in connection with a single transaction and is not so unduly complex as to justify such a structure."). This case is not so simple as to justify disturbing lead plaintiff's choice of lead counsel.

 **\*12** Given the extensive experience both of these firms have in the area of securities law, the Court approves them as co-lead counsel in this case. The Court recognizes, of course, its responsibility to carefully scrutinize any fee award sought in this case by co-lead counsel. See 15 U.S.C. § 78u–4(a)(6) (limiting the total award of attorneys' fees and expenses to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); see also *Hospira*, 2012 WL 1339678, at \*9 ("The parties are on notice, however, that the Court will carefully scrutinize any proposed fee award and will not hesitate to reject such an award if it proves to be unreasonable, especially given that two counsel are being appointed as lead counsel." (citations omitted)); *In re Sprint Corp. Sec. Litig.*, 164 F. Supp. 2d 1240, 1244 (D. Kan. 2001) ("Co-lead counsel are hereby on notice that the court will not approve any possible award of fees and expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the two firms."). And the Court certainly will do so in this case. Consistent with the foregoing discussion, the Court appoints Kessler Topaz and Bernstein Litowitz to serve as co-lead counsel.

### F. Motions to Seal and Motion for Discovery

The NYC Fund filed a motion [103] to seal certain portions of its reply brief in support of its appointment as lead plaintiff. In support of that motion, the NYC Fund contends that its reply brief includes financial data beyond that mandated to be disclosed by the Private Securities Litigation Reform Act. The NYC Fund further contends that the information constitutes confidential trade secrets, proprietary business information, and non-public client information concerning the NYC Fund's finances and trading. The redacted materials were provided in response to the argument by the AP7/Union Group that the NYC Fund lacks standing to assert claims on shares purchased through commingled funds.

The AP7/Union Group in turn moved for discovery on that issue. [See 106.] The AP7/Union Group also filed a motion [112] to seal its memorandum [108] in support of that motion [106]. In that motion, however, the AP7/Union Group indicates that it is filing its memorandum under seal only because it references the materials that the NYC Fund filed under seal. [See 112, at ¶ 1.] The AP7/Union Group also filed a motion [114; 115] for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief. The AP7/Union Group also filed a motion to seal its motion [117] for leave to file a sure-reply only because it referenced materials that the NYC Fund filed under seal. The NYC Fund then filed its response [123; 124] to AP7/Union Group's motion for discovery along with a motion [125] for leave to file under seal. The AP7/Union Group also filed a motion [129] to seal its reply in support of its motion for discovery. The Arca/Krupa Group filed a memorandum [119] in support of the AP7/Union Group's motion to conduct limited discovery. In that memorandum, the Arca/Krupa Group notes, however, that the motion for discovery becomes moot if the Court determines that merger shares should not be included in the NYC Fund's losses. [119, at 3.]

The NYC Fund then filed a motion [130] to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019. The AP7/Union Group filed its response [132; 133] and a motion to seal its response [134].

The Court begins by addressing the AP7/Union Group's motion for discovery [106]. The Court agrees with the Arca/Krupa Group's assertion that the motion for discovery becomes moot if the Court determines that merger shares should not be included in the NYC Fund's losses. [119, at 3.] "Discovery may be had on the issue of the adequacy of the presumed lead plaintiff only upon a showing of a reasonable basis for finding that the presumptive most adequate plaintiff cannot adequately represent the class." *Piven v. Sykes Enterprises, Inc.*, 137 F. Supp. 2d 1295, 1307 (M.D. Fla. 2000) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iv)).

2019 WL 4958238

As discussed above, if the NYC Fund's merger shares are excluded from the loss calculation, the NYC Fund is not the presumed lead plaintiff. Accordingly, the Court denies the AP7/Union Group's motion [106] for discovery.

**\*13** The Court in turn denies the NYC Fund's motion to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019 [130] as moot because the NYC Fund presented the document in connection with the motion for discovery. The Court also denies the AP7/Union Group's motion for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief [114; 115] as moot because the sur-reply is not necessary to the Court's resolution of the competing motions.

That leaves the remaining motions [103; 112; 117; 125; 129; 134] to seal. As noted above, although the AP7/ Union Group filed some of these motions to seal, they only did so because their submissions included materials that the NYC Fund contends should remain under seal. Specifically, the NYC Fund seeks to seal materials purporting to contain information that constitutes confidential trade secrets, proprietary business information, and non-public client information concerning the NYC Fund's finances and trading. The NYC Fund also seeks to seal materials purporting to contain privileged information.

Both the Federal Rules of Civil Procedure and this Court's Local Rules permit the filing of documents under seal for "good cause." See Fed. R. Civ. P. 26(c)(1); N.D. Ill. L.R. 26.2(b). Although sealing is permitted under circumstances, the Seventh Circuit has described "[t]he public's right of access to judicial records" as "fundamental to a democratic state" and that the "presumption [of public access] is of constitutional magnitude." *Matter of Cont'l Ill. Sec. Litig.,* 732 F.2d 1302, 1308 (7th Cir. 1984). The Court therefore has an "obligation to determine whether good cause exists to seal documents, or portions thereof, from the public record." *Camilotes v. Resurrection Healthcare,* 2012 WL 2192168, at *4 (N.D. Ill. June 14, 2012) (citing *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999)). The "property and privacy interests" of litigants can override the public's "interest in what goes on at all stages of a judicial proceeding" only when the litigants' interests "predominate in the particular case." *Citizens First Nat. Bank of Princeton,* 178 F.3d at 945. "If there is any doubt as to

whether the material should be sealed, it is resolved in favor of disclosure." *In re Bank One Sec. Litig.,* 222 F.R.D. 582, 586 (N.D. Ill. 2004).

To the extent that the NYC Fund's redactions are made to protect investment strategies beyond strategies that are common industry knowledge, the Court agrees that sealing the NYC Fund's unredacted submissions may be appropriate. However, after an initial review of the materials redacted, the Court is not satisfied that the NYC Fund's redactions are so limited. The Court recognizes that the NYC Fund only redacted a small portion of its submissions, but that does not relieve the Court of its obligation to determine whether good cause exists to seal those portions of the NYC Fund's submissions. Although the Court leaves open the possibility that there is good cause to seal portions of the NYC Fund's submissions (*e.g.*, portions of the declaration of Alan H. Kleinman discussing strategies), some of the redactions clearly are not supported by good cause. For example, the NYC Fund asserts that only $2,140,327 of its claimed losses are losses from comingled accounts. The Court also questions whether broad and well-known investment strategies—such as whether a certain strategy results in economies of scale —should be sealed under the good cause standard. Given the number of pending motions to seal—and the fact that the NYC Fund also seeks to file documents under seal on privilege grounds—the Court will refer the remaining sealing issues to the assigned magistrate judge for resolution.

## IV. Conclusion

**\*14** For the reasons set forth above, the Court consolidates the above-captioned cases. The Court further grants the lead plaintiff motion of the AP7/Union Group [57] and approves the selection of Kessler Topaz Meltzer & Check, LLP and Bernstein Litowitz Berger & Grossmann LLP as co-lead counsel. The Court denies the remaining lead plaintiff motions [46; 49; 52; 61] in full. The AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply, and the NYC Fund's motion [130] to take judicial notice are denied as moot. The motions to seal [103; 112; 117; 125; 129; 134] will be referred to a magistrate. The case is set for further status on October 22, 2019 at 9:00 a.m.

## All Citations

Slip Copy, 2019 WL 4958238

2019 WL 4958238

## Footnotes

1    Although Movants Timber Hill and the Chesson Group initially sought to be appointed lead plaintiff for all the above-captioned cases, they now only seek to be appointed lead plaintiff for derivatives investors. The Court addresses that request below.

2    The parties in this case have quantified their respective financial interests in terms of their approximate losses suffered. Although the NYC Fund also quantified its losses in terms of the other factors sometimes considered by courts, as noted above, approximate losses suffered is the most salient factor in assessing the lead plaintiff. Absent a compelling reason for focusing on the other factors considered by courts, the Court uses the approximate losses claimed by each of the remaining movants as the measure of each movant's respective financial interest. Furthermore, because the NYC Fund does not provide calculations of the remaining factors excluding merger shares, the Court is forced to use the losses analysis, as the Court will not independently adjust the movants' calculations.

3    The NYC Fund does not identify what additional discovery and/or expert testimony would be necessary for this analysis.

4    It certainly is counter-intuitive that Heinz would make a misleading or fraudulent statement that would artificially inflate the purchase price of Kraft.

5    Even if the Court were to include merger shares in its loss calculation, the Court would not appoint the NYC Fund as lead plaintiff under the facts of this case. Because such a substantial portion of the NYC Fund's claimed losses stem from merger shares, the Court concludes that the NYC Fund "is subject to unique defenses that render [it] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). As outlined in the briefs of the other Remaining Movants, claims based on merger shares will be susceptible to unique arguments. [See, *e.g.*, 146, at 9-12.] For example, Defendant may argue that investors who received merger shares actually received a windfall through the merger, as the price of Kraft's stock skyrocketed following the announcement of the merger, and because Heinz also paid a special cash dividend to investors who purchased shares in the new company as a result of the merger. [*Id.* at 10; see also 86, at 13-15.] While the Court takes no position on the merits of these defenses at this time, they render the NYC Fund incapable of adequately representing the class. For this reason, the Court also concludes that the NYC Fund would not be an adequate representative of the class under Rule 23, as there is a substantial risk that it will become distracted by defenses unique to investors whose claims are based on merger shares to the detriment of the rest of the class. *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer."). The Court recognizes that other investors also have claims based on merger shares. However, given that most, if not all, of the allegedly misleading statements occurred after the merger, these claims are not at the heart of this lawsuit.

6    The Arca/Krupa Group states, "because of the anticipated size and complexity of this action, Arca Krupa believes that a co-lead structure that includes Arca Krupa and the AP7/Union Group would be the most beneficial to the class." [86, at 7.] The Court finds this request puzzling, as the Arca/Krupa Group argues that the AP7/Union Group itself should not be permitted to aggregate their losses. In any event, the Court rejects the request by the Arca/Krupa Group, as the Arca/Krupa Group and the AP7/Union Group already have determined that they have divergent strategies. [86, at 8 n.6.]

7    Because the NYC Fund and the AP7/Union Group do not provide loss calculations excluding merger shares and shares sold before the alleged fraud was revealed, the Court uses the loss calculations provided by the Arca/Krupa Group. [See 86, at 5.] According to the Arca/Krupa Group, the financial losses for each movant "was calculated by taking each movant's trading data and then, for each: (1) calculating the net cost of Kraft Heinz common stock purchased during the Class Period; (2) determining the net number of shares purchased during the Class Period that were retained as of February 21, 2019 (the "retained shares"); (3) calculating the movant's "current position" in Kraft Heinz by multiplying the number of retained shares by the average share

**Hedick v. Kraft Heinz Company, Slip Copy (2019)**

2019 WL 4958238

price of Kraft Heinz common stock between February 22, 2019, and April 24, 2019 ($32.72 per share); and (4) subtracting the net cost from the current position." [86, at 15.] Furthermore, "[e]xcluded from the financial loss calculations are those constituent funds of Union and the NYC Fund that were either net sellers or in-and-out traders during the Class Period." [*Id.*] The NYC Fund fails to explain why these calculations are improper, nor does the NYC Fund provide calculations of its own excluding merger shares (presumably recognizing that they do not have the largest financial interest in the relief sought by the class if such losses are excluded). The Court therefore must rely on the Arca/Krupa Group's calculations.

8      As discussed below, Movants submitted numerous post-briefing submissions relating to the NYC Fund's losses related to commingled funds. For the purposes of this analysis, the Court assumes that the NYC Fund can included such losses in its loss calculation. The NYC Fund contends that approximately $2,140,327 million of its losses are related to commingled funds. [98, at 14.] However, it is unclear to the Court whether and to what extent the loss calculation of the Arca/Krupa Group includes losses related to commingled funds. The Court also recognizes that the NYC Fund's $2.14 million calculation is based on the NYC Fund's overall loss calculation, which the Court has concluded is overstated. The Court therefore lists the NYC Fund's losses as a range from $2,988,660.00 (the Arca/Krupa Group's calculation) to $5,128,987 (the Arca/Krupa Group's calculation plus $2,140,327 million). Again, for the purposes of the Court's loss analysis, the Court assumes that the NYC Fund's losses are at the top of that range ($5,128,987.00).

9      The NYC Fund also notes that Kessler previously represented the Iron Workers Plan in connection with the Iron Workers complaint. However, the NYC Fund fails to explain why this shows that the AP7/Union Group is unable to exercise appropriate oversight of their counsel.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    14

**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICIA THIEFFRY, Derivatively and on Behalf of SYNCHRONOSS TECHNOLOGIES, INC., | : : : : : | **OPINION** |
| Plaintiff, | : : | Civil Action No.: 17-7173(FLW) |
| v. | : : : | |
| STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, KAREN L. ROSENBERGER, RONALD W. HOVSEPIAN, and JOHN FREDERICK, | : : : : : : : : | |
| Defendants, | : : | |
| -and- | : : | |
| SYNCHRONOSS TECHNOLOGIES, INC., | : | |
| Nominal Defendant. | : : : | |
| KIRK LAUGHLIN, Derivatively and on Behalf of SYNCHRONOSS TECHNOLOGIES, INC., | : : : : | |
| Plaintiff, | : : | Civil Action No.:17-9039(FLW) |
| v. | : : : | |
| STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, ROBERT E. GARCIA, LAWRENCE IRVING, KAREN L. ROSENBERGER, RONALD W. HOVSEPIAN, and JOHN FREDERICK, | : : : : : : : : : | |
| -and- | : : | |

SYNCHRONOSS TECHNOLOGIES, INC., :
                                  :
          Nominal Defendant.      :
                                  :
_____   :
LISA LEBOEUF, Individually and    :
on Behalf of SYNCHRONOSS          :
TECHNOLOGIES, INC.,               :
                                  :          Civil Action No.: 17-9766(FLW)
          Plaintiff,              :
                                  :
      v.                          :
                                  :
STEPHEN G. WALDIS, WILLIAM J.     :
CADOGAN, THOMAS J. HOPKINS,       :
JAMES M. MCCORMICK, and DONNIE    :
M. MOORE,                         :
                                  :
    -and-                         :
                                  :
SYNCHRONOSS TECHNOLOGIES, INC.,   :
                                  :
          Nominal Defendant.      :
                                  :
_____   :
LARRY A. COLTRANE, Derivatively and :
on Behalf of SYNCHRONOSS          :
TECHNOLOGIES, INC.,               :
                                  :
                                  :
          Plaintiff,              :          Civil Action No.:17-10062(FLW)
                                  :
      v.                          :
                                  :
STEPHEN G. WALDIS, WILLIAM J.     :
CADOGAN, THOMAS J. HOPKINS,       :
JAMES M. MCCORMICK, DONNIE M.     :
MOORE, KAREN L. ROSENBERGER,      :
RONALD W. HOVSEPIAN, and JOHN     :
FREDERICK,                        :
                                  :
    -and-                         :
                                  :
SYNCHRONOSS TECHNOLOGIES, INC.,   :
                                  :
          Nominal Defendant.      :
_____   :

2

**WOLFSON, United States District Judge:**

These four separate shareholder derivative lawsuits—*Thieffry v. Waldis, et al.*, Civ. No. 07173, *Laughlin v. Waldis, et al.*, Civ. No. 09039, *LeBoeuf v. Waldis, et al.*, Civ. No. 09766,[1] and *Coltrane v. Waldis, et al.*, Civ. No. 10062—arise out of claims accusing certain former and current officers and directors of Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss") of breaching their fiduciary duties by selling a profitable portion of the business to a company controlled by friends and family of Synchronoss insiders. Before the Court are motions filed by each of the four plaintiffs seeking to consolidate the related cases. In addition, Plaintiffs Patricia Thieffry and Kirk Laughlin move to be named Co-Lead Plaintiffs and request that the Court appoint their attorneys, The Rosen Law Firm. P.A. and Johnson Fistel, LLP, as Co-Lead Counsel. Plaintiff Larry A. Coltrane seeks to appoint his attorneys, Harwood Feffer LLP and Schnader Harrison Segal & Lewis LLP, as Co-Lead Counsel. Finally, Plaintiff Lisa LeBoeuf moves to appoint Block & Levitan, LLP as Lead Counsel and Gardy & Notis LLP as Liaison Counsel.

For the reasons set forth herein, the motions to consolidate are granted. LeBoeuf is appointed as Lead Plaintiff, the law firm of Block & Leviton, LLP is appointed as Lead Counsel, and the law firm of Gardy & Notis LLP is appointed as Liaison Counsel.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts relevant to the present motions, as alleged by Plaintiffs in their Complaints, are as follows. Synchronoss is a Delaware-based provider of mobile services. Thieffry Compl. at ¶ 2. It operates an "Activation" business that provides mobile handset activation and network

---

[1] This matter was originally assigned to the Hon. Peter G. Sheridan, U.S.D.J. It was transferred to me in November 2017. *See* DKT # 11.

3

services to mobile phone carriers around the world. LeBoeuf Compl. at ¶ 4. Each of the Complaints name as defendants Synchnronoss Executive Chairman and CEO Stephen G. Waldis, as well as directors William J. Cadogan, Thomas J. Hopkins, James M. McCormack, and Donnie M. Moore, and Synchronoss as a nominal defendant. Coltrane Compl. at ¶¶ 15–20; Laughlin Compl. at ¶¶ 24–29; LeBoeuf Compl. at ¶¶ 19–24; Thieffry Compl. at ¶¶ 29–51. In addition, the Thieffry, Laughlin, and Coltrane Complaints name as defendants former Synchronoss Executive Vice President and Chief Financial Officer Karen L. Rosenberger, former CEO and director Ronald W. Hovsepian, and former Chief Financial Officer John Frederick. Coltrane Compl. at ¶¶ 21–23; Laughlin Compl. at ¶¶ 32–34; Thieffry Compl. at ¶¶ 52–59. The *Laughlin* Complaint additionally names as defendants Synchronoss Chief Financial Officer Lawrence Irving and President and Chief Operating Officer Robert E. Garcia. Laughlin Compl. at ¶¶ 30–31.[2]

Plaintiffs' allegations stem from the December 2016 sale of 70% of Synchronoss' Activation business to a company called Sequential Technology International, LLC ("Sequential"). Plaintiffs contend that Defendants failed to disclose that Sequential "was merely an alias for an entity called Omniglobe USA," a company with "extensive ties" to Synchronoss, namely that 50% of its ownership is comprised of "friends and family of Synchronoss." Coltrane Compl. at ¶ 5. Following the sale, when Synchronoss filed its annual form 10-K with the Securities and Exchange Commission ("SEC") on February 27, 2017, it disclosed that it had recognized $9.2 million in previously undisclosed licensing revenue from an agreement that licensed Synchronoss' analytics software to Sequential. Thieffry Compl. at ¶ 6. According to Plaintiffs, Synchronoss would not have achieved its revenue goals but for this licensing agreement. *Id.* In April of 2017, however, Synchronoss announced that it would in fact fall $13-

---

[2] The Court will refer to all of the named defendants as "Defendants" in this Opinion.

4

14 million short of its revenue goals, causing the company's stock price to drop nearly 50%. *Id.* at ¶¶ 8–9. Synchronoss ultimately announced that it would need to restate revenue for the three-year period ended December 31, 2016. LeBoeuf Compl. at ¶ 4.

The four derivative actions were filed in this Court on behalf of the corporation, alleging various claims related to Defendants' alleged breaches of their fiduciary duties. Plaintiff Thieffry first filed a Complaint on September 15, 2017, and Plaintiff Laughlin commenced his action on October 24, 2017. Plaintiffs LeBoeuf and Coltrane soon followed, filing Complaints on October 27, 2017 and October 30, 2017 respectively. There is also a related securities class action pending before this Court, *In Re Synchronoss Technologies, Inc. Securities Litigation*, Civ. No. 3:17-cv-02978.

Prior to filing her Complaint, Plaintiff LeBoeuf issued a pre-suit books-and-record demand pursuant to Section 220 of the General Corporation Laws of the State of Delaware ("Section 220"), receiving a 625-page production from Synchronoss on which she based a portion of her Complaint. *See, e.g.*, LeBoeuf Compl. at ¶¶ 70–89. On November 27, 2017, this Court granted Plaintiff Thieffry's Motion to Stay the *Thieffry* action in exchange for Synchronoss' agreement to "1) include Plaintiff Thieffry in any mediation with securities plaintiffs or plaintiffs in related derivative actions; and 2) to provide Plaintiff Thieffry with copies of documents produced to plaintiffs in [the securities class action], to any plaintiffs in any related derivative lawsuits, or to any purported Synchronoss shareholder in response to a related books and records request." ECF No. 20 at 7–8.

Soon after the Complaints were filed, each Plaintiff filed a motion to consolidate and an application to appoint lead plaintiff and counsel.

5

## II. **MOTIONS TO CONSOLIDATE**

Rule 42(a) of the Federal Rules of Civil Procedure allows consolidation of two or more actions that involve common questions of law and fact. *See also Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 103 n. 3 (3d Cir. 1988) (consolidation is appropriate where there are actions involving common questions of law or fact); *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 454 (D.N.J. 2000) (same) (citations omitted); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 80 (D.N.J. 1993) ("Rule 42(a) gives the [D]istrict [C]ourt 'broad powers to consolidate actions involving common questions of law or fact if, in its discretion, such consolidation would facilitate the administration of justice.'").

Here, all of the plaintiffs agree, and Defendants have not opposed, that the four individual cases should be consolidated. Indeed, there is no dispute that these cases involve common (although not identical) questions of law and fact. Each action was filed by a Synchronoss shareholder on behalf of the company, and they each share most of the same defendants. They all present overlapping facts and claims related to the sale of Synchronoss' Activation business to Sequential, and the resulting drop in stock price and financial restatements. Accordingly, all four civil actions will be consolidated for trial purposes.

## III. **MOTIONS TO APPOINT LEAD COUNSEL**

Next, each of the plaintiffs moves to appoint lead counsel. While the Third Circuit has not required the appointment of lead counsel in shareholder derivative litigation, courts have generally agreed that doing so enables the efficient management of the action. *See MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958) (An order consolidating such actions during the pre-trial stages, together with the appointment of a general counsel may in many instances prove the only effective means of channeling the efforts of counsel.); *KBC Asset Mgmt. NV on behalf of*

*Chemed Corp. v. McNamara*, 78 F. Supp. 3d 599, 608 (D. Del. 2015) (appointing lead and liaison counsel in consolidated derivative action); *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849, 2006 WL 3761986, at *2 (E.D.N.Y. Sept. 22, 2006) (appointing lead counsel in consolidated derivative action). I find appointing Lead Counsel in this case appropriate.

Although there is neither statutory nor controlling case law to guide the Court in selecting lead counsel, Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1") requires that a plaintiff in a derivative action "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23. 1. Courts differ in their approach in implementing this rule, but their inquiry nonetheless focuses on the competence of counsel, and significantly, the quality of counsel's legal representation in the litigation. Three factors are particularly relevant to this determination: 1) the quality of the pleadings, 2) the vigorousness of the prosecution of the lawsuits, and 3) the capabilities of counsel. *See In re Comverse*, 2006 WL 3761986, at *2. Appointing lead counsel is in the sound discretion of the court. *Resnik v. Woertz*, 774 F. Supp. 2d 614, 625 (D. Del. 2011); *see Berg v. Guthart*, No. 14-00515, 2014 U.S. Dist. LEXIS 105357, at *8 (N.D. Cal. July 30, 2014); *see also Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1989); *Berkowitz ex rel. Affymetrix, Inc. v. Fodor*, No. 06-05353, 2006 U.S. Dist. LEXIS 96065 (N.D. Cal. Nov. 20, 2006); *Millman ex rel. Friedman's, Inc. v. Brinkley*, No. 03-3831, 2004 U.S. Dist. LEXIS 20113 (N.D. Ga. Oct. 1, 2004)); *Brown v. Kelly*, No. 06-04671, 2006 U.S. Dist. LEXIS 89162 (N.D. Cal. Nov. 27, 2006).

Before turning to these factors, the Court will briefly address Plaintiffs Thieffry and Laughlin's contention that Plaintiff Coltrane lacks standing, thus disqualifying his counsel from being appointed. Pursuant to Rule 23.1, a plaintiff in a derivative suit (1) must be a stockholder

at the time of the suit, and (2) must have been a stockholder at the time of the wrong of which he complains. *In re Pittsburgh & L. E. R. Co Sec. & Antitrust Litig.*, 1065 (3d Cir. 1976). Although the Court need not determine Coltrane's Article III standing on a motion to appoint lead counsel, Thieffry nevertheless argues that Coltrane lacks standing because he failed to specify in his Complaint the period of his Synchronoss stock ownership. In response to the argument, Coltrane submitted a certification, under penalty of perjury, attesting to the fact that he purchased the Synchronoss stock on April 4, 2016, and that he would amend the Complaint to reflect that date. ECF No. 10 at ¶¶ 3–4. Based on this filing, I will consider Coltrane's lead counsel application, since he held Synchronoss stock during the relevant period, i.e., in late 2016 and early 2017. *See, e.g., Conrad v. Blank*, 940 A.2d 28, 41 (Del. Ch. 2007) (noting that even though "Delaware courts strictly interpret the contemporaneous ownership rule" they "acknowledge that that some transactions that are attacked in complaints continue over a period of time and that persons who buy shares during that time have standing to sue").

Next, the Court turns to each of the factors.[3]

### 1. Quality of the Pleadings

The quality of the pleadings can be helpful in forecasting which firm would best represent the interests of the shareholders and the rights of the corporation. The focus here is on counsel's efforts in drafting an adequate complaint that would advance shareholders' interests, not whether one's claims are superior to another's. *See In re Comverse*, 2006 WL 3761986, at

---

[3] In addition to these factors, Coltrane argues that his proposed liaison counsel, Schander Harrison Segal & Lewis, should be selected, because that firm has extensive knowledge of practicing in the District of New Jersey. While I acknowledge that such expertise is helpful in litigating in this district, neither the factors nor decisions in this area have placed any relevance on this particular expertise. As such, I do not find this fact probative in the selection of lead counsel.

Case 3:17-cv-07173-LW-LHG Document 21 Filed 05/24/19 Page 9 of 19 PageID: 456

*4. The "more comprehensive" the allegations, the better they can advance shareholder interests. *Id.*

Each of the complaints filed in this action is lengthy and extensive, providing evidence that any counsel the Court chooses would represent shareholders' interests in the consolidated derivative suit. However, one key factor sets apart the *LeBoeuf* Complaint: it contains allegations drawn from its Section 220 demand on Synchronoss, and thus include non-public information. For instance, although each of the complaints allege that Selection—the company to which Synchronoss sold its Activation business—was controlled by friends and family of Synchronoss insiders, the *LeBoeuf* Complaint, alone, actually identifies these purported friends and family members and explains their connections to Defendants. The other complaints, in contrast, rely solely on publicly available information, such as an article from the Southern Investigative Reporting Foundation disclosing that Activation had been sold to a company comprised of "friends of family." While such an allegation is not evidence of inadequate lawyering at this stage of the litigation, the lack of effort to obtain available relevant information regarding their claims suggests, at the least, that the other firms had not pursued this case with the same zeal as Block & Levitan.

Plaintiffs also criticize each other for using words and phrases that may subject the pleadings to heightened scrutiny. LeBoeuf takes aim at the other complaints for including allegations that will purportedly be subject to the defendant-friendly business judgment rule as opposed to plaintiff-friendly "entire fairness" review. Coltrane similarly contends that Thieffry and Laughlin unnecessarily assert claims under the Securities and Exchange Act that would heighten Plaintiffs' burden. At this stage, however, the Court need not evaluate the types of claims that these plaintiffs have brought, because it only demonstrates how each counsel views

9

the trajectory of his/her case. *See In re Comverse Tech.*, 2006 WL 3761986, at *4 (noting that "[a]t best the purported deficiencies show that each counsel views the case differently or has made tactical decisions on the best course for litigation"). Thus, the Court finds these criticisms not particularly relevant in the determination of lead counsel; ultimately, any purported deficiencies can be cured with the filing of a consolidated derivative complaint.

In sum, this factor weighs in favor of Plaintiff LeBoeuf given her detailed allegations based on the books-and-records demand.

### 2. Vigorousness of the Prosecution

Each Plaintiff stresses that he or she has expended significant effort in filing suit, and there is not doubt that any of the proposed counsel will prosecute the case with a certain degree of vigor. With that said, LeBoeuf contends that her counsel has demonstrated exceptional vigor because it was the only firm that issued a books-and-records demand and then obtained a 625-page production that underlies a substantial portion of her Complaint. Thieffry responds that this distinction is "academic" because Defendants "specifically confirmed that they would provide Rosen Law with the documents produced in response to the 220 demand" and thus, she would be filing a consolidated amended complaint containing allegations based on the same documents. ECF No. 12 at 8. Coltrane entered into no such agreement but claims that he "considered and ultimately rejected seeking a Chapter 220 production" because forcing Synchronoss "to incur the additional expense and legal fees necessary to response [sic] to such a request" was unnecessary "because of the existing wealth of public information." ECF No. 14 at 4.

The Court finds that the decision of LeBoeuf's counsel to obtain documents through a books-and-records demand elevates its efforts above the other firms. Although such a demand is not strictly necessary in the context of a derivative suit, LeBoeuf is correct that doing so is

10

preferred. *See, e.g.*, *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 580 (D.N.J. 2011) (noting that numerous courts have explained that it is in the best interest of all parties and the court for plaintiffs to seek copies of corporate records prior to filing a demand-futility shareholder derivative action). That only LeBoeuf's counsel had the foresight to seek these records suggests that it will continue to zealously protect the interests of shareholders.

LeBoeuf also claims that Thieffry's agreement to stay her case in exchange for the opportunity to mediate and to receive documents produced in related actions demonstrates counsel's lack of vigor. The Court appreciates that litigation strategy rather than indolence likely influenced this decision, and, as such, will not penalize counsel for its strategic maneuvers. Still, as already discussed, because LeBoeuf alone sought and obtained records by pre-suit demand, Thieffry's agreement to only receive documents obtained through the efforts of others undermines the litigation efforts of Thieffry's counsel in this context.

Finally, Thieffry and Laughlin for their part contend that their expeditiousness in filing suit before LeBoeuf or Coltrane should weigh in their favor. The New York state court decision upon which Thieffry relies for this proposition, however, evaluated "priority in instituting suit" only *after* determining that each counsel would prosecute the case with equal vigor. *Sollins v. Alexander*, No. 601272/2006, 2006 N.Y. Misc. LEXIS 2289, at \*11 (Sup. Ct. July 13, 2006). Here, because other factors favor LeBoeuf, the Court does not find that the fact that Thieffry and Laughlin raced to the courthouse tips this factor in their favor.

### 3. Capabilities of Counsel

The Court has reviewed the qualifications of all of the proposed counsel and is impressed with the experience and capabilities of each. Each counsel might have slightly different strengths, but "it is difficult to say which strengths will be most important in this case." *KBC*

11

*Asset Mgmt.,* 78 F. Supp. 3d at 608.  Further, "[n]o firm…has suggested a definitive template with which to measure experience and effectiveness, and moreover it is difficult to contemplate one." *In re Comverse,* 2006 WL 3761986, at *3.

While I recognize that each counsel is well qualified, I am particularly persuaded by Block & Levitan's experience in large securities class actions, such as its representations of plaintiffs in *In re BP Securities Litigation*, Civ. No. 4:10-MD-02185 (S.D. Tex.), *In re Google, Inc. Class C Shareholder Litigation*, Civ. No. 7469-CS (Del. Ch. Ct.), and *In re Volkswagen "Clean Diesel" Marketing, Sales and Products Liability Litigation*, Civ. No. 3:15-md-02672 (N.D. Cal.). I find that the experience garnered from such representations will benefit the shareholders in this suit.  In that connection, I further find that Gardy & Notis, LeBoeuf's proposed Liaison Counsel, is also qualified to assume its role.

In sum, the Court finds that this factor slightly favors counsel for LeBoeuf. And, having weighed all relevant factors, the Court selects Block & Levitan as Lead Counsel and Gardy & Notis as Liaison Counsel.

## IV.    MOTION TO APPOINT LEAD PLAINTIFF

In addition to requesting that their attorneys be appointed Co-Lead Counsel, Plaintiffs Thieffry and Laughlin seek to be appointed as Co-Lead Plaintiffs.  On the other hand, LeBoeuf and Coltrane point out that the Court need not appoint lead plaintiff at this time because this is a derivative suit rather than a class action under the Private Securities Litigation Reform Act. However, both LeBoeuf and Coltrane seek lead plaintiff status should the Court exercise its discretion to appoint a lead.  At the outset, I note that although these are derivative actions, I find that appointing a lead plaintiff helpful "in order to create an efficient case-management structure."  *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-1854, 2017 U.S. Dist. LEXIS

12

67533, at *32 (D. Del. Apr. 25, 2017); *N Miami Beach Gen. Employees Retirement Fund v. Parkinson*, No. 10-6514, 2011 U.S. Dist. LEXIS 71736, at *3 (N.D. Ill. July 5, 2011).

Here, each plaintiff was an individual investor, and as such, they all stand on equal footing. In that regard, I reject Thieffry and Laughlin's argument that their larger economic stake in the company should afford them Co-Lead Plaintiff status. See 7C Wright & Miller Fed. Prac. & Proc. Civ. § 1833, 1841 (1986) (noting that considerations focused on the shareholder's personal stake in the company "do[ ] not apply in a derivative suit…. Because the derivative suit is brought to enforce the corporation's right and the stockholders will benefit only indirectly… the dollar amount or numbers of representatives involved should not be relevant."). Rather, having considered the record, I find LeBoeuf is the most adequate lead plaintiff for many of the same reasons why her counsel is selected as lead — namely, the vigorousness with which she has prosecuted the case thus far, as evidenced by the Section 220 demand. As such, LeBoeuf is appointed as lead plaintiff.

## V.     **CONCLUSION**

For the foregoing reasons, the Court will consolidate the four actions into a single derivative action and will appoint LeBoeuf as Lead Plaintiff, Block & Leviton as Lead Counsel, and Gardy & Notis as Liaison Counsel.

Dated:  May 24, 2018                                          /s/ Freda L. Wolfson
                                                                          Hon. Freda L. Wolfson
                                                                          United States District Judge

13