2019 WL 3252221
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Chase MORTIMER, Plaintiff,
v.
DIPLOMAT PHARMACY
INC., et al., Defendants.

No. 19 C 1735
|
Signed 07/19/2019

**Attorneys and Law Firms**

Marvin Alan Miller, Lori Ann Fanning, Miller Law LLC, Chicago, IL, for Plaintiff.

James Wallace Ducayet, Nilofer Ibrahim Umar, David Allan Geiger, Sidley Austin LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Hon. Virginia M. Kendall, United States District Judge

 **\*1** This is a securities class action against Diplomat Pharmacy, Inc., ("Diplomat"), Brian T. Griffin, Jeffrey Park, Joel Saban, and Atul Kavthekar (collectively, "Defendants"). Two movants now seek appointment as lead plaintiff and lead counsel in this matter: Arsany Girgis [Dkt. 27] and the Iron Workers Local No. 25 Pension Fund (the "Pension Fund" or the "Fund") [Dkt. 26]. For the reasons set forth below, the Court grants the Pension Fund's motion for appointment as lead plaintiff [Dkt. 26] and approves its selection of Robins Geller Rudman & Dowd LLP ("Robins Geller") as lead counsel. The Court denies Girgis's motion [Dkt. 27] and dismisses Eugene Klabak's motion [Dkt. 21] as moot.

**I. Background**

Defendant Diplomat provides specialty pharmacy services. In 2017, Diplomat entered the Pharmacy Benefit Management ("PBM") business by acquiring National Pharmaceutical Services ("NPS") and LDI Integrated Pharmacy Services ("LDI"). Three complaints were filed and eventually consolidated before this Court. (*See* Dkt. 42.) The complaints

generally allege that Defendants violated federal securities laws by making false or misleading statements and failing to disclose key facts about the integration and growth of Diplomat's PBM business, the LDI and NPS acquisitions, impending impairment charges to its PBM business, and the nature of its preliminary 2019 full-year outlook. *See* Dkt. 1 ¶ 34; *see also* Dkt. 1, No. 19 C 2635 ("*Prentice* Compl.") ¶ 26; Dkt. 1, No. 19 C 2631 ("*Riehm* Compl.") ¶ 26. On November 6, 2018, Diplomat announced its financial results for the third quarter ending September 30, 2018 and Defendants attributed its "solid" results to its ability to "successfully execute on [its] growth plan" and "strong ... PBM performance." Dkt. 1 ¶ 24; *Prentice* Compl. ¶24; *Riehm* Compl. ¶24. The corrective statements and disclosures at issue in the complaints are discussed in further detail below.

There were originally five movants seeking appointment as lead plaintiff. Alexander Virgili withdrew his motion before the Court entered a briefing schedule on the movants' motions. (Dkt. 37, 42.) On May 15, 2019, Feihua Xu and Frank Mazur filed a notice of non-opposition to the Pension Fund's motion for appointment as lead plaintiff. (Dkt. 51.) The same day, Eugene Klabak filed a notice of non-opposition to the competing motions. (Dkt. 50.) Only Girgis and the Fund now remain.

**II. Legal Standard**

The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides guidelines for the appointment of a lead plaintiff in a securities class action case. The PSLRA requires that the Court "appoint as a lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members[.]" 15 U.S.C. § 78u–4(a)(3)(B)(i). The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the "person or group of persons" who "has either filed the complaint or made a motion in response to a notice," "has the largest financial interest in the relief sought by the class," and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted, however, if a member of the purported class establishes that the "presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). The PSRLA further provides that the "most adequate plaintiff shall,

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

Mortimer v. Diplomat Pharmacy Inc., Slip Copy (2019)

2019 WL 3252221

subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

## III. Discussion

### a. Largest Financial Interest

 *2  The PSLRA presumes that the most adequate plaintiff is the one who, in addition to satisfying other requirements, has the largest financial interest in the relief sought by the class. "The largest financial interest provision seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff.' The PSLRA, however, does not specify how courts should measure the largest financial interest in the relief sought by the class." Chandler v. Ulta Beauty, Inc., No. 18 CV-577, 2018 WL 3141763, at *2 (N.D. Ill. June 26, 2018) (internal citations and quotations omitted). Most courts consider: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered." Id. (citing Lax v. First Merch. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).

The movants agree that the fourth factor, approximate losses suffered, is most important for determining a moving party's financial interest, but they disagree about how losses should be calculated here. In his opening brief, Girgis claimed $156,079.32 in losses. (Dkt. 29 at 6; Dkt. 31-1, 31-2.) He later filed a corrected certification and corrected loss analysis adjusting his claimed losses to $130,006.90. (Dkt. 45-46, Dkt. 53 at 4-5.) Though the Pension Fund takes issue with the propriety of Girgis having filed a corrected certification and adjusted loss amount, it does not dispute Girgis's adjusted claimed losses of $130,006.90.

The Pension Fund claims $220,005.61 in losses. Girgis argues that the Fund actually suffered no compensable losses and has no financial interest in the case because it is an "in-and-out trader," having purchased and sold all its shares before the alleged fraud was revealed for the first time. Girgis argues that the Court should apply the Dura loss causation standard at this stage and find that the complaints do not allege that Defendants caused the Fund's losses and that the Fund thus has no financial interest in the case and should not be appointed lead plaintiff. (Dkt. 53 at 7-10) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345-46 (2005)). The Fund argues that the Court should not apply Dura at the lead-plaintiff stage, but that even if it does, the Fund still has a larger financial interest than Girgis because it sold its shares after a partial corrective disclosure and its claimed losses remain $220,005.61 even if Dura applies.

Some courts consider loss causation when appointing a lead plaintiff under the PSLRA. See, e.g., Chandler, 2018 WL 3141763, at *4 (excluding losses incurred before corrective disclosures from movant's financial interest calculation); In re Bally Total Fitness Sec. Litig., 2005 WL 627960, at *6 (N.D. Ill. March 15, 2005) (finding that presumptive lead plaintiff status was rebutted where in-and-out trader would be required to devote significant time and attention to loss causation issues); Pelletier v. Endo International PLC, 2018 WL 3035745, at *2 (E.D. Pa. June 19, 2018) (holding that losses incurred before any disclosures could not have been caused by the disclosures and should not be included in the " 'largest financial interest' calculus"); Sallustro v. CannaVest Corp., 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("Therefore, when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures.")

The Pension Fund argues that the Court should consider losses calculated on a LIFO (last in, first out) and FIFO (first in, first out) basis rather than Girgis's proposed "compensable damages" methodology because Girgis relied on the former method in his opening brief and only switched to the latter method after learning that the Fund's claimed losses were larger than his. There are some courts that frown upon a movant switching theories midstream after it learns it is not the top dog. See, e.g., Chandler, 2018 WL 3141763, at *3 n.5 ("Indeed, courts have rejected proposals to alter a proposed loss calculation method made after it was apparent that the proponent of the change would not have the largest financial interests under the initially proposed method."); Constr. Workers Pension Tr. Fund v. Navistar Int'l Corp., 2013 WL 3934243, at *3 (N.D. Ill. July 30, 2013) ("It was only after Retirement Funds discovered that it did not have the largest loss amount when compared to other Plaintiffs that Retirement changed its position in later filings as to the proper loss calculation, seeking to exclude pre-June 7, 2012 losses."); Cook v. Allergn PLC, 2019 WL

Mortimer v. Diplomat Pharmacy Inc., Slip Copy (2019)

2019 WL 3252221

1510894, at *3 (S.D.N.Y. Mar. 21, 2019) ("The fact that DeKalb used the same methodology as BRS in its original moving papers—only to alter its calculation when it learned that someone else had a larger loss—lends validity to the conclusion that the impact of *Dura* on the proposed lead plaintiffs' loss calculations is at best uncertain, and so should be discounted.")

**\*3** Ultimately, the Court need not determine whether it is appropriate to apply *Dura's* loss causation standard at this stage, because Girgis's loss causation argument relies on an overly technical reading of the complaints that is simply not consistent with the allegations. There are three alleged disclosures at issue in this case. The first happened on November 6, 2018, when Defendants revealed that Diplomat expected to lose roughly $200 million in revenue, 4% of total enterprise revenue, in its PBM business due to client losses. (Dkt. 1 ¶ 26; *see also Prentice* Compl. ¶ 24; *Riehm* Compl. ¶ 24.)[1] After this news, the price of Diplomat's common stock fell by 27%. (Dkt. 1 ¶ 27.) The second disclosure happened on January 7, 2019, when Diplomat issued a press release announcing lower than expected revenue for 2018 and announcing the departure of two senior executives. (Dkt. 1 ¶¶ 28-31; *see also Prentice* Compl. ¶ 25; *Riehm* Compl ¶ 25.)[2] Following this news, the price of Diplomat shares fell by 10.5%. (Dkt. 1 ¶ 33.) Finally, the third happened on February 22, 2019, when Diplomat filed a Form 8-K postponing its Form 10-K filing for fiscal year 2018 because it needed to record a non-cash impairment charge of approximately $630 million relating to its 2017 PBM acquisitions. (Dkt. 1 ¶ 35; *Prentice* Compl. ¶ 27; *Riehm* Compl. ¶ 27.) Following the 8-K filing and Diplomat's related press release, the share price fell by 56%. (Dkt. 1 ¶ 36; *Prentice* Compl. ¶ 28; *Riehm* Compl. ¶ 28.)

The Pension Fund sold all its shares by December 19, 2018 —*i.e.*, after the first alleged disclosure but before the second and third. (*See* Dkt. 26-3.) Despite this, Girgis argues that the Fund actually sold all its shares before *any* corrective disclosure had taken place. (*See* Dkt. 53 at 8, Dkt. 54 at 4-6.) Girgis does not argue that the November 2018 statements do not actually constitute a corrective disclosure or that the statements are absent from the *Mortimer* complaint. Instead, in support of his argument, Girgis cites a single paragraph of the *Mortimer* complaint that omits the date of the first disclosure. (*See* Dkt. 1 ¶ 39.) This paragraph alleges that Defendants' fraud first became known to the market on January 6, 2019—seemingly ignoring the first alleged disclosure in November 2018—which then led to

the plaintiffs' losses. (*Id.*) According to Girgis, this omission in paragraph 39 apparently negates the November 2018 disclosure allegations altogether and prevents the Fund from being able to show that the November 2018 disclosure caused its losses. Girgis's proposed reading of the complaint defies logic. The Complaint plainly alleges that on November 6, 2018, Defendants revealed that Diplomat expected to lose $200 million in revenue in its PBM business and that the revelation caused a 27% drop in the stock price. (Dkt. 1 ¶¶ 26-27.) To prove loss causation, a plaintiff must show that "the defendant's actions had something to do with the drop in value." *Ray v. Citigroup Global Markets*, 482 F.3d 991, 994-95 (7th Cir. 2007) (citing *Dura*, 544 U.S. at 342-43.) That is precisely what the *Mortimer* complaint alleges in paragraphs 26 and 27. Because the November 2018 date is omitted in paragraph 39, Girgis asks the Court to ignore those allegations altogether. But the fact that another paragraph of the complaint fails to mention the date of the allegations does not render them nonexistent.

Because the Pension Fund sold its shares after the first of three alleged corrective disclosures, all of its claimed losses, $200,005.61, should be included in the Court's consideration of its financial interest in the case. Girgis claims $130,006.90 in losses, giving the Pension Fund the greatest financial interest in the relief sought by the class and establishing a rebuttable presumption that it should be lead plaintiff.

#### b. **Rule 23** Requirements

The PSLRA further provides that the lead plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) provides that a party may serve as a class representative "only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

**\*4** The typicality and adequacy elements are relevant to the appointment of a lead plaintiff. *Chandler*, 2018 WL 3141763, at *5 (citing *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira*, No. 11 C 8332, 2012 WL 1339678, at *8 (N.D. Ill. Apr. 18, 2012)). "[A] plaintiff's claims are typical if they 'arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.' " *Id.* (quoting

*Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)). "A lead plaintiff meets the adequacy requirement if (1) its claims are not antagonistic or in conflict with those of the class; (2) it has sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) it is represented by competent, experienced counsel who be able to prosecute the litigation vigorously." *Id.* (quoting *Hospira*, 2012 WL 1339678, at *8).

Girgis argues that the Fund does not satisfy the relevant Rule 23 requirements because its losses are based solely on the first of the three alleged disclosures. He points out that if the Court were to eventually find that the November 2018 statement did not constitute a disclosure of fraud, the Fund would be unable to show that any of its losses were proximately caused by Defendants' conduct and the entire case would be subject to dismissal. Even if the Court were to find the November 2018 statement to constitute a partial disclosure, Girgis argues that the Fund "has no interest in devoting resources" to pursuing the claims based on the second and third disclosures and thus has no incentive to fairly and adequately represent the interests of the entire class. In response, the Fund points out that Girgis's argument cuts against him as well, because he did not hold any stock at the time of the first and second alleged disclosures and his losses are based entirely on the third disclosure. The Fund also argues that it does not need to have standing to sue on every available claim to meet the Rule 23 requirements at this stage.

The cases Girgis relies on involve true in-and-out traders —*i.e.*, those who bought and sold all of their shares before *any* allegedly corrective information became public. *See Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 239-240 (E.D.N.Y. 2011) (denying lead plaintiff motion of in-and-out trader after finding that complaint did not allege facts sufficient to establish that statement qualified as partial disclosure of fraud); *In re Bally*, 2005 WL 627960, at *5 (denying lead plaintiff motion of in-and-out trader that "purchased and then sold all of its stock ... many months before the alleged fraud was first revealed"); *Ruland v. InfoSonics Corp.*, 2006 WL 3746716, at *5 (S.D. Cal. Oct. 23, 2006) (disregarding losses suffered before June 12, 2006 because "there does not appear to be *any* allegation that the truth began to leak out before" that date) (emphasis added). That is not the case for the Fund here, as discussed above, because it sold its shares after the first of three alleged corrective disclosures.

Still, Girgis argues that the Fund is not an adequate or typical plaintiff because it does not have an interest in pursuing losses

based on the second and third alleged disclosures. In *Navistar*, the court found that the movant with the largest financial interest in the case was nonetheless not an appropriate lead plaintiff because it sold all its shares after the first of three disclosures and thus "ha[d] no incentive to fairly and adequately protect the interests of the class as to later disclosures." *Navistar*, 2013 WL 3934342, at *5. But as other courts have noted, "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). The Fund is not inadequate or atypical solely because it can only show losses related to one of the three disclosures at issue here. To the extent there are concerns about the Fund's incentives to pursue losses related to the second and third disclosures, the Fund has represented that it will ensure that class representatives are added to the amended consolidated complaint to ward off loss causation challenges. (Dkt. 55 n.12.) Given its alleged losses, and its commitment to add class representatives whose losses derive from the second and third disclosures, the Fund has a substantial interest in the outcome of this case. Its injuries are based on the same legal theories and arise from the same set of events as the other class members in this case and its claims do not conflict with those of the rest of the class. The Fund has satisfied its burden of making a preliminary showing that it satisfies Rule 23's requirements for lead plaintiff purposes.

### c. The Fund's Chosen Counsel

**\*5** "The PSLRA provides that the lead plaintiffs shall, subject to Court approval, select and retain counsel to represent the class they seek to represent." *Hospira, Inc.*, 2012 WL 1339678, at *9 (citing 15 U.S.C. § 78u–4(a)(3)(B)(v)). Girgis argues that the Fund's chosen counsel, Robins Geller, suffers from a disqualifying conflict of interest because it also represents a different class of investors in a separate lawsuit against Diplomat. In that suit, Robins Geller represents a separate class of plaintiffs suing Diplomat and two individuals (who are not named as defendants here) for securities fraud based on separate conduct from a different time period than the one at issue here. *See Zimmerman v. Diplomat*, No. 16 C 14005 (E.D. Mich.); *see also* Dkt. 55 at 14. Robbins Geller has co-counsel in the *Zimmerman* matter, and the *Zimmerman* court entered an order preliminarily approving settlement on May 7, 2019. *See id.* at Dkt. 62.

2019 WL 3252221

Girgis argues that the *Zimmerman* claims conflict with the class's claims here because both classes would be competing for the same pool of assets and Diplomat's ability to pay both judgments is in doubt—in other words, this is a "limited fund scenario." The Fund argues that any conflict of interest is entirely hypothetical, which is not enough to overcome the PSLRA's presumption. According to the Fund, a conflict of interest could only arise if the *Zimmerman* settlement was rejected, Robbins Geller's co-counsel and the three lead plaintiffs in *Zimmerman* "abandon[ed] their fiduciary and ethical responsibilities," the individual defendants in *Zimmerman* were rehired by Diplomat and named as defendants in this case, Diplomat lost $500 million in cash or $1.4 billion in total assets, *and* Robbins Geller "compromised" the *Zimmerman* action in favor of this one, or vice versa, without either court, any lead plaintiff, or its co-counsel raising an objection. (Dkt. 55 at 2.) The potential for conflict is less remote than the Fund argues, but the Court ultimately agrees that Robbins Geller's representation of both classes does not present a conflict of interest, particularly given the presence of ameliorating factors.

As a general rule, "class counsel will not necessarily be disqualified merely for representing another class against the same defendants when, for instance, the purported conflicts are illusory and speculative, the class has co-counsel untainted by the conflict, and there are procedural safeguards protecting the class's interests, such as requiring disclosure of the potential conflict to class members and requiring court approval for settlements." *Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549, 569 (N.D. Cal. 2015). "Most courts have held that class counsel may represent more than one class against the same set of defendants in large part because of the procedural safeguards in place to protect the proposed class; *i.e.*, the court must approve any proposed settlement." *Mehl v. Canadian Pac. Ry. Ltd.*, 227 F.R.D. 505, 515 (D.N.D. 2005) (collecting cases); *see also* Newberg on Class Actions § 3:75 (5th ed.) ("In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed."); 7A Fed. Prac. & Proc. Civ. § 1769.1 (3d ed.) ("[T]he fact that the counsel is engaged in multiple parallel or overlapping class suits does not, standing alone, establish a conflict."); *Bell v. Disner*, No. 14 C 91, 2018 WL 296035, at *3 (W.D.N.C. Jan. 4, 2018), *aff'd sub nom. Bell v. Brockett*, 922 F.3d 502 (4th Cir. 2019) ("Courts have generally

held that the mere existence of parallel representation does not create an insurmountable conflict of interest.").

That said, some courts have found that "[c]ounsel cannot represent different classes of plaintiffs with conflicting claims who are seeking recovery from a common pool of assets." *In re Cardinal Health, Inc. ERISA Litig.*, 225 F.R.D. 552, 557 (S.D. Ohio 2005); *see also Kuper v. Quantum Chem. Corp.*, 145 F.R.D. 80, 82 (S.D. Ohio 1992) (disqualifying potential conflict existed where counsel sought to represent two plaintiff classes seeking to recover from a common pool of assets); *Jackshaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.D. 183, 192 (N.D. Ohio 1984). In another instance, counsel's failure to disclose their involvement in other lawsuits to clients and failure to disclose settlement offers and negotiations to clients led to a finding that counsel was inadequate for Rule 23 purposes. *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 589-91 (W.D. Tex. 2002).

**\*6** Girgis argues that Robins Geller has a conflict of interest primarily because this is a limited fund scenario—*i.e.*, Diplomat may not have the ability to pay judgments in both *Zimmerman* and this case, which would require both classes to compete for the same limited pool of funds. If that situation were to arise, there indeed could be a potential conflict if Robbins Geller represented two classes of plaintiffs fighting over the same pot of money. But as the parties' motions and related filings demonstrate, this is not a limited fund scenario. Even if it were, additional safeguards are present that prevent the potential conflict from disqualifying Robbins Geller.

In support of its argument that this is a limited fund scenario, Girgis cites Diplomat's latest SEC filing and argues that it shows that Diplomat has less than $3 million in cash and shortterm assets from which to pay both judgments. (Dkt. 53 at 11, Dkt. 53-5 at 5.) The Fund argues that Girgis cites the wrong figure, pointing out that the same filing shows that Diplomat has over $517 million in "total current assets" and over $1.4 billion in "total assets." (Dkt. 55 at 13, Dkt. 53-5 at 5.) The Fund also notes that publicly-traded companies like Diplomat have "substantial multi-million dollar insurance policies that are often used to fund settlements." (*Id.*) Girgis counters that it is liquid assets —*i.e.*, cash and cash equivalents—that matter when a court determines a defendant's ability to pay a class settlement, not "total assets." (Dkt. 60 at 2.) To the extent courts consider a defendant's ability to pay at the class settlement approval stage, they look at a variety of factors, not just cash and cash equivalents. *See, e.g., In re Warfarin Sodium Antitrust Litig.*,

**Mortimer v. Diplomat Pharmacy Inc., Slip Copy (2019)**

2019 WL 3252221

391 F.3d 516, 538 (3d Cir. 2004) (considering "DuPont's total resources" when analyzing its ability to pay); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (considering availability of insurance proceeds to cover settlement); *see also In re Cardinal Health*, 225 F.R.D. at 557 (S.D. Ohio 2005) (noting that limited fund scenario could arise "if the amount sought by each proposed class could exceed the *total assets* of the Defendants") (emphasis added). Considering that Diplomat's total current assets exceed $500 million, and the high likelihood that insurance coverage would come into play should this case reach a settlement, this does not appear to be a limited fund scenario, at least given the record currently before the Court. Because this does not appear to be a limited fund scenario, any conflict arising from Robbins Geller's representation of both classes is speculative at this point, and a speculative or hypothetical conflict of interest will not rebut the PSLRA's presumption in favor of the Fund. *See, e.g.*, *Chahal v. Credit Suisse Grp. AG*, 18 C 2268, 2018 WL 3093965, at *7 (S.D.N.Y. June 21, 2018). Beyond that, Robbins Geller has co-counsel in both matters. The Fund's motion seeking appointment as lead plaintiff here also included counsel at Sullivan, Ward, Asher & Patton, P.C., and Hessian & McKasy, P.A., neither of which is involved in the *Zimmerman* case. And the *Zimmerman* case has preliminarily settled, pending court approval. Should this case advance that far, any settlement would require this Court's approval as well. Even if this were to become a limited fund scenario, the Court finds that that any potential conflict created by Robbins Geller's representation of both classes is ameliorated by the fact that Robbins Geller has co-counsel in both actions and that a settlement in either matter would require court approval under Rule 23(e). *See Sandoval*, 309 F.R.D. at 569.

## CONCLUSION

**\*7** For the reasons stated here, the Court grants the Pension Fund's motion for appointment as lead plaintiff [Dkt. 26] and approves its selection of Robins Geller as lead counsel. The Court denies Girgis's motion [Dkt. 27] and dismisses Eugene Klabak's motion [Dkt. 21] as moot.

## All Citations

Slip Copy, 2019 WL 3252221

### Footnotes

1  The *Prentice* and *Riehm* complaints characterize the November 6, 2018 statements as false or misleading statements, not corrective disclosures. (*Prentice* Compl. ¶ 26; *Riehm* Compl. ¶ 26.)

2  The *Prentice* and *Riehm* complaints characterize the January 7, 2019 statements as false or misleading statements, not corrective disclosures. (*Prentice* Compl. ¶ 26; *Riehm* Compl. ¶ 26.)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.