UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re GOHEALTH, INC. SECURITIES LITIGATION | ) ) ) ) | Case No. 1:20-cv-05593 |
| | | CLASS ACTION |
| This Document Relates To: | ) ) ) | Judge Sharon Johnson Coleman |
| ALL ACTIONS. | ) ) ) | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE GOHEALTH AND UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

                                                                                    **Page**

I.      INTRODUCTION ..........................................................................................................1

II.     BACKGROUND .........................................................................................................3

III.    ARGUMENT................................................................................................................7

        A.      Legal Standards................................................................................................7

        B.      The Heightened Pleading Standards of Rule 9(b) Do Not Apply............................8

        C.      The Complaint Is Not an Improper "Puzzle Pleading"..........................................11

        D.      The Complaint Adequately Alleges Materially False Misstatements and
                Material Omissions in the RS ........................................................................12

                1.      The Complaint Adequately "Connects the Dots" Regarding the
                        Falsity of the RS..................................................................................18

                2.      Defendants Had a Duty to Disclose Adverse Facts Impacting
                        GoHealth at the Time of the IPO ...............................................................21

                3.      The Complaint Adequately Pleads False and Misleading
                        Statements and Omissions of Material Facts ..............................................23

                4.      The Materially False Statements Are Not Puffery...................................25

                5.      Defendants Are Not Protected by the Bespeaks Caution Doctrine............27

                6.      Defendants Violated Items 303 and 105....................................................30

        E.      The Complaint States a Claim for Control Person Liability Under §15 of
                the 1933 Act ................................................................................................32

IV.     CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................35

*Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l*,
No. 08-cv-312-JL, 2009 WL 3255225 (D.N.H. Oct. 7, 2009) ...................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................................7

*Asher v. Baxter Int'l*,
377 F.3d 727 (7th Cir. 2004) ...............................................................................................29

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................................22

*Beezley v. Fenix Parts, Inc.*,
No. 1:17-cv-7896, 2018 WL 3454490 (N.D. Ill. July 13, 2018) ...........................8, 18, 21, 23

*Blatt v. Corn Prods. Int'l, Inc.*,
No. 05 C 3033, 2006 WL 1697013 (N.D. Ill. June 14, 2006) .................................................28

*Boston Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .................................12, 16

*Cai v. Switch, Inc.*,
No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591 (D. Nev. July 12, 2019) ....................30, 32

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ................................................................................................10

*Cent. Laborers' Pension Fund v. SIRVA, Inc.*,
No. 04 C 7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ................................................33

*City of Lakeland Emps. Pension Plan v. Baxter Int'l, Inc.*,
No. 10 C 6016, 2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ......................................11, 13, 27

*Conlee v. WMS Indus., Inc.*,
No. 11 C 3503, 2012 WL 3042498 (N.D. Ill. July 25, 2012) .................................................11

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*,
No. 13 C 2111, 2014 WL 3610877 (N.D. Ill. July 22, 2014) .................................................11

**Page**

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ........................................................................................27

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ..........................................................................................................22

*Evergreen Fund, Ltd. v. McCoy*,
No. 00 C 0767, 2000 WL 1693963 (N.D. Ill. Nov. 6, 2000) ................................9, 19

*Flynn v. Exelon Corp.*,
No. 19 C 8209, 2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ............................20, 33

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wis. 2003) ......................................................................23

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ....................................................................................27

*Harrison v. Dean Witter Reynolds, Inc.*,
974 F.2d 873 (7th Cir. 1992) ........................................................................................33

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ..........................................................................................2, 8, 19, 22

*In re Acadia Pharms. Inc. Sec. Litig.*,
No.: 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal. June 1, 2020) ..........................12

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ..........................................................................11

*In re Axis Capital Holdings Lts. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ..........................................................................20

*In re Bally Total Fitness Sec. Litig.*,
No. 04 C 3530, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ......................................26

*In re Bofi Holding, Inc. Sec. Litig.*,
No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ....................26

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..........................................................................20

*In re: Enzymotec Sec. Litig.*,
No.: 14-5556 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015) ..............................20

**Page**

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................................10

*In re Honeywell Int'l, Inc. Sec. Litig.*,
  182 F. Supp. 2d 414 (D.N.J. 2002) ............................................................................12

*In re Ins. Mgmt. Sols. Grp., Inc.*,
  No. 8:00CV2013T26MAP, 2001 WL 34106903 (M.D. Fla. July 11, 2001) ...........................10

*In re Mem'l Hosp. of Iowa Cnty., Inc.*,
  862 F.2d 1299 (7th Cir. 1988) ..................................................................................26

*In re Metro. Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) ...................................................................11

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................................................................10

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) .........................................................................33

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) .........................................................................12

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)........................................................................................9

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) ............................................................. *passim*

*In re ViroPharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ...........................................................................21

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)........................................................................................21

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016).....................................................................................30, 31

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  No. 0:15-CV-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016) .................................24

*Levitan v. McCoy*,
  No. 00 C 5096, 2001 WL 1117279 (N.D. Ill. Sept. 21, 2001).......................................9, 19

**Page**

*Litwin v. Blackstone Grp., L.P.*,
     634 F.3d 706 (2d Cir. 2011)..................................................................................................10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
     437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007)......................26

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
     513 F.3d 702 (7th Cir. 2008) ...............................................................................................28

*Marks v. CDW Comput. Ctrs., Inc.*,
     122 F.3d 363 (7th Cir. 1997) ...............................................................................................23

*McKenna v. SMART Techs., Inc.*,
     No. 11 Civ. 7673(KBF), 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012)................................32

*Miller v. Apropos Tech., Inc.*,
     No. 01 C 8406, 2003 WL 1733558 (N.D. Ill. Mar. 31. 2003) ...............................................25

*O'Neal v. Reilly*,
     961 F.3d 973 (7th Cir. 2020) ...............................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
     575 U.S. 175 (2015)....................................................................................................8, 13, 22

*Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*,
     388 F. Supp. 2d 871 (N.D. Ill. 2004) ...................................................................................26

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
     681 F. 3d 114 (2d Cir. 2012).................................................................................................30

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
     No. 18 Civ. 9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ..............................31

*Pierrelouis v. Gogo, Inc.*,
     No. 18 C 4473, 2021 WL 1608342 (N.D. Ill. Apr. 26, 2021)................................................28

*Pinter v. Dahl*,
     486 U.S. 622 (1988)..............................................................................................................22

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.
     Allscripts-Misys Healthcare Sols., Inc.*,
     778 F. Supp. 2d 858 (N.D. Ill. 2011) ...................................................................................27

**Page**

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..................................................................................10, 29

*Ross v. Career Educ. Corp.*,
No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .....................................13

*SEC v. Kameli*,
No. 17 C 4686, 2020 WL 2542154 (N.D. Ill. May 19, 2020) ...................................29

*SEC v. Stifel, Nicolaus & Co., Inc.*,
No. 11-C-0755, 2012 WL 4069346 (E.D. Wis. Sept. 14, 2012)...............................26

*SEC v. Winemaster*,
No. 19-cv-04843, 2021 WL 1172773 (N.D. Ill. Mar. 29, 2021) ..............................12

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ill. 2018) .................................................................30, 33

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)........................................................................................26

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc*,
No. 10 C 427, 2011 WL 814932 (N.D. Ill. Feb. 28, 2011).................................26, 27

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) .......................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................7, 21, 26

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..................................................................................................23

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
No. 19 C 3648, 2020 WL 564222 (N.D. Ill. Feb. 5, 2020).......................................28

*United States v. Stephens*,
421 F.3d 503 (7th Cir. 2005) ....................................................................................11

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ..........................................................10, 20, 24

*Yellowdog Partners, LP v. Curo Grp. Holdings, Corp.*,
426 F. Supp. 3d 864 (D. Kan. 2019)................................................................ *passim*

**Page**

*Zishka v. Am. Pad & Paper Co.*,
   No. 3:98-CV-0660-M, 2001 WL 1748741 (N.D. Tex. Sept. 28, 2001) ...................................35

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §77k.............................................................................................................................1, 13
   §77k(a) ......................................................................................................................10, 23
   §77o.....................................................................................................................................1
   §78t(a) ..............................................................................................................................33
   §77z-2(b)(2)(D)................................................................................................................27

Federal Rules of Civil Procedure
   Rule 8(a)(2) ........................................................................................................................8
   Rule 9(b) ..................................................................................................................8, 9, 10

17 C.F.R.
   §229.10...............................................................................................................................30
   §229.105.............................................................................................................................30
   §229.303.............................................................................................................................30
   §229.303(b)(2)(i)-(ii) .......................................................................................................30
   §229.303(b)(2)(ii) .............................................................................................................30

Lead Plaintiffs Sudhakara R. Murikinati, Jerry Nixon, Benjamin Sandmann, and Jeff S. Turnipseed ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants'[1] motion to dismiss [ECF Nos. 73, 74] ("Mem.") the Consolidated Class Action Complaint for Violations of the Securities Act of 1933 ("1933 Act") [ECF No. 66] ("Complaint").[2]

## I.      INTRODUCTION

This securities class action arises under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o, because GoHealth's Registration Statement ("RS") in connection with its $21 per share, $913 million, July 17, 2020, initial public offering ("IPO") contained materially false statements and omissions that caused the value of GoHealth stock to plummet after the IPO.  In offering materials, Defendants touted the rapid financial growth of GoHealth, a health insurance broker, without disclosing that prior to the IPO, the Company fundamentally altered it business strategy in order to overcome a growth plateau.  As a result and unbeknownst to Plaintiffs and the class of investors they seek to represent, GoHealth's most important business metrics, such as commission valuation estimates and customer acquisition costs, had deteriorated and would continue to deteriorate. These adverse facts first came to light only a few weeks after the IPO, in connection with the Company's second quarter 2020 ("2Q2020")[3] financial results, which ended ***prior to*** the IPO,

---

[1]    Defendants are: (i) GoHealth, Inc. ("GoHealth" or "Company"); (ii) Clinton P. Jones ("Jones"), Brandon M. Cruz ("Cruz"), and Travis J. Matthiesen ("Matthiesen") (together, "Individual Defendants"); (iii) NVX Holdings, Inc. ("NVX Holdings); (iv) Centerbridge Partners, L.P., CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., Blizzard Aggregator, LLC, Centerbridge Associates III, L.P., and CCP III Cayman GP Ltd. (together, "Centerbridge"); and (v) Goldman Sachs & Co. LLC, BofA Securities, Inc., and Morgan Stanley & Co. LLC (together, "Underwriter Defendants").  For purposes of this brief, "Defendants" are GoHealth, the Individual Defendants, and the Underwriter Defendants.  The "§15 Defendants" are GoHealth, the Individual Defendants, NVX Holdings, and Centerbridge.

[2]    Unless otherwise stated, all emphases and alterations are added and citations, internal quotations, and footnotes are omitted.  Additionally, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Complaint.

[3]    Throughout this brief, Plaintiffs refer to quarters in this manner, by their respective number and year.

- 1 -

along with several additional disclosures. ¶¶116-125. Ultimately, GoHealth stock plummeted *more than 50%* from its IPO price, and investors suffered hundreds of millions of dollars in losses. ¶¶25, 126. Although GoHealth and the Individual Defendants would later admit these disappointing results were "expected," "anticipated," and exactly as they "thought . . . would happen," ¶¶22, 119, 124, Defendants failed to disclose them in the RS as required by the federal securities laws.

The 1933 Act requires those involved in securities offerings to make accurate and fulsome disclosures to investors and §11 imposes strict liability on issuers that fail to comply. Indeed, issuer liability under §11 is "virtually absolute, even for innocent misstatements" and all "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). In the face of the Complaint's well-pled allegations, the low pleading hurdle of §11, Defendants' own subsequent admissions, and the significant losses suffered by investors, Defendants seek summary dismissal of this case prior to discovery. Defendants incorrectly argue the Complaint sounds in fraud (it doesn't), mischaracterize the Complaint as a "puzzle pleading" (it isn't), wrongly claim it alleges no actionable false statements or omissions (it does), and curiously argue, in contrast to the plain language of the RS describing GoHealth as a "controlled company" that the §15 Defendants are not control persons (they are). The Complaint, when considered in totality and in the light most favorable to Plaintiffs, as United States Supreme Court and Seventh Circuit precedent requires, more than adequately alleges 1933 Act violations and Defendants' motion should be denied in its entirety.[4]

---

[4] Defendants' motion to dismiss improperly turns to a source outside the four corners of the Complaint to make fact-based arguments, which they ask the Court to accept as true, regarding GoHealth's post-IPO financial performance. *See* Mem. at 10, 21, 32 (citing GoHealth's 2020 Form 10-K). Defendants' improper use of the 2020 10-K is addressed in Plaintiffs' motion to strike, filed contemporaneously herewith.

## II.     BACKGROUND

GoHealth operates a technology driven health insurance marketplace that uses a combination of websites and licensed agents to help consumers sign up for health insurance.  ¶¶4, 7, 31.  Leading up to the IPO, GoHealth reported rapid growth, swelling revenues (tied to commissions), and an "industry-leading" key financial metric, lifetime value of commissions/customer acquisition cost ("LTV/CAC") (described below).  ¶¶9, 62, 68-69.  For example, GoHealth reported 138.5% revenue growth year-over-year during 2019 to $539.5 million, reported 1Q2020 revenue of $141 million, a 104% increase year-over-year, and reported improvements in LTV/CAC.  ¶¶9(b)-(c), 62.  As a result, there was significant demand in anticipation of the IPO, which enabled Defendants to increase the size of the IPO from 39.5 million shares at $19 per share to 44.5 million shares at $21 per share.  ¶¶16-17.

Leading up to the IPO, GoHealth's financial performance hinged on commissions it earned from two insurance carriers, Humana Inc. ("Humana") and Anthem, Inc. ("Anthem"), for signing consumers up for Medicare plans.  ¶¶12, 19, 61-62.  Specifically, in 1Q2020, the quarter before the IPO, 89% of GoHealth's revenues and 98% of its total profit came from its Medicare segments.  ¶86.  Notably, Humana and Anthem accounted for 74% of GoHealth's total 1Q2020 revenues, up from 60% of revenues in 1Q2019.  ¶61.  GoHealth's concentration on Humana and Anthem in the lead up to the IPO corresponded with rapid revenue growth and best-in-class LTV/CAC.  ¶62.  Through this concentration, GoHealth benefitted financially prior to the IPO because Humana and Anthem subsidized GoHealth's marketing costs, paid it top-tier commission rates, and were deeply integrated with GoHealth's technology platform, leading to substantially lower marketing costs than GoHealth's peers.  ¶¶64, 88, 89(a), 89(c), 100(e), 105(e).  This deep integration was a substantial factor in GoHealth's ability to report best-in-class LTV/CAC and reduced customer churn, which was an industry-wide concern.  ¶¶62, 64, 116.

- 3 -

To that end, the RS touted GoHealth's track record of "industry-leading" growth and emphasized that GoHealth's technology platform was deeply integrated with its carrier customers, which provided "enhanced return of scale," "more efficient marketing," and "increased agent conversion rates." ¶¶9, 96. The RS also stated that GoHealth's business platform was rapidly scalable and would produce a higher LTV[5] of consumers that could be obtained at a lower CAC[6] relative to GoHealth's competitors. ¶¶93, 97. Although the LTV/CAC ratio was the most important indicator of GoHealth's financial performance, it was impossible for investors to calculate LTV/CAC on their own, or to even understand exactly how it was calculated by GoHealth. ¶15 ("[T]he metrics that went into GoHealth's LTV/CAC were not reported individually, turning GoHealth's critical financial metric into a veritable black box."); ¶58 ("LTV is based on a variety of variables that GoHealth does not report publicly"); ¶59 ("Because of the number of factors and assumptions underlying GoHealth's LTV calculations, there is no way for investors or analysts to crosscheck or fully understand how GoHealth calculates its LTV.").

The RS described GoHealth as primed for continued growth while maintaining its leading LTV/CAC rates and stated that GoHealth could "rapidly scale" while "*improving*" its "unit economics, as measured by LTV/CAC," meaning that GoHealth could grow quickly while increasing LTV and reducing CAC. ¶97. The RS added that attracting new carriers, and expanding existing relationships, was "critical" to GoHealth's growth – particularly in Medicare – but that GoHealth was, at the time of the IPO, "strategically adding carriers in the Medicare segments,"

---

[5]    LTV is "aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints[.]" ¶14.

[6]    CAC is the "cost to convert a prospect into a customer less other non-commission carrier revenue for such period" and added that it was comprised of "cost of revenue, marketing and advertising expenses and customer care and enrollment expenses less other revenue . . . presented on a per commissionable Approved Submission basis." ¶14.

which allowed GoHealth to "market *more efficiently*" and "*increase conversion rates* on consumer leads," which would lead to increased commissions. ¶¶60, 98. To further supplement growth, the RS stated GoHealth was adding special needs plans ("SNPs")[7] to existing and new carrier relationships, which would help maximize the value of marketing spend and help the Company utilize its agents outside of the annual Medicare enrollment periods. ¶99.

The Complaint focuses on GoHealth's 2020 business strategy, and the financial consequences of it, which were *not* accurately disclosed in the RS. Put simply, unbeknownst to investors, GoHealth was suffering from heightened customer churn at the time of the IPO. ¶18. On top of that, GoHealth needed a dramatic departure from its existing business model, which had fueled GoHealth's pre-IPO growth through deep concentration on Humana and Anthem. ¶¶12, 19, 61-62, 88, 100(b), 105(b). To make this necessary change, at the time of the IPO and afterwards, GoHealth significantly and rapidly expanded its insurance carrier customer base for Medicare and significantly increased its reliance on non-commissionable revenue generated by SNPs. ¶¶18, 88-89, 95, 100(c), 105(c). This rapid change in business plan (and its consequences), which made 2020 an "investment year" for the Company, was happening at the time of the IPO but was not disclosed in the RS and only came to light through a series of post-IPO events. ¶¶18-20, 89, 91, 100, 104-105, 108, 116-125.

*First*, on August 19, 2020, GoHealth reported its financial results for the 2Q2020 ended June 30, 2020, which closed two weeks *before* the IPO, and disclosed the addition of many new carriers. ¶¶20, 117. Jones disclosed the rapid change in customer mix would cause "an initial ramp-up period" with "forecasted lower LTVs" and that the Company's "strategy to add several

---

[7] SNPs are a type of Medicare Advantage plan designed to attract and enroll Medicare beneficiaries who fall into certain special needs demographics. *See* ¶20 n.3.

new large carriers" was resulting in and would continue to result in "lower initial commission rates and LTVs." ¶¶20, 120. Notably, the "strategy," which existed and was being implemented at the time of the IPO, included increased focus on SNPs that Matthiesen disclosed would have a "near-term drag on [GoHealth's] average LTV" along with higher customer churn. *Id.* GoHealth also revealed a 330% increase in marketing and advertising expense, which materially impacted GoHealth's CAC. ¶¶18, 24, 89(c), 100(e)-(f), 100(i), 104, 105(e)-(f), 105(i), 118. During an after-hours earnings call, Jones said the disappointing results were "largely as expected" and made clear that because GoHealth saw data "in real time[,]" "we don't see surprises." ¶119.

*Second*, on September 30, 2020, the Company reported its 3Q2020 financial results, including a significant financial loss of $0.65 per share – $0.64 *worse* than analyst estimates of a $0.01 loss per share – caused, in part, by increased non-commissionable revenue that created more of a "near-term" drag on GoHealth's average LTV, along with increased churn. ¶¶21, 121-123. The change in revenue mix was materially different than expected with: (a) commission revenue missing analyst forecasts by 32%; (b) non-commissionable revenue coming in at triple what analysts modeled; and (c) external revenue down 27% versus estimates of a significant increase. *Id.* This significant shift was a consequence of GoHealth's rapid strategy shift and was seen as adding confusion to the Company's reported financial results and expected performance. *Id.* And once again, GoHealth reported signing on several new, large carriers, which, along with more SNP focus, created a "short-term drag" on LTVs and swelling marketing and advertising expenses, which grew by 121%, further weighing on GoHealth's CAC. ¶¶122-123.

*Third*, on December 20, 2020, GoHealth participated in an investor conference, with Jones and Matthiesen speaking for the Company. Jones told investors that "we anticipated 2020 to be an investment year with new carriers," adding that new carriers paid GoHealth lower commissions

that would result in "LTV compression." ¶¶22, 124. Jones added that GoHealth "anticipated" the LTV compression, that GoHealth had "modeled [it] out" and "thought that would happen," and that there would be "more upside in 2021 from an LTV standpoint with carriers." *Id.* Adding on, Matthiesen stated GoHealth's plan to add new carriers in 2020 created a "short-term drag on LTV" and that GoHealth would not get to "top-level contracts" with the newly added carriers until "next year," *i.e.*, 2021. ¶¶124-125 ("it's important to understand that new carriers really are a short-term drag on LTV").

Despite dramatically shifting GoHealth's business model, which caused lowered average LTV, increased reliance on SNPs with a corresponding decrease in commissionable revenue, significantly increased marketing and advertising costs, and negative impacts on persistency and churn, all of which negatively impacted LTV/CAC, these facts were not disclosed in the RS. ¶¶18, 24, 89, 91. Since the IPO, the price of GoHealth stock declined significantly from the IPO price of $21 per share to $13.32 per share on September 21, 2020, the day this action commenced, a 36% drop. ¶25. The stock hit an all-time low of $10.05 per share on December 1, 2020 – less than half of the IPO price – and GoHealth has substantially underperformed the market, including its primary competitor, SelectQuote, Inc. ¶¶25-26, 126.

## III.   ARGUMENT

### A.   Legal Standards

A motion to dismiss should be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, all factual allegations must be taken as true, construed in the light most favorable to the plaintiff, and considered collectively. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Section 11 "places a relatively minimal burden on a plaintiff" and imposes liability when a registration statement contains a material misrepresentation or omission.

*Huddleston*, 459 U.S. at 381-82; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) ("Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement – one focusing on what the statement says and the other on what it leaves out."). Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1192 (N.D. Ill. 2009).

"To establish a [§11] claim, plaintiffs need only show that they purchased the security and that there was a material misrepresentation or omission." *Id.* Plaintiffs need not allege scienter, loss causation, or reliance. *Huddleston*, 459 U.S. at 381-82; *Omnicare*, 575 U.S. at 178-79. "Congress adopted § 11 to ensure that issuers tell the whole truth to investors." *Omnicare*, 575 U.S. at 192. Under §11, liability of an issuer is "virtually absolute, even for innocent misstatements" and all "[o]ther defendants bear the burden of demonstrating due diligence." *Huddleston*, 459 U.S. at 382; *see also Beezley v. Fenix Parts, Inc.*, 2018 WL 3454490, at \*3 (N.D. Ill. July 13, 2018).

**B.     The Heightened Pleading Standards of Rule 9(b) Do Not Apply**

Defendants incorrectly argue the Complaint sounds in fraud and should be subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). Mem. at 11. Plaintiffs' claims do not sound in fraud and, therefore, Plaintiffs' §11 claim is governed by the notice pleading standard of Fed. R. Civ. P. 8(a)(2), which requires only a short and plain statement of the claim showing the pleader is entitled to relief. Indeed, Plaintiffs expressly assert strict liability claims premised on allegations of Defendants' negligence.[8] *See, e.g.*, ¶¶1, 47, 90, 115, 131, 134, 137-139. The heightened

---

[8]     Defendants' accusation that Plaintiffs are "impugn[ing] Defendants' reputation with allegations of fraud" rings hollow. Mem. at 12. "In short, the reputational concerns that animate Rule 9(b) with respect

pleading standards of Rule 9(b) simply do not apply, and plaintiffs are not "required to plead particular facts" to support their claims. *See, e.g.*, *Levitan v. McCoy*, 2001 WL 1117279, at \*3-4 (N.D. Ill. Sept. 21, 2001) (complaint did not "sound in fraud" and did "not allege nor even suggest that the defendants intended to deceive . . . stockholders or acted with scienter in drafting the Registration Statement" and "the complaint's use of words such as 'predatory,' 'illegal,' and 'unlawful' in describing [company's] transactions with its credit card customers does not add up to allegations of security fraud"); *Evergreen Fund, Ltd. v. McCoy*, 2000 WL 1693963, at \*5 (N.D. Ill. Nov. 6, 2000) (because plaintiffs' allegations did not contain references to fraud, they did not "sound in fraud" and the heightened pleading standards of Rule 9(b) did not apply); *Suprema*, 438 F.3d at 272 (holding that Rule 9(b) does not apply to 1933 Act claims where "ordinary negligence is expressly pled").

In light of the fact that fraud and scienter are not elements of Plaintiffs' claims, courts in this District, when faced with similar arguments from defendants attempting to impose a heightened pleading standard, have aptly observed that it would be "illogical to require plaintiffs to plead more than they would have to prove to succeed on a § 11 claim standing alone." *Ulta*, 604 F. Supp. 2d at 1193 ("requiring a plaintiff to plead fraud and scienter with particularity when neither is an element" of §11 "comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure").

Nor do Plaintiffs' references to "untrue" and "materially false and misleading" statements (*see, e.g.*, ¶¶18, 24, 90, 100(f), 105(f), 108, 135) automatically transform Plaintiffs' strict liability

---

to a defendant accused of fraud are not implicated when a defendant stands accused of nothing more than negligence." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 (3d Cir. 2006).

claims into fraud claims subject to heightened pleading standards.[9] Plaintiffs' allegations track the language of the statute, which prohibits "*untrue* statement[s] of a *material* fact" or omissions of material facts "required to be stated therein or necessary to make the statements therein not *misleading*." 15 U.S.C. §77k(a); *In re Ins. Mgmt. Sols. Grp., Inc.*, 2001 WL 34106903, at *11 (M.D. Fla. July 11, 2001) (amended complaint did not "sound in fraud" where it contained references to "repeated misrepresentations or omissions of historical or hard facts about current or past conditions"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631-32 (S.D.N.Y. 2007) ("[T]he mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent.").

Finally, Defendants' cases are distinguishable, either because they do not involve 1933 Act claims at all, or because they involve 1933 Act claims coupled with §10(b) fraud claims, which require scienter. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 636-37 (N.D. Ill. 2020) (§11 claim sounded in fraud because it was based on the same misrepresentations as the §10(b) fraud claim, the statements were allegedly false or misleading for the same reasons, and plaintiffs alleged a "unified course of fraudulent conduct"); *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) (Rule 9(b) applied to §11 claim where plaintiffs also alleged violations of §10(b)); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-61 (3d Cir. 2004) (Rule 9(b) applied in a case alleging violations of §§10(b) and 11 where plaintiffs' §11 claims were "indisputably immersed in unparticularized allegations of fraud" and "expressly incorporate[d] by reference" scienter and scheme allegations, and claims "brim[med]

---

[9] Nor does Item 303's knowledge requirement somehow transform Plaintiffs' non-fraud claims into fraud claims subject to heightened pleading standards. Knowledge under Item 303 is not synonymous with intent to defraud. *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 506 (S.D.N.Y. 2013).

with references to defendants' intentional and reckless misrepresentation of material facts."); *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (defining "scheme to defraud" in the context of analyzing the sufficiency of the government's evidence in a criminal wire fraud case).

### C. The Complaint Is Not an Improper "Puzzle Pleading"

Defendants argue the Complaint should be dismissed because it is an improper "puzzle pleading." Mem. at 13-16. Defendants are wrong. To begin, the argument, which is yet another attack on the particularity of Plaintiffs' allegations, is inapposite. *See* Mem. at 15-16. As set forth above, Plaintiffs' strict liability, negligence-based claims are not subject to heightened pleading standards. *See* §III.B., *supra*.

Far from engaging in impermissible "puzzle pleading," the Complaint clearly "identifies and quotes the statements allegedly misleading, including bolding and italicizing the precise statements." *See, e.g.*, ¶¶91-99, 101-104; *City of Lakeland Emps. Pension Plan v. Baxter Int'l, Inc.*, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (Coleman, J.) (denying motion to dismiss in part and rejecting similar "puzzle pleading" argument). The 59-page Complaint is not overly long and explicitly connects the false statements to the factual allegations by "follow[ing] each set of allegedly misleading statements with the factual basis for why the statements are false and misleading."[10] *Baxter*, 2012 WL 607578, at *5; ¶¶100, 105. Additionally, the challenged statements (all of which were made in the RS) are organized in a designated section with a clear

---

[10] Defendants' cases are distinguishable. *See, e.g.*, *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 2014 WL 3610877, at *5-6 (N.D. Ill. July 22, 2014) (complaint did not link the alleged reasons for falsity to any specific statement); *Conlee v. WMS Indus., Inc.*, 2012 WL 3042498, at *4-5 (N.D. Ill. July 25, 2012) (dismissing complaint that organized challenged statements in chronological order, rendering the complaint confusing because the statements pertained to disparate subject matter and left the court to jump "from page to page in an attempt to link the alleged statements to the background" that made them false or misleading); *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007) (organization of the complaint made the nature of the fraud difficult to define and respond to); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing 250-paragraph, 102-page complaint that failed to support the alleged misstatements with particularized allegations of falsity).

heading. ¶¶90-105. And, contrary to Defendants' argument, the Complaint's use of block quotes does not automatically make it a "puzzle pleading." *See, e.g.*, *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at \*4 (S.D. Cal. June 1, 2020) (complaint containing large block quotes was not a "puzzle pleading"); *see also SEC v. Winemaster*, 2021 WL 1172773, at \*14 (N.D. Ill. Mar. 29, 2021) (rejecting defendants' "puzzle pleading" argument where the Court had "no difficulty in identifying the false statements giving rise to the claims" at issue).

Moreover, although Defendants contend the Complaint is a "paradigmatic puzzle pleading," their detailed motion to dismiss and lengthy (albeit improper) Appendix A, in which Defendants' make extensive arguments about, but do not overcome, the Complaint's allegations, demonstrate they understand Plaintiffs' allegations and are on notice of the claims against them. Mem. at 13; Defs.' App. A; *see also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1012 (N.D. Ill. 2004) (rejecting puzzle pleading argument and finding "[g]iven the complexity of the allegations and Defendants' extensive motions to dismiss, however, the [Defendants'] claim of prejudice is not well-taken" because "Defendants can fairly respond to the allegations"); *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 416 (D.N.J. 2002) ("The Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled readily."); *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*5 (N.D. Cal. Aug. 7, 2020) (rejecting "puzzle pleading" argument despite defendants' contention that the complaint at issue was "repetitive" and "hard to follow" because defendants were not "incapable of figuring out what statements [were] alleged to be false"). Defendants' supposed inability to respond to the Complaint rings hollow, and Defendants' motion to dismiss on this ground should be denied.

### D. The Complaint Adequately Alleges Materially False Misstatements and Material Omissions in the RS

Defendants incorrectly raise fact-bound assertions to argue the Complaint pleads no

actionable statements.  *See* Mem. at 16-20.  But the Complaint adequately pleads the RS contained untrue statements and omissions of material fact (¶¶90-105), which is all that is required to state a claim under §11.  15 U.S.C. §77k.  On a motion to dismiss, the Court need not conclusively "determine whether [defendants'] statements were in fact misleading, rather this Court need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute [falsity]."[11]  *Baxter*, 2012 WL 607578, at \*3.  "[W]hether a statement is misleading depends on the perspective of a reasonable investor: The inquiry (like the one into materiality) is objective."  *Omnicare*, 575 U.S. at 186-87.  This is important because "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation."  *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at \*6 (N.D. Ill. Oct. 30, 2012).

The gravamen of the §11 claim is GoHealth's failure to disclose the fact that ***at the time of the IPO***, GoHealth was in the midst of undisclosed, but immensely important, changes to its business model *via* a rapid, strategic shift that was necessary to sustain the Company's growth rate. *See, e.g.*, ¶¶18, 24, 59, 89, 91, 100, 105, 108, 114.  Unbeknownst to investors, at the time of the IPO GoHealth's quick shift in business model was, and would continue to: (1) negatively pressure GoHealth's 2020 financial results; (2) fundamentally alter the nature of its revenue stream; and (3) lead to increased customer churn and churn-related costs.  *Id.*  For example, the Complaint alleges the rapid expansion of GoHealth's Medicare insurance carrier base, while also increasing its reliance on SNPs, came at a significant cost, and the RS failed to disclose these changed tactics and the expected financial disruption that would result.  ¶¶89, 100, 105.

---

[11]  Although this Court's opinion in *Baxter* involved a §10(b) fraud claim, its reasoning as to what constitutes an actionable, false statement applies with equal force here.

Indeed, the "near-term" pressures on GoHealth's 2020 financial performance, which were occurring *prior to* the IPO, included the following: (1) new carriers would only pay reduced commission rates to GoHealth and it would take time for GoHealth to earn its way up to the maximum allowable commission rates that the Company earned with its established partners Humana and Anthem; (2) when adding new Medicare carriers, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions; (3) GoHealth's costs with new carriers were significant, as GoHealth had to significantly increase its marketing spend and hire and train more agents, facts that were exacerbated by Humana and Anthem's subsidization of GoHealth's marketing, which historically had benefitted the Company's LTV/CAC and overall financial performance; (4) selling new plans for new customers not only resulted in reduced commissions and reduced profits, but also decreased persistency and increased churn, as well as increased costs to counteract those issues, because customers placed into new plan offerings with new carriers by less experienced agents were more likely to change their minds; and (5) GoHealth was significantly increasing sales of SNPs in 2020, which lowered GoHealth's commissionable revenue, increased churn rates, and dragged down LTV/CAC. ¶89.

Despite these facts, the RS included materially false statements and omissions, including that GoHealth's platform was "engineered . . . for rapid scalability" (*i.e.*, expansion) and the Company could "*improve* [its] key drivers [of LTV/CAC]" while rapidly scaling its "innovative distribution model." *See, e.g.*, ¶¶91, 93-94, 96. Indeed, the RS touted GoHealth's ability to "rapidly scale while *improving* [its] unit economics, as measured by LTV/CAC" and stated, as GoHealth grew, it would "increase the lifetime commissions generated" which "increases LTV" while "lowering CAC." ¶97. The RS also omitted material facts regarding GoHealth's existing and in-process strategic shift for 2020, and the negative financial impact it would have on the

- 14 -

Company until at least 2021. For example, the RS stated, "[a]ttracting new carriers" was "critical to the growth of [GoHealth's] business" and that GoHealth was "strategically adding carriers in the Medicare segments" which would create "enhanced return of scale" and "allow [GoHealth] to market *more efficiently*[,] . . . increase conversion rates[,] . . . and drive[] revenue growth." ¶¶96, 98.

To the extent the RS addressed geographic expansion plans, it did not state GoHealth was already rapidly expanding its carrier base and indicated only that the "platform" would "include Medicare Advantage products from at least one of the top two carriers . . . in each county, in 49 states[.]" ¶96. Likewise, when the RS discussed adding SNP plans from "both existing and new carrier relationships," it stated doing so would "maximize the value of our customer interactions and marketing spend" to focus the business away "from other less profitable channels[.]" ¶99.

Even the RS' risk factors were materially false and omitted material information, failing to warn investors of already-materialized key risks. ¶¶101-104. For example, although the risk factors purported to warn that GoHealth's carrier customers *could* "reduce the commissions paid" to GoHealth, which *could* harm GoHealth's business, the risk factors did not state that GoHealth's newly added carrier partners were *already* paying reduced commissions and that this trend, along with ballooning advertising costs, would continue throughout 2020. ¶102. By pointing to the concentration of GoHealth's Medicare business in a "relatively small number of carriers," the risk warning regarding changes to commission rates implied that carrier expansion would help alleviate GoHealth's vulnerability to reduced commission rates with *existing* carrier customers, but did not disclose that GoHealth's strategic, rapid carrier expansion was already placing, and would continue to place, downward pressure on LTVs during 2020. ¶103. Rather than disclose the ongoing, rapid expansion, the RS warned instead that should GoHealth "become dependent on

- 15 -

*fewer* carrier relationships" that its "financial condition could be harmed." ¶104. Put simply, the risk factors were false and did not adequately warn of the negative financial impacts GoHealth was experiencing and expected to experience throughout 2020.

These statements and risk warnings thus gave the false and misleading impression that GoHealth was primed for ongoing, rapid growth and gave no indication to IPO investors that GoHealth was receiving, and would receive throughout 2020, reduced commissions and reduced marketing support from new carriers, while simultaneously having to spend aggressively to increase marketing and hire more agents in order to generate enough submissions at the new carriers to eventually justify top-tier commissions. *See* ¶100. Indeed, at the time of the IPO, GoHealth's 2Q2020 was complete, and the Company would report its financial results barely a month later. ¶¶20, 117. When GoHealth did report is 2Q2020 results, it revealed significant declines in net income and commissions, a *330%* increase in marketing and advertising expenses, higher churn, as well as the "strategy to add several new large carriers" that came with "an initial ramp-up period" and "forecasted lower LTVs" as the Company "look[ed] towards 2021." ¶¶117-120. Although GoHealth was not required to disclose its 2Q2020 financial results in the RS, Defendants "were required to remain transparent" in the RS "about the company's financial position" given they "had planned [a] massive restructuring . . . for a few weeks after the IPO." *See Boston Ret. Sys.*, 2020 WL 4569846, at *8 ("[D]efendants' statements were misleading given the information available to them at the time the statements were made."); *see also Yellowdog Partners, LP v. Curo Grp. Holdings, Corp.*, 426 F. Supp. 3d 864, 870 (D. Kan. 2019) (finding false statements actionable where "defendants failed to disclose specific facts, particularly concerning the strategy and timing of the [business] transition in Canada, which transition was bound to have a substantial undisclosed impact on financial performance").

Simply put, the RS failed to disclose adverse, historical facts rendering its statements materially misleading. For example, during the 2Q2020 earnings call after the IPO, Jones made clear GoHealth was experiencing "an initial ramp-up period for new carriers with forecasted lower LTVs as agents learn about new plans" and confirmed the "strategy to add several new large carriers" *in the second quarter 2020*, which ended before the IPO, resulted in "*lower* initial commission rates and LTVs." ¶120. Jones added that SNPs, which were now making up a larger portion of GoHealth's total revenues, "tend to have a lower LTV that pull down our average LTV[,]" a fact Matthiesen echoed on the same call. *Id.* (SNPs "create a near-term drag on [GoHealth's] average LTV"). Indeed, Matthiesen went so far as to state that GoHealth, in 2Q2020, implemented a "changing mix of business" that would "continue to impact" GoHealth's average LTVs. *Id.*

The trend continued when GoHealth reported its 3Q2020 financial results on November 11, 2020, with loss per share numbers dramatically missing market estimates and critically important commission revenue missing analyst forecasts by 32%, as they declined from 73% of revenue in 3Q2019 to only 62% of revenue in 3Q2020, while other, non-commissionable revenue (including from SNPs) increased from 27% of revenue to 38%. ¶122. At the same time, GoHealth's marketing and advertising expenses swelled 121%. *Id.* These facts further demonstrate that GoHealth's strategy to rapidly expand and change its mix of business, which was happening prior to the IPO, was having and would continue to have a detrimental effect on GoHealth's 2020 financial performance. ¶123 (LTVs "offset somewhat by the short-term drag from [GoHealth's] carrier expansion" as well as GoHealth's increased SNP business).

Then, during a December 2, 2020 analyst conference, Jones and Matthiesen laid bare the extent to which the RS contained false statements and omissions. ¶¶124-125. Specifically, Jones

- 17 -

stated, "*we anticipated 2020 to be an investment year with new carriers*" and made clear that new carriers were paying lower commission rates, causing "LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and *we thought that would happen*." ¶124. Matthiesen added that new carrier additions in 2020 created a "short-term drag on LTV" and that GoHealth would not get to "top-level contracts" with new carriers until 2021. ¶¶124-125 ("it's important to understand that new carriers really are a short-term drag on LTV").

In light of the foregoing, the Complaint alleges actionable, materially false statements and omissions in the RS, especially when considered in the context of post-IPO events, and Defendants' motion to dismiss on this ground should be denied. *See Beezley*, 2018 WL 3454490, at *3 ("Fenix's continual decrease in inventory value and the drastic impairment cost in quick succession to the IPO creates a reasonable inference that Fenix's offering documents misrepresented its inventory value, goodwill, and ability to acquire new companies. Even if the incorrect valuations were innocent and the result of Fenix's inadequate internal controls, this does not foreclose Fenix being liable under § 11. Accepting as true all well-pleaded facts in Plaintiff's complaint, and drawing all reasonable inferences in her favor, the Court determines that Plaintiff has plausibly alleged that Defendants violated § 11 of the [1933] Act.").

### 1. The Complaint Adequately "Connects the Dots" Regarding the Falsity of the RS

Defendants contend the Complaint fails to "connect the dots" between the reasons for their liability and the false statements in the RS. Mem. at 18, 21. Not so. Far from relying solely on Jones' "singular use of the phrase 'investment year'" as Defendants' wrongly argue (Mem. at 18), the Complaint provides several examples of GoHealth and the Individual Defendants admitting that the Company's strategy to rapidly expand its carrier base, while simultaneously increasing

reliance on non-commissionable revenue (via SNPs), was negatively impacting LTV/CAC prior to the IPO and would continue to do so throughout 2020 (¶¶116-125); *see also* §§II., III.D., *supra*; *Levitan*, 2001 WL 1117279, at *4-5 (rejecting defendants' argument that §11 complaint lacked falsity because it relied on "post hoc statements and 'falsity by hindsight' reasoning"); *Evergreen Fund*, 2000 WL 1693963, at *5-6 (denying motion to dismiss §11 complaint and rejecting defendants' attempt to argue "with the substance of all of plaintiffs' allegations," including reliance on "post hoc statements," and that defendants "did not admit the violations" and that "the change in [the company's] policies [did] not amount to an admission of wrongdoing").[12]

Similarly, Defendants' argument that GoHealth was not "suffering LTV drag in July 2020" falls flat.[13] Mem. at 21. As set forth above, GoHealth's 2Q2020 ended on June 30, 2020, prior to the IPO. When the Company did report its 2Q2020 results, it detailed rapid new carrier additions, a drop in commission revenue relative to non-commission revenue, and a 330% increase in marketing and advertising expenses. ¶118. Jones described increased customer churn in SNP plans, and made clear the disappointing financial results, were "as expected" because GoHealth did not "see surprises" and learned customer persistency data "in real time." ¶119. Jones

---

[12]   Defendants argue the "absence of any loss causation between the disclosure of the phrase 'investment year' and the decline in the price of GoHealth stock is apparent from the face of the Complaint." Mem. at 20. This is a red herring. The Complaint alleges the price of GoHealth stock declined from the IPO price to the date this action was filed, which is all that is required. ¶¶25, 126; *Ulta*, 604 F. Supp. 2d at 1194 ("Because the stock was selling below the IPO price at the time suit was filed [plaintiff] has alleged damages."); *see also Evergreen Fund*, 2000 WL 1693963, at *7 ("Because loss causation is an affirmative defense [to a §11 claim] and the failure to show loss causation is not evident from the [complaint], we deny defendants' motion to dismiss.").

[13]   The Individual Defendants also attempt to inject their knowledge as an issue relevant to the motion to dismiss. *See* MTD at 18 (arguing whether "Defendants *knew*" GoHealth's growth with two carriers had been maximized); *id.* at 21 (arguing the Complaint fails to "sustain a claim that Defendants *knew* and failed to disclose that GoHealth was suffering LTV drag in July 2020"). Defendants' "focus [on what Defendants knew] is curious, to say the least, because neither knowledge nor reason to know is an element in a plaintiff's prima facie case" under §11 and Defendants are liable "even for innocent misstatements." *Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l*, 2009 WL 3255225, at *6 (D.N.H. Oct. 7, 2009); *see also Huddleston*, 459 U.S. at 382 (scienter is not an element of a §11 claim).

- 19 -

confirmed the strategy to rapidly add carriers resulted in lower commission rates and LTVs, and

Matthiesen added SNPs were creating a "near-term drag" on average LTVs. ¶120.

While Defendants undoubtedly prefer to overlook these facts, it is clear the Complaint

amply "connects the dots" between the statements in the RS and the reasons for its falsity. *See In

re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015) (finding alleged false

statements that "growth was sustainable" were actionable where defendants were alleged to be

aware of "looming decrease in [formula] sales" and "deliberately withheld this information until

after completing the [secondary stock offering], while incredibly claiming that the Company's

growth was sustainable" and that defendants "either knew of and ignored the effects on

Enzymotec's business that the regulatory changes presented, or were deliberately reckless in not

knowing about them, in order to effectuate the [secondary stock offering].").[14] That Defendants

dispute the chronology of events and facts alleged merely confirms dismissal at the pleadings stage

is inappropriate, and Defendants' motion to dismiss on these grounds should be denied.

---

[14] The facts here contrast the cases relied on by Defendants. For example, *Conagra* involved a "lack of adequate allegations of fraudulent channel stuffing" in a §10(b) case. 495 F. Supp. 3d at 643. The court in *Conagra* did not hold that there is never a duty to disclose that a company's financial results are unsustainable; rather, the plaintiffs in that case failed to establish that fraudulent channel stuffing even existed. *Id.* at *641-43. Similarly, Defendants citation to *In re Axis Capital Holdings Lts. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), which held the defendant company was not required to speculate on the impact to its financials (and whether they were sustainable) if an undisclosed, illegal scheme to manipulate the insurance market was uncovered, is undermined by two things. First, the facts in this case do not turn on speculative, "what if" scenarios that potentially could impact GoHealth. Instead, they turn on GoHealth's plan, in place and occurring at the time of the IPO, to make 2020 an "investment year," which would negatively impact GoHealth's key financial metrics. Second, the reasoning of *Axis Capital* should only be considered in light of Judge Kendall's recent holding in *Flynn v. Exelon Corp.*, which denied the motion to dismiss and found the defendants "had a duty to disclose their alleged bribery scheme" and that their omission of the scheme made their statements misleading. 2021 WL 1561712, at *8 (N.D. Ill. Apr. 21, 2021). For this same reason, Defendants' reliance on *In re Citigroup, Inc. Sec. Litig.* is of no consequence. 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (finding fraud allegations unavailing because "the federal securities laws do not require a company to accuse itself of wrongdoing").

### 2. Defendants Had a Duty to Disclose Adverse Facts Impacting GoHealth at the Time of the IPO

Defendants use their motion to dismiss to divide the Complaint into two "theories" – what they call the Maximized Growth Theory and the LTV Drag Theory – and then attack each of their self-created theories in isolation to argue they had no duty to disclose either one. Mem. at 16-23.[15] The Complaint does not allege two separate "theories"; rather, it puts forth one cohesive set of facts that rendered the RS false: GoHealth was altering its business model and needed a carrier base expansion to continue its growth trajectory, which the Company rapidly put into place prior to the IPO but failed to disclose to investors, and this undisclosed, strategic shift was expected to (and did) negatively impact GoHealth's key LTV/CAC ratio in 2020. The Court should reject Defendants' inaccurate parsing of the Complaint's allegations. *See Tellabs*, 551 U.S. at 322 (the "court[] must consider the complaint in its entirety" to determine if the claims are properly stated); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (upholding jury finding where statements made up "a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie"); *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014) (denying motion to dismiss and rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative"). Moreover, such factual disputes are inappropriate for resolution on a motion to dismiss, where all inferences are to be drawn in Plaintiffs' favor. *See Beezley*, 2018 WL 3454490, at *3.

---

[15] Defendants improperly cite GoHealth's 2020 10-K to argue GoHealth suffered no LTV drag. Mem. at 21. Defendants' argument is nothing more than diversion. First, the 2020 10-K cannot be considered for the truth of its contents, as set forth in Plaintiffs' motion to strike. Second, Defendants wholly ignore that it is misleading to consider LTV in isolation, without also considering CAC, and that the 2020 10-K makes clear that there was a "decrease in LTV/CAC" for the year. *See* Defs. Ex. B at 61. Thus, if the Court does consider the 2020 10-K, it should do so to credit Plaintiffs' allegations that GoHealth's LTV/CAC ratio was negatively impacted by rapid carrier expansion, as admitted by Defendants after the IPO.

Regardless of Defendants' spin, they had a clear duty to disclose in the IPO that GoHealth already made a fundamental business shift that, unbeknownst to investors, was negatively impacting the Company's financial results and was expected to do so throughout 2020. *See Curo*, 426 F. Supp. 3d at 870 (failure to disclose pace and timing of business transition, which had a short-term, negative financial impact on company, held actionable). The 1933 Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). The 1933 Act "protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare*, 575 U.S. at 178 (quoting *Pinter v. Dahl*, 486 U.S. 622, 646 (1988)). Section 11 was "designed to assure compliance with the disclosure provisions of the [1933] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Huddleston*, 459 U.S. at 381-82; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (the "fundamental purpose" of the 1933 Act "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry").

Butting against this clear policy of full disclosure, Defendants claim they had no obligation to disclose that "otherwise accurately reported financial results may be unsustainable." Mem. at 18. First, Plaintiffs do not challenge GoHealth's financial results; rather, they challenge that GoHealth's rate of growth could not be sustained without rapid carrier expansion, that this strategic shift occurred prior to the IPO, and that the planned carrier expansion and business model shift were hurting GoHealth's key financial metrics. ¶¶5, 18-24, 86-89, 91, 95, 100, 105, 114. Second, a duty to disclose arises when a company puts the source of its success at issue, as the RS did here when it touted GoHealth's ability to rapidly scale while improving its economics, as measured by

- 22 -

LTV/CAC. ¶97; *see also Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 988 (W.D. Wis. 2003) (recognizing a duty to disclose material information that would make the statements made materially misleading). Determining whether an omitted fact made a statement materially misleading "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Therefore, "a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Comput. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997). For these additional reasons, the motion to dismiss should be denied.

### 3. The Complaint Adequately Pleads False and Misleading Statements and Omissions of Material Facts

Defendants go on to argue Plaintiffs failed to plead falsity for a list of statements cherry-picked from the RS. *See* Mem. at 24; Defs.' App. A. The Court, however, should not indulge Defendants' suggested navigation of the alleged misstatements. Critically, Defendants fail to appreciate that the RS is not only actionable for false statements, but also for material omissions. *See* 15 U.S.C. §77k(a); *Beezley*, 2018 WL 3454490, at *3. Thus, Plaintiffs are not strictly limited to pleading actionable statements by showing direct contradictions, as Defendants would have the Court believe. *See* Mem. at 24-25.

For example, Defendants claim falsity is undermined in the statement that "carriers . . . will often supplement [GoHealth's] marketing and technology investments." Mem. at 25 (quoting ¶92). This is a diversion. What the Complaint does plainly and consistently allege is that *because* "carriers . . . will often supplement [GoHealth's] marketing and technology investments" and "GoHealth benefitted from deep technical integration and subsidized marketing with its top carriers," it was false for the RS to omit the ongoing, rapid strategy shift, what was later described

- 23 -

as the "investment year," because GoHealth would receive reduced marketing support from newly added carriers. ¶¶18, 24, 64, 88, 89(c), 91-92, 100, 104, 114. To the contrary, the RS falsely stated that GoHealth's expansion would result in "***more*** efficient marketing[.]" ¶¶96, 98 (the addition of new carriers "allows us to market more efficiently . . . which drives revenue growth"). These omissions of material facts necessary to render the statements made not misleading are sufficient for Plaintiffs to state their claims. *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016) (holding statements that "represented [company's] acquisition strategy to investors as positive," including statements that defendants were "very happy" with how it was going, "all the while presenting little downside about the process," were sufficiently alleged as misleading).

The Complaint, however, pleads numerous actionable omissions, all of which are accompanied in the Complaint by sufficient factual support explaining why each is misleading or false, unlike the complaint in Defendants' sole cited case. *See* Mem. at 23, 25 (citing *Conagra Brands, Inc.*, 495 F. Supp. 3d at 645).[16] These omissions include that GoHealth had "maximized [its] growth" by having "dramatically increased concentration on just two Medicare insurance carriers[,]" and that, to overcome this, GoHealth significantly and rapidly expanded its carrier base and increased its reliance on non-commissionable SNPs, both of which negatively impacted LTV/CAC metric by resulting not only in reduced marketing support, but also in reduced commission rates, increased employee hiring and training expenses, reduced LTV data, increased churn/decreased persistency, and increased costs associated with fighting increased

---

[16] Because the Complaint is not a puzzle pleading and meets all pleading burdens as set forth in this opposition, Defendants' purported reservation of rights (Mem. at 23 n.7) is misguided. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.").

- 24 -

churn/decreased persistency. ¶¶18, 95, 99-103, 105.

All of these alleged omitted negative impacts demonstrate the falsity of the RS. ¶¶18, 100, 105. Chiefly, in light of these omissions, particularly those pertaining to reduced marketing support, increased churn/decreased persistency, and reduced LTV data, it was false for the RS to state that "expanding the Company's platform would 'improve' GoHealth's 'key drivers' of LTV/CAC," which "includ[ed] marketing costs," "consumer lead to customer conversion rate," "customer satisfaction" (*i.e.*, churn or persistency), and use of such "data." ¶91. For the same reasons, it was false for the RS to repeatedly state GoHealth could "rapid[ly] scal[e]" to add new carriers and that, with its use of the "data generated" in doing so, there would be a "resulting increase in the expected LTV of consumers obtained at a lower CAC." ¶¶60, 93, 97, 100.

Accordingly, the Complaint adequately pleads the RS included materially false statements and omissions of material facts, and Defendants' motion to dismiss should be denied. *See Miller v. Apropos Tech., Inc.*, 2003 WL 1733558, at *5 (N.D. Ill. Mar. 31. 2003) (denying motion to dismiss, in part, and finding "[e]ven if the Prospectus is factually accurate, that does not mean that it cannot be materially misleading as a matter of law" for "failure to disclose. . . information [that] would render it materially misleading").

### 4. The Materially False Statements Are Not Puffery

Defendants claim their statements regarding the Company's most important business metrics (LTV/CAC), carrier relationships, and the Company's ability to rapidly and profitably grow are mere puffery. Mem. at 29-30. Defendants are wrong, as evidenced by, among other things, the collapse in the price of GoHealth stock following the IPO as GoHealth made admissions to the market.

Whether statements are puffery turns on materiality and context, and thus presents a "mixed question of law and fact and requires delicate assessments of the inferences a reasonable

shareholder would draw from a given set of facts," which is "particularly appropriate for resolution by the trier of fact." *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 905-06 (N.D. Ill. 2004) (declining to conclude statements were immaterial puffery); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("The crux of materiality is whether, *in context*, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company," but "[i]f the statement amounts to vague aspiration or unspecific puffery, it is not material."), *vacated on other grounds*, 551 U.S. 308 (2007).[17]

The statements Defendants identify as puffery were neither vague nor unspecific. Instead, when viewed in context, they reflected consequential, then-present, and objectively verifiable facts that were either materially false or misleading.[18] ¶¶18-20, 24, 87-89, 91, 100, 104-105, 124.

Defendants' cited cases are inapposite. For example, *Singh v. Cigna Corp.* involved "general declarations about the importance of acting lawfully and with integrity" that the court found to be "textbook example[s] of 'puffery'" – a far cry from the statements here. 918 F.3d 57, 63 (2d Cir. 2019). The same goes for *In re Bally Total Fitness Sec. Litig.*, which involved statements that the "stock was a bargain" and the company "would continue to grow its earnings." 2007 WL 551574, at \*6 (N.D. Ill. Feb. 20, 2007); *see also St. Lucie Cnty. Fire Dist. Firefighters'*

---

[17] In vacating the judgment in *Tellabs*, 437 F.3d 588, the Supreme Court did not address the Seventh Circuit's materiality holding. *See* 551 U.S. 308. Thus, *Tellabs*, 437 F.3d 588, remains persuasive authority on materiality. *See, e.g.*, *In re Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299, 1302 (7th Cir. 1988) (denying motion to vacate trial court's opinion, stating persuasive force of opinion remained after vacatur).

[18] Defendants' puffery argument impermissibly separates phrases from their context and omits surrounding context. *See, e.g.*, *SEC v. Stifel, Nicolaus & Co., Inc.*, 2012 WL 4069346, at \*6 (E.D. Wis. Sept. 14, 2012) ("[D]efendants pull those words out of the sentences that give them context and help determine their substantive meaning."); *In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at \*9 (S.D. Cal. Sept. 27, 2016) ("[T]aking a few of Plaintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine Plaintiffs' detailed allegations that BofI's actual lending practices fell short of the standards BofI represented to investors."). The statements Defendants challenge as puffery, when viewed in context, were not so devoid of meaning that those statements can be dismissed as unimportant to a reasonable investor. *See Sears*, 388 F. Supp. 2d at 905-06.

*Pension Tr. Fund v. Motorola, Inc*, 2011 WL 814932, at *8 (N.D. Ill. Feb. 28, 2011) (noting plaintiffs "d[id] not allege that Defendants were not attempting to restore operational discipline" and "d[id] not dispute that Defendants were in fact [so] committed"); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 872-73 (N.D. Ill. 2011) (noted statements were, unlike here, "devoid of any substantive content" and "not falsifiable representations"). Accordingly, the statements Defendants contend are immaterial puffery were, in fact, materially misleading, and Defendants' motion to dismiss on this ground should be denied.[19]

### 5.    Defendants Are Not Protected by the Bespeaks Caution Doctrine

The bespeaks caution doctrine does not afford Defendants any protection because the statements they identify as forward looking (*see* Mem. at 27) are neither forward looking nor accompanied by meaningful cautionary language.[20]

First, the Complaint alleges omissions of then-existing and historical material negative facts that cannot be forward looking. *See* §III.D.3., *supra*; *Takara*, 429 F. Supp. 2d at 974 ( "it is axiomatic that the failure to make a statement cannot be forward looking"). Likewise, projections do not receive bespeaks caution protection for omissions rendering them false. *See Baxter*, 2012 WL 607578, at *3 (projections not protected as forward looking where company failed to disclose changes in its business that undermined basis for projections); *Ulta*, 604 F. Supp. 2d at 1196

---

[19]    Alternatively, the Court should treat Defendants' "immaterial puffery" arguments as premature, as courts routinely hold that "the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 976 (N.D. Ill. 2006).

[20]    While courts have generally recognized that the PSLRA safe harbor is based on the bespeaks caution doctrine (*see* Mem. at 26 (citing cases not involving §11 claims, *i.e.*, *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) and *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997))), the statutory safe harbor, as Defendants concede (Mem. at 26), does not apply to statements made in an initial public offering. *See* 15 U.S.C. §77z-2(b)(2)(D).

(holding trends reported in prospectus not protected as forward looking because defendants possessed contrary data); *Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at \*4 (N.D. Ill. June 14, 2006) (holding statement "looking to 2005 and expecting improvement" not protected as forward looking because "clear inference from the complaint's allegations is that no reasonable executive could, at the time of the statement, honestly have expected improvement in 2005"); *Curo*, 426 F. Supp. 3d at 870 (holding projections not protected as forward looking because plaintiffs alleged that "defendants failed to disclose that those projections were contradicted by known facts concerning the transition and its inevitable impact").

As for the statements Defendants list in their Appendix A, those statements are either not forward looking for the same reasons (*i.e.*, they are false present or mixed present/future tense statements[21] or omit then-existing negative material facts) or, as discussed below, were unaccompanied by meaningful cautionary language. Accordingly, Defendants are not protected by the bespeaks caution doctrine.

Even if a statement is purely forward looking, it must be accompanied by meaningful cautionary language. *See Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at \*11 (N.D. Ill. Apr. 26, 2021) (denying motion to dismiss and finding cautionary language not meaningful "in comparison with what plaintiff alleges to have been happening behind the scenes" because it "did not precisely disclose the exact risk that materialized" but "merely highlighted some parts of the business that might cause problems, without disclosing problems that were on the horizon although the precipice was in sight"); *Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at \*11 (N.D. Ill. Feb. 5, 2020) (cautionary language not meaningful because, while it stated the occurrence of an event (a

---

[21]  *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (holding not forward looking the present portion of a "mixed present/future statement," such as the "representation concerning current sales" in the statement that sales were "still going strong").

regulatory approval) was "hard to project and predict," it did not "meaningfully alert investors to the principal contingencies arising from data integrity problems" that "posed a significant risk to approval"); *SEC v. Kameli*, 2020 WL 2542154, at \*22 (N.D. Ill. May 19, 2020) (bespeaks caution doctrine inapplicable to warnings "not address[ing] the specific risk relevant to the SEC's claims").

As alleged, *none* of the RS' risk disclosures, including those Defendants reference (*see* Mem. at 27-28; Defs.' App. A.), touched upon the ongoing, significant and rapid carrier expansion and shift to non-commissionable SNPs in 2020, or their negative impact on LTV/CAC.  ¶¶18-20, 91, 95, 100-105.   To "warn," as Defendants highlight, that LTV is "based on numerous assumptions" and that "negative changes in any of those [undisclosed] factors could impact LTV" (Mem. at 28) did not meaningfully caution IPO investors as to the current state of affairs at GoHealth.  Neither did warning that "unsuccessful" carrier expansion could negatively impact GoHealth (*id.*) serve to warn that *successful* carrier expansion was hurting and would negatively impact LTV/CAC throughout 2020.  Thus, even if the RS' misstatements were considered forward looking, the "warnings" were not meaningful because they did not "identify important factors" or "point to the principal contingencies" that could cause results to differ from them.  *Asher v. Baxter Int'l*, 377 F.3d 727, 734 (7th Cir. 2004) ("For all we can tell, the major risks [the company] objectively faced . . . were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them.").[22]

Accordingly, the "bespeaks caution" doctrine affords Defendants no protection.

---

[22]    These statements are a far cry from *Motorola*, 2011 WL 814932, at \*10, (Mem. at 27, 30), where the "cautionary statements addressed [p]laintiffs' particular allegations *in individualized terms* . . . and, as such, were sufficiently specific."  Even *Rombach* (Mem. at 25), recognized "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired," 355 F.3d at 173.

### 6.      Defendants Violated Items 303 and 105

Defendants also failed to disclose information the SEC requires be included in the RS, per the affirmative disclosure obligations in Items 303 and 105 of Regulation S-K, governing non-financial statement portions of registration statements.  17 C.F.R. §229.10.  This includes "known trends or uncertainties" and "the principal factors that make an . . . offering speculative or risky." SEC Regulation S-K, 17 C.F.R. §229.303; 17 C.F.R. §229.105.

Specifically, Item 303 of Regulation S-K requires an issuer of a security to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" as well as "events that are reasonably likely to cause a material change in the relationship between costs and revenues[.]"  17 C.F.R. §229.303(b)(2)(ii).  "This 'reasonably expects' language has not been defined by the Seventh Circuit, but district courts in other circuits and the SEC have stated it requires more than a remote possibility but something less than more-likely-than-not."  *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821 (N.D. Ill. 2018).  Item 303 also requires disclosure of known "unusual or infrequent event[s]" or "uncertainties."  17 C.F.R. §229.303(b)(2)(i)-(ii); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94-97 (2d Cir. 2016) (plaintiff adequately pled Item 303 violation for failure to disclose known event or uncertainty); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F. 3d 114, 121-22 (2d Cir. 2012) (plaintiff adequately alleged "known uncertainties" stemming from undisclosed defect in important product).  Failure to comply with Item 303 constitutes a violation of §11 and failure to disclose a new strategy constitutes a violation of Item 303.  *Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (upholding Item 303 claim where company failed to disclosed its new sales strategy that "presented a serious risk of diminishing revenue due to new complications and required engineering").

Item 105 contains a related affirmative disclosure obligation, requiring offering documents to "discuss[] . . . the most significant factors that make the offering speculative or risky" and "how the risk affects the issuer or the securities being offered." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at \*7 (S.D.N.Y. Sept. 27, 2020). "[A]n Item 303 violation may also support an Item 105 violation, and a court's rationale for determining the former may also support the same determination of the latter." *Id.* "Although there is scant caselaw on Item [105], the inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid." *Id.* Failure to disclose information required by Item 105 is a violation of §11. *Id.*

As set forth above, before the IPO, GoHealth implemented a fundamental strategy shift that was already negatively pressuring GoHealth's LTV/CAC. Moreover, as later admitted, these negative trends were "expected" and "anticipated" to impact GoHealth's key financial metrics for the rest of 2020. *See* §§II., III.D.3., *supra*. This strategic shift and its negative effects, which predated the IPO, constituted a known "event[] or uncertaint[y]" required to be fully disclosed under Items 303 and 105 because they were reasonably likely to materially affect GoHealth's financial condition or operating results and made investing in the offering more speculative and risky as the Company rapidly expanded and disrupted its business model. *See Curo*, 426 F. Supp. 3d at 872 ("[Plaintiffs] allege that defendants failed to disclose decisions concerning the strategy and timing of the transition, as well as the resulting impact on the 2018 performance as a whole. The Court cannot conclude as a matter of law that there was no trend or uncertainty here.").

Additionally, GoHealth's rapid transition was reasonably likely to (and did) have a material negative effect on its financial condition or results of operations, and GoHealth and the Individual Defendants have admitted that it was expected to have such an effect. *SAIC*, 818 F.3d at 96 (Item 303 materiality is a "mixed question of law and fact" generally inappropriate for resolution on a

motion to dismiss).  The importance of the Medicare business, which relied on commissionable revenue, made it exceptionally likely that the Company's rapid transition away from its two top customers in its most profitable business line, while also relying more on SNPs, would have a negative, material impact on GoHealth's operations and financial condition.[23]  *See McKenna v. SMART Techs., Inc.*, 2012 WL 3589655, at \*4 (S.D.N.Y. Aug. 21, 2012) (allegations of uncertainty over demand for company's "core" product sufficient to establish likely material impact); *See Cai*, 2019 WL 3065591, at \*5-6 (upholding Item 303 claim where company failed to disclose a new sales strategy that presented a significant risk of adversely affecting revenue).  The Complaint thus adequately pleads violations of Items 303 and 105, and Defendants' motion should be denied.[24]

### E. The Complaint States a Claim for Control Person Liability Under §15 of the 1933 Act[25]

As detailed in the RS, GoHealth is a controlled company, subject to the control of the §15 Defendants.  *See, e.g.*, ¶¶77-85, 141-147.  Despite these admissions, the §15 Defendants now claim they did not control GoHealth and that the Complaint fails to state a §15 claim.  Mem. at 33-34. Defendants are demonstrably wrong.  To state a §15 claim, a plaintiff need only allege "whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and . . . whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated,

---

[23] There is also no question that Defendants knew of the strategic shift and its impact, prior to the IPO, on GoHealth's financial condition.  *See, e.g.*, ¶119 ("we don't see surprises" and see data "in real time").

[24] Defendants' argument about the rescission of SEC Staff Accounting Bulletin ("SAB") 104 is of no moment.  *See* Mem. at 30.  As noted in the accounting guidance Defendants cite, SAB 116 "modifies portions" of SAB 104 so as to make it consistent with accounting guidance in Accounting Standards Codification Topic No. 606, *Revenue from Contracts with Customers*.  But the SEC disclosure obligations at issue here, *i.e.*, those that obligated the RS to disclose the future financial impact of the change in the Company's business strategy (¶¶112-113), originate from and are required by Item 303 and are simply restated in SAB 104 so as to highlight its significance.  Accordingly, Defendants' argument is futile.

[25] Plaintiffs have separately responded to Centerbridge's motion to dismiss the §15 claim against it.

whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992) (reversing grant of summary judgement for defendants on control person claim, holding "[w]e leave that determination to the factfinder").[26] "Control person liability does not require any heightened pleading standard or scienter." *Shah*, 348 F. Supp. 3d at 851. Finally, any doubt as to whether dismissal is warranted is resolved in plaintiffs' favor because "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *Flynn*, 2021 WL 1561712, at *11 (same).

The Complaint adequately alleges control person liability (¶¶77-85, 141-147) and, contrary to the §15 Defendants' contentions, does far more than merely state Defendants' titles. *See* Mem. at 33-34. Rather, the Complaint alleges that each of the Individual Defendants: (1) signed the RS, which contained false statements and omissions; (2) reviewed and helped prepare the RS; and (3) participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and for the benefit of the Company. ¶35. The Complaint also alleges that the Company's founders – Jones and Cruz ("Founders") – along with Centerbridge, exercised significant control over GoHealth, including over: (1) all matters requiring shareholder approval, such as the election and removal of directors and the size of GoHealth's board; (2) any amendment to GoHealth's certificate of incorporation or bylaws; and (3) any approval of significant corporate transactions, including a sale of all or substantially all of GoHealth's assets. ¶¶35, 145. Further, it describes how the various transactions consummated via

---

[26] Control person liability under §15 of the 1933 Act and §20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a), are "parallel" in that "the analysis applied to them is the same." *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, 2006 WL 2787520, at *24 (N.D. Ill. Sept. 22, 2006).

the IPO provided the §15 Defendants with "substantial control over the Company." ¶¶77-85.[27]

The Complaint makes clear that, even after the IPO, Jones and Cruz, along with Centerbridge, collectively controlled 71% of the voting power represented by all classes of GoHealth stock and quotes the RS' admission that the Founders and Centerbridge "will continue to have *significant control* over our business, affairs and policies, *including the appointment of our management*." ¶¶35, 145. The RS added that the "Founders and Centerbridge can take actions that have the effect of delaying or preventing a change of control of us" and recognized there was a "concentration of voting power with the Founders and Centerbridge." *Id.* The RS also made clear that, after the IPO, NVX Holdings (an entity controlled by Jones and Cruz to house their holdings of GoHealth stock) and Centerbridge would have "more than 50% of the voting power for the election of directors, and, as a result, [GoHealth is] considered a 'controlled company.'" ¶¶36, 144-145.[28]

The allegations summarized above are more than adequate to state a claim for control person liability at the pleadings stage and largely mirror those in *Curo*, where the control person allegations were upheld against three board members who founded the company and three related entities who, along with the founders, were the company's controlling shareholders. 426 F. Supp. 3d at 876 (denying motion to dismiss control person allegations). In *Curo*, the court found the

---

[27] The Complaint explains that Centerbridge not only was the primary beneficiary of GoHealth's IPO (as a result of it having indirectly acquired 100% of GoHealth's operating entity Norvax (*i.e.*, the Acquisition)) but also, along with NVX Holdings, Jones, and Cruz (who was paid significant consideration per the Earnout Terms of the Acquisition), substantially benefitted from Transactions that GoHealth undertook in connection with its IPO, which determined how proceeds from GoHealth's IPO would be distributed among them, reorganized GoHealth's corporate structure in their favor, and included a Stockholder Agreement giving them voting rights far out of proportion to their economic stake in GoHealth. *See* ¶¶3, 41, 50, 66-67, 69, 77, 83-85.

[28] Notably, the 2020 10-K, which Defendants improperly attach to their motion to dismiss, includes an admission that supports the Complaint's control person allegations: "The Founders and Centerbridge have significant influence over us, including control over decisions that require the approval of stockholders." Defs. Ex. B at 3.

complaint adequately alleged that defendants "controlled Curo by virtue of their share ownership, power to appoint the entire board of directors, and their relationship to the company," and noted the complaint "cite[d] specifically to a past admission by Curo that these defendants 'collectively have the ability to elect all of the members of our board of directors and thereby control our policies and operations.'" *Id.* at 877.  In the face of these allegations, the *Curo* court specifically rejected the same argument advanced by the §15 Defendants here: that their positions are insufficient to allege control person liability.  *Id.* at 878.  In so doing, *Curo* noted the "additional allegation" that defendants controlled the company by virtue of their ability to elect the board and relationship to the company, and found defendants' control "supported by the company's own admission." *Id.*[29]  The same is true in this case, where the RS makes control explicitly clear.  Thus, the §15 Defendants' motion to dismiss the §15 claim should be denied.

## IV.    CONCLUSION

For the above reasons, the motion to dismiss should be denied in its entirety.

DATED:  June 14, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN (IL Bar # 6329016)

*s/ Brian E. Cochran*
BRIAN E. COCHRAN

---

[29]    The §15 Defendants' authorities do not suggest a different result.  *See* Mem. at 34.  For example, *Zishka v. Am. Pad & Paper Co.* held that "[s]tatus alone as to persons not involved in day to day management" was insufficient to support a §20(a) claim.  2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001) (plaintiffs' only control person allegations were stock ownership and the ability to appoint some of the board).  Likewise, in *Aldridge v. A.T. Cross Corp.*, "[a]t most the evidence pled is that the trust defendants are controlling shareholders."  284 F.3d 72, 85 (1st Cir. 2002).  These facts are far afield from the admissions in the RS that GoHealth was a "controlled company" subject to the "significant influence" of the Founders (and, by extension, NVX Holdings) and Centerbridge.  ¶145.

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS (admitted *pro hac vice*)
CHRISTIAN G. MONTELIONE (admitted *pro
hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
cmontelione@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS E. GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Additional Counsel for Lead Plaintiffs*

- 36 -

- 37 -

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 14, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Brian E. Cochran*
BRIAN E. COCHRAN