Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 1 of 306 PageID #:1957

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

2009 WL 3255225
United States District Court, D. New Hampshire.

ARKANSAS PUBLIC EMPLOYEE
RETIREMENT SYSTEM et al.
v.
GT SOLAR INTERNATIONAL, INC. et al.

Civil No. 08–cv–312–JL.
|
Oct. 7, 2009.

**Attorneys and Law Firms**

Christopher Cole, Sheehan Phinney Bass & Green, Christopher D. Hawkins, Nelson Kinder Mosseau & Saturley PC, Jamie N. Hage, Hage Hodes PA, David P. Slawsky, Lawrence A. Vogelman, Nixon Raiche Vogelman Barry & Slawsky PA, Manchester, NH, Mark L. Mallory, Mallory & Friedman PLLC, William L. Chapman, Orr & Reno PA, C. Kevin Leonard, Douglas Leonard & Garvey, Concord, NH, Edward F. Haber, Michelle H. Blauner, Shapiro Haber & Urmy, Boston, MA, Daniel S. Sommers, Matthew K. Handley, Steven J. Toll, Cohen Milstein Sellers & Toll, Washington, DC, Kenneth G. Bouchard, Bouchard Kleinman & Wright PA, Hampton, NH, Mark Punzalan, Finkelstein Thompson LLP, San Francisco, CA, for Arkansas Public Employee Retirement System et al.

Christopher B. Zimmerman, James W. Prendergast, Jeffrey B. Rudman, William H. Paine, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, W. Daniel Deane, W. Scott O'Connell, Nixon Peabody LLP, Manchester, NH, B. Andrew Bednark, Bradley J. Butwin, William J. Sushon, O'Melveny & Myers LLP, New York, NY, Edmund J. Boutin, Boutin & Associates PLLC, Londonderry, NH, John L. Altieri, Jr., Boutin & Altieri PLLC, Meredith, NH, for GT Solar International, Inc. et al.

**OPINION AND ORDER**

JOSEPH N. LAPLANTE, District Judge.

**\*1** Defendant GT Solar International, Inc., a New Hampshire-based manufacturer of furnaces and other equipment used to make components for solar power, or photovoltaic, systems, raised $500 million in its initial public offering ("IPO") on July 24, 2008. Early the next morning, however, GT Solar's biggest customer announced that it had signed a contract to purchase its furnaces from one of GT Solar's competitors; that day, after the United States market opened, GT Solar's stock fell by 24 percent from the price it fetched in the IPO the day before.

An investor who purchased GT Solar shares in the IPO, plaintiff Arkansas Public Employee Retirement System, brought this putative class action against GT Solar, a number of its directors and officers, the investment banks that underwrote the IPO, and the venture capital firms that own a controlling interest in GT Solar. The plaintiff alleges that the defendants' failure to disclose, in the registration statement or prospectus accompanying the IPO,[1] the "substantial likelihood" that GT Solar's biggest customer would stop buying its furnaces from GT Solar, among other facts, violated §§ 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l* (a)(2). The defendants have moved to dismiss the consolidated class action complaint, arguing that it fails to state a claim for relief. *See* Fed.R.Civ.P. 12(b)(6).

1    Because the registration statement is simply a completed form attaching the prospectus—which is the document containing all of the statements at issue here—this order will refer to the documents together as the "prospectus."

This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question). After oral argument, and for the foregoing reasons, the defendants' motion to dismiss is denied. As explained fully *infra,* the plaintiff need not allege that the defendants knew, or even that they should have known, of the substantial likelihood that GT Solar's biggest customer would take its business elsewhere, and the failure to disclose that risk in the prospectus could have rendered certain statements it did contain misleading in violation of §§ 11 and 12(2).

**I. *Background***
In ruling on the defendants' motion to dismiss for failure to state a claim, the court accepts the allegations of the complaint, including those that follow, as true. *See, e.g., Gray v. Evercore Restructuring L.L.C.,* 544 F.3d 320, 324 (1st Cir.2008). The court has also culled facts from the public documents submitted by the parties, chiefly GT Solar's registration statement and prospectus. *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,* 537 F.3d 35, 43 (1st Cir.2008).

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 2 of 306 PageID #:1958

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

One of GT Solar's principal products is its directional solidification systems ("DSS") furnace, used to melt and cast multicrystalline ingots from which solar wafers are manufactured. Sales of DSS units accounted for at least 85 percent of GT Solar's revenues in both its 2007 and 2008 fiscal years, and more than 70 percent of its revenue in the 2006 fiscal year. During these years, one of GT Solar's biggest customers was LDK Solar Co., Ltd., which had placed orders with GT Solar for more than 250 of its DSS furnaces by the end of the 2007 calendar year. (By comparison, GT Solar had delivered just 620 DSS furnaces to all of its customers in the three years preceding the IPO.) LDK, in fact, accounted for 62 percent of GT Solar's revenue in the 2008 fiscal year.

 **\*2** But LDK issued a press release in the early morning hours of July 25, 2008—the day following the IPO—that LDK had entered into a contract to buy furnaces used in manufacturing multicrystalline ingots from JYT Corporation, a competitor of GT Solar based in China. The press release announced that delivery of the furnaces would commence in 2008, extending through 2010, and that LDK was "granted the exclusive right by JYT in purchasing and using this new equipment for the contract period." After the United States stock market opened on the day of LDK's press release, GT Solar's share price fell to a low of $9.30 before closing at $12.59, as the stock traded at a volume 15 times its average between then and the commencement of this action. The share price in the IPO, just the day before LDK's press release, had been $16.50, so GT Solar's stock had lost nearly 24 percent of its market value.

Aside from this chronology, the plaintiff has alleged a number of facts that, in its view, further support the inference that GT Solar knew, at the time of the IPO, of a "substantial likelihood"—if not an absolute certainty—that LDK would choose another supplier of DSS furnaces.[2] These allegations are based on information from "confidential witnesses" who worked at GT Solar in the months and, in some cases, years, before the IPO. Among other happenings, these witnesses related: having seen a presentation, also reviewed by the chief executive officer and the board of directors, "that indicated JYT was growing and threatening GT Solar's business"; having heard that LDK "was looking around the industry to buy furnaces from other companies" besides GT Solar; and that GT Solar employees had "raised concerns that LDK was 'upset' with GT Solar's products," including an instance where the witness himself had gone directly to the company's vice president of customer support.[3]

[2] At oral argument, the defendants asserted that the plaintiff had conceded their lack of actual knowledge that LDK would not renew its contract with GT Solar. But what the plaintiff conceded—as it clarified at oral argument—is that it has not *alleged* actual knowledge at this point. That is not the same as conceding that the defendants had no actual knowledge. In any event, the defendants' knowledge, actual or constructive, is not an element of the plaintiff's prima facie case, *see infra* Part II.B.1, so the dispute is irrelevant anyway.

[3] The defendants point out, though, that LDK's 2007 annual report, filed on April 7, 2008, noted some "$278.6 million in purchase obligations to GT Solar[,] primarily for DSS furnaces to be delivered in 2008 and 2009," as well as that LDK was "engaged in research and development efforts in collaboration with GT Solar to increase the number of [multicrystalline] wafers that can be produced per standard ingot."

Despite these goings-on, the prospectus accompanying the IPO contained certain statements that, in the plaintiff's view, created the misleading impression that GT Solar would experience continued success in selling its DSS furnaces to LDK. In particular, the plaintiff identifies the following:

- "We believe our DSS unit is a market leading product."

- "*Leading market position in specialized furnaces essential for the production of multicrystalline solar wafers.* We believe our DSS units are the most widely used furnace for casting multicrystalline ingots in the solar industry."

- "Since 2004 we have delivered over 620 DSS units. We believe our installed base of DSS units and other [photovoltaic] equipment promotes recurring sales of additional equipment because of the high cost associated with changing equipment suppliers."

- "During the fiscal year ended March 31, 2008, one customer, LDK Solar Co., accounted for 62% of our revenue."

For their part, however, the defendants identify a number of other statements in the prospectus which, from their perspective, dispel any impression that GT Solar would necessarily maintain its lucrative relationship with LDK. First, they note that GT Solar disclosed the "risk that existing customers will elect not to do business with us in the future," magnified by the fact that "we depend on a small number of customers for a substantial part of our sales

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 3 of 306 PageID #:1959

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

and revenue." Second, the defendants point to a similar warning about GT Solar's reliance on a limited number of products, particularly its DSS furnaces; the prospectus cautioned, "There can be no assurance that DSS sales will increase beyond, or be maintained at past levels. Factors affecting the level of future DSS sales include factors beyond our control, including ... competing product offerings by other [photovoltaic] manufacturers."[4] Third, the prospectus mentioned that GT Solar "may face product liability claims" and "may face significant warranty claims" arising out of its DSS products.

[4]     The prospectus also stated, elsewhere, "We face competition from other manufacturers of equipment for [photovoltaic] products."

## II. *Applicable legal standard*

 **\*3** The defendants have raised two arguments as to the correct standard for deciding their motion to dismiss. First, they say that Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud," applies here. That is not correct.

"Fraud is not an element of a claim under either Section 11 or 12(2), and a plaintiff asserting such claims may avoid altogether any allegations of scienter or reliance." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996). The court of appeals did note in *Shaw* that "a complaint asserting violations of those statutes may yet sound in fraud," e.g., "if a plaintiff were to attempt to establish violations of Sections 11 and 12(2) as well as the anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct," with the result that "Rule 9(b) would probably apply to the Sections 11, 12(s), and Rule 10b–5 claims alike."[5] *Id.* But the plaintiff has not chosen that course here, bringing claims under §§ 11 and 12(2) only, and premising those claims on nondisclosures, rather than on false statements.

[5]     As the Supreme Court has noted, "a § 10(b) plaintiff carries a heavier burden than a § 11 plaintiff. Most significantly, he must prove that the defendant acted with scienter, i.e., with intent to deceive, manipulate, or defraud." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 383 (1983) (footnote omitted).

Furthermore, the defendants' argument that Rule 9(b) nevertheless applies because the plaintiff alleges that they made "knowing omissions" or "concealed" facts in the prospectus, *but see* note 2, *supra,* was squarely rejected in *Shaw.*[6] There, the court of appeals ruled that a complaint under §§ 11 and 12(2) alleging "that defendants actually possessed the information that they failed to disclose" does not trigger Rule 9(b), "absent any claim of scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b)." 82 F.3d at 1223. So Rule 9(b) does not apply in this case of alleged nondisclosures, as the defendants more or less conceded at oral argument.

[6]     The defendants also argue that the plaintiff alleges "a knowingly false statement," but that is inaccurate— as well as inconsistent with the defendants' argument that the plaintiffs have conceded they allege no false statement.

Second, the defendants argue that the complaint does not pass muster even under the lower pleading standard of Rule 8, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), as that standard has been illuminated by the recent decisions of the Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009). The defendants maintain that the complaint does not allege what they characterize as "plausible grounds to infer" that they knew at the time of the IPO what they are accused of failing to disclose: the "substantial likelihood" that LDK would stop purchasing DSS furnaces from GT Solar. Putting aside the fact that, as discussed *infra* at Part III.B.1, a plaintiff need not allege that the defendants knew, or even had reason to know, of the allegedly nondisclosed information to make out a claim under §§ 11 or 12(2), the defendants take too stringent a view of federal pleading standards, even post-*Twombly/Iqbal.*

 **\*4** While *Twombly* and *Iqbal* hold that "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,' " this "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570). Or, stated in the positive, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). At most, then, those cases suggest that if the facts alleged in a complaint could support either an inference of wrongdoing or an " 'obvious alternative explanation' " then the plausibility

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 4 of 306 PageID #:1960

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

standard requires the court to choose the "obvious alternative explanation."[7] *Iqbal,* 129 S.Ct. at 1951–52 (quoting *Twombly,* 550 U.S. at 567).

[7] In this court's view, that is the strictest reading of the pleading standard even arguably supported by *Twombly* and *Iqbal,* so this court accepts that reading here without deciding whether it is necessarily the correct one. It is worth noting that then-Justice Souter, author of the majority opinion in *Twombly,* dissented from the majority opinion in *Iqbal,* arguing that "*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, *no matter how skeptical the court may be.*" 129 S.Ct. at 1959 (emphasis added).

Here, as explained *infra,* the plaintiff's factual allegations do not make "obvious" the "alternative explanation" advanced by the defendants, i.e., that at the time of the IPO they knew of no "substantial likelihood" that LDK would take its furnace business elsewhere. The facts alleged in the complaint reasonably support the opposite inference, i.e., that the defendants were aware of such a likelihood. The inference is by no means inescapable, but, as just discussed, *Twombly* and *Iqbal* did not equate "plausible" with "inescapable" or even "likely." Instead, dismissal for failure to state a claim is appropriate only if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal,* 129 S.Ct. at 1950. That is the applicable standard.

## III. *Analysis*

### A. The statutory framework

Section 11 provides that "[i]n case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security" may sue a variety of enumerated persons. 15 U.S.C. § 77k(a). These include "every person who signed the registration statement," "every person who was a director ... in the issuer at the time of the filing of the registration statement," and "every underwriter with respect to such security." *Id.* Here, all of the officers and directors named as defendants are alleged to have signed the prospectus, and all of the banks named as defendants are alleged to have been underwriters of the IPO.

Section 11 also provides, however, that "no person, other than the issuer, shall be liable ... who shall sustain the burden of proof" that, in relevant part, "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, ... that there was no omission to state a material fact ... necessary to make the statements therein not misleading." *Id.* § 77k(b)(3)(A).

**\*5** Section 12(2), in relevant part, provides that any person who "offers or sells a security by the use of any means or instruments of interstate commerce or of the mails, by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading ... shall be liable ... to the person purchasing such security from him." 15 U.S.C. § 77*l* (a)(2) (parentheticals omitted). As this language suggests, the elements of a § 12(2) claim essentially mirror those of a § 11 claim, at least in all respects relevant here, where only the underwriters have been named as defendants to the § 12(2) claim. *See, e.g., In re Tyco Int'l Ltd.,* 2004 DNH 154, 45–46.

Like section 11, section 12(2) allows a defendant to escape liability by "sustain[ing] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission." 15 U.S.C. § 77*l* (a)(2). Section 12(2) creates a further affirmative defense of "loss causation," i.e., "if the person who offered or sold [the] security proves that any portion or all of the amount recoverable ... represents other than the depreciation in value of the subject security resulting from the part of the prospectus ... with respect to which the liability of that person is asserted ... then such portion or amount, as the case may be, shall not be recoverable." *Id.* § 77*l* (b).

Finally, § 15 of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under [15 U.S.C. § ] 77k or 77*l* shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o.* The complaint thus names the venture capital firm that owned 99.9% of GT Solar's voting stock at the time of the IPO, GT Holdings, as well as other venture capital firms that allegedly "own and control" or manage GT Holdings, as defendants under § 15.

### B. The defendants' arguments

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 5 of 306 PageID #:1961

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...
2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

The defendants seek dismissal of the complaint on a number of grounds. First, as referenced above, they argue that the plaintiff has not pled facts sufficient to support an inference that they knew, at the time of the IPO, of a substantial likelihood that LDK would discontinue purchasing furnaces from GT Solar. Second, the defendants argue that, even if they knew of that likelihood but failed to disclose it, the plaintiff has not pointed to any statement in the prospectus that was misleading as a result, particularly in light of the other "cautionary language" they identify. Third, the defendants argue that the complaint demonstrates an absence of loss causation under 15 U.S.C. § 77*l* (b). Fourth, the defendants argue that the complaint does not allege that the venture capital firms "controlled" GT Solar at the time of the IPO so as to render them liable for any deficiencies in the prospectus under § 15. The court will address these arguments in turn.

### 1. The defendants' knowledge

**\*6** The defendants devoted much of their briefing, and nearly all of their presentation at oral argument, to the proposition that the plaintiff had not adequately alleged they knew, or had reason to know, that LDK would stop ordering DSS furnaces from GT Solar. That focus is curious, to say the least, because "[n]either knowledge nor reason to know is an element in a plaintiff's prima facie case" under §§ 11 or 12(2) of the Securities Act. *Degulis v. LXR Biotechnology, Inc.,* Nos. 95–4204 *et al.,* 1997 WL 20832, at \*3 (S.D.N.Y. Jan. 21, 1997); *see also, e.g., In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 274 n. 7 (3d Cir.2004); *Hutchinson v. CBRE Realty Fin., Inc.,* ——F.Supp.2d ——, No. 03–1599, 2009 WL 2342768, at \*8 (D.Conn. July 29, 2009); *In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d 281, 343 (S.D.N.Y.2003); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.,* 202 F.Supp.2d 8, 12 (S.D.N.Y.2001); *In re WebSecure, Inc. Sec. Litig.,* 182 F.R.D. 364, 369–70 (D.Mass.1998). Instead, as the Supreme Court has held, section 11

> was designed to assure compliance with the disclosure provisions of the [Securities Act] by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, *he need show only a material misstatement or omission to establish his prima facie case.* Liability against the issuer of a security is virtually absolute, *even for innocent misstatements.* Other defendants bear the burden of demonstrating due diligence. *See* 15 U.S.C. § 77k(b).

*Huddleston,* 459 U.S. at 382 (emphases added; footnotes omitted).[8]

8    "The phrase 'due diligence' does not Securities Act, but two of the affirmative under Section 11(b) are collectively known defense." *In re WorldCom, Inc. Sec. Litig* 662 (S.D.N.Y.2004).

So the defendants' point about what the plaintiff has not alleged they knew is irrelevant to whether the complaint adequately states claims against them under §§ 11 and 12. At most, it invokes the statutory defense of due diligence (or reasonable investigation) on the part of the individual defendants under 15 U.S.C. § 77k(b)(3)(A) (or § 77*l* (a)(2)), on the theory that they had "reasonable ground to believe and did believe ... that there was no omission" from the prospectus (or "did not know, and in the exercise of reasonable care could not have known") of the substantial likelihood that LDK would go elsewhere for its DSS furnaces. Because section 11 places the burden of showing due diligence on the defendants, however, it cannot support their motion to dismiss unless "it is (1) definitively ascertainable from the complaint and other sources of information that are reviewable at this stage, and (2) [these] facts establish the affirmative defense with certitude." *Citibank Global Mkts., Inc. v. Rodríguez Santana,* 573 F.3d 17, 23 (1st Cir.2009). It is far from "definitively ascertainable" from the materials now before the court that the defendants' due diligence or reasonable investigation defenses have been established "with certitude."

**\*7** First, the fact that LDK announced its contract to purchase DSS furnaces from GT Solar's competitor the very next day after the prospectus was filed creates an inference, at least, that the individual defendants knew—to say nothing of whether they had "reasonable ground to believe" or "could have known"—of a substantial likelihood that LDK would do so.[9] Even in a case unlike this one, where a plaintiff must allege the defendants' actual knowledge of the undisclosed fact, "the short time frame between an ... omission and a later disclosure of inconsistent information ... provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge." *Shaw,* 82 F.3d at 1225. While a contrary inference is not beyond the realm of possibility, the exceedingly short time frame between the prospectus and LDK's announcement itself forecloses the conclusion "with certitude" that the defendants did not know, and could not, in the exercise of due diligence or reasonable investigation, have known, of the information omitted from the prospectus, i.e., the substantial likelihood that LDK would not renew its commitment to purchase DSS furnaces from GT Solar.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 6 of 306 PageID #:1962

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

9      It is important to note that the plaintiff does not fault the defendants for failing to predict that LDK would start buying furnaces from another supplier, but for failing to disclose the "substantial likelihood" of such a development.

Second, timing aside, the complaint marshals a number of other allegations further supporting the inference that the defendants knew, or could have known, of that likelihood. Among other things, the plaintiff has alleged that, prior to the IPO, a number of the defendants—including GT Solar's CEO and the members of its board of directors—reviewed a presentation that "indicated JYT was growing and threatening GT Solar's business," as well as that GT Solar employees had "raised concerns that LDK was 'upset' with GT Solar's products."

The defendants point out that these, as well as a number of other allegations which also might support the inference that the defendants appreciated a substantial risk of LDK's taking its business elsewhere, are based on statements by "confidential witnesses" who used to work for GT Solar, arguing that "[r]eliance on such unnamed and unsubstantiated sources cannot meet Plaintiff's burden under Rule 9(b)." Putting aside the fact that Rule 9(b) does not apply here, *see* Part II, *supra,* the court of appeals has, even in such cases, "decline[d] to adopt a rule which would exclude confidential source allegations which have every indication both that the source had access to information and that the information has the earmarks of credibility, simply because the identity of the source is not initially revealed." *N.J. Carpenters,* 537 F.3d at 52 (footnote omitted).

While perhaps not all of the plaintiff's confidential source allegations pass this test, those just described do, given "the level of detail provided by the confidential sources, the corroborative nature of the facts other alleged, [and] the coherence and plausibility of the allegations." *Id.* at 51 (parenthetical omitted). Indeed, the confidential source of each of those tidbits—that the CEO and board of directors were briefed on the threat posed by JYT, and that GT Solar employees had expressed concern to management over LDK's dissatisfaction—professed personal knowledge of those events. These allegations, then, are more than adequate at this stage to bolster the inference that the defendants knew or should have known of the risk of LDK's imminent switch to a different vendor. And that inference, in turn, is more than adequate to prevent a successful due diligence or reasonable investigation defense on the basis of the complaint and other

materials cognizable on a motion to dismiss.[10] *See, e.g., In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* No. MDL–1446, 2005 WL 3704688, at \*19 ("arguments ... based on due diligence ... are clearly not properly raised [in] a 12(b)(6) motion").

10      This is true despite the defendants' point, stressed at oral argument, that LDK's 2007 annual report noted obligations to GT Solar for furnaces to be delivered in 2008 and 2009, as well as ongoing research and development efforts between the companies. *See* note 3, *supra.* At this stage, it is sufficient to note that LDK's annual report was issued some three and one-half months before GT Solar's prospectus and LDK's immediately subsequent announcement that it had committed to buying furnaces from JYT through 2010.

**2. Misleading statements in the prospectus**

 **\*8** "The proposition that silence, absent a duty to disclose, cannot be actionably misleading[ ] is a fixture in federal securities law.... [T]he mere possession of material nonpublic information does not create a duty to disclose it." *Shaw,* 82 F.3d at 1202. So the plaintiff cannot premise its claims under §§ 11 and 12(2) on the simple fact that the prospectus failed to mention the substantial likelihood that LDK would leave for another supplier of DSS furnaces; the defendants must also have been under a duty to disclose that information. To this end, the plaintiff argues that, by not speaking of LDK's probable departure in the prospectus, the defendants "omitted to state a material fact 'necessary to make the statements therein not misleading,' " *id.* at 1204 (quoting 15 U .S.C. § 77k(a)), specifically, the statements listed in Part I, *supra.*[11]

11      The plaintiff's objection to the motion to dismiss—but not the complaint—argues another source of the defendant's duty to disclose, a Securities and Exchange Commission rule known as "Item 303." See 17 C.F.R. § 229.303. Part of Regulation S–K, which dictates the content of registration statements, *see id.* § 229.10(a)(1), Item 303 requires them, in relevant part, to "[d]escribe any know trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* § 303(a)(3)(ii). As the plaintiff points out, the SEC has interpreted this rule to require disclosure of "the likely non-renewal of a material contract." *Management's Discussion and Analysis of Financial Condition and Results of Operations,* Release No. 6835, 43 SEC Docket 1330, 1989 WL 1092885, at \*4 (May 18, 1989). Thus,

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 7 of 306 PageID #:1963

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

the plaintiff argues, Item 303 gave the defendants a duty to disclose the substantial likelihood that LDK would not continue buying DSS furnaces from GT Solar, without regard to whether that nondisclosure would have made any statements in the prospectus misleading. *See Shaw,* 82 F.3d at 1204–05 (explaining that a nondisclosure in violation of Item 303 supports a claim under §§ 11 and 12(2) that a prospectus "omitted to state a material fact required to be stated therein").

The court of appeals, however, has interpreted the "known trends and uncertainties" language of Item 303 "as referring to those trends discernible from hard information alone." *Glassman v. Computervision Corp.,* 90 F.3d 617, 631 (1st Cir.1996). Though, as just discussed, the complaint pleads facts supporting the inference that the defendants knew or had reason to know that LDK's discontinuance of its purchases of DSS equipment from GT Solar was substantially likely, those facts would not appear to constitute the "hard information" contemplated by *Glassman,* and the plaintiff does not argue to the contrary. But, because the plaintiff has successfully pled claims for the nondisclosure based on the allegedly misleading statements in the prospectus, the court need not—and does not decide—whether the plaintiff has also pled a nondisclosure claim based on Item 303.

The defendants counter that none of those statements was misleading because they were (1) simply accurate statements of historical fact carrying no implication about the future, (2) accompanied by cautionary language sufficient to negate any such implication regardless, and (3) "inactionable puffery." As explained below, the court finds these arguments unconvincing, at least at this stage. Because "[t]he existence of a material omission is usually a question for the trier of fact," securities fraud claims should not be dismissed for failure to plead that element unless the court can "say as a matter of law the complaint fails to raise a reasonable inference that [there] was a material omission." *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.,* 523 F.3d 75, 87 (1st Cir.2008). The court cannot reach that conclusion here, even though none of the statements seized upon by the plaintiff may have been blatantly misleading.

First, the defendants are correct that "accurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse." *Shaw,* 82 F.3d at 1202 (citing *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994)). With one exception,[12] though, the statements at issue are not "accurate reports of past successes."

12    The statement that "[d]uring the fiscal year ended March 31, 2008, one customer, LDK Solar Co., accounted for 62% of our revenue" undisputably fits the category of "accurate reports of past successes" which, as a rule, do not give rise to a duty to disclose that "present circumstances are less rosy." *Serabian,* 24 F.3d at 361. But the court of appeals has nevertheless recognized that " 'if defendant's apprehension was of a disaster the rule might be different.' " *Id.* 361 n. 4 (quoting *Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 8 (1st Cir.1991)). Whether GT Solar's loss of DSS furnace business from its biggest customer amounted to a "disaster" in this sense need not be decided at the moment because, as discussed *infra,* the other statements identified by the plaintiff could have given rise to a duty to disclose the risk of that development.

To the contrary, the statements—"our DSS unit *is* a market leading product," "our DSS units *are* the most widely used furnace for casting multicrystalline ingots in the solar industry," and "our installed base of DSS units and other PV equipment *promotes* recurring sales of additional equipment" (emphases added)—are "representation[s] of present fact," which, as the court of appeals recognized in *Shaw,* can give rise to a duty to disclose. *Id.* at 1213; *cf. Zouras v. Hallman,* 2004 DNH 144, 35 (dismissing securities fraud claim based on a statement that, in the prior quarter, the company "experienced volume increases in sales" of a product line because this statement "may well have reaffirmed the growing success of the ... product line, but [it] did so by reporting past results") (internal quotation marks omitted).

**\*9** The court in *Shaw* identified a "representation of present fact" in the statement "the remaining restructuring reserve of $443 million is adequate to cover presently planned restructuring actions," namely, that the issuer "had no current intent to undertake activities that would require any such restructuring charges to be taken." 82 F.3d at 1213. Furthermore, the court found that the statement also had "a forward-looking aspect" in suggesting that the issuer "would take no further restructuring charges in the near-term future." *Id.*

So the court reasoned that, in either its present or future orientation, the statement could have been misleading, in light of the issuer's failure to disclose either that "further restructuring actions would be necessary to put the company back on track after its impending third quarter setback" or that "performance in the third quarter would precipitate actions on a scale and on a schedule that would necessitate

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 8 of 306 PageID #:1964

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...
2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

the taking of additional restructuring charges." *Id.* at 1213–14. The court reached this conclusion, moreover, despite the issuer's argument that, at the time of the statement, the third quarter had yet to close. *Id.* at 1209–10. By the same reasoning, then, the statements in GT Solar's prospectus about the market-leading position of the company's DSS furnace and its promotion of recurring sales could be considered misleading in light of the undisclosed risk that the product would very soon lose its spot atop the market, and a large portion of its recurring sales, as a result of LDK's impending departure—even though, at the time of the prospectus, LDK had not publicly announced that move.[13]

13     The court notes that, while "forward-looking statements" are generally insulated from liability as a result of the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, tit. I, § 102(a), 109 Stat. 749, 750 (*codified at* 15 U.S.C. § 77z–2(c)(1)), that provision, by its terms, does not apply to such statements "made in connection with an initial public offering," 15 U.S.C. § 77z–2 (b)(2)(D).

This is not to say that simply mentioning the DSS furnace in the prospectus would have been misleading in light of the alleged nondisclosure, because the federal securities laws do not require that, "by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (en banc). Those laws do demand, however, the disclosure of any other facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.' " *Id.* (quoting *SEC v. Tex. Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir.1968)). So the statements about the present success of GT Solar's DSS furnaces, coming as they did just hours before the company's biggest customer for that product publicized its decision to switch to another supplier, "might well be found to be a material misrepresentation by half-truth and incompleteness." *Id.; see also In re Cabletron Sys., Inc.,* 311 F.3d 11, 36 (1st Cir.2002) (ruling that a manufacturer's statements about the availability of one of its products could have been misleading in "creat[ing] the impression that [it] was already commercially available on a large scale").

Second, the cautionary language in the prospectus was not necessarily sufficient as a matter of law to purge the statements at issue of their claimed tendency to mislead. Under what has become known as the " 'bespeaks caution' " doctrine, "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that

the statement was materially misleading because it gave rise to that very inference may fail as a matter of law." *Shaw,* 82 F.3d at 1213 (citing *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 364 (3d Cir.1993)). But the "bespeaks doctrine provides [the] basis for dismissal as a matter of law 'only when reasonable minds could not disagree as to whether the *mix* of information in the allegedly actionable document is misleading.' " *Id.* at 1214 (quoting *Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995)) (bracketing omitted).

 **\*10** Here, the cautionary statements identified by the defendants leave room for reasonable debate as to whether, despite their inclusion in the prospectus, it remained misleading in its exclusion of any reference to the substantial risk that LDK would no longer rely on GT Solar as a source of DSS furnaces. As recounted in Part I, *supra,* the prospectus mentioned the "risk that existing customers will elect not to do business with us in the future," warned against the "assurance that DSS sales will increase beyond, or be maintained at past levels" in light of, *inter alia,* "competing product offerings by other [photovoltaic] manufacturers," and noted products liability and warranty claims against the company. While these remarks allude to the chance of discontinued customer relationships and decreased sales, their lack of specificity as to the seriousness and immediacy of such threats prevents them from cloaking the prospectus in the bespeaks caution doctrine as a matter of law.

For that to occur, as the court of appeals has instructed, cautionary statements must "provide an unambiguous warning of the possibility" the prospectus allegedly failed to disclose. *Shaw,* 82 F.3d at 1214. There, where the registration statement was allegedly misleading because it "implie[d] a hiatus on new restructuring charges for the near future," the court ruled that the issuer's statement, "The Corporation will continue to take actions necessary to achieve a level of costs appropriate for its business," failed to "warn[ ] against such an implication with sufficient clarity to bespeak caution" as a matter of law. *Id.* at 1212–13. Likewise, GT Solar's generalized statements about potential lost customers and sales did not specifically warn against the implication that it would very soon lose its biggest customer for DSS furnaces and, with it, most of that product's sales. " 'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir.2004) (quoting *In re Prudential Secs. Inc. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996)).

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 9 of 306 PageID #:1965

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...

2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

Third, the defendants are wrong to characterize the allegedly misleading statements as "inactionable puffery," i.e., "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Shaw,* 82 F.3d at 1217 (footnote omitted). The defendants do not explain how the statements at issue fit that description, and the proposition is not readily apparent to the court. It would also appear irreconcilable with the defendants' position, discussed *supra,* that the very same statements are "accurate statements of *historical fact* " (emphasis added). While, as also discussed *supra,* the court disagrees that the statements are historical (in the relevant sense), it agrees that they are factual.

**\*11** For example, "our DSS unit is a market-leading product" is a specific representation of fact because, to quote again from the defendants' memorandum, " 'market-leading' products garner the highest sales revenue in a particular market" (footnote, citing dictionary definitions of "market leader," omitted). The same is true of the statements "our DSS units are the most widely used furnace for casting multicrystalline ingots in the solar industry"—they either are or they aren't—and "our installed base of DSS units and other PV equipment promotes recurring sales of additional equipment"—it either does or it doesn't, as the defendants also acknowledge in making their "historical fact" argument. So the "statements cannot accurately be described as the kind of diffuse expression of opinions or optimism that can be deemed, by their nature, obviously immaterial as a matter of law." *Shaw,* 82 F.3d at 1219.[14] In sum, the court cannot say as a matter of law, based on what is now before it, that the statements at issue were not materially misleading absent the disclosure of the substantial risk that LDK would stop buying DSS furnaces from GT Solar.

14    The court acknowledges that each of the complained-of statements was prefaced by the phrase "we believe." But this shibboleth does not magically transform the recitations of fact that follow into statements of opinion. That much is clear from the decision in *Shaw,* where the court found that liability under §§ 11 and 12(2) could follow from a statement initiated with "The Corporation believes." 82 F.3d at 1211–14. The defendants do not argue to the contrary.

### 3. Loss causation

As noted in Part III.A, *supra,* § 12(2) has a built-in affirmative defense of "loss causation:" "if the person who offered or sold [the] security proves that any portion or all of the amount recoverable ... represents other than the depreciation in value of the subject security resulting from the part of the prospectus ... with respect to which the liability of that person is asserted ... then such portion or amount, as the case may be, shall not be recoverable." 15 U.S.C. § 77*l* (b). And, as noted in Part III.B.1, *supra,* an affirmative defense cannot justify dismissing a complaint under Rule 12(b)(6) unless it is both "definitively ascertainable" from and "conclusively established" by materials cognizable at the pleadings stage. Undaunted, the defendants argue loss causation as a basis for dismissal because "it is apparent from the Complaint's face that the purported truth's disclosure to the market did not cause a significant fall in share price."

This argument is a non-starter. The complaint alleges that, after the United States markets opened on the very day that LDK publicly announced its contract to purchase furnaces from JYT, GT Solar's share price fell from its offering price of $16.50, to a low of $9.30, before closing at $12.59, in trading 15 times the average volume of GT Solar since. Given this chronology, the possibility that the stock's loss on that day "represents other than the depreciation in value of the subject security resulting from the part of the prospectus ... with respect to which ... liability ... is asserted," i.e., its nondisclosure of the substantial risk that LDK would jettison GT Solar as a supplier of furnaces, is difficult to conceive, let alone "definitively ascertainable" and "conclusively established." The defendants' loss causation argument cannot support dismissal.

### 4. Controlling person liability

**\*12** Finally, the venture capital funds named as defendants argue that the complaint fails to allege they "controlled" any of the other defendants so as to make the funds liable under § 15, as discussed in Part III.A, *supra.* As the funds correctly point out, for § 15 liability to attach, "the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company," so that "[i]n the absence of some indicia of the *exercise* of control over the entity primarily liable, ... [majority shareholder] status alone is not enough." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 85 (1st Cir.2002).

The funds' argument might have some force, then, if GT Solar were the only person allegedly liable under §§ 11 or 12(2) whom the funds allegedly controlled. But the complaint

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 10 of 306 PageID #:1966

Arkansas Public Employee Retirement System v. GT Solar..., Not Reported in...
2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

also claims that the funds "did in fact influence and control, directly or indirectly, the decision-making" of two of their employees and agents who, as members of GT Solar's board, signed the prospectus. By virtue of doing so as alleged, those individuals are liable for any omission in the prospectus in violation of § 11, 15 U.S.C. § 77k(a), and the funds, in turn, are jointly and severally liable for the violations by those controlled persons under § 15, *id.* § 77*o*—without regard to whether the funds could also be liable under § 15 for controlling GT Solar itself.

The funds do not argue that the complaint fails to allege that they controlled the directors in question for purposes of § 15; instead, they argue that the complaint fails to allege that the directors controlled GT Solar, but that is again irrelevant at this point because the directors are themselves directly charged with liability under § 11.[15] At this stage, then, the defendants' control person argument cannot support the funds' dismissal from the case. *See, e.g., Swack v. Credit Suisse First Boston,* 383 F.Supp.2d 223, 246 (D.Mass.2004) (refusing to dismiss control person claim against employer based on

employee's alleged securities law violations where it was "undisputed" that the employer possessed and exercised the power to control him).

[15]     Nor do the funds argue that, given their organizational structure, any one of them is not a proper defendant here because that entity in particular did not control the directors.

**IV.** *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss[16] is DENIED.

[16]     Document no. 67.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3255225, Fed. Sec. L. Rep. P 95,370, 2009 DNH 149

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3454490
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Amanda BEEZLEY, Individually,
and on Behalf of All Other
Similarly Situated, Plaintiff,

v.

FENIX PARTS, INC., et al., Defendants.

No. 1:17-cv-7896
|
Signed 07/13/2018

**Attorneys and Law Firms**

Erica Lauren Stone, The Rosen Law Firm, P.A., New York, NY, Ex Kano S. Sams, II, Robert Vincent Prongay, Glancy Prongay & Murray LLP, Los Angeles, CA, Laurence M. Rosen, The Rosen Law Firm, PA, South Orange, NJ, James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnesso, P.C., Roseland, NJ, Adam M. Apton, Adam Christopher McCall, Nicholas Porritt, Levi & Korsinsky, LLP, Washington, DC, Andrew Charles Murphy, Patrick Doyle Austermuehle, Vincent Louis DiTommaso, Peter Scott Lubin, DiTommaso Lubin, P.C., Oakbrook Terrace, IL, Eduard Korsinsky, Levi & Korsinsky LLP, Hackensack, NJ, for Plaintiff.

Jonathan Rotenberg, Scott A. Resnik, Katten Muchin Rosenman LLP, Amanda B. Protess, Goodwin Procter LLP, New York, NY, Michael J. Diver, Michael James Lohnes, Katten Muchin Rosenman LLP, Howard L. Teplinsky, Levin Ginsburg, Chicago, IL, Caitlin B. Munley, Eric Thomas Werlinger, Katten Muchin Rosenman, LLP, Washington, DC, Brian E. Pastuszenski, Goodwin Procter LLP, New York City, NY, Ezekiel L. Hill, Inez H. Friedman-Boyce, Goodwin Procter LLP, Boston, MA, for Defendants.

**ORDER**

CHARLES RONALD NORGLE, Judge

**\*1** Defendants Fenix Parts, Inc., Kent Robertson and Scott Pettit's Motion to Dismiss the Amended Complaint [63] pursuant to Rule 12(b)(6) is denied.

**STATEMENT**

Plaintiff Amanda Beezley ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Defendants Fenix Parts, Inc. ("Fenix"), Kent Robertson ("Robertson"), Scott Pettit ("Pettit"), (collectively "Defendants") BMO Capital Markets Corp. ("BMO Capital"), Stifel, Nicolaus & Company, Inc. ("Stifel"), BB&T Capital Markets ("BB&T"), and Barrington Research Associates, Inc. ("Barrington Research"), (collectively "Underwriter Defendants") for alleged violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78 ("Exchange Act") and § 11 and § 15 of the Securities Act of 1933, codified at 15 U.S.C. § 77 ("Securities Act"). Before the Court is Defendants Fenix, Robertson, and Pettit's motion to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

The Court has already discussed the allegations concerning this matter in its June 26, 2018 Order. Accordingly, the Court reiterates only those facts necessary for the present motion.

This is a putative federal securities class action. Plaintiff and putative class plaintiffs are all persons and entities who purchased shares of Fenix securities in Fenix's initial public offering on May 15, 2015. (the "IPO") and/or (2) on the public market between May 15, 2015, and June 28, 2017 (the "Class Period"). Fenix was a recycler and reseller of original automotive products and formed through the merging of separate different companies (the "Founding Companies"). In determining the aggregate consideration to be paid by Fenix, Fenix allegedly did not obtain independent valuations, appraisals, or fairness opinions to support the consideration that it paid for the Founding Companies. Fenix relied solely on Robertson and Pettit to negotiate with the Founding Companies—both of whom were hired by the owners of the Founding Companies to start Fenix.

Fenix's growth strategy consisted of acquiring other automotive products recycling businesses. To fund these acquisitions, company officers decided to take Fenix public. To further help fund the acquisitions, Defendants entered into a Credit Facility, which provided for $35 million of secured credit facilities and a $25 million revolving credit facility. Plaintiff alleges that initially Fenix wanted to go public at $10.00 per share, but was forced to open at $8.00 per share due to lack of interest.

Beezley v. Fenix Parts, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3454490

Plaintiff alleges that in order to raise investor interest in the IPO, Robertson and Pettit represented to potential investors that Fenix would acquire an additional ten to fifteen companies in the next two years, one to three per quarter. Fenix's offering documents and registration statement reported that as of December 31, 2014. the consolidated inventories were valued at $42,190,000 and the goodwill was valued at $58,879,000. Plaintiff argues that these were misrepresentations—resulting from Fenix's lack of adequate internal controls or procedures—made by Fenix to artificially inflate its value. As evidence of her assertion, Plaintiff points to the continual reduction of Fenix's inventory value, increase in goodwill, failure to acquire even four companies, and a $43.5 million impairment charge. Plaintiff further alleges that the SEC began an investigation into Fenix's change of auditors, the recent goodwill impairment charge, the effectiveness of its internal control over financial reporting, and its inventory valuation methodology. On June 29, 2017, Fenix was delisted from NASDAQ.

**\*2** A motion under Rule 12(b)(6) tests the sufficiency of the complaint under the plausibility standard, Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 570 (2007), not the merits of the suit. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.' " Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (quoting Twombly, 550 U.S. at 556). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' To rise above the 'speculative level' of plausibility, the complaint must make more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.' " Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP, 861 F.3d 644, 649 (7th Cir. 2017) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in a plaintiffs complaint, and draws all reasonable inferences in his favor. Burke v. 401 N. Wabash Venture, LLC, 714 F.3d 501, 504 (7th Cir. 2013) (citations omitted).

Defendants first argue that Plaintiff's § 11 claim is barred by the applicable statute of limitations. Plaintiff filed the original complaint on January 12, 2017, alleging violations of

§ 10(b) and § 20(a) of the Exchange Act. On August 28, 2017, Plaintiff filed her amended complaint which asserted her claim under § 11 of the Securities Act. Although not addressed by Plaintiff in her responsive brief, the Court determines that Plaintiff's § 11 claim arises out of the same conduct and occurrence as the original complaint—same putative class, defendants, security, and alleged misrepresentations. Thus, the claim relates back for purposes of statute of limitation. Fed. R. Civ. Pro. 15(c)(1)(b) ("An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.")

Accordingly, the preliminary issue then is whether Plaintiff possessed sufficient notice to start the statute of limitations period more than one year prior to the filing of the Complaint. The Court agrees with Defendants that inquiry notice is the proper discovery rule for § 11 claims, see June 26, 2018 Order. " 'Inquiry notice,' ... means as soon as the plaintiff discovers facts that while not constituting a violation create enough suspicion of one to induce a diligent person to investigate further and by doing so discover it." McCann v. Hy-Vee, Inc., 663 F.3d 926, 930 (7th Cir. 2011). Nonetheless, as it discussed in the June 26, 2018 Order, many of the events that the Court determined gave the Plaintiff inquiry notice as to her § 11 claim against Underwriter Defendants occurred within one year of her filing the original Complaint. Viewing the allegations in light most favorable to Plaintiff, it is not clear that Plaintiff was apprised of sufficient facts to be placed on inquiry notice of the § 11 claim more than one year prior to filing the Complaint. In making this determination, the Court has declined to take judicial notice of various documents attached to Defendants' motion—namely a news article from the *Street Sweeper* and press releases from various law firms. Judicial notice is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties. Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997). Defendants may renew the statute of limitations defense in a subsequent motion for summary judgment if they so desire.

**\*3** Defendants also argue that Plaintiff failed to allege any material misrepresentations in the offering documents. The Court disagrees. "In case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading,"

Beezley v. Fenix Parts, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3454490

any purchaser of the security may sue for damages. 15 U.S.C. § 77k(a). "[A] plaintiff ... need only show a material misstatement or omission to establish his prima facie case." Herman & Maclean v. Huddleston, 459 U.S. 375, 382 (1983). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." Id.

Plaintiff alleges that Fenix's offering statements contained three main material misrepresentations: Fenix's inventory value; goodwill; and ability to acquire ten to fifteen additional companies in two years. These misrepresentations were allegedly material in part due to the effect of inflating the value of the company at the IPO. Plaintiff argues that Fenix's lack of adequate internal controls prevented Fenix from making an accurate inventory or goodwill valuation. Within two years after the IPO: Fenix was forced to discount $14 million in inventory; take a $43.3 million goodwill impairment charge; had only acquired three additional companies—the last being in October 2015; and was delisted from the NASDAQ.

Fenix's continual decrease in inventory value and the drastic impairment cost in quick succession to the IPO creates a reasonable inference that Fenix's offering documents misrepresented its inventory value, goodwill, and ability to acquire new companies. Even if the incorrect valuations were innocent and the result of Fenix's inadequate internal controls, this does not foreclose Fenix being liable under § 11. Huddleston, 459 U.S. at 382. Accepting as true all well-pleaded facts in Plaintiff's complaint, and drawing all reasonable inferences in her favor, the Court determines that Plaintiff has plausibly alleged that Defendants violated § 11 of the Securities Act.

Next. Defendants argue that Plaintiff's claim pursuant to § 10(b) of the Exchange Act, fails to allege a compelling inference of scienter or loss causation. Under § 10(b), it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "The elements of a section 10(b) Securities Exchange Act claim are: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." AnchorBank, FSB v. Hofer, 649 F.3d 610, 617 (7th Cir. 2011) (citing Schleicher v. Wendt, 618 F.3d 679, 681–82 (7th Cir.

2010) ). The "Private Securities Litigation Reform Act of 1995, 109 Stat. 737, [ ("PSLRA") ] ... insists that securities fraud complaints specify each misleading statement; that they set forth the facts on which belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (internal quotations omitted).

"Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent— inference," not merely facts where an inference of scienter may be reasonably drawn. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). Nonetheless, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." Id. at 324 (internal quotations omitted). "A complaint must support allegations of falsehood and scienter in the way required by the PSLRA, as understood in Tellabs, but proof can await motions for summary judgment and trial." Schleicher, 618 F.3d at 687–88.

 *4 Plaintiff alleges that Defendants knowingly misrepresented Fenix's inventory valuation, goodwill, and acquisition schedule in order to artificially inflate the IPO. Plaintiff argues that Defendants knew it did not have appropriate internal controls and, as a result, they were unable to determine the proper valuations and acquisition schedule. Despite the continual reduction to the inventory valuation and increase in goodwill, on January 12, 2016, Defendants informed Plaintiff they were still on track for the future acquisitions—claiming a pipeline of companies representing $150 million of annual revenue. Despite further inventory reductions and no new business acquisitions in approximately seven months, on April 15, 2016, Defendants again expressed their ability to continue the acquisition process. Plaintiff argues that Defendants knew the claims about the acquisition pipeline were false because Fenix's improper inventory accounting would prohibit such acquisitions. Defendants improper accounting is demonstrated by Fenix being charged $43.5 million in a goodwill impairment in June 2016. This impairment charge affected Fenix's ability to borrow under the Credit Facility, which Defendants allegedly concealed. In addition to the allegations discussed *supra*, Plaintiff made numerous specific allegations regarding Defendants' alleged misrepresentations in her 130 page complaint. Accordingly, Plaintiff has alleged sufficient facts with particularity for a reasonable person to form a cogent inference of scienter. Tellabs, 551 U.S. at 324.

2018 WL 3454490

Finally, the Court concludes that Plaintiff has sufficiently alleged loss causation. Loss causation requires "that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." Bastian v. Petren Resources Corp., 892 F.2d 680, 685 (7th Cir. 1990). It must be shown "that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 995 (7th Cir. 2007). Plaintiff alleges that as a result of Defendants' wrongful conduct, Plaintiff and other members of the putative class plaintiffs suffered damages in connection with their purchases of Fenix securities during the Class Period. Plaintiff alleges that Fenix's wrongful conduct, which included in part a lack of control over internal controls, improper accounting for inventory valuation and goodwill, and misrepresentations of Fenix's ability to acquire new businesses and continue as a going concern, inflated Fenix's IPO and directly caused the subsequent devalue of the security resulting in Plaintiff's economic loss.

Accordingly, Plaintiff has sufficiently alleged her claims against Defendants under 11 of the Securities Act and § 10(b) of the Exchange Act; Defendants' motion to dismiss is denied. A status hearing is set for July 27, 2018, at 10 a.m.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3454490

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1697013

2006 WL 1697013
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Monty BLATT, Individually and on Behalf
of All Others Similarly Situated Plaintiff,
v.
CORN PRODUCTS INTERNATIONAL,
INC., and Samuel C. Scott, III, Defendants.

No. 05 C 3033.
|
June 14, 2006.

**Attorneys and Law Firms**

Samuel H. Rudman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Guri Ademi, Ademi & O'Reilly, Cudahy, WI, Jennifer Winter Sprengel, Marvin Alan Miller, Miller Faucher and Cafferty, LLP, Chicago, IL, for Plaintiff.

Adam B. Deutsch, Ameri Rose Giannotti, Nathan P. Eimer, Scott Charles Solberg, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

ZAGEL, J.

**\*1** This is a securities fraud class action. Defendants Corn Products International, Inc. ("Corn Products") and Samuel C. Scott ("Scott") seek dismissal of the complaint for failure to meet the heightened pleading requirements that apply in such cases. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.* 437 F.3d 588 (7th Cir.2006). For the purpose of this motion, the facts are not complicated and the claims are not based on arcane principles of corporate governance or accounting.

Corn Products refines corn (by grinding and milling it) into various products, such as high-fructose corn syrup, corn syrup and dextrose, which it sells to companies for use in the manufacture of products including candy, chewing gum, soft drinks and other foods. Com is the largest raw material cost. Other significant costs include energy to run the mills, storage and shipping. Corn Products hedges against the risk of upward fluctuations in the cost of corn so its future costs are known

well in advance. It also knows in advance the price it will get for high-fructose corn syrup (one of its principal sweetener products) because in the first quarter of each year it usually negotiates the price its United States customers will pay for the year ahead. Canadian customers negotiate prices earlier in the fall.

Almost all high-fructose corn syrup is made in this country by four large companies in the Midwest; their products are essentially fungible. All of the companies in this business make a substantial capital investment in refining equipment. Law prohibits the producers from agreeing amongst themselves to set a minimum price, so competition is stiff. Presumably the lowest-cost producer offers the best price and the other producers have to meet it and live with their higher costs (and lower profit margins).

The fall 2004 hedging against the cost of com did not work well for Corn Products in 2005. Corn prices had fallen by the time the U.S. prices were to be set and customers wanted prices that reflected the price of corn at the time of the negotiations. Othe things went wrong as well. The company had produced a large amount of product in the last quarter of 2004 and had to pay to store the large amount of excess product. There were also manufacturing failures at its largest U.S. plant in January 2005. All of these circumstances were considerably worse for Corn Products during the early months of 2005 than they had been in prior, comparable periods.

Defendants do not challenge the basis of these assertions.[1] Nor do they appear to challenge the proposition that the highest level of management knew of these problems. The challenge to the complaint is based, mostly, upon contentions that Corn Products' statements to the market about its financial status are not actionable under the securities law. Corn Products argues that the alleged fraudulent assertions are not misleading because the statements: (1) were directed to the projected performance for the entire 2005 year, while the problems were only first quarter 2005 problems; (2) constituted mere puffing; and (3) were forward-looking statements protected by a safe harbor in the law. Defendants also argue that the allegations of loss causation are inadequate.

**\*2** Cases like these turn on what the company told the public. On January 25, 2005, Corn Products issued a press release saying: "Corn Products International expects to see continued improvement over its 2004 performance...." In

Blatt v. Corn Products Intern., Inc., Not Reported in F.Supp.2d (2006)

2006 WL 1697013

the conference call with analysts that usually follows such releases the company said:

> We are again not in a position to advise a quantified outlook for 2005. However, we can provide some directional comments about what we expect will be another solid year of EPS growth. In North America, we look forward to another improving year.... Clearly, we have higher energy costs to contend with on the cost side ... we [are] not ready yet to quantify 2005. We expect after a very good 2004, to deliver an even-better 2005.

It Corn Products' practice to prepare "monthly books" for its executives, including the CEO (a defendant here) and the CFO. These reports contained financial results and other information that company officers discussed during a meeting the second week of each month. After the February officers' meeting the company released another statement. This February 22, 2005 press release said:

> [Corn Products] today stated that it has substantially completed contracting for its U.S. business. The Company expects that its U.S. sweetener prices will increase in the low-single-digit range in 2005. We believe that the price increase will be sufficient to offset higher energy costs in the U.S. business. As a result, the Company expects its U.S. business to see improving operating margins in 2005 and to have another year of improvement on its return on capital.

The company had a policy of not offering quarterly guidance to the public or the analysts, so this statement included no predictions about the first quarter of 2005. The statement did not refer to the bad hedge on corn prices, the manufacturing problems or the unusually high freight and storage costs.

On April 5, 2005, Corn Products issued another, much darker, press release. It said:

> [Corn Products] expects first-quarter diluted earnings per share (EPS) to decline 35 percent to 40 percent from the first quarter of 2004, due primarily to a combination of three factors that affected the U.S. and Canadian portions of its North America region:
>
> > -Net corn costs for the quarter were significantly higher than last year's first quarter, driven by lower co-product values and the timing of corn purchases for contracted business;
> >
> > -Energy and freight costs were higher compared to the first quarter of 2004; and

> > -Manufacturing expense problems during the first quarter.

The release noted that the first quarter of 2004 had the lowest corn costs of any quarter in 2004 and explained that "in addition to the expected increase in net corn costs and energy costs, the unanticipated manufacturing and freight expense issues contributed to results that were lower than our expectations." Corn Products' financial statements appear to establish that the profitability of each quarter varies from year to year. In any event, the price of the shares fell from $25.86 on April 4, 2005 to $20.98 at the close of April 5, 2005.[2]

**\*3** The analysts were unhappy. Prudential Equity Group, LLC asked two questions in unfriendly tones. First, "how much of these March 2005 difficulties were known when [Corn Products] issued [the] February 22 release?" Second, it noted that corn had been purchased before further drops had been seen and asked "why brag about higher sweetener prices when it has higher costs?" Salomon Smith Barney reported that "it was only a month ago, when [Com Products] issued a press release indicating that pricing increases ... would likely be sufficient to offset higher energy costs." Deutsche Bank sounded the harshest note when it reported: "[w]e believe that as of February 22[nd], Corn Products was very much aware of its net com costs and its energy costs and still was projecting growth in the U.S. business...."

The company announced its first quarter results just after the close of the putative class period, which would run from January 25, 2005 through April 4, 2005. A press release issued on April 19, 2005 reported that EPS was down to 22¢, compared to 35¢ in the same quarter of 2004. Operating income also fell from $24 million to $3 million. The analysts' call that followed this press release was predictably difficult for the company's executives. The theme voiced repeatedly by the analysts was that some of Corn Products' first quarter problems were not anticipated but some were. The unpredictable problems were "freakish power problems at several plants" which "reduced ... production rates ... and increased spending to recover from them." As Defendant and CEO Scott said, "when plants of our size go down in the winter, the cost of unfreezing and debottlenecking the problems that exist are major."

On the other hand, the Prudential Equity Group analyst challenged Scott on one of the very points at issue in this case when he said, "I just don't understand what happened between the timing of [the February 22nd] release, and six

Blatt v. Corn Products Intern., Inc., Not Reported in F.Supp.2d (2006)

2006 WL 1697013

weeks later, the timing of the early April press release. You sought to combat any negative sentiment in your stock by stating that your U.S. margins would be up.... What happened after that [earlier] press release and why did you feel so compelled to issue that press release?" In response, Scott offered his explanation but stated in the middle that "we knew beforehand our goals and our numbers reflected that our quarter would not be as strong as first quarter last year." The Smith Barney analyst asked a follow up question based on the obvious fact that the company knew its corn costs were high: "if you knew this the whole time, why wouldn't you just give us a little bit of guidance ... that the first-quarter numbers were going to be such [a] difficult comparison?" Scott responded that the company practice was to give guidance at the end of the first quarter.

*Defendants' Motion to Dismiss*

Defendants begin with the argument that the January and February statements are not alleged to be false or misleading because the statements addressed the full year results for 2005 and not the first quarter of 2005. Defendants contend that this is particularly clear from the context of the January release, which spoke mostly about the full year results for 2004. I find this argument difficult to understand. The full year 2005 includes the first quarter 2005. Assuming, as I must, that Defendants knowingly withheld information showing that the first quarter 2005 was going to be a disaster, it might be proved, *see Conley v. Gibson,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1957), that the statements were false and misleading about the full year 2005. It is reasonable to infer from the facts alleged that the first quarter 2005 was not merely an ordinary shortfall[3] but a near complete disaster. If the company's statements are neither puffing, nor protected by the safe harbor in the statute, then Plaintiffs *could* prevail.

 **\*4** There may be good defenses to Plaintiffs' claims. The company might have had a justifiable belief in the full year 2005 projections based on past disasters of a similar nature (and timing). This is a matter for the merits of the case, however; it fails as a ground for dismissal. The company also asserts that all it said (in January and February) was that it was "looking to 2005 and expecting improvement" and that Plaintiffs do not and cannot say this was false or misleading. I think Plaintiffs do say this well enough. The clear inference from the complaint's allegations is that no reasonable executive could, at the time of the statement, honestly have expected improvement in 2005. The specifics of the catastrophe of the first quarter of 2005 and Defendants'

knowledge of them are adequately alleged under the PSLRA. If the statements are not otherwise protected by law, then Plaintiffs are entitled to have an answer to their claims.

Defendants next argue that the statements are "puffing," which is the label the law applies to statements so general or vague that they could not possibly influence the market price of a share. *See Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir.1997) ("[m]ere sales puffery is not actionable under Rule 10b-5") (citations omitted); *Raab v. General Physics Corp.,* 4 F.3d 286, 289-90 (4th Cir.1993). Statements such as "we expect continued improvement" or "look forward to a better year" are often considered puffing. *See, e.g., Raab,* 4 F.3d at 289 (predictions of future growth found in defendant's annual report, such as "[r]egulatory changes ... have created a marketplace for the [company] with an expected annual growth rate of 10% to 30% over the next few years," and "[the company] is poised to carry the growth and success of 1991 well into the future" were puffing statements and not material); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996) ("general announcements by [defendant] that it was 'optimistic' about its earnings and 'expected' [the product] to perform well" did not trigger a duty to disclose an alternative marketing strategy). *See also Eisenstadt,* 113 F.3d at 746-7 (in case involving the sale of a company, a non-specific representation that sale efforts were going well was not material).

I do not think that puffing occurred here. Corn Products' statements were not general statements of corporate optimism. Rather, they included a measurable prediction of the results to be achieved, specifically "improvement over the 2004 performance" and a prediction that the company will achieve "improving operating margins and a [higher rate] of return on its capital." *Cf. Tellabs,* 437 F.3d at 597 (the positive statement "we're still seeing that product continue to *maintain its growth rate,"* offered in response to a specific investor question about a possible sales decline, was not mere puffery). Defendants statements were also made in the context of discussing specific factors that might affect profits and operating margins, such as higher energy costs and price increases in the low, single-digit range.[4] This context tends to show that Defendants' statements were not simple expressions of optimism but reasoned predictions of the future. I will not dismiss the Complaint on the ground that the alleged statements were mere puffing.[5]

**\*5** Defendants also claim that the statements at issue are forward-looking and protected by the safe harbor of the Private Securities Litigation Reform Act ("PSLRA"). This is their easiest argument to make because it is indisputable that the statements are forward-looking. Forward-looking statements are not actionable as long as at least one other condition is met. The statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those identified in the forward-looking statement" or the forward-looking statement must be "immaterial".[6] 15 U.S .C. § 78u-5 (c)(1)(A) & (B).

The use of the word "meaningful" is Delphic. One could interpret this to mean that the cautionary statements must be more than the customary boilerplate found in all filings of public companies. *See, e.g., Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 732 (7th Cir.2004) (in case involving safe harbor provision, " 'boilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections"). But boilerplate language is "meaningful" in the sense that without it, the filings would be defective. The boilerplate language is required by law and it has become boilerplate because we are so used to seeing it. One of the unfortunate side effects of mandated disclosure is the increasing familiarity of these disclosures; and what is routine is often ignored. Having heard several IPO-based cases in the later decades of the 20th century, I sometimes thought that an IPO that explicitly disclosed the criminal intent of those offering the security would still find buyers in the market.

On the other hand, conventional securities regulation statutes that mandate disclosure do not use the word "meaningful," so Congress may have intended to require more than "material" disclosures in order to exempt a defendant from liability for statements that, in hindsight, turn out to be wrong. *Asher* suggests that boilerplate statements will rarely be sufficient, *id* . at 732, and argues that cautions are "meaningful" when, for example, they "point to the principal contingencies that could cause actual results to depart from the projection," *id.* at 734.

It is partly to avoid this uncertainty that Defendants do not ask me to decide whether their statements were sufficiently cautionary, although they state in a footnote that there were adequate cautions given. Moreover, Defendants probably believe, as I do, that whether the cautions at issue here were adequate is a not question to be answered on a motion to dismiss. *See id.* at 734. The sufficiency of Defendants' cautionary tone (if, indeed, one was required) is a question of fact, or possibly a question of law, that can be answered only on a more developed record.

Finally, Defendants allege that Plaintiffs did not adequately allege causation. Federal law requires Plaintiffs to allege how it is that the claimed misrepresentations caused their loss. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In simple terms, Plaintiffs must state facts from which one could reasonably conclude that the stock price decline was caused by the "corrective disclosure" rather than some other cause, such as an explosion destroying the company plant.

**\*6** Defendants again argue, unconvincingly in the context of a motion to dismiss, that there was no corrective disclosure on April 5 because the January 25 and February 22 statements did not make any representations about the full 2005 year results nor offer assurance about the problems specifically disclosed in the April 5 report. I again reject the premise on which this reasoning is based. Under the conditions alleged here, the earlier statements did make representations by omission to the public about the 2005 year. Further, with respect to loss causation, Plaintiffs allege that Defendants made a public report effectively correcting the earlier reports and the share price dropped 19% in one heavy trading day immediately thereafter.[7]

Having decided that the complaint is adequate in its allegations against Corn Products, I decline to dismiss the claims against the Defendant Scott who is properly alleged to be a person in control of the company under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).[8]

The motion to dismiss the complaint is denied.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1697013

Footnotes

1    Plaintiffs rely, in part, on confidential sources, whom they describe with sufficient specificity. The sources are employees, most of whom worked at Corn Products during part or all of the class period. They include managers at the Argo facility,

2006 WL 1697013

a corporate accountant, an employee who worked in hedging and an administrative assistant. These employees claim knowledge of the operating problems alleged in the complaint and particularly the losses during one month. Defendants argue that these sources cannot draw conclusions about the overall earnings for the entire year 2005, which is true; but they have knowledge of facts which could support an inference that the problems encountered during the class period would have adverse effects on the full year performance in 2005.

2 An informal rule sometimes used for evaluating the potential worth of cases like this (from the perspective of plaintiffs' counsel) is that the one-day price drop should be about 25-30% for a truly promising case. This may explain why Plaintiffs specifically note that there was a 30% price drop from the high in the class period to the proposed close of the period on April 5.

3 I do not find fault with Defendants' general theory that disappointing monthly or first-quarter results are not sufficient to claim that a full year prognosis is false or misleading. However, this case, as pleaded, shows something far more than disappointing quarterly results. Plaintiffs allege is a catastrophic shortfall for one quarter of the year in question. Whether, in context, this shortfall was catastrophic by the standards of the industry or Corn Products' history remains to be seen. I do not doubt that it is difficult to delineate what constitutes such an extraordinary quarterly shortfall that it rightfully calls into question the projections for the whole year, but it seems to me that any standard would include the quarter at issue in this case.

4 *Cf. San Leandro Emergency Med. Group,* 75 F.3d at 810-12 (dismissing plaintiff's claim, which was based on defendant's failure to disclose an alternative marketing strategy); *and Raab,* 4 F.3d at 289 (annual report's failure to disclose a contracting slowdown not actionable when its predictions about the next year were too vague to be material, and when a contemporaneous press release "informed the market" of the slowdown).

5 Judge Wilkerson's 1993 *Raab* opinion provides perhaps the strongest support for dismissal of the claims. 4 F.3d 286. That case involved an annual report that failed to disclose a major blow (a contacting slowdown) to the firm's revenue. *Id.* at 289. The Court held that the failure to disclose was not actionable because there was a contemporaneous disclosure of the slowdown. *Id.* However, the opinion also noted that the annual report addressed the previous year's results and not the subsequent year's prospects; as such, predictions within the report were not material misstatements but puffery. *Id.* The predictions included estimates of a growth rate of 10-30% over the next few years and an expectation that the defendant would carry the "growth and success" of the previous year into the future. *Id.* Nevertheless, the more recent *Tellabs* decision in this Circuit suggests that puffery is limited to vague statements of optimism, such as "we feel very, very good about [our] robust growth" and "demand for our ... products remains strong." 437 F.3d at 597. *Tellabs* places executives' optimistic but specific predictions-made in response to analysts' questions or in statements published in a "frequently asked questions" section of an annual report-into the realm of non-puffery. *Id.* at 597-98.

6 There is a third condition which protects a speaker of bad predictions from liability: the failure of the plaintiff to prove actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1) ("a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that-... (B) the plaintiff fails to prove that the forward-looking statement-(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity; was-(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading"). The very language of this exception teaches that this is a matter for trial or summary judgment and not a motion to dismiss since it is directed to failure of proof. Although Defendants argue that actual knowledge is not alleged, their argument is based a theory that I have already rejected: that knowledge that the first quarter was bad could not under any circumstances constitute knowledge that the whole year would be worse. That Defendants knew that the first quarter would be worse than anticipated is adequately alleged. I will not dismiss the complaint for failure to adequately allege the actual knowledge required by the statute.

7 It is uncontradicted that the January and February statements were themselves followed by small percentage declines in the share price, but a wrongful misrepresentation that serves to limit share price loss is just as illegal as one that serves to raise the share price. A reasonable trier of the facts could conclude that the earlier statements were made by a management desperate to offset what they perceived to be looming pessimism of the market toward their company. Whether this is true will have to decided some other day.

8 I reserve for later briefing questions of standing of the individual Plaintiffs, an issue raised only in footnotes of the briefs.

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

2020 WL 4569846
United States District Court, N.D. California.

BOSTON RETIREMENT
SYSTEM, et al.,[1] Plaintiffs,
v.
UBER TECHNOLOGIES,
INC., et al., Defendants.

1   This case was originally filed as *Benjamin Stirratt v. Uber Technologies, Inc.* Boston Retirement System was subsequently appointed lead plaintiff. The Clerk shall change the caption of the case on ECF.

Case No. 19-cv-06361-RS
|
Signed 08/07/2020

**Attorneys and Law Firms**

Laurence Matthew Rosen, The Rosen Law Firm, P.A., Lesley F. Portnoy, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiff Benjamin Stirratt.

Christopher J. Keller, Pro Hac Vice, Francis P. McConville, Pro Hac Vice, Jonathan Gardner, Pro Hac Vice, Alfred L. Fatale, Pro Hac Vice, Anna Menkova, Pro Hac Vice, Lisa Marie Strejlau, Pro Hac Vice, Marco Antonio Duenas, Pro Hac Vice, Eric J. Belfi, Pro Hac Vice, Labaton Sucharow & Rudoff LLP, New York, NY, David Bricker, Thornton Law Firm, Beverly Hills, CA, Guillaume Buell, Pro Hac Vice, Thornton Law Firm LLP, Boston, MA, for Plaintiff Boston Retirement System.

Patrick David Robbins, Daniel Hector Rees Laguardia, Emily Victoria Griffen, George Bell Adams, III, Shearman & Sterling LLP, San Francisco, CA, Todd G. Cosenza, Pro Hac Vice, Willkie Farr and Gallagher LLP, New York, NY, for Defendants Uber Technologies, Inc., Dara Khosrowshahi, Nelson Chai, Glen Ceremony, Ronald D. Sugar, Ursula Burns, Garrett Camp, Matt Cohler, Ryan Graves, Arianna Huffington, Travis Kalanick, Wan Ling Martello, H.E. Yasir Al-Rumayyan, John Thain, David Trujillo.

Joseph Gerard Davis, Willkie Farr and Gallagher, Washington, DC, Simona Alessandra Agnolucci, Willkie Farr & Gallagher LLP, San Francisco, CA, Todd G. Cosenza,

Pro Hac Vice, Willkie Farr and Gallagher LLP, New York, NY, for Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., Allen & Company LLC, RBC Capital Markets, LLC, SunTrust Robinson Humphrey, Inc., Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., SMBC Nikko Securities America, Inc., Mizuho Securities USA LLC, Needham & Company, LLC, Loop Capital Markets LLC, Siebert Cisneros Shank & Co., L.L.C., Academy Securities, Inc., BTIG, LLC, Canaccord Genuity LLC, CastleOak Securities, L.P., Cowen and Company, LLC, Evercore Group L.L.C., JMP Securities LLC, Macquarie Capital (USA) Inc., Mischler Financial Group, Inc., Oppenheimer & Co. Inc., Raymond James & Associates, Inc., William Blair & Company, L.L.C., The Williams Capital Group, L.P., TPG Capital BD, LLC, Barclays Capital Inc.

**ORDER DENYING MOTION TO DISMISS**

RICHARD SEEBORG, United States District Judge

**I. INTRODUCTION**

 **\*1** Lead plaintiff Boston Retirement System ("BRS") brings this putative class action against defendants Uber Technologies, Inc. ("Uber"), several of its current and former executives, and the underwriters of its initial public offering ("IPO"). BRS alleges defendants made false or misleading statements and omissions in connection with Uber's IPO in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). Defendants now move to dismiss the complaint under Rule 12(b)(6). Pursuant to Civil Local Rule 7-1(b), the motion is suitable for disposition without oral argument, and the hearing set for August 13, 2020 is vacated. For the reasons set forth below, the motion is denied.

**II. BACKGROUND**[2]

2   The factual background is based on the allegations in the complaint (which must be taken as true for purposes of this motion), documents incorporated by reference, and documents of which judicial notice may be taken. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see generally* Part III, *infra.*

Uber is a transportation company which provides on demand rides and food delivery. The company was founded in San

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

Francisco in 2009 and has since expanded globally. On May 10, 2019, Uber conducted its IPO, in which it sold 180,000,000 shares of common share stock to the public. The IPO was priced at $45 per share and generated nearly $8 billion in proceeds for Uber. The IPO was conducted pursuant to several documents filed by defendants with the U.S. Securities and Exchange Commission ("SEC"), including an April 11, 2019 Registration Statement on Form S-1, which, after amendment, was declared effective by the SEC on May 5, 2019. *See* ECF No. 86-1 ("RS").

BRS purchased Uber's common stock in the IPO, and from an underwriter of the IPO, pursuant to the offering documents, including the RS. At the time BRS purchased this stock, only Uber shares offered in the IPO were available in the market. Uber's share price subsequently declined from $45 to an all-time low of $25.99 on November 14, 2019. This action was brought, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act. In January 2020, BRS was appointed lead plaintiff. The named defendants are Uber, several of its past and present executives, and the underwriters of its IPO.[3]

3       The full list of defendants is: Uber, Dara Khosrowshahi, Nelson Chai, Glen Ceremony, Ronald Sugar, Ursula Burns, Garrett Camp, Matt Cohler, Ryan Graves, Arianna Huffington, Travis Kalanick, Wan Ling Martello, H.E. Yasir Al-Rumayyan, John Thain, David Trujillo, Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc., Citigroup Global Markets, Inc., Allen & Company LLC, RBC Capital Markets, LLC, SunTrust Robinson Humphrey, Inc., Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., SMBC Nikko Securities America, Inc., Mizuho Securities USA LLC, Needham & Company, LLC, Loop Capital Markets LLC, Siebert Cisneros Shank & Co., L.L.C., Academy Securities, Inc., BTIG, LLC, Canaccord Genuity LLC, CastleOak Securities, L.P., Cowen and Company, LLC, Evercore Group L.L.C., JMP Securities LLC, Macquarie Capital (USA) Inc., Mischler Financial Group, Inc., Oppenheimer & Co. Inc., Raymond James & Associates, Inc., William Blair & Company, L.L.C., The Williams Capital Group, L.P., and TPG Capital BD, LLC. Defendants bring the present motion to dismiss jointly.

## III. INCORPORATION BY REFERENCE AND JUDICIAL NOTICE

### A. Legal Standard

**\*2** Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, "[t]here are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting documents incorporated by reference and "matters of which a court may take judicial notice" are properly considered when ruling on a motion to dismiss).

"Incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. A defendant may seek to incorporate a document into the complaint "if the plaintiff refers *extensively* to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 907 (emphasis added). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002. In general, "a court may assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6) ... [but] it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003 (internal quotations and citations omitted).

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.' " *Id.* at 999 (citing Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' " *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). "Accordingly, a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment ... [b]ut a court cannot take judicial notice of disputed facts contained in such public records." *Id.* (internal quotations and citation omitted). If either party requests judicial notice and "supplie[s] the necessary information," judicial notice "must" be taken. Fed. R. Evid. 201(c)(2).

### B. Discussion

In support of their motion to dismiss, defendants seek incorporation by reference and/or judicial notice of 29 documents, termed "exhibits" for ease of reference. Exhibit

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

A is the amended RS for Uber's IPO, as filed with the SEC on Form S-1/A on April 26, 2019. BRS agrees that the complaint refers extensively to, and in fact depends on, the amended RS; thus, incorporation by reference of the RS is appropriate.

Exhibits B and C are Uber's press releases announcing its financial results for the first and second quarters of 2019. These were filed with the SEC on May 30 and August 8, 2019, respectively. BRS argues incorporation by reference is inappropriate because the complaint "barely mentions" Uber's financial results; the company's earnings results, it points out, are mentioned in fewer than ten of the hundreds of paragraphs of the complaint. That argument, however, would allow BRS to do precisely what incorporation by reference attempts to avoid: selective use of documents. The complaint refers to Uber's financial results "extensively" in that one of its three main theories is that the company misrepresented its financial position to investors in violation of the Securities Act. Put differently, that theory "depends on" Uber's 2019 financial results, which BRS alleges paint a very different financial picture than the RS. Notably, BRS does not dispute the accuracy of the contents of Exhibits B and C; on the contrary, their contents, i.e., Uber's Q1 and Q2 2019 financial results, bolster BRS's claims. Incorporation by reference of Exhibits B and C is thus appropriate.[4]

4    Alternatively, because "SEC filings are publicly-filed documents whose accuracy cannot reasonably be questioned," judicial notice may be taken at least in order to "determin[e] what representations [Uber] made to the market." *In re Pivotal Sec. Litig.*, No. 19-cv-03589, 2020 WL 4193384, at *5 (N.D. Cal. July 21, 2020).

**\*3** The remaining 26 exhibits are news articles written in various publications about Uber between 2014 and 2019. BRS argues they should not be incorporated by reference because they are referenced nowhere in the complaint, and judicial notice should not be taken because they are offered for the sole purpose of raising a "truth-on-the-market" defense, which is inappropriate at the motion to dismiss stage. However, both arguments miss the mark. Defendants do not propose incorporation by reference, and whether they may offer a "truth-on-the-market" defense in a motion to dismiss, or whether the defense would succeed, goes to the substance of the motion, *see* section IV.B.2, *infra*, not the admissibility of evidence. Defendants have "supplied the necessary information"—notably, BRS does not dispute that the articles were published on the dates and in the publications that defendants represent they were—and judicial notice *must* therefore be taken. However, "[j]ust because [a] document

itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. Thus "judicial notice of these documents" will be taken "not for the truth of the matter asserted, but 'for the purpose of showing that particular information was available to the stock market.' " *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020) (quoting *Helitrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999)).

## IV. MOTION TO DISMISS

### A. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Id.*

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *SeeParks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-movant. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see alsoIqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true)).

Complaints in securities cases must also meet the pleading standards set forth by the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA mandates that "securities fraud complaints 'specify' each misleading statement; that they

set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–(2)). Furthermore, securities claims which are "grounded in fraud" must meet the pleading requirements of Rule 9(b). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotations and citations omitted).

### B. Discussion

**\*4** BRS asserts claims under Sections 11 and 12(a)(2) of the Securities Act, as well as a derivative claim under Section 15. To state a claim under Section 11, a plaintiff must allege plausibly that a registration statement "contained an untrue statement of material fact" or "omitted to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). An "untrue statement of material fact" must be both (1) false and (2) material to investors. *See Rigel Pharm*, 697 F.3d at 880 n.8. Not all relevant or material omitted facts are actionable omissions. *Id.* (citing *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 38 (2011)); *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Rather, to be actionable an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" to be actionable. *Brody*, 280 F.3d at 1006. Section 11 imposes strict liability. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1028 (9th Cir. 2005).

Section 12(a)(2) applies the same standard. See 15 U.S.C. § 77*l* (imposing liability where a prospectus or communication "includes an untrue statement of a material fact" or "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"). It creates said liability for any person who offers or sells a security through a prospectus or an oral communication creating a material misstatement or omission. Section 15 creates liability for anyone who "controls" a defendant who is themselves liable under Section 11 or 12(a)(2).

As a threshold matter, the parties disagree as to whether the heightened Rule 9(b) pleading standard applies. Rule 9(b) only applies to Section 11 claims which are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir. 1996). Each cause of action in the complaint explicitly disclaims a fraud theory. *See, e.g.*, Amended Complaint ("Complaint"), ECF No. 80, at 108 ("This cause of action does not sound in fraud."). While defendants are correct that "a disclaimer alone is insufficient to re-characterize a complaint whose gravamen is plainly fraud, here [BRS has] made an effort to plead a non-fraudulent basis for Section 11 liability." *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) (citing *Stac Elecs.*, 89 F.3d at 1405 n.2). In particular, the complaint states the claims against Uber are based on a strict liability theory and against all other defendants on negligence. *See* Complaint at 108. BRS will be held to this representation, and the heightened Rule 9(b) standard thus will not apply—with one exception. The complaint "expressly disclaims any allegations of scienter or fraudulent intent ... except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made." *Id.* Challenged statements of opinion, *see* section IV.B.3, *infra*, must be pled with particularity.

#### 1. Puzzle Pleading

Defendants' first argument in favor of dismissal is that BRS has engaged in impermissible "puzzle pleading." "In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *In re Cisco Sys. Inc. Sec. Litig.*, No. 11-cv-01568, 2013 WL 1402788, at \*5 (N.D. Cal. Mar. 29, 2013*); see also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001) (finding structure of complaint rendered it "exceedingly difficult to discern precisely which statements are alleged to be misleading"). "[A] securities fraud complaint that employs a true puzzle-style pleading format will recite lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Tarapara v. K12 Inc.*, No. 16-cv-04069, 2017 WL 3727112, at \*9 (N.D. Cal. Aug. 30, 2017).

**\*5** The complaint in the present case may be "long, confusing, and meandering," such that "it is difficult to locate the main points within it." *Id.* However, it "is not so

deficient that [d]efendants are incapable of figuring out what statements are alleged to be false." *Park v. GoPro, Inc.*, No. 18-cv-00193, 2019 WL 1231175, at \*8 (N.D. Cal. Mar. 15, 2019). BRS has "emphasize[d] the portions of [the RS] that [it] allege[s] to be false or misleading." *Id.* "Furthermore, [BRS] set forth the reasons why [it] believe[s] each statement to be false or misleading...." *Id.* While the complaint might be "repetitive" and "hard to follow, it is not so deficient as to amount to puzzle pleading."*Id. See also In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) (finding that a 113-page complaint, which "ramble[d] through long stretches of material quotes from defendants' public statement," suffered from "poor draftsmanship," and was "cumbersome almost to the point of abusiveness," nevertheless did not engage in puzzle pleading). BRS has not engaged in impermissible puzzle pleading.

### 2. Omissions

Defendants' next argument favoring dismissal is that they did not omit any material fact necessary to render the RS not misleading, because the facts BRS alleges were omitted were in fact disclosed. BRS alleges defendants omitted material facts about the legality (or lack thereof) of Uber's business model, its passenger safety record, and its financial condition.

Defendants argue each of these three categories of facts was adequately disclosed in the RS. With regard to the business model, the RS stated Uber was "subject to national, state, local, or municipal laws and regulations that are ambiguous in their application or enforcement or that we believe are invalid or inapplicable." RS at 62. It provided examples of such laws, for example the California Supreme Court's decision in *Dynamex Operations West, Inc. v. Superior Court* regarding the differences between employees and independent contractors. *Id.* at 35. With regard to passenger safety, the RS disclosed that "numerous incidents and allegations worldwide" of sexual assault, abuse, and kidnapping had been reported—though not the details of any of those instances. *Id.* at 40. The RS also stated the company planned to release a "transparency report" about these instances sometime in 2019 which could result in "negative media coverage and increased regulatory scrutiny." *Id.* at 38. Finally, with regard to the company's financial position, the RS disclosed that Uber expected its operating expenses to increase, largely as a result of promotional spending, and that it would incur losses "in the near term" as a result. *Id.* at 34.

"[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) (collecting cases). Here, defendants are correct that their disclosures were neither "terse" nor "generic." However, the point remains: given the facts BRS has plausibly alleged, the RS was "misleading; in other words, it ... affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

In particular, the RS begins with a letter from Uber's CEO, defendant Dara Khosrowshahi, which acknowledges Uber "didn't get everything right" and made "missteps" in its past. RS at vi. However, Khosrowshahi proclaims, "we've changed." *Id.* He goes on to explain the changes Uber has made to fulfill the unique responsibilities that come with being a public company. *Id.* The RS touts Khosrowshahi's installation as CEO as the beginning of a "new path forward" for Uber. *Id.* at 116. *See also* *id.* at 160 ("It's a new day at Uber."). The "Risk Factors" portion of the RS goes on to list numerous potential scenarios that, should they materialize, might affect Uber's prospects, but does not suggest that any of those scenarios already exist.

**\*6** Thus, the RS affirmatively created an impression of an optimistic state affairs: no matter what trouble Uber had faced in the past, Khosrowshahi was leading the company down a new path. The RS represented that, while Uber's future was not blemish-free, the company had turned over a new leaf. Unfortunately, given the facts BRS has plausibly alleged, this state of affairs differs in a material way from the one that actually existed. For example, BRS has alleged plausibly that Uber was continuing, well into 2019, to use a "playbook" to launch in new markets in ways it knew were undoubtedly illegal. In fact, BRS alleges Uber viewed paying fines for violating local laws, or bribes for avoiding those fines, as a cost of doing business. The laws were not, as the RS represented, "ambiguous" or "inapplicable," and Uber knew that. Similarly, BRS plausibly alleges that Uber intentionally delayed layoffs and restructuring it knew were inevitable given its financial position at the time of its IPO, in order to mislead the markets. In particular, mere weeks after its IPO, Uber announced it was dissolving its CMO and COO positions "with the IPO behind us." In other words, the "Risk Factors" in the RS were not mere possibilities; many had

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

already "come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (internal citation omitted), *aff'd*, 563 U.S. 27. Thus, what was disclosed in the RS was not enough to render what was *not* disclosed, not misleading.

Defendants next argue that the facts which BRS alleges were improperly omitted were adequately disclosed in the press coverage about Uber leading up to its IPO, 26 examples of which it presents as exhibits. *See* Part III, *supra.* That is, there had been enough unfavorable press coverage about Uber before its IPO, that the market was on notice about the risks of investing in it. This "truth-on-the-market" defense is unavailing for at least three reasons.

First, a truth-on-the-market defense is typically raised in the context of Section 10(b) of the Securities Exchange Act of 1934, not Section 11 of the Securities Act. *See, e.g.,Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996). While Section 11 is limited to liability for misrepresentations and omissions in registration statements, 15 U.S.C. § 77k(a), Section 10(b) sweeps more broadly, to all securities fraud, 15 U.S.C. § 78j. A truth-on-the-market defense is based on the theory that, if an alleged misstatement or omission of fact is already known to the market, then the fact will already be reflected in the stock price, and the market has not been misled. *Provenz*, 102 F.3d at 1492. Thus, the defense is less applicable to registration statements, IPOs, and Section 11 claims, where the stock price has been set privately; the public market has necessarily not had the opportunity to factor in information it may have into the share price.

Second, even assuming the defense is available for Section 11 claims, it is not available at the motion to dismiss stage. *In re Thoratec Corp. Sec. Litig.*, No. 04-cv-03168, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (citing *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004)). This is because, "as the Supreme Court and Ninth Circuit have explained, the truth-on-the-market defense is a method of refuting an alleged misrepresentation's *materiality.*" *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (internal citations omitted). Materiality is a "mixed question of law and fact," *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976), and "[p]roof of that sort is a matter for trial," *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988). *See alsoProvenz*, 102 F.3d at 1493 (stating summary judgment on truth-on-the-market defense is only warranted if defendants show "no rational jury could find that the market was misled,"

which is a "heavy burden of proof"); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

Finally, even if the truth-on-the-market defense were available at this juncture, defendants have not met their heavy burden of demonstrating it is appropriate on these facts. "[I]nvestors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008). The volume of the judicially noticed articles might demonstrate that the alleged misstatements and omissions were known to the market, or it might demonstrate that investors like BRS would have had to follow all press coverage about Uber quite closely to be on notice of all the alleged facts. At the present juncture, the plausible allegations must be construed in the light most favorable to BRS; viewing the facts this way requires the latter inference. Furthermore, there is no legal basis for defendants' contention that the form of the information—news articles, as opposed to SEC filings—determines whether it was "known" to the market as a matter of law. Thus, for at least these reasons, the judicially noticed articles do not defeat BRS's plausible allegations at this juncture.

**\*7** Defendants' final argument on this point is that they had no duty to disclose more information than they did. They are correct that they had no duty to disclose every legal challenge, passenger safety complaint, or financial detail—that is, there is no "freestanding completeness requirement." *Brody*, 280 F.3d at 1006. However, BRS has plausibly alleged that at least three independent bases which compelled defendants to disclose more than they did. First, as discussed above, the information defendants *did* disclose "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Id.* Under the facts as alleged by BRS, defendants had an affirmative duty to correct that impression. Second and third, Items 105 and 303 of SEC Security Regulation S–K impose their own duties to disclose, respectively, "the most significant factors that make an investment in the registrant or offering speculative or risky" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §§ 229.105, 229.303(3)(a)(ii). *See alsoPirani v. Slack Techs., Inc.*, No. 19-cv-05857, 2020 WL 1929241, at *12 (N.D. Cal. Apr.

Boston Retirement System v. Uber Technologies, Inc., Slip Copy (2020)

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

21, 2020). For the same reasons BRS has plausibly alleged a claim under Sections 11 and 12(a)(2), it has plausibly alleged a violation of Regulation S–K, *seeSteckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998), which imposes independent duties. Thus, the alleged omissions were required disclosures which were not adequately disclosed by defendants.

### *3. Non-Actionable Statements*

Defendants' final argument favoring dismissal is that the misstatements BRS alleges are not actionable for a variety of reasons. As discussed below, each argument is unavailing.

First, the alleged misstatements, considered in context, are not mere corporate puffery. "In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (internal quotations and citations omitted). On the other hand, "general statements of optimism, *when taken in context*, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker *knows* to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (emphases added) (internal citation omitted). Put differently, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Here, the optimistic statements in the RS—for example, "it's a new day Uber"—are not mere puffery when taken in context. As described above, the RS admitted Uber had stumbled in its past, by failing to comply with local laws and tolerating sexual harassment and even abuse of its passengers and employees. The RS implied the company had turned a corner, particularly with Khosrowshahi's hiring, and these problems were in the past. "It's a new day" is not mere puffery when the speaker knows significant remnants of the "old day"—for example, continuing to launch in markets where Uber was clearly illegal, and paying fines or bribes as a cost of doing business—remain. Similarly, the RS's claims that Uber was "committed to enhancing safety" or "work[ing] tirelessly to earn [its] customers' trust" are vague without context. However, when presented in the context of Uber's troubled history and the "new day" theme, they imply that something has changed—not, as BRS has pled, that Uber's

customer service team was still forbidden from involving law enforcement when passengers reported harassment or assault. Complaint at 11. BRS has adequately pled that defendants knew Uber was performing poorly in passenger safety—the company was in the process of compiling a passenger safety report, which was conveniently released after the IPO and demonstrated just how bad the situation was—yet allowed these misleading statements to be made. *Cf.Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was not puffery); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was not puffery). Thus, the optimistic statements in Uber's RS are actionable.

 **\*8**  Second, the complaint does not engage in impermissible hindsight pleading. Defendants are correct that plaintiffs cannot use post-IPO developments to claim statements in the RS were untrue at the time they were made, but the complaint relies on contemporaneous, not post-IPO events. For example, while defendants are correct that the California State Assembly passed AB5, classifying Uber drivers as employees, ten days after the IPO, the legislative process was well underway, and in any case the California Supreme Court had decided *Dynamex*, which AB5 codified, prior to the IPO. BRS thus plausibly pleads that defendants were aware at the time of the IPO that Uber's classification of its drivers as independent contractors was imminently, if not already, illegal in California. They chose, however, to disclose that Risk Factor as a mere possibility. Similarly, defendants are correct that they were not required to disclose their Q2 2019 financial results at the time of the IPO, which occurred during Q2. However, they were required to remain transparent about the company's financial position, and thus not to state, that they "expect[ed] ... growth to continue," RS at 118, when Uber had sustained (though conveniently, not yet disclosed) its biggest losses to date in Q1 2019, and had planned massive restructuring and layoffs for a few weeks after the IPO, as BRS has plausibly pled.[5] Thus, defendants' statements were misleading given the information available to them at the time the statements were made.

5       Defendants misstate the law on this point. They claim SEC Regulation S–X required them to disclose their financial position as of 135 days prior to the RS's effective date. However, Regulation S–X merely requires

2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

that the financial information disclosed be *no more than* 135 days old. *See*17 C.F.R. § 210.3-12(a), (g).

Third, the bespeaks caution doctrine does not protect defendants at this juncture. "The bespeaks caution doctrine protects affirmative, forward-looking statements from becoming the basis for a securities fraud claim when they are accompanied by cautionary language or risk disclosure." *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1088 (C.D. Cal. 2003) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)). "[I]nclusion of *some* cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading." *Stac Elecs.*, 89 F.3d at 1408 (internal quotations omitted). "Dismissal on the pleadings under the bespeaks caution doctrine ... requires a stringent showing: There must be sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (internal quotations omitted). Defendants have not made the stringent showing required.[6] It cannot be said that all reasonable minds would agree that the forward-looking statements in the RS were not misleading. To the contrary, as described above, BRS has plausibly pled that the predictions about Uber's future in the RS were misleading given the facts at the time of the IPO. Discovery may illuminate that the disclosures were enough, given defendants' knowledge at the time, to render the RS not misleading. However, the bespeaks caution does not warrant dismissal at this juncture.

[6]    Defendants' argument on this point, in their motion to dismiss and reply combined, spans all of two paragraphs out of 60 pages.

Finally, the alleged misstatements are not inactionable opinions. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that opinion statements—for example, statements prefaced by "we believe"—can serve as the basis for a securities fraud claim under limited circumstances. To plead fraud based on an opinion statement under an omissions theory, a plaintiff must "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. That is, the plaintiff must plead facts that "call into question the issuer's basis for offering the opinion." *Id.* That is precisely what BRS has done here. In particular, BRS has pled that the RS represented defendants believed Uber was complying with the law, keeping its passengers safe, and performing well financially—even though defendants had no factual basis for offering these opinions. To the contrary, the facts known to defendants at the time—for example, the facts set forth in the soon-to-be-released transparency report and Q1 results—demonstrated otherwise. Furthermore, to the extent the statements of opinion "are alleged to have been materially misstated statements of opinion or belief when made," Complaint at 108, BRS has pled them with particularity as required by Rule 9(b). That is, BRS has pled the underlying facts of which it alleges defendants had knowledge, when and in what context those facts arose, and why they rendered the opinion misleading. The allegations are not inactionable opinions under *Omnicare*.

## V. CONCLUSION

**\*9**  For the reasons set forth above, the motion to dismiss is denied. Defendants shall respond to the complaint within 21 days of this Order as set forth by Rule 12(a)(1)(A)(i).

## IT IS SO ORDERED.

### All Citations

Slip Copy, 2020 WL 4569846, Fed. Sec. L. Rep. P 100,881

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Mingbo Cai v. Switch, Inc., Slip Copy (2019)

2019 WL 3065591

2019 WL 3065591
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

MINGBO CAI, Individually and On Behalf
of All Others Similarly Situated, Plaintiffs,
v.
SWITCH, INC., et al., Defendants.

Case No. 2:18-cv-01471-JCM-VCF
|
Signed 07/12/2019

**Attorneys and Law Firms**

Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, for Plaintiff.

Andrew Gray, Pro Hac Vice, Michele D. Johnson, Pro Hac Vice, Latham & Watkins, Costa Mesa, CA, Joshua G. Hamilton, Pro Hac Vice, Latham & Watkins LLP, Los Angeles, CA, Ava M. Schaefer, Pisanelli Bice, Las Vegas, NV, Kevin M. McDonough, Latham & Watkins LLP, New York, NY, Kendall M. Howes, Pro Hac Vice, Latham & Wakins LLP, Los Angeles, CA, Todd L. Bice, Pisanelli Bice PLLC, Las Vegas, NV, Daniel J. Tyukody, Pro Hac Vice, Greenberg Traurig, LLP, Los Angeles, CA, Mark E. Ferrario, Christopher R. Miltenberger, Greenberg Traurig, Las Vegas, NV, for Defendants.

ORDER

JAMES C. MAHAN, UNITED STATES DISTRICT JUDGE

**\*1** Presently before the court is Magistrate Judge Cam Ferenbach's report and recommendation. (ECF No. 88). Plaintiff Oscar Farach filed an objection (ECF No. 89), to which defendants Switch, Inc. ("Switch"); Rob Roy, Gabriel Nacht, Zareh Sarrafian, Donald Snyder, Tom Thomas, and Bryan Wolf (collectively "defendants") responded (ECF No. 90).

Also before the court is defendants' motion to strike. (ECF No. 63). Farach filed a response (ECF No. 79), to which defendants replied (ECF No. 85).

Also before the court is defendants' motion to dismiss. (ECF No. 60). Farach filed a response (ECF No. 78), to which defendants replied (ECF No. 84).

**I. Facts**
Farach has brought forth this putative securities class action challenging Switch's failure to include certain information in the registration statement and prospectus that Switch issued in connection with its initial public offering ("IPO"). (ECF No. 58). The amended complaint contains the following allegations:

Switch is a Nevada corporation that hosts data centers and provides to its customers colocation, telecommunications, cloud, and content ecosystems services. *Id.* Most of Switch's revenue comes from colocation services, which amounted to 81.4% of total revenue in fiscal year 2016. *Id.* Colocation services are rental agreements where customers lease information technology infrastructure, such as servers and storage hardware, to avoid the cost of establishing and maintaining their own facilities. *Id.*

Roy was at all relevant times to this lawsuit Switch's chief executive officer ("CEO") and chairman of the board of directors. *Id.* In 2000, Roy founded Switch and began building a data center in Las Vegas near another data center that Enron Corporation ("Enron") was constructing. *Id.* In 2002, Enron declared bankruptcy a week before it planned to open its data center. *Id.* Roy subsequently acquired the state-of-the-art facility at a steep discount, which allowed Switch to transfer massive amounts of data at below market rates. *Id.*

Although Switch established other data centers over the years, the Las Vegas data center remained as the company's primary source of revenue. *Id.* Several market advantages, in addition to Roy's shrewd acquisition of the facility, are responsible for this success. *Id.* The Las Vegas data center is part of a fiber optic network that connects to Switch's Tahoe/Reno data center, San Francisco, and Los Angeles. *Id.* Switch also purchases power in Nevada at low costs because it is authorized to directly deal with the national power market. *Id.* Lastly, Nevada does not impose a corporate income tax and is adjacent to California, which has a large demand for information technology services. *Id.*

In 2017, Switch began changing its sales strategy to focus on selling hybrid cloud solutions, which would allow customers to move larger technology operations to Switch's data centers. *Id.* This new strategy presented a significant

Mingbo Cai v. Switch, Inc., Slip Copy (2019)

2019 WL 3065591

risk of lengthening sales timelines because it involved new complications and required engineering. *Id.* Switch did not disclose this shift in strategy and that it would likely have an adverse effect on revenue. *Id.*

**\*2** On June 13, 2017, Switch registered as a corporation so that it can issue class A common stock in an IPO. *Id.* On September 8, 2017, Switch filed the registration statement for its IPO with the Securities and Exchange Commission ("SEC") and, on September 25, 2017, Switch amended the registration statement and the prospectus therein. *Id.* The registration statement included Switch's offer to sell 31,250,000 shares, with an option for the underwriters to purchase an additional 4,687,400 shares, at $17.00 per share. *Id.*

Switch discussed in the registration statement its growth strategy, which involved developing new facilities in Grand Rapids, Michigan and Atlanta, Georgia. *Id.* However, the registration statement did not disclose facts explaining that these new facilities lacked the unique market advantages that made the Las Vegas data center successful. *Id.* The registration statement also failed to disclose that Switch had changed its sales strategy to focus on hybrid cloud solutions. *Id.* Lastly, the registration statement reported that Switch's recurring revenue for the first six months of 2017 was $177,213,000.00. *Id.* This figure included $9,400,000.00 for colocation services that eBay would use in 2018. *Id.* Had Switch not including this amount in the recurring revenue, Switch's revenue growth would have been 13% rather than 20%. *Id.*

On October 6, 2017, shares in Switch began trading on the New York Stock Exchange. *Id.* Six days later, Switch announced the closing of its IPO and that the underwriters executed their option to purchase an additional 4,687,400 shares. *Id.* In total, Switch sold 35,937,500 shares of class A common stock and received $577,300,000.00 in proceeds. *Id.* Switch also incurred $4,100,000.00 in offering expenses. *Id.*

On August 13, 2018, Switch issued a press release in which the company lowered its revenue guidance for the rest of the year. *Id.* Switch attributed this decrease in expected revenue to its shift in sales strategy towards selling hybrid cloud solutions. *Id.* Switch's chief financial officer ("CFO") and president, Nacht and Thomas Morton respectively, also stated that Switch had been working on hybrid cloud solutions for a while and that the company was not actually changing its sales approach. *Id.* Analysts critiqued the sales strategy for not

being as presented in the IPO materials and that the deviation in sales figures was unexpected. *Id.* The next day, Switch's stock dropped 22.3%—from $13.98 per share to $10.85 per share. *Id.*

In sum, the alleged misleading statements and omissions in the registration statement allowed Switch to sell its class A common stock at $17.00 per share. *Id.* Since the IPO, Switch's stock price has decreased to approximately $9 per share, over a 47% drop. *Id.* Farach alleges that, had Switch filed a registration statement with adequate disclosures, the purported class would not have incurred substantial losses in the form of decreased stock prices. *Id.*

**II. Procedural History**

On June 11, 2018, plaintiff Mingbo Cai initiated this action. (ECF No. 1). In the amended complaint, lead plaintiff Farach alleges two causes of action: (1) violation of section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, and (2) section 15 of the Securities Act, 15 U.S.C. § 77*o*. (ECF No. 58).

Now, defendants move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) and strike paragraphs 45, 46, 56, and 65, and footnotes 4 and 7, from the amended complaint. (ECF Nos. 60, 63). Magistrate Judge Ferenbach recommends striking paragraphs 45 and 46, and footnotes 3, 4, and 7. (ECF No. 88).

**III. Legal Standard**

*a. Report and recommendation*

**\*3** This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1).

Where a party fails to object, however, the court is not required to conduct "any review at all ... of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Indeed, the Ninth Circuit has recognized that a district court is not required to review a magistrate judge's report and recommendation where no objections have been filed. *See United States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (disregarding the standard of review employed by the

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Mingbo Cai v. Switch, Inc., Slip Copy (2019)
2019 WL 3065591

district court when reviewing a report and recommendation to which no objections were made).

#### b. Failure to state a claim

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

"Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. 662, 678 (citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678–79. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678.

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678.

Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks omitted). When the allegations in a complaint have not crossed the line from conceivable to plausible, plaintiff's claim must be dismissed. *Twombly*, 550 U.S. at 570.

The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The *Starr* court stated, in relevant part:

First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

**\*4** *Id.*

### IV. Discussion

Two motions and one report and recommendation are pending before the court. First, the court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike footnotes 4 and 7 from the amended complaint. Second, the court will grant in part and deny in part defendants' motion to dismiss.

#### a. Report and recommendation

Magistrate Judge Ferenbach recommends that the court strike paragraphs 45 and 46, and footnotes 3, 4, and 7, from the amended complaint. (ECF No. 88). Farach filed a timely objection to the report and recommendation. (ECF No. 89). Therefore, the court engages in a *de novo* review to determine whether to adopt the magistrate judge's recommendation. *See* 28 U.S.C. § 636(b)(1).

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispending with those issues prior to trial[.]" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

Farach alleges in paragraph 45 and footnote 3 that the IPO gave Roy complete control of Switch by incorporating the company as a C-corporation where class A common stock yields only a 5.6% voting interest. (ECF No. 58). In contrast, Roy's class C shares have 10-1 voting rights, giving him a 67% voting power over the company. *Id.* Farach alleges in paragraph 46 that Roy and Morton were highly compensated for the IPO. *Id.* Roy allegedly received $94,600,000.00 and his stake in Switch after the IPO was $875,000,000.00. *Id.* Morton allegedly received $12,000,000.00. *Id.*

Mingbo Cai v. Switch, Inc., Slip Copy (2019)

2019 WL 3065591

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (citing 15 U.S.C. § 77*o*). The facts alleged in paragraphs 45 and 46, and footnote 3, show that Roy had control over the IPO process because Roy structured the IPO in a manner that gave him a controlling stake in the company and significant financial benefits. Thus, because these allegations are material to Farach's section 15 claim and do not substantially raise other Rule 12(f) concerns, the court will not strike paragraphs 45 and 46, and footnote 3, of the amended complaint. *SeeWhittlestone*, 618 F.3d at 973–75.

Farach alleges in footnotes 4 and 7 that Switch's history of weak disclosures limit transparency and that Roy never participated in an investor earnings call despite being the CEO and controlling shareholder of Switch. (ECF No. 58). Farach generally remarks that the court should not strike these footnotes because they do not waste resources or prejudice the defendants. (ECF No. 89). However, the heart of the magistrate judge's finding is that these footnotes are all but irrelevant to determining whether defendants committed a section 11 violation. *See* (ECF No. 88). The court agrees with the magistrate judge. Switch's history of disclosure and Roy's participation in investor earnings calls are too attenuated from any alleged misleading statements or material omissions in the registration statement to survive a Rule 12(f) motion.

 **\*5** The magistrate judge also recommends that the court deny defendants' Rule 12(f) motion as it pertains to paragraphs 56 and 65. *Id.* Defendants have not objected to the recommendation. Nevertheless, the court conducted a *de novo* review and finds good cause to adopt the magistrate judge's finding as it pertains to paragraphs 56 and 65.

### b. Failure to state a claim

Defendants move to dismiss Farach's section 11 and section 15 claims. (ECF No. 60). The court addresses each in turn.

### i. Section 11 of the Securities Act

Section 11 of the Securities Act imposes liability on an issuer of a security if the corresponding registration statement "contained an untrue statement of material fact or omitted to state a material fact ... necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). To state a section 11 claim, a plaintiff must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quotation marks and citation omitted).

A heightened pleading standard does not typically apply to section 11 claims. *Id.* However, when the complaint sounds in fraud, plaintiffs must allege their causes of action with particularity under Federal Rule of Civil Procedure 9(b). *In re Rigel Pharm. Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012). Farach alleges that the defendants negligently signed the registration statement, which contained material misrepresentations and omissions. (ECF No. 58). A securities claim based on negligence does not sound in fraud because it does not rely on a "unified course of fraudulent conduct[.]" *Rubke*, 551 F.3d at 1161. Therefore, the notice pleading standard under Rule 8(a) applies to Farach's section 11 claim.

Farach alleges that defendants violated section 11 by (1) failing to disclose that Switch implemented a new sales strategy that presented a significant risk of adversely affecting revenue; (2) failing to disclose unique characteristics and circumstances of the Las Vegas data center that did not exist at other locations, making it highly unlikely that Switch could replicate the success of the Las Vegas data center; and (3) misrepresenting Switch's revenue by improperly including $9,400,000.00 for services that eBay would not use until the next fiscal year. (ECF No. 58).

### 1. Switch's new sales strategy

Regulation S-K governs the non-financial statement portion of registration statements. 17 C.F.R. § 229.10. Item 303 of regulation S-K requires an issuer of a security to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."17 C.F.R. § 229.303(a)(3)(ii). Failure to comply with item 303 constitutes a violation of section 11. *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Defendants note that the registration statement discussed that hybrid cloud solutions are a remarkable growth opportunity

Mingbo Cai v. Switch, Inc., Slip Copy (2019)

2019 WL 3065591

and that Switch expects to take advantage of that opportunity. (ECF No. 60). However, the sections which defendants quote do not indicate that Switch had already changed its sales strategy to focus on hybrid cloud solutions. *See id.* Based on the allegations in the complaint, Switch's strategy presented a serious risk of diminishing revenue due to new complications and required engineering. (ECF No. 58). Therefore, the complaint sufficiently alleges facts from which a reasonable jury could find that Switch violated Item 303 by failing to disclose its new sales strategy. *SeeDurning v. First Boston Corp.*, 815 F.3d 1265, 1268 (9th Cir. 1987) ("... adequacy of disclosure is normally a jury question.").

 **\*6** Similarly, item 503 of regulation S-K requires "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). The registration statement must include an explanation of "how the risk affects the issuer or the securities being offered." *Id.* Although the prospectus includes over thirty pages of risk disclosures, defendants identify only general statements that the company faced risks associated with long selling and implementation cycles. (ECF Nos. 60, 62-1). These kinds of boilerplate risk factors do not satisfy the requirements set forth in item 503. *See Plain English Disclosure, Securities Act Release No. 33–7497*, 63 Fed. Reg. 6370–01, 1998 WL 44199 (Feb. 6, 1998).

The court is not aware of any language in the registration statement that indicates the specific risks arising from Switch's new sales strategy. *See* (ECF No. 62-1). Further, Farach alleges that once Switch disclosed its sales strategy along with its potential effects on revenue, Switch's stock price dropped by 22.3%. (ECF No. 58). This is precisely the type of risk that item 503 requires issuers of securities to disclose. Thus, Farach has plausibly pleaded that Switch violated item 503 by failing to discuss and explain the risks of its new sales strategy.

*2. Switch's ability to replicate the success of the Las Vegas data center*

Defendants argue that they did not mislead investors about the prospects for the Grand Rapids and Atlanta data centers because the registration statement warned that revenue from the new data centers was uncertain. (ECF No. 60). These warnings mentioned that almost all of Switch's revenue comes from the Las Vegas data center and that the new data centers

presented greater risk because the demand in those markets may not support the new facilities. *See id.* The court agrees.

Farach does not allege in the complaint or identify in his response that any portion of the registration statement forecasted that the Grand Rapids and Atlanta data centers would have a similar degree of success as the Las Vegas data center. (ECF Nos. 58, 78). Instead, the registration statement discloses Switch's growth strategy and discusses the risks of the growth strategy without comparison to the Las Vegas facility. (ECF No. 62-1). These representations did not mislead investors into believing that the new data centers would replicate the success of the Las Vegas data center because "skilled investors are aware that a corporation's performance ... in a new market is unlikely to replicate past successes."*In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (9th Cir. 1992).

Further, defendants aptly note that the registration statement explains that the Las Vegas data center generates almost all of Switch's revenue and that the new data centers may not be profitable due to various market risks. (ECF No. 62-1). These statements expressly distinguish the market conditions for the new data centers from the market conditions in Las Vegas. Thus, any disclosures on the unique market advantages in Las Vegas would not have caused a reasonable investor to think differently about the nature of his or her investment. *SeeRubke*, 551 F.3d at 1161.

Accordingly, Farach has failed to plead that defendants' violated section 11 by misleading investors into believing that the new data centers would replicate the success of the Las Vegas data center.

*3. Switch's alleged misrepresentation of revenue*

Switch's registration statement included $9,400,000.00 for colocation services with eBay in its recurring revenue report for the first six months of 2017. (ECF No. 62-1). Farach argues that Switch should not have included this amount in the revenue report because eBay was going to use the corresponding colocation services in 2018. (ECF Nos. 58, 78). Farach further argues that this misrepresentation was material because it increased Switch's revenue growth from 13% to 20%. *Id.*

 **\*7** Farach has not provided and the court is not aware of any authority precluding issuers of securities from including

amounts that customers are contractually obligated to pay in recurring revenue reports. Moreover, it is irrelevant that eBay was not going to use colocation services under the contract until 2018 because eBay became obligated to pay for the licensed space in the first six months of 2017. *See* (ECF Nos. 58, 60). Thus, Farach has failed to allege a concrete falsehood or omission in the recurring revenue report and his section 11 claim with respect to the eBay contract cannot succeed.

### ii. Section 15 of the Securities Act

Section 15 of the Securities Act provides that "[e]very person who ... controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as the controlled person[.]" 15 U.S.C. § 77*o*. To state a section 15 claim, a plaintiff must allege (1) a primary violation of the Securities Act and (2) that the defendant controlled the primary violator. 15 U.S.C. § 77*o*; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

Defendants argue that Farach has failed to state a section 15 claim because he has not alleged a primary violation of the Securities Act. (ECF No. 60). However, as the court explained in section VI(b)(i)(1), Farach has plausibly pleaded that defendants violated section 11 by failing to disclose that Switch had implemented a new sales strategy and the risks arising from that strategy. Therefore, the court will not dismiss Farach's section 15 claim.

### V. Conclusion

The court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike only footnotes 4 and 7 from the amended complaint. The court will also dismiss Farach's section 11 claim as it pertains to (1) misleading investors that the new data centers would replicate the success of the Las Vegas data center and (2) including the eBay contract in the recurring revenue report for the first six months of 2017.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Magistrate Judge Ferenbach's report and recommendation (ECF No. 88) be, and the same hereby is, ADOPTED in part and REJECTED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendants' motion to strike (ECF No. 63) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendants' motion to dismiss (ECF No. 60) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

### All Citations

Slip Copy, 2019 WL 3065591

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2787520

2006 WL 2787520
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

CENTRAL LABORERS'
PENSION FUND, Plaintiff,

v.

SIRVA, INC., Brian P. Kelley, Joan E. Ryan,
James W. Rogers, Richard Schnall, Carl T.
Stocker, Credit Suisse First Boston LLC,
Goldman Sachs & Co., Deutsche Bank
Securities, Inc., Citigroup Global Markets,
Inc., J.P. Morgan Securities, Inc., Banc of
America Securities LLC, Morgan Stanley &
Co., Inc., Pricewaterhousecoopers LLP, and
Clayton Dubilier & Rice, Inc., Defendants.

No. 04 C 7644.
|
Sept. 22, 2006.

**Attorneys and Law Firms**

Maya Susan Saxena, Saxena White, P.A., Boca Raton, FL, for
Plaintiff.

Courtney Ann Rosen, Matthew Brian Kilby, Richard
Bradshaw Kapnick, Tara Kocheran Charnes, Brian A.
McAleenan, Tara Kocheran Charnes, Sidley Austin LLP,
Howard Steven Suskin, Keith V. Porapaiboon, Jenner &
Block LLP, Robert Y. Sperling, David E. Koropp, Michael
Patrick Digiannantonio, Nicole E. Wrigley, Ronald Steven
Betman, Winston & Strawn, John Conroy Martin, Paul Edwin
Greenwalt, III, Schiff Hardin LLP, Peter M. King, William H.
Jones, Canel, Davis & King, Chicago, IL, David W. Debruin,
Jenner & Block, Christopher Davies, Howard M. Shapiro,
Stuart F. Delery, Wilmer Cutler Pickering Hale and Dorr, LLP,
Washington, DC, John H. Hall, Stephen Chahn Lee, Steven
Klugman, Debevoise & Plimpton LLP, New York, NY, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

**\*1** Plaintiff has sued SIRVA, Inc., Joan E. Ryan, Brian P.
Kelley, James W. Rogers, Richard Schnall, Carl T. Stocker,
Clayton Dubilier & Rice, Inc., Credit Suisse First Boston
LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc.,
Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc.,
Banc of America Securities LLC, Morgan Stanley & Co.,
Inc., and PricewaterhouseCoopers LLP pursuant to the Public
Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §
78u-4, for their alleged violations of the Securities Act of
1933 and the Securities and Exchange Act of 1934. The
case is before the Court on defendants' Federal Rule of
Civil Procedure ("Rule") 12(b)(6) motions to dismiss. For the
reasons set forth below, the motions of SIRVA, Ryan, Kelley,
Rogers, Schnall, Stocker, Clayton Dubilier & Rice, Credit
Suisse First Boston LLC, Goldman Sachs & Co., Deutsche
Bank Securities, Inc., Citigroup Global Markets, Inc., J.P.
Morgan Securities, Inc., Banc of America, Securities LLC,
Morgan Stanley & Co, Inc., are granted in part and denied in
part, and PricewaterhouseCoopers' motion is denied.

*Facts*

SIRVA is a company that provides a variety of moving
and other services. (Corrected Consol. Am. Class Action
Compl. ("Compl.") ¶ 13.) The company is divided into
four operating units: Relocation Solutions-North America,
Relocation Solutions-Europe and Asia (collectively, "Global
Relocation Solutions"), Network Services and Transportation
Solutions. (*Id.* ¶ 14.) Global Relocation Solutions helps
SIRVA clients relocate employees by moving household
goods, assisting with the sale and purchase of homes, and
arranging financing for home purchases. (*Id.* ¶ 14a.) Network
Services provides insurance and other services to moving
and storage agents, independent owner-operators and small
fleet operators. (*Id.* ¶ 14b.) Transportation Solutions provides
outsourcing services for supply chain functions like freight
bill auditing and inventory management. (*Id.* ¶ 14c.)

Defendant Kelley is SIRVA's CEO, a position he has held
since August 2002. (*Id.* ¶ 16.) Defendant Ryan is a former
member of SIRVA's Audit Committee and served as SIRVA's
CFO from February 2003 until January 21, 2005. (*Id.* ¶
17.) Defendant Rogers is Chairman of the SIRVA Board of
Directors, a position he has occupied since November 1999,
and is a principal of defendant Clayton, Dubilier & Rice,
Inc. ("CDR"), SIRVA's majority shareholder. (*Id.* ¶¶ 18, 30.)

2006 WL 2787520

Defendant Schnall has been a SIRVA director since March 2002 and is also principal of CDR. (*Id.* ¶¶ 19, 30.) Defendant Stocker has been a SIRVA director since March 2000 and has served as Chairman of its Audit Committee since 2003. (*Id.* ¶¶ 20, 90.)

Defendants Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America Securities LLC and Morgan Stanley & Co., Inc. (collectively, "the Underwriters") are investment banking firms that served as underwriters for SIRVA's initial and supplemental public offerings ("IPO" and "SPO"). (*Id.* ¶¶ 22-28.)

 **\*2** Defendant PricewaterhouseCoopers ("Price") is an accounting firm that was SIRVA's auditor during the IPO and SPO. (*Id.* ¶ 29.) Price also served as SIRVA's actuary until May 2005. (*Id.* ¶ 94.)

Plaintiff is a union pension fund that purchased SIRVA common stock pursuant to the IPO and SPO. (*Id.* ¶ 12.)

On November 25, 2003, SIRVA conducted its IPO. (*Id.* ¶ 34.) In connection with that offering, SIRVA filed a prospectus and registration statement with the SEC that was signed by defendants Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) The prospectus included audited financial statements for the years 2001 and 2002, unaudited financial statements for the nine months ending September 30, 2003 and a favorable audit opinion by Price. (*Id.* ¶¶ 41-42.)

Plaintiff says that the prospectus contains numerous misstatements concerning, among other things, the health and potential of the company's European business, the company's accounting practices and financial results, and the method by which it calculated insurance reserves. (*Id.* ¶¶ 37-40, 43-46.)

Plaintiff alleges that Kelley, Ryan and Rogers knew that there were problems with the European business long before the IPO because a former senior European finance executive told them that the unit could not meet its budget and was "experiencing declining demand, revenue shortfalls, an inability to further cut costs and an inability of acquisitions to perform up to expectations." (*Id.* ¶¶ 102-03.) Plaintiff says that defendants knew the statements about their accounting practices and their financial results were false because they did not conform to Generally Accepted Accounting Principles. (*Id.* ¶¶ 359-89.) Plaintiff also alleges that defendants knew the statements about SIRVA's reserves

methodology were false because they manipulated the reserves to boost earnings and Price told them in June and December 2003 that certain insurance lines were under-reserved. (*Id.* ¶¶ 137-70.)

On June 10, 2004, SIRVA conducted its SPO. (*Id.* ¶ 54.) Again, SIRVA filed a prospectus and registration statement with the SEC that was signed by Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) Plaintiff alleges that the misstatements defendants made in the IPO prospectus were repeated in the SPO prospectus. (*Id.* ¶¶ 56-63.)

Defendants' misstatements, plaintiff says, were not limited to the prospectuses. According to plaintiff, during the first nine months of 2004, defendants also made false statements about the European operations, SIRVA's accounting practices and financial results and its insurance reserves in press releases, conference calls with securities analysts, SEC filings and its 2003 Annual Report to shareholders. (*Id.* ¶¶ 231-303, 318-22.)

On November 9, 2004, SIRVA announced that it had to take a $15.2 million charge to increase insurance reserves, a development that Kelley attributed to an increase in losses and SIRVA's change in actuarial firms. (*Id.* ¶¶ 304-09.) SIRVA also said it was scaling back its 2004 earnings guidance by approximately thirty-two cents per share. (*Id.* ¶ 305.) The following day, SIRVA's stock price dropped from $23.78 to $17.95 per share. (*Id.* ¶ 312.)

 **\*3** On January 21, 2005, CFO Ryan resigned from the company, effective immediately. (*Id.* ¶ 325.) According to a letter sent to Price on her behalf, Ryan was asked to leave because of her insistence on accurate financial reporting. (*Id.* ¶ 354.)

Ten days later, SIRVA announced that it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶¶ 327-28.) That announcement caused the price of SIRVA stock to drop from $14.40 to $8.86 per share. (*Id.* ¶ 329.)

On March 10, 2005, SIRVA announced that its financial statements for the years 2001-2003 and the first three quarters of 2004 would have to be restated because the company had to take a $22 million charge due to twelve accounting errors it had identified. (*Id.* ¶ 335.)

2006 WL 2787520

On June 20, 2005, SIRVA revised its estimate of the accounting errors charge from $22 million to $27 million. (*Id.* ¶ 339.)

On September 21, 2005, SIRVA filed its 2004 Form 8-K with the SEC. (*Id.* ¶ 347.) In that Form, the company admitted that it had material weaknesses in its internal control over financial reporting and identified twelve errors that lead to a $34 million overstatement of the company's pretax income for the years 2000 through the first nine months of 2004. (*Id.* ¶¶ 347-48.)

*Discussion*

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiffs' favor. *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir.2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

I. The Underwriters' Motion

A. *Count I-Standing*
In Count I, plaintiff charges the Underwriters with violating section 11 of the Securities Act of 1933. Section 11 holds underwriters liable for damages sustained by those who purchased stock pursuant to a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The Underwriters say these claims must be dismissed because: (1) plaintiff has no standing to pursue them; and, even if it does, (2) none of the allegedly false statements was material; and (3) it cannot satisfy the damage element of the claims related to the IPO.

It is not clear whether the Underwriters contend that plaintiff lacks Article III standing to pursue these claims or does not fall within the class of investors covered by the statute. To the extent it is the former, their motion must be denied. Plaintiff has standing under Article III if it suffered a "concrete and particularized" injury that is fairly traceable to defendants' conduct and is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)

(quotations omitted). Plaintiff alleges that it purchased SIRVA stock at an inflated price because of the misstatements in the offering documents, an economic injury that a lawsuit could redress. Thus, plaintiff has constitutional standing to assert its section 11 claims.

**\*4** Whether it falls within the class of persons entitled to sue under that section is a different, and non-jurisdictional, question. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 97 n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (noting that whether plaintiff has a cause of action under the statute is a "merits inquiry," and whether a plaintiff has "[a] remediable injury in fact," is a question of Article III standing). Though the Seventh Circuit has yet to address the issue, other circuit courts of appeal have interpreted section 11 as providing a cause of action to investors who purchase stock in an offering and "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003); *see Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 873 (5th Cir.2003) (same); *Joseph v. Wiles,* 223 F.3d 1155, 1160 (10th Cir.2000) (same); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1081 (9th Cir.1999) (same). Plaintiff has alleged that it purchased SIRVA stock "issued pursuant or traceable to the November 25, 2003 IPO and/or June 10, 2004 SPO." (Compl.¶ 64.) At this stage of the proceedings, that allegation is sufficient to put plaintiff in the class of investors covered by section 11. *See Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3rd Cir.1992) (allegation that plaintiff purchased the shares "pursuant to the [offering]" held sufficient to defeat motion to dismiss section 11 claim); *Danis v. USN Comms., Inc.,* 73 F.Supp.2d 923, 931 (N.D.Ill.1999) (holding that plaintiff need only allege that his injury is traceable to challenged registration to maintain section 11 claim); *Cf. In re LILCO Sec. Litig.,* 111 F.R.D. 663, 671 (E.D.N.Y.1986) ( [T]racing is a question of fact reserved for trial.").

B. *Materiality*
The Underwriters also argue that plaintiff cannot satisfy the material misstatement element of their section 11 claims. A misstatement or omission is material if "under all the circumstances, the omitted fact or the prediction without a reasonable basis is one that a reasonable investor would consider significant in making the decision to invest, such that it alters the total mix of information available about the proposed investment." *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1404 & 1405 n. 11 (7th Cir.1995) (quotation omitted). Plaintiff alleges that the IPO and SPO prospectuses misstated or failed to disclose material

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

information about SIRVA's European business, its insurance reserves, and its accounting practices and financial results. The Court will address each category in turn.

1. European Business

According to plaintiff, defendants failed to disclose various problems SIRVA was having with its European business, including: its failure to meet internal budget projections, the decline in demand for its services, its inability to cut costs further, and the poor performance of the companies it had acquired. (*See* Compl. ¶¶ 37, 63.) In addition, plaintiff says the prospectuses contained the following misstatements:

**\*5** We intend to increase our market share internationally as we continue to develop our global relocation solutions platform. We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development. We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia.

and

Historically, a majority of our operating revenues and income from operations was derived from our moving services businesses. A significant element of our growth model, however, is our new and unproven strategy of offering a global comprehensive relocation solution to customers by combining our higher margin relocation services with our proprietary moving services network. We embarked on this strategy less than two years ago with the acquisition of the business of Cooperative Resources Services, Ltd., and have not yet proven that it will succeed in the long-term, especially in Europe and Asia.

(*Id.* ¶¶ 38-39, 63.)

Boiled down, the Underwriters say, the first omissions claim is just a complaint that defendants did not disclose SIRVA's internal profit projections for 2004 for its European operations. Because there is no duty to disclose such projections, *see, e.g., In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir.1993), the Underwriters say this claim must be dismissed.

The Court disagrees. Plaintiff does not contend that defendants should have disclosed SIRVA's internal projections about the future profits of its European operations. Rather, it says that defendants should have revealed that SIRVA's European operations had fallen short of internal profit projections in both 2002 and 2003. (Compl.¶¶ 102-03.) Those are facts about past performance, not projections about future performance. As a result, that information is not exempt from disclosure. *Verifone,* 11 F.3d at 869 (stating that "financial data or other existing facts from which forecasts are typically derived" are not exempt).

The next question is whether that information is material; that is, whether "a reasonable investor would consider [it] significant in making the decision to invest." *Harden,* 65 F.3d at 1404. At least one court has said no, because: (1) internal estimates are generally prepared using more aggressive assumptions than estimates intended for the public; (2) "internal estimates ... necessarily change over time" and are "invariably wrong"; and (3) "a comparison of actual and internally[-]predicted results does not [bear on] the truthfulness of the actual results." *Saddle Rock Partners, Ltd. v. Hiatt,* No. 95-2326 GA, 1996 WL 859986, at \*9-11 (W.D.Tenn. Mar.26, 1996).

That may be true, but in this case, the budget shortfalls are only half of the story. The other half is that the shortfall was trending upward. In 2002, the European operations fell $3.5 million short of budget. By 2003, that number had climbed to $7 million. (Compl.¶¶ 102-03.) That trend could suggest any number of things-that demand was falling, costs were increasing, the European operations were poorly managed or SIRVA management set unrealistic budgets-any of which a reasonable investor could arguably consider significant. Given the possible implications of the budgetary shortfalls in this case, the Court cannot say as a matter of law that they are immaterial.

**\*6** The same is true for the other information plaintiff says SIRVA withheld, that demand for its services in Europe was declining, it could not cut costs in those operations any further and the European businesses it had acquired were underperforming. The financial statements in the IPO prospectus indicate that SIRVA increasingly relied on its European operations for its total operating revenues and income. By the end of 2003, those operations accounted for more than twenty percent of SIRVA's total operating revenues and more than a quarter of its income. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.,* Ex. 8, SPO Prospectus at 2, 23.)[1] Moreover, SIRVA specifically identified cutting costs and acquiring other companies as two of its strategies for increasing its revenues. (*Id.,* Ex. 1, IPO Prospectus at 5; *id.,* Ex. 8, SPO Prospectus at 5.) Given the importance of the European

operations to SIRVA's bottom line and its stated strategies for increasing revenues from them, the Court cannot say, as a matter of law, that no reasonable investor would consider the alleged omissions immaterial to an investment decision.

[1]  "[I]n securities actions, the court may ... rely on public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit without, pursuant to Rule 12(b), converting the motion into one for summary judgment." *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir.2006) (quotation and citation omitted).

Plaintiff also contends that defendants made the following affirmative misstatements about SIRVA's European operations: "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia." (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.,* Ex. 8, SPO Prospectus at 4-5.) Plaintiff does not allege that those statements are literally false, *i.e.,* that SIRVA did not intend to increase its international market share, did not believe the international opportunities were considerable and did not have a leading market share in Europe. But it says they are actionable because they are misleading in light of the material facts defendants did not disclose about the European operations: declining demand, revenue shortfall, an inability to cut costs, and the failure of acquisitions to perform up to expectations. (Compl.¶ 37.)

The Underwriters say those statements are not actionable under any circumstances because they are simply puffery. *See Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (stating, in the context of section 10(b), that "promotional phrase[s] ... devoid of any substantive information," "indefinite predictions of 'growth," ' and optimistic statements that "lack [ ] ... specificity" are immaterial as a matter of law). The Court agrees. The contested statements about the European operations are just the kind of vague, optimistic statements held not to be actionable in *Searls. See Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (per curiam) (statements that company "would not compromise its financial integrity," was "commit[ed] to

creat[ing] earnings opportunities" and was using "business strategies [that] would lead to continued prosperity" held to be non-actionable puffery); *Simon v. Am. Power Conversion Corp.,* 945 F.Supp. 416, 428-29 (D.R.I.1996) ("[W]e are gaining market share, we are gaining momentum, and our revenues are strong," and the company has "good opportunities to expand its products offerings" held to be puffery).

**\*7**  Finally, plaintiff alleges that defendants misled investors about the company's prospects, by saying that its "growth model" was largely based on its "new and unproven strategy of offering a global comprehensive relocation solution to customers," a strategy that was less than two years old and might not "succeed in the long-term, especially in Europe and Asia." (Compl. ¶ 39; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 14; *id.,* Ex. 8, SPO Prospectus at 11.) Defendants contend that this statement cannot be actionable because it cautions investors about investing rather than enticing them to do so. Plaintiff says this is a caveat in appearance only because defendants knew at the time of the IPO that its strategy was a failure in Europe. Whether that is true depends on a number of facts that cannot be determined on a motion to dismiss, among them: the length of time a strategy has to be in place before it can be deemed a success or a failure, whether defendants believed the European business would improve over time or thought it was in a downward spiral, and whether defendants were aware of any characteristics of or constraints on the European market that would negatively impact its strategy. Until those facts, are resolved, this claim cannot be dismissed.

### 2. Insurance Reserves

Plaintiff also alleges that defendants manipulated SIRVA's insurance reserves to inflate its earnings. (*See* Compl. ¶¶ 137-70.) That conduct, plaintiff says, rendered the following prospectus statements untrue, that: (1) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (2) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; and (3) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends." (*Id.* ¶¶ 44-45, 137; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.,* Ex. 8, SPO Prospectus at 28, 67.)

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2787520

The Underwriters say that all of these statements relate to reserves for cargo claims, which are not addressed in plaintiff's reserve manipulation allegations. The Court disagrees. Only the second statement is specifically limited to cargo claims. The others are statements about SIRVA's reserve methodology, generally.

The Underwriters are correct, however, that plaintiff does not allege that defendants manipulated reserves for cargo claims. Rather, plaintiff alleges that defendants manipulated reserves for claims made on National Association of Independent Truckers ("NAIT") policies and workers' compensation policies. (*See* Compl. ¶¶ 153-55, 162-63, 166-68.) Because plaintiff has not alleged that defendants manipulated reserves for cargo claims, it cannot base a section 11 claim on prospectus statements about those reserves.

 *8 The remaining reserves manipulation claims are based on information from: (1) a "Former TransGuard Finance Executive," a "Former NAIT Claims Manager," and a "Former NAIT Claims Supervisor," who reported that: (a) Dan Briody, Vice President of NAIT, would "actively push reserves downward" during large loss meetings; and (b) Price, which was serving as the company's actuary, concluded in June 2003 that SIRVA's workers' compensation line was under-reserved by up to $2 million (*id.* ¶¶ 145, 153, 162); (2) a "Former TransGuard Supervisor of Insurance Accounting" who said that "they would adjust reserves here and there" in order to "make the numbers" (*id.* ¶ 166); (3) a "Former TransGuard General Accounting Manager" who said Gary Jinx, then-head of accounting for TransGuard reserves, told him in March 2004 that the workers' compensation line was under-reserved by $4 to $5 million (*id.* ¶ 167); and (4) a "Former SIRVA Executive of Pricing" who said that "[i]t was widely known that we were going to take a big hit to reserves" (*id.* ¶ 170).

Those allegations are insufficient under the PSLRA. Though the statute permits plaintiff to rely on confidential sources to defeat a motion to dismiss, it must describe those sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged ..., or in the alternative provide other evidence to support [its] allegations." *Makor Issue & Rights, Ltd. v. Tellabs,* 437 F.3d 588, 596 (7th Cir.2006) (citation and quotation omitted). Plaintiff has offered no other evidence in support of the reserve manipulation claim. Thus, it must allege sufficient detail about the sources to suggest that they would have the information they report.

Plaintiff has not satisfied that standard with respect to any of its confidential sources. Plaintiff does not generally allege any of the sources' job duties or the dates of their employment. Moreover, with the exception of the Former TransGuard General Accounting Manager, plaintiff has not alleged how the sources obtained the information they report. Plaintiff does not explain whether the sources have personal knowledge of the alleged reserves manipulation or if they know that Kelley and Ryan actually received and read the documents that disclosed the manipulation and, if so, how. Nor does plaintiff explain how the Former TransGuard Supervisor of Insurance Accounting knew reserves were being adjusted "here and there," when such adjustments occurred, in which lines of insurance the adjustments were made or who was doing the adjusting. Similarly, plaintiff does not explain the basis for the assertion by the Former SIRVA Executive of Pricing that "[i]t was widely known that we were going to take a big hit to reserves." Without further support, plaintiff's reserves manipulation claims do not pass muster under the PSLRA. *See Calif. Pub. Employees' Retirement Sys. v. Chubb Corp.,* 394 F.3d 126, 148 (3rd Cir.2004) (dismissing section 10(b) claim premised on information from confidential sources because plaintiffs did not allege when the sources were employed by defendant, the dates the sources obtained the alleged information, or how they had access to such information).

3. Accounting Practices
 *9 The last category of statements plaintiff challenges are those pertaining to SIRVA's accounting practices. Specifically, plaintiff alleges that the financial results defendants' reported in the prospectuses were false because the company: (1) failed to take a timely charge to accrue additional liabilities related to its multiple-line property and commercial liability insurance; (2) improperly overstated premium revenue and commission income; (3) improperly accounted for accrued expenses; (4) improperly accelerated revenue related to corporate and referral fees; (5) improperly accounted for home inventory valuation reserve; and (6) failed to establish and maintain adequate internal accounting controls. (Compl.¶¶ 40, 47.)

The Underwriters contend that these errors, to which SIRVA admitted in the Form 8-K it filed in September 2005, did not materially impact the financial information in the prospectuses. In fact, the Underwriters say, but for the accounting errors, SIRVA's cumulative net income for the years 2000 through the first three quarters of 2003, would

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

have been higher than what was reported in the prospectuses. Because the actual numbers were higher than the numbers reported in the prospectuses, the Underwriters say the errors were immaterial as a matter of law.

The Underwriters' argument assumes that cumulative net income is the only figure an investor would find important in making the decision to invest. Whether that is true is a factual question that cannot be resolved on a motion to dismiss.

Moreover, the increase in cumulative net income notwithstanding, the impact of the restatement on SIRVA's financials was not wholly positive. Though the restatement effected a $11.7 million increase in SIRVA's net income for 2002, it effected a $5.8 million increase in the net loss SIRVA sustained in 2001. (*Compare* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 7, 9/21/05 10-K at 34 *with id.,* Ex. 1, IPO Prospectus at 8 & Ex. 8, SPO Prospectus at 7.) In addition, in the restatement SIRVA admitted that there were "material weaknesses in [its financial reporting] control environment, organizational structure and in [its] consistent application of GAAP [Generally Accepted Accounting Principles]." (*Id.,* Ex. 7, 9/21/05 Form 10-K at 41.) A material weakness, SIRVA explained, "is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." (*Id.* at 185.) Because it is arguable that a reasonable investor would find such information relevant to his investment decision, the section 11 accounting practices claim cannot be dismissed.

### C. Damage Related to the Offerings

Next, the Underwriters argue that plaintiff cannot state a section 11 claim in connection with either the IPO or the SPO because it did not suffer any damage that is traceable to those offerings. According to the statute, plaintiff was damaged if the price of the stock was higher on the date plaintiff purchased it than on the date plaintiff filed suit. *See*15 U.S.C. § 77k(e) ("[D]amages represent the difference between the amount paid for the security ... and the value thereof as of the time [the] suit was brought"). There is no dispute that plaintiff paid less for its SIRVA stock than it was fetching on November 24, 2004, the date plaintiff filed this suit. (*Compare* Initial Compl., Certification Proposed Lead Pl., Schedule A, *withhttp:// online.wsj.com/public/us* (enter "SIR" in "Quotes & Research"; then enter 11/24/04 in "Historical Quotes"

date).)[2] Plaintiff did not, however, assert a section 11 claim in its initial complaint.

2    The Court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 167 n. 8 (2d Cir.2000).

**\*10** That fact, the Underwriters say, is irrelevant. In their view, plaintiff's section 11 claims relate back to the initial complaint because they arise from the same "conduct, transaction, or occurrence" as the claims set forth in it. *See*Fed. R. Civ. P. 15(c)(2); (Compl. ¶¶ 5-7, 33-38, 53-58 (asserting violations of section 10(b) of the Exchange Act and Rule 10b-5 based on, among other things, the alleged misrepresentations in the offering documents); *id.* ¶¶ 37-41, 56-63 (alleging section 11 claims grounded in the same conduct).) Thus, the Underwriters contend that the Court should deem the section 11 claims to have been filed on November 24, 2004, the date plaintiff filed suit.

In support of their argument, the Underwriters cite *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525 (8th Cir.1996). As in this case, the plaintiff in *Alpern* filed an initial complaint asserting claims under section 10(b) and later amended the complaint to assert a section 11 claim. *Id.* at 1543. Because the stock price was higher on the date Alpern filed the section 11 claim than it was when he purchased it, the district court entered summary judgment for the defendant on the section 11 claims. *Id.* at 1541-43. Alpern appealed, arguing that the section 11 claims related back to the original filing date. *Id.* at 1542.

The Eighth Circuit agreed:

Alpern's § 11 claim was based on the same misappropriations alleged in the original complaint.... Both his [section 10(b) and section 11] claims asserted that he was unaware of the misappropriations and that UtiliCorp artificially inflated its stock prices by disseminating materially misleading statements and/or omitting to state material facts necessary to make its statements not misleading.

Other considerations also favor the relation back of the amended complaint.... Nothing suggests that Alpern sought to capitalize on a further drop in stock prices by waiting for a more favorable date to file his § 11 claim. Rather, he amended his claim less than two months after filing his initial complaint based on additional information discovered about the same underlying occurrences. Since

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 41 of 306 PageID #:1997
Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2787520

Alpern was a DRIP plan purchaser, Utilicorp also should not have been surprised that Alpern sought to hold it accountable for its statements related to the DRIP prospectus. Finally, it is unlikely that UtiliCorp's defense on the merits will be unfairly prejudiced, and it may also assert reasonable inquiry and good faith belief defenses against a § 11 claim. Under the circumstances Alpern's amended complaint relates back to the filing date of the original complaint under Rule 15(c)(2).

*Id.* at 1543-44.

The Underwriters ask this Court to follow *Alpern* and apply Rule 15(c) to plaintiff's section 11 claims. But there is an important difference between *Alpern* and this case. In *Alpern,* the plaintiff asked the court to apply the relation-back doctrine to save his section 11 claim. In this case, defendants ask the Court to use the doctrine to *defeat* plaintiff's claims. Defendants have not cited, and the Court has not found, any case in which the relation-back doctrine was used to bar claims. Moreover, applying the doctrine in that manner would defeat its purpose, which is to allow plaintiffs to assert time-barred claims as long as defendants have sufficient notice of their exposure. *See Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp. of Tex.,* 20 F.3d 1362, 1366 (5th Cir.1994) (stating that the purpose of Rule 15(c) is "to allow a party to amend an operative pleading despite an applicable statute of limitations in situations where the parties to litigation have been sufficiently put on notice of facts and claims which may give rise to future, related claims"). Applying the doctrine as the Underwriters urge would, in effect, shorten the statute of limitations on plaintiff's section 11 claims, not lengthen it, as Rule 15 contemplates.

 *11 Even if it might be appropriate to apply the doctrine in this manner in some cases, the facts of this case show that this is not one of them. Though SIRVA announced in November 2004 that it needed to take a $15.2 million charge to reserves, Kelley attributed that development to increased losses and a change in actuaries. (Compl.¶¶ 304-09.) It was not until the end of January 2005 that the company announced it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶¶ 327-28.) Moreover, the final decision to restate was not announced until March 2005, and SIRVA did not identify the actual accounting errors it had discovered until September 2005, nearly a year after plaintiff filed its initial complaint. (*Id.* ¶¶ 335, 347-48.) As a result, relating the section 10(b) claims back to the original filing date, would divest plaintiff of claims

about which it could not reasonably have known when it filed the suit.

In short, given the dearth of authority supporting the Underwriters' request and its tension with the purpose of the Rule and the facts of this case, the Court declines to relate plaintiff's section 11 claims back to the date the initial complaint was filed.

Plaintiff first asserted its section 11 claims in the amended complaint filed October 11, 2005. On that day, SIRVA stock was selling for $6.57 per share. (*See* http://online.wsj.com/public/us (enter "SIR" in "Quotes & Research"; then enter 10/11/05 in "Historical Quotes" date).) Plaintiff paid $22.11 and $24.47 per share, respectively, for the shares it bought after the IPO. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) Because plaintiff paid more for its IPO shares than they were worth on the day it filed its section 11 claims, plaintiff satisfies the damage element of those claims.

The Underwriters also say that plaintiff cannot trace its post-SPO stock purchases to that offering. Plaintiff's PSLRA certification shows that it purchased 25,820 shares in the aftermarket on nine separate occasions between June 15, 2004 and August 27, 2004. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) On the last eight of those dates, the Underwriters say, SPO stock mingled in the market with IPO stock and the stock of corporate insiders. Thus, they conclude, "[p]laintiff cannot possibly prove that the securities it bought after the SPO are directly traceable to an allegedly false registration statement." (Underwriters' Mem. Law. Supp. Mot. Dismiss at 10.)

That may be true, but at this stage of the litigation, plaintiff does not have to *prove* anything. It simply has to allege that it purchased stock that is traceable to the offerings. *See In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 274 n. 7 (3rd Cir.2006) (stating that "plaintiffs need not prove their shares are traceable to a false or misleading registration statement" to defeat a motion to dismiss and holding that allegations that plaintiffs purchased stock " 'in' and 'traceable to' the ... stock offerings were sufficient"). Plaintiff has made the requisite allegations. (*See* Compl. ¶ 74.)

*Count II*

 *12 In Count II, plaintiff alleges that defendants violated section 12(2) of the 1933 Act, which imposes liability on any person who offers or sells stock in interstate commerce pursuant to a prospectus or oral communication that "includes

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2787520

an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77*l*. However, standing under this section is limited to those who purchase stock pursuant to public offerings, which plaintiff admits it did not do. *See Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 566, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); (Compl. ¶¶ 34, 54 (alleging that IPO and SPO were November 25, 2003 and June 10, 2004, respectively); Initial Compl., Certification Proposed Lead Pl., Schedule A (showing that plaintiff made no purchases on those dates).)

Plaintiff says that is irrelevant because, as lead plaintiff in this PSLRA suit, it is not required to have standing as to every claim in the suit. While that is true, *see, e.g., Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82 (2d Cir.2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."), there must be least one named plaintiff who does have standing to sue as to every claim. *See id.* at 83 (stating that additional named plaintiffs who have standing lead plaintiff lacks can be appointed to assist lead plaintiff in representing the class); *Payton v. County of Kane,* 308 F.3d 673, 682 (7th Cir.2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action."); *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.,* 388 F.Supp.2d 871, 891-92 (N.D.Ill.2004) (dismissing certain section 12(2) claims because none of the named plaintiffs had purchased securities in those offerings). Because plaintiff is the only named plaintiff in this suit, Count II must be dismissed for lack of standing.

## II. The SIRVA Defendants' Motions

### *Count I*
In Count I, plaintiff seeks to hold SIRVA, Kelley, Ryan, Rogers, Schnall and Stocker liable for violating section 11 of the 1933 Act. The arguments advanced by these defendants for the dismissal of the Count I claims are the same as those advanced by the Underwriters. Thus, for the reasons discussed above, the SIRVA defendants' motions to dismiss the Count I claims is granted in part and denied in part.

### *Count II*
In Count II, plaintiff alleges that SIRVA is liable for violating section 12(2). Because the Court has determined that this

count must be dismissed for lack of standing, we need not address the SIRVA defendants' arguments with respect to it.

### *Count IV*[3]

[3]   Because each defendant's liability on Count III depends on their liability on Count I's section 11 claims, the Court addresses Count IV first.

In Count IV, plaintiff contends that SIRVA, Kelley, Ryan, Rogers, Schnall, Stocker and CDR ("the SIRVA defendants") violated section 10(b) of the 1934 Act and Rule 10b-5 (collectively, "section 10(b)") by making false statements or failing to disclose material facts about: (1) the health of SIRVA Europe; (2) the calculation of SIRVA's insurance reserves and (3) SIRVA's accounting practices and earnings projections. In addition, plaintiff alleges that CDR violated section 10(b) by trading on inside information. Section 10(b) prohibits the use of "any device, scheme, or artifice to defraud" or the making of "any untrue statement of a material fact" or omission of a material fact by "the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange." 17 C.F.R. § 240.10b-5; *see* 15 U.S.C. § 78j (prohibiting the "use ... in connection with the purchase or sale of any security registered on a national securities exchange ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe"). To state a section 10(b) claim, plaintiff must allege that: each defendant made a false statement of, or failed to disclose, a material fact; they did so with scienter and in connection with the purchase or sale of securities; plaintiff relied on the statement or the omission or the integrity of the market, and was damaged as a result. *Basic Inc. v. Levinson,* 485 U.S. 224, 250, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Tellabs,* 437 F.3d at 595. Such claims are also subject to the pleading requirements of the PSLRA:

 **\*13** Under the PSLRA, a securities fraud complaint must (1) specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset

2006 WL 2787520

that the defendants likely intended to deceive, manipulate, or defraud.

*Tellabs,* 437 F.3d at 594-95 (quotations and citations omitted).


A. European Operations

1. Materiality

The first category of misrepresentations plaintiff says defendants made concern SIRVA's European operations. Plaintiff alleges that, like the Underwriters, the SIRVA defendants misstated material facts in, or deliberately withheld such facts from the prospectuses, including that:

(1) SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a position of strength;

(2) the European business had failed to meet internal budget projections; and

(3) demand was declining, no further cost cutting was feasible, and the European businesses SIRVA had acquired were underperforming. (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.,* Ex. 8, SPO Prospectus at 4-5.)

In addition, plaintiff alleges that the SIRVA defendants made the following misrepresentations of material facts:

(4) in a February 10, 2004 conference call with securities analysts, Ryan said: "[W]ith our capabilities in place in Europe, we are now in a position to drive real, organic growth in 2004." (Compl.¶ 233);

(5) in an April 27, 2004 press release regarding the company's results for the first quarter of 2004, Kelley said: "[W]e made significant progress in broadening our services offering and expanding our presence throughout the European continent." (*Id.* ¶ 252);

(6) in an April 27, 2004 conference call with securities analysts, Kelley said that SIRVA Europe was "generating organic growth through [cross] selling relocation and moving services to our corporate clients. We're quickly integrating and growing acquisitions and as always, we're sharply focused on costs, productivity and quality." (*Id.* ¶ 255);

(7) in the same conference call, when an analyst asked Kelley, "[W]hat are you guys doing exactly in Europe that is allowing you to get these margins up so quickly. Is

it Scanvan? Did they come in with a better margin than anticipated or is this just blocking and tackling?"

Kelley responded: "It is blocking and ... tackling, Chris. It is looking at all of the operations we have across the UK and the continent. It's looking at how do we continue to wring costs out of this and wring efficiency [and] productivity out of it and do it in a way that is better and do it on an ongoing basis. This effort has been going on for 12 months, 18 months, and we anticipate that we will continue to be able to do this. If we look at this, we talked a little bit about Europe, we want to be able to continue to take the cost out, rip the cost out, make sure that we've got an efficient model so that we can invest in the front end. Invest in selling and marketing so we can grow the business. And that is basically what we have done. We have invested a significant amount on sales and marketing there. We had to have the cost reduction in order to do that and get the productivity to do that. So, that is what you're seeing in Europe." (*Id.* ¶ 258);

**\*14** (8) in an August 4, 2004 press release Kelley said: "We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth." (*Id.* ¶ 287).

As discussed above, the statements in the second category are material, but the statements in the first category are not. Consequently, the latter statements cannot be the basis for a section 10(b) claim.

Nor can the alleged misstatements in the fourth, fifth and eighth categories. Ryan's statement that SIRVA was "in a position [in Europe] to drive real, organic growth in 2004" is an "indefinite prediction[ ] of 'growth,' " and Kelley's statements that SIRVA "made significant progress in broadening [its] services offering and ... presence" in Europe, "continue[d] to invest in [the] European ... operations" and was "building the infrastructure for future growth" are vague statements of optimism, both of which are immaterial puffery. *See Searls,* 64 F.3d at 1066.

The situation is different for the third category, which concerns defendants' failure to disclose in the prospectuses that there were demand, cost reduction and acquisition problems in Europe. With respect to these problems, plaintiff alleges that a "Former Senior European Finance Executive" personally told Kelley and Ryan in a meeting that occurred in

2006 WL 2787520

October 2003 at SIRVA's "Centre of Excellence" in the United Kingdom and in another that occurred on December 12, 2003 at the Chelsea Royal Hospital that demand was falling in Europe, no further cost reductions could be made and the European companies SIRVA had acquired were performing poorly. (Compl.¶¶ 98, 100-03, 106-07.) Plaintiff also alleges, through a "Former SIRVA Relocation Business Development Executive," that at a February 2004 "Summit Meeting" in Florida, Kelley said "the European operations were losing money" and "Europe was bringing the Company down." (*Id.* ¶¶ 109-10, 113.) Moreover, plaintiff says this information was material because: (1) the financials in the prospectuses demonstrated that the company's bottom line had become increasingly dependent on the European operations which, by the end of 2003, accounted for more than a quarter of its income (*see id.* ¶ 37; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.,* Ex. 8, SPO Prospectus at 2, 23); and (2) SIRVA specifically identified cost cutting and corporate acquisitions as strategies for increasing its revenues (*id.,* Ex. 1, IPO Prospectus at 5; *id.,* Ex. 8, SPO Prospectus at 5). Those allegations are sufficient to satisfy the materiality element as modified by the PSLRA.

The materiality element is also satisfied with respect to the sixth and seventh categories of alleged misrepresentations. In the April 27, 2004 conference call, Kelley is alleged to have said that SIRVA Europe was "quickly integrating and growing acquisitions" and owed its profitability, both current and anticipated, to "wring[ing] costs ... efficiency [and] productivity" out of the operation. Given the company's alleged reliance on its European operations, the Court cannot say as a matter of law that these statements are immaterial.

### 2. Scienter

**\*15** The next question is whether plaintiff has sufficiently alleged the scienter element as to each defendant. *See Tellabs,* 437 F.3d at 603 ("[P]laintiffs must create th[e] inference [of scienter] with respect to each individual defendant in multiple defendant cases."). Defendants say scienter is lacking because plaintiff has not alleged that any of them had a motive to mislead investors. Motive is not, however, a prerequisite to scienter:

> Currently three different approaches toward the way to demonstrate the required "strong inference [of scienter]" exist among the courts of appeals. The Second and Third Circuits take the position that ... plaintiffs may ... state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious

> misbehavior. The Ninth and Eleventh Circuits disagree, believing that Congress opted instead for a more onerous burden. The remaining six circuits that have considered this issue take a middle ground, reasoning that Congress chose neither to adopt nor reject particular methods of pleading scienter-such as alleging facts showing motive and opportunity-but instead only required plaintiffs to plead facts that together establish a strong inference of scienter.... [W]e conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

*Id.* at 601 (citations, quotations and alterations omitted).

The *Tellabs* court also rejected defendants' argument that the scienter element is satisfied only if the most reasonable inference from the alleged facts is that defendants acted with fraudulent intent:

> The Sixth Circuit has said that the strong inference requirement creates a situation in which plaintiffs are entitled only to the most plausible of competing inferences, but that it does not mandate that the inference be irrefutable. As the Sixth Circuit itself has hinted, however, this standard could potentially infringe upon plaintiffs' Seventh Amendment rights.

> While we express no view on whether the Sixth Circuit's approach is in fact unconstitutional, we think it wiser to adopt an approach that cannot be misunderstood as a usurpation of the jury's role. Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent.

*Id.* at 601-02 (citation and quotation omitted). With these standards in mind, we will examine plaintiff's allegations.

Plaintiff argues that Kelley's scienter can be inferred from the alleged fact that he knew about the problems with the European operations and the company's increasing dependence on them, before he misrepresented or withheld material facts. In other words, plaintiff alleges that Kelley made public statements or disseminated information about the European business that he knew were untrue or materially incomplete. Those allegations are sufficient to support a reasonable inference that Kelley acted with scienter when he failed to disclose the problems with the

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2787520

European operations in the prospectuses and gave purportedly inaccurate information about them in the April 27, 2004 conference call.

**\*16** We turn now to Ryan. Having determined that her alleged statement in the February 10, 2004 conference call with the analysts is puffery, the section 10(b) claim against Ryan with respect to Europe rests only on the alleged omissions from the prospectuses. According to plaintiff, Ryan's scienter can be inferred from her alleged knowledge about the problems in Europe before the prospectuses were issued. The Court agrees. At this stage, Ryan's alleged knowledge that the prospectuses were materially incomplete is sufficient to satisfy the scienter element.

The claim against Rogers with respect to the European operations is also based solely on the alleged prospectus omissions. Plaintiff does not allege, however, that Rogers participated in the 2003 meetings in which the Former Senior European Finance Executive told Kelley and Ryan about the problems with Europe. But plaintiff does allege that during a conference call with Rogers, Kelley and Ryan that took place shortly after Kelley and Ryan's first meeting with the Former Executive, Rogers told the Former Executive that he had lowered the 2004 profit projection for Europe by fifteen percent. (*See* Compl. ¶¶ 99-105.) Plaintiff also alleges that Rogers attended the February 2004 summit meeting and that he, along with Kelley, said that Europe was "losing money" and "was bringing the Company down." (*Id.* ¶¶ 110, 113.) Taken together, those allegations are sufficient to enable a reasonable person to infer that Rogers acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses.

The situation is different for Schnall. Plaintiff does not allege any facts from which a reasonable person could infer that he knew the prospectus information about Europe was materially incomplete. But plaintiff says that his scienter can be inferred from the fact that he is one of the "principals" of and has a "financial and controlling interest[ ]" in CDR and, thus, had a financial motive to inflate the offering price. (Compl.¶¶ 30, 175, 179, 181.)

The Court disagrees. Every shareholder in a company that decides to go public has a financial interest in obtaining a high offering price. Equating that interest with an intent to defraud would make all such shareholders targets of securities fraud claims. Consequently, the Court holds that Schnall's alleged financial interest in the offerings does not,

by itself, give rise to a strong inference of scienter. *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 420 (5th Cir.2001) (allegations that officers and directors would benefit from higher public offering price held "insufficient to support a strong inference of scienter"); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l. Corp., N.V.,* 941 F.Supp. 1369, 1377 (S.D.N.Y.1996) (allegations that defendant bank "was a founder, a substantial creditor, and a shareholder" of company whose notes were sold in the offering and, therefore, "had ample motive to inflate [the company's] financial soundness to ensure a successful and profitable offering" held inadequate to allege scienter). Accordingly, the Court dismisses the section 10(b) claim asserted against Schnall for misstatements about SIRVA Europe.

**\*17** We turn now to the last individual defendant, Stocker. Plaintiff has not alleged any facts that suggest Stocker knew the prospectus information about Europe was materially incomplete, had any motive to defraud, or otherwise acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses. Therefore, the section 10(b) claim plaintiff asserts against him for those alleged omissions must be dismissed.

That leaves the two corporate defendants, SIRVA and CDR. The individual defendants' knowledge can be imputed to those entities but only if they obtained the knowledge when they were acting within the scope of their employment. *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida County, Wis.,* 965 F.2d 311, 316 (7th Cir.1992). Plaintiff alleges that Kelley and Ryan learned about the problems in Europe in the course of their duties as SIRVA's CEO and CFO, respectively, and that Rogers learned about them while acting in his capacity as a principal of CDR. Accordingly, their knowledge can be imputed to SIRVA and CDR.

### B. Insurance Reserves

Plaintiff alleges that the SIRVA defendants made the following misrepresentations and omissions about insurance reserves in the prospectuses: (1) that SIRVA manipulated insurance reserves to boost earnings; (2) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (3) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; (4) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends"; and

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

(5) SIRVA improperly failed to take a timely charge to accrue additional liabilities to its multiple-line property and commercial liability insurance (Compl. ¶¶ 40, 44-45, 137, 153-70; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.,* Ex. 8, SPO Prospectus at 28, 67.) In addition, plaintiff alleges that defendants made the following misrepresentations elsewhere:

> (6) in a February 10, 2004 conference call, Kelley said that SIRVA's insurance business was growing in an "intelligent and low-risk manner" and operated on "very careful risk models" (Compl.¶¶ 232, 235);

> (7) in the 2003 Form 10-K, defendants said that SIRVA was "cautious in choosing which customers to insure and what kinds of insurance to write" and reported that SIRVA had reserves of $48.7 million and $53.7 million at the end of 2002 and 2003, respectively (*id.* ¶¶ 240, 243-44);

> (8) in the Form 10-Q for the first quarter of 2004, defendants said that SIRVA had insurance reserves of $51.7 million and claims reserves of $19.6 million at the end of March 2004 (*id.* ¶ 262);

> (9) in an April 27, 2004 conference call, Kelley said that more than two-thirds of the insurance unit's growth "came organically" (*id.* ¶ 254); and

> **\*18** (10) In an August 5, 2004 conference call, Kelley said that SIRVA was "growing th[e] [insurance] business without compromising [its] risk standards" (*id.* ¶ 292).

As noted above, the third alleged misrepresentation concerning reserves for cargo claims is not actionable because plaintiff alleges that SIRVA manipulated reserves for NAIT and workers' compensation claims only. (*See* Compl. ¶¶ 153-55, 162-63, 166-68.) Consequently, plaintiff cannot base a section 10(b) claim on prospectus statements about cargo claims reserves.

Plaintiff fares no better with its claim that defendants concealed alleged reserves manipulation. As discussed above, the manipulation claims are based on information from confidential informants whose identities and personal knowledge are not described with the detail demanded by the PSLRA.

Plaintiff's remaining reserves claims-(1) that defendants falsely described SIRVA's reserves methodology in the prospectuses; (2) that defendants improperly failed to take a timely charge to accrue additional liabilities related to certain lines of insurance; (3) that Kelley falsely characterized SIRVA's insurance business and its growth in the February 10, April 27 and August 5, 2004 conference calls; and (4) that defendants falsely characterized SIRVA's insurance business and the amount of its reserves in its 2003 Form 10-K and its Form 10-Q for the first quarter of 2004-depend on the inadequately pleaded manipulation allegations. Thus, these claims must also be dismissed.

C. Accounting Practices & Projections

That last group of misstatements that plaintiff attributes to the SIRVA defendants concerns the company's accounting practices and financial projections. With respect to SIRVA's accounting practices, plaintiff alleges that defendants:

> (1) put false financial information for the years 2001-2003 and the first three quarters of 2004 in the prospectuses, the February 10, 2004 press release, SIRVA's 2003 Form 10-K, the April 27, 2004 press release and conference call, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, SIRVA's 2003 Annual Report, and the August 5, 2004 press release and conference call (Compl.¶¶ 40-41, 43, 48-52, 57, 59, 63, 231, 236, 251, 256, 259, 273-74, 279, 286, 289, 291, 293, 318, 374, 376-80, 384, 386, 388);

> (2) gave false assurances that the financial statements fairly presented the company's financial results in the prospectuses, in SIRVA's 2003 Form 10-K, in SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and in its 2003 Annual Report and Proxy (*id.* ¶¶ 41, 59, 63, 237-38, 259-60, 274, 277, 293-94, 318-19);

> (3) falsely stated the company's policy regarding revenue recognition in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, the 2003 Annual Report and Proxy and the January 31, 2005 conference call (*id.* ¶¶ 46, 62-63, 241-42, 261, 276, 295, 320, 333);

> **\*19** (4) falsely stated that the company had adequate internal accounting controls in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and its 2003 Annual Report and Proxy (*id.* ¶¶ 40, 52, 56, 63, 222, 237, 239, 263, 275, 296, 322, 398-99);

> (5) failed to disclose in the prospectuses changes defendants made in certain accounting methodologies (*id.* ¶¶ 52-53, 63); and

(6) falsely stated that SIRVA's financial statements had been prepared in accordance with GAAP in the 2003 Annual Report and Proxy, the 2003 Form 10-K and the Form 10-Qs for the second and third quarters of 2004 (*id.* ¶¶ 237, 260, 274-75, 294, 319, 263).

Defendants do not argue that these statements were true or immaterial, but they say plaintiff's allegations do not support the inference that any of them knew the statements were false.

With respect to the individual defendants' knowledge, plaintiff alleges, in essence, that they must have known about the accounting improprieties because they were actively involved in the company's management and/or their positions gave them access to all of SIRVA's financial information. (*See id.* ¶¶ 194-205, 219-27.) The fact that defendants were active managers does not, however, support the inference that they knew of the alleged accounting manipulations. *Fin. Acquisition,* 440 F.3d at 287 ("[O]fficers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). Nor does the fact that defendants, by virtue of their positions, had access to the accounting information. *City of Phila. v. Fleming Cos., Inc.,* 264 F.3d 1245, 1264 (10th Cir.2001) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate ...." (quotation omitted)). Rather, plaintiff must allege facts that support the inference that each defendant was actually aware, or had a duty to be aware, of the alleged improprieties.

Plaintiff has made the requisite allegations only as to Stocker and Ryan. Though plaintiff does not allege Ryan's responsibilities as SIRVA's CFO, it is reasonable to infer that one of them was to ensure that the company's financial statements were accurate. Moreover, plaintiff specifically alleges that Stocker and Ryan were members of the Audit Committee during the class period, a committee that was charged with:

> review[ing] the quality and integrity of SIRVA's financial reporting and other internal control processes, the quality and integrity of its financial statements, its compliance with legal and regulatory requirements and its code of conduct, the qualifications and independence of its auditors, the performance of its internal audit function and independent auditors and other significant financial matters.

**\*20** (Compl.¶¶ 219-20, 222, 226.) Further, because Ryan and Stocker are alleged to have learned of the accounting issues while acting in the scope of their employment with SIRVA, their knowledge can be imputed to the company. *One Parcel of Land,* 965 F.2d at 316. In sum, plaintiff's knowledge allegations are sufficient with respect to Ryan, Stocker and SIRVA but not with respect to Kelley, Schnall, Rogers or CDR.

Plaintiff also alleges that defendants made false earnings projections in the February 10, 2004 conference call, the April 27, 2004 press release and conference call and the August 5, 2004 press release and conference call. (Compl.¶¶ 234, 253, 257, 288, 290-91.) Defendants contend that these projections are protected by the PSLRA's "safe harbor" for forward-looking statements. Forward-looking statements include "projection[s] of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i). Defendants are shielded from liability for such statements if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" or "plaintiff fails to prove that the forward-looking statement[s] ... w[ere] made with actual knowledge ... that [they] w[ere] false or misleading." *Id.* § 78u-5(c)(1).

Defendants told investors both during the conference calls and in the press releases that the projections were forward-looking statements and directed them to the cautionary language in SIRVA's SEC filings, including the IPO prospectus and SIRVA's 2003 Form 10-K. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 2, Tr. 2/10/04 Conference Call at 1; *id.,* Ex. 4, Tr. 4/27/04 Conference Call at 1; *id.,* Ex. 13, Tr. 8/5/04 Conference Call at 1; *id.,* Ex. 14, 2/10/94 Press Release at 3; *id.,* Ex. 15, 4/27/04 Press Release at 2-3; *id.,* Ex. 16, 8/5/04 Press Release at 2-3.) The IPO prospectus sets forth twenty-three risk factors associated with SIRVA's business:

> (1) If we do not successfully compete within the highly competitive industries in which we operate, our operating revenues and profitability could be adversely affected.
>
> (2) Competition may force us to lower our prices thereby adversely affecting our operating revenues and profitability.

2006 WL 2787520

(3) Our business and financial condition could continue to be adversely affected by the present economic downturn and could also be affected by future economic downturns and other external events.

(4) Until recently, we had a history of net losses, and may not be profitable in the future.

(5) Our success depends in part on our relatively new and unproven strategy of offering a global comprehensive relocation solution to customers.

 *21 (6) Our global relocation solutions business exposes us to some of the risks of the real estate industry, including risks relating to the purchase, ownership and resale of transferred employees' homes at a loss.

(7) Our network services business exposes us to some of the risks of the insurance industry.

(8) We may not be able to recruit and retain a sufficient number of agents, representatives or owner/operators to carry out our growth plans.

(9) Actions taken by our agents may harm our brands or reputation, or result in legal action against us.

(10) Potential liability associated with accidents in the trucking industry is severe and occurrences are unpredictable. In addition, an increase in liability, property or casualty insurance premiums could cause us to incur significant costs.

(11) If we lost one or more of our government licenses or permits or became subject to more onerous government regulations, including the new federal safety rules on truck driver work hours, we could be adversely affected.

(12) We are subject to litigation or governmental investigations as a result of our operations.

(13) Contingent or future environmental liabilities could cause us to incur significant costs and adversely affect our operations.

(14) Our business is highly seasonal, which leads to fluctuations in our operating results and working capital needs.

(15) Our owner/operators are currently not considered to be employees by taxing and other regulatory authorities. Should these authorities change their position and consider

our owner/operators to be our employees, our costs related to our tax, unemployment compensation and workers' compensation payments could increase significantly.

(16) The international scope of our business may adversely affect our business.

(17) We are exposed to currency fluctuations, which may have an adverse effect on us.

(18) Fuel is a significant cost element in the trucking transportation industry. Fuel prices are currently high and may continue to rise and they, and the availability of fuel, have been subject to volatility in the past.

(19) We are a holding company with no significant independent operations and therefore rely on our subsidiaries to make funds available to us.

(20) We have had substantial existing debt and may incur substantial debt in the future, and the agreements governing our debt contain restrictions that could significantly restrict our ability to operate our business.

(21) Any difficulties with our information systems or our information systems providers could delay or disrupt our ability to service our customers and impair our competitiveness.

(22) We are dependent on our highly trained executive officers and employees. Any difficulty in maintaining our current employees or in hiring similar employees would adversely affect our ability to operate our business.

(23) If we acquire any companies or technologies in the future, they could prove difficult to integrate, disrupt our business, dilute stockholder value or have an adverse effect on our results of operations.

 *22 (*Id.,* Ex. 1, IPO Prospectus at 13-19.) The cautionary language in the 2003 Form 10-K, which was filed nearly six months later, is virtually identical. (*See id.,* Ex. 9, 2003 Form 10-K at 12-20.) Plaintiff contends that those warnings are too general to be meaningful, as the PSLRA safe harbor requires.

Our court of appeals discussed the parameters of the safe harbor provision in *Asher v. Baxter International, Inc.,* 377 F.3d 727 (7th Cir.2004). In that case, a group of investors sued Baxter under section 10(b) claiming that the earnings projections Baxter made for 2002 were false. *Id.* at 728. Baxter argued that the projections fell within the safe harbor

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

because they were accompanied by the following cautionary language:

> Many factors could affect the company's actual results, causing results to differ materially, from those expressed in any such forward-looking statements. These factors include, but are not limited to, interest rates; technological advances in the medical field; economic conditions; demand and market acceptance risks for new and existing products, technologies and health care services; the impact of competitive products and pricing; manufacturing capacity; new plant start-ups; global regulatory, trade and tax policies; regulatory, legal or other developments relating to the company's Series A, AF, and AX dialyzers; continued price competition; product development risks, including technological difficulties; ability to enforce patents; actions of regulatory bodies and other government authorities; reimbursement policies of government agencies; commercialization factors; results of product testing; and other factors described elsewhere in this report or in the company's other filings with the Securities and Exchange Commission. Additionally, as discussed in Item 3-"Legal Proceedings," upon the resolution of certain legal matters, the company may incur charges in excess of presently established reserves. Any such change could have a material adverse effect on the company's results of operations or cash flows in the period in which it is recorded.
>
> Currency fluctuations are also a significant variable for global companies, especially fluctuations in local currencies where hedging opportunities are unreasonably expensive or unavailable. If the United States dollar strengthens significantly against most foreign currencies, the company's ability to realize projected growth rates in its sales and net earnings outside the United States could be negatively impacted.
>
> The company believes that its expectations with respect to forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business operations, but there can be no assurance that the actual results or performance of the company will conform to any future results or performance expressed or implied by such forward-looking statements.

*Id.* at 730. The district court agreed and granted Baxter's motion to dismiss. *Id.*

**\*23** The investors appealed, arguing that Baxter could not take advantage of the safe harbor because the

cautionary language was not meaningful. *Id.* In the Seventh Circuit's view, the word "meaningful" prohibits "boilerplate" warnings, such as "all businesses are risky." *Id.* at 732-33. Rather, a caution "must be tailored to the risks that accompany the particular projections." *Id.* at 732. Ultimately, the court concluded that a caution falls within the safe harbor "only if it includes those sources of variance that (at the time of the projection) were the principal or important risks." *Id.* at 734.

The court did not, however, make a determination on the meaningfulness of Baxter's cautionary language because such a decision was premature:

> There is no reason to think-at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery-that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) "important" sources of variance. The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks. For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them.

*Id.*

As in *Asher,* the cautionary language in this case lists a host of factors and events that might impact SIRVA's projections but not the ones plaintiff contends were most important. As the *Asher* court explained, that omission is not necessarily fatal to defendants' quest for the safe harbor. But, given plaintiff's allegation that the missing information pertained to the "principal or important" risks at the time the projections were made, we cannot say, as a matter of law, that the cautionary language was meaningful.

All is not lost for defendants, however. Plaintiff must also allege that they had actual knowledge of the falsity of the projections, to defeat defendants' motion. As discussed above, plaintiff's allegations support the inference that Kelley, Ryan and Rogers knew the projections were false because of the problems in Europe. Moreover, because they obtained that information in the course of their duties for SIRVA and CDR, respectively, that knowledge can be imputed to the corporate defendants. *One Parcel of Land,* 965 F.2d at 316. Further, Rogers' alleged possession of material information

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

about SIRVA Europe and his alleged ownership and control of CDR are sufficient to support the inference that CDR engaged in insider trading. Finally, as noted above, plaintiff's allegations support the inference that Ryan and Stocker, and therefore, SIRVA, knew the projections were false because of the accounting improprieties.

**\*24** They do not, however, support the inference that: (1) Schnall or Stocker knew the projections were false because of the problems with Europe; (2) any of the defendants knew the projections were false because of manipulation of the insurance reserves; or (3) Kelley, Schnall, Rogers or CDR knew the projections were false because of improper accounting practices. Thus, the projections claim survives but only as to Kelley, Ryan, Rogers, SIRVA and CDR with respect to the problems in Europe and as to Ryan, Stocker and SIRVA with respect to the improper accounting practices.

*Counts III & V*

In Count III, plaintiff asserts a claim under section 15 of the 1933 Act against Kelley, Ryan, Schnall, Stocker and CDR. In Count V, plaintiff asserts a claim under section 20(a) of the 1934 Act against the same defendants. Section 15 provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 11 of the 1933 Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder [*i.e.,* section 10(b) ] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Though the two sections are not identical, the analysis applied to them is the same. *See Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 911-13 (7th Cir.1994) (analyzing section 15 and section 20(a) claims together); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986) (noting that the two sections are "parallel").

Defendants contend that these counts must be dismissed because they cannot be held liable both as primary violators, as charged in Counts I and IV, and as control persons. The statutory language suggests that control person liability is an alternative to liability for a primary violation, and some courts have interpreted it that way. *See, e.g., In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 77 (2d Cir.2001) (stating that control person liability "is a separate inquiry from that of primary liability and provides an alternative basis of culpability"). Only a few courts have addressed the issue, however, and the Seventh Circuit is not one of them. Thus, whether control person liability is an alternative or a supplement to primary liability is an open question in this circuit.

**\*25** At some point, the Court may have to decide that question, but we need not do it now. Because plaintiff is permitted to plead alternatively, the Court would not dismiss Counts III and V even if liability cannot be imposed on defendants under both theories.

Defendants also say that these counts must be dismissed because plaintiff has not pleaded enough facts to demonstrate that they are control persons within the meaning of the statutes. Control person claims are not, however, subject to a heightened pleading standard. *See*Fed. R. Civ. P. 9(b); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,* No. 02 C 5893, 2004 WL 574665, at \*16 (N.D.Ill. Mar.22, 2004). Consequently, plaintiff's allegation that each defendant "had direct involvement in the day to day operations of [SIRVA] and/or control over major corporate decision and policy making, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same" (Compl.¶ 461), is sufficient to satisfy the control element of the section 15 and 20(a) claims. *See Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992) (stating that a control person is one who "actually participated in, that is, exercised control over, the operations of the person in general and ... possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.").

However, a control person is liable under sections 15 and 20(a), only if the person or entity that it controls is liable for violating sections 11 and 10(b), respectively. As discussed above, plaintiff has adequately alleged that SIRVA violated both sections 11 and 10(b). Therefore, defendants' motions to dismiss Counts III and V are denied.

*Count VI*

In Count VI, plaintiff asserts a claim under section 20A of the 1934 Act against CDR for insider trading. Defendants say this claim must be dismissed because liability under section 10(b) is a predicate to liability under this section. *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]he language of the statute is ... quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the [19]34 Act or its rules and regulations.") Even if that is true, an issue we do not decide, Count VI survives. As discussed above, plaintiff has successfully pleaded section 10(b) claims against CDR.

III. Price

*Counts I and IV*

Plaintiff alleges that Price violated sections 11 and 10(b) by falsely stating in its audit opinions[4] for SIRVA's 2000-2003 financial statements, which were included in SIRVA's 2003 Annual Report, 2003 Form 10-K, 2004 Form 10-K and both prospectuses, that: (1) the financial statements were prepared in accordance with GAAP; and (2) Price had audited those statements in accordance with Generally Accepted Auditing Standards ("GAAS"). (Compl.¶¶ 95, 274, 280.)

[4]   It is not clear whether plaintiff asserts a 10(b) claim against Price for its actuarial work. To the extent that it does, the claim must be dismissed because plaintiff does not allege that Price made any false statements in connection with that work.

**\*26** Price says the section 11 claim must be dismissed because plaintiff has not alleged it with the particularity required by Rule 9(b). Plaintiff contends that such claims are not subject to that Rule, and both parties offer authority in support of their positions. We need not, however, decide whether the Rule applies because, even if it does, plaintiff's allegations pass muster.

Rule 9(b) requires plaintiff to allege the "who, what, when, where and how" of the alleged fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Plaintiff alleges

that Price falsely stated in specifically identified documents that its audits conformed to GAAS and SIRVA's financials conformed to GAAP, and that Price knew or should have known, for the reasons discussed below, that those statements were false. Those allegations are sufficient to satisfy Rule 9(b). Accordingly, Price's motion to dismiss the section 11 claim asserted against it is denied.[5]

[5]   In its reply brief, Price argues, for the first time, that plaintiff has no standing to pursue a section 11 claim with respect to the SPO and that even if it does, it has failed to allege damages that are traceable to that offering. (*See* Price Reply at 9-10.) To the extent that Price is arguing plaintiff lacks non-jurisdictional standing, Price has waived the argument by failing to raise it in its opening brief. *United States v. Turner,* 203 F.3d 1010, 1019 (7th Cir.2000). To the extent that Price argues that plaintiff lacks Article III standing, that argument fails for the reasons discussed above.

With respect to the section 10(b) claim, Price argues that plaintiff has not adequately alleged that it acted with scienter. "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994) (quotation omitted). Rather, plaintiff must allege that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (quotation omitted). Moreover, as discussed above, to satisfy the PSLRA, plaintiff must allege "sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud." *Tellabs,* 437 F.3d. at 594-95 (quotations and citations omitted).

Plaintiff says that Price's intent can be inferred from its disregard of numerous "red flags," of fraud, including: (1) the pervasive and obvious deficiencies in SIRVA's internal controls; (2) SIRVA's use of, and lack of control over, manual entries; (3) SIRVA's unusual growth or profitability compared to other companies in the industry; (4) management's failure to follow up on issues, provide oversight and display an appropriate attitude toward control; (5) the lack of properly trained personnel responsible for ensuring accurate financial reporting; (6) management's domination by a single person or small group and its undue emphasis on aggressive earnings targets; (7) earnings increases that were due solely to

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

changes in methodology; (8) SIRVA's flawed inter-company reconciliation process; (9) SIRVA's use of subjective or unsupported estimates about assumptions affecting the amount of assets, liabilities, revenues and expenses reported; and (10) SIRVA's understatement of its insurance reserves (Compl.¶¶ 408-10, 413-14, 416-17, 419, 420-26, 428).

**\*27** Plaintiff also alleges facts from which we can infer that Price actually knew, or should have known, about most of these issues. Plaintiff says that it is standard auditing practice to examine a company's internal controls before issuing an audit report, to question a company's unusual growth or profitability relative to its competitors and to scrutinize closely the use of manual journal entries and assumptions based on estimates. (*Id.* ¶¶ 413-14, 416, 427.) Plaintiff also says that Price should have realized that the statements did not accurately reflect insurance reserves because it served as the actuary for those reserves.[6] (*Id.* ¶¶ 162-63, 428.) Moreover, it is reasonable to infer, given the extent of the alleged problems, that a competent auditor would have discovered, in the course of investigating the sufficiency of SIRVA's internal controls, that the company lacked the personnel necessary to ensure accurate financial reporting, certain earnings increases were due solely to methodology changes and SIRVA's inter-company reconciliation process was flawed. Taken together, these allegations are sufficient to suggest that Price made the false GAAP and GAAS representations with the intent to defraud or with reckless disregard as to their accuracy. *See In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 21488087, at \*7 (S.D.N.Y.2003) (holding that scienter element was satisfied by allegations that auditor "had unlimited access to WorldCom's books and records ... [and] an obligation to review and evaluate those records in order to form an opinion regarding WorldCom's financial statements[,] .... [and that] WorldCom's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs"); *In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97 C 2715, 1998 WL 781118, at \*11 (N.D.Ill. Nov.4, 1998) ("Plaintiffs allege not only violations of GAAP and GAAS, but that Deloitte deliberately ignored several red flags in the financial statements which would have exposed the fraud.... Thus, the allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful." (quotation omitted)).[7] Price's motion to dismiss is, therefore, denied.

6    Price argues that plaintiff's assertion of this argument is an impermissible attempt to amend its complaint through a brief. The Court disagrees. That Price should have suspected accounting irregularities when it discovered SIRVA was under-reserved is a reasonable inference from the allegations in the complaint.

7    Price also argues that plaintiff's section 10(b) allegations do not satisfy Rule 9(b). For the reasons discussed above, the Court rejects this argument.

*Conclusion*

For all of the reasons stated above:

(1) the Underwriters' motion to dismiss [doc. no. 83] is granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; and (3) the claims in Count II, which are dismissed without prejudice. In all other respects, the Underwriters' motion is denied.

**\*28** (2) the SIRVA defendants' motions [doc. nos. 87 & 89] are granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; (3) the claims in Count II, which are dismissed without prejudice; (4) the Count IV claims premised on: (a) the prospectus statements that SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a

2006 WL 2787520

position of strength, which are dismissed with prejudice; (b) Ryan's statement in the February 10, 2004 conference call, which is dismissed with prejudice; (c) Kelley's statement in the April 27, 2004 press release that "[SIRVA] made significant progress in broadening [its] services offering and expanding [its] presence throughout the European continent," which is dismissed with prejudice; and (d) Kelley's statements in the August 4, 2004 press release that "We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth," which are dismissed with prejudice; (5) the Count IV claims asserted against defendants Schnall and Stocker that are premised on omissions from the prospectuses about SIRVA Europe, which are dismissed without prejudice; (6) all of the Count IV claims premised on alleged misstatements about the insurance reserves, which are dismissed without prejudice; (7) the Count IV claims premised on SIRVA's accounting practices that are asserted against Kelley, Rogers, Schnall and CDR, which are dismissed without prejudice; and (8) the Count IV claims premised on the alleged falsity of the financial projections; (a) due to undisclosed information about SIRVA Europe that are asserted against Schnall and Stocker; (b) due to undisclosed information about insurance reserves asserted against all of the SIRVA defendants; (c) due to undisclosed problems with SIRVA's accounting practices asserted against Kelley, Schnall, Rogers and CDR, all of which are dismissed without prejudice. In all other respects, the motions are denied.

(3) Price's motion to dismiss [doc. no. 86] is denied. Plaintiff has thirty days from the date of this Memorandum Opinion and Order to amend its complaint in accordance with this Order. If no amendment is timely filed, the Court will dismiss the deficient claims with prejudice.

**\*29** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2787520

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 607578
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

CITY OF LAKELAND EMPLOYEES
PENSION PLAN, Individually
and on Behalf of All Others
Similarly Situated, Plaintiff,
v.
BAXTER INTERNATIONAL
INC., et al., Defendants.

No. 10 C 6016.
|
Jan. 23, 2012.

**Attorneys and Law Firms**

David J. George, Robert J. Robbins, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, Lori Ann Fanning, Matthew E. Van Tine, Marvin Alan Miller, Miller Law LLC, Chicago, IL, for Plaintiff.

National Elevator Industry Pension Fund, pro se.

Matthew Robert Kipp, Andrew J. Fuchs, Donna L. McDevitt, Skadden Arps Slate Meagher & Flom, LLP, Chicago, IL, for Defendants.

**Opinion**

SHARON JOHNSON COLEMAN, Judge.

**\*1** Plaintiff shareholders, individually and on behalf of a proposed class of all purchasers of the publicly traded common stock of Baxter International, Inc. ("Baxter") filed an Amended Consolidated Class Action Complaint on April 15, 2011. The Amended Complaint alleges violations of the Securities Exchange Act of 1934 by Baxter stemming from various public statements between June 10, 2009, and May 3, 2010, relating to Baxter's plasma derivative products and the remediation of its Colleague infusion pump. Baxter moves to dismiss for failure to state a claim, arguing that the complaint lacks the requisite specificity for pleading fraud and that plaintiffs have pleaded themselves out of court because the

factual allegations in the complaint do no support a claim of securities fraud.

**Background**

Baxter is a global, diversified healthcare company that develops, manufactures and markets a variety of healthcare products. The complaint here is concerned with two aspects of Baxter's business: the plasma derivative products in its BioScience division and the Colleague infusion pump (a device that delivers IV fluids). The complaint essentially asserts that Baxter failed to disclose certain information that affected the demand for its plasma derivative products including, the failure of a merger between two of Baxter's competitors, the reduction in Baxter's plasma collections, and the omission of these facts caused Baxter's growth projections for its plasma derivative products to be misleading. Instead, of disclosing these facts which potentially affected Baxter's market share and ability to meet projections, plaintiffs claim that Baxter maintained projected growth and continued to state its confidence in the market to grow. With respect to the Colleague pump, the complaint alleges that Baxter knew it would not be able to meet its remediation goals and failed to disclose the additional restrictions placed on it by the FDA, namely requiring clinical data which effectively made it impossible for Baxter to remediate its Colleague pumps. Rather, than disclose the clinical data requirement imposed by the FDA, plaintiffs contend that Baxter stated that it was committed to remediation of its Colleague pump. The complaint alleges numerous false or misleading statements between June 10, 2009, and May 3, 2010. For the reasons stated below, the Baxter's motion to dismiss is denied in part and granted in part.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. When considering dismissal of a complaint, the court accepts all well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("Tellabs II"); *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 705 (7th Cir.2008) ("Tellabs III"). Rule 9(b) requires plaintiffs to plead with particularity the circumstances constituting fraud. Fed.R.Civ.P. 9(b). Particularity in pleading fraud, including securities fraud means "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

City of Lakeland Employees Pension Plan v. Baxter Intern. Inc., Not Reported in...
2012 WL 607578

**\*2** Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, ——, 131 S.Ct. 1309, 1317, 179 L.Ed.2d 398 (2011) (quoting 15 U.S.C. § 78j(b)). SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx,* 131 S.Ct. at 1317 (quoting 17 C.F.R. § 240.10b–5(b)).

In order to prevail on their claim that Baxter made material misrepresentations or omissions in violation of § 10(b) and Rule 10b–5, plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Baxter argues that plaintiffs have failed to adequately plead both a material omission and scienter.

Specifically, Baxter argues that with respect to its plasma derivative products the company made forward looking projections about growth and demand and it had no duty to disclose the failed merger between CSL and Talecris (Baxter competitors) and that it reduced plasma collections because those facts were already public knowledge. Baxter also argues that the mere fact that it reduced its 2010 projections for its plasma derivative products cannot be a basis for a fraud claim. With respect to the remediation of its Colleague infusion pump, Baxter argues that the facts alleged in the complaint show that Baxter was committed to remediating the Colleague infusion pump and that Baxter had no duty to disclose details about its meetings with the FDA or to speculate publicly about potential actions the FDA might take. Baxter further argues that plaintiffs have failed to adequately plead scienter.

**Discussion**
Here, plaintiffs have pleaded the who, what, where, when and how of the circumstances of the alleged fraud. The complaint clearly sets forth who made the allegedly misleading statements, what the statements were and when and how they were conveyed. It is not the function of this Court at the pleading stage to determine whether the statements were in fact false or misleading. Plaintiffs allege that Baxter's projections lacked a reasonable basis and were materially false or misleading because Baxter knew and failed to disclose certain changed circumstances including: (1) the failure of the CSL and Talecris merger eliminated Baxter's ability to manipulate supply and Baxter was losing market share; (2) after abandoning the merger, Talecris would increase supply of plasma-derivative products causing prices to drop; (3) Baxter was actively taking measures to deliberately decrease plasma collections. Plaintiffs allege that Baxter and CSL, the two largest suppliers of plasma derivative products were not true competitors rather they were coordinating efforts to control market. By 2006, Talecris was the third largest supplier and the only other company with the capacity to compete with Baxter. The proposed merger between CSL and Talecris would have brought Talecris into the anti-competitive fold. Thus, plaintiffs allege that Baxter knew the failure of the merger would result in Talecris' resurgence as a competitor and inevitably cause a loss of market share, an increase in supply, and decreased demand for Baxter.

**\*3** While a company's forward-looking statements need not be correct, they must have a reasonable basis. *Wielgos v. Commonwealth Edison,* 892 F.2d 509, 513 (7th Cir.1989). Plaintiffs allege that Baxter's projections were too positive and Baxter knew it and yet misled the market by repeatedly assuring investors that Baxter's view of its plasma derivative business remained unchanged. Baxter argues that its statements regarding the plasma derivative products were forward looking statements with a reasonable basis and that it had no duty to disclose the failure of the CSL and Talecris merger or that it reduced plasma collections because those facts were public knowledge.

Section 10(b) and Rule 10b–5 do not create an affirmative duty to disclose all material information. Disclosure is required only when necessary "to make [the] statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Indeed, companies are required to disclose only firm-specific information. *Wielgos,* 892 F.2d at 515. Thus, Baxter's motion is granted in part with respect to allegations that it failed to disclose information related to the CSL and Talecris merger since that information is not "firm-specific" and securities laws do not require companies to disclose the state of the

2012 WL 607578

world. *See Asher v. Baxter International Inc.,* 377 F.3d 727, 729 (7th Cir.2004). Yet, the allegations that Baxter failed to disclose that changes to its plasma collections combined with the changes to the market known to Baxter, assuming the facts to be true, are sufficient to undermine Baxter's argument that its positive sales projections had a reasonable basis.

Baxter also seeks dismissal of plaintiffs' claims that it misled investors by failing to disclose that the FDA imposed additional requirements, specifically clinical data, on Baxter's remediation of its Colleague infusion pump. Plaintiffs allege that Baxter's statements that it remained committed to remediation of the Colleague pump remained misleadingly constant despite the FDA imposing a clinical data requirement and consistently rejecting Baxter's remediation timeline. Baxter argues that it had no duty to disclose details about meetings with the FDA or to speculate publicly about what actions the FDA might take, including recalling all of Baxter's Colleague infusion pumps. While it is true that Baxter is not required to speculate publicly that the FDA would recall the pumps, the FDA's requirement that Baxter submit clinical data as part of its remediation efforts is firm-specific information that absent disclosure could render Baxter's statements that it was "committed to remediating" the Colleague infusion pump misleading. *See Asher,* 377 F.3d at 729. At this stage, this Court need not determine whether Baxter's statements were in fact misleading, rather this Court need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud.

**\*4** Additionally, Baxter argues that plaintiffs fail to adequately plead the element of scienter. To plead scienter under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with a mental state "embracing intent to deceive, manipulate or defraud." *Tellabs II,* 551 U.S. at 319. Under the Private Securities Litigation Reform Act ("PSLRA"), if the alleged misrepresentation or omission is a "forward-looking statement," the required level of scienter is "actual knowledge." 15 U.S.C. § 78u–5(c)(1)(B). In *Matrixx,* the U.S. Supreme Court assumed, without deciding, that a showing of "deliberate recklessness" is sufficient when the statements are not "forward-looking" projections. *See Matrixx,* ––– U.S. ––––, ––– – ––––, 131 S.Ct. 1309, 1323–24, 179 L.Ed.2d 398 (2011). A complaint adequately pleads the requisite "strong inference of scienter" under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Id.* at 1324 (quoting *Tellabs II,* 551 U.S. at 324.)

Baxter argues that "the most plausible conclusion ... is simply that Defendants failed to foresee with 100% clarity the events that adversely affected Baxter's business in the spring of 2010." (Def. Memo. of Law, Dkt. 78 at 39). Baxter also argues that plaintiffs' failure to plead either motive or that any defendant sold any stock during the class period weighs against finding scienter. However, absence of motive is not fatal to allegations of scienter. *Tellabs II,* 551 U.S. at 325. The relevant question is "when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

Here, plaintiffs allege that the individual named defendants, Parkinson, Davis, and Ladone, were at all relevant times officers of Baxter and authorized to speak on its behalf. Parkinson is Chairman of the Board, President and CEO of Baxter. Davis was Chief Financial Officer and Corporate Vice President. Ladone was Corporate Vice President of Investor Relations. Plaintiff alleges that by virtue of their positions the defendants had access to non-public and proprietary information concerning Baxter's operations, finances, and financial condition. These defendants controlled the content of Baxter's SEC filings, reports and press releases as well as other public statements. Plaintiffs further allege that the FDA imposed a clinical data requirement on Baxter's remediation efforts and defendant Parkinson was a party to the Consent Decree with the FDA and present at many meetings with the FDA relating to remediation of the pump. Therefore, a reasonable person could infer that Parkinson and the other corporate officer defendants at least acted with deliberate recklessness when they continued to reassure the public that Baxter was remediating the Colleague pump in the face of increasing difficulties in doing so.

**\*5** Additionally, plaintiffs allege that defendants knowingly disregarded the impact that the failed CSL and Talecris merger would have on the plasma market. Plaintiff relies on several confidential witnesses and two former FDA employees to support their allegations of scienter. While courts discount the allegations of confidential witnesses, in circumstances where the complaint sets forth in detail when and how the confidential witness obtained the information and in what capacity they were employed by the defendant, such assertions can support a strong inference of scienter. *See Tellabs III,* 513 F.3d at 712. The allegations in the complaint

**City of Lakeland Employees Pension Plan v. Baxter Intern. Inc., Not Reported in...**
2012 WL 607578

from the confidential witness set forth with specificity how informed the individual defendants were about the operations and financial state of the company including daily and monthly assessments of the amount of blood collected by Baxter and how that fit with projections. Thus, while it is plausible, that Baxter simply miscalled its projections, this Court finds that plaintiffs have pleaded facts supporting an inference of scienter that is cogent and at least as compelling as the opposing inference.

Baxter also argues that the complaint should be dismissed because it constitutes "puzzle pleading." This Court disagrees. Although the complaint is quite lengthy, it is divided into clear sections with headings and subheadings identifying two aspects of Baxter's business which plaintiffs allege Baxter misleading statements to investors. The complaint identifies and quotes the statements allegedly

misleading, including bolding and italicizing the precise statements. The complaint then follows each set of allegedly misleading statements with the factual basis for why the statements are false and misleading.

**Conclusion**

Based on the foregoing, Baxter's motion to dismiss is granted with respect only to the allegations that it was required to disclose the failed merger between its competitors CSL and Talecris. The motion is otherwise denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 607578

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3042498
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Wayne C. CONLEE, Plaintiff,
v.
WMS INDUSTRIES, INC., Brian r.
Gamache, Scott D. Schweinfurth,
and Orrin J. Edidin, Defendants.

No. 11 C 3503.
|
July 25, 2012.

**Attorneys and Law Firms**

James E. Barz, Robbins Geller Rudman & Dowd LLP, Marvin Alan Miller, Lori Ann Fanning, Miller Law LLC, Chicago, IL, John Grant, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Phong Tran, Robbins Geller Rudman & Dowd LLP, San Diego, CA, for Plaintiff.

Michael James Faris, Sean M. Berkowitz, Sue Kyon Paik, Zachary Thomas Fardon, Latham & Watkins LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JAMES B. ZAGEL, District Judge.

 **\*1** Kenneth Zeitlin ("Zeitlin" or "Lead Plaintiff") is the lead plaintiff in a securities fraud class action brought against Defendants WMS Industries, Inc. ("WMS"), WMS Chief Executive Officer and Chairman Brian R. Gamache, WMS Chief Financial Officer Scott D. Schweinfurth, and President Orrin J. Edidin. The amended complaint has two substantive counts. Count I alleges violations of § 10b of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Count II alleges control person liability for the individual Defendants under § 20(a) of the Securities Exchange Act.

I determine that the pleading is an impermissible "puzzle pleading" and therefore grant Defendants' motion to dismiss. Because the dismissal is due to the form of the pleading, rather than its substance, the dismissal is without prejudice to Lead Plaintiff filing an additional amended complaint.

**GENERAL BACKGROUND**

The facts, as alleged by Lead Plaintiff, are as follows.

WMS manufactures and distributes video and gaming machines, such as electronic slot machines, to casinos worldwide. WMS earns revenue through sales and leases of those machines. According to the Amended Complaint, at the start of the Class Period, the gaming industry was still in the midst of a slow replacement cycle. The replacement cycle is the process by which casinos swap out old gaming machines for new ones to refresh and modernize the gaming floors. The clear implication is that a faster replacement cycle essentially equates to greater demand for WMS's products, all other factors being equal.

Despite the comparatively slow replacement cycle, Defendants issued guidance showing robust growth in earnings and margins in FY11 over FY10. The forecasts, respectively, were $830–$850 million in revenues compared to $765 million and operating margins of 22.5–23% compared to 21.9%). Analysts were skeptical because the market was not expecting improvement in the replacement cycle in FY11. Despite this skepticism, Defendants assured investors that WMS would improve its financial performance over FY10 despite the slow replacement cycle. Defendants did so on the basis that they had two principal "levers" available to them to drive revenues and margins in FY11 above FY10.

The first lever Defendants touted was the launch of new products in FY11. One such product was "WAGENET," a purported "golden goose" that would be available for "full commercial launch" in second quarter of FY11 ("2Q11"). Defendants also touted the imminent launch of other theme-based gaming machines such as "The Price is Right" and "Attack from Mars." Defendants claimed to have "accelerated" the new product launches, with Defendant Gamache highlighting the quantity and scale of FY11 new product launches. Gamache allegedly told investors during a January 25, 2011 conference call that WMS "never had a back half of the year loaded with this kind of product launch, ever in the history of our company." Defendants further assured investors that WMS was "on track" to meet their lofty guidance due in part to the fact that they would be "having literally a theme every month in the back half of the year come out."

Conlee v. WMS Industries, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3042498, Fed. Sec. L. Rep. P 96,948

**\*2** Defendants claimed that the FY11 new products were "higher-margin" products, defendants' margin guidance showed considerable improvement, for example, margins of approximately 29% in 4Q11, much higher than FY10 (21.9%) and the first half of FY11 (17%), as a result of the favorable mix of the FY11 new, high margin products on total sales.

Defendants' statements are alleged to be false and misleading because WMS was experiencing development and process failures that were delaying regulatory submissions and commercialization of its FY11 new products. The new products that Defendants claimed would be launched in FY11 were more technologically complex to develop and, since the technology linked across products, these complexities caused development delays across multiple products. For example, the "Price is Right" game allegedly suffered from a programming error which miscalculated its incremental rate and required multiple fixes. Additionally, the "Attack from Mars" game failed in field trials (an important step in regulatory approval) because players were not winning. The touted "golden goose," WAGE–NET, had its initial regulatory approval delayed from October 2010 to April 2011, and even then only very limited approval was obtained.

The end result of the delays was that Defendants did not reach the final stage of regulatory approval, field trials, in critical jurisdictions like Nevada until 4Q11. This allegedly derailed the full commercial launch of new products. Rather than launching the most products "ever in the history of the company," defendants launched fewer new products in FY11 than in FY10, and only one of their usual four annual "tent pole" new products.

The amended complaint alleges that Defendants knew or recklessly disregarded facts that the FY11 new products were not on track to launch in sufficient time and quantity to drive FY11 revenues and margins in the manner they had forecast. Lead Plaintiff claims that Defendants closely monitored new products throughout the research and development process ("R & D") process, up to and including commercial launch.

These purported product and process failures left WMS with little to sell other than apparently low margin used gaming machines. Therefore, rather than increase, forecasted 29% guidance, margins came in at a "disappointing" 4.7% in 4Q11. Additionally, though WMS had slightly higher total sales in FY11, sales fell far short of the $830–$850 million FY11 guidance. Moreover, the higher sales came with lower profitability as margins dropped to 14.1 % from 21.9%.

The second "lever" used to justify improved performance was an operational improvement to fix a phenomenon called "quarter-end compression." WMS routinely discounted product at the end of quarters to boost sales, which led to a bulk of orders coming in at the ends of quarters. This both increased costs of production, for example extra overtime and shipping costs, and created difficulties sourcing product to fill orders on time. Defendants touted their "vigilance" and "intense focus" implementing these operational improvements to combat the inefficiencies of quarter-end compression. The goal of the process improvements was to achieve better monitoring of new product introductions and be able to replenish inventory "within two hours." However, allegedly unbeknownst to investors, Defendants had not undertaken the touted operational improvements. This was allegedly revealed when the Company disclosed that it failed to fill orders on time in 3Q11 because they could not timely source important machine components. Following up on that supposed failure, Defendants promised to undertake a host of operational improvements directed at cleaning up quarter-end compression of the sort that they had supposedly already been undertaking.

**\*3** According to the Amended Complaint, toward the end of the Class Period, WMS announced the shortfall in earnings and margins, refused to provide more guidance, and admitted few new products were launched in FY11. In addition, contrary to defendants' statements at the beginning of the Class Period that FY11 guidance was not dependent on improvement in the replacement cycle, Defendants—in Lead Plaintiff's view—"admitted" at the end of the Class Period that their guidance had been dependent on such improvement and they had to lower guidance when that improvement did not materialize. The Company's stock price dropped from $36 immediately before the initial disclosure on April 11 to $18 after the final disclosure on August 4 on very heavy trading volume.

## STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion in securities fraud actions, district courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (*"Tellabs II"* ). Courts are to consider the complaint in its entirety and not simply scrutinize each allegation in insolation. *Id.*

Conlee v. WMS Industries, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 3042498, Fed. Sec. L. Rep. P 96,948

Beyond these basic considerations, § 10(b) claims sound in fraud, and the rules require particularized pleading in fraud cases: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Rule 9 "requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Servs.,* Inc., 20 F.3d 771, 777 (7th Cir.1994) (internal quotation omitted).

On top of the special burden imposed by the Rules, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to combat perceived abuses in private securities fraud actions. *Tellabs II,* 551 U.S. at 313–14 (2007). One key component of the PSLRA was to further heighten pleading standards beyond Rule 9 for securities fraud suits. *Id.* In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b) (1). Further, in pleading scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A strong inference of the required state of mind means "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II,* 551 U.S. at 314 (2007).

**ANALYSIS**

 **\*4** The Amended Complaint levels two causes of action against Defendants. Count I asserts violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b) (5), 17 C.F.R. 240.10b–5. "Section 10(b) ... forbids the 'use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Tellabs II,* 551 U.S. at 318 (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 704 (7th Cir.2008) (quoting 17 C.F.R. § 240.10b–5(b)).

In a § 10(b) private action, a plaintiff must successfully plead and ultimately prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir.2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

Count II of the Complaint alleges violations of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person...." *Id.* To state a claim under § 20(a), then, Lead Plaintiff must first adequately plead a primary violation of securities laws-here, a violation of § 10(b) and Rule 10b–5. *Pugh,* 521 F.3d at 693.

Defendants' first argument for dismissal is that the Amended Complaint is an inadequate "puzzle pleading." *See e.g., In re Harley Davidson,* 660 F.Supp.2d 969, 983–984 (E.D.Wis.2009); *In re Guidant Corp. Sec. Litig.,* 536 F.Supp.2d 913, 926 (S.D.Ind.2008). A puzzle pleading, courts have stated, "improperly 'place[s] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards.' " *In re Harley Davidson* 660 F.Supp.2d at 984 (quoting *In re Alcatel Sec. Litig.,* 382 F.Supp.2d 513, 534 (S.D.N.Y.2005)). A complaint which relies on puzzle pleading does not meet Rule 9(b)'s particularity requirement. *Teamsters Local 617 Pension & Funds v. Apollo Group,* 633 F.Supp.2d 763, 783 (D.Ariz.2009).

The complaint here is an inappropriate puzzle pleading. At fifty-three pages and 126 paragraphs, the Amended Complaint is not especially long in the context of securities fraud cases. Nevertheless, the heart of the complaint, the section titled "Defendants' False and Misleading Statements Made During the Class Period," is a sixteen page mash-up

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

of block quotes, snippets, parentheticals, and Lead Plaintiff's characterizations of alleged statements made by one or more Defendants. Rather than simply lay out a given statement and then list the reasons it is false or misleading (as the PSLRA commands) Lead Plaintiff has laid the statements out in three chronological bunches (the statements made on September 21, 2010, those made on November 1, 2010, and those made on January 25, 2011). While in another context a simple chronological ordering might be appropriate, here the resulting pleading is less useful. This is because the statements, though contemporaneous, pertain to disparate subject matter. The net effect of the pleading's format is to leave the reader—whether Defendants or the court— jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading. Even this activity might be tolerable if the statements themselves were clearly identified, but as noted above, they are not. Rather, it is frequently difficult to discern where the supposedly challenged statements end and the context or characterization begins.

**\*5** The act of piecing together a disjointed complaint is certainly a nuisance, but if the court's and the parties' time and effort in interpreting a pleading were the only cost it might not necessarily require dismissal. The greater cost of inappropriate puzzle pleading comes in discovery. A vague and ill-formed complaint can lead to more expansive (and expensive) document production and unnecessarily lengthy depositions covering needless factual ground. For this reason,

where a complaint contains puzzle pleading, courts have recommended that Plaintiff should be required to "streamline and reorganize the complaint before allowing it to serve as the document controlling discovery."[1] *In re Metro. Sec. Litig.,* 532 F.Supp.2d 1260, 1280 (E.D.Wash.2007) (quoting *Decker v. Glenfed, Inc.,* 42 F.3d 1541, 1554 (9th Cir.1994)). For this reason, Lead Plaintiff is given one additional opportunity to makes his allegations with particularity.

[1] In the context of this particular complaint, the focus should be on reorganization and less on "streamlining." As I mentioned above, the current pleading is not particularly long as compared to other PSLRA complaints, but it is disjointed as to the factual ground it covers and the statements it identifies. The amended complaint (if any) may be shorter, but it may even be longer. The key point for this case is to present the allegations in an easier-to-follow format.

**CONCLUSION**

Defendant's motion to dismiss the amended complaint [38] is GRANTED. The dismissal is WITHOUT PREJUDICE. Lead Plaintiff is given 45 days from the entry of this motion to file an amended pleading, if he wishes to do so.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3042498, Fed. Sec. L. Rep. P 96,948

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 62 of 306 PageID #:2018

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....

2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

2014 WL 3610877
United States District Court,
N.D. Illinois, Eastern Division.

CONSTRUCTION WORKERS PENSION
FUND—LAKE COUNTY AND VICINITY,
Individually and on Behalf of All
Others Similarly Situated, Plaintiff,
v.
NAVISTAR INTERNATIONAL
CORPORATION, et al., Defendants.

No. 13 C 2111
|
Signed July 22, 2014

**Attorneys and Law Firms**

James E. Barz, Robbins Geller Rudman & Dowd LLP, Matthew Thomas Heffner, Susman Heffner & Hurst LLP, Carol V. Gilden, Cohen Milstein Sellers & Toll PLLC, Chicago, IL, Genevieve Odile Fontan, Stephen Douglas Bunch, Steven J. Toll, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Danielle S. Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Kenneth Mark Rehns, Cohen Milstein Sellers & Toll PLLC, New York, NY, for Plaintiff.

Robin M. Hulshizer, Sean M. Berkowitz, Eric Robert Swibel, Matthew Lawrence Kutcher, Latham & Watkins LLP, Chicago, IL, for Defendants.

*OPINION AND ORDER*

SARA L. ELLIS, United States District Judge

 **\*1** Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") brings this case on behalf of itself and a putative class of similarly situated persons or entities who purchased securities in Navistar International Corporation ("Navistar"). Central States alleges that Navistar and sixteen current and former officers and directors—Daniel C. Ustian, Andrew J. Cederoth, Eugenio Clariond, John D. Correnti, Diane H. Gulyas, Michael N. Hammes, David D. Harrison, James H. Keyes, Steven J. Klinger, William H. Osborne, Dennis D. Williams, Stanley A. McChrystal, John P. Waldron, Richard C.

Tarapchak, Jack Allen, and Eric Tech—made false or misleading representations with regard to Navistar's business operations that caused Navistar's stock price to be artificially inflated. Specifically, Central States alleges that Defendants misrepresented and concealed material information regarding the viability of Navistar's engine design and development efforts to meet certain Environmental Protection Agency ("EPA") standards. In doing so, Central States contends that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) and t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Now before the Court are Defendants' motions to dismiss the Consolidated Amended Complaint [99, 101, 103][1] and Central States' motion to strike certain statements and exhibits attached to one of the motions to dismiss [108]. Because Central States fails to specify which of Defendants' statements were false or misleading and fails to specifically connect each alleged misstatement with a contrary allegation of fact, the motions to dismiss are granted and the Consolidated Amended Complaint is dismissed without prejudice. Central States' motion to strike is denied as moot.

[1]    The motions to dismiss were filed by three groups of Defendants: (1) Navistar, Ustian, Cederoth, Allen, and Tech [99]; (2) Clariond, Correnti, Gulyas, Hammes, Harrison, Keyes, Klinger, Osborne, Williams, McChrystal, and Tarapchak [101]; and (3) Waldron [103]. The latter two motions incorporate the arguments the Court finds relevant to resolving the pending motions that are made in the first and thus all three motions will be treated jointly here.

**BACKGROUND**[2]

[2]    The facts in the background section are taken from the Consolidated Amended Complaint and are presumed true for the purpose of resolving Defendants' motions to dismiss. *See Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir.2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO v. Exelon Corp.,* 495 F.3d 779, 782 (7th Cir.2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.,* 556 F.3d 575, 582–83 (7th Cir.2009). Where a document is referenced in the complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.* The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074,

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 63 of 306 PageID #:2019

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....

2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

1080–81 (7th Cir.1997). Navistar, Ustian, Cederoth, Allen, and Tech attached various documents to their motion to dismiss, some of which Central States moved to strike. As the Court's resolution of the motions to dismiss does not require consideration of the documents and statements challenged in the motion to strike, that motion is denied as moot.

**\*2** Navistar produces commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, and provides parts and service for trucks and trailers. Its North American truck and engine market is a core segment of its business. Navistar's stock is listed on the New York Stock Exchange. Central States seeks to represent a class of individuals who purchased or otherwise acquired Navistar stock between June 9, 2009 and August 1, 2012 (the "Class Period"). The last day on which Central States purchased Navistar stock during the Class Period is October 27, 2011. The Individual Defendants served as directors and/or officers of Navistar during the Class Period.

Navistar's truck and engine business is subject to various EPA regulations. In 2001, pursuant to the Clean Air Act, the EPA issued a rule that required a 95% reduction in nitrogen oxide ("NOx") emissions from heavy-duty diesel engines. Specifically, new engines were to emit NOx at a rate of no more than 0.2 g/bhp-hr ("0.2 NOx") by 2010. To obtain EPA certification, a manufacturer had to demonstrate compliance with the 0.2 NOx standard. Alternatively, certification could be obtained through a combination of a 0.5 NOx engine and banked emissions credits. For a period of time, the EPA also allowed manufacturers to pay nonconformance penalties ("NCPs") while they finished developing their emissions control technology.

In response to the new EPA standard, the heavy-duty truck industry—except for Navistar—pursued selective catalytic reduction ("SCR") technology, which uses an after-treatment device to reduce emissions.[3] These manufacturers met the 0.2 NOx standard on time. Navistar decided to pursue a different technology—exhaust gas recirculation ("EGR"), an in-cylinder solution that does not require after-treatment. Because EGR technology was still being developed, Navistar's initial strategy to comply with EPA's regulation involved certification through the use of banked emissions credits.

3      Navistar uses SCR engines in its diesel engines for the European market.

Investors and analysts were particularly focused on Navistar's public updates on the development of EGR technology and progress toward obtaining 0.2 NOx certification. Navistar publicly made statements that it had developed "viable, 'proven' EGR technology and investors should not be concerned about whether Navistar would be able to certify EGR engines at 0.2 NOx because it already had produced 0.2 NOx engines that were being tested." Consol. Am. Compl. ¶ 9. For example, Ustian, Navistar's then-CEO and one of its directors, stated in November 2010 that Navistar was "100% there in terms of [its] ability to" achieve 0.2 NOx with EGR technology. *Id.* ¶ 10. Ustian was also quoted as saying that Navistar had products "that are running today at 0.2[NOx]."[4]*Id.* ¶ 115. Similar statements were made in press releases, conference calls, trade articles, and at various conferences. Navistar's SEC forms also discussed its strategy of focusing on EGR technology. Additionally, in March 2011, Ustian represented that Navistar had submitted its 13–liter EGR engine to the EPA for certification at 0.2 NOx, but the EPA stated in later court filings that it did not receive an application for such certification until January or February 2012. Navistar did announce that it submitted another application for its 13–liter EGR engine to the EPA for certification at 0.2 NOx on January 31, 2012.

4      Central States relies on various confidential witnesses in its Consolidated Amended Complaint. CW1 acknowledged that Navistar's engines may have achieved 0.2 NOx in tests performed in "dyno cells," the environment in which Defendants claim that EPA test certification takes place. But CW4 reported that Navistar's testing was not accurate because results of testing in a "dyno cell" are not reproducible in the real world.

**\*3** Navistar did not achieve the 0.2 NOx emissions requirements through EGR technology and never was certified as meeting that requirement independent of banked emissions credits. From the start, Navistar's engineers had encountered various technical problems with EGR technology and continually noted that additional time was needed before a compliant engine would be ready. These issues were brought to the attention of senior-level management, including Ustian, Tech, and Cederoth. For example, CW5, the Chief Engineer of Navistar's Engine Group, in an August 27, 2010 presentation (the "Go Fast presentation"), indicated that EGR technology meeting the 0.2 NOx standard would not go into production until at least Q1 2014 for a 13–liter engine, Q3 2014 for an 11–liter engine, and Q1 2015 for a 15–liter engine. This schedule would

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 64 of 306 PageID #:2020

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....

2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

leave Navistar with at least a 1.75 year gap between when its emissions credits would be exhausted and when the 13–liter engine would be compliant. And despite Navistar's engineers' suggestions that an alternative to EGR should be pursued, development of an SCR backup plan was halted. Additionally, Navistar incurred excessive warranty costs in connection with its newly-developed 2010 and 2011 engines, which had valve and soot problems. These warranty costs were larger than the amount for which Navistar had reserved.

On February 14, 2012, Navistar's share price declined after an internet article reported that the EPA would fine Navistar for shipping back-dated engines during its 2010 engine transition. Then, in February 28, 2012 letters to counsel for Daimler Trucks, Mack Trucks, and Volvo, the EPA indicated its initial concerns that Navistar would be able to certify its engine at 0.2 NOx and that even if it could be certified, Navistar would not be able to introduce it until June 15, 2012. On March 8, 2012, Navistar announced a $153 million loss for the first quarter of 2012. On April 19, 2012, Wells Fargo downgraded Navistar to "Market Perform" based on challenges Navistar faced, including obtaining EPA emissions certification for its engines.

On June 7, 2012, before the markets opened, Navistar reported a $172 million loss for its second fiscal quarter ending April 30, 2012, due in part to increased warranty expenses for repairs to 2010 and 2011 vehicles. This caused Navistar's stock price to drop by $4.04 per share (14.35%) that day. Then, on July 6, 2012, Navistar announced that it was abandoning EGR technology in favor of the SCR strategy the rest of the heavy-duty truck industry had already adopted. Navistar's stock price dropped by $4.37 per share (15.18%) that day. Finally, on August 2, 2012, Navistar issued a press release announcing that it was withdrawing its full year fiscal 2012 guidance until releasing its third quarter 2012 results in September. Navistar also disclosed an SEC formal letter of inquiry into accounting and disclosure matters dating back to November 2010.[5] Navistar's stock price fell $3.33 per share (13.44%) that day. On August 30, 2012, Navistar disclosed that Ustian had resigned from Navistar effective August 26, 2012.

[5]     Navistar received this letter on June 21, 2012, yet did not disclose its receipt until August 2, 2012. Navistar also received a subpoena from the SEC on July 16, 2012, which again was not disclosed until August 2, 2012.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed.R.Civ.P. 12(b)(6); *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

**\*4** Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir.2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

On top of the pleading burden imposed by Rules 8 and 9(b), Congress further heightened the pleading standards on securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA"). Congress created this standard to check pleading abuses in private securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs II),* 551 U.S. 308, 313–14, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In order to properly allege that the defendant misrepresented or omitted material facts, the PSLRA requires the plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In pleading scienter,

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 65 of 306 PageID #:2021

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....
2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

the PSLRA requires that the plaintiff, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For an inference to be "strong," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II,* 551 U.S. at 324.

## ANALYSIS

Defendants, in three separate motions to dismiss the Consolidated Amended Complaint, raise a number of arguments, including that (1) the Consolidated Amended Complaint is an improper puzzle pleading, (2) Central States cannot challenge statements made after its last Navistar stock purchase, (3) the PSLRA safe harbor protects forward-looking statements, (4) any remaining allegedly false statements were not false or misleading when made, (5) Central States has not properly alleged scienter or loss causation, and (6) Central States does not allege facts to support that any of the Individual Defendants were control persons so as to form the basis of the Section 20(a) claim. The Court focuses on the first argument, that Central States has failed to satisfy the PSLRA's heightened pleading standards by not specifically identifying which of Navistar's statements during the Class Period were false nor explaining exactly why each specific statement is false. Although the Court recognizes that, in doing so, it only invites Central States to clarify its allegations and Defendants to re-raise the arguments not addressed by any such amendment, the Court finds such a step necessary in order to streamline the case and ensure that the Court addresses the substantive issues raised by Defendants only with respect to the specific alleged false and misleading statements or omissions that Central States intends to pursue in this litigation.

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and all facts that form the plaintiff's basis for believing that the statement is misleading. 15 U.S.C. § 78u–4(b)(1). Courts around the country have made clear that a complaint does not satisfy the PSLRA's pleading standards when it quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph. For example, in *Boca Raton Firefighters & Police Pension Fund v. Bahash,* the Second Circuit dismissed a complaint

for failing to satisfy the PSLRA because it "consist[ed] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in ¶ 256 and the factual detail contained throughout this Complaint." 506 Fed.Appx. 32, 37–38 (2d Cir.2012) (second and third alterations in original). Likewise, in *Conlee v. WMS Industries, Inc.,* a court in this district dismissed the complaint wherein "the heart of the complaint, the section titled 'Defendants' False and Misleading Statements Made During the Class Period,' is a sixteen page mash-up of block quotes, snippets, parentheticals, and Lead Plaintiff's characterizations of alleged statements made by one or more Defendants." No. 11 C 3503, 2012 WL 3042498, at *4 (N.D.Ill. July 25, 2012).

 **\*5** Several courts have described this pleading style as "puzzle pleading," because it requires the Court and the defendants to piece together exactly which statements the plaintiff is challenging and which allegations contradict those statements. *Id.* In the context of the PSLRA, this practice "improperly place[s] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Id.* (alteration in original) (quoting *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d 969, 984 (E.D.Wis.2009)); *see also Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998) ("[C]ourts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." (second alteration in original) (internal quotation marks omitted) (citation omitted)). As in *Conlee,*

> [t]he net effect of the pleading's format is to leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading. Even this activity might be tolerable if the statements themselves were clearly identified, but as noted above, they are not. Rather, it is frequently difficult to discern where the supposedly challenged statements end and the context or characterization begins.

*Conlee,* 2012 WL 3042498, at *4. The imprecise nature of such a pleading not only makes the Court's job more difficult, but it also leads to increased discovery costs, as the parties are likely to incur costs examining irrelevant issues. *Id.* at *4–5 ("A vague and ill-formed complaint can lead to more expansive (and expensive) document production and

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 66 of 306 PageID #:2022

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....
2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

unnecessarily lengthy depositions covering needless factual ground.").

The PSLRA requires plaintiffs not only to identify specific false or misleading statements, but also to explicitly connect those statements to factual allegations demonstrating that they are false. *See Bashash,* 506 Fed.Appx. at 38 (holding that the complaint did not sufficiently connect the allegedly false statements with contrary allegations: "Needless to say, asking the Court to assess the truth of facts in light of 'the factual detail contained throughout this Complaint,' does not comport with our exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading." (citation omitted)). Directly contrary to the practice of puzzle pleading, the PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1061 (9th Cir.2008). Thus, a plaintiff may not "le[ave] it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 842 (N.D.Cal.2000).

Here, Central States' 101–page, 241–paragraph Consolidated Amended Complaint is an inappropriate "puzzle pleading." To start, Central States alleges that statements were false only after quoting Navistar representatives at length. Many of the Consolidated Amended Complaint's paragraphs include block quotes, with liberal use of bold and italics, leaving Defendants and the Court to speculate which statements or parts of statements Central States alleges are inaccurate. Indeed, the disconnect between the statements the parties consider to be at issue is evident from their briefs, which often focus on different parts of the same statements. *Compare* Doc. 100 at 21, *with* Doc. 112 at 24; *see Primo v. Pac. Biosciences of Cal., Inc.,* 940 F.Supp.2d 1105, 1112 (N.D.Cal.2013) (noting that "in their papers, Defendants did not evidence a clear understanding of the statements that Plaintiffs challenge"). Central States even appears to concede that it is not challenging certain statements that appear throughout the Consolidated Amended Complaint. *See* Doc. 112 at 28 ("Plaintiff does not allege that Defendants misrepresented the risk that the Company's EGR technology would not be approved by the EPA. Nor does Plaintiff allege that the Company misrepresented the risk that Navistar's emissions credits would be exhausted." (citations omitted)). And the

use of bold and italics to emphasize certain statements does nothing to clarify Plaintiffs' assertions of false statements. *See Lauria v. Biosante Pharm., Inc.,* 968 F.Supp.2d 951, 958 (N.D.Ill.2013) ("The italized [*sic* ]/bolded words in this paragraph are cryptic.... Perhaps the plaintiffs intended to italicize and bold the entire sentences, or merely used italics and bolding for emphasis."); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1074 (N.D.Cal.2001) ("The fact that certain sections of the report have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable, while non-bolded statements sometimes are actionable."). Thus, the Court is left without a clear understanding of which statements are relevant if it were to address Defendants' substantive arguments.

**\*6** Further, after quoting transcripts, press releases, SEC filings, and trade magazines at length, Central States merely sets out, as the plaintiffs in *Bashash* and *Conlee* did, that these statements were false and misleading for a laundry list of reasons in addition to "others" found throughout the remainder of the Consolidated Amended Complaint. *See, e.g.,* Consol. Am. Compl. ¶ 123 ("Defendants' statements in paragraphs 112–122 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others ...."); *id.* ¶ 140 ("Defendants' statements in paragraphs 125–138 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others ...."); *id.* ¶ 160 ("Defendants' statements in paragraphs 142–158 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others...."). These reasons are not linked to any specific statement but rather are alleged to be generally applicable to all allegedly misleading statements and omissions. This is not sufficient. *See In re Autodesk,* 132 F.Supp.2d at 841 ("It is not clear, however, which portion of ¶ 46(d) and (e) is meant to explain why the statement quoted from ¶ 45 is false or misleading."); *see also Primo,* 940 F.Supp.2d at 1112–13 (dismissing complaint as improper puzzle pleading, noting that "Plaintiffs make some attempt to connect the alleged omissions to particular statements but continue to do so in a general manner that requires the reader to guess what particular statements they mean or how those statements were rendered false or misleading.").

Thus, the Court finds that Central States has not satisfied the applicable pleading standards because the Consolidated Amended Complaint does not identify with specificity which statements Central States alleges are false, nor does it set

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 67 of 306 PageID #:2023

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....

2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

out why Central States believes each individual statement is false. The Court affords Central States another opportunity to amend the Consolidated Amended Complaint in order to comply with all applicable pleading standards. *See Conlee,* 2012 WL 3042498 at *5; *In re Metro. Sec. Litig.,* 532 F.Supp.2d 1260, 1280 (E.D.Wash.2007) (where a complaint involves improper puzzle pleading, plaintiff should be allowed to streamline and reorganize complaint). Although the Court expresses no opinion at this time on the merits of Defendants' remaining arguments, it cautions Central States to be cognizant of these arguments in amending the complaint so as to allow this litigation to move forward as expeditiously as possible.

**CONCLUSION**

For the reasons set forth above, Defendants' motions to dismiss [99, 101, 103] are granted and Central States' motion to strike [108] is denied as moot. The Consolidated Amended Complaint [66] is dismissed without prejudice. Plaintiffs are given until August 22, 2014 to file a Second Consolidated Amended Complaint in conformity with this Opinion and Order.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1693963
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

EVERGREEN FUND, LTD., Ole
W. Lyngklip, Jr., Perry Mount Park
Cemetery, Inc., and Dr. L. Reynolds
& Associates, P.C. Profit Sharing
Trust on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
June McPHERSON, on behalf of herself
and all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
Max GRILL, on behalf of himself and
all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
Harry R. LARSON, Frank F. Villiano,
Electronic Processing Source, Inc.,
TTEE Frank F. Villiano, and Robert J.
Murphy, on behalf of themselves and
all others similarly situated, Plaintiffs,
v.
BANK ONE CORPORATION, John
B. McCoy, Richard J. Lehmann,
Michael J. McMennamin, William
P. Boardman, David J. Vitale,
and Verne G. Istock, Defendants.
Mark BRUMLIK, Georgia Duran,
and Kevin Sandal, individually and
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.

No. 00 C 0767, 00 C 1357, 00
C 1359, 00 C 2100, 00 C 2109.
|
Nov. 6, 2000.

MEMORANDUM, OPINION AND ORDER

ANDERSEN, District J.

**\*1** This case is before the Court on the Consolidated Motion to Dismiss brought by defendants Bank One Corporation, Richard J. Lehmann, David J. Vitale, Verne G. Istock, Michael J. McMennamin, William P. Boardman, and John B. McCoy. In the consolidated motion, defendants seek the dismissal of five class action complaints currently pending before this court. This opinion will address *Evergreen Fund, Ltd. et al. v. McCoy,* Case No. 00 CV 767, *McPherson V. McCoy,* 00 CV 1357, *Grill v. McCoy,* 00 CV 1359, *Larson et al. v. Bank One Corporation,* 00 CV 2100, and *Brumlik et al. v. McCoy,* 00 CV 2109. Defendants seek to dismiss the complaints because they allege that: (1) plaintiffs fail to state a claim under Fed.R.Civ.P. 9(b), (2) plaintiffs fail to state a claim under Fed.R.Civ.P. 12(b)(6), (3) the allegations involving forward looking statements are not actionable, (4) the Larson Complaint fails to allege loss causation, (5) plaintiffs failed to allege tender or sale of their shares, (6) the claims in the Brumlik Complaint do not satisfy Fed.R.Civ.P. 9(b), and (7) plaintiffs' claims under Section 15(a) of the Securities Act and Section 20(a) of the Exchange Act fail to allege a predicate violation. For the following reasons, defendants' motion to dismiss is granted in part and denied in part.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Evergreen Fund, Ltd. v. McCoy, Not Reported in F.Supp.2d (2000)**

2000 WL 1693963

BACKGROUND

These allegations are drawn from the five Complaints identified above. The background allegations in the Complaints are virtually identical. This dispute arises from the October 2, 1998, merger between First Chicago NBD ("FCN") and Banc One Corporation ("Old Banc One"). This litigation concerns alleged misrepresentations related to Old Banc One's credit card division, First USA Bank.

In preparation for the merger, Old Banc One and FCN filed a joint Registration Statement pursuant to Section 6 of the Securities Act, 15 U.S.C. § 77f. In documents incorporated by reference, the corporations noted "that the generation of new credit card business remained very strong," increasing at an average rate of two million new credit card accounts per quarter. The Registration Statement also included financial statements, which reflected "enormous growth" in First USA's credit card business for the most recent fiscal year (1997) and the first and second quarters of 1998. Plaintiffs allege that the market viewed the First USA credit card business as a major asset and strength of Old Banc One.

The defendants also issued a Merger Proxy/Prospectus to solicit votes to approve the merger on July 31, 1998. In the prospectus, defendants stated that the combined corporation would be "one of the largest credit card businesses in the country." The prospectus incorporated by reference the Form 10–K for the year ending on December 31, 1997, and the Form 10–Q for the first quarter ending on March 31, 1998. In the prospectus, defendants noted that "such financial statements, in the opinion of Banc One management, contain the adjustments, all of which are normal and recurring in nature, necessary to present fairly Banc One's consolidated financial position, results of operations, and change in cash flows."

**\*2** Plaintiffs also allege that one or more consumer class action lawsuits alleging illegal credit practices had been filed against First USA before the Merger became effective. The existence of the lawsuits was not disclosed in the Registration Statement and Merger Proxy/Prospectus. In those documents, defendants represented that neither Bank One nor its subsidiaries were a party to any pending threatened material legal proceedings.

Plaintiffs allege that the statements misrepresented or omitted material facts regarding the success of the business and operations of First USA. First, plaintiffs allege that the statements failed to alleges that First USA achieved its growth through practices which allegedly violated the federal Truth in Lending Act ("TILA"), including improper billing procedures and charging of excessive late fees and interest to its credit card customers. Second, plaintiffs allege that defendants issued financial statements that did not comply with generally accepted accounting principles ("GAAP").

As a result of these alleged misstatements, plaintiffs state that they approved the merger and acquired Bank One shares at an artificially inflated price. On August 24, 1999, defendants began a series of disclosures, which plaintiffs allege revealed the truth about First USA. Bank One issued a press release announcing preliminary earnings for the third quarter and full year of 1999. In the release, Bank One reported that based on "revised outlooks" it anticipated earnings to be down 7–8% from the current market estimates. Bank One stated that the revised earnings outlook was solely the result of changes in growth for First USA.

Plaintiffs allege that during a conference call on August 25, 1999, certain defendants explained that Bank One would cease First USA's practice of "accelerating" credit card late fees and would provide credit card customers "interest rate concessions" related to First USA's past activities. These measures were allegedly expected to negatively impact earnings by at least $500 million. Plaintiffs alleged that the market found the news material. On August 25, 1999, the price of Bank One common stock fell 22.3% per share from the previous day's closing price. The volume of trading was more than 15 times the daily average trading volume for the previous 52–week period.

On November 1, 1999, Kiplinger's Personal Finance Magazine reported that government regulators were investigating thousands of complaints by First USA credit card holders. Plaintiffs allege that the complaints concerned practices that existed before the merger. The article reported that the allegedly illegal practices had existed since 1997.

On November 10, 1999, Bank One announced that earnings would be as much as 15% lower than the revised expectations. Plaintiffs allege that the shortfall was attributed to the performance of First USA. As a result, the price of Bank One stock dropped 11.5% from its previous day's close.

Evergreen Fund, Ltd. v. McCoy, Not Reported in F.Supp.2d (2000)

2000 WL 1693963

**\*3** On December 31, 1999, John B McCoy, Bank One's Chairman and Chief Executive Officer, resigned. Plaintiffs allege that he resigned as a result of the disclosures of improprieties at First USA.

On January 11, 2000, Bank One announced that earnings for 1999 would be as much as 18% less than analysts had expected and the profits for 2000 would drop sharply. Plaintiffs allege that the earnings drop was attributable to the allegedly illegal credit card practices. Bank One also announced that it would take a $725 million charge in the fourth quarter of 1999, largely to restructure the credit-card division.

The Evergreen, McPherson, Grill and Brumlik Complaints all seek the certification of a Class:

consisting of all persons and entities who exchanged their FCN common stock for shares of Bank One common stock, pursuant to the Registration Statement and Merger Proxy/Prospectus, in connection with the Merger. Excluded from the Class are defendants, members of the Individual Defendants' families; any entity in which any defendant has a controlling interest or is part or subsidiary of, or is controlled by, the Company; and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants.

The Larson Complaint seeks the certification of a Class comprised of:

all persons and entities who acquired Bank One securities as a result of the conversion of Old Banc One securities or the exchange of FCN securities pursuant to the Registration Statement and Merger Proxy/Prospectus, and who were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants, Robert W. Vague ("Vague"), members of the Individual Defendants' immediate families, members of Vague's immediate family, any entity in which any defendant or Vague has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded person.

In Count I, all five Complaints allege an action against Bank One for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of FCN securities holders who exchanged FCN common stock at a 1.62 shares of Bank One stock per share of FCN stock. Plaintiffs allege that defendants overstated earnings in the credit card division, failed to comply with generally accepted accounting practices, and

failed to disclose material information with regard to the purported growth of the First USA credit card operation. As a result, plaintiffs allege that they received too few shares of Bank One stock in exchange for their FCN stock.

In Count II, all five Complaints allege an action against the individual defendants for violations of Section 11 of the Securities Act on behalf of FCN securities holders. Plaintiffs allege that the individual defendants overstated the earnings of the credit card division and failed to disclose material information related to the growth of the First USA credit card operation.

In Count III, all five Complaints allege an action against Bank One for violations of Section 12(a)(2) of the Securities Act. 15 U.S .C. § 77l(a)(2). The Evergreen, McPherson, Grill and Brumlik Complaints make the allegation on behalf of class members who exchanged FCN securities for Bank One securities. The Larson Complaint also makes the allegations on behalf of class members who exchanged Old Banc One securities for new Bank One securities. Plaintiffs allege that the Registration Statement and Merger Proxy/Prospectus contained materially false and misleading statements. Plaintiffs allege that Bank One breached its duty to make a reasonable and diligent investigation of the statements contained in the document.

**\*4** In Count IV, all five Complaints allege an action against the individual defendants for violations of Section 15 of the Securities Act. 15 U.S.C. § 77(o). The Larson Complaint makes the allegation on behalf of former FCN and Old Banc One securities holders, while the other four Complaints make the allegation only on behalf of former FCN securities holders. Plaintiffs allege that the individual defendants failed to make a reasonable investigation of either the Registration Statement or the Merger Proxy/ Prospectus. Therefore, plaintiffs allege that each of the individual defendants are jointly and severally liable with Bank One.

In Count V, the Brumlik Complaint alleges an action against all defendants for violations of Section 14(a) of the Exchange Act, 15 U .S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, on behalf of FCN shareholders who acquired Bank One stock. The Brumlik plaintiffs allege that the defendants solicited proxies through the use of false and materially misleading statements.

Evergreen Fund, Ltd. v. McCoy, Not Reported in F.Supp.2d (2000)

2000 WL 1693963

In Count VI, the Brumlik Complaint alleges an action against the individual defendants for a violation of Section 20 of the Exchange Act. 15 U.S.C. § 78t(a). The Brumlik plaintiffs allege that each of the individual defendants was a controlling person within the meaning of Section 20 of the Exchange Act. The Brumlik plaintiffs allege that none of the individual defendants made a reasonable investigation of the statements contained in the Registration statements and Merger Proxy/Prospectus to determine whether they were true and devoid of any omission of material facts. Therefore, the Brumlik plaintiffs argue that each of the individual defendants is jointly and severally liable with Bank One.

DISCUSSION

I. *Pleading Standard*

As a preliminary matter, we must determine whether plaintiffs' Complaints should be reviewed by reference to the heightened pleading standards in Fed.R.Civ.P. 9(b). Several courts in this Circuit and other Circuits have reviewed this question, but the answer is not clear. In *Sears v. Likens,* the Seventh Circuit found that plaintiffs' claims under §§ 5, 12(1), 12(2), 15, and 17(a) of the Securities Act of 1933 "failed to state with particularity how any 'prospectus' was 'false and misleading' as required by Fed.R.Civ.P. 9(b)." *Sears,* 912 F.2d 889, 892 (7th Cir.1990). Two District Court decisions have analyzed the *Sears* decision. Judge Coar's opinion, *In re First Merchants Acceptance Corporation Securities Litigation,* held that "the court in Sears was not asked to, nor did it, determine whether Rule 9(b) properly applied to § 11 claims, which do not require scienter for liability." *In re First Merchants Acceptance Corporation Securities Litigation,* 1998 WL 781118, *11 (N.D.Ill.1998).

In *Danis,* Judge Conlon held that plaintiffs alleging violations of §§ 11 and 12 do not need to comply with 9(b)'s heightened pleading standard. *Danis v. USN Communications Inc.,* 73 F.Supp.2d 923, 932 (N.D.Ill.1999). However, she determined that the standard was irrelevant because the Complaint before her satisfied the heightened pleading standard. *Id.*

**\*5** We agree. If a Complaint does not "sound in fraud," plaintiffs should not be required to plead particular facts to support §§ 11 or 12. *In re Nations Mart Corp. Securities Litigation,* 130 F.3d 309, 315 (8th Cir.), *cert. denied,*524 U.S. 927 (1998). However, if plaintiffs make allegations that amount to fraud, then they must meet the Rule 9(b) heightened pleading standards. *Shaw v. Digital Equipment Corp.,* 82 F.3d

1194, 1223 (1st Cir.1996). Therefore, we must determine whether the instant Complaint "sounds in fraud."

Defendants argue that the Complaint "sounds in fraud" because of the references to the underlying alleged TILA violations. We disagree. The TILA violations, the only allegations in the Complaint which allege fraud, merely form the background for the plaintiffs' allegations. Plaintiffs allege that the individual defendants failed to make "a reasonable investigation or possessed reasonable ground for the belief that the statements described herein, which were contained in the Registration Statement and the Merger Proxy/Prospectus, were true, were without omission of any material facts, and/or were not misleading." The allegations do not contain references to fraud. Therefore, the instant Complaint does not "sound in fraud."

Furthermore, plaintiffs have met the heightened pleading standard. To meet the particularity requirements of Rule 9(b), a Complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Sears,* 912 F.2d at 892. Plaintiffs have referenced specific statements contained in the Registration Statement, the Merger Proxy/Prospectus, Old Banc One's 1997 Form 10–K, and the first and second quarter Forms 10–Q. Furthermore, the plaintiffs allege that the defendants signed the Registration Statement and Merger Proxy/Prospectus. Therefore, plaintiffs have satisfied the heightened pleading standard of Rule 9(b).

II. *12(b)(6) Motion to Dismiss*

A. *Plaintiffs' Reliance on Post Hoc Allegations*

Defendants argue that plaintiffs have failed to adequately allege that First USA violated TILA because they relied on post hoc statements and "falsity by hindsight" reasoning. A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests whether the plaintiff has stated a claim, not whether the plaintiff will prevail on the merits. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

*Evergreen Fund, Ltd. v. McCoy,* Not Reported in F.Supp.2d (2000)

2000 WL 1693963

**\*6** Defendants argue that plaintiffs allegations fail to show that First USA violated TILA. Plaintiffs present several allegations describing evidence of First USA's alleged TILA violations. Plaintiffs allege that First USA did not enable customers to make conforming payments to avoid impositions of late fees, did not enable customers to determine by which date credit card holders were required to make payments to First USA, and did not credit payments as of the date of receipt. Plaintiffs allege that First USA admitted the violations in late 1999. Further, plaintiffs reference an article in Kiplinger's Personal Finance Magazine. Plaintiffs allege that the article traces this activity back to 1997. Plaintiffs also allege that complaints about First USA tripled in 1999. Finally, plaintiffs allege the existence of at least three consumer fraud class action lawsuits.

Defendants argue with the substance of all of plaintiffs' allegations. Defendants state that they did not admit the violations, the change in First USA policies does not amount to an admission of wrongdoing, and that the employees interviewed for the Kiplinger article could not provide the basis for the Complaint. In evaluating this motion to dismiss, however, we must assume that all allegations in the Complaint are true. If plaintiffs do not have evidence to support their allegations, that First USA engaged in a plan to artificially boost its revenues in violation of TILA, then we will consider that failure when analyzing a motion for summary judgment. Taken in the light most favorable to the plaintiff, the Complaints sufficiently allege underlying TILA violations.

### B. *Failure to Allege Materiality of First USA to Old Banc One*

Defendants argue that plaintiffs have failed to allege that the TILA violations were so widespread as to be material to the overall financial condition of Old Banc One. We disagree. The Complaints clearly allege a connection between the disclosures of revised First USA revenue and a precipitous drop in the value of Bank One shares.

### C. *Failure to Allege GAAP Violations With Particularity*

Defendants argue that plaintiffs have failed to allege facts which raise an inference of violations of generally accepted accounting principles. Plaintiffs allege that defendants recognized revenues that they were not entitled to recognize in preparing the Registration Statement and Merger Proxy/ Prospectus. Plaintiffs have sufficiently alleged that First USA

was engaging in TILA violations at the time of the merger and that defendants over-recognized revenues. Therefore, we deny the motion to dismiss.

### D. *Forward Looking Statements*

Defendants argue that plaintiffs' allegations involving forward looking statements are not actionable. Plaintiffs quote forward looking statements in their Complaints, but those statements are not the basis for their allegations. Plaintiffs allege that, in the Registration Statement and the Merger Proxy/Prospectus, defendants omitted and misstated material facts. Plaintiffs are not attempting to argue that statements, for example that the combined company would be "one of the largest credit card business[es] in the country", are actionable because they did not come true. Plaintiffs argue that defendants should have included notification that First USA would not continue to grow because the present growth was based on alleged TILA violations. Therefore, we will not dismiss the Complaints.

### III. *Loss Causation and the Larson Complaint*

**\*7** Defendants argue that the Larson Complaint should be dismissed in part for failure to establish loss causation. The Larson Complaint seeks certification of a class including both former FCN shareholders and former Old Banc One shareholders. Defendants argue that both groups could not have suffered damages because, if the FCN shareholders received too few shares in exchange for their FCN stock, then the Old Banc One shareholders received too many shares of the new Bank One.

Plaintiffs argue that loss causation, an affirmative defense, cannot be the basis of a motion to dismiss. We disagree. An affirmative defense will support a motion to dismiss under Rule 12(b)(6) when a plaintiff's allegations clearly point to the existence of the defense. *Adamczyk v. Lever Brothers Co.,* 991 F.Supp. 931, 934 (N.D.Ill.1997).

Plaintiffs' allegations, however, do not show that loss causation cannot be established. For example, if plaintiffs can show that the alleged omission resulted in a lower stock price than they would have received had the information about First USA been included in the Merger/Proxy Prospectus, then plaintiffs are entitled to recover. Because loss causation is an affirmative defense and the failure to show loss causation is not evident from the Larson plaintiffs' Complaint, we deny defendants' motion to dismiss.

### IV. *Plaintiffs' Failure to Allege Tender or Sale of Their Shares*

Defendants argue that, other than the Larson Complaint, all plaintiffs have failed to allege tender or sale of their shares under Section 12(2). Section 12(a) directs that a person alleging a violation "may sue either in law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a)(2). The statute does not state a relevant time period for alleging tender or sale, but several courts have held that a complaint must make a proper allegation to withstand a motion to dismiss. *Metz v. United Counties Bancorp,* 61 F.Supp.2d 364, 378 (D.N.J.1999); *Wigland v. Flotek Inc.,* 609 F.2d 1028, 1034 (2d Cir.1979); *Anisteld v. Cantor Fitzgerald & Co.,* 631 F.Supp. 1461, 1464 (S.D.N.Y.1986). Therefore, defendants contend that we should dismiss the Counts alleging a violation of Section 12(2) in all Complaints that do not allege tender or sale of the securities.

Plaintiffs argue that the above cases are not on point because rescission is no longer possible. The consideration that plaintiffs paid for new Bank One stock is their FCN stock. Because defendants can not return FCN stock, plaintiffs argue that they should not have to allege a tender or sale of their shares of New Bank One. We disagree. Plaintiffs seek "damages to the extent permitted by law" in their Complaints. Under Section 12(2) they are eligible for either recission or damages. Plaintiffs have failed to provide this court with any precedent suggesting that if recission is not possible, then plaintiffs do not have to fulfill the requirement of alleging tender or sale of the shares. Therefore, we grant defendants motion to the extent that it seeks to dismiss the Counts alleging a violation of Section 12(2) from the Evergreen, Grill, McPherson and Brumlik Complaints. Those Counts will be dismissed.

### V. *The Brumlik Complaint's Section 14(a) Claims*

**\*8** The Brumlik plaintiffs allege violations of the antifraud provisions of the Exchange Act. 15 U.S.C. § 78n(a), 17 C.F.R. § 240.14a–9. Defendants argue that Section 14(a) claims are governed by the pleading requirements of Fed.R.Civ.P. Rule 9(b) and the heightened pleading requirements of the Reform Act, 15 U.S.C. § 87u–4(b)(1). This argument is analogous to the argument defendants advanced above. The Section 14(a) claims are based on the Section 11 and 12(2) claims. Defendants argue that the Section 14(a) claim should fail for the same reason as the Section 11 and 12(2) claims. We disagree. As noted above, plaintiffs' allegations do not sound in fraud. Therefore, the Complaint does not need to meet heightened pleading requirements. However, even if plaintiffs' allegations require pleadings with particularity, plaintiffs have satisfied the heightened pleading requirements of Rule 9(b). Therefore, we deny defendants' motion to dismiss.

### VI. *Section 15 and 20 Claims*

Plaintiffs assert claims under Section 15(a) of the Securities Act, 15 U.S.C. § 77*o*(a). The Brumlik plaintiffs also assert claims under Section 20(a), 15 U.S.C. § 78t(a) of the Exchange Act. Plaintiffs assert liability against the individual defendants as "controlling persons" who are jointly and severally liable for violations by persons under their control. Defendants, on the basis of their arguments above, argue that plaintiffs have failed to state a predicate violation. Because we have denied defendants' arguments above, plaintiffs have stated a predicate violation. Therefore, we deny this basis of the motion to dismiss.

### CONCLUSION

The motion to dismiss, brought by defendants Bank One Corporation, Lehmann, Vitale, Istock, McMennamin, Boardman and McCoy, is granted in part and denied in part. It is granted to the extent that it seeks to dismiss Counts III of the Evergreen Complaint, Count III of the McPherson Complaint, Count III of the Grill Complaint, and Count III of the Brumlik Complaint. Those Counts are dismissed. The motion to dismiss is denied in all other respects.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1693963

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 74 of 306 PageID #:2030

2021 WL 1561712
United States District Court,
N.D. Illinois, Eastern Division.

Joshua FLYNN, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

EXELON CORPORATION
et al., Defendants.

No. 19 C 8209
|
Signed 04/21/2021

**Attorneys and Law Firms**

J. Alexander Hood, II, Jeremy Alan Lieberman, Pomerantz LLP, New York, NY, Jared Matthew Schneider, Louis Carey Ludwig, Pomerantz LLP, Chicago, IL, for Plaintiff Joshua Flynn.

Frank Anthony Richter, James E. Barz, Brian E. Cochran, Cameran Gilliam, Gina Buschatzke, Robbins Geller Rudman & Dowd LLP, Chicago, IL, Danielle S. Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA, for Plaintiff Local 295 IBT Employer Group Pension Trust Fund.

Jaran Ryal Moten, Mark E. Schneider, Kirkland & Ellis LLP, Chicago, IL, Evelyn Blacklock, Pro Hac Vice, Kyla Jackson, Pro Hac Vice, Sandra C. Goldstein, Pro Hac Vice, Stefan Howard Atkinson, Pro Hac Vice, Kirkland & Ellis LLP, New York, NY, for Defendants Exelon Corporation, Christopher M. Crane, Joseph Dominguez.

Jaran Ryal Moten, Kirkland & Ellis LLP, Chicago, IL, Evelyn Blacklock, Pro Hac Vice, Kyla Jackson, Pro Hac Vice, Sandra C. Goldstein, Pro Hac Vice, Stefan Howard Atkinson, Pro Hac Vice, Kirkland & Ellis LLP, New York, NY, for Defendants Joseph Nigro, Jeanne M. Jones.

David Andrew Gordon, Scott R. Lassar, Jennifer Martin Wheeler, Sidley Austin LLP, Chicago, IL, for Defendant Anne Pramaggiore.

Mark E. Schneider, Kirkland & Ellis LLP, Chicago, IL, for Defendants Commonwealth Edison Company, William Von Hoene.

## MEMORANDUM OPINION AND ORDER

Virginia M. Kendall, United States District Judge

**\*1** Plaintiff, representing himself and a class of similarly situated persons, brings claims detailing violations of federal securities laws against the following individuals and entities: Exelon Corporation ("Exelon") and its controlled subsidiary the Commonwealth Edison Company ("ComEd"); Exelon's Chief Executive Officer Christopher M. Crane; Exelon's Chief Strategy Officer ("CSO"), William A. Von Hoene, Jr.; Exelon's former CEO of Exelon Utilities, Anne R. Pramaggiore; and ComEd's CEO, Joseph Dominguez. The putative class comprises all purchasers of Exelon common stock between February 8, 2019 and October 31, 2019 alleging Defendants made a series of false and misleading statements that concealed an eight-year bribery scheme. These false and misleading statements caused Exelon's common stock to trade at artificially inflated prices and, when the bribery scheme was uncovered, Exelon's stock price declined dramatically and investors suffered billions of dollars in market losses. All Defendants now move to dismiss. (Dkts. 73, 75). Because the Plaintiff has adequately pleaded a violation of federal securities law, the Motions to Dismiss are denied.

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The following factual allegations are taken from Flynn's Amended Complaint (Dkt. 65) and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

This case arises because Exelon and its subsidiary ComEd (together "the Company") allegedly engaged in an eight-year bribery scheme in order to influence Illinois lawmakers to enact legislation favorable to Exelon, resulting in hundreds of millions of dollars in additional revenue to Exelon. (Dkt. 65 ¶ 2). Exelon is one of the largest electric companies in the United States. (*Id.* ¶ 3). ComEd is a controlled subsidiary of Exelon responsible for delivering electricity to customers

Flynn v. Exelon Corporation, Slip Copy (2021)
2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

in northern Illinois. (Dkt. 65 ¶¶ 24, 34–35). This securities class action is brought on behalf of all purchasers of Exelon common stock between February 8, 2019 and October 31, 2019 (the "Class Period"). (*Id.* ¶ 1).

The Company operates in a highly-regulated industry and depends upon the continual passage of favorable legislation, including from the Illinois General Assembly, which passes legislation that impacts the rates ComEd can charge its customers and whether Exelon's nuclear power plants in Illinois can receive subsidies. (*Id.* ¶¶ 5, 36–44). Before the alleged bribery scheme, the Company faced opposition from Public Official A, who "torpedoed a rate hike" for ComEd. (*Id.* ¶¶ 6, 48). To solve the opposition, ComEd allegedly began bribing Public Official A through more than $1.3 million in payments to his "political allies" to "influence and reward Public Official A's efforts ... to assist ComEd with respect to legislation concerning ComEd and its business." (*Id.* ¶ 56). The bribery scheme lasted from 2011 into 2019 and allegedly included payments to a law firm favored by Public Official A, hiring interns from Public Official A's ward, and appointing a board member to ComEd's Board to please Public Official A. (*Id.* ¶¶ 57–71). In exchange, the Company received passage of favorable legislation that provided benefits "greater than $150,000,000," including the Energy Infrastructure Modernization Act ("EIMA") and Future Energy Jobs Act ("FEJA"), which would provide Exelon up to $2.35 billion in government-authorized subsidies and further rate increases. (*Id.* ¶¶ 8, 72–86).

 **\*2** Between July and October 2019, Exelon and ComEd disclosed that they had received two grand jury subpoenas from the U.S. Attorney's Office for the Northern District of Illinois and that the SEC was investigating their lobbying activities. (*Id.* ¶¶ 116–119, 144, 154). On July 16, 2020, ComEd entered into the Deferred Prosecution Agreement ("DPA") with the United States Attorney for the Northern District of Illinois. (*Id.* at 1). In the DPA, ComEd admitted that, from 2011 to 2019, it made certain payments to "political allies" of "Public Official A" in order to "influence" him to "assist" ComEd "with respect to legislation concerning ComEd and its business." (*Id.* ¶ 7). On July 17, 2020, Exelon and ComEd filed a Form 8-K disclosing that ComEd had entered into the DPA. (*Id.* ¶ 163). The Form 8-K stated "[u]nder the DPA, the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's

associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests." (*Id.*). The DPA was agreed to "pursuant to authority granted by the Board of Directors of Exelon" and the DPA admittedly contained "true and accurate" facts. (*Id.* ¶ 164). The DPA bound ComEd to pay $200 million and institute remedial policies and practices including compliance testing, training, internal reporting, and discipline, and also required ComEd to cooperate with, and provide periodic reports to, the federal prosecutor. (*Id.* ¶ 165). The DPA states "certain senior executives and agents of ComEd" were "aware of the[ ] payments from their inception until they were discontinued in or around 2019," were "aware of the purpose of these payments ... namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business interests," and had "designed the[ ] payment arrangements in part to conceal the size of payments made to Public Official A's associates." (*Id.* ¶ 57). The DPA specifically identified Fidel Marquez, Jr., ComEd's former Executive Vice President for Legislative and External Affairs, and Defendant Pramaggiore as being two senior executives involved in the scheme. (*Id.* ¶ 57).

Plaintiff alleges that Defendants made false and misleading statements, engaged in a scheme to deceive the market, and undertook a course of conduct that artificially inflated the price of Exelon common stock and operated as a fraud on Class Period purchasers of Exelon common stock by misrepresenting and concealing the illegal bribery scheme. (*Id.* ¶ 221). They further concealed from the Class that Exelon's and ComEd's Illinois legislative successes (and the benefits from those successes) were illusory and the result of the bribery scheme, exposing the Company to substantial risk of criminal penalties and diminished legislative and public reputation. (*Id.*). Defendants' false and misleading statements had their intended effect and directly and proximately caused Exelon common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $50.95 per share. (*Id.* ¶¶ 222–23). When Plaintiff and other members of the Class purchased their Exelon common stock, the true value of such common stock was substantially lower than the prices actually paid. (*Id.*). Plaintiff and other members of the Class relied to their detriment on Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Defendants, on such statements and documents, and the integrity of the market, purchasing their Exelon common stock at artificially inflated prices during the Class Period. (*Id.* ¶ 224). Had

Flynn v. Exelon Corporation, Slip Copy (2021)
2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

Plaintiff and other members of the Class known the truth, they would not have taken such actions. (*Id.*). When Defendants' misrepresentations and omissions were revealed through the series of partial disclosures beginning on July 18, 2019 and continuing through October 31, 2019, the price of Exelon common stock fell dramatically, causing substantial losses to investors. (*Id.* ¶ 225). As a result of their purchases of Exelon common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiff and other members of the Class suffered economic loss under the federal securities laws. (*Id.* ¶ 232).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). This means that the plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

## DISCUSSION

**\*3** Defendant Pramaggiore filed an individual Motion to Dismiss (Dkt. 75) while Defendants Von Hoene, Crane, Dominguez, Exelon Corporation, and ComEd filed a joint Motion to Dismiss. (Dkt. 73). However, the arguments across all Defendants' motions are essentially the same: that Plaintiff failed to plead with the requisite particularity sufficient to state a claim under federal securities law.

To state a claim for federal securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)). Securities fraud claims must satisfy Fed. R. Civ. P. 9(b)'s particularity standard which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This generally means "describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *see also Cornielsen*, 916 F.3d at 598 (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). The purpose of this particularity requirement is "to discourage a 'sue first, ask questions later' philosophy." *Cornielsen*, 916 F.3d at 598 (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)). "Greater precomplaint investigation is warranted in fraud cases ... because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual), ... because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it, ... and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Id.* (citing *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999)).

In addition, § 21D(b)(2) of the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires complaints alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Any complaint alleging a material misstatement or omission must also "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." *Id.* § 78u-4(b)(1).

First, Plaintiff alleges that all Defendants—Exelon, ComEd, Pramaggiore, Dominguez, Crane, and Von Hoene—violated § 10(b) of the Exchange Act and SEC Rule 10b-5 by engaging in misconduct that artificially inflated the price of

Flynn v. Exelon Corporation, Slip Copy (2021)
2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

Exelon's stock and maintained the artificially inflated prices, caused Plaintiff and Class Members to purchase the stock at artificially inflated prices, and then concealed ComEd and Exelon's true condition from the investing public by making misleading and false statements. Second, Plaintiff seeks to hold Exelon, Crane, Pramaggiore, Von Hoene, and Dominguez individually liable under § 20(a) of the Exchange Act as "controlling persons" of Exelon and ComEd.

### I. Whether the Complaint Alleges False Statements with Particularity Attributable to Defendants

**\*4** Defendants argue Plaintiff failed to attribute the allegedly false statements to each Defendant with particularity. To hold an individual defendant liable for a statement, a plaintiff must allege that the defendant was the "maker" of the statement —i.e., had "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–42 (2011).

To satisfy Rule 9(b)'s particularity standard, a complaint must "state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.' " *Cornielsen*, 916 F.3d at 599 (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation marks omitted)). As a result, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears*, 912 F.2d at 893. The Court will look at the allegations pertaining to each Defendant in turn.

#### A. Von Hoene

Defendant Von Hoene has served as Senior Executive Vice President and CSO of Exelon since 2012 and as an Executive Vice President of Exelon since 2008. (Dkt. 65 ¶ 27). Plaintiff alleges that on an August 1, 2019 conference call a third-party analyst asked Von Hoene about the efforts to advance CEPA or similar legislation and whether, "since this news from a few weeks ago came out about the subpoena, has there been any—have these talks continued?" (*Id.* ¶ 118(c)). Defendant Von Hoene responded: "The activity that has started and continued for a number of months on advancing the clean energy legislation among the coalition ... We're meeting regularly, we're doing the stakeholder outreach, we're trying to craft a package and educate members of legislature and the tendency of the grand jury and subpoenas [sic] had no

impact on the level of activity or the intensity of the activity in that regard." (*Id.*). Defendants acknowledge Von Hoene is specifically attributed as the maker of one class-period statement, yet argue the statement is not actionable because it "concerned the effect of the subpoenas on legislation unrelated to ComEd." (Dkt. 74 at 4). The Court surmises that Defendants are claiming the statement is immaterial, but such an argument is waived as underdeveloped.[1] *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). Plaintiff is clear about the who, when, why, and where of Von Hoene's allegedly false statement, and therefore has pled with sufficient particularity. *See Cornielsen*, 916 F.3d at 599.

[1] The Court would hesitate to dismiss on materiality because, for the purposes of § 10(b), nonpublic information is considered "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). This determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). "Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law." *Id.*

#### B. Crane

**\*5** Defendant Crane has served as CEO and a Director of Exelon, and Chairman of the Board of ComEd, since 2012 and as President of Exelon since 2008. (Dkt. 65 ¶ 26). Defendants acknowledge Plaintiff alleges numerous false statements attributable to Crane. *See id.* ¶¶ 102, 104(a), (e), 106, 11(a)– (c), 112(a)–(c), 116, 118(a)–(b), 119(a)–(b), (e)–(f). However, Defendants claim "Crane ... was the maker only of statements about Exelon, not statements about ComEd." (Dkt. 74 at 4– 5). Defendants do not provide support that Crane needed to provide statements about both Exelon and ComEd either in their initial Motion or in their Reply in order to be held liable under § 10(b). Defendants have only proffered this conclusory statement without additional clarification about why they believe this to be important. To the extent that Defendants

Flynn v. Exelon Corporation, Slip Copy (2021)

2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

wish to dismiss Crane, they have already admitted that Crane was the maker of one statement and the Court denies dismissal on this ground.

### C. Dominguez

Defendant Dominguez served as Exelon's Senior or Executive Vice President of Governmental and Regulatory Affairs and Public Policy from 2012 to 2018 and served as CEO and a Director of ComEd since 2018. (Dkt. 65 ¶ 28). Defendants acknowledge Dominguez was the maker of several false statements. (*See id.* ¶¶ 104(d)–(e), 112(c), (f), 116, 119(a)–(b)). However, similar to their position with respect to Crane, Defendants argue that Dominguez "who signed SEC reports on behalf of ComEd, was the maker only of statements about ComEd, not Exelon. (Dkt. 74 at 5). Again, such an argument is unsupported. The Court denies dismissal of Dominguez because Plaintiff has specifically alleged that Dominguez was the maker of several false statements, as Defendants acknowledge.

### D. Exelon and ComEd

Defendants claim that "Plaintiff identifies statements in SEC reports and earnings calls that had nothing to do with ComEd, and then repeatedly cites such statements as though they concerned ComEd—by lumping Exelon and ComEd together as 'the Company' and treating statements about Exelon or its subsidiaries as though they were made by ComEd. (*See, e.g.*, Compl. ¶ 112(a) (1Q19 10-Q stating that Exelon and ExGen (but not ComEd) were "working with legislators and stakeholders" to pass the CEPA, legislation not even mentioned in the DPA); *id.* ¶ 111(b) (earnings call statement that Exelon was "negotiating" bills that would affect various subsidiaries). Even the two isolated instances Defendants cite from the Complaint do not exemplify the inappropriate group pleading. In fact, Defendants' proffered examples show Plaintiff has clearly alleged which entity was engaging in what allegedly fraudulent behavior. This conforms with the precepts of *Janus* that "... attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." 564 U.S. at 142–43. Plaintiff was clear about which entity and which individual made certain statements. Defendants conclusory arguments to the contrary do not show otherwise.

Defendants claim the conflation of entities matters because "Plaintiff's entire theory of liability is that the challenged statements were misleading because they did not disclose

the conduct admitted in the DPA—but only ComEd made admissions in the DPA." (Dkt. 90 at 20). However, this misconstrues the Complaint. The Complaint states that "[o]n July 17, 2020, Exelon and ComEd filed a Form 8-K disclosing that ComEd had entered into the DPA. The Form 8-K stated, 'Under the DPA, the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests.' " (Dkt. 65 ¶ 163). The Complaint goes on to note

> **\*6** ... ComEd is a controlled subsidiary of Exelon, and Exelon also filed the Form 8-K attaching the DPA as an exhibit. The DPA stated that it was agreed to "pursuant to authority granted by the Board of Directors of Exelon." Thus, the DPA provided admissions on behalf of ComEd and Exelon (i.e., the Company). More specifically, the DPA stated the Company agreed that "the facts alleged in the Information and described in the Statement of Facts are true and accurate."

(*Id.* ¶ 164). Defendants' cited authority, *Dow Corning Corp. v. BB&T Corp.*, No. 09-5637, 2010 WL 4860354 (D.N.J. Nov. 23, 2010), does not support their arguments because Plaintiff is not bringing claims against Exelon only as the corporate parent of ComEd, but because Exelon also made allegedly false and misleading statements. The Court denies dismissal based on this claim.

### E. Pramaggiore

Defendant Pramaggiore acknowledges Plaintiff specifically alleged statements attributable to her but claims they are non-actionable because: 1) she did not make statements in the Form 10-K other than those specifically regarding ComEd, not Exelon; 2) the Complaint fails to plead facts that any statements relating to ComEd in the Form 10-K are false or misleading; 3) she did not make the statements in the Code of Conduct; and 4) Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA.

Pramaggiore argues she only made statements in the Form 10-K that relate specifically to ComEd, not Exelon. Again, the import of this argument is unclear. If Pramaggiore argues she can only be held liable for ComEd, and not Exelon, it would still not lead to dismissing her as a Defendant unless the statements she made on ComEd's behalf were otherwise

Flynn v. Exelon Corporation, Slip Copy (2021)

2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

deficient. As it is, "[n]othing in *Janus* undid the long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them.' " *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) (citations omitted).

Importantly, Pramaggiore does not dispute she had authority to make statements on behalf of ComEd, who is also a named Defendant here and is a subsidiary of Exelon. Pramaggiore also argues that she is not the maker of the statements in Exelon's Code of Conduct, which was incorporated as an exhibit to the 2018 Form 10-K. Pramaggiore is correct that she cannot be held liable for these statements as nothing in the Code of Conduct could be construed to hold her as the ultimate authority over these statements. *Glickenhaus & Co.*, 787 F.3d at 426. But Plaintiff also does not even attempt to attribute the Code of Conduct to Pramaggiore. Plaintiff acknowledges "the Company Code of Conduct was approved by the Exelon Board of Directors, including Defendant Crane, and began with a "Leadership Message" from Defendant Crane." (*See* Dkt. 65 ¶ 95). As the Plaintiff states, "the claims in this case are not based on who 'approved' the Code of Conduct, they are based upon the misleading statements made by, among others, Pramaggiore and Dominguez who signed SEC filings directing investors to the Code of Conduct that was attached and published on the Company website." (Dkt. 85 at 21). Plaintiff does not wish to hold Pramaggiore liable for the misleading statements in the Code of Conduct but rather her statements in the Form 10-K that were misleading, in part, because it references the Code of Conduct.[2]

2    As discussed further below, even if Plaintiff cannot hold Pramaggiore liable for the Code of Conduct, it still is a viable basis for a § 10-b claim based on the actions of other Defendants.

**\*7** Pramaggiore next argues Plaintiff fails to plead facts that any statements relating to ComEd in the Form 10-K are false or misleading and that Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA. The Complaint details a number of statements made in the Form 10-K, signed by Pramaggiore, that are false or misleading regarding the Company's lobbying activities, the benefits and revenues from favorable legislation, and the Company's risk factor. (*See* Dkt. 65 ¶¶ 104–05). Pramaggiore claims these allegations are deficient because they are accurate. But it is inappropriate at the motion to dismiss stage to resolve questions of fact. At the pleading stage, the relevant question for deciding whether a statement is misleading is "whether the facts alleged are sufficient to

support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*") (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)), *rev'd on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("*Tellabs II*"); *see also Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (noting "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation"); *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, No. 10 C 6016, 2012 WL 607578, at *2 (N.D. Ill. Jan. 23, 2012) ("The complaint clearly sets forth who made the allegedly misleading statements, what the statements were and when and how they were conveyed. It is not the function of this Court at the pleading stage to determine whether the statements were in fact false or misleading").

For the allegations supporting the Exchange Act claim, the PSLRA requires that the complaint specify each allegedly misleading statement, the reasons why it is misleading, and, if based on information and belief, what specific facts support that information and belief. *See* 15 U.S.C. § 78u–4(b)(1). Plaintiffs must "support with particularity ... the falsity of the statement of fact or the omission." *Tellabs I*, 437 F.3d at 595. Plaintiff met this requirement as he describes over several paragraphs in his Complaint why the statements were false and misleading when made. (See Dkt. 65 ¶ 105). The Court need not resolve whether the statements were actually false; it is enough that Plaintiff has described with particularity why he believes the statement to be misleading.

Lastly, Pramaggiore argues Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA. On this conference call, Pramaggiore allegedly discussed some background of ComEd's franchise agreement in Chicago. (Dkt. 65 ¶ 118(d)). Pramaggiore stated:

> We started to have discussions around that. We understand what their priorities are and they are, I think, priorities are very much aligned with ours. They want to see more clean energy in the city of Chicago and they are concerned about vulnerable population in particular in terms of pricing, and those are all – those are both strong strategic elements of our focus going forward at all our utilities. But that's the status right now.

(*Id.*). The Complaint does not detail how these statements are misleading and Plaintiff does not discuss these statements in his Response. To the extent that Plaintiff wishes to hold

Flynn v. Exelon Corporation, Slip Copy (2021)

2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

Pramaggiore liable for these statements, they are dismissed for failure to comply with the pleading requirements of the PSLRA.

## II. Whether Defendants Were Under a Duty to Disclose

Defendants collectively argue they were not under a general duty to disclose. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak."). First, as to whether Defendants had a duty to disclose the bribery scheme, for Plaintiff to state a § 10(b) claim, the Complaint must adequately plead that Defendants made a statement that—absent disclosure of the bribery scheme— was " 'misleading as to a material fact.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238(1988)) (emphasis omitted). That is because Defendants "did not have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752, 759-61 (S.D.N.Y. 2017). Federal securities law "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc.*, 563 U.S. at 44. Accordingly, "[d]isclosure of ... information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F.Supp.3d 12, 23 (S.D.N.Y. 2016) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). An omission is therefore actionable only when disclosure of the information in question is "necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)) (ellipses in original).

**\*8** Plaintiff argues as an initial matter that Items 105 and 303 of SEC Regulation S-K impose a duty to disclose any regulatory noncompliance. Item 303, which sets forth disclosure requirements for Forms 8-K and 10-Q, requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 105 requires disclosure of "the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.

As Plaintiff points out, although the Seventh Circuit has yet to rule on the issue, a line of recent cases held that Items 105

and 303 of SEC Regulation S-K impose a duty to disclose any regulatory noncompliance in its SEC forms. *See Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, Case No. 19 C 4651, 2020 WL 564222, at \*6–7 (N.D. Ill. Feb. 5, 2020) (acknowledging that the Seventh Circuit has not yet ruled on the issue, analyzing the circuit split, and ultimately upholding § 10(b) claim where "silence regarding [the company's] regulatory noncompliance in its Forms 8-K and 10-Q violated Item 303's duty to disclose" because "noncompliance with FDA data integrity standards was a 'known trend' " that could "have 'reasonably' been expected to materially impact [the company's] revenues by compromising the approval of their [regulatory] applications or subjecting them to FDA fines or other sanctions"); *Holwill v. AbbVie Inc.*, No. 1:18-cv-06790, 2020 WL 5235005, at \*3 (N.D. Ill. Sept. 1, 2020) (upholding § 10(b) claim based on Item 105 and Item 303 violations with regard to concealed kickback scheme).

Here, Plaintiff specifically alleged how Defendants plausibly had a duty to disclose under Items 105 and 305:

> In violation of Item 105, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to discuss the following significant factors that made investment in Exelon risky: that Exelon and ComEd faced substantial risk of criminal penalties, and substantial risk that proposed and future favorable legislation would be compromised, due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation

(Dkt. 65 ¶ 130). Plaintiff further alleges that:

> In violation of Item 303, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to disclose material trends, events, and uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's resources and results of operations, namely that: the Company faced substantial risk of criminal penalties due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation.

Flynn v. Exelon Corporation, Slip Copy (2021)

2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

(*Id.* ¶ 128). Plaintiff sufficiently alleged that Defendants had a duty to disclose their alleged bribery scheme under Items 105 and 303 and that they failed to do so.

Defendants also argue Plaintiff's allegations regarding risk factors, lobbying activities, the passage of the FEJA legislation, statements about government investigations, statements about political contributions, and statements about the Code of Conduct did not impose a duty to disclose the alleged bribery scheme. While Defendants characterize their arguments about these topics as pertaining to a duty to disclose, the crux of their arguments is that the relevant statements were not misleading or inaccurate. But again, at the motion to dismiss stage, the relevant question for deciding whether a statement is misleading is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission. *Tellabs I*, 437 F.3d at 595 (citations omitted). Plaintiff thoroughly laid out why these statements were misleading due to the omission of the bribery scheme throughout the Complaint. "If one speaks, he must speak the whole truth," and here, Defendants made statements that were misleading in light of the alleged bribery scheme. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). Defendants' arguments that Plaintiff "argues that because ComEd later admitted certain activity in the DPA, all Defendants were required, months or years earlier, to accuse themselves of wrongdoing that had not yet been determined to be wrongdoing" is equally misguided. (Dkt. 74 at 8). Plaintiff is not arguing Defendants were required to accuse themselves of wrongdoing; Plaintiff pleads throughout the Complaint that Defendants were making misleading statements and engaging in fraudulent behavior because they were aware of the bribery scheme but representing otherwise. The statements, in other words, were incorrect when they were made. *See e.g. Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16 C 10510, 2018 WL 1071442, at *6 (N.D. Ill. Feb. 27, 2018) (rejecting " 'fraud by hindsight' " argument).

**\*9** Defendants also claim the Code of Conduct and Guidelines cannot provide the basis of a misrepresentation claim because they were general claims that did not make representations about the actual state of Exelon's and ComEd's internal operations. Certain business's ethics codes have been held to be nonactionable when they are inherently aspirational or do not imply compliance. *See Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 932 (N.D. Ill. 2011) (business's ethics code requiring Executive Vice President to "diligently look for indications that unethical or illegal

conduct has occurred and report it" is inherently aspirational and does not constitute evidence supporting a finding that an individual subject to the code had specific control over transactions at issue); *Desai v. General Growth Properties*, 654 F. Supp. 2d 836, 857–59 (N.D. Ill. 2009) (business's ethics code that prohibited officers and directors from making loans to other officers and directors to avoid potential conflicts of interest, violations of which could result in discipline, did not imply that all directors and officers were in compliance with the code).

However, the Company's Code of Business Conduct contained unqualified statements regarding the Company's conduct. For example, the Code of Conduct claimed:

- "We never request, offer or accept any form of payment or incentive intended to improperly influence a decision." (Dkt. 65 ¶ 97(a)).

- "What's Expected ... Never use a third party to make payments or offers that could be improper." (*Id.* ¶ 97(c)).

Exelon's Contributions Guidelines, published on its website during the class period stated that, "[P]olitical contributions during the reporting period were all made in accordance with its Corporate Political Contributions Guidelines" and no contributions were to be made "under any condition requiring confidentiality" or "in return for any Official Act." (*Id.* ¶¶ 98(a), 99(a)).

Such statements take the Code of Conduct and Corporate Guidelines out of the realm of nonactionable aspirational statements and into the realm of statements regarding the Company's conduct and implies compliance. *See AbbVie Inc.*, 2020 WL 5235005, at *4 (discussing how defendants' corporate code of conduct which used terms like "we never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an *AbbVie* product" was actionable). The Court denies dismissal for failure to allege a duty to disclose or for failure to describe how the statements were misleading.

**III. Whether the Complaint Adequately Alleges Scienter**
Defendants' last argument is that Plaintiff has failed to adequately allege scienter. The scienter element refers to the defendant's required state of mind. *Cornielsen*, 916 F.3d at 601. For Plaintiff's § 10(b) claim, "that state of mind is 'an intent to deceive, demonstrated by knowledge of the

Flynn v. Exelon Corporation, Slip Copy (2021)

2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

statement's falsity or reckless disregard of a substantial risk that the statement is false.' " *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). "Recklessness" in this context is defined as "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing C*o., 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). This definition only requires knowledge of the danger or risk because the latter part of the definition ("danger ... so obvious that the defendant must have been aware of it") infers knowledge from the gravity of the risk. *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 704 (7th Cir. 2008). Yet "[a]lleging that a defendant should have known about fraud is not enough to show that the defendant was reckless." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020) (emphasis added).

**\*10** Additionally, the PSLRA requires a plaintiff to "satisfy a heightened standard of plausibility" in pleading scienter. *Kohl's Corp.*, 895 F.3d at 936. A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "each act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A). To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In determining whether a complaint has met this standard, the Court must account for "plausible, nonculpable explanations for the defendant's conduct" and weigh them against the strength of the inferences in favor of scienter. *Id.* at 323–24; *Pugh*, 521 F.3d at 693.

Defendants first argue Plaintiff has conflated Defendants. This Circuit does not allow group-pleading and, therefore, scienter must be pleaded with regard to "each fact or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind." *Cornielsen*, 916 F.3d at 600 (citations omitted); *see also Tellabs I*, 437 F.3d at 603 (disallowing group pleading in federal securities fraud cases). Defendants fail to provide a single example of group-pleading from the Complaint and the Court cannot find any. As discussed above, Plaintiff clearly attributed specific statements and actions to individual Defendants and entities.

Defendants further argue Plaintiff's allegations as to scienter fail because they are conclusory and fail to establish motive. Plaintiff pled sufficiently as to scienter and his Complaint is replete with specific allegations that give rise to an inference that each Defendant acted with the required state of mind. Plaintiffs pled motive, including that the bribery scheme was worth millions of dollars to the Company and each individual Defendant stood to gain from the scheme. (Dkt. 65 ¶¶ 8, 184(a), 194–98). Other courts have found scienter met where there was a financial motive. *See e.g. AbbVie*, 2020 WL 5235005, at \*5 (finding scienter requirement met where the Defendants had a motive to maximize sales and individual defendants' executive to "compensation [being] tied directly to" sales in kickback scheme); *Tellabs II*, 551 U.S. at 326 (stating that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference ..."). Additionally, Plaintiff pleads that the individual Defendants oversaw the lobbying activities, participated in fundraisers, had access to internal corporate documents and conversations with officers and employees, reviewed reports on the topics on which they spoke, and made public statements as well as by signing public filings. (Dkt. 65 ¶¶ 176–87, 200–07). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Tellabs I*, 437 F.3d at 603; *see also Desai*, 654 F. Supp. 2d at 860 ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue."). Plaintiff has pled that here. Additionally, Plaintiff pleads that Exelon spent more on lobbying than its peers, Defendants repeatedly acknowledged that legislative successes were essential to business success, the Company acknowledged a historically poor relationship with Public Official A that dramatically improved during the bribery scheme, the financial benefits procured during the bribery scheme were worth hundreds of millions of dollars, that the bribery scheme lasted 8 years, and ComEd was the largest of Exelon's utility companies. (Dkt. 65 ¶¶ 8, 35, 184(a), 194–96, 201–06; 213–20). Other courts have found scienter was met because it is "reasonable to assume top management [was] aware of matters central to that business's operation." *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 731 (D. Minn. 2019)(internal citation omitted); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008) (finding scienter met when the concealed facts would have a "devastating effect on the

corporation's revenue" and "it would be absurd to suggest that top management was unaware of them" and discussing similar cases). Not to mention, Plaintiff has pled specific instances giving rise to an inference of scienter for each of the individual Defendants. (*See* Dkt. 85 at 34–38 for in-depth discussion of allegations of each Defendant).

 **\*11** Plaintiff pled a number of circumstances that give rise to an inference of scienter. Defendants have attempted to isolate the pleadings but "courts must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322–23 (emphasis in original). Plaintiff's numerous reasons for scienter presents a cogent and compelling inference of fraudulent intent. The Court denies dismissal for failure to plead scienter.

### IV. Section 20(a) Claim

Defendants arguments to dismiss Plaintiff's § 20(a) claim are predicated on the failure of Plaintiff's § 10(b) claim. Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" *Pugh*, 521 F.3d at 693 (citing 15 U.S.C. § 78t(a)). Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws, namely a violation of § 10(b) and Rule 10b–5. *Id.* Since Plaintiff's § 10(b) is proceeding, so too may his § 20(a) claim. *See id.*; *Kohl's Corp.*, 895 F.3d at 936. Defendant Pramaggiore additionally argues that she is not a "controlling person" within the meaning of § 20(a); however, "determination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1029 (N.D. Ill. 2004) (citing *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D. Ill. 2003)).

### V. Motion to Strike

Plaintiff moves to strike certain of Defendants' arguments contained in their Reply briefs. (Dkt. 92). The Court denies Plaintiff's Motion to Strike as Defendants' Reply briefing did not contain any new, improperly raised arguments. Although, as Plaintiff points out, it is " 'well-settled that arguments first made in the reply brief are waived," *Tovar Snow Pros. Inc. v. ACE Am. Ins. Co.*, 20 C 1060, 2020 WL 5658705, at \*1–2 (N.D. Ill. Sept. 23, 2020), the arguments that Plaintiff wishes to strike are related to arguments raised in the opening Motions to Dismiss. Defendants had every right to respond to Plaintiff's case law raised in his Response by citing additional law that bolstered their initial arguments.

### CONCLUSION

Plaintiff has met the heightened pleading standard for federal securities fraud claims and has adequately alleged a violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, as well as § 20(a) of the Exchange Act. Therefore, the Motions to Dismiss are largely denied. (Dkts. 73, 75). However, Plaintiff's allegations regarding Pramaggiore's statements during the August 2019 conference call do not satisfy the requirements of the PSLRA and therefore these claims are dismissed. Motion to Strike (Dkt. 92) is denied because Defendants' Reply briefing was appropriate.

### All Citations

Slip Copy, 2021 WL 1561712, Fed. Sec. L. Rep. P 101,093

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2838686

2020 WL 2838686
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

IN RE ACADIA PHARMACEUTICALS
INC. SECRUTIES LITIGATION

Case No.: 18-CV-01647-AJB-BGS
|
Signed 06/01/2020

**ORDER:**

**(1) GRANTING PLAINTIFF'S MOTION TO STRIKE; AND**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Anthony J. Battaglia, United States District Judge

**\*1** Pending before the Court are Plaintiff's motion to strike, (Doc. No. 56), and Defendants' motion to dismiss the consolidated amended class action complaint, (Doc. No. 52). Defendants oppose Plaintiff's motion, (Doc. No. 59), and Plaintiff opposes Defendants' motion, (Doc. No. 55). For the reasons set forth more fully below, the Court **GRANTS** Plaintiff's motion to strike and **GRANTS in part** and **DENIES in part** Defendants' motion to dismiss.

**I. BACKGROUND**

Plaintiff represents a class of those who acquired ACADIA securities between April 29, 2016, and July 9, 2018, and who are suing under the Securities Exchange Act of 1934. (Doc. No. 48 ¶ 1.)[1] Plaintiffs allege that on April 29, 2016, the U.S. Food and Drug Administration ("FDA") approved ACADIA's lead drug, NUPLAZID. (*Id.* ¶¶ 2, 3.) Prior to approval, NUPLAZID went through four randomized, controlled trials for safety and efficacy. (*Id.* ¶ 41.) The scale used as the primary efficacy variable failed to show a statistically significant improvement in psychosis symptoms in three of the trials. (*Id.*) The fourth trial was statistically positive for efficacy, however 11.6% of trial patients discontinued the trial. (*Id.* ¶ 42.) In August 2014, ACADIA received a "Breakthrough Therapy Designation" for NUPLAZID. (*Id.* ¶ 43.) On September 1, 2015, ACADIA then submitted a new drug application to the FDA. (*Id.* ¶ 45.)

1   The following facts are taken from Plaintiff's complaint and construed as true for the limited purpose of resolving this motion. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247 (9th Cir. 2013).

In September 2015, Dr. Paul Andreason, the primary reviewer for the FDA of ACADIA's new drug application for NUPLAZID, issued a clinical review in September 2015 with a recommendation of "do not approve" based in part on the high death rate. (*Id.* ¶ 46.) On March 29, 2016, an advisory committee voted to approve the drug. (*Id.* ¶ 48–49.) The FDA accepted the committee's recommendation and approved NUPLAZID the following month. (*Id.* ¶ 50.) A black box warning was placed on NUPLAZID that indicated there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. (*Id.*) On May 31, 2016, NUPLAZID commercially launched. (*Id.* ¶ 51.)

Following the launch of NUPLAZID, ACADIA spent $609,556 on consulting, speaking, and travel and lodging payments with payments to individual doctors as large as $25,690 and $19,145. (*Id.* ¶ 67.) In 2017, ACADIA paid more than $8.6 million, with 62 doctors receiving more than $50,000 each, and 26 receiving at least $100,000. (*Id.* ¶ 68.) Many of the physicians who had received the consulting fee in 2016 and 2017 prescribed NUPLAZID in 2016. (*Id.* ¶ 71.)

The Class Period begins on April 29, 2016, when ACADIA issued a press release saying the FDA had approved NUPLAZID. (*Id.* ¶ 73.) On May 3, 2016, three members of ACADIA's board of directors announced they were leaving the company. (*Id.* ¶ 80.) On November 7, 2016, ACADIA stated that it was receiving positive feedback from doctors, patients, and caregivers regarding the drug, prescription growth, and net product sales. (*Id.* ¶ 94.)

**\*2** In April 2018, CNN published an article that expressed concern over reports of deaths from NUPLAZID and concerns that the drug had been approved too quickly. (*Id.* ¶ 121.) On April 9, 2018, ACADIA's stock price fell 23.4%. (*Id.* ¶ 122.) Two weeks later, the FDA announced it would reexamine NUPLAZID's safety. (*Id.* ¶ 125.) ACADIA's stock dropped 21.9% on April 25, 2018. (*Id.* ¶ 126.)

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 85 of 306 PageID #:2041

In re Acadia Pharmaceuticals Inc. Secrutles Litigation, Not Reported in Fed. Supp. (2020)
2020 WL 2838686

On July 9, 2019, the Southern Investigative Reporting Foundation ("SIRF") published a report that ACADIA accomplished its commercial success by "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths." (*Id.* ¶¶ 132–33.) On July 9, 2019, ACADIA's stock price dropped 6.8%. (*Id.* ¶ 134.)

Over four months later, ACADIA filed a prospectus supplement containing a statement that said the company had "received a civil investigative demand, or CID, from the DOJ pursuant to the Federal False Claims Act requesting certain documents and information related to our sales and marketing of NUPLAZID." (*Id.* ¶ 135.) The DOJ investigation is ongoing. (*Id.*)

On July 19, 2018, Plaintiff filed a complaint in this litigation. (Doc. No. 1.) On February 26, 2019, the Court granted consolidation, appointed lead plaintiff, and lead counsel. (Doc. No. 41.) Following that Order, Plaintiff filed a consolidated complaint. (Doc. No. 48.) On June 7, 2019, Defendants filed the instant motion to dismiss. (Doc. No. 52.) On July 23, 2019, Plaintiff filed the instant motion to strike. (Doc. No. 56.) This Order follows.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint and allows a court to dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief may be granted. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[A] court may dismiss a complaint as a matter of law for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). However, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, a court reviews the contents of the complaint, accepting all factual allegations as true, and drawing all reasonable inferences in favor of the nonmoving party. *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).

Notwithstanding this deference, the reviewing court need not accept "legal conclusions" as true. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). It is also improper for a court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## III. DISCUSSION

### A. Plaintiff's Motion to Strike

Plaintiff filed a motion pursuant to Federal Rules of Civil Procedure 12(f), Local Civil Rule 7.1(h), and the Court's inherent authority, to strike Exhibit A to the Declaration of Peter M. Adams in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint and references thereto in Defendants' Memorandum in Support of Motion to Dismiss. (Doc. No. 56-1 at 2.)

**\*3** Federal Rule of Civil Procedure 12(f) provides district courts with the right to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). All district courts have the inherent right to control their own dockets. *See, e.g.*, *Landis v. N. Am.*, 299 U.S. 248, 254 (1936). The Ninth Circuit has affirmed that this power includes the right to strike documents other than pleadings from its dockets. *See Lamos v. Astrue*, 275 F. App'x 617, 618 (9th Cir. 2008); *see also Smith v. Frank*, 923 F.2d 139, 142 (9th Cir. 1991). This District limits briefs filed in support motions to "a total of twenty (25) pages in length per party," absent leave from the Court. Local Civil Rule 7.1(h).

Plaintiff argues that Defendants submitted an exhibit, totaling 25 pages, for the sole purpose of presenting additional arguments against falsity which they could not fit in their Memorandum of Points and Authorities. The Court agrees. Defendants try to assert the argument that this is simply a chart for the Court's convenience, however, that is not the case. While the Court does appreciate charts to simplify complex arguments, Defendants utilized this chart to identify 108 statements encompassing 38 paragraphs of the complaint in a 25-page chart. This is simply an extension of Defendants' argument and thus, Defendants' have exceeded the 25-page limit for their briefs. *See e.g., Jiangchen v. Rentech, Inc.*, No. CV 17-1490-GW (FFMx), 2017 WL 10363990, at \*4 (C.D. Cal. Nov. 20, 2017) (striking an appendix that highlighted what defendants contended were defects in plaintiff's pleadings).

2020 WL 2838686

Defendants argue that the Court should still consider Exhibit A as good cause exists to allow extra pages. (Doc. No. 59 at 3–4.) However, Defendants would have needed to seek leave of the Court prior to filing their brief. Defendants failed to do so.

Accordingly, the Court **GRANTS** Plaintiff's motion to strike.

### B. Defendants' Request for Judicial Notice
Defendants request judicial notice of fifty-six (56) documents. Federal Rule of Evidence 201 states that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

However, this request reflects "[t]he overuse and improper application of judicial notice." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), *cert. denied* 139 S. Ct. 2615 (2019). Many of the documents for which Defendants seek judicial notice are not appropriate for judicial notice. For example, Defendants seek judicial notice of several press releases, (*see, e.g.*, Doc. No. 52-2, Exs. 11, 14, 15, 18, 21, 24, 27, 31, 34, 39, 44, 45), and transcripts of quarterly earnings calls, (*see, e.g.*, Doc. No. 52-2, Exs. 12, 13, 17, 20, 23, 26, 29, 33, 36, 47), but the Court may not take judicial notice of these documents. *See Von Saher v. Norton Simon Museum of Art at Pasadena,* 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.") (internal quotation marks omitted).

Further, given the number of documents Defendants seek to have considered, the Court finds that such documents would more be appropriate in connection with a motion for summary judgment. *See* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1366, at 159 ("As the language of [Rule 12(b)(6)] suggests, federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."). However, the Court does not convert the instant motion to dismiss to a motion for summary judgment. Accordingly, the Court **DENIES** Defendants' request for judicial notice.

### C. Defendants' Motion to Dismiss

**\*4** Defendants assert that Plaintiffs fail to state a claim under Section 10(b) since Plaintiff fails to identify any actionable misstatement or omission, fails to adequately plead scienter, and fails to adequately plead loss causation. (*See generally* Doc. No. 52-1.) Further, Defendants argue that Plaintiff has failed to state a claim under Section 20(a). (*See generally id.*)

Section 10(b) of the Exchange Act forbids: (1) the use or employment of any deceptive device, (2) in connection with the purchase or sale of any security, and (3) in contravention of Securities and Exchange Commission rules and regulations. 15 U.S.C. § 78j(b); *see Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Additionally, Rule 10b–5, promulgated by the SEC under Section 10(b), forbids the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made not misleading." 17 C.F.R. § 240.10b–5; *see Dura*, 544 U.S. at 341. To succeed in a private civil action under Section 10(b) and Rule 10b–5, a plaintiff must establish "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance ...; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 341–42.

#### i. Manner of Pleading
Defendants assert that Plaintiff's complaint is a "puzzle pleading" and does not comply with the PSLRA or Rule 9(b). (Doc. No. 52-1 at 20.) Plaintiff's complaint contains a designated section entitled "Materially False and Misleading Statements Issued During the Class Period." (Doc. No. 48 at 23.) While the Court notes that Plaintiff's complaint does contain large block quotes, Plaintiff's complaint does single out the actual statements that are the basis of Plaintiff's securities fraud claim. *Cf. Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013); *Lifschitz v. NextWave Wireless Inc.*, No. 08CV1697-LAB (WMC), 2010 WL 11512356, at \*3 (S. D. Cal. Mar. 5, 2010); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1100 (N.D. Cal. 2006). Accordingly, the Court does not find that Plaintiff's complaint is a "puzzle pleading."

#### ii. Not Actionable Statements
Defendants assert that the alleged misstatements are not actionable because they are accurate statements of fact, forward looking statements, expressions of opinion, and corporate optimism.[2] (Doc. No. 52-1 at 20–22.)

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 3

In re Acadia Pharmaceuticals Inc. Secruties Litigation, Not Reported in Fed. Supp. (2020)
2020 WL 2838686

2     As explained above, the Court grants Plaintiff's motion to strike Defendants' Exhibit A. Accordingly, the Court will only address the statements that were contained in Defendants' motion to dismiss. The Court will not evaluate every statement Defendants identified in Exhibit A and determine whether they are accurate statements of fact, forward looking statements, expressions of opinion, and corporate optimism.

Defendants explain that Plaintiff alleges certain statements such as "Net sales rose to 15.3 million" are misstatements. However, this statement is a true statement. To the extent, Plaintiff seeks to hold Defendants liable for statements that are true, the Court grants Defendants' motion to dismiss. *See* 15 U.S.C. § 78u-4(b)(1); *see, e.g., In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001).

**\*5** Defendants contend that several of the statements are forward-looking and protected by the PSLRA safe harbor. The Court agrees. Forward-looking statements are protected by the PSLRA safe harbor. *See* 15 U.S.C. § 78u-5(c)(1); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (forward-looking statements relate to "future expectations and performance"). For example, the following statements are in fact forward-looking, "we will need to increase awareness and education," "we expect that usage should increase and that the number of patients on drug will likely build over time," and "we're going to show the benefits and we're going to help guide the physician in seeing why NUPLAZID would be their best choice." (Doc. No. 48 ¶¶ 77, 82.) Plaintiff argues that these statements describe Defendants' current commercialization plan and the risk warnings were boilerplate, accordingly these statements are not subject to the safe harbor provision. (Doc. No. 55 at 23.) However, these statements were in relation to future expectations and performance. Accordingly, to the extent, Plaintiff seeks to hold Defendants liable for statements that are forward-looking, the Court grants Defendants' motion to dismiss.

Next, Defendants contend that Plaintiff attacks statements of opinion. However, the statements that Defendants point to are not statements of opinion. While Defendants only include the partial quotations in their motion in reading the selected statements in their entirety, it is clear some of these are not statements of opinion. For example, in paragraph 89 of the complaint, the statement, "we are very pleased to

see it appears both on the side effects and tolerance side as well as on the efficacy side, everything is supportive of the profile that we – that the drug demonstrated in clinical trials," is simply not an opinion. (Doc. No. 48 ¶ 89.) Further, Defendants assert that in paragraph 94 the statement contains the words "I'm especially pleased," however, paragraph 94 contains no such language. (*Id.* ¶ 94.) However, statements such as "we are confident NUPLAZID over time should become the standard of care for patients with hallucinations and delusions associated with PDP," is a statement of opinion. This statement does improperly form the basis of a securities fraud claim. (*Id.* ¶ 77); *see, e.g., In re Downey Sec. Litig.*, No. CV08-3261-JFW (RZx), 2009 WL 736802, at \*6 (C.D. Cal. Mar. 18, 2009). The Court will not parse through the entire complaint to determine which statements are opinion and which are not, but to the extent Plaintiff is relying on statements of opinion, the Court grants Defendants' motion to dismiss.

Defendants argue that Plaintiff relies on statements of corporate optimism. Again, as above, the Court will not parse through each statement of the complaint. However, as examples, the Court finds that the statements such as "there are good reasons for physicians to consider switching their patients," (Doc. No. 48 ¶ 82), and "we saw solid month-over-month prescription growth," (*Id.* ¶ 91) may form the basis for a securities fraud claim. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("general statements of optimism, when taken in context, may form a basis for a securities fraud claim.") However, statements such as "as was the case with the field management team we hired in March of 2015, this truly is an impressive group," (Doc. No. 48 ¶ 77), is a statement of corporate optimism and cannot form the basis of a securities fraud claim. *See Intuitive Surgical*, 759 F.3d at 1060. Thus, to the extent Plaintiff relies upon statement of corporate optimism, the Court grants Defendants' motion to dismiss.

Accordingly, Plaintiff must base his complaint on statements that are actionable. Plaintiff has currently based his complaint on actionable statements and some not actionable statements. Thus, to the extent Plaintiff bases his causes of action on not actionable statements, the Court **GRANTS** Defendants' motion to dismiss.

    iii. <u>Materially False or Misleading Statements</u>
Defendants argue that the alleged misstatements are not misleading as ACADIA fully disclosed the trial results, the post-marketing events were public, and ACADIA had no

In re Acadia Pharmaceuticals Inc. Secruties Litigation, Not Reported in Fed. Supp. (2020)
2020 WL 2838686

duty to accuse itself of wrongdoing. (Doc. No. 52-1 at 22–27.) To allege an actionable false or misleading statement, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). This is a demanding standard, requiring a plaintiff to allege with specificity "contemporaneous statements or conditions," *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001), that demonstrate both "how and why the statements were false" when made, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1071–72 (9th Cir. 2008).

### a. Disclosure of the Clinical Trial Results

 **\*6** Defendants assert that Plaintiff cannot establish a plausible claim. First, Plaintiff asserts that Defendants failed to disclose "that patients treated with NUPLAZID during the Phase III trial died at twice the rate of patients treated with placebo." (Doc. No. 48 ¶ 74.) Defendants assert that this information was publicly accessible in The Lancet and they expressly referred investors to the article. (Doc. No. 52-1 at 23.) Defendants are asserting the truth of the market defense. At this stage, the Court agrees with Plaintiff that this it would be inappropriate to dismiss based on this defense. *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) ("courts rarely dismiss a complaint on this basis.") Further, the information must be transmitted to the public "with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d at 1073. Pointing investors to read an article may not qualify as transmitting the information to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression. Accordingly, Plaintiff has established a plausible misleading claim based on the mortality rate.

Next, Defendants contend that Plaintiff does not assert any facts to support several bases to establish misleading statements. First, Plaintiff faults Defendants for failing to disclose that "the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs." (Doc. No. 48 ¶ 87.) Second, Plaintiff accuses Defendants of failing to disclose,

"that patients with [PDP] were also at greater risk of death even if they did not suffer from dementia." (*Id.* ¶¶ 50, 87.) And lastly, Plaintiff accuses Defendants of lying to investors by failing to tell them that Dr. Andreason recommended against approval before the advisory committee meeting. (*Id.* ¶¶ 46, 74.) The Court finds that Plaintiffs have alleged sufficient facts to establish that failure to disclose these factors were in fact misleading to investors. *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (finding that a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists.") Furthermore, this information is simply not trivial and immaterial, and thus was worthy of disclosure.

### b. Post Marketing Events

Defendants next argue that the FAERS data cannot give rise to a claim for fraud by omission because the data was public record and investors were presumed to have access to it. (Doc. No. 52-1 at 25); *see Philco Invs. v. Martin*, No. C10-02785 CRB, 2011 WL 4595247, at \*9 (N.D. Cal. Oct. 4, 2011) (investors "presumably" had access to FAERS data); *see also Tadros v. Celladon Corp.*, 738 F. App'x 448, 448 (9th Cir. 2018) (rejecting omission claim where omitted facts had been publicly disclosed); *McGoveny v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019); *Paskowitz v. Pacific Capital Bancorp*, No. CV 09-6449 DW (JCx), 2009 WL 4911850, at \*6 (C.D. Cal. Nov. 6, 2009). However, as described above, Defendants' assertion of the truth of the market defense at this stage is inappropriate. Further, FAERS data files only contain raw data and "[a] simple search of FAERS data cannot be performed with these files by persons who are not familiar with creation of relational databases." (Doc. No. 55 at 24.) In *Philco*, the plaintiffs were sophisticated investors in the pharmaceutical industry and the data had been referenced in public disclosures. *See Philco Invs.*, No. C10-02785 CRB, 2011 WL 4595247, at \*9. That is not the case here. There are no facts present that Plaintiff was a sophisticated investor in the pharmaceutical industry and this data was not referenced in a public disclosure by Defendants.

Defendants also argue that there are no facts alleged that show that the FAERS reports raised a "red flag" or were inconsistent with anything Defendants said. (Doc. No. 52-1 at 25.) However, the FDA decided to reevaluate the drug's safety based on these reports. (Doc. No. 48 ¶ 125.) Accordingly, Plaintiff has adequately pled that the statements were false or

misleading because they failed to disclose reports of death in patients taking NUPLAZID.

### c. Duty to Disclose Kickbacks

**\*7** Lastly, Defendants argue that they did not have a duty to accuse itself of wrongdoing. (Doc. No. 52-1 at 26.) "[F]ederal securities laws do not require a company to accuse itself of wrong-doing." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. June 28, 2017). While this is true, Plaintiffs argument is that Defendants had a duty to accurately describe its business practices, which included kickbacks to physicians. *See In re Qualcomm Inc. Sec. Litig.*, No. 17CV121-JAH-WVG, 2019 WL 1239301, at \*4 (S.D. Cal. Mar. 18, 2019). Here, Defendants did discuss their commercialization strategy. Defendants discussed specific aspects of their strategy in NUPLAZID's success and rising prescription rates. Thus, as the complaint alleges, kickbacks were a part of Defendants business practices. As Defendants chose to discuss their commercialization strategy, they had a duty to disclose that they were allegedly paying physicians to prescribe NUPLAZID. Accordingly, Plaintiff has adequately pled that the statements were false or misleading because they failed to disclose payments to physicians.

### iv. Scienter

"Scienter is [the] essential element of a § 10(b) claim." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1032 (9th Cir. 2002). The Supreme Court has explained that scienter for purposes of Section 10(b) and Rule 10b–5 is "the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308 (2007). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). This means a plaintiff "must provide, in great detail, all the relevant facts forming the basis of her belief" that the defendant has acted with "deliberate recklessness or intent." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. When analyzing the sufficiency of a plaintiff's scienter pleadings, the Court must "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Here, Plaintiff alleges that scienter has been adequately pled because: (1) Defendants tracked adverse events and had access to data showing that the Company paid doctors; (2) three ACADIA directors resigned four days after the FDA approved NUPLAZID; and (3) NUPLAZID is ACADIA's only source of revenue. (Doc. No. 55 at 26–29.) The Court will address each argument in turn.

First, Plaintiff argues that complaint supports a compelling inference of scienter because Defendants had access to data showing that ACADIA made large payments to physicians that prescribed NUPLAZID and Defendants admitted they tracked adverse events. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Here, the PPACA requires companies to report transfers of value to physicians to the government on an annual basis. Further, Defendants have a legal obligation to submit this data to the Center for Medicare and Medicaid Services. Accordingly, given the reporting requirements, Defendants cannot claim ignorance of the payments, and in fact Defendants do not claim ignorance in their motion. *See Bartelt v. Affymax, Inc.*, No. 13-CV-01205-WHO, 2014 WL 231551, at \*13 (N.D. Cal. Jan. 21, 2014). Defendants argue that there are no allegations to show what any Defendant believed about the reports or payments. *See In re Rigel Pharm. Sec. Litig.*, 697 F.3d 869, 883–84 (9th Cir. 2012). However, there is an inference of scienter. As alleged, Defendants had access to this information and were likely aware that ACADIA was making large payments to physicians that prescribed NUPLAZID with frequency.

**\*8** Second, it is undisputed that NUPLAZID is ACADIA's only product. Accordingly, Defendants focused all their attention on successfully commercializing NUPLAZID. Accordingly, the Court agrees that this supports an inference of scienter. It is likely that, based on the allegations in the complaint, that they knew about the alleged scheme to pay

2020 WL 2838686

off physicians to prescribe NUPLAZID. *See In re Amgen Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *11 (C.D. Cal. Aug. 4, 2014). Defendants argue that there must be "red flags" so dramatic that it would be "absurd" to think that Defendants "did not know that something was wrong." *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018). Here, there were red flags. The data that Defendants do not dispute tracking clearly showed red flags. Based on the allegations, the fact that NUPLAZID was ACADIA's only product supports the inference of scienter.

Third, it is undisputed that on May 3, 2016, three members of ACADIA's Board of Directors resigned. This was four days after the FDA approved NUPLAZID. Plaintiff argues that the timing of these resignations supports scienter and suggests that they wanted no part of the drug's commercialization. While this factor alone does not support a strong inference of scienter, if taken together with the other facts alleged, this fact does support scienter. It is plausible that the directors resigned due to the information regarding payments to physicians.

Accordingly, the Court **DENIES** Defendants' motion to dismiss regarding the element of scienter.

### v. Loss Causation

Even when deceptive conduct is properly pled, a securities fraud complaint must also adequately plead "loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011). Loss causation is shorthand for the requirement that "investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Id.* Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event. *Dura*, 544 U.S. at 343–44. The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through "corrective disclosures" which "caused the company's stock price to drop and investors to lose money." *Halliburton*, 573 U.S. at 808.

Plaintiff alleges that there were three stock drops. On April 9, 2018, the stock dropped 23.4%. On April 25, 2018, the stock dropped 21.9%. Finally, on July 9, 2018, the stock dropped 6.8%. On April 9, 2018, CNN reported that "[p]hysicians, medical researchers and other experts told CNN that they worried that [NUPLAZID] had been approved too quickly, based on too little evidence that it was safe or effective." (Doc. No. 48 ¶¶ 17, 121.) Defendants argue that

this article simply rehashed the already-public FAERS data. However, as explained above, the FAERS data is raw data and a simple search cannot be done. Accordingly, the Court finds this argument unpersuasive.

On April 25, 2018, CNN reported that the FDA was re-examining NUPLAZID. (Doc. No. 48 ¶¶ 19, 125.) Defendants argue that the announcement of an investigation without more is insufficient to establish loss causation. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *Mauss v. Nuvavsive, Inc.*, No. 13-cv-2005 JM (JLB), 2014 WL 6980441, at *6–7 (S.D. Cal. Dec. 9, 2014). Further, Defendants allege the investigation alleged to nothing being amiss and therefore, Plaintiff could not allege "more." However, the fact that the FDA affirmed its approval of NUPLAZID "does not *ipso facto* immunize [Defendants] from liability." *See In re Amgen Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *22 ("the issue before the Court is no whether the FDA ... approved Amgen's products as safe and effective, but whether Defendants violated securities laws.") Thus, Plaintiff has alleged loss causation for the stock drop on April 25, 2018.

**\*9** On July 9, 2018, the stock dropped following the SIRF report that cited to data on Defendants' payments to doctors and NUPLAZID prescriptions and alleged that Defendants must have been "dispensing wads of cash to doctors to incentivize prescription writing." (Doc. No. 52-1 at 32.) Defendants allege that this report also simply rehashed the CNN article and the data regarding payments was already public. Defendants explain that repackaging public information does not constitute a disclosure. Further, Defendants argue that using public information to form an opinion is really only disclosure of the opinion itself. *See Meyer*, 710 F.3d at 1199. However, as pled, the allegations create a sufficient connection between the misrepresentations and the decline in stock price. *See Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*, No. 10CV2502-CAB (DHB), 2013 WL 12123841, at *7–8 (S.D. Cal. Mar. 22, 2013).

Thus, the Court **DENIES** Defendants' motion to dismiss regarding loss causation.

### vi. Section 20(a)

Section 20(a) imposes liability on control persons. 15 U.S.C. § 78t(a). "To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5." *Kelly v. Electronic Arts, Inc.*, 71 F. Supp. 3d

2020 WL 2838686

1061, 1068 (N.D. Cal. 2014). Since Plaintiff has adequately pled a Section 10(b) claim and Defendants only challenged Plaintiff's Section 20(a) claim on that basis, the Court finds that Plaintiff has adequately pled a Section 20(a) claim. Accordingly, the Court **DENIES** Defendants' motion to dismiss regarding Section 20(a).

### IV. CONCLUSION

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants' motion to dismiss. Plaintiff

must ensure that the statements upon which he bases his allegations are actionable statements. Plaintiff will have **forty-five (45) days** from the date of this Order to file an amended complaint addressing the deficiencies noted herein.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2838686

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

2007 WL 551574
United States District Court,
N.D. Illinois,
Eastern Division.

In re BALLY TOTAL FITNESS
SECURITIES LITIGATION.

Nos. 04 C 3530, 04 C 3634, 04 C 3713, 04 C 3783,
04 C 3844, 04 C 3936, 04 C 4697, 06 C 1437.
|
Feb. 20, 2007.

## MEMORANDUM OPINION

JOHN F. GRADY, United States District Judge.

 **\*1** Before the court are defendants' motions to dismiss the amended consolidated class action complaint. For the reasons explained below, the motions are granted.

## BACKGROUND

Plaintiffs have filed several related securities fraud putative class actions against Bally Total Fitness Holding Corporation ("Bally"); three former officers and directors of Bally, Lee S. Hillman, John W. Dwyer, and Paul A. Toback;[1] and Bally's former auditor, Ernst & Young LLP ("E & Y"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 240.10b-5. Plaintiffs allege that defendants violated federal securities laws by publicly disseminating false and misleading corporate reports, financial statements, and press releases primarily through "two related fraudulent techniques": improperly recognizing revenue prematurely and improperly delaying the recordation of expenses. (Amended Consolidated Class Action Complaint ("ACCAC") ¶ 5.)

Lead plaintiff Cosmos Investment Company, LLC previously filed a consolidated class action complaint on behalf of a class consisting of those who purchased or acquired Bally securities between August 3, 1999 and April 28, 2004, inclusive. Defendants' motions to dismiss the consolidated class action complaint were granted. *See In re Bally Total Fitness Sec. Litig.,* Nos. 04 C 3530 et al., 2006 WL 3714708 (N.D.Ill. July 12, 2006) (*"Bally I"* ). Plaintiffs were given leave to file, and did file, an amended consolidated class action complaint (the "amended complaint"). Defendants now move to dismiss the amended complaint.[2]

Our opinion in *Bally I* contained a detailed recitation of plaintiffs' allegations, which will not be repeated here.[3] Instead, we will describe the changes and additions plaintiffs have made to the complaint. The primary substantive additions are allegations relating to four witnesses-three confidential witnesses as well as David Laird, a former owner of a Planet Fitness, a group of fitness centers that was acquired by Bally during the Class Period. Plaintiffs have also added allegations relating to the following: overstated earnings figures; inadequate accounting controls; the Audit Committee's findings, the preparation of Bally's original Restatement, and a Bally December 1, 2005 conference call with analysts; executive compensation; Bally's discontinuation of defendants Hillman and Dwyer's severance pay; a criminal investigation that was announced in February 2005; and "red flags."

## DISCUSSION

A complaint alleging violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder must allege that the defendant (1) made a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff justifiably relied, and (6) that the false statement or omission proximately caused the plaintiff's injury. *Otto v. Variable Annuity Life Ins. Co.,* 134 F.3d 841, 851 (7th Cir.1998). Because plaintiffs allege securities fraud, not only do the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply here, *see Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990), but also the even more stringent fact-pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4 *et seq., see Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 594 (7th Cir.2006), *cert. granted,* 127 S.Ct. 853 (2007).

 **\*2** The primary issue before us is whether the amended complaint adequately alleges defendants' scienter with sufficient, particularized facts.[4] In *Makor Issues,* the Seventh Circuit discussed the PSLRA scienter requirement as follows:

Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud.

437 F.3d at 594-95 (some internal quotation marks omitted). "[T]he best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish [a "strong"] inference [of scienter]." *Id.* at 601. "Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 602.

In *Bally I,* we found that plaintiffs had not adequately pled scienter. More specifically, we found that Bally's February 2005 press release and the Audit Committee's findings were vague and unspecific as well as hindsight conclusions and thus did not support an inference of scienter; that the characteristics of the Restatement did not support an inference of scienter; that plaintiffs' "motive and opportunity" allegations were insufficient to establish scienter; and that Bally's violation of its own internal accounting policies did not assist plaintiffs in establishing that the misstatements were made with the requisite intent. We noted that, with regard to the Individual Defendants, there were no allegations of circumstances suggestive of scienter, such as large insider stock sales or specific meetings during which particular financial representations were discussed. Because plaintiffs failed to allege facts giving rise to a strong inference that anyone acting for Bally had the requisite state of mind, they failed to adequately allege scienter against Bally. As for E & Y, we found that the alleged accounting errors, the characteristics of the Restatement and Bally's violation of its internal accounting policies failed to support an inference of scienter and that plaintiffs' "red flag" allegations were insufficient to support an inference of scienter. Taking all plaintiffs' allegations together, we found that plaintiffs had failed to allege sufficient particularized facts to give rise to a strong inference that the defendants acted recklessly or intentionally.

**\*3** In an attempt to remedy the scienter deficiencies of the original complaint, plaintiffs have repackaged some of their original allegations. In *Bally I,* we commented on plaintiffs' previous allegations of Bally's reported financial results, which showed that revenue was sometimes understated and losses sometimes overstated. Plaintiffs have now restyled those financial results (omitting the quarterly results unfavorable to them) and allege that "earnings were inflated or loss understated in a consistent pattern." (ACCAC ¶¶ 27, 180.) These repackaged allegations regarding the restated earnings do not alter our prior conclusion, which is that we can infer from the magnitude of the restatement that significant mistakes were made, but not that defendants acted with the required recklessness or deliberate intent. *See Davis v. SPSS, Inc.,* 385 F.Supp.2d 697, 714 (N.D.Ill.2005) (*"Davis I"* ) ("Restatements establish that misleading statements were made, but ... provid[e] no assistance in determining the intent behind the misstatements.").

In addition, plaintiffs have merely boldfaced certain original allegations regarding inadequate accounting controls, adding nothing new. The amended complaint also reiterates the prior allegations of the Audit Committee's findings as set forth in the February press release, adding only that some of these acknowlegments of prior accounting errors were repeated by Toback and Bally's then-CFO Carl Landeck in a conference call that took place on December 1, 2005 (ACCAC ¶ 184), and that errors discovered during the preparation of the original Restatement should have alerted defendants to the possibility that additional errors existed and that internal controls were flawed (ACCAC ¶¶ 182-183).[5] These new allegations, like the prior ones, do not support an inference of scienter because they are vague and unspecific[6] as well as hindsight conclusions that do not assist in determining the state of mind behind the misstatements at the time they were made. *See Davis I,* 385 F.Supp.2d at 714 ("Permutations of 'fraud by hindsight' do not create an inference, much less a strong inference, of *scienter."* ).

Plaintiffs also have made certain substantive additions to the amended complaint. The amended complaint includes additional details regarding executive compensation, the discontinuation of severance pay to Hillman and Dwyer, a criminal investigation that was announced in February 2005, and "red flags" that allegedly should have alerted E & Y to the risk of fraud. Also included are statements by four witnesses.

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

We will consider each category of additional allegations in turn.

### Executive Compensation

Plaintiffs now have included details of the Individual Defendants' compensation, including incentive-based bonuses, for the entire Class Period instead of for a single year. (ACCAC ¶¶ 39-41, 405.) Even considering the additional detail, our conclusion in *Bally I* still applies to the compensation allegations: "Regarding the motive to earn bonuses and awards, we agree with the view of numerous courts that these allegations are too common among corporations and their officers to be considered evidence of scienter." *Bally I,* 2006 WL 3714708, at *9 (citing, *inter alia, Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 434 (5th Cir.2002) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.... It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.")).

### Discontinuation of Severance Pay

**\*4** Plaintiffs alleged in the original complaint that Bally's Audit Committee announced as part of its findings in February 2005 that Hillman and Dwyer had been responsible for a culture of "aggressive accounting" and that their severance pay was being discontinued. We held that none of the Audit Committee's findings assisted plaintiffs in raising an inference of scienter; the term "aggressive accounting" was unspecific, and the findings were hindsight conclusions. *Bally I,* 2006 WL 3714708, at *7.

Plaintiffs have now added allegations that Bally's termination of Hillman and Dwyer's severance pay "effectively amounted to termination for 'cause' " and that "it must be inferred that both Hillman's and Dwyer's severance were terminated because they had, during the Class Period, engaged in fraud or dishonesty." (ACCAC ¶ 22.) The amended complaint further alleges:

> 398. Hillman's 2002 Amended and Restated Employment Agreement provided that he was to receive severance unless terminated for Cause. Cause is defined as:
>
> > (i) fraud or dishonesty;
> >
> > (ii) failure to cease and/or cure willful misconduct or gross negligence in the performance of his duties, after 30 days written notice; or

> > (iii) failure to cure a material breach of the agreement after 30 days written notice
>
> 399. Hillman was not employed by the Company when it terminated his severance and decided to explore legal action against him. Therefore, his severance could not have been terminated based on a failure to cure misconduct in his duties or a breach of the agreement after written notice. While Bally's February 16, 2005 press release characterizes the reason for Hillman's termination as "misconduct," the only misconduct that would permit Bally to terminate his severance for cause was fraud or dishonesty. Thus, in the context of its investigation into Bally's false and misleading accounting which led to the Restatement, Bally found Hillman to have engaged in fraud or dishonesty during the Class Period in connection with Bally's materially false and misleading public statements regarding Bally's accounting, financial results, and controls.
>
> 400. Similarly, Bally's termination of severance to Dwyer constitutes a finding that he engaged in fraud, dishonesty, illegal conduct or gross misconduct. Upon his resignation, Dwyer entered into a General Release and Settlement Agreement ("Settlement Agreement") that provided for severance compensation and a role as a consultant. The Settlement Agreement provides that Dwyer's consultancy and severance compensation may only be terminated for "cause" under the following circumstances:
>
> > i. He is found guilty of violating a law based on his acts or omissions while he was employed by Bally;
> >
> > ii. **A good faith determination by Bally that during his employment he engaged in fraud, dishonesty, illegal conduct or gross misconduct; and/or**
> >
> > iii. During the consultancy period, he failed to perform his duties as required.
>
> **\*5** 401. Dwyer's severance was terminated in the context of the Audit Committee's findings of his responsibility for the accounting manipulations at Bally and his making a false and misleading statement to the SEC. As a result, the only possibility is that Bally found Dwyer to have engaged in fraud, dishonesty, illegal conduct or gross misconduct during the Class Period in connection with Bally's materially false and misleading public statements regarding Bally's accounting, financial results, and controls.

(ACCAC ¶¶ 398-401.)

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

Hillman argues that he was not terminated by Bally-he resigned-and that the 2002 Amended and Restated Employment Agreement referred to in ¶ 398 was expressly superseded by a Separation Agreement he and Bally entered into in December 2002 upon his resignation. The Separation Agreement, which is attached as Amended Exhibit E to Hillman's memorandum in support of his motion, indeed states that it supersedes all prior agreements and that the 2002 Amended and Restated Employment Agreement is "null and void and of no further force and effect." (Hillman's Mem. in Support of Mot., Am. Ex. E, ¶ 11.) Plaintiffs do not directly respond to Hillman's argument, but merely contend that they are "entitled to the reasonable inference that Bally believed it had a right to terminate Hillman's severance for cause, and did so based on the terms of his Employment Agreement." (Pls.' Mem. in Opp'n to the Bally Defs.' Mots. at 30 n. 12.) We reject this argument. Plaintiffs are not entitled to an inference that Bally terminated Hillman's severance pay based on an agreement that was deemed "null and void" by Bally and Hillman years before the severance pay was discontinued. That would be a wholly *unreasonable* inference.[7]

The allegations as to Dwyer also fail to contribute to any inference of scienter. It does not necessarily follow from the fact of the severance discontinuation, as plaintiffs allege, that "the only possibility is that Bally found Dwyer to have engaged in fraud, dishonesty, illegal conduct or gross misconduct during the Class Period." (ACCAC ¶ 401.) We disagree. As plaintiffs themselves allege, there are two other provisions pursuant to which Dwyer's severance pay could be terminated in accord with the Settlement Agreement. Moreover, plaintiffs assume that Bally terminated Dwyer's severance pay in accord with the Settlement Agreement rather than in violation of the agreement. Bally's decision to discontinue severance pay to Hillman and Dwyer simply does not support an inference of scienter as to either defendant; it does not shed light on determining the state of mind of Hillman and Dwyer at the time the financial misstatements were made, nor is it particularized to any specific misstatements.

### Announcement of Criminal Investigation

One of plaintiffs' new allegations is that Bally announced in a February 16, 2005 press release that the office of the United States Attorney was conducting a criminal investigation into Bally's prior accounting practices. But the fact that an investigation was opened does not support an inference of scienter on the part of anyone. Plaintiffs do not allege any other facts about the investigation or that the United States Attorney took any action as a result of the investigation.

### Witness Allegations

**\*6** There are new allegations relating to four witnesses, three of whom are confidential witnesses. The Seventh Circuit has held that while plaintiffs are not required to provide "name, rank, and serial number" for confidential sources, they must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Makor Issues,* 437 F.3d at 596 (internal quotation marks omitted). "[V]ague statements of confidence are insufficient to establish a witness' reliability," and "any information witnesses received second- or third-hand is insufficient to establish its reliability." *Davis v. SPSS, Inc.,* 431 F.Supp.2d 823, 831 (N.D.Ill.2006) ( *"Davis II"* ). When assessing the particularity of confidential witness allegations, a court should examine "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29-30 (1st Cir.2002); *see also California Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 147 (3d Cir.2004).

We will begin with plaintiffs' non-confidential witness, David Laird.

### David Laird

The Laird allegations arise out of an action filed by Laird and others against Bally, Toback, Hillman, and Dwyer in the United States District Court for the District of Massachusetts (the "Massachusetts Action").[8] Laird is the former owner of Planet Fitness, a chain of fitness centers that Bally acquired for cash and Bally stock in spring 2002. He and his co-plaintiffs alleged a variety of claims sounding in contract and fraud in relation to the sale of the fitness centers. The amended complaint in the instant case contains allegations taken from both the complaint in the Massachusetts Action (the "Massachusetts Complaint") and an affidavit Laird filed in conjunction with the Massachusetts Action (the "Laird Affidavit"). Most of the allegations contained in the Massachusetts Complaint are irrelevant to defendants' scienter in this case. The portions that plaintiffs highlight are as follows: (1) the allegation in the Massachusetts Complaint that during the negotiations for the purchase of Planet Fitness,

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

Hillman told Laird's partner, Scott Baker, that Bally stock was a "bargain" at $23 per share and that Bally would "continue to grow its earnings" (ACCAC ¶ 99); and (2) the allegations in the Laird Affidavit pertaining to Toback's alleged "Starter Kit Scheme" (ACCAC ¶¶ 104-111).

The alleged comments by Hillman that the stock was a bargain and that Bally would continue to "grow" its earnings are classic examples of sales "puffing" and general corporate optimism, which are immaterial for purposes of the federal securities fraud laws.[9] *See In re Ford Motor Co. Sec. Litig.,* 381 F.3d 563, 570 (6th Cir.2004); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996) (statements about earnings optimism are mere puffery); *In re Staffmark, Inc. Sec. Litig.,* 123 F.Supp.2d 1160, 1173 (E.D.Ark.2000) (statement that company's stock was undervalued was puffery). Moreover, plaintiffs' contention that Hillman knew that the stock was "artificially inflated" does not follow from Hillman's statement that Bally's stock was a "bargain."

**\*7** With respect to the alleged "Starter Kit Scheme," Laird states in his affidavit that Toback boasted that he had originated the idea to introduce "supplemental services" (such as personal training, juice bars, and sales of dietary supplements) to Bally's health clubs, Toback was in charge of the program, and Bally's clubs made half of their profits from the supplemental services. (ACCAC ¶¶ 105-106.) To promote the supplemental services, Bally created a "Starter Kit" for new members that contained samples of protein shakes, dietary supplements, energy bars, and the like. After Bally bought the Planet Fitness clubs, Laird (who was still involved in the operation of the clubs) was told by Bally representatives that each new member was to receive a Starter Kit after the three-day period during which the member could rescind his or her contract. (ACCAC ¶ 107.)

When some problems arose regarding storing and displaying the Starter Kits, Laird called Sandor Feher, who was Bally's regional vice president for Laird's region. During their conversation, Feher told Laird that Bally actually did not want Laird's clubs to distribute the Starter Kits. "As Mr. Feher explained it, Bally would book some revenue for the sale of each Starter Kit at the time the new member signed up-that is, part of the initiation or prepayment fee would be allocated to the sale of the Starter Kit. But once that sale was booked, Bally had no interest in actually making sure that the member *got* the Starter Kit." (ACCAC ¶ 108.) Feher told Laird that this "policy" of not giving members the Starter Kits came

"right from the top"-from Toback, who, according to Feher, said that "we all make more money this way ." (ACCAC ¶ 109.) Plaintiffs allege that the "Starter Kit scheme violated GAAP because ... revenue was booked without the earnings process being completed." (ACCAC ¶ 111.)

Laird's allegations regarding the "Starter Kits" are insufficient to establish scienter against any of the defendants. What Laird actually learned firsthand from Toback-that Toback created the supplemental services and that they were profitable-is innocuous. Laird does not claim to have firsthand knowledge of the crux of the matter, an alleged scheme to improperly account for revenue. Laird allegedly learned about that from Feher, which is problematic because we are left to speculate as to how Feher learned that information-firsthand? Secondhand? Rumor? The allegations are therefore unreliable and an insufficient basis for an inference of scienter. *See, e.g., Davis II,* 431 F.Supp.2d at 831 (rejecting plaintiffs' attempt to establish scienter through secondhand information).

Another reason why Laird's testimony is insufficient to establish scienter, as defendants Bally and Toback point out, is that it does not concern Bally's corporate-level accounting. Even if the "Starter Kit" allegations were reliable, Laird is unable to provide any information about what relevance the purported scheme had to what Bally ultimately reported on its financial statements. Courts have rejected descriptions of localized problems by local employees as a sufficient basis for scienter because those employees do not and cannot know whether or how such problems were incorporated into the company's overall financial statements. *See, e.g., id.* at 832 (rejecting witnesses' statements about an employee's accounting scheme as a basis for scienter where it was unclear whether or how the employee's "conduct was integrated into the company's world-wide financials").

**\*8** The Laird allegations fail to raise an inference of scienter. We now turn to the confidential witnesses.

*CW1*

It is alleged that CW1 was "one of several Area Directors of Bally" from early 2002 to late 2003. He was responsible for managing a group of clubs in a particular area and reported to one of four regional vice presidents who then reported to "top executives." (ACCAC ¶ 112.) CW1 states that he had "run" several fitness clubs prior to joining Bally and as a result "became familiar with proper accounting for fitness membership revenue and expenses and product sales under GAAP." (ACCAC ¶ 113 .)

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 97 of 306 PageID #:2053

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 551574, Fed. Sec. L. Rep. P 94,164

CW1 attended quarterly meetings at Bally's corporate offices in Chicago at which financial results were discussed. Present at the meetings were all area directors and regional vice presidents, as well as Bally's top executives, including Hillman, Dwyer, and Toback. CW1 attended two meetings where Hillman was present, and concluded that, "based on Hillman's comments at these [ ] meetings regarding Bally's financial results, Hillman was familiar with every aspect of Bally's financial results and operations. According to CW1, no policies were implemented at Bally without Hillman's knowledge and approval." (ACCAC ¶ 115.)

A reasonable person could not infer from CW1's statements about Hillman that Hillman acted with the requisite recklessness or intent. CW1 does not allege that he ever spoke with Hillman or had knowledge of any specific reports or materials that Hillman reviewed that would have put him on notice of improper accounting. Instead, CW1's statements are sweeping generalizations based on Hillman's comments (none of which are specifically alleged) about the company at a quarterly meeting. It strikes us that CW1's conclusions about Hillman are another species of the "must have known" allegations about senior executives that we rejected in *Bally I,* 2006 WL 3714708, at *9.

The complaint also contains the following allegations from CW1 concerning the supplemental services offered by Bally:

116. In addition to being an Area Director, CW1 was entitled to certain additional compensation based on the earnings of the Bally clubs for which he had responsibility. As a result, CW1 had numerous one-on-one discussions with Toback, in the form of telephone conversations and at the quarterly meetings, regarding the accounting for various aspects of revenue and expenses.

117. As part of these discussions, CW1 had several conversations with Toback in the Fall of 2002 regarding the Starter Kit scheme described above and in the Laird Affidavit.

118. Bally was providing products to CW1 to hand out in Starter Kits, including nutritional bars and supplements, that were expired and could not be given out to new members to complete the sale. CW1 expressed his concerns to Toback that CW1 was not getting credit towards his additional compensation for sales of Starter Kit products because he was not actually delivering them to members, and therefore the revenue could not be taken under

provisions of GAAP. Toback told CW1, "don't worry, you will be given credit for product sales." When CW1 questioned Toback as to how this was possible if the sale wasn't completed, Toback told CW1 that revenues would be recognized in spite of the fact that the Starter Kits were not being delivered to new members.

 **\*9** 119. CW1 knew from conversations with other Area Directors that the Starter Kit scheme was widespread and that Starter Kits were not being delivered to members at the majority of Bally's locations.

120. According to CW1, Toback explicitly stated that Bally's method of accounting for the Starter Kit revenue in this manner had "been approved by E & Y."
(ACCAC ¶¶ 116-120.) CW1 also alleges "[a] similar accounting scheme" for revenue from sales of personal training. According to CW1, Toback pushed area directors to sell personal training services to new members and told CW1 that Bally would recognize the revenue immediately, even before the services were performed, and CW1 would get credit for the revenue in the calculation of his additional compensation. (ACCAC ¶ 121.) When questioned in fall 2002 by CW1, Toback said that if members didn't use the services, it was better for Bally because it could take the revenue without paying for the personal trainers and that this accounting had been explicitly approved by E & Y. (ACCAC ¶¶ 122-23.)

It is further alleged:

126. ... Bally prepared two separate sets of financial statements and accounted for revenue and expenses differently for different purposes.

127. The monthly reports that CW1 received as an Area Director-and that formed the basis of Bally's publicly reported financial statements-had one set of figures based on Bally's improper accounting practices. According to this set of numbers, CW1's clubs were extremely successful financially.

128. The second set of financial statements, which CW1 received quarterly from Ted Noncek and which formed the basis for CW1's additional compensation, claimed CW1's clubs were performing poorly. **Unlike the first set of numbers, this second set of financial statements was prepared in accordance with GAAP.** Thus, Bally knowingly reported inflated earnings in its publicly filed financial statements while, for the purpose of calculating CW1's additional compensation, internally accounting for

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

earnings in compliance with GAAP, resulting in drastically reduced earnings.

(ACCAC ¶¶ 126-128.)

Plaintiffs argue that it is reasonable to infer that because CW1 had managed various fitness clubs, he knew how to properly account for their revenue on a consolidated, company-wide basis under GAAP. We disagree. CW1's allegations are unreliable because he cannot testify competently about accounting matters. CW1 was not an accountant; like David Laird, CW1 did not work at corporate headquarters, and he was not privy to Bally's bookkeeping practices. It is clear that CW1's perspective on accounting was limited to the question of what commissions he would receive-in other words, what was in it for him. "Giving credit" to CW1 for product sales does not equate to a company-wide decision about revenue recognition. The allegations that Toback stated that certain methods of accounting had been approved by E & Y actually cut against an inference of scienter. And as against E & Y, CW1 does not purport to have personal knowledge of what E & Y knew at the time of the audits.

**\*10** As for the "two sets" of financial statements, these allegations are entirely too vague to permit an inference of wrongdoing. The complaint does not tell us anything about the specific contents of the reports, their intended use, who prepared them, who reviewed them, what GAAP principles were violated, or how the statements affected Bally's company-wide statements. Plaintiffs do not meet the requirement of alleging fraud with particularity simply by stating that the two sets of statements showed operations as "extremely successful financially" and "performing poorly." It is not even alleged that the two sets of statements were measuring the same things or that they contained the same categories of financial information.

Because CW1's allegations are unreliable and because they are not supported with particularized facts, they fail to provide a basis for an inference of scienter.

*CW2*

CW2's allegations are very brief. CW2 was a "senior executive" in Bally's marketing department from late 2003 to early 2005[10] "who participated in numerous meetings with senior executives, including Toback and Dwyer, addressing issues related to members." (ACCAC ¶ 388.) In mid- to late-2004, CW2

participated in meetings with Toback and Dwyer in which each of them acknowledged that Bally improperly recognized revenue prematurely when signing up new members by claiming the entire contract dollar amount as revenue immediately rather than spreading it out over the life of the contract. According to CW2, "Toback and Dwyer knew that Bally was improperly recognizing revenue prematurely ." Toback and Dwyer had been aware of this situation for years, but failed to correct it. According to CW2, Toback and Dwyer felt "trapped in a situation they did not want to be in," but which they nevertheless continued to knowingly permit.

(ACCAC ¶ 389.) Moreover, "[a]ccording to CW2, the SEC investigation was based on its belief that the defendants had manipulated Bally's stock price." (ACCAC ¶ 390.)

Like Laird and CW1, CW2's testimony lacks reliability. CW2 was not an accountant and did not work at Bally's corporate headquarters. He fails to clear the first hurdle, which is to explain why it is likely that Toback and Dwyer would discuss a company-wide accounting matter with a marketing executive. CW2's allegations are also extremely vague. Given the adroit use of words in certain parts of the amended complaint, it is notable that plaintiffs have chosen to allege what was "acknowledged"-a fuzzy word-instead of what was actually said by Toback and Dwyer at the meetings. It is impossible to discern what part of the allegation is based on fact and what part is CW2's conclusion. Furthermore, he does not give any details about the locations or dates of the meetings he attended, who was in attendance, or what was discussed. And as for what Toback and Dwyer "knew," were "aware" of, or "felt," CW2 fails to state any basis for these conclusions. We are also perplexed by CW2's assertion regarding the SEC's belief. Given that CW2 is not alleged to have been employed by or an agent of the SEC, he cannot competently testify about that agency's "belief."

**\*11** Because CW2's allegations are unreliable and unparticularized, they fail to raise an inference of scienter. *See Davis I,* 385 F.Supp.2d at 716 (rejecting confidential witnesses' testimony as a basis for inferring scienter where no factual allegations were provided to support the assertions, such as an explanation of how the witnesses acquired their knowledge).

*CW3*

CW3 was "a Mid-Level Manager in the Accounting Department of Bally from mid-2004 through early 2005, during the time Bally was preparing its restated financial

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 99 of 306 PageID #:2055

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 551574, Fed. Sec. L. Rep. P 94,164

statements." (ACCAC ¶ 172.) CW3's only allegation is the following:

> According to CW3, during the later half of 2004, Bally's internal investigation focused on gathering financial information that existed during the Class Period in an attempt to identify how the Bally accounting entries should have been made at the time. CW3 personally participated in this process of gathering contemporaneous financial information. According to CW3, the investigation "focused on revenue recognition problems and the way in which Bally had been recording revenue and expenses."

(ACCAC ¶ 173.)

CW3 adds the least to the mix because he is not a true witness. He joined Bally after the Class Period ended and offers nothing but hindsight conclusions, which we have already rejected as a basis for inferring scienter, see *supra.* Moreover, CW3's non-specific allegations do not cover any new territory; we are already aware of the subjects of the internal investigation from plaintiffs' other allegations.

CW3's allegations fail to raise an inference of scienter.

### *Red Flags*

In *Bally I,* we considered twelve "red flag" items that plaintiffs alleged should have prompted E & Y to exercise greater professional skepticism during its audits and agreed with E & Y that plaintiffs had attempted to "cherry-pick" a handful of generalized risk factors, label them as red flags, and assemble them in order to show scienter. 2006 WL 3714708, at *13. True red flags are "specific, highly suspicious" facts or circumstances available to an auditor at the time of the audits. *Riggs Partners, LLC v. Hub Group, Inc.,* No. 02 C 1188, 2002 WL 31415721, at *9 (N.D.Ill. Oct. 25, 2002).

The amended complaint alleges the same twelve red flags, except in a different order:

  1) the employment of ineffective accounting staff

  2) the use of unusually aggressive accounting practices

  3) the failure by management to display and communicate an appropriate attitude about financial reporting

  4) ineffective information systems

  5) the failure to correct known reportable conditions on a timely basis

  6) inadequate disclosure of Bally's accounting policies

  7) the need to obtain additional debt or equity financing to stay competitive

  8) frequent acquisitions during the Class Period

  9) unusually rapid growth or profitability during the Class Period

  10) Hillman and Dwyer's previous employment with E & Y

  **\*12** 11) significant portions of management's compensation being contingent upon achieving aggressive targets for operating results

  12) senior management's significant financial interests in the company during the Class Period

(ACCAC ¶ 413.)

Because the allegations of Items 1-4 are virtually identical to those that were originally alleged, they are rejected as a basis for inferring scienter because, as explained *supra,* the Audit Committee's findings involve hindsight and do not shed light on E & Y's knowledge at the time of the audits. *See, e.g., Davis I,* 385 F.Supp.2d at 713-14 (red flags cannot arise out of later discoveries). Items 6 and 10 are also virtually the same as alleged before; our previous conclusion that they are merely risk factors that do not rise to the level of red flags stands. *See Bally I,* 2006 WL 3714708, at *13.

The original version of Item 5 (failure to correct known reportable conditions) was too weak to raise a strong inference of scienter. Plaintiffs alleged that E & Y stated in 2004 that it had been aware of material weakness in "internal accounting control" for the years 2001-2003 and took that into account in performing its audits. In our opinion, it did not follow from that allegation that there was a failure to correct a "known reportable condition"; we remarked that it was not even clear what a "known reportable condition" is. *Id.* Plaintiffs have now added a footnote explaining that a "material weakness in internal control" is a "known reportable condition" as it is defined in the Auditing Standards of the American Institute of Certified Public Accountants. (ACCAC ¶ 413(e).) Even so, we are still unpersuaded that this factor amounts to anything more than a weak risk factor. *See, e.g ., Reiger v. PricewaterhouseCoopers LLP,* 117 F.Supp.2d 1003,

In re Bally Total Fitness Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

1009 n. 5 (S.D.Cal.2000) (noting that an allegation that an audited company had weak internal accounting controls is an unparticularized boilerplate "red flag" present in almost every securities fraud action that does not raise even a weak inference of scienter).

Plaintiffs have now beefed up five purported red flags (Items 7, 8, 9, 11, and 12) that we previously found to be problematic because they were not based on any factual allegations. In Item 7, plaintiffs alleged that Bally needed to obtain additional debt or equity financing to stay competitive, but did not allege any facts to support this conclusion. Now plaintiffs allege that Bally needed to obtain additional financing because its negative ratio of assets to liabilities was lower than the industry average. (ACCAC ¶ 413(g).) They fail to allege any facts, however, showing that Bally would not have been competitive but for the financing it obtained.

Item 8 cites Bally's frequent acquisitions during the Class Period. In the original complaint, plaintiffs failed to allege any facts showing that Bally had a merger calendar that was more active than comparable entities. Plaintiffs have now added the following sentence: "Bally's acquisition activity in terms of annual acquisition costs as a percent of Bally's annual sales and total assets was significantly greater than its publicly traded competitors in at least 1999 and 2001." (ACCAC ¶ 413(h).) Because plaintiffs chose to compare Bally's acquisition activity to only two publicly-traded companies, this is a virtually meaningless assertion. Moreover, plaintiffs qualify the assertion with the phrase "in terms of annual acquisition costs as a percent of Bally's annual sales and total assets," and because there are no further facts alleged, it is unclear what plaintiffs mean by the term "significantly greater." This item does not rise to the level of a red flag.

 **\*13** The next red flag, Item 9, alleges that Bally's unusually rapid growth or profitability should have alerted E & Y to the risk of fraud. The original complaint was deficient because it did not allege unusually rapid growth when compared to other companies. Plaintiffs have now merely added an allegation that Bally's continuous financial improvement throughout the Class Period was "unusual" because it "presented a consistent trend of highly favorable results over a prolonged period." (ACCAC ¶ 413(i).) This is another conclusory, hollow assertion that fails to bolster the original allegations.

We previously rejected Items 11 and 12 (significant portions of management's compensation being contingent upon aggressive targets and senior management having had "significant financial interests in the entity") because plaintiffs failed to allege that Bally's executives had incentives or financial interests that were much larger than those of executives at comparable entities. Plaintiffs now have added some details concerning bonuses, stock options, and stock grants to Bally's five highest-paid executives and also allege that these forms of compensation were "significant to the recipients because they constituted a large portion of the recipients' annual income" and that the stock award was "unusual because Bally's [two] publicly traded competitors did not award stock to their executives." (AC CAC ¶ 413(k).) Plaintiffs also have added some details of senior management's stock holdings during the Class Period. (ACCAC ¶ 413(l).) Plaintiffs still have not adequately alleged, however, that management had incentives or stock holdings that were comparatively much larger than their counterparts. That Bally's two publicly-traded competitors did not award stock to their executives is neither here nor there because those executives may have been compensated in other ways. Moreover, it is not at all unusual for high-level executives to receive significant amounts of their compensation in stock or stock options.

In sum, the "red flags" as alleged in the amended complaint are a negligible improvement on the original "red flags." Plaintiffs have again failed to identify any specific, highly suspicious facts or circumstances available to E & Y at the time of the audits.

### The Amended Complaint as a Whole

Plaintiffs have added little of substance to the amended complaint. They have recycled their previous insufficient allegations pertaining to the magnitude of the restatement and added more insufficient "fraud by hindsight" allegations. The purported "red flags" have been revamped but still offer nothing substantial; the facts alleged by plaintiffs are insufficient to meet the "especially stringent" standard for an outside auditor's recklessness under the PSLRA, which is "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company." *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 693 (6th Cir.2004) (internal quotation marks omitted).

 **\*14** None of plaintiffs' four new witnesses held positions during the relevant time that rendered them privy to Bally's contemporaneous bookkeeping, let alone to the specific accounting that went into the company's financial reporting. The witnesses' testimony also suffers from reliability and vagueness problems. "A court cannot aggregate allegations

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

relying on confidential witnesses' testimony that have not been pleaded with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.,* 388 F.Supp.2d 932, 945 (S.D.Ind.2005).

As in *Bally I,* plaintiffs argue that the facts alleged, when considered in their totality, permit the reasonable inference that defendants acted knowingly or recklessly. (Pls.' Mem. in Opp'n to the Bally Defs.' Mots. at 4-5.) They cite *Makor Issues* for the proposition that when faced with "two seemingly equally strong inferences" regarding scienter, one favoring the plaintiffs and one favoring the defendants, it is inappropriate for the court to make a determination as to which inference will ultimately prevail. 437 F.3d at 602. The problem with the amended complaint, however, is that we are unable to draw two seemingly equally strong inferences. The amended complaint simply fails to allege facts with particularity that give rise to a strong inference of scienter.[11] The inference must not only be reasonable; it must be strong, and the amended complaint again fails to meet this standard.[12]

### Dismissal

Count I of the amended complaint, the § 10(b) claim, will be dismissed. Count II, the § 20(a) "control person" claim against the Individual Defendants, will also be dismissed because if there is no actionable underlying violation of the securities laws, there can be no control person liability. *See Sequel Capital, LLC v. Rothman,* No. 03 C 678, 2003 WL 22757758, at *17 (N.D.Ill. Nov. 20, 2003); *In re Allscripts, Inc. Sec. Litig.,* No. 00 C 6796, 2001 WL 743411, at *12 (N.D. Ill. June 29, 2001).

Defendants ask the court to dismiss the amended complaint without leave to amend and with prejudice. At the conclusion of their brief in response to E & Y's motion to dismiss (but not in their brief in response to the Bally Defendants' motion to dismiss), plaintiffs make only a cursory request for leave

to amend their complaint yet again. They do not provide a proposed second amended complaint or offer any indication of what additional facts they would plead.

In *Bally I,* we pointed out numerous deficiencies in the original complaint with regard to scienter, and we gave plaintiffs leave to amend. The amended complaint failed to cure those deficiencies, and plaintiffs fail to propose another amendment that would meet the stringent pleading requirements of the PSLRA. The court has devoted a great deal of time and effort evaluating both the original complaint and the amended complaint and issuing detailed opinions. We see no indication that plaintiffs can file an amended complaint that would survive another motion to dismiss. Under these circumstances, we will dismiss the amended complaint with prejudice. *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 391 (9th Cir.2002) (dismissal with prejudice of securities fraud complaint was proper where plaintiffs "failed to come forward with additional facts that would meet the scienter pleading requirement"); *Davis II,* 431 F.Supp.2d at 833-34 (denying leave to amend and dismissing complaint with prejudice in PSLRA action where plaintiffs twice had failed to adequately plead scienter and court was confident plaintiffs had given it their "best shot").

### CONCLUSION

**\*15** For the foregoing reasons, the following motions to dismiss the amended consolidated class action complaint are granted: (1) the motion of Lee S. Hillman; (2) the motion of John W. Dwyer; (3) the motion of Bally Total Fitness Holding Corporation and Paul A. Toback; and (4) the motion of Ernst & Young LLP. The amended consolidated class action complaint is dismissed with prejudice.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 551574, Fed. Sec. L. Rep. P 94,164

Footnotes

1  We will refer to Hillman, Dwyer, and Toback collectively, where appropriate, as the "Individual Defendants."
2  Four separate motions to dismiss the amended complaint have been filed by (1) Bally and Toback; (2) Hillman; (3) Dwyer; and (4) E & Y.
3  One fact that has changed since *Bally I* was issued is that defendant Toback is no longer Bally's CEO.
4  As noted in *Bally I:*

2007 WL 551574, Fed. Sec. L. Rep. P 94,164

To satisfy the scienter requirement of § 10(b) and Rule 10b-5, a plaintiff must demonstrate that a defendant either had the "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976), or a "reckless disregard for the truth of the material asserted, whether by commission or omission," *Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776, 789 (7th Cir.1992) (internal quotation marks omitted). "[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977), *cited in Makor Issues,* 437 F.3d at 600.

"Congress did not, unfortunately, throw much light on what facts will suffice to create [a strong inference of scienter]. Currently three different approaches toward the way to demonstrate the required 'strong inference' exist among the courts of appeals." *Makor Issues,* 437 F.3d at 601. One approach is to allow plaintiffs to state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious misbehavior. The second approach declines to adopt the "motive and opportunity" analysis and imposes a more onerous burden of pleading in great detail facts constituting strong circumstantial evidence of deliberately reckless or conscious misconduct. *See id.* (summarizing case law). In *Makor Issues,* the Seventh Circuit chose the middle ground, which neither adopts nor rejects particular methods of pleading scienter, such as alleging facts showing motive and opportunity, but instead requires plaintiffs to plead facts that together establish a strong inference of scienter. *See id....* Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient." *Id.*

...

... [T]he "group pleading doctrine," pursuant to which scienter allegations made against one defendant could be imputed to all other defendants in the same action, did not survive the heightened pleading requirements of the PSLRA. *See id.* at 603. "While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." *Id.*

2006 WL 3714708, at *5-6 (emphasis omitted).

5 Plaintiffs have also added the following allegation: "[B]ased on the factual findings of its extensive internal investigation, Defendants Hillman and Dwyer personally caused Bally to recognize membership revenue improperly, despite the fact that there was no reasonable empirical basis to do so. What Hillman and Dwyer implemented, Toback knowingly or recklessly ignored." (ACCAC ¶ 199.) This is a conclusory allegation that is based on the unspecific hindsight conclusions of the Audit Committee, which we have rejected as a basis for inferring scienter. The fact that plaintiffs repeat the allegation several times throughout the amended complaint does not render it any more substantial.

6 Examples of these vague allegations are Toback's statement that when he became CEO in December 2002, "Bally was in the midst of an operational decay, coupled with a lack of faith in our accounting" and Landeck's statement that in 2005, there was a "lack of discipline in the accounting area." (ACCAC ¶ 29.)

7 Furthermore, we find it disheartening that even though both Hillman and Dwyer entered into separation agreements upon their resignations from Bally and that plaintiffs expressly rely on the separation agreement with respect to Dwyer, they completely ignore it with respect to Hillman and instead attempt to create the misleading impression in the amended complaint that Hillman's Employment Agreement was still in effect at the time of the discontinuation of his severance pay.

8 The case is now closed. Hillman and Dwyer's motions to dismiss for lack of personal jurisdiction were granted, and all remaining claims were then dismissed with prejudice in late 2006.

9 "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor Issues,* 437 F.3d at 596.

10 Defendant Hillman had already left Bally by the time CW2 began employment.

11 Plaintiffs assert that in the event they have not adequately pled scienter against the Individual Defendants, we can impute scienter to Bally by virtue of the scienter of its non-defendant agents. Plaintiffs point to the Audit Committee's finding that Bally's vice president and controller, Ted Noncek, and vice president and treasurer, Geoff Scheitlin, had engaged in "improper conduct." (Pls.' Mem. in Opp'n to the Bally Defs.' Mots. at 11 n. 4 .) We are unpersuaded. "Improper conduct" is a vague allegation that tells us nothing about the nature of the conduct, let alone the state of mind of Noncek or Scheitlin.

12 In view of this ruling, we need not address E & Y's alternative argument that the amended complaint should be dismissed for failure to allege loss causation.

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

2016 WL 5390533
United States District Court, S.D. California.

IN RE: BOFI HOLDING, INC.
SECURITIES LITIGATION.

Case No. 3:15-CV-02324-GPC-KSC
|
Signed 09/27/2016

**ORDER:**

**DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**

[ECF No. 37]

**GRANTING DEFENDANTS' MOTION TO SEAL**

[ECF No. 42]

**DENYING PLAINTIFFS' MOTION TO STRIKE**

[ECF No. 45]

**GRANTING PLAINTIFFS' MOTION TO SEAL**

[ECF No. 46]

Hon. Gonzalo P. Curiel, United States District Judge

**\*1** Plaintiffs, purchasers of BofI's common stock, have sued BofI and a number of its corporate officers for misrepresenting the risk involved in investing in its internet bank. On February 1, 2016, the Court consolidated two related securities class actions, *Golden v. BofI Holding Inc., et al*, Case No. 15-cv-02324-GPC-KSC (S.D. Cal.) and *Hazan v. BofI Holding, Inc. et al*, Case No. 15-cv-02486-GPC-KSC (S.D. Cal). ECF No. 23. At that time, the Court appointed Houston Municipal Employees Pension System (HMEPS) as lead plaintiff of the class action suit pursuant to 15 U.S.C. § 78u–4(a)(3). *Id.* HMEPS then filed a Consolidated Amended Class Action Complaint on April 11, 2016. ECF No. 26. The

Consolidated Amended Class Action Complaint ("CAC" or "the Complaint") asserts 1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and 2) violations of Section 20(a) of the Exchange Act. ECF No. 26. Presently before the Court is a motion to dismiss filed by Defendants BofI Holding Inc., Gregory Garrabrants, Andrew J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas (collectively "Defendants"). ECF No. 26. Defendants seek to dismiss both of Plaintiffs' claims on the theory that Plaintiffs have failed to meet the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), which requires that Section 10(b) claims plead both fraudulent misrepresentation and scienter with particularity. ECF No. 37-1 at 8.[1]

**BACKGROUND**

Founded in 1999, BofI[2] is a federally-chartered internet bank that operates from its headquarters in San Diego, California. *See* CAC ¶ 3. BofI is not your run-of-the-mill bank. Instead of relying on brick-and-mortar branches to generate business, BofI offers its products through retail distribution channels, such as websites, online advertising, a call center of salespeople, referrals from financial advisory firms, and referrals from affinity groups. *Id.* BofI is in the business of providing consumer and business products, including checking, savings, and time-deposit accounts, and services, such as financing for residential and commercial real estate, business, and vehicles. *Id.* ¶¶ 2-3. BofI is also in the business of consumer and business lending. *Id.* ¶ 30. BofI engages in Single Family Mortgage Secured Lending, MultiFamily Mortgage Secured Lending, Commercial Real Estate Secured and Commercial Lending, Specialty Financial Factoring, Prepaid Cards, and Auto, RV, and other consumer-related lending. *Id.* ¶ 30.

BofI has grown tremendously in recent years. *Id.* ¶ 5. Over the last five years, total deposits increased to $5.2 billion, signaling 235% growth, and net income increased from $20.6 million in fiscal year 2011 to $82.7 million in fiscal year 2015. *Id.* Development of the bank's loan portfolio propelled BofI's growth during these years. *Id.* ¶ 42. From 2011 to 2015, BofI's loan portfolio grew from $1.33 billion to $5 billion, representing 274% in growth. *Id.* By the end of calendar year 2015, BofI had a loan portfolio worth $5.715 billion. *Id.* ¶ 30. From September 4, 2013 to February 3, 2016 (the putative "Class Period"), Plaintiff HMEPS and other class members similarly situated purchased BofI's common stock.

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

*Id.* ¶ 1. During the Class Period BofI's stock reached a high of $142.54 per share, representing a 1,100% increase over its initial public offering of $11.50 per share in 2005. *Id.* ¶ 6. As of January 22, 2016, HMEPS had 63,032,258 in common stock shares outstanding. *Id.* ¶ 32.

**\*2** On October 13, 2015, *The New York Times* reported that a formal internal auditor at BofI had filed a federal whistleblower lawsuit ("the *Erhart* Case")[3] alleging that BofI was engaged in widespread misconduct. *Id.* ¶ 20. After the *Erhart* Case was filed, the price of BofI's stock fell by $10.72 per share (or $42.87 per share on a pre-split adjusted basis), or 30.2%, and closed at $24.78 on October 14, 2016. *Id.* ¶ 21. The total capital loss amounted to $675 million. *Id.* The price of Defendants' stock then continued to decrease through February 3, 2016 (i.e., the last day of the Class Period). *Id.* ¶ 22. Plaintiffs now allege that the decline in the market value of BofI's securities caused Plaintiffs to suffer significant damages. *Id.*

In addition to BofI, Plaintiffs have named five individuals as defendants in this action, all of whom served as BofI executives throughout the Class Period. Gregory Garrabrants is the CEO, President, and Director of BofI. *Id.* ¶ 33. He has held the CEO position since 2007 and been President and Director since 2008. *Id.* Andrew J. Micheletti is BofI's Executive Vice President and Chief Financial Officer, and has held those positions throughout the Class Period. *Id.* ¶ 34. Paul J. Grinberg is a member of BofI's Board of Directors and has been the Chairman of the Board Audit Committee, the Board Compensation Committee, and a member of the Board Nominating Committee for the Class Period. *Id.* ¶ 35. Nicholas A. Mosich has served as the Vice Chairman of BofI's Board of Directors and as a member of the Board Audit Committee throughout the Class Period. *Id.* ¶ 36. James S. Argalas served as a member of the Board of Directors and a member of the Board Audit Committee throughout the Class Period. *Id.* ¶ 37.

### 1. Defendants' Alleged Fraudulent Scheme

The tenor of Plaintiffs' claims is that Defendants materially misrepresented the risk of investing in BofI by engaging in knowing and reckless conduct that rendered the bank a "materially-less safe investment than investors were led to believe." *Id.* ¶ 23. The Defendants, Plaintiffs allege, sold themselves as offering "significant cost savings and operation efficiencies derived from its purported branchless business model, as well as low loan losses." *Id.* ¶ 7.

Yet while Defendants touted themselves as a "careful, prudent institution" and emphasized their "conservative loan-underwriting standards," Plaintiffs allege that the bank actually had a "troubled identity that resorted to lax lending practices and other unlawful conduct to fraudulently boost its loan volume and earnings." *Id.* ¶¶ 1 & 8. By way of numerous false and misleading representations, BofI allegedly concealed the actual risk of loss present on its ledger and deceived investors as to its true financial condition. In their more than 140-page complaint, Plaintiffs point to copious facts as evidence that BofI statements, and their omissions, were false and misleading when made. The gravamen of the allegations concerns Defendants' deviations from BofI's loan underwriting standards, inadequate internal control and audit measures, undisclosed related-party transactions, and other violations of the federal securities laws.

### 2. Defendants' False and Misleading Statements

Plaintiffs have identified four types of misleading statements made by BofI: 1) earnings calls; 2) SEC filings; 3) conference calls about the results in SEC filings; and 4) press releases about the results in SEC filings. *Id.* ¶¶ 45, 244-362. With regard to the SEC filings, Plaintiffs have specifically identified Defendants' 2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K as misleading, *id.* ¶¶ 253, 306, & 359, as well as Defendants' 10-Q forms for Quarters 1 through 3 of 2014, Quarters 1 through 3 of 2015, and Quarter 1 of 2016, *id.* ¶¶ 259, 272, 286, 312, 325, 337, 384. Most of the press releases and conference calls that Plaintiffs have identified refer specifically to BofI's financial earnings as published in the respective SEC filings. The statements made in response to the *Erhart* allegations are denials of the allegations made by the plaintiff in the *Erhart* case.[4]

#### a. Earnings Calls

**\*3** CEO Garrabrants described Defendants' lending practices in a series of earnings calls held on August 7, 2014, April 30, 2015, and October 29, 2015, respectively, as follows:

1) "we continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products," "we believe that we can continue to grow our [C & I loan] portfolio at similar yields in this coming

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

year as we have in the prior year and maintain our conservative credit guidelines," and "[w]e are pleased with the increase in the credit quality at the bank."

2) "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes," and "[r]isk is not hidden in the tail of the portfolio."

3) BofI's "portfolio credit quality is very strong," "[o]ur strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs."

*Id.* ¶ 45.

### b. 10-K Filings

The three 10-Ks that Defendants filed with the SEC during the Class Period made many of the same representations about credit quality and loan underwriting as indicated in the earnings calls above. They also address risk in BofI's loan portfolio and in its off-balance sheets. Because the representations made in Defendants' 2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K are essentially identical, the Court will treat the 2013 Form 10-K as illustrative. *Compare id.* ¶¶ 244-53 *with id.* ¶¶ 299-306 *and id.* ¶¶ 352-59. The annual report included in Defendants' 2013 Form 10-K detailed BofI's loan underwriting standards as follows:

We individually underwrite the loans that we originate and all loans that we purchase. Our loan underwriting policies and procedures are written and adopted by our board of directors and our loan committee. Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators.

In the underwriting process we consider the borrower's credit score, credit history, documented income, existing and new debt obligations, the value of the collateral, and other internal and external factors. For all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment, but we also endeavor to obtain personal guarantees from all borrowers or substantial principals of the borrower. In evaluating multifamily and commercial loans, we review the value and condition of the underlying property, as well as the financial condition, credit history and qualifications of the borrower. In evaluating

the borrower's qualifications, we consider primarily the borrower's other financial resources, experience in owning or managing similar properties and payment history with us or other financial institutions. In evaluating the underlying property, we consider primarily the net operating income of the property before debt service and depreciation, the ratio of net operating income to debt service and the ratio of the loan amount to the appraised value.

*\*4 Id.* ¶ 248. The 2013 Form 10-K also indicated that its "allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio"; that BofI was committed to "maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio"; and that "management performs an ongoing assessment of the risks inherent in the portfolio." *Id.* ¶ 245. The report went on to address BofI's off-balance sheet activities.

Credit-Related Financial Instruments. The Company is a party to credit-related financial instruments with off-balance-sheet risk in the normal course of business to meet the financing needs of its customers....

The Company's exposure to credit loss is represented by the contractual amount of these commitments. The Company follows the same credit policies in making commitments as it does for onbalance-sheet instruments.

*Id.* ¶ 249. Elaborating on the company's off-balance sheet commitments, the filing also stated that "[t]he fair value of off-balance sheet items is not considered material" and that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." *Id.* ¶ 250. Defendants Garrabrants and Micheletti certified BofI's 2013, 2014 and 2015 Form 10-Ks pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"). *Id.* ¶¶ 251, 305, 358

### c. 10-Q Filings

As stated previously, Plaintiffs identified seven of Defendants' Form 10-Qs submitted during the Class Period as false and misleading. *Id.* ¶¶ 259, 272, 286, 312, 325, 337, 384. The representations made in those documents are substantially similar in kind to those made in the Form 10-Ks.

Defendants' 2014 Form 10-Q explained that "[t]he Company's goal is to maintain the allowance for loan losses (sometimes referred to as the allowance) at a level that is considered to be commensurate with estimated probable

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

incurred credit losses in the portfolio" and that "the Company believes that the allowance for loan losses is adequate ...." *Id.* ¶ 255. The form also described Defendants' off-balance commitments and explained that it had "no commitments to purchase loans, investment securities or any other unused lines of credit" and that "[t]he fair value of off-balance sheet items is not considered material." *Id.* ¶ 257. Nearly identical statements were made in the remaining 10-Qs. *See id.* ¶¶ 254-59, 267-72, 281-86, 307-12, 320-25, 333-37.

BoFI's Q1 2016 filing, unlike the other quarter filings, also made reference to ongoing "Legal Proceedings." *Id.* ¶ 381.

> ...from time to time we may be a party to other claims or litigation that arise in the ordinary course of business, such as claims to enforce liens, claims involving the origination and servicing of loans, and other issues related to the business of the Bank. None of such matters are expected to have a material adverse effect on the Company's financial condition, results of operations or business. *Id.* ¶ 381.

Defendants Garrabrants and Micheletti certified BofI's 10-Q forms for Quarters 1 through 3 of 2014, Quarters 1 through 3 of 2015, and Quarter 1 of 2016 pursuant to SOX. *Id.* ¶¶ 258, 271, 285, 311, 324, 336, 383.

### d. Conference Calls

During the Class Period, BofI held regular conference calls with analysts and investors to discuss the outcomes reported in the most recent Form 10-Q. *See, e.g.*, *id.* ¶ 262. Each time, Defendant Micheletti "reiterated the financial results" and Defendant Garrabrants made statements concerning one or more of the following topics: BofI's credit quality, underwriting standards, risk management, as well as internal and external compliance.

**\*5** In an earnings call for Q1 2014 held on November 5, 2013, Garrabrants stated that "[w]e are pleased with the increase in the credit quality at the bank," a refrain also uttered in the earnings call identified above. *Id.* ¶ 263. He made similar remarks during subsequent conference calls. *See id.* ¶¶ 276, 290, 296, 317. In the same November 5 call, Garrabrants also remarked, with respect to BofI's operations and risk management, that "[w]e continue to make investments in our people, systems, and processes to ensure that we will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for

the future." *Id.* ¶ 264. He continued by discussing BofI's loan underwriting standards:

> ...We've always done full documentation loans. I don't believe in low documentation, and no documentation loans. From my perspective, I want to see everything. If we're making a judgment and a trade off [sic] about a particular aspect of something, that's fine. But we can do that with the holistic picture, and have that picture documented.

*Id.* ¶ 265.

On an earnings call held on February 5, 2014 for Q2 2014, Garrabrants commented as follows on the growth in BofI's Commercial & Industrial (C&I) loans, "the vast majority of those loans are loans that have been self originated by the bank, sourced by our team and they are a significant portion of those [sic] are lender financed loans that are backed by hard collateral, receivables, real estate or other loans." *Id.* ¶ 277. He went on to reiterate his comments from November 5 about fully documenting loans, "in our case, we never did no documentation loans. We always collected every piece of documentation that we possibly could including tax returns from the IRS and everything else, so that really didn't change anything that we did." *Id.* ¶ 278.

On May 6, 2014 BofI held a Q3 2014 conference call. *Id.* ¶ 289. At that time Garrabrants remarked that "[w]e remain highly focused on credit quality at the Bank and have not sacrificed credit quality to increase originations nor loosen our underwriting standards[.]" *Id.* ¶ 290. He added that "[o]ur current level of loan loss reserve reflects the low-risk and low loan-to-value ratio in the current portfolio." *Id.* ¶ 291.

On August 7, 2014, Garrabrants made the following statements during a Q4 and fiscal year conference call. *Id.* ¶ 295. "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products." *Id.* ¶ 296. He added, "we believe that we can continue to grow our portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines." *Id.* Garrabrants also addressed BofI's compliance programs, and specifically, its Bank Secrecy Act (BSA) and Anti-Money Laundering (AML) programs. *Id.* ¶ 297.

> We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance. We believe that

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

we are on the same page with our regulators about their expectations.

\* \* \*

We have spent a significant amount of money on BSA/ AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams.

\* \* \*

But we want to make sure we stay ahead of our risk management needs and make sure that certainly we stay out of BSA trouble and things like that.

*Id.*

On November 4, 2014 during a Q1 2015 conference call, Garrabrants made the similar refrain of: "[w]e continue to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination." *Id.* ¶ 318. He went on to add, "[o]ur strong credit discipline and low loan to value ratio of portfolio has resulted in consistently low credit losses and servicing costs." *Id.*

 **\*6** During a Q2 2015 conference call on January 29, 2015, Garrabrants made the following remark about BofI's compliance infrastructure.

We have invested significantly in our regulatory and compliance infrastructure, management and personnel to meet heightened regulatory demands and prepare ourselves for our relationship with H&R Block.

..."[w]e're investing in a new BSA system, which we think is going to be a lot more – better at detecting suspicious activity and those sorts of things.

*Id.* ¶ 330.

On April 30, 2015, during a conference call for Q3 2015, Garrabrants emphasized the qualities of BofI's loan underwriting standards: "We continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes...Risk is not hidden in the tail for the portfolio. Only 8% of the single-family has a loan-to-value ratio greater than 70%, less than 1% greater than 80% and no loans with a loan-to-value ratio of greater than 90%...." *Id.* ¶ 341.

During the conference calls on July 30, 2015 for Q4 2015 and October 29, 2015 for Q1 2016, Garrabrants made similar remarks to ones he made previously about credit quality and loan origination: "portfolio credit quality is very strong. Our strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs," *id.* ¶ 388; "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to increase loan volume," *id.*; "[c]urrently, the vast majority of our C&I loan book is sole sourced, originated and agented by us," *id.* ¶ 347.

**e. Press Releases**

Plaintiffs' allegations also rely on press releases elaborating on BofI's financial condition as detailed in Defendants' SEC filings. *See, e.g.*, *id.* ¶ 260. The press releases identified by Plaintiffs mostly reiterated issues previously addressed by Defendants' earnings calls, SEC filings, and conference calls. Plaintiffs highlight that all of the press releases emphasized that BofI had had "record" financial results for the respective calendar filing. *See, e.g.*, *id.* ¶ 273. The press releases quoted Garrabrants as making comments such as "[w]e achieved our loan growth without reducing our credit standards while improving our net interest margin," *id.* ¶ 293, and "[s]trong loan growth was achieved while maintaining high quality credit standards," *id.* ¶ 314.

## DISCUSSION

**LEGAL STANDARD**

**1. Rule 12(b)(6) Standard**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In re: Boff Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

**\*7** A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citations omitted).

Any complaint alleging fraud must also comply with Rule 9(b), which requires the complaint to state with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b). Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. *Id.* To satisfy the heightened pleading requirements, the plaintiff must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (internal citations omitted). In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

In the event that the Court does grant a motion to dismiss, Rule 15 provides that leave to amend should be freely granted when justice so requires. Accordingly, when a court dismisses a complaint for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (internal citations omitted). Amendment, therefore, may be denied if it would be futile. *See id.*

**2. Falsity and Scienter**

To survive the motion to dismiss, Plaintiffs' claims must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). In 1995, Congress enacted the PSLRA to curb abuses of securities fraud litigation. *Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1200 (2013). These include "nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and manipulation by class action lawyers." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007). In response to these abuses, the PSLRA imposed a heightened pleading requirement for securities fraud actions brought under § 10(b) and Rule 10b-5, requiring that falsity and scienter be plead with particularity. *Amgen*, 133 S. Ct. at 1200; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Under the PSLRA's heightened pleading instructions, a complaint alleging that the defendant made a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc.*, 551 U.S. at 321. "It does not suffice that a reasonable fact finder plausibly could infer...the requisite state of mind." *Id.* at 313. Rather, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 313.

**Alleged Violations**

**1. Section 10(b) of the 1934 Securities Act and Rule 10b–5**

**\*8** Section 10(b) of the Securities Exchange Act makes it unlawful for "any person... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or...for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5(b). Rule 10b-5 also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c).

To state a securities fraud claim under 10(b) of the Act and Rule 10b-5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). A complaint alleging claims under section 10(b) and Rule 10b-5 must satisfy the pleading requirements of both the PSLRA and Rule 9(b). *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). In order for an omission to be actionable under the securities laws, that omission must affirmatively create an impression that the state of affairs differs materially from the actual state of the matter. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

**A. Materially False and Misleading Statements**

Plaintiffs' complaint alleges that BofI's public statements about its financial results, lending practices, off-balance sheet activities, and internal controls were false and misleading when made because Defendants were engaged in a course of conduct that deviated from its loan underwriting standards, relied upon inadequate internal and audit controls, and failed to disclose related-party loans, among other misconduct. They have identified material statements made by Defendants in 10-K and 10-Q filings, earnings calls, press releases, and quarterly conference calls as misleading or false, CAC ¶¶ 244-362, and they have stated with tremendous care why those statements are misleading and false, *id.* ¶¶ 41-243. Notwithstanding the Complaint's length and detail, there are those misrepresentations that fall short of the PSLRA's heightened standards. Yet because Plaintiffs need only plead a single materially false misrepresentation to survive a motion to dismiss, the Court need not dwell on those aspects of the Complaint here. *See Feyko v. Yuhe Intern., Inc.*, 2013 WL 816409 *4 n.2 (C.D. Cal. Mar. 5, 2013) (noting that, in order to survive the motion to dismiss, the plaintiff need only allege a single material misrepresentation); *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148 *4 (C.D. Cal. May 12, 2011) (stating that there it "no reason that it [the court] must address parts of the CAC that *do not* work" (emphasis in original)). Defendants argue that Plaintiffs have failed to identify a single affirmative statement by Defendants

that was actually rendered false or misleading by Plaintiffs' allegations. ECF No. 41 at 4. The Court disagrees. Plaintiffs have plead that a material misrepresentation has occurred. Indeed, they have plead more than just one.

Examples of Plaintiffs' particularized pleadings include Defendants' representations that:

1) "We continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes," *id.* ¶ 45;

2) "Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators," *id.* ¶ 248;

**\*9** 3) "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products," *id.* ¶ 296;

4) "[W]e will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for the future," *id.* ¶ 264;

5) "We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance. We believe that we are on the same page with our regulators about their expectations," *id.* ¶ 297;

6) "We have spent a significant amount of money on BSA/ AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams," *id.*

Defendants do not persuasively dispute the alleged falsity of these, and other, statements identified in Plaintiffs' Complaint. One of Defendants' arguments is that statements discussing BofI's "conservative credit guidelines" or applauding the "increase in credit quality at the bank" are not actionable under 10(b) because they are "corporate puffery." *See* ECF No. 37-1 at 20 n. 6; *see also* ECF No. 40 at 41 (citing to *Lloyd v. CVB Fin. Corp.,* 811 F.3d 1200, 1206-07 (9th Cir. 2016)). As the Ninth Circuit explained in *Newcal Indus., Inc. v. Ikon Office Solution*, a statement is merely puffery when it is "extremely unlikely to induce consumer reliance." 513 F.3d 1038, 1053 (9th Cir. 2008). The Court finds, however, that taking a few of Plaintiffs' allegations out of context and labeling them as puffery is

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 110 of 306 PageID #:2066

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

not sufficient to undermine Plaintiffs' detailed allegations that BofI's actual lending practices fell short of the standards BofI represented to investors. In *In re New Century*, the court found that statements describing the defendant as having "higher credit quality," "strict underwriting and risk management disciplines," and "improved underwriting controls and appraisal review process" were not mere puffery and were sufficient to plead falsity with particularity. 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008). Moreover, Plaintiffs' allegations are unlike those that were dismissed as puffery in *Lloyd v. CVB Fin. Corp.*, 811 F.3d at 1206-07. There, the court characterized the plaintiff's allegations that its credit metrics were "superior" to those of its peers, that it had "strong credit culture," and that the company had "limited its exposure to problem credits" as puffery because the statements were vague and optimistic. *See id.* By contrast, Plaintiffs' allegations are neither aspirational nor general. They allege that Defendants repeatedly represented, in a variety of forums, that it continued to adhere to conservative loan underwriting practices and that it had not loosened credit guidelines in order to increase loan volume, when the defendants had, in fact, resorted to lax lending practices. *Cf. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("[A]s a mortgage lender...underwriting practices would be among the most important information looked to by investors."). Thus, because Plaintiffs' claims ring of those in *In re New Century* as opposed to those in *Lloyd*, Defendants' argument that Plaintiffs' claims are mere puffery is unavailing.

 **\*10** Defendants' other strategy is to dismiss Plaintiffs' allegations as the unreliable speculation of confidential witnesses, all former BofI employees, ex-employee Charles Matthew Erhart, and anonymous bloggers. ECF No. 37-1 at 16-17. As an initial matter, the Court need not address the reliability of Erhart or the articles posted on *Seeking Alpha*, *see e.g.,* CAC ¶¶ 70, 77, 89, as Plaintiffs have adequately plead misrepresentations that rely on neither source. What's more, the Court is satisfied that Plaintiffs have described the confidential witnesses with sufficient detail to provide an adequate basis for attributing facts reported by the witness to the witness' personal knowledge. *See Zucco*, 552 F.3d at 995. In *Zucco*, the Ninth Circuit summed up the confidential witness inquiry as a two-pronged test requiring plaintiffs to establish the reliability and personal knowledge of confidential witnesses cited in the allegations. *See Zucco*, 552 F.3d at 991. In *Daou*, the plaintiffs met this requirement by describing each of the confidential witnesses' job descriptions and responsibilities, and in some instances,

their job title and the title of the person to whom they reported. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005). Here, Plaintiffs have done exactly that. They have identified each confidential witness by title and job description, and in quite a few instances included the name of the individual to whom they reported. *See* CAC ¶¶ 52, 60, 66, 123, 133, 134, 146, 163, 164, 234. Accordingly, the Court finds no reliability issue with the confidential witness' allegations.

The Complaint sets forth numerous allegations made by confidential witnesses that corroborate Plaintiffs' claims that BofI was engaging in "lax lending practices" and failing to enforce adequate compliance measures. Accordingly, Plaintiffs have stated the "reason or reasons" why at least some of Defendants' representations, including those illustrated above, were false and misleading. *See* 15 U.S.C. § 78u–4(b)(1). Confidential Witness ("CW") 1, a former BofI senior underwriter, described being pressured by senior management to underwrite loans that CW 1 felt uncomfortable approving, refusing to recommend highly-leveraged loans that senior management ultimately approved, and noting that it "started to become very rare that we would deny a loan." CAC ¶¶ 52-59. Other confidential witnesses corroborated these allegations. CW 2, another former senior underwriter, described how BofI approved a multi-million dollar mortgage with suspicious repayment terms for a property that, in CW 2's estimation, had been grossly over-appraised in order to inflate the loan-to-value ratio. *Id.* ¶¶ 61-64. CW 10, a former senior underwriter[5], gave further credence to these allegations by stating that BofI's executive management funded many loans that CW 10 had declined to sign off on. *Id.* ¶ 66.

The Complaint also sets forth detailed allegations concerning Defendants' inadequate internal procedures and audit programs. Plaintiffs allege that BofI failed to operate an effective audit program as required by federal law and regulation. *Id.* ¶ 165. Plaintiffs described what laws and regulations require of BofI's audit procedures and then explained how many of BofI's observed practices fell short of those standards. For example, in the Complaint, Plaintiffs explained how guidance issued by the Office of the Comptroller of Currency (OCC) underscores the importance of maintaining independent auditors whose internal audit activities are not overseen by chief financial officers or the like. *Id.* ¶ 169. To demonstrate that BofI violated such guidance, Plaintiffs pointed to the allegations of CW 7, a former BofI lending compliance officer. CW 7 explained that

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

Garrabrants had interfered with the audit committee's duties by "cleaning up" loan documents given to OCC examiners after CW 7 had identified them as problematic. *Id.* ¶ 174. CW 9, who stopped working at BofI just prior to the Class Period, made similar allegations of BofI's less-than-independent audit committee. *Id.* ¶¶ 173 & 175. As for staffing needs, CW 3 noted that BofI's Third Party Risk Department was understaffed with only three persons, *id.* ¶ 161, and CW 7 described BofI's internal controls as "nonexistent." *Id.* ¶ 162.

 **\*11** Standing alone, these allegations demonstrate why at least some of Defendants' statements were misleading or false at the time they were made. For example, Defendants represented that they had "not loosened credit quality to enhance yields or increase loan volumes." Yet that statement was made false or misleading by allegations that senior management was pressuring underwriters to approve loans they were uncomfortable with, that senior management frequently approved loans against the recommendation of underwriters, and that at least one loan-to-value ratio had been fabricated. Defendants also represented that "[w]e have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance." And that statement was made false or misleading by the allegation that Garrabrants was interfering with auditor duties in contravention of OCC guidance, that internal controls were "nonexistent," and that the Third Party Risk Department was understaffed.

The Court's conclusion that Plaintiffs have plead a material representation is, moreover, consistent with other cases that have found similar allegations as sufficient to withstand scrutiny under the PSLRA. *See Atlas*, 556 F. Supp. 2d at 1142, 1149-53,1154-55 (S.D. Cal. 2008) (concluding that plaintiffs allegations regarding defendants' loan underwriting standards, alleged manipulation of reserve amounts, and improper accounting were sufficient to meet the 10(b) particularity standard); *In re New Century*, 588 F. Supp. at 1225-27 (C.D. Cal. 2008) (holding that defendants' false and misleading public statements about the strong credit quality and strict underwriting practices of the issuer were actionable under 10(b)); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) (concluding that plaintiffs had sufficiently plead defendants' misrepresentation of the rigor of their loan origination process, the quality of its loans, and the company's financial situation). Here, Plaintiffs have made analogous allegations against BofI concerning their lax lending practices, inadequate internal controls, and general failure to disclose the actual financial condition of the bank. Accordingly, Plaintiffs have plead a materially false representation with sufficient particularity to survive the PSLRA's heightened standard.

## B. Materiality

The Court further concludes that BofI's misrepresentations were material. The materiality of Defendants' statements is underscored by the very fact that Defendants repeatedly highlighted BofI's conservative loan underwriting standards, and to some extent its sophisticated controls, in myriad conference calls and press releases throughout the Class Period. *See Atlas*, 556 F. Supp. 2d at 1155 (S.D. Cal. 2008) (finding that materiality was demonstrated through Defendants' emphasis on underwriting policies and press releases and other public statements).

## C. Scienter

Plaintiffs must plead scienter with particularity to survive a motion to dismiss a 10(b) claim. Scienter encompasses the intent to deceive, manipulate, and defraud. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L.Ed. 2d 668 (1976)). To satisfy the requisite state of mind in the Ninth Circuit, "a complaint must 'allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness.' " *Zucco*, 552 F.3d at 991 (citation omitted). Recklessness involves "a highly unreasonable omission, involving...an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re NVIDIA*, 768 F.3d at 1053 (internal citations omitted). Facts showing mere recklessness or a motive to commit fraud and opportunity to do so, provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness. *In re VeriFone*, 704 F.3d at 701. Thus, to establish a strong inference of deliberate recklessness, plaintiffs must "state facts that come closer to demonstrating intent, as opposed to mere motive or opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (abrogated on other grounds by *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

### i. Holistic Review

 **\*12**  As stated above, a complaint brought under the PSLRA is well-plead if the facts give rise to a "strong inference" that the defendants acted with the requisite state of mind. In assessing the sufficiency of allegations under 10(b)(5) a district court must view the allegations holistically, not in isolation. *In re VeriFone*, 704 F.3d at 702-03 (discussing in-depth holistic review as required by the Supreme Court in *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1324 (2011)). That is not to say that the court cannot, if it chooses, "engage in an individualized discussion of the complaint's allegations," but rather that it should not "unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *Id.* At this stage, the court must test for allegations of scienter sufficient to justify the case to proceed against the defendant. *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011).

### ii. Defendants' Scienter

In order for a 10(b) claim to lie against BofI, the Court must find a strong inference of scienter for the corporate defendant. Generally speaking, such an inference must be made by pleading scienter as to the individual executive or director who made the misstatement.[6]*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008). In assessing the scienter of corporate officers, the Ninth Circuit has often spoken in terms of what is not enough to create a strong inference that a corporate officer acted with scienter. In *South Ferry* the Ninth Circuit tackled the question of whether and when the "core operations inference" – that is, the inference that key company officers have knowledge of facts critical to a business' core operations or important transactions – is sufficient to meet the strict pleading standards of the PSLRA. 542 F.3d at 781. There, the court concluded that an officers' position within a company was not sufficient, on its own, to create a strong inference of scienter, but that a kind of "core inference plus" would be sufficient. *Id.* at 784-85. By way of example, the *South Ferry* court noted that Plaintiffs might be able to meet the PSLRA requirement by relying on the core operations inference and by alleging that specific information had been conveyed to management relating to the fraud. *Id.* at 785. In *Zucco*, the Ninth Circuit made clear that SOX certifications are not sufficient "without more" to satisfy the PSLRA requirements. *Zucco*, 552 F.3d at 1004. Finally, in *In re Rigel Pharm., Inc. Sec. Regulation*, the Ninth Circuit

concluded that allegations of "routine corporate objectives" or executive compensation based upon corporate goals, were not sufficient by themselves to create a strong inference of scienter, despite the element of motive involved. *See* 697 F.3d 869, 884 (9th Cir. 2012).

To undermine Plaintiffs' allegations of scienter, Defendants attack their opponents' allegations one-by-one. *See* ECF No. 37-1 at 28-31. Defendants argue that based on the Ninth Circuit precedent expounded in *South Ferry*, *Zucco*, and *In re Rigel*, Plaintiffs cannot properly infer scienter from the Defendants' positions within BofI; from the fact that Defendants Garrabrants and Micheletti signed SOX certifications; or from the fact that defendants were eligible for cash bonuses during the Class Period. *Id.* Yet in light of the Supreme Court's mandate in *Matrixx* to view allegations of scienter holistically, Defendants' piecemeal argument fails to persuasively make the case that Plaintiffs have not satisfied the PSLRA's heightened standard. Given the holistic nature of the Court's inquiry, the Court concludes that Plaintiffs' allegations of false and misleading statements do give rise to a strong inference of scienter. As the Ninth Circuit stated in *In re Read-Rite Corp. Sec. Litig.*, falsity and scienter are "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." 335 F.3d 843, 846 (9th Cir. 2003). Thus, just as the Court is persuaded that Plaintiffs have alleged falsity with particularity, the Court is also satisfied that Plaintiffs have alleged scienter with particularity. Specifically, the Court finds that Plaintiffs have sufficiently alleged scienter as to Defendant Garrabrants and, thus, they have successfully alleged it as to BofI as well.

### iii. Garrabrants

 **\*13**  The complaint sets forth a number of facts from which the Court can infer that CEO Gregory Garrabrants knew that BofI was deviating from its stated lending practices and failing to maintain adequate internal and audit controls. For one, Plaintiffs' allegations indicate that Garrabrants was actually complicit in misconduct. Confidential Witness 7, who had once attended a meeting with Garrabrants to discuss negative audit findings, stated that Garrabrants not only brushed his findings "under the rug," CAC ¶ 147, but "cleaned up" audit reports that he disagreed with.[7]*Id.* ¶ 174. Then, according to a former BofI Assistant Vice President/ Senior Processor of Income Property Lending Operations, Garrabrants had instructed employees to do no further background checks on foreign nationals if their name did not

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

appear on the Office of Foreign Asset Control (OFAC) list. *Id.* ¶ 134. Confidential witnesses who worked at BofI before the Class Period made similar allegations of Garrabrants' complicity. *See id.* ¶ 133 (stating that Garrabrants had instructed BofI's Executive Vice President and Chief Credit Officer to underwrite loans even though they were missing TINs); *id.* ¶ 173 (stating that Garrabrants interfered with the audit committee's duties). Plaintiffs' allegations also set forth facts indicating that Defendant was aware – or should have been aware – of misconduct occurring at the bank. The Complaint contains allegations of a third party risk officer who stated that Garrabrants had said the officer's tombstone would read "died understaffed," in response to the officer's assertion that they needed more people in the Bank Secrecy Act department. *Id.* ¶ 124. Plaintiffs also alleged that a senior underwriter even went so far as to leave concerns about a multi-million dollar loan directly with Garrabrants' assistant, in order to explain why her boss should not have recommended that Garrabrants approve a specific loan over her objection. *Id.* ¶¶ 61-64.

Viewing these allegations holistically, and in light of the fact that Garrabrants was the CEO of BofI throughout the Class Period, had signed the SOX certifications on the company's quarterly and yearly earnings throughout the Class Period, and made repeated representations that BofI had sound underwriting and audit procedures during the Class Period, the Court finds that Plaintiffs have alleged a strong inference of scienter as to Garrabrants. The opposing inference that Defendants would have the Court adopt – that is, that the confidential witnesses are nothing more than "disgruntled" and "low-level" employees making unsubstantiated statements, *see* ECF No. 41 at 4-5 & ECF No. 37 at 17 – is not as strong as the inference that Garrabrants knowingly misrepresented BofI as having conservative credit guidelines, adequate internal controls, and as being in compliance with regulatory obligations. Accordingly, Plaintiffs have sufficiently plead scienter so as to survive Defendants' motion to dismiss.

**iv. Micheletti, Grinberg, Mosich, and Argalas**

As stated previously, a complaint must allege as to each defendant that he or she made a false or misleading statement either intentionally or with deliberate recklessness in order to plead a 10(b) claim. *See Zucco*, 552 F.3d at 991. Accordingly, Defendants are right to point out that Plaintiffs' Complaint "is all but silent with respect to Mr. Micheletti

and the Audit Committee Defendants." ECF No. 41 at 13. Indeed, neither Plaintiffs' Complaint, *see generally* CAC ¶¶ 407-17, nor response brief, ECF No. 40 at 25-31, identify specific statements or omissions made by the remaining individual defendants, or set forth facts demonstrating that the defendants were nonetheless aware of the falsity of representations being made by BofI. Instead, Plaintiffs ask the Court to infer scienter from the audit committee members' positions, from allegations of motive, and from the factual allegations pleaded as a whole.

The Court, however, is not persuaded by Plaintiffs' argument that it can draw a strong inference of scienter from the audit committee members' failure to recognize BofI's accounting errors, as was the conclusion in *Thomas v. Megaship Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 845288 (N.D. Cal. Mar. 4, 2016). The facts of that case indicate that the magnitude of the error missed by the audit committee members was so large that net income was inflated by 500% and total revenue by $121.7 million. *Id.* at *6. By contrast, here, Defendants' misconduct concealed, rather than revealed, the presence of illicit goings-on, thus belying any inference that audit committee members would have necessarily been aware of significant reporting errors.

**\*14** The Court is also not persuaded by Plaintiffs' argument that the individual defendants had motive to commit fraud because they had benefitted from related-party loans. *See* ECF No. 40 at 29 n. 26. In *Neborsky v. Valley Forge Composite Techs., Inc.*, the case Plaintiffs cite, the court found that the defendant's motive and opportunity to commit fraud was persuasive because the defendant had an unusually high monetary stake in the alleged misrepresentations. *See* No. 13-CV-2307-MMA BGS, 2014 WL 3767011 *8 (S.D. Cal. July 29, 2014) (noting that the defendant had advanced $491,257 to the defendant company, held over 31% of the company's stock, and controlled the SEC filings, press releases, and other corporate documents of the company). Here, Plaintiffs ask us to infer that the remaining individual defendants knew that BofI was engaged in widespread misconduct simply because they benefitted from a single loan that was allegedly made on more favorable terms than those offered to the public. CAC ¶¶ 414-15. The Court declines to make that leap with Plaintiffs.

Even viewing Plaintiffs' scienter allegations holistically, the Court finds that Plaintiffs have not adequately plead that the remaining individual defendants had the requisite scienter. There simply are too few facts from which to infer that the remaining defendants were aware of the falsity of BofI's

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

many misrepresentations. Plaintiffs also fail to proffer any theory of scienter that might, nonetheless, give rise to an inference that the remaining defendants acted with the appropriate state of mind. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (finding a strong inference that the company's CEO and CFO were aware of stop-work orders because they were heavily involved in the day-to-day operations of the company); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (finding that plaintiffs' specific allegations that the defendant CEO had access to and frequently monitored a database detailing the company's financial condition was sufficient to infer scienter). Because Plaintiffs have not set forth sufficient allegations from which the Court can infer a strong inference of scienter on the parts of Defendants Micheletti, Grinberg, Mosich, and Argalas, the Court GRANTS Defendants' motion to dismiss as to those defendants.

### 2. Section 20(a) of the Securities Act

To plead a violation of Section 20(a) of the Securities Act Plaintiff must prove a 1) primary violation of the securities laws and 2) demonstrate that the defendant exercised actual power over the primary violator. *See In re NVIDIA*, 768 F. 3d at 1052. In other words, Section 20(a) imposes liability on a "controlling person." *Id.*; 15 U.S.C. § 78t(a). The question of whether a defendant is a controlling person is an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Defendant asks the Court to dismiss the 20(a) claim as to all defendants because Plaintiff's have failed to plead a primary violation of the securities laws. ECF No. 37-1 at 25. Plaintiffs counter by making the conclusory assertion that its 10(b) allegations are sufficient to demonstrate that there was a primary securities violation and, therefore, those allegations are also sufficient to establish that the individual defendants are controlling persons. *See* ECF No. 40 at 31. Because the Court has determined that the allegations against Defendants Micheletti, Grinberg, Mosich, and Argalas should be dismissed, the Court need only address whether Garrabrants is rightly deemed a "controlling person." Given Garrabrants ability to control and influence BofI by virtue of his position as CEO, President, and Director of BofI, his involvement with the false statements at the center of this dispute, and his alleged oversight over

much of the company's daily operations, the Court finds Garrabrants to be a "controlling person" for purposes of Section 20(a). *See Howard*, 228 F.3d at 1065-66 (finding that allegations that the company's CEO and Chairman's day-to-day management of the company and the fact that he reviewed and signed the company's financial statements was sufficient to plead "control person" liability). Accordingly, Plaintiffs have sufficiently plead a violation of Section 20(a) so as to survive the motion to dismiss.

### Defendants' Request for Judicial Notice

**\*15** Generally, a court cannot consider matters outside of the complaint on a Rule 12(b)(6) motion to dismiss, unless those matters are: 1) authenticated documents that have been incorporated by the complaint or 2) facts subject to judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Documents may be incorporated into a complaint when the plaintiff "refers extensively" to the document or when the document forms the basis of the plaintiff's claims. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Courts may take judicial notice of adjudicative facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Indisputable facts are those that are "generally known" or that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Id.*

Here, Defendants have requested that the Court take judicial notice of eight exhibits in connection with Defendants' motion to dismiss. The first is a declaration of Jonathan Ball, the former Vice President of Internal Audit at BofI. ECF No. 37-2 at 2. Five are filings made with the SEC. ECF No. 37-2 at 2. The remaining two are requests to take judicial notice of a *Seeking Alpha* article and a BofI press release, respectively. Plaintiffs have opposed judicial notice of the Ball declaration and oppose judicially noticing the SEC filings for the truth of the matter asserted. ECF No. 40-1 at 4-5. Plaintiffs have not opposed the two remaining requests as Defendants made those requests in a supplemental memorandum attached to its reply to Plaintiffs opposition to the motion to dismiss. *See* ECF No. 41-2.

SEC filings are the proper subjects of judicial notice as they are not subject to reasonable dispute. *See Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *see also In re New Century*, 588 F. Supp. 2d at 1219-20 (taking judicial notice of the SEC filings submitted by Defendants). Accordingly, the Court will GRANT defendants' request to

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 115 of 306 PageID #:2071

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

take judicial notice of the SEC filings, but the Court will not, as Plaintiffs request, consider these documents for the truth of the matters asserted therein. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ("granting defendants' request to take judicial notice of SEC filings, but specifying that they will not "where inappropriate" be considered for the truth of the matter asserted."); *see also Curry v. Hansen Medical, Inc.*, 2012 WL 3242447 *3 (N.D. Cal. Aug. 10, 2012) (taking judicial notice of SEC filings, "but not for the truth of the matters asserted therein.")

Because the Court did not rely on the other documents included in Defendants' request, the Court will DENY Defendants' request to take judicial notice of the Ball Declaration, the *Seeking Alpha* article, and the BofI press release.[8] *See In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 996 (S.D. Cal. 2005) (denying defendants' request for judicial notice in part because the court did not rely on the document and found them irrelevant in deciding the motion to dismiss).

**Plaintiffs' and Defendants' Motions to Seal**

 **\*16**  Courts have recognized a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 & n. 7 (1978). Nonetheless, access to judicial records is not absolute. A narrow range of documents is not subject to the right of public access at all because the records have "traditionally been kept secret for important policy reasons." *Times Mirror Co. v. United States,* 873 F.2d 1210, 1219 (9th Cir. 1989). Unless a particular court record is one "traditionally kept secret," a "strong presumption in favor of access" is the starting point. *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1135 (9th Cir. 2003) (citing *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th Cir. 1995)). A party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the "compelling reasons" standard. *Id.* at 1135. That is, the party must "articulate[ ] compelling reasons supported by specific factual findings," *id.* (citing *San Jose Mercury News, Inc. v. U.S. Dist. Ct.,* 187 F.3d 1096, 1102-03 (9th Cir. 1999)), that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process," *id.* (quoting *Hagestad,* 49 F.3d at 1434). In turn, the court must "conscientiously balance[ ] the competing interests" of the public and the

party who seeks to keep certain judicial records secret. *Foltz,* 331 F.3d at 1135. After considering these interests, if the court decides to seal certain judicial records, it must "base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad,* 49 F.3d at 1434 (citing *Valley Broadcasting Co. v. U.S. Dist. Ct.,* 798 F.2d 1289, 1295 (9th Cir. 1986)).

In general, "compelling reasons" sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when "court files might have become a vehicle for improper purposes," such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets. *Nixon,* 435 U.S. at 598. Yet the mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records. *Foltz,* 331 F.3d at 1136.

In the instant case, the motions to seal seek to protect the identities of two confidential witnesses referenced in the Complaint and in Defendants' reply to Plaintiffs' opposition to the motion to dismiss. *See* ECF Nos. 26 & 41. The Court is aware that confidential witnesses have become a staple of securities litigation. *See* Justin Scheck, *Securities Lawyers Spar Over Use of Confidential Witnesses*, THE RECORDER (Apr. 11, 2005), http://www.therecorder.com/id=900005426901/Securities-Lawyers-Spar-Over-Use-of-Confidential-Witnesses?slreturn=20160826203048. The combination of the PSLRA's strict pleading requirements and discovery stay, *see* 15 U.S.C. § 78u–4(3)(B) ("all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss"), explains why the use of confidential witnesses has become so common. *See* Gideon Mark, Confidential Witnesses in Securities Litigation, 36 J. Corp. L. 551, 554-55 (2011). Confidential witnesses are typically current or former employees, customers, or suppliers, who are fearful of retaliation if their identities are disclosed. *Id.*

Here, the confidential witnesses identified in Plaintiffs' and Defendants' motions to seal are former BofI employees who reportedly fear such retaliation and potential harassment. *See, e.g.*, ECF No. 39 at 19-20; *see also Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron, Inc.*, 278 F.R.D. 335, 344 (S.D.N.Y. 2011) (noting that a confidential witness "may have a legitimate interest in non-disclosure, where revealing his

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 116 of 306 PageID #:2072

In re: BofI Holding, Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

or her name may lead to retaliation in a current or future job."). Plaintiffs have alleged that the confidential witnesses in this case complained of a "fear-based" culture at BofI "where dissent was not tolerated and fears of retaliation were fueled by constant reminders from upper management, primarily Garrabrants, that employees would be 'destroyed' for not following management directives." ECF No. 40 at 8. Plaintiffs have further claimed that such fears have begun to play out through Defendants' alleged efforts to "deceive and intimidate CWs in this action into self-identifying themselves and divulging attorney work-product," through Defendants' "recent initiation of criminal proceedings" against a CW who left the company three years ago, and through Defendants' counterclaims against the whistleblower in the *Erhart* Case. *Id.* Accordingly, because the Court finds the above-mentioned grounds to be compelling reasons that outweigh the public's interest in disclosure, the Court GRANTS the Plaintiffs' and Defendants' motions to seal.

## CONCLUSION

**\*17** For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss, ECF No. 37, be **DENIED** as to Defendant BofI and Defendant Gregory Garrabrants, and be **GRANTED** as to Defendants Andrew J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas **with leave to amend.**

2. Defendants' Motion to Seal, ECF No. 42, and Plaintiffs' Motion to Seal, ECF. No. 46, be **GRANTED**

3. Plaintiffs' Motion to Strike, ECF No. 45, be **DENIED**.

**IT IS SO ORDERED.**

Dated: September 27, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

Footnotes

1    All page numbers cited herein follow CM/ECF's internal pagination.

2    "BofI" will refer to both the holding company and its subsidiary, BofI Federal Bank. *Id.* ¶ 2.

3    *Erhart v. BofI Holding, Inc.*, Case No. 15-cv-2287-BAS-NLS (S.D. Cal).

4    The Court will not recount these statements in any depth because Defendants' other statements were sufficient for the Court to reach a decision.

5    According to Plaintiffs, CW 10 worked at BofI just before the start of the Class Period. CAC ¶ 66. Defendants point to the Ninth Circuit's decision *In re NVIDIA* as support for the argument that the Court should dismiss the allegations of employees who worked at BofI before the Class Period. *See* ECF No. 37-1 at 17. The Court is unpersuaded by this argument. In *In re NVIDIA*, the Ninth Circuit dismissed plaintiffs' 10(b) allegations that NVIDIA, a technology company specializing in graphic processing units, had strategically delayed disclosing a product defect to the detriment of the company's investors. *See In re NVIDIA*, 768 F.3d at 1056-57. One of the many reasons the court gave for dismissing plaintiffs' allegations was that some of the confidential witnesses had stopped working at NVIDIA "long before" the product defect arose. *Id.* at 1061. Here, unlike in *In re NVIDIA*, Plaintiffs allege that defendants engaged in a pattern of misrepresenting and misleading investors over a number of years. They do not point to one, isolated event as the source of misrepresentation, as did the plaintiffs in *In re NVIDIA*, but to a course of conduct. Thus, insofar as CW 10 corroborates other allegations that BofI was engaged in a pattern of misconduct during the Class Period, the Court finds that testimony relevant.

6    The Ninth Circuit has left open the possibility that a plaintiff, given certain circumstances, might be able to establish corporate scienter by pleading collective scienter on the part of the company's employees. *See Glazer*, 549 F.3d at 744. However, because Plaintiffs have not raised the issue of whether the Court should consider finding collective scienter, it will not address the question here.

7    Defendants' argument that this allegation actually "contradicts the notion that BofI's lending practices were lax" because the OCC did not take action after the reports were filed, is unconvincing. ECF No. 37-1 at 12 (internal citations omitted). For one, it is no surprise that a regulatory body would take no action as to a report that was intentionally altered so as to not raise suspicion. More importantly, Defendants' argument fails to address Plaintiffs' argument that Garrabrants should not have been interfering in the auditor's duties in the first place.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5390533, Fed. Sec. L. Rep. P 99,411

8     For similar reasons, the Court also DENIES Plaintiffs' Motion to Strike, ECF No. 51. The Court did not rely on the declarations of Confidential Witnesses 6 and 8, as offered by Defendants in ECF No. 42 or otherwise, in reaching its decision. Accordingly, the Court finds it proper to deny Plaintiffs' motion to strike. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 2003 WL 23208956 *1 n.1 (N.D. Cal. Mar. 24, 2003), *rev'd on other grounds*, 380 F.3d 1226 (9th Cir. 2004) (dismissing as moot plaintiffs' motion to strike defendants' appendix of confidential witness allegations because the court did not rely on the appendix in reaching its motion to dismiss).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 118 of 306 PageID #:2074

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

2015 WL 8784065
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE: ENZYMOTEC
SECURITIES LITIGATION.

Civil Action No.: 14-5556 (JLL) (MAH)
|
Signed 12/14/2015
|
Filed 12/15/2015

## OPINION

LINARES, DISTRICT JUDGE

**\*1** This matter comes before the Court by way of Defendant Enzymotec Ltd. ("Enzymotec" or the "Company"), the Officer Defendants, and the Director Defendants'[1] (collectively "Defendants") Motion to Dismiss the Amended Class Action Complaint (the "Amended Complaint" or "AC"). (ECF No. 36.) In this action, Lead Plaintiffs David R. Raabe, David E. Raabe, and Yehuda L. Danon (collectively "Lead Plaintiffs") allege claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Securities Exchange Act") and §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"),[2] arising from alleged fraudulent misrepresentations about the viability of Enzymotec's business, the strength of its customer relationships, and the sales visibility that these relationships provided.

The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants in part and denies in part the Motion to Dismiss.

## FACTUAL BACKGROUND[3]

### A. Enzymotec's Nutrition Business

Enzymotec is a global supplier of lipid-based specialty nutritional and medical food products and solutions. (AC ¶¶ 26-27; ECF No. 36-1, Declaration of Richard H. Zelichov

("Zelichov Decl."), Ex. B ("IPO Prospectus") at 49, 71.) Enzymotec was founded in 1998, and is headquartered in Migdal Ha'Emeq, Israel, where it maintains its sole research and development laboratory and manufacturing facility. (AC ¶ 20; IPO Prospectus at 17.) Enzymotec launched its first product in 2003 and, as of its IPO in September 2013, had designed and developed twelve products generating sales in over thirty countries. (IPO Prospectus at 1, 49.) However, Enzymotec's revenues are derived mostly from its Nutrition segment, comprised mainly of two products which are at the center of the Amended Complaint: InFat (an infant formula ingredient), and krill oil products for the omega-3 fatty acid market. (AC ¶ 26.)

**\*2** InFat is a nutritional ingredient that, when incorporated into baby formula, allows its fat composition and structure to more closely resemble human breast milk, which is considered the "gold standard" in infant nutrition. (AC ¶ 29; IPO Prospectus at 49.) Enzymotec manufactures an enzyme that it exclusively supplies to AAK, a Sweden-based global producer of specialty oils; AAK then mixes the enzymes with other raw materials at is facilities in Karlshamn, Sweden to produce InFat. (AC ¶ 30, IPO Prospectus at 77, 80, 86.) AL, a 50/50 joint venture formed in 2007 by Enzymotec and AAK, then markets and sells InFat to companies that make infant formula. (AC ¶ 30.)

China is the largest market for infant formula containing InFat. (AC if 31; IPO Prospectus at 15.) Specifically, approximately 89% of sales of InFat come in Asia and primarily China. (AC ¶ 31.) AL's customers in China consist of non-Chinese manufacturers primarily producing products containing InFat for Chinese infant formula brands, as well as a number of different Chinese manufacturers. (AC ¶¶ 30-31 & n.6; IPO Prospectus at 76.) The largest InFat customer is Biostime, a Hong Kong-based brand of premium pediatric nutrition and baby care products. (AC ¶ 31.) Sales of InFat attributable to sales in China by and under the brand name of Biostime accounted for between 10% to 12% of the Company's consolidated net revenues in 2012. (*Id.*)

Enzymotec's other main product is krill oil-which is used in supplements and nutritional products to provide omega-3 fatty acids-and which Enzymotec sells to vitamin and supplement manufacturers and distributors, mainly in the United States and Australia. (AC ¶ 32; IPO Prospectus at 49, 50, 54.) Krill are small ocean crustaceans and Enzymotec produces krill oil by sourcing raw krill meal and then extracting oil therefrom. (AC ¶ 32.) At the time of the

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 119 of 306 PageID #:2075

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

IPO, Enzymotec contracted a manufacturer in India for the extraction, but was in the process of expanding its Migdal Ha'Emaq facility so that it could process krill oil on its own. (*Id.* ¶ 33.) On January 13, 2014, Enzymotec announced a completion of the expansion and a successful operating run of the process, which was expected to ultimately lead to improvement in the company's gross margins. (*Id.*)

Enzymotec's ability to continue and grow InFat sales in China, and in particular through its sales to Biostime, as well as the Company's continued growth in krill oil sales, were of utmost importance to maintaining Enzymotec's overall financial results. (*Id.* ¶ 35.) Lead Plaintiffs allege that Defendants failed to disclose to investors that Enzymotec's Nutrition segment was on "unstable ground and that the rapid growth recorded prior to and during the first part of the Class Period was unsustainable." (*Id.*) The proposed Class Period is from September 27, 2013 through August 2014 (*id.* ¶ 196), and the Amended Complaint focuses on the Company's initial public offering in September and October of 2013 (IPO), the secondary public offering in February 2014 (SPO), and the ultimate disclosure of information relating to Enzymotec's nutrition segment.

### B. The Public Offerings

In September and October of 2013, the Company held an initial public offering of shares. (*Id.* ¶ 38.) The proceeds were from the IPO were to be used to "meet [the Company's] anticipated increased working capital requirements resulting from the expected growth in the Company's business." (*Id.*) In its IPO Prospectus, Enzymotec emphasized that InFat had been "achieving rapid penetration in the Chinese and other Asian markets," with "significant opportunities in other developing markets," attributing a significant increase in the volume of InFat sales to "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market" and financial prospects that "outpace[d] ... industry growth." (*Id.* ¶ 36.) Enzymotec further stated that it had "multi-year contracts with many of [its] customers" and "expect[ed] to continue attracting new customers." (*Id.* ¶ 37.) In the IPO, the Company issued 5,073,800 shares at $14 per share for net proceeds of $63.5 million. (*Id.* ¶ 38.) The shares closed at $18.16 after the first day of trading. (*Id.*) The market responded favorably to Enzymotec's representations concerning its business prospects. (*Id.* ¶ 40-41 (citing to analyst reports).)

**\*3** On November 11, 2013, the Company issued record results for the third quarter of 2013, including a 66.3%

increase in net revenues and an 87.5% increase in net income. (*Id.* ¶ 42.) In connection with these results, Defendant Katz stated that Enzymotec's "top line performance was driven by robust performance," including a growth of 68.9% year-over-year in Nutrition. (*Id.*) On the same day, the stock price increased approximately 6.2% to a close of $23.29 and analysts responded favorably. (*Id.* ¶¶ 43-44.)

On December 10, 2013, Defendant Katz emphasized Enzymotec's "very strong existing business growth" and the Company's prospects for future improvements based on its ability to "expan[d] the number of consumers because [of] the unique value proposition that we bring." (*Id.* ¶ 45.) On December 13, 2013, Enzymotec's share price reached a Class-Period high of $33.44. (*Id.*) Analysts continued to write favorably about the Company's prospects. (*Id.* ¶ 46.)

On February 13, 2014, Enzymotec reported positive financial results for the fourth quarter and full year 2013, including 59% and 72% increases in quarterly and annual net revenues, respectively; and 57% and 138% increases in quarterly and annual net income, respectively. (*Id.* ¶ 47.) Commenting on these results, Defendant Katz stated: "For fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance. ... Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position." (*Id.*) The Company further stated that it "expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 49.) Indeed, Enzymotec issued optimistic guidance for fiscal year 2014, including: "Net revenues, based on the equity method of accounting, of $88 million to $95 million, an increase of 35% to 46%"; "Net revenues, based on the proportionate consolidation method, of $110 million to $120 million, an increase of 36% to 49%"; "Non-GAAP net income of $18 million to $22 million, an increase of 31 % to 60%"; and "Non-GAAP diluted EPS of $0.77 to $0.94." (*Id.* ¶ 48.) Analysts continued to respond favorably. (*Id.* ¶ 51-52.)

Also on February 13, 2014-approximately five months after the IPO-the Company filed documents with the SEC for the SPO, in which selling shareholders would sell over 5.4 million shares of Enzyrnotec stock for proceeds of over $150 million. (*Id.* ¶ 50.) Two weeks later, the Company effectuated the SPO at a price of $28 per share (double the IPO price). (*Id.* ¶ 66.) Lead Plaintiffs allege that the selling shareholders included Defendants Katz and Bryan, who personally profited

nearly $8 million from their sales, as well as several other senior executives and directors of the Company. (*id*. ¶ 67.)

### C. The Essence of the Alleged Misrepresentations

Lead Plaintiffs assert that Defendants materially misrepresented Enzyrnotec's prospects for continued growth during the Class Period (September 2013 to August 2014), claiming that Defendants were "well-aware ... that Enzyrnotec was facing formidable hurdles in order to duplicate the astronomical growth in the Company's InFat sales that had fueled its increasing financial results leading up to the IPO and in the first few quarters of Enzyrnotec's history as a publicly-traded company." (*Id.* ¶ 53.) Specifically, Lead Plaintiffs allege that the Company's insiders "knew that the Chinese infant formula-market was facing a significant change in government regulations that would materially hinder Enzyrnotec's crucial Chinese InFat sales beginning in 2014" and that the Chinese infant formula market "was saturated and oversupplied, which would also have negative consequences to the Company's bottom line." (*Id.* ¶ 54.)

**\*4** Safety and price-fixing concerns led to increased government oversight of the infant formula industry in China. (*Id.* ¶¶ 55-56.) News of the impending regulations appeared as early as May 2013. (*Id.* ¶ 56.) On August 2, 2013-approximately eight weeks prior to the September 27, 2013 IPO–China announced newly proposed infant formula regulations, allegedly "drafted to increase restrictions on foreign imports and to strengthen domestic markets." (*Id.* ¶ 57.) The proposed legislation was enacted in November and December of 2013. (*Id.*; *see also id.* ¶¶ 58-59 (detailing the specific regulations).) Lead Plaintiffs thus claim that leading up to the IPO and throughout the Class Period, Defendants were "well-aware" that Chinese regulators "were implementing extensive new regulations over the Chinese infant formula market."

> These regulations stood to create significant changes to the infant formula production process in China and would have a dramatic effect on Chinese infant formula sales, which were a centerpiece of Enzymotec's business operations. These regulatory changes posed a significant and foreseeable threat to the profitability of InFat, which represented a significant portion of the Company's revenue.

(*Id.* ¶ 60; *see also* ¶ 61 highlighting Declaration of Dr. Mingruo Guo (Amended Complaint, Ex. A) to show that changes were foreseeable.) Lead Plaintiffs allege that Defendants failed to disclose this "known information" to investors despite their self-professed "regulatory expertise,"

and "instead forecasted unsustainable growth in the Company's financial results in order to stoke interest in and complete the Offerings." (*Id.* ¶ 62.)

Additionally, Lead Plaintiffs allege that Biostime, the largest purchaser of InFat,[4] had been involved in a price-fixing scandal and operational uncertainty prior to the Class Period which would have also alerted Enzymotec to impending problems. (*Id.* ¶ 63.) A Chinese investigation into Biostime's pricing practices began in March 2013, and in August 2013, Biostime was fined 162.9 million yuan, equivalent to six percent of its 2012 sales, which negatively affected Biostime's long-term prospects. (*Id.* ¶¶ 63-65.) Furthermore, Lead Plaintiffs allege that these issues were compacted by the fact that Biostime "had built up its inventory to approximately double year-over-year with sales increasing 38%, which would have caused concern for the Company's ability to reach its growth targets for the first half of 2014." (*Id.* ¶ 65.) Thus, Lead Plaintiffs allege that "[d]espite knowledge of the operational issues plaguing one of Enzymotec's most important customers, the Exchange Act Defendants materially misled investors concerning the impact of these issues on the Company's business." (*Id.* ¶ 65.)

### D. Disclosure to the Markets

On May 14, 2014, Enzymotec announced positive financial results for the first quarter of 2014: net revenues increased 29.1 % to $17.9 million under the equity method, and 43.5% to $23.7 million under the proportionate consolidation method; net income increased 118.0% to $5.1 million; non-GAAP net income increased 135.3% to $5.6 million; adjusted EBITDA increased 119.3% to $6.5 million; and quarterly operating cash flow of $4.8 million. (*Id.* ¶ 68.)

Also on May 14, 2014, however, Defendants disclosed that the Company's Chinese operations may experience problems due to changes in Chinese regulations over infant formula manufacturing. (*Id.* ¶ 69.) In particular, the Company stated as follows:

> The Company expects second quarter net revenues and earnings to be equal to or lower than the second quarter of 2013. As the Company previously disclosed, in the second quarter it plans to install new equipment to increase its manufacturing capacity, which will require a temporary shutdown of the plant. Additionally, recent changes in Chinese regulations require infant formula manufacturers to make certain changes to their production chain. As a result, changes may be required to supply arrangements

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

in response to customer requests. The Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year.

**\*5** (*Id.*) As a result, Enzyrnotec updated its guidance for fiscal year 2014-which it had previously issued on the same day it announced the SPO. (*Id.* ¶ 70.) The updated guidance included: "Net revenues, based on the equity method of accounting, of $68 million to $85 million, an increase of 5% to 31% over fiscal year 2013; Net revenues, based on the proportionate consolidation method, of $90 million to $110 million, an increase of 12% to 36% over fiscal year 2013; Non-GAAP net income of $15 million to $22 million, an increase of 9% to 60% over fiscal year 2013; and Non-GAAP diluted EPS of $0.64 to $0.94." (*Id.*) Commenting on the financial results and updated guidance, Defendant Katz stated that the Company believed "these headwinds will mainly impact us in the second quarter" and that it "remain[ed] optimistic in our outlook for second half of the year due to improved supply/demand dynamics across our business segments" and "believe[d] Enzyrnotec is well positioned for future growth in revenues in profit ...." (*Id.* ¶ 71.) The Company's share price dropped $6.48 per share on May 14, 2014 to close at $13.75 per share, a one-day decline of over 32% on heavy trading volume. (*Id.* ¶ 72.) Analysts incorporated these statements into their own guidance. (*Id.* ¶ 73.)

On August 5, 2014, Enzyrnotec announced negative financial results for the second quarter of 2014: net revenues decreased 39.5% to $9.0 million under the equity method, and 34.4% to $11.5 million under the proportionate consolidation method; second quarter net income decreased to $0.4 million, and EBITDA decreased to $1.2 million. (*Id.* if 77.) In connection with the results, the press release stated as follows:

> In the second quarter our business experienced operational challenges based on external market dynamics which hindered our financial performance," stated Dr. Ariel Katz, Enzymotec's President and Chief Executive Officer. "While we expected these headwinds in the quarter, particularly related to recent regulatory changes in the Chinese infant formula market and weakness in the U.S. and Australian Omega-3 industry, their overall impact was greater than anticipated and will continue to adversely impact Enzymotec for at least the next two quarters.

(*Id.* ¶ 78.) Enzymotec also decreased guidance again for 2014 as follows: "Net revenues, based on the equity method of

accounting, of $46 million to $52 million; Net revenues, based on the proportionate consolidation method, of $62 million to $70 million; Non-GAAP net income of $8 million to $10 million; and Non-GAAP diluted EPS of $0.34 to $0.43." (*Id.* ¶ 79.) Thus, as stated by Lead Plaintiffs, "in just five months after successfully completing the SPO in which Enzymotec insiders sold approximately $54.3 million of their personal Company stock, Enzymotec slashed its net revenue guidance in its key financial metrics by as much as 55%." (*Id.*) Analysts once again incorporated this information into their guidance. (*Id.* ¶ 80-81.) The Company's stock price declined $5.85 per share on August 5, 2014 to close at $9.11 or nearly 40%, on heavy trading volume, representing a 72% decrease from its Class Period high of $33.44. (*Id.* ¶ 82.)

## PROCEDURAL BACKGROUND

This action was commenced on September 5, 2014. (ECF No. 1.) By Order dated February 11, 2015 and Supplemental Letter Opinion & Order dated March 3, 2015, United States District Judge Madeline C. Arleo appointed the Enzymotec Investor Group as Co-Lead Plaintiffs, approved their selection of counsel, and consolidated the related actions. (ECF Nos. 20, 24.)

In accordance with a scheduling stipulation and Order (ECF No. 29): Lead Plaintiffs filed the Amended Complaint on May 18, 2015 (ECF No. 33); Defendants filed the instant motion to dismiss on July 17, 2015 (*see* ECF No. 36-3 ("Mov. Br.")); Lead Plaintiffs filed opposition on September 15, 2015 (ECF No. 38 ("Opp. Br.")); and Defendants replied on October 30, 2015 (ECF No. 43 ("Reply Br.")).

Separately, on July 23, 2015, this action was transferred to the undersigned. (ECF No. 37.) The motion is now ripe for resolution.

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

**\*6** To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

The Court's role is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). The Court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## ANALYSIS

### A. Section 10(b) and Rule 10b-5 of the Securities Exchange Act[5]

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission, makes it unlawful

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege that defendants: "[1] made a misstatement or an omission of material fact [2] with scienter [3] in connection with the purchase or the sale of a security [4] upon which plaintiff reasonably relied and [5] plaintiff's reliance was the proximate cause of their injury." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009) (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). Furthermore, "[a] corporation is liable for statements by employees who have apparent authority to make them." *Id.* (quoting *Makar Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 708 (7th Cir. 2008)).

Additionally, Lead Plaintiffs must meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014). Rule 9(b) provides, in relevant part, as follows: "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, at a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'-that is, the 'who, what, when, where and how' the events at issue." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

 **\*7** Similarly, as per the PSLRA, a plaintiff must satisfy heightened pleading requirements and "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makar Issues & Rights, Ltd.*, 551 U.S. 308, 313, 321 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976), and citing 15 U.S.C. § 78u-4(b)(1), (2)). First, with regard to misleading statements and omissions of material fact, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the statement must have been misleading at

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

the time it was made, as "liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d 2002). Additionally, "when assessing the sufficiency of allegations made on information and belief pursuant to 15 U.S.C. § 78u-4(b)(1)," "plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (adopting *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)). In other words, the facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.*

As to the second requirement of scienter-the intent to deceive, manipulate, or defraud investors-"each act or omission alleged to violate [Section 10(b) ], [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2).[6] In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. ... The inference ... need not be refutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 314, 324. The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *see also In re Radian Sec. Litig.*, 612 F.Supp.2d 594, 607 (E.D. Pa. 2009) (noting that although in *Tellabs* the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under 10b-5, "every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly.") In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *S.E.C. v. Infinity Grp. Co.*, 2 F.3d at 192. Finally, a court considers the entirety of a complaint in determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." *Tellabs I*, 551 U.S. at 322; *see also Avaya*, 564 F.3d at 273.

Aside from the two requirements pertaining to the facts surrounding the alleged violation and scienter, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.[7] However, a "'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Id.* at 255 (quoting *Tellabs II*, 513 F.3d at 705). If the statement is forward looking, cautionary language must be extensive yet specific and touch upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) ("[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.") (quoting *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir.1993)); *see also Avaya, Inc.*, 564 F.3d at 256 (3d Cir. 2009) (reiterating same). Thus, boilerplate language that merely warns readers of the risks associated with investing is generally insufficient. *Id.* Cautionary language in SEC filings "may be incorporated by reference" into the document containing the forward-looking statement, and need not be contained within the same document as the forward-looking statement itself. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) (quoting *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

**\*8** Defendants generally do not dispute that the following elements of the cause of action are properly pleaded: materiality, reliance, loss causation,[8] and damages. Falsity and scienter are heavily disputed. The Court analyzes falsity and scienter below.

1. Falsity

In the Amended Complaint, Lead Plaintiffs allege that "[i]n regular press releases, conference calls, and filings with the SEC, Enzymotec and the Officer Defendants regularly made false and misleading statements and material omissions during the Class Period" (AC ¶ 83), concerning Enzymotec's

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 124 of 306 PageID #:2080

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

financial guidance (*id.* ¶¶ 84-92), Enzymotec's sales of InFat in China (*id.* ¶¶ 93-102), Chinese regulations (*id.* ¶¶ 103-09), and internal controls (*id.* ¶¶ 110-13). Each category is discussed more fully below.

For all of these above categories of statements, Lead Plaintiffs contend that the Exchange Act Defendants made these statements "in contrast to Enzymotec's 'regulatory expertise'" and that these statements were materially false and misleading since

> Defendants knew, or were reckless in disregarding, significant information and red flags prevalent as early as May 2013-prior to the start of the Class Period-that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China-a core area of Enzymotec's operations.

(*Id.* ¶¶ 90, 100, 107, 111.) Lead Plaintiffs allege that Defendants "knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales." (*Id.* ¶¶ 91, 101, 108, 112). Additionally, for the statements concerning Enzymotec's financial guidance (*id.* ¶¶ 84-92), and internal controls (*id.* ¶¶ 110-13), Lead Plaintiffs allege that the Company

> knowingly or recklessly failed to account for the fact that a large percentage of Enzymotec's growth in krill sales from 2012 to 2013 leading up to the IPO were obtained on the strength of additional sales to a single customer who placed initial orders with the Company in 2012 and significantly increased those orders in 2013, thus rendering the Company dependent on these sales to maintain the business and growth projections provided to investors in order to stoke interest in the SPO.

**\*9** (*Id.* ¶¶91, 112.)

Defendants first argue that Enzymotec's guidance, forecasts, and predictions are protected by the "safe harbor" for forward-looking statements. (Def. Mov. Br. at 11-14; Def. Reply Br. at 2-3.) Next, they contend that Enzymotec made no false or misleading statements about InFat sales, since they were accurate statements of historical fact or puffery or otherwise not actionable. (Def. Mov. Br. at 14-16; Def. Reply Br. at 3-4.) Additionally, Defendants claim that Enzymotec had no duty to disclose Chinese regulations not directed at it

or specifics about its sales contracts. (Def. Mov. Br. at 16-20; Def. Reply Br. at 4-6.) Finally, Defendants argue that the market had complete information concerning the changes in the Chinese regulations of infant formula manufacturers. (Def Mov. Br. at 20-21; Def. Reply Br. at 6-7.)

In response, Lead Plaintiffs argue that the "safe harbor" is inapplicable because many of Defendants' statements were statement of present fact (in that the risks they were warning of had already come to pass), and that even if they were forward-looking they were not accompanied by meaningful cautionary language. (PL Opp. Br. at 8-12.) Next, Lead Plaintiffs contend that the statements are not mere puffery because they go to the heart of Enzymotec's financial stability, and in any event raise fact questions not to be determined at the pleadings state. (*Id.* at 12-14.) Additionally, Lead Plaintiffs argue that Defendants' statements were false and misleading at the time that they were issued. (*Id.* at 14-19.) Finally, Lead Plaintiffs contend that the Defendants omitted material information where there was a duty to disclose and that the truth on the market defense is without merit. (*Id.* at 19-21.) The Court addresses each argument in turn.

*a. The Court Cannot Conclude at This Stage That the Safe Harbor Applies to Enzymotec's Guidance, Forecasts, and Predictions because of Specific Allegations that Cautionary Language Was Not Meaningful.*

With respect to Enzymotec's guidance, Lead Plaintiffs allege that in the February 13, 2014 press release announcing financial results for the quarter and fiscal year ending December 31, 201 Defendant Katz stated: "[f]or fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance. ... Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position." (AC ¶ 85.) The February 13, 2014 press release further stated: "The Company expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 86.) In the Company's May 10, 2014 Q1 2014 press release, Defendant Katz cautioned that "headwinds" would impact the Company in the second quarter, but stated that "[n]otwithstanding our outlook for the second quarter, I believe Enzymotec is well positioned for future growth in revenues and profit as we continue to expand our customer base ...." (*Id.* 87.) Addressing the change in Chinese regulations, the guidance for 2014 contained in a May 14, 2014 press release stated that "[t]he Company

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 125 of 306 PageID #:2081

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year'" and on a conference call the same day Defendant Katz reiterated that "[t]he changes in Chinese regulation should not[ ] impact our 2014 revenues, but we do expect that this will result in revenues being shifted from the second quarter to the second half of the year." (*Id.* ¶¶ 88, 89.)

**\*10** Defendants argue that the statements Lead Plaintiffs challenge concerning Enzymotec's guidance (*id.* ¶¶ 84-92) "are quintessential forward-looking statements" that were "accompanied by meaningful cautionary language that mirrors Plaintiffs' allegations regarding Enzymotec's missed projections." (Mov. Br. at 12.) In other words, Defendants contend that Enzymotec provided its stockholders with adequate and meaningful risk disclosures warning them of the exact issues that Plaintiffs claim prevented Enzymotec from meeting its forecasts and reaching its goals. (Mov. Br. at 11-14; Reply Br. at 2-3.) Specifically, Defendants point out that Enzymotec's public filings warned that the Company's "international operations and sales are subject to a number of risks, including: ... regulatory limitations imposed by foreign governments and unexpected changes in regulatory requirements, tariffs, customs, duties, tax laws, and other trade barriers." (Mov. Br. at 12 (citing IPO Prospectus at 22; Zelichov Decl., Ex. C ("Annual Report") at 13; Zelichov Decl., Ex. D ("SPO Prospectus") at 2).) Defendants further note that Enzymotec also stated that it is "subject to significant and increasing government regulations regarding the sale and marketing of [its] products," that "regulatory authorities may change processes, regulations, and policies related to our products," and identified the Ministry of Health in China as one of the regulatory bodies to which Enzymotec and its products are subject. (*Id.* at 12-13 (citing IPO Prospectus at 24; Annual Report at 15; SPO Prospectus at 25).) Additionally, Defendants note that Enzymotec even disclosed that "Chinese authorities have recently launched investigations and levied fines related to alleged price fixing by infant nutrition companies including Biostime and may do so in the future." (*Id.* at 13 (citing IPO Prospectus at 15; Annual Report at 5; SPO Prospectus at 13).)

Furthermore, with respect to the krill oil business, Defendants point out that Enzymotec's Annual Report, filed on the same day as its February 13, 2014 press release, specifically disclosed that "[we] are subject to a degree of customer concentration and our customers do not enter into long-term purchase commitments with us" and that:

> Our remaining significant customers in 2013 include one North American purchaser of krill products that accounted for 15% of our revenues in that year up from less than 2% in 2012.

(*Id.*) at 13 (citing Annual Report at 6; SPO Prospectus at 14; Zelichov Decl., Ex. G ("Feb. 13, 2014 6-K") at 7 ("[W]e are subject to a degree of customer concentration"); Zelichov Decl., Ex. I ("May 14, 2014 6-K") at 5 (same).) Defendants note that the Company also disclosed that "[a]pproximately $9.2 million of the increase in sales of krill oil products was from one customer." (*Id.* (citing Annual Report at 51, F-18; SPO Prospectus at 14, 53).)

Finally, Defendants argue that the Amended Complaint "lacks particularized allegations that any of the Defendants had actual knowledge that their statements were false or misleading when made" such that the third prong of the safe harbor does not apply. (Reply Br. at 3 n.3.)

Lead Plaintiffs counter that the safe harbor is inapplicable because the statements concerning Enzymotec's financial guidance were either statements of present or historical fact, and that even if they were forward-looking, the cautionary language is insufficient because the risks Defendants were warning of had already come to pass. (Opp. Br. at 9-12.) First, Plaintiffs argue that the statements "concerned Enzymotec's present business and operational state that were materially false and misleading at the time they were made given the prevalent changes in China's regulatory environment, which changes would have a materially adverse effect on the Company's financial condition." (*Id.* at 9-10 (citing AC ¶¶ 86-87, 93, 94, 99).)

Second, Lead Plaintiffs argue that even if the statements can be considered forward looking, the safe harbor still does not apply because the cautionary language was "nothing but legally ineffective boilerplate" and that determining whether cautionary language is sufficiently "meaningful" raises fact issues that are improperly resolved on a motion to dismiss. (*Id.* at 9 n. 6, 10.) In particular, Lead Plaintiffs argue that disclosure that a company is "subject" to "government regulations" is applicable to "*any* company in *any* industry," and that the language does not warn investors of the specific risks that the changes in the Chinese regulations would have on the Company's business. (*Id.*) Similarly, Lead Plaintiffs contend that the disclosures regarding krill oil sales "do not warn of the specific risks actually experienced at the time, which is particularly ineffective given the Company's contemporaneous assurances that its customer relationships

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

provided 'good visibility' in sales." (*Id.* at 11.) Alternatively, Lead Plaintiffs argue that the statements are not entitled to safe harbor because they were made with knowledge of their falsity. (*Id.* at 11 (citing AC ¶¶ 85-89, 93-94, 99); *id.* at 15-16.)

**\*11**  The Court finds that Lead Plaintiffs have set forth sufficient allegations of materially false and misleading statements with respect to guidance, forecasts, and predictions to survive the Motion to Dismiss with respect to Infat. First, the Court finds that at least part of the statements relating to Enzymotec's guidance could be deemed by a fact finder to be statements of present or historical fact, and as such are not entitled to PSLRA's safe harbor at this stage. For example, statements relating to Enzymotec being "well positioned for future growth" (AC ¶ 87), or relating to InFat "achieving rapid penetration" or "increased market penetration" (*id.* ¶¶ 93, 94) relate to then-existing conditions as opposed to future projections. These statements, even if made within the context of truly forward-looking statements, are not entitled to the safe harbor. *See Avaya*, 564 F.3d at 255 ("'[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'") (quoting *Tellabs II*, 513 F.3d at 705).

Second, to the extent that the alleged misrepresentations by Defendant were forward-looking, the Court finds that Lead Plaintiffs have specifically alleged that the statements were not accompanied by meaningful cautionary language to entitle safe harbor protection at this stage. For example, even though Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect. (*See* AC ¶¶ 90, 91.) The Court finds that at this early stage of the litigation, Lead Plaintiffs have alleged with adequate particularity that any forward-looking statements made by Defendants regarding InFat were not accompanied by sufficient cautionary language. *See Semerenko*, 223 F.3d at 182 (nothing that a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation" and that "the cautionary statements must be substantive and tailored" to suffice); *see also City of Hialeah Employees' Ret. Sys. & Laborers Pension Trust Funds for N California v. Toll Bros.*, No. 07-1513, 2008 WL 4058690, at \*2 (E.D. Pa. Aug. 29, 2008) ("Plaintiffs have

specifically pied that there existed several material adverse facts at the time the future projections were made that suggest that these projections were unreasonable at the time they were made.").

However, the Court agrees with Defendants that Lead Plaintiffs have not stated a claim with respect to statements concerning krill oil. Specifically, the Court finds Defendants have demonstrated that they are entitled to safe harbor protection for statements relating to krill oil and that Lead Plaintiffs have not demonstrated how the cautionary language regarding the krill oil segment was insufficient. Enzymotec's Annual Report, filed on the same day as its February 13, 2014 press release, specifically disclosed that "[w]e are subject to a degree of customer concentration and our customers do not enter into long-term purchase commitments with us" and that:

> Our remaining significant customers in 2013 include one North American purchaser of krill products that accounted for 15% of our revenues in that year up from less than 2% in 2012.

(Annual Report at 6; SPO Prospectus at 14; Feb. 13, 2014 6-K at 7 ("[W]e are subject to a degree of customer concentration"); May 14, 2014 6-K at 5 (same).) (Further, the Company also disclosed that "[a]pproximately \$9.2 million of the increase in sales of krill oil products was from one customer." (Annual Report at 51, F-18; SPO Prospectus at 14, 53).) Lead Plaintiffs allegations that Defendants provided only generalized warnings with respect to krill oil sales (Opp. Br. at 11 (citing to statement regarding "good visibility" in sales)) are thus directly contradicted by these specific disclosures. *See St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. 04-4540, 2005 WL 1199045, at \*3 (D.N.J. May 18, 2005) ("To the extent that Plaintiffs allegations are contradicted by the documents attached to the Complaint upon which its claims are based, the Court need not accept such allegations as true.") (citing *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99-100 (3d Cir. 2002)).

**\*12**  Accordingly, the Court will grant the motion to dismiss with respect to claims concerning krill oil sales but will deny the motion to dismiss with respect to claims concerning InFat. Because the Amended Complaint makes specific allegations with adequate particularity about the alleged inapplicability of the safe harbor relating to InFat, the Court finds that Lead Plaintiffs are "entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302 (3d Cir. 2011).

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 127 of 306 PageID #:2083

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

*b. Statements Concerning InFat Sales are Mixed Questions of Law and Fact Not Appropriate for Resolution at This Stage*

With respect to sales of InFat in China, in the IPO Offering Documents, the Company stated that "InFat has been achieving rapid penetration in the Chinese and other Asian markets" and further touted "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market." (AC ¶ 93.) And in the July 10, 2013 Form DRS Draft Registration Statement, the Company emphasized that it had

> multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales.... Furthermore, we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime and IVC in our Nutrition segment, builds consumer awareness of our premium products. Sales of our infant formula products are currently strongest in China.... We expect net revenues to increase as additional infant nutrition brands choose to use InFat.

(*Id.* ¶ 94.) Similarly, on a November 11, 2013 conference call, Defendant Katz reiterated that "InFat has been achieving rapid penetration in Chinese and other Asian markets ...." (*Id.* ¶ 95.) And on a February 13, 2014 conference call, Defendant Bryan stated that "[w]e see continuous growth and interest [in InFat] ... [and] feel on track with what we have spoken in the-when we went to the IPO and we see a good acceptance of the products continue" and Defendant Katz stated "[r]egarding the contracts that we have in our – with our customers, we feel confident, we're striving all the time to bring more value and it seems that is very stable contracts." (*Id.* ¶¶ 96-97.) In the Company's 2013 Form 20-F, the Company highlighted "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market." (*Id.* ¶ 98.) Further, on the May 14, 2014 conference call, Defendant Katz stated that the InFat "joint venture with AAK has also been achieving rapid penetration in Chinese and other Asian market(s) ...." (*Id.* ¶ 99.)

Defendants argue that the statements concerning InFat sales (*id.* ¶¶ 93-100) are not actionable for three reasons. First, Defendants claim that the statements are accurate statements about Enzymotec's historical and present financial performance. For example, Enzymotec had been achieving "rapid" or "increased" penetration in China-"its sales in Asia

increased 45% in the first six months of 2013, 400% for the whole year, and Enzymotec had sales growth in line with its February 2014 projection in the first quarter of 2014 as well." (Mov. Br. at 15 (citing IPO Prospectus at 50; Annual Report at 47; May 14, 2014 6-K).) Defendants argue that "the fact that InFat sales did not continue to grow in the second quarter of 2014 does not render any of these statements false when made and simply constitutes an effort to plead fraud by hindsight." (Mov. Br. at 15.)

**\*13** Second, to the extent that the statements are not deemed accurate statements about Enzymotec's historical and present financial performance, Defendants assert that "most of Enzymotec's statements are puffery and cannot, as a matter of law, support a claim for securities fraud." (*Id.*) Defendants contend that statements such as "rapid penetration,"[9] "strong brand recognition,"[10] "continuous growth and interest,"[11] "on track,"[12] "good acceptance,"[13] "confident,"[14] and "very stable,"[15] are "simply 'vague expressions of hope' that 'have been almost uniformly rejected by the courts' as the basis for a claim under the securities laws." (Mov. Br. at 15 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997)).)

Third, Defendants argue that statements that the Company "expect[s] to continue attracting new customers" and "expect[s] net revenues to increase"[16] are entitled to safe harbor protection since they are forward-looking and accompanied by meaningful cautionary language. (Mov. Br. at 15-16.)

Lead Plaintiffs counter that the statements concerning the viability of InFat sales and the strength of Enzymotec's contractual relations cannot be considered inactionable puffery at this stage. (Opp. Br. at 12-14.) As an initial matter, Lead Plaintiffs contend that puffery determinations are a mixed question of law and fact that should ultimately be left to the trier of fact, since a statement is considered puffery only when it is immaterial, such that a "reasonable investor would not rely on it in considering the 'total mix' of [available] information." (*Id.* at 12 (citing *Shapiro v. UJB Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992)); *Hoxworth v. Blinder, Robinson & Co.*, 903 186, 200-01 (3d Cir. 1990).) Lead Plaintiffs thus argue that the statements regarding InFat sales were material to investors because they "go to the heart of Enzymotec's financial stability and were made against the backdrop of a general decline in the infant formula industry." (*Id.* at 12.) Additionally, they argue that statements

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

alluding to "good visibility" resulting from the Company's customer relationships "conveyed to investors stability in Enzymotec's customer relationships and a sound basis upon which their assurances concerning continued growth were evaluated." (*Id.* at 13.) Further, Lead Plaintiffs contend that they have sufficiently alleged specific facts concerning Defendants' knowledge of the falsity of their statements at the time they were made. (*Id.* at 13-18.)

Ultimately, Lead Plaintiffs assert that they "do not seek to hold Defendants accountable for failing to predict regulatory changes. Rather, the Amended Complaint's allegations are based on Defendants' misrepresentations and omissions about Enzymotec's practices and the then-existing developments in Chinese regulations, both of which were critical to Enzymotec's bottom line and to investors." (*Id.* at 14.) In essence, Lead Plaintiffs contend that "although Defendants knew (or should have known) of the looming decrease in InFat sales, they deliberately withheld this information until after completing the SPO, while incredibly claiming that the Company's growth was sustainable" (*id.* at 17 (citing AC ¶¶ 53-67)) and that Defendants "either knew of and ignored the effects on Enzymotec's business that the regulatory changes presented, or were deliberately reckless in not knowing about them, in order to effectuate the SPO." (*Id.* at 18.)

As an initial matter, for the reasons stated in Part A.1.a, *supra*, the Court finds that the statements regarding InFat sales are not entitled to safe harbor protection at this stage, since Lead Plaintiffs have specifically alleged that the accompanying cautionary language is inadequate. Additionally, the Court finds that when viewing the Amended Complaint in its entirety, it cannot conclude that all of the statements regarding InFat sales are accurate statements about Enzymotec's historical and present financial performance. Lead Plaintiffs' specifically allege that "Defendants knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues related to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales" and that "Defendants provided a materially false and misleading depiction of the Company's InFat sales in the Chinese market during the Class Period[.]" (AC ¶¶ 101, 102.) When taking such allegations into consideration and viewing them in a light most favorable to Lead Plaintiffs, the Court finds that the statements regarding InFat sales-such as "see[ing] continuous growth and interest," "good acceptance of the products continue," and "very stable contracts" (AC ¶¶ 96, 97)-can plausibly give rise to liability, such that Lead Plaintiffs are "entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302 (3d Cir. 2011). Indeed, although the Court acknowledges and appreciates Defendants' framing of the case as merely one of "fraud-by-hindsight," this particularized analysis "is not something that the Court is tasked with tackling at this stage, given the inferences owed to the Plaintiff." *In re Viropharma Inc. Sec. Litig.*, 21 F.Supp. 3d 458, 470 n.20 (E.D. Pa. 2014).

**\*14** Furthermore, the Court cannot conclude at this stage of the litigation that the statements regarding InFat sales are inactionable puffery. Puffery is "vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied." *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-00993, 2015 WL 3833849, at \*16 (M.D. Pa. June 2015) (citing *In re Advanta*, 180 F.3d 525 (3d Cir. 1999)); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (noting that puffery includes "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."). In other words, a statement is considered puffery only when it is immaterial. "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 (3d Cir. 1992) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Indeed, "the emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997). Although Defendants' argument that the statements concerning InFat sales amount to nothing more than puffery are well-taken, when viewing the Amended Complaint as a whole and in a light most favorable to Lead Plaintiffs as the Court must, the Court concludes that the allegations here sufficiently raise a mixed question of law and fact to allow the claims to proceed. "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro*, 964 F.2d at 280 (citing *TSC*, 426 U.S. at 450). Given the inferences owed to Lead Plaintiffs, the Court concludes at this stage of the litigation that reasonable minds could differ on the question of materiality with respect to the statements regarding InFat sales.

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

*c. Giving All Inferences to Lead Plaintiffs, Defendants Had a Duty to Disclose Chinese Regulations*

With respect to Chinese regulations, Lead Plaintiffs allege that in the Company's May 14, 2014 press release, the company acknowledged the "recent changes in Chinese regulations" but stated that "[t]he Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year." (AC ¶ 104.) This statement was reiterated when Defendant Bryan stated during the May 14, 2014 earnings call that "[w]e believe [the recent changes in Chinese regulation] will result in revenues being shifted form the second quarter to the second half of the year." (*Id.* ¶ 105.) During the June 5, 2014 Jefferies 2014 Global Healthcare Conference, Lead Plaintiffs allege that Defendant Katz stated that the regulatory change "doesn't impact our not expect [sic] to have impacting [sic] 2014" and reiterated that the Company "will see slowdown during quarter two and expect that (inaudible) catch-up in quarter three and quarter four." (*Id.* 106.)

Defendants argue that they had no obligation to disclose the details of the new Chinese regulations every time it "accurately described" sales of InFat in China because the securities laws do not require companies to disclose general industry-wide trends. (Mov. Br. at 16.) Defendants contend that since the regulations did not become effective until May 2014, "they have no bearing whatsoever on Enzymotec's statements through May 2014, rendering the vast majority of the [Amended Complaint] entirely irrelevant." (*Id.* at 17.) Additionally, Defendants stress that InFat was not immediately implicated by the regulatory changes-instead, the changes were to regulations of infant formula manufacturers, which Enzymotec does not manufacture. (*Id.* at 17-18.) Similarly, Defendants argue that statements about "good visibility" on sales do not require disclosure of every possible factor potentially affecting sales, especially because "good visibility" is puffery and Lead Plaintiffs have not explained how the statements make any of the statements about past results false or misleading. (*Id.* at 18-19.) Specifically, Defendants point out that Enzymotec's last indication that it had "good visibility on sales" was in the prospectus for the SPO in February 2014, and that thereafter, Enzymotec reported good results in May 2014, putting it on track to meet its February guidance. (*Id.* at 19.) Defendants thus argue that Lead Plaintiffs "cannot claim that any of Enzymotec's statements about 'good visibility' were

false or misleading because Enzymotec met its projections even after the last time it made that statement." (*Id.*)

**\*15** Lead Plaintiffs contend that Defendants "routinely and publicly highlighted the Company's viability of its InFat business-which drove Enzymotec's continuous growth-thus triggering a duty to disclose and correct any 'inaccurate or misleading prior disclosure.'" (Opp. Br. at 20 (citing *In re Urban Outfitters, Inc. Sec. Litig.*, 2015 WL 2069222, at \*10 (E.D. Pa. May 4, 2015)).) Lead Plaintiffs argue that at the very least, Defendants' arguments raise a fact question. (*Id.* at 20.)

"[N]on-disclosure of material information will not give rise to liability under Rule I Ob-5 unless the defendant had an affirmative duty to disclose that information." *See Oran v. Stafford*, 226 F.3d 275, 78-86 (3d Cir. 2000). "Disclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (quoting Rule 10b-5 and *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988)); *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) ("[A] duty to disclose may arise when there is ... an inaccurate, incomplete or misleading prior disclosure.").

Here, the Court finds that, when giving all inferences in favor of Lead Plaintiffs, Defendants had a duty to disclose the specifics of the Chinese regulations. As an initial matter, the Court agrees that the question of whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact. *See Weiner*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). Furthermore, Lead Plaintiffs specifically allege a duty to disclose. For example, although Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect. (*See* AC ¶¶107-09.) Accordingly, the Court finds that, at this early stage of the litigation, the Amended Complaint adequately alleges that Defendants had a duty to disclose.

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

*d. Whether There Was Complete Information in the Market Concerning the Changes in the Chinese Regulations of Infant Formula Manufacturers Should Not Be Determined at This Early Stage*

Defendants argue that all of the alleged misstatements and omissions are immaterial given the "total mix" of information available to investors. (Mov. Br. at 20-21.) Specifically, Defendants contend that because the new Chinese regulations were publicly known-as evidenced by news articles, government reports, and analyst reports subject to judicial notice—Plaintiffs cannot show a misstatement or an omission of material fact. (*Id.*)

Lead Plaintiffs counter that Defendants "repeatedly and directly obfuscated the impact" of the Chinese regulations, such that a reasonable investor could not have ascertained the effect of the changes. (Opp. Br. at 20-21.) Additionally, Lead Plaintiffs argue that, to prevail on this theory, Defendants would have to show that the market understood the regulations' implications, which is a fact question not properly addressed at this stage. (*Id.* at 21.)

 **\*16** "The 'truth on the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market." *The Winer Family v. Queen*, No. 03-4318, 2004 WL 2203709, at \*4 (E.D. Pa. Sept. 27, 2004) *aff'd sub nom, Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007). "To prevail on a 'truth on the market' defense at th[e] [motion to dismiss] stage of the litigation ... defendants must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint[.]" *In re Res. Am. Sec. Litig.*, No. 98-5446, 2000 WL 1053861, at \*5 (E.D. Pa. July 26, 2000). Again, the Court is guided by its duty to accept all factual allegations as true and to construe the Amended Complaint in a light most favorable to Lead Plaintiffs. Given the strong inferences in favor of Lead Plaintiffs, the Court finds that it is inappropriate to rule at this stage whether the truth on the market defense applies. *See, e.g., Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

*e. Lead Plaintiffs Have Sufficient Plead Allegations Relating to Internal Controls*

Finally, with respect to internal controls, Lead Plaintiffs allege that Enzymotec's February 13, 2014 Form 20-F included SOX certifications by Defendants Katz and Bryan, in which they certified in part that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report ...." (AC ¶ 110.)

Defendants argue that Lead Plaintiffs fail to explain how these SOX certifications were false or misleading. (Mov. Br. at 10 n.7.) Defendants contend that Lead Plaintiffs have failed to state a claim in part because Enzymotec has not restated any of its financial results and Enzymotec's independent auditors have never questioned Enzymotec's internal controls. (*Id.*)

Lead Plaintiffs counter that they have sufficiently stated a claim for relief with regard to internal controls because they specifically allege that Defendants Katz and Bryan each falsely certified under Sarbanes-Oxley that Enzymotec maintained effective internal controls over financial reporting and that the Company's financial statements were accurate and fairly presented the Company's financial condition. (Opp. Br. at 18.) Lead Plaintiffs contend that Defendants had no reasonable basis for stating that Enzymotec's financial results did "not contain any untrue statement" and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of the Company. (*Id.*)

Given the early stage of the litigation and the requirement that it must give all inferences in favor of the plaintiff, the Court finds that Lead Plaintiffs have adequately pled that Defendants Katz and Bryan each falsely certified that Enzymotec maintained effective internal controls over financial reporting and that the Company's financial statements were accurate and fairly represented the Company's financial condition. (AC ¶¶ 110-13.) In particular, in contrast to the certifications, Lead Plaintiffs specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly

fraudulent behavior during the Class Period. (*Id.* ¶ 113.) The Court finds this sufficient in light of the fact that its role at this stage is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302. (3d Cir. 2011).

### 2. Scienter

**\*17** Defendants move to dismiss the Amended Complaint on grounds that Lead Plaintiffs have failed to adequately plead scienter. (Mov. Br. at 22-28 (citing AC ¶¶ 7, 21-23, 67, 79, 130, 149-50, 152); Reply Br. at 7-12.) Defendants first argue that Lead Plaintiffs present nothing more than generalized imputations of knowledge, and point out that Lead Plaintiffs rely on the speculative assertions of an outside expert as opposed to a confidential witness, internal memorandum, or other Company source. (Mov. Br. at 22-23.) Defendants further contend that any allegations of scienter are undermined by both the timing of the new regulations and the fact that Biostime failed to accurately predict their impact. (*Id.* at 24-25.)

Additionally, Defendants argue that Lead Plaintiffs' attempt to plead scienter based upon the Officer Defendants' stock sales at an allegedly inflated price is without merit, since motive and opportunity alone cannot give rise to a strong inference of scienter. (*Id.* at 25-27.) Defendants assert that Officer Defendants "sold only 35% of their stock in the SPO, thereby remaining heavily invested in the Company by continuing to hold nearly 500,000 shares" and further note that the SPO took place in February 2014, approximately three months after Enzymotec's stock price reached its peak in December 2013. (*Id.* at 26.) Additionally, Defendants argue that Lead Plaintiffs have holistically failed to establish scienter since the Company expected continued sales growth in 2014, made large investments in its krill oil business and increased its raw materials inventory over 40% between the end of 2012 and 2013, provided early disclosure of its "disappointing" second quarter 2014 results, and reduced its guidance in May 2014 even when it had a good quarter. (*Id.* at 27.)

In response, Lead Plaintiffs argue that the Amended Complaint alleges compelling facts evidencing Defendants' knowledge and recklessness. (Pl. Opp. Br. at 22-25.) First, Lead Plaintiffs contend that because the alleged misstatements and omissions concerned Enzymotec's core business about which Defendants regularly spoke, knowledge may be imputed to individual defendants under the "core operations doctrine." (*Id.* at 22-23.) Additionally, Lead

Plaintiffs argue that Defendants were in possession of information regarding the Chinese regulations that "undercut their public statements regarding Enzymotec's operations in the Chinese markets, strength in its relationships with its then-current customers, and its ability to attract new customers." (*Id.* at 24-25.)

Furthermore, Lead Plaintiffs contend that Defendants were motivated to commit fraud in order to inflate the Company's stock price for purposes of profiting through the SPO. (*Id.* at 25-29.) The Amended Complaint alleges that, through the SPO, a total of ten insiders profited by selling 1.94 million shares for gross proceeds of approximately $54.3 million, which represented 58% the shares that these insiders collectively owned at the time, and that Defendants Katz (233,526 shares) and Bryan (51,802 shares) sold significant amounts of shares for nearly $8 million, representing respectively 35% and 42% of their holdings. (*Id.* at 25-27 (citing AC ¶ 67).) Lead Plaintiffs argue that these amounts are suspicious, even if the insiders did not liquidate all of their shares, especially since the SPO was announced almost contemporaneously with the Company's announcement of record financial results in February 2014. (*Id.*)

Additionally, Lead Plaintiffs note that Defendants are primarily located in Israel, with the operational events in Israel, Sweden, and China, and point to the relaxed particularity rules in situations where information is peculiarly within a defendant's knowledge or control. (*Id.* at 27.) Lead Plaintiffs further allege that Defendants are being disingenuous when they attempt to distance themselves from the infant formula market, especially given the importance of InFat to the Company's business. (*Id.* at 28.)

**\*18** As noted, "each act or omission alleged to violate [Section 10(b) ], [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u4(b)(2). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. ... The inference ... need not be refutable, *i.e.*, of the

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 314, 324.

The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *see also In re Radian Sec. Litig.*, 612 F.Supp.2d 594, 607 (E.D. Pa. 2009) (noting that although in *Tellabs* the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under 10b-5, "every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly.") In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *S.E.C. v. Infinity Grp. Co.*, 212 F.3d at 192. Finally, a court considers the entirety of a complaint in determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." *Tellabs I*, 551 U.S. at 322; *see also Avaya*, 564 F.3d at 273.

The Court finds that when considering the Amended Complaint in its entirety, Lead Plaintiffs have adequately pied scienter. As an initial matter, Lead Plaintiffs have alleged that the matter at issue is central to the core business of the Company,[17] about which Defendants spoke regularly.[18] Although such allegations are not sufficient in and of themselves to show scienter, the Court keeps them in consideration when viewing the entirety of the Amended Complaint. See Mill Bridge V. Inc. v. Benton, No. 08-2806, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("[W]hile a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.")

Most compelling to the Court when viewing the Amended Complaint holistically are the allegations surrounding the SPO. Although motive or opportunity "may no longer serve as an independent route to scienter," *Avaya*, 564 F.3d at 277-78, Lead Plaintiffs have specifically alleged that Defendants Katz and Bryan sold large amounts of shares for significant personal financial gain and that the sales were unusual in scope and timing. *See Tellabs*, 551 U.S. at 325 (noting that "personal financial gain may weigh heavily in favor of a scienter inference"); *In re Advanta*, 180 F.3d at 540 ("[W]e will not infer fraudulent intent from the mere fact that some officers sold stock. But if the stock sales were unusual in scope or timing, they may support an inference of scienter.") (citing *In re Burlington Coat Factory*, 114 F.3d at 1424) (internal citations and punctuation marks omitted); *see also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (reviewing complaint for allegations that stock sales were "unusual in scope (*e.g.*, compared to their total level of compensation or the size of previous sales) or timing (*e.g.*, compared to the timing of past trades)").

**\*19** In particular, the Amended Complaint alleges that as part of the SPO, Defendant Katz sold 233,526 shares, or 35% of his total holdings, for gross proceeds in excess of $6.5 million; Defendant Bryan sold 51,802 shares, or 42% of his total holdings, for gross proceeds of $1.45 million. (AC ¶ 67.) Furthermore, Lead Plaintiffs have specifically alleged that these sales were "suspiciously-timed" (*id.*), in that they occurred at a time when the price of the stock was allegedly artificially inflated due to Defendants' misrepresentations concerning the impact of the Chinese regulations. For example, Lead Plaintiffs allege that the SPO was announced on February 13, 2014: months after the IPO, the same day as favorable guidance (*id.* ¶ 48), the same day that Defendant Katz stated that "[f]or fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance.... Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position" (*id.* ¶ 47), and the same day that the Company stated that it "expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 49.) Crucially, Lead Plaintiffs specifically tie together the timing of these sales with the core of the alleged misrepresentations: at the time of the SPO, Defendants were aware, or should have been aware, of the severe negative impact that the impending Chinese regulations would have on the Company's business. (*Id.* ¶¶ 55-65.) Furthermore, Lead Plaintiffs allege that the truth about the impact of the regulations was fully revealed six months after the SPO, at which point the price of the shares tanked. (*Id.* ¶¶ 68-82.) Thus, Lead Plaintiffs allege that when the SPO was effectuated, the price of the stock was inflated as a result of the misrepresentations.

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

The allegedly suspiciously timed stock sales are bolstered by the declaration of Dr. Mingruo Guo, which Lead Plaintiffs attach to the Amended Complaint to support their contentions that Defendants should have known of, and anticipated, the true impact of the regulatory changes. (AC, Ex.A). Although the declaration of an outside expert of a food scientist such as Dr. Guo is admittedly not as strong as a confidential witness, the declaration of Dr. Guo only serves to supplement the allegations contained in the Amended Complaint,[19] especially where the operational events occurred in Israel, Sweden, and China. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418 ("[T]he normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.").

The particularized allegations before this Court of motive viewed in the context of the Amended Complaint as a whole are compelling. In short, the allegations significantly enhance the inference of scienter, especially when read in light of relevant Third Circuit precedent. *See Avaya*, 564 at 279 (concluding that allegations concerning stock transactions did not significantly enhance the inference of scienter where defendants sold 1.7% and 17.7% of their respective holdings and "trading practices remained consistent year-over-year"); *In re Suprema Specialties, Inc. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (concluding that allegations that stock sales were suspiciously timed since they occurred six weeks before defendants retired, occurred at artificially high prices as a result of the scheme, and resulted in significant personal gain of approximately $7 million were sufficient to survive motion to dismiss, despite the fact that defendants had retained significant percentage of stock holdings).

Upon a holistic consideration of the allegations contained in the Amended Complaint, the Court finds that a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *See Tellabs*, 551 U.S. at 314, 326. Accordingly, the Court finds that Lead Plaintiffs have adequately alleged a claim under Section 10(b) and Rule 10b-5 of the Securities Exchange Act, sufficient to allow the claim to proceed at this time.

**B. Control Person Claim Against the Officer Defendants under § 20(a) of the Securities Exchange Act**[20]
Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a);

*In re Suprema*, 438 F.3d at 284. Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *Avaya*, 564 F.3d at 252; *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted).

**\*20** Because the Court has found Lead Plaintiffs have adequately alleged a violation of the Securities Exchange Act, it likewise finds that Lead Plaintiffs Plaintiff have sufficiently stated a claim for control liability under Section 20(a). *See In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 418 (D.N.J. 2004). Accordingly, the Court will deny Defendant's motion to dismiss this claim.

**C. Securities Act Claims**[21]
The Securities Act creates federal duties related to the registration and disclosure of public offerings. *In re Suprema*, 438 F.3d at 269 (citations and quotation marks omitted). Lead Plaintiffs assert claims arising under the following sections of the Securities Act: Section 11, Section 1 and Section 15. (AC at 60-74.) Sections 11 and 12(a)(2) of the Securities Act "impose civil liability for the making of materially false statements in registration statements and prospectuses." *In re Adams Golf Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004); *see* 15 U.S.C. §§ 77k, 77l(a)(2). In addition, Section 15 allows a plaintiff to bring a claim for "control liability" against a person who controls a person liable for an underlying violation of the Securities Act. *See In re Suprema*, 438 F.3d at 284-85.

Section 11 of the Securities Act concerns material misstatements or omissions m registration statements. 15 U.S.C. § 77k(a). Under Section 11, "a private action for damages may be brought 'by any person acquiring such security' if a registration statement, as of its effective date: 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *In re Suprema*, 438 F.3d at 269 (quoting 15 U.S.C. § 77k(a)). Furthermore, a Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement. *Id.* Section I is a "virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267,

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

274 n. 7 (3d. 2004). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *In re Suprema*, 438 F.3d at 269 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Section 12(a)(2) provides civil liability for anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77l(a)(2). Thus, to state a claim under section 12(a)(2), a plaintiff must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted). And, like section 11, section 12 is a "virtually absolute" liability provision which does not require a plaintiff to allege that the defendants possessed scienter, and instead requires only rather, only that the plaintiff made the purchase pursuant to a materially false or misleading prospectus or oral communication. *In re Adams Golf*, 381 F.3d at 274 & n.7.

**\*21** Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12. *See* 15 U.S.C. § 77o; *see also, In re Adams Golf*, 381 F.3d at 273 n.3. To state a claim under § 15, plaintiffs must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws. *In re Suprema*, 438 F.3d at 284.

Section 11 and 12(a)(2) claims are generally not subject to the heightened pleading standards required under the PSLRA and Federal Rule of Civil Procedure 9(b); rather, the liberal notice pleading requirements of Rule 8 generally apply. *See In re Suprema*, 438 F.3d at 269-70 (citations omitted). However, "where the plaintiff grounds [the] Securities Act claims in allegations of fraud-and the claims thus 'sound in fraud'-the heightened pleading requirements of Rule 9(b) apply." *Id.* (citing *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161-63 (3d Cir.2004) ("CALPERS")). However, if the allegations are pled separately and plaintiffs expressly premise Securities Act claims on negligence rather than fraud, Rule 9(b) is inapplicable. *Id.* at 273 ("[W]here ... individual defendants are accused in separate claims of the same complaint as having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pied in

connection with those claims.") *Id.* at 273. In *In re Suprema* the plaintiff carefully separated its allegations of negligence from allegations of fraud against the same defendants by "pleading its Section 11 and Section 12(a)(2) claims in negligence before-and wholly apart from-pleading its fraud-based Section 10(b) claims." *Id.*

Here, the Amended Complaint similarly separates the factual allegations supporting the Securities Act claims from those supporting the Exchange Act claims. (*See* Compl.) The Section 10(b) claims are pied before the Section 11 and 12(a)(2) claims. (*Id.*) The Securities Act claims are prefaced by the following statement: "In this part of the Complaint, Lead Plaintiffs assert a series strict liability and negligence claims based on the Securities Act ... [and] expressly disclaim any allegations of knowing or reckless misconduct[.]" (AC ¶ 139.) Accordingly, the Court finds that Plaintiff has pied its Securities Act claims in a manner sufficient "to avoid triggering Rule 9(b)." *In re Suprema*, 438 F.3d at 273.

Keeping in mind the elements to state a claim and the requirement that the Court must accept all factual allegations as true at this stage, the Court finds that Lead Plaintiffs have sufficiently pied these causes of actions to survive the instant motion to dismiss. (*See* AC ¶¶ 169-81(Section 11); *id.* ¶¶ 182-89 (Section 12(a)(2)); *id.* ¶¶ 190-95 (Section 15).)

With respect to standing for these claims, Lead Plaintiffs specifically allege that they purchased Enzyrnotec securities issued in, or traceable to, the offering of Enzyrnotec securities that were conducted pursuant to either the IPO or SPO. (AC ¶¶ 141-43.) In the Third Circuit, the question of determining standing through tracing is a "factual one, to be resolved through discovery, as to whether plaintiffs can demonstrate that the shares they allegedly purchased are in fact traceable to the registration statement alleged to be false and misleading." *In re Suprema*, 438 F.3d at n.7 (concluding that plaintiffs' assertions of purchases "in" and "traceable to" the Suprema stock offerings were sufficient at the pleading stage). "If, as appellees suggest, plaintiffs have misrepresented the circumstances of their stock purchases and do not in fact have standing, appellees can raise that matter at the summary judgment stage after discovery." *Id.* Accordingly, accepting all allegations in the Amended Complaint as true at this stage as it must, the Court finds that Lead Plaintiffs have adequately alleged standing.

**\*22** Furthermore, as discussed above in Part A, *supra*, Lead Plaintiffs have adequately alleged that the Prospectuses

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 135 of 306 PageID #:2091

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

contained untrue statements or omissions of material facts. For example, even though Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect. (*See* AC ¶¶ 165-68; *see also id.* 161-64.) Additionally, the Court declines to rule on whether the truth-on-the-market doctrine applies at this stage and believes that discovery is necessary to determine that doctrine's applicability. *See, e.g., Ganino*, 228 F.3d at 1 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing

a § 10(b) complaint for failure to plead materiality.").[22] Accordingly, the Court denies the Motion to Dismiss the Securities Act claims.[23]

## **CONCLUSION**

For the reasons above, the Court grants in part and denies in part the Motion to Dismiss. An appropriate Order accompanies this Opinion.

### **All Citations**

Not Reported in Fed. Supp., 2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

Footnotes

1    The Officer Defendants are Ariel Katz ("Katz") and Oren Bryan ("Bryan"), Enzymotec's CEO and CFO, respectively. (AC ¶¶ 22-23.) The Director Defendants are: Jacob (Yaacov) Bachar ("Bachar"), Nir Belzer ("Belzer"), Yoav Doppelt ("Doppelt"), Steve Dubin ("Dubin"), Dov Pekelman ("Pekelman"), Yossi Peled ("Peled"), Imanuel Wasserman ("Wasserman"), Yossi Ohana ("Ohana"), Gilead Fortuna ("Fortuna"), Michal Silverberg ("Silverberg"), Joseph Tenne ("Tenne"). (*Id.* ¶¶ 148-58.) The Officer Defendants and Director Defendants are collectively the "Individual Defendants."

2    The § 10(b) and Rule 10b-5 claims are asserted against Enzymotec and the Officer Defendants (AC ¶¶ 124-32); the § 20(a) claim is asserted against the Officer Defendants (*id.* ¶¶ 133-38); the § 11 claim is alleged against all Defendants (*id.* ¶¶ 169-81); the § 12(a)(2) claim is alleged against Enzymotec (*id.* ¶¶ 182-89); and the § 15 claim is alleged against the Individual Defendants (*id.* ¶¶ 190-95).

3    This background is derived from Plaintiffs Amended Complaint, which the Court must accept as true at this stage of the proceedings, and other documents that are integral to and/or explicitly relied upon in the Amended Complaint, such as SEC filings, press releases, and earnings call transcripts. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009); *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

4    As noted, sales of InFat attributable to sales in China by and under the brand name of Biostime accounted for between 10% to 12% of the Company's consolidated net revenues in 2012. (AC ¶ 31.)

5    The§ 10(b) and Rule 10b-5 claims are asserted against Enzymotec and the Officer Defendants. (AC ¶¶ 124-32.)

6    To the extent that the PSLRA' s scienter pleading requirements conflict with those of Federal Rule of Civil Procedure 9(b), the PSLRA supersedes the latter as it relates to Rule 10b-5 actions. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir.2009); *see also Alpharma*, 372 F.3d at 148.

7    The Court also notes that the "bespeaks caution" doctrine is relevant to interpreting the PSLRA safe harbor. *Avaya*, 564 F.3d at 254-56; *see also In re Anadigics, Inc., Sec. Litig.*, Civil Action No. 08-5572, 2011 WL 4594845, at *10 n.4 (D.N.J. Sept. 30, 2011) (noting that the Third Circuit Court of Appeals has "incorporated much of the [bespeaks caution] doctrine into its analysis of the PSLRA") (citing *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 533-34 (D.N.J. 2010)).

8    Defendants do argue that Lead Plaintiffs have failed to allege loss causation with respect to their krill oil claims. (*See* Mov. Br. at 14 n.11 ("Plaintiffs assert that Enzymotec's stock price fell in response to press releases and conference calls on May 14, 2014 and August 14, 2014. Neither of those announcements revealed any "true facts" that had not already been disclosed concerning the high concentration of Enzymotec's sales of krill oil to a single customer.").) Lead Plaintiffs counter that loss causation is a fact intensive inquiry beyond the scope of a 12(b)(6) motion. (Opp. Br. at 11 n.9.) Because the Court grants the motion to dismiss with respect to the krill oil claims due to application of the safe harbor, *see* Part A.1.a, *infra*, the Court need not address this argument.

9    AC ¶¶ 93, 95, 99.

10   *Id.* ¶ 94.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 136 of 306 PageID #:2092

In re: Enzymotec Securities Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 8784065, Fed. Sec. L. Rep. P 98,876

11    *Id.* ¶ 96.

12    *Id.*

13    *Id.*

14    AC ¶ 97

15    AC ¶ 97

16    AC ¶¶ 93-94, 99.

17    *See* AC ¶¶ 26, 29, 32, 34 (noting that Nutrition segment made up 96% of Company's revenues in 2012, with InFat and krill oil sales comprising the vast majority of the segment); *see also id.* ¶¶ 28, 93 (suggesting that the Company viewed itself as a participant in the infant formula industry, despite its corporate structure).

18    *See, e.g.*, AC ¶ 47 (statement from Defendant Katz regarding financial outlook).

19    *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) *cert. denied sub nom. Amedisys, Inc. v. Pub. Employees' Ret. Sys. of Mississippi*, 135 S. Ct. 2892 (2015) (noting use of declaration of outside expert).

20    The § 20(a) claim is asserted against the Officer Defendants. (AC ¶¶ 133-38.)

21    The § 11 claim is alleged against all Defendants (AC ¶¶ 169-81); the § 12(a)(2) claim is alleged against Enzymotec (AC ¶¶ 182-89); and the § 15 claim is alleged against the Individual Defendants (AC ¶¶ 190-95).

22    *See also* Todd R. David, Jessica P. Corley, Ambreen A. Delawalla, *Heightened Pleading Requirements, Due Diligence, Reliance, Loss Causation, and Truth-on-the-Market – Available Defenses to Claims Under Sections 11 and 12 of the Securities Act of 1933*, 11 Transactions: Tenn. J. Bus. L. 53, 87-91 (2010).

23    Although Defendants argue that the claim against Defendant Gilead Fortuna must be dismissed because he was no longer a director of Enzymotec when the registration statement for the IPO went effective (Mov. Br. at 29 n.19), the Court denies the motion at this time. Even though Lead Plaintiffs did not directly respond to this point, Defendants do not cite to anything which would allow the Court to confirm this contention. Accordingly, the Court denies the motion with respect to Defendant Fortuna at this time but permits to Defendants to remove at summary judgment.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 34106903
Only the Westlaw citation is currently available.
United States District Court,
M.D. Florida.

In re INSURANCE MANAGEMENT
SOLUTIONS GROUP,
INC., Securities Litigation.

No. 8:00CV2013T26MAP.
|
Filed Sept. 28, 2000.
|
July 11, 2001.

**Attorneys and Law Firms**

William S. Lerach, Darren J. Robbins, Michael A. Swick, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Howard K. Coates, Jr., Paul J. Geller, Jack E. Reise, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, Kenneth Vianale, Vianale & Vianale LLP, Boca Raton, FL, for Murrel Neal, on behalf of himself and all others similarly situated, plaintiff.

Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York, NY, William S. Lerach, Darren J. Robbins, Michael A. Swick, Robert R. Adler, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Howard K. Coates, Jr., Jack E. Reise, Kenneth Vianale, for David Muti, on behalf of himself and all others similarly situated, consolidated plaintiff.

Marc A. Topaz, Schiffrin & Barroway, LLC, Bala Cynwyd, PA, Robert R. Adler, Howard K. Coates, Jr., Paul J. Geller, Jack E. Reise, Jonathan M. Stein, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA, for Todd Speir, on behalf of himself and all others similarly situated, consolidated plaintiff.

Richard S. Davis, Foley & Lardner, West Palm Beach, FL, USA, Douglas M. Hagerman, Foley & Lardner, Chicago, IL, for Insurance Management Solutions Group, Inc., defendant.

Richard S. Davis, for Geotrac of America, Inc., defendant.

Richard S. Davis, Douglas M. Hagerman, for Bankers Insurance Group, Inc., defendant.

Nancy J. Faggianelli, Chris S. Coutroulis, Carlton Fields, P.A., Tampa, FL, Matthew C. Lucas, Bricklemyer, Smolker & Bolves, P.A., Tampa, FL, for Venture Capital Corporation, defendant.

Richard S. Davis, Douglas M. Hagerman, for David K. Meehan, individually, defendant.

Richard S. Davis, Douglas M. Hagerman, for Jeffrey S. Bragg, individually, defendant.

Richard S. Davis, Douglas M. Hagerman, for Daniel J. White, individually, defendant.

Richard S. Davis, Douglas M. Hagerman, for Robert M. Menke, individually, defendant.

Richard S. Davis, Douglas M. Hagerman, for Robert G. Menke, individually, defendant.

Mark F. Bideau, Jon Andrew Jacobson, Greenberg Traurig P.A., West Palm Beach, FL, USA, for Raymond James & Associates, Inc., individually and as representatives of the defendant underwriter class, defendant.

Mark F. Bideau, Jon Andrew Jacobson, (See above), for Keefe, Bruyette & Woods, Inc., individually and as representatives of the defendant underwriter class, defendant.

Robert R. Adler, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Howard K. Coates, Jr., Jack E. Reise, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, Kenneth Vianale, Vianale & Vianale LLP, Boca Raton, FL, for Thomas Schmidt, plaintiff.

*Order on Motions to Dismiss*

LAZZARA, J.

**\*1** Before the Court is the Insurance Management Solutions Group (IMSG) Defendants' Motion to Dismiss and appendix (Dkts. 34 and 36), Venture Capital Corporation's Motion to Dismiss (Dkt.37), the Underwriter Defendants' Dispositive Motion to Dismiss (Dkt.40), Plaintiffs' Memorandum of Law in Opposition (Dkt.47), Plaintiffs' Notices of Supplemental Authority (Dkts. 48, 49, and 51), IMSG Defendants' Response to Notices of Supplemental Authority (Dkt.50), and the Amended Complaint (Dkt.27). After careful consideration of the allegations of the Amended Complaint and the documents

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)
2001 WL 34106903

which this Court may judicially notice in this securities case,[1] the Court concludes that the motions should be denied.

[1]     See discussion at section IV of this order for what documents this Court may judicially notice.

### I. Background

This securities class action stems from the purchase of the common stock of IMSG (also referred to as the Company)[2] following an initial public offering (IPO) on February 11, 1999. (Dkt.27). Plaintiffs Muriel Goodman and Thomas Schmidt, purchasers of the common stock, filed this suit asserting violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the 1933 Act). Plaintiffs essentially claim that the Defendants misrepresented the true condition and structure of the Company in the prospectus and registration statement, and at pre-IPO presentations. Plaintiffs claim that the Defendants did not conduct a sufficient and adequate due diligence examination of the Company in the preparation of the prospectus and registration statement.

[2]     The common stock was approved for inclusion on the National Association of Securities Dealers Automated Quotations (NASDAQ) market under the symbol "INMG." (Dkt. 36 at cover page).

The Defendants are comprised of essentially five groups or entities. Defendant IMSG (the Company) offers property and casualty (P & C) insurance-related services to companies and institutions. Defendant David K. Meehan is the Chairman of the Board, Chief Executive Officer, and a director of the Company. Defendant Jeffrey S. Bragg is the Executive Vice President, Chief Operating Officer, and a director of the Company. Defendant Daniel J. White is the President and Chief Executive Officer of Geotrac of America, Inc., and a director of the Company. Defendants Robert M. Menke and Robert G. Menke are directors of the Company. Defendants Raymond James & Associates, Inc. and Keefe, Bruyette & Woods, Inc. were the primary underwriters of the IPO. Defendant Venture Capital Corporation (Venture Capital) was the "Selling Shareholder" according to the prospectus. Defendant Bankers Insurance Group, Inc. (BIG) is the Company's parent corporation.[3]

[3]     The IMSG Defendants, which include the five individual Defendants, the Company and BIG, filed one motion to dismiss. The remaining two Defendants, Venture Capital Corporation and the representative underwriters, each filed a separate motion to dismiss.

### II. Facts

The Company is a holding company which was incorporated in 1996 by Defendant BIG. (Dkt.36, Exh. A at pg. 2). The Company offers two different services: (1) outsourcing services to P & C insurers, including policy administration, claims administration, and information technology services, with an emphasis on the flood insurance market; and (2) flood zone determinations to financial institutions, mortgage lenders and insurance companies, to facilitate compliance with federal regulations requiring the purchase of flood insurance. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at paras. 3, 23 and 24). BIG is the nation's second largest underwriter of flood insurance policies. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at para. 26). BIG contributed two of its wholly-owned subsidiaries to the Company: Insurance Management Solutions, Inc. (IMS) and Bankers Hazard Determination Services, Inc. (BHDS). IMS operates the outsourcing services and BHDS provides the flood zone determinations.

 *2  On July 31, 1997, BHDS acquired 49 per cent of the outstanding shares of Geotrac, Inc., a competitor flood zone determination company. (Dkt. 36, Exh. A at pg. 30). In July 1998, BHDS acquired the remaining 51 per cent. (Dkt. 36, Exh. A at pg. 30). In the transaction, Geotrac, Inc. was merged into BHDS. The surviving company changed its name to Geotrac of America, Inc. (Geotrac). Geotrac became the business providing flood zone determination services for the Company.

Prior to the IPO, the Company was a 74.4% owned subsidiary of BIG. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at para. 26). Immediately after the IPO, BIG reduced its beneficial ownership in the Company to 62.7% and obtained benefits totaling over $100 million. (Dkt. 27 at para. 26). BIG is the Company's principal customer, accounting for approximately 75.6%, on a historical basis, and 56.4%, on a pro forma basis, of the Company's total revenues. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at para. 26). BIG accounted for 98%, on both a historical and a pro forma basis, of the Company's outsourcing revenues in 1997. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at para. 26). It accounted for 56.2% and 96.8%, respectively, of the Company's total revenues and outsourcing revenues for the nine months ended September 30, 1998. (Dkt. 36, Exh. A at pg. 1; Dkt. 27 at para. 26). The Company's flood zone determinations, however, were provided to a wide client base, consisting of more than 880 banks, credit unions, mortgage lenders, insurance companies and financial institutions. (Dkt. 36; Exh. A at pg. 1).

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)
2001 WL 34106903

On February 11, 1999, the date of the IPO, the Company offered and sold 2,000,000 shares of its common stock at $11 per share pursuant to a registration statement filed with the SEC, including a prospectus. (Dkt. 27 at para. 2; Dkt. 36; Exh. A at cover page). Defendant Venture Capital, which had acquired 20 per cent of the Company's shares in July 1998, sold 1,350,000 shares. A group of 22 underwriters, including Defendants Raymond James & Associates, Inc. and Keefe, Bruyette & Woods, Inc., as the representative underwriters, agreed to purchase the 3,350,000 shares from the Company and Venture Capital. (Dkt. 36 at Exh. A at pg. 63). The underwriters then resold the shares to investors, including the Plaintiffs. (Dkt. 36 at Exh. A at pg. 63).

The Company and Venture Capital raised a total of $36.85 million in gross proceeds from the the IPO. (Dkt. 27 at paras. 2 and 6). The prospectus estimated that the IPO would generate approximately $23.2 million in net proceeds from the IPO. (Dkt. 27 at n. 1). Plaintiff alleges that the Company and its insiders ultimately received $20.7 million in net proceeds from the IPO. (Dkt. 27 at n. 1).

In contemplating the IPO, the Company contacted Defendant Raymond James & Associates, Inc. and Keefe, Bruyette & Woods, Inc. (the primary underwriters) to establish a syndicate to underwrite a public offering. The underwriters at the direction of Defendant David K. Meehan helped to market and sell the Company's stock by preparing and disseminating selling sheets at presentations during pre-IPO road shows. Plaintiffs allege that with the almost $37 million raised by selling the 3.5 million shares at $11 per share, the Company and its insiders agreed to indemnify the underwriters from any liability arising from the IPO. (Dkt. 27 at para. 6). Plaintiffs contend that the underwriters had no incentive to conduct a due diligence investigation because of the "large financial buffer [raised] to protect them from any adverse consequences resulting from any violations of the securities laws." (Dkt. 27 at para. 6).

**\*3** On September 29, 1999, the Company issued a press release in which it warned of disappointing third quarter 1999 financial results. (Dkt.36, Exh. B). The lowered earnings expectations for the third quarter ending September 30, 1999, and anticipated lowered earnings for the fiscal year ending December 31, 1999, were caused in part by Geotrac's insufficient performance ("continued weakness in the Company's flood zone determination business as well as lower than expected outsourcing services revenues"). (Dkt.36, Exh. B).

On October 29, 1999, the Company issued another press release announcing the financial results for the quarter ended September 30, 1999. (Dkt.36, Exh. C). The release stated that the flood zone determination revenues were "adversely impacted by a continued decline in mortgage refinancings and loan originations, which have historically driven the demand for flood zone determinations." (Dkt.36, Exh. C). The Company also announced that it was going to sell its flood mapping and flood zone determination business. After the stock prices fell to approximately $2.00 per share, this lawsuit ensued.

*A. Specific Allegations of False and Misleading Statements*
Plaintiffs allege that the Defendants issued false and misleading statements of present or past facts in the registration statement, the prospectus, and the statements presented at pre-IPO road shows. The false and misleading statements included that 1) the Company was successfully assimilating its two primary lines of business, 2) the Company was realizing synergies between these purportedly overlapping but independent businesses, and 3) it was well-positioned to execute its growth strategy. The Defendants also misrepresented their intended use of the proceeds raised from the IPO. Specifically, the Company's registration statement earmarked $23.2 million for general corporate purposes, $10 million to repay outstanding indebtedness, and $3.2 million to be used for capital expenditures on upgrading technology, including network and mainframe upgrades.

1. *Statements Disseminated at the Pre–IPO Road Shows*
Plaintiffs allege that the misrepresentations set forth above were made prior to February 1999 when the representatives of the underwriter Defendants conducted telephone conferences and met in person with potential investors in several cities throughout the United States. (Dkt. 27 at para. 31). Plaintiffs assert that Mr. Meehan also participated in the demonstrative presentations. Plaintiffs allege that the positive statements made at the pre-IPO stage were consistent with the statements made in the prospectus and registration statement.

Plaintiffs allege that the underwriters undertook the responsibility of marketing the IPO through road shows. The road shows occurred in New York City, Denver, Boston, Providence, Philadelphia and Los Angeles. (Dkt. 27 at para. 32). During the road shows, Defendants touted that the Geotrac flood mapping services were central to both the Company's present business model and its plans for future

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)

2001 WL 34106903

growth. Plaintiffs list the following specific representations made by the Defendants at the road shows:

**\*4** 1. Since the flood mapping and insurance outsourcing businesses were complimentary they could be expected to *create new business opportunities and create synergies that would increase revenues.*

2. Management *was fully able to integrate* Geotrac's flood mapping business with and into the Company's insurance outsourcing business.

3. Investors could reasonably expect the stock to rise approximately 60% in value in the next 12 months and 100% in value over the next 24.

4. IMSG's earnings were predictable because 55% of the numbers are recurring based on IMSG's proprietary links to the flood insurance market and in addition, aggressive new contract signings had broadened the firms' presence into all segments of personal and commercial lines insurance. Moreover, they represented that IMSG's turnkey outsourcing product would be a driving factor in obtaining new business.

5. IMSG was growing at 40%-plus and had the capability to maintain a 20% secular growth rate for the next five years.

6. The Company had a sound business plan, an experienced management team and new capital, which they stated would allow IMSG to successfully expand its revenue base with non-affiliated customers and grow earnings at an annualized rate of at least 20% over the next 18–24 months.

7. IMSG could be purchased at a compelling valuation as a pure play in the insurance processing and outsourcing fields with attractive earnings potential.

(Dkt. 27 at para. 32) (Emphasis added). Plaintiffs allege that it was known at the time of the IPO that there were no synergies created from the Geotrac acquisition. In fact, the computer systems of Geotrac were incompatible with the Company's. Given the nature of the flood mapping services, a compatible, effective computer system was vital and critical to the success of the entire second line of business of the Company.

#### 2. *The Prospectus*

Plaintiffs allege that the prospectus failed to disclose that IMSG's flood mapping and flood zone determination subsidiary, Geotrac, was not compatible with IMSG's outsourcing business. Plaintiffs allege that all of the

individual Defendants signed the registration statement issued in connection with the IPO.

The prospectus stated under the "Recent Acquisitions" section as follows:

The acquisition of Old Geotrac (the "Geotrac Acquisition") *strengthens the Company's position as a leader* in the flood zone determination business and broadens the range of flood data services the Company is able to provide. In addition, the Company is in the process of consolidating its own flood zone determination operations with those of Old Geotrac in an effort *to realize economies of scale.* Finally, the Company believes that access to Old Geotrac's customer base of financial institutions and insurance companies will *facilitate cross-selling opportunities and expansion of the Company's outsourcing services.*

(Dkt. 36, Exh. A at pg. 12) (Emphasis added.) The prospectus provided as follows with respect to the "Use of Proceeds" from the sale:

**\*5** The net proceeds to the Company from the sale of the 2,000,000 shares of Common Stock offered by the Company, after deducting the underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $19.5 million. The Company intends to use approximately $10.0 million of the net proceeds to repay indebtedness that is outstanding at the time of this offering. Additionally, the Company intends to use approximately $3.2 million for capital expenditures on *upgraded technology, including network and mainframe upgrades,* and the remaining balance of approximately $6.3 million *for general corporate purposes* including working capital and possible acquisitions. The Company has no present commitments or understandings with respect to the acquisition of any business, although the Company intends to monitor potential acquisition opportunities.

(Dkt. 35, Exh. A at pg. 12) (Emphasis added).

Plaintiffs allege that computer systems of the Company and Geotrac were incompatible from the outset. The computer system was critical to the operations of the flood mapping services, and computer shut-downs occurred on a daily basis. Although the Defendants promised that the proceeds from the IPO would be made available for critical purposes such as a back-up generator for the Company's computer system, no generator was ever purchased. Employees were told that none of the money generated from the IPO would be used

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)

2001 WL 34106903

for any infrastructure changes, including purchasing a back-up generator.

The prospectus set forth numerous risk factors including the Company's reliance on a key customer, dependence on economic and other factors, fluctuations in operating results, changes in legal and regulatory requirements, and integration of the Geotrac acquisition. The risk factors deemed by Plaintiffs to be inadequately disclosed include the following:

Reliance on Key Customer

The Company derives a substantial portion of its revenues from outsourcing services provided to its principal shareholder, BIG. For the years ended December 31, 1995, 1996, 1997 and 1997 (pro forma), and the nine months ended September 30, 1998, revenues from services provided to BIG accounted for approximately 40%, 37%, 76%, 56% and 56%, respectively, of the Company's total revenues and approximately 100%, 93%, 98%, and 97%, respectively of the Company's revenues from outsourcing services. The Company has entered into contracts with BIG pursuant to which it will continue to provide administrative services to BIG.... The Company's future financial condition and results of operations will depend to a significant extent upon the commercial success of BIG and its continued willingness to utilize the Company's services. Any significant downturn in the business of BIG or its commitment to utilize the Company's services could have a material adverse effect on the Company's business, financial condition and results of operations.

**\*6** Dependence on Economic and Other Factors; Fluctuations in Quarterly Operating Results

The Company's business is dependent upon various factors, such as general economic conditions and weather patterns, that are beyond its control. For example, the demand for flood zone determinations by lenders and their customers is directly related to the affordability of mortgage financing and refinancing. Current interest rates are relatively low and therefore conducive to a higher volume of mortgage lending and flood zone determinations. An increase in interest rates could have a negative impact on mortgage lending and consequently also on the level of flood zone determinations requested. Fluctuations in interest rates will likely produce fluctuations in the Company's quarterly earnings and operating results. Likewise, natural disasters such as hurricanes, tornadoes, and floods, all of which are unpredictable, directly impact the demand for both the

Company's outsourcing, particularly claims outsourcing, and flood zone determination services.

....

Integration of Geotrac Acquisition

On July 31, 1997, the Company acquired a 49% equity interest in Old Geotrac. In July, 1998, the Company acquired the remaining 51% equity interest in Old Geotrac. The Company is in the process of consolidating its existing flood zone determination operations with those of Old Geotrac in an effort to realize economies of scale. There can be no assurance, however, that the Company will be able to integrate the operations of Old Geotrac with its own operations, or that such economies of scale will be realized. The failure to successfully integrate its own operations with those of Old Geotrac could have a material adverse effect on the Company's business, financial condition and results of operations.

Limited Operating History in Third–Party Outsourcing

Since its inception, the Company has provided outsourcing services to BIG, the largest underwriter of flood insurance policies through independent agents (and the second largest overall) in the United States. As BIG's outsourcing provider, the Company has become a significant provider of flood insurance outsourcing services; however, to date it has not derived significant revenue from unaffiliated third-party outsourcing customers. A key element of the Company's growth strategy is to leverage its experience and expertise in servicing BIG's flood, homeowners and automobile businesses to market its outsourcing capabilities in various P & C lines, including flood, homeowners and automobile insurance, to other insurance companies and financial institutions. There can be no assurance that the Company will be successful in implementing this growth strategy, and the failure to do so could have a material adverse effect on the business, financial condition and results of operations of the Company.

....

Implementation of Acquisition Strategy

A key element of the Company's growth strategy is to pursue potential acquisitions that offer opportunities to increase market share or expand the Company's menu of outsourcing services. Nevertheless, there can be no

assurance that the Company will be able to locate and consummate or, if consummated, successfully integrate future acquisitions .....

**\*7** Dependence on Trend Toward Outsourcing

The Company's business and growth depend in large part on the insurance industry's trend toward outsourcing administration and information technology services. There can be no assurance that this trend will continue, as organizations may elect to perform such services in-house. A significant change in the direction of this trend could have a material adverse effect on the Company's business, financial condition and results of operations.

Reliance on Technology and Computer Systems

The Company currently licenses its primary processing software systems from BIG. Under the terms of its licensing agreement, the Company is responsible for maintaining and upgrading such systems. The Company anticipates that it will be necessary to continue to invest in and develop new technology to maintain its competitiveness. Significant capital expenditures may be required to keep its technology up-to-date. The Company's future success will also depend in part on its ability to anticipate and develop information technology solutions which keep pace with evolving industry standards and changing customer demands. The temporary or permanent loss of any such equipment or systems, through operating malfunctions or otherwise, could have a material adverse effect on the Company's business, financial condition and results of operations .....

Shares Eligible for Future Sale

....

Prior to this offering, there has been no public market for the Common Stock and no predictions can be made of the effect, if any, that the sale or availability for sale of additional shares of Common Stock will have on the market price of the Common Stock. Nevertheless, sales of substantial amounts of such shares in the public market, or the perception that such sales could occur, could materially and adversely affect the market price of the Common Stock and could impair the Company's future ability to raise capital through an offering of its equity securities.

No Prior Public Market; Volatility of Stock Price

Prior to this offering, there has been no public market for the Common Stock, and there can be no assurance that an active trading market will develop or continue following this offering, or that the market price of the Common Stock will not decline below the initial public offering price. The initial public offering price for the Common Stock has been determined by negotiations among the Company, the Selling Shareholder and the Underwriters based on several factors, and may not be indicative of the market price for the Common Stock after this offering.

The Company believes that various factors such as general economic conditions and changes or volatility in the financial markets, changing market conditions, and quarterly or annual variations in the Company's financial results, some of which are unrelated to the Company's performance, could cause the market price of the Common Stock to fluctuate substantially.

**\*8** (Dkt. 36, Exh. A at pgs. 5–11).

Plaintiffs allege that it was clear at the time of the IPO that the Geotrac acquisition was far from creating any synergies which would result in cross-selling between Geotrac and the Company. Plaintiffs allege that the risks disclosed in the prospectus were inadequate because the business of flood mapping services had already proven incompatible with the outsourcing services. Any claims of the flood mapping business declining based on fewer floods or fewer sales of flood insurance were irrelevant to the true "hard" facts that the Company was simply not producing in the area of flood mapping services due to the problems of the merger. Plaintiffs allege that these problems were known at the outset from the failed attempts at meshing the computer systems of Geotrac with the Company's.

3. *The Registration Statement*

Plaintiff alleges that the misleading statement in the registration statement provided as follows:

The net proceeds to the Company from the [IPO] ... are estimated to be approximately $23.2 million. The Company intends to use approximately $10.0 million of the net proceeds to repay indebtedness that is outstanding at the time of this offering. Additionally, the company intends to use approximately $3.2 million for capital expenditures on upgraded technology, including network and mainframe upgrades, and the remaining balance of $10.0 million for

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)
2001 WL 34106903

general corporate purposes including working capital and possible acquisitions.

(Dkt. 27 at para.44).[4] The underwriter Defendants assert in their response that the portion of the registration statement cited by Plaintiffs was later amended. (Dkt. 40 at pg. 17).[5] Plaintiffs respond that the substance of the misrepresentations remained the same as set forth above, even if subsequent amendments changed some of the language.

[4]    The underwriter Defendants contend that this language appears only in the second amendment to the registration statement filed on December 21, 1998. They contend that the registration statement was revised in a third amendment filed on January 22, 1999. They also point out that the language was revised again when it appeared in the prospectus on February 10, 1999. (Dkt. 40 at pg. 17).

[5]    The various amendments to the registration statement were not filed with this Court.

### III. Applicable Pleading Standard

To ascertain what standard to apply in examining the allegations of the Amended Complaint, this Court must determine whether the Amended Complaint "sounds in fraud." If it sounds in fraud, then the Court must apply the heightened pleading standard for fraud as recognized under securities cases brought pursuant to section 10(b) and rule 10b–5 of the Securities and Exchange Act of 1934 (the 1934 Act). *See, e.g., Harrison Enterprises, Inc. v. Moran,* 1999 WL 1211753, at *3 (S.D.Fla. Aug. 30, 1999); *Rhodes v. Omega Research, Inc.,* 38 F.Supp.2d 1353 (S.D.Fla.1999); *TAAM Assocs, Inc. v. Housecall Med. Res., Inc.,* 1998 WL 1745361, at * 10–15 (N.D.Ga.1998). In *TAAM,* the district court provided a thorough discussion of the origin of the application of the particularity requirements of Federal Rule of Civil Procedure 9(b) to actions brought pursuant to sections 11 and 12(a)(2) of the 1933 Act. *See TAAM,* 1998 WL 1745361, at * 10–15. Recognizing that neither section 11 nor section 12(a)(2) requires that a plaintiff prove scienter for misrepresentations in a registration statement, the *TAAM* court followed the majority of the circuit courts in applying rule 9(b) to a securities claim "grounded in" fraud or with "fraud at its core." *See id.* at * 10.

**\*9** Absent any Eleventh Circuit authority to the contrary, this Court will follow the majority of circuit courts[6] and consider whether this claim sounds in fraud. This Court must determine whether the claim, although brought pursuant to sections

11 and 12(a)(2) of the 1933 Act, is one that substantively alleges a fraud claim under section 10(b) and rule 10b–5 of the 1934 Act. If the Amended Complaint sounds in fraud, then the heightened pleading standard applies. If the Amended Complaint sounds more in negligence, then basic notice pleading requirements apply.

[6]    The TAAM court noted that the First, Second, Third, Fifth, Seventh and Ninth Circuits adhere to the heightened pleading standard for private securities claims that sound in fraud. *See TAAM,* 1998 WL 1745361, at * 10.

### IV. Analysis

In addition to examining the allegations contained within the four corners of the Amended Complaint, this Court is permitted in this securities action to take judicial notice at the motion to dismiss stage of "relevant public documents required to be filed with the Securities and Exchange Commission (SEC), and actually filed, for the purpose of determining what statements the documents contain." *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276, 1280 (11th Cir.1999).[7] In addition to a prospectus and registration statement, a press release may be properly considered in the context of a motion to dismiss pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA) pertaining to cautionary language accompanying forward-looking statements "provided that the contents are not in dispute." *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999). Newspaper articles or quotes from newspapers, on the other hand, are generally not considered the type of public document to be considered in the context of a motion to dismiss. *See In re Republic Servs., Inc.,* 134 F.Supp.2d 1355, 1361 (S.D.Fla.2001) (statement allegedly made by defendant in newspaper article should not be considered on motion to dismiss because of evidentiary issues created by fact that newspaper article was written by someone other than defendant and required court to evaluate evidence and make merits-related determination).

[7]    The *Bryant* court expressly refrained, however, from rendering an opinion on whether the SEC documents "should be judicially noticed for the truth of the matter contained in those documents[,]" reserving that determination for the district court if necessary. *See Bryant,* 187 F.3d at 1278 n. 10, 1280 n. 15.

Against this backdrop, the Court will address together the arguments central to all three motions to dismiss. Thereafter,

the Court will entertain any remaining arguments made by each of the particular Defendants or group of Defendants.

### A. *Forward-looking Statements*

All Defendants take the position that the misrepresentations and omissions at issue are nothing more than proper forward-looking statements accompanied by meaningful cautionary language. As such, Defendants contend that no liability may be imputed to them and this action must be dismissed.

### 1. *The PSLRA's Safe Harbor and "Bespeaks Caution" Doctrine*

The safe harbor of the PSLRA protects forward-looking statements from serving as the basis of liability in private securities fraud actions. *See* 15 U.S.C.A. §§ 78u–5(i)(A)–(F); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276 n. 7 (11th Cir.1999). Forward-looking statements may find a "safe harbor" if any one of three criteria are met: (1) if the statements are identified as forward-looking and are accompanied by the appropriate cautionary language; (2) if the statements are immaterial; and (3) if the plaintiff fails to prove that the statements were made with actual knowledge of their falsity. *See* 15 U.S.C.A. § 78u–5(c)(1)(A)(i), (ii), and (B). In the case of an initial public offering (IPO), however, such as the one in this case, the PSLRA expressly excludes IPO's from its protections. *See* 15 U.S.C.A. § 77z–2(b)(2)(D) (safe harbor for forward-looking statements does not apply to statements made in connection with initial public offerings).[8]

[8] A recent Eleventh Circuit opinion reviewed a case brought pursuant to sections 11, 12, and 15 of the 1933 Act only, as in the instant case. *See Ehlert v. Singer,* 245 F.3d 1313 (11th Cir.2001). *Ehlert* is distinguishable, however, because it involved a secondary (rather than initial) public offering, which is not specifically excluded from the PSLRA. Although the *Ehlert* court held that the district court had properly determined that meaningful cautionary language accompanied the forward-looking statements, it noted that the crux of the action focused on the company's decision not to provide free upgrades to a software version (Version 8) to make it Year 2000 compliant. Thus, the "known" discontinuance of service for Version 8 rendered it obsolete. In any event, the *Ehlert* court held that the cautionary language put the investors on notice that they needed to purchase Version 9 in order to have Year 2000 compliant software.

**\*10** Despite the PSLRA's inapplicability to initial public offerings, the Eleventh Circuit, along with most if not all of the other circuit courts of appeals, has adopted the judicially created "bespeaks caution" doctrine which provides some protection for forward-looking statements. *See Saltzberg v. TM Sterling/Austin Assoc.,* 45 F.3d 399, 400 (11th Cir.1995) ("we accept and apply the 'bespeaks caution' doctrine as explained in *In re Donald J. Trump Casinos Sec. Litig.,* 7 F.3d 357 (3d Cir.1993)").[9] The "bespeaks caution" doctrine, which existed before the PSLRA, provides similar (but not exactly the same) protection as the PSLRA. *See In re Trump,* 7 F.3d at 371 (courts must assess communication and determine materiality of soft information on case-by-case basis). Under the "bespeaks caution" doctrine, "the materiality of a statement or omission is negated where the market has been adequately cautioned about the alleged facts stated or omitted." *Hekker v. Ideon Group, Inc.,* 1996 WL 578335, at \*5 (M.D.Fla. Aug. 19, 1996) (citing *In re Trump* and *Saltzberg* ).

[9] The Eleventh Circuit continues to recognize the "bespeaks caution" doctrine as a viable defense in connection with forward-looking statements. *See Bryant,* 187 F.3d 1271, 1276 (11th Cir.1999).

### 2. *Materiality*

"Materiality" has been defined generally by the Supreme Court in the context of securities laws. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976), and extending the standard of materiality set forth in *TSC Industries* in the section 10(b) and rule 10b–5 context). For a false statement or omission to fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Basic,* 485 U.S. at 231–32 (quoting *TSC Industries* at 449). "This standard is applicable to claims brought under §§ 11 and 12(2)." *TAAM,* 1998 WL 1745361, at \*10 n. 15 (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996)).

Misstated forecasts, opinions, and projections are protected under the "bespeaks caution" doctrine if meaningful cautionary language accompanies the forward-looking statements. *See In re Theragenics Corp.,* 105 F.Supp.2d 1342, 1359 (N.D.Ga.2000) (citing *Saltzberg,* 45 F.3d at 400). In other words, " 'forecasts, opinions, or projections' do not amount to *'material* misrepresentations" ' if accompanied by meaningful cautionary statements. *See In re Miller Indus.,*

In re Insurance Management Solutions Group, Inc., Not Reported in F.Supp.2d (2001)
2001 WL 34106903

*Inc.,* 12 F.Supp.2d 1323, 1330 (N.D.Ga.1998) (emphasis added).[10] Moreover, materiality is a mixed question of law and fact. *See TSC Industries* at 450; *In re Theragenics Corp.,* 105 F.Supp.2d 1342, 1359 (N.D.Ga.2000) (citing *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)).

10      "[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *Upton v. McKerrow,* 887 F.Supp. 1573, 1578 (N.D.Ga.1995) (quoting *In re Trump* at 371).

After reviewing the Amended Complaint and the various cautionary statements in view of the applicable law, the Court cannot say that investors were adequately warned of the alleged risks associated with investing in the Company. Accordingly, the PSLRA's safe harbor is inapplicable to the statements at issue in this case. To the extent the bespeaks caution doctrine may apply to the statements made in connection with the IPO, the Court refrains from ruling at the motion to dismiss stage on this issue, requiring the development of a factual basis.

### B. *Present or past facts or conditions*

**\*11** Plaintiffs characterize their claim as one based on present or past "hard" facts rather than forward-looking statements. Plaintiffs contend that a reasonable investor would rely on the material statements made as true statements of the present or past hard or historical facts. In other words, Plaintiffs assert that the statements were not forward-looking, but rather a misrepresentation of the true state of the Company. If the statements are not considered forward-looking statements, neither the PSLRA nor the "bespeaks caution" doctrine apply. *See Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1473 (N.D.Ga.1997) (citing *Shaw,* 82 F.3d at 1213 & nn. 23 & 24 (1st Cir.1996)); *Harden v. Raffensperger,* 65 F.3d 1392, 1405–06 (7th Cir.1995); and *Upton v. McKerrow,* 887 F.Supp. 1573, 1579 (N.D.Ga.1995)).[11]

11      *See also Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.,* 2001 WL 300733, at * 408 (S.D.N.Y. Mar. 28, 2001); *In re Premiere Technologies, Inc.,* 2000 WL 33231639, at 17 (N.D.Ga. Dec. 8, 2000); *Cheney v. Cyberguard Corp.,* 2000 WL 1140306, at *3 n. 5 (S.D.Fla. July 31, 2000); *Sherleigh Assoc. LLC v. Windmere–Durable Holdings, Inc.,* 2000 U.S.Dist. LEXIS 9772, at * 44 n. 5 (S.D.Fla. June 8, 2000); *In re Sunbeam,* 89 F.Supp.2d 1326, 1339 (S.D.Fla.1999); *In re Valujet, Inc.,* 984 F.Supp. 1472, 1478 (N.D.Ga.1997). *But see Rhodes v. Omega Research, Inc.,* 38 F.Supp.2d 1353,

1359 (S.D.Fla.1999) (collecting cases applying rule 9(b) because section 11 claim sounded in fraud).

It appears from the existing case law that courts have employed various methods to determine whether statements are not forward-looking and therefore actionable. One district court opinion in particular provides support for the denial of these motions to dismiss. In *Sherleigh Associates, LLC v. Windmere–Durable Holdings, Inc.,* 2000 U.S.Dist. LEXIS 9772 (S.D.Fla. June 8, 2000), much like the instant case, the defendants had made certain representations in pre-offering road shows, the prospectus and registration statement that the company was benefitting from the "complimentary strengths" between it and a recently acquired company. At the time these and other representations were made, it was not disclosed that the risks and difficulties of merging the two companies definitely would result in more confusion, cost, and time. The defendants in *Sherleigh Associates* had touted that "synergies created by the acquisition" would produce significant business growth through several years.

The district court in *Sherleigh Associates* found that the complaint with respect to the counts brought under sections 11 and 12(b)(2) of the 1933 Act did not "sound in fraud" but rather were couched in terms of failure to adequately conduct "due diligence" investigations. The district court reiterated that "allegations cannot be thought to constitute 'averments of fraud,' absent any claim of scienter and reliance. Otherwise any allegation of nondisclosure of material information would be transformed into a claim for fraud for purposes of rule 9(b)." *See Sherleigh,* 2000 U.S. Dist. LEXIS 9772, at *39–40 (quoting *Rhodes,* 38 F.Supp .2d at 1360–61, quoting *Shaw,* 82 F.3d at 1223).

In the instant action, Plaintiffs' Amended Complaint refers to repeated misrepresentations or omissions of historical or "hard" facts about current or past conditions.[12] Plaintiffs allege that Defendants claimed synergies were created from the Geotrac acquisition which would result in greater opportunities for cross-selling between Geotrac and IMSG when no such synergies formed. Plaintiffs allege that Defendants knew the acquisition was proving more costly and detrimental long before February 11, 1999, the date of the IPO. The Amended Complaint asserts facts based on information provided by individuals associated with the Company. In preparing the IPO and presenting the pre-IPO road shows, Plaintiffs allege that Defendants failed to conduct the required due diligence search under the 1933 Act.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

12    With respect to the arguments made with respect to the misrepresentations constituting mere puffery, the Court finds them unpersuasive.

**\*12**  Applying the applicable law to the Amended Complaint read in its entirety, this Court finds that this claim brought solely pursuant to sections 11, 12(a)(2) and 15 of the 1933 Act does not "sound in fraud." In so doing, the Court finds that the heightened pleading standard of rule 9(b) does not apply. The Court cannot conclude that beyond a reasonable doubt, Plaintiffs "can prove no set of facts in support of [their] claim which would entitle [them] to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). Accordingly, the underwriter Defendants' motion to dismiss is denied in its entirety and the other two motions to dismiss are denied insofar as they assert dismissal based on forward-looking statements or puffery.

### C. Venture Capital and section 11 liability

Defendant Venture Capital asserts in its motion to dismiss that it was neither a signator of the registration statement or prospectus nor an underwriter and therefore cannot be liable under section 11 of the 1933 Act. Without the benefit of the various components of the registration statement, the Court is unable to ascertain whether Defendant Venture Capital is a signator. Thus, the Court denies Venture Capital's motion to dismiss on this basis.

### D. *Venture Capital and IMSG Defendants as sellers under section 12(a)(2)*

The IMSG Defendants and Venture Capital contend that Plaintiffs failed to allege that they were "statutory sellers" under section 12(a)(2) of the 1933 Act. (Dkt. 34 at pg. 25; Dkt. 37 at pg. 5). Plaintiffs respond that they have successfully alleged that they were "solicitor sellers,"[13] citing *In re Westinghouse Sec. Litig.,* 90 F.3d 716 (3d Cir.1996) (quoting *Pinter v. Dahl,* 486 U.S. 622, 643 (1988)). The Court agrees with Plaintiffs that they have alleged that the Defendants actively participated in the solicitation of IMSG stock to the proposed class and that financial motivation

existed. At this stage of the proceedings, the Court is not inclined to dismiss the IMSG Defendants or Venture Capital from any liability as solicitor sellers[14] under section 12(a) (2).[15]

13    In *Pinter v. Dahl,* 486 U.S. 622 (1988), the Supreme Court defined a statutory seller in two ways. The second test under *Pinter* involves "solicitor sellers."

14    Plaintiffs cannot meet the first test under *Pinter* because the common stock at issue was distributed through a "firm commitment underwriting." *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1215 (1st Cir.1996) (in firm commitment underwriting, the issuer sells all shares to one or more underwriters and then the investors buy directly from underwriters). Thus, title did not pass directly from the IMSG Defendants or Venture Capital to Plaintiffs, and those Defendants cannot be liable under the first prong of *Pinter.*

15    *Ryder International Corp. v. First American National Bank,* 943 F.2d 1521 (11th Cir.1991), does not require a contrary result.

Based on the foregoing reasons, it is therefore ordered and adjudged as follows:

1. IMSG Defendants' Motion to Dismiss (Dkt.34) is denied.

2. Venture Capital's Motion to Dismiss (Dkt.37) is denied.

3. The Underwriter Defendants' Dispositive Motion to Dismiss (Dkt.40) is denied.

4. All Defendants shall file their responses to the Amended Complaint no later than July 24, 2001.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 34106903

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 147 of 306 PageID #:2103

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

2016 WL 3981236
United States District Court, D.
South Carolina, Rock Hill Division.

KBC ASSET MANAGEMENT NV,
Individually and on Behalf of all
Others Similarly Situated, Plaintiff,
v.
3D SYSTEMS CORPORATION,
Abraham N. Reichental, Damon J.
Gregoire, and Ted Hull, Defendants.

CIVIL ACTION NO. 0:15-CV-02393-MGL
|
Signed 07/25/2016

**Attorneys and Law Firms**

Christopher Francis Moriarty, James Michael Hughes, Marlon E. Kimpson, William Paul Tinkler, Motley Rice, Mt. Pleasant, SC, David Patrick Abel, US Market Advisors Law Group, Washington, DC, Elizabeth A. Shonson, Robert J. Robbins, Jack Reise, Robbins Geller Rudman and Dowd, Boca Raton, FL, for Plaintiff.

Nikole Setzler Mergo, Susan Pedrick McWilliams, Nexsen Pruet Jacobs and Pollard, Columbia, SC, Courtney E. Quiros, Elizabeth Gingold Clark, John Allen Jordak, Jr., Lisa Rose Bugni, Alston and Bird, Atlanta, GA, for Defendants.

MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

MARY G. LEWIS, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

*1 Plaintiff filed this case as a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and Security Exchange Commission (SEC) Rule 10b-5, promulgated thereunder. See 17 C.F.R. § 240.10b-5. The Court has jurisdiction over the matter under 28 U.S.C. § 1331 and Section 26 of the Exchange Act, 15 U.S.C. § 78aa. Pending before this Court is Defendant 3D Systems Corporation (3D Systems or the Company) and Defendants

Abraham N. Reichental, Damon J. Gregoire, and Ted Hull's (collectively Individual Defendants) motion to dismiss Plaintiff's amended consolidated complaint brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 80. Having considered the motion, the response, the reply, the record, and the relevant law, it is the judgment of the Court that Defendants' motion to dismiss will be denied.

**II. FACTUAL AND PROCEDRUAL BACKGROUND**

This case arises out of allegations by Plaintiff against 3D Systems and Individual Defendants regarding the manner in which they represented the state of the Company to investors during a rapid acquisition strategy undertaken by the management of 3D Systems. ECF No. 78 at 1; ECF No. 90 at 1. The Company is a 3D printer manufacturer with its principal place of business in Rock Hill, South Carolina. ECF No. 78 at 8. Starting in 2008, 3D Systems embarked on a plan to make several acquisitions of other 3D printing companies so it could expand its product line and maintain its position as the leader in the market. ECF No. 90 at 4. During this time, and specifically during the Class Period, October 29, 2013, through May 5, 2015, Individual Defendants made several statements to investors and analysts about the progress of the strategy and the strength of 3D Systems. See generally ECF No. 78 at 41-107. Although the specific comments are numerous, and elaborated on further below, the complaint's main focus is statements Individual Defendants made to the market. These statements allegedly misrepresented or withheld the effects that 3D System's acquisition strategy had on the strength and revenues of the Company. Id. at 4-5. According to Plaintiff, the reports made prior to July 31, 2014, painted an optimistic picture of 3D Systems— record-breaking profits, successful acquisition of multiple new companies, and high organic growth rates, which is company growth not resulting from mergers and acquisitions. See id. 41-67. Plaintiff claims that behind the scenes, though, 3D Systems experienced significant problems with the integration process, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices. Plaintiff contends that these are all core operations of 3D Systems that Individual Defendants failed to disclose or misrepresented to the market. See e.g. id., at 47-50.

Plaintiff avers that statements Defendants made from July 31, 2014, until May 5, 2015, the end of the Class Period, incrementally revealed the problems plaguing 3D Systems in these core operations. Plaintiff avows that these issues ultimately resulted in 3D Systems reporting underwhelming

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 148 of 306 PageID #:2104

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

profits, failing to meet previously stated financial projections, a stunting of its organic growth rate, and an ending of 3D Systems' acquisition strategy so that the Company could focus on cost reduction. *Id.* at 67-108. According to Plaintiff, by the end of the Class Period, 3D System's stock price had dropped from its high of $96.42 on January 3, 2014, down to $22.90 per share on May 6, 2015, a decrease of over seventy-six percent. ECF No. 90 at 7.

 **\*2** Plaintiff advances that, throughout the entire Class Period, Individual Defendants all held executive roles in 3D Systems, giving them access to confidential internal information. ECF No. 78 at 8-9. Plaintiff avers that they were also involved in numerous aspects of 3D Systems, including actively participating in quarter-end meetings regarding shipping, determining what the Company could recognize as revenue, and visiting production areas. *Id.* at 30-31. Plaintiffs state that Individual Defendants also drafted and delivered many of the statements alleged by Plaintiff to be misleading and discussed at least one of the core operations of 3D Systems during each quarter. *Id.* at 31-34. In addition, during this Class Period, Defendants Reichental and Gregoire made several stock sales. ECF No. 90 at 28-32.

Because of these alleged misrepresentations and the subsequent stock price drop, several investors filed securities fraud claims against 3D Systems. On October 1, 2015, the Court consolidated the cases and appointed KBC Asset Management as the lead Plaintiff. ECF No. 65. Plaintiff filed an amended class action complaint on November 30, 2015, alleging that during the Class Period, 3D Systems, as well as Individual Defendants as agents of the Company, participated in a fraudulent scheme that artificially inflated 3D Systems' stock price by misrepresenting and concealing information about its business practices. ECF No. 78.

Defendants filed this motion to dismiss the amended complaint on January 14, 2016. ECF No. 80. Plaintiff filed a response in opposition to Defendants' motion to dismiss on February 29, 2016, ECF No. 90, and Defendants filed their reply to that response on March 25, 2016, ECF No. 91. The Court has considered the motions, memoranda, and arguments of the parties, and now turns to discussing the merits of Defendants' motion.

### III. STANDARD OF REVIEW
Defendants move to dismiss this putative securities fraud class action lawsuit under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the amended complaint fails to satisfy the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA) and Federal Rule of Civil Procedure 9(b). Therefore, according to Defendants, Plaintiff fails to state a claim for which relief may be granted. To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the...claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering the motion, a court accepts all of a plaintiff's well-pled allegations as true and liberally construes all reasonable inferences in the plaintiff's favor. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court may consider only the facts alleged in the complaint, which may include any documents referenced, and matters of which the court may take judicial notice. *Tellabs, Inc. v. Make Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To establish liability under Section 10(b) of the Exchange Act and under Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance... (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 n.2 (4th Cir. 2007) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). Section 20(a) of the Exchange Act assigns joint and several liability to one in control of another who violates a security regulation under § 10(b).

In a securities fraud case, a plaintiff must also satisfy the heightened pleading standards of Rule 9(b) and the PSLRA. *See Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009). Rule 9(b), which governs all actions alleging fraud, requires the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In addition, the PSLRA requires that a securities fraud plaintiff "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendants intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 213 (internal citations and quotations omitted). The Fourth Circuit has noted that the PSLRA modifies the traditional Rule 12(b)(6) analysis: "(1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegations of a misrepresentation or omission." *Hunter*, 477 F.3d at 172 (emphasis omitted). The PSLRA also requires a plaintiff to plead sufficient facts to raise a "*strong inference*" of scienter.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 149 of 306 PageID #:2105

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

*Id.* A district court must dismiss a complaint on motion of any defendant if the plaintiff fails to meet the pleading requirements of the PSLRA. 15 U.S.C. § 78u-4(b)(3)(A).

## IV. CONTENTIONS OF THE PARTIES

**\*3** In their motion to dismiss, Defendants contend that the complaint fails to meet the heightened pleading standards of the PSLRA as to both the misrepresentation or omission and the scienter elements. ECF No. 80 at 4. Regarding the misrepresentation factor, Defendants advance that the alleged misrepresentations in the complaint relate only to corporate mismanagement, which Plaintiff is unable to bring under federal securities law. *Id.* Further, Defendants avouch that, even assuming that Defendants' alleged mismanagement is actionable if Defendants were cognizant of the Company's problems, the complaint shows no evidence that they were actually aware. ECF No. 91 at 2-3. In addition, Defendants advocate that all of the allegedly misleading statements are forward-looking statements accompanied by meaningful cautionary language warning of the specific problems experienced by 3D Systems. ECF No. 80 at 16 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). Defendants, therefore, declare that the PSLRA's Safe Harbor Provision protects these forward-looking statements. *Id.* Defendants reject any claim that these declarations contain current or historical facts or that the cautionary language fails to meet the standard for meaningfulness simply because it appears to be boilerplate. ECF No. 91 at 6-9.

Defendants further allege that the complaint insufficiently pleads the scienter element. *Id.* They asseverate that Plaintiff improperly relied upon group pleading, i.e., that Defendants had a collective intent to defraud instead of pointing out each Defendant's individual intent. *Id.* at 4-5. In addition, Defendants maintain that the complaint improperly points to the sale of stocks by Defendants Reichental and Gregoire to support their inference of scienter. According to Defendants, merely claiming that executives sold stock during the Class Period unaccompanied by evidence that these sales were unusual or suspicious fails to meet the heightened pleading requirements of the PSLRA. *Id.* at 5. Further, Defendants maintain that Plaintiff is unable to meet the scienter requirement based on any of the reasons alleged as evidence, even if viewed holistically. ECF No. 91 at 10-14. Defendants also avow that the Court should, at a minimum, disregard any statements after July 31, 2014, under an on-the-market theory. In other words, according to Defendants, 3D Systems' problems were public knowledge after that date, and therefore the market was capable of being informed given the information then available, eliminating any possibility of fraud. *Id.* Finally, Defendants claim that because the § 10(b) charges of the Exchange Act fail, the § 20(a) claim must fail as well.

Plaintiff responds to these arguments by contending it has sufficiently met the pleading standards of both elements laid out in the PSLRA. ECF No. 90 at 2-3. It counters Defendants' assertions regarding mismanagement, claiming that the label of mismanagement is inconsequential because Defendants were nevertheless aware of the problems taking place and failed to disclose them. *Id.* Plaintiff further maintains that Defendants receive no protection under the PSLRA's Safe Harbor Provision because the statements Plaintiff identified as misleading related to current or historical facts instead of being entirely forward-looking. Plaintiff also posits that any statements that were forward-looking lacked meaningful cautionary language, but rather boilerplate risk warnings that failed to convey substantive information regarding the specific problems alleged in the complaint. *Id.*

For the scienter claims, Plaintiff propounds that the group pleading claim by Defendants is unfounded and points to multiple paragraphs in the complaint alleging scienter of each Individual Defendant. Plaintiff claims that these particularized facts, considered holistically, support a strong inference of scienter. *Id.* at 22-23. Plaintiff avouches that, because it properly pled its § 10(b) claim, their § 20(a) claim also meets the proper pleading standard. *Id.* at 35.

## V. DISCUSSION AND ANALYSIS

### A. Section 10(b) and Rule 10b-5 Claim

#### 1. Misrepresentation or Omission of Material Fact

To survive a motion to dismiss, a securities fraud complaint must first allege facts sufficient to support the plaintiff's information and belief that the statements were misleading, as required by § 78u-4(b)(1), which provides:

**\*4** In any private action arising under this chapter in which the plaintiff alleges that the defendant−

(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 150 of 306 PageID #:2106

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). In short, to fulfill the element of misrepresentation, a plaintiff "must point to a factual statement or omission—that is, one that is demonstrable as being true or false," *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (emphasis omitted), and show that the "statement is false or that the omitted fact renders a public statement misleading." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 353 (4th Cir. 2003). However, "if the plaintiff fails to allege all facts but does allege sufficient facts to support a reasonable belief in the allegation that the defendants statement was misleading, the court should deny the Rule 12(b)(6) motion as to this misrepresentation element." *Hunter*, 477 F.3d at 174 (emphasis omitted).

Further, as noted above, because § 10(b) claims are fraud claims, the plaintiff must satisfy the pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure, which requires all elements of fraud be stated with particularity. A plaintiff satisfies this requirement when it pleads with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009), *rev'd on other grounds, Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 (2011). Additionally, "any statement or omission of fact must be material," meaning objectively significant to a reasonable investor. *Food Lion, Inc.*, 197 F.3d at 682-83; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (holding misrepresentation or omission is material if "the 'reasonable investor' would have considered [it] significant" in making investment decisions). The Fourth Circuit has held that in "[d]etermining whether the complaint satisfies the standard necessarily entails a case-by-case assessment of the complaint as a whole." *Hunter*, 477 F.3d at 174.

The Court has reviewed the complaint and holds that it specifically identifies several alleged misrepresentations and omissions concerning 3D Systems' acquisition strategy, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices. The complaint also sufficiently sets out the time, place, and content of the statements as well as the

identity of the person making them as required by Rule 9 of the Federal Rules of Civil Procedure. *In re Mut. Funds Inv. Litig.*, 566 F.3d at 120.

**\*5** For instance, 3D Systems represented its acquisition strategy to investors as positive throughout most of the Class Period. Speaking at the January 15, 2014, Needham Growth Conference, Defendant Reichental told investors they were able to "quickly leverage" new acquisitions. ECF No. 78 at 47. He also stated that they were "very happy" with how the acquisition strategy was going and told investors that most of the new acquisitions were "completely in the Company and [were] all one Company right away." *Id.* at 52, 57. Further, Defendants Gregoire and Reichental responded to questions regarding a rise in operating expenses stating that they were "discretionary costs" that 3D Systems could "scale back and not affect the business further." *Id.* at 55. Defendant Reichental said they "fully expect operating leverage to return in 2015" and that they "don't see any obstacles to success, unless the world collapses somehow." *Id.* When again asked about operational challenges generated by these acquisitions, Defendant Gregoire insisted that integration "happens very easily, very quickly" and that the hardest part is usually with merging culture. *Id.* at 74. Even continuing into the third quarter of 2014, 3D Systems maintained that its strategy was going smoothly, with Defendant Reichental stating "we have done it really well, and we expect that, that will bode well for us in the future." *Id.* at 84.

The statements Individual Defendants made regarding 3D systems towards the end of the Class Period seem to paint a different picture. After the release of the Company's fourth quarter, 2014, results around February 26, 2015, Defendant Hull, who had only recently taken over for Defendant Gregoire in the role of Executive Vice President after Gregoire became the Vice President of Mergers and Acquisitions, announced that they were "at the end of our stepped-up investment phase and are beginning to tightly integrate our assembled assets." *Id.* at 84, 91. Then in announcing the first quarter of 2015's results, Defendant Reichental stated 3D Systems was trying to "eliminate some of the duplication and redundancy that we acquired from acquisitions" and, despite earlier claims that the rise in operating expenses were clearly completely discretionary, announced that these expenses had "got a little bit ahead of us." *Id.* at 96-97. Now, instead of the acquisition strategy going well, Defendant Hull announced that 3D Systems was taking "a hard look at our acquisition activity" and planning to "substantially dial down acquisitions for the

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 151 of 306 PageID #:2107

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

foreseeable future." *Id.* at 97. Taking all these statements as true, they appear to allege adequately that 3D Systems experienced some operating inefficiencies related to the acquisition strategy and failed to disclose them to the market, all the while presenting little downside about the process. *See id.* at 47-48, 58-59, 64-65, 75, 86-87, 92 (detailing Plaintiff's accusations of alleged misrepresentations regarding the acquisition strategy).

For inventory control, since as early as fourth quarter 2013, when the Class Period commenced, 3D Systems began experiencing a backlog of inventory. *Id.* at 53. Defendant Reichental told investors that this was a "healthy" backlog mostly due to new products announced. *Id.* In the first quarter of 2014, he again informed investors that this was in anticipation of new product releases and that inventory buildup had concluded, with the expectation that these inventory levels would come down. *See id.* at 64. Despite these assurances that the inventory backlog was healthy, in the second quarter of 2014, 3D Systems announced an inventory write-off that wound up compressing its gross profit margins. *Id.* at 68. Defendant Gregoire claimed this write-off was due to an aggressive shift towards new products, despite having previously made claims that most of the inventory backlog was in anticipation for shipment of these same new products. *Id.* A press release from 3D Systems and the SEC Form 10-Q, the quarterly report all public companies must file with the SEC that Defendants Reichental and Gregoire signed, echoed these sentiments. *Id.* at 68-69. Assuming these statements as true, on its face, the complaint adequately pled a misrepresentation by 3D Systems regarding the state of its inventory and failure to inform fully investors of its inventory-related difficulties. Plaintiff, therefore, pled sufficient misrepresentations related to inventory problems. *See id.* at 49, 59, 65, 75-76, 87, 92 (containing Plaintiff's accusations of alleged misrepresentation regarding inventory control).

**\*6** With respect to product quality, Individual Defendants frequently described their products as being "cutting edge" or "breakthrough" at the beginning of the Class Period. *Id.* at 44. As that period progressed, Defendants Reichental and Gregoire both praised their product line, with Defendant Reichental stating that 3D Systems had "the most comprehensive and attractive consumer portfolio available today at the right performance levels and price points to accelerate adoption." *Id.* at 54. Defendant Gregoire also referred to the "overwhelmingly positive reception" their product lines received. *Id.* On July 31, 2014, however, in announcing a decision to delay product shipments in the second quarter, Defendants Reichental stated in a conference call that the Company's decision to do so was to "improve user experience," after several of its beta testers "identified several...enhancements," it felt were needed. *See id.* at 67, 70.

Taken as true, these claims of beta testers identifying improvements seem to stand in stark contrast to the overwhelmingly positive reception Individual Defendants previously claimed 3D Systems was receiving. Also, at the August 7, 2014, Needham Advanced Industrial Technologies Conference, Defendant Gregoire stated that he "didn't feel the products were exactly there" yet in terms of performance, despite earlier claims that the Company's consumer portfolio was at the right performance levels. *Id.* at 73. The product quality issues continued throughout the Class Period, with Defendant Hull revealing in a conference call regarding their first quarter 2015 results that revenue shortfalls were occurring in part due to "certain metal and nylon applications and performance issues that delayed our ability to sell additional printers." *Id.* at 96. From these statements, it appears as if Plaintiff has adequately pled that 3D Systems misrepresented the state of their product quality and customer reception to investors. *See id.* at 48-49, 58-59, 64-65, 75, 86-87, 92 (setting forth Plaintiff's accusations of alleged misrepresentation regarding product quality).

Having now carefully and exhaustively reviewed each statement alleged as misleading in a similar manner as the examples above, the Court holds that Plaintiff's amended complaint adequately pleads that Individual Defendants' statements were misleading and omitted facts. Plaintiff has plead "each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and the facts on which any beliefs were formed. 15 U.S.C. § 78u-4(b)(1). Plaintiff has also sufficiently pled with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation that is required at this stage of the litigation. *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009). Further, Plaintiff has adequately alleged "what [Defendants] obtained thereby," an inflated stock price due to the alleged misrepresentations made about the true state of 3D Systems. *Id.* Therefore, Plaintiff has meet all the requirements for a misrepresentation claim.

The Court also holds that these alleged facts were material as they would have "altered the 'total mix' " of information made available to investors. *See Matrix Initiatives, Inc. v.*

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 152 of 306 PageID #:2108

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

*Siracusano*, 563 U.S. 27, 43-44 (2011) (upholding a charge of securities fraud against a pharmaceutical company in part because non-disclosure of a report was a material misrepresentation that altered the total mix of information available to investors when making their decisions). Further, although the Fourth Circuit has explicitly refrained from taking a position on this issue, the "majority rule" indicates that the negative market reaction to the disclosures made by 3D Systems—in which their stock price fell more than seventy-six percent—supports the conclusion that these misrepresentations were material. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660-61 (4th Cir. 2004) (noting the majority position is a fall of stock prices can be some evidence of materiality but not dispositive); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *In re Burlington Coat Factory Sex. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alter the price of the firm's stock.").

**\*7** This Court declines to accept Defendants' mismanagement argument. *See* ECF No. 80 at 12-15. Even if mismanagement itself is non-actionable—a question this Court thinks unnecessary to answer—the cases Defendants cite are distinguishable from this one. For example, Defendants cite to *In re Silicon Storage Technology, Inc. Sec. Litig.*, in which that court says that "[i]ncidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act." No. C05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006). Although this statement might be true, this case is about more than mismanagement. Here, 3D Systems allegedly mismanaged things like inventory control and product quality, but then purportedly misrepresented the state of those affairs to investors, as discussed above. Because Plaintiff pled more than just allegations of bad decision-making or mere mismanagement, this case is actionable under § 10(b) of the Exchange Act.

Further, this Court holds Defendants' argument that the misrepresentations were only a "formulaic set of allegations" to be devoid of merit. Here, Plaintiff does more than simply repeat a set of "allegations [stating] why, upon 'information and belief,' the statement[s] [were] misleading," but rather includes several references to the specific statements listed in the complaint that support the allegations

of misrepresentation. *Cf. Hunter*, 477 F.3d at 175 (upholding dismissal of a securities fraud case in part because the allegedly misleading statements were simply a formulaic set of allegations about why the statements were misleading without any particularity); *see* ECF No. 74 at 47-50, 58-60, 64-67, 75-77, 86-89, 91-94. The Court holds that the allegations are specifically tailored and stated with particularity regarding the allegations against Defendants and more than just a recitation of why "upon 'information and belief,' the statement[s] [were] misleading," as in *Hunter*. 477 F.3d at 175.

As a final note, this Court declines to rule on the sufficiency of every alleged misrepresentation at this stage of the proceedings as all that is required is for Plaintiff to have pled sufficient facts to permit a reasonable person to find a plausible claim for relief for the misrepresentation element. *See id.* at 173. Defendants, of course, deny the allegations in the amended complaint, disagree with Plaintiff's view of the facts, and may have compelling arguments disproving that all or some of the alleged statements were misrepresentations. At this stage in the litigation though, without proper discovery, this Court is unable to hold with any certainty that these statements are not, as a matter of law, misrepresentations or omissions. This Court will reserve any judgement on material disagreements about the facts until the appropriate stage in the proceedings.

### 2. "Safe Harbor" Protection for Certain Challenged Statements

The PSLRA includes a "safe harbor" provision, which provides protection for "forward-looking" statements made by company representatives when: (1) such statements are identified as forward-looking statements accompanied by meaningful cautionary statements identifying facts that could cause actual results to differ materially from the forward-looking statements; (2) such statements are immaterial; or (3) the plaintiff fails to prove the forward-looking statement was made by an individual or executive officer of a business entity with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A)-(B). The Reform Act defines the term "forward-looking statement" to include, amongst other things, "a statement containing a projection of revenues, incomes...earnings...or other financial items." 15 U.S.C. § 78u-5(i)(1)(A)-(F). The safe harbor provision fails to protect representations of current or historical fact. *Malone v. Microdyne Corp.*, 26 F.3d 471, 479-80 (4th Cir.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 153 of 306 PageID #:2109

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....
2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

1994) ("Misstatements or omissions regarding actual past or present facts are far more likely to be actionable than statements regarding projections of future performance.") (emphasis omitted).

 **\*8** The Court has considered the statements cited in the complaint and taken note of Defendants' assertions regarding the statements alleged to be forward-looking statements. Defendants specifically aver that all of the statements included in the complaint are forward-looking. ECF No. 80 at 17. They then point to a chart indicating twelve statements advanced as forward-looking as well as what they posit as meaningful cautionary language for each one of these statements. *Id.* at 19-24. Most of these statements included in the chart contain financial items relating to revenue, growth margins, or organic growth. Assuming arguendo that the cautionary language accompanying these statements is meaningful, they would meet one of the definitions included in the safe harbor provision of the Reform Act. Plaintiff correctly points out, however, that despite Defendants claiming all of the statements are forward-looking, Defendants' chart fails to challenge several of the other statements Plaintiff made in the complaint. ECF No. 90 at 18. The statements Defendants neglected to mention contain language relating to product quality, including 3D Systems statement that they have the most "comprehensive and attractive consumer portfolio available today at the right performance levels" and statements about the integration process such as "[t]he integration is going extremely well. And all of these companies have been completely on boarded as per usual." *Id.* at 18 n.9. These statements relate to current or historical facts, discussing the portfolio 3D Systems had available "today" or how the acquisitions "have been completely on boarded," and are therefore unprotected by the safe harbor provision. *See Malone*, 26 F.3d at 479-80; ECF No. 90 at 18 n.9. Because the Court is unable to conclude that all of the statements in the Amended Complaint are forward-looking, the Court declines Defendants' invitation to hold that the safe harbor provision warrants a full dismissal of the case at this stage in the litigation.

### 3. Strong Inference of Scienter

The PSLRA requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "To demonstrate scienter, a plaintiff must show that the defendant acted with a mental state

embracing intent to deceive, manipulate, or defraud." *Zak v. Chelsea Therapeutics Int'l., Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). A strong inference of scienter is one that is "powerful or cogent" and must be more than a "reasonable" or "permissible" inference. *See Tellabs* 551 U.S. at 323. The evidence establishing this inference of scienter, however, "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.' " *Id.* at 324.

At this stage "allegations of reckless conduct" can satisfy the scienter requirement. *Zak*, 780 F.3d at 606. Reckless conduct sufficient to establish a strong inference of scienter is described as "severe," *Ottmann*, 353 F.3d at 344, or conduct that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

To determine whether a plaintiff's allegations establish a strong inference of scienter, the court should view the evidence "holistically" instead of each piece being scrutinized in isolation. *See id.* at 326. After examining the evidence as a whole, the court then engages in a balancing test to see if the allegations, accepted as true, would create an inference of scienter "at least as strong as any opposing inferences" of non-fraudulent motives. *Id.* Accordingly, in a motion to dismiss, defendants must demonstrate that the allegations give rise to an inference of non-culpable conduct that is stronger than any inference of scienter. *See id.* at 324.

Finally, if the defendant is a corporation, the plaintiff must allege facts that support scienter "with respect to at least one authorized agent of the corporation, because corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184.

Here, the amended complaint offers several allegations to support Plaintiff's claim of scienter. Specifically, Plaintiff alleges that Individual Defendants: (1) all held high positions within 3D Systems during the Class Period, and therefore had access to confidential information about the state of the Company as a result; (2) must have been aware of the problems facing 3D Systems as the alleged misrepresentations claimed related to the Company's core operations; (3) were intimately involved in the operations of

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 154 of 306 PageID #:2110
KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....
2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

the business and therefore were purportedly aware that the statements they gave to the public about these core operations were misleading or incomplete; and (4) that Defendants Reichental and Gregoire both had the motive to engage in fraud as evidenced by their stock sales during the time, which Plaintiff claims evidences scienter through potential insider trading. *See generally* ECF No. 78 at 30-34, 121-122. Although each of Plaintiff's allegations standing alone may be insufficient to support a strong inference of scienter, looked at holistically, as the law requires the Court to do, the allegations, when viewed as a whole, are enough to suggest a strong inference of scienter at this motion to dismiss stage.

 **\*9** First, Defendants Reichental, Gregoire, and Hull were all senior executives at 3D Systems during the Class Period. ECF No. 78 at 35. Further, they were all part of the acquisitions team that executed the Company's rapid expansion strategy. *See id.* at 57. By nature of these positions, they necessarily had access to confidential information regarding the state of the acquisition strategy and its effects on the business as it progressed. Although the Fourth Circuit has rejected this element as alone establishing an element of scienter, the information is nonetheless "relevant to the court's holistic analysis of scienter." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014).

In addition to the inferences drawn from Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter. *See Yates*, 744 F.3d at 890 (holding misrepresentations about the core business of a company as "relevant" to a holistic analysis of scienter); *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."). The amended complaint alleges misrepresentations about 3D System's acquisition strategy, core product lines, shipping, inventory, and manufacturing capacity. *See generally* ECF No. 78 at 41-108. Bolstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases. At least once during every quarter, Defendants Reichental, Gregoire, or Hull purportedly answered questions about these core operations to the media or analysts. "[T]he most powerful evidence of scienter is the content and context of [defendants'] statements themselves," and when a defendant is "specifically asked, directly and repeatedly" about these core operations, denials

of any issues can support a strong inference of scienter. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). As already observed, each of the Individual Defendants made repeated statements about core operations of 3D Systems, such as the acquisition strategy, inventory control, and product quality. Once again, speaking about these core operations, without more, is insufficient to establish scienter, but they are relevant to a holistic analysis, and contribute to a strong inference of scienter. *Yates*, 744 F.3d at 890.

Further, the amended complaint also alleges Individual Defendants' intimate involvement in the day-to-day operations of the Company, which bolsters Plaintiff's claims of scienter and boosts the inference of "actual" exposure to the problems 3D Systems was experiencing. *Id.* ("[T]o be sure, such allegations [of holding positions in a company] are relevant to the court's holistic analysis of scienter. But without additional detailed allegations establishing the defendants' actual exposure to the accounting problem, the complaint falls short of the PSLRA's particularity requirements."). Here, because there are indeed "additional detailed allegations" establishing Individual Defendants' actual exposure to the problem, the complaint meets PSLRA's particularity requirements. *Id.* For example, the complaint discusses Reichental and Gregoire being physically present for quarter-end sales meetings, making decisions on when to ship goods and directly giving shipping approvals via email. ECF No. 78 at 31. Further, Defendant Gregoire made the final determination as to what sales to recognize as revenue. *Id.* Also, at a Telecommunications conference, a marketing director for 3D Systems revealed that Individual Defendants were on the acquisition team, which was directly responsible for the identification and negotiations for merging new companies. *Id.* at 57. Finally, Individual Defendants themselves made statements about how involved they were in handling the issues facing 3D Systems, such as Defendant Reichental stating that "we together conducted under Damon [Gregoire]'s leadership, a very careful and complete analysis," and "we have done nothing but look at these issues on a daily basis for quite some time." *Id.* at 71, 98. In combination with their positions at 3D Systems, these revelations of personal and intimate involvement with many of the allegedly misrepresented issues allows the Court to reasonably infer each Individual Defendants' knowledge regarding the true state of affairs at 3D Systems.

 **\*10** Finally, the allegations of insider trading bolster the strong inference of scienter. Allegations of "personal financial

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 155 of 306 PageID #:2111

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....

2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. These allegations, however, will support an inference of scienter only "if the timing and amount of a defendant's trading were unusual or suspicious." *Id.* (citing *Hunter*, 477 F.3d at 184). To determine whether an insider's sales were "unusual in scope" we consider factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Id.*

In this case, two of the three Individual Defendants, Reichental and Gregoire, sold stocks during the Class Period. ECF No. 78 at 121-122. Reichental sold 144,000 shares of stock for a total of $8,814,447, and Gregoire sold 162,500 shares for $8,927,815. *Id.* Further, from a review of Defendant Gregoire's Form 4's, incorporated by reference into Plaintiff's complaint, *Tellabs*, 551 U.S. at 322, it appears as if Defendant Gregoire sold a much higher amount of stocks during the Class Period than he did outside of it. *See also Janas v. McCracken (in Re Silicon Graphics Sec. Litig.)*, 183 F.3d 970, 986 (9th Cir. 1999) (upholding the district court's consideration of SEC Filings referenced in the Plaintiff's complaint under the incorporation by reference doctrine). From the beginning of 2012 until the beginning of the Class Period in 2013, a total of twenty-two months, Defendant Gregoire sold only 75,000 shares of stock. From the beginning of the Class Period through the end of 2014, a total of just fourteen months, he sold over 150,000 shares, all within the Class Period. These numbers are certainly consistent with an inference that the insiders who traded during the Class Period had a motive to commit fraud.

Further, the complaint alleges that Defendants Reichental and Gregoire timed these sales to take advantage of particular favorable disclosures, which can boost an inference of insider trading. *Cf. Hunter* 477 F.3d at 184 (finding deficient an allegation of insider trading because it, among other things, failed to "allege that defendants timed their sales to profit from any particular disclosures"). For instance, on December 13, 2013, Defendant Reichental sold 25,000 stocks; just days after 3D Systems stocks reached a high for the Class Period. ECF No. 78 at 121. Also, Defendant Reichental sold 52,300 shares of stock on August 29, 2014; within a month of 3D Systems raising their revenue guidance for that year. *Id.* Defendant Gregoire sold his stock off in a similar pattern, selling 45,000 shares on November 15, 2013; just two weeks after the Company released a positive earnings announcement and boasted of unprecedented consumer demand, acceleration of manufacturing capacity, and an increase in revenue

guidance. *Id.* at 122. He also sold another 50,000 shares on August 27, 2014; within a month of the company raising its revenue guidance, just like Defendant Reichental. *Id.* Further, unlike other cases in this Circuit that have failed to find an inference of scienter from insider trading, neither defendant sold their stock under a Rule 10b5-1 plan, a non-discretionary trading plan corporate executives can set up to sell shared as predetermined times to avoid allegations of insider trading, the presence of which in other cases weakened any inferences of scienter. *Yates*, 744 F.3d at 891. Given Defendant Gregoire's doubled stock sales during the Class Period, the large number of stocks sold by both Defendant Greogire and Reichental at times matching up with announcements that caused stock price highs, and the lack of 10b5-1 plans, at this stage of the proceedings, this Court holds that Plaintiff has adequately pled enough facts to infer scienter from these stock sales.

**\*11** The Court is unpersuaded by Defendants' group pleading argument. The complaint mentions several examples of each Individual Defendant's knowledge or reckless disregard of adverse undisclosed facts that rendered the statements they made to the market misleading. *See* ECF No. 90 at 22-23 (citing several paragraphs of the complaint for each Individual Defendant indicating their individual scienter). These numerous instances pointing to each Individual Defendants' conduct is therefore fatal to Defendants contention of group pleading.

Considering the totality of circumstances alleged above and giving "the inferential weight warranted by context and common sense," the Court concludes that Defendants' have neglected to show that the non-culpable inferences here are stronger than the culpable ones, and therefore holds that Plaintiff has adequately pled scienter to each Individual Defendant separately. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) ("While we ultimately evaluate plaintiffs' allegations of scienter holistically, we only afford their allegations the inferential weight warranted by context and common sense.") Further, because Plaintiff has adequately pled scienter for each Individual Defendant, they have also pled scienter for 3D Systems, as "corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184.

### B. Defendants' Truth-On-the-Market Defense

Alternatively, Defendants argue that the complaint's allegations regarding statements made after July 31, 2014 —the date Plaintiffs allege as the date the truth started

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 156 of 306 PageID #:2112

KBC Asset Management NV v. 3D Systems Corporation, Not Reported in Fed. Supp....
2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

incrementally revealing itself—warrant dismissal via a "truth-on-the-market" defense. Under this defense, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities, Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Defendants must convey this corrective information to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements. *Id.* Also, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.*

Here, this Court is unconvinced that the entire truth was on the market after the disclosures of July 31, 2014. As just one example, as late as November 10, 2014, Defendant Reichental maintained that the Company's integration of the new acquisitions had been done really well, "and we expect that, that will bode well for us in the future." ECF No. 78 at 84. It was not until April 24, 2015, that Defendant Reichental admitted that the operating expenses that resulted from the acquisition strategy had "got a little bit ahead of us" and that it had caused financial problems for 3D Systems. *Id.* at 96. Given that it is questionable whether the truth was on the market after July 31, 2014, and that this defense is intensely fact-specific, at this stage of the proceedings, the Court is unprepared to hold that Defendants made its disclosures with such "intensity and credibility" that it counter-balanced any alleged misleading information given by the Company earlier. *See Ganino*, 228 F.3d at 168 (engaging in a similar dismissal of a truth-on-the-market defense given the stage in the proceedings and the present record).

## C. Control Person Liability Pursuant to Section 20(a)

Section 20(a) of the Exchange Act establishes liability against "control persons." 15 U.S.C. § 78t(a). A claim of control person liability must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator. *In re Mut. Funds Inv. Litig.*, 566 F.3d at 129-30. Because § 20(a) liability is derivative of § 10(b) liability, on a motion to dismiss, a claim may stand or fall based on a decision regarding the § 10(b) claim. *Yates*, 744 F.3d at 894 n.8; *BearingPoint, Inc.*, 576 F.3d at 192.

**\*12** Here, Defendants move to dismiss Plaintiff's § 20(a) claim solely because the complaint allegedly fails to establish a § 10(b) claim. *See* ECF No. 80 at 34. Because this Court holds that Plaintiff adequately pled a primary violation under § 10(b) of the Exchange Act, however, the secondary claim that Individual Defendants violated § 20(a) will stand.

## VI. CONCLUSION

Consequently, based on the foregoing discussion and analysis, Defendants' motion to dismiss is **DENIED**. As such, Plaintiff's motion to strike is **RENDERED MOOT**.

## IT IS SO ORDERED.

Signed this day of 25th day of July, 2016, in Columbia, South Carolina.

## All Citations

Not Reported in Fed. Supp., 2016 WL 3981236, Fed. Sec. L. Rep. P 99,243

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Levitan v. McCoy, Not Reported in F.Supp.2d (2001)

Fed. Sec. L. Rep. P 91,608

2001 WL 1117279
United States District Court,
N.D. Illinois, Eastern Division.

Thomas LEVITAN, individually
and on behalf of all others
similarly situated, Plaintiff,
v.
John B. MCCOY, Jr., Richard J.
Lehmann, Michael J. McMennamin
and Bank One Corp., Defendants.

No. 00 C 5096.
|
Sept. 21, 2001.

*MEMORANDUM OPINION AND ORDER*

COAR, J.

**\*1** Before this court is a Joint Motion to Dismiss brought by defendants Bank One Corporation ("Bank One"), John B. McCoy, Jr., Richard J. Lehmann, and Michael J. McMennanmin (collectively "defendants"). In this consolidated motion, defendants seek the dismissal of plaintiff Thomas Levitan's ("Levitan" or "plaintiff") class action complaint alleging violations of the Federal Truth in Lending Act ("TILA") and Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. § 77k. Defendants seek to dismiss the complaint on the basis that: (1) plaintiff fails to state a claim under Fed.R.Civ. P. 9(b), (2) plaintiff fails to state a claim under Fed. R.Civ.P. 12(b)(6), (3) plaintiff's claims under Section 15(a) of the Securities Act fail to allege a predicate violation, and (4) plaintiff's claims are time-barred by the applicable statute of limitations. For the following reasons, the defendants' motion to dismiss is denied.

BACKGROUND

This dispute arises from a June 12, 1998, merger between First Commerce Corporation ("First Commerce") and Banc One Corporation ("Old Banc One"). This litigation concerns alleged misrepresentations related to Old Banc One's credit card division, First USA Bank.

In preparation for the merger, Old Banc One and First Commerce filed a joint Registration Statement pursuant to Section 6 of the Securities Act, 15 U.S.C. § 77f. The Registration Statement included financial statements, which reflected "enormous growth" in First USA's credit card business for the most recent fiscal year (1997) and the first and second quarters of 1998.

The defendants also issued a Merger Proxy/Prospectus in order to solicit votes in favor of the merger on July 31, 1998. The prospectus incorporated by reference the Form 10-K for the year ending on December 31, 1997, and the Form 10-Q for the first quarter ending on March 31, 1998. In the prospectus, defendants noted that "such financial statements, in the opinion of Banc One management, contain the adjustments, all of which are normal and recurring in nature, necessary to present fairly Banc One's consolidated financial position, results of operations, and change in cash flows."

The plaintiff first alleges that the Registration Statement, when it became effective on June 12, 1998, concealed the material fact that First USA had been systematically overcharging customers in a variety of ways in violation of TILA. Second, the plaintiff alleges that defendants issued financial statements that did not comply with generally accepted accounting principles. ("GAAP"). The complaint alleges that such violations took place "prior to and at the time of the merger." Complaint ¶ 54.

As a result of these alleged misstatements, the plaintiff states that he and others similarly situated approved the merger and acquired Bank One shares at a price that was artificially inflated, resulting in an Exchange Ratio that was artificially deflated. On August 24, 1999, defendants began a series of disclosures, which the plaintiff alleges revealed the truth about First USA. Bank One issued a press release announcing preliminary earnings for the third quarter and full year of 1999. In the release, Bank One reported that based on "revised outlooks" it anticipated earnings to be down 7-8% from the current market estimates. Bank One stated that the revised earnings outlook was solely the result of changes in growth for First USA.

**\*2** The plaintiff further alleges that during a conference call on August 25, 1999, certain defendants explained that Bank One would cease First USA's parctice of "accelerating" credit card late fees and would provide credit card customers

Levitan v. McCoy, Not Reported in F.Supp.2d (2001)

Fed. Sec. L. Rep. P 91,608

"interest rate concessions" related to First USA's past activities. These measures were allegedly expected to negatively impact earnings by at least $500 million. Plaintiff alleges that the market found the news material. On August 25, 1999, the price of Bank One common stock fell 22.3% per share from the previous day's closing price. The volume of trading was more than 15 times the daily average trading volume for the previous 52 week period.

On November 1, 1999, Kiplinger's Personal Finance Magazine reported that government regulators were investigating thousands of complaints by First USA credit card holders. The plaintiff alleges the complaints concerned practices that existed before the merger. The article reported that the allegedly illegal practices had existed since 1997.

On November 10, 1999, Bank One announced that earnings would be as much as 15% lower than the revised expectations. The plaintiff alleges that the shortfall was attributed to the performance of First USA. As a result, the price of Bank One stock dropped 11.5% from its previous day's close.

On December 31, 1999, John B. McCoy, Bank One's Chairman and Chief Executive Officer, resigned. The plaintiff alleges that he resigned as a result of the disclosures of improprieties at First USA.

On January 11, 2000, Bank One announced that earnings for 1999 would be as much a 18% less than analysts had expected and the profits for 2000 would drop sharply. The plaintiff alleges that the earnings drop was attributable to credit card practices. Bank One also announced that it would take a $725 million charge in the fourth quarter of 1999, largely to restructure the credit card division.

The plaintiff's complaint seeks the certification of a class:

> consisting of all persons who exchanged shares of First Commerce common stock for shares of Bank One common stock in connection the Merger and pursuant to the Registration Statement and Merger Proxy Prospectus.

Pursuant to the Merger, the plaintiff and other First Commerce stockholders received 1.408 shares of Old Banc One common stock in exchange for each share of First Commerce common stock (the Exchange Ratio).

In Count I, the plaintiff alleges an action against Bank One for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all First Commerce shareholders who exchanged

their First Commerce common stock for Banc One common stock issued in connection with the Merger, and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that defendants overstated earnings in the credit card division and failed to disclose material information with regard to the purported growth of Old Banc One's and First USA's credit card operations and the basis on which such growth was achieved.

**\*3** In Count II, the plaintiff alleges an action against the individual defendants for violations of Section 11 of the Securities Act on behalf of First Commerce shareholders who exchanged their First Commerce common stock for Old Banc One common stock issues in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that the individual defendants overstated the earnings of the credit card division and failed to disclose material information related to the growth of the First USA credit card operation.

In Count III, the plaintiff alleges an action against Bank One for violations of Section 12(a)(2) of the Securities Act. 15 U.S.C. § 771(a)(2). The plaintiff makes an allegation on behalf who exchanged their First Commerce common stock for Old Banc One common stock issues in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that the Registration Statement and Merger Proxy/Prospectus contained materially false and misleading statements. The plaintiff alleges that Bank One breached its duty to make a reasonable and diligent investigation.

In Count IV, the plaintiff alleges an action against the individual defendants pursuant to Section 15 of the Securities Act on behalf of all First Commerce shareholders who acquired Old Banc One stock in connection with the Merger. The plaintiff alleges that the individual defendants failed to make a reasonable investigation of either the Registration Statement or the Merger Proxy/Prospectus. Therefore, the plaintiff alleges that each of the individual defendants are jointly and severally liable with Bank One.

Standard of Review

Before embarking upon an analysis of the motion to dismiss, this court must determine whether the plaintiff's complaint should be scrutinized under the heightened pleading standards required by Fed.R.Civ.P. 9(b). If a plaintiff makes allegations

**Levitan v. McCoy, Not Reported in F.Supp.2d (2001)**

Fed. Sec. L. Rep. P 91,608

in a complaint that amounts to fraud, he or she must meet the Rule 9(b) heightened pleading requirement. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1 st Cir.1996). If, however, a complaint does not "sound in fraud," a plaintiff should not be required to plead particular facts to support §§ 11 and 12. *In re nations Mart Corp. Securities Litigation,* 130 F.3d 309, 315 (8 th Cir.), *cert. denied,* 524 U.S. 927 (1998). The plaintiff's complaint in this case does not "sound in fraud" and is exempt from the heightened pleading requirements of Rule 9(b); but the complaint, does in fact meet the Rule 9(b) heightened pleading requirements if required.

The defendants argue that the plaintiff's complaint "sounds in fraud" due to references to underlying alleged TILA violations as well as allegations that characterize First USA's conduct as allegedly "predatory", "illegal," and "unlawful". This court disagrees. In *Evergreen Fund, Ltd v. McCoy,* No. 00 C 0767, a case in which different plaintiffs brought similar allegations against the same defendants, Judge Andersen determined that the plaintiffs' complaint did not "sound in fraud" and therefore was not required meet the Rule 9(b) heightened pleading standards. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1 st Cir.1996). Judge Andersen reasoned, however, that the plaintiffs' complaint, in any case, did meet the heightened pleading standard.[1]

 **\*4** In this case, too, we find the plaintiff's complaint does not "sound in fraud" and therefore is exempt for the heightened pleading requirements under Rule 9(b). As in the *Evergreen Fund,* the alleged TILA violations here "merely form the background for the plaintiff's allegations." *Id.* at pg. 10. The plaintiff primarily alleges that the individual defendants failed to make "a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Merger Proxy/Prospectus, were true, were without omission of any material facts, and/or were not misleading." Complaint, ¶ 119. The plaintiff does not allege nor even suggest that the defendants intended to deceive First Commerce stockholders or acted with scienter in drafting the Registration Statement. Further, the complaint's use of words such as "predatory," "illegal," and "unlawful" in describing First USA's transactions with its credit card customers does not add up to allegations of security fraud. Therefore, the complaint in this case does not "sound in fraud."

Finally, as in the *Evergreen Fund* lawsuit, this court finds that the plaintiff's complaint has met even a heightened pleading standard. To meet the particularity requirements of Rule 9(b), a complaint must specify the identity of the person making the misrepresentation, the time, place, and content of misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Sears v. Likens,* 912 F.2d 889, 892 (7 th Cir.1990). In this case, the plaintiff has presented specific statements in the Registration Statement, Merger Proxy/Prospectus, Old Banc One's 10-K, and the first and second quarter Forms 8-K. And, the plaintiffs allege that the defendants have signed the Registration Statement and the Merger Proxy/Prospectus. Therefore, the plaintiff has met the heightened pleading standard imposed by Rule 9(b).

Discussion

A. Plaintiff's Reliance on Post Hoc Allegations and "Falsity By Hindsight"

As in *Evergreen Fund,* the defendants here argue that the plaintiff has failed to properly allege that the First USA violated TILA because the complaint relies on post hoc statements and "falsity by hindsight" reasoning. In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7 th Cir.1997). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

In this case, the defendants contend that the plaintiff does not provide any factual basis to establish a reasonable inference that First USA was violating TILA in 1997 and the first quarter of 1998. The plaintiff specifically alleges that First USA systematically violated the TILA from mid-1997 to the effective date of the merger. In addition, the plaintiff alleges that an article in Kiplinger's Personal Finance Magazine traces the alleged violations back to 1997. Plaintiffs also alleged that complaints about First USA dramatically increased.

 **\*5** The defendant further contends that the plaintiff's vagueness with respect to the alleged "GAAP fraud" warrants dismissal. This court has previously held that plaintiffs are not required to state the precise dollar amount when alleging that portions of financial statements were overstated. *In re First*

Levitan v. McCoy, Not Reported in F.Supp.2d (2001)

Fed. Sec. L. Rep. P 91,608

*Merchants Acceptance Corporation Securities Litigation,* 1998 WL 781118, *4 (N.D.Ill.1998) (Coar, J.). The complaint specifically alleges that both the earnings overstatements and resulting stock price inflation were material. The complaint identifies more than a half billion dollars of charges against earning that Old Banc One recorded as a consequence of the previously undisclosed illegal practices at First USA.

This court must assume that all allegations in the complaint are true. Whether plaintiffs have sufficient evidence to support their allegation, that First USA engaged in a plan to artificially boost its revenues in violation of TILA, is a matter that must be considered under a motion for summary judgment, not a motion to dismiss. Taken in a light most favorable to the plaintiff, the complaint sufficiently alleges underlying TILA violations.

B. Statute of Limitations

Defendants argue that the plaintiff's claims are time-barred under Section 77 of the Securities Act. This court disagrees.

An action claiming a securities violation must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf. Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S .Ct. 2773, 2782, 115 L.Ed.2d 321. The Seventh Circuit has held that "discovery" may be imputed to a plaintiff when he is put on "inquiry notice"- i.e., when he becomes "aware of facts that would have led a reasonable person to investigate whether he might have a claim". *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718, 722 (7th Cir.1993), certiorari denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465. Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b-5 is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367;*Tomera v. Galt,* 511 F.2d 504, 510-511 (7th Cir.1975), overruled on other grounds by *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990).

The defendants assert that the filing of other lawsuits against Bank One in April 1999 as well as Senator Phil Gramm's request for an investigation into First USA's practices in May 1999 should have put plaintiff on inquiry notice. The plaintiff argues that he was not put on actual or inquiry notice until August 25, 1999, when Bank One announced that its First USA subsidiary would, inter alia, cease engaging it its previously-undisclosed practice of "accelerating" credit card late fees and that the imposition of these measures, combined with customer attrition, was expected to negatively impact Bank One's earnings by at least $500 million.

**\*6** This court with agrees with the plaintiff's view that he could not have reasonably known before August 25, 1999 that he, personally, had a claim against Bank One. While some courts have found litigation has provided inquiry notice that a plaintiff has a claim arising out of similar factual allegations, the facts in this case are distinguishable. *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 436-437, n. 14 (N.D. Ill 1995); *Antell v. Arthur Anderson,* 1998 WL 245878, *4 (N.D. Ill 1998). The defendants rely heavily on the holding in *Cashman,* where the court dismissed a shareholder suit as time-barred because another shareholder had brought a similar action more than a year earlier. *Id.* at *4. In this case, the lawsuits brought in April 1999 were not lawsuits brought by other shareholders but rather they were consumer lawsuits brought against First USA. In addition, the lawsuits brought in April 1999 did not allege securities violations and did not contain references to statements in the Registration Statement or other Old Banc One financial statements. Therefore, unlike *Cashman,* the plaintiff in this suit was never privy information about the specific allegations against Bank One were or whether or not they had any credibility, as was the shareholder in *Cashman.* Consequently, it would be unreasonable to believe that Levitan could have discerned, simply from the press reports of these consumer suits, that he had a viable claim against Bank One. A reasonable investor learning that consumer class actions were filed against First USA claiming that it had payment processing problems would not, from that information, have concluded that either First USA's or Bank One's financial statements were or even may have been materially overstated or prepared in violation of GAAP, particularly when Bank One continued to deny any wrongdoing.

Similarly, the fact that Senator Gramm issued a statement directing the OCC to investigate whether or not First USA had violated TILA is not sufficient to impose inquiry notice on Levitan. In *Fujisawa Pharmaceutical Company. Ltd v. Kapoor,* 115 F.3d 1332, 1335 (7 th Cir.1997), a securities fraud case, the Seventh Circuit did find that an FDA investigation was one of the many things that put the plaintiff on inquiry notice. The facts in this case, however, are different. The Court found that the plaintiff in *Fujisawa* had "better access to the relevant documents than the FDA" and "should have

**Levitan v. McCoy, Not Reported in F.Supp.2d (2001)**

Fed. Sec. L. Rep. P 91,608

begun suspecting fraud many years earlier." *Id.* at 1335-1336. Recognizing the plaintiff's unusual situation, the Seventh Circuit stated that absent Fujisawa's easy access to the relevant information, the stated statute of limitations would not have begun to run until the FDA investigation brought light to the fraudulent applications submitted to the FDA by the defendant. *Id.* at 1335. In this case, the plaintiff only had notice that an investigation would begin. The plaintiff did not have access to relevant financial documents and therefore could not obtain the requisite knowledge to trigger inquiry notice.

**\*7** Consequently, the plaintiff's complaint is not time-barred by the relevant statute of limitations.

C. Section 15 Claims

The plaintiff asserts claims under Section 15(a) of the Securities Act, 15 U.S.C. § 77*o*(a). The plaintiff asserts liability against the individual defendants as "controlling persons" who are jointly and severally liable for violations by person under their control. Defendants argue that plaintiffs have failed to state a predicate violation. As this court has rejected the defendants' "failure to state" arguments, the plaintiffs have stated a predicate violation. Therefore defendants' motion to dismiss is denied.

Conclusion

For the foregoing reasons, defendant's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1117279, Fed. Sec. L. Rep. P 91,608

Footnotes

1    While this court recognizes that district judges in this circuit must not treat decisions by other district judges, in this and a fortiori in other circuits, as controlling, *Colby v. J.C. Penn Co.,* Inc., 811 F.2d 1119, 1124 (7th Cir.1987), we may consider the "intrinsic persuasiveness" of Judge Andersen's analysis. *Id.* Given the similarity of the allegations in *Evergreen Fund* and those in the present case, we find Judge Andersen's thorough discussion on the matter particularly persuasive.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

2012 WL 3589655
United States District Court,
S.D. New York.

Thomas McKENNA, individually
and on behalf of itself and all
others similarly situated, Plaintiffs,

v.

SMART TECHNOLOGIES
INC., et al., Defendants.

No. 11 Civ. 7673(KBF).
|
Aug. 21, 2012.

*MEMORANDUM & ORDER*

KATHERINE B. FORREST, District Judge.

 **\*1** Plaintiff City of Miami brings this putative class action against defendants for violations of Sections 11, 12(a)(2) and 15 of the Securities Act.[1] On April 3, 2012, this Court dismissed plaintiff's claims under sections 11, 12(a)(2), and 15 related to all misrepresentations or omissions *except* those claims concerning demand for NextWindows, and dismissed the section 12(a) (2) claim against the Individual Defendants. *See McKenna v. SMART Techs. Inc.,* 2012 WL 1131935, at \*22 (S.D.N.Y. Apr. 3, 2012) (*"McKenna I"* ). The Court granted plaintiff leave to replead only the claims related to misrepresentations and omissions relating to demand for SMART's core interactive whiteboards (the "demand claims"). *Id.*

Pursuant to the Court's order in *McKenna I,* plaintiff filed a corrected second amended complaint (the "SAC") on April 24, 2012, and defendants jointly moved to dismiss the demand claims on May 11, 2012. The motion was fully submitted as of May 18, 2012.[2]

For the reasons that follow, defendants' motion to dismiss the demand claims is DENIED.

BACKGROUND

The factual background underlying plaintiff's remaining claims is recited fully in *McKenna I. See* 2012 WL 1131935, at \*1–6. The Court presumes familiarity with those facts here, and sets forth only those new facts in the SAC related to the demand claims.

The claim at issue here focuses on plaintiff's allegation that by at least March 2010—four months prior to SMART's IPO —SMART "was experiencing a precipitous *decline* in the demand for its interactive whiteboards, as the Company's sales pipeline essentially began to dry up." According to the SAC, that decline was caused, at least in part, by reduced federal stimulus funding under the ARRA. (SAC ¶ 8.)

Plaintiff alleges that after the February 2009 passage of the ARRA, SMART sought to "capitalize" on the $650 million in funding that ARRA provided to local school districts for educational technology. (SAC ¶¶ 35–36.) According to the SAC, SMART was successful in that plan—*i.e.,* there was a "big jump in business because of the stimulus funds." (*Id.* ¶ 37.) The SAC alleges that starting in the spring of 2010— prior to SMART's July 15, 2010 IPO—the upward trend in demand turned downward. (*Id.*)

Plaintiff relies on a number of confidential witnesses ("CWs") —who are alleged to have worked in various departments within SMART—to buttress its demand claim allegations.[3]

The SAC alleges that CWs in the sales sector witnessed trends or compiled/had access to information indicating a decline in demand. CW9—an Education Solutions Specialist and SMART Territory Manager in the Midwest from 2009 through early 2011 whose job required, *inter alia,* speaking with potential customers each year to anticipate sales for the fiscal year—stated that SMART's sales representatives reported their findings from those interviews for "SMART's sales pipeline," and that SMART "collected and maintained detailed information [through its internal customer-related information program 'Pivotal']" regarding demand. (SAC ¶ 38.) According to CW9, "decline was sufficiently visible and concerning" by spring 2010 such that SMART began reaching out to current and potential customers to understand the lack of new orders. (*Id.* ¶ 39.) CW10, an Education Account Representative at SMART (the SAC provides no information about what that position is or what role it occupies at SMART), and CW11, a Telesales Account Coordinator (whose title provides some insight into the position), confirm those same allegations based on their vantage points within SMART and provide detail as to the internal information

McKenna v. SMART Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

they compiled or to which they had access regarding sales of SMART whiteboards (or lack thereof). (*See id.* ¶¶ 41–43, 45.)

**\*2** SMART marketing employees also experienced trends indicating a decline in demand. CW12, a Channel Marketing Specialist—*i.e.,* someone who, *inter alia,* collected information for use in SMART's whiteboard marketing materials—worked at SMART from 2008 until immediately prior to the IPO. (SAC ¶ 44.) CW12 spoke to SMART's whiteboard resellers who confirmed that schools were not looking to spend for high-priced technology, but rather for essentials. (*Id.*) CW16, a Market Insight Specialist who ensured that SMART properly handled all sales leads, likewise had customer confirmation that "nobody was spending." (*Id.* ¶ 46 .)

The slowdown in demand purportedly impacted SMART's manufacturing of its interactive whiteboards as well. As the SAC alleges, CW13, a SMART eleven-year veteran (who departed in the second half of 2011), worked as an assembly trainer and supervisor at SMART's Kanata manufacturing facility. (SAC ¶ 50.) CW13 stated that just prior to the IPO, "SMART dropped the midnight shift" at the plant where CW13 worked, allegedly because "demand 'was shot.' " (*Id.*) CW13 stated that decreased demand was the only explanation for the reduction in force. (*Id.*)

CW14, a whiteboard assembler in the Kanata plant from 2005 through the second half of 2011, stated that the usual summer production "ramp[ ] up" did not occur during the summer of 2010. (*Id.* ¶ 51.) Rather, SMART informed employees at the Kanata plant in October 2010 (three months after the IPO) of impending layoffs which took place "shortly thereafter." (*Id.*)

a mechanical designer and process engineer who designed "manufacturing and production equipment for different SMART product lines at SMART's production facilities" and who worked at SMART from 2002 until 2011, confirmed the 2010 summer slowdown. (*Id.* ¶ 52.) Indeed, CW15 stated that "SMART cut production down from three shifts to two shifts in the middle of the summer of 2010." (*Id.*)

At bottom, plaintiff alleges that the pre-IPO decline in demand for interactive whiteboards was pervasively understood throughout SMART and that information to that affect "would have been available to the Individual Defendants, and was by definition available within SMART." (SAC ¶ 53.)

## LEGAL STANDARDS

### A. *Motion to Dismiss*

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc.,* 493 F.3d at 98 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (quoting *Twombly,* 550 U.S. at 570).*See also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate. *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 556 U.S. at 679).

### B. *Pleading Requirements*

**\*3** Typically, the heightened pleading requirements of Fed.R.Civ.P. 9(b) do not apply to claims under the Securities Act. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 120 (2d Cir.2012). Only where those claims "sound in fraud," must a complaint plead the claims with particularity. *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004). As stated in *McKenna I,* whether a claim "sounds in fraud" does not turn on a mechanical application of the words used in a complaint, but rather on the conduct alleged. *See McKenna I,* 2012 WL 1131935, at \*8 (citing *Rombach,* 355 F.3d at 171);*see also Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 715 (2d Cir.2011).

### C. *Sections 11, 12(a)(2), and 15*

Sections 11 and 12 of the Securities Act impose strict liability on certain participants in registered securities offerings for misstatements or omissions contained in a registration statement or prospectus. *See*15 U.S.C. §§ 77k, 77*l*(a)(2). Section 15 imposes what is known as "control person" liability—*i.e.,* liability on individuals or entities that "control[ ] any person liable" under sections 11 or 12. 15 U.S.C. § 77*o*. Given that Securities Act claims are strict

McKenna v. SMART Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

liability claims, a plaintiff need not plead scienter, reliance, or loss causation. *Panther Partners,* 681 F.3d at 120.

As the Second Circuit has recognized recently in both *Panther Partners* and *Litwin,* an omission "in contravention of an affirmative legal disclosure obligation"—such as the disclosures required by Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a) (3)(ii) ("Item 303")—may form the basis for liability under sections 11 and 12(a) (2). *Panther Partners,* 681 F.3d at 120;*Litwin,* 634 F.3d at 715–716. Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3) (ii). "[T]he SEC's interpretive release regarding Item 303" notes that disclosure is required " 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.' " *Litwin,* 634 F .3d at 716 (citation omitted). "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive or mechanical inquiries." *Panther Partners,* 681 F.3d at 122. Rather, a court should consider the totality of the circumstances alleged as well as all "reasonable and plausible inferences" from those allegations, and determine whether known trends of "factually-based uncertainties of which it was aware"—or could have been aware with reasonable diligence—were adequately disclosed. *Id.* at 121–22.

DISCUSSION

A. *"Sounds in Fraud"*

**\*4** Defendants argue that plaintiff's demand claim sounds in fraud, and must be dismissed because it does not meet Rule 9(b)'s strictures. Plaintiff expressly disclaims that its claims are based upon allegations of fraud. (SAC ¶ ¶ 88, 99, 110.) That, however, is not a talisman for whether Rule 9(b) applies.

Indeed, when considering the totality of the SAC's allegations, the Court finds that the SAC does not sound in fraud. Although the SAC, like the Amended Complaint, implicates defendants' failure to disclose the decline in demand, the SAC differs from the Amended Complaint in one material respect. The SAC alleges simply that defendants "did not make a reasonable investigation or possess reasonable grounds to believe that those statements [in the Offering Documents] were true and that there were not omissions of material fact." (*Id.* ¶ 91.) Unlike the Amended Complaint, the SAC does not allege that defendants affirmatively knew of the decline in demand and chose to conceal it, *see*2012 WL 1131935, at \*8—only that information regarding such decline was available to defendants (SAC ¶ 53), but that they failed to take steps to properly inform themselves of SMART's position.

The Court easily finds that the SAC meets the requirements of Rule 8(a). Accordingly, neither Rule 9(b) nor Rule 8(a) provide a basis for dismissal.[4]

B. *The Demand Claim*

Defendants make three arguments in support of dismissal. First, they argue that plaintiff's demand allegations are implausible because sales and revenue continued to increase at the time of and subsequent to the IPO. Specifically, defendants point out that for the quarters ended June 30, 2010 and September 30, 2010, sales of interactive whiteboards were 26 percent and 16 percent higher, respectively, than for the same periods in the prior fiscal year. *See* SMART Techs. Inc., Report of Foreign Private Issuer (Form 6–K) (Aug.2010) at "Media Release"; SMART Techs. Inc., Report of Foreign Private Issuer (Form 6–K) (Nov.2010) at Ex. 99.1. Plaintiff has sufficiently alleged the existence of information within SMART indicating potential for a precipitous and/or imminent decline in demand.

The SAC plausibly alleges that the (imminent) decline in demand, and its potential impact on SMART's business, "constituted a known trend or uncertainty that [SMART] reasonably expected would have a material unfavorable impact on revenues or income." *Panther Partners,* 681 F.3d at 121. Allegations of internal indications at SMART —particularly knowledge of a decline in ARRA spending —coupled with (1) SMART's acknowledgement in the Prospectus that SMART was a "substantial beneficiary" of the ARRA, Prosp. at 16, and (2) the disclosure of the decline in demand for the quarter ended December 31, 2010 —*i.e.,* approximately five months after the IPO, *see* SMART Techs. Inc., Report of Foreign Private Issuer (Form 6–K) (Feb.2011) at Ex. 99.1, is sufficient to support plaintiff's claim that there was "uncertainty" over the demand for SMART's interactive whiteboards. The Court has no doubt that an uncertainty regarding demand for SMART's "core" product would impact SMART's business. As the Second Circuit stated in *Panther Partners,* "[i]t goes without saying that such

McKenna v. SMART Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

'known uncertainties' could materially impact revenues." 681 F.3d at 121–22.

 **\*5** Second, defendants argue that the CWs' allegations do not provide sufficient specificity with respect to how the CWs knew of the alleged slow-down in demand. Although there are certain CWs whose allegations, standing alone, would not take the demand claims "across the line from conceivable to plausible," *see Twombly,* 550 U.S. at 570;*see also McKenna I,* 2012 WL 1131935, at \*12, the totality of the allegations indicate that there was knowledge inside SMART regarding a change in demand that impacted significant aspects of SMART's operations. Although "general allegations and anecdotes of former [ ] employees alone do not indicate there were material misstatements or omissions in the offering documents ...," *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* No. 08 Civ. 5310, 2012 WL 1076143, at \*4 (S.D.N.Y. Mar. 29, 2012), the allegations of the CWs provide "sufficient plausible detail as to why the individuals who held those positions would have any knowledge regarding the demand for SMART's interactive cord products," *McKenna I,* 2012 WL 1131935, at \*11. With regards to the CWs discussed *supra,* the SAC details the employees' roles, why those employees would have access to the information discussed in the SAC regarding internal reports and information about decreased demand, and identifies the reports containing the information contrary to the picture of increasing demand portrayed in the Offering Documents.[5] That is sufficient at the pleading stage for the demand claim to survive. *See id.* at \*12.[6]

Third, defendants point to disclaimers in the Prospectus to argue that no reasonable investor would have been misled about SMART's demand. It is true that where "cautionary language addresses the relevant risk directly," the offering documents at issue are not rendered misleading. *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 360 (2d Cir.2002); *see also Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir.1996) (no actionable misstatements where cautionary "language fully disclosed the risk investment and was specific enough to warrant a reasonable investor's attention."). However, the cautionary language in the Prospectus regarding demand is too "generic" to provide defendants a safe haven. *See Panther Partners,* 681 F.3d at 122. With regard to the decreased spending by educational institutions, the Prospectus states:

> **If there are decreases in spending or changes in the spending policies or budget priorities for government funding of schools, colleges, universities, other education providers or government agencies, we could lose revenue.**

Our customers include primary and secondary schools, colleges, universities, other education providers, and, to a lesser extent, government agencies, each of which depends heavily on government funding. The recent worldwide recession has resulted in substantial declines in the tax revenues of many national, federal, state, provincial and local governments. Many of those governments could react to the decreases in revenue by cutting funding to those institutions, and if our products are not a high enough priority expenditure for those institutions, we could lose revenue.

 **\*6** *Any general decrease, delay or change in national, federal, state, provincial or local funding* for primary and secondary schools, colleges, universities, or other education providers or for government agencies that use our products *could cause our current and prospective customers to reduce their purchases of our products, which could cause us to lose revenue.* In addition, a specific reduction in governmental funding support for products such as ours could also cause us to lose revenue.

We believe that we have been an indirect but perhaps *substantial beneficiary of the American Recovery and Reinvestment Act of 2009,* or the ARRA. The ARRA was intended to provide a stimulus to the U.S. economy in the wake of the recent economic downturn. Among other things, the ARRA provided state and local governments with substantial additional funds for education. We believe that some of our sales since the enactment of the ARRA in February 2009 resulted from state and local governments' obtaining funds under the ARRA for technology purchases. *If state and local governments are unable to secure an alternative source of funds upon the depletion of the funds provided under the ARRA, we could experience a slowdown of revenue growth as a result of that lack of funding.*

Prosp. at 15–16 (bold in original; emphases added).

Although the Prospectus discloses that a change in federal funding could negatively impact revenues, the demand disclosure is missing a key sentence in between the last two sentences in the last paragraph. In between acknowledging that ARRA boosted sales of SMART's interactive whiteboards and stating that revenue would decline if alternative sources of funding could not be found, the Prospectus did not disclose that there were uncertainties around whether—and to what extent—ARRA funding would

McKenna v. SMART Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

continue at the levels it had in the past. Indeed, the SAC makes clear that there were at least "uncertainties" as to whether it would. If the disclosure had, for example, included that SMART had "indications that ARRA funding is less than in prior years," the "cautionary language [would have] addresse[d] the relevant risk directly." *See Halperin,* 295 F.3d at 360. In other words, the Prospectus' disclosure was not "specific enough to warrant a reasonable investor's attention." *See Olkey,* 98 F.3d at 9. In the absence of such additional cautionary language, the disclaimers are insufficient.

CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss is DENIED.

The PSLRA stay of discovery is lifted. The parties are directed to appear for an initial pretrial conference on September 21, 2012, at 2:30 p.m. The parties should comply with all of Judge Forrest's Individual Practices for initial pretrial conferences.

The Clerk of the Court is directed to terminate defendants' motion to dismiss at Docket No. 114.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3589655, Fed. Sec. L. Rep. P 96,988

Footnotes

1    Proper names and defined terms used herein are the same as those used in this Court's Opinion on defendants' motions to dismiss the Amended Complaint. *See McKenna v. SMART Techs. Inc.,* 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) (*"McKenna I"* ).

2    Plaintiff filed a notice of supplemental authority (without argument) to bring to this Court's attention the Second Circuit's decision in *Panther Partners Inc. v. Ikanos Communications, Inc.,* 681 F.2d 114 (2d Cir.2012). (Dkt. No. 119.) Defendants responded with argument and their own supplemental authority regarding *Panther Partners.* (Dkt. No. 120.) Plaintiff filed a reply on June 5, 2012. (Dkt. No. 121.)

3    The Court details the allegations from the CWs that are set forth with sufficient detail—*i.e.,* are not conclusory.

4    The Court also finds that the SAC's demand allegations "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made," and (4) explain why the statements were untrue when made, *see Rombach,* 355 F.3d at 170—*i.e.,* even if Rule 9(b) applied, the SAC is plead with specificity sufficient to meet the rule's requirements.

5    The Court still cannot credit the allegations of CWs 1 through 4, as their allegations are, as they were in the Amended Complaint, conclusory as to both the roles of those individuals, why they would have access to contrary information regarding demand, and the contrary information to which they had access. *See McKenna I,* 2012 WL 1131935, at *11–12. (*See* SAC ¶¶ 45, 47, 48, 49.)

6    The SAC further alleges that CW9, CW10, CW12, and CW15 received customer or reseller feedback indicating that the decline in demand resulted not only from reduced federal stimulus educational funding, but also from "increased competition," allegedly due to defects in the interactive whiteboards. (SAC ¶¶ 39, 41, 44, 52.) The Court need reach the sufficiency of those allegations at this stage.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 1733558

**2003 WL 1733558**
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Clive T. MILLER, on behalf of himself and
all others similarly situated, Lead Plaintiff,
v.
APROPOS TECHNOLOGY,
INC., et al. Defendants.

No. 01 C 8406.
|
March 31, 2003.

*MEMORANDUM OPINION AND ORDER*

COAR, J.

**\*1** This is a lawsuit arising under the Securities Act of 1933 and the Securities Exchange Act of 1934. Plaintiff Clive T. Miller represents a putative class of plaintiffs who purchased common stock in Defendant Apropos Technology on the open market during the period from February 17, 2000 through April 10, 2001 ("the class period"). The complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*o*, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). Plaintiffs named as Defendants Apropos Technology, several of Apropos' corporate officers, and several corporations who served as underwriters for the initial public offering of stock. Currently pending and fully briefed are three Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6); one each from Defendant Michael J. Profita, the Apropos Technology Defendants, and the underwriter Defendants.

Factual and Procedural Background
Defendant Apropos Technology, Inc. ("Apropos") is a corporation that develops, markets, and supports technology driven customer interaction management solutions for multimedia contact centers.[1] (Pl.Comp., ¶ 3) Translated roughly into plain English, Apropos builds software systems for companies that handle a high volume of customer inquiries. Apropos' software is adaptable to specific business needs, and it can accommodate the transfer and routing of customer inquiries that arrive via telephone, email, and/or the internet. Apropos began developing this product in January 1989 and the first product was shipped in March 1995. (Apropos Defs.' Mem. Supp. Mot. Dismiss, Ex. A ("Prospectus"), at 4.)

In 1999, Plaintiffs allege that there was a power struggle taking place between Apropos' CEO Kevin G. Kerns, and two other corporate officers: Chief Technology Officer Patrick K. Brady, and Vice–President for Technology William M. Bach. (Pl.Comp., ¶ 5.) Brady was a co-founder of the corporation; he and Bach were the Company's "most senior technology officers." (Pl. Comp., ¶ 4; Pl. Comp., ¶ 56–57.) At the Apropos Board meeting preceding the initial public offering, in July 1999, this struggle came to a head. Kerns emerged with the support of the majority of the Board.

After the Board Meeting, Brady left Apropos and did not return. (Pl.Comp., ¶ 58.) On September 21, 1999, Kerns sent an e-mail to others at Apropos explaining that Brady was on sabbatical for the next six months. (Pl.Comp., Ex. A.) Bach, meanwhile, was assigned to a more limited role with the corporation, a move which Plaintiffs believe was calculated to force his resignation. (Pl.Comp., ¶ 59.) In short, when Brady and Bach lost the power struggle, they were de facto ousted from the corporation. (Pl.Comp., ¶¶ 5–6.)

Meanwhile, Apropos Technologies was preparing for its initial public offering of stock. Apropos prepared a registration statement to authorize the sale of stock pursuant to 15 U.S.C. § 77f. Federal law regulates the contents of registration statements for the sale of Securities. *See*15 U.S.C. §§ 77g, 77aa. Apropos also prepared a prospectus offering the securities for sale. This, too, would have to conform to the requirements of federal law. *See*15 U.S.C. § 77j. In advance of the initial public offering (IPO), Apropos contracted with several financial organizations to serve as underwriters of the IPO.

**\*2** On February 17, 2000, Apropos held an initial public offering of shares of common stock, trading on the NASDAQ under symbol APRS. From the perspective of Apropos, the IPO was a success. The corporation sold almost 4 million shares of common stock, which generated 79.3 million dollars of net proceeds. (Pl.Comp., ¶ 3.) The price of the stock rose quickly from the initial offering at twenty-two dollars to a high of seventy dollars per share. (Pl.Comp.¶ 76.)

Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 1733558

From the perspective of Plaintiffs, however, the IPO was a failure. After its initial price increase, the stock flopped. By the end of the class period, the stock was trading at $2.98 per share. (Pl.Comp.¶ 76.) Faced with devastating losses, Plaintiffs believe they were hoodwinked into buying the stock by certain material misrepresentations in the prospectus. Putative class representative Clive T. Miller filed the consolidated amended class action complaint on April 17, 2002. The complaint alleges that the registration statement and prospectus contained material misrepresentations and omissions. Specifically, Plaintiff alleges that the registration statement omitted material information relating to Brady's and Bach's diminished roles within the company. (Pl.Comp.¶¶ 57, 62–68.) Plaintiff also claims that the registration statement contained false or misleading statements regarding the intended use of the proceeds from the initial public offering. (Pl.Comp., ¶¶ 69–75.) Defendants' motions to dismiss followed.

DISCUSSION

Plaintiff's complaint contains four counts. Count I alleges that all the Defendants (Apropos Technologies, Apropos' officers, and the underwriters of the IPO)[2] violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, through material misrepresentations about three things: (1) the changed role of William Bach; (2) the changed role of Patrick Brady; and (3) the intended use of proceeds from the IPO. Count II alleges that Defendant Kerns, as a control person at Apropos, is jointly and severally liable for any violations of Section 11 of the Securities Act of 1933 by persons under his control pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o. Count III alleges that Defendants Brady and Kerns violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), through their knowing misrepresentation in the registration statement about Brady's and Bach's roles in the corporation. Count IV alleges that Defendant Kerns, as a control person at Apropos, is jointly and severally liable for any violations of Section 10(b) of the 1934 Act by persons under his control pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

The Apropos Defendants, which include the corporation and six of the seven individuals who signed the registration statement, moved to dismiss all four counts of the complaint. Defendant Michael J. Profita, the seventh individual who signed the registration statement, joined in the arguments pertinent to Count I of the Apropos Defendants' Motion to Dismiss and also separately moved to dismiss Count I of the complaint. The Underwriter Defendants also joined in the Apropos Defendants' Motion to Dismiss to the extent it was pertinent to Count I, and filed their own Motion to Dismiss.

**\*3** The Court will analyze the Motions to Dismiss the Complaint count by count.

Legal Standard

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case. In evaluating the motion, the Court accepts as true all facts and allegations in the complaint and makes all reasonable inferences in the plaintiff's favor. *SeeStransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1330 (7th Cir.1995). Complaints should only be dismissed if it is clear that no set of facts in support of the claim would entitle the plaintiff to relief. *SeeLedford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69. 73 (1984)).

Ordinarily, the only document the Court relies upon in deciding a motion to dimiss is the Plaintiff's Complaint. Where the complaint alleges violations of federal securities laws, however, several circuits have held that the district court may also consider documents that are integral to Plaintiff's claims, such as the Registration Statement and Prospectus. *SeeSan Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos.,* 75 F.3d 801, 809 (2d Cir.1996); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996); *Bovee v. Coopers & Lybrand, CPA,* 272 F.3d 356, 360–61 (6th Cir.2001); *Ehlert v. Singer,* 245 F.3d 1313, 1317 n. 4 (11th Cir.2001).[3] Although the Seventh Circuit has not spoken to this issue in the context of securities litigation, it has held that on a motion to dismiss the district court may rely upon documents outside of the complaint provided that those documents are integral to the complaint. *SeeWright v. Associated Ins. Co.,* 29 F.3d 1244, 1248 (7th Cir.1994); *Venture Associates Corp. v. Zenith Data Systems, Inc.,* 987 F.2d 429, 431 (7th Cir.1993). "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim." *Venture Associates Corp.,* 987 F.2d at 431 (citing cases). In this case, although it was the Defendant that submitted the Prospectus, this Court finds

Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 1733558

it is central to Plaintiff's complaint and therefore can be considered on a Motion to Dismiss.

Count III of Plaintiff's Complaint asserts a violation of Section 10(b) of the Securities Exchange Act. This portion of the Complaint implicates the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Pro. 9(b). When the Court addresses that count below, it will address the heightened pleading requirements of Rule 9(b).

COUNT I: Violation of Section 11 of the Securities Act of 1933

In Count I, Plaintiffs allege that Apropos made false statements or material misrepresentations in its Securities Registration Statement. Liability for making false statements or material misrepresentations in a Securities registration statement extends quite broadly. The statute reads, in pertinent part:

> **\*4** In case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person who acquires such security ... may ... sue (1) every person who signed the registration statement; (2) every person who was a director of ... the issuer at the time of the filing ... of the registration statement; ... (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a). Count I of Plaintiff's Complaint is pleaded against seven people who signed the registration statement, six of whom were directors of Apropos at the time, and nineteen corporate underwriters of the initial public offering.

To state a claim under section 11 of the Securities Act, plaintiffs must allege that defendants made untrue statements of material fact or omitted material facts in a registration statement or prospectus. *See, e.g.,Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir.1997). A material omission from the registration statement or prospectus is actionable if the omitted facts were necessary to make the disclosures therein not misleading. *SeeIn re N2K Securities Litigation,* 82 F.Supp.2d 204, 207 (S.D.N.Y.2000), *aff'd*202 F.3d 81 (2d Cir.2000) (per curiam).

The Section 11 claim in this case has three components: (1) the changed role of William Bach; (2) the changed role of

Patrick Brady; and (3) the intended use of the proceeds from the IPO. The Court addresses each separately below.

### 1. Changed Role of William Bach

Plaintiffs allege that Bach's position within the corporation changed substantially prior to the IPO. According to the Complaint, Bach's role as Vice President for Technology had been substantially reconfigured to diminish his impact on the corporation and inspire him to resign. Plaintiffs' contention that the omission of this information about Bach was a material misrepresentation is readily dismissed. The Apropos Defendants rightly point out that the "diminished" duties Plaintiff's Complaint ascribes to Bach are entirely consistent with the description of his duties as Vice President for Technology.[4] If the Court were to accept Plaintiff's position as regards Bach, corporations would either be paralyzed from making internal changes to the duties of their corporate officers or required to disclose any and all internal changes of executive duties. Neither result is desirable or required under federal securities laws and regulations.

Corporations are given a relatively free hand to determine their organizational structure and the allocation of duties within that structure. A disclosure requirement for changes like those Plaintiff alleges Bach experienced at Apropos would accomplish little besides making it more difficult to determine which, if any, disclosures in securities filings are material. Accepting the allegations in Plaintiff's Complaint regarding Bach as true, the Court finds that the Prospectus did not contain a material misrepresentation about the role of William Bach in the corporation at the time of the IPO.

### 2. Changed Role of Patrick Brady

**\*5** The allegations regarding Patrick K. Brady, however, require closer scrutiny. Both parties agree that at the time of the IPO, Patrick K. Brady, the Chief Technology Officer and cofounder of Apropos, was on a leave of absence from the corporation. Plaintiffs assert that at least Kevin Kerns, the CEO of Apropos, and Patrick Brady both knew that Brady would not be coming back to the corporation.[5] The Prospectus makes no mention of any dispute between Brady and Kerns, nor does it discuss that Brady may not return to the corporation.

The central thrust of the Apropos' Defendants reply is that "when the Prospectus is read as a whole, no reasonable person could have attached any importance to the possible

Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 1733558

future role of ... Brady at Apropos." (Apropos Def. Rep. Mem. L. Supp. Mot. Dismiss, at 6.) The prospectus as a whole certainly permits an inference that the key personnel in general and Brady in particular had a future role at Apropos. For example, it reads: "We depend on the continued services of our executive officers and other key personnel. The loss of services of any of our executive officers or key personnel could have a material adverse effect on our business, financial condition and results of operations." (Prospectus at 8.) Elsewhere, the Prospectus reads: "Our future performance depends in significant part upon the continued service of our key technical, sales and marketing, and senior management personnel. The loss of the services of one or more of our key employees would harm our business." (Prospectus at 37.) (emphasis added) Apropos highlights this language as warning investors that "retention of personnel was a risk factor." (Apropos Def. Mem. L. Supp. Mot. Dismiss, at 12.) Again, Plaintiff's position is that Apropos was aware that the risk regarding Brady had already been realized at the time of the IPO.

As regards Brady particularly, there can be no doubt that he was both an executive officer and one of the key employees at Apropos. The Prospectus indicates that he was one of four members of Apropos' Executive Committee, which "has the authority of the Board of Directors to manage our business...." (Prospectus at 42.) The Prospectus contains conflicting statements about Brady's term as a Director of Apropos. At one point, it indicates that Brady's term as a Director was due to end in 2002, two years after the IPO. (Prospectus at 41) Elsewhere, it indicates that Brady "is entitled to be one of our directors until the expiration of his employment agreement [on March 19, 2000]." Whether his term as Director expired in 2000 or 2002, the Prospectus definitely establishes Brady as one of the four most central figures in the corporation. Plaintiff's Complaint alleges that the Prospectus failed to mention that Brady was already effectively out of the company at the time of the IPO.

Apropos' strongest argument in support of the failure to disclose Brady's pending departure from the corporation is that the Prospectus indicates that Brady's employment contract was due to expire on March 19, 2000. (Prospectus at 44.) From that, Apropos argues that no investor could reasonably expect Brady to remain with the corporation after the expiration of his employment agreement. Here, Apropos seeks to defend itself from the charge that its Prospectus was misleading with an assertion that it was factually accurate. Even if the Prospectus is factually accurate, that does not

mean that it cannot be materially misleading as a matter of law. Disclosure of the expiration date of an employment agreement is not equivalent to disclosure that an executive officer and co-founder of the corporation is going to leave the corporation when the contract expires. If proven, the failure to disclose this information in the Prospectus would render it materially misleading. The factual truth of the information regarding Brady does not alter its misleading nature.

**\*6** The presence of cautionary language about retention of key personnel similarly does not render the omission of information about Brady acceptable under Section 11. A statement that "we can give no assurance that we can retain or attract key personnel in the future" (Prospectus at 37) does not justify the omission of information regarding Brady's departure from the Prospectus. As regards Patrick Brady, Count I of Plaintiff's Complaint states a claim under Section 11 of the Securities Act of 1933.

### 3. Intended Use of Proceeds

Plaintiffs assert that the Prospectus contained material misrepresentations regarding the intended use of proceeds from the IPO. The Prospectus indicated that it anticipated net proceeds of either $74.2 million or $79.9 million, with the latter figure depending on whether the underwriters "exercise[d] their overallotment option in full." (Prospectus at 14.) Of those proceeds, the Prospectus indicated that "$8.0 million of the net proceeds will be used to repay debt," with the debt repayment plan described in some detail. Beyond the $8 million dedicated to debt repayment, the Prospectus contains some estimates regarding the use of the net proceeds from the IPO. Plaintiffs allege that Apropos did not adhere to the estimates given in the Prospectus regarding the Use of Proceeds.

Securities law requires that statements in Prospectus to be true and not misleading at the time they are made. 15 U.S.C. § 77k; *see also Glassman v. Computervision Corp.,* 90 F.3d 617, 627 (1st Cir.1996) ("[S]tatements in the Prospectus ... are required by law to be true *as of the effective date of the offering."* ). Plaintiff's Complaint alleges that a little over one year after the effective date of the IPO "the Company still had unspent proceeds of the Offering invested in cash and short term investments totaling over $60 million, rather than in pursuit of the Company's strategic goals". (Comp.¶ 75.)

Defendant correctly responds that the Prospectus did not contain a timetable for spending the proceeds from the IPO. Furthermore, the Prospectus indicates, "Pending any use, the

Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 1733558

net proceeds of this offering will be invested in short-term, interest bearing investment grade securities." (Prospectus at 14.). This is exactly how Plaintiff's Complaint alleges the proceeds were being used. Plaintiff's complaint regarding the use of proceeds is dismissed. Even accepting the allegations in the Complaint, Apropos is using the proceeds in keeping with the intended use described in the Prospectus.

Furthermore, the statements in the Prospectus about the intended use of proceeds are immediately proceeded by cautionary language about "forward-looking statements" and immediately followed by cautionary language about potential changes in the use of proceeds. (Prospectus at 13–14.) The "bespeaks caution" doctrine provides that forward-looking statements may not be misleading where they are accompanied by meaningful warnings and cautionary statements. *SeeHarden v. Raffensperger, Hughes & Co.,* 65 F.3d 1392, 1404 (7th Cir.1995) (quoting 3B Harold S. Bloomenthal, *Securities and Federal Corporate Law* § 8.26[1] at 8–110 (1995)). Even if Apropos were not using the proceeds in accord with the estimates in the Prospectus, the estimates are sandwiched between such meaningful cautionary language that they can not be misleading as a matter of law.

COUNT II: DEFENDANT KERNS' LIABILITY AS A CONTROL PERSON UNDER SECTION 15 OF THE SECURITIES ACT OF 1933

**\*7** Section 15 of the Securities Act of 1933 makes "every person who ... controls any person liable under section 77k [, that is, Section 11 of the Securities Act of 1933] ... jointly and severally [liable] with and to the same extent as such controlled person ... unless the controlling person had no knowledge of or reasonable ground to believe" that the facts supporting liability under Section 11 exist. 15 U.S.C. § 77*o.* In this case, Plaintiff's Complaint states a claim for a violation of Section 15 against Defendant Kerns. The requirements for claims under Section 15 are largely co-extensive with the requirements for Section 11 claims. The only additional element that Section 15 would require is that the Defendant was in a position of control over the alleged violators of Section 11. Here, the allegation that Defendant Kerns was CEO of Apropos at the time of the IPO is sufficient to make out the additional element.

As described above, Plaintiff's Complaint states a claim under Section 11 of the Securities Act of 1933 only for the failure to disclose information relating to Patrick Brady's departure from the corporation. The allegations relating to William

Bach and to the use of proceeds do not support a finding that the Prospectus was materially misleading in violation of Section 11. As such, Kerns could be jointly and severally liable under Section 15 only to the extent that the Count I Defendants are liable for the Section 11 violation.

COUNT III: DEFENDANTS KERNS AND BRADY'S VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

Section 10(b) of the Securities Exchange Act of 1934 imposes private civil liability on those who commit a manipulative or deceptive act in connection with the purchase or sale of a security. *See*15 U.S.C. § 78j(b); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 166 (1994). As mentioned earlier, violations of Section 10(b) of the Securities Exchange Act implicate the heightened pleading requirements of Rule 9. "With respect to securities fraud cases, Rule 9(b) requires that ... 'the complaint ... must afford a basis for believing that plaintiffs could prove scienter.' *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990)." *In re HealthCare Compare Corp. Securities Litigation,* 75 F.3d 276, 281 (7th Cir.1996).

Plaintiffs' allegations in Count III are only stated against Defendants Kerns and Brady. Plaintiffs' complaint alleges with particularity the elements of this violation of Section 10(b). Plaintiffs' position is that Kerns "effectively pushed Brady out of the company" (Comp.¶ 5.) and that Kerns and Brady conspired to keep his ouster secret until after the IPO. In support of their position, they attached to the complaint an email from Kerns to the company regarding Brady's leave of absence dated September 21, 1999. (Pl.Comp.Ex. A) This email indicated that Brady would be taking a six-month leave of absence from the corporation. Since his employment agreement terminated on March 19, 2000, this leave of absence would cover his absence for the final six months of his contract.

**\*8** Defendants assert that this e-mail reflects Brady's "continued technical leadership of the company." (Apropos Def. Mem. L. Supp. Mot. Dismiss, at 14.) While Defendants are certainly free to pursue this imminently plausible theory as this litigation proceeds, the e-mail could just as readily be interpreted as evidence of Kerns' and Brady's efforts to prevent his departure from Apropos from becoming public prior to the IPO. On a Motion to Dismiss, where the Court makes reasonable inferences in the Plaintiff's favor, the latter interpretation must be attributed to the e-mail.

Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 1733558

The Complaint provides sufficient allegations to support Plaintiff's allegations of scienter as against Brady and Kerns.

As with Count I, Count III of the Complaint also attempts to state a claim regarding William Bach. The analysis relating to Bach's role under Count I pertains equally well to Count III. Even if Plaintiff's allegations regarding Bach are true, his alleged changed role with the Defendant is not sufficiently material to sustain liability under Section 10(b).

Defendants rely to various degrees on the absence of loss causation in support of their motions to dismiss. All parties properly agree that "[section] 11 ... does not require a plaintiff to plead loss causation in the complaint." Apropos Def. Mot. Dismiss at 6; *accord* Profita Mot. Dismiss at 3 ("loss causation is not an element of a § 11 claim"). *See*15 U.S.C. § 77k(e). Counts I and II, therefore, will not be dismissed for failure to allege loss causation.[6]

Loss causation is a required element of Section 10(b) claims, though. The Apropos Defendants contend that the Seventh Circuit decision in *Bastian v. Petren Res. Corp.,* 892 F.2d 680 (7th Cir.1990), provides controlling precedent that requires their Motion to Dismiss to be granted. This suggestion is unavailing. In *Bastian,* the Seventh Circuit affirmed dismissal of an SEC Rule 10(b)(5) violation because the Plaintiffs failed to allege "the cause of the transaction's turning out to be a losing one." *Id.,* 892 F.2d at 684. In this case, Plaintiffs do make allegations that support the element of loss causation. Plaintiffs allege that the failure to disclose the alleged truth about Brady's pending absence from the company "caused the offering price of Apropos common stock on the [date of the] Offering to be higher than the offering price would have been had the true facts regarding the status and role [ ] of Defendant Brady ... been disclosed to the investing public." (Comp. ¶ 117). While this does not explain precisely why the stock eventually fell in value, it does support the charge that the Defendants' fraud caused damages to Plaintiffs who purchased common stock in the IPO at the inflated price.

Defendants point to the general decline in value of stocks, particularly internet stocks, since the IPO in February 2000 in support of their position that Plaintiffs cannot prove loss causation. While it is clear that the stock market has declined over the past few years, on a motion to dismiss, this Court is not prepared to hold as a matter of law that the Plaintiffs could not prove causation of damages. Plaintiffs may have a difficult road ahead in proving loss causation, but they allege the element in their Complaint, which is all they must do at this stage.

COUNT IV: DEFENDANT KERNS' LIABILITY AS A CONTROL PERSON UNDER SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

**\*9** As with Section 15 of the Securities Act of 1933, Section 20(a) of the Securities Exchange Act creates joint and several liability in a control person for violations of Section 10(b) of the Exchange Act by persons within the control person's control. *See*15 U.S.C. § 78t(a). The only additional element of a Section 20(a) violation is that the Defendant be in control of the alleged violators of Section 10(b). Defendant Kerns, as CEO of Apropos, would be a control person vis-a-vis Defendant Brady at the time of the IPO. Consequently, the Complaint states a claim against Defendant kerns for a violation of Section 20(a) of the Securities Exchange Act of 1934.

CONCLUSION

Counts I and II of Plaintiff's Complaint state claims for violations of Sections 11 and 15 of the Securities Act of 1933 for the failure to disclose that Patrick K. Brady was leaving Apropos in the prospectus and registration statement. Counts III and IV of Plaintiff's Complaint state claims for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934. Consequently, the Motions to Dismiss Count I (Defendant Michael J. Profita's Motion, the Underwriter Defendants' Motion, and Apropos Defendants' Motion) are granted as they relate to the role of William Bach and the intended use of proceeds, and denied as they relate to the role of Patrick Brady. The Apropos Defendants Motion to Dismiss Counts II, III, and IV is granted as they relate to the role of William Bach and (as to Count II) the intended use of proceeds, and denied as they relate to the changed role of Patrick Brady.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1733558

Footnotes

**Miller v. Apropos Technology, Inc., Not Reported in F.Supp.2d (2003)**

2003 WL 1733558

1   This recitation of facts comes primarily from Plaintiff's Complaint. The Court assumes that all of the well-pleaded allegations of the Complaint are true for the purposes of a Motion to Dismiss under Rule 12(b)(6).

2   Named as Defendants are: the corporation, seven individuals who signed the registration statement, and nineteen underwriters of the initial public offering. For a list of all the Defendants and their roles, see Pl. Comp. at ¶¶ 17–47.

3   Although they all reach the same conclusion, the circuits have taken two approaches to the use of documents integral to a securities complaint on a motion to dismiss. The majority approach, exemplified by the Second Circuit (where most securities litigation occurs), holds that district courts can consider SEC filings because securities complaints incorporate those filings by reference. *SeeSan Leandro,* 75 F.3d at 808–09;*Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985); *see alsoCredit Suisse First Boston Corp. v. Arm Financial Group, Inc.,* No. 99 CIV 12046 WHP, 2001 WL 300733, at *3 (S.D.N.Y. March 28, 2001). The minority approach, only employed in the Fifth Circuit, allows the district court to take judicial notice of statements required to be filed and actually filed with the Securities and Exchange Commission (SEC) on a motion to dismiss a securities fraud complaint. *SeeLovelace,* 78 F.3d at 1018;*see alsoIn re Azurix Corp. Securities Litigation,* 198 F.Supp.2d 862, 877 (S.D.Tex.2002).

4   Defendants assert that Bach continues to be an employee of Apropos, and that he experienced a promotion to Senior Vice President for Technology in 2000. (Apropos Def. Mem. L. Supp. Mot. Dismiss, at 19 n. 5). Although the Court makes no findings of fact on a motion to dismiss, if true, this further undermines the Complaint's untenable position regarding Mr. Bach.

5   Their knowledge supports Counts III and IV of the Complaint, and will be discussed along with those Counts, infra.

6   Defendants request the Court to dismiss the Complaint on loss causation grounds because the absence of loss causation is apparent from the face of Plaintiff's Complaint. While affirmative defenses such as the absence of loss causation can be grounds for dismissal under Rule 12(b)(6), *seePani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998) § , the Court does not find that the affirmative defense is sufficiently proved from the face of Plaintiff's Complaint to merit dismissal.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

2020 WL 5757628
United States District Court, S.D. New York.

PANTHER PARTNERS INC.,
individually and on behalf of all
others similarly situated, Plaintiff,
v.
JIANPU TECHNOLOGY INC., Daqing
(David) Ye, Yilu (Oscar) Chen, Jiayan
Lu, Caofeng Liu, Chenchao Zhuang,
James Qun Mi, Kui Zhou, Yuanyuan Fan,
Rong360 Inc., Goldman Sachs (Asia)
L.L.C., Morgan Stanley & Co. International
PLC, J.P. Morgan Securities LLC, and
China Renaissance Securities (Hong
Kong) Limited, inclusive, Defendants.

18 Civ. 9848 (PGG)
|
Signed 09/27/2020

**Attorneys and Law Firms**

Scott D. Musoff, Michael Charles Griffin, Robert Alexander Fumerton, Vincent Martin Chiappini, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants Jianpu Technology Inc., Rong360 Inc., Giselle Manon, Law Debenture Corporate Services Inc.

David B. Hennes, Fried, Frank, Harris, Shriver & Jacobson LLP, Martin Jonathan Crisp, Ropes & Gray LLP, New York, NY, Erin R. MacGowan, Pro Hac Vice, Ropes & Gray LLP, Boston, MA, for Defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. International PLC, J.P. Morgan Securities LLC, China Renaissance Securities (Hong Kong) Limited, Goldman Sachs & Co. LLC, China Renaissance Securities (US) Inc.

## MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, U.S.D.J.:

**\*1** Plaintiff Panther Partners Inc. brings this putative class action for violations of the Securities Act of 1933

in connection with the initial public offering ("IPO") of Defendant Jianpu Technology Inc. ("Jianpu"). (Am. Cmplt. (Dkt. No. 30)) Defendants have moved to dismiss. (Dkt. No. 52) For the reasons stated below, Defendants' motion will be denied.

## BACKGROUND[1]

### I. FACTS

#### A. Parties

Plaintiff owns American Depositary Shares ("ADSs") issued by Jianpu in connection with its November 16, 2017 IPO. (Am. Cmplt. (Dkt. No. 30) ¶¶ 1, 14)

Defendant Jianpu is a "Beijing-based holding company which, through its subsidiaries, operates an online platform that provides users with research and recommendations on financial products in China." (Id. ¶ 15) Jianpu's ADSs trade on the New York Stock Exchange under the ticker symbol "JT." (Id.)

Defendant Rong360 Inc. is Jianpu's parent company. (Id. ¶ 22)

Defendant Ye is a "Jianpu co-founder, [who] served as Chairman of the Company's Board of Directors and as its Chief Executive Officer at the time of the IPO." (Id. ¶ 16)

Defendant Chen "served as CFO of the Company at the time of the IPO." (Id. ¶ 17)

Defendants Lu, Liu, Zhuang, Mi, Zhou, Fan, and Lee each "served as a director of the Company at the time of the IPO." (Id. ¶ 18-19)

Defendant Manon was "Jianpu's authorized U.S. representative in connection with her position as Service of Process Officer for Defendant Law Debenture Corporate Services Inc.," which is a New York corporation that Jianpu designated as its agent for service of process in New York. (Id. ¶¶ 20-21)

Defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. International plc, J.P. Morgan Securities LLC, and China Renaissance Securities (Hong Kong) Limited "served as joint bookrunners of the IPO and representatives of the underwriters." (Id. ¶ 23)

Defendant Goldman Sachs & Co. LLC is "Goldman Sachs' SEC-registered broker-dealer affiliate in the U.S." and "acted as an underwriter of the ADSs." (Id. ¶ 24)

Defendant China Renaissance Securities (US) Inc. is China Renaissance Securities (Hong Kong) Limited's "SEC-registered broker-dealer affiliate in the U.S." and "acted as an underwriter of the ADSs." (Id. ¶ 25)

### B. The IPO

On October 20, 2017, Jianpu filed an SEC Form F-1 to register the IPO, which was soon followed by an SEC Form F-6. After amendments, the SEC declared these forms – collectively, the "Registration Statement" – effective on November 15, 2017. (Id. ¶ 33) On November 17, 2017, Jianpu filed its IPO prospectus on Form 424B, "which incorporated and formed part of the Registration Statement" and offered to sell 22.5 million ADSs for $8.00 each. (Id. ¶ 34) All the ADSs were sold; net proceeds totaled $164.9 million. (Id. ¶ 35)

Plaintiff alleges that the Registration Statement "failed to disclose the extent to which existing regulations in China – as well as the risk of heightened regulatory enforcement – threatened Jinapu's revenues from loan recommendation services – the source of 80% of its revenues at the time of the IPO." (Id. ¶ 37) According to Plaintiff, the Registration Statement did not disclose two material risks:

> **\*2** First, the Registration Statement failed to disclose Jianpu's exposure to financial service providers that were subject to regulations in China governing 'peer-to-peer' (or 'P2P') lending, known as the Interim Measures – or that the Interim Measures were causing a decline in the number of P2P financial service providers operating in China at the time of the IPO. Second, the Registration Statement failed to disclose that a material portion of the loans offered by financial service providers on Jianpu's platform featured annualized interest rates (also known as 'APR') in excess of 36%, in violation of [the People's Republic of China's] laws and regulations.

(Id. ¶ 4)

As to the first alleged undisclosed risk, the Amended Complaint provides a detailed overview of China's regulatory scheme for P2P lending. In August 2016, the China Banking Regulatory Commission ("CBRC") and other Chinese regulators "issued the Interim Measures on Administration of Business Activities of Online Lending Information Intermediaries (the 'Interim Measures'), which established the regulatory framework for online P2P companies in China."[2] (Id. ¶ 42) These regulations prohibit P2P companies from engaging in certain business activities, cap the amounts they can lend, and require them to obtain operating licenses and to deposit investor funds in escrow accounts at qualified custodial banks. (Id. ¶ 43) Between October 2016 and August 2017, the CBRC issued a series of "implementation rules further clarifying the regulatory requirements." (Id. ¶ 44)

After the Interim Measures and implementation rules were issued, the number of P2P companies operating in China dropped "from approximately 3,500 at the end of 2015 to less than 2,000 as of October 2017." Plaintiff alleges that the drop in P2P companies resulted from a more restrictive business environment in China. (Id. ¶¶ 46-50) Plaintiffs contend that the Registration Statement should have disclosed that "a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including the licensing and custodial bank requirements imposed by the Interim Measures ... and [that] heightened regulatory enforcement of the Interim Measures ... was reasonably likely to ... materially and adversely impact Jianpu's revenues...." (Id. ¶ 91)

As to the second alleged undisclosed risk, Plaintiff asserts that "the Registration Statement failed to disclose that a material portion of the loans offered by financial service providers on Jianpu's platform featured annualized interest rates ... in excess of 36%, in violation of PRC laws and regulations." (Id. ¶ 51) In April 2017, the CBRC and other regulators issued regulations providing "that the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and that regulators and local authorities should pay particular attention to lenders ... with annualized interest rates above the 36% cap with excessive fees that drive up the true interest rate." (Id. ¶ 55) Plaintiff contends that the Registration Statement should have disclosed that "a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including ... the 36% APR cap; and heightened regulatory enforcement of ... the 36% APR cap was reasonably likely to ... materially and adversely impact Jianpu's revenues...." (Id. ¶ 91)

**\*3** On December 1, 2017, following the November 16, 2017 IPO, Chinese regulators "issued a notice setting forth a host of regulations ... [which] prohibited loans with interest rates above the 36% annualized interest rate cap, and clarified

that the 36% cap was an 'all-in' interest rate ... [and] also prohibited unlicensed organizations and individuals from conducting a lending business...." (Id. ¶ 95 (emphasis in original)) On December 8, 2017, another Chinese regulator "issued a notice providing ... that P2P companies must comply with the Interim Measures announced in August 2016 in order to qualify for licensing." (Id. ¶ 96 (emphasis in original))

For the quarter ending March 31, 2018, "the growth in Jianpu's revenues from loan recommendation services slowed dramatically, to an increase of just 46.5% [year-over-year]" from 429% year-over-year in the previous quarter. (Id. ¶ 102) For the second quarter of 2018, revenues "increased by just 42.9% [year-over-year], and then decreased by 48.7% [year-over-year] in the third quarter of 2018, and decreased by 13.8% in the fourth quarter of 2018." (Id. ¶ 104 (emphasis in original)) In a press release concerning 2018 financial results, "the Company attributed the decrease in revenues from loan recommendation services in the fourth quarter in part to 'online lending market adjustments pertaining to the new regulatory framework since December 2017'...." (Id. ¶ 105 (emphasis in original)) "As of the filing of [the instant] action on October 25, 2018, Jianpu's ADSs traded at $4.75 per ADS – a decline of approximately 40% from the IPO price." (Id. ¶ 107)

### C. **The Registration Statement's Characterizations and Disclosures**

The Registration Statement characterizes Jianpu's business environment and potential risks as follows:

We have attracted a large and diversified group of financial service providers in China to our platform. In the first nine months of 2017, we worked with a total of over 2,500 financial service providers, including 257 banks, 21 credit card issuers, 10 consumer finance companies, 310 micro-loan companies and other licensed financial institutions and 746 emerging technology-enabled financial service providers and a variety of local financial service providers, offering a wide variety of financial products across a broad credit spectrum.

(Registration Statement (Dkt. No. 54-1) at 123)[3]

The Registration Statement states that

[t]he key drivers for growth include ... proliferation of new financial service providers, [and a] favorable regulatory environment such as interest rate liberalization[.]

(Id. at 10)

The Registration Statement warns, however, that

[r]egulatory uncertainties relating to online consumer finance in China could harm our business, financial condition and results of operations. Our business or the businesses of our financial service providers may be subject to a variety of PRC laws and regulations governing financial services. The application and interpretation of these laws and regulations are ambiguous and may be interpreted and applied inconsistently between different government authorities. In particular, the PRC government has not adopted a clear regulatory framework governing the new and rapidly-evolving online consumer finance market, which is the source of the transactions that our platform facilitates. As of the date of this prospectus, we have not been subject to any material fines or other penalties under any PRC laws or regulations on our business operations. The PRC government may adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants. The PRC government may also enhance the implementation of existing laws and regulations. There has been media speculation that the PRC government may, among other things, (i) impose new regulations on fees and interest charged by financial service providers, (ii) introduce licensing requirements for online lenders, (iii) close down unlicensed financial service providers that take deposits from consumers and (iv) close down financial service providers that engage in illegal collection practices. A significant number of financial service providers on our platform operate in the online and mobile consumer finance market. Consequently, new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects. It may be costly for us to comply with applicable PRC laws and regulations. If our practice is deemed to violate any existing or future laws and regulations, we may face injunctions, including orders to cease illegal activities, and may be subject to other penalties as determined by the relevant government authorities.

**\*4** ....

If any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected. Financial products and financial institutions are strictly regulated in China. We are not regulated as a financial institution, but we may be indirectly subject to PRC financial regulations as a result of the financial products on our platform and our services to and cooperation with financial service providers. If any financial product on our platform is deemed to violate any PRC laws or regulations, we may be liable for listing the product or assisting in offering the product on our platform, even if we are not its provider. If any of our financial service providers is deemed to violate any PRC laws or regulations, we may be jointly liable due to the services or solutions we provide. We may have to remove financial products from our platform or terminate relationship with financial service providers. As of the date of this prospectus, we have not been subject to any fines or other penalties under any PRC laws, rules or regulations. However, if any financial product on our platform is deemed to violate any laws, rules or regulations, we may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability. As a result, our business, reputation, financial performance and prospects could be materially and adversely affected.

(Id. at 28, 30)

The Registration Statement also warns that the Company

may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet-related businesses and companies. The PRC government extensively regulates the internet industry, including foreign ownership and the licensing and permit requirements for companies in the internet industry.... These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

....

The PRC government has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market, and we expect that the regulatory framework will remain unclear for some time to come. If the PRC government adopts stringent regulations on financial service providers in the online consumer

finance market, the growth of that market may slow, which may limit our growth. If they impose specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with.

(Id. at 46, 85-86)

## II. PROCEDURAL HISTORY

The Complaint was filed on October 25, 2018 (Dkt. No. 1), and the Amended Complaint was filed on March 28, 2019. (Dkt. No. 30) This case is brought as a putative class action, and the Amended Complaint alleges three causes of action under the Securities Act of 1933. The First Cause of Action names all Defendants except Rong360 Inc. and alleges that the Registration Statement "was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein," in violation of Section 11 of the Securities Act, 15 U.S.C. § 77k. (Id. ¶¶ 115-16) The Second Cause of Action names all Defendants and alleges that, for the same reasons, the Registration Statement was in violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*. (Id. ¶¶ 125, 128) The Third Cause of Action names Rong360, Law Debenture, and the individual Defendants other than Manon, and alleges that these Defendants "committed primary violations of the Securities Act, or are directly responsible and primarily liable for any such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) or employing a violator," in violation of Section 15 of the Securities Act, 15 U.S.C. § 77*o*. (Id. ¶¶ 133-34)

**\*5** On September 19, 2019, Defendants moved to dismiss the Amended Complaint. (Dkt. No. 52)

On March 13, 2020, this Court denied Plaintiff's motion to strike certain exhibits filed by Defendants in connection with their motion to dismiss. (Dkt. No. 64)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint,"

Panther Partners Inc. v. Jianpu Technology Inc., Slip Copy (2020)
2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions, are not entitled to the assumption of truth," however. Iqbal, 556 U.S. at 679. A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " id. at 678, offers " 'a formulaic recitation of the elements of a cause of action,' " id., or does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). While legal conclusions "can provide the complaint's framework, they must be supported by factual allegations." Iqbal. 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). For a document to be incorporated by reference, "the complaint must make 'a clear, definite and substantial reference to the documents.' " DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F.Supp.2d 327, 330-31 (S.D.N.Y. 2003)). "[L]imited quotation" of a document, Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), or a mere passing reference to a document outside of the complaint does not incorporate the document into the complaint. See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989) (although the amended complaint "discussed [certain] documents and presented short quotations from them[,]" these passing references and "brief[ ] excerpt[s]" are insufficient for incorporation by reference).

**B. Pleading Violations of the Securities Act**
Section 11 of the Securities Act

*6 imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 505 (S.D.N.Y. 2013) (quoting 15 U.S.C. § 77k(a)).

Section 12(a)(2) of the Securities Act

imposes liability under ... circumstances [similar to Section 11] for misstatements or omissions in a prospectus, on "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading."

Id. at 505-06 (quoting 15 U.S.C. § 77*l* (a)(2)).

" 'Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability ... (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading.' " Id. at 506 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010)).

"Every person who ... controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*.

"In order to survive [a] motion to dismiss, Plaintiff must plead factual allegations sufficient to sustain the conclusion that the omissions in question were 'reasonably likely' to be material...." In re Ply Gem Holdings, Inc. Sec. Litig., 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011)).

The materiality requirement is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions." ... At this stage, a "complaint may not

Panther Partners Inc. v. Jianpu Technology Inc., Slip Copy (2020)

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.”

Id. (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 161-62 (2d Cir. 2000)).[4]

“[A] misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality.” This assumption can be overcome by qualitative factors, such as “whether a known misstatement may result in a significant positive or negative market reaction.”

Yi Xiang v. Inovalon Holdings, Inc., 254 F. Supp. 3d 635, 642-43 (S.D.N.Y. 2017) (quoting IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 390-91 (2d Cir. 20150)) (citing 64 Fed. Reg. 45150-52 (Aug. 19, 1999)).

**\*7** Section 11 requires disclosure of material facts that are “required to be stated therein or necessary to make the statements therein not misleading....” See 15 U.S.C.A. § 77k. Facts can be “required to be stated” based on “ ‘affirmative legal disclosure obligation[s].’ ” In re Coty Inc. Sec. Litig., No. 14-CV-919 (RJS), 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) (quoting Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012)). One such disclosure obligation arises from Item 303[5] of Regulation S-K, which requires that a registration statement “ ‘[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ... impact on net sales or revenues or income from continuing operations.’ ” Id. (quoting 17 C.F.R. § 229.303(a)(3)(ii)) (first alteration in original); see also In re CPI Card Grp. Inc. Sec. Litig., No. 16-CV-4531 (LAK), 2017 WL 4941597, at *2 (S.D.N.Y. Oct. 30, 2017) (“A registrant therefore violates Section 11 if the registrant fails to disclose information required by Item 303, as Section 11 forbids the omission of facts ‘required to be stated.’ ”). “Item 303 ... requires the registrant's actual knowledge of the relevant trend or uncertainty.” Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016).

A related affirmative disclosure requirement is set forth in Item 503.[6] “Item 503 of SEC Regulation S-K requires offering documents to include a ‘discussion of the most significant factors that make the offering speculative or risky’ and ‘how the risk affects the issuer or the securities being offered.’ ” In re Barclays Bank PLC Sec. Litig., No. 09 CIV.

1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017) (quoting 17 C.F.R. § 229.503(a), (c)), aff'd, 756 F. App'x 41 (2d Cir. 2018), as amended (Nov. 20, 2018). “The same facts underlying an Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter.” Id. (citing In re Deutsche Bank AG Sec. Litig., No. 09-CV-1714 (DAB), 2016 WL 4083429, at *27 (S.D.N.Y. July 25, 2016); Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 484 n.4 (2d Cir. 2011)). “Although there is scant caselaw on Item 503, the inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid.” In re Deutsche Bank AG Sec. Litig., 2016 WL 4083429, at *18 (internal quotation marks and citations omitted). Failure to disclose information required by Item 503 can serve as the basis of a claim under Section 11. Y-GAR Capital LLC v. Credit Suisse Grp. AG, No. 19 CIV. 2827 (AT), 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020), appeal withdrawn, No. 20-441, 2020 WL 2128749 (2d Cir. Apr. 15, 2020).

**\*8** Even in the absence of a specific disclosure obligation, there is a general requirement that a registration statement disclose facts “necessary to make the statements therein not misleading....” See 15 U.S.C.A. § 77k.

In general there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact, but [d]isclosure is required ... when necessary to make ... statements made, in light of the circumstances under which they were made, not misleading. Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.

Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250-51 (2d Cir. 2014) (internal quotation marks and citations omitted).

“[P]laintiffs need not plead defendants’ knowledge as there is no scienter requirement in Section 11.” In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001). Plaintiff must, however, “plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.” Lin v. Interactive Brokers Grp., Inc., 574 F.Supp.2d 408, 421 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

“In evaluating a prospectus, we read it as a whole. Our inquiry does not focus on whether particular statements, taken separately, were literally true, but whether defendants’ representations, taken together and in context, would have misled a reasonable investor about the nature of the

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

securities." Demaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (internal citations and quotation marks omitted). "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." Meyer, 761 F.3d at 251.

## II. ANALYSIS

### A. Pre-IPO Violations of the Interim Measures

Plaintiff claims that Defendants violated Sections 11, 12, and 15 of the Securities Act by failing to disclose "Jianpu's exposure to financial service providers that were subject to regulations in China governing [P2P] lending, known as the Interim Measures – or that the Interim Measures were causing a decline in the number of P2P financial service providers operating in China at the time of the IPO." (Am. Cmplt. (Dkt. No. 30) ¶ 4)

Defendants contend that the Amended Complaint fails to state a claim as to this alleged violation.

### 1. Whether Plaintiff Has Adequately Pled a Material Trend

Defendants contend that Jianpu "had no obligation ... to disclose that, prior to the IPO, existing regulations were giving rise to a downward 'trend' in the number of 'P2P' lenders," because there is no alleged "impact on Jianpu before its IPO, much less a materially adverse one, from the alleged market-wide decline in the number of 'P2P' lenders." (Def. Br. (Dkt. No. 53) at 22-23)

Plaintiff has not merely alleged a pre-IPO market-wide decline in P2P lenders, however. The Amended Complaint also alleges that this decline was linked to pre-IPO violations of the Interim Measures by P2P lenders. In this regard, Plaintiff cites a January 2017 report by a "Shenzhen-based financial web portal" stating that out of 2,307 financially-viable P2P companies operating in China, only 184 were compliant with the Interim Measures' escrow account requirement and only 424 had the required operating licenses. (Am. Cmplt. (Dkt. No. 30) ¶ 46) This report makes plausible Plaintiff's allegation that – in a market where 75% to 90% of the participants are violating the Interim Measures – many of the 746 financial services providers operating on Jianpu's platform were also violating the Interim Measures.[7]

**\*9** Moreover, during a December 2017 conference call, Jianpu's top executives disclosed that "non-licensed financial institutions" were responsible for "around 12% of [Jianpu's] total revenue in November." (Am. Cmplt. (Dkt. No. 30) ¶ 98; Fumerton Decl. (Dkt. No. 54-12), Ex. L at 7) It is unlikely that all such non-licensed financial services providers joined Jianpu's platform in the second half of November, after the IPO. Accordingly, this allegation further supports an inference that a significant portion of financial services providers operating on Jianpu's platform were violating the Interim Measures.

This Court concludes that Plaintiff has pled sufficient facts to demonstrate that a significant portion of the financial services providers operating on Jianpu's platform were violating the Interim Measures prior to the IPO. The amount of revenue involved – approximately 12% – exceeds the 5% threshold for presumptive materiality. Yi Xiang, 254 F. Supp. 3d at 642-43.

Plaintiff has also pled facts sufficient to demonstrate that the number of financial services providers operating in the broader lending market in China was declining. As an initial matter, Plaintiff alleges that the above-mentioned January 2017 report states that "the growth rate of the P2P industry in 2016 had slowed to approximately half of the growth rate in 2014 and 2015 because of the Interim Measures and concerns over new P2P regulations." (Am. Cmplt. (Dkt. No. 30) ¶ 46) The Amended Complaint further alleges that a February 19, 2017 SouthChinaMorningPost article "cited a multi-agency report led by the Beijing Bureau of Financial Work predicting that '[n]ine out of 10 of the mainland's [P2P] lending platforms will struggle to survive this year as the government rolls out the tightened regulatory supervisions[.]' " (Id. ¶ 48 (quoting Feb. 19, 2017 article) (first and third alterations in Am. Cmplt.)) And the Amended Complaint also alleges that in July 2017 "one of the largest P2P companies in China[ ] announced its exit from the industry, citing the Interim Measures' cap on borrowing amounts as hampering the growth of its ... business." (Id. ¶ 49) Plaintiff also cites a report from Wangdaizhijia,[8] a P2P research firm, stating that the number of P2P companies operating in China declined "from approximately 3,500 at the end of 2015 to less than 2,000 as of October 2017 – the month prior to Jianpu's IPO." (Id. ¶ 50)

In sum, the Amended Complaint cites facts suggesting that the P2P market was in rapid decline between the end of 2015 and the fall of 2017. Although Defendants contend that Jianpu's business was still thriving as of the fall of 2017 (see Def.

Reply Br. (Dkt. No. 55) at 13), the rapid decline in the number of P2P financial services providers – on whom Jianpu relied for a substantial part of its revenue – was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." Ply Gem, 135 F. Supp. 3d at 150 (internal quotation marks and citations omitted).

The Court concludes that Plaintiff has adequately alleged that there was material information available about (1) financial services providers' non-compliance with the Interim Measures; (2) the fact that many of these financial services providers used Jianpu's platform; and (3) the possible effects of their non-compliance on Jianpu's business, and that Defendants were obliged to disclose this information under Items 303 and 503.

### 2. Whether Plaintiff Has Adequately Pled Defendants' Knowledge

 **\*10** Defendants argue that "Plaintiff fails to plead that any of the Defendants had 'actual knowledge' of the alleged 'trend' " regarding the declining number of P2P financial services providers. (Def. Br. (Dkt. No. 53) at 22) According to Defendants, "[w]hile Section 11 claims generally do not require pleading scienter, Item 303's knowledge requirement imposes an obligation on Plaintiff to plead, with specificity, facts establishing that the defendant had <u>actual</u> knowledge of the purported trend." (<u>Id.</u> at 22-23 (citing <u>Indiana Pub. Ret. Sys.</u>, 818 F.3d at 95 (emphasis in original))) Defendants assert that "Plaintiff expressly disclaims any such allegation here." (<u>Id.</u> at 23 (citing Am. Cmplt. (Dkt. No. 30) ¶¶ 115, 125, 133))

While Item 303 "requires a description of 'any <u>known</u> trends or uncertainties' " that are material, <u>City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.</u>, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (quoting 17 C.F.R. § 229.303(a)(3)(ii)) (emphasis added), "plaintiffs need not plead defendants' knowledge[,] as there is no scienter requirement in Section 11." <u>Turkcell</u>, 202 F. Supp. 2d at 12. Moreover, because Item 503 requires " 'a discussion of the most significant factors that make the offering speculative or risky,' " "courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard." <u>City of Roseville</u>, 814 F. Supp. 2d at 426 (quoting 17 C.F.R. § 229.503(c)). In sum, Plaintiff need not allege Defendants' knowledge in order to plead an Item 503 violation.

In any event, the Amended Complaint explicitly alleges that the trends underlying Plaintiff's allegations – including the P2P financial services providers' lack of compliance with the Interim Measures, and the impact that their lack of compliance would have on the P2P financial services providers and ultimately on Jianpu's business – were "known" to Defendants. (Am. Cmplt. (Dkt. No. 30) ¶ 91) This allegation is plausible given multiple public reports – cited in the Amended Complaint – to the effect that "the Interim Measures were widely expected to lead to an exodus of P2P companies from the online consumer finance market." (<u>Id.</u> ¶¶ 45-49)

Although the Amended Complaint does not allege "that any of the [D]efendants ... engaged in intentional or reckless misconduct or acted with fraudulent intent" (<u>id.</u> ¶¶ 115, 125, 133), this circumstance is irrelevant. The issue is whether the above-described trends were "known" for purposes of Item 303, not whether Defendants acted with fraudulent intent. The Amended Complaint's allegations are consistent with Plaintiff pleading obligations in alleging violations of Sections 11, 12, and 15; as noted above, these provisions have no scienter requirement. <u>Turkcell</u>, 202 F. Supp. 2d at 12.

The Court concludes that Plaintiff has adequately pleaded knowledge for purposes of Item 303, and finds that Item 503 has no knowledge requirement.

### 3. Whether Defendants' Disclosures Were Sufficient

Defendants argue that they disclosed: (1) Jianpu's "[e]xtensive and diversified network of [financial service providers ('FSPs') ], which includes ... emerging technology-enabled [FSPs]"; (2) "the general attributes of the loan products available on its platform"; (3) "that all FSPs on Jianpu's platform, including emerging technology-enabled FSPs (and therefore 'P2P' lenders), were <u>already</u> subject to regulations"; and (4) that Jianpu "depend[ed] on FSPs for its continuing success and the various risks – regulatory, reputational, relational, etc. – that might threaten its symbiotic relationship with the FSPs." (Def. Br. (Dkt. No. 53) at 19-21 (internal quotation marks and citations omitted) (emphasis in original)).

 **\*11** Plaintiff counters that these disclosures were insufficient because they fail to disclose that "a significant portion of the FSPs offering loans on Jianpu's platform were

*Panther Partners Inc. v. Jianpu Technology Inc.*, Slip Copy (2020)

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

currently failing to comply with ... the licensing and custodial bank requirements of the Interim Measures[.]" (Pltf. Opp. Br. (Dkt. No. 57) at 17 (citing Am. Cmplt. (Dkt. No. 30) ¶ 77)) Defendants also did not disclose that "the Interim Measures were causing a decline in the number of P2P companies operating in China at the time of the IPO." (Id. at 10 (citing Am. Cmplt. (Dkt. No. 30) ¶¶ 4, 38)) Plaintiff contends that the FSPs' non-compliance created a "presently-existing risk that [Chinese] authorities would take action to rectify FSPs' current non-compliance – either by stepping up enforcement of existing regulations, or by introducing new and tougher regulations." (Id. at 29 (emphasis in original))

Although Defendants cite a number of general statements in the Registration Statement that address risks from regulation, these statements are all framed as hypotheticals. (Def. Br. (Dkt. No. 53) at 20) For example, the Registration Statement states that (1) "[t]he PRC government has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market" (Registration Statement (Dkt. No. 54-1) at 85); (2) "[t]he PRC government may also enhance the implementation of existing laws and regulations" (id. at 28); (3) "new government laws and regulations [or] stricter enforcement of existing laws and regulations ... may materially and adversely affect our business" (id.); and (4) "[i]f any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected. Financial products and financial institutions are strictly regulated in China."[9] (Id. at 30)

**\*12** The Court acknowledges that certain of Jianpu's disclosures specifically mention licensing requirements. (See Def. Br. (Dkt. No. 53) at 25-26) For example, the Registration Statement states that (1) "[t]he PRC government may ... impose specific requirements (including licensing requirements) on market participants" (Registration Statement (Dkt. No. 54-1) at 28); (2) "[t]here has been media speculation that the PRC government may ... introduce licensing requirements for online lenders" (id.); and (3) "[i]f [the PRC government] impose[s] specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with." (Id. at 85-86) These disclosures are all framed as mere hypotheticals, however, and thereby imply that the risk of regulation is a theoretical one, rather than – as Plaintiff alleges – a risk that has already materialized in the marketplace. "Cautionary

words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004).

The Court also acknowledges that the Registration Statement warns that "[t]he PRC government extensively regulates the internet industry, including ... licensing and permit requirements for companies in the internet industry." (Registration Statement. (Dkt. No. 54-1) at 46) This disclosure refers to a section of the Registration Statement entitled "Regulations Related to Value-added Telecommunications Services" (id. at 141), however, and Plaintiff plausibly argues that this disclosure can reasonably be interpreted as relating only to "the licenses that Jianpu was required to hold ... [,] not the licensing requirements for the P2P lenders on its platform." (Pltf. Opp. Br. (Dkt. No. 57) at 16 n.4) Drawing all reasonable inferences in Plaintiff's favor, Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc., 422 F. Supp. 3d 821, 837 (S.D.N.Y. 2019), this Court finds Defendants' disclosure insufficient. The Court notes that even if this section of the Registration Statement were read to address the licenses required under the Interim Measures – despite not mentioning the Interim Measures by name – it does nothing to inform investors that financial services providers operating on Jianpu's platform do not currently hold such licenses.

As for the decline in the number of P2P financial services providers in the broader Chinese market, Defendants do not claim to have disclosed that fact. (Seegenerally Def. Reply Br. (Dkt. No. 55) at 12-14)

"In evaluating a prospectus, [courts] read it as a whole." DeMaria, 318 F.3d at 180 (internal citations and quotations omitted). Accordingly, Defendants' disclosures regarding regulation must be read together with other statements that portray a P2P lending market in a bullish manner: (1) "we benefit from a trend towards smaller and shorter duration loans to the extent that they result in larger numbers of loans being taken out more frequently" (Registration Statement (Dkt. No. 54-1) at 87); (2) "China's population has been increasing its consumption, which has driven the demand for consumer loans. As a result, a broad range of financial service providers ... offer consumer loan products through our platform" (id. at 126); and (3) "China's rapid economic growth has been accompanied by the emergence of a growing middle class population driving strong domestic consumption.... The key drivers for growth include changes in consumer attitudes due to China's economic transformation,

increasing focus by financial service providers on historically underserved mass market, shift of consumer demand from offline to online, [and the] proliferation of new financial service providers...." (Id. at 9-10)

These statements do not disclose that the PRC has already adopted a regulatory framework – the Interim Measures – that requires licensing and custodial bank accounts, and that financial services providers operating on Jianpu's platform are violating those regulations. Defendants claim that "compliance with these provisional attempts at regulation – as the very name Interim Measures suggests – was not mandatory until after the IPO," and that they "fully and completely disclosed" the risk that Chinese authorities might enhance regulation and enforcement. (Def. Reply Br. (Dkt. No. 55) at 8) Defendants likewise assert that "[t]he Company clearly disclosed that FSPs on its platform were subject to extensive regulations.... Indeed, the Company went even further and warned that these regulations might become increasingly stringent after the IPO." (Id. at 10)

**\*13** The Registration Statement's disclosures do not reveal what Plaintiff alleges, however: that financial services providers operating on Jianpu's platform were not in compliance with existing regulations. "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." Meyer, 761 F.3d at 251.

Moreover, although the Amended Complaint cites a post-IPO December 8, 2017 notice requiring "that P2P companies ... comply with the Interim Measures announced in August 2016 in order to qualify for licensing" (Am. Cmplt. (Dkt. No. 30) ¶ 96 (emphasis in original)), as Plaintiff points out, the post-IPO enforcement of the Interim Measures "did not come out of the blue." (Pltf. Opp. Br. (Dkt. No. 57) at 28) It should have been obvious that once the PRC enacted regulations governing P2P financial services providers – such as the Interim Measures – compliance would eventually be required. In sum – given Jianpu's reliance on revenue from P2P financial services providers operating on its platform – a reasonable investor would likely have considered it significant that these same financial services providers were actively violating regulations already in place.

The Registration Statement also does not disclose the rapid contraction taking place among P2P financial services providers. The financial services provider market was not merely "rapidly evolving." Instead, a significant subset of that market – P2P lenders – had contracted from 3,500 lenders to 2,000 lenders, a decrease of more than 40% in the two years leading up to the IPO. (Id. ¶ 50)

Defendants' bullish statements about the financial services provider market create a disclosure requirement, because "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." Morgan Stanley Info. Fund, 592 F.3d at 366 (internal citations and quotations omitted). "Sections 11 and 12(a)(2) both call for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements and prospectuses." Id. at 365 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). Accordingly, to correct the misleading impression created by Defendants' bullish statements concerning the financial services provider market, Jianpu was obligated to describe the regulatory framework then in place – nascent though it may have been – and disclose the impact of that regulation on the market, including the fact that the financial services providers on whom it relied for a substantial portion of its revenue were not in compliance.

Finally, Defendants argue that Plaintiff's claims "fail[ ] because any pre-IPO Chinese laws and regulations were publicly available." (Def. Reply Br. (Dkt. No. 55) at 11) Acknowledging that the laws and regulations were publicly available, Jianpu did not disclose the existence and extent of violations of those laws and regulations by financial service providers operating on its platform, or the possible impact of those violations on Jianpu's future business.

This Court concludes that Plaintiff has adequately pled an actionable omission under Sections 11 and 12(a) of the Securities Act as to pre-IPO violations of the Interim Measures by financial services providers operating on Jianpu's platform.

### B. 36% APR Cap

**\*14** The Amended Complaint alleges that "the Registration Statement fail[s] to disclose that a material portion of the loans offered by [financial services providers] on Jianpu's platform featured annualized interest rates [ ("APR") ] in excess of 36%, in violation of PRC laws and regulations." (Am. Cmplt. (Dkt. No. 30) ¶ 51) Defendants contend that Plaintiff's

allegations premised on this omission fail to state a claim. (Def. Br. (Dkt. No. 53) at 26-28)

**1. Whether Plaintiff Has Adequately Pled a Material Risk**

Defendants argue that "the applicable regulations clarifying the 36% cap and imposing stringent licensing requirements were introduced on December 1 and December 8, 2017 – weeks <u>after</u> Jianpu's November 16, 2017 IPO." (Def. Br. (Dkt. No. 53) at 26 (citing Am. Cmplt. (Dkt. No. 30) ¶¶ 95-97) (emphasis in original)) According to Defendants, Jianpu could not "be expected to disclose anything beyond the <u>risk</u> of additional regulations or enhanced enforcement," and in fact it "disclosed the risks of entirely new regulations ... <u>and</u> enhanced implementation and enforcement." (<u>Id.</u> at 27 (emphasis in original) (internal citations and quotation marks omitted)) While Defendants acknowledge a 2015 ruling of China's Supreme People's Court "that any loan agreement requiring the payment above an annualized rate of 36% was void to the extent the interest exceeded that rate," Defendants claim that "the court did not specify how this rate was to be calculated," nor did it "prohibit[ ] all loans with interest rates over 36%...." (<u>Id.</u> at 15) As to the APR calculation method, Defendants argue that "it was only <u>after</u> the IPO that new rules required miscellaneous fees to be included in the interest rate calculation." (Def. Reply Br. (Dkt. No. 55) at 9)

Plaintiff counters that, at the time of the IPO, "the FSPs on Jianpu's platform were <u>already</u> 'subject to a variety of PRC laws and regulations governing financial services,' including the Interim Measures and the 36% APR cap." (Pltf. Opp. Br. (Dkt. No. 57) at 16 (emphasis in original)) Plaintiff further contends that (1) the 2015 ruling applied to "the interest rate [ ] including penalties and fees" (Am. Cmplt. (Dkt. No. 30) ¶ 53); and (2) regulations in April 2017 "provided that the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and local authorities should pay particular attention to cash loans with excessive fees that drive up the true interest rate." (Pltf. Opp. Br. (Dkt. No. 57) at 11 (citing Am. Cmplt. (Dkt. No. 30) ¶ 55))

Nothing in the record suggests that the 2015 ruling has any language suggesting that the APR cap does not include associated fees and penalties. Moreover, Defendants ignore Plaintiff's allegations concerning the April 2017 CBRC regulations, which – as set forth above – allegedly provide that "the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and that regulators and local authorities should pay particular attention to lenders of cash loans with annualized interest rates above the 36% cap and with excessive fees that drive up the true interest rate." (Am. Cmplt. (Dkt. No. 30) ¶ 55) Defendants instead point to an analyst report stating that "prior to the IPO, 'the regulators ha[d] not released [an] official definition of [ ] "interest rate" ' " until the December 1, 2017 notice. (Def. Reply Br. (Dkt. No. 55) at 9 (alterations in Def. Reply Br.))

"Insofar as [Defendants'] contentions appear to take issue with [Plaintiff's] allegations, they serve merely to confirm that material factual disputes exist that cannot be resolved on a motion to dismiss." <u>Van Dongen v. CNinsure Inc.</u>, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Accordingly, to the extent that Defendants contend that there was not a 36% APR cap in place before the IPO, that factual disagreement cannot be resolved on the instant motion in light of Plaintiff's well-pled allegations to the contrary. The Court also notes that – to the extent that Defendants' alternative timeline suggests increased enforcement of existing regulations – Defendants' chronology is not inconsistent with Plaintiff's allegations, which describe the December 2017 measures as "regulations designed to <u>enhance</u> governmental enforcement of both the Interim Measures (including their licensing requirements) and the 36% APR cap." (Am. Cmplt. (Dkt. No. 30) ¶ 94 (emphasis added)) The Court concludes that Plaintiff has plausibly alleged that a 36% APR cap was in place before the IPO.

**\*15** Plaintiff has also alleged that many of the P2P financial services providers operating on Jianpu's platform were violating this 36% APR cap, citing

> a December 20, 2017 J.P. Morgan analyst report ... [that] as of October 25, 2017 – shortly before the IPO – "most" loan products offered on Jianpu's platform featured annualized interest rates greater than 36%, and as high as 540%. Citing [Jianpu] data, the report also stated that as of December 15, 2017 – one month after the IPO, following additional regulations designed to step up enforcement of the 36% APR cap – "most products" with annualized interest rates greater than 36% had "been delisted" from Jianpu's platform.

(Am. Cmplt. (Dkt. No. 30) ¶ 56 (emphasis in original)) Defendants do not dispute this report. Accordingly, the Court concludes that Plaintiff has sufficiently pled that most of the P2P financial services providers operating on Jianpu's platform prior to the IPO were violating the 36% APR cap.

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

The Court further concludes that these violations were material, because "most" of the loan products on Jianpu's platform violated the 36% APR cap. "At this stage, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ply Gem, 135 F. Supp. 3d at 150 (internal quotation marks and citations omitted).

In sum, Plaintiff has adequately pled a material risk stemming from alleged violations of the 36% APR cap. Defendants were obligated to disclose this risk under Items 303 and 503.[10]

### 2. Whether Defendants' Disclosures Were Sufficient

With respect to the risk to Jianpu's business presented by the 36% APR cap, Defendants argue that (1) "the Offering Documents disclosed the risk that lenders on Jianpu's platform were subject to existing regulations, as well as the potential for new and heightened regulation, that could, in turn, materially affect the Company's operations"; and (2) "Jianpu's FSPs were not in violation of the licensing and 36% interest rate restrictions at the time of the IPO, and Jianpu could not have foretold post-IPO regulatory changes." (Def. Br. (Dkt. No. 53) at 25)

As to the first argument, Defendants point to the same disclosures discussed above in connection with the Interim Measures. (Id. at 25-26; Def. Reply Br. (Dkt. No. 57) at 10-11) As already explained, these vague disclosures are not sufficient, because they are framed as hypotheticals and do not even reference the 36% APR cap, much less explain the nature and magnitude of the risk it presented to Jianpu's business. Moreover, while the Registration Statement references "media speculation that the PRC government may, among other things: (i) impose new regulations on fees and interest charged by [FSPs], [and] (ii) introduce licensing requirements for online lenders" (Registration Statement (Dkt. No. 54-1) at 28), this disclosure does not reveal that a 36% APR cap was already in place pursuant to the April 2017 CBRC regulations. (Am. Cmplt. (Dkt. No. 30) ¶¶ 55, 74-75)

**\*16** "Sections 11 and 12(a)(2) both call for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements and prospectuses." Morgan Stanley Info. Fund, 592 F.3d at 365 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). Moreover, "[s]ome

courts in this Circuit have held that a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." Chapman v. Mueller Water Prod., Inc., No. 19-CV-3260 (LJL), 2020 WL 3100243, at *15 (S.D.N.Y. June 11, 2020) (citing In re Mylan N.V. Sec. Litig., No. 16-CV-7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018)) ("the more specific the caution, the more likely it is to mislead a reasonable investor"). A reasonable investor reading about "media speculation" that the PRC might "impose new regulations on fees and interest" could well infer that there were no current "regulations on fees and interest" – or violations thereof – that warranted concern, and thus would have been misled as to the existing 36% APR cap and the risk it presented to Jianpu's business.

Defendants' second argument – that none of the P2P financial services providers operating on Jianpu's platform were violating PRC regulations, because no such regulations were in place – fails, because it contradicts Plaintiff's well-pleaded allegations that there was in fact a 36% APR cap in place. SeeVan Dongen, 951 F. Supp. 2d at 470.

This Court concludes that Plaintiff has adequately pled an actionable omission under Sections 11 and 12(a) of the Securities Act as to pre-IPO violations of the 36% APR cap by financial services providers operating on Jianpu's platform.

### C. Whether the Negative Loss Causation Doctrine Bars Plaintiff's Claims

Defendants contend that Plaintiff's claims "should be dismissed under the doctrine of negative causation," because "Plaintiff's alleged 'revelations' all dealt with post-IPO events," and Defendants "cannot be liable for failing to disclose events that were either unknown or unknowable at the time of the disclosures." (Def. Br. (Dkt. No. 53) at 28, 30; Def. Reply Br. (Dkt. No. 55) at 14 (internal quotation marks omitted))

Plaintiff counters that "loss causation may be pled by alleging that 'the loss was caused by the materialization of the risk concealed by the defendant's alleged' misstatements or omissions." (Pltf. Opp. Br. (Dkt. No. 57) at 30 (quoting In re Vivendi S.A. Sec. Litig., 838 F.3d 223, 261 (2d Cir. 2016) (internal quotation marks omitted)))

"[L]oss causation is an affirmative defense to be proven by defendants, not a primafacie element to be proven by plaintiffs.... The burden to prove negative loss causation is heavy...." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n

Panther Partners Inc. v. Jianpu Technology Inc., Slip Copy (2020)

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

v. Nomura Holding Am., Inc., 873 F.3d 85, 153 (2d Cir. 2017) (internal citations and quotation marks omitted).

Here, Plaintiff has plausibly alleged that Defendants concealed the business risks presented by then-existing violations of then-existing regulations, and that post-IPO "[e]nhanced enforcement of the Interim Measures and the 36% APR cap did in fact have a material, adverse effect on Jianpu's revenues from loan recommendation services – causing Jianpu to report a marked slow-down in growth, followed by a decline, in its revenues from loan recommendation services." (Am. Cmplt. (Dkt. No. 30) ¶ 101)

Defendants' alternative chronology – in which the risk was entirely hypothetical until post-IPO regulations were introduced – presents a factual dispute that cannot be resolved on a motion to dismiss. Van Dongen, 951 F. Supp. 2d at 470. As explained above, Plaintiff has adequately alleged that there was a material risk caused by alleged violations of the Interim Measures and of the 36% APR cap by financial services providers operating on Jianpu's platform prior to the IPO. The fact that Jianpu's business did not decline until after the IPO is not inconsistent with Plaintiff's allegation that the risk posed by pre-IPO violations materialized in the face of greater enforcement. Plaintiff's well-pleaded allegation of "materialization of risk," Vivendi, 838 F.3d at 261, suffices to preclude Defendants from meeting their "heavy" burden in arguing this affirmative defense, particularly on a motion to dismiss. Nomura, 873 F.3d at 153.

 **\*17**  Finally, Defendants' argument that "the price of Jianpu's ADSs had already fallen 36.5% from the IPO price ... [by] November 30, 2017" (see Def. Br. (Dkt. No. 53) at 29) goes to the issue of damages, and not to liability.

Accordingly, the doctrine of negative loss causation does not bar Plaintiff's claims.

### D. Whether Plaintiff Has Adequately Pled Control Person Liability

Defendants' only argument as to Plaintiff's Section 15 claims for control person liability is that "Plaintiff's Section[ ] 11 and 12 claims fail...." (Def. Br. (Dkt. No. 53) at 31) This Court

has rejected that argument. Accordingly, Defendants' motion to dismiss Plaintiff's Section 15 claims will be denied.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 52, 56).

The initial pretrial conference in this matter will take place telephonically on **October 29, 2020 at 11:00 a.m.** The parties are directed to dial 888-363-4749 to participate, and to enter the access code 6212642. The press and public may obtain access to the telephone conference by dialing the same number and using the same access code. The Court is conducting multiple telephone conferences on this date. The parties should call in at the scheduled time and wait on the line for their case to be called. At that time, the Court will un-mute the parties' lines. Seven days before the conference, the parties must email Michael_Ruocco@nysd.uscourts.gov and GardepheNYSDChambers@nysd.uscourts.gov with the phone numbers that the parties will be using to dial into the conference so that the Court knows which numbers to un-mute. The email should include the case name and case number in the subject line.

Seven days before the conference, the parties will submit a joint letter addressing the following in separate paragraphs: (1) a brief description of the case, including the factual and legal bases for the claims and defenses; (2) any contemplated motions; and (3) the prospect for settlement. For the Court's convenience, the parties must set forth the conference's date and time in the joint letter's opening paragraph. In preparing their joint letter and proposed case management plan, the parties will consult the Court's Individual Practices and model Case Management Plan and Scheduling Order – both of which are available on this District's website.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

Footnotes

1    Unless otherwise noted, the following facts are drawn from the Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss. SeeKassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Panther Partners Inc. v. Jianpu Technology Inc., Slip Copy (2020)

2020 WL 5757628, Fed. Sec. L. Rep. P 100,913

2   Defendants contend that "[t]he Interim Measures established general regulations for the broad category of 'online lending information intermediaries.' Notably, and contrary to Plaintiff's characterization ..., the Interim Measures did not specifically target 'P2P' lenders...." (Def. Br. (Dkt. No. 53) at 11) Plaintiffs respond that this contention is "simply wrong, and contradict[s] the [Amended Complaint's] well-pled allegations." (Pltf. Opp. Br. (Dkt. No. 57) at 28) This dispute is not material to Defendants' motion, because Defendants do not deny that the Interim Measures apply to P2P lenders.

3   The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

4   Although Ganino addresses the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., its discussion of materiality is relevant here, because "[t]he definition of materiality is the same for [Sections 11 and 12(a)(2) of the Securities Act] as it is under Section 10(b) of the Exchange Act[.]" In re Deutsche Bank AG Sec. Litig., No. 09 CV 1714 (DAB), 2016 WL 4083429, at *16 (S.D.N.Y. July 25, 2016) (internal citations omitted).

5   "Though Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 'apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F,' which does apply to foreign corporations. Accordingly, the Court will "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K." Christine Asia Co. v. Alibaba Grp. Holding Ltd., 192 F. Supp. 3d 456, 476 (S.D.N.Y. 2016) (internal quotations omitted) (first quoting In Re Comm'n Guidance Regarding MD & A of Fin. Condition & Results of Operation, Release No. 8350 (Dec. 19, 2003); then quoting Release No. 33-7745, 64 Fed. Reg. 53900, 59304 (Sept. 28, 1999)) (alterations in Christine Asia), vacated on other grounds and remanded sub nom.Christine Asia Co. v. Ma, 718 F. App'x 20 (2d Cir. 2017).

6   Effective May 2, 2019, Item 503(c) became Item 105. FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674-01, 12688. To avoid confusion, this Court will refer to this provision as Item 503. "The amendments to Item 503(c) relocate the current risk factor disclosure requirements to Subpart 100 ... without substantively changing the underlying disclosure requirements." Id. at 12712.

7   In response, Defendants argue that " 'guilt by association' pleading is plainly insufficient as a matter of law," citing In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009). (Def. Reply Br. (Dkt. No. 55) at 8) In that case, the Second Circuit stated that "[a]lthough Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge.... In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." Id. (internal quotation marks and citations omitted). "[C]laims under the Securities Act of 1933 are measured by Rule 8's notice pleading requirements[, however,] rather than Rule 9(b)'s particularity ones." Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07 CIV. 10528, 2010 WL 148617, at *7 (S.D.N.Y. Jan. 14, 2010) Accordingly, DDAVP is plainly not on point. In any event, it is a fair inference that Jianpu would have been subject to the same circumstances discussed in the January 2017 report.

8   The Amended Complaint does not disclose the date of this report.

9   Defendants contend that this disclosure is "nearly [a] mirror image[ ]" of a warning given in a recent Section 11 case, in which the court granted defendants' motion to dismiss. (July 27, 2020 Def. Ltr. (Dkt. No. 65) at 2) In Jiajia Luo v. Sogou, Inc., No. 19-CV-230 (LJL), 2020 WL 3051019 (S.D.N.Y. June 8, 2020), a Chinese internet search-engine company issued an American IPO on November 9, 2017, and by the following year its share price had fallen by more than half. Id. at *1. In April 2018, Chinese authorities issued a law prohibiting certain kinds of advertisements, and an advertisement on the company's search engine was found to violate the new law, resulting in a fine. Id. at *3. Investors sued the company, claiming that it had "failed to disclose that its screening mechanisms at the time of the IPO were inadequate to screen out content that new Chinese law (passed after the IPO) would prohibit." Id. at *9 (emphasis in original). The court dismissed the claim, in part because "the Prospectus warned investors of exactly the risk the plaintiffs claim was not disclosed.... It stated: 'We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms.' " Id. at *11 (internal quotation marks and citations omitted). Jiajia Luo is not on point here, because in that case the company disclosed that its compliance measures were fallible, and warned that an incorrect guess as to future Chinese regulation might be disastrous for its business. Id. at *9. In the instant action, Plaintiff does not complain about a failure to disclose risks resulting from possible future regulation. Plaintiff instead complains that Defendants did not disclose risks to Jianpu's business resulting from actual violations of existing regulations.

10  For the same reasons discussed above in connection with the Interim Measures, Plaintiff has adequately pled Defendants' knowledge for purposes of Item 303. (See Am. Cmplt. (Dkt. No. 30) ¶¶ 45-49, 91) As is also discussed above, such knowledge is not required as to Item 503.

2021 WL 1608342
United States District Court,
N.D. Illinois, Eastern Division.

Ashley PIERRELOUIS, individually
and on behalf of all others
similarly situated, Plaintiff,

v.

GOGO, INC., Michael J. Small,
Norman Smagley, Barry Rowan,
and John Wade, Defendants.

No. 18 C 4473
|
Signed 04/26/2021

**Attorneys and Law Firms**

Serena Pia Hallowell, Pro Hac Vice, Thomas W. Watson, Pro Hac Vice, Labaton Sucharow LLP, New York, NY, Carl V. Malmstrom, Wolf Haldenstein Adler Freeman & Herz LLC, Chicago, IL, for Plaintiff Ashley Pierrelouis.

Adam M. Apton, Pro Hac Vice, Levi & Korsinsky, LLP, Washington, DC, James W. Johnson, Serena Pia Hallowell, Pro Hac Vice, Thomas W. Watson, Pro Hac Vice, Labaton Sucharow LLP, New York, NY, James Vincent DiTommaso, Vincent Louis DiTommaso, DiTommaso Law LLC, Oakbrook Terrace, IL, Patrick Doyle Austermuehle, Peter Scott Lubin, Lubin Austermuehle, P.C., Elmhurst, IL, for Plaintiff Maria Zingas.

Casey E. Sadler, Pro Hac Vice, Glancy Prongay & Murray LLP, Los Angeles, CA, James W. Johnson, Irina Vasilchenko, Pro Hac Vice, Serena Pia Hallowell, Pro Hac Vice, Thomas W. Watson, Pro Hac Vice, Labaton Sucharow LLP, New York, NY, Adam M. Apton, Levi & Korsinsky, LLP, Washington, DC, John Scott Monical, Mitchell Benjamin Goldberg, Peter E. Cooper, Lawrence, Kamin, Saunders & Uhlenhop, Marielise Fraioli, Chicago, IL, Peter Scott Lubin, Lubin Austermuehle, P.C., Elmhurst, IL, for Plaintiff Daniel Rogers.

Andrew Gordon May, Jonathan Stuart Quinn, Neal, Gerber & Eisenberg LLP, Chicago, IL, Brian H. Polovoy, Pro Hac Vice, Jerome Steven Fortinsky, Pro Hac Vice, Shearman & Sterling LLP, New York, NY, for Defendant Gogo Inc.

Andrew Gordon May, Jonathan Stuart Quinn, Neal, Gerber & Eisenberg LLP, Chicago, IL, Brian H. Polovoy, Pro Hac Vice, Jerome Steven Fortinsky, Shearman & Sterling LLP, New York, NY, for Defendants Michael J. Small, Oakleigh Thorne, Norman Smagley, Barry Rowan, John Wade.

## MEMORANDUM OPINION AND ORDER

JORGE L. ALONSO, United States District Judge

**\*1** Lead plaintiff Daniel Rogers[1] has filed a Third Amended Class Action Complaint for Violation of the Federal Securities Laws ("Third Amended Complaint"), asserting violations of sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 of the Securities Exchange Commission ("SEC"). Defendants, Gogo, Inc. ("Gogo"), Michael J. Small, Norman Smagley, Barry Rowan, and John Wade, move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under Rule 8, Rule 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, the motion is denied.

## BACKGROUND

The Court assumes familiarity with its previous decision in this case, in which it granted defendants' motion to dismiss plaintiff's amended complaint for failure to state a claim. *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1176-77 (N.D. Ill. 2019). Since then, plaintiff has twice repleaded, but the core of the complaint has not changed. As before, plaintiff alleges that, during the class period between February 27, 2017 and May 4, 2018, defendants —Gogo and several of its executives—made certain false and misleading public statements about the reliability of Gogo's in-flight internet connectivity services and its impact on Gogo's financial picture. According to plaintiff, Gogo installed its new "2Ku" antenna-and-satellite-based in-flight wifi systems on numerous partner airplanes before and during the class period, although defendants knew that the 2Ku systems sometimes did not work after the airplanes had been sprayed with de-icing fluid. As a result, plaintiff alleges, defendants knew that Gogo would be unable to hit its service availability targets during periods of winter weather unless it made costly modifications to its 2Ku systems, which would hurt the company's financial performance. Nevertheless, according to plaintiff, defendants concealed the de-icing issue

Pierrelouis v. Gogo, Inc., Slip Copy (2021)
2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

from investors for months, and then, even after disclosing it in February 2018, still concealed its true seriousness, until Gogo's new CEO finally disclosed the extent of the problem in May 2018. The May 2018 disclosure caused Gogo's allegedly artificially inflated stock price to plummet, to the detriment of plaintiff and other investors.

The Court described these allegations in more detail in its prior opinion, *see id.* at 1168-70, and, apart from the above brief summary, it will not repeat that description here. In the present Third Amended Complaint, plaintiff's core allegations are the same, but he includes new allegations about the 2Ku system's importance to Gogo's business prospects and about Gogo employees' attempts to assess and correct the de-icing problem.

**\*2** According to plaintiff, Gogo's financial future was heavily dependent on the success of the 2Ku system. Investors perceived Gogo as a company that needed to make capital expenditures in the short term in order to achieve profitability in the long term. That meant that Gogo needed to spend heavily to install its systems on more and more aircraft so that it could reach more customers. Additionally, the improved bandwidth of the new 2Ku satellite system, as compared with the old air-to-ground system, was meant to attract more passengers per flight and increase average revenue per aircraft, a key accounting metric. Analysts perceived Gogo's ability to (a) contract with airline partners to install its systems on new planes and then (b) successfully and efficiently install its systems on the resulting "backlog" of planes as crucial to its fortunes. Gogo had incurred significant debt to finance 2Ku installations and buy satellite capacity, and it continued to borrow throughout the class period for the same purpose, expecting that it its investment would pay off with revenue growth as soon as the 2Ku installations were complete. In light of the expectations of analysts and investors and the increased debt, plaintiff alleges, any disruption to the rollout of the 2Ku product or to the installation of 2Ku systems on Gogo's backlog of partner airplanes would have had a significant impact on Gogo's financial position.

According to plaintiff, several former employees have confirmed that Gogo discovered the de-icing problem in the winter of 2016-2017, recognized its seriousness, and began to make an extensive, concerted effort to correct it by the start of the class period in February 2017. The first of these former employees, identified only as "FE-1," served as Director of Aircraft Engineering. FE-1 recalls that multiple planes began to have connectivity problems in December 2016 and January

2017. An airline partner grounded one plane so that engineers from ThinKom, the company that designed the 2Ku system, could inspect it. The ThinKom engineers determined that the problem was caused by de-icing fluid leaking into the "radome," the compartment that housed the 2Ku system's antennas. FE-1 recalled that the problem affected a dozen planes that winter, and the outages appeared on an outage list that was circulated to everyone in management.

Based on these developments, FE-1 recalled, Gogo engineers began working on a solution to the problem in February 2017. Gogo obtained an old airplane fuselage, affixed a 2Ku system to it, installed a camera in the radome, and sprayed it with de-icing fluid to determine how and where the fluid penetrated the radome. This testing revealed that the fluid leaked in under the rubber seal between the radome and the fuselage. Gogo continued to install the 2Ku systems on new airplanes while it sought a remedy for this problem. By October 2017, when FE-1 left the company, Gogo had managed to engineer a couple of repair procedures, but the repairs took about three days to implement, which was difficult to arrange with the airlines.

FE-2 served as a Project Engineer who oversaw installations of 2Ku systems, and he recalled that Gogo discovered the de-icing problem when cold weather arrived in the latter part of 2016. However, Gogo continued to install 2Ku systems on new airplanes, not wanting to disrupt its aggressive installation schedule. FE-2 was involved in the installations of supplemental equipment to address the de-icing problem, following an effort by a "fully coordinated, integrated product team comprised of people with subject matter expertise" to develop a fix to the problem. (3d Am. Compl. ¶ 77, ECF No. 101.) Gogo began to roll out its remedy for the de-icing problem in the spring or summer of 2017, after months of testing. FE-2 recalled that the de-icing fluid was a big concern that had reached the attention of many executives, given the importance of the 2Ku product for the company and the sophistication of the equipment. As FE-2 explained, "when you're putting stuff on an airplane, even if you're drilling one hole, there are about three dozen people at the company that know about that one hole." (*Id.* ¶ 79.)

FE-3 joined Gogo in February 2017 as "Director – Airline Technical Operations." (*Id.* ¶ 42.) At that time, Gogo was working on finding a solution to the de-icing problem. During FE-3's first few months at the company, fixing the de-icing problem before winter set in again was a priority for Gogo, and everyone was aware of what was going on, including

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

defendant John Wade, Gogo's chief operating officer during the class period. FE-3 recalled attending weekly meetings at which the de-icing problem was discussed. Wade also attended these meetings.

**\*3** FE-4 worked at Gogo from 2013 to May 2017, advancing to the role of "Senior VP, Airline Technical Operations." (*Id.* ¶ 43.) He recalls learning of the 2Ku problems in the winter of 2016-2017, and that Gogo was still working on assessing and fixing the problem when he left the company.

FE-5 worked at Gogo from 2014 to May 2017, advancing to the role of "Director, Aircraft Certification and Compliance." (*Id.* ¶ 44.) He recalls that the 2Ku system was having problems in the winter of 2016-2017. He learned of them because his team served as liaison between Gogo and the FAA for obtaining "Supplemental Type Certificates" or "STCs." Any modification to the outside of an airplane must receive an STC, which the FAA defines as "a type certificate ... issued when an applicant has received FAA approval to modify an aeronautical product from its original design." (3d Am. Compl. ¶ 92.) Gogo was required to obtain an STC for each type of aircraft on which it installed 2Ku systems, and indeed even for different configurations of the same aircraft type. This was a time-consuming, multi-step process that could take months or even years. In the case of the 2Ku system, according to FE-5, the STC application required testing the equipment under different environmental conditions and against different contaminants that the equipment might encounter once it was in use. Gogo's airline partners would have to supply specific parts for testing. Before FE-5 left the company in May 2017, his team had been involved in internal discussions at Gogo about whether the company's attempts to address the de-icing issue would require a new STC. FE-5 told members of the department tracking the functionality of the 2Ku system that he could not say whether a fix would require a new STC until after he saw the design of the proposed fix. He did not recall seeing a revised design before he left in May 2017, but he knew that Wade was aware of what was going on.

Plaintiff claims that defendants' false statements deceived and defrauded investors in violation of the Securities Exchange Act and Rule 10b-5 of the SEC. Additionally, plaintiff claims that the individual defendants are liable as "controlling persons" of Gogo under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t. Defendants have moved to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).

## ANALYSIS

Section 10(b) of the Securities Exchange Act prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j. Under SEC Rule 10b-5, it is unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Thus, under § 10(b) and Rule 10b-5, "a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The required scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

**\*4** "A motion [to dismiss] under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must " 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (ellipsis omitted)).

Under federal notice-pleading standards, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.' " *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Additionally, any claims of or including acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). Although fraudulent or deceptive intent "may be alleged generally," Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008).

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on private, class action claims of securities fraud under § 10(b) and Rule 10b-5:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of

the circumstances in which they were made, not misleading;

*the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*

**(2) Required state of mind**

**(A) In general**

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

**\*5** 15 U.S.C. § 78u-4 (italicized emphasis added). Thus, under the PSLRA, private securities fraud plaintiffs not only must plead with particularity the factual circumstances constituting fraud, including by specifying the alleged misrepresentations and the basis for any allegations made on information and belief, but they must also plead with particularity sufficient facts to give rise to a "strong inference" that the defendant acted with scienter. *See Tellabs I*, 437 F.3d at 594 ("[T]he PSLRA essentially returns the class of cases it covers [*i.e.*, private securities fraud class actions] to a very specific version of fact pleading—one that exceeds even the particularity requirement of ...Rule ... 9(b).").

A "strong inference" is one that is "strong in light of other explanations." *Tellabs*, 551 U.S. at 323. That is, it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Determining whether allegations give rise to such an inference requires courts to "take into account plausible opposing inferences" because "[t]he strength of an inference cannot be decided in a vacuum," and "[t]he inquiry is inherently comparative." *Id.* at 323 (internal quotation marks omitted); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 711 (7th Cir. 2008) ("*Tellabs II*") ("The plausibility of an explanation depends on the plausibility of the alternative explanations.").

**Pierrelouis v. Gogo, Inc., Slip Copy (2021)**

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

The required state of mind under the PLSRA is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Defendants acted with the required scienter if they spoke in disregard of a risk of falsity that was " 'so obvious that [they] must have been aware of it.' " *See Tellabs II*, 513 F.3d at 702, 704 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs II*, 513 F.3d at 704.

In support of their motion to dismiss, defendants argue—as before—that plaintiff does not meet his burden to plead falsity and plaintiff's complaint fails to raise a strong inference of scienter. Additionally, they argue that certain of the statements that plaintiff challenges were forward-looking statements protected by the PSLRA safe harbor, *see* 15 U.S.C. § 78u-5, and that defendants cannot be liable as control persons under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), because plaintiff does not state a claim for an underlying violation of § 10(b).

**I. Material Falsity**

Under the PSLRA, a complaint containing a Rule 10b-5 claim must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Tellabs I*, 437 F.3d at 595 (citing 15 U.S.C. § 78u–4(b)(1)). That does not mean that a complaint "automatically survives" if it states all the known facts that might support an inference of falsity, nor that it fails if it "leaves out a redundant detail." *Tellabs I*, 437 F.3d at 595. "[T]he relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.' " *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet" the standard set by the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

**\*6** Plaintiffs list all of the materially misleading statements and omissions defendants are alleged to have made in a thirty-one page, eighty-four-paragraph section of the Third Amended Complaint. (3d Am. Compl. ¶¶ 140-224.) The Court previously held that plaintiff had not alleged sufficiently "specific facts to demonstrate when the 2Ku problems showed themselves to be of [such] ... magnitude"

that they made the challenged statements false, at the time defendants made them, for failing to disclose the 2Ku problems or their severity. *Pierrelouis*, 414 F. Supp. 3d at 1174 (internal quotation marks and citations omitted). Plaintiff had alleged that Gogo tracked service outages, the individual defendants had access to the outage reports, and the outage reports showed that service availability had dropped; but without allegations bearing on "*when* the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary," the Court reasoned, plaintiff had not made sufficiently specific allegations to permit a plausible inference that defendants' statements were false when made. *Id.*

Defendant argues that the Third Amended Complaint suffers from the same defects, but the Court disagrees. The new former-employee allegations, combined with the allegations establishing the importance for Gogo's financial health of keeping to the 2Ku installation schedule, correct this deficiency. The former-employee allegations, particularly the allegations of FE-1, show that the de-icing fluid issue had begun to manifest itself prior to the beginning of the class period on February 27, 2017. According to FE-1, a dozen planes—12% of Gogo's 2Ku fleet, at that time—were experiencing problems. Such a high failure rate among 2Ku systems in the field would have been an extremely ominous sign, given the critical importance of the 2Ku product to Gogo's fortunes. Gogo was forced to make extensive efforts, beginning before the class period, to correct the problem, and the former-employee allegations show that Gogo's efforts involved not only extensive engineering and technical work, including the acquisition and testing of an old airplane fuselage, but also preparations to clear potential regulatory hurdles by obtaining new STCs, if necessary.

True, these allegations still lack certain specifics that might make plaintiff's claim more convincing, but the claim need not be airtight to survive a motion to dismiss. At this stage, the Court must ensure that "the grounds for the plaintiff's suspicions ... make the allegations plausible," while "remain[ing] sensitive to information asymmetries that may prevent [plaintiff] from offering more detail" before he has had the benefit of discovery. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011); *see Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at \*8-9 (N.D. Ill. Dec. 6, 2017). Given the extent of the company's efforts to address the de-icing problem and

Pierrelouis v. Gogo, Inc., Slip Copy (2021)

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

the importance of the 2Ku product, and given the limited information available to plaintiff concerning Gogo's internal deliberations and operations, plaintiff has alleged enough factual matter to make it at least plausible that the de-icing problem had shown itself to be of a "sufficient magnitude" to make defendants' statements misleading at the time they were made. *Cf. Pierrelouis*, 414 F. Supp. 3d at 1174-75 (citing *DeVry*, 2017 WL 6039926, at *8-9, and *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020-21 (N.D. Ill. 2010)).

## II. Scienter

As stated above, the PSLRA requires plaintiffs to make not general but *particularized* allegations of "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see id.* at 323-24. The Court previously held that plaintiff did not make sufficiently particularized allegations of facts giving rise to a strong inference of scienter because he did not allege when defendants knew or should have known of the magnitude of the de-icing problem. Defendants argue that plaintiff has not corrected this deficiency. As above, the Court disagrees.

 **\*7** Plaintiff has added particularized allegations based on accounts of former employees demonstrating that, by the beginning of the class period, an ominously large percentage of the 2Ku systems in operation had experienced problems, and Gogo was engaged in an extensive internal effort to assess and correct the de-icing fluid problem in late 2016 and early 2017. Further, plaintiff has explained in more detail that not only was the 2Ku product central to Gogo's success, but also the timing of its rollout was critical, and any disruption to Gogo's installation plans risked endangering Gogo's financial position.

Adding these new allegations to the old ones changes the relative strength of the competing inferences. Previously, the Court concluded that, "because the complaint contains so little factual detail about what defendants knew and when, there might be any of a number of different plausible explanations for why defendants did not disclose more facts about the 2Ku de-icing problems to investors at an earlier date." *Pierrelouis*, 414 F. Supp. 3d at 1176.

> For example, defendants could have reasonably believed subordinates who told them erroneously that the problem

was not serious or widespread and could be easily repaired or avoided, and it may have taken time to realize that they were wrong.... They may have thought outages were caused by other factors apart from the de-icing fluid that were easier to fix ...; they may not have known how expensive and difficult the necessary repairs would be at first; the weather may have been different from what they expected, preventing the problem from revealing itself right away or worsening it once it did, and so on and so forth.

*Id.* The Court relied on *Tellabs II*, which explained that a fraudulent inference is not "cogent" if it is only one of many possible explanations:

> Suppose a person woke up one morning with a sharp pain in his abdomen. He thought it was due to a recent operation to remove his gall bladder, but realized it could equally well have been due to any number of other things. The inference that it was due to the operation could not be thought cogent.

513 F.3d at 710-11; *see Pierrelouis*, 414 F. Supp. 3d at 1176-77.

In light of the new allegations in the Third Amended Complaint, the fraudulent inference is no longer essentially speculative. This case is now less like the above-quoted hypothetical in the *Tellabs II* decision and more like the *Tellabs* case itself. In *Tellabs*, the defendant company allegedly "paint[ed] the prospects" for its "key products" in misleadingly "rosy hues," *Tellabs II*, 513 F.3d at 710, by failing to acknowledge in public statements that there had been a reduction in orders for its "flagship" product and that orders for the flagship product's "heralded successor" had not materialized, *id.* at 709, due to "the bursting of the fiber-optics bubble," *id.* at 706. The Seventh Circuit explained that it was "exceedingly unlikely" that the defendants' misleading statements were "the result of merely careless mistakes at the management level ... rather than of an intent to deceive or a reckless indifference to whether the statements were misleading," because the challenged statements concerned the company's "most important products." *Id.* at 709. It was "very hard to credit" that "no member of the company's senior management who was involved in authorizing or making public statements about the demand" for these products "knew that they were false," at least in the absence of any "plausible story" to the contrary. *Id.*

Similarly, in this case, it seems unlikely, given the importance of the 2Ku product to Gogo's fortunes and the scale of the internal effort to fix the de-icing problem, that Gogo and members of "senior management" such as the individual defendants were unaware of the magnitude of the

**Pierrelouis v. Gogo, Inc., Slip Copy (2021)**

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

problem. Indeed, the former employees specifically allege that defendant Wade, the company's COO, did know of these problems at the start of the class period. Further, plaintiff alleges that defendants Small and Wade made private statements to an investor in February 2018 that showed that at least by that time, still several months before the full truth came out, they were aware of the problem to a greater extent than they had revealed in public comments. (3d Am. Compl. ¶ 228.)

**\*8** Defendants argue that the Court must "discount," *Higginbotham*, 495 F.3d at 757, the value of allegations based on information from anonymous sources such as the numbered—but not named—former employees mentioned in the Third Amended Complaint. The argument has some force, but this Court has previously recognized that the value of allegations from anonymous sources "need not be discounted to zero," if the accounts of the anonymous sources are "set forth in 'convincing detail' and the witnesses provide enough information about their jobs to demonstrate that they 'were in a position to know at first hand the facts to which they are prepared to testify.' " *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2018 WL 6714326, at \*3 n.2 (N.D. Ill. Dec. 20, 2018) (quoting *Tellabs II*, 513 F.3d at 711-12). As in *DeVry*, here the former employees' accounts are "rendered in sufficient detail to afford them a high degree of reliability." 2018 WL 6714326, at \*3 n.2.

Defendants argue that plaintiff has not established a motive for them to lie to Gogo's investors. In fact, defendants argue, Small purchased $100,000 shares of Gogo stock in November 2017, and, according to defendants, this all but proves that he was totally unaware that Gogo's stock value was artificially inflated. The Court does not find this line of argument convincing. Plaintiff does not need to allege any motive, *see Tellabs*, 551 U.S. at 325, and plaintiff succeeds in making allegations that permit a strong inference of scienter even without allegations that directly establish a clear motive or demonstrate that the fraud was directly or purely in the individual defendants' own rational economic self-interest. The point is illustrated by *Tellabs II*, in which the Seventh Circuit rejected the argument that the plaintiffs failed to state a claim in the absence of any allegation that the defendant company's executives stood to profit from the alleged fraud. The court explained that the argument "confuses expected with realized benefits," as the executives "may have thought that there was a chance that the [problem] would right itself,"

in which case "the benefits of concealment might exceed the costs":

> Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. Suppose the situation had corrected itself. Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can be diversified away, demand compensation in the form of a lower price; consequently the stock might not recover to its previous level. The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Tellabs II*, 513 F.3d at 710 (internal citation omitted). Similarly here, the Court sees no reason why it is particularly unlikely that Small's stock purchase was a "gamble" he took in the hope that he could "conceal[ ] bad news" long enough for it to be "overtaken by good news," such as the discovery of a miracle fix for the de-icing problem. The fact that the gamble failed is not inconsistent with its having been a "considered," if "reckless," gamble. *Id.*; *see Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("[T]he truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones."). Further, the stock purchase was not massive in comparison with Small's other stock holdings, plaintiff contends, and Small may have concluded that his need to demonstrate his commitment to Gogo in order to maintain his position by making the stock purchase outweighed any short-term harm that may come if the stock value subsequently dropped. Additionally, as plaintiff argues, the stock purchase could have been based on Small's judgment that the fraud "had been successful": by that time, Gogo had installed the 2Ku system on numerous partner airplanes and raised $100 million to pay expenses, and Small may have thought that the 2Ku had become too big to fail. (Lead Pl.'s Opp'n Br. at 27, ECF No. 111.) Given these plausible possibilities, the absence of a clear motive in the Third Amended Complaint does not doom plaintiff's claim.

**\*9** As in *Tellabs*, while it is perhaps "conceivable" that defendants were unaware of the problem during much of the class period, that nonfraudulent inference is certainly no more compelling than the fraudulent inference that plaintiff urges, in light of the allegations of the complaint as a whole. *See In*

**Pierrelouis v. Gogo, Inc., Slip Copy (2021)**

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

*re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 821 (N.D. Ill. 2017) ("Ultimately, it would not be unreasonable to infer that [defendants] acted with mere carelessness. But that inference is not *more* plausible or compelling than the inference that they acted recklessly or intentionally."). Additionally, the fact that it is not certain precisely when the "information available to defendants became 'bad enough to render Defendants' statements knowingly [or recklessly] false' " does not defeat plaintiff's claim because the Court need not " 'identify the precise moment at which the culpable inference overtook the innocent one' at this early stage." *DeVry*, 2018 WL 6714326, at *4 (quoting *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014)). " 'When the precise moment at which liability attached becomes clear, the Court can limit the class period accordingly,' if necessary." *DeVry*, 2018 WL 6714236, at *4 (quoting *ITT Educ. Servs.*, 34 F. Supp. 3d at 310). Because the fraudulent inference is cogent and at least as compelling as competing nonfraudulent inferences, it meets the PSLRA standard for pleading scienter.

### III. Safe Harbor for Forward-Looking Statements

Defendants argue that certain of their statements[2] are protected by the PSLRA's statutory safe harbor. The relevant provision states as follows:

> Except as provided in subsection (b), in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--
>
> **(A)** the forward-looking statement is--
>
> **(i)** identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> **(ii)** immaterial; or
>
> **(B)** the plaintiff fails to prove that the forward-looking statement--
>
> **(i)** if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

> **(ii)** if made by a business entity;[1] was--
>
> **(I)** made by or with the approval of an executive officer of that entity; and
>
> **(II)** made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). Under this provision, a material "forward-looking" statement "cannot give rise to liability if it was (1) 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) it was not made with 'actual knowledge' that it was 'false or misleading.' " *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19-CV-01323, 2020 WL 6118605, at *21 (N.D. Ill. Oct. 15, 2020) (quoting 15 U.S.C. § 78u-5(c)(1)). The PSLRA defines "forward-looking statements" to include the following:

> **(A)** a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> **(B)** a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> **(C)** a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> **(D)** any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)

15 U.S.C. §§ 78u-5(i)(1).

 **\*10** Defendants argue that certain of the statements that plaintiff challenges were forward-looking statements accompanied by meaningful cautionary language, and alternatively, that plaintiff has not plausibly alleged that any such forward-looking statements were made with actual knowledge that they were false or misleading, rather than merely recklessly or carelessly.

Plaintiff emphasizes in response, and defendants appear to concede, that this argument does not apply to all of the

**Pierrelouis v. Gogo, Inc., Slip Copy (2021)**

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

misleading statements plaintiffs cite in their complaint. Thus, even if the Court were to agree with defendants on this issue, it would not permit the Court to dismiss any claim in its entirety. That being the case, it might be argued that defendants' argument is out of place at this stage. The Seventh Circuit has explained that "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015). In this regard, Rule 12 is unlike Rule 56, which expressly permits courts to award "[p]artial [s]ummary [j]udgment" to litigants who "identif[y] each claim or defense —or the part of each claim or defense" on which there is no genuine dispute of material fact. *See BBL*, 809 F.3d at 325 (internal quotation marks omitted). If plaintiff states a claim based on some statements, then he states a claim that survives defendants' motion to dismiss, and the Court need not determine whether the forward-looking statements could support a claim on their own. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 618 (N.D. Ill. 2020); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 898 (N.D. Ill. 2018); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 159 F. Supp. 3d 898, 923-24 (N.D. Ill. 2016). But plaintiff does not make the argument, and it makes no difference because the Court concludes that, at least at this early stage, there is no basis for dismissal of even a claim based only on the forward-looking statements.

### A. Meaningful Cautionary Language

With respect to whether defendants made forward-looking statements that were accompanied by meaningful cautionary statements, the parties' arguments center on whether defendants adequately disclosed the risk that the 2Ku system might not work properly. Defendants do not dispute that they made some statements of their expectations for Gogo's financial future, but, defendants argue, they were identified as forward-looking and accompanied by public warnings of certain risks to Gogo's business. As examples of meaningful cautionary statements, defendants cite the press releases that Gogo made to announce financial results during the class period, which routinely warned of the risk of Gogo's

> inability to timely and efficiently deploy [the] 2Ku service ...[,] the effects of service interruptions or delays, technology failures and equipment failures or malfunctions arising from defects or errors in [Gogo's] software or defects in or damage to [Gogo's] equipment[, and]

increases in [Gogo's] projected capital expenditures due to, among other things, unexpected costs incurred in connection with the roll-out of [its] technology roadmap.

(Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 27 (citing Fortinsky Decl. Exs. N-Q, ECF Nos. 108-14–108-17).) Additionally, after the partial disclosure of the de-icing problem in February 2018, Gogo updated its 10-K form to disclose that Gogo had "encountered delays and quality problems" in "deploy[ing] 2Ku," and it "may continue to do so given the aggressive installation schedule" it had set. (3d Am. Compl. ¶ 223.) In response, plaintiff points out not only that the forward-looking statements are only a portion of the allegedly misleading statements he cites in the Third Amended Complaint, but also, even leaving that aside, defendants' supposedly cautionary statements are inadequate because they do not disclose the impact of the de-icing issue specifically and lack sufficient detail to "meaningful[ly]" inform investors.

**\*11** The Seventh Circuit has explained that, to be meaningful, a firm's warnings must amount to something more than "caveat emptor." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004). This means that it does not suffice to warn that " 'all businesses are risky' or 'the future lies ahead,' " nor does it suffice simply to "highlight[ ] some parts of the business that might cause problems." *Id.* If it were otherwise, "then any issuer could list its lines of business, say 'we could have problems in any of these,' and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Id.*; *see In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (internal quotation marks omitted); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)[3] ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants warned of the risk that that Gogo might not be able to "timely and efficiently deploy [the] 2Ku service" due to the "effects of ... technology failures and equipment failures or malfunctions arising from ... defects in or damage to [Gogo's] equipment[, and] increases in [Gogo's] projected capital expenditures" to remediate the defects. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 27.) They argue that, by providing these warnings concerning

the risk that defective or malfunctioning equipment might affect Gogo's ability to deploy the 2Ku system, they warned of the exact risk that plaintiff accuses them of failing to disclose. The Court disagrees. On the critical points, Gogo's caution is "vague" in comparison with what plaintiff alleges to have been happening behind the scenes with respect to the 2Ku system, and if plaintiff's allegations are true, then Gogo did not precisely disclose "the exact risk that materialized." *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (defendants' general warning of "potential deterioration in the high-yield sector" did not meaningfully warn of specific risk that "rising defaults on the bonds underlying [the defendant company's] own investment-grade CDOs would cause deterioration in [the defendant company's] own portfolio"). Obviously there is always the possibility that a new and untried technology may not work as well as intended, and defendants disclosed little more than that possibility. *See id.* If plaintiff's allegations are proved true, this might well be a case in which defendants merely "highlighted some parts of the business that might cause problems," without disclosing problems that were "on the horizon" although the "precipice was in sight." *Asher*, 377 F.3d at 733. Thus, at least at this stage of the case, plaintiff has the better of the argument on this issue.

### B. Actual Knowledge

For the same reasons the Court described in Part II of this Opinion, the Court concludes that it is at least plausible that defendants had actual knowledge that their statements were false at the time they were made. The Seventh Circuit explained in *Tellabs II* that it was "very hard to credit" that "no member of the company's senior management who was involved in authorizing or making public statements about the demand" for the defendant company's key products "knew that they were false." 513 F.3d at 709. This case is similar. If plaintiff's allegations are true, it is hard to imagine that Gogo's C-level executives did not know that there was a serious question about the 2Ku system's reliability, given the importance of the 2Ku product to Gogo's fortunes and the scale of the internal effort to fix the de-icing problem. Similarly, it is hard to imagine that they did not know that the de-icing issue was serious enough to require a reassessment of their expectations for the company's financial performance on some level. Thus, at least at this early stage, the PSLRA safe harbor does not bar plaintiff's claim.

### IV. Control Person Liability

**\*12** Finally, defendants argue that plaintiff has not properly pleaded control person liability under § 20(a) of the Securities Exchange Act, which would make the individual defendants liable to the extent they exercised general control over Gogo's operations and " 'possessed the power or ability to control the specific transaction or activity upon which the primary violation [of the securities laws] was predicated, whether or not that power was exercised.' " *See Ross v. Career Education Corp.*, No. 12 C 276, 2012 WL 5363431, at \*13-14 (N.D. Ill. Oct. 30, 2012) (quoting *Harrison v. Dean Witter Reynolds*, 974 F.2d 873, 881 (7th Cir. 1992)); 15 U.S.C. § 78t.

This argument is unavailing. First, whether an individual is a controlling person for purposes of § 20(a) is a fact-intensive issue that generally is not properly resolved at the pleading stage. *Ross*, 2012 WL 5363431, at \*14. Second, defendants argue only that there can be no control-person liability without an underlying violation of the securities laws; but, as the Court has explained above, plaintiff *has* pleaded a violation of section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Third, defendants argue that the Court must at least dismiss plaintiff's claim as to defendant Norman Smagley, who was Gogo's chief financial officer for only a portion of the class period, but they do not explain, and the Court does not see, why this entitles him to dismissal. As the Court has explained, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *See BBL*, 809 F.3d at 324-25.

### CONCLUSION

For the reasons set forth above, the Court denies defendants' motion to dismiss [106]. A status hearing is set for May 26, 2021 at 9:30 a.m.

### SO ORDERED.

### All Citations

Slip Copy, 2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

Footnotes

**Pierrelouis v. Gogo, Inc., Slip Copy (2021)**

2021 WL 1608342, Fed. Sec. L. Rep. P 101,096

1   This class action was initially brought by the above-captioned plaintiff, but class members Maria Zingas and Daniel Rogers, among others, moved for appointment as lead plaintiffs. After the other movants withdrew, the Court granted Zingas and Rogers's motions and appointed them as co-lead plaintiffs. (Oct. 10, 2018 Order, ECF No. 41.) Zingas became unable to continue serving as a lead plaintiff (*see* Lead Pl.'s Mem. In Supp. Of Mot. For Leave to Amend at 1 n.1, ECF No. 98), leaving Rogers as the sole lead plaintiff.

2   (*See* Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 32-33, ECF No. 107.)

3   Defendants argue in their reply brief that plaintiff's reliance on *Rombach* is "misplaced" (Reply Br. at 15 n.12, ECF No. 112) because *Rombach* interpreted the "bespeaks caution" doctrine rather than the PSLRA, but the Court is not convinced that the distinction makes *Rombach* any less persuasive. The two contexts are similar. As one court has put it, Congress "borrow[ed] from the "bespeaks caution" doctrine in creating the "analogous" PSLRA safe harbor. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842 (N.D. Ill. 2003).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

2012 WL 5363431
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Thurman ROSS, by and behalf of himself and all others similarly situated, Plaintiff,

v.

CAREER EDUCATION CORP.,
Gary E. McCullough, and
Michaelgraham, Defendants.

No. 12 C 276.
|
Oct. 30, 2012.

**Attorneys and Law Firms**

James M. Hughes, Motley Rice LLC, Mt. Pleasant, SC, Scott Forrest Hessell, Paul Ethan Slater, Sperling & Slater, PC, Chicago, IL, for Plaintiff.

Daniel E. Reidy, Lee Ann Russo, Jones Day, Mary Ellen Hennessy, Blake Matthew Mills, Jessica Renae Price, Katten Muchin Rosenman LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

MATTHEW F. KENNELLY, District Judge.

**\*1** Thurman Ross, on behalf of a proposed class of similarly situated persons, sued Career Education Corporation (CEC), Gary E. McCullough, and Michael J. Graham, alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. The Court appointed several entities to act as co-lead plaintiffs, who then filed a consolidated class action complaint. Defendants have moved to dismiss the complaint for failure to state a claim and for failure to plead fraud with sufficient particularity. For the reasons stated below, the Court dismisses the claims against Graham but otherwise denies defendants' motion.

**Background**

The Court draws the following facts from plaintiffs' complaint and accepts them as true for purposes of the motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (*Tellabs II* ).

CEC owns and operates for-profit professional schools and colleges. With a focus on offering "career-oriented" disciplines, CEC operates across ninety campuses and serves over 100,000 students. Almost all of CEC's revenue derives from federal financial aid provided to its students under Title IV (Title IV) of the Higher Education Act of 1965. Schools seeking to accept tuition payments from Title IV funding must be accredited by a national accrediting organization certified by the U.S. Department of Education. Meeting the requirements for accreditation is therefore essential for CEC to stay in business.

The two primary accrediting bodies covering CEC's schools are the Accrediting Commission of Career Schools and Colleges (ACCSC) and the Accrediting Counsel for Independent Colleges and Schools (ACICS). To gain accreditation from these organizations and thereby receive access to Title IV funding, a school must show that it complies with certain minimum standards. Compliance is based to a significant extent on the school achieving certain job placement rates for its graduates. These rates are calculated by counting the number of graduates who are gainfully employed in positions that require the degree they received.

Plaintiffs are individual and corporate investors that purchased CEC stock during the proposed class period, February 19, 2009 through November 21, 2011. According to plaintiffs' complaint, prior to the class period, CEC faced a number of lawsuits and government investigations, as well as scrutiny from accrediting agencies, regarding alleged falsification of job placement rates. In 2007, plaintiffs allege, years of legal and regulatory troubles led to the ouster of CEC's co-founder and the appointment of McCullough as CEO. CEC publicly heralded McCullough's arrival as marking a new era of compliance for the company.

On May 24, 2011, CEC reported that it had received a subpoena from the Attorney General of the State of New York (N.Y.AG) requesting documents pertaining to student employment outcomes and placement rates of graduates. Shortly thereafter, on August 3, 2011, CEC reported on

**Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

a Form 8–K filed with the Securities and Exchange Commission that in connection with preparing its response to the NYAG subpoena, CEC had found "improper practices ... relating to the determination of reported placement rates." Compl. ¶ 126. CEC also stated that due to this discovery, CEC had engaged the law firm of Dewey & LeBoeuf (Dewey) to conduct an internal investigation of CEC's student placement practices across the country. The price of CEC's stock thereafter declined.

**\*2** On October 31, 2011, McCullough and three senior vice presidents resigned. The very next day, CEC announced in a press release that the Dewey investigation, which had involved only CEC's 2010–11 placement rates, "confirmed the existence of improper placement determination practices" and found placements that "did not meet applicable placement guidelines established by [CEC]." Compl. ¶ 128. By November 3, 2011, the price of CEC's stock had fallen dramatically. On November 21, 2011, CEC announced receipt of a "show cause" letter from ACICS, threatening suspension of its accreditations of forty-nine CEC schools. Since the time that plaintiffs filed their complaint, CEC has publicly declined to extend Dewey's investigation of its placement rate practices to time periods before 2010–11. Compl. ¶ 134.

Plaintiffs allege that defendants violated SEC Rule 10b–5 by knowingly making numerous materially false public statements during the class period about CEC's placement rates, regulatory compliance, and accreditation status. These misleading statements, plaintiffs allege, artificially inflated CEC's stock value until the truth about its practices became public. Plaintiffs allege that McCullough and Graham are separately liable under section 20(a) as control persons. Defendants have moved to dismiss all of plaintiffs' claims.

**Discussion**

To prevail on a Rule 10b–5 claim, a plaintiff must prove that the defendant: (1) made a misstatement or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injuries. *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). The first three of these elements are subject to "[e]xacting pleading requirements" pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA). *Tellabs II,* 551 U.S. at 313; *see also* 15 U.S.C. § 78u–4(a)(1). This

requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). With respect to scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). The requirement of a "strong" inference means the inference must be cogent, more than plausible, and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II,* 551 U.S. at 310.

Under the PSLRA, a court must consider the complaint in its entirety and evaluate the factual allegations as a whole. *Id.* at 322–23. Particular allegations are not assessed in a vacuum. *Id.* Thus, "one or more deficient allegations will not doom [a] complaint if it is otherwise sufficient." *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.,* No. 10 C 7031, 2012 WL 1030474, at \*4 (N.D.Ill. Mar.27, 2012).

**\*3** Defendants argue that plaintiffs do not sufficiently allege any misleading statements attributable to defendants and have failed to allege scienter and loss causation sufficiently. Defendants also contend there is no basis for control-person liability under section 20(a) with regard to McCullough and Graham.

**1. Section 10(b) claims**

**a. Materially misleading statements**
Plaintiffs allege that defendants made a number of false and misleading statements throughout the class period. Plaintiffs categorize the statements in three groups: (1) statements about placement rates; (2) statements about regulatory compliance; and (3) statements about accreditation.

**i. Statements regarding reported placement rates**
As noted above, the PSLRA's heightened pleading standard requires plaintiffs to specify the allegedly misleading statements and explain why they were untrue. *See* 15 U.S.C. § 78u–4(b)(1). This means that plaintiffs must allege, with particularity, the factual basis for their allegations. *ABN AMRO, Inc. v. Capital Int'l Ltd.,* 595 F.Supp.2d 805, 835 (N.D.Ill.2008). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 437 F.3d 588, 595 (7th

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

Cir.2006) (*Tellabs I* ), *rev'd on other grounds,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Plaintiffs contend that during the class period, defendants improperly determined and reported falsified job placements. In the complaint, plaintiffs identify various excerpts from interviews, publications, and public disclosures in which defendants claim the absence of "any significant declines" in their placement rates. Compl. ¶ 143. Plaintiffs also describe statements in which defendants affirmatively represented that CEC's high placement rates pertained to students "who have obtained employment in their field or a related field" when, plaintiffs argue, they had not. *Id.* ¶ 145.

According to defendants, these statements were neither false nor misleading. Defendants contend that because ACICS accreditation criteria provides no specific guidance on what types of employment can be counted as a placement, CEC's reported placement rates cannot have been false. This argument incorrectly suggests that plaintiffs' allegations are dependent on the ACICS guidelines. In fact, they are not.

Plaintiffs cite CEC's November 1, 2011 press release, in which the results of the Dewey investigation into CEC's reporting practices for the 2010–11 period are discussed. In this press release, CEC reported a finding of "improper placement determination practices." Compl. ¶ 128. CEC also specifically stated in the release that the Dewey investigation found that CEC "did not meet applicable placement guidelines *established by [CEC]." Id.* (emphasis added). Thus, irrespective of whether ACICS' guidelines were sufficiently clear, plaintiffs allege that CEC misrepresented its placement rates by comparison to CEC's own standards. Thus, plaintiffs have adequately alleged, through defendants' own statements, facts sufficient to support the belief that CEC's reported job placements were improperly determined, at least for the 2010–11 period.

**\*4** With respect to alleged misrepresentations for the period preceding 2010–11, plaintiffs rely on a number of interviews with six confidential witnesses (CWs). According to the CWs, who worked for CEC at different schools, defendants artificially inflated placement numbers on a regular basis both before and during the class period. For example, plaintiffs allege that according to CW1, CW5, and CW6, CEC counted as placements short-term jobs at community health fairs—jobs that lasted only one to twelve days, and in some cases as little as a few hours. *Id.* ¶¶ 106–07, 113. Such improper practices, plaintiffs allege, were not limited to health fairs.

According to CW1, CEC often misused "waiver status," a classification for graduates who were not looking for jobs due to temporary circumstances such as pregnancy or military service. When the particular circumstance would end, however, CEC would maintain the graduate's waiver status to mask the lack of a placement.. *Id.* ¶ 116. In addition, CW1 and CW4 have informed plaintiffs that it was common practice at CEC to count as placements related to a student's field of study jobs that were actually unrelated to that field. *Id.* ¶ 119. Buttressing these allegations, plaintiffs offer allegations tending to show that CEC itself did not consider such placements to be legitimate. Plaintiffs allege, through the statements of the CWs, that students working in one-day health fairs signed "nontraditional" placement forms stating that CEC would continue to assist them in their job search once their short-term position ended. *Id.* ¶ 120. Plaintiffs allege, and the alleged statements by their confidential witnesses corroborate, that CEC made no distinction between "traditional" and "non-traditional" placements when reporting, even though such graduates ought not have been considered "placed" by CEC's own definition. *Id.*

Defendants argue that the statements by the CWs should be discounted because "information from anonymous sources is not regarded as compelling." Defs.' Opening Br. at 22 (citing *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 757 (7th Cir.2007)). As plaintiffs point out, however, this is true only when the complaint lacks enough detail for the Court to determine whether the unnamed witnesses were "in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 712 (7th Cir.2008) (*Tellabs III* ). So long as plaintiffs describe with particularity the sources of their information, including how the sources were in a position to know the matters alleged, such allegations are sufficient under the PSLRA. *See Taubenfeld v. Career Educ. Corp.,* No. 03 C 8884, 2005 WL 350339, at \*8 (N.D.Ill. Feb.11, 2005) (stating that the particularity requirement applies to allegations based on counsel's interviews with confidential witnesses); *DeVry,* 2012 WL 1030474, at \*3 (noting that a securities fraud plaintiff must " 'describe [its] sources with sufficient detail to support the probability that a person in the position occupied by the source would possess the information alleged' ") (quoting *Tellabs I,* 437 F.3d at 596).

**\*5** Plaintiffs have described the confidential witnesses with a high degree of specificity. For each CW, plaintiffs provide the witness's title, period of employment, and the state or

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 202 of 306 PageID #:2158

**Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

college in which each witness was employed. *See Tellabs I,* 437 F.3d at 597 (finding plaintiffs' descriptions of confidential witnesses' positions and dates of employment sufficient to show that witnesses were in a position to provide reliable information in determining whether defendants' statements were misleading). For example, plaintiffs describe CW1 as follows:

> Confidential Witness No. 1 ("CW1"), a former Career Services Representative at a Sanford–Brown Institute location in New Jersey from 2006 to 2009, and then the Director of Career Services in 2009 through December 2011, attests that there was tremendous pressure put on him/her daily to ... put CEC[ ] graduates on "waivers." Compl. ¶¶ 33–34.

Moreover, plaintiffs clearly identify the source of each particular allegation, explaining in each paragraph of the complaint exactly which CW reported what information. *See DeVry,* 2012 WL 1030474, at *3 (N.D.Ill. Mar.27, 2012) (emphasizing need to link anonymous sources with particular allegations). Plaintiffs also allege that all of their CWs worked as career services advisors or directors in varying geographic areas and that the CWs have reported that the practice of manipulating placement rates came from "all the way up" the corporate ladder. Compl. ¶ 112. Given all of these factors, plaintiffs' allegations regarding false reporting of placement rates meet the PSLRA's particularity requirements.

To be actionable, an alleged misleading statement must be material. Materiality requires "a substantial likelihood" that disclosure of CEC's actual placement rate "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, ——, 131 S.Ct. 1309, 1312, 179 L.Ed.2d 398 (2011) (citation omitted). Plaintiffs contend that had defendants reported CEC's actual, uninflated placement rates, plaintiffs and others would not have invested in CEC. Plaintiffs have alleged a company-wide, routine practice resulting in a substantial discrepancy between CEC's disclosed and actual placement rates. *See In re ITT Educ. Services, Inc. Sec. & S'holder Derivatives Litig.,* 859 F.Supp.2d 572, 580 (S.D.N.Y.2012) (finding for-profit school's alleged misrepresentation regarding employment placement rate immaterial because plaintiff failed to show an "especially egregious discrepancy between [the Company's] disclosed rate and its actual rate"). This, in turn, is substantially likely to have significantly altered the mix of information available to investors. To be more specific, because CEC's business model is based on offering "career-

oriented" education, a significant discrepancy in reported vs. actual placement rates of the sort that plaintiffs allege is substantially likely to have had an effect on how a potential investor viewed the company's revenues and prospects. Plaintiffs have thus met the requirements for pleading materiality.

**\*6** Plaintiffs also allege that the price of CEC's stock quickly diminished once news of CEC's improper placement practices was revealed in public disclosures following the company's receipt of the NYAG subpoena. The market's negative reaction further tends to show that defendants' alleged misstatements were material. *See Anderson v. Abbott Labs.,* 140 F.Supp.2d 894, 902 (N.D.Ill.2001) (even a small market reaction to an alleged misstatement suggests the misstatement was material to reasonable investors). For all of these reasons, plaintiffs have sufficiently alleged a substantial likelihood that disclosure of CEC's actual placement rate would have "significantly altered the reasonable investor's deliberations" during the relevant period. *See Matrixx Initiatives,* 131 S.Ct. at 1312.

### ii. Statements regarding regulatory compliance

Plaintiffs also allege that during the class period, defendants made misleading statements regarding CEC's compliance with legal and regulatory requirements, particularly with respect to Title IV eligibility. Plaintiffs point to such statements as:

> \# McCullough's statement in February 2009 regarding CEC's regulatory past: "[T]he most significant issues are behind us." Compl. ¶ 180.

> \# Graham's February 2009 statement regarding past compliance issues: "We've put almost all the legal issues behind us." *Id.* ¶ 181.

> \# McCullough's September 2009 statement regarding accreditation issues and lawsuits: "We've eliminated virtually all of those overhangs at this point in time." *Id.* ¶ 182.

> \# Graham's June 2010 statement: "[W]e've had a great increase in our culture in terms of compliance and quality." *Id.* ¶ 185.

> \# CEC's 2008 10–K: "We are committed to maintaining an industry-leading compliance program." *Id.* ¶ 190.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 203 of 306 PageID #:2159

Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

\# CEC's company spokesman's May 2011 statement regarding a new compliance culture: "[W]e have carefully reviewed and modified our policies and practices for reporting job placement rates, admissions and advertising." *Id.* ¶ 192.

Defendants contend that the first three statements, and others like them described in the complaint, cannot be misleading because they were true. Defs.' Opening Br. at 18. They argue that at the time the statements were made, CEC's major legal and compliance issues had been resolved—prior legal actions against CEC related to compliance had settled, and that Department of Justice and SEC investigations had resulted in no legal action being taken. *Id.* at 18. The PSLRA, however, requires a court to consider a complaint in its entirety and not simply assess individual allegations in isolation. *Tellabs II,* 551 U.S. at 322. It follows that CEC's statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation. *See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Allscripts–Misys Healthcare Solutions, Inc.,* 778 F.Supp.2d 858, 878 (N.D.Ill.2011) ("Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading.").

 **\*7** In a preliminary section of the complaint, plaintiffs outline CEC's long history of compliance troubles prior to the class period. They cite, among other things:

\# two lawsuits filed in 2003 that alleged fraudulent practices with respect to CEC's methods of reporting job placement rates and of passing accreditation audit inspections;

\# a 2004 securities fraud action alleging falsification of student records to increase graduation rates;

\# a probationary period imposed on CEC in 2005 by the Commission on Colleges of the Southern Association of Colleges and Schools for "failure to correct deficiencies of significant non-compliance";

\# a 2005 Department of Education ban on approving new school acquisitions or applications for additional branch campuses due to CEC's "history of non-compliance" and misrepresentations about graduate employment rates;

\# a 2005 SEC investigation regarding allegations that student records were falsified to maintain access to Title IV funds; and

\# a 2006 order from the Department of Education demanding the return of approximately $500,000 in federal financial student aid to resolve claims that students were not eligible for Title IV loans.

Compl. ¶¶ 54–75.

In their complaint, plaintiffs go on to detail how the matters listed above caused CEC's revenue and its stock price to drop, creating concern among various analysts, shareholders, and ultimately CEC's board of directors that the company was in dire need of an overhaul of its compliance regime. Plaintiffs conclude the complaint's historical section on CEC's regulatory past by providing allegations regarding CEC's cofounder's departure, followed by McCullough's recruitment and hiring, which plaintiffs allege CEC touted as ushering in a new era of reform at CEC.

The Court concludes that in light of these allegations, plaintiffs have adequately alleged that defendants' statements to the effect that CEC's "significant" legal issues had been put behind it were materially misleading. CEC made these statements during the class period, shortly after a change in management resulting directly from the company's poor compliance track record. Given that context, the statements reasonably could have been understood to convey the message that CEC had changed its placement-rate practices for which it had come under fire. Given the nature of CEC's tainted past, defendants' statements about the company's current status—that it had eliminated its significant regulatory issues—could have misled a reasonable investor to believe that CEC had remedied the practice that led to those problems—the company's alleged improper reporting of placement rates. *See Tellabs I,* 437 F.3d at 595. Plaintiffs have sufficiently alleged these statements were materially misleading.

Defendants also argue that the statements identified by plaintiffs regarding CEC's "culture of compliance" are mere puffery and too vague to be actionable. Again, as with all statements alleged to be materially misleading, this Court must take into account the context in which the statements were made to determine whether they amounted only to puffery. *See FTC v. Trudeau,* 579 F.3d 754, 766 (7th Cir.2009) ("In determining whether a statement is puffery, the context matters.") (citation omitted); *Casella v. Webb,* 883 F.2d 805,

**Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

808 (9th Cir.1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

 **\*8** In support of their argument, defendants rely on *Anderson v. Abbott Laboratories,* in which the court held that "[v]ague statements about industry leadership and unquantified growth are classic puffery." *Anderson,* 140 F.Supp.2d at 905. In that case, the court considered a company's statements that it was "a leader and has grown" and that it had "listened very closely to the customer to understand what the market wanted." *Id.* The court found that the statements were not only devoid of content, but more importantly that they were only tangentially related to the plaintiffs' allegations of regulatory noncompliance. *Id.* at 905–06. Absent any reference to regulatory issues, the court found that no reasonable investor could conclude from the statements that the company had no regulatory issues. *Id.*

In this case, by contrast, defendants' alleged statements were made in a context relating directly to regulatory compliance. The statements are not broad, commendatory, or generally optimistic statements regarding the overall health of the business. Rather, as is evident from their context, the statements reasonably could have been understood to convey that CEC had rectified a long period of sustained compliance problems. Put another way, a reasonable investor could understand CEC's representations about a "culture of compliance" to mean that the company was saying that it had brought its reporting practices into compliance with applicable standards. For these reasons, the Court rejects defendants' contention that these statements amounted only to non-actionable puffery.

Plaintiffs allege a third set of misleading statements, regarding defendants' accreditation status. But because plaintiffs have, by the allegations already discussed, met their burden of alleging the first requirement of a Rule 10b–5 claim, the Court need not address the statements in the third category.

### b. Scienter

Plaintiffs' claims require them to prove scienter, namely, that defendants intended "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 188, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). This means that plaintiffs must prove that defendants either knew the particular statement was false or were reckless in disregarding a substantial risk that it was

false. *Tellabs III,* 513 F.3d at 704. In this context, recklessness is defined as an "extreme departure from the standards of ordinary care" such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *Id.*

As stated above, the PSLRA requires a plaintiff to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u–4(b)(2). To determine whether a strong inference of scienter exists, a court must engage in a comparative analysis. First, the court must accept as true all factual allegations in the complaint; second, the court must consider all of the facts alleged as a collective whole; and third, the court must take into account plausible innocent explanations for the defendant's conduct. *Tellabs II,* 551 U.S. at 322. Ultimately, a complaint satisfies the PSLRA's requirements if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324.

 **\*9** Plaintiffs' complaint contains a number of allegations that, when taken collectively, support a strong inference of scienter. As discussed above, the CWs cited by plaintiffs have detailed facts supporting the claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive. The magnitude of defendants' alleged fraud lends weight to plaintiffs' allegations of scienter. *See Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware ... and the stronger is the inference that defendants must have known.").

Further, the facts alleged in the statements of the CWs indicate that "everyone" at CEC, including McCullough, was informed directly of problems regarding CEC's placement rates but nevertheless made contrary representations. Compl. ¶ 109. For instance, CW1 states that short-term health fair placements were widely and regularly discussed on weekly conference calls for CEC career services directors and that the improper practices were "encouraged and condoned." *Id.* ¶ 110. Plaintiffs also allege in the complaint that CW1 delivered a PowerPoint presentation regarding short-term job placements to the CEC divisional director responsible for overseeing all of the Presidents at CEC's colleges. According to CW1, the divisional director thought the presentation was "fabulous" and raised no objections to counting short-term jobs in CEC's reported placement rates. *Id.* ¶ 111. Given CEC's history of non-compliance, it is highly unlikely that

Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

none of the career services directors or the divisional director were aware that it was improper to count short-term jobs in CEC's reported rates.

Defendants posit that other facts alleged in the complaint give rise to inferences contrary to a finding of scienter that tip the scale in their favor. Specifically, defendants argue that their decision to immediately investigate CEC's reporting practices following receipt of the NYAG subpoena is evidence that the company was doing "exactly what [it] should have done." Defs.' Opening Br. at 27. But it is at least an equally plausible and compelling inference that, given what plaintiffs have alleged about CEC's checkered past and its subsequent claims of renewed compliance, defendants initiated the inquiry as an exercise in damage control and to head off further investigations. Indeed, defendants' decision not to extend the investigation to earlier years covered by the class period —years for which plaintiffs' CWs allege massive reporting problems—lends credence to this contrary inference.

Plaintiffs also sufficiently allege an inference of scienter with respect to CEC's CEO, McCullough. For example, CW1 states that McCullough attended a three-day conference of career services directors at CEC's headquarters and that he told the attendees what a "great job" they were doing, specifically with respect with short-term placements. *Id.* ¶ 110. Defendants argue that this merely suggests an inference that McCullough supported the practice of having graduates work at health fairs. But such an inference is not more compelling than the opposing inference, when one considers the complaint in its entirety. *Tellabs II,* 551 U.S. at 322 (explaining that the inquiry "is whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard"). Though McCullough's claimed knowledge that students were taking shortterm jobs does not necessarily indicate awareness that those jobs were being reported improperly, "when facts known to a person place him on notice of risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs III,* 513 F.3d at 704.

 **\*10** Plaintiffs allege facts supporting an inference that McCullough was on such notice. Indeed, CEC's public statements suggest that McCullough was hired for the express purpose of, among other things, fixing CEC's compliance problems regarding its placement reporting. The complaint supports this claim with various public statements made by CEC upon McCullough's hiring, for instance: "[McCullough] has the critical qualities we were looking for

in an individual to lead ... a highly regarded record in guiding a regulated organization that places a premium on controls and procedures." Compl. ¶ 81. Moreover, as discussed above, McCullough made numerous public pronouncements in which he asserted that CEC was working on and had accomplished this task. One may readily and reasonable infer from these facts that McCullough made it his business to look into CEC's reporting practices, determine what constituted proper reporting, and bring the company into compliance. *See In re Countrywide Fin. Corp. Derivative Litig.,* 554 F.Supp.2d 1044, 1060 (C.D.Cal.2008) (finding plaintiffs properly pled scienter as to directors who were "specifically tasked with monitoring" the very issues that underlay the allegations of fraud). Given this responsibility, the complaint sufficiently supports a reasonable inference, as compelling as any contrary inference, that McCullough was aware that, for instance, short-term placements at health fairs should not be considered "placements" but that CEC nonetheless was reporting them as though they amounted to permanent employment. *See Desai v. Gen. Growth Properties, Inc.,* 654 F.Supp.2d 836, 860 (N.D.Ill.2009) (stating that a strong inference of scienter may be found where "it is almost inconceivable" that an individual defendant would be unaware of the matters at issue).

Plaintiffs also allege that McCullough's resignation the day before the results of the Dewey investigation were announced shows that he made the alleged misleading statements with scienter. Defendants argue that this allegation, standing alone, does not suggest any knowledge regarding the misleading nature of the challenged statements. The Seventh Circuit has not examined in detail the impact of a corporate officer's resignation on a finding of scienter. The Ninth Circuit and district courts in that circuit have ruled that an inference of scienter arises only when a resignation or termination is accompanied by additional evidence of the defendant's "wrongdoing." *See, e.g., Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1002 (9th Cir.2009) (finding no inference of scienter where complaint merely alleged CFO's resignation in close proximity to alleged fraud); *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1273–74 (N.D.Cal.2000) (finding strong circumstantial evidence of fraud from multiple public statements by new corporate chairman and CEO that the terminated executives were fired for cause because they knew or should have known of the fraudulent accounting practices); *Middlesex Ret. Sys. v. Quest Software Inc.,* 527 F.Supp.2d 1164, 1188 (C.D.Cal.2007) (finding support for inference of scienter where officer resigned specifically to avoid cooperating with

Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

internal investigation). But even if a bare allegation of a high officer's resignation is not enough to support an inference of scienter, that is not the situation here. Plaintiffs have alleged that McCullough's resignation preceded the disclosure of CEC's placement rate improprieties by only one day and that three other senior vice presidents resigned concurrently. Just as importantly, given the complaint's additional allegations regarding McCullough's knowledge of improper practices, the timing of his resignation lends weight to a finding of scienter.

**\*11** Defendants also argue that plaintiffs' failure to allege any personal motive to defraud causes the scienter needle to move in their favor. But defendants' argument regarding McCullough's lack of personal motive to gain financially does not add much to their argument. Though it is true that motive can be a relevant consideration, and personal financial gain may weigh in favor of an inference of scienter, "the absence of a motive allegation is not fatal." *Tellabs I,* 437 F.3d at 601. In the present context, where the complaint's other allegations provide a strong basis to infer intent, there is little if any significance attributable to the absence of an allegation of a personal financial motive. Consequently, plaintiffs have alleged sufficient facts supporting the strong inference that McCullough acted with scienter.

By contrast, plaintiffs allege insufficient facts to permit a reasonable inference of scienter with respect to CFO Graham. Under the PSLRA, "plaintiffs must create a strong inference of scienter with respect to *each* individual defendant." *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir.2008) (emphasis added); *Tellabs II,* 551 U.S. at 326 ("[A]llegations of scienter made against one defendant cannot be imputed to all other individual defendants."). In their complaint, however, plaintiffs allege merely that Graham was the CFO of CEC, that he "knew" about all material aspects of CEC's operations, and that he approved the company's SEC filings. Compl. ¶ 23. Plaintiffs allege no direct interaction that any CW had with Graham, nor do they allege how he would be privy to information that would make his allegedly misleading statements knowingly or recklessly false. Plaintiffs' claim against Graham cannot survive "on information and belief" alone. *Davis v. SPSS, Inc.,* 385 F.Supp.2d 697, 718 (N.D.Ill.2005) (stating that a plaintiff must provide "some basis for his belief" at the motion to dismiss stage). The Court concludes that plaintiffs have alleged insufficient facts to support a strong inference of scienter against Graham.

**c. Loss causation**

The final element in dispute regarding plaintiffs' section 10(b) claim is loss causation. To state a claim, a plaintiff must allege that "the act or omission of the defendant alleged to violate [section 10(b) ] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). Although a plaintiff need not plead this causal connection with particularity, a simple allegation that "the price on the date of a stock's purchase was inflated due to the misrepresentation" does not suffice. *Dura Pharm., Inc. v. Brondo,* 544 U.S. 336, 342–43, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("[T]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.") (citation omitted). Rather, Plaintiffs must allege that "but for the circumstances that the fraud concealed, the investment ... would not have lost its value." *Ray v. Citigroup Global Markets, Inc.,* 482 F.3d 991, 995 (7th Cir.2007) (internal quotation marks omitted).

**\*12** In this case, because plaintiffs are pursuing a "fraud-on-the-market" theory of loss causation, they must allege that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the stock's value deteriorated once the market learned of the deception. *Id.* at 995. Plaintiffs may satisfy the second part of this test by alleging the existence of a "corrective disclosure," in which the truth about the previously misrepresented information was revealed and was followed by a decline in stock price. *See, e.g., In re Williams Sec. Litig.-WCG Subclass,* 558 F.3d 1130, 1137 (10th Cir.2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops").

Plaintiffs allege that in 2011, a series of corrective disclosures about CEC's alleged misrepresentations caused CEC's stock price to fall. According to the allegations in the complaint, CEC released its first corrective disclosure on May 24 via a Form 8–K in which the company stated that it had received a subpoena from the NYAG in connection with an investigation of whether it was in compliance with state consumer protection laws. Specifically, CEC stated in the Form 8–K that "[p]ursuant to the [s]ubpoena, the Attorney General has requested ... documents and detailed information on a broad spectrum of business practices for the time period May 17, 2005 to the present." Compl. ¶ 125. The next day, the price of CEC stock dropped by 5.16%. On August 3, CEC released a second Form 8–K, announcing that it had found "improper practices" at certain of its health education segment campuses relating to the determination of reported placement rates. *Id.* ¶ 126. The price of CEC stock promptly

dropped by another 15.4%. Plaintiffs go on to detail in their complaint the subsequent Dewey investigation regarding CEC's placement-rate practices, the results of which were reported to ACICS and in a November 1, 2011 press release. This third disclosure stated that—based on an investigation of CEC's reported 2010–11 placement rates—CEC "did not meet applicable placement guidelines." The stock price then fell for a third time, by 54%. *Id.* ¶ 128. Finally, on November 21, CEC announced in another Form 8–K that in response to the findings reported in the Dewey investigation, the company had received a letter from ACICS directing it to show cause why the accreditations of CEC's schools should not be suspended. *Id.* ¶ 132. The price of CEC's stock then fell by an additional 6.2%.

Defendants contend that plaintiffs' allegations fail to state a viable claim of loss causation for the company's alleged misrepresentations concerning years prior to the 2010–11 reporting period. In doing so, defendants focus on the November 1 press release, which disclosed Dewey's determination of CEC's improper placement practices, but only with respect to CEC's 2010–11 reporting period. Because the November 21 disclosure of the show cause demand was also based on Dewey's findings, CEC argues that it, too, was limited to informing the market of alleged misrepresentations for the 2010–11 reporting period. CEC does not address plaintiffs' allegations regarding the May 24 and August 3 disclosures.

**\*13** The Court agrees that neither the November 1 press release nor the November 21 show cause disclosure contained any information exposing CEC's alleged misrepresentations that had occurred prior to the 2010–11 reporting period. Corrective disclosures limited to exposing misrepresentations from a specific time period apply only to that time period. *See Tricontinental Indus., Ltd. v. Pricewaterhouse Coopers, LLP,* 475 F.3d 824, 843 (7th Cir.2007) (granting motion to dismiss because disclosure about misrepresentations expressly limited to 1998 and 1999 did not correct alleged misrepresentation from 1997).

Plaintiffs' allegations regarding CEC's May 24 Form 8–K disclosure are equally unavailing. Although the disclosure refers to a period as far back as 2005, it mentions nothing about CEC's improper *reporting* practices—only that the NYAG's subpoena relates to a "broad spectrum of *business* practices." Compl. ¶ 125 (emphasis added). The generic reference to business practices logically includes more than just reporting practices. Thus the decline in CEC's stock price

following that disclosure could be attributable to some factor other than reporting practices. For this reason, the allegation that CEC's May 24 Form 8–K disclosure is "corrective" is insufficient to give rise to a viable claim of loss causation. *See Dura Pharm.,* 544 U.S. at 343–45 (emphasizing need to link the inflated purchase price and later economic loss because "other factors" outside of the alleged fraud can cause a loss in investment value).

CEC's August 3, 2011 disclosure, however, is sufficient in this regard. CEC's August 3 Form 8–K relates directly to the alleged misrepresentations regarding the company's practices in reporting placement rates. Moreover, the disclosure is not limited to any specific time period, suggesting that the "improper practices" referenced in the disclosure could have occurred before the 2010–11 reporting period. Because plaintiffs have alleged a sufficient connection between CEC's August 3 disclosure and the alleged fraud, the Court concludes that they have adequately alleged loss causation.

**2. Section 20(a) claims**

To state a claim under section 20(a) of the Exchange Act, a plaintiff must allege: (1) a primary securities violation; (2) the individual defendant exercised general control over the issuer's operations; and (3) the individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992). Because section 20(a) claims sound in fraud, plaintiffs must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Zurich Capital Markets Inc. v. Coglianese,* 332 F.Supp.2d 1087, 1109–10 (N.D.Ill.2004). They are not, however, required to meet the even more stringent requirements of the PSLRA. *Id.*

**\*14** Because the Court has found insufficient plaintiffs' scienter allegations regarding Graham, it addresses the section 20(a) claim only as to defendant McCullough. For the reasons discussed earlier, plaintiffs have satisfied the first element of the test for a section 20(a) claim. CEC, however, disputes plaintiffs' allegations regarding any of the individual defendant's ability to control CEC's operations. In response, plaintiffs argue that McCullough was a controlling person by virtue of his positions as a senior executive officer and director of CEC, his ability to approve content of CEC's public statements, and his ability to control CEC's day-to-day operations. Compl. ¶ 286. "Determination of whether an individual defendant is a 'controlling person' under section

**Ross v. Career Educ. Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck and Co. Sec. Litig.,* 291 F.Supp.2d 722, 727 (N.D.Ill.2003) (quoting *Lindelow v. Hill,* 2001 WL 830956, at *9 (N.D.Ill. July 20, 2001). Plaintiffs have sufficiently alleged a section 20(a) claim.

**Conclusion**

For the reasons stated above, the Court grants Defendants' motion to dismiss [docket no. 52] with respect to Graham but otherwise denies the motion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5363431, Fed. Sec. L. Rep. P 97,070

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

2020 WL 2542154
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,
v.

Seyed Taher KAMELI, Chicagoland
Foreign Investment Group,
LLC, and American Enterprise
Pioneers, Inc., Defendants,
and
Bright Oaks Platinum Portfolio, LLC,
Platinum Real Estate and Property
Investments, Inc., and Bright Oaks
Development, Inc., Relief Defendants.

Case No. 17 C 4686
|
Signed 05/19/2020

**Attorneys and Law Firms**

Alyssa A. Qualls, Eric M. Phillips, BeLinda I. Mathie, Steven Lee Klawans, Tracy W. Lo, U.S. Securities and Exchange Commission, Chicago, IL, for Plaintiff.

John Nicolas Albukerk, Albukerk and Associates, Oak Park, IL, Taher Kameli, Kameli & Associates, P.C., Chicago, IL, for Defendants.

John Nicolas Albukerk, Albukerk and Associates, Oak Park, IL, for Relief Defendants.

**MEMORANDUM OPINION AND ORDER**

Joan B. Gottschall, United States District Judge

**\*1** The U.S. Securities and Exchange Commission ("SEC" or "Commission") filed this enforcement action against Sayed Taher Kameli ("Kameli") alleging that he violated § 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.[1] Also

named as defendants are two corporations owned by Kameli: Chicagoland Foreign Investment Group, LLC ("CFIG") and American Enterprise Pioneers, Inc. ("AEP") (Kameli, CFIG, and AEP, "defendants"). Before the court is defendants' motion to dismiss the SEC's Second Amended Complaint ("SAC" or "the complaint"). For the reasons explained below, the motion is denied.

**I. Background**

**A. The EB-5 Program**
The securities fraud alleged by the SEC involved investments that Kameli offered pursuant to the U.S. Immigrant Investor Program, 8 U.S.C. § 1153(b)(5)(A). Created as part of the 1990 Immigration Reform Act, Pub. L. No. 101-649, 104 Stat 4978, the Program offers U.S. citizenship to foreign nationals who invest the requisite amount of capital in the U.S. (in this case, $500,000)[2] leading to the creation of ten full-time jobs. The program is commonly referred to as the "EB-5 Program" because it is included among employment-based visas, and is ranked fifth in the order according to which employment-based visas are to be allotted. *See U.S. Sec. & Exch. Comm'n v. Hui Feng*, 935 F.3d 721, 725 n.2 (9th Cir. 2019).

Applicants begin by filing a petition referred to as a "Form I-526," presenting evidence that the petitioner has invested or is in the process of investing in a commercial enterprise that will create full-time positions for at least ten employees. If approved, the investor is granted a conditional green card conferring U.S. residency for a period of two years. The applicant then files a Form I-829, demonstrating that the investment has in fact created or preserved at least ten permanent full-time jobs for U.S. workers. If the Form I-829 is approved, the conditions on the investor's green card are removed and he or she becomes a lawful permanent resident. If not, the investor loses his or her conditional permanent residency and is not granted a visa.

**B. The SAC's Factual Allegations**
**\*2** According to the SAC, whose allegations the court take as true for purposes of this motion, *see, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 707 F. Supp. 2d 774, 781 (N.D. Ill. 2010) (citing *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007)), Kameli is an immigration attorney who heads his own law firm. Beginning around 2009, the SEC alleges that Kameli began offering foreign

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 210 of 306 PageID #:2166

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)
2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

nationals an opportunity to obtain EB-5 visas by investing in the creation and development of facilities providing memory care and/or assisted living services for senior citizens. Kameli initially planned four such facilities in Illinois: Aurora Memory Care, LLC d/b/a Bright Oaks of Aurora, LLC (the "Aurora Project"); Elgin Memory Care, LLC d/b/a Bright Oaks of Elgin, LLC (the "Elgin Project"); Golden Memory Care, Inc. d/b/a Bright Oaks of Fox Lake, Inc. (the "Golden Project"); and Silver Memory Care, Inc. d/b/a Bright Oaks of West Dundee, Inc. (the "Silver Project").[3] A separate fund was created to lend money to each Project: Aurora Assisted Living EB–5 Fund, LLC (the "Aurora Fund"); Elgin Assisted Living EB–5 Fund, LLC (the "Elgin Fund"); Golden Assisted Living EB–5 Fund, LLC (the "Golden Fund"); and Silver Assisted Living EB–5 Fund, LLC (the "Silver Fund"), respectively.[4] Each Fund used investors' money to make a loan to its associated Project for the development and construction of its affiliated senior living facility.

Later, Kameli followed the same pattern in Florida, planning the development and construction of four senior living facilities in various locations. He created four Funds: First American Assisted Living EB–5 Fund, LLC (the "First American Fund"); Naples Memory Care EB–5 Fund, LLC (the "Naples Fund"); Ft. Myers EB–5 Fund, LLC (the "Ft. Myers Fund"); and Juniper Assisted Living EB–5 Fund, LLC (the "Juniper Fund").[5] Again, each Fund loaned money to its associated Project for the development of a senior living center: First American Assisted Living, Inc. (the "First American Project") for a facility to be located in Wildwood, Florida; Naples ALF, Inc. (the "Naples Project") for a facility to be located in Naples, Florida; Ft. Myers ALF, Inc. (the "Ft. Myers Project"), for a facility to be located in Ft. Myers, Florida; and Juniper ALF, Inc. (the "Juniper Project") for a facility to be located in Sun City, Florida.[6]

In addition to the Funds and Projects, Kameli created a number of other corporations to manage them. The Illinois Funds were managed by Chicagoland Foreign Investment Group ("CFIG"). The Florida Funds were managed by American Enterprise Pioneers ("AEP"), a CFIG subsidiary. In addition to management services, Kameli created several other corporations to provide development services to the various Projects. The development services were initially provided by CFIG. In 2013, however, Kameli created Bright Oaks Group, Inc. and Bright Oaks Development, Inc. (together, "Bright Oaks") to provide business and development services to the Projects. Nader Kameli ("Nader"), Kameli's brother, served as the CEO of CFIG and later, CEO of Bright Oaks.

The specific terms of the investments were set forth in Private Placement Memorandums ("PPMs"). Although the PPMs for each Fund differed in their details, the general terms of the investments were largely the same. Each individual submitted a Subscription Agreement along with a capital contribution of $500,000. Kameli also charged investors an administrative fee of between $35,000 and $75,000. Initially, investors' money was held in an escrow or investor holdings account pending approval of their I-526 Petitions. If denied, investors typically received their money back. If granted, the investor's money was released into the relevant Fund. Investors' money was pooled together and lent to the affiliated Project. Once the senior living facility became operational, the Project would begin repaying the loans from the Funds, allowing investors to recoup their principal plus interest. Loan interest was also to be used to pay CFIG and AEP for their management services, which meant that they would not begin receiving compensation until after the Projects had become operational. Most of all, creation of the senior living facilities would create the jobs necessary to fulfill the EB-5 Program's requirements.

**\*3** In all, between 2009 and 2016, Kameli raised approximately $88.7 million in investment proceeds from at least 226 foreign investors. He also collected several million in administrative fees. According to the SEC, however, only one of the senior living facilities – the Aurora facility – is up and running (though several years behind schedule and at double the projected cost). The Commission alleges that the other Illinois Projects are behind schedule and have run out of money. Ground has yet to be broken on any of the Florida Projects. To date, most of the Illinois investors' I-526 Petitions have been granted. In the case of the Florida Funds, a number of First American Fund investors' I-526 Petitions have been granted. The petitions of investors in the other Florida Funds have for the most part not been acted on. The SAC does not specifically state whether any of the I-829 Petitions have been granted.[7]

### C. The SAC's Causes of Action

According to the SEC, defendants engaged in a range of illegal conduct in their handling of the investments. The details of the alleged misconduct are discussed more fully below. However, the SAC's central allegations are that defendants: (1) charged several of the Funds and Projects more than $4 million in undisclosed fees; (2) used

approximately $16 million of investors' funds to engage in securities trading; (3) used the money of certain Silver Fund investors as collateral to establish a line of credit ("the Silver Line of Credit"), which defendants then used for their own benefit and the benefit of Funds and Projects other than the Silver Fund; and (4) made an undisclosed profit of roughly $1 million by acquiring parcels of land through a separate entity owned by Kameli, Platinum Real Estate and Property Investments, Inc. ("Platinum"), and selling them at a higher price to the Florida Projects.

The Commission alleges that defendants' actions violated both § 17(a) of the Securities Act and § 10(b) and Rule 10b-5 of the Exchange Act. The statutes are very similar. The main difference is "that § 10(b) and Rule 10b–5 apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). Section 17(a) and Rule 10b-5 both include three subsections. Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud"; subsection (2) makes it unlawful to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ... not misleading"; and subsection (3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a). Similarly, Rule 10b-5(a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud'; subsection (b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading"; and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a)-(c).

The SEC alleges that defendants violated all three subsections of both § 17(a) and Rule 10b-5. They claim that defendants' actions constitute a scheme to defraud and fraudulent practices or courses of business under §§ 17(a)(1) and (a)(3) and under Rule 10b-5(a) and (c); and that, because defendants' actions were contrary to key representations in the PPMs, defendants have made misleading statements in violation of § 17(a)(2) and Rule 10b-5(b).

### D. Procedural History

**\*4** The SEC's original complaint, filed in June 2017, consisted of three counts—one alleging violations of § 17(a),

one alleging violations of § 10(b)/Rule 10b-5, and one alleging "control person" liability against Kameli under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The SEC also moved for a temporary restraining order and a preliminary injunction prohibiting defendants from further violations of the securities laws and further participation with the EB–5 Program. The court held a hearing on the motion over the course of several days and denied the motion. *See United States Sec. & Exch. Comm'n v. Kameli*, 276 F. Supp. 3d 852, 875 (N.D. Ill. 2017). After defendants moved to dismiss the complaint, the SEC filed an amended complaint (the "First Amended Complaint," "FAC"). Defendants moved to dismiss the FAC, asserting, among other grounds, that the FAC failed to comply with Federal Rule of Civil Procedure 9(b). The court granted the motion. *See United States Sec. & Exch. Comm'n v. Kameli*, 373 F. Supp. 3d 1194, 1204 (N.D. Ill. 2019).

The Commission subsequently filed a second amended complaint ("SAC"). Defendants have again moved to dismiss, adducing no fewer than twenty separate grounds for dismissal. They assert that the SAC still falls short of Rule 9(b)'s pleading requirements. In addition, they assert that the SEC has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court discusses these in turn. First, however, it is necessary to address a number of preliminary issues.

## II. Preliminary Issues

### A. Jurisdiction

Among their many other asserted bases for dismissal, defendants contend that the suit must be dismissed for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Although not raised until the middle of defendants' opening brief, and although, as noted below, defendants' argument betrays some ambiguity regarding the extent to which it challenges the court's jurisdiction, the court must be vigilant regarding the existence of jurisdiction, and must address jurisdictional questions before considering issues on the merits. *See, e.g.*, *Cobbs v. Chiapete*, 770 F. App'x 282, 284 (7th Cir. 2019) ("Subject-matter jurisdiction is the first issue any federal court must address.").

Defendants contend that the court lacks jurisdiction over the suit because the investor funds used as collateral for the Silver Line of Credit do not constitute "securities" within the meaning of § 10(b) and § 17(a). As noted above, the

SEC alleges that defendants collateralized a line of credit using the funds of Silver Fund investors. The SEC also alleges that defendants used the Silver Line of Credit for expenses unrelated to the Silver Fund. According to the SEC, this constituted fraud against Silver Fund investors because defendants represented to investors that their funds would be used only for the Silver Fund's benefit. (As is discussed more fully below, *see* section IV.H.1, *infra*, defendants dispute that they made such representations). They also argue, however, that since the funds used to collateralize the line of credit were still in the holdings accounts, they did not constitute "securities" within the meaning of § 17(a) and § 10(b). Rather, citing language in the Silver Fund offering documents, defendants contend that the interests in the Funds became securities only after investors' I-526 Petition were approved and their assets were transferred to the Silver Fund. *See, e.g.*, First Supplement to Silver Fund PPM, ECF No. 128-3 at 2 (defining Members of the Silver Fund as "each person who (i) executes such documents and instruments as the Manager requires, (ii) makes its Capital Contribution, and (iii) in the case of an Immigrant Investor, *has an I-526 Petition approved* by USCIS") (defendants' emphasis). Since § 17(a) and 10b-5 apply only to securities, defendants maintain that the court lacks subject-matter jurisdiction.

**\*5** The parties discuss the definitional issue in some depth but largely ignore the jurisdictional aspect of the dispute. As it turns out, however, the jurisdictional issue can be resolved without addressing the meaning of "securities" under the antifraud statutes.[8] This is for at least two reasons. First, defendants' argument implicates only the assets of Silver Fund investors. Thus, even if defendants were correct in regarding the definition of "securities," this would have no bearing on the SEC's claims involving other conduct and other Funds (e.g., defendants' alleged use of various Projects' assets to trade securities). Notably, while defendants conclude their argument by asserting that all of the SAC's counts must be dismissed for lack of subject-matter jurisdiction, *see* MTD 72 ("Plaintiff's claims fail for a lack of subject matter jurisdiction in accordance with Federal Rule of Civil Procedure 12. Therefore, counts one through fifteen must be dismissed with prejudice."), they assert elsewhere in the course of the argument that "the claims against Defendants that rest upon alleged wrongdoing *in regard to the Silver Line of Credit* must be dismissed for lack of subject matter jurisdiction," *id.* at 69 (emphasis added). In any case, the argument fails, regardless of what specific conclusion defendants believe may be entailed by it.

Second, defendants' argument fails even with respect to the claims premised on defendants' alleged wrongdoing in connection with the Silver Line of Credit. This is because, according to the SEC, defendants' alleged misconduct involving the Silver Line of Credit involved fraud not only against Silver Fund investors but against investors in other Funds as well. On the one hand, the SEC alleges that defendants misled Silver Fund investors by using the Silver Line of Credit for improper purposes. However, defendants' use of the Silver Line of Credit is also implicated in misrepresentations to investors in other Funds. For example, the SAC alleges that in December 2013, Kameli and CFIG improperly used $141,000 from the Silver Line of Credit to pay for certain of the Elgin Project's expenses. SAC ¶ 217. According to the Commission, this constituted fraud not only against investors whose funds were used to collateralize the line of credit (because defendants led these investors to believe that the line of credit would be used solely for the benefit of the Silver Fund), but also against Elgin Fund investors (because, among other things, the Elgin Fund PPM led investors to believe that the Elgin Project would be funded solely by the assets of Elgin Fund investors). *Id.* ¶ 222. The SEC's allegations regarding defendants' misrepresentations vis-à-vis the Elgin Fund investors forms the basis for a claim under § 17(a) and § 10(b) irrespective of whether the assets used to collateralize the Silver Line of Credit can be deemed "securities" under the statutes.

**\*6** For these reasons, defendants' definitional argument concerning the meaning of "securities" does not call into question the court's subject-matter jurisdiction over the suit.[9]

**B. Statute of Limitations**

A second preliminary issue raised by defendants (again, only in the middle of their opening brief) is their contention that the SEC's claims relating to the Golden, Elgin, and Aurora Funds are time-barred. It is well-settled that SEC enforcement actions seeking civil penalties are subject to 28 U.S.C. § 2462, the five-year statute of limitations period that generally applies to actions brought by the federal government. 28 U.S.C. § 2462 ("Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."); *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1645 (2017) ("Disgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462. Accordingly,

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued."). Because the Commission filed this suit on June 22, 2017, the limitations period began to run on June 22, 2012. Defendants argue that this bars the SEC's claims relating to the Golden, Elgin, and Aurora Funds because their PPMs were issued prior to June 22, 2012. Since the SEC's claims are based on alleged misrepresentations or omissions contained in the PPMs, defendants assert that the claims relating to these funds fall outside of the limitations period and are not actionable.

Mysteriously, the SEC has not responded to this argument. It seems unlikely that the Commission intended to concede the issue, however, because it is plainly incorrect. First, while the Golden, Elgin, and Aurora PPMs were issued prior to the limitations period, the SAC specifically alleges that defendants continued to use these offering documents until 2014. The SAC also specifically alleges that defendants' improper conduct did not begin, and hence the PPM's statements did not become false/misleading, until after June 22, 2012.[10] Thus, at least some of the conduct forming the basis for the SEC's claims involving these funds is alleged to have occurred within the limitations period.

 **\*7**  To be sure, the SAC alleges that the Elgin and Aurora Funds made undisclosed payments to CFIG prior to June 2012. *See* SAC ¶¶ 210, 251. It is not clear why this should render the claims time-barred, however, because in each case, the alleged payments continued until October 2012 for the Elgin Fund, *id.* ¶ 210, and until February 2016 for the Aurora Fund, *id.* ¶ 251. (Neither party discusses whether the continuing-violation doctrine might be applicable here). Further, many of the SEC's claims relating to the Elgin and Aurora Funds are based on entirely different representations that became false/misleading based on separate conduct that is alleged to have occurred much later. *See, e.g.*, *id.* ¶ 265 (alleging that, "[f]rom April 2013 to July 2013, Kameli and CFIG caused the Aurora Project to use money it borrowed from the Aurora Fund to trade in securities"); *id.* ¶ 225 (alleging that "[f]rom April 2013 to April 2015, Kameli and CFIG caused the Elgin Project to use money it borrowed from the Elgin Fund to trade in securities"). Finally, defendants' argument appears to address the timeliness of these claims only insofar as they are based on misrepresentations (i.e., those under Rule 10b-5(b) and § 17(a)(2)). The argument thus does not apply to the SEC's claims that are based on other conduct (i.e., claims involving the Elgin and Aurora Funds based on Rule 10b-5(a) and (c) and §§ 17(a)(1) and (3)). In

short, even if the claims involving the Golden, Elgin, and Aurora Funds were time-barred as to some of defendants' alleged misconduct, the claims would not be time-barred *in toto*.

The parties separately dispute whether § 2462 applies to the SEC's request for injunctive relief, which seeks a permanent injunction "enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order," from "engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object," in violation of § 10(b) and § 17(a). SAC 111. There is much disagreement among courts as to whether requests for injunctive relief are subject to § 2462's limitations period. *Compare Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019) (request for injunctive relief not subject to § 2462's five-year limitations period); *Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357, 1360 (11th Cir. 2016) (same); *United States v. Telluride Co.*, 146 F.3d 1241, 1248 (10th Cir. 1998), *with S.E.C. v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) ("Based on the severity and permanent nature of the sought-after remedies, the district court did not error [sic] in denying the SEC's request on grounds that the remedies are punitive, and are thus subject to § 2462's time limitations."); *Sec. & Exch. Comm'n v. Bio Def. Corp.*, No. CV 12-11669-DPW, 2019 WL 7578525, at \*11 (D. Mass. Sept. 6, 2019).

Although the Seventh Circuit has not addressed the question, district courts in this circuit have generally held, in a range of different statutory contexts, that requests for injunctive relief are not subject to § 2462's limitations period. *See, e.g.*, *United States Sec. & Exch. Comm'n v. Battoo*, 158 F. Supp. 3d 676, 691 (N.D. Ill. 2016) ("In view of the distinction between, on the one hand, fines, penalties, and forfeitures, and on the other hand, equitable relief like injunctions and disgorgement, the Court concludes that § 2462 does not bar the SEC's claim for disgorgement and injunctive relief arising from pre-September 6, 2007 conduct."); *S.E.C. v. Ogle*, No. 99 C 609, 2000 WL 45260, at \*3–4 (N.D. Ill. Jan. 11, 2000) ("Section 2462 does not apply to SEC civil enforcement actions seeking equitable relief because equitable remedies merely preserve the status quo; they do not constitute a punitive award. In fact, SEC actions pursuing a public right and seeking equitable relief are not subject to any limitations period. Accordingly, the claims in support of equitable remedies are timely.") (citations omitted); *see also United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1087 (W.D. Wis. 2001) ("Because

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

nothing in the Clean Air Act itself or § 2642 precludes the government from seeking injunctive relief beyond the five year statute of limitations period, plaintiff's claims for injunctive relief for claims one, two and three are not barred by the statute of limitations even if § 2462 precludes it from recovering damages."); *United States v. U.S. Steel Corp.*, 966 F. Supp. 2d 801, 810 (N.D. Ind. 2013) ("Numerous courts have addressed this issue, and they have converged on a relatively simple analysis. Section 2462's limitations period does not apply to injunctive relief if the injunction is actually remedial—i.e., if it seeks to undo prior damage or protect the public from future harm. On the other hand, Section 2462 does bar injunctive relief if it is really just a facade for a penalty or a forfeiture—i.e., where the injunctive relief sought is punitive in nature.") (citations and quotation marks omitted).

 **\*8**  In light of the foregoing, however, it is unnecessary to reach the issue here. For courts holding that requests for injunctive relief are not subject to § 2462 have concluded that such requests are not subject to *any* time limitation. *See, e.g., United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) (concluding that request for equitable relief was not time-barred under § 2462 and citing the "well-established rule that an action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it' ") (quoting *E.I. du Pont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)). Thus, having concluded that there is no time-bar to the claims relating to the Golden, Elgin, and Aurora Funds insofar as they seek civil penalties (and thus are plainly subject to § 2462), it follows that the claims are also not time-barred insofar as they seek injunctive relief.[11]

### C. Motion to Strike

A third and final preliminary issue is raised by the SEC's separate motion to strike defendants' motion to dismiss, or certain of the documents and exhibits cited within it. In each case, the exhibits in question are ultimately irrelevant to the court's analysis. Accordingly, the court denies the motion to strike as moot. However, because defendants rely on the exhibits to support a variety of different arguments, the basis for the court's determination is most usefully explained as these arguments arise in what follows.

### III. Rule 9(b)

The court now turns to defendants' arguments for dismissal based on the SAC's purported pleading deficiencies. Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b). *See, e.g., Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019); *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990). Rule 9(b) "requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud'. Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). "[T]he precise level of particularity required under Rule 9(b) depends upon the facts of the case." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). Thus, for example, where the scheme takes place over a long period of time, less specificity may be required. *See, e.g., Onesti v. Thomson McKinnon Sec., Inc.*, 619 F. Supp. 1262, 1265 (N.D. Ill. 1985) ("Rule 9(b)'s more stringent requirements must be read in conjunction with Rule 8, which requires a short and plain statement of the claim. The sufficiency of a pleading under these rules varies with the complexity of the transaction. When the transactions are numerous and take place over an extended period of time, less specificity is required.") (citations omitted).[12]

### A. The Second Amended Complaint's Factual Allegations
 **\*9**  In its opinion dismissing the FAC, the court indicated that the SEC had failed to comply with Rule 9(b) in several key respects. The central problem was that "the FAC's allegations cover[ed] eight projects with over 225 investors and span complex events that occurred between 2008 and 2016," and that, when taken as a whole, it did "not give notice of which of the many communications it mentions were allegedly fraudulent and which defendant is allegedly responsible for those communications." *Kameli*, 373 F. Supp. 3d at 1203. In concluding its discussion of the issue, the court explained that, while the SEC did not have to "plead the date, time, sender, recipient, and content of every securities transaction," the Commission was required to "make clear exactly which of the eight years of communications form the basis of its fraud allegations and must differentiate among the defendants sufficiently to give each defendant fair notice of its alleged role." *Id.* at 1194.

The SAC has sufficiently remedied these defects. The complaint sets forth in substantial detail the allegations recounted above. It then devotes separate sections to the

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 215 of 306 PageID #:2171

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)
2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

allegations relating to each Fund. Within each section, the SAC separately describes the particular ways in which the allegations support its claims under § 17(a) and Rule 10b-5. Each section also separately explains the ways in which defendants' conduct forms the basis for the claims under § 17(a)'s and Rule 10b-5's various subsections. Additionally, within each section for each Fund, the SAC separately identifies the different misrepresentations pertaining to each Fund. Specifically, the Commission alleges that the PPMs misleadingly represented to investors that: each Fund's sole business activity would be to invest in its associated Project; each Project would be funded by the EB-5 investor assets in its associated Fund; that CFIG and AEP would be compensated for their services by being paid a portion of the annual interest that each Project paid to its affiliated Fund once the senior living facility began receiving revenue; and that investments in the Funds would comply with the EB-5 Program's requirements.

In short, the SAC singles out the alleged misrepresentations; alleges where they were made (chiefly in the PPMs, but in some cases also in the Funds' Business Plans, Subscription Agreements, and Holdings Account Agreements); who was responsible for them (Kameli and either CFIG or AEP, depending on the Fund in question); and the time period during which the misrepresentations were made (based on the period during which defendants engaged in conduct contrary to the PPMs' representations).

The SAC has similarly rectified the deficiencies relating to the counts in which it sets forth its claims for relief. Whereas the FAC alleged only three counts – one for all § 10(b) claims, one for all § 17(a) claims, and one for control-person liability – the SAC asserts separate counts under § 10(b) and § 17(a) for each Fund. Hence, the SAC now consists of fifteen separate counts – separate § 10(b) and § 17(a) counts for each of the seven Funds, along with a control-person liability claim against Kameli alone under § 20(a) of Exchange Act.[13] Particularly in view of the size of the alleged scheme in both scale and duration, the court concludes that the SAC's allegations are sufficiently particular to comply with Rule 9(b).

**\*10** Defendants argue that the SAC remains vague or ambiguous in several respects. For example, they claim that the SAC still leaves unclear whether their alleged misrepresentations are based on the PPMs or on other sources. The court sees no basis for confusion on this point. Although the SAC occasionally refers to other statements in recounting some of the case's background facts, it cites only statements in the PPMs (and in some cases other offering documents) when stating the basis for its claims under Rule 10b-5(b) and § 17(a)(2).

According to defendants, the SAC also leaves unclear who made the statements in question. Was it Kameli, CFIG, and AEP, or the Funds themselves? It is true that the SAC in some places says that the Funds issued PPMs. *See, e.*g., SAC ¶ 83 ("The Silver Fund issued a PPM dated July 2012."). However, the SAC specifically alleges for each Fund that, for purposes of Rule 10b-5(b), defendants are the "makers" of the statements in the PPMs. *See id.* ¶ 86 (Silver Fund); *id.* ¶ 146 (Golden Fund); *id.* ¶ 191 (Elgin Fund); *id.* ¶¶ 233, 242 (Aurora Fund); *id.* ¶ 273 (First American Fund); *id.* ¶ 307 (Naples Fund); *id.* ¶ 337 (Ft. Myers Fund). In addition, the SAC goes on to provide additional allegations to establish why the defendants should be deemed the "makers" of the statements. *See, e.g.*, SAC ¶ 86 ("Because Kameli and CFIG directed the preparation, and approved the distribution, of the Silver Fund July 2012 PPM, and because the Silver Fund July 2012 PPM attributed the statements therein to Kameli and CFIG, Kameli and CFIG are considered 'makers' of those statements for purposes of primary liability under the antifraud provisions of the federal securities laws."). Nor is it clear why allegations showing that the Funds were makers are necessarily inconsistent with the conclusion that defendants were makers. Defendants offer no reason why *both* groups cannot be deemed makers.

A third point of ambiguity, defendants maintain, has to do with Kameli's relationship with CFIG and AEP. Defendants say that the SAC ignores that Kameli is a legally distinct person from CFIG and AEP, and that the SAC "fails to put forth any factual allegations that justify the imposition of primary liability under Section 10(b), Rule 10b-5, and Section 17(a) aside from its conclusory claim that Kameli 'controlled' the operations." MTD 23-24. This appears to confuse the question of whether the SEC's allegations are sufficiently clear with the question of whether the allegations are legally sufficient. In dismissing the FAC, the court highlighted the SEC's failure to distinguish between Kameli and CFIG and AEP. There, however, the problem was not whether or to what extent Kameli might be held liable for CFIG's and AEP's actions; it was that the FAC's allegations failed to specify whether it was CFIG or AEP that made the false statements with Kameli. *See Kameli*, 373 F. Supp. 3d at 1202 (citing FAC's allegation that "*Kameli and CFIG or AEP* made materially false and/or misleading statements about how the

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

Projects affiliated with these Funds would obtain money for development and construction.") (emphasis added). The SAC contains no such ambiguities.

### B. Shotgun Pleading

Defendants raise a separate set of challenges to the way in which the SAC's causes of action are pleaded. Specifically, defendants maintain that the SAC engages in so-called "shotgun pleading" by failing to separate each of its claims for relief into a separate count.[14] Typically, shotgun pleading involves incorporating in each count of a complaint all of the preceding paragraphs and counts, "notwithstanding that many of the facts alleged [are] not material to the claim, or cause of action, appearing in a count's heading.' " *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 650 n. 22 (11th Cir. 2010)). The problem with such pleadings is that they "make it 'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.' " *Id.* quoting (*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

**\*11** First, defendants contend that the SAC's Rule 10b-5 counts must be dismissed because the SEC asserts claims under all three of the Rule's subsections but fails to put them in separate counts. According to defendants, claims arising under Rule 10b-5(b) must be separated from those under Rule 10b-5(a) and (c) because the claims cannot be based on the same conduct. The court discusses in greater detail below the substantive issue of whether claims under Rule 10b-5(a) and (c) may be based on the same conduct used to assert claims under Rule 10b-5(b). *See* section IV.B, *infra*. Here, it suffices to note that, even assuming that defendants are correct on this point, it simply does not follow that the claims under Rule 10b-5's subsections cannot be *pleaded* in the same count. Defendants cite no authority for such a requirement. Nor is it uncommon for plaintiffs to allege violations of Rule 10b-5(a), (b), and (c) in a single count. *See, e.g.*, *Ledford v. Peeples*, 657 F.3d 1222, 1248 n.73 (11th Cir. 2011) (discussing Rule 10b–5(a) and Rule 10b-5(b) claims alleged in the same count); *OpenGate Capital Grp. LLC v. Thermo Fisher Sci. Inc.*, No. CV 13-1475-GMS, 2014 WL 3367675, at \*15 (D. Del. July 8, 2014) (denying motion to dismiss claim insofar it alleged violation of Rule 10b–5(b) but granting the motion insofar as the claim alleged violation of Rule 10b–5(a) and (c)); *Sec. & Exch. Comm'n v. Small Bus. Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at \*1 (N.D. Cal. Aug. 16, 2013) (discussing complaint in which violation of Rules 10b–

5(a), 10b–5(b), and 10b–5(c) were alleged as a single cause of action).

The same is true of claims asserted under § 17(a)'s various subsections. *See, e.g.*, *S.E.C. v. ABS Manager, LLC*, No. 13CV319-GPC BGS, 2014 WL 2605476, at \*5 (S.D. Cal. June 11, 2014) (discussing complaint in which cause of action alleged violations of sections 17(a)(1), 17(a)(2), and 17(a)(3)); *Sec. & Exch. Comm'n v. Small Bus. Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at \*3 (N.D. Cal. Aug. 16, 2013) (discussing complaint alleging violations of 17(a)(1), (a)(2), and (a)(3) in a single claim for relief); *JRA Architects & Project Managers, P.S.C. v. First Fin. Grp., Inc.*, No. CV 08-1285 (FAB/MEL), 2008 WL 11381412, at \*4 (D.P.R. Sept. 15, 2008), report and recommendation adopted, No. CV 08-1285 (FAB), 2009 WL 10688978 (D.P.R. Apr. 13, 2009) (fraud in violation of §§ 17(a)(1), 17(a)(2) and 17(a)(3) alleged in a single count of complaint); *see also Denny v. Carey*, 72 F.R.D. 574, 580–81 (E.D. Pa. 1976) ("The fact that plaintiff may assert violation of more than one section of the Securities Act of 1933 or the Securities Exchange Act of 1934 does not mean that there must be more than one cause of action with a separate count for each alleged violation.").

The reason Rule 10b-5 claims must be pleaded in separate counts, defendants say, is because the claims do not necessarily stand or fall together. They point out, for example, that the SEC might prevail on one of its Rule 10b-5(a) claims against one of the Funds but not its Rule 10b-5(b) claim against that Fund. If the claims are asserted in a single count, defendants argue, the court would be required either to dismiss both claims or allow both to stand, thereby either dismissing the valid Rule 10b-5(a) claim along with the defunct 10b-5(b) claim, or allowing the invalid Rule 10b-5(b) claim to proceed along with the valid 10b-5(a) claim.

That simply is not correct. It is perfectly possible for a court to permit a count or cause of action to proceed under one theory but not another. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016) (granting motion to dismiss Rule 10b-5(b) claim insofar as it relied on a duty to disclose uncharged wrongdoing but denying the motion insofar as Rule 10b-5(b) claim relied on statements about pending regulatory proceedings); *see also Stichting Pensioenfonds ABP v. Merck & Co.*, No. CIV.A. 05-5060 SRC, 2012 WL 3235783, at \*17 (D.N.J. Aug. 1, 2012) (dismissing control-person claim as to some defendants but not others).

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 217 of 306 PageID #:2173

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)
2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

In addition to arguing that the SAC's Rule 10b-5(b) claims must be separated from the Rule 10b-5(a) and (c) claims, defendants go on to argue by essentially the same logic that the SAC must also assert a separate count for each of its Rule 10b-5(b) claims against each of the Funds for each of the misrepresentations on which they are based. Thus, according to defendants, the SAC must assert its 10b-5(b) claim based on defendants' alleged misrepresentations to Silver Fund investors regarding the Fund's compliance with EB-5 regulations in a separate count from its 10b-5(b) claim based on defendants' alleged misrepresentations to Silver Fund investors regarding Kameli's and CFIG's compensation; and the SAC must devote still another separate count to its 10b-5(b) claim based on defendants' conflicts of interests; and so on for misrepresentation to the investors of each Fund.

 **\*12**  Once again, however, defendants cite no case in which a court has announced such a requirement. Their sole citation is to *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004), for the general proposition that Federal Rule of Civil Procedure 10(b) requires distinct claims to be separated into counts. But Federal Rule 10(b) specifically says that alleging separate counts is necessary only "[i]f doing so would promote clarity." Fed. R. Civ. P. 10(b). *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense."). In this case, clarity would not be promoted – and might well be hindered – by requiring such a balkanization of the complaint. This conclusion becomes even more evident in light of defendants' separate argument that the SAC must allege separate counts for its claims under § 17(a), as well as separate control-person counts for each of the primary violations on which they are based. Clearly, this would produce an unduly long and complicated pleading.

Lastly, defendants contend that the control-person claim alleged in Count XV of the SAC must be dismissed because it incorporates all of the complaint's preceding paragraphs. Defendants point out that the preceding paragraphs allege violations of § 17(a) as well as of § 10(b). This is a problem, they say, because there can be no "control person" liability under § 20(a) of the Exchange Act for violations of § 17(a) of the Securities Act. But Count XV itself specifically premises its assertion of liability only on the primary violations under § 10(b) and excludes mention of § 17(a). SAC ¶ 423 ("Pursuant to Section 20(a) of the Exchange Act, Kameli is liable as a control person for CFIG's and AEP's violations of Section 10(b) of the Exchange Act and Rule

l0b-5 thereunder.") (citations omitted). Hence, despite its incorporation of previous paragraphs, Count XV adequately apprises defendants of the basis for its assertion of control-person liability.

In short, the court concludes that the SAC meets Rule 9(b)'s pleading requirements. Accordingly, defendants' motion to dismiss based on the SAC's alleged pleading deficiencies is denied.

## IV. Rule 12(b)(6)

The court now turns to defendants' arguments for dismissal pursuant to Rule 12(b)(6). "Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). "To properly state a claim, a plaintiff's complaint must contain allegations that 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.' " *Id.* (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). "In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the court assumes all well-pleaded allegations in the complaint to be true and draws all inferences in the light most favorable to the plaintiff." *Plumbers & Pipefitters*, 707 F. Supp. 2d at 781.[15]

Defendants assert several different grounds for dismissal of the SAC's various claims. In large part, defendants' arguments assert that the SAC fails properly to allege a particular element necessary to state a claim under § 10(b) and § 17(a) of the Securities Act. As previously noted, the statutes are essentially the same, except that § 10(b) and Rule 10b–5 apply to acts committed "in connection with a purchase or sale of securities," while § 17(a) applies to acts committed "in connection with an offer or sale of securities." *Maio*, 51 F.3d at 631. While Rule 10b-5(b) and § 17(a)(2) impose liability for making misstatements and omissions, Rule 10b-5(a) and § 17(a)(1) impose liability for employing "any device, scheme, or artifice to defraud," and Rule 10b-5(c) and § 17(a) (3) impose liability for conduct that operates as a fraud or deceit "in connection with the purchase or sale of any security" and "in the offer or sale of any securities," respectively. A showing of scienter is required for claims under any of Rule 10b-5's subsections; a showing of scienter is necessary under § 17(a) (1) but not under §§ 17(a)(2) or (a)(3). *See, e.g.*, *S.E.C. v. Bauer*, 723 F.3d 758, 768 n.2 (7th Cir. 2013).

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

## A. "Maker" Allegations for the SAC's Rule 10b-5(b) Counts

 **\*13** Defendants first seek dismissal of the SAC's claims under Rule 10b-5(b) on the ground that the Commission fails to allege that they are "makers" of the alleged misrepresentations.[16] As the Supreme Court has explained, "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *See, e.g.*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Here, the SAC specifically alleges that defendants are "makers" for purposes of Rule 10b-5(b) because they "directed the preparation, and approved the distribution" of the PPMs and that the PPMs attributed the statements they contained to Kameli and CFIG/AEP. *See* SAC ¶ 86 ("Because Kameli and CFIG directed the preparation, and approved the distribution, of the Silver Fund July 2012 PPM, and because the Silver Fund July 2012 PPM attributed the statements therein to Kameli and CFIG, Kameli and CFIG are considered 'makers' of those statements for purposes of primary liability under the antifraud provisions of the federal securities laws."); *id.* ¶ 146 (Golden Fund); *id.* ¶ 191 (Elgin Fund); *id.* ¶¶ 233, 242 (Aurora Fund); *id.* ¶ 273 (First American Fund); *id.* ¶ 307 (Naples Fund); *id.* ¶ 337 (Ft. Myers Fund).

Defendants object that these allegations are conclusory. In point of fact, however, the allegations are sufficiently supported by many of the SAC's other allegations. For example, the allegation that defendants directed the preparation and approved the distribution of the PPMs is supported by the SAC's general allegations that Kameli created CFIG and AEP, SAC ¶¶ 7, 52, as well as the Funds, *id.* ¶¶ 5-6, and that he "controlled all the operations of CFIG, AEP, the Funds, and the Projects," *id.* ¶ 8 ("Kameli controlled all the operations of CFIG, AEP, the Funds, and the Projects."). The SAC pleads additional facts to support the specific allegation that the PPMs attributed their statements to defendants. For example, with respect to the Elgin Fund, the SAC alleges that:

> (i) CFIG was the manager of the Fund; (ii) CFIG was responsible for all costs and expenses of the offering of interests in the Fund, including expenses related to the costs of preparing, reproducing, or printing the PPM; (iii) Kameli was a stakeholder in CFIG; (iv) Kameli was the Executive Director of CFIG; and (v) Kameli served as counsel to the Fund and CFIG in connection with the formation of the Fund and the offering of interests in the Fund.

SAC ¶ 190; *see also* SAC ¶ 201 (alleging similar facts regarding the Elgin 2011 PPM). The SAC includes similar allegations for each of the Funds. *See id.* ¶ 85 (Silver Fund); *id.* ¶¶ 145-46 (Golden Fund); *id.* ¶ 232 (Aurora Fund); *Id.* ¶ 272 (First American Fund); *id.* ¶ 306 (Naples Fund); *id.* ¶ 336 (Ft. Myers Fund).

Defendants point to cases in which courts have held that serving in these roles – e.g., fund manager, principal, attorney – was not sufficient to impose maker liability under Rule 10b-5(b). Here, however, Kameli is alleged to have occupied all of these roles simultaneously -- in addition to creating, controlling, and operating the Funds. In any case, however, the question whether a defendant in fact exercised the requisite control over the content of the statement is "an inherently fact-bound inquiry." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). At this stage, the court concludes that, taking the SAC's allegations as true, and viewing them as a whole, the SEC has adequately alleged that defendants had "ultimate authority" over whether and how to communicate the PPMs' statements and content. The court therefore denies defendants' motion to dismiss insofar as it is based on the SAC's purported failure to plead "maker" liability.

## B. Failure to Allege Knowing Dissemination or Scheme: Rule 10b-5(a) and 10b-5(c)

 **\*14** Next, defendants argue that all of the SAC's claims under Rule 10b-5(a) and (c) must be dismissed because they fail to allege that defendants "disseminated" the misleading statements in the PPMs. As noted previously, unlike Rule 10b-5(b), the text of Rules 10b-5(a) and (c) contain no specific reference to statements of any kind. Rule 10b–5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud," and Rule 10b–5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §§ 240.10b-5(a), (c). According to defendants, this means that the conduct used to support a claim under Rule 10b-5(b) – defendants' false/misleading statements/omissions – cannot also be used as the basis for claims under Rule 10b-5(a) and (c). As they put it, "[l]iability pursuant to Rule 10b-5(a) and Rule 10b-5(c) cannot be imposed by simply rechristening Rule 10b-5(b) claims as Rule 10b-5(a) and Rule 10b-5(c) claims." MTD 36.

Until recently, this position enjoyed considerable support among courts. *See, e.g.*, *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *U.S. S.E.C. v. Benger*, 931 F. Supp. 2d 908, 913 (N.D. Ill. 2013); *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). It is no longer tenable, however, in light of the Supreme Court's decision in *Lorenzo v. Securities & Exchange Commission*, 139 S. Ct. 1094 (2019). The defendant in *Lorenzo* was an investment banker who sent an email at his boss's direction to prospective investors, knowing that the email contained false statements. The parties agreed that Lorenzo was not a "maker" for purposes of Rule 10b-5(b) because he was not responsible for the email's content. The question presented was whether Lorenzo could nonetheless be held liable under Rule 10b-5(a) and (c) given that the only conduct alleged in support of the claim was the misrepresentations. Lorenzo argued that "the only way to be liable for false statements is through those provisions that refer specifically to false statements" and that Rule 10b-5(a) and (c) apply "only when conduct other than misstatements is involved." *Id.* at 1101.

The Court rejected the notion "that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct," observing that the "Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Id.* at 1102. As the Court explained, " '[I]n declaring certain practices unlawful,' it was thought prudent 'to include both a general proscription against fraudulent and deceptive practices and, out of an abundance of caution, a specific proscription against nondisclosure' even though 'a specific proscription against nondisclosure' might in other circumstances be deemed 'surplusage.' " *Id.* (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 198-99 (1963)). " 'Each succeeding prohibition' was thus 'meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections.' " *Id.* (quoting *United States v. Naftalin*, 441 U.S. 768, 774 (1979)). Under *Lorenzo*, therefore, claims under Rule 10b-5(a) and (c) may be based on misrepresentations and omissions.

Defendants read *Lorenzo* differently. They contend that asserting claims under Rule 10b-5(a) and (c) based only on misrepresentations generally remains verboten under *Lorenzo*. On their view, *Lorenzo* merely carves out an exception allowing such claims where the defendant is alleged to have *disseminated* the misrepresentation, rather than having made it. This interpretation is not plausible.

Defendants arrive at their interpretation by seeking to square *Lorenzo* with prior cases holding that claims under Rule 10b-5(a) and (c) cannot be based on the same conduct as claims under Rule 10b-5(b). The court sees no basis for that assumption. Rather than positing a fine distinction between "making" statements and "disseminating" them, *Lorenzo* effectively abrogated the line of cases on which defendants rely and permits liability under Rule 10b-5(a) and (c) for both making and disseminating misleading statements – despite some resulting redundancy with Rule 10b-5(b). *See Sec. & Exch. Comm'n v. SeeThruEquity, LLC*, No. 18 CIV. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (*Lorenzo* foreclosed defendants' argument that the "SEC inadequately alleges 'scheme' liability under Rule 10b-5(a) and (c) ... because it fails to allege a deceptive act that is distinct from misstatements.").

**\*15** That said, however, the SAC actually alleges that defendants disseminated the false/misleading statements. *See* SAC ¶ 51 ("Kameli directed employees of his law firm to prepare the Funds' PPMs and the other offering documents attached to the PPMs, which included, but were not limited to, Business Plans, Subscription Agreements, and Operating Agreements. He approved the distribution of the PPMs and their attachments to prospective EB-5 Program investors."); *see also* ¶ 84 (Silver); *id.* 114 (Golden); *id.* ¶¶ 189, 200 (Elgin); *id.* ¶¶ 231, 240 (Aurora); *id.* ¶ 271 (First American); *id.* ¶ 305 (Naples); *id.* ¶ 335 (Ft. Myers). Although the SAC uses the word "distribution" rather than "dissemination," at least in this context, the words are essentially interchangeable. Defendants again characterize these allegations as "conclusory"; but they offer no basis or explanation for the characterization. To the contrary, the SAC's general allegations regarding defendants' control over all aspects of the Funds' operations provide sufficient support for the more specific allegations that defendants disseminated or distributed the alleged false/misleading statements.

Indeed, defendants are also mistaken in claiming that the SAC fails to allege any deceptive conduct apart from the misrepresentations forming the basis for the Rule 10b-5(b) claims. As detailed above, the complaint alleges that Kameli, CFIG, and AEP commingled funds; received undisclosed profit and compensation; and used funds for improper purposes such as securities trading.

In sum, the court rejects defendants' contention that claims under Rule 10b-5(a) and (c) cannot be predicated on the same conduct as that supporting claims under Rule

10b-5(b). Yet even granting the contention, defendants' argument for dismissal fails because the SAC alleges that defendants disseminated the PPMs' misleading statements, and also because the SAC alleges conduct other than misrepresentations in support of its Rule 10b-5(a) and (c) claims.

**C. Sellers**

Defendants go on to assert a parallel argument for dismissal of the SAC's § 17(a) claims, contending that the complaint fails to allege that defendants are "sellers" within the meaning of the statute. By its plain terms, § 17(a) applies to "any person in the offer or sale of any securities." 15 U.S.C. § 77q. According to defendants, "[i]n order to be considered a 'seller' of securities, one must pass title, or other interest in the security, to the buyer; or successfully solicit the purchase, motivated at least in part by a desire to serve its own financial interest or those of the securities owner. MTD at 39 (citing *S.E.C. v. JB Oxford Holdings, Inc.*, No. CV 04-07084 PA VBKX, 2004 WL 6234910 (C.D. Cal. Nov. 9, 2004)). Defendants assert that the SAC contains no such allegations. Instead, they claim, "a review of the offering documents of the respective Funds ... clearly show [sic] the purchase of securities from the funds themselves, and not any of the Defendants." MTD at 39.

The court is not persuaded. To begin with, defendants' definition of "seller" is too narrow. The Supreme Court has made clear that the statutory terms "in," "offer," and "sale" are to be construed liberally. In *United States v. Naftalin*, 441 U.S. 768 (1979), for example, the Court held that § 17(a) did not "require that the fraud occur in any particular phase of the selling transaction," and that the terms are "expansive enough to encompass the entire selling process, including the seller/ agent transaction." *Id.* at 773; *see also S.E.C. v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982) (rejecting the contention that "actual or first-hand contact with offerees or buyers [is] a condition precedent to primary liability" under § 17(a)); *U.S. S.E.C. v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *3 (S.D.N.Y. Nov. 29, 2010) ("[C]ontrary to the defendant's argument that section 17(a) requires that the defendant be an actual seller or offeror of securities for liability to attach, section 17(a) establishes broad anti-fraud prohibitions that are not limited to actual sellers of securities and can apply to persons who neither passed title nor solicited offers on behalf of securities issuers or sellers.") (quotation marks omitted). The SAC clearly alleges that defendants played a key role in the process of selling interests in the Funds.

**\*16** In fact, the SAC satisfies even defendants' narrow definition according to which being a "seller" within the meaning of § 17(a) requires that a defendant "successfully solicit the purchase, motivated at least in part by a desire to serve its own financial interest or those of the securities owner. MTD at 39 (citing *S.E.C. v. JB Oxford Holdings, Inc.*, No. CV 04-07084 PA VBKX, 2004 WL 6234910 (C.D. Cal. Nov. 9, 2004)). In many places, the SAC specifically alleges that defendants solicited investment in the Funds. *See* SAC ¶ 38 ("Defendants solicited and obtained investments in the CFIG and AEP Funds for an investment of $500,000 per investor, plus an administrative or service fee typically ranging from $35,000 to $75,000 for each investor."); *id.* ¶ 47 ("The CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States."); *id.* ¶ 49 ("Defendants solicited investors through similar, though not identical, offering documents for each Fund."); *id.* ¶ 12 ("This undisclosed practice would have been material to a reasonable investor in all of the Funds, both at the time [Kameli] improperly diverted money from a Fund or Project ... and when he solicited new investors for new Funds.").

As in so many other instances, defendants assert that these allegations are conclusory. Here, too, however, the SAC's allegations regarding defendants' solicitation of investments are supported by numerous other allegations. Among other things, the SAC alleges that the solicitation took place at various events, both in the U.S. and abroad, as well as via websites and internet videos, SAC ¶ 47; that the investments were offered in the PPMs, which defendants caused to be issued; and that investors sent their investment funds to Kameli, *id.* ¶ 44.

Lastly, defendants contend that any allegation that they were sellers of the investments is contradicted by other allegations in the SAC. Specifically, defendants point to allegations indicating that it was the Funds themselves that solicited investors. MTD 40. In one paragraph, for instance, the SAC alleges that "CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments,

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors." SAC ¶ 47.

As with defendants' argument vis-à-vis "maker" liability under Rule 10b-5(b), the Funds' alleged role as sellers is problematic only on the assumption that there can be only one seller for purposes of § 17(a). Defendants cite no authority and offer no argument for this proposition. In any case, when read along with the rest of the complaint, defendants are clearly alleged to have orchestrated the overall enterprise. As noted above, the SAC alleges that Kameli (along with CFIG and AEP) controlled the Funds. Indeed, the above-quoted paragraph on which defendants rely goes on by way of illustration to state that Kameli "has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States." SAC ¶ 47. In other words, the SAC indicates that, to the extent that the Funds are alleged to have engaged in selling, the activities were in large part carried out by Kameli.

Defendants argue that the paragraph's allegations do not expressly state that Kameli engaged in solicitation at these events. They suggest, for example, that Kameli may have attended the events in his role as an immigration attorney or for some purpose other than attracting EB-5 investors. MTD 41. However, that Kameli engaged in solicitation at these events can reasonably be inferred, and at this stage, the court is required to make all reasonable inferences in the Commission's favor. In any case, nothing turns on whether Kameli engaged in selling at these events. Even if he did not, the SAC's other allegations adequately plead that Kameli (and CFIG and AEP) are "sellers" for purposes of § 17(a).

**D. Scienter**

Defendants next contend that all of the SAC's claims under Rule 10b-5 and § 17(a)(1) must be dismissed because the complaint fails adequately to allege that defendants acted with scienter. For purposes of § 10(b) and § 17(a), "[s]cienter encompasses either a mental state embracing an intent to deceive, manipulate or defraud, or reckless acts that are not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) (citations and quotation marks omitted). "In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could

prove scienter." *Id.* (quotation marks and emphasis omitted). Generally speaking, scienter is a question of fact and is therefore usually best decided by the trier of fact. *See, e.g.*, *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 968 (N.D. Ill. 2011) ("First, and as a general matter, determinations as to a lack of scienter are typically—though not categorically—inappropriate at the summary judgment stage.").

**\*17** The SAC sufficiently alleges that defendants acted with scienter. For one thing, the complaint specifically alleges that defendants acted knowingly/recklessly with respect to all of the SEC's 10b-5 and § 17(a)(1) claims and with respect all of the Funds. *See* SAC ¶¶ 117-118, 133, 137, 141-42 (Silver Fund); SAC ¶¶ 160, 166-67, 171, 174, 187 (Golden Fund); SAC ¶¶ 214, 218, 224, 228-29 (Elgin Fund); SAC ¶¶ 254, 258, 264, 268-69 (Aurora Fund); SAC ¶¶ 286, 290, 294, 303, (First American Fund); SAC ¶¶ 320, 324, 333 (Naples Fund); SAC ¶¶ 350, 356, 364 (Ft. Myers Fund); SAC ¶¶ 11, 32 (knowledge of EB-5 Programs' requirements).

These allegations draw support from the SAC as a whole. The Commission alleges that defendants were responsible for, and thus aware of, all of the representations made in all of the PPMs. The Commission also alleges that defendants were responsible for the diversion and commingling of funds and other conduct in light of which the PPMs' representations became misleading. For example, the SAC alleges that defendants were aware of the EB-5 Program's requirement that the full amount of an investor's capital be made available to the business most closely responsible for creating the employment on which his or her immigration petition is based; and that, after they began commingling and diverting investor funds, defendants were aware that the PPMs' statements that the investments complied with the Program's requirements were false/misleading. *See, e.*g., SAC ¶ 11 ("At the time he raised money from investors, Kameli knew, or was reckless in not knowing, that a well-known and established requirement of the EB-5 Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. He knowingly or recklessly violated this requirement. He falsely represented to investors that the Funds and Projects would comply with the EB-5 Program's requirements even though he knew, or was reckless in not knowing, that they did not."); *id.* ¶ 166 ("As Kameli and CFIG knew, or were reckless in not knowing, the Golden Project's securities trading ... violated the [EB-5] Program's requirements because it prevented the full amount of a

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)
2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

Golden Fund investor's contribution from being used for the job-creating Project (i.e., the Golden Project) most closely associated with their investment. In light of Kameli's and CFIG's use of Golden Fund and Project assets for securities trading, Kameli's and CFIG's statements in the Golden Fund July 2011 PPM that the Fund and Project would comply with the Program's requirements were false and/or misleading as of April 2013.").

The SAC's scienter allegations are further supported by allegations that, at least in some instances, Kameli was motivated by a desire to enrich himself. *See* Resp. Br. 30-31 (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (stating that the "factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show a defendant's motive to commit securities fraud")). For example, with respect to the Florida Project land transactions, the SAC alleges that Kameli listed the cost of the land as substantially more than he paid for it. *See, e.g.*, SAC ¶ 302 ("Additionally, as of September 2016, the First American Fund March 2013 Business Plan falsely and/or misleadingly stated that the First American Project's land costs would be $1 million, when in fact the actual land costs were $664,850, with the difference constituting an undisclosed approximate $335,000 profit to Kameli.... Such self-dealing would be material to a reasonable investor."); *see also* SAC ¶ 13 ("Not satisfied with the millions of dollars collected directly from investors – apparently for administrative, service, and/or legal fees paid to Kameli and his companies, partly for their purported compliance with the EB-5 Program's requirements – Kameli has diverted investor funds from one Project to another and has spent a significant portion of investment proceeds for his own benefit, for the benefit of his brother, and for the benefit of companies he owns.").

**\*18** According to defendants, the SAC's scienter allegations are deficient because they are unsupported by any reference to specific emails, phone calls, conversations, or testimony. But the SEC is not required to present evidence at this stage. *See, e.g.*, *Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860, 868 (N.D. Ill. 2010) ("Even under Rule 9(b), it is not necessary to plead evidence.") (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). Nor do the cases cited by defendants, *SEC v. Steffes*, 805 F. Supp. 2d 601 (N.D. Il. 2011), and *S.E.C. v. Scoppetoulo*, No. 10-20475-CIV, 2011 WL 294443 (S.D. Fla. Jan. 27, 2011), suggest otherwise. The cases are factually dissimilar because, among other things, both involved allegations of insider trading. Here, much of the

conduct at issue is alleged to have been committed by Kameli alone, involving transactions between different entities that he owned and controlled. It should not be surprising, therefore, that the SAC does not cite communications between Kameli and other parties. In any case, the allegations identified above provide adequate support for the Commission's scienter allegations.

Defendants further argue that any inference of scienter is undercut by the fact that the PPMs are not alleged to have been deceptive at the time they were issued. Defendants point out that their alleged misconduct "occurred not days later, but rather and often years after the issuance of the PPMs." MTD 46. According to defendants, "[c]ourts have been hesitant to even inference [sic] scienter when there is a lack of proximity between the alleged misrepresentation or omission and the alleged contrary action." *Id.*

This argument is difficult to follow. At issue in the cases cited by defendants, *In re Verifone Sec. Litig.*, No. 5:13-CV-01038-EJD, 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016), and *In re Credit Acceptance Corp. Secs. Litig.*, 50 F. Supp. 2d 662 (E.D. Mich. 1999), was whether a defendant could be inferred to have acted with scienter at an earlier time based on subsequent events. In *In re Verifone*, for example, the plaintiffs claimed that one of the defendants had knowingly overstated his company's financial condition in a 2011 press release. *In re Verifone*, 2016 WL 1213666, at *8. To support their allegation that the defendant had knowingly misrepresented the company's financial condition, the plaintiffs cited the company's 2013 report of lower-than-expected revenue. *Id.* The court held that the lack of temporal proximity between the press release and subsequent report failed to support an inference of scienter. *Id.* at *9. Here, there is no allegation that the PPMs were false at the time they were issued and hence no issue of whether an inference of scienter can be made based on defendants' subsequent conduct. On the contrary, in this case the SEC alleges that it was defendants' own subsequent actions that actually gave rise to the false/misleading statements.

Defendants also challenge the SAC's allegation regarding Kameli's self-dealing. According to defendants, the SAC undermines any inference that Kameli acted self-interestedly. In defendants' characterization of the complaint, "it was not Defendants' nefarious actions that lead to the perilous financial situation of the projects"; instead, it was "due to Defendants allowing investors to redeem their investments." MTD 47. Defendants also say that, far from attempting to

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

cover up their actions, the SAC itself acknowledges that Defendants periodically issued supplements to the PPMs to apprise investors of important developments and to ensure that they remained committed to investing in the respective Funds. *Id.* All of this, they contend, supports "a reasonable inference that Defendants were attempting to be as open as possible with the investors, disclose as much as possible, allow investors to recoup their investment, and lacked any intent to defraud." *Id.*

**\*19** This reading of the SAC is difficult to square with its actual allegations. For one thing, while the SAC indicates that Kameli's handling of the redemptions worsened the Projects' financial condition, it does not allege that the redemptions were the *primary* reason for the Funds' economic difficulties. SAC ¶ 79 ("[W]hile Kameli has told investors at various points in time that they could withdraw from the Funds if they no longer wished to continue their investments, the Funds' poor financial condition has prevented Kameli from redeeming all Fund investors. Indeed, Kameli has declined some investors' redemption requests while allowing other investors to withdraw. Kameli's practice of allowing some, but not all, investors to withdraw their investments, even after they obtained their I-526 approvals from USCIS, has exacerbated the Funds' poor financial condition and harmed investors who remained invested in the funds.").

Nor does defendants' practice of updating and supplementing the PPMs undermine an inference of scienter. In fact, the SAC alleges that defendants deliberately omitted information from the supplements to deceive investors. In the case of the Silver and Golden Funds, for example, the Commission claims that the supplements failed to disclose the Silver and Golden Projects' relationship with Bright Oaks, and Nader Kameli's involvement with Bright Oaks. SAC ¶ 90 (none of the Silver Fund supplements disclosed that the Silver Project would receive money from any other Funds or Projects with which Kameli was involved); *id.* ¶ 130 ("In August 2013, Kameli and CFIG caused the Silver Fund to issue a First PPM Supplement, which asserted in pertinent part: 'Mr. Kameli is the principal of Bright Oaks Development, Inc. which may assist in the development and construction' of the Silver Project. However, this Silver Fund August 2013 First PPM Supplement omitted to state that Kameli had installed his brother as the President of Bright Oaks Development or that his brother had any involvement with the development of the Silver Project."); *id.* ¶ 150 (Golden Fund supplements never disclosed that the Golden Project would obtain money from any other Funds or Projects

with which Kameli was involved.); *id.* ¶ 184 (Golden Fund supplement informed investors of Golden Project's involvement with Bright Oaks Development, and Kameli's brother's involvement with Bright Oaks only in 2015, after they had stopped raising money).

In short, taking the SAC's allegations as true and drawing all reasonable inferences in the Commission's favor, the court concludes that the complaint adequately pleads scienter. The court therefore denies defendants' motion to dismiss the SAC's Rule 10b-5 and § 17(a)(1) for failing to allege scienter.[17]

### E. Forward-Looking Statements

**\*20** Defendants next contend that all of the SAC's counts must be dismissed because all of their alleged misrepresentations were forward-looking statements. They point out that a party cannot be held liable for forward-looking statements that turn out to be untrue, so long as they had a reasonable basis for making these statements at the time and they made the statements in good faith. *See, e.g.*, *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995) ("[A] projection can lead to liability under Rule 10b–5 only if it was not made in good faith or was made without a reasonable basis."). Defendants' argument focuses specifically on their alleged representations regarding the Funds' compliance with the EB-5 Program's requirements. They claim that "the SAC is devoid of any well-plead [sic] factual allegations that allow one to even infer a lack of good faith or reasonable basis at the time the statements were made." MTD 57.

The court disagrees. Simply put, the PPMs' statements regarding EB-5 compliance cannot be regarded as "forward-looking." They were not predictions or forecasts about the Funds' status in the future; they were representing to investors that the Funds were in fact compliant with the EB-5 Program at the time that they were made (or at the very least, that defendants would not knowingly act in such a way as to make the Funds non-compliant with the Program). These representations, according to the SAC, became false or misleading once defendants' alleged misconduct began. Thus, by continuing to use the PPMs to attract investors, defendants made representations that were false at the time that they were made. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[C]ourts often describe forward-looking statements as statements whose accuracy can only be verified after they

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

are made. The negative corollary to that proposition is that statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements.") (citations omitted); *see also Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012), on reconsideration in part (Jan. 10, 2013) ("The fact remains that a statement about a past or current fact can demonstrably be proven false. That is what distinguishes such facts from forward-looking predictions.").

Adopting a different tack, defendants argue that the SAC provides no basis for inferring that Kameli was aware of the Program's requirements or that the Funds were ever in violation of them. Indeed, they argue that, given USCIS's approval of many investors' I-526 Petitions, it was reasonable for Kameli to have believed that the Funds were compliant with the Program's requirements. The SAC, however, specifically alleges that Kameli was aware of the Program's requirements. In particular, the Commission alleges that Kameli was aware of *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998), a decision by the Administrative Appeals Office of USCIS's predecessor agency, which mandated that the full amount of an investor's funds be made available to the business most closely responsible for creating the jobs on which his or her immigration petition is based. *See* SAC ¶ 32 ("As of the date on which Kameli began representing investor/clients and launched the Funds, he knew, or was reckless in not knowing, about the *Izummi* precedent decision and the EB-5 Program's requirement that the full amount of an investor's money must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based.").

Once again, defendants assert that the SAC's allegations are conclusory. But, as with the other allegations, those relating to Kameli's knowledge of the EB-5 Program are adequately fleshed-out. For example, the SAC alleges that Kameli held himself out as an expert in the Program, SAC ¶ 4 ("Kameli held himself out to investors as an expert in the EB-5 Program and told investors that his expertise would help investors obtain permanent U.S. residency through the Program."); and that he routinely spoke at events centering on the EB-5 Program, *id.* ¶ 47 ("The CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has

routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States.").

**\*21** With respect specifically to Kameli's knowledge of the *Izummi* decision, the SAC alleges that Kameli and/or his firm cited the decision in filing investors' I-526 Petitions, *id.* ¶ 32 ("In fact, when Kameli and/or his law firm filed I-526 and I-829 Petitions with USCIS on behalf of Fund investors, they cited to the *Izummi* precedent decision in support of the Petitions, confirming that they knew the decision."), and in email communications, *id.* ¶ 33. Defendants object that these allegations leave unclear whether the acts were performed by Kameli or his firm, and they resist any notion that the firm's knowledge can be imputed to Kameli personally. But the fact that the SAC does not distinguish between Kameli and his firm on these points does not matter. The question is not whether the SAC makes sufficiently clear who made the statements for purposes of Rule 9(b); it is simply whether the complaint sufficiently alleges the element of scienter. With respect to the latter issue, it is not necessary to know whether Kameli personally made the statements; nor is it necessary to impute the firm's knowledge to Kameli himself. For even if Kameli was not personally involved in filing the petitions or composing the email in question, the fact that his firm was engaged in such matters makes it more plausible to infer that Kameli, too, was knowledgeable about them.

Yet it is not clear that defendants' position fares any better on the assumption that Kameli lacked knowledge of *Izummi*. As stated above, for purposes of § 10(b) and § 17(a)(1), scienter encompasses misleading statements made recklessly as well as knowingly. *Ustian*, 229 F. Supp. 3d at 774. The SAC alleges that if Kameli was not aware of *Izummi*, he acted recklessly. SAC ¶ 11 ("At the time he raised money from investors, Kameli knew, or was reckless in not knowing, that a well-known and established requirement of the EB-5 Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based."). Likewise, the court is unconvinced by defendants' argument that, given USCIS's approval of certain investors' I-526 Petitions, Kameli reasonably could have believed that the Funds were in compliance with EB-5 requirements. There is no indication that these approvals were anything more than routine or that they involved any actual scrutiny of the Funds and Projects.

None of the foregoing is to suggest that defendants ultimately will not be able to present evidence showing that Kameli did not know (and was not reckless in not knowing) of the EB-5 Program's requirements, or that he otherwise reasonably believed at all times that the Funds were in compliance with the requirements. At this juncture, however, the question is whether, taking the SAC's allegations as true, the complaint adequately alleges that, after he began diverting and commingling investor assets, Kameli lacked a good-faith basis for leading investors to believe that the Funds complied with the Program. The court concludes that it does.

### F. The "Bespeaks Caution" Doctrine

In a similar vein, defendants claim that their alleged misrepresentations are not actionable because they are protected by the "bespeaks caution" doctrine. As the Seventh Circuit has explained, the "bespeaks caution doctrine provides that 'when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading.' " *Harden v. Raffensperger*, Hughes & Co., 65 F.3d 1392, 1404–05 (7th Cir. 1995) (quoting 3B Harold S. Bloomenthal, Securities and Federal Corporate Law § 8.26 [1] at 8–110 (1995)).

Here, defendants point to the following cautionary language included under the heading "Immigration Risks" in all of the PPMs:

> The Company makes no representation or warranty of any kind concerning whether an investment in the Company will meet the requirements of the Immigrant Investor Pilot Program or other U.S. immigration requirements. No assurances can be given that an investment in the Company will result in an immigrant investor receiving an EB-5 Visa or conditional or permanent resident status in the U.S.

> Investors in this Offering who have subscribed for Units with the intention of applying for U.S. conditional permanent residence through investment in the Company should be aware of certain risk factors relating to immigration to the U.S. and the Immigrant Investor Pilot Program and its administration. An immigrant investor who purchases Units with the intention of obtaining U.S. conditional permanent residence is encouraged, along with his or her advisors, to make his or her own independent review of the Immigrant Investor Pilot Program and the various immigration risk factors relating to the process in obtaining conditional and permanent residency status

to determine if an investment in the Units is a suitable approach for such immigrant investor.

> **\*22** General Immigration Risks. Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an immigrant investor or the Company. Immigrant investors who obtain conditional or permanent residence status must intend to make the U.S. his or her primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining permanent resident status involves numerous factors or circumstances which are not within the control of the Company. These include an immigration investor's past history and quotas established by the U.S. Government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Immigrant Investor Pilot Program.

Golden Fund PPM 25, ECF 128-6; *see also* Silver Fund PPM 29-30; First American Fund PPM 30-31. According to defendants, this disclaimer put investors "on notice that none of the funds would necessarily adhere to the requirements of the EB-5 Program." MTD 60-61.

For at least two reasons, the bespeaks caution doctrine does not help defendants. First, the doctrine applies only to forward-looking statements. As already discussed, the SEC maintains that the statements were false at the time that they were made because at that point, the Funds had already run afoul of the EB-5 Program's requirements. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) ("Moreover, Facebook's risk warnings are alleged to be more than mere opinions, they were misstatements of present fact, warning that something "may" occur when that event "had" already occurred, and not mere opinions of future possibilities.").

Second, the cautionary language cited by defendants does not address the specific risk relevant to the SEC's claims. On a natural reading, the above-quoted passages alert investors to the possibility that, for reasons beyond defendants' control, USCIS might determine that the Funds failed to meet the EB-5 requirements. *See* MTD 59 ("Whether a particular investor project adheres to the requirements of the EB-5 Program is a decision for the USCIS (an arm's length

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

government agency who Defendants have no control over). Much in the same way a utility has no control over whether a government agency will or will not approve a permit for a power plant, and thus cannot be penalized when its prediction turns out to be inaccurate."). Here, the SAC alleges that defendants themselves are were responsible for the Funds' failure to comply with EB-5 requirements. The disclaimers on which defendants rely cannot reasonably be read as intending to caution investors that defendants might knowingly or recklessly operate the Funds in a way that violated the Program's requirements.

In short, just as defendants are not shielded from liability based on the purported forward-looking character of the PPMs' statements regarding EB-5 compliance, they likewise are not shielded by the PPMs' cautionary language regarding the EB-5 Program.

### G. Control Person Liability

Defendants next contend that the SAC's claim for control-person liability against Kameli must be dismissed. The Seventh Circuit has set forth a two-pronged test for determining whether a person may be held liable as a control person under § 20(a) of the Exchange Act. *See, e.g.*, *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994) (citing *Harrison v. Dean Witter Reynolds Inc.*, 974 F.3d 873, 880–81 (7th Cir. 1992)); *Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 927 (N.D. Ill. 2011). "First, the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. The court has further stated that § 20(a) is to be viewed as remedial and therefore "construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a control person" liable." *Harrison*, 974 F.2d at 880–81 (quotation marks omitted).

**\*23** Defendants argue that the control-person claim must be dismissed because it fails to allege that Kameli exercised sufficient control over CFIG and AEP. They insist that "[w]hether a defendant is a 'control person' subject to Section 20(a) liability is a factual question involving scrutiny of the defendant's participation in the day-to-day affairs of the primary violator and the defendant's power to control," MTD 62, and they claim that the SAC lacks such allegations.

This argument fails for several reasons. As an initial matter, defendants' proposed standard for determining control-person liability appears narrower than the one set forth in *Harrison*. In particular, there is nothing in *Harrison* to suggest that participation in day-to-day activities is determinative of the question. Even under defendants' standard, however, the SAC's allegations are sufficient. Although the complaint does not use the expression "day-to-day involvement," it nonetheless portrays Kameli as the prime mover behind all of the activities at issue in the suit and with CFIG and AEP in particular. He created and owns both corporations, SAC ¶ 7; he is CFIG's sole member, *id*. ¶ SAC 23; and he is AEP's President, *id.* ¶ 24. These allegations, along with the SAC's other allegations regarding Kameli's activities with the corporations, are easily sufficient to support an inference that Kameli possessed "some indirect means of discipline or influence" over CFIG's and AEP's daily activities. *Harrison*, 974 F.2d at 880–81 (quotation marks omitted).

Against this, defendants argue that any inference that Kameli exercised day-to-day control over CFIG and AEP is contradicted by the fact that his brother, Nader Kameli, served as CFIG's Chief Operating Officer (COO). But the mere fact that Nader served in this role does not mean that he exercised exclusive day-to-day control over CFIG and AEP. The SAC implies that Nader was installed as a result of nepotism, rather than any experience he had with the work in question. *See, e.g.*, SAC ¶ 53 (asserting that, "[a]s of 2009, neither Kameli nor his brother had any experience or expertise in the development, construction, or management" of the projects Kameli was considering for EB-5 investments). Moreover, Nader's day-to-day involvement in the corporations' activities does not exclude Kameli's. More than one person can be held liable as a control person for a corporation's actions. *See, e.g.*, *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1088 (9th Cir. 2010) ("Ownership is one means of control, but it is not the only means, and multiple persons can exercise control simultaneously."); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1030 (N.D. Ill. 2010) (declining to dismiss control-person claim asserted against two defendants); *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2008 WL 4372743, at \*9 (N.D. Ill. Sept. 23, 2008) (declining to dismiss control-person claim asserted against two defendants).

In any event, as defendants themselves assert, the question of whether control-person liability may be imposed on an individual is a generally a factual one. *See, e.g.*, *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2018 WL 6714326, at \*5 (N.D. Ill. Dec. 20,

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

2018) ("But whether an individual is a controlling person for purposes of § 20(a) is a fact-intensive issue that is not properly resolved at the pleading stage."); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Determination of whether an individual defendant is a " 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage."). For purposes of this motion, the SEC has sufficiently alleged that Kameli "actually exercised general control over the operations" of CFIG and AEP, and that he "had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. Hence, defendants' motion to dismiss Count XV of the SAC is denied.

## H. Particular Misrepresentations

**\*24** Defendants' remaining arguments focus specifically on many of the central misrepresentations at the heart of the SEC's case: defendants' use of the Silver Line of Credit; their receipt of $4 million in fees from several of the Projects; their payments to Bright Oaks Development; defendants' use of investor funds to trade securities; and defendants' representations in connection with the acquisition of land for the Florida Projects. While differing in the details, defendants' arguments with respect to the various misrepresentations are structurally identical (and in some cases, repeated verbatim). For each alleged misrepresentation, defendants argue that their actions were consistent with all of the representations in the offering documents and that, consequently, there *was* no misrepresentation. In each case, they argue separately and more specifically that the Funds were at all times compliant with the EB-5 Program's requirements and that, consequently, they made no misrepresentations on that point.[18] Given the overlap between the issues and arguments, the court will avoid repetition by addressing previously-advanced arguments only where the court's prior discussion is not applicable *mutatis mutandis*.[19]

## 1. Representations/Omissions Relating to the Silver Line of Credit

Defendants begin by challenging the Commission's allegation that they made misleading representations regarding the Silver Line of Credit—namely, that despite their representation to investors that the Silver Line of Credit would be used only for the investors' and the Fund's benefit, defendants in fact used the line of credit for the expenses of other Funds and Projects, and indeed even for their own personal expenses.

Defendants deny that they made any such representation restricting their use of the Silver Line of Credit. They point out that the funds used to secure the Silver Line of Credit belonged to investors who had specifically authorized defendants to do so. In addition, defendants cite section 11(d) of the Silver Fund Investor Holdings Account Agreement, which provides: "The Parties hereto consent to and agree that the Fund Manager [CFIG] has the right to use the funds held in the Investor Holdings Fund as collateral for the Fund Manager to secure a line of credit to be used for any expense the Fund Manager deems proper." Silver Fund Investor Holdings Account Agreement ¶ 11(d), ECF No. 128-1. According to defendants, this provision effectively gave them carte blanche with respect to the funds in the holdings account. As a result, they contend, investors would have had no reason to believe that the Silver Line of Credit could be used only for the Silver Fund.

The SEC maintains that this reading of section (d) is too sweeping. According to the Commission, the provision must be read alongside other representations in the Holdings Account Agreement as well as representations in the Silver PPM. In particular, the SEC cites a provision of the Holdings Account Agreement stating: "Investor Holdings Agent shall establish an interest or non-interest bearing cash account to hold the Capital Contribution *for the benefit of Company and Investor* to be disbursed in accordance with this Agreement." Silver Fund Investor Holdings Account Agreement ¶ 4 (emphasis added). The Commission also points to the more general representations in the Silver Fund PPMs indicating that investor assets would be used (as required by the EB-5 Program) solely for the Silver Project.

**\*25** At this stage, the court is not in a position to determine as a matter of law whether defendants misrepresented how the funds from the Silver Line of Credit would be used. "The test for whether a statement is materially misleading under Section 10(b) is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.' " *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). "This is an objective inquiry, considering whether a reasonable investor would have received a false impression from the statement given the context and manner in which [the defendant] presented the statement." *United States Sec. & Exch. Comm'n v. Ustian*,

No. 16 C 3885, 2019 WL 7486835, at *28 (N.D. Ill. Dec. 13, 2019) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)). Thus, as a general matter, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." S.*E.C. v. Todd*, 642 F.3d 1207, 1220–21 (9th Cir. 2011). " 'The issue is appropriately decided as a matter of law, however, when reasonable minds could not differ. In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law.' " *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (quoting *Silver v. H&R Block, Inc.*, 105 F.3d 394, 396 (8th Cir. 1997)). Given the tension between the different contractual provisions cited by the parties, and absent further information about the context in which the representations regarding the Silver Line of Credit were made, reasonable minds may differ as to how investors would have understood defendants' statements and what limits they would have believed defendants' use of the funds were subject to.

This conclusion holds notwithstanding the several additional arguments put forth by defendants. In support of their position, for example, defendants cite paragraph 8 of the Investor Holdings Account Agreement, which provides:

> The Investor Holdings Agent may hold the Capital Contribution deposited by the Investor in an interest-bearing account. Interest earned on such account shall first be used to pay the out-of-pocket expenses of the Investor Holdings Agent including, but not limited to, mailing costs and wire transfer fees incurred in connection with the transfer of the Capital Contribution not to exceed $500.00 per month. Any remaining interest shall be paid to the Manager of Company in the Investor Holdings Agent's normal course at the end of the Investor Holdings Agent's regular interest payment and in compliance with U.S. laws and regulations.

Silver Fund Investor Holdings Account Agreement ¶ 8.

According to defendants, when read in conjunction with section 11, "it is clear that while the creation of the escrow account may have been for the benefit of the Silver Fund and investors, the ancillary uses of and earnings from the investors' funds were for the benefit of CFIG." MTD 75. The court finds this interpretation highly strained. Section 8 says nothing about how the Silver Line of Credit would be used. It pertains only to the use of the interest earned on the escrowed funds. If anything, the provision's relatively strict

rules regarding the minor issue of interest allocation tend to undermine defendants' contention that they had complete free rein when it came to the Silver Line of Credit.

Defendants also cite a 2013 USCIS Policy Memorandum, which states: "[a]n investor's money may be held in escrow until the investor has obtained conditional lawful permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon approval of the investor's Form I-526 and subsequent visa issuance and admission to the United States as a conditional permanent resident." United States Citizen and Immigration Services, Policy Memorandum: EB-5 Adjudications Policy at 6 (May 30, 2013) ("USCIS 2013 Memo").[20] As the Commission correctly points out, however, this document merely states that investor funds may be held in escrow. It does not say that the funds may be used for a line of credit, much less that the funds from such a line of credit could be used for purposes unrelated to the EB-5 investment.

**\*26** Lastly, defendants separately argue that they had no duty to inform investors of how they spent funds from the Silver Line of Credit. They maintain that, "[g]enerally, there is no duty on the part of a company to provide investors with all material information." MTD 75. According to defendants, section 11(d) of the Holdings Account Agreement explicitly states that the Silver Line of Credit can be used for any expense CFIG deems proper, provided the investor authorized CFIG to do so. "What those expenses specifically are, although a reasonable investor may like to know, is not required to be disclosed by Kameli or CFIG." *Id.* at 76. But whether the investors authorized CFIG's use of the funds for the expenses in question is precisely what is at issue. In any case, the SAC identifies at least two sources of defendants' duty to disclose how they were to use the funds from the Silver Line of Credit. First, the Commission alleges in several places that, in virtue of his role as attorney for many investors, Kameli had a fiduciary duty to disclose the misuse of proceeds from the Silver Line of Credit. *See, e.g.*, SAC ¶¶ 67-69, 100, 114. In addition, the SAC alleges that "once Kameli and CFIG decided to speak on the issue of the Silver Line of Credit, they had an obligation to be both accurate and complete to avoid rendering their statements false or misleading." Resp. Br. 45. Defendants have offered no rejoinder on this point.

In short, because defendants have failed to show as a matter of law that they had unfettered authority with regard to the Silver Line of Credit, it is impossible to say as a matter of law that defendants' use of the line of credit entailed no

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

misrepresentations. Accordingly, the court denies defendants' motion to dismiss the Commission's claims insofar as they are based on defendants' use of the Silver Line of Credit.

**2. Representations/Omissions Regarding $4 million in Fees Paid to Defendants**

Next, defendants seek dismissal of the SEC's claims insofar as they are based on the allegation that defendants collected roughly $4 million in undisclosed fees from certain of the Projects. In particular, defendants challenge the SEC's assertion that defendants' receipt of these fees was contrary to the PPMs' statement that defendants' compensation would come entirely from loan interest and would not be paid until after the senior living centers began housing residents. Defendants also challenge the SEC's assertion that the payments violated EB-5 Program rules, thereby rendering false or misleading the PPMs' representation regarding EB-5 compliance.

With respect to the issue of compensation, defendants contend that the payments in question were for *development* services, whereas the PPMs' statements regarding compensation pertained only to *management* services. They argue that the compensation they received for development services was not subject to the conditions on compensation outlined in the PPMs for management services, and that their receipt of the $ 4 million in fees was not contrary to anything in the PPMs. Moreover, defendants cite a number of documents indicating that CFIG and AEP had indeed contracted with the Projects to provide development services. The amounts of these agreements largely match those on which the Commission's $ 4 million calculation is based.[21] As a result, they maintain, the payments in question were not undisclosed.

 **\*27** However, the Commission goes on to assert that the payments entailed misrepresentations about defendants' conflicts of interest. Specifically, the SEC says that defendants' conflict-of-interest disclosures focused on Kameli's role as counselor and manager, and that defendants never informed investors that Kameli, CFIG, or AEP intended to serve as developers for the Projects. "Even if the fees were disclosed," the Commission argues, "investors were not informed that those fees were going to Kameli, CFIG, or AEP." Resp. Br. 50. Further, the Commission asserts that "in some instances, Kameli was paying himself before the fees had been earned." *Id.*

In their opening brief, defendants give only glancing treatment to the adequacy of their conflict-of-interest disclosures. They assert that "the Funds' respective PPMs unequivocally state that CFIG, or CFIG's subsidiaries, would be reimbursed for services rendered and paid various fees as stipulated in the respective business plans' sources and uses"; that Kameli was a stakeholder in CFIG; that "the transactions entered into by Kameli, CFIG, and the projects will not be at arm's length, and that Kameli is the majority or sole equity holder in the Project." MTD 82. "Thus," defendants conclude, "investors ... knew that such payments would be made to CFIG and could benefit Kameli." *Id.* at 82-83.

These passing remarks do not sufficiently address the adequacy of defendants' conflict-of-interest disclosures. Defendants cite no authority to suggest that these highly generalized disclosures were sufficient to inform investors of the conflicts of interest involved in the payments received for development services agreements. Defendants also leave unaddressed some of the SEC's specific allegations that in some cases Kameli paid himself for the development services before the fees had been earned. Thus, the court concludes that, insofar as the conflicts-of-interest disclosures are concerned, defendants have failed to show as a matter of law that their statements regarding the $ 4 million in fees were not misleading.

With respect to EB-5 compliance, defendants similarly attempt to show that their representations on the issue were not misleading because their use of investor funds was permissible under guidance provided by USCIS. Their argument is again based on their reading of the 2013 USCIS Memo. In particular, defendants cite the memo for the proposition that "in the regional center context, a commercial enterprise may create jobs indirectly through multiple investments in corporate affiliates or in unrelated entities," MTD 86 (citing 2013 USCIS Memo at 7); and that "in the regional center context, if the new commercial enterprise is not the job-creating entity, then the full amount of the capital must be first invested in the new commercial enterprise [defined by the USCIS as any for-profit activity formed for the ongoing conduct of lawful business] *and then* made available to the job-creating entity," *id.* (citing 2013 USCIS Memo at 16) (emphasis in original).

As interpreted by defendants, USCIS requires merely that investor funds go first to the new commercial enterprise (in this case, the Funds) and then to the job-creating entity (the Projects). Defendants maintain that once the job-creating

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

entity receives the funds, it is free to dispose of them as it wishes. Here, they assert, investor funds always went first to the Funds, and only later were disbursed to the Projects. As a result, defendants maintain, the Projects paid the money to AEP and CFIG, who were free to do whatever they wanted with the money, including pay for development services. As they put it, "What CFIG or AEP did with its legitimately earned funds after the fact is their business alone and is not within the jurisdiction of Plaintiff." MTD at 87.

**\*28** On its face, this contention is implausible. It has no limiting principle and would essentially permit investor funds to be used for *any* purpose—including patently fraudulent ones—so long as the funds followed the required path from the Funds to the Projects. To make a persuasive showing on this point, defendants would need to address such problems, and to discuss USCIS regulations in far greater depth than they have done here.

In sum, defendants have failed to demonstrate that, in light of their receipt of the $4 million in fees, the PPMs' representations regarding conflicts of interest and EB-5 compliance were not misleading. The court therefore denies defendants' motion to dismiss with respect to the SEC's claims regarding defendants' collection of $4 million in fees.

**3. Representations/Omissions Regarding Bright Oaks Development**

The third misrepresentation alleged by the SEC stems from the allegation that, between June 2013 and June 2015, Kameli and CFIG caused the Golden and Silver Projects to pay Bright Oaks a total $745,000. SAC ¶¶ 119-20. Because defendants failed to disclose Nader Kameli's involvement with Bright Oaks during the time period in question, the SEC again alleges that defendants' conflict-of-interest disclosures were misleading.

Defendants initially argue that information about Bright Oaks could not have been disclosed to investors in the initial Golden and Silver PPMs because the documents were issued in 2011, and 2012, respectively, whereas Bright Oaks was not incorporated until 2013. This is beside the point, however, because the conduct on which the Commission's claim is based did not begin until 2013. Defendants assert that they informed investors of the relevant information regarding Bright Oaks in 2013. But the document they cite in support of the claim – an email memorandum sent by CFIG to Golden Fund investors and identified as a "Notice of Adjourned

Meeting"–fails to bear this out.[22] As the SEC notes, the letter at most shows only that Golden Fund investors were informed of Bright Oaks. It does nothing to show that Silver Fund investors were likewise informed. Moreover, the email merely discloses defendants' relationship with Bright Oaks. It says nothing about Nader Kameli's involvement with Bright Oaks.

For these reasons, the court declines to dismiss the SEC's claims insofar as they are based on the payments in question to Bright Oaks.

**4. Representations Regarding Securities Trading**

Defendants next challenge the SEC's claims insofar as they are based on their use of investor funds to engage in securities training. As discussed above, the SEC alleges that, between April 2013 and September 2015, defendants caused the Illinois Projects to trade securities with money lent to them by their respective Funds. In some cases, the SEC further alleges that defendants used profits derived from the trading for purposes unrelated to the respective funds. According to the Commission, these actions violated the EB-5 Program's requirement that the full amount of an investor's money be made available to the business most closely responsible for creating the jobs upon which the investor's immigration petition is based. Thus, the Commission says, defendants misled investors by representing in the PPMs that the Funds would comply with the Program.

**\*29** Defendants first argue that the Funds' operating agreements authorized their use of investor funds for securities trading. Specifically, paragraph 5.1 of the operating agreements provides:

> Subject to the terms of this Agreement and the terms of the Act, the Manager shall have the unrestricted power and exclusive authority to ... carry on the activities of the Company and to do and to perform any and all things necessary for, incidental to, or connected with carrying on the activities of the [Fund].

Aurora Fund Operating Agreement, ECF No. 128-21; Elgin Fund Operating Agreement, ECF No. 128-22; Golden Fund Operating Agreement, ECF No. 128-23; Silver Fund Operating Agreement, ECF No. 128-24. Section 5.1 additionally states that "[a]ll operational decisions made by the Manager hereby have the express consent, approval, and affirmative vote of the Members." *Id.*

Defendants argue that this provision gave them the authority to trade securities with investor funds. For at least two reasons, the argument fails. First, it is on all fours with defendants' previous argument that, based on section 11(d) of the Holdings Account Agreement, they had unbridled authority to use the Silver Line of Credit as they wished. Here, as there, the Commission correctly argues that the provisions on which defendants rely must be viewed in context. *See, e.g.*, *Rombach*, 355 F.3d at 172 n.7. The question is whether, when taken along with defendants' other representations, investors would have regarded the operating agreement as giving defendants license to use their funds to engage in securities trading. As with section 11(d) of the Holdings Account Agreement, the court cannot agree with defendants that, as a matter of law, a reasonable investor would have understood the operating agreement in such a sweeping manner.

Second, even assuming that the operating agreements permitted defendants to engage in securities trading, that would not show that their representations regarding the EB-5 Program were not misleading. Whatever might have been permitted under the operating agreements, EB-5 rules still required defendants to use investors' money for the business most closely responsible for creating the jobs upon which their immigration petition were based. It is unclear how using investor funds to trade securities would satisfy that requirement.

Defendants go on to repeat their argument, based on the USCIS 2013 Memo, that the *Izummi* decision requires only that investor money be distributed in the first instance to the new commercial enterprise (the Funds) and that whatever is done with the money once it goes through the job-creating entity (the Projects) is essentially irrelevant. The issue here, again, is whether EB-5 regulations are indeed indifferent to the way in which investor money is used once it is disbursed from the Funds to the Projects. Once more, the parties' briefing on this issue does not permit the court to address that issue in a meaningful way.

For these reasons, the court denies defendants' motion to dismiss the SEC's claims insofar as they are based on defendants' use of investor funds to trade securities.

### 5. Statements Regarding Land Acquired for the Florida Projects

**\*30** The final alleged misrepresentations challenged by defendants have to do with the transactions through which

the land for the Florida Projects was acquired. As recounted earlier, the SEC alleges that Platinum Real Estate and Property Investments, Inc., a company owned by Kameli, purchased the land to be used for the Florida Projects at a price between approximately $665,000 and $750,000, and later sold the land to the Projects at a price of $1 million each. According to the SEC, this resulted in a combined profit to Kameli and Platinum of over $1 million. The Commission alleges that these transactions involved several misrepresentations: first, that the profit from the purchases represented a form of compensation for Kameli that was never disclosed to investors; second, that defendants failed adequately to inform investors regarding conflicts of interest; and third, that defendants misled investors about the cost of the land by listing the price as $ 1 million rather than the substantially lesser amount Platinum actually paid for it.

Defendants do not address the SEC's contentions with respect to the issue of compensation. With respect to that issue, therefore, they have conceded the point. Defendants' arguments regarding the other alleged misrepresentations ultimately fail. As to the conflict-of-interest disclosures, defendants first dispute that they were required to disclose the matter at all. However, the Commission argues – and defendants fail to dispute – that the duty to disclose was based on Kameli's fiduciary relationship as attorney to several of the investors. Defendants go on to argue that the PPMs' disclosures were adequate, pointing to statements in the Florida PPMs. These are roughly the same as those of the Illinois Funds: they informed investors that Kameli owned both AEP and Platinum, and that defendants and that the Funds would not engage in arm's-length transactions. As in the case of the Illinois Funds' conflicts disclosures, however, the court is unable to say as a matter of law that the Florida Fund PPMs' disclosures were adequate. The issue turns on how reasonable investors might have understood these disclosures in light of defendants' other representations and other circumstances of this case. Because the parties have not addressed these matters in depth, the court cannot decide the issue at this juncture.

With respect to the issue of EB-5 compliance, defendants argue that they made no misrepresentations because they did not violate the Program's rules. Here, defendants rely entirely on second USCIS Policy Memorandum, issued in 2015, which states: "In terms of using funds from EB-5 investors to acquire real estate, *Matter of Izummi* requires that the full amount of money must be made available to the business(es) most closely responsible for creating the

employment upon which the petition is based. For example, *a job-creating entity may propose to allocate some EB-5 funds to purchasing land* and other EB-5 funds to developing and operating a business on the purchased land." MTD 109-10 (USCIS 2015 Memo at 4) (internal quotations omitted, defendants' emphasis). However, defendants provide no further explanation regarding how this sentence supports their conclusion. The quotation says merely that "some EB-5 funds" may be used to purchase land—a matter that does not appear to be in dispute. Defendants point to nothing further in the memo, and make no other argument, to suggest that land may be purchased and later sold at a higher price to turn a profit.

To be sure, the extent to which defendants may have profited from the sales is unclear. In their brief, they suggest that the "Land Costs" line item in the Funds' Business Plans includes costs and expenses beyond the parcel of land itself, so that the $1 million figure does not in fact represent a simple mark-up of the price. But they do not expand on the matter, and at any rate, this is a factual question that cannot be decided now. At this stage, the court is required to take the SAC's allegations, and all reasonable inferences therefrom, in the light most favorable to the Commission. Viewed in that light, defendants have failed to demonstrate that the land transactions for the Florida Projects comported with the EB-5 Program.

**\*31** For these reasons, the court denies defendants' motion to dismiss the SAC's claims relating to the Florida Project land transactions.[23] Having considered and rejected defendants' other arguments under Rule 12(b)(6), as well as under Rule 9(b), defendants' motion to dismiss is denied.

**Conclusion**

For the reasons discussed above, defendants' motion to dismiss [199] is denied and the SEC's motion to strike [200] is denied as moot.

**All Citations**

Slip Copy, 2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

Footnotes

1   Because the scope of § 10(b) and Rule 10b-5 are coterminous, the court uses them interchangeably. *S.E.C. v. Zandford*, 535 U.S. 813, 813 n.1 (2002) ("The scope of Rule 10b–5 is coextensive with the coverage of § 10(b), therefore, we use § 10(b) to refer to both the statutory provision and the Rule.").

2   Prior to November 2019, EB-5 applicants were generally required to invest $ 1 million, 8 U.S.C. § 1153(b)(5)(C)(i), but were permitted to invest $500,000 if the investment was located in "targeted employment areas" (defined as an area that, "at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate," 8 C.F.R. § 204.6). Following amendments in November 2019, the regulations now require an investment of $1.8 million and allow for an investment of $900,000 in targeted employment areas.

3   The court refers to these Projects collectively as the "Illinois Projects."

4   The court refers to these Funds collectively as the "Illinois Funds."

5   The court refers to these Funds collectively as the "Florida Funds."

6   The court refers to these Projects collectively as the "Florida Projects."

7   In their response brief, however, the SEC cites a case involving an investor in the Elgin Fund seeking to challenge the denial of his I-829 Petition. *See Doe v. Johnson*, No. 15-CV-01387, 2017 WL 1151036 (N.D. Ill. Mar. 28, 2017). The challenge was unsuccessful.

8   There is also a question as to whether the definitional issue actually implicates the court's subject-matter jurisdiction. For the question of whether the transactions at issue involve "securities" also goes to the merits of the SEC's claims. True, there are many cases suggesting that the question of whether a transaction involves "securities" is indeed jurisdictional in nature. *See, e.g.*, *Emisco Indus., Inc. v. Pro's Inc.*, 543 F.2d 38, 41 (7th Cir. 1976) ("The transaction involved nothing more than a note used as a cash substitute in the purchase of property. Hence the note did not constitute 'a security' within the meaning of the 1934 Securities Act on which plaintiffs premised federal jurisdiction."); *La Salle Nat. Bank v. Arthur Andersen & Co.*, 531 F. Supp. 702, 707 (N.D. Ill. 1982) ("This court agrees with the defendant Arthur Andersen that the complaints do not properly allege the existence of a 'security' for purposes of showing federal jurisdiction and that they should therefore be dismissed."). However, these cases were decided prior to more recent Supreme Court cases that "have generally narrowed the issues that federal courts treat as affecting subject matter jurisdiction[. They] have directed courts to take a statute at its word when it speaks in terms of jurisdiction." *Frey v. E.P.A.*, 751 F.3d 461, 467

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 233 of 306 PageID #:2189

United States Securities and Exchange Commission v. Kameli, Slip Copy (2020)
2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

(7th Cir. 2014); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) ("If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). There is no need to wade into these waters for purposes of this motion because, as is discussed in what follows, defendants' challenge to the court's jurisdiction fails in any event.

9 Having resolved the jurisdictional issue on other grounds, it is unnecessary to address the merits of the parties' arguments on the definitional question.

10 Specifically, with respect to the Golden Fund, the SAC alleges that defendants caused the Golden Project to make a $245,000 undisclosed payment to CFIG beginning in November 2012, SAC ¶ 157; engaged in securities trading with Golden Project funds from April 2013 to September 2015, *id.* ¶ 161; used $138,000 from the Silver Line of Credit to pay for various expenses of the Golden Project in December 2013, *id.* ¶ 170; and diverted Golden Project funds to Bright Oaks Development between June 2013 and June 2015, *id.* ¶ 175. With respect to the Elgin Fund, the SAC alleges that defendants made undisclosed payments from Elgin Project to Kameli and CFIG between 2010 and 2012, *id.* ¶ 210; used the Silver Line of Credit to pay for Elgin Project expenses in December 2013, *id.* ¶ 217; used an Elgin Fund investor's funds to pay CFIG credit card expenses in September 2014, *id.* ¶ 220; and used Elgin Project funds to trade in securities from April 2013 to April 2015, *id.* ¶ 225. With respect to the Aurora Fund, the SAC alleges that defendants made undisclosed payments from Aurora to CFIG in March 2011, September 2012, and February 2016, *id.* ¶ 251; used Silver Line of Credit funds to pay for Aurora Project expenses from December 2013 through October 2014, *id.* ¶ 257; and engaged in securities trading with Aurora Project funds from April 2013 to July 2013, *id.* ¶ 265.

11 Defendants additionally argue that the request for injunctive relief should be dismissed because it must be supported by a showing of actual risk of harm. They assert that many "individuals who are the officers, agents, servants, employees, and attorneys of Defendants are not accused of any wrongdoing in the SAC and have a relationship with Defendants that post-dates this matter. Reply Br. 20 (quotations marks and brackets omitted). This contention raises factual questions that are not properly decided at this stage. *See, e.g.*, *S.E.C. v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds by 568 U.S. 442 (2013) ("[W]here, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry.").

12 The SEC maintains that its complaint is not subject to the even more stringent pleading requirements of The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). As noted in ruling on defendants' motion to dismiss the FAC, while the Seventh Circuit has not addressed the question, most courts have concluded that the PSLRA's pleading requirements do not apply in SEC enforcement actions. *See Kameli*, 373 F. Supp. 3d at 1201 (citing *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 615–16 & n.12 (N.D. Ill. 2011)). Since defendants do not contend otherwise, the court applies the standard under Rule 9(b) (in concert with Rule 8(a)(2)).

13 Thus, Count I asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Silver Fund; and Count II asserts claims against Kameli and CFIG under § 17(a) in connection with the Silver Fund. Count III asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Golden Fund; and Count IV asserts claims against Kameli and CFIG under § 17(a) in connection with the Golden Fund. Count V asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Elgin Fund; and Count VI asserts claims against Kameli and CFIG under § 17(a) in connection with the Elgin Fund. Count VII asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Aurora Fund; and Count VIII asserts claims against Kameli and CFIG under § 17(a) in connection with the Aurora Fund. Count IX asserts claims under Rule 10b-5 against Kameli and AEP in connection with the First American Fund; Count X asserts claims against Kameli and AEP under § 17(a) in connection with the First American Fund. Count XI asserts claims under Rule 10b-5 against Kameli and AEP in connection with the Naples Fund; Count XII claims against Kameli and AEP under § 17(a) in connection with the Naples Fund. Count XIII asserts claims under Rule 10b-5 against Kameli and AEP in connection with the Ft. Myers Fund; Count XIV claims against Kameli and AEP under § 17(a) in connection with the Ft. Myers Fund. Lastly, Count XV asserts a claim under 20(a) of the Exchange Act for control-person liability against Kameli.

14 Although defendants devote separate sections of the brief to advancing this argument with respect to the SAC's § 10(b) claims, its § 17(a) claims, and its § 20(a) control-person liability claim, their arguments are largely the same. To avoid redundancy, the following discussion focuses on defendants' arguments as to the § 10(b) claims. Separate discussion will be necessary only briefly with respect to the SAC's control-person claim.

15 The court confines itself to the SAC, even though the parties presented testimony and other evidence in the course of the previous hearing on the Commission's motion for a preliminary injunction. *See, e.g.*, *Michigan v. U.S. Army Corps of*

*Engineers*, 911 F. Supp. 2d 739, 744 (N.D. Ill. 2012); *see also Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 215 (D. Mass. 2013) ("A substantial quantity of extrinsic evidence has already been presented to the Court as part of Plaintiff's Application for Preliminary Injunction. However, under the Rule 12(b)(6) standard, the Court will rely only upon the facts contained in Plaintiff's Second Amended Complaint or incorporated therein by reference.").

On this basis of this argument, defendants purport to seek dismissal of all of the SAC's § 10(b) counts. However, only Rule 10b-5(b) requires a showing that the defendant is the maker of misleading representations. Since the SAC's § 10(b) counts also assert claims under Rule 10b-5(a) and (c), defendants' argument on this point, even if correct, would not require dismissal of the § 10(b) counts in their entirety. And indeed, as discussed immediately below, defendants offer separate arguments for the SAC's claims under Rule 10b-5(a) and (c).

Defendants separately argue that the SAC fails sufficiently to allege negligence for purposes of the claims under § 17(a)(2) and § 17(a)(3). However, having found that the SAC adequately alleges scienter, it follows *a fortiori* that the complaint sufficiently alleges the less onerous standard of negligence. *See, e.g.*, *Ustian*, 2019 WL 7486835, at *39 (holding that it was unnecessary to address sufficiency of evidence regarding negligence claims given questions of fact as to whether defendant acted with scienter); *United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) ("[B]ecause the Court finds that the SEC has properly plead the higher standard of scienter in connection with its misrepresentation claim, Uchimoto's motion to dismiss the Section 17(a)(2) claim for a failure to plead negligence is denied."); *S.E.C. v. Coplan*, No. 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014)("In light of these factual allegations, Coplan is deemed to have acted with scienter and, consequently, with the lower standard of negligence required for the Commission's claim under Sections 17(a)(2) and (3) of the Securities Act."). Accordingly, the court does not separately address defendants' argument that the SAC fails to plead negligence.

The court notes that, with respect to these arguments, defendants have not replied to any of the arguments raised in the SEC's response brief. Typically, this results in the forfeiture of the point in question. *See, e.g.*, *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver."); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008). Although the court has opted against the rigid application of this rule by simply holding that defendants have conceded *all* of the points at issue, further discussion of some of the issues would have been helpful. In their reply brief, defendants explain that they decided not to reply to these arguments "[i]n an attempt to adhere to this Court's request that this current reply be within twenty-five pages." Reply Br. 27 n.2. In its minute entry addressing the briefing on the motion to dismiss, however, the court noted that defendants could request an expansion of the page limit if needed. *See* ECF No. 208.

In addition, some of defendants' arguments are insufficiently developed. This is true, for example, of their assertion that the SAC fails to allege materiality with respect to the representations at issue. The SAC's allegations on these points are sufficient with respect to all of the misrepresentations at issue. Extended discussion of the issue of materiality is therefore unnecessary.

This document, and a second USCIS memorandum, United States Citizen and Immigration Services, *Talking Points from EB-5 Interactive Series: Expenses that are Includable (or Excludable) for Job Creation* (June 4, 2015) ("USCIS 2015 Memo"), are among those that the SEC has sought to strike. The Commission's basis for seeking to exclude these documents is not entirely clear. In its motion, the SEC states that although it has no reason to contest that the documents are indeed issued by USCIS, it "is impossible for the SEC or the Court to tell, at this stage, what the significance of these documents may be." Mot. to Strike 3. "At the motion to dismiss stage," the Commission says, "the Court should not take Defendants' word for it about the supposed significance of these documents." *Id.* What the Commission means by the "significance" of the documents is unclear. Ultimately, however, neither of the USCIS memos supports defendants' position. Accordingly, the SEC's motion to strike these documents is denied as moot.

These include several documents that the SEC has moved to strike, namely: the Elgin Development Services Agreement, ECF No. 128-9; the Golden Site Selection & Pre-Development Services Agreement, ECF No. 128-10; the Aurora Development Services Agreement, ECF No. 128-11; the Silver Business Development & Advisory Services Agreement, ECF No. 128-12; the First American Amended Business Development & Advisory Services Agreement, ECF No. 128-19; the Golden Development Services Agreement, ECF No. 128-29; and the Silver Development Services Agreement, ECF. 128-30. The Commission claims that the exhibits should be excluded because they were not attached to the complaint. For two reasons, however, the court need not rely on these documents for purposes of defendants' motion to dismiss. First, the information for which defendants cite these documents is also found in the Funds' Business Plans, which the Commission does not seek to exclude. Second, as will become clear, the information in the documents is not responsive to the SEC's contention that, even if the payments themselves were disclosed, defendants' attendant conflicts of interest were not. Accordingly, as to these exhibits, the Commission's motion to strike is denied as moot.

2020 WL 2542154, Fed. Sec. L. Rep. P 100,822

22      Chicagoland Foreign Investment Group, Update from Manager of Golden Assisted Living EB-5 Fund, LLC; Notice of Adjourned Meeting on August 21, 2013 (July 17, 2013), ECF No. 199-5. This is the last of the exhibits that SEC has moved to strike. Since the document is ultimately unhelpful to defendants, the court denies plaintiff's request that it be stricken.

23      In addition to the payments to Bright Oaks, the SAC separately alleges that defendant violated the antifraud statutes by diverting funds from the Silver and Golden Funds through Bright Oaks to the Aurora Project. Defendants' arguments on this point overlap substantially with those already discussed. Specifically, they contend that the operating agreements and other documents gave them virtually unlimited authority regarding their handling of investor funds; and they argue that they complied with EB-5 rules because investor funds were always initially given to the Funds and were diverted and commingled only after the fact. Having considered these arguments already, the court will not address them separately here.

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

2012 WL 4069346
United States District Court,
E.D. Wisconsin.

UNITED STATES Securities and
Exchange Commission, Plaintiff,

v.

STIFEL, NICOLAUS & CO., INC.
and David W. Noack, Defendant.

No. 11–C–0755.
|
Sept. 14, 2012.

**Attorneys and Law Firms**

Anne C. McKinley, Jeffrey A. Shank, Kevin N. Guerrero, Robert Macdonald Moye, Steven C. Seeger, United States Securities and Exchange Commission, Chicago, IL, Susan M. Knepel, United States Department of Justice, Milwaukee, WI, for Plaintiff.

Brian G. Cahill, David J. Turek, Gass Weber Mullins LLC, Milwaukee, WI, Jeffrey J. Kalinowski, Richard H. Kuhlman, Bryan Cave LLP, St Louis, MO, Gilbert F. Urfer, Nistler Law Office SC, Brookfield, WI, Ronald P. Kane, Kane & Fischer Ltd., Chicago, IL, for Defendant.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS (DOCS.15, 16)

C.N. CLEVERT, JR., Chief Judge.

**\*1** The Securities and Exchange Commission sues Stifel, Nicolaus & Co ., Inc. and its former Senior Vice President, David W. Noack, for alleged violations of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 thereunder, and Section 17(a) of the Securities Act of 1933 in connection with the sale of collateralized debt obligations to five eastern Wisconsin school districts. In addition, the SEC asserts that Stifel violated Section 15(c)(1)(A) of the Exchange Act and that Noack aided and abetted that violation. The defendants move to dismiss under Fed.R.Civ.P. 9 and 12(b)(6) .[1]

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). The complaint has

to contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2). However, enough facts must be set forth to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); *St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 625 (7th Cir.2007). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (citing *Bell Atl.,* 550 U.S. at 555–56, 569 n. 14). When considering a Rule 12(b)(6) motion, the court is to construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008).

Federal Rule of Civil Procedure 12(e) allows a party to move for a more definite statement before filing an answer if the complaint "is so vague or ambiguous that the party cannot reasonably prepare a response." The motion must point out the defects complained of and the details desired. Fed.R.Civ.P. 12(e). A Rule 12(e) motion is disfavored and is not a substitute for discovery. *Coleman v. Majestic Star Casino, LLC,* No. 2:11–CV–391–PPS–PRC, 2012 WL 1424396, \*1 (N.D.Ind. Apr. 24, 2012). However, it may be used to put a defendant on notice regarding which claims apply to what parties. *Id.*

Here, defendants attack the Complaint on procedural and substantive grounds.

PLEADING WITH PARTICULARITY UNDER RULE 9

The allegations in the Complaint concern fraud and thus must satisfy special pleading requirements. The SEC acknowledges the pleading standard of Fed.R.Civ.P. 9(b), which means that it must "state with particularity the circumstances constituting fraud."

To set forth the circumstances of fraud with particularity, the plaintiff must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994) (internal quotation marks omitted). Put another way, a complaint has to identify "the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp.*

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

*Retiree Med. Benefits Tr. v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir.2011). However, courts and litigants should not take an overly rigid view of the dictates of Rule 9(b). *See id.* at 442. "The purposes of the pleading requirement are to protect a defending party's reputation from harm, to minimize strike suits, and to provide detailed notice of a fraud claim to a defending party," 2 James William Moore, *Moore's Federal Practice* § 9.03[1][a], at 9–15 (3d ed.2012) (footnotes omitted), and "to force the plaintiff to do more than the usual investigation before filing his complaint," *Ackerman v. Nw. Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999).

 **\*2** Defendants contend that certain allegations of fraud must be dismissed, struck from the Complaint, or repleaded or supplemented with a more definite statement because they fail to meet Rule 9(b) requirements through lack of precise dating and failure to identify the specific individuals to whom statements were made.

A. Specificity as to the Date Statements Were Made

Defendants argue that the contentions in paragraphs 73, 75, 79, 81, 87, 89, 91, 93, 95, and 103 of the Complaint suffer from a failure to identify when fraudulent statements may have been made. Defendants note that they need the dates to determine, for instance, whether such statements were made while Noack worked at Stifel and whether such statements were made before or after the first, second, or third transactions at issue. (Doc. 17 at 7–8.)

The SEC responds that the Complaint asserts, among other things, that the misrepresentations occurred before school districts invested in 2006 and that Noack was acting on behalf of Stifel at the time he made the statements. (*See* Doc. 20 at 8.) The SEC points to paragraphs that set forth specific dates for other statements (such as in Doc. 1 ¶¶ 77, 83) as support for the time frame of 2006. In addition, the Complaint charges that Noack worked for Stifel from 2000 to 2007. (Doc. 20 at 8 (citing Doc. 1 ¶¶ 17, 71).)

Plaintiffs are not absolutely required to plead specific dates of fraudulent acts "provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." 2 Moore, *supra,* § 9.03[1][b], at 9–18, *cited in Pirelli Armstrong Tire Co.,* 631 F.3d at 442. But here, as to the paragraphs challenged by defendants, the SEC has failed to provide any precision regarding a date or a sufficiently narrow time frame to satisfy Rule 9(b). "Sometime in 2006 or before" or "sometime before one of the three transactions" are too imprecise for Rule 9(b) purposes.

Thus, defendants' motions to dismiss or strike the claims in the following paragraphs are granted. However, the SEC will be allowed to amend the Complaint if it believes that it can set forth more specific dating for these statements.

| Compl. ¶ | Allegation | Sufficient re Date? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis–West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar | No. "[B]efore the first deal" is not sufficiently precise to satisfy Rule 9(b) regarding statements to West Allis–West Milwaukee. Further, from other documents in the record it appears that Waukesha was not part of the "first deal" with West Allis–West Milwaukee, drawing into question whether the statement occurred prior to the first of the three transactions or the first transaction involving West Allis–West Milwaukee. |

**U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | No. No specificity, precision, or time frame; likely sometime before one of the three transactions but that is not specific enough. |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. The second transaction occurred on September 29, 2006. Even if the SEC limited this to the year 2006, "before the second deal" leaves many months, which is too imprecise to satisfy Rule 9(b) in this case. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would | No. No time frame is given nor any other means of determining the date with relative precision. |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis–West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations | No. No time frame is given nor any other means of determining the date with relative precision. |

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 240 of 306 PageID #:2196

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)
2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be #15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate."

### B. Specificity as to Whom the Statements Were Made

**\*3** Next, defendants argue that the requirement regarding identification of the "who" of an allegedly fraudulent statement includes identification of "to whom" each statement was made, citing *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990), and *Roberts v. McCarthy,* 2:11–CV–00080, 2011 WL 1363811, \*3 (D.Nev. Apr. 11, 2011). According to defendants, the allegations in paragraphs 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95, 97, 99, and 103 do not satisfy Rule 9(b) pleading requirements because they do not adequately specify to whom the statements were made. While some of these statements are identified as having been made to the "School Districts," those claims fall short; defendants are not provided with the names of the *individuals* to whom the statements were made.

*DiLeo* does not discuss expressly a requirement of identifying the *recipient* of a fraudulent statement. However, the case sets forth the oft-quoted phrase that Rule 9(b) requires "the who, what, when, where, and how: the first paragraph of any newspaper story." 901 F.2d at 627. But the court did not add that "who" means identification of both the speaker and the listener. *See id.* Similarly, Roberts does not address whether the plaintiff must identify the person to whom a statement is made, although in a parenthetical it cites another case for the proposition that identification of the listener is required when the alleged fraud is that of a corporation. Nevertheless, Moore's Federal Practice suggests that Rule 9(b) often requires allegations regarding "[t]he persons or entities to whom the misrepresentation was communicated."

2 Moore, *supra,* § 9.03[b], at 9–18. But notably, even Moore's indicates that identification of the entity to whom the statement was made (not an individual at the *entity* ) is acceptable.

Here, in large part, the SEC's allegations of "who" are sufficient. Who *made* the statement is generally more important than who *heard* it, *cf. Vicom, Inc.,* 20 F.3d at 777 (stating that because fair notice is the most basic consideration underlying Rule 9(b) a fraud pleading must reasonably notify the defendant of his role in the fraud), and the SEC identifies the speaker as Noack for all statements. Plus, for many challenged statements the SEC identifies at least one school district to whom a statement was aimed.

Though defendants submit that the Complaint should name the individual at the school district who heard alleged misrepresentations, the absence of these names may be a matter for discovery rather than a basis for dismissal or striking portions of the Complaint. Here, the allegations naming a particular school district are sufficient. Moreover, assertions in the Complaint identify the individuals to whom misrepresentations were made as school board members, providing even more detail to the defendants.

In addition, for allegations naming the "School Districts" together as the listeners, the Complaint defines the term "School Districts" as five particular school districts in the State of Wisconsin: School District of West Allis–West Milwaukee, Kenosha School District No. 1, School District of Waukesha, Kimberly Area School District, and School

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

District of Whitefish Bay. (Doc. ¶¶ 1, 18.) Thus, if allegations indicate that a statement was made to the "School Districts," the Complaint is read as a whole to indicate that the statement was made to all five school districts, and that is sufficient as well.[2]

**\*4** However, in certain instances the Complaint asserts that a statement was made to "possible others." Such a reference is too vague to satisfy Rule 9(b). Additionally, some paragraphs assert a statement by Noack in general, followed by examples of the statement being made to a particular school district. Only the examples are sufficiently pled under Rule 9(b) unless the general statement is accompanied by other precise facts that describe it more particularly, such as where and when the statement occurred or that it was indeed made to all five school districts.

The SEC submits that when the Complaint is analyzed, it should be understood that statements not specifying a particular school district as recipient were made to all five school districts unless otherwise noted. But here, that is not acceptable. This case is not one in which the listener or recipient discussed in a complaint may be identified easily. Five school districts are involved. Moreover, the Complaint includes over 200 paragraphs of allegations. Hence, this case warrants particularity, not just assumptions that certain statements were made to all five school districts.

In short, the identification of a school district as the recipient of a fraudulent statement is acceptable even if an individual at the school district is not named. But in this case, with five different school districts involved, the SEC needs to identify at the least which school districts heard the statements.

Thus, the rulings as to each challenged statement are as follows:

| Compl. ¶ | Allegation | Sufficient re "to Whom"? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis–West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | Yes as to the statement made to West Allis–West Milwaukee and the separate statement made to Waukesha. No as to the first sentence of the paragraph to the extent it may have been made to others. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose | Yes as to the statement made to Waukesha. No as to "possible others." |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

their principal. For example, Noack made that representation to Waukesha, among possible others."

| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way —the real—you need 15 Enrons. You need something to happen that big overnight.' The audio was recorded." | Yes as to the statement made to Whitefish Bay. No as to the first sentence of the paragraph to the extent the statement may have been made to others. |
| --- | --- | --- |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | Yes. The allegation is that the statement was made to all five school districts. No as to the first sentence of the paragraph to the extent it may have been made to others. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | Yes as to the statement made to Kimberly. No as to "possible others." |
| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West | Yes. |

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | Allis–West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | |
| 85 | "Noack represented that the third deal would involve an investment in only investment-grade companies. During a meeting of the school board of Waukesha on November 27, 2006, which was videotaped, Noack stated to the school board: '[A]gain, we're only investing in higher grade companies. If you look at the balance sheets of investment grade companies in the world today, which is 805, they're doing better than ever.' Noack later said at that same meeting: '[T]he odds of, again, it takes twenty out of these hundred companies to default before it gets to your AA level." ' | Yes as to the statement to Waukesha. Moreover, all Waukesha school board members present at the meeting can be assumed to have heard the statements, providing even the level of specificity that defendants argue for. No as to the first sentence to the extent it may relate to other school districts. |
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | Yes as to the statement made to Kenosha. No as to "possible others." |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation | Yes as to the statement made to Kenosha. No as to "possible others." |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | to Kenosha, among possible others." | |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Yes as to the statement made to Waukesha. No as to "possible others." |
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis–West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | Yes as to the first statement as made to West Allis–West Milwaukee. No as to the second statement, as it does not indicate that it was made to all four other school districts —"other School Districts" is vague as to whether it is all four or just some of them. |
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | Yes as to the statement made to Whitefish Bay and Kimberly. No as to "possible others." |
| 97 | "Noack misrepresented the initial performance of the first investment. On or about August 14, 2006, Noack attended a West Allis–West Milwaukee school board meeting to propose an | Yes as to statement made to West Allis— West Milwaukee. No as to the first sentence to the extent it may have been made to anyone else. |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)
2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | additional investment in the GOAL Program. A school board member asked Noack how the first investment was performing. Noack responded that the investment was 'on course." ' | |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis–West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?" ' | Yes. Moreover, all Whitefish Bay school board members can be assumed to have heard or seen the statement, providing even the level of specificity that defendants argue for. |
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | Yes. Use of the defined term "School Districts" indicates that the statements were allegedly made to all five school districts. |

SUBSTANTIVE CHALLENGES

**\*5** The SEC does not disagree that its claims require that an alleged misrepresentation or omission be material. *See SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999) (stating that violations of § 10(b), § 17(a)(1)-(3), and Rule 10b–5 require a material misrepresentation or material omission as to which the individual had a duty to speak). A misrepresentation is material if there is a substantial likelihood that the statement or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

32 (1988) (internal quotation marks omitted). Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information" and is a fact-specific inquiry. *Id.* at 240.

Defendants contend that various alleged misrepresentations, even if pled properly, were immaterial as a matter of law because they were (1) puffery; (2) opinion, including predictions of future performance and generic statements about risk; or (3) as to West Allis–West Milwaukee contradicted by written offering documents. Thus, no reasonable investor would have considered the information significant.

In addition, defendants contend that certain allegations of omission must be dismissed because defendants had no duty to disclose the allegedly omitted information.

A. Puffery

"Mere sales puffery is not actionable under Rule 10b–5," *Eisenstadt v. Centel Corp.,* 113 *F.3d 738,* 745–46 (7th Cir.1997), because it is not material. Typically, puffery involves optimistic rhetoric and promotional sales talk that is devoid of substantive information and contains no useful information upon which a reasonable investor would base a decision to invest. *See Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995); *In re Midway Games, Inc. Sec. Litig.,* 332 F.Supp.2d 1152, 1164 (N.D.Ill.2004). It includes "general, optimistic statements that are not capable of being objectively verified." *In re Midway Games, Inc. Sec. Litig.,* 332 F.Supp.2d at 1164. "[L]oosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available," may be found immaterial as a matter of law and a basis for granting a motion to dismiss. *Id.* (internal quotation marks omitted).

Defendants maintain that the statements in paragraphs 73, 75, 77, 79, 81, 83, 85, 89, 91, 93, 95, 97, 99, and 103 of the Complaint are immaterial and nonactionable puffery. They argue that phrases like " 'treasury-like, 'higher-grade,' 'bread lines,' 'financial trouble,' 'on course,' and 'hiccup' all exemplify a lack of precision such that a reasonable investor could not find the information to be material. There is no way to define these phrases, and no way to quantify them." (Doc. 17 at 10.) Defendants further assert that such phrases were merely optimistic rhetoric. (*Id.* at 12.)

**\*6** However, defendants pull those words out of the sentences that give them context and help determine their substantive meaning. Moreover, for the reasons set forth below the court finds that, with one exception, the challenged allegations are more than puffery. As for the one exception, the court agrees that the alleged statement regarding bread lines is hyperbole and too vague for a reasonable investor to rely upon it. Therefore, the motion to dismiss will be granted as to that one allegation (paragraph 91) and it is dismissed as a matter of law.

| Compl. ¶ | Allegation | Puffery? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis–West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to | No. Treasury bonds are generally believed by the public to be very low-risk investments. See, e.g., Treasury Bills, Notes and Bonds Have Risk, Too, www.usatoday.com/ money/perfi/columnis t/krantz/2007–08–24– treasury–risk_N.htm (viewed Aug. 28, 2012) ("When you lend money to the government by buying a Treasury bill, note or bond, you're getting an investment backed by the full faith and credit of the |

**U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | | |
|---|---|---|---|
| | Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | | U.S. government. In other words, you'll get your interest and principal back unless the U.S. government fails."); What You Should Know/Risks of Investing in Bonds, www.investinginbonds.com/ learnmore.as p? catid=38id=383 (viewed Aug. 28, 2012) ("It's All Relative to 'Riskless' Treasury Yields: Bonds issued by the U.S. Treasury are backed by the full faith and credit of the U.S. government and therefore considered to have no credit risk."). Comparison to Treasury bonds conveys substantive, useful information that a reasonable investor would consider in the total mix when deciding whether to invest. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | | No. Noack was providing a meaningful computation to describe the safety of the investor's principal. The statement can be considered one of substantive, useful information that a reasonable investor would consider. The preciseness of the statement adds to its usefulness to the investor, suggesting that Noack looked at the 105 companies in the portfolio to make this assessment. |
| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it | | No. Taken in context of the entire paragraph, "15 Enrons" relates to "15 defaults" before Whitefish Bay would lose money on the investment. Moreover, taken in context with the rest of the paragraph, |

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way —the real—you need 15 Enrons. You need something to happen that big overnight.' The audio was recorded." | references to Enron could relate to how Enron was managed, and Noack's statement that "we have somebody watching over every company" suggested that managers of the investments at issue would take measures to prevent defaults from such companies from affecting the investment. A reasonable investor could see this as substantive, useful information in the total mix for decision making. |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. Again, Noack was providing a meaningful computation to describe the safety of the investor's principal. The statement can be considered one of substantive, useful information that a reasonable investor would consider. Again, the preciseness of the statement adds to its usefulness to the investor, suggesting that Noack had actual data from which he made the remark. Noack did not refer to "10 times" or "100 times" or some rounded number that suggests vagueness or opinion, but instead used "8.5 times," suggesting that his comment was not puffery. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | No. A reasonable investor could consider this comment to have been backed up by actual data—Noack had an actual year and named the defaulting company. A reasonable person would find the length of time from the last prior default to the time of investment to |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

|  |  | be substantive, useful information to consider in the total mix of information relied upon in making an investment. |
|---|---|---|
| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West Allis–West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | No. Regardless of whether "hiccup" alone could be vague, it was not vague in context of this sentence. Taken in a light favorable to plaintiff, Noack was representing that another school district had completed two deals and that if circumstances following either had caused any meaningful question about the investments he would suggest more time or consideration before additional investments. A reasonable person would find this to be substantive, useful information in determining whether to invest in a similar investment to those made previously by the other districts. |
| 85 | "Noack represented that the third deal would involve an investment in only investment-grade companies. During a meeting of the school board of Waukesha on November 27, 2006, which was videotaped, Noack stated to the school board: '[A]gain, we're only investing in higher grade companies. If you look at the balance sheets of investment grade companies in the world today, which is 805, they're doing better than ever.' Noack later said at that same meeting: '[T]he odds of, again, it takes twenty out of these hundred companies to default | No. The statement regarding twenty defaults is similar to the thirty or fifteen defaults discussed above and is actionable. While "higher grade companies" could be considered vague in isolation, it is not vague in context, as Noack's fuller statement related or compared the "higher grade companies" to 805 "investment grade companies," which he suggested were performing well. Taken in plaintiff's favor, the "higher grade companies" are or are similar to 805 identifiable investment-grade companies. A reasonable investor |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | before it gets to your AA level." ' | would find this useful information in determining whether to invest. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | No. Again, Noack was providing a meaningful computation to describe the safety of the investor's principal. The statement can be considered one of substantive, useful information that a reasonable investor would consider. |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Yes. The statement is one of hyperbole and sales talk, devoid of real substance and one on which a reasonable investor would not rely for investment decision making. |
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis–West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | No. The statement that the school districts would not lose their principal and would get it back in seven years was precise, useful information on which a reasonable investor would rely. It reflected the safety of the investments as well as the time frame for recovery of principal. The comment about a financial situation as bad as or worse than the Great Depression is also substantive enough to be actionable. The economic conditions of the Great Depression have been documented such that a reasonable investor could use a comparison with that era in assessing risk to the proposed investment. |
| 95 | "Noack represented that if any of the highly-rated portfolio credits | No. This was a precise, not vague, statement about the ability of the |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | portfolio manager to replace the contents of the portfolio. In addition, it indicated that the portfolio manager was monitoring the performance of the credit in the portfolio. This was substantive, useful information for a reasonable investor to consider in the total mix. |
| 97 | "Noack misrepresented the initial performance of the first investment. On or about August 14, 2006, Noack attended a West Allis–West Milwaukee school board meeting to propose an additional investment in the GOAL Program. A school board member asked Noack how the first investment was performing. Noack responded that the investment was 'on course.'' | No. While "on course" in isolation could be vague, it must be considered in context as a response to the question about how the prior investment was performing for purposes of considering a second investment. "On course" could reasonably be interpreted to mean "as anticipated" or "as expected." Taken in context, a different response might have suggested more time or consideration before additional investments, whereas "on course" suggested that the performance of the first investment caused no concern regarding a second investment. A reasonable person would find this to be substantive, useful information in determining whether to invest in an investment similar to that made previously. |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis–West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?'' | No. See the discussion regarding paragraphs 83 and 97. |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | No. See the discussion regarding paragraphs 75 and 77. |

B. Forward–Looking Opinion

**\*7** Defendants contend that some of the alleged misrepresentations are mere opinions or forecasts that are not actionable in the face of written disclosures that "bespeak caution." (Doc. 17 at 17.) According to defendants, written disclosures given to the school districts included cautionary statements, and as a matter of law the school districts could not rely upon projections about the future that could not be verified.

The court disagrees. First, the written disclosures, except for those involving West Allis, are not in the record. Thus, accepting defendants' argument would require outside evidence, which is not proper on a motion to dismiss or in the record before the court. Second, the court disagrees that the following statements are mere opinion or unverifiable forecasts.

| Compl. ¶ | Allegation | Forward Looking Opinion? |
|---|---|---|
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. This statement involves historical default levels, not a projection of what future default levels would be. The comment that it would require 8.5 times the historical default levels for a loss of money involves a measurement of the investment against past standards. It was not a projection of whether future default levels would be higher or lower than historical levels. |

| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West Allis–West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | No. Taken in the light most favorable to plaintiff, Noack was not predicting whether a "hiccup" would or could occur. Instead, he was assuring Whitefish Bay that he and Stifel would not push another investment if something was awry in the previous one of West Allis–West Milwaukee. Noack's assurances about his own and Stifel's conduct is different from an unverifiable prediction about whether a hiccup would or could occur. |
| --- | --- | --- |
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | No. In addition to any prediction as to what the portfolio manager *would* do, this was a representation of what the portfolio manager *could* do. Taking the facts in plaintiff's favor, the abilities of the portfolio manager (i.e., whether he or she had the authority to replace credit in the portfolio) should be verifiable. Moreover, the statement suggests that replacement would have no negative effect, which should be verifiable. |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis–West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?' " | No. See discussion of paragraph 83. |

C. West Allis–West Milwaukee Offering Documents

*8 When an allegedly inaccurate, oral statement is contradicted by an accurate, written statement, the written statement controls, rendering the oral statement immaterial

and not actionable. *See Carr v. CIGNA Sec. Inc.,* 95 F.3d 544, 547 (7th Cir.1996); *Assocs. in Adolescent Psychiatry v. Home Life Ins. Co.,* 941 F.2d 561, 571 (7th Cir.1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). An investor who knew the truth should not be permitted to say that an inconsistent oral statement significantly altered the total mix of information considered in investing. *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988). Moreover, "securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires." *Id.*

However, the issuer must disclose the truth clearly before a lie becomes immaterial. *Pommer v. Medtest Corp.,* 961 F.2d 620, 624–25 (7th Cir.1992) The contradiction must be on point: a conflict between "X" and "not-X," such as the difference between a written document saying "this is a risky investment" and an oral statement by the person handing out the document that "this is a safe investment." *See Carr,* 95 F.3d at 547. Documents trump oral statements only when they unambiguously cover the same point. *See Assocs. in Adolescent Psychiatry, S. C.,* 941 F.2d at 571. And obscurity of the written statement in a lengthy document may be considered. *See Acme Propane, Inc.,* 844 F.2d at 1323 ("A three-page Reserve Estimate is not so long that such a statement is too obscure to find.").

Defendants contend that the written offering documents relating to the first West Allis–West Milwaukee transaction contained express written disclosures such that any contrary oral misrepresentation cannot be actionable. Notably, defendants include with their motion the ninety-three page Tribune Limited $10,000,000,000 Secured Note Programme, and the 143–page Tribune Limited Supplemental Programme Memorandum, which they say were given to West Allis–West Milwaukee. (*See* Doc. 17 Ex. A.) Moreover, defendants contend that the alleged misrepresentations in paragraphs 73, 75, 77, 79, 87, 89, 91, 93, and 103 are not material because:

• The initial prospectus stated that the investment "involves substantial risks" and warned that "[e]ach prospective

investor should ensure that it fully understands the nature of the transaction into which it is entering and the nature and extent of its exposure to the risk of loss of all or a substantial part of its investment." (Doc. 17 Ex. A at 6.)

• The initial prospectus provided that "[n]o person has been authorized to give any information or to make any representation other than those contained in this Programme Memorandum and/or in the relevant Supplemental Programme Memorandum." (*Id.* at 3 (emphasis deleted).)

**\*9** • The supplemental prospectus said that "[p]urchasers of Notes should conduct such independent investigation and analysis regarding the issuer, the Notes, the Swap Counterparty, the Investment Advisor ... as they deem appropriate to evaluate the merits and risks of an investment in the Notes" (*id.* at 95), warned of "clear and substantial risks inherent in investing in or holding the Notes" (*id.* at 95), stated that the investor would be "exposed to the credit risk" of certain corporations and obligations (*id.* at 95–96), and noted that every substitution to the portfolio "may result in an increased risk" of defaults (*id.* at 96).

Documents submitted with a motion to dismiss may be considered part of the pleadings if they are "referred to in the plaintiff's complaint and are central to his claim." *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir.2002) (internal quotation marks omitted); *see also Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002). When a plaintiff has referred to a document submitted by a defendant with its motion to dismiss, a court may consider the document rather than having to convert the motion to one under Fed.R.Civ.P. 56; the exception prevents parties from surviving a motion to dismiss by artful pleading or by simply failing to attach relevant documents. *188 LLC,* 300 F.3d at 735

The SEC does not object to consideration of documents on file regarding the motion to dismiss. Instead, it defends its case based on the merits.

The court agrees with the SEC's position as follows.

| Compl. ¶ | Allegation | Contrary to Written Disclosure? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," | No. Although the written disclosures warned of risks generally, they |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis–West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | did not compare the investment to the level of risk of Treasuries. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to default before the loss of principal occurred. |
| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way —the real—you need 15 Enrons. You need something to happen | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk, such as by comparing the level of defaults to the failure of Enron for purposes of when the school districts may start to lose principal. |

**U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | |
|---|---|---|
| | that big overnight.' The audio was recorded." | |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk with any calculation using historical default data. The precise number stated is not contradicted by the written disclosure. |
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | No. Although the written disclosures warned of risks generally, they did not contradict that the investor would get principal back after seven years or discuss the difference between a short-term and long-term risk. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to fail before the loss of principal occurred. |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Previously dismissed on other grounds. |
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in | No. Although the written disclosures warned of risks generally, they did not contradict that the investor would get principal back after seven years or discuss |

U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)
2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

| | | | |
|---|---|---|---|
| | that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis–West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | | or compare the risk of losing principal to conditions like the Great Depression. |
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to default before the loss of principal occurred or compare the level of defaults to the failure of Enron regarding when the school districts may start to lose principal. |

**D. Omissions**

**\*10** Generally, silence is not actionable absent a duty to speak. *See Chiarella v. United States,* 445 U.S. 222, 232 (1980). A duty to speak may arise from a relationship between parties, *id.* at 228, 232, or from a duty to speak the whole truth when certain statements are made, *see* 15 U.S.C. §§ 78j(b), 77q(a)(2); 17 C.F.R. § 240.10b–5. For instance, Rule 10b–5 states that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.

Thus, once Noack and Stifel began speaking, they had a duty to speak truthfully and not omit material facts.

Defendants argue that the claims in paragraphs 8, 105–111, 125, 132, 134, 142, and 146 must be dismissed as a matter of law because the SEC alleges no duty to speak on the part of defendants. This argument is rejected in view of other paragraphs in the Complaint that are based on the

**U.S. S.E.C. v. Stifel, Nicolaus & Co., Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

defendants' duty to speak the whole truth. For instance, in paragraph 8 of the Complaint the SEC charges that defendants "did not disclose that the portfolio in the first transaction performed poorly from the outset, with a number of the credits suffering downgrades within weeks of closing." Paragraph 108 contains similar omissions. Those alleged omissions could be deemed necessary to complete Noack's comments in paragraphs 83 and 97 about prior investments being on course and that future investments would slow if there were hiccups. Likewise, in paragraph 106 the SEC asserts that "Stifel and Noack did not disclose to each of the School Districts that they could lose their entire investment if only a fraction of the portfolio defaulted," which could be necessary in conjunction with statements asserted in paragraphs 75 and 79 regarding how many defaults would be needed before a loss of principal occurred.

However, the matching of omissions to statements that would be misleading without the omitted information is not clear.[3] Under Rule 9(b) the responsibility for pairing an omission with a statement that otherwise is misleading is plaintiff's, not this court's or defendants. Without a connection between an asserted omission and a statement creating a duty to speak the complete truth, the allegations of omissions fail to meet the requirements of Rule 9(b) that fraud be pled with particularity. Thus, the motions to dismiss and to strike will be granted as

to these allegations, though the SEC will be given leave to replead.

CONCLUSION

Therefore,

IT IS ORDERED that defendants' motions to dismiss or strike (Docs .15, 16) are granted in part and denied in part as set forth above.

IT IS ORDERED that defendants' motions for more definite statement (Docs.15, 16) are denied as moot.

**\*11** IT IS FURTHER ORDERED that the SEC may replead the dismissed or struck allegations to address the problems discussed above by filing an amended complaint within twenty-one days. If no amended complaint is filed, the case will proceed on the original Complaint minus those paragraphs.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4069346, Fed. Sec. L. Rep. P 97,011

Footnotes

1    The defendants filed their motions to dismiss separately, but Noack adopted Stifel's briefs and arguments, so the motions are treated together as one.

2    Of course, when re pleading dates the SEC will need to identify the date the statement was made to each of the five school districts.

3    Although a couple alleged omissions are paired with affirmative statements (*see* Doc. 1 ¶¶ 97, 98, 146, 147), for the most part they are not.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

2021 WL 1172773
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,
v.
Gary WINEMASTER, et al., Defendants.

No. 19-cv-04843
|
Signed 03/29/2021

#### MEMORANDUM OPINION AND ORDER

Andrea R. Wood, United States District Judge

 **\*1** Power Solutions International, Inc. ("PSI") is a publicly traded company that manufactures and sells engines. Between the fourth quarter of 2014 and the fourth quarter of 2015, PSI encountered difficulties meeting its revenue targets. While PSI aggressively tried to solicit additional sales from its customers, it found a lack of demand for its products during that period. According to Plaintiff United States Securities and Exchange Commission ("SEC"), this led PSI to inflate artificially its revenue numbers by fraudulently accounting for several transactions. In total, PSI overstated its revenues by about $25 million. As a result of this alleged fraud, the SEC has brought the present action against PSI's Chief Executive Officer ("CEO"), Defendant Gary Winemaster; its Vice President of Sales, Defendant Craig Davis; and its General Manager for Industrial, Heavy Duty Products, Defendant James Needham. The SEC's 11-count complaint sets out several securities law claims against Defendants, including for violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Now before the Court are two motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Winemaster (Dkt. No. 34) and Needham (Dkt. No. 30). For the reasons that follow, both motions are denied.

#### BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to the SEC as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

PSI is a publicly traded company that manufactures and sells engines to industrial equipment manufacturers and transportation companies. (Compl. ¶¶ 1, 17–18, Dkt. No. 1.) As a publicly traded company, PSI must file various periodic reports with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q. (*Id.* ¶ 19.) In those reports, PSI is required to include financial statements that accurately and fairly reflect PSI's financial condition. (*Id.*) Moreover, any financial statements in those reports must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (*Id.*)

At all times relevant to this action, Winemaster served as PSI's CEO, President, and Chairman of the Board of Directors. (*Id.* ¶¶ 1, 14.) As PSI's CEO, Winemaster was responsible for reviewing and approving PSI's consolidated financial statements and reviewing, approving, signing, and certifying PSI's periodic public reports, including its Forms 10-K and 10-Q. (*Id.* ¶¶ 14, 24.) Among the representations Winemaster made when signing each of PSI's periodic public reports was that each report did not include any material misstatements or omissions and fairly presented, in all material respects, PSI's financial condition for the reporting period. (*Id.* ¶ 24.) In addition, Winemaster was responsible for establishing and maintaining PSI's system of internal financial reporting controls and was aware of and responsible for PSI's system of internal accounting controls. (*Id.* ¶¶ 24, 143)

 **\*2** Reporting directly to Winemaster was Needham, who served as PSI's General Manager for Industrial, Heavy Duty Products. (*Id.* ¶¶ 1, 16, 26.) Needham's position made him responsible for selling PSI's products to customers serving the oil and gas industry. As PSI's Vice President of Sales, Davis was in charge of PSI's sales department. (*Id.* ¶¶ 1, 15, 25.) While Davis oversaw most of PSI's sales personnel and approved all sales incentives offered to PSI customers, he did not have oversight authority over Needham. (*Id.* ¶ 25.) Davis also reported directly to Winemaster, who exercised close oversight of the sales department and maintained close contact with several PSI customers. (*Id.* ¶¶ 16, 25.)

#### I. Improper Recognition of Revenue

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Each quarter, PSI would provide the public with revenue guidance predicting the company's revenue for the upcoming quarter. (*Id.* ¶ 30.) Similarly, PSI provided revenue guidance for the full year. (*Id.*) Winemaster determined the revenue guidance provided to the public. (*Id.*) Stock analysts would review such guidance, along with PSI's periodic reports, to develop recommendations for investors and make projections for a number of PSI's financial metrics, including anticipated net revenue. (*Id.* ¶ 29.) Various financial firms and media outlets would then combine analysts' projections for PSI's quarterly net revenue and produce a publicly available consensus net revenue estimate for the time period. (*Id.*) Consensus net revenue estimates are important because when a company falls short of its projection, the company usually experiences a negative reaction from investors and a decrease in stock price. (*Id.*) Consequently, PSI management used quarterly analyst estimates as a benchmark for its internal quarterly revenue targets. (*Id.* ¶ 30.) Winemaster had ultimate authority for determining PSI's revenue targets. (*Id.*)

PSI's accounting department recorded PSI's revenue through an enterprise resource planning system known as EPICOR. (*Id.* ¶ 27.) When processing sales, the accounting department relied on the sales department to communicate whether there were any non-standard or atypical terms associated with a particular sale. (*Id.*) That is because the accounting department did not review customer purchase orders or shipping documents for customer orders before recording revenue. (*Id.* ¶ 28.) Thus, if a customer was given terms different from PSI's standard sales terms, those terms would not be accurately reflected in what the accounting department inputted into EPICOR. (*Id.* ¶¶ 27–28.) Sales department personnel, including Needham, knew that they needed to communicate to the accounting department any non-standard terms associated with a particular sale. (*Id.* ¶ 27.)

It was important for the accounting department to know any non-standard terms associated with a particular sale because such terms could affect how it recorded revenue from that sale. (*Id.* ¶¶ 21, 27.) Under the GAAP standard set forth at Accounting Standards Codification ("ASC")[1] 605-10-25-1, revenue may be recognized when it is realized, realizable, and earned. (*Id.* ¶ 20.) Consistent with ASC 605-10-25-1, PSI stated in its SEC filings that its policy was to recognize revenue "upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured." (*Id.* ¶ 21.) Further, PSI stated that

[i]n certain circumstances, [PSI] recognizes revenue before delivery has occurred. In such circumstances, among other things, risk of ownership has passed to the buyer, the buyer has made a written fixed commitment to purchase the finished goods, the buyer has requested the finished goods be held for future delivery as scheduled and designated by them, and no additional performance obligations exist by [PSI].

**\*3** (*Id.*) Thus, certain non-standard terms or side arrangements associated with a particular sale could affect PSI's ability to recognize revenue associated with that sale consistent with GAAP and PSI's own revenue recognition policies or the timing of when such revenue can be recognized. (*Id.* ¶¶ 2–4, 27–28, 32.)

[1]     The ASC is the single source codifying all United States Generally Accepted Accounting Principles.

Beginning in the fourth quarter of 2014, PSI encountered difficulties meeting its revenue targets. (*Id.* ¶¶ 32, 35.) Those difficulties were exacerbated in 2015 due to a decline in the price of oil. (*Id.* ¶ 32.) Because many of PSI's largest customers purchased engines to be used in the oil and gas industry, demand for a significant portion of PSI's products was tied to the price of oil. (*Id.* ¶ 18.) Thus, when the price of oil decreased, demand for many PSI products also decreased. (*Id.*) During this time, Winemaster, Needham, and Davis undertook efforts to encourage its customers to agree to purchases that would help PSI meet its revenue targets. (*Id.* ¶¶ 32–35.) In furtherance of those efforts, one or more Defendants would offer certain incentives or side arrangements to PSI customers to encourage them to make purchases prior to the end of the quarter, even when the customer did not have an immediate need for the products it purchased. (*Id.*) As a result of Defendants' conduct, PSI improperly recognized revenue for several transactions, causing the company to materially misstate the financial statements in its periodic filings for every period from the fourth quarter of 2014 through the fourth quarter of 2015. (*Id.* ¶¶ 1, 35.) The transactions at issue in the present action are presented according to the quarter in which the associated revenue was recognized and are summarized as follows.

**A. Fourth Quarter 2014**

In the fourth quarter of 2014, analysts' consensus estimate for PSI's net revenue was $103.4 million. (*Id.* ¶ 37.) However, as the end of the quarter drew closer, PSI was at risk of falling short of that number. (*Id.* ¶¶ 37, 39–40.) At

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Davis's direction, a PSI sales representative approached a PSI customer, Customer A, in late November 2014 and offered extended payment terms to incentivize Customer A to take early delivery of 30 engines that it had ordered for 2015. (*Id.* ¶¶ 39–40.) Customer A responded with a counteroffer, asking that, in addition to the extended payment terms, PSI agree to cover the cost of warehousing the engines at an off-site location as well as shipping costs to send the engines to that off-site location. (*Id.* ¶ 39.)

Davis approved the counteroffer, noting that PSI needed to do the deal because it was currently short of its quarterly revenue target. (*Id.*) Indeed, the sole purpose of the early sale was to allow PSI to hit its revenue target for the quarter. (*Id.* ¶ 39.) As the sales representative later acknowledged, "the WHOLE reason behind this entire exercise was to try and jam as much business in the [sic] 2014 as possible." (*Id.* ¶ 40.)

While PSI recognized about $846,000 of revenue from the sale in the fourth quarter of 2014, that revenue was not properly recognizable for that period. (*Id.* ¶¶ 37, 41.) Rather, PSI attempted to enter into a "bill and hold" transaction with Customer A, which refers to a sale in which revenue is recognized ahead of the delivery of the item. (*Id.* ¶¶ 21, 37.) But for revenue to be properly recognized from a bill and hold sale under GAAP, the sale must meet the following requirements:

> **\*4** (i) the risks of ownership pass to the buyer at the time of the bill and hold transaction; (ii) the buyer makes a fixed commitment to purchase the goods; (iii) the buyer, not the seller, requests that the transaction be on a bill and hold basis;
>
> (iv) the buyer has a substantial business purpose for ordering the goods on a bill and hold basis; (v) there is a fixed schedule for delivery of the goods that is both reasonable and consistent with the buyer's substantial business purpose for the bill and hold transaction; (vi) the seller does not retain any specific performance obligations related to the sale; and (vii) the goods are complete and ready for shipment at the time of the bill and hold transaction.

(*Id.* ¶ 38.) Here, the revenue did not meet the criteria for recognition on a bill and hold basis because Customer A neither requested the bill and hold nor had a business purpose for ordering on a bill and hold basis. (*Id.* ¶ 41.)

Davis did not inform accounting that Customer A did not request the bill and hold, had received extended payment terms, or that PSI agreed to cover the cost of storing the engines. (*Id.* ¶ 42.) When Davis was challenged by a senior operations executive over the propriety of recognizing revenue from the sale to Customer A, Davis falsely informed the executive that PSI's Chief Financial Officer and others in the accounting department had been informed of all pertinent details of the transaction and had approved of its accounting treatment. (*Id.* ¶ 42.) Because of Davis's misconduct, PSI improperly recognized $846,000 of revenue from the sale to Customer A in the financial statements included in its 2014 Form 10-K. (*Id.* ¶ 43.) Without the sale to Customer A, PSI's fourth quarter 2014 revenue would have fallen approximately $400,000 short of analysts' consensus net revenue expectation. (*Id.* ¶ 37.)

**B. First Quarter 2015**

In February 2015, PSI appeared to be falling far short of its quarterly revenue target. (*Id.* ¶ 46.) For that reason, Davis directed a PSI sales representative to approach Customer B about accelerating the delivery of about $7.8 million worth of engines that had been scheduled for delivery in the summer of 2015. (*Id.*) Although the sales representative expressed concern to Davis about pulling ahead sales to meet revenue targets, Davis told the salesperson that if PSI did not pull ahead the Customer B sale, "the quarterly results would be 'tragic.'" (*Id.*)

Initially, Customer B rejected multiple PSI offers of incentives to accept the engines early because it did not want the engines in the first quarter of 2015. (*Id.* ¶ 47.) This led Winemaster to call the president of Customer B and offer an indefinite right of return on the engines if Customer B's intended customer for the engines cancelled its order. (*Id.*) Customer B accepted Winemaster's offer and accepted delivery of the engines prior to the end of the first quarter. (*Id.*) Winemaster did not inform PSI's accounting department or anyone else at PSI of the indefinite right of return prior to filing PSI's Form 10-Q for the first quarter of 2015. (*Id.* ¶ 48.) Yet under ASC 605-15-25-1, which addresses recognizing revenue when a right of return exists, PSI could not recognize revenue in the first quarter unless it could reasonably estimate the amount of future returns. (*Id.* ¶ 50.) And because PSI had previously only accepted returns due to defects or performance issues, it had no way estimating returns or otherwise knowing whether Customer B's intended customer would ultimately cancel its order. (*Id.* ¶ 51.) Thus, the earnings process was not complete and the sale should not have been recognized in the first quarter of 2015. (*Id.*) Nonetheless, the $7.8 million in revenue from the

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 262 of 306 PageID #:2218

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

sale to Customer B was improperly recognized in the financial statements contained in PSI's first quarter 2015 Form 10-Q. (*Id.* ¶¶ 52, 54.) In addition, PSI filed a Form 8-K in May 2015 announcing its first quarter 2015 net revenue, a figure that included the improperly recognized $7.8 million from the Customer B sale. (*Id.* ¶ 54.)

 **\*5** By recognizing $7.8 million in revenue from the Customer B sale in the first quarter of 2015, PSI was able to report net revenue of $86.1 million for the quarter, which only narrowly fell short of analysts' $87 million consensus net revenue expectation. (*Id.* ¶ 45.) Had PSI accounted for the sale in accordance with GAAP, it would have missed the analysts' consensus expectation by a wider margin. (*Id.*)

In 2017, Customer B sought to exercise its right of return because there was no demand for the engines from its customers. (*Id.* ¶ 49.) Instead of taking the engines back, Winemaster and Davis (who learned of the right of return some time after the filing of the first quarter 2015 Form 10-Q) sought to conceal the right of return by authorizing the sales department to arrange for Customer B's engines to be sold to another PSI customer. (*Id.* ¶¶ 48–49, 136.)

## C. Second Quarter 2015

To meet its revenue target in the second quarter of 2015, PSI had to coerce Customer C to purchase $10 million of engines for which it had no need. (*Id.* ¶ 56.) Customer C's business involved manufacturing generators that it then leased to its customers who operated oil and gas wells. (*Id.* ¶ 57.) In late May 2015, Needham asked Customer C if it would make a $10 million purchase by the end of June 2015. (*Id.* ¶ 58.) Due to a drop in the price of oil at that time, there was insufficient demand for Customer C's generators to justify Customer C making such a purchase from PSI. (*Id.*) Yet Needham continued to pressure Customer C to consummate the transaction. (*Id.* ¶ 59.)

Customer C ultimately agreed to the $10 million sale, but it was subject to a side letter agreement ("Customer C Letter Agreement") containing numerous protections for Customer C should there be insufficient demand for its generators. (*Id.*) Needham signed and negotiated the Customer C Letter Agreement, and Winemaster and Davis knew and approved of the agreement. (*Id.* ¶ 60.) Among the provisions in that agreement were:

 (i) Customer C would not have to pay for each engine until 30 days after the engine was placed in a Customer

C generator (which Customer C did not do until it had a customer that desired to lease the generator); and (ii) Customer C could exchange engines at a later date for others that were more in demand.

(*Id.* ¶ 59.) The provision granting a right to exchange the engines contained no time limitation. (*Id.*) In its purchase order for the engine, Customer C specifically stated the order was pursuant to this letter agreement from PSI and signed by Needham. (*Id.*) The engines were then shipped to Customer C before the end of June 2015. (*Id.*)

PSI's accounting department was not notified of the Customer C Letter Agreement prior to the filing of PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 60.) But, under GAAP, where a seller is given a right to return a product, revenue from the transaction can only be recognized at the time of sale if the conditions in ASC 605-15-25-1 are satisfied. (*Id.* ¶ 61.) One of those conditions is that "the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product." (*Id.*) The condition is not met "[i]f the buyer does not pay at the time of sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product." (*Id.*) Here, the condition was not satisfied because the Customer C Letter Agreement allowed Customer C to withhold payment for the engines until they were consumed and also gave Customer C the right to exchange the engines in the future for other engines that were in more demand. (*Id.* ¶ 62.) Recognizing revenue from the sale to Customer C also violated ASC 605-15-25-1's requirement that PSI be able to estimate reasonably the amount of future returns. (*Id.* ¶ 63.) Again, because PSI had previously only accepted returns due to defect or performance issues, PSI had no way of estimating the future returns from Customer C. (*Id.*)

 **\*6** The $10 million from the Customer C sale was recognized as revenue in the financial statements contained in PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 64.) It was also included in the net revenue figure that PSI announced in the Form 8-K it filed on August 5, 2015. (*Id.* ¶ 66.) Moreover, the improper recognition of the $10 million of revenue enabled PSI to exceed analysts' $87 million consensus net revenue expectation, as PSI reported net revenue of $94.6 million in the second quarter. (*Id.* ¶ 56.) Had PSI properly accounted for the Customer C sale in accordance with GAAP, PSI would have missed the consensus expectation by over $2 million. (*Id.*) In turn, that would have revealed the downward revenue trend that PSI was experiencing in 2015. (*Id.* ¶ 64.)

## D. Third Quarter 2015

PSI faced difficulties in hitting its revenue target once again in the third quarter of 2015. (*Id.* ¶¶ 68–69.) This led to PSI aggressively pursuing customers to take additional product. (*Id.* ¶ 69.) In a September 3, 2015 email, Davis told Winemaster that "we are pushing every angle. I have some really unhappy customers...as I am jamming everything to them in the quarter and they are not happy with me." (*Id.*)

To aid its efforts, PSI turned to Customer C and solicited its purchase of $3 million of engines. (*Id.* ¶ 70.) While Customer C agreed to purchase the engines for $3 million, Needham directed it to issue a purchase order for $4.3 million. (*Id.* ¶¶ 70–71.) Needham verbally assured Customer C that it would only have to pay $3 million, but its $4.3 million purchase order would help PSI make its revenue numbers for the quarter look better. (*Id.* ¶ 71.) Both Winemaster and Davis knew and approved of Needham's direction to Customer C. (*Id.* ¶ 72.) PSI's accounting department, however, was not made aware of the true deal Needham made with Customer C prior to PSI filing its third quarter 2015 Form 10-Q. (*Id.*) Consequently, accounting booked $4.3 million from the sale to Customer C even though the true sale price was $3 million. (*Id.*)

Customer C only paid the $3 million that it had agreed to pay. (*Id.* ¶ 73.) Yet the financial statements in PSI's third quarter 2015 Form 10-Q recognized an additional $1.3 million in revenue from that sale, consistent with the figure from the purchase order. (*Id.* ¶ 75.) By improperly recognizing that revenue, PSI was able report net revenue of $112 million for the third quarter, which only narrowly missed analysts' consensus net revenue expectation of $113.6 million. (*Id.* ¶ 68.) In addition, Needham profited from the false purchase order, as he received $25,000 in incentive compensation related to his sales to customers in the third quarter. (*Id.* ¶ 74.) He would not have received that $25,000 if Customer C did not overstate its purchase order by $1.3 million. (*Id.*)

### E. Fourth Quarter 2015
In November 2015, it became apparent that PSI was falling far short of its revenue target for the fourth quarter of 2015. (*Id.* ¶ 80.) This led PSI to attempt to pull ahead multiple sales from 2016 so that it could recognize revenue from those sales in the fourth quarter. (*Id.* ¶¶ 80–81.) At issue in this action are four sales with four different customers. (*Id.* ¶¶ 82–102.)

*i. Customer D*

At the beginning of the fourth quarter of 2015, Davis told Winemaster that the sale of several Waukesha generator sets assembled by a PSI subsidiary was essential for PSI to hit its revenue target for the quarter. (*Id.* ¶ 82.) Normally, Customer D purchased those generator sets from Customer C and powered the generators with PSI engines. (*Id.*) For much of 2015, however, PSI endeavored to sell the Waukesha generator sets directly to Customer D. (*Id.* ¶ 83.)

On December 10, 2015, Needham and Customer D's CEO agreed to a deal in which Customer D would purchase 3 Waukesha generator sets from PSI for about $3 million. (*Id.*) In exchange, PSI would accept the return of 97 PSI engines previously purchased by Customer C to fulfill Customer D generator set orders. (*Id.*) PSI would then give Customer D a credit for the return of the 97 engines that Customer D would use to fund the purchase of the generator sets. (*Id.*) Needham instructed Customer D to issue a purchase order for the generator sets directly to PSI's subsidiary. (*Id.*) Before issuing the purchase order, Customer D sought written confirmation that PSI was agreeing to accept the return of the 97 PSI engines from Customer C and create a credit for Customer D. (*Id.*) Needham responded on December 29, 2015, stating that PSI would accept the return sometime in the first quarter of 2016. (*Id.*) That same day, Customer D issued the purchase order for the 3 Waukesha generator sets. (*Id.*) Yet those generator sets were not shipped to Customer D before the end of the year. (*Id.*)

**\*7** Needham, along with Davis, tried to characterize the sale to Customer D as a bill and hold so that PSI could recognize the revenue from the sale in the fourth quarter. (*Id.* ¶ 85.) To that effect, Needham asked Customer D to execute a bill and hold agreement, which provided that: (1) Customer D requested bill and hold treatment for the sale; (2) the Waukesha generator sets were complete; and (3) Customer D took title to the generator sets. (*Id.*) Contrary to the representations in the bill and hold agreement, Needham and Davis both knew that Customer D had not requested bill and hold treatment for the sale. (*Id.*) Rather, PSI had proposed the treatment for the purpose of recognizing revenue in 2015. (*Id.*) Moreover, at the time of the sale, Customer D did not have customers to whom it could lease the Waukesha generator sets and it had no need for the generator sets to be delivered in the foreseeable future. (*Id.*)

Neither Needham nor Davis informed PSI's accounting department about pertinent details of the transaction, particularly that it was subject to the return of 97 engines from

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 264 of 306 PageID #:2220
United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Customer C. (*Id.* ¶ 86.) As a result, PSI improperly recognized about $3 million of revenue from the sale to Customer D in the fourth quarter of 2015. (*Id.* ¶ 87.) Had accounting known about the return credit granted to PSI, no revenue from the sale would have been recognized that quarter. (*Id.*) Nor could the sale be treated as a bill and hold because Customer D neither requested nor had a substantial business purpose for such treatment. (*Id.* ¶ 88.)

#### ii. Customer E
Customer E had issued a $600,000 purchase order to PSI for 48 engines that PSI expected to ship to Customer E by the end of 2015. (*Id.* ¶ 89.) To meet Customer E's specifications, those engines had to be fitted with a custom oil pan. (*Id.*) Without the custom oil pan, the engines would not be functional within Customer E's intended product. (*Id.* ¶ 90.) Nonetheless, to recognize revenue in the fourth quarter, PSI's sales department arranged for the 48 engines to be shipped to a PSI-affiliated facility in China with a standard oil pan until they could be fitted with the custom pan sometime in 2016. (*Id.* ¶ 89.) Only then would they be delivered to Customer E. (*Id.*)

When PSI's Controller learned of the sales department's plan to ship the engines without the correct oil pan, he relayed the issue to PSI's Chief Financial Officer ("CFO"). (*Id.* ¶ 90.) The CFO informed the sales department that its plan would result in no revenue being recognized from the transaction in 2015 because the product could not be completed to Customer E's specifications and would not be delivered to Customer E by the end of 2015. (*Id.*) In response, the salesperson responsible for Customer E's account emailed Winemaster and told him that the CFO did not believe that revenue from the sale would be recognizable in 2015. (*Id.*) Winemaster then approached PSI's CFO and told him that Customer E's engines were fully functional and that revenue should be recognized from the sale. (*Id.* ¶ 92.) Yet Winemaster knew that the engines did not meet Customer E's specifications and would not function within Customer E's intended product without the custom oil pans. (*Id.*)

At no point prior to the end of 2015 did the engines meet Customer E's specifications such that they would operate appropriately for the customer's needs. (*Id.* ¶ 93.) For that reason, under GAAP, PSI had not completed the earnings process necessary to recognize revenue. (*Id.*) Moreover, the engines were not shipped to Customer E before the end of the year. (*Id.*) Instead, the engines were moved to a PSI-affiliated facility in China to be completed to Customer

E's specifications in 2016. (*Id.*) Thus, Customer E had not assumed the risk of loss for the engines by the end of 2016. (*Id.*) Nonetheless, PSI recognized $600,000 of revenue from this transaction in the fourth quarter of 2015. (*Id.*)

#### iii. Customer F
**\*8** In December 2015, a PSI salesperson convinced Customer F to accept delivery in 2015 of engines that it had previously ordered but had not planned to receive until after the year's end. (*Id.* ¶ 94.) As an incentive for accepting early delivery of the engines, PSI offered Customer F extended payment terms. (*Id.*) Customer F declined the offer because there was insufficient demand from its own customers for its product. (*Id.*)

On the last day of 2015, PSI was still facing a significant revenue shortfall. (*Id.* ¶ 95.) That led Davis to call PSI's Director of Facilities and instruct him to ship the 147 engines that Customer F had ordered, but declined to accept in 2015, to an offsite warehouse leased and controlled by PSI. (*Id.*) Davis told the Director of Facilities to complete the shipment by the end of the day and not tell anyone about it. (*Id.*) During the call, Davis mentioned that he had already talked to Winemaster about the shipment. (*Id.*)

After the 147 engines were successfully shipped to the offsite warehouse before year's end, PSI invoiced Customer F for about $300,000. (*Id.* ¶ 96.) However, Customer F never agreed to accept delivery of the engines in 2015 and was not even aware that the engines had been shipped to an offsite warehouse. (*Id.*) And because Customer F did not accept delivery of engines or authorize their offsite storage, PSI had not realized revenue in accordance with ASC 605-10-25-1. (*Id.* ¶ 97.) But because the accounting department was not made aware of the circumstances of the sale prior to the filing of PSI's 2015 Form 10-K, PSI recognized $300,000 of revenue. (*Id.* ¶¶ 96–98.) Only in March 2016 did PSI's accounting department learn of the circumstances of the sale, when it attempted to collect the balance owed by Customer F. (*Id.* ¶ 98.) During those efforts, PSI's sales representative for Customer F told accounting that Customer F was not even aware that PSI had shipped the 147 engines. (*Id.* ¶ 98.) This led accounting to reverse the $300,000 of revenue in the first quarter of 2016. (*Id.*)

#### iv. Customer G
Customer G agreed in November 2015 to purchase from PSI a type of engine that was being discontinued. (*Id.* ¶ 99.)

**United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)**

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Specifically, Customer G would purchase 775 "base engines," which consisted of the base engine bloc, fuel system, and catalyst, by the end of 2015. (*Id.*) The base engines would be stored at an offsite PSI-leased warehouse and then brought back in 2016 to be refitted with additional parts so the engines would function in Customer G's equipment. (*Id.*) Only after being refitted would the engines be shipped to Customer G. (*Id.*) The purpose behind the proposed structure of the sale was to increase PSI's 2015 revenue. (*Id.*)

Although PSI shipped the base engines to the offsite warehouse prior to the end of 2015, the engines did not include the catalysts because PSI had difficulty procuring them. (*Id.* ¶ 100.) Under PSI's sales agreement with Customer G, the catalysts were a required component. (*Id.*) When the salesperson responsible for Customer G's account told Winemaster and Davis about the situation, he said he was told that the order should ship without the catalysts. (*Id.*) The catalysts would be added when the engines were brought back the next year. (*Id.*) Neither Winemaster nor Davis told the accounting department prior to PSI's filing of its 2015 Form 10-K that the base engines did not contain catalysts. (*Id.*)

Because the base engines were missing catalysts, PSI had not completed the earning process required to recognize revenue from the sale of the base engines. (*Id.* ¶ 102.) Moreover, the risk of loss associated with the engines did not transfer to Customer G until 2016, when it took over the lease of the offsite warehouse.[2] (*Id.* ¶ 101.) Despite these facts, PSI still recognized about $1.9 million of revenue from the sale to Customer G. (*Id.*)

[2]     PSI's accounting department was aware that Customer G did not lease the warehouse before the end of 2015. (Compl. ¶ 101.)

*v. Fourth Quarter Transactions Included on 2015 Form 10-K*

**\*9**  Altogether, PSI improperly recognized about $5.8 million in revenue from the above four transactions in the fourth quarter of 2015. (*Id.* ¶¶ 81, 103.) Even including that revenue, PSI still fell well short of analysts' consensus net revenue expectation of $105.7 million when it reported net revenue of $96.7 million in the fourth quarter. (*Id.* ¶ 81.) That number fell short of the low end of PSI's public guidance of $100 million. (*Id.*) Of course, PSI would have missed those numbers by an even wider margin had the four transactions been accounted for properly. (*Id.*) That $5.8 million was improperly recognized as revenue on the financial statements included in PSI's Form 10-K. (*Id.*) When the $5.8 million is

combined with the other sales from the first three quarters of 2015, PSI improperly recognized approximately $24.1 million of revenue in the full-year 2015 financial statements included with PSI's 2015 Form 10-K. (*Id.*)

**II. Attempts to Conceal Improper Recognition of Revenue**

**A. Winemaster's Management Representation Letters to PSI's Auditor**

Following each quarter in 2015, Winemaster signed a management representation letter to PSI's auditor that included false representations in light of PSI's improper revenue recognition practices with respect to the above transactions. (*Id.* ¶¶ 55, 67, 78, 106.) Specifically, each letter certified that the financial information for that quarter was presented in accordance with GAAP, there was no fraud or suspected fraud affecting PSI, there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements, there were no undisclosed side agreements, and the company had informed the auditor of all uncorrected misstatements. (*Id.*) Contrary to his representations in the letters, Winemaster knew that there were undisclosed arrangements concerning the sales for which PSI improperly recognized revenue, such as side agreements and rights of return. (*Id.*)

**B. Efforts to Conceal Details of Customer C Sales**

When PSI's accounting department attempted to collect from Customer C the $10 million it agreed to pay for the engines it purchased in the second quarter of 2015, Customer C refused based on the provisions of the Customer C Letter Agreement. (*Id.* ¶ 108.) Following Customer C's refusal, accounting obtained a copy of the Letter Agreement from Needham in October 2015. (*Id.*) Subsequently, PSI's Controller provided PSI's CFO a copy of the agreement and informed the CFO that, in his opinion, the second quarter 2015 sale to Customer C constituted a consignment. (*Id.* ¶ 109.) And because PSI should have deferred the revenue from that sale, PSI would likely have to restate its second quarter 2015 financial reports. (*Id.*)

Upon learning of the Customer C Letter Agreement, PSI's CFO worked with the company's in-house counsel to draft a proposed amendment to the agreement that removed the conditional terms. (*Id.*) The agreement was shared with Winemaster, who sent the proposed amendment to Davis and Needham. (*Id.*) However, the proposed amendment was never sent to Customer C. (*Id.*)

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

In late January 2016, Customer C's Chief Operating Officer ("COO") emailed Needham regarding the sale from the third quarter of 2015 that PSI had booked for $4.3 million. (*Id.* ¶ 111.) The COO asked about the true amount that Customer C needed to pay for the engines, reminding Needham that the companies did a $3 million dollar deal, but "PSI upped the price so it made your numbers look better." (*Id.*) When Needham conferred with Davis about the email, Davis instructed him to have Customer C pay the $3 million and "not reference anything at this point in time." (*Id.* ¶ 112.) Needham then responded to Customer C that it should pay only the $3 million and PSI would adjust the $1.3 million at a later time. (*Id.*) In an update he provided to Winemaster on the transaction, Davis explained:

> It was agreed upon that we would sell these engines to [Customer C] at the JV price but sell them at the normal price and now as we negotiate with [Customer C] to pay these invoices they are going to short pay these invoices by 1.2 million dollars.[3] This is the deal that was agreed to. Before accounting gets short paid 1.2 million dollars I wanted you to be aware. This is obviously a problem.

**\*10** (*Id.*) Needham expressed concern to Davis that PSI's accounts receivable department would seek an explanation from Customer C as to why it paid only $3 million of the $4.3 million price set forth on the purchase order. (*Id.* ¶ 113.)

3    The recorded difference between the $4.3 million price on the purchase order and the $3 million Customer C agreed to pay was $1,286,000. In referring to that difference in this communication, Davis apparently rounded that number down. (Compl. ¶ 112 n.1.)

In an attempt to engineer a solution that would take care of the issues with both the second quarter and third quarter sales to Customer C, Needham proposed that PSI trade a write-off of the $1.3 million balance from the third quarter sale and price incentives for future purchases in exchange for Customer C's payment of the $10 million balance from the second quarter sale over six months. (*Id.*) Customer C's COO responded by email, stating that:

> The $1.2M was added in order to boost PSI's sales revenue. I see you're washing it away but why wasn't it "discounted" on the payment we just made? That was the deal you and I made. We shouldn't have that $1.2M anywhere involved with the $10M deal. In fact, if that $1.2M shows up as owed on our bill it's going to raise all sorts of red flags around here.

(*Id.*) Winemaster, Needham, and Davis continued their discussions with Customer C regarding the $10 million balance from the second quarter sale in February 2016. (*Id.* ¶ 114.) One offer they made to Customer C was for PSI to subsidize Customer C's cost of capital so that it could make a $5 million payment on the balance. (*Id.*) Customer C rejected that offer. (*Id.*)

PSI's accounting department learned of Customer C's COO's correspondence with Needham in late March 2016. (*Id.* ¶ 115.) That led PSI's Controller to provide a hard copy of the emails to PSI's CFO and communicate his concern that PSI had committed fraud by booking the additional $1.3 million in revenue from the third quarter sale to Customer C. (*Id.*) After PSI's CFO discussed the matter with Winemaster, he reported back to the Controller that Winemaster had insisted that PSI "doesn't do business like that" and that Winemaster planned to meet with Customer C regarding the transaction. (*Id.*)

By early April 2016, Needham and Winemaster had come up with a plan to create after-the-fact documentation to send to Customer C that would justify the $4.3 million price invoiced for the third quarter sale. (*Id.* ¶ 116.) Specifically, PSI would claim that it shipped domestic EPA-certified engines priced at $4.3 million instead of international non-certified engines priced at $3 million because PSI had an inadequate supply of the latter in September 2015. (*Id.* ¶ 117.) Winemaster then drafted a proposed email in which Customer C would state that it recognized that PSI did not have the reduced-price engine blocks in stock and therefore sold Customer C the domestic engines to meet the distribution requirement. (*Id.*) Customer C would go on to agree that it would purchase engines in 2016 at the reduced $3 million price to balance the agreement between the companies. (*Id.*) Contrary to the statements in the draft email, PSI had not sold Customer C the domestic engines in the third quarter. (*Id.* ¶ 118.) Rather, it sent Customer C the international engines that Customer C agreed to purchase for $3 million and PSI invoiced Customer C for the $4.3 million it would have paid for the domestic engines. (*Id.*)

**\*11** To avoid detection, Winemaster printed out the email and texted a picture of the print-out to PSI's CFO. (*Id.* ¶ 117.) In response, PSI's CFO texted Winemaster comments on the draft. (*Id.* ¶ 119.) The CFO stated in one comment that Winemaster should keep in mind his discussions with Customer C that PSI's auditors "will be in next week and the [Customer C] discount and cash collections will be front of mind. [Customer C] needs to return the discount

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

for now and restate their January email without mention of future discounts—anything less is a major problem." (*Id.*) Ultimately, Winemaster never sent the proposed email to Customer C. (*Id.*)

On April 14, 2016, Winemaster and Needham met with Customer C. (*Id.* ¶ 120.) At the meeting, Winemaster pressured Customer C to make payments on the engines purchased in the $10 million second quarter sale, despite knowing that the engines had not been placed in Customer C's generators, as required under the Customer C Letter Agreement. (*Id.*) Winemaster threatened to stop selling Customer C additional engines or engine parts if it did not pay the balance. (*Id.*) The threat carried significant weight given that PSI was the only supplier of the engines Customer C used to operate its generators. (*Id.*) Thus, although it had a right to withhold payment under the Customer C Letter Agreement, Customer C agreed to make a $5 million payment to PSI in connection with the second quarter sale. (*Id.* ¶ 121.) In return, Winemaster agreed that PSI would subsidize Customer C's cost of capital on the $5 million payment for six months and to allow Customer C to return $4 million worth of product. (*Id.*)

Following the meeting with Customer C, Winemaster informed PSI's CFO that Customer C would pay PSI $5 million imminently and pay the remaining balance by the end of June 2016. (*Id.* ¶ 122.) Shortly thereafter, PSI's CFO told the accounting department about the forthcoming payments. (*Id.*) But accounting never learned that Winemaster had induced the payment by agreeing to provide Customer C a capital subsidy and a right of return. (*Id.*)

### C. Efforts to Conceal Details of Customer D Sale

In April 2016, a dispute arose between PSI and Customer D concerning the fourth quarter 2015 sale of the 3 Waukesha generator sets. (*Id.* ¶ 124.) It began when PSI refused to fulfill its obligation to accept the return of the Customer C engines. (*Id.*) This led Customer D's COO to send the following email to Needham:

> As you know, the PO [Customer D] issued was requested by PSI in order for PSI to book the sale of the three Waukesha's by the end of 2015. We were going to utilize the deal you and I made to return [Customer C's] excess 8T and 11L engines to use as a credit towards the three Waukesha's. As you know the PO wasn't for a direct deal between [Customer D] and PSI instead it notionally represented that [Customer D] would end up with the Waukesha's when PSI received the returned 8T and 11T [sic] inventory. The PO

> used for PSI to book the sale is not a valid PO and was built at your request.

(*Id.*) Over the ensuing months, Winemaster and Customer D executives exchanged correspondence in which they asserted their respective positions and threatened legal action. (*Id.* ¶ 125.) As a result of this correspondence, Winemaster became aware of the engine exchange element of the transaction no later than June 3, 2016. (*Id.*)

During the back-and-forth between PSI and Customer D, PSI's CFO emailed Winemaster on July 25, 2016 and asked him when they could discuss Customer D's units, as "[a]uditors will want to remove these sales and force a change to history—not an outcome we want." (*Id.* ¶ 126.) The same day, Winemaster responded, saying that "these will get cleared. Try and push for end of August (15th min if you can). We are shutting off the telematics 7/31 to force them to pay thier [sic] outstanding."[4] (*Id.*) Finally, PSI and Customer D settled their dispute near the end of August 2016 when Customer D agreed to take delivery of and pay for the 3 Waukesha generator sets. (*Id.* ¶ 127.) But, at the insistence of Winemaster and PSI's Chief Legal Officer, Customer D did not issue a new purchase order. (*Id.*) Instead, the transaction supplemented the purchase order previously issued in December 2015. (*Id.*)

4    Telematics referenced in this email were used by Customer D to manage and monitor its operating units. (Compl. ¶ 126.) PSI controlled access to the telematics, which were important to Customer D's operations. (*Id.*)

### D. PSI's Internal Investigation

**\*12** Due to an employment dispute, PSI's COO left the company in May 2016. (*Id.* ¶ 128.) Shortly after his departure, the COO sent PSI's Board of Directors a letter and draft complaint against PSI, alleging that PSI's top management directed sales staff to "channel stuff" and "pull-up" sales from 2016 to inflate PSI's 2015 revenues so that the company would not miss its revenue guidance. (*Id.*) Among the transactions cited in the COO's complaint were the two sales to Customer C, the Customer D transaction, and the Customer F transaction. (*Id.*) The complaint led PSI's Audit Committee and Board of Directors to confront Winemaster about its allegations. (*Id.* ¶ 129.) Winemaster denied that the COO's allegations had any merit but promised that PSI's Chief Legal Officer and its CFO would investigate them. (*Id.*) In addition, PSI's Board of Directors retained independent counsel in July 2016 to investigate the allegations in the former COO's complaint. (*Id.* ¶ 130.)

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

On July 31, 2016, PSI's CFO sent the former COO's letter and draft complaint to PSI's auditor. (*Id.* ¶ 131.) Upon receiving the documents, the auditor stated that it would not sign off on PSI's second quarter 2016 Form 10-Q until it received the results of the internal investigation. (*Id.*) The internal investigation commenced on August 2, 2016. (*Id.* ¶ 132.) During the course of the investigation, Winemaster gave false explanations for certain of the transactions under investigation. (*Id.*) For instance, he told investigators that the $1.3 million shortfall related to the third quarter 2015 sale to Customer C was a misunderstanding. (*Id.*) Winemaster also stated that he directed the shipment of Customer F's engines to a PSI-leased offsite warehouse so that PSI could easily reclaim the engines should Customer F fail to make payment. (*Id.*) Both misrepresentations were conveyed to PSI's auditor. (*Id.*) Just before the deadline for PSI to file its second quarter 2016 Form 10-Q, Winemaster participated in a conference call during which he tried to convince PSI's auditors that the transactions identified in the former COO's complaint were each legitimate and fully collectable business deals. (*Id.* ¶ 133.) Winemaster's efforts were unsuccessful and the auditor did not sign off on the Form 10-Q. (*Id.*)

**E. Concealment Efforts in Response to SEC Investigation**
The SEC issued a document preservation notice and subpoena to PSI in August 2016. (*Id.* ¶ 134.) The next month, Winemaster told the company's Vice President of Advanced Product Development that PSI needed to clean up its outstanding receivables from Customer C before the end of 2016 in light of the SEC's investigation. (*Id.* ¶ 135.) Winemaster therefore directed the Vice President of Advanced Product Development to find a buyer for Customer C's excess engine inventory so that Customer C would pay its outstanding balance for the second and third quarter transactions. (*Id.*) As 2016 drew to a close, Winemaster directed the purchase of 60 generator sets from Customer C that contained PSI engines. (*Id.*) Yet PSI did not have potential customers for the generators and the purchase was meant only to encourage Customer C to pay its 2015 balance so that PSI could cover up its accounting misstatements. (*Id.*) In addition, Winemaster and Davis tried to disguise the right of return granted to Customer B in connection with its $7.8 million purchase in the first quarter of 2015. (*Id.* ¶ 136.) They did so by instructing PSI's sales staff to help Customer B resell the engines to another PSI customer after Customer B attempted to return the engines to PSI in 2017. (*Id.*)

**III. Restatement of Financial Statements**
Between August 4, 2016 and April 7, 2017, PSI revealed its accounting misstatements in several current reports on Form 8-K. (*Id.* ¶ 137.) And on January 27, 2017, after PSI's independent investigation revealed more details regarding PSI's improper recognition of revenue from 2014 and 2015, PSI's auditor resigned. (*Id.* ¶ 138.) When PSI filed its 2017 Form 10-K, it included restated financial statements that resulted in a total reduction of revenue of $29.8 million for financial statements from the fourth quarter of 2014 though the fourth quarter of 2015. (*Id.* ¶ 140.) A summary of PSI's restatement of revenues and income is depicted in the below charts:

**\*13** Editor's Note: Tabular or graphical material not displayable at this time.

(*Id.* ¶ 141.)

**DISCUSSION**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, the short and plain statement must meet two threshold requirements. First, the complaint's factual allegations must be sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Securities fraud claims under § 10(b) of the Exchange Act and Rule 10b-5 must also satisfy the heightened pleading standard set forth under Federal Rule of Civil Procedure 9(b). *SEC v. Steffes*, 805 F. Supp 2d 601, 607 (N.D. Ill. 2011). Rule 9(b) requires that a party alleging fraud must "state with particularity the circumstances constituting

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 269 of 306 PageID #:2225

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To state the circumstances of fraud with sufficient particularity, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). This "stringent pleading requirement...serves three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Steffes*, 805 F. Supp. 2d at 608.

Broadly, the SEC alleges in its 11-count complaint that Winemaster, Needham, and Davis violated multiple securities laws by engaging in accounting fraud that caused PSI to issue materially misstated financial statements in its SEC filings. While Davis opted answer the SEC's complaint, Winemaster and Needham have filed motions to dismiss. Both Winemaster and Needham argue that the entire complaint should be dismissed for employing a pleading format that fails to satisfy Rule 9(b)'s particularity requirement. They then turn to attacking the sufficiency of several, but not all, of the counts against them. The specific Counts at issue are as follows. Count I alleges that Winemaster violated § 10(b) of the Exchange Act and Rule 10b-5(b). Separately, Count II alleges that Needham (along with Davis)[5] aided and abetted Winemaster's Rule 10b-5(b) violation. In addition, Count III asserts a claim against Winemaster and Needham for violating Rules 10b-5(a) and 10b-5(c). In addition to the Rule 10b-5 claims, Winemaster seeks dismissal of the claims brought under Rule 13a-14 under the Exchange Act (Count IX); § 20(a) of the Exchange Act (Count X); and § 304 of the Sarbanes-Oxley Act ("SOX") (Count XI). Needham seeks dismissal of the claims against him for aiding and abetting PSI's violations of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Count IV); aiding and abetting PSI's violations of § 13(b)(2)(A) of the Exchange Act (Count V); and violating § 13(b)(5) of the Exchange Act and Rule 13b2-1 (Count VII).

5    In every Count in which a claim is asserted against Needham, the same claim is asserted against Davis.

## I. "Shotgun" and "Puzzle" Pleading

**\*14** According to both Winemaster and Needham, the SEC's complaint improperly relies on so-called "shotgun" and "puzzle" pleading to assert their claims. They claim both forms of pleading are improper in a complex securities action

because they fail to adequately apprise each Defendant of what alleged conduct gives rise to the claims against him.

Shotgun pleading refers to a pleading style in which each count of the complaint "incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading." *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (internal quotation marks omitted). In certain circumstances, the shotgun style of pleading "can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult." *Chriswell v. Village of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at \*5 (N.D. Ill. Nov. 4, 2013) (internal quotation marks omitted). Relatedly, puzzle pleading refers to a pleading style that forces "the Court and the defendant to piece together exactly which statements [the plaintiff is] challenging and what allegations contradict those statements." *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at \*5 (N.D. Ill. June 16, 2014). Such a pleading can "improperly place[ ] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at \*4 (N.D. Ill. July 25, 2012) (internal quotation marks omitted). The net effect of a puzzle pleading may be to "leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." *Id.*

But the mere fact that a complaint's counts incorporate by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them. *E.g.*, *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1324–25 (11th Cir. 2018); *Koh v. Graf*, No. 11-cv-02605, 2013 WL 5348326, at \*5 (N.D. Ill. Sept. 24, 2013). "What is impermissible...is grouping multiple defendants together and failing to set out which of the defendants made which of the fraudulent statements/conduct." *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1051 (N.D. Cal. 2016). Here, the format of the SEC's complaint "does not prevent the Court from reviewing the sufficiency of each count." *SEC v. Ustian*, 229 F. Supp. 3d 739, 778 (N.D. Ill. 2017). Unlike improper shotgun pleadings, the SEC's complaint specifically identifies the role of each Defendant in the alleged fraud, their actions and inactions that led to

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

the misstated financial statements, and why their actions constituted fraud. *See Bardman*, 216 F. Supp. 3d at 1051.

Similarly, the SEC's complaint will not be dismissed for employing so-called puzzle pleading. Winemaster and Needham contend that the complaint's supposed puzzle pleading makes it difficult for them to discern the specific statements that the SEC alleges to be fraudulent and the conduct that gives rise to the claims against them. However, as discussed below, the Court has no difficulty in identifying the false statements giving rise to the claims. And it is sufficiently clear how Winemaster's and Needham's actions contributed the alleged fraud. Simply put, the complaint did not require the Court to go through any great effort "to determine exactly which statements [the SEC] allege[s] are misleading and which alleged facts support [the SEC's] claims." *Alizadeh*, 2014 WL 2726676, at \*5; *see also Boca Raton Firefighters' and Police Pension Fund v. DeVry, Inc.*, No. 10 C 7031, 2012 WL 1030474, at \*1 n.4 (N.D. Ill. Mar. 27, 2012) (declining to dismiss a complaint for puzzle pleading even where the complaint's format created repetition because it did not make the complaint too difficult to understand).

## II. Primary Liability Under § 10(b) of the Exchange Act and Rule 10b-5

**\*15**  Three of the counts in the SEC's complaint arise under § 10(b) of the Exchange Act, which makes it "unlawful for any person...[t]o use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). As authorized under § 10(b), the SEC promulgated Rule 10b-5. Rule 10b-5 makes it unlawful for any person, in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5. In Count I of the complaint, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b), whereas Count III asserts a claim under subsections

(a) and (c) of Rule 10b-5 against both Winemaster and Needham.

### A. Rule 10b-5(b)

To state a Rule 10b-5(b) claim, "the SEC must allege that the defendant[ ] (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *Ustian*, 229 F. Supp. 3d at 764 (internal quotation marks omitted). The maker of a statement subject to liability under Rule 10b-5(b) is "the entity with authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011). Here, the purported misstatements were made in PSI's SEC filings. Because Winemaster, as CEO, reviewed and approved PSI's financial statements, and reviewed, approved, signed, and certified its SEC filings, he was the maker of the misstatements in them. *E.g.*, *SEC v. Carter*, No. 10 C 6145, 2011 WL 5980966, at \*3 (N.D. Ill. Nov. 28, 2011) ("[D]efendant...signed an SEC form (a form 8-K) as highranking corporate officer (CEO). The defendant's electronic signature indicates that he 'made' the statements therein."). Thus, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b) based on his direct involvement in six of the eight transactions leading to misstatements at issue in this action.[6]

---

6      The SEC acknowledges that Winemaster was not directly involved in the fraud committed with respect to the Customer A transaction in the fourth quarter of 2014 or the Customer D transaction in the fourth quarter of 2015. Nonetheless, as discussed below, it seeks to hold Winemaster liable as a control person with respect to those transactions pursuant to § 20(a) of the Exchange Act.

---

*i. Material Misstatement*

As a result of each of the six transactions in which Winemaster was directly involved, PSI's financial statements submitted with its SEC filings contained inflated and false revenue numbers. "A company's overstatement of revenues in violation of GAAP may constitute a false or misleading statement of material fact necessary to establish securities fraud." *Takara Tr. v. Molex, Inc.*, 429 F. Supp. 2d 960, 978 (N.D. Ill. 2006). Here, the SEC pleads with sufficient particularity each of the filings that contained misstated revenue figures, the details of the transactions from which revenue was improperly recognized, how recognition of

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

revenue from each subject transaction violated GAAP and PSI's own revenue recognition policy, and the specific amount by which the revenue was misstated. *See Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 35 (D. Mass. 2000) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." (internal quotation marks omitted)). And the allegations that PSI had to restate its financial statements due to the improper recognition of revenue from the subject transactions sufficiently demonstrates that the financial statements were false when made. *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." (internal quotation marks omitted)); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 709 (N.D. Ill. 2005) (finding that a company's subsequent restatement of its financial statements to be evidence of the statements' falsity).

 **\*16** Neither Winemaster nor Needham argue that the SEC failed to plead that the misstatements in PSI's corporate filings were false or misleading. Nonetheless, they contend that many of the misstated revenue numbers were not material. "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). Put differently, Rule 10b-5(b) recognizes a misstatement or omission as material "if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the 'total mix of information made available.' " *Id.* (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). Whether a misstatement is material is "an inherently fact-specific finding." *Ustian*, 229 F. Supp. 3d at 765. "Because materiality requires assessments of how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches, assessing materiality is for the trier of fact and rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Id.* (internal quotation marks omitted).

According to Winemaster, the net revenue reductions reflected in the restated financial statements for three of the five quarters at issue here are immaterial as a matter of law because the deviation between the original and restated revenue numbers was less than 5%.[7] In support of this 5% materiality threshold, Winemaster points to two Second Circuit cases stating that "the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009); *see also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Of course, even those cases acknowledged that "bright-line numerical tests for materiality are inappropriate," *ECA, Loc. 134*, 553 F.3d at 204, and the 5% threshold "is not conclusive," *IBEW Loc. Union No. 58*, 783 F.3d at 390. Instead, "[c]ourts must also consider qualitative factors, which can turn a quantitively immaterial statement into a material misstatement." *Id.*

7    Similarly, Needham claims that three of the four misstatements attributable to his conduct are immaterial because those allegedly fraudulent transactions affected less than 5% of the revenue reported for the quarter or fiscal year. The materiality analysis here applies equally to Needham's materiality argument.

Here, the Court cannot conclude at the pleadings stage that any of the misstated revenue figures were immaterial, even if they were not quantitively material. As pleaded in the complaint, the analysts' consensus net revenue estimate was an important metric for a company's performance and failure to meet that projection would provoke a negative reaction from investors and a corresponding decrease in stock price. (Compl. ¶ 29.) Thus, it is important from the standpoint of qualitative materiality that, for each quarter at issue here, PSI's revenues were falling just short of the analysts' net revenue estimate. But by improperly recognizing revenue from the subject transactions, PSI was able to meet the analysts' revenue estimates or at least keep the shortfall within a respectable range of the estimate. Thus, although the amount of revenue recognized from any particular subject transaction may have been quantitively small, it played an important role for PSI in demonstrating that its financial performance was meeting expectations when, in fact, its sales were slumping.

At a minimum, there is a substantial question of fact as to whether investors would have deemed it significant if the improperly recognized revenue were not included in PSI's financial statements. *See Van Noppen v.*

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

*InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (finding misstatements material where they "reflect consequential facts about the Company, namely, its financial health" (internal quotation marks omitted)); *Takara*, 429 F. Supp. 2d at 977 ("Accurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating a company's stock." (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002))). Moreover, the fact that PSI issued restatements, by itself, is "evidence of materiality, as financial accounting standards provide that financial results shall be restated only when errors are material." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (internal quotation marks omitted). For these reasons, the Court concludes that the materiality issue is not suitable for resolution at this stage.

### ii. Scienter

**\*17** Winemaster contends that the SEC fails to allege that he acted with scienter with respect to each of the six subject transactions in which he had some involvement. Under Rule 10b-5, the scienter requirement "embraces an 'intent to deceive, manipulate, or defraud,' as well as reckless disregard of the truth." *SEC v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) (quoting *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980)). Recklessness can be shown where there is "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McConville v. SEC*, 465 F.3d 780, 788 (7th Cir. 2006) (internal quotation marks omitted). "In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could prove scienter."[8] *Ustian*, 229 F. Supp. 3d at 774 (internal quotation marks omitted). Typically, "scienter is a question of fact and is therefore usually best decided by the trier of fact." *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at \*16 (N.D. Ill. May 19, 2020).

[8] By contrast, when a private party—as opposed to the SEC—brings an action under § 10(b) and Rule 10b- 5, the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) govern. Under the PSLRA, a private party plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Neither Winemaster nor Needham request that the PSLRA standard be applied here. Nonetheless, the Court notes the heightened pleading standard as it will cite

cases brought under PSLRA where the plaintiff had to meet "strong inference of scienter" standard.

#### a) Customer B Transaction

As alleged by the SEC, after Customer B resisted PSI's attempts to convince it to take early delivery of $7.8 million worth of engines in the first quarter of 2015, Winemaster personally called Customer B's president to try and make the sale. During that call, Winemaster purportedly closed the deal by offering an indefinite right of return on the engines. And even though under GAAP, such right of return could preclude PSI from recognizing immediately recognizing revenue from the sale, Winemaster failed to inform the accounting department of the right of return. As a result, the entire $7.8 million from the sale was recognized as revenue.

As CEO, Winemaster was responsible for PSI's system of internal accounting controls. (Compl. ¶ 143.) Thus, it is reasonable to infer that he was familiar with basic GAAP standards regarding revenue recognition. *See, e.g.*, *SEC v. Jacoby*, No. CCB-17-3230, 2018 WL 3732102, at \*6–7 (D. Md. Aug. 3, 2018) (noting that the defendant's role as CEO made it plausible that he would recognize accounting improprieties that would result in improper revenue recognition); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 538210, at \*7 (W. D. Wash. Mar. 2, 2006) (finding a complaint sufficiently alleged scienter where it alleged that the defendant's "training and position in the company" meant that he knew or was reckless in not knowing that it was improper for the company to recognize revenue from a transaction in violation of GAAP). Moreover, Winemaster also knew he needed to inform PSI's accounting department when sales contained terms that deviated from PSI's standard terms. (*Id.* ¶ 27.) Indeed, accounting depended on the sales personnel to directly inform it of such deviations, otherwise the revenue associated with that sale might not be properly recorded. (*Id.*) Yet according to the SEC, despite his direct involvement in closing the sale with Customer B, Winemaster failed to disclose the right of return to accounting, and later, PSI's auditor, even though he knew or should have known it was pertinent to the proper accounting of the sale.

**\*18** The allegations that Winemaster concealed the right of return further supports scienter. *See SEC v. Espuelas*, 698 F. Supp. 2d 415, 429–30 (S.D.N.Y. 2010) (stating that the SEC pleaded scienter based on allegations that the defendants withheld details of transactions that they should have known would cause the company to improperly recognize revenue); *SEC v. Nacchio*, 438 F. Supp. 2d 1266,

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 273 of 306 PageID #:2229

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

1282 (D. Colo. 2006) (finding that scienter was alleged where the defendant engaged in conduct intended to deceive the company's accountants into improperly recognizing revenue); *cf. Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith.").

The complaint further alleges that, despite knowing about the right of return, Winemaster nonetheless allowed PSI to represent to investors and the public that it earned net revenue for the first quarter of 2015 that included $7.8 million of revenue from the Customer B sale. That Winemaster signed off on published statements concerning PSI's first quarter revenue when he "knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Moreover, the SEC's allegations that Winemaster continued to conceal the right of return in 2017, when Customer B sought to exercise it, reinforces his scienter. While scienter cannot be inferred by "hindsight," *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007), "common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind." *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005). Thus, "that a person takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew he made a mistake." *Id.*; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (stating that a CEO's attempts to cover up specifics of an unlawful promotional scheme supported a "strong inference" of scienter); *SEC v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at *3 (N.D. Ill. Aug. 19, 2010) ("[The defendant's] guilty knowledge is confirmed by his alleged attempt to 'cover-up' the fraud....").

Winemaster contends, however, that the SEC's allegations fail to show how he, as a non-accountant, should have known that the right of return would affect the accounting treatment of the Customer B sale. Further, he argues that the SEC's complaint demonstrates that the right of return did not implicate a simple revenue recognition principle. Rather, as alleged, PSI's ability to recognize revenue turned on a subsection of ASC 605-10-25-1 stating that revenue could only be recognized if the amount of future returns could be reasonably estimated. For support, Winemaster cites *SEC v. Lucent Technologies, Inc.* ("*Lucent II*"), No. Civ. 04-2315(WHW), 2005 WL 1206841, at *5 (D.N.J. May 20, 2005), where the district court

found that the SEC failed to plead scienter on the part of one of the company's vice presidents based on her failure to disclose in connection with a sale a side agreement providing a right of return. The district court found that the complaint contained no allegations that would allow it to infer that the vice president "had any knowledge of accounting principles or that she had any role in [the] decisions to recognize revenue in connection with the transactions that [she] executed." *Id.*

**\*19** Unlike in *Lucent II*, however, Winemaster was not just a "regular business [person]," *id.*, who had no reason to know that the existence of a right of return might be significant to how revenue from the Customer B sale would be recognized. Rather, Winemaster was PSI's CEO, who was responsible for the company's internal accounting and financial reporting controls. It is not necessary to allege that Winemaster knew the particular GAAP standard that was implicated by the sale or otherwise show his extensive familiarity with GAAP. Indeed, "if the GAAP rules...[the defendant is] alleged to have violated are relatively simple, it is more likely that [he was] aware of the violations and consciously or intentionally implemented or supported them, or [was] reckless in this regard." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000). And while the intricacies involved in recognizing revenue from a sale subject to a right of return might be complex, a CEO need not be well-versed in GAAP to understand that the existence of such right should be properly disclosed. *See, e.g.*, *Marksman Partners, LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1315 (C.D. Cal. 1996) ("Premature accounting recognition...where a right of return is clearly capable of exercise, permits an inference of scienter."). At a minimum, the SEC's allegations establish that Winemaster knew or should have known that the right of return would affect the accounting treatment of the Customer B sale, and he was at least reckless in failing to disclose its existence. Thus, the SEC has pleaded Winemaster's scienter with respect to the Customer B transaction.

*b) Customer C Transaction—Second Quarter 2015*
In the second quarter of 2015, Customer C bought about $10 million worth of engines from PSI. As alleged in the complaint, the sale was subject to the Customer C Letter Agreement, which permitted Customer C to withhold payment for each engine until 30 days after it was placed in a Customer C generator and also gave Customer C a right to exchange the engines for a different model. The complaint further alleges that Needham negotiated the Customer C Letter Agreement and Winemaster approved it.

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Once again, despite Winemaster's alleged knowledge of the side letter agreement, the details of the agreement were not disclosed to PSI's accounting department. Similar to the right of return in the Customer B transaction, the right of exchange provided to Customer C would have affected the accounting treatment of the sale. Moreover, the Customer C Letter Agreement contained another obstacle to immediate recognition of revenue: under GAAP, revenue cannot be recognized where a buyer is given a right of return if the buyer does not pay at the time of the sale and its payment obligation is contingent on the buyer's ability to resell the product. As CEO, Winemaster should have at least known that the provisions of the Customer C Letter Agreement were relevant to the accounting of the sale, such that the agreement should have been disclosed to the accounting department. Instead, according to the complaint, Winemaster concealed the Customer C Letter Agreement from accounting, thereby allowing PSI to inflate its revenues by $10 million.

Winemaster claims that the SEC fails to allege that he knew the actual terms of the Customer C Letter Agreement. However, Winemaster seems to be asking the Court to draw an inference in his favor when all reasonable inferences must be drawn in favor of the SEC at this stage. Despite his protestations, it is reasonable to infer that Winemaster knew the terms of the Customer C Letter Agreement based on the SEC's allegation that he knew and approved of it. Conversely, it is unreasonable to infer that Winemaster would approve of the agreement without any knowledge of its specific terms, particularly given the substantial size of the sale. Further bolstering the inference are the allegations that Needham, who negotiated the agreement, reported directly to Winemaster and Winemaster exercised close oversight of PSI's sales personnel.

Winemaster also points to a contradiction between the SEC's allegations that he met with Customer C in April 2016 and pressured Customer C to make additional payments on the engines even though they had not yet been placed in generators, which was a precondition to payment under the Customer C Letter Agreement. The Court does not believe that these allegations are irreconcilable, especially when the April 2016 meeting is viewed in context. As alleged, that meeting occurred in the course of Winemaster's increasingly desperate attempts to cover up the fraud in connection with both the $10 million second quarter 2015 Customer C sale and the third quarter 2015 Customer C sale that PSI artificially inflated by $1.3 million. Just days before the meeting, Winemaster proposed a draft email that would enlist

Customer C in the fraud with respect to the third quarter 2015 sale. (Compl. ¶¶ 116–19.) And during the meeting, Winemaster threatened that PSI would stop selling Customer C engines that were critical to its operations and of which PSI was the sole supplier. (*Id.* ¶ 120.) Moreover, after the meeting, Customer C agreed to pay $5 million to PSI with respect to the second quarter 2015 sale even though it had no obligation to do so under the Customer C Letter Agreement. (*Id.* ¶ 121.) Given this context, it is certainly plausible that Winemaster knew of but disregarded the precondition to payment set forth in the Customer C Letter Agreement.

**\*20** Finally, Winemaster challenges the SEC's allegation that PSI's accounting department was not aware of the Customer C Letter Agreement. In particular, he points to the SEC's allegation that "Customer C referenced the [Customer C] Letter Agreement on its purchase order for the engines, specifically stating the order was pursuant to letter dated June 8, 2015 from PSI and signed by Jim Needham." (*Id.* ¶ 59.) But the SEC also alleges that the "accounting department did not review customer purchase orders...before recording revenue. If the customer was given terms different from those entered by sales department personnel into EPICOR, those terms would not be reflected on the invoice generated by the accounting department." (*Id.* ¶ 28.) And given Winemaster's knowledge of and responsibility for internal accounting controls, it is reasonable to infer that the disclosure of the Customer C Letter Agreement on Customer C's purchase order would not hinder his ability to conceal the existence of the agreement from accounting.

In short, the SEC has pleaded sufficiently that Winemaster knew of and approved the Customer C Letter Agreement and it is reasonable to infer that he knew the agreement's terms and that they could impact the sale's accounting treatment. Nonetheless, as alleged, Winemaster did not disclose the agreement to accounting and allowed PSI to recognize $10 million of revenue from the sale in the second quarter of 2015. These allegations are sufficient to establish Winemaster's scienter with respect to the second quarter 2015 Customer C sale.

*c) Customer C Transaction—Third Quarter 2015*
According to the complaint, PSI turned again to Customer C in the third quarter of 2015 when it faced the prospect of missing its revenue target. But instead of adding conditions to the sale, Needham simply directed Customer C to inflate its purchase order to make it appear that the order was for $4.3 million while assuring Customer C that it would only

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 275 of 306 PageID #:2231

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

have to pay $3 million. As alleged, Winemaster was aware of and approved Needham's direction to Customer C to inflate its purchase order by $1.3 million.

Winemaster's scienter as to the third quarter Customer C sale can be inferred for the same reasons that it could be inferred for the second quarter Customer C sale. Specifically, Winemaster knew of and approved Needham's direction to Customer C. That Winemaster directly supervised Needham and exercised close oversight of PSI's salespeople all bolster the allegations of Winemaster's awareness of the artificial inflation. Moreover, it should have been manifestly obvious to any competent businessperson that recognizing $1.3 million of revenue out of thin air is improper and deceptive. Later, as discussed above, Winemaster is alleged to have drafted an email that he proposed to have Customer C send, providing a false explanation to cover up the $1.3 million shortfall.

According to Winemaster, the SEC's allegations regarding his subsequent conduct demonstrate that he was not aware of the artificial inflation associated with the sale until months after the improperly recognized revenue was included in PSI's quarterly and annual filings. He points to an email Davis sent to Winemaster in January 2016 updating Winemaster on the transaction, in which Davis explained "the deal that was agreed to" so that Winemaster was aware of the problem "[b]efore accounting gets short paid 1.2 million dollars." (Compl. ¶ 112.) At the pleading stage, the Court cannot conclude that Davis's email was informing Winemaster of the deal for the first time as opposed to simply refreshing his memory. Indeed, Needham, who allegedly directed the artificial inflation, also needed to be refreshed about the terms of the deal in an email from Customer C's COO. (*Id.* ¶ 111 ("[I]f you remember when we did the $3M deal...PSI upped the price so it made your numbers look better.").) Thus, the allegations concerning Winemaster's awareness and approval of the artificial inflation of the revenue from the third quarter 2015 sale to Customer C are sufficient to plead his scienter as to that transaction.

*d) Customer E Transaction*

 **\*21**  PSI had expected to fulfill a $600,000 purchase order from Customer E in the fourth quarter of 2015. However, due to a delay in procuring necessary custom oil pans, it became apparent to PSI that it would not be able to meet Customer E's specifications for the order. According to the SEC, with PSI falling far short of its fourth quarter 2015 revenue goals, the company sought to recognize revenue from the sale in the quarter by shipping the engines to a PSI-affiliated warehouse

in China with a standard oil pan and delivering them to Customer E in 2016 with the correct oil pan. When PSI's CFO became aware of this plan, he informed PSI's sales department that no revenue could be recognized in 2015 from this sale. In turn, the salesperson responsible for the Customer E account relayed the CFO's message to Winemaster. Winemaster then approached PSI's CFO and falsely informed him that the engines would be fully functional in Customer E's intended product, and thus revenue could be recognized in 2015 from the sale.

Here, as alleged, Winemaster was directly made aware of the risk of improperly recognizing revenue from the sale by PSI's CFO. Despite knowing that the engines did not meet Customer E's specifications and would not work in its intended product, Winemaster responded to the CFO's warning by falsely stating that the engines would be fully functional. Thus, Winemaster had direct knowledge of the revenue recognition problem and was at least reckless in failing to honestly address it. With his motion, Winemaster seeks to divert the Court's attention from the issue of which Winemaster was aware by saying that the real GAAP defect was the fact that the engines were not shipped to Customer E by the end of 2015. But the fact that there was an additional reason that revenue could not be recognized from the sale does not detract from the fact that Winemaster was aware of and disregarded an independent reason that PSI could not recognize revenue from that transaction. For that reason, the SEC has adequately alleged Winemaster's scienter as to the Customer E transaction.

*e) Customer F Transaction*

As alleged in the complaint, by December 2015, PSI was urgently attempting to generate revenue to make up for an anticipated revenue shortfall. It therefore sought to convince Customer F to accept early delivery of engines it had expected to accept in 2016. But even after it was offered multiple incentives, Customer F declined PSI's pleas. Yet, on the last day of 2015, Davis called PSI's Director of Facilities and ordered the shipment of the 147 engines Customer F had ordered to an offsite warehouse and then invoiced Customer F $300,000 for the engines. PSI recognized that $300,000 as revenue in 2015.

On his call with PSI's Director of Facilities, Davis stated that he already informed Winemaster of the shipment. Thus, the SEC has pleaded Winemaster's awareness of the shipment. Not only did it violate GAAP to recognize revenue from the delivery of engines that Customer F had not accepted or even

authorized, it also violated PSI's own revenue recognition policies. Specifically, PSI stated that it would not recognize revenue before delivery has occurred if the risk of ownership has not passed to the buyer or the buyer and the buyer has not requested that the goods be held for future delivery. And courts have found that a "violation of a company's own policy supports an inference of scienter." *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999); *see also Provenz*, 102 F.3d at 1490 (denying summary judgment on scienter where the defendants' accounting figures violated GAAP and the company's own revenue recognition policies).

Further, the unauthorized delivery occurred near the end of the quarter and fiscal year, as PSI was significantly underperforming its revenue targets. Indeed, Davis reported to Winemaster in November 2015 that "PSI was going to have to pull forward a lot of sales from 2016 because" it was about $30 million short of analysts' consensus net revenue estimate for the quarter. (Compl. ¶ 80.) Scienter can be supported where, as here, a defendant is alleged to know of a revenue shortfall and thus has "a motive to increase revenue to meet earnings expectations." *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 970 (N.D. Ill. 2011); *see also SEC v. Arnold*, No. 03-CV-0328-REB-OES, 2007 WL 2786428, at *2–3 (D. Colo. Sept. 24, 2007) (finding that the SEC pleaded scienter with allegations that the defendant knew that the company was falling short of quarterly revenue targets and therefore entered into a transaction "solely for the purpose of inflating materially the company's revenues and overstating its business performance").

 **\*22** Winemaster contends that while the SEC pleads his awareness of the shipment, it fails to allege that he knew the shipment was being made without Customer F's consent. However, the complaint alleges that Winemaster later claimed responsibility for the shipment, telling PSI's Chief Legal Officer in August 2016 that the shipment was made at his direction. (Compl. ¶ 132.) Thus, accepting this as true, Winemaster admitted that he ordered the shipment to the offsite warehouse and it is reasonable to infer that he was aware of the other surrounding circumstances of the shipment.

Winemaster also claims that the SEC failed to plead that he withheld details of the transaction from PSI's accounting department. Instead, according to Winemaster, it alleges in passive voice that "PSI's accounting group was not made aware of the circumstances surrounding the shipment." (Compl. ¶ 96.) But that argument amounts to little more than nitpicking over grammar. In any case, the

SEC alleges that only Winemaster, Davis, and the Director of Facilities knew of the shipment. Thus, Winemaster was one of only three people who could have alerted the accounting department. Given his responsibilities for internal accounting control, Winemaster should have known that the accounting department would find the details of the shipment relevant to the proper treatment of this transaction.

In sum, the SEC has alleged facts sufficient to show that Winemaster should have known that PSI could not recognize revenue where Customer F had not agreed to accept the shipment before the end of the year. As one of the three people who were aware of the transaction, he should have made sure that accounting was aware of the details that precluded the recognition of revenue. Thus, the SEC has adequately pleaded Winemaster's scienter as to the Customer F transaction.

*f) Customer G Transaction*

As alleged, Customer G agreed to purchase in the fourth quarter of 2015 $1.9 million of base engines, essentially engines that lacked parts to function in Customer G's equipment. Those engines would then be shipped to an offsite warehouse by the end of 2015 and then brought back to PSI to be completed and shipped to Customer G in 2016. The purported purpose behind the transaction was to allow PSI to recognize revenue from the sale in 2015. But PSI could not even ensure that those already incomplete engines were at least completed in accordance with the order. Specifically, the engines were missing the catalysts, a required component under the order. Nonetheless, the salesperson responsible for Customer G's account was told by Winemaster to ship the engines without the catalysts.

Similar to the Customer E sale, PSI recognized revenue from a sale that did not meet Customer G's specifications because it was missing a required part. Winemaster argues that the SEC failed to plead his scienter because both PSI (and its accounting department) and Customer G were aware that the shipment involved incomplete, non-functional engines. While it is true that the base engines were missing other parts and would have to be completed in 2016, the catalysts were a required component of the base engine portion of Customer G's order. Customer G was never informed of or excused the deviation. And it is telling that PSI's accounting department knew of the details of Customer G's agreement with PSI and apparently found it proper to recognize revenue from the sale. That plausibly suggests that Winemaster failed to disclose to accounting that the base engines were missing the catalysts because that information could affect accounting's

willingness to recognize revenue in 2015 from the transaction. At the very least, the SEC has pleaded facts showing that Winemaster was reckless in failing to inform accounting of the missing catalysts so that it could determine how the issue would impact the sale's accounting treatment.

*iiiIn Connection with the Purchase or Sale of Securities*

 **\*23**  Winemaster does not contend that his conduct was not in connection with the purchase or sale of securities. Nor could he, as misrepresentations and omissions about a company's finances contained in its SEC filings are indisputably made in connection with the purchase or sale of securities. *E.g.*, *SEC v. Wolfson*, 539 F.3d 1249, 1262–63 (10th Cir. 2008). And because the SEC has sufficiently alleged that Winemaster made, with the requisite scienter, material misstatements concerning the revenue from the above transactions, it has sufficiently pleaded Winemaster's primary liability under § 10(b) and Rule 10b-5 for those misstatements.

**B. Rule 10b-5(a) and (c)**
In addition to the Rule 10b-5(b) claim against Winemaster, Count III of the SEC's complaint sets forth claims under Rule 10b-5(a) and (c). "Violations of subsections (a) and (c) are often called 'scheme liability.' " *SEC v. Familant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012). The elements of a Rule 10b-5(a) and (c) claim are similar to a Rule 10b-5(b) claim. *See Kameli*, 2020 WL 2542154, at \*12. But instead of a misstatement, the SEC must allege "acts that created a false appearance of fact in furtherance of the scheme, including making false statements." *Ustian*, 229 F. Supp. 2d at 774 (internal quotation marks omitted). "A scheme is a plan or program of something to be done; an enterprise, a project; as, a business scheme, or a crafty, unethical project. The scheme, in other words, is the plan or design, not the ultimate result." *Id.* (internal quotation marks omitted). In short, liability under Rule 10b-5(a) and (c) is "premised on a course of deceptive or manipulative conduct." *Takata v. Riot Blockchain, Inc.*, No. 18-02293 (FLW), 2020 WL 2079375, at \*14 (D.N.J. Apr. 30, 2020).

Winemaster has addressed the claims against him under Rule 10b-5(b) and Rule 10b-5(a) and (c) together. Thus, his motion to dismiss the Rule 10b-5(a) and (c) claim fails for the same reasons as his challenge to the sufficiency of the SEC's claim under Rule 10b-5(b). That leaves the Court to address the sufficiency of the SEC's allegations against Needham.

*i. Deceptive Conduct*
Needham contends that the SEC's scheme liability claim cannot be sustained because the SEC fails to allege that he engaged in conduct that was deceptive on its own rather than based on its relationship to a fraudulent misstatement made by someone else. According to Needham, the allegations simply show that he entered into lawful transactions with consenting parties that were then used by others to fraudulently recognize revenue.

To the extent Needham claims that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim, the Court rejects that contention. While this position was previously adopted by many courts, "[i]t is no longer tenable...in light of the Supreme Court's decision in *Lorenzo v. SEC*, 139 S Ct. 1094 (2019)." *Kameli*, 2020 WL 2542154, at \*14. In that decision, the Supreme Court held that Rule 10b-5(a) and (c) "capture[s] a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101. That includes "the dissemination of false or misleading statements with intent to defraud....even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Id.* at 1100–01. Indeed, the Supreme Court recognized that there was "considerable overlap among the subsections" of Rule 10b-5 as "each succeeding prohibition was...meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." *Id.* at 1102. Thus, there was no basis to find that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct." *Id.* Although Needham contends that an overly expansive view of scheme liability would erode the line between primary and secondary liability, the Supreme Court was unconcerned about that issue, stating that "it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another." *Id.* at 1103. Thus, that Needham's allegedly deceptive acts were part of a course of conduct that resulted in PSI making misleading statements in its SEC filings does not put his actions outside the scope of Rule 10b-5(a) and (c).

 **\*24**  Broadly, the SEC has pleaded here a scheme to artificially inflate PSI's revenue figures. It alleges that Needham participated in the scheme by negotiating sales with certain PSI customers from which PSI recognized revenue in violation of GAAP. Nonetheless, Needham contends that his role in the scheme involved no inherently deceptive acts. Rather, he claims that he was negotiating and consummating lawful sales with PSI customers and had no role in the later

deception. The Court addresses the allegations with respect to each subject transaction in which Needham was involved to determine whether his conduct was deceptive.

### a) Customer C Transaction—Second Quarter 2015

The complaint alleges that Needham initially approached Customer C and pressured it to take $10 million worth of engines in the second quarter of 2015 but initially encountered resistance. Ultimately, Customer C agreed to the sale but it was subject to the Customer C Letter Agreement, which Needham negotiated and signed. That agreement excused Customer C from paying until 30 days after the engine was placed in a Customer C generator and contained a right to exchange the engines that affected PSI's ability to immediately recognize the full $10 million price as revenue from the sale.

Certainly, Needham's argument is well-taken that there is nothing deceptive about negotiating a side letter agreement. However, Needham also failed to disclose the existence of the Customer C Letter Agreement to PSI's accounting department. Needham claims that the SEC's allegations give no reason to believe that he had any familiarity with GAAP or how PSI accounted for revenue from the sales he transacted. But while the complaint does not allege that Needham was familiar with GAAP, it does allege that he knew about PSI's revenue recognition standards and policies. (Compl. ¶ 23.) Further, the complaint alleges that Needham was "told by accounting department personnel on multiple occasions to inform accounting of any side arrangements" and that he "knew that [he] needed to inform PSI's accounting department about any sales transactions terms that deviated from PSI's standard terms so that the accounting department could properly record the revenue associated with those transactions." (*Id.* ¶ 27.) Thus, accepting the allegations against him as true, Needham knew that disclosing the existence of the agreement was necessary for proper accounting and yet failed to do so. That was a deceptive act. *See SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (finding that the SEC pleaded a deceptive act where the defendants' "activities or the concealment of their actions resulted in the misrepresentations to the market by others").

Needham points to *SEC v. Lucent Technologies, Inc.* ("*Lucent III*"), 610 F. Supp. 2d 342 (D.N.J. 2009), as rejecting a similar claim of scheme liability. There, the defendants authorized side agreements to induce the company's customers to purchase equipment. *Id.* at 345. In turn, the company recognized revenue from those sales in violation of GAAP. However, the district court noted that the defendants' conduct of giving assurances of rights of return in connection with the sales was not inherently deceptive. *Id.* at 360. Rather, the real "deception in this case arose from the failure to disclose the 'real terms' of the deal." *Id.* at 361 (internal quotation marks omitted). But because that was "nothing more than a reiteration of the misrepresentation of the misrepresentation and omissions that underlie" the previously rejected Rule 10b-5(b) claim, it could not give rise to a separate Rule 10b-5(a) and (c) claim. *Id.* at 361. Of course, the *Lucent III* court's holding is no longer viable following the Supreme Court's decision in *Lorenzo* and the Court does not find it instructive here.

### b) Customer C Transaction—Third Quarter 2015

**\*25** The complaint further alleges that when Needham sought to make a sale to Customer C in the third quarter of 2015, he personally negotiated a deal in which Customer C would submit a $4.3 million purchase order while he verbally assured it that the true price it would pay was only $3 million. The SEC further alleges that Needham issued the direction "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) There is no question that Needham committed a deceptive act by documenting the sale at one price while simultaneously entering into a side verbal agreement a reduced price in order to artificially inflate the revenue from the sale. Moreover, Needham committed another deceptive act by failing to inform the accounting department of the true sale price.

Nonetheless, Needham claims that there was no deception because he disclosed the true terms of the deal to Customer C and his superiors. Of course, his disclosure to his superiors does little to mitigate the deceptiveness of his conduct when the cited two superiors were Davis and Winemaster and therefore also participants in the scheme. To the extent Customer C participated in the wrongdoing, that also does nothing to absolve Needham of liability. Thus, Needham fails to rebut the SEC's allegations as to his deceptive conduct in connection with the sale to Customer C in the third quarter of 2015.

### c) Customer D Transaction

As the fourth quarter of 2015 was drawing to a close, Needham allegedly negotiated and agreed to a deal with Customer D in which Customer D would buy 3 Waukesha generator sets directly from PSI for about $3 million.

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

However, Customer D's purchase would be funded with a credit it would receive from Customer C's return of 97 PSI engines it had previously purchased to fulfill Customer D's generator set orders. Needham then drafted a bill and hold agreement that he presented to Customer D. The bill and hold agreement contained several statements that Needham knew to be false, including that Customer D requested bill and hold treatment for the sale. Thus, Needham committed a deceptive act by drafting a bill and hold agreement with a statement he knew to be false. Further, Needham failed to inform PSI's accounting department about either the bill and hold agreement or the fact that the sale was to be funded by a credit granted in connection with Customer C's return of 97 previously purchased engines.

Needham fails to genuinely contest the SEC's allegations regarding his allegedly deceptive acts in connection with the Customer D sale. Instead, he misconstrues the factual allegations to minimize his involvement. For example, Needham claims that the SEC fails to distinguish between Needham and Davis with respect to the bill and hold agreement. While the complaint states that Davis and Needham improperly attempted to characterize this transaction as a bill and hold sale, it goes on to say that Needham provided Customer D with the agreement. (Compl. ¶ 85.) It further alleges that "Needham worked to create documentation supporting the transaction." (*Id.* ¶ 84.) Although the SEC does not directly allege that Needham drafted the bill and hold agreement, the reasonable inference from that allegation is that the bill and hold agreement was among the supporting documentation drafted by Needham. The Court thus rejects Needham's attempts to twist the SEC's allegations and finds that the allegations, as recounted above, sufficiently plead deceptive acts in connection with the Customer D transaction.

*ii. Scienter*

Having found that the SEC has pleaded Needham committed deceptive acts in furtherance of the scheme, the Court must determine whether the allegations support that Needham acted with scienter. According to Needham, the SEC fails to allege particularized facts showing that he either intended to deceive buyers or sellers of PSI stock or acted recklessly.

 **\*26**  First, Needham contends that he was simply a salesperson who had no familiarity with GAAP or how PSI would account for revenue. As discussed above, that contention is belied by the SEC's allegation that Needham was familiar with PSI's revenue recognition standards. Further,

the SEC alleges that Needham knew that "PSI filed financial statements in its quarterly and annual reports" and he knew that those "financial statements needed to be truthful and accurate." (Compl. ¶ 23.) Moreover, it is not the case that "a defendant must always have accounting knowledge or accounting expertise to have actual knowledge of an accounting violation." *Espuelas*, 698 F. Supp. 2d at 432. Indeed, if that were true, "even the most egregious violation of revenue recognition principles—recognizing revenue from a transaction that never happened, for example—would not give rise to an inference of actual knowledge of an accounting violation, unless accounting knowledge were also alleged." *Id.* For example, here, it should not have required even basic accounting knowledge for Needham to know that it was improper to recognize $4.3 million of revenue from the sale to Customer C when he knew that Customer was only obligated to pay $3 million.

The SEC also makes specific allegations evidencing Needham's knowledge and active involvement in the fraudulent accounting scheme. With respect to the third quarter 2015 Customer C sale, the SEC alleges that Needham directed Customer C to issue the inflated $4.3 million purchase order "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) A later email from Customer C's COO reinforces Needham's scienter at the time of the sale, as the COO reminded Needham that "PSI upped the price so it made your numbers look better." (*Id.*) Not only did the extra $1.3 recognized from the sale improve PSI's sales numbers, but it also allowed Needham to earn a $25,000 bonus he would not have received had PSI not recognized that additional revenue. *See, e.g.*, *Nguyen v. New Line Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) ("[A]llegations regarding [the defendants'] specific motives to obtain outsized bonuses may certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter."). Needham then allegedly assisted Winemaster as he attempted to cover up the artificial inflation. Similarly, when Needham presented Customer D with the bill and hold agreement, he admitted that the agreement would "allow [PSI] to recognize revenue" from the sale. (*Id.* ¶ 85.) Needham's failure to disclose the terms of each of the three subject transactions to the accounting department also supports his scienter, as he was told by accounting on multiple occasions that he needed to inform it of any side agreements or atypical terms.

Viewing the SEC's allegations as to Needham as a whole, they tend to show that Needham was not an unwitting tool

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 280 of 306 PageID #:2236

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

in Winemaster and Davis's fraudulent accounting scheme. Rather, he was a key player in the scheme, knowingly negotiating and structuring the three subject transactions and then concealing from PSI's accounting department key details of the sales, thereby leading accounting to recognize revenue from the sales improperly. Further, the SEC has pleaded Needham's awareness that the purpose of his conduct was to artificially inflate PSI's revenue. Consequently, the SEC has pleaded Needham's scienter for purposes of scheme liability.

*iii. In Connection with the Purchase or Sale of Securities*
According to Needham, the SEC fails to allege that his deceptive conduct occurred in connection with the purchase or sale of securities. In particular, he claims that the SEC fails to allege that any of his conduct was directed toward investors. Rather, he claims that he dealt only with PSI's customers and had no responsibilities related to PSI's contacts with investors.

The Supreme Court has held that the "in connection with" requirement simply requires "a misrepresentation 'coinciding' with or 'touching' a securities transaction." *United States v. Durham*, 766 F.3d 672, 682 (7th Cir. 2014) (quoting *SEC v. Zandford*, 535 U.S. 813, 822 (2002), and *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)). The phrase should be read broadly as § 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation marks omitted).

**\*27** Here, Needham's deceptive acts satisfy the "in connection with" requirement because he knew or was reckless in not knowing that his conduct would cause PSI to misstate its revenue. Even though Needham did not have direct contact with investors, he either knew or could have anticipated that those misstated revenue numbers would eventually reach investors. *See, e.g.*, *SEC v. Delphi Corp.*, No. 06-14891, 2008 WL 4539519, at *8 (E.D. Mich. Oct. 8, 2008) (holding that the "in connection with" requirement was satisfied where the defendant "acted to create income numbers with the purpose that they be reported to the public in company filings and public statements"); *Nacchio*, 438 F. Supp. 2d at 1282 ("Because the Complaint adequately alleges that [the defendant's] omissions had the intended result of deceiving investors as to [the company's] actual revenues, the SEC has sufficiently alleged that [the defendant's] misrepresentations and omissions occurred in connection with the purchase or sale of securities."). For that reason, Needham's actions were in connection with the

purchase or sale of securities. Because the SEC has pleaded that Needham's actions were deceptive, undertaken with the requisite state of mind, and in furtherance of a fraudulent accounting scheme, it has successfully stated a Rule 10b-5(a) and (c) claim as to Needham.

**III. Aiding and Abetting Securities Law Violations— Needham**
Counts II, IV, and V of the SEC's complaint set forth claims against Needham for aiding and abetting securities law violations.[9] In Count II, the SEC alleges that Needham aided and abetted Winemaster and PSI's Rule 10b-5(b) violations.[10] Counts IV and V assert claims against Needham for aiding and abetting PSI's reporting and recordkeeping violations under § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, and § 13(b)(2)(A). Because Needham focuses his arguments against aiding and abetting liability on the Rule 10b-5(b) claim and then asserts that the reporting and recording keeping claims fail for the same reasons, the Court will likewise center its aiding and abetting liability analysis on the Rule 10b-5(b) claim.

[9]     Winemaster is also named as a Defendant in Counts IV and V, but he does not address the merits of these Counts in his motion to dismiss.

[10]     Although PSI is not named as a Defendant in this action, it is identified as an "uncharged related entity" that committed securities law violations. (*See, e.g.*, Compl. ¶ 149.)

Under § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the SEC may hold "any person that knowingly or recklessly provides substantial assistance to another person in violation of" the Exchange Act liable as an aider and abettor. To hold someone secondarily liable as an aider and abettor, the SEC must allege: "(1) there is a primary violation of securities law; (2) the aider and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted in the primary violation." *Ustian*, 229 F. Supp. 3d at 776.

As discussed above, the SEC has adequately pleaded Rule 10b-5(b) violations for two of the three transactions with which Needham was involved. Neither Winemaster nor Needham has challenged whether the allegations concerning misstatements arising from the third Needham transaction, the Customer D sale, state a claim under Rule 10b-5(b). For present purposes, the Court will assume that they do.

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Needham does contend that the SEC has failed to plead his scienter for aiding and abetting violations and that it has not alleged facts showing he provided substantial assistance in the primary violation.

First, Needham argues that the SEC has not pleaded scienter because the complaint lacks allegations showing that Needham knew his conduct or omissions were in assistance of Winemaster or PSI in making fraudulent misstatements of revenue. Needham's contentions concerning his scienter have already been addressed above in the Court's discussion of the Rule 10b-5(a) and (c) claim and decided in the SEC's favor.

Next, Needham contends that he did not provide substantial assistance to Winemaster and PSI in their primary violations. To plead substantial assistance "requires a showing that the aider and abettor proximately caused harm to the victim on which the primary liability is predicated." *SEC v. DiBella*, 587 F.3d 553, 566 (7th Cir. 2009) (internal quotation marks omitted). Here, Needham allegedly negotiated and structured the Customer C and D sales in a way that would lead PSI's accounting department to recognize revenue for the quarters in which they were made. At the same time, Needham provided the customers with certain terms, undisclosed to accounting, that would have affected PSI's ability to recognize revenue from the sales immediately. Those sales were the vehicle by which PSI fraudulently recognized revenue; they gave legitimacy to that revenue and allowed PSI to conceal, at least temporarily, its fraudulent accounting. Thus, by doing the legwork on those sales, Needham substantially assisted Winemaster and PSI in making statements that improperly recognized revenue from those sales.

 **\*28** Because the SEC's allegations establish that Needham substantially assisted the Rule 10b-5(b) violations associated with the Customer C and D sales, with a general awareness that his actions were associated with an improper or illegal course of conduct, the SEC has successfully stated a claim against Needham for aiding and abetting Rule 10b-5(b) violations. As Needham does not separately challenge the merits of the reporting and recordkeeping aiding and abetting claims, his motion to dismiss is denied as to those claims as well.

## IV. Control Person Liability—Winemaster
In Count X of the complaint, the SEC alleges that Winemaster violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Section 20(a) sets out " 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the

securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). The Seventh Circuit has set forth a two-prong test for control person liability. *Id.* "First, the 'control person' needs to have ***actually*** exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Id.* at 911–12.

Here, the SEC seeks to hold Winemaster liable as a control person for the two transactions in which he was not directly involved (the Customer A and D sales) as well as other securities law violations committed by PSI.[11] Winemaster first argues that the SEC fails to allege primary violations for which he can be held liable as a control person because it does not allege that PSI acted with scienter. However, the "[k]nowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00CV1338(GBD), 2004 WL 137073, at \*13 (S.D.N.Y. Jan. 26, 2004); *see also Zurich Cap. Mkts. v. Coglianese*, No. 03 C 7960, 2005 WL 1950653, at \*3 (N.D. Ill. Aug. 12, 2005) (imputing the scienter of the defendant company's agent with respect to the agent's fraud to the defendant company). Thus, "[a]llegations that corporate employees or agents[ ] have knowingly deceived or failed to make the requisite public disclosures does not immunize the corporation from liability for the knowing deception." *UCAR Int'l*, 2004 WL 137073, at \*13.

11    That PSI is not a Defendant in this action does not preclude Winemaster from being held liable as a control person for its uncharged violations. *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at \*9 (N.D. Ill. May 25, 2004) ("The fact that the controlled person...is not a defendant in [the] action is of no legal significance....").

The Court has already discussed above that the SEC has adequately alleged Needham's scienter. Moreover, the complaint contains numerous allegations of Davis's scienter and Winemaster does not challenge the sufficiency of those allegations. He simply contends that Needham's and Davis's scienter should not be imputed to PSI because they played no role in the financial reporting giving rise to the primary violations. While Winemaster attempts to play down Needham's and Davis's roles in the company, the Court has already found that Needham played an important part in the fraudulent accounting scheme. And

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

the complaint sufficiently pleads Davis's role, as he was PSI's Vice President of Sales—a corporate officer—and had responsibilities relating to communicating sales incentives to PSI's accounting department, which in turn calculated the revenue that was reported in PSI's financial statements. (Compl. ¶ 15, 25.)

**\*29** Next, Winemaster contends that the SEC has not alleged that he had the ability to control the transactions and statements at issue in this action. He argues that all the SEC alleges is his control over the day-to-day management and overall direction of PSI, which is insufficient. The Seventh Circuit has emphasized that § 20(a) is "remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (internal quotation marks omitted). Here, the SEC has alleged that Winemaster held the roles of PSI's CEO, President, and Chairman of the Board, and was responsible for PSI's system of internal accounting controls, reviewing and approving PSI's financial statements and SEC filings, and establishing and maintaining PSI's internal controls over financial reporting. (Compl. ¶¶ 14, 24, 143.) Moreover, "numerous...courts have held that signing [public filings] makes the officer a control person for liability related to" the statements contained therein. *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 771 (S.D. Ind. 2018).

Together, the SEC's allegations sufficiently plead that Winemaster exercised control over PSI's operations and had the ability to control the specific transactions and misstatements allegedly giving rise to PSI's primary violations. For that reason, the SEC adequately states a control person claim as to Winemaster.

## V. Section 13(b)(5) of the Exchange Act and Rule 13b2-1—Needham

Although Count VII of the complaint sets forth claims against both Needham and Winemaster under § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, only Needham challenges the claim on its merits. Section 13(b)(5) makes it unlawful for any person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be kept by an issuer under § 13(b)(2) of the Exchange Act. 15 U.S.C. § 78m(b)(5). Similarly, Rule 13b2-1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of" the Exchange Act. 17 C.F.R. §

240.13b2-1. While § 13(b)(5) expressly requires knowledge, scienter is not required under Rule 13b2-1. *McConville*, 465 F.3d at 789.

Needham contends that the SEC fails to allege any particularized facts showing that he had knowledge of PSI's system of internal controls or any responsibility to report any information to PSI's accounting department but knowingly failed to do so. However, the allegations in the complaint show that Needham knew about PSI's revenue recognition standards and policies and had been told by PSI's accounting department to inform it of any side arrangements or atypical sales terms. (Compl. ¶¶ 23, 27.) Yet Needham failed to disclose to accounting the Customer C Letter Agreement that was part of the second quarter 2015 Customer C sale. Further, he directed Customer C to draft a false purchase order for the third quarter 2015 sale and drafted a bill and hold agreement for the Customer D sale that contained falsehoods. Moreover, he failed to disclose to accounting details from those sales, knowing that they would affect their accounting treatment. These allegations are sufficient to state a claim under § 13(b)(5) and Rule 13b2-1 against Needham.

## VI. Rule 13a-14—Winemaster

The SEC alleges in Count IX that Winemaster violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14, by falsely certifying that PSI's periodic reports did not contain any material misstatements and fairly presented PSI's financial condition. Winemaster contends that there is no standalone cause of action for violations of Rule 13a-14, and in any case, the Rule can only be violated by failing to certify.

For his contention that there is no Rule 13a-14 standalone cause of action, Winemaster cites *SEC v. Black*, No. 04 C 7377, 2008 WL 4394891, at \*17 (N.D. Ill. Sept. 24, 2008), which held that a false certification under Rule 13a-14 "does not state an independent violation of the securities law." However, many courts that have considered *Black* disagree with its analysis, concluding that it mistakenly relied on cases involving Rule 13a-14 claims brought by private parties. *E.g.*, *Ustian*, 229 F. Supp. 3d at 777; *SEC v. Brown*, 740 F. Supp. 2d 148, 164–65 (D.D.C. 2010). Those cases further hold that the SEC has the authority to bring a Rule 13a-14 claim pursuant to § 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), which allows the SEC "to bring an action in a United States District Court 'to enjoin' any 'acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder.' " *Brown*, 740 F. Supp. 2d at 165 (quoting 15 U.S.C. § 78u(d)(1)). The Court agrees that §

21(d)(1) gives the SEC the authority to enforce violations of Rule 13a-14. Moreover, even the *Black* court agreed that Rule 13a-14 extends to false certifications.

**\*30** Finally, Winemaster contends that the Rule 13a-14 claim should be dismissed because Count IX does not allege that Winemaster knew that the certification was false or was reckless in not knowing. That argument is unavailing as the SEC alleges that Winemaster signed and certified each filing despite knowing that revenue had been improperly recognized. (Compl. ¶¶ 54, 66, 77, 105.) In short, the SEC has pleaded a viable standalone cause of action for Winemaster's violation of Rule 13a-14.

## VII. Section 304 of SOX—Winemaster

In the final Count of its complaint, Count XI, the SEC claims that Winemaster's reimbursement obligations under § 304 of SOX, 15 U.S.C. § 7243(a), were triggered due to PSI's accounting restatements. Thus, he must reimburse the $280,000 bonus he received on July 10, 2015.

Under § 304 of SOX, "[i]f an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws," the CEO and CFO "shall reimburse the issuer for...any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the [SEC] (whichever first occurs) of the financial document embodying such financial reporting requirement." 15 U.S.C. § 7243(a)(1). The plain language of § 304 allows "the SEC to seek disgorgement from the CEOs and CFOs even if the triggering restatement did not result from the misconduct on the part of those officers." *SEC v. Jensen*, 835 F.3d 1100, 116 (9th Cir. 2016).

Winemaster argues that the SEC does not sufficiently allege actionable misconduct attributable to PSI. Of course, this Court already rejected those arguments when it found that Winemaster could be held liable as a control person. Next, Winemaster claims that the restatement was not based on misconduct at all, given that it showed other adjustments to net revenue that were not attributable to fraud. Indeed, for three of the five quarters, those other adjustments were larger than the adjustments associated with the fraud. However, under the plain language of the § 304 of SOX, the issue is whether a restatement is "*required*...due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement." 15 U.S.C. § 7243(a) (emphasis added). The issuer's "actual motivation in issuing the restatement is therefore of no moment." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 788 (5th Cir. 2017). Here, the SEC alleges that PSI was required to prepare the restatement due to the accounting errors caused by Winemaster, Needham, and Davis's misconduct. (Compl. ¶ 190.) The fact that, in the course of preparing the restatement, PSI made other adjustments to its income is irrelevant. Consequently, the SEC has sufficiently stated a claim under § 304 of SOX.

## CONCLUSION

For the foregoing reasons, Winemaster's and Needham's motions to dismiss (Dkt. Nos. 30, 34) are denied.

**All Citations**

Slip Copy, 2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 284 of 306 PageID #:2240

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

2011 WL 814932
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

ST. LUCIE COUNTY FIRE DISTRICT
FIREFIGHTERS' PENSION TRUST
FUND, Town of North Branford Pension
Committee, On Behalf of Themselves and
All Others Similarly Situated, Plaintiffs,

v.

MOTOROLA, INC., Edward J.
Zander, Gregory Q. Brown, and
Thomas Meredith, Defendants.

No. 10 C 427.
|
Feb. 28, 2011.

**Attorneys and Law Firms**

Beth A. Kaswan, Scottscott LLP, New York, NY, Jeffrey A. Leon, Julie D. Miller, Freed & Weiss LLC, Chicago, IL, David R. Scott, Scott & Scott LLP, Colchester, CT, Donald Lewis Sawyer, Michael Jerry Freed, Steven A. Kanner, Freed Kanner London & Millen LLC, Bannockburn, IL, Geoffrey M. Johnson, Scott & Scott, LLP, Cleveland Heights, OH, Mary K. Blasy, Scott+Scott LLP, San Diego, CA, for Plaintiffs.

Robert J. Kopecky, Anne J. Sidrys, Jess M. Krannich, Kirkland & Ellis LLP (Chicago), Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

VIRGINIA M. KENDALL, District Judge.

 **\*1** Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund and the Town of North Branford Pension Committee (together "Plaintiffs") filed suit against Motorola, Inc., ("Motorola"), Edward J. Zander ("Zander"), Gregory Q. Brown ("Brown"), and Thomas Meredith ("Meredith") (together "Defendants") alleging, in their Second Amended Complaint, violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("1934

Act") and violations of Rule 10b–5, 17 C.F.R. § 240. 10b–5. Defendants move to dismiss for failure to state a claim and for failure to meet the heightened pleading standards required in securities class actions. For the following reasons, the Court grants Defendants' Motion to Dismiss with prejudice.

*STATEMENT OF FACTS*

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). Defendants included several exhibits, including SEC filings and transcripts of shareholder meetings and conferences that are referenced and excerpted in Plaintiffs' Second Amended Complaint. The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment. *See, e.g., Stavros v. Exelon,* 266 F.Supp.2d 833, 844 n. 8 (N.D.Ill.2003). The Court may also examine the documents included in Defendants' Motion to Dismiss because they are referred to in Plaintiffs' Second Amended Complaint and they are central to Plaintiffs' claims. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002).

**I. Motorola Mobile Devices**

Motorola is a technology company that operates in three primary business segments: mobile devices, networks and enterprise, and connected home solutions. (Second Amd. Compl. ¶ 16.) From October 25, 2007 until January 22, 2008 ("Class Period") the largest of these was mobile devices. (*Id.*) The mobile device division had 42% of its 2007 net sales concentrated in several large phone operators. (*Id.* ¶ 17.) This high level of concentration gave Motorola's management access to sales data that was useful for forecasting future purchases. (*Id.* ¶ 18.) According to Plaintiffs' confidential witnesses, Motorola provided concessions to the major cell phone carriers to accept unneeded inventory (a process known as "channel stuffing" that depresses sales volumes in later quarters) to meet quarterly and annual targets. (*Id.* ¶ 19.)

By the close of fiscal year 2006 Motorola was the second largest global supplier of wireless handsets with an estimated global market share of 22%. (*Id.* ¶ 23.) Indeed, Motorola's RAZR cell phone was the most popular line of mobile phones ever released until it ceded that title to Apple's iPhone 3G in November 2008 (the iPhone 3G was released in June 2007). (*Id.*) Motorola sold 100 million units of the RAZR through

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 285 of 306 PageID #:2241

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

July 2007, the month that the RAZR2 was released. (*Id.*) By the end of the third quarter ("3Q") in 2007, however, Motorola's global market share was down to 13%. (*Id.* ¶ 25.) Its profits and sales were similarly down, and Motorola recognized hundreds of millions of dollars in losses during the first three quarters of 2007. (*Id.* ¶ 26.)

**\*2** On September 7, 2007, at its annual analyst conference, Motorola announced a turnaround plan to restore the health of its mobile devices unit. (*Id.* ¶ 28.) This turnaround plan was reaffirmed on October 25, 2007 and again on December 6, 2007. (*Id.* ¶¶ 26, 213.)

## II. Motorola Officers

Zander joined Motorola as CEO, Chairman of the Board and Chairman of the Board's Executive Committee in January 2004. (*Id.* ¶ 29.) Zander served as Motorola's CEO until December 31, 2007 and as Chairman of its Board and its Executive Committee until May 5, 2008. (*Id.*) Zander received a salary of over $14 million in 2006 and over $17 million in 2007, however the vast majority of this compensation came in the form of restricted stock units ("RSUs"), stock options, and other long-term incentive payments. (*Id.*) Zander's RSUs would not vest unless Motorola's stock price closed above $22; Zander's stock options had an exercise price of $12.97, which rendered them valueless if Motorola's stock was trading below that amount. (*Id.* ¶ 30.)

Meredith served as Motorola's Acting Chief Financial Officer and Executive Vice President between April 1, 2007 and March 1, 2008. (*Id.* ¶ 31.) Like Zander, Meredith received a substantial portion of his 2007 compensation in stock options and RSUs. (*Id.*)

Brown served as President and Chief Operating Officer of Motorola from March 2007 through December 2007. (*Id.* ¶ 33.) Brown assumed the role of President and CEO on January 1, 2008. (*Id.*)

## III. October 25, 2007: 3Q Earnings Conference

Motorola released its 3Q 2007 financial results on October 25, 2007, reporting that sales were down 36% from 3Q 2006 in the mobile device segment. (*Id.* ¶ 202.) The mobile device segment also incurred a 3Q 2007 operating loss of $138 million, compared to a second quarter ("2Q") 2007 operating loss of $264 million. (*Id.*)

Zander, Brown, and Meredith also held an earnings conference on October 25, 2007 to discuss 3Q 2007 and look ahead to the fourth quarter ("4Q") of the year, which was already underway. (*Id.* ¶ 203.) Zander stated that "[o]ur 3Q can be characterized by one word, progress." (*Id.*) Zander continued, "We ... made substantial improvement in all key metrics in mobile devices." (*Id.*) Zander further represented that "We increased unit sales and gross margin percentage" and "lower[ed] operating expenses," concluding that Motorola had already sold 900,000 units of the RAZR2 phone. (*Id.*)

Turning to 4Q 2007, Meredith stated that "we are encouraged by progress in mobile devices as compared to prior quarters. We expect continued improvement in the 4Q." (*Id.* ¶ 204.) Meredith then specified that "[w]e expect 4Q earnings per share from continuing operations to be in the range of $0.12 to $0.14." (*Id.*) Meredith continued, "we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line." (*Id.*) Zander stated that the management team "is committed to returning the company to our financial targets as outlined during the September Analyst meeting." (*Id.*) Brown concluded that "[w]e will continue the momentum and drive further improvements in the coming quarter." (*Id.*)

**\*3** Motorola's stock price closed up $0.75 to reach $19.30 per share on unusually high trading volume. (*Id.* ¶ 206.)

## IV. December 6, 2007 Lehman Brothers Conference

By early December, investors were concerned with Motorola's viability—whether the company would be broken up and sold—as well as the recent announcement that Zander would be stepping down as CEO. (*Id.* ¶¶ 211–12.) Motorola's stock price closed at $15.75 on December 5, 2007. (*Id.*)

Meredith appeared at the Lehman Brothers Conference in San Francisco on December 6, 2007. (*Id.* ¶ 213.) Meredith "affirmed" earlier 4Q 2007 projections, specifically that earnings from continuing operations in 4Q would be "in the $0.12 to $0.14 range." (*Id.*) Meredith also affirmed that Motorola would experience "sequential improvement in our top and bottom line." (*Id.* ¶ 214.) In response to a question, Meredith echoed the characterization of Q3 as a "start or progress" and stated that he believed "that's sort of where we are." (*Id.* ¶ 215.)

At the end of the session, Meredith was questioned about Motorola's attempts to diversify its semi-conductor chip

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 286 of 306 PageID #:2242

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

suppliers. (*Id.* ¶ 217.) Meredith responded that "we're in and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months. And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space." (*Id.*)

After the conference, based in part on Meredith's affirming previous earnings estimates, Motorola's stock price increased $0.56 to close at $16.31 on December 6, 2007. (*Id.* ¶ 221.)

### V. January 22, 2008: Estimates Questioned

On January 22, 2008, a research analyst at Merril Lynch's Telecom Equipment/Wireless Cellular division issued an estimate change report for Motorola. (*Id.* ¶ 225.) Based on "supply chain checks" that suggested "steeper than normal order declines in December," Merrill Lynch lowered its first quarter ("1Q") 2008 earnings per share estimates from $0.12 to $0.09. (*Id.*) Merrill Lynch also noted Motorola's decline in the orders it was placing with its suppliers for 1Q 2008 delivery. (*Id.*)

### VI. January 23, 2008: Motorola 4Q 2007 Results

Motorola announced its 4Q 2007 and full-year 2007 results on January 23, 2008. (*Id.* ¶ 227.) Motorola's mobile phone sales from 3Q 2007 to 4Q 2007 had improved by 7%. (*Id.* ¶ 219.) Demand for Motorola's mobile devices had "slowed" during 4Q 2007 while competitors such as Apple experienced growth. (*Id.*) Motorola reported earnings per share of only $0.04, due in part to a $277 million settlement with a chip manufacturer, Freescale Semiconductor ("Freescale"), in January 2008 that accounted for a loss of $0.07 per share. (*Id.* ¶ 227.) Motorola's earnings per share based on continuing operations for 4Q 2007 were $0.14. (*Id.* ¶ 116) Motorola's revenue in the mobile devices segment increased from $4.5 billion in 3Q 2007 to $4.8 billion in 4Q 2007 and sales increased from 37.2 million units to 40.9 million units in the same period. (*Id.* ¶ 27.) Motorola's 4Q operating loss, however, increased to $388 million, up from $138 million the quarter before, due in significant part to the $277 million Freescale settlement. (*Id.*)

**\*4** Motorola issued earnings per share projections for 1Q 2008 of a loss of $0.05 to $0.07 and stated that it expected to "lose market share in Q1." (*Id.* ¶ 227.) The market had expected 1Q projections of up to $0.10 per share profit. (*Id.*)

During a conference call on January 23, 2008, in response to an analyst's question, Meredith responded that the "Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated." (*Id.* ¶ 228.)

Motorola's stock price dropped 18.8%, or $2.31 per share, to close at $10.01 on January 23, 2008, bringing the stock to its lowest price since September 2003. (*Id.* ¶ 229.)

### VII. Class Period

Plaintiffs' class action is brought on behalf of all purchasers of Motorola common stock between the Class Period of October 25, 2007 and January 22, 2008. (*Id.* ¶ 1.) Specifically, Plaintiffs claim they suffered damage when Motorola's stock price declined as a result of its 4Q earnings release on January 23, 2008. (*Id.* ¶ 264.) Plaintiffs allege that Motorola failed to disclose material facts regarding its projected revenue, the demand for its products, its progress in turning around the mobile device division, and a legal dispute with Freescale, the settlement of which further reduced its 4Q 2007 earnings. (*Id.* ¶¶ 122–23.)

Plaintiffs filed suit on January 21, 2010, amending their Complaint on June 11, 2010 and again on December 3, 2010.

### *STANDARD OF REVIEW*

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3 d at 717. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––U.S. ––, ––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines if they plausibly give rise to an entitlement to relief. *Id.* A claim has facial plausibility when the pleaded factual content allows the

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 287 of 306 PageID #:2243

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

2011 WL 814932, Fed. Sec. L. Rep. P 96,226

Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 1949.

Rule 9 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9. This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business of a firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007). Pursuant to Rule 9, a plaintiff must set forth "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

 **\*5** Section 10(b) and Rule 10b–5 claims are subject to the even higher pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(1)-(2) ("the PSLRA"). *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 551 U.S. 308 at 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Under the PSLRA's heightened pleading standards, "a private securities complaint alleging that the defendant made a false or misleading statement must (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 321 (quoting 15 U.S.C. § 78u–4(b)(1) and (b)(2)).

To establish liability under § 10(b) and Rule 10b–5, a plaintiff must prove that the defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused the plaintiff's injury. *See Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995).

### *DISCUSSION*

Defendants move to dismiss Count I of the Second Amended Complaint—alleging violations of § 10(b) and Rule 10b–5—for failure to state a claim. Specifically, Defendants challenge whether Plaintiffs have sufficiently alleged that they made a misstatement or omission of material fact and whether that misstatement or omission was made with scienter. Defendants do not address the sufficiency of the remaining elements—whether the alleged misstatement or omission was made in connection with the purchase or sale of securities, whether Plaintiffs relied on the misstatement or omission, and whether

the Plaintiffs suffered damages as a result—that are necessary to state a claim. This is presumably because Plaintiffs allege a "fraud-on-the-market" theory, under which Plaintiffs bought and sold in an open and efficient market and, as such, need not show individual and specific reliance. *See Schleicher v. Wendt,* 618 F.3d 679, 682 (7th Cir.2010) ("[T]he fraud-on-the-market doctrine [ ] supplants 'reliance' as an independent element by establishing a more direct method of causation."). Defendants also argue that Plaintiffs cannot state a claim in Count II, which alleges that Defendants are liable as controlling persons under § 20(a), if Count I is dismissed.

### I. Count I

Plaintiffs allege that Defendants made material misstatements or omissions on October 25, 2007, November 14, 2007, December 6, 2007, and January 23, 2008. According to Plaintiffs, these misstatements or omissions dealt with: (1) Motorola's progress in turning around its mobile devices division; (2) its expected earnings; and (3) a previously undisclosed settlement with Freescale.

**A. Progress in Turning Around Mobile Devices Division**
Plaintiffs allege that Defendants made material misstatements and omissions regarding their progress in "turning around" Motorola's mobile devices division. Specifically, Plaintiffs cite to the following statements made on October 25, 2007:(1) Meredith's prediction that both revenue and the bottom line would improve in 4Q 2007; and (2) Zander's representations that Motorola was putting "operational discipline and execution back into Mobile Devices," that Motorola's 3Q could be "characterized by one word, progress," and that Motorola was "committed to returning" to the financial targets mentioned at the September 7, 2007 analyst meeting. Plaintiffs also cite to Brown's November 14, 2007 statement that unit sales and revenue would increase sequentially in 4Q 2007, which Meredith affirmed on December 6, 2007. Defendants respond that these statements were accurate predictions and, if found to be misleading, were merely corporate puffery that reasonable investors would not rely on.

### 1. Material Misstatements and Omissions
 **\*6** Material misstatements and omissions occur when a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls v. Glasser,* 64 F.3d 1061, 1065 (7th Cir.1995). A statement is material if it would be viewed by "a reasonable investor as

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 288 of 306 PageID #:2244

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.,* 2000 WL 1705279 at * 14 (N.D.Ill. Nov.14, 2000) (Kennelly, J.) (citations omitted). Discussing an issue, while withholding specific facts, can also mislead. *See, e.g., Anderson v. Abbott Labs.,* 140 F.Supp.2d 894, 903 (N.D.Ill.2001) ("If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it."). Defendants, however, are not liable where the facts and circumstances allegedly "omitted or represented have actually been disclosed." *Silverman v. Motorola, Inc.,* 2008 WL 4360648 at *9 (N.D.Ill. Sept.23, 2008) (Moran, J.) (citation omitted). To allege that a historical statement violated § 10(b), "the plaintiff must set forth sufficient facts to show that the statement was either false or misleading because of omitted information." *Selbst v. McDonald's Corp.,* 432 F.Supp.2d 777, 785 (N.D.Ill.2006) (internal quotations and citations omitted).

#### a. Revenue

Here, Plaintiffs' own Second Amended Complaint contains data confirming that Meredith's and Brown's predictions of increasing revenue and unit sales from 3Q 2007 to 4Q 2007 were accurate. From 3Q 2007 to 4Q 2007 unit sales of mobile phones increased from 37.2 million units to 40.9 million units. During the same period, revenue in the mobile devices division increased from $4.5 billion to $4.8 billion. Plaintiffs' claims that demand for Motorola mobile devices was actually dropping during this period and that mobile phones are seasonal and thus naturally increase during 4Q are insufficient to plead material misstatements or omissions. The challenged statements simply predicted an increase in revenue and unit sales over the coming quarter, a prediction that was proven accurate. Zander's statement that Motorola had made "substantial improvement in all key metrics" is borne out by the reduced operating loss of $138 million in Q3 2007 compared with a loss of $264 million in Q2 2007.

Moreover, Meredith's January 23, 2008 statement that sales from the Thanksgiving to Christmas period in 2007 were slower than expected does not make the omission of this information in statements made on October 25 and on December 6 material because the alleged misstatements and omissions occurred well before the slow Christmas sales would have been known. Finally, Plaintiffs' allegation that Motorola's top executives would have been aware of a decline in supply parts when they made these statements is irrelevant to a challenge to statements that merely predicted that sales figures would increase from one quarter to the next. *Cf. Silverman,* 2008 WL 4360648 at *9 (noting that omissions

regarding problems plaguing a new product's rollout may have been misleading because defendants stated the rollout was "on track."). As such, Plaintiffs fail to demonstrate a material omission.

**\*7** Plaintiffs fail to allege what other information should have been included in the October 25th and December 6th statements because, as the documents cited in their Second Amended Complaint claim, Motorola's 4Q 2007 loss was based in large part on reduced Christmas/holiday sales. (Second Amd. Compl. ¶ 14.) Zander's description that 3Q was an example of progress is attested to by the documents and data referenced in Plaintiffs' Second Amended Complaint. That Motorola's incoming CEO, Brown, stated privately on January 4, 2008 that the company's 4Q 2007 performance "will be significantly worse than anybody's imagined," does not alter the fact that especially weak Christmas/holiday sales data could not have been known on December 6th, let alone October 25th.

#### b. Demand for RAZR2

Plaintiffs' reliance on confidential witnesses who describe the RAZR2 as being a complete flop and cite Motorola's lack of new or exciting products as the reason 4Q sales were low, does not amount to an allegation that Motorola omitted material information. Nor can Plaintiffs rely on confidential witnesses who state that top executives knew that their products were not selling yet did not disclose this information. In fact, Motorola repeatedly and accurately stated the number of RAZR2 phones sold in 3Q and 4Q. Moreover, on December 6, 2007 Meredith, in response to a question about the "product hole" that Motorola had been facing, stated that he was "not satisfied" with progress on its new products in the mobile device division. Transcript Dec. 6, 2007 Lehman Bros. Annual Tech. Conf. Specifically, Meredith stated that Motorola was "not on time," that its "new product introduction process has not been crisp," and that Motorola is "not satisfied with where [it is]." *Id; see, e.g., In re CNET Networks, Inc.,* 483 F.Supp.2d 947, 966 (N.D.Cal.2007) ("Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored."). These statements, made at a conference relied upon by Plaintiffs in their Second Amended Complaint, adequately refute Plaintiffs' allegations that Defendants omitted material statements about the challenges its mobile devices division faced with respect to demand for its new products. *See, e.g., Silverman,* 2008 WL 4360648 at *9 (dismissing allegations of fraud based on RAZR price decrease because plaintiffs' own complaint

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 289 of 306 PageID #:2245

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

contained a statement by defendants specifically mentioning the price reduction).

### 2. Corporate Puffery

"Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.' " *In re Midway Games, Inc. Sec. Litig.,* 332 F.Supp.2d 1132, 1164 (N.D.Ill.2004) (citation omitted). "Scrutiny of vaguely optimistic statements ... is 'especially robust' in cases involving a fraud-onthe-market theory of liability ... because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." *Id.* (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1218 (1st Cir.1996). "[I]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir.2010). Statements regarding a company's "strong balance sheet" or its "proven record of growth" are immaterial puffery that no reasonable investor would rely on. *Silverman,* 2008 WL 4360648 at *9 ("Statements that the new products are 'competitive' or 'compelling' are ... immaterial as a matter of law," as are statements that a company is "well-positioned to continue creating value" or that it has "substantial resources"); *see also Jones v. Corus Bankshares, Inc.,* 701 F.Supp.2d 1014, 1027 (N.D.Ill.2010) (collecting cases). Certain specific statements made within a broader vague characterization may nonetheless be considered material if they "reinforce factual misstatements and therefore contribute to ongoing deception." *In re Sears, Roebuck and Co. Sec. Litig.,* 291 F.Supp.2d 722, 726 (N.D.Ill.2003).

**\*8** Here, Zander's October 25, 2007 statement that he was putting "operational discipline and execution" back into the mobile devices unit is loosely optimistic corporate puffery and, as such, is immaterial. *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1077 (N.D.Cal.2001) (noting that statements using the words "strong" and "increased awareness" were vague puffery). Moreover, Plaintiffs do not allege that Defendants were not attempting to restore operational discipline in this division, only that they were aware of and failed to disclose an anticipated reduction in sales based on slowing demand for their mobile phones.

Similarly, while Zander stated on October 25, 2007 that Motorola's management team was "committed to returning the company to [its] financial targets as outlined during the September Analyst meeting," Plaintiffs do not dispute that Defendants were in fact committed to this approach. The Court finds Zander's general commitment to growth to be immaterial corporate puffery. *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (finding defendant's reference to its "commitment to create earnings opportunities" to be immaterial puffery). To the extent that Zander's October statement referenced specific growth targets from the September Analyst meeting, those targets were for a moderated outlook over a "two-to-three-year operating model" and fall under the analysis of forward-looking statements below. The Court also notes that the statements from the September Analyst meeting relied upon by Plaintiffs refer to a time-frame well beyond the Class Period.

Because Plaintiffs fail to allege any material misstatements or omissions regarding Motorola's attempts to turn its mobile device division around, the Court grants Defendants' Motion to Dismiss with respect to the allegations in Count I regarding the attempted turnaround of Motorola's mobile device division.

### B. Earnings Projections

Plaintiffs allege that Meredith's projections on October 25, 2007 and December 6, 2007 that Motorola would earn between $0.12 and $0.14 for 4Q 2007, were false and are not covered by the PSLRA's forward-looking safe harbor provisions. Defendants respond that these earnings projections were accurate and, even if challenged, also contained cautionary language. Defendants further argue that Plaintiffs are unable to sufficiently plead scienter.

### 1. Forward–Looking Statements

The PSLRA provides a safe harbor from liability for certain "forward-looking statements" that prove to be false. Forward-looking statements include statements (1) containing a projection of revenues or other financial items; (2) of the plans and objectives of management for future operations, including those relating to the products or services of the issuer; (3) of future economic performance; or (4) of the assumptions underlying or relating to the aforementioned statements. 15 U.S.C. § 78u–5(i)(1). Corporations and individual defendants may avoid liability for forward-looking statements that prove to be false if the statements are "accompanied by meaningful cautionary statements," are immaterial, or were not made "with actual knowledge" of the

CASE: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 290 of 306 PageID #:2246

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

2011 WL 814932, Fed. Sec. L. Rep. P 96,226

falsity or misleading nature of the statement. *Id.* § 78u–5(c)(1).

**\*9** A mixed statement containing both present and future elements is not entitled to the safe harbor "with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir.2008) (defendant stating that sales were "still going strong" constituted a mixed present/future statement).

Here, Plaintiffs' allegations regarding the sequential increase in sales and revenue have already been discussed and deemed immaterial. Defendants' specific predictions that Motorola's earnings per share from continuing operations would be in the range of $0.12 to $0.14 fall within the category of forward-looking statements. § 78u–5(i)(1). Motorola announced this 4Q 2007 estimate on October 25th and reaffirmed it on December 6th. Plaintiffs rely on Motorola's January 23, 2008 release of 4Q 2007 earnings per share of $0.04 to allege that the predictions were materially inaccurate. The $0.04 figure, however, included net charges of $0.09 per share related to a legal settlement with Freescale and to other costs associated with previously announced workforce reductions. Motorola's 4Q operating income before these special charges was $0.14 per share, in line with Defendants' forecasts. Moreover, Defendants' earnings per share predictions were specifically for "earnings per share from continuing operations" that excluded special charges. (Second Amd. Compl. ¶ 204.) The Court therefore finds that Defendants accurately predicted their 4Q 2007 earnings from continuing operations to be $0.14 per share.

To the extent, however, that Plaintiffs insist that Defendants' earnings projections were false in light of the net charges of $0.09 per share and the overall reduction in demand for Motorola mobile phones, the Court finds that Defendants included meaningful cautionary language in their predictions.

### 2. Cautionary Language

If a forward-looking statement is accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is "irrelevant, and the statement is not actionable regardless of [a] plaintiff's showing of scienter." *In re Cutera Sec. Litig.,* 610 F.3d at 1112–13. "The PSLRA does not require the *most* helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 734 (7th Cir.2004) (quotation marks omitted). "[I]t

is enough to point to the principal contingencies that could cause actual results to depart from the projection." *Id.; see, e.g., Stavros,* 266 F.Supp.2d at 843 (noting that cautionary language must be "more than boilerplate" and "specifically tailored to the company's business"). Cautionary statements may accompany the forward-looking statement or they may be incorporated by reference. *See, e.g., Desai v. Gen. Growth Props., Inc.,* 654 F.Supp.2d 836, 844 (N.D.Ill.2009) (cautionary statements contained in SEC filings were "absorbed into the market" under the fraud-on-the-market theory).

**\*10** The Court notes at the outset the factually similar case of *Silverman,* where analogous forward-looking earnings projections made by Motorola executives were found to be protected by cautionary language and thus within the PSLRA's safe harbor protections. *See, e.g., Silverman,* 2008 WL 43 60648 at * 12. In *Silverman,* the district court held that the cautionary language accompanying Motorola's press releases and conference calls, as well as its SEC filings, were sufficient to insulate alleged misstatements referring to its projected sales and revenue in 2006. *See, e.g., id.* (noting the press releases and conference calls contained "between 18 and 20 risk factors which might change the outcome" of Motorola's predictions and that Motorola's SEC filings contained "extensive and specific" risk factors).

Here, similarly, Motorola's press releases and conference calls were accompanied by cautionary language and also referred participants and listeners to additional risk factors "on pages 16 through 24 and item 1A of Motorola's 2006 Annual Report on Form 10–K and in other SEC filings." Transcript of Oct. 25, 2007 Earnings Conference Call. Specifically, Motorola addressed risk factors including: the level of demand for the company's products; its ability to introduce new products; and risks related to certain "key suppliers." Oct. 25, 2007 3Q Press Release. For example, Motorola's 2006 SEC 10–K filing cautioned that the markets for many of its products are "characterized by rapidly changing technologies, frequent new product introductions, short product life cycles and evolving industry standards" and that Motorola is "constantly exposed to the risk that [its] competitors may implement new technologies before [it does]." Motorola also warned that if its strategic alliances and partnerships with industry leaders do not develop as expected, its "business could be adversely impacted." Motorola stated at its conference calls that the risk factors described in its press releases and in its 10–K filings "in some cases have caused" its actual results to differ materially from its forward-looking predictions. Transcript of

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...
2011 WL 814932, Fed. Sec. L. Rep. P 96,226

Oct. 25, 2007 Earnings Conference Call. Motorola also made abundantly clear that its conference call would contain "[a] number of forward-looking statements." *Id.*

The Court finds that Motorola's cautionary statements addressed Plaintiffs' particular allegations in individualized terms—regarding demand for Motorola's mobile devices, its predicted growth, and its pending settlement negotiations with a key supplier, Freescale—and, as such, were sufficiently specific to provide a safe harbor. *See Asher,* 377 F.3d at 734; *see, e.g., In re Midway Games,* 332 F.Supp.2d at 1166 (finding risk factor stating "[w]e depend on market acceptance of new products" to be sufficient cautionary language).

Because the Court finds that Defendants' forward-looking earnings projections were either accurate or protected by sufficient cautionary language, the Court need not address whether Defendants made these projections with actual knowledge that they were false. 15 U.S.C. § 78u–5(c)(1); *see, e.g., In re Midway Games,* 332 F.Supp.2d at 1168 ("proof of knowledge of the falsity of a forward-looking statement is 'irrelevant' when the statement is accompanied by meaningful cautionary language.") (citations omitted). The Court therefore grants Defendants' Motion to Dismiss with respect to forward-looking earnings projections.

### C. Freescale Settlement

 **\*11** Plaintiffs allege that Defendants misled investors by making material omissions and presenting knowingly false earnings projections when they failed to mention Motorola's settlement with Freescale until December 31, 2007 and then included the settlement cost as a special charge in their 4Q earnings. Defendants respond that the Freescale settlement information was not known on December 6, 2007 when the 4Q earnings projections were affirmed and, even if they were, Plaintiffs cannot allege Defendants knowingly made false statements.

### 1. Material Omissions or Misstatements

As a preliminary matter, the Court finds that Motorola's decision to not disclose its settlement with Freescale until December 31, 2007 was not a material omission. Plaintiffs do not cite to any caselaw that requires companies to disclose settlement talks or confidential renegotiations of supplier contracts. *See, e.g., Hallberg v. Am. Agencies General Agencies, Inc.,* 2005 WL 563211 at \*6 (N.D.Ill. Mar.8, 2005) (Filip, J.) ("Thus, even assuming that a duty to disclose existed, there is no reason to think Defendants had any

potential merger or IPO to disclose to Plaintiffs before the two sides reached and agreement and executed a settlement agreement."). Plaintiffs' Second Amended Complaint states that Freescale and Motorola renegotiated their contract agreement in February 2007 and extended it for at least two years. (Second Amd. Compl. ¶ 121.) Regarding the settlement at issue here, Plaintiffs only allege that Freescale and Motorola had engaged in negotiations over a compromise agreement during 4Q 2007. (*Id.* ¶ 11.) Plaintiffs imply that Motorola's senior executives must have been aware of these negotiations, but Plaintiffs do not allege that Motorola and Freescale executed a settlement agreement before Meredith's December 6, 2007 statements. *See, e.g., Hallberg,* 2005 WL 563211 at \*6 (dismissing complaint for failure to plead when the parties reached and executed a settlement). As such, "even assuming a duty to disclose existed," Plaintiffs do not plead facts alleging the settlement had been executed, and therefore Meredith was not obligated to disclose it at the Lehman Brothers Conference. *Id.; Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999) ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all information.").

Here, unlike in *Silverman,* where the defendants stated that everything was "on track" but did not mention product delays, Meredith simply stated, accurately, that Motorola was in discussions with all of the named players in the chip industry. Meredith also stated that he would be finalizing those arrangements within the coming weeks and months—an accurate forecast of the Freescale disclosure three weeks later. Meredith concluded by telling investors that they should "watch" Motorola's relationship with its chip suppliers. Meredith made no mention of Freescale, nor did he make any "affirmative characterization" of the discussions—for example, he did not describe them optimistically or as "conservative" or "adequate." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 282 (3d Cir.1992) ("where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' ")

 **\*12** Plaintiffs' argument that Defendants "opened the door" to this subject with his response is therefore unavailing. *See, e.g., Anderson,* 140 F.Supp.2d at 903 ("Merely mentioning a topic ... does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important."). To that end, the analysts cited in Plaintiffs' own Second Amended Complaint do not appear troubled by news of the settlement. In fact, the analysts take the settlement as a positive sign, allowing

Case: 1:20-cv-05593 Document #: 83-1 Filed: 06/14/21 Page 292 of 306 PageID #:2248

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

2011 WL 814932, Fed. Sec. L. Rep. P 96,226

Motorola to further diversify its chip supplier base to better compete in the 3G space. As Plaintiffs themselves note, "what really shocked analysts" at the January 23, 2008 meeting "was defendants' report that Motorola's Mobile Devices sales projection for 1Q08 was devastating." (Second Amd. Compl. ¶ 116.)

Because Plaintiffs have not cited to any cases requiring the disclosure of pending settlement negotiations, and because they have not pled facts alleging that Freescale and Motorola executed a settlement prior to the December 6, 2007 conference, the Court finds that Defendants did not materially omit any statements regarding the Freescale settlement by waiting to disclose its amount until December 31, 2007.

### 2. Future Statements

Plaintiffs allege that the failure to include information about the Freescale settlement in Motorola's 4Q 2007 earnings projections amounts to a failure to include cautionary language and thus negates the corresponding safe harbor protections.

For the reasons discussed above, the Court finds Defendants' forward-looking earnings projections to be accurate because they were explicitly and repeatedly based on "continuing operations" and did not reflect "special charges" such as a one-time settlement. Moreover, Motorola has incurred special charges similar to the Freescale settlement in recent years, including for charges associated with annual workforce reductions. *See, e.g., Silverman,* 2008 WL 4360648 at \*13 (noting that past stock trading history of Motorola executives demonstrated that certain stock sales at issue were not suspicious in scope or timing). Notably, in April 2007 Motorola reported 1 Q 2007 special charges of $0.11 per share, substantially larger than the $0.07 per share special charge at issue here.

Even if the Court were to consider these forward-looking statements inaccurate, they would nonetheless be protected

by the meaningful cautionary language referred to and accompanying Motorola's press releases, conferences, and SEC disclosures. As such, the Court grants Defendants' Motion to Dismiss with respect to omission of Freescale-related charges until December 31, 2007. Since the Court finds that Defendants' forward-looking earnings projections were either accurate or protected by sufficient cautionary language, the Court need not address whether Defendants made these projections with actual knowledge that they were false. *See In re Cutera Sec. Litig.,* 610 F.3d at 1112–13 ("if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statements is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.").

### II. Count II

**\*13** Because Plaintiffs fail to state a claim for violations of § 10(b) and Rule 10b–5, their control person liability claims in Count II must also be dismissed. *See, e.g., In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.,* 604 F.Supp.2d 1188, 1197 (N.D.Ill.2009) (dismissing control person liability claims when § 10b claims were denied).

### *CONCLUSION*

For the reasons stated, the Court grants Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. The case is dismissed with prejudice.

So ordered.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 814932, Fed. Sec. L. Rep. P 96,226

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 564222

2020 WL 564222
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

TWIN MASTER FUND, LTD.,
Twin Opportunities Fund, LP, and
Twin Securities, Inc., Plaintiffs,
v.
AKORN, INC., Rajat Rai, Duane
Portwood, Alan Weinstein, Ronald
Johnson, and Brian Tambi, Defendants.
Manikay Master Fund, LP, and
Manikay Merger Fund, LP, Plaintiffs,
v.
Akorn, Inc., Rajat Rai, Duane Portwood,
Alan Weinstein, Ronald Johnson,
and Brian Tambi, Defendants.

Case No. 19 C 3648, Case No. 19 C 4651
|
Signed 02/05/2020

**Attorneys and Law Firms**

Lawrence M. Rolnick, Jennifer A. Randolph, Pro Hac Vice, Michael J. Hampson, Pro Hac Vice, Richard A. Bodnar, Pro Hac Vice, Lowenstein Sandler LLP, Roseland, NJ, Andrew Dylan Campbell, John B. Haarlow, Jr., Novack and Macey LLP, Chicago, IL, for Plaintiffs.

Justin C. Clarke, Pro Hac Vice, Robert H. Baron, Pro Hac Vice, Cravath, Swaine & Moore LLP, New York, NY, for Defendant Akorn, Inc.

Robert H. Baron, Cravath, Swaine & Moore LLP, New York, NY, for Defendant Duane A. Portwood.

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

**\*1** In 2017, Akorn, Inc., a pharmaceutical company, announced that it would be acquired by Fresenius, an international healthcare company. Before the merger closed,

however, a whistleblower alerted Fresenius to possible regulatory compliance problems at Akorn facilities. Fresenius investigated these allegations, found substantial compliance problems, and subsequently announced that it was terminating the merger. After the termination announcement, the price of Akorn's stock dropped precipitously.

Twin Master Fund, Ltd., Twin Opportunities Fund, LP, and Twin Securities, Inc. (collectively "Twin") purchased Akorn securities shortly after it announced the merger with Fresenius. Manikay Master Fund, LP and Manikay Merger Fund, LP (collectively "Manikay") also purchased Akorn securities around this time. Twin and Manikay have each sued Akorn and several corporate officers and board members, alleging that they made misrepresentations regarding Akorn's regulatory compliance that were fraudulent and violated the Securities Exchange Act of 1934. The defendants have moved to dismiss all of the plaintiffs' claims.

**Background**

Akorn is a pharmaceutical company that produces and sells generic drugs. At all times relevant to this suit, the individual defendants had the following roles at Akorn: Rajat Rai was the Chief Executive Officer, Duane Portwood was the Chief Financial Officer, and Alan Weinstein, Ronald Johnson, and Brian Tambi were board members.

Akorn is subject to U.S. Food and Drug Administration (FDA) regulations that set forth "current good manufacturing practices" for production of drugs. These regulations require manufacturers to meet certain data integrity standards, such as ensuring that data is backed-up and periodically reviewed for accuracy. Akorn's Vice President of Global Quality is in charge of ensuring that the company complies with the FDA's current good manufacturing practices.

To enforce compliance with its good manufacturing practices, the FDA periodically inspects drug manufacturing facilities. After inspection, the FDA may issue a "Form 483," which lists the observed violations and gives the manufacturer fifteen days to respond with a corrective action plan. Once the manufacturer submits this plan, the FDA informs the facility whether the agency is satisfied with the proposed changes or plans to take enforcement action.

Akorn, like all generic drug manufacturers, must receive FDA approval of its generics prior to releasing them on the market.

2020 WL 564222

To gain approval, a manufacturer submits an Abbreviated New Drug Application (ANDA) to the FDA. An ANDA must include data demonstrating that the generic drug performs in the same manner as the analogous brand-name drug, and this data is subject to the FDA's data integrity standards. If the data submission in the ANDA is inadequate, the FDA will issue the company a "complete response letter," which lists the deficiencies and the action needed to overcome them. The applicant can then address the issues and resubmit the ANDA.

## A. Data integrity issues at Akorn

 **\*2**  In January 2016, an Akorn employee reported to Rai, Portwood, and other executive officers that Akorn's then-Vice President of Global Quality was providing misleading information to the FDA and thwarting Akorn's internal investigations of data integrity. In April 2016, Akorn's Global Quality Compliance team investigated data practices at the company's headquarters in Lake Forest, Illinois and found that it was not meeting data integrity standards. The team also investigated Akorn's research facility in Vernon Hills, Illinois and concluded that the data practices there were not meeting standards either. An independent data-integrity consulting company, Cerulean, inspected Akorn's manufacturing facility in Decatur, Illinois and found that its data practices did not meet FDA standards.

In mid-2016, the FDA also inspected Akorn's Decatur facility and issued a Form 483. Rai reported the Form 483 to investors. In December 2016, following up on the Form 483, the FDA reinspected the Decatur facility. Akorn passed the inspection, and agency informed the company that it would not take further enforcement action.

## B. Akorn's merger agreement with Fresenius

In April 2017, Akorn accepted a buyout bid from Fresenius, and the two companies executed a merger agreement. A provision in the agreement allowed Fresenius to terminate the merger if Akorn's representations in the agreement were not "true and correct" as of both the signing date and closing date of the merger. Among Akorn's representations was a regulatory compliance statement stating that, "to the [k]nowledge of Akorn":

> [Akorn] and its Subsidiaries are[,] and ... since July 1, 2013 ... have been[,] in compliance with ... all applicable Laws (including all rules, regulations, guidance and policies) relating to or promulgated by the U.S. Food and

> Drug Administration ... and other Healthcare Regulatory Authorities....

Merger Agr., Ex. 4, Akorn's Mot. to Dismiss, dkt. no. 29-6, at 33.[1] Another provision allowed Fresenius to terminate if Akorn breached its commitment to operate "in the ordinary course of business" during the pendency of the merger. *Id.* at 40.

After the companies executed the merger agreement, Akorn filed a Form 8-K—announcing the merger and attaching the agreement—with the U.S. Securities and Exchange Commission (SEC). Twin and Manikay first purchased Akorn securities shortly thereafter, in April 2017 and August 2017, respectively.

In October 2017, Fresenius received a whistleblower complaint alerting it to issues with Akorn's product development and quality control processes. Both Akorn and Fresenius retained independent counsel to concurrently investigate the whistleblower's allegations. On February 26, 2018, Fresenius issued a press release announcing it was investigating "alleged breaches of FDA data integrity requirements ... at Akorn" and that the "consummation of the [merger] may be affected" if the findings revealed that Akorn was not in compliance with the agreement conditions. Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶ 130.[2] The same day, Akorn released a statement in which is said that its investigation "investigation has not found any facts that would result in a material impact on Akorn's operations and the Company does not believe this investigation should affect the closing of the [sale] with Fresenius." *Id.* ¶ 131. After these announcements, Akorn's stock price dropped from $30.28 per share on February 26, 2018 to $18.65 per share on February 27.

 **\*3**  Fresenius's investigation resulted in a determination that Akorn was not in compliance with data integrity standards, and on April 22, 2018, Fresenius informed Akorn that it was terminating the merger. Fresenius issued a press release stating that it planned to pull out, in part, because Akorn had breached FDA data integrity requirements. Akorn issued its own release, stating that its investigation had not uncovered any facts that would compromise the merger. Akorn's stock price fell from $19.70 per share on April 22, 2018, to $13.05 per share on April 23, the day after the companies' announcements.

On April 23, 2018, Akorn sued Fresenius in Delaware chancery court, seeking an order requiring consummation

**Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)**

2020 WL 564222

of the merger, and the court held a five-day trial. In October 2018, it issued a decision concluding that Fresenius's termination was valid on two independent grounds: the inaccuracy of Akorn's regulatory compliance statement and its failure to operate in "the ordinary course of business." First, the court concluded that Akorn's regulatory compliance statement was inaccurate because it had "widespread regulatory violations and pervasive compliance problems ... [that] existed at signing and got worse." *Akorn, Inc. v. Fresenius Kabi AG*, No. 2018-300, 2018 WL 4719347, at *66 (Del. Ch. Oct. 1, 2008). Second, the court found that Akorn had breached its commitment to operate in ordinary course of business because it cancelled internal audits and failed to address data integrity deficiencies. *Id.* at *88.

In May 2019, Twin sued the defendants, asserting three fraud-based claims: (1) violation of section 10(b) the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (count 1); (2) violation of section 18 of the Act, 15 U.S.C. §§ 78r(a) (count 3); and (3) common law fraud (count 4).[3] In July 2019, Manikay also sued, alleging the same misconduct by the defendants and asserting identical claims.

## Discussion

The defendants have moved to dismiss all of the plaintiffs' claims. First, they argue that the section 18 claim is time-barred. Second, the defendants contend that Twin and Manikay failed to adequately plead two elements common to all of their claims: material misrepresentation and causation. Additionally, the defendants have moved to dismiss the section 18 claim, arguing that the plaintiffs did not adequately plead actual reliance. Finally, defendant Portwood has separately moved for dismissal from the common law fraud and section 10(b) claims, arguing that the plaintiffs' allegations were insufficient to establish the requisite mental state for these claims.

### A. Timeliness of the Section 18 claim

Section 18 imposes civil liability for false statements knowingly made in any SEC filing and sets a one-year limitations period from the time a "reasonably diligent plaintiff" would have discovered—or did discover—conduct actionable under this provision. 15 U.S.C § 78r(a), (c); *see Merck & Co. v. Reynolds,* 559 U.S. 633, 653 (2010). The Sarbanes-Oxley Act extended to two years the limitations

period for "claim[s] of fraud, deceit, manipulation, or contrivance in contravention of ... securities laws." 28 U.S.C. § 1658(b)(1).

**\*4** Preliminarily, the parties dispute whether the Sarbanes-Oxley Act extension applies to section 18(a) claims. The defendants argue that because section 18(a) does not include a fraudulent intent element, these are not fraud-based claims for which the Sarbanes-Oxley Act extended the limitations period. The Seventh Circuit has not yet ruled on the issue.

The Second Circuit held, in *Dekalb County Pension Fund v. Transocean Ltd.*, 817 F.3d 393 (2d Cir. 2016), that the two-year limitations period established by the Sarbanes-Oxley Act does apply to section 18 claims. *Id.* at 407. It explained that although section 18(a) does not expressly set forth a scienter requirement, the Supreme Court has "strongly indicated" that it includes one. *Id.* at 406. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976), the Court observed that civil liability provisions of the Securities Exchange Act all include "a state-of-mind requiring something more than negligence." *Id.* at 209 n.28. And later, in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993), the Court stated that section 18 imposes liability on defendants who violate securities laws "with scienter." *Id.* at 296.

This Court agrees with the Second Circuit's reading of *Ernst & Ernst* and *Musick* and concludes that the two-year limitations period applies to the plaintiffs' section 18 claims, rendering them timely. The parties dispute the date on which the limitations period began to run. The plaintiffs contend that it was May 2, 2018, when a news article reported that Fresenius had accused Akorn of fraud in the Delaware court proceedings; the defendants contend that it was October 1, 2018, when the chancery court issued its decision. Even if the two-year limitations period began to run on the earlier May 2, 2018 date, the plaintiffs' claims were timely: Twin filed its complaint on May 31, 2019, and Manikay filed its on July 10, 2019.

### B. Sufficiency of fraud allegations

The defendants have moved to dismiss the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and for failure to plead fraud with particularity under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1). In deciding a motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded factual allegations in the complaint and must draw all reasonable inferences in the

Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)

2020 WL 564222

plaintiffs' favor. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019). To survive a motion to dismiss, the plaintiff must allege facts sufficient for a court to draw a plausible inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

All of the plaintiffs' claims are based on fraud and are therefore subject to heightened pleading standards. Federal Rule of Civil Procedure 9(b) requires a plaintiff to allege "with particularity" the circumstances that constitute fraud, which is the "who, what, when, where, and how" of the deceptive conduct. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). The particularity standard requires plaintiffs to plead fraud with precision and "some measure of substantiation." *Id.* (quoting 2 James W. Moore et al., Moore's Federal Practice § 9.03[1][b], at 9-22 (3d ed. 2015)).

**\*5** The plaintiffs' securities fraud claims must also meet the even more stringent standard set forth in the PSLRA, which requires that plaintiffs plead with particularity:

> each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and the basis for the belief that the defendants' statements were misleading, and, if an allegation regarding the statement or omission is based on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(B); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006) *vacated and remanded on other grounds*, 551 U.S. 308 (2007). Unlike Rule 9(b), the PSLRA also requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The defendants argue that the plaintiffs have failed to allege facts sufficient under these standards to support any of their fraud claims. To state a securities fraud claim under section 10(b) and Rule 10b-5, a plaintiff must sufficiently allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) justifiable reliance by the plaintiff; (5) economic loss; and (6) loss causation. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.

1997) (reliance must be justifiable). Section 18(a) creates civil liability for misrepresentations made in SEC filings, and the elements of this claim track those of a section 10b-5 claim. *See* 15 U.S.C. § 78r. The elements of common law fraud in Illinois are also analogous to those for a claim under Rule 10b-5. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013) (applying Illinois law).[4]

### 1. Material misrepresentations

The defendants argue that Twin and Manikay failed to adequately allege that they made any misrepresentation of material fact, an element common to all of the fraud claims.

For claims under the Securities Exchange Act, a statement or omission must be materially misleading from the perspective of a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). A misrepresentation is material if a reasonable investor would view it as "significantly alter[ing]" the "total mix" of information available and important to deciding whether to buy or sell a security. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616 (7th Cir. 2012). For forward-looking statements, materiality depends on "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). And under Illinois law, a misrepresentation is material if the plaintiff "would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller v. William Chevrolet/ GEO, Inc.*, 326 Ill. App. 3d 642, 649, 762 N.E.2d 1, 7 (2001).

**\*6** The plaintiffs have alleged that the defendants misrepresented Akorn's (1) compliance with FDA regulations, (2) manufacturing facilities' attributes, (3) volume of pending ANDA applications, (4) commitments to regulatory compliance, (5) internal data integrity investigations, and (6) SEC disclosure procedures. The Court will review the adequacy of the complaint regarding each of these alleged misrepresentations.

#### a. Regulatory compliance

The plaintiffs have alleged that the defendants fraudulently misrepresented Akorn's compliance with FDA regulations

Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)

2020 WL 564222

through: (1) statements and omissions in Akorn's Forms 8-K (annual reports) and 10-Q (quarterly reports) filed with SEC between March 2017 and February 2018; (2) Akorn's regulatory compliance statement in the Fresenius merger agreement; and (3) statements on Akorn's website.

### i. Forms 8-K and 10-Q

The allegedly false statement that Akorn made in its Forms 8-K and 10-Q was that the company is "subject to extensive government regulations which if ... we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities." Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶ 144. As the defendants correctly observe, this statement is not misleading—it is true. The plaintiffs argue that it was misleading for the defendants to suggest that adverse consequences were only a possibility "if" Akorn was not in regulatory compliance, contending that the defendants internally knew there were serious compliance issues. But no reasonable investor would have understood Akorn's statement to represent anything about the status of its regulatory compliance; it was "nothing more than a boilerplate statement of what the government regulates." *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill. 2001). Because the plaintiffs have failed to allege —with sufficient particularity to satisfy even the Rule 9(b) standard—the reasons this statement was misleading, it does not support their claim that the defendants misrepresented Akorn's regulatory compliance.

The plaintiffs argue, alternatively, that omissions from Akorn's Forms 8-K and 10-Q regarding the company's data integrity issues amounted to material misrepresentations. "Mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). Securities laws do not impose an "absolute duty to disclose all information material to stock prices," and firms are "entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001). Similarly, for a common law fraud claim under Illinois law, an omission is not actionable unless the defendant had a duty to speak. *See Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.*, 2014 IL App (1st) 130764, ¶ 99, 16 N.E.3d 197, 216.

The plaintiffs contend that Item 303 of Regulation S-K, which sets forth disclosure requirements for Forms 8-K and 10-Q, created a duty to disclose regulatory noncompliance at Akorn's facilities. Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The SEC has issued guidance explaining Item 303's materiality standard. It requires the following two assessments:

>  **\*7**  (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend ... on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Management's Discussion and Analysis of Financial Condition and Results of Operations*, 54 Fed. Reg. 22427, 22430 (May 24, 1989) (hereafter "*SEC Guidance*"). The SEC has clarified that Item 303 materiality is "inapposite" with regard to the materiality standard for securities fraud claims articulated in *Basic*, 485 U.S. at 238. *See SEC Guidance*, 54 Fed. Reg. at 22430 n.27. The *Basic* standard, which governs whether a forward-looking misrepresentation is material, requires a balancing of the probability of occurrence of an event and the magnitude of its effect. *See* 485 U.S. at 238.

The Seventh Circuit has not yet decided whether Item 303 imposes a duty to disclose that, when violated, can give rise to fraud liability under the Securities Exchange Act. Other circuits are divided on the issue. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104, 108 (2d Cir. 2015); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). The Second Circuit considered the matter most recently, in *Stratte-McClure*, and held that Item 303 does impose a duty to disclose for the purposes of securities fraud claims, because silence as to Item 303 conditions in an SEC filing has the potential to mislead investors. *Stratte-McClure*, 776 F.3d at 102. The court concluded that a reasonable investor, familiar with Item 303's "obligatory nature," would understand a company's nondisclosure of Item 303 conditions as a representation that no such condition exists. *Id.* The court clarified, however, that a violation of Item 303's duty to disclose is not automatically actionable as securities fraud;

Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)

2020 WL 564222

an actionable securities violation also requires the plaintiff to meet the materiality standard under *Basic*. *Id.*

The Second Circuit in *Stratte-McClure* rejected the Ninth Circuit's conclusion that Item 303 does not impose a duty to disclose because it has a different materiality standard than the one that applies to a claim for securities fraud. *See id.* at 103-4; *INVIDIA*, 768 F.3d at 1055. The Second Circuit explained that the Item 303 and *Basic* standards are not truly in tension: "a violation of Item 303's disclosure requirements can only sustain a [securities fraud] claim ... if the allegedly omitted information satisfies *Basic*'s test for materiality." *Stratte-McClure*, 776 F.3d at 103. In sum, the Second Circuit set forth a two-step approach to determining whether an omission that violates Item 303's duty to disclose is actionable as securities fraud: (1) does Item 303 require disclosure of the condition; and if so, then (2) does the omission meet the *Basic* materiality standard?

The Court finds the Second Circuit's reasoning in *Stratte-McClure* compelling and more persuasive than that of the Ninth Circuit. Further, the Court concludes that the plaintiffs have alleged, with sufficient particularity to satisfy the PSLRA standard, actionable material omissions in Akorn's SEC filings. First, the silence regarding Akorn's regulatory noncompliance in its Forms 8-K and 10-Q violated Item 303's duty to disclose. Akorn's noncompliance with FDA data integrity standards was a "known trend": Rai and Portwood had received an employee report that the Vice President of Global Quality was thwarting data integrity investigations; Akorn's Global Quality Compliance team had found data integrity issues at Akorn's headquarters in Lake Forest and research facility in Vernon Hills; and the FDA had issued a Form 483 for its Decatur facility. Furthermore, these conditions could have "reasonably" been expected to materially impact Akorn's revenues by compromising the approval of their ANDA applications or subjecting them to FDA fines or other sanctions.

 **\*8** The plaintiffs have also sufficiently alleged that the Item 303 omissions meet the materiality standard under *Basic* for forward-looking statements, measured by "the size [of the impact] if the worst happens, multiplied by the probability that it will happen." *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) (explaining the *Basic* standard). "Even very improbable events may be material if the injury is great enough." *Id.* The plaintiffs' allegations reflect that Akorn's data integrity issues were widespread across many of the company's facilities and thus that any

impact—FDA enforcement action or compromise of merger execution conditions—would be substantial. And there was some non-zero probability of adverse effects arising out of Akorn's data integrity problems: the FDA had already found noncompliance with its standards at one of Akorn's facility and the buy-out by Fresenius was contingent on Akorn's regulatory compliance. These allegations are sufficient to meet the materiality standard under *Basic* at the pleading stage.

The Item 303 omissions also satisfy the materiality requirement for an Illinois common law fraud claim, because they involve is the "type of information upon which [a plaintiff] would be expected to rely when making his decision to act." *Miller*, 326 Ill. App. 3d at 649, 762 N.E.2d at 7. As explained above, investors like Manikay and Twin Securities rely on disclosures of Item 303 conditions to understand a company's risk exposure and whether to buy its securities. *See Stratte-McClure*, 776 F.3d at 102. And because the Court has concluded that the plaintiffs' allegations regarding this omission were sufficient to meet the heightened particularity standard of the PSLRA, they are likewise sufficient to satisfy Rule 9(b).

### ii. Merger agreement

The plaintiffs have sufficiently alleged that Akorn's regulatory compliance statement in the merger agreement was a material misrepresentation. They contend that the defendants are precluded from arguing otherwise because the Delaware chancery court concluded that the compliance statements were inaccurate. *See Akorn*, 2018 WL 4719347, at *47, *64-66.

Issue preclusion, or collateral estoppel, bars relitigation of facts that were already decided by another court. *See Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 934 F.3d 553, 563 (7th Cir. 2019). The Court's application of issue preclusion is governed by the law of the state that issued the earlier decision, in this case Delaware. *See id.* at 560; *see also* 28 U.S.C. § 1738. Under Delaware law, issue preclusion requires: (1) the same factual issue was presented in a prior case; (2) the issue was litigated and decided in the prior suit; and (3) the finding was essential to the prior judgment. *See Rogers v. Morgan*, 208 A.3d 342, 346 (Del. 2019).

Even if the chancery court's finding regarding Akorn's regulatory compliance statement is the same issue in this case,

Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)

2020 WL 564222

which the parties dispute, issue preclusion does not apply because the falsity finding was not essential to the chancery court's judgment. A finding is not essential to a judgment if it could have been "grounded ... upon an issue other than that which [a party] seeks to foreclose from consideration." *See Taylor v. State*, 402 A.2d 373, 375 (Del. 1979). The chancery court concluded that the inaccuracy of Akorn's regulatory compliance statement was one of two breaches of the merger agreement by Akorn and that either breach independently entitled Fresenius to terminate. *See Akorn*, 2018 WL 4719347, at *45, 101. Thus, the chancery court's finding on Akorn's regulatory compliance statement does not preclude the defendants from litigating the accuracy of the statement in this proceeding.

The Court concludes, however, that the plaintiffs have adequately alleged that Akorn's regulatory compliance statement was a material misrepresentation. Specifically, they allege that by the time the merger agreement was executed in April 2017, Akorn's Global Quality Compliance team and Cerulean had identified severe noncompliance with FDA data integrity standards at several Akorn sites. Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶¶ 86, 88, 90, 150. These allegations are sufficiently particularized, within the meaning of the PSLRA, to support an inference that Akorn falsely stated that it was then in compliance with "all applicable Laws (including all rules, regulations, guidance and policies) relating to or promulgated by the U.S. Food and Drug Administration." Merger Agr., Ex. 4, Akorn's Mot. to Dismiss, dkt. no. 29-6, at 33.

**\*9** The Court turns next to whether this alleged false statement meets the materiality standard for securities fraud claims. The defendants argue that the regulatory compliance statement is not actionable securities fraud because no reasonable investor would view such provisions in a merger agreement as statements of material fact. They point out that the Form 8-K to which the merger agreement was attached included disclaimers alerting the investing public that representations in the agreement were made only for purposes of the merger transaction. The defendants add that the disclaimer explained that the regulatory compliance statement's role in the merger agreement involved risk allocation, not communication of facts.

The Seventh Circuit has not yet addressed whether representations in a merger agreement representations can be actionable as securities fraud, but in *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008), the Ninth Circuit held that representations in a merger agreement may be actionable. *Id.* at 741. In *Glazer*, the defendant moved to dismiss section 10(b) claims based on a representation of regulatory compliance made in a merger agreement. *Id.* It argued that the representation was not actionable because no reasonable investor would interpret statements in a merger agreement—representations directed only to parties to the agreement—as factual communications directed to the investing public. *Id.* The Ninth Circuit rejected this argument, concluding that "the mere context of the statements" was not sufficient to "render these statements inactionable *as a matter of law.*" *Id.* The court reasoned that because the merger was a "very significant event" for the company, there would have been significant investor interest in the details of the agreement. *Id.* Thus, a reasonable investor might rely on the agreement's terms. *Id.*

The Court finds the Ninth Circuit's reasoning in *Glazer Capital Management* persuasive and concludes that plaintiffs have alleged with particularity sufficient to satisfy the PSLRA that the regulatory compliance statement was a material misrepresentation. Like the merger in *Glazer*, the Fresenius merger was a very significant event for Akorn, and the company should have anticipated high investor interest in the details of the agreement. Reviewing the agreement, an investor would have seen not only the regulatory compliance statement but also the provision making the merger contingent on the truth of its regulatory compliance statement. A reasonable investor could conclude that Akorn would not have agreed to this condition if it had serious regulatory compliance problems. Thus, plaintiffs' allegations regarding Akorn's merger-agreement representation of compliance with all FDA regulations meets the materiality requirement, because one could reasonably find that a reasonable investor would deem this information important to a decision to buy or sell Akorn securities. *See Appert*, 673 F.3d at 616.

This statement likewise meets the materiality standard for common law fraud, because the plaintiffs have alleged with particularity that it was "the type of information upon which [investors] would be expected rely" when deciding to buy or sell Akorn securities, for the reasons just discussed. *See Miller*, 326 Ill. App. 3d at 649, 762 N.E.2d at 7.

### iii. Statements on Akorn's website

Finally, the plaintiffs have alleged that several statements on Akorn's website asserting that it had internal policies to ensure

regulatory compliance were material misrepresentations. But the plaintiffs have not alleged, with particularity, the "who, what, when, where, and how" regarding these statements and therefore have not satisfied either the Rule 9(b) pleading standard or the more stringent PSLRA standard. *See Presser*, 836 F.3d at 776. There are no allegations in the complaint about when these statements were posted to the website. Nor have the plaintiffs alleged that Akorn lacked regulatory compliance or quality assurance policies, which is what would be needed to render the website statements false. Rather, the plaintiffs have alleged only that there were widespread noncompliance and quality issues at Akorn. This supports, at most, a reasonable inference that whatever policies Akorn had failed, not that it lacked compliance policies in the first place. Thus, the plaintiffs cannot rely on Akorn's website statements as the basis for their fraud claims.

### b. Qualities of Akorn's manufacturing facilities

 **\*10** Twin and Manikay have alleged that the defendants misrepresented particular qualities of Akorn's manufacturing facilities through the following statements: (1) its facilities were approved by the FDA; (2) Akorn had "expertise" in research and development and manufacturing; and (3) the FDA had determined, after its December 2016 reinspection of the Decatur facility, that Akorn did not need to take any further action to comply with FDA standards. None of these qualify as material misrepresentations.

First, the plaintiffs have not alleged with particularity sufficient for Rule 9(b) or the PSLRA their basis for contending that it was deceptive for Akorn to characterize its facilities as "Food and Drug Administration ... approved" and "in good standing with the FDA." Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶¶ 154, 155. They have not alleged any facts setting forth the requirements for FDA approval for a pharmaceutical manufacturing facility or even that the FDA makes any such facility-wide designation. Rather, the plaintiffs have alleged only that Akorn is generally subject to FDA regulations and that the agency conducts inspections of facilities to enforce compliance with its current good manufacturing practices. The FDA's Form 483 process, as described in the complaint, does not involve any "approval" or "good standing" facility designation by the FDA. Rather, at least as alleged in the plaintiffs' complaints, it involves the FDA giving facilities notice of compliance issues at a facility and following up with its approval or disapproval of any proposed corrective action. Thus, because the plaintiffs'

allegations do not describe with particularity any FDA approval process for facilities, the purported misstatements that Akorn's facilities are "FDA approved" or "in good standing" with the agency do not support the plaintiffs' fraud claims.

Second, the statements touting Akorn's expertise are not actionable because they are not material—rather, they amount to puffery. For the purposes of a securities fraud claim, statements of "vague aspiration or unspecific puffery" are not material. *Makor Issues & Rights*, 437 F.3d at 596. Puffery consists of an "empty superlative[ ]" that is not actionable as fraud because no reasonable person would rely on such a statement when deciding to buy a security. *See United States v. Burns*, 843 F.3d 679, 684 (7th Cir. 2016). Similarly, Illinois courts define puffery as a seller's "exaggerations" or "subjective descriptions" about the quality of its products or services, which sellers are "reasonably expected" to make. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173-74, 835 N.E.2d 801, 847 (2005). The Court concludes that Akorn's assertions regarding its expertise are nonactionable puffery under both Illinois and federal securities law. *See id.* at 174 (noting that claim of "expert workmanship" is puffery); *see also Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co. of N.Y.*, 751 F. Supp. 727, 733 (N.D. Ill. 1990) (holding that statement of "expertise" was puffery).

Finally, the plaintiffs have failed to adequately allege that the defendants' statements—made in November 2016, December 2016, and March 2017—regarding a Form 483 and follow-up inspection of Akorn's Decatur facility amounted to material misrepresentations. The Decatur facility had received a Form 483 in mid-2016, and in December 2016, after reinspecting the facility, the FDA notified Akorn that there were no outstanding compliance issues. The plaintiffs have alleged that it was misleading for the defendants to report the results of the reinspection because other data integrity issues— undetected by the FDA—still existed at the Decatur site. But the fact that there were other compliance problems does not undermine or render misleading the assertion that Akorn had addressed, to the FDA's satisfaction, the issues cited in the Form 483.

 **\*11** In sum, the plaintiffs have not alleged with particularity sufficient to satisfy Rule 9(b) or the PSLRA that any of the defendants' statements about their manufacturing facilities amounted to material misrepresentations.

Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)
2020 WL 564222

### c. Volume of pending ANDA applications

The plaintiffs have alleged that the defendants made two statements that fraudulently misrepresented the volume of Akorn's pending ANDA applications. First, the defendants allegedly stated that they had "a large pipeline" of pending ANDA applications. This statement is not actionable, however, because, again, it amounts to mere puffery—a subjective exaggeration on which no reasonable investor would rely. *See Burns*, 843 F.3d at 684; *Avery*, 216 Ill. 2d at 173-74, 835 N.E.2d at 847.

Next, Rai is alleged to have misled investors on an earnings call in February 2017, when he stated: "We have received ... our first ANDA approval from the Decatur facility since the [FDA] reinspection. This implies we should now expect to receive approvals for other [applications] ... from our Decatur facility that was delayed due to compliance status." Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶ 164. The plaintiffs contend that this was misleading because the defendants knew about Akorn's widespread data compliance issues, which would compromise further ANDA application approvals.

The defendants argue that Rai's statement is not actionable as fraud because it is protected under the PSLRA's safe harbor, which forecloses liability for forward-looking statements that are accompanied by "meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004). Illinois law recognizes this same principle as the "bespeaks caution" doctrine. *Rasgaitis v. Waterstone Fin. Grp., Inc.*, 2013 IL App (2d) 111112, ¶ 34, 985 N.E.2d 621, 632. "[T]he *most* helpful caution" is not necessary to protect against liability for forward-looking statements—sellers need only "point to the principal contingencies that could cause actual results to depart form the projection." *Asher*, 377 F.3d at 734; *see Rasgaitis*, 2013 IL App (2d) 111112, ¶ 36, 985 N.E.2d at 632 (explaining that adequate cautionary language must note specific risks). Sufficient cautionary language renders a misrepresentation immaterial as a matter of law. *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir. 1995); *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 19, 653 N.E.2d 968, 974 (1995).

Although Rai's statements were forward-looking, they are not protected under the PSLRA safe harbor, because they lacked sufficient cautionary language. The defendants point out that Rai indicated that it is "hard to project and predict the timing

of the approvals." Defs.' Mot. to Dismiss, Ex. 8, No. 19-4651, dkt. no. 29-10, at 6. But this statement did not meaningfully alert investors to the principal contingencies arising from data integrity problems at the Decatur site, which posed a significant risk to approval of Akorn's ANDA applications. Although the Decatur facility did pass the FDA's December 2016 inspection, there were still substantial data integrity compliance issues at the site, and the defendants allegedly knew this. And Cerulean's report identified significant problems that FDA missed during its December 2016 inspection. Additionally, Fresenius's investigation revealed that there was "no data integrity" at the Decatur site, so data integrity problems reemerged after FDA's December 2016 inspection. Twin Compl., No. 19-cv-3648, dkt. no. 1, at ¶¶ 113, 115.

**\*12** These allegations regarding data integrity problems at Akorn's Decatur facility meet the PSLRA's particularity requirements and support a reasonable inference that Rai's projection of additional ANDA approvals was misleading.

### d. Commitment to operating "in the ordinary course of business," SEC disclosure procedures, and internal data integrity investigations

None of the remaining statements cited in the complaint are sufficient to support the plaintiffs' fraud claims. The plaintiffs have not adequately alleged that Akorn's merger-agreement commitment to operate "in the ordinary course of business" was an actionable misrepresentation vis-à-vis a potential investor. There are no allegations in the complaint explaining what exactly a reasonable investor would have understood this representation to mean, beyond Akorn's commitment to simply continue to operate as a going concern. The plaintiffs assert only that Akorn's obligations under the "ordinary course" provision "included investigating and remediating ... data-integrity violations." Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶ 107. But the merger agreement did not define the "ordinary course of business," and the plaintiffs' unsupported allegation that this term included data-integrity remediation lacks the particularity necessary to satisfy even Rule 9(b). *See Presser*, 836 F.3d at 776.

The plaintiffs point out that the Delaware chancery court interpreted the "ordinary course" provision as requiring Akorn to address data integrity problems during the pendency of the merger. *See Akorn*, 2018 WL 4719347, at \*19. But assuming the chancery court's reading adequately establishes

2020 WL 564222

the meaning of "ordinary course of business," the plaintiffs have not sufficiently alleged that a reasonable investor would regard this statement as material. *See Appert*, 673 F.3d at 616; *Miller*, 326 Ill. App. 3d at 649, 762 N.E.2d at 7. The chancery court's reading of the contractual provision was based on trial testimony from Rai and another witness rather than on a common understanding of the term "ordinary course." *See id.* at *19 n.223. And the plaintiffs have not alleged that any such common understanding exists. Thus, they have failed to adequately allege a factual basis for their contention that a reasonable investor would understand the "ordinary course" provision as anything more than boilerplate but rather as a specific commitment by Akorn to internally investigate data integrity problems.

The plaintiffs likewise have not sufficiently alleged that statements that Akorn had "effective" controls and procedures governing its SEC disclosures were material misrepresentations. The plaintiffs have not described Akorn's SEC disclosure policies, assuming it had any. Nor have they described the claimed features of "effective" SEC disclosure policies. Instead, the plaintiffs cite to deficiencies in Akorn's SEC filings, such as the Item 303 omissions, to support their allegation that the company's policies were not effective. But merely pointing to the failure of a policy is not adequate to support the allegation that the policy was deficient. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) (holding that allegation of control process failure did not support strong inference of scienter required for securities fraud claim) ("[B]y definition, *all* frauds demonstrate the 'inadequacy' of existing controls, just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems).

 **\*13** Finally, the plaintiffs have failed to allege that a reasonable investor would have viewed Akorn's February 2018 press release, denying accusations of data integrity problems, as significantly altering the total mix of information about Akorn. *See Matrixx*, 563 U.S. at 38. Investors understand a statement "in its full context," not in a vacuum, and this context includes "apparently conflicting information." *Omnicare,* 575 U.S. at 190. Akorn's press release was a response to an earlier press release from Fresenius, which alleged that serious data integrity problems at Akorn could compromise the merger. Given this context, the plaintiffs have not allege facts sufficient to support an inference that, a reasonable investor would have viewed Akorn's denials as important to a decision to buy or sell Akorn securities. *See Appert*, 673 F.3d at 616.

### 2. Loss causation

To recap, the plaintiffs have adequately alleged that the following were material misrepresentations actionable as fraud: the Item 303 omissions, the regulatory compliance statement in the merger agreement, and Rai's statement regarding anticipated ANDA approvals out of the Decatur facility. The defendants argue that the Court should nevertheless dismiss the plaintiffs' claims because they have not adequately alleged causation.

The loss causation element of securities fraud claims requires plaintiffs to "tether ... directly" the fraudulent conduct to the harm. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 335 (7th Cir. 2019). A plaintiff can make this connection by alleging that a defendant's misrepresentations artificially inflated its stock price and that once the market learned of the deception, the stock value declined. *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). An Illinois common law fraud claim similarly requires that a defendant's misrepresentation caused the plaintiff's damages. *Clinton Imperial China, Inc. v. Lippert Mktg., Ltd.*, 377 Ill. App. 3d 474, 484, 878 N.E.2d 730, 739 (2007).

The plaintiffs have adequately alleged losses caused by the defendants' actionable misrepresentations regarding Akorn's regulatory compliance. Both Twin and Manikay owned Akorn stock before significant stock-price drops that followed the market's discovery of the company's data integrity problems. Specifically, the day after Fresenius announced that it was investigating data integrity issues that could compromise the merger, Akorn's stock price dropped to $18.65 per share from $30.28 the previous day. And the day after Fresenius announced that it was terminating the merger due to these data integrity issues, Akorn's stock price dropped to $13.05 per share, down from $19.70 the day before. This close connection between the market revelations about Akorn's data compliance issues and the drops in stock prices are sufficient, at this stage, to properly allege loss causation.

### 3. Reliance for section 18 claim

The defendants have moved to dismiss the section 18 claim, arguing that the plaintiffs have failed to adequately allege reliance. The defendants argue that the allegations do not support a connection between any specific securities purchase and a misrepresentation by the defendants. For federal securities claims, reliance is a "synthetic" concept: "it is

2020 WL 564222

the confluence of materiality and causation." *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 572 (7th Cir. 2009). The Court has already concluded that the plaintiffs have adequately alleged materiality and loss causation with respect to the defendants' claimed misrepresentations of Akorn's regulatory compliance and anticipated ANDA approvals. Consequently, they have also adequately alleged reliance. The Court declines to dismiss the section 18 claim.

### 4. Portwood's scienter

Portwood asks the Court to dismiss him from the section 10(b) and common law fraud claims, arguing that the plaintiffs have not adequately alleged that he had the requisite mental state for either claim. For a section 10(b) claim, scienter is "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh*, 521 F.3d at 693. As noted earlier, the PSLRA's pleading standard requires the plaintiffs' allegations to support a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Pleading "collective scienter" for a group of defendants does not meet the PSLRA's particularity standard, and a plaintiff must plead a defendant's scienter as to each statement or omission underlying a section 10(b) claim. *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 600 (7th Cir. 2019).

**\*14** The plaintiffs' fraud claims are all based in part on the allegedly fraudulent Item 303 omissions on the Forms 8-K and 10-Q—all of which Portwood signed. They have adequately pled scienter as to Portwood with respect to this omission. In January 2016, Portwood received an employee complaint alleging that Akorn's Vice President of Quality Assurance was thwarting internal investigations regarding data integrity and sending misleading information to FDA. Twin Compl., No. 19-cv-3648, dkt. no. 1, ¶ 187. That officer's

role was to ensure that Akorn complied with the FDA's data integrity standards, and—for pleading purposes at least—the employee complaint put Portwood on notice that there were serious compliance problems at the company. The plaintiffs' allegations are therefore sufficient to support a strong inference that Portwood's failure to note the risk of compliance issues in Akorn's SEC filings, in violation of Item 303, amounted to omissions made with reckless disregard for the truth. *See Pugh*, 521 F.3d at 693-94.

Similarly, under Illinois law, reckless disregard satisfies the knowledge element of a fraud claim. *See Bunting v. Progressive Corp.,* 348 Ill. App. 3d 575, 588, 809 N.E.2d 225, 236 (2004). And because the plaintiffs' allegations of Portwood's scienter satisfy the PSLRA's heightened pleading standard for the section 10(b) claim, they are likewise sufficient for the common law fraud claim.

For these reasons, the Court denies Portwood's request for dismissal from the section 10(b) and common law fraud claims.

### Conclusion

For the foregoing reasons, the Court denies the defendants' motions to dismiss Twin's complaint [No. 19-cv-3648, dkt. nos. 27, 29] and Manikay's complaint [No. 19-cv-4651, dkt. nos. 29, 31]. Defendants are directed to answer both complaints within 21 days of this order.

### All Citations

Slip Copy, 2020 WL 564222

### Footnotes

1    In deciding this motion, the Court is generally limited to the complaint, but it may also consider the merger agreement and other documents referenced in and central to the complaint. *See Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014).

2    Manikay's complaint and Twin's complaint contain the same allegations of the defendants' conduct, and for convenience, this opinion cites to Twin's complaint only.

3    The complaint also includes a claim against the individual defendants under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which holds "controlling persons" jointly and severally liable for violations of the Act. It does not provide an independent cause of action, and "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The fate of this claim therefore depends on the section 10(b) and 18(a) claims.

4    The parties agree, for the purposes of this motion, that Illinois law applies to the common law fraud claim. The elements of a common law fraud under Illinois law are: (1) a false statement of material fact; (2) defendant's knowledge of falsity;

**Twin Master Fund, Ltd. v. Akorn, Inc., Slip Copy (2020)**

2020 WL 564222

> (3) defendant's intent to induce the plaintiff to act; (4) plaintiff's reasonable reliance; and (5) damages. *See Cohen*, 735 F.3d at 613 (stating elements); *Pack v. Maslikiewicz*, 2019 IL App (1st) 182447, ¶ 105 (reliance must be reasonable).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Zishka v. American Pad & Paper Co., Not Reported in F.Supp.2d (2001)

2001 WL 1748741

2001 WL 1748741
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Allan ZISHKA, et al., On Behalf
of Themselves and All Others
Similarly Situated, Plaintiffs,

v.

AMERICAN PAD & PAPER
COMPANY, et al. Defendants.

No. Civ.A.3:98-CV-0660-M.
|
Sept. 28, 2001.

*ORDER*

LYNN, J.

 **\*1** Having considered the Motions to Dismiss filed by the Defendants on December 14, 2000, the Plaintiffs' Responses, the Defendants' Replies, supporting appendices, the applicable authorities, and the arguments at a hearing held on April 25, 2001, the Court is of the opinion that the Motions to Dismiss should be GRANTED in part, and DENIED in part.

On September 13, 2000, this Court entered its Memorandum Opinion and Order, granting the Defendants' Motions to Dismiss, but permitting the Plaintiffs an opportunity to replead. They did so by filing an Amended Complaint on October 30, 2000. Defendants again moved to dismiss.

The Court concludes that a limited number of the Plaintiffs' claims are sufficient under the Private Securities Litigation Reform Act. Most are not. The Amended Complaint is virtually entirely comprised of allegations of fraud-by-hindsight and is premised on vague statements of optimism by American Pad and Paper Company ("Ampad") and its executives. Such allegations are not sufficient under the Private Securities Litigation Reform Act ("PSLRA") or this Court's Order.

The Court will begin its analysis with the Bain Defendants-Bain Venture Capital and Defendants Wolpow, Gay & Lavine-

as to whom the Plaintiffs' allegations are made only under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). The allegations against the Bain Defendants are legally insufficient. Plaintiffs plead only that because the Bain investment funds owned 38%-50% of the stock of Ampad, and thus had the power to, and did, place three persons on the Ampad Board who were affiliated with Bain (Wolpow, Gay and Lavine), Bain and Wolpow, Gay, and Lavine are liable as control persons under Section 20(a). The Court holds that the Plaintiffs have not pleaded sufficient exercise of power and control by the Bain Defendants as to the challenged acts. Status alone as to persons not involved in day to day management is legally insufficient to support a Section 20(a) claim. *See Dartley v. Ergobilt Inc., et al.,* No. 3:98-CV-1442-M (N.D.Tex. Mar. 29, 2001) (Lynn, J.). *See generally, Abbott v. Equity Group, Inc.,* 2 F.3d 613, 615 n. 15 (5 [th] Cir.1993), *cert. denied,* 510 U.S. 1177 (1994); *Dennis v. Gen. Imaging, Inc.,* 918 F.2d 496 (5 [th] Cir.1990); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945 (5 [th] Cir.1981). Since Plaintiffs were given one additional opportunity to replead, and have not done so satisfactorily with respect to the Bain Defendants, the claims against the Bain Defendants are dismissed with prejudice.

The Court also dismisses with prejudice those claims regarding the LIFO reserves (Amended Complaint ¶¶ 28-31) except for those relating to rising costs of paper in late 1996 and early 1997. In the Court's view, the Amended Complaint adequately details the contention that the Defendants knew that during the last quarter of 1996 and the first quarter of 1997, paper prices were rising, but Ampad intentionally delayed adjusting the reserve. All other allegations regarding the LIFO reserves are dismissed with prejudice.

 **\*2** Plaintiffs also adequately allege claims relating to Ampad's pricing policies providing protection against rising paper prices. The risk disclosures in Ampad's filings are insufficient to outweigh the apparently unsubstantiated and seemingly unjustified statements that Ampad had implemented a pricing strategy that would protect it in an era of rising prices. When prices rose, profits suffered. There is nothing before the Court explaining what objective facts justified the repeated and persistent trumpeting of the Company's pricing policy as a protection if paper prices began to rise.

The claims of improper revenue recognition and problems involving returns of goods (¶¶ 26-27 of Amended Complaint) are legally insufficient. Plaintiffs do not provide sufficient

2001 WL 1748741

detail to support those allegations, such as describing specific transactions in which there was improper recognition, the materiality of such transactions and any restatements resulting, including any alleged impact on the December 1997 charges. The claimed deficiencies in statements regarding returns and discounts or rebates are similarly defective. The risk disclosures in the prospectus clearly note that reserves and rebates will affect profitability. Reserves for returns and rebates were established and disclosed. The Complaint does not allege that the reserves were false nor does it allege the volume of returns, the materiality of same nor the impact on any restatement. The Court is not persuaded by the Plaintiffs' claims that the PSLRA permits Plaintiffs to impute knowledge to senior executives of what appear to be some plant-specific problems.

The allegations regarding the Williamhouse acquisition and the Williamhouse reporting system are inadequate and do not comply with this Court's Order directing that Plaintiffs set out when the Defendants discovered the problem, when they attempted to remedy it (which is not satisfied by a vague statement of a two year period), when they learned the attempted remedy was unsuccessful, and its dollar impact. These omissions render the allegations factually deficient.

Plaintiffs' allegations regarding introduction of new products, the effect of consolidation, the integration (or lack thereof) of acquisitions, and the failure to make new acquisitions are also fatally deficient. Plaintiffs identify no statement that a particular new product would be introduced at a particular time. The Shade and Williamhouse acquisitions undeniably brought product to Ampad that it did not sell previously, and they were acquisitions during the class period. Ampad

guaranteed no particular acquisitions on any certain schedule and also disclosed that the likely impact on Ampad of competition and consolidation was uncertain. These claims all fail for lack of detail, for lack of factual support, and due to the existence of clear risk disclosures in the prospectus and in later Ampad press releases.

Finally, Plaintiffs' Amended Complaint is wholly deficient in improperly attributing analysts' projections of earnings per share to individual defendants, when it is not alleged that the defendants made such projections, and in charging them with liability for miscellaneous generalized GAAP allegations (¶ 33). Such contentions do not satisfy the PSLRA.

**\*3** As to Benson and McAleer, scienter is not properly pleaded. One cannot divine a strong inference of fraudulent intent as to them from the Amended Complaint. Therefore, the claims against them are DISMISSED with prejudice.

As to Hanson and Gard, the few remaining allegations of false statements regarding Ampad's pricing policy and failure to disclose the need for an adjustment to the LIFO reserve are adequately stated, and scienter as to them is sufficiently alleged by their stock transactions. All other claims in the Amended Complaint are DISMISSED with prejudice. Plaintiffs are directed to submit within twenty days a new complaint striking the allegations dismissed herein, and adding no others.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1748741

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.