2006 WL 2787520

2006 WL 2787520
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

CENTRAL LABORERS'
PENSION FUND, Plaintiff,
v.
SIRVA, INC., Brian P. Kelley, Joan E. Ryan, James W. Rogers, Richard Schnall, Carl T. Stocker, Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America Securities LLC, Morgan Stanley & Co., Inc., Pricewaterhousecoopers LLP, and Clayton Dubilier & Rice, Inc., Defendants.

No. 04 C 7644.
|
Sept. 22, 2006.

**Attorneys and Law Firms**

Maya Susan Saxena, Saxena White, P.A., Boca Raton, FL, for Plaintiff.

Courtney Ann Rosen, Matthew Brian Kilby, Richard Bradshaw Kapnick, Tara Kocheran Charnes, Brian A. McAleenan, Tara Kocheran Charnes, Sidley Austin LLP, Howard Steven Suskin, Keith V. Porapaiboon, Jenner & Block LLP, Robert Y. Sperling, David E. Koropp, Michael Patrick Digiannantonio, Nicole E. Wrigley, Ronald Steven Betman, Winston & Strawn, John Conroy Martin, Paul Edwin Greenwalt, III, Schiff Hardin LLP, Peter M. King, William H. Jones, Canel, Davis & King, Chicago, IL, David W. Debruin, Jenner & Block, Christopher Davies, Howard M. Shapiro, Stuart F. Delery, Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC, John H. Hall, Stephen Chahn Lee, Steven Klugman, Debevoise & Plimpton LLP, New York, NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

**\*1** Plaintiff has sued SIRVA, Inc., Joan E. Ryan, Brian P. Kelley, James W. Rogers, Richard Schnall, Carl T. Stocker, Clayton Dubilier & Rice, Inc., Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America Securities LLC, Morgan Stanley & Co., Inc., and PricewaterhouseCoopers LLP pursuant to the Public Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, for their alleged violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934. The case is before the Court on defendants' Federal Rule of Civil Procedure ("Rule") 12(b)(6) motions to dismiss. For the reasons set forth below, the motions of SIRVA, Ryan, Kelley, Rogers, Schnall, Stocker, Clayton Dubilier & Rice, Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America, Securities LLC, Morgan Stanley & Co, Inc., are granted in part and denied in part, and PricewaterhouseCoopers' motion is denied.

*Facts*

SIRVA is a company that provides a variety of moving and other services. (Corrected Consol. Am. Class Action Compl. ("Compl.") ¶ 13.) The company is divided into four operating units: Relocation Solutions-North America, Relocation Solutions-Europe and Asia (collectively, "Global Relocation Solutions"), Network Services and Transportation Solutions. (*Id.* ¶ 14.) Global Relocation Solutions helps SIRVA clients relocate employees by moving household goods, assisting with the sale and purchase of homes, and arranging financing for home purchases. (*Id.* ¶ 14a.) Network Services provides insurance and other services to moving and storage agents, independent owner-operators and small fleet operators. (*Id.* ¶ 14b.) Transportation Solutions provides outsourcing services for supply chain functions like freight bill auditing and inventory management. (*Id.* ¶ 14c.)

Defendant Kelley is SIRVA's CEO, a position he has held since August 2002. (*Id.* ¶ 16.) Defendant Ryan is a former member of SIRVA's Audit Committee and served as SIRVA's CFO from February 2003 until January 21, 2005. (*Id.* ¶ 17.) Defendant Rogers is Chairman of the SIRVA Board of Directors, a position he has occupied since November 1999, and is a principal of defendant Clayton, Dubilier & Rice, Inc. ("CDR"), SIRVA's majority shareholder. (*Id.* ¶¶ 18, 30.)

2006 WL 2787520

Defendant Schnall has been a SIRVA director since March 2002 and is also principal of CDR. (*Id.* ¶¶ 19, 30.) Defendant Stocker has been a SIRVA director since March 2000 and has served as Chairman of its Audit Committee since 2003. (*Id.* ¶¶ 20, 90.)

Defendants Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America Securities LLC and Morgan Stanley & Co., Inc. (collectively, "the Underwriters") are investment banking firms that served as underwriters for SIRVA's initial and supplemental public offerings ("IPO" and "SPO"). (*Id.* ¶¶ 22-28.)

 **\*2** Defendant PricewaterhouseCoopers ("Price") is an accounting firm that was SIRVA's auditor during the IPO and SPO. (*Id.* ¶ 29.) Price also served as SIRVA's actuary until May 2005. (*Id.* ¶ 94.)

Plaintiff is a union pension fund that purchased SIRVA common stock pursuant to the IPO and SPO. (*Id.* ¶ 12.)

On November 25, 2003, SIRVA conducted its IPO. (*Id.* ¶ 34.) In connection with that offering, SIRVA filed a prospectus and registration statement with the SEC that was signed by defendants Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) The prospectus included audited financial statements for the years 2001 and 2002, unaudited financial statements for the nine months ending September 30, 2003 and a favorable audit opinion by Price. (*Id.* ¶¶ 41-42.)

Plaintiff says that the prospectus contains numerous misstatements concerning, among other things, the health and potential of the company's European business, the company's accounting practices and financial results, and the method by which it calculated insurance reserves. (*Id.* ¶¶ 37-40, 43-46.)

Plaintiff alleges that Kelley, Ryan and Rogers knew that there were problems with the European business long before the IPO because a former senior European finance executive told them that the unit could not meet its budget and was "experiencing declining demand, revenue shortfalls, an inability to further cut costs and an inability of acquisitions to perform up to expectations." (*Id.* ¶¶ 102-03.) Plaintiff says that defendants knew the statements about their accounting practices and their financial results were false because they did not conform to Generally Accepted Accounting Principles. (*Id.* ¶¶ 359-89.) Plaintiff also alleges that defendants knew the statements about SIRVA's reserves

methodology were false because they manipulated the reserves to boost earnings and Price told them in June and December 2003 that certain insurance lines were under-reserved. (*Id.* ¶¶ 137-70.)

On June 10, 2004, SIRVA conducted its SPO. (*Id.* ¶ 54.) Again, SIRVA filed a prospectus and registration statement with the SEC that was signed by Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) Plaintiff alleges that the misstatements defendants made in the IPO prospectus were repeated in the SPO prospectus. (*Id.* ¶¶ 56-63.)

Defendants' misstatements, plaintiff says, were not limited to the prospectuses. According to plaintiff, during the first nine months of 2004, defendants also made false statements about the European operations, SIRVA's accounting practices and financial results and its insurance reserves in press releases, conference calls with securities analysts, SEC filings and its 2003 Annual Report to shareholders. (*Id.* ¶¶ 231-303, 318-22.)

On November 9, 2004, SIRVA announced that it had to take a $15.2 million charge to increase insurance reserves, a development that Kelley attributed to an increase in losses and SIRVA's change in actuarial firms. (*Id.* ¶¶ 304-09.) SIRVA also said it was scaling back its 2004 earnings guidance by approximately thirty-two cents per share. (*Id.* ¶ 305.) The following day, SIRVA's stock price dropped from $23.78 to $17.95 per share. (*Id.* ¶ 312.)

 **\*3** On January 21, 2005, CFO Ryan resigned from the company, effective immediately. (*Id.* ¶ 325.) According to a letter sent to Price on her behalf, Ryan was asked to leave because of her insistence on accurate financial reporting. (*Id.* ¶ 354.)

Ten days later, SIRVA announced that it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶ ¶ 327-28.) That announcement caused the price of SIRVA stock to drop from $14.40 to $8.86 per share. (*Id.* ¶ 329.)

On March 10, 2005, SIRVA announced that its financial statements for the years 2001-2003 and the first three quarters of 2004 would have to be restated because the company had to take a $22 million charge due to twelve accounting errors it had identified. (*Id.* ¶ 335.)

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

On June 20, 2005, SIRVA revised its estimate of the accounting errors charge from $22 million to $27 million. (*Id.* ¶ 339.)

On September 21, 2005, SIRVA filed its 2004 Form 8-K with the SEC. (*Id.* ¶ 347.) In that Form, the company admitted that it had material weaknesses in its internal control over financial reporting and identified twelve errors that lead to a $34 million overstatement of the company's pretax income for the years 2000 through the first nine months of 2004. (*Id.* ¶¶ 347-48.)

*Discussion*

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiffs' favor. *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir.2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

I. The Underwriters' Motion

A. *Count I-Standing*

In Count I, plaintiff charges the Underwriters with violating section 11 of the Securities Act of 1933. Section 11 holds underwriters liable for damages sustained by those who purchased stock pursuant to a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The Underwriters say these claims must be dismissed because: (1) plaintiff has no standing to pursue them; and, even if it does, (2) none of the allegedly false statements was material; and (3) it cannot satisfy the damage element of the claims related to the IPO.

It is not clear whether the Underwriters contend that plaintiff lacks Article III standing to pursue these claims or does not fall within the class of investors covered by the statute. To the extent it is the former, their motion must be denied. Plaintiff has standing under Article III if it suffered a "concrete and particularized" injury that is fairly traceable to defendants' conduct and is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)

(quotations omitted). Plaintiff alleges that it purchased SIRVA stock at an inflated price because of the misstatements in the offering documents, an economic injury that a lawsuit could redress. Thus, plaintiff has constitutional standing to assert its section 11 claims.

**\*4** Whether it falls within the class of persons entitled to sue under that section is a different, and non-jurisdictional, question. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 97 n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (noting that whether plaintiff has a cause of action under the statute is a "merits inquiry," and whether a plaintiff has "[a] remediable injury in fact," is a question of Article III standing). Though the Seventh Circuit has yet to address the issue, other circuit courts of appeal have interpreted section 11 as providing a cause of action to investors who purchase stock in an offering and "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003); *see Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 873 (5th Cir.2003) (same); *Joseph v. Wiles,* 223 F.3d 1155, 1160 (10th Cir.2000) (same); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1081 (9th Cir.1999) (same). Plaintiff has alleged that it purchased SIRVA stock "issued pursuant or traceable to the November 25, 2003 IPO and/or June 10, 2004 SPO." (Compl.¶ 64.) At this stage of the proceedings, that allegation is sufficient to put plaintiff in the class of investors covered by section 11. *See Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3rd Cir.1992) (allegation that plaintiff purchased the shares "pursuant to the [offering]" held sufficient to defeat motion to dismiss section 11 claim); *Danis v. USN Comms., Inc.,* 73 F.Supp.2d 923, 931 (N.D.Ill.1999) (holding that plaintiff need only allege that his injury is traceable to challenged registration to maintain section 11 claim); *Cf. In re LILCO Sec. Litig.,* 111 F.R.D. 663, 671 (E.D.N.Y.1986) ( [T]racing is a question of fact reserved for trial.").

B. *Materiality*

The Underwriters also argue that plaintiff cannot satisfy the material misstatement element of their section 11 claims. A misstatement or omission is material if "under all the circumstances, the omitted fact or the prediction without a reasonable basis is one that a reasonable investor would consider significant in making the decision to invest, such that it alters the total mix of information available about the proposed investment." *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1404 & 1405 n. 11 (7th Cir.1995) (quotation omitted). Plaintiff alleges that the IPO and SPO prospectuses misstated or failed to disclose material

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

information about SIRVA's European business, its insurance reserves, and its accounting practices and financial results. The Court will address each category in turn.


   1. European Business

According to plaintiff, defendants failed to disclose various problems SIRVA was having with its European business, including: its failure to meet internal budget projections, the decline in demand for its services, its inability to cut costs further, and the poor performance of the companies it had acquired. (*See* Compl. ¶¶ 37, 63.) In addition, plaintiff says the prospectuses contained the following misstatements:

 **\*5** We intend to increase our market share internationally as we continue to develop our global relocation solutions platform. We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development. We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia.

and

 Historically, a majority of our operating revenues and income from operations was derived from our moving services businesses. A significant element of our growth model, however, is our new and unproven strategy of offering a global comprehensive relocation solution to customers by combining our higher margin relocation services with our proprietary moving services network. We embarked on this strategy less than two years ago with the acquisition of the business of Cooperative Resources Services, Ltd., and have not yet proven that it will succeed in the long-term, especially in Europe and Asia.

(*Id.* ¶¶ 38-39, 63.)

Boiled down, the Underwriters say, the first omissions claim is just a complaint that defendants did not disclose SIRVA's internal profit projections for 2004 for its European operations. Because there is no duty to disclose such projections, *see, e.g., In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir.1993), the Underwriters say this claim must be dismissed.

The Court disagrees. Plaintiff does not contend that defendants should have disclosed SIRVA's internal projections about the future profits of its European operations. Rather, it says that defendants should have revealed that SIRVA's European operations had fallen short of internal

profit projections in both 2002 and 2003. (Compl.¶¶ 102-03.) Those are facts about past performance, not projections about future performance. As a result, that information is not exempt from disclosure. *Verifone,* 11 F.3d at 869 (stating that "financial data or other existing facts from which forecasts are typically derived" are not exempt).

The next question is whether that information is material; that is, whether "a reasonable investor would consider [it] significant in making the decision to invest." *Harden,* 65 F.3d at 1404. At least one court has said no, because: (1) internal estimates are generally prepared using more aggressive assumptions than estimates intended for the public; (2) "internal estimates ... necessarily change over time" and are "invariably wrong"; and (3) "a comparison of actual and internally[-]predicted results does not [bear on] the truthfulness of the actual results." *Saddle Rock Partners, Ltd. v. Hiatt,* No. 95-2326 GA, 1996 WL 859986, at \*9-11 (W.D.Tenn. Mar.26, 1996).

That may be true, but in this case, the budget shortfalls are only half of the story. The other half is that the shortfall was trending upward. In 2002, the European operations fell $3.5 million short of budget. By 2003, that number had climbed to $7 million. (Compl.¶¶ 102-03.) That trend could suggest any number of things-that demand was falling, costs were increasing, the European operations were poorly managed or SIRVA management set unrealistic budgets-any of which a reasonable investor could arguably consider significant. Given the possible implications of the budgetary shortfalls in this case, the Court cannot say as a matter of law that they are immaterial.

 **\*6** The same is true for the other information plaintiff says SIRVA withheld, that demand for its services in Europe was declining, it could not cut costs in those operations any further and the European businesses it had acquired were underperforming. The financial statements in the IPO prospectus indicate that SIRVA increasingly relied on its European operations for its total operating revenues and income. By the end of 2003, those operations accounted for more than twenty percent of SIRVA's total operating revenues and more than a quarter of its income. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.,* Ex. 8, SPO Prospectus at 2, 23.)[1] Moreover, SIRVA specifically identified cutting costs and acquiring other companies as two of its strategies for increasing its revenues. (*Id.,* Ex. 1, IPO Prospectus at 5; *id.,* Ex. 8, SPO Prospectus at 5.) Given the importance of the European

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2787520

operations to SIRVA's bottom line and its stated strategies for increasing revenues from them, the Court cannot say, as a matter of law, that no reasonable investor would consider the alleged omissions immaterial to an investment decision.

1      "[I]n securities actions, the court may ... rely on public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit without, pursuant to Rule 12(b), converting the motion into one for summary judgment." *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir.2006) (quotation and citation omitted).

Plaintiff also contends that defendants made the following affirmative misstatements about SIRVA's European operations: "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia." (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.,* Ex. 8, SPO Prospectus at 4-5.) Plaintiff does not allege that those statements are literally false, *i.e.,* that SIRVA did not intend to increase its international market share, did not believe the international opportunities were considerable and did not have a leading market share in Europe. But it says they are actionable because they are misleading in light of the material facts defendants did not disclose about the European operations: declining demand, revenue shortfall, an inability to cut costs, and the failure of acquisitions to perform up to expectations. (Compl.¶ 37.)

The Underwriters say those statements are not actionable under any circumstances because they are simply puffery. *See Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (stating, in the context of section 10(b), that "promotional phrase[s] ... devoid of any substantive information," "indefinite predictions of 'growth,' " and optimistic statements that "lack [ ] ... specificity" are immaterial as a matter of law). The Court agrees. The contested statements about the European operations are just the kind of vague, optimistic statements held not to be actionable in *Searls. See Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (per curiam) (statements that company "would not compromise its financial integrity," was "commit[ed] to

creat[ing] earnings opportunities" and was using "business strategies [that] would lead to continued prosperity" held to be non-actionable puffery); *Simon v. Am. Power Conversion Corp.,* 945 F.Supp. 416, 428-29 (D.R.I.1996) ("[W]e are gaining market share, we are gaining momentum, and our revenues are strong," and the company has "good opportunities to expand its products offerings" held to be puffery).

**\*7** Finally, plaintiff alleges that defendants misled investors about the company's prospects, by saying that its "growth model" was largely based on its "new and unproven strategy of offering a global comprehensive relocation solution to customers," a strategy that was less than two years old and might not "succeed in the long-term, especially in Europe and Asia." (Compl. ¶ 39; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 14; *id.,* Ex. 8, SPO Prospectus at 11.) Defendants contend that this statement cannot be actionable because it cautions investors about investing rather than enticing them to do so. Plaintiff says this is a caveat in appearance only because defendants knew at the time of the IPO that its strategy was a failure in Europe. Whether that is true depends on a number of facts that cannot be determined on a motion to dismiss, among them: the length of time a strategy has to be in place before it can be deemed a success or a failure, whether defendants believed the European business would improve over time or thought it was in a downward spiral, and whether defendants were aware of any characteristics of or constraints on the European market that would negatively impact its strategy. Until those facts, are resolved, this claim cannot be dismissed.

### 2. Insurance Reserves

Plaintiff also alleges that defendants manipulated SIRVA's insurance reserves to inflate its earnings. (*See* Compl. ¶¶ 137-70.) That conduct, plaintiff says, rendered the following prospectus statements untrue, that: (1) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (2) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; and (3) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends." (*Id.* ¶¶ 44-45, 137; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.,* Ex. 8, SPO Prospectus at 28, 67.)

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

The Underwriters say that all of these statements relate to reserves for cargo claims, which are not addressed in plaintiff's reserve manipulation allegations. The Court disagrees. Only the second statement is specifically limited to cargo claims. The others are statements about SIRVA's reserve methodology, generally.

The Underwriters are correct, however, that plaintiff does not allege that defendants manipulated reserves for cargo claims. Rather, plaintiff alleges that defendants manipulated reserves for claims made on National Association of Independent Truckers ("NAIT") policies and workers' compensation policies. (*See* Compl. ¶¶ 153-55, 162-63, 166-68.) Because plaintiff has not alleged that defendants manipulated reserves for cargo claims, it cannot base a section 11 claim on prospectus statements about those reserves.

 *8 The remaining reserves manipulation claims are based on information from: (1) a "Former TransGuard Finance Executive," a "Former NAIT Claims Manager," and a "Former NAIT Claims Supervisor," who reported that: (a) Dan Briody, Vice President of NAIT, would "actively push reserves downward" during large loss meetings; and (b) Price, which was serving as the company's actuary, concluded in June 2003 that SIRVA's workers' compensation line was under-reserved by up to $2 million (*id.* ¶¶ 145, 153, 162); (2) a "Former TransGuard Supervisor of Insurance Accounting" who said that "they would adjust reserves here and there" in order to "make the numbers" (*id.* ¶ 166); (3) a "Former TransGuard General Accounting Manager" who said Gary Jinx, then-head of accounting for TransGuard reserves, told him in March 2004 that the workers' compensation line was under-reserved by $4 to $5 million (*id.* ¶ 167); and (4) a "Former SIRVA Executive of Pricing" who said that "[i]t was widely known that we were going to take a big hit to reserves" (*id.* ¶ 170).

Those allegations are insufficient under the PSLRA. Though the statute permits plaintiff to rely on confidential sources to defeat a motion to dismiss, it must describe those sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged ..., or in the alternative provide other evidence to support [its] allegations." *Makor Issue & Rights, Ltd. v. Tellabs,* 437 F.3d 588, 596 (7th Cir.2006) (citation and quotation omitted). Plaintiff has offered no other evidence in support of the reserve manipulation claim. Thus, it must allege sufficient detail about the sources to suggest that they would have the information they report.

Plaintiff has not satisfied that standard with respect to any of its confidential sources. Plaintiff does not generally allege any of the sources' job duties or the dates of their employment. Moreover, with the exception of the Former TransGuard General Accounting Manager, plaintiff has not alleged how the sources obtained the information they report. Plaintiff does not explain whether the sources have personal knowledge of the alleged reserves manipulation or if they know that Kelley and Ryan actually received and read the documents that disclosed the manipulation and, if so, how. Nor does plaintiff explain how the Former TransGuard Supervisor of Insurance Accounting knew reserves were being adjusted "here and there," when such adjustments occurred, in which lines of insurance the adjustments were made or who was doing the adjusting. Similarly, plaintiff does not explain the basis for the assertion by the Former SIRVA Executive of Pricing that "[i]t was widely known that we were going to take a big hit to reserves." Without further support, plaintiff's reserves manipulation claims do not pass muster under the PSLRA. *See Calif. Pub. Employees' Retirement Sys. v. Chubb Corp.,* 394 F.3d 126, 148 (3rd Cir.2004) (dismissing section 10(b) claim premised on information from confidential sources because plaintiffs did not allege when the sources were employed by defendant, the dates the sources obtained the alleged information, or how they had access to such information).

3. Accounting Practices

 *9 The last category of statements plaintiff challenges are those pertaining to SIRVA's accounting practices. Specifically, plaintiff alleges that the financial results defendants' reported in the prospectuses were false because the company: (1) failed to take a timely charge to accrue additional liabilities related to its multiple-line property and commercial liability insurance; (2) improperly overstated premium revenue and commission income; (3) improperly accounted for accrued expenses; (4) improperly accelerated revenue related to corporate and referral fees; (5) improperly accounted for home inventory valuation reserve; and (6) failed to establish and maintain adequate internal accounting controls. (Compl.¶¶ 40, 47.)

The Underwriters contend that these errors, to which SIRVA admitted in the Form 8-K it filed in September 2005, did not materially impact the financial information in the prospectuses. In fact, the Underwriters say, but for the accounting errors, SIRVA's cumulative net income for the years 2000 through the first three quarters of 2003, would

2006 WL 2787520

have been higher than what was reported in the prospectuses. Because the actual numbers were higher than the numbers reported in the prospectuses, the Underwriters say the errors were immaterial as a matter of law.

The Underwriters' argument assumes that cumulative net income is the only figure an investor would find important in making the decision to invest. Whether that is true is a factual question that cannot be resolved on a motion to dismiss.

Moreover, the increase in cumulative net income notwithstanding, the impact of the restatement on SIRVA's financials was not wholly positive. Though the restatement effected a $11.7 million increase in SIRVA's net income for 2002, it effected a $5.8 million increase in the net loss SIRVA sustained in 2001. (*Compare* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 7, 9/21/05 10-K at 34 *with id.,* Ex. 1, IPO Prospectus at 8 & Ex. 8, SPO Prospectus at 7.) In addition, in the restatement SIRVA admitted that there were "material weaknesses in [its financial reporting] control environment, organizational structure and in [its] consistent application of GAAP [Generally Accepted Accounting Principles]." (*Id.,* Ex. 7, 9/21/05 Form 10-K at 41.) A material weakness, SIRVA explained, "is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." (*Id.* at 185.) Because it is arguable that a reasonable investor would find such information relevant to his investment decision, the section 11 accounting practices claim cannot be dismissed.

### C. Damage Related to the Offerings

Next, the Underwriters argue that plaintiff cannot state a section 11 claim in connection with either the IPO or the SPO because it did not suffer any damage that is traceable to those offerings. According to the statute, plaintiff was damaged if the price of the stock was higher on the date plaintiff purchased it than on the date plaintiff filed suit. *See* 15 U.S.C. § 77k(e) ("[D]amages represent the difference between the amount paid for the security ... and the value thereof as of the time [the] suit was brought"). There is no dispute that plaintiff paid less for its SIRVA stock than it was fetching on November 24, 2004, the date plaintiff filed this suit. (*Compare* Initial Compl., Certification Proposed Lead Pl., Schedule A, *with* http:// online.wsj.com/public/us (enter "SIR" in "Quotes & Research"; then enter 11/24/04 in "Historical Quotes"

date).)[2] Plaintiff did not, however, assert a section 11 claim in its initial complaint.

[2]    The Court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 167 n. 8 (2d Cir.2000).

**\*10** That fact, the Underwriters say, is irrelevant. In their view, plaintiff's section 11 claims relate back to the initial complaint because they arise from the same "conduct, transaction, or occurrence" as the claims set forth in it. *See* Fed. R. Civ. P. 15(c)(2); (Compl. ¶¶ 5-7, 33-38, 53-58 (asserting violations of section 10(b) of the Exchange Act and Rule 10b-5 based on, among other things, the alleged misrepresentations in the offering documents); *id.* ¶¶ 37-41, 56-63 (alleging section 11 claims grounded in the same conduct).) Thus, the Underwriters contend that the Court should deem the section 11 claims to have been filed on November 24, 2004, the date plaintiff filed suit.

In support of their argument, the Underwriters cite *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525 (8th Cir.1996). As in this case, the plaintiff in *Alpern* filed an initial complaint asserting claims under section 10(b) and later amended the complaint to assert a section 11 claim. *Id.* at 1543. Because the stock price was higher on the date Alpern filed the section 11 claim than it was when he purchased it, the district court entered summary judgment for the defendant on the section 11 claims. *Id.* at 1541-43. Alpern appealed, arguing that the section 11 claims related back to the original filing date. *Id.* at 1542.

The Eighth Circuit agreed:

Alpern's § 11 claim was based on the same misappropriations alleged in the original complaint.... Both his [section 10(b) and section 11] claims asserted that he was unaware of the misappropriations and that UtiliCorp artificially inflated its stock prices by disseminating materially misleading statements and/or omitting to state material facts necessary to make its statements not misleading.

Other considerations also favor the relation back of the amended complaint.... Nothing suggests that Alpern sought to capitalize on a further drop in stock prices by waiting for a more favorable date to file his § 11 claim. Rather, he amended his claim less than two months after filing his initial complaint based on additional information discovered about the same underlying occurrences. Since

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

Alpern was a DRIP plan purchaser, Utilicorp also should not have been surprised that Alpern sought to hold it accountable for its statements related to the DRIP prospectus. Finally, it is unlikely that UtiliCorp's defense on the merits will be unfairly prejudiced, and it may also assert reasonable inquiry and good faith belief defenses against a § 11 claim. Under the circumstances Alpern's amended complaint relates back to the filing date of the original complaint under Rule 15(c)(2).

*Id.* at 1543-44.

The Underwriters ask this Court to follow *Alpern* and apply Rule 15(c) to plaintiff's section 11 claims. But there is an important difference between *Alpern* and this case. In *Alpern,* the plaintiff asked the court to apply the relation-back doctrine to save his section 11 claim. In this case, defendants ask the Court to use the doctrine to *defeat* plaintiff's claims. Defendants have not cited, and the Court has not found, any case in which the relation-back doctrine was used to bar claims. Moreover, applying the doctrine in that manner would defeat its purpose, which is to allow plaintiffs to assert time-barred claims as long as defendants have sufficient notice of their exposure. *See Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp. of Tex.,* 20 F.3d 1362, 1366 (5th Cir.1994) (stating that the purpose of Rule 15(c) is "to allow a party to amend an operative pleading despite an applicable statute of limitations in situations where the parties to litigation have been sufficiently put on notice of facts and claims which may give rise to future, related claims"). Applying the doctrine as the Underwriters urge would, in effect, shorten the statute of limitations on plaintiff's section 11 claims, not lengthen it, as Rule 15 contemplates.

 *11 Even if it might be appropriate to apply the doctrine in this manner in some cases, the facts of this case show that this is not one of them. Though SIRVA announced in November 2004 that it needed to take a $15.2 million charge to reserves, Kelley attributed that development to increased losses and a change in actuaries. (Compl.¶¶ 304-09.) It was not until the end of January 2005 that the company announced it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶¶ 327-28.) Moreover, the final decision to restate was not announced until March 2005, and SIRVA did not identify the actual accounting errors it had discovered until September 2005, nearly a year after plaintiff filed its initial complaint. (*Id.* ¶¶ 335, 347-48.) As a result, relating the section 10(b) claims back to the original filing date, would divest plaintiff of claims

about which it could not reasonably have known when it filed the suit.

In short, given the dearth of authority supporting the Underwriters' request and its tension with the purpose of the Rule and the facts of this case, the Court declines to relate plaintiff's section 11 claims back to the date the initial complaint was filed.

Plaintiff first asserted its section 11 claims in the amended complaint filed October 11, 2005. On that day, SIRVA stock was selling for $6.57 per share. (*See* http://online.wsj.com/public/us (enter "SIR" in "Quotes & Research"; then enter 10/11/05 in "Historical Quotes" date).) Plaintiff paid $22.11 and $24.47 per share, respectively, for the shares it bought after the IPO. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) Because plaintiff paid more for its IPO shares than they were worth on the day it filed its section 11 claims, plaintiff satisfies the damage element of those claims.

The Underwriters also say that plaintiff cannot trace its post-SPO stock purchases to that offering. Plaintiff's PSLRA certification shows that it purchased 25,820 shares in the aftermarket on nine separate occasions between June 15, 2004 and August 27, 2004. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) On the last eight of those dates, the Underwriters say, SPO stock mingled in the market with IPO stock and the stock of corporate insiders. Thus, they conclude, "[p]laintiff cannot possibly prove that the securities it bought after the SPO are directly traceable to an allegedly false registration statement." (Underwriters' Mem. Law. Supp. Mot. Dismiss at 10.)

That may be true, but at this stage of the litigation, plaintiff does not have to *prove* anything. It simply has to allege that it purchased stock that is traceable to the offerings. *See In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 274 n. 7 (3rd Cir.2006) (stating that "plaintiffs need not prove their shares are traceable to a false or misleading registration statement" to defeat a motion to dismiss and holding that allegations that plaintiffs purchased stock " 'in' and 'traceable to' the ... stock offerings were sufficient"). Plaintiff has made the requisite allegations. (*See* Compl. ¶ 74.)

*Count II*

 *12 In Count II, plaintiff alleges that defendants violated section 12(2) of the 1933 Act, which imposes liability on any person who offers or sells stock in interstate commerce pursuant to a prospectus or oral communication that "includes

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77*l*. However, standing under this section is limited to those who purchase stock pursuant to public offerings, which plaintiff admits it did not do. *See Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 566, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); (Compl. ¶¶ 34, 54 (alleging that IPO and SPO were November 25, 2003 and June 10, 2004, respectively); Initial Compl., Certification Proposed Lead Pl., Schedule A (showing that plaintiff made no purchases on those dates).)

Plaintiff says that is irrelevant because, as lead plaintiff in this PSLRA suit, it is not required to have standing as to every claim in the suit. While that is true, *see, e.g., Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82 (2d Cir.2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."), there must be least one named plaintiff who does have standing to sue as to every claim. *See id.* at 83 (stating that additional named plaintiffs who have standing lead plaintiff lacks can be appointed to assist lead plaintiff in representing the class); *Payton v. County of Kane,* 308 F.3d 673, 682 (7th Cir.2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action."); *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.,* 388 F.Supp.2d 871, 891-92 (N.D.Ill.2004) (dismissing certain section 12(2) claims because none of the named plaintiffs had purchased securities in those offerings). Because plaintiff is the only named plaintiff in this suit, Count II must be dismissed for lack of standing.

II. The SIRVA Defendants' Motions

*Count I*

In Count I, plaintiff seeks to hold SIRVA, Kelley, Ryan, Rogers, Schnall and Stocker liable for violating section 11 of the 1933 Act. The arguments advanced by these defendants for the dismissal of the Count I claims are the same as those advanced by the Underwriters. Thus, for the reasons discussed above, the SIRVA defendants' motions to dismiss the Count I claims is granted in part and denied in part.

*Count II*

In Count II, plaintiff alleges that SIRVA is liable for violating section 12(2). Because the Court has determined that this

count must be dismissed for lack of standing, we need not address the SIRVA defendants' arguments with respect to it.

*Count IV*[3]

[3]     Because each defendant's liability on Count III depends on their liability on Count I's section 11 claims, the Court addresses Count IV first.

In Count IV, plaintiff contends that SIRVA, Kelley, Ryan, Rogers, Schnall, Stocker and CDR ("the SIRVA defendants") violated section 10(b) of the 1934 Act and Rule 10b-5 (collectively, "section 10(b)") by making false statements or failing to disclose material facts about: (1) the health of SIRVA Europe; (2) the calculation of SIRVA's insurance reserves and (3) SIRVA's accounting practices and earnings projections. In addition, plaintiff alleges that CDR violated section 10(b) by trading on inside information. Section 10(b) prohibits the use of "any device, scheme, or artifice to defraud" or the making of "any untrue statement of a material fact" or omission of a material fact by "the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange." 17 C.F.R. § 240.10b-5; *see* 15 U.S.C. § 78j (prohibiting the "use ... in connection with the purchase or sale of any security registered on a national securities exchange ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe"). To state a section 10(b) claim, plaintiff must allege that: each defendant made a false statement of, or failed to disclose, a material fact; they did so with scienter and in connection with the purchase or sale of securities; plaintiff relied on the statement or the omission or the integrity of the market, and was damaged as a result. *Basic Inc. v. Levinson,* 485 U.S. 224, 250, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Tellabs,* 437 F.3d at 595. Such claims are also subject to the pleading requirements of the PSLRA:

  **\*13** Under the PSLRA, a securities fraud complaint must (1) specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset

2006 WL 2787520

that the defendants likely intended to deceive, manipulate, or defraud.

*Tellabs,* 437 F.3d at 594-95 (quotations and citations omitted).

A. European Operations

1. Materiality

The first category of misrepresentations plaintiff says defendants made concern SIRVA's European operations. Plaintiff alleges that, like the Underwriters, the SIRVA defendants misstated material facts in, or deliberately withheld such facts from the prospectuses, including that:

(1) SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a position of strength;

(2) the European business had failed to meet internal budget projections; and

(3) demand was declining, no further cost cutting was feasible, and the European businesses SIRVA had acquired were underperforming. (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.,* Ex. 8, SPO Prospectus at 4-5.)

In addition, plaintiff alleges that the SIRVA defendants made the following misrepresentations of material facts:

(4) in a February 10, 2004 conference call with securities analysts, Ryan said: "[W]ith our capabilities in place in Europe, we are now in a position to drive real, organic growth in 2004." (Compl.¶ 233);

(5) in an April 27, 2004 press release regarding the company's results for the first quarter of 2004, Kelley said: "[W]e made significant progress in broadening our services offering and expanding our presence throughout the European continent." (*Id.* ¶ 252);

(6) in an April 27, 2004 conference call with securities analysts, Kelley said that SIRVA Europe was "generating organic growth through [cross] selling relocation and moving services to our corporate clients. We're quickly integrating and growing acquisitions and as always, we're sharply focused on costs, productivity and quality." (*Id.* ¶ 255);

(7) in the same conference call, when an analyst asked Kelley, "[W]hat are you guys doing exactly in Europe that is allowing you to get these margins up so quickly. Is

it Scanvan? Did they come in with a better margin than anticipated or is this just blocking and tackling?"

Kelley responded: "It is blocking and ... tackling, Chris. It is looking at all of the operations we have across the UK and the continent. It's looking at how do we continue to wring costs out of this and wring efficiency [and] productivity out of it and do it in a way that is better and do it on an ongoing basis. This effort has been going on for 12 months, 18 months, and we anticipate that we will continue to be able to do this. If we look at this, we talked a little bit about Europe, we want to be able to continue to take the cost out, rip the cost out, make sure that we've got an efficient model so that we can invest in the front end. Invest in selling and marketing so we can grow the business. And that is basically what we have done. We have invested a significant amount on sales and marketing there. We had to have the cost reduction in order to do that and get the productivity to do that. So, that is what you're seeing in Europe." (*Id.* ¶ 258);

 **\*14** (8) in an August 4, 2004 press release Kelley said: "We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth." (*Id.* ¶ 287).

As discussed above, the statements in the second category are material, but the statements in the first category are not. Consequently, the latter statements cannot be the basis for a section 10(b) claim.

Nor can the alleged misstatements in the fourth, fifth and eighth categories. Ryan's statement that SIRVA was "in a position [in Europe] to drive real, organic growth in 2004" is an "indefinite prediction[ ] of 'growth,'" ' and Kelley's statements that SIRVA "made significant progress in broadening [its] services offering and ... presence" in Europe, "continue[d] to invest in [the] European ... operations" and was "building the infrastructure for future growth" are vague statements of optimism, both of which are immaterial puffery. *See Searls,* 64 F.3d at 1066.

The situation is different for the third category, which concerns defendants' failure to disclose in the prospectuses that there were demand, cost reduction and acquisition problems in Europe. With respect to these problems, plaintiff alleges that a "Former Senior European Finance Executive" personally told Kelley and Ryan in a meeting that occurred in

2006 WL 2787520

October 2003 at SIRVA's "Centre of Excellence" in the United Kingdom and in another that occurred on December 12, 2003 at the Chelsea Royal Hospital that demand was falling in Europe, no further cost reductions could be made and the European companies SIRVA had acquired were performing poorly. (Compl.¶¶ 98, 100-03, 106-07.) Plaintiff also alleges, through a "Former SIRVA Relocation Business Development Executive," that at a February 2004 "Summit Meeting" in Florida, Kelley said "the European operations were losing money" and "Europe was bringing the Company down." (*Id.* ¶¶ 109-10, 113.) Moreover, plaintiff says this information was material because: (1) the financials in the prospectuses demonstrated that the company's bottom line had become increasingly dependent on the European operations which, by the end of 2003, accounted for more than a quarter of its income (*see id.* ¶ 37; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.,* Ex. 8, SPO Prospectus at 2, 23); and (2) SIRVA specifically identified cost cutting and corporate acquisitions as strategies for increasing its revenues (*id.,* Ex. 1, IPO Prospectus at 5; *id.,* Ex. 8, SPO Prospectus at 5). Those allegations are sufficient to satisfy the materiality element as modified by the PSLRA.

The materiality element is also satisfied with respect to the sixth and seventh categories of alleged misrepresentations. In the April 27, 2004 conference call, Kelley is alleged to have said that SIRVA Europe was "quickly integrating and growing acquisitions" and owed its profitability, both current and anticipated, to "wring[ing] costs ... efficiency [and] productivity" out of the operation. Given the company's alleged reliance on its European operations, the Court cannot say as a matter of law that these statements are immaterial.

### 2. Scienter

**\*15** The next question is whether plaintiff has sufficiently alleged the scienter element as to each defendant. *See Tellabs,* 437 F.3d at 603 ("[P]laintiffs must create th[e] inference [of scienter] with respect to each individual defendant in multiple defendant cases."). Defendants say scienter is lacking because plaintiff has not alleged that any of them had a motive to mislead investors. Motive is not, however, a prerequisite to scienter:

> Currently three different approaches toward the way to demonstrate the required "strong inference [of scienter]" exist among the courts of appeals. The Second and Third Circuits take the position that ... plaintiffs may ... state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious

misbehavior. The Ninth and Eleventh Circuits disagree, believing that Congress opted instead for a more onerous burden. The remaining six circuits that have considered this issue take a middle ground, reasoning that Congress chose neither to adopt nor reject particular methods of pleading scienter-such as alleging facts showing motive and opportunity-but instead only required plaintiffs to plead facts that together establish a strong inference of scienter.... [W]e conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

*Id.* at 601 (citations, quotations and alterations omitted).

The *Tellabs* court also rejected defendants' argument that the scienter element is satisfied only if the most reasonable inference from the alleged facts is that defendants acted with fraudulent intent:

> The Sixth Circuit has said that the strong inference requirement creates a situation in which plaintiffs are entitled only to the most plausible of competing inferences, but that it does not mandate that the inference be irrefutable. As the Sixth Circuit itself has hinted, however, this standard could potentially infringe upon plaintiffs' Seventh Amendment rights.
>
> While we express no view on whether the Sixth Circuit's approach is in fact unconstitutional, we think it wiser to adopt an approach that cannot be misunderstood as a usurpation of the jury's role. Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent.

*Id.* at 601-02 (citation and quotation omitted). With these standards in mind, we will examine plaintiff's allegations.

Plaintiff argues that Kelley's scienter can be inferred from the alleged fact that he knew about the problems with the European operations and the company's increasing dependence on them, before he misrepresented or withheld material facts. In other words, plaintiff alleges that Kelley made public statements or disseminated information about the European business that he knew were untrue or materially incomplete. Those allegations are sufficient to support a reasonable inference that Kelley acted with scienter when he failed to disclose the problems with the

European operations in the prospectuses and gave purportedly inaccurate information about them in the April 27, 2004 conference call.

**\*16** We turn now to Ryan. Having determined that her alleged statement in the February 10, 2004 conference call with the analysts is puffery, the section 10(b) claim against Ryan with respect to Europe rests only on the alleged omissions from the prospectuses. According to plaintiff, Ryan's scienter can be inferred from her alleged knowledge about the problems in Europe before the prospectuses were issued. The Court agrees. At this stage, Ryan's alleged knowledge that the prospectuses were materially incomplete is sufficient to satisfy the scienter element.

The claim against Rogers with respect to the European operations is also based solely on the alleged prospectus omissions. Plaintiff does not allege, however, that Rogers participated in the 2003 meetings in which the Former Senior European Finance Executive told Kelley and Ryan about the problems with Europe. But plaintiff does allege that during a conference call with Rogers, Kelley and Ryan that took place shortly after Kelley and Ryan's first meeting with the Former Executive, Rogers told the Former Executive that he had lowered the 2004 profit projection for Europe by fifteen percent. (*See* Compl. ¶¶ 99-105.) Plaintiff also alleges that Rogers attended the February 2004 summit meeting and that he, along with Kelley, said that Europe was "losing money" and "was bringing the Company down." (*Id.* ¶¶ 110, 113.) Taken together, those allegations are sufficient to enable a reasonable person to infer that Rogers acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses.

The situation is different for Schnall. Plaintiff does not allege any facts from which a reasonable person could infer that he knew the prospectus information about Europe was materially incomplete. But plaintiff says that his scienter can be inferred from the fact that he is one of the "principals" of and has a "financial and controlling interest[ ]" in CDR and, thus, had a financial motive to inflate the offering price. (Compl.¶¶ 30, 175, 179, 181.)

The Court disagrees. Every shareholder in a company that decides to go public has a financial interest in obtaining a high offering price. Equating that interest with an intent to defraud would make all such shareholders targets of securities fraud claims. Consequently, the Court holds that Schnall's alleged financial interest in the offerings does not,

by itself, give rise to a strong inference of scienter. *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 420 (5th Cir.2001) (allegations that officers and directors would benefit from higher public offering price held "insufficient to support a strong inference of scienter"); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l. Corp., N.V.,* 941 F.Supp. 1369, 1377 (S.D.N.Y.1996) (allegations that defendant bank "was a founder, a substantial creditor, and a shareholder" of company whose notes were sold in the offering and, therefore, "had ample motive to inflate [the company's] financial soundness to ensure a successful and profitable offering" held inadequate to allege scienter). Accordingly, the Court dismisses the section 10(b) claim asserted against Schnall for misstatements about SIRVA Europe.

**\*17** We turn now to the last individual defendant, Stocker. Plaintiff has not alleged any facts that suggest Stocker knew the prospectus information about Europe was materially incomplete, had any motive to defraud, or otherwise acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses. Therefore, the section 10(b) claim plaintiff asserts against him for those alleged omissions must be dismissed.

That leaves the two corporate defendants, SIRVA and CDR. The individual defendants' knowledge can be imputed to those entities but only if they obtained the knowledge when they were acting within the scope of their employment. *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida County, Wis.,* 965 F.2d 311, 316 (7th Cir.1992). Plaintiff alleges that Kelley and Ryan learned about the problems in Europe in the course of their duties as SIRVA's CEO and CFO, respectively, and that Rogers learned about them while acting in his capacity as a principal of CDR. Accordingly, their knowledge can be imputed to SIRVA and CDR.

### B. Insurance Reserves

Plaintiff alleges that the SIRVA defendants made the following misrepresentations and omissions about insurance reserves in the prospectuses: (1) that SIRVA manipulated insurance reserves to boost earnings; (2) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (3) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; (4) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends"; and

2006 WL 2787520

(5) SIRVA improperly failed to take a timely charge to accrue additional liabilities to its multiple-line property and commercial liability insurance (Compl. ¶¶ 40, 44-45, 137, 153-70; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.,* Ex. 8, SPO Prospectus at 28, 67.) In addition, plaintiff alleges that defendants made the following misrepresentations elsewhere:

(6) in a February 10, 2004 conference call, Kelley said that SIRVA's insurance business was growing in an "intelligent and low-risk manner" and operated on "very careful risk models" (Compl.¶¶ 232, 235);

(7) in the 2003 Form 10-K, defendants said that SIRVA was "cautious in choosing which customers to insure and what kinds of insurance to write" and reported that SIRVA had reserves of $48.7 million and $53.7 million at the end of 2002 and 2003, respectively (*id.* ¶¶ 240, 243-44);

(8) in the Form 10-Q for the first quarter of 2004, defendants said that SIRVA had insurance reserves of $51.7 million and claims reserves of $19.6 million at the end of March 2004 (*id.* ¶ 262);

(9) in an April 27, 2004 conference call, Kelley said that more than two-thirds of the insurance unit's growth "came organically" (*id.* ¶ 254); and

**\*18** (10) In an August 5, 2004 conference call, Kelley said that SIRVA was "growing th[e] [insurance] business without compromising [its] risk standards" (*id.* ¶ 292).

As noted above, the third alleged misrepresentation concerning reserves for cargo claims is not actionable because plaintiff alleges that SIRVA manipulated reserves for NAIT and workers' compensation claims only. (*See* Compl. ¶¶ 153-55, 162-63, 166-68.) Consequently, plaintiff cannot base a section 10(b) claim on prospectus statements about cargo claims reserves.

Plaintiff fares no better with its claim that defendants concealed alleged reserves manipulation. As discussed above, the manipulation claims are based on information from confidential informants whose identities and personal knowledge are not described with the detail demanded by the PSLRA.

Plaintiff's remaining reserves claims-(1) that defendants falsely described SIRVA's reserves methodology in the prospectuses; (2) that defendants improperly failed to take a timely charge to accrue additional liabilities related to

certain lines of insurance; (3) that Kelley falsely characterized SIRVA's insurance business and its growth in the February 10, April 27 and August 5, 2004 conference calls; and (4) that defendants falsely characterized SIRVA's insurance business and the amount of its reserves in its 2003 Form 10-K and its Form 10-Q for the first quarter of 2004-depend on the inadequately pleaded manipulation allegations. Thus, these claims must also be dismissed.

C. Accounting Practices & Projections

That last group of misstatements that plaintiff attributes to the SIRVA defendants concerns the company's accounting practices and financial projections. With respect to SIRVA's accounting practices, plaintiff alleges that defendants:

(1) put false financial information for the years 2001-2003 and the first three quarters of 2004 in the prospectuses, the February 10, 2004 press release, SIRVA's 2003 Form 10-K, the April 27, 2004 press release and conference call, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, SIRVA's 2003 Annual Report, and the August 5, 2004 press release and conference call (Compl.¶¶ 40-41, 43, 48-52, 57, 59, 63, 231, 236, 251, 256, 259, 273-74, 279, 286, 289, 291, 293, 318, 374, 376-80, 384, 386, 388);

(2) gave false assurances that the financial statements fairly presented the company's financial results in the prospectuses, in SIRVA's 2003 Form 10-K, in SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and in its 2003 Annual Report and Proxy (*id.* ¶¶ 41, 59, 63, 237-38, 259-60, 274, 277, 293-94, 318-19);

(3) falsely stated the company's policy regarding revenue recognition in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, the 2003 Annual Report and Proxy and the January 31, 2005 conference call (*id.* ¶¶ 46, 62-63, 241-42, 261, 276, 295, 320, 333);

**\*19** (4) falsely stated that the company had adequate internal accounting controls in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and its 2003 Annual Report and Proxy (*id.* ¶¶ 40, 52, 56, 63, 222, 237, 239, 263, 275, 296, 322, 398-99);

(5) failed to disclose in the prospectuses changes defendants made in certain accounting methodologies (*id.* ¶¶ 52-53, 63); and

2006 WL 2787520

(6) falsely stated that SIRVA's financial statements had been prepared in accordance with GAAP in the 2003 Annual Report and Proxy, the 2003 Form 10-K and the Form 10-Qs for the second and third quarters of 2004 (*id.* ¶¶ 237, 260, 274-75, 294, 319, 263).

Defendants do not argue that these statements were true or immaterial, but they say plaintiff's allegations do not support the inference that any of them knew the statements were false.

With respect to the individual defendants' knowledge, plaintiff alleges, in essence, that they must have known about the accounting improprieties because they were actively involved in the company's management and/or their positions gave them access to all of SIRVA's financial information. (*See id.* ¶¶ 194-205, 219-27.) The fact that defendants were active managers does not, however, support the inference that they knew of the alleged accounting manipulations. *Fin. Acquisition,* 440 F.3d at 287 ("[O]fficers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). Nor does the fact that defendants, by virtue of their positions, had access to the accounting information. *City of Phila. v. Fleming Cos., Inc.,* 264 F.3d 1245, 1264 (10th Cir.2001) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate ...." (quotation omitted)). Rather, plaintiff must allege facts that support the inference that each defendant was actually aware, or had a duty to be aware, of the alleged improprieties.

Plaintiff has made the requisite allegations only as to Stocker and Ryan. Though plaintiff does not allege Ryan's responsibilities as SIRVA's CFO, it is reasonable to infer that one of them was to ensure that the company's financial statements were accurate. Moreover, plaintiff specifically alleges that Stocker and Ryan were members of the Audit Committee during the class period, a committee that was charged with:

> review[ing] the quality and integrity of SIRVA's financial reporting and other internal control processes, the quality and integrity of its financial statements, its compliance with legal and regulatory requirements and its code of conduct, the qualifications and independence of its auditors, the performance of its internal audit function and independent auditors and other significant financial matters.

**\*20** (Compl.¶¶ 219-20, 222, 226.) Further, because Ryan and Stocker are alleged to have learned of the accounting issues while acting in the scope of their employment with SIRVA, their knowledge can be imputed to the company. *One Parcel of Land,* 965 F.2d at 316. In sum, plaintiff's knowledge allegations are sufficient with respect to Ryan, Stocker and SIRVA but not with respect to Kelley, Schnall, Rogers or CDR.

Plaintiff also alleges that defendants made false earnings projections in the February 10, 2004 conference call, the April 27, 2004 press release and conference call and the August 5, 2004 press release and conference call. (Compl.¶¶ 234, 253, 257, 288, 290-91.) Defendants contend that these projections are protected by the PSLRA's "safe harbor" for forward-looking statements. Forward-looking statements include "projection[s] of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i). Defendants are shielded from liability for such statements if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" or "plaintiff fails to prove that the forward-looking statement[s] ... w[ere] made with actual knowledge ... that [they] w[ere] false or misleading." *Id.* § 78u-5(c)(1).

Defendants told investors both during the conference calls and in the press releases that the projections were forward-looking statements and directed them to the cautionary language in SIRVA's SEC filings, including the IPO prospectus and SIRVA's 2003 Form 10-K. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 2, Tr. 2/10/04 Conference Call at 1; *id.,* Ex. 4, Tr. 4/27/04 Conference Call at 1; *id.,* Ex. 13, Tr. 8/5/04 Conference Call at 1; *id.,* Ex. 14, 2/10/94 Press Release at 3; *id.,* Ex. 15, 4/27/04 Press Release at 2-3; *id.,* Ex. 16, 8/5/04 Press Release at 2-3.) The IPO prospectus sets forth twenty-three risk factors associated with SIRVA's business:

> (1) If we do not successfully compete within the highly competitive industries in which we operate, our operating revenues and profitability could be adversely affected.

> (2) Competition may force us to lower our prices thereby adversely affecting our operating revenues and profitability.

2006 WL 2787520

(3) Our business and financial condition could continue to be adversely affected by the present economic downturn and could also be affected by future economic downturns and other external events.

(4) Until recently, we had a history of net losses, and may not be profitable in the future.

(5) Our success depends in part on our relatively new and unproven strategy of offering a global comprehensive relocation solution to customers.

**\*21** (6) Our global relocation solutions business exposes us to some of the risks of the real estate industry, including risks relating to the purchase, ownership and resale of transferred employees' homes at a loss.

(7) Our network services business exposes us to some of the risks of the insurance industry.

(8) We may not be able to recruit and retain a sufficient number of agents, representatives or owner/operators to carry out our growth plans.

(9) Actions taken by our agents may harm our brands or reputation, or result in legal action against us.

(10) Potential liability associated with accidents in the trucking industry is severe and occurrences are unpredictable. In addition, an increase in liability, property or casualty insurance premiums could cause us to incur significant costs.

(11) If we lost one or more of our government licenses or permits or became subject to more onerous government regulations, including the new federal safety rules on truck driver work hours, we could be adversely affected.

(12) We are subject to litigation or governmental investigations as a result of our operations.

(13) Contingent or future environmental liabilities could cause us to incur significant costs and adversely affect our operations.

(14) Our business is highly seasonal, which leads to fluctuations in our operating results and working capital needs.

(15) Our owner/operators are currently not considered to be employees by taxing and other regulatory authorities. Should these authorities change their position and consider

our owner/operators to be our employees, our costs related to our tax, unemployment compensation and workers' compensation payments could increase significantly.

(16) The international scope of our business may adversely affect our business.

(17) We are exposed to currency fluctuations, which may have an adverse effect on us.

(18) Fuel is a significant cost element in the trucking transportation industry. Fuel prices are currently high and may continue to rise and they, and the availability of fuel, have been subject to volatility in the past.

(19) We are a holding company with no significant independent operations and therefore rely on our subsidiaries to make funds available to us.

(20) We have had substantial existing debt and may incur substantial debt in the future, and the agreements governing our debt contain restrictions that could significantly restrict our ability to operate our business.

(21) Any difficulties with our information systems or our information systems providers could delay or disrupt our ability to service our customers and impair our competitiveness.

(22) We are dependent on our highly trained executive officers and employees. Any difficulty in maintaining our current employees or in hiring similar employees would adversely affect our ability to operate our business.

(23) If we acquire any companies or technologies in the future, they could prove difficult to integrate, disrupt our business, dilute stockholder value or have an adverse effect on our results of operations.

**\*22** (*Id.,* Ex. 1, IPO Prospectus at 13-19.) The cautionary language in the 2003 Form 10-K, which was filed nearly six months later, is virtually identical. (*See id.,* Ex. 9, 2003 Form 10-K at 12-20.) Plaintiff contends that those warnings are too general to be meaningful, as the PSLRA safe harbor requires.

Our court of appeals discussed the parameters of the safe harbor provision in *Asher v. Baxter International, Inc.,* 377 F.3d 727 (7th Cir.2004). In that case, a group of investors sued Baxter under section 10(b) claiming that the earnings projections Baxter made for 2002 were false. *Id.* at 728. Baxter argued that the projections fell within the safe harbor

2006 WL 2787520

because they were accompanied by the following cautionary language:

> Many factors could affect the company's actual results, causing results to differ materially, from those expressed in any such forward-looking statements. These factors include, but are not limited to, interest rates; technological advances in the medical field; economic conditions; demand and market acceptance risks for new and existing products, technologies and health care services; the impact of competitive products and pricing; manufacturing capacity; new plant start-ups; global regulatory, trade and tax policies; regulatory, legal or other developments relating to the company's Series A, AF, and AX dialyzers; continued price competition; product development risks, including technological difficulties; ability to enforce patents; actions of regulatory bodies and other government authorities; reimbursement policies of government agencies; commercialization factors; results of product testing; and other factors described elsewhere in this report or in the company's other filings with the Securities and Exchange Commission. Additionally, as discussed in Item 3-"Legal Proceedings," upon the resolution of certain legal matters, the company may incur charges in excess of presently established reserves. Any such change could have a material adverse effect on the company's results of operations or cash flows in the period in which it is recorded.

> Currency fluctuations are also a significant variable for global companies, especially fluctuations in local currencies where hedging opportunities are unreasonably expensive or unavailable. If the United States dollar strengthens significantly against most foreign currencies, the company's ability to realize projected growth rates in its sales and net earnings outside the United States could be negatively impacted.

> The company believes that its expectations with respect to forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business operations, but there can be no assurance that the actual results or performance of the company will conform to any future results or performance expressed or implied by such forward-looking statements.

*Id.* at 730. The district court agreed and granted Baxter's motion to dismiss. *Id.*

**\*23** The investors appealed, arguing that Baxter could not take advantage of the safe harbor because the cautionary language was not meaningful. *Id.* In the Seventh Circuit's view, the word "meaningful" prohibits "boilerplate" warnings, such as "all businesses are risky." *Id.* at 732-33. Rather, a caution "must be tailored to the risks that accompany the particular projections." *Id.* at 732. Ultimately, the court concluded that a caution falls within the safe harbor "only if it includes those sources of variance that (at the time of the projection) were the principal or important risks." *Id.* at 734.

The court did not, however, make a determination on the meaningfulness of Baxter's cautionary language because such a decision was premature:

> There is no reason to think-at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery-that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) "important" sources of variance. The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks. For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them.

*Id.*

As in *Asher,* the cautionary language in this case lists a host of factors and events that might impact SIRVA's projections but not the ones plaintiff contends were most important. As the *Asher* court explained, that omission is not necessarily fatal to defendants' quest for the safe harbor. But, given plaintiff's allegation that the missing information pertained to the "principal or important" risks at the time the projections were made, we cannot say, as a matter of law, that the cautionary language was meaningful.

All is not lost for defendants, however. Plaintiff must also allege that they had actual knowledge of the falsity of the projections, to defeat defendants' motion. As discussed above, plaintiff's allegations support the inference that Kelley, Ryan and Rogers knew the projections were false because of the problems in Europe. Moreover, because they obtained that information in the course of their duties for SIRVA and CDR, respectively, that knowledge can be imputed to the corporate defendants. *One Parcel of Land,* 965 F.2d at 316. Further, Rogers' alleged possession of material information

about SIRVA Europe and his alleged ownership and control of CDR are sufficient to support the inference that CDR engaged in insider trading. Finally, as noted above, plaintiff's allegations support the inference that Ryan and Stocker, and therefore, SIRVA, knew the projections were false because of the accounting improprieties.

**\*24** They do not, however, support the inference that: (1) Schnall or Stocker knew the projections were false because of the problems with Europe; (2) any of the defendants knew the projections were false because of manipulation of the insurance reserves; or (3) Kelley, Schnall, Rogers or CDR knew the projections were false because of improper accounting practices. Thus, the projections claim survives but only as to Kelley, Ryan, Rogers, SIRVA and CDR with respect to the problems in Europe and as to Ryan, Stocker and SIRVA with respect to the improper accounting practices.

*Counts III & V*

In Count III, plaintiff asserts a claim under section 15 of the 1933 Act against Kelley, Ryan, Schnall, Stocker and CDR. In Count V, plaintiff asserts a claim under section 20(a) of the 1934 Act against the same defendants. Section 15 provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 11 of the 1933 Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder [*i.e.,* section 10(b) ] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Though the two sections are not identical, the analysis applied to them is the same. *See Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 911-13 (7th

Cir.1994) (analyzing section 15 and section 20(a) claims together); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986) (noting that the two sections are "parallel").

Defendants contend that these counts must be dismissed because they cannot be held liable both as primary violators, as charged in Counts I and IV, and as control persons. The statutory language suggests that control person liability is an alternative to liability for a primary violation, and some courts have interpreted it that way. *See, e.g., In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 77 (2d Cir.2001) (stating that control person liability "is a separate inquiry from that of primary liability and provides an alternative basis of culpability"). Only a few courts have addressed the issue, however, and the Seventh Circuit is not one of them. Thus, whether control person liability is an alternative or a supplement to primary liability is an open question in this circuit.

**\*25** At some point, the Court may have to decide that question, but we need not do it now. Because plaintiff is permitted to plead alternatively, the Court would not dismiss Counts III and V even if liability cannot be imposed on defendants under both theories.

Defendants also say that these counts must be dismissed because plaintiff has not pleaded enough facts to demonstrate that they are control persons within the meaning of the statutes. Control person claims are not, however, subject to a heightened pleading standard. *See*Fed. R. Civ. P. 9(b); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,* No. 02 C 5893, 2004 WL 574665, at \*16 (N.D.Ill. Mar.22, 2004). Consequently, plaintiff's allegation that each defendant "had direct involvement in the day to day operations of [SIRVA] and/or control over major corporate decision and policy making, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same" (Compl.¶ 461), is sufficient to satisfy the control element of the section 15 and 20(a) claims. *See Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992) (stating that a control person is one who "actually participated in, that is, exercised control over, the operations of the person in general and ... possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.").

2006 WL 2787520

However, a control person is liable under sections 15 and 20(a), only if the person or entity that it controls is liable for violating sections 11 and 10(b), respectively. As discussed above, plaintiff has adequately alleged that SIRVA violated both sections 11 and 10(b). Therefore, defendants' motions to dismiss Counts III and V are denied.

*Count VI*

In Count VI, plaintiff asserts a claim under section 20A of the 1934 Act against CDR for insider trading. Defendants say this claim must be dismissed because liability under section 10(b) is a predicate to liability under this section. *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]he language of the statute is ... quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the [19]34 Act or its rules and regulations.") Even if that is true, an issue we do not decide, Count VI survives. As discussed above, plaintiff has successfully pleaded section 10(b) claims against CDR.

III. Price

*Counts I and IV*

Plaintiff alleges that Price violated sections 11 and 10(b) by falsely stating in its audit opinions[4] for SIRVA's 2000-2003 financial statements, which were included in SIRVA's 2003 Annual Report, 2003 Form 10-K, 2004 Form 10-K and both prospectuses, that: (1) the financial statements were prepared in accordance with GAAP; and (2) Price had audited those statements in accordance with Generally Accepted Auditing Standards ("GAAS"). (Compl.¶¶ 95, 274, 280.)

4    It is not clear whether plaintiff asserts a 10(b) claim against Price for its actuarial work. To the extent that it does, the claim must be dismissed because plaintiff does not allege that Price made any false statements in connection with that work.

**\*26** Price says the section 11 claim must be dismissed because plaintiff has not alleged it with the particularity required by Rule 9(b). Plaintiff contends that such claims are not subject to that Rule, and both parties offer authority in support of their positions. We need not, however, decide whether the Rule applies because, even if it does, plaintiff's allegations pass muster.

Rule 9(b) requires plaintiff to allege the "who, what, when, where and how" of the alleged fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Plaintiff alleges

that Price falsely stated in specifically identified documents that its audits conformed to GAAS and SIRVA's financials conformed to GAAP, and that Price knew or should have known, for the reasons discussed below, that those statements were false. Those allegations are sufficient to satisfy Rule 9(b). Accordingly, Price's motion to dismiss the section 11 claim asserted against it is denied.[5]

5    In its reply brief, Price argues, for the first time, that plaintiff has no standing to pursue a section 11 claim with respect to the SPO and that even if it does, it has failed to allege damages that are traceable to that offering. (*See* Price Reply at 9-10.) To the extent that Price is arguing plaintiff lacks non-jurisdictional standing, Price has waived the argument by failing to raise it in its opening brief. *United States v. Turner,* 203 F.3d 1010, 1019 (7th Cir.2000). To the extent that Price argues that plaintiff lacks Article III standing, that argument fails for the reasons discussed above.

With respect to the section 10(b) claim, Price argues that plaintiff has not adequately alleged that it acted with scienter. "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994) (quotation omitted). Rather, plaintiff must allege that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (quotation omitted). Moreover, as discussed above, to satisfy the PSLRA, plaintiff must allege "sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud." *Tellabs,* 437 F.3d. at 594-95 (quotations and citations omitted).

Plaintiff says that Price's intent can be inferred from its disregard of numerous "red flags," of fraud, including: (1) the pervasive and obvious deficiencies in SIRVA's internal controls; (2) SIRVA's use of, and lack of control over, manual entries; (3) SIRVA's unusual growth or profitability compared to other companies in the industry; (4) management's failure to follow up on issues, provide oversight and display an appropriate attitude toward control; (5) the lack of properly trained personnel responsible for ensuring accurate financial reporting; (6) management's domination by a single person or small group and its undue emphasis on aggressive earnings targets; (7) earnings increases that were due solely to

Central Laborers' Pension Fund v. SIRVA, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2787520

changes in methodology; (8) SIRVA's flawed inter-company reconciliation process; (9) SIRVA's use of subjective or unsupported estimates about assumptions affecting the amount of assets, liabilities, revenues and expenses reported; and (10) SIRVA's understatement of its insurance reserves (Compl.¶¶ 408-10, 413-14, 416-17, 419, 420-26, 428).

**\*27** Plaintiff also alleges facts from which we can infer that Price actually knew, or should have known, about most of these issues. Plaintiff says that it is standard auditing practice to examine a company's internal controls before issuing an audit report, to question a company's unusual growth or profitability relative to its competitors and to scrutinize closely the use of manual journal entries and assumptions based on estimates. (*Id.* ¶¶ 413-14, 416, 427.) Plaintiff also says that Price should have realized that the statements did not accurately reflect insurance reserves because it served as the actuary for those reserves.[6] (*Id.* ¶¶ 162-63, 428.) Moreover, it is reasonable to infer, given the extent of the alleged problems, that a competent auditor would have discovered, in the course of investigating the sufficiency of SIRVA's internal controls, that the company lacked the personnel necessary to ensure accurate financial reporting, certain earnings increases were due solely to methodology changes and SIRVA's inter-company reconciliation process was flawed. Taken together, these allegations are sufficient to suggest that Price made the false GAAP and GAAS representations with the intent to defraud or with reckless disregard as to their accuracy. *See In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 21488087, at \*7 (S.D.N.Y.2003) (holding that scienter element was satisfied by allegations that auditor "had unlimited access to WorldCom's books and records ... [and] an obligation to review and evaluate those records in order to form an opinion regarding WorldCom's financial statements[,] .... [and that] WorldCom's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs"); *In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97 C 2715, 1998 WL 781118, at \*11 (N.D.Ill. Nov.4, 1998) ("Plaintiffs allege not only violations of GAAP and GAAS, but that Deloitte deliberately ignored several red flags in the financial statements which would have exposed the fraud.... Thus, the allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful." (quotation omitted)).[7] Price's motion to dismiss is, therefore, denied.

6    Price argues that plaintiff's assertion of this argument is an impermissible attempt to amend its complaint through a brief. The Court disagrees. That Price should have suspected accounting irregularities when it discovered SIRVA was under-reserved is a reasonable inference from the allegations in the complaint.

7    Price also argues that plaintiff's section 10(b) allegations do not satisfy Rule 9(b). For the reasons discussed above, the Court rejects this argument.

*Conclusion*

For all of the reasons stated above:

(1) the Underwriters' motion to dismiss [doc. no. 83] is granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; and (3) the claims in Count II, which are dismissed without prejudice. In all other respects, the Underwriters' motion is denied.

**\*28** (2) the SIRVA defendants' motions [doc. nos. 87 & 89] are granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; (3) the claims in Count II, which are dismissed without prejudice; (4) the Count IV claims premised on: (a) the prospectus statements that SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a

2006 WL 2787520

position of strength, which are dismissed with prejudice; (b) Ryan's statement in the February 10, 2004 conference call, which is dismissed with prejudice; (c) Kelley's statement in the April 27, 2004 press release that "[SIRVA] made significant progress in broadening [its] services offering and expanding [its] presence throughout the European continent," which is dismissed with prejudice; and (d) Kelley's statements in the August 4, 2004 press release that "We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth," which are dismissed with prejudice; (5) the Count IV claims asserted against defendants Schnall and Stocker that are premised on omissions from the prospectuses about SIRVA Europe, which are dismissed without prejudice; (6) all of the Count IV claims premised on alleged misstatements about the insurance reserves, which are dismissed without prejudice; (7) the Count IV claims premised on SIRVA's accounting practices that are asserted against Kelley, Rogers, Schnall and CDR, which are dismissed without prejudice; and (8) the Count IV claims premised on the alleged falsity of the financial projections; (a) due to undisclosed information about SIRVA Europe that are asserted against Schnall and Stocker; (b) due to undisclosed information about insurance reserves asserted against all of the SIRVA defendants; (c) due to undisclosed problems with SIRVA's accounting practices asserted against Kelley, Schnall, Rogers and CDR, all of which are dismissed without prejudice. In all other respects, the motions are denied.

(3) Price's motion to dismiss [doc. no. 86] is denied. Plaintiff has thirty days from the date of this Memorandum Opinion and Order to amend its complaint in accordance with this Order. If no amendment is timely filed, the Court will dismiss the deficient claims with prejudice.

**\*29** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2787520

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

2016 WL 215476
United States District Court,
S.D. Texas, Houston Division.

IN RE COBALT INTERNATIONAL
ENERGY, INC. Securities Litigation.

CIVIL ACTION NO. H–14–3428
|
Signed 01/19/2016

**Attorneys and Law Firms**

David D. Sterling, Daniel David, Amy Pharr Hefley, Russell Carter Lewis, Baker Botts LLP, Houston, TX, for Cobalt International Energy, Inc. Securities Litigation.

**MEMORANDUM AND ORDER**

NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT JUDGE

 **\*1** This securities case is before the Court on the Motion to Dismiss [Doc. # 81] filed by Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Tudor, Pickering, Holt & Co. Securities, Inc., Deutsche Bank Securities Inc., RBC Capital Markets, LLC, UBS Securities LLC, Howard Weil Incorporated, Stifel, Nicolaus & Company, Incorporated, Capital One Southcoast, Inc., and Lazard Capital Markets LLC (collectively, "Underwriter Defendants").[1] Also pending is the Motion to Dismiss [Doc. # 82] filed by Defendants Goldman Sachs Group, Inc., Riverstone Holdings LLC ("Riverstone"), First Reserve, and Kern Partners Ltd. ("Kern") (collectively together with The Carlyle Group, L.P., "Control Defendants"), in which Defendant The Carlyle Group, L.P. ("Carlyle") joined [Doc. # 84].[2] Cobalt International Energy, Inc. ("Cobalt"), Joseph H. Bryant, James W. Farnsworth, John P. Wilkirson, Peter R. Coneway, Henry Cornell, Jack E. Golden, N. John Lancaster, Jon A. Marshall, Kenneth W. Moore, J. Hardy Murchison, Michael G. France, Kenneth A. Pontarelli, Scott L. Lebovitz, Myles W. Scoggins, D. Jeff van Steenbergen, Martin H. Young, Jr., and William P. Utt (collectively, the "Cobalt Defendants") filed a separate Motion to Dismiss [Doc. # 83],

to which Plaintiffs filed an Opposition [Doc. # 88], and the Cobalt Defendants filed a Reply [Doc. # 98].

1    Plaintiffs GAMCO Global Gold, Natural Resources & Income Trust, GAMCO Natural Resources, Gold & Income Trust, St. Lucie County Fire District Firefighters' Pension Trust Fund, Fire and Police Retiree Health Care Fund, San Antonio, Sjunde AP–Fonden, and Universal Investment Gesellschaft m.b.H. filed an Opposition [Doc. # 89], and the Underwriter Defendants filed a Reply [Doc. # 97].

2    Plaintiffs filed an Opposition [Doc. # 90], and the Control Defendants filed a Reply [Doc. # 95], in which Defendant Carlyle joined [Doc. # 96].

The Court has reviewed the full record, including Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint") [Doc. # 72]. Based on this review, and the application of relevant legal authorities, the Court **grants in part and denies in part** the pending Motions to Dismiss.

**I. BACKGROUND**

Cobalt is an exploration and production company that was formed in 2005 as a private company. Defendant Joseph H. Bryant, Goldman Sachs, and Riverstone founded the company, which was incorporated in the state of Delaware. Cobalt conducted an initial public offering ("IPO") of its shares in December 2009. At the time of the IPO, Bryant was Cobalt's Chief Executive Officer ("CEO") and Chairman of Cobalt's Board of Directors.

In 2007, Cobalt entered into an agreement with Sonangol E.P. ("Sonangol"), the Angolan national oil company, to acquire a 40% interest in oil exploration Blocks 9, 20, and 21 in offshore Angola. In 2009, the Angolan Parliament issued two decrees assigning an interest in the Blocks to Nazaki Oil & Gaz ("Nazaki"), Sonangol P&P, and Alper Oil, Limitada ("Alper"). In February 2010, Cobalt and these other companies signed Risk Services Agreements ("RSAs") with Sonangol.

 **\*2** On January 4, 2011, Cobalt filed a Registration Statement and Prospectus ("January 2011 Registration Statement") with the Securities and Exchange Commission ("SEC"). Based on this 2011 Registration Statement, Cobalt conducted, *inter alia*, a stock offering in late February 2012 ("February 2012 Stock Offering") and a bond offering in December 2012 ("2012 Bond Offering").

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

On March 10, 2011, Cobalt learned that the SEC was conducting an informal inquiry into allegations that there existed a connection between Nazaki and senior government officials in Angola. The next day, Cobalt contacted the Department of Justice ("DOJ") regarding the same allegations. Both the SEC and the DOJ began formal investigations into whether Cobalt had violated the Foreign Corrupt Practices Act of 1977 ("FCPA"). The SEC investigation terminated in January 2015 with no recommendation for enforcement action against Cobalt. The DOJ investigation remains ongoing.

Meanwhile, Cobalt drilled two exploration wells in the offshore Angola drilling region: Lontra on Block 20 and Loengo on Block 9. Cobalt had no rights to gas discoveries and, instead, had rights only to any oil that was discovered in the Blocks. Ultimately, Lontra was found to contain a substantially higher percentage of gas than originally estimated, and drilling at Loengo failed to discover oil.

On November 30, 2014, Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") and Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio"), who each purchased Cobalt securities, filed a Complaint [Doc. # 1] alleging violations of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"). On December 5, 2014, Steven Neuman, a purchaser of Cobalt securities, filed a Complaint [Doc. # 1 in Civil Action No. H–14–cv–3488], alleging violations of the Securities Act and the Exchange Act. By Order [Doc. # 67] entered March 3, 2015, the Court consolidated the two civil cases. By Order [Doc. # 68] entered the same day, the Court appointed GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust (collectively, "GAMCO") as lead Plaintiffs in the consolidated cases.

On May 1, 2015, Plaintiffs filed their Consolidated Amended Class Action Complaint ("Complaint") [Doc. # 72]. Plaintiffs allege in Count I of their Complaint that Cobalt and its executives violated Section 10(b) of the Exchange Act and Rule 10b–5. In Count II, Plaintiffs allege that Cobalt and its executives violated Section 20(a) of the Exchange Act. Plaintiffs assert in Count III a claim under Section 11 of the Securities Act against Cobalt, its directors, and the Underwriter Defendants. In Count IV, Plaintiffs assert a claim against the Control Defendants under Section 15 of the Securities Act. In Count V, Plaintiffs assert a claim against

the Underwriter Defendants under Section 12(a)(2) of the Securities Act.

Defendants filed their Motions to Dismiss. All Defendants seek dismissal of all claims against them. The Motions to Dismiss have been fully briefed and are now ripe for decision.

## II. APPLICABLE LEGAL STANDARDS

### A. Pleading Standard for Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147. The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal–Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). When there are well–pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679.

**\*3** Except as explained below regarding the special pleading requirements for two elements of a § 10(b) claim, these pleading requirements apply to Plaintiffs' claims in this case. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004) ("Section 11 only requires notice pleading under FED. R. CIV. P. 8 rather than the detailed pleading mandated by FED. R. CIV. P. 9(b) or the Private Securities Litigation Reform Act"); *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658 (N.D. Tex. 2013).

### B. Special Pleading Requirements for § 10(b) Claims

The basic elements of a § 10(b) claim involving publicly traded securities are: (1) a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, (3) scienter by the defendant, (4) justifiable reliance by the plaintiff, (5) damages; and (6) a causal connection between the material misrepresentation and the loss, referred to a "loss causation." *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009). The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading requirement for two elements of a § 10(b) claim – the misrepresentation and scienter elements. *See Owens v.*

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

*Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citing 15 U.S.C. § 78u–4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). Specifically, "the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so–called 'particularity' requirement." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u–4(b)(1)).

Additionally, the PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). To satisfy the pleading standard for the required "strong inference" of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 324). "[A] tie favors the plaintiff." *Id.* (quoting *Lormand*, 565 F.3d at 254).

### III. COBALT DEFENDANTS' MOTION TO DISMISS

#### A. "Foundational Infirmities"

The Cobalt Defendants argue that the allegations in the Complaint should be "deeply discounted because of their dubious origins." *See* Cobalt Defendants' Motion, p. 20. Specifically, the Cobalt Defendants ask the Court to disregard allegations based on information from confidential witnesses and various published articles. The Cobalt Defendants argue also that Plaintiffs engaged in "selective editing" of the documents on which they base their claims.

Courts often discount allegations from confidential sources. *See, e.g., Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). In this case, however, the confidential witnesses not identified by name are adequately identified in other ways and the basis for their knowledge is set forth in the Complaint. For example, two of the confidential witnesses are Cobalt's Chief Financial Officer ("CFO") and Executive Vice President from June 2009 to June 2010, and its Chief Information Officer ("CIO") from June 2012 to April 2014. Another was the executive administrative assistant for Cobalt's West Africa division from April 2010 to March 2015, who reported to Richard Smith (at the relevant time, Cobalt's Country Manager for Angola and Vice President, International Business Development, Commercial and Finance) for her first two years at Cobalt, and to Michael Drennon (Cobalt's Executive Vice President and General Manager Angola) throughout her tenure at Cobalt. These witnesses may be confidential to the extent that their names are not included in the Complaint,

but they are neither anonymous nor secret. The allegations in the Complaint based on knowledge obtained from these witnesses will not be discounted, deeply or otherwise.

**\*4** Plaintiffs identify and cite to several articles which the Cobalt Defendants argue lack reliability. The cited articles relate primarily to the issue regarding Cobalt's alleged knowledge that Nazaki and Alper were owned by Angolan governmental officials, providing one source of evidentiary support for the allegations. Plaintiffs allege other bases, however, for their claim that the Cobalt Defendants made false or misleading statements. The content of the articles is properly alleged and the accuracy of the articles is not a proper subject for a motion to dismiss.

The Cobalt Defendants argue also that Plaintiffs selectively edited certain statements, and that the editing "casts even further doubt on Plaintiffs' claims." *See* Cobalt Defendants' Motion, p. 25. The pleading stage, however, is not the time to consider whether Plaintiffs' allegations should be doubted. The only issue is whether Plaintiffs' allegations in the Complaint satisfy the pleading requirements of the Federal Rules of Civil Procedure and the PSLRA.

#### B. Allegations of False or Misleading Statements

The Cobalt Defendants argue that Plaintiffs' § 10(b) and § 11 claims should be dismissed for failure to allege a false or misleading statement. As noted above, an essential element of a § 10(b) claim is that the defendant made a material statement that was false or misleading. *See Lormand*, 565 F.3d at 238. The only elements of a § 11 claim are: (1) an omission or misrepresentation of (2) a material fact required to be stated or necessary to make other statements not misleading. *See Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993); *see also In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 379 (S.D. Tex. 2011). A fact is "material" if "a reasonable investor would consider [it] significant in the decision whether to invest, such that it alters the total mix of information available about the proposed investment." *Krim*, 989 F.2d at 1445.

*__Nazaki and Alper.__–* Plaintiffs adequately allege with particularity that the Cobalt Defendants, through corporate filings and through statements during investor conference calls, misrepresented their knowledge that Angolan government officials owned Nazaki and Alper. Plaintiffs allege also that the Cobalt Defendants, in Cobalt's 2011 Form

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 24 of 105 PageID #:2306

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

10–K and otherwise, falsely represented that Nazaki was "a full paying member" of the partnership with Cobalt.[3]

[3]    The Cobalt Defendants argue that "full paying member" did not mean a member who had paid anything but, instead, described Nazaki's interests in the Angolan blocks as "non–carried." *See* Cobalt Defendants' Motion [Doc. # 83], p. 40. While this argument may be relevant to a motion for summary judgment, it does not indicate that Plaintiffs have failed to allege false and misleading statements to support their claims under the Securities Act and the Exchange Act.

Plaintiffs allege that an attorney in the United States conducted an investigation in 2008 and "was told that" Nazaki was controlled by Angolan government officials. Plaintiffs allege that it had been publicly reported as early as the first half of 2010 that Nazaki was controlled by an Angolan General. Plaintiffs allege that the *Global Witness* reported in May 2010 that "top Angolan officials" might be using Nazaki and Alper as fronts for the officials' own private benefit. Plaintiffs allege that, in response to the *Global Witness* report, the Cobalt Defendants denied the allegations and claimed they were unaware of any connection between Nazaki and any senior Angolan government officials. Plaintiffs allege that, even after the *Financial Times* reported in April 2012 that the three senior Angolan officials admitted their ownership of Nazaki, the Cobalt Defendants said they had refuted any allegations of wrongdoing and had conducted rigorous due diligence on the issue of Nazaki's ownership beginning in 2007.

**\*5** These and many other allegations in the Complaint satisfy the PSLRA requirements for pleading a false or misleading representation regarding a material matter – the ownership of Nazaki and Alper and whether Nazaki was a "full paying member" of the partnership.

***Longra and Loengo Wells.***– Plaintiffs adequately allege with particularity that the Cobalt Defendants through corporate filings and through statements during investor conference calls misrepresented their knowledge regarding the Longra and Loengo wells. Plaintiffs allege that the Cobalt Defendants described the two wells in the offering materials for the January 2013 and May 2013 stock offerings as "large [and] oil–focused." Plaintiffs allege that the Cobalt Defendants throughout 2013 described Lontra as a "super–size prospect" with oil potential greater than a billion barrels. Plaintiffs allege that Cobalt's Chief Exploration Officer, Defendant Farnsworth, falsely stated in October 2013 that Lontra was

"not the big gas field" but was, instead, "an oil field" that was "a significant discovery." Plaintiffs allege that the Cobalt Defendants made these representations knowing that Lontra was primarily gas, to which Cobalt had no rights, and that there was "not even a remote chance" of success in the Loengo well.

***Forward–Looking Statements.***– The Cobalt Defendants argue also that certain statements regarding the Angolan wells are protected by the PSLRA's Safe Harbor clause as forward–looking. Under the Safe Harbor clause, a forward–looking statement is not actionable if: (1) it is identified as forward–looking and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the forward–looking statement was made with actual knowledge that it was false or misleading. *See Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u–5(c)(1)(A), (B); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004)). "Whether or not a statement is forward–looking is governed by the nature of the statement, not a litigant's allegations about the statement." *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 7760201, \*10 (W.D. Tex. Dec. 1, 2015).

Many court have held that the Safe Harbor clause does not protect statements when the plaintiff adequately alleges that the defendant knew his statements were misleading when made. *See, e.g., Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, \*2 (E.D. Tex. Sept. 29, 2015). Plaintiffs in this case clearly allege that the Cobalt Defendants knew "fairly early on" that the Lontra well was producing primarily gas, to which Cobalt had no rights, and knew by the end of 2013 that there was "not even a remote chance" that the Loengo well would be successful. As a result, to the extent a plaintiff's allegation that the defendant knew that the statements were misleading precludes application of the Safe Harbor clause, the Motion to Dismiss based on that provision is denied.

**\*6** Moreover, the Safe Harbor clause applies only when the alleged misrepresentations are accompanied by "meaningful cautionary language." *SeeLormand*, 565 F.3d at 244 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus*,

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 25 of 105 PageID #:2307

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

2015 WL 5766870 at *3. "When cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful." *Id.* (internal quotations and ellipsis omitted). In this case, the Cobalt Defendants note that the statements regarding the Lontra and Loengo wells related to their "potential" and "prospects." Plaintiffs allege, however, that by the time the Cobalt Defendants made the statements in 2012 and 2013 regarding the potential of the Lontra and Loengo wells, these Defendants already knew that the wells had limited potential, and that the risks that the Lontra well would be primarily gas and that the Loengo well would be a "dry" well had already begun to materialize. As a result, Plaintiffs have adequately alleged that the Safe Harbor provision does not apply to protect the "forward–looking" statements.

***Conclusion Regarding Material Misrepresentation Element.*** – Plaintiffs have adequately alleged with particularity the factual basis for the material misrepresentation element of their § 10(b) and § 11 claims.

### C. Allegations of Scienter
Scienter is an element of Plaintiffs' § 10(b) claim. "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 326). Plaintiffs have alleged, primarily based on information received from the confidential witnesses who were Cobalt insiders, that the Cobalt Defendants knew that Nazaki was owned by Angolan officials. Plaintiffs have similarly alleged, based on information from Cobalt insiders, that the Cobalt Defendants knew "fairly early on" that Lontra was primarily gas, to which Cobalt had no rights, and that there was "not even a remote chance" that Loengo would be successful. Viewing all the factual allegations in the Complaint holistically and not in isolation, the Court finds that Plaintiffs have alleged with adequate particularity that the Cobalt Defendants acted with the requisite scienter.

### D. Allegations of Loss Causation
The loss causation element of a § 10(b) claim under the PSLRA requires the plaintiff to prove that the defendant's act or omission caused plaintiff's loss. *See*15 U.S.C. § 78u–4(b)(4); *Pub. Emp. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). "For a complaint to adequately plead this requirement, it need only set forth 'a short and plain statement of the claim showing that the pleader is

entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Amedisys, Inc.*, 769 F.3d at 320 (quoting *Dura Pharm., Inc., v. Broudo*, 544 U.S. 336, 341–42 (2005)). The plaintiff "must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Id.* (citing *Lormand*, 565 F.3d at 255 (citing *Dura*, 544 U.S. at 342)). "Loss causation in fraud–on–the–market cases can be demonstrated circumstantially by (1) identifying a corrective disclosure (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is *more probable* than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of price drop." *Id.* at 320–21 (internal quotations and citations omitted).

In this case, Plaintiffs have alleged that the Cobalt Defendants misrepresented their knowledge of the connection between Nazaki and senior government officials in Angola, and misrepresented their knowledge regarding the Lontra and Loengo wells. Plaintiffs have alleged that when Cobalt issued corrective disclosures on December 1, 2013, admitting that Lontra was primarily a gas–producing well, the stock price fell more than 21% over the next two days. Plaintiffs have alleged that when Cobalt issued corrective disclosures regarding the elevation of the SEC and DOJ investigations regarding Nazaki's ownership in August 2014, the stock price fell more than 11%. Similarly, Plaintiffs have alleged that when Cobalt disclosed in November 2014 that Loengo was a "dry well," the stock price immediately declined 11.5% on high volume trading. Based on Plaintiffs' allegations in the Complaint, the factfinder could reasonably infer that it is more probable than not that the corrective disclosures caused at least a substantial portion of these episodes of price decline.

### E. Allegations of Reliance
**\*7** Reliance is an element of Plaintiffs' § 10(b) claim. To invoke the presumption of reliance based on a "fraud–on–the–market" theory, a plaintiff must allege, *inter alia*, that the security traded in an efficient market. *See Halliburton Co. v. Erica P. JohnFund, Inc.*, 134 S. Ct. 2398, 2408 (2014). "Efficiency is a relative concept, a matter of degree." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 750 (S.D. Tex. 2006).

There is no challenge to Plaintiffs' allegation that the market for Cobalt common stock was an efficient one. The Cobalt Defendants argue that Plaintiffs failed to allege reliance as to the December 2012 and May 2014 bond offerings. Plaintiffs respond that the Cobalt bonds offered in December 2012 and May 2014 were convertible bonds and, therefore, their market price necessarily tracked that of the common stock.[4]

4    In their Reply, the Cobalt Defendants argue that Plaintiffs do not allege that the bonds are convertible. In the Complaint, however, Plaintiffs clearly allege that the bonds offered in the December 2012 Bond Offering (¶ 232) and in the May 2014 Bond Offering (¶ 252) were convertible.

Because the bonds were convertible to common stock, and because Plaintiffs adequately alleged that there was an efficient market for the common stock, Plaintiffs have alleged sufficient facts on the reliance factor for their § 10(b) claim as to the bond offerings. *See Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 675 (E.D. Pa. 2004); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 826 (N.D. Ill. 2000). The Cobalt Defendants' Motion to Dismiss on this basis is denied.

### F. Control Person Liability

The Cobalt Defendants argue that the § 20 and § 15 control person liability claims must be dismissed because Plaintiffs have failed to allege a primary claim under § 10(b) and § 11. As explained above, however, Plaintiffs have adequately alleged their § 10(b) and § 11 claims. Therefore, the § 20 and § 15 claims are not subject to dismissal.

### G. Conclusions On Cobalt Defendants' Motion to Dismiss

The only issue before the Court at this time is whether the securities claims in Plaintiffs' Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery. As discussed above, Plaintiffs have adequately alleged their Securities Act and Exchange Act claims against the Cobalt Defendants.

### IV. UNDERWRITER DEFENDANTS' MOTION TO DISMISS

Plaintiffs allege that the Underwriter Defendants violated Section 11 of the Securities Act and Section 12(a)(2) of the Securities Act. Plaintiffs allege that each of the Underwriter

Defendants except Lazard Capital Markets, LLC ("Lazard") served as an underwriter for Cobalt's February 2012 Stock Offering, that Goldman Sachs[5] and Morgan Stanley & Co. LLC ("Morgan Stanley") served as underwriters for the December 2012 Bond Offering, that Morgan Stanley and Citigroup Global Markets Inc. ("CGMI") served as underwriters for the January 2013 Stock offering, that CGMI served as an underwriter for the May 2013 Stock Offering, and that Goldman Sachs, Credit Suisse Securities (USA) LLC ("Credit Suisse"), CGMI, RBC Capital Markets, LLC ("RBC"), and Lazard served as underwriters for the May 2014 Bond Offering.

5    Goldman Sachs is also sued as a Control Person pursuant to § 20 of the Exchange Act. Its Motion to Dismiss the § 20 claims against it will be addressed below with the Control Defendants' Motions to Dismiss.

**\*8**  The Underwriter Defendants have moved to dismiss, asserting (1) that the Securities Act claims based on the February 2012 Stock Offering are barred by the three–year statute of repose; (2) that claims based on the statements regarding Nazaki are barred by the one–year statute of limitations; (3) that Plaintiffs who purchased shares after April 30, 2013, have failed to allege reliance in support of their § 11 claim, and (4) that Plaintiffs fail to allege that any of the Underwriter Defendants is a "statutory seller" for purposes of the § 12 claim.[6]

6    The Underwriter Defendants argue also that Plaintiffs' Securities Act claims should be dismissed for failure to allege adequately a material statement that was false or misleading. For the reasons discussed above in connection with the Cobalt Defendants' Motion to Dismiss, dismissal on this basis is denied.

### A. Statute of Repose

Section 11 claims are subject to a three–year statute of repose which provides that "[i]n no event" shall an action be brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. In this case, Cobalt stock was "bona fide offered to the public" on February 23, 2012. St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") and Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio") filed an original class action complaint on November 30, 2014, prior to the expiration of the three–year statute of repose. The Underwriter Defendants argue that the November 2014 complaint does not prevent dismissal based on the statute of repose. Specifically, the

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 27 of 105 PageID #:2309

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 215476, Fed. Sec. L. Rep. P 99,001

Underwriter Defendants argue that neither of the two named Plaintiffs in the November 2014 complaint had standing to assert a Securities Act claim based on the February 2012 Stock Offering because neither Plaintiff purchased stock in that offering. As explained below, however, the allegations in the Complaint establish for present purposes that St. Lucie had standing on November 30, 2014, to assert the Securities Act claim based on the February 2012 Offering.

"Section 11 of the Securities Act, imposing civil liability for public offering of securities pursuant to a false registration statement, permits 'any person acquiring such security' to sue." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005) (citing 15 U.S.C. § 77k(a)). Section 11's "standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement." *Id.* (internal quotations and citation omitted). The plain language of the statute confers standing on any person who acquires a security issued under the registration statement that allegedly contained an untrue statement of material fact, "so long as the security was indeed issued under *that* registration statement and not another." *Id.* (emphasis in original); *see also Hopson v. Chase Home Fin. LLC*, 14 F. Supp. 3d 774, 783 (S.D. Miss. 2014) (citing *Krim*'s holding that § 11 provides a right of action to any person acquiring shares issued pursuant to an untrue registration statement); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010) (holding that if a registration statement contains an untrue statement of material fact, "then any person acquiring a security pursuant to that registration statement has standing to sue a variety of participants in the security's issuance" and citing 15 U.S.C. § 77k(a)); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 892 (S.D. Tex. 2002) (holding that the term "any person acquiring such security" in § 77k(a) includes "purchasers of shares issued and sold pursuant to the challenged registration statement").

 **\*9** In this case, Plaintiffs allege that the February 2012 Stock Offering that is the subject of the Underwriter Defendants' statute of repose challenge, and the December 2012 Bond Offering in which St. Lucie purchased Cobalt securities, were both conducted pursuant to the same January 2011 Registration Statement and Prospectus. *See* Complaint, ¶¶ 223, 233. "The point of Article III standing...is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases 'securities' as that term is defined in the Act issued pursuant to a particular registration statement." *In re Fleming Cos. Inc. Sec.*

*& Derivative Litig.*, 2004 WL 5278716, \*49 (E.D. Tex. June 16, 2004). Although reserving and not deciding the issue, the First Circuit in *Plumbers' Union Local No.12 Pension Fund v. Nomura Asset Acceptance Corp.*, a case cited by the Underwriter Defendants, stated in *dicta* that a plaintiff could have standing "where the claims of the named plaintiffs necessarily give them – not just their lawyers – essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members." *Plumbers' Union*, 632 F.3d 762, 770 (2d Cir. 2011). In the November 2014 complaint, St. Lucie, as a purchaser in the December 2012 Bond Offering, challenged statements in the January 2011 Registration Statement on which both the December 2012 Bond Offering and the February 2012 Stock Offering were based. Therefore, St. Lucie had the same incentive to litigate its challenge to the subject Registration Statement as those purchasers of Cobalt stock in the February 2012 Stock Offering.

Here, St. Lucie purchased Cobalt securities in an offering pursuant to the same registration statement as any purchasers of Cobalt securities in the February 2012 Offering.[7] Because St. Lucie had standing to sue based on the January 2011 Registration Statement, it has standing to assert class–based claims for all purchasers of securities pursuant to that Registration Statement. St. Lucie's original complaint was filed on November 30, 2014, less than three years after the February 2012 Offering and within the statute of repose under the Securities Act. The policy concerns and the language of the applicable cases convince the Court that St. Lucie had standing on November 30, 2014.[8] The Underwriter Defendants' Motion to Dismiss claims based on the February 2012 Offering is, therefore, denied.

[7]    Universal Investment Gesellschaft m.b.h., a named Plaintiff in the Complaint filed May 1, 2015, alleges that it purchased shares of Cobalt stock in the February 2012 Offering.

[8]    As noted above, the GAMCO Plaintiffs, not St. Lucie, have been appointed Lead Plaintiffs in this case.

 **B. Statute of Limitations**
The Underwriter Defendants argue that the claims relating to statements about the Nazaki's ownership are barred by the applicable statute of limitations. Claims under the Securities Act must be filed "within one year after the discovery of the untrue statement or the omission, or after such discovery

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

should have been made by the exercise of reasonable diligence."15 U.S.C. § 77m; *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 107 (2d Cir. 2013); *In re Magnum Hunter Resources Corp. Sec. Litig.*, 616 F. App'x 442, 446–47 (2d Cir. June 23, 2015). "The one–year limitations period applicable to discovery of the violation begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *In re Petrobras Sec. Litig.*, ___F. Supp. 3d ____, 2015 WL 4557364, *14 (S.D.N.Y. July 30, 2015) (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)). Determining when a plaintiff has sufficient information for the limitations period to begin is often fact specific and inappropriate for a motion to dismiss pursuant to Rule 12(b)(6). *LC Capital*, 318 F.3d at 156.

In this case, Plaintiffs allege that it was reported in an article in the *Financial Times* in April 2012 that senior Angolan officials admitted their ownership of Nazaki. Plaintiffs allege also, however, that Cobalt representatives immediately denied any alleged wrongdoing and stated that they had conducted rigorous due diligence regarding Nazaki's ownership. Plaintiffs allege that, days later, Morgan Stanley issued a report advising that it was reassured by Cobalt's statements in response to the *Financial Times* article. Therefore, the Court cannot conclude as a matter of law that the statute of limitations began to run in April 2012. It may have been, as Plaintiffs argue, that they did not have adequate information for the statute of limitations to begin until August 2014, when Cobalt announced that Angola had terminated Nazaki's participation in the partnership with Cobalt. Because it is plausible that the allegations in the Complaint could support a finding that the statute of limitations did not begin to run until August 2014, the Court cannot conclude at this pleading stage that the claims relating to Nazaki's ownership are time–barred.

### C. Section 11 Claim – Reliance

**\*10** A plaintiff asserting a § 11 claim must allege (and eventually prove) reliance on the misrepresentation in the registration statement if, and only if, the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). In this case, Cobalt issued earnings statements between February 2012

and April 2013.[9] The Underwriter Defendants argue that, as a result, Plaintiffs who purchased Cobalt securities after April 30, 2013, must allege reliance in support of their § 11 claim.

9      Specifically, Cobalt issued a Q2 2012 Form 10–Q on July 31, 2012, a Q3 2012 Form 10–Q on October 30, 2012, a 2012 Form 10–K on February 26, 2013, and a Q1 2013 Form 10–Q on April 30, 2013. This "combination of reports" may be considered an "earning statement" for purposes of § 77k(a). *See*17 C.F.R. § 230.158(a)(2)(i).

Plaintiffs argue first that Cobalt's earning statements were not "earning statements" for purposes of § 77k(a) because they continued to include the allegedly false statements. The Court find this argument unpersuasive. The clear language of the statute and the legislative history reflect that the term "earning statement" is unqualified and should be given its general meaning. *See Petrobras*, 2015 WL 4557364 at *15; H.R. CONF. REP. NO. 73–1838, 1934 WL 1291, *41 (1934) (explaining that the "basis of this provision is that in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated on that statement rather than upon the information disclosed upon registration.").

Plaintiffs argue also that they are entitled to rely on the "fraud–on–the–market" theory of reliance to support their § 11 claim. Plaintiffs in the Complaint, however, specifically allege that their reliance allegations, including those pertaining to the "fraud–on–the–market" theory, "pertain only to Plaintiffs' claim under the Exchange Act." *See* Complaint, ¶ 214.

Based on the current Complaint, Plaintiffs who purchased Cobalt securities after April 30, 2013, must plead reliance on the alleged misrepresentations in issue, in support of their § 11 claim. Having failed to do so, the § 11 claims of those Plaintiffs are dismissed. The Court will, however, permit Plaintiffs to file a Second Amended Consolidated Class Action Complaint by the deadline set forth below.

### D. Section 12 Claim – Underwriter Defendants as "Statutory Sellers"

The Underwriter Defendants argue that Plaintiffs lack standing to assert their § 12 claim. Section 12(a)(2) imposes liability on anyone who "offers or sells a security... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 215476, Fed. Sec. L. Rep. P 99,001

an untrue statement of a material fact." 15 U.S.C. § 77*l*. Only persons who "directly purchase securities from the defendant in a public offering, rather than on the secondary market," have standing to assert a claim under § 12(a)(2). *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995).

In this case, Plaintiffs adequately allege that they purchased their shares from the Underwriter Defendants in the public offerings, rather than on a secondary market. *See* Complaint, ¶¶ 312–316. As a result, dismissal of Plaintiffs' § 12 claim against the Underwriter Defendants is not appropriate and is denied.

### E. Conclusion as to Underwriter Defendants' Motion to Dismiss

Plaintiffs' Securities Act claims against the Underwriter Defendants are not subject to dismissal at this stage of the proceedings as barred by either the three–year statute of repose or the one–year statute of limitations. As to those Plaintiffs who purchased shares of Cobalt stock after April 30, 2013, they will be granted leave to amend to allege reliance, if such allegations comply with the requirements of Rule 11 of the Federal Rules of Civil Procedure. Plaintiffs have adequately alleged that they purchased their shares from the Underwriter Defendants in the public offerings and, therefore, dismissal based on the allegations in the Complaint would be inappropriate. Consequently, the Underwriter Defendants' Motion to Dismiss is granted with leave to replead as to the § 11 claim by Plaintiffs who purchased their Cobalt securities after April 30, 2013, and is denied in all other respects.

### V. CONTROL DEFENDANTS' MOTION TO DISMISS

**\*11** Plaintiffs allege that Goldman Sachs, Riverstone, Carlyle, First Reserve, and Kern are liable as control persons under § 15 of the Securities Act for the violations of § 11 as alleged in the Complaint. Under § 15, any "person who, by or through stock ownership, agency, or otherwise,...controls any person liable under [§ 11 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 77*o*. To state a § 15 claim for control person liability, Plaintiffs must allege: (1) a primary violation of § 11 and/or § 12 of the Securities Act; and (2) that the defendant exercised "control" over the primary violator. *See In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004); *see also In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011); *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

By regulation, the SEC has defined "control" as the "possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Control can also be established by "business relationships, interlocking directors, family relations, or the power to influence and control the activities of another." *In re Dynegy*, 339 F. Supp. 2d at 828. A "plaintiff needs to allege some facts beyond the defendant's position or title that show the defendant had actual power or control over the controlled person." *Id.* (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509–10 (5th Cir. 1990)).

There are no United States Supreme Court or Fifth Circuit decisions establishing the pleading requirements for § 15. However, the Court finds persuasive the reasoning of district courts in the Fifth Circuit that "apply a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, \*2 (E.D. Tex. November 23, 2015) (citing *Trendsetter Insurers, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, \*15 (S.D. Tex. Jan. 18, 2007)). At the pleading stage, "a plaintiff need only allege that [the defendant] possessed the power to control the primary violator, not that control was exercised." *Id.* at \*3 (citing *G.A.Thompson & Co. v. Partridge*, 737 F.2d 945, 957–58 (5th Cir. 1981)).

Whether a defendant is a control person is an intensely factual question, and Plaintiffs here allege that Goldman Sachs, Riverstone, Carlyle, First Reserve, and Kern together controlled Cobalt based, *inter alia*, on their significant stock ownership and ability to elect a majority of Cobalt's Board of Directors. Plaintiffs allege also that the Control Defendants possessed the ability to control or influence Cobalt's day–to–day operation because a Stockholder Agreement gave them the right to select a majority of the members of every Board Committee except the Audit Committee. Plaintiffs allege that the Control Defendants, except Carlyle, had one or two Managing Directors serving simultaneously as a member of Cobalt's Board. This gave the Control Defendants the power to influence those interlocking directors and, thereby, control or influence the Cobalt Board.

Plaintiffs also cite to statements by Cobalt in filings with the SEC. For example, in the Form 10–K for the fiscal year ending December 31, 2010, Cobalt stated that its "four largest stockholders collectively own approximately 72% of [Cobalt's] outstanding stock" and "have significant influence

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 30 of 105 PageID #:2312

In re Cobalt International Energy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 215476, Fed. Sec. L. Rep. P 99,001

over all matters that require approval by [the] shareholders, including election of directors and approval of significant corporate transactions." In the same SEC filing, Cobalt identified itself as a "controlled company" in which "more than 50% of the voting power is held by another person or group of persons acting together." The Form 10–K identified First Reserve, Goldman Sachs, Riverstone, Carlyle, and Kern as the entities controlling a majority of voting power. The next Form 10–K, for fiscal year ending December 31, 2011, included similar statements.

**\*12** As noted above, the determination of whether a defendant is a control person is highly fact intensive. Plaintiffs and Control Defendants have cited a variety of district court cases that hold the plaintiffs there have or have not adequately alleged § 15 liability. Each one is similar to this case in certain respects and dissimilar in others. The issue is currently before this Court on Motions to Dismiss at the pleading stage. The Court is reviewing only Plaintiffs' allegations and expresses no opinion regarding what the evidence may ultimately show. The Court finds that although the allegations in the Complaint regarding control liability are limited, particularly as to Defendant Carlyle, the allegations are sufficient to satisfy the notice pleading requirements of Rule 8 and the PSLRA.

## VI. CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Underwriter Defendants' Motion to Dismiss [Doc. # 81] is **GRANTED with leave to replead** as to claims by Plaintiffs who purchased Cobalt securities after April 30, 2013, and **DENIED** in all other respect. It is further

**ORDERED** that Plaintiffs shall file their Second Amended Class Action Complaint by **February 5, 2016**. It is further

**ORDERED** that the Control Defendants' Motion to Dismiss [Doc. # 82] is **DENIED**. It is further

**ORDERED** that the Cobalt Defendants' Motion to Dismiss [Doc. # 83] is **DENIED**. It is further

**ORDERED** that Carlyle's Motion to Dismiss [Doc. # 84] is **DENIED**.

SIGNED at Houston, Texas, this **19th** day of **January, 2016**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 215476, Fed. Sec. L. Rep. P 99,001

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 31 of 105 PageID #:2313

In re Cobalt International Energy, Inc. Securities Litigation, Not Reported in Fed. Supp....

2016 WL 949065

2016 WL 949065
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

IN RE COBALT
INTERNATIONAL ENERGY,
INC. SECURITIES LITIGATION.

CIVIL ACTION NO. H-14-3428
|
Signed 03/14/2016

## MEMORANDUM AND ORDER

NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT
JUDGE

**\*1** This securities case is before the Court on the Motions
to Certify Order for Interlocutory Appeal ("Motions to
Certify") filed by Defendants Goldman Sachs Group, Inc.,
Riverstone Holdings LLC ("Riverstone"), First Reserve,
ACM Ltd., and The Carlyle Group L.P. (collectively, "Control
Defendants") [Doc. # 117]; by Cobalt International Energy,
Inc. ("Cobalt"), Joseph H. Bryant, James W. Farnsworth,
John P. Wilkirson, Peter R. Coneway, Henry Cornell, Jack
E. Golden, N. John Lancaster, Jon A. Marshall, Kenneth W.
Moore, J. Hardy Murchison, Michael G. France, Kenneth A.
Pontarelli, Scott L. Lebovitz, Myles W. Scoggins, D. Jeff
van Steenbergen, Martin H. Young, Jr., and William P. Utt
(collectively, the "Cobalt Defendants") [Doc. # 118]; and
by Defendants Goldman, Sachs & Co. ("Goldman Sachs"),
Morgan Stanley & Co. LLC, Credit Suisse Securities (USA)
LLC, Citigroup Global Markets Inc., J.P. Morgan Securities
LLC, Tudor, Pickering, Holt & Co. Securities, Inc., Deutsche
Bank Securities Inc., RBC Capital Markets, LLC, UBS
Securities LLC, Howard Weil Incorporated, Stifel, Nicolaus
& Company, Incorporated, Capital One Southcoast, Inc.,
and Lazard Capital Markets LLC (collectively, "Underwriter
Defendants") [Doc. # 120]. Pursuant to 28 U.S.C. § 1292(b),
Defendants seek certification of the Court's Memorandum
and Order [Doc. # 108] entered January 19, 2016.[1]

| 1 | Section 1292(b) allows the Court to certify for
interlocutory appeal a non-final order if the Court finds
that the order "involves a controlling question of law

as to which there is substantial ground for difference of
opinion and that an immediate appeal from the order
may materially advance the ultimate termination of the
litigation." 28 U.S.C. § 1292(b).

Plaintiffs filed an Omnibus Opposition [Doc. # 121], and a
Reply was filed by the Control Defendants [Doc. # 122],
the Underwriter Defendants [Doc. # 123], and the Cobalt
Defendants [Doc. # 124]. The Court has reviewed the
record, including its January 19, 2016 Memorandum and
Order. Based on this review, consideration of the parties'
arguments, and the application of binding and persuasive
legal authorities, the Court **denies** the pending Motions to
Certify.

## I. BACKGROUND

The factual background of this lawsuit was set forth fully
in the Court's January 19, 2016 Memorandum and Order.
Briefly, Cobalt is an exploration and production company that
was formed in 2005 as a private company. Cobalt conducted
an initial public offering ("IPO") of its shares in December
2009.

Previously, in 2007, Cobalt had entered into an agreement
with Sonangol E.P. ("Sonangol"), the Angolan national oil
company, to acquire a 40% interest in oil exploration Blocks
in offshore Angola. In 2009, the Angolan Parliament issued
two decrees assigning an interest in the Blocks to Nazaki Oil
& Gaz ("Nazaki"), Sonangol P&P, and Alper Oil, Limitada
("Alper").

On January 4, 2011, Cobalt filed a Registration Statement
and Prospectus ("January 2011 Registration Statement") with
the Securities and Exchange Commission ("SEC"). Based on
this January 2011 Registration Statement, Cobalt conducted,
*inter alia*, a stock offering in late February 2012 ("February
2012 Stock Offering") and a bond offering in December 2012
("2012 Bond Offering").

**\*2** On March 10, 2011, Cobalt learned that the SEC
was conducting an informal inquiry into allegations that
there existed a connection between Nazaki and senior
government officials in Angola. The next day, Cobalt
contacted the Department of Justice ("DOJ") regarding the
same allegations. Both the SEC and the DOJ engaged in
formal investigations into whether Cobalt had violated the
Foreign Corrupt Practices Act of 1977. The SEC investigation
terminated in January 2015 with no recommendation for

In re Cobalt International Energy, Inc. Securities Litigation, Not Reported in Fed. Supp....

2016 WL 949065

enforcement action against Cobalt. The DOJ investigation is ongoing.

On November 30, 2014, Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") and Fire and Police Retiree Health Care Fund, San Antonio filed a Class Action Complaint [Doc. # 1] alleging violations of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"). On December 5, 2014, Steven Neuman filed a Complaint [Doc. # 1 in Civil Action No. H-14-cv-3488], alleging violations of the Securities Act and the Exchange Act. By Orders [Docs. # 67 and # 68] entered March 3, 2015, the Court consolidated the two civil cases and appointed lead Plaintiffs.

On May 1, 2015, Plaintiffs filed their Consolidated Amended Class Action Complaint ("Complaint") [Doc. # 72], asserting claims under the Exchange Act and the Securities Act. Defendants filed Motions to Dismiss, which were denied in most respects in the January 19, 2016 Memorandum and Order.

Defendants have now filed their Motions to Certify the January 19, 2016 Memorandum and Order for interlocutory appeal. The Motions to Certify have been fully briefed and are ripe for decision.

## II. APPLICABLE LEGAL STANDARD

Certification of an interlocutory appeal from an order is permitted if the district court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Nguyen v. Am. Comm. Lines, L.L.C.*, 805 F.3d 134, 137-38 (5th Cir. 2015) (quoting 28 U.S.C. § 1292(b)). "Interlocutory appeals are generally disfavored, and statutes permitting them must be strictly construed." *Mae v. Hurst*, 613 F. App'x 314, 318 (5th Cir. June 2, 2015) (quoting *Allen v. Okam Holdings, Inc.*, 116 F.3d 153, 154 (5th Cir. 1997)). "Section 1292(b) appeals are exceptional." *Derrick Petroleum Servs. v. PLS, Inc.*, 2015 WL 224991, *2 (S.D. Tex. Jan. 15, 2015) (quoting *Clark-Dietz & Assocs. v. Basic Constr. Co.*, 702 F.2d 67, 69 (5th Cir. 1983)).

General standards for § 1292(b) certification that have commonly been identified by courts include: (1) "the decision to permit such an appeal is firmly within the district court's discretion;" (2) the statute "is not a vehicle to question the correctness of a district court's ruling or to obtain a

second, more favorable opinion;" (3) "the issue for appeal must involve a question of *law* – not fact" and a "'question of law' does *not* mean the application of settled law to disputed facts;" (4) the "issue for appeal must involve a *controlling* question of law;" (5) permitting an interlocutory appeal must "speed up the litigation;" and (6) "there must be substantial ground for difference of opinion over the controlling question of law for certification under § 1292(b)." *See Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 722-23 (N.D. Tex. 2006) (emphasis in original). "District courts have unfettered discretion to deny certification, even when all [statutory criteria] are satisfied." *Nieman v. City of Dallas*, 2016 WL 470235, *3 (N.D. Tex. Feb. 8, 2016) (Lynn, J.); *see also Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 141 (E.D.N.Y. 2015); *Villareal v. Caremark LLC*, 85 F. Supp. 3d 1063, 1068 (D. Ariz. 2015).

## III. ANALYSIS

### A. Controlling Question of Law

**\*3** The first requirement for certification under § 1292(b) is that the issue for appeal must involve a controlling question of law. A "controlling question of law – although not consistently defined – at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation – thereby saving time and expense for the court and the litigants." *Ryan*, 444 F. Supp. 2d at 723.

**Control Defendants.—** The Control Defendants seek certification of the following issues for interlocutory appeal:

1. Whether a complaint can state a claim for control-person liability merely by alleging that a private-equity sponsor owned a minority of a company's shares and appointed a minority of the company's board.

2. In the absence of any allegations that separate private-equity sponsors acted jointly to control the primary defendant, whether such separate sponsors may be treated as a group for purposes of determining whether a complaint states a control-person claim against each of them.

Control Defendants' Motion to Certify, p. 6.

In the January 19, 2016 Memorandum and Order, the Court set forth the requirements for § 15 control person liability, noting that the SEC defines "control" to mean the "possession, direct or indirect, of the power to direct or

cause the direction of management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." Memorandum and Order, p. 29 (citing 17 C.F.R. § 230.405). The Court noted that control can be established by "business relationships, interlocking directors, family relations, or the power to influence and control the activities of another." *Id.* (citing *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004)). The Court stated specifically that a "plaintiff needs to allege some facts beyond the defendant's position or title that show the defendant had actual power or control over the controlled person." *Id.* at 29-30 (citations omitted). The Court noted further that whether a defendant is a § 15 control person "is an intensely factual question." *Id.* at 30, 31. The Court found that Plaintiffs in this case alleged facts beyond the Control Defendants' positions by alleging, *inter alia*, "that the Control Defendants possessed the ability to control or influence Cobalt's day-to-day operation because a Stockholder Agreement gave them the right to select a majority of the members of every Board Committee except the Audit Committee" and that Cobalt stated in SEC filings that its "four largest stockholders collectively own approximately 72% of [Cobalt's] outstanding stock" and "have significant influence over all matters that require approval by [the] shareholders, including election of directors and approval of significant corporate transactions." *Id.* at 30-31.

The Court finds that the issues the Control Defendants want certified for interlocutory appeal are not controlling questions of law but are, instead, issues regarding the Court's application of established legal principles to the factual allegations in this lawsuit. As a result, the Control Defendants have failed to satisfy the first requirement for § 1292(b) certification, and their Motion to Certify is denied.

***Cobalt Defendants.***— The Cobalt Defendants seek certification of the following issues for interlocutory appeal:

1. Even if a complaint identifies a confidential witness ("CW") by his or her job title, responsibilities, and tenure, must a district court analyze at the motion to dismiss stage whether the complaint adequately pleads that the CW could have personal knowledge of each allegation he or she makes before deciding whether to credit those allegations...?

**\*4** 2. Must a district court analyze at the motion to dismiss stage the reliability and accuracy of articles and their

underlying sources to determine whether they satisfy the [applicable pleading standards]?

Cobalt Defendants' Motion to Certify, p. 1.

In their Motion to Dismiss, the Cobalt Defendants asked the Court to disregard allegations based on information from confidential witnesses and various published articles. In the January 19, 2016 Memorandum and Order, the Court noted correctly that courts often discount allegations from confidential sources. Memorandum and Order, p. 8 (citing *Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008)). The Court then stated, however, that in this case, "the confidential witnesses not identified by name are adequately identified in other ways ***and the basis for their knowledge is set forth in the Complaint***." *Id.* (emphasis added).

With reference to the published articles cited by Plaintiffs in support of the allegation that the Cobalt Defendants had knowledge that Nazaki and Alper were owned by Angolan government officials, the Court noted that the content of the articles was properly alleged and that the articles provided only one source of evidentiary support of the claim that the Cobalt Defendants made false or misleading statements. *Id.* at 9.

The issues that the Cobalt Defendants ask this Court to certify for interlocutory appeal are not controlling questions of law. Instead, they are issues regarding the Court's application of established legal principles to the factual allegations in this lawsuit. Additionally, with reference to the published articles, the issue would not be controlling because there were other allegations to support Plaintiffs' assertion that the Cobalt Defendants had knowledge of the relationship among Nazaki, Alper, and the Angolan government officials. As a result, the Cobalt Defendants have failed to satisfy the first requirement for § 1292(b) certification, and their Motion to Certify is denied.

***Underwriter Defendants.***— The Underwriter Defendants seek certification of the following question for interlocutory appeal:

Whether a Securities Act claim is timely under its three-year statute of repose, where it is brought by a person who purchased different securities in a different offering, and where the different offering was based on the same shelf registration statement filed more than three years prior to suit.

Underwriter Defendants Motion to Certify, p. 3. Plaintiffs concede, and the Court agrees, that this is a controlling question of law as to the statute of repose defense.

### B. Substantial Ground for Difference of Opinion

The second requirement for certification under § 1292(b) is that there is a substantial ground for difference of opinion regarding the controlling question of law. "[C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Ryan*, 444 F. Supp. 2d at 723-24 (internal quotation and citation omitted); *Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil*, 2015 WL 851920, *2 (S. D. Tex. Feb. 26, 2015). "But simply because a court is the first to rule on a question or counsel disagrees on applicable precedent does not qualify the issue as one over which there is substantial disagreement." *Ryan*, 444 F. Supp. 2d at 724; *see also Ministry of Oil*, 2015 WL 851920 at *2.

**\*5** As noted above, the Control Defendants and the Cobalt Defendants have not raised issues that are ready for presentation. All of the questions they identify are fact-intensive, not suitable for disposition on the pleadings. The issue posed by the Underwriter Defendants, however, warrants a closer evaluation on the question of "substantial ground for difference of opinion."

In the January 19, 2016 Memorandum and Order, the Court held that the allegations in Plaintiffs' Complaint established for purposes of a motion to dismiss that St. Lucie had standing when it filed its Class Action Complaint on November 30, 2014, to assert the Securities Act claim based on Cobalt's February 2012 Offering. The Court held that St. Lucie had standing because it purchased Cobalt securities in the December 2012 Bond Offering that was based on the same January 2011 Registration Statement and Prospectus as the February 2012 Offering. *See* Memorandum and Order, pp. 21-24.

Although the statute of repose issue is a controlling question of law, the Court does not find that there exists a substantial ground for difference of opinion. The Fifth Circuit has held that Section 11's "standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who

purchase securities that are the direct subject of the prospectus and registration statement." *Krim v. pcOrder.com, Inc*., 402 F.3d 489, 495 (5th Cir. 2005). Other federal courts of appeals have held the same. *See, e.g., DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003) (holding that § 11 provides a cause of action for any person who acquired a security issued pursuant to a materially false registration statement); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976-77 (8th Cir. 2002) (stating that a § 11 plaintiff need only have purchased securities that were "originally registered under the allegedly defective registration statement – so long as the security was indeed issued under that registration statement and not another").

The Underwriter Defendants' reliance on the First Circuit's decision in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, is unpersuasive. In that case, none of the named plaintiffs had purchased certificates issued by the defendants. *See Plumbers' Union*, 632 F.3d 762, 768 (2d Cir. 2011). As a result, the First Circuit held that the plaintiffs lacked standing – with a qualification. *Id.* at 770. The "qualification," described by the First Circuit in *dicta*, was that a plaintiff could have standing "where the claims of the named plaintiffs necessarily give them – not just their lawyers – essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members." *Id*. That is the case here. In the November 2014 complaint, St. Lucie, as a purchaser in the December 2012 Bond Offering, challenged statements in the January 2011 Registration Statement on which both the December 2012 Bond Offering and the February 2012 Stock Offering were based. Therefore, St. Lucie had the same incentive to litigate its challenge to the allegedly false Registration Statement as those purchasers of Cobalt stock in the February 2012 Stock Offering.

The Fifth Circuit in *Krim* addressed the issue that the Underwriter Defendants want certified. The Fifth Circuit's decision in *Krim* is consistent with decisions by other courts of appeals, including the Second and the Eighth Circuits. The First Circuit's decision in *Plumbers' Union* is not inconsistent with the Fifth Circuit's *Krim* decision and, therefore, does not demonstrate substantial ground for difference of opinion. The Underwriter Defendants have failed to satisfy the second requirement for § 1292(b) certification of an interlocutory appeal, and their Motion to Certify is denied.

### C. Materially Advance the Ultimate Termination of the Litigation

**\*6** The third requirement for certification under § 1292(b) is that the interlocutory appeal will materially advance the ultimate termination of the litigation. Indeed, the "institutional efficiency of the federal court system is among the chief concerns motivating § 1292(b)." *Ryan*, 444 F. Supp. 2d at 723. None of the moving Defendants has satisfied this element.

As to the questions raised by the Control Defendants and the Cobalt Defendants, an interlocutory appeal is unlikely to advance the ultimate termination of the lawsuit because, even if successful, the appeal will likely result in remand to this Court for Plaintiffs to have an opportunity to replead. Therefore, an interlocutory appeal – even a successful one – will delay rather than advance final resolution of this dispute.

As to the question raised by the Underwriter Defendants, a successful appeal would materially advance the termination of the lawsuit as to only a few of the Defendants. On this basis, also, the Court finds that an interlocutory appeal would not materially advance the final resolution of this lawsuit. *See, e.g., ExxonMobil Corp. v. U.S.*, 108 F. Supp. 3d 486, 516 (S.D. Tex. 2015).

As to the questions raised by all Defendants, those issues can be appealed, if appropriate, after all remaining issues have been resolved. The Court has handled, and will continue to handle, this case expeditiously. The case will progress efficiently to final resolution, at which time all disputed issues can be raised in one appeal rather than piecemeal.

## IV. CONCLUSION AND ORDER

As explained above, Defendants have failed to satisfy the three requirements for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In any event, the Court does not find that this is an exceptional case that would benefit from an interlocutory appeal. Therefore, in the exercise of this Court's discretion, it is hereby

**ORDERED** that the Motions to Certify Order for Interlocutory Appeal [Docs. # 117, # 118, and # 120] are **DENIED**.

SIGNED at Houston, Texas, this **14th** day of **March, 2016**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 949065

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

In re Global Crossing, Ltd. Securities Litigation; Not Reported in F.Supp.2d (2005)
2005 WL 1875445, Fed. Sec. L. Rep. P 93,358

2005 WL 1875445
United States District Court,
S.D. New York.

In re GLOBAL CROSSING, LTD.
SECURITIES LITIGATION

No. 02 Civ. 910(GEL).
|
Aug. 5, 2005.

**Attorneys and Law Firms**

Jay W. Eisenhofer, Sidney S. Liebesman, Michael J. Barry, Michelle T. Wirtner, Grant & Eisenhofer, P.A., Wilmington, DE, for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

James A. Beha II, Winston & Strawn LLP, New York, NY, for Defendant J.P. Morgan Chase & Co.

*OPINION AND ORDER*

LYNCH, J.

**\*1** In this consolidated class action arising from the alleged accounting improprieties at the telecommunications firm Global Crossing, Ltd. ("GC"), and its subsidiary Asia Global Crossing Ltd. ("AGC"), Count XX of the Second Amended Consolidated Class Action Complaint ("complaint") charges J.P. Morgan Chase & Co. ("JPMC") with control-person liability pursuant to Section 15 of the Securities Act of 1933. JPMC moves to dismiss this count. The motion will be denied.

BACKGROUND

The facts set forth below, drawn from the complaint,[1] must be taken as true for purposes of this motion. *SeeBolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995).

1  All references to the "complaint" refer to the Second Amended Consolidated Class Action Complaint.

The alleged fraud underlying plaintiffs' complaint, and this motion, has been described in this Court's previous opinions, and the facts will be repeated here only to the extent that they are relevant to JPMC's motion. *See,e.g.,In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319 (S.D.N.Y.2004); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189 (S.D.N.Y.2003). According to plaintiffs, AGC was integral to GC's scheme to defraud the public and its investors. Specifically, plaintiffs allege that GC and AGC booked revenue in the hundreds of millions of dollars from economically worthless swap transactions in which they simply exchanged telecom capacity between themselves or with other members of the telecom industry.

As to JPMC, plaintiffs allege that JPMC acted as a controlling person of its subsidiary J.P. Morgan Chase Securities, Inc. ("Securities"), which was a member of the underwriters group for AGC's October 2000 initial public offering of its common stock. (Compl.¶ 1239.) Securities was the successor to Chase H & Q and Chase Securities Inc. (*Id.* ¶ 103.) Plaintiffs allege that the AGC IPO Registration Statement contained materially false and misleading statements regarding AGC. The complaint specifically alleges that:

[b]y virtue of its ownership, executive conditions, superior positions, contractual rights, participation in and/or interaction in the operations and/or underwriting of Offerings for [AGC] ... [JPMC] had the power to influence and control and did influence and control, directly or indirectly, the decision-making of [Securities], including the content and dissemination of the various statements which [p]laintiffs contend are false and misleading.... [JPMC] and/or its predecessors in interest, had direct involvement in the day-to-day operations of [Securities] and/or its predecessors in interest, and its employees and agents, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.... As a direct and proximate result of [JPMC's] wrongful conduct [p]laintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of [AGC] securities. (*Id.* ¶¶ 1239-41.)

**\*2** Moreover, according to plaintiffs, Securities "is a wholly-owned subsidiary of [JPMC] and is held out as part of J.P. Morgan's 'Investment Bank' franchise; the subsidiary's results are consolidated with the results of the rest of [JPMC's] business and all revenues from [Securities] flow to [JPMC]; and [Securities] does not have any independent directors separate from those elected by [JPMC's] shareholders and its executive officers are also officers of [JPMC]." (P. Mem. 4 n. 2 (citing J.P. Morgan 2000 Annual Report filed with the SEC on Form 10-K on March 30, 2001, at 1, 10, 110, 116-17).)[2]

2    Defendant argues that the 2000 Annual Report "does not say what plaintiffs claim about the 'executive officers' of Securities," and correctly point out that plaintiffs failed to provide copies of the Report's pages to which they cite. Plaintiffs also cite that JMPC is registered as a "bank holding company" with the Board of Governors of the Federal Reserve Board under the U.S. Bank Holding Act of 1965 ("BHCA"). (P. Mem.5.) The BHCA defines "bank holding company" as "any company which has control over any bank or any company." As defendant points out (D.Reply.Mem.3), plaintiffs fail to specify why this information is relevant or which bank JPMC so holds. Defendant suggests the bank it holds is not Securities, which it urges is not a bank, but rather JPMorgan Chase Bank. (*Id.*)

In addition to alleging facts about JPMC's relationship to Securities, plaintiffs attempt to paint a picture of collusion between various J.P. Morgan entities and GC. Plaintiffs point out that Gary Winnick, GC's Chairman, was appointed to J.P. Morgan's National Advisory Board and Maria Elena Lagomasino, CEO of J.P. Morgan's Private Bank, was appointed as a director on the AGC's board of directors in April 2001. "Through the activities of J.P. Morgan's wholly-owned subsidiaries, the appointment of Winnick to J.P. Morgan's National Advisory board and the presence of Lagomasino on the [AGC] Board, J.P. Morgan gained extensive knowledge about the integrity of [GC] and [AGC's] business and was in the distinct position of being able to warn investors of the problems in [GC] and [AGC's] business that were evident at the time of the [AGC] IPO." (P. Mem. 4 (citing Compl. ¶¶ 103, 846-50, 855).) But "[t]hese warnings were ignored and [Securities, in its capacity as an underwriter] instead sold 3,000,060 shares of [AGC] to the investing public." (*Id.* (citing Compl. ¶ 639).) "[JPMC] served as one of Gary Winnick's personal bankers and, through its subsidiaries including [Securities] and J.P. Morgan Private Bank, earned millions of dollars in fees from [AGC] through underwriting activities, letters of credit, and personal loans made to [GC] and [AGC] directors and executives." (*Id.* (citing Compl. ¶ 103).)

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

For the purposes of this motion to dismiss, the facts as alleged in the plaintiffs' complaint must be taken as true, *Bolt Elec.,* 53 F.3d at 469, and all reasonable inferences must be drawn in the plaintiffs' favor. *Freedom Holdings, Inc. v. Spitzer,* 357

F.3d 205, 216 (2d Cir.2004). At the same time, "[g]eneral, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference, or, even documents that may not be incorporated by reference but are integral to the complaint. *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *seeSira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004). In addition to facts alleged in the complaint, the Court may take judicial notice of public disclosure documents filed with the SEC. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). Ultimately, this Court may only dismiss a complaint if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Patel v. Searles,* 305 F.3d 130, 135 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (internal quotation marks omitted)).

### II. *The Section 15 Claim*

#### A. Elements

**\*3** Under Section 15 of the Securities Act of 1933:

[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Sections 11 or 12(a)(2) ], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*. In order to state a claim under Section 15, a plaintiff must allege (a) a primary violation of Sections 11 or 12 by a controlled person, and (b) control by the defendant of the primary violator. *SeeBurstyn v. Worldwide Xceed Group, Inc.,* No. 01 Civ. 1125(GEL), 2002 WL 31191741, at \*7 (S.D.N.Y. Sept.30, 2002); *seealsoBoguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998).

To be liable as a control person, the defendant "must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." *Wallace v. Buttar,* 239 F.Supp.2d 388, 396 (S.D.N.Y.2003). In other words, plaintiffs

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 38 of 105 PageID #:2320

In re Global Crossing, Ltd. Securities Litigation; Not Reported in F.Supp.2d (2005)
2005 WL 1875445, Fed. Sec. L. Rep. P 93,358

must show both that the defendant "possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise," *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir.1996) (internal citation and quotation marks omitted); *In re Blech Sec. Litig.,* 961 F.Supp. 569, 586 (S.D.N.Y.1997), and that defendant had "actual control over the transaction in question." *Ross v. Bolton,* No. 83 Civ. 8244(WK), 1989 WL 80428 (S.D.N.Y. Apr.4, 1989) (internal citation and quotation marks omitted); *seeWallace,* 239 F.Supp.2d at 396;*In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 319 (E.D.N.Y.2002). Conclusory allegations of control are insufficient as a matter of law. *SeeIn re Deutsche Telekom AG Sec. Litig.,* No. 00 Civ. 9475(SHS), 2002 WL 244597, at *5-*7 (S.D.N.Y. Feb.20, 2002); *Converse, Inc. v. Norwood Venture Corp.,* No. 96 Civ. 3745(HB), 1997 WL 742534, at *3-*4 (S.D.N.Y. Dec.1, 1997); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.,* 941 F.Supp. 1369, 1378-79 (S.D.N.Y.1996); *Martin v. EVP Second Corp.,* No. 90 Civ. 7074(LLS), 1991 WL 131176, at *3 (S.D.N.Y. July 9, 1991).

### B. Pleading Standard

Section 15 claims are governed by the notice-pleading standard articulated in Rule 8, Fed. R. Civ. Proc., and must provide defendants "with fair notice of [plaintiffs'] theory of control." *In re WorldCom, Inc., Sec. Litig.,* Nos. 02 Civ 3288, 03 Civ. 890, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004). "The heightened pleading standard under Rule 9(b) or the PSLRA does not apply because fraud and scienter are not necessary elements of the claim." *In re Vivendi Universal, S.A.,* No. 02 Civ. 5571, 2003 WL 22489764, at *22 (S.D.N.Y. Nov. 3, 2003).

### B. Application to Plaintiffs' Claim

 **\*4** JPMC argues that plaintiffs allegations are insufficient to sustain a Section 15 control-person claim because plaintiffs have failed to allege that JPMC "control[led]" Securities. Plaintiffs argue that the facts alleged in the complaint pertinent to JPMC are sufficient to establish control.[3]

---

3    Plaintiffs contend that JPMC's motion does not challenge the sufficiency of plaintiffs' allegations regarding Securities' primary liability. (P. Mem.3.) Although defendant's memorandum in support of the motion was not entirely clear about whether it challenges plaintiffs' allegations as to the primary violation, since JPMC failed to respond to plaintiffs' charge in its reply brief, the Court accepts plaintiffs' characterization, and accordingly does

not reach the sufficiency of plaintiffs' allegations as to the primary violation.

Although "it is a well-settled principle of corporate law that 'a parent corporation and its subsidiary are regarded as legally distinct entities," ' *In re WorldCom, Inc., Sec. Litig.,* 2004 WL 1097786, at *3, plaintiffs point to persuasive authority in which courts have sustained Section 15 claims against a parent corporation for the acts of a subsidiary on allegations similar to those plaintiffs bring here. (P. Mem.8.) *SeePollack v. Laidlaw Holdings, Inc.,* No. 90 Civ. 5788, 1995 WL 261518, at *18 (S.D.N.Y. May 3, 1995) ("[As] Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors ..., plaintiffs have provided prima facie evidence of Laidlaw Holdings' status as a controlling person."); *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 484 (2001) (allegations that "EYB 'owned and controlled' FASB and K & W by exercising 'direct, daily supervision, oversight and control' through common personnel and shared offices" and that "FASB and K & W [was] 'the corporate vehicle through which' EYB provided administrative services to its clients" sufficient to allege control); *seeIn re Indep. Energy Holdings, PLC Sec. Litig.,* 154 F.Supp.2d 741, 770 (S.D.N.Y.2001) (allegations that parent company conducted business through wholly owned subsidiaries with common management sufficient to allege control); *Borden, Inc. v. Spoors Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 591 (S.D.N.Y.1990) (allegation that "defendants were sole shareholders of [plaintiff] clearly meets th[e] standard [of alleging control because it] strongly suggest[s] that [defendants] had the potential power to influence and direct [plaintiff's] activities"); *seealsoIn re Enron Corp. Sec.,* No. MDL-1446, H-01-3624, 2004 WL 3410449, at *3-4 (S.D.Tex. April 6, 2004).

Defendant puts forth *In re WorldCom, Inc., Sec. Litig.,* 2004 WL 1097786, as contrary authority, but as plaintiffs point out, upon closer inspection, the facts there are distinguishable. In *WorldCom,* Judge Cote dismissed a Section 15 claim against a parent corporation as a control person for its subsidiary, but only after the plaintiffs "had the benefit of extensive discovery," leaving only the plaintiffs' "implied assertion" that the parent was the control person of its subsidiary by virtue of the parent-subsidiary relationship *Id.* at *3 & n. 10. The mere existence of a parent/subsidiary relationship may be an insufficient basis from which to infer control for allegations of Section 15 liability, *In re WorldCom, Inc., Sec. Litig.,* 2004 WL 1097786, at *3, but plaintiffs have pled more than that. Although it is

2005 WL 1875445, Fed. Sec. L. Rep. P 93,358

true as defendant points out that plaintiffs' arguments and assertions sometimes seem to "blow fog" more than to provide notice of the claim (D.Reply.Mem.4), once the smoke is clear, sufficient facts remain to allege control-person liability against JPMC. Plaintiffs have alleged that Securities is JPMC's wholly owned subsidiary, that the directors of both corporations were "interchangeab[le]" (P. Mem.7), and that JPMC "had direct involvement in the day-to-day operations of [Securities]" (Compl.¶ 1240). These facts, viewed in the light most favorable to plaintiffs, suggest that JPMC controlled Securities in general and for the purposes of the transactions at issue. Under the liberal notice pleading rules, these allegations are sufficient to state a claim of control under Section 15 of the Securities Act.

CONCLUSION

**\*5** For the forgoing reasons, JPMC's motion to dismiss is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1875445, Fed. Sec. L. Rep. P 93,358

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Lindelow v. Hill, Not Reported in F.Supp.2d (2001)

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

2001 WL 830956
United States District Court,
N.D. Illinois, Eastern Division.

Craig W. LINDELOW, Robin
Brisker, and Wilcris Trading,
L.L.P., individually and on behalf of
others similarly situated Plaintiffs,
v.
Jay HILL, K. Shan Padda, Stephen L.
Holden, and John Reilly, Defendants.

No. 00 C 3727.
|
July 20, 2001.

*MEMORANDUM OPINION AND ORDER*

HOLDERMAN, J.

 **\*1** Plaintiffs Craig Lindelow, *et. al.,* filed a class action suit on behalf of all persons who purchased shares of Sabratek Corporation ("Sabratek") between July 6, 1999 and October 6, 1999 against defendants Jay Hill, K. Shan Padda, Stephen L. Holden, and John Reilly alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), § 78t(a). All four defendants have individually filed motions to dismiss,[1] arguing that plaintiffs have failed to allege violations of § 10(b) and § 20(a) generally, and that plaintiffs have failed to state a claim as to them, individually. For the following reasons, this court finds that plaintiffs have stated a claim under § 10(b) and § 20(a). This court also finds that plaintiffs have stated a claim as to each individual defendant under both § 10(b) and § 20(b). Defendants' motions to dismiss are therefore DENIED.

---

1    Defendants all initially filed motions to dismiss which were put on hold pending efforts by the parties to resolve their differences without litigation. When efforts at settlement proved unsuccessful, the defendants all submitted what they called "refiled" motions to dismiss. Accordingly, this order applies to defendants' refiled motions. Defendants' original motions are moot.

*BACKGROUND*

This securities class action litigation arises out of a press release ("the press release") issued by Sabratek on July 6, 1999 concerning its acquisition of a company called "Moon" and Moon's plans to and work towards launching an Internet portal entitled "OneMedPlace.com." According to plaintiffs' allegations, through early 1999, Moon's business was to develop remote clinical medical monitoring computer technology that would be operated through a "closed" network on non-Internet telephone line connections. (Pl.Comp.¶¶ 28-31.) In or about July 1997, Moon and Sabratek entered into a licencing and an option agreement. Under the option agreement, Moon could not make any meaningful decisions or spend money without Sabratek's consent. (Pl.Comp.¶ 30.) Throughout 1998, Moon continued to work on the development of its clinical software. On or about January 23, 1999, Sabratek used its influence over Moon to replace its CEO with defendant Hill. Hill was hand-picked by defendant Padda, Sabratek's CEO, and reported to defendant Holden even before Moon was formally acquired in 1999. (Pl.Comp.¶ 32.)

In February 1999, defendants Padda, Holden, and Hill caused Moon to abandon Moon's development efforts on clinical software and pursue a different business plan-trying to develop an Internet healthcare "portal," later dubbed OneMedPlace.com. (Pl.Comp.¶¶ 33-36.) Unlike the clinical software, OneMedPlace.com was to be an open Internet system geared toward administrative, not clinical, applications. As such, according to plaintiffs, the change represented a fundamental shift in Moon's business plans which bore no relation to Moon's prior work on clinical applications. (Pl.Comp.¶ 34.) Because it required the development of interfaces to doctors, HMOs, hospitals, and other entities, all of Moon's healthcare portal work for OneMedPlace.com had to be done from scratch beginning on or after February 1999. (Pl.Comp.¶ 34.)

According to plaintiffs' allegations, Moon's programers and other technical employees reacted to the internal February 1999 announcement of the change in Moon's business plan by informing Moon management that the proposed Internet healthcare portal could not possibly be brought to fruition in 1999 or any time soon thereafter. (Pl.Comp.¶ 35.) This conclusion was later confirmed by consultants hired by Sabratek in connection with OneMedPlace.com. (Pl.Comp.¶ 53(3).)

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

**\*2** By early July 1999, Moon management had not firmly settled on what its OneMedPlace.com Internet concept would offer. As of July 6, 1999, the day that OneMedPlace.com was introduced to the investing public as a "product," there were no concrete specifications or requirements, no technical development work had been completed, and not a single line of source code had been written for OneMedPlace.com. (Pl.Comp.¶ 37.)

The press release announcing Sabratek's acquisition of Moon which is the focus of this litigation was released by Sabratek on July 6, 1999. The press release's headline stated "Sabratek acquires Moon Communications, Internet Portal/ ASP Company." The portions of the press release which are at issue here stated:

> With Sabratek's involvement and guidance since the execution of a product licensing agreement, Moon has been evolving into a vertical healthcare portal with characteristics of an Application Service Provider (ASP).

The press release also quoted defendant Hill, Moon's CEO, as stating:

> 'We are very excited about, and are getting ready for, our controlled market launch of OneMedPlace.com' Moon's internet portal, said Jay Hill, Moon's CEO. 'We have until now remained very much in stealth mode, as we incorporated knowledge gained from trial sites to make our system as robust as it could be. Over the course of 1999, we look forward to systematic implementation of our product and rollout strategy. Our goal is to make OneMedPlace.com the de facto web based network of choice for physicians, patients, providers and payors.'

(Pl.Comp.¶ 53.) The press release concluded with the following statement: "This press release contains forward-looking statements. The actual results may differ materially from those projected in the forward-looking statements." The press release went on to advise investors that additional information concerning factors which could cause the actual results to differ from those contained in the forward-looking statements could be found in Sabratek's publically filed periodic reports.

Plaintiffs allege that the above statements, among others, were false and misleading at the time they were made for several reasons, including: (1) there were no OneMedPlace.com trial sites; (2) there was no OneMedPlace.com "system," but merely a dummy demo version with woefully minimal content; (3) given the lack of any kind of operational system and the enormous hurdles involved in creating one, there was no reasonable possibility of a "systematic implementation" or "product rollout" or "market launch" of OneMedPlace.com in 1999 (as Moon's own technical personnel had advised defendant Hill); (4) no material, concrete steps had been taken to evolve Moon into a "vertical healthcare portal"; and (5) Moon had no near-term ability to assist in the creation of an "all-encompassing, interactive, web-enabled, on-line medical network" linking multiple constituents in the healthcare arena. (Pl.Comp.¶ 53.)

## STANDARD OF REVIEW

**\*3** In ruling on a motion to dismiss, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2 (1977). The court must view those allegations in the light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Dismissal under Rule 12(b)(6) is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957); *see also Panares v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 791 (7th Cir.1996).

## ANALYSIS

I. *Plaintiffs' Fraud Allegations under Fed.R.Civ.P. 9(b) and the PSLRA Generally*

SEC Rule 10b-5, promulgated under Section 10(b) of the Securities Exchange Act of 1934, prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. To state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries. *In re HealthCare Compare Corp. Securities Litig.,* 75 F.3d 276, 280 (7th Cir.1996). In addition, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." Fed.R.Civ.P. 9(b). With respect to securities fraud cases, Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support: "the complaint ... must afford a basis

**Lindelow v. Hill, Not Reported in F.Supp.2d (2001)**

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

for believing that plaintiffs could prove scienter." *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990). The Seventh Circuit has held that a sufficient level of factual support may be found where the circumstances are pled "in detail." *Id.* at 627. "This means the who, what, when, where, and how" of the statement. *Id.*

Each defendant separately argues that plaintiffs have failed to allege violations of § 10(b) of the Securities Exchange Act of 1934 because they have failed to allege both scienter and material misrepresentations or omissions which are not covered by the Private Securities Litigations Reform Act's ("PSLRA") "safe harbor" provision for forward-looking statements.

### A. *False and Misleading Statements*
Defendants argue that the statements contained in the press release are not actionable because, read literally, word-by-word, the statements are true. For example, Hill argues that the press release's reference to "trial sites" was intended to refer to the non-Internet version of Moon's virtual hospital room's trial sites, not OneMedPlace.com trial sites. This court rejects defendants' arguments. Though some statements complained of by plaintiffs could be read as literally accurate, plaintiffs have sufficiently alleged that the statements were misleading in context. Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers. *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2nd Cir.1990); *Kaufman v. Motorola, Inc.,* 1999 WL 688780,*5 (N.D.Ill. Apr. 16, 1999) (same). In assessing the sufficiency of plaintiffs' allegations for purposes of defendants' 12(b)(6) motion to dismiss, a court must consider the statements at issue both individually *and* collectively in the context in which they are made. *In re Next Level Sys., Inc.,* 1999 WL 387446,*4 (N.D.Ill. Mar. 31, 1999). This court finds plaintiffs' allegations sufficient to show that the statements at issue, like those in *Next Level,* were misleading in the context in which they were made-as an announcement of a new, Internet-based portal.

**\*4** In addition, the press release is not protected from the securities laws merely because it speaks to matters of opinion and hope. In some circumstances, statements of goals can, in context, be read by the investor to imply that the company

had a reasonable basis for its opinion. *See Roots Partnership v. Lands' End,* 965 F.2d 1411, 1417 (7th Cir.1992) ("Although defendants' alleged statements were contingent by their very nature, a reasonable investor could have taken them to imply that defendants' had a reasonable basis for stating that Lands' End's earnings goal was attainable in fiscal 1990."); *see also Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1405-06 (7th Cir.1995) ("The plaintiffs' claim alleges that, contrary to what the registration statement says, such plans did not exist and were not under consideration.... The dispute over the existence or nonexistence of these 'plans' is not the type of 'soft information' to which the bespeaks caution doctrine applies."). While "mere sales puffery is not actionable under Rule 10b-5," statements of opinion will be actionable if it is possible defendants "said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir.1997). Plaintiffs have alleged that defendants made many of the alleged statements of "strategy" and "goals" while knowing or recklessly ignoring the fact that the stated goals were not attainable. Those allegations are sufficient to state a claim that defendants made false and misleading statements.

### B. *Forward-looking Statement Exception*
Defendants also argue that their statements are not actionable because they are "forward-looking statements," and thus protected by the PSLRA's "safe harbor" provision. This court does not agree. First, to the extent plaintiffs allege statements of "opinion" which, in context, appear to rest upon historical fact, those statements are not protected by the "forward-looking statement" safe harbor because they were not actually forward-looking. Second, to the extent the press release contains pure forward-looking statements of goals and projections, those statements were not accompanied by the "meaningful cautionary language" required to bring them within the PSLRA's safe harbor.

Cases involving forward-looking statements are unique. "Predictions of future performance are inevitably inaccurate because things almost never go exactly as planned," *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993). Thus, companies making forward-looking statements are afforded a safe harbor: plaintiffs must allege "specific facts which illustrate that [the company's] predictions lacked a reasonable basis." *Id.* at 1468; *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir.1993) ("If those statements had a reasonable basis when made, the defendants did not commit fraud."). Projections which turn out to be inaccurate are not fraudulent

Lindelow v. Hill, Not Reported in F.Supp.2d (2001)

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

simply because subsequent events reveal that a different projection would have been more reasonable. *Grassi v. Information Resources, Inc.,* 63 F.3d 596, 599 (7th Cir.1995). However, the PSLRA provides a safe harbor for class actions based on forward-looking statements only if and to the extent the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). To be effective, the cautionary language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Harden v. Raffensperger, Hughes & Co., Inc .,* 65 F.3d 1392, 1404 (7th Cir.1995).

**\*5** Plaintiffs have alleged sufficient facts to take the press release out of the PSLRA's forward-looking statement safe harbor. First, plaintiffs allege several statements which, while appear to be forward-looking, were not actually strictly forward-looking in the context in which they were made. For example, the press release's statement that Moon was "getting ready for" the market launch of OneMedPlace.com, in context, could reasonably be read to be premised on the existence of some material steps and bona fide plans for a product rollout in 1999. Plaintiffs have alleged that neither existed. *See In re Ribozyme Pharm., Inc. Sec. Litig.,* 119 F.Supp.2d 1156, 1163 (D.Colo.2000) ( "Defendants' statements that Angiozyme had made 'both clinical history and industry news,' and a 'history-making leap,' are not necessarily forward-looking *given the full context* of the Press Release.") (emphasis added). Plaintiffs have also alleged that no reasonable basis existed for defendants' forward-looking statements at the time they were made, such that they are not protected by the forward-looking statements safe harbor.

Defendants also argue that the press release's forward-looking statements are protected because they were accompanied by meaningful cautionary language. Specifically, the press release stated: "This press release contains forward-looking statements. The actual results might differ materially from those projected in the forward-looking statements." The warning also stated that additional information concerning factors that could cause actual results to materially differ from the forward-looking statements was contained in Moon's publicly filed records. The first part of the "cautionary language" is not sufficient to protect the statements because it is vague and does not advise the investor of any particular risks associated with Moon's ability (or inability)

to launch OneMedPlace.com in 1999. "Vague or boilerplate disclaimers advising that a particular investment has risks generally will not suffice." *United States v. Morris,* 80 F.3d 1151, 1167 (7th Cir.1996). The second part of the "cautionary language" purports to provide more information, and refers the reader to Moon's publically filed records. However, defendants do not even attempt to argue that those records contain any information as to how the launch of OneMedPlace.com might be delayed, nor that it had not even entered a substantive planning stage, as plaintiffs allege. "[C]autionary language must be substantive and it must be tailored to the specific future projections, estimates and opinions' that are alleged to be misleading." *Id.; see also Helwig v. Vencor, Inc.,* 251 F.3d 540, 559 (6th Cir.2001) ("[C]autionary statements must be substantive and tailored to the specific future projections, estimates, or opinions ... which the plaintiffs challenge.") (internal quotations omitted). Defendants' proffered cautionary statements are boilerplate and not tied to the specific future projections made by defendants and thus fall into the same category as those discussed and rejected in *Morris.* As such, the press release is not protected by the PSLRA's safe harbor for forward-looking statements.

C. *Statements Attributable to Each Individual Defendant*
**\*6** Each defendant argues that plaintiffs have not alleged sufficient facts to show that the allegedly false or misleading statements were attributable to him. However, the press release directly quotes three of the four defendants-Padda, Reilly, and Hill. This court finds plaintiffs' allegations, including the attached allegedly false and misleading press release, sufficient to tie Padda, Reilly, and Hill to the allegedly fraudulent statements. *In re Newbridge Networks Sec. Litig.,* 926 F.Supp. 1163, 1174 (D.D.C.1996) ( "Furthermore, at least one press release specifically quoted defendant Sommerer, and another quoted defendant Matthews ... These allegations would seem to tie [the individual defendants] to the fraud itself.") (*quoting Cammer v. Bloom,* 711 F.Supp. 1264, 1295 (D.N.J.1989).[2] Plaintiffs argue that the press release is attributable to Holden, in addition to the quoted defendants, under the "group published" document doctrine. For the reasons explained more fully below, concerning all defendants' scienter, this court finds that plaintiffs have adequately alleged that Holden is responsible for the press release, as well. Plaintiffs allege that Holden was Sabratek's president and that Hill, who is directly quoted in the press release and whom plaintiffs allege had knowledge that OneMedPlace.com could not be launched in 1999,

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

reported directly to him. Plaintiffs also state that they have subsequently learned that Holden was one of three Moon board members as of the date of the July 6, 1999 press release. Finally, plaintiffs allege that, by the time of the press release, Moon' business essentially was OneMedPlace.com. As such, plaintiffs have alleged sufficient facts to tie the July 6, 1999 press release to Holden.

2    While defendant Hill argues that *Newbridge Networks* is inapposite because the court made the statement in the context of § 20(b) control person liability, this court finds the court's statement in *Newbridge Networks,* that a defendant's quoted language in an allegedly false or misleading statement seems to tie the defendant to the fraud, to be equally apposite in determining to whom false and misleading statements are attributable in the context of § 10(b) liability.

### D. *Scienter as to Each Individual Defendant*

Each defendant argues that plaintiffs have not met the PLSRA's scienter pleading requirements as to each of them. Plaintiffs respond by arguing that the group pleading doctrine applies to the Securities Exchange Act of 1934, and that in any event, plaintiffs have sufficiently plead facts regarding each defendant's scienter to satisfy the PSLRA's scienter pleading requirement.

The PSLRA requires that: "In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The overwhelming majority of courts, particularly in this District, have adopted the Second Circuit's formulation for alleging scienter. *See, e.g., Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 936-37 (N .D. Ill.1999); *Miller v. Material Sci. Corp.,* 9 F.Supp.2d 925, 927 (N.D.Ill.1998). Under that standard, a plaintiff may allege two types of facts to establish the required "strong inference" of scienter: (1) facts showing the defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Danis,* 73 F.Supp.2d at 937 (citing *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2nd Cir.1999); *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2nd Cir.1994)).

**\*7** Here, plaintiffs allege facts which they contend show strong circumstantial evidence of conscious misbehavior or recklessness. This court agrees that plaintiffs' allegations of what was represented about Moon and OneMedPlace.com and the facts, including what defendants were told regarding the feasability of launching the site in 1999 and lack of preparation toward that goal, supports a strong inference of scienter. *See In re 2TheMart.com, Inc. Sec. Litig.,* 114 F.Supp.2d 955, 960 (C.D.Cal.2000) (finding strong circumstantial evidence of deliberate recklessness where defendants made press releases regarding stage of development which did not mesh with reality). However, in order to sufficiently state a claim under the PSLRA, the complaint must allege facts showing *each* defendant acted with the required state of mind. Plaintiffs argue that: (1) the false and misleading statements alleged were so fundamental to the core operation of Moon that they can be attributed to defendants, who were all top management at Moon and/or Sabratek, its corporate parent; and (2) that they have alleged sufficient facts to demonstrate that each individual defendant was aware of the falsity of the statements, yet contributed to the press release nonetheless. This court addresses each argument in turn.

### 1. *Defendants' Positions as "Top Management"*

Plaintiffs and defendants debate the level of particularity required to meet the PSLRA's requirement that "the complaint ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Judges of this District have likewise been unable to agree as to what is required to attribute fraudulent statements to corporate directors. *See Dardick v. Zimmerman,* 2001 WL 735580,*1 (N.D. Ill. June 27, 2001) (recognizing division between courts in this District as to whether "group pleading" survived the enactment of the PSLRA). As pointed out by Judge Milton Shadur of this District, the schism has not generated any opinion from a source that makes precedent because pleading issues do not find their way to appellate court decisions. *See id.* The competing views among district courts are exemplified here, as they were in *Dardick,* by plaintiffs' reliance on an opinion by Judge Suzanne Conlon in *Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 936-39 (N.D.Ill.1999), and by defendants' counter-reliance on the opinion of Judge Ruben Castillo in *Chu v. Sabratek Corp.,* 100 F.Supp.2d 827, 835-37 (N.D.Ill.2000) (previous litigation against Sabratek and its officers for different alleged misrepresentations). This court concurs with Judge Shadur that, "[w]hatever side of that

Lindelow v. Hill, Not Reported in F.Supp.2d (2001)

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

disagreement might seem more persuasive as an abstract matter, there is of course no question that it is not fatal for any complaint to collectivize 'defendants' in certain respects." *Dardick,* 2001 WL 735580 at [*]1.

 **\*8** Here, as in *Dardick,* plaintiffs' allegations of misrepresentations concern matters fundamental to the operations of Sabratek and Moon, namely Moon's ability (or inability) to conduct or even "get ready for" a market launch of OneMedPlace.Com in 1999. According to plaintiffs' allegations, OneMedPlace.com was virtually the only business of Moon by mid-1999, and constituted a "core project" of Sabratek, Moon's corporate parent. In *Dardick,* Judge Shadur found it "highly significant" that the alleged misrepresentation was the corporation's "deep and pervasive corporate illness-the existence of LINC's extraordinarily serious financial difficulties" and distinguished the facts from *Chu,* in which the alleged misrepresentation concerned allegedly flawed accounting practices of which a limited group of corporate managers would be expected to know. *Dardick,* 2001 WL 735580 at [*]3. This case is thus like *Dardick,* and unlike *Chu,* in that it is strongly inferential that every officer or director of Moon and Sabratek either had the knowledge of the feasibility of launching OneMedPlace.com in 1999, or, if not, that his failure to have such knowledge equated to reckless disregard. *See id.* "[N]othing in the Act or in any claimed abolition of a 'group pleading doctrine' renders such allegations insufficient as a matter of law." *Id.*

### 2. *Statements Attributable to Each Defendant*

Plaintiffs have also alleged sufficient facts to show that each individual defendant was responsible for the statements contained in the press release, and that each defendant was reckless as to the truth of those statements. As explained above, each defendant was quoted in the press release, with the sole exception of Holden.

Reilly argues that he cannot be held accountable for the press release statements because he was employed by Sabratek for only two months before the press release was issued. However, Reilly was directly quoted in the release, and, to the extent Reilly did not know the extent of Moon's capabilities to launch OneMedPlace.com in 1999, he could be found to have been reckless to allow his name to be used.

Hill argues that he cannot be held accountable because Sabratek, not Moon, issued the release, and he had no control over Sabratek as a controlling person at Moon. However, Hill

is directly quoted in the press release, and therefore plaintiffs have alleged that he made the statement, was aware that it lacked a factual basis, and was aware of facts which directly undermined his quoted words.

Defendant Padda argues that plaintiffs have failed to allege scienter as to him because they did not allege that Padda sold any stock. Padda misreads the pertinent case law. The Second Circuit's test, adopted by certain judges in this District, states that a plaintiff may allege *either* facts showing the defendants had both motive and opportunity to commit fraud *or* facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Danis,* 73 F.Supp.2d at 937. Here, plaintiffs rely on the later type of evidence, and have no obligation to allege motive in order to survive a motion to dismiss.

 **\*9** Holden argues that plaintiffs have alleged no more than his position as a corporate director to impute liability. However, this court has already found that plaintiffs have alleged sufficient facts to show that Holden could be responsible for the press release, and that he was in a position to know the truth, which was, according to plaintiffs' allegations, contrary to the statements in the press release.

In summary, plaintiffs have alleged that false and misleading statements were made, that each and every defendant was responsible for the allegedly false and misleading statements, and that each and every defendant acted with actionable scienter required by the PSLRA. Whether or not the statements truly were false or misleading, defendants were responsible for the statements, or defendants were reckless in making the statements, are facts which can be elicited during discovery. However, for now, plaintiffs have stated a claim against defendants for violations of § 10(b). As such, each defendant's 12(b)(6) motion to dismiss plaintiffs' § 10(b) claims must be denied.

### II. *Control Person Liability under Section 20(a)*

Reilly and Hill argue that plaintiffs have failed to allege facts to establish control liability under § 20(a). Section 20(a) of the 1934 Act states: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15

2001 WL 830956, Fed. Sec. L. Rep. P 91,483

U.S.C. § 78t(a). In this Circuit, a claim for controlling person liability must plead two elements: (1) that the defendant actually exercised general control over the operations of the entity; and (2) that the defendant had the power or ability to control the specific acts constituting the primary violation. *Donohoe v. Consol. Operating & Prod. Corp.,* 982 F.2d 1130, 1138-39 (7th Cir.1992). Ordinarily, whether a defendant is a "controlling person" under § 20(a) is a question of fact that cannot be determined at the pleading stage. *In re Discovery Zone Sec. Litig.,* 943 F.Supp. 924, 943 (N.D.Ill.1996).

This court finds that plaintiffs have adequately alleged control liability under § 20(b) as to all defendants, including Reilly and Hill. As for Reilly, plaintiffs allege that he acted as CFO of Sabratek and exercised general control over the operations of Sabratek, the corporation which issued the press release. Plaintiffs also allege that Reilly, as well as Hill, controlled Moon and had the power to influence the statements made in the July 6, 1999 press release. As for Hill, plaintiffs allege that he acted as CEO, president, and chairman of Moon. Plaintiffs have thus alleged that both Reilly and Hill were "control persons" because of their status as top-ranking company officials whose high level positions necessarily involve general oversight and direction. *See Discovery Zone.,* 943 F.Supp. at 943. Plaintiffs have also alleged that both Reilly and Hill acted "knowingly" in issuing the press release. As such, plaintiffs have stated a claim for control person liability against Hill and Reilly, and their motions to dismiss plaintiffs' § 20(b) claims must be denied.

III. *Claim Preclusion of Certain Plaintiffs' Claims against Defendant Padda*

 **\*10**  Finally, Padda argues that because plaintiffs Lindelow and Wilcris Trading, LLC ("Wilcris") have already pursued a lawsuit against Padda and other former officers of Sabratek arising out of their purchase of Sabratek securities (the *Chu* suit), they are barred by claim preclusion from pursuing this litigation. Padda argues that the claims are barred because Lindelow and Wilcris could have raised their claims in that litigation. In support, Padda cites *Roboserve, Inc. v. Kato Kaguku Co.,* 121 F.3d 1027, 1034 (7 th Cir.1997), in which the

court stated "[r]es judicata ... operates not only as a bar to any further litigation of matters decided in the prior action, but also as to any issues which could have been raised." However, in *Roboserve,* the court also stated that for res judicata to apply in federal court, there must be an identity of the causes of action, and that "a cause of action" consists of a single core of operative facts which give rise to a remedy. *Id.* The Seventh Circuit has defined "transaction" to mean "a single core of operative facts which gives rise to a remedy." *See Andersen v. Chrysler Corp.,* 99 F.3d 846, 852 (7 th Cir.1993) (allowing subsequent suit between same parties for plaintiffs' post-termination benefits where second case concerned different benefits).

Here, the previous *Chu* suit, upon which Padda relies, concerned Sabratek's flush syringe business and its improper accounting. *See Chu v. Sabratek Corp.,* 100 F.Supp.2d 827, 830 (N.D.Ill.2000). This case, by contrast, is limited to Sabratek's involvement with Moon and OneMedPlace.com. While both suits involve Lindelow and Wilcris's purchase of Sabratek securities, the claims arise out of completely different sets of operative facts. Accordingly, Lindelow and Wilcris's present claims are not barred by claim preclusion.

*CONCLUSION*

For all the reasons stated, defendants Jay Hill, K. Shan Padda, Stephen L. Holden, and John Reilly's "refiled" motions to dismiss are all DENIED. The defendants' original motions to dismiss are moot. The parties are strongly encouraged to discuss settlement of this case. All defendants are to file an answer to plaintiffs' complaint by August 3, 2001. Counsel for the parties are to confer pursuant to Federal Rule of Civil Procedure 26(f) by August 7, 2001 and file a completed Form 35 by August 22, 2001. This case is set for report on status at 9:00 a.m. on August 28, 2001.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 830956, Fed. Sec. L. Rep. P 91,483

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

2012 WL 1131935
United States District Court,
S.D. New York.

Thomas McKENNA, individually
and on behalf of itself and all
others similarly situated, Plaintiffs,

v.

SMART TECHNOLOGIES
INC., et al., Defendants.

No. 11 Civ. 7673(KBF).
|
April 3, 2012.

*OPINION & ORDER*

KATHERINE B. FORREST, District Judge.

 **\*1** Lead Plaintiff the City of Miami General Employees'
and Sanitation Employees' Retirement Trust ("plaintiff" or
"City of Miami") brings this putative class action against
defendants SMART Technologies, Inc. ("SMART"), various
of SMART's officers and directors, and SMART's co-
founders (who, as minority shareholders prior to the initial
public offering ("IPO"), appointed one member each to
SMART's four-person pre-IPO board of directors)—*i.e.,* Intel
Corporation ("Intel") and Apax Partners L.P. with Apax
Partners Europe Managers Ltd. (collectively, "Apax" or the
"Apax Defendants"). Plaintiff alleges that the registration
statement (the "Registration Statement") and prospectus
(the "Prospectus" and collectively with the Registration
Statement, the "Offering Documents") filed in connection
with SMART's July 14, 2010 initial public offering contained
materially false and misleading statements in violation of
sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the
"Securities Act").

Defendants have jointly moved to dismiss plaintiff's
Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of
the Federal Rules of Civil Procedure.

For the reasons that follow, defendants' motion is GRANTED
IN PART and DENIED IN PART.

## BACKGROUND

For purposes of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded allegations in the Amended
Complaint and draws all reasonable inferences in plaintiff's
favor. *See Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10,
14 (2d Cir.2001). The Court also considers the Securities
and Exchange Commission ("SEC") filings that plaintiff
references in the Amended Complaint—namely, SMART's
Prospectus relating to the IPO, filed with the SEC on July
15, 2010. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007);
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d
Cir.2007).

## I. THE PARTIES

 A. *Plaintiff*
Lead Plaintiff City of Miami manages pension assets
on behalf of Miami's municipal general and sanitation
employees. (Am.Compl.(Dkt. No. 81) ¶ 17.) City of Miami
purchased SMART common stock in the IPO and in the
post-IPO secondary market or traceable to the Offering
Documents, over the period of time from July 14, 2010
through December 14, 2010. (*Id.; see also id.* Ex. A at 2.)

 B. *Defendants*
Defendant SMART is a Canadian corporation that designs,
develops, and sells interactive technology products and
solutions. (Am.Compl.¶ 18.) *See also* SMART Techs. Inc.,
Prospectus (Form 424B4) at 1 (July 15, 2010) (hereinafter
"Prosp.") (Decl. of Andrew Stern (Dkt. No. 102) Ex. A).
SMART is best known for its interactive whiteboards—
the "core" of SMART's interactive technology solutions.
(Am.Compl.¶ 18.) *See also* Prosp. at 1. By SMART's own
account, interactive whiteboards, which SMART introduced
in 1991, "combine the simplicity of a whiteboard and the
power of a computer," and allow the user via touch to "control
computer applications, access the Internet, write in digital ink
and save and share work." Prosp. at 1.

 **\*2** The "Individual Defendants"—Nancy L. Knowlton,
G.A. (Drew) Fitch, David A. Martin, Salim Nathoo, Arvind
Sodhani, Michael J. Mueller, and Robert C. Hagerty—are
SMART's current or former officers and directors. During
the relevant time period, Knowlton was SMART's Chief
Executive Officer; Fitch was SMART's Chief Financial

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

Officer and principal financial and accounting officer; Martin was Chairman of SMART's Board of Directors; and Nathoo, Sodhani, Mueller, and Hagerty were directors on SMART's board. (Am.Compl.¶¶ 19–25.) Each signed the Registration Statement, except for Mueller and Hagerty who were named therein with consent "as about to become [ ] director[s]" of SMART. (*Id.* ¶¶ 19–25.)

The Apax Defendants advised or managed funds that held more than 56 million shares of SMART stock prior to the IPO, which amounted to approximately 47 percent of SMART's total voting power at the time of the IPO. (Am.Compl.¶ 27.) Apax sold almost 20 million of its shares in the IPO. (*Id.*) Defendant Nathoo was one of Apax's partners. (*Id.*)

Intel owned more than 27 million shares of SMART's pre-IPO stock, which amounted to 23.5 percent of SMART's total pre-IPO voting power. (*Id.* ¶ 28.) Intel sold 10 million of its shares in the IPO. (*Id.*)

The third primary shareholder of SMART's pre-IPO stock was the wholly-owned company of SMART's co-founders, IFF Holdings Inc. ("IFF"), which held shares totaling just under 30 percent of SMART's total voting power. Prosp. at 100. IFF is not a party to this action.

II. THE IPO
On July 14, 2010, SMART announced that it would offer to the public 38.83 million shares of Class A Subordinate Voting Shares at $17.00 per share, with trading on the NASDAQ to begin the following day. (Am.Compl.¶ 32.) SMART offered the shares pursuant to (a) the Registration Statement filed with the SEC on June 24, 2010, amended initially on June 28, 2010 and then again on July 12, 2010, and effective July 14, 2010; and (b) the July 14, 2010 Prospectus which was incorporated into the Registration Statement and filed with the SEC on July 15, 2010. (*Id.* ¶ 33.) SMART did not itself sell the shares to the public, but rather sold them to a syndicate of underwriters—Morgan Stanley & Co., Inc., Deutsche Bank Securities Inc., and RBC Dominion Securities Inc—who offered them to the public.[1] Prosp. at 129–30.

[1]   The underwriters were originally named as defendants when this action was first filed (Compl.(Dkt. No. 1)), but subsequently were dismissed voluntarily (Dkt. No. 71).

III. THE ALLEGED MISREPRESENTATIONS AND OMISSIONS

Plaintiff alleges that the Offering Documents contained material misstatements of fact or omitted material facts regarding four topics: (a) demand for SMART's "core" interactive whiteboards; (b) the demand for and benefits of SMART's then recently-acquired NextWindow business; (c) SMART's ability to sell its whiteboards to corporate or foreign clients; and (d) the status of SMART's internal enterprise resources planning system ("ERP"). Plaintiff's essential claim is that defendants were aware of specific facts regarding the four topics, but failed to disclose them in the Offering Documents, rendering the Offering Documents false and misleading.

A. *Demand for Interactive Whiteboards*
**\*3** Plaintiff alleges that the Offering Documents contained positive statements regarding the growing demand for SMART whiteboards when, at the time of the IPO, defendants affirmatively knew that demand for whiteboards was already materially declining. (Am.Compl.¶¶ 63–64.)

Specifically, plaintiff alleges that SMART benefitted from the American Recovery and Reinvestment Act of 2009 ("ARRA"),[2] which sought to "preserve and create jobs and promote economic recovery," among other things, by infusing public funds into the economy—most relevant here, financial aid for local school districts, including for Enhanced Education Through Technology Program. *See*Pub.L. 111–5, § 3(a)(1). (Am.Compl.¶ 45.) According to plaintiff, although schools used government stimulus funds to purchase SMART's interactive whiteboards (usually only once) (Am.Compl.¶¶ 45, 46, 65), the Prospectus allegedly failed to disclose the "known trend" (as of the IPO) of decreased educational spending as ARRA funding began to dry up. (Am.Compl.¶¶ 37, 65.) *See also* Prosp. at 44, 50 ("demand for our core products *has been increasing* as a result of a general expansion of the market for interactive whiteboards and other complementary products") (emphasis added).

[2]   Congress passed ARRA on February 17, 2009, which President Obama signed into law four days later. (Am.Compl.¶ 45.)

Plaintiff alleges, through four confidential witnesses ("CWs"), that as much as a year prior to the IPO and by at least March 2010—four months prior to the IPO—SMART was encountering a " 'big slowdown' " in sales, which was confirmed by a "decrease in forecasted revenues from SMART's training group in July 2010"—*i.e.,* the month

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

SMART made its public offering. (Am. Compl. ¶¶ 40, 46 (quoting CWs); *see generally id.* ¶¶ 40–46.) According to CW4, each school used ARRA funding to purchase interactive whiteboards once, and thus, as ARRA funding wound down prior to the IPO, SMART's sales already had decreased. (*Id.* ¶ 43.) On those grounds, as alleged through CW1, SMART *"knew* that the future of the [stimulus] program was uncertain," and thus, that the sales growth SMART had enjoyed prior to the IPO "wasn't going to continue." (*Id.* ¶ 46 (emphasis added).)

Immediately following the allegedly misleading "demand" language, the Prospectus discloses that "the education market, which represents an estimated 85% of our revenue base, has been aided by various government economic stimulus programs in fiscal 2010 as governments undertook spending initiatives .... " Prosp. at 50. SMART credits those initiatives with "support[ing] the growth in technology spending in education and the adoption of [its] technology in several markets." *Id.; see also id.* at 16.

SMART cautioned investors that a decrease in "technology spending in education" "may adversely impact [its] revenue." Prosp. at 16; *see also id.* at 4. SMART acknowledged that ARRA funding was limited, warning, "If state and local governments are unable to secure an alternative source of funds upon the depletion of the funds provided under the ARRA, we could experience a slowdown of revenue growth as a result of that lack of funding." *Id.* at 16.

### B. *Demand for NextWindow*

 **\*4** Three months prior to the IPO, in April 2010, SMART acquired Next Holdings Limited ("NextWindow"), a company that "designs and manufactures interactive touch components to manufacturers of interactive displays and PCs," for $82 million. (Am. Compl. ¶ 54 .) *See also* Prosp. at 4, 45. Plaintiff alleges that the acquisition was motivated by SMART's desire to resolve a patent dispute with NextWindow—a fact never disclosed in the Offering Documents. (Am.Compl.¶¶ 54, 83.)

As of July 14, 2010, there were no touch applications for Windows 7—*i.e.,* the program through which NextWindow's touch components are run. (*Id.* ¶ 55.) The Offering Documents, however, state that "the Microsoft Windows 7 operating system released in October 2009 supports touch capabilities for computer capabilities for computer displays." Prosp. at 69 (quoted in Am. Compl. ¶ 79).

Although the lack of Windows 7 touch applications allegedly weakened the "demand for NextWindow's touch-enabled products" "in the period leading up to the IPO" (Am.Compl.¶ 55), it is alleged that SMART touted a "strong and growing demand for NextWindow products" in the Offering Documents (*id.* ¶ 78). Plaintiff purports that even though the lack of touch applications for Windows 7 in the period leading up to the IPO purportedly "was known in the industry," "was known to SMART," and was known to the public (*i.e.,* citing a July 12, 2010 msnbc.com article) at the time of the IPO, defendants "had a duty to disclose" the impact of that fact on SMART's business. (*Id.* ¶¶ 55, 83; *see also id.* ¶¶ 84, 85.)

### C. *Ability to Sell to Corporate and/or Foreign Clients*

According to plaintiff, in reliance upon CWs, the Offering Documents contained misrepresentations and omissions related to SMART's ability to expand sales of its core products to corporate clients and into foreign markets. (*See* Am. Compl. ¶ 47.) SMART allegedly provided an overly optimistic view of its ability to expand into corporate and foreign markets when it knew that it was facing an uphill battle to do so, had not invested the necessary resources, or at least had faced setbacks that should not have allowed it to paint the rosy picture it did in the Offering Documents. (*Id.* ¶¶ 37, 50–53, 67, 71, 73, 75.) Plaintiff takes particular umbrage at the representation that SMART sold 100 interactive whiteboards to British Telecommunications plc ("BT") "for use by more than 3,000 developers," Prosp. at 77, but did not disclose that SMART originally had pitched a deal that would include BT's purchase of 1,500 SMART whiteboards for use by 100,000 users that eventually was negotiated down to the terms of the disclosed deal. (Am. Compl. ¶ 52; *see also id.* ¶ 74.)

The Prospectus contains risk disclosures in this regard. SMART forewarned potential investors that the U.S. and British market for interactive learning products was becoming "more saturated," which would lead to a decrease in the "growth rate of [SMART's] revenue," and thus, SMART would necessarily have to expand into additional foreign markets. Prosp. at 16. SMART disclosed that expansion into those new overseas markets could require development of additional "customized solutions," which (implicitly) had yet to be undertaken. *See id.* SMART further disclosed that it faced "lengthy and unpredictable sales cycles in foreign markets," including, in some instances, "indefinite deferrals of purchases or cancellations of requests for proposals." *Id.* SMART even acknowledged the questions about its ability to expand into foreign markets in its general risk

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

disclosures about managing its overall growth, stating that "the difficulties and risks associated with our growth could be exacerbated by our expansion into foreign markets." *Id.* at 12.

**\*5** With regard to developing its network in the corporate sector, SMART disclosed that such expansion would require "develop[ing] new distributor and dealer relationships," in which SMART "may not be successful." *Id.* at 21.

### D. *ERP*

SMART's ERP system purportedly "integrate[s] the Company's finance and accounting department with its sales, manufacturing and service departments" in an effort "to provide a central repository of information that is shared among the various departments in order to smooth the flow of information across the organization." (Am.Compl.¶ 57.) It is alleged that ERP "was materially deficient" from the time of its implementation in 2008 (*id.* ¶ 58), and any efforts to correct the issues were not rectified fully by the time of the IPO. (*Id.* ¶¶ 60–62.) As of July 2010, SMART allegedly "was using multiple sets of books to track operations and finances, and could not accurately assess its finances or shipments," such that SMART hired "Deloitte consultants" to "improve[e] information technology functions"—namely, ERP. (*Id* . ¶¶ 57, 59.)

The Prospectus included an ERP-related risk disclosure that is worth quoting in full:

> On April 1, 2008, we commenced implementing a new enterprise resource planning, or ERP, system. We experienced significant difficulties with this implementation which resulted in severe disruptions to our operations and to our financial and accounting systems for a number of months. For example, we were unable to issue invoices or ship any products for a significant period of time during the first quarter of fiscal 2009. This resulted in our inability to complete reliable quarterly financial statements for fiscal 2009. In order to temporarily resolve the issues associated with the ERP system implementation, we adopted several manual processes and workarounds to perform functions that would typically be automated in a company of our size. By the end of the second quarter of fiscal 2009, we had shipped all the products that we were unable to ship in the first quarter of fiscal 2009, and as of December 31, 2009, we had substantially resolved all material issues associated with the portions of the ERP system that we had implemented as of that date.

> We have not yet completed the implementation of the new ERP system and *many manual processes for functions that should be automated remain.* The existence of such manual processes *allows the possibility for human error that could potentially result in material mistakes in our operations as well as our financial reporting. Such mistakes, if made, could have a material adverse effect on our business.* In addition, we currently do not have, and until we complete the implementation of our ERP system, we will not have, the necessary systems in place to provide us with certain data that would normally be automatically collected in an organization of our size. For example, until the first quarter of fiscal 2010, our systems were unable to generate operating expense reports for our various business cost centers. Furthermore, *we have identified, and are in the process of correcting, additional weaknesses in the ERP system that could potentially have a material adverse effect on our business.* Specifically, the configuration of our ERP system lacks sufficient authority controls and many users are able to make changes to the system that may affect all users. If a user makes unauthorized changes to the system, our business could be harmed. These issues did not prevent us from obtaining unqualified audit reports on our annual financial statements.

> **\*6** In the first quarter of fiscal 2010, we continued to experience problems of a less material nature in the implementation of the ERP system. For example, on one occasion, a particular module of the system was not properly tested, and after implementing the module, we discovered that the system prevented the shipment of certain products and the issuance of invoices for certain shipments. While in that particular instance we were able to remediate the problem in time to prevent any significant issues, *we cannot assure you that similar problems will not recur or that we will be able to remediate these problems on a timely basis.* If additional problems arise in the implementation of additional modules of the ERP system, *we could experience further disruptions to our business and operations that could have a material adverse effect on our business and could impair our ability to report our operating results on a timely and accurate basis.*

Prosp. at 20 (emphases added) (quoted in Am. Compl. ¶ 87 (different emphases supplied)).

### E. *Post–IPO "Corrective" Disclosures*

On November 9, 2010, four months after the IPO, SMART issued a Form 6–K in which it reported its 2011 second quarter

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

financial results. *See* SMART Techs. Inc., Report of Foreign Private Issuer (Form 6–K) (Nov. 9, 2010). SMART disclosed that SMART experienced "slower than anticipated sales in our recently acquired NextWindow business," reduced revenue guidance for the second half of SMART's 2011 fiscal year by nine percent, and reported that second quarter earnings fell 22 percent. *Id.* at Ex. 99.1. (*See also* Am. Compl. ¶ 91.) On a conference call that same day, defendant Knowlton confirmed that SMART "adjusted our fiscal 2011 revenue outlook lower by approximately $80 million due to lower-than-expected performance of our recently-acquired NextWindow business and the more conservative near-term growth estimates for the North American market." (Am. Compl. ¶ 92 (quoting conference call).) In that same call, Knowlton stated that the NextWindow sales could be attributed to "the limited number of touch applications developed for Windows 7," and that SMART expected stagnant sales of NextWindow products until the release of Windows 8 (expected in late 2012). (*Id.* ¶ 93.) The next day, SMART's stock dropped by 30 percent —from $13.07 at market close on November 9 to $8.91 on November 10. (Am.Compl.¶ 95.)

On May 18, 2011, SMART issued its full-year and fourth quarter 2011 financial results in which allegedly revealed that it had missed its quarterly earnings target, with a decline of 28 percent, and earnings per share of $0.01, both of which were attributable to "significant increase in operating expenses"—namely, research and development for corporate development. (Am.Compl.¶ 99.) *See also* SMART Techs. Inc., Report of Foreign Private Issuer (Form 6–K) (May 18, 2011). Those disclosures allegedly caused a 23 percent drop in SMART's stock price. (Am.Compl.¶ 101.)

IV. PROCEDURAL HISTORY

 *7 On January 26, 2011, Thomas McKenna filed this action in the United States District Court for the Northern District of Illinois. (*See* Dkt. No. 1.) On June 16, 2011, Judge Edmond Chang of the Northern District of Illinois appointed plaintiff City of Miami lead plaintiff under the PSLRA's "greatest financial interest" presumption. (Dkt. No. 63.)

On March 15, 2011, defendants moved pursuant to 28 U.S.C. § 1404 to transfer this action to the Southern District of New York, which plaintiff opposed. (Dkt.Nos.41, 68.) On October 14, 2011, Judge Chang granted defendants' motion, and the instant action joined this Court's docket. (Dkt. No. 78.)

Pursuant to the schedule set by the Court at the December 2, 2011 initial conference in this matter, defendants filed a joint motion to dismiss the Amended Complaint on January 6, 2012. (Dkt. No. 100.) Plaintiff opposed the motion on February 6, 2012, and the motion was fully briefed as of February 17, 2012. (Dkt.Nos.104, 105.) The Court heard oral argument on the motion on March 9, 2012. (*See* Dkt. No. 107.)

DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc.,* 493 F.3d at 98 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Twombly,* 550 U.S. at 570).*See also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In applying that standard, the court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate. *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950).

I. PLEADING STANDARD
Defendants argue that the Amended Complaint "sounds in fraud," and thus, is subject to Rule 9(b)'s heightened pleading standards. (Mem. of Law in Support of Defs.' Joint Mot. to Dismiss Pl.'s Am. Compl. ("Defs.Mem.") (Dkt. No. 101) at 11–12.)

Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). A complaint predicated upon fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quotation marks omitted). Failure to do so requires dismissal of the complaint. *Id.*

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

**\*8** Although sections 11 and 12 do not require allegations of fraud, when a claim under those statutes is "premised on averments of fraud," the heightened pleading standard applies. *Rombach,* 355 F.3d at 170, 171. A determination that a complaint "sounds in fraud" turns on the conduct alleged, not on the claims asserted. *Id.* at 171.

Close scrutiny of the Amended Complaint confirms that it sounds in fraud. *See Ladman Partners, Inc. v. Globalstar, Inc.,* No. 07 Civ. 976, 2008 WL 4449280, at \*11 (S.D.N.Y. Sept. 30, 2008). The "gravamen" of the Amended Complaint is that defendants, as allegedly evidenced by the CWs, were aware of certain known trends and, pursuant to Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), were obligated to disclose the impact of those trends on SMART's business. By allegedly failing to make disclosure of *known* facts, plaintiff claims that the Offering Documents were materially "false and misleading." (*See, e.g.,* Am. Compl. ¶¶ 65 ("Defendants had a duty to speak fully and truthfully on that subject," but "fail[ed] to disclose these facts" which "rendered the Offering Materials false and misleading"), 71 (same), 74 (same), 77 (statements about global network and corporate clients were "materially false and misleading"), 83 ("Defendants had a duty to disclose that very few touch applications had been developed for Windows 7 in the period leading up to the IPO," and that "SMART acquired NextWindow in part to resolve a patent dispute" but failed to do so which "rendered the Offering Materials false and misleading), 86 (same), 89 (same re ERP); *see also* Am. Compl. ¶ 7 (the subject misrepresentations were "materially false").) Plaintiff further alleges that defendants purposefully planned the date of the IPO such that the Offering Documents would not disclose facts already known to defendants, but not to the investing public. (Am.Compl.¶ 46.)

Allegations that defendants (i) sought to hide unpleasant, *known* facts from the public—or the material impact of those facts on aspects of SMART's business—and (ii) strategically timed the IPO to take advantage of certain known, but not-yet-disclosed facts, rendering the Offering Documents materially false and misleading, amount to claims of purposeful, fraudulent conduct. *See Rombach,* 355 F.3d at 172 (allegations that, *inter alia,* "materially *false* and *misleading* statements were issued" contributed to the claim sounding in fraud); *Ladmen Partners, Inc.,* 2008 WL 4449280, at \*11 (finding that the complaint sounded in fraud where "Plaintiff basically assert[ed] that not only did Globalstar have actual knowledge of the degradation of its satellite constellation prior to the IPO, but it deliberately withheld information from

investors"); *In re Axis Capital Holdings Ltd. Secs. Litig.,* 456 F.Supp.2d 576, 597 (S.D.N.Y.2006) (where the plaintiffs "allege[d] that the Registration Statement and Prospectus contained materially false and misleading information," the Securities Act claims "sounded in fraud").

**\*9** Plaintiff rejoins that it merely alleges that defendants "must have known," leading to the conclusion that the Amended Complaint is cloaked in negligence, not fraud. (Lead Pl.'s Opp'n to Defs.' Mot. to Dismiss the Compl. ("Pl.Opp'n") (Dkt. No. 104) at 16.)[3] Such an argument ignores the statements of plaintiff's own CWs, who allege that certain facts were known internally at SMART but were not disclosed in the Offering Documents. (*See, e.g.,* Am. Compl. ¶¶ 41–43, 46, 52, 55, 58–59, 62 ("CW 3 explained, 'We weren't doing the types of numbers they said we were. I don't want to say fabricated, but speculative at the best of times.' ").) Plaintiff cannot, on the one hand, use to their advantage the statements of their CWs to allege that defendants in fact actually *knew* certain facts and purposely omitted them from the Offering Documents and, on the other hand, disclaim the substance of those statements to evade Rule 9(b). A finding that the Amended Complaint sounded in anything other than fraud would require turning a blind eye to the foundation upon which this action is premised.

3    Even if plaintiff only alleged that defendants "must have known" of the alleged problems but failed to disclose them, that in itself would be sufficient to trigger Rule 9(b). *See Ladmen Partners, Inc.,* 2008 WL 4449280, at \*11 (allegations that the defendant "had to know" were part of the "classic allegations of fraud").

Having found that the Amended Complaint sounds in fraud, the Court concludes that, except as to the statements by plaintiff's CW regarding the fact that SMART knew that demand was decreasing (as discussed further below), it nevertheless meets Rule 9(b)'s "particularity" requirement. As to the three other topics as to which it is alleged that the Offering Documents were false and misleading, the Amended Complaint sufficiently states—and gives defendants notice—of the allegedly false particular statements, identifies in which document those statements can be found, where in the document they are, the date that the document was filed with the SEC (*i.e.,* who the "speaker" is and "where and when the statements were made"), and explains why the statements made were purportedly false and misleading—*i.e.,* defendants knew certain facts, but purposely did not disclose them and/or their impact on SMART's business. Thus, there is no basis for

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

the Court to dismiss the Amended Complaint *in full* on these grounds.[4] *See Rombach,* 355 F.3d at 170.

[4]     As mentioned above and discussed further in Part II.A.i., *infra,* the section 11 claim (and thus, the section 12 and 15 claims) related to demand for SMART's core interactive whiteboards do not meet Rule 9(b)'s requirements.

## II. SECTIONS 11 AND 12

Sections 11 and 12 are "Securities Act siblings with roughly parallel elements." *In re Morgan Stanley Info. Fund Secs. Litig.,* 592 F.3d 347, 359 (2d Cir.2011). As with all siblings, sections 11 and 12 have certain similarities, but also certain differences. Under both statutes, a plaintiff need only establish one of three bases for liability: "(1) a material misrepresentations; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading ...." *Litwin v. Blackstone,* 634 F.3d 706, 715–716 (2d Cir.2011). (As discussed above and below, plaintiff's case rests on the second basis for liability.) Neither provision requires allegations of scienter, reliance, or loss causation in order to state a claim. *Fait v. Regions Fin. Corp.,* 655 F.3d 105, 109 (2d Cir.2011).

**\*10** Section 11 applies to material misstatements or omissions made in a registration statement while section 12(a)(2) applies to the same as contained in prospectuses, among other things. *Id.* Section 11 imposes "virtually absolute" liability while section 12 holds defendants accountable for negligence. *In re Morgan Stanley Info. Fund,* 592 F.3d at 359.

In considering whether alleged misrepresentations and/or omissions constitute violations of the securities laws, a court must read the offering documents as a whole. *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir.1996); *see also In re Morgan Stanley Info. Fund,* 592 F.3d at 366 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety."); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991). The "central issue" a court considers in assessing sibling Securities Act claims "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities ." *Olkey,* 98 F.3d at 5 (quotation marks and brackets omitted). Where "the risks of which plaintiffs complained were disclosed in the prospectus"—*i.e.,* where a "reasonable investor" was

informed "about the nature of the securities"—dismissal of the claims under Rule 12(b)(6) is appropriate. *Steinberg v. PRT Grp., Inc.,* 88 F.Supp.2d 294, 300 (S.D.N.Y.2000) (citing *Olkey,* 98 F.3d at 9).

### A. *Section 11*

Plaintiff's theory of the case rests on the so-called "second basis for liability"—*i.e.,* that defendants omitted certain material information from the Offering Document in contravention of an affirmative legal disclosure obligation (here, Item 303), which rendered the Offering Documents false and misleading and/or caused the Offering Documents to contain material misrepresentations. *See Litwin,* 634 F.3d at 715–716;*In re Morgan Stanley Info. Fund,* 592 F.3d at 360.

The Court addresses seriatim the four topics on which the Offering Documents were allegedly misleading, and considers, as it must, the Offering Documents (namely the Prospectus) as a whole.

#### i. *Demand for Interactive Whiteboards*

Of the four topics, plaintiff principally focuses on the allegations that SMART knew about, but failed to disclose, a "precipitous decline in the demand" for SMART's "core" interactive whiteboards. (*See* Am. Compl. ¶¶ 8, 37, 40–46, 63–65.)

Defendants counter those allegations, arguing first that the Prospectus' risk disclosures could not have lead a reasonable investor to believe that, *inter alia,* "SMART's sales figures had not benefitted from government-stimulus [*i.e.,* ARRA] spending," and that "SMART's sales figures would not decline *in the future* if stimulus spending were to decline." (Defs. Mem. at 16 (emphasis added).) Defendants are correct as to the former and incorrect on the latter. They are correct on the former because the Prospectus, read as a whole, clearly demonstrates that SMART was a beneficiary of ARRA-spending in its interactive whiteboards sales. *See, e.g.,* Prosp. at 16 ("We believe we have been an indirect but perhaps substantial beneficiary of ... ARRA."); *id.* ("We believe that some of our sales since the enactment of the ARRA in February 2009 resulted from state and local governments' obtaining funds under the ARRA for technology purchases."). They are incorrect on the latter because the Court reads the Prospectus as touting ARRA-funding—and thus, ARRA-funded sales—as a present-based phenomenon. *See, e.g., id.* at 16. In other words, even if a reasonable investor would understand that absent ARRA

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

funding demand for SMART products would decline in the *future,* a reasonable investor would not have read the disclosures to state that demand was presently declining, or had declined already.

**\*11** The parties focus on the verb tense of SMART's demand disclosures to assess whether those statements are ones dealing with past, present, or future demand. (Defs. Mem. at 16, 17; Pl. Opp'n at 22; Reply Mem. of Law in Further Support of Defs.' Joint Mot. to Dismiss Pl.'s Am. Compl. ("Reply Mem.") (Dkt. No. 105) at 3.) The phrase that has taken hold on that front is "has been increasing." *See, e.g.,* Prosp. at 44, 50. Defendants argue that the phrase references the time period from 2008 through 2010 (Defs. Reply at 3), while plaintiff sees it as a report on the existing state of demand—*i.e.,* that demand was continuing to increase at the time of the IPO (Pl. Opp'n at 22).

The purpose of a Prospectus for an initial public offering, like SMART's here, is to provide potential investors with a picture of the company's financial health and prospects for growth, which in turn provides a projection of the investors' return on their investment. Statements of demand trend for SMART's core products leading up to the IPO, without any explicit disclosure regarding differences or changes in that trend, necessarily provided a present and future perspective on demand for SMART's interactive whiteboards. In other words, a reasonable investor would have understood the "has been increasing" language, even if referring to the 2008 to 2010 time period as defendants argue, with a view that demand is continuing—and will continue—to increase.

Thus, the Court must turn to whether plaintiff plausibly alleges that at the time of the IPO SMART knew that demand for interactive whiteboards either had already decreased or would do so imminently such that the statements regarding demand are misleading. Plaintiff relies exclusively on statements by four CWs—primarily on the statements of CW1—to demonstrate such knowledge. (*See* Am. Compl. ¶¶ 40–46.)

To determine whether confidential witness statements give facial plausibility to a plaintiff's claims, a court need only determine whether the CW allegations are alleged with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000). The complaint must provide descriptions of the positions the CWs held such that the court can determine

the probability "that a person in such position would have information regarding" the allegations at issue. *In re Gen. Elec. Co. Secs. Litig.,* No. 09 Civ.1951, 2012 WL 90191, at \*11 (S.D.N.Y. Jan. 11, 2012).

The allegations regarding CWs 3 and 4 fall short of meeting either the above standard or Rule 9(b)'s requirements. CW3, a "Senior Manager in Global Information Systems Service Operations," provides only that "a slowdown in sales 'was apparent' " "months before the IPO." (Am.Compl.¶ 42.) As to CW4, "an Education Account Representative for SMART," the Amended Complaint alleges only that CW4 "confirmed the decline in sales prior to the IPO," and that the government funding was a temporary bump given that "SMART's whiteboards were a one-time purchase and sales had decreased before the IPO." (*Id.* ¶ 43.) The Amended Complaint provides the Court with no information as to why individuals who held the positions that CW3 and CW4 held would have particular knowledge as to that information nor does it provide information as to by which defendants the particular knowledge of declining demand was held— or where or when particular defendants came to have that information. Accordingly, the Court will not consider the allegations supported by the statements of CW3 and CW4.

**\*12** That leaves plaintiff with CWs 1 and 2 to support their "knowledge of declining demand" claim. Both CW1 and CW2 were in SMART's "training" division. CW1 "worked at the Company's headquarters in the Services Division," "including as a Team Leader in Technical Training," and CW2 was a "Corporate Trainer." (Am.Compl.¶¶ 40–41.) The allegations do not provide sufficient plausible detail as to why individuals who held those positions would have any knowledge regarding the demand for SMART's interactive core products. *Cf. In re Scottish Re Grp. Secs. Litig. .,* 524 F.Supp.2d 370, 392–93 (S.D.N.Y.2007) ("The CWs, all of whom claim knowledge of a systematic failure in the Company's ability to manage its financial information, occupied positions that would have allowed for relevant hands on experience in various parts of the Company.").

Plaintiff attempts to buttress CW1's alleged understanding of the decline in demand for whiteboards through the statement, " 'Training revenues mirrored sales revenues. If sales go up, training revenues go up; if sales go down, training revenues go down .' " (Am.Compl.¶ 40.) Such a statement is, however, conclusory. There are no allegations of reports or other internal documents that show the correlation between training and sales revenue and/or why someone with the title

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

"Team Leader" (let alone "Corporate Trainer" like CW2) would have such knowledge (other than circumstantially) of any such correlation. *See Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.,* 638 F.Supp.2d 120, 127–28 (D.Mass.2009) (dismissing Securities Act claims where the plaintiff's confidential witnesses allegations were "too subjective," "lack[ed] contextualizing information," or provided information that was "insufficient to draw any meaningful conclusions").

CW1's allegation of an internal SMART report that forecasted revenues for SMART's training group in July 2010 "confirmed" "the big slowdown in sales" (Am.Compl. ¶ 40)—without more—does not "nudge[ ] the demand claims across the line from conceivable to plausible." *See Twombly,* 550 U.S. at 570. In particular, the Amended Complaint does not allege which, if any, of defendants saw the report and, as above, why or how the "forecasted revenues from SMART's training group" were correlated to demand for SMART's interactive whiteboards. Thus, that allegation cannot support the section 11 demand claim. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996) (an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales is insufficient to survive a motion to dismiss"); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 196 (2d Cir.2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information" (quotations marks and citation omitted)).

**\*13** Taken collectively, CW1 and CW2's allegations simply are not enough (particularly when compared to the type of allegations that courts in this District have found sufficient) to show that defendants knew that demand for interactive whiteboards had declined prior to the IPO. *Cf. In re Ambac Fin. Grp., Inc. Secs. Litig.,* 693 F.Supp.2d 241, 267–68 (S.D.N.Y.2010) (allegations of scienter were supported by confidential sources where the sources, *inter alia,* "ma[d]e detailed allegations that Ambac lowered its underwriting standards in several ways, and that such changes were known to Ambac's officers," including identifying "[a] memo detailing th[e] change [in lowering overcollateralization requirements for HELOC deals from 3.5% to 0.5%] [that] was sent to the Credit Risk Committee," on which defendants sat).

Drawing all inferences in plaintiff's favor, the CW allegations would have passed muster under *Iqbal* and *Twombly.* But

under Rule 9(b), the allegations supported by CWs 1 and 2 (and certainly CWs 3 and 4) simply do not have the hallmark specificity to support plaintiff's claim. *See*Rombach, 355 F.3d at 170. Without additional "corroborative facts," the section 11 claim as to declining demand cannot withstand defendants' motion. *See Ladmen Partners, Inc.,* 2008 WL 4449280, at *16.

The Court does not find that such allegations are irreparably insufficient, however. It may be that plaintiff has sufficient factual information to bolster the demand allegations. Accordingly, the section 11 claim related to demand for SMART's interactive whiteboards is dismissed without prejudice; plaintiff is granted leave to replead this claim. *See ATSI Commc'ns, Inc.,* 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

### ii. *Demand for NextWindows*

Although the Prospectus does not include projections of future demand for NextWindow (*see* Defs. Mem. at 25), that does not render SMART's statements about NextWindow inactionable. SMART's touting its expectation that the NextWindow acquisition "will accelerate our ability to expand into the market for interactive touch products other than interactive whiteboards," Prosp. at 6, put the question of such expansion—and NextWindow's contribution to that expansion—"in play" such that SMART was required to make full disclosures to ensure the accuracy of the Offering Documents. (*See* Pl. Opp'n at 26–27; Defs. Reply at 5–6.) *See Freudenberg v. E\*Trade Fin. Corp.,* 712 F.Supp.2d 171, 179–80 (S.D.N.Y.2010) ("Once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading" (quotations marks, citations, and alterations omitted)).

That the world was "on notice" of the absence of Windows 7 touch applications is insufficient to absolve defendants of liability as to those statements. (*See* Defs. Mem. at 26.) Although it is true that "information already in the public domain" or "reasonably available" to shareholders or potential investors is part of the "total mix of information" investors should consider, *Garber v. Legg Mason Inc.,* 347 Fed. Appx. 665, 668 (2d Cir.2009), an issuer has a duty to disclose information or facts in the public domain where it and/or its impact is or would be "material in the eyes of a reasonable investor," *Litwin,* 634 F.3d at 718, 719.

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

**\*14** Materiality of an omitted fact is actionable where "a reasonable investor would have considered [it] significant in making investment decisions." *Litwin,* 634 F.3d at 716–17 (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161–62 (2d Cir.2000) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 107 S.Ct. 978, 99 L.Ed.2d 194 (1988))). A court need not assess whether an "investor would have acted differently if an accurate disclosure was made," but only whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Id.*

Item 303—the SEC regulation upon which plaintiff relies for its theory that defendants should have disclosed (a) the lack of touch applications for NextWindows; and (b) the impact of that fact on SMART's business—requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations ." 17 C.F.R. § 229.303(a)(3)(ii). As the Second Circuit recognized in *Litwin,* "the SEC's interpretive release regarding Item 303" notes that disclosure is required " 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.' " 634 F.3d at 716 (citation omitted).

Defendants argue that the Prospectus does not contain misleading statements regarding NextWindow because there was no negative trend as of the relevant date. (Defs. Reply at 6.) But Item 303 also requires disclosures as to "known ... uncertainties." 17 C.F.R. § 229.303(a)(3)(ii). It is plausible that the total lack of any touch applications for Windows 7 would create a "known uncertainty" as to how, whether, and when SMART could "accelerate" its "expan[sion] into the market for interactive touch products"—and the material effect of such acceleration (or lack thereof) on SMART's financial condition. The Offering Documents do not contain any disclosure to that effect, however.

Defendants point instead to the following disclosure as an adequate warning of the potential problems with NextWindow: "If [SMART] is unable to integrate [its] products with certain third-party operating system software and other products, the functionality of our products would be adversely affected." Prosp. at 22 (cited in Defs. Mem. at 26).

As an initial matter, that warning bears no clear connection to NextWindow when read in the context of the entire Prospectus. A reasonable investor reading that disclosure would expect that there *was* a possibility of integration between SMART and third-party operating systems. But without any available applications, no integration could be possible—which the Prospectus does not state anywhere. At bottom, the Prospectus' discussion of NextWindow is inadequate to provide a reasonable investor with a clear picture of SMART's ability to integrate NextWindow products and thus, "accelerate [SMART's] ability to expand into the market for interactive touch products ...." Prosp. at 4.

**\*15** Further, defendant Knowlton's statements on the November 9, 2011 conference call regarding the fact that the "limited number" of touch applications for Windows 7 contributed to disappointing NextWindow sales (Am.Compl.¶ 93) likewise carries the claim over the line from conceivable to plausible. As alleged in the Amended Complaint, the number of Windows 7 touch applications could only have increased from July 14, 2010 to November 9, 2011, meaning that SMART certainly knew of the trend or uncertainty and could have—or should have—considered how such trend or uncertainty would or could affect the demand for NextWindow products.

On the allegations here, the Court finds that plaintiff plausibly alleges that defendants omitted information about NextWindow that was material to their business that they were legally required to disclose. Plaintiff's claims as to NextWindow thus withstand defendants' motion to dismiss.

iii. *Expansion into Corporate and Foreign Markets*

Plaintiff reduces its allegations regarding SMART's expansion into corporate and foreign markets to the fact that SMART failed to disclose the need for significant additional investments to accomplish such expansion. (Pl. Opp'n at 29–30 (foreign markets); *id.* at 30–31 (corporate sales).) Reading the Prospectus as a whole, the Court does not find that the discussion of SMART's expansion into those markets amounts to actionable statements under the Securities Act.

The risk disclosures directly address that SMART faced an uphill battle in building its hold in both corporate and foreign markets. Taking the latter first, SMART's risk disclosures state that "[i]n order for [its] products to gain broad acceptance in foreign markets, we may need to *develop customized solutions* specifically designed for each country in which we seek to grow our sales," including "significant

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

customization and modification" of SMART's software "to adapt to the needs of foreign customers" such that it was available "in several languages and alphabets." Prosp. at 16 (emphasis added). Any reasonable investor digesting that disclosure would understand "develop [ment] [of] customized solution[s]" to require investment on SMART's part.

With regard to plaintiff's allegation that SMART should have disclosed that it originally pitched a larger contract to BT than the one disclosed in the Prospectus (*see* Am. Compl. ¶¶ 52, 74), that cannot amount to an actionable misstatement or omission. Taken to its logical extension, requiring companies to disclose the substance of all contract negotiations would impose new and substantial burdens on businesses. Compelling such a disclosure obligation could impose a severe impediment to even beginning contract discussions between companies if outcome was known to be uncertain (as often, of course, it is). The Court declines to read such a burdensome requirement into the securities laws. Accordingly, plaintiff's allegations as to foreign sales do not form the basis for a claim.

**\*16** Plaintiff's allegations as to corporate sales fare no better. SMART clearly acknowledged that "there has not been widespread adoption of interactive whiteboard solutions" in the business sector, and disclosed that corporate and government sales collectively only amounted to 15 percent of SMART's revenue. Prosp. at 20, 77. Those statements in and of themselves address the allegations that SMART subrogated corporate sales in favor of education sales (including those allegations supported by statements from two of plaintiff's CWs). (*See* Am. Compl. ¶¶ 48–51; *see also* Pl. Opp'n at 30–31.)

The allegation that plaintiff did not have "workable corporate products" (Pl. Opp'n at 31 (citing Am. Compl. ¶¶ 99–100)) likewise cannot withstand SMART's risk disclosures. SMART conceded that its interactive whiteboards in their current form were not appropriate for corporate or government users who are "occasional users for whom the training required to use our interactive whiteboards may be too significant of a time investment." Prosp. at 20. According to the Prospectus, expansion into the corporate sector thus would "depend on [SMART's] ability to introduce products that are easier to use intuitively with relatively minimal or no training." *Id.* at 20–21. The Court finds the only reasonable interpretation of that disclosure to mean that SMART needed to develop new products to expand its business into the corporate sector.

The Prospectus clearly addressed the risks relating to the expansion into corporate and foreign markets; they, therefore, do not support a section 11 claim. *See Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 360 (2d Cir.2002) ("The cautionary language addresses the relevant risk directly, and therefore neither offering memorandum was misleading."); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991) (the "central inquiry" is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment").

iv. *ERP*

As plaintiff would have it, the numerous references throughout the Prospectus regarding SMART's ERP system, including an extensive and detailed risk disclosure, is actionable because the risk disclosure discusses past problems and does not include enough language about the continuing problems with ERP. (Pl. Opp'n at 32–34.) The Court disagrees.

The ERP risk disclosure is quite explicit and comprehensive regarding present and future risks. Reading the full ERP risk disclosure, no reasonable investor could possibly have thought that SMART had adequate internal controls. Indeed, the Court finds that disclosure nothing if not disquieting. So much so that the Court finds it necessary to reiterate part of the disclosure here to demonstrate just how it was "specific enough to warrant a reasonable investor's attention." *Olkey,* 98 F.3d at 9.

The Prospectus stated that SMART

**\*17** *had not yet completed* the implementation of the new ERP system and *many manual processes for functions that should be automated remain.* The existence of such manual processes allows the possibility for human error that could potentially result in material mistakes in our operations as well as our financial reporting. Such mistakes, if made, could have a *material adverse affect* on our business.

Prosp. at 20 (emphases added). In addition, the Prospectus disclosed that "the configuration of our ERP system *lacks* sufficient authority controls and many users are able to make changes to the system that may affect all users." *Id.* (emphasis added). Those statements are couched in the *present* tense —*i.e.,* they reveal current problems at SMART. A reasonable investor, reading the full ERP disclosure, would understand that SMART was continuing to do certain of its books "by

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

hand," which allowed for significant room for error. The full ERP disclosure is more than sufficient to find that defendants did not make misstatements or omissions about ERP in the Offering Documents. *See Halperin,* 295 F.3d at 360.

B. *Section 12*

i. *Section 12 Claims Against SMART*

For the reasons that certain alleged misrepresentations or omissions succeed or fail with regard to plaintiff's section 11 claims against SMART, so too do they succeed or fail with respect to section 12. *See Fait,* 655 F.3d at 109, 110, 112;*In re Morgan Stanley Info. Fund,* 592 F.3d at 359–60, 361. Given the cautionary statements with respect to SMART's expansion into corporate/foreign markets and ERP, defendants cannot be liable under section 12(a)(2). *See P. Stoltz Family P'ship L.P. v. Daum,* 355 F.3d 92, 96 (2d Cir.2004) ("A defendant may not be liable under § 12(a)(2) for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security.").

Plaintiff may proceed against SMART under section 12(a)(2) for alleged misrepresentations or omissions relating to the statements about demand for NextWindows.

The section 12(a)(2) claim with respect to demand for SMART's interactive whiteboards is dismissed without prejudice for the same reasons as the section 11 claim on that topic.

ii. *The Individual Defendants as Statutory Sellers*

As discussed above, sections 11 and 12(a)(2) have "roughly parallel elements." *In re Morgan Stanley Info. Fund Secs. Litig.,* 592 F.3d at 359. A *prima facie* section 12(a)(2) claim requires that (a) defendant be a "statutory seller"; (b) who effectuated the alleged violative sale "by means of a prospectus or oral communication"; and (c) said prospectus or oral communication must "include[ ] an untrue statement of a material fact or omit [ ] to state a material fact necessary in order to make the statutes, in the light of the circumstances under which they made, not misleading ." 15 U.S.C. § 771(a)(2); *In re Morgan Stanley Info. Fund,* 592 F.3d at 359. Thus, establishing that an individual or entity is a statutory seller is a necessary prerequisite to stating a claim under 12(a)(2). *See In re Morgan Stanley Info. Fund,* 592 F.3d at 359.

**\*18** An individual meets the definition of a "statutory seller" subject to 12(a)(2) liability in one of two circumstances: (i) he "passed title, or other interest in the security, to the buyer for value," or (ii) he "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl,* 486 U.S. 622, 642, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *see also In re Morgan Stanley Info. Fund,* 592 F.3d at 359.

Plaintiff asserts claims under section 12(a)(2) against SMART—a conceded statutory seller—and the Individual Defendants. Defendants argue that the claim cannot lie against the Individual Defendants because they are not "statutory sellers." (Defs. Mem. at 30–31.) Plaintiff asserts that the Individual Defendants can be held liable under section 12(a)(2) as mere signatories of the registration statement. (Pl. Opp'n at 25.) The Court finds defendants are on the correct side of this argument.

In *Citiline Holdings, Inc. v. iStar Financial Inc.,* 701 F.Supp.2d 506 (S.D.N.Y.2010), Judge Sullivan squarely addressed whether individuals face liability under section 12 merely for signing a registration statement. Without guidance from the Second Circuit, *Citiline* considered "[e]very Court of Appeals to have considered the issue," *id.* at 512 (citing *Rosenzweig v. Azurix Corp.,* 332 F.3d 845, 871 (5th Cir.2003), *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1216 (1st Cir.1996), *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 636 (3d Cir.1989)), and "Pinter's statement that Congress did not intend to impose liability under Section 12 'for mere participation in unlawful sales transactions,' " 701 F.Supp.2d at 512 (quoting *Pinter,* 486 U.S. at 650), and concluded that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." 701 F.Supp.2d at 512.

Plaintiff seeks to have this Court disregard *Citiline,* relying instead upon a swath of cases (except one) that predate *Citiline* by almost a decade. (*See* Pl. Opp'n at 35 n. 13.) Those cases stand for the proposition that "on a motion to dismiss, officers or directors who signed the registration statement are deemed to have solicited the purchase of the offered stock." *Briarwood Invs. Inc. v. Care Inv. Trust Inc.,* No. 07 civ. 8159, 2009 WL 536517, at \*4 (S.D.N.Y. Mar.4, 2009). *Briarwood Investments,* decided one year before *Citiline* and the only recent case on which plaintiff relies, cited only to the same, decade-old district court decisions on which plaintiff relies; it did not consider rulings of Courts of Appeals outside

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

the Second Circuit or the rationale underlying *Pinter. See Briarwood Invs. Inv.,* 2009 WL 536517, at *4.

The Court finds Judge Sullivan's reasoning in *Citiline* well-reasoned and well-supported, and sees no reason to deviate from it here. Plaintiff alleges nothing more than that the Individual Defendants signed the registration statement. Accordingly, the section 12(a)(2) claims against the Individual Defendants are dismissed.

III. SECTION 15

A. *Legal Standard*

**\*19** Section 15 of the Securities Act imposes what is known as "control person" liability upon individuals

who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 ....

15 U.S.C. § 77*o*(a).

To adequately allege a section 15 violation, a plaintiff must plead a primary violation and "actual control" of the primary violator by the defendant. *In re Lehman Bros. Mortgage–Backed Secs. Litig.,* 650 F.3d 167, 185–86 (2d Cir.2011); *In re Global Crossing, Ltd. Secs. Litig.,* No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) (Lynch, J.). "Control" means "the power to direct or cause the direction of the management and policies of [the primary violators] ...," as well as the transaction in question. *In re Lehman Bros.,* 650 F.3d at 185; *accord In re Global Crossing, Ltd.,* 2005 WL 1875445, at *3; *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 425 (S.D.N.Y.2010).

B. *Primary Violation*

As discussed above, plaintiff has not pleaded adequately a primary violation related to demand for interactive whiteboards, the expansion of SMART's corporate and foreign networks, or ERP. Accordingly, the section 15 claim based upon those grounds is dismissed, without prejudice as to the demand claim.

Primary violations related to demand for NextWindow remain, requiring the Court to examine whether plaintiff has pleaded adequately Apax's and Intel's "control" over SMART and the Individual Defendants, as well as over the IPO.

C. *"Collective" Control*

Apax and Intel argue that their individual stock ownership —*i.e* ., 23.5 percent for Intel and 47 percent for Apax—and their ability to appoint directors to the board do not suffice for purposes of section 15. (Defs. Mem. at 34–35.) The Court agrees that if that were all that were before the Court, the claim would fail. *See In re Alstom SA Secs. Litig.,* 406 F.Supp.2d 433, 487 (S.D.N.Y.2005); *In re Flag Telecom Holdings, Ltd. Secs. Litig. .,* 352 F.Supp.2d 429, 458–49 (S.D.N.Y.2005), *abrogated on other grounds,* 574 F.3d 29 (2d Cir.2009); *In re Deutsche Telekom AG Sec. Litig.,* No. 00 CIV 9475, 2002 WL 244597, at *7 (S.D.N.Y.2002). But it is not.

As plaintiff argued in its opposition—and at oral argument —the Court should look at Apax and Intel's stock ownership and board presence collectively. (Pl. Opp'n at 38.) Plaintiff asserts that in taking Apax and Intel's "control" together, it is clear "the transaction here could never have happened without their mutual agreement and joint action." (*Id.* at 38–39.) Plaintiff did not, however, include such allegations in the Amended Complaint, nor cite any cases to support its "collective control" theory. Plaintiff relies upon section 15's express language—*"an agreement or understanding with one or more other persons* by or through stock ownership, agency, or otherwise," 15 U.S.C. § 77*o*(a) (emphasis supplied by plaintiff)—to suggest that the Court should analyze Apax and Intel's "practical control" "collectively." (Pl. Opp'n at 39.) If plaintiff's pleadings and the text of section 15 were the only things before the Court, the section 15 claim would necessarily fail. There would only be speculation about whether Apax and Intel were actually acting in concert.

**\*20** Despite plaintiff's failure to plead any plausible facts alleging Apax and Intel's collective control, the Court has considered the Prospectus on this motion. *See ATSI Commc'ns, Inc.,* 493 F.3d at 98 (on a motion to dismiss, a court may consider of "legally required public disclosure documents filed with the SEC" as well as documents "incorporated into the complaint by reference" or relied upon by the plaintiff "in bringing suit"). The Prospectus itself does away with any speculation about Apax and Intel's "collectivity" of action. There, SMART disclosed that one of the risks to which its "business is subject," is "the *concentration* of voting power *and control* with our co-founders, Intel and Apax Partners." Prosp. at 4 (emphasis added); *see also id.* at 28. The "concentrated control," according to SMART, "will limit [shareholders'] ability to influence corporate matters, including takeovers." *Id.* at 4.

McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

That risk disclosure "nudge[s]" plaintiff's section 15 claim "across the line from conceivable to plausible." *See Twombly,* 550 U.S. at 570.

SMART's decision to warn prospective investors about the concentration of Apax and Intel's control—and how it may curb their power over all of SMART's "corporate matters" (and not just "takeovers" as Intel's counsel suggested at oral argument)[5]—sufficiently alleges that Apax and Intel either had an "agreement or understanding" by virtue of their collective stock ownership to act together in a way that would effectively "control" SMART. With respect to the IPO itself, that disclosure plausibly supports the inference that Apax and Intel used its pre-IPO *collective* 70.5 percent voting power to approve of the IPO—*i.e.,* to "control" by virtue of its collective vote whether SMART would undertake the IPO. That is enough to meet the "actual control" prong of a section 15 claim.[6]

[5] At oral argument, defendants focused on page 28 of the Prospectus, urging the Court to read the "concentrated control" risk disclosure as related to takeovers *only.* Reading the disclosure as a whole—in particular the heading itself—leads to a contrary conclusion—*i.e.,* that Apax and Intel's "concentrated control" will limit prospective shareholders' ability to influence all "corporate matters." *See* Prosp. at 28.

[6] Per this Court's Order on questions to be answered at oral argument (Dkt. No. 106), counsel for Intel provided the Court with two cases that do not assess control "collectively." *See LLDVF v. DiNicola,* No. 09 Civ. 1280, 2010 WL 3210613, at *12 (D.N.J. Aug. 12, 2010) ("[E]ach defendant's control must be evaluated separately unless there is some basis on which to consider their collective action.... [A] contrary holding would mean that any shareholder, no matter how small, could be grouped with others to form a majority control group, even absent any allegations or facts supporting that shareholder's actual control"); *Fouad v. Isilon Sys., Inc.,* No. C07–1794, 2008 WL 5412397, at *13 (W.D.Wash. Dec.29, 2008) ("Without additional allegations that the venture capital firms acted together to control Isilon, these allegations of control by virtue of collective ownership are conclusory and unconvincing").

The Court does not find those cases persuasive here for two reasons. First, there is no indication that the record before the respective courts in those cases contained the type of risk disclosure that the Prospectus includes here. Second, both cases include language (cited in the above parentheticals) that suggest that if the courts there had been presented with facts evidencing "collective action," as the Court is here, the results may have been different.

### D. *Culpable Participation*

Defendants argue that plaintiff's failure to allege "culpable participation" independently dooms the section 15 claim. (Defs. Mem. at 38–39.)

Requiring "culpable participation" in the context of the Securities Act's "control person" statute, as opposed to the Exchange Act's—*i.e.,* section 20(a)—remains an open question in this Circuit. *In re Lehman Bros.,* 650 F.3d at 186. District courts that have considered the question are divided. *Compare In re Sec. Capital Assur. Secs. Litig.,* No. 07 Civ. 11086, 2011 WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011) (requiring culpable participation); *Pub. Emps.' Ret. Sys. Of Mississippi v. Merrill Lynch & Co. Inc.,* 714 F.Supp.2d 475, 485 (S.D.N.Y.2010) (same); *Ladmen Partners, Inc.,* 2008 WL 4449280, at *10 (same); *P. Stoltz Family P'Ship, L.P. v. Daum,* 166 F.Supp.2d 871, 873 (S.D.N.Y.2001) (same), *rev'd in part on other grounds by* 355 F.3d 92 (2d Cir.2004) *with In re Deutsche Bank AG Secs. Litig.,* No. 09 Civ. 1714, 2011 WL 3664407, at *11 (S.D.N.Y. Aug. 19, 2011) (culpable participation is not an element of section 15); *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* No. 08 Civ. 5310, 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011) (same); *Police & Fire Ret. Sys. Of City of Detroit v. SafeNet, Inc.,* 645 F.Supp.2d 210, 242 (S.D.N.Y.2009); *In re Fuwei Films Secs. Litig.,* 634 F.Supp.2d 419, 435 (S.D.N.Y.2009); *In re Scottish Re Group Secs. Litig.,* 524 F.Supp.2d 370, 387 (S.D.N.Y.2007); *In re Adelphia Commc'ns Corp. Secs. & Deriv. Litig.,* No. 03 MD 1529, 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 10, 2007); *In re Refco, Inc. Secs. Litig.,* 503 F.Supp.2d 611, 661 (S.D.N.Y.2007) (Lynch, J.); *Am. High–Income Trust v. AlliedSignal,* 329 F.Supp.2d 534, 549 n. 10 (S.D.N.Y.2004) ("this Court joins the apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15" (quotation marks omitted)); *In re Global Crossing, Ltd.,* 2005 WL 1907005, at *11; *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I,* No. 08 CV 1713, 2012 WL 601448, at *21 (E.D.N.Y. Feb. 23, 2012); *In re CINAR Corp. Secs. Litig.,* 186 F.Supp.2d 279, 309–10 (E.D.N.Y.2002). *See also In re WorldCom, Inc.,* 377 B.R. 77, 102–03 (Bankr.S.D.N.Y.2007) (discussing the split among district courts and collecting cases). The Court agrees with the weight of the authority in this Circuit and declines to impose the additional "culpable participation" requirement.

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

**\*21** "Culpable participation" is akin to scienter. *In re WorldCom, Inc.,* 377 B.R. at 102. Courts declining to read the Exchange Act's "culpable participation" requirement into the Securities Act have relied upon the fact that

> because claims under the Securities Act do not contain an intent element—indeed, defendants need not even know about the misrepresentations—it would make little sense to compel plaintiffs to allege a culpable state of mind in order to state a claim under Section 15.

*In re CINAR Corp.,* 186 F.Supp.2d at 310;*accord In re Deutsche Telekom AG Secs. Litig.,* 2002 WL 244597, at \*6. The Court agrees.

Defendants argue that where, as here, a plaintiff's claims sound in fraud, a court must require allegations of "culpable participation." (Defs. Mem. at 38–39.) That the Amended Complaint sounds in fraud simply connotes the pleading standard that plaintiff must meet under procedural rules. It is axiomatic that procedural rules cannot eviscerate substantive law, imposed by statute or otherwise. *See*28 U.S.C. § 2072(b) (procedural rules "shall not abridge, enlarge, or modify any substantive right"). The Securities Act is a strict liability statute, imposing liability for, at a minimum, negligence and does not, as just discussed, require allegations of scienter. The "sounds in fraud" argument fails on that ground. *Cf. Emps.' Ret. Sys. Of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.,* 804 F.Supp. 141, 158 n. 6 (S.D.N.Y.2011) ("[T]he 'culpable participation' cases [in this District] should not impose the scienter requirement from Section 20 or otherwise impose any conduct or state of mind standard that is more stringent than the standards of Section 11 itself.").

There are two additional, independent reasons that that argument does not work. First, lack of knowledge (*i.e.,* lack of "culpable participation") is an affirmative defense under section 15: the text of the statute eliminates Securities Act "control person" liability where the alleged control person "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*(a). Thus, requiring a plaintiff to allege "culpable participation" would turn the relative burdens imposed by the statute on their head. Second, Congress added the "culpable participation" requirement to section 20(a) liability at the same time it amended section 15, *see Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973), demonstrating that Congress knew how to impose the "culpable participation" element when it believed it should be required. Importing the scienter requirement into a section 15 claim every time a complaint

sounds in fraud would do away with the statute as Congress intended it.

Accordingly, defendants' motion to dismiss the Section 15 claims related to demand for NextWindow is denied as to Apax and Intel. To the extent that plaintiff successfully repleads a section 11 and 12 claim related to demand for SMART's interactive whiteboards, that would support a claim against Apax and Intel under section 15.

## CONCLUSIONS

**\*22** For the aforementioned reasons, defendants' joint motion to dismiss the Amended Complaint is GRANTED IN PART and DENIED IN PART.

Plaintiff's section 11 and section 12(a)(2) claims related to misrepresentations or omissions on demand for NextWindow survive.

Plaintiff section 11 and 12(a)(2) claims related to misrepresentations and omissions on demand for SMART's core interactive whiteboard are dismissed without prejudice.

Claims under section 11 and section 12(a)(2) for misrepresentations or omissions related to (i) ERP; and (ii) SMART's corporate and foreign network are dismissed with prejudice.

Plaintiff's section 12(a)(2) claims against the Individual Defendants are dismissed.

The section 15 claims against Apax and Intel as to ERP and SMART's corporate and foreign networks are dismissed with prejudice. The section 15 claim as to demand for NextWindow survives, and the claim as to demand for interactive whiteboards is dismissed without prejudice.

No later than April 23, 2012, plaintiff is directed to file a second amended complaint to reflect the Court's rulings herein as well as to amend its allegations on its Section 15 claim to include the language from the Prospectus regarding "concentrated" control, on which it relied at oral argument, but does not appear in the Amended Complaint.

If defendants plan to move against any new allegations in a second amended complaint related to demand for SMART's interactive whiteboards, they should do so no later than May

**McKenna v. Smart Technologies Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

11, 2012, with plaintiff's opposition thereto due no later than May 18, 2012. No reply will be allowed. Any memorandum of law in support of or in opposition to a motion to dismiss shall be limited to no more than 15 pages.

The Clerk of Court is directed to terminate defendants' joint motion to dismiss the amended complaint (Dkt. No. 100)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1131935, Fed. Sec. L. Rep. P 96,795

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 21960357

2003 WL 21960357
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

PREMIER CAPITAL MANAGEMENT,
L.L.C., a Virginia Limited Liability
Company, et al., Plaintiffs,
v.
Larry COHEN, Individually, Brian
Flanagan, Individually, Wan Hee
Kim, Individually, Jung Koh,
Individually., et al., Defendants.

No. 02 C 5368.
|
Aug. 15, 2003.

*MEMORANDUM OPINION & ORDER*

GOTTSCHALL, J.

**\*1** Plaintiffs Premier Capital Management, LLC ("Premier Capital"), TMB, LLC and Xen Investors, LLC have sued defendants Xentex Technologies ("Xentex"), Xentex's officers and/or directors Larry Cohen, Brian Flanagan, Wan Hee Kim and Michael Turcotte, Ron Falese, a Xentex shareholder, Northview Bank and Trust, and the bank's president Blair Robinson, claiming that defendants violated federal and state securities laws, as well as several state statutory and common laws. Before the court are two motions to dismiss: the motion of defendants Xentex, Cohen, Kim, Turcotte and Falese (the "Xentex defendants") to dismiss the federal claims raised against them in the second amended complaint ("complaint" or "SAC"), and defendant Flanagan's motion to dismiss the federal claims against him. Although both Flanagan and the Xentex defendants have moved to dismiss all claims against them, this order pertains only to the federal claims raised in Counts 1–3, 8–10, and 24–26 against Xentex, Turcotte and Kim, respectively,[1] and the federal claims against Flanagan in Counts 17–19. Plaintiffs seek relief under both § 10(b) of the Exchange Act of 1934, 15 U.S.C. 78j(b), and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. 77*l*(a)(2). For example, plaintiffs bring a claim against Xentex for allegedly violating § 12(a)(2) in Count 1 and for

violating § 10(b) in Counts 2 and 3.[2] Plaintiffs follow the same pattern in their claims against Turcotte, Kim, and Flanagan. Plaintiffs also seek to impose control-person liability against Turcotte, Kim, and Flanagan.[3] The court assumes they bring their control-person liability claims under both § 15 of the Securities Act, 15 U.S.C. § 77*o*, and § 20 of the Exchange Act, 15 U.S.C. § 78t. The Xentex defendants and Flanagan seek dismissal of all the federal securities claims under Fed.R.Civ.P. 12(b)(6), asserting primarily that plaintiffs failed to satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, as well as the requirements of Fed.R.Civ.P. 9(b). They also argue that § 12(a)(2) is inapplicable to the securities offering at issue. Additionally, Flanagan argues that plaintiffs fail to plead violations of either § 12(a)(2) or § 15 against him.

1     At the Xentex defendants' request, the court allowed them to bifurcate briefing and address first the counts alleging violations of the federal securities laws. Of the Xentex defendants, only Xentex, Turcotte, and Kim face claims for violations of the federal securities laws.

2     Actually, plaintiffs' complaint states only that Count 1 asserts a violation of the Securities Act whereas Counts 2 and 3 asserted violations of the Exchange Act–they do not specifically refer to Section 12(a)(2) or Section 10(b) anywhere in the pleading.

3     Plaintiffs do not raise the control-person liability claims in separate counts. Additionally, as with the other federal securities claims, plaintiffs do not specifically refer to the section number that was allegedly violated.

For the reasons explained below, the claims against Xentex, Turcotte, Kim, and Flanagan under § 10(b) and § 20 of the Exchange Act are hereby dismissed, as is the § 12(a)(2) claim against Flanagan. The § 12(a)(2) claims against Xentex, Turcotte and Kim survive, however, as do the control-person liability claims against Turcotte, Kim and Flanagan under § 15.

*Background*

According to the complaint, plaintiffs made two investments in Xentex, the first through a stock purchase, the second in the form of a promissory note. Xentex, through its CEO Jeff Batio and its Vice Chairman and Executive Vice President Douglas Tucker, presented plaintiffs with an opportunity to invest at a meeting on November 1, 2000. At that time, Xentex was in the process of developing and

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)
2003 WL 21960357

launching a flip-pad computer known as the Voyager. During that meeting, plaintiffs received an Information Statement dated November 1, 2000 ("Information Statement"), which contained numerous representations relating to Xentex, the Voyager computer, and Xentex's plans for launching the Voyager into the market. In reliance on the representations made in the Information Statement, as well as certain oral representations made by Batio and Tucker at the November 1st meeting, plaintiffs invested more than $3.3 million in Xentex stock. Subsequently, on June 4, 2001, after certain additional representations by various members of Xentex's Board of Directors, plaintiffs loaned Xentex $650,000 in return for a promissory note. Plaintiffs now claim that the representations made in the Information Statement, the oral representations made at the November 1st meeting, and the representations made in connection with the execution of the promissory note were false, and that as a result, defendants have violated federal securities laws as well as numerous state statutory and common laws. Flanagan and the Xentex defendants have moved to dismiss.

*Analysis*

**\*2** In evaluating the motions to dismiss, the court accepts all of plaintiffs' well-pled allegations in the complaint as true and draws all reasonable inferences in plaintiffs' favor. *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 675 (7th Cir.2000). The court need " 'not strain to find inferences favorable to the plaintiffs' which are not apparent on the face of the complaint," however. *In re Allscripts, Inc. Secs. Litig.,* No. 00 C 6796, 2001 WL 743411, \*4 (N.D. Ill. June 29, 2001) (quoting *Coates v. Ill. State Bd. of Ed.,* 559 F.2d 445, 447 (7th Cir.1977)). To the extent plaintiffs raise securities fraud claims under § 10(b), they must meet the heightened pleading requirements of Rule 9(b) as well as § 78u–4(b) in order to state a claim for fraud. Under Rule 9(b), a plaintiff must plead "the circumstances constituting fraud ... with particularity." *In re HealthCare Compare Corp. Secs. Litig.,* 75 F.3d 276, 281 (7th Cir.1996). In other words, a plaintiff must allege "the who, what, when, where and how" of the fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Since the enactment of the PSLRA in 1995, the pleading requirements for claims under the Exchange Act are now even higher: the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1)(B). Additionally, with respect to each alleged misrepresentation or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2). These two requirements

are closely related. The PSLRA requires, in the absence of direct evidence of falseness and scienter, the pleading of facts which justify a strong inference of both elements. *See In re Navarre Corp. Secs. Litig.,* 299 F.3d 735, 744 (8th Cir.2002).

The heightened pleading requirements imposed by the PSLRA do not apply to plaintiffs' claims under § 12(a) (2), however. Although the PSLRA amended both the Securities Act and the Exchange Act, the heightened pleading requirements imposed by § 78u–4(b) apply only to claims brought under the Exchange Act. *In re Adams Golf, Inc. Secs. Litig.,* 176 F.Supp.2d 216, 230 (D.Del.2001); 15 U.S.C. § 78u–4(b).

With these pleading requirements in mind, the court turns to the counts at issue.

I. *Claims Under Section 10(b) and Section 20 of the Exchange Act of 1934*

A. § 10(b) Claims Against Xentex: Counts 2 and 3

1. For Claims under § 10(b), Plaintiffs Must Identify Specific False Statements and Provide the Reasons Why Each Statement is Misleading.

To state a claim under § 10(b) of the Exchange Act for a violation of Rule 10b–5, 17 C.F.R. § 24010b–5, a plaintiff must plead that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff has relied, and (6) that reliance proximately caused plaintiff's injuries." *HealthCare,* 75 F.3d at 280. Moreover, as explained above, plaintiffs must satisfy the pleading requirements imposed by the PSLRA: they must not only specify each statement they claim was misleading, they must also allege "the reason or reasons why [each] statement is misleading." 15 U.S.C.A. § 78u–4(b)(1)(B). Claiming that a particular statement was untrue is not enough–plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue. *Clark v. TRO Learning, Inc.,* No. 97 C 8683, 1998 WL 292382, at \*4 (N.D.Ill. May 20, 1998).

**\*3** Plaintiffs in this case fail to state claims under § 10(b) against Xentex because the complaint is woefully deficient under the PSLRA.[4] Although plaintiffs identify numerous specific statements that they believe were misleading, they repeatedly fail to provide "the reason or reasons why [each] statement is misleading." 15 U.S.C.A. § 78u–4(b)(1)(B).

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)
2003 WL 21960357

Further, in the few instances where plaintiffs provide the reasons why a particular statement was false, they fail to plead scienter adequately.

4      The court need not address whether plaintiffs satisfied Rule 9(b). The PSLRA requires at least as much and more.

Plaintiffs specifically identify the following representations from the Information Statement as false:

(1) Xentex had $5.3 million in assets, including $4.25 million in tooling;

(2) Korean Data Systems ("KDS") had agreed to open a service center for warranty & repair services;

(3) Xentex expected to launch the Voyager in fourth quarter of 2000;[5]

5      This representation is a forward-looking statement. Such a prediction is not actionable unless plaintiffs alleged that Xentex lacked a reasonable basis for making it. *Zoghlin v. Renaissance Worldwide, Inc.,* No. 99 C 1965, 1999 WL 1004624, at *6 (N.D.Ill. Nov. 4, 1999).

(4) KDS had provided approximately $40 million for product financing; and

(5) KDS had agreed to pay for all further product development and tooling costs.

(SAC at ¶ 20(a-e)). According to plaintiffs, the first statement was false because Xentex never had those assets, and the third statement was false because at the time, "Defendant was in a position wherein said launch was impossible," (*id.* ¶ 23). These are not adequate allegations of *why* the subject statements were false: plaintiffs merely allege that the statements were false because the opposite was true. These are conclusory allegations, not facts. As for statements 2, 4, and 5, plaintiffs offer no reasons whatsoever explaining why those representations were false.[6] Plaintiffs have failed to state a securities fraud claim based on the representations in the Information Statement.

6      Indeed, with respect to statement 4, there is not even an allegation that the statement was false, let alone an explanation of why it was false.

Plaintiffs also allege that Batio and Tucker made oral misrepresentations during the November 1st meeting. The purported oral misrepresentations were that:

(1) Xentex had made all necessary production arrangements with KDS for mass production;

(2) KDS had completed the tooling required to mass produce;

(3) all conditions precedent for production of the computers had been completed and any money sought was for marketing;

(4) the computer presented at the meeting was manufactured and produced by KDS; and

(5) there were no lawsuits pending against Xentex.

(SAC ¶¶ 34(a-e).) For present purposes, the court assumes each of these statements would be actionable if properly pled. But neither of the first two statements is properly pled. According to plaintiffs, the first statement was false because the arrangements have never been completed and the computers have never been mass-produced, again nothing more than the conclusion that the the opposite of the statements was true. Moreover, the fact that the computers have never been mass produced does not mean that the necessary production arrangements were never made. As for the second oral statement, plaintiffs claim it was false, but offer no reason why, again failing to satisfy the PSLRA requirements.

**\*4** Plaintiffs' pleading marginally improves with respect to the remaining three oral statements. They allege the third oral statement was false because the funds plaintiffs invested were not used for marketing, but rather were used "to pay off unrelated past debt and to purchase automobiles for Mr. Batio, pay his rent, fund his vacations and for other inappropriate purposes," (SAC ¶ 37). These allegations, which purport to be based on direct knowledge,[7] are suspiciously vague; if plaintiffs have such evidence, one would think they would describe with some particularity what debt, what automobiles, what vacations, and what "other inappropriate purposes" they are referring to. In any event, even if the alleged "facts" are specific enough to show why the representation was false, they do not provide a basis for inferring that the representation was false at the time it was made. " '[O]ften there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." ' *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245,

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

1260 (10th Cir.2001) (quoting *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548–49 (9th Cir.1994)). As for the statements concerning the origin of the computer and the lack of any pending lawsuits, plaintiffs probably adequately allege the falsity of those statements. However, for reasons explained below, even if the allegations regarding each of the last three oral statements satisfy the "why" requirement of the PSLRA, they fail to satisfy the Act's scienter prong.

7      If these allegations are based on information and belief rather than direct knowledge, plaintiffs have failed set out "with particularity all facts on which that belief is formed" as required by the PSLRA. 15 U.S.C. § 78u–4(b)(1)(B).

Additionally, plaintiffs raise a claim against Xentex under § 10(b) based on allegedly untrue representations made to induce plaintiffs to loan Xentex $650,000 in June 2001 pursuant to a promissory note.[8] Plaintiffs plead that:

8      Plaintiffs allege, and defendants at this stage do not contest, that this loan constituted a sale of securities within the meaning of the Exchange Act.

(1) Kim tendered a production schedule dated March 21, 2001, which represented that Xentex had the ability to mass produce Voyager computers at that time;

(2) Xentex, through Tucker, tendered a memo dated April 5, 2001 to plaintiffs representing that Xentex had made all arrangements to possess seventy prototypes from Asia within 3 weeks from the date of the memo;

(3) Xentex, through Batio, informed plaintiffs in May 2001 that the Voyager computers were essentially complete and assembled;

(4) Xentex, through defendant Brian Flanagan, advised the plaintiff that the company was able to pay its bills and was not financially depleted;

(5) Xentex, through Flanagan, advised plaintiff that no engineering or mechanical defects existed regarding the computers and that Xentex was being properly managed; and

(6) Xentex, through Batio, advised plaintiffs that the money tendered pursuant to the promissory note would be used for marketing purposes only, as the computers were assembled and complete.

**\*5**  (SAC ¶¶ 53–59.) Plaintiffs' allegations regarding statements 2, 3 and 4 are deficient under the PSLRA's pleading requirements because they failed to plead any specific facts showing the falsity of those statements at the time they were made.

As for the first statement, plaintiffs allege that the statement that Xentex was capable of mass producing Voyager computers was false because Xentex, to date, has never mass-produced the computers. (*Id.* ¶ 61.) As explained above, the fact that Xentex has not mass-produced the computers does not mean that it was never capable of doing so, and thus does not support the inference that the statement was false when made. Plaintiffs also attempt to show the falsity of the first statement by alleging that the production schedule Kim gave them "failed to accurately disclose Xentex['s] ability to mass-produce the Voyager computers." (*Id.* at 62.) Plaintiffs have again merely stated that the production memo was untrue, without providing facts showing why it was untrue.

The allegations regarding the falsity of the fourth statement also falter. According to the complaint, Flanagan's statement that the company was able to pay its bills and was not financially depleted was false because in fact, Xentex was deeply in debt, underfunded, and a defendant in numerous lawsuits based on its failure to pay its bills. (*Id.* ¶ 60.) The allegation that Xentex was deeply in debt and underfunded is conclusory. The allegation that Xentex was a defendant in numerous lawsuits based on its failure to pay its bills is more specific, but the court cannot infer from this allegation that the company was underfunded. Plaintiffs give no information about the lawsuits in question.[9] For that matter, a claim for $1000 or even $100,000, without more, does not show that a company is underfunded.

9      It seems odd that plaintiffs know enough to allege that two lawsuits were pending, yet entirely fail to identify or describe them.

According to plaintiffs, the sixth statement, Batio's representation that the money loaned pursuant to the promissory note would be used only for marketing purposes, was false because Xentex actually used the money to pay past due bills and to pay for Batio's living expenses, car payments, and vacations. Those vague allegations do not provide any basis for inferring that the sixth statement was false at the time it was made. *City of Philadelphia,* 264 F.3d at 1260. Whether the sixth statement adequately explains why the statement was false when made is therefore questionable. But even assuming the complaint adequately alleges why the fourth and sixth statements were false, plaintiffs have failed to satisfy

the PSLRA's requirements for pleading scienter in connection with those statements.

2. *The Complaint Lacks Facts Giving Rise to a Strong Inference that Xentex Acted with Scienter in Violation of § 10(b).*

To satisfy the PSLRA's heightened pleading requirements for scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For a claim under § 10(b), the requisite scienter is "a mental state embracing the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). "[R]eckless disregard for the truth counts as intent" for purposes of § 10(b).[10] *Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 822 (N.D.Ill.2000) (quoting *SEC v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998)). Conclusory allegations that defendants acted with knowledge that the representations were false and misleading do not satisfy the PSLRA's pleading requirements. Plaintiffs "must do more than speculate as to defendants' motives or make conclusory allegations of scienter; [they] must allege specific facts." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997). The facts alleged must be sufficient to strongly support the inference that at the time the statements were made, defendants knew, or were reckless in not knowing, that the statements were false.

[10]  Recklessness requires, at minimum, "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997).

 ***6**  Even if, as explained above in Section I.A.1, plaintiffs adequately allege the reasons why three of the oral statements made at the November 1st meeting and two of the oral statements relating to the promissory note were false, they have failed to allege facts giving rise to a strong inference that defendants made those purported misrepresentations knowingly or recklessly. With respect to the statements at the November 1st meeting[11] and the statements relating to the promissory note,[12] plaintiffs plead that "Xentex, through its Board of Directors and corporate officers, made the above-referenced false and misleading statements and/or omissions, although the Board of Directors and said corporate officers knew them to be false, untrue and misleading." (SAC ¶¶ 46,

70.) This is merely a conclusion and therefore is inadequate to satisfy the heightened pleading standards of the PSLRA.

[11]  *I.e.,* Batio's and Tucker's statements that the money would be used for marketing, that KDS manufactured the computer displayed at the meeting, and that there were no lawsuits pending against Xentex.

[12]  *I.e.,* Flanagan's statement that the company was able to pay its bills and was not financially depleted and Batio's representation that the money loaned pursuant to the promissory note would be used only for marketing purposes.

Plaintiffs also allege that defendants made the misrepresentations because Xentex had "misappropriated and squandered the corporation[']s money," "needed to alleviate the corporation's extreme financial difficulties," and sought to enable Xentex's Board of Directors, corporate officers, and employees to "loot the corporation for their personal gain." (*Id.* ¶¶ 43–44; 71–72.) These allegations similarly are devoid of the level of factual specificity required to satisfy the PSLRA. Plaintiffs "must do more than speculate as to defendants' motives or make conclusory allegations of scienter; [they] must allege specific facts." *Rehm,* 954 F.Supp. at 1255; *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (requiring particularized facts under Rule 9(b) pre-PSLRA). Plaintiffs allege no specific facts to show that Xentex was experiencing extreme financial difficulties at the time the representations were made.[13] Bare allegations that a company has cash flow problems, without factual support, are insufficient to support a finding of scienter. *Rehm,* 954 F.Supp. at 1254 n. 4. Nor do plaintiffs plead facts supporting their vague allegations that Xentex's Board, officers, and employees were misappropriating, squandering, and looting Xentex's money. The most they allege, in highly general and hence inadequate form, is that at some *later* time the money they invested was used to pay Batio's personal expenses. Such an allegation, even if factually specific enough (which the court doubts) does not support a strong inference that at the time of the November 1st meeting, looting and misappropriation of corporate funds was occurring at Xentex, and that Xentex thus made fraudulent misrepresentations in order to continue the looting and misappropriation.

[13]  In their briefs opposing the motion to dismiss, plaintiffs argue that Xentex owed defendant Flanagan $500,000 pursuant to a promissory note, and that he ultimately (*i.e.,* at a later time) called that note and forced Xentex

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)
2003 WL 21960357

into bankruptcy. Notably, the allegations concerning Flanagan were not incorporated into the allegations against Xentex and have therefore not been raised against Xentex. In any event, the fact that a start-up company like Xentex owed $500,000 under a promissory note is far from remarkable; indeed, Xentex owed plaintiffs $650,000 pursuant to another promissory note.

Plaintiffs have failed to set forth facts demonstrating why most of the misrepresentations they allege were false. In the few instances where some "why" information is provided, plaintiffs have not set forth facts sufficient to give rise to a strong inference that Xentex (through its Board and/or corporate officers) knew the statements were false and acted knowingly or recklessly in making the misstatements. For these reasons, plaintiffs have failed to plead securities fraud claims against Xentex under § 10(b). Counts 2 and 3 are dismissed.

### B. § 10(b) Claims Against Turcotte: Counts 9 and 10

**\*7** Plaintiffs also claim that Michael Turcotte, Xentex's Vice President of Accounting and Control, committed securities fraud in violation of § 10(b) by making misrepresentations in financial statements distributed prior to the initial stock purchase (Count 9) and prior to the execution of the promissory note (Count 10).

Specifically, plaintiffs allege that the Information Statement they received included financial statements prepared by Turcotte which falsely represented that Xentex owned tooling worth more than $4.25 million and total assets exceeding $5.3 million. A subsequent financial statement prepared by Turcotte dated December 31, 2000, less than two months after plaintiffs invested in Xentex, represented that Xentex had just $4.3 million in assets, including only $1.5 million in tooling. Plaintiffs claim they relied on the original financial statement when they invested $3.3 million in Xentex. Turcotte then allegedly prepared another financial statement, dated March 15, 2001, in which the value of tooling was raised back to $4.25 million. Plaintiffs plead that this March 15th representation induced them to execute the promissory note and loan Xentex an additional $650,000. Plaintiffs further allege that in preparing the financial statements, Turcotte violated Generally Accepted Accounting Procedures ("GAAP").

Plaintiffs rely on the variations between the financial statements to support their allegations of fraud. But plaintiffs may not rest a securities fraud claim on the differences between financial statements. *DiLeo,* 901 F.2d at 627. Rather, "[i]nvestors must point to some facts suggesting that the difference is attributable to fraud...." *Id.* Moreover, the allegations against Turcotte fail to give rise to a strong inference that he knew the statements were false and acted knowingly or recklessly in making the misstatements. For the most part, plaintiffs make the same scienter allegations against Turcotte that they alleged against Xentex; that Turcotte, according to the complaint, made misrepresentations and omissions because Xentex "had misappropriated and squandered money tendered by previous investors," "was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company." (SAC ¶¶ 179–80, 196–97.) The court has already addressed the deficiencies of these allegations above.

Plaintiffs also allege that Turcotte made misrepresentations in the financial statements "to properly secure his inflated salary and ensure he was compensated by other [unspecified] means" (*Id.* ¶¶ 181, 198), and that he committed various GAAP violations. Plaintiffs' allegation regarding Turcotte's desire to maintain his inflated salary, obviously aimed at establishing his motive to commit fraud, fails to establish a strong inference of scienter. There is disagreement among the courts of appeals which have addressed the issue as to the adequacy of allegations of motive and opportunity, standing alone, to create the necessary strong inference of scienter. *See Goldstein v. MCI WorldCom,* __ F.3d __, Nos. 02–60322, 03–60248, 2003 WL 21738963, at \*6 (5th Cir. July 28, 2003). But this court agrees with the Eighth Circuit's observation that "having the motive and opportunity to do wrong are certainly not the same as having the intent to do it," and that generally alleging greed as a motive fails even to establish motive, led alone scienter. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 655 (8th Cir.2001). To establish motive, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields,* 25 F.3d at 1130. Further, alleged GAAP violations, without more, have consistently been held insufficient to give rise to a strong inference of scienter. *In re K–Tel Int'l, Inc. Secs. Litig.,* 300 F.3d 881, 890 (8th Cir.2002); *Riggs Partners, LLC v. Hub Group, Inc.,* No. 02 C 1188, 2002 WL 31415721, \*5 (N.D.Ill. Oct. 25, 2002); *Rehm,* 954 F.Supp. at 1255.

**\*8** Counts 9 and 10 fail to meet the PSLRA's pleading standards and are therefore dismissed to the extent they raise claims under § 10(b) of the Exchange Act.

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

C. § 10(b) Claims Against Kim: Counts 25 and 26

Plaintiffs also claim that Dr. Wan Hee Kim, a member of Xentex's Board of Directors and chairman of its Executive Committee, committed securities fraud in violation of § 10(b) by making misrepresentations to them prior to the initial stock purchase (Count 25) and prior to the execution of the promissory note (Count 26).

To the extent plaintiffs seek to hold Kim directly responsible for misrepresentations made in the Information Statement, their claim is based on the same flawed allegations that form the basis of the deficient claim against Xentex, and thus fails for the same reasons the claim against Xentex fails. But plaintiffs also allege that Kim had a direct conversation with them in early November 2000 in which Kim "failed to disclose the fact that Xentex was drastically underfunded, was incapable of producing Voyager computers and was the subject of several lawsuits for failure to pay its bills." (SAC ¶ 425–26.) These allegations suffer from the same lack of factual specificity that afflicted the allegations discussed above, and thus cannot sustain a § 10(b) claim. Plaintiffs offer no facts showing that Xentex was underfunded or incapable of producing the computers. Further, plaintiff's conclusory allegations that Kim knew the representations were false and made them in order to induce plaintiffs to invest are wholly inadequate, for the reasons repeatedly rehearsed above, to constitute facts giving rise to a strong inference of scienter.

Nor have plaintiffs stated a claim in Count 26 against Kim for misrepresentations relating to the promissory note. Count 26, like Count 25, is premised on Kim's failure to disclose that Xentex was underfunded, incapable of producing Voyager computers, and involved in several lawsuits due to its failure to pay bills. Plaintiffs do not allege that Kim had a duty to disclose, or that he ever even discussed with them, pending lawsuits. They do, however, allege that he made representations about Xentex's ability to produce Voyager computers, and thus should have disclosed that Xentex was incapable of doing so. They claim that in March 2001, Kim learned that a design problem was holding up production of the computers, and that he proceeded to give them a production schedule dated March 21, 2001 "which represented [Xentex's] present position and ability to mass produce Voyager computers, stat[ing] that Voyager computers would start to be produced in October, 2001." (SAC ¶ 441.) But Kim's representation that production of the Voyager computers would start in October was a projection or a forward-looking statement. "[P]redictions of future performance are inevitably inaccurate because things

almost never go exactly as planned." *Zoghlin v. Renaissance Worldwide, Inc.,* No. 99 C 1965, 1999 WL 1004624, at \*6 (N.D.Ill. Nov. 4, 1999) (quoting *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993)). Forward-looking statements are therefore not actionable unless plaintiffs allege "specific facts which illustrate that [the defendant's] predictions lacked a reasonable basis." *Arazie,* 2 F.3d at 1468. The mere allegation that there were design problems in March 2001 does not support the inference that there was no reasonable basis for Kim to represent that production would begin nearly seven months later.

**\*9** To the extent Counts 25 and 26 seek to hold Kim liable under § 10(b), they are dismissed for failure to state a claim.

D. § 10(b) Claims Against Flanagan: Counts 18 and 19

Plaintiffs sue Flanagan, a member of Xentex's Board of Directors, for misrepresentations purportedly made in connection with their initial stock purchase (Count 18) and the execution of the promissory note (Count 19). Neither of these claims satisfy the PSLRA's heightened pleading requirements.

With respect to the initial stock purchase, plaintiffs do not allege any direct contact with Flanagan. Rather, they claim Flanagan is liable for misrepresentations in the Information Statement because he "played a role in the preparation of said information sheet and/or had reviewed said Information [Statement] in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation." (SAC ¶ 303.) In other words, they seek to hold him liable for a "group-published" document. "The group pleading doctrine is generally construed as applying only to high-level corporate officers and directors with direct involvement in the day-to-day business of the company." *Sutton v. Bernard,* No. 00 C 6676, 2001 WL 897593, at \*5 (N.D.Ill. Aug. 9, 2001). Assuming plaintiffs' allegations are adequate under the group pleading doctrine and that the doctrine is applicable to Flanagan, plaintiffs' § 10(b) claim against Flanagan nevertheless fails for their failure to comply with the PSLRA's requirements that they allege facts indicating why the purported misrepresentations were false and facts giving rise to a strong inference of scienter.

Likewise, the § 10(b) claim against Flanagan based on misrepresentations relating to the promissory note is deficient. Plaintiffs allege that before they executed the promissory note, their principals had a telephone conversation with Flanagan during which he represented that "Xentex

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

management was stable and effective, production of the Voyager computers were [sic] on schedule, [Xentex] was not under funded and he did not know the reason that the CEO of [Xentex] had quit." (SAC ¶ 320.) Plaintiffs, as is their wont, fail to offer any specific facts indicating that any of these representations were false. They merely allege that Flanagan, as a Board member, attended Board meetings, had frequent conversations with the former CEO, had reviewed documentation, and "otherwise knew" the representations were false. (SAC ¶ 320.) Such vague allegations are not nearly factually specific enough to satisfy the PSLRA's pleading standards.

Given the aforementioned deficiencies, the court need not address the sufficiency of plaintiffs' allegations regarding Flanagan's scienter. To the extent Counts 18 and 19 raise claims against Flanagan under § 10(b), they are dismissed.

### E. Control Person Claims Under § 20 Against Turcotte, Kim & Flanagan

Plaintiffs also sue Turcotte, Kim, and Flanagan as control persons under § 20 of the Exchange Act based on misrepresentations relating to plaintiffs' initial stock purchase and their subsequent loan pursuant to the promissory note.[14] Plaintiffs' control-person claims under § 20 are derivative claims, and thus are actionable only if plaintiffs adequately allege a primary violation under § 10(b). *Heartland Fin. USA, Inc. v. Fin. Insts. Capital Appreciation Partners I, L.P.,* No. 02 CV 3982, 2002 WL 31819008, at * 8 (N.D.Ill.Dec. 12, 2002). Because plaintiffs here failed to state a claim under § 10(b) against any of the defendants, plaintiffs' claims under § 20 must be dismissed as well. *Id.*

14      As noted earlier, plaintiffs did not bring the control-person liability claims under § 20 in counts separate from the direct liability claims under § 10(b). The § 20 claims are raised against Turcotte in Counts 9 and 10, against Kim in Counts 24 and 25, and against Flanagan in Counts 18 and 19.

## II. *Claims Under Section 12(a)(2) and Section 15 of the Securities Act of 1933*

 **\*10** Plaintiffs also bring claims against Xentex, Turcotte, Kim and Flanagan under § 12(a)(2) of the Securities Act relating to their initial stock purchase. The PSLRA's heightened pleading requirements do not apply to claims under the Securities Act. *Adams Golf,* 176 F.Supp.2d at 230. Likewise, neither fraud nor scienter are elements of a Section

12(a)(2) claim. *In re Nationsmart Corp. Secs. Litig.,* 130 F.3d 309, 318 (8th Cir.1997). Nor need plaintiffs satisfy Rule 9(b), as long as they are not making allegations of fraud. Flanagan and the Xentex defendants, however, argue that plaintiffs have no cause of action under § 12(a)(2) because plaintiffs purchased stock through a private placement, not a public offering. Plaintiffs disagree.

Section 12(a)(2) applies only to public offerings, not private placements. Liability under § 12(a)(2) extends to any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading...." 15 U.S.C. § 77*l* (a)(2). As the Supreme Court explained in *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 567–68, 571 (1995), § 12(a)(2) provides for liability only for misstatements in prospectuses or false oral communications relating to such prospectuses. Further, the term "prospectus" is "confined to documents related to public offerings by an issuer or its controlling shareholders." *Id.* at 569.[15] Accordingly, causes of action brought under § 12(a)(2), where the transaction at issue was a private placement rather than a public offering, are subject to dismissal. *See, e.g., Abbell Credit Corp. v. Banc of Am. Secs., L.L.C.,* No. 01 C 2227, 2001 WL 1104601, at \*3 (N.D.Ill. Sept. 17, 2001) (dismissing § 12(a)(2) claims pursuant to Rule 12(b)(6)); *Liberty Ridge LLC v. Realtech Sys. Corp.,* 173 F.Supp.2d 129, 135 (S.D.N.Y.2001) (same).

15      *Gustafson* addressed Section 12(2), which by amendment in 2000 became Section 12(a)(2).

Plaintiffs allege that they made their initial stock purchase in a public offering. That allegation, however, is contradicted by the offering document for plaintiffs' initial investment. "It is a well-settled rule that when a written instrument [properly before the court as an exhibit] contradicts allegations in the complaint, ... the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998).[16] The Information Statement plainly states that the offering was a "private placement," that was "being made pursuant to Regulation D of the Securities Act of 1933," that "investors must be 'accredited investors' under Regulation D," and that no public trading market existed for the shares offered. (Information Statement at unnumbered p. 2.) Sales of securities made pursuant to Regulation D, 17 C.F.R. § 230.506, are not public offerings.

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

16    In determining whether to grant the motion to dismiss, the court may properly consider the Information Statement, which the Xentex defendants submitted as an exhibit to their brief in support of their motion to dismiss, because plaintiffs referred to the Information Statement in their complaint and the document is central to plaintiffs' claims. *Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). For the same reasons, the court will consider the Promissory Note and the Amendment to that note. The court will not, however, consider any of the other documents submitted by the Xentex defendants, *i.e.,* the Worldwide Manufacturing Agreement, the Sales and Distribution Licensing Agreement, the list of Due Diligence Documents Delivered to Copeland Family, or the Subscription Agreement. Although those documents may well be central to resolution of plaintiffs' claims, none of those documents were referenced in the complaint. The exception allowing a court to consider documents referenced in a complaint, and central to the claims, is a narrow one. "It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment...." *Levenstein v. Salafasky,* 164 F.3d 345, 347 (7th Cir.1998).

But despite what the Information Statement says, plaintiffs argue that Xentex's sale of securities does not qualify as a private placement under Regulation D. Regulation D applies only if certain conditions are met, one of which requires that the number of purchasers not exceed thirty-five. 17 C.F.R. § 230.506(b)(2)(i). Regulation D also places restrictions on investments by purchasers who are not accredited investors. *See id.* at § 230.506(b)(2)(ii). According to plaintiffs, "there were over 300 investors in [Xentex] and a large percentage of the investors were unaccredited." (Pls.' Surreply at 9.)[17] If these assertions are true, the offering by which plaintiffs acquired their Xentex stock would not qualify as a private placement and would have to satisfy the requirements for a public offering. At this stage, the court must accept their truth. Consistent with these assertions, plaintiffs could prove that they acquired their stock in a public offering, subject to the requirements of § 12(a)(2).[18] The Xentex defendants and Flanagan bear the burden of proving that the private placement exemption applies to the stock sale at issue. *UBS Asset Mgmt. (N.Y.) Inc. v. Wood Gundy Corp.,* 914 F.Supp. 66, 68 (S.D.N.Y.1996) (burden of showing exemption falls on person claiming it).

17    Even though these allegations are not in the complaint, the court may consider them. In opposing dismissal, a plaintiff is allowed to assert additional facts that are consistent with the complaint to show facts which, if proved, would entitle him to judgment. *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir.1992).

18    These assertions are not necessarily inconsistent with a private placement, however. For example, Xentex could have achieved 300 investors by means of multiple private placements with no more than 35 investors per offering.

**\*11** The Xentex defendants raise no other challenges to plaintiffs' § 12(a)(2) claims against Xentex (Count 1), Turcotte (Count 8), and Kim (Count 24). Accordingly, those counts survive the motion to dismiss. Counts 8 and 24 also sought to impose control-person liability under § 15 against Turcotte and Kim, respectively. Claims under § 15 are derivative claims, seeking to impose joint and several liability against control persons for others' primary violations of § 12(a)(2). Because the Xentex defendants' only challenge to the § 15 claims was that plaintiffs failed to allege a primary violation under § 12(a)(2), the control-person claims against Turcotte and Kim also survive.

Flanagan, on the other hand, raises two additional arguments for dismissal of the claims against him under the Securities Act. He argues first that plaintiffs failed to properly state a claim against him under § 12(a)(2) because they do not allege that Flanagan was a seller within the meaning of the statute. Liability under § 12(a)(2) is limited to "those who pass title of securities or solicit their sale." *Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 936 (N.D.Ill.1999) (citing *Pinter v. Dahl,* 486 U.S. 622 (1988)). Thus, individual officers and directors are not liable "absent allegations that they actually promoted or solicited the sale of [Xentex's] securities."[19]*Maton v. Arthur Andersen & Co.,* No. 91 C 1885, 1991 WL 131184, at \*3 (N.D.Ill. July 5, 1991). Here, plaintiffs effectively concede that Flanagan is not liable under § 12(a)(2). They argue that as a control person under § 15, Flanagan can be liable for another person's primary violation of § 12(a)(2). That is true, but as a control person, he would be liable only under § 15, not under both § 15 and § 12(a)(2). Plaintiffs' § 12(a)(2) claim against Flanagan is therefore dismissed.

19    At the November 1st meeting, it was Batio and Tucker, not Flanagan, who met with plaintiffs and presented them with the opportunity to invest in Xentex.

Flanagan also asserts that plaintiffs have not adequately pled control-person liability under § 15. In the Seventh Circuit, plaintiffs seeking to establish control-person liability must plead two clements: "(1) that the defendant actually exercised

2003 WL 21960357

general control over the operations of the entity [that is liable for a primary violation]; and (2) that the defendant had the power or ability to control the specific acts constituting the primary violation." *Lindelow v. Hill,* No. 00 C 3727, 2001 WL 830956, at *9 (N.D.Ill. July 20, 2001) (citing *Donohoe v. Consol. Operating & Prod. Corp.,* 982 F.2d 1130, 1138–39 (7th Cir.1992)).[20] Simply relying on Flanagan's status as a member of the Board of Directors is insufficient to state a control person claim. *See, e.g., Donovan v. ABC–NACO, Inc.,* No. 02 C 1951, 2002 WL 1553259, at *6 (N.D.Ill. July 15, 2002) (fact that defendants were directors insufficient to support control-person liability). But here, plaintiffs allege a bit more. They contend that Flanagan "actively participated in and controlled decisions of the Board of Directors" (general control), that he helped prepare and/or review the Information Statement (control over specific acts) and that he held a security interest in all of Xentex's assets. These allegations are enough to survive a motion to dismiss. Claims under § 15 need only satisfy federal notice pleading standards. Moreover, "[o]rdinarily, whether a defendant is a 'controlling person' ... is a question of fact that cannot be determined at the pleading stage." *Lindelow,* 2001 WL 830956, at *9.

20    Both *Lindelow* and *Donohoe* involved control person liability under § 20, not § 15, but the same standards apply to both. *See In re VMS Secs. Litig.,* 752 F.Supp. 1373, 1402 (N.D.Ill.1990).

*Conclusion*

 **\*12** Both Flanagan's and the Xentex defendants' motions to dismiss the federal claims against them in the Second Amended Complaint are granted in part and denied in part. As explained above, the claims against Xentex, Turcotte, Kim, and Flanagan under § 10(b) and § 20 of the Exchange Act are hereby dismissed, as is the § 12(a)(2) claim against Flanagan. The claims against Xentex, Turcotte and Kim under § 12(a)(2) survive, however, as do the control-person liability claims against Turcotte, Kim and Flanagan under § 15.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21960357

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

2021 WL 1172773
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,
v.
Gary WINEMASTER, et al., Defendants.

No. 19-cv-04843
|
Signed 03/29/2021

**MEMORANDUM OPINION AND ORDER**

Andrea R. Wood, United States District Judge

 **\*1** Power Solutions International, Inc. ("PSI") is a publicly traded company that manufactures and sells engines. Between the fourth quarter of 2014 and the fourth quarter of 2015, PSI encountered difficulties meeting its revenue targets. While PSI aggressively tried to solicit additional sales from its customers, it found a lack of demand for its products during that period. According to Plaintiff United States Securities and Exchange Commission ("SEC"), this led PSI to inflate artificially its revenue numbers by fraudulently accounting for several transactions. In total, PSI overstated its revenues by about $25 million. As a result of this alleged fraud, the SEC has brought the present action against PSI's Chief Executive Officer ("CEO"), Defendant Gary Winemaster; its Vice President of Sales, Defendant Craig Davis; and its General Manager for Industrial, Heavy Duty Products, Defendant James Needham. The SEC's 11-count complaint sets out several securities law claims against Defendants, including for violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Now before the Court are two motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Winemaster (Dkt. No. 34) and Needham (Dkt. No. 30). For the reasons that follow, both motions are denied.

**BACKGROUND**

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to the SEC as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

PSI is a publicly traded company that manufactures and sells engines to industrial equipment manufacturers and transportation companies. (Compl. ¶¶ 1, 17–18, Dkt. No. 1.) As a publicly traded company, PSI must file various periodic reports with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q. (*Id.* ¶ 19.) In those reports, PSI is required to include financial statements that accurately and fairly reflect PSI's financial condition. (*Id.*) Moreover, any financial statements in those reports must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (*Id.*)

At all times relevant to this action, Winemaster served as PSI's CEO, President, and Chairman of the Board of Directors. (*Id.* ¶¶ 1, 14.) As PSI's CEO, Winemaster was responsible for reviewing and approving PSI's consolidated financial statements and reviewing, approving, signing, and certifying PSI's periodic public reports, including its Forms 10-K and 10-Q. (*Id.* ¶¶ 14, 24.) Among the representations Winemaster made when signing each of PSI's periodic public reports was that each report did not include any material misstatements or omissions and fairly presented, in all material respects, PSI's financial condition for the reporting period. (*Id.* ¶ 24.) In addition, Winemaster was responsible for establishing and maintaining PSI's system of internal financial reporting controls and was aware of and responsible for PSI's system of internal accounting controls. (*Id.* ¶¶ 24, 143)

 **\*2** Reporting directly to Winemaster was Needham, who served as PSI's General Manager for Industrial, Heavy Duty Products. (*Id.* ¶¶ 1, 16, 26.) Needham's position made him responsible for selling PSI's products to customers serving the oil and gas industry. As PSI's Vice President of Sales, Davis was in charge of PSI's sales department. (*Id.* ¶¶ 1, 15, 25.) While Davis oversaw most of PSI's sales personnel and approved all sales incentives offered to PSI customers, he did not have oversight authority over Needham. (*Id.* ¶ 25.) Davis also reported directly to Winemaster, who exercised close oversight of the sales department and maintained close contact with several PSI customers. (*Id.* ¶¶ 16, 25.)

**I. Improper Recognition of Revenue**

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Each quarter, PSI would provide the public with revenue guidance predicting the company's revenue for the upcoming quarter. (*Id.* ¶ 30.) Similarly, PSI provided revenue guidance for the full year. (*Id.*) Winemaster determined the revenue guidance provided to the public. (*Id.*) Stock analysts would review such guidance, along with PSI's periodic reports, to develop recommendations for investors and make projections for a number of PSI's financial metrics, including anticipated net revenue. (*Id.* ¶ 29.) Various financial firms and media outlets would then combine analysts' projections for PSI's quarterly net revenue and produce a publicly available consensus net revenue estimate for the time period. (*Id.*) Consensus net revenue estimates are important because when a company falls short of its projection, the company usually experiences a negative reaction from investors and a decrease in stock price. (*Id.*) Consequently, PSI management used quarterly analyst estimates as a benchmark for its internal quarterly revenue targets. (*Id.* ¶ 30.) Winemaster had ultimate authority for determining PSI's revenue targets. (*Id.*)

PSI's accounting department recorded PSI's revenue through an enterprise resource planning system known as EPICOR. (*Id.* ¶ 27.) When processing sales, the accounting department relied on the sales department to communicate whether there were any non-standard or atypical terms associated with a particular sale. (*Id.*) That is because the accounting department did not review customer purchase orders or shipping documents for customer orders before recording revenue. (*Id.* ¶ 28.) Thus, if a customer was given terms different from PSI's standard sales terms, those terms would not be accurately reflected in what the accounting department inputted into EPICOR. (*Id.* ¶¶ 27–28.) Sales department personnel, including Needham, knew that they needed to communicate to the accounting department any non-standard terms associated with a particular sale. (*Id.* ¶ 27.)

It was important for the accounting department to know any non-standard terms associated with a particular sale because such terms could affect how it recorded revenue from that sale. (*Id.* ¶¶ 21, 27.) Under the GAAP standard set forth at Accounting Standards Codification ("ASC")[1] 605-10-25-1, revenue may be recognized when it is realized, realizable, and earned. (*Id.* ¶ 20.) Consistent with ASC 605-10-25-1, PSI stated in its SEC filings that its policy was to recognize revenue "upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured." (*Id.* ¶ 21.) Further, PSI stated that

[i]n certain circumstances, [PSI] recognizes revenue before delivery has occurred. In such circumstances, among other things, risk of ownership has passed to the buyer, the buyer has made a written fixed commitment to purchase the finished goods, the buyer has requested the finished goods be held for future delivery as scheduled and designated by them, and no additional performance obligations exist by [PSI].

**\*3** (*Id.*) Thus, certain non-standard terms or side arrangements associated with a particular sale could affect PSI's ability to recognize revenue associated with that sale consistent with GAAP and PSI's own revenue recognition policies or the timing of when such revenue can be recognized. (*Id.* ¶¶ 2–4, 27–28, 32.)

[1]    The ASC is the single source codifying all United States Generally Accepted Accounting Principles.

Beginning in the fourth quarter of 2014, PSI encountered difficulties meeting its revenue targets. (*Id.* ¶¶ 32, 35.) Those difficulties were exacerbated in 2015 due to a decline in the price of oil. (*Id.* ¶ 32.) Because many of PSI's largest customers purchased engines to be used in the oil and gas industry, demand for a significant portion of PSI's products was tied to the price of oil. (*Id.* ¶ 18.) Thus, when the price of oil decreased, demand for many PSI products also decreased. (*Id.*) During this time, Winemaster, Needham, and Davis undertook efforts to encourage its customers to agree to purchases that would help PSI meet its revenue targets. (*Id.* ¶¶ 32–35.) In furtherance of those efforts, one or more Defendants would offer certain incentives or side arrangements to PSI customers to encourage them to make purchases prior to the end of the quarter, even when the customer did not have an immediate need for the products it purchased. (*Id.*) As a result of Defendants' conduct, PSI improperly recognized revenue for several transactions, causing the company to materially misstate the financial statements in its periodic filings for every period from the fourth quarter of 2014 through the fourth quarter of 2015. (*Id.* ¶¶ 1, 35.) The transactions at issue in the present action are presented according to the quarter in which the associated revenue was recognized and are summarized as follows.

**A. Fourth Quarter 2014**

In the fourth quarter of 2014, analysts' consensus estimate for PSI's net revenue was $103.4 million. (*Id.* ¶ 37.) However, as the end of the quarter drew closer, PSI was at risk of falling short of that number. (*Id.* ¶¶ 37, 39–40.) At

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Davis's direction, a PSI sales representative approached a PSI customer, Customer A, in late November 2014 and offered extended payment terms to incentivize Customer A to take early delivery of 30 engines that it had ordered for 2015. (*Id.* ¶¶ 39–40.) Customer A responded with a counteroffer, asking that, in addition to the extended payment terms, PSI agree to cover the cost of warehousing the engines at an off-site location as well as shipping costs to send the engines to that off-site location. (*Id.* ¶ 39.)

Davis approved the counteroffer, noting that PSI needed to do the deal because it was currently short of its quarterly revenue target. (*Id.*) Indeed, the sole purpose of the early sale was to allow PSI to hit its revenue target for the quarter. (*Id.* ¶ 39.) As the sales representative later acknowledged, "the WHOLE reason behind this entire exercise was to try and jam as much business in the [sic] 2014 as possible." (*Id.* ¶ 40.)

While PSI recognized about $846,000 of revenue from the sale in the fourth quarter of 2014, that revenue was not properly recognizable for that period. (*Id.* ¶¶ 37, 41.) Rather, PSI attempted to enter into a "bill and hold" transaction with Customer A, which refers to a sale in which revenue is recognized ahead of the delivery of the item. (*Id.* ¶¶ 21, 37.) But for revenue to be properly recognized from a bill and hold sale under GAAP, the sale must meet the following requirements:

> **\*4** (i) the risks of ownership pass to the buyer at the time of the bill and hold transaction; (ii) the buyer makes a fixed commitment to purchase the goods; (iii) the buyer, not the seller, requests that the transaction be on a bill and hold basis;
>
> (iv) the buyer has a substantial business purpose for ordering the goods on a bill and hold basis; (v) there is a fixed schedule for delivery of the goods that is both reasonable and consistent with the buyer's substantial business purpose for the bill and hold transaction; (vi) the seller does not retain any specific performance obligations related to the sale; and (vii) the goods are complete and ready for shipment at the time of the bill and hold transaction.

(*Id.* ¶ 38.) Here, the revenue did not meet the criteria for recognition on a bill and hold basis because Customer A neither requested the bill and hold nor had a business purpose for ordering on a bill and hold basis. (*Id.* ¶ 41.)

Davis did not inform accounting that Customer A did not request the bill and hold, had received extended payment terms, or that PSI agreed to cover the cost of storing the engines. (*Id.* ¶ 42.) When Davis was challenged by a senior operations executive over the propriety of recognizing revenue from the sale to Customer A, Davis falsely informed the executive that PSI's Chief Financial Officer and others in the accounting department had been informed of all pertinent details of the transaction and had approved of its accounting treatment. (*Id.* ¶ 42.) Because of Davis's misconduct, PSI improperly recognized $846,000 of revenue from the sale to Customer A in the financial statements included in its 2014 Form 10-K. (*Id.* ¶ 43.) Without the sale to Customer A, PSI's fourth quarter 2014 revenue would have fallen approximately $400,000 short of analysts' consensus net revenue expectation. (*Id.* ¶ 37.)

**B. First Quarter 2015**

In February 2015, PSI appeared to be falling far short of its quarterly revenue target. (*Id.* ¶ 46.) For that reason, Davis directed a PSI sales representative to approach Customer B about accelerating the delivery of about $7.8 million worth of engines that had been scheduled for delivery in the summer of 2015. (*Id.*) Although the sales representative expressed concern to Davis about pulling ahead sales to meet revenue targets, Davis told the salesperson that if PSI did not pull ahead the Customer B sale, "the quarterly results would be 'tragic.' " (*Id.*)

Initially, Customer B rejected multiple PSI offers of incentives to accept the engines early because it did not want the engines in the first quarter of 2015. (*Id.* ¶ 47.) This led Winemaster to call the president of Customer B and offer an indefinite right of return on the engines if Customer B's intended customer for the engines cancelled its order. (*Id.*) Customer B accepted Winemaster's offer and accepted delivery of the engines prior to the end of the first quarter. (*Id.*) Winemaster did not inform PSI's accounting department or anyone else at PSI of the indefinite right of return prior to filing PSI's Form 10-Q for the first quarter of 2015. (*Id.* ¶ 48.) Yet under ASC 605-15-25-1, which addresses recognizing revenue when a right of return exists, PSI could not recognize revenue in the first quarter unless it could reasonably estimate the amount of future returns. (*Id.* ¶ 50.) And because PSI had previously only accepted returns due to defects or performance issues, it had no way estimating returns or otherwise knowing whether Customer B's intended customer would ultimately cancel its order. (*Id.* ¶ 51.) Thus, the earnings process was not complete and the sale should not have been recognized in the first quarter of 2015. (*Id.*) Nonetheless, the $7.8 million in revenue from the

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 76 of 105 PageID #:2358

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

sale to Customer B was improperly recognized in the financial statements contained in PSI's first quarter 2015 Form 10-Q. (*Id.* ¶¶ 52, 54.) In addition, PSI filed a Form 8-K in May 2015 announcing its first quarter 2015 net revenue, a figure that included the improperly recognized $7.8 million from the Customer B sale. (*Id.* ¶ 54.)

**\*5** By recognizing $7.8 million in revenue from the Customer B sale in the first quarter of 2015, PSI was able to report net revenue of $86.1 million for the quarter, which only narrowly fell short of analysts' $87 million consensus net revenue expectation. (*Id.* ¶ 45.) Had PSI accounted for the sale in accordance with GAAP, it would have missed the analysts' consensus expectation by a wider margin. (*Id.*)

In 2017, Customer B sought to exercise its right of return because there was no demand for the engines from its customers. (*Id.* ¶ 49.) Instead of taking the engines back, Winemaster and Davis (who learned of the right of return some time after the filing of the first quarter 2015 Form 10-Q) sought to conceal the right of return by authorizing the sales department to arrange for Customer B's engines to be sold to another PSI customer. (*Id.* ¶¶ 48–49, 136.)

**C. Second Quarter 2015**
To meet its revenue target in the second quarter of 2015, PSI had to coerce Customer C to purchase $10 million of engines for which it had no need. (*Id.* ¶ 56.) Customer C's business involved manufacturing generators that it then leased to its customers who operated oil and gas wells. (*Id.* ¶ 57.) In late May 2015, Needham asked Customer C if it would make a $10 million purchase by the end of June 2015. (*Id.* ¶ 58.) Due to a drop in the price of oil at that time, there was insufficient demand for Customer C's generators to justify Customer C making such a purchase from PSI. (*Id.*) Yet Needham continued to pressure Customer C to consummate the transaction. (*Id.* ¶ 59.)

Customer C ultimately agreed to the $10 million sale, but it was subject to a side letter agreement ("Customer C Letter Agreement") containing numerous protections for Customer C should there be insufficient demand for its generators. (*Id.*) Needham signed and negotiated the Customer C Letter Agreement, and Winemaster and Davis knew and approved of the agreement. (*Id.* ¶ 60.) Among the provisions in that agreement were:

> (i) Customer C would not have to pay for each engine until 30 days after the engine was placed in a Customer

> C generator (which Customer C did not do until it had a customer that desired to lease the generator); and (ii) Customer C could exchange engines at a later date for others that were more in demand.

(*Id.* ¶ 59.) The provision granting a right to exchange the engines contained no time limitation. (*Id.*) In its purchase order for the engine, Customer C specifically stated the order was pursuant to this letter agreement from PSI and signed by Needham. (*Id.*) The engines were then shipped to Customer C before the end of June 2015. (*Id.*)

PSI's accounting department was not notified of the Customer C Letter Agreement prior to the filing of PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 60.) But, under GAAP, where a seller is given a right to return a product, revenue from the transaction can only be recognized at the time of sale if the conditions in ASC 605-15-25-1 are satisfied. (*Id.* ¶ 61.) One of those conditions is that "the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product." (*Id.*) The condition is not met "[i]f the buyer does not pay at the time of sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product." (*Id.*) Here, the condition was not satisfied because the Customer C Letter Agreement allowed Customer C to withhold payment for the engines until they were consumed and also gave Customer C the right to exchange the engines in the future for other engines that were in more demand. (*Id.* ¶ 62.) Recognizing revenue from the sale to Customer C also violated ASC 605-15-25-1's requirement that PSI be able to estimate reasonably the amount of future returns. (*Id.* ¶ 63.) Again, because PSI had previously only accepted returns due to defect or performance issues, PSI had no way of estimating the future returns from Customer C. (*Id.*)

**\*6** The $10 million from the Customer C sale was recognized as revenue in the financial statements contained in PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 64.) It was also included in the net revenue figure that PSI announced in the Form 8-K it filed on August 5, 2015. (*Id.* ¶ 66.) Moreover, the improper recognition of the $10 million of revenue enabled PSI to exceed analysts' $87 million consensus net revenue expectation, as PSI reported net revenue of $94.6 million in the second quarter. (*Id.* ¶ 56.) Had PSI properly accounted for the Customer C sale in accordance with GAAP, PSI would have missed the consensus expectation by over $2 million. (*Id.*) In turn, that would have revealed the downward revenue trend that PSI was experiencing in 2015. (*Id.* ¶ 64.)

**D. Third Quarter 2015**

PSI faced difficulties in hitting its revenue target once again in the third quarter of 2015. (*Id.* ¶¶ 68–69.) This led to PSI aggressively pursuing customers to take additional product. (*Id.* ¶ 69.) In a September 3, 2015 email, Davis told Winemaster that "we are pushing every angle. I have some really unhappy customers...as I am jamming everything to them in the quarter and they are not happy with me." (*Id.*)

To aid its efforts, PSI turned to Customer C and solicited its purchase of $3 million of engines. (*Id.* ¶ 70.) While Customer C agreed to purchase the engines for $3 million, Needham directed it to issue a purchase order for $4.3 million. (*Id.* ¶¶ 70–71.) Needham verbally assured Customer C that it would only have to pay $3 million, but its $4.3 million purchase order would help PSI make its revenue numbers for the quarter look better. (*Id.* ¶ 71.) Both Winemaster and Davis knew and approved of Needham's direction to Customer C. (*Id.* ¶ 72.) PSI's accounting department, however, was not made aware of the true deal Needham made with Customer C prior to PSI filing its third quarter 2015 Form 10-Q. (*Id.*) Consequently, accounting booked $4.3 million from the sale to Customer C even though the true sale price was $3 million. (*Id.*)

Customer C only paid the $3 million that it had agreed to pay. (*Id.* ¶ 73.) Yet the financial statements in PSI's third quarter 2015 Form 10-Q recognized an additional $1.3 million in revenue from that sale, consistent with the figure from the purchase order. (*Id.* ¶ 75.) By improperly recognizing that revenue, PSI was able report net revenue of $112 million for the third quarter, which only narrowly missed analysts' consensus net revenue expectation of $113.6 million. (*Id.* ¶ 68.) In addition, Needham profited from the false purchase order, as he received $25,000 in incentive compensation related to his sales to customers in the third quarter. (*Id.* ¶ 74.) He would not have received that $25,000 if Customer C did not overstate its purchase order by $1.3 million. (*Id.*)

### E. Fourth Quarter 2015

In November 2015, it became apparent that PSI was falling far short of its revenue target for the fourth quarter of 2015. (*Id.* ¶ 80.) This led PSI to attempt to pull ahead multiple sales from 2016 so that it could recognize revenue from those sales in the fourth quarter. (*Id.* ¶¶ 80–81.) At issue in this action are four sales with four different customers. (*Id.* ¶¶ 82–102.)

*i. Customer D*

At the beginning of the fourth quarter of 2015, Davis told Winemaster that the sale of several Waukesha generator sets assembled by a PSI subsidiary was essential for PSI to hit its revenue target for the quarter. (*Id.* ¶ 82.) Normally, Customer D purchased those generator sets from Customer C and powered the generators with PSI engines. (*Id.*) For much of 2015, however, PSI endeavored to sell the Waukesha generator sets directly to Customer D. (*Id.* ¶ 83.)

On December 10, 2015, Needham and Customer D's CEO agreed to a deal in which Customer D would purchase 3 Waukesha generator sets from PSI for about $3 million. (*Id.*) In exchange, PSI would accept the return of 97 PSI engines previously purchased by Customer C to fulfill Customer D generator set orders. (*Id.*) PSI would then give Customer D a credit for the return of the 97 engines that Customer D would use to fund the purchase of the generator sets. (*Id.*) Needham instructed Customer D to issue a purchase order for the generator sets directly to PSI's subsidiary. (*Id.*) Before issuing the purchase order, Customer D sought written confirmation that PSI was agreeing to accept the return of the 97 PSI engines from Customer C and create a credit for Customer D. (*Id.*) Needham responded on December 29, 2015, stating that PSI would accept the return sometime in the first quarter of 2016. (*Id.*) That same day, Customer D issued the purchase order for the 3 Waukesha generator sets. (*Id.*) Yet those generator sets were not shipped to Customer D before the end of the year. (*Id.*)

**\*7** Needham, along with Davis, tried to characterize the sale to Customer D as a bill and hold so that PSI could recognize the revenue from the sale in the fourth quarter. (*Id.* ¶ 85.) To that effect, Needham asked Customer D to execute a bill and hold agreement, which provided that: (1) Customer D requested bill and hold treatment for the sale; (2) the Waukesha generator sets were complete; and (3) Customer D took title to the generator sets. (*Id.*) Contrary to the representations in the bill and hold agreement, Needham and Davis both knew that Customer D had not requested bill and hold treatment for the sale. (*Id.*) Rather, PSI had proposed the treatment for the purpose of recognizing revenue in 2015. (*Id.*) Moreover, at the time of the sale, Customer D did not have customers to whom it could lease the Waukesha generator sets and it had no need for the generator sets to be delivered in the foreseeable future. (*Id.*)

Neither Needham nor Davis informed PSI's accounting department about pertinent details of the transaction, particularly that it was subject to the return of 97 engines from

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 78 of 105 PageID #:2360

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Customer C. (*Id.* ¶ 86.) As a result, PSI improperly recognized about $3 million of revenue from the sale to Customer D in the fourth quarter of 2015. (*Id.* ¶ 87.) Had accounting known about the return credit granted to PSI, no revenue from the sale would have been recognized that quarter. (*Id.*) Nor could the sale be treated as a bill and hold because Customer D neither requested nor had a substantial business purpose for such treatment. (*Id.* ¶ 88.)

*ii. Customer E*

Customer E had issued a $600,000 purchase order to PSI for 48 engines that PSI expected to ship to Customer E by the end of 2015. (*Id.* ¶ 89.) To meet Customer E's specifications, those engines had to be fitted with a custom oil pan. (*Id.*) Without the custom oil pan, the engines would not be functional within Customer E's intended product. (*Id.* ¶ 90.) Nonetheless, to recognize revenue in the fourth quarter, PSI's sales department arranged for the 48 engines to be shipped to a PSI-affiliated facility in China with a standard oil pan until they could be fitted with the custom pan sometime in 2016. (*Id.* ¶ 89.) Only then would they be delivered to Customer E. (*Id.*)

When PSI's Controller learned of the sales department's plan to ship the engines without the correct oil pan, he relayed the issue to PSI's Chief Financial Officer ("CFO"). (*Id.* ¶ 90.) The CFO informed the sales department that its plan would result in no revenue being recognized from the transaction in 2015 because the product could not be completed to Customer E's specifications and would not be delivered to Customer E by the end of 2015. (*Id.*) In response, the salesperson responsible for Customer E's account emailed Winemaster and told him that the CFO did not believe that revenue from the sale would be recognizable in 2015. (*Id.*) Winemaster then approached PSI's CFO and told him that Customer E's engines were fully functional and that revenue should be recognized from the sale. (*Id.* ¶ 92.) Yet Winemaster knew that the engines did not meet Customer E's specifications and would not function within Customer E's intended product without the custom oil pans. (*Id.*)

At no point prior to the end of 2015 did the engines meet Customer E's specifications such that they would operate appropriately for the customer's needs. (*Id.* ¶ 93.) For that reason, under GAAP, PSI had not completed the earnings process necessary to recognize revenue. (*Id.*) Moreover, the engines were not shipped to Customer E before the end of the year. (*Id.*) Instead, the engines were moved to a PSI-affiliated facility in China to be completed to Customer

E's specifications in 2016. (*Id.*) Thus, Customer E had not assumed the risk of loss for the engines by the end of 2016. (*Id.*) Nonetheless, PSI recognized $600,000 of revenue from this transaction in the fourth quarter of 2015. (*Id.*)

*iii. Customer F*

**\*8** In December 2015, a PSI salesperson convinced Customer F to accept delivery in 2015 of engines that it had previously ordered but had not planned to receive until after the year's end. (*Id.* ¶ 94.) As an incentive for accepting early delivery of the engines, PSI offered Customer F extended payment terms. (*Id.*) Customer F declined the offer because there was insufficient demand from its own customers for its product. (*Id.*)

On the last day of 2015, PSI was still facing a significant revenue shortfall. (*Id.* ¶ 95.) That led Davis to call PSI's Director of Facilities and instruct him to ship the 147 engines that Customer F had ordered, but declined to accept in 2015, to an offsite warehouse leased and controlled by PSI. (*Id.*) Davis told the Director of Facilities to complete the shipment by the end of the day and not tell anyone about it. (*Id.*) During the call, Davis mentioned that he had already talked to Winemaster about the shipment. (*Id.*)

After the 147 engines were successfully shipped to the offsite warehouse before year's end, PSI invoiced Customer F for about $300,000. (*Id.* ¶ 96.) However, Customer F never agreed to accept delivery of the engines in 2015 and was not even aware that the engines had been shipped to an offsite warehouse. (*Id.*) And because Customer F did not accept delivery of engines or authorize their offsite storage, PSI had not realized revenue in accordance with ASC 605-10-25-1. (*Id.* ¶ 97.) But because the accounting department was not made aware of the circumstances of the sale prior to the filing of PSI's 2015 Form 10-K, PSI recognized $300,000 of revenue. (*Id.* ¶¶ 96–98.) Only in March 2016 did PSI's accounting department learn of the circumstances of the sale, when it attempted to collect the balance owed by Customer F. (*Id.* ¶ 98.) During those efforts, PSI's sales representative for Customer F told accounting that Customer F was not even aware that PSI had shipped the 147 engines. (*Id.* ¶ 98.) This led accounting to reverse the $300,000 of revenue in the first quarter of 2016. (*Id.*)

*iv. Customer G*

Customer G agreed in November 2015 to purchase from PSI a type of engine that was being discontinued. (*Id.* ¶ 99.)

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Specifically, Customer G would purchase 775 "base engines," which consisted of the base engine bloc, fuel system, and catalyst, by the end of 2015. (*Id.*) The base engines would be stored at an offsite PSI-leased warehouse and then brought back in 2016 to be refitted with additional parts so the engines would function in Customer G's equipment. (*Id.*) Only after being refitted would the engines be shipped to Customer G. (*Id.*) The purpose behind the proposed structure of the sale was to increase PSI's 2015 revenue. (*Id.*)

Although PSI shipped the base engines to the offsite warehouse prior to the end of 2015, the engines did not include the catalysts because PSI had difficulty procuring them. (*Id.* ¶ 100.) Under PSI's sales agreement with Customer G, the catalysts were a required component. (*Id.*) When the salesperson responsible for Customer G's account told Winemaster and Davis about the situation, he said he was told that the order should ship without the catalysts. (*Id.*) The catalysts would be added when the engines were brought back the next year. (*Id.*) Neither Winemaster nor Davis told the accounting department prior to PSI's filing of its 2015 Form 10-K that the base engines did not contain catalysts. (*Id.*)

Because the base engines were missing catalysts, PSI had not completed the earning process required to recognize revenue from the sale of the base engines. (*Id.* ¶ 102.) Moreover, the risk of loss associated with the engines did not transfer to Customer G until 2016, when it took over the lease of the offsite warehouse.[2] (*Id.* ¶ 101.) Despite these facts, PSI still recognized about $1.9 million of revenue from the sale to Customer G. (*Id.*)

2      PSI's accounting department was aware that Customer G did not lease the warehouse before the end of 2015. (Compl. ¶ 101.)

*v. Fourth Quarter Transactions Included on 2015 Form 10-K*

**\*9** Altogether, PSI improperly recognized about $5.8 million in revenue from the above four transactions in the fourth quarter of 2015. (*Id.* ¶¶ 81, 103.) Even including that revenue, PSI still fell well short of analysts' consensus net revenue expectation of $105.7 million when it reported net revenue of $96.7 million in the fourth quarter. (*Id.* ¶ 81.) That number fell short of the low end of PSI's public guidance of $100 million. (*Id.*) Of course, PSI would have missed those numbers by an even wider margin had the four transactions been accounted for properly. (*Id.*) That $5.8 million was improperly recognized as revenue on the financial statements included in PSI's Form 10-K. (*Id.*) When the $5.8 million is

combined with the other sales from the first three quarters of 2015, PSI improperly recognized approximately $24.1 million of revenue in the full-year 2015 financial statements included with PSI's 2015 Form 10-K. (*Id.*)

**II. Attempts to Conceal Improper Recognition of Revenue**

**A. Winemaster's Management Representation Letters to PSI's Auditor**

Following each quarter in 2015, Winemaster signed a management representation letter to PSI's auditor that included false representations in light of PSI's improper revenue recognition practices with respect to the above transactions. (*Id.* ¶¶ 55, 67, 78, 106.) Specifically, each letter certified that the financial information for that quarter was presented in accordance with GAAP, there was no fraud or suspected fraud affecting PSI, there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements, there were no undisclosed side agreements, and the company had informed the auditor of all uncorrected misstatements. (*Id.*) Contrary to his representations in the letters, Winemaster knew that there were undisclosed arrangements concerning the sales for which PSI improperly recognized revenue, such as side agreements and rights of return. (*Id.*)

**B. Efforts to Conceal Details of Customer C Sales**

When PSI's accounting department attempted to collect from Customer C the $10 million it agreed to pay for the engines it purchased in the second quarter of 2015, Customer C refused based on the provisions of the Customer C Letter Agreement. (*Id.* ¶ 108.) Following Customer C's refusal, accounting obtained a copy of the Letter Agreement from Needham in October 2015. (*Id.*) Subsequently, PSI's Controller provided PSI's CFO a copy of the agreement and informed the CFO that, in his opinion, the second quarter 2015 sale to Customer C constituted a consignment. (*Id.* ¶ 109.) And because PSI should have deferred the revenue from that sale, PSI would likely have to restate its second quarter 2015 financial reports. (*Id.*)

Upon learning of the Customer C Letter Agreement, PSI's CFO worked with the company's in-house counsel to draft a proposed amendment to the agreement that removed the conditional terms. (*Id.*) The agreement was shared with Winemaster, who sent the proposed amendment to Davis and Needham. (*Id.*) However, the proposed amendment was never sent to Customer C. (*Id.*)

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

In late January 2016, Customer C's Chief Operating Officer ("COO") emailed Needham regarding the sale from the third quarter of 2015 that PSI had booked for $4.3 million. (*Id.* ¶ 111.) The COO asked about the true amount that Customer C needed to pay for the engines, reminding Needham that the companies did a $3 million dollar deal, but "PSI upped the price so it made your numbers look better." (*Id.*) When Needham conferred with Davis about the email, Davis instructed him to have Customer C pay the $3 million and "not reference anything at this point in time." (*Id.* ¶ 112.) Needham then responded to Customer C that it should pay only the $3 million and PSI would adjust the $1.3 million at a later time. (*Id.*) In an update he provided to Winemaster on the transaction, Davis explained:

> It was agreed upon that we would sell these engines to [Customer C] at the JV price but sell them at the normal price and now as we negotiate with [Customer C] to pay these invoices they are going to short pay these invoices by 1.2 million dollars.[3] This is the deal that was agreed to. Before accounting gets short paid 1.2 million dollars I wanted you to be aware. This is obviously a problem.

 **\*10**  (*Id.*) Needham expressed concern to Davis that PSI's accounts receivable department would seek an explanation from Customer C as to why it paid only $3 million of the $4.3 million price set forth on the purchase order. (*Id.* ¶ 113.)

3       The recorded difference between the $4.3 million price on the purchase order and the $3 million Customer C agreed to pay was $1,286,000. In referring to that difference in this communication, Davis apparently rounded that number down. (Compl. ¶ 112 n.1.)

In an attempt to engineer a solution that would take care of the issues with both the second quarter and third quarter sales to Customer C, Needham proposed that PSI trade a write-off of the $1.3 million balance from the third quarter sale and price incentives for future purchases in exchange for Customer C's payment of the $10 million balance from the second quarter sale over six months. (*Id.*) Customer C's COO responded by email, stating that:

> The $1.2M was added in order to boost PSI's sales revenue. I see you're washing it away but why wasn't it "discounted" on the payment we just made? That was the deal you and I made. We shouldn't have that $1.2M anywhere involved with the $10M deal. In fact, if that $1.2M shows up as owed on our bill it's going to raise all sorts of red flags around here.

(*Id.*) Winemaster, Needham, and Davis continued their discussions with Customer C regarding the $10 million balance from the second quarter sale in February 2016. (*Id.* ¶ 114.) One offer they made to Customer C was for PSI to subsidize Customer C's cost of capital so that it could make a $5 million payment on the balance. (*Id.*) Customer C rejected that offer. (*Id.*)

PSI's accounting department learned of Customer C's COO's correspondence with Needham in late March 2016. (*Id.* ¶ 115.) That led PSI's Controller to provide a hard copy of the emails to PSI's CFO and communicate his concern that PSI had committed fraud by booking the additional $1.3 million in revenue from the third quarter sale to Customer C. (*Id.*) After PSI's CFO discussed the matter with Winemaster, he reported back to the Controller that Winemaster had insisted that PSI "doesn't do business like that" and that Winemaster planned to meet with Customer C regarding the transaction. (*Id.*)

By early April 2016, Needham and Winemaster had come up with a plan to create after-the-fact documentation to send to Customer C that would justify the $4.3 million price invoiced for the third quarter sale. (*Id.* ¶ 116.) Specifically, PSI would claim that it shipped domestic EPA-certified engines priced at $4.3 million instead of international non-certified engines priced at $3 million because PSI had an inadequate supply of the latter in September 2015. (*Id.* ¶ 117.) Winemaster then drafted a proposed email in which Customer C would state that it recognized that PSI did not have the reduced-price engine blocks in stock and therefore sold Customer C the domestic engines to meet the distribution requirement. (*Id.*) Customer C would go on to agree that it would purchase engines in 2016 at the reduced $3 million price to balance the agreement between the companies. (*Id.*) Contrary to the statements in the draft email, PSI had not sold Customer C the domestic engines in the third quarter. (*Id.* ¶ 118.) Rather, it sent Customer C the international engines that Customer C agreed to purchase for $3 million and PSI invoiced Customer C for the $4.3 million it would have paid for the domestic engines. (*Id.*)

 **\*11**  To avoid detection, Winemaster printed out the email and texted a picture of the print-out to PSI's CFO. (*Id.* ¶ 117.) In response, PSI's CFO texted Winemaster comments on the draft. (*Id.* ¶ 119.) The CFO stated in one comment that Winemaster should keep in mind his discussions with Customer C that PSI's auditors "will be in next week and the [Customer C] discount and cash collections will be front of mind. [Customer C] needs to return the discount

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 81 of 105 PageID #:2363

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

for now and restate their January email without mention of future discounts—anything less is a major problem." (*Id.*) Ultimately, Winemaster never sent the proposed email to Customer C. (*Id.*)

On April 14, 2016, Winemaster and Needham met with Customer C. (*Id.* ¶ 120.) At the meeting, Winemaster pressured Customer C to make payments on the engines purchased in the $10 million second quarter sale, despite knowing that the engines had not been placed in Customer C's generators, as required under the Customer C Letter Agreement. (*Id.*) Winemaster threatened to stop selling Customer C additional engines or engine parts if it did not pay the balance. (*Id.*) The threat carried significant weight given that PSI was the only supplier of the engines Customer C used to operate its generators. (*Id.*) Thus, although it had a right to withhold payment under the Customer C Letter Agreement, Customer C agreed to make a $5 million payment to PSI in connection with the second quarter sale. (*Id.* ¶ 121.) In return, Winemaster agreed that PSI would subsidize Customer C's cost of capital on the $5 million payment for six months and to allow Customer C to return $4 million worth of product. (*Id.*)

Following the meeting with Customer C, Winemaster informed PSI's CFO that Customer C would pay PSI $5 million imminently and pay the remaining balance by the end of June 2016. (*Id.* ¶ 122.) Shortly thereafter, PSI's CFO told the accounting department about the forthcoming payments. (*Id.*) But accounting never learned that Winemaster had induced the payment by agreeing to provide Customer C a capital subsidy and a right of return. (*Id.*)

**C. Efforts to Conceal Details of Customer D Sale**
In April 2016, a dispute arose between PSI and Customer D concerning the fourth quarter 2015 sale of the 3 Waukesha generator sets. (*Id.* ¶ 124.) It began when PSI refused to fulfill its obligation to accept the return of the Customer C engines. (*Id.*) This led Customer D's COO to send the following email to Needham:

> As you know, the PO [Customer D] issued was requested by PSI in order for PSI to book the sale of the three Waukesha's by the end of 2015. We were going to utilize the deal you and I made to return [Customer C's] excess 8T and 11L engines to use as a credit towards the three Waukesha's. As you know the PO wasn't for a direct deal between [Customer D] and PSI instead it notionally represented that [Customer D] would end up with the Waukesha's when PSI received the returned 8T and 11T [sic] inventory. The PO

used for PSI to book the sale is not a valid PO and was built at your request.

(*Id.*) Over the ensuing months, Winemaster and Customer D executives exchanged correspondence in which they asserted their respective positions and threatened legal action. (*Id.* ¶ 125.) As a result of this correspondence, Winemaster became aware of the engine exchange element of the transaction no later than June 3, 2016. (*Id.*)

During the back-and-forth between PSI and Customer D, PSI's CFO emailed Winemaster on July 25, 2016 and asked him when they could discuss Customer D's units, as "[a]uditors will want to remove these sales and force a change to history—not an outcome we want." (*Id.* ¶ 126.) The same day, Winemaster responded, saying that "these will get cleared. Try and push for end of August (15th min if you can). We are shutting off the telematics 7/31 to force them to pay thier [sic] outstanding."[4] (*Id.*) Finally, PSI and Customer D settled their dispute near the end of August 2016 when Customer D agreed to take delivery of and pay for the 3 Waukesha generator sets. (*Id.* ¶ 127.) But, at the insistence of Winemaster and PSI's Chief Legal Officer, Customer D did not issue a new purchase order. (*Id.*) Instead, the transaction supplemented the purchase order previously issued in December 2015. (*Id.*)

4      Telematics referenced in this email were used by Customer D to manage and monitor its operating units. (Compl. ¶ 126.) PSI controlled access to the telematics, which were important to Customer D's operations. (*Id.*)

**D. PSI's Internal Investigation**
**\*12** Due to an employment dispute, PSI's COO left the company in May 2016. (*Id.* ¶ 128.) Shortly after his departure, the COO sent PSI's Board of Directors a letter and draft complaint against PSI, alleging that PSI's top management directed sales staff to "channel stuff" and "pull-up" sales from 2016 to inflate PSI's 2015 revenues so that the company would not miss its revenue guidance. (*Id.*) Among the transactions cited in the COO's complaint were the two sales to Customer C, the Customer D transaction, and the Customer F transaction. (*Id.*) The complaint led PSI's Audit Committee and Board of Directors to confront Winemaster about its allegations. (*Id.* ¶ 129.) Winemaster denied that the COO's allegations had any merit but promised that PSI's Chief Legal Officer and its CFO would investigate them. (*Id.*) In addition, PSI's Board of Directors retained independent counsel in July 2016 to investigate the allegations in the former COO's complaint. (*Id.* ¶ 130.)

On July 31, 2016, PSI's CFO sent the former COO's letter and draft complaint to PSI's auditor. (*Id.* ¶ 131.) Upon receiving the documents, the auditor stated that it would not sign off on PSI's second quarter 2016 Form 10-Q until it received the results of the internal investigation. (*Id.*) The internal investigation commenced on August 2, 2016. (*Id.* ¶ 132.) During the course of the investigation, Winemaster gave false explanations for certain of the transactions under investigation. (*Id.*) For instance, he told investigators that the $1.3 million shortfall related to the third quarter 2015 sale to Customer C was a misunderstanding. (*Id.*) Winemaster also stated that he directed the shipment of Customer F's engines to a PSI-leased offsite warehouse so that PSI could easily reclaim the engines should Customer F fail to make payment. (*Id.*) Both misrepresentations were conveyed to PSI's auditor. (*Id.*) Just before the deadline for PSI to file its second quarter 2016 Form 10-Q, Winemaster participated in a conference call during which he tried to convince PSI's auditors that the transactions identified in the former COO's complaint were each legitimate and fully collectable business deals. (*Id.* ¶ 133.) Winemaster's efforts were unsuccessful and the auditor did not sign off on the Form 10-Q. (*Id.*)

**E. Concealment Efforts in Response to SEC Investigation**
The SEC issued a document preservation notice and subpoena to PSI in August 2016. (*Id.* ¶ 134.) The next month, Winemaster told the company's Vice President of Advanced Product Development that PSI needed to clean up its outstanding receivables from Customer C before the end of 2016 in light of the SEC's investigation. (*Id.* ¶ 135.) Winemaster therefore directed the Vice President of Advanced Product Development to find a buyer for Customer C's excess engine inventory so that Customer C would pay its outstanding balance for the second and third quarter transactions. (*Id.*) As 2016 drew to a close, Winemaster directed the purchase of 60 generator sets from Customer C that contained PSI engines. (*Id.*) Yet PSI did not have potential customers for the generators and the purchase was meant only to encourage Customer C to pay its 2015 balance so that PSI could cover up its accounting misstatements. (*Id.*) In addition, Winemaster and Davis tried to disguise the right of return granted to Customer B in connection with its $7.8 million purchase in the first quarter of 2015. (*Id.* ¶ 136.) They did so by instructing PSI's sales staff to help Customer B resell the engines to another PSI customer after Customer B attempted to return the engines to PSI in 2017. (*Id.*)

**III. Restatement of Financial Statements**
Between August 4, 2016 and April 7, 2017, PSI revealed its accounting misstatements in several current reports on Form 8-K. (*Id.* ¶ 137.) And on January 27, 2017, after PSI's independent investigation revealed more details regarding PSI's improper recognition of revenue from 2014 and 2015, PSI's auditor resigned. (*Id.* ¶ 138.) When PSI filed its 2017 Form 10-K, it included restated financial statements that resulted in a total reduction of revenue of $29.8 million for financial statements from the fourth quarter of 2014 though the fourth quarter of 2015. (*Id.* ¶ 140.) A summary of PSI's restatement of revenues and income is depicted in the below charts:

 **\*13** Editor's Note: Tabular or graphical material not displayable at this time.

(*Id.* ¶ 141.)

**DISCUSSION**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, the short and plain statement must meet two threshold requirements. First, the complaint's factual allegations must be sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Securities fraud claims under § 10(b) of the Exchange Act and Rule 10b-5 must also satisfy the heightened pleading standard set forth under Federal Rule of Civil Procedure 9(b). *SEC v. Steffes*, 805 F. Supp 2d 601, 607 (N.D. Ill. 2011). Rule 9(b) requires that a party alleging fraud must "state with particularity the circumstances constituting

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 83 of 105 PageID #:2365

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To state the circumstances of fraud with sufficient particularity, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). This "stringent pleading requirement...serves three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Steffes*, 805 F. Supp. 2d at 608.

Broadly, the SEC alleges in its 11-count complaint that Winemaster, Needham, and Davis violated multiple securities laws by engaging in accounting fraud that caused PSI to issue materially misstated financial statements in its SEC filings. While Davis opted answer the SEC's complaint, Winemaster and Needham have filed motions to dismiss. Both Winemaster and Needham argue that the entire complaint should be dismissed for employing a pleading format that fails to satisfy Rule 9(b)'s particularity requirement. They then turn to attacking the sufficiency of several, but not all, of the counts against them. The specific Counts at issue are as follows. Count I alleges that Winemaster violated § 10(b) of the Exchange Act and Rule 10b-5(b). Separately, Count II alleges that Needham (along with Davis)[5] aided and abetted Winemaster's Rule 10b-5(b) violation. In addition, Count III asserts a claim against Winemaster and Needham for violating Rules 10b-5(a) and 10b-5(c). In addition to the Rule 10b-5 claims, Winemaster seeks dismissal of the claims brought under Rule 13a-14 under the Exchange Act (Count IX); § 20(a) of the Exchange Act (Count X); and § 304 of the Sarbanes-Oxley Act ("SOX") (Count XI). Needham seeks dismissal of the claims against him for aiding and abetting PSI's violations of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Count IV); aiding and abetting PSI's violations of § 13(b)(2)(A) of the Exchange Act (Count V); and violating § 13(b)(5) of the Exchange Act and Rule 13b2-1 (Count VII).

5      In every Count in which a claim is asserted against Needham, the same claim is asserted against Davis.

## I. "Shotgun" and "Puzzle" Pleading

**\*14** According to both Winemaster and Needham, the SEC's complaint improperly relies on so-called "shotgun" and "puzzle" pleading to assert their claims. They claim both forms of pleading are improper in a complex securities action because they fail to adequately apprise each Defendant of what alleged conduct gives rise to the claims against him.

Shotgun pleading refers to a pleading style in which each count of the complaint "incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading." *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (internal quotation marks omitted). In certain circumstances, the shotgun style of pleading "can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult." *Chriswell v. Village of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at \*5 (N.D. Ill. Nov. 4, 2013) (internal quotation marks omitted). Relatedly, puzzle pleading refers to a pleading style that forces "the Court and the defendant to piece together exactly which statements [the plaintiff is] challenging and what allegations contradict those statements." *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at \*5 (N.D. Ill. June 16, 2014). Such a pleading can "improperly place[ ] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at \*4 (N.D. Ill. July 25, 2012) (internal quotation marks omitted). The net effect of a puzzle pleading may be to "leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." *Id.*

But the mere fact that a complaint's counts incorporate by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them. *E.g.*, *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1324–25 (11th Cir. 2018); *Koh v. Graf*, No. 11-cv-02605, 2013 WL 5348326, at \*5 (N.D. Ill. Sept. 24, 2013). "What is impermissible...is grouping multiple defendants together and failing to set out which of the defendants made which of the fraudulent statements/ conduct." *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1051 (N.D. Cal. 2016). Here, the format of the SEC's complaint "does not prevent the Court from reviewing the sufficiency of each count." *SEC v. Ustian*, 229 F. Supp. 3d 739, 778 (N.D. Ill. 2017). Unlike improper shotgun pleadings, the SEC's complaint specifically identifies the role of each Defendant in the alleged fraud, their actions and inactions that led to

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

the misstated financial statements, and why their actions constituted fraud. *See Bardman*, 216 F. Supp. 3d at 1051.

Similarly, the SEC's complaint will not be dismissed for employing so-called puzzle pleading. Winemaster and Needham contend that the complaint's supposed puzzle pleading makes it difficult for them to discern the specific statements that the SEC alleges to be fraudulent and the conduct that gives rise to the claims against them. However, as discussed below, the Court has no difficulty in identifying the false statements giving rise to the claims. And it is sufficiently clear how Winemaster's and Needham's actions contributed the alleged fraud. Simply put, the complaint did not require the Court to go through any great effort "to determine exactly which statements [the SEC] allege[s] are misleading and which alleged facts support [the SEC's] claims." *Alizadeh*, 2014 WL 2726676, at *5; *see also Boca Raton Firefighters' and Police Pension Fund v. DeVry, Inc.*, No. 10 C 7031, 2012 WL 1030474, at *1 n.4 (N.D. Ill. Mar. 27, 2012) (declining to dismiss a complaint for puzzle pleading even where the complaint's format created repetition because it did not make the complaint too difficult to understand).

## II. Primary Liability Under § 10(b) of the Exchange Act and Rule 10b-5

 **\*15**  Three of the counts in the SEC's complaint arise under § 10(b) of the Exchange Act, which makes it "unlawful for any person...[t]o use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). As authorized under § 10(b), the SEC promulgated Rule 10b-5. Rule 10b-5 makes it unlawful for any person, in connection with the purchase or sale of any security:

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5. In Count I of the complaint, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b), whereas Count III asserts a claim under subsections

(a) and (c) of Rule 10b-5 against both Winemaster and Needham.

### A. Rule 10b-5(b)

To state a Rule 10b-5(b) claim, "the SEC must allege that the defendant[ ] (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *Ustian*, 229 F. Supp. 3d at 764 (internal quotation marks omitted). The maker of a statement subject to liability under Rule 10b-5(b) is "the entity with authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011). Here, the purported misstatements were made in PSI's SEC filings. Because Winemaster, as CEO, reviewed and approved PSI's financial statements, and reviewed, approved, signed, and certified its SEC filings, he was the maker of the misstatements in them. *E.g.*, *SEC v. Carter*, No. 10 C 6145, 2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) ("[D]efendant...signed an SEC form (a form 8-K) as highranking corporate officer (CEO). The defendant's electronic signature indicates that he 'made' the statements therein."). Thus, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b) based on his direct involvement in six of the eight transactions leading to misstatements at issue in this action.[6]

6      The SEC acknowledges that Winemaster was not directly involved in the fraud committed with respect to the Customer A transaction in the fourth quarter of 2014 or the Customer D transaction in the fourth quarter of 2015. Nonetheless, as discussed below, it seeks to hold Winemaster liable as a control person with respect to those transactions pursuant to § 20(a) of the Exchange Act.

*i. Material Misstatement*

As a result of each of the six transactions in which Winemaster was directly involved, PSI's financial statements submitted with its SEC filings contained inflated and false revenue numbers. "A company's overstatement of revenues in violation of GAAP may constitute a false or misleading statement of material fact necessary to establish securities fraud." *Takara Tr. v. Molex, Inc.*, 429 F. Supp. 2d 960, 978 (N.D. Ill. 2006). Here, the SEC pleads with sufficient particularity each of the filings that contained misstated revenue figures, the details of the transactions from which revenue was improperly recognized, how recognition of

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

revenue from each subject transaction violated GAAP and PSI's own revenue recognition policy, and the specific amount by which the revenue was misstated. *See Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 35 (D. Mass. 2000) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." (internal quotation marks omitted)). And the allegations that PSI had to restate its financial statements due to the improper recognition of revenue from the subject transactions sufficiently demonstrates that the financial statements were false when made. *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." (internal quotation marks omitted)); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 709 (N.D. Ill. 2005) (finding that a company's subsequent restatement of its financial statements to be evidence of the statements' falsity).

**\*16** Neither Winemaster nor Needham argue that the SEC failed to plead that the misstatements in PSI's corporate filings were false or misleading. Nonetheless, they contend that many of the misstated revenue numbers were not material. "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). Put differently, Rule 10b-5(b) recognizes a misstatement or omission as material "if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the 'total mix of information made available.' " *Id.* (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). Whether a misstatement is material is "an inherently fact-specific finding." *Ustian*, 229 F. Supp. 3d at 765. "Because materiality requires assessments of how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches, assessing materiality is for the trier of fact and rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Id.* (internal quotation marks omitted).

According to Winemaster, the net revenue reductions reflected in the restated financial statements for three of the five quarters at issue here are immaterial as a matter of law because the deviation between the original and restated revenue numbers was less than 5%.[7] In support of this 5% materiality threshold, Winemaster points to two Second Circuit cases stating that "the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009); *see also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Of course, even those cases acknowledged that "bright-line numerical tests for materiality are inappropriate," *ECA, Loc. 134*, 553 F.3d at 204, and the 5% threshold "is not conclusive," *IBEW Loc. Union No. 58*, 783 F.3d at 390. Instead, "[c]ourts must also consider qualitative factors, which can turn a quantitively immaterial statement into a material misstatement." *Id.*

7     Similarly, Needham claims that three of the four misstatements attributable to his conduct are immaterial because those allegedly fraudulent transactions affected less than 5% of the revenue reported for the quarter or fiscal year. The materiality analysis here applies equally to Needham's materiality argument.

Here, the Court cannot conclude at the pleadings stage that any of the misstated revenue figures were immaterial, even if they were not quantitively material. As pleaded in the complaint, the analysts' consensus net revenue estimate was an important metric for a company's performance and failure to meet that projection would provoke a negative reaction from investors and a corresponding decrease in stock price. (Compl. ¶ 29.) Thus, it is important from the standpoint of qualitative materiality that, for each quarter at issue here, PSI's revenues were falling just short of the analysts' net revenue estimate. But by improperly recognizing revenue from the subject transactions, PSI was able to meet the analysts' revenue estimates or at least keep the shortfall within a respectable range of the estimate. Thus, although the amount of revenue recognized from any particular subject transaction may have been quantitively small, it played an important role for PSI in demonstrating that its financial performance was meeting expectations when, in fact, its sales were slumping.

At a minimum, there is a substantial question of fact as to whether investors would have deemed it significant if the improperly recognized revenue were not included in PSI's financial statements. *See Van Noppen v.*

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

*InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (finding misstatements material where they "reflect consequential facts about the Company, namely, its financial health" (internal quotation marks omitted)); *Takara*, 429 F. Supp. 2d at 977 ("Accurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating a company's stock." (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002))). Moreover, the fact that PSI issued restatements, by itself, is "evidence of materiality, as financial accounting standards provide that financial results shall be restated only when errors are material." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (internal quotation marks omitted). For these reasons, the Court concludes that the materiality issue is not suitable for resolution at this stage.

### ii. Scienter

**\*17** Winemaster contends that the SEC fails to allege that he acted with scienter with respect to each of the six subject transactions in which he had some involvement. Under Rule 10b-5, the scienter requirement "embraces an 'intent to deceive, manipulate, or defraud,' as well as reckless disregard of the truth." *SEC v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) (quoting *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980)). Recklessness can be shown where there is "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McConville v. SEC*, 465 F.3d 780, 788 (7th Cir. 2006) (internal quotation marks omitted). "In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could prove scienter."[8] *Ustian*, 229 F. Supp. 3d at 774 (internal quotation marks omitted). Typically, "scienter is a question of fact and is therefore usually best decided by the trier of fact." *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at \*16 (N.D. Ill. May 19, 2020).

[8] By contrast, when a private party—as opposed to the SEC—brings an action under § 10(b) and Rule 10b- 5, the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) govern. Under the PSLRA, a private party plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Neither Winemaster nor Needham request that the PSLRA standard be applied here. Nonetheless, the Court notes the heightened pleading standard as it will cite cases brought under PSLRA where the plaintiff had to meet "strong inference of scienter" standard.

### a) Customer B Transaction

As alleged by the SEC, after Customer B resisted PSI's attempts to convince it to take early delivery of $7.8 million worth of engines in the first quarter of 2015, Winemaster personally called Customer B's president to try and make the sale. During that call, Winemaster purportedly closed the deal by offering an indefinite right of return on the engines. And even though under GAAP, such right of return could preclude PSI from recognizing immediately recognizing revenue from the sale, Winemaster failed to inform the accounting department of the right of return. As a result, the entire $7.8 million from the sale was recognized as revenue.

As CEO, Winemaster was responsible for PSI's system of internal accounting controls. (Compl. ¶ 143.) Thus, it is reasonable to infer that he was familiar with basic GAAP standards regarding revenue recognition. *See, e.g.*, *SEC v. Jacoby*, No. CCB-17-3230, 2018 WL 3732102, at \*6–7 (D. Md. Aug. 3, 2018) (noting that the defendant's role as CEO made it plausible that he would recognize accounting improprieties that would result in improper revenue recognition); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 538210, at \*7 (W. D. Wash. Mar. 2, 2006) (finding a complaint sufficiently alleged scienter where it alleged that the defendant's "training and position in the company" meant that he knew or was reckless in not knowing that it was improper for the company to recognize revenue from a transaction in violation of GAAP). Moreover, Winemaster also knew he needed to inform PSI's accounting department when sales contained terms that deviated from PSI's standard terms. (*Id.* ¶ 27.) Indeed, accounting depended on the sales personnel to directly inform it of such deviations, otherwise the revenue associated with that sale might not be properly recorded. (*Id.*) Yet according to the SEC, despite his direct involvement in closing the sale with Customer B, Winemaster failed to disclose the right of return to accounting, and later, PSI's auditor, even though he knew or should have known it was pertinent to the proper accounting of the sale.

**\*18** The allegations that Winemaster concealed the right of return further supports scienter. *See SEC v. Espuelas*, 698 F. Supp. 2d 415, 429–30 (S.D.N.Y. 2010) (stating that the SEC pleaded scienter based on allegations that the defendants withheld details of transactions that they should have known would cause the company to improperly recognize revenue); *SEC v. Nacchio*, 438 F. Supp. 2d 1266,

1282 (D. Colo. 2006) (finding that scienter was alleged where the defendant engaged in conduct intended to deceive the company's accountants into improperly recognizing revenue); *cf. Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith.").

The complaint further alleges that, despite knowing about the right of return, Winemaster nonetheless allowed PSI to represent to investors and the public that it earned net revenue for the first quarter of 2015 that included $7.8 million of revenue from the Customer B sale. That Winemaster signed off on published statements concerning PSI's first quarter revenue when he "knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Moreover, the SEC's allegations that Winemaster continued to conceal the right of return in 2017, when Customer B sought to exercise it, reinforces his scienter. While scienter cannot be inferred by "hindsight," *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007), "common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind." *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005). Thus, "that a person takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew he made a mistake." *Id.*; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (stating that a CEO's attempts to cover up specifics of an unlawful promotional scheme supported a "strong inference" of scienter); *SEC v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at *3 (N.D. Ill. Aug. 19, 2010) ("[The defendant's] guilty knowledge is confirmed by his alleged attempt to 'cover-up' the fraud....").

Winemaster contends, however, that the SEC's allegations fail to show how he, as a non-accountant, should have known that the right of return would affect the accounting treatment of the Customer B sale. Further, he argues that the SEC's complaint demonstrates that the right of return did not implicate a simple revenue recognition principle. Rather, as alleged, PSI's ability to recognize revenue turned on a subsection of ASC 605-10-25-1 stating that revenue could only be recognized if the amount of future returns could be reasonably estimated. For support, Winemaster cites *SEC v. Lucent Technologies, Inc.* ("*Lucent II*"), No. Civ. 04-2315(WHW), 2005 WL 1206841, at *5 (D.N.J. May 20, 2005), where the district court

found that the SEC failed to plead scienter on the part of one of the company's vice presidents based on her failure to disclose in connection with a sale a side agreement providing a right of return. The district court found that the complaint contained no allegations that would allow it to infer that the vice president "had any knowledge of accounting principles or that she had any role in [the] decisions to recognize revenue in connection with the transactions that [she] executed." *Id.*

**\*19** Unlike in *Lucent II*, however, Winemaster was not just a "regular business [person]," *id.*, who had no reason to know that the existence of a right of return might be significant to how revenue from the Customer B sale would be recognized. Rather, Winemaster was PSI's CEO, who was responsible for the company's internal accounting and financial reporting controls. It is not necessary to allege that Winemaster knew the particular GAAP standard that was implicated by the sale or otherwise show his extensive familiarity with GAAP. Indeed, "if the GAAP rules...[the defendant is] alleged to have violated are relatively simple, it is more likely that [he was] aware of the violations and consciously or intentionally implemented or supported them, or [was] reckless in this regard." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000). And while the intricacies involved in recognizing revenue from a sale subject to a right of return might be complex, a CEO need not be well-versed in GAAP to understand that the existence of such right should be properly disclosed. *See, e.g.*, *Marksman Partners, LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1315 (C.D. Cal. 1996) ("Premature accounting recognition...where a right of return is clearly capable of exercise, permits an inference of scienter."). At a minimum, the SEC's allegations establish that Winemaster knew or should have known that the right of return would affect the accounting treatment of the Customer B sale, and he was at least reckless in failing to disclose its existence. Thus, the SEC has pleaded Winemaster's scienter with respect to the Customer B transaction.

*b) Customer C Transaction—Second Quarter 2015*

In the second quarter of 2015, Customer C bought about $10 million worth of engines from PSI. As alleged in the complaint, the sale was subject to the Customer C Letter Agreement, which permitted Customer C to withhold payment for each engine until 30 days after it was placed in a Customer C generator and also gave Customer C a right to exchange the engines for a different model. The complaint further alleges that Needham negotiated the Customer C Letter Agreement and Winemaster approved it.

Once again, despite Winemaster's alleged knowledge of the side letter agreement, the details of the agreement were not disclosed to PSI's accounting department. Similar to the right of return in the Customer B transaction, the right of exchange provided to Customer C would have affected the accounting treatment of the sale. Moreover, the Customer C Letter Agreement contained another obstacle to immediate recognition of revenue: under GAAP, revenue cannot be recognized where a buyer is given a right of return if the buyer does not pay at the time of the sale and its payment obligation is contingent on the buyer's ability to resell the product. As CEO, Winemaster should have at least known that the provisions of the Customer C Letter Agreement were relevant to the accounting of the sale, such that the agreement should have been disclosed to the accounting department. Instead, according to the complaint, Winemaster concealed the Customer C Letter Agreement from accounting, thereby allowing PSI to inflate its revenues by $10 million.

Winemaster claims that the SEC fails to allege that he knew the actual terms of the Customer C Letter Agreement. However, Winemaster seems to be asking the Court to draw an inference in his favor when all reasonable inferences must be drawn in favor of the SEC at this stage. Despite his protestations, it is reasonable to infer that Winemaster knew the terms of the Customer C Letter Agreement based on the SEC's allegation that he knew and approved of it. Conversely, it is unreasonable to infer that Winemaster would approve of the agreement without any knowledge of its specific terms, particularly given the substantial size of the sale. Further bolstering the inference are the allegations that Needham, who negotiated the agreement, reported directly to Winemaster and Winemaster exercised close oversight of PSI's sales personnel.

Winemaster also points to a contradiction between the SEC's allegations that he met with Customer C in April 2016 and pressured Customer C to make additional payments on the engines even though they had not yet been placed in generators, which was a precondition to payment under the Customer C Letter Agreement. The Court does not believe that these allegations are irreconcilable, especially when the April 2016 meeting is viewed in context. As alleged, that meeting occurred in the course of Winemaster's increasingly desperate attempts to cover up the fraud in connection with both the $10 million second quarter 2015 Customer C sale and the third quarter 2015 Customer C sale that PSI artificially inflated by $1.3 million. Just days before the meeting, Winemaster proposed a draft email that would enlist

Customer C in the fraud with respect to the third quarter 2015 sale. (Compl. ¶¶ 116–19.) And during the meeting, Winemaster threatened that PSI would stop selling Customer C engines that were critical to its operations and of which PSI was the sole supplier. (*Id.* ¶ 120.) Moreover, after the meeting, Customer C agreed to pay $5 million to PSI with respect to the second quarter 2015 sale even though it had no obligation to do so under the Customer C Letter Agreement. (*Id.* ¶ 121.) Given this context, it is certainly plausible that Winemaster knew of but disregarded the precondition to payment set forth in the Customer C Letter Agreement.

**\*20** Finally, Winemaster challenges the SEC's allegation that PSI's accounting department was not aware of the Customer C Letter Agreement. In particular, he points to the SEC's allegation that "Customer C referenced the [Customer C] Letter Agreement on its purchase order for the engines, specifically stating the order was pursuant to letter dated June 8, 2015 from PSI and signed by Jim Needham." (*Id.* ¶ 59.) But the SEC also alleges that the "accounting department did not review customer purchase orders...before recording revenue. If the customer was given terms different from those entered by sales department personnel into EPICOR, those terms would not be reflected on the invoice generated by the accounting department." (*Id.* ¶ 28.) And given Winemaster's knowledge of and responsibility for internal accounting controls, it is reasonable to infer that the disclosure of the Customer C Letter Agreement on Customer C's purchase order would not hinder his ability to conceal the existence of the agreement from accounting.

In short, the SEC has pleaded sufficiently that Winemaster knew of and approved the Customer C Letter Agreement and it is reasonable to infer that he knew the agreement's terms and that they could impact the sale's accounting treatment. Nonetheless, as alleged, Winemaster did not disclose the agreement to accounting and allowed PSI to recognize $10 million of revenue from the sale in the second quarter of 2015. These allegations are sufficient to establish Winemaster's scienter with respect to the second quarter 2015 Customer C sale.

*c) Customer C Transaction—Third Quarter 2015*
According to the complaint, PSI turned again to Customer C in the third quarter of 2015 when it faced the prospect of missing its revenue target. But instead of adding conditions to the sale, Needham simply directed Customer C to inflate its purchase order to make it appear that the order was for $4.3 million while assuring Customer C that it would only

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 89 of 105 PageID #:2371

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

have to pay $3 million. As alleged, Winemaster was aware of and approved Needham's direction to Customer C to inflate its purchase order by $1.3 million.

Winemaster's scienter as to the third quarter Customer C sale can be inferred for the same reasons that it could be inferred for the second quarter Customer C sale. Specifically, Winemaster knew of and approved Needham's direction to Customer C. That Winemaster directly supervised Needham and exercised close oversight of PSI's salespeople all bolster the allegations of Winemaster's awareness of the artificial inflation. Moreover, it should have been manifestly obvious to any competent businessperson that recognizing $1.3 million of revenue out of thin air is improper and deceptive. Later, as discussed above, Winemaster is alleged to have drafted an email that he proposed to have Customer C send, providing a false explanation to cover up the $1.3 million shortfall.

According to Winemaster, the SEC's allegations regarding his subsequent conduct demonstrate that he was not aware of the artificial inflation associated with the sale until months after the improperly recognized revenue was included in PSI's quarterly and annual filings. He points to an email Davis sent to Winemaster in January 2016 updating Winemaster on the transaction, in which Davis explained "the deal that was agreed to" so that Winemaster was aware of the problem "[b]efore accounting gets short paid 1.2 million dollars." (Compl. ¶ 112.) At the pleading stage, the Court cannot conclude that Davis's email was informing Winemaster of the deal for the first time as opposed to simply refreshing his memory. Indeed, Needham, who allegedly directed the artificial inflation, also needed to be refreshed about the terms of the deal in an email from Customer C's COO. (*Id.* ¶ 111 ("[I]f you remember when we did the $3M deal...PSI upped the price so it made your numbers look better.").) Thus, the allegations concerning Winemaster's awareness and approval of the artificial inflation of the revenue from the third quarter 2015 sale to Customer C are sufficient to plead his scienter as to that transaction.

*d) Customer E Transaction*
 **\*21** PSI had expected to fulfill a $600,000 purchase order from Customer E in the fourth quarter of 2015. However, due to a delay in procuring necessary custom oil pans, it became apparent to PSI that it would not be able to meet Customer E's specifications for the order. According to the SEC, with PSI falling far short of its fourth quarter 2015 revenue goals, the company sought to recognize revenue from the sale in the quarter by shipping the engines to a PSI-affiliated warehouse

in China with a standard oil pan and delivering them to Customer E in 2016 with the correct oil pan. When PSI's CFO became aware of this plan, he informed PSI's sales department that no revenue could be recognized in 2015 from this sale. In turn, the salesperson responsible for the Customer E account relayed the CFO's message to Winemaster. Winemaster then approached PSI's CFO and falsely informed him that the engines would be fully functional in Customer E's intended product, and thus revenue could be recognized in 2015 from the sale.

Here, as alleged, Winemaster was directly made aware of the risk of improperly recognizing revenue from the sale by PSI's CFO. Despite knowing that the engines did not meet Customer E's specifications and would not work in its intended product, Winemaster responded to the CFO's warning by falsely stating that the engines would be fully functional. Thus, Winemaster had direct knowledge of the revenue recognition problem and was at least reckless in failing to honestly address it. With his motion, Winemaster seeks to divert the Court's attention from the issue of which Winemaster was aware by saying that the real GAAP defect was the fact that the engines were not shipped to Customer E by the end of 2015. But the fact that there was an additional reason that revenue could not be recognized from the sale does not detract from the fact that Winemaster was aware of and disregarded an independent reason that PSI could not recognize revenue from that transaction. For that reason, the SEC has adequately alleged Winemaster's scienter as to the Customer E transaction.

*e) Customer F Transaction*
As alleged in the complaint, by December 2015, PSI was urgently attempting to generate revenue to make up for an anticipated revenue shortfall. It therefore sought to convince Customer F to accept early delivery of engines it had expected to accept in 2016. But even after it was offered multiple incentives, Customer F declined PSI's pleas. Yet, on the last day of 2015, Davis called PSI's Director of Facilities and ordered the shipment of the 147 engines Customer F had ordered to an offsite warehouse and then invoiced Customer F $300,000 for the engines. PSI recognized that $300,000 as revenue in 2015.

On his call with PSI's Director of Facilities, Davis stated that he already informed Winemaster of the shipment. Thus, the SEC has pleaded Winemaster's awareness of the shipment. Not only did it violate GAAP to recognize revenue from the delivery of engines that Customer F had not accepted or even

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 90 of 105 PageID #:2372

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

authorized, it also violated PSI's own revenue recognition policies. Specifically, PSI stated that it would not recognize revenue before delivery has occurred if the risk of ownership has not passed to the buyer or the buyer and the buyer has not requested that the goods be held for future delivery. And courts have found that a "violation of a company's own policy supports an inference of scienter." *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999); *see also Provenz*, 102 F.3d at 1490 (denying summary judgment on scienter where the defendants' accounting figures violated GAAP and the company's own revenue recognition policies).

Further, the unauthorized delivery occurred near the end of the quarter and fiscal year, as PSI was significantly underperforming its revenue targets. Indeed, Davis reported to Winemaster in November 2015 that "PSI was going to have to pull forward a lot of sales from 2016 because" it was about $30 million short of analysts' consensus net revenue estimate for the quarter. (Compl. ¶ 80.) Scienter can be supported where, as here, a defendant is alleged to know of a revenue shortfall and thus has "a motive to increase revenue to meet earnings expectations." *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 970 (N.D. Ill. 2011); *see also SEC v. Arnold*, No. 03-CV-0328-REB-OES, 2007 WL 2786428, at *2–3 (D. Colo. Sept. 24, 2007) (finding that the SEC pleaded scienter with allegations that the defendant knew that the company was falling short of quarterly revenue targets and therefore entered into a transaction "solely for the purpose of inflating materially the company's revenues and overstating its business performance").

 **\*22** Winemaster contends that while the SEC pleads his awareness of the shipment, it fails to allege that he knew the shipment was being made without Customer F's consent. However, the complaint alleges that Winemaster later claimed responsibility for the shipment, telling PSI's Chief Legal Officer in August 2016 that the shipment was made at his direction. (Compl. ¶ 132.) Thus, accepting this as true, Winemaster admitted that he ordered the shipment to the offsite warehouse and it is reasonable to infer that he was aware of the other surrounding circumstances of the shipment.

Winemaster also claims that the SEC failed to plead that he withheld details of the transaction from PSI's accounting department. Instead, according to Winemaster, it alleges in passive voice that "PSI's accounting group was not made aware of the circumstances surrounding the shipment." (Compl. ¶ 96.) But that argument amounts to little more than nitpicking over grammar. In any case, the

SEC alleges that only Winemaster, Davis, and the Director of Facilities knew of the shipment. Thus, Winemaster was one of only three people who could have alerted the accounting department. Given his responsibilities for internal accounting control, Winemaster should have known that the accounting department would find the details of the shipment relevant to the proper treatment of this transaction.

In sum, the SEC has alleged facts sufficient to show that Winemaster should have known that PSI could not recognize revenue where Customer F had not agreed to accept the shipment before the end of the year. As one of the three people who were aware of the transaction, he should have made sure that accounting was aware of the details that precluded the recognition of revenue. Thus, the SEC has adequately pleaded Winemaster's scienter as to the Customer F transaction.

*f) Customer G Transaction*

As alleged, Customer G agreed to purchase in the fourth quarter of 2015 $1.9 million of base engines, essentially engines that lacked parts to function in Customer G's equipment. Those engines would then be shipped to an offsite warehouse by the end of 2015 and then brought back to PSI to be completed and shipped to Customer G in 2016. The purported purpose behind the transaction was to allow PSI to recognize revenue from the sale in 2015. But PSI could not even ensure that those already incomplete engines were at least completed in accordance with the order. Specifically, the engines were missing the catalysts, a required component under the order. Nonetheless, the salesperson responsible for Customer G's account was told by Winemaster to ship the engines without the catalysts.

Similar to the Customer E sale, PSI recognized revenue from a sale that did not meet Customer G's specifications because it was missing a required part. Winemaster argues that the SEC failed to plead his scienter because both PSI (and its accounting department) and Customer G were aware that the shipment involved incomplete, non-functional engines. While it is true that the base engines were missing other parts and would have to be completed in 2016, the catalysts were a required component of the base engine portion of Customer G's order. Customer G was never informed of or excused the deviation. And it is telling that PSI's accounting department knew of the details of Customer G's agreement with PSI and apparently found it proper to recognize revenue from the sale. That plausibly suggests that Winemaster failed to disclose to accounting that the base engines were missing the catalysts because that information could affect accounting's

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

willingness to recognize revenue in 2015 from the transaction. At the very least, the SEC has pleaded facts showing that Winemaster was reckless in failing to inform accounting of the missing catalysts so that it could determine how the issue would impact the sale's accounting treatment.

*iiiIn Connection with the Purchase or Sale of Securities*

**\*23** Winemaster does not contend that his conduct was not in connection with the purchase or sale of securities. Nor could he, as misrepresentations and omissions about a company's finances contained in its SEC filings are indisputably made in connection with the purchase or sale of securities. *E.g.*, *SEC v. Wolfson*, 539 F.3d 1249, 1262–63 (10th Cir. 2008). And because the SEC has sufficiently alleged that Winemaster made, with the requisite scienter, material misstatements concerning the revenue from the above transactions, it has sufficiently pleaded Winemaster's primary liability under § 10(b) and Rule 10b-5 for those misstatements.

**B. Rule 10b-5(a) and (c)**
In addition to the Rule 10b-5(b) claim against Winemaster, Count III of the SEC's complaint sets forth claims under Rule 10b-5(a) and (c). "Violations of subsections (a) and (c) are often called 'scheme liability.' " *SEC v. Familant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012). The elements of a Rule 10b-5(a) and (c) claim are similar to a Rule 10b-5(b) claim. *See Kameli*, 2020 WL 2542154, at *12. But instead of a misstatement, the SEC must allege "acts that created a false appearance of fact in furtherance of the scheme, including making false statements." *Ustian*, 229 F. Supp. 2d at 774 (internal quotation marks omitted). "A scheme is a plan or program of something to be done; an enterprise, a project; as, a business scheme, or a crafty, unethical project. The scheme, in other words, is the plan or design, not the ultimate result." *Id.* (internal quotation marks omitted). In short, liability under Rule 10b-5(a) and (c) is "premised on a course of deceptive or manipulative conduct." *Takata v. Riot Blockchain, Inc.*, No. 18-02293 (FLW), 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020).

Winemaster has addressed the claims against him under Rule 10b-5(b) and Rule 10b-5(a) and (c) together. Thus, his motion to dismiss the Rule 10b-5(a) and (c) claim fails for the same reasons as his challenge to the sufficiency of the SEC's claim under Rule 10b-5(b). That leaves the Court to address the sufficiency of the SEC's allegations against Needham.

*i. Deceptive Conduct*
Needham contends that the SEC's scheme liability claim cannot be sustained because the SEC fails to allege that he engaged in conduct that was deceptive on its own rather than based on its relationship to a fraudulent misstatement made by someone else. According to Needham, the allegations simply show that he entered into lawful transactions with consenting parties that were then used by others to fraudulently recognize revenue.

To the extent Needham claims that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim, the Court rejects that contention. While this position was previously adopted by many courts, "[i]t is no longer tenable...in light of the Supreme Court's decision in *Lorenzo v. SEC*, 139 S Ct. 1094 (2019)." *Kameli*, 2020 WL 2542154, at *14. In that decision, the Supreme Court held that Rule 10b-5(a) and (c) "capture[s] a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101. That includes "the dissemination of false or misleading statements with intent to defraud....even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Id.* at 1100–01. Indeed, the Supreme Court recognized that there was "considerable overlap among the subsections" of Rule 10b-5 as "each succeeding prohibition was...meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." *Id.* at 1102. Thus, there was no basis to find that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct." *Id.* Although Needham contends that an overly expansive view of scheme liability would erode the line between primary and secondary liability, the Supreme Court was unconcerned about that issue, stating that "it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another." *Id.* at 1103. Thus, that Needham's allegedly deceptive acts were part of a course of conduct that resulted in PSI making misleading statements in its SEC filings does not put his actions outside the scope of Rule 10b-5(a) and (c).

**\*24** Broadly, the SEC has pleaded here a scheme to artificially inflate PSI's revenue figures. It alleges that Needham participated in the scheme by negotiating sales with certain PSI customers from which PSI recognized revenue in violation of GAAP. Nonetheless, Needham contends that his role in the scheme involved no inherently deceptive acts. Rather, he claims that he was negotiating and consummating lawful sales with PSI customers and had no role in the later

deception. The Court addresses the allegations with respect to each subject transaction in which Needham was involved to determine whether his conduct was deceptive.

### a) Customer C Transaction—Second Quarter 2015

The complaint alleges that Needham initially approached Customer C and pressured it to take $10 million worth of engines in the second quarter of 2015 but initially encountered resistance. Ultimately, Customer C agreed to the sale but it was subject to the Customer C Letter Agreement, which Needham negotiated and signed. That agreement excused Customer C from paying until 30 days after the engine was placed in a Customer C generator and contained a right to exchange the engines that affected PSI's ability to immediately recognize the full $10 million price as revenue from the sale.

Certainly, Needham's argument is well-taken that there is nothing deceptive about negotiating a side letter agreement. However, Needham also failed to disclose the existence of the Customer C Letter Agreement to PSI's accounting department. Needham claims that the SEC's allegations give no reason to believe that he had any familiarity with GAAP or how PSI accounted for revenue from the sales he transacted. But while the complaint does not allege that Needham was familiar with GAAP, it does allege that he knew about PSI's revenue recognition standards and policies. (Compl. ¶ 23.) Further, the complaint alleges that Needham was "told by accounting department personnel on multiple occasions to inform accounting of any side arrangements" and that he "knew that [he] needed to inform PSI's accounting department about any sales transactions terms that deviated from PSI's standard terms so that the accounting department could properly record the revenue associated with those transactions." (*Id.* ¶ 27.) Thus, accepting the allegations against him as true, Needham knew that disclosing the existence of the agreement was necessary for proper accounting and yet failed to do so. That was a deceptive act. *See SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (finding that the SEC pleaded a deceptive act where the defendants' "activities or the concealment of their actions resulted in the misrepresentations to the market by others").

Needham points to *SEC v. Lucent Technologies, Inc.* ("*Lucent III*"), 610 F. Supp. 2d 342 (D.N.J. 2009), as rejecting a similar claim of scheme liability. There, the defendants authorized side agreements to induce the company's customers to purchase equipment. *Id.* at 345. In turn, the company recognized revenue from those sales in violation of GAAP. However, the district court noted that the defendants' conduct of giving assurances of rights of return in connection with the sales was not inherently deceptive. *Id.* at 360. Rather, the real "deception in this case arose from the failure to disclose the 'real terms' of the deal." *Id.* at 361 (internal quotation marks omitted). But because that was "nothing more than a reiteration of the misrepresentation of the misrepresentation and omissions that underlie" the previously rejected Rule 10b-5(b) claim, it could not give rise to a separate Rule 10b-5(a) and (c) claim. *Id.* at 361. Of course, the *Lucent III* court's holding is no longer viable following the Supreme Court's decision in *Lorenzo* and the Court does not find it instructive here.

### b) Customer C Transaction—Third Quarter 2015

**\*25** The complaint further alleges that when Needham sought to make a sale to Customer C in the third quarter of 2015, he personally negotiated a deal in which Customer C would submit a $4.3 million purchase order while he verbally assured it that the true price it would pay was only $3 million. The SEC further alleges that Needham issued the direction "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) There is no question that Needham committed a deceptive act by documenting the sale at one price while simultaneously entering into a side verbal agreement a reduced price in order to artificially inflate the revenue from the sale. Moreover, Needham committed another deceptive act by failing to inform the accounting department of the true sale price.

Nonetheless, Needham claims that there was no deception because he disclosed the true terms of the deal to Customer C and his superiors. Of course, his disclosure to his superiors does little to mitigate the deceptiveness of his conduct when the cited two superiors were Davis and Winemaster and therefore also participants in the scheme. To the extent Customer C participated in the wrongdoing, that also does nothing to absolve Needham of liability. Thus, Needham fails to rebut the SEC's allegations as to his deceptive conduct in connection with the sale to Customer C in the third quarter of 2015.

### c) Customer D Transaction

As the fourth quarter of 2015 was drawing to a close, Needham allegedly negotiated and agreed to a deal with Customer D in which Customer D would buy 3 Waukesha generator sets directly from PSI for about $3 million.

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 93 of 105 PageID #:2375

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

However, Customer D's purchase would be funded with a credit it would receive from Customer C's return of 97 PSI engines it had previously purchased to fulfill Customer D's generator set orders. Needham then drafted a bill and hold agreement that he presented to Customer D. The bill and hold agreement contained several statements that Needham knew to be false, including that Customer D requested bill and hold treatment for the sale. Thus, Needham committed a deceptive act by drafting a bill and hold agreement with a statement he knew to be false. Further, Needham failed to inform PSI's accounting department about either the bill and hold agreement or the fact that the sale was to be funded by a credit granted in connection with Customer C's return of 97 previously purchased engines.

Needham fails to genuinely contest the SEC's allegations regarding his allegedly deceptive acts in connection with the Customer D sale. Instead, he misconstrues the factual allegations to minimize his involvement. For example, Needham claims that the SEC fails to distinguish between Needham and Davis with respect to the bill and hold agreement. While the complaint states that Davis and Needham improperly attempted to characterize this transaction as a bill and hold sale, it goes on to say that Needham provided Customer D with the agreement. (Compl. ¶ 85.) It further alleges that "Needham worked to create documentation supporting the transaction." (*Id.* ¶ 84.) Although the SEC does not directly allege that Needham drafted the bill and hold agreement, the reasonable inference from that allegation is that the bill and hold agreement was among the supporting documentation drafted by Needham. The Court thus rejects Needham's attempts to twist the SEC's allegations and finds that the allegations, as recounted above, sufficiently plead deceptive acts in connection with the Customer D transaction.

#### ii. Scienter

Having found that the SEC has pleaded Needham committed deceptive acts in furtherance of the scheme, the Court must determine whether the allegations support that Needham acted with scienter. According to Needham, the SEC fails to allege particularized facts showing that he either intended to deceive buyers or sellers of PSI stock or acted recklessly.

**\*26** First, Needham contends that he was simply a salesperson who had no familiarity with GAAP or how PSI would account for revenue. As discussed above, that contention is belied by the SEC's allegation that Needham was familiar with PSI's revenue recognition standards. Further,

the SEC alleges that Needham knew that "PSI filed financial statements in its quarterly and annual reports" and he knew that those "financial statements needed to be truthful and accurate." (Compl. ¶ 23.) Moreover, it is not the case that "a defendant must always have accounting knowledge or accounting expertise to have actual knowledge of an accounting violation." *Espuelas*, 698 F. Supp. 2d at 432. Indeed, if that were true, "even the most egregious violation of revenue recognition principles—recognizing revenue from a transaction that never happened, for example—would not give rise to an inference of actual knowledge of an accounting violation, unless accounting knowledge were also alleged." *Id.* For example, here, it should not have required even basic accounting knowledge for Needham to know that it was improper to recognize $4.3 million of revenue from the sale to Customer C when he knew that Customer was only obligated to pay $3 million.

The SEC also makes specific allegations evidencing Needham's knowledge and active involvement in the fraudulent accounting scheme. With respect to the third quarter 2015 Customer C sale, the SEC alleges that Needham directed Customer C to issue the inflated $4.3 million purchase order "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) A later email from Customer C's COO reinforces Needham's scienter at the time of the sale, as the COO reminded Needham that "PSI upped the price so it made your numbers look better." (*Id.*) Not only did the extra $1.3 recognized from the sale improve PSI's sales numbers, but it also allowed Needham to earn a $25,000 bonus he would not have received had PSI not recognized that additional revenue. *See, e.g.*, *Nguyen v. New Line Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) ("[A]llegations regarding [the defendants'] specific motives to obtain outsized bonuses may certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter."). Needham then allegedly assisted Winemaster as he attempted to cover up the artificial inflation. Similarly, when Needham presented Customer D with the bill and hold agreement, he admitted that the agreement would "allow [PSI] to recognize revenue" from the sale. (*Id.* ¶ 85.) Needham's failure to disclose the terms of each of the three subject transactions to the accounting department also supports his scienter, as he was told by accounting on multiple occasions that he needed to inform it of any side agreements or atypical terms.

Viewing the SEC's allegations as to Needham as a whole, they tend to show that Needham was not an unwitting tool

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

in Winemaster and Davis's fraudulent accounting scheme. Rather, he was a key player in the scheme, knowingly negotiating and structuring the three subject transactions and then concealing from PSI's accounting department key details of the sales, thereby leading accounting to recognize revenue from the sales improperly. Further, the SEC has pleaded Needham's awareness that the purpose of his conduct was to artificially inflate PSI's revenue. Consequently, the SEC has pleaded Needham's scienter for purposes of scheme liability.

*iii. In Connection with the Purchase or Sale of Securities*
According to Needham, the SEC fails to allege that his deceptive conduct occurred in connection with the purchase or sale of securities. In particular, he claims that the SEC fails to allege that any of his conduct was directed toward investors. Rather, he claims that he dealt only with PSI's customers and had no responsibilities related to PSI's contacts with investors.

The Supreme Court has held that the "in connection with" requirement simply requires "a misrepresentation 'coinciding' with or 'touching' a securities transaction." *United States v. Durham*, 766 F.3d 672, 682 (7th Cir. 2014) (quoting *SEC v. Zandford*, 535 U.S. 813, 822 (2002), and *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)). The phrase should be read broadly as § 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation marks omitted).

 **\*27** Here, Needham's deceptive acts satisfy the "in connection with" requirement because he knew or was reckless in not knowing that his conduct would cause PSI to misstate its revenue. Even though Needham did not have direct contact with investors, he either knew or could have anticipated that those misstated revenue numbers would eventually reach investors. *See, e.g.*, *SEC v. Delphi Corp.*, No. 06-14891, 2008 WL 4539519, at \*8 (E.D. Mich. Oct. 8, 2008) (holding that the "in connection with" requirement was satisfied where the defendant "acted to create income numbers with the purpose that they be reported to the public in company filings and public statements"); *Nacchio*, 438 F. Supp. 2d at 1282 ("Because the Complaint adequately alleges that [the defendant's] omissions had the intended result of deceiving investors as to [the company's] actual revenues, the SEC has sufficiently alleged that [the defendant's] misrepresentations and omissions occurred in connection with the purchase or sale of securities."). For that reason, Needham's actions were in connection with the purchase or sale of securities. Because the SEC has pleaded that Needham's actions were deceptive, undertaken with the requisite state of mind, and in furtherance of a fraudulent accounting scheme, it has successfully stated a Rule 10b-5(a) and (c) claim as to Needham.

**III. Aiding and Abetting Securities Law Violations—Needham**
Counts II, IV, and V of the SEC's complaint set forth claims against Needham for aiding and abetting securities law violations.[9] In Count II, the SEC alleges that Needham aided and abetted Winemaster and PSI's Rule 10b-5(b) violations.[10] Counts IV and V assert claims against Needham for aiding and abetting PSI's reporting and recordkeeping violations under § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, and § 13(b)(2)(A). Because Needham focuses his arguments against aiding and abetting liability on the Rule 10b-5(b) claim and then asserts that the reporting and recording keeping claims fail for the same reasons, the Court will likewise center its aiding and abetting liability analysis on the Rule 10b-5(b) claim.

9     Winemaster is also named as a Defendant in Counts IV and V, but he does not address the merits of these Counts in his motion to dismiss.

10     Although PSI is not named as a Defendant in this action, it is identified as an "uncharged related entity" that committed securities law violations. (*See, e.g.*, Compl. ¶ 149.)

Under § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the SEC may hold "any person that knowingly or recklessly provides substantial assistance to another person in violation of" the Exchange Act liable as an aider and abettor. To hold someone secondarily liable as an aider and abettor, the SEC must allege: "(1) there is a primary violation of securities law; (2) the aider and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted in the primary violation." *Ustian*, 229 F. Supp. 3d at 776.

As discussed above, the SEC has adequately pleaded Rule 10b-5(b) violations for two of the three transactions with which Needham was involved. Neither Winemaster nor Needham has challenged whether the allegations concerning misstatements arising from the third Needham transaction, the Customer D sale, state a claim under Rule 10b-5(b). For present purposes, the Court will assume that they do.

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Needham does contend that the SEC has failed to plead his scienter for aiding and abetting violations and that it has not alleged facts showing he provided substantial assistance in the primary violation.

First, Needham argues that the SEC has not pleaded scienter because the complaint lacks allegations showing that Needham knew his conduct or omissions were in assistance of Winemaster or PSI in making fraudulent misstatements of revenue. Needham's contentions concerning his scienter have already been addressed above in the Court's discussion of the Rule 10b-5(a) and (c) claim and decided in the SEC's favor.

Next, Needham contends that he did not provide substantial assistance to Winemaster and PSI in their primary violations. To plead substantial assistance "requires a showing that the aider and abettor proximately caused harm to the victim on which the primary liability is predicated." *SEC v. DiBella*, 587 F.3d 553, 566 (7th Cir. 2009) (internal quotation marks omitted). Here, Needham allegedly negotiated and structured the Customer C and D sales in a way that would lead PSI's accounting department to recognize revenue for the quarters in which they were made. At the same time, Needham provided the customers with certain terms, undisclosed to accounting, that would have affected PSI's ability to recognize revenue from the sales immediately. Those sales were the vehicle by which PSI fraudulently recognized revenue; they gave legitimacy to that revenue and allowed PSI to conceal, at least temporarily, its fraudulent accounting. Thus, by doing the legwork on those sales, Needham substantially assisted Winemaster and PSI in making statements that improperly recognized revenue from those sales.

 **\*28** Because the SEC's allegations establish that Needham substantially assisted the Rule 10b-5(b) violations associated with the Customer C and D sales, with a general awareness that his actions were associated with an improper or illegal course of conduct, the SEC has successfully stated a claim against Needham for aiding and abetting Rule 10b-5(b) violations. As Needham does not separately challenge the merits of the reporting and recordkeeping aiding and abetting claims, his motion to dismiss is denied as to those claims as well.

## IV. Control Person Liability—Winemaster

In Count X of the complaint, the SEC alleges that Winemaster violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Section 20(a) sets out " 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the

securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). The Seventh Circuit has set forth a two-prong test for control person liability. *Id.* "First, the 'control person' needs to have **actually** exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Id.* at 911–12.

Here, the SEC seeks to hold Winemaster liable as a control person for the two transactions in which he was not directly involved (the Customer A and D sales) as well as other securities law violations committed by PSI.[11] Winemaster first argues that the SEC fails to allege primary violations for which he can be held liable as a control person because it does not allege that PSI acted with scienter. However, the "[k]nowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00CV1338(GBD), 2004 WL 137073, at \*13 (S.D.N.Y. Jan. 26, 2004); *see also Zurich Cap. Mkts. v. Coglianese*, No. 03 C 7960, 2005 WL 1950653, at \*3 (N.D. Ill. Aug. 12, 2005) (imputing the scienter of the defendant company's agent with respect to the agent's fraud to the defendant company). Thus, "[a]llegations that corporate employees or agents[ ] have knowingly deceived or failed to make the requisite public disclosures does not immunize the corporation from liability for the knowing deception." *UCAR Int'l*, 2004 WL 137073, at \*13.

11      That PSI is not a Defendant in this action does not preclude Winemaster from being held liable as a control person for its uncharged violations. *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at \*9 (N.D. Ill. May 25, 2004) ("The fact that the controlled person...is not a defendant in [the] action is of no legal significance....").

The Court has already discussed above that the SEC has adequately alleged Needham's scienter. Moreover, the complaint contains numerous allegations of Davis's scienter and Winemaster does not challenge the sufficiency of those allegations. He simply contends that Needham's and Davis's scienter should not be imputed to PSI because they played no role in the financial reporting giving rise to the primary violations. While Winemaster attempts to play down Needham's and Davis's roles in the company, the Court has already found that Needham played an important part in the fraudulent accounting scheme. And

United States Securities and Exchange Commission v. Winemaster, Slip Copy (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

the complaint sufficiently pleads Davis's role, as he was PSI's Vice President of Sales—a corporate officer—and had responsibilities relating to communicating sales incentives to PSI's accounting department, which in turn calculated the revenue that was reported in PSI's financial statements. (Compl. ¶ 15, 25.)

**\*29** Next, Winemaster contends that the SEC has not alleged that he had the ability to control the transactions and statements at issue in this action. He argues that all the SEC alleges is his control over the day-to-day management and overall direction of PSI, which is insufficient. The Seventh Circuit has emphasized that § 20(a) is "remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (internal quotation marks omitted). Here, the SEC has alleged that Winemaster held the roles of PSI's CEO, President, and Chairman of the Board, and was responsible for PSI's system of internal accounting controls, reviewing and approving PSI's financial statements and SEC filings, and establishing and maintaining PSI's internal controls over financial reporting. (Compl. ¶¶ 14, 24, 143.) Moreover, "numerous...courts have held that signing [public filings] makes the officer a control person for liability related to" the statements contained therein. *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 771 (S.D. Ind. 2018).

Together, the SEC's allegations sufficiently plead that Winemaster exercised control over PSI's operations and had the ability to control the specific transactions and misstatements allegedly giving rise to PSI's primary violations. For that reason, the SEC adequately states a control person claim as to Winemaster.

## V. Section 13(b)(5) of the Exchange Act and Rule 13b2-1 —Needham

Although Count VII of the complaint sets forth claims against both Needham and Winemaster under § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, only Needham challenges the claim on its merits. Section 13(b)(5) makes it unlawful for any person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be kept by an issuer under § 13(b)(2) of the Exchange Act. 15 U.S.C. § 78m(b)(5). Similarly, Rule 13b2-1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of" the Exchange Act. 17 C.F.R. §

240.13b2-1. While § 13(b)(5) expressly requires knowledge, scienter is not required under Rule 13b2-1. *McConville*, 465 F.3d at 789.

Needham contends that the SEC fails to allege any particularized facts showing that he had knowledge of PSI's system of internal controls or any responsibility to report any information to PSI's accounting department but knowingly failed to do so. However, the allegations in the complaint show that Needham knew about PSI's revenue recognition standards and policies and had been told by PSI's accounting department to inform it of any side arrangements or atypical sales terms. (Compl. ¶¶ 23, 27.) Yet Needham failed to disclose to accounting the Customer C Letter Agreement that was part of the second quarter 2015 Customer C sale. Further, he directed Customer C to draft a false purchase order for the third quarter 2015 sale and drafted a bill and hold agreement for the Customer D sale that contained falsehoods. Moreover, he failed to disclose to accounting details from those sales, knowing that they would affect their accounting treatment. These allegations are sufficient to state a claim under § 13(b)(5) and Rule 13b2-1 against Needham.

## VI. Rule 13a-14—Winemaster

The SEC alleges in Count IX that Winemaster violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14, by falsely certifying that PSI's periodic reports did not contain any material misstatements and fairly presented PSI's financial condition. Winemaster contends that there is no standalone cause of action for violations of Rule 13a-14, and in any case, the Rule can only be violated by failing to certify.

For his contention that there is no Rule 13a-14 standalone cause of action, Winemaster cites *SEC v. Black*, No. 04 C 7377, 2008 WL 4394891, at \*17 (N.D. Ill. Sept. 24, 2008), which held that a false certification under Rule 13a-14 "does not state an independent violation of the securities law." However, many courts that have considered *Black* disagree with its analysis, concluding that it mistakenly relied on cases involving Rule 13a-14 claims brought by private parties. *E.g.*, *Ustian*, 229 F. Supp. 3d at 777; *SEC v. Brown*, 740 F. Supp. 2d 148, 164–65 (D.D.C. 2010). Those cases further hold that the SEC has the authority to bring a Rule 13a-14 claim pursuant to § 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), which allows the SEC "to bring an action in a United States District Court 'to enjoin' any 'acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder.' " *Brown*, 740 F. Supp. 2d at 165 (quoting 15 U.S.C. § 78u(d)(1)). The Court agrees that §

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

21(d)(1) gives the SEC the authority to enforce violations of Rule 13a-14. Moreover, even the *Black* court agreed that Rule 13a-14 extends to false certifications.

**\*30** Finally, Winemaster contends that the Rule 13a-14 claim should be dismissed because Count IX does not allege that Winemaster knew that the certification was false or was reckless in not knowing. That argument is unavailing as the SEC alleges that Winemaster signed and certified each filing despite knowing that revenue had been improperly recognized. (Compl. ¶¶ 54, 66, 77, 105.) In short, the SEC has pleaded a viable standalone cause of action for Winemaster's violation of Rule 13a-14.

## VII. Section 304 of SOX—Winemaster

In the final Count of its complaint, Count XI, the SEC claims that Winemaster's reimbursement obligations under § 304 of SOX, 15 U.S.C. § 7243(a), were triggered due to PSI's accounting restatements. Thus, he must reimburse the $280,000 bonus he received on July 10, 2015.

Under § 304 of SOX, "[i]f an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws," the CEO and CFO "shall reimburse the issuer for...any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the [SEC] (whichever first occurs) of the financial document embodying such financial reporting requirement." 15 U.S.C. § 7243(a)(1). The plain language of § 304 allows "the SEC to seek disgorgement from the CEOs and CFOs even if the triggering restatement did not result from the misconduct on the part of those officers." *SEC v. Jensen*, 835 F.3d 1100, 116 (9th Cir. 2016).

Winemaster argues that the SEC does not sufficiently allege actionable misconduct attributable to PSI. Of course, this Court already rejected those arguments when it found that Winemaster could be held liable as a control person. Next, Winemaster claims that the restatement was not based on misconduct at all, given that it showed other adjustments to net revenue that were not attributable to fraud. Indeed, for three of the five quarters, those other adjustments were larger than the adjustments associated with the fraud. However, under the plain language of the § 304 of SOX, the issue is whether a restatement is "***required***...due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement." 15 U.S.C. § 7243(a) (emphasis added). The issuer's "actual motivation in issuing the restatement is therefore of no moment." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 788 (5th Cir. 2017). Here, the SEC alleges that PSI was required to prepare the restatement due to the accounting errors caused by Winemaster, Needham, and Davis's misconduct. (Compl. ¶ 190.) The fact that, in the course of preparing the restatement, PSI made other adjustments to its income is irrelevant. Consequently, the SEC has sufficiently stated a claim under § 304 of SOX.

## CONCLUSION

For the foregoing reasons, Winemaster's and Needham's motions to dismiss (Dkt. Nos. 30, 34) are denied.

## All Citations

Slip Copy, 2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 98 of 105 PageID #:2380

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2019 WL 4597518

2019 WL 4597518
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

WASHTENAW COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually
and on Behalf of All Others
Similarly Situated, Plaintiffs,
v.
WALGREEN CO., Gregory D. Wasson,
and Wade Miquelon, Defendants.

Case No. 15-cv-3187
|
Signed 09/23/2019

**Attorneys and Law Firms**

Frank Anthony Richter, James E. Barz, Robbins Geller Rudman & Dowd LLP, Chicago, IL, Nicole Temkin Schwartzberg, Pro Hac Vice, Kessler Topaz Meltzer & Check, LLP, San Francisco, CA, for Plaintiffs.

Amy Curtner Andrews, Caroline Anna Wong, Elizabeth Y. Austin, Heather Benzmiller Sultanian, John M. Skakun, III, Jacqueline Marie Pruitt, James Wallace Ducayet, Kristen R. Seeger, John M. Skakun, III, Sidley Austin LLP, Chicago, IL, for Defendant Walgreen Co.

Thomas B. Quinn, Eli Joseph Litoff, Riley Safer Holmes & Cancila LLP, for Defendant Gregory D. Wasson.

Caz Hashemi, Evan L. Seite, Pro Hac Vice, Jessica L. Snorgrass, Pro Hac Vice, Stephen B. Strain, Pro Hac Vice, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Laurence Harvey Levine, Chicago, IL, for Defendant Wade Miquelon.

**MEMORANDUM OPINION AND ORDER**

SHARON JOHNSON COLEMAN, United States District Court Judge

**\*1** Industriens Pensionforsikring, A/S, as lead plaintiff,[1] brings this shareholder class action lawsuit against defendants Walgreen Co. ("Walgreens"), former Walgreens Chief Executive Officer ("CEO") Gregory D. Wasson, and former Walgreens Chief Financial Officer ("CFO") Wade Miquelon for violations of the Securities Exchange Act of 1934. Defendants have moved to dismiss plaintiff's first amended class action complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part and denies in part defendants' motion.

1    The Court granted Industriens Pensionforsikring, A/S motion for appointment as lead plaintiff on June 16, 2015. The Court will refer to Industriens Pensionforsikring, A/S as plaintiff throughout this ruling.

**Background**

Walgreens is a retail drugstore chain, which sells prescription and non-prescription drugs. Prescription drugs represent Walgreens' largest class of products and are the lead driver of its revenue and profit. The majority of prescription drugs sold by Walgreens are generic drugs. Generic drugs generate a higher profit margin than branded drugs due to their lower production costs. That profit margin is dependent on the difference between the cost to procure the generic drug and the reimbursement rate Walgreens receives for supplying a customer with the drug. Historically, generic drug prices have followed a deflationary trend, but starting in 2014 that trend reversed. At that time, Walgreens had contracted with several major Pharmacy Benefit Managers ("PBMs") to provide fixed maximum rates of reimbursement for each drug over the term of the contract based on the assumption that generic drug prices would continue to decline. If those prices rose, Walgreens would be forced to absorb the additional cost of those drugs beyond the contractually-capped rate of reimbursement.

To give context to plaintiff's securities fraud claims, Walgreens announced that it was entering into a merger with Alliance Boots GmbH ("Alliance") in June 2012. As part of this transaction, Walgreens set forth long-range goals for fiscal year 2016 ("FY16") reflecting the expected benefits of the new partnership, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"). In late 2013, Walgreens' internal long-range planning process revealed that the FY16 EBIT goal was tracking under $8.5 billion. Miquelon, in a state court complaint filed in a separate lawsuit, admitted that by the end of 2013, Walgreens had identified the sources of that deficit as: (1) the unprecedented level of generic drug price inflation; and (2) reimbursement contracts that failed to provide meaningful inflationary relief.

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 99 of 105 PageID #:2381

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2019 WL 4597518

Walgreens nonetheless restated the FY16 EBIT goal of $9 to $9.5 billion when it reported its first quarter results in 2014. By March 2014, defendants determined that Walgreens had a FY16 earnings shortfall of well over $1 billion. This additional shortfall, along with the $500 to $600 million shortfall the company knew about in late 2013, increased the aggregate shortfall to $2 billion less than the high end of the FY16 EBIT goal.

**\*2** The class period, which runs from March to August 2014, encompasses the announcement of Walgreens second quarter and third quarter results, as well as public statements made in the interim. At that time, defendants continued to make statements that downplayed the risk of not achieving the FY16 EBIT goal. Miquelon's state court complaint, however, states that by March 2014 when Walgreens issued its second quarter results, the company was well aware of the systematic inflation of generic drug prices.

In April 2014, Miquelon shared an interim long-range planning update with Walgreens' Board of Directors that stated Walgreens would realize $7.5 billion in EBIT in 2016. Also in April, activist investors began to push aggressively for Walgreens to execute a tax inversion (by moving the company overseas) and expressed a desire that the Alliance management team take on a greater leadership role in the combined companies leading to speculation that Wasson was losing control of the company. In May 2014, Wasson told Miquelon that if Walgreens did not proceed with the tax inversion, he believed that the activist investors would force him out of his position.

Miquelon finalized his estimate by June 2014 and determined that the FY16 EBIT goal was tracking at $7.2 to $7.5 billion. Miquelon informed Wasson of the scope of the shortfall in mid-June and advocated for publicly withdrawing the FY16 EBIT goal during the next quarterly call on June 24. Wasson wanted to delay the scheduled earnings announcement so that the withdrawal of the EBIT goal could be bundled with the favorable news concerning the merger with Alliance, including that Walgreens might complete a tax inversion resulting in a significantly lower corporate tax rate.

Walgreens held an earnings conference call on June 24 withdrawing its FY16 earnings target attributing the decision to "Step 2 considerations" and "current business performance." Although Walgreens withdrew its FY16 earnings target, it did not disclose that the shortfall would be $1.8 to $2.3 billion less than the original target.

Walgreens also mentioned generic drug price inflation and reimbursement pressures at the conference call, although its statements could be taken as downplaying the actual significance of those trends.

On August 6, 2014, Walgreens held an investor call regarding the merger with Alliance. During the call, Walgreens disclosed the actual extent of the resulting earnings shortfall announcing the new FY16 EBIT target as $7.2 billion— well below the original estimated $9 to $9.5 billion goal. Walgreens attributed this shortfall to "rapid and pronounced generic drug cost inflation" and unfavorable contract terms with PBMs. After this August 6 disclosure, Walgreens stock dropped 14.3% in a single day. This litigation followed.

Plaintiff initially sought to pursue a number of claims, which the Court narrowed in its September 2016 motion to dismiss ruling. Although the Court presumes familiarity with its ruling, a short recap is in order. The alleged misrepresentations that survived Walgreens' initial motion to dismiss concern statements where defendants purportedly concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. More specifically, plaintiff sufficiently alleged the following non-forward looking statements under Rule 9(b)'s particularity requirements: (1) Miquelon's statement during a March 25, 2014, investor conference call about the second quarter report that "the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year;" (2) Walgreens statement made in its March 27, 2014 Form 10-Q filed with the Securities and Exchange Commission ("SEC") that "[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements;" and (3) Wasson's April 17, 2014 conference call with J.P. Morgan in which the resulting report stated "management noted that it is seeing nothing unusual at this point" with respect to reimbursement pressures. Plaintiff's allegations concerning the forward-looking statements related to the FY16 EBIT goal of $9.0 to $9.5 million did not survive defendants' initial motion to dismiss.

**\*3** On September 28, 2018, the SEC issued an administrative cease-and-desist order against Walgreens, Wasson, and Miquelon under § 17(a)(2) of the Securities Act of 1933. The SEC found defendants "acted negligently in failing to adequately disclose to investors the material increase in risk to the company's ability to achieve the FY16

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 100 of 105 PageID #:2382

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2019 WL 4597518

EBIT Goal." Without admitting or denying the findings, Walgreens, Wasson, and Miquelon consented to the entry of the SEC cease-and-desist order. The SEC also required Walgreens to pay a $34.5 million penalty, and Wasson and Miquelon to each pay a $160,000 penalty.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When considering dismissal of a complaint, the Court accepts all well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 397 (7th Cir. 2019). To survive a motion to dismiss, plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Rule 9(b) requires plaintiffs to plead with particularity the circumstances constituting fraud. *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); Fed. R. Civ. P. 9(b). Particularity in pleading fraud, including securities fraud, means describing the who, what, when, where, and how of the fraud. *Cornielsen*, 916 F.3d at 598; *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990).

**Discussion**

To adequately plead defendants made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5 of the '34 Act, plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted). Scienter is defined as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a

substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

The Private Securities Litigation Reform Act ("PSLRA") requires that the complaint specify each statement alleged to be misleading and the reason or reasons why it is misleading. *Cornielsen*, 916 F.3d at 599; 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that plaintiffs plead with particularity facts giving rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a "strong inference" of scienter, the allegations must be more than merely plausible, they must be as compelling as any opposing inference of non-fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Further, the PSLRA contains a safe harbor provision that heightens the pleading requirements for forward-looking statements. 15 U.S.C. § 78u-5(c); 17 C.F.R. § 230.175. A plaintiff alleging that a forward-looking statement contains a misrepresentation or omission must establish a "strong inference" that the statement was made with actual knowledge by the speaker that the statement was false or misleading. *City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013); 15 U.S.C. § 78u-5(c)(1)(B).

**Forward-Looking Statements**

March 25, 2014, Second Quarter Report

 **\*4** In the first amended complaint, plaintiff has re-alleged certain FY16 EBIT goal-related statements and added new ones. To start, plaintiff re-alleges that on March 25, 2014, Walgreens issued its second quarter report and press release. That same day, Wasson and Miquelon held a conference call with investors to present the report and answer questions. With respect to the FY16 EBIT goal, Miquelon stated that Walgreens was currently tracking below the Compound Annual Growth Rate ("CAGR") needed to achieve the goal, yet Walgreens' presentation slides for the March 25 conference call unequivocally stated the FY16 EBIT goal remained at $9.0 to $9.5 billion. Also, Miquelon stated: "We continue to recognize that there are risks to achieving this goal; however, we remain focused on delivering it." Plaintiff asserts that these statements, in tandem with the slides, were false and misleading because by March 25 defendants knew that the FY16 EBIT goal was tracking at least $1 billion below target.

In the September 2016 motion to dismiss ruling, the Court concluded that these statements were not actionable because

Case: 1:20-cv-05593 Document #: 84-1 Filed: 06/14/21 Page 101 of 105 PageID #:2383

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2019 WL 4597518

plaintiff did not sufficiently allege that the $9.0 to $9.5 billion goal was not attainable. To clarify, statements about earnings forecasts or goals "may be actionable if they are made with the knowledge that they are incorrect or are otherwise without [a] reasonable basis." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1039 (7th Cir. 1996); *see also In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) ("companies making forward-looking statements are afforded a safe harbor: plaintiffs must allege 'specific facts which illustrate that [the company's] predictions lacked a reasonable basis.' ") (citation omitted). Under this standard, courts in this district have concluded that a plaintiff sufficiently alleges a forward-looking claim when defendants disclose goals that they know are not attainable. *See Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001) (Holderman, J.)

Plaintiff has cured its earlier pleading deficiencies by providing additional allegations raising a strong inference that by March 2014 defendants knew that the $9.0 to $9.5 billion earnings goal was not attainable. For example, in a December 17, 2013, email to Miquelon, the Vice President of Global Finance stated in reference to the earnings shortfall: "I can see that we're trying to have adequate upside to offset the risk shown on the slide," but "[b]ased on what I see, we don't have support to imply this range of value is reasonable." Similarly, when discussing the trend in generic price increases, Miquelon informed Wasson (and others) that the "trend may not continue, but as the Finance team has modeled it out if it does[,] we will have a hurdle nearly impossible to climb" in an email dated December 4, 2013.[2] Other internal emails support this inference, including a June 7, 2013, email regarding talking points for Miquelon where the Senior Director in Financial Planning and Analysis explained that asking Walgreens' businesses to close a $400-$500 million gap in the long-range plan "will lead to unattainable goal setting."

2    Although this December 2013 email is not mentioned in the first amended complaint, "nothing prevents a plaintiff opposing dismissal from elaborating on the complaint or even attaching materials to an opposition brief illustrating the facts the plaintiff expects to be able to prove." *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Plaintiff provides other communications and allegations from early 2014 through the beginning of the class period starting in March 2014 that underscore Miquelon's and Wasson's knowledge that by early March 2014, the FY16 EBIT goal of $9.0 to $9.5 billion did not have a reasonable basis and was not attainable. (R. 198, First Am. Compl. ¶¶ 123-26, 130, 146-47, 150.) Such allegations include that Walgreens prepared a long-range plan "refresh" in January and February 2014, which provided management with the forecast of FY16 EBIT at $8.4 billion. Under these allegations, plaintiff has adequately alleged particular facts to show that defendants should not be protected by the safe harbor provision for these March 25 forward-looking statements.

May 15, 2014, Goldman Sachs Analyst Report

**\*5** Next, plaintiff adds new goal-related allegations focusing on defendants' statements and omissions made in May 2014. On May 15, Miquelon made statements during investor meetings hosted by Goldman Sachs. That same day, Goldman Sachs issued a report "Takeaways from Day 1 of meetings with management," which stated, "[o]f the five targets all are tacking on/ahead of plan with the exception being the adj. EBIT goal of at least $9.0bn as core growth has lagged. That said, [Walgreens] did not back away from this target." Plaintiff also highlights a May 23 Goldman Sachs report that provided additional information discussed with Miquelon at the May 15 meeting. The report stated in pertinent part:

> During our meetings, Wade Miquelon, CFO, highlighted that [Walgreens] is tracking on or ahead of plan for each of its five FY16 financial targets with the lone exception of adj. EBIT. That said, management believes this target remains achievable and sees further upside beyond FY16 by leveraging a global footprint, expanding in growth markets, and bringing [Alliance's] best practices to the US.

As explained, plaintiff has sufficiently alleged that by March 2014 defendants knew the $9.0 to $9.5 billion earnings goal did not have a reasonable basis and was not attainable. Defendants nevertheless argue that they cannot be held liable for the May 2014 statements written by third-party analysts because defendants did not have the ultimate authority over the content of the analysts' reports. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *see also Lorenzo v. SEC*, 139 S.Ct. 1094, 1096 (2019) (same). As the Supreme Court teaches, "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is

strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus,* 564 U.S. at 142. Nonetheless, "[n]othing in *Janus* undid the long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them.' " *Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 426 (7th Cir. 2015) (citation omitted); *see also In re Smith Barney Transfer Agent Litig.,* 884 F.Supp.2d 152, 164 (S.D.N.Y. 2012) ("*Janus* did not change the longstanding rule that corporate officials are liable for misstatements to which they give their imprimatur.").

The context in which Goldman Sachs analysts reported Miquelon's statements was the May 15 investor meeting hosted by Goldman Sachs. The May 15 report stated that at the meeting with Miquelon, Miquelon highlighted the FY16 targets, including the EBIT goal. The May 15 report was entitled "Takeaways from Day 1 of meetings with management" and stated that "[Walgreens] did not back away from this target." Without any attribution to Miquelon, these statements are the author's "takeaways" or conclusions from the meeting. And, the statement that "Walgreens" did not back away from the FY16 EBIT target is too broad to create any inference that this statement should be attributed to Miquelon.

On the other hand, the May 23 report specifically identified Miquelon as the speaker by stating "Wade Miquelon, CFO, highlighted" and then immediately stated that "management believed the FY16 EBIT target remains achievable." Because the Goldman Sachs report specifically attributed this statement to Miquelon, this May 2014 statement is actionable.

**Generic drug inflation/reimbursement pressures**
Plaintiff also brings additional claims related to defendants' allegedly false and misleading statements that concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. Because these statements are not forward-looking, but instead discuss historical and present facts that are not contingent on any future event, they are not protected by the PSLRA's safe harbor provision. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 705 (7th Cir. 2008); *In re Aratana Therapeutics Inc. Sec. Litig.,* 315 F.Supp.3d 737, 756 (S.D.N.Y. 2018) ("The scienter requirement for forward-looking statements—actual knowledge—is 'stricter than for statements of current fact.' ") (citation omitted).

April 17, 2014, J.P. Morgan Conference Call

**\*6** On April 17, 2014, J.P. Morgan hosted a conference call with Wasson. At the conference call, the J.P Morgan analyst asked Wasson about the impact of generic price inflation. Wasson replied, "we think that it was really kind of a one-time phenomenon" and that it "was probably an anomaly." He further stated that Walgreens had "a better opportunity than anyone to offset that generic inflation." Plaintiff argues that Wasson knew that these statements were false or misleading because the generic inflation and reimbursement problems were structural and systemic—not an "anomaly" or "one time phenomenon."

Defendants contend that these statements are not actionable because plaintiff has failed to sufficiently allege that Wasson knew generic inflation and reimbursement problems were more than an anomaly. On the contrary, plaintiff has adequately alleged that Wasson was aware of the systemic generic drug price inflation and reimbursement pressures at the time he made these statements. Allegations in the first amended complaint, taken as true for purposes of this motion to dismiss, reveal that during the relevant time period, Wasson and Miquelon, as Walgreens' most senior officers, were regularly informed of generic inflation and pricing trends in the generic drug market, along with third-party reimbursement trends, both of which had a substantial impact of Walgreens' profits. They had ultimate responsibility for directing and managing the company's financial performance, public statements, and business affairs raising an inference that Wasson knew by late April/early May 2014 that Walgreens' third-party payer reimbursement contract negotiations were not going well, along with the inflation and pricing trends in the generic drug market.

Next, plaintiff points to the J.P. Morgan analyst's question at the April 17 investor conference call about reimbursement pressures by third-party payers, including prescription drug plans, Medicare, and PBMs, to which Wasson replied "we're not seeing anything that I would call unusual. I think it's more normal course of business." Defendants, in turn, argue that these statements are not false or misleading because Wasson was discussing pressure from third-party payers—not price increases by generic drug manufacturers resulting in the generic price inflation. In making this argument, defendants ignore the interconnection between the two trends. As explained, Walgreens has contracts with third-party payers, including PBMs, that provide for fixed maximum rates of reimbursement based on the assumption of a deflationary generic price trend. Thus, whether a reasonable investor would have interpreted Wasson's statement about

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....
2019 WL 4597518

reimbursement pressure to say anything about generic price inflation is a question of fact. *See SEC v. Ustian*, 229 F.Supp.3d 739, 765 (N.D. Ill. 2017) ("how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches," is "for the trier of fact."). Wasson's April 17, 2014 statements survive defendants' motion to dismiss.

April 30, 2014, Barclay's Conference

Plaintiff next re-alleges its claim in relation to statements made by Walgreens' Head of Investor Relations, Rick Hans, who appeared at the Barclay's Retail and Consumer Discretionary Conference on April 30, 2014. Plaintiff highlights the following question posed to Hans: "When we think about maybe this fiscal year, how has the gross margin advantage from generics helped you? I'm not talking about the supply chain changes." In response, Hans stated, "we've had a kind of a dearth of new generics. So that caused a big mismatch, it's kind of that peak to trough that we've talked about relative to the introduction of new generics and that had an impact on the margin." Plaintiff asserts that this statement misled investors by explaining that the drop in pharmacy margin was due to the lack of new generic drugs, rather than the generic drug price inflation combined with Walgreen's unfavorable contracts with PBMs.

**\*7** The questioned posed, however, unequivocally states that the inquiry did not involve "supply chain changes," such as generic pricing or generic drug price inflation. Rather, the question asked about the gross margin advantages generics have over branded drugs. As previously discussed, generic drugs generate a higher profit margin than branded drugs due to their lower production costs, and, as alleged in the first amended complaint, the profit margins on generic drugs are typically 50% higher than branded competitors. Therefore, Hans' answer concerning the lack of new generics directly responds to the question about the gross margin advantage on generics and not generic drug price inflation. Accordingly, Hans' answer is not misleading nor actionable.

May 16, 2014, Morgan Stanley Conference Call

Last, plaintiff seeks to revive its claim concerning a May 16, 2014 analyst report issued by Morgan Stanley after a conference call with Wasson and Miquelon. In the report, Morgan Stanley stated Walgreens "has not seen any unusual activity" in relation to generic price inflation and that its joint venture with Alliance leaves Walgreens in "better shape than peers to cope with generic price increases." In the

September 2016 ruling, the Court concluded it was unclear who made these statements, therefore, the allegations were insufficient to state a claim. *See Janus,* 564 U.S. at 142 ("attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made" by "party to whom it is attributed."); *see also Fulton Cty. Empls.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at \*6 (E.D. Wis. Feb. 18, 2010) (conclusions analysts drew after meeting with corporation's executive were not executive's statements).

Plaintiff contends that it has cured this deficiency by alleging new surrounding facts in the first amended complaint. The Court agrees. It is undisputed that Wasson and Miquelon were the only Walgreens' executives in attendance on the conference call. Moreover, Wasson's statement that Walgreens "has not seen any unusual activity" is similar to his earlier statement at the J.P. Morgan investor conference raising an inference that he made the later statement. Plaintiff further relies on Wasson's September 17, 2017 testimony in the SEC proceedings where he stated it was "most likely it could've been both of us" who addressed the generic price inflation at the May 2014 call. Viewing the well pleaded allegations in plaintiff's favor, its additional allegations sufficiently connect Wasson to the statements made in the May 16 Morgan Stanley report. The May 2014 Morgan Stanley statements thus survive defendant's motion to dismiss.

**Loss Causation**

Walgreens further argues that the Court should dismiss all of plaintiff's § 10(b) claims because plaintiff fails to adequately allege loss causation under the "fraud-on-the-market" theory of damages. The fraud-on-the market theory is based on the presumption that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. Walgreens contends that because it withdrew its FY16 earnings target at the June 24, 2014 conference call, the relevant misrepresentations were publicly known on that date. Yet, Walgreens points out, the stock price did not drop until after the August 6, 2014, disclosure. Walgreens therefore argues that because it disclosed the actionable misrepresentations to the public on June 24, over a month before the August 6 stock drop, there was no causal connection to establish loss causation.

To prove loss causation, the plaintiff has "the burden to establish that the price of the securities they purchased was

'inflated'—that is, it was higher than it would have been without the false statements—and that it declined once the truth was revealed." *Glickenhaus*, 787 F.3d at 415. The loss causation element of a § 10(b) claim "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). At the motion to dismiss stage, "a plaintiff who has suffered an economic loss" must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). As the Seventh Circuit instructs, the requirement of loss causation "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997); *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by [the] circumstances").

**\*8** In essence, Walgreens is arguing that the "truth" was known to the public on June 24, well before the stock price dropped 14.3% on August 6. According to plaintiff's allegations, however, the June 24 conference call at which Walgreens withdrew its FY16 earnings target revealed only part of the truth because it did not fully disclose that the shortfall would be $1.8 to $2.3 billion less than the original target. At the call, Miquelon explained:

> As a result of the many Step 2 considerations in current business performance we are withdrawing the fiscal year 2016 goals that were previously announced in 2012. Once key decisions have been made on the above matters Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all at that time.

(First Am. Compl. ¶ 231.) In contrast, as plaintiffs allege, the August 6 disclosure provided the full magnitude or scope of the FY16 earnings shortfall and reasons for the shortfall, including systemic generic price inflation and reimbursement pressures. The August 6 investor call also announced that Walgreens would not re-domicile as part of its merger with Alliance, therefore, the significantly lower corporate tax rate resulting from a tax inversion would not be realized.

Drawing all reasonable inferences in plaintiff's favor, it has adequately alleged a direct casual connection between defendants' various misstatements and omissions and the stock drop on August 6 by asserting that the artificial inflation in Walgreens common stock prices was removed through the corrective disclosure on August 6, which revealed the true magnitude of the FY16 EBIT target shortfall, along with generic price inflation and unfavorable reimbursement contracts. This causal connection is further supported by analysts' reactions to August 6 disclosures, such as a Credit Suisse report dated August 6 that stated:

> After more than a year of positive investor meetings and earnings calls where management hinted at the large potential of a combined WAG/AB, management shocked investors when its new fiscal '16 targets fell well short of elevated expectations and prior guidance. Fiscal '16 EBIT is now expected to be almost 20% lower than the guidance provided when the deal was initially announced.

(First Am. Compl. ¶ 261.) Under the detailed allegations in the first amended complaint, defendants' loss causation argument fails at this procedural posture.

### Section 20(a) Claims

Plaintiff also brings claims based on "controlling person" liability against Wasson and Miquelon in violation of § 20(a) of the '34 Act. A violation of § 10(b) and Rule 10b-5 is necessary predicate to support a violation of § 20(a). *Pension Trust Fund for Operating Eng'r v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018). Defendants argue that plaintiff cannot bring a § 20(a) claim because there is no predicate violation of § 10(b)—an argument that is unavailing at this juncture. The Court thus denies this aspect of defendants' motion to dismiss.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part defendants' Rule 12(b)(6) motion to dismiss.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4597518

**Washtenaw County Employees' Retirement System v...., Not Reported in Fed....**

2019 WL 4597518

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.