ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

2007 WL 845046
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

ABN AMRO, INCORPORATED, Plaintiff,
v.
CAPITAL INTERNATIONAL LIMITED,
Eirles Four Limited, Deutsche Bank
Aktiengesellschaft, Sarco Holdings and
Dhananjay (Dan) Hajela Defendants.

No. 04 C 3123.
|
March 16, 2007.

**Attorneys and Law Firms**

Stephen Patrick Bedell, Miki Vucic Tesija, Thomas Paul Krebs, Foley & Lardner, Chicago, IL, for Plaintiff.

James R. Figliulo, Gregory L. Stelzer, Peter A. Silverman, Figliulo & Silverman, Jerrold E. Salzman, Phillip Leon Stern, Richard P. Campbell, Freeman, Freeman & Salzman, P.C., Gino L. Divito, John Matthew Fitzgerald, Tabet Divito Rothstein, Mark H. Horwitch, Jenkens & Gilchrist, Chicago, IL, Ralph A. Siciliano, George F. Du Pont, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS TO STRIKE

FILIP, J.

 **\*1** Plaintiff, ABN AMRO, Inc. ("ABN") has filed an Amended Complaint ("Complaint") against Deutsche Bank Aktiengesellschaft ("Deutsche Bank" or "DB"), Eirles Four Limited ("Eirles"), Capital International Limited ("Capital"), Sarco Holdings ("Sarco"), and Dhananjay Hajela ("Hajela"), alleging securities fraud and other claims in connection with a chain of back-to-back sales of secured notes issued by Eirles (the "Series 42 Notes" or the "Notes"). (*See* D.E. 85-1; D.E. 85-2; D.E 85-3.) ABN claims that Defendants' collective omission of material information about the Series 42 Notes-

specifically, that there was an absolute restriction on their sale within the United States or to a U.S. person-led to ABN's purchase of the Notes, and that ABN suffered $44 million in damages because of this omission. (D.E. 85-1 ¶ 7.) The Complaint alleges violations of federal and state securities laws, common law fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and other state law claims.

Deutsche Bank and Eirles on the one hand (also "DB/Eirles"), and Sarco and Hajela (also "Sarco/Hajela") on the other, filed separate motions to dismiss, both for failure to state a claim and for lack of personal jurisdiction. (*See* D.E. 126-1 (DB/Eirles Rule 12(b)(6) Memorandum and Exhibits); D.E. 129 (Eirles Rule 12(b)(2) Memorandum)[1]); D.E. 131 (Sarco/Hajela Rule 12(b)(6) Memorandum); D.E. 133 (Sarco/Hajela Rule 12(b)(2) Memorandum); and D.E. 134 (Sarco/Hajela Exhibits in support of their Rule 12(b)(6) and 12(b)(2) Memoranda).) Capital has filed an answer to the Complaint (D.E.123) and therefore it is not discussed in this opinion.

1    It does not appear that Deutsche Bank contends that it is not subject to personal jurisdiction here.

Before the Court are (1) ABN's motions to strike documents and portions of the briefs in support of DB/Eirles' and Sarco/Hajela's motions to dismiss under Rule 12(b)(6); and (2) ABN's opposition to Sarco/Hajela's request to convert their Rule 12(b)(6) motion into a summary judgment motion. (*See* D.E. 142; D.E. 145.) ABN has also requested the Court to award it fees and costs incurred in preparing its motion to strike against Sarco/Hajela. Both sets of defendants have opposed ABN's motions to strike. (*See* D.E. 147; D.E. 148; *see also* D.E. 150 (ABN's reply memo), D.E. 153 (DB/Eirles sur-reply), D.E. 154 (Sarco/Hajela sur-reply).) For the reasons discussed below, ABN's motions to strike are granted in part and denied in part. The Court respectfully rejects Sarco/Hajela's suggestion to convert their motion to dismiss into a motion for summary judgment, and the Court denies ABN's request for fees

Any pending motions are stricken without prejudice. Defendants are free to refile memoranda that conform with this order within 2 weeks of this opinion. Plaintiffs have four weeks to respond, and Defendants will have two weeks to reply. If any motions are unaffected by this ruling, the movants are free simply to refile the prior version of their motion and brief.

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

FACTS

**\*2** This case arose out of an alleged botched sale of the Series 42 Notes worth $105 million. (D.E. 85-1 ¶¶ 1, 5.)[2] The Notes were to be issued by Eirles and its issuing agent, Deutsche Bank, with Sarco acting as Deutsche Bank and Eirles' sales agent to arrange purchasers for the Notes. (*Id.* ¶ 1.) According to the original plan for the issuance, Eirles and Deutsche Bank were to issue the Notes to Capital, a broker-dealer in the Isle of Man, which was to distribute the Notes to ABN. (*Id.* ¶ 5.) ABN then planned to sell the Notes to its customer, Hopewell Capital Group, Inc. ("Hopewell"), which planned to sell them to Sterling Capital Management ("Sterling"), another U.S. broker-dealer, and other end purchasers. (*Id.*) Initially, ABN planned to act only as a clearing agent in the transaction. (*Id.* ¶ 3.) At Capital's insistence, however, ABN agreed to act as a principal for Hopewell, guaranteeing Hopewell's purchase of the Series 42 Notes, because neither Capital nor Hopewell could afford to finance the transaction. (*Id.*)

---

2    The following facts are taken from the Complaint (D.E.85). For present purposes, the Court accepts the allegations in the Complaint as true, as precedent instructs. *See, e.g., Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir.2004). The Court takes no position on whether any of the allegations are, in fact, well founded.

All parties to the transaction allegedly agreed that ABN would act as a "riskless principal," which meant it would serve only as a "pass through" for the Notes between Capital and Hopewell. (*Id* .) ABN expected its role to be minimal-allegedly little more than that of a clearing broker. (*Id.*) ABN's only interest in the transaction was the payment of a regular clearing fee. (*Id.*) ABN entered into a Principal Letter Agreement with Capital, which confirmed that the Series 42 Notes were exempted securities, and ABN also received copies of term sheets drafted by Deutsche Bank. (*Id.* ¶ 4.) None of the documentation ABN received regarding the Notes mentioned any restrictions on sale of the Notes. (*Id.*)

The Series 42 Notes were issued on July 15, 2003, and on that same day were distributed from Eirles and Deutsche Bank, through Capital, to ABN in a series of virtually simultaneous transactions. (*Id.* ¶ 5.) However, the remaining parties in the chain of distribution reneged on the deal, and ABN was left holding the Notes, for which it had paid $97.9 million. (*Id.*) Weeks after the deal fell through, while ABN was working

with Hopewell and others to arrange for another buyer of the Notes, ABN received a copy of a Series 42 Supplemental Programme Memorandum, which governed the Series 42 Notes. (*Id.* ¶ 6.) ABN alleges that the original Programme Memorandum contemplated sales of the Notes in the United States. (*Id.* ¶ 9.) The Supplemental Memorandum, however, allegedly revealed to ABN for the first time that the Series 42 Notes were restricted from being "offered, sold, resold, delivered or transferred within the United States or to, or for the account or benefit of, U.S. persons." (*Id.* ¶ 6.) ABN alleges that it would not have participated in the transaction if it had been aware of this absolute restriction. (*Id.* ¶ 7.) After much difficulty, ABN ultimately sold the Notes for 47 cents on the dollar, resulting in a loss exceeding $44 million. (*Id.*)

**\*3** ABN commenced this action against Eirles and Capital for alleged violations of Sections 5 and 12 of the Securities Act, among other claims. (*Id.* ¶ 8.) ABN also filed suit in state court against Hopewell, Sterling, and their principals. (*Id.*) During jurisdictional discovery in the federal case, ABN alleges it discovered a larger fraudulent scheme by Eirles, Deutsche Bank, Capital, Sarco, and Sarco's sole shareholder, officer, and director, Dan Hajela. (*Id.*) In its Amended Complaint, ABN alleges that, from the inception of the transaction to its completion, Eirles and Deutsche Bank, and their agents Capital and Sarco, engaged in a fraudulent scheme to distribute the Series 42 Notes into the United States without disclosing the relevant absolute prohibition on such distribution. (*Id.* ¶ 12.)

LEGAL STANDARDS

Rule 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike are disfavored, because they potentially serve only to delay litigation. *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989). A district court has broad discretion to grant or deny a motion to strike. *See, e.g., Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 664-65 (7th Cir.1992). This motion to strike was filed in response to the Defendants' motions to dismiss, and it seeks to exclude documents attached to, and portions of, Defendants' briefs in support of their motions on the basis that those documents were not attached to or incorporated in the Complaint. Thus, ABN contends, the non-incorporated documents, and references to them, are not properly considered under a Rule 12(b)(6) analysis.

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)
2007 WL 845046

In response to an ordinary Rule 12(b)(6) motion, a court simply examines the allegations in the complaint to determine whether they pass muster. *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299 (2d ed.1990)). A court is not to consider documents or allegations extrinsic to the pleadings on a Rule 12(b)(6) motion. *Id.* The pleadings include the complaint, the answer, and any written instruments attached to the complaint as exhibits. *See, e.g.,* Fed.R.Civ.P. 7; Fed.R.Civ.P. 10(c); *Hirata Corp. v. J.B. Oxford and Co.,* 193 F.R.D. 589, 592 (S.D.Ind.2000) (collecting cases).

If a district court considers matters outside the pleadings, the procedural rules require that "the motion shall be treated as one for summary judgment" under Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b). When proceeding on such a converted motion, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Id.* Consideration of outside matter without converting the Rule 12(b)(6) motion into a Rule 56 motion can produce reversible error. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1431 (7th Cir.1996).

**\*4** As discussed in greater detail below, however, precedent has crafted two exceptions to this general ban on material extrinsic to the complaint and any attachments thereto. First, a district court may consider documents attached to the motion to dismiss-but not to the complaint-if those documents are referred to in the complaint and central to the plaintiff's claim. *See, e.g., Venture Associates Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (collecting cases). Second, a district court may take judicial notice of matters of "public record" without converting a motion to dismiss into a motion for summary judgment. *See General Electric,* 128 F.3d at 1080 (collecting cases).

DISCUSSION

I. The Documents ABN Seeks to Exclude
ABN has moved to strike documents from both DB/Eirles' and Sarco/Hajela's Rule 12(b)(6) motions to dismiss. Because several of the documents appear as exhibits to both motions to dismiss, this opinion addresses both motions to strike

together. ABN has moved to strike the following documents from DB/Eirles' Rule 12(b)(6) Motion to Dismiss:

1. *Exhibit J,* an undated settlement letter from Tom de Swaan of ABN to Clement Borsig of Deutsche Bank (D.E.126-12);

2. *Group Exhibit C,* the Deutsche Bank-Capital, Capital-Hopewell, and Hopewell-Sterling purchase agreements ("the purchase agreements"), and a couple of fax pages (D.E.126-5);

3. *Exhibit H,* a memorandum written by Anthony Long of Capital (D.E.126-10); and

4. *Exhibit A,* the Illinois state court complaint filed in *ABN AMRO v. Hopewell Capital Group, et al* ("the state complaint") (D.E.126-3).

(D.E. 142-1 at 2.)

ABN has also moved to strike the following documents from Sarco/Hajela's Rule 12(b)(6) Motion to Dismiss:

1. *Exhibit J,* the Deutsche Bank-Capital purchase agreement (D.E.134-11);

2. *Exhibit K,* the Capital-Hopewell purchase agreement (D.E.134-12);

3. *Exhibit L,* the Hopewell-Sterling purchase agreement (D.E.134-13);

4. *Exhibit B,* ABN account documents of third-party ZAG LLC (D.E.134-3);

5. *Exhibit C,* a principal letter agreement between ABN and Capital relating to the portion of Eirles notes purchased by third-party ZAG LLC (D.E.134-4);

6. *Exhibit D,* fax sheets relating to the ZAG LLC transaction (D.E.134-5);

7. *Exhibit A,* the state complaint (D.E.134-2);

8. *Exhibit G,* excerpts of the deposition testimony of Michael G. Whelan of Eirles (D.E.134-8);

9. *Exhibit I,* the deposition testimony of Robert S. Jersey (D.E.134-10);

10. *Exhibit P,* a July 15, 2003, memorandum from Deutsche Bank to Eirles regarding the "Portfolio Credit Swap Transaction" (D.E.134-17).

2007 WL 845046

(D.E. 145-1 at 2.)

DB/Eirles have withdrawn Exhibits J and H from their motion to dismiss (*see* D.E. 147-1 at 1-2), so the Court need not address whether those documents should be struck from the record. DB/Eirles' Group Exhibit C (D.E.126-5) overlaps with Sarco/Hajela's Exhibits J, K, and L (D.E. 134-11, 134-12, and 134-13);[3] DB/Eirles' Exhibit A (D.E.126-3) overlaps with Sarco/Hajela's Exhibit A (D.E.134-2) (both exhibits contain the state complaint). Thus, the final list of contested documents includes the following:

3        Both sets of exhibits include the Deutsche Bank-Capital, Capital-Hopewell, and Hopewell-Sterling purchase agreements. While the sets of exhibits are not identical-they differ in font, layout, and in at least one case are signed by different parties-they are substantially the same.

**\*5** 1. the Deutsche Bank-Capital, Capital-Hopewell, and Hopewell-Sterling purchase agreements (D.E.126-5[4]);

4        For clarity and consistency, the Court will cite to the purchase agreements as D.E. 126-5, which is where the agreements appear as an exhibit to DB/Eirles' motion to dismiss for failure to state a claim. The purchase agreements appear in substantially similar form at D.E. 134-11, 134-12, and 134-13, where they are attached as exhibits to Sarco/Hajela's motions to dismiss for failure to state a claim and for lack of personal jurisdiction.

2. the state complaint (D.E.126-3[5]);

5        The Court will cite to the state complaint as D.E. 126-3, which is where that complaint appears as an exhibit to DB/Eirles' motion to dismiss for failure to state a claim. The state complaint also appears at D.E. 134-2, as an exhibit attached to Sarco/Hajela's motions to dismiss for failure to state a claim and for lack of personal jurisdiction.

3. Sarco/Hajela's Exhibits B, C, and D ("the ZAG documents") (D.E.134-3, 134-4, 134-5);

4. excerpts of the Whelan deposition (D.E.134-8);

5. the Jersey deposition (D.E.134-10); and

6. the July 15, 2003, memo from Deutsche Bank to Eirles (D.E.134-17).

Instead of converting either motion to dismiss into a motion for summary judgment, the Court will, in accordance

with precedent and as discussed in detail below, consider the purchase agreements only with respect to Defendants' motions to dismiss. These documents, though not attached to the Complaint, are referenced in the Complaint, and they are central to Plaintiff's claims. The Court will strike the fax transmittal sheets included with the purchase agreements in DB/Eirles' Exhibit C (D.E.126-5 at 6-7), the ZAG documents, the Jersey and Whelan deposition testimony, the allegations from the state complaint, and the July 15 memo. These documents are not referenced in the Complaint, nor are they central to Plaintiff's claims. Moreover, they are not documents in the public record, so the Court may not take judicial notice of them, at least for the alleged truth of statements in them.

II. Exceptions to the Bar on Extrinsic Documents

The courts have crafted two exceptions to the rule that documents outside the pleadings are not to be considered on a motion to dismiss. These exceptions are discussed immediately below.

A. Documents Referenced in the Complaint and Central to the Plaintiff's Claim

First, courts will consider documents attached to a motion to dismiss, but not to the complaint, where the complaint refers to those documents and they are central to the plaintiff's claim. *See Venture Associates,* 987 F.2d at 431; *accord, e.g., Wright v. Associated Ins. Companies, Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). Some courts mention a third requirement: that the extrinsic documents be "concededly" or "undisputedly" authentic. *See Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002) (dicta stating that the documents must be "concededly authentic"); *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citation omitted). The Seventh Circuit has explained that "this is a narrow exception aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998). However, although "the usual example is a contract, in a suit for breach of contract," *Tierney,* 304 F.3d at 738, as discussed further below, courts sometimes consider non-contractual extrinsic documents on a motion to dismiss; in addition, sometimes courts consider such documents in non-contract cases. Because precedent teaches that the scope of this exception is uncertain, *see Tierney,* 304 F.3d at 739, the Court discusses it at some length.

2007 WL 845046

### 1. Documents Pertinent to a Contract Claim

**\*6** The clearest cases for admitting extrinsic documents on a motion to dismiss are those where the plaintiff's complaint alleges a breach of contract or some other contract-related claim, and the plaintiff does not attach the contract to the complaint. In such cases, defendants are allowed to attach the contract to their motion to dismiss, and the court is allowed to consider it as part of the pleadings. *See, e.g., Allstate Life Insurance Co. v. Peoplesoft, Inc.,* No. 03 C 7025, 2004 WL 1375383, at \*2 (N.D.Ill. May 26, 2004) (collecting cases); *Hirata,* 193 F.R.D. at 592 (citing *Venture Associates Corp.,* 987 F.2d at 431).[6] Caselaw also reflects that courts sometimes allow consideration of extrinsic documents in the "chain of correspondence" leading up to the formation of a contract between the parties. *See Magellan International Corp. v. Salzgitter Handel GmbH,* 76 F.Supp.2d 919, 923 (N.D.Ill.1999); *see also id.* ("Though this Court is duty-bound at this stage of the game to look at the picture of the parties' transaction (as framed by their correspondence) through a lens most favorable to Magellan, it cannot do so by examining only half that picture in that light.... [I]t would be totally wasteful to uphold a claim on the false premise created by less than complete documentation when the delayed consideration of the remaining documents would lead to dismissal of that claim."). Likewise, in *Ken-Pin, Inc. v. Vantage Bowling Corp.,* No. 02 C 7991, 2004 WL 783092, at \*2 (N.D.Ill. Jan.20, 2004), the court allowed consideration of a letter offer in a breach of contract suit. The court reasoned that the letter was centrally relevant to the contractual claim and dispute between the parties, and therefore that it could be considered on the motion to dismiss. *Id.* The court in *Ken-Pin* also allowed consideration of two of Ken-Pen's employment contracts in connection with its claims against a competitor for tortious interference with those contracts, based on the competitor's hiring away of two of Ken-Pin's employees in violation of their non-compete agreements. *Id.*

6    *See also, e.g., Lutheran General Hospital, Inc. v. Printing Industry of Illinois/Indiana Employee Benefit Trust,* 24 F.Supp.2d 846, 848 n. 3 (N.D.Ill.1998) (holding that the court could consider a contract between the hospital and a third-party health-plan administrator in an ERISA claim for breach of that contract); *James v. Heartland Health Services,* No. 04 C 2744, 2005 WL 678732, at \*6 (N.D.Ill. Jan.28, 2005) (allowing consideration of a company handbook on a motion to dismiss where there were references to the "employee manual" in other counts of the complaint, and plaintiff had argued in her response to defendant's motion to dismiss that the manual created a contract).

### 2. Documents Pertinent to a Non-Contract Claim

Courts also sometimes consider contract documents in cases where the claims do not solely or strictly involve a contract dispute between the plaintiff and the defendant. For example, in *McCabe v. Crawford & Co.,* 210 F.R.D. 631 (N.D.Ill.2002), the plaintiff sued a debt collection agency for violations of various consumer protection statutes after the agency sent him a letter attempting to collect on an old debt. *Id.* at 635. The debt stemmed from a car accident the plaintiff had been involved in while driving a rental truck without having purchased the rental company's additional vehicle loss and damage insurance. *Id.* at 635-36. The rental company unsuccessfully sought to collect payment for the damage to the truck and eventually turned the debt over to the defendant/debt collector. *Id.* at 635-36. In its motion to dismiss, the defendant attached the truck rental agreement, which provided that the "renter will also pay all direct costs of collection, including attorney fees, and interest at the highest rate permitted by law." *Id.* at 639. The court held that it was "permitted to consider the rental agreement attached to Crawford's motion to dismiss because it is implicitly and explicitly referred to in McCabe's complaint, ... and but for the contract between Budget and McCabe, McCabe's claims would not exist." *Id.* at 639 n. 4 (citing *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998)). *McCabe* further stated that, "[m]oreover, we will not allow McCabe to avoid dismissal under Rule 12(b)(6) by failing to attach the contract which proves that he has no claim." *Id.* (citing *Tierney,* 304 F.3d at 738); *accord Munoz v. Seventh Avenue, Inc. .,* No. 04 C 2219, 2004 WL 1593906, at \*2 (N.D.Ill. July 15, 2004) (allowing consideration of an entire catalog on a motion to dismiss plaintiff's Truth in Lending Act claim where plaintiff had attached only a page or two).

**\*7** Furthermore, in some instances, courts have considered extrinsic documents in fraud cases such as the case at bar. In *Cortec Industries, Inc. v. Sum Holding L.P., et al.,* 949 F.2d 42 (2d Cir.1991), a securities fraud case, the Second Circuit held that it was proper to consider such documents because the plaintiffs had notice of the documents and the documents were integral to their claim, even though those documents were not incorporated into the complaint by reference nor attached to it. *Id.* at 48. The documents included an offering memorandum describing the company, and a stock purchase agreement between one of the plaintiffs' subsidiaries and the selling defendants that contained representations

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

and warranties about the company. *Id.* at 45. In their complaint, the plaintiffs had alleged that they would not have entered into the transaction to purchase the company "if not for defendants' repeated fraudulent or negligent representations and omissions concerning [the company's] financial condition, operations and prospects." *Id.* (internal quotation marks omitted). In allowing consideration of these documents, the court explained that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim...." *Id.* at 47 (citing *I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991)); *accord Romani v. Shearson Lehman Hutton, et al.,* 929 F.2d 875, 879 n. 3 (1st Cir.1991) (allowing consideration of a prospectus in a securities fraud claim).

*Cortec* focuses on ensuring proper notice to the plaintiff:

A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since ... the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason-requiring notice so that the party against whom the motion to dismiss is made may respond-that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.... Despite the fact that the documents attached to defendant['s] motion to dismiss were neither public disclosure documents required by law to be filed with the SEC, nor documents actually filed with the SEC, nor attached as exhibits to the complaint or incorporated by reference in it, the district court was entitled to consider them in deciding the motion to dismiss [because they] were documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit. It did not lack notice of those documents; these papers were integral to its complaint.

**\*8** *Id.* at 48; *see also Tierney,* 304 F.3d at 738 (citing *Cortec'* s analysis of the notice issue). When courts take notice of documents in cases such as securities fraud cases (or otherwise consider them because they are central to the complaint), courts typically consider the documents for a non-hearsay purpose-*i.e.,* for the notice that statements in the documents provided concerning certain risks, as it relates to

fraud or reliance questions-as opposed to for the substantive truth of statements in the documents. *See, e.g., I. Meyer Pincus & Assocs.,* 936 F.2d at 762 ("Read in context, the language ... could not mislead any reasonable investor into believing that the Fund was predicting a bright trading future for its shares. Indeed, we find the language remarkably direct."); *Romani,* 929 F.2d at 879 ("The offering materials are replete with statements ... emphasizing the high risks.... Documents such as this, which clearly bespeak caution, are not the stuff of which securities fraud claims are make.") (internal quotation marks and citations omitted); *see also Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354-55 (7th Cir.1995) (affirming trial court's refusal to consider contents of certain SEC filings as to the truth of the matters asserted therein because they were subject to reasonable dispute).

B. The Second Exception: Judicial Notice of Matters of Public Record

The second exception permits the district court to take judicial notice of matters of public record. *See General Electric Capital Corp.,* 128 F.3d at 1080. "A court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Id.* at 1081 (quoting Fed.R.Evid. 201(b)). The exemption applies to " 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." ' *Id.* (quoting 5A Wright & Miller § 1357, at 299) (internal quotation marks omitted). Like the putative third prong of the first exception-that the extrinsic documents be "concededly" or "undisputedly" authentic-this second exception is for "undisputed fact[s]." *Id.* This exception "has allowed courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Id.; see also Hennessy,* 69 F.3d at 1354 ("In order for a fact to be judicially noticed, indisputability is a prerequisite.").

Judicial notice is premised on the concept that certain facts exist which a court may accept as true without requiring additional proof from the opposing party or parties. "It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *General Electric Capital Corp.,* 128 F.3d at 1081 (citing *York v. American Tel. & Tel. Co.,* 95 F.3d 948, 958

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

(10th Cir.1996); and *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 865 (7th Cir.1983)).

**\*9** Judicial notice is most frequently used for noticing the contents of court records such as judicial orders or decrees. *See, e.g., Global Relief Foundation v. New York Times Co.,* No. 01 C 8821, 2002 WL 31045394, at \*4 (N.D.Ill. Sept.11, 2002) (citing *General Electric Capital Corp.,* 182 F.3d at 1081). Typically, however, because of the indisputability requirement, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation filing; judicial notice is generally not for the truth of the matters asserted in a court document. *Global Relief Foundation,* 2002 WL 31045394, at \*4 (citing *General Electric Capital Corp.,* 182 F.3d at 1081 n. 6).

This Court must adhere to the criteria established by the Federal Rules of Evidence before taking judicial notice of pertinent facts. *See General Electric Capital Corp.,* 128 F.3d at 1081. Thus, for example, in *Global Relief Foundation,* the court took judicial notice of a complaint filed in a related case over the plaintiff's objection that facts in the complaint were disputable. *Global Relief Foundation,* 2002 WL 31045394, at \*5. "The Court may ... take notice of the fact that GRF filed a complaint against the government for the raiding of GRF's offices and the freezing of its assets." *Id.* However, the court declined to take judicial notice of documents filed by the government in the same related case. *Id.; accord Lum v. Bank of America,* 361 F.3d 217, 222 n. 3 (3d Cir.2004) ("While a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion") (citation omitted); *Hennessy,* 69 F.3d at 1354-55.

III. Analysis of the Documents ABN Seeks to Exclude

A. The Purchase Agreements

DB/Eirles and Sarco/Hajela both attached to their motions to dismiss three purchase agreements for the sale of the Series 42 Notes, between Deutsche Bank and Capital, Capital and Hopewell, and Hopewell and Sterling. (*See* D.E. 126-5; D.E. 134-11; D.E. 134-12; D.E. 134-13.) DB/Eirles also attached a fax cover sheet and fax transmittal letter purporting to relate to the Hopewell-Sterling purchase agreement. (D.E. 126-5 at 6-7.) These purchase agreements were part of Deutsche Bank's required documentation for the sale of the Notes. (*See* D.E. 85 ¶ 87.) According to Defendants, each of these purchase agreements restricted U.S. sales of the Notes, and

ABN saw a copy of at least one of these agreements (the agreement between Hopewell and Sterling) before the Notes transaction closed. (*See, e.g.,* D.E. 126-1 at 12-13; D.E. 131 at 13.) Defendants use the purchase agreements in their motions to dismiss purportedly to show that ABN knew about the restriction on sale and that it was immaterial to ABN's decision to purchase the Notes. (D.E. 126-1 at 14; D.E. 131 at 14.)

**\*10** ABN argues in its motions to strike that these purchase agreements should not be considered by the Court because they fail to meet the requirements of either exception to the bar on using materials extrinsic to the complaint. (D.E. 142-1 at 10; D.E. 145-1 at 5.) First, ABN appears to argue that it did not refer explicitly to the purchase agreements in its Complaint, and that a "general reference" in its Complaint to Deutsche Bank's "required documentation for the Series 42 Notes" is insufficient to find the purchase agreements incorporated by reference into the Complaint. (D.E. 142-1 at 11 (citing *Ninth Avenue Remedial Group v. Allis Chalmers Corp.,* 974 F.Supp. 684, 687 (N.D.Ind.1997); *Hirata,* 193 F.R.D. at 594-95); D.E. 145-1 at 6 (same).) Next, ABN argues that, even if the Court were to determine that ABN "implicitly referred" to the purchase agreements in its Complaint, the Court still should not consider them because they are not indisputably authentic and they are not central to ABN's claims. (D.E. 142-1 at 11; D.E. 145-1 at 6.) According to ABN, the agreements "do not form the basis of any of ABN AMRO's claims against Defendants. Rather, ABN AMRO's claims are based on the fact that none of the documents to which ABN AMRO was a party or which Defendants published or distributed to ABN AMRO prior to the closing of the Series 42 Notes disclosed the Absolute Restriction." (D.E. 142-1 at 11 (citing *The Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Jenrette Securities Corp.,* 9 F.Supp.2d 994, 999 (N.D.Ind.1998)); *see also* D.E. 145-1 at 6.)

ABN also argues that the purchase agreements do not fit the exception for documents in the public record because they are private documents and thus do not meet the requirement of indisputability. (D.E. 142-1 at 11 (citing *General Electric Capital Corp.,* 128 F.3d at 1084; *Ninth Ave. Remedial Group,* 974 F.Supp. at 687)); D.E. 145-1 at 6 (same).) ABN then denies having seen the Hopewell-Sterling purchase agreement before the closing (D.E. 145-1 at 11-12), and states that DB/Eirles's assertion to the contrary is based on the fact that the two pages immediately preceding that purchase agreement in DB/Eirles's Exhibit C (D.E.126-5) consist of a fax confirmation page and a fax transmittal letter. "But it is

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

impossible to determine whether the purchase agreement was in fact faxed with those fax pages, or whether the fax pages are associated with an entirely different document." (D.E. 142-1 at 12.) Further, ABN argues that DB/Eirles have distorted the facts by neglecting to inform the Court that the language in the purchase agreements differs from that of the absolute restriction on U.S. sales in the Supplemental Memorandum, such that even if ABN had seen the Hopewell-Sterling purchase agreement before closing, it would not have put ABN on notice of the restriction at issue. (*Id.*)

In response, DB/Eirles and Sarco/Hajela cite sixteen references to the purchase agreements in the Complaint (D.E. 147-1 at 5-8; *see also* D.E. 148 at 6 (citing seventeen separate references to the purchase agreements in the Complaint)), at least eight of which explicitly refer to "purchase agreements." DB/Eirles further argue that during jurisdictional discovery, ABN marked as exhibits and asked questions about the Deutsche Bank-Capital and Capital-Hopewell purchase agreements, "thus expressly authenticating those exhibits." (D.E. 147-1 at 4.)

 **\*11** Sarco/Hajela add that this exception to the ban on documents extrinsic to the complaint has been extended to documents " 'central to the plaintiff's claims which were implicitly incorporated into, although not explicitly referred to by, the complaint." ' (D.E. 148 at 4. (quoting *Hirata,* 194 F.R.D. at 593) (internal quotation marks omitted). Furthermore, Sarco/Hajela argue, the purchase agreements "are contract documents which were signed in connection with the Notes Transaction which is the subject of the Complaint. They set forth conditions relating to the Notes Transaction, including restrictions on sales to U.S. persons which pertain to a central issue in this case." (D.E. 148 at 5.) "The parties to these Purchase Letters are the Defendants in this case ... and the Letters reflect the transfer of the Notes in a chain of transactions which is referred to throughout the Complaint." (*Id.* at 5-6.)

This Court agrees with Defendants that the purchase agreements may be considered on their motions to dismiss, because they are central to Plaintiff's claims and are repeatedly referred to in the Complaint. However, the Court excludes the fax letter and transmission sheet included with DB/Eirles' copies of the purchase agreements. The purchase agreements are further central to Plaintiff's claims because they establish the terms of the transactions specifically at issue in this case. *Accord, e.g. McCabe,* 210 F.R.D. at 639 n. 4 (allowing consideration of a rental agreement between

plaintiff and non-party truck rental company because the agreement was implicitly referred to in the complaint and, but for that agreement, plaintiff's claims would not exist). Plaintiff relies on *The Lincoln Nat'l,* 9 F.Supp.2d 994, for the proposition that documents are not central to a claim if the "claims were based on misrepresentations contained in other documents." (D.E. 142-1 at 11 (citing *The Lincoln Nat'l,* 9 F.Supp.2d at 999).) However, *The Lincoln Nat'l* only excluded documents that had not been referenced in the complaint; it considered another document that *had* been referenced in the complaint. *See The Lincoln Nat'l,* 9 F.Supp.2d at 998. Unlike the plaintiff in *The Lincoln Nat'l,* ABN refers to the purchase agreements repeatedly in the Complaint. (*See, e.g.,* D.E. 85 ¶¶ 89, 126, 129, 132 (references to the Deutsche Bank-Capital purchase agreement); *id.* ¶¶ 93, 140, 143 (references to the Capital-Hopewell purchase agreement); *id.* ¶ 87 (reference to the Hopewell-Sterling purchase agreement).) The purchase agreements are, in the context of this case, central to Plaintiff's claims. Furthermore, although Plaintiff argues that the agreements are unauthenticated, Plaintiff does not assert that they are inauthentic. *See Sa'Buttar Health & Medical, P.C. v. TAP Pharmaceuticals, Inc.,* No. 03 C 4074, 2004 WL 1510023, at \*3 (N.D.Ill. July 2, 2004) (citations omitted).

### B. The State Complaint

 **\*12** Shortly after ABN filed its initial federal complaint in this case, it filed a state court complaint against its customers Hopewell, Sterling, and others for, *inter alia,* breach of contract, promissory fraud, and conspiracy in relation to Hopewell's failure to purchase the Series 42 Notes. (*See* D.E. 142-1 at 14.) The state complaint seeks damages from downstream purchasers, or persons involved with the placement of the Series 42 Notes downstream. (*Id.*) Both sets of Defendants attach and cite the state complaint in their motions to dismiss in support of their claim that their conduct could not have caused ABN's damages if Hopewell and the other state defendants instead were responsible for those damages. (*See, e.g.,* D.E. 126-1 at 11 ("Therefore, by ABN's own admission, any loss suffered by ABN by reason of its acquisition of the Notes flowed directly from its interaction with Hopewell.") (citing state complaint); *id.* at 27-28 ("ABN went forward with the transaction based solely on Hopewell's assurances that it had a buyer for the Notes.... ABN, however, was not able to consummate a sale because Hopewell 'reject[ed] bona fide purchasers of, and purchase offers for, the Series 42 Notes." ') (quoting state complaint); D.E. 131 at 10 ("Thus, AAI took the position in its Hopewell Complaint that it was Hopewell's misrepresentation of its capacity to secure payment of the Notes and Hopewell's

2007 WL 845046

failure to deliver the funds for the $105 million portion of
the Notes Transaction that was the direct and proximate cause
of the loss it incurred as a result of the Notes Transaction.")
(citing state complaint.)

ABN argues that the state complaint is not referred to in the
Complaint, nor is it central to ABN's claims. (*See* D.E. 142-1
at 15.) ABN further argues that the state complaint is not
judicially noticeable under Fed.R.Evid. 201(b), because it is
subject to reasonable dispute. (*See id.*)

DB/Eirles respond that there is no requirement that the
allegations in a complaint (as opposed to judicial findings of
fact) be undisputed (*see* D.E. 147-1 at 9), adding, however,
that the Complaint *is* authentic and that ABN does not
argue otherwise. DB/Eirles argue that the Court may take
notice "not only of the judicial act (that [sic] fact that
plaintiff had filed a related complaint), but also of the basis
of the allegations contained in the complaint." (*Id.* (citing
*Global Relief Foundation,* 2002 WL 31045394, at *5).) DB/
Eirles point out that *General Electric Capital Corp.,* ABN's
primary "judicial notice" case in its motion to strike, is about
taking notice of judicial findings of fact, not allegations in a
complaint. (D.E. 147-1 at 9.)[7]

[7] DB/Eirles go on to cite a series of cases where the court
considered EEOC charges not attached to a plaintiff's
complaint, but at least two of these cases are not "judicial
notice" cases; the courts in question considered the
extrinsic documents not because they were in the public
record but because they had been referred to in the
complaint and were central to the plaintiff's claim. *See
Shannon v. Hotel Employees and Restaurant Employees
Int'l Union,* No. 01 C 9711, 2003 WL 1338457, at
*1 (N.D.Ill. March 18, 2003); *Ruff v. Guardsmark,
Inc.,* No. 02 C 1381, 2002 WL 31761408, at *2 n. 1
(N.D.Ill.Dec.10, 2002).

Sarco/Hajela echo DB/Eirles's arguments regarding the lack
of an indisputability requirement for taking notice of the state
complaint. (*See* D.E. 148 at 9.) They cite to a series of cases
from the Southern District of New York for the proposition
that "a court may take judicial notice of admissions in
pleadings and other documents in the public record filed
by a party in other judicial proceedings that contradict
the party's factual assertions in a subsequent action." (*Id.*
(quoting *Carruthers v. Flaum,* 388 F.Supp.2d 360, 365 n. 4
(S.D.N.Y.2005) (internal quotation marks omitted).) Sarco/
Hajela further argue that the state complaint fits the first
exception because it is "clearly central" to ABN's claims: the

state complaint seeks to recover the same losses that ABN
is seeking in this case. (D.E. 148 at 9.) Moreover, Sarco/
Hajela argue, ABN "makes direct and explicit reference to the
litigation in which the Hopewell Complaint was filed ... and
refers to that litigation as 'parallel.' " (*Id.* (citing D.E. 85-1 ¶
8).) ABN responds that the Complaint's "passing reference"
to the Hopewell litigation is insufficient to argue that it is
"referred to" in the complaint. (D.E. 142-1 at 14 n. 14.)

**\*13** With respect, Defendants appear to elide the hearsay
aspect of taking judicial notice of another court's records. As
discussed in Part II.B. above, the Court may take judicial
notice of the fact that Plaintiff filed a complaint in a related
state court action, but the Court may not take notice of the
facts alleged in the complaint for the truth of the matters
asserted. *See, e.g., Global Relief Foundation,* 2002 WL
31045394, at *5; *General Electric Capital Corp.,* 128 F.3d
at 1082; *Baloun v. Williams,* No. 00 C 7584, 2002 WL
31426647, at *1 n. 1 (N.D.Ill. Oct.25, 2002). The state
complaint is a source "whose accuracy cannot be reasonably
questioned," in the sense that the document filed in the state
court can be reliably assumed to be irrefutable proof that a
complaint was actually filed. The state complaint therefore
satisfies the first requisite of Fed.R.Evid. 201(b). However,
the facts alleged in the state complaint are disputed, and
therefore they do not meet the second requisite of Fed.R.Evid.
201(b). Although the Seventh Circuit has qualified the rule
in *General Electric Capital Corp.* with the caveat that
"it is conceivable that a finding of fact may satisfy the
indisputability requirement of Fed.R.Evid. 201(b)," *see id.,*
128 F.3d at 1082 n. 6, as in that case, that requirement has not
been met here. Despite Defendants' arguments to the contrary,
the indisputability requirement does appear to apply equally
to complaints and other pleadings as it does to "findings of
fact." *See* 21B Charles Alan Wright & Kenneth W. Graham,
Jr., *Federal Practice & Procedure Evidence* 2d § 5106.4 ("It
seems clear that a court cannot notice pleadings or testimony
as true simply because these statements are filed with the
court.... However, it is proper to notice pleadings or testimony
for some nonhearsay purpose.") (collecting cases).

Defendants also assert that the state complaint can be
considered simply as an admission of a party opponent. That
statement is true, but considering admissions is normally the
stuff of summary judgment analyses, and not the stuff of Rule
12(b)(6) review. As explained further in Part IV below, the
Court respectfully declines to put this case into a Rule 56
posture-a step that would be of only academic consequence
in many respects anyhow, as Plaintiff has not been permitted

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

merits discovery and seemingly would be entitled to such discovery under Fed.R.Civ.P. 56(f), so few, if any, efficiency gains seemingly would be realized.

In addition, the ability to consider the state complaint as an "admission" would not be conclusive. The parties ignored this subject in their briefs, so the Court will not speak definitively in the absence of adversarial briefing. However, the Court notes that even if Plaintiff had made the statements Defendants ascribe to it (via the state complaint) in an earlier complaint in this very case, that would seemingly not end the analysis. That is true because when a litigant files an amended complaint or counterclaim, the allegations in the prior pleading are superseded and are no longer operative, even in the case where the initial filing occurred. *See, e.g., Duda v. Bd. of Educ. of Franklin Park,* 133 F.3d 1054, 1057 (7th Cir.1998) ("Once an amended pleading is filed, it supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading, and becomes functus officio.") (collecting cases; internal citations and quotation marks omitted). Relatedly, statements or putative admissions in prior pleadings are generally understood to have only evidentiary, as opposed to conclusive force, and therefore cannot estop the pleader from ever pleading to the contrary. *See, e.g., Flannery v. Recording Indus. Ass'n of America,* 354 F.3d 632, 640 (7th Cir.2004) (collecting authorities). Thus, even if statements in the state court complaint can be properly considered for a non-hearsay purpose, that consideration will await summary judgment analysis in this case.[8] These documents are excluded for purposes of the Rule 12(b)(6) motions.

8  Defendants contend, at least at times, that the statements in the state complaint are sworn statements. If by that Defendants contend that the state complaint is a verified complaint, that appears to be an erroneous assertion. The Court's review of the proffered state complaint (*see* D.E. 126-3 (Exhibit A); D.E. 134-2 (Exhibit A)) reveals that it was not signed by the Plaintiff (as opposed to by one of its attorneys, who clearly does not have personal knowledge of all the matters stated therein) and it contains no apparent affidavit or sworn verification by a representative of Plaintiff. If the state complaint ever has been filed in verified form, that may limit or preclude the Plaintiff from disclaiming its representations (*e.g.,* in a summary judgment posture), although in any event there would still appear to be a legal and/or factual question that would potentially need to be resolved concerning the issue of proximate cause or causes within the context of this case.

**C. The ZAG Documents**

**\*14** ABN also moves to strike documents (and references to those documents) from Sarco/Hajela's motion to dismiss relating to a transaction between ABN and ZAG LLC ("the ZAG documents"). (D.E. 145-1 at 7; *see also* D.E. 134-3, 134-4, 134-5.) The ZAG transaction involved ZAG's purchase of $10 million worth of Series 42 Notes through ABN; this was apparently the only portion of the $115 million Notes transaction at issue that went through to completion as at least ABN allegedly anticipated. (*See* D.E. 131 at 10.) Sarco/Hajela use the ZAG documents to attempt to show that Sarco/Hajela had nothing to do with ABN's damages. They argue that, had ABN received payment from Hopewell for the remaining $105 million in Notes, as ABN had from the third-party ZAG, ABN would have suffered no loss. (*Id.*) ABN argues that the ZAG documents should be excluded from Sarco/Hajela's motion to dismiss because they do not meet the requirements of either of the two exceptions discussed above. (D.E. 145-1 at 7-8.)

Sarco/Hajela respond that the ZAG transaction was not "just another sale of the Notes; it was part and parcel of the very same $115 million transaction involving the Notes which [ABN] purchased and which is the subject of the Complaint." (D.E. 148 at 7.) Sarco/Hajela argue that the fact that the ZAG transaction was completed undermines two elements of ABN's fraud claims: the materiality of the alleged omission and loss causation. (*Id.*) Sarco/Hajela further argue that ABN cannot assert that it suffered a loss because the absolute sale restriction prevented ABN from selling the Notes through a broker-dealer in the United States, when the ZAG transaction was consummated via two U.S. broker-dealers-ABN and Hopewell. (*Id.* (citing D.E. 85 ¶ 209).)

The Court agrees with Plaintiff that the ZAG documents should not be considered on Sarco/Hajela's motion to dismiss. Unlike the purchase agreements underlying the transaction, without which there would be no claim, the ZAG documents are not "central" or "integral" to Plaintiff's claims. Furthermore, unlike the purchase agreements, ABN does not refer to the ZAG documents anywhere in the Complaint-these documents are not necessary to state a claim. It follows that they are extrinsic to the Complaint and should not be considered on a motion to dismiss.

**D. Excerpts of the Whelan Deposition and the Jersey Deposition**

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)

2007 WL 845046

ABN moves to strike deposition testimony from Sarco/Hajela's motions to dismiss. (D.E. 145-1 at 10-11.) Sarco/Hajela cite the deposition of Michael Whelan, an Eirles director, who testified that prior to the settlement of the Notes Transaction, the Supplemental Memorandum including the absolute restriction on sale had not been distributed to anyone other than Eirles' directors and legal advisors. Sarco/Hajela cite this testimony to show that they were not aware of the absolute restriction before the closing and therefore could not have had the scienter required for ABN's fraud claims. (D.E. 131 at 11.) Sarco/Hajela also cite the deposition of Robert Jersey, an ABN executive, who testified that he had received the original Programme Memorandum governing the Notes transaction but did not review it carefully before the closing. Sarco/Hajela use this testimony to attack ABN's allegations of reasonable reliance. (*Id.* at 12.) Sarco/Hajela add that Whelan and Jersey are both "mentioned in the Complaint." (*Id.* at 11-12.) ABN argues that this deposition testimony is not referred to in the Complaint, is not "indisputably authentic," and is not central to ABN's claims. Moreover, ABN asserts that the deposition testimony does not meet the requirements of Fed.R.Evid. 201(b), and therefore that the Court may not take judicial notice of it.

 **\*15** The Court agrees with ABN that it is inappropriate to take judicial notice of deposition testimony for purposes of a Rule 12(b)(6) motion, at least when that testimony is not part of the record in a case, and particularly not for the truth of the matters asserted therein. *See Unity House, Inc. v. First Commercial Financial Group,* No. 96 C 1716, 1997 WL 282725, at \*5 (N.D.Ill. May 19, 1997); *Lum,* 361 F.3d at 222 n. 3. Therefore, it is only appropriate to consider the deposition testimony in question if ABN referred to the testimony in its Complaint and the testimony is central to ABN's claims. ABN, of course, has not included averments in its operative complaint that parallel the putative admissions that Sarco/Hajela would seek to draw from the Whelan deposition; otherwise, there would be no need for Sarco/Hajela to attempt to interject the deposition testimony into the Rule 12(b)(6) analysis. In addition, while ABN made a couple of passing references to testimony of Mr. Whelan in its Complaint, those references are unrelated to the substance of the putative admissions Sarco/Hajela would seek to have considered under Rule 12(b)(6). Sarco/Hajela offers no authority, and the Court is not aware of any, that suggests that the mere fact that portions of a complaint are based on or reference aspects of a witness's deposition thereby renders that witness's entire deposition, including his or her testimony on subjects materially discrete from

those referenced in the complaint, fair game for purposes of the Rule 12(b)(6) analysis. The Court therefore respectfully declines to include the putative Whelan admissions in its Rule 12(b)(6) analysis.

The Jersey deposition is not referred to in the Complaint. The Court agrees with ABN that mere mention of a person's name is insufficient to incorporate that person's deposition in a complaint. The Court will not consider the Jersey deposition for purposes of Rule 12(b)(6) review.

   E. The July 15, 2003, Memo from Deutsche Bank to Eirles
Finally, ABN moves to strike Sarco/Hajela's references to a July 15, 2003, memo from Deutsche Bank to Eirles. (D.E. 145-1 at 11.) Sarco/Hajela use the memo to describe the function of the portfolio underlying securities for the Notes, and to help explain their role in monitoring that portfolio. (D.E. 148 at 11.) Sarco/Hajela argue that ABN refers to this document in the Complaint explicitly several times (*see id.*), but the references cited do not clearly refer to this particular memo. Moreover, this memo, unlike the purchase agreements discussed above, is not central to ABN's claims. Therefore, the Court strikes references to it in Sarco/Hajela's motions to dismiss.

IV. The Court Respectfully Declines to Convert Certain Rule 12(b)(6) Motions to Rule 56 Motions
A district court has discretion to convert a Rule 12(b)(6) motion into a Rule 56 summary judgment motion. *See* Fed.R.Civ.P. 12(b)(6); see also D.E. 148 at 11 (Sarco/Hajela's acknowledgment that a district court "may, in its discretion, decline to convert a motion to dismiss into a summary judgment motion"). If a court exercises such discretion, Rule 12(b)(6) specifies that all parties thereafter "shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Relatedly, Fed.R.Civ.P. 56(f) provides that the summary judgment non-movant may, if appropriate, seek additional discovery so as to respond to a summary judgment motion.

 **\*16** This Court generally does not convert Rule 12(b)(6) motions into Rule 56 motions. Such a conversion can be appropriate in some circumstances; however, often the conversion simply leads to an extended discovery period and the eventual withdrawal and reframing of the summary judgment motion, because discovery typically reveals relevant information that the movant needs to incorporate and address.

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 12 of 118 PageID #:2416

ABN AMRO, Inc. v. Capital Intern. Ltd., Not Reported in F.Supp.2d (2007)
2007 WL 845046

In this case, there has been no merits discovery because of the discovery stay provisions of the PSLRA. *See* 15 U.S.C. § 77z-1(b)(1). It would be, at best, awkward to attempt to resolve the viability of the case as against Sarco/Hajela without allowing Plaintiff merits discovery on at least certain issues. Moreover, certain of the co-Defendants of Sarco/Hajela, namely Deutsche Bank and Eirles, do not wish to lift any discovery stay and proceed to Rule 56 review.

Under the circumstances, the Court respectfully declines the Sarco/Hajela invitation to convert its Rule 12(b)(6) motion into a Rule 56 motion. Those defendants, of course, will be able to file a Rule 56 motion, if appropriate. However, the most prudent time for review of such a motion will be after the conclusion of discovery, in conjunction with the review of any other summary judgment motions filed by the various Defendants-assuming Plaintiff survives any properly framed Rule 12(b)(6) motions and prevails on any Rule 12(b)(2) challenges at the threshold.

## V. ABN's Request for Attorney's Fees Is Denied

ABN has requested that the Court award it the fees and costs that it has incurred in preparing its motion to strike against Sarco/Hajela. (D.E. 145-1 at 3.) ABN does not cite authority, statutory or otherwise, granting the Court discretion to award fees in these circumstances.

Even if the Court has such discretionary authority, the Court would decline to exercise it. Plaintiff has chosen to file a 150+ page complaint, which traverses vast areas of commercial interactions. While the Court has determined that some of the exhibits Defendants offer cannot properly be considered in a Rule 12(b)(6) analysis, the proffering of the documents is nowhere near sufficiently egregious or manifestly erroneous that fee-shifting would be appropriate. This is particularly true given that the litigants in this case, including Plaintiff, include some of the most successful and well-resourced financial institutions in the world. Plaintiff, like most (if not all) of the Defendants, is among the least likely of litigants to be deterred from pursuing its rights because of the garden-variety costs of motion practice in commercial litigation. For all of these reasons, the Court respectfully denies the request for fees.

## CONCLUSION

For the reasons given above, the Court grants in part and denies in part the motions to strike. The parties should proceed on the briefing schedule outlined herein.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 845046

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 13 of 118 PageID #:2417

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

2013 WL 566805
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

CITY OF STERLING HEIGHTS
GENERAL EMPLOYEES' RETIREMENT
SYSTEM, et al., Plaintiffs,
v.
HOSPIRA, INC., Thomas E. Werner,
Christopher B. Begley, F. Michael Ball,
and James H. Hardy, Jr., Defendants.

No. 11 C 8332.
|
Feb. 13, 2013.

**Attorneys and Law Firms**

Edward Anthony Wallace, Wexler Wallace LLP, Chicago, IL, for Plaintiff.

Jack Reise, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, James E. Barz, Robbins Geller Rudman & Dowd LLP, Katharine Crane Byrne, Cooney & Conway, Kenneth A. Wexler, Kara Anne Elgersma, Wexler Wallace LLP, Chicago, IL, for Plaintiff.Mark Robert Filip, Joshua Z. Rabinovitz, Robert J. Kopecky, Kirkland & Ellis LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** This is a federal securities class action against Hospira, Inc., F. Michael Ball, Thomas E. Werner, Christopher B. Begley, and James H. Hardy, Jr. Plaintiffs have brought this action on behalf of themselves and all person or entities who purchased or acquired shares of Hospira between February 4, 2010 and October 17, 2011 (the "Class Period"). Plaintiffs allege that Defendants engaged in a fraudulent scheme to artificially inflate Hospira's stock price during the Class Period. Defendants have moved to dismiss the Amended Consolidated Class Action Complaint (the "Complaint"). (R. 75.) In response, Plaintiffs moved to strike Exhibits D, and

O–V from Defendants' memorandum accompanying their Motion to Dismiss, as well as "all references to and assertions based upon those materials" in the memorandum. (R. 90, Pls.' Mot. to Strike.) For the reasons discussed below, the Court grants Defendants' Motion to Dismiss in part without prejudice and denies in part Defendants' Motion to Dismiss. The Court also grants Plaintiffs' Motion to Strike.

**FACTUAL ALLEGATIONS**

**I. The Parties**

The Court appointed Plaintiffs Sheet Metal Fund, KBC Asset Management NV, Laborers Funds, and Roofers Fund to serve as Lead Plaintiffs in this case. (Am.Compl.¶¶ 17–20.) Each Plaintiff allegedly purchased Hospira stock at artificially inflated prices during the Class Period and suffered an economic loss "when the true facts about the Company's business and financial condition were disclosed and the stock price resultantly declined." (*Id.* ¶¶ 17–20.)

Defendant Hospira, formed in 2004 from a spin-off from Abbott Laboratories, "is a U.S.-based global pharmaceutical and medical device company headquartered in Lake Forest, Illinois, and describes itself as the world's leading provider of injectable drugs and infusion technologies." (*Id.* ¶¶ 35, 39.) Its products are "used by hospitals, clinics, long-term care facilities, and home healthcare providers." (*Id.* at ¶ 35.) In 2011, it had $4.1 billion in sales. (*Id.*)

Hospira conducts business primarily in three segments: 1) the Americas, including the United States, Canada, and Latin America; 2) Europe, the Middle East, and Africa; and 3) Asia Pacific, including Asia, Japan, Australia, and New Zealand. (*Id.*) Hospira markets products in each of these segments in three general categories: 1) specialty injectable pharmaceuticals ("SIP"), "which include approximately 200 injectable generic drugs that provide customers with lower cost alternatives to name brand products;" 2) other pharmaceuticals, including large volume intravenous ("IV") solutions and nutritional products and solutions for cleaning wounds and surgical sites; and 3) medication management systems, "which include electronic pumps to deliver IV fluids and medications to patients and other offerings to support the pumps." (*Id.* ¶ 36.) Hospira's Rocky Mount, North Carolina facility is among Hospira's largest facilities, producing "approximately 100 different injectable pharmaceuticals—or roughly half of Hospira's entire SIP portfolio" and

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 14 of 118 PageID #:2418
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

"account[ing] for 25% of [Hospira's] $4 Billion in annual revenue." (*Id.* ¶¶ 37, 38.)

 **\*2** Defendant F. Michael Ball has served as the Chief Executive Officer ("CEO") of Hospira since March 28, 2011 and the Director of the Board since March 2011. (*Id.* at ¶ 22.) Defendant Thomas E. Werner is the Chief Financial Officer and Senior Vice President of Finance of Hospira. (*Id.* at ¶ 23.) Defendant Christopher Begley is the Executive Chairman of the Board of Hospira, and served as Hospira's CEO until March 28, 2011. (*Id.* at ¶ 25.)[1] Defendant James H. Hardy, Jr. served as the Senior Vice President of Operations from January 2011 until his departure from Hospira in April 2012. (*Id.* at ¶ 24.) Previously, Mr. Hardy served as Corporate Vice President, Supply Chain, from 2009 through 2010. (*Id.*)

| 1 | The Court adopts the Complaint's practice of referring to Defendants Ball, Werner, Hardy, and Begley collectively as "Defendants." (Am.Compl.¶ 26.) |
|---|---|

## II. Factual Allegations

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5. Plaintiffs contend that throughout the Class Period, while Defendants were "promising" to address issues raised by the FDA following inspections of Hospira's facilities, "they were actually making the problems worse by gutting quality control efforts through cost cutting aimed at boosting short-term profitability." (*Id.* at ¶ 3.)

In August of 2009, following an inspection of Hospira's Morgan Hill, California facility, the U.S. Food and Drug Administration ("FDA") issued a warning letter to Hospira. (*Id.* ¶¶ 116, 145.) The August 2009 Warning Letter raised issues "related to Hospira's corrective action plans with respect to the failure of certain AC power cords ... used on certain infusion pumps and related products." (*Id.* ¶ 145.)

In March of 2009, Hospira began Project Fuel, an initiative "with the stated purpose to increase shareholder value through the purported optimization of Hospira's operations." (*Id.* ¶ 45.) Defendants stated that Project Fuel would accomplish this goal by (1) identifying and eliminating underperforming and duplicative units and non-strategic assets; and (2) "reducing Hospira's global workforce by 10% through a 'de-layering' of its management structure, a consolidation of certain functions, and a 'heightening' of the Company's focus on 'process improvement.' " (*Id.* ¶ 17.) According to Plaintiffs, Project Fuel's "reduced operating budgets

and slashed workforces ... wreak[ed] havoc on Hospira's already declining quality control efforts, especially at Rocky Mount—the Company's largest facility." (*Id.* ¶ 47.) As a result, Project Fuel exacerbated Hospira's problems, including "quality and equipment failures, rejected products, production delays, and re-inspection delays." (*Id.* ¶ 59.)

In January of 2010, an FDA inspection of Hospira's Rocky Mount facility revealed significant problems with Hospira's quality control and drug validation processes. (*Id.* ¶ 4.) On April 12, 2010, the FDA issued a warning letter to Begley "identifying numerous violations of the Federal Food, Drug, and Cosmetic Act and its implementing regulations." (*Id.* ¶¶ 4, 107.) With respect to the Rocky Mount facility, the April 2010 Warning Letter noted the following: Hospira (1) "did not have adequate written procedures for production and process controls designed to assure that the drug products it manufactured had the identity, strength, quality, and purity they were purported to have"; (2) "had failed to adequately validate the mixing processes for certain products"; and (3) "had failed to submit adverse events reports to the Agency." (*Id.* ¶ 108.) The April 2010 Warning Letter also identified "Current Good Manufacturing" issues at Hospira's Clayton, North Carolina facility. (*Id.* ¶ 107.) The April 2010 Warning Letter allegedly showed that Hospira had failed to address the concerns raised about Hospira's facilities in the FDA's August 2009 Warning Letter. (*Id.* ¶ 4.) Plaintiffs allege that Defendants "were well aware of the Company's significant and varied operational deficiencies, particularly at Rocky Mount." (*Id.* ¶ 8.)

 **\*3** Following a May/June 2011 inspection of Rocky Mount, on June 17, 2011, the FDA issued a Form 483 to Hector Jimenez, the Director of Quality at Rocky Mount, identifying 18 "manufacturing and quality control deficiencies." (*Id.* ¶ 112.) On August 4, 2011, the FDA issued another Form 483 addressed to Jonathan Waldron, Rocky Mount's Vice President of Operations, following a July/August 2011 inspection. The August 2011 Form 483 allegedly cited three deficiencies: (1) "Hospira's failure to thoroughly review the failure of a batch or any of its components;" (2) "the Company's laboratory controls not including the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards"; and (3) "the quality control unit's failure to fully follow applicable responsibilities and procedures, which resulted in numerous product lots being released for distribution despite having failing in-process and/or finished product results." (*Id.* ¶ 114.)

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Plaintiffs allege that from February 2010 through July 2011, Defendants knowingly or recklessly made various misleading or false statements or omitted statements of material fact regarding Project Fuel and Hospira's quality control issues, remediation efforts, and relationship with the FDA in Hospira's SEC filings, press releases, on conference calls, and at investor conferences. (*Id.* ¶¶ 142–219.) Defendants Begley and Werner also signed certifications for certain filings attesting that the filings complied with the requirements of the Exchange Act and that the information in them "fairly presented ... the financial condition and results of the operations of the Company." (*Id.* ¶ 145.) Plaintiffs contend that these alleged misrepresentations hid information from the market and "buoy[ed Hospira's share price, allowing Defendants Begley and Werner to line their pockets during the Class Period with nearly $27 million in combined proceeds from unusual and suspicious insider stock sales." (*Id.* ¶ 220.)

After Hospira's disclosures at a September 7, 2011 "Investor Day," Hospira's stock price fell "approximately 13%, from a close of $45.61 on September 7, 2011, to a close of $39.51 on September 13, 2011." (*Id.* ¶¶ 221, 225.) Specifically, Plaintiffs allege that these disclosures revealed "the seriousness of Hospira's quality control and facility deficiencies at Rocky Mount," "the scope and cost of remediation efforts necessary to fix the problems," and "the fact that Project Fuel was not improving quality but was working against it." (*Id.* ¶ 225.) On October 18, 2011, Hospira "issued a press release announcing disappointing preliminary financial results for the third quarter of 2011." (*Id.* ¶ 234.) Plaintiffs allege that the press release also revealed for the first time "that Rocky Mount's operational woes were inhibiting service as inventory was not sufficient to make up for decreased production capacity." (*Id.* ¶ 234.) On November 28, 2011, RBC Capital Markets published a report concluding that "Hospira's manufacturing issues are far greater than investors realize and will take a minimum of 2–3 years to resolve." (*Id.* ¶ 243.) The Report also noted that based upon its authors "more recent conversations with experts," they were "inclined to believe a consent decree is more likely than not, which could have significant commercial implications for Hospira." (*Id.*) As a result, Hospira's stock price fell "approximately 9%, from a close of $30.98 on November 28, 2011, to a close of $28.17 on November 29, 2011, on unusually heavy trading volume." (*Id.* ¶ 246.)

**III. Alleged False or Misleading Statements**

**\*4** Plaintiffs allege that from February 2010 through July 2011, Defendants made various misleading or false statements or omitted statements of material fact regarding Project Fuel and Hospira's quality control issues in Hospira's SEC filings, on conference calls, and at investor conferences.

**A. February to March 2010**[2]

2    Because Plaintiffs allege that Defendants repeated the same allegedly misleading statements at numerous times, the Court, while considering the effect of the statements as a whole, will discuss in each grouping only those statements that were not previously discussed in prior sections.

On February 4, 2010, Hospira issued a press release announcing fourth-quarter and full-year 2009 financial results, which "was also filed with the SEC on [a] Form 8–K that same day." (Am.Compl.¶ 142.) The release quoted Begley as stating that Hospira has "made significant progress on many fronts, including ... advancing Project Fuel, our corporate-wide optimization initiative." (*Id.* ¶ 142.) The release further quoted Begley as stating, "Looking forward, we expect 2010 to be another good year of growth for Hospira." (*Id.*) On a February 4, 2010 conference call with analysts, Begley stated, "We kicked off Project Fuel, a corporate wide optimization initiative to drive long-term profitable growth and increase[ ] shareholder value, and we met the commitments we set forth for 2009." (*Id.* ¶ 143.) Begley noted that Hospira was "aggressively driving transformation throughout the organization" and that Project Fuel and other efforts would "optimize [Hospira's] productivity." (*Id.*)

In response to a question about the extent to which "FDA policy ke[pt][him] up at night, given all the regulatory submissions [Hospira's] got pending?," Begley answered, "we've got a very good relationship with the FDA, and we'll continue to work very closely with the FDA.... And so I don't mean to put it aside, but it's not something that keeps me up at night. The organization here is very well aware of the importance of working with the FDA and changing as their requirements change." (*Id.* ¶ 144.)

Hospira's 2009 Form 10–K filed on February 18, 2010 contained the following statements regarding Project Fuel and Hospira's remediation efforts: (1) "Hospira is actively involved in setting quality policies and managing internal and external quality performance. Its quality assurance department provides quality leadership and supervises its

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 16 of 118 PageID #:2420

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

quality systems."; (2) "In addition, higher production volume and cost reductions associated with Project Fuel and Facilities Optimization initiatives contributed to manufacturing efficiency gains." With regard to Hospira's receipt of FDA warning letters "alleging violations of applicable regulations and standards," the 2009 Form 10–K also acknowledged the letters and stated that, "Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues." The Form 10–K specified that the 2009 Warning Letter was "related to Hospira's corrective action plans with respect to the failure of certain AC power cords ... used on certain infusion pumps and related products." (*Id.* ¶ 145.) The Form 10–K further stated that "Hospira has responded to the warning letter and is working closely with the FDA to conclude this matter." (*Id.*) Lastly, the Form 10–K stated that Hospira's "facilities and equipment are in good operating condition and are well maintained." (*Id.*) An analyst report reacted favorably to the statements, concluding that "overall positive themes are intact with Fuel driven margin expansion and underlying growth in SIP still strong." (*Id.* ¶ 148.)

**\*5** In March of 2010, Werner participated in two conference calls. In the first conference call, Werner noted that Project Fuel was "adopted to drive operational excellence" and that it would "support further long-term growth," "consistent, sustainable shareholder value performance," and "increased efficiencies." (*Id.* ¶ 149.) In response to a question from the audience, Werner further noted with respect to Project Fuel that "We've been able to exceed just about every goal we've laid out" and that it was the type of project "where sort of the more we look, the more we find. We've had—I really can't think of any significant negative surprises." (*Id.* at 150.) In the second conference call, Werner noted that Hospira "continu[es] to be highly respected for our quality, reliability and manufacturing capabilities" and that Project Fuel "continues to have us very focused on the base business and its health." (*Id.* ¶¶ 151–52.)

### B. April to June 2010

On April 16, 2010, Hospira filed with the SEC a "Form 8–K, disclosing that the Company had received a warning letter, dated April 12, 2010, from the FDA in connection with the FDA's inspection of the Company's manufacturing facilities in Rocky Mount, North Carolina and Clayton, North Carolina." (*Id.* ¶ 154.) The Form 8–K noted that the Warning Letter had "cited Current Good Manufacturing Practice deficiencies and other inadequacies at those facilities, some of which were repeat observations." (*Id.*) Hospira stated that

it "t [ook] this matter seriously and intends to respond fully, and in a timely manner," and intended "a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.*) An April 18, 2010 analyst report "had minimal reaction to disclosure of the letter" and noted that the "impact of the FDA warning letter looks manageable." (*Id.* ¶ 155.)

On April 27, 2010, Hospira "issued a press release announcing its financial results for the first quarter of 2010, which was also filed with the SEC on a Form 8–K the same day." (*Id.* ¶ 156.) The release quoted Begley as stating that Hospira's "positive performance was driven by continued momentum in our Specialty Injectable Pharmaceuticals business, as well as by additional progress on our Project Fuel optimization initiatives." (*Id.* ¶ 156.) Hospira's April 27, 2010 first-quarter 10–Q reiterated that Hospira would be taking "a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 157.) On a conference call with analysts the same day, Begley and Werner made several statements addressing the April 2010 Warning Letter. Begley stated that he was confident Hospira could demonstrate its "commitment to not only implement these corrective actions, but also to ensure the global application of all improvements" and that Hospira was "raising our bar internally" and "redoubling our commitment to quality, proactively addressing certain product issues to ensure they meet our high standards." (*Id.* ¶ 159.) Werner noted Hospira was "in the process of implementing corrective actions." (*Id.*) Plaintiffs allege that Defendant Werner "attributed adjusted gross margin gains to 'improvements to manufacturing productivity, mainly as a result of Project Fuel efforts.' " (*Id.* ¶ 160.) In the question-and-answer session, Begley further stated that "It's part of the fabric of our culture, and we will do whatever it takes from a technology quality improvement standpoint to make sure that we are able to deliver the best product out there." (*Id.* ¶ 161.)

**\*6** At the Bank of America Merrill Lynch Health Care Conference on May 12, 2010, Werner noted that "Project Fuel had "transformed our organization ... driving operational excellence and freeing up capital to invest in areas for growth." (*Id.* ¶ 165.) Additionally, at the May 27, 2010 Citi Global Healthcare Conference, Werner stated that "we think that, particularly with Project Fuel, that we've positioned the Company for sustained growth ." (*Id.* ¶ 166.) On a June 2, 2010 conference call, Begley commented with respect to the regulatory issues identified at the Rocky Mount and Clayton facilities that "[N]either of those are systemic

issues to Hospira, and neither of those are systemic issues to the two plants either." (*Id.* ¶ 169.) He also added that "process improvements" were "taking frustration out of the organization." (*Id.* ¶ 168.) At the June 17, 2010 Goldman Sachs Global Healthcare Conference, Werner noted that "we're tracking very well with Project Fuel and I went back four or five quarters and it just continues to notch up." (*Id.* ¶ 170.)

**C. July to September 2010**

On July 28, 2010, Hospira issued a press release announcing its financial results for the second quarter of 2010 that was also filed as a Form 8–K the same day with the SEC. The release quoted Begley as stating that Hospira's results were "driven ... by continued momentum of our Project Fuel optimization initiatives." (*Id.* ¶ 172.) The release also noted that Hospira was "highly focused on executing our strategy of investing for growth" and "on driving quality improvements across our global manufacturing organization." (*Id.*)

On the same day, Hospira filed with the SEC its second-quarter 2010 Form 10–Q. The Form 10–Q reiterated that Hospira "ha[d] taken a number of actions to reduce operating costs and optimize operations," that Hospira was "working closely with the FDA to conclude th[e] matter [relating to the August 2009 Warning Letter]," and that Hospira "ha[d] begun to undertake a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 173.) The Form 10–Q also acknowledged that "Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters." (*Id.*)

On a July 28, 2010 conference call to discuss second-quarter 2010 financial results, Begley and Werner made several statements with respect to the status of the remediation plan with the FDA. Begley stated that "[w]e believe the FDA has [accepted] the remediation plan we laid out" and that Hospira was "now dedicated to fulfilling the planned commitments, the bulk of which we expect to complete by year-end." (*Id.* ¶ 175.) Begley also noted that "[w]e have taken our learnings from our Rocky Mount and Clayton facilities and are applying them to our manufacturing operations around the world to ensure that we meet the highest standards of quality going forward." (*Id.*) Begley and Werner further noted the success of Project Fuel in "driving improved operational performance." (*Id.*) Begley reiterated that Hospira simultaneously "remain[s] highly focused on our quality improvement efforts, working diligently to raise the standards

of quality across the Company and address the concerns of the FDA." (*Id.* ¶ 175 .) In the question-and-answer session following the call, Werner explained that the costs of the remediation plan "should really start to taper off as you progress through the fourth quarter [of 2010]." (*Id.* ¶ 176.) Begley noted that the FDA was "very pleased with some of the things that we are doing around creating some centralized functions here in Chicago from a quality standpoint ." (*Id.* ¶ 176.) Analysts reacted positively to the statements. (*Id.* ¶ 177.) During a subsequent conference call on August 12, 2010, Werner reiterated Hospira's "very strong track record for quality and reliability" and Project Fuel's focus on "driving operational excellence." (*Id.* ¶ 178.)

**\*7** On August 20, 2010, Defendants hosted a conference call with analysts regarding Hospira's CEO succession plan. (*Id.* ¶ 179.) In addressing his upcoming departure as CEO, Begley stated that "there is nothing more important for Hospira other than Project Fuel and all of our quality initiatives." (*Id.* ¶ 179 .) Begley further noted Hospira's "tremendous progress on the quality front." (*Id.*) At the September 13, 2010 Morgan Stanley Global Health Conference, Werner stated that he expected a "calmer regulatory environment" for Hospira in 2011 and that "the quality issues we've seen and others have seen in the industry will be largely behind us." (*Id.* ¶ 180.)

**D. October 2010 to January 2011**

Hospira issued a press release on October 26, 2010 with its 2010 financial results that it filed with the SEC on a Form 8–K on the same day. The press release quoted Begley as noting "continued contributions" from Project Fuel. (*Id.* ¶ 182.) Regarding the April 2010 Warning Letter, Hospira's third quarter 10–Q filed with the SEC on October 26, 2010 noted that Hospira "had made significant progress on completing a comprehensive review of its manufacturing operations" and that "Hospira took "immediate actions to address the FDA's concerns," including recalling certain products. (*Id.* ¶ 183.) The same day, at a conference call with analysts, Begley and Werner reiterated Hospira's "progress" on "quality improvement initiatives," compliance with the Warning Letter, and Project Fuel. (*Id.*) Analysts reacted favorably to the news. (*Id.* ¶ 186.) One analyst report noted Hospira's "quality improvements" were on track. (*Id.*) Subsequently, Hospira received two "buy" ratings. (*Id.* ¶ 187.) At the January 11 JP Morgan Healthcare Conference, Werner stated with respect to remediation plans that Hospira has "essentially completed all of the activities in the Clayton and Rocky Mountain facilities that we outlined in our response to the warning letter from the FDA" and that "we think we're on

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 18 of 118 PageID #:2422

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

a good path to bring things back to a more normal stage here in the first part of the year." (*Id.* ¶ 190.) Werner also stated "we're beginning to roll those changes out globally to all of our facilities." (*Id.*)

**E. February to March 2011**

On February 2, 2011, Hospira issued a press release announcing its fourth quarter and full-year financial results and filed the press release with the SEC on a Form 8–K that same day. This press release repeated substantially the same statements about Project Fuel as in the press release announcing the third quarter results, referencing the "[i]mproved manufacturing efficiency from the company's Project Fuel optimization initiatives" and "cost savings from Project Fuel." (*Id.* ¶ 192.) On a conference call the same day, Begley stated that receipt of the warning letter "was a sizable pothole, but "we resolved to meet the FDA's expectations and raised our bar internally." (*Id.* ¶ 193.) Begley also stated that "we not only met our commitments for Project Fuel, our corporate-wide optimization initiative, but we over achieved many of our goals, allowing us to invest in key drivers of our business." (*Id.*) In addition, Begley stated that "[t]he optimized efficiencies we've achieved through Project Fuel and the focus it has instilled in the Company is driving us towards continual improvement and has enhanced our commitment to operational excellence." (*Id.*) Begley also discussed improvements to Hospira's quality-control system: "Of what is a very, very low-level complaint, we now do a thorough root cause analysis on and come up with a fix for it. Then the expectation is to incorporate that fix across the whole product line." (*Id.* ¶ 194.) Hospira's Form 10–K, filed on February 16, 2011, reiterated that "Hospira has responded to the 2010 warning letter and is working closely with the FDA to conclude the matter" and that Hospira's "facilities and equipment are in good operating condition and are well maintained." (*Id.* ¶ 195.)

**F. April to June 2011**

 **\*8**  On April 26, 2011, Hospira issued a press release and filed a Form 8–K with information on its first-quarter 2011 earnings. The release quoted Begley as stating that Hospira had "made good progress in decreasing [its] level of backorders to better serve our customers" and that Hospira "remain[s] focused on driving quality enhancements throughout the organization and on improving shareholder value through strong execution and sustainable growth." (*Id.* ¶ 201.) The release also referenced "[i]mproved manufacturing efficiency from the company's Project Fuel optimization

initiatives." (*Id.*) The Form 10–Q that Hospira filed with the SEC on April 26, 2011 also contained statements substantially the same as in previous filings regarding Hospira's efforts to comply with and make progress on the April 2010 Warning Letter, as well as Hospira's goal "to achieve a culture of continuous improvement." (*Id.* ¶ 202.)

As in prior quarters, on April 26, 2011, Defendants hosted a conference call with analysts to discuss first-quarter 2011 financial results. On the call, Defendants made numerous statements regarding the April 2010 Warning Letter. Significantly, Defendant Begley stated that the "next major milestone is the inspection of our Rocky Mount facility" and that Hospira "ha[d] been diligently preparing for that inspection and look[ed] forward to the FDA's response." (*Id.* ¶ 204.) Regarding Project Fuel, Werner stated, "we have very successfully concluded this two-year optimization initiative and not only consistently met our initial commitments but overachieved them." (*Id.* ¶ 204.) Regarding Hospira's relationship with the FDA, Werner noted that the FDA "ha[d] been over to the Orchid Pan Am facility," as well as to "[Hospira's] factory in Croatia" and that both had received a "clean bill of health." (*Id.* ¶ 205.) Begley further noted that "we are encouraged with the inspections that have taken place at other facilities." (*Id.* ¶ 205.) Analysts reacted positively to the statements. One report stated that "[o]perating performance was strong in 1Q with progress on the SIP and MMS quality issues." (*Id.* ¶ 206.)

On April 27, 2011, Hospira participated in the Bank of America Merrill Lynch Healthcare Conference. Begley noted that Hospira was "moving through the quality issues with the FDA" and "starting to see light at the end of the tunnel here" and that "the back orders will also improve." (*Id.* ¶ 208.) On June 6, 2011, at the Sanford C. Bernstein Strategic Decisions Conference, Begley also commented that Hospira's inventory build-up was due to a "new quality system" that "increased [Hospira's] cycle times" and resulted "in work in process and raw materials beginning to build up as it takes us longer to release product underneath those new quality standards." (*Id.* ¶ 209.) Begley maintained that Hospira was not "capacity constrained." (*Id.*) At the June 8, 2011 Goldman Sachs Global Healthcare Conference, Werner noted Hospira's "focus ... on the quality initiatives and working with the FDA and getting the back orders down" and that Hospira "will act like the leader and use the quality improvements, hopefully, as a strength and a differentiator." (*Id.* ¶ 210.)

**G. July 2011**

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 19 of 118 PageID #:2423

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

**\*9** On July 27, 2011, Hospira issued a press release discussing its second quarter 2011 financial results and filed the press release with the SEC on a Form 8–K. The release quoted F. Michael Ball as stating that Hospira "continued to advance the business and make progress on our quality and product supply improvement initiatives." (*Id.* ¶ 212.) Hospira's second-quarter 2011 Form 10–Q filed on July 27, 2011 also contained statements substantially similar to those in prior filings regarding Hospira's "comprehensive review of its manufacturing operations," Hospira's efforts to comply with the April 2010 Warning Letter, and Project Fuel's "contribut[ion] to net manufacturing efficiency gains." (*Id.* ¶ 213.)

During a July 27, 2011 conference call with analysts to discuss second-quarter 2011 earnings and the FDA's inspection of Rocky Mount, Defendant Ball noted the following:

> During the second quarter, the FDA completed an inspection of Rocky Mount, as expected. While we received verbal feedback acknowledging that we had made progress with respect to our validation processes, the agency was not fully satisfied. We received observations and are aggressively working to address their areas of concern. We have submitted a full response with corrective and preventative actions. We continue to interact and work with the agency to resolve our warning letter and fully comply with their expectations.

(*Id.* ¶ 215.)

Werner also acknowledged that "our focus on driving higher-quality manufacturing processes and products has impacted the timing of certain of our cost improvement and lean optimization efforts in manufacturing." (*Id.*) Ball noted that Hospira "remain[ed] focused on achieving our previously-projected range given [its commitment to providing customers with high-quality products] and our expected strong sales performance, subject to product approvals and progress on our remediation and service level efforts. We believe we are on track." (*Id.*)

During the question-and-answer session, Werner explained that Hospira's focus was on "product quality and getting our supply levels built back up." (*Id.* ¶ 216.) Ball reiterated that "we need to ensure that we are making the highest quality products, the highest quality processes, we have to get things remediated." (*Id.*) Defendant Werner also discussed the return of the FDA to Hospira facilities and that Hospira had received a Form 483. Specifically, with respect to the Form 483, Werner stated that "[w]e're not expecting there

to be a substantial amount of additional cost, it's just heavy lifting and working through it." (*Id.*) Werner further noted that Hospira "did receive some verbal acknowledgment that we had made some good progress, but unfortunately, it was not to the full satisfaction of the agency, and we're working very cooperatively with them to move forward." (*Id.*) Ball stated that Hospira was "taking all necessary steps in order to support Rocky Mount," noting that Hospira had deployed quality specialists and consultants to Lake Forest and "increased the number of quality people in Rocky Mount by some 20 folks going to 30 more people." (*Id.*)

## ANALYSIS

**\*10** On April 18, 2012, the Court appointed the Institutional Investor Group and the Laborers and Roofers Funds as Lead Plaintiffs and Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as lead counsel .[3] (R. 63.) On June 25, 2012, Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Complaint"). (R. 75.) Both counts in the Complaint are premised on securities fraud arising out of the purchase of Hospira's common stock. In count one, Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. Count two alleges that the Individual Defendants violated Section 20(a) of the Exchange Act. Defendants moved to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b) (6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the heightened pleading mandates of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4. In response, Plaintiffs moved to strike Exhibits D, and O–V from Defendants' memorandum accompanying their Motion to Dismiss, as well as "all references to and assertions based upon those materials" in the memorandum. (R. 90, Pls.' Mot. to Strike.)

3     The Executive Committee reassigned this case from the Honorable William Hibbler to this Court on March 19, 2012. (R. 60.)

### I. Motion to Strike

Generally, in deciding a motion to dismiss, courts look only to matters within the four corners of the complaint. *See* Fed.R.Civ.P. 12(d); *Tierney v. Vahle,* 304 F.3d 734, 738–739 (7th Cir.2002). The Seventh Circuit, however, recognizes exceptions for "documents attached to the complaint, documents that are critical to the complaint and referred to in

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 20 of 118 PageID #:2424

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

it," as well as "information that is subject to proper judicial notice." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir.2012). If the court looks to documents other than the complaint and those that fall within these exceptions, the court must convert the motion to one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(d); *Wright v. Assoc. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir.1994); *Ennenga v. Starns,* 677 F.3d 766, 773 (7th Cir.2012). With respect to the "incorporation by reference" exception, "[t]he purpose ... is to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir.2002); *Tierney,* 304 F.3d at 738 (7th Cir.2002) ("[W]ere it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit."). The classic example of a document falling within the exception is a contract in a breach of contract suit. *Tierney,* 304 F.3d at 738.

With respect to the "judicial notice" exception, a court "[t]aking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment." *Ennenga,* 677 F.3d at 773. Federal Rule of Evidence 201 provides that a court may take judicial notice of "a fact that is not subject to reasonable dispute" because it (1) "is generally known within the trial court's territorial jurisdiction;" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *Ennenga,* 677 F.3d at 773–74. Nevertheless, judicial notice "merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts." *Doss v. Clearwater Title Co.,* 551 F.3d 634, 640 (7th Cir.2008).

### A. Procedural Mechanism of Motion to Strike

**\*11** As a threshhold matter, Defendants argue that Plaintiffs' Motion is procedurally improper because Federal Rule of Civil Procedure 12(f) only provides for motions to strike pleadings, and a motion to dismiss is not a pleading under the Federal Rules. (Defs.' Opp. Mot. to Strike 4–5.)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). While Rule 12(f) does not explicitly authorize a motion to strike documents other than pleadings, courts routinely entertain such motions. *See, e.g., Ind. Ins. Co. v. Westfield Ins. Co.,* 10 C 2660, 2010 WL 3404971, at

\*3 (N.D.Ill. Aug.26, 2010) (denying motion to strike portions of response to motion to dismiss); *Unytite, Inc. v. Lohr Structural Fasteners, Inc.,* 91 C 2849, 1992 WL 34143, at \*6 (N.D.Ill. Feb.13, 1992) (granting motion to strike affidavit and exhibit in plaintiff's response to motion to dismiss); *Hanover Ins. Group v. Singles Roofing Co.,* 10 C 611, 2012 WL 2368328, at \*9 (N.D.Ill. June 21, 2012) (granting motion to strike unauthorized and untimely supplemental response brief to preliminary injunction motion). This authority comes from the Court's inherent power to strike impermissible filings. *Cf. Cleveland v. Porca Co.,* 38 F.3d 289, 297 (7th Cir.1994) (upholding district court's discretion to strike filing not provided for by the Local Rules); *see also In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.,* 763 F.Supp.2d 423, 581–82 (S.D.N.Y.2011) (noting the district court's "inherent authority to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances" in deciding motion to strike exhibits from a motion to dismiss).

Regardless of whether the authority for Plaintiffs' Motion is Rule 12(f) or the Court's inherent power, the Court will address the merits of it, namely, which documents the Court may consider in deciding Defendants' Motion to Dismiss.

### B. Disputed Exhibits

#### 1. Exhibits T–V: Hospira's Proxy Statements

Defendants argue that the Court may take judicial notice of Exhibits T, U, and V, which, respectively, are Hospira's 2010, 2011, and 2012 proxy statements. (Defs.' Mem. Exs. T, U, V.) Defendants cite to these documents to "show[ ] the increase in Defendants Begley and Werner's Hospira stock holdings during the class period." (Defs.' Opp. Mot. to Strike 11.)

The Seventh Circuit has not addressed whether a district court on a motion to dismiss in a securities fraud action may properly take judicial notice of the truth of the statements contained in proxy materials. Other circuits have concluded that the court may take judicial notice only of the fact that the statements as public records contain certain statements, but not the truth of the statements themselves. In *Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991), the Second Circuit held that a district court did not err in taking judicial notice of a joint proxy statement and an offer to purchase that were not part of the complaint in deciding a motion to dismiss a securities fraud action, when the documents at issue were "the very documents that [were] alleged to contain the various misrepresentations or omissions." *Kramer v. Time*

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

*Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991). The Second Circuit emphasized that the documents were "relevant not to prove the truth of their contents but only to determine what the documents stated." *Id.* Subsequently, the Fifth, Eleventh, and Third Circuits have followed *Kramer* 's approach. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999) ("[W]e hold that a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed."); *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) (holding that on a motion to dismiss that SEC filings "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents."); *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000) (finding *Kramer* 's reasoning persuasive). This approach is also consistent with the holdings of courts in this District. *See, e.g., George v. Kraft Foods Global, Inc.,* 674 F.Supp.2d 1031, 1044 (N.D.Ill.2009) ("[A] court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein." (internal quotation marks omitted)); *Hernandez v. Midland Credit Mgmt., Inc.,* 04 C 7844, 2006 WL 695451 (N.D.Ill. Mar.14, 2006) (citing cases noting that "SEC filings may be considered for their content, but not for the truth of statements therein"); *Riggs Ptrs., LLC. v. Hub Group, Inc.,* 02 C 1188, 2002 WL 31415721, at *1 (N.D.Ill. Oct.25, 2002) ("[T]he court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein.").

**\*12** The Court agrees with the holdings of these cases. Here, in arguing that Plaintiffs have not made a sufficient showing of scienter based upon Begley's and Werner's stock sales, Defendants ask the Court to take judicial notice not only of the fact that the proxy statements contain certain sales data for Begley and Werner, but the truth of that sales data. Otherwise, such information would not be relevant to the issue of scienter. Moreover, this approach is consistent with the Seventh Circuit's decision in a related context in *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354 (7th Cir.1995), which upheld the district court's ruling not to take judicial notice of the number of a company's employees from a 10–K form in determining punitive damages at trial, where there was "considerable argument over the significance of the 10–K form." *Hennessy v. Penril Datacomm Networks, Inc.,*

69 F.3d 1344, 1354 (7th Cir.1995). While citing *Kramer* in recognizing that some courts had found judicial notice of SEC filings appropriate, the Seventh Circuit nonetheless held that the "fact in question here was not capable of accurate and ready determination by resort to the 10–K." *Hennessy,* 69 F.3d at 1355.

Defendants' argument that the proxy statements merely "aggregate ... in one place" the sales data from the Form 4s is unavailing. (Defs.' Opp. Mot. to Strike 12.) Defendants fail to specify which proxy statements or portions thereof aggregate the data from which Form 4s, which is not obvious given that the Form 4s and the proxy statements cover different time periods. Indeed, this lack of clarity demonstrates that the facts that Defendants wish the Court to take judicial notice of are not susceptible to "accurate and ready determination."

The Court declines to take judicial notice of Exhibits T, U, and V strikes them from the record.

**2. Exhibits O–S: Form 4s for Defendants' Begley and Werner**

Exhibits O–S are Hospira SEC Form 4s filed in 2010 and 2011 reflecting changes in beneficial ownership of securities for Defendants Begley and Werner. (R. 87–4.) Although Plaintiffs neither cite nor reference the Form 4s in their Complaint, Defendants contend that the Complaint incorporates the Form 4s by reference because the sales data in the Complaint "match[es] the data provided in the SEC Form 4s documenting those sales." (Defs. Opp. Mot. to Strike 8.) Significantly, Defendants argue that these Forms "detail both halves of the dual-faceted transactions" and show that Werner and Begley "actually acquired more shares than they sold in all but one of their stock transactions." (*Id.* at 2, 8.) Thus, according to Defendants, "the Court may assume that Plaintiffs obtained the information in their complaint from Exhibits O–S, and so incorporated those documents by reference." (Defs.' Opp. Mot. to Strike 7.)

In support of their Motion, Plaintiffs cite the Seventh Circuit's opinion in *Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). In *Wright,* the Seventh Circuit upheld the district court's consideration of the entirety of a health insurance risk plan administration agreement in deciding a motion to dismiss where the plaintiff failed to attach the agreement to his complaint but "repeatedly quote[d] from and refer[ed] to the Agreement in his complaint" and the agreement was "central" to the plaintiff's claims. *Wright,* 29 F.3d at 1248 (noting plaintiff's allegations that

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 22 of 118 PageID #:2426

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

the "Agreement grant[ed] him a property interest in his employment, of which the defendants deprived him without due process of law" and that the agreement was "the contract with which the defendants allegedly interfered").

**\*13** The Seventh Circuit has not addressed, however, whether a plaintiff incorporates by reference those documents that contain the same data as the complaint but which plaintiffs neither cite to nor reference in their complaint. While Defendants argue that the Form 4s are "central" to the Plaintiffs' claim, there are notable differences between the contract in *Wright* and the Form 4s. Unlike in *Wright,* in which the plaintiff contended that the contract gave rise to the rights of which the defendant had allegedly deprived him, here, plaintiffs raise the stock sales as facts supporting but one element of their § 10(b) claim. Further, unlike the contract in *Wright,* it is not entirely clear where Plaintiffs here obtained the alleged stock information. Defendants also contend that the Court may properly consider the Form 4s on a motion to dismiss because otherwise, Plaintiffs could impermissibly evade dismissal by failing to acknowledge that Defendants not only sold but bought Hospira stock over the Class Period. Whether or not Defendants bought or sold more Hospira stock over the Class Period is not determinative of whether Plaintiffs have adequately alleged scienter, however, as *Tellabs* instructs courts to consider the allegations of scienter collectively. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 326, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179 (2007) (*"Tellabs"* ).

Moreover, the same reasoning in *Kramer* and *Hennessy* that weighs against considering the proxy statements also applies here. As with the proxy statements, Defendants cite to the Form 4s not to show which statements they contain, but for the purpose of demonstrating that the Defendants bought or sold a particular amount of stock during the Class Period. (Defs.' Opp. Mot. to Strike 8; Defs.' Mem. 18–19.) In other words, in challenging Plaintiffs' scienter allegations on the basis of data in the Form 4s, Defendants rely upon these documents for "the truth of their contents" as opposed to the fact of "what the documents stated." *Kramer,* 937 F.2d at 774.

Ultimately, however, the Court need not reach this issue. Because Defendants rely upon the Form 4s to challenge Plaintiffs' scienter allegations, and the scienter inquiry turns on other allegations,[4] the Court will not decide this issue.

4     Although the Court concludes that Plaintiffs have adequately pled scienter under the PSLRA with respect

to certain statements, the stock sale allegations are not dispositive of the Court's scienter rulings.

### 3. Exhibit D: FDA Report

Exhibit D is a copy of a June 15, 2012 U.S. House of Representatives Committee on Oversight and Government Reform staff report entitled "FDA's Contribution to the Drug Shortage Crisis." (Mot. to Dismiss, Ex. D.) ("FDA Report"). Plaintiffs argue that the Court may not consider the FDA report on two grounds: (1) it was neither referenced in the Complaint nor is it central to the Plaintiffs' claims; and (2) Defendants cite the FDA Report to make an impermissible "factual argument about the FDA's alleged increased enforcement against manufacturers of generic injectable pharmaceuticals." (Pls.' Mem. Mot. to Strike 4.)

**\*14** Defendants cite to the FDA report in support of the allegation that "[a]t around the same time that Hospira initiated Project Fuel, the FDA began to raise its expectations for manufacturers of generic injectable pharmaceuticals through increased enforcement activity during routine inspections." (Defs.' Mem. 5.) Specifically, Defendants assert that the "number of warning letters sent by the FDA increased" by certain percentages from 2009 to 2010 and from 2010 to 2011; that these increases "clearly show a dramatic change in [sic] FDA's regulatory approach"; and that "nearly all of America's major producers of generic injectable medications were essentially required to remediate facilities at the same time." (*Id.* at 5, 6.) Defendants argue that the Court may properly take judicial notice of the Report as a public record and "the facts in those exhibits on which Defendants rely." (Defs .' Opp. Mot. to Strike 8.)

The Court declines to take judicial notice of the FDA Report. Here, Defendants ask the Court to take judicial notice of the facts contained in the report, namely, that the number of warning letters sent by the FDA increased from 2009 to 2010 and from 2010 to 2011. According to Defendants, since the number of warning letters cited in the Report "can be accurately and readily determined by visiting the FDA's website and reviewing each of those letters," the Court may take judicial notice of the number of warning letters as an uncontested fact. (Defs.' Opp. Mot. to Strike 10.)

Defendants' argument is unpersuasive for several reasons. First, although Plaintiffs do not dispute the fact of whether the number of warning letters increased from 2009 to 2010 and 2010 to 2011, these facts, nonetheless, are not "readily determined from sources whose accuracy cannot reasonably

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 23 of 118 PageID #:2427

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

be questioned." Although the FDA website does contain copies of warning letters issued in 2009, 2010, and 2010, it also designates certain warning letters in these years as "not issued," which denotes that a "close-out letter" has issued, a distinction which Defendants fail to address. *See* http:// www.fda.gov/ICECI/Enf orcementActions/ WarningLetters/2009/default.htm. Moreover, the fact of the increase in the number of letters, as one that involves a calculation—albeit a straight-forward one in theory—may, in reality, be subject to interpretation in a way that other typically judicially noticed facts are not. *See, e.g., Pugh v. Tribune Co.,* 521 F.3d 686, 691 n. 1 (7th Cir.2008) (taking judicial notice of stock prices); *Deicher v. City of Evansville,* 545 F.3d 537, 541 (7th Cir.2007) (holding district court did not abuse discretion in taking judicial notice of filing date of complaint). Finally, the cases Defendants cite in support of their argument are distinguishable. Those cases involve courts taking judicial notice of a few warning letters, not the extrinsic fact of the total number of warning letters issued in a year, and in *U.S. ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 756 (S.D.Tex.2010), only the fact of the warning letter itself, and not the truth of its contents. *See Van Koenig v. Snapple Beverage Corp.,* 713 F.Supp.2d 1066, 1073 (taking judicial notice of several FDA warning letters and responses addressing the use of the term "natural"); *U.S. ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 756 (S.D.Tex.2010) ("The letter only informs St. Jude that its promotion of its surgical ablation device violated FDA regulations. The court may take judicial notice of this document without resolving whether its contents are true."); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation,* 271 F.Supp.2d 1224, 1234 (E.D.Cal.2003) (taking judicial notice of senate and house reports while noting to the "extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

 **\*15** The Court declines to take judicial notice of Exhibit D and strikes those references to it in Defendants' Motion to Dismiss.

#### 4. Stock Transaction Chart

Plaintiffs also object to Defendants' inclusion of a "stock transaction chart" in Defendants' memorandum accompanying its Motion to Dismiss on the ground that it improperly "summarizes information from Exhibits T, U, and V to assert that Defendants Begley and Werner ultimately increased their Hospira stock holdings after the class period." (Pls.' Mot. to Strike 5.); (Defs.' Mem. 19.) The chart shows the number of shares held by Begley and

Werner in March 2010, March 2011, and March 2012, and the percentage change in the number of shares held from year to year. Defendants appear to have drawn the entries from Exhibits T, U, and V, Hospira's 2010–2012 proxy statements. As the Court has already declined to take judicial notice of the contents of Exhibits T, U, V, it will not do so for the summary of such exhibits.

#### II. Legal Standard

In order to state a securities fraud claim under Section 10(b), Plaintiffs must allege the following elements of a fraud claim under Section 10(b): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[5] *Janus Capital Grp., Inc. v. First Derivative Traders,* —— U.S. ——, —— n. 3, 131 S.Ct. 2296, 2301 n. 3, 180 L.Ed.2d 166 (2011); *see also AnchorBank FSB v. Hofer,* 649 F.3d 610, 617 (7th Cir.2011). To succeed on a § 10(b) claim, a plaintiff must show that the defendant "made material misrepresentations or omissions." *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, ——, 131 S.Ct. 1309, 1317, 179 L.Ed.2d 398 (2011).

5    Defendants' Motion to Dismiss does not challenge that Plaintiffs' have adequately pled the third through sixth elements of a § 10(b) claim.

#### A. Rule 12(b)(6)

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011) (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570); *see also McCauley v. City of Chicago,* 671 F.3d 611, 616–17 (7th Cir.2011).

### B. Rule 9(b) and the PSLRA

 **\*16**  Under Federal Rule of Civil Procedure 9(b), Plaintiffs must state with particularity the circumstances constituting fraud. Fed.R.Civ.P. Rule 9(b). Rule 9(b) requires a plaintiff to allege the "who, what, when, where, and how" of the fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 649 F.3d 436, 441–42 (7th Cir.2011).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further increases the pleading standard in securities fraud cases. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 594 (7th Cir.2006) *vacated and remanded on other grounds,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (*"Makor I"* ) ("The PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading—one that exceeds even the particularity requirements of Federal Rule of Civil Procedure 9(b).") Congress enacted the PSLRA as a "check against abusive litigation by private parties." *Tellabs,* 551 U.S. at 313. Indeed, "[e]xacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313.

The PSLRA provides that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4.

Under *Tellabs,* "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756 (7th Cir.2007) (quoting *Tellabs,* 551 U.S. at 314). Courts must also "take into account plausible opposing inferences." *Higginbotham,* 495 F.3d at 756 (quoting *Tellabs,* 551 U.S. at 323). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319. In the Seventh Circuit, "reckless disregard of the truth" qualifies as scienter.[6] *S.E.C. v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998). "[R]ecklessness in this context is 'an extreme

departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 704 (7th Cir.2008) (*"Makor II"* ). In considering allegations of scienter, a court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324. In describing whether an inference of scienter is "cogent" under the *Tellabs* inquiry, the Seventh Circuit has noted that the "plausibility of an explanation depends on the plausibility of the alternative explanations." *Makor II,* 513 F.3d at 711. "Thus, "[a]s more and more alternatives to a given explanation are ruled out, the probability of that explanation's being the correct one rises." *Id.* (citations omitted). Courts should not "scrutinize each allegation in isolation but ... assess all the allegations holistically." *Tellabs,* 551 U.S. at 326. While "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference ... the absence of a motive allegation is not fatal." *Id.* at 325.

6      The Supreme Court has reserved the question of whether "recklessness" may satisfy scienter in this context. *Matrixx,* 131 S.Ct. at 1309 ("Because Matrixx does not challenge the Court of Appeals' holding that the scienter requirement may be satisfied by a showing of "deliberate recklessness," we assume, without deciding, that the standard applied by the Court of Appeals is sufficient to establish scienter.").

### III. Information from Former Undisclosed Hospira Employees

 **\*17**  In the Complaint, Plaintiffs allege facts based upon information from undisclosed former Hospira employees. Defendants argue that the Court should "steeply discount" allegations based upon information from these undisclosed employees. In *Makor I, Higginbotham,* and *Makor II,* the Seventh Circuit addressed the extent to which plaintiffs may rely on confidential sources to satisfy the heightened pleading requirements of the PSLRA. In *Makor I,* the Seventh Circuit noted that if plaintiffs support their allegations with confidential sources, they "must ... describe their sources with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged,' or in the alternative provide other evidence to support their allegations." *Makor I,* 437 F.3d at 596 (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 25 of 118 PageID #:2429

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Cir.2000) (citation omitted)). The complaint, however, need not "provide 'name, rank, and serial number' for each of these sources." *Id.* In *Higginbotham,* which followed *Makor I* and *Tellabs,* the Seventh Circuit reasoned that the *Tellabs* "competing inference" analysis requires courts to "discount allegations that the complaint attributes to ...'confidential witnesses.' " *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 757 (7th Cir.2007) ("To determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals.") In *Makor II,* the Seventh Circuit clarified that a particularly troubling use of the confidential sources prompted the holding in *Higginbotham.* There, the plaintiffs described the witnesses "merely as three ex-employees of Baxter and two consultants" and sought to rely upon them exclusively to establish scienter. *Makor I,* 513 F.3d at 712.

Plaintiffs have sufficiently described their sources "to support the probability that a person in the position occupied by the source would possess the information alleged." *Makor I,* 437 F.3d at 596. For each undisclosed employee, Plaintiffs have provided the job title, duration of employment at Hospira, and a description of employee responsibilities. Unlike in *Higginbotham,* Plaintiffs rely upon the information from undisclosed sources to corroborate and particularize their allegations that Defendants' statements were misleading in light of the employees' observations and opinions regarding conditions at Hospira, rather than to allege a basis for the misleading nature of the statements that is otherwise absent from the Complaint. Thus, the Court will consider the allegations attributed to confidential witnesses and discount them as appropriate in determining whether Plaintiffs have alleged each false statement with particularity.

**IV. Alleging Statements or Omissions with Particularity**
Defendants argue that Plaintiffs have failed to satisfy the PSLRA requirement to plead allegedly false or misleading statements with particularity. Under the PSLRA, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4. With respect to whether Plaintiffs have sufficiently pled that the statement is false or misleading, "the relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.' " *Makor I,* 437 F.3d at 595. Although "[m]ere silence about even

material information is not fraudulent absent a duty to speak ... If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995). Moreover, "[t]he more important a fact would be to investors, the more likely its omission will mislead them." *Silverman v. Motorola, Inc.,* No. 07 C 4507, 2008 WL 4360648, at \*10 (N.D.Ill. Sept.23, 2008). In assessing whether a plaintiff has pled false or misleading statements with particularity, the Court must not consider allegations in "isolation," but instead must look to the complaint in its entirety. *Tellabs,* 551 U.S. at 322–23.

**\*18** The Court will consider each category of alleged false or misleading statements below.

**A. Failure to Disclose Rocky Mount's Facilities Were Nowhere Near "Operational Excellence"**
Plaintiffs allege that throughout the Class Period that Defendants made the following statements or descriptions connecting Project Fuel with "operational excellence":[7]

[7]  Although the Court concludes that other similar-sounding statements that Project Fuel was "really serving to transform the company" constitute puffery, Plaintiffs' specific allegations that Defendants accompanied these statements with references to either "driving quality," or Hospira's "reputation of quality," "meeting the highest levels of compliance with all of our products," and "very strong track record for quality and reliability," distinguish them in context and thus require a different analysis. (*Id.* ¶¶ 160, 163, 175, 178.)

(1) "We remain on track with our optimization program, which is designed to simplify our business and drive quality and operational excellence to obtain top-tier financial performance." (*Id.* ¶ 160.)

(2) Project Fuel was "[a]n aggressive enterprisewide optimization initiative we adopted to drive operational excellence and generate top financial performance." (*Id.* ¶ 163.)

(3) "We remain on track with Project Fuel and we are pleased with our progress on this organization wide optimization program. As many of you know, Project Fuel is designed to simplify our business and drive continuous improvement and operational excellence in order to obtain top tier financial performance." (*Id.* ¶ 175.)

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 26 of 118 PageID #:2430

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

(4) "[I]t really was about driving operational excellence, improving margins, driving additional cash flow ...." (*Id.* ¶ 178.)

Plaintiffs assert that these statements omitted material facts with respect to Hospira's Rocky Mount facility because "Rocky Mount's manufacturing operations were nowhere near 'operational excellence' but in fact suffered from serious issues with regard to quality control and deterioration of its facilities and equipment." (*Id.* ¶¶ 153(a), 171(a), 181(a), 191(a), 200(a), 211(a).)

In support of this argument, Plaintiffs allege that "Project Fuel's cutbacks" resulted in "quality and equipment failures, rejected products, production delays, and re-inspection delays." (Am.Compl.¶ 59.) Based upon information from a former Rocky Mount Quality Engineer, Plaintiffs contend that Rocky Mount was "constantly exceeding acceptable quality levels for broken glass because management 'had to make their numbers.' " (Am.Compl.¶ 62.) A former Rocky Mount Line Coordinator also identified a problem with mixing solutions that was "attributable to the mixing team either not having been properly trained or being understaffed for the mixing portion of the production process." (*Id.* ¶ 64 .) In addition, Plaintiffs allege that the Rocky Mount Quality Engineer noted that "there were 10% budget cuts 'across the board, and [q]uality was cut.' " (*Id.* ¶ 53.) Plaintiffs further contend, as supported by information from a former Rocky Mount Technician, that as a result of Project Fuel, Hospira "got rid of the quality people," which had the effect of shifting quality control responsibilities onto the "people running the line—the production folks." (*Id.* ¶ 54.) In turn, this allegedly altered Hospira's standard operating procedures ("SOPs"), such that they "specified how production personnel were now responsible for quality control inspections and doing checks of completed products." (*Id.*) Furthermore, Plaintiffs allege that the above statements made from February to March 2010 were misleading in light of Hospira's receipt of "failure to supply" penalties. (*Id.* ¶¶ 95–99.)

**\*19** Defendants argue that Plaintiffs have failed to allege with particularity that Defendants failed to disclose quality issues at Rocky Mount on two grounds: (1) Defendants disclosed the receipt of the FDA Warning Letters and Form 483s throughout the Class Period; and (2) Defendants disclosed both back orders at Rocky Mount and the receipt of "failure to supply" penalties. (Defs.' Mem. 33–34.) Plaintiffs, however, have alleged that Defendants failed to disclose in particular the effect of Project Fuel on Hospira's quality-control efforts by "reduc[ing] operating budgets and slash[ing] workforces" such that it "wreak[ed] havoc on Hospira's already declining quality control efforts, especially at Rocky Mount ." (Am.Compl.¶ 47.) Plaintiffs support these allegations with information from numerous former Rocky Mount employees connecting Project Fuel with deficiencies at Rocky Mount. (*Id.* ¶¶ 49–82.) Moreover, Plaintiffs have alleged that Rocky Mount was a significant plant for Defendants, accounting for 25% of Hospira's annual revenue. (*Id.* ¶ 38.) On the record before the Court and viewing the allegations in the light most favorable to the Plaintiffs, Plaintiffs have alleged with sufficient particularity that the alleged omissions regarding Project Fuel's impact on the Rocky Mount facility were misleading. *See Brasher v. Broadwind Energy, Inc.,* 11 CV 991, 2012 WL 1357699, at \*22 (N.D.Ill. Apr.19, 2012); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 401 (S.D.N.Y.2005) (holding plaintiffs satisfied particularity requirement with respect to statements "concerning the sources and significance of the revenue generated by VDM Specialists" where such statements "put the sources of VDM Specialists revenue at issue").

### B. Facilities and Equipment in "Good Operating Condition" and "Well–Maintained"

Next, Plaintiffs contend that the following statement, which appeared in both Hospira's 2009 and 2010 Form 10–Ks was false or misleading:

"Hospira believes that its facilities and equipment are in good operating condition and are well maintained." (*Id.* ¶¶ 145(b), 153(b), 195, 200(b).)

In support of this contention, Plaintiffs rely on Defendant Hardy's statements at the September 7, 2011 "Investor Day" event that Hospira's facilities were "aged" and "in need of a 'facelift,' " (*Id.* ¶ 221), as well as information from the Rocky Mount Quality Assurance Validation Engineer[8] "that Hospira failed to make necessary improvements at Rocky Mount because it was unwilling to spend the money to do so," including improvements to Rocky Mount's SOPs and its "archaic, DOS-based computer information system 'from the 80s.' " (*Id.* ¶ 84.) In addition, according to various former employees, the Rocky Mount facility had such problems as a leaking ceiling, mold in the asceptic room, defective dipsticks used to "measure mixtures of solutions in large vessels," a failed isolator used to fill glass vials used on a line that "produced roughly 115,000 to 120,000 units a day," as well as a failing depyrogenation tunnel "used to sterilize glass vials" to meet validation. (*Id.* ¶¶ 84, 86–91.) Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

have alleged with the requisite specificity that Defendants made false or misleading statements regarding the condition of Hospira's facilities. *See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Allscripts– Misys Healthcare Solutions, Inc.,* 778 F.Supp.2d 858, 879– 80 (N.D.Ill.2011); *Ross v. Career Educ. Corp.,* 12 C 276, 2012 WL 5363431, at *5 (N.D.Ill. Oct.30, 2012) (holding allegedly false statements regarding placement rates satisfied particularity requirement where plaintiffs "clearly identify the source of each particular allegation" and "explain[ ] in each paragraph of the complaint exactly which [confidential witness] reported what information").

8      Plaintiffs allege that the former Rocky Mount Quality Assurance Validation Engineer "worked for Hospira at its Rocky Mount plant from June of 2010 to December 2011" and "was responsible for quality engineering, including evaluating and remediating deficiencies in the quality assurance practices at Rocky Mount." In addition, they allege that the "former Rocky Mount Quality Assurance Validation Engineer was tasked with bringing the plant's validation program 'more in line' with 'what was seen in the industry' at that time." (Am.Compl.21n.13.)

### C. "Very Good Relationship" with the FDA

**\*20**  During the question-and-answer session of a February 4, 2010 conference call to discuss full-year 2009 financial results, Defendant Begley stated the following in response to questions as to "what extent ... FDA policy ke[pt] [him] up at night, given all the regulatory submissions [Hospira's] got pending?" and "what's the risk?":

First of all, we've got a very good relationship with the FDA, and we'll continue to work very closely with the FDA.... And so—and I think we are on top of it. And so I don't mean to put it aside, but it's not something that keeps me up at night. The organization here is very well aware of the importance of working with the FDA and changing as their requirements change. (*Id.* ¶ 144.)

Plaintiffs allege that the statement that Hospira "has a very good relationship with the FDA" was false or misleading notwithstanding Hospira's disclosure of its receipt of the August 2009 Warning Letter from the FDA in its 2009 Form 10–K. (*Id.* ¶ 144–45, 153(d).) Plaintiffs contend that the August 2009 Warning Letter stated that the violations addressed in it "may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems" and that "[Hospira] should investigate and determine the

causes of the violations, and take prompt actions to correct the violations and to bring your products into compliance ." (*Id.* ¶¶ 116, 120.) Plaintiffs also maintain that the April 2010 Warning Letter, which resulted from the FDA's January 2010 inspection of Rocky Mount noted the following: "[W]e are concerned about the length of time your firm has needed to develop and implement its Validation Prioritization Plan at the Rocky Mount Facility. You have been aware of our concerns regarding process validations since 2005." (*Id.* ¶ 109.) The word "relationship" is ambiguous, however, and these other allegations do not suggest that the relationship between Hospira and the FDA was poor. Thus, Plaintiffs have failed to allege these statements were false or misleading with sufficient particularity.

### D. "Systemic Issues"

On June 2, 2010, Begley participated in the Sanford C. Bernstein Strategic Decision Conference. (*Id.* ¶ 167.) With respect to the FDA and Hospira's regulatory issues, Begley stated that "[n]either of those are systemic issues to Hospira, and neither of those are systemic issues to the two plants either." (*Id.* ¶ 169.)

Plaintiffs allege that "contrary to Defendants assurances," the problems identified by the FDA were "systemic" because Project Fuel required "across the board sacrifices" throughout Hospira's manufacturing facilities. (*Id.* ¶ 171(e).) Additionally, Plaintiffs maintain that numerous quality issues "resulted in widespread production slowdowns as early as 2010." (*Id.* ¶ 95 .) To support these assertions, Plaintiffs rely upon information from undisclosed former Hospira employees who worked at different locations, including the Austin Production Supervisor, based in Austin, the former Accounting Manager, based in Lake Forest, Illinois, and other former employees of the Rocky Mount facility. (*Id.* ¶¶ 49–58.) Moreover, following the Class Period, Defendant Ball noted at an October 18, 2011 conference call that issues at Rocky Mount "had implications that were greater than anticipated" and that "[r]eceiving two 483s so close together was a clear signal that we were not making satisfactory progress to fully comply with the FDA's concerns and that we had to ramp up our remediation efforts." (*Id.* ¶ 235.) Specifically, Ball acknowledged that Hospira "did not anticipate the degree to which the production slowdown and resulting charges would impact performance through the rest of September" and lacked "visibility into the magnitude of the reversal in customer service levels." (*Id.* ¶ 234.) *Compare In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.,* 859 F.Supp.2d 572, 578 (S.D.N.Y.2012) ("Although the Complaint describes

all of these statements ... as 'false,' it does not allege any facts contradicting their veracity.") Accordingly, Plaintiffs have sufficiently plead with particularity under the PSLRA that the statements were false or misleading.

### E. Statements Regarding Hospira's Efforts to Address the FDA Warning Letters

**\*21** Defendants broadly challenge Plaintiffs' allegations that Defendants made false or misleading statements regarding Hospira's efforts to comply with the FDA Warning Letters. (Defs.' Mem. 28.) The Court will consider each category of statements below.

### 1. "Comprehensive Review of Manufacturing Operations," "[C]omplet[ing]" Responses to the Warning Letter, and "Roll[ing] [O]ut" Changes

Plaintiffs identify the following statements in this general category:

(1) "Hospira will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 157).

(2) "We think we have essentially completed all of the activities in the Clayton and Rocky Mount facilities that we outlined in our response to the warning letter from [the] FDA. At some point they'll be back in the facilities. There's not an official lifting of the warning letter as of—per se, but we fulfilled all of the things that we need to do essentially. (*Id.* ¶ 190.)

(3) "And more importantly or as important, we're beginning to roll those changes out globally to all of our facilities so that when [the] FDA shows up wherever and whenever, they should expect to see a very consistent approach to things across all Hospira facilities in the U.S. and globally." (*Id.* ¶ 190.)

Plaintiffs allege that these statements were false or misleading because Hospira's Rocky Mount facility "was plagued with deficiencies that were well known within Hospira in 2010 and only increased heading into 2011" and that "Hospira had not made any concerted effort to remediate the issues identified in the April 2010 Warning Letter until after it received the June 2011 Form 483 identifying 18 more problems at Rocky Mount." (*Id.* ¶ 121.) Among other allegations, Plaintiffs point to a former Rocky Mount Batch Release Specialist's description of a consultant's visit to Rocky Mount between January and March of 2011, in which the consultant gave

a powerpoint presentation entitled "something to the effect" of "10 Things in the Lab that Will Shut the Plant Down ." Subsequently, Rocky Mount's management allegedly "had 'harsh words' with the consultant. (*Id.* ¶ 122.) In addition, Plaintiffs allege that according to a former Rocky Mount Quality Assurance Validation Engineer, "it was not until after the FDA had issued the Form 483 in June 2011 that 'you heard a lot of talk about timelines' " and that "corporate vice presidents [were] sent to Rocky Mount after the June 2011 Form 483 to assist in dealing with the plant's quality issues." (*Id.* ¶ 123.)

Defendants argue that Plaintiffs fail to plead these allegations with particularity because "Plaintiffs' own 'confidential' witness allegations establish that Hospira was making an effort to address the FDA's concerns." (Defs.' Mem. 28.) Plaintiffs allege facts raising contrary inferences, however, such that, according to the former Rocky Mount Quality Assurance Validation Engineer, Hospira "only began to 'dabble' in remediation efforts" after the April 2010 Warning Letter and had no "sense of urgency." (*Id.* ¶ 124.) Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have satisfied the particularity requirement with respect to these statements. *See Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 821 (N.D.Ill.2000) ("We agree with KPMG that GAAP does provide for some flexibility in the timing of revenue recognition. However, drawing all reasonable inferences in favor of the plaintiffs ... they have sufficiently alleged that Sabratek's revenue recognition practices violated GAAP.").

### 2. "Tak[ing][FDA][M]atters [S]eriously" and "[W]orking [C]losely with the FDA"

**\*22** Similarly, Plaintiffs allege the following statements are misleading:

(1) "Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility." (*Id.* ¶ 183.)

(2) "The FDA's Warning Letters are publicly available on the FDA's website. Hospira takes all of these matters seriously and intends to respond fully, and in a timely manner, to the FDA's Warning Letters." (*Id.* ¶ 183.)

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 29 of 118 PageID #:2433

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Plaintiffs have failed to allege with particularity that these statements are false or misleading. Although these statements also concern Hospira's efforts to address the Warning Letters, the factual allegations Plaintiffs rely upon to establish that they are false or misleading are insufficient. With respect to the first statement, Plaintiffs fail to allege that Hospira did not recall products in response to the April 2010 Warning Letter. Furthermore, Plaintiffs fail to allege facts showing that Hospira did not "take[ ] seriously" the FDA Warning Letters. Like the statements concerning Hospira's "relationship" with the FDA, these statements are ambiguous, and Plaintiffs do not allege facts showing that Defendants did not intend to respond to the FDA's Warning Letters.

### 3. "Open Investigations" Trending Downward

During the question-and-answer portion of a February 2, 2011 conference call, Defendant Begley stated the following:

> Of what is a very, very low-level complaint, we now do a thorough root cause analysis on and come up with a fix for it. Then the expectation is to incorporate that fix across the whole product line. So you've seen a couple spikes like that, that have had a recent impact, but I don't see that occurring long term through the business and creating situations like we just had in Q4. And on the SIP overall, it's driven to the difficulty of us getting product out the door as efficiently as we used to, but as I talked about, we are beginning to see the light at the end of the tunnel there. And the key metric that we look at is our internal investigations and the number of open investigations we have and the aging of that. We review all of that data literally at my level weekly at the Thursday meeting, and there's people looking at the data on a daily basis, and all of those trends are downwards in each of our manufacturing plants, so that's a real positive sign. What it says is you are not opening up new investigations at all and the fact that the age is less says you're driving root cause more quickly and implementing those changes. I really believe a good piece of this is behind us as we move forward. (*Id.* ¶ 194).

Plaintiffs allege that Hospira knowingly or recklessly omitted to disclose that despite the fact that " 'open investigations' were in fact trending 'downwards,' " " " 'open investigations' at Rocky Mount, Hospira's largest facility, were actually ballooning throughout 2011." (*Id.* ¶¶ 194, 200(d).) Plaintiffs rely upon information from the former Rocky Mount Senior Production Supervisor, who described an increase in open investigations at Rocky Mount from between 8 and 10 to 45 or 50 per month. (*Id.* ¶ 101.) Plaintiffs allege, however, that the Rocky Mount Senior Production Supervisor "worked in the flexible container group" of Hospira and then "from February 2011 until his departure in November 2011 ... worked in the small volume unit in Rocky Mount's R2 building." (*Id.* at 33 n. 21.) Given that Begley made the above statement on February 2, 2011, and Plaintiffs have alleged that the Rocky Mount Senior Production Supervisor did not join Rocky Mount until February 2011, his observations are insufficient. Therefore, Plaintiffs have failed to satisfy the PSLRA particularity requirements for this statement.

### V. Puffery

**\*23** "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor I,* 437 F.3d at 596 (7th Cir.2006). If "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement is material." *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)). "[M]ateriality is typically an issue to be resolved by the finder of fact. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1333 (7th Cir.1995) (quoting *TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133). Thus, "[i]f the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.* at 596; *Searls,* 64 F.3d 1061, 1066 (7th Cir.1995) (describing puffery as a "devoid of any substantive information."). Because puffery "contains no useful information upon which a reasonable investor would base a decision" it is nonmaterial. *Id.* at 1066.

Defendants argue that "nearly all the alleged statements that Plaintiffs allege were fraudulent are immaterial puffery." (Defs.' Mem. 24.) Defendants identify the following kinds of statements as examples of puffery:

> (1) "Hospira believes that its facilities and equipment are in good operating condition and are well maintained." (Am.Compl.¶¶ 145, 195)

> (2) "We believe [Project Fuel] is really serving to transform the company." (*Id.* ¶ 149.)

> (3) Hospira is "working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products." (*Id.* ¶ 178.)

(4) "Hospira aims to achieve a culture of continuous improvement that will enhance its efficiency, effectiveness and competitiveness and substantially improve its cost base." (*Id.* ¶¶ 202, 213.)

(5) Hospira is "redoubling [its] commitment to quality" and "raising the bar internally." (*Id.* ¶¶ 159, 175.)

The Court will consider each of the statements that Defendants argue are puffery below.

### A. *"Hospira believes that its facilities and equipment are in good operating condition and are well maintained."*

This statement appeared in the Hospira 2009 and 2010 Form 10–Ks filed with the SEC on September 18, 2010 and February 16, 2011. The Form 10–Ks also contained statements that Hospira had "developed definitive action plans" in response to "notices from regulatory authorities alleging violations of applicable regulations and standards." (*Id.* ¶¶ 145, 195.) The 2009 Form 10–K also acknowledged that Hospira had initiated voluntary recalls to address the issue. (*Id.* ¶ 145.)

Viewing the statement in the context of the "total mix" of information, it does not amount to puffery as a matter of law. First, as the statement specifically refers to the present condition of Hospira's facilities and equipment, it is different from a vague aspiration or "indefinite prediction." *Searls,* 64 F.3d at 1066–67 (noting "indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact"); *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993) (distinguishing "[p]redictions of future growth" from "expressions of belief or opinion concerning current facts" "because [predictions of future growth] will almost always prove to be wrong in hindsight.") Moreover, Plaintiffs allege that the statement was made in Hospira's 10–Ks, which also mentioned Hospira's receipt of warning letters identifying quality-control issues at Hospira's facilities. Thus, notwithstanding the generality of the statement, given the context, it is not so lacking in specificity or unconnected from other facts that the Court may conclude at this stage that the statement is entirely "devoid of any substantive information." *Searls,* 64 F.3d at 1066; *see also Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir.2000) (noting defendants statements that "the inventory situation was 'in good shape' or 'under control' were not puffery).

### B. *"We believe [Project Fuel] is really serving to transform the company."*

**\*24** In context, this particular statement, which describes Project Fuel as "transforming" Hospira in terms of "support[ing] further long-term growth" and "consistent, sustainable shareholder value performance," is too vague to constitute material information. (*See* Am. Compl. ¶ 149.) Rather, the statement is the type of "rosy affirmation" that public companies regularly use to describe their initiatives. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217, *abrogated on other grounds by statute* (1st Cir.1996) (holding statements that DEC was "basically on track," and that spokesperson was "confident that DEC was pursuing the right strategy" were immaterial puffery); *see also In re Ford Motor Co. Sec. Litig., Class Action,* 381 F.3d 563, 570 (6th Cir.2004) ("All public companies praise their products and their objectives."); *Allscripts–Misys,* 778 F.Supp.2d at 872 (holding statement "regarding Version 11 and its contribution to helping Allscripts become the 'Bloomberg of healthcare' " immaterial puffery). Similarly, the statements that Project Fuel has "positioned the Company for sustained growth" and "optimized [Hospira's] operations and refined [Hospira's] culture," as well as those describing the plan as a "corporate wide optimization initiative to drive long-term profitable growth and increased shareholder value" are devoid of substantive factual material and constitute puffery.[9] (*See* Am. Compl. ¶¶ 189, 166, 143.)

9    In the alternative, Defendants argue that the PSLRA safe-harbor for forward-looking statements protects these statements. (Defs.' Mem. 35.) Because the Court concludes that these statements are puffery, the Court need not reach this argument.

### C. Hospira is *"working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products."*

This statement does not constitute puffery as a matter of law. Like the statement regarding the condition of Hospira's facilities, this statement, while general in nature may in context alter the total mix of information for a reasonable investor. Plaintiffs allege that Defendant Werner made the statement at a Specialty Pharmaceuticals Conference, in which he allegedly referenced Hospira's "very strong track record for quality and reliability." (*Id.* ¶ 178.) Notably, Plaintiffs allege the statement was made shortly after the release of Hospira's second-quarter 2010 financial results on July 28, 2010 and that analysts "reacted positively" to the

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 31 of 118 PageID #:2435

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

results. (*Id.* ¶ 177.) *See Desai v. Gen. Growth Props., Inc.,* 654 F.Supp.2d 836, 854 (N.D.Ill.2009). Therefore, at this stage, the Court cannot conclude that the statement constitutes puffery as a matter of law. *See In re Spiegel, Inc. Sec. Litig.,* 382 F.Supp.2d 989, 1028 (N.D.Ill.2004).

### D. *"Hospira aims to achieve a culture of continuous improvement that will enhance its efficiency, effectiveness and competitiveness and substantially improve its cost base."*

Similar to the statement regarding Project Fuel's "transformation" of Hospira, this statement is devoid of substantive factual matter. Even accounting for the context, the phrase "culture of continuous improvement" is an expression of corporate optimism that "so clearly constitut[es] the opinions of the speaker" such that a reasonable investor would not consider it material. *In re Ford Motor Co. Sec. Litig., Class Action,* 381 F.3d 563, 571 (6th Cir.2004) (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996)).

### E. *"Redoubling Commitment to Quality"* and *"Raising the Bar Internally"*

**\*25** Plaintiffs contend throughout their Complaint that various statements about Hospira "raising the bar internally" and "redoubling commitment to quality" are material. (*See* Am. Compl. ¶¶ 159, 175.) Similarly, these statements' "lack of specificity precludes [them] from being deemed material." *See Searls,* 64 F.3d at 1066; *Anderson v. Abbott Laboratories,* 140 F.Supp.2d 894, 905 (N.D.Ill.2001), *aff'd sub nom. Gallagher v. Abbott Laboratories,* 269 F.3d 806 (7th Cir.2001) (noting statements about "unquantified growth are classic puffery").

## VI. Scienter

Plaintiffs allege the following bases for Defendants' scienter: (1) Defendants' stock sales; (2) Defendants' alleged misleading statements themselves; and (3) Defendants' participation in meetings and receipt of reports regarding Hospira's remediation efforts. While considering the allegations in the Complaint as a whole, the Court will describe each set of allegations separately.

First, Plaintiffs allege that Begley's and Werner's stock transactions during the Class Period constitute evidence of scienter. Plaintiffs allege that Defendants "were motivated to artificially inflate Hospira's stock price during the Class

Period in order to line their own pockets with the proceeds of insider stock sales." (Am.Compl.¶ 269.) Specifically, Plaintiffs contend that Begley sold "roughly 64% of his share holdings" in June 2010 when the share price was "near its Class Period high." (*Id.* at ¶ 269.) Similarly, Plaintiffs allege that Werner, "beginning in June 2010 and continuing through early 2011" sold "over 86% of his stock holdings." (*Id.* at ¶ 270.) Because "neither Defendant Begley nor Defendant Werner sold any Hospira stock in the five years prior to the start of the Class Period ... [these sales] were thus unusual and suspicious in both timing and amount." (*Id.* at ¶ 271.) Additionally, according to Plaintiffs, Defendants were "motivated to hide the true scope of the Company's operational troubles and thereby keep Hospira's market value artificially inflated so that they could successfully raise $500 million in a September 2010 debt offering." (*Id.* at ¶ 272.)

Next, Plaintiffs argue that "the fact that Defendants made false and misleading statements ... itself supports a strong inference of scienter." (Pls.' Mem. 32.) ("Simply put, an inference can be made that Defendants knew of what they spoke.")

Finally, Plaintiffs rely on their allegations regarding Defendants' monitoring of Hospira's remediation efforts through meetings and reports to support scienter. (Pls.' Mem. 33.) Specifically, Plaintiffs allege that "Defendant Begley called weekly management meetings to review Hospira's progress in its Company-wide remediation efforts." (Am.Compl.¶ 128.) During the second-quarter 2010 earnings call on July 28, 2010, Begley explained that at such weekly meetings he would "review[ ] the progress on the plan, not only for Clayton and Rocky Mount, but the status of [Hospira's] initiatives across all of our manufacturing plants." (*Id.*) Defendants also "held weekly management meetings every Thursday morning that included all plant-level quality control managers." At the fourth-quarter and full-year 2010 earnings call on February 2, 2011, Begley noted at the meetings that the "senior leadership team" would discuss "inventory and related issues with "every plant manager and plant quality control manager from around world." (*Id.* ¶ 129.) Furthermore, Plaintiffs allege that Defendants held " 'Town Hall meetings in which the Company's top executives discussed, among other things, ongoing issues with the FDA." (*Id.* ¶ 130.)

**\*26** Plaintiffs have sufficiently alleged scienter under the PSLRA regarding Defendants' statements that Hospira's plants were "in good operating condition" and "well-maintained," statements that Hospira's regulatory issues were

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 32 of 118 PageID #:2436

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

not "systemic," those statements regarding Hospira's efforts to address the FDA Warning Letters that Plaintiffs have alleged with particularity, and the alleged failure to disclose Rocky Mount's facilities were "nowhere near operational excellence." Defendants' participation in various meetings on Hospira's remediation efforts support the inference that they were aware of the quality-control issues at Rocky Mount and other Hospira facilities. Although allegations that executives attended meetings or received reports on a problem do not exclusively support an inference of scienter, *see Zimmer,* 679 F.3d 952, 955 (upholding lack of scienter where plaintiffs allegations included that executives "attended meetings at which quality issues were discussed"), the circumstances allegedly surrounding these particular meetings merits pause. Plaintiffs allege that Begley called weekly management meetings "to review Hospira's progress in its Company-wide remediation efforts" and that management met with "every plant manager and plant quality control manager from around world" to discuss "inventory and related issues." (Am.Compl.¶¶ 128, 129.) Viewing the facts as alleged in the light most favorable to Plaintiffs, these meetings were not routine, but specifically directed to addressing Hospira's remediation and quality control issues at its various facilities. Moreover, Plaintiffs allege that the August 2009 Warning Letter advised Defendants that "certain identified issues may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems." (*Id.* ¶ 127.) *See Allscripts–Misys Healthcare Solutions,* 778 F.Supp.2d at 885 (N.D.Ill.2011).

Plaintiffs' allegations respecting Hardy's statement at the close of the Class Period that Hospira had inherited "aged" facilities, combined with the allegations noted above, also raises an inference that Defendants' prior statements about the facilities being in "good condition," if indeed false, were made with knowledge or recklessness toward their falsity. In addition, Plaintiffs allege that between January and March of 2011, Begley "received a presentation from a well-respected consultant that addressed the Company's quality problems" and that Begley met personally with the FDA "as part of the Company's response to the April 2010 Warning Letter." (Am.Compl.¶¶ 133–34, 136.) These allegations raise an inference that is at least, if not more, compelling than the inference that Defendants made these statements without scienter. Indeed, if the statements as to the condition of Hospira's facilities were in fact false or misleading, it is difficult to imagine a non-culpable explanation as to how Defendants, given their monitoring of Hospira's plants in connection with Hospira's remediation efforts and quality-control problems, could have made the statements without scienter.

**\*27** Nor do Defendants' disclosures on conference calls of the existence and purpose of such meetings significantly undercut the inference of scienter. While the disclosures of the meetings addressed to Hospira's quality-control issues may weigh against the conclusion that the statements were misleading, they are not dispositive of the issue as to whether, if such statements were misleading, Defendants knew or recklessly disregarded these facts.

Defendants argue that *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,* 679 F.3d 952, 954 (7th Cir.2012), which analyzed scienter in the context of similar allegations, forecloses the inference of scienter. In *Zimmer,* the plaintiff contended that Zimmer fraudulently "delayed revealing quality-control problems at its plant" and failed to use lower estimates in reflecting the impact of the suspension and recall of certain products on earnings. The Seventh Circuit rejected the plaintiff's argument that a medical-device company made a false statement and that the statement was made with scienter when the company, in taking a device temporarily off the market, attributed the device's failure rate to improper surgical technique rather than poor design quality. *See Zimmer,* 679 F.3d at 954. The Seventh Circuit noted that because "[c]orporate executives who know that one group of surgeons experiences success, and another group failure ... could believe that the different outcomes had been caused by differences in the way the surgeons had implanted the device," the plaintiff failed to establish an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *See Zimmer,* 679 F.3d at 955.

*Zimmer,* however, is distinguishable from this case given the alleged omission regarding the extent of Project Fuel's impact as a cost-cutting measure on Rocky Mount for several reasons. First, in *Zimmer,* the Seventh Circuit noted that the fact that the alleged misstatement concerned "one plant and one product that together produced less than 10% of the firm's income" undermined the inference of scienter. *See id.* at 956. Here, Plaintiffs allege that Defendants' failure to disclose the extent of Project Fuel's impact as a cost-cutting measure on Rocky Mount in particular is misleading because Rocky Mount was Hospira's largest facility and the "crown jewel" of Hospira. (Am.Compl.¶ 38.) Because of the alleged importance of Rocky Mount to Hospira, the inference is stronger in these circumstances than in *Zimmer*

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 33 of 118 PageID #:2437

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

that if the Defendants omitted material facts with respect to Project Fuel's impact on Rocky Mount, they did so knowingly or with reckless disregard toward this risk. *Makor II,* 513 F.3d at 711 (noting that where the alleged false statements concerned the "company's key products" it was "exceedingly unlikely" that the CEO was "unaware of the problems" in light of alternative explanations). Second, in *Zimmer,* the relationship between the gravity of the alleged problem and statements allegedly hiding it is different than in this case. There, the Seventh Circuit noted that despite the company's temporary recall of the product, ultimately "the Food and Drug Administration ... never concluded that the Durom Cup was defectively designed or made, indeed never even issued a warning or caution concerning the Durom Cup." *Zimmer,* 679 F.3d at 955. Here, Plaintiffs allege that Project Fuel's cost-cutting over the course of the Class Period exacerbated the problems at Rocky Mount and "left Hospira understaffed and unable to perform necessary quality control to ensure the safety of its products, plant, and equipment." (Am.Compl.¶ 115.) In support of this allegation, Plaintiffs further point to the FDA's issuance of Form 483s in June and August of 2011 identifying failures that Plaintiffs allege "at least in part, appear to be the result of Project Fuel related cuts." (Am.Compl.¶¶ 104–116.) Accordingly, the differences in the magnitude, timing, and nature between the alleged misstatements and the supporting allegations in *Zimmer* and those Plaintiffs identify here raise different inferences in the scienter analysis.

**\*28** Viewing the allegations in the Complaint as a whole and in the light most favorable to the Plaintiffs, Plaintiffs have raised an inference of scienter that is at least as compelling as any opposing inference that, if in fact these specific statements were false or failed to disclose material facts, this risk "was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Makor II,* 513 F.3d at 704.

**VII. Section 20(a) Claims for Control Person Liability**

Plaintiffs allege Defendants are liable under Section 20(a) of the Exchange Act. Defendants seek to dismiss the "control-person" claim on the ground that Plaintiffs have failed to allege a primary securities fraud violation. Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ..., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *see also Janus,* 131 S.Ct. at 2304. In order to state a Section 20(a) claim, Plaintiffs must allege the following: (1) a primary securities violation; (2) each of the Defendants exercised general control over the operations of Hospira; and (3) each of the Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992).

Because Plaintiffs have pled a primary securities violation as to those statements for which they have sufficiently alleged with particularity both that the statement is false or misleading and scienter, and Defendants have not challenged Plaintiffs' Section 20(a) claims on any other grounds, the Section 20(a) claim stands as to those statements. Conversely, with respect to the other allegedly false or misleading statements for which Plaintiffs have failed to plead a primary securities law violation, Plaintiffs' Section 20(a) claim fails. *See Pugh,* 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws.").

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss without prejudice and grants Plaintiffs' Motion to Strike.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 566805, Fed. Sec. L. Rep. P 97,287

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

City of Sterling Heights Police & Fire Retirement System..., Not Reported in...

2015 WL 1478565

2015 WL 1478565
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

CITY OF STERLING HEIGHTS POLICE
& FIRE RETIREMENT SYSTEM, Plaintiff,
v.
KOHL'S CORPORATION, Kevin Mansell,
and Wesley S. McDonald, Defendants.

No. 13–C–1159.
|
Signed March 31, 2015.

**Attorneys and Law Firms**

Anne M. Plichta, K. Scott Wagner, Andrew G. Frank, Hale & Wagner SC, Milwaukee, WI, David A. Rosenfeld, Joseph F. Russello, Mario Alba, Jr., Robert Rothman, Samuel H. Rudman, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiff.

Andrew C. Gilman, Matthew Alexander Schwartz, Robert J. Giuffra, Jr., Sullivan & Cromwell LLP, New York, NY, Howard A. Pollack, John L. Kirtley, Godfrey & Kahn SC, Milwaukee, WI, for Defendants.

DECISION AND ORDER GRANTING MOTION TO STRIKE (DOC. 50), DENYING WITHOUT PREJUDICE MOTION TO DISMISS (DOC. 43), AND SETTING STATUS CONFERENCE

C.N. CLEVERT, JR., District Judge.

**\*1** Various shareholders of Kohl's Corporation filed this securities lawsuit against the corporation and two of its officers concerning alleged devaluation of shares after the company disclosed that its accounting for lease agreements had not complied with Generally Accepted Accounting Principles. The City of Sterling Heights Police and Fire Retirement System filed this case; however, the Pension Trust Fund for Operating Engineers later was appointed lead plaintiff. Following its appointment as lead plaintiff, the Pension Trust Fund filed an Amended Complaint, which is the operative pleading at this time.

The Amended Complaint raises two causes of action against defendants. First, it asserts violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b–5. Section 10(b) of the Act provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Second, the Amended Complaint alleges violations of § 20(a) of the Securities Exchange Act of 1934, which states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

Kohl's, Kevin Mansell, and Wesley McDonald moved to dismiss under Fed.R.Civ.P. 12(b)(6). Defendants attached twenty-seven exhibits to a declaration of counsel in support of their motion to dismiss the Amended Complaint. (See Docs. 45–47). The exhibits total about 500 pages. Plaintiffs filed a brief opposing the motion to dismiss and, by separate motion and brief, asked the court to strike many of defendants' submitted documents.

MOTION TO STRIKE

Generally, Rule 12(b)(6) and (c) motions focus on the allegations in the complaint. Under Fed.R.Civ.P. 12(d), the district court may exclude documents submitted with a Rule 12(b)(6) or (c) motion to dismiss or treat the motion as one for summary judgment. But exceptions to the rule exist for documents that should be considered part of the pleadings and those that the court can judicially notice.

Documents submitted with a motion to dismiss may be considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to a claim. *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir.2002); *see also Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002). This rule prevents parties from surviving a motion to dismiss by

City of Sterling Heights Police & Fire Retirement System..., Not Reported in...
2015 WL 1478565

artful pleading or by failing to attach relevant documents to the complaint. *188 LLC,* 300 F.3d at 735. The exception is narrow; it is aimed at situations in which a plaintiff quotes from a document or the case requires interpretation of an unattached contract, for instance. *Tierney,* 304 F.3d at 738. "It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment...." *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998).

**\*2** The court may take judicial notice of facts that are not subject to reasonable dispute because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Judicial notice "is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997). However, the device "merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts." *Id.*

Plaintiffs move to strike Exhibits 3, 9, 12, 19, 20, 21, 22, 23, 24, 25, 26, and 27[1] in their entirety. Moreover, they move to strike portions of Exhibits 2 and 7.[2] In addition, they ask the court to strike those portions of defendants' briefs filed in support of the motion to dismiss that discuss or rely upon the challenged exhibits.

[1]     All exhibits referenced with respect to plaintiffs' motion to strike are attached to Documents 45, 46, and 47 of the record.

[2]     Plaintiffs do not challenge the remaining exhibits.

Defendants contend that the motion to strike is procedurally improper. Civil L.R. 7(i) provides that any motion not authorized by the Federal Rules of Civil Procedure or local rules or court order must be accompanied by a motion requesting leave to file it, and plaintiffs did not seek permission under Civil L.R. 7(i) to file their motion to strike. Further, motions to strike are generally disfavored. *See* Civil L.R. 56(b)(9) (stating that regarding summary judgment motions, collateral motions such as motions to strike are disfavored). In addition, defendants contend that by briefing the motion to strike plaintiffs have expanded their page limitations, as they should have addressed the documentation issues within the confines of the brief in opposition.

Nevertheless, the court will consider the motion to strike. Defendants' submission of 500 pages of documentation raised the court's concerns as to whether defendants seek summary judgment rather than a Rule 12(b)(6) ruling. The court would have scrutinized defendants' submissions even without a motion to strike. Further, it is true that Fed.R.Civ.P. 12(f) permits motions to strike from *pleadings* "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." But to the extent defendants justify their submissions on the incorporation doctrine (i.e., that the documents should be considered part of the pleadings because they are referred to in the plaintiff's complaint and central to a claim), Rule 12(f) seems to apply. And to the extent defendants argue judicial notice, "a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed.R.Evid. 201(e). Finally, though plaintiffs' motion may, for practical purposes, allow them to exceed the page limits to discuss the use of the submitted documents, defendants' opposition brief on the motion to strike evens out any page-limit concerns.

**\*3** Defendants' documentary submissions are rejected for several reasons. First, the Declaration of Robert J. Giuffra, Jr. is insufficient to authenticate them. Affidavits and declarations must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify about the matter. *See* Fed.R.Civ.P. 56(c)(4). Giuffra states that he is admitted to practice in this district and is a member of the law firm Sullivan & Cromwell LLP, counsel to the defendants. He swears that the documents he attached to the declaration are true and correct copies. (See Doc. 45 at 1.) However, these attestations fail to describe any personal knowledge concerning the attachments. What personal knowledge does he have to swear to the analysts' reports, for instance? Where did he get them? Are they publicly available? How can he vouch that they are true and correct copies of the originals? Similarly, how does he have personal knowledge of McDonald's 10b5–1 trading plans, which reference what is said to be contracts between McDonald and the Charles Schwab firm? Where did he find the letter from the chief accountant of the Securities Exchange Commission?

Second, the submitted documents are not incorporated in the Amended Complaint. For instance, the analyst reports are neither mentioned nor central to plaintiffs' claims, which concern alleged misrepresentations regarding lease accounting and internal procedures. Defendant cites three

City of Sterling Heights Police & Fire Retirement System..., Not Reported in...
2015 WL 1478565

places within the Amended Complaint where the reports are referenced. (Doc. 52 at 26 (citing Doc. 42, ¶¶ 25, 93, 162).) However, none of the allegations rely on such reports or specifically mention them. Paragraph 25 of the Amended Complaint states that the individual defendants controlled Kohl's reports and information provided to securities analysts. (Doc. 42, ¶ 25.) Paragraph 93 states that Kohl's provided information to analysts. (Doc. 42, ¶ 93.) And paragraph 162 states that analysts from major brokerage firms wrote reports on Kohl's and made them publicly available. (Doc. 42, ¶ 162.) That the defendants provided information to analysts and that analysts generally wrote reports in no way incorporates the specific analyst reports submitted with the motion to dismiss. None of the references in the Amended Complaint imply that the analyst reports attached to defendants' motion to dismiss are central to plaintiff's claims. And if the analyst reports are not incorporated in the Amended Complaint, defense counsel's summary of the reports surely is not.

The argument that the Amended Complaint incorporated the 10b5–1 trading plan rests on a single paragraph in the Amended Complaint (see Doc. 52 at 17) stating in part: "to the extent that any of the Individual Defendants' sales took place pursuant to a Rule 10b5–1 trading plan, they consciously or recklessly disregarded adverse information concerning the Company's erroneous lease accounting practices, and the conformity of its financial statements with GAAP, to allow their sales to take place as scheduled." (Doc. 42, ¶ 157). This allegation does not rely on any trading plans. Neither within this paragraph nor elsewhere in the Amended Complaint do plaintiffs ever explicitly reference either of the two specific 10b5–1 plans submitted as Exhibit 25. The Amended Complaint simply states that *if* a plan existed, defendants acted consciously or recklessly. McDonald's 10b5–1 trading plans are not incorporated within the Amended Complaint.

**\*4** Defendants argue that proxy statements for the years 2009, 2010, 2011, and 2012 are incorporated in the Amended Complaint, but the Amended Complaint does not cite or reference the proxy statements.

Certain allegations in the Amended Complaint may contain similar or identical to information within the Form 4s submitted by defendants. (*Compare* Doc. 42, ¶¶ 155–57 *with* Doc. 47, Ex. 24.) However, it is not clear from the pleadings whether plaintiffs used the Form 4s as the source of their information. Nothing in the Amended Complaint suggests that plaintiffs relied on the Form 4s to form the basis of any claim. *See In re Shopko Sec. Litig.,* No. 01–C–1034,

2002 U.S. Dist. LEXIS 23887, *3–*5, 2002 WL 32003318 (E.D.Wis. Nov. 5, 2002) (Adelman, J.) (declining to consider as incorporated documents that did not supply the source for a Rule 10b–5 claim but only evidence in support or denial of such a claim).

Third, several of the challenged submissions go beyond what can be judicially noticed. Counsel's summary of the analyst reports, chart of beneficial ownership, and chart of dispositions of Kohl's stock (Exs.9, 22, 23) are not items that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The court cannot be confident that errors did not occur in summarizing the information or that the summaries include all information the plaintiffs or the court would find pertinent. Additionally, the court is unable to find that the analyst reports are beyond reasonable dispute. As documents, the reports are not facts generally known and whose accuracy cannot reasonably be questioned. It may well be that the reports are publicly available and reliably produced, but that is not self-evident. At trial the court would expect a party to authenticate such a document and explain its production.[3]

[3] Defendants may be correct that they do not offer the reports for the truth of what they state but rather to show what information the public may have been aware of during the relevant time period. (*See* Doc. 44 at 13–15, 34). Nevertheless, the defendants fail to persuade the court that judicial notice of the reports is proper.

And fourth, even though the court could judicially notice the existence of some documents (such as Forms 10–K, 10–Q, 8–K, and 4 that Kohl's filed with the SEC) and what they say, the content of the documents cannot be used for the truth of the matters asserted (as defendants use them in their motion to dismiss). *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.,* No. 11C8332, 2013 U.S. Dist. LEXIS 19156, *35–*38, 2013 WL 566805 (N.D.Ill. Feb. 13, 2013) (St.Eve, J.) (discussing cases and concluding that the court may take judicial notice of the fact that proxy statements exist and contain certain statements, but not the truth of the statements themselves); *In re Shopko Sec. Litig.,* 2002 U.S. Dist. LEXIS 23887, at *5–*7, 2002 WL 32003318 ("Courts have taken judicial notice of SEC filings and considered them in ruling on motions to dismiss. However, in these cases, the courts did not consider the SEC filings for the truth of the defendants' disclosures asserted therein; they considered them only to determine what disclosures defendants made." (citations omitted)).

City of Sterling Heights Police & Fire Retirement System..., Not Reported in...
2015 WL 1478565

The *New York Times* article (Ex. 12) is the clearest offender here. Defendants cite the article as evidence that a market-wide decline (rather than Kohl's announcement of accounting errors) caused a decrease in Kohl's stock value. In their brief, defendants state: "Kohl's August 4, 2011 share price decline occurred in conjunction with a broader market downturn caused by concerns of the sovereign debt crisis in Europe, the potential downgrade of the U.S. credit rating, and the general weakness of the U.S. economy." (Doc. 44 at 34.) The statements within the article are subject to reasonable dispute; the court has no basis for knowing whether the author's assessment of the market was accurate or disputed by knowledgeable persons. The possible causes of stock market decline or Kohl's stock-price decline as discussed in the article are *not* capable of accurate and ready determination.

**\*5** In *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344 (7th Cir.1995), the Seventh Circuit refused to take judicial notice of a company's annual report because "the fact in question ... was not capable of accurate and ready determination by resort to the [filing]." *Id.* at 1355. The court determined judicial notice was improper because "indisputability is a prerequisite" and the facts were in dispute. *Id.* at 1354. Defendants' attempt to use proxy statements and other SEC filings here makes this case analogous to *Hennessy.* Defendants use the proxy statements, for instance, for the truth of their contents, to establish the amount of Kohl's stock holdings of the individual defendants. (See Doc. 44 at 21–26). Moreover, plaintiffs contest the accuracy of the information within the documents. The information within the proxy statements was reported by defendants to the SEC; there is no way for the court to accurately and readily determine at this time whether that information as reported was correct.

Similar to the proxy statements, defendants attached SEC Form 4s for the relevant time period. The Form 4s reflect Kohl's reporting of securities transactions. For reasons similar to those for the proxy statements, it is improper for the court to consider the contents for their truth. Defendants cite the Form 4s not to show what they say, but instead to show that defendants bought or sold an amount of stock during the class period. (See Doc. 44 at 21–26). Plaintiffs have not had the opportunity to engage in discovery to disprove these numbers. Kohl's personnel reported those amounts, and it is impossible at this stage of the case for the court to determine whether they are correct.

Defendants seek to use McDonald's 10b5–1 trading plans for the truth of their contents and for what is said. (See generally Doc. 44). But there is nothing indicating that these documents are available to the public or allowing the court to readily determine whether the documents are authentic and their contents are true.

Defendants attached documents relating to a program for Kohl's to repurchase stock from its stockholders. Defendants seek to use the exhibits to establish that Kohl's announced the repurchase program, the terms of the announcement, and the total amounts of stock that were eventually bought. (See Doc. 44 at 30). To establish the third point, the court must accept the truth of what the documents say. But the truth of such facts is not readily and accurately determined; it is impossible for the court to know from these SEC forms whether stock was eventually purchased following the announcement.[4]

4    The court notes that the copy of the letter sent from the SEC's chief accountant to the chairman of the American Institute of Certified Public Accountants may be subject to judicial notice. Defendants seek to show a change in accounting guidelines and offer the letter for what it says rather than for its truth, and plaintiffs do not dispute the authenticity of the letter. (See Doc. 51 at 16–18.) Moreover, the letter appears to be publicly available based on the website address printed on it. However, as set forth above, Giuffra's affidavit is insufficient regarding the letter's origins.

For all of these reasons, the motion to strike will be granted. All submitted exhibits will be disregarded and the court will disregard all references to them in the defendants' briefs.

MOTION TO DISMISS

Striking the portions of the defendants' briefs referencing the exhibits is problematic, as defendants rely so heavily upon them. Defendants say their statement of facts was drawn from their exhibits *and* the Amended Complaint (Doc. 44 at 4 n. 1), but a review of the citations in their statement of facts reveals that all but a handful are to their exhibits (*see id.* at 4–14). Unsurprisingly, much of their argument relies on the exhibits as well. Because the stricken portions of defendants' brief are so prevalent, the court cannot consider the motion as presently briefed.

**\*6** Motions to dismiss, even in Private Securities Litigation Reform Act cases, must focus on the allegations in the

**City of Sterling Heights Police & Fire Retirement System..., Not Reported in...**

2015 WL 1478565

complaint rather than on documents that essentially convert the motion into one for summary judgment. Because the defendants' motion to dismiss depends so heavily on documentary support that the court is striking, the motion to dismiss as briefed must be denied.

AMENDED COMPLAINT

The court has ongoing concerns about the prolixity of the Amended Complaint—sixty-one pages, with 173 numbered paragraphs. *See UPS Store, Inc. v. Hagan,* No. 14cv1210, 2015 U.S. Dist. LEXIS 36971, 2015 WL 1456654 (S .D.N.Y. Mar. 24, 2015) (addressing a 175–paragraph complaint and 1263–paragraph amended answer). Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The Amended Complaint is repetitive in many respects. Allegations regarding the adjustments and restatements of financial information could have been more concise, block quotes could have been shortened, and repetitive quotations from the Form 10–Qs might have been avoided. In the event defendants choose to answer the Amended Complaint rather than filing a new motion to dismiss, the court wishes to avoid an equally lengthy answer. Consequently, before defendants answer the Amended Complaint, *see* Fed.R.Civ.P. 12(a)(4),

the parties must attend a conference to discuss pleadings and further proceedings in this case.

CONCLUSION

Therefore,

IT IS ORDERED that plaintiffs' motion to strike (Doc. 50) is granted.

IT IS FURTHER ORDERED that defendants' motion to dismiss (Doc. 43) is denied without prejudice.

IT IS ORDERED that the parties participate in a status conference set for April 29, 2015, at 3:00 p.m., in Courtroom 222, 517 E. Wisconsin Avenue, Milwaukee, WI 53202. The parties are to notify the court within two weeks regarding whether out-of-town counsel will participate in the status conference. If so, the conference may be conducted by telephone at the parties' request.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1478565

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 39 of 118 PageID #:2443

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

2011 WL 1303387
United States District Court,
N.D. Illinois,
Eastern Division.

GARDEN CITY EMPLOYEES'
RETIREMENT SYSTEM, and
Indiana Laborers Pension Fund,
Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,
v.
ANIXTER INTERNATIONAL, INC.,
Robert J. Eck, Dennis J. Letham
and Robert Grubbs, Defendants.

No. 09–CV–5641.
|
March 31, 2011.

**Attorneys and Law Firms**

Debra J. Wyman, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Lori Ann Fanning, Marvin Alan Miller, Matthew E. Van Tine, Miller Law LLC, Amelia Susan Newton, Heidi E. Vonderheide, Leigh R. Lasky, Norman Rifkind, Lasky & Rifkind, Ltd., Chicago, IL, Sarah R. Holloway, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs.

David J. Bradford, Daniel J. Weiss, Howard Steven Suskin, Marc David Sokol, Jenner & Block LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

ROBERT M. DOW, JR., District Judge.

 **\*1** Garden City Employees' Retirement System and Indiana Laborers Pension Fund ("Plaintiffs") bring this putative class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired the common stock of Anixter International Inc. ("Anixter" or the "Company") between January 29, 2008 and October 20, 2008, inclusive. On November 17, 2009, this Court appointed Indiana Laborers

Pension Fund as Lead Plaintiff [36], and on January 6, 2010, Plaintiffs filed an amended complaint [39]. Before the Court is Defendants' motion to dismiss that complaint [43]. Also before the Court is Plaintiffs' motion to strike certain materials Defendants attached to their motion to dismiss [47]. For the following reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice. Plaintiffs' motion to strike [47] is granted in part and denied in part.

**I. Allegations in Plaintiffs' Complaint**[1]

[1]     Unless indicated otherwise, all citations in this section correspond to Plaintiffs' amended complaint [39]. For present purposes, the Court accepts the allegations in the complaint as true, as precedent instructs. See, *e.g., Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir.2004). At this juncture, the Court takes no position on whether any of the allegations are, in fact, well-founded. The complaint is nearly 60 pages long and includes 141 numbered paragraphs; many paragraphs are more than a page long and have numerous subparagraphs. Furthermore, the complaint is replete with long blocks of text, quoted from press releases and scripts of conference calls. The Court has done its best to summarize the operative facts and language that Plaintiffs consider most important. However, the parties should give no weight to whether the Court has chosen not to include a particular quote or fact in this section of its opinion—as precedent instructs, the Court has based its analysis on its reading of the complaint in its entirety.

Plaintiffs allege that beginning on January 29, 2008 and continuing throughout the class period, Defendants engaged in a scheme to deceive and defraud investors of the true value of Anixter's stock in violation of federal securities law. The "core of plaintiff's claims" is that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis (and achieving it was becoming more remote as the economy soured), and that defendants' fervent and repeated denials that Anixter was being negatively affected by the slowing economy were false and misleading." (Pl. Resp. Mot. Dismiss [46] at 14–15). Plaintiffs contend that while Anixter's stock was artificially inflated, Individual Defendants sold off some of their own holdings for handsome gains.

Defendant Anixter is a publicly-traded Delaware corporation with its headquarters in Glenview, Illinois. ¶ 30. The Individual Defendants were officers of Anixter during some or all of the class period: Defendant Robert J. Eck is President and CEO of Anixter; prior to that he was the Company's

chief operating officer and executive vice president. ¶ 31. Defendant Dennis J. Letham is Anixter's executive vice president of finance and chief financial officer, and Defendant Robert Grubbs was president and CEO of Anixter from February 1998 to June 2008, *Id.*

Anixter is a global supplier of communication products, electrical and electronic wire and cable, fasteners and other small parts used to connect voice, video, data and security systems. ¶ 2. Anixter operates through three main lines of business: (1) the Enterprise Cabling and Security Solutions ("ECS") group; (2) the Electric Wire and Cable ("EWC") group, and (3) the Operating End Markets ("OEM") group. ¶ 36. The ECS group represented approximately 54% of the Company's total revenue in 2007 and 52% in 2008. *Id.* The EWC group represented approximately 28% of revenue in 2007 and 29% in 2008. ¶ 37. The OEM group—the smallest division—represented approximately 18% of revenue in 2007 and 19% in 2008. ¶ 37. In 2007, 70% of the Company's sales were from North America, 22% were from Europe, and 8% were from other emerging markets (Latin America and Asia Pacific). ¶ 39. The majority of the OEM business (56%) is based in Europe. ¶ 37. Accordingly, simple math applied to Plaintiffs' allegations shows that about 10 percent of Anixter's sales come from its European OEM business.

### A. Pre–Class Period Allegations

**\*2** Historically, Anixter had grown its sales base through both strategic acquisitions and organic sales growth. ¶ 40. However, acquisition opportunities dried up during 2007 leaving the Company dependant on organic sales to drive its overall sales growth. ¶¶ 40, 41. But during the first parts of 2007, the Company's organic growth rate also had been in decline, falling from 22% to 19% in the first quarter of 2007 and to 17% in the second quarter. ¶ 43.

Plaintiffs allege that "as early as mid–2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008." ¶ 42.

By late 2007, Plaintiffs allege that the U.S. and global economies were declining and credit markets were contracting. ¶ 42. In fact, in October 2007, the Company reported that there was a "significant amount of economic uncertainty * * * particularly in the U.S. related to the credit markets." *Id.* Plaintiffs allege that by the end of 2007 Anixter's sales and profits were under pressure due

to slower global demand, including lower levels of non-residential construction and technology spending. ¶ 43. Moreover, Anixter's organic growth rate had continued to fall, to 9% in the third and fourth quarters of 2007. ¶ 43. In an attempt to allay investors' persistent concerns about the Company, in November 2007, the Company began aggressively repurchasing its stock. ¶ 44. This maneuver was met with some approval in the market. *Id.*

### B. January and February 2008 Statements

On January 29, 2008 (the first day of the class period), Anixter issued a press release announcing its financial results for the fourth quarter and fiscal year 2007. ¶ 46. The Company reported year-over-year organic sales growth of 9%.[2] *Id.* In the press release, Defendant Grubbs reported that Anixter had continued to experience "strong growth * * * from our strategic initiatives in the security and OEM markets." ¶ 47. Grubbs also reported that the Company had a "solid backlog and healthy pipeline of potential new projects and customers" both in Europe and North America. *Id.* However, Grubbs also recognized that "sales in Europe were flat as compared to unusually strong sales in the year ago quarter." *Id.* Overall, Grubbs told investors that Anixter would continue to achieve "solid sales and earnings growth" in 2008 despite deteriorating market conditions. For example, Grubbs stated:

2    Plaintiffs do not challenge the accuracy of this figure or in fact any of Anixter's reported financials.

> While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year.
>
> ¶ 48.

The same day, the Company held an earnings conference call with analysts and investors to discuss the Company's earnings and operations. ¶ 49. Describing the Company's performance in 2007, Defendant Letham stated that "[o]verall end market demand remain [sic] healthy across all markets. Larger project demand generally remained robust and we continue to have good success with our strategic initiatives." *Id.* Defendant Letham stated that despite "economic uncertainty in other parts of the economy," the Company had "performed so strongly" during the last quarter of 2007. Letham stated that "early indications" suggested that the trend would continue into 2008. *Id.;* see also ¶ 51.

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 41 of 118 PageID #:2445
Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

**\*3** During the call, Defendant Letham recognized that as compared to 2006, the 2007 "year on year sales in Europe were flat" and that growth in Europe had slowed compared to prior years. ¶ 50. However, Letham said that the Company's "business activity levels in Europe remain strong" and that the Company was "optimistic" about "growth in Europe in the coming quarters." *Id.* In response to a question from an analyst about whether the Company could sustain "that level of growth in that let's say nine to 11% range continuing ahead here in Europe," Letham responded that "to answer your questions about Europe, we are still comfortable driving the kind of growth we have driven." ¶ 52.

After the call ended, the Company's stock price rose 18%, or $10.55 per share in a single day, to close at $68.85 per share. ¶ 53. That same day, Grubbs sold 14,000 Anixter shares for proceeds of $938,000. *Id.* On February 15, 2008, when the stock was between $66.91 and $68.29 per share, Defendant Letham sold 3,668 shares for proceeds of $248,199. *Id.*[3]

3       The Individual Defendants sold Anixter stock at other points during the class period. In all, Plaintiffs allege that during the class period, Defendant Letham sold 37,444 shares (26.5% of his holdings, or 9.41% including stock options) for proceeds of over $2.4M, Defendant Grubbs sold 15,000 shares (9.29% of his holdings, or 3.70% including options) for proceeds of over $1M, and Defendant Eck sold 1,045 shares (7.17% of his holdings, 1.92% including options) for proceeds of over $73,000. See ¶¶ 114–115. All of the Individual Defendants' stock sales were made under trading plans adopted pursuant to Rule 10b5–1 of the Exchange Act. ¶¶ 118–119. Defendant Letham's sales were made pursuant to a plan that he adopted on April 24, 2007. Defendant Grubbs's sales were made pursuant to plans that he adopted on April 24, 2007 and July 24, 2008. Defendant Eck's sales were made pursuant to a plan that he adopted on July 24, 2008. *Id.*

On February 21, 2008, the Company filed its 2007 Form 10–K for the period ending December 28, 2007, which Defendants Letham and Grubbs signed. The Form 10–K reported that the Company had experienced "strong organic growth" in 2007 and, describing 2007 as compared to 2006, reported that the Company "continues to experience strong growth in security and OEM supply sales." ¶ 55; see also Ex. K to Def. Mem., at 17.

### C. April 2008 Statements

On April 22, 2008 the Company issued a press release announcing its financial results for the first quarter of 2008. The Company reported year-over-year organic sales growth of 7%. ¶ 61. The Company also announced that its organic growth rate for Europe had fallen to only 2%. ¶ 69. However, other numbers for the quarter were positive, including a rise in sales, operating profits, and earnings per diluted share over the prior year quarter. ¶ 61.

In the press release, Defendant Grubbs discussed the Company's positive results and reported that he believed the Company would continue to succeed despite the worsening economic conditions:

> The multiple end markets we serve, the diversity of industries in which our customers operate and the broad geographies over which our business is conducted have given is the ability to sustain overall growth despite certain economic concerns. We believe that the diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions.

¶ 61. Defendant Eck echoed Defendant's Grubbs' optimism about future prospects, yet Eck warned that the Company's growth could be affected by macro-economic conditions generally and in the European OEM market specifically. "Short-term macro-economic conditions may slow our organic sales growth from the rates of the past couple of years, which when combined with the investment in these initiatives may limit near-term earnings growth. We believe, however, that continued focus, investment and successful execution on these strategies will drive full-year and longer-term growth and profitability of the business." ¶ 62. Eck reported that the Company had seen a "number of customer-specific situations where spending was reduced in response to slower economic conditions, [but] we do not believe this represents a broader trend." *Id.* Regarding growth from the European OEM market, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe." ¶ 63. Eck predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. *Id.* Defendant Eck also blamed the first quarter's "divergent growth rates" in part on an unfavorable impact from the timing of New Year's and Easter, not on the global economic slowdown. *Id.*

**\*4** Following the press release, the Company held an earnings conference call with analysts and investors wherein the Individual Defendants expanded on these themes. Defendant Letham explained that the "geographic diversity of our business model and various company driven initiates"

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 42 of 118 PageID #:2446

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

allowed the Company to "mitigate the effects of the current economic slowdown." ¶ 64. While there was "concern about the condition of the U.S. economy," Eck explained that the Company's performance remained "healthy" and growing. ¶ 65. Letham stated that the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Eck stated that the Company had noticed "softer corporate spending" but that much of the spending decrease was "relate[d] to specific project plans of individual customers." ¶ 65. "While some customers have reduced their production schedules, this was offset by growth with other customers and added products." *Id.* Similarly, Defendant Letham blamed a recent decline in daily booking activity in one of its product lines as "more of a seasonal pattern impact here" rather than "anything about the credit market issue" or "some broader economic issue." ¶ 67.[4]

4    Plaintiffs note that Anixter's 2007 Annual Report stated that "[t]he operating results of the Company are not significantly affected by seasonal fluctuations." ¶ 11.

And while Letham again recognized the problems in the North American electrical wire & cable market and the European OEM market, Letham reported that "we've experienced recent improvements in both situations over the last several weeks." ¶ 64.

Following the Defendants' April 22, 2008 statements and the disclosure of slowed growth rates, Anixter's stock price dropped $10 .31 between the closing price on April 21, 2008 and the closing price on April 24, 2008. ¶ 73.

### D. July 2008 Statements

On July 22, 2008, the Company released its financial results for the second quarter of 2008. ¶ 74. Some numbers were indicative of solid performance, for example the Company reported a 10 percent increase in sales from the first to the second quarter of 2008. ¶ 75. However, the Company reported organic sales growth of only 4% for the quarter. ¶ 74. (Overall growth, including sales growth from recently completed acquisitions, was 7% for the quarter). The Company also reported a slight decline in gross margins from the same quarter a year ago, from 24% to 23.8%. ¶ 75.

Discussing the slower organic sales growth rates, Defendant Eck said that the lower growth figure was not the result of any "broad-based negative trends." ¶ 74.

"While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence. We believe the overall market conditions, as they currently exist, should allow for consecutive quarter sales growth from the second to third quarter of this year. If we achieve a modest level of consecutive quarter growth, it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth."

**\*5** *Id.*

Eck reported that he was "pleased with the 10 percent increase in sales from the first to the second quarter of this year, which despite continuing macroeconomic uncertainty, exceeded longer-term seasonal trends." ¶ 75. Eck explained that the lower sales growth rates were "modest due to the difficult comparison to last year's exceptionally strong second quarter." *Id.* While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. *Id.* In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id.*

In the subsequent conference call, Defendant Eck told listeners that "while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world." ¶ 77. According to Eck, "quote activity" was "holding reasonably steady" and the Company had not seen "big downward trends [in quote activity] anyplace." ¶ 78; see also *id.* ("Letham: * * * we have seen good quote activity in the OEM supply business * * * "). Defendant Eck closed his presentation with the words "[w]e expect the third quarter will again show sequential growth over the second quarter as well as over prior year ." ¶ 77.

Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity" these customers were being "offset by growth with other customers and other geographies." ¶¶ 78–79. Defendant Eck recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id.* Addressing the issue of continued "margin pressure from steel

price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id.*

During the question and answer session, one analyst asked about Anixter's ability to make forecasts about its sales and growth with precision. Defendant Letham responded:

> Basically, we don't have a lot of hard visibility. Backlog here at any point in time is typically in the range of about a month. We have pipelines on project-type activity, pipeline tools that give us project activity outlook that extend beyond that but projects are 10%, 20% or so of our enterprise and electrical wire and cable business. The real issue here is you get your bulk of your business day-to-day, short order, so there is not a lot of long term visibility.

On July 31, 2008, the Company filed its Form 10–Q for the second quarter of 2008, in which the Company recognized that its major initiatives appeared to be succeeding despite "macroeconomic uncertainty that existed during the quarter." ¶ 83.

 **\*6** On the morning of July 22, Anixter's stock opened at $61.50 per share. On the morning of August 1, the stock opened at $68.29 per share, an increase of 11%.

### E. Post–Class Period Allegations

The class period ends on October 20, 2008. On October 21, Anixter issued a press release announcing its financial results for the third quarter of 2008, which ended September 26, 2008. ¶ 96. The Company reported organic growth of only 2%. *Id.* Gross margins had declined further, to 23.4% (versus 24.1% in the year ago quarter). ¶¶ 91, 100.

In the accompanying press release, the Company stated: "[w]hile we experienced strength early in the third quarter, broader negative economic factors, especially in Europe, impacted sales activities late in the period." *Id.* While the quarter began favorably (July was the best month in the history of the Company), the Company admitted that its third quarter results had been affected by "macro economic trends." *Id.* The Company explained that it had been affected by lower operating margins in Europe and a decline in sales in their OEM supply business. ¶ 97.

Following the press release, the Defendants held a conference call where they further discussed how the Company's third

quarter results had been affected by the slowing global economy. ¶¶ 99–102. During the call, the following exchange took place:

> **Analyst:** Hi, good morning. Just following up on that idea, if you look at the Enterprise Ts here, where would you the project activity level is in this fourth quarter and in the last month of the third quarter? As a percentage I guess you talked about a 15 to 20% range but that's slightly more than average, what do you think it is right now?
>
> **Letham:** It's probably in the mid to low teens right now.
>
> **Analyst:** And ...
>
> **Letham:** It definitely pulled in the last couple of quarters, we were probably pursing that 20% number late last year, early part of this year and I think we've definitely probably given up at least five percentage points in the mix shift there.
>
> **Eck:** I think what happens * * * if you look back over the prior four years we saw a really strong growth in the enterprise business and that was in the strength of good corporate spending on projects in IT infrastructure where we tend to do particularly well because of our business model. So when the market slows the chunk of the market that we do particularly well ends up being a little bit smaller and so we see an effect from that pretty quickly in our business.

The Company attributed the decline in its gross margins to "lower year-on-year sales growth rates," "a sales mix shift resulting from slower sales in our higher gross margin OEM supply business," and the "resolution of a customer pricing dispute that reduced current quarter gross profit by $3 million or approximately 20 basis points of gross margin." ¶ 100.

Over the next five trading days, Anixter's stock fell $18.76 per share, approximately 40%, to close at $29.07 per share on October 27, 2008.

 **\*7** According to Plaintiffs, Eck's statement above that "we see an effect from that pretty quickly" was an admission that the Individual Defendants knew their business had been being affected by the slowing global economy months earlier. ¶ 106. Similarly, Plaintiffs allege that on February 3, 2009, Defendant Letham stated that "Anixter had experienced a 'trend of decelerating growth rates * * * in the past few quarters." ¶ 107. Because Defendant Eck had earlier stated that Anixter has a "very detailed view of what's

happening in each of the end markets and each one of the geographies" it serves (*id* ), according to Plaintiffs, Defendant Letham's February 3, 2009 statement was an "admission" that Defendants knew about yet failed to disclose Anixter's "decelerating growth rates."[5]

5  To counter Plaintiffs' allegations that after the class period, Defendants "admitted" that they had a good view of what was happening regarding Anixter's growth and prospects, Defendants rely on the above-described statement from the July 22, 2008 conference call wherein Defendant Letham said that Anixter does not "have a lot of hard visibility" going past a month in the future regarding their ability to make sales forecasts.

### F. Defendants' Contemporaneous Knowledge Rendering the Class–Period Statements False

Plaintiffs plead the following to support their allegations that the Defendants' had contemporaneous knowledge that their statements in January, February, April and July 2008 were false when made, and that "defendant's guidance of 8% to 12% organic growth for 2008 had no reasonable basis." ¶ 57.

First, Plaintiffs make the general allegation that the Defendants knew "[b]y 2008" that economic conditions were deteriorating and that Anixter's business was being and would be affected. Plaintiffs allege that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe. As a result, Anixter was experiencing a slowdown in sales in its enterprise cabling business, which depended largely on IT projects for sales growth." ¶ 58; 68.

Plaintiffs also allege that "[t]he declining economic conditions were also impacting Anixter's OEM supply business, the majority of which was based in Europe" which depended on sales to the industrial and automotive industries. ¶ 59. "[B]y 2008, these industries were slowing dramatically as a result of the economic downturn. * * * Indeed, in January 2008, Moody's Global Corporate Finance predicted that demand in the major Western European markets for European OEMs would "stagnate" in 2008." ¶ 59; see also ¶ 68. The complaint alleges that according to "Confidential Witness" ("CW") 4, a "U.S.-based Product Planner in Anixter's OEM division," by "mid–2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88; see also ¶ 112 (delaying of orders took place "beginning in August 2008" and continuing to September 2008). Many of the canceled or delayed orders involved one customer—Case New Holland. ¶¶ 89–90; 110. The complaint alleges that these actions were evidence of Anixter's slowing European OEM business. ¶ 89. The directions to cancel or delay certain orders were made by upper management, with input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4 worked. *Id.* The alleged purpose of delaying or cancelling these orders was so that Anixter could avoid "having inventory on its books that it would be unable to push through because of the significant decline in business it was experiencing during the Class Period." ¶ 112.

**\*8** In addition to the above, Plaintiffs allege that the Individual Defendants were aware of problems in Anixter's *European* OEM business specifically. Plaintiffs put forth CW1, who was a "former Credit Manager for Anixter's European Markets." According to CW1, "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. Similarly, Plaintiffs also allege that, according to CW3 (a "former Operations Manager for Anixter's UK operations"), "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008. * * * These sales trends were made known to Anixter's U.S. operations on at least a monthly basis." ¶ 86.

Furthermore, Plaintiffs allege that "[D]efendants knew, and failed to disclose that Anixter was involved in a significant pricing dispute with major European OEM customer JLR." ¶ 70; see also ¶ 113. According to CW2 a "former Programme Buyer for Anixter's UK operations" the dispute involved the amount of a rebate Anixter owed to JLR. According to CW2 and CW3 it was "well known at Anixter's Spitfire Park Plat in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed rebate amount." ¶ 71. Ultimately, on October 20, 2008, Anixter "was forced to pay the $3M disputed amount * * * which had a material impact on the Company's earnings and gross margins."[6] *Id.*

6  Plaintiffs also allege that "Anixter was also involved in a material pricing dispute with major OEM customer Lucent" which "resulted in decreased sales to Lucent and, ultimately, the loss of Lucent's business completely in 2009." ¶ 92. Plaintiffs do not identify whether (and when) this dispute was taking place during the class period, or whether and when the individual defendants knew of the dispute.

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 45 of 118 PageID #:2449

Garden City Employees' Retirement System V. Anixter..., Not Reported In...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

## II. Additional Materials Submitted by Defendant and Plaintiffs' Motion to Strike

Along with their motion to dismiss, Defendants have filed an appendix containing 22 separate exhibits. Defendants have relied on and referenced the bulk of these exhibits in their motion. Plaintiffs have moved to strike or limit the Court's consideration of a number of these materials. Before the Court can analyze the merits of Defendants' motion to dismiss, the Court must first determine what materials the Court may consider in doing so.

A court considering a motion to dismiss in a securities fraud action must consider "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b) (6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (3d ed.2004 and Supp.2007)). Documents attached to a motion to dismiss fit into the first category if they are " 'referred to in the plaintiff's complaint and are central to her claim.' " *Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)). Matters subject to judicial notice are those that are both " 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997) (quoting Fed.R.Evid. 201(b)).

**\*9** Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are generally disfavored, because they potentially serve only to delay litigation. *ABN AMRO, Inc. v. Capital Intern. Ltd.,* 2007 WL 845046, at \*3 (N.D.Ill. March 16, 2007) (citing *Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989)). A district court has broad discretion to grant or deny a motion to strike. *Id.* (citing *Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 664–65 (7th Cir.1992)).

### A. Defendants' Chart of Responses to Plaintiff's Allegations

First, attached to Defendants' motion as Exhibit A is a 22–page chart titled "Reasons Why Alleged Misrepresentations in Amended Complaint Are Not Actionable." The chart compiles each of the statements that Plaintiffs consider misleading together with a reference to the relevant portion of Anixter's motion to dismiss. The first column of the chart sets forth the alleged misrepresentation (copied from the complaint); the second column lists the corresponding paragraph number in the complaint; and the third column contains a short description of why the statement is inactionable (for example, "Immaterial puffery") along with a reference to the relevant portion of Defendants' memorandum. Plaintiffs have moved to strike the chart. In the event that the Court declines to strike the chart, Plaintiffs have submitted their own chart which adds a fourth column to Defendants' chart, indicating Plaintiffs' response to each entry.

Plaintiffs first argue that the chart should be stricken because it is not a document subject to judicial notice or referred to in the complaint and central to Plaintiffs' claims. (Pl. Mot. Strike [47] at 5). These arguments are misplaced because the chart does not purport to introduce any facts or evidence extrinsic to the complaint. Instead, the chart merely reproduces portions of Plaintiffs' complaint and references portions of Defendants' memorandum in support of their motion to dismiss.

The only ground on which Plaintiffs could challenge the exhibit is that it allows defendants "22 pages of additional argument" above the Court-ordered page limit extension. (Pl. Reply Mot. Strike [55] at 6; see also Order granting Defendants leave to file an oversized memorandum of law of up to 35 pages [42] ). In response, Defendants argue that the chart is "simply a summary document intended to assist the Court in evaluating the scores of statements quoted and challenged in the complaint." (Def. Resp. Mot. Strike [54] at 3). Because Plaintiffs have submitted a response to the chart, Defendants argue that Plaintiffs would suffer no prejudice if the Court considered both the chart and Plaintiffs' response thereto.

In *K & R Ltd. P'ship. v. Mass. Hous. Fin. Agency,* 456 F.Supp.2d 46, 52–53 (D.D.C.2006), a district court judge was faced with a motion to strike a nearly identical document. The district court noted that for the most part, the chart at issue there "does not present any information or argument that is not contained in [defendant's filing]; it is simply the same argument from the reply presented in a different manner." *Id.* Further, the district court found that the chart

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 46 of 118 PageID #:2450

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

"is organizational work that the Court would otherwise have to take upon itself, and it does not appear to have been an attempt by [the defendant] to evade any of this Court's rules" regarding page limits. *Id.; cf. King v. Enterprise Rent–A–Car Co.,* 231 F.R.D. 255, 265 (E.D.Mich.2004) (seventeen page memorandum summarizing numerous cases cited by opposing party plaintiffs was "legal argument" that "effectively, added an additional seventeen pages to [d]efendants' brief."). While not controlling, the Court finds the reasoning in *K & K Ltd. P'Ship* to be persuasive. Furthermore, because Plaintiffs have submitted a response to Defendants' chart, any unfairness to Plaintiffs resulting from extra pages allotted to Defendants is greatly reduced. Accordingly, the Court has considered Defendants' Exhibit A and Plaintiffs' response thereto to the extent that they were helpful to the Court in deciding the instant motion to dismiss.

### B. Forms 4 and Defendants' Chart of Stock Sales

**\*10** Next, Plaintiffs take issue with Defendants' Exhibit D, which includes a three-page chart created by Defendants that shows the number of Anixter shares sold by Individual Defendants from January 2006 to September 2008. The chart is populated with information taken from Forms 4 filed by Individual Defendants during that time period. The Forms 4 themselves (191 pages of them) are attached behind the chart. According to Defendants, the Forms 4 show that Individual Defendants' stock sales during the class period were not unusual, therefore rebutting the allegations of scienter raised in Plaintiffs' complaint.[7]

[7] Plaintiffs rely on Individual Defendants' stock sales within the class period as evidence of "scienter," which is an element of a securities fraud claim. See *infra* Sec. III. The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). One method that securities fraud plaintiffs use to demonstrate the required scienter is through insider trades made by corporate executives. As discussed in detail below, "stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008).

Plaintiffs argue that the Court should not consider the Forms 4 at this stage of the litigation because the complaint did not cite to any of the forms and the Forms 4 from outside the class period are not central to Plaintiff's claims. Plaintiffs argue that even if the Court were to judicially notice the existence of the

Forms 4, the Court could not consider the facts reported in the Forms 4 (*i.e.,* the dates of the sales, number of shares sold, and the sale price) for their truth. Plaintiffs also argue that Forms 4 from outside the class period are irrelevant, and the Court cannot consider them for any purpose. Plaintiffs further argue that the Court cannot consider the chart summarizing the information from the Forms 4.

As an initial matter, the Forms 4 from *within* the class period do not appear to be at issue in Plaintiffs' motion to strike. The complaint includes a table, at ¶ 114, which purports to show all of the insider trades made by Individual Defendants during the class period. The complaint does not explicitly disclose the source of the information in Plaintiffs' chart. However, the entries in the chart (including the dates of sales, number of shares sold, and share price) are identical to the information found in the relevant Forms 4 from Defendants' Exhibit D. Because the information in the chart and the information in the Forms 4 from within the class period is identical, and because "the only source" of insider trading data available to plaintiffs when drafting complaints "is the Forms 3, 4, and 5 filed with the SEC," *Malin v. XL Capital Ltd.,* 499 F.Supp.2d 117, 133 (D.Conn.2007), the Court can safely assume that the Forms 4 filed by the Individual Defendants during the class period were the source of the entries in the chart at paragraph 114 of the complaint. Accordingly, the Forms 4 from that period are incorporated into the complaint by reference. See, *e.g. In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1991) (discussed *infra* pp. 27–29). Further, in their motion to strike, Plaintiffs recognize that the "Form 4s during the class period may be relevant to plaintiff's insider trading allegations" and do not direct their arguments at these forms. (See Pl. Mot. Strike at 7; Pl. Reply Mot. Strike at 8). Accordingly, the Court will consider the Forms 4 in Defendants' Exhibit D that show Individual Defendants' trades from within the class period.

**\*11** However, Plaintiffs do move to strike the Forms 4 from *outside* the class period. Plaintiffs first argue that the forms from outside the class period are not referenced in and central to the allegations of the complaint such that they may be considered regardless of whether they are attached to the complaint. See *Albany Bank & Trust Co.,* 310 F.3d at 971. The complaint does not cite to any Forms 4 from 2006 or 2007 and does not discuss any stock sales from those years. Yet, it is clear that because they are public documents, "[j]udicial notice may be taken of publicly filed [Securities and Exchange Commission ("SEC") ] documents, including Forms 3 and 4." *In re Spyglass, Inc., Securities Litigation,*

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 47 of 118 PageID #:2451
Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

1999 WL 543197, at *5 (N.D.Ill.1999). But what is "not at all clear" is whether the Court may take judicial notice not only of the existence of the Forms 4, but also of the truth of the information reported within them. See *Jones v. Corus Bankshares, Inc.,* 701 F.Supp.2d 1014, 1025 n. 3 (N.D.Ill.2010).

Judicial notice is premised on the concept that certain facts exist which a court may accept as true without requiring additional proof from the opposing party or parties. "It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997) (citing *York v. American Tel. & Tel. Co.,* 95 F.3d 948, 958 (10th Cir.1996); and *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 865 (7th Cir.1983)). Accordingly, judicial notice " 'merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts.' " *Doss v. Clearwater Title Co.,* 551 F.3d 634, 640 (7th Cir.2008) (quoting *General Electric Capital Corporation,* 128 F.3d at 1081).

In *General Electric Capital Corp.,* 128 F.3d at 1082 n. 6, the Seventh Circuit considered when and for what purposes a court could take judicial notice of facts from prior proceedings—an issue very similar to one presented in the instant motion. The Seventh Circuit noted that "some appellate decisions have refused to allow a court to take judicial notice of any adjudicative fact in a court record for the truth of the matter asserted." *Id.* (citing *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994) (concluding that a court "may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation"); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) (holding that a "court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings' "). The Seventh Circuit agreed that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed." *Id.* However, the Seventh Circuit did not impose an outright ban on judicial notice of these types of facts, and instead concluded that "it is conceivable that a finding of fact may satisfy the indisputability requirement of Fed.R.Evid. 201(b)." *Id.;* see also *ABN AMRO, Inc. v.*

*Capital Int'l Ltd.,* 2007 WL 845046, at *9 (N.D.Ill. March 16, 2007) ("Typically, * * * because of the indisputability requirement, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation filing; judicial notice is generally not for the truth of the matters asserted in a court document."); *Collins v. Cook County,* 2008 WL 4925009, at *7 (N.D.Ill. Nov.14, 2008).

**\*12** In *Doss v. Clearwater Title Co.,* 551 F.3d 634, 639–640 (7th Cir.2008), the Seventh Circuit had occasion to apply the rule from *General Electric Capital Corp.* There, the defendants had attached a publicly-filed deed to their motion to dismiss, and had used the deed to show that the plaintiff's suit was subject to dismissal because he had sold the property that was the subject of the lawsuit. *Id.* at 637–38. In response to the motion to dismiss, the plaintiff argued that he had not sold his property and that the deed attached to the defendants' motion was a forgery. *Id.* The district court took judicial notice of the deed and dismissed the complaint. *Id.* at 637. On appeal, the Seventh Circuit reversed the district court, reasoning that because the authenticity of the deed was in dispute, the court could not properly take judicial notice of it. *Id.* at 693–94. An earlier case, *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354–55 (7th Cir.1995), also illustrates the rule. In *Hennessy,* an employment discrimination case, the district court was attempting to determine the size of the defendant corporation so as to assess the applicability of a punitive damages cap under the 1991 Civil Rights Act. *Id.* at 1354. The district court had received conflicting testimony at trial, but declined to take judicial notice of an SEC filing that pegged the number on the higher end. *Id.* The *Hennessy* court affirmed this decision not to take judicial notice because the parties disputed the relevance of the SEC filings (which covered more units of the defendant corporation than the one unit specifically involved in the suit). *Id.* at 1355.[8]

8   Courts from other circuits apply the same test as the one articulated in General Electric Capital Corp. and other Seventh Circuit cases. See, *e.g. Lustgraaf v. Behrens,* 619 F.3d 867, 885–886 (8th Cir.2010) (court should not have noticed fact in corporation's state regulatory filings for their truth as fact was in dispute).

On the other hand, courts have concluded that judicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute. See, *e.g. Hernandez v. Midland Credit Mgmt., Inc.,* 2006 WL 695451, at *4 (N.D.Ill. March 14, 2006) (taking judicial notice of excerpted portion of Form 10–K where no dispute existed); *Sharbaugh v. First*

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

*Amendment Title Ins. Co.,* 2007 WL 3307019, at *3 (N.D.Ill. Nov.2, 2007) (taking judicial notice of statements in form 10–K that were not in dispute); see also *In re FedEx Ground Package System, Inc., Employment Practices Litigation,* 2010 WL 1253891, at *4–6 (N.D.Ind. Mar.29, 2010).

On the basis of the foregoing discussion, there is a strong argument for concluding that the amount of stock Individual Defendants sold in 2006 and 2007, along with the date of each sale and the price at which the stock was sold, are judicially noticeable because the Forms 4 that contain these facts are publicly-filed documents, the contents of which are not in dispute. First, neither in their motion to strike nor in their reply in support of the motion do Plaintiffs challenge the authenticity of the forms or the accuracy of the financial reporting contained in them. Instead, Plaintiffs only assert that the Forms 4 are not properly considered at this stage of the litigation. The fact that Plaintiffs apparently relied on the Forms 4 from *within* the class period as the source of their allegations regarding Individual Defendants' allegedly-improper insider trades is further evidence that the Forms 4 from *outside* the class period are accurate and trustworthy. Having relied on the Forms 4 filed in 2008 (a period during which Plaintiffs allege that Defendants were committing securities fraud), it would be passing strange for Plaintiffs to argue that similar Forms 4 from 2006 and 2007 (filed during a period in which no securities fraud is alleged) are untrustworthy.[9]

[9] In their reply, Plaintiffs assert that the Forms 4 (and other documents) are "subject to reasonable dispute" and therefore not judicially noticeable because Defendants use the documents "to make extrinsic factual assertions to support competing inferences." (Pl. Reply Mot. Strike at 3–4; 6–7). Of course Plaintiffs and Defendants each urge the Court to accept a competing conclusion to which the Forms are relevant—whether or not Plaintiffs have adequately alleged scienter. While this ultimate question is disputed, the authenticity and accuracy of the Forms 4 themselves is not. Plaintiffs seem to argue that on a motion to dismiss, courts cannot judicially notice any fact that contradicts an inference alleged in a plaintiff's complaint. This of course is not the law. A fact is judicially noticeable and properly considered on a motion to dismiss if it meets the requirements of Fed.R.Evid. 201 (as well as the other requirements of the Rules of Evidence), regardless of which party's position the fact supports. By way of analogy: Take a case arising out of an early morning car accident where the plaintiff alleged that the defendant driver "could not

see." On a motion to dismiss, a court could judicially notice the fact that the sun rose an hour before the crash, even though this fact goes toward contradicting the ultimate allegation in the complaint. By noticing the hour of the sunrise, the court would not necessarily be accepting the competing inference that the driver *could* see; for example, the complaint could have alleged the presence of heavy fog. But when the court decides the motion to dismiss, it takes all the facts properly before it (including those alleged and those properly noticed), accepts them all as true, and then decides if the plaintiff has stated a claim. Plaintiffs are fond of quoting the following line from *Tellabs:* "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw *from the facts alleged."* 551 U.S. at 314 (Plaintiffs' emphasis). But this quote is misleading when taken in a vacuum. In fact, the Supreme Court in *Tellabs* made clear that courts considering complaints alleging securities fraud are to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. at 322.

**\*13** However, the Court is also cognizant of the recent decision, *Jones v. Corus Bankshares, Inc.,* in which Judge Bucklo denied a defendant's request to judicially notice the fact that the defendant did not sell company stock during the period in question. 701 F.Supp.2d 1014, 1025 n. 3 (N.D.Ill.2010) (citing *Riggs Partners, LLC. v. Hub Group, Inc.,* 2002 WL 31415721 (N.D.Ill. Oct.25, 2002)). The court in Jones did not discuss the cases in which courts in this circuit have taken judicial notice of undisputed portions of SEC filings and did not categorically rule that such information is not susceptible to judicial notice. 701 F.Supp.2d at 1025 n. 3 ("Corus believes that I may take judicial notice of the fact that Glickman did not sell Corus stock during the period in question. *It is not at all clear* that this is so.") (emphasis added). In addition, it is not clear from the opinion in *Riggs Partners* whether the defendants' stock purchases were undisputed. See 2002 WL 31415721, at *5 n. 7. That said, *Jones* and *Riggs* represent instances in which courts in this district have considered the precise question posed in Plaintiffs' motion to strike and decided not to accept the facts reported in the Forms 4 as true.

At the end of the day, the Court concludes that it can resolve the motion to dismiss without any need to consider the Forms 4 outside the class period for the truth of the information

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 49 of 118 PageID #:2453

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

contained in them. As explained in detail below, the complaint is subject to dismissal for failure to adequately allege scienter irrespective of the content of the disputed Forms 4. Thus, the Court need not express at this time a definitive view on what aspects of the Forms 4 may be judicially noticed.

However, the Court writes further to address another of Plaintiffs' arguments against consideration of the truth of the content of the Forms 4 from outside the class period. Plaintiffs argue that these Forms 4 are "irrelevant" to determining whether Plaintiffs have stated a claim for securities fraud—presumably because Plaintiffs' allegations concern Defendants' actions during 2008 only. (Pl. Reply Mot. Strike at 7–8); see also *Gas Tech. Inst. v. Rehmat,* 2006 WL 3743576, at *15 (N.D.Ill.Dec.15, 2006) (refusing to take judicial notice of information that was "irrelevant" to determining whether plaintiffs had adequately alleged a cause of action). Because "facts subject to judicial notice are not exempt from analysis under the other rules of evidence," *Sunstar, Inc. v. Alberto–Culver Co.,* 2006 WL 6505615, at *3 (N.D.Ill. Nov.16, 2006), Plaintiffs are correct that truly irrelevant facts are not properly considered on a motion to dismiss. However, Plaintiffs are incorrect that Individual Defendants' trades from outside the class period would be "irrelevant" to determining the presence of scienter. The opposite is true. The Seventh Circuit has held that, in order to establish an inference of scienter, a plaintiff must allege "facts that would allow an assessment of whether the trading during the class period was unusual or suspicious," in other words, "context showing that the applicable time period was unusual." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008); see also *Higginbotham v. Baxter Int'l., Inc.,* 495 F.3d 753, 759 (7th Cir.2007) ( "Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April."). For those reasons, Forms 4 showing trades made *outside* of the alleged class period would be relevant to assess whether trading during the class period is suspicious or unusual within context. See, *e.g. In re Pixar Sec. Litig.,* 450 F.Supp.2d 1096, 1105 (N.D.Cal.2006) ("stock sales during the class period must be considered in light of his trading history"); *Malin,* 499 F.Supp.2d at 151.[10]

[10] Another interesting question (not addressed by the parties) is whether the Court should decline to consider the statements in the Forms 4 for their truth because they are inadmissible hearsay. Because courts must "strictly adhere to the [ ] Federal Rules of Evidence before taking judicial notice of pertinent facts," *General Electric*

*Capital Corporation,* 128 F.3d at 1081, inadmissible hearsay is not noticeable. It does not appear to the Court that the statements in the Forms 4 would be hearsay. Instead, the Forms 4—which Individual Defendants signed and submitted to the government under penalty of perjury—would likely qualify as either government or business records within the Evid. R. 803(6) and 803(8) hearsay exceptions, if a proper foundation were laid. See McGhee v. Joutras, 1996 WL 706919, at *3 (N.D.Ill.Dec.5, 1996) (SEC forms 4 subject to Rule 803(6) hearsay exception); *In re Silicon Graphics Securities Litigation,* 970 F.Supp. 746, 759 n. 6 (N.D.Cal.1997) (SEC forms 3 and 4 "may be admissible under the business and/or government records exceptions to the hearsay rule") (citing *United States v. Bland,* 961 F.2d 123, 127 (9th Cir.1992) (holding that gun shop records kept pursuant to government requirements are admissible business records); *United States v. Central Gulf Lines, Inc.,* 747 F.2d 315, 319 (5th Cir.1984) (holding that shipping reports prepared by private citizen and submitted to the government pursuant to law fell within government records exception to hearsay rule)). But in any event, the exhibits would be offered not only for their truth, but also to demonstrate the state of mind of the Individual Defendants. As such, they may well fall within the exception to the hearsay rule in Rule 803(3). See *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1246 (D.Utah 1999) (citing *In re Silicon Graphics Securities Litigation,* 970 F.Supp. at 759 n. 6 ("Alternatively, [the SEC forms] may be admissible not to prove the truth of the information contained in them, but to show the lack of scienter on the part of the defendants ."). If the Court had considered the disputed Forms 4 filed by Defendants, the Court also could have considered the three-page chart that summarizes the information in those forms. Fed.R.Evid. 1006; *Amsted Industries, Inc. v. National Castings, Inc.,* 1990 WL 106548, at *22 (N.D.Ill. July 11, 1990) (collecting cases) (under Evidence Rule 1006, "charts and graphs summarizing data culled from the financial records of the parties have often been admitted in the recognition that such summaries are a reasonable and efficient means of presenting the relevant information").

## C. Defendants' Stock Price Graph

 **\*14** Both Plaintiffs and Defendants have submitted their own graphs of Anixter's stock price. Defendants' Exhibit E contains an eight-page chart taken from Yahoo! Finance that shows Anixter's stock price from Jan. 2, 2008 to December 31, 2008. The last page of Defendants' Exhibit E is a graphical representation of the data contained in the previous eight pages. Plaintiffs concede that the Court may consider the

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 50 of 118 PageID #:2454

Garden City Employees' Retirement System V. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

stock price *data* set out in the first eight pages of Defendants' exhibit, *Pugh,* 521 F.3d at 691, n. 2 (taking judicial notice of stock prices), but contend that the Court may not consider the graphical representation of that *same data* on page nine of the exhibit. Plaintiffs do not argue that the graph is inaccurate or misleading in any way, or explain how they will be prejudiced by the Court's consideration of the graph. The Court will consider the entirety of Exhibit E. *Amsted Industries, Inc.,* 1990 WL 106548, at \*22.

**D. October 23, 2007 Conference Call Transcript**

Attached to Defendants' motion as Exhibit G is a transcript of an October 23, 2007 Anixter earnings conference call. Defendants do not argue that the Court can take judicial notice of the transcript. See *In re Neopharm, Inc. Securities Litigation,* 2003 WL 262369, at \*2–3 (N.D.Ill. Feb.7, 2003) (quoting *Abrams v. Van Kampen Funds, Inc.,* 2002 WL 1160171, at \*2 (N.D.Ill. May 30, 2002) ("[earnings call] transcripts are not subject to judicial notice, as they are not 'historical documents, documents contained in public record, or reports, decisions, and regulations of administrative bodies' ")). Furthermore, neither the transcript nor the conference call that it memorializes was referred to in Plaintiffs' complaint.

Nevertheless, Defendants argue that the Court may consider the October 23, 2007 transcript. Defendants want the Court to consider the transcript to support their position that Anixter did not, in fact, set a firm organic growth projection of 8–12% for the 2008 year. The October 23, 2007 transcript reflects the following exchange.

> [Analyst]: Hi. Last year around this point, I think you expressed confidence in being able to achieve an 8% to 12% organic revenue growth number in 2007. Does that remain a target in ′08? Or are you kind of reevaluating that?

> [Grubbs]: I think that still remains our target and we've never really assigned that, Noelle, to any given time period. But we have looked at it kind of as an intermediate, you know, couple of year outlook for the business. Any given quarter or any given time period might be a little above or below that. That still would be our objective would be 8% to 12% organic growth.

Defendants argue that Plaintiffs have admitted that the "core" of their claims is that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 5). However, Defendants note that Plaintiffs "nowhere *quote* [ ] and nowhere *identify* [ ] the specific statement made by Anixter in 2007 supposedly

communicating" that projection. (Def. Resp. Mot. Strike at 9) (emphasis in original); see also Cmplt. at ¶ 42 ("As early as mid–2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008."). Defendants argue that failing to specifically cite to or incorporate the October 23, 2007 conference call transcript was "artful pleading" that deprives the Court of the opportunity of evaluating the statement that forms the basis of Plaintiff's complaint in "the context in which it was made." *Id.*

**\*15** In support of their argument, Defendants cite a number of federal cases that stand for the proposition that plaintiffs cannot deliberately omit reference to a key document in their complaints and then later complain when defendants introduce the document on a motion to dismiss. See, *e.g. In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1991) (Alito, J.) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *Weitschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1109 (N.D.Cal.2003) (citing *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998) ("On a motion to dismiss, documents crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based."). While the Seventh Circuit only permits consideration of documents that are "referred to in the plaintiff's complaint and are central to her claim," *Albany Bank & Trust Co.,* 310 F.3d at 971, Defendants have identified two cases that appear to slightly relax the first of those requirements in the presence of certain circumstances.

In *Rosenblum v. Travelbyus.com Ltd.,* 233 F.3d 657, 661– 62 (7th Cir.2002), the Seventh Circuit considered an employment agreement to which the plaintiff's complaint had not explicitly referred. The Seventh Circuit found that consideration of the agreement was appropriate, because the plaintiff had only attached part of the contract that formed the basis of the dispute.

> "From Travelbyus' point of view, the contract under review is the combination of the Acquisition Agreement and the Employment Agreement. In moving to dismiss on the ground that the contract, read in this matter, requires that the parties resort to arbitration, Travelbyus is entitled to take the position that Mr. Rosenblum has appended only a part of the relevant instrument and to append what it

Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

contends is the remainder. It would have been impossible for the district court or for this court to evaluate the disagreement between the parties without having all of the documentation." *Id.* Similarly, in *Hecker v. Deere & Co.,* 556 F.3d 575, 582–83 (7th Cir.2009), the Seventh Circuit upheld a district court's consideration of two supplemental summary plan descriptions ("SPDs") that were "not mentioned separately in the Complaint." There, the Seventh Circuit stressed that the supplemental SPDs "serve much the same purpose as the originals," which were themselves explicitly referred to in the complaint and "central to plaintiffs' case." *Id.* The Seventh Circuit further stressed that "[t]aking into account the limited purpose to which the prospectuses were put," the district court had not abused its discretion in considering the supplemental SPDs on a motion to dismiss. *Id.*

 **\*16** With those principles in mind, the Court respectfully declines to consider the October 23, 2007 earnings call transcript. Unlike the documents at issue in *Rosenblum, Hecker,* and *Burlington,* Plaintiffs' claims do not appear to be based—either in whole or in part—on the October 23, 2007 transcript. In their reply in support of the motion to strike, Plaintiffs clarify that the complaint "does ***not,*** implicitly or explicitly, reply on the October 23, 2007 conference call transcript." (Pl. Reply Mot. Strike [55] at 9) (emphasis in original). Plaintiffs point out that the complaint, at ¶ 42, alleges that Defendants first began promising 8% to 12% growth in 2008 "[a]s early as mid–2007"—months before the conference call at issue.

The case on which Defendants most heavily rely is the Third Circuit's opinion in *Burlington.* 114 F.3d at 1426. In *Burlington,* the plaintiff claimed that the district court below had erred in using cost data contained in defendant's 1994 Annual Report as a basis for its materiality analysis because the 1994 Annual Report was neither attached to, nor referred to, in the complaint. The Third Circuit examined the complaint and agreed that the complaint did not explicitly refer to or cite the report. However, the complaint did include certain cost data, but did not provide a citation or source for that data. Third Circuit found that it was "unambiguous" that the source of the cost data was the 1994 Annual Report, and therefore it was proper for the district court to consider the document. *Id.* Where it was "unambiguous" that the 1994 Annual Report was the source of the cost data in *Burlington,* here, for the reasons explained above, it is not at all clear that the October 23, 2007 conference call transcript was the initial source of Plaintiffs' allegation that Defendants' projected 8

to 12% organic growth in 2008. As the transcript is neither "referred to" in Plaintiffs' complaint nor "central" to the claims, the Court will not consider it.

### E. Anixter's SEC Filings Not Referenced in the Complaint—Exhibits B, C, F, H, N, T, U and V

Next, Plaintiffs ask the Court to strike eight SEC filings (Exhibits B, C, F, H, N, T, U and V) that are "not referred to in the Complaint nor central to Plaintiffs' claims." (Pl. Mot. Strike at 9). The Court will not strike these documents, as SEC filings are publicly filed documents subject to judicial notice whether or not they are referred to in Plaintiffs' complaint.[11] *Selbst v. McDonald's Corp.,* 2005 WL 2319936, at *1 n. 4 (N.D.Ill. Sept.21, 2005) (citing *Stavros v. Exelon,* 2003 WL 21372468, at *8 n. 8 (N.D.Ill. June 13, 2003) ("The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment.")).

[11]   Initially, Plaintiffs note that because Defendants do not cite to Exhibits F and U in their motion to dismiss, they should be excluded. Plaintiffs cite no case that stands for the proposition that failing to make use of an attachment to a motion is sufficient grounds for a court to strike that document. The Court declines to strike Exhibits F and U for the reason that Defendants did not specifically discuss them; however the Court has not considered either exhibit in deciding the motion to dismiss. From the Court's own review of the motion, it appears that Defendants also do not cite Exhibit H. The Court has not considered that document either.

Plaintiffs further argue that the Court may not consider any of the statements in the eight filings for their truth. For example, Defendants cite Exhibits B and C for the proposition that "[t]he executives received stock options with expiration dates as part of their compensation." The Court did not find it necessary to accept as true any of the facts reported in Exhibits B, C, N, T, or V in order to resolve any of the issues presented in Defendants' motion to dismiss.

### F. Anixter's SEC Filings Referenced in the Complaint—Exhibits I, J, K, L, M, O, P, Q, R, and S

 **\*17** Exhibits I, J, K, L, M, O, P, Q, R, and S are SEC filings which admittedly form the basis of the complaint and to which Plaintiffs referred in their complaint. Plaintiffs admit that the "Court may consider the full text of these documents to prove the appropriate context" of Defendants' statements. (Pl. Reply Mot. Strike at 3).

Plaintiffs further argue that even if the "existence, date, and contents of the SEC filings might be public record" and therefore subject to judicial notice, "any facts, calculations, and inference defendants seek to have this Court draw from them are inappropriate." (Mot. Strike at 11). Again, the Court did not find it necessary to accept as true any of the facts reported in Exhibits I, J, K, L, M, O, P, Q, R, and S in order to resolve any of the issues presented in Defendants' motion to dismiss.

Finally, because the Court has not considered any materials not properly subject to judicial notice that are extraneous to the complaint, it need not convert Defendants' motion from a motion to dismiss to one for summary judgment. See *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993); *Gas Technology Inst. v. Rehmat,* 2006 WL 3743576, at *14 (N.D.Ill.Dec.15, 2006) (citing *E.E.O.C v. Park Ridge Pub. Library,* 856 F.Supp. 477, 480 (N.D.Ill.1994) ("the court is not required to convert a motion to dismiss to a motion for summary judgment if it excludes the extrinsic evidence from consideration")).

## III. Legal Standards

The complaint alleges two causes of action against Defendants. Count I of the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b–5. "Section 10(b) * * * forbids the 'use or employ, in connection with the purchase or sale of any security * * * [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 also forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir.2008) (citing *Stoneridge Inc. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

Count II of the complaint is directed against the Individual Defendants only and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws-here, a violation of § 10(b) and Rule 10b–5." *Pugh,* 521 F.3d at 693.

**\*18** Defendants move to dismiss the amended complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g., Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion in securities fraud actions, courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs,* 551 U.S. at 322. To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Bell Atlantic,* 550 U.S. at 569 n. 14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic,* 550 U.S. at 563.

Allegations of fraud, such as the allegations made in support of Plaintiffs' securities fraud claim, are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280–81 (7th Cir.1996). Plaintiffs must plead the circumstances constituting fraud with particularity. Fed.R.Civ.P. 9(b). They must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was communicated. *Vicom, Inc.*

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 53 of 118 PageID #:2457

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

*v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994); see also *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007) (fraud must be pled with particularity by providing the who, what, when, where, and how).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), further raises the pleading standard for securities fraud claims. See *Teamsters Affiliates Pension Plan v. Walgreen Co.,* 2010 WL 3894149, at *2 (N.D.Ill. Sept.29, 2010) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I),* 437 F.3d 588, 596 (7th Cir.2006) ("[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading-one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b).")). Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties," *Tellabs,* 551 U.S. at 313—it was intended "to screen out frivolous suits, while allowing meritorious actions to move forward." *Id.* at 324. "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313. In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

 **\*19** Further, in claiming scienter under the PSLRA, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). A complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged. *Tellabs,* 551 U.S. at 324. The Supreme Court has emphasized that "[t]he inquiry * * * is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (original emphasis). As the Court explained, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others,

follows from the underlying facts?" *Id.* at 323. Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable, or even the "most plausible of competing inferences." *Id.* at 324. It must, however, be "cogent and compelling." *Id.* The Seventh Circuit has rejected the " 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh,* 521 F.3d at 693.

As is common with similar securities actions, some of Plaintiffs' contentions are made on information obtained from confidential sources. "While the PSLRA does not require [plaintiffs] to name their confidential source, they must nevertheless describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' " *Selbst v. McDonald's Corp.,* 432 F.Supp.2d 777, 782–83 (N.D.Ill.2006) (quoting *Tellabs I,* 437 F.3d at 596); see also *Makor Issues & Rights, Ltd v. Tellabs Inc. ("Tellabs III"),* 513 F.3d 702, 712 (7th Cir.2008) (permitting reliance on the assertions of unnamed confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"). While the Seventh Circuit does allow information from confidential witnesses to help generate a strong inference of scienter, see *Silverman v. Motorola, Inc.,* 2008 WL 4360648, at *14 (N.D.Ill. Sept.23, 2008) (citing *Tellabs III,* 513 F.3d at 712), it has expressed a healthy skepticism regarding information obtained from confidential sources. See *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756–57 (7th Cir.2007) (stating that information from confidential sources should be discounted as unreliable and is of limited value in establishing scienter).

## IV. Analysis of Motion to Dismiss

### A. Count I

### 1. Failure to Adequately Plead Falsity

 **\*20** The first argument that Defendants direct at the complaint is that Plaintiffs have failed to specify each statement alleged to have been false or misleading and the reasons why the statement is false or misleading, as required by the PSLRA. § 78u–4(b)(1)(B). As stated above, the PSLRA's heightened pleading instructions require Plaintiffs to "specify each statement alleged to have been

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 54 of 118 PageID #:2458

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Claiming that a particular statement was untrue is not enough—Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue. See *Premier Capital Management, L.L.C. v. Cohen,* 2003 WL 21960357, at *2 (N.D.Ill. Aug.15, 2003) (citing *Clark v. TRO Learning, Inc.,* 1998 WL 292382, at *4 (N.D.Ill. May 20, 1998)); see also *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d 969, 1000 (E.D.Wis.2009) (complaint deficient because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made"). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I,* 437 F.3d at 595 (quoting *Novak v. Kasaks* 216 F.3d 300, 314 n. 1 (2d Cir.2000)).

Defendants correctly emphasize that Plaintiffs must allege facts that show with sufficient particularity that Anixter made statements that were "false when made (not incorrect in retrospect)." (Def. Mem. Mot. Dismiss [44] at 7); see also *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332 (7th Cir.1995) ("[T]he securities laws typically do not act as a Monday Morning Quarterback. The securities laws approach matters from an *ex ante* perspective.") (internal citation and quotation omitted); *Zerger v. Midway Games, Inc.,* 2009 WL 3380653, at *7 (N.D.Ill. Oct.19, 2009) (plaintiffs required to plead facts known to Defendants "contemporaneous to the [allegedly-false] statements"). To this point, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.' " *Higginbotham,* 495 F.3d at 759–60 (quoting *Tellabs,* 551 U.S. at 320 and *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)); see also *Pugh,* 521 F.3d at 694–95; *Sutton v. Bernard,* 2001 WL 897593, at *4 (N.D.Ill. Aug.9, 2001) ("statements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading"). As Defendants aptly phrased it, Plaintiffs cannot merely "contrast relatively positive statements from Anixter during the first half of 2008 with less positive statements from the third quarter, and argue that it was fraud—not an intervening global economic catastrophe—that explains the difference." (Def. Mem. Mot. Dismiss at 7).

As described above, Plaintiffs allege that Defendants made false or misleading statements on five occasions: (1) on January 29, 2008, when Anixter announced its results for the fourth quarter and full year of 2007; (2) on February 21, 2008,

in Anixter's 2007 Form 10–K; (3) on April 22, 2008, when Anixter announced its results for the first quarter of 2008; (4) on July 22, 2008, when Anixter announced its results for the second quarter of 2008; and (5) on July 31, 2008, in Anixter's Form 10–Q for the second quarter of 2008. The Court will consider each of these instances in turn.

*January and February 2008 Statements*

**\*21** As noted above, Plaintiffs' complaint is nearly 60 pages long and is replete with long blocks of text, quoted from press releases and scripts of conference calls. Accordingly, it was not an easy task for the Court to determine precisely which statements Plaintiffs consider to be fraudulent.[12] However, in their response to Defendants' motion to dismiss [46 at 11–12], Plaintiffs have helpfully focused the Court on those statements that they consider to be actionable. Plaintiffs allege that the following statements made on January 29, 2008 were false:

12      Some courts have found complaints to be subject to dismissal under the PSLRA solely for utilizing a pleading style similar to Plaintiffs'. See, *e.g. Tabor v. Bodisen Biotech, Inc.,* 579 F.Supp.2d 438, 453 (S.D.N.Y.2008) ("Plaintiff['s] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements."); *Brodsky v. Yahoo! Inc.,* 592 F.Supp.2d 1192, 1198 (N.D.Cal.2008) ("because most of the [complaint] consists of block quotations taken from statements by Defendants and securities analysts, Plaintiffs have not plead falsity with the required particularity" under the PSLRA); see also *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998) ("In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.").

(1) that the Company continued to successfully execute its 2008 growth strategy;

(2) that the OEM business had a solid backlog of orders and a strong pipeline of new projects;

(3) that business activity levels in Europe were strong and expected to grow;

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 55 of 118 PageID #:2459

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

(4) that despite an uncertain economic environment, Anixter's end markets were not being affected and the recent solid trends in sales and growth would continue into 2008; and

(5) that Defendants saw nothing in its European business that would derail the 9–11% growth for that segment they expected.

Plaintiffs do not plead facts sufficient to suggest that any of the statements cited above were false or misleading when made.[13] For example, Plaintiffs do not identify any information known to Defendant Grubbs on January 29, 2008 that suggests that he knew that his statement that Anixter had a "solid backlog and healthy pipeline of potential new projects and customers" was untrue at the time that he made it. Plaintiffs allege no inaccuracy or fraud in any of Anixter's financial reporting.[14] None of Plaintiffs' six confidential witnesses offers any allegations that pertain to the January or February 2008 timeframe. See ¶¶ 69–72, 86–90, 92–93, 109–13.

[13]    In addition to the statements identified in Plaintiffs' response, the Court has scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from January/February 2008 were false or misleading.

[14]    For example, Plaintiffs could properly allege the falsity of Anixter's statement that "business levels in Europe were strong" if they could identify undisclosed financial information in Defendants' possession at the time that the statement was made that showed the opposite.

Plaintiffs argue that the January 29 statements were false because Defendants knew that business in two of the market segments that Anixter served (the "OEM Market—particularly in the U.S. and European automotive industries" and the market for corporate IT projects) had begun to slow in late 2007 and already was negatively affecting Anixter's business. (Pl. Resp. Mot. Dismiss at 12). In support of this argument, Plaintiffs point the Court to allegations that generally demonstrate that these sectors of the global economy were slowing.

For example, Plaintiffs rely on their allegations in paragraph 58, which states that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe." As an initial matter, Defendants were not required to publicly disclose to the markets statements about the general condition of the global economy. See *Higginbotham v. Baxter Intern., Inc.,* 495 F.3d 753, 759 (7th Cir.2007) (citing *Wielgos v. Commonwealth Edison Co. .,* 892 F.2d 509, 517 (7th Cir.1989) ("The securities laws do not require firms to 'disclose' information that is already in the public domain.")). But more to the point, even if Grubbs knew that corporate spending on IT projects was beginning to decline in January of 2008, that knowledge is not sufficient to support a reasonable belief that Grubbs' statement that Anixter had a "solid backlog" of new projects and customers was false. Perhaps Anixter, at that time, did have a solid backlog of new projects despite the worsening economic conditions. Contrasting Defendants' specific statements about Anixter's business with generalized, well-known allegations about the state of the economy is insufficient to establish falsity under the strict pleading requirements of the PSLRA. *Premier Capital Management, L.L.C.,* 2003 WL 21960357, at *2.

 **\*22**  Paragraph 58 also alleges that Defendants knew (but failed to disclose) that by January 2008, Anixter was suffering a "slowdown in sales in its enterprise cabling business." The next sentence of Paragraph 58 is intended to provide support for this statement: "Indeed, defendant Eck later admitted after the Class Period that 'IT projects spending ... that drives [Anixter's] cabling business tends to slow down, very obviously slows down, in difficult times.' " It is not apparent to the Court that Eck's later statement is an "admission" that Anixter was aware (yet failed to disclose) that its IT projects business actually was slowing in January of 2008. Regardless, post-class period allegations are no substitute for facts showing contemporaneous knowledge of a statement's falsity. *Higginbotham,* 495 F.3d at 759–60; *Sutton,* 2001 WL 897593, at *4.[15]

[15]    See discussion of post-class statements, *infra* Sec. IV. 2.

Regarding Anixter's OEM business, Plaintiffs allege that by 2008 the "industrial and automotive industries * * * were slowing dramatically as a result of the global economic crisis." ¶ 59. Again, Defendants do not commit securities fraud by failing to specifically alert investors to the general condition of certain segments of the market. *Higginbotham,* 495 F.3d at 759; see also *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.,* 7 F.3d 357, 377 (3d Cir.1993) ("[W]e hold that the defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast. As the reasonable investor should have known

of the economic downturn in the Northeast at that time, the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors. The federal securities laws, in a word, do not compel the Partnership to state the obvious."); *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 279 (3d Cir.2004) (defendant "was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); *Baron v. Smith,* 380 F.3d 49, 57 (1st Cir.2004) ("It is not a material omission to fail to point out information of which the market is already aware.").[16]

[16]    Plaintiffs also direct the Court to ¶¶ 60 and 106 of their Complaint. The allegations in ¶ 106 are not actionable for the same reasons as those in ¶¶ 58 and 59.

The Court now turns to one of the key components of Plaintiffs' claims—namely, that the "organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 14). Plaintiffs' complaint does not identify with the particularity required by the PSLRA (or Rule 9(b)) the source for their allegation that by January and February of 2008, Defendants were promising 8–12% organic growth for the entire company for 2008. Instead, paragraph 42 generally pleads that by "mid–2007, defendants began telling investors that * * * Anixter expected to achieve organic revenue growth of 8% to 12% * * * in 2008." However, that allegation fails to identify which Anixter executive or executives made the statement or statements, when they were made, and the particulars of each statement. Accordingly, the Court disregards the allegation in paragraph 42. Plaintiffs may not plead generally that Anixter provided "guidance of 8% to 12% organic growth for 2008," as they do throughout the complaint. See ¶¶ 4, 6, 15, 57, 108.

 **\*23**  The closest that Plaintiffs come for support for their "8–12%" allegation in early 2008 is from Defendant Letham's response (during the January 29th earnings call) to a question about whether he expected the "nine to 11% [growth] range continuing ahead here in Europe and then Asia Pacific, Latin America" to continue. See ¶ 52. Accepting all reasonable inferences in favor of Plaintiffs, the exchange can be read as Defendant Letham reporting that he expected to see that level of growth continuing for Europe "as we go into the next year." However, the statement cannot be stretched as far as Plaintiffs would like. Letham never said that he expected 9–11% *organic* growth (as opposed to growth including acquisitions), or that he expected 9–11% growth for the *entire company,* as opposed to the regions that he identified. Further,

the time period in the statement is indefinite—nowhere does Letham promise 9–11% over 2008 in its entirety.[17]

[17]    Defendants argue that even if they had explicitly promised "8–12% organic growth for 2008," such a statement would not be actionable under the securities laws. In support of their position, Defendants cite a number of cases that have held "vague statements predicting growth" to be nonactionable. *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 289–90 (4th Cir.1993) (statement projecting "expected annual growth rate of 10% to 30% over the next several years" was not actionable "because the market price of a share is not inflated by vague statements predicting growth"); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993) ( "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."). The Seventh Circuit has commented favorably on both *Raab* and *Krim,* but has not adopted a per se rule that predictions of future growth are immaterial and therefore not actionable. *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332–33 & n .6 (7th Cir.1995) ("While it often may be the case that predictions of growth are not material, we hesitate to impose a *per se* rule to this effect. The Supreme Court has cautioned that materiality is typically an issue to be resolved by the finder of fact. A blanket rule that forward-looking statements are not material does not allow for the contextual, fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity.") (citations omitted). Accordingly, in the Seventh Circuit it appears that forward looking statements that are false when made or made without a reasonable basis can give rise to § 10(b) and Rule 10b–5 liability, if they are material. *Id.; Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995); see also *Iles v. Swank,* 2006 WL 1806365, at \*3 (N.D.Ill. June 28, 2006); *Weiner v. Quaker Oats Co.,* 2000 WL 1700136, at \*11 (N.D.Ill. Nov.13, 2000).

Plaintiffs' other central allegation is that Defendants "repeatedly disclaimed that Anixter was suffering any negative effects associated with deteriorating credit markets and global economic conditions." (Pl. Resp. Mot. Dismiss at 4; see also *id.* at 14–15). Contrary to Plaintiffs' allegations, Defendants never told investors in early 2008 that Anixter was categorically immune to the effects of a global economic slowdown. For example, in January of 2008, Defendant Letham recognized the "negative economic news" in the "broader markets," and stated that *"early indications* of our business activity continue to support a continuation of solid trends for our business despite the economic uncertainties in

Garden City Employees' Retirement System V. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

other parts of the economy." ¶ 49 (emphasis added). Letham's statement was a measured one; the statement itself reflects the fact that it was based only on the preliminary data then available. The complaint does not identify information in Defendants' possession as of January 2008 that would render fraudulent Letham's generally positive statements about the business as a whole.[18]

18      Similarly, Defendant Grubbs stated that in spite of "a well publicized less certain overall economic environment than 2007, *recent activity levels* suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year." ¶ 48 (emphasis added). Plaintiffs do not identify any information known to Defendant Grubbs that undercuts the proposition that then-recent activity levels suggested that 2008 would present "opportunities for growth."

Furthermore, Plaintiffs' response makes clear that its main claim of poor performance concerns Anixter's European OEM business. But that emphasis falls short for at least a couple of reasons. First, Defendant Grubbs disclosed on January 29th that organic revenue growth in Europe was "flat" (¶ 47), undermining Plaintiffs' allegation that Defendants painted an improperly rosy picture of their prospects in that market. Second, even if Defendants had failed to sufficiently account for weaknesses in Anixter's European OEM business, that division represents only 10% of Anixter's sales. Weaknesses in one (relatively small) part of Anixter's business would not necessarily render untrue positive statements about the company as a whole. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 960 (8th Cir.2008) (citing *In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 549–50 (8th Cir.2004)) ("[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."). Plaintiffs do not explain with the particularity required by the PSLRA why Anixter's European OEM business was so important to Anixter's overall financial health that declining sales there would necessarily have a material impact on the Company's bottom line. Similarly, Plaintiffs do not explain why Anixter's positive statements about its business did not take into account any problems that existed in its European OEM businesses along with other offsetting factors in other countries and with other products.

*April 2008 Statements*
 **\*24** Similarly, Plaintiffs have not properly alleged that any of Defendants' statements from April 2008 were false

or misleading. Plaintiffs challenge as fraudulent statements that Defendants made on April 22, 2008 indicating that Anixter's business *as a whole* was succeeding and would continue to succeed in the face of an economic slowdown. For example, on April 22, 2008, Defendant Grubbs reported that the "diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions." ¶ 61. During the same call, Defendant Eck reported that "any effect from the declining economic environment on Anixter was limited to specific customers and did not represent a 'broader trend' for the Company's businesses." ¶ 62. Plaintiffs' explanation as to why these and similar statements were untrue at the time they were made is insufficient.

Here again, Plaintiffs' tactic is to contrast positive statements (which again, pertained to the business as a whole) with increasingly poor performance from Anixter's European OEM business. As an initial matter, Defendants do not deny that they were aware of the increasing weakness in this segment of Anixter's business. In fact, on April 22, 2008, the Company announced that its organic growth rate for Europe had fallen to only 2%.[19] ¶ 61. Defendants discussed lower gross margins and operating margins in the European OEM supply business in the April 22, 2008 earnings call and the press release that accompanied it. See ¶ 64. Further, Defendant Eck was specifically discussing Anixter's "OEM supply businesses" when he warned that "[s]hort-term macro-economic conditions may slow our organic sales growth from the rates of the past couple of years."[20] ¶ 62. Despite these caveats and warnings regarding Anixter's OEM and European businesses, Plaintiffs hew to their argument that Defendants' positive statements about Anixter as a whole were misleading in light of the poor performance in the European OEM segment. Here again, Plaintiffs cannot explain how weakness in one relatively small segment of Anixter's business renders false generally positive statements about the business as a whole (especially when the weaknesses in the European OEM business were disclosed).[21]

19      By way of contrast, the complaint reflects that many of the company-wide results Anixter reported for 1Q08 were positive. See ¶ 61 (reporting rise in sales, operating profits, and earnings per diluted share over the prior year quarter).

20      CW1 reports that "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. The

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 58 of 118 PageID #:2462

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

information provided by this witness is of little value to Plaintiffs—Defendants do not deny that they were aware of problems in their European OEM business, which they timely disclosed. CW1 does not allege that Individual Defendants knew, as of April 22, 2008, that results in that particular business line would trend downward for the rest of the year, or that such a downward trend would not be offset by successes in other businesses. The complaint also reflects the fact that Defendant Eck described a slowdown in Anixter's OEM business as a "[s]hort term anomaly" attributable in part to cycles in the commodities markets. Plaintiffs offer no allegations sufficient to suggest that this statement was false when it was made. Additionally, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe," but predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. ¶ 63. Defendants offer no facts that would suggest that Eck knew that seasonal upticks in sales and pricing actions would not, in fact, mitigate the "pressure" in those markets.

21      As with the challenged January/February statements, the Court has carefully scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from April 2008 were false or misleading. For example, Plaintiffs have failed to plead specific facts suggesting that Anixter did not, in fact "continue[ ] to make significant progress on [its] major initiatives" in Q108 (¶ 63), or that Anixter had not experienced "an improvement in conditions" between Q1 and Q2 (¶ 67).

The only other allegation to which Plaintiffs point to establish the falsity of Defendants' April 22, 2008 statements involves Anixter's pricing dispute with JLR, a major European OEM customer. See ¶¶ 70, 71, 113. Defendants did not disclose this dispute to shareholders until after the end of the class period. As an initial matter, the Complaint does not allege with adequate particularity that the Individual Defendants knew of the dispute at any time during the class period. The Complaint does not identify precisely when the dispute between JLR and Anixter began and when Individual Defendants became aware of it. See *id.* Instead, the complaint alleges that "JLR's pressure on Anixter [to lower prices] became even more pronounced * * * in March 2008." The complaint alleges that it was "well known at Anixter's Spitfire Park Plant in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed amount." ¶ 71. However, Plaintiffs do not allege how or when any of Individual Defendants learned of the dispute (although Plaintiffs do

allege that Eck visited the Spitfire Park plant in July 2008). *Id.* Assuming for the sake of argument that Plaintiffs have properly alleged that Individual Defendants knew of the JLR dispute on April 22, 2008, the complaint fails to properly allege facts suggesting that Defendants knew that they would lose the dispute and would have to pay JLR.

**\*25**  Assuming further that the complaint alleged that Defendants knew about the dispute and knew on April 22, 2008 that Anixter would have to pony up, the complaint does not adequately allege that the dispute was "material" such that Anixter was required to disclose it. Rule 10b–5 forbids a company or an individual "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The complaint alleges that "[u]ltimately, on October 20, 2008, defendants admitted that Anixter was involved in this 'pricing dispute' and was forced to pay the $3 million disputed amount during the class period, which had a material impact on the Company's earnings and gross margins." ¶ 71. The allegation that $3 million had a "material impact" on Anixter's financials (and thus the dispute was a "material fact" that should have been disclosed) is a legal conclusion which the Court is not bound to accept. See *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); see also *Twombly,* 550 U.S. at 555 (while a court must take all of the factual allegations in the complaint as true for purposes of a motion to dismiss, it is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiffs have not included allegations in their complaint that are sufficient to plausibly suggest that $3 million is an amount material to Anixter and the Court cannot assume that it is. For example, Plaintiffs do not identify how much revenue Anixter took in during 2008. Three million dollars almost certainly would be a material amount to a mom-and-pop grocery store, but it would not be material to an international giant like Microsoft. Where Anixter lies on the continuum of corporate financial resources should be a fact ascertainable by Plaintiffs from available, publicly-filed documents.[22] Apart from the allegations involving the JLR pricing dispute, Plaintiffs offer no other undisclosed information at Anixter as of April 22, 2008 that suggests that any of the executives' statements were false.

22      As discussed above, Defendants attempted to cite to their SEC filings to establish that Anixter had more than

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 59 of 118 PageID #:2463

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

$6 billion in revenue in 2008, and that the $3 million disputed amount, if it had not been paid, would have represented an increase of less than 1% in Anixter's profit for 2008. See *Higginbotham,* 495 F.3d at 759 ("securities lawyers often use a 5% change as a rule-of-thumb approach to what is 'material' "). The Court has not considered this argument, as the Court has not judicially noticed the SEC filings which establish Anixter's size for the truth of their contents. See *infra* Sec. II.

The Court now returns to the "core" of Plaintiffs' complaint-that Defendants were promising 8–12% organic growth for 2008 at a time when they knew that they could not possibly deliver on that goal. The April statement that Plaintiff challenges is Defendant Letham's statement that "the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Nothing in the statement can be read as a projection or promise of performance for the 2008 year—instead, reading all inferences in favor of Plaintiffs, Letham here reports that Anixter had a "target range" of 8–12% organic growth, not limited to a specific time frame or division of the company. As explained above, Plaintiffs identify no facts then known to Letham that suggest that a general organic growth projection of 8–12% (not limited to a certain time frame or division of the company) made on April 22, 2008 would have been in bereft of a reasonable basis or in bad faith.

*July 2008 Statements*

 **\*26**  Like the challenged statements from the first half of 2008, the Court has considered Plaintiffs' allegations pertaining to the statements Defendants made in July of 2008 and concludes that none are actionable. Because Plaintiffs' discussion of the July statements in their response focuses on their twin "core" allegations (Pl. Resp. Mot. Dismiss at 14–15), the Court will begin there.

First, Plaintiffs essentially argue that by July of 2008, the economy had soured to such a state that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." *Id.* The problem with Plaintiffs' argument is the same for the July statements as it was for the statements from the early parts of 2008—Anixter simply did not promise "8–12% organic growth for 2008" either in its July SEC filings, press releases, or during the July 22, 2008 earnings call with analysts.

On July 22, Anixter reported some positive numbers, but reported organic sales growth of only 4% for the quarter. ¶ 74.

Discussing the slower organic sales growth rates, Defendant Eck said the following:

"While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence. We believe the overall market conditions, as they currently exist, should allow for consecutive quarter sales growth from the second to third quarter of this year. *If we achieve a modest level of consecutive quarter growth, it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth."*

¶ 74 (emphasis added). The plain implication of the statement is that Anixter was then not on track to hit its "longer-term target" of 8 to 12 percent yearly growth, and assuming a "modest level of consecutive quarter growth," Anixter's growth rates would move "closer" to the 8–12% range.

Plaintiffs' second "core" argument is that in July, Defendants continued to falsely deny "that Anixter was being negatively effected [sic] by the slowing economy." (Pl. Resp. Mot. Dismiss at 15). When Anixter reported its 2Q08 results, Defendants recognized that organic growth had slowed to 4% (see ¶ 74), but also reported some positive results for the quarter (see ¶ 75). With these results in mind, Anixter's executives did recognize the "continuing concerns about weaknesses in our economy." ¶ 77; see also ¶ 75 (acknowledging "continuing macroeconomic uncertainty"). However, many of Individual Defendants' July statements about Anixter's business prospects as a whole were of a positive nature. Individual Defendants opined that Anixter's business as a whole would continue to succeed in the face of the economic downturn. See, *e.g.* ¶ 74 ("While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence"); ¶ 77 ("while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world"). Plaintiffs have not properly alleged that these statements were false or misleading because they have failed to identify "specific, contradictory information presumably known" to Individual Defendants in July that contradicted these statements about Anixter's business as a whole. *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d at 1000. As explained below, to the extent Plaintiffs' confidential witnesses offer undisclosed information known to Defendants in July of 2008, the information regards only Anixter's

European OEM business and one customer of Anixter's U.S.-based OEM business.

**\*27** Individual Defendants also spoke about Anixter's OEM business and its business prospects in Europe. The statements regarding these aspects of Anixter's business can best be described as "mixed." Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity," these developments were "offset by growth with other customers and other geographies." ¶¶ 78–79. Defendant Eck recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id.* While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. ¶ 75. In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id.* However, addressing the issue of continued "margin pressure from steel price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id.* Defendant Letham reported "good quote activity in the OEM supply business." ¶ 78.

These statements (which again, reflect a rather mixed outlook) would be misleading only if (1) Plaintiffs could point to specific statements that were untrue or misleading; or (2) Plaintiffs could identify information known to Individual Defendants at that time that was of such a negative nature as to preclude Anixter from saying nearly anything positive about Anixter's OEM business or its prospects in Europe. The complaint fails to do either. First, Plaintiffs offer nothing to contradict any *specific* statement made by Individual Defendants in July. For example, Plaintiffs do not offer facts to suggest that Anixter was not seeing "good quote activity" in its company-wide OEM supply business. (¶ 78). Again, Plaintiffs take no issue with any of Anixter's reported financials.

Instead, Plaintiffs essentially argue that Anixter's OEM supply business (especially in the U.S. and Europe) was doing so poorly that the positive statements Defendants made in July were misleading. (Pl. Resp. Mot. Dismiss at 15). Plaintiffs fail

to offer "specific, contradictory information," *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d at 1000, presumably known to Individual Defendants in July that is sufficient to establish this proposition. Instead, the allegations they do offer (from "confidential witnesses") fail to establish much of anything.

According to CW1, a "former Credit Manager for Anixter's European Markets," "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. CW1 reports that Anixter's UK OEM business had fallen nearly by half "by the end of 2008," but does not offer information as to that division's performance as of July 22, 2008. As noted above, Defendants did report that Anixter's UK OEM business was "beginning to slow a touch" because of "macroeconomic factors." ¶ 79. Nothing that CW1 reports concerning Anixter's performance at year end is inconsistent with any of Individual Defendants' statements to the markets on July 22. The information provided by CW3 is more temporally specific but less specific in regard to the level of decline of Anixter's sales. CW3 reports that "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008." ¶ 86. The Court is left to guess what a "significant decline" in sales is. Considering the fact that in July, Defendants did acknowledge slowed sales from this division, CW3 does not provide information sufficient to suggest that Defendants' July statements were false or misleading.

**\*28** Finally, the allegations from CW4—a "U.S.-based Product Planner in Anixter's OEM division"—are insufficient to suggest that any of Defendants' July statements were false or misleading. CW4 reports that by "mid–2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88. The Court is left to guess what "mid–2008" means. It is unclear whether the events described by CW4 began prior to Defendants' July 22, 2008 statements. In the next paragraph, Plaintiffs' are more specific, alleging that "by the summer of 2008, an increasing number of orders were ranked at 900" (meaning they were slated to be cancelled or delayed). ¶ 89. However, later in the complaint, Plaintiffs cite CW4 for the proposition that *"beginning in August 2008,* an increasing number of orders were ranked at 900." ¶ 112 (emphasis added); see also ¶ 111 ("According to CW4 * * * by *August and September 2008,* Anixter was pushing out delivery dates for products previously ordered from vendors, or cancelling the orders

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 61 of 118 PageID #:2465

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

entirely, in order to avoid taking delivery of new inventory * * * ”) (emphasis added). The internal inconsistencies in the complaint make it impossible for the Court to assess whether the events described by CW4 began before or after Individual Defendants spoke to the market on July 22, 2008.

Furthermore, CW4's information is of limited value, because “many of” the orders that were delayed or cancelled involved one customer—Case New Holland. ¶¶ 89–90; 110–112. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 960 (8th Cir.2008) (citing *In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 549–50 (8th Cir.2004)) (“[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard.”); *California Pub. Employees' Ret. Sys. V. Chubb Corp.,* 394 F.3d 126, 156 (3d Cir.2004) (“[A]nectdotal examples of profitable customers lost of policies renewed at flat or slightly raised raises [do] not demonstrate that the rate initiative was failing”). The complaint says that “many of” the delayed or cancelled orders involved Case New Holland, leading to the inference that there were some delayed or cancelled orders that involved other customers. However, Plaintiffs have not identified any of these other orders or customers.

Because Plaintiffs have failed to specify any statements alleged to have been false or misleading and the reasons why the statements are false or misleading, as required by the PSLRA. § 78u–4(b)(1) (B), dismissal of Count I is appropriate.

### 2. Failure to Plead Scienter in Accordance with the PSLRA

Count I also is subject to dismissal for a second, independent reason. As discussed above, the PSLRA provides that the complaint in a securities-fraud action must, “with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u–4(b)(2). That “required state of mind” is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). In many ways, the analysis the Court has undertaken in Section IV.A.1. above overlaps with the scienter analysis; for if Plaintiffs have failed to properly plead that any of Anixter's statements were false or misleading, Planitiffs could hardly allege that Defendants made false statements with the required state of mind. For example, the information provided by Plaintiffs' confidential witnesses

does not give rise to an inference that Defendants were acting with scienter, as the information provided by the CWs is not inconsistent with Defendants' disclosures.[23]

23     Similarly, Defendants' statements regarding Anixter's European OEM business do not add to an inference of scienter. As discussed above, Defendants disclosed difficulties in this area of its business during the class period. See, *e.g. Cutsforth v. Renschler,* 253 F.Supp.2d 1216, 1261 (M.D.Fla.2002) (disclosure of negative information “is inconsistent with the contention that * * * defendants were acting with scienter”).

**\*29** With that said, the Court writes further to elaborate on why Plaintiffs complaint fails to adequately allege the required “strong” and “cogent” inference of scienter. *Tellabs,* 551 U .S. at 322–24. The two grounds on which Plaintiffs base their allegations of scienter not previously discussed by the Court are (1) Defendants' post-class period statements, and (2) Individual Defendants' stock sales during the class period.[24] The Court will discuss each of these issues in turn.[25]

24     Additionally, throughout the complaint, Plaintiffs allege that Defendants “acted with scienter” (*e.g.* ¶ 105) or “knew” that the economic downturn was affecting the Company or that the Company would not meet its growth goals (*e.g.* ¶ 106). These sorts of “generalized and conclusory assertions do not satisfy the heightened pleading standard imposed on securities actions by the PSLRA,” *Roth v. OfficeMax, Inc.,* 527 F.Supp.2d 791, 800 (N.D.Ill.2007), and the Court need not discuss them further.

25     Although the Court discusses each of these issues separately, the Court wishes to make clear that it has not “scrutinize[d] each allegation [regarding scienter] in isolation” but instead has assess[ed] all the allegations holistically” to determine whether Plaintiffs properly alleged scienter. *Tellabs,* 551 U.S. at 326.

First, at various places in the complaint, Plaintiffs attempt to cite to Defendants' post-class period statements as evidence that Anixter's executives knew that their statements during the class period were false or misleading. See, *e.g.* ¶¶ 86, 96–102; 106–107. For example, Plaintiffs argue that on February 3, 2009 (when the fiscal year 2008 financial results were announced), Defendants “admitted” that Anixter had experienced a “trend of decelerating growth rates * * * in the past few quarters.” (Pl. Resp. Mot. to Dismiss at 21–22 (citing ¶ 107)). Similarly, after the end of the class period, Defendants allegedly “admitted” that they “have a very detailed view of

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 62 of 118 PageID #:2466

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

what's happening in each of the end markets and each one of the geographies," and that "when the market slows, the chunk of the market that we do particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly in our business." (*Id.* (citing ¶¶ 106–107)). Plaintiffs use these "admissions" in an to attempt to show that Defendants knew during the class period that Anixter's business was being affected by the economic downturn, yet failed to disclose that fact. (*Id.*).

As explained above, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.' " *Higginbotham,* 495 F.3d at 759–60. Post-class period statements by Defendants recognizing that their business has experienced a downturn do nothing to suggest that Defendants had contemporaneous knowledge (yet failed to disclose) that their company was earlier experiencing a downturn. That said, it is not the case that post-class period statements are never relevant in a securities fraud action. For example, in *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 254 (5th Cir.2009), cited by Plaintiffs, the plaintiff had provided "admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails)." The Fifth Circuit held that these "admissions" did support an inference of scienter. *Id.* ("The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly."). The Fifth Circuit further explained that "the plaintiff's partial reliance on alleged facts dating from the post-class period does not amount to 'fraud by hindsight' " because "the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.,* they are evidence that the defendants actually knew earlier that the course of action would turn out badly." *Id* .

 **\*30**  Here, the Court has carefully considered all of the post-class period statements identified by Plaintiffs. Unlike the "admissions" used by the plaintiffs in *Lormand,* the later statements seized on by Plaintiffs here are not akin to "admissions" by Individual Defendants that they had engaged in securities fraud. Many of the statements (*e.g.,* the statement Anixter had experienced a "trend of decelerating growth rates") amount to nothing more than *ex-post* descriptions of Anixter's financial performance in 2008.

The statements do not establish that Defendants knew—from an *ex ante* perspective—that Anixter's growth rates would trend downward over the year. *Higginbotham,* 495 F.3d at 759–60. The statements that Defendants "have a very detailed view" of Anixter's financial performance and that Defendants would notice the effect of a slowed market "pretty quickly" are not admissions that Defendants foresaw (yet failed to disclose) the fact that Anixter's growth rates would continue to decline over the course of 2008 to the extent that they did. If Plaintiffs could identify contemporaneous information known to Defendants that showed that Anixter's current financial health or future prospects was poorer than what Defendants disclosed to the market, such post-class period statements may be relevant to corroborate and build on the inference of scienter raised by the possession of that contemporaneous information. See *Lormand,* 565 F.3d at 254. But on their own, the post-class period statements identified by Plaintiffs do not help to establish a "strong" or "cogent" inference of scienter.

Individual Defendants' sales of Anixter stock during the class period likewise do not raise an inference of scienter. Most importantly, Plaintiffs' complaint fails to establish a strong inference of scienter because Plaintiffs have only provided information about Defendants' stock sales from *within* the class period. Without contextual information about Defendants' stock sales outside the class period, the Court cannot determine if the class period sales were "unusual or suspicious." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008). In *Pugh,* the Seventh Circuit held that the plaintiffs' discussion of the defendants' sales of stock in the complaint had failed to create a strong inference of scienter. There, the "complaint merely set[ ] forth the aggregate amount of shares sold during the class period and the value of those shares," *id.*—which is precisely what Plaintiffs here have done. "[T]he failure to provide any context showing that the applicable time period was unusual undercuts a 'strong' demonstration of scienter." *Id.* (citing *Higginbotham,* 495 F.3d at 759 ("Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April.")). Plaintiffs do not even attempt to distinguish *Pugh,* despite the fact that Defendants repeatedly cited it throughout their opening memorandum.[26] Instead, Plaintiffs argue that Defendants' sales were "suspicious in both timing and amount"—suspicious in timing because Defendants Grubbs sold stock on January 29, 2008 (the same day they spoke to the market),[27] and suspicious in amount because of the allegedly large amount of stock sold and the price at which the sales were made. (Pl. Resp. Mot. Dismiss at 26). But

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 63 of 118 PageID #:2467

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

without contextual information about Defendants' stock sales outside the class period, the Court cannot properly evaluate these arguments. *Pugh* is directly on point, and in light of that controlling authority, Plaintiffs' reliance on Defendants' class period stock sales to establish scienter fails.

26    Plaintiffs also ignore *Higginbotham's* discussion of the same issue.

27    Defendant Letham sold a block of stock two weeks later, on February 15.2008.

 **\*31**  As discussed above, Defendants have attached Forms 4 showing Defendants' sales from 2006 and 2007. Because the Court has determined that Plaintiffs' complaint is subject to dismissal for the reasons stated above, the Court need not rule definitively on the difficult question (discussed at length above) of whether it may consider at this stage of the case the Forms 4 for the truth of what is discussed in them. Nevertheless, looking ahead to the possibility of an amended complaint—and further down the road to a possible motion for summary judgment—it would appear that the Forms 4 provide the "context" that Plaintiffs thus far have omitted. A review of those Forms and the chart at Exhibit D which summarizes them, seems to undermine any notion that a strong inference of scienter can be drawn from Defendants' stock sales. In fact, Defendant Letham sold no more shares during the class period than during the same months in each of the two prior years.[28] Defendant Grubbs sold substantially less stock during the class period than in prior years.[29] Interestingly, Defendant Grubbs sold more stock in January of 2008 than he sold in any other single month in 2006, 2007, and 2008 (29,000 shares). However, Plaintiffs do not mention that Defendant Grubbs sold 14,000 of those shares on January 2, 2008—just weeks *before* he allegedly began to engage in securities fraud. If anything, a large sale of stock just before a defendant is alleged to have begun engaging in securities fraud undercuts an allegation of scienter. The *only* sale that Defendant Eck made in 2006, 2007, and 2008 was a sale of 1,045 shares in September of 2008.[30] As this sale represented only 7.17% of his holdings at the time (1.92% including options), it is difficult to infer much of anything from it.[31]

28    For example, Defendant Letham sold 3,668 shares per month in January through June of 2008, 3,668 shares per month in January through June of 2007, and 3,332 shares per month in January through June of 2006.

29    Defendant Grubbs sold 15,000 shares during the class period. He sold 30,000 shares during the months of January–October 2008, 196,125 shares during that same period in 2007, and 91,550 shares during that same period in 2006.

30    In their complaint, Plaintiffs mention sales by other Anixter executives who are not Defendants in this case. These sales "need not be considered" as "[t]here are no allegations that th[ese] officer[s] * * * [were] in any way involved in the alleged fraudulent misconduct." *Higginbotham v. Baxter Inter., Inc.,* 2005 WL 1272271, at *8 n. 6 (N.D.Ill. May 25, 2005).

31    Because the Court has found Count I to be subject to dismissal on two independent grounds, it need not address the other arguments Defendants raise regarding Count I—namely, that their forward-looking statements are protected by the PSLRA's statutory safe harbor (19 U.S.C. § 78u–5(c)), that some of Defendants' statements were immaterial puffery, or that Plaintiffs have failed to plead loss causation.

 **B. Count II**

As discussed above, Count II of the complaint is directed against the Individual Defendants and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh,* 521 F.3d at 693. Because Plaintiffs have failed to do this, Count II is dismissed as well.[32]

32    The Court need not address the other argument Defendants have raised in opposition to Count II; namely, that Plaintiffs have failed to properly allege that Individual Defendants had general or specific control over Anixter. See *Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 911–12 (7th Cir.1994).

 **V. Conclusion**

For the foregoing reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice.[33] Plaintiffs are given 28 days to replead if they believe that they can cure the deficiencies identified above. Plaintiffs' motion to strike [47] is granted in part and denied in part.

33    In *Fannon v. Guidant Corp.,* 583 F.3d 995, 1001–02 (7th Cir.2009), the Seventh Circuit discussed whether a district court had abused its discretion in dismissing a securities fraud complaint with prejudice. The court cited a number of cases in which courts of appeals have

found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. *Id.* at 1002. However, the Seventh Circuit declined to adopt a *per se* rule regarding when such complaints should be dismissed without prejudice, finding instead that "each [case] must be evaluated on its own merit, in light of its own procedural history." *Id.* In affirming the district court's dismissal with prejudice, the Seventh Circuit noted that there, plaintiffs had had "a number of opportunities to craft a complaint that complied with the standards of the PSLRA." This is the first time that the Court has dismissed Plaintiffs' complaint and the Court does not see why Plaintiffs should not have at least one opportunity to correct the pleading deficiencies identified in this opinion, if they can do so.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

2006 WL 3743576
United States District Court,
N.D. Illinois,
Eastern Division.

GAS TECHNOLOGY INSTITUTE,
Gas Research Institute, and Endesco
Clean Harbors, LLC., Plaintiffs,
v.
Amirali G. REHMAT, Anthony L. Lee,
S. Peter Barone, et al., Defendants.

No. 05 C 2712.
|
Dec. 15, 2006.

**Attorneys and Law Firms**

Alexander S. Vesselinovitch, Daniel J. Polatsek, Michelle Therese McGuinness, Katten Muchin Rosenman LLP, Joel David Bertocchi, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for Plaintiffs.

Mark L. Rotert, Matthew John Gulde, Law Office of Mark L. Rotert, Theodore Thomas Poulos, Terence H. Campbell, Cotsirilos, Stephenson, Tighe & Streicker, Chris C. Gair, Stephen M. Geissler, Donald R. Harris, Joanne Hannaway Sweeney, Jenner & Block, Joseph Paul Adamczyk, Freeman, Freeman & Salzman, P.C., Joseph J. Duffy, William Paul Ziegelmueller, Stetler & Duffy, Ltd., Jerald P. Esrick, Elizabeth Mary Troy Keiley, Heather Elyse Nolan, Robert Loren Wagner, Wildman, Harrold, Allen & Dixon, Chicago, IL, Andrew R. Miller, Keith, Miller, Butler & Webb, PLLC, Rogers, AR, for Defendants.

***AMENDED MEMORANDUM OPINION AND ORDER***

REBECCA R. PALLMEYER, United States District Judge.

**\*1** Over a period beginning as early as 1993 and lasting at least ten years, Plaintiffs, Gas Technology Institute ("GTI"), Gas Research Institute, ("GRI"), and Endesco Clean Harbors LLC, ("ECH"), entered into subcontracts related to the research and development of certain technologies. Plaintiffs received project reports and paid invoices for work done under these subcontracts, only to discover in mid-2002 that

the subcontracting entities had not, in fact, performed the work. In this lawsuit, filed on May 6, 2005, Plaintiffs, GTI and GRI, Illinois not-for-profit corporations, and ECH, a for-profit Delaware company, allege that Defendants engaged in a scheme to prepare and submit fraudulent invoices and charges to Plaintiffs for projects that were never performed. (Compl.¶¶ 1, 4.) In response to the fraudulent invoices, Plaintiffs mailed numerous checks for deposit in bank accounts set up by Defendants in the U.S. and Canada, and lost millions of dollars as a result of fraud and deceit by the individual Defendants and the subcontractors they set up to facilitate the alleged theft and embezzlement.[1] (*Id.* ¶ 1-3.) Plaintiffs now seek monetary and punitive damages as well as a permanent injunction to prevent Defendants from concealing or squandering these allegedly stolen funds and assets. (*Id.* ¶ 2.)

[1]    Plaintiffs have divided these Defendant subcontractors and the individual Defendants into three groups based on location. The Pacific Northwest Group consists of individual Defendants Minazali Rehmat ("Minaz Rehmat"), Zulfikar Rehmat ("Zuli Rehmat"), Jinnet Hemani (a.k.a. Jinnet Rehmat), Rozy Fazal, Michael Morin, and subcontractor Defendants Energy and Environmental Monitors ("EEM"), TEFES Pure Tech, Inc. ("TEFES"), ANE Research Corporation ("ANE"), Benvisa Technology, Inc., and Ultra-Time Products, Inc. (Compl.¶¶ 22-31.) The Illinois Group is composed of individual Defendants Shyam Singh, Surijit Randhava ("Serge Randhava"), Richard Kao, and Defendant subcontractors Resource Recovery Consultants, Inc., Reaction Kinetics Consultants, Inc., Barone Consulting Group, Inc., Unitel Technologies, Inc., and UT/GT, LLC. (*Id.* ¶¶ 32-39.) The Oklahoma Group consists of individual Defendants Lloyd L. Lee, Charles Wayne Jones, Kathreen L. Jones, and Defendant subcontractors Molecular Thermoengines and Homatex, Inc. (*Id.* ¶¶ 40-46.)

In their seven-count complaint,[2] Plaintiffs allege substantive racketeering under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964 against Defendants S. Peter Barone ("Peter Barone"), Amirali G. Rehmat ("Amir Rehmat"), and Anthony L. Lee ("Tony Lee") (Count I); a racketeering conspiracy under 18 U.S.C. §§ 1962(d) and 1964 against all Defendants (Count II); breach of fiduciary duties and the duty of loyalty against Defendants Peter Barone, Amir Rehmat, Tony Lee, and Serge Randhava (Count III); and common law fraud against Defendants Amir Rehmat, Minaz Rehmat, Peter Barone, Tony Lee, Michael Morin, Lois A. Barone, Charles Wayne Jones, Kathreen

**Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)**

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

L. Jones, Jinnet Hemani, Zuli Rehmat, and Rozy Fazal (Count IV). In addition, Plaintiff GRI alleges common law fraud against Defendants Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao (Count V), all Plaintiffs allege civil conspiracy to commit fraud against all Defendants (Count VI), and GRI seeks an equitable accounting against Serge Randhava and UT/GT LLC (Count VII).

2   The court presumes that the Complaint's designation of two counts as "Count VI" was in error. The court will refer to the civil conspiracy claim as Count VI and to the claim for equitable accounting as Count VII.

As described in more detail below, twenty-two of the Defendants now move for dismissal of the various claims against them.[3] Some of these Defendants move, in the alternative, for summary judgment. As explained below, the court declines to consider any materials outside the pleadings and therefore denies the motions for summary judgment without prejudice. Further, the court grants in part and denies in part Defendants Peter Barone and Barone Consulting Group, Inc.'s Motion to Dismiss, grants in part and denies in part Defendants Charles Wayne Jones, Kathreen L. Jones, Homatex, Inc. and Wayne and Associates' Motion to Dismiss the Complaint, grants in part and denies in part Defendants Amirali G. Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Rehmat, ANE Research Inc., and Resource Recovery Consultants, Inc.'s Motion to Dismiss the Complaint, grants Defendants Surijit Randhava, Richard Kao, Unitel Technologies, and UT/GT's Motion to Dismiss, grants in part and denies in part Defendants Susan Lee and Reaction Kinetics Consultants' Motion to Dismiss, grants in part and denies in part Defendant Lloyd L. Lee's Motion to Dismiss, grants in part and denies in part Defendant Anthony Lee's Motion to Dismiss, grants in part and denies in part Defendant Lois Barone's Motion to Dismiss, and grants Defendant Shyam Singh's Motion to Dismiss.

3   The following Defendants have not moved to dismiss: Michael Morin, Rozy Fazal, Benvisa Technology, Inc., Energy & Environmental Monitors, Inc., Molecular Thermoengines, Inc., and Ultra-Time Products. This court previously entered default judgment against Defendant Minazali Rehmat. (*See* 6/22/06 Order.)

### BACKGROUND

 **\*2** The court accepts all well-pleaded allegations as true on a motion to dismiss. *Shawnee Trail Conservancy v. U.S. Dep't*

of Agric., 222 F.3d 383, 385 (7th Cir.2000). Plaintiffs GTI and GRI, two of the nation's premier natural gas research and development organizations, provide research products and technical services to help their customers solve environmental and energy problems related to natural gas. (Compl.¶ 7.) GTI was created in April of 2000 as a "combination" of GRI and the Institute of Gas Technology ("IGT"). (*Id.* ¶ 7.)[4] Endesco Services, Inc. ("ESI"), is a wholly-owned subsidiary of GTI and is also organized under the laws of Illinois. (*Id.* ¶ 8.) In 1997, Plaintiff ECH was established as a jointly-owned, for-profit subsidiary of GRI and ESI with the principal mission of constructing and operating commercial-scale plants for waste processing based on the "Cement-Lock Technology," a process that decontaminates soils, sediments, and waste and converts them into a construction-grade cement additive. (*Id.* ¶¶ 9, 11.) At some point subsequent to ECH's formation, Cement-Lock Group LLC licensed the Cement-Lock Technology to Plaintiff ECH. (*Id.* ¶ 54.)

4   The Complaint does not specify the nature of this combination.

Cement-Lock Group's ownership of rights to the Cement-Lock Technology has a complicated history in itself. Around 1996, Defendants Amir Rehmat and Tony Lee, GTI employees; Richard Kao, a former GTI employee; Serge Randhava, and others began circumventing GTI's policy that GTI employees must assign all of their rights in inventions to GTI. (*Id.* ¶¶ 47-48.) Instead, GTI employees Amir Rehmat and Tony Lee assigned their rights in any GTI technology inventions to Cement-Lock LLC, an entity that Amir Rehmat and Tony Lee formed around 1996 together with Serge Randhava, Richard Kao, Wayne and Associates,[5] Jinnet Hemani, and others for the alleged purpose of misappropriating intellectual property belonging to GTI. (*Id.* ¶¶ 48-49.) In December of 1996, senior GTI staff became aware that GTI employees were attempting to obtain, for Cement-Lock LLC, patents in technology-including the Cement-Lock Technology-largely developed in the course of Amir Rehmat and Tony Lee's employment for GTI, and had filed patent applications in the United States and abroad. (*Id.* ¶¶ 50-51.) GTI responded by negotiating with Cement-Lock LLC for the formation of a new entity, "Cement-Lock Group LLC." (*Id.* ¶ 52.) The formation of Cement-Lock Group LLC in 1997 resolved the dispute between Cement-Lock LLC and GTI concerning the patent rights and gave Cement-Lock Group LLC the right to hold the intellectual property rights at issue and market and develop the technology. (*Id.* ¶¶ 51-52.)

5   Plaintiffs allege that Wayne and Associates, a corporation that does not conduct and is not qualified to conduct any business relating to the Plaintiffs' research and development projects, was originally incorporated in Oklahoma in 1992 and underwent a name change in 1994. (Compl.¶ 46.)

The Cement-Lock Technology is among the technologies Defendants exploited and misused to perpetrate the fraudulent schemes that give rise to this action. (*Id.* ¶ 10.) This action also concerns the Defendants' misuse of other technologies, including the "ACIMET Technology," the "Perpetual Light Project," the "Gas Tech Technology," the "New Acid Removal System," the "TDP Technology," and the "Thermogenics Technology/Autofluff." (*Id.* ¶¶ 11-17.)

**\*3** Three of the Defendants-Amir Rehmat, Tony Lee, and Peter Barone (referred to by Plaintiffs as the "Core Group")-had oversight and planning responsibilities for the schemes to defraud Plaintiffs and held positions in each of the Plaintiff organizations. (*Id.* ¶¶ 3, 21.) Amir Rehmat was formerly the president of ECH and an employee of GTI, Tony Lee was a chemical engineer employed by GTI and president of the Cement-Lock Group, and Peter Barone was also the president of ECH at relevant times and employed by GTI and GRI. (*Id.* ¶¶ 18-20.) In each scheme described in the Complaint, a Defendant or Defendants requested that a Plaintiff disburse funds to pay for research, development, or other expenses related to one of the technologies; Defendants in fact intended to distribute the funds among themselves and use them for their own purposes. (*Id.* ¶ 53.) The Core Group Defendants used their positions as insiders in the Plaintiffs' organizations to facilitate approval of these funding requests. (*Id.*) The Core Group Defendants and other Defendants further set up sham subcontractors and presented fraudulent paperwork to make it appear that the subcontractors would perform the services described. (*Id.*) In combination with other Defendants, the Core Group planned and executed at least the following four schemes to defraud Plaintiffs. (*Id.*) Plaintiffs did not discover the schemes until sometime in mid-2002. (*Id.* ¶ 175.)

**1. Cement-Lock Technology Scheme**

Plaintiffs claim to have been defrauded of more than $4,300,000 as a result of fraudulent subcontracts relating to the research, development, and testing of the Cement-Lock Technology. (*Id.* ¶¶ 86, Ex.C.) As president of ECH, Defendant Amir Rehmat had the authority to negotiate and execute subcontracts to assist ECH in developing the Cement-Lock Technology licensed to ECH by Cement-Lock Group

LLC, as described above. (*Id.* ¶¶ 54-55.) Defendants Tony Lee and Peter Barone were authorized to assist Amir Rehmat in the project to demonstrate the capability of the Technology. (*Id.* ¶ 56.) Together, the Core Group Defendants purported to rely on outside contractors to perform "nearly all of the key and sensitive work needed to develop" the Cement-Lock Technology, (*id.* ¶ 57), with Amir Rehmat preparing and executing subcontracts on behalf of Plaintiff ECH for actual and purported projects related to the Cement-Lock Technology. (*Id.* ¶ 58.) Some of the entities with which Amir Rehmat executed subcontracts were authentic and did work related to the Cement-Lock Technology, but at least ten of the entities, all named as Defendants in this lawsuit, were "sham entities" controlled or owned by the Core Group Defendants, their friends and relatives, or other Defendants, a fact the Core Group Defendants intentionally concealed from Plaintiffs. (*Id.*) Defendants represented to Plaintiffs that the Defendant entities were authentic operations capable of performing work for GTI, GRI, or related to the Cement-Lock Technology, that the subcontracts executed with Defendant entities were valid, and that invoices accurately reflected services rendered. (*Id.* ¶ 81.) These representations caused GTI, GRI, and ECH to pay money to Defendants for work they did not perform. (*E.g., id.* ¶¶ 196, 198, 202, Exs. A & B.)[6]

6   The Complaint claims, in more than one instance, that GTI and GRI paid money under multiple subcontracts executed between ECH and a Defendant entity. (*See e.g., id.* ¶¶ 190, 192, 194, 196, 198.) As further discussed below, however, the exhibits to the Complaint-spreadsheets listing checks paid to the alleged sham subcontractors-identify payments related to the "Cement Lock Fraud" from GTI only (*see id.* ¶ Ex. C), and list no payments by GRI in any exhibit. Further, the Complaint alleges that GTI and GRI both paid money under subcontracts executed with ECH, but further states in reference to these subcontracts that "GTI and ECH" paid monies to Defendants. (*Id.* ¶ 202.) Finally, Exhibit A asserts that GTI paid and issued checks on behalf of ECH because ECH "did not have its own payment system." (*Id.* ¶ Ex. A.) Again, no payments by GRI are mentioned.

**\*4** For example, the Core Group Defendants and individuals from the Oklahoma and Pacific Northwest groups, including Minaz Rehmat, Rozy Fazal, Lloyd Lee, Lois Barone, Zuli Rehmat, Jinnet Hemani, Charles Wayne Jones, Kathreen Jones, and Michael Morin knew that the sham entities were not performing work under the subcontracts and were not qualified to do so. (*Id.* ¶ 64.) These Defendants nevertheless prepared (or caused to be prepared) contracts between ECH

and sham subcontractors TEFES, ANE, EEM, Wayne and Associates, Homatex, and Molecular Thermoengines, and submitted invoices for payment under these subcontracts. (*Id.*) GTI allegedly wrote checks-delivered by mail or other means-on ECH's behalf to pay these sham subcontractors a total of $4,646,442 for purported research and development related to the Cement-Lock Technology. (*Id.* ¶¶ 64, Ex. A.) Similarly, the Core Group Defendants and individuals from the Oklahoma and Pacific Northwest groups, including Zuli Rehmat, Minaz Rehmat, Jinnet Hemani, Lloyd Lee, Susan Lee, Lois Barone, Charles Wayne Jones, and Kathreen Jones, knew that the entities were not performing such work but nevertheless prepared (or caused to be prepared) and submitted invoices to Plaintiffs for work arising from research and development for GTI or the Cement-Lock Technology Project. (*Id.* ¶¶ 65, Ex. B.) As a result, GTI paid invoices totaling $2,419,580, through checks delivered by mail or other means, for purported research and development related to the GTI or Cement-Lock Technology Project. (*Id.* ¶¶ 65, Exs. A & B.)

Defendant TEFES, a corporation registered under the law of British Columbia, Canada in March of 2002, is among the "sham entities" that subcontracted to do research for ECH. (*Id.* ¶¶ 27, 59.) TEFES did no actual work on ECH projects, was not adequately capitalized or professionally staffed, and had no research facilities, all of which the Core Group and Defendant Michael Morin deliberately concealed from Plaintiffs. (*Id.* ¶ 59.) Morin, an attorney, held himself out as president of TEFES, although he is not qualified to perform any work that relates to the business performed by GTI or the Cement-Lock Technology. (*Id.* ¶¶ 25, 27, 59.) Defendants Peter Barone, Tony Lee, Amir Rehmat, Michael Morin, Minaz Rehmat, and Charles Wayne Jones each had ownership and shared interest in TEFES. (*Id.* ¶ 199.)

TEFES also billed Plaintiffs for marketing services purportedly rendered by other Defendant subcontractors. (*Id.* ¶¶ 199-200.)[7] Around February 5, 2001, Tony Lee prepared and submitted an invoice from TEFES for marketing services rendered by Defendant Reaction Kinetics though Reaction Kinetics never rendered any such services. (*Id.* ¶ 199.) On February 6, 2001, Peter Barone similarly prepared and submitted an invoice for marketing services rendered by Defendant Barone Consulting to TEFES, which also were never rendered. (*Id.* ¶ 200.)

[7]    The Complaint is not clear as to whether these marketing
      services related to the Cement-Lock Technology. In fact,

the Complaint lists a number of subcontracts without specifically identifying whether these subcontracts related to the Cement-Lock Technology or to some other technology. Thus, the court recognizes that some of the subcontracts discussed within this section on the "Cement-Lock Technology Scheme" may not actually have concerned work directly related to the Cement-Lock Technology.

**\*5** The Core Group Defendants further concealed from Plaintiffs that Amir Rehmat and his brother, Defendant Minaz Rehmat, who was not qualified to perform any work for GTI or related to the Cement-Lock Technology, controlled subcontractor Defendant EEM. (*Id.* ¶¶ 22, 60.) They also concealed the facts that EEM had no production or research facilities, did no actual work on ECH projects, was not staffed with professionals or engineers, and listed as a director Defendant Rozy Fazal, an employee and associate of Minaz Rehmat with no relevant professional background or qualifications. (*Id.* ¶¶ 24, 26, 60.) On October 3, 2001, Amir Rehmat, representing ECH, and Minaz Rehmat and Rozy Fazal, who were associated with EEM, signed and executed a subcontract for research between ECH and EEM. (*Id.* ¶ 191.)[8] Though this work was never performed, it was paid for by GTI and GRI with kickbacks going to Defendants. (*Id.* ¶ 192.)

[8]    While the allegation does not specify which Defendants
      signed on behalf of ECH and EEM, Amir Rehmat
      negotiated contracts for ECH, (*id.* ¶ 55), and Rozy Fazal
      and Minaz Rehmat were alleged to have been associated
      with EEM. (*Id.* ¶ 26.)

Defendant ANE, a corporation also registered under the laws of British Columbia, Canada in 2000, was controlled by Amir Rehmat's brother, Defendant Zuli Rehmat, and Zuli Rehmat's wife, Defendant Jinnet Hemani. (*Id.* ¶¶ 22, 23, 28-29, 61.) Neither Zuli Rehmat or Jinnet Hemani had any experience or background to qualify them for work on a GTI or Cement-Lock Technology project. (*Id.* ¶¶ 22, 23.) ANE did no work on ECH projects and had no professional staff or research facilities. (*Id.* ¶ 61.) Nevertheless, ECH had contracted with ANE to perform research on May 29, 2001 and July 15, 2001 in subcontracts executed by Amir Rehmat, Zuli Rehmat, and Jinnet Hemani. (*Id.* ¶ 189.) These Defendants received kickbacks from payments made by GTI and GRI under the subcontracts. (*Id.* ¶ 190.)

Defendant Molecular Thermoengines is an Oklahoma corporation formed in 1994 but suspended in 1995. (*Id.* ¶ 43, 63.) Molecular Thermoengines was controlled by Defendant Lloyd Lee, Tony Lee's brother, and also allegedly did not

Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

perform any of the work for which it billed Plaintiffs. (*Id.* ¶¶ 40, 63.) Lloyd Lee and Amir Rehmat executed two subcontracts between ECH and Molecular Thermoengines on June 13, 2000 and November 13, 2000. (*Id.* ¶ 195.) Monies paid by GTI and GRI under these subcontracts were kicked back to these Defendants for their personal use. (*Id.* ¶ 196.)

Defendants Wayne and Associates, incorporated in Oklahoma in 1994, and Homatex, incorporated in Oklahoma in 1997, were controlled by Defendants Charles Wayne Jones, the president of both entities, and his wife, Kathreen Jones, the treasurer of Homatex and secretary of Wayne and Associates. Neither Charles nor Kathreen had a business affiliation with GTI or GRI or a professional background relating to projects conducted by GTI or ECH. (*Id.* ¶ ¶ 42, 44-46, 62) Homatex is not qualified to conduct business that relates to Plaintiffs' research and development projects, but Defendant Charles Wayne Jones nevertheless entered into two subcontracts (December 27, 2000 and September 27, 2001) with Amir Rehmat for work to be done by Homatex for ECH. (*Id.* ¶¶ 44, 193.) This work was not performed and the money paid by GTI and GRI was kicked back to Defendants. (*Id.* ¶ 194.) Charles Wayne Jones also signed a subcontract with Amir Rehmat for Wayne and Associates to perform research for ECH, despite the fact that Wayne and Associates is not qualified to do any research related to the work of ECH. (*Id.* ¶¶ 46, 197.) This work was not done, and money paid by GTI and GRI was kicked back to Defendants. (*Id.* ¶ 198.)

**\*6** The Core Group Defendants and their spouses set up a number of entities in order to deposit, conceal, and spend the money paid by Plaintiffs under the subcontracts related to the Cement-Lock Technology. In each case, the Core Group Defendant and his wife had access to and controlled the bank account of the entity. (*Id.* ¶¶ 69-71.) Amir Rehmat and his wife, Anar Rehmat, set up Defendant Resource Recovery Consultants as an Illinois corporation in 1997. (*Id.* ¶¶ 35, 69.) Tony Lee and his wife, Susan Lee, set up Defendant Reaction Kinetics as an Illinois corporation in 1987. (*Id.* ¶¶ 36, 70.) The Lees also prepared invoices for services to be performed by Defendant Ultra-Time for Reaction Kinetics, which services were not actually rendered. (*Id.*) Peter Barone and his wife, Lois Barone, likewise set up Defendant Barone Consulting. (*Id.* ¶ 71.) The Barones also prepared invoices for services from Barone Consulting to Plaintiffs, though Barone Consulting did not render any services of value. (*Id.*)

Around April 17, 2001, multiple Defendants also signed and executed a Declaration of Trust for the purpose of disposing

of funds paid by GTI and GRI. (*Id.* ¶ 186.) By signing this declaration, Defendants Amir Rehmat, Michael Morin, Peter Barone, Lois Barone, Charles Wayne Jones, Kathreen Jones, and others confirmed their ownership and proprietary interests in the TEFES Trust. (*Id.*) Defendants did not inform Plaintiffs of the TEFES trust or of Defendants' ownership of shares in the TEFES trust. (*Id.*)[9]

9     It is unclear from Plaintiffs' Complaint to what subcontracts this trust was related or exactly what funds were disposed of through the TEFES Trust.

The Core Group Defendants and their spouses as well as Zuli Rehmat, Jinnet Hemani, and Minaz Rehmat diverted and used, for their personal benefit, the monies paid by Plaintiff in a number of instances. (*Id.* ¶ 72.) In January of 2002, Amir and Minaz Rehmat diverted $230,000 of funds paid by Plaintiff to EEM in Canada for work EEM claimed to have performed and used the funds to pay off a mortgage loan on Amir's personal residence. (*Id.* ¶ 73.) In that same month, Amir and Minaz Rehmat also diverted funds paid to Resource Recovery, EEM, and ANE, (*id.* ¶ 74), and, together with Michael Morin, Tony Lee, and Peter Barone, converted $360,000 that had been paid to TEFES for work performed by TEFES for personal purposes. (*Id.* ¶ 75.)

In May of 2002, Amir Rehmat, Minaz Rehmat, and Michael Morin diverted $245,000 of Plaintiff's money, and converted $82,000 to Amir and Anar Rehmat, $93,000 to Amir Rehmat's son, and $66,000 to a Canadian bank that was a creditor of Amir Rehmat. (*Id.* ¶ 76.) EEM, Peter Barone, and Amir and Minaz Rehmat also took part in kicking back $220,000 of Plaintiffs' funds from EEM to the Barone Consulting Group, the sham entity set up by the Barones. (*Id.* ¶ 77.) From February through April 2002, Amir and Zuli Rehmat and Jimmet Hemani took part in another scheme whereby $270,000 of funds paid by Plaintiff to EEM were kicked back to Reaction Kinetics, the sham entity set up by Tony and Susan Lee. (*Id.* ¶ 78.)

**\*7** In both 2001 and 2002, the Core Group Defendants and their wives received (and used, in part, to pay mortgages on their personal residences) several million dollars that had been stolen from Plaintiffs and deposited in the accounts of the sham entities that the Core Group Defendants or other Defendants controlled. (*Id.* ¶ 79.) In total, Plaintiffs claim that of the $21,000,000 allocated to the development, implementation, and testing of the Cement-Lock Technology, Defendants converted approximately $4,300,000 for their personal use, and that GTI and others incurred at least

**Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)**

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

$1,000,000 in other general costs and expenses as a result of Defendants' scheme. (*Id.* ¶¶ 86, Ex. C.)

**2. ACIMET Technology Scheme**
Plaintiffs also claim losses arising out of fraudulent subcontracts with Defendant entities ANE, TEFES, Molecular Thermoengines, and Ultra-Time Production for work concerning the ACIMET Technology and the related Perpetual Light Technology. The ACIMET Technology is a technology developed by GTI and owned by ECH to treat wastewater sludge in order to generate methane gas, which is then used to generate electric power. (*Id.* ¶ 87.) The Perpetual Light Technology is a process related to ACIMET Technology, developed by GTI and ESI to convert wastewater sludge into electrical power. (*Id.* ¶ 88.) From February 2001 until at least March of 2002, Amir Rehmat, Peter Barone, Michael Morin, Jinnet Hemani, and Lloyd Lee participated in a scheme to defraud Plaintiff GTI of at least $1,051,500 in funds designated for the process referred to as ACIMET Technology. (*Id.* ¶ 89, Ex. D.)

In February of 2001, Amir Rehmat, signing on behalf of ECH, and Jinnet Hemani, signing as President of ANE, executed a subcontract for ANE to conduct research related to an ACIMET facility for $432,900. (*Id.* ¶¶ 91-92, Ex. D.) The subcontract stated, falsely, according to Plaintiffs, that ANE was, among other qualifications, familiar with wastewater treatment technologies and had expertise in "biosolids." (*Id.* ¶ 95.) Neither Jinnet Hemani nor ANE performed any research work under the subcontract, but after causing GTI to pay the $432,000 contract amount, Amir Rehmat, Jinnet Hemani, and other Defendants converted the funds for their personal use. (*Id.* ¶¶ 94, 96.)

Defendant TEFES likewise entered into a subcontract with ECH for research relating to the ACIMET and Perpetual Light Technologies in the city of Victoria, British Columbia, Canada. (*Id.* ¶ 98.) Defendants executed this subcontract in July of 2001, Amir Rehmat signing on behalf of ECH and Defendant Michael Morin signing as "Director" of TEFES. (*Id.*) Both Amir Rehmat and Michael Morin knew that TEFES was not capable and would not perform the research for which it contracted. (*Id.* ¶¶ 99, 187.) Amir Rehmat, Michael Morin, and other Defendants nevertheless falsely stated in a "sole source justification form" provided to GRI that TEFES was an expert in waste technologies and had relationships that would help it to secure lucrative projects. (*Id.* ¶ 101.) The subcontract work was not performed, yet GTI paid $229,600 under the subcontract signed by ECH, its subsidiary. (*Id.* ¶¶ 102-03, Ex.

D.) Amir Rehmat, Michael Morin, Minaz Rehmat, and other Defendants converted this sum to their personal use. (*Id.* ¶ 104.)

**\*8** In June 2001, Amir Rehmat executed, on behalf of ECH, another subcontract with Molecular Thermoengines, this time for "design and engineering work" for the Perpetual Light Technology. Defendant Lloyd Lee signed the contract on behalf of Molecular Thermoengines. (*Id.* ¶ 106.) Amir Rehmat and Lloyd and Tony Lee knew that Molecular Thermoengines would not perform the work for which ECH contracted, and Molecular Thermoengines did not in fact perform such work. (*Id.* ¶ 107.) Nevertheless, Molecular Thermoengines, Lloyd Lee, and Amir Rehmat, submitted a report to Plaintiffs purporting to summarize work on the project. (*Id.* ¶ 110.) Between July 2001 and November 2, 2001, GTI sent checks to Molecular Thermoengines for the contracted amount of $365,000, which Amir Rehmat, Lloyd Lee, and other Defendants diverted and used for their personal benefit. (*Id.* ¶¶ 109, Ex. D.)

Also in June of 2001, Amir Rehmat, Minaz Rehmat, and Rozy Fazal prepared a letter from Defendant Ultra-Time Productions to ECH, proposing to assist ECH in publicizing the Perpetual Light Technology in Canada for a flat fee of $19,700 to Ultra-Time and Fazal. (*Id.* ¶ 111.) In July and August 2001, Amir Rehmat prepared and submitted to ECH a false invoice for services allegedly performed by Ultra-Time, including the publishing of a newspaper article about Perpetual Light Technology-services that Ultra-Time did not in fact provide. (*Id.* ¶ 112.) These three Defendants and other Defendants also submitted a purchase order to ECH in July of 2001 in the amount of $4,300 for preparation of a PowerPoint presentation, though no such presentation was ever prepared. (*Id.* ¶¶ 113-14.) GTI paid Ultra-Time a total of $24,000 for work not performed. (*Id.* ¶ Ex. D.)

**3. Gas Tech Technology Scheme**
In September 1999, GRI and Defendant Unitel Technologies agreed to form a joint venture to develop and market an "adsorption technology" involving methane gas to be applied in the fertilizer and ammonia markets (the "Gas Tech Project"). (*Id.* ¶ 122.) Gas Tech LLC, formed in early November of 1999, was the result. (*Id.*) At GRI, Peter Barone was the project manager for the Gas Tech Project; he maintained this responsibility in 1999 and 2000 after the creation of Gas Tech LLC. (*Id.* ¶¶ 122, 127.) Plaintiffs allege that GRI owned 50% of Gas Tech LLC.[10] (*Id.* ¶ 123.) The

other 50% was owned by Defendant UT/GT LLC, a company set up and controlled by Defendant Serge Randhava, who also owned and controlled Unitel Technologies and executed the Gas Tech LLC Agreement on behalf of UT/GT LLC. (*Id.* ¶¶ 118, 123, 129.) According to Plaintiffs, GRI agreed to provide $650,000 to capitalize Gas Tech LLC in exchange for the intellectual property that UT/GT LLC was to contribute to Gas Tech LLC. (*Id.* ¶ 124.)

10    The court notes that the Gas Tech LLC Agreement shows on its face that GRI International, not Plaintiff GTI, formed Gas Tech LLC together with UT/GT LLC. (*See infra* Section I.A.1; 11/03/99 Limited Liability Company Agreement of Gas Tech, L.L.C., Ex. A to Unitel Motion to Dismiss) (hereinafter "Gas Tech Agreement"). As discussed in the court's analysis of Plaintiffs' standing, there is no mention of GRI International in the Complaint. The court nevertheless recites here the allegations regarding the Gas Tech Project as set forth in Plaintiff's Complaint.

Although the agreement required separate capital accounts to be maintained for each member of Gas Tech LLC, Serge Randhava failed to establish or maintain such separate accounts, and funds for Gas Tech LLC were deposited into Unitel Technologies' accounts. (*Id.* ¶¶ 130-31.) Under the Agreement, Randhava was also required to maintain full and accurate books and records of Gas Tech LLC, subject to inspection by each LLC member. (*Id.* ¶ 214.) Before the filing of the Complaint, Plaintiff GRI requested repeatedly that UT/GT or Randhava, the manager of UT/GT, provide Plaintiff with the accounting information related to the disposition and expenditure of funds by GRI for the Gas Tech Project, but UT/GT and Randhava refused to provide such information. (*Id.* ¶ 213.)

 **\*9** On about November 15, 1999, Barone requested that GRI pay Gas Tech LLC-through a bank account of Unitel Technologies-the lump-sum of $650,000 for the Gas Tech Project. (*Id.* ¶ 132.) Four days later, on November 19, 1999, Barone caused GRI to transfer the $650,000 to Unitel Technologies' checking account. (*Id.* ¶ 133.) Defendants Shyam Singh, Serge Randhava, Peter Barone, Richard Kao, Charles Wayne Jones, and others did not work on the research or development for the Gas Tech Project but converted money from Unitel Technologies' checking account for their personal use. (*Id.* ¶¶ 134, Ex. E.) Defendants "omitted to disclose" to GRI these payments to subcontractors that did no work on the Gas Tech Project, nor did they disclose that at least $530,000 of the funds that GRI had contributed to Gas Tech LLC

were not spent on the Project. (*Id.* ¶ 148.)[11] In total, at least $530,000 of the $650,000 contributed by GRI to Gas Tech LLC for the development, testing, and commercialization of the Gas Tech Technology was converted to the personal use of Defendants specified above and others. (*Id.* ¶¶ 128, 151.)

11    Plaintiffs do not identify the individuals at GRI from whom information was being concealed or omitted or the individuals at GRI to whom Defendants made misrepresentations.

The amount converted out of the $650,000 deposited by GRI for the Gas Tech Project varied by Defendant but included the following: Serge Randhava (at least $110,000); Richard Kao (at least $29,000); and Shyam Singh (at least $280,000). (*Id.* ¶¶ 135-37.) For his part, Randhava used the $150,000[12] he diverted for expenses such as his salary, credit card bills, utility bills, health insurance, and other lease payments relating to his office. (*Id.* ¶¶ 143, Ex. E.) Randhava further caused $20,000 of the funds to be paid to Wayne and Associates, which were later converted to the personal use of Charles Wayne Jones. (*Id.* ¶ 138.) Barone and Randhava represented to unidentified persons at GRI and others that Wayne and Associates and Charles Wayne Jones were working on the Gas Tech Project and were entitled to the $20,000. (*Id.* ¶ 147.)

12    Plaintiffs' Complaint alleges that Randhava diverted "at least $110,000 of GRI funds related to the Gas Tech Project," (*id.* ¶ 135), and later alleges that he diverted at least $150,000 of these same funds. (*Id.* ¶ 143.)

Around March 25, 2000 and April 25, 2000, Shyam Singh caused two checks totaling $185,425 to be paid to Barone & Associates, an entity controlled by Peter Barone, as a kickback for the GRI funds previously deposited in bank accounts controlled by Singh. (*Id.* ¶ 139.) Singh represented to GRI and others that three entities owned or controlled by Singh, including SS Environmental Energy, Inc. and Thermoplastec Inc., would conduct work on the Gas Tech Project and were entitled to be paid more than $300,000. (*Id.* ¶ 147.) SS Environmental Energy specializes in processes related to the industries of glass, high temperature firing, petroleum products, textile and food, and Thermoplastec engages in thermoforming tooling and assisting other companies in producing tools and dies. (*Id.* ¶ 145.) Thus, Plaintiffs allege, neither of these companies conduct research or development related to the work on methane adsorption conducted by Gas Tech LLC. (*Id.* ¶ 145.)

Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)
2006 WL 3743576, RICO Bus.Disp.Guide 11,219

**\*10** To further the scheme relating to the Gas Tech Technology, Randhava, Unitel Technologies, and others prepared a written report on May 30, 2002 entitled "Methane Adsorption in Mixed Gas Streams (A+ Process)." (*Id.* ¶ 142.) Randhava and others claimed to GRI and others that the report reflected the work done for $650,000 on the Gas Tech Project. (*Id.*) The report, however, was incomplete and allegedly did not accomplish the goals of the Gas Tech Project. (*Id.*)

### 4. Schemes Related to Other Technologies

Plaintiffs also claim losses to GTI of some $1,652,000 as a result of payments made by GTI for work and services relating to various other technologies-the New Acid Removal System, Thermoengines Tech nology/Autofluff, and the TDP Technology-that were never performed. (*Id.* ¶¶ 153-56, Ex. F.) As with the schemes previously described, Defendants facilitated this scheme whereby GTI paid for work never performed by concealing the relationships between the Core Group Defendants and the subcontractors and by representing to Plaintiffs that the Defendant entities were authentic operations capable of performing the work related to the technology in the subcontract, that the subcontracts executed with Defendant entities were valid, and that invoices accurately reflected services rendered. (*Id.* ¶¶ 81-82.)

The claimed $1,652,000 loss includes $409,000 that the Core Group Defendants, Lloyd Lee, and other Defendants caused GTI to pay to Molecular Thermoengines between May 1996 and February 2000 for work on the New Acid Removal System that was never performed. (*Id.* ¶ 158, Ex. F.) From May 1995 until approximately December 1997, the Core Group Defendants and Lloyd Lee, Charles Wayne Jones, and others also caused GTI to pay $489,000 to Defendants Wayne and Associates and Molecular Thermoengines for work on the Thermogenics Technology/Autofluff project that was not performed. (*Id.* ¶ 159, Ex. F.) Similarly, the Core Group Defendants, Minaz Rehmat, Jinnet Hemani, Lloyd Lee, Rozy Fazal, and others also caused GTI to pay $616,000 to Defendants EEM, ANE, and Molecular Thermoengines between March 2002 and November 2002 for work and services related to the TDP Technology that were never performed. (*Id.* ¶ 160, Ex. F.) Defendants converted the $1,652,000 spent by GTI for work relating to the New Acid Removal System, Thermogenics Tech nol ogy/Autofluff, and TDP Technology for their personal use and gain. (*Id.* ¶ 163.)

### 6. Present Action

Plaintiffs filed this Complaint on May 6, 2005. Count I alleges substantive racketeering by Amir Rehmat, Peter Barone, and Tony Lee under 18 U.S.C. §§ 1962(c) and 1964. Plaintiffs allege a pattern of racketeering activity conducted through an "enterprise" comprised of these three individual Defendants that also had the legitimate purpose of developing, marketing, and testing various technologies. (*Id.* ¶¶ 165, 169.) The alleged ongoing pattern of racketeering activity included acts of mail fraud, and the transportation, possession, and receipt of stolen goods through interstate and foreign commerce. It allegedly began around 1993 and continued until at least early 2005. (*Id.* ¶¶ 165, 167-68.) Count II alleges, under 18 U.S.C. §§ 1962(d) and 1964, that all Defendants have conspired to conduct or participate in the affairs of the enterprise with the objective of participating in a pattern of racketeering activity to defraud Plaintiffs of money. (*Id.* ¶¶ 178-79.) These acts also give rise to a claim of civil conspiracy to commit fraud against all Defendants in Count VI. (*Id.* ¶ 210.) In Count III, Plaintiffs allege that Defendants Amir Rehmat, Tony Lee, Peter Barone, and Serge Randhava each had fiduciary duties arising out of their positions or association with Plaintiffs and breached their fiduciary duties and duty of loyalty by engaging in certain wrongful conduct, including the diverting of Plaintiffs' money and self-dealing. (*Id.* ¶ 183.) Count IV alleges common law fraud against Amir Rehmat, Minaz Rehmat, Peter Barone, Tony Lee, Michael Morin, Lois A. Barone, Charles Wayne Jones, Kathreen L. Jones, Jinnet Hemani, Zuli Rehmat, and Rozy Fazal arising out of Defendants' intentional omissions or failures to disclose to Plaintiffs, among other acts, their participation in the TEFES trust, the preparation and submission of invoices for work not performed, and the execution of subcontracts with entities that were not qualified and would not complete the work under the subcontract. (*Id.* ¶¶ 186-204.) Count V also alleges common law fraud against Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao for omissions and misrepresentations causing GRI to pay these Defendants and Unitel Technologies $530,000 for work not performed. (*Id.* ¶¶ 206-08.) Finally, Count VII seeks an equitable accounting from Serge Randhava and UT/GT LLC based on their refusal to provide GRI with accounting information regarding the disposition of funds paid by GRI for the Gas Tech Project. (*Id.* ¶¶ 213-16.)

### DISCUSSION

**\*11** Federal Rule of Civil Procedure 8(a) requires, in relevant part, that a complaint provide a "short and plain

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

statement of the claim" to give the defendant "fair notice" of the plaintiff's claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a); *Cler v. Illinois Educ. Ass'n,* 423 F.3d 726, 729 (7th Cir.2005) (citations and internal quotations omitted). On a motion to dismiss, the court accepts the complaint's well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Shawnee Trail Conservancy,* 222 F.3d at 385. Dismissal is proper only if no set of facts, even hypothesized, would entitle the plaintiff to relief. *Massey v. Merrill Lynch & Co., Inc.,* 464 F.3d 642, 645 (7th Cir.2006). Thus, a complaint will survive a 12(b) (6) motion to dismiss as long as it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief." *U.S. Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 626 (7th Cir.2003) (citations omitted). If matters outside of the complaint are presented and not excluded by the court in a motion to dismiss under 12(b) (6), however, the court must treat the motion as a motion for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(b); *Woods v. City of Chicago,* 234 F.3d 979, 986 (7th Cir.2000).

This opinion addresses nine motions to dismiss, some of which also seek, in the alternative, summary judgment. Defendants Amirali Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Hemani, ANE Research, Inc., and Resource Recovery (collectively, "the Rehmat Defendants") move to dismiss Plaintiffs' complaint on the ground that Plaintiffs lack standing. They argue, further, that Counts I and II fail to state RICO claims, that Count III for breach of fiduciary duties is barred by the statute of limitations and fails to state a claim, and that Counts IV for common law fraud and Count VI for civil conspiracy to commit fraud fail to state a claim. The Rehmat Defendants also contend that Count VI is duplicative, and that a release executed on behalf of GTI and its agents with Amir Rehmat exonerates the Rehmat Defendants from all liability.

Defendant Tony Lee joins in the arguments of the Rehmat Defendants and moves to dismiss Counts I, II, III, IV, and VI as against him. Tony Lee further contends that, as an alleged co-conspirator with Amir Rehmat, he, too, is released from liability by Plaintiffs' alleged release of their claims against Amir Rehmat. Defendant Lloyd Lee also joins the Rehmat Defendants' arguments and moves to dismiss Counts II and VI as they apply to him, and seeks enforcement of Plaintiffs' alleged release of Amir Rehmat on his behalf as an agent of Amir Rehmat. Defendants Susan Lee and Reaction Kinetics also adopt the arguments set forth by the Rehmat Defendants and Lois Barone and move to dismiss Counts II and VI for

failure to state RICO conspiracy or civil conspiracy claims against them. Susan Lee further argues that she, like Tony and Lloyd Lee, is entitled to dismissal by virtue of the alleged release of co-conspirator Amir Rehmat.

**\*12** Defendants Peter Barone and Barone Consulting Group, Inc. move to dismiss all Plaintiffs' claims as against them for lack of standing. They further contend that Plaintiffs' RICO claims are time-barred or fail to state a claim, and that Plaintiffs' allegations are insufficient to state claims of breach of fiduciary duties or common law fraud against Peter Barone, or civil conspiracy against both Peter Barone and Barone Consulting. Defendant Lois Barone moves to dismiss Counts II, IV, and VI for failure to state RICO, civil conspiracy, or common law fraud claims against her.

Defendants Charles Wayne Jones, Kathreen Jones, Homatex, Inc. and Wayne and Associates (collectively, "the Jones Defendants") also seek dismissal of Counts II, IV, and VI for lack of standing and failure to state a claim. They urge that Plaintiffs' claim of civil conspiracy to commit fraud must be dismissed as duplicative. Defendant Shyam Singh moves to dismiss Counts II, V, and VI for failure to adequately state RICO, common law fraud, and civil conspiracy claims against Singh. Singh further contends that all claims against him are barred by the statute of limitations.

Finally, Defendants Serge Randhava, Richard Kao, Unitel Technologies, and UT/GT LLC (collectively, the "Unitel Defendants") argue that Plaintiffs lack standing on all claims against the Unitel Defendants including their equitable accounting claim and that all of Plaintiffs' claims are barred by the statute of limitations. The Unitel Defendants further move to dismiss Counts II, III, V, VI, and VII for failure to state claims for RICO conspiracy, common law fraud, civil conspiracy to commit fraud, or equitable accounting against the relevant Unitel Defendants in each count.

The court will addresses the various Defendants' arguments for dismissal in turn.

## I. Plaintiffs' Standing

### A. RICO "Standing"

To establish standing to sue, a plaintiff to a civil RICO action must show injury to "his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *Evans v. City of Chicago,* 434 F.3d 916, 924-25 (7th Cir.2006). "[S]ome direct relation between the injury asserted and

the injurious conduct alleged" is required. *See Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[13] A plaintiff who is harmed merely as the result of "misfortunes visited upon a third person" by a defendant's conduct generally cannot establish this direct relation. *See id.* at 268-69. In other words, a defendant's alleged violations of § 1962 must be the proximate cause of the plaintiff's injury. *Id.* at 268.

[13]     The Seventh Circuit has acknowledged that *Holmes* does not preclude all possibility of recovery for indirect injuries; rather, common law ideas about proximate cause inform the proximate cause requirement for RICO purposes. *See Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir.1995).

Whether a plaintiff has "standing" for the purpose of a civil RICO claim is generally viewed as a 12(b)(6) question of whether the plaintiff has stated an actionable claim, and not a question of subject matter jurisdiction. *See Anderson v. Ayling,* 396 F.3d 265, 269 (3d Cir.2005) (citation omitted); *see also Lemer v. Fleet Bank, N.A.,* 318 F.3d 113, 129-30 (2d Cir.2003) ( "[D]espite describing the proximate causation requirements as 'RICO standing,' such standing is not jurisdictional in nature ... but is rather an element of the merits addressed under a [12(b)(6) ] motion ....") The court will therefore consider Defendants' arguments contesting Plaintiffs' standing to bring their RICO claims under the standards appropriate for a 12(b)(6) motion for failure to state a claim.[14] Thus, Plaintiffs' RICO claims meet the requirements of § 1964(c) and Plaintiffs can sue under RICO as long as they allege a set of facts that, if true, would entitle them to relief-in this case, an injury to their business or property proximately caused by Defendants' RICO violation. *See Massey,* 464 F.3d at 645.

[14]     Defendants make extensive arguments contesting Plaintiffs' standing to bring their RICO claims and urge that Plaintiffs lack standing to bring their state law claims for the same reasons. (*See* Barone Mot. at 4-5; Jones Mot. at 15; Rehmat Mot. at 13; Unitel Mot. at 6-7.) The court addresses the matter of RICO standing first; Plaintiffs' standing to bring their state law claims, which is a matter of subject matter jurisdiction, is analyzed separately below. (*See infra* Section I.B.)

**\*13** Defendants' contention that Plaintiffs lack standing to bring their RICO claims, (Counts I and II), rests on the notion that the research grant money allegedly stolen by Defendants was not the property of any of the Plaintiffs. (Barone Mot. at 3-5; Jones Mot. at 3-10; Rehmat Mot. at

5-12; Unitel Mot. at 6-7.)[15] Defendants argue that Plaintiffs cannot sufficiently allege that injury to GTI, GRI, or ECH was proximately caused by Defendants' conduct where Plaintiffs did not own the money and thus were not the direct victims of the alleged fraud. (Barone Mot. at 4; Jones Mot. at 12-13; Rehmat Mot. at 12.) Rather, Defendants assert, the victims of fraud are representatives of the natural gas industry that paid surcharges to fund research and development of technologies related to natural gas. Harm to these third parties is not sufficient to confer standing on Plaintiffs, Defendants contend. (Barone Mot. at 4; Jones Mot. at 11-12; Rehmat Mot. at 10-11.) Defendants also contend that Plaintiffs' claim of damages in the form of general and administrative losses is insufficient because Plaintiffs cannot recover under RICO for such costs. (Jones Mot. at 13-14; Rehmat Mot. at 12-13.) The Unitel Defendants more specifically assert that Plaintiffs lack standing because no Plaintiff has an interest in Gas Tech LLC, and therefore Plaintiffs have suffered no injury as a result of the conduct of the Unitel Defendants. (Unitel Mot. at 6-7.)

[15]     The following Defendants contest Plaintiffs' standing to bring their RICO claims: the Rehmat Defendants, Tony Lee, Lloyd Lee, Susan Lee, Reaction Kinetics, Peter Barone, Barone Consulting Group, the Jones Defendants, and the Unitel Defendants. Although the court refers to "Defendants" generally for convenience, the court's citations clarify the grounds on which these various Defendants contest Plaintiffs' RICO standing.

In support of their standing challenge, Defendants urge the court to take judicial notice of an order issued by the United States Federal Energy Regulatory Commission (FERC) that, according to Defendants, establishes the following: GTI and GRI are one entity, GTI; GTI does not operate for profit; and GTI serves only as a conduit for money-money that is not GTI's property-to pay for research intended to benefit others. (Jones Mot. at 6-8; Rehmat Mot. at 6-7.) Defendants further contend that the court should consider assertions made by GTI in its motion to dismiss in *Cement-Lock v. Gas Technology Institute,* No. 05-C-0018 (*"Cement-Lock* case"), also pending before this court, to the effect that only the agencies granting money for research have standing to sue for the misappropriation of those funds. (Jones Mot. at 8-11; Rehmat Mot. at 7-10.) GTI also took the position, in its briefs in the *Cement-Lock* case, that GRI was a funding source with standing to sue; as Defendants read it, however, the FERC Order establishes that neither GTI nor GRI has standing: that order confirms that GTI and GRI were one entity and that GRI was not a funding source. Thus, Defendants assert, GRI could not have been a victim of the alleged fraud. (Jones Mot. at

Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

9-10; Rehmat Mot. at 9.) They note, further, the Complaint does not allege that ECH is a funding source and conclude that, as the intended beneficiary of the funds at issue, ECH also lacks standing to bring RICO claims. (Jones Mot. at 10-11; Rehmat Mot. at 9-10.) The Unitel Defendants also urge the court to consider extraneous material. They attach to their motion the Limited Liability Agreement of Gas Tech, LLC; because that Agreement shows that none of the named Plaintiffs has an interest in Gas Tech LLC, none can claim injury from any misuse of Gas Tech LLC funds. (Unitel Mot. at 6-7.)

**\*14** Plaintiffs insist that GTI, GRI, and ECH each have standing to bring RICO claims because they made direct payments to Defendants, were the direct victims of the fraud, and are best equipped to vindicate the alleged wrongdoing. (*Id.* at 5-6.) Plaintiffs also challenge any consideration of the extraneous evidence Defendants offer. First, they contend it is inappropriate for the court to take judicial notice of findings in the FERC Order, which Plaintiffs claim are disputed. (Pl. Opp'n at 1-3.) In any event, Plaintiffs argue, the FERC order is irrelevant because it concerns funding for a 2005-2009 research and development program, not the funds that GTI, GRI, or ECH used during the relevant time period. (*Id.* at 3-4.) Plaintiffs also argue that the court should not consider Plaintiffs' position in the *Cement-Lock* case-a position that Plaintiffs assert is anyway consistent with Plaintiffs' position here-given that the *Cement-Lock* case has completely different factual allegations. (*Id.* at 7-8.) Likewise, Plaintiffs contend that it is improper for the court to look outside the allegations of the Complaint to determine the standing of the Unitel Defendants. (*Id.* at 6-7.) Those allegations, Plaintiffs argue, show that only GRI injured by Defendants' alleged fraud and racketeering activity as it relates to the Gas Tech Project. (*Id.* at 6-7.)[16]

16    Consistent with this contention, the claims of common law fraud and equitable accounting (Count VII) that arise solely out of the Gas Tech Project (Count V) are only brought by Plaintiff GRI.

### 1. Consideration of Extraneous Materials

As a preliminary matter, the court must determine whether it is appropriate to consider the extraneous materials Defendants present-the FERC Order, GTI's statements in the *Cement-Lock* case, and the Gas Tech LLC Agreement-in assessing Plaintiff's standing under RICO. Consideration of extraneous materials usually requires the court to convert Defendants' motion to dismiss into one for summary judgment under Rule

56. Fed. R. Civ. P. 12(b); *Woods,* 234 F.3d at 986; *see Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (Rule 12(b)'s requirement is mandatory, and that if documents outside the pleadings are put before the court and not excluded, the court "must convert a motion to dismiss to one for summary judgment and afford the plaintiff the opportunity to submit evidentiary materials"). The court can, however, take judicial notice of a public record without converting a motion to dismiss to one for summary judgment. *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim;" thus, the court can consider such documents without converting the motion to one for summary judgment. *Venture Assocs. Corp.,* 987 F.2d at 431 (citation omitted). Further, the court is not required to convert a motion to dismiss to a motion for summary judgment if it excludes the extrinsic evidence from consideration. *See* Fed. R. Civ. P. 12(b); *see, e.g., E.E.O.C v. Park Ridge Pub. Library,* 856 F.Supp. 477, 480 (N.D.Ill.1994). For the reasons set forth below, the court will not consider the FERC Order and GTI's statements in the *Cement-Lock* case as Defendants urge. The court will, however, consider the Gas Tech LLC Agreement as a part of the pleadings without converting these motions to dismiss into motions for summary judgment.

**\*15** First, the FERC Order: Defendants claim that the Order, (11/18/04 FERC Order, Ex. A to Rehmat Mot. to Dismiss), establishes that Plaintiffs GTI and GRI cannot claim injury from Defendants' alleged RICO violation because GRI and GTI are one in the same, and GTI, a mere conduit for money paid by participants in the natural gas industry, could not have been harmed by misuse of that money. (Jones Mot. at 7-8; Rehmat Mot. at 6-7.) Plaintiffs and Defendants agree that judicial notice of the FERC Order, a public record, would not require the court to convert Defendants' motion to dismiss to a motion for summary judgment. (Jones Mot. at 6; Rehmat Mot. at 6-7.) Nevertheless, the court concludes that the factual findings contained within the FERC Order are not properly a matter for judicial notice, and declines to otherwise consider the disputed facts in the FERC Order at this stage.

Judicial notice is proper when a fact is "not subject to reasonable dispute." Fed.R.Evid. 201(b). Courts generally do not take judicial notice of findings of facts from other proceedings for their truth because "these findings are disputable and usually are disputed." *Gen. Elec. Cap. Corp.,* 128 F.3d at 1082 n. 6. Citing *Texas & Pacific Railway*

*Company v. Pottorff,* 291 U.S. 245, 254 n. 4, 54 S.Ct. 416, 78 L.Ed. 777 (1934), Defendants compare the findings set forth in the FERC Order to government reports, treatises, and textbooks, materials that courts have judicially noticed. (Jones Reply at 5-6.) The court is not persuaded by the comparison. Findings of fact in an agency order reached through an adversarial process are wholly different from publications issued by organizations considered authoritative on the topics the publication addresses. Plaintiffs here assert that they did dispute the findings in the FERC Order. (Pl. Opp'n at 3.) Drawing all reasonable inferences in favor of Plaintiffs at this stage, the court presumes that at least some of the disputes concerned findings of which Defendants ask the court to take judicial notice.

It is true that a court may take judicial notice of another court's order-or, as here, an agency's order-for the limited purpose of recognizing that the "judicial act" occurred or the subject matter of the litigation. *See Opoka v. I.N.S.,* 94 F.3d 392, 395 (7th Cir.1996) (citing *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994)). Though Defendants cite *Opoka,* (Jones Reply at 5), they fail to mention this important limitation. Here, however, the fact that an agency hearing occurred regarding an application by GTI for approval for a 2005-2009 research program and certain funding related to that program is irrelevant to determining whether Plaintiffs have adequately alleged that Defendants' RICO violations proximately caused them injuries. The court therefore declines to take judicial notice of the FERC Order and otherwise excludes the FERC Order from consideration in determining Plaintiffs' RICO standing.

The court likewise excludes from consideration certain statements that appear in GTI's pleadings in the *Cement-Lock* case. (*See* 2/23/05 Memorandum, Ex. C to Rehmat Mot. to Dismiss.) Specifically, Defendants urge the court to consider GTI's statement in the *Cement-Lock* case that only the granting agencies that awarded money used for the research grants were the direct victims of the fraud at issue and had standing to sue for the misappropriation of those funds. (Jones Mot. at 9; Rehmat Mot. at 8.) Although they have not so characterized their argument, Defendants appear to be arguing that Plaintiff GTI is judicially estopped by its contentions in the *Cement-Lock* case from asserting its standing here. Judicial estoppel prevents a party who prevails on one legal or factual ground in a lawsuit from later repudiating that ground in subsequent litigation. *See Urbania v. Central States, Southeast and Southwest Areas Pension Fund,* 421 F.3d 580, 589 (7th Cir.2005) (citation omitted). For

judicial estoppel to apply, (1) the later position must be clearly inconsistent with the one the party took in prior litigation, (2) the facts at issue in both cases must be the same, and (3) the party taking inconsistent positions must have "prevailed upon the first court to adopt the position." *See id.* (citing *United States v. Hook,* 195 F.3d 299, 306 (7th Cir.1999)).

**\*16** GTI's position in its motion to dismiss the *Cement-Lock* case-that only the granting agencies who owned the funds at issue in the *Cement-Lock* case had standing to sue for the misappropriation of those funds-does not merit the application of the doctrine of judicial estoppel to preclude Plaintiffs from bringing this case. Defendants admit that the factual allegations in the present case "are very different" from those in the *Cement-Lock* case. (Rehmat Reply at 3-4.) The court notes that the Plaintiffs who claim to have been defrauded in this case are not completely identical to the defendants in the *Cement-Lock* case. More importantly, however, Plaintiffs did not prevail in convincing the court to adopt their position in the *Cement-Lock* case: this court rejected GTI's position and allowed the plaintiffs in the *Cement-Lock* case to pursue RICO claims against entities other than the granting agencies, finding in that case that the plaintiffs' "relationship with the grant funding sources was a direct target of the alleged scheme." *See Cement-Lock v. Gas Tech. Inst.,* No. 05-C-0018, 2005 WL 2420374, \*12 (N.D.Ill. Sept.30, 2005). The court further concluded that because the *Cement-Lock* plaintiff was the intended recipient of the funds, it was "thus a direct victim of the alleged misappropriation of funds." *See id.* Accordingly, GTI's position in the *Cement-Lock* case does not bar it from pursuing this case.

Whether the court should consider the Gas Tech LLC Agreement in determining Plaintiffs' standing to bring a RICO claim against the Unitel Defendants presents a closer issue. The Unitel Defendants urge that the Agreement shows that Plaintiff GRI could not have been injured by the alleged misappropriation of Gas Tech LLC funds: it shows that, contrary to Plaintiffs' allegations, GRI was not a 50% party to the Gas Tech LLC Agreement. (Unitel Mot. at 6-7, citing Compl. ¶¶ 123, 129.) In fact, the Unitel Defendants assert, the Agreement shows that Plaintiffs have "no interest whatsoever" in Gas Tech LLC. (Unitel Mot. at 6-7.) Plaintiffs argue that the court is restricted to the allegations of the Complaint, (Pl. Opp'n at 6), but they do not dispute the authenticity of the Gas Tech LLC Agreement or otherwise address the Unitel Defendants' claim that no Plaintiff was a party to the Gas Tech LLC Agreement. Nor have Plaintiffs alleged a relationship to GRI International, which is a party to

the Agreement. (Unitel Mot. at 6 n. 4.) The court may consider documents attached to a motion to dismiss if the documents are referred to in the complaint and are central to Plaintiff's claim. *McCready v. Ebay, Inc.,* 453 F.3d 882, 891-92 (7th Cir.2006) (citations omitted); *Venture Assocs.,* 987 F.2d at 431. Such documents are not considered to be outside the pleadings and may be addressed without converting a motion to dismiss into one for summary judgment. *See McCready,* 453 F.3d at 892; *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994).

**\*17** In *Wright,* the Seventh Circuit found a "Health Insurance Risk Plan Administration Agreement" between one of the defendants (AICI) and a third-party (ICHIA) central to the plaintiff's claim and held that the district court properly considered that agreement, which was attached by the defendants to their motion to dismiss, when deciding whether to dismiss the plaintiff's complaint. *Id.* at 1247-48. In the agreement, AICI agreed to provide ICHIA with a manager to administer a certain plan, a position subsequently offered to the plaintiff, and in a later amendment to the agreement, AICI assigned its rights and obligations under the agreement to one of its subsidiaries who was also named as a defendant. *Id.* at 1247. The court found the agreement central to the plaintiff's § 1983 claim, which alleged that the agreement granted him a property interest in his employment. *Id.* at 1248. The court further found the agreement central to the plaintiff's claim of tortious interference with his contractual relationship since the agreement was the contract with which the defendants allegedly interfered. *Id.*

Here, Plaintiffs' Complaint similarly refers several times to the November 3, 1999 Agreement to create Gas Tech LLC, stating that under the Agreement, GRI was a 50% owner of Gas Tech LLC and that GRI agreed to provide $650,000 to capitalize Gas Tech LLC. (*See* Compl. ¶¶ 124, 129-30, 214.) This Agreement is central to Plaintiffs' claims against the Unitel Defendants: Plaintiffs' claim arises out of the Unitel Defendants' misappropriation of $650,000 that Plaintiffs allegedly paid under the Agreement. (*Id.* ¶¶ 122-48.) The court will therefore consider the Gas Tech LLC Agreement in its analysis of Plaintiffs' RICO standing against the Unitel Defendants.

### 2. Analysis of Plaintiffs' RICO "Standing" Under Rule 12(b) (6) Standard

As described above, a plaintiff to a civil RICO action must show injury to "his business or property" proximately caused by a defendant's violation of section 1962. 18 U.S.C. §

1964(c); *Holmes,* 503 U.S. at 267-68; *Evans,* 434 F.3d at 924-25. In other words, the plaintiff must show some "direct relation between the injury asserted and the injurious conduct alleged." *Holmes,* 503 U.S. at 268. The court now turns to whether Plaintiffs have adequately alleged that Defendants' violations of § 1962 proximately caused injury to Plaintiffs' businesses or property, *see Anderson,* 396 F.3d at 269, considering only the Complaint, which includes the Gas Tech LLC Agreement.

Defendants argue that Plaintiffs are not the direct victims of the alleged fraud and that Defendants' alleged conduct could not have proximately caused harm to Plaintiffs. According to Defendants, the direct victims are the companies in the natural gas industry that pay a mandatory surcharge to fund the research that GTI administered or distributed.[17] Accordingly, the alleged fraudulent scheme could only cause harm to the companies that funded the research grants. (Barone Mot. at 4; Jones Mot. at 12-13; Rehmat Mot. at 10-12.) Plaintiffs assert that Defendants proximately caused them harm because Plaintiffs made payments directly to Defendants, and Plaintiffs were the intended targets and victims of the alleged fraud. (Pl. Opp'n at 4-6.) Although Plaintiffs' cursory response to Defendants' standing challenge seems to imply that each of the three Plaintiffs were affected equally by Defendants' alleged RICO violations, the court finds otherwise.

17     Plaintiffs have not explained the source of the obligation to pay the mandatory surcharge.

**\*18** The facts alleged establish that only Plaintiffs GTI and GRI, and not ECH, have standing to sue Defendants under RICO. As to both the Unitel Defendants and Shyam Singh, all of whom are named in the claim for racketeering conspiracy (Count II), the allegations do not support that any of the Plaintiffs, including GTI or GRI, have standing to sue the Unitel Defendants or Shyam Singh under RICO.[18] Plaintiffs cite this court's decision in *State Farm Mutual Auto. Insurance Co. v. Abrams,* No. 96-C-6365, 2000 WL 152143 (N.D.Ill. Feb.4, 2000), for the conclusion that GTI, GRI, and ECH each have standing to sue Defendants if they made payments directly to Defendants, the alleged wrongdoers, and if Plaintiffs were the targets of the alleged fraudulent acts. (Pl. Opp'n at 5-6.)[19] In *Abrams,* the plaintiff insurance company sued attorneys and health care providers alleged to have orchestrated automobile accidents, which eventually caused the plaintiff insurer to pay these defendants, the alleged wrongdoers, as the result of property damage and

personal injury claims arising out of the accidents. *Abrams,* 2000 WL 152143, at \*1-2. This court found that the *Abrams* plaintiff had RICO standing because the injury to the plaintiff was direct-the plaintiff had made payments directly to the defendants. *Id.* at \*2. The court further found that the fraudulent acts the plaintiff alleged were directly related to the conspiracy's goal of defrauding insurance companies. *Id.*

18    Although Shyam Singh has moved to dismiss the RICO claim, he has not specifically argued that Plaintiffs lack standing. (*See* Singh Mot. at 1-2.) The court provides further detail below on why the RICO claims against Shyam Singh are nevertheless appropriate for dismissal.

19    In *Abrams,* this court certified a question regarding the plaintiff's ability to seek recovery under RICO to the Seventh Circuit. *See Abrams,* 2000 WL 152143, at \*3-4. The Seventh Circuit declined interlocutory review and this court subsequently affirmed its preliminary conclusion that the plaintiff had sufficiently established its RICO standing. *See State Farm Mut. Auto. Ins. Co. v. Abrams,* No. 96-C-6365, 2000 WL 574466, \*3 (N.D.Ill. May 11, 2000).

The analysis in *Abrams* illustrates precisely why the allegations here support the conclusion that only GTI and GRI have standing to sue Defendants for their alleged RICO violations. Plaintiffs have alleged that GTI and GRI suffered economic losses to their business as a proximate result of Defendants' RICO violations. (*See, e.g.,* Compl. ¶¶ 174, 180.) *See Evans,* 434 F.3d at 932 (stating the injuries must be "concrete and actual" to confer RICO standing on plaintiff) (citations omitted). Defendants contend that GTI and GRI's injury is an indirect injury and cite *Marshall & Ilsley Trust Company v. Pate,* 819 F.2d 806 (7th Cir.1987), and *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago,* 877 F.2d 1333 (7th Cir.1989), to support their argument that a derivative injury, as opposed to a direct injury, "is not sufficient to convey standing under § 1964(c)." (Jones Reply at 9-10.) While Defendants' view of the law is correct, their view of the facts-that the injury here is derivative because the direct victims of Defendants' alleged scheme are the members of the natural gas industry that initially funded the research-is not. (*Id.* at 9-10.)

The Complaint alleges that GTI and GRI exist for the purpose of providing research and technology development for the natural gas industry. (*Id.* ¶ 1.) Regardless of the original source of the funds with which GTI and GRI funded their research and development-a fact that is not apparent from the four corners of the Complaint-they possessed and distributed funds to further research and development work for the natural gas industry. The Complaint, without question, adequately alleges that GTI provided funds to Defendants for such research and development. (*See e.g., id.* ¶¶ Exs. A-D, F) (listing hundreds of checks written by GTI to Defendants).[20] GRI, as well, allegedly paid money to a variety of entities-namely, ANE, EEM, Homatex, Molecular Thermoengines, and Wayne and Associates-that were misappropriated and kicked back to various Defendants. (Compl.¶¶ 190, 192, 194, 196, 198.) Other portions of the Complaint do raise questions as to whether GRI ever directly paid funds to Defendants as is necessary to establish that GRI was victimized by the later misappropriation of these funds. The exhibits documenting Plaintiffs' injury identify payments by GTI; no payments by GRI are listed in any exhibit. And, although it alleges that GTI and GRI both paid money under subcontracts executed with ECH, the Complaint further states in reference to these subcontracts that "GTI and ECH" paid monies to Defendants. (Compl.¶ 202.) Exhibit A, which purports to be a list of payments by ECH to fraudulent subcontractors, notes without mentioning GRI that GTI paid and issued checks on behalf of ECH because ECH "did not have its own payment system." (*Id.* ¶ Ex. A.) Viewing the allegations in the light most favorable to GRI, however, the court acknowledges that the list of checks contained in the exhibits may not be an exhaustive list. (*See id.* ¶ 165) (implying that Exhibits A-F are only a partial list of checks mailed in response to Defendants' fraud). The court will accept as true, as it must, Plaintiffs' well-pleaded allegations that not only GTI but GRI as well paid money that was later misappropriated. (*Id.* ¶¶ 190, 192, 194, 196, 198.)

20    In light of Plaintiffs' allegation that "GTI was created in April 2000," (*id.* ¶ 7), the court is perplexed as to how GTI was writing checks to subcontractors well before 2000. (*See id.* ¶¶ Exs. A-D, F.)

**\*19** Accepting, then, the allegation that GTI and GRI both paid funds to Defendants, it is reasonable to infer that GTI and GRI were the intended recipients of the funds they distributed and were therefore the direct victims of Defendants' misappropriation of those funds. *See Cement-Lock,* 2005 WL 2420374, at \*12 ("Cement-Lock was the intended recipient of the funds, and thus a direct victim of the alleged misappropriation of funds.") As the direct victim of Defendants' misappropriation, the injury to GRI and GTI was not derivative. When a business receives nothing in return for its expenditures, those expenditures constitute a business injury within the meaning of § 1964(c), even for not-for-profit entities. 18 U.S.C. § 1964(c) (allowing recovery under RICO

for injuries to "business or property"). Drawing all reasonable inferences in Plaintiffs' favor, the money spent or revenue gained would otherwise have been spent productively to further the research and technology development related to natural gas, the very purpose for which GTI and GRI exist. (Compl.¶ 1.)

The Complaint also alleges in numerous instances that Defendants' RICO violations-the scheme of fraudulent subcontracts, bills, reports, and invoices that comprised Defendants' racketeering activity-were the proximate or direct cause of Plaintiffs' injury. (Compl.¶¶ 174, 180.) As for GTI, the Complaint contains the following allegations that GTI's injury was proximately caused by Defendants' RICO violations:

- As a direct and proximate result of the misconduct and scheme to defraud perpetrated by defendants Amir Rehmat, Jinnet Hemani, and ANE Research Group, GTI lost $432,900 that it paid for the phony invoices issued by ANE Research Group and approved for payment by defendant Amir Rehmat relating to the ACIMET/ Perpetual Light projects. (*Id.* ¶ 97.)

- As a direct and proximate result of the misconduct and scheme to defraud perpetrated by Core Group defendants Amir Rehmat and Pacific Northwest Group defendants Michael Morin, Minaz Rehmat, and TEFES Pure Tech, GTI lost $229,600 that it paid for the phony invoices issued by TEFES Pure Tech and fraudulently approved for payment by defendant Amir Rehmat relating to the ACIMET/Perpetual Light projects. (*Id.* ¶ 105.)

- As a direct and proximate result of the foregoing willful misconduct and scheme to defraud perpetrated by Core Group defendants Amir Rehmat, Peter Barone, and Tony Lee, together with Oklahoma Group defendants Lloyd Lee, Molecular Thermoengines and Pacific Northwest Group defendants Minaz Rehmat, Jinnet Hemani, Michael Morin, ANE Research, and TEFES Pure Tech, GTI lost $1.051,500 that it paid for the phony invoices issued by Molecular Thermoengines, TEFES Pure Tech, ANE Research and others that defendant Amir Rehmat, Peter Barone, and Tony Lee fraudulently approved for payment relating to the ACIMET/Perpetual Light projects. (*Id.* ¶ 117.)

- As a direct result of the foregoing scheme to defraud, interstate transport of stolen GTI funds, and willful misconduct, over $1,652,000 belonging to Plaintiff GTI spent on and allocated to the New Acid Removal System, Thermogenics Technology, and TDP Technology was illegally converted to the personal use and gain of defendants. (*Id.* ¶ 163.)

**\*20** GTI has therefore alleged a direct relation between Defendants' conduct and GTI's injury. *Holmes,* 503 U.S. at 267-68.

While the Complaint does not set forth comparable allegations pertaining to GRI, viewing the evidence in the light most favorable to Plaintiff, the court concludes that GRI has also adequately pleaded the proximate cause element of RICO standing. As discussed above, GRI has adequately pleaded that it paid money to Defendants that was later misappropriated. This fact, presumed true here, coupled with Plaintiffs' general allegations that Defendants' RICO violations were the proximate or direct cause of Plaintiffs' injury, (Compl.¶¶ 174, 180), are sufficient for the court to find that GRI has adequately established that Defendants' alleged RICO violations proximately caused GRI a concrete injury.

That leaves the matter of ECH's standing under RICO. The Complaint alleges that "Plaintiffs," generally speaking, were directly and proximately injured by Defendants' conduct because "they paid out more than $7,600,000 in connection with fraudulent bills, reports, and invoices arising from the pattern of racketeering activity." (Compl.¶¶ 174, 180.) As explained above, the court is willing to infer that this general language applies to GRI as well as to GTI. Plaintiffs ask the court to infer that ECH also made direct payments to the alleged wrongdoers, a fact they acknowledge is necessary for RICO standing. (Pl. Opp'n at 5.) *See Abrams,* 2000 WL 152143, at \*2. Notably, however, not one allegation states specifically that ECH paid and lost funds as a result of Defendants' RICO violations. Nor does the Complaint identify any other compensable losses to ECH as a proximate result of Defendants' RICO violations.[21] Of the 246 checks listed as "RICO Events" Exhibits A through F, which Plaintiffs attach as a part of the Complaint to detail their injuries (Compl.¶ 180), not one was paid by ECH. In fact, in Exhibit A, which purportedly details payments by ECH as a result of the fraudulent subcontracts alleged to be a part of the RICO scheme, Plaintiffs acknowledge that "GTI issued and paid these checks on behalf of [ECH] because [ECH] did not have its own payment system." (*Id.* ¶ Ex. A.). Even if GTI made payments on ECH's behalf pursuant to subcontracts to which ECH was a party, the court is not satisfied that ECH suffered any direct injury. *See Holmes,* 503

U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (requiring "some direct relation between the injury asserted and the injurious conduct alleged"; harm to plaintiff as a result of "misfortunes visited upon a third person" is not sufficient to establish direct relation between RICO violation and injury).

21    While the Complaint subsequently alleges, under the captions of the state law claims, that "Plaintiffs," generally speaking, have lost money, customers, revenue, and goodwill, the Complaint does not allege that such losses are a proximate result of Defendants' RICO violations. (*See e.g.,* Compl. ¶ 204.)

Plaintiffs do claim that "GTI and others" incurred over $1,000,000 "in other general and administrative losses, costs, and expenses." (Compl.¶ 86.) This allegation is not sufficient in the court's view to rectify ECH's failure to allege that RICO violations by Defendants proximately injured ECH's business or property. If "others" is meant to include ECH, the allegation is insufficient to give notice to Defendants of the nature of ECH's losses. *See Cler,* 423 F.3d at 729 (stating that the complaint must give the defendant "fair notice" of the plaintiff's claim and the grounds upon which it rests). Nor does Plaintiffs' allegation that they "have incurred substantial investigative, audit, legal fees, and litigation expenses in an amount to be determined, but well in excess of $1,500,000," (Compl.¶¶ 174, 180), alter the court's analysis. First, it is not clear that losses such as the cost of an investigation are always compensable under RICO. *See Rylewicz v. Beaton Servs., Ltd.,* 698 F.Supp. 1391, 1396 (N.D.Ill.1988) (finding the cost of investigation not compensable under RICO where it was a pecuniary loss incident to injuries that did not give rise to RICO standing). In any case, Defendants could not have caused a direct injury to ECH's business or property as a result of investigative, audit, legal fees, and litigation expenses if ECH itself did not have the capacity to make payments for such fees and expenses. *See Holmes,* 503 U.S. at 267. Again, if the injury to ECH is an indirect one, merely the result of an injury to GTI or another third party who paid the expenses on ECH's behalf, there is no direct relation between the alleged RICO violations and injury suffered by ECH. *See Holmes,* 503 U.S. at 267-69.

**\*21**  The court also concludes that no Plaintiffs, including GTI or GRI, have standing to sue the Unitel Defendants or Shyam Singh under RICO. The Complaint does allege, in relation to the Gas Tech Project, that GRI lost over $530,000 of the $650,000 it allocated and paid "for the development, testing and commercialization of the Gas Tech Technology." (Compl.¶ 151.) As stated above, the Gas Tech

LLC Agreement-the agreement pursuant to which GRI claims to have paid this $650,000 sum-is referenced in Plaintiffs' Complaint and may fairly be considered as part of the pleadings for the purpose of this motion to dismiss. (*See supra* Section I.A.1.) The Unitel Defendants argue that because neither GRI (nor any other Plaintiff) is a party to the Gas Tech LLC Agreement and Plaintiffs have not alleged a relationship to GRI International or an interest in GRI International, which is a party to the Agreement, Plaintiffs cannot claim to have been injured by the misuse of Gas Tech LLC's funds. (Unitel Mot. at 7.) Plaintiff makes no substantive response to this argument. (Pl. Opp'n at 6-7.) The court agrees with Defendants and further finds that, for the same reasons that all Plaintiffs lack RICO standing to sue the Unitel Defendants, they also lack standing to bring a RICO claim against Shyam Singh.[22]

22    Shyam Singh stands in the same position as the Unitel Defendants *vis a vis* the Plaintiffs for the purpose of RICO standing, primarily because all allegations against both the Unitel Defendants and Shyam Singh arise out of the Gas Tech Project. Thus, if no Plaintiffs have RICO standing to sue the Unitel Defendants because the allegations do not support that any of the Plaintiffs were injured by the Gas Tech Project, it naturally follows that the allegations also do not support RICO standing against Shyam Singh. Because RICO standing is considered as a matter of whether the plaintiff has stated a claim, the court notes that *sua sponte* dismissals for failure to state a claim are permitted if "a sufficient basis for the court's action is apparent from the pleading." *See Apostol v. Landau,* 957 F.2d 339, 342-43 (7th Cir.1992) (citations omitted). Not only is the basis for the court's dismissal of the RICO claims against Shyam Singh apparent from the pleadings, which include the Gas Tech Agreement, but the Unitel Defendants' Motion to Dismiss has put the Plaintiffs on notice of the arguments that justify dismissal of the RICO claims against Shyam Singh, and Plaintiffs have had the opportunity to respond to those arguments.

The Gas Tech LLC Agreement is between UT/GT LLC and GRI International, Inc., who is not a plaintiff to this action. (*See* Gas Tech Agreement at 1.) The Agreement never mentions Plaintiff Gas Research Institute, a not-for-profit Illinois company, or either of the other Plaintiffs. (*See id.;* Compl. ¶ 1.) Exhibit A to the Gas Tech Agreement confirms that the only members of Gas Tech LLC are "GRI International, Inc., a for-profit Delaware corporation" and UT/GT, LLC, (*see id.* at 15). (*But see* Compl. ¶ 123) ("Gas Tech LLC was 50% owned by GRI and 50% owned by defendant UT/GT LLC ...") Given the plain language of

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

this Agreement and given that the Plaintiffs have alleged no facts to establish a relationship between GRI and GRI International, the court cannot reasonably infer that the Unitel Defendants or Shyam Singh have proximately caused GRI any injury sufficient to enable GRI to sue these Defendants under RICO.

Nor has any other Plaintiff sufficiently alleged its standing to bring a RICO claim against the Unitel Defendants or Shyam Singh. No other Plaintiff is alleged to have been injured as a result of money paid in connection with the Gas Tech Project. (Compl.¶ 151.) No allegations except those pertaining to the Gas Tech Project name the Unitel Defendants or Shyam Singh, so the court cannot infer their participation in any of the other schemes alleged from the allegations. Further, aside from checks paid by Gas Tech LLC in connection with the Gas Tech Project, Exhibits A through F detailing the checks paid in connection with Defendants' alleged fraudulent scheme show no involvement of the Unitel Defendants or Shyam Singh in any other scheme. Thus, as GRI lacks standing to sue the Unitel Defendants and Shyam Singh under RICO, no other Plaintiff stands in such direct relationship as to give rise to a RICO claim against the Unitel Defendants or Shyam Singh. In their opposition brief, Plaintiffs admit as much when they state that "the only entity which actually paid the money to the alleged wrongdoers for the Gas Tech project, and the only entity that lost its money for the Gas Tech project because of the Defendants' fraud and racketeering activity, is Plaintiff GRI." (Pl. Opp'n at 7.)

 **\*22** ECH's claims under RICO are dismissed without prejudice as against all Defendants-including those who did not move for dismissal and those who did not raise a standing challenge. GTI and GRI do have standing to bring their RICO claims, with the exception of the RICO claim against the Unitel Defendants and Shyam Singh. The sole RICO claim against the Unitel Defendants and Shyam Singh is therefore dismissed without prejudice.

### B. Plaintiffs' Standing To Bring State Law Claims
Plaintiffs' standing to bring their state law claims is a matter of subject matter jurisdiction. *See O'Sullivan v. City of Chicago,* 396 F.3d 843, 853 (7th Cir.2005). The analysis of Article III standing for these claims thus differs from the 12(b) (6) analysis applicable to RICO standing. To have standing, a plaintiff must have a personal stake in the outcome of a dispute that concerns the legal rights of two parties with adverse legal interests so as to ensure a sharp presentation of the legal issues to the court. *See id.* at 854. To this end,

a plaintiff seeking to sue in federal court must demonstrate: "(1) an 'injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;' (2) a causal connection between the injury and the conduct complained of, that is, the injury is fairly traceable to the challenged action of the defendant, not the result of 'the independent action of some third party not before the court;' and (3) a favorable decision likely will redress the injury." *See id.* at 854 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Prudential considerations, such as a general prohibition against a litigant raising the legal rights of another person, a bar on adjudicating general grievances better suited to legislative action, and a requirement that a plaintiff's complaint falls "within the zone of interest" that the law invoked protects, also inform standing requirements. *O'Sullivan,* 396 F.3d at 854 (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

Defendants contend that the arguments against Plaintiffs' RICO standing apply equally to their contention that Plaintiffs lack standing to bring their state law claims for breach of fiduciary duties, common law fraud, civil conspiracy to commit fraud, and equitable accounting. (*See* Barone Mot. at 4-5; Jones Mot. at 15; Rehmat Mot. at 13; Unitel Mot. at 6-7.) For the reasons explained earlier, in addressing this issue, the court considers the Gas Tech LLC Agreement as part of the pleadings but declines to consider the FERC Order or GTI's statements in the *Cement-Lock* case at this stage.

Accepting as true all well-pleaded factual allegations, GTI and GRI have suffered a "concrete and particularized" injury in fact as a result of Defendants' breach of fiduciary duties, common law fraud, and civil conspiracy to commit fraud, which is sufficient to satisfy the injury in fact requirement, (*see, e.g.,* Compl. ¶¶ 184, 203, 211, Exs. A-D, F.) Although GTI and GRI's economic losses are sufficient injuries for standing purposes, the Complaint also alleges that the "Plaintiffs" have suffered non-economic losses of goodwill and customers. (*See, e.g.,* Compl. ¶¶ 204, 211.)[23] *See South East Lake View Neighbors v. Dep't of Housing and Urban Dev.,* 685 F.2d 1027, 1036 (7th Cir.1982) (stating that "injury in fact" is not confined to "economic harm"). The court need not determine whether these non-economic losses are concrete and not speculative in this case, as GTI and GRI's economic losses are concrete and fairly traceable to the Defendants' conduct based on GTI and GRI's well-pleaded allegations. GTI has identified dozens of checks written

directly to certain Defendants who now challenge GTI's standing, and Plaintiffs have alleged that both GTI and GRI paid funds that Defendants misappropriated. (See, e.g., Compl. Exs. A-3, F; ¶¶ 190, 192, 194, 196, 198). GTI and GRI have established the requisite "causal connection" between these economic losses and Defendants' tortious acts of breach of fiduciary duty, fraud, and conspiracy. (*See* Comp. ¶¶ 184, 203, 211.) Economic losses can always be redressed; GTI and GRI's claimed economic losses in this case are no exception. *See Wernsing v. Thompson,* 423 F.3d 732, 745 (7th Cir.2005) ( "[I]njuries compensable in monetary damages can always be redressed by a court judgment.") GTI and GRI's losses could, for example, be redressed by restoring them to the economic position they occupied before Defendants allegedly misappropriated their funds. Thus, GTI and GRI generally have standing to sue Defendants for breach of fiduciary duties, common law fraud, and civil conspiracy with the slight modifications discussed below.

23      That GRI and GTI, both not-for-profit entities, actually had customers or goodwill is not clear from the Complaint.

 **\*23**  On the other hand, for reasons similar to those the court explained earlier with respect to ECH's standing under RICO, the court concludes that ECH lacks standing to sue Defendants on these state law claims. Again, despite allegations that "Plaintiffs," collectively, have suffered from monetary losses, there is no indication in the Complaint that ECH made payments to Defendants so as to claim direct economic losses arising from such payments. To the contrary, the Exhibits to the Complaint establish that ECH has made no direct payments to Defendants. (*See, e.g.,* Compl. ¶¶ Exs. A-F.) The Complaint does allege that "Plaintiffs" have suffered from lost revenue, goodwill, and customers, (Compl.¶ 204), but it does not appear that that these general allegations establish present concrete losses to ECH, as opposed to speculative losses. *See DH2, Inc. v. U.S. S.E.C.,* 422 F.3d 591, 596 (7th Cir.2005) (citations omitted) (requiring plaintiff to establish that it is immediately in danger of a "direct injury" and stating that "speculation is not enough" to satisfy the injury in fact requirement). Even drawing an inference in favor of ECH on that issue, however, where there is no allegation that ECH made any payments to these Defendants, the connection between any injury to ECH-whether it is an economic or non-economic injury-and Defendants' conduct is unclear. The court is therefore not satisfied, based on the pleadings, that ECH's claimed injury can be fairly traced to Defendants' conduct.

With respect to the Unitel Defendants and Shyam Singh, the court notes that the only allegations relevant to claims against these Defendants relate to the Gas Tech Project. (Compl.¶¶ 122-48.) When read in conjunction with the Gas Tech LLC Agreement, the Complaint does not identify any Plaintiff other than GRI that was victimized by any fraud in connection with that Project. As noted earlier, Plaintiffs concede that GRI is "the only entity which actually paid the money to the alleged wrongdoers for the Gas Tech Project, and the only entity that lost its money for the Gas Tech Project." (Pl. Opp'n at 7.) But it is GRI International-not GRI-which was a party to the Gas Tech LLC Agreement out of which the alleged breach of fiduciary duty and fraud arose, and Plaintiffs have neither pleaded a relationship to GRI International nor so much as mentioned GRI International in their Complaint. The court concludes that these allegations are insufficient to establish that GRI was injured as a result of money it contributed to Gas Tech LLC under the Agreement. Thus, because no Plaintiff presently a part of this lawsuit has standing to sue for allegedly unlawful conduct in connection with the Gas Tech Project, all of the claims that arise solely out of that Project must be dismissed.[24]

24      The following claims arise solely out of the Gas Tech Project as they pertain to these Defendants: Count VI (Civil Conspiracy to Commit Fraud) to the extent it is against Serge Randhava, Richard Kao, Unitel Technologies, and UT/GT; Count III (Breach of Fiduciary Duties) to the extent it is against Serge Randhava; Count V (Common Law Fraud) brought by Plaintiff GRI only against Shyam Singh, Serge Randhava, Peter Barone and Richard Kao and arising only out of the Gas Tech Project; and Count VII (Equitable Accounting) brought by Plaintiff GRI only against Serge Randhava and UT/GT and arising only out of the Gas Tech Project.

It also follows that GRI-the only Plaintiff requesting equitable accounting against Serge Randhava and UT/GT LLC in Count VII-does not have standing to request such a court order. In its claim for equitable accounting, GRI requests information GRI claims it is entitled to "under the terms of the Gas Tech LLC Agreement." (Compl.¶ 214.) Because Plaintiff GRI is not a party to that Agreement, GRI has no claim for injury resulting from Randhava's or UT/GT LLC's alleged breach. The court therefore dismisses without prejudice the breach of fiduciary duty claim (Count III) against Serge Randhava, the common law fraud claim against Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao (Count V),[25] the Civil Conspiracy to Commit Fraud claim (Count VI) against the

Unitel Defendants and Shyam Singh only, and the equitable accounting claim (Count VII) against Serge Randhava and UT/GT LLC.

25    Although Peter Barone has not previously been grouped with the "Unitel Defendants," Count V is dismissed as against Peter Barone because the common law fraud alleged in Count V relates only to the Gas Tech Project. This does not affect Count IV for Common Law Fraud, which is also brought against Peter Barone.

**\*24** In summary, the court finds that GTI and GRI have standing to bring their state law claims of breach of fiduciary duty, common law fraud, and civil conspiracy to commit fraud against all Defendants except where the sole basis of the claim against the particular Defendant is the Gas Tech Project. ECH does not have standing to bring any state law claims. As a result, the claim of equitable accounting is dismissed without prejudice in its entirety; all state law claims are dismissed against the Unitel Defendants and Shyam Singh without prejudice; and Count V for common law fraud against Peter Barone is dismissed without prejudice.

## II. Allegations of Fraud Under Rule 9(b)

Before considering whether Plaintiffs[26] have adequately pleaded their RICO and state law claims, the court will address whether Plaintiffs' allegations of fraud, which are relevant to both the RICO claims and the state law claim of common law fraud, satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). *See Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir.1994) (citations omitted) (confirming that Rule 9(b) applies to RICO violations that rest on the predicate acts of mail and wire fraud). Rule 9(b) requires a plaintiff to state "with particularity" the "circumstances constituting fraud" whenever fraud is alleged. Fed. R. Civ. P. 9(b). Thus, Rule 9(b) requires a plaintiff to plead the "who, what, when, where, and how" of the communications perpetrating the alleged fraud. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). By requiring allegations that specify the "time, place, and content" of the communication perpetrating the fraud, Rule 9(b) is an exception to the otherwise liberal pleading standards of the Federal Rules. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago,* 927 F.2d 988, 992-93 (7th Cir.1991).

26    "Plaintiffs" as used from here forward refers only to GTI and GRI-the two Plaintiffs found to have standing for both their RICO and state law claims.

In a case such as this, where fraud claims are brought against multiple defendants, Plaintiffs must provide detail concerning who was involved in each fraudulent activity and may not "[lump] all the defendants together." *See Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990). Essentially, the complaint must reasonably notify each defendant of his or her role in the fraudulent scheme alleged. *See Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992). All of the remaining Defendants that have moved for dismissal-the Barone Defendants, the Jones Defendants, the Rehmat Defendants,[27] Anthony Lee, Lloyd Lee, Lois Barone, Susan Lee, and Reaction Kinetics-contend that Plaintiffs have not pleaded their fraud claims with the requisite particularity. (Barone Mot. at 8-9, 12-13, 14-15; L. Barone Mot. at 3-5, Jones Mot. at 23-24; A. Lee Mot. at 2; L. Lee Mot. at 2; S. Lee Mot. at 3; Rehmat Mot. at 24-25.) Plaintiffs, on the other hand, argue that the Complaint satisfies Rule 9(b)'s particularity requirement by specifying which Defendants were involved in each of the four allegedly fraudulent schemes, the individuals associated with each sham entity, the sham entities involved in each scheme, the amount that each sham subcontractor stole from Plaintiffs, and details of the fraudulent payments that Plaintiffs made to each sham subcontractor, such as purchase order, invoice number, date, check number, and amount of each fraudulent payment. (Pl. Opp'n at 9, 45-46.) The court will examine whether Plaintiffs have met the requirements of Rule 9(b) as to each of the underlying fraud claims.

27    Several of the Defendants have argued that Plaintiffs are barred from pursuing this case by a settlement agreement in which GTI allegedly released Amir Rehmat from liability for "any and all claims" and "causes of actions" from "known and unknown" injuries. (Rehmat Mot. at 27-29; Settlement and Release of All Claims at 1, Ex. B to Rehmat Mot.; A. Lee Mot. at 2; L. Lee Mot. at 2; S. Lee Mot. at 2.) Assuming this argument can properly be made as part of a motion to dismiss (*but see Papa John's Intern., Inc. v. Rezko,* No. 04 C 3131, 2006 WL 566468 (N.D.Ill. Mar.3, 2006) (Moran, J.) (collecting cases reaching different results on the question whether it is proper to grant a motion to dismiss that rests on an affirmative defense, including release)), the court is not inclined to entertain it at this stage. It is well-established that a general release is valid for all claims the signing party had knowledge of or could have discovered with "reasonable inquiry." *See Fair v. Int'l Flavors & Fragrances, Inc.,* 905 F.2d 1114, 1116 (7th Cir.1990) (citations omitted); *Thornwood, Inc. v. Jenner & Block,* 344 Ill.App.3d 15, 21, 278 Ill.Dec. 891, 799

N.E.2d 756, 762 (1st Dist.2003) (stating that a general release will not apply to unknown claims which the party could not have contemplated when giving the release). Without a fuller record, the court cannot determine whether Thomas O'Laughlin had knowledge or could have discovered the claims brought in this lawsuit at the time he signed the release on Sept. 30, 2002. The court also declines Defendants' invitation to order a limited period of discovery focused on the circumstances of the release. (Rehmat Reply at 13.) Discovery in this case is well underway. If information revealed in discovery supports dismissal of some Defendants on the basis of the release, the court will entertain a motion for summary judgment on that basis.

### A. RICO Predicate Acts Sounding in Fraud

**\*25** Mail fraud is committed whenever someone, "having "devised or intending to devise any scheme" to defraud or in order to obtain money or property by false or fraudulent pretenses, uses the mails or "knowingly causes [something] to be delivered by mail" for the purposes of executing a scheme to defraud. 18 U.S.C. § 1341. "It is well settled that a defendant 'causes' a mailing for purposes of 18 U.S.C. § 1341 either when he makes use of the mails or when he causes someone else to do so." *United States v. Castor,* 558 F.2d 379, 385 (7th Cir.1977) (citation omitted); *see U.S. v. Swan,* 250 F.3d 495, 500 (7th Cir.2001) ("Swan did not have to mail the check himself to be guilty of mail fraud. He only needed to cause it to be mailed or to commit some act that would cause the mailing of the check to be reasonably foreseeable.") For example, Plaintiffs allege that "Defendants directly transmitted, and caused to be transmitted, documents (including invoices, bills, and checks) arising from the above-described fraudulent conduct to and from Plaintiffs and among the defendant entities ... through the United States mails ...." (Compl. ¶ 83; *see also* ¶¶ 65-66, 89, 90, 93, 103, 108, 114, 157, 165.) Plaintiffs have repeatedly alleged that Defendants, many of whom resided in different states, submitted fraudulent subcontracts, invoices, and bills to Plaintiffs. (*See, e.g., id.* ¶¶ 65-66, 83, 89, 90, 93, 103, 108, 114, 157, 165.) It is, therefore, reasonably foreseeable that Plaintiffs would respond to these alleged fraudulent invoices and bills by sending payment through the mail.

While Defendants' alleged conduct clearly falls within the description of mail fraud, Plaintiffs still must satisfy Rule 9(b) and plead, "within reason," the "time, place and content" of the mail communication, "identify[ing] the parties" to those communications, and alleging facts from which the court can reasonably infer the Defendants' fraudulent intent. *See*

*Jepson,* 34 F.3d at 1328. Plaintiffs' allegations easily meet the "time, place and content" test. *See Midwest Grinding Co.,* 976 F.2d at 1020 (quoting *Graue Mill Dev.,* 927 F.2d at 992). The Exhibits to the Complaint (lists of checks that Plaintiffs sent to Defendant subcontractors) provide extensive detail concerning the mail communications that Defendants "caused" to be transmitted to further their scheme to defraud in violation of § 1341. *See Castor,* 558 F.2d at 385. For each check (more than 200, even after disregarding those pertaining to the Gas Tech Project), Plaintiffs have identified the subcontractor paid, the invoice number (if available), the check number, the dollar amount of the check, the date of payment, the method of transport (U.S.Mail), and the mailing date. (*See id.*) *See Alumax Mill Prods., Inc. v. Krzysztofiak,* No. 96-C-5012, 1997 WL 201555, \* 3 (N.D.Ill. Apr.17, 1997) ("Plaintiff ... details the date and number of the invoices, the exact amount charged and overbilled, and that the invoice was transmitted to plaintiff through the United States mails. Plaintiff also alleges that the fraudulent invoices were specifically prepared and mailed by United Volume.")

**\*26** Defendants urge that Plaintiffs' allegations are nevertheless inadequate because they present no basis for the inference that Defendants engaged in the scheme of mail fraud with fraudulent intent. (Barone Mot. at 8.) They rely on *Jepson,* but the court concludes that case is not analogous; the plaintiff there alleged only "multiple instances" of the use of the mails and failed to identify who was contacted by mail and when. *See Jepson,* 34 F.3d at 1328. Here, not only does Plaintiff allege that the checks identified "were caused to be mailed in furtherance of the scheme to defraud," (Compl.¶ 83), but Defendants' fraudulent intent can be inferred from the initial submission of fraudulent invoices that Plaintiffs allege. It is true that Plaintiffs do not specify exactly which Defendant caused Plaintiffs to send checks by mail. To the extent these particular details are exclusively known by Defendants, Plaintiffs may be relieved of the duty to plead this information. *See Jepson,* 34 F.3d at 1328. In any event, Plaintiffs have specified the payee of each check, and it is reasonable to infer that the payee is the very party from whom Plaintiff received the alleged fraudulent invoice or bill. Further, Plaintiffs have extensively identified the individual Defendants' associations with each of the Defendant subcontractors. (Compl.¶¶ 22-46.) Plaintiffs' allegations are thus sufficient to apprise the Defendants of their alleged role in the mail fraud.

The other predicate acts alleged fall under the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, which

prohibits the interstate transportation of stolen goods. Section 2314 prohibits the transportation or transmission of goods or money in a value in excess of $5,000 that are known to have been "stolen, converted or taken by fraud," and also prohibits, as a part of a scheme to defraud, obtaining or transporting money, causing money to be transported, or inducing a person to transport in interstate commerce money or property in a value in excess of $5,000 to execute or conceal the scheme to defraud. 18 U.S.C. § 2314. Section 2315 prohibits possession, concealing, storing, bartering, selling or disposing of money or goods across state or national borders with knowledge that the money or goods were "stolen, unlawfully converted or taken." 18 U.S.C. § 2315. As the court reads the Complaint, Plaintiffs allege that, as part of their scheme to defraud, Defendants knowingly caused the Plaintiff entities to transport money to Defendants in excess of $5,000 in interstate or foreign commerce, Defendants themselves allegedly transported or received funds across state or national boundaries with knowledge that the money was stolen from Plaintiffs.

Violations of § 2314 and § 2315 do not, "in and of themselves, constitute allegations of fraud that must be pled with specificity." *See Perlman v. Zell,* 938 F.Supp. 1327, 1348 (N.D.Ill.1996) (citation omitted); *see also P.M.F. Servs., Inc. v. Grady,* 681 F.Supp. 549, 554 (N.D.Ill.1988) (having found "no case specifically discussing whether allegations of violations of Section 2315 in a RICO Complaint must comply with 9(b)," court notes that the receipt of stolen property "is not 'fraud,' " and concludes that Rule 9(b) does not apply). Cases addressing violations of §§ 2314 and 2315 as RICO predicate acts have required particularity where the funds that have been transported are alleged to have been obtained by fraud. *See Perlman,* 938 F.Supp. at 1348-49 (collecting cases). In other words, Plaintiffs do not need to plead all elements of a violation of §§ 2314 or 2315-e.g., the circumstances of the transport and defendAnts' knowledge-with particularity, but do need to plead with particularity the acts of fraud by which the funds were obtained. *See id.* at 1348-49. The court follows this approach here and finds the Plaintiffs' allegations as to the underlying fraud sufficiently particular for the same reasons that the mail fraud allegations are sufficient.

 **\*27** Plaintiffs allege numerous instances in which Defendants have submitted invoices to Plaintiffs for services and projects that were not rendered and refer specifically to Exhibits listing payments made in response to these invoices. (*See, e.g.,* Compl. ¶¶ 64-67, 92-93, 97, 112-114, 157-158,

Exs. A-D, F.) These allegations describe the content of the fraudulent communication as invoices for payment, state the technology to which the invoice related, and refer to the Exhibit that provides further detail on the content of the communications in the form of the amount of money paid under these invoices. (*See, e.g., id.* ¶¶ Exs. A-D, F.) Plaintiffs do list a number of individual Defendants and Defendant entities in these allegations. It is true that "lump [ing] all Defendants together" is not sufficiently particular, *Sears,* 912 F.2d at 893, but from Plaintiffs' allegations describing which Defendants are associated with which subcontracting entities, the court can reasonably infer which Defendants named in each of these allegations made fraudulent communications.

Plaintiffs have not explicitly alleged that Defendants caused all of these checks to be transported in interstate or foreign commerce, and Plaintiffs do admit that some of the "sham entities" are located in Illinois, where Plaintiffs are based. (Compl.¶¶ 1, 3.) The Complaint does allege, however, that many of the sham entities were located in places other than Illinois and that "Defendants knowingly caused funds to be stolen from the Plaintiffs in Illinois and to be transported to bank accounts located in both the United States and Canada." (*Id.* ¶¶ 3, 165.) Transportation of funds in interstate commerce can be inferred, as well, from many alleged instances in which Plaintiffs have identified payments and the distant locations of the entities to which the payments were made.[28] Indeed, none of the checks listed in the exhibits attached to Plaintiffs' Complaint were paid to the Defendant entities based in Illinois-Resource Recovery Consultants, Reaction Kinetics Consultants, and Barone Consulting Group. (*Id.* ¶¶ 35-37, Exs. A-D, F.) The court concludes that Plaintiffs have pleaded the RICO predicate acts of mail fraud and interstate transport of stolen goods under § 2314 and § 2315 with the requisite particularity. The court therefore considers as RICO predicate acts: (a) some 200 alleged instances of mail fraud under § 1341; (b) numerous instances in which Defendants caused the Plaintiff entities to transport money to Defendants in excess of $5,000 in interstate or foreign commerce as a part of their scheme to defraud; and (c) instances in which Defendants allegedly transported money in excess of $5,000 across borders with knowledge that the funds were stolen or taken from Plaintiffs.

28  For example, Plaintiffs allege fraud from the submission of false invoices causing Plaintiff GTI to pay funds for work purportedly related to the GTI or Cement-Lock Technology (Compl.¶ 65.) Though Plaintiffs are not explicit, in this instance, that the funds Plaintiff GTI

was caused to pay as a part of Defendants' fraudulent scheme were transported through interstate or foreign commerce, the court can infer as much from Exhibit B, which shows thirty-three checks mailed through the U.S. Mails to six different Defendant entities which Plaintiff has otherwise identified as located outside of Illinois. In other instances, Plaintiffs are explicit that the checks Defendants caused Plaintiffs to pay were transported in interstate and foreign commerce. (*See, e.g., id.* ¶¶ 91-97, 278 Ill.Dec. 891, 799 N.E.2d 756) (describing fraudulent scheme relating to ACIMET research and alleging that certain Defendants caused GTI to mail checks to ANE Research in Surrey, British Columbia).

### B. Common Law Fraud

A cause of action for common law fraud likewise must be pleaded with particularity. Such a claim requires Plaintiff to allege: "(1) a false statement of material fact by the defendant; (2) the defendant's knowledge that the statement was false; (3) the defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's reliance on the truth of the statement; and (5) damages resulting from the plaintiff's reliance on the statement." *Addison v. Distinctive Homes, Ltd.,* 359 Ill.App.3d 997, 1000, 296 Ill.Dec. 673, 836 N.E.2d 88, 92 (1st Dist.2005) (citing *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 496, 221 Ill.Dec. 389, 675 N.E.2d 584, 591 (1996)). To satisfy Rule 9(b), a plaintiff claiming fraud must allege in detail the person making the representation, the "time, place, and content" of the misrepresentation, and how the misrepresentation "was communicated to the plaintiff." *Hefferman v. Bass,* 467 F.3d 596, 601 (7th Cir.2006) (citations omitted); *see also Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993) (citation omitted) (describing requirements of Rule 9(b) and stating that plaintiff must allege that "misrepresentation, *omission,* or other action or inaction" was fraudulent) (emphasis added). The remaining Defendants against whom Plaintiffs claim common law fraud are Amir Rehmat, Peter Barone, Tony Lee, Lois Barone, Charles Wayne Jones, Kathreen Jones, Jinnet Hemani, and Zuli Rehmat. As explained here, the court concludes Plaintiffs have met the standard of Rule 9(b) in pleading common law fraud against these individual Defendants with the exception of Tony Lee.

 **\*28** In many instances, the Complaint does not specify the date of an alleged fraudulent omission or representation, or simply alleges that the "Defendants," collectively, failed to disclose material facts to Plaintiffs. In addition, however, for each Defendant charged with fraud, with the exception of Tony Lee, Plaintiffs had set forth at least one sufficiently

detailed allegation of fraud. As to each of these Defendants, Plaintiffs allege either an intentional omission or a willful misrepresentation of material fact, specify the date on which it occurred, and identify nature of the misrepresentation or omission. The following are examples of these sufficiently particular allegations:

- On or about April 17, 2001, defendants Amir G. Rehmat, G. Michael Morin, S. Peter Barone, Lois A. Barone, Charles Wayne Jones, Kathreen L. Jones, Minaz Rehmat, Resource Recovery Consultants, Wayne and Associates and others, known and unknown, signed and executed a Declaration of Trust in Richmond, British Columbia, Canada that confirmed specific ownership and proprietary interests in the TEFES Trust, for the purpose of defrauding and disposing of stolen funds from GTI and GRI. Defendants intentionally omitted to disclose the existence of the TEFES Trust, or that of defendants' ownership shares in that Trust, to Plaintiffs. (Compl.¶ 186.)

- On or about February 8, 2001, May 29, 2001, and July 15, 2002, defendants Amir Rehmat, Zuli Rehmat, and Jinnet Hemani signed and executed Subcontracts for Research between ANE Research Corporation and ECH. Defendants willfully misrepresented material facts in the Subcontracts to GTI and ECH, namely, that ANE Research would in fact perform and had the capability to perform, the services and research described in the Subcontracts. (*Id.* ¶ 189.) At relevant times, Defendants Amir Rehmat, Jinnet Hemani, and Zuli Rehmat intentionally omitted to disclose or to inform Plaintiffs of material facts, namely that ANE Research could not and did not perform any services described in the Subcontracts and that the monies paid by GTI and GRI to ANE Research were distributed and kicked-back to Defendants for their personal use and benefit. (*Id.* ¶ 190.)[29]

29    Elsewhere in the Complaint, Plaintiffs alleged that the subcontracting entities are unable to perform the work for which they contracted, (*e.g.,* Compl. ¶¶ 26-31), confirming that the misrepresentations and omissions Plaintiffs allege amount to false statements of existing fact rather than mere false promises about future conduct. See *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 168, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (1989) (distinguishing promises to perform future acts, which generally do not constitute fraud, from misrepresentations of existing fact).

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

The court is satisfied that Plaintiffs' allegations are sufficiently specific to state a claim of fraud against Amir Rehmat, Peter Barone, Lois Barone, Charles Wayne Jones, Kathreen Jones, Jinnet Hemani, and Zuli Rehmat.

As to Tony Lee, a variety of allegations within the Complaint mention Tony Lee in conjunction with a material misrepresentation or omission: for example, that he prepared or caused to be prepared "false and fraudulent invoices and bills submitted to Plaintiffs." (*See, e.g., id.* ¶¶ 64-66.) These allegations are general; they do not give any indication of the named individuals' role in the alleged fraud; and they do not specify the time period in which the alleged fraud occurred other than by reference to the Exhibits detailing Plaintiffs' payments. These general allegations regarding misrepresentations of material facts that "Defendants knowingly made" are insufficiently particular to allege fraud against Tony Lee. (*See id.* ¶¶ 81, 82.) In some paragraphs, Plaintiffs lump Tony Lee with a group of other Defendants and allege that these Defendants made certain misrepresentations; but the court remains uncertain which of these misrepresentations, if any, are alleged to have been made by Tony Lee and when these misrepresentations were made. (*See id.* ¶ 162.) Likewise, allegations that Tony Lee "fraudulently caused" Plaintiffs to pay certain sums for work not performed are also insufficient, as they fail to identify the misrepresentation or omission perpetrating the fraud. (*See id.* ¶¶ 158-59.) Finally, Plaintiffs allege that on February 5, 2001, Tony Lee prepared and submitted an invoice for marketing services rendered by Reaction Kinetics Consultants to TEFES Pure Tech for services that Tony Lee knew were not rendered. (*Id.* ¶ 199.) But Plaintiffs have not alleged that Tony Lee, or anyone else, ever submitted this invoice for payment. Thus, unlike other allegations supporting Plaintiffs' common law fraud claims, this allegation is not sufficiently particular. *Hefferman,* 467 F.3d 596, 2006 WL 2973677, *5 (stating that Rule 9(b) requires plaintiff to plead how the misrepresentation "was communicated to the Plaintiff"). The court therefore dismisses the common law fraud claim against Tony Lee without prejudice.

## III. RICO Claims

### A. Statute of Limitations

 **\*29** RICO claims are subject to a four-year statute of limitations. *Fujisawa Pharm. Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1338 (7th Cir.1997). The limitations period begins to run for a RICO violation from the time the plaintiff knew of his injury-even if Plaintiff had not yet discovered the alleged pattern of racketeering-or should have known of his injury. *See McCool v. Strata Oil Co.,* 972 F.2d 1452, 1464-65 (7th Cir.1992). Plaintiffs allege that they "did not discover and should not have reasonably discovered that their damages were attributable to fraud or to interstate transport of stolen property until sometime in mid-2002." (Compl.¶ 175.) Defendants argue that Plaintiffs' allegation merely states when Plaintiffs learned that their injuries were caused by a pattern of racketeering as opposed to when Plaintiffs knew of their injuries. (Barone Mot. at 10-11.) Plaintiffs respond that this allegation "expressly allege[s] that they did not discover their injuries with respect to Defendants' fraudulent schemes until sometime in mid-2002." (Pl. Opp'n at 34.)

In the court's view, this particular allegation is not explicit as to when Plaintiffs actually discovered their injuries. In light of the nature of the alleged scheme, however, in which Plaintiffs were paying numerous subcontractors for work that was never performed, it is reasonable to infer that Plaintiffs did not discover their injuries until mid-2002. The court presumes that Plaintiffs, who first made payments to Defendants in 1996, would not have continued to make frequent payments to the Defendants if they were aware that they were incurring injury as a result. Plaintiffs' payments essentially ceased in mid-2002 (with only a few payments made in October of 2002). (*See* Compl. ¶¶ Exs. A-D, F.) The court infers that Plaintiffs are indeed claiming that they were not aware or should not have reasonably been aware of their injury until mid-2002. The Complaint, filed in 2005, was timely.

### B. Substantive Racketeering

Count I of Plaintiffs' Complaint alleges substantive racketeering by Peter Barone, Amir Rehmat, and Tony Lee under 18 U.S.C. §§ 1962(c) and 1964.[30] Section 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "To state a claim under § 1962(c), a RICO plaintiff must show the '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Richmond v. Nationwide Cassel L.P.* 52 F.3d 640, 644 (7th Cir.1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

[30]  As discussed above, the court no longer considers ECH as a party to this count.

Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

Defendants claim that Plaintiffs fail to state a RICO claim because they do not sufficiently allege the existence of an enterprise as required by § 1962(c) and fail to allege a pattern of racketeering activity. (Barone Mot. at 5-11; Jones Mot. 15-23; Rehmat Mot. at 15-17.) Plaintiffs contend that they have adequately alleged an association-in-fact enterprise and a pattern of racketeering activity with closed-ended continuity. (Pl. Opp'n at 19-28.)

### 1. Association-in-Fact Enterprise

**\*30** An "association in fact" is an enterprise characterized by a "union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4). To qualify as a RICO enterprise, the association-in-fact must be comprised of persons associated together " 'for a common purpose of engaging in a course of conduct.' " *Richmond,* 52 F.3d at 644 (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). A RICO enterprises may be a formal or informal organization, *Bachman v. Bears, Stearns & Co.,* 178 F.3d 930, 931 (7th Cir.1999), but the enterprise must have structure. *Richmond,* 52 F.3d at 644. In other words, there must be "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Id.* The enterprise must further have "goals separate from the predicate acts themselves." *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 675 (7th Cir.2000). Further, to be liable under § 1962(c), the members of the association-in-fact must participate in the operation or management of the enterprise. *Richmond,* 52 F.3d at 646 (citation omitted). Plaintiffs have adequately pleaded an association-in-fact enterprise comprised of Amir Rehmat, Peter Barone, and Tony Lee.

Plaintiffs have alleged that, in addition to overseeing and coordinating schemes to defraud Plaintiffs, the enterprise engaged in the legitimate activities of developing, marketing, and testing "the efficacy and production capabilities of the Cement-Lock and other valid Technologies, including projects known as ACIMET, Perpetual Light, and Gas Tech, as well as [undertaking] legitimate and approved research projects." (Compl.¶ 169.) In addition, the enterprise allegedly conducted a variety of activities "with legitimate and competent sub-contractors and research entities who conduct valid work and research," including negotiating and executing sub-contracts and securing funding for the sub-contractors' research. (*Id.* ¶ 171.) In Defendants' view, Plaintiffs have merely recast parts of GTI's mission statement as the purpose of the enterprise; Defendants contend that the

alleged enterprise has not undertaken any acts as an enterprise that are independent from businesses formed by the entities for which the alleged enterprise members worked. (Barone Mot. at 6-7; Jones Mot. at 15-18; Rehmat Mot. at 14-17.) If, as Defendants claim, all of the enterprise's alleged activities were, in fact, undertaken by the Plaintiff entities, there might be a basis for this challenge. (Barone Reply at 2-3; Rehmat Reply at 9.) But at this stage, the court accepts Plaintiffs' allegations as true. The Plaintiffs need only allege a purpose of the RICO enterprise separate and apart from the predicate acts, which Plaintiffs have done. *See Stachon,* 229 F.3d at 675.

Plaintiffs here have described the structure of the enterprise as including all Defendants, not just the members of the association-in-fact. Whatever the wisdom of this approach, the court concludes that Plaintiffs have adequately pleaded the structure of the RICO enterprise. (*See* Compl. ¶ 166.) Plaintiffs allege that each member in the enterprise fulfills a "specific and necessary role to carry out and facilitate its purpose." (*Id.*) Specifically, Amir Rehmat allegedly used his executive position in ECH and GTI to devise, manage, supervise, and perpetrate the fraudulent scheme. Tony Lee and Peter Barone worked closely with Amir Rehmat in implementing the fraudulent concealment, and all three of these men set up sham entities, directed others to set up sham entities, and recruited others to take part in the scheme. (*Id.*) From Plaintiffs' reference to Amir Rehmat's executive positions at ECH and GTI, it is reasonable for the court to infer that Amir Rehmat sits highest in the hierarchy of the enterprise. Similarly, from the allegation that Tony Lee and Peter Barone both worked closely together with Amir Rehmat for the same purpose, the court infers that Lee and Barone functioned at the same level in the enterprise's hierarchy under Amir Rehmat's direction.

**\*31** Peter Barone contends that the Complaint does not adequately allege his participation in the operation or management of the RICO enterprise such that he could be considered an association-in-fact member. (Barone Mot. at 7-8.) Barone points to the lack of allegations that he "signed any contracts, controlled any funds, or issued any invoices on behalf of the enterprise." (*Id.* at 8.) Barone cites *Slaney v. The International Amateur Athletic Federation,* 244 F.3d 580, 598 (7th Cir.2001), in which the court found that the plaintiff did not adequately allege that the United States Olympic Committee (USOC) was an enterprise member because the allegations did not support that the USOC could have directed the enterprise's affairs but rather only that the USOC performed services for the enterprise. *Id.* In the

court's view, *Slaney* is distinguishable. The Complaint here alleges that Peter Barone, along with Amir Rehmat and Tony Lee, "organized, oversaw, and planned the schemes to defraud." (Compl.¶ 21.) Even if Peter Barone was not the upper-most manager of the enterprise, he may still be liable for operating and managing the enterprise. *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.,* 62 F.3d 967, 977 (7th Cir.1995) (stating that "lower-rung participants in the enterprise" may be liable if "under the direction of upper management.") The Complaint also states that Peter Barone, along with Tony Lee, not only implemented the scheme to defraud but also directed the formation of sham entities in order to perpetrate the scheme to defraud. (Compl.¶ 166.) Assuming Plaintiffs' allegations are true, as this court must, they are sufficient to establish that Peter Barone was not merely performing services for the enterprise but was directing its affairs.

### 2. Pattern of Racketeering Activity

Plaintiffs also must allege that the enterprise conducted a pattern of racketeering activity. *Richmond,* 52 F.3d at 644. A pattern of racketeering activity requires at least two predicate acts of racketeering within ten years. 18 U.S.C. § 1961(5). To establish a pattern, the plaintiff must sufficiently allege continuous criminal activity and that the predicate acts are related. *See Roger Whitmore's Automotive Servs., Inc. v. Lake County, Illinois,* 424 F.3d 659, 672 (7th Cir.2005). If the course of criminal conduct has ended, the plaintiff must demonstrate "close-ended continuity," in other words, that a series of related predicate acts occurred over a substantial but closed period of time. *See id.* at 672-73; *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 779-80 (7th Cir.1994) (citation omitted).

In order to ensure that RICO claims address "long-term criminal conduct," the following factors are relevant: (1) the number of predicate acts; (2) the variety of predicate acts; (3) the length of time over which they were committed; (4) the number of victims; (5) the presence of separate schemes; and (6) the occurrence of distinct injuries. *See Vicom, Inc.,* 20 F.3d at 780 (citation omitted). Defendants dispute that Plaintiffs have sufficiently established any of the factors relevant to close-ended continuity. (Jones Mot. at 21-23; Rehmat Mot. at 19-21.) Plaintiffs claim that their allegations are sufficient under each one of the factors relevant to closed-ended continuity. (Pl. Opp'n at 25-28.) Having concluded that Plaintiffs pleaded mail fraud and the interstate transport of stolen goods with the necessary particularity, the court considers whether Plaintiffs have sufficiently stated a pattern

of racketeering activity with closed-ended continuity based on these alleged predicate acts.

**\*32** As stated in *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986), the Seventh Circuit case initially setting forth the factors for closed-ended continuity, no single factor is necessarily determinative and the determination depends on the "fact and circumstances" of a particular case. *See id.* at 975-76. Plaintiffs here have alleged at least 200 hundred occurrences of the predicate acts, which the court finds significant. Even removing from consideration payments made in connection with the Gas Tech Project, for which no Plaintiff here has standing to sue, the 200 acts are instances where fraudulent invoices submitted by Defendants caused Plaintiffs to use the mails and to transport money to Defendant subcontractors in interstate or foreign commerce in the execution of a scheme to defraud Plaintiffs. *See* 18 U.S.C. §§ 2314, 1341. In addition, Plaintiffs have alleged multiple instances where, in violation of §§ 2314 and 2315, Defendants transferred and received money in excess of $5,000 that Defendants knew to be stolen or taken from Plaintiffs. (*See, e.g.,* Compl. ¶¶ 75, 77.) Plaintiffs allege that this pattern began as early as 1993 and continued as late as January 2005. (Compl.¶ 165.) Even if the predicate acts are determined to have ceased in late 2002, when Plaintiffs made their final payments to the Defendant entities, the period of time alleged remains substantial.

As explained earlier, the court has concluded that only GTI and GRI were victims for the purpose of analyzing the alleged pattern of racketeering activity. As to the alleged injuries, each fraudulent act alleged to constitute mail fraud or the transport of stolen goods resulted in a distinct injury to Plaintiffs given that additional money was fraudulently obtained or transported with each act. *See Fortney v. Kuipers,* No. 98-C-5387, 1999 WL 102772, \*8 (N.D.Ill. Feb.22, 1999) (stating that distinct injuries occurred each time additional money was fraudulently transferred in each of the twenty distinct acts alleged).

With respect to the final factor, the presence of separate schemes, *Morgan* is instructive. The plaintiffs in *Morgan* alleged that defendants committed several acts of mail fraud to further a scheme to defraud plaintiffs. *See* 804 F.2d at 976. The court found the acts distinct, as some related to the initial loan transaction, and others related to two separate foreclosure sales that occurred two years apart. *See id.* Even if the acts were viewed as a part of "a single grand scheme," because they were ongoing for a period of nearly four years

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

and were distinct, the pattern requirement was still satisfied. *See id.* at 975-76 (untenable to permit defendants to escape RICO liability because their acts related to "a large and ongoing scheme").

This case presents comparable facts. Even if Plaintiffs' allegations are read as charging Defendants with one grand scheme to defraud Plaintiffs of funds intended to be used for the research and development of natural gas technologies, the predicate acts were distinct. Not only did the fraudulent subcontracts and invoices at issue relate to different technologies, but the predicate acts relating to certain technologies took place in temporal proximity to each other, while the scheme as a whole occurred over a period of several years. To illustrate, Exhibit C reveals payments the Plaintiffs were allegedly caused to make relating to the Cement-Lock Technology from 1998-2002, while Exhibit F reveals that payments related to the TDP Technology occurred throughout 2002, and payments relating to the Thermogenics Technology/Autofluff occurred from 1995 to 1997. (*See* Compl. ¶¶ Exs. C, F.) Defendants' predicate acts therefore stand in stark contrast to situations where predicate acts are considered to lack the requisite continuity, such as the paradigmatic case when a defendant commits two acts of mail fraud in falsifying an application for a single loan. *See Morgan,* 804 F.2d at 976.

 **\*33** Here, as in *Morgan,* Plaintiffs have alleged a single grand scheme with many distinct predicate acts occurring over an extended period of time. *Compare Roger Whitmore's Automotive Servs. Inc.,* 424 F.3d at 673 (determining that a single scheme over two years with a confined number of victims did not constitute a pattern of racketeering where the number of predicate acts was "fairly small"). The large number and continuity of predicate acts also distinguish this case from the distinctly "one-shot" scheme in *Gamboa v. Velez,* 457 F.3d 703 (7th Cir.2006), where the alleged pattern of racketeering activity did occur over a period of several years but was a part of a "one-time endeavor to wreak havoc upon all matters linked to a single murder investigation." *See id.* at 708. Weighing all of the relevant factors, the court is satisfied that Plaintiffs have adequately alleged, based on the predicate acts of mail fraud and interstate transport of stolen goods, both the continuity of and relationship between acts that is necessary for a pattern of racketeering activity. *See Morgan,* 804 F.2d 975-77.

## C. Racketeering Conspiracy

Count II alleges a racketeering conspiracy against all Defendants under §§ 1962(d) and 1964.[31] To state a claim under § 1962(d), the plaintiff must allege that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish these goals." *See Slaney,* 244 F.3d at 600. All remaining Defendants argue that Plaintiffs have not sufficiently alleged a conspiracy to violate RICO. The Barone Defendants, Lois Barone, and Susan Lee contend more specifically that Plaintiffs failed to meet heightened pleading requirements of Rule 9(b) as to them. (Barone Mot. at 9-10; L. Barone 2-4; S. Lee at 4.)

31    Neither ECH, the Unitel Defendants (Serge Randhava, Richard Kao, Unitel Technologies, and U/GT LLC), nor Shyam Singh remain as parties to this count.

The Seventh Circuit has not required the pleading of claims under § 1962(d) with particularity, nor has this court. *Goren v. New Vision Intern'l Inc.,* 156 F.3d 721, 733 n. 10 (7th Cir.1998); *Cement-Lock,* 2005 WL 2420374, at *10 ("Plaintiff has sufficiently alleged a conspiracy against all Defendants by alleging that all Defendants 'conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Enterprise' ... and 'agreed to the commission of [predicate] acts.' ") Further, a defendant can conspire with an association-in-fact enterprise even where that defendant is not a part of the enterprise, *Cement-Lock,* 2005 WL 2420374, at *10, so long as the defendant has agreed that someone would commit the predicate acts. *See Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 785 (7th Cir.1999). Plaintiffs here adequately allege that "Defendants willfully combined, conspired, and agreed with one another and with others to violate [1962(c) ], that is, to conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Enterprise ... and agreed with one another that someone would commit at least two predicate acts to accomplish the goals of this conspiracy." (Compl.¶ 178.) The Complaint further identifies the object of the conspiracy to violate RICO and the specific predicate acts alleged to comprise the pattern of racketeering activity. (*Id.* ¶¶ 178-79.)

 **\*34** Citing *Goren,* 156 F.3d at 733, Lois Barone contends that allegations concerning the collective conduct of Defendants are insufficient to plead a conspiracy and that conclusory allegations about a conspiracy are also insufficient. (Barone Reply at 3-4.) While Plaintiffs'

Gas Technology Inst. v. Rehmat, Not Reported in F.Supp.2d (2006)

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

Complaint may name groups of Defendants or multiple Defendants in factual allegations, the court infers that this is because all Defendants named in the particular allegation are alleged to have engaged in similar conduct. Though many Defendants are alleged to have engaged in the same conduct, the Complaint does not run afoul of *Goren,* where the complaint stated the conduct of "defendants" generally, without identifying which of them took any particular action. *Id.* at 733. Here, in contrast, the Plaintiffs' general allegations are supplemented by factual allegations describing individual Defendants' conduct (albeit sometimes more than one). *See id.* at 732 (noting the plaintiff's failure to "allege any facts indicating an agreement by [defendants] as to which roles they would play in the enterprise").

Defendants do not dispute that a conspiracy can be inferred from the facts. It is sufficient here that the allegations enable the court to infer each Defendants' agreement to the conspiracy. *See United States v. Cea,* 914 F.2d 881, 886 (7th Cir.1990). To illustrate, using those Defendants that have specifically challenged the conspiracy allegations as examples, Plaintiffs allege that Peter Barone, Lois Barone, and Susan Lee-and other individually identified Defendants-prepared or caused to be prepared certain false invoices and fraudulent subcontracts. (Compl.¶¶ 64-66.) The Complaint further alleges that these specific Defendants had a role in setting up sham entities, (*id.* ¶¶ 70, 71, 166), that they received stolen funds, (*id.* ¶ 79), and that Peter Barone transported stolen funds. (*Id.* ¶ 90.) The court is satisfied that together with the general allegation as to Defendants' agreement, the allegations describing the individual Defendants' acts allow the inference that each Defendant agreed to maintain an interest in or control of the enterprise or to participate in the affairs of the enterprise, and that someone would commit at least two predicate acts to accomplish these goals.

## IV. State Law Claims

### A. Statute of Limitations

Defendants contend that Plaintiffs' state law claims were not timely filed. (Jones Mot. at 16; Rehmat Mot. at 23-24.) The statute of limitations for Plaintiffs' state law claims is five years. *See* 735 ILCS 5/13-205. In Illinois, the statute of limitation begins to run when the plaintiff knows or reasonably should have known of the injury that was wrongfully caused. *See Knox College v. Celotex Corp.,* 88 Ill.2d 407, 415-16, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981) ("At some point the injured person becomes possessed of sufficient information concerning his injury

and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule, the running of the limitations period commences.") Plaintiffs have not specified in the sections of the Complaint referring to common law fraud, civil conspiracy to commit fraud, or breach of fiduciary duty the date on which they discovered their injuries. They did, however, specifically allege that they "did not discover and should not have reasonably discovered that their damages were attributable to fraud ... until sometime in mid-2002." (Compl.¶ 175.) As explained earlier, it is reasonable for the court to infer that the time at which Plaintiffs ceased paying the Defendant entities-mid to late 2002-would approximately coincide with the time when when Plaintiffs discovered their injuries resulting either from Defendants' conduct or from the conduct of those individuals who were responsible on Plaintiffs' behalf for contracting and overseeing the work with the Defendant entities. As such, Plaintiffs' filing in 2005 was timely.

**\*35** Defendants insist that Plaintiffs' claims are nevertheless time-barred because Plaintiffs have known since 1996 that Amir Rehmat was disloyal. (Rehmat Mot. at 23-24.) In fact, as alleged in the Complaint, GTI senior staff became aware that Amir Rehmat attempted to misappropriate its intellectual property as early as 1996. (Compl.¶¶ 47-52.) Plaintiffs also allege that they resolved this dispute by forming Cement Lock Group LLC. (*Id.* ¶ 52, 58 Ill.Dec. 725, 430 N.E.2d 976.) For purposes of this motion, however, Plaintiffs' awareness of Amir Rehmat's disloyalty with respect to GTI's intellectual property rights is not sufficient to establish that Plaintiffs knew or should have known of the distinct fraudulent scheme alleged in the Complaint. (Compl.¶¶ 47-52.)

### C. Civil Conspiracy to Commit Fraud[32]

[32] Before proceeding with analysis of this claim, the court notes that both the Jones Defendants and the Rehmat Defendants argue that Count VI (Civil Conspiracy to Commit Fraud) should be dismissed as duplicative of Plaintiffs' other claims. (Jones Mot. at 25-26; Rehmat Mot. at 26-27.) Count VI does incorporate the factual allegations stated elsewhere in the Complaint and presents no new factual allegations, but because a claim for civil conspiracy has different legal requirements than all other claims in the Complaint, the court does not view Count VI as duplicative. The Barone Defendants similarly claim that Count VI must be dismissed as duplicative if it is not brought against additional defendants or if it does not involve new facts not pleaded

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

in the underlying tort. (Barone Mot. at 14.) Assuming this argument has merit, the court notes that it does not require dismissal here, as the civil conspiracy claim is in fact brought against many more Defendants than the underlying tort of common law fraud.

A claim for civil conspiracy to commit fraud requires-"(1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action; (3) either an unlawful purpose or a lawful purpose by unlawful means"- if the aim of the conspiracy is to commit fraud. *Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 235, 148 Ill.Dec. 22, 560 N.E.2d 324, 329 (1990). Defendants challenge the sufficiency of Plaintiffs' civil conspiracy allegations, contending that Plaintiffs' pleading of their civil conspiracy claim should comport with Rule 9(b). (Barone Mot. at 15; Jones Mot. at 16-17.) The Barone Defendants cite to two cases, *Prince v. Campbell,* 314 F.Supp.2d 793 (N.D.Ill.2004), and *Edelman, Combs & Latturner v. Hinshaw & Culbertson,* 338 Ill.App.3d 156, 273 Ill.Dec. 149, 788 N.E.2d 740 (1st Dist.2003), neither of which are explicit that a claim of civil conspiracy must meet the requirements of Rule 9(b). Rather, these cases only state that vague and conclusory allegations of the existence of a conspiracy are insufficient. *See Prince,* 314 F.Supp.2d at 793; *Edelman, Combs & Latturner,* 338 Ill.App.3d at 168, 273 Ill.Dec. 149, 788 N.E.2d at 750. The Jones Defendants cite one unreported case, *see Dexia Credit Local v. Rogan,* No. 02-C-8288, 2003 WL 22349111, *9 (N.D.Ill. Oct.14, 2003), which is not controlling. The Seventh Circuit has stated that conspiracy claims need not meet the heightened pleading rules of 9(b) but, because "a bare claim of conspiracy" is unenlightening, a claim of civil conspiracy does require allegations as to the parties, the purpose, and approximate date of the conspiracy. *See Loubser v. Thacker,* 440 F.3d 439, 442 (7th Cir.2006).

Plaintiffs' allegations meet this standard. First, they have adequately identified the purpose of the conspiracy: Under the caption of "civil conspiracy to commit fraud," Plaintiffs allege that Defendants assisted the Core Group in their schemes to defraud Plaintiffs of millions of dollars. (Compl.¶ 210.) The purpose of the conspiracy-to defraud Plaintiffs of money-can easily be inferred. Further, Plaintiffs allege elsewhere in the Complaint that, "since at least 1993," the Defendants agreed and conspired to violate RICO, with the object of the conspiracy being to participate in a pattern of racketeering activity to defraud Plaintiffs. (Compl.¶¶ 178-79.) While this allegation falls under the caption for "racketeering conspiracy," it also confirms the purpose of the civil conspiracy and identifies the year in which it

commenced. *See Loubser,* 440 F.3d at 443 (finding that plaintiff adequately alleged conspiracy in complaint though in "disjointed" form). It is of no importance that Plaintiffs do not plead the dates that particular Defendants joined the conspiracy, as Plaintiffs cannot be expected to have this information at the time of filing. *See Loubser,* 440 F.3d at 443. Plaintiff also alleges that "Defendants," generally speaking, were all parties to the conspiracy and brings the conspiracy count against all Defendants. (Compl.¶ 210.)

**\*36** Even if greater particularity is required because the purpose of the alleged conspiracy is fraud, the Complaint's allegations are sufficient. Plaintiffs have supplemented their conspiracy claim with factual allegations as to the conduct of each Defendant, from which the court can infer each of the Defendants' agreement to and role in the conspiracy. *See Multiut Corp. v. Draiman,* 359 Ill.App.3d 527, 538-39, 295 Ill.Dec. 818, 834 N.E.2d 43, 51 (1st Dist.2005) (internal quotations and citations omitted) ("The conspiracy may be inferred if parties pursue the same object by common means, one performing one part and another performing another part.") In discussing the racketeering conspiracy above, the court provided examples of allegations describing individual Defendants' acts so as to enable an inference that each Defendant agreed to and furthered the conspiracy with the RICO enterprise. The same examples apply here. To take just one, Plaintiffs' allegation that Peter Barone, Lois Barone, and Susan Lee (and other individually identified Defendants) prepared or caused to be prepared certain false invoices and fraudulent subcontracts is certainly sufficient, for the purpose of this motion, to identify these Defendants as alleged conspirators because it establishes that each of them acted to further the conspiracy. (Compl.¶¶ 64-66.)

In the context of a conspiracy claim, of course, all of the members of the conspiracy are liable for the unlawful acts "performed pursuant to and in furtherance of the conspiracy." *See Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 895 (1994). Thus, it is not necessary that each member of the conspiracy actually commit an act of fraud and Plaintiff here would not be required to plead as much, even under 9(b)'s heightened pleading rules. Plaintiffs' civil conspiracy claim survives as against all Defendants.

### C. Breach of Fiduciary Duties

In Count III, Plaintiffs allege breaches of fiduciary duty and of loyalty on the part of Defendants Amir Rehmat, Tony Lee, and Peter Barone.[33] To state a claim for breach of a

fiduciary duty, a plaintiff must allege: "(1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury." *See In re Estate of Lis,* 365 Ill.App.3d 1, 8, 301 Ill.Dec. 869, 847 N.E.2d 879, 885 (1st Dist.2006). Each of the three Defendants moves to dismiss this claim. Defendant Peter Barone argues that Plaintiffs have not identified any source of fiduciary duty on Barone's part and that the funds Plaintiffs claim to have lost as a result of Barone's breach did not belong to Plaintiff. (Barone Mot. at 11-12.) Defendant Amir Rehmat challenges Plaintiffs' allegation that Rehmat breached his duties to "Plaintiffs" generally; he urges that the Complaint does not allege that he was an employee of GRI and does not otherwise identify the nature of any duty he owed to GRI. (Rehmat Mot. at 21.) The Complaint does allege an employer/employee relationship between Rehmat and GTI, but Rehmat urges that allegation is insufficient to establish a fiduciary duty. (Rehmat Mot. at 22.) Defendant Tony Lee joins Rehmat's arguments. (A. Lee Mot. at 1.)

33    The court dismissed Count III against Serge Randhava above and ECH is no longer a Plaintiff to this count.

**\*37** Defendants' argument that an employment relationship is insufficient to create a fiduciary duty has no traction. Under Illinois law, all employees, not just officers and directors, owe a duty of loyalty to their employer. *Beltran v. Brentwood North Healthcare Center, LLC,* 426 F.Supp.2d 827, 831-32 (N.D.Ill.2006). " 'A fiduciary cannot act inconsistently with his agency or trust.' " *See id.* at 831 (quoting *ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.,* 62 Ill.App.3d 671, 20 Ill.Dec. 160, 379 N.E.2d 1228, 1237 (1978)). The duty of loyalty prohibits an employee from action inconsistent with his employer's interest, including diversion of business opportunities or engaging in self-dealing or otherwise misappropriating the employer's property or funds. *See Beltran,* 426 F.Supp.2d at 831 (collecting cases).

*Gross v. University of Chicago,* 14 Ill.App.3d 326, 339, 302 N.E.2d 444, 454 (1st Dist.1973), an early case on which Defendants rely, does indicate that an employment relationship by itself is insufficient to support the existence of a fiduciary duty. (Barone Mot at 11; Rehmat Mot. at 22.) *Gross* states that some proof of "domination and influence" is necessary to establish a fiduciary relationship, *see Gross,* 14 Ill.App.3d at 339, 302 N.E.2d at 454. More recent Illinois cases do not impose this same requirement, *see ABC Trans Nat'l Transp. Inc.,* 62 Ill.App.3d at 683, 379 N.E.2d 1223 at 1237; in any event, Plaintiffs here have alleged that Amir Rehmat, Peter Barone, and Tony Lee used their positions

as insiders at the Plaintiff organizations to gain approval of funding requests. (Compl.¶ 53.) For purposes of this motion, this allegation is sufficient to support the conclusion that these Defendants were in a fiduciary relationship with their employers by virtue of their influence over such funds. Plaintiffs have adequately alleged a variety of breaches of Defendant's fiduciary duties, including theft of funds from Plaintiffs and self-dealing. (*Id.* ¶ 183, 20 Ill.Dec. 160, 379 N.E.2d 1228.) *See Beltran,* 426 F.Supp.2d at 831 (collecting cases). Plaintiffs also allege that Defendants' conduct caused them direct injury, which is sufficient to plead the proximate cause element. (Compl.¶ 183.)

The court does agree with Defendants, however, that Plaintiffs' allegations are insufficient to establish a fiduciary duty toward any entity other than Defendants' employers. Accordingly, GRI's breach of fiduciary duty claim is dismissed without prejudice as against Amir Rehmat and Tony Lee, who are not alleged to have been employees of GRI. (*Id.* ¶¶ 18-19.) GRI may proceed on this claim only against Peter Barone, who is alleged to have been employed by GRI. (*Id.* ¶ 20.) And GTI's claim survives as against all three Defendants, as all three are alleged to have been employed by GTI at relevant times. (*Id.* ¶¶ 18-20.)

### *CONCLUSION*

For the reasons stated above, Defendants Peter Barone's and Barone Consulting Group, Inc.'s Motion to Dismiss (78) is granted in part and denied in part, Defendants Charles Wayne Jones, Kathreen L. Jones, Homatex, Inc. and Wayne and Associates' Motion to Dismiss the Complaint, or, in the Alternative for Summary Judgment (73-1,-2,-3) is granted in part and denied in part, Defendants Amirali G. Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Rehmat, ANE Research Inc., and Resource Recovery Consultants, Inc.'s Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment (64) is granted in part and denied in part, Defendants Surijit Randhava, Richard Kao, Unitel Technologies, and UT/GT's Motion to Dismiss (61) is granted, Defendants Susan Lee and Reaction Kinetics Consultants' Motion to Dismiss the Complaint (59) is granted in part and denied in part, Defendant Lloyd L. Lee's Motion to Dismiss or, in the Alternative, for Summary Judgment (68-1,-2) is granted in part and denied in part, Defendant Anthony Lee's Motion to Dismiss the Complaint (83) is granted in part and denied in part, Defendant Lois Barone's Motion to Dismiss (76) is granted in part and denied in

2006 WL 3743576, RICO Bus.Disp.Guide 11,219

part, and Defendant Shyam Singh's Motion to Dismiss the Complaint (80) is granted.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3743576, RICO Bus.Disp.Guide 11,219

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 375591
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. Illinois, Eastern Division.

IN RE: QUADRANT 4 SYSTEM
CORPORATION, et al., Debtor.
Amherst Partners LLC, solely as
Liquidating Trustee of the Quadrant
4 Liquidating Trust, Plaintiff.
v.
Krishna Kurapati, individually, and
the Kurapati 1999 Family Trust, by
Prasad Praturi, Trustee, Defendants.

Bankruptcy No. 17 BK 19689
|
Adversary No. 19 AP 00809
|
Signed January 22, 2020

**Attorneys and Law Firms**

Michael A. Brandess, Hajar Jouglaf, John C. Martin, Joelle M. Shabat, Elizabeth B. Vandesteeg, Sugar, Felsenthal, Grais & Helsinger LLP, Chicago, IL, for Plaintiff.

Douglas Harper, The Law Office of Douglas B. Harper, Chicago, IL, Lloyd E. Ward, Ward Legal Group, Dallas, TX, for Defendants.

**MEMORANDUM OPINION ON MOTION TO DISMISS [DKT. NO. 41]**

Jack B. Schmetterer, United States Bankruptcy Judge

**\*1** Krishna Kurapati, individually, and the Kurapati 1999 Family Trust (collectively, "Defendants") now move to dismiss the adversary proceeding brought against them by Amherst Partners LLC, solely as Liquidating Trustee of the Quadrant 4 Liquidating Trust ("Plaintiff"). For reasons articulated below, Defendants' Motion to Dismiss Adversary Complaint (the "Motion to Dismiss") will be **DENIED** by separate order to be entered concurrently herewith, with leave given to Plaintiff to amend Count I of the Complaint to cover a pleading error.

**BACKGROUND**

**A. History**

For purposes of this Motion to Dismiss, the Complaint is construed in the light most favorable towards Plaintiff, all well-pleaded facts are accepted as true, and all reasonable inferences are drawn in Plaintiff's favor. *See Yeftich v. Navistar, Inc.,* 722 F.3d 911, 915 (7th Cir. 2013). Plaintiff's Complaint, as stated, alleges the following "facts" in this subsection.

Debtor is a corporation headquartered in Illinois. Nandu Thondavadi ("Thondavadi") and Dhru Desai ("Desai"), the-then Chief Executive Officer and Chairman of the board of directors of Debtor, respectively, controlled Stonegate Holdings, Inc. ("Stonegate"), a significant shareholder of Debtor. In December of 2010, Stonegate executed promissory notes with Defendants. Thondavadi and Desai personally guaranteed these notes.[1] Stonegate eventually defaulted, and Defendants sued in state court. There, a settlement agreement was eventually reached, and an agreed judgment was entered ordering Stonegate, Thondavadi, and Desai, among other things, to pay $500,000 to Defendants over a period of time. Assertedly using misleading and fraudulent bookkeeping entries, on January 6, 2014, Thondavadi caused $280,000 in cash to be conveyed from Debtor's bank account to Defendants to pay off the final installment of the state court judgment (the "Transfer"). Debtor was insolvent at the time of the Transfer based on: (1) the market value of Debtor's assets compared to its liabilities; and (2) negative cash flow from business operations in conjunction with increased debt borrowings and liabilities as reflected in Debtor's Securities and Exchange Commission ("SEC") filings from the year 2013 through the third quarter of 2016. Given that Debtor was not obligated to Defendants at time of the Transfer and allegedly received no benefit in return for the Transfer, Debtor received less than reasonably equivalent value in exchange for the Transfer. Thondavadi and Desai were later arrested for securities fraud and pled guilty to criminal charges for fraud and deceit. On June 29, 2019, the SEC filed a civil action against Debtor, Thondavadi, and Desai.

1   The Complaint references that another unnamed individual also personally guaranteed these loans.

On June 29, 2019, Debtor filed for bankruptcy. [Bankr.No. 17-19689, Dkt. No. 1]. On July 12, 2018, Debtor's Amended

In re Quadrant 4 System Corporation, Slip Copy (2020)
2020 WL 375591

Joint Plan of Liquidation was confirmed. [Bankr. No. 17-19689, Dkt. No. 463]. Plaintiff was then appointed as the Liquidating Trustee of Debtor's Liquidating Trust with the authority to pursue Debtor's avoidance actions. On June 28, 2019, Plaintiff filed the present adversary seeking to avoid and recover fraudulent transfers from Defendants under 11 U.S.C. § 554(b)(1) and the Illinois Uniform Fraudulent Transfer Act ("IUFTA") 740 ILCS 160/5(a)(2) and 740 ILCS 16076(a). [Dkt No. 1].

### B. The Present Motion to Dismiss

 **\*2**  On December 4, 2019, Defendants filed the present Motion to Dismiss. In their Motion to Dismiss, Defendants argue that Plaintiff's Complaint fails to plead sufficient facts to state a claim for fraud under Sections 5 and Sections 6 of the IUFTA. Specifically, Defendants contend that actual fraud is not applicable here as Plaintiff does not allege an actual intent to hinder, delay, or fraud. Moreover, Defendants argue that constructive fraud likewise fails here since Debtor received reasonably equivalent value for the Transfer as it was a party to the state court judgment (and therefore benefited from the Transfer). Additionally, Defendants assert that Plaintiff's claims of Debtor's insolvency are conclusory and incorrect based on Debtor's SEC filings. Defendants further argue that Plaintiff's Complaint alleges only general and conclusory averments insufficient to demonstrate facial plausibility under Rule 12(b)(6) and additionally fails to satisfy the heightened pleading standard for allegations of fraud under Rule 9(b). Finally, Defendants argue that Plaintiff lacks standing to pursue this action under the IUFTA as no allegations as to the identity of any hypothetical lien creditor was ever asserted as required by applicable law.

Plaintiff filed its Response on January 10, 2020. [Dkt. No. 50]. In response, Plaintiff argues that determinations as to insolvency and reasonably equivalent value are questions of fact inappropriate to be decided upon in a motion to dismiss. Plaintiff contends that the sufficiency of a complaint's allegations is the only proper consideration on a Rule 12(b)(6) motion whereas the Motion to Dismiss improperly raises and relies on factual allegations that would purportedly defeat its allegations. Plaintiff asserts that it has pled sufficient facts to support the existence of the Transfer, pointing to specific statements in the Complaint regarding the manner, purpose, fraudulent nature, and actors involved in the Transfer. Moreover, Plaintiff argues that the heightened pleading standards of Rule 9(b) do not apply to constructive fraudulent transfer claims. As to standing, Plaintiff asserts that the Complaint specifically references the existence of an existing creditor at the time of the Transfer and that further identification of such a creditor is not required as long as one exists.

Defendants filed their Reply on January 15, 2020. [Dkt. No. 53]. In reply, Defendants argue that the settlement agreement, which purportedly refutes Plaintiff's allegations of the lack of reasonably equivalent value, is amenable to judicial notice as it is referenced in Plaintiff's Complaint and contained in state court records. Additionally, Defendants aver that while determinations of reasonably equivalent value and insolvency involve a question of fact, a court is not prohibited from deciding whether those facts are adequately plead for dismissal purposes. Defendants further contend that while certain carve outs exist for Rule 9(b) requirements for claims under the IUFTA, nonetheless claimants must still plead the circumstances surrounding the elements of the cause of action with sufficiently particularity (which Defendants argue Plaintiff has failed to do here). Particularly, Defendants argue that Plaintiff pleads no facts, but rather incorrect conclusions, as to reasonably equivalent value and insolvency given the settlement agreement and Debtor's SEC filings.

## JURISDICTION AND VENUE

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157 and 28 U.S.C. § 1334, and this proceeding was thereby referred here by Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## DISCUSSION

### A. Sufficiency of the Pleadings under Rule 8 and Rule 12

Federal Civil Procedure Rule 8[2] ("Rule 8") and Federal Civil Procedure Rule 12(b)(6)[3] ("Rule 12(b)(6)") establish the requirements for a sufficient pleading. Rule 12(b)(6) permits a court to dismiss claims if the claimant fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint rather than the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). "The

In re Quadrant 4 System Corporation, Slip Copy (2020)

2020 WL 375591

issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Cole v. U.S. Capital,* 389 F.3d 719, 724 (7th Cir. 2004) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "The consideration of a [Rule] 12(b)(6) motion is restricted solely to the pleading, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, a complaint must clear two "easy-to-clear hurdles" of Rule 8, which lists certain requirements that a pleading must contain. *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007).

2    Federal Civil Procedure Rule 8 is made applicable to this adversary matter by Federal Bankruptcy Procedure Rule 7008. Fed. R. Bankr. P. 7008(a) ("Rule 8 F.R.Civ.P. applies in adversary proceedings.").

3    Federal Civil Procedure Rule 12 is made applicable to this adversary matter by Federal Bankruptcy Procedure Rule 7012. Fed. R. Bankr. P. 7012(b) ("F. R.Civ.P. Rule 12(b)—(i) F.R.Civ.P. applies in adversary proceedings.").

**\*3** First, the complaint must contain enough factual detail to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the plaintiff is entitled to relief." Fed. R. Civ. P. 8(a)(2), "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Twombly,* 550 U.S. at 555. Mere " 'naked assertions' devoid of 'further factual enhancement' " will not suffice. *Id.* Instead, Plaintiff must plead some facts to support the claim. *McCauley v. City of Chicago,* 671 F.3d 611, 616-17 (7th Cir. 2011). Requiring detailed facts would interfere with the liberal intent of the pleading system, which ensures that claims are heard on their merits. *Concentra Health*, 496 F.3d at 779. Rather, only a very minimal level of factual detail is needed. *Id.*

Second, the complaint's allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Id.* A demonstration of merely conceivable entitlement to relief will not suffice. *Taha v. Int'l Bhd. of Teamsters, Local 781,* No. 19-1085, 2020 WL 132503, at \*2 (7th Cir. Jan. 13, 2020). Rather, the facts alleged in the complaint must show that the claim is "plausible on its face." *Twombly*, 550 U.S. at 570. The plausibility

standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations omitted). To establish plausibility, a plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A determination as to whether a claim is sufficiently plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley,* 671 F.3d at 616 (quoting *Iqbal,* 556 U.S. at 679).

## B. Heightened Pleading Standards Under Rule 9(b)

Federal Civil Procedure Rule 9(b)[4] ("Rule 9(b)") provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The "fraud" which Rule 9(b) encompasses include fraudulent transfer claims, both actual and constructive. *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1079 (7th Cir. 1997).

4    Federal Civil Procedure Rule 9 is made applicable to this adversary matter by Federal Bankruptcy Procedure Rule 7009. Fed. R. Bankr. P. 7012(b) ("Rule 9 F.R.Civ.P. applies in adversary proceedings.").

Actual fraud under the Illinois UFTA requires only that a transfer be made with "actual intent to hinder, delay or defraud creditors." 740 111. Comp. Stat. Ann. 160/5(a). This actual intent must be proven by clear and convincing evidence. *Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743, 757 (7th Cir. 2012). However, under Section 5(b), eleven non-exclusive factors, known as "badges of fraud," are set out from which an inference of fraudulent intent may be drawn from. 740 Ill. Comp. Stat. Ann. 160/5(b)(1)-(11); *Frank Ix & Sons, Inc. v. Phillipp Textiles, Inc.,* 165 F.3d 32 (7th Cir. 1998) ("[T]he presence of a sufficient number of these "badges" gives rise to a presumption of fraud.").

A transfer is also "fraudulent" under the IUFTA as to a past or future creditor if the debtor made the transfer:

**\*4** without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business

or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 Ill. Comp. Stat. Ann, 160/5(a)(2). Furthermore, under Section 6 of the IUFTA, a transfer is fraudulent solely as to a creditor whose claim arose before the transfer was made "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 Ill. Comp. Stat. Ann. 160/6(a). Under the IUFTA, insolvency is met if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation" and presumed if "[a] debtor [is generally] not paying his debts as they become due." 740 Ill. Comp. Stat. Ann. 160/3(a), (b).

As to constructive fraud claims made under the IUFTA, since the statute "creates a cause of action for constructive fraud that requires neither evidence of actual intent to defraud nor a specific misrepresentation by the defendant," the test for evaluating such a claim depends on whether the plaintiff has pled the "circumstances surrounding the elements of this statutory cause of action with sufficient particularity to satisfy Rule 9(b)." *General Elec.,* 128 F.3d at 1079. While not explicitly stated in *General Elec.,* to plead the surrounding circumstances with sufficient particularity, generally in fraudulent conveyance cases, this is met if the pleading "ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 737 (7th Cir. 2014) (quoting *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 615 (7th Cir. 2011)); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,* 631 F.3d 436, 441 (7th Cir. 2011) (applying Rule 9(b) to fraudulent conveyance claims under the Illinois Consumer Fraud and Deceptive Business Practices Act); *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (applying Rule 9(b) to fraudulent conveyance claims under the False Claims Act); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 669 (7th Cir. 2008) (applying Rule 9(b) to fraudulent conveyance claims under common law fraud).

### C. Plaintiff's Complaint is Plausible

Defendants first argue that actual fraud and insider fraud are not present and therefore IUFTA Sections 5(a)(1) and 6(b) are not applicable to this case. Defendants' arguments as to actual fraud and insider fraud are not relevant here as Plaintiff's

Complaint does not seek relief under those subsections of the IUFTA, but rather under Sections 5(a)(2) and 6(a) which encompass only constructive fraud. [Dkt No. 1, ¶¶ 37, 45].

In regard to constructive fraud, contrary to Defendants' assertions that Plaintiff has failed to plead sufficiently, the allegations in the Complaint do adequately allege both the statutory elements of the cause of action and the circumstances surrounding the Transfer with sufficient particularity.

Indeed, Plaintiff's Complaint lays out how the Transfer satisfies the statutory elements. Specifically, the Transfer, comprising of cash funds belonging to Debtor, was of an interest in Debtor's property. The Transfer was made to the benefit of Defendants as satisfaction of a state court judgment entered in Defendants' favor. Debtor, as it allegedly received nothing in return for the Transfer, received less than reasonably equivalent value in exchange. At the time of the Transfer, Debtor was incurring debts beyond its ability to pay and its capital were unreasonably small in relation to business affairs as "rogue" officers of Debtor were funneling money out of the corporation to benefit their family members and to satisfy personal debts and obligations. Finally, Debtor was asserted to be insolvent at the time of transfer due to its negative operations cash flows, increase in debt borrowing and total liabilities, and lack of sufficient revenue or positive cash flows to pay its debts.

**\*5** The Complaint additionally adequately pleads with particularity the entire background of the "who, what, when, where, and how of the fraud." The-then Chief Executive Officer and Chairman of the board of directors, Thondavadi and Desai, diverted funds from Debtor. On January 6, 2014, they caused the Transfer to be paid directly from a bank account of Debtor. As high-level officers of Debtor, they utilized their authority to conduct the transmission. This was done to satisfy personal liability on a judgment order entered against them (and other parties) in state court. To hide their wrongdoing, Thondavadi and Desai recorded false entries in corporate records as to the Transfer.

Given the foregoing pleadings, Plaintiff's Complaint is not a hollow complaint. Rather, Plaintiff has sufficiently pled the reason, method, and exact circumstances surrounding the Transfer with particularity to satisfy Rule 9(b). Plaintiff's Complaint is plausible on its face to state a claim under the IUFTA.

Defendants would have the analysis go further and evaluate Plaintiff's allegations against other public records for internal consistency, an issue that cannot be addressed in considering the motion to dismiss. Defendants urge the court to go beyond viewing the facts alleged in the complaint in a light favorable to the pleader to instead find that Debtor received reasonably equivalent value in exchange for the Transfer and/or that Debtor was not insolvent. Whether a debtor received reasonably equivalent value for a transfer is a question of fact. *In re Wierzbicki*, 830 F.3d 683, 686 (7th Cir. 2016). So is insolvency. *Goodpaster v. City of Indianapolis,* 736 F.3d 1060, 1070 (7th Cir. 2013). As explained above, the pleader's responsibility to "state a claim to relief that is plausible on its face" does not imply that, at this stage, it must be decided whose version to believe, or which version is more likely than not. *See Twombly*, 550 U.S. at 570. Such analysis would be improper on a motion to dismiss. *Swanson,* 614 F.3d at 404. Instead, these arguments should be raised in an answer to the Complaint.

**D. Plaintiff Has Not Demonstrated Standing for Count I**
Section 544(b) of the Bankruptcy Code grants the trustee the power to "commandeer the rights of an unsecured creditor who could have avoided the transfer under applicable law." 11 U.S.C. § 544(b)(1); *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir. 2002). This so-called "strong-arm" power allows the bankruptcy trustee to do what a creditor outside of bankruptcy could have done, except that the property will be recovered for benefit of the estate. *In re Equip. Acquisition Res., Inc.,* 742 F.3d 743, 746 (7th Cir. 2014). But, to utilize this power, an unsecured creditor that could have brought the action must exist; in essence, the "trustee stands in the shoes of [such] an actual unsecured creditor." *Id.*

Plaintiff's Complaint lies under the IUFTA. As to Count I of the Complaint, which is made under Section 5(a)(2), the IUFTA grants standing under this section to a "creditor whether the creditor's claim arose before or after the transfer was made." 740 Ill. Comp. Stat. Ann. 160/5(a). In contrast, as to Count II of the Complaint, which is made under Section 6(a), the IUFTA grants standing only to a "creditor whose claim arose before the transfer was made." 740 Ill. Comp. Stat. Ann. 160/6(a).

Defendants argue that Plaintiff lacks standing as no hypothetical lien creditor was pled in Count I of the Complaint by category or by description. Defendants are correct. Indeed, Plaintiff did not plead the existence of such an actual unsecured creditor in Count I of the Complaint.

Rather, Plaintiff only pled the existence of such an actual unsecured creditor in Count II of the Complaint. In Count II of the Complaint, Plaintiff asserts that "Q4 had one or more creditors whose claim(s) arose prior to and existed as of the time of the Fraudulent Transfer." [Dkt No. 1, ¶¶ 44]. But, no such assertion is found in Count I of the Complaint.

**\*6** Defendants further argue that some facts must be pled as to identity of such a hypothetical lien creditor. For this, Defendants are not correct. Plaintiff is not required to specifically plead facts regarding the nature of such an unsecured creditor. "The trustee need not identify the creditor, so long as the unsecured creditor exists." *In re Image Worldwide, Ltd.,* 139 F.3d 574, 577 (7th Cir. 1998).

Accordingly, Plaintiff has pled sufficient facts to be granted standing to maintain its claims under Count II of the Complaint. But, through an apparent pleading error, Plaintiff has not currently pled sufficient facts to be granted standing under Count I of the Complaint. However, the fact that Plaintiff has not adequately done so is not grounds to grant the relief Defendants request, which is dismissal with prejudice.

Under Federal Civil Procedure Rule 15(a)[5] ("Rule 15(a)"), leave to amend a complaint is to be "freely given when justice so requires," and the rule expressly grants plaintiffs an opportunity to amend their complaint "once as a matter of course before being served with a responsive pleading." Fed. R. Civ. P. 15(a). A motion to dismiss under Rule 12(b)(6) is not a responsive pleading, and if no answer has been filed, a plaintiff "ordinarily retains the ability to amend his complaint once as a matter of right, even after a court grants a motion to dismiss." *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011). Furthermore, Rule 15(a) has been interpreted by the Supreme Court to "require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.,* 800 F.3d 343, 357-58 (7th Cir. 2015) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). No exception that might justify denying amendment of the Complaint can be found in this case. As explained above, Plaintiff's Complaint is plausible on its face. Plaintiff has adequately pled a cause of action under the IUFTA. Defendants do not argue that undue delay, and unfair prejudice, or bad faith can be found.

[5]     Federal Civil Procedure Rule 15 is made applicable to this adversary matter by Federal Bankruptcy Procedure

**In re Quadrant 4 System Corporation, Slip Copy (2020)**

2020 WL 375591

Rule 7015. Fed. R. Bankr. P. 7015 ("Rule 15 F.R.Civ.P. applies in adversary proceedings.").

Accordingly, dismissal with prejudice is not warranted. Because Defendants have not yet filed an Answer to the Complaint, Plaintiff retains the ability to amend its Complaint as of right to correct Count I of the Complaint.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss will be **DENIED** by separate order entered concurrently herewith, on assumption that Plaintiff is willing and able to correct Count I of the Complaint as is necessary for it to stand.

**All Citations**

Slip Copy, 2020 WL 375591

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

In re Shopko Securities Litigation, Not Reported in F.Supp.2d (2002)

2002 WL 32003318, Fed. Sec. L. Rep. P 92,267

2002 WL 32003318
United States District Court,
E.D. Wisconsin.

In re SHOPKO SECURITIES LITIGATION.

No. 01–C–1034.
|
Nov. 5, 2002.

**Attorneys and Law Firms**

Beth J. Kushner of von Briesen & Roper, Milwaukee, Wisconsin, for plaintiffs Robert Farer, Christopher J. Peterson and Market Street Investments LP.

Guri Ademi, Robert K. O'Reilly, and Shpetim Ademi of Ademi & O'Reilly, Cudahy, Wisconsin, Nadeem Faruqi of Faruqi & Faruqi, New York, New York, and Samuel H. Rudman and Steven G. Schulman of Milberg Weiss Bershad Hynes & Lerach, New York, New York, for plaintiff Robert Farer.

David C. Harrison and Richard Bemporad of Lowey Dannenberg Bemporad Selinger, White Plains, New York, for plaintiffs Christopher J. Peterson and Market Street Investments LP.

Karen S. Orman, Robin Switzenbaum and Sherrie R. Savett of Berger & Montague, Philadelphia, Pennsylvania, and Maureen A. Hegarty of von Briesen & Roper, Milwaukee, Wisconsin, for plaintiffs Christopher J. Peterson and Market Street Investments LP.

Anthony S. Baish and Howard A. Pollack of Godfrey & Kahn, Milwaukee, Wisconsin, and R. Rene Pengra and Richard B. Kapnick of Sidley Austin Brown & Wood, Chicago, Illinois, for defendants ShopKo Stores Inc. and William J. Podany.

Andrew L. Barroway and Stuart L. Berman of Schiffrin & Barroway, Bala Cynwyd, Pennsylvania, for movants Ronald Bergh and Gary Tremble.

Guri Ademi, Robert K. O'Reilly and Shpetim Ademi of Ademi & O'Reilly, Cudahy, Wisconsin, for movants Ronald Bergh, Gary Tremble and Robert Fuller.

Samuel H. Rudman and Steven G. Shulman of Milberg Weiss Bershad Hynes & Lerach, New York, New York, for movants Ronald Bergh and Gary Tremble.

Paul J. Geller of Cauley Geller Bowman & Coates, Boca Raton, Florida, for movant Robert Fuller.

Randall K. Pulliam and Steven E. Cauley of Cauley Geller Bowman & Coates, Little Rock, Arkansas, for movant Robert Fuller.

Opinion

ADELMAN, J.

**\*1** Plaintiffs bring these consolidated Rule 10b–5 securities fraud actions on behalf of a class of investors who purchased stock in Shopko Stores, Inc. ("Shopko") between March 9 and November 9, 2000. Defendants Shopko and William J. Podany ("Podany"), ShopKo's president and chief executive officer during the class period, have moved to dismiss.

I. DOCUMENTS TO BE CONSIDERED

Before I can determine whether plaintiffs' complaint should be dismissed, I must determine what documents I can properly consider. Plaintiffs filed a "Consolidated Class Action Complaint" which refers to and quotes other documents including filings made by Shopko with the Securities and Exchange Commission ("SEC"), press releases and newspaper articles. (R. 29.) None of the referenced documents is attached. Defendants, however, in moving to dismiss, have provided the court with copies of the documents and urge me to consider them as part of the complaint. [HN1] As a general rule, when reviewing a motion to dismiss, the court cannot consider material outside the complaint without treating the motion as one for summary judgment and giving all parties a reasonable opportunity to supplement their filings. Fed.R.Civ.P. 12(b). However, defendants argue that I can consider their material without converting the motion to one for summary judgment for two reasons.

First, defendants argue that the SEC filings, press releases and newspaper articles are incorporated by reference into plaintiffs' complaint and, thus, are a part of the complaint. [HN2] Fed.R.Civ.P. 10(c) states that a "written instrument which is an exhibit to a pleading is a part thereof for all purposes." Such exhibits may include documents provided to the court by the defendant in its motion to dismiss if they are referred to in the complaint and "central" to the plaintiffs' claim. Wright v. Associated of Ins. Cos. Inc.,

29 F.3d 1244, 1248 (7th Cir.1994). However, "this is a narrow exception.... It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir.1998). For example, the Seventh Circuit has, on motions to dismiss, considered treaties to determine whether plaintiff stated a claim for violation of treaty rights, Menominee Indian Tribe v. Thompson, 161 F.3d 449, 456 (7th Cir.1998), a contract to determine whether plaintiff stated a claim for breach of contract, Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431032 (7th Cir.1993), and an agreement to determine whether plaintiff stated a claim for violation of due process based on an alleged property interest derived from the agreement, Wright, 29 F.3d at 1248. In each of these cases, the documents considered were central because they were the source of the right upon which the plaintiff based its claim. Here, defendants offer materials which do not supply the source for plaintiffs' claim that defendants violated Rule 10b–5. Rather, the documents are offered as evidence of whether defendants violated Rule 10b–5. Considering such documents as part of the pleadings would greatly expand the "narrow exception" and eliminate the distinction between a motion for summary judgment and a motion to dismiss. See Levenstein, 164 F.3d at 347. Thus, I reject defendants' first argument for consideration of the additional materials.

 **\*2** Second, defendants argue that I can consider at least the SEC filings because they are appropriate for judicial notice. See Anderson v. Simon, 217 F.3d 472, 474–75 (7th Cir.2000)[HN3] ("In ruling on a 12(b)(6) motion, a district court may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment."). Courts have taken judicial notice of SEC filings and considered them in ruling on motions to dismiss. E.g., Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276–81 (11th Cir.1999); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir.1999); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017–18 (5th Cir.1996); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991). However, in these cases, the courts did not consider the SEC filings for the truth of the defendants' disclosures asserted therein; they considered them only to determine what disclosures the defendants made. In Kramer, Bryant and Lovelace, the courts expressly relied on this distinction in finding that judicial notice was proper. Bryant, 187 F.3d at 1277–78; Lovelace, 78 F.3d at 1017–18[HN4] ("Such documents should be considered only for the purpose of determining what statements the documents contain, not

to prove the truth of the documents' contents."); Kramer, 937 F.2d at 774. In the present case, defendants ask me to consider the filings as evidence of the time line of events at ShopKo, which the defendants described in their SEC filings. Thus, they ask me to consider the documents for the truth of the disclosures contained therein, not as evidence of what disclosures defendants made. The cases defendants cite do not support application of the judicial notice rule under these circumstances. Therefore, defendants' second argument is also rejected. I will consider only the allegations in the complaint.

## II. FACTS ALLEGED IN COMPLAINT

ShopKo operates discount retail stores. The discount retail business is highly seasonal, with most of its annual revenues generated during the third and fourth quarters. Previously, ShopKo's stores were all large facilities located in mid-sized and large cities. However, in 1999, ShopKo acquired Pamida Holding Co. ("Pamida"), which operated smaller discount stores in rural areas that could not support a large ShopKo store. After the acquisition, ShopKo consolidated some of ShopKo and Pamida's departments and reduced Pamida's five distribution centers to three. The distribution centers were warehouses that supplied Pamida stores with approximately 72% of their merchandise. Among those distribution centers retained was the center in Lebanon, Indiana (the "Lebanon Center"), which ShopKo began to enlarge from 200,000 to 418,000 square feet so that it could store inventory, as well as ship it out to Pamida stores. ShopKo also developed plans to open more Pamida stores in 2000. By the end of 2000, the Lebanon Center would serve 107 of ShopKo's 229 Pamida stores.

 **\*3** On March 9, 2000, the beginning of the alleged class period, ShopKo announced, " 'the Pamida integration was a clear success and is largely behind us." ' (Id. P 29). The Omaha World–Herald and Mass Market Retailer quoted Podany as making the same statement. (Id. P 30.) ShopKo's stock then rose 11%. On April 28, 2000, ShopKo filed a form 10–K with the SEC discussing the Lebanon Center and its planned expansion and stating that Pamida's success was due in part to its " 'special emphasis on maintaining a strong in-stock position in all merchandise categories." ' (Id. P 34.)

ShopKo's first quarter ended the next day; and on May 11, 2000, ShopKo issued a press release announcing the quarter's results. The press release said, " 'With a sound infrastructure

In re Shopko Securities Litigation, Not Reported in F.Supp.2d (2002)
2002 WL 32003318, Fed. Sec. L. Rep. P 92,267

in place, our retail operations and a strong balance sheet that has the flexibility and liquidity to support our Company's growth, we feel we are well positioned for a successful 2000." ' (Id. P 35.)

However, on June 28, 2000, ShopKo announced that its second quarter earnings would be not as high as expected. A press release explained, " 'We believe the softness is driven by external forces beyond our control," ' such as the cool and wet spring and increase in gasoline prices, not " 'weaknesses in our ShopKo or Pamida business models." ' (Id. P 42.) " 'Expenses and inventories are under control." ' (Id.) Newspapers subsequently reported that in a conference call, Podany also had blamed external forces for the downturn. He said, " 'Although I despise placing blame for poor performance in the hands of the weather, our data does support that in regions where we have experienced poor weather, sales have been off." ' (Id. P 44.) However, he stated that the company maintains " 'aggressive inventory and margin management." ' (Id. P 45.) The newly expanded Lebanon Center opened sometime in July; and the second quarter ended on July 29.

On August 10, 2000, ShopKo announced its financial results for the second fiscal quarter stating, " 'During this time of retail softness, our management team's top priorities remain stringent cost containment, focused inventory management practices and, a continued emphasis on maintaining the value we have built in the shopping experience." ' (Id. P 47.)

Also in August, Lehman Brothers, Inc. and Merrill Lynch Capital Markets both issued reports recommending ShopKo stock. Lehman Brothers said that " 'Pamida is expected to be a key factor in the company's goal to grow.... The company plans to open an additional 20–25 new Pamida stores in 2000." ' (Id. P 49.) In addition, the report said that, " 'advanced technology systems provide a significant strategic advantage [for ShopKo]. ShopKo has invested heavily in systems as the company's structure has shifted from a decentralized operation to a centralized operation. The investment has already begun to bear fruit in terms of more efficient inventory management." ' (Id.) The Merrill Lynch report said, "Gross margin has improved the past three quarters helped by the inclusion of the higher gross margin Pamida." (Id. P 50.)

**\*4** However, on October 5, 2000, ShopKo predicted that earnings for the third and fourth quarters would again be lower than expected, only $ 0.02 to $ 0.07 per share for

the third quarter, compared to the previous estimate of $ 0.25, and $ 1.44 to $ 1.64 for the fourth. A press release explained that the low earnings were " 'due largely to an economic backdrop that translates into less discretionary income for our customers. Customers debt levels and rising energy costs are just a few of the factors taking their toll on the consumer's capacity to spend in the retail area." ' (Id. P 52.) To improve financial results during this slump, ShopKo said it would, " 'Aggressively manage inventories: The company will continue a disciplined inventory management approach. Inventories will be managed commensurate with sales trends. Seasonal product will be cleared on a timely basis. Inventory turns are expected to stay on track for the year." ' (Id. P 53.) After a conference call on the same day, newspapers reported that "ShopKo executives sought to assure analysts that the problems were with the economy, not the company's merchandising strategy." ' (Id. P 54.) Podany was quoted as saying, " 'our problem is declining rates of people coming to the door." ' (Id.) Following the October 5 announcement, stock prices fell. The third quarter ended on October 28.

On November 9, the last day of the class period, ShopKo reported a third quarter loss of $ 0.27 per share. Podany stated that the company had " 'underestimated the severity of sales softness and corresponding margin impact." ' (Id. P 57.) He maintained that the "shortfall [was] due largely to a difficult economic environment" and that ShopKo's " 'business model remains fundamentally sound," ' but stated that " '[a] number of serious and aggressive initiatives [were] underway including ... inventory and expense management." ' (Id.) Podany also said that Pamida's retail gross margins as a percent of sales were 26.2 percent, compared to 25.2 for the year before, due to the "elimination of the highly promotional events reflected in prior year margins, partly offset be inefficiencies in the recently expanded distribution center in Indiana." ' (Id.) This was the first public mention of problems at the Lebanon Center. The next day, the Milwaukee Journal Sentinal reported that ShopKo executives blamed at least some the company's losses on " 'a new distribution center that ... left 67 [Pamida] stores short of inventory." ' (Id. P 59.)

Poorer than expected earnings continued with the company reporting losses for the fourth quarter of 2000 and the first quarter of 2001. Following the fourth quarter 2000 report, Podany told analysts that 2001 would be a year for ShopKo to digest its Pamida acquisition and fix problems at the Lebanon Center, which he reported had been slow in moving merchandise since its expansion resulting in under-stocked

stores. Following the first quarter 2001 report, the company stated that its losses were again due in part to "inefficiencies at its Pamida division." (Id. P 62.)

**\*5** On June 6, 2001, at the annual shareholders' meeting, Podany described the Lebanon Center as having been riddled with problems. In later interviews and meetings with analysts, he described the Lebanon Center distribution system as having " 'crashed' ' during 2000, (id. P 66); "we got into the third and fourth quarter, and the place became dysfunctional," (id. P 69). He explained that the newly expanded facility was unable to efficiently receive and ship merchandise. Trucks came to the center and could not be unloaded; meanwhile, Pamida stores were understocked, and even lacked advertised items. He described the problem as " 'like having clogged arteries" ' (id) and stated that " 'seventy-five percent of the slowdown at Pamida [was] self-inflicted" ' (id. P 68).

## III. ELEMENTS OF CLAIM AND STANDARD OF REVIEW

Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Among those rules is Rule 10b–5, which prohibits a party from making an untrue statement or omission of material fact that would render misleading statements made in connection with the purchase or sale of any security. 17 C.F .R. § 240.10b–5. [HN6] To state a claim under 10b–5, a plaintiff must allege that the defendant: (1) made a false or misleading statement or omission (2) of material fact (3) with scienter, (4) in connection with the purchase or sale of a security, (5) upon which plaintiff relied, and (6) that reliance proximately caused plaintiff's injury. Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir.1995).

In order to be material, the statements must contain concrete information upon which analysts and investors would reasonably rely in making investment decisions. SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir.1998). Vague statements and statements of puffery, such as general predictions of success, do not suffice. See Gallagher v. Abbott Labs., 269 F.3d 806, 811 (7th Cir.2001); Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir.1997); Raab v. Gen. Physics

Corp., 4 F.3d 286, 289–90 (4th Cir.1993); Tricontinental Indus. Ltd. v. Anixter, 215 F.Supp.2d 942, 948 (N.D.Ill.2002).

Scienter is a "mental state embracing intent to deceive, manipulate or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 47 L.Ed.2d 668, 96 S.Ct. 1375 (1976), and encompassing "reckless disregard of the truth," Jakubowski, 150 F.3d at 681 (citation omitted). "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rehm v. Eagle Fin. Corp., 954 F.Supp. 1246, 1255 (N.D.Ill.1997) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.1978) (internal alteration and quotation marks omitted)). Recklessness satisfying scienter is more akin to conscious disregard than to mere negligence. See Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir.1977); Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.1977); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550, 550 n. 7 (6th Cir.1999).

**\*6** In evaluating a motion to dismiss, I accept all plaintiff's well-pleaded allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir.2000). However, when a plaintiff claims securities fraud, the plaintiff must also meet the heightening pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S .C. § 78u–4(b). Rule 9(b) requires a plaintiff to plead "the circumstances constituting fraud ... with particularity," In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 281 (7th Cir.1996), meaning "the who, what, when, where and how" of the fraud, DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).[HN9] The PSLRA ratcheted up the pleading requirements for securities fraud claims by requiring a plaintiff to also "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1) and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," id. § 78u–4(b)(2).[1] These PSLRA pleading requirements apply to the falsity and scienter elements respectively. However, because "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, ... the two requirements may be combined into a unitary inquiry." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1091 (9th Cir.2002); see also In Re Revlon, Inc. Sec. Litig., No.

99–Civ–10192, 2001 U.S. Dist. LEXIS 3265, *18 (S.D.N.Y. Mar. 26, 2001) (citing Rothman v. Gregor, 220 F.3d 81, 89–90 (2d Cir.2000)).

1   The Seventh Circuit has not yet interpreted this "strong inference" standard. See Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P., 137 F.Supp.2d 1114, 1120 (E.D.Wis.2001) (noting lack of Seventh Circuit authority); see also Gallagher, 269 F.3d at 808 (declining to address the issue in its most recent case addressing securities fraud pleading requirements).

A plaintiff may satisfy the heightened requirements for falsity and scienter and thus, raise a strong inference of fraud, by pointing to specific facts indicating that (1) the defendants' statements were false or misleading at the time they were made, DiLeo, 901 F.2d at 628; City of Phila. v. Fleming Cos., Inc., 264 F.3d 1245, 1260 (10th Cir.2001), and (2) the defendants either actually knew they were false or misleading, or "egregiously refused to see the obvious, or to investigate the doubtful" Rehm, 954 F.Supp. at 1255 (quoting Goldman v. McMahan, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y.1989) (ellipses in original; internal quotation marks omitted)), or "failed to check information they had a duty to monitor," see Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir.2000) (citing Rolf, 570 F.2d at 47–48). There is no precise formula or magic combination of facts for raising a "strong inference." See Fla. State Bd. of Amin. v. Green Tree Fin. Corp., 270 F.3d 645, 658–60 (8th Cir.2001) (surveying cases from eight other circuits). Rather, courts take a case-by-case approach to determine whether the facts alleged are sufficient to make it "highly likely" that the defendant acted with the required state of mind. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir.2002); see also City of Phila., 264 F.3d at 1262–63; Helwig v. Vencor, 251 F.3d 540, 551 (6th Cir.2001) (en banc); Great Neck Capital, 137 F.Supp.2d at 1120; see also Helwig, 251 F.3d at 553 ("The strong inference requirement means that plaintiffs are entitled only to the most plausible of competing inferences.").[2]

2   I note that the courts of appeal have strenuously disagreed over whether allegations of motive and opportunity are adequate by themselves to raise a "strong inference" of scienter; however, they agree that some amount of circumstantial evidence can suffice. See generally Green Tree, 270 F.3d at 658–60 (collecting cases). I need not weigh in on the motive and opportunity debate because plaintiffs do not rely on such allegations in the case before me.

*7   However, it is well-established that [HN11] a plaintiff does not raise a strong inference that a defendant acted with scienter by simply contrasting a defendant's past optimistic statements with less favorable actual results. E.g., DiLeo, 901 F.2d at 628 ("There is no 'fraud by hindsight' ") (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.)). Plaintiff must, instead, point to "facts suggesting that the difference is attributable to fraud." 901 F.2d at 627–28; see also City of Phila., 264 F.3d at 1260.

## IV. DISCUSSION

Plaintiffs allege that defendants' statements during the first, second and third quarters of 2000[3] were fraudulent and misleading because they omitted mention of the inventory management problems at the expanded Lebanon Center. Defendants move to dismiss on the ground that plaintiffs have failed to satisfy the pleading requirements established by the PSLRA. I address the statements made during each quarter separately.

3   The class period in this case spans all four quarters of ShopKo's 2000 fiscal year, but plaintiffs only allege fraud based on statements made during the first three.

### A. First Quarter Statements

Plaintiffs allege that during the first quarter of 2000, defendants made statements touting ShopKo's and the Pamida division's successes. Defendants, on March 9, stated, "the Pamida integration was a clear success and is largely behind us" (R. 24 PP 29, 30), and on April 28, attributed Pamida's profitability to its "special emphasis on maintaining a strong in-stock position," (id. P 34). However, these statements cannot support a fraud claim.

First, they are largely puffery; they are vague, general assertions of success, not concrete factual reports on ShopKo's or Pamida's performance. See Tricontinental Indus., 215 F.Supp.2d at 948. They are not the sort of information upon which investors and analysts would reasonably rely and, thus, not material.

Second, to the extent these statements do contain concrete information, plaintiffs point to no facts raising a strong inference that these statements were false or misleading at the time they were made. Plaintiffs hang their case on defendants'

2002 WL 32003318, Fed. Sec. L. Rep. P 92,267

failure to mention that the Lebanon Center could not efficiently ship and receive merchandise once its operations were expanded. However, plaintiffs' own allegations indicate that the problems occurred in the third and fourth quarters, (see R. 24 P 69 (quoting Podany as stating, "we got into the third and fourth quarter, and the place [the Lebanon Center] became dysfunctional")), and that the expanded Lebanon Center did not even open until July 2000, the last month of the second quarter. Even if one can infer that problems at least began before the third quarter, plaintiffs' allegations do not permit a strong inference that problems had begun and were significant during the first quarter or raise a strong inference that there were clear warning signals during the first quarter. Thus, plaintiffs have failed to adequately plead fraud based on defendants' first quarter statements. Plaintiffs' allegations of fraud based on these statements will be dismissed.

### B. Second Quarter Statements

 **\*8** On May 11, during the second quarter, defendants stated that ShopKo was "well positioned for a successful 2000" in part because of its "strong infrastructure." (Id. P 35). This statement cannot support a claim either.

First, it is again puffery and vague. See Tricontinental Indus, 215 F.Supp.2d at 948 (holding that [HN12] general statements about the company's strength and predictions of a successful year were puffery and vague and, thus, not material). Analysts and investors would not reasonably rely on such statements. See Stransky, 51 F.3d at 1332.

Second, plaintiffs again point to no specific facts indicating that the statement was false at the time it was made and that defendants knew or acted with reckless disregard to whether it was false. Once again, the expanded Lebanon Center still had not yet opened. Thus, plaintiffs' allegations of fraud based this statement will also be dismissed.

On June 28, one month before the end of the second quarter's end, defendants blamed the recent financial slowdown on "external forces" and stated that "expenses and inventories [were] under control." (R. 84 Cal. 281, 24 P 42.) Defendants said that the company intended to weather these difficult economic conditions by maintaining its "aggressive inventory and margin management" (id. P 25) and that "focused inventory management ... [remained a] top priority" (id. P 47). However, these statements also fail to support a claim for securities fraud because plaintiffs point to no specific

facts raising an inference that they were false or misleading when made. Once again, the expanded center still had not yet opened and had not yet become "dysfunctional."

The only support for concluding that the June 28 statements were misleading when made comes from their proximity in time to the center's opening[4] and the third quarter when the Lebanon Center did become "dysfunctional." However, proximity in time is insufficient by itself to raise a strong inference that ShopKo's second quarter statements were false when made, much less a strong inference that defendants either knew they were false or recklessly disregarded their falsity. See Arazie v. Mullane, 2 F.3d 1456, 1467–68 (7th Cir.1993) (temporal proximity insufficient by itself to raise a strong inference of scienter). Plaintiffs' allegations plead "fraud by hindsight," an approach the Seventh Circuit has expressly rejected. See DiLeo, 901 F.2d at 628. Thus, plaintiffs' allegations of fraud based on defendants' June 28 statements must also be dismissed.

4       It is not clear from the complaint how close in time these events were. Plaintiffs only allege that the Lebanon Center opened in July, but do not indicate precisely when.

### C. Third Quarter Statements

By the third quarter, the newly expanded Lebanon Center had opened and, according to Podany, soon after "became dysfunctional." On August 10, defendants announced their second quarter results and said that "during this time of retail softness, ... focused inventory management ... remained a ... top priority."

However, despite the fact that Lebanon Center had opened and had begun experiencing problems,[5] plaintiffs point to no specific facts making this particular statement false. Defendants' statement reported on ShopKo's past performance and then indicated that inventory management was a priority. Defendants did not report that inventory management was sound at that time, or was not a cause of the decline earnings. The Lebanon Center's difficulties alone, even though they involved inventory management, do not make false defendants' statement about the past and priorities for the future. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir.1999) (holding that [HN13] a report of past performance and expression of confidence in the future was not made false by an undisclosed negative fact). Plaintiffs point to no other facts contradicting defendants' statement.

Thus, plaintiffs' allegations based on this statement will also be dismissed.

5    It is not apparent precisely when during third quarter the Lebanon Center became "dysfunctional." However, construing the facts in the light most favorable to plaintiffs, I assume that the center did not function effectively starting from the beginning of the third quarter.

**\*9** However, on October 5, defendants made additional statements which discussed the present causes of ShopKo's low earnings and indicated that inventory and merchandising problems were not among them. Defendants said that ShopKo's low earnings were "due largely" to external factors such as "the economy, not the company's merchandising strategy" (R. 24 P 54), and that "the company [would] continue a disciplined inventory management approach" (id. P 53). Defendants further said that the "problems were with the economy, not the company's merchandising strategy" and that the "merchandise and marketing programs remained sound." (Id. P 54.) Considering all the allegations as a whole, I conclude that defendants' October 5 statements were material and that plaintiffs raise a strong inference both that they were false or misleading at the time they were made and that defendants acted with the required state of mind.

These statements were material because they contained concrete information about ShopKo's present condition that could reasonably be expected to alter investor decision-making. The statements informed investors about what was and was not causing the slowdown in earnings at Shopko; defendants told investors that ShopKo's problems were external, not internal, and indicated that ShopKo's inventory management and merchandising were sound. Defendants' use of the word "largely" to modify "external" does not alter the fact that defendants placed the blame for declining earnings elsewhere and, thus, their statements could reasonably be expected to mollify investor concerns.

In addition, plaintiffs raise a strong inference that defendants' October 5 statements were false or misleading when made and that defendants acted with the required statement of mind. Several factors support this conclusion.

First, as stated above, by the time these statements were made, the expanded Lebanon Center had opened and was not effectively shipping and receiving merchandise. Thus, contrary to defendants' statements, ShopKo's merchandising and inventory management were not "sound" on October 5. In addition, according to Podany's later statements, the Lebanon Center's problems were responsible for 75% of the slowdown at Pamida. Thus, also contrary to defendants' statements, the causes of ShopKo's declining earnings were not "largely external." Plaintiffs' allegations, thus, raise a strong inference that defendants' statements were false or misleading at the time they were made.

Second, the above and other factual allegations indicate that the problems at the Lebanon Center were substantial, thereby raising a strong inference that defendants must have known about them. See Rehm, 954 F.Supp. at 1256 (stating that [HN14] problems of great magnitude can give rise to a strong inference of scienter where defendants were in a position to detect them). Podany described the Lebanon Center as having "become dysfunctional," as having "crashed" and compared the center's problems to "having clogged arteries." Although his expressive language was perhaps hyperbolic, these statements indicate that the Lebanon Center's problems were not insignificant or intermittent; they were wholly debilitating. The resulting problems for Pamida were also substantial. Pamida stores were understocked while trucks sat outside the Lebanon Center unable to unload, all during ShopKo's most important revenue-generating season of the year. ShopKo executives would more than likely have known about problems of this magnitude.

**\*10** Third, defendants' particular insistence that the problems lay with external factors, such as the economy, supports an inference of at least reckless disregard for the truth. See id. (holding that the "reassuring 'spin'" defendants placed on otherwise damaging information raised strong inference of scienter). Defendants' statements make plain that they knew ShopKo was suffering. But before blaming external factors for the downturn in earnings, defendants had a duty to investigate what the actual causes were. Podany's subsequent assertion that internal factors caused 75% of Pamida's decline raises a strong inference that defendants either did investigate but ignored the signs of internal problems or did not investigate at all. Either way, defendants' statements blaming external factors which, according to Podany's later statements, were only a minor cause, raise a strong inference that defendants spoke with at least reckless disregard of the truth. See Rolf, 570 F.2d at 47–48; Novak, 216 F.3d at 311.

This inference of recklessness is further strengthened by the fact that defendants indicated that inventory management was strong and not a cause of the downturn. However, once

again, before indicating that inventory management was not causing earnings to dip, defendants had a duty to inquire into whether this was the case. See Rolf, 570 F.2d at 47–48. Podany's later statements about the Lebanon Center's inventory management "crash" support the inference that defendants either did not inquire or did not disclose the problems they uncovered.

Finally, plaintiffs' allegations indicate that the Lebanon Center was of particular importance to Pamida and to ShopKo, thereby bolstering the inference that defendants knew or at least should have known whether or not the center was functioning as intended. See Rehm, 1256 (finding a strong inference where alleged misstatement addressed an important aspect of the business); Aldridge, 284 F.3d at 84 (finding strong inference where alleged misstatements concerned a new venture of particular importance to the business); see also In re Peoplesoft, Inc. Sec. Litig., 2000 U.S. Dist. LEXIS 10953, 2000 WL 1737936, * (N.D.Cal. May 25, 2000) (stating that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"). The success of the Lebanon Center was of critical importance to Pamida's success. The Lebanon Center was one of only three Pamida distribution centers and ShopKo had recently more than doubled its size and expanded its operations. By the end of 2000, ShopKo had made it the transfer point for 72% of the merchandise at almost half of ShopKo's Pamida stores. At the same time, ShopKo was opening new Pamida stores which would be served by the Lebanon Center. Indeed, the center was ultimately so important to Pamida that its "crash[ ]" was responsible for 75% of the slowdown. Thus, it is highly likely that by October 5 defendants knew that the newly opened center was not meeting expectations, and had instead "crashed."

 *11  Pamida's overall success, of which the Lebanon Center was a key piece, was of vital importance to ShopKo's success. The acquisition and rapid growth of Pamida had been primary causes of ShopKo's 1999 and 2000 earnings growth and popularity with investors and analysts. (See R. 24 PP 30–32 (alleging that Podany's announcement about Pamida's successes and planned growth caused the market price of ShopKo's stock to jump 11% the same day); P 49 (reporting that Lehman Brothers, Inc. advised investors to buy ShopKo stock on account of the growth potential of the Pamida division); P 50 (reporting that Merrill Lynch Capital Markets recommended that investors buy ShopKo stock based in part

on the past successes of the Pamida division).) The Lebanon Center was to play a pivotal role in that growth because it would serve almost half of the Pamida stores. Thus, it is likely that defendants were keeping tabs on whether Pamida and the Lebanon Center in particular, were functioning and effectively managing inventory as new Pamida stores opened during the third quarter of 2000.

Taken as whole, the allegations in the complaint raise a strong inference that defendants acted with intentional or at least reckless disregard for the truth on October 5, when they blamed the company's low earnings on external factors and indicated that inventory management were strong despite the fact that the Lebanon Center was not functioning and was causing earnings to dip.

Defendants raise several arguments in response. First, defendants argue that plaintiffs have failed to plead with sufficient particularity because plaintiffs have not alleged examples of the Lebanon Center's problems, when problems began and when they became sufficiently material that disclosure was required, who knew about the problems, and what information ShopKo should have included in its public statements. However, plaintiffs have alleged that the center was unable to effectively receive and ship merchandise during the third and fourth quarters, resulting in understocked stores and causing 75% of Pamida's financial slow-down. These allegations are sufficiently particular to put defendants on notice of the precise nature of plaintiffs' claim. Cf. Roots P'ship v. Lands End, Inc., 965 F.2d 1411, 1418–19 (7th Cir.1992). As discussed above, plaintiffs have also pointed to specific facts raising a strong inference that defendants' October 5 statements were false when made and that defendants acted with the required state of mind. Plaintiffs need do no more.[6]

6        Defendants also argue that plaintiffs failed to point to facts indicating the cause of the Lebanon Center's problems. However, such allegations would have little if any relevance to plaintiffs' claim. Regardless of the causes, defendants could still commit by fraud for failing to disclose the problems.

Second, defendants argue that regardless of whether plaintiffs have pled with particularity, plaintiffs fail to state a claim because defendants had no duty to disclose the Lebanon Center's distribution problems until they did so in their SEC disclosure report filed after the end of the class period. To be sure, defendants had no duty to continuously disclose information. Gallagher, 269 F.3d at 808–09; However, when

In re Shopko Securities Litigation, Not Reported in F.Supp.2d (2002)
2002 WL 32003318, Fed. Sec. L. Rep. P 92,267

defendants chose to speak about the financial difficulties ShopKo faced, they had a duty not to provide false information or omit material information so as to mislead investors. See Stransky, 51 F.3d at 1331 [HN15] ("If one speaks, he must speak the whole truth."); cf. Gallagher, 269 F.3d at 808–10 (finding no duty to disclose where defendants made no public statements).

**\*12** Defendants further argue that even if they had a duty not to mislead, that duty did not encompass revealing the distribution and warehousing problems at the Lebanon Center, which were only tangentially related to the topics of the defendants' disclosures. See Anderson v. Abbott Labs., 140 F.Supp.2d 894, 903 (N.D.Ill.2001) ("Merely mentioning a topic ... does not require the company to disclose every tangentially related fact that might interest investors") aff'd sub nom. Gallagher, 269 F.3d 806. However, the Lebanon Center's inability to manage inventory was not merely tangentially related to the business downturn and to ShopKo's ability to manage inventory in general; the Lebanon Center's problems were closely related and, according to later reports, the principal cause of at least Pamida's slowdown. The cases that defendants cite for support present factual scenarios where the withheld information bore a much more tenuous relationship to the information disclosed and thus, do not support defendants' position. See, e.g., id. at 905 (holding that statement listing product names and distribution network did not give rise to duty to disclose information about regulatory environment); In re Union Carbide Sec.

Litig., 648 F.Supp. 1322, 1327–28 (S.D.N.Y.1986) (holding that statement concerning defendant's ability to meet safety standards did not give rise to a duty to disclose information about insurance coverage, corporate liability and financial ratings should an accident occur). Defendants' argument is, thus, rejected.

V. CONCLUSION

In sum, plaintiffs have alleged securities fraud with sufficient particularity based on statements made by defendants on October 5, 2000, but not based on defendants' statements made before that date.

THEREFORE IT IS ORDERED that defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART. Plaintiffs' allegations of securities fraud based on defendants' statements made before October 5, 2000 are DISMISSED.

IT IS FURTHER ORDERED that the court shall hold a telephonic status conference on November 26, 2002 at 11:30 am. The court will initiate the call.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 32003318, Fed. Sec. L. Rep. P 92,267

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

2017 WL 1398646
United States District Court, C.D. Illinois,
Peoria Division.

Amy L. INGENHUTT and
Teresa L. Odell, Plaintiffs,
v.
STATE FARM INVESTMENT
MANAGEMENT
CORPORATION, Defendant.

Case No. 1:15-cv-01303-JES-JEH
|
Signed 04/17/2017
|
Filed April 18, 2017

**Attorneys and Law Firms**

John Barton Goplerud, Hudson Mallaney Shindler &
Anderson P.C., West Des Moines, IA, Ellen T. Noteware,
Shanon J. Carson, Todd S. Collins, Berger & Montague PC,
Philadelphia, PA, Kyle Geoffrey Bates, Mark T. Johnson,
Todd M. Schneider, Schneider Wallace Cottrell Konecky
Wotkyns LLP, Emeryville, CA, Michael C. McKay, Garrett
W. Wotkyns, Schneider Wallace Cottrell Konecky Wotkyns
LLP, Scottsdale, AZ, for Plaintiffs.

Robert A. Skinner, Amy D. Roy, Ropes & Gray LLP, Boston,
MA, Nathan Bach, Timothy L. Bertschy, Heyl Royster
Voelker & Allen, Peoria, IL, for Defendant.

**ORDER AND OPINION**

James E. Shadid, Chief United States District Judge

 **\*1** This matter is before the Court on the Defendant's Motion
to Dismiss (Doc. 37) and Motion to Strike Declaration of
Steve Pomerantz, Ph.D. (Doc. 39). For the reasons set forth
below, the Motion to Dismiss (Doc. 37) and Motion to Strike
(Doc. 39) are DENIED.

**BACKGROUND**

This action is for breach of fiduciary duty under Section
36(b) of the Investment Company Act of 1940, 15 U.S.C.
§ 80a-35(b) (the "ICA"). Defendant, State Farm Investment
Management Corporation ("SFIMC") is the investment
adviser for a group of target date mutual funds, known as the
"LifePath Funds" (the "Funds"). Target date mutual funds are
designed to provide a certain level of risk/return based on the
date the investments are expected to be needed for retirement.
As the target date approaches, the investments should adjust
to become more conservative over time. Plaintiffs Amy
Ingenhutt and Teresa Odell bring this action derivatively on
behalf of the Funds in which they have invested,[1] alleging
that SFIMC breached its fiduciary duties to the Funds by
collecting excessive management fees. As a result, the Funds
and the shareholders in the Funds have suffered losses.

1      Ingenhutt is a shareholder in the LifePath 2050 Funds,
       while Odell is a shareholder in the LifePath 2030 Funds.

The following facts are taken from the Plaintiff's Second
Amended Complaint and the briefs. The Funds do not
invest directly in stocks, bonds, or money market funds.
Instead, each of the Funds is a feeder into a "master-feeder"
arrangement, investing all of its assets in a corresponding
separate portfolio called a Master Portfolio. Each Master
Portfolio is itself one of a series of funds contained within an
unaffiliated fund known as the Master Investment Portfolio or
Master Fund. The Master Fund then invests in a combination
or subset of approximately 12 underlying funds. The Master
Fund and each of the Master Portfolios were sponsored
or launched by BlackRock, Inc., and are managed by
Black Rock Fund Advisors ("BFA"), a private investment
management company unaffiliated with SFIMC. Thus, BFA
is the investment adviser for each of the Master Portfolios,
as well as the underlying funds in the Master Fund in which
the Master Portfolios invest. SFIMC relies on BFA to provide
portfolio allocations among the asset classes offered through
the underlying funds in managing the Funds.

The fees paid by the Funds include management fees,
distribution and/or service fees and other expenses and fees,
including administrative fees. Only the management fees
received by SFIMC are at issue here. These management fees
are for the purpose of compensating SFIMC for its services
as the manager or investment advisor to the Funds and are
paid as a percentage of the assets under management. As
of 2015, the management fees for the Funds ranged from
102 basis points[2] (1.02%) to 110 basis points (1.1%). The
management fees paid by the Funds are alleged to include the

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 111 of 118 PageID #:2515

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....

2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

management fees charged by SFIMC for services provided to the Funds, the fees charged by BFA for its services in managing the underlying funds, and the fees charged by BFA for its services in managing the Master Portfolios. However, due to its status as advisor at both the Master Portfolio and underlying funds levels, BFA has contractually agreed to waive its management fees at the Master Portfolio level in an amount equal to the management fees and administrative fees its affiliate receives from each investment company in which the Master Portfolios invest. SFIMC has also contractually agreed to waive its management fees in an amount required to keep the Fund's Total Annual Operating Expenses at or below a specified amount for each share class. As reported in the 2015 Prospectus, the fee waivers for the Funds ranged from 41 basis points (.41%) to 48 basis points (.48%), causing the net management fee for each fund to be consistently 62 or 63 basis points (.62% or .63%).

2    For purposes of this Order, a basis point equals .01%.

 **\*2** In layman's terms, this arrangement translated into management fees ranging from $1,361,772 to $11,738,532 among the five Funds and totaling $39,232,034 in 2014.[3] The total fees were then apportioned between SFIMC and BFA, with SFIMC receiving $17,495,659 (or 28 basis points) and BFA receiving $21,736,375 (or 34 basis points). According to Plaintiffs, the net management fee in excess of $17,000,000 that SFIMC receives is approximately 44% of the total fee even though BFA provides virtually all of the investment advisory and portfolio management services. Thus, they maintain that the fees retained by SFIMC are so disproportionately large that they bear no reasonable relationship to the services rendered in exchange for those fees, and could not have been negotiated through arm's-length bargaining.

3    The funds at issue are two of the five "LifePath" funds.

**PROCEDURAL HISTORY**

Plaintiffs brought this action under the ICA claiming excessive or unfair fees under § 36(b) of the Act. 15 U.S.C. § 80a-35(b). On June 22, 2016, the Court granted the Defendant's Motion to Dismiss. (Doc. 34). The Plaintiffs subsequently filed a Second Amended Complaint ("SAC"). (Doc. 35). The Defendant now moves to dismiss the Plaintiffs' SAC. (Doc. 37, 38). The Defendant also filed a Motion to Strike the Declaration of Steve Pomerantz, Ph.D. (Doc. 39). The matter is fully briefed, and this Order follows.

**LEGAL STANDARD**

Courts have traditionally held that a complaint should not be dismissed unless it appears from the pleadings that the plaintiff could prove no set of facts in support of her claim which would entitle her to relief. *See Conley v. Gibson*, 355 U.S. 41 (1957); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 548 (7th Cir. 1993). Rather, a complaint should be construed broadly and liberally in conformity with the mandate in Federal Rules of Civil Procedure 8(f). More recently, the Supreme Court has phrased this standard as requiring a showing sufficient "to raise a right to relief beyond a speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). Furthermore, the claim for relief must be "plausible on its face." *Id.*; *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (2009). For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff; its well-pleaded factual allegations are taken as true, and all reasonably-drawn inferences are drawn in favor of the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Hishon v. King & Spalding*, 467 U.S. 69 (1984); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997); *M.C.M. Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 969 (7th Cir. 1995); *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75 (7th Cir. 1992).

**ANALYSIS**

Defendant seeks dismissal of the Amended Complaint on the grounds that Plaintiffs have failed to state a claim for breach of fiduciary duty. Section 36(b) of the ICA imposes a fiduciary on the investment managers of mutual funds with respect to their receipt of compensation for services:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection ... by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser ... for breach of fiduciary duty in respect to such compensation or

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....
2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

**\*3** 15 U.S.C. § 80a-35(b).

To state a claim under § 36(b), Plaintiffs must plausibly allege that the investment advisor charged a fee that "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Associates L.P.*, 559 U.S. 335, 346 (2010). The court's function is to use "the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees" and "identify the outer bounds of arm's length bargaining." *Id.*; *Jones v. Harris Associates L.P.*, 611 Fed.Appx. 359, 360 (7th Cir. 2015) ("*Jones II*"). In applying the *Jones* standard, courts employ the *Gartenberg* test, which takes into account "all relevant circumstances." *Jones*, 559 U.S. at 1420 (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)). These factors include:

(1) The nature and quality of the services provided to the fund and shareholders;

(2) The profitability of the fund to the adviser;

(3) Any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund;

(4) Comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and

(5) The independence, expertise, care and conscientiousness of the board in evaluating adviser compensation.

*Jones*, 559 U.S. at 1426, n.5 (citing *Gartenberg*, 694 F.2d at 929-932).

The Defendant argues that the Court should dismiss the Second Amended Complaint because the Plaintiffs once again fail to state a plausible claim for excessive fees under § 36(b) of the ICA. In particular, they argue that the Plaintiffs fail to establish a basis for comparability to other mutual funds and to define a relevant bargaining range to establish excessive fees. The Defendants also argue that the Plaintiffs make baseless assertions that SFIMC provides only minimal services. According to the Defendant, the Plaintiffs also fail to provide necessary facts to support the other *Gartenberg* factors—economies of scale, profitability, and independence and conscientiousness of the board.

Finally, the Defendant argues that because the Plaintiffs fail to state a plausible claim under § 36(b), they are not entitled to rescission under § 47(b), nor can they ask for a jury trial when § 36(b) is an equitable claim. The Defendant separately moves to strike the declaration of Steve Pomerantz, Ph.D. (Doc. 43), which the Plaintiffs cite in support of their allegations. The Court will address each of the Defendant's arguments in turn.

**I. Motion to Strike the Pomerantz Declaration**
As an initial matter, the Court will address the Declaration of Dr. Pomerantz, and specifically the Defendant's Motion to Strike the Declaration. The Plaintiffs incorporated the Declaration of Steve Pomerantz, Ph.D. in their Second Amended Complaint, in hopes to support their factual allegations and survive another Motion to Dismiss. The Defendant makes a number of arguments in the Motion to Dismiss that pertain to Pomerantz. Accordingly, the Court will address the Declaration before reaching the § 36(b) analysis.

**\*4** Dr. Pomerantz is an "investment management consultant" retained by the Plaintiffs, who provides an opinion on portions of the relationship between SFIMC and the Funds. The Defendant, however, argues that the Pomerantz Declaration is devoid of facts and contains legal opinions that should be reserved for the Court to determine.

The Defendant also argues that the Court should strike all opinions and conclusions stated in the Declaration, particularly his legal opinion the SFIMC's compensation is disproportionate to the services rendered and not negotiated through arms-length bargaining. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). This includes his interpretation of the underlying service contracts, the SFIMC Advisory Agreement and the BFA Advisory Agreement. (Doc. 39, p. 6, citing *Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994)). Questioning his background in the industry, the Defendant also contends that Pomerantz lacks knowledge and makes speculative assumptions. Finally, the Defendant argues that the Declaration is not properly part of the SAC because it is not a written instrument pursuant to Rule 10(c) nor does it not satisfy Fed. R. Civ. P. 702, concerning testimony by expert witnesses.

In their Opposition to the Motion to Strike, the Plaintiffs argue that the Defendant is improperly imposing *Daubert*-like barriers to Pomerantz at the pleading stage. Instead,

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 113 of 118 PageID #:2517

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....
2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

the Plaintiff describes Pomerantz's experience in support of his ability to give his opinion and frame the facts of the case. Additionally, the Plaintiff argues that the Pomerantz Declaration contains assertions of fact, and these are expressly incorporated by reference into the SAC. His statements are based upon publicly available information as the basis of the facts he presents about the costs of the services, not contract interpretation, as the Defendant argues.

These claims in the SAC are supported by reference to the Pomerantz Declaration. (Doc. 35-1). The Plaintiffs respond that their factual allegations support their claim that SFIMC's services differ from investment advisory services and perform business-management services that are mostly ministerial in nature. For instance, Pomerantz opines that the non-asset management services provided by SFIMC are not identified and considered a part of the administrative service, and therefore the services provided by investment advisors are insignificant. (Doc. 35-1, ¶¶ 12, 21). Additionally, the SAC states that the services provided are independent of the size of the underlying fund and are fixed costs, citing to Pomerantz. *Id.* at ¶ 17. The Plaintiffs argue that they cannot be required to plead information they could only obtain through discovery, citing *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 529 (7th Cir. 2015) (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010)) (a plaintiff need not "plead information she could not access without discovery"). Instead, they contend that the Declaration is properly incorporated to support their assertions.

The purpose of a 12(b)(6) motion to dismiss is "to test the legal sufficiency of a complaint, not the merits of the case." *Blau v. Harrison*, 2006 WL 850959, at *4 (N.D. Ill. Mar. 24, 2006). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Courts must be careful to avoid turning a 12(b)(6) motion into a Rule 56 motion for summary judgment, and accordingly must exclude matters outside the pleadings from its consideration of whether the Plaintiff has stated a claim. The Court should consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents attached to the pleading. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998). The court should not accept every word in an attached written instrument as true without regard to the intent of the party attaching the exhibit. *Id.*

**\*5** Rule 10(c) provides that "[a] copy of any written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). This does not mean that a document attached to a complaint is automatically admissible in trial for any purpose. *American Skandia Life Assur. Corp. v. McCarty*, 2008 WL 3009850, *2 (C.D. Ill. August 1, 2008). An affidavit attached to a complaint constitutes a written instrument under Rule 10(c). *Warrentech Auto., Inc. v. Heritage Warranty Ins. Risk Retention Grp., Inc.*, 2008 WL 4876936, at *8 (N.D. Ill. Aug. 12, 2008), citing *Northern Ind. Gun*, 163 F.3d at 453 n. 4 (7th Cir. 1998); *Schnell v. City of Chi.*, 407 F.2d 1084, 1085 (7th Cir. 1969). See *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 453, n.4 (7th Cir. 1998) ("[T]he broader interpretation comports with the traditionally generous nature in which we view pleadings."). A fact affidavit, therefore, is a "written instrument" within the meaning of Rule 10(c).

Accordingly, the Court holds that Dr. Pomerantz's Declaration qualifies as a "written instrument" within the meaning of Rule 10(c), and therefore the Defendant's Motion to Strike the Pomerantz Declaration is DENIED. The Plaintiffs' intent for including the Declaration was to address the Court's concerns in its previous Order dismissing the FAC, and to cite general industry knowledge about the bargaining range.

The Court has considered the statements incorporated within specific paragraphs in the SAC to determine whether the Plaintiffs have met the pleading standard. This does not guarantee that the Declaration attached to the SAC will be admissible at trial, *American Skandia Life Assur. Corp. v. McCarty*, 2008 WL 3009850, *2 (C.D. Ill. Aug. 1, 2008); rather, at this juncture the Court only considers whether the allegations in the Complaint are sufficient to survive a motion to dismiss. Thus, the Court does not yet need to determine whether Pomerantz is a qualified expert or if his opinions will be admissible. Consequently, the Court will not strike the portions of the SAC that were derived from the non-conclusory and non-speculative statements in the Declaration. It appears that the Plaintiffs have revealed one expert ahead of discovery. Later in the proceedings, the Defendant may wish to bring an objection to Pomerantz as an expert, and the Court will then consider arguments about the expert's qualifications and credibility. Such arguments are more adequately addressed at the summary judgment stage rather than the pleading stage.

## II. Judicial Notice of Documents

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 114 of 118 PageID #:2518

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....

2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

The Defendant requests the Court to take judicial notice of the documents attached to the Declaration of Robert A. Skinner in support of the Motion to Dismiss pursuant to Fed. R. Evid. 201. (Doc. 37-1). According to the Defendant, the exhibits in question are incorporated by reference into the SAC and are therefore properly considered in their entirety. The Defendant argues that these documents are subject to judicial notice because they are directly referenced in the SAC and are public records whose authenticity is not in dispute. The Plaintiffs object, and argue that these documents are generally improper on a Rule 12(b)(6) motion and even the documents that fall within the exception of documents which can be considered on a motion to dismiss may not be judicially noticed for the truth of their statements. The Plaintiffs also argue that the documents are not central to their claims.

When ruling on a motion to dismiss, courts may properly consider documents attached to the motion to dismiss or a response. *Metz v. Joe Rizza Imports, Inc.*, 700 F.Supp.2d 983 (N.D. Ill. 2010). These documents are part of the pleadings if they are referred to in the complaint and central to the plaintiff's claim. *Solis v. Caro, N.C.*, No. 11 C 6884, 2012 WL 1409558, at *3 (N.D. Ill. Apr. 23, 2012). A court may also take judicial notice of a matter of public record, which also fall into this exception. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997). Pursuant to Fed. R. Evid. 201, the Court can make judicial notice of a fact that is not subject to reasonable dispute because it is generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). See also, *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper."). A court may take judicial notice of SEC filings "for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein." *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1044 (N.D. Ill. 2009) (quoting *Riggs Partners, LLC v. Hub Group*, 2002 WL 31415721, at *1 (N.D. Ill. Oct. 25, 2002)).

**\*6** It is not necessary for the Court to judicially notice these documents for the purposes of the Motion to Dismiss. The Court may consider documents incorporated in and referenced by the pleadings. However, because the documents contain facts the Plaintiffs claim are subject to reasonable dispute, the Court refrains from taking judicial notice. The

parties will have an opportunity to discuss or dispute the significance of the contents of these documents at later stages of the litigation, including summary judgement. Next, the Court will address the § 36(b) claims as alleged in the SAC.

### III. Section 36(b) Claims

The Defendant argues that the Plaintiffs fail to establish a basis for comparability to other mutual funds and to define a relevant bargaining range to establish excessive fees, and make baseless assertions that SFIMC provides only minimal services. The Defendant avers that this is insufficient to show the challenged fees are beyond the range of arm's-length bargaining. The Defendant further argues that the Plaintiffs fail to provide necessary facts to support the other *Gartenberg* factors: economies of scale, profitability, and independence and conscientiousness of the board.

First, the Defendant argues that the Plaintiffs fail to specify how the Comparators are similar to the Funds in regards to services or costs, and rely on their retained expert, Pomerantz. Therefore, the Defendant argues that the Plaintiffs have failed to identify the bounds of arm's-length bargaining. See *Jones*, 611 Fed.Appx. at 360. Mainly, the Defendant argues that the Plaintiffs improperly compare the Funds to the other purported comparators because they are too dissimilar for an apt comparison, and the comparative fees presented in the SAC are misleading because they omit acquired funds fees.

The SAC alleges that SFIMC does not provide active or passive investment management services. The Plaintiff responds that SFIMC is incorrect, because the management fees in the comparisons should not be combined with acquired fund fees and expenses/fees received by BFA. The Plaintiffs acknowledge that the Funds' master-feeder arrangement differs from the "fund of funds" comparators, the latter of which perform more services. The Plaintiffs argue that SFIMC does not manage underlying funds; the acquired fund fees and expenses amount includes costs paid to an investment adviser for managing underlying funds. Because SFIMC does not manage underlying funds, the Plaintiffs argue, the combined fees comparison is inaccurate. (Doc. 38, p. 5-6).

In *Jones*, the Supreme Court cautioned that courts should be wary of "inapt comparisons" where "services rendered are sufficiently different." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 350 (2010). Such a comparison is not probative. *Id.* The Court previously found that the Plaintiffs did not present a sufficient foundation to find that these Comparators

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....
2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

are similar enough or provide similar services. In the SAC, the Plaintiffs cure this deficiency. They assert that mutual fund complexes provide similar services and cost a fraction of what SFIMC charges. (Doc. 35, ¶ 59-60). "Accordingly, the management fee collected by the adviser directly from the target date fund is in exchange for precisely the same types of management services as SFIMC provides to the LifePath Funds...." *Id.* at ¶ 62. The facts presented in the SAC, if true, show that the services rendered are not sufficiently different. Thus, the Court finds that the Plaintiffs have adequately stated which fees are compared and why the fees paid to comparators are not inapt comparisons. *Id.* at ¶¶ 62-63. An inference can be made from the facts pleaded in the SAC that the fees paid to SFIMC do not fall within the arm's-length bargaining range when considering the fees charged by comparators.

 **\*7**  Second, the Defendant argues that the Plaintiffs make baseless allegations that SFIMC provides minimal services to establish the fees are beyond the range of arm's-length bargaining. The Plaintiffs describe the services as limited in scope and ministerial. *Id.* at ¶¶ 49, 50, 58. The Plaintiffs make an attempt to provide factual support by listing the same facts they stated in the FAC and rearranging them in the SAC. See Doc. 19, ¶¶ 51, 75 and Doc. 35, ¶ 55. However, the Plaintiffs also provide additional facts that lay a foundation to their claim that SFIMC's services are not extraordinary and SFIMC's business needs are not more substantial or costly for the Trust here than for other trusts. (Doc. 35, ¶ 56, 58). These facts have been added at behest of the Court's last Order, which pointed out the dearth of factual support and citations to factual or legal authority in the FAC. (Doc. 34, p. 6-7). Specifically, the Court found that the Plaintiffs failed to adequately support their claim that the actual investment services were delegated to and performed by BFA, and cost much more than the services performed by SFIMC. Here, the Plaintiffs, albeit minimally, add citations to Pomerantz in order to further contrast the fees and services of other mutual funds with those of the Funds. (Doc. 35, ¶¶ 56-58).

The Court notes that the primary difference between these allegations in the FAC and SAC is that the latter cites to the Pomerantz Declaration for factual support. The Defendant argues that this is improper. However, without restating the Court's analysis above, the citations to Pomerantz are not improper as they are incorporated into the SAC. The elaborations of the duties that SFIMC and BFA perform, combined with the specific allegations that other mutual funds provide similar services for much lower fees, are enough to

allow an inference that the fees are outside of the arm's-length bargaining range.

The Defendant argues that Pomerantz's statement that all mutual fund advisers necessarily provide the same or similar services "says nothing about the worth or cost of those services." (Doc. 38, p. 22; Doc. 35-1, ¶ 15).[4] The Plaintiffs, however, respond that the Agreement between SFIMC and State Farm Mutual Fund Trust (Doc. 37-21, p. 3-6) ("Trust Agreement") differentiates between Management Services provided by SFIMC and Investment Management Services performed by BFA. Further, they argue that the master-feeder fund arrangement and comparison between the subadvisory agreement and Trust Agreement supports this assertion. The Court finds that the insufficiencies in the FAC regarding this factor have been sufficiently addressed in the SAC. The facts as stated support a claim for a breach of fiduciary duty; that is, SFIMC charges disproportionately higher fees for the same or similar services offered by comparator funds, some of which provide more services than SFIMC, particularly funds that provide more services.

4          The Defendants argue that Pomerantz's statement that BFA performs more or all of the investment advisory services is improper because it is interpreting a contract. The Plaintiffs respond that Pomerantz is not interpreting a contract but rather states what services the adviser actually performs. The Court finds that as stated in the SAC, the Plaintiffs merely cite Pomerantz to lend support to the claim that SFIMC performs the same services that other mutual fund advisers perform but receives significantly higher compensation, although these services are less costly. Doc. 35-1, ¶ 15. Thus, the Plaintiffs do not rely on his legal interpretation in the SAC, nor does it appear here that he is giving a legal opinion. Rather, Plaintiffs appear to be relying on his industry knowledge.

The Defendant argues that the services described by the Plaintiffs are extensive and are not ministerial and are misnamed business services. There is, however, no way for the Court to determine the exact nature of these services or reach the merits of the case prior to discovery. It may be that at after discovery, SFIMC's duties may be actually quite extensive. However, at the motion to dismiss stage, the Court determines whether or not a Plaintiffs have stated a claim. Further, the parties argue over what the public documents state and whether or not these documents contradict allegations in the SAC. However, "simply presenting the Court with an alternative version of

Case: 1:20-cv-05593 Document #: 86-1 Filed: 06/14/21 Page 116 of 118 PageID #:2520

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....
2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

events does not establish that [the plaintiff] has failed to state a claim." *Izsak v. Draftkings, Inc.*, 191 F. Supp. 3d 900, 906 (N.D. Ill. 2016). As alleged, the Plaintiffs have stated a plausible claim sufficient to survive the Motion to Dismiss.

**\*8** Next, the Defendant argues that the Plaintiffs fail to allege that there were cost savings as the assets increased and these assets were not shared with shareholders—the economies of scale factor. The Defendant argues that the increase does not establish that the benefits from the economies of scale were not passed along to the investors. In general, the Plaintiffs argue that the fees should not have simultaneously increased with the increase in the size of the funds.

The Plaintiffs attempt to remedy the lack of factual basis for the economies of scale factor by referencing Pomerantz in the SAC. (Doc. 34-1, ¶ 17). Pomerantz stated that the tasks and services remain the same no matter the size of the fund. In their response, the Plaintiffs expand upon their argument, stating that the tasks "do not become more complex or resource-intensive as the assets under management grow in size." (Doc. 42, p. 12-13). The Plaintiffs respond that the services do not contribute to the Funds' value or performance, and are performed generally for all of the State Farm Mutual funds.

Although the Plaintiffs merely cite to their expert restating the same allegation, the SAC does not fail for not meeting one of the *Gartenberg* factors. *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 2012 WL 6568409, at \*2 (D.N.J. Dec. 17, 2012) ("The plaintiff need not address all of the *Gartenberg* factors to survive a motion to dismiss if, when taken as a whole, the complaint demonstrates a plausible claim for relief under § 36(b)."). In *Kasilag*, the court considered the sufficiency of the § 36(b) claim as a whole, "through the lens of the *Gartenberg* factors," and determining whether the *Gartenberg* factors weighed in plaintiff's favor. *Id.* at \*2, 6. The district court in *Reso* used similar reasoning in evaluating the *Gartenberg* factors. *Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, 2011 WL 5826034, at \*5 (E.D. Wis. Nov. 18, 2011) ("[S]everal other district courts have allowed complaints to survive dismissal when the alleged facts did not show each of the six *Gartenberg* factors."). Here, the Court will not dismiss because the complaint as a whole sufficiently states a claim, and the Plaintiffs adequately support the economies of scale factor in their response.

Next, the Defendant argues that the Plaintiffs failed to allege that the Funds' profitability indicates the fees are excessive.

Although the Plaintiff spends little time on this factor, the facts alleged throughout the SAC, and specifically for the economies of scale factor, tip this factor into the Plaintiffs' favor. The SAC bolsters the services and economies of scale factors and sets forth facts to support an inference that the fees SFIMC collects are so large scale that there are less profits passed on to shareholders. The Plaintiffs need not plead all the facts necessary to support their claim, but need to allege facts sufficient to make the claim plausible on its face. *Iqbal*, 556 U.S. at 678.

Finally, the Defendant argues that the Plaintiffs have not supported the allegation that the Board lacked independence, conscientiousness, and adequate information. The Court found that the FAC was conjectural. The SAC adds the following: "the Board looks at the overall expense ratio of the funds. It does not separately evaluate the portion of the management fees paid to and retained by SFIMC and compare those fees to the services actually provided by SFIMC to determine whether SFIMC's fees are disproportionate to the services it renders." (Compare Doc. 35, ¶ 94 with Doc. 19, ¶ 93). The Plaintiffs do not address this allegation, which remains speculative. The Plaintiffs argue that the Defendant's exhibits, Docs. 37-7 and 37-8, demonstrate that the Board did not consider all of the relative facts or expenses in approving the fees. These arguments, however, present questions of fact and are best reserved for summary judgment.

**\*9** Although the Plaintiffs do not add additional support for this factor, as discussed above, combined with the other facts as alleged, the Plaintiffs have alleged enough facts to survive the Motion to Dismiss. See *Zehrer v. Harbor Capital Advisors, Inc.*, 2014 WL 6478054, at \*4 (N.D. Ill. Nov. 18, 2014) ("Although these allegations alone may not be sufficient to survive a motion to dismiss, they support Zehrer's claim that the fees are disproportionate to the services rendered and are not the product of arm's length bargaining."). See also, *Sivolella v. AXA Equitable Life Ins. Co.*, 2016 WL 4487857, at \*4 (D.N.J. Aug. 25, 2016) ("These factors are guides for the Court to follow; and not all of them need to favor Plaintiffs to impose liability.").

As stated above, the Plaintiffs' failure to provide support for one factor does not require dismissal. While this factor has not been met, the Plaintiffs have addressed the deficiencies in the FAC and dismissal is not warranted. In viewing the Complaint in the light most favorable to the Plaintiff, the Plaintiff makes a plausible claim under § 36(b) of the ICA, 15 U.S.C. § 80a-35(b). The Defendant raises the issue that the Plaintiffs

Ingenhutt v. State Farm Investment Management Corporation, Not Reported in Fed....
2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

are unable to support their claims that the fees were excessive. This issue may very well be an issue for summary judgment, depending upon facts uncovered during discovery. However, for purposes of the Motion to Dismiss, the Second Amended Complaint sufficiently states a plausible claim under § 36(b) and gives the Defendant fair notice of the claim.

### IV. Rescission and Jury Trial

Finally, the Defendant argues that because the Plaintiff fails to state a plausible claim under § 36(b), they are not entitled to rescission under § 47(b), nor can they ask for a jury trial when § 36(b) is an equitable claim. Also, the Defendant argues that § 47(b) is only available to a party to the contract, i.e., SFIMC and State Farm Mutual Fund Trust. The Plaintiffs did not respond.

First, Section 36(b) claims have been held to be equitable in nature, and there is no right to jury trial. See *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990), *reversed on other grounds*, 500 U.S. 90 (1991). See also, *Sivolella v. AXA Equitable Funds Mgmt., LLC*, 2013 WL 4096239, at *6 (D.N.J. July 3, 2013), *R&R adopted*, 2013 WL 4402331 (D.N.J. Aug. 15, 2013) (equitable restitution is not triable to a jury). Additionally, rescission is an equitable remedy. *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 463 (7th Cir. 2014). Thus, the demand for jury trial is stricken. If the Plaintiffs seek to amend at a later time and add legal claims which do entitle them to a trial by jury, the Court will revisit the issue.

Second, the Court will not strike the Plaintiffs' request for rescission before a violation of § 36(b) established. See *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14 C 789, 2014 WL 6478054, at *4 (N.D. Ill. Nov. 18, 2014):

> [§ 36(b) ] does not, however, explicitly foreclose other equitable remedies, such as injunctive relief or rescission. Because it is unsettled whether rescission under § 47(b) is an appropriate remedy if Zehrer is able to make out a violation of § 36(b), the court will not strike Zehrer's alternate request for rescission at this stage.

Although the matter is not yet settled in this Circuit, the Plaintiffs, if they prove their claim, may have rescission available as a remedy. See *Id.*; *Jacobs v. Bremner*, 378 F. Supp. 2d 861, 869 (N.D. Ill. 2005). Other courts have held that § 47(b) provides a remedy for a violation of the ICA, but that there is no separate § 47(b) claim. See *Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp. 429, 438 (D. Conn. 1983). See also, *Smith v. Franklin/Templeton Distributors, Inc.*, 2010 WL

2348644, at *7 (N.D. Cal. June 8, 2010) ("Courts that have considered the issue have concluded that a plaintiff can seek relief under § 47(b) only by asserting a violation of some other section of the ICA."). Therefore, the Court will reserve ruling on whether rescission under § 47(b) is an available remedy if a § 36(b) violation is established. If the matter of rescission as a remedy does come before the Court, the Court will also address the issue of standing to seek rescission at that time.

### V. Supplemental Authority

**\*10** The Defendant filed a Notice of Supplemental Authority in Support of Motion to Dismiss (Doc. 49), citing the case *Paskowitz v. Prospect Capital Management L.P.*, 2017 WL 375682 (S.D.N.Y. Jan. 24, 2017). According to the Defendant, the Court should adopt the reasoning in *Paskowitz*, where the court dismissed the complaint because it failed to allege an adequate claim under § 36(b). *Paskowitz*, 2017 WL 375682, *5. The Court has reviewed *Paskowitz* as persuasive authority, and finds that the claims in that case are distinguishable from the case at hand. Specifically, the facts in that case focused on underperformance of the funds.

### CONCLUSION

### I.

In the wake of *Twombly* and *Iqbal*, to survive a motion to dismiss, a plaintiff must provide "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1082-83 (7th Cir. 2008); *Reger Dev., LLC v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

The Court, considering the *Gartenberg* factors, finds that the SAC sets forth facts that create a plausible inference that the fees paid to SFIMC are disproportionately large in relation to the services rendered, and fall outside of the range of what arm's-length bargaining could produce. Construing the Complaint in the light most favorable to the Plaintiffs, and accepting as true all well-pleaded facts alleged, and drawing all possible inferences in the Plaintiff's favor, the SAC states a plausible claim under § 36(b). *Hecker v. Deere & Co.*, 556 F.3d 75, 580 (7th Cir. 2009).

## II.

For the reasons stated above, Defendant's Motion to Dismiss and Motion to Strike are DENIED. The Plaintiffs' jury demand is STRICKEN.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1398646, Fed. Sec. L. Rep. P 99,694

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---