2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

2012 WL 1357699
United States District Court,
N.D. Illinois,
Eastern Division.

Arthur L. BRASHER, et al., Plaintiffs,
v.
BROADWIND ENERGY, INC., et al., Defendants.

No. 11 CV 991.
|
April 19, 2012.

### Attorneys and Law Firms

Lori Ann Fanning, Marvin Alan Miller, Miller Law LLC, Chicago, IL, William B. Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiffs.

James Wallace Ducayet, Brian S. Shull, Kristen R. Seeger, Meredith Jenkins Laval, Sidley Austin LLP, John Conroy Martin, Law Offices of John C. Martin, Chicago, IL, Gary Stein, Michael G. Cutini, Schulte Roth & Zabel LLP, New York, NY, for Defendants.

### MEMORANDUM OPINION AND ORDER

JAMES B. ZAGEL, District Judge.

**\*1** Plaintiffs bring this shareholder class action on behalf of purchasers of the common stock of Broadwind Energy, Inc. ("Broadwind" or the "Company") during the period of March 16, 2009 through August 9, 2010. The complaint names Broadwind, eleven individual defendants (including several current and former Broadwind officers and directors), and Broadwind's primary shareholder (the "Tontine defendants") as defendants, and alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that Plaintiffs have failed to meet the pleading requirements of Federal Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4 ("PSLRA"). For

the following reasons, Defendants' motion is granted in part and denied in part.

## FACTS

### I. The Parties

Lead Plaintiffs Jerry Pehlke, Arthur Brasher and Brian Grothues bring this putative class action on behalf of all purchasers of Broadwind common stock during the period March 16, 2009 through August 9, 2010.

Broadwind is a Delaware corporation that manufactures products used in the wind, oil, gas and mining energy industries, and also provides infrastructure services in these fields. The company was incorporated in 2008 and consistently generated net losses from its inception and throughout the Class Period.

Defendant J. Cameron Drecoll served as CEO and director of Broadwind from October 2007 to December 2010. Prior to becoming CEO, Drecoll was the majority shareholder of outstanding stock and CEO of Brad Foote, an Illinois-based manufacturer of gearing systems used for the wind turbine and other energy-related industries. Broadwind acquired Brad Foote in October 2007, and at that time Drecoll assumed CEO responsibilities for the combined company.

Defendant Stephanie Kushner was named CFO of Broadwind in August 2009 and remains in that position today. Defendant Matthew Gadow served as Broadwind's Executive Vice President and CFO from May 2008 until his resignation in April 2009. Defendant Stephen Graham served as Broadwind's CFO from May 2009 until his resignation in June 2009. Defendant Kevin Johnson served as Broadwind's Corporate Controller and Chief Accounting Officer during the class period. He also served as the Company's interim Chief Financial Officer from June 2009 to August 2009.

Defendants Tontine Capital Partners, L.P. ("TCP"), Tontine Capital Overseas Master Fund, L.P. ("TMF"), Tontine Partners, L.P. ("TP"), Tontine Overseas Fund, Ltd. ("TOF"), Tontine 25 Overseas Master Fund, L.P. ("T25") (herein collectively referred to as "Tontine") owned roughly 47.7% of Broadwind's outstanding common stock during the Class Period and, according to Plaintiffs, effectively constituted the controlling shareholders.

**\*2** Defendant Jeffrey Gendell is the managing member of several of the Tontine corporate entities. Because of his

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

position, Plaintiffs allege Gendell was the beneficial owner of all Tontine shares of Broadwind stock, making him the controlling shareholder during the Class Period.

Defendant James Lindstrom served as a director of Broadwind from October 2007 to May 2010. His positions included Chairman of the Board, Chairman of the Compensation and Executive Committees and member of the Governance/Nominating Committee. Lindstrom was an employee of a Tontine affiliate, and was nominated to Broadwind's Board pursuant to a 2007 securities purchase agreement that allowed Tontine to nominate up to three Broadwind directors.

Defendant David Reiland has served as a Broadwind director since April 2008 and as Chairman of the Board since May 2010. Reiland is a member of the Audit Committee and has also served as Chairman and member of the Finance and Executive Committees and as a member of the Governance/Nominating Committee.

Defendant Charles Beynon has served as a Broadwind director since October 2007. He served as Chairman and member of the Audit Committee during the Class Period, and also served as a member of the Compensation Committee. Like Defendant Lindstrom, Tontine nominated Beynon to serve on Broadwind's Board pursuant to the 2007 securities purchase agreement.

Defendant William Fejes has served as a Broadwind director since March 2009. He was a member of the Audit Committee during the Class Period and has also served as Chairman and member of the Governance/Nominating Committee and as a member of the Compensation Committee. He was also nominated by Tontine pursuant to the 2007 securities purchase agreement.

Defendant Terence Fox has served as a Broadwind director since February 2006. Fox has served as Chairman and member of the Compensation Committee and member of the Governance/Nominating Committee.

## II. Confidential Informants

As part of its investigation into the class claims, Lead Plaintiff's counsel interviewed several current and former Broadwind employees. It is common practice in securities fraud cases to keep the names of such sources confidential, at least at the pleading stage. As the Seventh Circuit recently explained,

"[b]ecause the [PSLRA] requires detailed fact pleading ... the plaintiff's lawyers in securities-fraud litigation have to conduct elaborate pre-complaint investigations ... Unable to compel testimony from employees of the prospective defendant, the lawyers worry that they won't be able to get to first base without assuring confidentiality to the employees whom they interview ...." *Makor Issues & Rights, LTD. v. Tellabs Inc. ("Tellabs II"),* 513 F.3d 702, 711 (7th Cir.2008).

As part of their investigation, Lead Plaintiff's counsel developed six confidential informants ("CI"), all of whom are represented to be current or former Broadwind executives or employees. The weight and relevance of the CI allegations depends on several factors, including whether they were "in a position to know at first hand the facts to which they are prepared to testify," the number of confidential informants used (and the degree to which they corroborate one another), whether the information is supported by other sources, and the level of detail with which the information obtained from CIs is set forth. *Id.,* at 712.

**\*3** CI 1 is alleged to have been the Vice President of Operations of Tower Tech Specialty Structures, a Broadwind predecessor company, and worked there from 2004 to 2010. As Vice President, CI 1 regularly interacted with Broadwind executives. CI 2 is alleged to have been the Cost Accounting Manager at Brad Foote from January 2009 to December 2009, and the Assistant Controller of Broadwind and Brad Foote from January 2010 to August 2010. In these positions, CI 2 handled day-to-day accounting and budget analysis.

CI 3 is alleged to have been the Controller of Brad Foote from March 2008 to March 2009. CI 3 was also part of a management team responsible for improving accounting practices at Brad Foote. CI 4 is alleged to have been a Senior Procurement Specialist at Brad Foote from August 2008 through July 2009. In this position, CI 4 was responsible for purchasing raw materials, component parts, and outsourcing sub-contracts for the manufacturing of gears and gearboxes.

CI 5 is alleged to have been a member of Brad Foote's Human Resources team from September 2008 to February 2009. In this position, CI 5 reported to Bruce Black, Brad Foote's Vice President of Operations. CI 6 is alleged to be a former high-ranking executive of one of Broadwind's divisions.

### III. Broadwind's Acquisition of Brad Foote and Subsequent Cuts in Demand Forecasts

In October 2007 Broadwind acquired Brad Foote Gear Works ("Brad Foote"), a company that produced "precision and custom-engineered gearing systems for the wind power generation, oil production, steel, and transportation industries." (Compl.¶ 47). In connection with this acquisition, Broadwind booked intangible assets of approximately $105 million. This figure largely reflected the value of the relationships and goodwill between Brad Foote and its two largest customers, General Electric ("GE") and Clipper Windpower ("Clipper"). Plaintiffs allege that Brad Foote was a critical subsidiary during the Class Period; so important that a common saying at the Company was, "Broadwind goes as Brad Foote goes." (Compl.¶ 2).

Beginning in or around November 2008, GE and Clipper substantially cut their order forecasts with Brad Foote as a result of the economic downturn and freezing capital markets. The order forecasts continued to decline each month during the class period. CI 4 estimates that forecasts from GE and Clipper dropped 75 percent from November 2008 to July 2009. (Compl.¶ 82). According to CI 3, by early 2009 GE wanted to renegotiate its contract with Brad Foote because the small wind energy companies that purchased turbines from GE could not obtain financing. (Compl.¶ 70). CI 3 also reported that around the same time Clipper "simply stopped paying" Brad Foote costs owed under contract. *Id.* CI 4 corroborates that Clipper defaulted on its contract with Brad Foote, pointing to an event in June 2009 when Clipper refused shipment of $2.9 million worth of product. (Compl.¶ 80).

 **\*4** The impact of the economic downturn and GE and Clipper's order forecast cuts appears to have reverberated throughout Brad Foote. CI 3 reports that between late 2008 and March 2009 Brad Foote laid off half its workforce. (Compl.¶ 74). CI 5 corroborates that Brad Foote laid off a large number of employees during that period. (Compl.¶ 86).

There is evidence that by November 2008, Brad Foote was experiencing serious cash flow problems. According to CI 5, "we [Brad Foote] couldn't pay our bills, so we were being put on credit hold with a variety of vendors and ... we weren't able to pay [staffing agency] invoices." (Compl.¶ 87). As a further sign of liquidity shortages, in the first quarter of 2009 Brad Foote was unable to meet a set of earning covenants attached to a $10 million line of credit it had established with Bank of America. As a result, the credit line was reduced by $3 million and the payment terms were renegotiated at a lower interest rate.

### IV. The 2008 10–K Report and Accompanying Press Release

Under federal law, Broadwind is required to file with the SEC a series of disclosure statements that detail the company's operations during a given time period and disclosing known risks that may materially impact future operations. These statements include the annual 10–K form and the quarterly 10–Q form, the disclosure requirements of which are governed by Regulation S–K. Item 303(a) (3)(ii) ("Item 303") of Regulation S–K provides that registration and annual 10–K reports must reveal "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues of income from continuing operations." 17 CFR § 229.303.

On March 16, 2009, Broadwind filed its Form 10–K for the year ended December 31, 2008 ("2008 10–K"). In the statement, Broadwind reported, "[o]ur operating results and business strategy, particularly in the fourth quarter of 2008, were affected by the downturn in the economy and the effects of disruptions in the global credit markets and financial systems and the corresponding effect on the wind industry and global heavy manufacturing industry." (2008 10–K at 26). Because of the economic downturn, the Company "changed our immediate business and operating focus from rapidly growing the Company through strategic acquisitions and increased capital expenditures to concentrating on achieving operational excellence within our existing businesses, evaluating and restructuring our financing arrangements, and focusing our efforts on maintaining adequate levels of liquidity and working capital." *Id.*

Broadwind also commented on the nature of its contractual agreements and its concentrated customer base:

> "Many of our products are sold under long-term supply agreements. These longterm agreements have various terms, but generally range from several months to three years....As of December 31, 2008, the range of our backlog to be shipped in 2009 was estimated to be between $170 million and $212 million based upon the options that our customers may exercise during the year." *Id.* at 6.

> **\*5** "We are substantially dependent on a few significant customers. Each of our segments has significant customers

and concentrated sales to such customers. If our relationships with significant customers should change materially, including as a result of decreased customer demand for our products and services due to the impact of current or future economic conditions on our customers, it could be difficult for us to immediately and profitably replace lost sales in such a market where we have significant revenue concentration." *Id.* at 9.

As with the directly preceding quote, much of the language was future-oriented and conditional in nature; caveats that negative financial developments "could" or "might" develop appear throughout the report:

"Our businesses, and therefore our results of operations and financial condition, may be adversely affected by the current disruption in the global credit markets and instability of financial systems." *Id.* at 8.

"If these conditions continue or worsen, they may result in reduced worldwide demand for energy and additional difficulties in obtaining financing, which may adversely affect our business. Risks we might face could include: potential declines in revenues in our business segments due to reduced orders or other factors caused by economic challenges faced by our customers and prospective customers and potential adverse impacts on our ability to access credit and other financing sources (and the cost thereof) beyond the approved credit lines we currently have." *Id.*

The report also discloses that Brad Foote "failed compliance" with two covenants contained in its Bank of America loan agreement, including its cash flow coverage ratio calculations, and explained how repayment terms would be readjusted to prevent future default. Finally, the 2008 Form 10–K contained the general disclaimer that Broadwind had "generated limited revenue and have generated net losses and negative cash flows since our inception ... in light of current economic conditions, we anticipate that future losses and negative cash flow is possible for the foreseeable future." *Id.* at 14.

On March 17, 2009, Broadwind issued a press release to accompany its 2008 10–K filing ("2008 10–K PR"). The press release announced full-year revenues of $217.3 million and a net loss of $25.3 million. These numbers were up from full-year revenues of $29.8 million and a net loss of $3.4 million in 2007. For the fourth quarter of fiscal year 2008, the Company reported revenues of $77.6 million and a net

loss of $12.4 million. This information was also contained in the Form 10–K. Commenting on the Company's outlook for the coming year, Defendant Drecoll stated, "[d]espite the challenging market conditions, our investments in people and enhanced infrastructure have positioned us to benefit from continued demand for our services." 2008 10–K PR at 2–3. He also noted that "[t]he Products segment posted significant growth in fiscal 2008, fueled by increased production and sales of wind towers and gearing systems." *Id.* at 2.

## V. 2009 Quarterly (10–Q) Statements and Accompanying Press Releases

**\*6** Broadwind filed three 10–Q statements in 2009–one on May 11, 2009, for the first quarter ended March 31, 2009 ("1Q09"); another on August 10, 2009, for the second quarter ended June 30, 2009 ("2Q09"); and one more on November 2, 2009, for the third quarter ended September 31, 2009 (3Q09).

*1Q09:*

The 1Q09 statement reported revenues of $35.2 million for the period ending March 31, 2008, and a net loss of $7.2 million. The Company reported goodwill in the amount of $30.95 million and intangible assets in the amount of $102.69 million. The Products segment recorded an operating loss of $3.83 million, as compared to a $737,000 profit for the same period in 2008. The 1 Q09 report and accompanying press release contained the following pertinent statements:

"Intangible assets represent the fair value assigned to definite-lived assets such as trade names, customer relationships, and non-compete agreements as part of our acquisitions completed during 2007 and 2008. Intangible assets are amortized on a straight-line basis over their estimated useful lives, which range from 3 to 20 years ... the Company tests intangible assets for impairment only when events or circumstances indicate that the carrying value of these assets may not be recovered. During the three months ended March 31, 2009 and 2008, the Company did not record an impairment charge related to its intangible assets" (1Q09 at 8).

"The company continued to be affected by the current economic downturn and the associated effects of the disruptions in the credit markets. As a result, the Company expects to see a continuing economic slowdown in the wind and energy related industries for the foreseeable future as wind turbine manufacturers, wind farm operators and service providers have scaled back existing manufacturing

Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

orders and have delayed new projects and service arrangements." (1Q09 at 20).

"... we expect wind industry demand to rebound over the next six to twelve months, and we continue to take a long-term view with our actions and investments to ensure we're growing the value of our enterprise." (Defendant Drecoll, 1Q09 PR at 1).

*2Q09*

The 2Q09 statement reported revenues of $52.3 million and a net loss of $5.4 million. The Company reported goodwill in the amount of $33.98 million and intangible assets in the amount of $99.78 million. The Products segment reported an operating loss of $9.5 million for the six months ended June 30, 2009, compared to operating gains of $2.7 million for the same period in 2008. The 2Q09 and accompanying press release ("2Q09 PR") contained the following pertinent statements:

> "A continued economic slowdown may result in impairment to our goodwill and intangible assets and could result in changes to the Company's expectations with respect to future financial results and cash flows. These changes could indicate an unfavorable change to management's estimates of the fair value of the Company's reportable segments and could result in a review of our goodwill and intangible assets, which could indicate potential impairment to the carrying value of the Company's assets." (2Q09 at p. 9).

> **\*7** "Historically, the majority of our revenues are highly concentrated with a limited number of customers. During the first half of 2009, several of our customers within our products segment have expressed their intent to scale back, delay or restructure existing customer agreements. As a result, our operating profits and gross margins have been negatively affected by a decline in production levels, which have created production volume inefficiencies in our operations and cost structures." (2Q09 at p. 23).

> "The challenges associated with the ongoing global economic slowdown have resulted in lower customer demand levels and project delays. As a result, our operating profits and gross margins have been negatively affected by the decline in production levels, which has created inefficiencies in the cost structures of our operations. Accordingly, the Company has taken initiatives to mitigate these effects through cost cutting measures throughout

our operations, increased focus on operating cash flow, headcount rationalization as well as reducing our capital spending, while still attempting to position Broadwind to benefit from the anticipated recovery in the wind market." (Defendant Drecoll, 2Q09 PR at 1).

*3Q09*

The 3Q09 statement reported revenues of $59.5 million and a net loss of $4.9 million. The Company recorded goodwill in the amount of $33.98 million and intangible assets in the amount of $96.88 million. The Products segment recorded an operating loss of $678,000, as compared to an operating loss of $1.02 million for the same period in 2008. The 3Q09 report and accompany press release ("3Q09 PR") contained the following pertinent statements:

> "A prolonged downturn in the U.S. or global economy could have a material adverse effect on our business in a number of ways....Risks we might face include potential declines in revenues in our business segments due to reduced orders or other factors caused by economic challenges faced by our customers and prospective customers, potential adverse impacts on our ability to access credit and other financing sources beyond the approved credit lines we currently have, and increased costs associated with accessing additional credit and financing sources." (3Q09 at 24).

> "The decrease in revenues within our Products segment was primarily attributable to a decline in gearing orders and specialty welding services, which was partially offset by an increase in wind tower units sold during the third quarter. The manufacturer of gearing for the wind industry during the third quarter of 2009 continued to be negatively affected by reduced or delayed production orders from our key wind energy customers. However, higher revenues related to custom-engineered gearing orders for non-wind related sectors continued to remain strong relative to the prior year in addition to Brad Foote's ability to fulfill backlog production orders for the wind related markets." (3Q09 at 26).

> "Since late 2008, we have been significantly impacted by a slowdown in our industry caused by reduced capital availability to fund new wind farm developments. We have reacted accordingly, focusing on managing our expenses, improving our operations and preserving our liquidity. We are seeing early signs that capital is again flowing into wind energy project developments, and are well-

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

positioned to take advantage of a recovery in 2010 and beyond." (Defendant Drecoll, 3Q09 PR at 1).

## VI. The January 2010 Secondary Public Offering and Accompanying S–1 Filings and Public Statements

**\*8** In the face of the continued economic downturn, Broadwind determined it was necessary to raise additional capital in order to maintain adequate cash flows and liquidity. On October 30, 2009, Broadwind filed a Form S–1 ("Oct. 30 S–1") with the SEC in preparation for a proposed public offering of 15 million shares of its common stock. It released a press statement the same day ("Oct. 30 S–1 PR") which stated, "Broadwind expects to use its anticipated net proceeds from its share of the offering to repay a portion of its outstanding debt and the remainder for general corporate purposes, including capital expenditures to grow the Company's services businesses." Oct. 30 S–1 PR at 1. The Form S–1 included the Company's financial statements for the year ended December 31, 2008, and the six months ended June 30, 2009. It also contained much of the same language as the 2008 Form 10–K, 1Q09, 2Q09 and 3Q09 statements concerning Broadwind's dependency on a "a few significant customers," and the fact that these customers within the Products segment had "expressed their intent to scale back, delay or restructure existing customer agreements, which has led to reduced revenues from these customers." (Oct 30 S–1 at 12). The Form S–1 also stated, "[o]ur future operating results and the market price of our common stock could be materially adversely affected if we are required to write down the carrying value of goodwill or intangible assets associated with any of our operating segments in the future ... [s]ince a large portion of the value of our intangibles has been ascribed to projected revenues from certain key customers, a change in our expectation of future cash from one or more of these customers could indicate potential impairment to the carrying value of our assets." *Id.* at 16.

On January 6, 2010, Broadwind issued a press release announcing the commencement of an underwritten public offering of 15 million shares of its common stock. On January 14, 2010, Broadwind filed a Form S–1/A Registration Statement ("S–1/A"), followed by the Prospectus on January 15, 2010. The Form S–1, Form S–1/A and the Prospectus contained the following risk factor assessment:

> As of September 30, 2009 our goodwill and intangible balances were

$34.0 million and $96.9 million respectively. We perform an annual goodwill impairment test during the fourth quarter of each year, or more frequently when events or circumstances indicate that the carrying value of our assets may not be recovered. The 2008–2009 recession has impacted our financial results and has reduced near-term purchases from certain of our key customers. We may determine that our expectations of future financial results and cash flows from one or more of our businesses has decreased or a decrease in stock valuation may occur, which could result in a review of our goodwill and intangible assets associated with these businesses. Since a large portion of the value of our intangibles has been ascribed to projected revenues from certain key customers, a change in our expectation of future cash from one or more of these customers could indicate potential impairment to the carrying value of our assets. (S–1/A at 16; Prospectus at 16).

**\*9** The Prospectus became effective on January 15th and over the next several days 15 million shares of common stock were sold to the public at $5.75 per share, raising approximately $53.9 million in net proceeds. On January 22, 2010, Broadwind issued a press release announcing the completion of the public offering, and stating that "[i]n the offering, Broadwind sold 10,000,000 newly issued shares, Tontine Capital Partners, L.P, and certain of its affiliated funds, sold a combined total of 6,125,000 shares, and Broadwind's CEO, J. Cameron Drecoll, sold 1,125,000 shares." (January 22, 2010 PR at 1).

## VII. The 2009 Form 10–K, $82.2 Million Write–Down of Intangible Assets and Stock Price Fallout

On March 12, 2010, Broadwind filed its Form 10–K for the year ended December 31, 2009 ("2009 10–K"). The Form 10–K reported revenues of $32.9 million and a net loss of $92.6 million for the fourth quarter of 2009. The unusually large net loss reflected a charge of $82.2 million to goodwill and

**Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

intangible assets. An accompanying press release ("2009 10–K PR") stated: "The $82.2 million fourth quarter intangible charge was largely driven by market conditions causing a revision in management's assessment of future cash flows under certain key customer contracts." (2009 10–K PR at 1). Commenting on the the Company's performance, Drecoll stated, "Broadwind was signifcantly impacted by lower fourth quarter purchases under our multi-year framework agreements ... The good news is we are now seeing increases in orders from some of these same customers, and are actively engaged in negotiations on other new contracts. (2009 10–K PR at 1). As to the gearing segment's performance in 2009, Drecoll stated,

"[r]evenue from the Gearing segment was $9.7 million in the fourth quarter of 2009, compared with $28.0 million in the fourth quarter of 2008, down significantly due to weak demand from both wind energy and industrial customers. The segment reported an $85.3 million operating loss in the fourth quarter of 2009, including an $80.3 million non-cash intangible impairment charge. Excluding this charge, the operating loss of $5.0 million approximated the $5.1 million operating loss in the fourth quarter of 2008." (2009 10–K PR at 3).

Regarding Broadwind's outlook for 2010, Drecoll stated,

"Year-end backlog totaled $247 million, down slightly from $260 million at the end of September, 2009. Of the total, approximately $119 million is deliverable during 2010. The company expects revenue to trough in the first quarter of 2010 and be down sequentially from the prior quarter. For the balance of 2010, revenue should increase sequentially and, during the second half of the year, exceed the prior year quarters." (2009 10–K PR at 4).

The same day Defendants Drecoll and Kushner participated in an earnings conference call with investors. Kushner made the following statements pertaining to the $82.2 million write-down:

"I'd like to provide some more color regarding the large intangible impairment charge taken in the quarter. As we completed our annual test of recoverability of our intangible assets, we determined that a portion of these investments, mainly associated with the Brad Foote acquisition,

were impaired. At the time of the acquisition, we had placed a significant share of the purchase price value against key wind customer contracts. Coming out of the year when these same customers almost unilaterally reduced or postponed their purchases, we had to recognize that especially in a weak market the contract value in practice was not in line with the balance sheet valuation. This resulted in a charge of $56 million. In addition, due to market conditions we revised our cash flow projections regarding the business, and increased the discount rate to reflect the risks inherent in what today is an underutilized and therefore unprofitable business. This drove a full impairment of the $24 million of good will on our balance sheet."

**\*10** After the release of the press statement, shares of Broadwind stock fell $1.21 per share, or roughly 20%, to close at $4.47 per share. The next day, March 13, 2010, the stock price fell another $0.36 per share, or 8%, to close at $4.11 per share. The stock price continued to fall throughout 2010 on the heels of quarterly reports reflecting ongoing weak demand in the wind industry, bottoming out at $2.06 per share on August 12, 2010.

**STANDARD OF REVIEW**

A complaint in a securities fraud action must not only "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), but must also meet the "exacting pleading requirements" of the Private Securities Litigation Reform Act (PSLRA). [1] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The PSLRA requires plaintiffs to: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78(u)–4(b)(2).

Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

[1] Securities fraud claims must also meet Federal Rule 9(b)'s heightened pleading standard but this is effectively subsumed by the PSLRA, which requires plaintiffs to plead with particularity as to circumstances *and* state of mind.

The "required state of mind" in a § 10(b) case is scienter, which is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756 (7th Cir.2007). I must dismiss the complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324 (2007). Group pleading is not allowed; "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Company,* 521 F.3d 686, 693 (7th Cir.2008).

**ANALYSIS**

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] ... [of] any manipulative or deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC rules and regulations. 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by declaring it unlawful:

> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5.

Section 10(b) provides purchasers or sellers of securities injured by its violation with an implied private cause of action. *Makor,* 551 U.S. at 318.

 **\*11** Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder in two different ways. First, by failing to adequately disclose existing events, uncertainties and trends—specifically, the extent and impact of demand cuts by GE and Clipper—as required under SEC Regulation S–K, Item 303(a), which rendered certain statements made during the Class Period

false or misleading. Second, by materially overstating the value of Broadwind's goodwill and intangible assets (or materially understating net losses) through fraudulent delay of impairment testing.

I begin with a discussion of three general deficiencies of the complaint—failure to adequately plead scienter individually, failure to adequately plead control person liability under Section 20(a), and overshooting on the length of the Class Period. I then turn to the substantive allegations, first examining whether the complaint adequately alleges that a statement or omission was both material and misleading, and then, if necessary, considering whether a strong inference of scienter has been established.

**I. General Pleading Deficiencies**

  A. *Inadequately Individualized Pleading*
Plaintiffs use four types of evidence to establish scienter: statements made by individual defendants, group-published information (e.g. 10–K, 10Q, S–1 statements) signed by individual defendants, individual defendant stock sales, and CI allegations as to individual defendants' state of mind. The only evidence of scienter offered for Defendants Gadow, Graham, Lindstrom, Reiland, Beynon, Fejes and Fox, is that they signed group-published information containing allegedly misleading information. Affixing one's signature to a document that contains misleading information does not, standing alone, create a strong inference of scienter. *See Makor II,* 513 F.3d at 710. Plaintiffs are attempting to proceed under the group pleading doctrine, which the Seventh Circuit has rejected. *Id.* The claims against these six defendants are dismissed with prejudice.[2]

[2] Plaintiffs point out that Defendant Graham commented on cash management strategies in the 1Q09 press release, but do not allege that his statements were misleading.

As to Defendant Johnson, in addition to signing group-published information, Plaintiffs allege that CI 2 "expressed the belief [to Johnson] that the Company's goodwill impairment should have been recorded prior to the January 2010 Offering." But the complaint does not make clear *when* CI 2 made the alleged statement-before or after the January 2010 offering. Ultimately, it does not matter. Assuming the statement was made prior to January 2010, this falls far short of establishing a strong inference of scienter. That an apparently mid to high-level officer expressed his or her

Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

opinion to Johnson regarding the timing of an impairment test does nothing to show that Johnson was responsible for any delay, let alone that he acted with scienter. The claim against Defendant Johnson is dismissed with prejudice.

As to Defendant Kushner, in addition to signing group-published information and allegedly being told by CI 2 that Broadwind should have conducted impairment testing prior to the January 2010 offering, the complaint references statements she made on the March 12, 2010 earning conference call. Specifically, Plaintiffs point to the statement, "[c]oming out of the year when these same customers almost unilaterally reduced or postponed their purchases, we had to recognize that especially in a weak market the contract value in practice was not in line with the balance sheet valuation." The parties are in dispute over what year—2008 or 2009—Kushner was referring to "coming out of." Plaintiffs believe she meant 2008, which would evidence that Broadwind knew long before the March 2010 write-down that its intangible assets were impaired. While I agree with Defendants' interpretation—she was referring to 2009—this also does not matter. As I will explain below, the statement itself is not actionable because it was made at the tail end of the class period and therefore could not have plausibly induced reliance. Nor is it particularly probative of Kushner's actions or state of mind in relation to the statements and alleged conduct that I am allowing through the 12(b)(6) gate. The claim against Defendant Kushner is dismissed with prejudice.

B. *Failure to Adequately Plead Control Person Liability*
**\*12** Plaintiffs allege control person liability pursuant to Section 20(a) of the Exchange Act against the Tontine Defendants. Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

In order to state a claim under Section 20(a), Plaintiffs must allege three things: (1) a primary securities violation; (2) each of the Tontine Defendants exercised general control over the operations of Broadwind; and (3) each of the Tontine Defendants possessed the power or ability to control the specific transaction or activity upon which the primary

violation was predicated, whether or not that power was exercised. *See Zurich Capital Markets, Inc. v. Coglianese,* 332 F.Supp.2d 1087, 1109–10 (N.D.Ill.2004); *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992). Section 20(a) claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) but not the PSLRA. *Coglianese,* 332 F.Supp.2d 1110.

The complaint does not contain a single allegation that the Tontine Defendants possessed the power or ability to control the content of Broadwind's SEC disclosure statements or determine the timing of impairment testing of goodwill and other intangible assets. Instead, Plaintiffs rely on the fact that the Tontine Defendants owned approximately 47.7 percent of Broadwind's stock during the Class Period, and general statements contained in the 2008 Form 10–K that Tontine "influences [Broadwind's] affairs significantly." These facts do not state with adequate particularity how the Tontine Defendants were in a position to control the specific conduct that constitutes the alleged primary securities violation. The claim against the Tontine Defendants is dismissed with prejudice.

C. *Failure to Allege With Particularity Misleading Statements Past March 12, 2010*
The only apparent reason for extending the class period past March 12, 2010 is an alleged inconsistency between Defendant Kushner's statement on the earnings conference call that day and a press statement released after Broadwind filed its second quarterly report for 2010 (2Q10). On the March 12, 2010 call Kushner stated, "[o]ur wind gearing customers are now gradually ramping up their demands for the course of the rest of the year. So, 2010 should be a year of revenue growth." In the 2Q10 press statement, Broadwind disclosed that "[r]educed purchases from one large wind industry customer with a multi-year framework agreement also impacted revenues." These statements are not inconsistent. It could very well have been the case that in March 2010, several customers were slowly increasing demand for wind gearing systems but this one major customer was not among them, or the one major customer was among them but scaled back its orders later in the year. Plaintiffs have not alleged with sufficient particularity how this or any other statements made past March 12, 2010 were misleading, and therefore I am shortening the Class Period to run from March 16, 2009, the date Broadwind filed its Form 10–K for the year ending December 31, 2008, to March 19, 2010, one week after

Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

Broadwind filed its 2009 Form 10–K announcing the $82.2 million charge to goodwill and other intangible assets. [3]

[3] By this time, the market should have fully absorbed the news of the impairment charges and stock prices would reflect the alleged injury. *See generally* C. Carvalho, N. Klagge and E. Moench, *How Well Do Financial Markets Separate News from Noise? Evidence from an Internet Blooper,* Federal Reserve Bank of New York "Liberty Street Economics" posting (October 5, 2011), http://libertystreeteconomic s.newyorkfed.org/2011/10/how-well-do-financialmarkets-separate-news-from-n oise-evidence-from-an-internet-blooper.html ("... markets may take as long as a week to fully process the "signal," or relevant information, component of news.").

## II. *Alleged Misleading Statements and Omissions Regarding Existing Events, Uncertainties, and Trends in Violation of SEC Regulation S–K, Item 303(a)*

**\*13** Plaintiffs' first substantive claim is that during the Class Period Defendants omitted material information from the Company's SEC filings and accompanying press releases by failing to adequately disclose the impact of GE and Clipper's decreased order forecasts on Broadwind's continuing operations. Specifically, Plaintiffs allege that Defendants failed to adequately "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations," as required under Item 303.

There is no independent private cause of action under Item 303. *Oran v. Stafford,* 226 F.3d 275, 287 (3d Cir.2000); *Anderson v. Abbott Laboratories,* 140 F.Supp.2d 894, 909 (N.D.Ill.2001). Item 303 is relevant to a Section 10(b) claim only as a benchmark for measuring the materiality of an omission. But the degree to which Section 10(b) materiality is coextensive with Item 303 disclosure requirements is not clearly settled. *See Oran,* 226 F.3d at 287–288 ("SK–303's disclosure obligations extend considerably beyond those required by Rule 10b–5."); *but see In re Scholastic Corp. Securities Litigation,* 252 F.3d 63, 70 (C.A.2 (N.Y.) 2001) (reversing dismissal of Section 10(b) claim where complaint adequately alleged that defendants failed to disclose a "known trend" under Item 303 on Form 10–Q).

Of course, if Defendants did in fact comply with Item 303 I need not settle the question of the extent to which Section 10(b) materiality and Item 303 disclosure requirements overlap-no one is arguing that Section 10(b) requires *more* than Item 303. Plaintiffs acknowledge (as they must) that throughout the Class Period Defendants repeatedly warned investors that (1) since its inception, Broadwind had generated "limited revenue ... net losses and negative cash flows" and "anticipate[d] that future losses and negative cash flow [were] possible for the foreseeable future"; (2) Broadwind was suffering from the global economic downturn; (3) Broadwind revenues were highly concentrated among a limited number of customers who were difficult to replace; (4) several of its customers within the products segment had "expressed their intent to scale back, delay or restructure existing customer agreements" as a result of the economic downturn; (5) "operating profits and gross margins" were negatively affected by the demand cuts, creating "production volume inefficiencies in our operations and cost structures"; and (6) Broadwind expected to see "continuing economic slowdown in the wind and energy related industries for the foreseeable future."

Plaintiffs allege that these disclosures were inadequate because Broadwind did not disclose the magnitude of the demand forecast cuts, the identity of the customers making the cuts, the fact that Brad Foote was laying off a significant number of employees during the Class Period, or that Brad Foote was experiencing cash flow problems. I disagree.

### A. *Defendants Disclosed Much of the Information Plaintiffs Claim Was Omitted*

**\*14** First, Broadwind disclosed much of the information Plaintiffs claim was omitted. In several filings, beginning with the 2008 10–K, Broadwind disclosed the highly concentrated nature of the wind energy market, identified its most important individual customers by name and disclosed that these customers each accounted for more than 10 percent of Broadwind's consolidated revenues:

"... the top three wind turbine manufacturers in the U.S. constituted 77% of the market and the top five constituted 95% of the market. As a result, we currently have concentrations with a limited number of customers for a majority of our revenues. Sales to each of Gamesa, Clipper and General Electric Transportation Services represents an amount greater than 10% of our Company's consolidated revenues and the loss of any such customer could have a material adverse effect on the Company." (2008 10–K at 7).

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

Plaintiffs claim that Broadwind's later disclosures, beginning in the Form 1Q09, that "several of our customers within our products segment expressed their intent to scale back, delay or restructure existing customer agreements, which has led to reduced revenues from these customers," was materially misleading because Broadwind "baldly omitt[ed]" the fact that "these customers" included GE and Clipper. This argument fails. The warning that several customers had scaled back orders was always directly preceded by the above-quoted language from the 2008 10–K disclosing the identity of Broadwind's most important wind turbine customers and the highly concentrated nature of the wind energy market. No reasonable investor could read these risk disclosures in tandem and walk away with the understanding that "these customers" did not, in all likelihood, include GE and Clipper.

Plaintiffs also assert that Defendants omitted material information concerning substantial layoffs made at Brad Foote during early 2009. It is not disputed that both the 2008 and 2009 Form 10–Ks contained accurate employment figures (1,127 employees at year end 2008 and 690 at year end 2009). But Plaintiffs assert that Broadwind's employment figure disclosures were misleading for two reasons: (1) the 2008 report contained a detailed breakdown of employment figures by segment and subsidiary, whereas the 2009 report gave a single figure for the entire company; (2) Defendants were required to make the disclosures earlier (in the 2009 quarterly statements and the S–1 filings) because the layoffs constituted a "known trend" under Item 303.

I reject out of hand the first argument. There is no legal requirement to provide a sectorby-sector employment breakdown, nor does failing to do so render the aggregate figure provided materially misleading. The second argument is equally unavailing. As Defendants correctly noted in their briefings, the securities laws do not impose a generalized duty to disclose everything that an investor might like to know. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5," *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Item 303 contains no language requiring registrants to disclose employment figures generally, nor to alert investors when substantial layoffs occur. Plaintiffs have not provided, and I am unable to find, any case law interpreting Item 303 to create such a duty.

**\*15** Item 303's apparent lack of concern with employment figures is quite logical. Layoffs and hiring do not, standing alone, tell an investor anything about "material change[s] in the relationship between costs and revenues." Item 303(a)(3)(ii). Substantial hiring may signal expansion and increased revenues, but that does not automatically translate into greater profitability-there are costs associated with expansion that may more than offset increased revenues. This was exhibited at Broadwind itself. The Company greatly expanded in 2008, acquiring several subsidiaries, hiring many new employees, and increasing full-year revenues by nearly 645 percent from 2007. But the expansion also greatly increased costs, which led to a net loss of $12.4 million for 2008, compared to a net loss of $4.7 million in 2007.

The opposite phenomenon is equally possible—downsizing can increase profitability by shaving costs and increasing productivity. These gains, in turn, could outweigh any revenue losses associated with the contraction. At the end of the day, it is the revenue and cost figures that matter to investors—not employment figures—and Plaintiffs do not allege that these figures were ever misrepresented (with the exception of goodwill and intangible asset valuation, which I deal with below).

Nor do layoffs necessarily reflect Broadwind's long-term views on the strength of the wind market. Companies are entitled to respond to market shocks without immediately disclosing the details—it takes time to determine whether demand fluctuations will materially alter revenue streams in the long-run. A wave of layoffs does not signal a permanent decline in a company's workforce nor a belief among management that their market will not recover. This is especially the case during a general recession, when forces originating from *outside* the wind energy markets accounted for the decline in demand, not shifts *within* the market (such as widespread substitution of wind energy for solar energy). In short, Defendants had no legal obligation to disclose employment figures, nor were investors materially misled by their failure to do so.

Plaintiffs also claim that Broadwind failed to disclose that Brad Foote was experiencing serious cash flow problems by early 2009. This argument also fails. In the 2008 10–K, Broadwind disclosed that Brad Foote had failed compliance with two of the covenants contained in its Bank of America loan agreement, including the cash flow coverage ratios. What possible inference could an investor draw from this disclosure other than that Brad Foote was experiencing liquidity shortages? If that was not enough, Broadwind also disclosed, beginning in the 2008 10–K and continuing

**Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

throughout the Class Period, that "[w]e have generated limited revenue and have generated net losses *and negative cash flows* since our inception" and anticipated that this would continue "for the foreseeable future." (*See* 2008 10–K at 14; Oct.2008 S–1 at 15.) At times, the complaint reads as if Plaintiffs believe Defendants should be held liable not for failing to disclose risks, but for failing to surround truthful disclosures with flashing lights and arrows. Investors might prefer that, but the securities laws do not require it.

### B. *Immateriality of Late 2008/Early 2009 Timing Discrepency*

**\*16** Second, much of the complaint focuses around a minor timing discrepancy—whether GE and Clipper first cut their demand forecasts in late 2008 or early 2009. Even if Plaintiff is correct—demand forecast cuts began in mid-November 2008—Defendants were not required to immediately disclose this in the 2008 Form 10–K. Item 303 requires disclosure of "known trends or uncertainties" that the registrant "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 303(a)(3)(ii). The period between October 2008 and March 2009 was one of the most economically uncertain times in American history. Plaintiffs cannot show what Defendants—or any other market participant—should have "reasonably expected." Under the circumstances, it was reasonable for Defendants to wait until the 1Q09 report before concluding that the demand cuts would not be "of such short duration that [they would] not support any conclusions about [Broadwind's] business environment." *Oxford Asset Management, Ltd. v. Jaharis,* 297 F.3d 1182, 1191 (11th Cir.2002).

Nor, if Plaintiffs' mid-November 2008 time frame is accurate, does that make Defendants' later statements that demand cuts began in early 2009 actionable. While those statements would be false, I do not regard the timing difference as material. To properly allege materiality, plaintiffs must allege that there is "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Makor Issues & Rights, Ltd. v. Tellabs, Inc. ("Tellabs I"),* 437 F.3d 588, 596 (7th Cir.2006), *overruled on other grounds by Tellabs,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179. It is undisputed that Defendants did disclose in the 2008 Form 10–K that its fourth quarter operations had been negatively impacted by the global economic downturn. It is also undisputed that

beginning with the 1Q09 and continuing throughout the Class Period, Defendants disclosed that (1) Brad Foote's Product segment was "substantially dependent on a few significant customers"; (2) "wind turbine manufacturers, wind farm operators and service providers have scaled back existing manufacturing orders and have delayed new projects and service arrangements"; and (3) "the Company expects to see a continuing economic slowdown in the wind and energy related industries for the foreseeable future."

Given the extensive, timely, and truthful disclosures that were made, I find it implausible to suggest that, had Defendants specifically represented that a few key customers had cut order forecasts in late 2008 rather than early 2009, investors would have viewed this as important in determining whether to purchase Broadwind stock. Nor would it have significantly altered the total mix of truthful information Broadwind provided on the state of the wind gearing market.

### C. *Failure to Plead with Particularity the Nature of the Demand Forecast Cuts*

**\*17** Third, Plaintiffs gloss over several key factual issues that render the pleadings fatally inadequate. For one thing, Plaintiffs do not plead with particularity the specifics of the cuts. How big were they?[4] When were they forecasted to kick in? Would they affect backlogged orders or only new orders?[5] When and how were they communicated by the customers? Were the cuts projected to be permanent or only temporary until credit markets recovered?

[4] I do not give great weight to CI 4's estimate that customer forecasts were down 75 percent between November 2008 and July 2009. "Based on the decreased amount of purchases CI 4 was making" is not sufficiently particularized pleading, and this figure is not corroborated anywhere else.

[5] This is critical because throughout the Class Period Brad Foote appears to have had substantial backlogged orders. A cut to short-term demand forecasts may not be significant if Brad Foote was continuing to fill these orders. Additionally, Brad Foote operated on multi-year contracts with its biggest customers, and its not clear from the complaint how longer term deals were affected by demand forecast cuts. A single anecdote about Clipper refusing to inspect a shipment of gear systems in July 2009 does not

Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

suffice to explain how cuts to demand forecasts affected backlogged orders or complex multi-year contractual agreements.

Nor do Plaintiffs explain the significance of the demand cuts in relation to the operations of the rest of the Company. There is evidence that demand cuts to wind gearing systems during the Class Period were substantially offset by increases in wind tower manufacturing and non-wind gearing systems sales. (*See, e.g.,* 3Q09 PR: "For the nine-month period [January 1–September 30 2009], revenue rose from $115.3 million in 2008 to $130.9 million in 2009 due to the start-up of a new structural wind tower production facility in Abilene, TX early in 2009, which *more than offset* lower demand for wind turbine gearing."). [6]

[6]     The construction of the 2009 facility in Abilene, Texas was followed by a similar construction project in Brandon, South Dakota in 2010. Thus, Broadwind's Products segment was boosted by increased wind tower manufacturing throughout the Class Period.

SEC filings are meant to give investors an accurate understanding of a company's overall financial position and identify market risks that could substantially alter that position—not to provide a detailed explanation of every single operating component of the company. *See Gallagher v. Abbott Laboratories,* 269 F.3d 806, 809 (7th Cir.2001) (SEC filings meant to be "snapshot" of registrant's status on or near the filing date.) Under-performance in a single sector becomes less significant to the overall financial picture of a company when other segments step in to pick up the slack. The complaint contains little by way of hard facts on this critical point. Instead, Plaintiffs rely on a purported maxim around the Company—"Broadwind goes as Brad Foote goes"—to resolve numerous and complex questions about Broadwind's aggregate financial picture during the Class Period. This does not get the job done under the PSLRA.

D. *Future–Oriented Risk Assessments Were Always Accompanied by Meaningful Present–Tense Warnings*

Fourth, while Defendants frequently used future-oriented, conditional language to describe adverse market developments that had already materialized, these statements were always accompanied by meaningful, present-tense disclosures. For example, Plaintiffs allege that statements in the 2008 Form 10–K such as "[o]ur businesses ... *may be* adversely affected by the current disruption in the global

credit markets and instability of financial systems" was misleading because "the Company's operations and financial conditions were already adversely affected by the disruption in global markets." But the 2008 Form 10–K also contains language disclosing exactly that: "[o]ur operating results and business strategy, particularly in the fourth quarter of 2008, were affected by the downturn in the economy and the effects of the disruptions in the global credit markets and financial systems and the corresponding effect on the wind industry and global heavy manufacturing industry."

**\*18** And while Defendants recycled these "may" and "could"-style warnings throughout the Class Period, the present-tense, "this-is-happening-now" warnings became increasingly detailed as the full implications of the global financial downturn began to sink in. By the first quarter of 2009, Defendants disclosed that "wind turbine manufacturers, wind farm operators and service providers have scaled back existing manufacturing orders and have delayed new projects and service arrangements," and that "the Company expects to see a continuing economic slowdown in the wind and energy related industries for the foreseeable future." By the second quarter, Defendants disclosed that production levels were down, operating profits and gross margins were negatively affected, and that goodwill and intangible assets could be impaired if things did not improve. And so on. "Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored." *St. Lucie County Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.,* No. 10–C427, 2011 WL 814932, at \*7 (N.D.Ill. Feb.28, 2011) (internal quotations omitted).

The mix of present-tense and future-oriented warnings was not misleading; it was a reasonable way of conveying the Company's prospects during a period of extraordinary economic uncertainty. No reasonable investor could read Defendants' statements, as a whole, and come away with anything other than an understanding that "the market for wind gearing systems is bad, and it could very well get worse."

E. *Plaintiffs Do Not Adequately Account for the Fact that Broadwind was Dealing with Cuts in Demand Forecasts*

Fifth, Plaintiffs do not satisfactorily deal with the fact that Broadwind was facing cuts in demand *forecasts* from its biggest customers, not final orders. So when Broadwind stated in its SEC filings that customers had "expressed their intent to scale back" orders, not only does this appear to be an entirely accurate statement, but it was also always

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

accompanied by disclosures explaining how the forecast cuts were impacting *current* operations, such as by lowering production levels and profit margins. (*See, e.g.,* 3Q09 at 23).

More importantly, actual demand decreases were of course reflected in the Product segment revenue reports, which Plaintiffs do not claim were ever inaccurate. Plaintiffs do not adequately allege how an investor could be materially misled about the state of the wind gear market when furnished with truthful, albeit general, warnings of substantial market decline coupled with entirely accurate quarterly revenue reports.

### F. *Safe Harbor Statements*

The PSLRA provides a statutory "safe harbor" for allegedly misleading statements that are forward-looking. A forward looking statement is not actionable if it is: (1) identified as a forward looking statement and is accompanied by meaningful cautionary language identifying factors that could cause actual results to materially differ from those in the forward-looking statement; (2) immaterial; or (3) the Plaintiff fails to prove that the forward statement was made with actual knowledge of its falsity.[7] 15 U.S.C. § 78u–5(c)(1). The pleading implications of the safe harbor provision is to further ratchet up the scienter standard: "the 'strong inference' that must be drawn to avoid dismissal cannot be an inference merely of recklessness" but must be of actual knowledge. *Makor II,* 513 F.3d at 705.

[7] As Plaintiffs correctly note, registrants cannot seek safe harbor refuge by representing a risk that has already materialized as something that could develop in the future. But, as discussed above, Broadwind consistently coupled forward-looking warnings with meaningful disclosures detailing present impacts of the market downturn.

**\*19** Throughout the Class Period, Broadwind and Defendant Drecoll made several forward-looking statements indicating that they expected demand to recover in the wind industry in the near future. *See, e.g.,* 1Q09 PR at 1, ("we expect wind industry demand to rebound over the next six to twelve months."). Some of these forward looking statements were contained in Broadwind's SEC filings, and some were made in press statements accompanying those filings. The forward-looking statements contained in SEC filings were always accompanied with meaningful cautionary language that identified risk factors that could cause actual results to materially differ. Therefore none of those statements is actionable.

All Broadwind press releases that included forward-looking statements came with the same general forward-looking statement disclaimer at the end. However, this general disclaimer did not identify specific factors that could cause actual results to materially differ. Plaintiffs point to several forward-looking statements contained in press releases that they regard as actionable under Section 10(b). I am not going to go through each one. Rather, I will examine a representative statement and explain why Plaintiffs fail to clear the safe harbor provision.

Plaintiffs allege that on May 12, 2009, Defendant Drecoll could not possibly have believed that "industry demand [would] rebound over the next six to twelve months," (1Q09 PR at 1) given that "key customers were decreasing their forecasts, the Company was experiencing serious cash flow problems, and the Company had been and was continuing to lay off employees." (Compl.¶ 122). The latter two points-cash flow problems and internal layoffs-are nonsensical; they are consequences of lower demand, not causes. As to making these predictions in the face of substantial declines in demand forecasts, Plaintiffs fail to plead with adequate particularity that Defendant Drecoll had actual knowledge his statements were false.

Plaintiffs do not plead any facts to suggest that it was unreasonable for Defendants to believe wind market demand would rebound as soon as credit markets recovered.[8] The demand cuts at issue in this case took place during the biggest global economic recession in 75 years. Nobody in late 2008 or 2009 knew how deep markets would plunge or how long it would take them to recover. Plaintiffs do not allege that there was anything unique about the wind gearing market such that it could not be expected to return in full force as soon as credit markets thawed, nor do they allege that GE and Clipper's position within that market had changed so that Defendants could not have reasonably believed that their pre-recession demand levels would eventually be restored. It would be one thing if GE signaled that it was leaving the wind energy market to focus greater resources on improving its line of dishwashers, but Plaintiffs do not plead any facts to suggest Broadwind was facing this kind of permanent market disruption.

[8] Indeed, it was reasonable to believe that demand would begin to recover before credit markets recovered, as the 2009 federal stimulus bill allocated billions of loans and investments into

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

green energy technology. American Recovery and Reinvestment Act, Pub.L. No. 111–5.

**\*20** Defendants disclosed enough of what they knew at the time they knew it to give the investing public a reasonably accurate and complete picture of Broadwind's current operations and short-term prospects. *See Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) ("Corporate officers need not be clairvoyant, they are only responsible for revealing those material facts reasonably available to them."). There was not enough certainty one way or the other for Defendants to make definitive statements, so they did what any rational actor would do-they hedged. To claim that Defendants did not go far enough in explaining the "true gravity of the situation"—when nobody could know the true gravity of the situation—is classic "fraud by hindsight" pleading. *See Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978).

Even if Defendants could clear the first PSLRA hurdle by adequately pleading that misleading statements were made, they cannot establish a strong inference of scienter. Given the amount of truthful and timely disclosures that were made, ranging from general market trends to specifics such as Brad Foote's defaulting on its loan agreement with Bank of America, I do not find the inference of scienter to be equally as compelling as several alternative explanations, including simple negligence.

### III. *Fraudulent Delay of Impairment Testing on Goodwill and Other Intangible Assets*

Plaintiffs' second theory of Section 10(b) liability is that Defendants failed to record timely impairment charges to goodwill and other intangible assets in violation of GAAP.[9] This, in turn, allowed them to overstate Broadwind's overall value (or understate its net losses) in order to keep stock prices inflated for the January 2010 offering. Before deciding whether Plaintiffs have adequately pled this theory, I review GAAP standards for valuing goodwill and other intangible assets.

[9] "Goodwill" is the excess of purchase price over the fair value of the net assets acquired. It is considered an asset because it reflects expected future economic benefits. An intangible asset refers to any non-financial asset that lacks physical substance —the most important examples being customer contracts and related customer relationships. Of course, neither goodwill nor other intangible assets

can ever be precisely quantified. Their values are essentially estimates of what competitors would be willing to pay for them at the time they are recorded.

#### A. *GAAP and SFAS Requirements*

GAAP includes the Statement of Financial Accounting Standards ("SFAS"), a set of generally accepted accounting methods promulgated by the Financial Accounting Standards Board ("FASB"). Of particular importance to this case are SFAS 141, 142, and 144. SFAS 141 requires an acquiring corporation to record the fair market values of any assets acquired or liabilities assumed through a business combination. When Broadwind acquired Brad Foote in October 2007 and recognized intangible assets in the amount of $75.5 million and goodwill in the amount of $21 million, it was following SFAS 141. Defendants do not deny that the $75.5 million largely reflected the value of Brad Foote's relationship with GE and Clipper.

Under SFAS 142 and 144, the acquiring corporation is required to keep the valuation of goodwill and other intangible assets up to date after initial recognition. SFAS 142 requires a company to review its goodwill to determine if the asset is impaired. An impairment occurs when the carrying amount of goodwill—i.e. the valuation the company currently has in its books-exceeds its fair market value. SFAS 142 requires companies to conduct impairment tests at least annually, and intra-annually when certain triggering events arise that indicate goodwill is likely impaired. Examples of such triggering events include "a significant adverse change in legal factors or in the business climate," "unanticipated competition," "a loss of key personnel" and "the testing for recoverability under [SFAS] 144 of a significant asset group within a reporting unit."

**\*21** SFAS 144 addresses financial accounting and reporting for the impairment or disposal of long-lived assets subject to amortization.[10] GAAP requires that impairment losses be recognized if the carrying amount of an intangible asset is not recoverable and its carrying amount exceeds its fair value. A long-lived asset is to be tested for recoverability "whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." (SFAS 144, ¶ 8). Examples of such events include "a significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used," "a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset," and "a current-period operating or cash flow loss

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset."

10  An intangible asset with a finite useful life is amortized. The amortization period represents the length of time that the asset is expected to contribute to the owning company's cash flows.

Financial statements filed with the SEC that are not in accordance with GAAP are presumed to be misleading or inaccurate. SEC Regulation S–X, 17 C.F.R. § 210.4–01(a)(1). However, allegations of GAAP violations do not automatically state a claim under Section 10(b) because such violations, standing alone, are insufficient to raise a strong inference of scienter. *See Stavros v. Exelon Corp.,* 266 F.Supp.2d 833, 850 (N.D.Ill.2003). Rather, a plaintiff must plead additional facts to make the inference that a GAAP violation was made knowingly or with reckless disregard to its falsity at least as compelling as the inference that it was caused by mere negligence. *Tellabs,* 551 U.S. at 324.

B. *Plaintiffs Plead with Adequate Particularity that Defendants Made Misleading Statements and Engaged in Deceptive Practices with Respect to the Timing of Impairment Testing and Write–Downs of Goodwill and Other Intangible Assets*

Plaintiffs allege that Defendants violated SFAS 142 and 144 by failing to conduct impairment testing despite numerous triggering events that indicated the fair market value of Brad Foote's goodwill and other intangible assets had fallen substantially below the carrying value. Specifically, Plaintiffs allege that by July 2009, the combination of GE and Clipper forecast declines, extensive layoffs at Brad Foote, and current and historical operating losses should have triggered intra-annual impairment testing of goodwill and recoverability testing for other intangible assets. Plaintiffs further allege that Defendants actually delayed Broadwind's annual goodwill impairment tests, which traditionally occurred in October of each year, in order to avoid recording a loss prior to the January 2010 offering.

Courts should be cautious in second guessing a corporation's decision on the timing of impairment testing. Considerable business judgment goes into determining when a triggering event has materialized, or when an intangible asset may not be recoverable, and courts are generally no better (and often are considerably worse) positioned to make this call. *See generally Thor Power Tool Co. v. C.I.R.,* 439 U.S. 522, 544,

99 S.Ct. 773, 58 L.Ed.2d 785 (1979) ( "[GAAP] ... tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management.").

**\*22** But that is not to say that disputes over the timing of impairment write downs can never form the basis of a Section 10(b) claim. Defendants cite two cases from this Circuit, *DiLeo v. Ernst and Young,* 901 F.2d 624 (7th Cir.1990) and *Stavros v. Exelon Corp.,* 266 F.Supp.2d 833 (N.D.Ill.2003), as precluding the timing of impairment recording as the basis for a fraud claim. I disagree with their sweeping interpretation of these cases. I read *DiLeo* and *Stavros* to hold that, standing alone, allegations that a write-down should have been taken earlier do not adequately plead fraud. But coupled with well-pled facts creating a strong inference of scienter, there is no reason why delaying the timing of an impairment write-down until after a stock sale would not qualify as an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 CFR § 240.10b–5.

Defendants argue that Plaintiffs have not created a strong inference of scienter because the alleged "triggering events"—GE and Clipper's demand forecast cuts, substantial layoffs at Brad Foote, a history of operating losses, and failure to meet loan covenants—did not require Broadwind to conduct impairment testing any earlier than it actually did. Defendants are conflating two separate issues here. The significance of the triggering events goes toward whether Defendants violated GAAP, not whether Plaintiffs have adequately pled scienter. A GAAP violation is not necessary to plead fraud, and, for the business judgment concerns I have described, I decline to decide whether there was some point in time prior to October 2009 when GAAP required Defendants to conduct impairment testing.

But inability to establish a pre-October 2009 GAAP trip wire does not preclude Plaintiffs from showing that Defendants engaged in manipulative or deceptive practices with respect to intangible asset valuation. The question remains whether, once having determined that goodwill and intangible assets were impaired, Broadwind did anything to delay disclosure until after the January 2010 public offering. Plaintiffs plead with adequate particularity that Defendants delayed reporting the results of their annual October goodwill impairment tests in order to keep stock prices inflated through the January 2010 public offering. Indeed, Defendants themselves do not appear to be straight on when the impairment testing was concluded.[11]

11     The 2009 10–K report gives conflicting dates on when impairment testing was concluded. On page 17 it says impairment testing was not completed until March 2010; in the following paragraph, the report states impairment testing was completed in February 2010 (2009 10–K at 17).

Similarly, while Broadwind conducted annual impairment tests on goodwill, it only conducted impairment testing on long-lived assets like customer relationships "whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." (2008 10–K at 16; 2009 10–K at 17). That means that some time prior to March 12, 2010, Defendants made the determination that their long-lived assets may not be recoverable and needed to be tested. Given that goodwill impairment testing purportedly took roughly five months to complete, it is likely that Defendants made this determination prior to January 2010. At the very least, that would render certain statements contained in the January 2010 S–1 /A and Prospectus materially misleading—namely, that Broadwind *"may* determine that our expectations of future financial results and cash flows from one or more of our businesses has decreased or a decrease in stock valuation may occur, which *could* result in a review of our goodwill and intangible assets associated with these businesses." Plaintiffs have cleared the first PSLRA hurdle by pleading with particularity misleading statements and deceptive practices in connection with the timing of impairment testing and write-downs of goodwill and other intangible assets.

### C. *Plaintiffs Have Pled Sufficient Facts to Create a "Strong Inference" of Scienter with Respect to Impairment Testing and Write–Downs*

**\*23** Plaintiffs plead several facts to show Defendants acted with scienter in overvaluing intangible assets, including CI 1's statement that Defendant Drecoll "absolutely knew" prior to the January 2010 offering that there would be a large write-down to goodwill; "Defendants position as high level officers of the company" which "afforded them with access to material, non-public information concerning the Company"; and Defendants' motive to keep stock prices inflated through the January 2010 public offering. (Compl.¶ ). Most of this I do not find particularly compelling.

What gets Plaintiffs across the "strong inference" line is the timing and scale of the impairment write-downs. The $82.2 million impairment charge reported on March 12, 2010 represented approximately 63 percent of Broadwind's goodwill and intangible balances. (Prospectus at 16 (listing goodwill and intangible balances at $34.0 million and $96.9 million, respectively, as of September 30, 2009)). Losses of this size do not fall out of the sky. It is difficult to imagine that as late as January 15, 2010, the date Defendants filed their prospectus—less than two months before the write-down was recorded-Defendants did not have knowledge that a substantial write-down in the coming weeks was a certainty.

As mentioned above, even if Defendants had only made the determination prior to the January 2010 public offering that the value of certain long-lived assets (i.e. customer relationships with GE and Clipper) needed to be tested under SFAS 144, that should have been disclosed. The decision to test alone—without knowing the results—is probative of Defendants' state of mind, because such testing is only done when decision-makers believe long-lived assets are not recoverable. Given the significance of the decision to test, and the obvious implications this would have on the price of Broadwind stock, in failing to disclose this information prior to the January 2010 public offering I regard an intent to deceive as being at least as plausible as any alternative explanation. *Tellabs,* 551 U.S. at 324.

Further, Plaintiffs have pled several concrete facts to show that, at least by the time the S–1/A and Prospectus statements were filed, Defendants knew that a substantial write-down (i.e. the results of the impairment test) was not just possible, but inevitable. Defendants knew that a "significant share of the purchase price value" of its intangible assets was valued "against key wind customer contracts." (Defendant Kushner, March 12, 2010 Earnings Conference Call). At the time impairment testing began, in October 2009 for goodwill and presumably around the same time for other long-lived intangible assets, Defendants also knew, based on weak demand all year, that the value of those key wind customer contracts had substantially declined since October 2007, when first recorded. So at best, in January 2010 with impairment testing two months underway and demand continuing to lag, Defendants' statement that "a change in our expectation of future cash from one or more of these customers could indicate potential impairment to the carrying value of our assets" was a "reckless gamble" that the situation would right itself before impairment testing was concluded and write-downs recorded. *See Tellabs II,* 513 F.3d and 710.

**\*24** Defendants attempt to distinguish this case from *Tellabs II* on the grounds that, whereas in *Tellabs II* the alleged misstatement dealt with "objective facts," here the claims "involved highly discretionary accounting judgments as to

**Brasher v. Broadwind Energy, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

which reasonable minds could differ." (Def. Rep. at 20. That is a nice argument when it comes to determining *whether* to conduct an impairment test (i.e. determining if a triggering event has occurred). Indeed, I adopt Defendants' stance on this point by refusing to rule that Broadwind was required under GAAP to conduct impairment testing prior to October 2009. But once the decision to test had been made, Broadwind could not mislead investors as to what it knew the tests would reveal. There are very few entirely "objective facts" in the world of intangible asset valuation—that Broadwind was going to take a substantial hit when impairment testing was completed in late 2009 or early 2010 is about as close as it gets. [12]

[12]     Defendants' argument that the involvement of an outside appraisal firm in conducting impairment testing undercuts a strong inference of scienter is, frankly, specious. No one is claiming that the results of the testing were inaccurate; the claim is that the testing should have been done much sooner. The appraisal firm plays no role in determining *when* to test assets; they simply review *how* they are tested.

The inference that Defendants acted with scienter is further supported by the fact that Defendants, by their own admission, had been conducting impairment testing for more than two months prior to the January 2010 public offering. It is exceedingly unlikely that after spending that amount of time examining assets that turned out to be so severely impaired, the statement "[o]ur future operating results and the market price of our common stock could be materially adversely affected if we are required to write-down the carrying value of goodwill or intangible assets associated with any of our operating segments in the future" (Prospectus, p. 16) fully and accurately reflected what Defendants knew going into the sale.

It is of course possible that failure to detect a massive impending write-down was the result of negligence. Many factual issues must be resolved before that can be ruled out. But at this stage, the facts surrounding the timing of Broadwind's impairment testing of its intangible assets in the lead up to the January 2010 offering establish a strong inference of scienter—one that is cogent, and at least as compelling as all opposing inferences. *Tellabs,* 551 U.S. at 314.

### IV. *Remaining Defendants*

At this point, two Defendants remain: Broadwind and Drecoll. Plaintiffs have adequately pled corporate scienter as to the timing of the impairment write-down so the case against Broadwind will go forward. *See Id.* at 710 ("... it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."). The question is whether Plaintiffs have pled sufficient facts to attach a strong inference of scienter to Drecoll. I believe they have.

Drecoll sat "at the top of the corporate pyramid." *Id.* at 711. He had deep connections to and an intimate familiarity with Brad Foote's operations. He is the only Broadwind officer to sell shares in the January 2010 public offering (1.125 million); he also sold a substantial number of shares during October 2009—directly prior to Broadwind's annual goodwill impairment testing. CI 2 claims that Drecoll directly resisted efforts to conduct impairment testing prior to the January 2010 offering. This tends to corroborate CI 1's otherwise unsupported assertion that Drecoll "absolutely knew" there would be a large write-down to goodwill. Drecoll is directly quoted in many of the statements and reports alleged to contain misleading information concerning intangible asset valuation. While it is conceivable that in January 2010 Drecoll was unaware of the enormous impairment charges Broadwind would soon take, considering the collective factual allegations it is "exceedingly unlikely." *Id.*

### V. CONCLUSION

**\*25** For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs claim that Broadwind and Defendant Drecoll engaged in deceptive practices with regards to the timing of the impairment write-down survives. All other claims are dismissed with prejudice.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1357699, Fed. Sec. L. Rep. P 96,811

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.