LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

KeyCite Yellow Flag - Negative Treatment

Distinguished by Carmignac Gestion, S.A. v. Perrigo Company PLC, D.N.J., July 31, 2019

2010 WL 3210613
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

LLDVF, L.P., Plaintiff,
v.
Robert J. DINICOLA, Francis M. Rowan, Peter
P. Copses, Andrew S. Jhawar, Linens Investors,
LLC, Apollo Investors, LLC, Lee S. Neibart, Brian
Pall, NRDC Real Estate Advisors I, LLC, Michael
A. Gatto, Silver Point Capital Fund Investments
LLC and Apollo Management V, L.P., Defendants.

Civil Action No. 09–1280 (JLL).
|
Aug. 12, 2010.

West KeySummary

1   **Securities Regulation** 🗝 Causation;
    Existence of Injury

    Investors failed to clearly identify the loss
    claimed, and also failed to clearly allege
    how the loss was caused by corporate board
    chairman's alleged misstatements and omissions,
    as required to support their claim of negligent
    misrepresentation in violation of the Securities
    Exchange Act. At oral argument investors'
    counsel stated the claim was based on the
    loss associated with the company's filing of
    bankruptcy and final conversion to liquidation,
    but that was not alleged in the indictment.
    Securities Exchange Act of 1934, § 18(a), 15
    U.S.C.A. § 78r(a).

**Attorneys and Law Firms**

William C. Cagney, Windels, Marx, Lane & Mittendorf, LLP, New Brunswick, NJ, for Plaintiff.

Liza M. Walsh, Hector Daniel Ruiz, Connell Foley, LLP, Roseland, NJ, Robert E. Levy, Scarinci Hollenbeck, Lyndhurst, NJ, for Defendants.

**Opinion**

LINARES, District Judge.

**\*1** This matter comes before the Court on a motion to dismiss Plaintiff's Amended Class Action Complaint filed by the "Management Defendants," [1] a motion to dismiss filed by the "Shareholder Defendants" [2] and "Non–Management Defendants," [3] and a motion to dismiss filed by Defendant Silver Point Capital Fund Investments LLC (collectively "Defendants"). Plaintiff's Amended Class Action Complaint asserts claims for violations of §§ 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78r and 78t, and negligent misrepresentation. Oral argument on the motions was heard on June 21, 2010. The Court has considered the submissions in support of and in opposition to the motions as well as the arguments from the June 21 hearing. For the reasons discussed below, all motions are granted.

1   Robert J. DiNicola and Francis M. Rowan.

2   Linens Investors, LLC, Apollo Investors LLC, Apollo Management V, L.P., and NRDC Real Estate Advisors I, LLC.

3   Peter P. Copses, Andrew S. Jhawar, Lee Neibert, Brian Pall, and Michael Gatto.

**I. BACKGROUND** [4]

4   The factual allegations pled in this case are voluminous. Only a small portion of them are necessary for resolution of the present motions. Therefore, in this section, the Court provides only a broad factual background of the case; specific facts necessary for the parties' arguments are included in each relevant discussion section.

Linens 'n Things, Inc. ("Linens") "is a wholly owned subsidiary of Linens Holdings Co." (Am.Compl.¶ 21.) Linens Holdings was formed "[i]n November of 2005 ... [by] affiliates of [Defendants] Apollo Management, L.P. ["Apollo"], National Realty & Development Corp. ["NRDC"] and Silver Point Capital Fund Investments LLC ["Silver Point"] (collectively, the "Sponsors")." (Id. at ¶ 41.)

**LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)**

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

Linens Holdings acquired Linens on February 14, 2006, in a leverage buyout transaction ("LBO"). (*Id.* at ¶¶ 2, 41.) The Sponsors, through a special purpose entity, Linens Investors LLC, collectively "owned 99.3% of the common stock of Linens as of March 1, 2007." (*Id.* at ¶¶ 29, 35.) Of this amount, the individual ownership shares of the Sponsors were as follows: Apollo, 69.79%; NRDC, 22.49%; and Silver Point, 7.72%. (Mem. of Law in Supp. of Def. Silver Point Capital Fund. Invs. LLC's Mot. to Dismiss Pl.'s First Am. Compl. at 5.)

"In connection with the LBO, Linens recapitalized and ... issued certain senior secured floating rate notes." (Am.Compl.¶ 2.) Plaintiff "purchased in the open market a total of $43,500,000 face amount" of these Notes between May 4, 2007, and November 16, 2007. (*Id.* at ¶¶ 23.) They were purchased at a substantial discount. (*See* Dec. of John W. Brewer in Supp. of Silver Point Capital Fund Invs. LLC's Mot. to Dismiss Pl.'s First Am. Compl. [hereinafter "Brewer Dec."], Ex. 2 (citing the Amended Complaint ¶¶ 175–76, 195–96, 221–22, 233, 244).) The Notes "are collateralized by substantially all of the Company's 'equipment, intellectual property rights and related general intangibles,' or most of the Company's 'longlived assets.' " (Am.Compl.¶ 2.) Plaintiff "has not sold any of the Notes." (*Id.* at ¶ 23.)

Defendant Richard DiNicola became the Chairman and Chief Executive Officer of Linens in February 2006. (*Id.* at ¶ 25.) Defendant Francis Rowan became Linens' Chief Financial Officer in April 2006. (*Id.* at ¶ 26.) Defendants DiNicola and Rowan signed Linens' 2006 and 2007 Form 10–Ks. (*Id.* at ¶¶ 25–26.) Defendants Copses, Jhawar, Neibert, Pall, and Gatto were members of Linens' Board of Directors and all signed Linens' 2006 10–K. (*Id.* at ¶¶ 27–28, 31–33.) All of these board members, except Mr. Gatto, also signed the 2007 10–K. (*Id.*)

**\*2** After the acquisition, Linens purported to be operating pursuant to a nine-year plan designed to turn the company around. (*See id.* at ¶ 7.) Plaintiff alleges that, "[d]espite a clearly poor macroeconomic environment, [Linens'] maintained that [the] ... turnaround plan was on track." (*Id.*) It further alleges that "[f]rom the time Linens was purchased in or about February 2006 until May 2, 2008, ... defendants portrayed Linens' financial condition significantly better than it was, to the detriment of noteholders such as [Plaintiff]." (*Id.* at ¶ 9.)

Linens filed for bankruptcy protection on May 2, 2008. (*Id.* at ¶ 279.) In October 2008, "the debtor-in possession ... moved to liquidate all of [Linens'] assets and cease operations." (*Id.* at ¶ 21.) Plaintiff's claims are based on its assertion that "Defendants were at least negligent in their communications to investors ... concerning [Linens'] financial condition and future prospects." (*Id.*) Defendants presently move to dismiss all of the claims.

## II. LEGAL STANDARD

For a complaint to survive dismissal under Rule 8, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plausibility standard is not akin to a "probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully;" mere consistency with liability is insufficient. *Id.* In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[;] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. It is the underlying specific facts alleged in a complaint that should be treated as true and evaluated.

## III. DISCUSSION

### A. Section 18 Claims

Plaintiff brings § 18 claims only against the Management Defendants and the Non–Management Defendants. However, because a primary securities law violation is an element of the § 20 claims asserted against all defendants, all defendants argue that the § 18 claims should be dismissed. Defendants argue that Plaintiff's § 18 claims should be dismissed either because the claims are time-barred or because the allegations pled in the Amended Complaint are insufficient to state a claim.

Section 18 provides:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement ..., which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading....

**\*3** 15 U.S.C. § 78r(a). Thus, a prima facie case under § 18 requires a plaintiff to plead: "(i) the defendant made a false or misleading statement, (ii) the statement was contained in a document 'filed' pursuant to the Exchange Act or any rule or regulation thereunder, (iii) reliance on the false statement, and (iv) resulting loss to the plaintiff." *In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 193 (1st Cir.2005); *see also Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.,* 454 F.3d 1168, 1171 (10th Cir.2006).

### 1. *Statute of Limitations*

Section 18 provides: "No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). Despite this language, the parties disagree over the applicable limitations period. Defendants argue that, pursuant to the language quoted above, it is one year. On the other hand, Plaintiff argues that the Sarbanes–Oxley Act extended the limitations period for § 18 claims to two years. The Court need not resolve this issue because, for the reasons discussed below, it finds that, using either period, Plaintiff's § 18 claims are not time

barred. [5] Therefore, for simplicity, the Court has used the more stringent one year limitations period in its discussion.

[5]     The Court does note that, for the reasons stated in *In re Able Labs. Sec. Litig.,* No. 05–2681, 2008 WL 1967509, at \*22–23 (D.N.J. Mar.24, 2008), the Court finds that the one year express statutory period is most likely appropriate absent specific allegations of fraud.

"A statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint." *B en ak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.,* 435 F.3d 396, 400 n. 14 (3d Cir.2006); *see also Lapin v. Goldman Sachs Group, Inc.,* 506 F.Supp.2d 221, 234 (S.D.N.Y.2006) ("[O]n a motion to dismiss, unless Defendants can produce uncontroverted evidence that irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.") (internal quotations omitted). But, although, at the motion to dismiss stage, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record," *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994), a Court may take judicial notice of some publicly available facts, such as newspaper articles, in addition to the allegations in the complaint, *Benak,* 435 F.3d at 401 n. 15. *See also Beverly Enters., Inc. v. Trump,* 182 F.3d 183, 190 n. 3 (3d Cir.1999) (holding that a court may consider "matters of public record" on a motion to dismiss without converting the motion to one for summary judgment). Although Defendants submitted numerous supplemental facts with their briefs, they particularly focus on various news reports and a letter from Plaintiff to Linens' management dated February 15, 2008. Plaintiff does not appear to oppose consideration of these items. Plaintiff filed an opposition to Defendants' submissions requesting that the Court not consider certain indices also provided by Defendants. In that opposition, Plaintiff did not address the news articles or the February 15 letter. The Court finds that consideration of the news reports and Plaintiff's letter are properly considered for purposes of this motion with converting it into one for summary judgment.

**\*4** The Supreme Court recently held that the limitations period for a securities fraud claim under 28 U.S.C. § 1658(b)(1) "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discover [ed] the

facts constituting the violation-whichever comes first." *Merck & Co., Inc. v. Reynolds,* —— U.S. ——, ——, 130 S.Ct. 1784, 1798, 176 L.Ed.2d 582 (2010) (alteration in original; internal quotations omitted). The Court further held that "discovery of facts that put a plaintiff on inquiry notice does not automatically begin the running of the limitations period." *Id.* (internal quotations omitted). The key is when the plaintiff did or should have discovered the *facts constituting the violation.* The parties in this case agree that this standard also applies to interpreting when the limitations period for a § 18 violation begins to run, except that, for a § 18 claim, a court must look to when the plaintiff did or should have discovered the *facts constituting the cause of action.* (*See* Surreply on *Merck & Co., Inc. v. Reynolds* at 1 (Plaintiff); June 21, 2010 Hearing Tr. [hereinafter "Tr."] 19:21–20–8 (Defendants).)

The core of Plaintiff's § 18 claims is that Defendants made misstatements involving impairment charges and vendor terms and relationships and omitted that there was doubt as to whether Linens could continue as a going concern. Overall, Defendants argue that Plaintiff was on actual and constructive notice of the causes of action related to these alleged misstatements and omission more than one year before filing of the original complaint on March 20, 2009. On the other hand, Plaintiff argues that it did not have all of the facts necessary to constitute the causes of action until Linens' bankruptcy filing on May 2, 2008. It further argues that its first real notice that there was a problem with its collateral was approximately May 15, 2008, when Linens took a 42% impairment charge on 120 stores. (*See* Am. Compl. ¶ 11; Tr. 29:4–14.) With respect to its claims related to vendor terms, Plaintiff asserts that a news report in early April, stating that Linens was not paying its vendors, was the first notice it had that the vendor relationships and terms had changed. It argues that, because of Defendants' assurances prior to these dates, it was not on notice of its claims prior to March 20, 2008, one year before the filing of its complaint.

Defendants specifically argue that Plaintiff was on actual notice of its claims before March 20, 2008, given that Linens' management informed it, in a meeting in October 2007, that half of the Linens' stores were unprofitable and that Linens had no plans to close the stores. Defendants assert that "[i]f [Plaintiff's] legal theory is, as [it] suggested, that impairment charges should have been taken for the underperforming stores even prior to the closing of the underperforming stores, a revelation that the number of underperforming stores increased to 305 out of 580 stores by October of 2007 ... goes to the issue of their notice of the impairment

charges." (Tr. 16:6–14.) On the other hand, Plaintiff asserts that "the Linens' representatives," including Mr. Rowan, stated at the October 2007 meeting that the "C" stores "were now benefiting from the narrowing and deepening of the merchandise strategy and from the commitment by new management to these ... stores." (Am. Compl. ¶ 226 (internal quotations omitted).) Plaintiff further alleges that, at the meeting, the Linens' representatives also stated that there were no current plans to close the stores "because stores take approximately four to five years to reach full profit potential and the Company added 140 new stores in the past three years, [and] management does not wish to close stores that eventually could be profitable." (*Id.* at ¶ 227.) Additionally, Plaintiff alleges that Linens represented at this meeting that "there was no change in vendor terms[,] [a]nd that the Company only received two calls from vendors in October 2007." (*Id.* at ¶ 228.) Finally, in support of its argument that it was reassured by these statements and not put on notice of any claims, it points out that it purchased more bonds after the meeting. (Tr. 28:11–13.)

**\*5** Defendants also argue that a February 15, 2008, letter from Plaintiff to Mr. DiNicola, Mr. Rowan, and the Linens' Board of Directors demonstrates that, at that time, Plaintiff was aware of the precarious financial situation of Linens and had all the facts constituting its claims. (Dec. of John W. Berry in Supp. of Shareholder Defs.' and Non–Mgmt. Defs.' Mot. to Dismiss [hereinafter "Berry Dec."], Ex. 6.) In the letter, Plaintiff stated that it "has become increasingly concerned with respect to Linens' operations and the steps Linens' management and its Board of Directors has taken (and more importantly, failed to take) to maximize value for Note holders." (*Id.,* at 1.) It asserted that Linens was being mismanaged and was operating under a "prohibitively high cost structure." (*Id.,* at 2.) It noted that the "Linens' store base includes numerous underperforming stores," and that, given "Linens' cash burn, Linens has not been able to pay down its working capital revolving credit facility and has added an incremental layer of permanent debt of $205.9 million into the Company's capital structure as of December 29, 2007." (*Id.*) The letter further stated that "[t]he Company is clearly in the zone of insolvency (if not already insolvent) and is obligated to act in the best interest of creditors." (*Id.*) It further states that "[t]he Company is currently unable to meet its fixed charges, burning cash, and layering on permanent debt which is destroying the value of the Company and the Noteholders' collateral." (*Id.*) Plaintiff noted that it has "repeatedly requested store level profitability information to help further analyze Linens'

deteriorating financial performance, but management has refused to provide this crucial information." (*Id.*) Lastly, Plaintiff demanded that Linens "reduce its cost structure by closing unprofitable stores immediately to minimize the cash burn and value erosion," that it cease paying management fees to Apollo, and that it recoup management fee "payments made since February 2006." (*Id.,* at 3.)

Defendants argues that this letter "paints a highly pessimistic picture of a struggling company," (Tr. 10:23–25), and that the letter makes clear that Plaintiff was on actual notice of the issues on which its Amended Complaint is based. On the other hand, Plaintiff states that it was merely expressing concerns, requesting information, and seeking answers-answers which subsequently were given and which reassured Plaintiff.

Defendants also argue that Plaintiff was on constructive notice of its claims prior to March 20, 2008, because of the steady stream of negative press, the steady decline in price of the Notes, the data publicly available in SEC filings, and the downgrading of Linens' credit rating by Fitch. Defendants argue that "[e]ven if [Plaintiff] thought that the management was being overly optimistic, there is no question that by December 3rd, 2007, Barrons, a financial publication, is not optimistic at all[;][i]t's saying that the company is amongst the worst LBOs, and that if the economy doesn't improve, that the equity owners could lose their entire investment." (Tr. 39:20–40:1; *see also* Berry Dec., Ex. 4.) Defendants provide numerous other news articles which state that Linens was struggling. (*See* Berry Dec., Exs. 1–6.) Additionally, on October 2, 2007, Fitch downgraded the issuer default rating of Linens to a "CCC," indicating increased risk of default. (*See id.* at Ex. 5.) But, the business wire article discussing the Fitch downgrading also stated that "the company is currently in the second half of the first phase of a three-phase turnaround plan which Fitch expects will improve the company's operating performance over time." (*Id.*) Finally, with regard to the allegations related to vendor terms, Defendants assert that "a decline in days payable outstanding was an indicator of tightening credit terms," and that Plaintiff "had all of the financial information necessary [prior to March 20, 2008] to calculate days payable outstanding because that is just a function of the accounts payable and cost of sales," which was publicly available. (Tr. 18:11–12, 23–25.) For all of these reasons, Defendants argue that Plaintiff was clearly on notice of the facts constituting its claims prior to March 20, 2008.

**\*6** Plaintiff counters that, although there may have been bad news, because of the misstatements and omissions and assurances from Linens' management, it was not aware of the severity of the situation until after March 20. In addition to the statements and allegations made by Mr. DiNicola and Mr. Rowan at the October 2007 meeting and other allegedly reassuring statements during 2007, Plaintiff focuses on a March 20 conference call in support of its position. On March 20, 2008, Mr. DiNicola and Mr. Rowan held a conference call with analysts and investors. On the call, Mr. DiNicola stated:

> In light of [the] challenges [facing Linens], and as we continue to plow ahead with our turnaround plans, we most certainly recognize that we need to address certain aspects of our financial performance. We know that the external environment is not going to improve any time in the near future. And in spite of all the progress that has been made on the operational side of the business, which is now relatively stable, we must now do more to affect the financial side of the equation going forward. Consequently, in those areas that we can control internally, we have developed a comprehensive plan of attack that will address certain expense categories that will help bring our cost structure more in line with our anticipated sales productivity.

(Am Compl. ¶ 260.) He also stated that "[t]he execution of the cost reduction plan is underway and we expect to yield savings from these initiatives in the second quarter and throughout the rest of the year." (*Id.* at ¶ 261.) Mr. Rowan stated that Linens "continue[s] to pay [its] vendors in an orderly manner under their normal customary terms." (*Id.* at ¶ 267.) Mr. Rowan further asserted that Linens' management "believe[d] that [its] cash flow from operations and availability under our credit facility is sufficient to fund our expected [capital expenditures], ... working capital needs ... includ[ing] ... our debt service obligations [through 2008]." (*Id.* at ¶ 269.) Finally, when asked if the Linens' auditors were going to issue a clean opinion, Mr. Rowan answered yes, indicating that there was not a going concern issue. (*Id.*) Plaintiff asserts that the price of the Notes rose in the days immediately after this call. (*Id.* at ¶ 272.)

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

One week after this call, however, the New York Post reported "that Linens has been delaying payments to vendors." (*Id.* at ¶ 273 (internal quotations omitted).) On April 8, 2008, both the Wall Street Journal and the New York Post reported that "Leon Black [of Apollo Management] may soon push the struggling retailer toward bankruptcy.' " (*Id.* at ¶ 274 (alteration in original). Then, "[o]n April 16, 2008, the New York Post reported that it had obtained a copy of DiNicola's 'January meeting notes' with Apollo, where he described [Linens'] situation as 'dire for a while' and under the heading 'Cash Flow,' he [wrote], 'No Volume = No Cash—Can't Pay Bills.' " (*Id.* at ¶ 277.) The article also stated that "Insiders say a planned Chapter 11 filing is expected to close laggard stores, but protect the company from liquidation." (*Id.*)

**\*7** Six weeks after the March 20 call, on May 2, 2008, Linens filed for bankruptcy. In connection with the bankruptcy, Mr. Rowan filed an affidavit stating that the turnaround plan was on hold. (*See* Tr. 34:7–12.) Then, in a May 15, 2008 filing, "the Company announced the closing of 120 underperforming stores and took $36.4 million in charges." (Am.Compl.¶ 11.) This charge "turns out to be a 42 percent charge on 120 stores." (Tr. 29:11.) Plaintiff argues that such a charge was "extremely high ... considering [that in] the quarter end of December 31 st, 2007, there was no charge whatsoever." (Tr. 29:12–14; *see also* Am. Compl. ¶ 10.) For all of 2007, Linens took an impairment charge of approximately three percent on all assets. (Am. Compl. ¶ 63; Tr. 33:19–20.) For 2006, the charge was approximately four and a half percent. (*See* Tr. 33:16–18.) Finally, in October 2008, "the debtor-in possession ... moved to liquidate all of its assets and cease operations." (Am.Compl.¶ 21.) Thus, Plaintiff argues that it did not know that the turnaround plan was going to be stopped until May 2, 2008, and that its collateral was severely impaired until at least mid-May.

Defendants reiterate that, prior to March 20, 2008, Plaintiff was "on notice [that] things [were] not so rosy." (Tr. 24:16–17.) But, this is not the issue here. There is no doubt that Linens was a distressed company and that Plaintiff knew this. Shortly before buying any of the Notes, Linens filed its 2006 10–K showing a loss of $154 million. Defendants state: "There was no question that from the get-go, Linens–n–Things' notes were junk bonds." (Tr. 78:24–25.) But, trading in distressed securities or notes does not mean that the purchaser has no protection when false or misleading statements conceal a more dire situation and the purchaser suffers losses as a result. Thus, the question here is not whether Plaintiff knew that Linens was continuing

to experience financial difficulty, but whether the situation was different than was reported, causing an economic loss to Plaintiff. In a situation like this, the Court finds that hard, fact-based assurances, like were given on the March 20 call, are more significant than the various news reports discussing and speculating on Linens' financial condition and the likelihood of turnaround. Even the article discussing the Fitch rating noted that the company's performance could improve over time. With respect to the February 15 letter, although it does highlight that Plaintiff had serious concerns about the management and financial condition of the company, the overall import of the letter is that Plaintiff wanted answers and wanted to see better financial management of the company. The Court agrees with Plaintiff that the subsequent March 20 call, while not addressing every point in the letter, did address the primary questions with seemingly hard facts about the company's financial situation, including that they had enough liquidity to meet obligations through 2008. Therefore, the Court finds that Plaintiff's claims are not time-barred.

### 2. *Sufficiency of the Allegations*

**\*8** Before addressing Defendants' specific sufficiency arguments, the Court notes the difficulty created for Defendants and the Court by Plaintiff's filing of a "shotgun" Amended Complaint. [6] The general allegations comprise 296 paragraphs on 92 pages. The three claims are stated on a mere 5 pages and each primarily incorporates by reference *all* of the general allegations. In opposing the present motions, Plaintiff repeatedly points out that Defendants, in their motions, focus on the wrong allegations; Plaintiff argues that many of the arguments that Defendants make are addressed to allegations that do not form the heart of Plaintiff's claims. Defendants' difficulty in responding to the Amended Complaint is unsurprising given its structure.

6    *See Opdycke v. Stout,* 233 Fed. App'x 125, 127 (3d Cir.2007) (unpublished) (noting that a "shotgun complaint usually creates a task that can be quite onerous for courts") (internal quotations omitted).

The basic pleading requirements of Rule 8(a) require that a complaint put the defendant on notice of the basis of the claims asserted against him. *See Twombly,* 550 U.S. at 1964. While, typically, a failure to satisfy Rule 8 occurs where few or only conclusory facts are pled, a complaint like Plaintiff's arguably also fails to satisfy this basic rule. Clearly, Plaintiff's Amended Complaint, standing alone, failed to put Defendants on notice of the basis of all of the claims against them. Plaintiff added some clarity through briefing and at oral

LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)
2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

argument, identifying the specific allegations in the Amended Complaint which form the basis for some of the claims. For example, Plaintiff has clarified that "the gravamen of the Section 18 complaint is the impairment charges and the lack of a going concern discussion." (Tr. 45:24–46:1.) Plaintiff also clarified that, "with regard to the non-managers," the negligent misrepresentation claims are limited to the 10–Ks, whereas for the Management Defendants, it encompasses the other misstatements alleged in the Amended Complaint. (Tr. 116:16–117:24.) However, such clarification still falls short of providing a clear, stationary, picture of the basis for the § 18 claims and the negligent misrepresentation claims as to each defendant.

For the reasons discussed below, this Court finds that causation has been insufficiently pled, and so dismisses Plaintiff's § 18 and negligent misrepresentation claims without prejudice to amend the complaint to cure the deficiencies. Because Plaintiff will have an opportunity to amend the complaint on this basis, rather than try to piece together all of Plaintiff's clarifying statements to fully evaluate the other elements of its claims, the Court finds that the better approach is to have Plaintiff amend these claims to clearly identify the basis for each claim as to each defendant. Not only will this assist the Court in determining if Plaintiff has stated a claim against each defendant, but it also will aid the Court in managing the case going forward if the amendment successfully cures the deficiencies. [7] But, because there has been extensive briefing and argument on many of the issues, the Court does reach some of the other legal arguments made by the parties. These issues will not be re-visited by the Court in any subsequent motion practice except to the extent of applying the holding to any new facts alleged by Plaintiff in an amendment.

[7] The Court acknowledges that Plaintiff has pled many detailed factual allegations which may sufficiently support most elements of its claims, but neither the Court nor Defendants should be required to sift through a tome of allegations to piece together those claims. *See Albrechtsen v. Board of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir.2002) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotations omitted).

*Causation*

**\*9** To demonstrate loss causation in a securities fraud case, "the plaintiff must show that the defendant misrepresented

or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.* 494 F.3d 418, 426 (3d Cir.2007). In other words, a plaintiff must "allege[ ] sufficient facts to show that the alleged misrepresentations proximately caused the claimed loss." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 185 (3d Cir.2000); *see also Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) ("[T]o establish loss causation, a plaintiff must allege ... that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (internal quotations omitted).

Defendants assert that Plaintiff must show that the alleged misstatements and omission resulted in the economic loss claimed. To do so, Defendants argue that Plaintiff must plead that there was a specific corrective disclosure that caused the loss, and that Plaintiff must plead enough facts for a fact finder to be able to apportion how much of the loss is attributable to the claims as opposed to other factors. They argue that, in this case, any decline in the price of the Notes was caused by economic and market conditions and not by any alleged misstatement or omission.

Plaintiff argues that the bankruptcy, subsequent additional charges, and, finally, the liquidation may constitute sufficient "corrective disclosures" for purposes of pleading causation. This Court agrees. *See In re Enron Corp Sec., Derivative & "Erisa" Litig.,* No. MD L–1446, 2005 WL 3504860, at * 16 (D.Tex. Dec.22, 2005); *see also Livid Holdings Ltd. v. Salomon Smith Barney,* 416 F.3d 940, 949 (9th Cir.2005) (holding that causation was sufficiently plead where the plaintiff pled that "Defendants misrepresentation concealed PCI's financial situation" and "[a]s a result of its dire financial situation, PCI eventually went bankrupt, which caused [the plaintiff] to lose the entire value of its investment in PCI."). This Court also agrees with Plaintiff that, to survive a motion to dismiss, Plaintiff need not allege facts identifying how much loss is attributable to its claim versus other factors so long as it alleges sufficient facts from which a reasonable fact-finder could find that some loss is attributable to the claim. *See Semerenko,* 223 F.3d at 186–87 ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery."); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003) ("[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established.

LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *In re Countrywide Fin. Corp. Sec. Litig.,* 588 F.Supp.2d 1132, 1174 (C.D.Cal.2008) (The "issue [on a motion to dismiss] is *whether* the alleged securities violations caused a loss[,][n] ot *how much* of the loss the alleged violations proximately caused.") (emphasis in original).

**\*10** Although the Court agrees with Plaintiff's general propositions, the Court finds that Plaintiff has failed to adequately plead causation. The Amended Complaint alleges:

- When the truth was finally revealed by Linens' abrupt filing for bankruptcy protection on May 2, 2008, plaintiff was damaged significantly by the resulting loss in value of the Notes. (Am.Compl.¶ 303.)

- As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damage in connection with its purchase of the Notes in 2007. (*Id.* at ¶ 304.)

At oral argument, Plaintiff appeared to concede that the Amended Complaint failed even to clearly identify the loss claimed. Plaintiff's counsel stated that Plaintiff was "not making a claim on the [$]94 to the [$]40" price drop, but, rather, that it was "making a claim [on the loss associated with] the filing of the bankruptcy, then the impairment charges, and then finally the conversion to liquidation." (Tr. 120:19–22.) This is not alleged in the Amended Complaint. Since this loss is not alleged, it follows that the Amended Complaint also fails to clearly allege how the loss was caused by the alleged misstatements and omissions. Therefore, Plaintiff's § 18 claims are dismissed; Defendants' motions are granted.

*False Statements*

Defendants also argue that the § 18 claims should be dismissed because "[t]he complaint does not plead that Defendants made a materially false or misleading statement with particularity as required by the PSLRA." (Mem. of Law in Supp. of Mot. of [the Management Defs.] to Dismiss the Compl. for Failure to State a Claim Upon Which Relief Can Be Granted, at 15.) The Private Securities Litigation Reform Act ("PSLRA") provides:

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). Thus, for a § 18 claim, the PSLRA "requires the complaint to specify (1) each statement alleged to have been misleading, (2) the reason why the statement is misleading, and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Deephaven* 454 F.3d at 1172–73. Additionally, "[t]he PSLRA requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Winer Family Trust v. Queen,* 503 F.3d 319, 335–36 (3d Cir.2007).

**\*11** Defendants argue that the statements focused on by Plaintiff are non-actionable, forward-looking statements. With respect to impairment charges, if properly pled, the Court disagrees. A statement that impairment charges were three percent when it is alleged that they should have been higher is not vague, forward-looking, or a mere optimistic statement. On the other hand, for example, the Court agrees with respect to a statement that vendor relationships are "strong and diverse." The words strong and diverse could mean many different things. Such a statement is different from saying that vendor credit terms remained the same as last year, when in fact they did not, or that vendors are being paid on time, when they are not.

Additionally, even if Plaintiff identifies an actionable statement, it also must allege the basis for its belief that the statement was false or misleading. To this end, Plaintiff may not rely solely on a subsequent write-down or a statement that numbers or terms have now changed. *See, e.g., Davidco Investors, LLC v. Anchor Glass Container Corp.,* No. 04CV2561T–24EAJ, 2006 WL 547989, at * 16– 17 (M.D.Fla. Mar.6, 2006). But, the Court disagrees with Defendants that Plaintiff must state exactly how the amounts were calculated incorrectly, or that it must specify what the correct amounts should have been, so long as Plaintiff makes allegations from which a reasonable fact-finder could

**LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)**

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

determine that the statements were incorrect when made. *See In re Campbell Soup,* 145 F.Supp.2d 574, 593 (D.N.J.2001); *see also Davidco Investors,* 2006 WL 547989, at * 17. Therefore, in any amendment, Plaintiff must clearly identify which specific statements form the basis of its § 18 claims, the reason why it believes the statements are misleading or false, and the basis for that belief.

*Reliance*

Defendants argue that Plaintiff also has insufficiently pled actual reliance. The Third Circuit has held that, under § 18, a plaintiff must "plead actual reliance on specific statements contained in the SEC filings at issue." *In re Suprema Specialities, Inc. Sec. Litig.,* 438 F.3d 256, 283 (3d Cir.2006). In *Suprema,* the Third Circuit found that allegations that simply stated that Plaintiffs "received, reviewed, actually read, and relied upon various Form 10–Q filings and the 2000 and 2001 Form 10–K filings" were insufficient where the allegations did not identify the specific false statements relied on. *Id.* at 284 (internal quotations omitted).

Here, Plaintiff alleges that it "read and relied upon the Company's Form 10–K and the financial statements contained therein, not knowing that they were false and misleading." (Am.Compl.¶ 300.) Plaintiff further alleges that it "[s]pecifically ... relied on, among other statements and figures: the reported values of long-term assets, including Property and equipment, net, Goodwill, and identifiable intangible assets, net, and impairment charges (or lack thereof) related to such." (*Id.*) This allegation appears directed only at the allegations of misstatement of the impairment charges, not the other alleged misstatements or omissions. At oral argument, Plaintiff highlighted paragraph 168 of the Amended Complaint which identifies a statement regarding vendor relationships. Plaintiff did not point to any allegation, however, that it actually relied on this statement. Additionally, identifying categories of items relied on, as Plaintiff did in paragraph 300 of the Amended Complaint, is not the same as identifying a "specific false statement." *See Witriol v. Conexant Sys., Inc.,* No. 04–6219, 2006 WL 3511155, at * 7 (D.N.J. Dec.4, 2006) ("Plaintiffs allege reliance on false statements, but state only generalizations about the subject matter of the statements[;][n]o specific false statements are identified.") As noted above, the voluminous Amended Complaint highlights numerous statements made in SEC filings as well as statements by Linens' management, all of which it generally alleges were false or misleading. As noted above, Plaintiff does not, however, identify which statements form the basis for each claim against each defendant. Nor does

it state that it actually relied on those specific statements. Any amendment should clearly identify the specific statements which form the basis of Plaintiff's § 18 claims and on which Plaintiff actually relied.

**B. Section 20 Claims**

**\*12** Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, to state a prima facie § 20 claim, a "plaintiff must prove [1] that one person controlled another person or entity and [2] that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema,* 438 F.3d at 284. All defendants argue that Plaintiff's § 20 fails because it has failed to properly state a claim for a primary violation of the securities laws. Alternatively, Defendants Silver Point and NRDC argue that the § 20 claim against them must fail because Plaintiff has insufficiently pled that they are control persons under the statute. Also alternatively, all defendants except Mr. DiNicola and Mr. Rowan argue that the § 20 claim must fail because Plaintiff was required to plead culpable participation and failed to do so.

Because this Court has dismissed Plaintiff's § 18 primary violation claims, the Court grants all defendants' motions to dismiss the § 20 claim on that basis. However, for reasons of judicial economy, given that the alternative arguments have been fully briefed and argued and will be re-presented based on any amended complaint, the Court alternatively finds that the § 20 claims against Silver Point and NRDC also should be dismissed for failure to sufficiently plead that these entities are control persons.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

"Control under [§ 20] is defined as the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise ." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 308 F.Supp.2d 249, 273 (S.D.N.Y.2004) (quoting 17 C.F.R. § 240.12b–2) (internal quotations omitted). "Allegations of control under this section must be substantial because ... § 20(a) imposes liability on a party that is not a primary violator of the Exchange Act." *Id.* at 274. Therefore, "when a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred." *Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp.,* 941 F.Supp. 1369, 1378 (S.D.N.Y.1996). Finally, as noted above, each defendant's control must be evaluated separately unless there is some basis on which to consider their collective action. As Defendants point out, a contrary holding would mean that any shareholder, no matter how small, could be grouped with others to form a majority control group, even absent any allegations or facts supporting that shareholder's actual control.

The Third Circuit has found a § 20 claim adequately pled where the allegations "detailed the manner in which [the defendants] ... tightly controlled [the] business and operations." *In re Suprema,* 438 F.3d at 286. Allegations of control also have been found to be sufficient where a minority shareholder was "intimately involved in the drafting and publication of the offering materials at issue." *In re Proxima Corp. Sec. Litig.,* No. 93–1139, 1994 WL 374306, at * 14 (S.D.Cal. May 3, 1994); *see also In re Flag Telecom,* 308 F.Supp.2d at 274 (finding allegations against certain defendants sufficient where the "plaintiff has established that they had significant power within [the company] and controlled the content and dissemination of the allegedly false and misleading statements").

 **\*13**  On the other hand, allegations of control have been found to be insufficient where the plaintiff merely alleged that the defendant owned thirty percent of the voting stock and selected three of nine board members. *In re Flag Telecom,* 308 F.Supp.2d at 273–74 (holding that while such facts may establish influence over the company, "they [did] not create the inference that [the defendant] could control [the company]"); *see also In re Global Crossing, Ltd. Sec. Litig.,* No. 02–910, 2005 WL 1881514, at * 13 (S.D.N.Y. Aug.5, 2005) (dismissing § 20 claims against minority shareholders who had a right to appoint only one member of the twelve member board of directors and holding that "a party's

ability to appoint or elect a director to the board [does not] constitute control of the company by the party appointing that director"); *Sloane,* 941 F.Supp. at 1379 (holding that an 8% ownership interest was insufficient to plead control even where the defendant had a vice president on the board, was an underwriter for the offering at issue, and was a creditor at formation because the facts did not "support a reasonable inference that [the defendant] had the potential power to influence and direct the activities of [the company]").

Here, the parties agree that Defendant Apollo owned approximately 70% of the shares of the entity that controlled Linens. NRDC and Silver Point were minority shareholders, owning 22% and 8% of the shares, respectively. Plaintiff points to a Management Services Agreement between Linens and the Sponsors which refers to the Sponsors as "managers." (Mem. of Law in Opp'n to the Mot. of Def. [Silver Point] to Dismiss Pl.'s First Am. Compl. at 24–25; Am. Compl. ¶ 53.) But, the Management Services Agreement does not provide that any of the Sponsors will control or direct the operational activities of Linens. (See Brewer Dec., Ex. 4, Management Services Agreement.) Rather, it outlines various *advisory* services that the Sponsors, particularly Apollo, will provide. (*Id.*) In addition, the Linens Investors LLC Agreement specifically states that its members (including Silver Point and NRDC) "shall have not part in the management of the LLC." (Reply Mem. of Law in Further Supp. of Def. [Silver Point's] Mot. to Dismiss Pl.'s First Am. Compl. at 7–8 (quoting Brewer Dec., Ex. 3, LLC Agreement, at ¶ 7(a)).)

The Amended Complaint makes no specific allegations about NRDC's or Silver Point's control over Linens, instead it refers to the Sponsors as one unit. In fact, at oral argument, Plaintiff's counsel admitted that there was no management responsibility for NRDC or Silver Point under the agreements. On the other hand, the Amended Complaint does allege that Apollo received weekly flash reports from Linens' management, and that it spoke with Mr. DiNicola almost daily. (Am.Compl.¶¶ 137–38.) Apollo also had the right to appoint a majority of the Board of Directors. NRDC and Silver Point only had the right to appoint a minority of directors—two for NRDC and one for Silver Point. Additionally, although the Amended Complaint makes the conclusory allegation that NRDC and Silver Point controlled their respective directors, there are no factual allegations supporting this general statement. Defendants' counsel asserted at the June 21 hearing that Mr. Gatto and Mr. Niebert, directors appointed by Silver Point and NRDC,

**LLDVF, L.P. v. Dinicola, Not Reported in F.Supp.2d (2010)**

2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

respectively, were not partners at the defendant firms but were employees or partners only at affiliates of the defendants. (*See* Tr. 53:15–23, 58:4–59:2.) Plaintiff's counsel did not dispute these assertions. (*See, e.g.,* 68:1–6.) Finally, there is no allegation of a voting agreement between the Sponsors, and there is no allegation that NRDC or Silver Point were responsible for or controlled the drafting of the 10–Ks at issue. Therefore, the Court, alternatively, finds that Plaintiff has not sufficiently plead that NRDC and Silver Point were control persons under § 20.

 **\*14** Finally, there is a split in the district courts as to whether, to survive a motion to dismiss, a plaintiff must plead culpable participation for a negligence-based § 18 claim in addition to pleading a primary violation and control. *Compare In re Able Labs. .,* 2008 WL 1967509, at \*29 (pleading not required), *with WM High Yield v. O'Hanlon,* No. 04–3423, 2005 WL 1017811, at \*9 (E.D.Pa. Apr.29, 2005) (pleading required). Additionally, even some courts that do require culpable participation to be pled have held that "pleading control of a defendant that is alleged to be a primary violator generally suffices to establish 'culpable participation' within the meaning of [§ 20] at the pleading stage." *In re Flag Telecom,* 308 F.Supp.2d at 272.

Here, Defendants acknowledge that, "[w]ith respect to the individual directors [,] ... [e]ssentially the culpable participation and the primary violation are the same." (Tr. 65:21–23.) Thus, Defendants appear not to really argue that Plaintiff has not adequately pled culpable participation against these defendants, even if required. The Court agrees that pleading that a defendant signed a SEC filing which is alleged to have been a primary violation by a control person is sufficient. And, because Mr. DiNicola and Mr. Rowan do not challenge the § 20 claim on this basis, and the Court has found that Plaintiff has not sufficiently pled that NRDC and Silver Point are control persons, the argument that culpable participation has not adequately been pled essentially applies only to Defendant Apollo. Apollo does not challenge that it is a control person within the meaning of the statute. Additionally, Plaintiff has alleged a high degree of involvement by Apollo in the management of Linens, including daily communication with senior management. Apollo owned approximately seventy percent of the shares and appointed a majority of the board of directors. The Court finds that these allegations against Apollo are sufficient at

this stage, even if some pleading of culpable participation is required.

### C. Negligent Misrepresentation Claims

Plaintiff asserts its negligent misrepresentation claims only against the Management Defendants and the Non–Management Defendants. To establish a cause of action for negligent misrepresentation in New Jersey, a "plaintiff must establish that the defendant negligently made an incorrect statement of a past or existing fact, that the plaintiff justifiably relied on it and that his reliance caused a loss or injury." *Masone v. Levine,* 382 N.J.Super. 181, 887 A.2d 1191, 1195 (N.J.Super.Ct.App.Div.2005) (citing *Kaufman v. i-Stat Corp.,* 165 N.J. 94, 754 A.2d 1188, 1195 (N.J.2000). As noted above, Plaintiff's Amended Complaint fails to identify which statements in its voluminous Amended Complaint form the basis of this claim against each defendant. Based on statements made at the June 21 hearing and in Plaintiff's briefs, Plaintiff's negligent misrepresentation claim against the Non–Management Defendants appears to be based only on statements in the 10–Ks, 2006 and 2007, which each, except Mr. Gatto, signed. The Court assumes that all other misstatements alleged throughout the Amended Complaint form the basis of the claims against the Management Defendants. In any amendment, Plaintiff must make clear which statements form the basis for these claim against each defendant. Additionally, as with the § 18 claim, Plaintiff's failure to identify the loss on which its claims are based means that it also has failed to sufficiently plead causation for these claims. Again, it follows that it also has failed to sufficiently plead how the alleged misstatements caused its loss. Therefore, Defendants' motions to dismiss the negligent misrepresentation claims are also granted.

### IV. CONCLUSION

 **\*15** For the foregoing reasons, the Management Defendants', the Shareholder and Non–Management Defendants', and Silver Point's motions to dismiss are granted. All claims are dismissed without prejudice. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3210613, Fed. Sec. L. Rep. P 95,839

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.