Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

KeyCite Yellow Flag - Negative Treatment
Disagreed With by   Faye L. Roth Revocable Trust v. UBS Painewebber, Inc., S.D.Fla.,   March 30, 2004

2003 WL 21960357
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

PREMIER CAPITAL MANAGEMENT, L.L.C., a Virginia Limited Liability Company, et al., Plaintiffs,

v.

Larry COHEN, Individually, Brian Flanagan, Individually, Wan Hee Kim, Individually, Jung Koh, Individually., et al., Defendants.

No. 02 C 5368.
|
Aug. 15, 2003.

*MEMORANDUM OPINION & ORDER*

GOTTSCHALL, J.

**\*1**  Plaintiffs Premier Capital Management, LLC ("Premier Capital"), TMB, LLC and Xen Investors, LLC have sued defendants Xentex Technologies ("Xentex"), Xentex's officers and/or directors Larry Cohen, Brian Flanagan, Wan Hee Kim and Michael Turcotte, Ron Falese, a Xentex shareholder, Northview Bank and Trust, and the bank's president Blair Robinson, claiming that defendants violated federal and state securities laws, as well as several state statutory and common laws. Before the court are two motions to dismiss: the motion of defendants Xentex, Cohen, Kim, Turcotte and Falese (the "Xentex defendants") to dismiss the federal claims raised against them in the second amended complaint ("complaint" or "SAC"), and defendant Flanagan's motion to dismiss the federal claims against him. Although both Flanagan and the Xentex defendants have moved to dismiss all claims against them, this order pertains only to the federal claims raised in Counts 1–3, 8–10, and 24–26 against Xentex, Turcotte and Kim, respectively, [1] and the federal claims against Flanagan in Counts 17–19. Plaintiffs seek relief under both § 10(b) of the Exchange Act of 1934, 15 U.S.C. 78j(b), and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. 77*l*(a)(2). For example, plaintiffs bring a claim against Xentex for allegedly violating § 12(a)

(2) in Count 1 and for violating § 10(b) in Counts 2 and 3. [2] Plaintiffs follow the same pattern in their claims against Turcotte, Kim, and Flanagan. Plaintiffs also seek to impose control-person liability against Turcotte, Kim, and Flanagan. [3] The court assumes they bring their control-person liability claims under both § 15 of the Securities Act, 15 U.S.C. § 77*o*, and § 20 of the Exchange Act, 15 U.S.C. § 78t. The Xentex defendants and Flanagan seek dismissal of all the federal securities claims under Fed.R.Civ.P. 12(b)(6), asserting primarily that plaintiffs failed to satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, as well as the requirements of Fed.R.Civ.P. 9(b). They also argue that § 12(a)(2) is inapplicable to the securities offering at issue. Additionally, Flanagan argues that plaintiffs fail to plead violations of either § 12(a)(2) or § 15 against him.

[1]   At the Xentex defendants' request, the court allowed them to bifurcate briefing and address first the counts alleging violations of the federal securities laws. Of the Xentex defendants, only Xentex, Turcotte, and Kim face claims for violations of the federal securities laws.

[2]   Actually, plaintiffs' complaint states only that Count 1 asserts a violation of the Securities Act whereas Counts 2 and 3 asserted violations of the Exchange Act–they do not specifically refer to Section 12(a)(2) or Section 10(b) anywhere in the pleading.

[3]   Plaintiffs do not raise the control-person liability claims in separate counts. Additionally, as with the other federal securities claims, plaintiffs do not specifically refer to the section number that was allegedly violated.

For the reasons explained below, the claims against Xentex, Turcotte, Kim, and Flanagan under § 10(b) and § 20 of the Exchange Act are hereby dismissed, as is the § 12(a)(2) claim against Flanagan. The § 12(a)(2) claims against Xentex, Turcotte and Kim survive, however, as do the control-person liability claims against Turcotte, Kim and Flanagan under § 15.

*Background*
According to the complaint, plaintiffs made two investments in Xentex, the first through a stock purchase, the second

2003 WL 21960357

in the form of a promissory note. Xentex, through its CEO Jeff Batio and its Vice Chairman and Executive Vice President Douglas Tucker, presented plaintiffs with an opportunity to invest at a meeting on November 1, 2000. At that time, Xentex was in the process of developing and launching a flip-pad computer known as the Voyager. During that meeting, plaintiffs received an Information Statement dated November 1, 2000 ("Information Statement"), which contained numerous representations relating to Xentex, the Voyager computer, and Xentex's plans for launching the Voyager into the market. In reliance on the representations made in the Information Statement, as well as certain oral representations made by Batio and Tucker at the November 1st meeting, plaintiffs invested more than $3.3 million in Xentex stock. Subsequently, on June 4, 2001, after certain additional representations by various members of Xentex's Board of Directors, plaintiffs loaned Xentex $650,000 in return for a promissory note. Plaintiffs now claim that the representations made in the Information Statement, the oral representations made at the November 1st meeting, and the representations made in connection with the execution of the promissory note were false, and that as a result, defendants have violated federal securities laws as well as numerous state statutory and common laws. Flanagan and the Xentex defendants have moved to dismiss.

*Analysis*

 **\*2**  In evaluating the motions to dismiss, the court accepts all of plaintiffs' well-pled allegations in the complaint as true and draws all reasonable inferences in plaintiffs' favor. *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 675 (7th Cir.2000). The court need " 'not strain to find inferences favorable to the plaintiffs' which are not apparent on the face of the complaint," however. *In re Allscripts, Inc. Secs. Litig.,* No. 00 C 6796, 2001 WL 743411, \*4 (N.D. Ill. June 29, 2001) (quoting *Coates v. Ill. State Bd. of Ed.,* 559 F.2d 445, 447 (7th Cir.1977)). To the extent plaintiffs raise securities fraud claims under § 10(b), they must meet the heightened pleading requirements of Rule 9(b) as well as § 78u–4(b) in order to state a claim for fraud. Under Rule 9(b), a plaintiff must plead "the circumstances constituting fraud ... with particularity." *In re HealthCare Compare Corp. Secs. Litig.,* 75 F.3d 276, 281 (7th Cir.1996). In other words, a plaintiff must allege "the who, what, when, where and how" of the fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Since the enactment of the PSLRA in 1995, the pleading requirements for claims under the Exchange Act are now even higher: the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement

is misleading...." 15 U.S.C. § 78u–4(b)(1)(B). Additionally, with respect to each alleged misrepresentation or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2). These two requirements are closely related. The PSLRA requires, in the absence of direct evidence of falseness and scienter, the pleading of facts which justify a strong inference of both elements. *See In re Navarre Corp. Secs. Litig.,* 299 F.3d 735, 744 (8 [th] Cir.2002).

The heightened pleading requirements imposed by the PSLRA do not apply to plaintiffs' claims under § 12(a) (2), however. Although the PSLRA amended both the Securities Act and the Exchange Act, the heightened pleading requirements imposed by § 78u–4(b) apply only to claims brought under the Exchange Act. *In re Adams Golf, Inc. Secs. Litig.,* 176 F.Supp.2d 216, 230 (D.Del.2001); 15 U.S.C. § 78u–4(b).

With these pleading requirements in mind, the court turns to the counts at issue.

I. *Claims Under Section 10(b) and Section 20 of the Exchange Act of 1934*

A. § 10(b) Claims Against Xentex: Counts 2 and 3

1. For Claims under § 10(b), Plaintiffs Must Identify Specific False Statements and Provide the Reasons Why Each Statement is Misleading.
To state a claim under § 10(b) of the Exchange Act for a violation of Rule 10b–5, 17 C.F.R. § 24010b–5, a plaintiff must plead that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff has relied, and (6) that reliance proximately caused plaintiff's injuries." *HealthCare,* 75 F.3d at 280. Moreover, as explained above, plaintiffs must satisfy the pleading requirements imposed by the PSLRA: they must not only specify each statement they claim was misleading, they must also allege "the reason or reasons why [each] statement is misleading." 15 U.S.C.A. § 78u–4(b)(1)(B). Claiming that a particular statement was untrue is not enough–plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue. *Clark v. TRO Learning, Inc.,* No. 97 C 8683, 1998 WL 292382, at \*4 (N.D.Ill. May 20, 1998).

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

**\*3** Plaintiffs in this case fail to state claims under § 10(b) against Xentex because the complaint is woefully deficient under the PSLRA.[4] Although plaintiffs identify numerous specific statements that they believe were misleading, they repeatedly fail to provide "the reason or reasons why [each] statement is misleading." 15 U.S.C.A. § 78u–4(b)(1)(B). Further, in the few instances where plaintiffs provide the reasons why a particular statement was false, they fail to plead scienter adequately.

[4]     The court need not address whether plaintiffs satisfied Rule 9(b). The PSLRA requires at least as much and more.

Plaintiffs specifically identify the following representations from the Information Statement as false:

(1) Xentex had $5.3 million in assets, including $4.25 million in tooling;

(2) Korean Data Systems ("KDS") had agreed to open a service center for warranty & repair services;

(3) Xentex expected to launch the Voyager in fourth quarter of 2000;[5]

[5]     This representation is a forward-looking statement. Such a prediction is not actionable unless plaintiffs alleged that Xentex lacked a reasonable basis for making it. *Zoghlin v. Renaissance Worldwide, Inc.,* No. 99 C 1965, 1999 WL 1004624, at \*6 (N.D.Ill. Nov. 4, 1999).

(4) KDS had provided approximately $40 million for product financing; and

(5) KDS had agreed to pay for all further product development and tooling costs.

(SAC at ¶ 20(a-e)). According to plaintiffs, the first statement was false because Xentex never had those assets, and the third statement was false because at the time, "Defendant was in a position wherein said launch was impossible," (*id.* ¶ 23). These are not adequate allegations of *why* the subject statements were false: plaintiffs merely allege that the statements were false because the opposite was true. These are conclusory allegations, not facts. As for statements 2, 4, and 5, plaintiffs offer no reasons whatsoever explaining why those representations were false.[6] Plaintiffs have failed to state a securities fraud claim based on the representations in the Information Statement.

[6]     Indeed, with respect to statement 4, there is not even an allegation that the statement was false, let alone an explanation of why it was false.

Plaintiffs also allege that Batio and Tucker made oral misrepresentations during the November 1st meeting. The purported oral misrepresentations were that:

(1) Xentex had made all necessary production arrangements with KDS for mass production;

(2) KDS had completed the tooling required to mass produce;

(3) all conditions precedent for production of the computers had been completed and any money sought was for marketing;

(4) the computer presented at the meeting was manufactured and produced by KDS; and

(5) there were no lawsuits pending against Xentex.

(SAC ¶¶ 34(a-e).) For present purposes, the court assumes each of these statements would be actionable if properly pled. But neither of the first two statements is properly pled. According to plaintiffs, the first statement was false because the arrangements have never been completed and the computers have never been mass-produced, again nothing more than the conclusion that the the opposite of the statements was true. Moreover, the fact that the computers have never been mass produced does not mean that the necessary production arrangements were never made. As for the second oral statement, plaintiffs claim it was false, but offer no reason why, again failing to satisfy the PSLRA requirements.

**\*4** Plaintiffs' pleading marginally improves with respect to the remaining three oral statements. They allege the third oral statement was false because the funds plaintiffs invested were not used for marketing, but rather were used "to pay off unrelated past debt and to purchase automobiles for Mr. Batio, pay his rent, fund his vacations and for other inappropriate purposes," (SAC ¶ 37). These allegations, which purport to be based on direct knowledge,[7] are suspiciously vague; if plaintiffs have such evidence, one would think they would describe with some particularity what debt, what automobiles, what vacations, and what "other inappropriate purposes" they are referring to. In any event, even if the alleged "facts"

are specific enough to show why the representation was false, they do not provide a basis for inferring that the representation was false at the time it was made. " '[O]ften there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." ' *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245, 1260 (10th Cir.2001) (quoting *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548–49 (9th Cir.1994)). As for the statements concerning the origin of the computer and the lack of any pending lawsuits, plaintiffs probably adequately allege the falsity of those statements. However, for reasons explained below, even if the allegations regarding each of the last three oral statements satisfy the "why" requirement of the PSLRA, they fail to satisfy the Act's scienter prong.

7      If these allegations are based on information and belief rather than direct knowledge, plaintiffs have failed set out "with particularity all facts on which that belief is formed" as required by the PSLRA. 15 U.S.C. § 78u–4(b)(1)(B).

Additionally, plaintiffs raise a claim against Xentex under § 10(b) based on allegedly untrue representations made to induce plaintiffs to loan Xentex $650,000 in June 2001 pursuant to a promissory note. [8] Plaintiffs plead that:

8      Plaintiffs allege, and defendants at this stage do not contest, that this loan constituted a sale of securities within the meaning of the Exchange Act.

(1) Kim tendered a production schedule dated March 21, 2001, which represented that Xentex had the ability to mass produce Voyager computers at that time;

(2) Xentex, through Tucker, tendered a memo dated April 5, 2001 to plaintiffs representing that Xentex had made all arrangements to possess seventy prototypes from Asia within 3 weeks from the date of the memo;

(3) Xentex, through Batio, informed plaintiffs in May 2001 that the Voyager computers were essentially complete and assembled;

(4) Xentex, through defendant Brian Flanagan, advised the plaintiff that the company was able to pay its bills and was not financially depleted;

(5) Xentex, through Flanagan, advised plaintiff that no engineering or mechanical defects existed regarding the computers and that Xentex was being properly managed; and

(6) Xentex, through Batio, advised plaintiffs that the money tendered pursuant to the promissory note would be used for marketing purposes only, as the computers were assembled and complete.

**\*5** (SAC ¶¶ 53–59.) Plaintiffs' allegations regarding statements 2, 3 and 4 are deficient under the PSLRA's pleading requirements because they failed to plead any specific facts showing the falsity of those statements at the time they were made.

As for the first statement, plaintiffs allege that the statement that Xentex was capable of mass producing Voyager computers was false because Xentex, to date, has never mass-produced the computers. (*Id.* ¶ 61.) As explained above, the fact that Xentex has not mass-produced the computers does not mean that it was never capable of doing so, and thus does not support the inference that the statement was false when made. Plaintiffs also attempt to show the falsity of the first statement by alleging that the production schedule Kim gave them "failed to accurately disclose Xentex['s] ability to mass-produce the Voyager computers." (*Id.* at 62.) Plaintiffs have again merely stated that the production memo was untrue, without providing facts showing why it was untrue.

The allegations regarding the falsity of the fourth statement also falter. According to the complaint, Flanagan's statement that the company was able to pay its bills and was not financially depleted was false because in fact, Xentex was deeply in debt, underfunded, and a defendant in numerous lawsuits based on its failure to pay its bills. (*Id.* ¶ 60.) The allegation that Xentex was deeply in debt and underfunded is conclusory. The allegation that Xentex was a defendant in numerous lawsuits based on its failure to pay its bills is more specific, but the court cannot infer from this allegation that the company was underfunded. Plaintiffs give no information about the lawsuits in question. [9] For that matter, a claim for $1000 or even $100,000, without more, does not show that a company is underfunded.

9      It seems odd that plaintiffs know enough to allege that two lawsuits were pending, yet entirely fail to identify or describe them.

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)

2003 WL 21960357

According to plaintiffs, the sixth statement, Batio's representation that the money loaned pursuant to the promissory note would be used only for marketing purposes, was false because Xentex actually used the money to pay past due bills and to pay for Batio's living expenses, car payments, and vacations. Those vague allegations do not provide any basis for inferring that the sixth statement was false at the time it was made. *City of Philadelphia,* 264 F.3d at 1260. Whether the sixth statement adequately explains why the statement was false when made is therefore questionable. But even assuming the complaint adequately alleges why the fourth and sixth statements were false, plaintiffs have failed to satisfy the PSLRA's requirements for pleading scienter in connection with those statements.

2. *The Complaint Lacks Facts Giving Rise to a Strong Inference that Xentex Acted with Scienter in Violation of § 10(b).*

To satisfy the PSLRA's heightened pleading requirements for scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For a claim under § 10(b), the requisite scienter is "a mental state embracing the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). "[R]eckless disregard for the truth counts as intent" for purposes of § 10(b).[10] *Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 822 (N.D.Ill.2000) (quoting *SEC v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998)). Conclusory allegations that defendants acted with knowledge that the representations were false and misleading do not satisfy the PSLRA's pleading requirements. Plaintiffs "must do more than speculate as to defendants' motives or make conclusory allegations of scienter; [they] must allege specific facts." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997). The facts alleged must be sufficient to strongly support the inference that at the time the statements were made, defendants knew, or were reckless in not knowing, that the statements were false.

[10]    Recklessness requires, at minimum, "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997).

*\*6* Even if, as explained above in Section I.A.1, plaintiffs adequately allege the reasons why three of the oral statements made at the November 1st meeting and two of the oral statements relating to the promissory note were false, they have failed to allege facts giving rise to a strong inference that defendants made those purported misrepresentations knowingly or recklessly. With respect to the statements at the November 1st meeting[11] and the statements relating to the promissory note,[12] plaintiffs plead that "Xentex, through its Board of Directors and corporate officers, made the above-referenced false and misleading statements and/or omissions, although the Board of Directors and said corporate officers knew them to be false, untrue and misleading." (SAC ¶¶ 46, 70.) This is merely a conclusion and therefore is inadequate to satisfy the heightened pleading standards of the PSLRA.

[11]    *I.e.,* Batio's and Tucker's statements that the money would be used for marketing, that KDS manufactured the computer displayed at the meeting, and that there were no lawsuits pending against Xentex.

[12]    *I.e.,* Flanagan's statement that the company was able to pay its bills and was not financially depleted and Batio's representation that the money loaned pursuant to the promissory note would be used only for marketing purposes.

Plaintiffs also allege that defendants made the misrepresentations because Xentex had "misappropriated and squandered the corporation[']s money," "needed to alleviate the corporation's extreme financial difficulties," and sought to enable Xentex's Board of Directors, corporate officers, and employees to "loot the corporation for their personal gain." (*Id.* ¶¶ 43–44; 71–72.) These allegations similarly are devoid of the level of factual specificity required to satisfy the PSLRA. Plaintiffs "must do more than speculate as to defendants' motives or make conclusory allegations of scienter; [they] must allege specific facts." *Rehm,* 954 F.Supp. at 1255; *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (requiring particularized facts under Rule 9(b) pre-PSLRA). Plaintiffs allege no specific facts to show that Xentex was experiencing extreme financial difficulties at the time the representations were made.[13] Bare allegations that a company has cash flow problems, without factual support, are insufficient to support a finding of scienter. *Rehm,* 954 F.Supp. at 1254 n. 4. Nor do plaintiffs plead facts supporting their vague allegations that Xentex's Board, officers, and employees were

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)
2003 WL 21960357

misappropriating, squandering, and looting Xentex's money. The most they allege, in highly general and hence inadequate form, is that at some *later* time the money they invested was used to pay Batio's personal expenses. Such an allegation, even if factually specific enough (which the court doubts) does not support a strong inference that at the time of the November 1st meeting, looting and misappropriation of corporate funds was occurring at Xentex, and that Xentex thus made fraudulent misrepresentations in order to continue the looting and misappropriation.

13     In their briefs opposing the motion to dismiss, plaintiffs argue that Xentex owed defendant Flanagan $500,000 pursuant to a promissory note, and that he ultimately (*i.e.,* at a later time) called that note and forced Xentex into bankruptcy. Notably, the allegations concerning Flanagan were not incorporated into the allegations against Xentex and have therefore not been raised against Xentex. In any event, the fact that a start-up company like Xentex owed $500,000 under a promissory note is far from remarkable; indeed, Xentex owed plaintiffs $650,000 pursuant to another promissory note.

Plaintiffs have failed to set forth facts demonstrating why most of the misrepresentations they allege were false. In the few instances where some "why" information is provided, plaintiffs have not set forth facts sufficient to give rise to a strong inference that Xentex (through its Board and/or corporate officers) knew the statements were false and acted knowingly or recklessly in making the misstatements. For these reasons, plaintiffs have failed to plead securities fraud claims against Xentex under § 10(b). Counts 2 and 3 are dismissed.

   B. § 10(b) Claims Against Turcotte: Counts 9 and 10
 **\*7** Plaintiffs also claim that Michael Turcotte, Xentex's Vice President of Accounting and Control, committed securities fraud in violation of § 10(b) by making misrepresentations in financial statements distributed prior to the initial stock purchase (Count 9) and prior to the execution of the promissory note (Count 10).

Specifically, plaintiffs allege that the Information Statement they received included financial statements prepared by Turcotte which falsely represented that Xentex owned tooling worth more than $4.25 million and total assets exceeding $5.3 million. A subsequent financial statement prepared by

Turcotte dated December 31, 2000, less than two months after plaintiffs invested in Xentex, represented that Xentex had just $4.3 million in assets, including only $1.5 million in tooling. Plaintiffs claim they relied on the original financial statement when they invested $3.3 million in Xentex. Turcotte then allegedly prepared another financial statement, dated March 15, 2001, in which the value of tooling was raised back to $4.25 million. Plaintiffs plead that this March 15th representation induced them to execute the promissory note and loan Xentex an additional $650,000. Plaintiffs further allege that in preparing the financial statements, Turcotte violated Generally Accepted Accounting Procedures ("GAAP").

Plaintiffs rely on the variations between the financial statements to support their allegations of fraud. But plaintiffs may not rest a securities fraud claim on the differences between financial statements. *DiLeo,* 901 F.2d at 627. Rather, "[i]nvestors must point to some facts suggesting that the difference is attributable to fraud...." *Id.* Moreover, the allegations against Turcotte fail to give rise to a strong inference that he knew the statements were false and acted knowingly or recklessly in making the misstatements. For the most part, plaintiffs make the same scienter allegations against Turcotte that they alleged against Xentex; that Turcotte, according to the complaint, made misrepresentations and omissions because Xentex "had misappropriated and squandered money tendered by previous investors," "was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company." (SAC ¶¶ 179–80, 196–97.) The court has already addressed the deficiencies of these allegations above.

Plaintiffs also allege that Turcotte made misrepresentations in the financial statements "to properly secure his inflated salary and ensure he was compensated by other [unspecified] means" (*Id.* ¶¶ 181, 198), and that he committed various GAAP violations. Plaintiffs' allegation regarding Turcotte's desire to maintain his inflated salary, obviously aimed at establishing his motive to commit fraud, fails to establish a strong inference of scienter. There is disagreement among the courts of appeals which have addressed the issue as to the adequacy of allegations of motive and opportunity, standing alone, to create the necessary strong inference of scienter. *See Goldstein v. MCI WorldCom,* __ F.3d __, Nos. 02–60322, 03–60248, 2003 WL 21738963, at \*6 (5th Cir. July 28, 2003). But this court agrees with the Eighth Circuit's observation that "having the motive and opportunity to do wrong are

Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)
2003 WL 21960357

certainly not the same as having the intent to do it," and that generally alleging greed as a motive fails even to establish motive, led alone scienter. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 655 (8 th Cir.2001). To establish motive, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields,* 25 F.3d at 1130. Further, alleged GAAP violations, without more, have consistently been held insufficient to give rise to a strong inference of scienter. *In re K–Tel Int'l, Inc. Secs. Litig.,* 300 F.3d 881, 890 (8th Cir.2002); *Riggs Partners, LLC v. Hub Group, Inc.,* No. 02 C 1188, 2002 WL 31415721, *5 (N.D.Ill. Oct. 25, 2002); *Rehm,* 954 F.Supp. at 1255.

**\*8** Counts 9 and 10 fail to meet the PSLRA's pleading standards and are therefore dismissed to the extent they raise claims under § 10(b) of the Exchange Act.

C. § 10(b) Claims Against Kim: Counts 25 and 26
Plaintiffs also claim that Dr. Wan Hee Kim, a member of Xentex's Board of Directors and chairman of its Executive Committee, committed securities fraud in violation of § 10(b) by making misrepresentations to them prior to the initial stock purchase (Count 25) and prior to the execution of the promissory note (Count 26).

To the extent plaintiffs seek to hold Kim directly responsible for misrepresentations made in the Information Statement, their claim is based on the same flawed allegations that form the basis of the deficient claim against Xentex, and thus fails for the same reasons the claim against Xentex fails. But plaintiffs also allege that Kim had a direct conversation with them in early November 2000 in which Kim "failed to disclose the fact that Xentex was drastically underfunded, was incapable of producing Voyager computers and was the subject of several lawsuits for failure to pay its bills." (SAC ¶ 425–26.) These allegations suffer from the same lack of factual specificity that afflicted the allegations discussed above, and thus cannot sustain a § 10(b) claim. Plaintiffs offer no facts showing that Xentex was underfunded or incapable of producing the computers. Further, plaintiff's conclusory allegations that Kim knew the representations were false and made them in order to induce plaintiffs to invest are wholly inadequate, for the reasons repeatedly rehearsed above, to constitute facts giving rise to a strong inference of scienter.

Nor have plaintiffs stated a claim in Count 26 against Kim for misrepresentations relating to the promissory note.

Count 26, like Count 25, is premised on Kim's failure to disclose that Xentex was underfunded, incapable of producing Voyager computers, and involved in several lawsuits due to its failure to pay bills. Plaintiffs do not allege that Kim had a duty to disclose, or that he ever even discussed with them, pending lawsuits. They do, however, allege that he made representations about Xentex's ability to produce Voyager computers, and thus should have disclosed that Xentex was incapable of doing so. They claim that in March 2001, Kim learned that a design problem was holding up production of the computers, and that he proceeded to give them a production schedule dated March 21, 2001 "which represented [Xentex's] present position and ability to mass produce Voyager computers, stat[ing] that Voyager computers would start to be produced in October, 2001." (SAC ¶ 441.) But Kim's representation that production of the Voyager computers would start in October was a projection or a forward-looking statement. "[P]redictions of future performance are inevitably inaccurate because things almost never go exactly as planned." *Zoghlin v. Renaissance Worldwide, Inc.,* No. 99 C 1965, 1999 WL 1004624, at *6 (N.D.Ill. Nov. 4, 1999) (quoting *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993)). Forward-looking statements are therefore not actionable unless plaintiffs allege "specific facts which illustrate that [the defendant's] predictions lacked a reasonable basis." *Arazie,* 2 F.3d at 1468. The mere allegation that there were design problems in March 2001 does not support the inference that there was no reasonable basis for Kim to represent that production would begin nearly seven months later.

**\*9** To the extent Counts 25 and 26 seek to hold Kim liable under § 10(b), they are dismissed for failure to state a claim.

D. § 10(b) Claims Against Flanagan: Counts 18 and 19
Plaintiffs sue Flanagan, a member of Xentex's Board of Directors, for misrepresentations purportedly made in connection with their initial stock purchase (Count 18) and the execution of the promissory note (Count 19). Neither of these claims satisfy the PSLRA's heightened pleading requirements.

With respect to the initial stock purchase, plaintiffs do not allege any direct contact with Flanagan. Rather, they claim Flanagan is liable for misrepresentations in the Information Statement because he "played a role in the preparation of said information sheet and/or had reviewed said Information [Statement] in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in

said corporation." (SAC ¶ 303.) In other words, they seek to hold him liable for a "group-published" document. "The group pleading doctrine is generally construed as applying only to high-level corporate officers and directors with direct involvement in the day-to-day business of the company." *Sutton v. Bernard,* No. 00 C 6676, 2001 WL 897593, at *5 (N.D.Ill. Aug. 9, 2001). Assuming plaintiffs' allegations are adequate under the group pleading doctrine and that the doctrine is applicable to Flanagan, plaintiffs' § 10(b) claim against Flanagan nevertheless fails for their failure to comply with the PSLRA's requirements that they allege facts indicating why the purported misrepresentations were false and facts giving rise to a strong inference of scienter.

Likewise, the § 10(b) claim against Flanagan based on misrepresentations relating to the promissory note is deficient. Plaintiffs allege that before they executed the promissory note, their principals had a telephone conversation with Flanagan during which he represented that "Xentex management was stable and effective, production of the Voyager computers were [sic] on schedule, [Xentex] was not under funded and he did not know the reason that the CEO of [Xentex] had quit." (SAC ¶ 320.) Plaintiffs, as is their wont, fail to offer any specific facts indicating that any of these representations were false. They merely allege that Flanagan, as a Board member, attended Board meetings, had frequent conversations with the former CEO, had reviewed documentation, and "otherwise knew" the representations were false. (SAC ¶ 320.) Such vague allegations are not nearly factually specific enough to satisfy the PSLRA's pleading standards.

Given the aforementioned deficiencies, the court need not address the sufficiency of plaintiffs' allegations regarding Flanagan's scienter. To the extent Counts 18 and 19 raise claims against Flanagan under § 10(b), they are dismissed.

### E. Control Person Claims Under § 20 Against Turcotte, Kim & Flanagan

Plaintiffs also sue Turcotte, Kim, and Flanagan as control persons under § 20 of the Exchange Act based on misrepresentations relating to plaintiffs' initial stock purchase and their subsequent loan pursuant to the promissory note. [14] Plaintiffs' control-person claims under § 20 are derivative claims, and thus are actionable only if plaintiffs adequately allege a primary violation under § 10(b). *Heartland Fin. USA, Inc. v. Fin. Insts. Capital Appreciation Partners I, L.P.,* No. 02 CV 3982, 2002 WL 31819008, at * 8 (N.D.Ill.Dec. 12,

2002). Because plaintiffs here failed to state a claim under § 10(b) against any of the defendants, plaintiffs' claims under § 20 must be dismissed as well. *Id.*

[14]     As noted earlier, plaintiffs did not bring the control-person liability claims under § 20 in counts separate from the direct liability claims under § 10(b). The § 20 claims are raised against Turcotte in Counts 9 and 10, against Kim in Counts 24 and 25, and against Flanagan in Counts 18 and 19.

## II. *Claims Under Section 12(a)(2) and Section 15 of the Securities Act of 1933*

**\*10** Plaintiffs also bring claims against Xentex, Turcotte, Kim and Flanagan under § 12(a)(2) of the Securities Act relating to their initial stock purchase. The PSLRA's heightened pleading requirements do not apply to claims under the Securities Act. *Adams Golf,* 176 F.Supp.2d at 230. Likewise, neither fraud nor scienter are elements of a Section 12(a)(2) claim. *In re Nationsmart Corp. Secs. Litig.,* 130 F.3d 309, 318 (8th Cir.1997). Nor need plaintiffs satisfy Rule 9(b), as long as they are not making allegations of fraud. Flanagan and the Xentex defendants, however, argue that plaintiffs have no cause of action under § 12(a)(2) because plaintiffs purchased stock through a private placement, not a public offering. Plaintiffs disagree.

Section 12(a)(2) applies only to public offerings, not private placements. Liability under § 12(a)(2) extends to any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading...." 15 U.S.C. § 77l (a)(2). As the Supreme Court explained in *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 567–68, 571 (1995), § 12(a)(2) provides for liability only for misstatements in prospectuses or false oral communications relating to such prospectuses. Further, the term "prospectus" is "confined to documents related to public offerings by an issuer or its controlling shareholders." *Id.* at 569. [15] Accordingly, causes of action brought under § 12(a)(2), where the transaction at issue was a private placement rather than a public offering, are subject to dismissal. *See, e.g., Abbell Credit Corp. v. Banc of Am. Secs., L.L.C.,* No. 01 C 2227, 2001 WL 1104601, at *3 (N.D.Ill. Sept. 17, 2001) (dismissing § 12(a)(2) claims pursuant to Rule 12(b)(6)); *Liberty Ridge LLC v. Realtech Sys. Corp.,* 173 F.Supp.2d 129, 135 (S.D.N.Y.2001) (same).

15    *Gustafson* addressed Section 12(2), which by amendment in 2000 became Section 12(a)(2).

Plaintiffs allege that they made their initial stock purchase in a public offering. That allegation, however, is contradicted by the offering document for plaintiffs' initial investment. "It is a well-settled rule that when a written instrument [properly before the court as an exhibit] contradicts allegations in the complaint, ... the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998). [16] The Information Statement plainly states that the offering was a "private placement," that was "being made pursuant to Regulation D of the Securities Act of 1933," that "investors must be 'accredited investors' under Regulation D," and that no public trading market existed for the shares offered. (Information Statement at unnumbered p. 2.) Sales of securities made pursuant to Regulation D, 17 C.F.R. § 230.506, are not public offerings.

16    In determining whether to grant the motion to dismiss, the court may properly consider the Information Statement, which the Xentex defendants submitted as an exhibit to their brief in support of their motion to dismiss, because plaintiffs referred to the Information Statement in their complaint and the document is central to plaintiffs' claims. *Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). For the same reasons, the court will consider the Promissory Note and the Amendment to that note. The court will not, however, consider any of the other documents submitted by the Xentex defendants, *i.e.,* the Worldwide Manufacturing Agreement, the Sales and Distribution Licensing Agreement, the list of Due Diligence Documents Delivered to Copeland Family, or the Subscription Agreement. Although those documents may well be central to resolution of plaintiffs' claims, none of those documents were referenced in the complaint. The exception allowing a court to consider documents referenced in a complaint, and central to the claims, is a narrow one. "It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment...." *Levenstein v. Salafasky,* 164 F.3d 345, 347 (7th Cir.1998).

But despite what the Information Statement says, plaintiffs argue that Xentex's sale of securities does not qualify as a private placement under Regulation D. Regulation D applies only if certain conditions are met, one of which requires that the number of purchasers not exceed thirty-five. 17 C.F.R. § 230.506(b)(2)(i). Regulation D also places restrictions on investments by purchasers who are not accredited investors. *See id.* at § 230.506(b)(2)(ii). According to plaintiffs, "there were over 300 investors in [Xentex] and a large percentage of the investors were unaccredited." (Pls.' Surreply at 9.) [17] If these assertions are true, the offering by which plaintiffs acquired their Xentex stock would not qualify as a private placement and would have to satisfy the requirements for a public offering. At this stage, the court must accept their truth. Consistent with these assertions, plaintiffs could prove that they acquired their stock in a public offering, subject to the requirements of § 12(a)(2). [18] The Xentex defendants and Flanagan bear the burden of proving that the private placement exemption applies to the stock sale at issue. *UBS Asset Mgmt. (N.Y.) Inc. v. Wood Gundy Corp.,* 914 F.Supp. 66, 68 (S.D.N.Y.1996) (burden of showing exemption falls on person claiming it).

17    Even though these allegations are not in the complaint, the court may consider them. In opposing dismissal, a plaintiff is allowed to assert additional facts that are consistent with the complaint to show facts which, if proved, would entitle him to judgment. *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir.1992).

18    These assertions are not necessarily inconsistent with a private placement, however. For example, Xentex could have achieved 300 investors by means of multiple private placements with no more than 35 investors per offering.

 *11   The Xentex defendants raise no other challenges to plaintiffs' § 12(a)(2) claims against Xentex (Count 1), Turcotte (Count 8), and Kim (Count 24). Accordingly, those counts survive the motion to dismiss. Counts 8 and 24 also sought to impose control-person liability under § 15 against Turcotte and Kim, respectively. Claims under § 15 are derivative claims, seeking to impose joint and several liability against control persons for others' primary violations of § 12(a)(2). Because the Xentex defendants' only challenge to the § 15 claims was that plaintiffs failed to allege a primary violation under § 12(a)(2), the control-person claims against Turcotte and Kim also survive.

Flanagan, on the other hand, raises two additional arguments for dismissal of the claims against him under the Securities

**Premier Capital Management, L.L.C. v. Cohen, Not Reported in F.Supp.2d (2003)**

2003 WL 21960357

Act. He argues first that plaintiffs failed to properly state a claim against him under § 12(a)(2) because they do not allege that Flanagan was a seller within the meaning of the statute. Liability under § 12(a)(2) is limited to "those who pass title of securities or solicit their sale." *Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 936 (N.D.Ill.1999) (citing *Pinter v. Dahl,* 486 U.S. 622 (1988)). Thus, individual officers and directors are not liable "absent allegations that they actually promoted or solicited the sale of [Xentex's] securities." [19] *Maton v. Arthur Andersen & Co.,* No. 91 C 1885, 1991 WL 131184, at *3 (N.D.Ill. July 5, 1991). Here, plaintiffs effectively concede that Flanagan is not liable under § 12(a)(2). They argue that as a control person under § 15, Flanagan can be liable for another person's primary violation of § 12(a)(2). That is true, but as a control person, he would be liable only under § 15, not under both § 15 and § 12(a)(2). Plaintiffs' § 12(a)(2) claim against Flanagan is therefore dismissed.

[19]     At the November 1st meeting, it was Batio and Tucker, not Flanagan, who met with plaintiffs and presented them with the opportunity to invest in Xentex.

Flanagan also asserts that plaintiffs have not adequately pled control-person liability under § 15. In the Seventh Circuit, plaintiffs seeking to establish control-person liability must plead two elements: "(1) that the defendant actually exercised general control over the operations of the entity [that is liable for a primary violation]; and (2) that the defendant had the power or ability to control the specific acts constituting the primary violation." *Lindelow v. Hill,* No. 00 C 3727, 2001 WL 830956, at *9 (N.D.Ill. July 20, 2001) (citing *Donohoe v. Consol. Operating & Prod. Corp.,* 982 F.2d 1130, 1138–39 (7th Cir.1992)). [20] Simply relying on Flanagan's status as

a member of the Board of Directors is insufficient to state a control person claim. *See, e.g., Donovan v. ABC–NACO, Inc.,* No. 02 C 1951, 2002 WL 1553259, at *6 (N.D.Ill. July 15, 2002) (fact that defendants were directors insufficient to support control-person liability). But here, plaintiffs allege a bit more. They contend that Flanagan "actively participated in and controlled decisions of the Board of Directors" (general control), that he helped prepare and/or review the Information Statement (control over specific acts) and that he held a security interest in all of Xentex's assets. These allegations are enough to survive a motion to dismiss. Claims under § 15 need only satisfy federal notice pleading standards. Moreover, "[o]rdinarily, whether a defendant is a 'controlling person' ... is a question of fact that cannot be determined at the pleading stage." *Lindelow,* 2001 WL 830956, at *9.

[20]     Both *Lindelow* and *Donohoe* involved control person liability under § 20, not § 15, but the same standards apply to both. *See In re VMS Secs. Litig.,* 752 F.Supp. 1373, 1402 (N.D.Ill.1990).

*Conclusion*

**\*12** Both Flanagan's and the Xentex defendants' motions to dismiss the federal claims against them in the Second Amended Complaint are granted in part and denied in part. As explained above, the claims against Xentex, Turcotte, Kim, and Flanagan under § 10(b) and § 20 of the Exchange Act are hereby dismissed, as is the § 12(a)(2) claim against Flanagan. The claims against Xentex, Turcotte and Kim under § 12(a)(2) survive, however, as do the control-person liability claims against Turcotte, Kim and Flanagan under § 15.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21960357

---

**End of Document**      © 2021 Thomson Reuters. No claim to original U.S. Government Works.