United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

2021 WL 1172773
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,
v.
Gary WINEMASTER, et al., Defendants.

No. 19-cv-04843
|
Signed 03/29/2021

**Attorneys and Law Firms**

Daniel J. Hayes, Steven Lee Klawans, Michael Mueller, United States Securities and Exchange Commission, Senior Trial Counsel/Enforcement Division, Chicago, IL, for Plaintiff.

John J. Sikora, Jr., Eric Robert Swibel, Heather A. Waller, Jack Mitchell McNeily, Sean M. Berkowitz, Adam L. Rosenbloom, Latham & Watkins LLP, Chicago, IL, for Defendant Gary S. Winemaster.

Vincent Dominick Pinelli, Burke, Burns & Pinelli, Ltd., Chicago, IL, for Defendant Craig Davis.

Alexander Martin Madrid, Pro Hac Vice, McGuireWoods LLP, Pittsburgh, PA, Christina M. Egan, Vinu George Joseph, McGuire Woods LLP, Chicago, IL, Edward Andrew Southerling, Pro Hac Vice, Nathan Pittman, Pro Hac Vice, McGuireWoods LLP, Washington, DC, Molly M. White, Pro Hac Vice, McGuireWoods LLP, Los Angeles, CA, for Defendant James F. Needham.

**MEMORANDUM OPINION AND ORDER**

Andrea R. Wood, United States District Judge

**\*1** Power Solutions International, Inc. ("PSI") is a publicly traded company that manufactures and sells engines. Between the fourth quarter of 2014 and the fourth quarter of 2015, PSI encountered difficulties meeting its revenue targets. While PSI aggressively tried to solicit additional sales from its customers, it found a lack of demand for its products during that period. According to Plaintiff United States Securities and Exchange Commission ("SEC"), this led PSI to inflate artificially its revenue numbers by fraudulently accounting

for several transactions. In total, PSI overstated its revenues by about $25 million. As a result of this alleged fraud, the SEC has brought the present action against PSI's Chief Executive Officer ("CEO"), Defendant Gary Winemaster; its Vice President of Sales, Defendant Craig Davis; and its General Manager for Industrial, Heavy Duty Products, Defendant James Needham. The SEC's 11-count complaint sets out several securities law claims against Defendants, including for violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Now before the Court are two motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Winemaster (Dkt. No. 34) and Needham (Dkt. No. 30). For the reasons that follow, both motions are denied.

**BACKGROUND**

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to the SEC as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

PSI is a publicly traded company that manufactures and sells engines to industrial equipment manufacturers and transportation companies. (Compl. ¶¶ 1, 17–18, Dkt. No. 1.) As a publicly traded company, PSI must file various periodic reports with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q. (*Id.* ¶ 19.) In those reports, PSI is required to include financial statements that accurately and fairly reflect PSI's financial condition. (*Id.*) Moreover, any financial statements in those reports must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (*Id.*)

At all times relevant to this action, Winemaster served as PSI's CEO, President, and Chairman of the Board of Directors. (*Id.* ¶¶ 1, 14.) As PSI's CEO, Winemaster was responsible for reviewing and approving PSI's consolidated financial statements and reviewing, approving, signing, and certifying PSI's periodic public reports, including its Forms 10-K and 10-Q. (*Id.* ¶¶ 14, 24.) Among the representations Winemaster made when signing each of PSI's periodic public reports was that each report did not include any material misstatements or omissions and fairly presented, in all material respects, PSI's financial condition for the reporting period. (*Id.* ¶ 24.) In addition, Winemaster was responsible for establishing

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 2 of 27 PageID #:2645

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

and maintaining PSI's system of internal financial reporting controls and was aware of and responsible for PSI's system of internal accounting controls. (*Id.* ¶¶ 24, 143)

 **\*2** Reporting directly to Winemaster was Needham, who served as PSI's General Manager for Industrial, Heavy Duty Products. (*Id.* ¶¶ 1, 16, 26.) Needham's position made him responsible for selling PSI's products to customers serving the oil and gas industry. As PSI's Vice President of Sales, Davis was in charge of PSI's sales department. (*Id.* ¶¶ 1, 15, 25.) While Davis oversaw most of PSI's sales personnel and approved all sales incentives offered to PSI customers, he did not have oversight authority over Needham. (*Id.* ¶ 25.) Davis also reported directly to Winemaster, who exercised close oversight of the sales department and maintained close contact with several PSI customers. (*Id.* ¶¶ 16, 25.)

### I. Improper Recognition of Revenue

Each quarter, PSI would provide the public with revenue guidance predicting the company's revenue for the upcoming quarter. (*Id.* ¶ 30.) Similarly, PSI provided revenue guidance for the full year. (*Id.*) Winemaster determined the revenue guidance provided to the public. (*Id.*) Stock analysts would review such guidance, along with PSI's periodic reports, to develop recommendations for investors and make projections for a number of PSI's financial metrics, including anticipated net revenue. (*Id.* ¶ 29.) Various financial firms and media outlets would then combine analysts' projections for PSI's quarterly net revenue and produce a publicly available consensus net revenue estimate for the time period. (*Id.*) Consensus net revenue estimates are important because when a company falls short of its projection, the company usually experiences a negative reaction from investors and a decrease in stock price. (*Id.*) Consequently, PSI management used quarterly analyst estimates as a benchmark for its internal quarterly revenue targets. (*Id.* ¶ 30.) Winemaster had ultimate authority for determining PSI's revenue targets. (*Id.*)

PSI's accounting department recorded PSI's revenue through an enterprise resource planning system known as EPICOR. (*Id.* ¶ 27.) When processing sales, the accounting department relied on the sales department to communicate whether there were any non-standard or atypical terms associated with a particular sale. (*Id.*) That is because the accounting department did not review customer purchase orders or shipping documents for customer orders before recording revenue. (*Id.* ¶ 28.) Thus, if a customer was given terms different from PSI's standard sales terms, those terms would not be accurately reflected in what the accounting department

inputted into EPICOR. (*Id.* ¶¶ 27–28.) Sales department personnel, including Needham, knew that they needed to communicate to the accounting department any non-standard terms associated with a particular sale. (*Id.* ¶ 27.)

It was important for the accounting department to know any non-standard terms associated with a particular sale because such terms could affect how it recorded revenue from that sale. (*Id.* ¶¶ 21, 27.) Under the GAAP standard set forth at Accounting Standards Codification ("ASC") [1] 605-10-25-1, revenue may be recognized when it is realized, realizable, and earned. (*Id.* ¶ 20.) Consistent with ASC 605-10-25-1, PSI stated in its SEC filings that its policy was to recognize revenue "upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured." (*Id.* ¶ 21.) Further, PSI stated that

> [i]n certain circumstances, [PSI] recognizes revenue before delivery has occurred. In such circumstances, among other things, risk of ownership has passed to the buyer, the buyer has made a written fixed commitment to purchase the finished goods, the buyer has requested the finished goods be held for future delivery as scheduled and designated by them, and no additional performance obligations exist by [PSI].

 **\*3** (*Id.*) Thus, certain non-standard terms or side arrangements associated with a particular sale could affect PSI's ability to recognize revenue associated with that sale consistent with GAAP and PSI's own revenue recognition policies or the timing of when such revenue can be recognized. (*Id.* ¶¶ 2–4, 27–28, 32.)

[1]   The ASC is the single source codifying all United States Generally Accepted Accounting Principles.

Beginning in the fourth quarter of 2014, PSI encountered difficulties meeting its revenue targets. (*Id.* ¶¶ 32, 35.) Those difficulties were exacerbated in 2015 due to a decline in the price of oil. (*Id.* ¶ 32.) Because many of PSI's largest customers purchased engines to be used in the oil and gas

industry, demand for a significant portion of PSI's products was tied to the price of oil. (*Id.* ¶ 18.) Thus, when the price of oil decreased, demand for many PSI products also decreased. (*Id.*) During this time, Winemaster, Needham, and Davis undertook efforts to encourage its customers to agree to purchases that would help PSI meet its revenue targets. (*Id.* ¶¶ 32–35.) In furtherance of those efforts, one or more Defendants would offer certain incentives or side arrangements to PSI customers to encourage them to make purchases prior to the end of the quarter, even when the customer did not have an immediate need for the products it purchased. (*Id.*) As a result of Defendants' conduct, PSI improperly recognized revenue for several transactions, causing the company to materially misstate the financial statements in its periodic filings for every period from the fourth quarter of 2014 through the fourth quarter of 2015. (*Id.* ¶¶ 1, 35.) The transactions at issue in the present action are presented according to the quarter in which the associated revenue was recognized and are summarized as follows.

### A. Fourth Quarter 2014

In the fourth quarter of 2014, analysts' consensus estimate for PSI's net revenue was $103.4 million. (*Id.* ¶ 37.) However, as the end of the quarter drew closer, PSI was at risk of falling short of that number. (*Id.* ¶¶ 37, 39–40.) At Davis's direction, a PSI sales representative approached a PSI customer, Customer A, in late November 2014 and offered extended payment terms to incentivize Customer A to take early delivery of 30 engines that it had ordered for 2015. (*Id.* ¶¶ 39–40.) Customer A responded with a counteroffer, asking that, in addition to the extended payment terms, PSI agree to cover the cost of warehousing the engines at an off-site location as well as shipping costs to send the engines to that off-site location. (*Id.* ¶ 39.)

Davis approved the counteroffer, noting that PSI needed to do the deal because it was currently short of its quarterly revenue target. (*Id.*) Indeed, the sole purpose of the early sale was to allow PSI to hit its revenue target for the quarter. (*Id.* ¶ 39.) As the sales representative later acknowledged, "the WHOLE reason behind this entire exercise was to try and jam as much business in the [sic] 2014 as possible." (*Id.* ¶ 40.)

While PSI recognized about $846,000 of revenue from the sale in the fourth quarter of 2014, that revenue was not properly recognizable for that period. (*Id.* ¶¶ 37, 41.) Rather, PSI attempted to enter into a "bill and hold" transaction

with Customer A, which refers to a sale in which revenue is recognized ahead of the delivery of the item. (*Id.* ¶¶ 21, 37.) But for revenue to be properly recognized from a bill and hold sale under GAAP, the sale must meet the following requirements:

> **\*4** (i) the risks of ownership pass to the buyer at the time of the bill and hold transaction; (ii) the buyer makes a fixed commitment to purchase the goods; (iii) the buyer, not the seller, requests that the transaction be on a bill and hold basis; (iv) the buyer has a substantial business purpose for ordering the goods on a bill and hold basis; (v) there is a fixed schedule for delivery of the goods that is both reasonable and consistent with the buyer's substantial business purpose for the bill and hold transaction; (vi) the seller does not retain any specific performance obligations related to the sale; and (vii) the goods are complete and ready for shipment at the time of the bill and hold transaction.

(*Id.* ¶ 38.) Here, the revenue did not meet the criteria for recognition on a bill and hold basis because Customer A neither requested the bill and hold nor had a business purpose for ordering on a bill and hold basis. (*Id.* ¶ 41.)

Davis did not inform accounting that Customer A did not request the bill and hold, had received extended payment terms, or that PSI agreed to cover the cost of storing the engines. (*Id.* ¶ 42.) When Davis was challenged by a senior operations executive over the propriety of recognizing revenue from the sale to Customer A, Davis falsely informed the executive that PSI's Chief Financial Officer and others in the accounting department had been informed of all pertinent details of the transaction and had approved of its accounting treatment. (*Id.* ¶ 42.) Because of Davis's misconduct, PSI improperly recognized $846,000 of revenue from the sale to Customer A in the financial statements included in its 2014 Form 10-K. (*Id.* ¶ 43.) Without the sale to Customer A, PSI's fourth quarter 2014 revenue would have fallen approximately $400,000 short of analysts' consensus net revenue expectation. (*Id.* ¶ 37.)

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

**B. First Quarter 2015**

In February 2015, PSI appeared to be falling far short of its quarterly revenue target. (*Id.* ¶ 46.) For that reason, Davis directed a PSI sales representative to approach Customer B about accelerating the delivery of about $7.8 million worth of engines that had been scheduled for delivery in the summer of 2015. (*Id.*) Although the sales representative expressed concern to Davis about pulling ahead sales to meet revenue targets, Davis told the salesperson that if PSI did not pull ahead the Customer B sale, "the quarterly results would be 'tragic.' " (*Id.*)

Initially, Customer B rejected multiple PSI offers of incentives to accept the engines early because it did not want the engines in the first quarter of 2015. (*Id.* ¶ 47.) This led Winemaster to call the president of Customer B and offer an indefinite right of return on the engines if Customer B's intended customer for the engines cancelled its order. (*Id.*) Customer B accepted Winemaster's offer and accepted delivery of the engines prior to the end of the first quarter. (*Id.*) Winemaster did not inform PSI's accounting department or anyone else at PSI of the indefinite right of return prior to filing PSI's Form 10-Q for the first quarter of 2015. (*Id.* ¶ 48.) Yet under ASC 605-15-25-1, which addresses recognizing revenue when a right of return exists, PSI could not recognize revenue in the first quarter unless it could reasonably estimate the amount of future returns. (*Id.* ¶ 50.) And because PSI had previously only accepted returns due to defects or performance issues, it had no way estimating returns or otherwise knowing whether Customer B's intended customer would ultimately cancel its order. (*Id.* ¶ 51.) Thus, the earnings process was not complete and the sale should not have been recognized in the first quarter of 2015. (*Id.*) Nonetheless, the $7.8 million in revenue from the sale to Customer B was improperly recognized in the financial statements contained in PSI's first quarter 2015 Form 10-Q. (*Id.* ¶¶ 52, 54.) In addition, PSI filed a Form 8-K in May 2015 announcing its first quarter 2015 net revenue, a figure that included the improperly recognized $7.8 million from the Customer B sale. (*Id.* ¶ 54.)

**\*5** By recognizing $7.8 million in revenue from the Customer B sale in the first quarter of 2015, PSI was able to report net revenue of $86.1 million for the quarter, which only narrowly fell short of analysts' $87 million consensus net revenue expectation. (*Id.* ¶ 45.) Had PSI accounted for the sale in accordance with GAAP, it would have missed the analysts' consensus expectation by a wider margin. (*Id.*)

In 2017, Customer B sought to exercise its right of return because there was no demand for the engines from its customers. (*Id.* ¶ 49.) Instead of taking the engines back, Winemaster and Davis (who learned of the right of return some time after the filing of the first quarter 2015 Form 10-Q) sought to conceal the right of return by authorizing the sales department to arrange for Customer B's engines to be sold to another PSI customer. (*Id.* ¶¶ 48–49, 136.)

**C. Second Quarter 2015**

To meet its revenue target in the second quarter of 2015, PSI had to coerce Customer C to purchase $10 million of engines for which it had no need. (*Id.* ¶ 56.) Customer C's business involved manufacturing generators that it then leased to its customers who operated oil and gas wells. (*Id.* ¶ 57.) In late May 2015, Needham asked Customer C if it would make a $10 million purchase by the end of June 2015. (*Id.* ¶ 58.) Due to a drop in the price of oil at that time, there was insufficient demand for Customer C's generators to justify Customer C making such a purchase from PSI. (*Id.*) Yet Needham continued to pressure Customer C to consummate the transaction. (*Id.* ¶ 59.)

Customer C ultimately agreed to the $10 million sale, but it was subject to a side letter agreement ("Customer C Letter Agreement") containing numerous protections for Customer C should there be insufficient demand for its generators. (*Id.*) Needham signed and negotiated the Customer C Letter Agreement, and Winemaster and Davis knew and approved of the agreement. (*Id.* ¶ 60.) Among the provisions in that agreement were:

> (i) Customer C would not have to pay for each engine until 30 days after the engine was placed in a Customer C generator (which Customer C did not do until it had a customer that desired to lease the generator); and (ii) Customer C could exchange engines at a later date for others that were more in demand.

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 5 of 27 PageID #:2648

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

(*Id.* ¶ 59.) The provision granting a right to exchange the engines contained no time limitation. (*Id.*) In its purchase order for the engine, Customer C specifically stated the order was pursuant to this letter agreement from PSI and signed by Needham. (*Id.*) The engines were then shipped to Customer C before the end of June 2015. (*Id.*)

PSI's accounting department was not notified of the Customer C Letter Agreement prior to the filing of PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 60.) But, under GAAP, where a seller is given a right to return a product, revenue from the transaction can only be recognized at the time of sale if the conditions in ASC 605-15-25-1 are satisfied. (*Id.* ¶ 61.) One of those conditions is that "the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product." (*Id.*) The condition is not met "[i]f the buyer does not pay at the time of sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product." (*Id.*) Here, the condition was not satisfied because the Customer C Letter Agreement allowed Customer C to withhold payment for the engines until they were consumed and also gave Customer C the right to exchange the engines in the future for other engines that were in more demand. (*Id.* ¶ 62.) Recognizing revenue from the sale to Customer C also violated ASC 605-15-25-1's requirement that PSI be able to estimate reasonably the amount of future returns. (*Id.* ¶ 63.) Again, because PSI had previously only accepted returns due to defect or performance issues, PSI had no way of estimating the future returns from Customer C. (*Id.*)

 **\*6** The $10 million from the Customer C sale was recognized as revenue in the financial statements contained in PSI's second quarter 2015 Form 10-Q. (*Id.* ¶ 64.) It was also included in the net revenue figure that PSI announced in the Form 8-K it filed on August 5, 2015. (*Id.* ¶ 66.) Moreover, the improper recognition of the $10 million of revenue enabled PSI to exceed analysts' $87 million consensus net revenue expectation, as PSI reported net revenue of $94.6 million in the second quarter. (*Id.* ¶ 56.) Had PSI properly accounted for the Customer C sale in accordance with GAAP, PSI would have missed the consensus expectation by over $2 million. (*Id.*) In turn, that would have revealed the downward revenue trend that PSI was experiencing in 2015. (*Id.* ¶ 64.)

### D. Third Quarter 2015

PSI faced difficulties in hitting its revenue target once again in the third quarter of 2015. (*Id.* ¶¶ 68–69.) This led to PSI aggressively pursuing customers to take additional product. (*Id.* ¶ 69.) In a September 3, 2015 email, Davis told Winemaster that "we are pushing every angle. I have some really unhappy customers ... as I am jamming everything to them in the quarter and they are not happy with me." (*Id.*)

To aid its efforts, PSI turned to Customer C and solicited its purchase of $3 million of engines. (*Id.* ¶ 70.) While Customer C agreed to purchase the engines for $3 million, Needham directed it to issue a purchase order for $4.3 million. (*Id.* ¶¶ 70–71.) Needham verbally assured Customer C that it would only have to pay $3 million, but its $4.3 million purchase order would help PSI make its revenue numbers for the quarter look better. (*Id.* ¶ 71.) Both Winemaster and Davis knew and approved of Needham's direction to Customer C. (*Id.* ¶ 72.) PSI's accounting department, however, was not made aware of the true deal Needham made with Customer C prior to PSI filing its third quarter 2015 Form 10-Q. (*Id.*) Consequently, accounting booked $4.3 million from the sale to Customer C even though the true sale price was $3 million. (*Id.*)

Customer C only paid the $3 million that it had agreed to pay. (*Id.* ¶ 73.) Yet the financial statements in PSI's third quarter 2015 Form 10-Q recognized an additional $1.3 million in revenue from that sale, consistent with the figure from the purchase order. (*Id.* ¶ 75.) By improperly recognizing that revenue, PSI was able report net revenue of $112 million for the third quarter, which only narrowly missed analysts' consensus net revenue expectation of $113.6 million. (*Id.* ¶ 68.) In addition, Needham profited from the false purchase order, as he received $25,000 in incentive compensation related to his sales to customers in the third quarter. (*Id.* ¶ 74.) He would not have received that $25,000 if Customer C did not overstate its purchase order by $1.3 million. (*Id.*)

### E. Fourth Quarter 2015

In November 2015, it became apparent that PSI was falling far short of its revenue target for the fourth quarter of 2015. (*Id.* ¶ 80.) This led PSI to attempt to pull ahead multiple sales from 2016 so that it could recognize revenue from those sales in the fourth quarter. (*Id.* ¶¶ 80–81.) At issue in this action are four sales with four different customers. (*Id.* ¶¶ 82–102.)

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

#### i. Customer D

At the beginning of the fourth quarter of 2015, Davis told Winemaster that the sale of several Waukesha generator sets assembled by a PSI subsidiary was essential for PSI to hit its revenue target for the quarter. (*Id.* ¶ 82.) Normally, Customer D purchased those generator sets from Customer C and powered the generators with PSI engines. (*Id.*) For much of 2015, however, PSI endeavored to sell the Waukesha generator sets directly to Customer D. (*Id.* ¶ 83.)

On December 10, 2015, Needham and Customer D's CEO agreed to a deal in which Customer D would purchase 3 Waukesha generator sets from PSI for about $3 million. (*Id.*) In exchange, PSI would accept the return of 97 PSI engines previously purchased by Customer C to fulfill Customer D generator set orders. (*Id.*) PSI would then give Customer D a credit for the return of the 97 engines that Customer D would use to fund the purchase of the generator sets. (*Id.*) Needham instructed Customer D to issue a purchase order for the generator sets directly to PSI's subsidiary. (*Id.*) Before issuing the purchase order, Customer D sought written confirmation that PSI was agreeing to accept the return of the 97 PSI engines from Customer C and create a credit for Customer D. (*Id.*) Needham responded on December 29, 2015, stating that PSI would accept the return sometime in the first quarter of 2016. (*Id.*) That same day, Customer D issued the purchase order for the 3 Waukesha generator sets. (*Id.*) Yet those generator sets were not shipped to Customer D before the end of the year. (*Id.*)

 **\*7** Needham, along with Davis, tried to characterize the sale to Customer D as a bill and hold so that PSI could recognize the revenue from the sale in the fourth quarter. (*Id.* ¶ 85.) To that effect, Needham asked Customer D to execute a bill and hold agreement, which provided that: (1) Customer D requested bill and hold treatment for the sale; (2) the Waukesha generator sets were complete; and (3) Customer D took title to the generator sets. (*Id.*) Contrary to the representations in the bill and hold agreement, Needham and Davis both knew that Customer D had not requested bill and hold treatment for the sale. (*Id.*) Rather, PSI had proposed the treatment for the purpose of recognizing revenue in 2015. (*Id.*) Moreover, at the time of the sale, Customer D did not have customers to whom it could lease the Waukesha generator sets and it had no need for the generator sets to be delivered in the foreseeable future. (*Id.*)

Neither Needham nor Davis informed PSI's accounting department about pertinent details of the transaction, particularly that it was subject to the return of 97 engines from Customer C. (*Id.* ¶ 86.) As a result, PSI improperly recognized about $3 million of revenue from the sale to Customer D in the fourth quarter of 2015. (*Id.* ¶ 87.) Had accounting known about the return credit granted to PSI, no revenue from the sale would have been recognized that quarter. (*Id.*) Nor could the sale be treated as a bill and hold because Customer D neither requested nor had a substantial business purpose for such treatment. (*Id.* ¶ 88.)

#### ii. Customer E

Customer E had issued a $600,000 purchase order to PSI for 48 engines that PSI expected to ship to Customer E by the end of 2015. (*Id.* ¶ 89.) To meet Customer E's specifications, those engines had to be fitted with a custom oil pan. (*Id.*) Without the custom oil pan, the engines would not be functional within Customer E's intended product. (*Id.* ¶ 90.) Nonetheless, to recognize revenue in the fourth quarter, PSI's sales department arranged for the 48 engines to be shipped to a PSI-affiliated facility in China with a standard oil pan until they could be fitted with the custom pan sometime in 2016. (*Id.* ¶ 89.) Only then would they be delivered to Customer E. (*Id.*)

When PSI's Controller learned of the sales department's plan to ship the engines without the correct oil pan, he relayed the issue to PSI's Chief Financial Officer ("CFO"). (*Id.* ¶ 90.) The CFO informed the sales department that its plan would result in no revenue being recognized from the transaction in 2015 because the product could not be completed to Customer E's specifications and would not be delivered to Customer E by the end of 2015. (*Id.*) In response, the salesperson responsible for Customer E's account emailed Winemaster and told him that the CFO did not believe that revenue from the sale would be recognizable in 2015. (*Id.*) Winemaster then approached PSI's CFO and told him that Customer E's engines were fully functional and that revenue should be recognized from the sale. (*Id.* ¶ 92.) Yet Winemaster knew that the engines did not meet Customer E's specifications and would not function within Customer E's intended product without the custom oil pans. (*Id.*)

At no point prior to the end of 2015 did the engines meet Customer E's specifications such that they would operate appropriately for the customer's needs. (*Id.* ¶ 93.) For that

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 7 of 27 PageID #:2650

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

reason, under GAAP, PSI had not completed the earnings process necessary to recognize revenue. (*Id.*) Moreover, the engines were not shipped to Customer E before the end of the year. (*Id.*) Instead, the engines were moved to a PSI-affiliated facility in China to be completed to Customer E's specifications in 2016. (*Id.*) Thus, Customer E had not assumed the risk of loss for the engines by the end of 2016. (*Id.*) Nonetheless, PSI recognized $600,000 of revenue from this transaction in the fourth quarter of 2015. (*Id.*)

### iii. Customer F

**\*8** In December 2015, a PSI salesperson convinced Customer F to accept delivery in 2015 of engines that it had previously ordered but had not planned to receive until after the year's end. (*Id.* ¶ 94.) As an incentive for accepting early delivery of the engines, PSI offered Customer F extended payment terms. (*Id.*) Customer F declined the offer because there was insufficient demand from its own customers for its product. (*Id.*)

On the last day of 2015, PSI was still facing a significant revenue shortfall. (*Id.* ¶ 95.) That led Davis to call PSI's Director of Facilities and instruct him to ship the 147 engines that Customer F had ordered, but declined to accept in 2015, to an offsite warehouse leased and controlled by PSI. (*Id.*) Davis told the Director of Facilities to complete the shipment by the end of the day and not tell anyone about it. (*Id.*) During the call, Davis mentioned that he had already talked to Winemaster about the shipment. (*Id.*)

After the 147 engines were successfully shipped to the offsite warehouse before year's end, PSI invoiced Customer F for about $300,000. (*Id.* ¶ 96.) However, Customer F never agreed to accept delivery of the engines in 2015 and was not even aware that the engines had been shipped to an offsite warehouse. (*Id.*) And because Customer F did not accept delivery of engines or authorize their offsite storage, PSI had not realized revenue in accordance with ASC 605-10-25-1. (*Id.* ¶ 97.) But because the accounting department was not made aware of the circumstances of the sale prior to the filing of PSI's 2015 Form 10-K, PSI recognized $300,000 of revenue. (*Id.* ¶¶ 96–98.) Only in March 2016 did PSI's accounting department learn of the circumstances of the sale, when it attempted to collect the balance owed by Customer F. (*Id.* ¶ 98.) During those efforts, PSI's sales representative for Customer F told accounting that Customer F was not even aware that PSI had shipped the 147 engines. (*Id.* ¶ 98.) This

led accounting to reverse the $300,000 of revenue in the first quarter of 2016. (*Id.*)

### iv. Customer G

Customer G agreed in November 2015 to purchase from PSI a type of engine that was being discontinued. (*Id.* ¶ 99.) Specifically, Customer G would purchase 775 "base engines," which consisted of the base engine bloc, fuel system, and catalyst, by the end of 2015. (*Id.*) The base engines would be stored at an offsite PSI-leased warehouse and then brought back in 2016 to be refitted with additional parts so the engines would function in Customer G's equipment. (*Id.*) Only after being refitted would the engines be shipped to Customer G. (*Id.*) The purpose behind the proposed structure of the sale was to increase PSI's 2015 revenue. (*Id.*)

Although PSI shipped the base engines to the offsite warehouse prior to the end of 2015, the engines did not include the catalysts because PSI had difficulty procuring them. (*Id.* ¶ 100.) Under PSI's sales agreement with Customer G, the catalysts were a required component. (*Id.*) When the salesperson responsible for Customer G's account told Winemaster and Davis about the situation, he said he was told that the order should ship without the catalysts. (*Id.*) The catalysts would be added when the engines were brought back the next year. (*Id.*) Neither Winemaster nor Davis told the accounting department prior to PSI's filing of its 2015 Form 10-K that the base engines did not contain catalysts. (*Id.*)

Because the base engines were missing catalysts, PSI had not completed the earning process required to recognize revenue from the sale of the base engines. (*Id.* ¶ 102.) Moreover, the risk of loss associated with the engines did not transfer to Customer G until 2016, when it took over the lease of the offsite warehouse. [2] (*Id.* ¶ 101.) Despite these facts, PSI still recognized about $1.9 million of revenue from the sale to Customer G. (*Id.*)

[2]     PSI's accounting department was aware that Customer G did not lease the warehouse before the end of 2015. (Compl. ¶ 101.)

### v. Fourth Quarter Transactions
### Included on 2015 Form 10-K

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 8 of 27 PageID #:2651
United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

**\*9** Altogether, PSI improperly recognized about $5.8 million in revenue from the above four transactions in the fourth quarter of 2015. (*Id.* ¶¶ 81, 103.) Even including that revenue, PSI still fell well short of analysts' consensus net revenue expectation of $105.7 million when it reported net revenue of $96.7 million in the fourth quarter. (*Id.* ¶ 81.) That number fell short of the low end of PSI's public guidance of $100 million. (*Id.*) Of course, PSI would have missed those numbers by an even wider margin had the four transactions been accounted for properly. (*Id.*) That $5.8 million was improperly recognized as revenue on the financial statements included in PSI's Form 10-K. (*Id.*) When the $5.8 million is combined with the other sales from the first three quarters of 2015, PSI improperly recognized approximately $24.1 million of revenue in the full-year 2015 financial statements included with PSI's 2015 Form 10-K. (*Id.*)

## II. Attempts to Conceal Improper Recognition of Revenue

### A. Winemaster's Management Representation Letters to PSI's Auditor

Following each quarter in 2015, Winemaster signed a management representation letter to PSI's auditor that included false representations in light of PSI's improper revenue recognition practices with respect to the above transactions. (*Id.* ¶¶ 55, 67, 78, 106.) Specifically, each letter certified that the financial information for that quarter was presented in accordance with GAAP, there was no fraud or suspected fraud affecting PSI, there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements, there were no undisclosed side agreements, and the company had informed the auditor of all uncorrected misstatements. (*Id.*) Contrary to his representations in the letters, Winemaster knew that there were undisclosed arrangements concerning the sales for which PSI improperly recognized revenue, such as side agreements and rights of return. (*Id.*)

### B. Efforts to Conceal Details of Customer C Sales

When PSI's accounting department attempted to collect from Customer C the $10 million it agreed to pay for the engines it purchased in the second quarter of 2015, Customer C refused based on the provisions of the Customer C Letter Agreement. (*Id.* ¶ 108.) Following Customer C's refusal, accounting obtained a copy of the Letter Agreement from Needham in October 2015. (*Id.*) Subsequently, PSI's Controller provided PSI's CFO a copy of the agreement and informed the CFO that, in his opinion, the second quarter 2015 sale to Customer C constituted a consignment. (*Id.* ¶ 109.) And because PSI should have deferred the revenue from that sale, PSI would likely have to restate its second quarter 2015 financial reports. (*Id.*)

Upon learning of the Customer C Letter Agreement, PSI's CFO worked with the company's in-house counsel to draft a proposed amendment to the agreement that removed the conditional terms. (*Id.*) The agreement was shared with Winemaster, who sent the proposed amendment to Davis and Needham. (*Id.*) However, the proposed amendment was never sent to Customer C. (*Id.*)

In late January 2016, Customer C's Chief Operating Officer ("COO") emailed Needham regarding the sale from the third quarter of 2015 that PSI had booked for $4.3 million. (*Id.* ¶ 111.) The COO asked about the true amount that Customer C needed to pay for the engines, reminding Needham that the companies did a $3 million dollar deal, but "PSI upped the price so it made your numbers look better." (*Id.*) When Needham conferred with Davis about the email, Davis instructed him to have Customer C pay the $3 million and "not reference anything at this point in time." (*Id.* ¶ 112.) Needham then responded to Customer C that it should pay only the $3 million and PSI would adjust the $1.3 million at a later time. (*Id.*) In an update he provided to Winemaster on the transaction, Davis explained:

> It was agreed upon that we would sell these engines to [Customer C] at the JV price but sell them at the normal price and now as we negotiate with [Customer C] to pay these invoices they are going to short pay these invoices by 1.2 million dollars.[3] This is the deal that was agreed to. Before accounting gets short paid 1.2 million dollars I wanted you to be aware. This is obviously a problem.

**\*10** (*Id.*) Needham expressed concern to Davis that PSI's accounts receivable department would seek an explanation

from Customer C as to why it paid only $3 million of the $4.3 million price set forth on the purchase order. (*Id.* ¶ 113.)

3    The recorded difference between the $4.3 million price on the purchase order and the $3 million Customer C agreed to pay was $1,286,000. In referring to that difference in this communication, Davis apparently rounded that number down. (Compl. ¶ 112 n.1.)

In an attempt to engineer a solution that would take care of the issues with both the second quarter and third quarter sales to Customer C, Needham proposed that PSI trade a write-off of the $1.3 million balance from the third quarter sale and price incentives for future purchases in exchange for Customer C's payment of the $10 million balance from the second quarter sale over six months. (*Id.*) Customer C's COO responded by email, stating that:

> The $1.2M was added in order to boost PSI's sales revenue. I see you're washing it away but why wasn't it "discounted" on the payment we just made? That was the deal you and I made. We shouldn't have that $1.2M anywhere involved with the $10M deal. In fact, if that $1.2M shows up as owed on our bill it's going to raise all sorts of red flags around here.

(*Id.*) Winemaster, Needham, and Davis continued their discussions with Customer C regarding the $10 million balance from the second quarter sale in February 2016. (*Id.* ¶ 114.) One offer they made to Customer C was for PSI to subsidize Customer C's cost of capital so that it could make a $5 million payment on the balance. (*Id.*) Customer C rejected that offer. (*Id.*)

PSI's accounting department learned of Customer C's COO's correspondence with Needham in late March 2016. (*Id.* ¶ 115.) That led PSI's Controller to provide a hard copy of the emails to PSI's CFO and communicate his concern that PSI had committed fraud by booking the additional $1.3 million in revenue from the third quarter sale to Customer C. (*Id.*) After PSI's CFO discussed the matter with Winemaster, he reported back to the Controller that Winemaster had insisted that PSI

"doesn't do business like that" and that Winemaster planned to meet with Customer C regarding the transaction. (*Id.*)

By early April 2016, Needham and Winemaster had come up with a plan to create after-the-fact documentation to send to Customer C that would justify the $4.3 million price invoiced for the third quarter sale. (*Id.* ¶ 116.) Specifically, PSI would claim that it shipped domestic EPA-certified engines priced at $4.3 million instead of international non-certified engines priced at $3 million because PSI had an inadequate supply of the latter in September 2015. (*Id.* ¶ 117.) Winemaster then drafted a proposed email in which Customer C would state that it recognized that PSI did not have the reduced-price engine blocks in stock and therefore sold Customer C the domestic engines to meet the distribution requirement. (*Id.*) Customer C would go on to agree that it would purchase engines in 2016 at the reduced $3 million price to balance the agreement between the companies. (*Id.*) Contrary to the statements in the draft email, PSI had not sold Customer C the domestic engines in the third quarter. (*Id.* ¶ 118.) Rather, it sent Customer C the international engines that Customer C agreed to purchase for $3 million and PSI invoiced Customer C for the $4.3 million it would have paid for the domestic engines. (*Id.*)

**\*11**  To avoid detection, Winemaster printed out the email and texted a picture of the print-out to PSI's CFO. (*Id.* ¶ 117.) In response, PSI's CFO texted Winemaster comments on the draft. (*Id.* ¶ 119.) The CFO stated in one comment that Winemaster should keep in mind his discussions with Customer C that PSI's auditors "will be in next week and the [Customer C] discount and cash collections will be front of mind. [Customer C] needs to return the discount for now and restate their January email without mention of future discounts—anything less is a major problem." (*Id.*) Ultimately, Winemaster never sent the proposed email to Customer C. (*Id.*)

On April 14, 2016, Winemaster and Needham met with Customer C. (*Id.* ¶ 120.) At the meeting, Winemaster pressured Customer C to make payments on the engines purchased in the $10 million second quarter sale, despite knowing that the engines had not been placed in Customer C's generators, as required under the Customer C Letter Agreement. (*Id.*) Winemaster threatened to stop selling Customer C additional engines or engine parts if it did not pay the balance. (*Id.*) The threat carried significant weight given that PSI was the only supplier of the engines Customer C used to operate its generators. (*Id.*) Thus, although it had a right to

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 10 of 27 PageID #:2653

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

withhold payment under the Customer C Letter Agreement, Customer C agreed to make a $5 million payment to PSI in connection with the second quarter sale. (*Id.* ¶ 121.) In return, Winemaster agreed that PSI would subsidize Customer C's cost of capital on the $5 million payment for six months and to allow Customer C to return $4 million worth of product. (*Id.*)

Following the meeting with Customer C, Winemaster informed PSI's CFO that Customer C would pay PSI $5 million imminently and pay the remaining balance by the end of June 2016. (*Id.* ¶ 122.) Shortly thereafter, PSI's CFO told the accounting department about the forthcoming payments. (*Id.*) But accounting never learned that Winemaster had induced the payment by agreeing to provide Customer C a capital subsidy and a right of return. (*Id.*)

### C. Efforts to Conceal Details of Customer D Sale

In April 2016, a dispute arose between PSI and Customer D concerning the fourth quarter 2015 sale of the 3 Waukesha generator sets. (*Id.* ¶ 124.) It began when PSI refused to fulfill its obligation to accept the return of the Customer C engines. (*Id.*) This led Customer D's COO to send the following email to Needham:

> As you know, the PO [Customer D] issued was requested by PSI in order for PSI to book the sale of the three Waukesha's by the end of 2015. We were going to utilize the deal you and I made to return [Customer C's] excess 8T and 11L engines to use as a credit towards the three Waukesha's. As you know the PO wasn't for a direct deal between [Customer D] and PSI instead it notionally represented that [Customer D] would end up with the Waukesha's when PSI received the returned 8T and 11T [sic] inventory. The PO used for PSI to book the sale is not a valid PO and was built at your request.

(*Id.*) Over the ensuing months, Winemaster and Customer D executives exchanged correspondence in which they asserted their respective positions and threatened legal action. (*Id.* ¶

125.) As a result of this correspondence, Winemaster became aware of the engine exchange element of the transaction no later than June 3, 2016. (*Id.*)

During the back-and-forth between PSI and Customer D, PSI's CFO emailed Winemaster on July 25, 2016 and asked him when they could discuss Customer D's units, as "[a]uditors will want to remove these sales and force a change to history—not an outcome we want." (*Id.* ¶ 126.) The same day, Winemaster responded, saying that "these will get cleared. Try and push for end of August (15th min if you can). We are shutting off the telematics 7/31 to force them to pay thier [sic] outstanding."[4] (*Id.*) Finally, PSI and Customer D settled their dispute near the end of August 2016 when Customer D agreed to take delivery of and pay for the 3 Waukesha generator sets. (*Id.* ¶ 127.) But, at the insistence of Winemaster and PSI's Chief Legal Officer, Customer D did not issue a new purchase order. (*Id.*) Instead, the transaction supplemented the purchase order previously issued in December 2015. (*Id.*)

[4]     Telematics referenced in this email were used by Customer D to manage and monitor its operating units. (Compl. ¶ 126.) PSI controlled access to the telematics, which were important to Customer D's operations. (*Id.*)

### D. PSI's Internal Investigation

 **\*12**  Due to an employment dispute, PSI's COO left the company in May 2016. (*Id.* ¶ 128.) Shortly after his departure, the COO sent PSI's Board of Directors a letter and draft complaint against PSI, alleging that PSI's top management directed sales staff to "channel stuff" and "pull-up" sales from 2016 to inflate PSI's 2015 revenues so that the company would not miss its revenue guidance. (*Id.*) Among the transactions cited in the COO's complaint were the two sales to Customer C, the Customer D transaction, and the Customer F transaction. (*Id.*) The complaint led PSI's Audit Committee and Board of Directors to confront Winemaster about its allegations. (*Id.* ¶ 129.) Winemaster denied that the COO's allegations had any merit but promised that PSI's Chief Legal Officer and its CFO would investigate them. (*Id.*) In addition, PSI's Board of Directors retained independent counsel in July 2016 to investigate the allegations in the former COO's complaint. (*Id.* ¶ 130.)

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

On July 31, 2016, PSI's CFO sent the former COO's letter and draft complaint to PSI's auditor. (*Id.* ¶ 131.) Upon receiving the documents, the auditor stated that it would not sign off on PSI's second quarter 2016 Form 10-Q until it received the results of the internal investigation. (*Id.*) The internal investigation commenced on August 2, 2016. (*Id.* ¶ 132.) During the course of the investigation, Winemaster gave false explanations for certain of the transactions under investigation. (*Id.*) For instance, he told investigators that the $1.3 million shortfall related to the third quarter 2015 sale to Customer C was a misunderstanding. (*Id.*) Winemaster also stated that he directed the shipment of Customer F's engines to a PSI-leased offsite warehouse so that PSI could easily reclaim the engines should Customer F fail to make payment. (*Id.*) Both misrepresentations were conveyed to PSI's auditor. (*Id.*) Just before the deadline for PSI to file its second quarter 2016 Form 10-Q, Winemaster participated in a conference call during which he tried to convince PSI's auditors that the transactions identified in the former COO's complaint were each legitimate and fully collectable business deals. (*Id.* ¶ 133.) Winemaster's efforts were unsuccessful and the auditor did not sign off on the Form 10-Q. (*Id.*)

### E. Concealment Efforts in Response to SEC Investigation

The SEC issued a document preservation notice and subpoena to PSI in August 2016. (*Id.* ¶ 134.) The next month, Winemaster told the company's Vice President of Advanced Product Development that PSI needed to clean up its outstanding receivables from Customer C before the end of 2016 in light of the SEC's investigation. (*Id.* ¶ 135.) Winemaster therefore directed the Vice President of Advanced Product Development to find a buyer for Customer C's excess engine inventory so that Customer C would pay its outstanding balance for the second and third quarter transactions. (*Id.*) As 2016 drew to a close, Winemaster directed the purchase of 60 generator sets from Customer C that contained PSI engines. (*Id.*) Yet PSI did not have potential customers for the generators and the purchase was meant only to encourage Customer C to pay its 2015 balance so that PSI could cover up its accounting misstatements. (*Id.*) In addition, Winemaster and Davis tried to disguise the right of return granted to Customer B in connection with its $7.8 million purchase in the first quarter of 2015. (*Id.* ¶ 136.) They did so by instructing PSI's sales staff to help Customer B resell the engines to another PSI customer after Customer B attempted to return the engines to PSI in 2017. (*Id.*)

### III. Restatement of Financial Statements

**\*13** Between August 4, 2016 and April 7, 2017, PSI revealed its accounting misstatements in several current reports on Form 8-K. (*Id.* ¶ 137.) And on January 27, 2017, after PSI's independent investigation revealed more details regarding PSI's improper recognition of revenue from 2014 and 2015, PSI's auditor resigned. (*Id.* ¶ 138.) When PSI filed its 2017 Form 10-K, it included restated financial statements that resulted in a total reduction of revenue of $29.8 million for financial statements from the fourth quarter of 2014 though the fourth quarter of 2015. (*Id.* ¶ 140.) A summary of PSI's restatement of revenues and income is depicted in the below charts:

**Impact of All Adjustments on Net Revenue**
*(dollar amounts in thousands)*

| | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | FY 2015 |
|---|---|---|---|---|---|---|
| *Originally Reported Net Revenue* | 103,910 | 86,139 | 94,629 | 112,008 | 96,670 | 389,446 |
| Fraudulent Transactions | (846) | (6,951) | (10,020) | (1,286) | (5,823) | (24,080) |
| Other Adjustments | (1,863) | 4,132 | 746 | 4,229 | (12,087) | (2,981) |
| Net Revenue Adjustments | (2,709) | (2,819) | (9,274) | 2,943 | (17,910) | (27,060) |
| **Restated Net Revenue** | 101,202 | 83,320 | 85,355 | 114,951 | 78,760 | 362,386 |
| *Net Revenue Adjustment, as Percentage of Restated Net Revenue* | 2.7% | 3.4% | 10.9% | 2.6% | 22.7% | 7.5% |

**Impact of All Revenue Related Adjustments on Income Before Taxes**
*(dollar amounts in thousands)*

| | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | FY 2015 |
|---|---|---|---|---|---|---|
| *Originally Reported Income (Loss) Before Taxes* | 13,630 | (72) | 6,206 | 8,643 | (887) | 13,890 |
| *Restated Income (Loss) Before Taxes* | 10,585 | (2,585) | 1,246 | 6,908 | (18,162) | (12,593) |
| Fraudulent Transactions | (320) | (2,424) | (3,007) | (1,286) | (1,054) | (7,771) |
| Other Adjustments | (2,438) | 384 | (482) | 26 | (3,751) | (3,823) |
| Gross Profit Adjustment | (2,758) | (2,040) | (3,489) | (1,260) | (4,805) | (11,594) |
| *Gross Profit Adjustment, as Percentage of Restated Income Before Taxes* | 26.1% | 78.9% | 280.0% | 18.2% | 26.5% | 92.1% |

(*Id.* ¶ 141.)

### DISCUSSION

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, the short and plain statement must meet two threshold requirements. First, the complaint's factual allegations must be sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Second, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

Securities fraud claims under § 10(b) of the Exchange Act and Rule 10b-5 must also satisfy the heightened pleading standard set forth under Federal Rule of Civil Procedure 9(b). *SEC v. Steffes*, 805 F. Supp 2d 601, 607 (N.D. Ill. 2011). Rule 9(b) requires that a party alleging fraud must "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To state the circumstances of fraud with sufficient particularity, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). This "stringent pleading requirement ... serves three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Steffes*, 805 F. Supp. 2d at 608.

Broadly, the SEC alleges in its 11-count complaint that Winemaster, Needham, and Davis violated multiple securities laws by engaging in accounting fraud that caused PSI to issue materially misstated financial statements in its SEC filings. While Davis opted answer the SEC's complaint, Winemaster and Needham have filed motions to dismiss. Both Winemaster and Needham argue that the entire complaint should be dismissed for employing a pleading format that fails to satisfy Rule 9(b)'s particularity requirement. They then turn to attacking the sufficiency of several, but not all, of the counts against them. The specific Counts at issue are as follows. Count I alleges that Winemaster violated § 10(b) of the Exchange Act and Rule 10b-5(b). Separately, Count II alleges that Needham (along with Davis)[5] aided and abetted Winemaster's Rule 10b-5(b) violation. In addition, Count III asserts a claim against Winemaster and Needham for violating Rules 10b-5(a) and 10b-5(c). In addition to the Rule 10b-5 claims, Winemaster seeks dismissal of the claims brought under Rule 13a-14 under the Exchange Act (Count IX); § 20(a) of the Exchange Act (Count X); and § 304 of the Sarbanes-Oxley Act ("SOX") (Count XI). Needham seeks dismissal of the claims against him for aiding and abetting PSI's violations of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Count IV); aiding and abetting PSI's violations of § 13(b)(2)(A) of the Exchange Act

(Count V); and violating § 13(b)(5) of the Exchange Act and Rule 13b2-1 (Count VII).

5    In every Count in which a claim is asserted against Needham, the same claim is asserted against Davis.

### I. "Shotgun" and "Puzzle" Pleading

**\*14** According to both Winemaster and Needham, the SEC's complaint improperly relies on so-called "shotgun" and "puzzle" pleading to assert their claims. They claim both forms of pleading are improper in a complex securities action because they fail to adequately apprise each Defendant of what alleged conduct gives rise to the claims against him.

Shotgun pleading refers to a pleading style in which each count of the complaint "incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading." *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (internal quotation marks omitted). In certain circumstances, the shotgun style of pleading "can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult." *Chriswell v. Village of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at \*5 (N.D. Ill. Nov. 4, 2013) (internal quotation marks omitted). Relatedly, puzzle pleading refers to a pleading style that forces "the Court and the defendant to piece together exactly which statements [the plaintiff is] challenging and what allegations contradict those statements." *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at \*5 (N.D. Ill. June 16, 2014). Such a pleading can "improperly place[ ] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at \*4 (N.D. Ill. July 25, 2012) (internal quotation marks omitted). The net effect of a puzzle pleading may be to "leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." *Id.*

But the mere fact that a complaint's counts incorporate by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them. *E.g.*, *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1324–25 (11th Cir. 2015); *Koh v. Graf*, No. 11-cv-02605, 2013 WL 5348326, at \*5 (N.D.

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 13 of 27 PageID #:2656

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

Ill. Sept. 24, 2013). "What is impermissible ... is grouping multiple defendants together and failing to set out which of the defendants made which of the fraudulent statements/ conduct." *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1051 (N.D. Cal. 2016). Here, the format of the SEC's complaint "does not prevent the Court from reviewing the sufficiency of each count." *SEC v. Ustian*, 229 F. Supp. 3d 739, 778 (N.D. Ill. 2017). Unlike improper shotgun pleadings, the SEC's complaint specifically identifies the role of each Defendant in the alleged fraud, their actions and inactions that led to the misstated financial statements, and why their actions constituted fraud. *See Bardman*, 216 F. Supp. 3d at 1051.

Similarly, the SEC's complaint will not be dismissed for employing so-called puzzle pleading. Winemaster and Needham contend that the complaint's supposed puzzle pleading makes it difficult for them to discern the specific statements that the SEC alleges to be fraudulent and the conduct that gives rise to the claims against them. However, as discussed below, the Court has no difficulty in identifying the false statements giving rise to the claims. And it is sufficiently clear how Winemaster's and Needham's actions contributed the alleged fraud. Simply put, the complaint did not require the Court to go through any great effort "to determine exactly which statements [the SEC] allege[s] are misleading and which alleged facts support [the SEC's] claims." *Alizadeh*, 2014 WL 2726676, at *5; *see also Boca Raton Firefighters' and Police Pension Fund v. DeVry, Inc.*, No. 10 C 7031, 2012 WL 1030474, at *1 n.4 (N.D. Ill. Mar. 27, 2012) (declining to dismiss a complaint for puzzle pleading even where the complaint's format created repetition because it did not make the complaint too difficult to understand).

## II. Primary Liability Under § 10(b) of the Exchange Act and Rule 10b-5

**\*15** Three of the counts in the SEC's complaint arise under § 10(b) of the Exchange Act, which makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). As authorized under § 10(b), the SEC promulgated Rule 10b-5. Rule 10b-5 makes it unlawful for any person, in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5. In Count I of the complaint, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b), whereas Count III asserts a claim under subsections (a) and (c) of Rule 10b-5 against both Winemaster and Needham.

### A. Rule 10b-5(b)

To state a Rule 10b-5(b) claim, "the SEC must allege that the defendant[ ] (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *Ustian*, 229 F. Supp. 3d at 764 (internal quotation marks omitted). The maker of a statement subject to liability under Rule 10b-5(b) is "the entity with authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). Here, the purported misstatements were made in PSI's SEC filings. Because Winemaster, as CEO, reviewed and approved PSI's financial statements, and reviewed, approved, signed, and certified its SEC filings, he was the maker of the misstatements in them. *E.g.*, *SEC v. Carter*, No. 10 C 6145, 2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) ("[D]efendant ... signed an SEC form (a form 8-K) as highranking corporate officer (CEO). The defendant's electronic signature indicates that he 'made' the statements therein."). Thus, the SEC seeks to hold Winemaster primarily liable under Rule 10b-5(b) based on his direct involvement in six of the eight transactions leading to misstatements at issue in this action. [6]

6      The SEC acknowledges that Winemaster was not directly involved in the fraud committed with respect to the Customer A transaction in the fourth quarter of 2014 or the Customer D transaction in the fourth quarter of 2015. Nonetheless, as discussed below, it seeks to hold Winemaster liable as a control person with respect to those transactions pursuant to § 20(a) of the Exchange Act.

#### i. Material Misstatement

As a result of each of the six transactions in which Winemaster was directly involved, PSI's financial statements submitted with its SEC filings contained inflated and false revenue numbers. "A company's overstatement of revenues in violation of GAAP may constitute a false or misleading statement of material fact necessary to establish securities fraud." *Takara Tr. v. Molex, Inc.*, 429 F. Supp. 2d 960, 978 (N.D. Ill. 2006). Here, the SEC pleads with sufficient particularity each of the filings that contained misstated revenue figures, the details of the transactions from which revenue was improperly recognized, how recognition of revenue from each subject transaction violated GAAP and PSI's own revenue recognition policy, and the specific amount by which the revenue was misstated. *See Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 35 (D. Mass. 2000) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." (internal quotation marks omitted)). And the allegations that PSI had to restate its financial statements due to the improper recognition of revenue from the subject transactions sufficiently demonstrates that the financial statements were false when made. *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." (internal quotation marks omitted)); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 709 (N.D. Ill. 2005) (finding that a company's subsequent restatement of its financial statements to be evidence of the statements' falsity).

 **\*16**  Neither Winemaster nor Needham argue that the SEC failed to plead that the misstatements in PSI's corporate filings were false or misleading. Nonetheless, they contend that many of the misstated revenue numbers were not material. "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). Put differently, Rule 10b-5(b) recognizes a misstatement or omission as material "if it is substantially

likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the 'total mix of information made available.' " *Id.* (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Whether a misstatement is material is "an inherently fact-specific finding." *Ustian*, 229 F. Supp. 3d at 765. "Because materiality requires assessments of how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches, assessing materiality is for the trier of fact and rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Id.* (internal quotation marks omitted).

According to Winemaster, the net revenue reductions reflected in the restated financial statements for three of the five quarters at issue here are immaterial as a matter of law because the deviation between the original and restated revenue numbers was less than 5%. [7] In support of this 5% materiality threshold, Winemaster points to two Second Circuit cases stating that "the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009); *see also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Of course, even those cases acknowledged that "bright-line numerical tests for materiality are inappropriate," *ECA, Loc. 134*, 553 F.3d at 204, and the 5% threshold "is not conclusive," *IBEW Loc. Union No. 58*, 783 F.3d at 390. Instead, "[c]ourts must also consider qualitative factors, which can turn a quantitively immaterial statement into a material misstatement." *Id.*

---

[7]    Similarly, Needham claims that three of the four misstatements attributable to his conduct are immaterial because those allegedly fraudulent transactions affected less than 5% of the revenue reported for the quarter or fiscal year. The materiality analysis here applies equally to Needham's materiality argument.

Here, the Court cannot conclude at the pleadings stage that any of the misstated revenue figures were immaterial, even if they were not quantitively material. As pleaded in the complaint, the analysts' consensus net revenue estimate was an important metric for a company's performance and failure to meet that projection would provoke a negative reaction from investors and a corresponding decrease in stock price. (Compl. ¶ 29.) Thus, it is important from the standpoint of

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 15 of 27 PageID #:2658
United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

qualitative materiality that, for each quarter at issue here, PSI's revenues were falling just short of the analysts' net revenue estimate. But by improperly recognizing revenue from the subject transactions, PSI was able to meet the analysts' revenue estimates or at least keep the shortfall within a respectable range of the estimate. Thus, although the amount of revenue recognized from any particular subject transaction may have been quantitively small, it played an important role for PSI in demonstrating that its financial performance was meeting expectations when, in fact, its sales were slumping.

At a minimum, there is a substantial question of fact as to whether investors would have deemed it significant if the improperly recognized revenue were not included in PSI's financial statements. *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (finding misstatements material where they "reflect consequential facts about the Company, namely, its financial health" (internal quotation marks omitted)); *Takara*, 429 F. Supp. 2d at 977 ("Accurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating a company's stock." (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002))). Moreover, the fact that PSI issued restatements, by itself, is "evidence of materiality, as financial accounting standards provide that financial results shall be restated only when errors are material." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (internal quotation marks omitted). For these reasons, the Court concludes that the materiality issue is not suitable for resolution at this stage.

### ii. Scienter

**\*17** Winemaster contends that the SEC fails to allege that he acted with scienter with respect to each of the six subject transactions in which he had some involvement. Under Rule 10b-5, the scienter requirement "embraces an 'intent to deceive, manipulate, or defraud,' as well as reckless disregard of the truth." *SEC v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) (quoting *Aaron v. SEC*, 446 U.S. 680, 686 n.5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)). Recklessness can be shown where there is "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McConville v. SEC*, 465 F.3d 780, 788 (7th Cir. 2006) (internal quotation marks omitted). "In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be

some basis for believing the plaintiff could prove scienter." [8] *Ustian*, 229 F. Supp. 3d at 774 (internal quotation marks omitted). Typically, "scienter is a question of fact and is therefore usually best decided by the trier of fact." *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at \*16 (N.D. Ill. May 19, 2020).

[8]    By contrast, when a private party—as opposed to the SEC—brings an action under § 10(b) and Rule 10b-5, the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) govern. Under the PSLRA, a private party plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Neither Winemaster nor Needham request that the PSLRA standard be applied here. Nonetheless, the Court notes the heightened pleading standard as it will cite cases brought under PSLRA where the plaintiff had to meet "strong inference of scienter" standard.

### a) Customer B Transaction

As alleged by the SEC, after Customer B resisted PSI's attempts to convince it to take early delivery of $7.8 million worth of engines in the first quarter of 2015, Winemaster personally called Customer B's president to try and make the sale. During that call, Winemaster purportedly closed the deal by offering an indefinite right of return on the engines. And even though under GAAP, such right of return could preclude PSI from recognizing immediately recognizing revenue from the sale, Winemaster failed to inform the accounting department of the right of return. As a result, the entire $7.8 million from the sale was recognized as revenue.

As CEO, Winemaster was responsible for PSI's system of internal accounting controls. (Compl. ¶ 143.) Thus, it is reasonable to infer that he was familiar with basic GAAP standards regarding revenue recognition. *See, e.g.*, *SEC v. Jacoby*, No. CCB-17-3230, 2018 WL 3732102, at \*6–7 (D. Md. Aug. 3, 2018) (noting that the defendant's role as CEO made it plausible that he would recognize accounting improprieties that would result in improper revenue recognition); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 538210, at \*7 (W. D. Wash. Mar. 2, 2006) (finding a complaint sufficiently alleged scienter where it alleged that the defendant's "training and position in the company"

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

meant that he knew or was reckless in not knowing that it was improper for the company to recognize revenue from a transaction in violation of GAAP). Moreover, Winemaster also knew he needed to inform PSI's accounting department when sales contained terms that deviated from PSI's standard terms. (*Id.* ¶ 27.) Indeed, accounting depended on the sales personnel to directly inform it of such deviations, otherwise the revenue associated with that sale might not be properly recorded. (*Id.*) Yet according to the SEC, despite his direct involvement in closing the sale with Customer B, Winemaster failed to disclose the right of return to accounting, and later, PSI's auditor, even though he knew or should have known it was pertinent to the proper accounting of the sale.

 **\*18** The allegations that Winemaster concealed the right of return further supports scienter. *See SEC v. Espuelas*, 698 F. Supp. 2d 415, 429–30 (S.D.N.Y. 2010) (stating that the SEC pleaded scienter based on allegations that the defendants withheld details of transactions that they should have known would cause the company to improperly recognize revenue); *SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1282 (D. Colo. 2006) (finding that scienter was alleged where the defendant engaged in conduct intended to deceive the company's accountants into improperly recognizing revenue); *cf. Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith.").

The complaint further alleges that, despite knowing about the right of return, Winemaster nonetheless allowed PSI to represent to investors and the public that it earned net revenue for the first quarter of 2015 that included $7.8 million of revenue from the Customer B sale. That Winemaster signed off on published statements concerning PSI's first quarter revenue when he "knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Moreover, the SEC's allegations that Winemaster continued to conceal the right of return in 2017, when Customer B sought to exercise it, reinforces his scienter. While scienter cannot be inferred by "hindsight," *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007), "common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind." *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005). Thus, "that a person takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew

he made a mistake." *Id.*; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (stating that a CEO's attempts to cover up specifics of an unlawful promotional scheme supported a "strong inference" of scienter); *SEC v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at \*3 (N.D. Ill. Aug. 19, 2010) ("[The defendant's] guilty knowledge is confirmed by his alleged attempt to 'cover-up' the fraud ....").

Winemaster contends, however, that the SEC's allegations fail to show how he, as a non-accountant, should have known that the right of return would affect the accounting treatment of the Customer B sale. Further, he argues that the SEC's complaint demonstrates that the right of return did not implicate a simple revenue recognition principle. Rather, as alleged, PSI's ability to recognize revenue turned on a subsection of ASC 605-10-25-1 stating that revenue could only be recognized if the amount of future returns could be reasonably estimated. For support, Winemaster cites *SEC v. Lucent Technologies, Inc. ("Lucent II")*, No. Civ. 04-2315(WHW), 2005 WL 1206841, at \*5 (D.N.J. May 20, 2005), where the district court found that the SEC failed to plead scienter on the part of one of the company's vice presidents based on her failure to disclose in connection with a sale a side agreement providing a right of return. The district court found that the complaint contained no allegations that would allow it to infer that the vice president "had any knowledge of accounting principles or that she had any role in [the] decisions to recognize revenue in connection with the transactions that [she] executed." *Id.*

 **\*19** Unlike in *Lucent II*, however, Winemaster was not just a "regular business [person]," *id.*, who had no reason to know that the existence of a right of return might be significant to how revenue from the Customer B sale would be recognized. Rather, Winemaster was PSI's CEO, who was responsible for the company's internal accounting and financial reporting controls. It is not necessary to allege that Winemaster knew the particular GAAP standard that was implicated by the sale or otherwise show his extensive familiarity with GAAP. Indeed, "if the GAAP rules ... [the defendant is] alleged to have violated are relatively simple, it is more likely that [he was] aware of the violations and consciously or intentionally implemented or supported them, or [was] reckless in this regard." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000). And while the intricacies involved in recognizing revenue from a sale subject to a right of return might be complex, a CEO need not be well-versed in GAAP to understand that the existence of such right should be properly disclosed. *See, e.g., Marksman Partners, LP v.*

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

*Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1315 (C.D. Cal. 1996) ("Premature accounting recognition ... where a right of return is clearly capable of exercise, permits an inference of scienter."). At a minimum, the SEC's allegations establish that Winemaster knew or should have known that the right of return would affect the accounting treatment of the Customer B sale, and he was at least reckless in failing to disclose its existence. Thus, the SEC has pleaded Winemaster's scienter with respect to the Customer B transaction.

### b) Customer C Transaction—Second Quarter 2015

In the second quarter of 2015, Customer C bought about $10 million worth of engines from PSI. As alleged in the complaint, the sale was subject to the Customer C Letter Agreement, which permitted Customer C to withhold payment for each engine until 30 days after it was placed in a Customer C generator and also gave Customer C a right to exchange the engines for a different model. The complaint further alleges that Needham negotiated the Customer C Letter Agreement and Winemaster approved it.

Once again, despite Winemaster's alleged knowledge of the side letter agreement, the details of the agreement were not disclosed to PSI's accounting department. Similar to the right of return in the Customer B transaction, the right of exchange provided to Customer C would have affected the accounting treatment of the sale. Moreover, the Customer C Letter Agreement contained another obstacle to immediate recognition of revenue: under GAAP, revenue cannot be recognized where a buyer is given a right of return if the buyer does not pay at the time of the sale and its payment obligation is contingent on the buyer's ability to resell the product. As CEO, Winemaster should have at least known that the provisions of the Customer C Letter Agreement were relevant to the accounting of the sale, such that the agreement should have been disclosed to the accounting department. Instead, according to the complaint, Winemaster concealed the Customer C Letter Agreement from accounting, thereby allowing PSI to inflate its revenues by $10 million.

Winemaster claims that the SEC fails to allege that he knew the actual terms of the Customer C Letter Agreement. However, Winemaster seems to be asking the Court to draw an inference in his favor when all reasonable inferences must be drawn in favor of the SEC at this stage. Despite his protestations, it is reasonable to infer that Winemaster knew the terms of the Customer C Letter Agreement based

on the SEC's allegation that he knew and approved of it. Conversely, it is unreasonable to infer that Winemaster would approve of the agreement without any knowledge of its specific terms, particularly given the substantial size of the sale. Further bolstering the inference are the allegations that Needham, who negotiated the agreement, reported directly to Winemaster and Winemaster exercised close oversight of PSI's sales personnel.

Winemaster also points to a contradiction between the SEC's allegations that he met with Customer C in April 2016 and pressured Customer C to make additional payments on the engines even though they had not yet been placed in generators, which was a precondition to payment under the Customer C Letter Agreement. The Court does not believe that these allegations are irreconcilable, especially when the April 2016 meeting is viewed in context. As alleged, that meeting occurred in the course of Winemaster's increasingly desperate attempts to cover up the fraud in connection with both the $10 million second quarter 2015 Customer C sale and the third quarter 2015 Customer C sale that PSI artificially inflated by $1.3 million. Just days before the meeting, Winemaster proposed a draft email that would enlist Customer C in the fraud with respect to the third quarter 2015 sale. (Compl. ¶¶ 116–19.) And during the meeting, Winemaster threatened that PSI would stop selling Customer C engines that were critical to its operations and of which PSI was the sole supplier. (*Id.* ¶ 120.) Moreover, after the meeting, Customer C agreed to pay $5 million to PSI with respect to the second quarter 2015 sale even though it had no obligation to do so under the Customer C Letter Agreement. (*Id.* ¶ 121.) Given this context, it is certainly plausible that Winemaster knew of but disregarded the precondition to payment set forth in the Customer C Letter Agreement.

**\*20** Finally, Winemaster challenges the SEC's allegation that PSI's accounting department was not aware of the Customer C Letter Agreement. In particular, he points to the SEC's allegation that "Customer C referenced the [Customer C] Letter Agreement on its purchase order for the engines, specifically stating the order was pursuant to letter dated June 8, 2015 from PSI and signed by Jim Needham." (*Id.* ¶ 59.) But the SEC also alleges that the "accounting department did not review customer purchase orders ... before recording revenue. If the customer was given terms different from those entered by sales department personnel into EPICOR, those terms would not be reflected on the invoice generated by the accounting department." (*Id.* ¶ 28.) And given Winemaster's knowledge of and responsibility for internal accounting

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

controls, it is reasonable to infer that the disclosure of the Customer C Letter Agreement on Customer C's purchase order would not hinder his ability to conceal the existence of the agreement from accounting.

In short, the SEC has pleaded sufficiently that Winemaster knew of and approved the Customer C Letter Agreement and it is reasonable to infer that he knew the agreement's terms and that they could impact the sale's accounting treatment. Nonetheless, as alleged, Winemaster did not disclose the agreement to accounting and allowed PSI to recognize $10 million of revenue from the sale in the second quarter of 2015. These allegations are sufficient to establish Winemaster's scienter with respect to the second quarter 2015 Customer C sale.

### c) Customer C Transaction—Third Quarter 2015

According to the complaint, PSI turned again to Customer C in the third quarter of 2015 when it faced the prospect of missing its revenue target. But instead of adding conditions to the sale, Needham simply directed Customer C to inflate its purchase order to make it appear that the order was for $4.3 million while assuring Customer C that it would only have to pay $3 million. As alleged, Winemaster was aware of and approved Needham's direction to Customer C to inflate its purchase order by $1.3 million.

Winemaster's scienter as to the third quarter Customer C sale can be inferred for the same reasons that it could be inferred for the second quarter Customer C sale. Specifically, Winemaster knew of and approved Needham's direction to Customer C. That Winemaster directly supervised Needham and exercised close oversight of PSI's salespeople all bolster the allegations of Winemaster's awareness of the artificial inflation. Moreover, it should have been manifestly obvious to any competent businessperson that recognizing $1.3 million of revenue out of thin air is improper and deceptive. Later, as discussed above, Winemaster is alleged to have drafted an email that he proposed to have Customer C send, providing a false explanation to cover up the $1.3 million shortfall.

According to Winemaster, the SEC's allegations regarding his subsequent conduct demonstrate that he was not aware of the artificial inflation associated with the sale until months after the improperly recognized revenue was included in PSI's quarterly and annual filings. He points to an email Davis sent to Winemaster in January 2016 updating

Winemaster on the transaction, in which Davis explained "the deal that was agreed to" so that Winemaster was aware of the problem "[b]efore accounting gets short paid 1.2 million dollars." (Compl. ¶ 112.) At the pleading stage, the Court cannot conclude that Davis's email was informing Winemaster of the deal for the first time as opposed to simply refreshing his memory. Indeed, Needham, who allegedly directed the artificial inflation, also needed to be refreshed about the terms of the deal in an email from Customer C's COO. (*Id.* ¶ 111 ("[I]f you remember when we did the $3M deal ... PSI upped the price so it made your numbers look better.").) Thus, the allegations concerning Winemaster's awareness and approval of the artificial inflation of the revenue from the third quarter 2015 sale to Customer C are sufficient to plead his scienter as to that transaction.

### d) Customer E Transaction

**\*21** PSI had expected to fulfill a $600,000 purchase order from Customer E in the fourth quarter of 2015. However, due to a delay in procuring necessary custom oil pans, it became apparent to PSI that it would not be able to meet Customer E's specifications for the order. According to the SEC, with PSI falling far short of its fourth quarter 2015 revenue goals, the company sought to recognize revenue from the sale in the quarter by shipping the engines to a PSI-affiliated warehouse in China with a standard oil pan and delivering them to Customer E in 2016 with the correct oil pan. When PSI's CFO became aware of this plan, he informed PSI's sales department that no revenue could be recognized in 2015 from this sale. In turn, the salesperson responsible for the Customer E account relayed the CFO's message to Winemaster. Winemaster then approached PSI's CFO and falsely informed him that the engines would be fully functional in Customer E's intended product, and thus revenue could be recognized in 2015 from the sale.

Here, as alleged, Winemaster was directly made aware of the risk of improperly recognizing revenue from the sale by PSI's CFO. Despite knowing that the engines did not meet Customer E's specifications and would not work in its intended product, Winemaster responded to the CFO's warning by falsely stating that the engines would be fully functional. Thus, Winemaster had direct knowledge of the revenue recognition problem and was at least reckless in failing to honestly address it. With his motion, Winemaster seeks to divert the Court's attention from the issue of which Winemaster was aware by saying that the real GAAP defect

was the fact that the engines were not shipped to Customer E by the end of 2015. But the fact that there was an additional reason that revenue could not be recognized from the sale does not detract from the fact that Winemaster was aware of and disregarded an independent reason that PSI could not recognize revenue from that transaction. For that reason, the SEC has adequately alleged Winemaster's scienter as to the Customer E transaction.

#### e) Customer F Transaction

As alleged in the complaint, by December 2015, PSI was urgently attempting to generate revenue to make up for an anticipated revenue shortfall. It therefore sought to convince Customer F to accept early delivery of engines it had expected to accept in 2016. But even after it was offered multiple incentives, Customer F declined PSI's pleas. Yet, on the last day of 2015, Davis called PSI's Director of Facilities and ordered the shipment of the 147 engines Customer F had ordered to an offsite warehouse and then invoiced Customer F $300,000 for the engines. PSI recognized that $300,000 as revenue in 2015.

On his call with PSI's Director of Facilities, Davis stated that he already informed Winemaster of the shipment. Thus, the SEC has pleaded Winemaster's awareness of the shipment. Not only did it violate GAAP to recognize revenue from the delivery of engines that Customer F had not accepted or even authorized, it also violated PSI's own revenue recognition policies. Specifically, PSI stated that it would not recognize revenue before delivery has occurred if the risk of ownership has not passed to the buyer or the buyer and the buyer has not requested that the goods be held for future delivery. And courts have found that a "violation of a company's own policy supports an inference of scienter." *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999); *see also Provenz*, 102 F.3d at 1490 (denying summary judgment on scienter where the defendants' accounting figures violated GAAP and the company's own revenue recognition policies).

Further, the unauthorized delivery occurred near the end of the quarter and fiscal year, as PSI was significantly underperforming its revenue targets. Indeed, Davis reported to Winemaster in November 2015 that "PSI was going to have to pull forward a lot of sales from 2016 because" it was about $30 million short of analysts' consensus net revenue estimate for the quarter. (Compl. ¶ 80.) Scienter can be supported where, as here, a defendant is alleged to know of a revenue shortfall and thus has "a motive to increase revenue to meet earnings expectations." *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 970 (N.D. Ill. 2011); *see also SEC v. Arnold*, No. 03-CV-0328-REB-OES, 2007 WL 2786428, at *2–3 (D. Colo. Sept. 24, 2007) (finding that the SEC pleaded scienter with allegations that the defendant knew that the company was falling short of quarterly revenue targets and therefore entered into a transaction "solely for the purpose of inflating materially the company's revenues and overstating its business performance").

**\*22** Winemaster contends that while the SEC pleads his awareness of the shipment, it fails to allege that he knew the shipment was being made without Customer F's consent. However, the complaint alleges that Winemaster later claimed responsibility for the shipment, telling PSI's Chief Legal Officer in August 2016 that the shipment was made at his direction. (Compl. ¶ 132.) Thus, accepting this as true, Winemaster admitted that he ordered the shipment to the offsite warehouse and it is reasonable to infer that he was aware of the other surrounding circumstances of the shipment.

Winemaster also claims that the SEC failed to plead that he withheld details of the transaction from PSI's accounting department. Instead, according to Winemaster, it alleges in passive voice that "PSI's accounting group was not made aware of the circumstances surrounding the shipment." (Compl. ¶ 96.) But that argument amounts to little more than nitpicking over grammar. In any case, the SEC alleges that only Winemaster, Davis, and the Director of Facilities knew of the shipment. Thus, Winemaster was one of only three people who could have alerted the accounting department. Given his responsibilities for internal accounting control, Winemaster should have known that the accounting department would find the details of the shipment relevant to the proper treatment of this transaction.

In sum, the SEC has alleged facts sufficient to show that Winemaster should have known that PSI could not recognize revenue where Customer F had not agreed to accept the shipment before the end of the year. As one of the three people who were aware of the transaction, he should have made sure that accounting was aware of the details that precluded the recognition of revenue. Thus, the SEC has adequately pleaded Winemaster's scienter as to the Customer F transaction.

#### f) Customer G Transaction

As alleged, Customer G agreed to purchase in the fourth quarter of 2015 $1.9 million of base engines, essentially engines that lacked parts to function in Customer G's equipment. Those engines would then be shipped to an offsite warehouse by the end of 2015 and then brought back to PSI to be completed and shipped to Customer G in 2016. The purported purpose behind the transaction was to allow PSI to recognize revenue from the sale in 2015. But PSI could not even ensure that those already incomplete engines were at least completed in accordance with the order. Specifically, the engines were missing the catalysts, a required component under the order. Nonetheless, the salesperson responsible for Customer G's account was told by Winemaster to ship the engines without the catalysts.

Similar to the Customer E sale, PSI recognized revenue from a sale that did not meet Customer G's specifications because it was missing a required part. Winemaster argues that the SEC failed to plead his scienter because both PSI (and its accounting department) and Customer G were aware that the shipment involved incomplete, non-functional engines. While it is true that the base engines were missing other parts and would have to be completed in 2016, the catalysts were a required component of the base engine portion of Customer G's order. Customer G was never informed of or excused the deviation. And it is telling that PSI's accounting department knew of the details of Customer G's agreement with PSI and apparently found it proper to recognize revenue from the sale. That plausibly suggests that Winemaster failed to disclose to accounting that the base engines were missing the catalysts because that information could affect accounting's willingness to recognize revenue in 2015 from the transaction. At the very least, the SEC has pleaded facts showing that Winemaster was reckless in failing to inform accounting of the missing catalysts so that it could determine how the issue would impact the sale's accounting treatment.

### iii. In Connection with the Purchase or Sale of Securities

 **\*23**  Winemaster does not contend that his conduct was not in connection with the purchase or sale of securities. Nor could he, as misrepresentations and omissions about a company's finances contained in its SEC filings are indisputably made in connection with the purchase or sale of securities. *E.g.*, *SEC v. Wolfson*, 539 F.3d 1249, 1262–63 (10th Cir. 2008). And because the SEC has sufficiently alleged that Winemaster made, with the requisite scienter, material misstatements concerning the revenue from the above transactions, it has

sufficiently pleaded Winemaster's primary liability under § 10(b) and Rule 10b-5 for those misstatements.

### B. Rule 10b-5(a) and (c)

In addition to the Rule 10b-5(b) claim against Winemaster, Count III of the SEC's complaint sets forth claims under Rule 10b-5(a) and (c). "Violations of subsections (a) and (c) are often called 'scheme liability.' " *SEC v. Familant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012). The elements of a Rule 10b-5(a) and (c) claim are similar to a Rule 10b-5(b) claim. *See Kameli*, 2020 WL 2542154, at \*12. But instead of a misstatement, the SEC must allege "acts that created a false appearance of fact in furtherance of the scheme, including making false statements." *Ustian*, 229 F. Supp. 2d at 774 (internal quotation marks omitted). "A scheme is a plan or program of something to be done; an enterprise, a project; as, a business scheme, or a crafty, unethical project. The scheme, in other words, is the plan or design, not the ultimate result." *Id.* (internal quotation marks omitted). In short, liability under Rule 10b-5(a) and (c) is "premised on a course of deceptive or manipulative conduct." *Takata v. Riot Blockchain, Inc.*, No. 18-02293 (FLW), 2020 WL 2079375, at \*14 (D.N.J. Apr. 30, 2020).

Winemaster has addressed the claims against him under Rule 10b-5(b) and Rule 10b-5(a) and (c) together. Thus, his motion to dismiss the Rule 10b-5(a) and (c) claim fails for the same reasons as his challenge to the sufficiency of the SEC's claim under Rule 10b-5(b). That leaves the Court to address the sufficiency of the SEC's allegations against Needham.

### i. Deceptive Conduct

Needham contends that the SEC's scheme liability claim cannot be sustained because the SEC fails to allege that he engaged in conduct that was deceptive on its own rather than based on its relationship to a fraudulent misstatement made by someone else. According to Needham, the allegations simply show that he entered into lawful transactions with consenting parties that were then used by others to fraudulently recognize revenue.

To the extent Needham claims that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim, the Court rejects that contention. While this position was previously adopted

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 21 of 27 PageID #:2664

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

by many courts, "[i]t is no longer tenable ... in light of the Supreme Court's decision in *Lorenzo v. SEC*, —— U.S. ——, 139 S Ct. 1094, 203 L.Ed.2d 484 (2019)." *Kameli*, 2020 WL 2542154, at \*14. In that decision, the Supreme Court held that Rule 10b-5(a) and (c) "capture[s] a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101. That includes "the dissemination of false or misleading statements with intent to defraud .... even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Id.* at 1100–01. Indeed, the Supreme Court recognized that there was "considerable overlap among the subsections" of Rule 10b-5 as "each succeeding prohibition was ... meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." *Id.* at 1102. Thus, there was no basis to find that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct." *Id.* Although Needham contends that an overly expansive view of scheme liability would erode the line between primary and secondary liability, the Supreme Court was unconcerned about that issue, stating that "it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another." *Id.* at 1103. Thus, that Needham's allegedly deceptive acts were part of a course of conduct that resulted in PSI making misleading statements in its SEC filings does not put his actions outside the scope of Rule 10b-5(a) and (c).

**\*24** Broadly, the SEC has pleaded here a scheme to artificially inflate PSI's revenue figures. It alleges that Needham participated in the scheme by negotiating sales with certain PSI customers from which PSI recognized revenue in violation of GAAP. Nonetheless, Needham contends that his role in the scheme involved no inherently deceptive acts. Rather, he claims that he was negotiating and consummating lawful sales with PSI customers and had no role in the later deception. The Court addresses the allegations with respect to each subject transaction in which Needham was involved to determine whether his conduct was deceptive.

### a) Customer C Transaction—Second Quarter 2015

The complaint alleges that Needham initially approached Customer C and pressured it to take $10 million worth of engines in the second quarter of 2015 but initially encountered resistance. Ultimately, Customer C agreed to the sale but it was subject to the Customer C Letter Agreement, which Needham negotiated and signed. That agreement excused

Customer C from paying until 30 days after the engine was placed in a Customer C generator and contained a right to exchange the engines that affected PSI's ability to immediately recognize the full $10 million price as revenue from the sale.

Certainly, Needham's argument is well-taken that there is nothing deceptive about negotiating a side letter agreement. However, Needham also failed to disclose the existence of the Customer C Letter Agreement to PSI's accounting department. Needham claims that the SEC's allegations give no reason to believe that he had any familiarity with GAAP or how PSI accounted for revenue from the sales he transacted. But while the complaint does not allege that Needham was familiar with GAAP, it does allege that he knew about PSI's revenue recognition standards and policies. (Compl. ¶ 23.) Further, the complaint alleges that Needham was "told by accounting department personnel on multiple occasions to inform accounting of any side arrangements" and that he "knew that [he] needed to inform PSI's accounting department about any sales transactions terms that deviated from PSI's standard terms so that the accounting department could properly record the revenue associated with those transactions." (*Id.* ¶ 27.) Thus, accepting the allegations against him as true, Needham knew that disclosing the existence of the agreement was necessary for proper accounting and yet failed to do so. That was a deceptive act. *See SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at \*9 (N.D. Cal. Aug. 10, 2012) (finding that the SEC pleaded a deceptive act where the defendants' "activities or the concealment of their actions resulted in the misrepresentations to the market by others").

Needham points to *SEC v. Lucent Technologies, Inc. ("Lucent III")*, 610 F. Supp. 2d 342 (D.N.J. 2009), as rejecting a similar claim of scheme liability. There, the defendants authorized side agreements to induce the company's customers to purchase equipment. *Id.* at 345. In turn, the company recognized revenue from those sales in violation of GAAP. However, the district court noted that the defendants' conduct of giving assurances of rights of return in connection with the sales was not inherently deceptive. *Id.* at 360. Rather, the real "deception in this case arose from the failure to disclose the 'real terms' of the deal." *Id.* at 361 (internal quotation marks omitted). But because that was "nothing more than a reiteration of the misrepresentation of the misrepresentation and omissions that underlie" the previously rejected Rule 10b-5(b) claim, it could not give rise to a separate Rule 10b-5(a) and (c) claim. *Id.* at 361. Of course, the *Lucent III*

court's holding is no longer viable following the Supreme Court's decision in *Lorenzo* and the Court does not find it instructive here.

### b) Customer C Transaction—Third Quarter 2015

**\*25** The complaint further alleges that when Needham sought to make a sale to Customer C in the third quarter of 2015, he personally negotiated a deal in which Customer C would submit a $4.3 million purchase order while he verbally assured it that the true price it would pay was only $3 million. The SEC further alleges that Needham issued the direction "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) There is no question that Needham committed a deceptive act by documenting the sale at one price while simultaneously entering into a side verbal agreement a reduced price in order to artificially inflate the revenue from the sale. Moreover, Needham committed another deceptive act by failing to inform the accounting department of the true sale price.

Nonetheless, Needham claims that there was no deception because he disclosed the true terms of the deal to Customer C and his superiors. Of course, his disclosure to his superiors does little to mitigate the deceptiveness of his conduct when the cited two superiors were Davis and Winemaster and therefore also participants in the scheme. To the extent Customer C participated in the wrongdoing, that also does nothing to absolve Needham of liability. Thus, Needham fails to rebut the SEC's allegations as to his deceptive conduct in connection with the sale to Customer C in the third quarter of 2015.

### c) Customer D Transaction

As the fourth quarter of 2015 was drawing to a close, Needham allegedly negotiated and agreed to a deal with Customer D in which Customer D would buy 3 Waukesha generator sets directly from PSI for about $3 million. However, Customer D's purchase would be funded with a credit it would receive from Customer C's return of 97 PSI engines it had previously purchased to fulfill Customer D's generator set orders. Needham then drafted a bill and hold agreement that he presented to Customer D. The bill and hold agreement contained several statements that Needham knew to be false, including that Customer D requested bill and hold treatment for the sale. Thus, Needham committed

a deceptive act by drafting a bill and hold agreement with a statement he knew to be false. Further, Needham failed to inform PSI's accounting department about either the bill and hold agreement or the fact that the sale was to be funded by a credit granted in connection with Customer C's return of 97 previously purchased engines.

Needham fails to genuinely contest the SEC's allegations regarding his allegedly deceptive acts in connection with the Customer D sale. Instead, he misconstrues the factual allegations to minimize his involvement. For example, Needham claims that the SEC fails to distinguish between Needham and Davis with respect to the bill and hold agreement. While the complaint states that Davis and Needham improperly attempted to characterize this transaction as a bill and hold sale, it goes on to say that Needham provided Customer D with the agreement. (Compl. ¶ 85.) It further alleges that "Needham worked to create documentation supporting the transaction." (*Id.* ¶ 84.) Although the SEC does not directly allege that Needham drafted the bill and hold agreement, the reasonable inference from that allegation is that the bill and hold agreement was among the supporting documentation drafted by Needham. The Court thus rejects Needham's attempts to twist the SEC's allegations and finds that the allegations, as recounted above, sufficiently plead deceptive acts in connection with the Customer D transaction.

### ii. Scienter

Having found that the SEC has pleaded Needham committed deceptive acts in furtherance of the scheme, the Court must determine whether the allegations support that Needham acted with scienter. According to Needham, the SEC fails to allege particularized facts showing that he either intended to deceive buyers or sellers of PSI stock or acted recklessly.

**\*26** First, Needham contends that he was simply a salesperson who had no familiarity with GAAP or how PSI would account for revenue. As discussed above, that contention is belied by the SEC's allegation that Needham was familiar with PSI's revenue recognition standards. Further, the SEC alleges that Needham knew that "PSI filed financial statements in its quarterly and annual reports" and he knew that those "financial statements needed to be truthful and accurate." (Compl. ¶ 23.) Moreover, it is not the case that "a defendant must always have accounting knowledge or accounting expertise to have actual knowledge of an

accounting violation." *Espuelas, 698 F. Supp. 2d at 432.* Indeed, if that were true, "even the most egregious violation of revenue recognition principles—recognizing revenue from a transaction that never happened, for example—would not give rise to an inference of actual knowledge of an accounting violation, unless accounting knowledge were also alleged." *Id.* For example, here, it should not have required even basic accounting knowledge for Needham to know that it was improper to recognize $4.3 million of revenue from the sale to Customer C when he knew that Customer was only obligated to pay $3 million.

The SEC also makes specific allegations evidencing Needham's knowledge and active involvement in the fraudulent accounting scheme. With respect to the third quarter 2015 Customer C sale, the SEC alleges that Needham directed Customer C to issue the inflated $4.3 million purchase order "in order to make PSI's revenue numbers look better for the quarter." (Compl. ¶ 71.) A later email from Customer C's COO reinforces Needham's scienter at the time of the sale, as the COO reminded Needham that "PSI upped the price so it made your numbers look better." (*Id.*) Not only did the extra $1.3 recognized from the sale improve PSI's sales numbers, but it also allowed Needham to earn a $25,000 bonus he would not have received had PSI not recognized that additional revenue. *See, e.g., Nguyen v. New Line Genetics Corp., 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018)* ("[A]llegations regarding [the defendants'] specific motives to obtain outsized bonuses may certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter."). Needham then allegedly assisted Winemaster as he attempted to cover up the artificial inflation. Similarly, when Needham presented Customer D with the bill and hold agreement, he admitted that the agreement would "allow [PSI] to recognize revenue" from the sale. (*Id.* ¶ 85.) Needham's failure to disclose the terms of each of the three subject transactions to the accounting department also supports his scienter, as he was told by accounting on multiple occasions that he needed to inform it of any side agreements or atypical terms.

Viewing the SEC's allegations as to Needham as a whole, they tend to show that Needham was not an unwitting tool in Winemaster and Davis's fraudulent accounting scheme. Rather, he was a key player in the scheme, knowingly negotiating and structuring the three subject transactions and then concealing from PSI's accounting department key details of the sales, thereby leading accounting to recognize revenue from the sales improperly. Further, the SEC has pleaded

Needham's awareness that the purpose of his conduct was to artificially inflate PSI's revenue. Consequently, the SEC has pleaded Needham's scienter for purposes of scheme liability.

### iii. In Connection with the Purchase or Sale of Securities

According to Needham, the SEC fails to allege that his deceptive conduct occurred in connection with the purchase or sale of securities. In particular, he claims that the SEC fails to allege that any of his conduct was directed toward investors. Rather, he claims that he dealt only with PSI's customers and had no responsibilities related to PSI's contacts with investors.

The Supreme Court has held that the "in connection with" requirement simply requires "a misrepresentation 'coinciding' with or 'touching' a securities transaction." *United States v. Durham, 766 F.3d 672, 682 (7th Cir. 2014)* (quoting *SEC v. Zandford, 535 U.S. 813, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), and Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)).* The phrase should be read broadly as § 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford, 535 U.S. at 819, 122 S.Ct. 1899* (internal quotation marks omitted).

**\*27** Here, Needham's deceptive acts satisfy the "in connection with" requirement because he knew or was reckless in not knowing that his conduct would cause PSI to misstate its revenue. Even though Needham did not have direct contact with investors, he either knew or could have anticipated that those misstated revenue numbers would eventually reach investors. *See, e.g., SEC v. Delphi Corp., No. 06-14891, 2008 WL 4539519, at *8 (E.D. Mich. Oct. 8, 2008)* (holding that the "in connection with" requirement was satisfied where the defendant "acted to create income numbers with the purpose that they be reported to the public in company filings and public statements"); *Nacchio, 438 F. Supp. 2d at 1282* ("Because the Complaint adequately alleges that [the defendant's] omissions had the intended result of deceiving investors as to [the company's] actual revenues, the SEC has sufficiently alleged that [the defendant's] misrepresentations and omissions occurred in connection with the purchase or sale of securities."). For that reason, Needham's actions were in connection with the purchase or sale of securities. Because the SEC has pleaded that Needham's actions were deceptive, undertaken with the

Case: 1:20-cv-05593 Document #: 90-12 Filed: 07/06/21 Page 24 of 27 PageID #:2667

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)
2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

requisite state of mind, and in furtherance of a fraudulent accounting scheme, it has successfully stated a Rule 10b-5(a) and (c) claim as to Needham.

### III. Aiding and Abetting Securities Law Violations—Needham

Counts II, IV, and V of the SEC's complaint set forth claims against Needham for aiding and abetting securities law violations.[9] In Count II, the SEC alleges that Needham aided and abetted Winemaster and PSI's Rule 10b-5(b) violations.[10] Counts IV and V assert claims against Needham for aiding and abetting PSI's reporting and recordkeeping violations under § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, and § 13(b)(2)(A). Because Needham focuses his arguments against aiding and abetting liability on the Rule 10b-5(b) claim and then asserts that the reporting and recording keeping claims fail for the same reasons, the Court will likewise center its aiding and abetting liability analysis on the Rule 10b-5(b) claim.

[9]    Winemaster is also named as a Defendant in Counts IV and V, but he does not address the merits of these Counts in his motion to dismiss.

[10]    Although PSI is not named as a Defendant in this action, it is identified as an "uncharged related entity" that committed securities law violations. (*See, e.g.*, Compl. ¶ 149.)

Under § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the SEC may hold "any person that knowingly or recklessly provides substantial assistance to another person in violation of" the Exchange Act liable as an aider and abettor. To hold someone secondarily liable as an aider and abettor, the SEC must allege: "(1) there is a primary violation of securities law; (2) the aider and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted in the primary violation." *Ustian*, 229 F. Supp. 3d at 776.

As discussed above, the SEC has adequately pleaded Rule 10b-5(b) violations for two of the three transactions with which Needham was involved. Neither Winemaster nor Needham has challenged whether the allegations concerning misstatements arising from the third Needham transaction, the Customer D sale, state a claim under Rule 10b-5(b). For present purposes, the Court will assume that they do. Needham does contend that the SEC has failed to plead his scienter for aiding and abetting violations and that it has not

alleged facts showing he provided substantial assistance in the primary violation.

First, Needham argues that the SEC has not pleaded scienter because the complaint lacks allegations showing that Needham knew his conduct or omissions were in assistance of Winemaster or PSI in making fraudulent misstatements of revenue. Needham's contentions concerning his scienter have already been addressed above in the Court's discussion of the Rule 10b-5(a) and (c) claim and decided in the SEC's favor.

Next, Needham contends that he did not provide substantial assistance to Winemaster and PSI in their primary violations. To plead substantial assistance "requires a showing that the aider and abettor proximately caused harm to the victim on which the primary liability is predicated." *SEC v. DiBella*, 587 F.3d 553, 566 (7th Cir. 2009) (internal quotation marks omitted). Here, Needham allegedly negotiated and structured the Customer C and D sales in a way that would lead PSI's accounting department to recognize revenue for the quarters in which they were made. At the same time, Needham provided the customers with certain terms, undisclosed to accounting, that would have affected PSI's ability to recognize revenue from the sales immediately. Those sales were the vehicle by which PSI fraudulently recognized revenue; they gave legitimacy to that revenue and allowed PSI to conceal, at least temporarily, its fraudulent accounting. Thus, by doing the legwork on those sales, Needham substantially assisted Winemaster and PSI in making statements that improperly recognized revenue from those sales.

**\*28** Because the SEC's allegations establish that Needham substantially assisted the Rule 10b-5(b) violations associated with the Customer C and D sales, with a general awareness that his actions were associated with an improper or illegal course of conduct, the SEC has successfully stated a claim against Needham for aiding and abetting Rule 10b-5(b) violations. As Needham does not separately challenge the merits of the reporting and recordkeeping aiding and abetting claims, his motion to dismiss is denied as to those claims as well.

### IV. Control Person Liability—Winemaster

In Count X of the complaint, the SEC alleges that Winemaster violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Section 20(a) sets out " 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir.

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

1994). The Seventh Circuit has set forth a two-prong test for control person liability. *Id.* "First, the 'control person' needs to have **actually** exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Id.* at 911–12.

Here, the SEC seeks to hold Winemaster liable as a control person for the two transactions in which he was not directly involved (the Customer A and D sales) as well as other securities law violations committed by PSI. [11] Winemaster first argues that the SEC fails to allege primary violations for which he can be held liable as a control person because it does not allege that PSI acted with scienter. However, the "[k]nowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00CV1338(GBD), 2004 WL 137073, at \*13 (S.D.N.Y. Jan. 26, 2004); *see also Zurich Cap. Mkts. v. Coglianese*, No. 03 C 7960, 2005 WL 1950653, at \*3 (N.D. Ill. Aug. 12, 2005) (imputing the scienter of the defendant company's agent with respect to the agent's fraud to the defendant company). Thus, "[a]llegations that corporate employees or agents[ ] have knowingly deceived or failed to make the requisite public disclosures does not immunize the corporation from liability for the knowing deception." *UCAR Int'l*, 2004 WL 137073, at \*13.

[11] That PSI is not a Defendant in this action does not preclude Winemaster from being held liable as a control person for its uncharged violations. *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at \*9 (N.D. Ill. May 25, 2004) ("The fact that the controlled person ... is not a defendant in [the] action is of no legal significance ....").

The Court has already discussed above that the SEC has adequately alleged Needham's scienter. Moreover, the complaint contains numerous allegations of Davis's scienter and Winemaster does not challenge the sufficiency of those allegations. He simply contends that Needham's and Davis's scienter should not be imputed to PSI because they played no role in the financial reporting giving rise to the primary violations. While Winemaster attempts to play down Needham's and Davis's roles in the company, the Court has already found that Needham played an important part in the fraudulent accounting scheme. And

the complaint sufficiently pleads Davis's role, as he was PSI's Vice President of Sales—a corporate officer—and had responsibilities relating to communicating sales incentives to PSI's accounting department, which in turn calculated the revenue that was reported in PSI's financial statements. (Compl. ¶ 15, 25.)

**\*29** Next, Winemaster contends that the SEC has not alleged that he had the ability to control the transactions and statements at issue in this action. He argues that all the SEC alleges is his control over the day-to-day management and overall direction of PSI, which is insufficient. The Seventh Circuit has emphasized that § 20(a) is "remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (internal quotation marks omitted). Here, the SEC has alleged that Winemaster held the roles of PSI's CEO, President, and Chairman of the Board, and was responsible for PSI's system of internal accounting controls, reviewing and approving PSI's financial statements and SEC filings, and establishing and maintaining PSI's internal controls over financial reporting. (Compl. ¶¶ 14, 24, 143.) Moreover, "numerous ... courts have held that signing [public filings] makes the officer a control person for liability related to" the statements contained therein. *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 771 (S.D. Ind. 2018).

Together, the SEC's allegations sufficiently plead that Winemaster exercised control over PSI's operations and had the ability to control the specific transactions and misstatements allegedly giving rise to PSI's primary violations. For that reason, the SEC adequately states a control person claim as to Winemaster.

### V. Section 13(b)(5) of the Exchange Act and Rule 13b2-1—Needham

Although Count VII of the complaint sets forth claims against both Needham and Winemaster under § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, only Needham challenges the claim on its merits. Section 13(b)(5) makes it unlawful for any person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be kept by an issuer under § 13(b)(2) of the Exchange Act. 15 U.S.C. § 78m(b)(5). Similarly, Rule 13b2-1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2021)

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

to section 13(b)(2)(A) of" the Exchange Act. 17 C.F.R. § 240.13b2-1. While § 13(b)(5) expressly requires knowledge, scienter is not required under Rule 13b2-1. *McConville*, 465 F.3d at 789.

Needham contends that the SEC fails to allege any particularized facts showing that he had knowledge of PSI's system of internal controls or any responsibility to report any information to PSI's accounting department but knowingly failed to do so. However, the allegations in the complaint show that Needham knew about PSI's revenue recognition standards and policies and had been told by PSI's accounting department to inform it of any side arrangements or atypical sales terms. (Compl. ¶¶ 23, 27.) Yet Needham failed to disclose to accounting the Customer C Letter Agreement that was part of the second quarter 2015 Customer C sale. Further, he directed Customer C to draft a false purchase order for the third quarter 2015 sale and drafted a bill and hold agreement for the Customer D sale that contained falsehoods. Moreover, he failed to disclose to accounting details from those sales, knowing that they would affect their accounting treatment. These allegations are sufficient to state a claim under § 13(b)(5) and Rule 13b2-1 against Needham.

### VI. Rule 13a-14—Winemaster

The SEC alleges in Count IX that Winemaster violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14, by falsely certifying that PSI's periodic reports did not contain any material misstatements and fairly presented PSI's financial condition. Winemaster contends that there is no standalone cause of action for violations of Rule 13a-14, and in any case, the Rule can only be violated by failing to certify.

For his contention that there is no Rule 13a-14 standalone cause of action, Winemaster cites *SEC v. Black*, No. 04 C 7377, 2008 WL 4394891, at *17 (N.D. Ill. Sept. 24, 2008), which held that a false certification under Rule 13a-14 "does not state an independent violation of the securities law." However, many courts that have considered *Black* disagree with its analysis, concluding that it mistakenly relied on cases involving Rule 13a-14 claims brought by private parties. *E.g.*, *Ustian*, 229 F. Supp. 3d at 777; *SEC v. Brown*, 740 F. Supp. 2d 148, 164–65 (D.D.C. 2010). Those cases further hold that the SEC has the authority to bring a Rule 13a-14 claim pursuant to § 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), which allows the SEC "to bring an action in a United States District Court 'to enjoin' any 'acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder.' " *Brown*, 740 F. Supp. 2d at 165

(quoting 15 U.S.C. § 78u(d)(1)). The Court agrees that § 21(d)(1) gives the SEC the authority to enforce violations of Rule 13a-14. Moreover, even the *Black* court agreed that Rule 13a-14 extends to false certifications.

**\*30** Finally, Winemaster contends that the Rule 13a-14 claim should be dismissed because Count IX does not allege that Winemaster knew that the certification was false or was reckless in not knowing. That argument is unavailing as the SEC alleges that Winemaster signed and certified each filing despite knowing that revenue had been improperly recognized. (Compl. ¶¶ 54, 66, 77, 105.) In short, the SEC has pleaded a viable standalone cause of action for Winemaster's violation of Rule 13a-14.

### VII. Section 304 of SOX—Winemaster

In the final Count of its complaint, Count XI, the SEC claims that Winemaster's reimbursement obligations under § 304 of SOX, 15 U.S.C. § 7243(a), were triggered due to PSI's accounting restatements. Thus, he must reimburse the $280,000 bonus he received on July 10, 2015.

Under § 304 of SOX, "[i]f an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws," the CEO and CFO "shall reimburse the issuer for ... any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the [SEC] (whichever first occurs) of the financial document embodying such financial reporting requirement." 15 U.S.C. § 7243(a)(1). The plain language of § 304 allows "the SEC to seek disgorgement from the CEOs and CFOs even if the triggering restatement did not result from the misconduct on the part of those officers." *SEC v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016).

Winemaster argues that the SEC does not sufficiently allege actionable misconduct attributable to PSI. Of course, this Court already rejected those arguments when it found that Winemaster could be held liable as a control person. Next, Winemaster claims that the restatement was not based on misconduct at all, given that it showed other adjustments to net revenue that were not attributable to fraud. Indeed, for three of the five quarters, those other adjustments were larger than the adjustments associated with the fraud. However, under the plain language of the § 304 of SOX, the issue is whether a restatement is "***required*** ... due to the material

2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement." 15 U.S.C. § 7243(a) (emphasis added). The issuer's "actual motivation in issuing the restatement is therefore of no moment." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 788 (5th Cir. 2017). Here, the SEC alleges that PSI was required to prepare the restatement due to the accounting errors caused by Winemaster, Needham, and Davis's misconduct. (Compl. ¶ 190.) The fact that, in the course of preparing the restatement, PSI made other adjustments to its income is irrelevant. Consequently, the SEC has sufficiently stated a claim under § 304 of SOX.

## CONCLUSION

For the foregoing reasons, Winemaster's and Needham's motions to dismiss (Dkt. Nos. 30, 34) are denied.

## All Citations

--- F.Supp.3d ----, 2021 WL 1172773, Fed. Sec. L. Rep. P 101,070

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.