**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **In re GOHEALTH, INC. SECURITIES LITIGATION** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 1:20-cv-5593**<br><br>**Judge:  Sharon Johnson Coleman** |

**GOHEALTH AND UNDERWRITER DEFENDANTS' REPLY MEMORANDUM OF
LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS
<u>ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT.........................................................................................................1

    A.    Plaintiffs Have Not Identified Any Actionable Omission or Misstatement ............1

        1.    Plaintiffs' Claims Rest on An Unsupported Premise.................................2

        2.    Plaintiffs Have Not Identified Any Material Omission .............................4

        3.    Plaintiffs Have Not Identified Any Materially False Misstatement ............6

    B.    Rule 9(b) Applies to Plaintiffs' Claims .................................................................7

    C.    Plaintiffs' Complaint is an Improper Puzzle Pleading...........................................9

    D.    Plaintiffs' Claims Based Upon Protected Forward-Looking Statements
        Fail ........................................................................................................................10

    E.    Plaintiffs' Claims Based Upon Immaterial Puffery Fail........................................12

    F.    Plaintiffs' Claims under Items 303 and 105 of Regulation S-K Fail.....................13

    G.    Plaintiffs Fail to State a Claim Under Section 15 ..................................................14

III.   CONCLUSION....................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) .................................................................................................15

*Anderson v. Abbott Lab'ys*,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Lab'ys*,
269 F.3d 806 (7th Cir. 2001) ............................................................................................4, 6

*Asher v. Baxter Int'l*,
377 F.3d 727 at 734 (7th Cir. 2004) ...................................................................................11

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ..................................................................................5

*Basic Inc. v. Levinson*,
485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ..........................................................4

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..................................................................................5

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
2014 WL 3610877 (N.D. Ill. July 22, 2014) ....................................................................9, 10

*Evergreen Fund, Ltd. v. McCoy*,
No. 00-cv-0767, 2000 WL 1693963 (N.D. Ill. Nov. 6, 2000) ..............................................8

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..................................................................................9

*Flynn v. Exelon*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .......................................................................5

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) .............................................................................................12

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wis. 2003) ................................................................................6

*Fugman v. Aprogenex, Inc.*,
961 F. Supp. 1190 (N.D. Ill. 1997) ....................................................................................11

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009) ..................................................................................4

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)......................................................................................................14

*Levitan v. McCoy*,
    No. 00-cv-5096, 2001 WL 1117279 (N.D. Ill. Sept. 21, 2001)...............................................8

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011).......................................................................................................9

*McClellan v. Cantrell*,
    217 F.3d 890 (7th Cir. 2000) .....................................................................................................8

*Mingbo Cai v. Switch, Inc.*,
    No. 218-cv-01471, 2019 WL 3065591 (D. Nev. July 12, 2019) ............................................14

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012).....................................................................................................14

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) .....................................................................................................8

*Silverman v. Motorola, Inc.*,
    No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)...............................................12

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).......................................................................................................12

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
    No. 10 C 427, 2011 WL 814932 (N.D. Ill. Feb. 28, 2011).....................................................13

*Starr v. Hey!, Inc.*,
    2003 WL 21212596 (N.D. Ill. May 23, 2003) ........................................................................15

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................................10, 11

*United States v. Stephens*,
    421 F.3d 503 (7th Cir. 2005) .....................................................................................................8

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622, 2020 WL 6118605 (N.D. Ill. 2020).............................................. *passim*

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019)..................................................................................14, 15

*Zerger v. Midway Games, Inc.*,
    2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)..........................................................................13

*Zishka v. Am. Pad & Paper Co.*,
   2001 WL 1748741 (N.D. Tex. Sept. 28, 2001),
   *aff'd*, 72 F. App'x 130 (5th Cir. 2003)..................................................................................15

## RULES

Fed. R. Civ. P. Rule 8(a)(2) ............................................................................................................7

Fed. R. Civ. P. Rule 9(b)............................................................................................................7, 9

## REGULATIONS

17 C.F.R. § 229.105 .....................................................................................................................14

17 C.F.R. § 229.303(a)(2)(ii) ..................................................................................................13, 14

17 C.F.R. § 240.3b–6(c)................................................................................................................11

## I.  INTRODUCTION

Plaintiffs'[1] Opposition ("Opp'n") to the GoHealth and Underwriter Defendants' Motion to Dismiss only highlights the fundamental shortcomings of the Complaint.  In conclusory fashion, the Opposition continues to assert that GoHealth failed to disclose its so-called rapid and radical business shift, despite the fact that Plaintiffs concede that Defendants disclosed the carrier base expansion and increased reliance on SNPs that Plaintiffs argue constitute that alleged radical shift. Plaintiffs' argument is an attempt to contrive a claim using one of the oldest (and most rejected) tricks in the securities law book—mischaracterizing events (carrier expansion and SNP reliance as a "radical[] departure from [GoHealth's] business strategy," ¶ 18) and insisting Defendants were required to use those pejorative and misleading descriptors in their disclosures.  Because Plaintiffs fail to allege adequate facts to support their invented theory of liability and because Plaintiffs have not identified any actionable misstatements or omissions, their claims fail as a matter of law.

## II.  ARGUMENT

### A.  Plaintiffs Have Not Identified Any Actionable Omission or Misstatement

Plaintiffs rely upon the premise that (1) GoHealth undertook a radical change to its business model by seeking to expand its carrier base and increase its reliance on non-commissionable SNPs; (2) it undertook that change to overcome the fact that it had maximized its growth with existing carriers; and (3) GoHealth knew the change would negatively impact its financial metrics.[2] Building from that premise, Plaintiffs then assert that Defendants omitted disclosure of that radical

---

[1] All capitalized terms, abbreviated terms, and citation conventions have the same definitions and meanings used in the GoHealth and Underwriter Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Class Action Complaint (Dkt. 74 ("Memo")).

[2] Plaintiffs dispute Defendants' characterization of their premise as the "Maximized Growth Theory" and "LTV Drag Theory," *see* Opp'n at 21-23, but they readily accept (as they must) that their claims—however described—rest on this premise.

1

shift and its impact on GoHealth's financials and made other materially false statements concerning growth and scalability. But Plaintiffs have neither alleged sufficient facts to support this premise nor identified any actionable omission or misstatement relating thereto. Simply put, Plaintiffs have failed to allege the existence of any "radical" business change, let alone facts that could support that Defendants misled investors about it.

### 1. Plaintiffs' Claims Rest on An Unsupported Premise

Fundamentally, Plaintiffs have not (and cannot) allege any facts that demonstrate (1) GoHealth undertook a rapid and significant business plan shift; (2) GoHealth believed it had maximized its growth with existing carriers; or (3) GoHealth knew any business shift would result in lower LTV/CAC numbers. This pleading failure is fatal to Plaintiffs' claims.

**Business plan shift.** Plaintiffs begin by mischaracterizing GoHealth's decision to expand its carrier base and add SNP plans as a "radical[] depart[ure] from its business strategy leading up to the IPO." ¶ 18. Plaintiffs allege that this description is supported by the fact that GoHealth's CEO, Clinton P. Jones, told the market at a post-IPO conference that GoHealth "anticipated 2020 to be an investment year with new carriers," contending that Jones' reference to an "investment year" constituted a belated admission of GoHealth's secret and radical business plan shift. *See* ¶ 124. Now, Plaintiffs try to distance themselves from reliance on the "investment year" statement by claiming that the Complaint "provides several examples" of Defendants admitting to the so-called radical departure. *See* Opp'n at 18-19 (citing ¶¶ 116-125). But none of those 10 cited paragraphs—which contain post-IPO statements by Defendants—reference a business plan shift of any nature, let alone a radical one. Plaintiffs make no effort to explain how these statements demonstrate actionable admissions of a radical departure from pre-IPO strategy.

**Maximized growth.** Similarly, Plaintiffs allege that GoHealth undertook the supposed radical shift because it had maximized its growth potential with Humana and Anthem, citing the

2

same paragraphs (¶116-125) for support, but ignoring that *none* of those paragraphs mention maximized growth, existing carriers, Humana, or Anthem at all.[3]

**Impact on LTV/CAC.** The final, flawed piece of Plaintiffs' premise is that the so-called radical business shift was negatively impacting GoHealth's LTV/CAC as of the IPO.[4] Once more, Plaintiffs cite paragraphs 116-125. But, yet again, none of those paragraphs supports Plaintiffs' contention that GoHealth's LTV/CAC was impaired at the time of the IPO (let alone impaired because of any radical business shift). Contrary to Plaintiffs' arguments, GoHealth's 2Q 2020 financial results do not say GoHealth was suffering from decreased LTV/CAC at the time of the IPO. Instead, they reflect decreases in certain, standalone LTV/CAC *inputs*. And because LTV/CAC is an averaged calculation, which incorporates numerous variable inputs (some of which are disclosed in GoHealth's financials, some of which are not), the movement of any single LTV/CAC input does not describe how the LTV/CAC metric changed *overall*. Plaintiffs' effort to paint a picture of impaired LTV/CAC by looking at one input is like trying to tell time with only one clock hand. Indeed, the 2Q 2020 financials that Plaintiffs rely upon actually show that GoHealth's LTV/CAC *increased from 2.3 to 2.7X year over year*—directly undermining Plaintiffs' argument. *See* Ex. A (GoHealth 2Q 2020 Financial Results) at 1.[5]

---

[3] Plaintiffs also take the bizarre position that the Individual Defendants inappropriately "attempt to inject their knowledge [of the alleged business plan shift, its causes, and its effects] as an issue relevant to the motion to dismiss." *See* Opp'n at n. 13. To be clear, Plaintiffs' claims fail because they have alleged no facts supporting their theory of liability (known or unknown to Defendants). Defendants raised knowledge because Plaintiffs explicitly alleged that Defendants "failed to disclose . . . **known** trends, events, or uncertainties in existence at the time of the IPO." (¶ 114 (emphasis added)).

[4] LTV/CAC is a calculation of average estimated lifetime value of commissions divided over cost of converting prospective consumers.

[5] Plaintiffs moved to strike GoHealth's 2020 10-K filing used to show that 2020 annual LTV also increased year over year (in further direct conflict with Plaintiffs' theory). Defendants maintain that consideration of the 2020 10-K is appropriate as they will explain in response to that motion, but Plaintiffs' mistaking LTV/CAC inputs as synonymous with LTV/CAC itself is fatal to their claims, regardless of the specific LTV/CAC results GoHealth reported in any given period.

### 2. Plaintiffs Have Not Identified Any Material Omission

Even if Plaintiffs had alleged a cognizable theory of liability against Defendants, their claims would still fail because they have not identified any material information Defendants were obligated, and failed, to disclose concerning any intention to expand GoHealth's carrier base or reliance on SNPs. To begin, Plaintiffs concede that the Registration Statement disclosed GoHealth's intention to expand its carrier base, including that GoHealth would include products "from at least one of the top two carriers . . . in each county, in 49 states," Opp'n at 15 (citing ¶ 96), and its reliance on SNPs by "adding SNP plans from 'both existing and new carrier relationships.'" Opp'n at 15 (citing ¶ 99). Moreover, Plaintiffs concede that they "do not challenge GoHealth's financial results." Opp'n at 22. Nonetheless, Plaintiffs argue GoHealth needed to disclose additional language about the purported radical business shift they had undertaken and that such a shift was hurting GoHealth's key financial metrics at the time of the IPO. *See* Opp'n at 22. They are wrong on both counts.

*First*, by Plaintiffs' own account, the alleged business shift in question boils down to GoHealth's plan to expand its carrier and product base and Plaintiffs concede the Registration Statement discloses both topics. Opp'n at 15, 22. Thus, even if those events constituted a shift, GoHealth disclosed the shift. Any claim for additional or different specific language about the alleged shift fails because the federal securities laws do not require a specific incantation of words or impose any duty to disclose all information shareholders could conceivably find useful. *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001). Rather, the law requires Plaintiffs to plead an omission that would have a substantial likelihood of being viewed by the reasonable investor to have significantly altered the total mix of information. *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 984 (E.D. Wis. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32

4

(1988)). Plaintiffs have not and cannot make that showing, given their concession that GoHealth disclosed the events they allege constitute the alleged business shift.

*Second*, Defendants had no obligation to disclose that the so-called business shift may have rendered GoHealth's past growth unsustainable, because public companies are not required to disclose that previously reported financial metrics may not be sustainable. *See West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 643, 2020 WL 6118605, at *11 (N.D. Ill. 2020) (dismissing claims that defendants failed to disclose that revenue and growth metrics resulted from unsustainable channel stuffing); *see also In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no statements regarding AXIS's accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (claims "premised on the assertion that [defendant] breached a duty to disclose that its revenues were 'unsustainable'" are not actionable).[6] Plaintiffs' claims that Defendants were required to disclose how the alleged business shift would affect GoHealth's LTV/CAC inputs, *see* Opp'n 15-16, are also untenable because Plaintiffs acknowledge that GoHealth did not disclose all inputs to LTV/CAC and that investors did not have the information necessary to "crosscheck or fully understand how GoHealth calculates its LTV." ¶¶ 15, 59. Plaintiffs cannot argue that they were misled by undisclosed changes to LTV/CAC

---

[6] Plaintiffs' attempt to distinguish this authority fails. First, despite Plaintiffs' bald assertion to the contrary, their claims rest on the same speculation that hypothetical events unsupported by allegations of fact may negatively impact accurately reported financial metrics that was rejected in *Conagra*, *Axis*, and *Citigroup*. *See supra* Section II.A.1. Second, *Flynn v. Exelon* is inapposite. *Flynn* involved allegations that Exelon failed to disclose its regulatory noncompliance due to an undisclosed, ongoing scheme to bribe public officials, and had nothing to do with allegations that prior financial metrics were unsustainable. 2021 WL 1561712, at *1 (N.D. Ill. Apr. 21, 2021).

inputs whose values are not uniformly disclosed in the first instance, especially when the net result of those changes was an *increase* in LTV/CAC. *See* Ex. A at 1.

*Friedman v. Rayovac Corp* does not command a different outcome. Plaintiffs allege, citing *Rayovac*, that Defendants had a duty to disclose the negative impact of carrier base and product expansion on LTV/CAC based on the fact that Defendants put "the source of its success at issue" by touting "GoHealth's ability to rapidly scale while improving its economics." Opp'n at 22-23 (*citing Friedman v. Rayovac Corp*, 295 F. Supp. 2d 957 (W.D. Wis. 2003); ¶ 97). But mentioning scalability and economics does not impose a duty on Defendants to disclose every possible detail concerning LTV/CAC inputs, particularly when many of those inputs are not disclosed in GoHealth's financials in the normal course. As the court explained in *Rayovac*, "even if a reasonable investor would want to know an omitted fact, there is no duty to disclose it unless omitting it alters the meaning of a statement that *was* made." 295 F. Supp. 2d 957, 988 (W.D. Wis. 2003) (emphasis in original); *see also Anderson*, 140 F. Supp. 2d at 903 ("Merely mentioning a topic, however, does not require the company to disclose every tangentially related fact that might interest investors."). Plaintiffs make no effort to tie the law to the facts by explaining how any allegedly omitted information rendered GoHealth's Registration Statement misleading to investors. Nor could they, given that GoHealth's Registration Statement did not suggest that carrier base expansion or increased reliance on SNPs would positively affect *all* LTV/CAC inputs in fiscal year 2020.

### 3. Plaintiffs Have Not Identified Any Materially False Misstatement

Plaintiffs also do not identify any materially false statement concerning carrier base expansion or increased reliance on SNPs in GoHealth's Registration Statement. Defendants attempted to parse Plaintiffs' puzzle pleading to identify the statements actually at issue and demonstrated that 19 bolded or italicized statements were not adequately alleged to be false.

Rather than respond to those arguments, Plaintiffs resorted to reciting two of the 19 statements at issue and baldly asserting they constituted materially false statements: "the RS included materially false statements and omissions, including that GoHealth's platform was 'engineered . . . for rapid scalability' (*i.e.* expansion) and the Company could '*improve* [its] key drivers of [LTV/CAC]' while rapidly scaling its 'innovative distribution model.'" Opp'n at 14 (citing ¶¶ 91, 93-94, 96 (emphasis in original)). Plaintiffs offer no explanation at all as to why these two statements are false and make no mention whatsoever of the remaining 17 statements.[7] Because Plaintiffs have offered no basis on which this Court can find the statements identified to be false, Plaintiffs' claims should be dismissed.

### B. Rule 9(b) Applies to Plaintiffs' Claims

While Plaintiffs' claims should be dismissed regardless of whether Fed. R. Civ. P. 8(a)(2) or Fed. R. Civ. P. 9(b) applies, the nature of Plaintiffs' claims requires application of Rule 9(b). Plaintiffs assert that their claims are not subject to Rule 9(b) because "fraud and scienter are not elements of Plaintiffs' claims." Opp'n at 9. But it is the substance, not the form of a claim, that determines the applicability of Rule 9(b). Rule 9(b) applies to Securities Act claims—including Section 11 and 15 claims—to the extent the "Securities Act claims *sound in fraud*." *Conagra Brands, Inc.*, 2020 WL 6118605, at *4 (emphasis added). A claim sounds in fraud where it alleges liability for "statements that the defendant knows to be false, as well as a 'half-truth' that the

---

[7] Plaintiffs' failure to plead falsity for the two statements above concerning GoHealth's scalability and improvement of key drivers is unsurprising. Plaintiffs argue that GoHealth's Registration Statement misled investors about the movement of LTV/CAC inputs in 2020, but neither of the statements identified above is temporally limited to 2020 or speaks to improvement of *all* LTV/CAC inputs. Thus, the statements identified by Plaintiffs would not be false even if scaling GoHealth's platform would negatively impact certain LTV/CAC inputs in the short term. For example, if scaling GoHealth's platform to add new carriers negatively impacted marketing costs, but positively impacted overall LTV/CAC in the long term due to offsetting gains to, e.g., customer persistency, the statements identified are still true and accurate. Because Plaintiffs fail to adequately plead actual falsity with respect to any identified statements, Plaintiffs' claims fail. *See Conagra Brands*, 2020 WL 6118605, at *13.

defendant knows to be misleading and which the defendant expects another to act upon to his detriment and the defendant's benefit." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011) (*citing Stephens*, 421 F.3d at 507); *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). Here, Plaintiffs allege that Defendants *knew* GoHealth undertook a radical business plan change they failed to disclose to the market, a classic fraud allegation. Moreover, Plaintiffs explicitly allege that Defendants knew of the alleged misrepresentations at the time they were made to the market. *See, e.g.*, ¶¶ 119 ("These negative facts, trends, and uncertainties that existed at the time of the IPO were nevertheless not disclosed to investors in the Registration Statement. As Jones admitted, 'we don't see surprises'"); 120 ("During the call, Jones stated that the disappointing results 'came in largely as expected,' confirming that the trends existed and were known prior to the IPO."). The substance of Plaintiffs' claims thus register as fraud, even if Plaintiffs seek to disclaim the label.

Moreover, the cases on which Plaintiffs rely are distinguishable. In both *Evergreen* and *Levitan*, the courts held that the claims did not sound in fraud because they alleged that defendants "failed to make a reasonable investigation or possessed reasonable grounds for belief that the statements" at issue were accurate. *Evergreen Fund, Ltd. v. McCoy*, No. 00-cv-0767, 2000 WL 1693963, at *5 (N.D. Ill. Nov. 6, 2000) (internal quotations omitted); *Levitan v. McCoy*, No. 00-cv-5096, 2001 WL 1117279, at *4 (N.D. Ill. Sept. 21, 2001) (same). In other words, in both cases, plaintiffs alleged that defendants failed to exercise adequate due diligence concerning accuracy, *not* that defendants *knew* of inaccuracies and proceeded in any event, as Plaintiffs allege here. *Id*. Moreover, both *Evergreen* and *Levitan* were addressed more recently in *Conagra*, in which the

court found neither case to be an impediment to applying Rule 9(b) to the Section 11 and 15 claims at issue in that case. *See* 2020 WL 6118605, *6 (N.D. Ill. 2020).[8]

### C. Plaintiffs' Complaint is an Improper Puzzle Pleading

The Complaint should also be dismissed because it is an improper puzzle pleading. Plaintiffs purport to identify the statements at issue, but do nothing more than copy and paste lengthy block quotes from the Registration Statement, bold and italicize pieces of those quotes without explanation, and follow those quotes with a copy and pasted laundry list of reasons why the statements are false. That is plainly insufficient. *See e.g., Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5-6 (N.D. Ill. July 22, 2014) (dismissing complaint relying on "block quotes [from SEC filings], with liberal use of bold and italics" and a "laundry list of [adverse facts]" as an "inappropriate 'puzzle pleading'").

The Opposition underscores the puzzle nature of the pleading. For example, Plaintiffs cite language from a different case where this Court ruled that plaintiffs' bolding and italicizing of the precise statements at issue was not a puzzle pleading, *see* Opp'n at 11, but Plaintiffs still fail to confirm that the pieces of the block quotes *they* bolded and italicized in *their* Complaint are the ones at issue. Instead, Plaintiffs attempt to argue that the Motion to Dismiss is itself evidence that the Complaint is adequately clear. *See* Opp'n at 12. But Plaintiffs' Opposition is telling. Plaintiffs (i) make no mention of the majority of the bolded, italicized statements that Defendants assumed

---

[8] Plaintiffs also argue, citing *Litwin* and *In re Facebook*, the unremarkable proposition that Item 303's knowledge requirement does not automatically transform a Section 11 claim into a fraud claim. *See* Opp'n at n. 9 (citing *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 506 (S.D.N.Y. 2013)). But Defendants do not argue that the mere existence of an alleged Item 303 violation, in and of itself, triggers Rule 9(b). Instead, the analysis turns on whether the allegations, taken together, allege that "[defendants] knew or were reckless with respect to the falsity of the challenged statements in the [] Offering Documents"—if they do, they sound in fraud. *See Conagra*, 2020 WL 6118605, at *6. *Litwin* and *In re Facebook* do not hold otherwise. *See, e.g., Litwin*, 634 F.3d at 716; *In re Facebook, Inc.*, 986 F. Supp. 2d at 506.

to be at issue and demonstrated are not actionable and (ii) argue that Defendants took certain of these statements out of context. *See* Opp'n at 25-27. In short, Plaintiffs continue their evasive tactics and leave the Court and Defendants "without a clear understanding of which statements are relevant" to "Defendants' substantive arguments." *Navistar Int'l Corp.*, 2014 WL 3610877, at *5.

Plaintiffs also misleadingly suggest that they "explicitly connect[] the false statements to the factual allegations" in their Complaint; in reality, Plaintiffs applied the same laundry list of 10 allegedly adverse facts to each of their 13 paragraphs with block quotes from the Registration Statement. They provide no detail whatsoever on which facts relate to which block quotes, much less which statements within those block quotes. Even if the Court and Defendants assume the bolded, italicized statements are the ones at issue, they are still left guessing as to which of the 10 reasons listed by Plaintiffs renders those statements false. That alone is an independent basis for dismissal. *Navistar Int'l Corp.*, 2014 WL 3610877, at *6 ("The[] [alleged] reasons [of falsity] are not linked to any specific statement but rather are alleged to be generally applicable to all allegedly misleading statements and omissions. This is not sufficient.").

### D. Plaintiffs' Claims Based Upon Protected Forward-Looking Statements Fail

Defendants identified 11 of the 19 bolded and italicized statements as forward-looking statements protected under the bespeaks caution doctrine. The Opposition does not address those 11 statements in detail, but instead summarily states that the statements "are either not forward looking … or … were unaccompanied by meaningful cautionary language." Opp'n at 28. Plaintiffs are incorrect.

*First*, each of the 11 statements are all plainly forward-looking. "A forward-looking statement is one whose truth can only be discerned after it is made." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 n. 7 (N.D. Ill. 2003). Take for example, the statement bolded and italicized in paragraph 95: "In 2020, we expect our platform will include Medicare Advantage products from

10

at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments." ¶ 95; *see also* App'x A to Memo at 2. It is beyond dispute that the expectations referred to in that statement could not be confirmed (one way or the other) by the time the statement was made in June 2020. By definition, that statement is forward-looking. *See Stavros*, 266 F. Supp. 2d at 843 n. 7. The same logic applies to the remaining statements identified as forward-looking in Appendix A that reference, among other things, the scalability of the GoHealth platform, improvement of key financial drivers, increase in expected LTVs, improved and deepening relationships with carriers, reduction of costs of acquiring consumer leads, and improved customer satisfaction rates. Each of those statements constitutes a projection of financial data, a description of management plans or objectives, a statement of future economic performance, or a disclosure of assumptions underlying the foregoing, and therefore constitutes a forward-looking statement. *See Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1196 n. 6 (N.D. Ill. 1997) (*citing* 17 C.F.R. § 240.3b–6(c)) (dismissing claims relating to forward-looking statements).

*Second*, Plaintiffs are incorrect that these statements are unaccompanied by meaningful cautionary language. Meaningful cautionary language must "identify [] important factors that could cause actual results to differ materially from those in the forward-looking statement." *Asher v. Baxter Int'l*, 377 F.3d 727, 734 (7th Cir. 2004). "[T]he language need not explicitly refer to the risk that ultimately caused the projection to differ from the actual results; it is sufficient that the language warned of risks of a significance similar to that actually realized." *Stavros*, 266 F. Supp. 2d at 843 (internal quotations and citation omitted). Here, Plaintiffs contend that GoHealth failed to disclose the risk that GoHealth's carrier base expansion and increased reliance on SNPs could negatively affect LTV/CAC. But GoHealth's Registration Statement contained extensive risk

11

disclosures concerning carrier expansion, reliance on SNPs, and the risk of LTV/CAC decline. *See*, *e.g.*, Opp'n at 15 (citing ¶ 96); Opp'n at 15 (citing ¶ 99). Indeed, the Registration Statement informed investors that LTV/CAC is an estimate based on numerous assumptions that can decline—*i.e.* the core issue about which Plaintiffs now claim they were in the dark. *See* Ex. A to Memo at 36-37. Accordingly, Plaintiffs' assertion that the cautionary language in the Registration Statement failed to mention the alleged risks that came to pass is without merit.

### E. Plaintiffs' Claims Based Upon Immaterial Puffery Fail

Once again, Plaintiffs fail to address any of the specific statements Defendants identified as immaterial puffery. Instead, Plaintiffs start from the baseless position that the puffery argument is somehow contradicted by "the collapse in the price of GoHealth stock following the IPO as GoHealth made admissions to the market." Opp'n at 25. But allegations of a decline in the price of stock alone are insufficient to defeat an argument that certain statements constitute immaterial puffery. *See Conagra Brands, Inc.*, 2020 WL 6118605 at *20 (dismissing Securities Act claims and holding that "stock drop . . . allegations are not enough to show the materiality" of a subset of statements at issue); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (in a stock drop suit, distinguishing between statements that were puffery and those that were not).

Plaintiffs go on to summarily state that the statements Defendants identified "were neither vague nor unspecific." Opp'n at 26.[9] Not so. The statements identified in Appendix A

---

[9] Plaintiffs also inappropriately attempt to recast puffery as a narrow concept defined solely by examples previously identified by other courts. Opp'n at 26. For example, *Singh*, which Plaintiffs attempt to distinguish, found defendants' "general statements about reputation, integrity and compliance" to be puffery, but *Singh* did not hold that those are the *only* types of statements that could constitute puffery. *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Instead, puffery can be any statement "that a reasonable investor would not view as significantly changing the general gist of available information, and thus,[] not material, even if [it was] misleading." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).

concerning, among other things, GoHealth's scalability, deep relationships with carriers, platform appeal, status as a "partner of choice" for carriers, and efficiency are all exactly the types of optimistic talk that no reasonable investor could say impacted an investment decision. *See Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL 3380653, at *6, 9 (N.D. Ill. Oct. 19, 2009) (holding statements that acquisition was "strengthening", "facilitating", "adding depth", and "expertise" classic puffery); *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, No. 10 C 427, 2011 WL 814932, at *7 (N.D. Ill. Feb. 28, 2011) ("Statements regarding a company's 'strong balance sheet' or its 'proven record of growth' are immaterial puffery that no reasonable investor would rely on."). Accordingly, the statements identified in Appendix A as puffery cannot support Plaintiffs' claims.

F.     **Plaintiffs' Claims under Items 303 and 105 of Regulation S-K Fail**

Items 303 and 105 of SEC Regulation S-K also provide no basis for Plaintiffs' claims. Plaintiffs argue that information concerning GoHealth's intent to expand its carrier base and increase reliance on SNPs constitute known events or uncertainties required to be disclosed under those two items. Plaintiffs are wrong.

Item 303 requires SEC registrants to disclose (1) "known trends or uncertainties," (2) that "have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on sales or revenues or income," (3) "from continuing operations." ¶ 107 (quoting 17 C.F.R. § 229.303(a)(2)(ii)).). Here, Plaintiffs have not alleged facts sufficient to support that any decision to expand GoHealth's carrier base or increase reliance on SNPs satisfied any of the three required triggers above. Plaintiffs cite no authority for the proposition that a plan to broaden the customer base and increase reliance on a certain product offering constitutes a "trend" or "uncertainty" under Item 303. Indeed, the four cases Plaintiffs cite involved undisclosed overbilling of a customer of hundreds of millions of dollars, undisclosed product defects, an

13

undisclosed switch to a new product line involving significant complication and engineering risk, and an undisclosed transition away from a company's most profitable business line, respectively. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Mingbo Cai v. Switch, Inc.*, No. 18-cv-01471, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 868 (D. Kan. 2019). Not only are each of the trends and/or uncertainties discussed in those cases a far cry from the alleged carrier expansion and addition of SNP plans alleged here, but, once again, Plaintiffs concede (as they must) that GoHealth *disclosed* its intent to expand its carrier base and add SNP plans. *See*, *e.g.*, Opp'n at 15 (citing ¶ 96); Opp'n at 15 (citing ¶ 99); *see also Conagra Brands, Inc.*, 2020 WL 6118605, at *15 ("Even if Plaintiffs could enforce Item 303's disclosure requirements through the federal securities laws, they do not adequately allege any known trend or uncertainty within Item 303's scope that Defendants failed to disclose in an SEC filing."). In addition, Plaintiffs have failed to allege how intended carrier expansion or increased reliance on SNPs constitute "continuing operations" or how, if at all, those changes would impact "sales or revenues or income." (¶ 107 (quoting 17 C.F.R. §229.303(a)(2)(ii)).). Accordingly, Plaintiffs' Item 303 claim fails.

Item 105 requires public companies to adequately describe the most significant factors making the offering at issue risky. (¶ 107 (quoting 17 C.F.R. § 229.105).). Plaintiffs' Item 105 claim—which rests on the same flawed grounds as their alleged Item 303 violation—also fails as GoHealth's Registration Statement contained extensive risk disclosures concerning the very topics about which Plaintiffs now complain. *See* Memo at 32-33 (citing ¶ 102-104).

### G.      Plaintiffs Fail to State a Claim Under Section 15

Finally, Plaintiffs' Control Person claims under Section 15 also fail. As a threshold matter, because Plaintiffs have failed to adequately allege any predicate violation under Section 11, their

derivative Section 15 claims must also be dismissed. *See, e.g., Conagra Brands*, 2020 WL 6118605, at *37 ("Without a claim for primary liability under Sections 11 or 12(a)(2), there can be no control liability claim under Section 15.").

Moreover, Plaintiffs' allegation of control person status boils down to Defendants' (1) position within the Company and (2) control through collective ownership interest and ability to appoint directors. *See* ¶¶ 143-145. Such allegations are insufficient to establish control person status. *See Starr v. Hey!, Inc.*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) ("Courts within this District have consistently held that a plaintiff may not premise control person liability solely upon status within the company."); *Zishka v. Am. Pad & Paper Co.*, No. 98-cv-0660-M, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001) (dismissing control person claims against defendants who owned 38%-50% of the company's stock and placed three affiliates on the board), *aff'd*, 72 F. App'x 130 (5th Cir. 2003); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) (controlling shareholders who could elect two-thirds of board not control persons where no facts alleged their actual exercise of control over company's management and operations). Plaintiffs' reliance on *Curo* in which the court explicitly ruled "[i]n light of the Tenth Circuit's instructions" on Section 15 is inapposite and does not direct a different result. *CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 878 (D. Kan. 2019). Accordingly, Plaintiffs' Section 15 claims should be dismissed.

## III.     CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Date:  July 6, 2021

Respectfully submitted,

*/s/ Christopher J. Clark*
One of the Attorneys for Defendants GoHealth, Inc., Clinton P. Jones, Brandon M. Cruz, Travis J. Matthiesen, and NVX Holdings, Inc.

Matthew Walch (ARDC No. 626308)
matthew.walch@lw.com
Jack M. McNeily (ARDC No. 6332140)
jack.mcneily@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Christopher J. Clark *(pro hac vice)*
christopher.clark@lw.com
Sandeep Savla (*pro hac vice*)
sandeep.savla@lw.com
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Counsel for Defendants GoHealth, Inc., Clinton P. Jones, Brandon M. Cruz, Travis J. Matthiesen, and NVX Holdings, Inc.*

*/s/ Susan L. Saltzstein (with consent)*
One of the Attorneys for Defendants Goldman Sachs & Co., LLC, BofA Securities, Inc., and Morgan Stanley & Co. LLC

Marcella L. Lape (ARDC No. 6286676)
marcie.lape@skadden.com
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

Susan L. Saltzstein *(pro hac vice)*
susan.saltzstein@skadden.com

16

Lara A. Flath (ARDC No. 6289481)
lara.flath@skadden.com
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Counsel for Defendants Goldman Sachs & Co.,
LLC, BofA Securities, Inc., and Morgan Stanley &
Co. LLC*

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| **In re GOHEALTH, INC. SECURITIES** | ) | **Case No. 1:20-cv-5593** |
| **LITIGATION** | ) |  |
|  | ) |  |
|  | ) | **Judge:  Sharon Johnson Coleman** |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**EXHIBIT INDEX TO REPLY MEMORANDUM OF LAW IN SUPPORT
OF GOHEALTH AND UNDERWRITER DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

| Exhibit | Description |
|---|---|
| Exhibit A. | August 19,2020 GoHealth Reports Second Quarter 2020 Results and Provides 2020 Outlook |

# EXHIBIT A



## GoHealth Reports Second Quarter 2020 Results and Provides 2020 Outlook

August 19, 2020

**Growth Fueled by Strong Medicare Advantage Enrollments**

CHICAGO, Aug. 19, 2020 /PRNewswire/ -- GoHealth, Inc. (GoHealth) (Nasdaq: GOCO), a leading health insurance marketplace, announced financial results for the three and six months ended June 30, 2020.



- Second quarter 2020 net revenues of $127.1 million increased 71% compared to the prior year period, and first half 2020 net revenues of $268.1 million increased 87% compared to the prior year period
- Second quarter 2020 net loss of $(22.9) million compared to net income of $15.3 million in the prior year period, and first half 2020 net loss of $(23.8) million compared to net income of $20.3 million in the prior year period
- Second quarter 2020 adjusted EBITDA[1] of $26.9 million increased 56% compared to the prior year period, and first half 2020 adjusted EBITDA of $61.9 million increased 154% compared to the prior year period

The Company also provided a full year 2020 outlook, including net revenues of $840-890 million and adjusted EBITDA[1] of $265-290 million.

Clint Jones, co-founder and CEO said, "We delivered 71% revenue growth in the second quarter, powered by strong Medicare Advantage enrollments. Our strategic focus on LTV/CAC ensures that these high rates of growth convert into industry-leading margins and strong cash returns. Given the trajectory of our business and the investments we have been making in our direct-to-consumer marketplace, we believe we are on track for another record year of results in fiscal 2020."

Jones continued, "GoHealth is one of the largest enrollers of Medicare Advantage plans in the United States. Our targeted marketing efforts help spur seniors to evaluate their Medicare plans as we continue to expand our carrier offerings and geographic footprint. The COVID-19 pandemic has accelerated the shift from traditional field agents to our technology enabled model, as consumers seek the expert advice of our agents from the comfort and safety of their homes. Importantly, we are rapidly scaling up in a fast growing, 60 million plus person market where our larger scale and leadership position will allow us to better help both consumers and carriers."

**Year-to-date highlights**

- LTV/CAC[2] for the Medicare-Internal segment increased from 2.3x to 2.7x during the first half 2020, driven by lower marketing costs per opportunity and higher conversion, resulting in EBITDA margins of 23% vs 17% in the prior year period. Trailing twelve-month LTV/CAC jumped from 2.8x to 3.6x.
    - LTV per carrier approved Medicare Advantage submission increased 1.3% from $868 to $879 during the first half 2020 compared to the prior year period

- 79% of consumer leads were generated internally vs 30% in the prior year period
- Total Medicare Submitted Policies[3] grew 148% in the first half 2020 to 245,396
  - Medicare - Internal revenue increased 242% in the first half 2020 to $182.5 million
  - Medicare - Internal profit increased 276% in the first half 2020 to $74.5 million
- 76% increase in customer care and enrollment investments in the first half 2020 ahead of the Annual Enrollment Period
  - On track for over 1,000 new agents in 2020 (957 hired as of August 1st, 2020) and four new virtual sales centers, substantially resolving COVID-19 related state licensing delays to date
  - TeleCare team engaging with customers to maximize benefits, deliver them into value-based care models and administer health based assessments through GoHealth's Encompass Platform
- Expanded footprint through carrier additions that drive consumer choice and fit into 2021
  - Added UnitedHealthcare and Aetna nationally, in addition to multiple regional carriers

## Financial Outlook

The trajectory of the US economy remains challenging to predict, particularly given the heightened uncertainty associated with the COVID-19 pandemic. During these times, demand for healthcare has demonstrated great resilience, and we believe that the COVID-19 pandemic has created favorable industry dynamics for technology-driven direct-to-consumer models such as GoHealth's insurance marketplace. The Company is providing an outlook for the fiscal year ending December 31, 2020 based on current market conditions and expectations:

**1. Full year 2020 net revenue of $840 - $890 million, representing year-over-year growth of 56% - 65%**
**2. Full year 2020 adjusted EBITDA of $265 - $290 million, representing year-over-year growth of 55% - 71%**

Jones concluded, "Our recent IPO marked an important milestone nearly two decades after Brandon Cruz and I founded the Company, providing us with the necessary capital to deliver our long-term plan. We believe we have the winning strategy necessary to deliver great results for our shareholders over the coming years by working to improve access to healthcare in America."

## Conference Call Details

The Company will host a conference call today, Wednesday, August 19, 2020 at 5:00 pm (ET) to discuss its financial results. A live audio webcast and a supplemental presentation will be available online at https://investors.gohealth.com. The conference call can also be accessed by dialing 1-833-519-1310 for U.S. participants, or 1-914-800-3876 for international participants, and referencing participant code 9537505. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call, at the same web link.

## About GoHealth

As a leading health insurance marketplace, GoHealth's mission is to improve access to healthcare in America. Enrolling in a health insurance plan can be confusing for customers, and the seemingly small differences between plans can lead to significant out-of-pocket costs or lack of access to critical medicines and even providers. GoHealth combines cutting-edge technology, data science and deep industry expertise to match customers with the healthcare policy and carrier that is best for them. Since its inception, GoHealth has enrolled millions of people in Medicare and individual and family plans. For more information, visit https://www.gohealth.com

*[1] Adjusted EBITDA is a non-GAAP measure. For a definition of Adjusted EBITDA and a reconciliation to the most comparable GAAP measure, please refer to the appendix. [2] LTV/CAC defined as (i) aggregate commissions estimated to be collected over the estimated life of all Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a prospect into a customer less other non-commission carrier revenue for such period, or CAC. [3] Total Medicare Advantage Submitted Policies includes Commissionable and non-Commissionable Policies.*

**Investor Relations:**
Jay Koval, VP of Investor Relations
jkoval@gohealth.com

**Media Relations:**
pressinquiries@gohealth.com

## Forward-Looking Statements

This release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical facts contained in this press release may be forward-looking statements. Statements regarding the Company's future results of operations and financial position, business strategy and plans and objectives of management for future operations, including, among others, statements regarding expected financial performance and operational performance for the fiscal year 2020, including with respect to revenue and Adjusted EBITDA, are forward-looking statements. In some cases, you can identify forward-looking statements by terms, such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Accordingly, we caution you that any such forward-looking statements are not guarantees of future performance and are subject to risks, assumptions and uncertainties that are difficult to predict. Although the Company believes that the expectations reflected in these forward-looking statements are reasonable as of the date made, actual results may prove to be materially different from the results expressed or implied by the forward-looking statements. There are or will be important factors that could cause the Company's actual results to differ materially from those indicated in these forward-looking statements, including, but are not limited to, the following: the Company's ability to comply with the numerous, complex and frequently changing laws regulating the marketing and sale of Medicare plans; the potential for an adverse change in our relationships with carriers, including a loss of a carrier relationships; failure to grow the Company's customer base or retain our existing customers; carriers' ability to reduce commissions paid to the Company and adversely change their underwriting practices; significant consolidation in the healthcare industry which could adversely alter the Company's relationships with carriers; information technology systems failures or capacity constraints interrupting the Company's operations; factors that adversely impact the Company's estimate of LTV; the Company's dependence on agents to sell insurance plans; changes in the health insurance system and laws and regulation governing health insurance markets; the inability to effectively advertise the Company's products; and our ability to successfully implement our business plan during a global economic downturn caused by the COVID-19 pandemic.

The foregoing factors should not be construed as exhaustive and should be read together with the other cautionary statements included in this press release, as well as the cautionary statements and other risk factors set forth in the Company's Quarterly Report on Form 10-Q for the second quarter ended June 30, 2020 filed with the SEC. If one or more events related to these or other risks or uncertainties materialize, or if the Company's underlying assumptions prove to be incorrect, actual results may differ materially from what the Company anticipates. Many of the important factors that will determine these results are beyond the Company's ability to control or predict. Accordingly, you should not place undue reliance on any such forward-looking statements. Any forward-looking statement speaks only as of the date on which it is made, and, except as otherwise required by law, the Company does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise. New factors emerge from time to time, and it is not possible for us to predict which will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Use of Non-GAAP Financial Measures and Key Performance Indicators**
In this press release, we use supplemental measures of our performance that are derived from our consolidated financial information, but which are not presented in our consolidated financial statements prepared in accordance with GAAP. These non-GAAP financial measures include net income (loss) before interest expense, income tax expense (benefit) and depreciation and amortization expense, or EBITDA; Adjusted EBITDA and Adjusted EBITDA margin. Adjusted EBITDA is the primary financial performance measure used by management to evaluate its business and monitor its results of operations.

Adjusted EBITDA represents EBITDA as further adjusted for share-based compensation, change in fair value of earnout liability, Centerbridge Acquisition costs, severance costs and incremental organizational costs in connection with the IPO. Adjusted EBITDA margin represents Adjusted EBITDA divided by net revenues.

We use non-GAAP financial measures to supplement financial information presented on a GAAP basis. We believe that excluding certain items from our GAAP results allows management to better understand our consolidated financial performance from period to period and better project our future consolidated financial performance as forecasts are developed at a level of detail different from that used to prepare GAAP-based financial measures. Moreover, we believe these non-GAAP financial measures provide our stakeholders with useful information to help them evaluate our operating results by facilitating an enhanced understanding of our operating performance and enabling them to make more meaningful period to period comparisons. There are limitations to the use of the non-GAAP financial measures presented in this press release. For example, our non-GAAP financial measures may not be comparable to similarly titled measures of other companies. Other companies, including companies in our industry, may calculate non-GAAP financial measures differently than we do, limiting the usefulness of those measures for comparative purposes.

The non-GAAP financial measures are not meant to be considered as indicators of performance in isolation from or as a substitute for net income (loss) prepared in accordance with GAAP, and should be read only in conjunction with financial information presented on a GAAP basis. Reconciliations of each of EBITDA and Adjusted EBITDA to its most directly comparable GAAP financial measure, net income (loss), are presented in the tables below in this press release. We encourage you to review the reconciliations in conjunction with the presentation of the non-GAAP financial measures for each of the periods presented. In future periods, we may exclude similar items, may incur income and expenses similar to these excluded items and include other expenses, costs and non-recurring items.

Management has provided its outlook regarding adjusted EBITDA, which is a non-GAAP financial measures and exclude certain charges. Management has not reconciled these non-GAAP financial measures to the corresponding GAAP financial measures because guidance for the various reconciling items are not provided. Management is unable to provide guidance for these reconciling items because we cannot determine their probable significance, as certain items are outside of the company's control and cannot be reasonably predicted since these items could vary significantly from period to period. Accordingly, reconciliations to the corresponding GAAP financial measures are not available without unreasonable effort.

"LTV/CAC" refers to the Lifetime Value of Commissions per Consumer Acquisition Cost, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a prospect into a customer less other noncommission carrier revenue for such period, or CAC. CAC is comprised of cost of revenue, marketing and advertising expenses and customer care and enrollment expenses less other revenue and is presented on a per commissionable Approved Submission basis. "Approved Submissions" refer to Submitted Policies approved by carriers for the identified product during the indicated period. "LTV Per Approved Submission" refers to the Lifetime Value of Commissions per Approved Submission, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, divided by (ii) the number of commissionable Approved Submissions for such period.

The following table sets forth the components of our results of operations for the three months ended June 30, 2020 and 2019 (unaudited):

| | Successor | | Predecessor | | | |
| | Three Months Ended June 30, 2020 | | Three Months Ended June 30, 2019 | | | |
| *(in thousands, except percentages)* | Dollars | % of Net Revenues | Dollars | % of Net Revenues | $ Change | % Change |
|---|---|---|---|---|---|---|
| Net revenues: | | | | | | |
| Commission | $ 96,606 | 76.0% | $ 60,077 | 80.6% | $ 36,529 | 60.8% |
| Other | 30,451 | 24.0% | 14,434 | 19.4% | 16,017 | 111.0% |
| | | | | | | |
| Net revenues | 127,057 | 100.0% | 74,511 | 100.0% | 52,546 | 70.5% |
| | | | | | | |
| Operating expenses: | | | | | | |
| Cost of revenue | 36,559 | 28.8% | 26,561 | 35.6% | 9,998 | 37.6% |
| Marketing and advertising | 21,634 | 17.0% | 5,026 | 6.7% | 16,608 | 330.4% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Customer care and enrollment | 28,394 | 22.3% | 15,814 | 21.2% | 12,580 | 79.5% |
| Technology | 5,705 | 4.5% | 4,301 | 5.8% | 1,404 | 32.6% |
| General and administrative | 10,359 | 8.2% | 7,106 | 9.5% | 3,253 | 45.8% |
| Change in fair value of contingent consideration liability | 15,300 | 12.0% | - | - | 15,300 | NM |
| Amortization of intangible assets | 23,514 | 18.5% | - | - | 23,514 | NM |
| Transaction costs | - | - | 299 | 0.4% | (299) | (100.0)% |
| Total operating expenses | 141,465 | 111.3% | 59,107 | 79.3% | 82,358 | 139.3% |
| (Loss) income from operations | (14,408) | (11.3)% | 15,404 | 20.7% | (29,812) | (193.5)% |
| Interest expense | 8,986 | 7.1% | 81 | 0.1% | 8,905 | NM |
| Other (income) expense | (505) | (0.4)% | 38 | 0.1% | (543) | NM |
| (Loss) income before income tax expense | (22,889) | (18.0)% | 15,285 | 20.5% | (38,174) | (249.7)% |
| Income tax expense (benefit) | (22) | 0.0% | 9 | 0.0% | (31) | (344.4)% |
| Net (loss) income | $ (22,867) | (18.0)% | $ 15,276 | 20.5% | $ (38,143) | (249.7)% |
| **Non-GAAP Financial Measures:** | | | | | | |
| EBITDA | $ 10,615 | | $ 16,871 | | $ (6,256) | (37.1)% |
| Adjusted EBITDA | $ 26,936 | | $ 17,269 | | $ 9,667 | 56.0% |
| Adjusted EBITDA margin | 21. 2% | | 23.2% | | | |

\*   NM indicates that the percentage is not meaningful.

The reconciliations of GAAP net (loss) income to EBITDA and Adjusted EBITDA for the three months ended June 30, 2020 and 2019 are as follows:

| | Three Months Ended June 30, | |
|---|---|---|
| | Successor | Predecessor |
| (in thousands) | 2020 | 2019 |
| Net revenues | $ 127,057 | $ 74,511 |
| Net (loss) income | $ (22,867) | $ 15,276 |
| Interest expense | 8,986 | 81 |
| Income tax (benefit) expense | (22) | 9 |
| Depreciation and amortization expense | 24,518 | 1,505 |
| EBITDA | 10,615 | 16,871 |
| Share-based compensation expense[1] | 597 | - |
| Change in fair value of contingent consideration liability[2] | 15,300 | - |
| Centerbridge Acquisition costs[3] | - | 299 |
| IPO transaction costs[4] | 424 | - |
| Severance costs[5] | - | 99 |
| Adjusted EBITDA | $ 26,936 | $ 17,269 |
| Adjusted EBITDA margin | 21.2% | 23.2% |

(1)Represents non-cash share-based compensation expense in connection with profits interests.
(2)Represents the change in fair value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition.
(3)Represents legal, accounting, consulting, and other costs related to the Centerbridge Acquisition.
(4)Represents legal, accounting, consulting, and other indirect costs associated with the Company's IPO.
(5)Represents costs associated with the termination of employment.

The following table sets forth the components of our results of operations for the six months ended June 30, 2020 and 2019 (unaudited):

| | Successor Six Months Ended June 30, 2020 | | Predecessor Six Months Ended June 30, 2019 | | | |
|---|---|---|---|---|---|---|
| (in thousands, except percentages) | Dollars | % of Net Revenues | Dollars | % of Net Revenues | $ Change | % Change |
| Net revenues: | | | | | | |
| Commission | $ 209,116 | 78.0% | $ 111,293 | 77.5% | $ 97,823 | 87.9% |
| Other | 58,951 | 22.0% | 32,308 | 22.5% | 26,643 | 82.5% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Net revenues | 268,067 | 100.0% | 143,601 | 100.0% | 124,466 | 86.7% |
| | | | | | | |
| Operating expenses: | | | | | | |
| Cost of revenue | 78,693 | 29.4% | 54,113 | 37.7% | 24,580 | 45.4% |
| Marketing and advertising | 47,708 | 17.8% | 16,437 | 11.4% | 31,271 | 190.2% |
| Customer care and enrollment | 52,371 | 19.5% | 29,753 | 20.7% | 22,618 | 76.0% |
| Technology | 10,298 | 3.8% | 8,457 | 5.9% | 1,841 | 21.8% |
| General and administrative | 20,849 | 7.8% | 14,096 | 9.8% | 6,753 | 47.9% |
| Change in fair value of contingent consideration liability | 19,700 | 7.3% | - | - | 19,700 | NM |
| Amortization of intangible assets | 47,029 | 17.5% | - | - | 47,029 | NM |
| Transaction costs | - | - | 299 | 0.2% | (299) | (100.0)% |
| | | | | | | |
| Total operating expenses | 276,648 | 103.2% | 123,155 | 85.8% | 153,493 | 124.6% |
| | | | | | | |
| (Loss) income from operations | (8,581) | (3.2)% | 20,446 | 14.2% | (29,027) | (142.0)% |
| Interest expense | 15,742 | 5.9% | 109 | 0.1% | 15,633 | NM |
| Other (income) expense | (495) | (0.2)% | 48 | 0.0% | (543) | NM |
| | | | | | | |
| (Loss) income before income tax expense | (23,828) | (8.9)% | 20,289 | 14.1% | (44,117) | (217.4)% |
| Income tax expense (benefit) | (24) | 0.0% | 11 | 0.0% | (35) | (318.2)% |
| | | | | | | |
| Net (loss) income | $ (23,804) | (8.9)% | $ 20,278 | 14.1% | $(44,082) | (217.4)% |
| | | | | | | |
| Non-GAAP Financial Measures: | | | | | | |
| EBITDA | $ 40,579 | | $ 23,441 | | $ 17,138 | 73.1% |
| Adjusted EBITDA | $ 61,857 | | $ 24,405 | | $ 37,452 | 153.5% |
| Adjusted EBITDA margin | 23.1% | | 17.0% | | | |

\*  NM indicates that the percentage is not meaningful.

The reconciliations of GAAP net (loss) income to EBITDA and Adjusted EBITDA for the six months ended June 30, 2020 and 2019 are as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| | Successor | Predecessor |
| (in thousands) | 2020 | 2019 |
| Net revenues | $ 268,067 | $ 143,601 |
| | | |
| Net (loss) income | $ (23,804) | $ 20,278 |
| Interest expense | 15,742 | 109 |
| Income tax (benefit) expense | (24) | 11 |
| Depreciation and amortization expense | 48,665 | 3,043 |
| | | |
| EBITDA | 40,579 | 23,441 |
| Share-based compensation expense[1] | 1,077 | - |
| Change in fair value of contingent consideration liability[2] | 19,700 | - |
| Centerbridge Acquisition costs[3] | - | 299 |
| IPO transaction costs[4] | 424 | - |
| Severance costs[5] | 77 | 665 |
| | | |
| Adjusted EBITDA | $ 61,857 | $ 24,405 |
| | | |
| Adjusted EBITDA margin | 23.1% | 17.0% |

(1) Represents non-cash share-based compensation expense in connection with profits interests.
(2) Represents the change in fair value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition.
(3) Represents legal, accounting, consulting, and other costs related to the Centerbridge Acquisition.
(4) Represents legal, accounting, consulting, and other indirect costs associated with the Company's IPO.
(5) Represents costs associated with the termination of employment.

**GoHealth Holdings, LLC and Subsidiaries**
**Condensed Consolidated Balance Sheets**
**(dollars in thousands, except unit and per unit data)**

| | Successor | Successor |
|---|---|---|
| | **June 30, 2020** | **December 31, 2019** |
| | **(Unaudited)** | |
| **Assets** | | |
| Current assets: | | |
| | $ | $ |
| Cash and cash equivalents | 118,341 | 12,276 |
| Accounts receivable, net of allowance for doubtful accounts of $729 in 2020 and $904 in 2019 | 9,444 | 24,461 |
| Commissions receivable – current | 74,044 | 101,078 |
| Prepaid expenses and other current assets | 15,019 | 5,954 |
| Total current assets | 216,848 | 143,769 |
| Commissions receivable – non-current | 367,596 | 281,853 |
| Property, equipment, and capitalized software, net | 12,467 | 6,339 |
| Intangible assets, net | 735,754 | 782,783 |
| Goodwill | 386,553 | 386,553 |
| Other long-term assets | 1,193 | 998 |
| | $ | $ |
| Total assets | 1,720,411 | 1,602,295 |
| **Liabilities and members' equity** | | |
| Current liabilities: | | |
| | $ | $ |
| Accounts payable | 10,243 | 13,582 |
| Accrued liabilities | 21,659 | 22,568 |
| Commissions payable – current | 46,240 | 56,003 |
| Deferred revenue | 1,047 | 15,218 |
| Current portion of debt | 4,170 | 3,000 |
| Other current liabilities | 3,974 | 2,694 |
| Total current liabilities | 87,333 | 113,065 |
| Non-current liabilities: | | |
| Commissions payable – non-current | 125,387 | 97,489 |
| Long-term debt, net of current portion | 397,235 | 288,233 |
| Contingent consideration | 62,400 | 242,700 |
| Other non-current liabilities | 543 | 664 |
| Total non-current liabilities | 585,565 | 629,086 |
| Commitments and contingencies (Note 10) | | |
| Members' Equity: | | |
| Preferred Units – $1.00 par value; 541,263,042 units authorized, issued and outstanding at June 30, 2020 and December 31, 2019 | 536,489 | 547,542 |
| Class A Common Units – $1.00 par value; 351,345,682 and 237,938,682 units authorized, issued and outstanding at June 30, 2020 and December 31, 2019 | 282,317 | 218,911 |
| Class B Common Units – $1.00 par value; 157,372,734 and 102,061,318 units authorized, issued and outstanding at June 30, 2020 and December 31, 2019, respectively | 130,536 | 93,708 |
| Senior Preferred Earnout Units – no par value; 100,000,000 and 0 units authorized, issued, and outstanding at June 30, 2020 and December 31, 2019, respectively | 98,063 | — |
| Profits Units – no par value; 97,918,116 units authorized at June 30, 2020 and December 31, 2019; 86,097,861 and 78,398,133 units issued at June 30, 2020 and December 31, 2019, respectively; and none outstanding at June 30, 2020 and December 31, 2019 | — | — |
| Accumulated other comprehensive income (loss) | 81 | (17 ) |
| Total members' equity | 1,047,513 | 860,144 |
| | $ | $ |
| Total liabilities and members' equity | 1,720,411 | 1,602,295 |

**GoHealth Holdings, LLC and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows**

**(dollars in thousands, unaudited)**

| | Successor Six Months Ended June 30, 2020 | Predecessor Six Months Ended June 30, 2019 |
|---|---|---|
| **Operating activities:** | | |
| Net (loss) income | $ (23,804) | $ 20,278 |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities: | | |
| Share-based compensation | 1,077 | — |
| Depreciation and amortization | 1,636 | 3,043 |
| Amortization of intangible assets | 47,029 | — |
| Amortization of debt discount and issuance costs | 1,058 | — |
| Change in fair value of contingent consideration | 19,700 | — |
| Other non-cash items | (458) | 808 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 15,506 | 860 |
| Commissions receivable | (58,709) | (33,885) |
| Prepaid expenses and other assets | (1,329) | 1,276 |
| Accounts payable | (3,467) | (3,496) |
| Accrued liabilities | (7,641) | (1,792) |
| Deferred revenue | (14,171) | 12,210 |
| Commissions payable | 18,135 | 12,377 |
| Other liabilities | 1,269 | 1,300 |
| Net cash (used in) provided by operating activities | (4,169) | 12,979 |
| **Investing activities:** | | |
| Purchases of property, equipment and software | (7,764) | (4,783) |
| Net cash used in investing activities | (7,764) | (4,783) |
| **Financing activities:** | | |
| Borrowings under term loans | 117,000 | — |
| Principal payments under term loans | (1,793) | — |
| Payment of deferred offering costs | (874) | — |
| Principal payments under capital lease obligations | (144) | — |
| Borrowings under revolving credit facilities | — | 42,967 |
| Payments under revolving credit facilities | — | (47,823) |
| Debt issuance cost payments | (6,289) | — |
| Proceeds received upon issuance of common units | 10,000 | — |
| Net cash provided by (used in) financing activities | 117,900 | (4,856) |
| Effect of exchange rate changes on cash | 98 | (53) |
| Increase in cash and cash equivalents | 106,065 | 3,287 |
| Cash and cash equivalents at beginning of period | 12,276 | 505 |
| Cash and cash equivalents at end of period | $ 118,341 | $ 3,792 |
| **Supplemental disclosure of cash flow information:** | | |
| Non-cash investing and financing activities: | | |
| Purchases of property, equipment and software included in accounts payable | $ 798 | $ 26 |
| Purchases of property, equipment and software under capital leases | $ — | $ 654 |
| Issuance of senior preferred earnout units to settle contingent consideration liability | $ 100,000 | $ — |
| Issuance of common A and B units to settle contingent consideration liability | $ 100,000 | $ — |

## Segment Information

The following table sets forth operating segment results for the three months ended June 30, 2020 and 2019

| | Successor Three Months Ended June 30, 2020 | | Predecessor Three Months Ended June 30, 2019 | | | |
|---|---|---|---|---|---|---|
| (in thousands, except percentages) | Dollars | % of Total Revenues | Dollars | % of Total Revenues | $ Change | % Change |
| Net revenues: | | | | | | |
| Medicare—Internal | $ 87,201 | 68.6% | $ 32,412 | 43.5% | $ 54,789 | 169.0% |
| Medicare—External | 28,108 | 22.1% | 19,070 | 25.6% | 9,038 | 47.4% |
| IFP and Other—Internal | 7,019 | 5.5% | 12,340 | 16.6% | (5,321) | (43.1)% |
| IFP and Other—External | 4,729 | 3.7% | 10,689 | 14.3% | (5,960) | (55.8)% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total revenues | 127,057 | 100.0% | 74,511 | 100.0% | 52,546 | 70.5% |
| | | | | | | |
| Segment profit: | | | | | | |
| Medicare—Internal | 32,746 | 25.8% | 14,941 | 20.1% | 17,805 | 119.2% |
| Medicare—External | 495 | 0.4% | 5,692 | 7.6% | (5,197) | (91.3)% |
| IFP and Other—Internal | (54) | 0.0% | (268) | (0.4)% | 214 | (79.9)% |
| IFP and Other—External | 130 | 0.1% | 107 | 0.1% | 23 | 21.5% |
| Total segment profit | 33,317 | 26.2% | 20,472 | 27.5% | 12,845 | 62.7% |
| Corporate expense | 8,911 | 7.0% | 4,769 | 6.4% | 4,142 | 86.9% |
| Change in fair value of contingent consideration liability | 15,300 | 12.0% | - | - | 15,300 | NM |
| Amortization of intangible assets | 23,514 | 18.5% | - | - | 23,514 | NM |
| Transaction costs | - | - | 299 | 0.4% | (299) | NM |
| Interest expense | 8,986 | 7.1% | 81 | 0.1% | 8,905 | NM |
| Other (income) expense | (505) | (0.4)% | 38 | 0.1% | (543) | NM |
| | | | | | | |
| (Loss) income before income taxes | $ (22,889) | (18.0)% | $ 15,285 | 20.5% | $ (38,174) | (249.7)% |

\* NM indicates that the percentage is not meaningful.

The following table sets forth operating segment results for the six months ended June 30, 2020 and 2019

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | Six Months Ended June 30, 2020 | | Six Months Ended June 30, 2019 | | | |
| | | % of Total | | % of Total | | |
| (in thousands, except percentages) | Dollars | Revenues | Dollars | Revenues | $ Change | %Change |
| Net revenues: | | | | | | |
| Medicare—Internal | $ 182,488 | 68.1% | $ 53,324 | 37.1% | $ 129,164 | 242.2% |
| Medicare—External | 57,053 | 21.3% | 39,404 | 27.4% | 17,649 | 44.8% |
| IFP and Other—Internal | 15,651 | 5.8% | 26,780 | 18.6% | (11,129) | (41.6)% |
| IFP and Other—External | 12,875 | 4.8% | 24,093 | 16.8% | (11,218) | (46.6)% |
| | | | | | | |
| Total revenues | 268,067 | 100.0% | 143,601 | 100.0% | 124,466 | 86.7% |
| | | | | | | |
| Segment profit: | | | | | | |
| Medicare—Internal | 74,482 | 27.8% | 19,806 | 13.8% | 54,676 | 276.1% |
| Medicare—External | 173 | 0.1% | 9,071 | 6.3% | (8,898) | (98.1)% |
| IFP and Other—Internal | 427 | 0.2% | 612 | 0.4% | (185) | (30.2)% |
| IFP and Other—External | 642 | 0.2% | 1,370 | 1.0% | (728) | (53.1)% |
| Total segment profit | 75,724 | 28.2% | 30,859 | 21.5% | 44,865 | 145.4% |
| Corporate expense | 17,576 | 6.6% | 10,114 | 7.0% | 7,462 | 73.8% |
| Change in fair value of contingent consideration liability | 19,700 | 7.3% | - | - | 19,700 | NM |
| Amortization of intangible assets | 47,029 | 17.5% | - | - | 47,029 | NM |
| Transaction Costs | - | - | 299 | 0.2% | (299) | NM |
| Interest expense | 15,742 | 5.9% | 109 | 0.1% | 15,633 | NM |
| Other (income) expense | (495) | (0.2)% | 48 | 0.0% | 543 | NM |
| | | | | | | |
| (Loss) income before income taxes | $ (23,828) | (8.9)% | $ 20,289 | 14.1% | $ (44,117) | (217.4)% |

\* NM indicates that the percentage is not meaningful.

The following table presents the number of Submitted Policies by product for the Medicare segments for the three and six months ended June 30, 2020 and 2019, split between those submissions that are commissionable (compensated through commissions received from carriers) and those that are non-commissionable (compensated via hourly fees and enrollment fees):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Successor | Predecessor | Successor | Predecessor |
| | 2020 | 2019 | 2020 | 2019 |
| Medicare Advantage | 99,078 | 47,039 | 216,413 | 83,095 |
| Medicare Supplement | 2,248 | 4,260 | 4,919 | 8,114 |
| Prescription Drug Plans | 1,969 | 2,766 | 4,431 | 5,458 |
| | | | | |
| Total Medicare—Commissionable | 103,295 | 54,065 | 225,763 | 96,667 |

| | | | | |
|---|---|---|---|---|
| Medicare Advantage | 7,407 | 1,404 | 14,334 | 1,902 |
| Medicare Supplement | 1,734 | 260 | 3,546 | 416 |
| Prescription Drug Plans | 955 | 109 | 1,753 | 136 |
| Total Medicare—Non Commissionable | 10,096 | 1,773 | 19,633 | 2,454 |
| Total Medicare Submitted Policies | 113,391 | 55,838 | 245,396 | 99,121 |

The following tables present the number of Approved Submissions by product relating to commissionable policies for the Medicare segments for the three and six months ended June 30, 2020 and 2019. Only commissionable policies are used to calculate our LTV.

*Medicare—Internal*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Successor | Predecessor | Successor | Predecessor |
| | 2020 | 2019 | 2020 | 2019 |
| Medicare Advantage | 67,818 | 30,814 | 151,426 | 50,274 |
| Medicare Supplement | 465 | 1,185 | 1,287 | 2,254 |
| Prescription Drug Plans | 1,571 | 1,882 | 3,745 | 3,467 |
| Medicare—Internal Commissionable Approved Submissions | 69,854 | 33,881 | 156,458 | 55,995 |

*Medicare—External*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Successor | Predecessor | Successor | Predecessor |
| | 2020 | 2019 | 2020 | 2019 |
| Medicare Advantage | 28,979 | 16,176 | 61,266 | 32,790 |
| Medicare Supplement | 1,633 | 2,615 | 3,191 | 5,213 |
| Prescription Drug Plans | 405 | 884 | 854 | 1,991 |
| Medicare—External Commissionable Approved Submissions | 31,017 | 19,675 | 65,311 | 39,994 |

The following table presents the LTV per Approved Submission by product for the Medicare segments for the three and six months ended June 30, 2020 and 2019:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Successor | Predecessor | Successor | Predecessor |
| | 2020 | 2019 | 2020 | 2019 |
| Medicare Advantage | $ 905 | $ 873 | $ 879 | $ 868 |
| Medicare Supplement | $ 937 | $ 946 | $ 928 | $ 936 |
| Prescription Drug Plans | $ 215 | $ 192 | $ 216 | $ 192 |

C View original content to download multimedia:http://www.prnewswire.com/news-releases/gohealth-reports-second-quarter-2020-results-and-provides-2020-outlook-301115173.html

SOURCE GoHealth, Inc.