Fed. Sec. L. Rep. P 98,111

2014 WL 3610877
United States District Court,
N.D. Illinois, Eastern Division.

CONSTRUCTION WORKERS PENSION FUND—
LAKE COUNTY AND VICINITY, Individually and
on Behalf of All Others Similarly Situated, Plaintiff,
v.
NAVISTAR INTERNATIONAL
CORPORATION, et al., Defendants.

No. 13 C 2111
|
Signed July 22, 2014

**Attorneys and Law Firms**

James E. Barz, Robbins Geller Rudman & Dowd LLP, Matthew Thomas Heffner, Susman Heffner & Hurst LLP, Carol V. Gilden, Cohen Milstein Sellers & Toll PLLC, Chicago, IL, Genevieve Odile Fontan, Stephen Douglas Bunch, Steven J. Toll, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Danielle S. Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Kenneth Mark Rehns, Cohen Milstein Sellers & Toll PLLC, New York, NY, for Plaintiff.

Robin M. Hulshizer, Sean M. Berkowitz, Eric Robert Swibel, Matthew Lawrence Kutcher, Latham & Watkins LLP, Chicago, IL, for Defendants.

## *OPINION AND ORDER*

SARA L. ELLIS, United States District Judge

**\*1** Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") brings this case on behalf of itself and a putative class of similarly situated persons or entities who purchased securities in Navistar International Corporation ("Navistar"). Central States alleges that Navistar and sixteen current and former officers and directors—Daniel C. Ustian, Andrew J. Cederoth, Eugenio Clariond, John D. Correnti, Diane H. Gulyas, Michael N. Hammes, David D. Harrison, James H. Keyes, Steven J. Klinger, William H. Osborne, Dennis D. Williams, Stanley A. McChrystal, John P. Waldron, Richard C. Tarapchak, Jack Allen, and Eric Tech—made false or misleading representations with regard to Navistar's business operations that caused Navistar's stock price to be artificially inflated. Specifically, Central States alleges that Defendants misrepresented and concealed material information regarding the viability of Navistar's engine design and development efforts to meet certain Environmental Protection Agency ("EPA") standards. In doing so, Central States contends that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) and t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Now before the Court are Defendants' motions to dismiss the Consolidated Amended Complaint [99, 101, 103][1] and Central States' motion to strike certain statements and exhibits attached to one of the motions to dismiss [108]. Because Central States fails to specify which of Defendants' statements were false or misleading and fails to specifically connect each alleged misstatement with a contrary allegation of fact, the motions to dismiss are granted and the Consolidated Amended Complaint is dismissed without prejudice. Central States' motion to strike is denied as moot.

## BACKGROUND[2]

**\*2** Navistar produces commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, and provides parts and service for trucks and trailers. Its North American truck and engine market is a core segment of its business. Navistar's stock is listed on the New York Stock Exchange. Central States seeks to represent a class of individuals who purchased or otherwise acquired Navistar stock between June 9, 2009 and August 1, 2012 (the "Class Period"). The last day on which Central States purchased Navistar stock during the Class Period is October 27, 2011. The Individual Defendants served as directors and/or officers of Navistar during the Class Period.

Navistar's truck and engine business is subject to various EPA regulations. In 2001, pursuant to the Clean Air Act, the EPA issued a rule that required a 95% reduction in nitrogen oxide ("NOx") emissions from heavy-duty diesel engines. Specifically, new engines were to emit NOx at a rate of no more than 0.2 g/bhp-hr ("0.2 NOx") by 2010. To obtain EPA certification, a manufacturer had to demonstrate compliance with the 0.2 NOx standard. Alternatively, certification could be obtained through a combination of a 0.5 NOx engine and banked emissions credits. For a period of time, the EPA also allowed manufacturers to pay nonconformance penalties ("NCPs") while they finished developing their emissions control technology.

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 2 of 61 PageID #:2717

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....

Fed. Sec. L. Rep. P 98,111

In response to the new EPA standard, the heavy-duty truck industry—except for Navistar—pursued selective catalytic reduction ("SCR") technology, which uses an after-treatment device to reduce emissions.[3] These manufacturers met the 0.2 NOx standard on time. Navistar decided to pursue a different technology—exhaust gas recirculation ("EGR"), an in-cylinder solution that does not require after-treatment. Because EGR technology was still being developed, Navistar's initial strategy to comply with EPA's regulation involved certification through the use of banked emissions credits.

Investors and analysts were particularly focused on Navistar's public updates on the development of EGR technology and progress toward obtaining 0.2 NOx certification. Navistar publicly made statements that it had developed "viable, 'proven' EGR technology and investors should not be concerned about whether Navistar would be able to certify EGR engines at 0.2 NOx because it already had produced 0.2 NOx engines that were being tested." Consol. Am. Compl. ¶ 9. For example, Ustian, Navistar's then-CEO and one of its directors, stated in November 2010 that Navistar was "100% there in terms of [its] ability to" achieve 0.2 NOx with EGR technology. *Id.* ¶ 10. Ustian was also quoted as saying that Navistar had products "that are running today at 0.2[NOx]."[4] *Id.* ¶ 115. Similar statements were made in press releases, conference calls, trade articles, and at various conferences. Navistar's SEC forms also discussed its strategy of focusing on EGR technology. Additionally, in March 2011, Ustian represented that Navistar had submitted its 13–liter EGR engine to the EPA for certification at 0.2 NOx, but the EPA stated in later court filings that it did not receive an application for such certification until January or February 2012. Navistar did announce that it submitted another application for its 13–liter EGR engine to the EPA for certification at 0.2 NOx on January 31, 2012.

**\*3** Navistar did not achieve the 0.2 NOx emissions requirements through EGR technology and never was certified as meeting that requirement independent of banked emissions credits. From the start, Navistar's engineers had encountered various technical problems with EGR technology and continually noted that additional time was needed before a compliant engine would be ready. These issues were brought to the attention of senior-level management, including Ustian, Tech, and Cederoth. For example, CW5, the Chief Engineer of Navistar's Engine Group, in an August 27, 2010 presentation (the "Go Fast presentation"), indicated that EGR technology meeting the

0.2 NOx standard would not go into production until at least Q1 2014 for a 13–liter engine, Q3 2014 for an 11–liter engine, and Q1 2015 for a 15–liter engine. This schedule would leave Navistar with at least a 1.75 year gap between when its emissions credits would be exhausted and when the 13–liter engine would be compliant. And despite Navistar's engineers' suggestions that an alternative to EGR should be pursued, development of an SCR backup plan was halted. Additionally, Navistar incurred excessive warranty costs in connection with its newly-developed 2010 and 2011 engines, which had valve and soot problems. These warranty costs were larger than the amount for which Navistar had reserved.

On February 14, 2012, Navistar's share price declined after an internet article reported that the EPA would fine Navistar for shipping back-dated engines during its 2010 engine transition. Then, in February 28, 2012 letters to counsel for Daimler Trucks, Mack Trucks, and Volvo, the EPA indicated its initial concerns that Navistar would be able to certify its engine at 0.2 NOx and that even if it could be certified, Navistar would not be able to introduce it until June 15, 2012. On March 8, 2012, Navistar announced a $153 million loss for the first quarter of 2012. On April 19, 2012, Wells Fargo downgraded Navistar to "Market Perform" based on challenges Navistar faced, including obtaining EPA emissions certification for its engines.

On June 7, 2012, before the markets opened, Navistar reported a $172 million loss for its second fiscal quarter ending April 30, 2012, due in part to increased warranty expenses for repairs to 2010 and 2011 vehicles. This caused Navistar's stock price to drop by $4.04 per share (14.35%) that day. Then, on July 6, 2012, Navistar announced that it was abandoning EGR technology in favor of the SCR strategy the rest of the heavy-duty truck industry had already adopted. Navistar's stock price dropped by $4.37 per share (15.18%) that day. Finally, on August 2, 2012, Navistar issued a press release announcing that it was withdrawing its full year fiscal 2012 guidance until releasing its third quarter 2012 results in September. Navistar also disclosed an SEC formal letter of inquiry into accounting and disclosure matters dating back to November 2010.[5] Navistar's stock price fell $3.33 per share (13.44%) that day. On August 30, 2012, Navistar disclosed that Ustian had resigned from Navistar effective August 26, 2012.

## LEGAL STANDARD

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 3 of 61 PageID #:2718
Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....
Fed. Sec. L. Rep. P 98,111

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed.R.Civ.P. 12(b)(6); *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

**\*4** Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir.2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

On top of the pleading burden imposed by Rules 8 and 9(b), Congress further heightened the pleading standards on securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA"). Congress created this standard to check pleading abuses in private securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs II),* 551 U.S. 308, 313–14, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In order to properly allege that the defendant misrepresented or omitted material facts, the PSLRA requires the plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In pleading scienter, the PSLRA requires that the plaintiff, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For an inference to be "strong," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II,* 551 U.S. at 324.

### ANALYSIS

Defendants, in three separate motions to dismiss the Consolidated Amended Complaint, raise a number of arguments, including that (1) the Consolidated Amended Complaint is an improper puzzle pleading, (2) Central States cannot challenge statements made after its last Navistar stock purchase, (3) the PSLRA safe harbor protects forward-looking statements, (4) any remaining allegedly false statements were not false or misleading when made, (5) Central States has not properly alleged scienter or loss causation, and (6) Central States does not allege facts to support that any of the Individual Defendants were control persons so as to form the basis of the Section 20(a) claim. The Court focuses on the first argument, that Central States has failed to satisfy the PSLRA's heightened pleading standards by not specifically identifying which of Navistar's statements during the Class Period were false nor explaining exactly why each specific statement is false. Although the Court recognizes that, in doing so, it only invites Central States to clarify its allegations and Defendants to re-raise the arguments not addressed by any such amendment, the Court finds such a step necessary in order to streamline the case and ensure that the Court addresses the substantive issues raised by Defendants only with respect to the specific alleged false and misleading statements or omissions that Central States intends to pursue in this litigation.

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and all facts that form the plaintiff's basis for believing that the statement is misleading. 15 U.S.C. § 78u–4(b)(1). Courts around the country have made clear that a complaint does not satisfy the PSLRA's pleading standards when it quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph. For example, in *Boca Raton Firefighters & Police Pension Fund v. Bahash,* the Second Circuit dismissed a complaint for failing to satisfy the PSLRA because it "consist[ed] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced

Construction Workers Pension Fund—Lake County and..., Not Reported in Fed....
Fed. Sec. L. Rep. P 98,111

in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in ¶ 256 and the factual detail contained throughout this Complaint." 506 Fed.Appx. 32, 37–38 (2d Cir.2012) (second and third alterations in original). Likewise, in *Conlee v. WMS Industries, Inc.,* a court in this district dismissed the complaint wherein "the heart of the complaint, the section titled 'Defendants' False and Misleading Statements Made During the Class Period,' is a sixteen page mash-up of block quotes, snippets, parentheticals, and Lead Plaintiff's characterizations of alleged statements made by one or more Defendants." No. 11 C 3503, 2012 WL 3042498, at \*4 (N.D.Ill. July 25, 2012).

 **\*5** Several courts have described this pleading style as "puzzle pleading," because it requires the Court and the defendants to piece together exactly which statements the plaintiff is challenging and which allegations contradict those statements. *Id.* In the context of the PSLRA, this practice "improperly place[s] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Id.* (alteration in original) (quoting *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d 969, 984 (E.D.Wis.2009)); *see also Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998) ("[C]ourts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." (second alteration in original) (internal quotation marks omitted) (citation omitted)). As in *Conlee,*

> [t]he net effect of the pleading's format is to leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading. Even this activity might be tolerable if the statements themselves were clearly identified, but as noted above, they are not. Rather, it is frequently difficult to discern where the supposedly challenged statements end and the context or characterization begins.

*Conlee,* 2012 WL 3042498, at \*4. The imprecise nature of such a pleading not only makes the Court's job more difficult, but it also leads to increased discovery costs, as the parties are likely to incur costs examining irrelevant issues. *Id.* at \*4–5 ("A vague and ill-formed complaint can lead to more expansive (and expensive) document production and unnecessarily lengthy depositions covering needless factual ground.").

The PSLRA requires plaintiffs not only to identify specific false or misleading statements, but also to explicitly connect those statements to factual allegations demonstrating that they are false. *See Bashash,* 506 Fed.Appx. at 38 (holding that the complaint did not sufficiently connect the allegedly false statements with contrary allegations: "Needless to say, asking the Court to assess the truth of facts in light of 'the factual detail contained throughout this Complaint,' does not comport with our exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading." (citation omitted)). Directly contrary to the practice of puzzle pleading, the PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1061 (9th Cir.2008). Thus, a plaintiff may not "le[ave] it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 842 (N.D.Cal.2000).

Here, Central States' 101–page, 241–paragraph Consolidated Amended Complaint is an inappropriate "puzzle pleading." To start, Central States alleges that statements were false only after quoting Navistar representatives at length. Many of the Consolidated Amended Complaint's paragraphs include block quotes, with liberal use of bold and italics, leaving Defendants and the Court to speculate which statements or parts of statements Central States alleges are inaccurate. Indeed, the disconnect between the statements the parties consider to be at issue is evident from their briefs, which often focus on different parts of the same statements. *Compare* Doc. 100 at 21, *with* Doc. 112 at 24; *see Primo v. Pac. Biosciences of Cal., Inc.,* 940 F.Supp.2d 1105, 1112 (N.D.Cal.2013) (noting that "in their papers, Defendants did not evidence a clear understanding of the statements that Plaintiffs challenge"). Central States even appears to concede that it is not challenging certain statements that appear throughout

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

the Consolidated Amended Complaint. *See* Doc. 112 at 28 ("Plaintiff does not allege that Defendants misrepresented the risk that the Company's EGR technology would not be approved by the EPA. Nor does Plaintiff allege that the Company misrepresented the risk that Navistar's emissions credits would be exhausted." (citations omitted)). And the use of bold and italics to emphasize certain statements does nothing to clarify Plaintiffs' assertions of false statements. *See Lauria v. Biosante Pharm., Inc.,* 968 F.Supp.2d 951, 958 (N.D.Ill.2013) ("The italized [*sic* ]/bolded words in this paragraph are cryptic.... Perhaps the plaintiffs intended to italicize and bold the entire sentences, or merely used italics and bolding for emphasis."); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1074 (N.D.Cal.2001) ("The fact that certain sections of the report have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable, while non-bolded statements sometimes are actionable."). Thus, the Court is left without a clear understanding of which statements are relevant if it were to address Defendants' substantive arguments.

 **\*6**  Further, after quoting transcripts, press releases, SEC filings, and trade magazines at length, Central States merely sets out, as the plaintiffs in *Bashash* and *Conlee* did, that these statements were false and misleading for a laundry list of reasons in addition to "others" found throughout the remainder of the Consolidated Amended Complaint. *See, e.g.,* Consol. Am. Compl. ¶ 123 ("Defendants' statements in paragraphs 112–122 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others ...."); *id.* ¶ 140 ("Defendants' statements in paragraphs 125–138 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others ...."); *id.* ¶ 160 ("Defendants' statements in paragraphs 142–158 above ... were false and misleading when made, and/or omitted material facts, for the following reasons, among others...."). These reasons are not linked to any specific statement but rather are alleged to be generally applicable to all allegedly misleading statements and omissions. This is not sufficient. *See In re Autodesk,* 132 F.Supp.2d at 841 ("It is not clear, however, which portion

of ¶ 46(d) and (e) is meant to explain why the statement quoted from ¶ 45 is false or misleading."); *see also Primo,* 940 F.Supp.2d at 1112–13 (dismissing complaint as improper puzzle pleading, noting that "Plaintiffs make some attempt to connect the alleged omissions to particular statements but continue to do so in a general manner that requires the reader to guess what particular statements they mean or how those statements were rendered false or misleading.").

Thus, the Court finds that Central States has not satisfied the applicable pleading standards because the Consolidated Amended Complaint does not identify with specificity which statements Central States alleges are false, nor does it set out why Central States believes each individual statement is false. The Court affords Central States another opportunity to amend the Consolidated Amended Complaint in order to comply with all applicable pleading standards. *See Conlee,* 2012 WL 3042498 at \*5; *In re Metro. Sec. Litig.,* 532 F.Supp.2d 1260, 1280 (E.D.Wash.2007) (where a complaint involves improper puzzle pleading, plaintiff should be allowed to streamline and reorganize complaint). Although the Court expresses no opinion at this time on the merits of Defendants' remaining arguments, it cautions Central States to be cognizant of these arguments in amending the complaint so as to allow this litigation to move forward as expeditiously as possible.

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss [99, 101, 103] are granted and Central States' motion to strike [108] is denied as moot. The Consolidated Amended Complaint [66] is dismissed without prejudice. Plaintiffs are given until August 22, 2014 to file a Second Consolidated Amended Complaint in conformity with this Opinion and Order.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 3610877, Fed. Sec. L. Rep. P 98,111

**Footnotes**

Fed. Sec. L. Rep. P 98,111

1      The motions to dismiss were filed by three groups of Defendants: (1) Navistar, Ustian, Cederoth, Allen, and Tech [99]; (2) Clariond, Correnti, Gulyas, Hammes, Harrison, Keyes, Klinger, Osborne, Williams, McChrystal, and Tarapchak [101]; and (3) Waldron [103]. The latter two motions incorporate the arguments the Court finds relevant to resolving the pending motions that are made in the first and thus all three motions will be treated jointly here.

2      The facts in the background section are taken from the Consolidated Amended Complaint and are presumed true for the purpose of resolving Defendants' motions to dismiss. *See Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir.2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO v. Exelon Corp.,* 495 F.3d 779, 782 (7th Cir.2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.,* 556 F.3d 575, 582–83 (7th Cir.2009). Where a document is referenced in the complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.* The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080–81 (7th Cir.1997). Navistar, Ustian, Cederoth, Allen, and Tech attached various documents to their motion to dismiss, some of which Central States moved to strike. As the Court's resolution of the motions to dismiss does not require consideration of the documents and statements challenged in the motion to strike, that motion is denied as moot.

3      Navistar uses SCR engines in its diesel engines for the European market.

4      Central States relies on various confidential witnesses in its Consolidated Amended Complaint. CW1 acknowledged that Navistar's engines may have achieved 0.2 NOx in tests performed in "dyno cells," the environment in which Defendants claim that EPA test certification takes place. But CW4 reported that Navistar's testing was not accurate because results of testing in a "dyno cell" are not reproducible in the real world.

5      Navistar received this letter on June 21, 2012, yet did not disclose its receipt until August 2, 2012. Navistar also received a subpoena from the SEC on July 16, 2012, which again was not disclosed until August 2, 2012.

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1693963
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

EVERGREEN FUND, LTD., Ole W. Lyngklip,
Jr., Perry Mount Park Cemetery, Inc., and
Dr. L. Reynolds & Associates, P.C. Profit
Sharing Trust on behalf of themselves and
all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
June McPHERSON, on behalf of herself
and all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
Max GRILL, on behalf of himself and
all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael
J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.
Harry R. LARSON, Frank F. Villiano, Electronic
Processing Source, Inc., TTEE Frank F. Villiano,
and Robert J. Murphy, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
BANK ONE CORPORATION, John B.
McCoy, Richard J. Lehmann, Michael J.
McMennamin, William P. Boardman, David
J. Vitale, and Verne G. Istock, Defendants.
Mark BRUMLIK, Georgia Duran, and Kevin
Sandal, individually and on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
John B. McCOY, Jr., Richard J. Lehmann,
David J. Vitale, Verne G. Istock, Michael

J. McMennamin, William P. Boardman,
and Bank One Corporation, Defendants.

No. 00 C 0767, 00 C 1357, 00
C 1359, 00 C 2100, 00 C 2109.
|
Nov. 6, 2000.

MEMORANDUM, OPINION AND ORDER

ANDERSEN, District J.

**\*1** This case is before the Court on the Consolidated Motion to Dismiss brought by defendants Bank One Corporation, Richard J. Lehmann, David J. Vitale, Verne G. Istock, Michael J. McMennamin, William P. Boardman, and John B. McCoy. In the consolidated motion, defendants seek the dismissal of five class action complaints currently pending before this court. This opinion will address *Evergreen Fund, Ltd. et al. v. McCoy,* Case No. 00 CV 767, *McPherson V. McCoy,* 00 CV 1357, *Grill v. McCoy,* 00 CV 1359, *Larson et al. v. Bank One Corporation,* 00 CV 2100, and *Brumlik et al. v. McCoy,* 00 CV 2109. Defendants seek to dismiss the complaints because they allege that: (1) plaintiffs fail to state a claim under Fed.R.Civ.P. 9(b), (2) plaintiffs fail to state a claim under Fed.R.Civ.P. 12(b)(6), (3) the allegations involving forward looking statements are not actionable, (4) the Larson Complaint fails to allege loss causation, (5) plaintiffs failed to allege tender or sale of their shares, (6) the claims in the Brumlik Complaint do not satisfy Fed.R.Civ.P. 9(b), and (7) plaintiffs' claims under Section 15(a) of the Securities Act and Section 20(a) of the Exchange Act fail to allege a predicate violation. For the following reasons, defendants' motion to dismiss is granted in part and denied in part.

BACKGROUND

These allegations are drawn from the five Complaints identified above. The background allegations in the Complaints are virtually identical. This dispute arises from the October 2, 1998, merger between First Chicago NBD ("FCN") and Banc One Corporation ("Old Banc One"). This litigation concerns alleged misrepresentations related to Old Banc One's credit card division, First USA Bank.

In preparation for the merger, Old Banc One and FCN filed a joint Registration Statement pursuant to Section 6 of the

Securities Act, 15 U.S.C. § 77f. In documents incorporated by reference, the corporations noted "that the generation of new credit card business remained very strong," increasing at an average rate of two million new credit card accounts per quarter. The Registration Statement also included financial statements, which reflected "enormous growth" in First USA's credit card business for the most recent fiscal year (1997) and the first and second quarters of 1998. Plaintiffs allege that the market viewed the First USA credit card business as a major asset and strength of Old Banc One.

The defendants also issued a Merger Proxy/Prospectus to solicit votes to approve the merger on July 31, 1998. In the prospectus, defendants stated that the combined corporation would be "one of the largest credit card businesses in the country." The prospectus incorporated by reference the Form 10–K for the year ending on December 31, 1997, and the Form 10–Q for the first quarter ending on March 31, 1998. In the prospectus, defendants noted that "such financial statements, in the opinion of Banc One management, contain the adjustments, all of which are normal and recurring in nature, necessary to present fairly Banc One's consolidated financial position, results of operations, and change in cash flows."

 **\*2** Plaintiffs also allege that one or more consumer class action lawsuits alleging illegal credit practices had been filed against First USA before the Merger became effective. The existence of the lawsuits was not disclosed in the Registration Statement and Merger Proxy/Prospectus. In those documents, defendants represented that neither Bank One nor its subsidiaries were a party to any pending threatened material legal proceedings.

Plaintiffs allege that the statements misrepresented or omitted material facts regarding the success of the business and operations of First USA. First, plaintiffs allege that the statements failed to alleges that First USA achieved its growth through practices which allegedly violated the federal Truth in Lending Act ("TILA"), including improper billing procedures and charging of excessive late fees and interest to its credit card customers. Second, plaintiffs allege that defendants issued financial statements that did not comply with generally accepted accounting principles ("GAAP").

As a result of these alleged misstatements, plaintiffs state that they approved the merger and acquired Bank One shares at an artificially inflated price. On August 24, 1999, defendants began a series of disclosures, which plaintiffs allege revealed the truth about First USA. Bank One issued a press release announcing preliminary earnings for the third quarter and full year of 1999. In the release, Bank One reported that based on "revised outlooks" it anticipated earnings to be down 7–8% from the current market estimates. Bank One stated that the revised earnings outlook was solely the result of changes in growth for First USA.

Plaintiffs allege that during a conference call on August 25, 1999, certain defendants explained that Bank One would cease First USA's practice of "accelerating" credit card late fees and would provide credit card customers "interest rate concessions" related to First USA's past activities. These measures were allegedly expected to negatively impact earnings by at least $500 million. Plaintiffs alleged that the market found the news material. On August 25, 1999, the price of Bank One common stock fell 22.3% per share from the previous day's closing price. The volume of trading was more than 15 times the daily average trading volume for the previous 52–week period.

On November 1, 1999, Kiplinger's Personal Finance Magazine reported that government regulators were investigating thousands of complaints by First USA credit card holders. Plaintiffs allege that the complaints concerned practices that existed before the merger. The article reported that the allegedly illegal practices had existed since 1997.

On November 10, 1999, Bank One announced that earnings would be as much as 15% lower than the revised expectations. Plaintiffs allege that the shortfall was attributed to the performance of First USA. As a result, the price of Bank One stock dropped 11.5% from its previous day's close.

 **\*3** On December 31, 1999, John B McCoy, Bank One's Chairman and Chief Executive Officer, resigned. Plaintiffs allege that he resigned as a result of the disclosures of improprieties at First USA.

On January 11, 2000, Bank One announced that earnings for 1999 would be as much as 18% less than analysts had expected and the profits for 2000 would drop sharply. Plaintiffs allege that the earnings drop was attributable to the allegedly illegal credit card practices. Bank One also announced that it would take a $725 million charge in the fourth quarter of 1999, largely to restructure the credit-card division.

The Evergreen, McPherson, Grill and Brumlik Complaints all seek the certification of a Class:

> consisting of all persons and entities who exchanged their FCN common stock for shares of Bank One common stock, pursuant to the Registration Statement and Merger Proxy/Prospectus, in connection with the Merger. Excluded from the Class are defendants, members of the Individual Defendants' families; any entity in which any defendant has a controlling interest or is part or subsidiary of, or is controlled by, the Company; and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants.

The Larson Complaint seeks the certification of a Class comprised of:

> all persons and entities who acquired Bank One securities as a result of the conversion of Old Banc One securities or the exchange of FCN securities pursuant to the Registration Statement and Merger Proxy/Prospectus, and who were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants, Robert W. Vague ("Vague"), members of the Individual Defendants' immediate families, members of Vague's immediate family, any entity in which any defendant or Vague has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded person.

In Count I, all five Complaints allege an action against Bank One for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of FCN securities holders who exchanged FCN common stock at a 1.62 shares of Bank One stock per share of FCN stock. Plaintiffs allege that defendants overstated earnings in the credit card division, failed to comply with generally accepted accounting practices, and failed to disclose material information with regard to the purported growth of the First USA credit card operation. As a result, plaintiffs allege that they received too few shares of Bank One stock in exchange for their FCN stock.

In Count II, all five Complaints allege an action against the individual defendants for violations of Section 11 of the Securities Act on behalf of FCN securities holders. Plaintiffs allege that the individual defendants overstated the earnings of the credit card division and failed to disclose material information related to the growth of the First USA credit card operation.

In Count III, all five Complaints allege an action against Bank One for violations of Section 12(a)(2) of the Securities Act. 15 U.S .C. § 77l(a)(2). The Evergreen, McPherson, Grill and Brumlik Complaints make the allegation on behalf of class members who exchanged FCN securities for Bank One securities. The Larson Complaint also makes the allegations on behalf of class members who exchanged Old Banc One securities for new Bank One securities. Plaintiffs allege that the Registration Statement and Merger Proxy/Prospectus contained materially false and misleading statements. Plaintiffs allege that Bank One breached its duty to make a reasonable and diligent investigation of the statements contained in the document.

*4 In Count IV, all five Complaints allege an action against the individual defendants for violations of Section 15 of the Securities Act. 15 U.S.C. § 77(o). The Larson Complaint makes the allegation on behalf of former FCN and Old Banc One securities holders, while the other four Complaints make the allegation only on behalf of former FCN securities holders. Plaintiffs allege that the individual defendants failed to make a reasonable investigation of either the Registration Statement or the Merger Proxy/ Prospectus. Therefore, plaintiffs allege that each of the individual defendants are jointly and severally liable with Bank One.

In Count V, the Brumlik Complaint alleges an action against all defendants for violations of Section 14(a) of the Exchange Act, 15 U .S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, on behalf of FCN shareholders who acquired Bank One stock. The Brumlik plaintiffs allege that the

defendants solicited proxies through the use of false and materially misleading statements.

In Count VI, the Brumlik Complaint alleges an action against the individual defendants for a violation of Section 20 of the Exchange Act. 15 U.S.C. § 78t(a). The Brumlik plaintiffs allege that each of the individual defendants was a controlling person within the meaning of Section 20 of the Exchange Act. The Brumlik plaintiffs allege that none of the individual defendants made a reasonable investigation of the statements contained in the Registration statements and Merger Proxy/Prospectus to determine whether they were true and devoid of any omission of material facts. Therefore, the Brumlik plaintiffs argue that each of the individual defendants is jointly and severally liable with Bank One.

## DISCUSSION

### I. *Pleading Standard*

As a preliminary matter, we must determine whether plaintiffs' Complaints should be reviewed by reference to the heightened pleading standards in Fed.R.Civ.P. 9(b). Several courts in this Circuit and other Circuits have reviewed this question, but the answer is not clear. In *Sears v. Likens,* the Seventh Circuit found that plaintiffs' claims under §§ 5, 12(1), 12(2), 15, and 17(a) of the Securities Act of 1933 "failed to state with particularity how any 'prospectus' was 'false and misleading' as required by Fed.R.Civ.P. 9(b)." *Sears,* 912 F.2d 889, 892 (7th Cir.1990). Two District Court decisions have analyzed the *Sears* decision. Judge Coar's opinion, *In re First Merchants Acceptance Corporation Securities Litigation,* held that "the court in Sears was not asked to, nor did it, determine whether Rule 9(b) properly applied to § 11 claims, which do not require scienter for liability." *In re First Merchants Acceptance Corporation Securities Litigation,* 1998 WL 781118, *11 (N.D.Ill.1998).

In *Danis,* Judge Conlon held that plaintiffs alleging violations of §§ 11 and 12 do not need to comply with 9(b)'s heightened pleading standard. *Danis v. USN Communications Inc.,* 73 F.Supp.2d 923, 932 (N.D.Ill.1999). However, she determined that the standard was irrelevant because the Complaint before her satisfied the heightened pleading standard. *Id.*

**\*5** We agree. If a Complaint does not "sound in fraud," plaintiffs should not be required to plead particular facts to support §§ 11 or 12. *In re Nations Mart Corp. Securities Litigation,* 130 F.3d 309, 315 (8th Cir.), *cert. denied,* 524

U.S. 927 (1998). However, if plaintiffs make allegations that amount to fraud, then they must meet the Rule 9(b) heightened pleading standards. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996). Therefore, we must determine whether the instant Complaint "sounds in fraud."

Defendants argue that the Complaint "sounds in fraud" because of the references to the underlying alleged TILA violations. We disagree. The TILA violations, the only allegations in the Complaint which allege fraud, merely form the background for the plaintiffs' allegations. Plaintiffs allege that the individual defendants failed to make "a reasonable investigation or possessed reasonable ground for the belief that the statements described herein, which were contained in the Registration Statement and the Merger Proxy/Prospectus, were true, were without omission of any material facts, and/or were not misleading." The allegations do not contain references to fraud. Therefore, the instant Complaint does not "sound in fraud."

Furthermore, plaintiffs have met the heightened pleading standard. To meet the particularity requirements of Rule 9(b), a Complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Sears,* 912 F.2d at 892. Plaintiffs have referenced specific statements contained in the Registration Statement, the Merger Proxy/Prospectus, Old Banc One's 1997 Form 10–K, and the first and second quarter Forms 10–Q. Furthermore, the plaintiffs allege that the defendants signed the Registration Statement and Merger Proxy/Prospectus. Therefore, plaintiffs have satisfied the heightened pleading standard of Rule 9(b).

### II. *12(b)(6) Motion to Dismiss*

#### A. *Plaintiffs' Reliance on Post Hoc Allegations*

Defendants argue that plaintiffs have failed to adequately allege that First USA violated TILA because they relied on post hoc statements and "falsity by hindsight" reasoning. A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests whether the plaintiff has stated a claim, not whether the plaintiff will prevail on the merits. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997). The court may dismiss a complaint for failure to state a claim under Rule

12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

 **\*6** Defendants argue that plaintiffs allegations fail to show that First USA violated TILA. Plaintiffs present several allegations describing evidence of First USA's alleged TILA violations. Plaintiffs allege that First USA did not enable customers to make conforming payments to avoid impositions of late fees, did not enable customers to determine by which date credit card holders were required to make payments to First USA, and did not credit payments as of the date of receipt. Plaintiffs allege that First USA admitted the violations in late 1999. Further, plaintiffs reference an article in Kiplinger's Personal Finance Magazine. Plaintiffs allege that the article traces this activity back to 1997. Plaintiffs also allege that complaints about First USA tripled in 1999. Finally, plaintiffs allege the existence of at least three consumer fraud class action lawsuits.

Defendants argue with the substance of all of plaintiffs' allegations. Defendants state that they did not admit the violations, the change in First USA policies does not amount to an admission of wrongdoing, and that the employees interviewed for the Kiplinger article could not provide the basis for the Complaint. In evaluating this motion to dismiss, however, we must assume that all allegations in the Complaint are true. If plaintiffs do not have evidence to support their allegations, that First USA engaged in a plan to artificially boost its revenues in violation of TILA, then we will consider that failure when analyzing a motion for summary judgment. Taken in the light most favorable to the plaintiff, the Complaints sufficiently allege underlying TILA violations.

### B. *Failure to Allege Materiality of First USA to Old Banc One*

Defendants argue that plaintiffs have failed to allege that the TILA violations were so widespread as to be material to the overall financial condition of Old Banc One. We disagree. The Complaints clearly allege a connection between the disclosures of revised First USA revenue and a precipitous drop in the value of Bank One shares.

### C. *Failure to Allege GAAP Violations With Particularity*

Defendants argue that plaintiffs have failed to allege facts which raise an inference of violations of generally accepted accounting principles. Plaintiffs allege that defendants recognized revenues that they were not entitled to recognize in preparing the Registration Statement and Merger Proxy/Prospectus. Plaintiffs have sufficiently alleged that First USA was engaging in TILA violations at the time of the merger and that defendants over-recognized revenues. Therefore, we deny the motion to dismiss.

### D. *Forward Looking Statements*

Defendants argue that plaintiffs' allegations involving forward looking statements are not actionable. Plaintiffs quote forward looking statements in their Complaints, but those statements are not the basis for their allegations. Plaintiffs allege that, in the Registration Statement and the Merger Proxy/Prospectus, defendants omitted and misstated material facts. Plaintiffs are not attempting to argue that statements, for example that the combined company would be "one of the largest credit card business[es] in the country", are actionable because they did not come true. Plaintiffs argue that defendants should have included notification that First USA would not continue to grow because the present growth was based on alleged TILA violations. Therefore, we will not dismiss the Complaints.

### III. *Loss Causation and the Larson Complaint*

 **\*7** Defendants argue that the Larson Complaint should be dismissed in part for failure to establish loss causation. The Larson Complaint seeks certification of a class including both former FCN shareholders and former Old Banc One shareholders. Defendants argue that both groups could not have suffered damages because, if the FCN shareholders received too few shares in exchange for their FCN stock, then the Old Banc One shareholders received too many shares of the new Bank One.

Plaintiffs argue that loss causation, an affirmative defense, cannot be the basis of a motion to dismiss. We disagree. An affirmative defense will support a motion to dismiss under Rule 12(b)(6) when a plaintiff's allegations clearly point to the existence of the defense. *Adamczyk v. Lever Brothers Co.,* 991 F.Supp. 931, 934 (N.D.Ill.1997).

Plaintiffs' allegations, however, do not show that loss causation cannot be established. For example, if plaintiffs can show that the alleged omission resulted in a lower stock price than they would have received had the information about First USA been included in the Merger/Proxy Prospectus, then plaintiffs are entitled to recover. Because loss causation is an affirmative defense and the failure to show loss causation is

not evident from the Larson plaintiffs' Complaint, we deny defendants' motion to dismiss.

## IV. *Plaintiffs' Failure to Allege Tender or Sale of Their Shares*

Defendants argue that, other than the Larson Complaint, all plaintiffs have failed to allege tender or sale of their shares under Section 12(2). Section 12(a) directs that a person alleging a violation "may sue either in law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 771(a)(2). The statute does not state a relevant time period for alleging tender or sale, but several courts have held that a complaint must make a proper allegation to withstand a motion to dismiss. *Metz v. United Counties Bancorp,* 61 F.Supp.2d 364, 378 (D.N.J.1999); *Wigland v. Flotek Inc.,* 609 F.2d 1028, 1034 (2d Cir.1979); *Anisteld v. Cantor Fitzgerald & Co.,* 631 F.Supp. 1461, 1464 (S.D.N.Y.1986). Therefore, defendants contend that we should dismiss the Counts alleging a violation of Section 12(2) in all Complaints that do not allege tender or sale of the securities.

Plaintiffs argue that the above cases are not on point because rescission is no longer possible. The consideration that plaintiffs paid for new Bank One stock is their FCN stock. Because defendants can not return FCN stock, plaintiffs argue that they should not have to allege a tender or sale of their shares of New Bank One. We disagree. Plaintiffs seek "damages to the extent permitted by law" in their Complaints. Under Section 12(2) they are eligible for either rescission or damages. Plaintiffs have failed to provide this court with any precedent suggesting that if recission is not possible, then plaintiffs do not have to fulfill the requirement of alleging tender or sale of the shares. Therefore, we grant defendants motion to the extent that it seeks to dismiss the Counts alleging a violation of Section 12(2) from the Evergreen, Grill, McPherson and Brumlik Complaints. Those Counts will be dismissed.

## V. *The Brumlik Complaint's Section 14(a) Claims*

**\*8** The Brumlik plaintiffs allege violations of the antifraud provisions of the Exchange Act. 15 U.S.C. § 78n(a), 17 C.F.R. § 240.14a–9. Defendants argue that Section 14(a) claims are governed by the pleading requirements of Fed.R.Civ.P. Rule 9(b) and the heightened pleading requirements of the Reform Act, 15 U.S.C. § 87u–4(b)(1). This argument is analogous to the argument defendants advanced above. The Section 14(a) claims are based on the Section 11 and 12(2) claims. Defendants argue that the Section 14(a) claim should fail for the same reason as the Section 11 and 12(2) claims. We disagree. As noted above, plaintiffs' allegations do not sound in fraud. Therefore, the Complaint does not need to meet heightened pleading requirements. However, even if plaintiffs' allegations require pleadings with particularity, plaintiffs have satisfied the heightened pleading requirements of Rule 9(b). Therefore, we deny defendants' motion to dismiss.

## VI. *Section 15 and 20 Claims*

Plaintiffs assert claims under Section 15(a) of the Securities Act, 15 U.S.C. § 77*o*(a). The Brumlik plaintiffs also assert claims under Section 20(a), 15 U.S.C. § 78t(a) of the Exchange Act. Plaintiffs assert liability against the individual defendants as "controlling persons" who are jointly and severally liable for violations by persons under their control. Defendants, on the basis of their arguments above, argue that plaintiffs have failed to state a predicate violation. Because we have denied defendants' arguments above, plaintiffs have stated a predicate violation. Therefore, we deny this basis of the motion to dismiss.

## CONCLUSION

The motion to dismiss, brought by defendants Bank One Corporation, Lehmann, Vitale, Istock, McMennamin, Boardman and McCoy, is granted in part and denied in part. It is granted to the extent that it seeks to dismiss Counts III of the Evergreen Complaint, Count III of the McPherson Complaint, Count III of the Grill Complaint, and Count III of the Brumlik Complaint. Those Counts are dismissed. The motion to dismiss is denied in all other respects.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1693963

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 1117279
United States District Court,
N.D. Illinois, Eastern Division.

Thomas LEVITAN, individually and on behalf
of all others similarly situated, Plaintiff,
v.
John B. MCCOY, Jr., Richard J. Lehmann, Michael
J. McMennamin and Bank One Corp., Defendants.

No. 00 C 5096.
|
Sept. 21, 2001.

*MEMORANDUM OPINION AND ORDER*

COAR, J.

**\*1** Before this court is a Joint Motion to Dismiss brought by defendants Bank One Corporation ("Bank One"), John B. McCoy, Jr., Richard J. Lehmann, and Michael J. McMennanmin (collectively "defendants"). In this consolidated motion, defendants seek the dismissal of plaintiff Thomas Levitan's ("Levitan" or "plaintiff") class action complaint alleging violations of the Federal Truth in Lending Act ("TILA") and Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. § 77k. Defendants seek to dismiss the complaint on the basis that: (1) plaintiff fails to state a claim under Fed.R.Civ. P. 9(b), (2) plaintiff fails to state a claim under Fed. R.Civ.P. 12(b)(6), (3) plaintiff's claims under Section 15(a) of the Securities Act fail to allege a predicate violation, and (4) plaintiff's claims are time-barred by the applicable statute of limitations. For the following reasons, the defendants' motion to dismiss is denied.

BACKGROUND

This dispute arises from a June 12, 1998, merger between First Commerce Corporation ("First Commerce") and Banc One Corporation ("Old Banc One"). This litigation concerns alleged misrepresentations related to Old Banc One's credit card division, First USA Bank.

In preparation for the merger, Old Banc One and First Commerce filed a joint Registration Statement pursuant to Section 6 of the Securities Act, 15 U.S.C. § 77f. The

Registration Statement included financial statements, which reflected "enormous growth" in First USA's credit card business for the most recent fiscal year (1997) and the first and second quarters of 1998.

The defendants also issued a Merger Proxy/Prospectus in order to solicit votes in favor of the merger on July 31, 1998. The prospectus incorporated by reference the Form 10-K for the year ending on December 31, 1997, and the Form 10-Q for the first quarter ending on March 31, 1998. In the prospectus, defendants noted that "such financial statements, in the opinion of Banc One management, contain the adjustments, all of which are normal and recurring in nature, necessary to present fairly Banc One's consolidated financial position, results of operations, and change in cash flows."

The plaintiff first alleges that the Registration Statement, when it became effective on June 12, 1998, concealed the material fact that First USA had been systematically overcharging customers in a variety of ways in violation of TILA. Second, the plaintiff alleges that defendants issued financial statements that did not comply with generally accepted accounting principles. ("GAAP"). The complaint alleges that such violations took place "prior to and at the time of the merger." Complaint ¶ 54.

As a result of these alleged misstatements, the plaintiff states that he and others similarly situated approved the merger and acquired Bank One shares at a price that was artificially inflated, resulting in an Exchange Ratio that was artificially deflated. On August 24, 1999, defendants began a series of disclosures, which the plaintiff alleges revealed the truth about First USA. Bank One issued a press release announcing preliminary earnings for the third quarter and full year of 1999. In the release, Bank One reported that based on "revised outlooks" it anticipated earnings to be down 7-8% from the current market estimates. Bank One stated that the revised earnings outlook was solely the result of changes in growth for First USA.

**\*2** The plaintiff further alleges that during a conference call on August 25, 1999, certain defendants explained that Bank One would cease First USA's parctice of "accelerating" credit card late fees and would provide credit card customers "interest rate concessions" related to First USA's past activities. These measures were allegedly expected to negatively impact earnings by at least $500 million. Plaintiff alleges that the market found the news material. On August

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

**Levitan v. McCoy, Not Reported in F.Supp.2d (2001)**

Fed. Sec. L. Rep. P 91,608

25, 1999, the price of Bank One common stock fell 22.3% per share from the previous day's closing price. The volume of trading was more than 15 times the daily average trading volume for the previous 52 week period.

On November 1, 1999, Kiplinger's Personal Finance Magazine reported that government regulators were investigating thousands of complaints by First USA credit card holders. The plaintiff alleges the complaints concerned practices that existed before the merger. The article reported that the allegedly illegal practices had existed since 1997.

On November 10, 1999, Bank One announced that earnings would be as much as 15% lower than the revised expectations. The plaintiff alleges that the shortfall was attributed to the performance of First USA. As a result, the price of Bank One stock dropped 11.5% from its previous day's close.

On December 31, 1999, John B. McCoy, Bank One's Chairman and Chief Executive Officer, resigned. The plaintiff alleges that he resigned as a result of the disclosures of improprieties at First USA.

On January 11, 2000, Bank One announced that earnings for 1999 would be as much a 18% less than analysts had expected and the profits for 2000 would drop sharply. The plaintiff alleges that the earnings drop was attributable to credit card practices. Bank One also announced that it would take a $725 million charge in the fourth quarter of 1999, largely to restructure the credit card division.

The plaintiff's complaint seeks the certification of a class:

> consisting of all persons who exchanged shares of First Commerce common stock for shares of Bank One common stock in connection the Merger and pursuant to the Registration Statement and Merger Proxy Prospectus.

Pursuant to the Merger, the plaintiff and other First Commerce stockholders received 1.408 shares of Old Banc One common stock in exchange for each share of First Commerce common stock (the Exchange Ratio).

In Count I, the plaintiff alleges an action against Bank One for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all First Commerce shareholders who exchanged their First Commerce common stock for Banc One common stock issued in connection with the Merger, and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that defendants overstated earnings in the credit card division and failed to disclose material information with regard to the purported growth of Old Banc One's and First USA's credit card operations and the basis on which such growth was achieved.

**\*3** In Count II, the plaintiff alleges an action against the individual defendants for violations of Section 11 of the Securities Act on behalf of First Commerce shareholders who exchanged their First Commerce common stock for Old Banc One common stock issues in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that the individual defendants overstated the earnings of the credit card division and failed to disclose material information related to the growth of the First USA credit card operation.

In Count III, the plaintiff alleges an action against Bank One for violations of Section 12(a)(2) of the Securities Act. 15 U.S.C. § 77l(a)(2). The plaintiff makes an allegation on behalf who exchanged their First Commerce common stock for Old Banc One common stock issues in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus. The plaintiff alleges that the Registration Statement and Merger Proxy/Prospectus contained materially false and misleading statements. The plaintiff alleges that Bank One breached its duty to make a reasonable and diligent investigation.

In Count IV, the plaintiff alleges an action against the individual defendants pursuant to Section 15 of the Securities Act on behalf of all First Commerce shareholders who acquired Old Banc One stock in connection with the Merger. The plaintiff alleges that the individual defendants failed to make a reasonable investigation of either the Registration Statement or the Merger Proxy/Prospectus. Therefore, the plaintiff alleges that each of the individual defendants are jointly and severally liable with Bank One.

### Standard of Review

Levitan v. McCoy, Not Reported in F.Supp.2d (2001)

Fed. Sec. L. Rep. P 91,608

Before embarking upon an analysis of the motion to dismiss, this court must determine whether the plaintiff's complaint should be scrutinized under the heightened pleading standards required by Fed.R.Civ.P. 9(b). If a plaintiff makes allegations in a complaint that amounts to fraud, he or she must meet the Rule 9(b) heightened pleading requirement. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1 st Cir.1996). If, however, a complaint does not "sound in fraud," a plaintiff should not be required to plead particular facts to support §§ 11 and 12. *In re nations Mart Corp. Securities Litigation,* 130 F.3d 309, 315 (8 th Cir.), *cert. denied,* 524 U.S. 927 (1998). The plaintiff's complaint in this case does not "sound in fraud" and is exempt from the heightened pleading requirements of Rule 9(b); but the complaint, does in fact meet the Rule 9(b) heightened pleading requirements if required.

The defendants argue that the plaintiff's complaint "sounds in fraud" due to references to underlying alleged TILA violations as well as allegations that characterize First USA's conduct as allegedly "predatory", "illegal," and "unlawful". This court disagrees. In *Evergreen Fund, Ltd v. McCoy,* No. 00 C 0767, a case in which different plaintiffs brought similar allegations against the same defendants, Judge Andersen determined that the plaintiffs' complaint did not "sound in fraud" and therefore was not required meet the Rule 9(b) heightened pleading standards. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1 st Cir.1996). Judge Andersen reasoned, however, that the plaintiffs' complaint, in any case, did meet the heightened pleading standard. [1]

 **\*4** In this case, too, we find the plaintiff's complaint does not "sound in fraud" and therefore is exempt for the heightened pleading requirements under Rule 9(b). As in the *Evergreen Fund,* the alleged TILA violations here "merely form the background for the plaintiff's allegations." *Id.* at pg. 10. The plaintiff primarily alleges that the individual defendants failed to make "a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Merger Proxy/Prospectus, were true, were without omission of any material facts, and/or were not misleading." Complaint, ¶ 119. The plaintiff does not allege nor even suggest that the defendants intended to deceive First Commerce stockholders or acted with scienter in drafting the Registration Statement. Further, the complaint's use of words such as "predatory," "illegal," and "unlawful" in describing First USA's transactions with its credit card customers does

not add up to allegations of security fraud. Therefore, the complaint in this case does not "sound in fraud."

Finally, as in the *Evergreen Fund* lawsuit, this court finds that the plaintiff's complaint has met even a heightened pleading standard. To meet the particularity requirements of Rule 9(b), a complaint must specify the identity of the person making the misrepresentation, the time, place, and content of misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Sears v. Likens,* 912 F.2d 889, 892 (7 th Cir.1990). In this case, the plaintiff has presented specific statements in the Registration Statement, Merger Proxy/Prospectus, Old Banc One's 10-K, and the first and second quarter Forms 8-K. And, the plaintiffs allege that the defendants have signed the Registration Statement and the Merger Proxy/Prospectus. Therefore, the plaintiff has met the heightened pleading standard imposed by Rule 9(b).

Discussion

A. Plaintiff's Reliance on Post Hoc Allegations and "Falsity By Hindsight"

As in *Evergreen Fund,* the defendants here argue that the plaintiff has failed to properly allege that the First USA violated TILA because the complaint relies on post hoc statements and "falsity by hindsight" reasoning. In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7 th Cir.1997). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

In this case, the defendants contend that the plaintiff does not provide any factual basis to establish a reasonable inference that First USA was violating TILA in 1997 and the first quarter of 1998. The plaintiff specifically alleges that First USA systematically violated the TILA from mid-1997 to the effective date of the merger. In addition, the plaintiff alleges that an article in Kiplinger's Personal Finance Magazine traces the alleged violations back to 1997. Plaintiffs also alleged that complaints about First USA dramatically increased.

Fed. Sec. L. Rep. P 91,608

**\*5** The defendant further contends that the plaintiff's vagueness with respect to the alleged "GAAP fraud" warrants dismissal. This court has previously held that plaintiffs are not required to state the precise dollar amount when alleging that portions of financial statements were overstated. *In re First Merchants Acceptance Corporation Securities Litigation,* 1998 WL 781118,* 4 (N.D.Ill.1998) (Coar, J.). The complaint specifically alleges that both the earnings overstatements and resulting stock price inflation were material. The complaint identifies more than a half billion dollars of charges against earning that Old Banc One recorded as a consequence of the previously undisclosed illegal practices at First USA.

This court must assume that all allegations in the complaint are true. Whether plaintiffs have sufficient evidence to support their allegation, that First USA engaged in a plan to artificially boost its revenues in violation of TILA, is a matter that must be considered under a motion for summary judgment, not a motion to dismiss. Taken in a light most favorable to the plaintiff, the complaint sufficiently alleges underlying TILA violations.

**B. Statute of Limitations**

Defendants argue that the plaintiff's claims are time-barred under Section 77 of the Securities Act. This court disagrees.

An action claiming a securities violation must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf. Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S .Ct. 2773, 2782, 115 L.Ed.2d 321. The Seventh Circuit has held that "discovery" may be imputed to a plaintiff when he is put on "inquiry notice"- i.e., when he becomes "aware of facts that would have led a reasonable person to investigate whether he might have a claim". *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718, 722 (7th Cir.1993), certiorari denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465. Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b-5 is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367;*Tomera v. Galt,* 511 F.2d 504, 510-511 (7th Cir.1975), overruled on other grounds by *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990).

The defendants assert that the filing of other lawsuits against Bank One in April 1999 as well as Senator Phil Gramm's request for an investigation into First USA's practices in May 1999 should have put plaintiff on inquiry notice. The plaintiff argues that he was not put on actual or inquiry notice until August 25, 1999, when Bank One announced that its First USA subsidiary would, inter alia, cease engaging it its previously-undisclosed practice of "accelerating" credit card late fees and that the imposition of these measures, combined with customer attrition, was expected to negatively impact Bank One's earnings by at least $500 million.

**\*6** This court with agrees with the plaintiff's view that he could not have reasonably known before August 25, 1999 that he, personally, had a claim against Bank One. While some courts have found litigation has provided inquiry notice that a plaintiff has a claim arising out of similar factual allegations, the facts in this case are distinguishable. *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 436-437, n. 14 (N.D. Ill 1995); *Antell v. Arthur Anderson,* 1998 WL 245878,* 4 (N.D. Ill 1998). The defendants rely heavily on the holding in *Cashman,* where the court dismissed a shareholder suit as time-barred because another shareholder had brought a similar action more than a year earlier. *Id.* at * 4. In this case, the lawsuits brought in April 1999 were not lawsuits brought by other shareholders but rather they were consumer lawsuits brought against First USA. In addition, the lawsuits brought in April 1999 did not allege securities violations and did not contain references to statements in the Registration Statement or other Old Banc One financial statements. Therefore, unlike *Cashman,* the plaintiff in this suit was never privy information about the specific allegations against Bank One were or whether or not they had any credibility, as was the shareholder in *Cashman.* Consequently, it would be unreasonable to believe that Levitan could have discerned, simply from the press reports of these consumer suits, that he had a viable claim against Bank One. A reasonable investor learning that consumer class actions were filed against First USA claiming that it had payment processing problems would not, from that information, have concluded that either First USA's or Bank One's financial statements were or even may have been materially overstated or prepared in violation of GAAP, particularly when Bank One continued to deny any wrongdoing.

Similarly, the fact that Senator Gramm issued a statement directing the OCC to investigate whether or not First USA had violated TILA is not sufficient to impose inquiry notice on Levitan. In *Fujisawa Pharmaceutical Company.*

Fed. Sec. L. Rep. P 91,608

*Ltd v. Kapoor,* 115 F.3d 1332, 1335 (7 th Cir.1997), a securities fraud case, the Seventh Circuit did find that an FDA investigation was one of the many things that put the plaintiff on inquiry notice. The facts in this case, however, are different. The Court found that the plaintiff in *Fujisawa* had "better access to the relevant documents than the FDA" and "should have begun suspecting fraud many years earlier." *Id.* at 1335-1336. Recognizing the plaintiff's unusual situation, the Seventh Circuit stated that absent Fujisawa's easy access to the relevant information, the stated statute of limitations would not have begun to run until the FDA investigation brought light to the fraudulent applications submitted to the FDA by the defendant. *Id.* at 1335. In this case, the plaintiff only had notice that an investigation would begin. The plaintiff did not have access to relevant financial documents and therefore could not obtain the requisite knowledge to trigger inquiry notice.

**\*7** Consequently, the plaintiff's complaint is not time-barred by the relevant statute of limitations.

C. Section 15 Claims

The plaintiff asserts claims under Section 15(a) of the Securities Act, 15 U.S.C. § 77*o*(a). The plaintiff asserts liability against the individual defendants as "controlling persons" who are jointly and severally liable for violations by person under their control. Defendants argue that plaintiffs have failed to state a predicate violation. As this court has rejected the defendants' "failure to state" arguments, the plaintiffs have stated a predicate violation. Therefore defendants' motion to dismiss is denied.

### Conclusion

For the foregoing reasons, defendant's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1117279, Fed. Sec. L. Rep. P 91,608

### Footnotes

1      While this court recognizes that district judges in this circuit must not treat decisions by other district judges, in this and a fortiori in other circuits, as controlling, *Colby v. J.C. Penn Co.,* Inc., 811 F.2d 1119, 1124 (7 th Cir.1987), we may consider the "intrinsic persuasiveness" of Judge Andersen's analysis. *Id.* Given the similarity of the allegations in *Evergreen Fund* and those in the present case, we find Judge Andersen's thorough discussion on the matter particularly persuasive.

**End of Document**                                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3065591
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

MINGBO CAI, Individually and On Behalf
of All Others Similarly Situated, Plaintiffs,
v.
SWITCH, INC., et al., Defendants.

Case No. 2:18-cv-01471-JCM-VCF
|
Signed 07/12/2019

**Attorneys and Law Firms**

Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, for Plaintiff.

Andrew Gray, Pro Hac Vice, Michele D. Johnson, Pro Hac Vice, Latham & Watkins, Costa Mesa, CA, Joshua G. Hamilton, Pro Hac Vice, Latham & Watkins LLP, Los Angeles, CA, Ava M. Schaefer, Pisanelli Bice, Las Vegas, NV, Kevin M. McDonough, Latham & Watkins LLP, New York, NY, Kendall M. Howes, Pro Hac Vice, Latham & Wakins LLP, Los Angeles, CA, Todd L. Bice, Pisanelli Bice PLLC, Las Vegas, NV, Daniel J. Tyukody, Pro Hac Vice, Greenberg Traurig, LLP, Los Angeles, CA, Mark E. Ferrario, Christopher R. Miltenberger, Greenberg Traurig, Las Vegas, NV, for Defendants.

ORDER

JAMES C. MAHAN, UNITED STATES DISTRICT JUDGE

 **\*1** Presently before the court is Magistrate Judge Cam Ferenbach's report and recommendation. (ECF No. 88). Plaintiff Oscar Farach filed an objection (ECF No. 89), to which defendants Switch, Inc. ("Switch"); Rob Roy, Gabriel Nacht, Zareh Sarrafian, Donald Snyder, Tom Thomas, and Bryan Wolf (collectively "defendants") responded (ECF No. 90).

Also before the court is defendants' motion to strike. (ECF No. 63). Farach filed a response (ECF No. 79), to which defendants replied (ECF No. 85).

Also before the court is defendants' motion to dismiss. (ECF No. 60). Farach filed a response (ECF No. 78), to which defendants replied (ECF No. 84).

**I. Facts**
Farach has brought forth this putative securities class action challenging Switch's failure to include certain information in the registration statement and prospectus that Switch issued in connection with its initial public offering ("IPO"). (ECF No. 58). The amended complaint contains the following allegations:

Switch is a Nevada corporation that hosts data centers and provides to its customers colocation, telecommunications, cloud, and content ecosystems services. *Id.* Most of Switch's revenue comes from colocation services, which amounted to 81.4% of total revenue in fiscal year 2016. *Id.* Colocation services are rental agreements where customers lease information technology infrastructure, such as servers and storage hardware, to avoid the cost of establishing and maintaining their own facilities. *Id.*

Roy was at all relevant times to this lawsuit Switch's chief executive officer ("CEO") and chairman of the board of directors. *Id.* In 2000, Roy founded Switch and began building a data center in Las Vegas near another data center that Enron Corporation ("Enron") was constructing. *Id.* In 2002, Enron declared bankruptcy a week before it planned to open its data center. *Id.* Roy subsequently acquired the state-of-the-art facility at a steep discount, which allowed Switch to transfer massive amounts of data at below market rates. *Id.*

Although Switch established other data centers over the years, the Las Vegas data center remained as the company's primary source of revenue. *Id.* Several market advantages, in addition to Roy's shrewd acquisition of the facility, are responsible for this success. *Id.* The Las Vegas data center is part of a fiber optic network that connects to Switch's Tahoe/Reno data center, San Francisco, and Los Angeles. *Id.* Switch also purchases power in Nevada at low costs because it is authorized to directly deal with the national power market. *Id.* Lastly, Nevada does not impose a corporate income tax and is adjacent to California, which has a large demand for information technology services. *Id.*

In 2017, Switch began changing its sales strategy to focus on selling hybrid cloud solutions, which would allow customers to move larger technology operations to Switch's data centers. *Id.* This new strategy presented a significant

risk of lengthening sales timelines because it involved new complications and required engineering. *Id.* Switch did not disclose this shift in strategy and that it would likely have an adverse effect on revenue. *Id.*

**\*2** On June 13, 2017, Switch registered as a corporation so that it can issue class A common stock in an IPO. *Id.* On September 8, 2017, Switch filed the registration statement for its IPO with the Securities and Exchange Commission ("SEC") and, on September 25, 2017, Switch amended the registration statement and the prospectus therein. *Id.* The registration statement included Switch's offer to sell 31,250,000 shares, with an option for the underwriters to purchase an additional 4,687,400 shares, at $17.00 per share. *Id.*

Switch discussed in the registration statement its growth strategy, which involved developing new facilities in Grand Rapids, Michigan and Atlanta, Georgia. *Id.* However, the registration statement did not disclose facts explaining that these new facilities lacked the unique market advantages that made the Las Vegas data center successful. *Id.* The registration statement also failed to disclose that Switch had changed its sales strategy to focus on hybrid cloud solutions. *Id.* Lastly, the registration statement reported that Switch's recurring revenue for the first six months of 2017 was $177,213,000.00. *Id.* This figure included $9,400,000.00 for colocation services that eBay would use in 2018. *Id.* Had Switch not including this amount in the recurring revenue, Switch's revenue growth would have been 13% rather than 20%. *Id.*

On October 6, 2017, shares in Switch began trading on the New York Stock Exchange. *Id.* Six days later, Switch announced the closing of its IPO and that the underwriters executed their option to purchase an additional 4,687,400 shares. *Id.* In total, Switch sold 35,937,500 shares of class A common stock and received $577,300,000.00 in proceeds. *Id.* Switch also incurred $4,100,000.00 in offering expenses. *Id.*

On August 13, 2018, Switch issued a press release in which the company lowered its revenue guidance for the rest of the year. *Id.* Switch attributed this decrease in expected revenue to its shift in sales strategy towards selling hybrid cloud solutions. *Id.* Switch's chief financial officer ("CFO") and president, Nacht and Thomas Morton respectively, also stated that Switch had been working on hybrid cloud solutions for a while and that the company was not actually changing its sales approach. *Id.* Analysts critiqued the sales strategy for not

being as presented in the IPO materials and that the deviation in sales figures was unexpected. *Id.* The next day, Switch's stock dropped 22.3%—from $13.98 per share to $10.85 per share. *Id.*

In sum, the alleged misleading statements and omissions in the registration statement allowed Switch to sell its class A common stock at $17.00 per share. *Id.* Since the IPO, Switch's stock price has decreased to approximately $9 per share, over a 47% drop. *Id.* Farach alleges that, had Switch filed a registration statement with adequate disclosures, the purported class would not have incurred substantial losses in the form of decreased stock prices. *Id.*

## II. Procedural History

On June 11, 2018, plaintiff Mingbo Cai initiated this action. (ECF No. 1). In the amended complaint, lead plaintiff Farach alleges two causes of action: (1) violation of section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, and (2) section 15 of the Securities Act, 15 U.S.C. § 77*o*. (ECF No. 58).

Now, defendants move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) and strike paragraphs 45, 46, 56, and 65, and footnotes 4 and 7, from the amended complaint. (ECF Nos. 60, 63). Magistrate Judge Ferenbach recommends striking paragraphs 45 and 46, and footnotes 3, 4, and 7. (ECF No. 88).

## III. Legal Standard

### a. Report and recommendation

**\*3** This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1).

Where a party fails to object, however, the court is not required to conduct "any review at all ... of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Indeed, the Ninth Circuit has recognized that a district court is not required to review a magistrate judge's report and recommendation where no objections have been filed. *See* *United States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (disregarding the standard of review employed by the

district court when reviewing a report and recommendation to which no objections were made).

#### b. Failure to state a claim

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).

"Factual allegations must be enough to rise above the speculative level." *Twombly,* 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. 662, 678 (citation omitted).

In *Iqbal,* the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678–79. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678.

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678.

Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks omitted). When the allegations in a complaint have not crossed the line from conceivable to plausible, plaintiff's claim must be dismissed. *Twombly,* 550 U.S. at 570.

The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011). The *Starr* court stated, in relevant part:

First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

**\*4** *Id.*

### IV. Discussion

Two motions and one report and recommendation are pending before the court. First, the court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike footnotes 4 and 7 from the amended complaint. Second, the court will grant in part and deny in part defendants' motion to dismiss.

#### a. Report and recommendation

Magistrate Judge Ferenbach recommends that the court strike paragraphs 45 and 46, and footnotes 3, 4, and 7, from the amended complaint. (ECF No. 88). Farach filed a timely objection to the report and recommendation. (ECF No. 89). Therefore, the court engages in a *de novo* review to determine whether to adopt the magistrate judge's recommendation. *See* 28 U.S.C. § 636(b)(1).

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispending with those issues prior to trial[.]" *Whittlestone, Inc. v. Handi-Craft Co.,* 618 F.3d 970, 973 (9th Cir. 2010).

Farach alleges in paragraph 45 and footnote 3 that the IPO gave Roy complete control of Switch by incorporating the company as a C-corporation where class A common stock yields only a 5.6% voting interest. (ECF No. 58). In contrast, Roy's class C shares have 10-1 voting rights, giving him a 67% voting power over the company. *Id.* Farach alleges in paragraph 46 that Roy and Morton were highly compensated for the IPO. *Id.* Roy allegedly received $94,600,000.00 and his stake in Switch after the IPO was $875,000,000.00. *Id.* Morton allegedly received $12,000,000.00. *Id.*

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (citing 15 U.S.C. § 77*o*). The facts alleged in paragraphs 45 and 46, and footnote 3, show that Roy had control over the IPO process because Roy structured the IPO in a manner that gave him a controlling stake in the company and significant financial benefits. Thus, because these allegations are material to Farach's section 15 claim and do not substantially raise other Rule 12(f) concerns, the court will not strike paragraphs 45 and 46, and footnote 3, of the amended complaint. *See Whittlestone*, 618 F.3d at 973–75.

Farach alleges in footnotes 4 and 7 that Switch's history of weak disclosures limit transparency and that Roy never participated in an investor earnings call despite being the CEO and controlling shareholder of Switch. (ECF No. 58). Farach generally remarks that the court should not strike these footnotes because they do not waste resources or prejudice the defendants. (ECF No. 89). However, the heart of the magistrate judge's finding is that these footnotes are all but irrelevant to determining whether defendants committed a section 11 violation. *See* (ECF No. 88). The court agrees with the magistrate judge. Switch's history of disclosure and Roy's participation in investor earnings calls are too attenuated from any alleged misleading statements or material omissions in the registration statement to survive a Rule 12(f) motion.

**\*5** The magistrate judge also recommends that the court deny defendants' Rule 12(f) motion as it pertains to paragraphs 56 and 65. *Id.* Defendants have not objected to the recommendation. Nevertheless, the court conducted a *de novo* review and finds good cause to adopt the magistrate judge's finding as it pertains to paragraphs 56 and 65.

### b. Failure to state a claim

Defendants move to dismiss Farach's section 11 and section 15 claims. (ECF No. 60). The court addresses each in turn.

### i. Section 11 of the Securities Act

Section 11 of the Securities Act imposes liability on an issuer of a security if the corresponding registration statement "contained an untrue statement of material fact or omitted to state a material fact ... necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). To state a section 11 claim, a plaintiff must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quotation marks and citation omitted).

A heightened pleading standard does not typically apply to section 11 claims. *Id.* However, when the complaint sounds in fraud, plaintiffs must allege their causes of action with particularity under Federal Rule of Civil Procedure 9(b). *In re Rigel Pharm. Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012). Farach alleges that the defendants negligently signed the registration statement, which contained material misrepresentations and omissions. (ECF No. 58). A securities claim based on negligence does not sound in fraud because it does not rely on a "unified course of fraudulent conduct[.]" *Rubke*, 551 F.3d at 1161. Therefore, the notice pleading standard under Rule 8(a) applies to Farach's section 11 claim.

Farach alleges that defendants violated section 11 by (1) failing to disclose that Switch implemented a new sales strategy that presented a significant risk of adversely affecting revenue; (2) failing to disclose unique characteristics and circumstances of the Las Vegas data center that did not exist at other locations, making it highly unlikely that Switch could replicate the success of the Las Vegas data center; and (3) misrepresenting Switch's revenue by improperly including $9,400,000.00 for services that eBay would not use until the next fiscal year. (ECF No. 58).

### 1. Switch's new sales strategy

Regulation S-K governs the non-financial statement portion of registration statements. 17 C.F.R. § 229.10. Item 303 of regulation S-K requires an issuer of a security to disclose

"any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."17 C.F.R. § 229.303(a)(3)(ii). Failure to comply with item 303 constitutes a violation of section 11. *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Defendants note that the registration statement discussed that hybrid cloud solutions are a remarkable growth opportunity and that Switch expects to take advantage of that opportunity. (ECF No. 60). However, the sections which defendants quote do not indicate that Switch had already changed its sales strategy to focus on hybrid cloud solutions. *See id.* Based on the allegations in the complaint, Switch's strategy presented a serious risk of diminishing revenue due to new complications and required engineering. (ECF No. 58). Therefore, the complaint sufficiently alleges facts from which a reasonable jury could find that Switch violated Item 303 by failing to disclose its new sales strategy. *SeeDurning v. First Boston Corp.*, 815 F.3d 1265, 1268 (9th Cir. 1987) ("... adequacy of disclosure is normally a jury question.").

 **\*6**  Similarly, item 503 of regulation S-K requires "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). The registration statement must include an explanation of "how the risk affects the issuer or the securities being offered." *Id.* Although the prospectus includes over thirty pages of risk disclosures, defendants identify only general statements that the company faced risks associated with long selling and implementation cycles. (ECF Nos. 60, 62-1). These kinds of boilerplate risk factors do not satisfy the requirements set forth in item 503. *See Plain English Disclosure, Securities Act Release No. 33–7497*, 63 Fed. Reg. 6370–01, 1998 WL 44199 (Feb. 6, 1998).

The court is not aware of any language in the registration statement that indicates the specific risks arising from Switch's new sales strategy. *See* (ECF No. 62-1). Further, Farach alleges that once Switch disclosed its sales strategy along with its potential effects on revenue, Switch's stock price dropped by 22.3%. (ECF No. 58). This is precisely the type of risk that item 503 requires issuers of securities to disclose. Thus, Farach has plausibly pleaded that Switch violated item 503 by failing to discuss and explain the risks of its new sales strategy.

### 2. Switch's ability to replicate the success of the Las Vegas data center

Defendants argue that they did not mislead investors about the prospects for the Grand Rapids and Atlanta data centers because the registration statement warned that revenue from the new data centers was uncertain. (ECF No. 60). These warnings mentioned that almost all of Switch's revenue comes from the Las Vegas data center and that the new data centers presented greater risk because the demand in those markets may not support the new facilities. *See id.* The court agrees.

Farach does not allege in the complaint or identify in his response that any portion of the registration statement forecasted that the Grand Rapids and Atlanta data centers would have a similar degree of success as the Las Vegas data center. (ECF Nos. 58, 78). Instead, the registration statement discloses Switch's growth strategy and discusses the risks of the growth strategy without comparison to the Las Vegas facility. (ECF No. 62-1). These representations did not mislead investors into believing that the new data centers would replicate the success of the Las Vegas data center because "skilled investors are aware that a corporation's performance ... in a new market is unlikely to replicate past successes."*In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (9th Cir. 1992).

Further, defendants aptly note that the registration statement explains that the Las Vegas data center generates almost all of Switch's revenue and that the new data centers may not be profitable due to various market risks. (ECF No. 62-1). These statements expressly distinguish the market conditions for the new data centers from the market conditions in Las Vegas. Thus, any disclosures on the unique market advantages in Las Vegas would not have caused a reasonable investor to think differently about the nature of his or her investment. *SeeRubke*, 551 F.3d at 1161.

Accordingly, Farach has failed to plead that defendants' violated section 11 by misleading investors into believing that the new data centers would replicate the success of the Las Vegas data center.

### 3. Switch's alleged misrepresentation of revenue

Switch's registration statement included $9,400,000.00 for colocation services with eBay in its recurring revenue report

for the first six months of 2017. (ECF No. 62-1). Farach argues that Switch should not have included this amount in the revenue report because eBay was going to use the corresponding colocation services in 2018. (ECF Nos. 58, 78). Farach further argues that this misrepresentation was material because it increased Switch's revenue growth from 13% to 20%. *Id.*

**\*7** Farach has not provided and the court is not aware of any authority precluding issuers of securities from including amounts that customers are contractually obligated to pay in recurring revenue reports. Moreover, it is irrelevant that eBay was not going to use colocation services under the contract until 2018 because eBay became obligated to pay for the licensed space in the first six months of 2017. *See* (ECF Nos. 58, 60). Thus, Farach has failed to allege a concrete falsehood or omission in the recurring revenue report and his section 11 claim with respect to the eBay contract cannot succeed.

### ii. Section 15 of the Securities Act

Section 15 of the Securities Act provides that "[e]very person who ... controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as the controlled person[.]" 15 U.S.C. § 77*o*. To state a section 15 claim, a plaintiff must allege (1) a primary violation of the Securities Act and (2) that the defendant controlled the primary violator. 15 U.S.C. § 77*o*; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

Defendants argue that Farach has failed to state a section 15 claim because he has not alleged a primary violation of the Securities Act. (ECF No. 60). However, as the court explained in section VI(b)(i)(1), Farach has plausibly pleaded

that defendants violated section 11 by failing to disclose that Switch had implemented a new sales strategy and the risks arising from that strategy. Therefore, the court will not dismiss Farach's section 15 claim.

### V. Conclusion

The court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike only footnotes 4 and 7 from the amended complaint. The court will also dismiss Farach's section 11 claim as it pertains to (1) misleading investors that the new data centers would replicate the success of the Las Vegas data center and (2) including the eBay contract in the recurring revenue report for the first six months of 2017.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Magistrate Judge Ferenbach's report and recommendation (ECF No. 88) be, and the same hereby is, ADOPTED in part and REJECTED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendants' motion to strike (ECF No. 63) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendants' motion to dismiss (ECF No. 60) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

### All Citations

Slip Copy, 2019 WL 3065591

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4360648
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Eric SILVERMAN, On Behalf of Himself
and All Others Similarly Situated, Plaintiffs,
v.
MOTOROLA, INC., et al., Defendants.

No. 07 C 4507.
|
Sept. 23, 2008.

**Attorneys and Law Firms**

Darren J. Robbins, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, David A. Rosenfeld, Joseph Russello, Matthew P. Montgomery, Samuel H. Rudman, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, Melville, NY, Lori Ann Fanning, Marvin Alan Miller, Miller Law, LLC, Chicago, IL, for Plaintiffs.

Elizabeth Leise, John C. Massaro, Stephen M. Sacks, Arnold & Porter, LLP, Washington, DC, J. Timothy Eaton, Michael P. Sheehan, Shefsky & Froelich, Ltd., Matthew E. Van Tine, Miller Law, LLC, Chicago, IL, Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Richard A. Maniskas, Schiffrin & Barroway, LLP, Radnor, PA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JAMES B. MORAN, Senior District Judge.

**\*1** Plaintiffs Eric Silverman and Macomb County Employees' Retirement System, purchasers of Motorola stock during the alleged class period of July 19, 2006 to January 5, 2007, filed suit on behalf of themselves and a purported class of similarly situated persons against Motorola, Inc. and certain of its officers and directors (collectively "defendants," with individual officers as "defendant officers"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5). The individual complaints were consolidated in this court—a lead plaintiff was appointed and a consolidated amended

complaint filed. In Count I of their consolidated amended complaint, plaintiffs claim that defendants violated § 10(b) and Rule 10b–5 by artificially inflating the value of Motorola stock when they issued statements omitting important facts and containing material misrepresentations about the company's future. Plaintiffs allege they lost money when the market discovered the falsity of Motorola's statements and the stock price fell from the allegedly artificially inflated prices. In Count II, plaintiffs allege that the individual defendant officers violated § 20(a) by acting as control persons of Motorola during the class period. Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted (Fed. R. Civ.Pro.12(b)(6)), and for failure to plead fraud with specificity, as required by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. § 78u–4 et seq.). For the following reasons, we grant defendants' motion.

*BACKGROUND*

When deciding a motion to dismiss we take as true all well-pleaded factual allegations in the complaint and make all plausible inferences from those allegations in plaintiff's favor. *Levy v. Pappas,* 510 F.3d 755, 764 (7th Cir.2007). The focus is on the complaint. However, the court must consider any written instrument either attached to the complaint or referred to therein, and may take judicial notice of public disclosure documents filed with the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* ––– U.S. ––––, ––––, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). Therefore, the following facts are assumed to be true and are taken from the complaint and the full text of Motorola SEC filings, press releases and conference calls attached to defendants' motion and referenced in plaintiff's complaint. *Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002).

Motorola builds, markets, and sells products, services and applications that connect people, information and entertainment through broadband, embedded systems and wireless networks. It has three primary business segments: Mobile Devices, Networks and Enterprise, and Connected Home Solutions.

**\*2** Defendant Edward Zander served as Motorola's Board Chairman and Chief Executive Officer from 2004 until he was replaced on November 30, 2007. During the period in question, defendant David Devonshire served as Motorola's Executive Vice–President and Chief Financial

Officer. Defendant Ronald Garriques served as Executive Vice–President and President of Motorola's Mobile Devices division. Defendant Gregory Brown served as the President, Chief Operations Officer and Executive Vice–President of the Networks and Enterprises division and succeeded Garriques as President of the Mobile Devices division in February 2007. Defendant Daniel Moloney served as Executive Vice–President and President of the Connected Home Services division. Defendant Richard Nottenburg served as Executive Vice–President and Chief Strategy Officer. Defendant Padmasree Warrior served as Executive Vice–President and Chief Technology Officer.

At issue in this suit is Motorola's development of its cell phone products, specifically, its third generation or "3G" cell phones. These phones are designed to work on new and improved networks, called 3G networks, which are high capacity radio access wireless networks providing users with enhanced data services, improved internet access and increased voice capacity. In December 2005, according to the Global Mobile Suppliers Association, 100 3G networks were operating in 40 countries.

By July 2006, Motorola was behind its competitors in product offerings, since its portfolio did not include the feature-rich 3G phones that were in strong demand by European and American customers. On top of this, Motorola's product line needed revamping because its core product, the original RAZR phone ("RAZR"), was losing cache as competitors introduced comparable products. It was therefore crucial to both Motorola and its investors to introduce its new product portfolio, including the 3G phones, in time for the 2006 holiday selling season, which occurred during Motorola's fourth quarter of 2006. During the class period, defendants issued a number of positive statements about Motorola's financial results, its financial outlook, the continued success of the RAZR, and the launch of the 3G phones. [1] Also during this time, Motorola stock rose from $18.95 per share at the beginning of the class period to $25.84 per share on October 13, 2006, an increase of 36%.

*July 19, 2006, Press Release and Conference Call*
On July 19, 2006, Motorola issued its financial results for the second quarter of 2006, showing earnings of $0.55 per share. It also issued a press release in which defendant Zander stated, in pertinent part: "With our strong balance sheet, leading technologies and proven record of growth, Motorola is well-positioned to continue creating value for

its shareholders." (cplt.¶ 66). The company announced its outlook for the third quarter of 2006, estimating sales in the range of $10.9 to $11.1 billion, "driven primarily by continuing momentum in the Mobile Devices business." *Id.*

On the same day, Motorola held a conference call with securities analysts and investors to discuss second quarter results and business operations. In that call, defendant Zander stated that during an annual meeting of analysts, Motorola would be "unveiling several new exciting products." (cplt.¶ 67). He referred to these products as "very competitive" and "on track." *Id.* He later reiterated that Motorola's UMTS and HSDPA (3G networks) products were "quite on track ... quite compelling," and stated, "I think that we will fare quite well on both UMTS and HSDPA devices in the second half of the year." *Id.*

**\*3** Zander also stated that the RAZR was "stronger than ever." *Id.* He stated that the company had just shipped its 50 millionth RAZR, and that it was still a must-have device. Zander further stated that "we see good things ahead for the wireless segment. We expect the mobile device market to grow by more than 15% for the full year 2006," and reiterated the press releases estimate of sales in the $10.9 billion range, driven by the Mobile Devices segment. *Id.*

*Analyst Day*
On July 26 and 27, 2006, Motorola hosted its annual "Analyst Day" with Wall Street Security Analysts. During that day, Motorola unveiled seven new cell phones, two of which were 3G phones, the RAZRxx ("XX") and the RAZRmaxx ("MAXX"). Defendant Zander called these products "flagship products for the second half of the year." (cplt.¶ 71). He stated that the new products incorporated Freescale chipsets, which he called "the best platform that we have," and some were using a Linux Java operating system. *Id.* Regarding the Linux Java platform, Zander stated that "it is the right long-term platform. We're glad that we're on it. And now we're starting to build— build momentum." *Id.* He further stated that "Motorola is the fastest-growing high-tech high-cap company here—in the U.S. And the group, if we look a little bit upbeat, we are. I will say we're confident, not arrogant." *Id.*

In response to a question posed by a reporter regarding Motorola's limited use of the Linux Java operating system, defendant Garriques stated that the company has been moving resources over to Linux Java every quarter and by the middle of 2007 "the bulk of everything that we do ... will be on Linux

Java." (cplt.¶ 73) Defendant Warrior also made statements about the Linux Java platform, discussing its features and capabilities in general, but not as related to any specific device. Analysts attending the event noted that Motorola stated that most of the new devices would be available in the third quarter of 2006, with the XX and MAXX shipping in the fourth quarter. They stated that the new products "bode[d] well for market share gains and handset margin expansion." (cplt.¶ 78). Analysts were especially impressed with the unveiling of the 3G phones. With regard to the status of the RAZR, analysts noted that the handset's price had dropped 60% in 18 months, more than typical phones, but that a spokesman for Motorola said that the price had not declined more than "previous home-run products." (cplt.¶ 79). Finally, analysts stated that defendant Garriques "has assured [them] that he would beat the division's margins in coming quarters." *Id.*

*September 6, 2006, Conference*

**\*4** On September 6, 2006, defendant Zander appeared at Citigroup's 14th Annual Global Technology Conference, where he responded to a question about normal seasonality for the handset industry. Included in his response was the following statement; "[W]e've got some good products coming out for the Q4 rush, so I'm still feeling Okay, but you never know. That's why every week I have a staff meeting, every week I have a call, how are we doing?" (cplt.¶ 81). He stated that both the XX and the MAXX "will ship in Q4. So, I was told that all our products are going to ship," and later reiterated that statement. *Id.* Following these statements, analysts issued positive reports recommending the purchase of Motorola stock Analysts "anticipate[d] that the KRZR K1 [a non–3G product] and Motorola's other new models will have a significant impact on the company's 4Q06 results." (cplt.¶ 83).

*October 17, 2006, Press Release and Conference Call*
On October 17, 2006, Motorola issued a press release announcing its financial results for the third quarter of 2006. It reported quarterly sales of $10.6 billion and earnings per share of $0.39. The release stated that the Mobile Devices segment sales were up 26% compared with a year ago, and operating earnings increased to $819 million. The segment's operating margin improved 0.7% from the second quarter and 0.9% from the previous year, as a result of product launches and licensing income.

On the same day, Motorola held a conference call with investors and analysts, during which defendant Zander made the following statement: "As we look ahead to Q4 this year and fiscal 2007, we feel optimistic about our competitive position in our key businesses. With our new portfolio of mobile devices shipping this quarter ... we look forward to continued successes in the months and years ahead." (cplt.¶ 86). He reiterated the third quarter increases in the Mobile Device segment, and stated that "we continue to achieve our goals of year-to-year operating margin improvements and quarter-over-quarter market-share growth." *Id.* Zander discussed "the strategic repositioning of RAZR to the midtier to make way for" two new handsets. *Id.* Regarding the 3G handsets, Zander stated that these "will be shipping this quarter ... and should be a definite boost." *Id.* He also offered the following guidance:

> As we look to the fourth quarter of 2006, we expect the market to grow by greater than 15% for full year 2006. We expect typical seasonality and strong demand for new products in the fourth quarter, and we expect Mobile Devices to continue to keep growing market share on a sequential basis, and doing this profitably by expanding OE on a year-over-year basis.

(cplt.¶ 86). During the conference call, defendant Devonshire stated that the "outlook for fourth quarter is sales between $11.8 billion and $12.1 billion, which is up in the 18% to 21% range versus the fourth quarter of 2005." (cplt.¶ 88).

In response to a question by an analyst regarding what Motorola needed to become more bullish in the 3G market, defendant Garriques discussed the Freescale platform upon which the 3G phones were built:

> **\*5** This quarter is about platform change. We took our previous platform, which we built kind of V3x on, and now have transitioned to what we call [Argon LV] from Freescale with new products like XX and MAXX. I do believe this platform in

this quarter gets us a very competitive set of products out in the marketplace.

(cplt.¶ 90). Given that Motorola had previously experienced supply issues with phones, an analyst asked the following question: "[I]t looks like the new products for Q4 are all on track to launch on time. How should we think about any potential supply constrains?" Defendant Garriques responded: "The big products for us—XX, MAXX, RIZR and the two version of MOTOFONE—I feel very good, and don't feel supply-constrained ramping those up in Q4. From a macro level, I'm not seeing any significant macro problems in the industry, given the platforms that we are building on. So I feel pretty comfortable." *Id.* A second analyst asked about the handsets, including the XX and the MAXX: "Are these going to be late-quarter introductions ... or do you expect these to be in meaningful volume perhaps before that November Thanksgiving Weekend holiday sales season?" Defendant Garriques responded: "Across the board, with the exception of the CDMA MOTOFONE, I expect these to be October and early to mid-November shipments, making sure that we hit that all-important fill the channel for the holiday season ... [except the MOTOFONE] the rest of them are all solid and ready for the holiday season." *Id.* After the conference call, analysts issued positive guidance on Motorola stock.

Unbeknownst to investors, Motorola was experiencing problems in the manufacture of its 3G phones; problems that would eventually delay the launch of the phones and cause Motorola to not have sufficient inventory for the 2006 holiday selling season. For example, the company that manufactured the chipset to be used in the 3G phones, Freescale Semiconductor, Inc., was experiencing significant design, production and quality issues. In addition, Motorola was experiencing problems with the development of a new Linux-based software operating system for its 3G phones, which further delayed the phones' development and manufacture. In support of these allegations, plaintiff offers the statements of eight confidential witnesses ("CW"). [2]

According to CW4, CW5, CW6 and CW7, Motorola and Freescale collaborated in the design of the Argon chipsets to be used for the 3G phones, and the chipset design, in which two chips were mounted on top of the other, was creating quality issues resulting in poor manufacturing yields. In the process of mounting the chips, the chipset warped, causing the defect. It also required Freescale to consume more silicone than originally planned. According to CW4

Motorola first discovered the defect in the chipset design in late 2005, but since Motorola was contractually bound to procure chips from Freescale, they worked directly with Freescale to resolve the problem. CW4 stated that Motorola engineers worked extremely long hours during the second half of 2006 to resolve the quality issues. CW4 also stated that the problems with the chipsets materially delayed the launch of Motorola's 3G phones until sometime in late November or early December 2006. CW4 stated that the delayed launch negatively impacted Motorola's fourth quarter financial results because there was not sufficient time to get the phones through the distribution channels in time for critical fourth quarter sales. According to CW4, the phones were not available by the day after Thanksgiving, and likely not available to consumers until well into December 2006.

The confidential witnesses also discussed software problems. CW4 stated that the software showed bugs during testing. After the bugs were resolved, issues emerged with the hardware that were undetectable without the updated software. CW5 confirmed that the chipset issues could not be separated from the other software issues that Motorola was experiencing, because whenever Motorola changed elements of its software it had to publish "errata" specifying changes in the code, which then affected the design of the chipsets. Other multimedia software also caused delay, according to CW1, because developers failed to adequately test certain functions. CW8 stated that the development of the software "user interface," which was to be incorporated into the MAXX phone, fell two months behind schedule during July and August 2006. As a result, the launch of that phone was at least two months behind schedule.

**\*6** There were also problems with the Linux Java platform on which the 3G phones were to run. CW1 stated that directors of each software engineering group assigned to the Linux Java development, held weekly meetings with various company department vice-presidents to inform them about the status of the project CW1 stated that at the beginning of 2006, the company had set customer trials for the new Linux Java-based 3G phones for June 2006, followed by shipment to customers during the fourth quarter 2006. However, by April 2006, it was widely known within Motorola that the trials would not take place until fourth quarter 2006, and the first shipments would not occur prior to the end of first quarter 2007. Problems arose with the guidelines people are required to follow when using such open source code as Linux Java, requiring the rewriting of code and the reprogramming of the platform. CW1 stated that by September 2006, the delivery

schedule bad slipped again, with customer trials pushed to sometime in 2007, and shipments to sometime after. CW2 confirms the "slippage" in the delivery schedule because of the platform change. As a result of these problems, the 3G phones launched during fourth quarter 2006 were in fact re-spins of prior models that did not offer consumers the functionality or features Motorola had promised. CW8 stated that the XX and MAXX phones operated on the company's proprietary P2K platform, instead of the Linux Java platform, because the latter was too unstable at the time of product launch.

Plaintiffs allege that defendants knew or recklessly disregarded this information in making their positive statements in press releases and on conference calls during the class period. Plaintiffs also allege that defendants made misstatements about the continued success of the RAZR, since they knew or recklessly disregarded the fact that Motorola had reduced the price of the RAZR. Furthermore, in light of the problems with 3G phones and the reduction in price of the RAZR, plaintiffs allege defendants issued fraudulent guidance on Motorola's third and fourth quarter sales and income forecasts.

*January 4, 2007, Press Release*

**\*7** On January 4, 2007, Motorola issued a press release reporting disappointing financial results for the fourth quarter of 2006. The press release stated: "The shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast." (cplt.¶ 92). In response to this announcement, the price of Motorola stock fell from $20.31 to $18.72 a share, a drop of 8%.

On January 19, 2007, Motorola issued its final results for the fourth quarter 2007. On that same day it conducted a conference call with analysts and investors in which defendant Zander attributed the disappointing numbers to the fact that the 3G products began to ship in the December time frame and therefore Motorola "did not get the benefit of some of the increase in 3G markets." He also attributed the results to the price decrease on the RAZR.

On February 21, 2007, defendant Devonshire spoke at a Bank of America Technology Conference and stated that the 3G phone development was negatively impacted by problems with the chipset: "3G, we were a little hampered all year long because the chipset coming from our sole supplier ... was

a little late, so it's out there now." He also stated that the company did reduce the price of the RAZR.

On March, 1, 2007, defendant Zander spoke at a Goldman Sachs Technology Investment Symposium and he noted that both the chipset and Linux Java software contributed to the problems with the 3G rollout: "We've got to get platforms LINUX/JAVA done and implemented. We've got a couple of products that are now coming out with LINUX/JAVA ... We just totally messed that up with our designs and lateness and with our semiconductor partners and got behind the 3G curve." (cplt.¶ 99).

On February 16, 2007, Motorola announced that defendant Garriques had "resigned, effective immediately." On March 21, 2007, defendant Devonshire retired. On November 30, 2007, defendant Zander was replaced as CEO by defendant Brown.

*ANALYSIS*

I. *Section 10(b) and Rule 10(b)–5 Claims*

Section 10(b) of the Securities and Exchange Act forbids the use of any manipulative or deceptive practice in connection with the purchase or sale of any registered security. 15 U.S.C. § 78j(b). Rule l0b–5 states that it is "unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

To state a claim under these provisions, plaintiff must adequately allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e. a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation;' (5) 'economic loss;' and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (internal citations omitted).

Allegations of fraud must be pleaded with particularity in accordance with Rule 9(b). This means the plaintiff must identify "the person who made the misrepresentation, the time, place and content of the misrepresentation, and the

method by which the misrepresentation was communicated to the plaintiff.' " *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994) (internal citations and quotations omitted). However, the standard plaintiffs are held to under the Private Securities Litigation Reform Act ("PSLRA") is more stringent than Rule 9(b), requiring plaintiffs to (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1), (2). A complaint will survive only if a "reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Tellabs,* l27 S.Ct. at 2511.

**\*8** In this case plaintiffs have alleged a "fraud-on-the-market" theory. Under such a theory, "[w]here the security involved is traded in an open and efficient market, the plaintiff need not show individual and specific reliance on the misrepresentation of a defendant; he may instead rely on the ... theory and allege only that he suffered injury in his capacity as a purchaser or seller in such a market." *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992).

A. *Materiality*

Information is material if "a reasonable investor would have considered [it] a reason to buy (or not sell, if he already owned) stock." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). "The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lindelow v. Hill,* 2001 U.S. Dist. LEXIS 10301, \*11, 2001 WL 830956 (N.D.Ill. July 20, 2001). "The relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Takara Trust v. Molex Inc.,* 429 F.Supp.2d 960, 972 (N.D.Ill.2006) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 437 F.3d 588, 595 (7th Cir.2006) ("Makor I") *rev'd on other grounds* —— U.S. ——, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

Plaintiffs argue that materiality cannot be decided on a motion to dismiss because it is an issue of fact. *See, e.g., Tatz v. Nanophase Tech. Corp.,* 2002 U.S. Dist. LEXIS 19467, \*14–\*16, 2002 WL 31269485 (N.D.Ill. Oct. 9, 2002). However, courts can and have decided materiality as a matter of law

when the facts allow. *In re Midway Games Inc. Sec. Litig.,* 332 F.Supp.2d 1152, 1164 (N.D.Ill.2004) (collecting cases).

Plaintiffs' complaint highlights certain statements offered in the context of other statements, which they allege were materially false and misleading. As we understand the complaint, plaintiffs are not alleging that the entire paragraphs are false, but only the highlighted statements, though we read those statements in context. *See Davis v. SPSS, Inc.,* 385 F.Supp.2d 697, 708–09 (N.D.Ill.2005). As such, we do not understand plaintiffs as challenging true statements of historical fact, such as Motorola's financial results from the second or third quarter, and therefore we do not address those. The statements and omissions plaintiffs allege are misleading, can be broken down into two categories: (1) 3G product rollout, (2) drop in the price of the RAZR. We address the second category first.

**\*9** Plaintiffs allege that defendants made material misstatements about the continued success of the RAZR, and intentionally omitted the fact that Motorola slashed the price of the RAZR during the third quarter of 2006. However, defendants point out that plaintiffs' own complaint contains the following statements by defendant Zander, made during the October 17, 2006, conference call; "During the quarter, Mobile Devices did have lower average selling prices. This was given by ... the strategic repositioning of RAZR to the midtier to make way for KRZR and RIZR...." (cplt.¶ 86). Thus, defendants did not mislead investors by making misstatements or by omitting relevant facts regarding the RAZR's price—they specifically mentioned the reduction in price, albeit in executive jargon, at the same press conference plaintiffs cite to support other allegations of fraud. "Where the facts and circumstances allegedly omitted or represented have actually been disclosed ... there will be no liability under the securities laws." *In re Next Level Systems, Inc.,* 1999 U.S. Dist. LEXIS 5653, \*25, 1999 WL 387446 (N.D.Ill. March. 31, 1999). Therefore, any allegations of fraud based on statements regarding the RAZR price decrease are dismissed.

The second category of statements requires a more in-depth analysis. Defendants argue that all of the alleged misstatements are immaterial as a matter of law because they are either corporate "puffery" or are forward-looking statements protected by the PSLRA's safe-harbor provision.

B. *Puffery*

"Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in

specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.' " *In re Midway,* 332 F.Supp.2d at 1164 (quoting *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996)). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp. Inc.,* 25 F.3d 1124, 1129–30 (2d Cir.1994). "Scrutiny of vaguely optimistic statements ... is 'especially robust' in cases involving a fraud-on-the-market theory of liability, such as this one, because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." *In re Midway,* 332 F.Supp.2d at 1164 citing *Shaw,* 82 F.3d at 1218.

Defendants are correct that a number of the statements plaintiffs allege to be misleading, are in fact merely corporate puffery. Statements regarding Motorola's "strong balance sheet ... and proven record of growth," making "Motorola [ ] well-positioned to continue creating value," is so vague and unspecific that no reasonable investor would rely on it (cplt.¶ 66). The same can be said for statements that Motorola is "upbeat," "confident," "the fastest-growing high-tech high-cap company," or statements touting the benefits of the new Freescale or Linux Java platforms (cplt.¶¶ 67, 71, 73, 75). Statements that the new products are "competitive" or "compelling" are similarly broad and undetailed (cplt.¶¶ 86). Such statements are immaterial as a matter of law (*see also* cplt. ¶¶ 79, 81, 84).

**\*10** However, defendants go too far in lumping large groups of statements together. Among the puffery lies certain specific statements of present fact that could be considered material. The fact that the "competitive" products are "on track," "quite on track," or "keyed up," would be material if in fact defendants knew that those products were not on track (cplt.¶¶ 67, 73). And statements that Motorola was "on" the Freescale platform, and was "on" or "[had] been moving" resources over to the Linux Java platform, could be material if that was not, in fact, the case (cplt.¶ 73). The materiality of these statements is supported by the fact that an analyst specifically asked if the 3G products were on track or were supply-constrained, and defendant Garriques answered that they were on track and he did not feel supply-constrained (cplt.¶ 90); *Makor I,* 437 F.3d at 597 (direct response to analyst inquiry about possible decline in sales not mere puffery).

C. *Omissions*

Additionally, plaintiffs argue that defendants misled investors by omitting facts about the extensive problems and delays associated with the 3G rollout. This court has previously discussed the relationship between misstatements and omissions:

> Whether a fact is material and whether a statement omitting it is misleading are closely intertwined. The more important a fact would be to investors, the more likely its omission will mislead them. Consequently, materiality is more like a continuum than a simple yes or no, material or immaterial. On one extreme, some facts are so important they independently demand disclosure. Silence on the issue is itself misleading. On the other extreme are direct misstatements. Because investors rely on them, inaccurately reporting even the most marginally material facts will likely mislead. This case, alleging that existing statements triggered the duty to disclose additional information, rests between these poles. Discussing an issue, while withholding specific facts, can mislead. Merely mentioning a topic, however, does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important. If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it. But omitting smaller details, even if investors might care about them, is not necessarily misleading.

*Anderson v. Abbott Laboratories,* 140 F.Supp.2d 894, 903 (N.D.Ill.2001) (footnote omitted). We agree with plaintiffs that given the apparent significance of the facts allegedly omitted, defendants' omissions regarding the problems

plaguing the 3G rollout may have rendered misleading their statements that the rollout was "on track" and that the company was not "supply constrained." Taking the CW statements as true, "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the mix of information." *In re Next Level,* 1999 U.S. Dist. LEXIS 5653, *22, 1999 WL 387446.

### D. *Forward-looking Statements*

**\*11** Defendants also argue that the alleged statements are forward-looking and protected by the PSLRA's safe harbor provision. The PSLRA provides a safe harbor for class actions based on forward-looking statements, so long as those statements are accompanied by "meaningful cautionary statements," are "immaterial." or were not made "with actual knowledge" of the falsity or misleading nature of the statement. 15 U.S.C. § 78u–5(c) (1)(A)(i)—(B)(i). Forward-looking statements include statements (1) "containing a projection of revenues," or other financial items; (2) "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "of future economic performance;" or (4) "of the assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u–5(i)(1)(A)—(D).

We agree with defendants that the alleged misstatements referring to projected sales and revenue, as well as those discussing the roll-out of the 3G products, constitute forward-looking statements under this definition. However, similar to their argument regarding puffery, defendants have stated broadly what they believe qualifies as a forward-looking statement, to include statements both of future and present fact. Defendants include some of the statements we deemed material above. We disagree that any of those statements are forward-looking, as that term is defined by the statute; rather, they are statements of present fact. Simply because they are located among forward-looking statements does not qualify them as such. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir.2008) ("Makor II") ("a mixed present/ future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). We agree with defendants that the other alleged misstatements are forward-looking and we must determine whether they are protected under the safe-harbor provision of the PSLRA. Defendants argue that the statements were both accompanied by meaningful cautionary language and were not made with actual knowledge of their falsity.

### E. *Cautionary Language*

"To be effective, the cautionary language 'must be substantive and tailored to the specific future projections, estimates or opinions' that are alleged to be misleading." *Lindelow,* 2001 U.S. Dist. LEXIS 10301, *14–*15, 2001 WL 830956 (quoting *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1292, 1404 (7th Cir.1995)). The warnings should be "more than boilerplate" and should "convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *Stavros v. Exelon Corp.,* 266 F.Supp.2d 833, 843 (N.D.Ill.2003) (citations omitted). "If a statement is accompanied by meaningful cautionary language, the defendant's state of mind is irrelevant." *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999) (citing H.R. Conf. Rep. 104–369, at 44 (1995)); *In re Midway,* 332 F.Supp.2d at 1168.

**\*12** Plaintiffs argue that defendants' statements are not protected by the PSLRA's safe harbor because they are accompanied only by "boilerplate" cautionary language, not warnings specifically tailored to the risks Motorola could face. Defendants' press releases and conference calls were accompanied by cautionary language specifically detailing between 18 and 20 risk factors which might change the outcome of such predictions, including "(2) the company's ability to continue to increase profitability and market share in its wireless handset business ... (4) the company's ability to introduce new products and technologies in a timely manner; (5) the company's ability to purchase sufficient materials, parts and components to meet customer demands." (def. exh.3, p. 4; def. exh.4, p. 4–5; see also similarly specific language def. exh.6, p. 19; def. exh.7, p. 19). This is sufficient. The statute requires only that the language mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Harris,* 182 F.3d at 807 citing 15 U.S.C. § 78u–5(c)(1)(A)(i). It does not require that defendant list *every* factor, and that "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." *Harris,* 182 F.3d at 807 quoting H.R. Conf. Rep. 104–369, at 44 (1995); *Stavros,* 266 F.Supp.2d at 843. This court previously determined that much less specific language satisfied the PSLRA's requirements for invoking safe harbor. *See Davis,* 285 F.Supp.2d at 711. [3]

Only defendants' September 6, 2006, statements at the Citigroup Conference were accompanied by less specific language, which could be considered boilerplate. However, the cautionary language in that statement specifically refers readers to "important factors and risks, which are more specifically identified in the companies' [sic] most recent SEC filings" (def.exh.8, p. 13). The Seventh Circuit has yet to rule on whether meaningful cautionary language must "accompany" the statement by being found within the same document as the statement The Tenth Circuit, discussing the analogous "bespeaks caution" doctrine, has answered in the negative, noting that although "remote statements are less likely effective" because the focus is on the "total mix of information available" to the investor at the time of the statement cautionary language found in the company's other documents, including SEC filings, may be considered. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1122–23 (10th Cir.1997); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996). The Sixth and Ninth Circuits, specifically discussing the PSLRA, agree. *Miller v. Champion Enters., Inc.,* 346 F.3d 660, 677 (6th Cir.2003) (cautionary language found in 10–K form sufficient to protect letter under safe harbor); *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1133 (9th Cir.2004) (language in 10–K protects statements made in conference call).

At least two district courts in this circuit have taken this approach. *See Stavros,* 266 F.Supp.2d at 843; *In re Midway,* 332 F.Supp.2d at 1167. Similar to here, the *Stavros* court noted that "the documents containing the projections at issue specifically reference other factors listed in Exelon's filings with the SEC." *Id.* at 844. The risk factors found in Motorola's SEC 10–K filings are extensive and specific, extending beyond eight pages. They discuss in great detail past and potential issues with quality relating to design and manufacture of products, pricing of new products and the timing of their introduction, the ability to purchase a sufficient amount of materials, and reliance on problems related to reliance on third party manufacturers, among other things (def.exh.2, pp. 19–21). This is more than sufficient to satisfy the safe harbor requirements.[4] Therefore, the allegations of Count I that rest on statements that are forward-looking in nature are dismissed with prejudice.

#### F. *Scienter*

**\*13** "In order to allege scienter in a private securities action for money damages, the PSLRA requires that 'the complaint shall, with respect to each act of omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Miller v. Champion Enters., Inc.,* 346 F.3d 660, 671–72 (6th Cir.2003) (quoting 15 U.S.C. § 78u–4(b)(2)). A "strong inference" is one that is both "cogent" and "at least as compelling as any opposing inference." *Tellabs,* 127 S.Ct. at 2510; *Makor II,* 513 F.3d at 705. Because we have held that defendants' forward-looking statements are accompanied be meaningful cautionary language, we need only address the state of mind required for statements of material present or past fact. For such statements, plaintiffs are required to plead with particularity "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor I,* 437 F.3d at 600.

In an attempt to meet the scienter requirement, plaintiffs first plead actual knowledge. They point to the fact that all of the defendants, save defendant Zander, sold large amounts of stock during the class period, "Insider trading alone does not raise an inference of scienter," *Davis,* 385 F.Supp.2d at 714. "The sale must be suspicious in scope or timing to support an inference of scienter." *Id.* at 715. Plaintiffs allege that the sales were suspicious in scope because they represented between 29% and 80% of each defendant's holdings, and suspicious in timing because they came during the class period, and shortly after several of the statements plaintiffs allege were misleading. What plaintiffs have not alleged is that defendants' sale of stock was out of line from their previous trading history. Defendants have provided this court with their trading history for 2005 into 2006, which demonstrates that the sales made during the class period were not unusual, either in scope or in timing, when compared with previous sales, negating an inference of scienter (def.exh., pp. 11–16). *See Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 759 (7th Cir.2007); *Davis,* 385 F.Supp.2d at 713–16. Furthermore, each defendant who sold stock during the class period had, on May 3, 2006, received an employee stock option of between 200,000 and 350,000 shares, making a later large sale not appear as suspicious (def. exh. 11, p. 22; exh. 12, p. 17; exh. 13, p. 14; exh. 14, p. 11; exh. 15, p. 16, exh. 16, p. 29). Finally, the fact that defendant Zander, who is alleged to have made a majority of the misleading statements, did not sell any stock during this period, further negates any inference

of scienter based on the sale of stock. *Davis,* 385 F.Supp.2d at 713–16.

Plaintiffs next argue that because defendants were in high-ranking positions within the company, it is clear that they "should have known" about the problems with the 3G phones and the effect those problems would have on Motorola's fourth quarter forecast. This argument falls flat from the start with regard to defendants Brown and Moloney. While both were executive vice-presidents, neither was connected with the Mobile Devices division. Both were in charge of other divisions within Motorola, and plaintiffs have alleged no facts to infer that even if problems were communicated to the upper levels of management, those facts reached defendants in entirely separate divisions. In addition, the fact that neither Brown nor Moloney is alleged to have made any statements or omissions, supports the conclusion that neither defendant had knowledge of or was reckless in disregarding the 3G situation. *Roth v. Officemax, Inc.,* 527 F.Supp.2d 791, 800 (N.D.Ill.2007) (plaintiffs failed to allege that defendant made false or misleading statements, and allegations of duty to disclose failed for lack of facts giving rise to a strong inference of scienter).

**\*14** Plaintiffs' inference of scienter is stronger against the remaining defendants. Zander, Devonshire, Nottenburg and Warrior were all corporate executives. Garriques was the executive in charge of the Mobile Devices Division during the period in question. As such, it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company. Zander himself stated that be had a staff meeting or call "every week" to monitor the status of the 3G phones.

Defendants argue that scienter cannot be presumed from a defendant's executive position, and cite to a number of cases where courts decline to make such a presumption. These cases all relate to various failures to follow generally accepted accounting principles in preparing financial statements. *See Roth,* 527 F.Supp.2d 791; *In re Career Educ. Corp.,* 2007 WL 1029092 (N.D.Ill. Mar.29, 2007); *In re Bally,* 2006 WL 3714708 (N.D.Ill. July 12, 2006); *Selbst v. McDonald's Corp.,* 432 F.Supp.2d 777 (N.D.Ill.2006); *Davis v. SPSS, Inc.,* 385 F.Supp.2d 697 (N.D.Ill.2005). This case is different, it is about an operations problem, not an accounting deficiency.

Furthermore, plaintiffs also rely on the statements of the eight CWs. With perhaps a few exceptions, the CWs are

in a position to testify about the problems associated with the 3G phones. CW1 stated that the directors of each software engineering group assigned to the Linux Java development, held weekly meetings with various company department vice-presidents, and that it was "widely known" within Motorola that Linux Java-based phones would not ship prior to the end of the first quarter of 2007. CW4 stated that Motorola engineers were working extremely long hours to rectify the chipset problems. CW1, CW2 and CW8 all discuss the continual delay in the testing and delivery schedules. We recognize that general statements such as this, by themselves, are not enough to create a "strong inference" of scienter. *See, e.g., Malin v. XL Capital Ltd.,* 499 F.Supp.2d 117, 140–42 (D.Conn.2007) (confidential witness allegations that accounting deficiencies were "well known" in industry and company not sufficient); *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1333 (S.D.Fla.2004) (confidential witness allegations that problems were "generally known," insufficient). As stated above, there is more in this case. The material misstatement here is related to a production problem in an important new product line, not an accounting issue that may have flown under the radar of some executives.

We recognize that the Seventh Circuit has held that information from confidential witnesses "must be discounted" and "usually that discount will be steep." *Higginbotham,* 495 F.3d at 757. Despite this broad pronouncement, the court later held, in *Makor II,* that confidential witnesses could help generate a strong inference of scienter where they were sufficiently described, and had first-hand knowledge of the information about which they would testify. 513 F.3d at 712. The fact that the information was corroborated by multiple sources contributed to the court's conclusion. *Id.* We find that those requirements are met in this complaint and that the inference that the corporate executives and Garriques were aware of the production problems, while still making statements that the 3G rollout would proceed on schedule, is at least as cogent and compelling as any plausible opposing inference, and therefore plaintiffs' complaint adequately alleges scienter.

### G. *Loss Causation*

**\*15** To prevail in their action, plaintiffs must also allege and prove that defendants' misrepresentation proximately caused their economic loss. *Dura,* 544 U.S. at 345–46 (citing 15 U.S.C. § 78u–4(b)(4)). In this circuit, "loss causation" is treated as a restatement of the rule in common law fraud actions requiring a plaintiff to show that "but for the defendant's wrongdoing, the plaintiff would not have

incurred the harm of which he complains." *Bastian,* 892 F.2d at 683, 685. The Supreme Court's recent opinion in *Dura,* for the most part confirmed this approach. *See, e.g., Ray v. Citigroup Global Markets, Inc.,* 482 F.3d 991, 995 (7th Cir.2007) (noting that the Seventh Circuit made the same point about loss causation "years before *Dura,"* in *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683 (7th Cir.1990)); *see also Dura,* 544 U.S. at 340 (citing *Bastian,* 892 F.2d at 685). Plaintiffs cannot rely merely on an allegation that they suffered damages from purchasing securities at a price artificially inflated due to defendants' misrepresentations. *Dura,* 544 U.S. at 347. However, the loss causation requirement "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997).

Defendants contend that plaintiffs have not adequately pleaded loss causation because the alleged material misrepresentations concern the delay in bringing Motorola's 3G cell phones to market, and that the January 4, 2007, press release that preceded the drop in stock price "says nothing about Motorola's 3G cellular phones, much less that their delayed launch caused Motorola to miss its sales projections" (def.'s mot. at 24). The first disclosure that references the delay in bringing to market the 3G phones appeared on January 19, 2007. The defendants also assert that the documents referenced in the complaint demonstrate that Motorola faced multiple challenges in the Mobile Devices division in the second half of 2006, which are at least as likely, if not more likely, to have caused Motorola to miss its earnings projections.

We believe that the defendants read the loss causation requirement too narrowly. The possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists. There is no requirement at the pleading stage that a plaintiff "affirmatively rule out those other factors in its complaint; rather that burden arises at trial." *Ong ex rel. Ong v. Sears, Roebuck & Co.,* 459 F.Supp.2d 729, 748–49 (N.D.Ill.2006). At this early stage, we find that plaintiffs have met their burden. The price of the stock dropped after the earnings warning issued on January 4, 2007. Although this warning did not single out the delay in marketing the 3G phones as the cause, it did indicate that below forecasted sales and earnings were a problem primarily in the Mobile Devices division. It is not unreasonable to assume that the market was aware of the absence of 3G phones in retail outlets during the all-important holiday season which had just ended, and attributed some or all of the weak sales to the 3G phones,

particularly in light of the importance Motorola had placed on the 3G phones in earlier phone calls. *See, e.g., In re Motorola Securities Litigation,* 505 F.Supp.2d 501, 546 (N.D.Ill.2007) (holding that earnings disclosure in case of still-concealed fraud could serve as a corrective disclosure in which "the relevant truth begins to leak out").

II. *Control Person Liability*

 **\*16** Section 20(a) creates vicarious liability for a person who actually or potentially controlled the primary violator's acts, 15 U.S.C. § 78t(a); *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 880–81 (7th Cir.1992). In this case, Motorola is the controlled "person." *See In re Stone & Webster, Inc. Securities Litigation,* 424 F.3d 24, 27 (1st Cir.2005) (allowing corporate officers to be held secondarily liable under section 20(a) for primary violations of the corporation). So in order to state a section 20(a) claim, plaintiffs must allege the following: (1) a primary securities violation; (2) each of the defendant officers exercised general control over Motorola's operations; and (3) each of the defendant officers "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison,* 974 F.2d at 881. As we discussed above, plaintiffs have successfully pleaded a primary violation under § 10(b). We now examine the remaining requirements.

Defendants argue that this count should be dismissed because a control person liability claim must meet the heightened pleading standards of Rule 9(b), and plaintiffs' generalized allegations of control are insufficient. The Seventh Circuit has yet to speak directly on whether control must be alleged with particularity, and the courts in this district are divided on the issue. We agree that the primary violation must be pleaded with particularity—if it were not, then the underlying § 10(b) count would be dismissed—but we are not convinced that the allegations of control are also subject to the heightened standards. *See In re Sears Roebuck & Co. Securities Litigation,* 291 F.Supp.2d 722, 727 (N.D.Ill.2003) (" § 20(a) has neither a scienter requirement nor a heightened pleading requirement."); *see also Central Laborers' Pension Fund v. SIRVA, Inc.,* No. 04 C 7644, 2006 WL 2785720, at \*25 (N.D.Ill. Sept. 22, 2006); *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.,* No. 02 C 5893, 2004 WL 574665, at \*16 (N.D.Ill. Mar.22, 2004).

The complaint alleges that the individual defendants exercised control over Motorola by virtue of their position as senior executives in the company. That for now is enough.

At trial, plaintiffs will still have the burden of sustaining the charge of control person liability. That burden may be difficult as to Brown and Moloney, for reasons we have already discussed. Defendants, in turn, will have the opportunity to defeat the charge by proving they acted in good faith.

### III. *Motion for Oral Argument*

**\*17** The parties filed a joint request for oral argument on defendants' motion to dismiss. We took that motion under advisement. Because we are satisfied that we were able to resolve the motion solely on the briefs, the motion for oral argument is denied,

*CONCLUSION*

For the forgoing reasons, Count I is dismissed as to defendants Brown and Moloney. The remainder of the defendants' motion to dismiss is denied.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4360648

## Footnotes

1     Specific statements are discussed herein.

2     CW1 is a former Connectivity Department manager in Motorola's Mobile Devices segment and was employed from 1999 until April, 3007. During 2006 and 2007, CW1 was primarily responsible for managing the development of software for connectivity functions that were being integrated with the new Linux Java platform Motorola was developing for its 3G phones. CW2 is a former Business Operations manager in the 3G unit of Motorola's Mobile Devices segment and was employed from 1999 until June 2007. CW3 is a former Program Manager for a third party software applications company employed by Motorola during the class period. Plaintiffs do not attribute any statements to CW3, CW4 is a former Senior Baseband Engineer employed by Motorola from 2005 through September 2007. CW5 is a former employee of both Motorola and Freescale. CW5 began working for Motorola in 1982 and served as Freescale Division Controller from 2002 through late 2006. Thereafter, CW5 was responsible for Freescale's strategic financial planning until June 2007. CW6 is a former Freescale Financial Controller and was employed in the company's manufacturing group until April 2007. CW7 is a former Freescale customer supply analyst who was initially hired by Motorola in 1991, CW7 was assigned to Motorola's account after Freescale was spun off by Motorola in 2004, and was employed there through May 2007. CW8 is a former Motorola Senior Software Engineer employed in the company's Mobile Devices division during the class period. CW8 was responsible for the software design and development associated with Motorola's 3G and GSM phones.

3     In *Davis,* we determined sufficient language that "warned that some of the statements in the release were forward-looking and that such variables as market conditions, changes in demand, competition, product release schedules and currency fluctuations could cause actually company results to differ from predictions."

4     We are unsure if any cautionary language accompanied defendant Garriques statements in the "Heard on the Street" column of the Wall Street Journal. However, since we hold that the detailed cautionary language found in Motorola's 10–K form should be considered as "part of the total mix of information" available to the investor, the forward-looking statements made in that article are protected by the PSLRA's safe harbor.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Fed. Sec. L. Rep. P 96,226

2011 WL 814932
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

ST. LUCIE COUNTY FIRE DISTRICT
FIREFIGHTERS' PENSION TRUST
FUND, Town of North Branford Pension
Committee, On Behalf of Themselves and
All Others Similarly Situated, Plaintiffs,
v.
MOTOROLA, INC., Edward J. Zander, Gregory
Q. Brown, and Thomas Meredith, Defendants.

No. 10 C 427.
|
Feb. 28, 2011.

**Attorneys and Law Firms**

Beth A. Kaswan, Scottscott LLP, New York, NY, Jeffrey A. Leon, Julie D. Miller, Freed & Weiss LLC, Chicago, IL, David R. Scott, Scott & Scott LLP, Colchester, CT, Donald Lewis Sawyer, Michael Jerry Freed, Steven A. Kanner, Freed Kanner London & Millen LLC, Bannockburn, IL, Geoffrey M. Johnson, Scott & Scott, LLP, Cleveland Heights, OH, Mary K. Blasy, Scott+Scott LLP, San Diego, CA, for Plaintiffs.

Robert J. Kopecky, Anne J. Sidrys, Jess M. Krannich, Kirkland & Ellis LLP (Chicago), Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

VIRGINIA M. KENDALL, District Judge.

 **\*1** Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund and the Town of North Branford Pension Committee (together "Plaintiffs") filed suit against Motorola, Inc., ("Motorola"), Edward J. Zander ("Zander"), Gregory Q. Brown ("Brown"), and Thomas Meredith ("Meredith") (together "Defendants") alleging, in their Second Amended Complaint, violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("1934 Act") and violations of Rule 10b–5, 17 C.F.R. § 240. 10b–5. Defendants move to dismiss for failure to state a claim and for failure to meet the heightened pleading standards required in

securities class actions. For the following reasons, the Court grants Defendants' Motion to Dismiss with prejudice.

*STATEMENT OF FACTS*

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). Defendants included several exhibits, including SEC filings and transcripts of shareholder meetings and conferences that are referenced and excerpted in Plaintiffs' Second Amended Complaint. The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment. *See, e.g., Stavros v. Exelon,* 266 F.Supp.2d 833, 844 n. 8 (N.D.Ill.2003). The Court may also examine the documents included in Defendants' Motion to Dismiss because they are referred to in Plaintiffs' Second Amended Complaint and they are central to Plaintiffs' claims. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002).

**I. Motorola Mobile Devices**

Motorola is a technology company that operates in three primary business segments: mobile devices, networks and enterprise, and connected home solutions. (Second Amd. Compl. ¶ 16.) From October 25, 2007 until January 22, 2008 ("Class Period") the largest of these was mobile devices. (*Id.*) The mobile device division had 42% of its 2007 net sales concentrated in several large phone operators. (*Id.* ¶ 17.) This high level of concentration gave Motorola's management access to sales data that was useful for forecasting future purchases. (*Id.* ¶ 18.) According to Plaintiffs' confidential witnesses, Motorola provided concessions to the major cell phone carriers to accept unneeded inventory (a process known as "channel stuffing" that depresses sales volumes in later quarters) to meet quarterly and annual targets. (*Id.* ¶ 19.)

By the close of fiscal year 2006 Motorola was the second largest global supplier of wireless handsets with an estimated global market share of 22%. (*Id.* ¶ 23.) Indeed, Motorola's RAZR cell phone was the most popular line of mobile phones ever released until it ceded that title to Apple's iPhone 3G in November 2008 (the iPhone 3G was released in June 2007). (*Id.*) Motorola sold 100 million units of the RAZR through July 2007, the month that the RAZR2 was released. (*Id.*) By the end of the third quarter ("3Q") in 2007, however, Motorola's global market share was down to 13%. (*Id.* ¶

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 37 of 61 PageID #:2752

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

25.) Its profits and sales were similarly down, and Motorola recognized hundreds of millions of dollars in losses during the first three quarters of 2007. (*Id.* ¶ 26.)

 **\*2** On September 7, 2007, at its annual analyst conference, Motorola announced a turnaround plan to restore the health of its mobile devices unit. (*Id.* ¶ 28.) This turnaround plan was reaffirmed on October 25, 2007 and again on December 6, 2007. (*Id.* ¶¶ 26, 213.)

## II. Motorola Officers

Zander joined Motorola as CEO, Chairman of the Board and Chairman of the Board's Executive Committee in January 2004. (*Id.* ¶ 29.) Zander served as Motorola's CEO until December 31, 2007 and as Chairman of its Board and its Executive Committee until May 5, 2008. (*Id.*) Zander received a salary of over $14 million in 2006 and over $17 million in 2007, however the vast majority of this compensation came in the form of restricted stock units ("RSUs"), stock options, and other long-term incentive payments. (*Id.*) Zander's RSUs would not vest unless Motorola's stock price closed above $22; Zander's stock options had an exercise price of $12.97, which rendered them valueless if Motorola's stock was trading below that amount. (*Id.* ¶ 30.)

Meredith served as Motorola's Acting Chief Financial Officer and Executive Vice President between April 1, 2007 and March 1, 2008. (*Id.* ¶ 31.) Like Zander, Meredith received a substantial portion of his 2007 compensation in stock options and RSUs. (*Id.*)

Brown served as President and Chief Operating Officer of Motorola from March 2007 through December 2007. (*Id.* ¶ 33.) Brown assumed the role of President and CEO on January 1, 2008. (*Id.*)

## III. October 25, 2007: 3Q Earnings Conference

Motorola released its 3Q 2007 financial results on October 25, 2007, reporting that sales were down 36% from 3Q 2006 in the mobile device segment. (*Id.* ¶ 202.) The mobile device segment also incurred a 3Q 2007 operating loss of $138 million, compared to a second quarter ("2Q") 2007 operating loss of $264 million. (*Id.*)

Zander, Brown, and Meredith also held an earnings conference on October 25, 2007 to discuss 3Q 2007 and look ahead to the fourth quarter ("4Q") of the year, which

was already underway. (*Id.* ¶ 203.) Zander stated that "[o]ur 3Q can be characterized by one word, progress." (*Id.*) Zander continued, "We ... made substantial improvement in all key metrics in mobile devices." (*Id.*) Zander further represented that "We increased unit sales and gross margin percentage" and "lower[ed] operating expenses," concluding that Motorola had already sold 900,000 units of the RAZR2 phone. (*Id.*)

Turning to 4Q 2007, Meredith stated that "we are encouraged by progress in mobile devices as compared to prior quarters. We expect continued improvement in the 4Q." (*Id.* ¶ 204.) Meredith then specified that "[w]e expect 4Q earnings per share from continuing operations to be in the range of $0.12 to $0.14." (*Id.*) Meredith continued, "we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line." (*Id.*) Zander stated that the management team "is committed to returning the company to our financial targets as outlined during the September Analyst meeting." (*Id.*) Brown concluded that "[w]e will continue the momentum and drive further improvements in the coming quarter." (*Id.*)

 **\*3** Motorola's stock price closed up $0.75 to reach $19.30 per share on unusually high trading volume. (*Id.* ¶ 206.)

## IV. December 6, 2007 Lehman Brothers Conference

By early December, investors were concerned with Motorola's viability—whether the company would be broken up and sold—as well as the recent announcement that Zander would be stepping down as CEO. (*Id.* ¶¶ 211–12.) Motorola's stock price closed at $15.75 on December 5, 2007. (*Id.*)

Meredith appeared at the Lehman Brothers Conference in San Francisco on December 6, 2007. (*Id.* ¶ 213.) Meredith "affirmed" earlier 4Q 2007 projections, specifically that earnings from continuing operations in 4Q would be "in the $0.12 to $0.14 range." (*Id.*) Meredith also affirmed that Motorola would experience "sequential improvement in our top and bottom line." (*Id.* ¶ 214.) In response to a question, Meredith echoed the characterization of Q3 as a "start or progress" and stated that he believed "that's sort of where we are." (*Id.* ¶ 215.)

At the end of the session, Meredith was questioned about Motorola's attempts to diversify its semi-conductor chip suppliers. (*Id.* ¶ 217.) Meredith responded that "we're in and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

in coming weeks and months. And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space." (*Id.*)

After the conference, based in part on Meredith's affirming previous earnings estimates, Motorola's stock price increased $0.56 to close at $16.31 on December 6, 2007. (*Id.* ¶ 221.)

### V. January 22, 2008: Estimates Questioned

On January 22, 2008, a research analyst at Merril Lynch's Telecom Equipment/Wireless Cellular division issued an estimate change report for Motorola. (*Id.* ¶ 225.) Based on "supply chain checks" that suggested "steeper than normal order declines in December," Merrill Lynch lowered its first quarter ("1Q") 2008 earnings per share estimates from $0.12 to $0.09. (*Id.*) Merrill Lynch also noted Motorola's decline in the orders it was placing with its suppliers for 1Q 2008 delivery. (*Id.*)

### VI. January 23, 2008: Motorola 4Q 2007 Results

Motorola announced its 4Q 2007 and full-year 2007 results on January 23, 2008. (*Id.* ¶ 227.) Motorola's mobile phone sales from 3Q 2007 to 4Q 2007 had improved by 7%. (*Id.* ¶ 219.) Demand for Motorola's mobile devices had "slowed" during 4Q 2007 while competitors such as Apple experienced growth. (*Id.*) Motorola reported earnings per share of only $0.04, due in part to a $277 million settlement with a chip manufacturer, Freescale Semiconductor ("Freescale"), in January 2008 that accounted for a loss of $0.07 per share. (*Id.* ¶ 227.) Motorola's earnings per share based on continuing operations for 4Q 2007 were $0.14. (*Id.* ¶ 116) Motorola's revenue in the mobile devices segment increased from $4.5 billion in 3Q 2007 to $4.8 billion in 4Q 2007 and sales increased from 37.2 million units to 40.9 million units in the same period. (*Id.* ¶ 27.) Motorola's 4Q operating loss, however, increased to $388 million, up from $138 million the quarter before, due in significant part to the $277 million Freescale settlement. (*Id.*)

**\*4** Motorola issued earnings per share projections for 1Q 2008 of a loss of $0.05 to $0.07 and stated that it expected to "lose market share in Q1." (*Id.* ¶ 227.) The market had expected 1Q projections of up to $0.10 per share profit. (*Id.*)

During a conference call on January 23, 2008, in response to an analyst's question, Meredith responded that the "Thanksgiving through the Christmas selling season was

where we experienced slower demand than we otherwise anticipated." (*Id.* ¶ 228.)

Motorola's stock price dropped 18.8%, or $2.31 per share, to close at $10.01 on January 23, 2008, bringing the stock to its lowest price since September 2003. (*Id.* ¶ 229.)

### VII. Class Period

Plaintiffs' class action is brought on behalf of all purchasers of Motorola common stock between the Class Period of October 25, 2007 and January 22, 2008. (*Id.* ¶ 1.) Specifically, Plaintiffs claim they suffered damage when Motorola's stock price declined as a result of its 4Q earnings release on January 23, 2008. (*Id.* ¶ 264.) Plaintiffs allege that Motorola failed to disclose material facts regarding its projected revenue, the demand for its products, its progress in turning around the mobile device division, and a legal dispute with Freescale, the settlement of which further reduced its 4Q 2007 earnings. (*Id.* ¶¶ 122–23.)

Plaintiffs filed suit on January 21, 2010, amending their Complaint on June 11, 2010 and again on December 3, 2010.

### *STANDARD OF REVIEW*

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3 d at 717. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." [Fed.R.Civ.P. 8(a)(2).](#) "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* [——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)](#) (quoting *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)](#)). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal,* [129 S.Ct. at 1950.](#) When there are well-pleaded factual allegations, the Court assumes their veracity and then determines if they plausibly give rise to an entitlement to relief. *Id.* A claim has facial plausibility when the pleaded factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 1949.

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 39 of 61 PageID #:2754

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

Rule 9 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9. This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business of a firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007). Pursuant to Rule 9, a plaintiff must set forth "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

 **\*5** Section 10(b) and Rule 10b–5 claims are subject to the even higher pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(1)-(2) ("the PSLRA"). *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 551 U.S. 308 at 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Under the PSLRA's heightened pleading standards, "a private securities complaint alleging that the defendant made a false or misleading statement must (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 321 (quoting 15 U.S.C. § 78u–4(b)(1) and (b)(2)).

To establish liability under § 10(b) and Rule 10b–5, a plaintiff must prove that the defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused the plaintiff's injury. *See Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995).

### *DISCUSSION*

Defendants move to dismiss Count I of the Second Amended Complaint—alleging violations of § 10(b) and Rule 10b–5— for failure to state a claim. Specifically, Defendants challenge whether Plaintiffs have sufficiently alleged that they made a misstatement or omission of material fact and whether that misstatement or omission was made with scienter. Defendants do not address the sufficiency of the remaining elements— whether the alleged misstatement or omission was made in connection with the purchase or sale of securities, whether Plaintiffs relied on the misstatement or omission, and whether the Plaintiffs suffered damages as a result—that are necessary to state a claim. This is presumably because Plaintiffs allege a "fraud-on-the-market" theory, under which Plaintiffs bought

and sold in an open and efficient market and, as such, need not show individual and specific reliance. *See Schleicher v. Wendt,* 618 F.3d 679, 682 (7th Cir.2010) ("[T]he fraud-on-the-market doctrine [ ] supplants 'reliance' as an independent element by establishing a more direct method of causation."). Defendants also argue that Plaintiffs cannot state a claim in Count II, which alleges that Defendants are liable as controlling persons under § 20(a), if Count I is dismissed.

### I. Count I
Plaintiffs allege that Defendants made material misstatements or omissions on October 25, 2007, November 14, 2007, December 6, 2007, and January 23, 2008. According to Plaintiffs, these misstatements or omissions dealt with: (1) Motorola's progress in turning around its mobile devices division; (2) its expected earnings; and (3) a previously undisclosed settlement with Freescale.

### A. Progress in Turning Around Mobile Devices Division
Plaintiffs allege that Defendants made material misstatements and omissions regarding their progress in "turning around" Motorola's mobile devices division. Specifically, Plaintiffs cite to the following statements made on October 25, 2007:(1) Meredith's prediction that both revenue and the bottom line would improve in 4Q 2007; and (2) Zander's representations that Motorola was putting "operational discipline and execution back into Mobile Devices," that Motorola's 3Q could be "characterized by one word, progress," and that Motorola was "committed to returning" to the financial targets mentioned at the September 7, 2007 analyst meeting. Plaintiffs also cite to Brown's November 14, 2007 statement that unit sales and revenue would increase sequentially in 4Q 2007, which Meredith affirmed on December 6, 2007. Defendants respond that these statements were accurate predictions and, if found to be misleading, were merely corporate puffery that reasonable investors would not rely on.

### 1. Material Misstatements and Omissions
 **\*6** Material misstatements and omissions occur when a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls v. Glasser,* 64 F.3d 1061, 1065 (7th Cir.1995). A statement is material if it would be viewed by "a reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.,* 2000 WL 1705279

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 40 of 61 PageID #:2755

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

at * 14 (N.D.Ill. Nov.14, 2000) (Kennelly, J.) (citations omitted). Discussing an issue, while withholding specific facts, can also mislead. *See, e.g., Anderson v. Abbott Labs.,* 140 F.Supp.2d 894, 903 (N.D.Ill.2001) ("If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it."). Defendants, however, are not liable where the facts and circumstances allegedly "omitted or represented have actually been disclosed." *Silverman v. Motorola, Inc.,* 2008 WL 4360648 at *9 (N.D.Ill. Sept.23, 2008) (Moran, J.) (citation omitted). To allege that a historical statement violated § 10(b), "the plaintiff must set forth sufficient facts to show that the statement was either false or misleading because of omitted information." *Selbst v. McDonald's Corp.,* 432 F.Supp.2d 777, 785 (N.D.Ill.2006) (internal quotations and citations omitted).

#### a. Revenue

Here, Plaintiffs' own Second Amended Complaint contains data confirming that Meredith's and Brown's predictions of increasing revenue and unit sales from 3Q 2007 to 4Q 2007 were accurate. From 3Q 2007 to 4Q 2007 unit sales of mobile phones increased from 37.2 million units to 40.9 million units. During the same period, revenue in the mobile devices division increased from $4.5 billion to $4.8 billion. Plaintiffs' claims that demand for Motorola mobile devices was actually dropping during this period and that mobile phones are seasonal and thus naturally increase during 4Q are insufficient to plead material misstatements or omissions. The challenged statements simply predicted an increase in revenue and unit sales over the coming quarter, a prediction that was proven accurate. Zander's statement that Motorola had made "substantial improvement in all key metrics" is borne out by the reduced operating loss of $138 million in Q3 2007 compared with a loss of $264 million in Q2 2007.

Moreover, Meredith's January 23, 2008 statement that sales from the Thanksgiving to Christmas period in 2007 were slower than expected does not make the omission of this information in statements made on October 25 and on December 6 material because the alleged misstatements and omissions occurred well before the slow Christmas sales would have been known. Finally, Plaintiffs' allegation that Motorola's top executives would have been aware of a decline in supply parts when they made these statements is irrelevant to a challenge to statements that merely predicted that sales figures would increase from one quarter to the next. *Cf. Silverman,* 2008 WL 4360648 at *9 (noting that omissions regarding problems plaguing a new product's rollout may have been misleading because defendants stated the rollout

was "on track."). As such, Plaintiffs fail to demonstrate a material omission.

**\*7** Plaintiffs fail to allege what other information should have been included in the October 25th and December 6th statements because, as the documents cited in their Second Amended Complaint claim, Motorola's 4Q 2007 loss was based in large part on reduced Christmas/holiday sales. (Second Amd. Compl. ¶ 14.) Zander's description that 3Q was an example of progress is attested to by the documents and data referenced in Plaintiffs' Second Amended Complaint. That Motorola's incoming CEO, Brown, stated privately on January 4, 2008 that the company's 4Q 2007 performance "will be significantly worse than anybody's imagined," does not alter the fact that especially weak Christmas/holiday sales data could not have been known on December 6th, let alone October 25th.

#### b. Demand for RAZR2

Plaintiffs' reliance on confidential witnesses who describe the RAZR2 as being a complete flop and cite Motorola's lack of new or exciting products as the reason 4Q sales were low, does not amount to an allegation that Motorola omitted material information. Nor can Plaintiffs rely on confidential witnesses who state that top executives knew that their products were not selling yet did not disclose this information. In fact, Motorola repeatedly and accurately stated the number of RAZR2 phones sold in 3Q and 4Q. Moreover, on December 6, 2007 Meredith, in response to a question about the "product hole" that Motorola had been facing, stated that he was "not satisfied" with progress on its new products in the mobile device division. Transcript Dec. 6, 2007 Lehman Bros. Annual Tech. Conf. Specifically, Meredith stated that Motorola was "not on time," that its "new product introduction process has not been crisp," and that Motorola is "not satisfied with where [it is]." *Id; see, e.g., In re CNET Networks, Inc.,* 483 F.Supp.2d 947, 966 (N.D.Cal.2007) ("Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored."). These statements, made at a conference relied upon by Plaintiffs in their Second Amended Complaint, adequately refute Plaintiffs' allegations that Defendants omitted material statements about the challenges its mobile devices division faced with respect to demand for its new products. *See, e.g., Silverman,* 2008 WL 4360648 at *9 (dismissing allegations of fraud based on RAZR price decrease because plaintiffs' own complaint contained a statement by defendants specifically mentioning the price reduction).

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

## 2. Corporate Puffery

"Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.' " *In re Midway Games, Inc. Sec. Litig.,* 332 F.Supp.2d 1132, 1164 (N.D.Ill.2004) (citation omitted). "Scrutiny of vaguely optimistic statements ... is 'especially robust' in cases involving a fraud-onthe-market theory of liability ... because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." *Id.* (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1218 (1st Cir.1996). "[I]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir.2010). Statements regarding a company's "strong balance sheet" or its "proven record of growth" are immaterial puffery that no reasonable investor would rely on. *Silverman,* 2008 WL 4360648 at *9 ("Statements that the new products are 'competitive' or 'compelling' are ... immaterial as a matter of law," as are statements that a company is "well-positioned to continue creating value" or that it has "substantial resources"); *see also Jones v. Corus Bankshares, Inc.,* 701 F.Supp.2d 1014, 1027 (N.D.Ill.2010) (collecting cases). Certain specific statements made within a broader vague characterization may nonetheless be considered material if they "reinforce factual misstatements and therefore contribute to ongoing deception." *In re Sears, Roebuck and Co. Sec. Litig.,* 291 F.Supp.2d 722, 726 (N.D.Ill.2003).

**\*8** Here, Zander's October 25, 2007 statement that he was putting "operational discipline and execution" back into the mobile devices unit is loosely optimistic corporate puffery and, as such, is immaterial. *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1077 (N.D.Cal.2001) (noting that statements using the words "strong" and "increased awareness" were vague puffery). Moreover, Plaintiffs do not allege that Defendants were not attempting to restore operational discipline in this division, only that they were aware of and failed to disclose an anticipated reduction in sales based on slowing demand for their mobile phones.

Similarly, while Zander stated on October 25, 2007 that Motorola's management team was "committed to returning the company to [its] financial targets as outlined during the September Analyst meeting," Plaintiffs do not dispute

that Defendants were in fact committed to this approach. The Court finds Zander's general commitment to growth to be immaterial corporate puffery. *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (finding defendant's reference to its "commitment to create earnings opportunities" to be immaterial puffery). To the extent that Zander's October statement referenced specific growth targets from the September Analyst meeting, those targets were for a moderated outlook over a "two-to-three-year operating model" and fall under the analysis of forward-looking statements below. The Court also notes that the statements from the September Analyst meeting relied upon by Plaintiffs refer to a time-frame well beyond the Class Period.

Because Plaintiffs fail to allege any material misstatements or omissions regarding Motorola's attempts to turn its mobile device division around, the Court grants Defendants' Motion to Dismiss with respect to the allegations in Count I regarding the attempted turnaround of Motorola's mobile device division.

## B. Earnings Projections

Plaintiffs allege that Meredith's projections on October 25, 2007 and December 6, 2007 that Motorola would earn between $0.12 and $0.14 for 4Q 2007, were false and are not covered by the PSLRA's forward-looking safe harbor provisions. Defendants respond that these earnings projections were accurate and, even if challenged, also contained cautionary language. Defendants further argue that Plaintiffs are unable to sufficiently plead scienter.

## 1. Forward–Looking Statements

The PSLRA provides a safe harbor from liability for certain "forward-looking statements" that prove to be false. Forward-looking statements include statements (1) containing a projection of revenues or other financial items; (2) of the plans and objectives of management for future operations, including those relating to the products or services of the issuer; (3) of future economic performance; or (4) of the assumptions underlying or relating to the aforementioned statements. 15 U.S.C. § 78u–5(i)(1). Corporations and individual defendants may avoid liability for forward-looking statements that prove to be false if the statements are "accompanied by meaningful cautionary statements," are immaterial, or were not made "with actual knowledge" of the falsity or misleading nature of the statement. *Id.* § 78u–5(c) (1).

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**\*9** A mixed statement containing both present and future elements is not entitled to the safe harbor "with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir.2008) (defendant stating that sales were "still going strong" constituted a mixed present/future statement).

Here, Plaintiffs' allegations regarding the sequential increase in sales and revenue have already been discussed and deemed immaterial. Defendants' specific predictions that Motorola's earnings per share from continuing operations would be in the range of $0.12 to $0.14 fall within the category of forward-looking statements. § 78u–5(i)(1). Motorola announced this 4Q 2007 estimate on October 25th and reaffirmed it on December 6th. Plaintiffs rely on Motorola's January 23, 2008 release of 4Q 2007 earnings per share of $0.04 to allege that the predictions were materially inaccurate. The $0.04 figure, however, included net charges of $0.09 per share related to a legal settlement with Freescale and to other costs associated with previously announced workforce reductions. Motorola's 4Q operating income before these special charges was $0.14 per share, in line with Defendants' forecasts. Moreover, Defendants' earnings per share predictions were specifically for "earnings per share from continuing operations" that excluded special charges. (Second Amd. Compl. ¶ 204.) The Court therefore finds that Defendants accurately predicted their 4Q 2007 earnings from continuing operations to be $0.14 per share.

To the extent, however, that Plaintiffs insist that Defendants' earnings projections were false in light of the net charges of $0.09 per share and the overall reduction in demand for Motorola mobile phones, the Court finds that Defendants included meaningful cautionary language in their predictions.

### 2. Cautionary Language

If a forward-looking statement is accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is "irrelevant, and the statement is not actionable regardless of [a] plaintiff's showing of scienter." *In re Cutera Sec. Litig.,* 610 F.3d at 1112–13. "The PSLRA does not require the *most* helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 734 (7th Cir.2004) (quotation marks omitted). "[I]t is enough to point to the principal contingencies that could cause actual results to depart from the projection."

*Id.; see, e.g., Stavros,* 266 F.Supp.2d at 843 (noting that cautionary language must be "more than boilerplate" and "specifically tailored to the company's business"). Cautionary statements may accompany the forward-looking statement or they may be incorporated by reference. *See, e.g., Desai v. Gen. Growth Props., Inc.,* 654 F.Supp.2d 836, 844 (N.D.Ill.2009) (cautionary statements contained in SEC filings were "absorbed into the market" under the fraud-on-the-market theory).

**\*10** The Court notes at the outset the factually similar case of *Silverman,* where analogous forward-looking earnings projections made by Motorola executives were found to be protected by cautionary language and thus within the PSLRA's safe harbor protections. *See, e.g., Silverman,* 2008 WL 43 60648 at * 12. In *Silverman,* the district court held that the cautionary language accompanying Motorola's press releases and conference calls, as well as its SEC filings, were sufficient to insulate alleged misstatements referring to its projected sales and revenue in 2006. *See, e.g., id.* (noting the press releases and conference calls contained "between 18 and 20 risk factors which might change the outcome" of Motorola's predictions and that Motorola's SEC filings contained "extensive and specific" risk factors).

Here, similarly, Motorola's press releases and conference calls were accompanied by cautionary language and also referred participants and listeners to additional risk factors "on pages 16 through 24 and item 1A of Motorola's 2006 Annual Report on Form 10–K and in other SEC filings." Transcript of Oct. 25, 2007 Earnings Conference Call. Specifically, Motorola addressed risk factors including: the level of demand for the company's products; its ability to introduce new products; and risks related to certain "key suppliers." Oct. 25, 2007 3Q Press Release. For example, Motorola's 2006 SEC 10–K filing cautioned that the markets for many of its products are "characterized by rapidly changing technologies, frequent new product introductions, short product life cycles and evolving industry standards" and that Motorola is "constantly exposed to the risk that [its] competitors may implement new technologies before [it does]." Motorola also warned that if its strategic alliances and partnerships with industry leaders do not develop as expected, its "business could be adversely impacted." Motorola stated at its conference calls that the risk factors described in its press releases and in its 10–K filings "in some cases have caused" its actual results to differ materially from its forward-looking predictions. Transcript of Oct. 25, 2007 Earnings Conference Call. Motorola also made

Fed. Sec. L. Rep. P 96,226

abundantly clear that its conference call would contain "[a] number of forward-looking statements." *Id.*

The Court finds that Motorola's cautionary statements addressed Plaintiffs' particular allegations in individualized terms—regarding demand for Motorola's mobile devices, its predicted growth, and its pending settlement negotiations with a key supplier, Freescale—and, as such, were sufficiently specific to provide a safe harbor. *See Asher,* 377 F.3d at 734; *see, e.g., In re Midway Games,* 332 F.Supp.2d at 1166 (finding risk factor stating "[w]e depend on market acceptance of new products" to be sufficient cautionary language).

Because the Court finds that Defendants' forward-looking earnings projections were either accurate or protected by sufficient cautionary language, the Court need not address whether Defendants made these projections with actual knowledge that they were false. 15 U.S.C. § 78u–5(c)(1); *see, e.g., In re Midway Games,* 332 F.Supp.2d at 1168 ("proof of knowledge of the falsity of a forward-looking statement is 'irrelevant' when the statement is accompanied by meaningful cautionary language.") (citations omitted). The Court therefore grants Defendants' Motion to Dismiss with respect to forward-looking earnings projections.

### C. Freescale Settlement

**\*11** Plaintiffs allege that Defendants misled investors by making material omissions and presenting knowingly false earnings projections when they failed to mention Motorola's settlement with Freescale until December 31, 2007 and then included the settlement cost as a special charge in their 4Q earnings. Defendants respond that the Freescale settlement information was not known on December 6, 2007 when the 4Q earnings projections were affirmed and, even if they were, Plaintiffs cannot allege Defendants knowingly made false statements.

### 1. Material Omissions or Misstatements

As a preliminary matter, the Court finds that Motorola's decision to not disclose its settlement with Freescale until December 31, 2007 was not a material omission. Plaintiffs do not cite to any caselaw that requires companies to disclose settlement talks or confidential renegotiations of supplier contracts. *See, e.g., Hallberg v. Am. Agencies General Agencies, Inc.,* 2005 WL 563211 at \*6 (N.D.Ill. Mar.8, 2005) (Filip, J.) ("Thus, even assuming that a duty to disclose existed, there is no reason to think Defendants had any potential merger or IPO to disclose to Plaintiffs before the

two sides reached and agreement and executed a settlement agreement."). Plaintiffs' Second Amended Complaint states that Freescale and Motorola renegotiated their contract agreement in February 2007 and extended it for at least two years. (Second Amd. Compl. ¶ 121.) Regarding the settlement at issue here, Plaintiffs only allege that Freescale and Motorola had engaged in negotiations over a compromise agreement during 4Q 2007. (*Id.* ¶ 11.) Plaintiffs imply that Motorola's senior executives must have been aware of these negotiations, but Plaintiffs do not allege that Motorola and Freescale executed a settlement agreement before Meredith's December 6, 2007 statements. *See, e.g., Hallberg,* 2005 WL 563211 at \*6 (dismissing complaint for failure to plead when the parties reached and executed a settlement). As such, "even assuming a duty to disclose existed," Plaintiffs do not plead facts alleging the settlement had been executed, and therefore Meredith was not obligated to disclose it at the Lehman Brothers Conference. *Id.; Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999) ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all information.").

Here, unlike in *Silverman,* where the defendants stated that everything was "on track" but did not mention product delays, Meredith simply stated, accurately, that Motorola was in discussions with all of the named players in the chip industry. Meredith also stated that he would be finalizing those arrangements within the coming weeks and months—an accurate forecast of the Freescale disclosure three weeks later. Meredith concluded by telling investors that they should "watch" Motorola's relationship with its chip suppliers. Meredith made no mention of Freescale, nor did he make any "affirmative characterization" of the discussions—for example, he did not describe them optimistically or as "conservative" or "adequate." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 282 (3d Cir.1992) ("where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' ")

**\*12** Plaintiffs' argument that Defendants "opened the door" to this subject with his response is therefore unavailing. *See, e.g., Anderson,* 140 F.Supp.2d at 903 ("Merely mentioning a topic ... does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important."). To that end, the analysts cited in Plaintiffs' own Second Amended Complaint do not appear troubled by news of the settlement. In fact, the analysts take the settlement as a positive sign, allowing Motorola to further diversify its chip supplier base to better

Case: 1:20-cv-05593 Document #: 91-1 Filed: 07/06/21 Page 44 of 61 PageID #:2759

St. Lucie County Fire Dist. Firefighters' Pension Trust Fund..., Not Reported in...

Fed. Sec. L. Rep. P 96,226

compete in the 3G space. As Plaintiffs themselves note, "what really shocked analysts" at the January 23, 2008 meeting "was defendants' report that Motorola's Mobile Devices sales projection for 1Q08 was devastating." (Second Amd. Compl. ¶ 116.)

Because Plaintiffs have not cited to any cases requiring the disclosure of pending settlement negotiations, and because they have not pled facts alleging that Freescale and Motorola executed a settlement prior to the December 6, 2007 conference, the Court finds that Defendants did not materially omit any statements regarding the Freescale settlement by waiting to disclose its amount until December 31, 2007.

### 2. Future Statements

Plaintiffs allege that the failure to include information about the Freescale settlement in Motorola's 4Q 2007 earnings projections amounts to a failure to include cautionary language and thus negates the corresponding safe harbor protections.

For the reasons discussed above, the Court finds Defendants' forward-looking earnings projections to be accurate because they were explicitly and repeatedly based on "continuing operations" and did not reflect "special charges" such as a one-time settlement. Moreover, Motorola has incurred special charges similar to the Freescale settlement in recent years, including for charges associated with annual workforce reductions. *See, e.g., Silverman,* 2008 WL 4360648 at *13 (noting that past stock trading history of Motorola executives demonstrated that certain stock sales at issue were not suspicious in scope or timing). Notably, in April 2007 Motorola reported 1 Q 2007 special charges of $0.11 per share, substantially larger than the $0.07 per share special charge at issue here.

Even if the Court were to consider these forward-looking statements inaccurate, they would nonetheless be protected

by the meaningful cautionary language referred to and accompanying Motorola's press releases, conferences, and SEC disclosures. As such, the Court grants Defendants' Motion to Dismiss with respect to omission of Freescale-related charges until December 31, 2007. Since the Court finds that Defendants' forward-looking earnings projections were either accurate or protected by sufficient cautionary language, the Court need not address whether Defendants made these projections with actual knowledge that they were false. *See In re Cutera Sec. Litig.,* 610 F.3d at 1112–13 ("if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statements is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.").

## II. Count II

**\*13** Because Plaintiffs fail to state a claim for violations of § 10(b) and Rule 10b–5, their control person liability claims in Count II must also be dismissed. *See, e.g., In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.,* 604 F.Supp.2d 1188, 1197 (N.D.Ill.2009) (dismissing control person liability claims when § 10b claims were denied).

### *CONCLUSION*

For the reasons stated, the Court grants Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. The case is dismissed with prejudice.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 814932, Fed. Sec. L. Rep. P 96,226

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Fed. Sec. L. Rep. P 92,427

2003 WL 21212596
United States District Court,
N.D. Illinois, Eastern Division.

David A. STARR, Plaintiff,
v.
!HEY, INC., a Delaware corporation;
Icontact.Com,Inc., a Delaware corporation;
William G. Christie; Robert A. Bowman;
Richard Ward; Rahul Prakash; Roger Dow;
Telcom-Internet Investors, LLC; Telcom-Online
Investors, LLC; Telcom Ventures, LLC; Harbor
Capital, LLC; and Duncan Mackay, Defendants.

No. 01 C 6087.
|
May 23, 2003.

**Synopsis**
Shareholder brought action under Securities Act and common law alleging that officers of corporation sold him unregistered securities in connection with merger, and, thus, were liable for diminution in value. On defendants' motions to dismiss, the District Court, Hibbler, J., held that: (1) mere diminution in value of corporate assets was insufficient direct harm to give shareholder standing to sue in his own right; (2) burden of demonstrating application of exemption from Securities Act registration requirement rested upon party invoking that exemption; (3) officers and directors of corporate seller were not "sellers"; and (4) shareholder's sweeping and self-serving statement, that defendants were liable as control persons solely by virtue of their shareholder status or directorships, was insufficient to state claim for control person liability.

Motions granted.

MEMORANDUM OPINION AND ORDER

HIBBLER, J.

**\*1** David Starr filed this five-count complaint pursuant to § 12(a)(1) of the 1933 Securities Act, 15 U.S.C. § 77l(a)(1), § 5 and Regulation D of the 1933 Securities Act, 15 U.S.C. § 77e, and principles of common law. According to Starr, the Defendants sold him unregistered securities in connection with the merger of icontact.com, inc. and !

hey, inc., and thus are liable for the diminution in its value. Rahul Prakash, Telcom-Internet Investors, Telcom-Online Investors, and Telcom Ventures (Prakash and Telcom Entities) have filed a motion to dismiss all claims against them pursuant to Fed.R.Civ.P. 12(b)(6). Robert Bowman and Harbor Capital filed a similar motion to dismiss. For the reasons stated herein, the Court GRANTS both motions and dimisses with prejudice all counts against Rahul Prakash, Telcom-Internet Investors, Telcom-Online Investors, Telcom Ventures, Robert Bowman, and Harbor Capital.

I. Factual Background

David Starr was employed by icontact as a software developer and by August 8, 2000, had accumulated 64,883 shares of icontact common stock. Pursuant to a "Stock Option Grant Certificate," Starr exercised an option to purchase additional shares on a cashless basis, and by September 8, 2000, had increased his total shareholding to 102,277. Starr began exercising his options shortly after receiving a mailing from icontact and its CEO, William Christie, notifying him of a proposed merger between icontact and !hey. The merger was approved by a majority of icontact shareholders, and Starr's icontact shares were converted into approximately 110,000 ! hey shares. According to Starr, !hey represented to him on August 18, 2000, that his icontact shares were valued at $3.3127 per share, but in October 2000 represented to him that the converted icontact shares were in fact valued at only $0.30 per share.

In the five-count complaint, Starr seeks the difference between the value of shares as represented on August 18, 2000 and during October 2000. Starr alleges in Count I that icontact, !hey, and the individual Board members of icontact and !hey (including Prakash and Bowman) violated Sections 5 & 12(1) of the 1933 Securities Act (the Act) because they sold unregistered securities to him. In Count II, Starr alleges that by reason of their status as controlling persons the individual Board members of icontact (including Prakash and Bowman) as well as other shareholders (including the Telcom entities and Harbor Capital) had the power to cause icontact and !hey to engage in the sale of unregistered securities and thus are liable for its acts. Count III alleges a breach of fiduciary duty. Count IV alleges a breach of contract because ! hey did not redeem his shares at the price promised. Count V alleges that the individual Defendants converted Starr's property by refusing to redeem his shares.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

Starr v. !Hey, Inc., Not Reported in F.Supp.2d (2003)

Fed. Sec. L. Rep. P 92,427

## II. Standard of Review

Motions to dismiss test the sufficiency of the complaint, not the merits of the case. *Pickrel v. City of Springfield, III., 45 F.3d 1115 (7th Cir.1995).* The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from them. *Id.* The Court will dismiss a complaint under Rule 12(b)(6) only if it appears that the plaintiffs can prove no set of facts that would entitle them to relief. *Conley v. Gibson,* 335 U .S. 41 (1957).

## III. Analysis

A. *Standing*

**\*2** At the outset, the Court holds that Starr lacks standing to bring this suit against the moving Defendants. As a general principle, a corporate shareholder does not have an individual right of action against third parties for damages to the shareholder resulting indirectly from injury to the corporation. *Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989); *Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985). There are certain exceptions to this general rule, such as when the shareholder's injuries are distinct from those of other shareholders. *Twohy,* 758 F.2d at 1194. But the mere diminution in the value of corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right, because the corporation alone is the directly injured party. *Flynn,* 881 F.2d at 449. A derivative suit brought on behalf of the corporation is the proper vehicle for an individual shareholder to address the diminution of the value of his stock caused by alleged third-person malfeasance.

The Court agrees with Prakash and the Telcom Entities that Starr's claims, for the most part, are derivative. Counts I, II, and III all allege that the Defendants caused the value of Starr's stocks to be diminished as a result of their actions in the merger of icontact and !hey, and thus are derivative in nature. The language contained within Starr's complaint demonstrates beyond doubt the derivative nature of his suit. Starr alleges that the "value of [his] converted shares were valued at the equivalent of $ .30 per share of icontact ... substantially below [the] $3.3127" they were previously valued. Starr further alleges that the Defendants' "attempt[ed] to secure certain rights and benefits for themselves alone, *at the expense of minority shareholders."* (emphasis added). By the very allegations of his complaint, Starr demonstrates that his injury is one that results from the diminution of the

value of his shares and one that he has in common with other shareholders. Accordingly, Starr lacks standing to assert Counts I, II, and III against the moving Defendants and those counts must be dismissed as to Prakash, Bowman, the Telcom Entities, and Harbor Capital on this ground alone. Even if Starr did have standing to pursue Counts I, II, and III, they would still fail for the reasons stated below.

B. Count I - *Section 12(1) Claim*

Prakash moves to dismiss Count I of Starr's claim, arguing that he was exempt from the disclosure and registration requirements because: (1) the stocks were issued to Starr as part of an employee stock option plan, 15 U.S.C. § 77c(a)(2); (2) the transaction did not involve a public offering, 15 U.S.C. § 77d(2). Bowman moves to dismiss Count I of Starr's claim, arguing that he was not a seller for purposes of Section 12(1), and therefore Starr cannot state a claim against him.

If a security or transaction is exempted under § 77c then a person cannot incur section 12(1) liability pursuant to § 77c. *Donohoe v. Consolidated Operating & Prod. Corp.,* 982 F.2d 1130, 1140 (7th Cir.1992) (observing that § 77e is subject to a number of exceptions and limitations); *see also Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.,* 3 F.3d 208, 209 (7th Cir.1993) (discussing exemption from securities regulation of most governmental securities); *American Deposit Corp. v. Schacht,* 84 F.3d 834, 856 (7th Cir.1996) (Flaum, J., dissenting) (observing that Congress recognizes distinct nature of annuities and insurance contracts and exempts them from securities regulation). Section 77c(a)(2) provides that "except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities: ... a stock bonus, pension, or profit-sharing plan which meets the requirements under section 401 of Title 26." 15 U.S.C. § 77c(a)(2). Thus, stocks acquired pursuant to an employee stock option plan are generally exempt from the registration requirements of the Act, and therefore if Starr's shares were issued pursuant to such a plan his claim must necessarily fail.

**\*3** Starr argues, however, that § 77c does not apply, pointing to paragraph forty-eight of his complaint, which reads "icontact and !hey failed to file a registration statement for the merger ... and failed to rely on any exemption from registration." Stark argues that his allegation must be taken as true and therefore Prakash's motion must be denied. But paragraph forty-eight contains a bare legal conclusion-that no exemption excuses icontact's and ! hey's failure to register the securities-not a statement of fact, and thus the Court

Fed. Sec. L. Rep. P 92,427

need not accept it as true. *Panaras v. Liquid Carbonic Ind. Corp.,* 74 F.3d 786, 792 (7th Cir.1996). In support of his motion, Prakash invites the Court to dismiss Count I of Starr's complaint against him because Starr's holdings in icontact and !hey were acquired pursuant to a stock option plan, attaching an affidavit of icontact's CEO, William Christie averring that Starr's shares were issued pursuant to such a plan. Starr protests that the Court should not consider the affidavit in ruling on a 12(b)(6) motion and steadfastly denies that he "acquire[d] his securities pursuant to [an Employee Stock Option Plan]." Generally, Starr is correct that the Court may not consider materials outside the pleadings without converting the motion into one for summary judgment, which the Court declines to do. *See Covington v. Illinois Sec. Serv., Inc.,* 269 F.3d 863, 864-65 (7th Cir.2001).

But the exhibits that Starr attaches to his complaint are fair game. *Menominee Indian Tribe of Wisc. v. Thompson,* 11 F.3d 449, 456 (7th Cir.1998). Starr attaches to his complaint a "Stock Option Grant Certificate." It is clear from reading the document that the certificate is part of an employee stock option plan, for it contains a provision alerting Starr that the option is not a guarantee of continued employment rights. Thus, at a minimum, it appears from the face of the complaint that *some* of Starr's shares were acquired through an employee stock option plan, contrary to his assertion in his brief. Nevertheless, the document does not, on its face, demonstrate that it meets the requirements of 26 U.S.C. § 401, as the exemption mandates. Further, merely because some of Starr's shares were acquired through an employee stock option plan does not mean that all of the shares were so acquired. Starr insists in his brief that his initial acquisition of shares was a direct investment in icontact, and thus the exemption listed in § 77c would not apply. At this stage of the litigation, the Court must accept this allegation as true and dismissal on § 77c grounds is thus improper at this time.

Prakash also argues that the securities were not issued in a public offering, and thus exempt from the Securities Act registration requirement by 15 U.S.C. § 77d. But nothing in the complaint (or in Prakash's brief for that matter) demonstrates whether the securities were issued in a public or a private offering. Prakash argues that the burden is on Starr to plead that the securities were involved in a public offering and not on him to prove that they were involved in a private offering. Prakash's argument has no merit. The burden of demonstrating that an exemption applies rests upon the party invoking the exemption, and thus Starr need not plead facts to demonstrate that it does not apply. *SEC v.*

*Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953). Starr has not pleaded himself out of Court. Nothing in the amended complaint demonstrates that § 77c or § 77d are applicable, and at this stage of the litigation, the Court takes Starr's well-pleaded allegation that the securities were unregistered as true. However, given the language of the Stock Option Grant Certificate as well as the restrictive legend on the reverse of Starr's stock certificates informing him that they have not been registered, the Court cautions Starr that, should it later be revealed that he knowingly misrepresented material facts (for example, facts that demonstrate the securities were issued pursuant to an employee stock option plan or that they were privately issued, and thus that the § 77c or § 77d exemptions are applicable), the Court will consider sanctions against him.

**\*4** Despite the fact that § 77c and § 77d provide no grounds to warrant dismissal at this stage of the litigation, Count I must still be dismissed as to both Prakash and Bowman. Liability under Section 12(1) [1] of the Securities Act is limited to those who pass or offer securities. *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Collateral participants in the sale of securities are not liable as sellers under section 12(1). *Id.* at 650. Instead, liability extends only to those either sell unregistered securities or who actively solicit a purchase motivated in part by a desire to serve his own financial interest or those of the seller. *Id.* at 645-47; *see also Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 936 (N.D.Ill.1999); *Wheaten v. Mathews Holmquist & Assoc., Inc.,* No. 94 C 1134, 1996 WL 494245, \*11 (N.D.Ill. Aug.28, 1996); *Endo v. Albertine,* 812 F.Supp. 1479, 1494 (N.D.Ill.1993). In other words, a person who solicits an offer to buy a security, while acting as the agent of the issuer of the security, shares the status of statutory seller. *Pinter,* 486 U.S. 643-45. Thus, in order to be liable under section 12(1), Prakash and Bowman must have either sold the securities to Starr or actively solicited the purchase.

Starr's complaint alleges that Prakash and Bowman as board members of icontact "solicited Starr, through Christie," and thus are liable under section 12(1) for the sale of an unregistered security. But officers and directors of a corporate seller are not "sellers" for purposes of section 12(1) solely by virtue of their positions within the company. *See Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1017 (2nd Cir.1989). Here, the complaint contains no allegations that demonstrate that Bowman and Prakash did any active solicitation. Indeed the complaint does not allege any contact whatsoever between Starr and Bowman

Fed. Sec. L. Rep. P 92,427

or Prakash. Starr's complaint contains only the conclusory allegation that because icontact CEO Christie solicited his approval of the merger that Bowman and Prakash, as board members, also solicited him. The Court is not convinced. The guidance in *Pinter* is clear: only those who actively solicit the purchase of unregistered securities can be liable under Section 12(1). *Pinter,* 486 U.S. 643-47; *see also Endo, 812 F.Supp. at 1494.* Starr's complaint fails to allege that Bowman and Prakash actively participated in the solicitation or sale of unregistered securities and therefore Count I must be dismissed as to them.

### C. *Count II - Controlling Persons Liability*

Count II of the complaint alleges that Prakash, Bowman, the Telcom Entities, and Harbor Capital are liable under 15 U.S.C. § 77*o* as control persons of icontact or !hey. The Act provides, in relevant part, that "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78o. In order to state a claim for control person liability, a plaintiff must allege: (1) a primary violation; (2) that the defendant actually exercised control over the general operations of the primary violator; and (3) that the control person had the power or ability (even if not exercised) to control the specific transaction that is alleged to give rise to liability. *Donohoe v. Consolidated Operating & Prod. Corp.,* 30 F.3d 907, 911-12 (7th Cir.1994); *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 880 (7th Cir.1992).* Starr's allegations in this regard consist of but a single paragraph: "By reason of their shareholder status, senior management positions and/or directorships as alleged above, these individual and corporate defendants had the power to influence, and exercised such power, to cause icontact and !hey to engage in the unlawful acts and conduct complained of herein." Starr self-servingly pleads a bare legal conclusion-that the individual and corporate defendants were control persons. But Starr alleges no facts, other than the Defendants' status as shareholders, senior managers, or directors, to support his conclusion. Courts within this District have consistently held that a plaintiff may not premise control person liability solely upon status within the company. *See, e.g., Donovan v. ABC-NACO, Inc.,* No. 02 C 1951, 2002 WL 1553259, * 6 (N.D.Ill. Jul.15, 2002); *In re Westell Tech ., Inc., Sec. Litig.,* No. 00 C 6735, 2001 WL 1313785, *12 (N.D.Ill. Oct.26, 2001); *Kaufman v. Motorola, Inc.,* No. 95 C 1069, 1999 WL 688780, * 16 (N.D. Ill. Apr. 16 1999); *Whirlpool Fin. Corp. v. GN*

*Holdings, Inc.,* 873 F.Supp. 111, 120 (N.D.Ill.1995); *Feldman v. Motorola, Inc.,* No. 90 C 5887, 1993 WL 497228, *10 (N.D.Ill. Oct.14, 1993); *Craig v. First American Capital Res.,* 740 F.Supp. 530, 537 (N.D.Ill.1990).* Instead, courts have required plaintiffs to plead sufficient facts to meet the two-part test announced in *Harrison:* (1) that defendants exercised control over the primary violator; and (2) that defendants exercised control over the operations constituting the specific violation. For example, a plaintiff sufficiently pleaded control person liability where the complaint alleged that the defendant was the majority shareholder (and therefore had control over the directors) and other defendants caused the corporation to disseminate to its minority shareholders information containing false and misleading statements. *Canel v. Lincoln Nat'l Bank,* No. 96 C 6595, 1997 WL 321679, *7 (N.D.Ill. Jun.6, 1997).* Another plaintiff successfully avoided dismissal because the complaint alleged that the directors had day-to-day control over the operations of the corporation and the power to control the particular transaction in question. *In re Nanophase Tech. Corp. Sec. Litig.,* No. 98 C 3450, 2000 WL 1154631, *7 (N.D.Ill. Aug.14, 2000).* Similarly, a court denied the motion to dismiss of directors who allegedly could have, but had not, prevented the dissemination of misleading information. *In re First Merch. Acceptance Corp. Sec. Litig.,* No. 97 C. 2715, 1998 WL 781118, *12-13 (N.D.Ill. Nov.4, 1998).* Here, Starr presents nothing to support his claim that the individual defendants were control persons other than his sweeping and self-serving statement that the defendants should be liable solely by virtue of shareholder status or directorships. Such allegations are insufficient to state a claim for control person liability, and the Defendants' motions to dismiss Count II as to Prakash, Bowman, the Telcom Entities, and Harbor Capital is GRANTED.

### D. *Counts III & v. - Common Law Claims*

**\*5** Starr's common law claims are frivolous at best. First, Starr claims that Prakash, Bowman, the Telcom Entities, and Harbor Capital breached a fiduciary duty they owed him because they failed to disclose to him sufficient information in regards to the merger. Starr's claim is predicated on the assumption that the Defendants had some duty under the Act to disclose to him information about the merger by registering the securities that icontact and ! hey issued to him. At the outset, the Court is hard pressed to see how the Telcom Entities and Harbor Capital, both shareholders in icontact or !hey just as Starr was, would owe him any fiduciary duty whatsoever. But in any event, as noted in the Court's discussion of Counts I and II, none of the individual Defendants had any duty to Starr under the Securities Act. The

Defendants' motion to dismiss Count III is GRANTED as to Prakash, Bowman, the Telcom Entities, and Harbor Capital.

In Count V, Starr alleges that the named Defendants converted his shares of ! hey when they refused to redeem his shares. Conversion requires a plaintiff to show that: (1) the defendant wrongfully assumed control over property; (2) his right to immediate possession of the property has been denied by the defendants; and (3) he has made a demand for the property. But the only entity that would be required to redeem Starr's shares of !hey would be !hey itself; Starr has no right to immediate redemption of the shares from the named Defendants. In other words, only !hey was obligated to redeem the shares and so only !hey could conceivably be liable for a refusal to redeem them. Starr could perhaps state a claim for conversion against the moving defendants if he alleged, for example, that Prakash, Bowman, the Telcom Entities, or Harbor Capital had swiped his stock certificates and refused to return them (but that clearly is not what happened). Defendants' motions to dismiss Count V of Starr's complaint is GRANTED as to Prakash, Bowman, the Telcom Entities, and Harbor Capital.

## IV. Conclusion

For the foregoing reasons, the motions to dismiss of Prakash, Bowman, the Telcom Entities, and Harbor Capital are GRANTED and the Court dismisses with prejudice all counts against the moving Defendants. Starr's complaint remains pending against the non-moving Defendants, but as this opinion makes clear, Starr is skating on thin ice. Should it later be revealed that Starr's claims in response to Prakash's § 77c and § 77d are false, and Starr knew them to be false, Starr risks the possibility of Rule 11 sanctions against him.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21212596, Fed. Sec. L. Rep. P 92,427

## Footnotes

1    In his brief, Bowman refers to Section 12(2). But Section 12(2) regulates the use of fraud in the sale of securities. 15 U.S.C. § 77l(a)(2). Section 12(1) governs the sale of securities in violation of 15 U.S.C. § 77e, which is at issue in this case. 15 U.S.C. § 77l(a)(1).

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3380653
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Joseph ZERGER, on Behalf of Himself and All
Others Similarly Situated, Yap Group, Plaintiffs,
v.
MIDWAY GAMES, INC., Steven M. Allison,
James R. Boyle, Miguel Iribarren, Thomas
E. Powell, and David F. Zucker, Defendants.

No. 07 C 3797.
|
Oct. 19, 2009.

**Attorneys and Law Firms**

Amelia Susan Newton, Leigh R. Lasky, Norman Rifkind, Lasky & Rifkind, Ltd., Chicago, IL, David A. Rosenfeld, Mario Alba, Jr., Coughlin, Stoia, Geller, Rudman & Robbins, LLP, Melville, NY, Thomas E. Egler, Trig Randall Smith, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, Sean M. Handler, Schiffrin, Barroway, Topaz & Kessler, LLP, Radnor, PA, for Plaintiffs.

David H. Kistenbroker, Heather J. Kuhn O'Toole, Jessica Lynn Heckinger, Theresa Lynn Davis, Katten, Muchin, Rosenman, LLP, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

DAVID H. COAR, District Judge.

 **\*1** The lead plaintiffs in this fraud-on-the-market case have brought suit against several executives of Midway Games, Inc. under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b–5, *see* C.F.R. § 240.10b–5, alleging that the executives artificially inflated the market value of Midway stock by deceiving the public about the company's financial position. While the executives rushed to sell their Midway stock at the trumped-up prices their "scheme" temporarily sustained, the lead plaintiffs and other putative class members purchased it—and lost millions when the market eventually learned the truth. Or so the plaintiffs allege. The defendants have moved to dismiss the Consolidated Amended Class Action

Complaint for failure to state a claim under the stringent pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u–4(b)(1)-(2). For the reasons stated below, the motion to dismiss is GRANTED.

### *FACTS*

Andre Pappas and Giancarlo Dimizio ("Plaintiffs") are the lead plaintiffs in this consolidated action against Steven M. Allison, James R. Boyle, Miguel Iribarren, Thomas E. Powell, and David F. Zucker ("Defendants"), all executives of Midway Games, Inc. Plaintiffs purport to represent a class consisting of "all purchasers of the common stock of Midway between August 4, 2005 and May 24, 2005" (the "Class Period"). (Consol.Am.Compl.¶ 1.) Between August 29 and November 22, 2005, Pappas purchased a total of 3,300 shares of Midway's common stock; between November 3 and November 23, 2005, Dimizio purchased 4,300 shares. (R. 28, Ex. B at 2.) They voluntarily dismissed their claims against Midway on March 3, 2009, after Midway had filed Chapter 11 bankruptcy on February 13, 2009. (R. 85.)

### *Midway's Business Model*

Midway Games develops and publishes video games. Over the last twenty-plus years, it has published more than 400 video-game titles spanning the home-console, handheld, coin-operated, and PC platforms. (Consol.Am.Compl.¶ 2.) Midway focuses its development efforts on creating a large catalog of titles across many of the most popular video-game genres. (*Id.*) In 2001, Midway's management decided to focus exclusively on the home-console and handheld markets. (*Id.*) Midway already had titles available on many major platforms in these markets, including Microsoft's *Xbox,* Nintendo's *Game Cube* and *Game Boy Advance,* and Sony's *PlayStation 2* and *PlayStation Portable.* (*Id.*)

In February 2005, Midway announced its first profitable quarter in five years: for the fourth quarter of 2004, Midway took in $77 million in revenue and posted a net income of $17 million, in large part due to the successful release of the games *Mortal Kombat—Deception* and *Arcade Treasure 2,* as well as its ability to control costs. (*Id.* ¶ 3.) Midway's continued success would depend upon its ability to deliver new titles across various platforms in a cost-efficient manner; thus, an important objective for Midway

in 2005 was "reasonable growth" in its product-development infrastructure, i.e., attracting and retaining some of the highest quality product developers. (*Id.*) Midway sought to "internally develop[ ] products due to the favorable profit margin contribution and the ability to leverage ... products into sequels and derivative products" (*Id.* ¶ 5) and repeatedly told the market that "robust internal product development resources will be a critical advantage" to Midway in the future. (*Id.* ¶ 6.)

**\*2** Accordingly, in 2004–2005, Midway increased its in-house product development team from 330 to 650 employees, in part by acquiring competitors in the interactive-entertainment industry. (*Id.*) Midway acquired Ratbag Holdings Pty. Ltd. in August 2005, and The Pitbull Syndicate in October 2005. (*Id.*) Keeping its focus on in-house development of titles for home-console and handheld platforms, Midway contracted with outside companies to develop titles for its PC catalog, including *Rise & Fall: Civilizations of War,* which was to be developed by Stainless Steel Studios. (*Id.* ¶¶ 5, 9.)

### *Failure of Midway's 2005 Strategy*

But all was not well with Midway's business model. After posting a successful fourth quarter in 2004, Midway failed to generate any net income in 2005. (*Id.* ¶ 4.) Its sustained investment in infrastructure for in-house product development was a significant drain on its capital resources. (*Id.* ¶ 7.) In September 2005, Midway had to borrow $75 million to fund day-to-day operations. (*Id.*) Throughout the Class Period, however, Defendants repeatedly assured the market that Midway had sufficient working capital to fund day-to-day operations and to continue product development. (*Id.*)

In December 2005, Midway shut down Ratbag—four months after the acquisition that Defendants (Zucker, in particular) had publicly touted as bolstering Midway's capabilities for in-house development of multi-genre action games. (*Id.* ¶¶ 8, 38, 40.) Plaintiffs assert that the decision to shut down Ratbag was made in "late October 2005" without specifying any basis at all for their asserted chronology. (*Id.* ¶ 38.) Plaintiffs allege that Defendants' true, "undisclosed strategy" was to acquire Ratbag's customer base, not its product developers or its products. (*Id.*) Midway's management also concluded that it would be more cost-effective to shut down Ratbag than to integrate its computer systems with Midway's. (*Id.* ¶ 38.) At

the same time, management fired thirty product developers located at Midway's San Diego, California campus. (*Id.*) On December 16, 2005, Midway announced that it had incurred approximately $13 million in restructuring charges for 2005. (*Id.* ¶¶ 8, 38.) These charges were the result of closing down Ratbag and firing the San Diego product developers. (*Id.*)

In November 2005, Midway cancelled its contract with Stainless Steel for the development of *Rise & Fall* and brought the project in-house. (*Id.* ¶¶ 9, 37.) Since PC games were not a significant part of Midway's business, it had to increase its investment in PC-game development to accommodate the project. (*Id* . ¶ 37.) *Rise & Fall* was also plagued with an abnormally high number of bugs (approximately 1,800) when Midway took over development, and this required Midway to devote additional development resources to fixing them in time for the game's promised release date in June 2006. (*Id.*) Plaintiffs allege that Defendants "concealed that Midway would be forced to invest millions of dollars of additional internal product development resources for PC-based products between November 2005 and June 2006" as a result of bringing the development of *Rise & Fall* in-house. (*Id.* ¶ 9.)

### *Defendants' Stock Sales*

**\*3** By closing Ratbag and cancelling the Stainless Steel contract, Midway "incurred, and would continue to incur, millions of dollars of incremental costs." (*Id.* ¶ 10.) According to Plaintiffs, Defendants knew that these missteps would soon force Midway into a dilutive convertible debt offering in order to raise capital for day-to-day operations. (*Id.*) And Defendants "took full advantage of this undisclosed reality," selling 782,950 shares of their Midway stock for $15.3 million. (*Id.*) They sold nearly all of their shares (740,450 shares for $14.7 million) between December 19, 2005 and January 6, 2006. (*Id.*) By December 29, 2005, when Sumner Redstone clarified his intentions regarding Midway, Defendants had already sold 490,450 shares for $10.3 million. (*Id.* ¶ 11.)

### *Sumner Redstone*

Plaintiffs attribute the inflated price of Midway stock and its subsequent "precipitous decline" to the actions of Sumner Redstone, the chairman of Viacom and controlling shareholder of Midway. Redstone had announced, at some

point prior to the Class Period, that he was evaluating Midway as a potential acquisition target for Viacom. (*Id.* ¶ 12.) At the same time, he started acquiring large blocks of Midway shares in open-market transactions. (*Id.*) Plaintiffs acknowledge that "[t]he market considered the information regarding Redstone important." (*Id.* ¶ 13.) Indeed, on March 1, 2005, Wedbush Morgan Securities opined that Redstone's "massive purchases" had caused Midway's shares to be "somewhat overvalued." (*Id.*) And on March 23, 2005, Wall Strategies opined that "if Redstone decides that Midway is not a suitable growth vehicle in the years to come, he could dump his shares on the open market, thus depreciating Midway's share price." (*Id.*) On December 29, 2005, Redstone announced that he had pledged over 33 million of his Midway shares to Sumco, one of his privately held corporations, to collateralize a $425 million personal loan—and that Midway would not be acquired by Viacom. (*Id.* ¶¶ 11, 33–35, 48–50.) Midway stock immediately began to lose value "as Redstone's accumulation of Midway stock abruptly halted and market expectations of an acquisition by Viacom or a 'going private' transaction fizzled." (*Id.* ¶ 50.) During January and February 2006, Midway's stock price experienced a "precipitous decline of over 50%." (*Id.* ¶ 35.) By the end of May 2006, Midway stock traded at $7 per share, down from $20 per share in late December 2005. (*Id.* ¶ 14.)

### *Defendants' False and Misleading Statements*

Plaintiffs set forth, in some detail, what they describe as a "number of partial disclosures [by Defendants] which had the effect of dissipating some, but not all, of the artificial inflation from Midway's stock price." (*Id.* ¶ 15.) For example, they point to the Form 8–K Midway filed with the SEC on December 16, 2005, announcing the $13 million in restructuring costs and the layoff of the Ratbag developers. (*Id.* ¶¶ 15, 46.) In the next two trading days, Midway shares fell from $23.25 to $20.97, "as artificial inflation *partially* dissipated from the stock price." (*Id.* ¶ 47, emphasis added). All in all, Plaintiffs allege ten such "false and misleading statements" during the Class Period and attribute them either to Zucker (*Id.* ¶¶ 39, 40, 44, 52) or to Powell (*Id.* ¶¶ 52, 57) or to "Defendants," without further specification. (*Id.* ¶¶ 42, 43, 46, 51, 56.) The court will recount the details of these statements below, as they become relevant to its analysis. With these statements, Defendants "maintained the illusion that Midway's cash position was strong ... just long enough to sell almost all of their personal holdings of Midway stock [i.e., by January 6, 2006] before lowering the boom on

unwitting investors on May 24, 2006." (*Id.* ¶ 17.) On that day, Defendants finally "admitted" that Midway was "cash strapped" and that the statements they had made throughout the Class Period, concerning Midway's cash position, had been "utterly false." (*Id.*) This alleged admission came in the form of Midway's announcement that it had priced the offering of its $75 million of Convertible Senior Notes due 2026. (*Id.* ¶ 59.) The market was "shocked" by this news, and in two days, Midway's stock fell 17.4%, from $9.87 to $7.39, "as the artificial inflation dissipated from the stock price." (*Id.* ¶¶ 17, 61.)

### *LEGAL STANDARD*

**\*4** In considering a Rule 12(b)(6) motion to dismiss a § 10(b) action, the court must accept as true all factual allegations in the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) (*"Tellabs II"* ). The court must consider the complaint in its entirety, along with any documents it incorporates by reference and any facts of which the court may take judicial notice. *Id.*

Under the PSLRA's heightened pleading standards, a private securities complaint alleging that the defendant made a false or misleading statement must (1) "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* at § 78u–4(b)(2). *Tellabs II,* 127 S.Ct. at 2508.

### *ANALYSIS*

### *Standing of Lead Plaintiffs*

The court begins with a threshold matter: Defendants correctly argue that Pappas and Dimizio, the putative class representatives, lack standing to complain about any statements or actions post-dating their final purchase of Midway stock. Plaintiffs' own submissions put the date of that purchase at November 23, 2005. (R. 28, Ex. B at 2.) Any statements made by Defendants after November 23, 2005 are therefore not actionable.

Plaintiffs contend that they have standing to pursue a § 10(b) claim—regardless of the timing of their final purchase—because they have alleged a "fraudulent scheme and course of business" that persisted throughout the class period. *See, e.g., Upton v. McKerrow,* 887 F.Supp. 1573, 1577 (N.D.Ga.1995) (holding that plaintiff had standing to bring action for statements made after final purchase where common scheme to defraud is alleged); *Crowell v. Ionics, Inc.,* 343 F.Supp.2d 1, 13–14 (D.Mass.2004) (same). However, they cite no authority from this circuit and fail to distinguish Seventh Circuit precedent that says otherwise.

The Seventh Circuit has explicitly held that "post-purchase statements cannot form the basis of Rule 10(b)–5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *Roots P'ship v. Lands' End, Inc.,* 965 F.2d 1411, 1420 (7th Cir.1992). This rule is well settled and unambiguous, and district courts in this circuit routinely reject Plaintiffs' common-course-of-fraudulent-conduct argument and its accompanying citations. [1] Plaintiffs offer no plausible grounds for distinguishing the facts of *Roots* from the allegations in their complaint; nor do they offer any basis for their vague misdescription of the statements in *Roots* as "un-interrelated." (Opp'n at 4.) In *Roots,* the plaintiffs advanced a fraud-on-the-market theory and alleged that the defendants issued false and misleading statements about the company's expected profits and overall business outlook, which "artificially inflated the market price" of the company's stock until the truth was revealed. *See* 965 F.3d at 1415–16. That is exactly what Plaintiffs allege in their complaint. Plaintiffs therefore lack standing to bring a § 10(b) suit based on any statements or conduct after their final purchase of Midway stock on November 23, 2005.

**\*5** Plaintiffs have also requested leave to amend their complaint, should the court hold that they lack standing to pursue any of their claims. This request is denied. Plaintiffs have ignored binding and well-settled precedent and have had ample opportunity to proffer putative class representatives with standing to complain of the statements made in 2006. They were put on notice of this specific defect in their complaint when Defendants moved for dismissal, and that—at the latest—was the appropriate time to seek leave to amend; they are not "entitled to wait and see what the district court [says] before making any changes to the complaint—because it would impose unnecessary costs and inefficiencies on both the courts and party opponents." *Pugh v. Tribune Co.,* 521 F.3d 686, 698 (7th Cir.2008) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 57 (1st Cir.2008) ("The plaintiffs

do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA.")). Plaintiffs' § 10(b) claim is therefore limited to the statements made on August 4 2005, and November 1 and 7, 2005. [2]

### *False and Misleading Statements/Omissions*

Rule 10b–5 forbids an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). In the complaint, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Tellabs I,* 437 F.3d at 595. The materiality of a statement depends on the significance a reasonable investor would place on the withheld or misrepresented information. *Id.* at 596. "[T]here must be a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* (internal quotation marks omitted). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.*

The statements at issue fall into two categories. First, there are Defendants' statements about Midway's acquisition of Ratbag. On August 4, 2005, Midway announced the acquisition in a press release, in which Zucker commented:

> This transaction is consistent with our strategy of adding depth to our internal product development organization and strengthening our ability to deliver highquality, compelling and commercially successful content for current and future systems. Ratbag brings to Midway a rare combination of development expertise in driving and on-foot combat that they are

incorporation into our games now in development.

**\*6** (Consol.Am.Compl.¶ 39.) That same day, Zucker also commented on the acquisition during a conference call. (The complaint does not say with whom.) He said:

> We announced this morning the acquisition of the Ratbag Holdings, an Australian developer who expands our internal product development capabilities overseas. We are working closely with Ratbag in one of our key titles for next year. We believe with this is an opportunity to establish our development presence [in] the midst of the great pool of talent in Australia, and bring to Midway technical expertise and experience that will specifically help facilitate our development of multi-genre action games. We look forward to announcing the projects that our new Midway Studios Australia is developing.

(*Id.* ¶ 40.)

These statements convey nothing more to the would-be investor than the aspiration that acquiring Ratbag would advance Midway's strategic objectives; talk of "strengthening" and "facilitating" and "adding depth" and "expertise" falls far short of the threshold for concrete, materially false or misleading statements. Rather, these statements fall squarely within the category of "[v]ague statements about industry leadership and unquantified growth [that] are classic puffery, and are generally not actionable." *See Anderson v. Abbott Labs.,* 140 F.Supp.2d 894, 905 (N.D.Ill.2001), *aff'd,* 269 F.3d 806 (7th Cir.2001); *Tellabs I,* 437 F.3d at 597 (comparing optimistic puffery about projected growth and product demand with specific statement that demand for product "continue[s] to maintain its growth rate"). Defendants' statements that internal product development would be critical to Midway's business model and continued success do not—Plaintiffs' assertions to the contrary—render their statements about the acquisition of Ratbag more than a

mere attempt to "put a rosy face on an inherently uncertain process." *See Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir.1997) (optimistic sales predictions are immaterial puffery); *Roth v. OfficeMax, Inc.,* No. 05 C 236, 2006 WL 2661009, at \*4 (N.D.Ill. Sept.13, 2006) ("combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments" deemed puffery); *Sutton v. Bernard,* No. 00 C 6676, 2001 WL 897593, at \*3 (N.D.Ill. Aug.9, 2001) ("[t]he combination of our two dynamic cultures and their extraordinary success stories gives us amazing competitive strengths" deemed puffery); *In re Newell Rubbermaid Inc. Sec. Litig.,* No. 99 C 6853, 2000 WL 1705279, at ——2, 7 (N.D.Ill. Nov.14, 2000) (statements that merger "would create synergies, a 'stronger combined presence,' 'broader acquisition opportunities,' and a better ability to serve Europe" deemed puffery). Plaintiffs have failed to show that Defendants said or did anything more than publicly adopt a hopeful posture that its strategic plans would pay off. Such preening for the financial press is classic puffery.

**\*7** Even if these statements were not puffery, Plaintiffs cannot establish that they were false *when made.* Defendants falsely claimed that the Ratbag acquisition was part of a "strategy of adding depth to our internal product development organization," Plaintiffs allege, because their real yet "undisclosed" plan was to acquire Ratbag's customer base without acquiring any of its products or product developers, at least not for more than four months. (Consol.Am.Compl.¶¶ 38, 40–41.) Plaintiffs' only putative support for this allegation suffers from a basic chronological confusion: As Plaintiffs contend, "[t]he Complaint sufficiently alleges why these statements were false when made *as by October 2005,* Midway had already decided to terminate Ratbag's product developers and close the business down." (Opp'n at 11, emphasis added.) Obviously this fact, on its own, cannot establish that the decision had been made, or even contemplated, by *August* 2005. Moreover, while Plaintiffs have alleged facts showing that Midway shut down Ratbag in December 2005, they offer no factual basis for their claim that the decision to do so was made in October. (*Id.;* Consol. Am. Compl. ¶ 38.) This bald assertion does not satisfy the particularity requirements of the PSLRA.

Plaintiffs also allege that by omitting the following "adverse facts," Defendants rendered their statements—indeed, *all* of their pre-November 23, 2005 statements—materially misleading: *first,* Midway acquired Ratbag for the purpose

of obtaining its customer base, not its products or product developers, and always intended to close Ratbag "within months" of acquiring it; *second,* Midway would incur $13 million in incremental costs by closing Ratbag and firing the San Diego developers, creating additional cash needs for the company; *third,* as a result of the ensuing "desperate need for working capital," Midway would be forced into a $75 million convertible debt offering. (Consol.Am.Compl.¶¶ 42, 45.)

Plaintiffs' contention that the statements about Ratbag were materially misleading when made founders on the same temporal problem as their contention that the statements were false, as Plaintiffs continue to point to precisely the same fact: the "undisclosed plan" to buy Ratbag on the premise that owning a company for four months and then shutting it down at a $13 million loss is a plausible strategy for acquiring the target company's customer base. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990) ("[I]ndulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case."). Again, Plaintiffs do not allege any facts contemporaneous to the statements to support their theory that the "plan" had already been hatched—or that Midway's eventual debt offering was, at that time, a knowable consequence of the "plan" and the mounting need for cash it would create. In sum, Plaintiffs have alleged no facts (as opposed to conclusions) that Defendants' statements relating to the acquisition of Ratbag were false or misleading when made, or even material; thus, they have asserted no factual basis for § 10(b) liability against Defendants.

**\*8** The second category of statements comprises revenue and earnings guidances released in August and November 2005. During the August 4 conference call, Zucker announced:

> Turning to guidance. Partially due to the shortfall from the second quarter results, and also from our decision to move the release of our next premium PC title, The Rise and Fall Civilizations at War into the first quarter of 2006, we're revising our full year revenue guidance to approximately 200 million, down from previous estimate of with 225 million, and increasing our net loss

to approximately 60 million from our previous estimate of 47 million.

(Consol.Am.Compl.¶ 40.) On November 1, 2005, Midway announced further revisions in a press release:

> For the year ending December 31, 2005, Midway has revised its net revenue expectations in part due to re-scheduling certain products into 2006 from the fourth quarter of 2005, as well as lower-than-expected retailer reorders for several recently released titles, including *The Suffering: Ties That Bind and L.A. RUSH.* As such, for the year ending December 31, 2005, the Company now expects net revenues of approximately $145 million, compared with the Company's previous estimate of net revenue of $200 million. Additionally, the Company now expects a 2005 full year net loss of approximately $95 million compared with its prior guidance for a net loss of approximately $60 million.

(*Id.* ¶ 42.) The company issued another press release approximately one week later, on November 7, 2005, in which it repeated this statement verbatim and added that "For the quarter ending December 31, 2005, the Company expects net revenue of approximately $65 million, with a net loss of approximately $20 million." (*Id.* ¶ 43.) That same day, Defendants held a conference call in which Zucker again reiterated the substance of the November 1 and November 7 press releases and added that Midway "expect[s] to end the year [with] between $95 to $100 million in cash on the balance sheet." (*Id.* ¶ 44.) The rest of his remarks on the conference call were obvious puffery and Plaintiffs have not challenged them.

Plaintiffs allege that all of the revenue and earnings guidances were false or materially misleading when made and that Defendants knew as much: "defendants lacked any reasonable basis to represent expected losses of $20.0 million and $95.0 million for 4Q05 and FY05, respectively, because ***prior*** to making those statements, they had already

decided to shut down Ratbag and terminate its developers (along with other San Diego, California based product developers)." (Opp'n at 12; Consol. Am. Compl. ¶¶ 38, 45–46.) *See Katz v. Household Int'l, Inc.,* 91 F.3d 1036, 1040 (7th Cir.1996) (earnings forecast may be actionable as securities fraud if it is made without a "reasonable basis"). Thus, Defendants reason, the November guidances should have reflected the financial consequences of the decision to close Ratbag.

**\*9** Plaintiffs again rely on their conclusory allegation that Defendants' "undisclosed plan" was hatched in October 2005. That chronology could not impugn the August guidance, even if Plaintiffs provided some factual basis for this timeline. But they do not; indeed, they allege only one fact that relates to the timing of the decision to close Ratbag: the Form 8–K filed on December 16, 2005 states that *"[o]n December 14, 2005,* the Company's Board of Directors committed to a plan to reduce the Company's cost structure and increase product development synergy and efficiency" and then announces Midway's plan to close Ratbag and reduce its workforce by 8–11%. (Consol. Am. Compl. ¶ 46, emphasis added.) Plaintiffs seem to infer from this that the decision to close Ratbag must have been made sometime in October, since the guidances issued in early November were revised to reflect the closing of Ratbag *"a mere five weeks"* later, on December 16, 2005. (Opp'n at 12, double emphasis in original.) This nonsequitur does not support Plaintiffs' bald allegation that the decision to close Ratbag had in fact been made prior to the November guidances; even less does it show that the financial consequences of that decision were known, or could have been known, at the time those guidances were issued. Plaintiffs thus fail to plead the "when" of Defendants' alleged fraud with enough particularity—or lack of outright confusion—to satisfy either the PSLRA or Fed.R.Civ.P. 9(b). *See DiLeo,* 901 F.2d at 627 (Rule 9(b) required securities-fraud plaintiff to allege "the who, what, when, where, and how: the first paragraph of any newspaper story").

Thus, nothing in the complaint supports Plaintiffs' contention that any of the guidances were made without a "reasonable basis." Or put differently, Plaintiffs have not alleged facts "sufficient to support a reasonable belief as to the misleading nature of" any statements made by Defendants. *See Tellabs I,* 437 F.3d at 595. The facts alleged cannot support the conclusion that the guidances failed to reflect any information they should have reflected, and Plaintiffs do not allege that Defendants based the revisions announced in the November guidances on anything other than what they claimed to base

them on, namely, lower-than-expected reorders and delayed release dates for new products. As for Zucker's forecast that Midway would end the year 2005 with $95–$100 million in cash, Midway ended with $98,376,000. (R. 77, Ex. 5 at 2.) This lack of any false or materially misleading statement is an adequate basis for dismissal. *See, e.g., Gallagher v. Abbot Labs.,* 269 F.3d 806, 808 (7th Cir.2001) ("What sinks plaintiffs' position is their inability to identify any false statement—or for that matter any truthful statement made misleading by ... omission.").

Plaintiffs' inability to cite a single fact earlier than the announcement in the Form 8–K as support for their hypothesis of an "undisclosed plan" betrays the fraud-by-hindsight theory that quietly fuels their complaint. *See DiLeo,* 901 F.2d at 627–28 ("The story ... is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud."). This is precisely what the heightened pleading requirements of the PSLRA were designed to foreclose.

### *Scienter*

**\*10** Although Plaintiffs' failure to adequately allege any material misrepresentation or omission by Defendants is an adequate basis for dismissal, consideration of the particular difficulties that plague Plaintiffs' scienter allegations further highlights the fundamental deficiencies in the complaint.

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" that each named defendant acted with "intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756 (7th Cir.2007). For "forward-looking statements—predictions or speculations about the future," however, "actual knowledge of falsity, not merely indifference to the danger that a statement is false, is required for liability." *Tellabs III,* 513 F.3d at 705 (citing 15 U.S.C. § 78u–5(c)(1)(B)(ii)). The proper inquiry is "whether all the facts alleged, taken together, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II,* 127 S.Ct. at 2509. An inference of scienter is "strong" only if it is "cogent and compelling, thus strong in light of other explanations." *Id.* at 2510. Thus, a § 10(b) complaint will survive a motion to dismiss only if the inference of scienter is

"at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Plaintiffs argue that two factors, taken together, support a strong inference of scienter: *first,* "Defendants may be imputed with either knowing about or recklessly disregarding matters concerning key decisions that effect *[sic ]* the Company," namely, the cancellation of the Stainless Steel contract and the decision to shut down Ratbag; *second,* Defendants engaged in "unusual and suspicious insider trading." (Opp'n at 5.)

Plaintiffs first "impute" scienter to Defendants on the basis of a "core-operations theory:" Defendants can be credited with knowledge of the facts surrounding the Stainless Steel and Ratbag decisions because Defendants are "key officers" of Midway and these decisions involved "core operations of the company." (Opp'n at 6.) Indeed, these two "key, strategic decisions ... form the crux of defendants' Class Period scheme to mislead investors about the Company's cash needs." (*Id.* at 5.) Even assuming *arguendo* that Plaintiffs' theory is viable in this circuit, it speaks only to the question of *who* can be credited with knowledge of these decisions; it leaves open the question of *when* anybody knew anything. The complaint's basic chronological defects preclude any finding that the decision to close Ratbag is evidence of scienter in connection with the August or November statements: Plaintiffs, at the risk of belaboring the point, do not sufficiently allege that the decision had already been made when these statements were issued.

**\*11** Plaintiffs also cite the decision to cancel the Stainless Steel contract and develop *Rise & Fall* in-house as evidence that Defendants intended to mislead the public with the November guidances: Defendants, they say, knew or recklessly ignored the possibility that this decision would result in millions of dollars in incremental costs, drain Midway's working capital to the breaking point, and ultimately require the company to issue $75 million in convertible debt in May 2006. (*Id.* at 6; Consol. Am. Compl. ¶¶ 9, 55, 58.) Curiously, though, Plaintiffs do not claim that the November guidances—as opposed to statements made in February and May 2006—were rendered false or materially misleading by Defendants' failure to disclose these "adverse facts." (*Id.* ¶¶ 41, 45, 55, 58.) In effect, Plaintiffs argue that Defendants intended to deceive the public with the November guidances by withholding information, the absence of which did not render the guidances false or misleading in the first

place. Taken together, these aspects of the complaint are incoherent.

Moreover, Plaintiffs again fail to allege the "when" with sufficient particularity to support an inference of scienter in connection with the November guidances. This inference requires that Defendants knew—by November 1 or November 7, 2005—that the financial consequences of cancelling the Stainless Steel contract and developing *Rise & Fall* in-house would render the guidances false or misleading. *See Tellabs III,* 513 F.3d at 705 (15 U.S.C. § 78u–5(c)(1)(B)(ii) requires actual knowledge of falsity for liability premised on "forward-looking statements" like predictions). But no specific facts in the complaint support the conclusion that Defendants had even decided to cancel the Stainless Steel contract by November 1 or 7—Plaintiffs allege only that the decision was made "in November 2005" or "during November 2005," without further specification. (Consol.Am.Compl.¶¶ 9, 55, 58.) Even less do any specific facts support the conclusion, for example, that Defendants already knew that *Rise & Fall* contained an "abnormal[ly] high number of bugs," or that the cost of developing the game in-house would leave Midway "in desperate need for working capital," or that this cash shortage would require a $75 million convertible debt offering in May 2006. (*Id.* ¶¶ 9, 55, 58.) Given the facts as pled, none of these developments can support Plaintiffs' inference that Defendants intended to mislead the public on November 1 or 7, 2005. In essence, Plaintiffs complain that the decision to develop *Rise & Fall* in-house proved disastrously bad; Midway, as it turned out, was not up to the task without making costly investments in product-development infrastructure. Plaintiffs once again allege fraud by hindsight.

Lastly, Plaintiffs contend that Defendants' "unusual and suspicious insider trading" in December 2005 supplies "circumstantial evidence" that Defendants intended to deceive the public in their August and November 2005 statements. *See Tellabs I,* 437 F.3d at 604. What makes Defendants' stock sales "unusual and suspicious" is, of course, the timing: "they sold nearly all their stock immediately before the single largest shareholder, Redstone, announced that he had been accumulating Midway stock to collateralize a personal loan." (Consol.Am.Compl.¶ 62.) That revelation caused a "precipitous decline" in the value of Midway shares. (*Id.* ¶¶ 35, 50.) The timing of Defendants' extensive stock sales vis-à-vis Redstone's announcement does seem a little too perfect, and Defendants may well have possessed and traded on knowledge of Redstone's plan before

it was announced to the public. So Plaintiffs are correct that a strong inference of motive may be drawn from the facts alleged—but it would be a motive to hush up about Redstone's plan and sell their shares before he went public with it, not a motive to commit the specific fraud alleged in the complaint, i.e., to misrepresent the state of product development, cash flow, and capital reserves at Midway. Defendants' alleged fraud has no meaningful relation to the information that sent the price of Midway shares tumbling when it was disclosed, and it offers no explanation of why Defendants sold large blocks of their Midway shares immediately before that information was disclosed. If, however, Plaintiffs intend to argue that Defendants were engaged in an ongoing scheme since August or November to inflate the value of Midway stock with their alleged misrepresentations *because* they knew Redstone would announce his unfavorable intentions in December—an implausible scenario to say the least— Plaintiffs would, at a minimum, have to allege facts showing that Defendants knew of Redstone's intentions when they issued their August or November statements. They have not alleged any such facts. Thus, the stock sales do not support an inference that Defendants intended to deceive the public about the state of affairs at Midway. That inference of scienter is weak and ill-supported in its own right, and it is far from "strong in the light of other explanations." *See Tellabs II,* 127 S.Ct. at 2510. Defendants offer their own detailed explanation, on which the timing of their stock sales vis-à-

vis Redstone's announcement is wholly fortuitous. But there is no need to consider that explanation here; Plaintiffs have not, in any event, adequately pled a knowing fraud, and their complaint must be dismissed.

### *§ 20(a) Control-Person Liability*

**\*12** Claims under § 20(a) of the Securities Exchange act of 1934 are "derivative, requiring proof of a separate underlying violation of the Exchange Act." *Tellabs I,* 437 F.3d at 605 (citations omitted); *see* 15 U.S.C. § 78t(a). Plaintiffs have not adequately alleged the direct liability of any defendant, so their § 20(a) claim must also be dismissed. *See Pugh,* 521 F.3d at 698 (dismissal of § 10(b) and Rule 10b–5 claim mandates dismissal of § 20(a) claim).

### *CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Consolidated Amended Class Action Complaint is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3380653

---

### Footnotes

1    *See, e.g., In re Guidant Corp. Sec. Litig.,* No. 05 C 1658, 2008 WL 540848, at \*9–10 (S.D. Ind. Feb 27, 2008) ("though the law of other jurisdictions may indeed permit a plaintiff, in some cases, to bring a § 10(b) claim based in part on post-purchase statements, the Seventh Circuit's pronouncements to the contrary in *Roots* appears to us to be unequivocal"); *In re Career Educ. Corp. Sec. Litig.,* No. 03 C 8884, 2006 WL 999988, at \*2–3 (N.D.Ill. Mar.28, 2006) (applying *Roots* to hold plaintiff lacked standing to assert § 10(b) claim for post-purchase statements); *Davis v. SPSS, Inc.,* 385 F.Supp.2d 697, 705–06 (N.D.Ill.2005) (same); *Ong v. Sears, Roebuck & Co.,* 388 F.Supp.2d 871, 895–96 (N.D.Ill.2004) (same); *In re Discovery Zone Sec. Litig.,* 169 F.R.D. 104, 112 (N.D.Ill.1996) (applying *Roots* to reject "common course of fraudulent conduct" argument as means to extend class period beyond date of class representative's final stock purchase).

2    Defendants also argue that Plaintiffs' factual allegations patently fail to connect Defendants Allison, Boyle, Irribarren, or Powell to any actionable statements without relying on the so-called group pleading presumption that the PSLRA effectively abolished, at least in this circuit. *See Makor Issues & Rights, LTD. v. Tellabs, Inc.,* 437 F.3d 588, 602–03 (7th Cir.2006) (*"Tellabs I"), vacated on other grounds, Tellabs II,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179; *Makor Issues & Rights, LTD. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir.2008) (*"Tellabs II"* ) (explicitly "not disturb[ing]" this ruling on remand). The court need not consider this argument

since, for the reasons given below, the disputed statements do not support § 10(b) liability, no matter who made or is alleged to have made them.

---

**End of Document**                                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 1748741
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Allan ZISHKA, et al., On Behalf of Themselves
and All Others Similarly Situated, Plaintiffs,
v.
AMERICAN PAD & PAPER
COMPANY, et al. Defendants.

No. Civ.A.3:98-CV-0660-M.
|
Sept. 28, 2001.

*ORDER*

LYNN, J.

**\*1** Having considered the Motions to Dismiss filed by the Defendants on December 14, 2000, the Plaintiffs' Responses, the Defendants' Replies, supporting appendices, the applicable authorities, and the arguments at a hearing held on April 25, 2001, the Court is of the opinion that the Motions to Dismiss should be GRANTED in part, and DENIED in part.

On September 13, 2000, this Court entered its Memorandum Opinion and Order, granting the Defendants' Motions to Dismiss, but permitting the Plaintiffs an opportunity to replead. They did so by filing an Amended Complaint on October 30, 2000. Defendants again moved to dismiss.

The Court concludes that a limited number of the Plaintiffs' claims are sufficient under the Private Securities Litigation Reform Act. Most are not. The Amended Complaint is virtually entirely comprised of allegations of fraud-by-hindsight and is premised on vague statements of optimism by American Pad and Paper Company ("Ampad") and its executives. Such allegations are not sufficient under the Private Securities Litigation Reform Act ("PSLRA") or this Court's Order.

The Court will begin its analysis with the Bain Defendants-Bain Venture Capital and Defendants Wolpow, Gay & Lavine-as to whom the Plaintiffs' allegations are made only under Section 20(a) of the Securities Exchange Act of 1934, 15

U.S.C. § 78t(a). The allegations against the Bain Defendants are legally insufficient. Plaintiffs plead only that because the Bain investment funds owned 38%-50% of the stock of Ampad, and thus had the power to, and did, place three persons on the Ampad Board who were affiliated with Bain (Wolpow, Gay and Lavine), Bain and Wolpow, Gay, and Lavine are liable as control persons under Section 20(a). The Court holds that the Plaintiffs have not pleaded sufficient exercise of power and control by the Bain Defendants as to the challenged acts. Status alone as to persons not involved in day to day management is legally insufficient to support a Section 20(a) claim. *See Dartley v. Ergobilt Inc., et al.,* No. 3:98-CV-1442-M (N.D.Tex. Mar. 29, 2001) (Lynn, J.). *See generally, Abbott v. Equity Group, Inc.,* 2 F.3d 613, 615 n. 15 (5 th Cir.1993), *cert. denied,* 510 U.S. 1177 (1994); *Dennis v. Gen. Imaging, Inc.,* 918 F.2d 496 (5 th Cir.1990); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945 (5 th Cir.1981). Since Plaintiffs were given one additional opportunity to replead, and have not done so satisfactorily with respect to the Bain Defendants, the claims against the Bain Defendants are dismissed with prejudice.

The Court also dismisses with prejudice those claims regarding the LIFO reserves (Amended Complaint ¶¶ 28-31) except for those relating to rising costs of paper in late 1996 and early 1997. In the Court's view, the Amended Complaint adequately details the contention that the Defendants knew that during the last quarter of 1996 and the first quarter of 1997, paper prices were rising, but Ampad intentionally delayed adjusting the reserve. All other allegations regarding the LIFO reserves are dismissed with prejudice.

**\*2** Plaintiffs also adequately allege claims relating to Ampad's pricing policies providing protection against rising paper prices. The risk disclosures in Ampad's filings are insufficient to outweigh the apparently unsubstantiated and seemingly unjustified statements that Ampad had implemented a pricing strategy that would protect it in an era of rising prices. When prices rose, profits suffered. There is nothing before the Court explaining what objective facts justified the repeated and persistent trumpeting of the Company's pricing policy as a protection if paper prices began to rise.

The claims of improper revenue recognition and problems involving returns of goods (¶¶ 26-27 of Amended Complaint) are legally insufficient. Plaintiffs do not provide sufficient detail to support those allegations, such as describing specific transactions in which there was improper recognition,

the materiality of such transactions and any restatements resulting, including any alleged impact on the December 1997 charges. The claimed deficiencies in statements regarding returns and discounts or rebates are similarly defective. The risk disclosures in the prospectus clearly note that reserves and rebates will affect profitability. Reserves for returns and rebates were established and disclosed. The Complaint does not allege that the reserves were false nor does it allege the volume of returns, the materiality of same nor the impact on any restatement. The Court is not persuaded by the Plaintiffs' claims that the PSLRA permits Plaintiffs to impute knowledge to senior executives of what appear to be some plant-specific problems.

The allegations regarding the Williamhouse acquisition and the Williamhouse reporting system are inadequate and do not comply with this Court's Order directing that Plaintiffs set out when the Defendants discovered the problem, when they attempted to remedy it (which is not satisfied by a vague statement of a two year period), when they learned the attempted remedy was unsuccessful, and its dollar impact. These omissions render the allegations factually deficient.

Plaintiffs' allegations regarding introduction of new products, the effect of consolidation, the integration (or lack thereof) of acquisitions, and the failure to make new acquisitions are also fatally deficient. Plaintiffs identify no statement that a particular new product would be introduced at a particular time. The Shade and Williamhouse acquisitions undeniably brought product to Ampad that it did not sell previously, and they were acquisitions during the class period. Ampad guaranteed no particular acquisitions on any certain schedule

and also disclosed that the likely impact on Ampad of competition and consolidation was uncertain. These claims all fail for lack of detail, for lack of factual support, and due to the existence of clear risk disclosures in the prospectus and in later Ampad press releases.

Finally, Plaintiffs' Amended Complaint is wholly deficient in improperly attributing analysts' projections of earnings per share to individual defendants, when it is not alleged that the defendants made such projections, and in charging them with liability for miscellaneous generalized GAAP allegations (¶ 33). Such contentions do not satisfy the PSLRA.

**\*3** As to Benson and McAleer, scienter is not properly pleaded. One cannot divine a strong inference of fraudulent intent as to them from the Amended Complaint. Therefore, the claims against them are DISMISSED with prejudice.

As to Hanson and Gard, the few remaining allegations of false statements regarding Ampad's pricing policy and failure to disclose the need for an adjustment to the LIFO reserve are adequately stated, and scienter as to them is sufficiently alleged by their stock transactions. All other claims in the Amended Complaint are DISMISSED with prejudice. Plaintiffs are directed to submit within twenty days a new complaint striking the allegations dismissed herein, and adding no others.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1748741

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.