2013 WL 566805
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

CITY OF STERLING HEIGHTS
GENERAL EMPLOYEES' RETIREMENT
SYSTEM, et al., Plaintiffs,
v.
HOSPIRA, INC., Thomas E. Werner,
Christopher B. Begley, F. Michael Ball,
and James H. Hardy, Jr., Defendants.

No. 11 C 8332.
|
Feb. 13, 2013.

**Attorneys and Law Firms**

Edward Anthony Wallace, Wexler Wallace LLP, Chicago, IL, for Plaintiff.

Jack Reise, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, James E. Barz, Robbins Geller Rudman & Dowd LLP, Katharine Crane Byrne, Cooney & Conway, Kenneth A. Wexler, Kara Anne Elgersma, Wexler Wallace LLP, Chicago, IL, for Plaintiff.Mark Robert Filip, Joshua Z. Rabinovitz, Robert J. Kopecky, Kirkland & Ellis LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** This is a federal securities class action against Hospira, Inc., F. Michael Ball, Thomas E. Werner, Christopher B. Begley, and James H. Hardy, Jr. Plaintiffs have brought this action on behalf of themselves and all person or entities who purchased or acquired shares of Hospira between February 4, 2010 and October 17, 2011 (the "Class Period"). Plaintiffs allege that Defendants engaged in a fraudulent scheme to artificially inflate Hospira's stock price during the Class Period. Defendants have moved to dismiss the Amended Consolidated Class Action Complaint (the "Complaint"). (R. 75.) In response, Plaintiffs moved to strike Exhibits D, and

O–V from Defendants' memorandum accompanying their Motion to Dismiss, as well as "all references to and assertions based upon those materials" in the memorandum. (R. 90, Pls.' Mot. to Strike.) For the reasons discussed below, the Court grants Defendants' Motion to Dismiss in part without prejudice and denies in part Defendants' Motion to Dismiss. The Court also grants Plaintiffs' Motion to Strike.

**FACTUAL ALLEGATIONS**

**I. The Parties**
The Court appointed Plaintiffs Sheet Metal Fund, KBC Asset Management NV, Laborers Funds, and Roofers Fund to serve as Lead Plaintiffs in this case. (Am.Compl.¶¶ 17–20.) Each Plaintiff allegedly purchased Hospira stock at artificially inflated prices during the Class Period and suffered an economic loss "when the true facts about the Company's business and financial condition were disclosed and the stock price resultantly declined." (*Id.* ¶¶ 17–20.)

Defendant Hospira, formed in 2004 from a spin-off from Abbott Laboratories, "is a U.S.-based global pharmaceutical and medical device company headquartered in Lake Forest, Illinois, and describes itself as the world's leading provider of injectable drugs and infusion technologies." (*Id.* ¶¶ 35, 39.) Its products are "used by hospitals, clinics, long-term care facilities, and home healthcare providers." (*Id.* at ¶ 35.) In 2011, it had $4.1 billion in sales. (*Id.*)

Hospira conducts business primarily in three segments: 1) the Americas, including the United States, Canada, and Latin America; 2) Europe, the Middle East, and Africa; and 3) Asia Pacific, including Asia, Japan, Australia, and New Zealand. (*Id.*) Hospira markets products in each of these segments in three general categories: 1) specialty injectable pharmaceuticals ("SIP"), "which include approximately 200 injectable generic drugs that provide customers with lower cost alternatives to name brand products;" 2) other pharmaceuticals, including large volume intravenous ("IV") solutions and nutritional products and solutions for cleaning wounds and surgical sites; and 3) medication management systems, "which include electronic pumps to deliver IV fluids and medications to patients and other offerings to support the pumps." (*Id.* ¶ 36.) Hospira's Rocky Mount, North Carolina facility is among Hospira's largest facilities, producing "approximately 100 different injectable pharmaceuticals— or roughly half of Hospira's entire SIP portfolio" and

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

"account[ing] for 25% of [Hospira's] $4 Billion in annual revenue." (*Id.* ¶¶ 37, 38.)

 **\*2**  Defendant F. Michael Ball has served as the Chief Executive Officer ("CEO") of Hospira since March 28, 2011 and the Director of the Board since March 2011. (*Id.* at ¶ 22.) Defendant Thomas E. Werner is the Chief Financial Officer and Senior Vice President of Finance of Hospira. (*Id.* at ¶ 23.) Defendant Christopher Begley is the Executive Chairman of the Board of Hospira, and served as Hospira's CEO until March 28, 2011. (*Id.* at ¶ 25.)[1] Defendant James H. Hardy, Jr. served as the Senior Vice President of Operations from January 2011 until his departure from Hospira in April 2012. (*Id.* at ¶ 24.) Previously, Mr. Hardy served as Corporate Vice President, Supply Chain, from 2009 through 2010. (*Id.*)

[1]     The Court adopts the Complaint's practice of referring to Defendants Ball, Werner, Hardy, and Begley collectively as "Defendants." (Am.Compl.¶ 26.)

## II. Factual Allegations

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5. Plaintiffs contend that throughout the Class Period, while Defendants were "promising" to address issues raised by the FDA following inspections of Hospira's facilities, "they were actually making the problems worse by gutting quality control efforts through cost cutting aimed at boosting short-term profitability." (*Id.* at ¶ 3.)

In August of 2009, following an inspection of Hospira's Morgan Hill, California facility, the U.S. Food and Drug Administration ("FDA") issued a warning letter to Hospira. (*Id.* ¶¶ 116, 145.) The August 2009 Warning Letter raised issues "related to Hospira's corrective action plans with respect to the failure of certain AC power cords ... used on certain infusion pumps and related products." (*Id.* ¶ 145.)

In March of 2009, Hospira began Project Fuel, an initiative "with the stated purpose to increase shareholder value through the purported optimization of Hospira's operations." (*Id.* ¶ 45.) Defendants stated that Project Fuel would accomplish this goal by (1) identifying and eliminating underperforming and duplicative units and non-strategic assets; and (2) "reducing Hospira's global workforce by 10% through a 'de-layering' of its management structure, a consolidation of certain functions, and a 'heightening' of the Company's focus on 'process improvement.' " (*Id.* ¶ 17.) According to Plaintiffs, Project Fuel's "reduced operating budgets

and slashed workforces ... wreak[ed] havoc on Hospira's already declining quality control efforts, especially at Rocky Mount—the Company's largest facility." (*Id.* ¶ 47.) As a result, Project Fuel exacerbated Hospira's problems, including "quality and equipment failures, rejected products, production delays, and re-inspection delays." (*Id.* ¶ 59.)

In January of 2010, an FDA inspection of Hospira's Rocky Mount facility revealed significant problems with Hospira's quality control and drug validation processes. (*Id.* ¶ 4.) On April 12, 2010, the FDA issued a warning letter to Begley "identifying numerous violations of the Federal Food, Drug, and Cosmetic Act and its implementing regulations." (*Id.* ¶¶ 4, 107.) With respect to the Rocky Mount facility, the April 2010 Warning Letter noted the following: Hospira (1) "did not have adequate written procedures for production and process controls designed to assure that the drug products it manufactured had the identity, strength, quality, and purity they were purported to have"; (2) "had failed to adequately validate the mixing processes for certain products"; and (3) "had failed to submit adverse events reports to the Agency." (*Id.* ¶ 108.) The April 2010 Warning Letter also identified "Current Good Manufacturing" issues at Hospira's Clayton, North Carolina facility. (*Id.* ¶ 107.) The April 2010 Warning Letter allegedly showed that Hospira had failed to address the concerns raised about Hospira's facilities in the FDA's August 2009 Warning Letter. (*Id.* ¶ 4.) Plaintiffs allege that Defendants "were well aware of the Company's significant and varied operational deficiencies, particularly at Rocky Mount." (*Id.* ¶ 8.)

 **\*3**  Following a May/June 2011 inspection of Rocky Mount, on June 17, 2011, the FDA issued a Form 483 to Hector Jimenez, the Director of Quality at Rocky Mount, identifying 18 "manufacturing and quality control deficiencies." (*Id.* ¶ 112.) On August 4, 2011, the FDA issued another Form 483 addressed to Jonathan Waldron, Rocky Mount's Vice President of Operations, following a July/August 2011 inspection. The August 2011 Form 483 allegedly cited three deficiencies: (1) "Hospira's failure to thoroughly review the failure of a batch or any of its components;" (2) "the Company's laboratory controls not including the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards"; and (3) "the quality control unit's failure to fully follow applicable responsibilities and procedures, which resulted in numerous product lots being released for distribution despite having failing in-process and/or finished product results." (*Id.* ¶ 114.)

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 3 of 61 PageID #:2877

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Plaintiffs allege that from February 2010 through July 2011, Defendants knowingly or recklessly made various misleading or false statements or omitted statements of material fact regarding Project Fuel and Hospira's quality control issues, remediation efforts, and relationship with the FDA in Hospira's SEC filings, press releases, on conference calls, and at investor conferences. (*Id.* ¶¶ 142–219.) Defendants Begley and Werner also signed certifications for certain filings attesting that the filings complied with the requirements of the Exchange Act and that the information in them "fairly presented ... the financial condition and results of the operations of the Company." (*Id.* ¶ 145.) Plaintiffs contend that these alleged misrepresentations hid information from the market and "buoy[ed] Hospira's share price, allowing Defendants Begley and Werner to line their pockets during the Class Period with nearly $27 million in combined proceeds from unusual and suspicious insider stock sales." (*Id.* ¶ 220.)

After Hospira's disclosures at a September 7, 2011 "Investor Day," Hospira's stock price fell "approximately 13%, from a close of $45.61 on September 7, 2011, to a close of $39.51 on September 13, 2011." (*Id.* ¶¶ 221, 225.) Specifically, Plaintiffs allege that these disclosures revealed "the seriousness of Hospira's quality control and facility deficiencies at Rocky Mount," "the scope and cost of remediation efforts necessary to fix the problems," and "the fact that Project Fuel was not improving quality but was working against it." (*Id.* ¶ 225.) On October 18, 2011, Hospira "issued a press release announcing disappointing preliminary financial results for the third quarter of 2011." (*Id.* ¶ 234.) Plaintiffs allege that the press release also revealed for the first time "that Rocky Mount's operational woes were inhibiting service as inventory was not sufficient to make up for decreased production capacity." (*Id.* ¶ 234.) On November 28, 2011, RBC Capital Markets published a report concluding that "Hospira's manufacturing issues are far greater than investors realize and will take a minimum of 2–3 years to resolve." (*Id.* ¶ 243.) The Report also noted that based upon its authors "more recent conversations with experts," they were "inclined to believe a consent decree is more likely than not, which could have significant commercial implications for Hospira." (*Id.*) As a result, Hospira's stock price fell "approximately 9%, from a close of $30.98 on November 28, 2011, to a close of $28.17 on November 29, 2011, on unusually heavy trading volume." (*Id.* ¶ 246.)

**III. Alleged False or Misleading Statements**

**\*4** Plaintiffs allege that from February 2010 through July 2011, Defendants made various misleading or false statements or omitted statements of material fact regarding Project Fuel and Hospira's quality control issues in Hospira's SEC filings, on conference calls, and at investor conferences.

**A. February to March 2010**[2]

2    Because Plaintiffs allege that Defendants repeated the same allegedly misleading statements at numerous times, the Court, while considering the effect of the statements as a whole, will discuss in each grouping only those statements that were not previously discussed in prior sections.

On February 4, 2010, Hospira issued a press release announcing fourth-quarter and full-year 2009 financial results, which "was also filed with the SEC on [a] Form 8–K that same day." (Am.Compl.¶ 142.) The release quoted Begley as stating that Hospira has "made significant progress on many fronts, including ... advancing Project Fuel, our corporate-wide optimization initiative." (*Id.* ¶ 142.) The release further quoted Begley as stating, "Looking forward, we expect 2010 to be another good year of growth for Hospira." (*Id.*) On a February 4, 2010 conference call with analysts, Begley stated, "We kicked off Project Fuel, a corporate wide optimization initiative to drive long-term profitable growth and increase[ ] shareholder value, and we met the commitments we set forth for 2009." (*Id.* ¶ 143.) Begley noted that Hospira was "aggressively driving transformation throughout the organization" and that Project Fuel and other efforts would "optimize [Hospira's] productivity." (*Id.*)

In response to a question about the extent to which "FDA policy ke[pt][him] up at night, given all the regulatory submissions [Hospira's] got pending?," Begley answered, "we've got a very good relationship with the FDA, and we'll continue to work very closely with the FDA.... And so I don't mean to put it aside, but it's not something that keeps me up at night. The organization here is very well aware of the importance of working with the FDA and changing as their requirements change." (*Id.* ¶ 144.)

Hospira's 2009 Form 10–K filed on February 18, 2010 contained the following statements regarding Project Fuel and Hospira's remediation efforts: (1) "Hospira is actively involved in setting quality policies and managing internal and external quality performance. Its quality assurance department provides quality leadership and supervises its

quality systems."; (2) "In addition, higher production volume and cost reductions associated with Project Fuel and Facilities Optimization initiatives contributed to manufacturing efficiency gains." With regard to Hospira's receipt of FDA warning letters "alleging violations of applicable regulations and standards," the 2009 Form 10–K also acknowledged the letters and stated that, "Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues." The Form 10–K specified that the 2009 Warning Letter was "related to Hospira's corrective action plans with respect to the failure of certain AC power cords ... used on certain infusion pumps and related products." (*Id.* ¶ 145.) The Form 10–K further stated that "Hospira has responded to the warning letter and is working closely with the FDA to conclude this matter." (*Id.*) Lastly, the Form 10–K stated that Hospira's "facilities and equipment are in good operating condition and are well maintained." (*Id.*) An analyst report reacted favorably to the statements, concluding that "overall positive themes are intact with Fuel driven margin expansion and underlying growth in SIP still strong." (*Id.* ¶ 148.)

**\*5** In March of 2010, Werner participated in two conference calls. In the first conference call, Werner noted that Project Fuel was "adopted to drive operational excellence" and that it would "support further long-term growth," "consistent, sustainable shareholder value performance," and "increased efficiencies." (*Id.* ¶ 149.) In response to a question from the audience, Werner further noted with respect to Project Fuel that "We've been able to exceed just about every goal we've laid out" and that it was the type of project "where sort of the more we look, the more we find. We've had—I really can't think of any significant negative surprises." (*Id.* at 150.) In the second conference call, Werner noted that Hospira "continu[es] to be highly respected for our quality, reliability and manufacturing capabilities" and that Project Fuel "continues to have us very focused on the base business and its health." (*Id.* ¶¶ 151–52.)

### B. April to June 2010

On April 16, 2010, Hospira filed with the SEC a "Form 8–K, disclosing that the Company had received a warning letter, dated April 12, 2010, from the FDA in connection with the FDA's inspection of the Company's manufacturing facilities in Rocky Mount, North Carolina and Clayton, North Carolina." (*Id.* ¶ 154.) The Form 8–K noted that the Warning Letter had "cited Current Good Manufacturing Practice deficiencies and other inadequacies at those facilities, some of which were repeat observations." (*Id.*) Hospira stated that

it "t [ook] this matter seriously and intends to respond fully, and in a timely manner," and intended "a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.*) An April 18, 2010 analyst report "had minimal reaction to disclosure of the letter" and noted that the "impact of the FDA warning letter looks manageable." (*Id.* ¶ 155.)

On April 27, 2010, Hospira "issued a press release announcing its financial results for the first quarter of 2010, which was also filed with the SEC on a Form 8–K the same day." (*Id.* ¶ 156.) The release quoted Begley as stating that Hospira's "positive performance was driven by continued momentum in our Specialty Injectable Pharmaceuticals business, as well as by additional progress on our Project Fuel optimization initiatives." (*Id.* ¶ 156.) Hospira's April 27, 2010 first-quarter 10–Q reiterated that Hospira would be taking "a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 157.) On a conference call with analysts the same day, Begley and Werner made several statements addressing the April 2010 Warning Letter. Begley stated that he was confident Hospira could demonstrate its "commitment to not only implement these corrective actions, but also to ensure the global application of all improvements" and that Hospira was "raising our bar internally" and "redoubling our commitment to quality, proactively addressing certain product issues to ensure they meet our high standards." (*Id.* ¶ 159.) Werner noted Hospira was "in the process of implementing corrective actions." (*Id.*) Plaintiffs allege that Defendant Werner "attributed adjusted gross margin gains to 'improvements to manufacturing productivity, mainly as a result of Project Fuel efforts.' " (*Id.* ¶ 160.) In the question-and-answer session, Begley further stated that "It's part of the fabric of our culture, and we will do whatever it takes from a technology quality improvement standpoint to make sure that we are able to deliver the best product out there." (*Id.* ¶ 161.)

**\*6** At the Bank of America Merrill Lynch Health Care Conference on May 12, 2010, Werner noted that "Project Fuel had "transformed our organization ... driving operational excellence and freeing up capital to invest in areas for growth." (*Id.* ¶ 165.) Additionally, at the May 27, 2010 Citi Global Healthcare Conference, Werner stated that "we think that, particularly with Project Fuel, that we've positioned the Company for sustained growth ." (*Id.* ¶ 166.) On a June 2, 2010 conference call, Begley commented with respect to the regulatory issues identified at the Rocky Mount and Clayton facilities that "[N]either of those are systemic

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 5 of 61 PageID #:2879

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

issues to Hospira, and neither of those are systemic issues to the two plants either." (*Id.* ¶ 169.) He also added that "process improvements" were "taking frustration out of the organization." (*Id.* ¶ 168.) At the June 17, 2010 Goldman Sachs Global Healthcare Conference, Werner noted that "we're tracking very well with Project Fuel and I went back four or five quarters and it just continues to notch up." (*Id.* ¶ 170.)

**C. July to September 2010**
On July 28, 2010, Hospira issued a press release announcing its financial results for the second quarter of 2010 that was also filed as a Form 8–K the same day with the SEC. The release quoted Begley as stating that Hospira's results were "driven ... by continued momentum of our Project Fuel optimization initiatives." (*Id.* ¶ 172.) The release also noted that Hospira was "highly focused on executing our strategy of investing for growth" and "on driving quality improvements across our global manufacturing organization." (*Id.*)

On the same day, Hospira filed with the SEC its second-quarter 2010 Form 10–Q. The Form 10–Q reiterated that Hospira "ha[d] taken a number of actions to reduce operating costs and optimize operations," that Hospira was "working closely with the FDA to conclude th[e] matter [relating to the August 2009 Warning Letter]," and that Hospira "ha[d] begun to undertake a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 173.) The Form 10–Q also acknowledged that "Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters." (*Id.*)

On a July 28, 2010 conference call to discuss second-quarter 2010 financial results, Begley and Werner made several statements with respect to the status of the remediation plan with the FDA. Begley stated that "[w]e believe the FDA has [accepted] the remediation plan we laid out" and that Hospira was "now dedicated to fulfilling the planned commitments, the bulk of which we expect to complete by year-end." (*Id.* ¶ 175.) Begley also noted that "[w]e have taken our learnings from our Rocky Mount and Clayton facilities and are applying them to our manufacturing operations around the world to ensure that we meet the highest standards of quality going forward." (*Id.*) Begley and Werner further noted the success of Project Fuel in "driving improved operational performance." (*Id.*) Begley reiterated that Hospira simultaneously "remain[s] highly focused on our quality improvement efforts, working diligently to raise the standards

of quality across the Company and address the concerns of the FDA." (*Id.* ¶ 175 .) In the question-and-answer session following the call, Werner explained that the costs of the remediation plan "should really start to taper off as you progress through the fourth quarter [of 2010]." (*Id.* ¶ 176.) Begley noted that the FDA was "very pleased with some of the things that we are doing around creating some centralized functions here in Chicago from a quality standpoint ." (*Id.* ¶ 176.) Analysts reacted positively to the statements. (*Id.* ¶ 177.) During a subsequent conference call on August 12, 2010, Werner reiterated Hospira's "very strong track record for quality and reliability" and Project Fuel's focus on "driving operational excellence." (*Id.* ¶ 178.)

**\*7** On August 20, 2010, Defendants hosted a conference call with analysts regarding Hospira's CEO succession plan. (*Id.* ¶ 179.) In addressing his upcoming departure as CEO, Begley stated that "there is nothing more important for Hospira other than Project Fuel and all of our quality initiatives." (*Id.* ¶ 179 .) Begley further noted Hospira's "tremendous progress on the quality front." (*Id.*) At the September 13, 2010 Morgan Stanley Global Health Conference, Werner stated that he expected a "calmer regulatory environment" for Hospira in 2011 and that "the quality issues we've seen and others have seen in the industry will be largely behind us." (*Id.* ¶ 180.)

**D. October 2010 to January 2011**
Hospira issued a press release on October 26, 2010 with its 2010 financial results that it filed with the SEC on a Form 8–K on the same day. The press release quoted Begley as noting "continued contributions" from Project Fuel. (*Id.* ¶ 182.) Regarding the April 2010 Warning Letter, Hospira's third quarter 10–Q filed with the SEC on October 26, 2010 noted that Hospira "had made significant progress on completing a comprehensive review of its manufacturing operations" and that "Hospira took "immediate actions to address the FDA's concerns," including recalling certain products. (*Id.* ¶ 183.) The same day, at a conference call with analysts, Begley and Werner reiterated Hospira's "progress" on "quality improvement initiatives," compliance with the Warning Letter, and Project Fuel. (*Id.*) Analysts reacted favorably to the news. (*Id.* ¶ 186.) One analyst report noted Hospira's "quality improvements" were on track. (*Id.*) Subsequently, Hospira received two "buy" ratings. (*Id.* ¶ 187.) At the January 11 JP Morgan Healthcare Conference, Werner stated with respect to remediation plans that Hospira has "essentially completed all of the activities in the Clayton and Rocky Mountain facilities that we outlined in our response to the warning letter from the FDA" and that "we think we're on

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 6 of 61 PageID #:2880

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

a good path to bring things back to a more normal stage here in the first part of the year." (*Id.* ¶ 190.) Werner also stated "we're beginning to roll those changes out globally to all of our facilities." (*Id.*)

### E. February to March 2011

On February 2, 2011, Hospira issued a press release announcing its fourth quarter and full-year financial results and filed the press release with the SEC on a Form 8–K that same day. This press release repeated substantially the same statements about Project Fuel as in the press release announcing the third quarter results, referencing the "[i]mproved manufacturing efficiency from the company's Project Fuel optimization initiatives" and "cost savings from Project Fuel." (*Id.* ¶ 192.) On a conference call the same day, Begley stated that receipt of the warning letter "was a sizable pothole, but "we resolved to meet the FDA's expectations and raised our bar internally." (*Id.* ¶ 193.) Begley also stated that "we not only met our commitments for Project Fuel, our corporate-wide optimization initiative, but we over achieved many of our goals, allowing us to invest in key drivers of our business." (*Id.*) In addition, Begley stated that "[t]he optimized efficiencies we've achieved through Project Fuel and the focus it has instilled in the Company is driving us towards continual improvement and has enhanced our commitment to operational excellence." (*Id.*) Begley also discussed improvements to Hospira's quality-control system: "Of what is a very, very low-level complaint, we now do a thorough root cause analysis on and come up with a fix for it. Then the expectation is to incorporate that fix across the whole product line." (*Id.* ¶ 194.) Hospira's Form 10–K, filed on February 16, 2011, reiterated that "Hospira has responded to the 2010 warning letter and is working closely with the FDA to conclude the matter" and that Hospira's "facilities and equipment are in good operating condition and are well maintained." (*Id.* ¶ 195.)

### F. April to June 2011

**\*8** On April 26, 2011, Hospira issued a press release and filed a Form 8–K with information on its first-quarter 2011 earnings. The release quoted Begley as stating that Hospira had "made good progress in decreasing [its] level of backorders to better serve our customers" and that Hospira "remain[s] focused on driving quality enhancements throughout the organization and on improving shareholder value through strong execution and sustainable growth." (*Id.* ¶ 201.) The release also referenced "[i]mproved manufacturing efficiency from the company's Project Fuel optimization

initiatives." (*Id.*) The Form 10–Q that Hospira filed with the SEC on April 26, 2011 also contained statements substantially the same as in previous filings regarding Hospira's efforts to comply with and make progress on the April 2010 Warning Letter, as well as Hospira's goal "to achieve a culture of continuous improvement." (*Id.* ¶ 202.)

As in prior quarters, on April 26, 2011, Defendants hosted a conference call with analysts to discuss first-quarter 2011 financial results. On the call, Defendants made numerous statements regarding the April 2010 Warning Letter. Significantly, Defendant Begley stated that the "next major milestone is the inspection of our Rocky Mount facility" and that Hospira "ha[d] been diligently preparing for that inspection and look[ed] forward to the FDA's response." (*Id.* ¶ 204.) Regarding Project Fuel, Werner stated, "we have very successfully concluded this two-year optimization initiative and not only consistently met our initial commitments but overachieved them." (*Id.* ¶ 204.) Regarding Hospira's relationship with the FDA, Werner noted that the FDA "ha[d] been over to the Orchid Pan Am facility," as well as to "[Hospira's] factory in Croatia" and that both had received a "clean bill of health." (*Id.* ¶ 205.) Begley further noted that "we are encouraged with the inspections that have taken place at other facilities." (*Id.* ¶ 205.) Analysts reacted positively to the statements. One report stated that "[o]perating performance was strong in 1Q with progress on the SIP and MMS quality issues." (*Id.* ¶ 206.)

On April 27, 2011, Hospira participated in the Bank of America Merrill Lynch Healthcare Conference. Begley noted that Hospira was "moving through the quality issues with the FDA" and "starting to see light at the end of the tunnel here" and that "the back orders will also improve." (*Id.* ¶ 208.) On June 6, 2011, at the Sanford C. Bernstein Strategic Decisions Conference, Begley also commented that Hospira's inventory build-up was due to a "new quality system" that "increased [Hospira's] cycle times" and resulted "in work in process and raw materials beginning to build up as it takes us longer to release product underneath those new quality standards." (*Id.* ¶ 209.) Begley maintained that Hospira was not "capacity constrained." (*Id.*) At the June 8, 2011 Goldman Sachs Global Healthcare Conference, Werner noted Hospira's "focus ... on the quality initiatives and working with the FDA and getting the back orders down" and that Hospira "will act like the leader and use the quality improvements, hopefully, as a strength and a differentiator." (*Id.* ¶ 210.)

### G. July 2011

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 7 of 61 PageID #:2881

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

**\*9** On July 27, 2011, Hospira issued a press release discussing its second quarter 2011 financial results and filed the press release with the SEC on a Form 8–K. The release quoted F. Michael Ball as stating that Hospira "continued to advance the business and make progress on our quality and product supply improvement initiatives." (*Id.* ¶ 212.) Hospira's second-quarter 2011 Form 10–Q filed on July 27, 2011 also contained statements substantially similar to those in prior filings regarding Hospira's "comprehensive review of its manufacturing operations," Hospira's efforts to comply with the April 2010 Warning Letter, and Project Fuel's "contribut[ion] to net manufacturing efficiency gains." (*Id.* ¶ 213.)

During a July 27, 2011 conference call with analysts to discuss second-quarter 2011 earnings and the FDA's inspection of Rocky Mount, Defendant Ball noted the following:

> During the second quarter, the FDA completed an inspection of Rocky Mount, as expected. While we received verbal feedback acknowledging that we had made progress with respect to our validation processes, the agency was not fully satisfied. We received observations and are aggressively working to address their areas of concern. We have submitted a full response with corrective and preventative actions. We continue to interact and work with the agency to resolve our warning letter and fully comply with their expectations.

(*Id.* ¶ 215.)

Werner also acknowledged that "our focus on driving higher-quality manufacturing processes and products has impacted the timing of certain of our cost improvement and lean optimization efforts in manufacturing." (*Id.*) Ball noted that Hospira "remain[ed] focused on achieving our previously-projected range given [its commitment to providing customers with high-quality products] and our expected strong sales performance, subject to product approvals and progress on our remediation and service level efforts. We believe we are on track." (*Id.*)

During the question-and-answer session, Werner explained that Hospira's focus was on "product quality and getting our supply levels built back up." (*Id.* ¶ 216.) Ball reiterated that "we need to ensure that we are making the highest quality products, the highest quality processes, we have to get things remediated." (*Id.*) Defendant Werner also discussed the return of the FDA to Hospira facilities and that Hospira had received a Form 483. Specifically, with respect to the Form 483, Werner stated that "[w]e're not expecting there

to be a substantial amount of additional cost, it's just heavy lifting and working through it." (*Id.*) Werner further noted that Hospira "did receive some verbal acknowledgment that we had made some good progress, but unfortunately, it was not to the full satisfaction of the agency, and we're working very cooperatively with them to move forward." (*Id.*) Ball stated that Hospira was "taking all necessary steps in order to support Rocky Mount," noting that Hospira had deployed quality specialists and consultants to Lake Forest and "increased the number of quality people in Rocky Mount by some 20 folks going to 30 more people." (*Id.*)

## ANALYSIS

**\*10** On April 18, 2012, the Court appointed the Institutional Investor Group and the Laborers and Roofers Funds as Lead Plaintiffs and Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as lead counsel .[3] (R. 63.) On June 25, 2012, Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Complaint"). (R. 75.) Both counts in the Complaint are premised on securities fraud arising out of the purchase of Hospira's common stock. In count one, Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. Count two alleges that the Individual Defendants violated Section 20(a) of the Exchange Act. Defendants moved to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b) (6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the heightened pleading mandates of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4. In response, Plaintiffs moved to strike Exhibits D, and O–V from Defendants' memorandum accompanying their Motion to Dismiss, as well as "all references to and assertions based upon those materials" in the memorandum. (R. 90, Pls.' Mot. to Strike.)

3    The Executive Committee reassigned this case from the Honorable William Hibbler to this Court on March 19, 2012. (R. 60.)

## I. Motion to Strike

Generally, in deciding a motion to dismiss, courts look only to matters within the four corners of the complaint. *See* Fed.R.Civ.P. 12(d); *Tierney v. Vahle,* 304 F.3d 734, 738–739 (7th Cir.2002). The Seventh Circuit, however, recognizes exceptions for "documents attached to the complaint, documents that are critical to the complaint and referred to in

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 8 of 61 PageID #:2882

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

it," as well as "information that is subject to proper judicial notice." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir.2012). If the court looks to documents other than the complaint and those that fall within these exceptions, the court must convert the motion to one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(d); *Wright v. Assoc. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir.1994); *Ennenga v. Starns,* 677 F.3d 766, 773 (7th Cir.2012). With respect to the "incorporation by reference" exception, "[t]he purpose ... is to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir.2002); *Tierney,* 304 F.3d at 738 (7th Cir.2002) ("[W]ere it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit."). The classic example of a document falling within the exception is a contract in a breach of contract suit. *Tierney,* 304 F.3d at 738.

With respect to the "judicial notice" exception, a court "[t]aking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment." *Ennenga,* 677 F.3d at 773. Federal Rule of Evidence 201 provides that a court may take judicial notice of "a fact that is not subject to reasonable dispute" because it (1) "is generally known within the trial court's territorial jurisdiction;" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *Ennenga,* 677 F.3d at 773–74. Nevertheless, judicial notice "merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts." *Doss v. Clearwater Title Co.,* 551 F.3d 634, 640 (7th Cir.2008).

### A. Procedural Mechanism of Motion to Strike

**\*11** As a threshhold matter, Defendants argue that Plaintiffs' Motion is procedurally improper because Federal Rule of Civil Procedure 12(f) only provides for motions to strike pleadings, and a motion to dismiss is not a pleading under the Federal Rules. (Defs.' Opp. Mot. to Strike 4–5.)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). While Rule 12(f) does not explicitly authorize a motion to strike documents other than pleadings, courts routinely entertain such motions. *See, e.g., Ind. Ins. Co. v. Westfield Ins. Co.,* 10 C 2660, 2010 WL 3404971, at

\*3 (N.D.Ill. Aug.26, 2010) (denying motion to strike portions of response to motion to dismiss); *Unytite, Inc. v. Lohr Structural Fasteners, Inc.,* 91 C 2849, 1992 WL 34143, at \*6 (N.D.Ill. Feb.13, 1992) (granting motion to strike affidavit and exhibit in plaintiff's response to motion to dismiss); *Hanover Ins. Group v. Singles Roofing Co.,* 10 C 611, 2012 WL 2368328, at \*9 (N.D.Ill. June 21, 2012) (granting motion to strike unauthorized and untimely supplemental response brief to preliminary injunction motion). This authority comes from the Court's inherent power to strike impermissible filings. *Cf. Cleveland v. Porca Co.,* 38 F.3d 289, 297 (7th Cir.1994) (upholding district court's discretion to strike filing not provided for by the Local Rules); *see also In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.,* 763 F.Supp.2d 423, 581–82 (S.D.N.Y.2011) (noting the district court's "inherent authority to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances" in deciding motion to strike exhibits from a motion to dismiss).

Regardless of whether the authority for Plaintiffs' Motion is Rule 12(f) or the Court's inherent power, the Court will address the merits of it, namely, which documents the Court may consider in deciding Defendants' Motion to Dismiss.

### B. Disputed Exhibits

#### 1. Exhibits T–V: Hospira's Proxy Statements

Defendants argue that the Court may take judicial notice of Exhibits T, U, and V, which, respectively, are Hospira's 2010, 2011, and 2012 proxy statements. (Defs.' Mem. Exs. T, U, V.) Defendants cite to these documents to "show[ ] the increase in Defendants Begley and Werner's Hospira stock holdings during the class period." (Defs.' Opp. Mot. to Strike 11.)

The Seventh Circuit has not addressed whether a district court on a motion to dismiss in a securities fraud action may properly take judicial notice of the truth of the statements contained in proxy materials. Other circuits have concluded that the court may take judicial notice only of the fact that the statements as public records contain certain statements, but not the truth of the statements themselves. In *Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991), the Second Circuit held that a district court did not err in taking judicial notice of a joint proxy statement and an offer to purchase that were not part of the complaint in deciding a motion to dismiss a securities fraud action, when the documents at issue were "the very documents that [were] alleged to contain the various misrepresentations or omissions." *Kramer v. Time*

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 9 of 61 PageID #:2883

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

*Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991). The Second Circuit emphasized that the documents were "relevant not to prove the truth of their contents but only to determine what the documents stated." *Id.* Subsequently, the Fifth, Eleventh, and Third Circuits have followed *Kramer* 's approach. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999) ("[W]e hold that a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed."); *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) (holding that on a motion to dismiss that SEC filings "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents."); *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000) (finding *Kramer* 's reasoning persuasive). This approach is also consistent with the holdings of courts in this District. *See, e.g., George v. Kraft Foods Global, Inc.,* 674 F.Supp.2d 1031, 1044 (N.D.Ill.2009) ("[A] court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein." (internal quotation marks omitted)); *Hernandez v. Midland Credit Mgmt., Inc.,* 04 C 7844, 2006 WL 695451 (N.D.Ill. Mar.14, 2006) (citing cases noting that "SEC filings may be considered for their content, but not for the truth of statements therein"); *Riggs Ptrs., LLC. v. Hub Group, Inc.,* 02 C 1188, 2002 WL 31415721, at *1 (N.D.Ill. Oct.25, 2002) ("[T]he court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein.").

**\*12** The Court agrees with the holdings of these cases. Here, in arguing that Plaintiffs have not made a sufficient showing of scienter based upon Begley's and Werner's stock sales, Defendants ask the Court to take judicial notice not only of the fact that the proxy statements contain certain sales data for Begley and Werner, but the truth of that sales data. Otherwise, such information would not be relevant to the issue of scienter. Moreover, this approach is consistent with the Seventh Circuit's decision in a related context in *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354 (7th Cir.1995), which upheld the district court's ruling not to take judicial notice of the number of a company's employees from a 10–K form in determining punitive damages at trial, where there was "considerable argument over the significance of the 10–K form." *Hennessy v. Penril Datacomm Networks, Inc.,*

69 F.3d 1344, 1354 (7th Cir.1995). While citing *Kramer* in recognizing that some courts had found judicial notice of SEC filings appropriate, the Seventh Circuit nonetheless held that the "fact in question here was not capable of accurate and ready determination by resort to the 10–K." *Hennessy,* 69 F.3d at 1355.

Defendants' argument that the proxy statements merely "aggregate ... in one place" the sales data from the Form 4s is unavailing. (Defs.' Opp. Mot. to Strike 12.) Defendants fail to specify which proxy statements or portions thereof aggregate the data from which Form 4s, which is not obvious given that the Form 4s and the proxy statements cover different time periods. Indeed, this lack of clarity demonstrates that the facts that Defendants wish the Court to take judicial notice of are not susceptible to "accurate and ready determination."

The Court declines to take judicial notice of Exhibits T, U, and V strikes them from the record.

**2. Exhibits O–S: Form 4s for Defendants' Begley and Werner**
Exhibits O–S are Hospira SEC Form 4s filed in 2010 and 2011 reflecting changes in beneficial ownership of securities for Defendants Begley and Werner. (R. 87–4.) Although Plaintiffs neither cite nor reference the Form 4s in their Complaint, Defendants contend that the Complaint incorporates the Form 4s by reference because the sales data in the Complaint "match[es] the data provided in the SEC Form 4s documenting those sales." (Defs. Opp. Mot. to Strike 8.) Significantly, Defendants argue that these Forms "detail both halves of the dual-faceted transactions" and show that Werner and Begley "actually acquired more shares than they sold in all but one of their stock transactions." (*Id.* at 2, 8.) Thus, according to Defendants, "the Court may assume that Plaintiffs obtained the information in their complaint from Exhibits O–S, and so incorporated those documents by reference." (Defs.' Opp. Mot. to Strike 7.)

In support of their Motion, Plaintiffs cite the Seventh Circuit's opinion in *Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). In *Wright,* the Seventh Circuit upheld the district court's consideration of the entirety of a health insurance risk plan administration agreement in deciding a motion to dismiss where the plaintiff failed to attach the agreement to his complaint but "repeatedly quote[d] from and refer[ed] to the Agreement in his complaint" and the agreement was "central" to the plaintiff's claims. *Wright,* 29 F.3d at 1248 (noting plaintiff's allegations that

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 10 of 61 PageID #:2884

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

the "Agreement grant[ed] him a property interest in his employment, of which the defendants deprived him without due process of law" and that the agreement was "the contract with which the defendants allegedly interfered").

**\*13** The Seventh Circuit has not addressed, however, whether a plaintiff incorporates by reference those documents that contain the same data as the complaint but which plaintiffs neither cite to nor reference in their complaint. While Defendants argue that the Form 4s are "central" to the Plaintiffs' claim, there are notable differences between the contract in *Wright* and the Form 4s. Unlike in *Wright,* in which the plaintiff contended that the contract gave rise to the rights of which the defendant had allegedly deprived him, here, plaintiffs raise the stock sales as facts supporting but one element of their § 10(b) claim. Further, unlike the contract in *Wright,* it is not entirely clear where Plaintiffs here obtained the alleged stock information. Defendants also contend that the Court may properly consider the Form 4s on a motion to dismiss because otherwise, Plaintiffs could impermissibly evade dismissal by failing to acknowledge that Defendants not only sold but bought Hospira stock over the Class Period. Whether or not Defendants bought or sold more Hospira stock over the Class Period is not determinative of whether Plaintiffs have adequately alleged scienter, however, as *Tellabs* instructs courts to consider the allegations of scienter collectively. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 326, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179 (2007) (*"Tellabs"* ).

Moreover, the same reasoning in *Kramer* and *Hennessy* that weighs against considering the proxy statements also applies here. As with the proxy statements, Defendants cite to the Form 4s not to show which statements they contain, but for the purpose of demonstrating that the Defendants bought or sold a particular amount of stock during the Class Period. (Defs.' Opp. Mot. to Strike 8; Defs.' Mem. 18–19.) In other words, in challenging Plaintiffs' scienter allegations on the basis of data in the Form 4s, Defendants rely upon these documents for "the truth of their contents" as opposed to the fact of "what the documents stated." *Kramer,* 937 F.2d at 774.

Ultimately, however, the Court need not reach this issue. Because Defendants rely upon the Form 4s to challenge Plaintiffs' scienter allegations, and the scienter inquiry turns on other allegations,[4] the Court will not decide this issue.

[4]  Although the Court concludes that Plaintiffs have adequately pled scienter under the PSLRA with respect

to certain statements, the stock sale allegations are not dispositive of the Court's scienter rulings.

### 3. Exhibit D: FDA Report

Exhibit D is a copy of a June 15, 2012 U.S. House of Representatives Committee on Oversight and Government Reform staff report entitled "FDA's Contribution to the Drug Shortage Crisis." (Mot. to Dismiss, Ex. D.) ("FDA Report"). Plaintiffs argue that the Court may not consider the FDA report on two grounds: (1) it was neither referenced in the Complaint nor is it central to the Plaintiffs' claims; and (2) Defendants cite the FDA Report to make an impermissible "factual argument about the FDA's alleged increased enforcement against manufacturers of generic injectable pharmaceuticals." (Pls.' Mem. Mot. to Strike 4.)

**\*14** Defendants cite to the FDA report in support of the allegation that "[a]t around the same time that Hospira initiated Project Fuel, the FDA began to raise its expectations for manufacturers of generic injectable pharmaceuticals through increased enforcement activity during routine inspections." (Defs.' Mem. 5.) Specifically, Defendants assert that the "number of warning letters sent by the FDA increased" by certain percentages from 2009 to 2010 and from 2010 to 2011; that these increases "clearly show a dramatic change in [sic] FDA's regulatory approach"; and that "nearly all of America's major producers of generic injectable medications were essentially required to remediate facilities at the same time." (*Id.* at 5, 6.) Defendants argue that the Court may properly take judicial notice of the Report as a public record and "the facts in those exhibits on which Defendants rely." (Defs .' Opp. Mot. to Strike 8.)

The Court declines to take judicial notice of the FDA Report. Here, Defendants ask the Court to take judicial notice of the facts contained in the report, namely, that the number of warning letters sent by the FDA increased from 2009 to 2010 and from 2010 to 2011. According to Defendants, since the number of warning letters cited in the Report "can be accurately and readily determined by visiting the FDA's website and reviewing each of those letters," the Court may take judicial notice of the number of warning letters as an uncontested fact. (Defs.' Opp. Mot. to Strike 10.)

Defendants' argument is unpersuasive for several reasons. First, although Plaintiffs do not dispute the fact of whether the number of warning letters increased from 2009 to 2010 and 2010 to 2011, these facts, nonetheless, are not "readily determined from sources whose accuracy cannot reasonably

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 11 of 61 PageID #:2885

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

be questioned." Although the FDA website does contain copies of warning letters issued in 2009, 2010, and 2010, it also designates certain warning letters in these years as "not issued," which denotes that a "close-out letter" has issued, a distinction which Defendants fail to address. *See* http:// www.fda.gov/ICECI/Enf orcementActions/ WarningLetters/2009/default.htm. Moreover, the fact of the increase in the number of letters, as one that involves a calculation—albeit a straight-forward one in theory—may, in reality, be subject to interpretation in a way that other typically judicially noticed facts are not. *See, e.g., Pugh v. Tribune Co.,* 521 F.3d 686, 691 n. 1 (7th Cir.2008) (taking judicial notice of stock prices); *Deicher v. City of Evansville,* 545 F.3d 537, 541 (7th Cir.2007) (holding district court did not abuse discretion in taking judicial notice of filing date of complaint). Finally, the cases Defendants cite in support of their argument are distinguishable. Those cases involve courts taking judicial notice of a few warning letters, not the extrinsic fact of the total number of warning letters issued in a year, and in *U.S. ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 756 (S.D.Tex.2010), only the fact of the warning letter itself, and not the truth of its contents. *See Van Koenig v. Snapple Beverage Corp.,* 713 F.Supp.2d 1066, 1073 (taking judicial notice of several FDA warning letters and responses addressing the use of the term "natural"); *U.S. ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 756 (S.D.Tex.2010) ("The letter only informs St. Jude that its promotion of its surgical ablation device violated FDA regulations. The court may take judicial notice of this document without resolving whether its contents are true."); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation,* 271 F.Supp.2d 1224, 1234 (E.D.Cal.2003) (taking judicial notice of senate and house reports while noting to the "extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

 **\*15** The Court declines to take judicial notice of Exhibit D and strikes those references to it in Defendants' Motion to Dismiss.

### 4. Stock Transaction Chart

Plaintiffs also object to Defendants' inclusion of a "stock transaction chart" in Defendants' memorandum accompanying its Motion to Dismiss on the ground that it improperly "summarizes information from Exhibits T, U, and V to assert that Defendants Begley and Werner ultimately increased their Hospira stock holdings after the class period." (Pls.' Mot. to Strike 5.); (Defs.' Mem. 19.) The chart shows the number of shares held by Begley and Werner in March 2010, March 2011, and March 2012, and the percentage change in the number of shares held from year to year. Defendants appear to have drawn the entries from Exhibits T, U, and V, Hospira's 2010–2012 proxy statements. As the Court has already declined to take judicial notice of the contents of Exhibits T, U, V, it will not do so for the summary of such exhibits.

## II. Legal Standard

In order to state a securities fraud claim under Section 10(b), Plaintiffs must allege the following elements of a fraud claim under Section 10(b): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[5] *Janus Capital Grp., Inc. v. First Derivative Traders,* —— U.S. ——, —— n. 3, 131 S.Ct. 2296, 2301 n. 3, 180 L.Ed.2d 166 (2011); *see also AnchorBank FSB v. Hofer,* 649 F.3d 610, 617 (7th Cir.2011). To succeed on a § 10(b) claim, a plaintiff must show that the defendant "made material misrepresentations or omissions." *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, ——, 131 S.Ct. 1309, 1317, 179 L.Ed.2d 398 (2011).

[5]     Defendants' Motion to Dismiss does not challenge that Plaintiffs' have adequately pled the third through sixth elements of a § 10(b) claim.

### A. Rule 12(b)(6)

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011) (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 12 of 61 PageID #:2886

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570); *see also McCauley v. City of Chicago,* 671 F.3d 611, 616–17 (7th Cir.2011).

### B. Rule 9(b) and the PSLRA

**\*16** Under Federal Rule of Civil Procedure 9(b), Plaintiffs must state with particularity the circumstances constituting fraud. Fed.R.Civ.P. Rule 9(b). Rule 9(b) requires a plaintiff to allege the "who, what, when, where, and how" of the fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 649 F.3d 436, 441–42 (7th Cir.2011).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further increases the pleading standard in securities fraud cases. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 594 (7th Cir.2006) *vacated and remanded on other grounds,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (*"Makor I"* ) ("The PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading—one that exceeds even the particularity requirements of Federal Rule of Civil Procedure 9(b).") Congress enacted the PSLRA as a "check against abusive litigation by private parties." *Tellabs,* 551 U.S. at 313. Indeed, "[e]xacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313.

The PSLRA provides that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4.

Under *Tellabs,* "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756 (7th Cir.2007) (quoting *Tellabs,* 551 U.S. at 314). Courts must also "take into account plausible opposing inferences." *Higginbotham,* 495 F.3d at 756 (quoting *Tellabs,* 551 U.S. at 323). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319. In the Seventh Circuit, "reckless disregard of the truth" qualifies as scienter.[6] *S.E.C. v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998). "[R]ecklessness in this context is 'an extreme

departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 704 (7th Cir.2008) (*"Makor II"* ). In considering allegations of scienter, a court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324. In describing whether an inference of scienter is "cogent" under the *Tellabs* inquiry, the Seventh Circuit has noted that the "plausibility of an explanation depends on the plausibility of the alternative explanations." *Makor II,* 513 F.3d at 711. "Thus, "[a]s more and more alternatives to a given explanation are ruled out, the probability of that explanation's being the correct one rises." *Id.* (citations omitted). Courts should not "scrutinize each allegation in isolation but ... assess all the allegations holistically." *Tellabs,* 551 U.S. at 326. While "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference ... the absence of a motive allegation is not fatal." *Id.* at 325.

6      The Supreme Court has reserved the question of whether "recklessness" may satisfy scienter in this context. *Matrixx,* 131 S.Ct. at 1309 ("Because Matrixx does not challenge the Court of Appeals' holding that the scienter requirement may be satisfied by a showing of "deliberate recklessness," we assume, without deciding, that the standard applied by the Court of Appeals is sufficient to establish scienter.").

### III. Information from Former Undisclosed Hospira Employees

**\*17** In the Complaint, Plaintiffs allege facts based upon information from undisclosed former Hospira employees. Defendants argue that the Court should "steeply discount" allegations based upon information from these undisclosed employees. In *Makor I, Higginbotham,* and *Makor II,* the Seventh Circuit addressed the extent to which plaintiffs may rely on confidential sources to satisfy the heightened pleading requirements of the PSLRA. In *Makor I,* the Seventh Circuit noted that if plaintiffs support their allegations with confidential sources, they "must ... describe their sources with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged,' or in the alternative provide other evidence to support their allegations." *Makor I,* 437 F.3d at 596 (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 13 of 61 PageID #:2887

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Cir.2000) (citation omitted)). The complaint, however, need not "provide 'name, rank, and serial number' for each of these sources." *Id.* In *Higginbotham,* which followed *Makor I* and *Tellabs,* the Seventh Circuit reasoned that the *Tellabs* "competing inference" analysis requires courts to "discount allegations that the complaint attributes to ...'confidential witnesses.' " *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 757 (7th Cir.2007) ("To determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals.") In *Makor II,* the Seventh Circuit clarified that a particularly troubling use of the confidential sources prompted the holding in *Higginbotham.* There, the plaintiffs described the witnesses "merely as three ex-employees of Baxter and two consultants" and sought to rely upon them exclusively to establish scienter. *Makor I,* 513 F.3d at 712.

Plaintiffs have sufficiently described their sources "to support the probability that a person in the position occupied by the source would possess the information alleged." *Makor I,* 437 F.3d at 596. For each undisclosed employee, Plaintiffs have provided the job title, duration of employment at Hospira, and a description of employee responsibilities. Unlike in *Higginbotham,* Plaintiffs rely upon the information from undisclosed sources to corroborate and particularize their allegations that Defendants' statements were misleading in light of the employees' observations and opinions regarding conditions at Hospira, rather than to allege a basis for the misleading nature of the statements that is otherwise absent from the Complaint. Thus, the Court will consider the allegations attributed to confidential witnesses and discount them as appropriate in determining whether Plaintiffs have alleged each false statement with particularity.

**IV. Alleging Statements or Omissions with Particularity**
Defendants argue that Plaintiffs have failed to satisfy the PSLRA requirement to plead allegedly false or misleading statements with particularity. Under the PSLRA, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4. With respect to whether Plaintiffs have sufficiently pled that the statement is false or misleading, "the relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.' " *Makor I,* 437 F.3d at 595. Although "[m]ere silence about even

material information is not fraudulent absent a duty to speak ... If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995). Moreover, "[t]he more important a fact would be to investors, the more likely its omission will mislead them." *Silverman v. Motorola, Inc.,* No. 07 C 4507, 2008 WL 4360648, at *10 (N.D.Ill. Sept.23, 2008). In assessing whether a plaintiff has pled false or misleading statements with particularity, the Court must not consider allegations in "isolation," but instead must look to the complaint in its entirety. *Tellabs,* 551 U.S. at 322–23.

**\*18** The Court will consider each category of alleged false or misleading statements below.

**A. Failure to Disclose Rocky Mount's Facilities Were Nowhere Near "Operational Excellence"**
Plaintiffs allege that throughout the Class Period that Defendants made the following statements or descriptions connecting Project Fuel with "operational excellence":[7]

7  Although the Court concludes that other similar-sounding statements that Project Fuel was "really serving to transform the company" constitute puffery, Plaintiffs' specific allegations that Defendants accompanied these statements with references to either "driving quality," or Hospira's "reputation of quality," "meeting the highest levels of compliance with all of our products," and "very strong track record for quality and reliability," distinguish them in context and thus require a different analysis. (*Id.* ¶¶ 160, 163, 175, 178.)

(1) "We remain on track with our optimization program, which is designed to simplify our business and drive quality and operational excellence to obtain top-tier financial performance." (*Id.* ¶ 160.)

(2) Project Fuel was "[a]n aggressive enterprisewide optimization initiative we adopted to drive operational excellence and generate top financial performance." (*Id.* ¶ 163.)

(3) "We remain on track with Project Fuel and we are pleased with our progress on this organization wide optimization program. As many of you know, Project Fuel is designed to simplify our business and drive continuous improvement and operational excellence in order to obtain top tier financial performance." (*Id.* ¶ 175.)

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 14 of 61 PageID #:2888

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

(4) "[I]t really was about driving operational excellence, improving margins, driving additional cash flow ...." (*Id.* ¶ 178.)

Plaintiffs assert that these statements omitted material facts with respect to Hospira's Rocky Mount facility because "Rocky Mount's manufacturing operations were nowhere near 'operational excellence' but in fact suffered from serious issues with regard to quality control and deterioration of its facilities and equipment." (*Id.* ¶¶ 153(a), 171(a), 181(a), 191(a), 200(a), 211(a).)

In support of this argument, Plaintiffs allege that "Project Fuel's cutbacks" resulted in "quality and equipment failures, rejected products, production delays, and re-inspection delays." (Am.Compl.¶ 59.) Based upon information from a former Rocky Mount Quality Engineer, Plaintiffs contend that Rocky Mount was "constantly exceeding acceptable quality levels for broken glass because management 'had to make their numbers.' " (Am.Compl.¶ 62.) A former Rocky Mount Line Coordinator also identified a problem with mixing solutions that was "attributable to the mixing team either not having been properly trained or being understaffed for the mixing portion of the production process." (*Id.* ¶ 64 .) In addition, Plaintiffs allege that the Rocky Mount Quality Engineer noted that "there were 10% budget cuts 'across the board, and [q]uality was cut.' " (*Id.* ¶ 53.) Plaintiffs further contend, as supported by information from a former Rocky Mount Technician, that as a result of Project Fuel, Hospira "got rid of the quality people," which had the effect of shifting quality control responsibilities onto the "people running the line—the production folks." (*Id.* ¶ 54.) In turn, this allegedly altered Hospira's standard operating procedures ("SOPs"), such that they "specified how production personnel were now responsible for quality control inspections and doing checks of completed products." (*Id.*) Furthermore, Plaintiffs allege that the above statements made from February to March 2010 were misleading in light of Hospira's receipt of "failure to supply" penalties. (*Id.* ¶¶ 95–99.)

**\*19** Defendants argue that Plaintiffs have failed to allege with particularity that Defendants failed to disclose quality issues at Rocky Mount on two grounds: (1) Defendants disclosed the receipt of the FDA Warning Letters and Form 483s throughout the Class Period; and (2) Defendants disclosed both back orders at Rocky Mount and the receipt of "failure to supply" penalties. (Defs.' Mem. 33–34.) Plaintiffs, however, have alleged that Defendants failed to disclose in particular the effect of Project Fuel on Hospira's quality-control efforts by "reduc[ing] operating

budgets and slash[ing] workforces" such that it "wreak[ed] havoc on Hospira's already declining quality control efforts, especially at Rocky Mount ." (Am.Compl.¶ 47.) Plaintiffs support these allegations with information from numerous former Rocky Mount employees connecting Project Fuel with deficiencies at Rocky Mount. (*Id.* ¶¶ 49–82.) Moreover, Plaintiffs have alleged that Rocky Mount was a significant plant for Defendants, accounting for 25% of Hospira's annual revenue. (*Id.* ¶ 38.) On the record before the Court and viewing the allegations in the light most favorable to the Plaintiffs, Plaintiffs have alleged with sufficient particularity that the alleged omissions regarding Project Fuel's impact on the Rocky Mount facility were misleading. *See Brasher v. Broadwind Energy, Inc.,* 11 CV 991, 2012 WL 1357699, at \*22 (N.D.Ill. Apr.19, 2012); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 401 (S.D.N.Y.2005) (holding plaintiffs satisfied particularity requirement with respect to statements "concerning the sources and significance of the revenue generated by VDM Specialists" where such statements "put the sources of VDM Specialists revenue at issue").

### B. Facilities and Equipment in "Good Operating Condition" and "Well–Maintained"

Next, Plaintiffs contend that the following statement, which appeared in both Hospira's 2009 and 2010 Form 10–Ks was false or misleading:

"Hospira believes that its facilities and equipment are in good operating condition and are well maintained." (*Id.* ¶¶ 145(b), 153(b), 195, 200(b).)

In support of this contention, Plaintiffs rely on Defendant Hardy's statements at the September 7, 2011 "Investor Day" event that Hospira's facilities were "aged" and "in need of a 'facelift,' " (*Id.* ¶ 221), as well as information from the Rocky Mount Quality Assurance Validation Engineer[8] "that Hospira failed to make necessary improvements at Rocky Mount because it was unwilling to spend the money to do so," including improvements to Rocky Mount's SOPs and its "archaic, DOS-based computer information system 'from the 80s.' " (*Id.* ¶ 84.) In addition, according to various former employees, the Rocky Mount facility had such problems as a leaking ceiling, mold in the asceptic room, defective dipsticks used to "measure mixtures of solutions in large vessels," a failed isolator used to fill glass vials used on a line that "produced roughly 115,000 to 120,000 units a day," as well as a failing depyrogenation tunnel "used to sterilize glass vials" to meet validation. (*Id.* ¶¶ 84, 86–91.) Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

have alleged with the requisite specificity that Defendants made false or misleading statements regarding the condition of Hospira's facilities. *See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Allscripts–Misys Healthcare Solutions, Inc.,* 778 F.Supp.2d 858, 879–80 (N.D.Ill.2011); *Ross v. Career Educ. Corp.,* 12 C 276, 2012 WL 5363431, at \*5 (N.D.Ill. Oct.30, 2012) (holding allegedly false statements regarding placement rates satisfied particularity requirement where plaintiffs "clearly identify the source of each particular allegation" and "explain[ ] in each paragraph of the complaint exactly which [confidential witness] reported what information").

8      Plaintiffs allege that the former Rocky Mount Quality Assurance Validation Engineer "worked for Hospira at its Rocky Mount plant from June of 2010 to December 2011" and "was responsible for quality engineering, including evaluating and remediating deficiencies in the quality assurance practices at Rocky Mount." In addition, they allege that the "former Rocky Mount Quality Assurance Validation Engineer was tasked with bringing the plant's validation program 'more in line' with 'what was seen in the industry' at that time." (Am.Compl.21n.13.)

### C. "Very Good Relationship" with the FDA
 **\*20**  During the question-and-answer session of a February 4, 2010 conference call to discuss full-year 2009 financial results, Defendant Begley stated the following in response to questions as to "what extent ... FDA policy ke[pt] [him] up at night, given all the regulatory submissions [Hospira's] got pending?" and "what's the risk?":

First of all, we've got a very good relationship with the FDA, and we'll continue to work very closely with the FDA.... And so—and I think we are on top of it. And so I don't mean to put it aside, but it's not something that keeps me up at night. The organization here is very well aware of the importance of working with the FDA and changing as their requirements change. (*Id.* ¶ 144.)

Plaintiffs allege that the statement that Hospira "has a very good relationship with the FDA" was false or misleading notwithstanding Hospira's disclosure of its receipt of the August 2009 Warning Letter from the FDA in its 2009 Form 10–K. (*Id.* ¶ 144–45, 153(d).) Plaintiffs contend that the August 2009 Warning Letter stated that the violations addressed in it "may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems" and that "[Hospira] should investigate and determine the

causes of the violations, and take prompt actions to correct the violations and to bring your products into compliance ." (*Id.* ¶¶ 116, 120.) Plaintiffs also maintain that the April 2010 Warning Letter, which resulted from the FDA's January 2010 inspection of Rocky Mount noted the following: "[W]e are concerned about the length of time your firm has needed to develop and implement its Validation Prioritization Plan at the Rocky Mount Facility. You have been aware of our concerns regarding process validations since 2005." (*Id.* ¶ 109.) The word "relationship" is ambiguous, however, and these other allegations do not suggest that the relationship between Hospira and the FDA was poor. Thus, Plaintiffs have failed to allege these statements were false or misleading with sufficient particularity.

### D. "Systemic Issues"
On June 2, 2010, Begley participated in the Sanford C. Bernstein Strategic Decision Conference. (*Id.* ¶ 167.) With respect to the FDA and Hospira's regulatory issues, Begley stated that "[n]either of those are systemic issues to Hospira, and neither of those are systemic issues to the two plants either." (*Id.* ¶ 169.)

Plaintiffs allege that "contrary to Defendants assurances," the problems identified by the FDA were "systemic" because Project Fuel required "across the board sacrifices" throughout Hospira's manufacturing facilities. (*Id.* ¶ 171(e).) Additionally, Plaintiffs maintain that numerous quality issues "resulted in widespread production slowdowns as early as 2010." (*Id.* ¶ 95 .) To support these assertions, Plaintiffs rely upon information from undisclosed former Hospira employees who worked at different locations, including the Austin Production Supervisor, based in Austin, the former Accounting Manager, based in Lake Forest, Illinois, and other former employees of the Rocky Mount facility. (*Id.* ¶¶ 49–58.) Moreover, following the Class Period, Defendant Ball noted at an October 18, 2011 conference call that issues at Rocky Mount "had implications that were greater than anticipated" and that "[r]eceiving two 483s so close together was a clear signal that we were not making satisfactory progress to fully comply with the FDA's concerns and that we had to ramp up our remediation efforts." (*Id.* ¶ 235.) Specifically, Ball acknowledged that Hospira "did not anticipate the degree to which the production slowdown and resulting charges would impact performance through the rest of September" and lacked "visibility into the magnitude of the reversal in customer service levels." (*Id.* ¶ 234.) *Compare In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.,* 859 F.Supp.2d 572, 578 (S.D.N.Y.2012) ("Although the Complaint describes

all of these statements ... as 'false,' it does not allege any facts contradicting their veracity.") Accordingly, Plaintiffs have sufficiently plead with particularity under the PSLRA that the statements were false or misleading.

### E. Statements Regarding Hospira's Efforts to Address the FDA Warning Letters

**\*21** Defendants broadly challenge Plaintiffs' allegations that Defendants made false or misleading statements regarding Hospira's efforts to comply with the FDA Warning Letters. (Defs.' Mem. 28.) The Court will consider each category of statements below.

### 1. "Comprehensive Review of Manufacturing Operations," "[C]omplet[ing]" Responses to the Warning Letter, and "Roll[ing] [O]ut" Changes

Plaintiffs identify the following statements in this general category:

(1) "Hospira will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (*Id.* ¶ 157).

(2) "We think we have essentially completed all of the activities in the Clayton and Rocky Mount facilities that we outlined in our response to the warning letter from [the] FDA. At some point they'll be back in the facilities. There's not an official lifting of the warning letter as of—per se, but we fulfilled all of the things that we need to do essentially. (*Id.* ¶ 190.)

(3) "And more importantly or as important, we're beginning to roll those changes out globally to all of our facilities so that when [the] FDA shows up wherever and whenever, they should expect to see a very consistent approach to things across all Hospira facilities in the U.S. and globally." (*Id.* ¶ 190.)

Plaintiffs allege that these statements were false or misleading because Hospira's Rocky Mount facility "was plagued with deficiencies that were well known within Hospira in 2010 and only increased heading into 2011" and that "Hospira had not made any concerted effort to remediate the issues identified in the April 2010 Warning Letter until after it received the June 2011 Form 483 identifying 18 more problems at Rocky Mount." (*Id.* ¶ 121.) Among other allegations, Plaintiffs point to a former Rocky Mount Batch Release Specialist's description of a consultant's visit to Rocky Mount between January and March of 2011, in which the consultant gave

a powerpoint presentation entitled "something to the effect" of "10 Things in the Lab that Will Shut the Plant Down ." Subsequently, Rocky Mount's management allegedly "had 'harsh words' with the consultant. (*Id.* ¶ 122.) In addition, Plaintiffs allege that according to a former Rocky Mount Quality Assurance Validation Engineer, "it was not until after the FDA had issued the Form 483 in June 2011 that 'you heard a lot of talk about timelines' " and that "corporate vice presidents [were] sent to Rocky Mount after the June 2011 Form 483 to assist in dealing with the plant's quality issues." (*Id.* ¶ 123.)

Defendants argue that Plaintiffs fail to plead these allegations with particularity because "Plaintiffs' own 'confidential' witness allegations establish that Hospira was making an effort to address the FDA's concerns." (Defs.' Mem. 28.) Plaintiffs allege facts raising contrary inferences, however, such that, according to the former Rocky Mount Quality Assurance Validation Engineer, Hospira "only began to 'dabble' in remediation efforts" after the April 2010 Warning Letter and had no "sense of urgency." (*Id.* ¶ 124.) Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have satisfied the particularity requirement with respect to these statements. *See Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 821 (N.D.Ill.2000) ("We agree with KPMG that GAAP does provide for some flexibility in the timing of revenue recognition. However, drawing all reasonable inferences in favor of the plaintiffs ... they have sufficiently alleged that Sabratek's revenue recognition practices violated GAAP.").

### 2. "Tak[ing][FDA][M]atters [S]eriously" and "[W]orking [C]losely with the FDA"

**\*22** Similarly, Plaintiffs allege the following statements are misleading:

(1) "Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility." (*Id.* ¶ 183.)

(2) "The FDA's Warning Letters are publicly available on the FDA's website. Hospira takes all of these matters seriously and intends to respond fully, and in a timely manner, to the FDA's Warning Letters." (*Id.* ¶ 183.)

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 17 of 61 PageID #:2891

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

Plaintiffs have failed to allege with particularity that these statements are false or misleading. Although these statements also concern Hospira's efforts to address the Warning Letters, the factual allegations Plaintiffs rely upon to establish that they are false or misleading are insufficient. With respect to the first statement, Plaintiffs fail to allege that Hospira did not recall products in response to the April 2010 Warning Letter. Furthermore, Plaintiffs fail to allege facts showing that Hospira did not "take[ ] seriously" the FDA Warning Letters. Like the statements concerning Hospira's "relationship" with the FDA, these statements are ambiguous, and Plaintiffs do not allege facts showing that Defendants did not intend to respond to the FDA's Warning Letters.

### 3. "Open Investigations" Trending Downward

During the question-and-answer portion of a February 2, 2011 conference call, Defendant Begley stated the following:

> Of what is a very, very low-level complaint, we now do a thorough root cause analysis on and come up with a fix for it. Then the expectation is to incorporate that fix across the whole product line. So you've seen a couple spikes like that, that have had a recent impact, but I don't see that occurring long term through the business and creating situations like we just had in Q4. And on the SIP overall, it's driven to the difficulty of us getting product out the door as efficiently as we used to, but as I talked about, we are beginning to see the light at the end of the tunnel there. And the key metric that we look at is our internal investigations and the number of open investigations we have and the aging of that. We review all of that data literally at my level weekly at the Thursday meeting, and there's people looking at the data on a daily basis, and all of those trends are downwards in each of our manufacturing plants, so that's a real positive sign. What it says is you are not opening up new investigations at all and the fact that the age is less says you're driving root cause more quickly and implementing those changes. I really believe a good piece of this is behind us as we move forward. (*Id.* ¶ 194).

Plaintiffs allege that Hospira knowingly or recklessly omitted to disclose that despite the fact that " 'open investigations' were in fact trending 'downwards,' " " 'open investigations' at Rocky Mount, Hospira's largest facility, were actually ballooning throughout 2011." (*Id.* ¶¶ 194, 200(d).) Plaintiffs rely upon information from the former Rocky Mount Senior Production Supervisor, who described an increase in open investigations at Rocky Mount from between 8 and 10 to 45 or 50 per month. (*Id.* ¶ 101.) Plaintiffs allege, however, that the Rocky Mount Senior Production Supervisor "worked in the flexible container group" of Hospira and then "from February 2011 until his departure in November 2011 ... worked in the small volume unit in Rocky Mount's R2 building." (*Id.* at 33 n. 21.) Given that Begley made the above statement on February 2, 2011, and Plaintiffs have alleged that the Rocky Mount Senior Production Supervisor did not join Rocky Mount until February 2011, his observations are insufficient. Therefore, Plaintiffs have failed to satisfy the PSLRA particularity requirements for this statement.

### V. Puffery

**\*23** "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor I,* 437 F.3d at 596 (7th Cir.2006). If "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement is material." *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)). "[M]ateriality is typically an issue to be resolved by the finder of fact. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1333 (7th Cir.1995) (quoting *TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133). Thus, "[i]f the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.* at 596; *Searls,* 64 F.3d 1061, 1066 (7th Cir.1995) (describing puffery as a "devoid of any substantive information."). Because puffery "contains no useful information upon which a reasonable investor would base a decision" it is nonmaterial. *Id.* at 1066.

Defendants argue that "nearly all the alleged statements that Plaintiffs allege were fraudulent are immaterial puffery." (Defs.' Mem. 24.) Defendants identify the following kinds of statements as examples of puffery:

> (1) "Hospira believes that its facilities and equipment are in good operating condition and are well maintained." (Am.Compl.¶¶ 145, 195)

> (2) "We believe [Project Fuel] is really serving to transform the company." (*Id.* ¶ 149.)

> (3) Hospira is "working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products." (*Id.* ¶ 178.)

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 18 of 61 PageID #:2892

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

(4) "Hospira aims to achieve a culture of continuous improvement that will enhance its efficiency, effectiveness and competitiveness and substantially improve its cost base." (*Id.* ¶¶ 202, 213.)

(5) Hospira is "redoubling [its] commitment to quality" and "raising the bar internally." (*Id.* ¶¶ 159, 175.)

The Court will consider each of the statements that Defendants argue are puffery below.

### A. *"Hospira believes that its facilities and equipment are in good operating condition and are well maintained."*

This statement appeared in the Hospira 2009 and 2010 Form 10–Ks filed with the SEC on September 18, 2010 and February 16, 2011. The Form 10–Ks also contained statements that Hospira had "developed definitive action plans" in response to "notices from regulatory authorities alleging violations of applicable regulations and standards." (*Id.* ¶¶ 145, 195.) The 2009 Form 10–K also acknowledged that Hospira had initiated voluntary recalls to address the issue. (*Id.* ¶ 145.)

Viewing the statement in the context of the "total mix" of information, it does not amount to puffery as a matter of law. First, as the statement specifically refers to the present condition of Hospira's facilities and equipment, it is different from a vague aspiration or "indefinite prediction." *Searls,* 64 F.3d at 1066–67 (noting "indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact"); *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993) (distinguishing "[p]redictions of future growth" from "expressions of belief or opinion concerning current facts" "because [predictions of future growth] will almost always prove to be wrong in hindsight.") Moreover, Plaintiffs allege that the statement was made in Hospira's 10–Ks, which also mentioned Hospira's receipt of warning letters identifying quality-control issues at Hospira's facilities. Thus, notwithstanding the generality of the statement, given the context, it is not so lacking in specificity or unconnected from other facts that the Court may conclude at this stage that the statement is entirely "devoid of any substantive information." *Searls,* 64 F.3d at 1066; *see also Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir.2000) (noting defendants statements that "the inventory situation was 'in good shape' or 'under control' were not puffery).

### B. *"We believe [Project Fuel] is really serving to transform the company."*

**\*24** In context, this particular statement, which describes Project Fuel as "transforming" Hospira in terms of "support[ing] further long-term growth" and "consistent, sustainable shareholder value performance," is too vague to constitute material information. (*See* Am. Compl. ¶ 149.) Rather, the statement is the type of "rosy affirmation" that public companies regularly use to describe their initiatives. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217, *abrogated on other grounds by statute* (1st Cir.1996) (holding statements that DEC was "basically on track," and that spokesperson was "confident that DEC was pursuing the right strategy" were immaterial puffery); *see also In re Ford Motor Co. Sec. Litig., Class Action,* 381 F.3d 563, 570 (6th Cir.2004) ("All public companies praise their products and their objectives."); *Allscripts–Misys,* 778 F.Supp.2d at 872 (holding statement "regarding Version 11 and its contribution to helping Allscripts become the 'Bloomberg of healthcare' " immaterial puffery). Similarly, the statements that Project Fuel has "positioned the Company for sustained growth" and "optimized [Hospira's] operations and refined [Hospira's] culture," as well as those describing the plan as a "corporate wide optimization initiative to drive long-term profitable growth and increased shareholder value" are devoid of substantive factual material and constitute puffery.[9] (*See* Am. Compl. ¶¶ 189, 166, 143.)

9    In the alternative, Defendants argue that the PSLRA safe-harbor for forward-looking statements protects these statements. (Defs.' Mem. 35.) Because the Court concludes that these statements are puffery, the Court need not reach this argument.

### C. Hospira is *"working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products."*

This statement does not constitute puffery as a matter of law. Like the statement regarding the condition of Hospira's facilities, this statement, while general in nature may in context alter the total mix of information for a reasonable investor. Plaintiffs allege that Defendant Werner made the statement at a Specialty Pharmaceuticals Conference, in which he allegedly referenced Hospira's "very strong track record for quality and reliability." (*Id.* ¶ 178.) Notably, Plaintiffs allege the statement was made shortly after the release of Hospira's second-quarter 2010 financial results on July 28, 2010 and that analysts "reacted positively" to the

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 19 of 61 PageID #:2893

City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

results. (*Id.* ¶ 177.) *See Desai v. Gen. Growth Props., Inc.,* 654 F.Supp.2d 836, 854 (N.D.Ill.2009). Therefore, at this stage, the Court cannot conclude that the statement constitutes puffery as a matter of law. *See In re Spiegel, Inc. Sec. Litig.,* 382 F.Supp.2d 989, 1028 (N.D.Ill.2004).

### D. *"Hospira aims to achieve a culture of continuous improvement that will enhance its efficiency, effectiveness and competitiveness and substantially improve its cost base."*

Similar to the statement regarding Project Fuel's "transformation" of Hospira, this statement is devoid of substantive factual matter. Even accounting for the context, the phrase "culture of continuous improvement" is an expression of corporate optimism that "so clearly constitut[es] the opinions of the speaker" such that a reasonable investor would not consider it material. *In re Ford Motor Co. Sec. Litig., Class Action,* 381 F.3d 563, 571 (6th Cir.2004) (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996)).

### E. *"Redoubling Commitment to Quality" and "Raising the Bar Internally"*

**\*25** Plaintiffs contend throughout their Complaint that various statements about Hospira "raising the bar internally" and "redoubling commitment to quality" are material. (*See* Am. Compl. ¶¶ 159, 175.) Similarly, these statements' "lack of specificity precludes [them] from being deemed material." *See Searls,* 64 F.3d at 1066; *Anderson v. Abbott Laboratories,* 140 F.Supp.2d 894, 905 (N.D.Ill.2001), *aff'd sub nom. Gallagher v. Abbott Laboratories,* 269 F.3d 806 (7th Cir.2001) (noting statements about "unquantified growth are classic puffery").

### VI. Scienter

Plaintiffs allege the following bases for Defendants' scienter: (1) Defendants' stock sales; (2) Defendants' alleged misleading statements themselves; and (3) Defendants' participation in meetings and receipt of reports regarding Hospira's remediation efforts. While considering the allegations in the Complaint as a whole, the Court will describe each set of allegations separately.

First, Plaintiffs allege that Begley's and Werner's stock transactions during the Class Period constitute evidence of scienter. Plaintiffs allege that Defendants "were motivated to artificially inflate Hospira's stock price during the Class Period in order to line their own pockets with the proceeds of insider stock sales." (Am.Compl.¶ 269.) Specifically, Plaintiffs contend that Begley sold "roughly 64% of his share holdings" in June 2010 when the share price was "near its Class Period high." (*Id.* at ¶ 269 .) Similarly, Plaintiffs allege that Werner, "beginning in June 2010 and continuing through early 2011" sold "over 86% of his stock holdings." (*Id.* at ¶ 270.) Because "neither Defendant Begley nor Defendant Werner sold any Hospira stock in the five years prior to the start of the Class Period ... [these sales] were thus unusual and suspicious in both timing and amount." (*Id.* at ¶ 271.) Additionally, according to Plaintiffs, Defendants were "motivated to hide the true scope of the Company's operational troubles and thereby keep Hospira's market value artificially inflated so that they could successfully raise $500 million in a September 2010 debt offering." (*Id.* at ¶ 272.)

Next, Plaintiffs argue that "the fact that Defendants made false and misleading statements ... itself supports a strong inference of scienter." (Pls.' Mem. 32.) ("Simply put, an inference can be made that Defendants knew of what they spoke.")

Finally, Plaintiffs rely on their allegations regarding Defendants' monitoring of Hospira's remediation efforts through meetings and reports to support scienter. (Pls.' Mem. 33.) Specifically, Plaintiffs allege that "Defendant Begley called weekly management meetings to review Hospira's progress in its Company-wide remediation efforts." (Am.Compl.¶ 128.) During the second-quarter 2010 earnings call on July 28, 2010, Begley explained that at such weekly meetings he would "review[ ] the progress on the plan, not only for Clayton and Rocky Mount, but the status of [Hospira's] initiatives across all of our manufacturing plants." (*Id.*) Defendants also "held weekly management meetings every Thursday morning that included all plant-level quality control managers." At the fourth-quarter and full-year 2010 earnings call on February 2, 2011, Begley noted at the meetings that the "senior leadership team" would discuss "inventory and related issues with "every plant manager and plant quality control manager from around world." (*Id.* ¶ 129.) Furthermore, Plaintiffs allege that Defendants held " 'Town Hall meetings in which the Company's top executives discussed, among other things, ongoing issues with the FDA." (*Id.* ¶ 130.)

**\*26** Plaintiffs have sufficiently alleged scienter under the PSLRA regarding Defendants' statements that Hospira's plants were "in good operating condition" and "well-maintained," statements that Hospira's regulatory issues were

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 20 of 61 PageID #:2894
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2013 WL 566805, Fed. Sec. L. Rep. P 97,287

not "systemic," those statements regarding Hospira's efforts to address the FDA Warning Letters that Plaintiffs have alleged with particularity, and the alleged failure to disclose Rocky Mount's facilities were "nowhere near operational excellence." Defendants' participation in various meetings on Hospira's remediation efforts support the inference that they were aware of the quality-control issues at Rocky Mount and other Hospira facilities. Although allegations that executives attended meetings or received reports on a problem do not exclusively support an inference of scienter, *see Zimmer,* 679 F.3d 952, 955 (upholding lack of scienter where plaintiffs allegations included that executives "attended meetings at which quality issues were discussed"), the circumstances allegedly surrounding these particular meetings merits pause. Plaintiffs allege that Begley called weekly management meetings "to review Hospira's progress in its Company-wide remediation efforts" and that management met with "every plant manager and plant quality control manager from around world" to discuss "inventory and related issues." (Am.Compl.¶¶ 128, 129.) Viewing the facts as alleged in the light most favorable to Plaintiffs, these meetings were not routine, but specifically directed to addressing Hospira's remediation and quality control issues at its various facilities. Moreover, Plaintiffs allege that the August 2009 Warning Letter advised Defendants that "certain identified issues may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems." (*Id.* ¶ 127.) *See Allscripts–Misys Healthcare Solutions,* 778 F.Supp.2d at 885 (N.D.Ill.2011).

Plaintiffs' allegations respecting Hardy's statement at the close of the Class Period that Hospira had inherited "aged" facilities, combined with the allegations noted above, also raises an inference that Defendants' prior statements about the facilities being in "good condition," if indeed false, were made with knowledge or recklessness toward their falsity. In addition, Plaintiffs allege that between January and March of 2011, Begley "received a presentation from a well-respected consultant that addressed the Company's quality problems" and that Begley met personally with the FDA "as part of the Company's response to the April 2010 Warning Letter." (Am.Compl.¶¶ 133–34, 136.) These allegations raise an inference that is at least, if not more, compelling than the inference that Defendants made these statements without scienter. Indeed, if the statements as to the condition of Hospira's facilities were in fact false or misleading, it is difficult to imagine a non-culpable explanation as to how Defendants, given their monitoring of Hospira's plants in connection with Hospira's remediation efforts and quality-

control problems, could have made the statements without scienter.

**\*27** Nor do Defendants' disclosures on conference calls of the existence and purpose of such meetings significantly undercut the inference of scienter. While the disclosures of the meetings addressed to Hospira's quality-control issues may weigh against the conclusion that the statements were misleading, they are not dispositive of the issue as to whether, if such statements were misleading, Defendants knew or recklessly disregarded these facts.

Defendants argue that *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,* 679 F.3d 952, 954 (7th Cir.2012), which analyzed scienter in the context of similar allegations, forecloses the inference of scienter. In *Zimmer,* the plaintiff contended that Zimmer fraudulently "delayed revealing quality-control problems at its plant" and failed to use lower estimates in reflecting the impact of the suspension and recall of certain products on earnings. The Seventh Circuit rejected the plaintiff's argument that a medical-device company made a false statement and that the statement was made with scienter when the company, in taking a device temporarily off the market, attributed the device's failure rate to improper surgical technique rather than poor design quality. *See Zimmer,* 679 F.3d at 954. The Seventh Circuit noted that because "[c]orporate executives who know that one group of surgeons experiences success, and another group failure ... could believe that the different outcomes had been caused by differences in the way the surgeons had implanted the device," the plaintiff failed to establish an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *See Zimmer,* 679 F.3d at 955.

*Zimmer,* however, is distinguishable from this case given the alleged omission regarding the extent of Project Fuel's impact as a cost-cutting measure on Rocky Mount for several reasons. First, in *Zimmer,* the Seventh Circuit noted that the fact that the alleged misstatement concerned "one plant and one product that together produced less than 10% of the firm's income" undermined the inference of scienter. *See id.* at 956. Here, Plaintiffs allege that Defendants' failure to disclose the extent of Project Fuel's impact as a cost-cutting measure on Rocky Mount in particular is misleading because Rocky Mount was Hospira's largest facility and the "crown jewel" of Hospira. (Am.Compl.¶ 38.) Because of the alleged importance of Rocky Mount to Hospira, the inference is stronger in these circumstances than in *Zimmer*

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 21 of 61 PageID #:2895

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2013 WL 566805, Fed. Sec. L. Rep. P 97,287

that if the Defendants omitted material facts with respect to Project Fuel's impact on Rocky Mount, they did so knowingly or with reckless disregard toward this risk. *Makor II,* 513 F.3d at 711 (noting that where the alleged false statements concerned the "company's key products" it was "exceedingly unlikely" that the CEO was "unaware of the problems" in light of alternative explanations). Second, in *Zimmer,* the relationship between the gravity of the alleged problem and statements allegedly hiding it is different than in this case. There, the Seventh Circuit noted that despite the company's temporary recall of the product, ultimately "the Food and Drug Administration ... never concluded that the Durom Cup was defectively designed or made, indeed never even issued a warning or caution concerning the Durom Cup." *Zimmer,* 679 F.3d at 955. Here, Plaintiffs allege that Project Fuel's cost-cutting over the course of the Class Period exacerbated the problems at Rocky Mount and "left Hospira understaffed and unable to perform necessary quality control to ensure the safety of its products, plant, and equipment." (Am.Compl.¶ 115.) In support of this allegation, Plaintiffs further point to the FDA's issuance of Form 483s in June and August of 2011 identifying failures that Plaintiffs allege "at least in part, appear to be the result of Project Fuel related cuts." (Am.Compl.¶¶ 104–116.) Accordingly, the differences in the magnitude, timing, and nature between the alleged misstatements and the supporting allegations in *Zimmer* and those Plaintiffs identify here raise different inferences in the scienter analysis.

**\*28** Viewing the allegations in the Complaint as a whole and in the light most favorable to the Plaintiffs, Plaintiffs have raised an inference of scienter that is at least as compelling as any opposing inference that, if in fact these specific statements were false or failed to disclose material facts, this risk "was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Makor II,* 513 F.3d at 704.

## VII. Section 20(a) Claims for Control Person Liability

Plaintiffs allege Defendants are liable under Section 20(a) of the Exchange Act. Defendants seek to dismiss the "control-person" claim on the ground that Plaintiffs have failed to

allege a primary securities fraud violation. Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ..., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *see also Janus,* 131 S.Ct. at 2304. In order to state a Section 20(a) claim, Plaintiffs must allege the following: (1) a primary securities violation; (2) each of the Defendants exercised general control over the operations of Hospira; and (3) each of the Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992).

Because Plaintiffs have pled a primary securities violation as to those statements for which they have sufficiently alleged with particularity both that the statement is false or misleading and scienter, and Defendants have not challenged Plaintiffs' Section 20(a) claims on any other grounds, the Section 20(a) claim stands as to those statements. Conversely, with respect to the other allegedly false or misleading statements for which Plaintiffs have failed to plead a primary securities law violation, Plaintiffs' Section 20(a) claim fails. *See Pugh,* 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws.").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss without prejudice and grants Plaintiffs' Motion to Strike.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 566805, Fed. Sec. L. Rep. P 97,287

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1303387
United States District Court,
N.D. Illinois,
Eastern Division.

GARDEN CITY EMPLOYEES'
RETIREMENT SYSTEM, and
Indiana Laborers Pension Fund,
Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,
v.
ANIXTER INTERNATIONAL, INC.,
Robert J. Eck, Dennis J. Letham
and Robert Grubbs, Defendants.

No. 09–CV–5641.
|
March 31, 2011.

**Attorneys and Law Firms**

Debra J. Wyman, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Lori Ann Fanning, Marvin Alan Miller, Matthew E. Van Tine, Miller Law LLC, Amelia Susan Newton, Heidi E. Vonderheide, Leigh R. Lasky, Norman Rifkind, Lasky & Rifkind, Ltd., Chicago, IL, Sarah R. Holloway, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs.

David J. Bradford, Daniel J. Weiss, Howard Steven Suskin, Marc David Sokol, Jenner & Block LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

ROBERT M. DOW, JR., District Judge.

 **\*1** Garden City Employees' Retirement System and Indiana Laborers Pension Fund ("Plaintiffs") bring this putative class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired the common stock of Anixter International Inc. ("Anixter" or the "Company") between January 29, 2008 and October 20, 2008, inclusive. On November 17, 2009, this Court appointed Indiana Laborers Pension Fund as Lead Plaintiff [36], and on January 6, 2010, Plaintiffs filed an amended complaint [39]. Before the Court is Defendants' motion to dismiss that complaint [43]. Also before the Court is Plaintiffs' motion to strike certain materials Defendants attached to their motion to dismiss [47]. For the following reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice. Plaintiffs' motion to strike [47] is granted in part and denied in part.

**I. Allegations in Plaintiffs' Complaint**[1]

[1] Unless indicated otherwise, all citations in this section correspond to Plaintiffs' amended complaint [39]. For present purposes, the Court accepts the allegations in the complaint as true, as precedent instructs. See, *e.g., Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir.2004). At this juncture, the Court takes no position on whether any of the allegations are, in fact, well-founded. The complaint is nearly 60 pages long and includes 141 numbered paragraphs; many paragraphs are more than a page long and have numerous subparagraphs. Furthermore, the complaint is replete with long blocks of text, quoted from press releases and scripts of conference calls. The Court has done its best to summarize the operative facts and language that Plaintiffs consider most important. However, the parties should give no weight to whether the Court has chosen not to include a particular quote or fact in this section of its opinion—as precedent instructs, the Court has based its analysis on its reading of the complaint in its entirety.

Plaintiffs allege that beginning on January 29, 2008 and continuing throughout the class period, Defendants engaged in a scheme to deceive and defraud investors of the true value of Anixter's stock in violation of federal securities law. The "core of plaintiff's claims" is that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis (and achieving it was becoming more remote as the economy soured), and that defendants' fervent and repeated denials that Anixter was being negatively affected by the slowing economy were false and misleading." (Pl. Resp. Mot. Dismiss [46] at 14–15). Plaintiffs contend that while Anixter's stock was artificially inflated, Individual Defendants sold off some of their own holdings for handsome gains.

Defendant Anixter is a publicly-traded Delaware corporation with its headquarters in Glenview, Illinois. ¶ 30. The Individual Defendants were officers of Anixter during some or all of the class period: Defendant Robert J. Eck is President and CEO of Anixter; prior to that he was the Company's

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 23 of 61 PageID #:2897

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

chief operating officer and executive vice president. ¶ 31. Defendant Dennis J. Letham is Anixter's executive vice president of finance and chief financial officer, and Defendant Robert Grubbs was president and CEO of Anixter from February 1998 to June 2008, *Id.*

Anixter is a global supplier of communication products, electrical and electronic wire and cable, fasteners and other small parts used to connect voice, video, data and security systems. ¶ 2. Anixter operates through three main lines of business: (1) the Enterprise Cabling and Security Solutions ("ECS") group; (2) the Electric Wire and Cable ("EWC") group, and (3) the Operating End Markets ("OEM") group. ¶ 36. The ECS group represented approximately 54% of the Company's total revenue in 2007 and 52% in 2008. *Id.* The EWC group represented approximately 28% of revenue in 2007 and 29% in 2008. ¶ 37. The OEM group—the smallest division—represented approximately 18% of revenue in 2007 and 19% in 2008. ¶ 37. In 2007, 70% of the Company's sales were from North America, 22% were from Europe, and 8% were from other emerging markets (Latin America and Asia Pacific). ¶ 39. The majority of the OEM business (56%) is based in Europe. ¶ 37. Accordingly, simple math applied to Plaintiffs' allegations shows that about 10 percent of Anixter's sales come from its European OEM business.

### A. Pre–Class Period Allegations

 **\*2**  Historically, Anixter had grown its sales base through both strategic acquisitions and organic sales growth. ¶ 40. However, acquisition opportunities dried up during 2007 leaving the Company dependant on organic sales to drive its overall sales growth. ¶¶ 40, 41. But during the first parts of 2007, the Company's organic growth rate also had been in decline, falling from 22% to 19% in the first quarter of 2007 and to 17% in the second quarter. ¶ 43.

Plaintiffs allege that "as early as mid–2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008." ¶ 42.

By late 2007, Plaintiffs allege that the U.S. and global economies were declining and credit markets were contracting. ¶ 42. In fact, in October 2007, the Company reported that there was a "significant amount of economic uncertainty * * * particularly in the U.S. related to the credit markets." *Id.* Plaintiffs allege that by the end of 2007 Anixter's sales and profits were under pressure due

to slower global demand, including lower levels of non-residential construction and technology spending. ¶ 43. Moreover, Anixter's organic growth rate had continued to fall, to 9% in the third and fourth quarters of 2007. ¶ 43. In an attempt to allay investors' persistent concerns about the Company, in November 2007, the Company began aggressively repurchasing its stock. ¶ 44. This maneuver was met with some approval in the market. *Id.*

### B. January and February 2008 Statements

On January 29, 2008 (the first day of the class period), Anixter issued a press release announcing its financial results for the fourth quarter and fiscal year 2007. ¶ 46. The Company reported year-over-year organic sales growth of 9%.[2] *Id.* In the press release, Defendant Grubbs reported that Anixter had continued to experience "strong growth * * * from our strategic initiatives in the security and OEM markets." ¶ 47. Grubbs also reported that the Company had a "solid backlog and healthy pipeline of potential new projects and customers" both in Europe and North America. *Id.* However, Grubbs also recognized that "sales in Europe were flat as compared to unusually strong sales in the year ago quarter." *Id.* Overall, Grubbs told investors that Anixter would continue to achieve "solid sales and earnings growth" in 2008 despite deteriorating market conditions. For example, Grubbs stated:

[2]   Plaintiffs do not challenge the accuracy of this figure or in fact any of Anixter's reported financials.

> While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year.
> ¶ 48.

The same day, the Company held an earnings conference call with analysts and investors to discuss the Company's earnings and operations. ¶ 49. Describing the Company's performance in 2007, Defendant Letham stated that "[o]verall end market demand remain [sic] healthy across all markets. Larger project demand generally remained robust and we continue to have good success with our strategic initiatives." *Id.* Defendant Letham stated that despite "economic uncertainty in other parts of the economy," the Company had "performed so strongly" during the last quarter of 2007. Letham stated that "early indications" suggested that the trend would continue into 2008. *Id.;* see also ¶ 51.

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 24 of 61 PageID #:2898

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

**\*3** During the call, Defendant Letham recognized that as compared to 2006, the 2007 "year on year sales in Europe were flat" and that growth in Europe had slowed compared to prior years. ¶ 50. However, Letham said that the Company's "business activity levels in Europe remain strong" and that the Company was "optimistic" about "growth in Europe in the coming quarters." *Id.* In response to a question from an analyst about whether the Company could sustain "that level of growth in that let's say nine to 11% range continuing ahead here in Europe," Letham responded that "to answer your questions about Europe, we are still comfortable driving the kind of growth we have driven." ¶ 52.

After the call ended, the Company's stock price rose 18%, or $10.55 per share in a single day, to close at $68.85 per share. ¶ 53. That same day, Grubbs sold 14,000 Anixter shares for proceeds of $938,000. *Id.* On February 15, 2008, when the stock was between $66.91 and $68.29 per share, Defendant Letham sold 3,668 shares for proceeds of $248,199. *Id.*[3]

3      The Individual Defendants sold Anixter stock at other points during the class period. In all, Plaintiffs allege that during the class period, Defendant Letham sold 37,444 shares (26.5% of his holdings, or 9.41% including stock options) for proceeds of over $2.4M, Defendant Grubbs sold 15,000 shares (9.29% of his holdings, or 3.70% including options) for proceeds of over $1M, and Defendant Eck sold 1,045 shares (7.17% of his holdings, 1.92% including options) for proceeds of over $73,000. See ¶¶ 114–115. All of the Individual Defendants' stock sales were made under trading plans adopted pursuant to Rule 10b5–1 of the Exchange Act. ¶¶ 118–119. Defendant Letham's sales were made pursuant to a plan that he adopted on April 24, 2007. Defendant Grubbs's sales were made pursuant to plans that he adopted on April 24, 2007 and July 24, 2008. Defendant Eck's sales were made pursuant to a plan that he adopted on July 24, 2008. *Id.*

On February 21, 2008, the Company filed its 2007 Form 10–K for the period ending December 28, 2007, which Defendants Letham and Grubbs signed. The Form 10–K reported that the Company had experienced "strong organic growth" in 2007 and, describing 2007 as compared to 2006, reported that the Company "continues to experience strong growth in security and OEM supply sales." ¶ 55; see also Ex. K to Def. Mem., at 17.

**C. April 2008 Statements**

On April 22, 2008 the Company issued a press release announcing its financial results for the first quarter of 2008. The Company reported year-over-year organic sales growth of 7%. ¶ 61. The Company also announced that its organic growth rate for Europe had fallen to only 2%. ¶ 69. However, other numbers for the quarter were positive, including a rise in sales, operating profits, and earnings per diluted share over the prior year quarter. ¶ 61.

In the press release, Defendant Grubbs discussed the Company's positive results and reported that he believed the Company would continue to succeed despite the worsening economic conditions:

The multiple end markets we serve, the diversity of industries in which our customers operate and the broad geographies over which our business is conducted have given is the ability to sustain overall growth despite certain economic concerns. We believe that the diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions.

¶ 61. Defendant Eck echoed Defendant's Grubbs' optimism about future prospects, yet Eck warned that the Company's growth could be affected by macro-economic conditions generally and in the European OEM market specifically. "Short-term macro-economic conditions may slow our organic sales growth from the rates of the past couple of years, which when combined with the investment in these initiatives may limit near-term earnings growth. We believe, however, that continued focus, investment and successful execution on these strategies will drive full-year and longer-term growth and profitability of the business." ¶ 62. Eck reported that the Company had seen a "number of customer-specific situations where spending was reduced in response to slower economic conditions, [but] we do not believe this represents a broader trend." *Id.* Regarding growth from the European OEM market, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe." ¶ 63. Eck predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. *Id.* Defendant Eck also blamed the first quarter's "divergent growth rates" in part on an unfavorable impact from the timing of New Year's and Easter, not on the global economic slowdown. *Id.*

**\*4** Following the press release, the Company held an earnings conference call with analysts and investors wherein the Individual Defendants expanded on these themes. Defendant Letham explained that the "geographic diversity of our business model and various company driven initiates"

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 25 of 61 PageID #:2899

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

allowed the Company to "mitigate the effects of the current economic slowdown." ¶ 64. While there was "concern about the condition of the U.S. economy," Eck explained that the Company's performance remained "healthy" and growing. ¶ 65. Letham stated that the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Eck stated that the Company had noticed "softer corporate spending" but that much of the spending decrease was "relate[d] to specific project plans of individual customers." ¶ 65. "While some customers have reduced their production schedules, this was offset by growth with other customers and added products." *Id.* Similarly, Defendant Letham blamed a recent decline in daily booking activity in one of its product lines as "more of a seasonal pattern impact here" rather than "anything about the credit market issue" or "some broader economic issue." ¶ 67.[4]

4    Plaintiffs note that Anixter's 2007 Annual Report stated that "[t]he operating results of the Company are not significantly affected by seasonal fluctuations." ¶ 11.

And while Letham again recognized the problems in the North American electrical wire & cable market and the European OEM market, Letham reported that "we've experienced recent improvements in both situations over the last several weeks." ¶ 64.

Following the Defendants' April 22, 2008 statements and the disclosure of slowed growth rates, Anixter's stock price dropped $10 .31 between the closing price on April 21, 2008 and the closing price on April 24, 2008. ¶ 73.

### D. July 2008 Statements

On July 22, 2008, the Company released its financial results for the second quarter of 2008. ¶ 74. Some numbers were indicative of solid performance, for example the Company reported a 10 percent increase in sales from the first to the second quarter of 2008. ¶ 75. However, the Company reported organic sales growth of only 4% for the quarter. ¶ 74. (Overall growth, including sales growth from recently completed acquisitions, was 7% for the quarter). The Company also reported a slight decline in gross margins from the same quarter a year ago, from 24% to 23.8%. ¶ 75.

Discussing the slower organic sales growth rates, Defendant Eck said that the lower growth figure was not the result of any "broad-based negative trends." ¶ 74.

"While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence. We believe the overall market conditions, as they currently exist, should allow for consecutive quarter sales growth from the second to third quarter of this year. If we achieve a modest level of consecutive quarter growth, it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth."

**\*5**  *Id.*

Eck reported that he was "pleased with the 10 percent increase in sales from the first to the second quarter of this year, which despite continuing macroeconomic uncertainty, exceeded longer-term seasonal trends." ¶ 75. Eck explained that the lower sales growth rates were "modest due to the difficult comparison to last year's exceptionally strong second quarter." *Id.* While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. *Id.* In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id.*

In the subsequent conference call, Defendant Eck told listeners that "while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world." ¶ 77. According to Eck, "quote activity" was "holding reasonably steady" and the Company had not seen "big downward trends [in quote activity] anyplace." ¶ 78; see also *id.* ("Letham: * * * we have seen good quote activity in the OEM supply business * * * "). Defendant Eck closed his presentation with the words "[w]e expect the third quarter will again show sequential growth over the second quarter as well as over prior year ." ¶ 77.

Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity" these customers were being "offset by growth with other customers and other geographies." ¶¶ 78–79. Defendant Eck recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id.* Addressing the issue of continued "margin pressure from steel

Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id.*

During the question and answer session, one analyst asked about Anixter's ability to make forecasts about its sales and growth with precision. Defendant Letham responded:

Basically, we don't have a lot of hard visibility. Backlog here at any point in time is typically in the range of about a month. We have pipelines on project-type activity, pipeline tools that give us project activity outlook that extend beyond that but projects are 10%, 20% or so of our enterprise and electrical wire and cable business. The real issue here is you get your bulk of your business day-to-day, short order, so there is not a lot of long term visibility.

On July 31, 2008, the Company filed its Form 10–Q for the second quarter of 2008, in which the Company recognized that its major initiatives appeared to be succeeding despite "macroeconomic uncertainty that existed during the quarter." ¶ 83.

 **\*6** On the morning of July 22, Anixter's stock opened at $61.50 per share. On the morning of August 1, the stock opened at $68.29 per share, an increase of 11%.

### E. Post–Class Period Allegations
The class period ends on October 20, 2008. On October 21, Anixter issued a press release announcing its financial results for the third quarter of 2008, which ended September 26, 2008. ¶ 96. The Company reported organic growth of only 2%. *Id.* Gross margins had declined further, to 23.4% (versus 24.1% in the year ago quarter). ¶¶ 91, 100.

In the accompanying press release, the Company stated: "[w]hile we experienced strength early in the third quarter, broader negative economic factors, especially in Europe, impacted sales activities late in the period." *Id.* While the quarter began favorably (July was the best month in the history of the Company), the Company admitted that its third quarter results had been affected by "macro economic trends." *Id.* The Company explained that it had been affected by lower operating margins in Europe and a decline in sales in their OEM supply business. ¶ 97.

Following the press release, the Defendants held a conference call where they further discussed how the Company's third

quarter results had been affected by the slowing global economy. ¶¶ 99–102. During the call, the following exchange took place:

**Analyst:** Hi, good morning. Just following up on that idea, if you look at the Enterprise Ts here, where would you the project activity level is in this fourth quarter and in the last month of the third quarter? As a percentage I guess you talked about a 15 to 20% range but that's slightly more than average, what do you think it is right now?

**Letham:** It's probably in the mid to low teens right now.

**Analyst:** And ...

**Letham:** It definitely pulled in the last couple of quarters, we were probably pursing that 20% number late last year, early part of this year and I think we've definitely probably given up at least five percentage points in the mix shift there.

**Eck:** I think what happens * * * if you look back over the prior four years we saw a really strong growth in the enterprise business and that was in the strength of good corporate spending on projects in IT infrastructure where we tend to do particularly well because of our business model. So when the market slows the chunk of the market that we do particularly well ends up being a little bit smaller and so we see an effect from that pretty quickly in our business.

The Company attributed the decline in its gross margins to "lower year-on-year sales growth rates," "a sales mix shift resulting from slower sales in our higher gross margin OEM supply business," and the "resolution of a customer pricing dispute that reduced current quarter gross profit by $3 million or approximately 20 basis points of gross margin." ¶ 100.

Over the next five trading days, Anixter's stock fell $18.76 per share, approximately 40%, to close at $29.07 per share on October 27, 2008.

 **\*7** According to Plaintiffs, Eck's statement above that "we see an effect from that pretty quickly" was an admission that the Individual Defendants knew their business had been being affected by the slowing global economy months earlier. ¶ 106. Similarly, Plaintiffs allege that on February 3, 2009, Defendant Letham stated that "Anixter had experienced a 'trend of decelerating growth rates * * * in the past few quarters." ¶ 107. Because Defendant Eck had earlier stated that Anixter has a "very detailed view of what's

happening in each of the end markets and each one of the geographies" it serves (*id* ), according to Plaintiffs, Defendant Letham's February 3, 2009 statement was an "admission" that Defendants knew about yet failed to disclose Anixter's "decelerating growth rates."[5]

5     To counter Plaintiffs' allegations that after the class period, Defendants "admitted" that they had a good view of what was happening regarding Anixter's growth and prospects, Defendants rely on the above-described statement from the July 22, 2008 conference call wherein Defendant Letham said that Anixter does not "have a lot of hard visibility" going past a month in the future regarding their ability to make sales forecasts.

### F. Defendants' Contemporaneous Knowledge Rendering the Class–Period Statements False

Plaintiffs plead the following to support their allegations that the Defendants' had contemporaneous knowledge that their statements in January, February, April and July 2008 were false when made, and that "defendant's guidance of 8% to 12% organic growth for 2008 had no reasonable basis." ¶ 57.

First, Plaintiffs make the general allegation that the Defendants knew "[b]y 2008" that economic conditions were deteriorating and that Anixter's business was being and would be affected. Plaintiffs allege that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe. As a result, Anixter was experiencing a slowdown in sales in its enterprise cabling business, which depended largely on IT projects for sales growth." ¶ 58; 68.

Plaintiffs also allege that "[t]he declining economic conditions were also impacting Anixter's OEM supply business, the majority of which was based in Europe" which depended on sales to the industrial and automotive industries. ¶ 59. "[B]y 2008, these industries were slowing dramatically as a result of the economic downturn. * * * Indeed, in January 2008, Moody's Global Corporate Finance predicted that demand in the major Western European markets for European OEMs would "stagnate" in 2008." ¶ 59; see also ¶ 68. The complaint alleges that according to "Confidential Witness" ("CW") 4, a "U.S.-based Product Planner in Anixter's OEM division," by "mid–2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88; see also ¶ 112 (delaying of orders took place "beginning in August 2008" and continuing to September 2008). Many of the canceled or delayed orders involved one customer—Case New Holland. ¶¶ 89–90; 110. The complaint alleges that these actions were evidence of Anixter's slowing European OEM business. ¶ 89. The directions to cancel or delay certain orders were made by upper management, with input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4 worked. *Id.* The alleged purpose of delaying or cancelling these orders was so that Anixter could avoid "having inventory on its books that it would be unable to push through because of the significant decline in business it was experiencing during the Class Period." ¶ 112.

**\*8** In addition to the above, Plaintiffs allege that the Individual Defendants were aware of problems in Anixter's *European* OEM business specifically. Plaintiffs put forth CW1, who was a "former Credit Manager for Anixter's European Markets." According to CW1, "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. Similarly, Plaintiffs also allege that, according to CW3 (a "former Operations Manager for Anixter's UK operations"), "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008. * * * These sales trends were made known to Anixter's U.S. operations on at least a monthly basis." ¶ 86.

Furthermore, Plaintiffs allege that "[D]efendants knew, and failed to disclose that Anixter was involved in a significant pricing dispute with major European OEM customer JLR." ¶ 70; see also ¶ 113. According to CW2 a "former Programme Buyer for Anixter's UK operations" the dispute involved the amount of a rebate Anixter owed to JLR. According to CW2 and CW3 it was "well known at Anixter's Spitfire Park Plat in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed rebate amount." ¶ 71. Ultimately, on October 20, 2008, Anixter "was forced to pay the $3M disputed amount * * * which had a material impact on the Company's earnings and gross margins."[6] *Id.*

6     Plaintiffs also allege that "Anixter was also involved in a material pricing dispute with major OEM customer Lucent" which "resulted in decreased sales to Lucent and, ultimately, the loss of Lucent's business completely in 2009." ¶ 92. Plaintiffs do not identify whether (and when) this dispute was taking place during the class period, or whether and when the individual defendants knew of the dispute.

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

## II. Additional Materials Submitted by Defendant and Plaintiffs' Motion to Strike

Along with their motion to dismiss, Defendants have filed an appendix containing 22 separate exhibits. Defendants have relied on and referenced the bulk of these exhibits in their motion. Plaintiffs have moved to strike or limit the Court's consideration of a number of these materials. Before the Court can analyze the merits of Defendants' motion to dismiss, the Court must first determine what materials the Court may consider in doing so.

A court considering a motion to dismiss in a securities fraud action must consider "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b) (6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (3d ed.2004 and Supp.2007)). Documents attached to a motion to dismiss fit into the first category if they are " 'referred to in the plaintiff's complaint and are central to her claim.' " *Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)). Matters subject to judicial notice are those that are both " 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997) (quoting Fed.R.Evid. 201(b)).

 **\*9** Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are generally disfavored, because they potentially serve only to delay litigation. *ABN AMRO, Inc. v. Capital Intern. Ltd.,* 2007 WL 845046, at \*3 (N.D.Ill. March 16, 2007) (citing *Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989)). A district court has broad discretion to grant or deny a motion to strike. *Id.* (citing *Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 664–65 (7th Cir.1992)).

### A. Defendants' Chart of Responses to Plaintiff's Allegations

First, attached to Defendants' motion as Exhibit A is a 22–page chart titled "Reasons Why Alleged Misrepresentations in Amended Complaint Are Not Actionable." The chart compiles each of the statements that Plaintiffs consider misleading together with a reference to the relevant portion of Anixter's motion to dismiss. The first column of the chart sets forth the alleged misrepresentation (copied from the complaint); the second column lists the corresponding paragraph number in the complaint; and the third column contains a short description of why the statement is inactionable (for example, "Immaterial puffery") along with a reference to the relevant portion of Defendants' memorandum. Plaintiffs have moved to strike the chart. In the event that the Court declines to strike the chart, Plaintiffs have submitted their own chart which adds a fourth column to Defendants' chart, indicating Plaintiffs' response to each entry.

Plaintiffs first argue that the chart should be stricken because it is not a document subject to judicial notice or referred to in the complaint and central to Plaintiffs' claims. (Pl. Mot. Strike [47] at 5). These arguments are misplaced because the chart does not purport to introduce any facts or evidence extrinsic to the complaint. Instead, the chart merely reproduces portions of Plaintiffs' complaint and references portions of Defendants' memorandum in support of their motion to dismiss.

The only ground on which Plaintiffs could challenge the exhibit is that it allows defendants "22 pages of additional argument" above the Court-ordered page limit extension. (Pl. Reply Mot. Strike [55] at 6; see also Order granting Defendants leave to file an oversized memorandum of law of up to 35 pages [42] ). In response, Defendants argue that the chart is "simply a summary document intended to assist the Court in evaluating the scores of statements quoted and challenged in the complaint." (Def. Resp. Mot. Strike [54] at 3). Because Plaintiffs have submitted a response to the chart, Defendants argue that Plaintiffs would suffer no prejudice if the Court considered both the chart and Plaintiffs' response thereto.

In *K & R Ltd. P'ship. v. Mass. Hous. Fin. Agency,* 456 F.Supp.2d 46, 52–53 (D.D.C.2006), a district court judge was faced with a motion to strike a nearly identical document. The district court noted that for the most part, the chart at issue there "does not present any information or argument that is not contained in [defendant's filing]; it is simply the same argument from the reply presented in a different manner." *Id.* Further, the district court found that the chart

"is organizational work that the Court would otherwise have to take upon itself, and it does not appear to have been an attempt by [the defendant] to evade any of this Court's rules" regarding page limits. *Id.; cf. King v. Enterprise Rent–A–Car Co.,* 231 F.R.D. 255, 265 (E.D.Mich.2004) (seventeen page memorandum summarizing numerous cases cited by opposing party plaintiffs was "legal argument" that "effectively, added an additional seventeen pages to [d]efendants' brief."). While not controlling, the Court finds the reasoning in *K & K Ltd. P'Ship* to be persuasive. Furthermore, because Plaintiffs have submitted a response to Defendants' chart, any unfairness to Plaintiffs resulting from extra pages allotted to Defendants is greatly reduced. Accordingly, the Court has considered Defendants' Exhibit A and Plaintiffs' response thereto to the extent that they were helpful to the Court in deciding the instant motion to dismiss.

### B. Forms 4 and Defendants' Chart of Stock Sales

 **\*10** Next, Plaintiffs take issue with Defendants' Exhibit D, which includes a three-page chart created by Defendants that shows the number of Anixter shares sold by Individual Defendants from January 2006 to September 2008. The chart is populated with information taken from Forms 4 filed by Individual Defendants during that time period. The Forms 4 themselves (191 pages of them) are attached behind the chart. According to Defendants, the Forms 4 show that Individual Defendants' stock sales during the class period were not unusual, therefore rebutting the allegations of scienter raised in Plaintiffs' complaint.[7]

7    Plaintiffs rely on Individual Defendants' stock sales within the class period as evidence of "scienter," which is an element of a securities fraud claim. See *infra* Sec. III. The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). One method that securities fraud plaintiffs use to demonstrate the required scienter is through insider trades made by corporate executives. As discussed in detail below, "stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008).

Plaintiffs argue that the Court should not consider the Forms 4 at this stage of the litigation because the complaint did not cite to any of the forms and the Forms 4 from outside the class period are not central to Plaintiff's claims. Plaintiffs argue that even if the Court were to judicially notice the existence of the

Forms 4, the Court could not consider the facts reported in the Forms 4 (*i.e.,* the dates of the sales, number of shares sold, and the sale price) for their truth. Plaintiffs also argue that Forms 4 from outside the class period are irrelevant, and the Court cannot consider them for any purpose. Plaintiffs further argue that the Court cannot consider the chart summarizing the information from the Forms 4.

As an initial matter, the Forms 4 from *within* the class period do not appear to be at issue in Plaintiffs' motion to strike. The complaint includes a table, at ¶ 114, which purports to show all of the insider trades made by Individual Defendants during the class period. The complaint does not explicitly disclose the source of the information in Plaintiffs' chart. However, the entries in the chart (including the dates of sales, number of shares sold, and share price) are identical to the information found in the relevant Forms 4 from Defendants' Exhibit D. Because the information in the chart and the information in the Forms 4 from within the class period is identical, and because "the only source" of insider trading data available to plaintiffs when drafting complaints "is the Forms 3, 4, and 5 filed with the SEC," *Malin v. XL Capital Ltd.,* 499 F.Supp.2d 117, 133 (D.Conn.2007), the Court can safely assume that the Forms 4 filed by the Individual Defendants during the class period were the source of the entries in the chart at paragraph 114 of the complaint. Accordingly, the Forms 4 from that period are incorporated into the complaint by reference. See, *e.g. In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1991) (discussed *infra* pp. 27–29). Further, in their motion to strike, Plaintiffs recognize that the "Form 4s during the class period may be relevant to plaintiff's insider trading allegations" and do not direct their arguments at these forms. (See Pl. Mot. Strike at 7; Pl. Reply Mot. Strike at 8). Accordingly, the Court will consider the Forms 4 in Defendants' Exhibit D that show Individual Defendants' trades from within the class period.

 **\*11** However, Plaintiffs do move to strike the Forms 4 from *outside* the class period. Plaintiffs first argue that the forms from outside the class period are not referenced in and central to the allegations of the complaint such that they may be considered regardless of whether they are attached to the complaint. See *Albany Bank & Trust Co.,* 310 F.3d at 971. The complaint does not cite to any Forms 4 from 2006 or 2007 and does not discuss any stock sales from those years. Yet, it is clear that because they are public documents, "[j]udicial notice may be taken of publicly filed [Securities and Exchange Commission ("SEC") ] documents, including Forms 3 and 4." *In re Spyglass, Inc., Securities Litigation,*

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 30 of 61 PageID #:2904

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

1999 WL 543197, at \*5 (N.D.Ill.1999). But what is "not at all clear" is whether the Court may take judicial notice not only of the existence of the Forms 4, but also of the truth of the information reported within them. See *Jones v. Corus Bankshares, Inc.,* 701 F.Supp.2d 1014, 1025 n. 3 (N.D.Ill.2010).

Judicial notice is premised on the concept that certain facts exist which a court may accept as true without requiring additional proof from the opposing party or parties. "It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997) (citing *York v. American Tel. & Tel. Co.,* 95 F.3d 948, 958 (10th Cir.1996); and *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 865 (7th Cir.1983)). Accordingly, judicial notice " 'merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts.' " *Doss v. Clearwater Title Co.,* 551 F.3d 634, 640 (7th Cir.2008) (quoting *General Electric Capital Corporation,* 128 F.3d at 1081).

In *General Electric Capital Corp.,* 128 F.3d at 1082 n. 6, the Seventh Circuit considered when and for what purposes a court could take judicial notice of facts from prior proceedings—an issue very similar to one presented in the instant motion. The Seventh Circuit noted that "some appellate decisions have refused to allow a court to take judicial notice of any adjudicative fact in a court record for the truth of the matter asserted." *Id.* (citing *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994) (concluding that a court "may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation"); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) (holding that a "court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings' "). The Seventh Circuit agreed that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed." *Id.* However, the Seventh Circuit did not impose an outright ban on judicial notice of these types of facts, and instead concluded that "it is conceivable that a finding of fact may satisfy the indisputability requirement of Fed.R.Evid. 201(b)." *Id.;* see also *ABN AMRO, Inc. v.*

*Capital Int'l Ltd.,* 2007 WL 845046, at \*9 (N.D.Ill. March 16, 2007) ("Typically, \* \* \* because of the indisputability requirement, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation filing; judicial notice is generally not for the truth of the matters asserted in a court document."); *Collins v. Cook County,* 2008 WL 4925009, at \*7 (N.D.Ill. Nov.14, 2008).

**\*12** In *Doss v. Clearwater Title Co.,* 551 F.3d 634, 639–640 (7th Cir.2008), the Seventh Circuit had occasion to apply the rule from *General Electric Capital Corp.* There, the defendants had attached a publicly-filed deed to their motion to dismiss, and had used the deed to show that the plaintiff's suit was subject to dismissal because he had sold the property that was the subject of the lawsuit. *Id.* at 637–38. In response to the motion to dismiss, the plaintiff argued that he had not sold his property and that the deed attached to the defendants' motion was a forgery. *Id.* The district court took judicial notice of the deed and dismissed the complaint. *Id.* at 637. On appeal, the Seventh Circuit reversed the district court, reasoning that because the authenticity of the deed was in dispute, the court could not properly take judicial notice of it. *Id.* at 693–94. An earlier case, *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354–55 (7th Cir.1995), also illustrates the rule. In *Hennessy,* an employment discrimination case, the district court was attempting to determine the size of the defendant corporation so as to assess the applicability of a punitive damages cap under the 1991 Civil Rights Act. *Id.* at 1354. The district court had received conflicting testimony at trial, but declined to take judicial notice of an SEC filing that pegged the number on the higher end. *Id.* The *Hennessy* court affirmed this decision not to take judicial notice because the parties disputed the relevance of the SEC filings (which covered more units of the defendant corporation than the one unit specifically involved in the suit). *Id.* at 1355.[8]

8    Courts from other circuits apply the same test as the one articulated in General Electric Capital Corp. and other Seventh Circuit cases. See, *e.g. Lustgraaf v. Behrens,* 619 F.3d 867, 885–886 (8th Cir.2010) (court should not have noticed fact in corporation's state regulatory filings for their truth as fact was in dispute).

On the other hand, courts have concluded that judicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute. See, *e.g. Hernandez v. Midland Credit Mgmt., Inc.,* 2006 WL 695451, at \*4 (N.D.Ill. March 14, 2006) (taking judicial notice of excerpted portion of Form 10–K where no dispute existed); *Sharbaugh v. First*

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 31 of 61 PageID #:2905

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

*Amendment Title Ins. Co.,* 2007 WL 3307019, at \*3 (N.D.Ill. Nov.2, 2007) (taking judicial notice of statements in form 10–K that were not in dispute); see also *In re FedEx Ground Package System, Inc., Employment Practices Litigation,* 2010 WL 1253891, at \*4–6 (N.D.Ind. Mar.29, 2010).

On the basis of the foregoing discussion, there is a strong argument for concluding that the amount of stock Individual Defendants sold in 2006 and 2007, along with the date of each sale and the price at which the stock was sold, are judicially noticeable because the Forms 4 that contain these facts are publicly-filed documents, the contents of which are not in dispute. First, neither in their motion to strike nor in their reply in support of the motion do Plaintiffs challenge the authenticity of the forms or the accuracy of the financial reporting contained in them. Instead, Plaintiffs only assert that the Forms 4 are not properly considered at this stage of the litigation. The fact that Plaintiffs apparently relied on the Forms 4 from *within* the class period as the source of their allegations regarding Individual Defendants' allegedly-improper insider trades is further evidence that the Forms 4 from *outside* the class period are accurate and trustworthy. Having relied on the Forms 4 filed in 2008 (a period during which Plaintiffs allege that Defendants were committing securities fraud), it would be passing strange for Plaintiffs to argue that similar Forms 4 from 2006 and 2007 (filed during a period in which no securities fraud is alleged) are untrustworthy.[9]

[9] In their reply, Plaintiffs assert that the Forms 4 (and other documents) are "subject to reasonable dispute" and therefore not judicially noticeable because Defendants use the documents "to make extrinsic factual assertions to support competing inferences." (Pl. Reply Mot. Strike at 3–4; 6–7). Of course Plaintiffs and Defendants each urge the Court to accept a competing conclusion to which the Forms are relevant—whether or not Plaintiffs have adequately alleged scienter. While this ultimate question is disputed, the authenticity and accuracy of the Forms 4 themselves is not. Plaintiffs seem to argue that on a motion to dismiss, courts cannot judicially notice any fact that contradicts an inference alleged in a plaintiff's complaint. This of course is not the law. A fact is judicially noticeable and properly considered on a motion to dismiss if it meets the requirements of Fed.R.Evid. 201 (as well as the other requirements of the Rules of Evidence), regardless of which party's position the fact supports. By way of analogy: Take a case arising out of an early morning car accident where the plaintiff alleged that the defendant driver "could not see." On a motion to dismiss, a court could judicially notice the fact that the sun rose an hour before the crash, even though this fact goes toward contradicting the ultimate allegation in the complaint. By noticing the hour of the sunrise, the court would not necessarily be accepting the competing inference that the driver *could* see; for example, the complaint could have alleged the presence of heavy fog. But when the court decides the motion to dismiss, it takes all the facts properly before it (including those alleged and those properly noticed), accepts them all as true, and then decides if the plaintiff has stated a claim. Plaintiffs are fond of quoting the following line from *Tellabs:* "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw *from the facts alleged."* 551 U.S. at 314 (Plaintiffs' emphasis). But this quote is misleading when taken in a vacuum. In fact, the Supreme Court in *Tellabs* made clear that courts considering complaints alleging securities fraud are to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. at 322.

**\*13** However, the Court is also cognizant of the recent decision, *Jones v. Corus Bankshares, Inc.,* in which Judge Bucklo denied a defendant's request to judicially notice the fact that the defendant did not sell company stock during the period in question. 701 F.Supp.2d 1014, 1025 n. 3 (N.D.Ill.2010) (citing *Riggs Partners, LLC. v. Hub Group, Inc.,* 2002 WL 31415721 (N.D.Ill. Oct.25, 2002)). The court in Jones did not discuss the cases in which courts in this circuit have taken judicial notice of undisputed portions of SEC filings and did not categorically rule that such information is not susceptible to judicial notice. 701 F.Supp.2d at 1025 n. 3 ("Corus believes that I may take judicial notice of the fact that Glickman did not sell Corus stock during the period in question. *It is not at all clear* that this is so.") (emphasis added). In addition, it is not clear from the opinion in *Riggs Partners* whether the defendants' stock purchases were undisputed. See 2002 WL 31415721, at \*5 n. 7. That said, *Jones* and *Riggs* represent instances in which courts in this district have considered the precise question posed in Plaintiffs' motion to strike and decided not to accept the facts reported in the Forms 4 as true.

At the end of the day, the Court concludes that it can resolve the motion to dismiss without any need to consider the Forms 4 outside the class period for the truth of the information

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 32 of 61 PageID #:2906

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

contained in them. As explained in detail below, the complaint is subject to dismissal for failure to adequately allege scienter irrespective of the content of the disputed Forms 4. Thus, the Court need not express at this time a definitive view on what aspects of the Forms 4 may be judicially noticed.

However, the Court writes further to address another of Plaintiffs' arguments against consideration of the truth of the content of the Forms 4 from outside the class period. Plaintiffs argue that these Forms 4 are "irrelevant" to determining whether Plaintiffs have stated a claim for securities fraud—presumably because Plaintiffs' allegations concern Defendants' actions during 2008 only. (Pl. Reply Mot. Strike at 7–8); see also *Gas Tech. Inst. v. Rehmat,* 2006 WL 3743576, at *15 (N.D.Ill.Dec.15, 2006) (refusing to take judicial notice of information that was "irrelevant" to determining whether plaintiffs had adequately alleged a cause of action). Because "facts subject to judicial notice are not exempt from analysis under the other rules of evidence," *Sunstar, Inc. v. Alberto–Culver Co.,* 2006 WL 6505615, at *3 (N.D.Ill. Nov.16, 2006), Plaintiffs are correct that truly irrelevant facts are not properly considered on a motion to dismiss. However, Plaintiffs are incorrect that Individual Defendants' trades from outside the class period would be "irrelevant" to determining the presence of scienter. The opposite is true. The Seventh Circuit has held that, in order to establish an inference of scienter, a plaintiff must allege "facts that would allow an assessment of whether the trading during the class period was unusual or suspicious," in other words, "context showing that the applicable time period was unusual." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008); see also *Higginbotham v. Baxter Int'l., Inc.,* 495 F.3d 753, 759 (7th Cir.2007) ( "Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April."). For those reasons, Forms 4 showing trades made *outside* of the alleged class period would be relevant to assess whether trading during the class period is suspicious or unusual within context. See, *e.g. In re Pixar Sec. Litig.,* 450 F.Supp.2d 1096, 1105 (N.D.Cal.2006) ("stock sales during the class period must be considered in light of his trading history"); *Malin,* 499 F.Supp.2d at 151.[10]

[10]    Another interesting question (not addressed by the parties) is whether the Court should decline to consider the statements in the Forms 4 for their truth because they are inadmissible hearsay. Because courts must "strictly adhere to the [ ] Federal Rules of Evidence before taking judicial notice of pertinent facts," *General Electric*

*Capital Corporation,* 128 F.3d at 1081, inadmissible hearsay is not noticeable. It does not appear to the Court that the statements in the Forms 4 would be hearsay. Instead, the Forms 4—which Individual Defendants signed and submitted to the government under penalty of perjury—would likely qualify as either government or business records within the Evid. R. 803(6) and 803(8) hearsay exceptions, if a proper foundation were laid. See McGhee v. Joutras, 1996 WL 706919, at *3 (N.D.Ill.Dec.5, 1996) (SEC forms 4 subject to Rule 803(6) hearsay exception); *In re Silicon Graphics Securities Litigation,* 970 F.Supp. 746, 759 n. 6 (N.D.Cal.1997) (SEC forms 3 and 4 "may be admissible under the business and/or government records exceptions to the hearsay rule") (citing *United States v. Bland,* 961 F.2d 123, 127 (9th Cir.1992) (holding that gun shop records kept pursuant to government requirements are admissible business records); *United States v. Central Gulf Lines, Inc.,* 747 F.2d 315, 319 (5th Cir.1984) (holding that shipping reports prepared by private citizen and submitted to the government pursuant to law fell within government records exception to hearsay rule)). But in any event, the exhibits would be offered not only for their truth, but also to demonstrate the state of mind of the Individual Defendants. As such, they may well fall within the exception to the hearsay rule in Rule 803(3). See *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1246 (D.Utah 1999) (citing *In re Silicon Graphics Securities Litigation,* 970 F.Supp. at 759 n. 6 ("Alternatively, [the SEC forms] may be admissible not to prove the truth of the information contained in them, but to show the lack of scienter on the part of the defendants .")). If the Court had considered the disputed Forms 4 filed by Defendants, the Court also could have considered the three-page chart that summarizes the information in those forms. Fed.R.Evid. 1006; *Amsted Industries, Inc. v. National Castings, Inc.,* 1990 WL 106548, at *22 (N.D.Ill. July 11, 1990) (collecting cases) (under Evidence Rule 1006, "charts and graphs summarizing data culled from the financial records of the parties have often been admitted in the recognition that such summaries are a reasonable and efficient means of presenting the relevant information").

## C. Defendants' Stock Price Graph

**\*14** Both Plaintiffs and Defendants have submitted their own graphs of Anixter's stock price. Defendants' Exhibit E contains an eight-page chart taken from Yahoo! Finance that shows Anixter's stock price from Jan. 2, 2008 to December 31, 2008. The last page of Defendants' Exhibit E is a graphical representation of the data contained in the previous eight pages. Plaintiffs concede that the Court may consider the

stock price *data* set out in the first eight pages of Defendants' exhibit, *Pugh,* 521 F.3d at 691, n. 2 (taking judicial notice of stock prices), but contend that the Court may not consider the graphical representation of that *same data* on page nine of the exhibit. Plaintiffs do not argue that the graph is inaccurate or misleading in any way, or explain how they will be prejudiced by the Court's consideration of the graph. The Court will consider the entirety of Exhibit E. *Amsted Industries, Inc.,* 1990 WL 106548, at *22.

### D. October 23, 2007 Conference Call Transcript

Attached to Defendants' motion as Exhibit G is a transcript of an October 23, 2007 Anixter earnings conference call. Defendants do not argue that the Court can take judicial notice of the transcript. See *In re Neopharm, Inc. Securities Litigation,* 2003 WL 262369, at *2–3 (N.D.Ill. Feb.7, 2003) (quoting *Abrams v. Van Kampen Funds, Inc.,* 2002 WL 1160171, at *2 (N.D.Ill. May 30, 2002) ("[earnings call] transcripts are not subject to judicial notice, as they are not 'historical documents, documents contained in public record, or reports, decisions, and regulations of administrative bodies' ")). Furthermore, neither the transcript nor the conference call that it memorializes was referred to in Plaintiffs' complaint.

Nevertheless, Defendants argue that the Court may consider the October 23, 2007 transcript. Defendants want the Court to consider the transcript to support their position that Anixter did not, in fact, set a firm organic growth projection of 8–12% for the 2008 year. The October 23, 2007 transcript reflects the following exchange.

> [Analyst]: Hi. Last year around this point, I think you expressed confidence in being able to achieve an 8% to 12% organic revenue growth number in 2007. Does that remain a target in ′08? Or are you kind of reevaluating that?

> [Grubbs]: I think that still remains our target and we've never really assigned that, Noelle, to any given time period. But we have looked at it kind of as an intermediate, you know, couple of year outlook for the business. Any given quarter or any given time period might be a little above or below that. That still would be our objective would be 8% to 12% organic growth.

Defendants argue that Plaintiffs have admitted that the "core" of their claims is that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 5). However, Defendants note that Plaintiffs "nowhere *quote* [ ] and nowhere *identify* [ ] the specific statement made by Anixter in 2007 supposedly

communicating" that projection. (Def. Resp. Mot. Strike at 9) (emphasis in original); see also Cmplt. at ¶ 42 ("As early as mid–2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008."). Defendants argue that failing to specifically cite to or incorporate the October 23, 2007 conference call transcript was "artful pleading" that deprives the Court of the opportunity of evaluating the statement that forms the basis of Plaintiff's complaint in "the context in which it was made." *Id.*

**\*15** In support of their argument, Defendants cite a number of federal cases that stand for the proposition that plaintiffs cannot deliberately omit reference to a key document in their complaints and then later complain when defendants introduce the document on a motion to dismiss. See, *e.g. In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1991) (Alito, J.) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *Weitschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1109 (N.D.Cal.2003) (citing *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998) ("On a motion to dismiss, documents crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based."). While the Seventh Circuit only permits consideration of documents that are "referred to in the plaintiff's complaint and are central to her claim," *Albany Bank & Trust Co.,* 310 F.3d at 971, Defendants have identified two cases that appear to slightly relax the first of those requirements in the presence of certain circumstances.

In *Rosenblum v. Travelbyus.com Ltd.,* 233 F.3d 657, 661–62 (7th Cir.2002), the Seventh Circuit considered an employment agreement to which the plaintiff's complaint had not explicitly referred. The Seventh Circuit found that consideration of the agreement was appropriate, because the plaintiff had only attached part of the contract that formed the basis of the dispute.

> "From Travelbyus' point of view, the contract under review is the combination of the Acquisition Agreement and the Employment Agreement. In moving to dismiss on the ground that the contract, read in this matter, requires that the parties resort to arbitration, Travelbyus is entitled to take the position that Mr. Rosenblum has appended only a part of the relevant instrument and to append what it

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 34 of 61 PageID #:2908
Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

contends is the remainder. It would have been impossible for the district court or for this court to evaluate the disagreement between the parties without having all of the documentation."

*Id.* Similarly, in *Hecker v. Deere & Co.,* 556 F.3d 575, 582–83 (7th Cir.2009), the Seventh Circuit upheld a district court's consideration of two supplemental summary plan descriptions ("SPDs") that were "not mentioned separately in the Complaint." There, the Seventh Circuit stressed that the supplemental SPDs "serve much the same purpose as the originals," which were themselves explicitly referred to in the complaint and "central to plaintiffs' case." *Id.* The Seventh Circuit further stressed that "[t]aking into account the limited purpose to which the prospectuses were put," the district court had not abused its discretion in considering the supplemental SPDs on a motion to dismiss. *Id.*

 **\*16**  With those principles in mind, the Court respectfully declines to consider the October 23, 2007 earnings call transcript. Unlike the documents at issue in *Rosenblum, Hecker,* and *Burlington,* Plaintiffs' claims do not appear to be based—either in whole or in part—on the October 23, 2007 transcript. In their reply in support of the motion to strike, Plaintiffs clarify that the complaint "does *not,* implicitly or explicitly, reply on the October 23, 2007 conference call transcript." (Pl. Reply Mot. Strike [55] at 9) (emphasis in original). Plaintiffs point out that the complaint, at ¶ 42, alleges that Defendants first began promising 8% to 12% growth in 2008 "[a]s early as mid–2007"—months before the conference call at issue.

The case on which Defendants most heavily rely is the Third Circuit's opinion in *Burlington.* 114 F.3d at 1426. In *Burlington,* the plaintiff claimed that the district court below had erred in using cost data contained in defendant's 1994 Annual Report as a basis for its materiality analysis because the 1994 Annual Report was neither attached to, nor referred to, in the complaint. The Third Circuit examined the complaint and agreed that the complaint did not explicitly refer to or cite the report. However, the complaint did include certain cost data, but did not provide a citation or source for that data. Third Circuit found that it was "unambiguous" that the source of the cost data was the 1994 Annual Report, and therefore it was proper for the district court to consider the document. *Id.* Where it was "unambiguous" that the 1994 Annual Report was the source of the cost data in *Burlington,* here, for the reasons explained above, it is not at all clear that the October 23, 2007 conference call transcript was the initial source of Plaintiffs' allegation that Defendants' projected 8

to 12% organic growth in 2008. As the transcript is neither "referred to" in Plaintiffs' complaint nor "central" to the claims, the Court will not consider it.

### E. Anixter's SEC Filings Not Referenced in the Complaint—Exhibits B, C, F, H, N, T, U and V

Next, Plaintiffs ask the Court to strike eight SEC filings (Exhibits B, C, F, H, N, T, U and V) that are "not referred to in the Complaint nor central to Plaintiffs' claims." (Pl. Mot. Strike at 9). The Court will not strike these documents, as SEC filings are publicly filed documents subject to judicial notice whether or not they are referred to in Plaintiffs' complaint.[11] *Selbst v. McDonald's Corp.,* 2005 WL 2319936, at *1 n. 4 (N.D.Ill. Sept.21, 2005) (citing *Stavros v. Exelon,* 2003 WL 21372468, at *8 n. 8 (N.D.Ill. June 13, 2003) ("The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment.")).

[11]     Initially, Plaintiffs note that because Defendants do not cite to Exhibits F and U in their motion to dismiss, they should be excluded. Plaintiffs cite no case that stands for the proposition that failing to make use of an attachment to a motion is sufficient grounds for a court to strike that document. The Court declines to strike Exhibits F and U for the reason that Defendants did not specifically discuss them; however the Court has not considered either exhibit in deciding the motion to dismiss. From the Court's own review of the motion, it appears that Defendants also do not cite Exhibit H. The Court has not considered that document either.

Plaintiffs further argue that the Court may not consider any of the statements in the eight filings for their truth. For example, Defendants cite Exhibits B and C for the proposition that "[t]he executives received stock options with expiration dates as part of their compensation." The Court did not find it necessary to accept as true any of the facts reported in Exhibits B, C, N, T, or V in order to resolve any of the issues presented in Defendants' motion to dismiss.

### F. Anixter's SEC Filings Referenced in the Complaint—Exhibits I, J, K, L, M, O, P, Q, R, and S

 **\*17**  Exhibits I, J, K, L, M, O, P, Q, R, and S are SEC filings which admittedly form the basis of the complaint and to which Plaintiffs referred in their complaint. Plaintiffs admit that the "Court may consider the full text of these documents to prove the appropriate context" of Defendants' statements. (Pl. Reply Mot. Strike at 3).

Plaintiffs further argue that even if the "existence, date, and contents of the SEC filings might be public record" and therefore subject to judicial notice, "any facts, calculations, and inference defendants seek to have this Court draw from them are inappropriate." (Mot. Strike at 11). Again, the Court did not find it necessary to accept as true any of the facts reported in Exhibits I, J, K, L, M, O, P, Q, R, and S in order to resolve any of the issues presented in Defendants' motion to dismiss.

Finally, because the Court has not considered any materials not properly subject to judicial notice that are extraneous to the complaint, it need not convert Defendants' motion from a motion to dismiss to one for summary judgment. See *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993); *Gas Technology Inst. v. Rehmat,* 2006 WL 3743576, at *14 (N.D.Ill.Dec.15, 2006) (citing *E.E.O.C v. Park Ridge Pub. Library,* 856 F.Supp. 477, 480 (N.D.Ill.1994) ("the court is not required to convert a motion to dismiss to a motion for summary judgment if it excludes the extrinsic evidence from consideration")).

## III. Legal Standards

The complaint alleges two causes of action against Defendants. Count I of the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b–5. "Section 10(b) * * * forbids the 'use or employ, in connection with the purchase or sale of any security * * * [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 also forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir.2008) (citing *Stoneridge Inc. Partners, LLC v. Scientific– Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

Count II of the complaint is directed against the Individual Defendants only and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws-here, a violation of § 10(b) and Rule 10b–5." *Pugh,* 521 F.3d at 693.

**\*18** Defendants move to dismiss the amended complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g., Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion in securities fraud actions, courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs,* 551 U.S. at 322. To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Bell Atlantic,* 550 U.S. at 569 n. 14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic,* 550 U.S. at 563.

Allegations of fraud, such as the allegations made in support of Plaintiffs' securities fraud claim, are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280–81 (7th Cir.1996). Plaintiffs must plead the circumstances constituting fraud with particularity. Fed.R.Civ.P. 9(b). They must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was communicated. *Vicom, Inc.*

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 36 of 61 PageID #:2910

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

*v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994); see also *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007) (fraud must be pled with particularity by providing the who, what, when, where, and how).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), further raises the pleading standard for securities fraud claims. See *Teamsters Affiliates Pension Plan v. Walgreen Co.,* 2010 WL 3894149, at *2 (N.D.Ill. Sept.29, 2010) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I),* 437 F.3d 588, 596 (7th Cir.2006) ("[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading-one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b).")). Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties," *Tellabs,* 551 U.S. at 313—it was intended "to screen out frivolous suits, while allowing meritorious actions to move forward." *Id.* at 324. "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313. In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

 **\*19** Further, in claiming scienter under the PSLRA, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). A complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged. *Tellabs,* 551 U.S. at 324. The Supreme Court has emphasized that "[t]he inquiry * * * is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (original emphasis). As the Court explained, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others,

follows from the underlying facts?" *Id.* at 323. Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable, or even the "most plausible of competing inferences." *Id.* at 324. It must, however, be "cogent and compelling." *Id.* The Seventh Circuit has rejected the " 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh,* 521 F.3d at 693.

As is common with similar securities actions, some of Plaintiffs' contentions are made on information obtained from confidential sources. "While the PSLRA does not require [plaintiffs] to name their confidential source, they must nevertheless describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' " *Selbst v. McDonald's Corp.,* 432 F.Supp.2d 777, 782–83 (N.D.Ill.2006) (quoting *Tellabs I,* 437 F.3d at 596); see also *Makor Issues & Rights, Ltd v. Tellabs Inc. ("Tellabs III"),* 513 F.3d 702, 712 (7th Cir.2008) (permitting reliance on the assertions of unnamed confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"). While the Seventh Circuit does allow information from confidential witnesses to help generate a strong inference of scienter, see *Silverman v. Motorola, Inc.,* 2008 WL 4360648, at \*14 (N.D.Ill. Sept.23, 2008) (citing *Tellabs III,* 513 F.3d at 712), it has expressed a healthy skepticism regarding information obtained from confidential sources. See *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756–57 (7th Cir.2007) (stating that information from confidential sources should be discounted as unreliable and is of limited value in establishing scienter).

## IV. Analysis of Motion to Dismiss

### A. Count I

**1. Failure to Adequately Plead Falsity**
 **\*20** The first argument that Defendants direct at the complaint is that Plaintiffs have failed to specify each statement alleged to have been false or misleading and the reasons why the statement is false or misleading, as required by the PSLRA. § 78u–4(b)(1)(B). As stated above, the PSLRA's heightened pleading instructions require Plaintiffs to "specify each statement alleged to have been

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 37 of 61 PageID #:2911

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Claiming that a particular statement was untrue is not enough—Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue. See *Premier Capital Management, L.L.C. v. Cohen,* 2003 WL 21960357, at *2 (N.D.Ill. Aug.15, 2003) (citing *Clark v. TRO Learning, Inc.,* 1998 WL 292382, at *4 (N.D.Ill. May 20, 1998)); see also *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d 969, 1000 (E.D.Wis.2009) (complaint deficient because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made"). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I,* 437 F.3d at 595 (quoting *Novak v. Kasaks* 216 F.3d 300, 314 n. 1 (2d Cir.2000)).

Defendants correctly emphasize that Plaintiffs must allege facts that show with sufficient particularity that Anixter made statements that were "false when made (not incorrect in retrospect)." (Def. Mem. Mot. Dismiss [44] at 7); see also *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332 (7th Cir.1995) ("[T]he securities laws typically do not act as a Monday Morning Quarterback. The securities laws approach matters from an *ex ante* perspective.") (internal citation and quotation omitted); *Zerger v. Midway Games, Inc.,* 2009 WL 3380653, at *7 (N.D.Ill. Oct.19, 2009) (plaintiffs required to plead facts known to Defendants "contemporaneous to the [allegedly-false] statements"). To this point, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.' " *Higginbotham,* 495 F.3d at 759–60 (quoting *Tellabs,* 551 U.S. at 320 and *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)); see also *Pugh,* 521 F.3d at 694–95; *Sutton v. Bernard,* 2001 WL 897593, at *4 (N.D.Ill. Aug.9, 2001) ("statements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading"). As Defendants aptly phrased it, Plaintiffs cannot merely "contrast relatively positive statements from Anixter during the first half of 2008 with less positive statements from the third quarter, and argue that it was fraud—not an intervening global economic catastrophe—that explains the difference." (Def. Mem. Mot. Dismiss at 7).

As described above, Plaintiffs allege that Defendants made false or misleading statements on five occasions: (1) on January 29, 2008, when Anixter announced its results for the fourth quarter and full year of 2007; (2) on February 21, 2008,

in Anixter's 2007 Form 10–K; (3) on April 22, 2008, when Anixter announced its results for the first quarter of 2008; (4) on July 22, 2008, when Anixter announced its results for the second quarter of 2008; and (5) on July 31, 2008, in Anixter's Form 10–Q for the second quarter of 2008. The Court will consider each of these instances in turn.

*January and February 2008 Statements*

**\*21** As noted above, Plaintiffs' complaint is nearly 60 pages long and is replete with long blocks of text, quoted from press releases and scripts of conference calls. Accordingly, it was not an easy task for the Court to determine precisely which statements Plaintiffs consider to be fraudulent.[12] However, in their response to Defendants' motion to dismiss [46 at 11–12], Plaintiffs have helpfully focused the Court on those statements that they consider to be actionable. Plaintiffs allege that the following statements made on January 29, 2008 were false:

12   Some courts have found complaints to be subject to dismissal under the PSLRA solely for utilizing a pleading style similar to Plaintiffs'. See, *e.g. Tabor v. Bodisen Biotech, Inc.,* 579 F.Supp.2d 438, 453 (S.D.N.Y.2008) ("Plaintiff['s] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements."); *Brodsky v. Yahoo! Inc.,* 592 F.Supp.2d 1192, 1198 (N.D.Cal.2008) ("because most of the [complaint] consists of block quotations taken from statements by Defendants and securities analysts, Plaintiffs have not plead falsity with the required particularity" under the PSLRA); see also *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998) ("In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.").

(1) that the Company continued to successfully execute its 2008 growth strategy;

(2) that the OEM business had a solid backlog of orders and a strong pipeline of new projects;

(3) that business activity levels in Europe were strong and expected to grow;

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 38 of 61 PageID #:2912

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

(4) that despite an uncertain economic environment, Anixter's end markets were not being affected and the recent solid trends in sales and growth would continue into 2008; and

(5) that Defendants saw nothing in its European business that would derail the 9–11% growth for that segment they expected.

Plaintiffs do not plead facts sufficient to suggest that any of the statements cited above were false or misleading when made.[13] For example, Plaintiffs do not identify any information known to Defendant Grubbs on January 29, 2008 that suggests that he knew that his statement that Anixter had a "solid backlog and healthy pipeline of potential new projects and customers" was untrue at the time that he made it. Plaintiffs allege no inaccuracy or fraud in any of Anixter's financial reporting.[14] None of Plaintiffs' six confidential witnesses offers any allegations that pertain to the January or February 2008 timeframe. See ¶¶ 69–72, 86–90, 92–93, 109–13.

13    In addition to the statements identified in Plaintiffs' response, the Court has scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from January/February 2008 were false or misleading.

14    For example, Plaintiffs could properly allege the falsity of Anixter's statement that "business levels in Europe were strong" if they could identify undisclosed financial information in Defendants' possession at the time that the statement was made that showed the opposite.

Plaintiffs argue that the January 29 statements were false because Defendants knew that business in two of the market segments that Anixter served (the "OEM Market— particularly in the U.S. and European automotive industries" and the market for corporate IT projects) had begun to slow in late 2007 and already was negatively affecting Anixter's business. (Pl. Resp. Mot. Dismiss at 12). In support of this argument, Plaintiffs point the Court to allegations that generally demonstrate that these sectors of the global economy were slowing.

For example, Plaintiffs rely on their allegations in paragraph 58, which states that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe." As an initial matter, Defendants were not required to publicly disclose to the markets statements about the general condition of the global economy. See *Higginbotham v. Baxter Intern., Inc.,* 495 F.3d 753, 759 (7th Cir.2007) (citing *Wielgos v. Commonwealth Edison Co. .,* 892 F.2d 509, 517 (7th Cir.1989) ("The securities laws do not require firms to 'disclose' information that is already in the public domain.")). But more to the point, even if Grubbs knew that corporate spending on IT projects was beginning to decline in January of 2008, that knowledge is not sufficient to support a reasonable belief that Grubbs' statement that Anixter had a "solid backlog" of new projects and customers was false. Perhaps Anixter, at that time, did have a solid backlog of new projects despite the worsening economic conditions. Contrasting Defendants' specific statements about Anixter's business with generalized, well-known allegations about the state of the economy is insufficient to establish falsity under the strict pleading requirements of the PSLRA. *Premier Capital Management, L.L.C.,* 2003 WL 21960357, at *2.

**\*22** Paragraph 58 also alleges that Defendants knew (but failed to disclose) that by January 2008, Anixter was suffering a "slowdown in sales in its enterprise cabling business." The next sentence of Paragraph 58 is intended to provide support for this statement: "Indeed, defendant Eck later admitted after the Class Period that 'IT projects spending ... that drives [Anixter's] cabling business tends to slow down, very obviously slows down, in difficult times.' " It is not apparent to the Court that Eck's later statement is an "admission" that Anixter was aware (yet failed to disclose) that its IT projects business actually was slowing in January of 2008. Regardless, post-class period allegations are no substitute for facts showing contemporaneous knowledge of a statement's falsity. *Higginbotham,* 495 F.3d at 759–60; *Sutton,* 2001 WL 897593, at *4.[15]

15    See discussion of post-class statements, *infra* Sec. IV. 2.

Regarding Anixter's OEM business, Plaintiffs allege that by 2008 the "industrial and automotive industries * * * were slowing dramatically as a result of the global economic crisis." ¶ 59. Again, Defendants do not commit securities fraud by failing to specifically alert investors to the general condition of certain segments of the market. *Higginbotham,* 495 F.3d at 759; see also *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.,* 7 F.3d 357, 377 (3d Cir.1993) ("[W]e hold that the defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast. As the reasonable investor should have known

Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

of the economic downturn in the Northeast at that time, the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors. The federal securities laws, in a word, do not compel the Partnership to state the obvious."); *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 279 (3d Cir.2004) (defendant "was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); *Baron v. Smith,* 380 F.3d 49, 57 (1st Cir.2004) ("It is not a material omission to fail to point out information of which the market is already aware.").[16]

16     Plaintiffs also direct the Court to ¶¶ 60 and 106 of their Complaint. The allegations in ¶ 106 are not actionable for the same reasons as those in ¶¶ 58 and 59.

The Court now turns to one of the key components of Plaintiffs' claims—namely, that the "organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 14). Plaintiffs' complaint does not identify with the particularity required by the PSLRA (or Rule 9(b)) the source for their allegation that by January and February of 2008, Defendants were promising 8–12% organic growth for the entire company for 2008. Instead, paragraph 42 generally pleads that by "mid–2007, defendants began telling investors that * * * Anixter expected to achieve organic revenue growth of 8% to 12% * * * in 2008." However, that allegation fails to identify which Anixter executive or executives made the statement or statements, when they were made, and the particulars of each statement. Accordingly, the Court disregards the allegation in paragraph 42. Plaintiffs may not plead generally that Anixter provided "guidance of 8% to 12% organic growth for 2008," as they do throughout the complaint. See ¶¶ 4, 6, 15, 57, 108.

**\*23** The closest that Plaintiffs come for support for their "8–12%" allegation in early 2008 is from Defendant Letham's response (during the January 29th earnings call) to a question about whether he expected the "nine to 11% [growth] range continuing ahead here in Europe and then Asia Pacific, Latin America" to continue. See ¶ 52. Accepting all reasonable inferences in favor of Plaintiffs, the exchange can be read as Defendant Letham reporting that he expected to see that level of growth continuing for Europe "as we go into the next year." However, the statement cannot be stretched as far as Plaintiffs would like. Letham never said that he expected 9–11% *organic* growth (as opposed to growth including acquisitions), or that he expected 9–11% growth for the *entire company,* as opposed to the regions that he identified. Further,

the time period in the statement is indefinite—nowhere does Letham promise 9–11% over 2008 in its entirety.[17]

17     Defendants argue that even if they had explicitly promised "8–12% organic growth for 2008," such a statement would not be actionable under the securities laws. In support of their position, Defendants cite a number of cases that have held "vague statements predicting growth" to be nonactionable. *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 289–90 (4th Cir.1993) (statement projecting "expected annual growth rate of 10% to 30% over the next several years" was not actionable "because the market price of a share is not inflated by vague statements predicting growth"); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993) ( "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."). The Seventh Circuit has commented favorably on both *Raab* and *Krim,* but has not adopted a per se rule that predictions of future growth are immaterial and therefore not actionable. *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332–33 & n .6 (7th Cir.1995) ("While it often may be the case that predictions of growth are not material, we hesitate to impose a *per se* rule to this effect. The Supreme Court has cautioned that materiality is typically an issue to be resolved by the finder of fact. A blanket rule that forward-looking statements are not material does not allow for the contextual, fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity.") (citations omitted). Accordingly, in the Seventh Circuit it appears that forward looking statements that are false when made or made without a reasonable basis can give rise to § 10(b) and Rule 10b–5 liability, if they are material. *Id.; Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995); see also *Iles v. Swank,* 2006 WL 1806365, at *3 (N.D.Ill. June 28, 2006); *Weiner v. Quaker Oats Co.,* 2000 WL 1700136, at *11 (N.D.Ill. Nov.13, 2000).

Plaintiffs' other central allegation is that Defendants "repeatedly disclaimed that Anixter was suffering any negative effects associated with deteriorating credit markets and global economic conditions." (Pl. Resp. Mot. Dismiss at 4; see also *id.* at 14–15). Contrary to Plaintiffs' allegations, Defendants never told investors in early 2008 that Anixter was categorically immune to the effects of a global economic slowdown. For example, in January of 2008, Defendant Letham recognized the "negative economic news" in the "broader markets," and stated that *"early indications* of our business activity continue to support a continuation of solid trends for our business despite the economic uncertainties in

other parts of the economy." ¶ 49 (emphasis added). Letham's statement was a measured one; the statement itself reflects the fact that it was based only on the preliminary data then available. The complaint does not identify information in Defendants' possession as of January 2008 that would render fraudulent Letham's generally positive statements about the business as a whole.[18]

18    Similarly, Defendant Grubbs stated that in spite of "a well publicized less certain overall economic environment than 2007, *recent activity levels* suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year." ¶ 48 (emphasis added). Plaintiffs do not identify any information known to Defendant Grubbs that undercuts the proposition that then-recent activity levels suggested that 2008 would present "opportunities for growth."

Furthermore, Plaintiffs' response makes clear that its main claim of poor performance concerns Anixter's European OEM business. But that emphasis falls short for at least a couple of reasons. First, Defendant Grubbs disclosed on January 29th that organic revenue growth in Europe was "flat" (¶ 47), undermining Plaintiffs' allegation that Defendants painted an improperly rosy picture of their prospects in that market. Second, even if Defendants had failed to sufficiently account for weaknesses in Anixter's European OEM business, that division represents only 10% of Anixter's sales. Weaknesses in one (relatively small) part of Anixter's business would not necessarily render untrue positive statements about the company as a whole. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 960 (8th Cir.2008) (citing *In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 549–50 (8th Cir.2004)) ("[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."). Plaintiffs do not explain with the particularity required by the PSLRA why Anixter's European OEM business was so important to Anixter's overall financial health that declining sales there would necessarily have a material impact on the Company's bottom line. Similarly, Plaintiffs do not explain why Anixter's positive statements about its business did not take into account any problems that existed in its European OEM businesses along with other offsetting factors in other countries and with other products.

*April 2008 Statements*

**\*24**   Similarly, Plaintiffs have not properly alleged that any of Defendants' statements from April 2008 were false

or misleading. Plaintiffs challenge as fraudulent statements that Defendants made on April 22, 2008 indicating that Anixter's business *as a whole* was succeeding and would continue to succeed in the face of an economic slowdown. For example, on April 22, 2008, Defendant Grubbs reported that the "diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions." ¶ 61. During the same call, Defendant Eck reported that "any effect from the declining economic environment on Anixter was limited to specific customers and did not represent a 'broader trend' for the Company's businesses." ¶ 62. Plaintiffs' explanation as to why these and similar statements were untrue at the time they were made is insufficient.

Here again, Plaintiffs' tactic is to contrast positive statements (which again, pertained to the business as a whole) with increasingly poor performance from Anixter's European OEM business. As an initial matter, Defendants do not deny that they were aware of the increasing weakness in this segment of Anixter's business. In fact, on April 22, 2008, the Company announced that its organic growth rate for Europe had fallen to only 2%.[19] ¶ 61. Defendants discussed lower gross margins and operating margins in the European OEM supply business in the April 22, 2008 earnings call and the press release that accompanied it. See ¶ 64. Further, Defendant Eck was specifically discussing Anixter's "OEM supply businesses" when he warned that "[s]hort-term macroeconomic conditions may slow our organic sales growth from the rates of the past couple of years."[20] ¶ 62. Despite these caveats and warnings regarding Anixter's OEM and European businesses, Plaintiffs hew to their argument that Defendants' positive statements about Anixter as a whole were misleading in light of the poor performance in the European OEM segment. Here again, Plaintiffs cannot explain how weakness in one relatively small segment of Anixter's business renders false generally positive statements about the business as a whole (especially when the weaknesses in the European OEM business were disclosed).[21]

19    By way of contrast, the complaint reflects that many of the company-wide results Anixter reported for 1Q08 were positive. See ¶ 61 (reporting rise in sales, operating profits, and earnings per diluted share over the prior year quarter).

20    CW1 reports that "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. The

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 41 of 61 PageID #:2915

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

information provided by this witness is of little value to Plaintiffs—Defendants do not deny that they were aware of problems in their European OEM business, which they timely disclosed. CW1 does not allege that Individual Defendants knew, as of April 22, 2008, that results in that particular business line would trend downward for the rest of the year, or that such a downward trend would not be offset by successes in other businesses. The complaint also reflects the fact that Defendant Eck described a slowdown in Anixter's OEM business as a "[s]hort term anomaly" attributable in part to cycles in the commodities markets. Plaintiffs offer no allegations sufficient to suggest that this statement was false when it was made. Additionally, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe," but predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. ¶ 63. Defendants offer no facts that would suggest that Eck knew that seasonal upticks in sales and pricing actions would not, in fact, mitigate the "pressure" in those markets.

As with the challenged January/February statements, the Court has carefully scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from April 2008 were false or misleading. For example, Plaintiffs have failed to plead specific facts suggesting that Anixter did not, in fact "continue[ ] to make significant progress on [its] major initiatives" in Q108 (¶ 63), or that Anixter had not experienced "an improvement in conditions" between Q1 and Q2 (¶ 67).

The only other allegation to which Plaintiffs point to establish the falsity of Defendants' April 22, 2008 statements involves Anixter's pricing dispute with JLR, a major European OEM customer. See ¶¶ 70, 71, 113. Defendants did not disclose this dispute to shareholders until after the end of the class period. As an initial matter, the Complaint does not allege with adequate particularity that the Individual Defendants knew of the dispute at any time during the class period. The Complaint does not identify precisely when the dispute between JLR and Anixter began and when Individual Defendants became aware of it. See *id.* Instead, the complaint alleges that "JLR's pressure on Anixter [to lower prices] became even more pronounced * * * in March 2008." The complaint alleges that it was "well known at Anixter's Spitfire Park Plant in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed amount." ¶ 71. However, Plaintiffs do not allege how or when any of Individual Defendants learned of the dispute (although Plaintiffs do

allege that Eck visited the Spitfire Park plant in July 2008). *Id.* Assuming for the sake of argument that Plaintiffs have properly alleged that Individual Defendants knew of the JLR dispute on April 22, 2008, the complaint fails to properly allege facts suggesting that Defendants knew that they would lose the dispute and would have to pay JLR.

**\*25** Assuming further that the complaint alleged that Defendants knew about the dispute and knew on April 22, 2008 that Anixter would have to pony up, the complaint does not adequately allege that the dispute was "material" such that Anixter was required to disclose it. Rule 10b–5 forbids a company or an individual "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The complaint alleges that "[u]ltimately, on October 20, 2008, defendants admitted that Anixter was involved in this 'pricing dispute' and was forced to pay the $3 million disputed amount during the class period, which had a material impact on the Company's earnings and gross margins." ¶ 71. The allegation that $3 million had a "material impact" on Anixter's financials (and thus the dispute was a "material fact" that should have been disclosed) is a legal conclusion which the Court is not bound to accept. See *Ashcroft v. Iqbal,* ––––U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); see also *Twombly,* 550 U.S. at 555 (while a court must take all of the factual allegations in the complaint as true for purposes of a motion to dismiss, it is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiffs have not included allegations in their complaint that are sufficient to plausibly suggest that $3 million is an amount material to Anixter and the Court cannot assume that it is. For example, Plaintiffs do not identify how much revenue Anixter took in during 2008. Three million dollars almost certainly would be a material amount to a mom-and-pop grocery store, but it would not be material to an international giant like Microsoft. Where Anixter lies on the continuum of corporate financial resources should be a fact ascertainable by Plaintiffs from available, publicly-filed documents.[22] Apart from the allegations involving the JLR pricing dispute, Plaintiffs offer no other undisclosed information at Anixter as of April 22, 2008 that suggests that any of the executives' statements were false.

22      As discussed above, Defendants attempted to cite to their SEC filings to establish that Anixter had more than

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 42 of 61 PageID #:2916

Garden City Employees' Retirement System v. Anixter..., Not Reported in...
2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

$6 billion in revenue in 2008, and that the $3 million disputed amount, if it had not been paid, would have represented an increase of less than 1% in Anixter's profit for 2008. See *Higginbotham,* 495 F.3d at 759 ("securities lawyers often use a 5% change as a rule-of-thumb approach to what is 'material' "). The Court has not considered this argument, as the Court has not judicially noticed the SEC filings which establish Anixter's size for the truth of their contents. See *infra* Sec. II.

The Court now returns to the "core" of Plaintiffs' complaint-that Defendants were promising 8–12% organic growth for 2008 at a time when they knew that they could not possibly deliver on that goal. The April statement that Plaintiff challenges is Defendant Letham's statement that "the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Nothing in the statement can be read as a projection or promise of performance for the 2008 year—instead, reading all inferences in favor of Plaintiffs, Letham here reports that Anixter had a "target range" of 8–12% organic growth, not limited to a specific time frame or division of the company. As explained above, Plaintiffs identify no facts then known to Letham that suggest that a general organic growth projection of 8–12% (not limited to a certain time frame or division of the company) made on April 22, 2008 would have been in bereft of a reasonable basis or in bad faith.

*July 2008 Statements*

**\*26** Like the challenged statements from the first half of 2008, the Court has considered Plaintiffs' allegations pertaining to the statements Defendants made in July of 2008 and concludes that none are actionable. Because Plaintiffs' discussion of the July statements in their response focuses on their twin "core" allegations (Pl. Resp. Mot. Dismiss at 14–15), the Court will begin there.

First, Plaintiffs essentially argue that by July of 2008, the economy had soured to such a state that "the organic growth projection of 8–12% [Defendants] gave to the market was without a reasonable basis." *Id.* The problem with Plaintiffs' argument is the same for the July statements as it was for the statements from the early parts of 2008—Anixter simply did not promise "8–12% organic growth for 2008" either in its July SEC filings, press releases, or during the July 22, 2008 earnings call with analysts.

On July 22, Anixter reported some positive numbers, but reported organic sales growth of only 4% for the quarter. ¶ 74.

Discussing the slower organic sales growth rates, Defendant Eck said the following:

"While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence. We believe the overall market conditions, as they currently exist, should allow for consecutive quarter sales growth from the second to third quarter of this year. *If we achieve a modest level of consecutive quarter growth, it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth.*"

¶ 74 (emphasis added). The plain implication of the statement is that Anixter was then not on track to hit its "longer-term target" of 8 to 12 percent yearly growth, and assuming a "modest level of consecutive quarter growth," Anixter's growth rates would move "closer" to the 8–12% range.

Plaintiffs' second "core" argument is that in July, Defendants continued to falsely deny "that Anixter was being negatively effected [sic] by the slowing economy." (Pl. Resp. Mot. Dismiss at 15). When Anixter reported its 2Q08 results, Defendants recognized that organic growth had slowed to 4% (see ¶ 74), but also reported some positive results for the quarter (see ¶ 75). With these results in mind, Anixter's executives did recognize the "continuing concerns about weaknesses in our economy." ¶ 77; see also ¶ 75 (acknowledging "continuing macroeconomic uncertainty"). However, many of Individual Defendants' July statements about Anixter's business prospects as a whole were of a positive nature. Individual Defendants opined that Anixter's business as a whole would continue to succeed in the face of the economic downturn. See, *e.g.* ¶ 74 ("While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence"); ¶ 77 ("while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world"). Plaintiffs have not properly alleged that these statements were false or misleading because they have failed to identify "specific, contradictory information presumably known" to Individual Defendants in July that contradicted these statements about Anixter's business as a whole. *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d at 1000. As explained below, to the extent Plaintiffs' confidential witnesses offer undisclosed information known to Defendants in July of 2008, the information regards only Anixter's

European OEM business and one customer of Anixter's U.S.-based OEM business.

 **\*27** Individual Defendants also spoke about Anixter's OEM business and its business prospects in Europe. The statements regarding these aspects of Anixter's business can best be described as "mixed." Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity," these developments were "offset by growth with other customers and other geographies." ¶¶ 78–79. Defendant Eck recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id.* While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. ¶ 75. In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id.* However, addressing the issue of continued "margin pressure from steel price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id.* Defendant Letham reported "good quote activity in the OEM supply business." ¶ 78.

These statements (which again, reflect a rather mixed outlook) would be misleading only if (1) Plaintiffs could point to specific statements that were untrue or misleading; or (2) Plaintiffs could identify information known to Individual Defendants at that time that was of such a negative nature as to preclude Anixter from saying nearly anything positive about Anixter's OEM business or its prospects in Europe. The complaint fails to do either. First, Plaintiffs offer nothing to contradict any *specific* statement made by Individual Defendants in July. For example, Plaintiffs do not offer facts to suggest that Anixter was not seeing "good quote activity" in its company-wide OEM supply business. (¶ 78). Again, Plaintiffs take no issue with any of Anixter's reported financials.

Instead, Plaintiffs essentially argue that Anixter's OEM supply business (especially in the U.S. and Europe) was doing so poorly that the positive statements Defendants made in July were misleading. (Pl. Resp. Mot. Dismiss at 15). Plaintiffs fail

to offer "specific, contradictory information," *In re Harley–Davidson, Inc. Sec. Litig.,* 660 F.Supp.2d at 1000, presumably known to Individual Defendants in July that is sufficient to establish this proposition. Instead, the allegations they do offer (from "confidential witnesses") fail to establish much of anything.

According to CW1, a "former Credit Manager for Anixter's European Markets," "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. CW1 reports that Anixter's UK OEM business had fallen nearly by half "by the end of 2008," but does not offer information as to that division's performance as of July 22, 2008. As noted above, Defendants did report that Anixter's UK OEM business was "beginning to slow a touch" because of "macroeconomic factors." ¶ 79. Nothing that CW1 reports concerning Anixter's performance at year end is inconsistent with any of Individual Defendants' statements to the markets on July 22. The information provided by CW3 is more temporally specific but less specific in regard to the level of decline of Anixter's sales. CW3 reports that "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008." ¶ 86. The Court is left to guess what a "significant decline" in sales is. Considering the fact that in July, Defendants did acknowledge slowed sales from this division, CW3 does not provide information sufficient to suggest that Defendants' July statements were false or misleading.

 **\*28** Finally, the allegations from CW4—a "U.S.-based Product Planner in Anixter's OEM division"—are insufficient to suggest that any of Defendants' July statements were false or misleading. CW4 reports that by "mid–2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88. The Court is left to guess what "mid–2008" means. It is unclear whether the events described by CW4 began prior to Defendants' July 22, 2008 statements. In the next paragraph, Plaintiffs' are more specific, alleging that "by the summer of 2008, an increasing number of orders were ranked at 900" (meaning they were slated to be cancelled or delayed). ¶ 89. However, later in the complaint, Plaintiffs cite CW4 for the proposition that *"beginning in August 2008,* an increasing number of orders were ranked at 900." ¶ 112 (emphasis added); see also ¶ 111 ("According to CW4 * * * by *August and September 2008,* Anixter was pushing out delivery dates for products previously ordered from vendors, or cancelling the orders

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 44 of 61 PageID #:2918

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

entirely, in order to avoid taking delivery of new inventory * * * ”) (emphasis added). The internal inconsistencies in the complaint make it impossible for the Court to assess whether the events described by CW4 began before or after Individual Defendants spoke to the market on July 22, 2008.

Furthermore, CW4's information is of limited value, because “many of” the orders that were delayed or cancelled involved one customer—Case New Holland. ¶¶ 89–90; 110–112. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 960 (8th Cir.2008) (citing *In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 549–50 (8th Cir.2004)) (“[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard.”); *California Pub. Employees' Ret. Sys. V. Chubb Corp.,* 394 F.3d 126, 156 (3d Cir.2004) (“[A]nectdotal examples of profitable customers lost of policies renewed at flat or slightly raised raises [do] not demonstrate that the rate initiative was failing”). The complaint says that “many of” the delayed or cancelled orders involved Case New Holland, leading to the inference that there were some delayed or cancelled orders that involved other customers. However, Plaintiffs have not identified any of these other orders or customers.

Because Plaintiffs have failed to specify any statements alleged to have been false or misleading and the reasons why the statements are false or misleading, as required by the PSLRA. § 78u–4(b)(1) (B), dismissal of Count I is appropriate.

### 2. Failure to Plead Scienter in Accordance with the PSLRA

Count I also is subject to dismissal for a second, independent reason. As discussed above, the PSLRA provides that the complaint in a securities-fraud action must, “with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u–4(b)(2). That “required state of mind” is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756 (7th Cir.2007). In many ways, the analysis the Court has undertaken in Section IV.A.1. above overlaps with the scienter analysis; for if Plaintiffs have failed to properly plead that any of Anixter's statements were false or misleading, Planitiffs could hardly allege that Defendants made false statements with the required state of mind. For example, the information provided by Plaintiffs' confidential witnesses

does not give rise to an inference that Defendants were acting with scienter, as the information provided by the CWs is not inconsistent with Defendants' disclosures.[23]

23    Similarly, Defendants' statements regarding Anixter's European OEM business do not add to an inference of scienter. As discussed above, Defendants disclosed difficulties in this area of its business during the class period. See, *e.g. Cutsforth v. Renschler,* 253 F.Supp.2d 1216, 1261 (M.D.Fla.2002) (disclosure of negative information “is inconsistent with the contention that * * * defendants were acting with scienter”).

**\*29** With that said, the Court writes further to elaborate on why Plaintiffs complaint fails to adequately allege the required “strong” and “cogent” inference of scienter. *Tellabs,* 551 U .S. at 322–24. The two grounds on which Plaintiffs base their allegations of scienter not previously discussed by the Court are (1) Defendants' post-class period statements, and (2) Individual Defendants' stock sales during the class period.[24] The Court will discuss each of these issues in turn.[25]

24    Additionally, throughout the complaint, Plaintiffs allege that Defendants “acted with scienter” (*e.g.* ¶ 105) or “knew” that the economic downturn was affecting the Company or that the Company would not meet its growth goals (*e.g.* ¶ 106). These sorts of “generalized and conclusory assertions do not satisfy the heightened pleading standard imposed on securities actions by the PSLRA,” *Roth v. OfficeMax, Inc.,* 527 F.Supp.2d 791, 800 (N.D.Ill.2007), and the Court need not discuss them further.

25    Although the Court discusses each of these issues separately, the Court wishes to make clear that it has not “scrutinize[d] each allegation [regarding scienter] in isolation” but instead has assess[ed] all the allegations holistically” to determine whether Plaintiffs properly alleged scienter. *Tellabs,* 551 U.S. at 326.

First, at various places in the complaint, Plaintiffs attempt to cite to Defendants' post-class period statements as evidence that Anixter's executives knew that their statements during the class period were false or misleading. See, *e.g.* ¶¶ 86, 96–102; 106–107. For example, Plaintiffs argue that on February 3, 2009 (when the fiscal year 2008 financial results were announced), Defendants “admitted” that Anixter had experienced a “trend of decelerating growth rates * * * in the past few quarters.” (Pl. Resp. Mot. to Dismiss at 21–22 (citing ¶ 107)). Similarly, after the end of the class period, Defendants allegedly “admitted” that they “have a very detailed view of

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 45 of 61 PageID #:2919

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

what's happening in each of the end markets and each one of the geographies," and that "when the market slows, the chunk of the market that we do particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly in our business." (*Id.* (citing ¶¶ 106–107)). Plaintiffs use these "admissions" in an to attempt to show that Defendants knew during the class period that Anixter's business was being affected by the economic downturn, yet failed to disclose that fact. (*Id.*).

As explained above, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.' " *Higginbotham,* 495 F.3d at 759–60. Post-class period statements by Defendants recognizing that their business has experienced a downturn do nothing to suggest that Defendants had contemporaneous knowledge (yet failed to disclose) that their company was earlier experiencing a downturn. That said, it is not the case that post-class period statements are never relevant in a securities fraud action. For example, in *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 254 (5th Cir.2009), cited by Plaintiffs, the plaintiff had provided "admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails)." The Fifth Circuit held that these "admissions" did support an inference of scienter. *Id.* ("The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly."). The Fifth Circuit further explained that "the plaintiff's partial reliance on alleged facts dating from the post-class period does not amount to 'fraud by hindsight' " because "the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.,* they are evidence that the defendants actually knew earlier that the course of action would turn out badly." *Id* .

 **\*30** Here, the Court has carefully considered all of the post-class period statements identified by Plaintiffs. Unlike the "admissions" used by the plaintiffs in *Lormand,* the later statements seized on by Plaintiffs here are not akin to "admissions" by Individual Defendants that they had engaged in securities fraud. Many of the statements (*e.g.,* the statement Anixter had experienced a "trend of decelerating growth rates") amount to nothing more than *ex-post* descriptions of Anixter's financial performance in 2008.

The statements do not establish that Defendants knew—from an *ex ante* perspective—that Anixter's growth rates would trend downward over the year. *Higginbotham,* 495 F.3d at 759–60. The statements that Defendants "have a very detailed view" of Anixter's financial performance and that Defendants would notice the effect of a slowed market "pretty quickly" are not admissions that Defendants foresaw (yet failed to disclose) the fact that Anixter's growth rates would continue to decline over the course of 2008 to the extent that they did. If Plaintiffs could identify contemporaneous information known to Defendants that showed that Anixter's current financial health or future prospects was poorer than what Defendants disclosed to the market, such post-class period statements may be relevant to corroborate and build on the inference of scienter raised by the possession of that contemporaneous information. See *Lormand,* 565 F.3d at 254. But on their own, the post-class period statements identified by Plaintiffs do not help to establish a "strong" or "cogent" inference of scienter.

Individual Defendants' sales of Anixter stock during the class period likewise do not raise an inference of scienter. Most importantly, Plaintiffs' complaint fails to establish a strong inference of scienter because Plaintiffs have only provided information about Defendants' stock sales from *within* the class period. Without contextual information about Defendants' stock sales outside the class period, the Court cannot determine if the class period sales were "unusual or suspicious." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir.2008). In *Pugh,* the Seventh Circuit held that the plaintiffs' discussion of the defendants' sales of stock in the complaint had failed to create a strong inference of scienter. There, the "complaint merely set[ ] forth the aggregate amount of shares sold during the class period and the value of those shares," *id.*—which is precisely what Plaintiffs here have done. "[T]he failure to provide any context showing that the applicable time period was unusual undercuts a 'strong' demonstration of scienter." *Id.* (citing *Higginbotham,* 495 F.3d at 759 ("Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April.")). Plaintiffs do not even attempt to distinguish *Pugh,* despite the fact that Defendants repeatedly cited it throughout their opening memorandum.[26] Instead, Plaintiffs argue that Defendants' sales were "suspicious in both timing and amount"—suspicious in timing because Defendants Grubbs sold stock on January 29, 2008 (the same day they spoke to the market),[27] and suspicious in amount because of the allegedly large amount of stock sold and the price at which the sales were made. (Pl. Resp. Mot. Dismiss at 26). But

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

without contextual information about Defendants' stock sales outside the class period, the Court cannot properly evaluate these arguments. *Pugh* is directly on point, and in light of that controlling authority, Plaintiffs' reliance on Defendants' class period stock sales to establish scienter fails.

26    Plaintiffs also ignore *Higginbotham's* discussion of the same issue.

27    Defendant Letham sold a block of stock two weeks later, on February 15.2008.

**\*31** As discussed above, Defendants have attached Forms 4 showing Defendants' sales from 2006 and 2007. Because the Court has determined that Plaintiffs' complaint is subject to dismissal for the reasons stated above, the Court need not rule definitively on the difficult question (discussed at length above) of whether it may consider at this stage of the case the Forms 4 for the truth of what is discussed in them. Nevertheless, looking ahead to the possibility of an amended complaint—and further down the road to a possible motion for summary judgment—it would appear that the Forms 4 provide the "context" that Plaintiffs thus far have omitted. A review of those Forms and the chart at Exhibit D which summarizes them, seems to undermine any notion that a strong inference of scienter can be drawn from Defendants' stock sales. In fact, Defendant Letham sold no more shares during the class period than during the same months in each of the two prior years.[28] Defendant Grubbs sold substantially less stock during the class period than in prior years.[29] Interestingly, Defendant Grubbs sold more stock in January of 2008 than he sold in any other single month in 2006, 2007, and 2008 (29,000 shares). However, Plaintiffs do not mention that Defendant Grubbs sold 14,000 of those shares on January 2, 2008—just weeks *before* he allegedly began to engage in securities fraud. If anything, a large sale of stock just before a defendant is alleged to have begun engaging in securities fraud undercuts an allegation of scienter. The *only* sale that Defendant Eck made in 2006, 2007, and 2008 was a sale of 1,045 shares in September of 2008.[30] As this sale represented only 7.17% of his holdings at the time (1.92% including options), it is difficult to infer much of anything from it.[31]

28    For example, Defendant Letham sold 3,668 shares per month in January through June of 2008, 3,668 shares per month in January through June of 2007, and 3,332 shares per month in January through June of 2006.

29    Defendant Grubbs sold 15,000 shares during the class period. He sold 30,000 shares during the months of January–October 2008, 196,125 shares during that same period in 2007, and 91,550 shares during that same period in 2006.

30    In their complaint, Plaintiffs mention sales by other Anixter executives who are not Defendants in this case. These sales "need not be considered" as "[t]here are no allegations that th[ese] officer[s] * * * [were] in any way involved in the alleged fraudulent misconduct." *Higginbotham v. Baxter Inter., Inc.,* 2005 WL 1272271, at *8 n. 6 (N.D.Ill. May 25, 2005).

31    Because the Court has found Count I to be subject to dismissal on two independent grounds, it need not address the other arguments Defendants raise regarding Count I—namely, that their forward-looking statements are protected by the PSLRA's statutory safe harbor (19 U.S.C. § 78u–5(c)), that some of Defendants' statements were immaterial puffery, or that Plaintiffs have failed to plead loss causation.

### B. Count II

As discussed above, Count II of the complaint is directed against the Individual Defendants and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh,* 521 F.3d at 693. Because Plaintiffs have failed to do this, Count II is dismissed as well.[32]

32    The Court need not address the other argument Defendants have raised in opposition to Count II; namely, that Plaintiffs have failed to properly allege that Individual Defendants had general or specific control over Anixter. See *Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 911–12 (7th Cir.1994).

### V. Conclusion

For the foregoing reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice.[33] Plaintiffs are given 28 days to replead if they believe that they can cure the deficiencies identified above. Plaintiffs' motion to strike [47] is granted in part and denied in part.

33    In *Fannon v. Guidant Corp.,* 583 F.3d 995, 1001–02 (7th Cir.2009), the Seventh Circuit discussed whether a district court had abused its discretion in dismissing a securities fraud complaint with prejudice. The court cited a number of cases in which courts of appeals have

Case: 1:20-cv-05593 Document #: 93-1 Filed: 07/27/21 Page 47 of 61 PageID #:2921

Garden City Employees' Retirement System v. Anixter..., Not Reported in...

2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. *Id.* at 1002. However, the Seventh Circuit declined to adopt a *per se* rule regarding when such complaints should be dismissed without prejudice, finding instead that "each [case] must be evaluated on its own merit, in light of its own procedural history." *Id.* In affirming the district court's dismissal with prejudice, the Seventh Circuit noted that there, plaintiffs had had "a number of opportunities to craft a complaint that complied with the standards of the PSLRA." This is the first time that the Court has dismissed Plaintiffs' complaint and the Court does not see why Plaintiffs should not have at least one opportunity to correct the pleading deficiencies identified in this opinion, if they can do so.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1303387, Fed. Sec. L. Rep. P 96,291

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 695451

2006 WL 695451
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Frank HERNANDEZ, Jr., Plaintiff,

v.

MIDLAND CREDIT MANAGMENT,
INC.; MRC Receivables Corporation;
and Encore Capital Group, Inc., formerly
MCM Capital Group, Inc., Defendants.

No. 04 C 7844.
|
March 14, 2006.

**Attorneys and Law Firms**

Derek B. Rieman, Cathleen M. Combs, John D. Blythin, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL, for Plaintiff.

James William McConkey, Richard Eric Gottlieb, Margaret J. Rhiew, Renee Lynn Zipprich, Dykema Gossett PLLC, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.

**\*1** On November 14, 2004, Plaintiff Frank N. Hernandez, Jr. received a dunning letter from Defendant Midland Credit Management, Inc. (hereinafter, "MCM,") as part of MCM's attempt to collect more than $3,000 in debt. MCM enclosed a privacy notice with this letter, disclosing that MCM or its parent corporation, Defendant Encore Capital Group, Inc. (hereinafter, "Encore"), might share nonpublic information gathered in the course of debt collection with certain nonaffiliated third parties, and that Hernandez had the option to opt out of such disclosures by taking certain affirmative steps. Contending that these statements violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter, "FDCPA"), Hernandez brought suit against MCM and Encore for statutory damages and attorneys fees.[1] Specifically, Hernandez believes that the privacy notice indicates either that Defendant MCM and Defendant

Encore actually engage in prohibited third-party disclosures and publications of debtors' information, or have illegally threatened to do so as part of a debt collection effort.

1      Plaintiff had also originally included MRC Receivables Corp. as a defendant in this suit, but has since agreed to drop this party in exchange for certain stipulations from the remaining Defendants unrelated to the resolution of this motion.

Hernandez now moves for judgment on the pleadings. For the following reasons, the court denies his motion.

*STATEMENT OF FACTS*

Illinois resident Hernandez, at some unspecified point, incurred several hundreds of dollars' worth of debt to Providian National Bank. (Compl. ¶ 3, Ex. A at 1.) MRC Receivables Corp.[2] (hereinafter, "MRC,") acquired Hernandez's debt from Providian National Bank. (*Id.*)

2      MRC is a Delaware corporation with its principal place of business in California. (Compl.¶ 4.)

On November 14, 2004, Hernandez received a dunning letter from MCM,[3] stating, in relevant part:

3      MCM is a Kansas corporation with its principal place of business in California. (Compl.¶ 5.)

MRC Receivables Corp. recently purchased your PROVIDIAN NATION B account and Midland Credit Management, Inc. ("MCM"), a debt collection company, is the servicer of this obligation. As the new servicer of this account, we would like to find a positive resolution to your account.

Midland Credit Management, Inc. (MCM) is currently able to offer you a substantial discount of 50% *off* your Current Balance *if we receive payment by 12-29-2004.*

What's In It For You? Once MCM receives your payment of $1,567.63, we will:

• Notify the credit bureaus that the debt is "Paid".

• Immediately stop all recovery activity on this account.

(Compl. ¶¶ 19-20, Ex. A at 1.) The letter explains that any payment on the debt-to which an MCM account number

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 695451

was given-should be made payable to MCM and remitted to MCM. (*Id.* at Ex. A. at 1.)

Both MCM and MRC are wholly owned subsidiaries of the publicly-traded Delaware corporation Encore.[4] (*Id.* at ¶ 11.) Defendant Encore prepared a privacy notice that Hernandez received with the dunning letter. (*Id.* at ¶ 21.) The privacy notice states that Encore, on behalf of its affiliates, including MCM, "is delivering this Privacy Notice so that you understand what nonpublic personal information we gather about you, how we use or share that nonpublic personal information, and the safeguards we have in place in order to protect that nonpublic personal information." (*Id.* at Ex. A at 3.) The privacy notice explains that:

[4]    Encore is headquartered in the same San Diego offices as MCM and MRC. (Compl.¶ 11.) Encore also operated under the name MCM Capital Group, Inc. at the time relevant to this action.

**\*2** In connection with collection on, or servicing, your account, we collect nonpublic personal information about you from the following sources:

• Directly from you, application or other forms (e.g., your name, address, social security number, telephone number and other information obtained from our communications with you);

• From your account transactions with us, our affiliates or others including, without limitation, the originating creditor (e.g., account balance, payment history, banking information and customer information);

• From consumer reporting agencies (e.g., creditworthiness or credit history); and

• From other nonaffiliated third parties (e.g., providers of location information and demographic information).

(*Id.*) The notice states, further, that Encore and its affiliates reserve "the right to disclose all the nonpublic personal information" they collect to third parties, including:

• Financial service providers, such as mortgage bankers or other lenders;

• Non-financial companies, such as direct marketers or retailers.

(*Id.*) Finally, the Encore privacy notice includes an opt-out provision advising Hernandez that if he wished to prevent the disclosure of nonpublic personal information

to nonaffiliated third parties, he must make a request for non-disclosure in writing. (*Id.*) The notice explained that such a request must include Hernandez's MCM account number and must be mailed to "MCM Privacy Notice," at an address different from the MCM address to which Hernandez was to remit payments. (*Id.*)

Hernandez alleges that debt collectors often sell lists of people who have not paid their debts to issuers of subprime credit cards and mortgage loans, to enable those issuers to make loans to the listed debtors. (*Id.* at ¶ 30.) Hernandez excerpts Encore's Report on SEC Form 10-K for the twelve months ending December 31, 2003 (hereinafter, "Rep. SEC 10-K"), as evidence that Encore and MCM engage in this practice. (*Id.* at ¶ 31.) The report does not directly support Plaintiff's allegation that Defendants sell "lists" of debtors. The excerpted provision states:

*Account Balance Transfer*. We may transfer to our credit card partner accounts with a low expected value or those for which collection efforts have failed. The credit card partner may offer the debtor the opportunity to put the balance on a credit card. If the account is transferred we receive an agreed upon payment. We retain the ownership of and the ability to collect on the charged-off accounts that the card issuer has solicited until a successful balance-transfer has occurred.

(*Id.*) The rest of this report was not attached to complaint, but is available for download on the SEC's website. *See* http:// www.sec.gov/edgar/searchedgar/companysearch.html. According to this report, the excerpted paragraph appears in a section entitled "Collection Strategies," which also includes the use of "call centers," "legal action," "direct mail," "[debt] sale[s]," and "skip tracing."[5] (Rep. SEC 10-K, pp. 9-11.) Encore employs these collection strategies with respect to what Encore describes as its "systems-driven purchas[ing] and manage[ment] of charged-off consumer receivables portfolios." (*Id.* at 3.) Encore states that it "acquires these portfolios at deep discounts from their face values using its proprietary valuation process that is based on the consumer attributes of the underlying accounts." (*Id.*)

[5]    In addition to the collection strategies mentioned above, the SEC filing indicates that with respect to some accounts, Defendant Encore does not pursue any collection strategies at all, but rather allows them to remain "inactive." (Rep. SEC 10-K, p. 11.)

*PROCEDURAL HISTORY*

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 695451

**\*3** On December 3, 2004, Plaintiff Hernandez filed suit against Defendants MCM and Encore, alleging violations of §§ 1692c-1692e of the FDCPA. In its answer, MCM asserted four affirmative defenses: (1) the privacy notice contains no false or misleading statements; (2) MCM did not commit any actionable violation of the FDCPA; (3) any violation of the FDCPA was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such an error; and (4) MCM "may possess certain arbitration rights based on contracts entered into by" Hernandez. (Defendant, Midland Credit Management, Inc.'s Answer and Affirmative Defenses to Plaintiff's Complaint (hereinafter, "Def. MCM's Answer"), pp. 11-12.) Encore asserts these same affirmative defenses in its answer, adding that: (1) Encore did not engage in any debt collection activities and (2) is not a debt collector. (Defendant, Encore Capital Group, Inc.'s, Answer and Affirmative Defenses to Plaintiff's Complaint (hereinafter, "Def. Encore's Answer"), pp. 12-13.)

Plaintiff now moves for judgment on the pleadings on the issue of Defendants' liability.

*DISCUSSION*

I. Standard of Review

When a party attempts "to dispose of the case on the basis of the underlying substantive merits," the appropriate standard for assessing a motion for judgment on the pleadings "is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." *Alexander v. City of Chicago,* 994 F.2d 333, 336 (7th Cir.1993). Thus, when a plaintiff moves for judgment on the pleadings in an FDCPA case, a court may only grant the motion if the plaintiff clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law based on the pleadings viewed in the light most favorable to the defendants. *Turner v. J.V.D.B. & Assocs., Inc.,* 330 F.Supp.2d 998, 1000 (N.D.Ill.2004) (citing *Nat'l Fidelity Life Ins. Co. v. Karaganis,* 811 F.2d 357, 358 (7th Cir.1987)); 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1368 at 530 (1990)). The pleadings "consist of the complaint, the answer, and any written instruments attached as exhibits."[6] *Housing Auth. Risk Retention Group, Inc. v. Chicago Hous. Auth.,* 378 F.3d 596, 600 (7th Cir.2004); *see also* Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, the court may also take judicial notice of "the contents of certain matters in the public record."

*Radaszewski ex rel. Radaszewski v. Maram,* 383 F.3d 599, 600 (7th Cir.2004) (relying on administrative findings about the plaintiff's medical condition in a disability discrimination suit).

6      Plaintiff includes a number of exhibits that were not attached to his complaint in moving for judgment on the pleadings, including Defendants' responses to interrogatories. Where a party submits material outside the pleadings on a motion for judgment on the pleadings, the court must either refrain from considering the extraneous submissions or provide the other parties with an opportunity to submit supplementary materials as well. *Jacobs v. City of Chicago,* 215 F.3d 758, 765 (7th Cir.2000). This court chooses the first option.

II. Consideration of SEC Filings

As set forth above, the court has taken judicial notice of Encore's Report on SEC Form 10-K for the twelve months ending December 31, 2003. Defendants object, arguing that an SEC filing should not be judicially noticed where the contents are subject to dispute. (Defendants' Response to Rule 12(c) Motion for Judgment on the Pleadings (hereinafter, "Defs.' Mem."), p. 3.) Defendants cite the Seventh Circuit's decision in *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344 (7th Cir.1995), in support of that proposition.

**\*4** In *Hennessy,* an employment discrimination case, the district court was attempting to determine the size of the defendant corporation so as to assess the applicability of a punitive damages cap under the 1991 Civil Rights Act. *Id.* at 1354. The district court had received conflicting testimony, but declined to take judicial notice of an SEC filing that pegged the number on the higher end. *Id.* The *Hennessy* court affirmed this decision not to take judicial notice because the parties disputed the relevance of the SEC filings which covered more units of the defendant corporation than the one unit specifically involved in the suit. *Id.* at 1355.

No such dispute exists here. Defendant Encore does not contest the excerpted portions from this SEC filing in its answer, but rather states that "the SEC filings speak for themselves." (Def. Encore's Answer ¶ 31.) This court will take judicial notice of this SEC filing. *See, e.g., In re PEC Solutions, Inc. Sec. Litig.,* 418 F.3d 379, 388 n. 7 (4th Cir.2005) (observing, in a securities fraud case, that the Second, Third, and Fourth Circuits all allow a court to examine a public document relied on in the complaint without converting a motion to dismiss into a motion for summary judgment); *R2 Investments LDC v. Phillips,* 401 F.3d 638,

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 695451

640 n. 2 (5th Cir.2005) (observing, in a securities fraud case, that SEC filings may be considered for their content, but not for the truth of statements therein); *Bryant v. Dupree,* 252 F.3d 1161, 1163 n. 1 (11th Cir.2001) (authorizing a district court in a securities fraud case to take judicial notice of public documents filed with the SEC for the purpose of determining what statement the document contains).

The court declines to take judicial notice of SEC filings which were not mentioned in the complaint or Plaintiff's initial brief on this motion and which Defendants would thus not have had an opportunity to contest in either their answers to the complaint or response brief on this motion. The specific filing that this court excludes is the filing attached to the Plaintiff's reply brief, which purports to include the servicing contract between MRC and MCM with respect to debts purchased by MRC. In addition to excluding this filing on equity grounds, the court finds that Plaintiff has not included enough information about this filing for the court to find this filing and compare its entirety to the portion excerpted here. Fed.R.Evid. 201(d).

### III. FDCPA Claims

The FDCPA seeks to eliminate abusive debt collection practices. 15 U.S.C. § 1692(e). To that end, the Act prohibits all communications "in connection with the collection of any debt" between a debt collector and "any person other than the [debtor], his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector" "without the prior consent of the [debtor] given directly to the debt collector."[7] 15 U.S.C. § 1692c(b). The Act also prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Examples of such harassment include: "[t]he publication of a list of consumers who allegedly refuse to pay debts" and "[t]he advertisement for sale of any debt to coerce payment of the debt." 15 U.S.C. § 1692d(3)-(4). Excluded from the former prohibition is publication of a list of debtors to a credit reporting agency or any person to whom a credit reporting agency could furnish a credit report. 15 U.S.C. § 1692d(3). Finally, "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Prohibited representations include: "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken" and "[t]he use of any

false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(5), (10).

7    The Act makes an exception from this provision for communications between the debt collector and third parties made in order to determine the location of the debtor, 15 U.S.C. § 1692c(b), and regulates these communications separately. 15 U.S.C. § 1692b.

**\*5** The FDCPA covers only attempts to collect debts incurred "primarily for personal, family or household purposes," 15 U.S.C. § 1692a(5), and draws a distinction between "creditors" and "debt collectors." The Act defines creditors as "any person who offers or extends credit creating a debt or to whom a debt is owed, but ... does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such a debt for another." 15 U.S.C. § 1692a(4). A debt collector is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[8] 15 U.S.C. § 1692a(6). Only debt collectors can violate the FDCPA, and violation of any provision triggers liability. 15 U.S.C. § 1692k(a).

8    The statutory definition includes six specific exemptions from this definition, but because neither party argues that any party falls into one of these exempt categories, the court will forgo their lengthily recitation.

Plaintiff's theory of the case is that the privacy notice he received and the actions Defendants are assertedly willing to take violate the FDCPA. The privacy notice states that Defendants will disclose nonpublic information about Plaintiff to third parties in violation of the FDCPA. (Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (hereinafter, "Pltf.'s Mem."), pp. 9-10.) Actual disclosure to these prohibited third parties would constitute a communication prohibited by § 1692c, while the false statement that the debt collector is entitled to make such disclosures or the threat that the debt collector would make such disclosures violates § 1692e. (*Id.* at 10-11.) Plaintiff notes that the opt-out requirement for such disclosures set out in the privacy notice violates the express requirement of § 1692c, which gives the debtor this privacy right without taking any action, and also constitutes a false statement of debtor's rights in violation of § 1692e. (*Id.* at 11.) Finally,

2006 WL 695451

Plaintiff argues that the putative disclosures amount to a harassing publication of lists of debtors in a manner that violates the FDCPA. (*Id.* at 10-11.) Actual publication would violate § 1692d, while the false statement that the debt collector is entitled to make such publications or the threat that the debt collector would make such publication violates § 1692e. (*Id.*)

Defendants argue that Encore is not a debt collector and as such is not subject to the liability under the FDCPA for its actions. (Defs.' Mem., pp. 5-10.) Additionally, Defendants contend that neither Encore nor MCM can be found to have violated the FDCPA as a matter of law because there are factual disputes on this point and because they have presented a valid affirmative defense, specifically the bona fide error defense. (*Id.* at 11-12.)

This court turns to the threshold question of whether Plaintiff can establish on the pleadings that Defendant Encore is a debt collector for the purpose of FDCPA liability before turning to the substantive question of whether or not the pleadings establish an FDCPA violation.

### A. Debt Collectors

**\*6** Defendants concede that MCM is a debt collector for the purpose of applying the FDCPA to its actions.[9] (Defs.' Mem., p. 1.) The parties differ, however, on the questions of whether Encore is similarly covered by the statutory provisions.

9     Defendants state:

> MCM is a collection agency that collects consumer debts. MCM is a "debt collector" under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"). MCM sent Mr. Hernandez a collection letter dated November 14, 2004 in an attempt to collect a debt originally owed to Providian National Bank that was assigned to MRC. Plaintiff claims that this collection letter was false and misleading in violation of the FDCPA because it contained a "privacy notice" that suggests that the debtor's information may be disclosed to prospective grantors of credit. An FDCPA claim against MCM is hardly noteworthy.

> (Defs.' Mem., p. 1.)

Defendant Encore is the sole shareholder in the corporation that is Defendant MCM. Defendants note, however, that the Seventh Circuit has repeatedly held that a shareholder in a corporation is not liable for the actions of the corporation without some showing that corporate formalities have been

ignored. (Defs.' Mem., pp. 5-6.) For example, in *Pettit v. Retrieval Masters Creditors Bureau,* the Seventh Circuit refused to extend liability to the largest shareholder and president of a debt collector corporation without a showing sufficient to pierce the corporate veil. 211 F.3d 1057, 1059-60 (7th Cir.2000). Moreover, the Seventh Circuit warned in *White v. Goodman* that frivolous allegations of a shareholder's joint liability could merit sanctions. 200 F.3d 1016, 1019 (7th Cir.2000).

Plaintiff here explicitly denies that his theory of liability is based on the idea that Defendant Encore and Defendant MCM were part of a single economic enterprise. (Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment (hereinafter, "Pltf.'s Reply"), p. 6.) Instead, Plaintiff argues that Defendant Encore meets the statutory definition of a debt collector under the FDCPA directly by its "material[ ] participat[ion] in the debt collection process." (Pltf.'s Mem., p. 6.) Plaintiff's theory is that Defendant Encore's privacy notice, sent on behalf of Defendant MCM, was part of Defendant MCM's debt collection effort. (*Id.* at 7.) Plaintiff argues that a debtor might be induced to pay on the delinquent claim so as to avoid the potentially financially damaging and embarrassing disclosures to third parties threatened in Encore's notice. (*Id.*)

In support of this position, Plaintiff cites *Romine v. Diversified Collection Servs., Inc.,* 155 F.3d 1142 (9th Cir.1998). In *Romine,* DCS, a debt collector, contracted with Western Union for use of Western Union's "Talking Telegram." *Id.* at 1143. Western Union had advertised the Talking Telegram as a way of stimulating debtors' responses to debt collection efforts. *Id.* at 1144. DCS gave Western Union the names and addresses of debtors for whom it did not have phone numbers. *Id.* Western Union would then send each debtor a telegram asking him or her to call a Western Union phone number and enter their own phone number for identity confirmation. *Id.* Western Union would then turn these confirmed phone numbers of debtors back over to DCS. *Id.* When DCS was sued for an alleged FDCPA violation, the plaintiffs also named Western Union, which secured a dismissal on the theory that it was not a debt collector. *Id.* at 1144-45. The *Romine* court reversed that decision by the district court, finding that "Appellant's pleadings and other materials in the record leave open the *possibility* that Western Union's activities amount to an indirect attempt to collect a debt." *Id.* at 1147 (emphasis added).

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 695451

**\*7** This court finds itself in a similar position as the *Romine* court. It is possible that Defendant Encore's inclusion of the privacy notice with Defendant MCM's dunning letter amounts to an indirect attempt to collect a debt.[10] It is also possible, however, that Defendant Encore's inclusion of the privacy notice has nothing to do with debt collection. Defendant Encore denies that it participated in the complained of debt collection activities, and raised in its defense the possibility that the privacy notice was not a debt collection effort, but simply an attempt to comply with the requirements the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.,* another federal law discussed more extensively below. (Def. Encore's Answer ¶ 12, p. 12.) Because these competing possibilities cannot be resolved on the pleadings alone, judgment on the pleadings for Plaintiff with respect to this issue would be inappropriate.

10    Defendant Encore's SEC filings certainly suggest that it is thoroughly enmeshed in the debt collection business.

### B. Violation of the FDCPA

The pleadings alone also cannot resolve the Defendants' liability under the FDCPA. As noted, plaintiff's theory of the case is that the privacy notice he received was part of the same debt collection contact as the dunning letter to which it was attached. (Pltf.'s Mem., pp. 9-11.) That notice states that Defendants may disclose Hernandez's nonpublic information to nonaffiliated third parties. (*Id.*) Defendant Encore's SEC filings acknowledge that Defendant Encore does in fact make these disclosures. (*Id.*)

Both Defendants have raised the statutory bona fide error affirmative defense.[11] (Defs.' Mem., p. 12.) Notwithstanding a showing of any actual violation of any other provision of the FDCPA, § 1692k(c) precludes liability

11    Defendants also assert that the notice itself does not violate the FDCPA, but dedicate the majority of their brief to arguing the affirmative defense point. (Defs.' Mem., pp. 11-12.)

if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. 15 U.S.C. § 1692k(c). To qualify for this defense, Defendants must show: (1) the FDCPA violation was not intentional; (2) the FDCPA violation resulted from a

bona fide error; and (3) Defendants maintained procedures reasonably adapted to avoid such an error. *Kort v. Diversified Collection Servs. Inc.,* 394 F.3d 530, 537 (7th Cir.2005) (citing *Jenkins v. Heintz,* 124 F.3d 824, 834 (7th Cir.1997)). In *Kort,* the Seventh Circuit affirmed summary judgment in favor of a debt collector that faced liability for allegedly misstating the debtor's rights in violation of § 1692e of the FDCPA. 394 F.3d at 535. The debt collector took its statement of the debtor's rights directly from another federal statute, and the *Kort* court found this attempt to comply absolved the debt collector from liability under the FDCPA. *Id.* at 537-39.

Defendants in the instant case claim that the privacy notice is an attempt to comply with the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.* (hereinafter, "GLB"). (Defs.'s Mem., p. 10.) GLB is a federal statute designed to protect consumers' private nonpublic information as collected by financial institutions. 15 U.S.C. § 6801(a). The statute prevents financial institutions from disclosing nonpublic private information about a consumer to nonaffiliated third parties unless a privacy notice like the one Plaintiff received is sent to the consumer. 15 U.S.C. §§ 6802, 6804. This statute, unlike the FDCPA, permits an opt-out rather than an opt-in regime with respect to third-party disclosures. 15 U.S.C. § 6802. Nothing in the Defendants' pleadings would prevent Defendants from proving in a later stage of this litigation an affirmative defense based on GLB to Plaintiff's allegation that Defendants misstated debtors' rights, threatened debtors, or sought to harass debtors by sending GLB-compliant privacy notices.

**\*8** The cases Plaintiff cites are not to the contrary. (Pltf.'s Mem., pp. 11-14.) They hold simply that the presence of a GLB-related defense does not support a motion to dismiss-not that such a defense is irrelevant to a motion for judgment on the pleadings. The Southern District of Indiana declined to dismiss a similar FDCPA suit based on an allegedly offending privacy notice when the debt collector pointed to the potential GLB compliance of the privacy notice. *Stewart v. Asset Acceptance,* 04-CV-1213, pp. 8-9 (S.D.Ind. Nov. 19, 2004). The *Stewart* court held that so long as the plaintiff's complaint does not admit "all of the ingredients of an impenetrable defense" or the defense is "unmistakable" "from the face of the complaint," an affirmative defense is irrelevant to a defendant's motion to dismiss the complaint for failure to state a claim. *Id.* at 9 (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir.2004); *Walker v. Thompson,* 288 F.3d 1005, 1009-10 (7th Cir.2002)). Judge Plunkett of this Court cited *Stewart* in reaching the same

Hernandez v. Midland Credit Management, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 695451

conclusion where another debt collector raised its GLB-related affirmative defense on a motion to dismiss plaintiff's FDCPA complaint *Blair v. Sherman Acquisition,* 2004 WL 2870080, *12-13 (N.D.Ill.Dec.13, 2004). The *Blair* court added, "Defendants have not made the requisite showing of this affirmative defense that would dispose of this claim." *Id.* at 13. *Chapman v. Worldwide Asset Management,* 04-C-7625 (N.D.Ill. Apr. 6, 2005), is, in this court's reading, indistinguishable from *Stewart* and *Blair,* both of which it cites. *Chapman,* at 9-10. Just as the defendants in *Chapman, Stewart,* and *Blair* could not effectively prevail on the issue of liability without proving their affirmative defense, Plaintiff in the instant case cannot prevail on that same issue before Defendants have been given an opportunity to present any facts related to such a showing.

Given the content of Defendant Encore's SEC filings, it is unlikely that it will be able to prove that it did not make FDCPA-prohibited disclosures to impermissible parties. Moreover, Defendant MCM and Defendant Encore are unlikely to convince this court that the disclosures of nonpublic information allowable under GLB cannot easily be reconciled with those allowable under the FDCPA in a manner that effectuates Congress's legislative intent in enacting both statutes. Plaintiff might even ultimately prevail on a motion for summary judgment, but at a bare minimum, Defendants are entitled to attempt to convince this court of the merit of

their position. Errors of law may constitute bona fide errors under the FDCPA. *See, e.g., Nielsen v. Dickerson,* 307 F.3d 623, 641 (7th Cir.2002); *Jenkins v. Heintz,* 124 F.3d 824, 832 n. 7 (7th Cir.1997). Furthermore, Defendant Encore's and Defendant MCM's intentions are material to this defense and are in dispute in the pleadings. *See Kort,* 124 F.3d at 537 ("A debt collector need only show that its FDCPA violation was unintentional, not that its actions were unintentional."). At this early stage of the litigation, the court cannot conclude based on the pleadings alone that Defendants could not prove some set of facts consistent with their affirmative defense and thus avoid liability under the FDCPA.

*CONCLUSION*

**\*9** For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (27) is denied. The court cannot determine as a matter of law that Defendant Encore is a debt collector subject to the FDCPA. Even if it could, this court does not foreclose Defendant Encore's and Defendant MCM's opportunity to prove an affirmative defense to liability under that Act.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 695451

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3404971

2010 WL 3404971
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

INDIANA INSURANCE COMPANY,
an Indiana corporation, Plaintiff,

v.

WESTFIELD INSURANCE COMPANY,
an Ohio corporation, Defendant.

No. 10 C 2660.
|
Aug. 26, 2010.

**Attorneys and Law Firms**

Jay S. Judge, Michael E. Kujawa, William Charles Barasha, Andrew G. Witik, Judge, James & Kujawa, LLC, Park Ridge, IL, for Plaintiff.

Richard Thomas Valentino, Smithamundsen LLC, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

 **\*1** Before the Court are Defendant Westfield Insurance Company's ("Westfield") motion to strike paragraphs 9–18 of the complaint, Rule 12(b)(6) motion to dismiss, and motion to strike portions of Plaintiff Indiana Insurance Company's ("Indiana") response to Westfield's Rule 12(b)(6) motion to dismiss. For the following reasons, the Court denies Westfield's motion to strike paragraphs 9–18 of the complaint, denies Westfield's motion to strike portions of Indiana's response, and grants Westfield's motion to dismiss.

**BACKGROUND**

For the purpose of resolving the motion to dismiss, the Court assumes the following allegations are true. On November 30, 1996, a gas explosion occurred at the home of Kim Bowen in Downers Grove which resulted in two deaths, several injuries and property damage. (R. 1–1, Compl., ¶ 6.) The accident also resulted in the filing of eight lawsuits (collectively, the "Bowen Estate litigation"). The allegations in the Bowen Estate litigation asserted that Professional Plumbing, Inc. ("Professional Plumbing"), a subcontractor that conducted plumbing and gas delivery work, was negligent in its work at the Bowen premises, and that Richard Smykal, Inc. ("Smykal"), the general contractor, was negligent in allowing Professional Plumbing to conduct its plumbing and gas delivery work at the Bowen premises. *Id.* at ¶¶ 6–8. At the time of the accident, Indiana insured Smykal, and Westfield insured Professional Plumbing. *Id.* at ¶¶ 1–2.

On March 25, 1998, Indiana tendered the defense of the Bowen Estate litigation to Westfield. *Id.* at ¶ 9. On May 19, 1999, Westfield refused to defend Smykal because it asserted that, as of the date of the accident, Professional Plumbing has completed its operations at the Bowen premises and the policy contained no "completed operations" coverage. *Id.* at ¶ 10. As a result, Smykal filed a third-party complaint for declaratory judgment against Westfield in a pending action in the Bowen Estate litigation between American States Insurance, Co. and Northern Illinois Gas, Co. in Illinois state court. *Id.* at ¶ 13, Ex. 4.[1]

1    Indiana alleges that it was a party to the declaratory judgment action filed in state court. The face of the complaint filed in state court, however, reflects that Smykal filed the third-party complaint and that Indiana was not a party to the lawsuit. (R. 1–1, Compl.Ex. 4.) In the context of ruling on a 12(b)(6) motion to dismiss, "[w]here an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Savings Bank, F.A.,* 507 F.3d 540, 542 (7th Cir.2007). "A court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document." *Id.*

On September 21, 2000, before the court ruled on the parties' cross-motions for summary judgment, Westfield wrote Smykal's attorney to accept the defense of Smykal and stated:

> [T]he defense is accepted without reservation as to coverage.... Westfield does, however, reserve its right to seek contribution, apportionment and/or reimbursement for any defense costs and/or other payments made on behalf of Smykal with regard to this litigation from any other insurance company which provides insurance coverage to Smykal with regard to the aforesaid lawsuit.

*Id.* at Ex. 6.[2] On September 29, 2000, Westfield withdrew its counterclaim for declaratory judgment against Smykal, and Smykal voluntarily dismissed its third-party complaint for declaratory judgment against Westfield. *Id.* at Ex. 5. Thereafter, on February 16, 2001, Westfield wrote Ralph Smykal, President of Smykal and stated:

2    In its Complaint, Indiana alleges that Westfield "wrote Indiana Insurance Co., through its attorneys, Condon & Cook." This allegation, however, conflicts with the exhibits attached to Plaintiff's complaint which show that Condon & Cook was Smykal's attorney in the state court declaratory judgment proceeding. (R. 1–1, Compl., Ex. 5.)

> **\*2** Westfield Companies has accepted the defense of Richard Smykal, Inc.... However, Westfield reserves its right to seek contribution, apportionment and/or reimbursement for any defense costs and other payments made on behalf of Smykal with regard to this litigation from any other insurance company which provides insurance coverage to Smykal with regard to the aforesaid lawsuit.

(R. 1–1, Compl., Ex. 7.)

Five years later, on May 7, 2006, the parties reached a settlement in the Bowen Estate litigation. *Id.* at ¶ 23. At the settlement conference, Westfield agreed that it would "square up" with Indiana once the Bowen Estate litigation was "put to rest and all releases and dismissal orders entered." *Id.* at ¶ 28. To settle the litigation, Indiana paid $2,525,000 on behalf of Professional Plumbing, and Westfield paid $2,250,000 on behalf of Smykal. *Id.* Westfield had two policies providing coverage for Professional Plumbing and its "additional insured", Smykal: (a) a CGL Policy with $1 million policy limits, and (b) a Commercial Umbrella Policy with $10 million policy limits. *Id.* at ¶ 24. Indiana also had two polices providing coverage for Smykal: (a) a CGL Policy with $1 million policy limits; and (b) a Commercial Umbrella Policy with $5 million policy limits. *Id.* at ¶ 25. Because Westfield agreed to provide the defense for Smykal without reservation as to coverage, once Indiana exhausted its $1 million in primary CGL policy limits, Westfield should have paid the remaining $1,250,000 under its $10 million Commercial Umbrella Policy limits. *Id.* at ¶ 27. Westfield has not paid the $1,250,000 owed for Smykal under its $10 million Commercial Umbrella Policy. *Id.* at ¶ 28.

Indiana seeks the following amounts as damages from Westfield: (i) $1,250,000 that Indiana paid but Westfield owes under its $10 million Commercial Umbrella Policy; (ii) $250,000 in interest; and (iii) $282,046.51 for defense fees and costs paid by Indiana to Condon & Cook for the defense of Smykal. *Id.* at ¶ 29.

## LEGAL STANDARD

### I. 12(b)(6) Motion to Dismiss

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As the Seventh Circuit recently explained, this "[r]ule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir.2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests ." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570); *see also Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009) (amount of factual allegations required to state a plausible claim for relief depends on complexity of legal theory). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Justice v. Town of Cicero,* 577 F.3d 768, 771 (7th Cir.2009) (court construes complaint in light most favorable to plaintiff drawing all reasonable inferences in plaintiff's favor).

### II. Motion to Strike

**\*3** Rule 12(f) governs motions to strike. Pursuant to that Rule, the Court can strike "any insufficient defense

or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "Motions to strike, however, are disfavored and will usually be denied." *Cumis Ins. Soc., Inc. v. Peters,* 983 F.Supp. 787, 798 (N.D.Ill.1997). In order to succeed on a motion to strike allegations contained in a complaint, "the movant must show that 'the allegations being challenged are so unrelated to plaintiff's claim as to be void of merit and unworthy of any consideration' and that the allegations are unduly prejudicial." *Id.* (citing *Trustmark Life Ins. Co. v. University of Chicago Hosps.,* No. 94 C 4692, 1996 WL 68009, at *1 (N.D.Ill. Feb.14, 1996)). The Seventh Circuit has "advise[d] defense counsel against moving to strike extraneous matter unless its presence in the complaint is actually prejudicial to the defense." *Davis v. Ruby Foods, Inc.,* 269 F.3d 818, 821 (7th Cir.2001). "Prejudice results where the challenged allegation has the effect of confusing the issues or is so lengthy and complex that it places an undue burden on the responding party." *Cumis,* 983 F.Supp. at 798 (citing *VPHI, Inc. v. National Educ. Training Group, Inc.,* No. 94 C 5559, 1995 WL 51405, at *3 (N.D.Ill. Jan.20, 1995)).

## ANALYSIS

### I. Westfield's Motion to Strike Paragraphs 9–8 of Indiana's Complaint

Westfield has moved pursuant to Rule 12(f) to strike the allegations contained in paragraphs 9–18 of Plaintiff's complaint. Paragraphs 9–18 of Indiana's complaint summarize proceedings in a related state court action between Indiana's insured, Smykal, and Westfield which ultimately resulted in a voluntary dismissal after the parties reached an agreement. Indiana contends that the allegations relating to that lawsuit are immaterial because the earlier declaratory judgment action, as a matter of law, has no bearing on Indiana and Westfield's duty to indemnify Smykal.

The Seventh Circuit has made clear, however, that a defendant must demonstrate prejudice in order to succeed on a motion to strike extraneous matter from a complaint. *Davis,* 269 F.3d at 821. Westfield only conclusorily asserts that "[t]his case meets that standard of prejudice" without any supporting explanation for that contention. (R. 14, Def.'s Mot. to Strike at 3.) Such conclusory assertions fail to demonstrate prejudice. *Davis,* 269 F.3d at 821. The Court accordingly denies Westfield's motion to strike.

### II. Westfield's Motion to Strike Portions of Indiana's Response to Westfield's Rule 12(b)(6) Motion to Dismiss

In its response to Westfield's motion to dismiss, Plaintiff raises a series of arguments relating to a *John Burns* targeted or selective tender. (R. 20–1, Pls.' Resp. to Def.'s Mot. to Dismiss, pp. 5, 6, 10–11.) On July 1, 2010, subsequent to the filing of Plaintiff's response, the parties filed a stipulation in which Indiana stated that it does not claim a *John Burns* targeted or selective tender and that its "mentioning of a *John Burns* selective or targeted tender is by way of analogy and by way of discussion of cases cited by *Westfield."* (R. 21–1, Stipulation at 2.) Because the stipulation makes clear that the discussion of a *John Burns* tender is merely an analogy and Indiana has again failed to demonstrate prejudice, the Court denies Indiana's motion to strike portions of Indian's response. *See Davis,* 269 F.3d at 821.

### III. Westfield's 12(b)(6) Motion to Dismiss

 **\*4** While titled a Complaint for Declaratory Judgment, Indiana contends that it sued Westfield for breach of contact and equitable subrogation. Even considering its complaint in this manner, however, Indiana has failed to state a claim upon which relief can be granted.

#### A. Breach of Contract

To establish a breach of contract under Illinois law[3], a party must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract; (3) breach of the contract; and (4) resultant damages. *See TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 631 (7th Cir.2007) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 351 Ill.App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 967 (Ill.App.Ct.2004)). In Illinois, the determination of whether a contract is ambiguous, as well as the construction of an unambiguous contract, are questions of law for the court. *See Gallagher v. Lenart,* 226 Ill.2d 208, 219, 314 Ill.Dec. 133, 140, 874 N.E.2d 43, 50 (Ill.2007); *Central Ill. Light Co. v. Home Ins. Co.,* 213 Ill.2d 141, 153–54, 290 Ill.Dec. 155, 163, 821 N.E.2d 206, 214 (Ill.2004). "In Illinois, as in other states, if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence." *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir.2009). "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher,* 226 Ill.2d at 232, 314 Ill.Dec. 133, 874 N.E.2d 43.

Indiana Ins. Co. v. Westfield Ins. Co., Not Reported in F.Supp.2d (2010)
2010 WL 3404971

3    The parties agree that Illinois law governs the breach of contract claim.

Illinois courts interpret contracts according to the "four corners" rule: " '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined by the language used. It is not to be changed by extrinsic evidence." *Camico Mut. Ins. Co. v. Citizens Bank,* 474 F.3d 989, 992–93 (7th Cir.2007) (quoting *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 878 (7th Cir.2005) (citations and internal quotation marks omitted)). In applying this rule, Illinois courts first look to the language of the contract alone. *See Camico,* 474 F.3d at 993 (citing *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 462, 236 Ill.Dec. 8, 10, 706 N.E.2d 882, 884 (Ill.1999)); *see also Gallagher,* 226 Ill.2d at 233, 314 Ill.Dec. 133, 874 N.E.2d 43 ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."). Illinois courts interpret contract terms according to their plain meaning unless otherwise defined. *See Utility Audit, Inc. v. Horace Mann Serv. Corp.,* 383 F.3d 683, 687 (7th Cir.2004).

Indiana claims that there "is a valid and enforceable written contract found in Westfield's two letters contracting to provide $1 million in CGL coverage and $10 million Umbrella coverage for Smykal and to undertake the defense 'without reservation as to coverage." (R. 20–1, Pls.' Resp., p. 7.) Indiana also asserts that the consideration for Westfield's promise to provide coverage for Smykal was Smykal and Indiana's dismissal of the state court action because Westfield agree to provide the coverage sought in that action. *Id* .

**\*5** Despite these assertions, however, Indiana has not identified a contract to which it is a party. The September 21, 2000 letter is from Charles P. Menges at Westfield to Smykal's attorney. (R. 1, Complaint, Ex. 6.) In the letter, Mr. Menges states:

> [T]he defense is accepted without reservation as to coverage.... Westfield does, however, reserve its right to seek contribution, apportionment and/or reimbursement for any defense costs and/or other payments made on behalf of Smykal with regard to this litigation from any other insurance company which provides insurance coverage to Smykal with regard to the aforesaid lawsuit.

*Id.* Indiana is not a party to the letter, nor does the letter specifically reference Indiana. The February 16, 2001 letter is from Robert Hunt, Claims Specialist at Westfield, to Smykal. (R. 1, Compl., Ex. 7.) That letter similarly provides:

> Westfield Companies has accepted the defense of Richard Smykal, Inc.... However, Westfield reserves its right to seek contribution, apportionment and/or reimbursement for any defense costs and other payments made on behalf of Smykal with regard to this litigation from any other insurance company which provides insurance coverage to Smykal with regard to the aforesaid lawsuit.

*Id.* Gerald Kukta, of Indiana, is copied on the letter, but the letter does not specifically refer to Indiana.

Under Illinois law, "[a]n individual not a party to a contract may only enforce the contract's rights when the contract's original parties intentionally entered into the contract for the direct benefit of the individual." *Martis v. Grinnell Mut. Reinsurance Co.,* 388 Ill.App.3d 1017, 1020, 329 Ill.Dec. 82, 905 N.E.2d 920, 924 (Ill.App.Ct.2009). "There is a strong presumption that the parties to a contract intend that the contract's provisions apply only to them, and not to third parties." *Id.* (citing *Barney v. Unity Paving, Inc.,* 266 Ill.App.3d 13, 19, 203 Ill.Dec. 272, 639 N.E.2d 592, 596 (Ill.App.Ct.1994)). "That the contracting parties know, expect, or even intend that others will benefit from their agreement is not enough to overcome the presumption that the contract was intended for the direct benefit of the parties." *Id* . (citing *Barney,* 266 Ill.App.3d at 19, 203 Ill.Dec. 272, 639 N.E.2d at 596). Whether someone is a third-party beneficiary depends on the intent of the contracting parties, as evidenced by the contract language." *Id.* (citing *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.,* 372 Ill.App.3d 89, 96, 309 Ill.Dec. 865, 865 N.E.2d 228, 235 (Ill.App.Ct.2007)).

Indiana fails to allege or explain its assertion that the letters between Westfield and Smykal form a contract to which it is a party. Because the "contract makes no mention of [Indiana] or the class to which [it] belongs, [it] is not a third-party beneficiary of the contract." *Id.* (citing *155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.,* 209 Ill.App.3d 631, 647, 154 Ill.Dec. 365, 568 N.E.2d 365, 375 (Ill.App.Ct.1991); *Swaw v. Ortell,* 137 Ill.App.3d 60, 70, 92 Ill.Dec. 49, 484 N.E.2d 780, 787 (Ill.App.Ct.1984)). Moreover, there is no indication in the language of the letters that Westfield and Smykal entered into the contract for the "direct, not merely incidental, benefit of [Indiana]." *Id.* Indeed, in both letters Westfield specifically reserved its rights of contribution and reimbursement against "any other insurance company which provides coverage to Smykal with regard to the aforesaid lawsuit," a group that includes Indiana.

Indiana Ins. Co. v. Westfield Ins. Co., Not Reported in F.Supp.2d (2010)
2010 WL 3404971

**\*6** Treating Indiana's allegations as true and drawing all inferences in its favor, Indiana has failed to sufficiently allege that it is a party to or a third-party beneficiary of the alleged contracts. *See Sieron v. Hanover Fire and Cas. Ins. Co.,* 485 F.Supp.2d 954 (S.D.Ill.2007) (dismissing plaintiff's breach of contract claims against insurance company where plaintiffs were not parties to any contract at issue and failed to set forth theory under which they could obtain relief for breaches of contracts to which they were not parties). Westfield's motion to dismiss is accordingly granted with respect to Indiana's breach of contract claim.

### B. Equitable Subrogation

Indiana also asserts that its claim for breach of contract pleads equitable subrogation.[4] To establish a right to equitable subrogation, Indiana must show: "(1) that the defendant is primarily liable to the insured for a loss under a policy of insurance; (2) that the plaintiff is secondarily liable to the insured for the same loss under its policy; and (3) the plaintiff discharged its liability to the insured and at the same time extinguished the liability of the defendant." *Chicago Hosp. Risk Pooling Program v. Illinois State Medical Inter–Insurance Exchange,* 397 Ill.App.3d 512, 525, 339 Ill.Dec. 95, 925 N.E.2d 1216, 1228 (Ill.App.Ct.2010) (citing *Home Insurance Co. v. Cincinnati Insurance Co.,* 213 Ill.2d 307, 316–17, 290 Ill.Dec. 218, 821 N.E.2d 269 (2004)). Indiana contends that it meets the first prong of this test because: "Westfield was primarily liable to Smykal to pay the $1,250,000 under its Umbrella policy because: (a) Indiana made a *John Burns* targeted tender of Smykal's defense to

it; and (b) it contracted to pay Smykal's defense 'without reservation as to coverage.' " (R. 20, Pls.'s Resp. at 10.) Since the filing of its response, Indiana has stipulated that it is not alleging that Indiana made a *John Burns* tender to Westfield. Indiana instead must rely on its contention that Westfield is primarily liable to Smykal for a loss under an insurance policy because it contracted with Indiana to pay Smykal's defense. In other words, Indiana's equitable subrogation claim also rests on the existence of a contract between it and Westfield. As described above, Indiana has failed to identify a contract with Westfield to which it was a party. The Court accordingly grants Westfield's motion to dismiss with respect to Indiana's equitable subrogation claim.

4       Westfield argued in its motion to dismiss that Indiana failed to state a claim for equitable contribution. Because Indiana contends in its response that it is not pleading a claim for equitable contribution (R. 20, Pls.' Resp at 8.), the Court need not address this argument.

### CONCLUSION

For the foregoing reasons, denies Westfield's motion to strike paragraphs 9–18 of the complaint, denies Westfield's motion to strike portions of Indiana's response, and grants Westfield's motion to dismiss without prejudice.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3404971

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3307019

2007 WL 3307019
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Douglas SHARBAUGH, individually
and on behalf of all others
similarly situated, Plaintiff,
v.
FIRST AMERICAN TITLE
INSURANCE COMPANY, Defendant.

No. 07 C 2628.
|
Nov. 2, 2007.

**Attorneys and Law Firms**

George A. Zelcs, Donald M. Flack, Korein Tillery Llc, Chicago, IL, Daniel J. Becka, Jacie C. Zolna, Myron Milton Cherry, Myron M. Cherry & Associates, Chicago, IL, for Plaintiff.

Brian Joseph Murray, Adam W. Wiers, Erik J. Clark, James R. Daly, Matthew A. Kairis, Jones Day, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

RONALD A. GUZMAN, United States District Judge.

**\*1** Douglas Sharbaugh has sued First American Title Insurance Company ("First American") for its alleged violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.,* the Illinois Title Insurance Act, 215 Ill. Comp. Stat. 155/1, *et seq.,* the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.,* and for unjust enrichment. Defendant has filed a motion pursuant to Federal Rule of Civil Procedure ("Rule") 12(c) for judgment on the pleadings on the RESPA and unjust enrichment claims asserted in Counts I and IV. For the reasons set forth below, the Court grants in part and denies in part the motion.

### Facts

On June 29, 2005, plaintiff purchased real property located in Cook County, Illinois. (Compl.¶ 1.) He also purchased a title insurance policy from defendant to protect himself from any defects in title. (*Id.*)

Title insurance policies are issued through agents acting on behalf of the title insurance company. (*Id.* ¶¶ 6-7.) These agents, usually attorneys, earn fees for the services they provide in association with the title insurance placement. (*Id.*) These services generally include examining title search reports, generating the title commitment, performing any necessary pre-closing title clearance, and retaining liability for any errors in the title evidenced in the policy. (*Id.* ¶ 8.)

In some real property transactions, the attorney representing one of the parties designates the title insurance company that issues the policy for his client. (*Id.* ¶ 9.) Plaintiff alleges that defendant began soliciting such attorneys to act as its agents ("attorney agents") to place title insurance with them. (*Id.* ¶ 10.) However, plaintiff claims, defendant did not require its attorney agents to perform any services in exchange for their fees. (*Id.*) Instead, defendant compensated them simply for referring their clients to defendant for title insurance, a practice that plaintiff claims violates RESPA and a number of state statutes. (*Id.* ¶¶ 10-11.) In the alternative, plaintiff says that these practices unjustly enrich defendant. (*Id.* ¶¶ 49-50.)

### Legal Standard

"A motion for judgment on the pleadings under [Rule] 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b) (6)." *Kolle v. SGB Corp.,* No. 01 C 5708, 2002 WL 31133183, at *1 (N.D.Ill. Sept.24, 2002). Thus, "a complaint attacked by a Rule 12[ (c) ] motion ... does not need detailed factual allegations," but plaintiff must make sufficient "[f]actual allegations ... to raise [his] right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (quotation omitted).

### Discussion

Among other things, RESPA prohibits "kickbacks or referral fees that tend to increase unnecessarily the costs of certain

Sharbaugh v. First American Title Ins. Co., Not Reported in F.Supp.2d (2007)

2007 WL 3307019

settlement services" performed in connection with federally-regulated mortgage loans. *Id.* § 2601(b)(2). Plaintiff alleges that First American violated RESPA by paying part of the premiums to attorneys who referred their clients to it for title insurance. (Compl.¶¶ 25-26.) Defendant argues that Count I fails to state a viable claim because plaintiff does not allege that his loan was a federally regulated mortgage loan as required by the statute.

**\*2** RESPA defines as a federally regulated mortgage loan any loan that "is made in whole or in part by any lender which is regulated by an agency of the Federal Government." 12 U.S.C. § 2602(1)(B) (i). Plaintiff does not allege that his mortgage loan is federally regulated. However, in response to defendant's motion, he submitted the HUD-1 settlement statement for his loan, which states that the lender was Countrywide Full Spectrum Lending ("Country wide"), and the 2006 10-K Form that Countrywide filed with the Securities and Exchange Commission, which says that its mortgage business is regulated by federal agencies. (*See* Pl.'s Resp. Opp'n Def.'s Mot. Partial J. Pleadings, Ex. A, HUD-1 Settlement Statement at 1; *id.,* Ex. C, Countrywide 10-K Form at 23.) The statements in the Form 10-K about the federal regulation of Country wide's mortgage business, which defendant does not dispute, are subject to judicial notice. *See Hernandez v. Midland Credit Mgmt., Inc.,* No. 04 C 7844, 2006 WL 695451, at \*3-4 (N.D.Ill. Mar.14, 2006) (noting that a court can take judicial notice of portions of SEC filings that are not contested). But the contents of the HUD-1 settlement statement are not. *See* Fed.R.Evid. 201(b) (stating that a court may take judicial notice of facts only if they are "not subject to reasonable dispute" because they are "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). Because there is no basis for the Court to infer that Countrywide was indeed the lender in this case, plaintiff has not alleged that his mortgage loan is federally-regulated within the meaning of RESPA, Defendant's motion for judgment on the pleadings as to Count I is, therefore, granted.

In Count IV of the complaint, plaintiff alleges that defendant was unjustly enriched by its scheme of paying shares of title insurance premiums to attorney agents in exchange for their referral of business to defendant. (*Id.* ¶¶ 48-50.) Defendant says this claim is defective because (1) the parties' relationship is governed by a contract, (2) plaintiff has

adequate remedies at law, and (3) the complaint docs not adequately allege that First American was unjustly enriched.

It is true, as defendant argues, that a claim for unjust enrichment will not lie if the parties' conduct is governed by a contract or plaintiff has an adequate remedy at law. *See Guinn v. Hoskins Chevrolet,* 361 Ill.App.3d 575, 296 Ill.Dec. 930, 836 N.E.2d 681, 704 (Ill.App.Ct.2005). The Federal Rules of Civil Procedure, however, permit plaintiff to plead claims in the alternative. *See* Fed.R.Civ.P. 8(a) ("Relief in the alternative or of several different types may be demanded."). Thus, plaintiff may plead an alternative claim for unjust enrichment, even if he alleges in other counts that the parties have a contract or he has an adequate remedy at law.

Plaintiff has also adequately alleged that First American was unjustly enriched. To plead such a claim, plaintiff must "allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience." *Firemen's Annuity & Benefit Fund of City of Chi. v. Mun. Employees', Officers', & Officials' Annuity & Benefit Fund of Chi.,* 219 Ill.App.3d 707, 162 Ill.Dec. 189, 579 N.E.2d 1003, 1007 (Ill.App.Ct.1991). Plaintiff alleges that he paid more than fair market value for the title insurance he purchased because of defendant's improper solicitation of attorney agents. (Compl.¶¶ 48-50.) Those allegations sufficiently state an unjust enrichment claim. Accordingly, defendant's motion for judgment on the pleadings on Count IV is denied,

### *Conclusion*

**\*3** For the reasons set forth above, defendant's Rule 12(c) motion for partial judgment on the pleadings [doc. no. 21] is granted in part and denied in part. The motion is granted as to the RESPA claim in Count I, which is dismissed without prejudice, but is otherwise denied. Plaintiff has fourteen days from the date of this Memorandum Opinion and Order to amend Count I.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3307019

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.