UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re GOHEALTH, INC. SECURITIES LITIGATION | ) ) ) | Case No. 1:20-cv-05593 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | Judge Sharon Johnson Coleman |
| ALL ACTIONS. | ) ) ) ) | |

## <u>CENTERBRIDGE ANSWER TO THE CONSOLIDATED COMPLAINT</u>

Defendants CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., and Blizzard Aggregator, LLC, (collectively, "Centerbridge")[1] by and through their undersigned attorneys, Akin Gump Strauss Hauer & Feld LLP and MoloLamken LLP, hereby submits their Answer to the Consolidated Complaint (the "CC") filed by Lead Plaintiffs Sudhakara R. Murikinati, Jerry Nixon, Benjamin Sandmann, and Jeff S. Turnipseed (collectively, "Lead Plaintiffs") [Dkt. No. 66].

## INTRODUCTORY STATEMENT

Many of the CC's allegations are overly broad, vague, conclusory, and/or contain terms which are undefined and susceptible to different meanings. Accordingly, by way of general response, all allegations in the CC are denied unless expressly and specifically admitted. Any factual allegation admitted below is admitted only as to the specific facts described in this Answer and not as to any conclusions, characterizations, implications, or speculation contained in the allegation or the CC as a whole. For ease of reference, section headings from the CC have been copied into this Answer. No response to these headings is required, and to the extent a response is required, Centerbridge denies them. The comments and objections in this Introductory Statement are incorporated into each numbered Paragraph of this Answer.

## NATURE OF THE ACTION

1. The claims asserted herein are strict liability claims for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o, relating to GoHealth's initial public offering ("IPO" or "Offering"), commenced on or about July 14, 2020, of over 44,500,000 shares of Class A common stock at a price of $21.00 per share, which generated over $900 million in gross proceeds. This federal securities class action is brought on behalf of a Class (as defined herein) of all those who purchased GoHealth Class A common stock in or

---

[1] The claims against Defendants Centerbridge Partners, Centerbridge Associates III, L.P., and CCP III Cayman GP Ltd. were dismissed without prejudice on April 18, 2022 (Dkt. No. 104).

traceable to the Registration Statement and Prospectus (collectively, "Registration Statement") issued in connection with the IPO.

> **ANSWER:** Paragraph 1 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 1.

2.      GoHealth was formed on March 27, 2020, and was the issuer of stock in the IPO pursuant to the Registration Statement. Despite its legal formation shortly before the IPO, GoHealth has been in business since 2001. GoHealth is organized as a holding company, with GoHealth Holdings, LLC as its principal asset. Through a complex structure, GoHealth's operations are carried out by Norvax, LLC ("Norvax"), which is a wholly-owned subsidiary of Blizzard Midco, LLC, which, in turn, is a wholly-owned subsidiary of GoHealth Holdings.

> **ANSWER:** Centerbridge admits that GoHealth was formed on or about March 27, 2020, was the issuer of stock in GoHealth's IPO and is organized as a holding company.[2] Centerbridge admits that GoHealth's principal asset is LLC interests in GoHealth Holdings, LLC ("GoHealth Holdings"). Centerbridge further admits that the operations of the GoHealth Companies are carried out by Norvax, LLC ("Norvax") and Norvax's subsidiaries. Centerbridge further admits that Norvax is a wholly-owned subsidiary of Blizzard Midco, LLC, which in turn, is a wholly owned subsidiary of GoHealth Holdings. Except as expressly admitted, Centerbridge denies the allegations in Paragraph 2.

3.      GoHealth Holdings was previously known as Blizzard Parent, LLC. That changed in September 2019, when private equity firm Centerbridge Partners, L.P. ("Centerbridge Partners") acquired 100% of Norvax and effectively took control of the Company along with its founders. Even after the IPO, GoHealth remained a controlled company, with Centerbridge Partners and the Company's founders owning the majority of GoHealth stock and exercising control over its Board of Directors ("Board").

---

[2] Hereinafter the "GoHealth Companies" will refer to GoHealth, Inc., and, unless otherwise stated, all of its direct and indirect subsidiaries, including GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC).

**ANSWER:** Centerbridge admits that GoHealth Holdings was previously known as Blizzard Parent, LLC. Centerbridge denies the remaining allegations in Paragraph 3.

4. As for its business operations, GoHealth operates a health insurance marketplace that uses a combination of online websites and licensed agents to help consumers sign up for health insurance with health insurance carriers. The Company operates in four business segments: (a) Medicare-Internal; (b) Medicare-External; (c) Individual and Family Plans ("IFP") and Other-Internal; and (d) IFP and Other-External.

**ANSWER:** Centerbridge admits that the allegations in Paragraph 4 provide a general description of the operations and business segments of GoHealth and its subsidiaries. Centerbridge denies the remaining allegations in Paragraph 4.

5. In the four years leading up to the IPO, GoHealth shifted its focus to signing up consumers for Medicare products, specifically Medicare Advantage plans,[3] as opposed to individual or family insurance plans. This enabled GoHealth to rapidly grow in the intensely competitive insurance sales market in the time period before the IPO. In the Registration Statement, GoHealth emphasized that its shift to Medicare enabled the Company to capitalize on "strong demographic trends," as Medicare enrollment was expected to grow from approximately 61 million individuals in 2019 to approximately 77 million individuals by 2028, with 10,000 plus Americans turning 65 every day, and with an increasing proportion of Medicare-eligible individuals choosing commercial insurance solutions by enrolling in Medicare Advantage plans instead of basic Medicare.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration

---

[3] Medicare Advantage or "MA" is a type of health insurance plan that provides Medicare benefits through a private-sector health insurer. In a Medicare Advantage plan, a Medicare beneficiary pays a monthly premium to a private insurance company and receives coverage for inpatient hospital and outpatient services. Typically, the plan also includes prescription drug coverage.

-4-

Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 5.

6. The Registration Statement stated that GoHealth estimated a "total addressable market" of $28 billion for Medicare Advantage and Medicare Supplement products. The Registration Statement added that the Medicare market trends were poised to "drive a larger market in the coming years" that, when taken together with GoHealth's "other product and plan offerings," would result in an even larger addressable market.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 6.

7. In the Registration Statement, GoHealth described itself as primed to disrupt the traditional field agent-driven sales process for insurance, and specifically for Medicare, by using its digitally-enabled and technology-driven marketplace.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 7.

8. Consumers using GoHealth to shop for insurance do not pay any fees for access to the Company's platform or for enrollment or other services. Rather, GoHealth is typically paid an initial commission by health insurance carriers when consumers enroll in carriers' products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. Therefore, customer "persistency" – i.e., customers staying enrolled in their health insurance plans – was necessary to counter "churn," an industry term used to describe customers who drop from one insurance company's plan in favor of a competitor's plan.

**ANSWER:** Centerbridge admits that consumers do not pay any fees for access to the GoHealth Companies' platform or for enrollment, education or other services, and that, generally, the GoHealth Companies are paid an initial commission by carriers when

consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. Centerbridge denies the remaining allegations in Paragraph 8.

9. The Registration Statement touted GoHealth's "strong" relationships with leading insurance carriers and its 19-year track record of "industry-leading" growth, pointing to a 52% compound annual growth rate between 2003 and 2019. The financial information included in the Registration Statement demonstrated GoHealth's rapid growth leading up to the IPO. For example, the Registration Statement stated that GoHealth's:

(a) total commissions receivable, which represented expected future commission streams, was $388.8 million as of the close of the first quarter ended March 31, 2020 ("1Q2020"), an increase of 223.4% compared to the first quarter ended March 31, 2019 ("1Q2019");

(b) net revenues grew by 104.1% to $141.0 million for pro forma 1Q2020 compared to $69.1 million for 1Q2019, and by 138.5% to $539.5 million for pro forma 2019 compared to $226.2 million for 2018;

(c) adjusted EBITDA grew by 394% to $35.2 million for pro forma 1Q2020 compared to $7.1 million for 1Q2019, and by 387.6% to $170 million for pro forma 2019 from $34.9 million for 2018; and

(d) net income was $1.4 million for pro forma 1Q2020 compared to net income of $5 million for 1Q2019, and net income was $30.5 million for pro forma 2019 compared to net income of $28.1 million for 2018.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 9.

10. The Registration Statement also stated that GoHealth's recent focus on Medicare had contributed significantly to its growth, with total revenues generated in GoHealth's Medicare segments growing to $124.2 million for 1Q2020 from $41.2 million for 1Q2019, representing a 201.5% increase, and to $432.7 million for pro forma 2019 from $112.2 million for 2018, representing a 285.7% increase. In the Medicare segments, GoHealth's total submitted policies grew to over 132,000 Medicare policies for 1Q2020, as compared to 43,200 Medicare policies for

1Q2019, and over 427,000 Medicare policies for 2019 as compared to over 118,000 Medicare policies for 2018.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 10.

11. The majority of the Company's revenues and profits are generated in its Medicare segments, making those segments critically important to the Company's financial performance. In 1Q2020, the Medicare segments generated 89% of the Company's revenues, with the Medicare-Internal segment accounting for 68% of GoHealth's total revenues and the Medicare-External segment accounting for 21% of total revenues. Within the Medicare segments, Medicare Advantage products generate the majority of net revenues, accounting for 75% of net revenues for the Medicare-Internal segment and 95% of net revenues for the Medicare-External segment during 1Q2020.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 11.

12. Although the Company's important Medicare-Internal segment, which focused on Medicare Advantage plans, generated the lion's share of GoHealth's revenues and drove GoHealth's overall financial performance, it was concentrated heavily on just two insurance carrier customers: Humana Inc. ("Humana") and Anthem, Inc. ("Anthem"). In 2019, Humana and Anthem accounted for 40% and 20%, respectively, of the Company's total revenues. In 1Q2020, Humana and Anthem collectively accounted for 74% of the Company's total revenues, up from 43% in 1Q2019.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration

Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 12.

13. The Registration Statement stated that GoHealth's key financial metric, a ratio that GoHealth calls "LTV/CAC," was first among its peers. LTV/CAC is a shorthand description that divides the lifetime value of commissions that GoHealth estimated it would receive per "approved submission" ("LTV") by the cost to convert a prospective customer into an actual one that signs up for an insurance policy with a carrier ("CAC"). As a result, LTV/CAC is a measure of the Company's commissions relative to its customer acquisition cost.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 13.

14. Despite being a critical metric to the Company's financial performance, the complexity of GoHealth's LTV/CAC made it impossible for investors to understand exactly how it was calculated for one period versus another or to calculate it for themselves. For example, the Company defined LTV/CAC in the Registration Statement as follows:

> "LTV/CAC" refers to the Lifetime Value of Commissions per Consumer Acquisition Cost, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions[4] for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a prospect into a customer less other non-commission carrier revenue for such period, or CAC. CAC is comprised of cost of revenue, marketing and advertising expenses

---

[4] "Approved Submissions" refer to Submitted Policies approved by carriers for the identified product during the indicated period.

and customer care and enrollment expenses less other revenue and is presented on a per commissionable Approved Submission basis.

> **ANSWER:** Centerbridge denies the allegation that "[d]espite being a critical metric to the Company's financial performance, the complexity of GoHealth's LTV/CAC made it impossible for investors to understand exactly how it was calculated for one period versus another or to calculate it for themselves." Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 14.

15. Many of the metrics that went into GoHealth's LTV/CAC were not reported individually, turning GoHealth's critical financial metric into a veritable black box. Despite this, it is clear that GoHealth uses real-time data to continuously analyze and understand the day-to-day financial performance of its operations, including how those fluctuations impact GoHealth's LTV/CAC. For example, the Company repeatedly emphasized as a main selling point to investors that GoHealth, in real time, collects data on all aspects of its business and various financial performance metrics. The Company uses advanced statistical models to calculate and predict LTV/CAC and the profitability and conversion probability of consumer leads, as well as future commission streams associated with each consumer enrolled in each specific plan product, all of which the Company uses to determine its total commissions receivable.

> **ANSWER:** Centerbridge denies the allegation that "[m]any of the metrics that went into GoHealth's LTV/CAC were not reported individually, turning GoHealth's critical financial metric into a veritable black box." Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 15. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 15.

16. With GoHealth's eye-popping growth, swelling revenues, and industry-leading LTV/CAC, there was significant demand in anticipation of the IPO. On June 19, 2020, GoHealth filed a draft Registration Statement with the SEC on Form S-1. The Registration Statement was amended by a filing on July 8, 2020, which stated the IPO would consist of 39.5 million shares at

-9-

an offering price of $19.00 per share. Then, on July 14, 2020, GoHealth increased the size of the

Offering by 4.6 million shares, bringing the total Offering to 44.5 million shares. Two weeks after

the close of the second quarter of 2020 ("2Q2020"), on July 14, 2020, GoHealth priced the IPO at

$21.00 per share and filed the final Prospectus for the IPO, which forms part of the Registration

Statement.

> **ANSWER:** Centerbridge admits that GoHealth filed a draft Registration Statement with the SEC on or about June 19, 2020, amended the Registration Statement on or about July 8, 2020, and filed the final Prospectus for the IPO on or about July 14, 2020. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 16.

17. By July 17, 2020, GoHealth completed the IPO, selling 44.5 million shares at

$21.00 per share, generating over $913,500,000 in gross proceeds.

> **ANSWER:** Centerbridge admits that GoHealth conducted an IPO in which GoHealth offered shares of its stock to the public at $21.00 per share. Centerbridge denies the remaining allegations in Paragraph 17.

18. The Registration Statement, in violation of Section 11 of the Securities Act,

contained materially false statements, omitted statements necessary to make the statements made

in the Registration Statement not misleading, and failed to disclose information that was required

to be disclosed therein. Specifically, unbeknownst to investors, because it was not disclosed in the

Registration Statement, GoHealth was suffering heightened customer churn at the time of the IPO.

In addition, GoHealth had reached the limits of the growth that could be achieved under its existing

business model, and as a result, was required to radically depart from its business strategy leading

up to the IPO in order to continue generating rapid revenue growth. To make this necessary

change, the Company and its senior executives and officers planned to make 2020 an "investment

year" for the Company, in which GoHealth would significantly and rapidly expand its insurance

carrier customer base for Medicare. These plans created negative pressure on the Company's critical LTV/CAC metric by, among other things: (a) lowering commission rates on approved submissions; (b) significantly increasing marketing expenses; (c) impairing persistency and generating a corresponding increase in customer churn, or, at a minimum, requiring GoHealth to increase its efforts (and costs) to combat churn; and (d) reducing GoHealth's commissionable revenue in favor of increased non-commissionable revenue, which also dragged down GoHealth's LTV and resulted in decreased persistency.

> **ANSWER:** Paragraph 18 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 18.

19.     GoHealth's planned, but not disclosed, altering of its business strategy was necessary because, prior to and at the time of the IPO, the Company had relied heavily on just two Medicare carrier customers: Humana and Anthem. The Company had effectively maximized the growth that could be achieved by continuing to rely on these two carriers. Thus, in order to continue increasing its financial performance at the rate investors expected at the time of the IPO, GoHealth needed to route increasing numbers of Medicare-eligible consumers to a greater variety of insurance carriers while simultaneously expanding into new geographies. As a result, GoHealth needed to rapidly expand its base of insurance carrier customers.

> **ANSWER:** Centerbridge denies the allegations in Paragraph 19.

20.     Rather than reading about GoHealth's planned "investment year" in the Registration Statement as was required, investors learned of it in a series of post-IPO events. On August 19, 2020, GoHealth reported its financial results for 2Q2020 ended June 30, 2020, which closed two weeks before the IPO. During an after-hours conference call to discuss GoHealth's 2Q2020 financial results and outlook, investors learned that GoHealth had added and was adding many new carriers, including UnitedHealth Group, Aetna, Kaiser, and "some other regional" Blue

-11-

Cross Blue Shield providers as the Company "look[ed] towards 2021." Investors also learned that when the Company added new Medicare insurance carrier customers, there was "an initial ramp-up period for new carriers with forecasted lower LTVs" and that the Company's "strategy to add several new large carriers" was resulting and would continue to result in "lower initial commission rates and LTVs." The "strategic decision" by the Company also included an increased focus on GoHealth promoting and selling Medicare "Special Needs Plans" ("SNPs"),[5] which resulted in non-commissionable "other" revenue, that also created a "near-term drag on [GoHealth's] average LTV" and resulted in higher disenrollment rates, e.g., churn.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing GoHealth's 10-Q for the quarterly period ending June 30, 2020. Centerbridge respectfully refers the Court to the 10-Q for a true and complete statement of its contents. Plaintiffs also make allegations regarding GoHealth's 2Q 2020 earnings call. Centerbridge respectfully refers the Court to the transcript or recording of the earnings call for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 20.

21.     When GoHealth reported its third quarter financial results for the period ending September 30, 2020 ("3Q2020"), it not only reported a loss per share of $0.65, which was $0.64 worse than analyst estimates of a loss per share of $0.01, but it again increased its reliance on non-commissionable revenue to the detriment of commissionable revenue, creating more "near-term" drag on the Company's average LTV.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing GoHealth's 10-Q for the quarterly period ending September 30, 2020. Centerbridge respectfully refers the Court to the 10-Q for a true and complete statement of its contents. Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegation

---

[5] Medicare SNPs are a type of Medicare Advantage plan designed to attract and enroll Medicare beneficiaries who fall into certain special needs demographics. Special needs individuals typically include: (a) institutionalized individuals (living in a long-term care facility or needing an equivalent level of care at home); (b) dually eligible individuals (meaning also entitled to Medicare and some form of Medicaid benefit); or (c) individuals with severe or chronic disabling conditions.

concerning unidentified analyst estimates. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 21.

22.     The extent to which 2020 was an "investment year" was made clear well after the IPO. On December 2, 2020, investors learned that GoHealth's plan for 2020 included reduced, lower-than-normal commissions from newly added carriers and LTV compression, with the Company not seeing the "upside" until 2021. Specifically, during the Evercore ISI HealthCONx Conference on December 2, 2020, GoHealth's co-founder, Chief Executive Officer ("CEO"), and Co-Chair of the Company's Board, Clinton P. Jones ("Jones"), stated:

> *So we anticipated 2020 to be an investment year with new carriers*. If you think about a new carrier, there's technology integrations, there's understanding other compliance and nuances, there's understanding all the different plan options and plan types and building that out. [Indiscernible] side of things. So there's a -- and we also -- when you add a new carrier, you're typically not -- they don't view you as anybody special, right? *They're going to give you just a normal commission level*. You've got to prove yourself on volume and quality to move up the ranks. *And typically, you'll see LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and we thought that would happen*.
>
> As we think about where we've gone from a volume standpoint, we quickly rose through the ranks, we've proven ourselves, *and we think there's more upside in 2021 from an LTV standpoint with carriers*. We also know more about their effectuation rates, rapid disenrollment rates, things we can look at in the reporting because other -- every carrier is reporting is different as well.
>
> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing Clinton P. Jones' remarks at the Evercore ISI HealthCONx Conference on December 2, 2020. Centerbridge respectfully refers the Court to the transcript of those remarks for a true and complete

statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 22.

23. Following Jones' statements, GoHealth's Chief Financial Officer ("CFO") Travis J. Matthiesen ("Matthiesen") added that the Company's plan to add new carriers in 2020 created a "short-term drag on LTV" and that the Company would not get to "top-level contracts" with new carriers until "next year," i.e., 2021. Matthiesen added that "it's important to understand that new carriers really are a short-term drag on LTV[.]"

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing Travis J. Matthiesen's remarks at the Evercore ISI HealthCONx Conference on December 2, 2020. Centerbridge respectfully refers the Court to the transcript of those remarks for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 23.

24. Despite planning 2020 as an "investment year" prior to the IPO wherein GoHealth would suffer from lowered average LTV, increased reliance on SNPs with a corresponding decrease in commissionable revenue, increased marketing costs, and negative impacts on persistency and churn, these facts were not disclosed in the Registration Statement. Therefore, the Registration Statement, which GoHealth and the other Defendants used to secure more than $900 million from investors, contained materially false statements of fact and omitted material facts required to be disclosed in order to make the statements in the Registration Statement not misleading.

> **ANSWER:** Paragraph 24 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 24.

25. The price of GoHealth stock has declined from the Offering price of $21.00 per share to $13.32 per share on the day this action was commenced, a 36% decline, to an all-time low of $10.05 per share on December 1, 2020, a 52% decline from the Offering price.

**ANSWER:** Centerbridge admits that the reported closing prices of GoHealth's stock were $13.32 on September 21, 2020 and $10.05 on December 1, 2020. Centerbridge denies the remaining allegations in Paragraph 25.

26.     As a result of Defendants' violations of law, investors have suffered hundreds of millions of dollars in losses and damages under the Securities Act. Since the IPO, GoHealth has substantially underperformed the market, including its primary competitor SelectQuote, Inc. ("SelectQuote"), as reflected in the following chart:



**ANSWER:** Centerbridge denies the allegations in Paragraph 26.

-15-

**JURISDICTION AND VENUE**

27.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, 15 U.S.C. §77v.

> **ANSWER:** Paragraph 27 states a legal conclusion to which no response is required.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 27.

28.     Venue is proper in this District pursuant to 28 U.S.C.  §1391(b) and Section 22 of the Securities Act because many of the acts and practices complained of herein occurred in substantial part in this District, Defendants are found or transact business in this District, and GoHealth is headquartered in this District.

> **ANSWER:** Centerbridge admits that GoHealth is headquartered in this District.  Paragraph 28 also states a legal conclusion to which no response is required.  To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 28.

29.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

> **ANSWER:** Paragraph 29 states a legal conclusion to which no response is required.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 29.

**PARTIES**

**Lead Plaintiffs**

30.     As set forth in their previously filed Certifications incorporated by reference herein [ECF No. 43-2], Lead Plaintiffs purchased GoHealth shares in and/or traceable to the Registration Statement for the IPO, and were damaged thereby.

> **ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 30 regarding whether Lead Plaintiffs purchased

GoHealth shares in and/or traceable to the Registration Statement for the IPO.  To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 30.

**Defendants**

31.     Defendant GoHealth, Inc. is a Delaware corporation headquartered at 214 West Huron Street, Chicago, Illinois 60654.  Following the Offering, the Class A common stock of GoHealth trades on the Nasdaq under the ticker symbol "GOCO." GoHealth describes itself as a leading health insurance marketplace that uses a proprietary technology platform that leverages modern machine learning algorithms to help sign individuals up for healthcare plans with health insurance carriers.

> **ANSWER:** Centerbridge admits that "Defendant GoHealth, Inc. is a Delaware corporation headquartered at 214 West Huron Street, Chicago, Illinois 60654.  Centerbridge admits that "[f]ollowing the Offering, the Class A common stock of GoHealth trades on the Nasdaq under the ticker symbol 'GOCO.'"  Plaintiffs also make allegations regarding the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 31.

32.     Defendant Clinton P. Jones is a co-founder of GoHealth, has been its CEO since GoHealth's founding in 2001, and is Co-Chair of the Board.  Jones also has been a member of GoHealth Holdings' board of managers since 2019 and served on the board of managers of GoHealth's predecessor since its founding in 2001.

> **ANSWER:** Centerbridge admits that Mr. Jones is the CEO and Co-Chair of the Board of Directors for GoHealth, Inc. and that he has been a member of GoHealth Holdings LLC's board of managers since 2019.  Except as expressly admitted, Centerbridge denies the allegations in Paragraph 32.

33.     Defendant Brandon M. Cruz ("Cruz") is a co-founder of GoHealth, its Chief Strategy Officer, a Special Advisor to the Executive Team, and Co-Chair of the Board.  Prior to these roles, he served as GoHealth's President since 2001.  Cruz has been a member of GoHealth Holdings' board of managers since 2019 and served on the board of managers of GoHealth

Holdings' predecessor since its founding. Cruz also served as a member of the board of directors of Creatix, Inc., a GoHealth subsidiary, from 2016 to 2019.

> **ANSWER:** Centerbridge admits that Mr. Cruz is the Chief Strategy Officer, Special Advisor to the Executive Team, and Co-Chair of the Board of Directors for GoHealth, Inc. Centerbridge further admits that Mr. Cruz has been a member of GoHealth Holdings, LLC's board of managers since 2019 and served as a member of the board of directors for Creatix, Inc. from 2016 to 2019. Except as expressly admitted, Centerbridge denies the allegations in Paragraph 33.

34. Defendant Travis J. Matthiesen is GoHealth's "CFO," a position he has held since 2018. Prior to serving as CFO, Matthiesen served as GoHealth's Vice President of Finance and Marketplace Operations from 2017 to 2018 and as GoHealth's Corporate Controller from 2010 to 2017.

> **ANSWER:** Centerbridge admits Mr. Matthiesen is GoHealth, Inc.'s Chief Financial Officer. Except as expressly admitted, Centerbridge denies the allegations in Paragraph 34.

35. The Defendants identified in ¶¶32-34 above are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of GoHealth. Prior to the consummation of the IPO, GoHealth entered into separate indemnification agreements with each of its directors and executive officers and purchased directors' and officers' liability insurance. In addition, Jones and Cruz, along with Centerbridge (defined below) exercise significant control over GoHealth, including over all matters requiring stockholder approval, including the election and removal of directors and the size of GoHealth's Board, any amendment of GoHealth's certificate of incorporation or bylaws, and any approval of significant corporate transactions (including a sale of all or

substantially all of GoHealth's assets). Even after the IPO, Defendants Jones and Cruz, along with Centerbridge, collectively controlled approximately 71% of the voting power represented by all classes of GoHealth stock and exercised significant control over GoHealth's business, affairs, and policies, including the appointment of its management.

> **ANSWER:** Paragraph 35 states, "The Defendants identified in ¶¶32-34 above are collectively referred to herein as the "Individual Defendants." This a legal conclusion to which no response is required. Paragraph 35 also refers to the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegation that "[e]ach of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO." Centerbridge admits that "[p]rior to the consummation of the IPO, GoHealth entered into separate indemnification agreements with each of its directors and executive officers and purchased directors' and officers' liability insurance." Centerbridge denies all of the remaining allegations in Paragraph 35.

36.     Defendant NVX Holdings, Inc. ("NVX Holdings") is a Delaware corporation based in Chicago that is controlled by Cruz and Jones (who are also known as GoHealth's "Founders") for their benefit and to house their ownership of GoHealth Class A and Class B stock. Cruz served as President of NVX Holdings, and Jones served as its CEO. Like Jones and Cruz, NVX Holdings exercised significant control over GoHealth.

> **ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations that "Defendant NVX Holdings, Inc. ('NVX Holdings') is a Delaware corporation based in Chicago that is controlled by Cruz and Jones (who are also known as GoHealth's 'Founders') for their benefit and to house their ownership of GoHealth Class A and Class B stock. Cruz served as President of NVX Holdings, and Jones served as its CEO."

37.     Defendant Centerbridge Partners, L.P. is a New York-based private equity firm.

> **ANSWER:** Centerbridge Partners, L.P. was dismissed from this action by the Court in its Opinion and Order on April 18, 2022, and as such no response is required. To the extent a response is required, Centerbridge admits that Centerbridge Partners, L.P. is a New York-based private equity firm.

38.     Defendants CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., and Blizzard Aggregator, LLC are investment vehicles created for the benefit of Centerbridge Partners to house its ownership of GoHealth Class A and Class B stock.

**ANSWER:** Centerbridge denies the allegations in Paragraph 38.

39.     Defendant Centerbridge Associates III, L.P. is the general partner of CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P.

> **ANSWER:** Centerbridge Associates III, L.P. was dismissed from this action by the Court in its Opinion and Order on April 18, 2022, and as such no response is required. To the extent a response is required, Centerbridge admits that Centerbridge Associates III, L.P. is the general partner of CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P.

40.     Defendant CCP III Cayman GP Ltd. is the general partner of Centerbridge Associates III, L.P. and the sole manager of Blizzard Aggregator, LLC.

> **ANSWER:** CCP III Cayman GP Ltd. was dismissed from this action by the Court in its Opinion and Order on April 18, 2022, and as such no response is required. To the extent a response is required, Centerbridge admits that CCP III Cayman GP Ltd. is the general partner of Centerbridge Associates III, L.P. and the sole manager of Blizzard Aggregator, LLC.

41.     The Defendants identified in ¶¶37-40 above are collectively referred to herein as "Centerbridge." On September 13, 2019, Centerbridge acquired 100% of the equity in GoHealth's operating entity – Norvax – indirectly through GoHealth Holdings (which had been formed for the purpose of this acquisition) for $807 million in cash and $306 million in equity ("Acquisition"). Centerbridge was a controlling shareholder and primary beneficiary of the IPO, as well as its private equity sponsor, as detailed herein. Centerbridge, along with Jones and Cruz, has significant influence over GoHealth, including control over decisions that require the approval of stockholders.

> **ANSWER:** Centerbridge Partners, L.P., Centerbridge Associates III, L.P., and CCP III Cayman GP Ltd. were dismissed from this action by the Court in its Opinion and Order on

April 18, 2022, and as such no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 41.

**The Underwriter Defendants**

42. Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), BofA Securities, Inc. ("BofA Securities"), and Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, "Underwriter Defendants") are financial services companies that acted as managing underwriters for the IPO and as representatives of the underwriters involved in the IPO. Collectively, the underwriters shared in more than $50.2 million in underwriting discounts and commissions in connection with the IPO. Additionally, according to the Registration Statement, the Underwriter Defendants purchased the following number of shares of GoHealth Class A common stock in connection with the IPO:

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 11,540,550 |
| BofA Securities, Inc. | 10,679,250 |
| Morgan Stanley & Co. LLC | 8,430,300 |
| **Total** | 30,650,100 |

**ANSWER:** Centerbridge admits that, "Defendants Goldman Sachs & Co. LLC ('Goldman Sachs'), BofA Securities, Inc. ('BofA Securities'), and Morgan Stanley & Co. LLC ('Morgan Stanley') (collectively, 'Underwriter Defendants') are financial services companies that acted as managing underwriters for the IPO and as representatives of the underwriters involved in the IPO." Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegation that, "[c]ollectively, the underwriters shared in more than $50.2 million in underwriting discounts and commissions in connection with the IPO." Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 42.

43. Defendant Goldman Sachs & Co. LLC is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282. Goldman Sachs operates as an investment management company. The Registration Statement

represented that shares of GoHealth Class A common stock purchased by Goldman Sachs would be offered for sale by Goldman Sachs to the public at the IPO price.  Accordingly, Goldman Sachs acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

> **ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 43.  Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Finally, Paragraph 43 states a legal conclusion to which no response is required.

44.     Defendant BofA Securities, Inc. is a Delaware corporation whose principal executive office is located at 222 Broadway, NY3-222-12-05, New York, New York 10038.  BofA Securities is a brokerage firm that offers buying and selling of securities.  The Registration Statement represented that shares of GoHealth Class A common stock purchased by BofA Securities would be offered for sale by BofA Securities to the public at the IPO price.  In addition, at GoHealth's request, an affiliate of BofA Securities reserved for sale, at the IPO price, up to 5% of the Class A common stock offered in the IPO for sale to certain of GoHealth's directors, officers, and employees through a reserved share program.  Any reserved shares of Class A common stock that were not so purchased were offered by the underwriters to the general public on the same terms as the other shares of Class A common stock offered by the Registration Statement.  Accordingly, BofA Securities acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

> **ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 44.  Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement

of its contents. Finally, Paragraph 44 states a legal conclusion to which no response is required.

45.     Defendant Morgan Stanley & Co., LLC is a Delaware limited liability company whose principal executive office is located at 1585 Broadway, New York, New York 10036. Morgan Stanley operates as an investment management company. The Registration Statement represented that shares of GoHealth Class A common stock purchased by Morgan Stanley would be offered for sale by Morgan Stanley to the public at the IPO price. Accordingly, Morgan Stanley acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

> **ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 45. To the extent a response is required, Centerbridge denies the allegations in Paragraph 45. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Finally, Paragraph 45 states a legal conclusion to which no response is required.

46.     On information and belief, the Underwriter Defendants participated in the Company's financial roadshow in connection with the IPO, which was conducted entirely through virtual meetings.

> **ANSWER:** Centerbridge admits that representatives of the Underwriter Defendants attended certain presentations. Centerbridge denies the remaining allegations in Paragraph 46.

47.     The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and failed to perform adequate due diligence in connection with their roles as underwriters. As a result, they were negligent in failing to ensure that the Registration Statement was prepared accurately and in accordance with the rules and regulations governing its preparation. Additionally, they participated in preparing road show and other materials used to solicit Class A common stock purchasers in connection with the IPO.

**ANSWER:** Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 47. To the extent a response is required, Centerbridge denies the allegations in Paragraph 47. Paragraph 47 also states a legal conclusion to which no response is required.

48. "Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, NVX Holdings, Centerbridge, and the Underwriter Defendants. "Section 11 Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, and the Underwriter Defendants. "Section 15 Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, NVX Holdings, and Centerbridge.

**ANSWER:** Centerbridge Partners, Centerbridge Associates III, L.P., and CCP III Cayman GP Ltd. were dismissed from this action by the Court in its Opinion and Order on April 18, 2022, and as such no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 48.

## SUBSTANTIVE ALLEGATIONS

### Background of GoHealth

49. Founded in 2001 by Cruz and Jones, GoHealth operates an end-to-end health insurance marketplace that specializes in matching consumers with health insurance carrier plans.

**ANSWER:** Centerbridge admits that GoHealth operates an end-to-end health insurance marketplace that specializes in matching consumers with health insurance carrier plans. Except as expressly admitted, Centerbridge denies the allegations in Paragraph 49.

50. GoHealth is organized as a holding company, with GoHealth Holdings as the Company's principal asset. GoHealth Holdings, however, does not itself have any material operations; instead, all of the Company's operations are carried out by Norvax, which is a wholly owned subsidiary of Blizzard Midco, LLC, which in turn is a wholly owned subsidiary of GoHealth Holdings. GoHealth Holdings was formerly known as Blizzard Parent, LLC until September 2019, when Centerbridge acquired 100% of Norvax. The Company's unusual structure, after the IPO, is set forth in the diagram below:

-24-



**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 50.

51.    GoHealth describes itself as a "leading health insurance marketplace." The Company uses a "proprietary technology platform," as well as machine-learning algorithms, to help individuals find health insurance plans.  To support its technology platform, the Company also uses licensed insurance agents to help enroll consumers in insurance plans with health insurance carriers.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 51.

52.    The Company holds itself out as a rapidly growing, technology-enabled enterprise, which it uses to differentiate itself from the traditional face-to-face method of selling insurance. The Company states that by using technology and having real time access to data, as well as a base of licensed agents, it can operate more efficiently than traditional players in the highly competitive insurance marketplace.  To that end, Jones has stated that with the level of "data and insights" available to GoHealth, "we don't see surprises."

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of GoHealth's August 19, 2020 earnings call.  Centerbridge respectfully refers the Court to the transcript of GoHealth's August 19, 2020 earnings call for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 52.

53.    Although the Company's platform offers a wide array of health insurance policies, including IFPs, in the years leading up to the IPO GoHealth's focus became increasingly concentrated on Medicare products (specifically Medicare Advantage plans) as the Company deemphasized other product types.

> **ANSWER:** Centerbridge denies the allegations in Paragraph 53.

54.    Consumers shopping for health insurance are not GoHealth's real customers. Rather, GoHealth makes its money from insurance carriers.  Thus, consumers do not pay any fees

for access to GoHealth's platform or for its enrollment services. Generally, GoHealth is paid commissions by the health insurance carriers that GoHealth partners with. The Company is typically paid an initial commission when consumers enroll in carriers' products and become customers, and additional, recurring commissions as long as those consumers retain their health insurance plans. The commission structure results in GoHealth collaborating with carriers in order to help the carriers sell more health insurance policies. To that end, the Company uses "advanced statistical models" built on "observable commissions," to analyze consumer data and estimate the Company's future commission streams (from which the Company determines its LTV).

> **ANSWER:** Centerbridge admits that consumers do not pay any fees for access to the GoHealth Companies' platform or for enrollment, education or other services, and that, generally, the GoHealth Companies are paid an initial commission by carriers when consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 54.

55.     As set forth above, GoHealth divides its operations into four operating segments: (a) Medicare-Internal; (b) Medicare-External; (c) IFP and Other-Internal; and (d) IFP and Other-External. "Internal" refers to commission revenues generated by GoHealth-employed agents, whereas "External" refers to commission revenues generated by an independent, national network of agents that use the GoHealth platform. The Medicare-Internal and Medicare-External segments focus on sales of Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare SNPs for insurance carriers.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 55.

56.     The majority of the Company's revenues and profits are generated in its Medicare-Internal and Medicare-External segments.   In 1Q2020, the Company's Medicare segments generated 89% of the Company's revenues, with the Medicare-Internal segment accounting for 68% of GoHealth's total revenues and the Medicare-External segment accounting for 21% of total revenues.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 56.

57.     Within the Company's critically important Medicare segments, Medicare Advantage products generate the majority of net revenues, accounting for 75% of net revenues for the Medicare-Internal segment and 95% of net revenues for the Medicare-External segment during 1Q2020.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 57.

58.     According to the Company, the best or key metric for assessing its overall business profitability and efficiency, and the performance of its integrated platform, is the lifetime value of commissions per consumer acquisition cost, what GoHealth calls its LTV/CAC.  LTV refers to the commission revenues GoHealth expects to receive from insurance carriers in connection with approved submissions for insurance policies by consumers over time.  LTV is based on a variety of variables that GoHealth does not report publicly, such as contracted commission rates, carrier mix, policy persistency, and the number of expected submissions.  CAC, on the other hand, refers to the cost to GoHealth of acquiring its consumers.  Thus, LTV/CAC is a type of profitability

metric that generally refers to how much of a return GoHealth expects on its consumer acquisition investments.

> **ANSWER:** Centerbridge denies the allegation that, "[a]ccording to the Company, the best or key metric for assessing its overall business profitability and efficiency, and the performance of its integrated platform, is the lifetime value of commissions per consumer acquisition cost, what GoHealth calls its LTV/CAC." Plaintiffs also make allegations regarding the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 58.

59. The Company recognizes revenue at the time a "[s]ubmitted [p]olicy" becomes an "[a]pproved [p]olicy" by "applying the latest estimated LTV for that product." GoHealth estimates commission revenue for each product by using a "portfolio approach" to a group of approved customers that are organized based on a variety of attributes that GoHealth refers to as "cohorts." GoHealth estimates the cash commission it expects to collect for each "approved customer cohort" by evaluating various factors, including "commission rates, carriers, estimated average plan duration, the regulatory environment, and historic cancellations of health insurance plans offered by carriers with which [GoHealth has] a relationship." The Company recomputes LTV on a quarterly basis "at a cohort level for all outstanding cohorts" while reviewing and monitoring changes in the data used to estimate LTV as well as the cash received for each cohort as compared to GoHealth's original estimates. Because of the number of factors and assumptions underlying GoHealth's LTV calculations, there is no way for investors or analysts to crosscheck or fully understand how GoHealth calculates its LTV. But, it is clear that: (a) changes in LTV have an impact on revenue and the Company's commissions receivables; and (b) negative changes in the factors upon which GoHealth estimates its LTV, such as reduced commission rates and increased churn or decreased persistency, hurt its financial performance.

-29-

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 59.

60. GoHealth states that the Company's Medicare-Internal and Medicare-External segments drive the highest LTV/CAC of the products and plans the Company offers, including in the two years preceding the Company's IPO. With respect to these segments, the Company has emphasized its agent-assisted model as maximizing LTV/CAC and identified its ability to rapidly scale and expand relationships with existing carriers as critical to the growth of these segments and overall LTV/CAC.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60.

61. Unlike many of its competitors, however, GoHealth generated a substantial majority of its revenues from only two insurance carriers: Humana and Anthem. In 2019, Humana and Anthem accounted for 40% and 20%, respectively, of the Company's total revenues. In 1Q2020, these two insurance carriers, together, accounted for 74% of the Company's total revenues, up from 43% of the Company's total revenues in 1Q2019. The effect of GoHealth's business concentration on just two insurance carriers was even more pronounced in GoHealth's Medicare-Internal and Medicare-External segments, in which Humana and Anthem accounted for approximately 85% of those segments' revenues in 1Q2020.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 61.

62.     GoHealth's increased concentration in Humana and Anthem in the lead up to the IPO corresponded with a period of rapid revenue growth and best-in-class LTV/CAC.   For example, GoHealth claimed that its revenues grew 138.5% year-over-year during 2019 to $539.5 million and grew 104.1% year-over-year during 1Q2020 to $141.0 million.   The Company had also purportedly improved its LTV/CAC to 3.9x in 2019 (from 2.7x the prior year) and to 2.7x for 1Q2020 (from 1.7x for the comparable prior year period) for its critical Medicare-Internal segment.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 62.

63.     The enrollment of consumers on GoHealth's platform requires significant upfront expenses, including marketing and advertising expenses, and customer care and enrollment expenses, in order to generate qualified prospects, educate and enroll those consumers in insurance carriers' products and plans, and submit completed applications to carriers.  Because the resulting commissions are generally paid to GoHealth over time, with the first payments often occurring several weeks or months after GoHealth submits completed applications to its carriers, the Company requires significant cash to fund its operational needs.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 63.

64.     By heavily concentrating its critically important Medicare business with two customers – Humana and Anthem – GoHealth was able to benefit from reduced customer acquisition costs prior to the IPO.  This was because GoHealth's top carriers subsidized its marketing costs, paid GoHealth top-tier commission rates, and were deeply integrated with GoHealth's technology platform, which led to a substantially lower direct marketing cost per

policy than GoHealth's peers, generating best-in-class LTV/CAC. If GoHealth were to, over a short period of time, substantially expand the number of carriers in its Medicare business, GoHealth faced lowered commission rates, decreased marketing support, lessened technical integration, and increased agent training costs to educate GoHealth agents on the new carriers' plans, which stood to weaken GoHealth's touted LTV/CAC. In addition, selling new plans for new customers, with reduced commissions as the result, naturally led to less profitability, but also decreased persistency and increased churn, or at least increased costs to combat the heightened potential for decreased persistency and increased churn, as customers placed into new plan offerings by less experienced sales agents in the highly competitive Medicare insurance market (which was plagued by rising churn at the time of the IPO) were more likely to change their minds. This, in turn, would materially weaken GoHealth's LTV/CAC.

**ANSWER:** Centerbridge denies the allegations in Paragraph 64.

65. Despite the foregoing concentration of insurance carriers, the Company repeatedly lauded its high LTV/CAC ratio, which GoHealth achieved in a highly competitive environment, as the primary result of the Company's purportedly unique competitive advantages in the services it provided to its insurance carrier customers.

**ANSWER:** Centerbridge denies the allegations in Paragraph 65.

### Centerbridge Acquires a Controlling Interest in GoHealth in Advance of the IPO and GoHealth Reports Rapid Growth

66. Centerbridge, the primary beneficiary and private equity sponsor of GoHealth's IPO, is a global private investment firm with over $25 billion in assets. Centerbridge manages capital through varied investment funds and special purpose partnerships.

**ANSWER:** Centerbridge Partners, L.P., Centerbridge Associates III, L.P., and CCP III Cayman GP Ltd. were dismissed from this action by the Court in its Opinion and Order on April 18, 2022, and as such no response is required. To the extent a response is required,

Centerbridge admits that Centerbridge manages capital through varied investments funds and special purpose partnerships and was the sponsor of GoHealth. Centerbridge denies the remaining allegations in Paragraph 66.

67. As set forth above, on September 13, 2019, Centerbridge acquired 100% of the equity in GoHealth's operating entity – Norvax – indirectly through a newly formed entity, GoHealth Holdings, for $807 million in cash and $306 million in equity. In connection with the Acquisition, Centerbridge also agreed to pay Norvax's selling shareholders up to $275 million of additional contingent consideration, to be paid in the form of common and senior preferred earnout units, if the Company achieved certain earnings targets in late 2019 and 2020 ("Earnout Terms"). The Earnout Terms, therefore, created a strong incentive for the Individual Defendants to report strong growth following the Acquisition.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 67.

68. The Registration Statement stated that GoHealth reported tremendous growth in the post-Acquisition period leading up to its IPO. From September 13, 2019 through December 31, 2019, GoHealth generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019. As a result, GoHealth generated substantially more – 33% more – revenues in the three-and-a-half months following the Acquisition than in the eight-and-a-half months preceding the Acquisition. GoHealth also generated 36% more revenues in the short period at the end of 2019 following the Acquisition than in the Company's entire 2018 fiscal year, when it generated $226 million in net revenues.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 68.

69.     As a result of the Company's apparently exceptional earnings growth following the Acquisition, the Company, per the Earnout Terms of the Acquisition, incurred $75 million in contingent consideration liability from the close of the Acquisition through the end of 1Q2020, to be paid out to Norvax's selling shareholders in the Acquisition, which included Cruz.

**ANSWER:** Centerbridge denies the allegations in Paragraph 69.

### GoHealth's IPO

70.     On or about June 19, 2020, GoHealth filed a Registration Statement on Form S-1 with the SEC, which sought to register shares of GoHealth Class A common stock in anticipation of the IPO.  GoHealth amended the Registration Statement on July 6, 2020 to include certain exhibits, such as the amended and restated certificate of incorporation and bylaws of GoHealth to be in effect following various post-IPO transactions (described below) and an indemnification agreement between GoHealth and its officers and directors.

> **ANSWER:** Lead Plaintiffs make allegations regarding the filing and regarding or paraphrasing the contents of the Registration Statements.  Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 70.

71.     On July 8, 2020, GoHealth filed its second amendment to the Registration Statement, which registered 39,500,000 shares of GoHealth Class A common stock and indicated that the IPO would be priced between $18.00 and $20.00 per share.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the second amendment to the Registration Statement.  Centerbridge respectfully refers the Court to the second amendment to the Registration Statement for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 71.

72.     On July 14, 2020, GoHealth filed an additional Registration Statement with the SEC that registered an additional 4.6 million shares of GoHealth Class A common stock to be sold in the IPO.  The 4.6 million additional shares included 600,000 shares of Class A common stock

to be sold pursuant to the Underwriter Defendants' option to purchase additional shares. The July 14, 2020 updated Registration Statement incorporated the prior Registrations Statements by reference, and indicated the IPO would be priced at $21 per share.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the additional Registration Statement filed on July 14, 2020. Centerbridge respectfully refers the Court to the additional Registration Statement filed on July 14, 2020 for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 72.

73. GoHealth priced the IPO at $21 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement. At 4:00 p.m. Eastern on July 14, 2020, two weeks after the close of GoHealth's 2Q2020, the SEC issued a notice of effectiveness for the IPO.

> **ANSWER:** Centerbridge admits the allegation that "[a]t 4:00 p.m. Eastern on July 14, 2020, two weeks after the close of GoHealth's 2Q2020, the SEC issued a notice of effectiveness for the IPO." Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the final Prospectus for the IPO. Centerbridge respectfully refers the Court to the final Prospectus for the IPO for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 73.

74. On July 15, 2020, the NASDAQ approved listing of GoHealth Class A common stock.

> **ANSWER:** Centerbridge admits the allegations in Paragraph 74.

75. On July 16, 2020, GoHealth filed with the SEC the Prospectus for the IPO on Form 424B4. The Prospectus, which was dated July 14, 2020, and forms part of the Registration Statement, stated the IPO was for the sale of 43.5 million shares of GoHealth Class A common stock in the IPO at $21.00 per share. The Prospectus stated the IPO would generate $913.5 million in proceeds, less the underwriting discount of $1.155, or $50,242,000, giving GoHealth net proceeds, before expenses, of $863,257,500. The Prospectus stated the underwriters had the option to purchase up to an additional 6,525,000 shares of Class A common stock at the IPO price less the underwriting discount within 30 days of the date of the Prospectus.

**ANSWER:** Centerbridge admits that GoHealth filed a Prospectus on Form 424(b)(4) in connection with the IPO on July 16, 2020. Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Prospectus. Centerbridge respectfully refers the Court to the Prospectus for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 75.

76. On July 17, 2020, the Company completed the IPO, which, upon the underwriters' exercise of their option to purchase shares, issued and sold a total of 44,500,000 shares, generating over $913,500,000 in gross proceeds, with the Company receiving approximately $852,400,000 in net proceeds, after deducting the underwriting discount and Offering expenses.

**ANSWER:** Centerbridge admits that GoHealth completed its IPO on July 17, 2020, that the IPO generated $913,500,000 in gross proceeds and approximately $852.0 million in net proceeds after deducting the underwriting discount and offering expenses. Centerbridge denies the remaining allegations in Paragraph 76.

77. In connection with GoHealth's IPO, GoHealth undertook certain organizational transactions in order to reorganize its corporate structure and determine how the proceeds from GoHealth's Offering would be applied or distributed across the various interested parties ("Transactions"). These interested parties, who stood to (and did) substantially benefit from GoHealth's IPO, included:

(a) **Blocker Company**: an entity affiliated with Centerbridge that is an indirect owner of LLC interests in GoHealth Holdings prior to the Transactions;

(b) **Blocker Shareholders**: shareholders in the Blocker Company prior to the Transactions, who, in consummation of the Transactions, would exchange their interests in the Blocker Company for cash and shares of GoHealth Class A common stock;

(c) **Centerbridge**, including certain funds affiliated with it, other entities over which it had voting control, and any funds or entities formed to hold shares of GoHealth's Class A common stock for the Blocker Shareholders;

(d) **Founders** Cruz and Jones and **NVX Holdings**, which the Founders control;

(e) **Norwest Equity Partners ("Norwest")**, along with certain affiliated funds, which owned LLC interests in GoHealth Holdings prior to the consummation of the Transactions;

(f) "**Original Equity Owners**," a term used in the Registration Statement, which collectively referred to Centerbridge, Norwest, the Founders, and certain executive officers, employees, and other minority investors of the Company, by virtue of their ownership of LLC interests in GoHealth Holdings prior to the consummation of the Transactions; and

(g) "**Continuing Equity Owners**," a term used in the Registration Statement, which collectively referred to the direct and indirect holders of LLC interests in GoHealth

-36-

Holdings and the Company's Class B common stock immediately following the consummation of the Transactions. As relevant here, these Continuing Equity Owners included, but are not limited to, Centerbridge, Norwest, NVX Holdings, and the Founders.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 77.

78. Prior to the Company's IPO, the Original Equity Owners were the only members of GoHealth Holdings. As one of the Transactions in connection with this IPO, however, the Company amended and restated the existing LLC agreement of GoHealth Holdings in order to recapitalize all of the existing ownership interests in GoHealth Holdings, add the Company as a member of GoHealth Holdings, and appoint the Company as the sole managing member of GoHealth Holdings upon the Company's acquisition of LLC interests in GoHealth Holdings as part of the Transactions in connection with the Company's IPO.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 78.

79. In addition to recapitalizing all of the LLC interests in GoHealth Holdings, the Company also amended and restated its certificate of incorporation in order to recapitalize the Company's outstanding shares of existing common stock into one share of Class A common stock. This amendment and restatement of the Company's certificate of incorporation also provided for Class A and Class B common stock, each of which would entitle its holder to one vote per share on matters presented to the Company's stockholders generally, and required that shares of Class B common stock be held only by the Continuing Equity Owners or transferred by them only to certain permitted persons. All of the shares of Class B common stock, held by the Continuing

Equity Owners, ultimately would constitute approximately 73.2% of the voting power of GoHealth's outstanding common stock.[6]

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents.

80.     As part of the Transactions, the Company also acquired the Blocker Company through a merger ("Blocker Merger") by and in consideration for issuing to the Blocker Shareholders 40,682,961 shares of the Company's Class A common stock and paying them, upon consummation of the Company's IPO, $96.2 million in cash.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents.

81.     With more than $852 million in net proceeds from the IPO, the Company purchased 38,679,685 newly issued LLC interests in GoHealth Holdings at a price per unit of $21.00 and paid $96.2 million in cash to the Blocker Shareholders in consideration of the Blocker Merger.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents.

82.     As for the net proceeds that GoHealth Holdings would receive from the sale of its newly issued LLC interests to the Company, GoHealth Holdings: (a) paid $508.3 million in cash to redeem certain of the LLC interests in it held by the Continuing Equity Owners; (b) paid in full, per the Earnout Terms of the Acquisition, $100 million in contingent consideration liability to

---

[6] Consequently, the Company issued 229,399,322 shares of Class B common stock, for nominal consideration, to the Continuing Equity Owners – equal to the number of LLC interests in GoHealth Holdings held directly or indirectly by the Continuing Equity Owners immediately following the Transactions.

Norvax's selling shareholders in the Acquisition; and (c) supported the growth of the Company's business.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents.

83. The Transactions also included the Company entering into a variety of additional agreements that impacted the Company's and its subsidiaries' ability to act. These included, for example, a Stockholder Agreement with Centerbridge and NVX Holdings that provided Centerbridge and NVX Holdings with substantial control over the Company.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents. Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Stockholder Agreement and other agreements. Centerbridge respectfully refers the Court to those agreements for a true and complete statement of their contents. Centerbridge denies the remaining allegations in Paragraph 83 and specifically denies that the Stockholder Agreement provided Centerbridge with substantial control over the Company.

84. Following all of these Transactions and the consummation of the Company's IPO, the Individual Defendants, NVX Holdings, and Centerbridge exercised substantial control over GoHealth and the business and affairs of GoHealth Holdings and its direct and indirect subsidiaries. Specifically:

(a) The Company served as the holding company and sole managing member of GoHealth Holdings, with control over GoHealth Holdings' business, affairs, and subsidiaries. The Company's principal assets consist of the LLC interests in GoHealth Holdings that the Company (through the application of the proceeds from its IPO) acquired directly from GoHealth Holdings and indirectly from the Blocker Shareholders and certain Continuing Equity Owners. To that end, GoHealth owns between 26% and 27% of the economic interest in GoHealth Holdings.

(b) The Founders, through their ownership of LLC interests in GoHealth Holdings, owned approximately 30.1% of the economic interest in GoHealth Holdings and, through their ownership of the Company's Class B common stock, had approximately 30.9% of the combined voting power of all of the Company's common stock.

(c) Centerbridge owned:

(i)     by virtue of its ownership of the Company's Class A common stock, approximately 13% of the combined voting power of all of the Company's common stock and approximately 48.3% of the economic interest in the Company;

(ii)     by virtue of its ownership of LLC interests in GoHealth Holdings directly and indirectly through the Company's ownership of LLC interests in GoHealth Holdings, approximately 38.7% of the economic interest in GoHealth Holdings; and

(iii)     by virtue of its ownership of the Company's Class B common stock, approximately 25.8% of the combined voting power of all of the Company's common stock.

(d)     The purchasers in the Company's IPO:

(i)     by virtue of their ownership of the Company's Class A common stock, would own approximately 51.7% of the economic interest in the Company and approximately 13.9% of the combined voting power of all of the Company's common stock; and

(ii)     by virtue of the Company's ownership of LLC interests in GoHealth Holdings, would indirectly own approximately 13.9% of the economic interest in GoHealth Holdings.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statements. Centerbridge respectfully refers the Court to the Registration Statements for a true and complete statement of their contents. Lead Plaintiffs make allegations regarding the contents of various agreements. Centerbridge respectfully refers the Court to those agreements for a true and complete statement of their contents. Centerbridge denies the remaining allegations in Paragraph 84 and specifically denies that Centerbridge exercised substantial control over GoHealth and its business and affairs.

85.     As a result, the Section 15 Defendants possessed and exercised control over GoHealth before, during, and after the IPO far out of proportion to their economic stake in the Company.

**ANSWER:** Centerbridge denies the allegations in Paragraph 85.

### By the Time of the IPO, GoHealth Planned to Change Its Business Model, Negatively Impacting Customer Churn and the Company's LTV

86.     Leading up to the IPO, GoHealth increasingly shifted its business model to focus on Medicare Advantage products while deemphasizing the IFP aspect of its business. The Company's Medicare-Internal segment was the largest segment by revenue and the primary contributor to GoHealth's financial performance. Specifically, for 1Q2020, the Medicare segments represented 88.1% of GoHealth's total revenues, compared to 59.7% of total revenues for 1Q2019, and 98% of total profit, compared to 47% of total profit for 1Q2019.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of a GoHealth SEC filing. Centerbridge respectfully refers the Court to the GoHealth SEC filing for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 86.

87. Unbeknownst to investors, GoHealth's purportedly stunning growth and improved profitability in the lead up to the IPO were predicated on increasing its reliance on just two insurance carriers: Human and Anthem. By the time of the IPO, however, GoHealth had effectively maximized the growth that could be achieved by relying on this carrier concentration tactic and, as a result, needed to substantially and rapidly change its business model to pursue a broader array of carriers to continue growth.

**ANSWER:** Centerbridge denies the allegations in Paragraph 87.

88. To make this change, GoHealth and the Individual Defendants planned 2020 as an "investment year" for the Company. This changed strategy entailed significant disruptions to the Company's critical LTV/CAC metric as GoHealth significantly expanded its Medicare business to establish relationships with additional insurance carrier customers. Leading up to the IPO, GoHealth benefitted from deep technical integration and subsidized marketing with its top carriers – Humana and Anthem. This provided substantial, but not publicly quantified, benefits to GoHealth as it had significantly lower direct marketing costs per policy than its peers. These symbiotic relationships were a key reason that GoHealth experienced rapid growth leading up to the IPO, which included peer-leading LTV/CAC numbers.

**ANSWER:** Centerbridge denies the allegations in Paragraph 88.

89. Thus, additional expansion of GoHealth's Medicare Advantage insurance carrier base came at a significant cost to the business. The Registration Statement failed to disclose these changed tactics and the expected business disruptions that would result. As GoHealth planned to, and did, significantly expand its Medicare business to include several additional, large Medicare

carriers in 2020, while also increasing its reliance on SNPs, the Company faced significant near-term pressures on its financial performance that led the Individual Defendants to refer to 2020 as GoHealth's "investment year." These negative, near-term pressures included the following factors:

(a)     **First**, new carriers would only pay reduced commission rates to GoHealth and it would take time for GoHealth to earn its way up to the maximum allowable commission rates that the Company enjoyed with established partners like Humana and Anthem.

(b)     **Second**, when rolling out to new Medicare carriers, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions.

(c)     **Third**, GoHealth's upfront costs with new carriers were significant, as GoHealth spent aggressively to increase marketing, hire more agents, and drive conversions of consumers to Medicare Advantage plans. This factor was exacerbated by the fact that Humana and Anthem subsidized GoHealth's marketing, which greatly benefitted the Company's LTV/CAC and financial performance prior to and at the time of the IPO.

(d)     **Fourth**, selling new plans for new carrier customers resulted in not only reduced commissions and less profitability, but also decreased persistency and increased churn, or at least increased costs to combat the heightened potential for decreased persistency and increased churn, because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly competitive Medicare insurance market, which was suffering from increased churn. This also weakened GoHealth's LTV/CAC during 2020.

(e)     **Fifth**, to combat this disruption, GoHealth also increased its sales of SNPs in 2020, including in 2Q2020, which closed two weeks prior to the IPO, which decreased the percentage of commissionable revenue versus non-commissionable revenue earned by the Company, had higher churn rates, and also dragged down GoHealth's LTV.

**ANSWER:** Centerbridge denies the allegations in Paragraph 89.

### The Registration Statement Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Statements Therein Not Misleading

90.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material facts that were required to be disclosed pursuant to the regulations governing its preparation.

**ANSWER:** Paragraph 90 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 90.

91.     Specifically, the Registration Statement did not provide information to investors regarding the negative impact resulting from GoHealth's shift in business strategy and the Company's planned "investment year" as a result of its expansion to several large health insurance carrier customers and increased focus on SNPs that generated non-commissionable revenue, both of which would negatively pressure GoHealth's LTV/CAC in 2020.  Quite the opposite, the Registration Statement stated that expanding the Company's platform would "improve" GoHealth's "key drivers" of LTV/CAC, stating:

> We focus on strengthening the key drivers of LTV/CAC, including marketing costs, the consumer lead to customer conversion rate and customer satisfaction.  While we offer both do-it-yourself and agent-assisted channels to accommodate consumers' preferences, we believe that for most qualified Medicare prospects, an agent-assisted model maximizes LTV/CAC.  ***As we continue to scale our platform, we improve our key drivers through specialization and optimization using our proprietary data and machine-learning***.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Centerbridge denies the remaining allegations in Paragraph 91.

92.     Describing the Company's important Medicare-Internal segment, the Registration Statement stated that "[g]oing forward, [GoHealth] intend[ed] to continue our focus on growth and placing qualified prospects within this segment." The Registration Statement added that "**carriers that partner with [GoHealth] through one or more of [GoHealth's] internal segment businesses will often supplement [GoHealth's] marketing and technology investments**."

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Centerbridge denies the remaining allegations in Paragraph 92.

93. Detailing the Company's "strengths," the Registration Statement again highlighted GoHealth's "rapid scalability" and implied that GoHealth's connection to "many carriers" created increased LTVs at lower CACs and that the data generated through the sales process "deepen[ed] GoHealth's] relationships with carriers." Specifically, the Registration Statement stated:

We use a combination of proprietary and third-party data, direct API connections to many carriers, and our proprietary technology platform, Marketplace, to educate, quote and enroll consumers in real-time to the health insurance plan best suited to meet their specific needs, which enhances long-term customer satisfaction. **The resulting increase in the expected LTV of consumers obtained at a lower CAC has made our innovative distribution model more appealing to carriers and has altered their own approach to strategic marketing and consumer acquisition**. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. **We engineered our marketplace for rapid scalability**, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms and complies with HIPAA, TCPA and DOI and CMS regulations. We had over 132,000 Submitted Policies in the Medicare segments for the three months ended March 31, 2020 and over 427,000 Submitted Policies in the Medicare segments for the year ended December 31, 2019, which we believe makes us one of the largest health insurance marketplaces based on publicly available information about our competitors and our carriers and our general knowledge of the industry acquired over our 19-year operating history. **The data generated through the sales process by these consumers helps us increase LTV/CAC**

**through machine-learning enabled feedback loops, and allows us to improve and deepen our relationships with carriers**.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 93.

94. Regarding the Company's concentration and focus on only two insurance carrier customers in GoHealth's critical Medicare Advantage business, the Registration Statement touted the Company's "deep, tenured, and expanding" relationships with top carriers and stated:

Our carrier relationships allow us to offer a wide variety of products and plans across our platform and offer solutions tailored to consumers' healthcare needs. We are a critical partner to our top carriers, for which we use our data and direct API connections to help inform their plan and network design and assist with budgeting. **Our carrier relationships are stable, as evidenced by the fact that our relationships with each of our five largest carriers, measured by 2019 submission volume, exceeds five years**. Over the past five years, we have expanded those relationships from initially covering individual and family products to covering Medicare Advantage products at all five of these carriers. **We are licensed in all 50 states and the District of Columbia, which combined with our data-driven, omni-channel marketing and effective and scalable marketplace, makes us a partner of choice for the leading Medicare Advantage plans nationally and in each state**.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 94.

95.     While the Registration Statement did state that the Company would expand the geographic reach of its platform to include more Medicare Advantage products in 2020, it only stated that it would cover "at least one of the top two carriers" and neither indicated that the Company's recent, rapid growth had been predicated on an unsustainable tactic – namely increasing its concentration in just two carriers – nor that the Company was experiencing and planning significant and rapid Medicare Advantage carrier expansion, which would result in 2020 being an "investment year" for the Company with an expected drag on LTVs.   Rather, the Registration Statement stated:

> *We continue to focus on building out our carrier footprint in order to provide our consumers with a greater choice of health insurance plans.  In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments.  In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments.*

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Centerbridge denies the remaining allegations in Paragraph 95.

96.     Describing the Company's growth strategies, the Registration Statement stated that Medicare carriers had "shown increased interest in working with [GoHealth], including those who had not traditionally used digitally-enabled models" and stated that GoHealth would benefit from enhanced return of scale and **more efficient** marketing:

We believe we are a partner of choice for the top carriers in the Medicare marketplace because of our scale, efficiency and ability to integrate with carriers using direct API connections to exchange data and insights. Given our growth in Approved Submissions in the Medicare segments and the integrated data and technology of our platform, Medicare carriers have shown increased interest in working with us, including those who have not traditionally used digitally-enabled models. **In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. This allows us to benefit from enhanced return of scale, more efficient marketing in these geographies, increased agent conversion rates of qualified prospects to customers, and improved customer satisfaction rates as we meet the needs of our customers**.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 96.

97.     In addition to highlighting the Company's relationships with top carriers, the Registration Statement represented that the Company could "rapidly scale" while "improving" its critical measure of financial performance – the LTV/CAC ratio. Specifically, the Registration Statement stated:

*Our integrated technology platform, business processes, data and highly skilled and trained agents enable us to rapidly scale while improving our unit economics, as*

*measured by LTV/CAC.* As we scale our business, our machine- learning data combined with our omni-channel marketing allows us to become progressively better at acquiring consumer leads with favorable engagement potential and to do so at lower cost. ***In doing so, we increase the lifetime commissions generated by the consumer leads we convert, which increases LTV per Approved Submission, and we reduce the cost of acquiring consumer leads, lowering CAC per commissionable Approved Submission.***

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 97.

98. Further addressing the matters that stood to impact the Company's results of operations, the Registration Statement included materially false statements and omissions regarding the Company's ability to attract new carriers and expand relationships with existing carriers. Specifically, the Registration Statement stated:

We generate revenue primarily from commissions earned through policy sales utilizing our platform. Carriers and other partners also pay us enrollment fees, hourly fees and other fees for services performed for specific carriers. **Attracting new carriers and expanding relationships with our existing carriers to offer more products and plans is critical to the growth of our business, particularly in the Medicare segments, which drive the highest LTV/CAC of the products and plans we offer. We are strategically adding carriers in the Medicare segments in order to offer top-rated plans and multiple plan choices in each of the U.S. counties in which we operate. This also allows us to market more efficiently in these geographies, increase conversion rates on consumer leads, and improve customer satisfaction rates as we are better able to meet consumers' specific needs, which drives revenue growth.**

**ANSWER:** Paragraph 98 states a legal conclusion to which no response is required. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the remaining allegations in Paragraph 98, and specifically denies the allegations that the Registration Statement contained any false or misleading statements or omissions.

99. In several instances, the Registration Statement highlighted the Company's ability to sell SNPs year-round, which would help "prioritize agent growth year round." The Registration Statement did not, however, disclose that GoHealth's increasing use of SNPs, which generated non-commissionable "other" revenue, would also create a near-term drag on GoHealth's average LTV while increasing churn. For example, the Registration Statement stated:

In addition, *we are increasingly adding SNPs into our marketplace from both existing and new carrier relationships*. Unlike Medicare Advantage products, which can largely be sold only during the Medicare annual enrollment period and open enrollment period, SNPs can generally be sold throughout the special enrollment period. *As a result, we are able to maximize the value of our consumer interactions and marketing spend during the special enrollment period and prioritize agent growth year round. As we add more Medicare products and expand SNP offerings, we allocate more of our existing agent seat count to the Medicare—Internal segment from other less profitable channels, reducing the need to open new facilities*.

\* \* \*

*We were also able to utilize more agents on a year-round basis instead of during enrollment periods due to the addition of SNPs into our marketplace which are able to be sold at any time of year. Net revenues also increased in this segment due to the*

-49-

*implementation of new marketing strategies to generate a greater number of qualified*

*prospects and due to an increase in non-commission revenues*.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge denies the remaining allegations in Paragraph 99.

100. The statements referenced above in ¶¶91-99 were materially false because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) That GoHealth's recent revenue increases and improved LTV/CAC metrics touted in the Registration Statement were the result of an unsustainable business strategy, namely dramatically increased concentration on just two Medicare insurance carriers;

(b) That GoHealth had maximized the growth that could be achieved by concentrating its business with Humana and Anthem and, as a result, needed to significantly alter its business model in order to continue its growth trajectory;

(c) That GoHealth and the Individual Defendants had planned 2020 as an "investment year" for the Company, which included significant and rapid carrier expansion in the Company's Medicare business as well as increased reliance on non-commissionable SNPs, both of which would result in negative impacts to GoHealth's important LTV metric;

(d) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced commission rates until it could earn its way up to the maximum allowable commission rates that the Company enjoyed with its established carrier relationships, negatively impacting GoHealth's LTV and creating a "near-term drag" on GoHealth's average LTV;

(e) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced marketing support from new carriers compared to the subsidized marketing GoHealth enjoyed with Humana and Anthem, negatively impacting GoHealth's LTV/CAC;

(f) That GoHealth's purported ability to "rapidly scale" was materially false because by rapidly scaling with new carriers, the Company faced negatively changed financial dynamics, including reduced commission rates and decreased marketing support;

(g) That in order to enroll a substantial volume of new consumers with the Company's new insurance carrier partners, GoHealth needed to incur significant upfront expenses, including substantial marketing, advertising, and employee-related expenses in excess of typical levels, in exchange for reduced commissions, resulting in negative pressure on GoHealth's critical LTV/CAC ratio as well as significant, additional cash expenditures by the Company during 2020;

(h) That as GoHealth added several large Medicare carriers in 2020, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions for such new business;

(i) That GoHealth's upfront costs with the new Medicare carriers it had already added and planned to add in 2020 would be significant and detrimental to LTV/CAC because GoHealth needed to spend aggressively to increase marketing and hire more agents in order to

-50-

generate enough approved submissions at the new carriers to justify the ability to earn top-tier commissions in the future; and

(j)     That GoHealth faced increased churn and decreased persistency, and increased costs related to fighting churn and supporting persistency, as a consequence of selling SNPs as well as new plans for new Medicare carrier customers because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly competitive Medicare insurance market, resulting in reduced commissions, reduced profitability, and a drag on GoHealth's LTV/CAC.

> **ANSWER:** Paragraph 100 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 100.

101.    The risk factors included in the Registration Statement also included materially false statements and omissions. For example, the risk warnings failed to disclose the most significant risk factors impacting GoHealth – including the maximization of its historical business model and need to rapidly expand to additional carriers and engage in substantial investments and untested business strategies in 2020. The Registration Statement also provided generic boilerplate discussions of potential, future contingent "risks," such as stating that GoHealth's business **could** be harmed, and commissions **could** decrease, if carriers were not satisfied with GoHealth's services or if GoHealth failed to develop new carrier relationships, but failed to disclose that the converse was **already** coming true and would continue to come true in 2020. As GoHealth quickly expanded its relationships to include several new, large carriers, it suffered and would continue to suffer near-term negative financial impacts, including decreased commission rates and near-term pressure on LTVs.

> **ANSWER:** Paragraph 101 states a legal conclusion to which no response is required. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge admits that the Registration Statement contained detailed risk factor disclosures. Centerbridge denies the remaining allegations in Paragraph 101.

102. Although the risk factors purported to warn that GoHealth's insurance carrier customers **could** "reduce the commissions paid" to GoHealth and change their underwriting policies in ways that reduced the number, or impacted the renewal or approved rates, of insurance policies sold through GoHealth's platform, which **could** harm GoHealth's business, the risk factors did not suggest that GoHealth was then **already** experiencing, and would continue to experience in 2020, reduced commissions as a consequence of adding several large Medicare Advantage carriers in 2020. Specifically, the Registration Statement stated:

> Our commission rates from carriers are either set by each carrier or negotiated between us and each carrier. The commission rates we are paid are, for any given plan for a given customer, based on a number factors [sic], including the carriers offering those plans, the state of residence of customers, the laws and regulations in the jurisdictions where the customer is located, and the customer's previous Medicare enrollment history (if any). **Carriers have the right to alter these commission rates with relatively short notice and have altered, and may in the future alter, the contractual relationships we have with them, including, in certain instances by unilateral amendment of our contracts relating to commission rates or otherwise**. For example, CMS could reduce the amount paid by CMS to Medicare Advantage plans or change the regulations and/or timelines applicable to the Medicare Advantage program, particularly in response to the COVID-19 pandemic, which could result in decreased commission rates or reduce carrier participation in the Medicare Advantage program. Changes of this nature could result in reduced commissions, or could impact our relationship with such carriers and potentially lead to contract termination. **Because revenue in the Medicare segments is concentrated in a relatively small number of carriers, we are particularly vulnerable to changes in**

**commission rates and changes in the competitiveness of our carriers' Medicare products**.

ANSWER: Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. Centerbridge admits that the Registration Statement contained detailed risk factor disclosures. Centerbridge denies the remaining allegations in Paragraph 102.

103. As set forth in the paragraph above, the risk warning pointed to carriers altering commission rates through amendment of contracts relating to "commissions or otherwise," and, as an example, described how CMS' decision to change its rates could carry over to GoHealth's contracts with carriers.[7] And by pointing to the concentration of GoHealth's Medicare business in a "relativity small number of carriers," the risk warning implied that carrier expansion would *help* alleviate GoHealth's vulnerability to reduced commission rates, but did not disclose that carrier expansion itself was placing, and would continue to place, downward pressure on LTVs during 2020. In a similar vein, an additional risk warning in the Registration Statement stated that GoHealth *could* be "adversely impacted by factors that impact [its] estimate of LTV," but, once again, the warning gave no indication that adding new Medicare Advantage customers, or SNPs, was *already* hurting and would continue to hurt the Company's LTV in 2020:

> *Commission rates are also a factor in estimating our LTVs, which are impacted by a variety of factors, including the particular health insurance plans chosen by our customers, the carriers offering those plans, our customers' states of residence, the laws and regulations in those jurisdictions, the average premiums of plans purchased through*

---

[7] CMS is shorthand for the Centers for Medicare & Medicaid Services, a federal agency within the United States Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid, the Children's Health Insurance Program, and health insurance portability standards.

*us and healthcare reform.  Any reduction in our average commission revenue per customer could harm our business, operating results and financial condition.*

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Centerbridge admits that the Registration Statement contained detailed risk factor disclosures.  Centerbridge admits that the Centers for Medicare & Medicaid Services is a federal agency within the United States Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid, the Children's Health Insurance Program, and health insurance portability standards.  Centerbridge denies the remaining allegations in Paragraph 103.

104.    The risk factors included statements regarding the Company's dependence on "a small group of carriers for a substantial portion of [GoHealth's] revenue," but did not indicate that the planned, but undisclosed, "investment year" in 2020 would include significant new carrier expansion at the expense of weakened LTV and increased marketing expense.  As a result, the following risk warning, which discussed GoHealth depending on **fewer** carrier relationships, was false and omitted material facts that were required to be disclosed:

Our agreements with carriers to sell policies are typically terminable by our carriers without cause.  **Should we become dependent on fewer carrier relationships (whether as a result of the termination of carrier relationships, carrier consolidation or otherwise), we may become more vulnerable to adverse changes in our relationships with carriers, particularly in states where we distribute insurance from a relatively smaller number of carriers or where a small number of carriers dominate the market, and our business, operating results and financial condition could be harmed.**

**ANSWER:** Paragraph 104 states a legal conclusion to which no response is required.  Lead Plaintiffs also make allegations regarding or paraphrasing the contents of the Registration Statement.  Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents.  Centerbridge admits that the Registration Statement contained detailed risk factor disclosures.  Centerbridge denies the remaining allegations in Paragraph 104.

105. The risk factor statements referenced above in ¶¶101-104 were materially false because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) That GoHealth's recent revenue increases and improved LTV/CAC metrics touted in the Registration Statement were the result of an unsustainable business strategy, namely dramatically increased concentration on just two Medicare insurance carriers;

(b) That GoHealth had maximized the growth that could be achieved by concentrating its business with Humana and Anthem and, as a result, needed to significantly alter its business model in order to continue its growth trajectory;

(c) That GoHealth and the Individual Defendants had planned 2020 as an "investment year" for the Company, which included significant and rapid carrier expansion in the Company's Medicare business as well as increased reliance on non-commissionable SNPs, both of which would result in negative impacts to GoHealth's important LTV metric;

(d) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced commission rates until it could earn its way up to the maximum allowable commission rates that the Company enjoyed with its established carrier relationships, negatively impacting GoHealth's LTV and creating a "near-term drag" on GoHealth's average LTV;

(e) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced marketing support from new carriers compared to the subsidized marketing GoHealth enjoyed with Humana and Anthem, negatively impacting GoHealth's LTV/CAC;

(f) That GoHealth's purported ability to "rapidly scale" was materially false and misleading because by rapidly scaling with new carriers, the Company faced changed financial dynamics, including reduced commission rates and decreased marketing support;

(g) That in order to enroll a substantial volume of new consumers with the Company's new insurance carrier partners, GoHealth needed to incur significant upfront expenses, including substantial marketing, advertising, and employee-related expenses in excess of typical levels, in exchange for reduced commissions, resulting in negative pressure on GoHealth's critical LTV/CAC ratio as well as significant, additional cash expenditures by the Company during 2020;

(h) That as GoHealth rapidly added several large Medicare carriers in 2020, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions for such new business;

(i) That GoHealth's upfront costs with the new Medicare carriers it had already added and planned to add in 2020 would be significant and detrimental to LTV/CAC because as GoHealth needed to spend aggressively to increase marketing and hire more agents in order to generate enough approved submissions at the new carriers to justify the ability to earn top-tier commissions in the future; and

(j) That GoHealth faced increased churn and decreased persistency, and increased costs related to fighting churn and supporting persistency, as a consequence of selling SNPs as well as new plans for new Medicare carrier customers because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly

competitive Medicare insurance market, resulting in reduced commissions, reduced profitability, and a drag on GoHealth's LTV/CAC.

> **ANSWER:** Paragraph 105 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge admits that the Registration Statement contained detailed risk factor disclosures. Centerbridge denies the remaining allegations in Paragraph 105.

**The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles**

106. The Registration Statement failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on GoHealth's operating performance.

> **ANSWER:** Centerbridge denies the allegations in Paragraph 106.

107. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(2)(ii) ("Item 303"), required the Section 11 Defendants to "[d]escribe any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on sales or revenues or income from continuing operations." Similarly, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required in the "Risk Factors" section of registration statements and prospectuses "a discussion of the [most significant] factors that make [the offering] ... speculative or risky" and requires each risk factor to "adequately describe[] the risk." In addition, SEC Staff Accounting Bulletin No. 104 ("SAB 104") required the disclosure of "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."

> **ANSWER:** Paragraph 107 states a legal conclusion to which no response is required. Lead Plaintiffs also make allegations regarding or paraphrasing regulations, statutes, and documents. Centerbridge respectfully refers the Court to those regulations, statutes, and documents for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 107.

108. The failure of the Registration Statement to disclose the omitted material facts set forth herein – including the planned material changes to GoHealth's business model and the attendant negative consequences and risks stemming from this change that were already occurring at the time of the IPO – violated Item 303 because these undisclosed facts, trends, and uncertainties were known and would (and did) have an unfavorable impact on the Company's financial performance. This failure also violated Item 105 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in GoHealth stock speculative or risky. Indeed, as alleged above, the purported risk factors provided in the Registration Statement were themselves materially false and misleading when made and failed to apprise investors of the most significant risks facing the Company at the time of the IPO. Likewise, the Registration Statement violated SAB 104 because it failed to disclose that in addition to significantly expanding the Medicare business to many new, large carriers, which would hurt LTV in the near-term (e.g., during 2020), GoHealth was also shifting its business model to increasingly rely on SNPs that generated non-commissionable "other" revenue which also created near-term, negative impacts on LTV.

> **ANSWER:** Paragraph 108 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge admits that the Registration Statement contained detailed risk factor disclosures. Centerbridge denies the remaining allegations in Paragraph 108.

109. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on **currently known trends, events, and uncertainties that are reasonably expected to have material effects**, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

* * *

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

**ANSWER:** Lead Plaintiffs make allegations regarding the contents of an SEC interpretative release. Centerbridge respectfully refers the Court to the SEC interpretive release for a true and complete statement of its contents.

110. The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

**ANSWER:** Lead Plaintiffs make allegations regarding the contents of an SEC interpretive release. Centerbridge respectfully refers the Court to the SEC interpretive release for a true and complete statement of its contents.

111. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are

reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

> **ANSWER:** Lead Plaintiffs make allegations regarding the contents of an SEC interpretive release. Centerbridge respectfully refers the Court to the SEC interpretive release for a true and complete statement of its contents.

112. Similarly, within SAB 104, the SEC Staff provides specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenues: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease." The MD&A should "'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.'" This includes an "increasing trend toward sales to a different class of customer, such as [one] that has a lower gross profit margin than existing sales that are principally made to [other types of customers]."

> **ANSWER:** Lead Plaintiffs make allegations regarding the contents of an SEC release. Centerbridge respectfully refers the Court to the SEC release for a true and complete statement of its contents.

113. Accordingly, GoHealth had an affirmative obligation to disclose in the Registration Statement information required by Items 303 and SAB 104.

> **ANSWER:** Paragraph 113 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 113.

114. The Registration Statement, however, omitted material facts required to be stated therein because it failed to disclose information regarding the following known trends, events, or uncertainties in existence at the time of the IPO, including: (a) an ongoing, planned material expansion of GoHealth's business to include several new, large Medicare providers; (b) that the ongoing, planned material expansion placed near-term negative pressure on the Company's critical LTV/CAC metric as the additional, large Medicare providers paid GoHealth lower commissions and did not subsidize GoHealth's marketing costs, leading to increased costs for the Company; (c) that new relationships with additional, large Medicare providers led to decreased persistency and increased churn as GoHealth's agents had to learn how to market and sell new plan choices, and the Company faced increased costs to combat such effects; (d) that GoHealth's increased reliance on non-commissionable "other" revenue from SNPs pushed down GoHealth's LTV and increased churn; and (e) that the Company was in the midst of a strategic shift that caused 2020 to be an "investment year" with new carriers that would result in near-term negative financial impacts that would not yield benefits until 2021 or beyond.

> **ANSWER:** Paragraph 114 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 114.

115. The Registration Statement similarly omitted material facts required to be stated therein because it negligently failed to disclose information on some of the most material risks facing GoHealth at the time of the IPO in violation of Item 303, Item 105, and SAB 104. As set forth above, the Registration Statement omitted material facts required to be stated therein because it failed to disclose the risks associated with the undisclosed trends, events, or uncertainties identified above, as well as the risk that the favorable financial trends GoHealth experienced at the time of the IPO had deteriorated as those trends, events, or uncertainties came to fruition. The

foregoing rendered the IPO significantly riskier than portrayed. The absence of this information misled investors about the prospects and drawbacks of investing in GoHealth, as well as the true risk profile of investing in GoHealth Class A common stock.

> **ANSWER:** Paragraph 115 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 115.

**Post-IPO Events**

116.     On July 23, 2020, executives for eHealth Inc. ("eHealth") – a major GoHealth competitor – stated during an earnings call that the Medicare brokerage industry had been suffering from elevated churn during the first half of 2020. Although certain of the issues were specific to eHealth, others were not and impacted the entire industry, including GoHealth. On the call, eHealth's CEO stated that, "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." He continued in pertinent part:

> On the macro side, consumers are faced with broader plan choice and multiple enrollment opportunities throughout the year, which is benefiting the broader MA [Medicare Advantage] market and increasing the market share of MA plans. At the same time, **these dynamics have also led to more shopping and more switching by MA members**.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of an eHealth earnings call transcript. Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents. Centerbridge otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 116. To the extent a response is required, Centerbridge denies the allegations in Paragraph 116.

117.     Then, after the market closed on August 19, 2020, barely a month after the IPO, GoHealth reported its 2Q2020 financial results for the quarter ended June 30, 2020. Although the Company reported 2Q2020 and first-half 2020 revenue growth and pointed to "strong" Medicare Advantage enrollments, it also reported a 2Q2020 net loss of $22.9 million compared to net income

of $15.3 million in the prior year period, representing a 250% decline from the prior year period, and a first-half 2020 net loss of $23.8 million compared to net income of $20.3 million in the prior year period, representing a 217% decline from the prior year period.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of GoHealth's August 20, 2020 10-Q and press release issued on or about August 19, 2020. Centerbridge respectfully refers the Court to the 10-Q filing and the press release for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 117.

118. The Company stated that it had made several new carrier additions, which included UnitedHealth Group and Aetna nationally, in addition to "multiple regional carriers." The unaudited results of operations disclosed to investors that as a percentage of revenue, critically important commissions from carriers **declined** from 80.6% of revenue in the second quarter of 2019 ("2Q2019") to 76% of revenue in 2Q2020, while "other" revenue increased from 19.4% of revenue in 2Q2019 to 24% of revenue in 2Q2020. Simultaneously, the Company's marketing and advertising expenses increased 330%, from $5 million in 2Q2019 to more than $21 million in 2Q2020, representing approximately 17% of the Company's total 2Q2020 revenues.

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of GoHealth's August 20, 2020 10-Q and press release issued on or about August 19, 2020. Centerbridge respectfully refers the Court to the 10-Q filing and the press release for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 118.

119. Also on August 19, 2020, the Company hosted an after-hours earnings call to discuss GoHealth's 2Q2020 financial results. During the call, Jones stated that the disappointing results "came in largely as expected," confirming that the trends existed and were known prior to the IPO. With regard to negative churn dynamics, GoHealth confirmed that customer persistency during the quarter was consistent with GoHealth's planned "expectations," including, inter alia: (a) that in new markets, 90-day customer retention was "as low as 50% to 60%"; (b) that SNP

-62-

customers "exhibit lower effectuation rates and higher disenrollment rates"; and (c) "higher churn as [GoHealth] agents become educated and fully understand those plans" from new carriers. These negative facts, trends, and uncertainties that existed at the time of the IPO were nevertheless not disclosed to investors in the Registration Statement. As Jones admitted, "we don't see surprises[,]" and GoHealth learned customer persistency data "in real time."

> **ANSWER:** Paragraph 119 states a legal conclusion to which no response is required. Lead Plaintiffs also make allegations regarding or paraphrasing the contents of an earnings call transcript. Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 119 and specifically denies the allegation that the Registration Statement omitted any material information.

120. Also on the 2Q2020 call, Jones stated that GoHealth had taken a "rifle-shot approach to adding new carriers" and that as the Company "look[ed] towards 2021," it would "have expanded coverage with many of the top carriers, including United, Aetna, Kaiser and some other regional Blues." Jones stated there was "**an initial ramp-up period for new carriers with forecasted lower LTVs as agents learn about new plans**" and that the near-term costs would ultimately support GoHealth's long-term growth. As the call continued, Matthiesen further confirmed that GoHealth's "strategy to add several new large carriers" would result in "**lower initial commission rates and LTVs**." Regarding SNPs, Jones stated that SNPs "tend to have a lower LTV that pull down our average LTV[,]" and Matthiesen also added that the Company's increasing use of SNPs, which resulted in non-commissionable "other" revenue, resulted in "lower LTVs," and would "create a **near-term drag on [GoHealth's] average LTV**" that would ultimately help the Company "over time." Matthiesen also stated that GoHealth had implemented a "changing mix of business" in 2Q2020 – which closed two weeks before the IPO – and that the changed business mix would "continue to impact [GoHealth's] average LTVs[.]"

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of an earnings call transcript. Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 120.

121. On November 11, 2020, GoHealth reported its 3Q2020 financial results. GoHealth reported earnings per share ("EPS") of negative $0.65, missing EPS estimates by $0.61, and fell short of its revenue estimates by $6.04 million. Notably, the Company's revenue mix was materially different than expected, with: (a) commission revenue missing analyst forecasts by 32%; (b) enterprise revenue (formerly "other") coming in at triple what analysts modeled, at $62 million versus $20.5 million; and (c) external revenue down 27% versus estimates of a significant increase. The significant shift in GoHealth's revenue stream was seen as adding confusion to the Company's reported financial results and expected performance.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of GoHealth's press release filed on or about November 11, 2020 and GoHealth's 10-Q filed on or about November 13, 2020. Centerbridge respectfully refers the Court to the 10-Q and press release for a true and complete statement of their contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 121.

122. Specifically, the unaudited results of operations disclosed to investors that as a percentage of revenue, critically important commissions from carriers **declined** from 73% of revenues in the third quarter of 2019 ("3Q2019") to 62% of revenues in 3Q2020, while "other" revenue increased from 27% of revenues in 3Q2019 to 38% of revenues in 3Q2020. Simultaneously, the Company's marketing and advertising expenses increased 121% from $28.5 million in 3Q2019 to more than $62.8 million in 3Q2020, representing approximately 39% of the Company's total 3Q2020 revenues.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of GoHealth's press release issued on or about November 11, 2020 and GoHealth's 10-Q filed on or about November 13, 2020. Centerbridge respectfully refers the Court to the press release and 10-Q for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 122.

123.     During an after-hours conference call to discuss the Company's 3Q2020 financial performance, Jones stated that GoHealth's technology platform had powered the direct sales platform of 12 of its insurance carrier partners and that, during 2020, GoHealth signed on several new large carriers, such as UnitedHealth Group, Cigna, Aetna, and Allwell.  Matthiesen added that the Company's year-to-year "[c]ommission growth and improved persistency" helped "push [GoHealth's] LTVs higher" but also stated that LTVs were "offset somewhat by the short-term drag from [GoHealth's] carrier expansion as well as [GoHealth's] growing business with profitable [SNPs.]" Matthiesen also made clear that to the extent the Company experienced "strong" persistency, it was because of increased "scale and effective outreach" by the Company's customer service representatives, who "ramped up their consumer engagement efforts[.]"

> **ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of a conference call transcript.  Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents.  To the extent a response is required, Centerbridge denies the allegations in Paragraph 123.

124.     On December 2, 2020, GoHealth participated in the Evercore ISI HealthCONx Conference, with Jones and Matthiesen speaking on behalf of the Company.  During the conference, GoHealth was asked to describe the Company's LTV progression in light of new carrier integrations.  In response, Jones revealed that GoHealth planned for 2020 to be an "investment year" for GoHealth that would result in reduced, lower-than-normal commissions from carriers and LTV compression in 2020, with the Company not seeing the "upside" until 2021. Specifically, Jones stated:

> ***So we anticipated 2020 to be an investment year with new carriers***.  If you think about a new carrier, there's technology integrations, there's understanding other compliance and nuances, there's understanding all the different plan options and plan types and building that out.  [Indiscernible] side of things.  So there's a -- and we also -- when you add a new

carrier, you're typically not -- they don't view you as anybody special, right? ***They're going to give you just a normal commission level***. You've got to prove yourself on volume and quality to move up the ranks. ***And typically, you'll see LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and we thought that would happen***.

As we think about where we've gone from a volume standpoint, we quickly rose through the ranks, we've proven ourselves, ***and we think there's more upside in 2021 from an LTV standpoint with carriers***. We also know more about their effectuation rates, rapid disenrollment rates, things we can look at in the reporting because other -- every carrier is reporting is different as well.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of a conference transcript. Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents. To the extent a response is required, Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124 and, on that basis, denies the allegations in Paragraph 124.

125.    Affirming Jones' statements, Matthiesen then added that although the Company was seeing higher persistency with certain customers, the Company's plan to add new carriers in 2020 created a "short-term drag on LTV" and that the Company would not get to "top-level contracts" with new carriers until "next year," i.e., 2021. Specifically, Matthiesen stated:[8]

No. I'll just reiterate what you said, Clint [Jones]. I think we've gotten questions around new carriers, and **it's important to understand that new carriers really are a short-term drag on LTV** as you think about it. And again, based off of the volume that we're

---

[8] On January 11, 2021, CFO Matthiesen sold 146,000 shares of GoHealth Class A common stock at a price of $14.98 per share, generating proceeds exceeding $2.1 million.

writing here in AEP for these new carriers, we'll be at those top-tier contracts, so those top-level contracts into next year, which will create more opportunity.

And I think the other part of **adding those carriers, while it can be a short- term drag on LTV**, we've also seen, and this is what was exhibited in Q3, higher conviction at the point of sale by offering more choice across our carriers. So we're seeing higher effectuation rates, lower rapid disenrollment rates. And so as we continue to both create that conviction at the point of sale as well as building out and engaging with our consumers via TeleCare and actually helping them use the benefits that Clint just alluded to earlier. We're finding it's one thing to tell someone that they're in the best plan. It's another for them to actually know it by using all of those benefits. And so we're seeing those improvements. And that's what caused a little bit of the waterfall we showed in Q3 that, despite the **short-term drag on these new carrier adds**, we're still seeing higher persistency because of those things I just described.

**ANSWER:** Centerbridge admits that on January 11, 2021, CFO Matthiesen sold 146,000 shares of GoHealth Class A common stock at a weighted average price of $14.98 per share, generating proceeds exceeding $2.1 million. Lead Plaintiffs make allegations regarding or paraphrasing the contents of a conference transcript. Centerbridge respectfully refers the Court to the transcript for a true and complete statement of its contents. To the extent a response is required, Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 125 and, on that basis, denies the allegations in Paragraph 125.

126. By December 2, 2020, the price of GoHealth Class A common stock fell to a low of just $10.01 per share, more than **50% below** the IPO price. This stunning drop in the price of GoHealth Class A common stock occurred in less than five months, and during a period that the S&P 500 increased 14%. GoHealth's primary competitor, SelectQuote, has also experienced a significant upswing in the price of its stock since the IPO, as reflected in the following chart:



**ANSWER:** Centerbridge admits that GoHealth's Class A common stock traded at a low price of $10.01 per share on December 2, 2020. Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 126 and, on that basis, denies the remaining allegations in Paragraph 126.

### Class Action Allegations

127. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all purchasers of GoHealth Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO ("Class"). Excluded from the Class are Defendants, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

> **ANSWER:** Paragraph 127 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 127.

128. The members of the Class are so numerous that joinder of all members is impracticable. GoHealth Class A common stock is actively traded on the Nasdaq, and more than 43 million shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GoHealth or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

> **ANSWER:** Paragraph 128 states a legal conclusion to which no response is required. Centerbridge lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 128 and, on that basis, denies the remaining allegations in Paragraph 128.

129. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

> **ANSWER:** Paragraph 129 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 129.

130. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

> **ANSWER:** Paragraph 130 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 130.

131. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendants violated the Securities Act;

    (b)    whether the Registration Statement issued by the Section 11 Defendants to the investing public in connection with the IPO was negligently prepared and contained inaccurate statements of material fact or omitted material information required to be stated therein; and

    (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** Paragraph 131 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 131.

132. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Paragraph 132 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 132.

**COUNT I**
**For Violations of Section 11 of the Securities Act**
**Against the Section 11 Defendants**

133. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Centerbridge repeats and reasserts each response above.

134. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, by Lead Plaintiffs on behalf of themselves and the Class against the Section 11 Defendants. Lead Plaintiffs do not claim that any of the Section 11 Defendants engaged in intentional or reckless misconduct or acted with fraudulent intent.

-70-

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 134 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 134.

135. The Registration Statement for the IPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

**ANSWER:** Paragraph 135 states a legal conclusion to which no response is required. Centerbridge also is not required to respond to the allegations in Paragraph 135 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 135.

136. GoHealth was the registrant for the IPO. As the issuer of its common stock, GoHealth is strictly liable to Lead Plaintiffs and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required to be disclosed therein pursuant to the regulations governing the Registration Statement's preparation.

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 136 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 136.

137. The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material facts. As such, the Individual Defendants are strictly liable to Lead Plaintiffs and the Class under Section 11 of the Securities Act.

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 137 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 137.

138. The Underwriter Defendants served as underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendant's failure to exercise reasonable care, the Registration Statement contained false statements of material facts and omissions of material facts necessary to make the statements made therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 138 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 138.

139. The Section 11 Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate. By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

-72-

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 139 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 139.

140.    At the time of their purchases of GoHealth Class A common shares in and/or traceable to the IPO, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action commenced.

**ANSWER:** Centerbridge is not required to respond to the allegations in Paragraph 140 as they are directed solely at the other defendants. To the extent a response is required, Centerbridge denies the allegations in Paragraph 140.

## COUNT II
### For Violations of Section 15 of the Securities Act
### Against the Section 15 Defendants

141.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Centerbridge repeats and reasserts each response above.

142.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiffs and the Class against the Individual Defendants for their control of GoHealth, and also against GoHealth for its control of the Individual Defendants and all of its employees and subsidiaries in connection with the controlled persons' violations of Section 11 of the Securities Act relating to the IPO.

**ANSWER:** Paragraph 142 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 142.

-73-

143. The Individual Defendants possessed the power to control, and did control, directly and/or indirectly, the actions of GoHealth at all relevant times. By virtue of their positions as directors and/or senior officers of GoHealth, the Individual Defendants possessed the power and authority to control the contents of GoHealth's Registration Statement and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of GoHealth. GoHealth also exercised control over and directed the actions of its senior managers, directors, employees, and agents, including the Individual Defendants.

**ANSWER:** Centerbridge denies the allegations in Paragraph 143.

144. NVX Holdings and Centerbridge also control GoHealth. After the IPO, GoHealth was considered a "controlled company" within the meaning of the listing rules of the Nasdaq because NVX Holdings and Centerbridge have more than 50% of the voting power for the election of directors to GoHealth's Board.

**ANSWER:** Centerbridge admits that, after GoHealth's IPO, GoHealth was a "controlled company" within the meaning of the corporate governance standards of the Nasdaq rules. Centerbridge denies the remaining allegations in Paragraph 144.

145. The Registration Statement made clear that the Section 15 Defendants named in this Count acted as controlling persons of the Company, stating:

Upon consummation of this offering, the Founders and Centerbridge will control, in the aggregate, approximately 70.8% of the voting power represented by all our outstanding classes of stock. As a result, the Founders and Centerbridge will continue to exercise significant influence over all matters requiring stockholder approval, including the election

-74-

and removal of directors and the size of our board, any amendment of our amended and restated certificate of incorporation or bylaws and any approval of significant corporate transactions (including a sale of all or substantially all of our assets), and will continue to have significant control over our business, affairs and policies, including the appointment of our management. The directors that the Founders and Centerbridge elect have the authority to vote to authorize the Company to incur additional debt, issue or repurchase stock, declare dividends and make other decisions that could be detrimental to stockholders.

We expect that members of our board will continue to be appointed by and/or affiliated with the Founders and Centerbridge who will have the ability to appoint the majority of directors. The Founders and Centerbridge can take actions that have the effect of delaying or preventing a change of control of us or discouraging others from making tender offers for our shares, which could prevent stockholders from receiving a premium for their shares. These actions may be taken even if other stockholders oppose them. The concentration of voting power with the Founders and Centerbridge may have an adverse effect on the price of our Class A common stock. The Founders and Centerbridge may have interests that are different from yours and may vote in a way with which you disagree and that may be adverse to your interests.

* * *

After the consummation of the Transactions, NVX Holdings and Centerbridge will have more than 50% of the voting power for the election of directors, and, as a result, we will be considered a "'controlled company"' within the meaning of the Nasdaq rules. As such, we will qualify for, and intend to rely on, exemptions from certain corporate governance

-75-

requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or to perform annual performance evaluations of the nominating and corporate governance and compensation committees.

**ANSWER:** Lead Plaintiffs make allegations regarding or paraphrasing the contents of the Registration Statement. Centerbridge respectfully refers the Court to the Registration Statement for a true and complete statement of its contents. To the extent a response is required, Centerbridge denies the allegations in Paragraph 145, and specifically denies the allegation that Centerbridge acted as a controlling person of the Company.

146. This claim is brought within the applicable statute of limitations.

**ANSWER:** Paragraph 146 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 146.

147. As control persons of GoHealth, the Section 15 Defendants are liable jointly and severally and to the same extent as GoHealth for its violations of Section 11 of the Securities Act. By reason of such conduct, and participation, the Section 15 Defendants are liable pursuant to Section 15 of the Securities Act.

**ANSWER:** Paragraph 147 states a legal conclusion to which no response is required. To the extent a response is required, Centerbridge denies the allegations in Paragraph 147.

148. In response to Plaintiffs' prayer for relief, Centerbridge denies each and every allegation contained in Plaintiffs' prayer for relief.

149. In response to Plaintiffs' demand for a jury trial, Centerbridge denies Plaintiffs' jury demand.

## SEPARATE DEFENSES

By designating the following defenses, Centerbridge does not in any way waive or limit any defenses that are or may be raised by its denials and averments. These defenses are pled in the alternative, and are raised to preserve the rights of Centerbridge to assert such defenses, and are without prejudice to Centerbridge's ability to raise other and further defenses. Centerbridge expressly reserves all rights to re-evaluate its defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and/or during pretrial proceedings in this action. Centerbridge incorporates by reference any additional defenses raised by all other Defendants with the same force and effect as if fully set forth herein.

Without admitting any wrongful conduct on the part of Centerbridge and without conceding that it has the burden of proof on any of the following defenses, Centerbridge asserts the following defenses to the Complaint and reserves the right to add, alter and/or amend its defenses and affirmative defenses as the course of discovery so requires.

### First Defense

(Failure to State a Claim for Relief)

Plaintiffs' claims for relief are barred, in whole or in part, because they fail to state a claim against Centerbridge upon which relief may be granted.

### Second Defense

(Negative Causation; No Loss Causation)

Plaintiffs' claims for relief are barred, in whole or in part, by the lack of loss causation, because Plaintiffs have not suffered any injury as a result of the alleged misstatements or omissions.

Case: 1:20-cv-05593 Document #: 125 Filed: 05/31/22 Page 78 of 83 PageID #:3172

### **Third Defense**

(No Primary Violation)

Plaintiffs' claims for relief are barred, in whole or in part, because Plaintiffs cannot prove a primary violation by the Section 11 Defendants.

### **Fourth Defense**

(Statutes of Limitations or Repose)

Plaintiffs' claims for relief are barred, in whole or in part, by the applicable statutes of limitation or statutes of repose.

### **Fifth Defense**

(Doctrine of Laches)

Plaintiffs' claims for relief are barred, in whole or in part, by the doctrine of laches.

### **Sixth Defense**

(Standing)

Plaintiffs' claims for relief are barred, in whole or in part, insofar as Plaintiffs lack standing to assert the claims alleged in this action.

### **Seventh Defense**

(Estoppel, Waiver, Consent, and Ratification)

Plaintiffs' claims for relief are barred, in whole or in part, under the doctrines of estoppel, waiver, consent, and ratification.

### **Eighth Defense**

(Contributory Negligence, Comparative Negligence and/or Assumption of Risk)

Plaintiffs' claims for relief are barred, in whole or in part, by Plaintiffs' own negligence under the doctrines of contributory negligence, comparative negligence, and/or assumption of risk.

-78-

Plaintiffs voluntarily assumed the risks disclosed by GoHealth and further assumed the risk that the value of GoHealth's securities would decline.

## Ninth Defense

(Facts Publicly Known)

Centerbridge is informed and believes, and on that basis alleges, that if and to the extent the Registration Statement is found to have false or misleading statements (which Centerbridge denies), the actual facts which Plaintiffs allege to have been misrepresented or omitted were in fact known to and entered the securities market through credible sources. Centerbridge is further informed and believe, and on that basis alleges, that Plaintiffs are not entitled to any recovery from Centerbridge under the Securities Act because the substance of the allegedly material information that Plaintiffs allege to have been omitted or misrepresented was in fact disclosed in the public disclosures of other parties and third parties, in GoHealth's own public filings and announcements, in the Registration Statement, and from other sources that were otherwise publicly available and/or widely known to the market and to the investing community.

## Tenth Defense

(Actual Knowledge)

Plaintiffs' claims for relief are barred, in whole or in part, because to the extent the Registration Statement is found to have false or misleading statements (which Centerbridge denies), the actual facts which Plaintiffs allege to have been misrepresented or omitted were in fact known to Plaintiffs at the time Plaintiffs acquired the securities at issue.

## Eleventh Defense

(No Duty to Disclose)

Plaintiffs' claims for relief are barred, in whole or in part, because Centerbridge had no duty to disclose, or cause the disclosure of, any allegedly omitted material information.

**Twelfth Defense**

(Bespeaks Caution Doctrine)

Plaintiffs' claims for relief are barred, in whole or in part, because some or all of the alleged public disclosures bespoke caution.

**Thirteenth Defense**

(No Material Misrepresentation)

Plaintiffs' claims for relief are barred, in whole or in part, because GoHealth's Registration Statement did not contain any actionable misrepresentations or omissions, all statements alleged to have been made had a reasonable basis in fact, and because any alleged misrepresentations or omissions were not material.

**Fourteenth Defense**

(No Control Person Liability)

Plaintiffs' claims for relief are barred, in whole or in part, because Centerbridge was not a "control person" under the Securities Act.

**Fifteenth Defense**

(Good Faith)

Plaintiffs' claims for relief are barred, in whole or in part, because Centerbridge acted at all times in good faith and had no knowledge, and was not reckless in not knowing, that any alleged statement or omission was false or misleading.

**Sixteenth Defense**

(Due Diligence Defense / No Culpable Participation)

Plaintiffs' claims for relief are barred, in whole or in part, because Centerbridge did not have knowledge of or reasonable ground to believe in the existence of the facts by reason of which the Section 11 Defendants' liability is alleged to exist, and, to the extent that lack of culpable

participation is an element of any defense, did not culpably participate in any violation of the Securities Act.

### Seventeenth Defense

(Expertized Portions)

Plaintiffs' claims for relief are barred, in whole or in part, to the extent that the acts or omissions alleged in the Complaint relate to portions of the Registration Statement reviewed by experts retained to assist in preparing such documents, as to which Centerbridge had reasonable ground to believe, and did believe, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

### Eighteenth Defense

(Plaintiffs Not Purchasers)

Plaintiffs' claims for relief and the claims for relief of the members of the class are barred to the extent that they did not purchase shares traceable to the IPO.

### Nineteenth Defense

(No Reasonable Reliance)

Plaintiffs' claims for relief are barred, in whole or in part, because at all relevant times Plaintiffs and/or their purported agents did not reasonably rely on any material misrepresentations or omissions in purchasing GoHealth securities.

### Twentieth Defense

(No Damages)

Plaintiffs' claims for relief are barred, in whole or in part, because Plaintiffs suffered no economic loss.

-82-

### Twenty-First Defense

(No Compensatory Damages)

Plaintiffs' claims for relief are barred, in whole or in part, because Plaintiffs suffered no compensatory damages.

### Twenty-Fourth Defense

(Failure to Mitigate Damages)

Any damage, loss, or liability sustained by Plaintiffs (which Centerbridge denies) must be reduced, diminished, and/or barred in proportion to Plaintiffs' failure to mitigate, reduce, or otherwise avoid any alleged damages.

### Twenty-Fifth Defense

(Proportionate Reduction of Judgment)

Any judgment against Centerbridge must be reduced, diminished, and/or barred in proportion to the percentage of responsibility, if any, assessed by the jury as to Centerbridge pursuant to 15 U.S.C. § 78u-4, principles of equitable allocation, recoupment, set off, proportionate responsibility, comparative fault, any settlement credit, and/or any other applicable law or doctrine.

### Twenty-Sixth Defense

(No Injunctive Relief)

Centerbridge denies that Plaintiffs are entitled to injunctive relief.

### Twenty-Seventh Defense

(Pre-Judgment Interest)

Centerbridge denies that Plaintiffs are entitled to pre-judgment interest.

Dated: May 31, 2022
Dallas, Texas

Respectfully submitted,

/s/ Michelle Reed
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Katherine R. Goldstein
kgoldstein@akingump.com
Nathaniel B. Botwinick
nbotwinick@akingump.com
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Michelle Reed
mreed@akingump.com
2300 N. Field Street
Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

Megan Cunniff Church
mchurch@mololamken.com
**MOLOLAMKEN LLP**
300 North LaSalle Drive, Suite 5350
Chicago, Illinois 60654
Telephone: (312) 450-6716
Facsimile: (312) 450-6701