**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **In re GOHEALTH, INC. SECURITIES** | ) | **Case No. 1:20-cv-5593** |
| **LITIGATION** | ) | |
| | ) | |
| | ) | **Judge:  Sharon Johnson Coleman** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF
THE GOHEALTH DEFENDANTS TO CLASS ACTION COMPLAINT**

Defendants GoHealth, Inc. ("GoHealth" or the "Company"), NVX Holdings, Inc. ("NVX Holdings") and Clinton P. Jones, Brandon M. Cruz and Travis J. Matthiesen (collectively, the "Individual Defendants" and, together with GoHealth and NVX Holdings, the "GoHealth Defendants"), by and through their undersigned counsel, hereby submit their First Amended Answer and Affirmative Defenses to the claims and allegations made by Lead Plaintiffs Sudhakara R. Murikinati, Jerry Nixon, Benjamin Sandmann, and Jeff S. Turnipseed (collectively, "Plaintiffs") in their Consolidated Class Action Complaint (Dkt. No. 66) (the "Complaint").

Except to the extent expressly admitted herein, the GoHealth Defendants deny each and every allegation in the Complaint, including any allegations contained in its headings or footnotes. With respect to any purported document cited to or quoted in the Complaint, the GoHealth Defendants do not admit that the document is authentic, accurate, relevant, or admissible in this action, and the GoHealth Defendants reserve all objections regarding admissibility. With respect to the enumerated paragraphs of the Complaint, the GoHealth Defendants respond as follows:

## NATURE OF THE ACTION[1]

1. The claims asserted herein are strict liability claims for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o, relating to GoHealth's initial public offering ("IPO" or "Offering"), commenced on or about July 14, 2020, of over 44,500,000 shares of Class A common stock at a price of $21.00 per share, which generated over $900 million in gross proceeds. This federal securities class action is brought on behalf of a Class (as defined herein) of all those who purchased GoHealth Class A common stock in or traceable to the Registration Statement and Prospectus (collectively, "Registration Statement") issued in connection with the IPO.

**ANSWER:** The GoHealth Defendants admit that Plaintiffs purport to bring this action under Sections 11 and 15 of the Securities Act on behalf of a purported class. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 1.

2. GoHealth was formed on March 27, 2020, and was the issuer of stock in the IPO pursuant to the Registration Statement. Despite its legal formation shortly before the IPO, GoHealth has been in business since 2001. GoHealth is organized as a holding company, with GoHealth Holdings, LLC as its principal asset. Through a complex structure, GoHealth's operations are carried out by Norvax, LLC ("Norvax"), which is a wholly-owned subsidiary of Blizzard Midco, LLC, which, in turn, is a wholly-owned subsidiary of GoHealth Holdings.

**ANSWER:** The GoHealth Defendants admit that GoHealth was formed on or about March 27, 2020, was the issuer of stock in GoHealth's IPO and is organized as a holding company.[2] The GoHealth Defendants admit that GoHealth's principal asset is LLC interests in GoHealth Holdings, LLC ("GoHealth Holdings"). The GoHealth Defendants further admit that the operations of the GoHealth Companies are carried out by Norvax, LLC ("Norvax") and Norvax's

---

[1] To aid the Court in reviewing Defendants' Answer, Defendants have included the headings reflected in the Complaint. To the extent these headings comprise legal conclusions, no response is required. To the extent these headings comprise factual allegations, Defendants expressly deny them.

[2] GoHealth, Inc. is a holding company with no material operations. GoHealth, Inc. conducts its business through GoHealth Holdings, LLC and its direct and indirect subsidiaries. Hereinafter, the "GoHealth Companies" will refer to GoHealth, Inc. and, unless otherwise stated, all of its direct and indirect subsidiaries, including GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC).

subsidiaries. The GoHealth Defendants further admit that Norvax is a wholly-owned subsidiary of Blizzard Midco, LLC, which in turn, is a wholly owned subsidiary of GoHealth Holdings. To the extent the allegations in Paragraph 2 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 2.

3.      GoHealth Holdings was previously known as Blizzard Parent, LLC. That changed in September 2019, when private equity firm Centerbridge Partners, L.P. ("Centerbridge Partners") acquired 100% of Norvax and effectively took control of the Company along with its founders. Even after the IPO, GoHealth remained a controlled company, with Centerbridge Partners and the Company's founders owning the majority of GoHealth stock and exercising control over its Board of Directors ("Board").

**ANSWER:** The GoHealth Defendants admit that GoHealth Holdings, LLC was previously known as Blizzard Parent, LLC. To the extent the allegations in Paragraph 3 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 3.

4.      As for its business operations, GoHealth operates a health insurance marketplace that uses a combination of online websites and licensed agents to help consumers sign up for health insurance with health insurance carriers. The Company operates in four business segments: (a) Medicare-Internal; (b) Medicare-External; (c) Individual and Family Plans ("IFP") and Other-Internal; and (d) IFP and Other-External.

**ANSWER:** The GoHealth Defendants admit that the allegations in Paragraph 4 provide a general description of the operations and business segments of GoHealth and its subsidiaries. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 4.

5.      In the four years leading up to the IPO, GoHealth shifted its focus to signing up consumers for Medicare products, specifically Medicare Advantage plans, as opposed to individual or family insurance plans. This enabled GoHealth to rapidly grow in the intensely competitive insurance sales market in the time period before the IPO. In the Registration Statement, GoHealth emphasized that its shift to Medicare enabled the Company to capitalize on "strong demographic trends," as Medicare enrollment was expected to grow from approximately

3

61 million individuals in 2019 to approximately 77 million individuals by 2028, with 10,000 plus Americans turning 65 every day, and with an increasing proportion of Medicare-eligible individuals choosing commercial insurance solutions by enrolling in Medicare Advantage plans instead of basic Medicare.

**ANSWER:** To the extent the allegations in Paragraph 5 and/or footnote 1 purport to quote or paraphrase GoHealth's Registration Statement and/or amendments thereto (collectively, "Registration Statement"), GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 5, including footnote 1.

6. The Registration Statement stated that GoHealth estimated a "total addressable market" of $28 billion for Medicare Advantage and Medicare Supplement products. The Registration Statement added that the Medicare market trends were poised to "drive a larger market in the coming years" that, when taken together with GoHealth's "other product and plan offerings," would result in an even larger addressable market.

**ANSWER:** To the extent the allegations in Paragraph 6 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 6.

7. In the Registration Statement, GoHealth described itself as primed to disrupt the traditional field agent-driven sales process for insurance, and specifically for Medicare, by using its digitally-enabled and technology-driven marketplace.

**ANSWER:** To the extent the allegations in Paragraph 7 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 7.

8. Consumers using GoHealth to shop for insurance do not pay any fees for access to the Company's platform or for enrollment or other services. Rather, GoHealth is typically paid an initial commission by health insurance carriers when consumers enroll in carriers' products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. Therefore, customer "persistency" – *i.e.*, customers staying enrolled in their

health insurance plans – was necessary to counter "churn," an industry term used to describe customers who drop from one insurance company's plan in favor of a competitor's plan.

**ANSWER:** The GoHealth Defendants admit that consumers do not pay any fees for access to the GoHealth Companies' platform or for enrollment, education or other services, and that, generally, the GoHealth Companies are paid an initial commission by carriers when consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. To the extent the allegations in Paragraph 8 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 8.

9. The Registration Statement touted GoHealth's "strong" relationships with leading insurance carriers and its 19-year track record of "industry-leading" growth, pointing to a 52% compound annual growth rate between 2003 and 2019. The financial information included in the Registration Statement demonstrated GoHealth's rapid growth leading up to the IPO. For example, the Registration Statement stated that GoHealth's:

(a) total commissions receivable, which represented expected future commission streams, was $388.8 million as of the close of the first quarter ended March 31, 2020 ("1Q2020"), an increase of 223.4% compared to the first quarter ended March 31, 2019 ("1Q2019");

(b) net revenues grew by 104.1% to $141.0 million for pro forma 1Q2020 compared to $69.1 million for 1Q2019, and by 138.5% to $539.5 million for pro forma 2019 compared to $226.2 million for 2018;

(c) adjusted EBITDA grew by 394% to $35.2 million for pro forma 1Q2020 compared to $7.1 million for 1Q2019, and by 387.6% to $170 million for pro forma 2019 from $34.9 million for 2018; and

(d) net income was $1.4 million for pro forma 1Q2020 compared to net income of $5 million for 1Q2019, and net income was $30.5 million for pro forma 2019 compared to net income of $28.1 million for 2018.

**ANSWER:** To the extent the allegations in Paragraph 9 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is

5

required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 9.

10. The Registration Statement also stated that GoHealth's recent focus on Medicare had contributed significantly to its growth, with total revenues generated in GoHealth's Medicare segments growing to $124.2 million for 1Q2020 from $41.2 million for 1Q2019, representing a 201.5% increase, and to $432.7 million for pro forma 2019 from $112.2 million for 2018, representing a 285.7% increase. In the Medicare segments, GoHealth's total submitted policies grew to over 132,000 Medicare policies for 1Q2020, as compared to 43,200 Medicare policies for 1Q2019, and over 427,000 Medicare policies for 2019 as compared to over 118,000 Medicare policies for 2018.

**ANSWER:** To the extent the allegations in Paragraph 10 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 10.

11. The majority of the Company's revenues and profits are generated in its Medicare segments, making those segments critically important to the Company's financial performance. In 1Q2020, the Medicare segments generated 89% of the Company's revenues, with the Medicare-Internal segment accounting for 68% of GoHealth's total revenues and the Medicare-External segment accounting for 21% of total revenues. Within the Medicare segments, Medicare Advantage products generate the majority of net revenues, accounting for 75% of net revenues for the Medicare-Internal segment and 95% of net revenues for the Medicare-External segment during 1Q2020.

**ANSWER:** To the extent the allegations in Paragraph 11 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 11.

12. Although the Company's important Medicare-Internal segment, which focused on Medicare Advantage plans, generated the lion's share of GoHealth's revenues and drove GoHealth's overall financial performance, it was concentrated heavily on just two insurance carrier customers: Humana Inc. ("Humana") and Anthem, Inc. ("Anthem"). In 2019, Humana and Anthem accounted for 40% and 20%, respectively, of the Company's total revenues. In 1Q2020, Humana and Anthem collectively accounted for 74% of the Company's total revenues, up from 43% in 1Q2019.

6

**ANSWER:** To the extent the allegations in Paragraph 12 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 12.

13.     The Registration Statement stated that GoHealth's key financial metric, a ratio that GoHealth calls "LTV/CAC," was first among its peers. LTV/CAC is a shorthand description that divides the lifetime value of commissions that GoHealth estimated it would receive per "approved submission" ("LTV") by the cost to convert a prospective customer into an actual one that signs up for an insurance policy with a carrier ("CAC"). As a result, LTV/CAC is a measure of the Company's commissions relative to its customer acquisition cost.

**ANSWER:** To the extent the allegations in Paragraph 13 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 13.

14.     Despite being a critical metric to the Company's financial performance, the complexity of GoHealth's LTV/CAC made it impossible for investors to understand exactly how it was calculated for one period versus another or to calculate it for themselves. For example, the Company defined LTV/CAC in the Registration Statement as follows:

> "*LTV/CAC*" refers to the Lifetime Value of Commissions per Consumer Acquisition Cost, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions[3] for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a prospect into a customer less other non-commission carrier revenue for such period, or CAC. CAC is comprised of cost of revenue, marketing and advertising expenses and customer care and enrollment expenses less other revenue and is presented on a per commissionable Approved Submission basis.

**ANSWER:** To the extent the allegations in Paragraph 14 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no

---

[3] "Approved Submissions" refer to Submitted Policies approved by carriers for the identified product during the indicated period.

response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 14, including footnote 2.

15. Many of the metrics that went into GoHealth's LTV/CAC were not reported individually, turning GoHealth's critical financial metric into a veritable black box. Despite this, it is clear that GoHealth uses real-time data to continuously analyze and understand the day-to-day financial performance of its operations, including how those fluctuations impact GoHealth's LTV/CAC. For example, the Company repeatedly emphasized as a main selling point to investors that GoHealth, in real time, collects data on all aspects of its business and various financial performance metrics. The Company uses advanced statistical models to calculate and predict LTV/CAC and the profitability and conversion probability of consumer leads, as well as future commission streams associated with each consumer enrolled in each specific plan product, all of which the Company uses to determine its total commissions receivable.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 15.

16. With GoHealth's eye-popping growth, swelling revenues, and industry-leading LTV/CAC, there was significant demand in anticipation of the IPO. On June 19, 2020, GoHealth filed a draft Registration Statement with the SEC on Form S-1. The Registration Statement was amended by a filing on July 8, 2020, which stated the IPO would consist of 39.5 million shares at an offering price of $19.00 per share. Then, on July 14, 2020, GoHealth increased the size of the Offering by 4.6 million shares, bringing the total Offering to 44.5 million shares. Two weeks after the close of the second quarter of 2020 ("2Q2020"), on July 14, 2020, GoHealth priced the IPO at $21.00 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a draft Registration Statement with the SEC on or about June 19, 2020, amended the Registration Statement on or about July 8, 2020, and filed the final Prospectus for the IPO on or about July 14, 2020. To the extent the allegations in Paragraph 16 purport to quote or paraphrase from those documents, those documents speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 16.

17. By July 17, 2020, GoHealth completed the IPO, selling 44.5 million shares at $21.00 per share, generating over $913,500,000 in gross proceeds.

**ANSWER:** The GoHealth Defendants admit that GoHealth conducted an IPO in which GoHealth offered shares of its stock to the public at $21.00 per share. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 17.

18.     The Registration Statement, in violation of Section 11 of the Securities Act, contained materially false statements, omitted statements necessary to make the statements made in the Registration Statement not misleading, and failed to disclose information that was required to be disclosed therein. Specifically, unbeknownst to investors, because it was not disclosed in the Registration Statement, GoHealth was suffering heightened customer churn at the time of the IPO. In addition, GoHealth had reached the limits of the growth that could be achieved under its existing business model, and as a result, was required to radically depart from its business strategy leading up to the IPO in order to continue generating rapid revenue growth. To make this necessary change, the Company and its senior executives and officers planned to make 2020 an "investment year" for the Company, in which GoHealth would significantly and rapidly expand its insurance carrier customer base for Medicare. These plans created negative pressure on the Company's critical LTV/CAC metric by, among other things: (a) lowering commission rates on approved submissions; (b) significantly increasing marketing expenses; (c) impairing persistency and generating a corresponding increase in customer churn, or, at a minimum, requiring GoHealth to increase its efforts (and costs) to combat churn; and (d) reducing GoHealth's commissionable revenue in favor of increased non-commissionable revenue, which also dragged down GoHealth's LTV and resulted in decreased persistency.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 18.

19.     GoHealth's planned, but not disclosed, altering of its business strategy was necessary because, prior to and at the time of the IPO, the Company had relied heavily on just two Medicare carrier customers: Humana and Anthem. The Company had effectively maximized the growth that could be achieved by continuing to rely on these two carriers. Thus, in order to continue increasing its financial performance at the rate investors expected at the time of the IPO, GoHealth needed to route increasing numbers of Medicare-eligible consumers to a greater variety of insurance carriers while simultaneously expanding into new geographies. As a result, GoHealth needed to rapidly expand its base of insurance carrier customers.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 19.

20.     Rather than reading about GoHealth's planned "investment year" in the Registration Statement as was required, investors learned of it in a series of post-IPO events. On August 19, 2020, GoHealth reported its financial results for 2Q2020 ended June 30, 2020, which closed two weeks before the IPO. During an after-hours conference call to discuss GoHealth's 2Q2020 financial results and outlook, investors learned that GoHealth had added and was adding many new carriers, including UnitedHealth Group, Aetna, Kaiser, and "some other regional" Blue Cross Blue Shield providers as the Company "look[ed] towards 2021." Investors also learned that when the Company added new Medicare insurance carrier customers, there was "an initial ramp-up period for new carriers with forecasted lower LTVs" and that the Company's "strategy to add several new large carriers" was resulting and would continue to result in "lower initial commission rates and LTVs." The "strategic decision" by the Company also included an increased focus on GoHealth promoting and selling Medicare "Special Needs Plans" ("SNPs"),[4] which resulted in

---

[4] Medicare SNPs are a type of Medicare Advantage plan designed to attract and enroll Medicare beneficiaries who fall into certain special needs demographics. Special needs individuals typically

9

non-commissionable "other" revenue, that also created a "near-term drag on [GoHealth's] average LTV" and resulted in higher disenrollment rates, *e.g.*, churn.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020, and that GoHealth issued a press release on or about August 19, 2020. The GoHealth Defendants further admit that on or about August 19, 2020, GoHealth held a conference call. The GoHealth Defendants further admit that GoHealth's 2Q2020 ended approximately two weeks before its IPO. To the extent the allegations in Paragraph 20 purport to quote or paraphrase a transcript or recording of the August 19, 2020 GoHealth conference call, that transcript or recording speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 20, including footnote 3.

21.     When GoHealth reported its third quarter financial results for the period ending September 30, 2020 ("3Q2020"), it not only reported a loss per share of $0.65, which was $0.64 *worse* than analyst estimates of a loss per share of $0.01, but it again increased its reliance on non-commissionable revenue to the detriment of commissionable revenue, creating more "near-term" drag on the Company's average LTV.

**ANSWER:** The GoHealth Defendants admit that on or about November 11, 2020, GoHealth issued a press release, and that on or about November 13, 2020, GoHealth filed a Form 10-Q with the SEC. To the extent the allegations in Paragraph 21 purport to quote or paraphrase the press release or Form 10-Q, those documents speak for themselves and no response is required. The GoHealth Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegation concerning unidentified analyst estimates, and on that basis denies it. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 21.

22.     The extent to which 2020 was an "investment year" was made clear well after the IPO. On December 2, 2020, investors learned that GoHealth's plan for 2020 included reduced, lower-than-normal commissions from newly added carriers and LTV compression, with the Company not seeing the "upside" until 2021. Specifically, during the Evercore ISI HealthCONx

include: (a) institutionalized individuals (living in a long-term care facility or needing an equivalent level of care at home); (b) dually eligible individuals (meaning also entitled to Medicare and some form of Medicaid benefit); or (c) individuals with severe or chronic disabling conditions.

Conference on December 2, 2020, GoHealth's co-founder, Chief Executive Officer ("CEO"), and Co-Chair of the Company's Board, Clinton P. Jones ("Jones"), stated:

> ***So we anticipated 2020 to be an investment year with new carriers***. If you think about a new carrier, there's technology integrations, there's understanding other compliance and nuances, there's understanding all the different plan options and plan types and building that out. [Indiscernible] side of things. So there's a -- and we also -- when you add a new carrier, you're typically not -- they don't view you as anybody special, right? ***They're going to give you just a normal commission level***. You've got to prove yourself on volume and quality to move up the ranks. ***And typically, you'll see LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and we thought that would happen***.
>
> As we think about where we've gone from a volume standpoint, we quickly rose through the ranks, we've proven ourselves, ***and we think there's more upside in 2021 from an LTV standpoint with carriers***. We also know more about their effectuation rates, rapid disenrollment rates, things we can look at in the reporting because other -- every carrier is reporting is different as well.

**ANSWER:** The GoHealth Defendants admit that Mr. Jones and Mr. Matthiesen virtually attended the 3rd Annual Evercore ISI HealthCONx Conference on or about December 2, 2020. To the extent the allegations in Paragraph 22 purport to quote or paraphrase from a transcript or webcast of a December 2, 2020 Evercore ISI HealthCONx Conference, those documents or recordings speak for themselves and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 22.

23. Following Jones' statements, GoHealth's Chief Financial Officer ("CFO") Travis J. Matthiesen ("Matthiesen") added that the Company's plan to add new carriers in 2020 created a "short-term drag on LTV" and that the Company would not get to "top-level contracts" with new carriers until "next year," *i.e.*, 2021. Matthiesen added that "***it's important to understand that new carriers really are a short-term drag on LTV[.]***"

**ANSWER:** The GoHealth Defendants admit that Mr. Jones and Mr. Matthiesen virtually attended the 3rd Annual Evercore ISI HealthCONx Conference on or about December 2, 2020. To the extent the allegations in Paragraph 23 purport to quote or paraphrase from a transcript or webcast of a December 2, 2020 Evercore ISI HealthCONx Conference, those documents or recordings

speak for themselves and no response is required.  Except as expressly admitted, the GoHealth

Defendants deny the allegations in Paragraph 23.

24.     Despite planning 2020 as an "investment year" prior to the IPO wherein GoHealth would suffer from lowered average LTV, increased reliance on SNPs with a corresponding decrease in commissionable revenue, increased marketing costs, and negative impacts on persistency and churn, these facts were not disclosed in the Registration Statement. Therefore, the Registration Statement, which GoHealth and the other Defendants used to secure more than $900 million from investors, contained materially false statements of fact and omitted material facts required to be disclosed in order to make the statements in the Registration Statement not misleading.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 24.

25.     The price of GoHealth stock has declined from the Offering price of $21.00 per share to $13.32 per share on the day this action was commenced, a 36% decline, to an all-time low of $10.05 per share on December 1, 2020, a 52% decline from the Offering price.

**ANSWER:** The GoHealth Defendants admit that the reported closing prices of GoHealth's stock

were $13.32 on September 21, 2020 and $10.05 on December 1, 2020.  The GoHealth Defendants

specifically deny that any stock price movement or purported investor harm was the result of any

alleged deficiency in the Registration Statement or conduct of the GoHealth Defendants. Except

as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 25.

26.     As a result of Defendants' violations of law, investors have suffered hundreds of millions of dollars in losses and damages under the Securities Act. Since the IPO, GoHealth has substantially underperformed the market, including its primary competitor SelectQuote, Inc. ("SelectQuote"), as reflected in the following chart:

12



**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 26.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by Section 22 of the Securities Act, 15 U.S.C. §77v.

**ANSWER:** The GoHealth Defendants admit that Plaintiffs purport to bring this action under

Sections 11 and 15 of the Securities Act.  The remainder of the allegations in Paragraph 27 contains

legal conclusions, arguments, and characterizations to which no response is required.  Except as

expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 27.

28.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 22 of the Securities Act because many of the acts and practices complained of herein occurred in substantial part in this District, Defendants are found or transact business in this District, and GoHealth is headquartered in this District.

**ANSWER:** The GoHealth Defendants admit that GoHealth is headquartered in this District. Paragraph 28's allegation that venue is proper in this District is a legal conclusion, argument, and characterization to which no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 28.

29. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

**ANSWER:** The allegations in Paragraph 29 contain legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 29.

**PARTIES**

**Lead Plaintiffs**

30. As set forth in their previously filed Certifications incorporated by reference herein [ECF No. 43-2], Lead Plaintiffs purchased GoHealth shares in and/or traceable to the Registration Statement for the IPO, and were damaged thereby.

**ANSWER:** The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the allegations in Paragraph 30 regarding whether Lead Plaintiffs purchased GoHealth shares in and/or traceable to the Registration Statement for the IPO, and on that basis deny them. The GoHealth Defendants deny the remaining allegations in Paragraph 30.

**Defendants**

31. Defendant GoHealth, Inc. is a Delaware corporation headquartered at 214 West Huron Street, Chicago, Illinois 60654. Following the Offering, the Class A common stock of GoHealth trades on the Nasdaq under the ticker symbol "GOCO." GoHealth describes itself as a leading health insurance marketplace that uses a proprietary technology platform that leverages modern machine learning algorithms to help sign individuals up for healthcare plans with health insurance carriers.

**ANSWER:** The GoHealth Defendants admit that GoHealth, Inc. is a Delaware corporation headquartered at 214 West Huron Street, Chicago, Illinois 60654, and that following the offering,

14

Class A common stock of GoHealth trades on the Nasdaq under the ticker symbol "GOCO."  The

GoHealth Defendants also admit that GoHealth has described itself, together with  its subsidiaries,

as a "leading health insurance marketplace," and that GoHealth stated in its Registration Statement

that the proprietary technology platform of the GoHealth Companies "leverages modern machine-

learning algorithms powered by nearly two decades of insurance behavioral data to reimagine the

optimal process for helping individuals find the best health insurance plan for their specific needs."

Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 31.

32.     Defendant Clinton P. Jones is a co-founder of GoHealth, has been its CEO since GoHealth's founding in 2001, and is Co-Chair of the Board. Jones also has been a member of GoHealth Holdings' board of managers since 2019 and served on the board of managers of GoHealth's predecessor since its founding in 2001.

**ANSWER:** The GoHealth Defendants admit that Mr. Jones is the CEO and Co-Chair of the Board

Directors for GoHealth, Inc.  The GoHealth Defendants further admit that Mr. Jones has been a

member of GoHealth Holdings LLC's board of managers since 2019.  The GoHealth Defendants

further admit that since 2001, Mr. Jones has been a co-founder, CEO, and member of the board of

managers for certain entities that became direct or indirect subsidiaries of GoHealth upon

GoHealth's formation in 2020.  Except as expressly admitted, the GoHealth Defendants deny the

allegations in Paragraph 32.

33.     Defendant Brandon M. Cruz ("Cruz") is a co-founder of GoHealth, its Chief Strategy Officer, a Special Advisor to the Executive Team, and Co-Chair of the Board. Prior to these roles, he served as GoHealth's President since 2001. Cruz has been a member of GoHealth Holdings' board of managers since 2019 and served on the board of managers of GoHealth Holdings' predecessor since its founding. Cruz also served as a member of the board of directors of Creatix, Inc., a GoHealth subsidiary, from 2016 to 2019.

**ANSWER:** The GoHealth Defendants admit that Mr. Cruz is the Chief Strategy Officer, Special

Advisor to the Executive Team, and Co-Chair of the Board of Directors for GoHealth, Inc.  The

GoHealth Defendants further admit that Mr. Cruz has been a member of GoHealth Holdings,

LLC's board of managers since 2019 and served as a member of the board of directors for Creatix,

Inc. from 2016 to 2019. The GoHealth Defendants further admit that since 2001, Mr. Cruz has

been a co-founder, President, and member of the board of managers for certain entities that became

direct or indirect subsidiaries of GoHealth upon GoHealth's formation in 2020. Except as

expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 33.

34.     Defendant Travis J. Matthiesen is GoHealth's "CFO," a position he has held since 2018. Prior to serving as CFO, Matthiesen served as GoHealth's Vice President of Finance and Marketplace Operations from 2017 to 2018 and as GoHealth's Corporate Controller from 2010 to 2017.

**ANSWER:** The GoHealth Defendants admit that Mr. Matthiesen is GoHealth Inc.'s Chief

Financial Officer. The GoHealth Defendants further admit that prior to GoHealth's formation in

2020, Mr. Matthiesen served as the CFO, Vice President of Finance and Marketplace Operations,

and Corporate Controller at various times for certain entities that became direct or indirect

subsidiaries of GoHealth upon its formation in 2020. Except as expressly admitted, the GoHealth

Defendants deny the allegations in Paragraph 34.

35.     The Defendants identified in ¶¶32-34 above are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of GoHealth. Prior to the consummation of the IPO, GoHealth entered into separate indemnification agreements with each of its directors and executive officers and purchased directors' and officers' liability insurance. In addition, Jones and Cruz, along with Centerbridge (defined below) exercise significant control over GoHealth, including over all matters requiring stockholder approval, including the election and removal of directors and the size of GoHealth's Board, any amendment of GoHealth's certificate of incorporation or bylaws, and any approval of significant corporate transactions (including a sale of all or substantially all of GoHealth's assets). Even after the IPO, Defendants Jones and Cruz, along with Centerbridge, collectively controlled approximately 71% of the voting power represented by all classes of GoHealth stock and exercised significant control over GoHealth's business, affairs, and policies, including the appointment of its management.

**ANSWER:** The GoHealth Defendants admit that Mr. Jones, in his capacity as GoHealth's Chief

Executive Officer, Mr. Matthiesen, in his capacity as GoHealth's Chief Financial Officer, and Mr.

Cruz, in his capacity as Director of GoHealth signed, either directly or through power of attorney,

16

GoHealth's Registration Statement. The GoHealth Defendants further admit that GoHealth entered into indemnification agreements with its officers and directors and purchased directors' and officers' liability insurance. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 35.

36. Defendant NVX Holdings, Inc. ("NVX Holdings") is a Delaware corporation based in Chicago that is controlled by Cruz and Jones (who are also known as GoHealth's "Founders") for their benefit and to house their ownership of GoHealth Class A and Class B stock. Cruz served as President of NVX Holdings, and Jones served as its CEO. Like Jones and Cruz, NVX Holdings exercised significant control over GoHealth.

**ANSWER:** The GoHealth Defendants admit that NVX Holdings, Inc. is a Delaware corporation based in Chicago and that Mr. Cruz has served as its President. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 36.

37. Defendant Centerbridge Partners, L.P. is a New York-based private equity firm.

**ANSWER:** The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the allegations in Paragraph 37, and on that basis deny them.

38. Defendants CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., and Blizzard Aggregator, LLC are investment vehicles created for the benefit of Centerbridge Partners to house its ownership of GoHealth Class A and Class B stock.

**ANSWER:** The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the allegations in Paragraph 38, and on that basis deny them.

39. Defendant Centerbridge Associates III, L.P. is the general partner of CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P.

**ANSWER:** The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the allegations in Paragraph 39, and on that basis deny them.

40. Defendant CCP III Cayman GP Ltd. is the general partner of Centerbridge Associates III, L.P. and the sole manager of Blizzard Aggregator, LLC.

**ANSWER:** The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the allegations in Paragraph 40, and on that basis deny them.

17

41. The Defendants identified in ¶¶37-40 above are collectively referred to herein as "Centerbridge." On September 13, 2019, Centerbridge acquired 100% of the equity in GoHealth's operating entity – Norvax – indirectly through GoHealth Holdings (which had been formed for the purpose of this acquisition) for $807 million in cash and $306 million in equity ("Acquisition"). Centerbridge was a controlling shareholder and primary beneficiary of the IPO, as well as its private equity sponsor, as detailed herein. Centerbridge, along with Jones and Cruz, has significant influence over GoHealth, including control over decisions that require the approval of stockholders.

**ANSWER:** GoHealth denies that the allegations in Paragraph 41 accurately describe the organizational structure of the GoHealth companies today or after consummation of all the organizational transactions in connection with GoHealth's IPO. To the extent the allegations in Paragraph 41 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 41.

### The Underwriter Defendants

42. Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), BofA Securities, Inc. ("BofA Securities"), and Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, "Underwriter Defendants") are financial services companies that acted as managing underwriters for the IPO and as representatives of the underwriters involved in the IPO. Collectively, the underwriters shared in more than $50.2 million in underwriting discounts and commissions in connection with the IPO. Additionally, according to the Registration Statement, the Underwriter Defendants purchased the following number of shares of GoHealth Class A common stock in connection with the IPO:

| Underwriters | Number of Shares |
| --- | --- |
| Goldman Sachs & Co. LLC | 11,540,550 |
| BofA Securities, Inc. | 10,679,250 |
| Morgan Stanley & Co. LLC | 8,430,300 |
| Total | 30,650,100 |

**ANSWER:** The GoHealth Defendants admit that Goldman Sachs & Co. LLC, ("Goldman Sachs"), BofA Securities, Inc. ("BofA Securities"), and Morgan Stanley & Co. LLC ("Morgan Stanley) (collectively, the "Underwriter Defendants") participated in the IPO and purchased the number of shares of GoHealth Class A common stock listed in the table. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 42.

18

43.     Defendant Goldman Sachs & Co. LLC is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282. Goldman Sachs operates as an investment management company. The Registration Statement represented that shares of GoHealth Class A common stock purchased by Goldman Sachs would be offered for sale by Goldman Sachs to the public at the IPO price. Accordingly, Goldman Sachs acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

**ANSWER:** To the extent the allegations in Paragraph 43 purport to quote or paraphrase GoHealth's Registration Statement,  GoHealth's Registration Statement speaks for itself and no response is required.   Further, the allegations in Paragraph 43 contain legal conclusions, arguments, and characterizations for which no response is required.  The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 43, and on that basis deny them.

44.     Defendant BofA Securities, Inc. is a Delaware corporation whose principal executive office is located at 222 Broadway, NY3-222-12-05, New York, New York 10038. BofA Securities is a brokerage firm that offers buying and selling of securities. The Registration Statement represented that shares of GoHealth Class A common stock purchased by BofA Securities would be offered for sale by BofA Securities to the public at the IPO price. In addition, at GoHealth's request, an affiliate of BofA Securities reserved for sale, at the IPO price, up to 5% of the Class A common stock offered in the IPO for sale to certain of GoHealth's directors, officers, and employees through a reserved share program. Any reserved shares of Class A common stock that were not so purchased were offered by the underwriters to the general public on the same terms as the other shares of Class A common stock offered by the Registration Statement. Accordingly, BofA Securities acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

**ANSWER:** To the extent the allegations in Paragraph 44 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.   Further, the allegations in Paragraph 44 contain legal conclusions, arguments, and characterizations for which no response is required.  The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 44, and on that basis deny them.

45.     Defendant Morgan Stanley & Co., LLC is a Delaware limited liability company whose principal executive office is located at 1585 Broadway, New York, New York 10036.

Morgan Stanley operates as an investment management company. The Registration Statement represented that shares of GoHealth Class A common stock purchased by Morgan Stanley would be offered for sale by Morgan Stanley to the public at the IPO price. Accordingly, Morgan Stanley acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

**ANSWER:** To the extent the allegations in Paragraph 45 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Further, the allegations in Paragraph 45 contain legal conclusions, arguments, and characterizations for which no response is required. The GoHealth Defendants lack sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 45, and on that basis deny them.

46. On information and belief, the Underwriter Defendants participated in the Company's financial roadshow in connection with the IPO, which was conducted entirely through virtual meetings.

**ANSWER:** The GoHealth Defendants admit that representatives of the Underwriter Defendants attended certain presentations. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 46.

47. The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and failed to perform adequate due diligence in connection with their roles as underwriters. As a result, they were negligent in failing to ensure that the Registration Statement was prepared accurately and in accordance with the rules and regulations governing its preparation. Additionally, they participated in preparing road show and other materials used to solicit Class A common stock purchasers in connection with the IPO.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 47.

48. "Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, NVX Holdings, Centerbridge, and the Underwriter Defendants. "Section 11 Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, and the Underwriter Defendants. "Section 15 Defendants," as used herein, collectively refers to GoHealth, the Individual Defendants, NVX Holdings, and Centerbridge.

**ANSWER:** No response is required to the allegations in Paragraph 48.

### SUBSTANTIVE ALLEGATIONS

20

**Background of GoHealth**

49.     Founded in 2001 by Cruz and Jones, GoHealth operates an end-to-end health insurance marketplace that specializes in matching consumers with health insurance carrier plans.

**ANSWER:** The GoHealth Defendants admit that the allegations in Paragraph 49 provide a general description of the operations of the GoHealth Companies, and that Mr. Cruz and Mr. Jones founded the GoHealth Companies in 2001.  Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 49.

50.     GoHealth is organized as a holding company, with GoHealth Holdings as the Company's principal asset. GoHealth Holdings, however, does not itself have any material operations; instead, all of the Company's operations are carried out by Norvax, which is a wholly owned subsidiary of Blizzard Midco, LLC, which in turn is a wholly owned subsidiary of GoHealth Holdings. GoHealth Holdings was formerly known as Blizzard Parent, LLC until September 2019, when Centerbridge acquired 100% of Norvax. The Company's unusual structure, after the IPO, is set forth in the diagram below:

21



**ANSWER:** The GoHealth Defendants admit that GoHealth is organized as a holding company. The GoHealth Defendants further admit that the operations of the GoHealth Companies are carried out by Norvax, LLC and its subsidiaries. The GoHealth Defendants further admit that Norvax, LLC is a wholly-owned subsidiary of Blizzard Midco, LLC, which in turn, is a wholly owned subsidiary of GoHealth Holdings, LLC. The GoHealth Defendants also admit that GoHealth Holdings, LLC was formerly known as Blizzard Parent, LLC. To the extent the allegations in Paragraph 50 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 50.

22

51.     GoHealth describes itself as a "leading health insurance marketplace." The Company uses a "proprietary technology platform," as well as machine-learning algorithms, to help individuals find health insurance plans. To support its technology platform, the Company also uses licensed insurance agents to help enroll consumers in insurance plans with health insurance carriers.

**ANSWER:** The GoHealth Defendants admit that GoHealth has described itself, together with its subsidiaries, as a "leading health insurance marketplace," and that GoHealth stated in its Registration Statement that the proprietary technology platform of the GoHealth Companies "leverages modern machine-learning algorithms powered by nearly two decades of insurance behavioral data to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs." The GoHealth Defendants further admit that the GoHealth Companies use licensed insurance agents to help enroll consumers in insurance plans. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 51.

52.     The Company holds itself out as a rapidly growing, technology-enabled enterprise, which it uses to differentiate itself from the traditional face-to-face method of selling insurance. The Company states that by using technology and having real time access to data, as well as a base of licensed agents, it can operate more efficiently than traditional players in the highly competitive insurance marketplace. To that end, Jones has stated that with the level of "data and insights" available to GoHealth, "we don't see surprises."

**ANSWER:** To the extent the allegations in Paragraph 52 purport to quote or paraphrase a transcript from GoHealth's August 19, 2020 earnings call, that transcript speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 52.

53.     Although the Company's platform offers a wide array of health insurance policies, including IFPs, in the years leading up to the IPO GoHealth's focus became increasingly concentrated on Medicare products (specifically Medicare Advantage plans) as the Company deemphasized other product types.

**ANSWER:** The GoHealth Defendants admit that the GoHealth Companies offer a wide array of health insurance policies, including, but not limited to, Medicare Advantage, Medicare

23

Supplement, prescription drug plans, and individual and family plans. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 53.

54. Consumers shopping for health insurance are not GoHealth's real customers. Rather, GoHealth makes its money from insurance carriers. Thus, consumers do not pay any fees for access to GoHealth's platform or for its enrollment services. Generally, GoHealth is paid commissions by the health insurance carriers that GoHealth partners with. The Company is typically paid an initial commission when consumers enroll in carriers' products and become customers, and additional, recurring commissions as long as those consumers retain their health insurance plans. The commission structure results in GoHealth collaborating with carriers in order to help the carriers sell more health insurance policies. To that end, the Company uses "advanced statistical models" built on "observable commissions," to analyze consumer data and estimate the Company's future commission streams (from which the Company determines its LTV).

**ANSWER:** The GoHealth Defendants admit that consumers do not pay any fees for access to the GoHealth Companies' platform or for enrollment, education or other services, and that, generally, the GoHealth Companies are paid an initial commission by carriers when consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. To the extent the allegations in Paragraph 54 purport to quote or paraphrase the GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 54.

55. As set forth above, GoHealth divides its operations into four operating segments: (a) Medicare-Internal; (b) Medicare-External; (c) IFP and Other-Internal; and (d) IFP and Other-External. "Internal" refers to commission revenues generated by GoHealth-employed agents, whereas "External" refers to commission revenues generated by an independent, national network of agents that use the GoHealth platform. The Medicare-Internal and Medicare-External segments focus on sales of Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare SNPs for insurance carriers.

**ANSWER:** The GoHealth Defendants admit that the allegations in Paragraph 55 provide a general description of the operations of the GoHealth Companies. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 55.

56. The majority of the Company's revenues and profits are generated in its Medicare-Internal and Medicare-External segments. In 1Q2020, the Company's Medicare segments

generated 89% of the Company's revenues, with the Medicare-Internal segment accounting for 68% of GoHealth's total revenues and the Medicare-External segment accounting for 21% of total revenues.

**ANSWER:** To the extent the allegations in Paragraph 56 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 56.

57. Within the Company's critically important Medicare segments, Medicare Advantage products generate the majority of net revenues, accounting for 75% of net revenues for the Medicare-Internal segment and 95% of net revenues for the Medicare-External segment during 1Q2020.

**ANSWER:** To the extent the allegations in Paragraph 57 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 57.

58. According to the Company, the best or key metric for assessing its overall business profitability and efficiency, and the performance of its integrated platform, is the lifetime value of commissions per consumer acquisition cost, what GoHealth calls its LTV/CAC. LTV refers to the commission revenues GoHealth expects to receive from insurance carriers in connection with approved submissions for insurance policies by consumers over time. LTV is based on a variety of variables that GoHealth does not report publicly, such as contracted commission rates, carrier mix, policy persistency, and the number of expected submissions. CAC, on the other hand, refers to the cost to GoHealth of acquiring its consumers. Thus, LTV/CAC is a type of profitability metric that generally refers to how much of a return GoHealth expects on its consumer acquisition investments.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 58.

59. The Company recognizes revenue at the time a "[s]ubmitted [p]olicy" becomes an "[a]pproved [p]olicy" by "applying the latest estimated LTV for that product." GoHealth estimates commission revenue for each product by using a "portfolio approach" to a group of approved customers that are organized based on a variety of attributes that GoHealth refers to as "cohorts." GoHealth estimates the cash commission it expects to collect for each "approved customer cohort" by evaluating various factors, including "commission rates, carriers, estimated average plan duration, the regulatory environment, and historic cancellations of health insurance plans offered by carriers with which [GoHealth has] a relationship." The Company recomputes LTV on a quarterly basis "at a cohort level for all outstanding cohorts" while reviewing and monitoring

changes in the data used to estimate LTV as well as the cash received for each cohort as compared to GoHealth's original estimates. Because of the number of factors and assumptions underlying GoHealth's LTV calculations, there is no way for investors or analysts to crosscheck or fully understand how GoHealth calculates its LTV. But, it is clear that: (a) changes in LTV have an impact on revenue and the Company's commissions receivables; and (b) negative changes in the factors upon which GoHealth estimates its LTV, such as reduced commission rates and increased churn or decreased persistency, hurt its financial performance.

**ANSWER:** To the extent the allegations in Paragraph 59 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 59.

60. GoHealth states that the Company's Medicare-Internal and Medicare-External segments drive the highest LTV/CAC of the products and plans the Company offers, including in the two years preceding the Company's IPO. With respect to these segments, the Company has emphasized its agent-assisted model as maximizing LTV/CAC and identified its ability to rapidly scale and expand relationships with existing carriers as critical to the growth of these segments and overall LTV/CAC.

**ANSWER:** To the extent the allegations in Paragraph 60 purport to quote or paraphrase the Registration Statement or separate GoHealth statements, GoHealth's Registration Statement and those separate statements speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 60.

61. Unlike many of its competitors, however, GoHealth generated a substantial majority of its revenues from only two insurance carriers: Humana and Anthem. In 2019, Humana and Anthem accounted for 40% and 20%, respectively, of the Company's total revenues. In 1Q2020, these two insurance carriers, together, accounted for 74% of the Company's total revenues, up from 43% of the Company's total revenues in 1Q2019. The effect of GoHealth's business concentration on just two insurance carriers was even more pronounced in GoHealth's Medicare-Internal and Medicare-External segments, in which Humana and Anthem accounted for approximately 85% of those segments' revenues in 1Q2020.

**ANSWER:** To the extent the allegations in Paragraph 61 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 61.

62.     GoHealth's increased concentration in Humana and Anthem in the lead up to the IPO corresponded with a period of rapid revenue growth and best-in-class LTV/CAC. For example, GoHealth claimed that its revenues grew 138.5% year-over-year during 2019 to $539.5 million and grew 104.1% year-over-year during 1Q2020 to $141.0 million. The Company had also purportedly improved its LTV/CAC to 3.9x in 2019 (from 2.7x the prior year) and to 2.7x for 1Q2020 (from 1.7x for the comparable prior year period) for its critical Medicare-Internal segment.

**ANSWER:** To the extent the allegations in Paragraph 62 purport to quote or paraphrase the GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 62.

63.     The enrollment of consumers on GoHealth's platform requires significant upfront expenses, including marketing and advertising expenses, and customer care and enrollment expenses, in order to generate qualified prospects, educate and enroll those consumers in insurance carriers' products and plans, and submit completed applications to carriers. Because the resulting commissions are generally paid to GoHealth over time, with the first payments often occurring several weeks or months after GoHealth submits completed applications to its carriers, the Company requires significant cash to fund its operational needs.

**ANSWER:** To the extent the allegations in Paragraph 63 purport to quote or paraphrase the GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 63.

64.     By heavily concentrating its critically important Medicare business with two customers – Humana and Anthem – GoHealth was able to benefit from reduced customer acquisition costs prior to the IPO. This was because GoHealth's top carriers subsidized its marketing costs, paid GoHealth top-tier commission rates, and were deeply integrated with GoHealth's technology platform, which led to a substantially lower direct marketing cost per policy than GoHealth's peers, generating best-in-class LTV/CAC. If GoHealth were to, over a short period of time, substantially expand the number of carriers in its Medicare business, GoHealth faced lowered commission rates, decreased marketing support, lessened technical integration, and increased agent training costs to educate GoHealth agents on the new carriers' plans, which stood to weaken GoHealth's touted LTV/CAC. In addition, selling new plans for new customers, with reduced commissions as the result, naturally led to less profitability, but also decreased persistency and increased churn, or at least increased costs to combat the heightened potential for decreased persistency and increased churn, as customers placed into new plan offerings by less experienced sales agents in the highly competitive Medicare insurance market (which was plagued by rising churn at the time of the IPO) were more likely to change their minds. This, in turn, would materially weaken GoHealth's LTV/CAC.

27

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 64.

65.     Despite the foregoing concentration of insurance carriers, the Company repeatedly lauded its high LTV/CAC ratio, which GoHealth achieved in a highly competitive environment, as the primary result of the Company's purportedly unique competitive advantages in the services it provided to its insurance carrier customers.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 65.

### Centerbridge Acquires a Controlling Interest in GoHealth in Advance of the IPO and GoHealth Reports Rapid Growth

66.     Centerbridge, the primary beneficiary and private equity sponsor of GoHealth's IPO, is a global private investment firm with over $25 billion in assets. Centerbridge manages capital through varied investment funds and special purpose partnerships.

**ANSWER:** The GoHealth Defendants admit that Centerbridge Capital Partners III, L.P. is a private investment firm and that Centerbridge Capital Partners III, L.P. was GoHealth's IPO sponsor.  To the extent the allegations in Paragraph 66 purport to quote or paraphrase the GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 66.  The GoHealth Defendants lack knowledge or information to form a belief as to the remaining allegations in Paragraph 66, and on that basis deny them.  Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 66.

67.     As set forth above, on September 13, 2019, Centerbridge acquired 100% of the equity in GoHealth's operating entity – Norvax – indirectly through a newly formed entity, GoHealth Holdings, for $807 million in cash and $306 million in equity. In connection with the Acquisition, Centerbridge also agreed to pay Norvax's selling shareholders up to $275 million of additional contingent consideration, to be paid in the form of common and senior preferred earnout units, if the Company achieved certain earnings targets in late 2019 and 2020 ("Earnout Terms"). The Earnout Terms, therefore, created a strong incentive for the Individual Defendants to report strong growth following the Acquisition.

**ANSWER:** To the extent the allegations in Paragraph 68 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no

28

response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 67.

68. The Registration Statement stated that GoHealth reported tremendous growth in the post-Acquisition period leading up to its IPO. From September 13, 2019 through December 31, 2019, GoHealth generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019. As a result, GoHealth generated substantially more – 33% more – revenues in the three-and-a-half months following the Acquisition than in the eight-and-a-half months preceding the Acquisition. GoHealth also generated 36% more revenues in the short period at the end of 2019 following the Acquisition than in the Company's entire 2018 fiscal year, when it generated $226 million in net revenues.

**ANSWER:** To the extent the allegations in Paragraph 68 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 68.

69. As a result of the Company's apparently exceptional earnings growth following the Acquisition, the Company, per the Earnout Terms of the Acquisition, incurred $75 million in contingent consideration liability from the close of the Acquisition through the end of 1Q2020, to be paid out to Norvax's selling shareholders in the Acquisition, which included Cruz.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 69.

### GoHealth's IPO

70. On or about June 19, 2020, GoHealth filed a Registration Statement on Form S-1 with the SEC, which sought to register shares of GoHealth Class A common stock in anticipation of the IPO. GoHealth amended the Registration Statement on July 6, 2020 to include certain exhibits, such as the amended and restated certificate of incorporation and bylaws of GoHealth to be in effect following various post-IPO transactions (described below) and an indemnification agreement between GoHealth and its officers and directors.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a draft Registration Statement with the SEC on or about June 19, 2020. To the extent the allegations in Paragraph 70 quote or paraphrase GoHealth's Registration Statement or any amendments thereto, those documents speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 70.

71.     On July 8, 2020, GoHealth filed its second amendment to the Registration Statement, which registered 39,500,000 shares of GoHealth Class A common stock and indicated that the IPO would be priced between $18.00 and $20.00 per share.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed an amended Registration Statement with the SEC on or about July 8, 2020.  To the extent the allegations in Paragraph 71 quote or paraphrase GoHealth's amended Registration Statement, GoHealth's amended Registration Statement speaks for itself and no response is required.  Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 71.

72.     On July 14, 2020, GoHealth filed an additional Registration Statement with the SEC that registered an additional 4.6 million shares of GoHealth Class A common stock to be sold in the IPO. The 4.6 million additional shares included 600,000 shares of Class A common stock to be sold pursuant to the Underwriter Defendants' option to purchase additional shares. The July 14, 2020 updated Registration Statement incorporated the prior Registrations Statements by reference, and indicated the IPO would be priced at $21 per share.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed an additional Registration Statement with the SEC on or about July 14, 2020.  To the extent the allegations in Paragraph 72 quote or paraphrase from that document, GoHealth's additional Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 72.

73.     GoHealth priced the IPO at $21 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement. At 4:00 p.m. Eastern on July 14, 2020, two weeks after the close of GoHealth's 2Q2020, the SEC issued a notice of effectiveness for the IPO.

**ANSWER:** The GoHealth Defendants admit that GoHealth conducted an IPO in which GoHealth offered shares of its stock to the public at $21.00 per share, and that, on or about July 16, 2020, GoHealth filed a Prospectus with the SEC on Form 424B4.  To the extent the allegations in Paragraph 73 quote or paraphrase from GoHealth's Prospectus, GoHealth's Prospectus speaks for itself and no response is required.  Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 73.

74. On July 15, 2020, the NASDAQ approved listing of GoHealth Class A common stock.

**ANSWER:** The GoHealth Defendants admit the allegations in Paragraph 74.

75. On July 16, 2020, GoHealth filed with the SEC the Prospectus for the IPO on Form 424B4. The Prospectus, which was dated July 14, 2020, and forms part of the Registration Statement, stated the IPO was for the sale of 43.5 million shares of GoHealth Class A common stock in the IPO at $21.00 per share. The Prospectus stated the IPO would generate $913.5 million in proceeds, less the underwriting discount of $1.155, or $50,242,000, giving GoHealth net proceeds, before expenses, of $863,257,500. The Prospectus stated the underwriters had the option to purchase up to an additional 6,525,000 shares of Class A common stock at the IPO price less the underwriting discount within 30 days of the date of the Prospectus.

**ANSWER:** The GoHealth Defendants admit that on or about July 16, 2020, GoHealth filed a Prospectus with the SEC on Form 424B4. To the extent the allegations in Paragraph 75 quote or paraphrase from GoHealth's Prospectus, GoHealth's Prospectus speaks for itself and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 75.

76. On July 17, 2020, the Company completed the IPO, which, upon the underwriters' exercise of their option to purchase shares, issued and sold a total of 44,500,000 shares, generating over $913,500,000 in gross proceeds, with the Company receiving approximately $852,400,000 in net proceeds, after deducting the underwriting discount and Offering expenses.

**ANSWER:** The GoHealth Defendants admit that on July 17, 2020, the Company completed its IPO, receiving approximately $852.0 million in net proceeds, after deducting the underwriting discount and estimated offering expenses. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 76.

77. In connection with GoHealth's IPO, GoHealth undertook certain organizational transactions in order to reorganize its corporate structure and determine how the proceeds from GoHealth's Offering would be applied or distributed across the various interested parties ("Transactions"). These interested parties, who stood to (and did) substantially benefit from GoHealth's IPO, included:

(a) **Blocker Company**: an entity affiliated with Centerbridge that is an indirect owner of LLC interests in GoHealth Holdings prior to the Transactions;

31

(b)  **Blocker Shareholders**: shareholders in the Blocker Company prior to the Transactions, who, in consummation of the Transactions, would exchange their interests in the Blocker Company for cash and shares of GoHealth Class A common stock;

(c)  **Centerbridge**, including certain funds affiliated with it, other entities over which it had voting control, and any funds or entities formed to hold shares of GoHealth's Class A common stock for the Blocker Shareholders;

(d)  **Founders** Cruz and Jones and **NVX Holdings**, which the Founders control;

(e)  **Norwest Equity Partners ("Norwest")**, along with certain affiliated funds, which owned LLC interests in GoHealth Holdings prior to the consummation of the Transactions;

(f)  "**Original Equity Owners**," a term used in the Registration Statement, which collectively referred to Centerbridge, Norwest, the Founders, and certain executive officers, employees, and other minority investors of the Company, by virtue of their ownership of LLC interests in GoHealth Holdings prior to the consummation of the Transactions; and

(g)  "**Continuing Equity Owners**," a term used in the Registration Statement, which collectively referred to the direct and indirect holders of LLC interests in GoHealth Holdings and the Company's Class B common stock immediately following the consummation of the Transactions. As relevant here, these Continuing Equity Owners included, but are not limited to, Centerbridge, Norwest, NVX Holdings, and the Founders.

**ANSWER:** To the extent the allegations in Paragraph 77 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 77.

78.  Prior to the Company's IPO, the Original Equity Owners were the only members of GoHealth Holdings. As one of the Transactions in connection with this IPO, however, the Company amended and restated the existing LLC agreement of GoHealth Holdings in order to recapitalize all of the existing ownership interests in GoHealth Holdings, add the Company as a member of GoHealth Holdings, and appoint the Company as the sole managing member of GoHealth Holdings upon the Company's acquisition of LLC interests in GoHealth Holdings as part of the Transactions in connection with the Company's IPO.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020.  To the extent the allegations in Paragraph 78 purport to quote or paraphrase that Form 10-Q, that document speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 78.

79.    In addition to recapitalizing all of the LLC interests in GoHealth Holdings, the Company also amended and restated its certificate of incorporation in order to recapitalize the Company's outstanding shares of existing common stock into one share of Class A common stock. This amendment and restatement of the Company's certificate of incorporation also provided for Class A and Class B common stock, each of which would entitle its holder to one vote per share on matters presented to the Company's stockholders generally, and required that shares of Class B common stock be held only by the Continuing Equity Owners or transferred by them only to certain permitted persons. All of the shares of Class B common stock, held by the Continuing Equity Owners, ultimately would constitute approximately 73.2% of the voting power of GoHealth's outstanding common stock.[5]

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020.  To the extent the allegations in Paragraph 79 purport to quote or paraphrase that Form 10-Q or GoHealth's Registration Statement, those documents speak for themselves and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 79.

80.    As part of the Transactions, the Company also acquired the Blocker Company through a merger ("Blocker Merger") by and in consideration for issuing to the Blocker Shareholders 40,682,961 shares of the Company's Class A common stock and paying them, upon consummation of the Company's IPO, $96.2 million in cash.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020.  To the extent the allegations in Paragraph 80 purport to quote or paraphrase that Form 10-Q, that document speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 80.

81.    With more than $852 million in net proceeds from the IPO, the Company purchased 38,679,685 newly issued LLC interests in GoHealth Holdings at a price per unit of $21.00 and paid $96.2 million in cash to the Blocker Shareholders in consideration of the Blocker Merger.

---

[5] Consequently, the Company issued 229,399,322 shares of Class B common stock, for nominal consideration, to the Continuing Equity Owners – equal to the number of LLC interests in GoHealth Holdings held directly or indirectly by the Continuing Equity Owners immediately following the Transactions.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020. To the extent the allegations in Paragraph 81 purport to quote or paraphrase that Form 10-Q, that document speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 81.

82. As for the net proceeds that GoHealth Holdings would receive from the sale of its newly issued LLC interests to the Company, GoHealth Holdings: (a) paid $508.3 million in cash to redeem certain of the LLC interests in it held by the Continuing Equity Owners; (b) paid in full, per the Earnout Terms of the Acquisition, $100 million in contingent consideration liability to Norvax's selling shareholders in the Acquisition; and (c) supported the growth of the Company's business.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020. To the extent the allegations in Paragraph 82 purport to quote or paraphrase that Form 10-Q, that document speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 82.

83. The Transactions also included the Company entering into a variety of additional agreements that impacted the Company's and its subsidiaries' ability to act. These included, for example, a Stockholder Agreement with Centerbridge and NVX Holdings that provided Centerbridge and NVX Holdings with substantial control over the Company.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020. To the extent the allegations in Paragraph 83 purport to quote or paraphrase that Form 10-Q, that document speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 83.

84. Following all of these Transactions and the consummation of the Company's IPO, the Individual Defendants, NVX Holdings, and Centerbridge exercised substantial control over GoHealth and the business and affairs of GoHealth Holdings and its direct and indirect subsidiaries. Specifically:

(a) The Company served as the holding company and sole managing member of GoHealth Holdings, with control over GoHealth Holdings' business, affairs, and subsidiaries. The Company's principal assets consist of the LLC interests in GoHealth Holdings that the Company (through the application of the proceeds from its IPO) acquired directly from GoHealth Holdings and indirectly from the Blocker Shareholders and certain Continuing Equity Owners. To that end, GoHealth owns between 26% and 27% of the economic interest in GoHealth Holdings.

34

(b)     The Founders, through their ownership of LLC interests in GoHealth Holdings, owned approximately 30.1% of the economic interest in GoHealth Holdings and, through their ownership of the Company's Class B common stock, had approximately 30.9% of the combined voting power of all of the Company's common stock.

(c)     Centerbridge owned:

(i)     by virtue of its ownership of the Company's Class A common stock, approximately 13% of the combined voting power of all of the Company's common stock and approximately 48.3% of the economic interest in the Company;

(ii)     by virtue of its ownership of LLC interests in GoHealth Holdings directly and indirectly through the Company's ownership of LLC interests in GoHealth Holdings, approximately 38.7% of the economic interest in GoHealth Holdings; and

(iii)     by virtue of its ownership of the Company's Class B common stock, approximately 25.8% of the combined voting power of all of the Company's common stock.

(d)     The purchasers in the Company's IPO:

(i)     by virtue of their ownership of the Company's Class A common stock, would own approximately 51.7% of the economic interest in the Company and approximately 13.9% of the combined voting power of all of the Company's common stock; and

(ii)     by virtue of the Company's ownership of LLC interests in GoHealth Holdings, would indirectly own approximately 13.9% of the economic interest in GoHealth Holdings.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020. To the extent the allegations in Paragraph 84 purport to quote or paraphrase that Form 10-Q or GoHealth's Prospectus, those documents speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 84.

85.     As a result, the Section 15 Defendants possessed and exercised control over GoHealth before, during, and after the IPO far out of proportion to their economic stake in the Company.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 85.

**By the Time of the IPO, GoHealth Planned to Change Its Business Model, Negatively Impacting Customer Churn and the Company's LTV**

35

86. Leading up to the IPO, GoHealth increasingly shifted its business model to focus on Medicare Advantage products while deemphasizing the IFP aspect of its business. The Company's Medicare-Internal segment was the largest segment by revenue and the primary contributor to GoHealth's financial performance. Specifically, for 1Q2020, the Medicare segments represented 88.1% of GoHealth's total revenues, compared to 59.7% of total revenues for 1Q2019, and 98% of total profit, compared to 47% of total profit for 1Q2019.

**ANSWER:** To the extent the allegations in Paragraph 86 purport to quote or paraphrase from

GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no

response is required. To the extent a response is required, the GoHealth Defendants deny the

allegations in Paragraph 86.

87. Unbeknownst to investors, GoHealth's purportedly stunning growth and improved profitability in the lead up to the IPO were predicated on increasing its reliance on just two insurance carriers: Human and Anthem. By the time of the IPO, however, GoHealth had effectively maximized the growth that could be achieved by relying on this carrier concentration tactic and, as a result, needed to substantially and rapidly change its business model to pursue a broader array of carriers to continue growth.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 87.

88. To make this change, GoHealth and the Individual Defendants planned 2020 as an "investment year" for the Company. This changed strategy entailed significant disruptions to the Company's critical LTV/CAC metric as GoHealth significantly expanded its Medicare business to establish relationships with additional insurance carrier customers. Leading up to the IPO, GoHealth benefitted from deep technical integration and subsidized marketing with its top carriers – Humana and Anthem. This provided substantial, but not publicly quantified, benefits to GoHealth as it had significantly lower direct marketing costs per policy than its peers. These symbiotic relationships were a key reason that GoHealth experienced rapid growth leading up to the IPO, which included peer-leading LTV/CAC numbers.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 88.

89. Thus, additional expansion of GoHealth's Medicare Advantage insurance carrier base came at a significant cost to the business. The Registration Statement failed to disclose these changed tactics and the expected business disruptions that would result. As GoHealth planned to, and did, significantly expand its Medicare business to include several additional, large Medicare carriers in 2020, while also increasing its reliance on SNPs, the Company faced significant near-term pressures on its financial performance that led the Individual Defendants to refer to 2020 as GoHealth's "investment year." These negative, near-term pressures included the following factors:

(a) **First**, new carriers would only pay reduced commission rates to GoHealth and it would take time for GoHealth to earn its way up to the maximum allowable commission rates that the Company enjoyed with established partners like Humana and Anthem.

(b)      **Second**, when rolling out to new Medicare carriers, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions.

(c)      **Third**, GoHealth's upfront costs with new carriers were significant, as GoHealth spent aggressively to increase marketing, hire more agents, and drive conversions of consumers to Medicare Advantage plans. This factor was exacerbated by the fact that Humana and Anthem subsidized GoHealth's marketing, which greatly benefitted the Company's LTV/CAC and financial performance prior to and at the time of the IPO.

(d)      **Fourth**, selling new plans for new carrier customers resulted in not only reduced commissions and less profitability, but also decreased persistency and increased churn, or at least increased costs to combat the heightened potential for decreased persistency and increased churn, because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly competitive Medicare insurance market, which was suffering from increased churn. This also weakened GoHealth's LTV/CAC during 2020.

(e)      **Fifth**, to combat this disruption, GoHealth also increased its sales of SNPs in 2020, including in 2Q2020, which closed two weeks prior to the IPO, which decreased the percentage of commissionable revenue versus non-commissionable revenue earned by the Company, had higher churn rates, and also dragged down GoHealth's LTV.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 89.

### The Registration Statement Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Statements Therein Not Misleading

90.      The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material facts that were required to be disclosed pursuant to the regulations governing its preparation.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 90.

91.      Specifically, the Registration Statement did not provide information to investors regarding the negative impact resulting from GoHealth's shift in business strategy and the Company's planned "investment year" as a result of its expansion to several large health insurance carrier customers and increased focus on SNPs that generated non-commissionable revenue, both of which would negatively pressure GoHealth's LTV/CAC in 2020. Quite the opposite, the Registration Statement stated that expanding the Company's platform would "improve" GoHealth's "key drivers" of LTV/CAC, stating:

> We focus on strengthening the key drivers of LTV/CAC, including marketing costs, the consumer lead to customer conversion rate and customer satisfaction. While we offer both do-it-yourself and agent-assisted channels to accommodate consumers' preferences, we believe that for most qualified Medicare prospects, an agent-assisted model maximizes LTV/CAC. *As we continue to scale our platform, we improve our key drivers through specialization and optimization using our proprietary data and machine-learning*.

**ANSWER:** To the extent the allegations in Paragraph 91 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 91.

92. Describing the Company's important Medicare-Internal segment, the Registration Statement stated that "[g]oing forward, [GoHealth] intend[ed] to continue our focus on growth and placing qualified prospects within this segment." The Registration Statement added that "*carriers that partner with [GoHealth] through one or more of [GoHealth's] internal segment businesses will often supplement [GoHealth's] marketing and technology investments*."

**ANSWER:** To the extent the allegations in Paragraph 92 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 92.

93. Detailing the Company's "strengths," the Registration Statement again highlighted GoHealth's "rapid scalability" and implied that GoHealth's connection to "many carriers" created increased LTVs at lower CACs and that the data generated through the sales process "deepen[ed] GoHealth's] relationships with carriers." Specifically, the Registration Statement stated:

> We use a combination of proprietary and third-party data, direct API connections to many carriers, and our proprietary technology platform, Marketplace, to educate, quote and enroll consumers in real-time to the health insurance plan best suited to meet their specific needs, which enhances long-term customer satisfaction. *The resulting increase in the expected LTV of consumers obtained at a lower CAC has made our innovative distribution model more appealing to carriers and has altered their own approach to strategic marketing and consumer acquisition.* The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. *We engineered our marketplace for rapid scalability*, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms and complies with HIPAA, TCPA and DOI and CMS regulations. We had over 132,000 Submitted Policies in the Medicare segments for the three months ended March 31, 2020 and over 427,000 Submitted Policies in the Medicare segments for the year ended December 31, 2019, which we believe makes us one of the largest health insurance marketplaces based on publicly available information about our competitors and our carriers and our general knowledge of the industry acquired over our 19-year operating history. *The data generated through the sales process by these consumers helps us increase LTV/CAC through machine-learning enabled*

38

*feedback loops, and allows us to improve and deepen our relationships with carriers*.

**ANSWER:** To the extent the allegations in Paragraph 93 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 93.

94. Regarding the Company's concentration and focus on only two insurance carrier customers in GoHealth's critical Medicare Advantage business, the Registration Statement touted the Company's "deep, tenured, and expanding" relationships with top carriers and stated:

> Our carrier relationships allow us to offer a wide variety of products and plans across our platform and offer solutions tailored to consumers' healthcare needs. We are a critical partner to our top carriers, for which we use our data and direct API connections to help inform their plan and network design and assist with budgeting. ***Our carrier relationships are stable, as evidenced by the fact that our relationships with each of our five largest carriers, measured by 2019 submission volume, exceeds five year*** s. Over the past five years, we have expanded those relationships from initially covering individual and family products to covering Medicare Advantage products at all five of these carriers. ***We are licensed in all 50 states and the District of Columbia, which combined with our data-driven, omni- channel marketing and effective and scalable marketplace, makes us a partner of choice for the leading Medicare Advantage plans nationally and in each state***.

**ANSWER:** To the extent the allegations in Paragraph 94 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 94.

95. While the Registration Statement did state that the Company would expand the geographic reach of its platform to include more Medicare Advantage products in 2020, it only stated that it would cover "at least one of the top two carriers" and neither indicated that the Company's recent, rapid growth had been predicated on an unsustainable tactic – namely increasing its concentration in just two carriers – nor that the Company was experiencing and planning significant and rapid Medicare Advantage carrier expansion, which would result in 2020 being an "investment year" for the Company with an expected drag on LTVs. Rather, the Registration Statement stated:

> ***We continue to focus on building out our carrier footprint in order to provide our consumers with a greater choice of health insurance plans. In 2020, we expect***

*our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments.*

**ANSWER:** To the extent the allegations in Paragraph 95 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 95.

96. Describing the Company's growth strategies, the Registration Statement stated that Medicare carriers had "shown increased interest in working with [GoHealth], including those who had not traditionally used digitally-enabled models" and stated that GoHealth would ***benefit*** from enhanced return of scale and ***more efficient*** marketing:

> We believe we are a partner of choice for the top carriers in the Medicare marketplace because of our scale, efficiency and ability to integrate with carriers using direct API connections to exchange data and insights. Given our growth in Approved Submissions in the Medicare segments and the integrated data and technology of our platform, Medicare carriers have shown increased interest in working with us, including those who have not traditionally used digitally-enabled models. ***In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. This allows us to benefit from enhanced return of scale, more efficient marketing in these geographies, increased agent conversion rates of qualified prospects to customers, and improved customer satisfaction rates as we meet the needs of our customers***.

**ANSWER:** To the extent the allegations in Paragraph 96 purport to quote or paraphrase GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 96.

97.     In addition to highlighting the Company's relationships with top carriers, the Registration Statement represented that the Company could "rapidly scale" while "improving" its critical measure of financial performance – the LTV/CAC ratio. Specifically, the Registration Statement stated:

> ***Our integrated technology platform, business processes, data and highly skilled and trained agents enable us to rapidly scale while improving our unit economics, as measured by LTV/CAC.*** As we scale our business, our machine-learning data combined with our omni-channel marketing allows us to become progressively better at acquiring consumer leads with favorable engagement potential and to do so at lower cost. ***In doing so, we increase the lifetime commissions generated by the consumer leads we convert, which increases LTV per Approved Submission, and we reduce the cost of acquiring consumer leads, lowering CAC per commissionable Approved Submission.***

**ANSWER:** To the extent the allegations in Paragraph 97 purport to quote or paraphrase GoHealth's Registration statement, GoHealth's Registration Statement speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 97.

98.     Further addressing the matters that stood to impact the Company's results of operations, the Registration Statement included materially false statements and omissions regarding the Company's ability to attract new carriers and expand relationships with existing carriers. Specifically, the Registration Statement stated:

> We generate revenue primarily from commissions earned through policy sales utilizing our platform. Carriers and other partners also pay us enrollment fees, hourly fees and other fees for services performed for specific carriers. ***Attracting new carriers and expanding relationships with our existing carriers to offer more products and plans is critical to the growth of our business, particularly in the Medicare segments, which drive the highest LTV/CAC of the products and plans we offer***. ***We are strategically adding carriers in the Medicare segments in order to offer top-rated plans and multiple plan choices in each of the U.S. counties in which we operate***. ***This also allows us to market more efficiently in these geographies, increase conversion rates on consumer leads, and improve customer satisfaction rates as we are better able to meet consumers' specific needs, which drives revenue growth***.

**ANSWER:** To the extent the allegations in Paragraph 98 purport to quote or paraphrase GoHealth's Registration statement, GoHealth's Registration Statement speaks for itself and no

response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 98.

99. In several instances, the Registration Statement highlighted the Company's ability to sell SNPs year-round, which would help "prioritize agent growth year round." The Registration Statement did not, however, disclose that GoHealth's increasing use of SNPs, which generated non-commissionable "other" revenue, would also create a near-term drag on GoHealth's average LTV while increasing churn. For example, the Registration Statement stated:

> In addition, *we are increasingly adding SNPs into our marketplace from both existing and new carrier relationships*. Unlike Medicare Advantage products, which can largely be sold only during the Medicare annual enrollment period and open enrollment period, SNPs can generally be sold throughout the special enrollment period. *As a result, we are able to maximize the value of our consumer interactions and marketing spend during the special enrollment period and prioritize agent growth year round. As we add more Medicare products and expand SNP offerings, we allocate more of our existing agent seat count to the Medicare—Internal segment from other less profitable channels, reducing the need to open new facilities*.

> \*      \*      \*

> *We were also able to utilize more agents on a year-round basis instead of during enrollment periods due to the addition of SNPs into our marketplace which are able to be sold at any time of year. Net revenues also increased in this segment due to the implementation of new marketing strategies to generate a greater number of qualified prospects and due to an increase in non-commission revenues.*

**ANSWER:** To the extent the allegations in Paragraph 99 purport to quote or paraphrase GoHealth's Registration statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 99.

100. The statements referenced above in ¶¶91-99 were materially false because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) That GoHealth's recent revenue increases and improved LTV/CAC metrics touted in the Registration Statement were the result of an unsustainable business strategy, namely dramatically increased concentration on just two Medicare insurance carriers;

42

(b)     That GoHealth had maximized the growth that could be achieved by concentrating its business with Humana and Anthem and, as a result, needed to significantly alter its business model in order to continue its growth trajectory;

(c)     That GoHealth and the Individual Defendants had planned 2020 as an "investment year" for the Company, which included significant and rapid carrier expansion in the Company's Medicare business as well as increased reliance on non-commissionable SNPs, both of which would result in negative impacts to GoHealth's important LTV metric;

(d)     That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced commission rates until it could earn its way up to the maximum allowable commission rates that the Company enjoyed with its established carrier relationships, negatively impacting GoHealth's LTV and creating a "near-term drag" on GoHealth's average LTV;

(e)     That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced marketing support from new carriers compared to the subsidized marketing GoHealth enjoyed with Humana and Anthem, negatively impacting GoHealth's LTV/CAC;

(f)     That GoHealth's purported ability to "rapidly scale" was materially false because by rapidly scaling with new carriers, the Company faced negatively changed financial dynamics, including reduced commission rates and decreased marketing support;

(g)     That in order to enroll a substantial volume of new consumers with the Company's new insurance carrier partners, GoHealth needed to incur significant upfront expenses, including substantial marketing, advertising, and employee-related expenses in excess of typical levels, in exchange for reduced commissions, resulting in negative pressure on GoHealth's critical LTV/CAC ratio as well as significant, additional cash expenditures by the Company during 2020;

(h)     That as GoHealth added several large Medicare carriers in 2020, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions for such new business;

(i)     That GoHealth's upfront costs with the new Medicare carriers it had already added and planned to add in 2020 would be significant and detrimental to LTV/CAC because GoHealth needed to spend aggressively to increase marketing and hire more agents in order to generate enough approved submissions at the new carriers to justify the ability to earn top-tier commissions in the future; and

(j)     That GoHealth faced increased churn and decreased persistency, and increased costs related to fighting churn and supporting persistency, as a consequence of selling SNPs as well as new plans for new Medicare carrier customers because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly competitive Medicare insurance market, resulting in reduced commissions, reduced profitability, and a drag on GoHealth's LTV/CAC.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 100.

101.    The risk factors included in the Registration Statement also included materially false statements and omissions. For example, the risk warnings failed to disclose the most significant risk factors impacting GoHealth – including the maximization of its historical business model and need to rapidly expand to additional carriers and engage in substantial investments and untested business strategies in 2020. The Registration Statement also provided generic boilerplate discussions of potential, future contingent "risks," such as stating that GoHealth's business ***could*** be harmed, and commissions ***could*** decrease, if carriers were not satisfied with GoHealth's services or if GoHealth failed to develop new carrier relationships, but failed to disclose that the converse was ***already*** coming true and would continue to come true in 2020. As GoHealth quickly expanded its relationships to include several new, large carriers, it suffered and would continue to suffer near-term negative financial impacts, including decreased commission rates and near-term pressure on LTVs.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 101.

102.    Although the risk factors purported to warn that GoHealth's insurance carrier customers ***could*** "reduce the commissions paid" to GoHealth and change their underwriting policies in ways that reduced the number, or impacted the renewal or approved rates, of insurance policies sold through GoHealth's platform, which ***could*** harm GoHealth's business, the risk factors did not suggest that GoHealth was then ***already*** experiencing, and would continue to experience in 2020, reduced commissions as a consequence of adding several large Medicare Advantage carriers in 2020. Specifically, the Registration Statement stated:

> Our commission rates from carriers are either set by each carrier or negotiated between us and each carrier. The commission rates we are paid are, for any given plan for a given customer, based on a number factors [sic], including the carriers offering those plans, the state of residence of customers, the laws and regulations in the jurisdictions where the customer is located, and the customer's previous Medicare enrollment history (if any). ***Carriers have the right to alter these commission rates with relatively short notice and have altered, and may in the future alter, the contractual relationships we have with them, including, in certain instances by unilateral amendment of our contracts relating to commission rates or otherwise***. For example, CMS could reduce the amount paid by CMS to Medicare Advantage plans or change the regulations and/or timelines applicable to the Medicare Advantage program, particularly in response to the COVID-19 pandemic, which could result in decreased commission rates or reduce carrier participation in the Medicare Advantage program. Changes of this nature could result in reduced commissions, or could impact our relationship with such carriers and potentially lead to contract termination. ***Because revenue in the Medicare segments is concentrated in a relatively small number of carriers, we are particularly vulnerable to changes in commission rates and changes in the competitiveness of our carriers' Medicare products***.

**ANSWER:** To the extent the allegations in Paragraph 102 purport to quote or paraphrase from

GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself and no

44

response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 102.

103. As set forth in the paragraph above, the risk warning pointed to carriers altering commission rates through amendment of contracts relating to "commissions or otherwise," and, as an example, described how CMS' decision to change its rates could carry over to GoHealth's contracts with carriers. And by pointing to the concentration of GoHealth's Medicare business in a "relativity small number of carriers," the risk warning implied that carrier expansion would *help* alleviate GoHealth's vulnerability to reduced commission rates, but did not disclose that carrier expansion itself was placing, and would continue to place, downward pressure on LTVs during 2020. In a similar vein, an additional risk warning in the Registration Statement stated that GoHealth *could* be "adversely impacted by factors that impact [its] estimate of LTV," but, once again, the warning gave no indication that adding new Medicare Advantage customers, or SNPs, was *already* hurting and would continue to hurt the Company's LTV in 2020:

> *Commission rates are also a factor in estimating our LTVs, which are impacted by a variety of factors, including the particular health insurance plans chosen by our customers, the carriers offering those plans, our customers' states of residence, the laws and regulations in those jurisdictions, the average premiums of plans purchased through us and healthcare reform. Any reduction in our average commission revenue per customer could harm our business, operating results and financial condition.*

**ANSWER:** To the extent the allegations in Paragraph 103 purport to quote or paraphrase GoHealth's Registration statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 103.

104. The risk factors included statements regarding the Company's dependence on "a small group of carriers for a substantial portion of [GoHealth's] revenue," but did not indicate that the planned, but undisclosed, "investment year" in 2020 would include significant new carrier expansion at the expense of weakened LTV and increased marketing expense. As a result, the following risk warning, which discussed GoHealth depending on *fewer* carrier relationships, was false and omitted material facts that were required to be disclosed:

> Our agreements with carriers to sell policies are typically terminable by our carriers without cause. *Should we become dependent on fewer carrier relationships (whether as a result of the termination of carrier relationships, carrier consolidation or otherwise), we may become more vulnerable to adverse changes in our relationships with carriers, particularly in states where we distribute insurance from a relatively smaller number of carriers or where a small number of carriers dominate the market, and our business, operating results and financial condition could be harmed.*

45

**ANSWER:** To the extent the allegations in Paragraph 104 purport to quote or paraphrase GoHealth's Registration statement, GoHealth's Registration Statement speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 104.

105. The risk factor statements referenced above in ¶¶101-104 were materially false because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) That GoHealth's recent revenue increases and improved LTV/CAC metrics touted in the Registration Statement were the result of an unsustainable business strategy, namely dramatically increased concentration on just two Medicare insurance carriers;

(b) That GoHealth had maximized the growth that could be achieved by concentrating its business with Humana and Anthem and, as a result, needed to significantly alter its business model in order to continue its growth trajectory;

(c) That GoHealth and the Individual Defendants had planned 2020 as an "investment year" for the Company, which included significant and rapid carrier expansion in the Company's Medicare business as well as increased reliance on non-commissionable SNPs, both of which would result in negative impacts to GoHealth's important LTV metric;

(d) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced commission rates until it could earn its way up to the maximum allowable commission rates that the Company enjoyed with its established carrier relationships, negatively impacting GoHealth's LTV and creating a "near-term drag" on GoHealth's average LTV;

(e) That the changed business model and addition of new carriers had resulted in GoHealth receiving reduced marketing support from new carriers compared to the subsidized marketing GoHealth enjoyed with Humana and Anthem, negatively impacting GoHealth's LTV/CAC;

(f) That GoHealth's purported ability to "rapidly scale" was materially false and misleading because by rapidly scaling with new carriers, the Company faced changed financial dynamics, including reduced commission rates and decreased marketing support;

(g) That in order to enroll a substantial volume of new consumers with the Company's new insurance carrier partners, GoHealth needed to incur significant upfront expenses, including substantial marketing, advertising, and employee-related expenses in excess of typical levels, in exchange for reduced commissions, resulting in negative pressure on GoHealth's critical LTV/CAC ratio as well as significant, additional cash expenditures by the Company during 2020;

(h) That as GoHealth rapidly added several large Medicare carriers in 2020, GoHealth lacked enough data (or had less observed data) to make accurate LTV assumptions for such new business;

46

(i)      That GoHealth's upfront costs with the new Medicare carriers it had already added and planned to add in 2020 would be significant and detrimental to LTV/CAC because as GoHealth needed to spend aggressively to increase marketing and hire more agents in order to generate enough approved submissions at the new carriers to justify the ability to earn top-tier commissions in the future; and

(j)      That GoHealth faced increased churn and decreased persistency, and increased costs related to fighting churn and supporting persistency, as a consequence of selling SNPs as well as new plans for new Medicare carrier customers because customers placed into new plan offerings by less experienced sales agents were more likely to change their minds in the highly competitive Medicare insurance market, resulting in reduced commissions, reduced profitability, and a drag on GoHealth's LTV/CAC.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 105.

### The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles

106.    The Registration Statement failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on GoHealth's operating performance.

**ANSWER:**  The GoHealth Defendants deny the allegations in Paragraph 106.

107.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(2)(ii) ("Item 303"), required the Section 11 Defendants to "[d]escribe any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on sales or revenues or income from continuing operations." Similarly, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required in the "Risk Factors" section of registration statements and prospectuses "a discussion of the [most significant] factors that make [the offering] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk." In addition, SEC Staff Accounting Bulletin No. 104 ("SAB 104") required the disclosure of "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."

**ANSWER:** The allegations in Paragraph 107 consist of legal conclusions, arguments, and characterizations to which no response is required.  To the extent the allegations in Paragraph 107 purport to quote or paraphrase from regulations, statutes, and documents, those regulations, statutes, and documents speak for themselves and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 107.

108.    The failure of the Registration Statement to disclose the omitted material facts set forth herein – including the planned material changes to GoHealth's business model and the

47

attendant negative consequences and risks stemming from this change that were already occurring at the time of the IPO – violated Item 303 because these undisclosed facts, trends, and uncertainties were known and would (and did) have an unfavorable impact on the Company's financial performance. This failure also violated Item 105 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in GoHealth stock speculative or risky. Indeed, as alleged above, the purported risk factors provided in the Registration Statement were themselves materially false and misleading \when made and failed to apprise investors of the most significant risks facing the Company at the time of the IPO. Likewise, the Registration Statement violated SAB 104 because it failed to disclose that in addition to significantly expanding the Medicare business to many new, large carriers, which would hurt LTV in the near-term (*e.g.*, during 2020), GoHealth was also shifting its business model to increasingly rely on SNPs that generated non-commissionable "other" revenue which also created near-term, negative impacts on LTV.

**ANSWER:** The allegations in Paragraph 108 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 108.

109. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> &ast; &ast; &ast;
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

**ANSWER:** To the extent the allegations in Paragraph 109 purport to quote or paraphrase the SEC's May 18, 1989 interpretive guidance release, titled *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835; 34-26831; IC-16961; FR-36, the document speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 109.

110. The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)  Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)  If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

**ANSWER:** To the extent the allegations in Paragraph 110 purport to quote or paraphrase the SEC's May 18, 1989 interpretive guidance release, titled *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835; 34-26831; IC-16961; FR-36, the document speaks for itself and no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 110.

111. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – *i.e.*, reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

**ANSWER:** To the extent the allegations in Paragraph 111 purport to quote or paraphrase the SEC's December 29, 2003 interpretive guidance release, titled *Commission Guidance Regarding*

*Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release

Nos. 33-8350; 34-48960; FR-72, the document speaks for itself and no response is required. To

the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 111.

112. Similarly, within SAB 104, the SEC Staff provides specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenues: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease." The MD&A should "'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."' This includes an "increasing trend toward sales to a different class of customer, such as [one] that has a lower gross profit margin than existing sales that are principally made to [other types of customers]."

**ANSWER:** To the extent the allegations in Paragraph 112 purport to quote or paraphrase the

SEC's Staff Accounting Bulletin No. 104, the document speaks for itself and no response is

required. To the extent a response is required, the GoHealth Defendants deny the allegations in

Paragraph 112.

113. Accordingly, GoHealth had an affirmative obligation to disclose in the Registration Statement information required by Items 303 and SAB 104.

**ANSWER:** The allegations in Paragraph 113 contain legal conclusions, arguments, and

characterizations to which no response is required. To the extent a response is required, the

GoHealth Defendants deny the allegations in Paragraph 113.

114. The Registration Statement, however, omitted material facts required to be stated therein because it failed to disclose information regarding the following known trends, events, or uncertainties in existence at the time of the IPO, including: (a) an ongoing, planned material expansion of GoHealth's business to include several new, large Medicare providers; (b) that the ongoing, planned material expansion placed near-term negative pressure on the Company's critical LTV/CAC metric as the additional, large Medicare providers paid GoHealth lower commissions and did not subsidize GoHealth's marketing costs, leading to increased costs for the Company; (c) that new relationships with additional, large Medicare providers led to decreased persistency and increased churn as GoHealth's agents had to learn how to market and sell new plan choices, and the Company faced increased costs to combat such effects; (d) that GoHealth's increased reliance on non-commissionable "other" revenue from SNPs pushed down GoHealth's LTV and increased churn; and (e) that the Company was in the midst of a strategic shift that caused 2020 to be an

"investment year" with new carriers that would result in near-term negative financial impacts that would not yield benefits until 2021 or beyond.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 114.

115. The Registration Statement similarly omitted material facts required to be stated therein because it negligently failed to disclose information on some of the most material risks facing GoHealth at the time of the IPO in violation of Item 303, Item 105, and SAB 104. As set forth above, the Registration Statement omitted material facts required to be stated therein because it failed to disclose the risks associated with the undisclosed trends, events, or uncertainties identified above, as well as the risk that the favorable financial trends GoHealth experienced at the time of the IPO had deteriorated as those trends, events, or uncertainties came to fruition. The foregoing rendered the IPO significantly riskier than portrayed. The absence of this information misled investors about the prospects and drawbacks of investing in GoHealth, as well as the true risk profile of investing in GoHealth Class A common stock.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 115.

### Post-IPO Events

116. On July 23, 2020, executives for eHealth Inc. ("eHealth") – a major GoHealth competitor – stated during an earnings call that the Medicare brokerage industry had been suffering from elevated churn during the first half of 2020. Although certain of the issues were specific to eHealth, others were not and impacted the entire industry, including GoHealth. On the call, eHealth's CEO stated that, "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." He continued in pertinent part:

> On the macro side, consumers are faced with broader plan choice and multiple enrollment opportunities throughout the year, which is benefiting the broader MA [Medicare Advantage] market and increasing the market share of MA plans. At the same time, *these dynamics have also led to more shopping and more switching by MA members*.

**ANSWER:** To the extent the allegations in Paragraph 116 purport to quote or paraphrase a transcript of an earnings call held by eHealth, Inc., that transcript, to the extent it exists, speaks for itself and no response is required. The GoHealth Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 116 and on that basis deny them.

117. Then, after the market closed on August 19, 2020, barely a month after the IPO, GoHealth reported its 2Q2020 financial results for the quarter ended June 30, 2020. Although the Company reported 2Q2020 and first-half 2020 revenue growth and pointed to "strong" Medicare Advantage enrollments, it also reported a 2Q2020 net loss of $22.9 million compared to net income

of $15.3 million in the prior year period, representing a 250% decline from the prior year period, and a first-half 2020 net loss of $23.8 million compared to net income of $20.3 million in the prior year period, representing a 217% decline from the prior year period.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020 and that GoHealth issued a press release on or about August 19, 2020. To the extent the allegations in Paragraph 117 purport to quote or paraphrase that Form 10-Q or the August 19, 2020 press release, those documents speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 117.

118. The Company stated that it had made several new carrier additions, which included UnitedHealth Group and Aetna nationally, in addition to "multiple regional carriers." The unaudited results of operations disclosed to investors that as a percentage of revenue, critically important commissions from carriers ***declined*** from 80.6% of revenue in the second quarter of 2019 ("2Q2019") to 76% of revenue in 2Q2020, while "other" revenue increased from 19.4% of revenue in 2Q2019 to 24% of revenue in 2Q2020. Simultaneously, the Company's marketing and advertising expenses increased 330%, from $5 million in 2Q2019 to more than $21 million in 2Q2020, representing approximately 17% of the Company's total 2Q2020 revenues.

**ANSWER:** The GoHealth Defendants admit that GoHealth filed a Form 10-Q with the SEC on or about August 20, 2020 and that GoHealth issued a press release on or about August 19, 2020. To the extent the allegations in Paragraph 118 purport to quote or paraphrase that Form 10-Q or the August 19, 2020 press release, those documents speaks for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 118.

119. Also on August 19, 2020, the Company hosted an after-hours earnings call to discuss GoHealth's 2Q2020 financial results. During the call, Jones stated that the disappointing results "came in largely as expected," confirming that the trends existed and were known prior to the IPO. With regard to negative churn dynamics, GoHealth confirmed that customer persistency during the quarter was consistent with GoHealth's planned "expectations," including, *inter alia*: (a) that in new markets, 90-day customer retention was "as low as 50% to 60%"; (b) that SNP customers "exhibit lower effectuation rates and higher disenrollment rates"; and (c) "higher churn as [GoHealth] agents become educated and fully understand those plans" from new carriers. These negative facts, trends, and uncertainties that existed at the time of the IPO were nevertheless not

disclosed to investors in the Registration Statement. As Jones admitted, "we don't see surprises[,]" and GoHealth learned customer persistency data "in real time."

**ANSWER:** The GoHealth Defendants admit that GoHealth held a conference call on or about August 19, 2020. To the extent the allegations of Paragraph 119 purport to quote or paraphrase from GoHealth's August 19, 2020 earnings call, the transcript of that call speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 119.

120. Also on the 2Q2020 call, Jones stated that GoHealth had taken a "rifle-shot approach to adding new carriers" and that as the Company "look[ed] towards 2021," it would "have expanded coverage with many of the top carriers, including United, Aetna, Kaiser and some other regional Blues." Jones stated there was "***an initial ramp-up period for new carriers with forecasted lower LTVs as agents learn about new plans***" and that the near-term costs would ultimately support GoHealth's long-term growth. As the call continued, Matthiesen further confirmed that GoHealth's "strategy to add several new large carriers" would result in "***lower initial commission rates and LTVs***." Regarding SNPs, Jones stated that SNPs "tend to have a lower LTV that pull down our average LTV[,]" and Matthiesen also added that the Company's increasing use of SNPs, which resulted in non-commissionable "other" revenue, resulted in "lower LTVs," and would "create a ***near-term drag on [GoHealth's] average LTV***" that would ultimately help the Company "over time." Matthiesen also stated that GoHealth had implemented a "changing mix of business" in 2Q2020 – which closed two weeks before the IPO – and that the changed business mix would "continue to impact [GoHealth's] average LTVs[.]"

**ANSWER:** The GoHealth Defendants admit that GoHealth held a conference call on or about August 19, 2020. To the extent the allegations of Paragraph 120 purport to quote or paraphrase from GoHealth's August 19, 2020 earnings call, the transcript of that call speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 120.

121. On November 11, 2020, GoHealth reported its 3Q2020 financial results. GoHealth reported earnings per share ("EPS") of negative $0.65, missing EPS estimates by $0.61, and fell short of its revenue estimates by $6.04 million. Notably, the Company's revenue mix was materially different than expected, with: (a) commission revenue missing analyst forecasts by 32%; (b) enterprise revenue (formerly "other") coming in at triple what analysts modeled, at $62 million versus $20.5 million; and (c) external revenue down 27% versus estimates of a significant increase. The significant shift in GoHealth's revenue stream was seen as adding confusion to the Company's reported financial results and expected performance.

53

**ANSWER:** The GoHealth Defendants admit that GoHealth issued a press release on or about November 11, 2020 and that GoHealth filed a Form 10-Q with the SEC on or about November 13, 2020. To the extent the allegations in Paragraph 121 purport to quote or paraphrase the November 11, 2020 press release or Form 10-Q, those documents speak for themselves and no response is required. The GoHealth Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegation concerning unidentified analyst estimates, and on that basis denies it. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 121.

122. Specifically, the unaudited results of operations disclosed to investors that as a percentage of revenue, critically important commissions from carriers *declined* from 73% of revenues in the third quarter of 2019 ("3Q2019") to 62% of revenues in 3Q2020, while "other" revenue increased from 27% of revenues in 3Q2019 to 38% of revenues in 3Q2020. Simultaneously, the Company's marketing and advertising expenses increased 121% from $28.5 million in 3Q2019 to more than $62.8 million in 3Q2020, representing approximately 39% of the Company's total 3Q2020 revenues.

**ANSWER:** The GoHealth Defendants admit that GoHealth issued a press release on or about November 11, 2020 and that GoHealth filed a Form 10-Q with the SEC on or about November 13, 2020. To the extent the allegations in Paragraph 122 purport to quote or paraphrase the November 11, 2020 press release or Form 10-Q, those documents speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 122.

123. During an after-hours conference call to discuss the Company's 3Q2020 financial performance, Jones stated that GoHealth's technology platform had powered the direct sales platform of 12 of its insurance carrier partners and that, during 2020, GoHealth signed on several new large carriers, such as UnitedHealth Group, Cigna, Aetna, and Allwell. Matthiesen added that the Company's year-to-year "[c]ommission growth and improved persistency" helped "push [GoHealth's] LTVs higher" but also stated that LTVs were "offset somewhat by the short-term drag from [GoHealth's] carrier expansion as well as [GoHealth's] growing business with profitable [SNPs.]" Matthiesen also made clear that to the extent the Company experienced "strong" persistency, it was because of increased "scale and effective outreach" by the Company's customer service representatives, who "ramped up their consumer engagement efforts[.]"

**ANSWER:** The GoHealth Defendants admit that GoHealth held a conference call on or about November 11, 2020. To the extent the allegations of Paragraph 123 purport to quote or paraphrase from GoHealth's November 11, 2020 earnings call, the transcript of that call speaks for itself and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 123.

124. On December 2, 2020, GoHealth participated in the Evercore ISI HealthCONx Conference, with Jones and Matthiesen speaking on behalf of the Company. During the conference, GoHealth was asked to describe the Company's LTV progression in light of new carrier integrations. In response, Jones revealed that GoHealth planned for 2020 to be an "investment year" for GoHealth that would result in reduced, lower-than-normal commissions from carriers and LTV compression in 2020, with the Company not seeing the "upside" until 2021. Specifically, Jones stated:

> *So we anticipated 2020 to be an investment year with new carriers.* If you think about a new carrier, there's technology integrations, there's understanding other compliance and nuances, there's understanding all the different plan options and plan types and building that out. [Indiscernible] side of things. So there's a -- and we also -- when you add a new carrier, you're typically not -- they don't view you as anybody special, right? *They're going to give you just a normal commission level.* You've got to prove yourself on volume and quality to move up the ranks. *And typically, you'll see LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and we thought that would happen.*
>
> As we think about where we've gone from a volume standpoint, we quickly rose through the ranks, we've proven ourselves, *and we think there's more upside in 2021 from an LTV standpoint with carriers.* We also know more about their effectuation rates, rapid disenrollment rates, things we can look at in the reporting because other -- every carrier is reporting is different as well.

**ANSWER:** The GoHealth Defendants admit that Mr. Jones and Mr. Matthiesen virtually attended the 3rd Annual Evercore ISI HealthCONx Conference on or about December 2, 2020. To the extent the allegations in Paragraph 124 purport to quote or paraphrase from a transcript or webcast

of a December 2, 2020 Evercore ISI HealthCONx Conference, those documents or recordings speak for themselves and no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 124.

125. Affirming Jones' statements, Matthiesen then added that although the Company was seeing higher persistency with certain customers, the Company's plan to add new carriers in 2020 created a "short-term drag on LTV" and that the Company would not get to "top-level contracts" with new carriers until "next year," *i.e.*, 2021. Specifically, Matthiesen stated:[6]

> No. I'll just reiterate what you said, Clint [Jones]. I think we've gotten questions around new carriers, and *it's important to understand that new carriers really are a short-term drag on LTV* as you think about it. And again, based off of the volume that we're writing here in AEP for these new carriers, we'll be at those top-tier contracts, so those top-level contracts into next year, which will create more opportunity.

> And I think the other part of *adding those carriers, while it can be a short-term drag on LTV*, we've also seen, and this is what was exhibited in Q3, higher conviction at the point of sale by offering more choice across our carriers. So we're seeing higher effectuation rates, lower rapid disenrollment rates. And so as we continue to both create that conviction at the point of sale as well as building out and engaging with our consumers via TeleCare and actually helping them use the benefits that Clint just alluded to earlier. We're finding it's one thing to tell someone that they're in the best plan. It's another for them to actually know it by using all of those benefits. And so we're seeing those improvements. And that's what caused a little bit of the waterfall we showed in Q3 that, despite the *short-term drag on these new carrier adds*, we're still seeing higher persistency because of those things I just described.

**ANSWER:** The GoHealth Defendants admit that Mr. Matthiesen sold 146,000 shares of GoHealth Class A common stock at a price of $14.9835 on or about January 11, 2021. The GoHealth Defendants further admit that Mr. Jones and Mr. Matthiesen virtually attended the 3rd Annual Evercore ISI HealthCONx Conference on or about December 2, 2020. To the extent the allegations in Paragraph 125 purport to quote or paraphrase from a transcript or webcast of a December 2, 2020 Evercore ISI HealthCONx Conference, those documents or recordings speak

---

[6] On January 11, 2021, CFO Matthiesen sold 146,000 shares of GoHealth Class A common stock at a price of $14.98 per share, generating proceeds exceeding $2.1 million.

for themselves and no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 125.

126. By December 2, 2020, the price of GoHealth Class A common stock fell to a low of just $10.01 per share, more than *50% below* the IPO price. This stunning drop in the price of GoHealth Class A common stock occurred in less than five months, and during a period that the S&P 500 increased 14%. GoHealth's primary competitor, SelectQuote, has also experienced a significant upswing in the price of its stock since the IPO, as reflected in the following chart:



**ANSWER:** The GoHealth Defendants admit that the lowest reported trading price of GoHealth stock on December 2, 2020 was $10.01. The GoHealth Defendants lack sufficient knowledge and information as to the truth or falsity of the remaining allegations in Paragraph 126 and on that basis deny them. Except as expressed admitted, the GoHealth Defendants deny the allegations in Paragraph 126.

57

**Class Action Allegations**

127. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all purchasers of GoHealth Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO ("Class"). Excluded from the Class are Defendants, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

**ANSWER:** The GoHealth Defendants admit that Plaintiffs purport to bring this action under Sections 11 and 15 of the Securities Act. Except as expressly admitted, the GoHealth Defendants deny the allegations of Paragraph 127.

128. The members of the Class are so numerous that joinder of all members is impracticable. GoHealth Class A common stock is actively traded on the Nasdaq, and more than 43 million shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GoHealth or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

**ANSWER:** The allegations in Paragraph 128 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 128.

129. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

**ANSWER:** The allegations in Paragraph 129 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 129.

130. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

**ANSWER:** The allegations in Paragraph 130 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 130

131. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     whether Defendants violated the Securities Act;

      (b)     whether the Registration Statement issued by the Section 11 Defendants to the investing public in connection with the IPO was negligently prepared and contained inaccurate statements of material fact or omitted material information required to be stated therein; and

      (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** The allegations in Paragraph 131 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 131.

132. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** The allegations in Paragraph 132 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 132.

**COUNT I**
**For Violations of Section 11 of the Securities Act**
**Against the Section 11 Defendants**

133. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference the answers to Paragraphs 1 through 132 as if fully set forth herein.

59

134. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, by Lead Plaintiffs on behalf of themselves and the Class against the Section 11 Defendants. Lead Plaintiffs do not claim that any of the Section 11 Defendants engaged in intentional or reckless misconduct or acted with fraudulent intent.

**ANSWER:** The GoHealth Defendants admit that none of the GoHealth Defendants engaged in

intentional or reckless misconduct or acted with fraudulent intent. The remaining allegations in

Paragraph 134 consist of legal conclusions, arguments, and characterizations to which no response

is required. Except as expressly admitted, Defendants deny the allegations in Paragraph 134.

135. The Registration Statement for the IPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 135.

136. GoHealth was the registrant for the IPO. As the issuer of its common stock, GoHealth is strictly liable to Lead Plaintiffs and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required to be disclosed therein pursuant to the regulations governing the Registration Statement's preparation.

**ANSWER:** The GoHealth Defendants admit that GoHealth was the issuer of the common stock

sold pursuant to the Registration Statement. The remaining allegations in Paragraph 136 consist

of legal conclusions, arguments, and characterizations to which no response is required. Except

as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 136.

137. The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material facts. As such, the Individual Defendants are strictly liable to Lead Plaintiffs and the Class under Section 11 of the Securities Act.

**ANSWER:** The GoHealth Defendants admit that Mr. Jones, in his capacity as GoHealth's Chief

Executive Officer, Mr. Matthiesen, in his capacity as GoHealth's Chief Financial Officer, and Mr.

60

Cruz, in his capacity as Director of GoHealth signed, either directly or through power of attorney, GoHealth's Registration Statement. The allegations in the second and third sentences in Paragraph 137 consist of legal conclusions, arguments, and characterizations to which no response is required. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 137.

138. The Underwriter Defendants served as underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendant's failure to exercise reasonable care, the Registration Statement contained false statements of material facts and omissions of material facts necessary to make the statements made therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

**ANSWER:** The GoHealth Defendants admit that the Underwriter Defendants served as underwriters for GoHealth's IPO. The remaining allegations in the first sentence, as well as in the second, third and fourth sentences of Paragraph 138 consist of legal conclusions, arguments, and characterizations to which no response is required. Except as expressed admitted, the GoHealth Defendants deny the allegations of Paragraph 138.

139. The Section 11 Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate. By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 139.

140. At the time of their purchases of GoHealth Class A common shares in and/or traceable to the IPO, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead

Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action commenced.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 140.

## COUNT II
### For Violations of Section 15 of the Securities Act
### Against the Section 15 Defendants

141.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** The GoHealth Defendants incorporate by reference the answers to Paragraphs 1 through 140 as if fully set forth herein.

142.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiffs and the Class against the Individual Defendants for their control of GoHealth, and also against GoHealth for its control of the Individual Defendants and all of its employees and subsidiaries in connection with the controlled persons' violations of Section 11 of the Securities Act relating to the IPO.

**ANSWER:** The allegations in Paragraph 142 consist of legal conclusions, arguments, and characterizations to which no response is required.  To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 142.

143.   The Individual Defendants possessed the power to control, and did control, directly and/or indirectly, the actions of GoHealth at all relevant times. By virtue of their positions as directors and/or senior officers of GoHealth, the Individual Defendants possessed the power and authority to control the contents of GoHealth's Registration Statement and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of GoHealth. GoHealth also exercised control over and directed the actions of its senior managers, directors, employees, and agents, including the Individual Defendants.

**ANSWER:** The GoHealth Defendants deny the allegations in Paragraph 143.

144.   NVX Holdings and Centerbridge also control GoHealth. After the IPO, GoHealth was considered a "controlled company" within the meaning of the listing rules of the Nasdaq because NVX Holdings and Centerbridge have more than 50% of the voting power for the election of directors to GoHealth's Board.

**ANSWER:** The GoHealth Defendants admit that, after GoHealth's IPO, GoHealth was a "controlled company" within the meaning of the corporate governance standards of the Nasdaq rules. Except as expressly admitted, the GoHealth Defendants deny the allegations in Paragraph 144.

145. The Registration Statement made clear that the Section 15 Defendants named in this Count acted as controlling persons of the Company, stating:

> Upon consummation of this offering, the Founders and Centerbridge will control, in the aggregate, approximately 70.8% of the voting power represented by all our outstanding classes of stock. As a result, the Founders and Centerbridge will continue to exercise significant influence over all matters requiring stockholder approval, including the election and removal of directors and the size of our board, any amendment of our amended and restated certificate of incorporation or bylaws and any approval of significant corporate transactions (including a sale of all or substantially all of our assets), and will continue to have significant control over our business, affairs and policies, including the appointment of our management. The directors that the Founders and Centerbridge elect have the authority to vote to authorize the Company to incur additional debt, issue or repurchase stock, declare dividends and make other decisions that could be detrimental to stockholders.

> We expect that members of our board will continue to be appointed by and/or affiliated with the Founders and Centerbridge who will have the ability to appoint the majority of directors. The Founders and Centerbridge can take actions that have the effect of delaying or preventing a change of control of us or discouraging others from making tender offers for our shares, which could prevent stockholders from receiving a premium for their shares. These actions may be taken even if other stockholders oppose them. The concentration of voting power with the Founders and Centerbridge may have an adverse effect on the price of our Class A common stock. The Founders and Centerbridge may have interests that are different from yours and may vote in a way with which you disagree and that may be adverse to your interests.

> \* \* \*

> After the consummation of the Transactions, NVX Holdings and Centerbridge will have more than 50% of the voting power for the election of directors, and, as a result, we will be considered a "'controlled company"' within the meaning of the Nasdaq rules. As such, we will qualify for, and intend to rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or to perform annual performance

evaluations of the nominating and corporate governance and compensation committees.

**ANSWER:** To the extent the allegations in Paragraph 145 purport to quote or paraphrase from GoHealth's Registration Statement, GoHealth's Registration Statement speaks for itself. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 145.

146. This claim is brought within the applicable statute of limitations.

**ANSWER:** The allegations in Paragraph 146 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 146.

147. As control persons of GoHealth, the Section 15 Defendants are liable jointly and severally and to the same extent as GoHealth for its violations of Section 11 of the Securities Act. By reason of such conduct, and participation, the Section 15 Defendants are liable pursuant to Section 15 of the Securities Act.

**ANSWER:** The allegations in Paragraph 147 consist of legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, the GoHealth Defendants deny the allegations in Paragraph 147.

## ANSWER TO PRAYER FOR RELIEF

The GoHealth Defendants deny that Plaintiffs are entitled to relief against them and request that the Court dismiss all claims against them with prejudice and order such further relief as the Court deems just and proper.

## ANSWER TO JURY DEMAND

The GoHealth Defendants admit that Plaintiffs purport to demand a trial by jury.

## AFFIRMATIVE DEFENSES

In further response to the Complaint, subject to discovery, based on information and belief, and without assuming the burden of proof on any issue for which Plaintiffs bear the burden of proof, the GoHealth Defendants assert the following defenses:

1. The Complaint fails, in whole or in part, pursuant to the bespeaks caution doctrine and 17 C.F.R. § 230.175 to the extent that it is based on forward-looking statements accompanied by meaningful cautionary language, including language identifying the principal or important risks at the time GoHealth's Registration Statement was prepared, and/or to the extent those forward-looking statements were made with a reasonable basis and in good faith.

2. The Complaint fails, in whole or in part, because Plaintiffs and/or the putative class members suffered no losses and/or any alleged losses suffered do not represent a depreciation in the value of the shares resulting from alleged misstatements or omissions in GoHealth's Registration Statement.

3. Plaintiffs may not recover on Counts I-II of the Complaint because the conduct of persons and/or entities other than the GoHealth Defendants was a superseding or intervening cause of any damage, loss, or injury allegedly sustained by Plaintiffs or the putative class members.

4. If Plaintiffs are entitled to recover any damages, such award against the GoHealth Defendants must be reduced, diminished, and/or barred in proportion to the conduct

65

of persons or entities for which the GoHealth Defendants have no responsibility and do not control.

5.   If Plaintiffs are entitled to recover any damages, such award must be reduced by all damages attributable to Plaintiffs' and/or the putative class members' failure to take appropriate action to mitigate damages prior to and subsequent to the institution of this action.

6.   Plaintiffs' claims against the GoHealth Defendants are barred in whole or in part because the alleged damages or other injuries were caused solely by the acts or omissions of, or because of the contribution of or the comparative fault and contributory negligence of, Plaintiffs or others (including the non-GoHealth defendants) over which the GoHealth Defendants had no control.

7.   The Complaint fails, in whole or in part, because the challenged statements are non-actionable statements of puffery, belief, and/or opinion made with genuine belief and with the basis that a reasonable investor would expect.

8.   The Complaint fails, in whole or in part, because the substance of the information that Plaintiffs allege was misrepresented or omitted was disclosed, was publicly available or widely known in the investing community, and/or was otherwise known to Plaintiffs and/or the putative class members.

9.   The Complaint fails, in whole or in part, because Plaintiffs and/or the putative class members assumed the risks disclosed in GoHealth's Registration Statement and

66

Prospectus, and any losses Plaintiffs or the putative class members experienced were caused because those risks materialized.

10. The Complaint fails against NVX Holdings and the Individual Defendants, in whole or in part, by the due diligence defense because NVX Holdings and the Individual Defendants had no knowledge of, or reasonable grounds to believe in, the existence of facts alleged to support liability of the allegedly controlled persons.

11. The Complaint fails, in whole or in part, because the claims of Plaintiffs and/or the putative class members are time-barred under the applicable statutes of limitation and/or statutes of repose.

12. The Complaint fails, in whole or in part, because the Court lacks personal jurisdiction over some putative class members.

13. If Plaintiffs are entitled to recover any damages against the GoHealth Defendants, the amount recoverable must not exceed the price at which the securities were offered to the public.

14. The Complaint fails, in whole or in part, against NVX Holdings and the Individual Defendants, because they acted at all times in good faith and had no knowledge, and were not reckless in not knowing, that any alleged statement or omission was false or misleading.

## RESERVATION OF RIGHTS

The GoHealth Defendants reserve the right to raise any additional defenses, affirmative or otherwise, and any counterclaims that may become apparent through discovery or otherwise in this course of this action.

## PRAYER FOR RELIEF

WHEREFORE, the GoHealth Defendants respectfully pray for judgment and relief as follows:

1.      That the Court deny the relief sought in the Complaint;

2.      That the Court enter final judgment in favor of the GoHealth Defendants;

3.      That the GoHealth Defendants be awarded such other and further relief as the Court deems necessary and appropriate.

Dated:  June 21, 2022                    Respectfully Submitted,

/s/ J. Gregory Deis
J. Gregory Deis (ARDC No. 6278910)
gdeis@mayerbrown.com
Sara Norval (ARDC No. 6324420)
snorval@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel.:  (312) 782-0600

Glenn K. Vanzura (*pro hac vice*)
gvanzura@mayerbrown.com
Jacqueline M. Vallette (*pro hac vice*)
jvallette@mayerbrown.com

Matthew O. Kussman (*pro hac vice*)
mkussman@mayerbrown.com
MAYER BROWN LLP
350 S. Grand Ave. #2500
Los Angeles, California 90071
Tel.:  (213) 229-9500

*Counsel for Defendants GoHealth, Inc., Clinton P. Jones, Brandon M. Cruz, Travis J. Matthiesen, and NVX Holdings, Inc.*