Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 1 of 101 PageID #:3666

Endo v. Albertine, Not Reported In F.Supp. (1995)

1995 WL 170030

1995 WL 170030
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Henry T. ENDO et al., Plaintiffs,

v.

John M. ALBERTINE, et al., Defendants.

No. 88 C 1815.
|
April 7, 1995.

*MEMORANDUM OPINION AND ORDER*

HOLDERMAN, District Judge:

 **\*1** Named plaintiff Henry T. Endo, on behalf of himself and a class of similarly situated individuals, initially filed a nine-count complaint against defendants, including a claim for violations of § 12(2) of the Securities Act of 1933. On January 29, 1993, United States District Judge James H. Alesia dismissed plaintiff § 12(2) claims as to defendants Fruit of the Loom, Inc., ("FOL") and FOL's various directors and officers (collectively the "FOL defendants"). *Endo v. Albertine,* 812 F.Supp. 1479, 1493–94 (N.D.Ill.1993). Plaintiffs have now filed a motion requesting this court to reconsider Judge Alesia's decision as to the dismissal of plaintiffs' § 12(2) claims against the FOL defendants. In addition, defendants have filed a joint motion to decertify the class of plaintiffs which Judge Alesia certified on February 26, 1993. *Endo v. Albertine,* 147 F.R.D. 164 (N.D.Ill.1993). For the reasons stated below, plaintiffs' motion to reconsider is denied, and defendants' motion to decertify the class is granted in part as to Counts IV and V and as to the shortening of the applicable time period.

*ANALYSIS*

I. *Motion to Reconsider*
The fact that plaintiffs challenge the merits of Judge Alesia's dismissal of plaintiffs' § 12(2) claims as to the FOL defendants means that the motion must fall under either Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure. The Seventh Circuit has adopted a bright line test to determine whether a motion is made under Rule 59(e) or Rule 60(b).

"The time of a motion's service controls whether a motion challenging a judgment is a 60(b) or a 59(e) motion. Such a motion, if served within ten days of a final judgment, is a 59(e) motion." *Helm v. Resolution Trust Corp.,* 43 F.3d 1163, 1166–67 (7th Cir.1995) (citing *United States v. Deutsch,* 981 F.2d 299, 301 (7th Cir.1992)). "Conversely, a motion served more than ten days after final judgment is a 60(b) motion." *Id.* Thus defendants' motion, filed over two years after the challenged judgment, falls under Rule 60(b).

Motions filed under Rule 60(b) "must be shaped to the specific grounds for modification or reversal listed in Rule 60(b)—they cannot be general pleas for relief." *Deutsch,* 981 F.2d at 301 (citations omitted). The court does not does not have the burden of "agonizing over whether a motion asserts grounds for relief included in Rule 60(b); it is the movant's task to make its contentions clear." *Id.* at 302.

In support of their motion to reconsider, plaintiffs argue that in light of the facts developed in discovery after Judge Alesia's ruling and the recent developments in the law, it is now clear that the FOL defendants are subject to § 12(2) liability. Plaintiffs contend that the discovery that plaintiffs conducted after Judge Alesia's decision establishes that the FOL defendants solicited sales of FOL securities for the financial benefit of FOL and William Farley, and are therefore sellers under § 12(2) under the standards established by the Supreme Court in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063 (1988).[1]

 **\*2** Section 12(2) of the 1933 Act provides in relevant part that a person who "offers or sells a security" by means of fraudulent statements or omissions "*shall be liable to the person purchasing such security from him*." 15 U.S.C. § 77l(2) (emphasis added). In order to determine whether one not actually selling a security, that is one not in privity with the purchaser, may be deemed a "seller" under § 12, many courts adopted a "substantial factor" test. Under the substantial factor approach, a § 12 seller of securities is defined as one " 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.' " *Pinter,* 486 U.S. at 648–49, 108 S.Ct. at 2079 (quoting *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980)).

In *Pinter v. Dahl,* however, the Supreme Court rejected the use of the "substantial factor" test for determining whether a party should be considered a seller of securities under § 12(1) of the 1933 Act.[2] *Pinter,* 486 U.S. at 649–51, 108 S.Ct. at 2079–81. The Court found that Congress did not

Endo v. Albertine, Not Reported in F.Supp. (1995)

1995 WL 170030

contemplate imposing § 12 liability under such broad terms, finding that "[t]here is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who 'offer,' including those who 'solicit' offers." *Id.* at 2080. The court stated that the deficiency of the substantial factor test is that it focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances, rather than focusing on the "purchase from" requirement of § 12 and the defendant's relationship with the plaintiff-purchaser. *Id.* "Thus, although the substantial-factor test undoubtedly embraces persons who pass title and who solicit the purchase of unregistered securities as statutory sellers, the test also would extend § 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction." *Id.*

Instead of using the substantial factor test, the Court found that a natural reading of the statutory language would include in the statutory seller status, persons who successfully solicited a buyer to purchase. *Pinter,* 108 S.Ct. at 2078. In addition, one particular section of the Court's analysis supports the conclusion that Congress did not intend for an issuer to ordinarily be considered a seller absent an actual sale to the plaintiff:

> Section 11 of the Securities Act, 15 U.S.C. section 77k, lends strong support to the conclusion the Congress did not intend to extend section 12 primary liability to collateral participants in the unlawful securities sales transaction. The section provides an express cause of action for damages to a person acquiring securities pursuant to a registration statement that misstates or omits a material fact. Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in section 12 therefore we may conclude that Congress did not intend such persons to be defendants in section 12 actions.

**\*3** 486 U.S. at 650 n. 26, 108 S.Ct. at 2080 n. 26.

In this case plaintiffs are urging the court to read § 12(2) so broadly that the activities of an issuer are always sufficient to make it a seller to anyone who purchases securities from the underwriter. As the Supreme Court explained above, "it is difficult to imagine why Congress would have seen the need for sections 10 and 11 if issuers can always be reached under section 12." *Jackson v. First Federal Savings of Arkansas,* 709 F.Supp. 863, 884 (E.D.Ark.1988).

Plaintiffs do not claim that any of the FOL defendants either directly sold them shares or directly solicited them to buy shares of FOL stock. Even if, as plaintiffs argue, the FOL defendants participated in "road show" presentations for the purpose of soliciting institutional investors to purchase FOL securities in the March 1987 offering, plaintiffs have failed to state a § 12(2) claim against the FOL defendants because plaintiffs have presented no evidence indicating that the FOL defendant solicited any of the plaintiffs to purchase securities in the March 1987 offering or even had any contact with these plaintiffs. Absent direct contact of any kind between the FOL defendants and the plaintiff-purchasers, the court finds that as a matter of law the FOL defendants are not sellers under § 12(2). *See In re Newbridge Networks Securities Litigation,* 767 F.Supp. 275, 281 (D.D.C.1991); *In re Gas Reclamation, Inc. Securities Litigation,* 733 F.Supp. 713, 723–24 (S.D.N.Y.1990). Therefore, plaintiffs' motion to reconsider Judge Alesia's dismissal of plaintiffs' § 12(2) claims against the FOL defendants is denied.[3]

II. *Motion to Decertify the Class*

On February 26, 1993, Judge Alesia certified a class of plaintiffs in this case including:

> All persons and entities who purchased or otherwise acquired the Class A common stock, 6¾% convertible debentures or 10¾% notes of Fruit of the Loom during the period from March 3, 1987 to and including March 1, 1988 pursuant to the 1987 public offering or at any time, during this period in the open market, but excluding defendants, members of their family, their heirs, successors and assigns, the officers, directors and affiliates and subsidiaries of any corporate defendant.

*Endo v. Albertine,* 147 F.R.D. 164, 166 (N.D.Ill.1993). Judge Alesia held that plaintiffs met all four prerequisites of Rule 23(a) including numerosity, commonality, typicality and adequacy of representation, as well as the requirements of Rule 23(b). *Id.* at 166–170. Presently before the court is defendants' joint motion to decertify the above plaintiff class. Defendants argue that discovery has revealed evidence that the class period should be shortened; commonality has been destroyed; and the state law claims should be decertified because the applicable state laws are so diverse that class certification is inappropriate.

A. *Applicable Class Period*

Courts have uniformly held that in a securities class action based on material misrepresentations and omissions to the

Endo v. Albertine, Not Reported in F.Supp. (1995)

1995 WL 170030

investing public the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market. *See In re Kirschner Medical Corp. Securities Litigation,* 139 F.R.D. 74, 82 (D.Md.1991); *Sherin v. Gould,* 115 F.R.D. 171, 174 (E.D.Pa.1987); *In re AM Int'l Securities Litigation,* 108 F.R.D. 190, 194 (S.D.N.Y.1985); *In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 143–44 (D.N.J.1984); *McFarland v. Memorex Corp.,* 96 F.R.D. 357, 364 (N.D.Cal.1982). "At that point subsequent purchasers are charged with the knowledge of the true state of business affairs, and thus common questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class." *In re Kirschner Medical,* 139 F.R.D. at 82.

**\*4** In this case plaintiffs' class damages and causation expert, Mr. Paul Grier, testified in his deposition that unlike in the usual securities fraud action, in this case the market did not react to the filing of this lawsuit because the allegedly nondisclosed information had slowly leaked into the market over time and was fully disseminated into the market before the lawsuit was filed.[4] Mr. Grier stated that full leakage of the information regarding FOL's tax liabilities, environmental liabilities and production capacity had occurred and that all of the information had been absorbed into the market prices of FOL 10¾% notes by April 14, 1987,[5] FOL Class A common stock by August 11, 1987,[6] and FOL 6¾% convertible debentures by November 2, 1987.[7] Therefore, because plaintiffs admit, through the testimony of their own expert Mr. Paul Grier, that all of the alleged nondisclosed information regarding FOL's tax liabilities, environmental liabilities and capacity issues, was fully leaked into the market prior to the filing of this lawsuit, the applicable class period must be shortened to the period between March 3, 1987 —April 14, 1987 for the 10¾% note purchasers, March 3, 1987—August 11, 1987 for the Class A common stock purchasers, and March 3, 1987—November 2, 1987 for the 6¾% convertible debenture purchasers.[8]

### B. *Commonality*

Defendants contend that commonality no longer exists because there are incurable conflicts among the remaining class members regarding the length of time each plaintiff owned his or her securities and the damages that each plaintiff suffered. The court rejects defendants' contentions and finds that the possible factual differences between

plaintiffs regarding damages do not defeat commonality in this case.

The claims of the class are based on a common course of conduct and the same alleged misrepresentations and omissions made in connection with the March 1987 offering of three different types of FOL securities. The facts and legal theories asserted by the class to prove any violations will be identical regardless of the type of security at issue and the length of time each plaintiff owned his or her security. The only real difference between the claims for the different types of securities is that any violation may have affected the damages each plaintiff suffered. The court concludes that these differences are insufficient to defeat either commonality or typicality of the class. *See Fry v. UAL Corp.,* 136 F.R.D. 626, 634 (N.D.Ill.1991) (any alleged conflict in the fact that class members owned different types of securities will arise at the damages stage of the litigation and does not prevent a finding of typicality); *In re VMS Securities Litigation,* 136 F.R.D. 466, 475 (N.D.Ill.1991) (factual differences regarding the circumstances surrounding each plaintiff's investment decision did not destroy typicality); *In re McDonnell Douglas Corp. Securities Litigation,* 98 F.R.D. 613, 620 (E.D.Mo.1982) (price differences in the securities at issue and any variation in damages based on the differences in price movement that may arise did not defeat typicality because any difference in price movement that arise can be addressed later if liability is established through the creation of a subclass).

### C. *State Claims*

#### 1. *Common Law Fraud Claims*

**\*5** Plaintiffs have invoked the court's pendant jurisdiction over their common law fraud claims. Defendants oppose class certification of these claims arguing that a conflict of laws problem is likely to arise because the court will have to apply the law of all fifty states to the state claims of the individual class members thereby rendering a class action as to these claims unmanageable.

In *Phillips Petroleum,* 472 U.S. 797, 105 S.Ct. 2965 (1985), the Supreme established a two-step analysis to determine if a forum state may constitutionally apply its law to all of the individual state claims of a class. First, the court must determine whether the forum state law conflicts with that of any jurisdiction connected to the suit. 472 U.S. at 817, 105

1995 WL 170030

S.Ct. at 2977. Second, the court must determine whether the forum has "a 'significant contact or significant aggregation of contacts' creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 472 U.S. at 821–22, 105 S.Ct. at 2979 (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 639–40 (1981)).

It is plaintiff Endo's burden, as the class action proponent, to establish that there are no conflicts between the common law from the various states at issue in this case. *See In re Rhone–Poulenc Rorer, Inc.,* No. 94–3912, slip op. at 13–17 (7th Cir. March 16, 1995); *Community Federal Savings v. Reynolds,* No. 87 C 4948, 1989 WL 39798, at *2, 1989 U.S.Dist. LEXIS 4143, at *6–7 (N.D.Ill. April 19, 1993) (citing *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1016 (D.C.Cir.1986), *cert. denied,* 482 U.S. 915 (1987)). A class proponent's failure to do so precludes certification of state law claims. *In re Rhone–Poulenc Rorer,* No. 94–3912, slip op. at 17.

The plaintiffs in this case have presented no information to the court regarding whether there are variations in the applicable state law. In response to defendants' examples of the differences in the laws of the various states regarding common law fraud, plaintiffs simply state that such differences are minor and do not justify decertification of the state fraud claims. Even assuming that plaintiffs' statement is true and the difference are minor, the Seventh Circuit has held that even minor differences may be enough to decertify state law claims.

> The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may as the plaintiffs have argued forcefully to us differ among the states only in nuance.... But nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts.

*In re Rhone–Poulenc Rorer,* No. 94–3912, slip op. at 14.

In addition, the court finds that Illinois does not have significant contacts to the claims asserted by each member of the plaintiff class in order to ensure that the choice of Illinois law is not arbitrary or unfair. *Shutts,* 472 U.S. at 821–22, 105 S.Ct. at 2979. Aside from the fact that defendant FOL's primary place of business is located in Illinois, there is no indication that when the non-Illinois class members in this case purchased their securities in various states across the country, they had any idea that Illinois law would control in any later suit. *See Shutts,* 472 U.S. at 822, 105 S.Ct.

at 2979–80 ("When considering fairness in this context, an important element is the expectation of the parties. There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control." *Id.*). Therefore, the court concludes that because plaintiff Endo has failed to satisfy the requirements for certification of the pendant common law fraud claims contained in Count IV, defendants' motion to decertify the class as to Count IV is granted.[9]

2. *Illinois Consumer Fraud and Deceptive Business Practices Act Claim*

**\*6** Defendants argue that plaintiffs' claims under the Illinois Consumer Fraud and Deceptive Practices Act ("Act"), 815 ILCS 505/1–505/2, must be also be decertified because the Act does not afford a cause of action to non-Illinois resident class members.

Section 2 of the Act provides in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices ... in the conduct of any trade or commerce are hereby declared unlawful ...

815 ILCS 505/2. Section 1 of the Act defines the terms trade and commerce as "any trade or commerce directly or indirectly affecting *the people of this State.*" 815 ILCS 505/1(f) (emphasis added). Based on the specific language outlined above, limiting the scope of the Act to commerce affecting only Illinois residents, the court concludes that the Act "is intended to deal only with the impact of the statutorily prohibited practices on *Illinois* consumers." *Swartz v. Schaub,* 818 F.Supp. 1214 (N.D.Ill.1993) (citing *Seaboard Seed Co. v. Bemis Co.,* 632 F.Supp. 1133, 1140 (N.D.Ill.1986)). Therefore, the court grants defendants' motion to decertify the class as to the Illinois Consumer Fraud and Deceptive Practices Act claims contained in Count V.[10]

*CONCLUSION*

For the reasons stated above, plaintiffs' motion to reconsider is DENIED and defendants' motion to decertify the class is GRANTED IN PART as to Counts IV—V and as to the shortening of the applicable time period. The parties are again strongly urged to discuss the settlement of this case.

**Endo v. Albertine, Not Reported in F.Supp. (1995)**

1995 WL 170030

**All Citations**

Not Reported in F.Supp., 1995 WL 170030

Footnotes

1       Although plaintiffs claim that their motion to reconsider is based on recent developments in the law regarding § 12(2) liability, plaintiff appears to be relying on cases decided before Judge Alesia's January 29, 1993 dismissal of the § 12(2) claims against the FOL defendants, which Judge Alesia already considered when making his decision to dismiss the § 12(2) claims. *See Endo,* 812 F.Supp. at 1494 (citing *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063 (1988); *In re Worlds of Wonder Sec. Litigation,* 674 F.Supp. 1417 (N.D.Cal.1988)).

2       Although in *Pinter* the Court discussed the scope of seller liability under § 12(1) for the sale of unregistered securities, the Court noted that the relevant language contained in both § 12(1) and § 12(2) is identical and that courts and commentators have generally assumed that the concept is the same in both. 486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20.

3       As to plaintiffs' § 12(2) claims against the other defendants, it is undisputed by the parties that the Supreme Court's recent decision in *Gustafson v. Alloyd Co., Inc.,* No. 93–404, slip op. at 15–22 (Feb. 28, 1995), limits recovery under § 12(2) to only those class members who purchased securities in a public offering. Therefore, any class member in this case who purchased securities pursuant to a private sale agreement, no longer has a § 12(2) right of action against any of the defendants.

4       Grier Dep. at 511, 512, 524, 536, and 539.

5       Grier Excerpt at 15.

6       Grier Dep. at 629–31; Grier Excerpt at 15.

7       Grier Except at 16.

8       The plaintiffs who purchased FOL securities after the relevant dates must be notified that they are no longer part of this class. Counsel are requested to propose for the court's consideration an appropriate procedure to provide notice to each former class member. Until these former class members receive appropriate notification the class as to them has been decertified, the statute of limitations period for any claims they may have against the defendants will continue to be tolled. *See Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345–353–54, 103 S.Ct. 2392, 2397–98 (1983) (commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class, and the statute of limitations remains tolled for all members of the class until class certification is denied).

9       The plaintiff class members must be notified that the class is being decertified as to the common law fraud claims. Until these class members receive written notification of the decertification, the statute of limitations period for any individual common law fraud claims they may have against the defendants will continued to be tolled.

10      The plaintiff class members must be appropriately notified that the class is being decertified as to the Illinois Consumer Fraud and Deceptive Business Practices Act claims. Until these class members receive written notification of the decertification, the statute of limitations period for any individual claims they may have against the defendants under this Act will continued to be tolled. *See Crown, Cork & Seal,* 462 U.S. at 353–54, 103 S.Ct. at 2397–98.

**End of Document**                                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 7366274

2021 WL 7366274
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Mayuko HOLWILL, Individually
and on Behalf of All Others
Similarly Situated, Plaintiff,

v.

ABBVIE INC., et al., Defendants.

Case No. 1:18-cv-06790
|
Signed 09/23/2021

**Attorneys and Law Firms**

Patrick Vincent Dahlstrom, Louis Carey Ludwig, Pomerantz LLP, Chicago, IL, Arthur C. Leahy, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, J. Alexander Hood, II, Jeremy Alan Lieberman, Pomerantz LLP, New York, NY, for Plaintiff.

Joshua Z. Rabinovitz, Anne Katherine Reser, Brenton A. Rogers, Brittany Paige Cramer, Kirkland & Ellis LLP, Chicago, IL, Holly R. Trogdon, Pro Hac Vice, Kevin Ross Powell, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Shainee Shah, Pro Hac Vice, Kirkland & Ellis LLP, Houston, TX, for Defendant AbbVie Inc.

Joshua Z. Rabinovitz, Anne Katherine Reser, Brenton A. Rogers, Brittany Paige Cramer, Kirkland & Ellis LLP, Chicago, IL, Kevin Ross Powell, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Shainee Shah, Pro Hac Vice, Kirkland & Ellis LLP, Houston, TX, for Defendants Richard A. Gonzalez, William J. Chase.

**ORDER**

CHARLES RONALD NORGLE, Judge

**\*1** Plaintiffs' motion for class certification [122] is granted. Lead Plaintiff Metzler Asset Management GmbH is appointed as a class representative and Motley Rice, LLC is appointed as class counsel pursuant to Federal Rule of Civil Procedure 23(g). The Court declines to appoint Plaintiff Ironworkers National Pension Plan as a class representative at this time.

**MEMORANDUM OPINION**

Plaintiff, Mayuko Holwill, filed this putative class action against Defendants, Abbvie Inc., Richard A. Gonzalez, and William J. Chase, for violations of §§ 10(b) (against all Defendants) and 20(a) (against Gonzalez and Chase) of the Securities Exchange Act of 1934. Dkt. 74. The Court previously appointed Metzler Asset Management GmbH ("Metzler") as Lead Plaintiff and denied Defendants' motion to dismiss. Dkt. 64, 104. Metzler moves this Court to (1) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (2) appoint Metzler and Plaintiff Ironworkers National Pension Plan ("Iron Workers") as co-class representatives; and (3) appoint Motley Rice LLC ("Motley Rice") as class counsel pursuant to Federal Rule of Civil Procedure 23(g). For the reasons set out below, the Court certifies this matter as a class action, appoints Metzler as a class representative, appoints Motley Rice as class counsel, but declines to appoint Iron Workers as a class representative at this time.

**I. BACKGROUND**

Plaintiffs allege that Defendants made false and misleading claims regarding the basis for the success of AbbVie's sales of its flagship drug, Humira, which has accounted for more than half of AbbVie's yearly net revenues. Dkt. 74 at ¶¶ 3, 50-51. Between 2013 and 2018, Defendants made numerous statements attributing the growth and success of AbbVie's sales of Humira to its sales and marketing practices, representing that those practices and programs complied with laws regulating the sales and marketing of prescription medication. Dkt. 74 at ¶¶ 123-263. Plaintiffs allege that Defendants' statements were false or misleading because AbbVie's sales and marketing practices included an unlawful kickback scheme to bribe and influence physicians to prescribe Humira, which Defendants failed to disclose. Dkt. 74 at ¶¶ 1, 14. AbbVie's alleged unlawful sales and marketing scheme involved providing physicians with classic kickbacks like cash, meals, drinks, gifts, trips, and patient referrals to induce and reward Humira prescriptions. Dkt. 74 at ¶¶ 20-21, 109, 111. AbbVie also allegedly provided more sophisticated forms of kickbacks to physicians, including through AbbVie's Nurse Ambassador program, that encompassed assistance with marketing physicians' practices, proprietary medical practice management software, administrative support on insurance and fulfillment issues, administration of Humira

2021 WL 7366274

injections to patients, and training on self-administration. Dkt. 74 at ¶¶ 14-15, 20-21, 84-86, 89, 109-111.

The details of AbbVie's alleged kickback scheme became public starting in early 2018. Specifically, a federal *qui tam* action under the False Claims Act against AbbVie that focused on the Nurse Ambassador program was unsealed in March 2018 after the government declined to intervene. Dkt. 74 at ¶¶ 101, 103. A similar *qui tam* action in California state court initiated by the same relator became public on September 18, 2018 when the California Department of Insurance intervened and filed a publicly available superseding complaint including allegations concerning the same unlawful kickback schemes. Dkt. 74 at ¶¶ 105-07, 109-11, 314. AbbVie's stock price declined about 5% by the following day, September 19, 2018, Dkt. 74 at ¶¶ 313-15, including a 3% decline on September 18, 2018. Dkt. 74 at ¶ 317.

## II. LEGAL STANDARD

**\*2**  Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23(a) includes four prerequisites to class actions: (1) the class must be so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If those prerequisites are satisfied, a class action may be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23 requirements are more than a mere pleading standard: Plaintiff must prove them by a preponderance of the evidence. Messner v. Northshore University HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012). However, in conducting the Rule 23 analysis, courts "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." Id.

## III. ANALYSIS

Plaintiffs bring securities fraud claims against a large, public company for alleged misrepresentations affecting the company's stock price. Such a case generally meets the standards for certifying a class action. Dancel v. Groupon, Inc., 949 F.3d 999, 1005 (7th Cir. 2019); Schleicher v. Wendt, 618 F.3d 679, 681 (7th Cir. 2010) ("When a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action."); Tatz v. Nanophase Techs. Corp., 2003 WL 21372471, at \*3 (N.D. Ill. June 13, 2003).

Defendants lodge a single objection to class certification, arguing that Plaintiffs cannot show reliance of the class members on the alleged misstatements. Reliance on the misrepresentations by class members must be demonstrated by a preponderance of the evidence to merit certification. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 461 (2013). In cases like this one, reliance is often established through the " 'fraud-on-the-market' theory, which permits certain Rule 10b–5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." Id. Defendants argue that "the fraud-on-the-market presumption provides that a stock's price can incorporate information only once, when that information is first disclosed. After the first disclosure, subsequent disclosures of the same information will not cause the stock price to react." Dkt. 148 at 8. As a result, Defendants say, because the "allegation that the Ambassador Program was an unlawful kickback was made public by at least March 2018 through the unsealing of the complaint in U.S. ex rel. Suarez v. AbbVie," the repeated disclosure of that allegation later in September 2018, when the California Department of Insurance announced its lawsuit, cannot be the basis for the depreciation in stock value that occurred in September. Id. at 9.

Although the term is nowhere mentioned in Defendants' brief, this argument is known as the "truth on the market defense," which is where "the market was already aware of the truth regarding defendants' misrepresentations at the time the class members purchased their shares, meaning the market price had already adjusted to the revelation of defendants' misstatements, and class members could not have relied on those misstatements in choosing to buy stock." Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 485 (2d Cir. 2018). Courts routinely hold, however, that the truth-on-the-market defense is not appropriately resolved at the class certification stage. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 481 (2013); In re Allstate Corp. Sec. Litig., 966 F.3d 595, 602 (7th Cir. 2020); Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co., 2018

WL 1535156, at *4 (N.D. Ill. Mar. 29, 2018) ("Numerous courts have agreed that a 'truth on the market' defense cannot be used to rebut the presumption of reliance at the class-certification stage."); In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017); In re Bridgepoint Educ., Inc. Sec. Litig., 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015). The Supreme Court and Seventh Circuit's holdings on this issue are binding, despite Defendants counsel's failure to disclose those truth-on-the-market holdings to this Court when citing these opinions for other, more favorable, propositions of law. See ABA Model Rules of Professional Conduct Rule 3.3(a); N.D. Ill. Local R. 83.50.

 **\*3** When exactly the allegations credibly entered the market has yet to be determined. But, per the Supreme Court's guidance, that determination is reserved for summary judgment or trial. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 481 (2013). Having rejected Defendant's sole objection to certification, and having reviewed the evidence submitted with Plaintiffs' motion, the Court grants Plaintiffs' motion to certify the class.

Further, the Court appoints Metzler as class representative and appoints Motley Rice as class counsel. The Defendant does not object to either of these appointments. Metzler has already been appointed Lead Plaintiff in this matter, and Motley Rice is a well-respected firm capable of providing competent counsel in complex securities fraud class actions. Dkt. 64.

Despite Plaintiffs' request, however, the Court does not appoint Iron Workers as a class representative at this time.

The burden rests on Plaintiffs to show that Iron Workers is an adequate class representative, although "the burden of demonstrating that the class representative is adequate is not heavy." Lau v. Arrow Fin. Servs., LLC, 2007 WL 1502118, at *6 (N.D. Ill. May 22, 2007), report and recommendation adopted, 245 F.R.D. 620 (N.D. Ill. 2007). "Adequacy requires the named plaintiff to be conscientious and to understand the basic facts underlying his claims." Id.

In their opening brief, Plaintiffs made no showing concerning Iron Worker's adequacy as a class representative. Rather, Plaintiffs waited until their reply to proffer any arguments or evidence on the issue. Horvath v. Apria Healthcare, LLC, 2019 WL 5725378, at *2 (N.D. Ill. Nov. 5, 2019) ("[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply.") (citing Murphy v. Vill. of Hoffman Ests., 1999 WL 160305, at *2 (N.D. Ill. Mar. 17, 1999), aff'd, 234 F.3d 1273 (7th Cir. 2000)). The Court concludes that this issue is underdeveloped and will not grant the requested appointment at this time. The Court grants leave for Plaintiffs to file a renewed motion for the appointment of a co-class representative within 30 days, setting forth in detail the basis for the proposed appointment, and giving Defendants a fair opportunity to respond to Plaintiffs' arguments.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 7366274

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5789237
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

In re CHINA INTELLIGENT
LIGHTING AND ELECTRONICS,
INC. SECURITIES LITIGATION.

No. CV 11–2768 PSG (SSx).
|
Oct. 25, 2013.

**Attorneys and Law Firms**

Jonathan Richard Horne, The Rosen Law Firm PA, New York, NY, Laurence M. Rosen, Rosen Law Firm, Los Angeles, CA, Solomon B. Cera, Thomas C. Bright, Gold Bennett Cera and Sidener, San Francisco, CA, for Plaintiffs.

**Proceedings: (In Chambers) Order GRANTING Class Certification**

PHILIP S. GUTIERREZ, District Judge.

 **\*1** Wendy K. Hernandez, Deputy Clerk.

Before the Court is Plaintiffs' unopposed motion for class certification, appointment of class representatives, and appointment of class counsel. *See* Dkt. # 226. The Court finds this matter appropriate for decision without oral argument. *See*Fed.R.Civ.P. 78(b); L.R. 7–15. Having considered the arguments in Plaintiffs' submissions, the Court GRANTS Plaintiffs' motion.

I. *Background*
China Intelligent Lighting and Electronics, Inc. ("CIL") manufactures LED lighting products in China, through a Chinese operating subsidiary. *See FAC* ¶ 16. From June through December 2010, CIL conducted an Initial Public Offering, an Initial Resale, and a Secondary Resale of stock in the United States. *See id.* ¶¶ 60, 62. In connection with those offerings, CIL filed several registration statements and prospectuses containing information about CIL's financial condition with the Securities and Exchange Commission ("SEC"). Specifically, CIL filed two Registration Statements

that were declared effective on June 17, 2010 and December 15, 2010, respectively, and filed three Prospectuses on June 21, 2010, July 27, 2010, and December 15, 2010, respectively (collectively, the "Offering Documents"). *See id.* ¶¶ 1–2. The Offering Documents included audited financial statements. *See id.* ¶¶ 61–62.

CIL's Chinese operating subsidiary also filed audited financial statements with the Chinese government's State Administration of Industry and Commerce (the "SAIC") covering the same years as the statements filed with the SEC. *See id.* ¶¶ 43–44, 74–77. The Chinese operating subsidiary was CIL's only source of revenue. *See id.* ¶¶ 17, 69. However, the statements filed with the SAIC show that the subsidiary—and thus CIL—had revenues and profits that were significantly lower than stated in the Offering Documents. *See id.* ¶¶ 70–72. Plaintiffs allege that the financial statements submitted to the SAIC reflected CIL's true financial condition, and that the information in the Offering Documents was materially false. *See id.* ¶¶ 66, 73.

Plaintiffs Perritt Emerging Opportunities Fund, Acerco SA, and Antoine de Sejournet (collectively, "Plaintiffs") brought this action against: CIL; various officers and directors of CIL who signed the Offering Documents ("Individual CIL Defendants"), WestPark Capital, Inc. ("WestPark") and Rodman & Renshaw, LLC ("Rodman & Renshaw"), who served as underwriters for CIL's stock offerings; WestPark Chief Executive Officer Richard Rappaport ("Rappaport"); Rodman & Renshaw President and Chief Executive Officer Edward Rubin ("Rubin"); Rodman & Renshaw Head of Investment Banking John Borer ("Borer"); and MaloneBailey LLP ("MaloneBailey") and Kempisty & Company, P.C. ("Kempisty"), CIL's auditors for the financial statements in the Offering Documents. *See id.* ¶¶ 16–44.

On July 7, 2011, the Court appointed the Plaintiffs as Lead Plaintiffs pursuant to 15 U.S.C. § 77z1 (a)(3)(B)(i) and 15 U.S.C. § 78u–4a(3)(B)(i), and appointed Gold Bennett Cera & Sidener LLP ("Gold Bennett Cera & Sidener") and the Rosen Law Firm, P.A. ("Rosen Law Firm") as Co–Lead Counsel pursuant to 15 U.S.C. § 77z1 (a)(3)(B)(v) and 15 U.S.C. § 78u4(a)(3)(B)(v). Dkt. # 14.

 **\*2** Plaintiffs filed a First Consolidated Amended Complaint ("FAC") on March 16, 2012. Dkt. # 115. On September 5, 2012, the Court dismissed Plaintiffs' claims against Rubin and Borer, but otherwise allowed Plaintiffs to proceed with

their claims. Dkt. # 161.[1] The Court refers to the remaining defendants collectively as "Defendants."

Plaintiffs currently assert causes of action for: (1) violations of § 11 of the Securities Act of 1933 (the "Securities Act") (against all Defendants other than Rappaport); (2) violations of § 12(a)(2) of the Securities Act (against WestPark and Rodman & Renshaw); and (3) violations of § 15 of the Securities Act (against Rappaport, Li Xuemei, and Kui Jiang, collectively, the "Section 15 Defendants").[2] *See FAC* ¶¶ 133–167.

Plaintiffs now move to certify a class (the "Class"), pursuant to Federal Rule of Civil Procedure 23(b)(3), comprised of:

> All persons and entities who purchased or otherwise acquired the common stock of China Intelligent Lighting and Electronics, Inc. ("CIL" or the "Company") pursuant or traceable to two (2) separate Registration Statements and three (3) accompanying Prospectuses filed with the U.S. Securities and Exchange Commission ("SEC") by CIL[.]

*Mem.* 1:6–1:12. The Registration Statements and Prospectuses referred to in the definition of the Class are the Offering Documents. *Id.* 1:13–2:3. Plaintiffs assert that all purchases or acquisitions of CIL common stock from June 18, 2010 (the day after CIL's first Registration Statement became effective) through March 24, 2011 (the date when MaloneBailey terminated its engagement with CIL, citing accounting fraud) (the "Class Period") can be traced to the Offering Documents. FAC ¶ 3. The only shares CIL registered for resale before the end of the Class Period were registered through the Offering Documents. *See id.* ¶ 63.

The Class excludes: (1) Defendants; (2) the parents, successors, subsidiaries, affiliates, and assigns of CIL; (3) members of the immediate family of each of the individual Defendants, and their legal representatives, heirs, successors, or assigns; (4) any person who was an officer or director of CIL, or any subsidiary thereof at the time of CIL's stock offering; (5) any underwriter, or affiliate of an underwriter, who offered, sold, or purchased CIL common stock during the offering; and (6) any firm, trust, corporation, or other entity in which any of the Defendants has a controlling interest or had a controlling interest at the time of CIL's stock offering. *Mem.* 1 n. 1.

Plaintiffs also move to appoint themselves as Class Representatives, and to appoint Gold Bennett Cera & Sidener and the Rosen Law Firm as Class Counsel. *Mem.* 2:4–2:7.

## II. *Legal Standard*

### A. *Class Certification*

A plaintiff seeking class certification must affirmatively demonstrate that it meets the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). To satisfy Rule 23(a), the plaintiff must show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a). To certify a class under Rule 23(b) (3), as Plaintiffs seek to do here, the plaintiff must also show that: (5) "questions of law or fact common to class members predominate over any questions affecting only individual class members," and (6) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These requirements are often referred to, respectively, as numerosity, commonality, typicality, adequacy, predominance, and superiority.

**\*3** The Court must conduct a "rigorous analysis" to confirm that the Rule 23 standard is met. *See Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,* 660 F.3d 1170, 1175 (9th Cir.2011); *Zinser v. Accufix Rsch. Inst., Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001). As the Supreme Court has explained: "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

### B. *Appointment of Class Counsel*

The adequacy of class counsel is governed by Rule 23(g). Pursuant to that Rule, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A).

The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1) (B). Finally, "[c]lass counsel must fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(4).

III. *Discussion*

  A. *Class Certification*

*i. Numerosity*
The numerosity requirement is met if the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no fixed threshold for numerosity-rather, it is based on a consideration of the specific facts of each case. *See Gen. Tel. Co. of the Nw., Inc. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *Rannis v. Recchia,* 380 F. App'x 646 (9th Cir.2010). However, courts have generally presumed numerosity when there are at least forty members in the proposed class. *See Charlebois v. Angels Baseball, LP,* No. SACV 10–0853 DOC (ANx), 2011 WL 2610122, at *4 (C.D. Cal. June 30, 2011); *Alba v. Papa John's USA, Inc.,* No. CV 05–7487 GAF (CTx), 2007 WL 953849, at *5–6 (C.D.Cal. Feb.7, 2007); *see also Jordan v. Cnty. of Los Angeles,* 669 F.2d 1311, 1319 (9th Cir.1982)*vacated on other grounds,*459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982) (stating that the court "would be inclined to find the numerosity requirement in the present case satisfied solely on the basis of the number of ascertained class members, i.e. 39, 64, and 71"). Plaintiffs are also not required to establish the precise number of class members, as long as common sense and reasonable inferences from the available facts show that the numerosity requirement is met. *See Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 587–88 (C.D.Cal.2011); *Bruno v. Quten Rsch. Inst., LLC,* 280 F.R.D. 524, 533 (C.D.Cal.2011); *O'Donovan v. CashCall, Inc.,* 278 F.R.D. 479, 488 (N.D.Cal.2011). The court may also consider factors such as "the geographical diversity of class members, [and] the ability of individual claimants to institute separate suits." *Jordan,* 669 F.2d at 1319.

 **\*4**  In this case, the Court can reasonably infer that the numerosity standard is met, given that the Class includes all persons or entities who purchased or acquired the approximately the 6.6 million shares of CIL stock traceable to the Offering Documents. *See FAC* ¶ 62. Courts have regularly found numerosity based on similar allegations. *See, e.g., In re Unioil Sec. Litig.,* 107 F.R.D. 615, 618 (C.D.Cal.1985) (finding numerosity based on the purchase of "several million

shares"); *Katz v. Image Innovations Holdings, Inc.,* No. 06 Civ. 3707(JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (sale of approximately 1.2 million shares); *Wade v. Indus. Funding Corp.,* No. C 92–0343 TEH, 1993 WL 594019, at *3 (N.D.Cal. Dec.14, 1993) (sale of approximately 1.8 million shares); *In re PE Corp. Sec. Litig.,* 228 F.R.D. 102, 107 (D.Conn.2005) (sale of "almost 4 million shares"); *In re Activision Sec. Litig.,* 621 F.Supp. 415, 428 (N.D.Cal.1985) (sale of four million shares); *Brosious v. Children's Place Retail Stores,* 189 F.R.D. 138, 145 (D.N.J.1999) (sale of at least four million shares); *Gilbert v. First Alert, Inc.,* 904 F.Supp. 714, 719 (N.D.Ill.1995) ("more than four million" outstanding shares); *In re AnnTaylor Stores Sec. Litig.,* No. 91 Civ. 7145(CBM), 1992 WL 249975, at *1 (S.D.N.Y. Sept.22, 1992) (sale of approximately seven million shares); s*ee also Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039–40 (5th Cir.1981) (noting that an allegation of six million shares in trading volume would ordinarily satisfy numerosity) (collecting cases). Further, because this is a securities action involving a publicly-traded stock, it is highly likely that the members of the Class are geographically diverse, making joinder impractical.

For the reasons above, the Court finds that the numerosity requirement is met.

  *ii. Commonality*
To satisfy Rule 23(a)(2), Plaintiffs must establish that there are questions of law or fact common to the Class as a whole. Fed.R.Civ.P. 23(a)(2). To meet this burden, Plaintiffs must show that the Class members' claims "depend upon a common contention" that is "capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of its claims in one stroke." *Dukes,* 131 S.Ct. at 2551;*see Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588–89 (9th Cir.2012) (quoting *Dukes,* 131 S.Ct. at 2551). However, not every question of law or fact must be common to the Class —all that is required is "a single *significant* question law or fact." *See Mazza,* 666 F.3d at 589.

Here, the members of the Class were all allegedly injured by the same misstatements and omissions in the Offering Documents. As a result, there are numerous common questions of law or fact that can be resolved on a classwide basis, including: (1) whether the Offering Documents contain misstatements or omissions regarding CIL's financial condition; (2) whether those misstatements or omissions would be material to a reasonable investor; and (3) whether

In re China Intelligent Lighting and Electronics, Inc...., Not Reported in...
2013 WL 5789237

the Section 15 Defendants were "control persons" for the purposes of the Securities Act. *See Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1161 (9th Cir.2009) (describing the elements of a § 11 violation); *Miller v. Thane Int'l, Inc.,* 519 F.3d 879, 885 (9th Cir.2007) (describing the elements of a § 12(a)(2) violation); 15 U.S.C. § 77*o* (establishing "control person" liability for violations of § 11 and § 12(a)(2)).

**\*5** Accordingly, the Court finds that the commonality requirement is met.

#### iii. Typicality

Plaintiffs seeking to represent a class must establish that their claims are typical of the class. Fed.R.Civ.P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998) (citation omitted). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992) (citation omitted).

In this case, to the extent the Offering Documents contained material misstatements or omissions, all members of the Class, including Plaintiffs, were injured by the same course of conduct and suffered essentially the same injury. It does not appear that Defendants engaged in any conduct unique to Plaintiffs, or that Plaintiffs' claims are subject to any unique defenses.

Accordingly, the Court finds that the typicality requirement is met.

#### iv. Adequacy

Plaintiffs seeking to represent a class must also show that they will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 462 (9th Cir.2000) (citation omitted).

Plaintiffs assert that there are no conflicts of interest between them and the absent members of the Class. *Mem.* 15:3–15:12. The Court concurs. As the Supreme Court has noted, the commonality, typicality, and adequacy requirements of Rule 23(a) "tend to merge." *Dukes,* 131 S.Ct. at 2551 n. 5. Here, because the claims of the Class members are based almost entirely on common issues of law and fact, and because the Plaintiffs' claims are typical of the Class, Plaintiffs' interests appear to be closely bound to those of the absent Class members.

Plaintiffs also assert that they will continue to vigorously prosecute this case on behalf of the Class. *Mem.* 15:12–15:17. Plaintiffs have diligently prosecuted this case since they were appointed as Lead Plaintiffs in July 2011, and have successfully advanced the case through two rounds of dispositive motions.

As a result, the Court finds that Plaintiffs will fairly and adequately protect the interests of the Class as Class Representatives.

#### v. Predominance

Plaintiffs seeking class certification under Rule 23(b)(3) must show that common issues of law or fact predominate over questions affecting only individual class members. Fed.R.Civ.P. 23(b)(3). The predominance test gauges "whether proposed classes are sufficiently cohesive to warrant adjudication by representation .... [and] focuses on the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis.' " *Hanlon,* 150 F.3d at 1022 (citation omitted). This assessment "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011).

**\*6** Here, the predominance requirement is easily met, as it appears that virtually all of the material issues of law and fact will be common to the Class. To establish their claims, Plaintiff will not need to show scienter, their reliance, or loss causation. *See Rubke,* 551 F.3d at 1161. Rather, the principal issues Plaintiffs will have to prove, as discussed above, will be: (1) whether the Offering Documents contain misstatements or omissions regarding CIL's financial condition; (2) whether those misstatements or omissions

would be material to a reasonable investor; and (3) whether the Section 15 Defendants were "control persons" for the purposes of the Securities Act. These issues are all common to the Class.

The only notable issue that is not common to the Class is damages. Each member of the Class will suffer different damages based on their shareholdings. However, "[t]he amount of damages is *invariably* an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975) (emphasis). Further, the calculation of damages will be governed by statutory formulas. *See*15 U.S.C. §§ 77k(e), 77*l*(a).

Accordingly, the Court finds that common issues of law or fact predominate over questions affecting only individual class members.

#### vi. Superiority

Finally, Plaintiffs must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). As part of this analysis, the Court must consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

No individual member of the Class has expressed any interest here in separately controlling the prosecution of their case, and Plaintiffs have represented that no member of the Class has brought an individual suit based on the Offering Documents. *See Mem.* 20:13–20:16. Further, the relatively low $3 offering price of CIL's stock suggests that most Class members will not have a financial incentive to litigate their claims separately, because their damages will be limited by the price at which the CIL shares were offered to the public multiplied by their shareholdings. *See*15 U.S.C. §§ 77k(e), 77*l*(a).

In the Court's view, it would be desirable to concentrate the litigation of claims related to the Offering Documents in one forum. It would be inefficient to have individual members of the Class—who are likely geographically dispersed, given that CIL was a publicly-traded company— bring separate claims in scattered courts across the country.

Such fragmentation would be inconvenient for witnesses and Defendants, would unnecessarily burden the courts, and would needlessly create a risk of inconsistent judgments.

**\*7** With regards to manageability, in light of the overwhelming predominance of common issues in this case and the statutory formulas for the calculation of damages, the Court sees no reason why this case cannot be effectively managed as a class action.

For the reasons above, the Court finds that a class action is superior to other available methods for the fair and efficient adjudication of this case.

In summary, Plaintiffs have shown that class certification is appropriate under Rule 23(b)(3).

#### B. *Appointment of Class Counsel*

Gold Bennett Cera & Sidener and the Rosen Law Firm have shown that they are qualified to serve as Class Counsel. The firms investigated the claims at issue and have successfully litigated them to date. Both firms also have substantial experience in shareholder class actions. *See Bright Decl.* Exs. B–E; Dkt. # 6, Ex. C. Further, in this litigation, the firms have demonstrated their knowledge of the applicable law, and have shown that they are willing to commit the resources necessary to prosecute this case.

#### IV. *Conclusion*

For the reasons above, the Court GRANTS Plaintiffs' motion for class certification with respect to their claims for: (1) violations of § 11 of the Securities Act (against all Defendants other than Rappaport and Rodman & Renshaw[3]); (2) violations of § 12(a)(2) of the Securities Act (against WestPark); and (3) violations of § 15 of the Securities Act (against Rappaport, Li Xuemei, and Kui Jiang). Subject to the exceptions described above, the Class is defined as:

> All persons and entities who purchased or otherwise acquired the common stock of China Intelligent Lighting and Electronics, Inc. ("CIL" or the "Company") pursuant or traceable to two (2) separate Registration Statements and three (3) accompanying Prospectuses filed with the U.S. Securities and Exchange Commission ("SEC") by CIL.
> The Registration Statements and Prospectuses referred to in the definition of the Class are the Offering Documents: the Registration Statements that were declared effective on

June 17, 2010 and December 15, 2010, respectively, and the Prospectuses that were filed on June 21, 2010, July 27, 2010, and December 15, 2010.

The Court also GRANTS Plaintiffs' motion to be appointed as Class Representatives, and GRANTS Plaintiffs' motion to appoint Gold Bennett Cera & Sidener and the Rosen Law Firm as Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5789237

Footnotes

1       Plaintiffs incorrectly state that the Court upheld Plaintiffs' claims against Rubin and Borer. *Mem.* 2:21–3:6 & n. 4. The Court clearly held that: "the motion to dismiss Rubin and Borer from the Third Cause of Action is GRANTED. Rubin and Borer are DISMISSED from this action, without prejudice." *Sept. 5, 2012 Order* at 8.

2       Plaintiffs' § 15 claim is pleaded against "the Individual Defendants," but the only individuals alleged to be control persons are Rappaport, Xumei, Jiang, Rubin, and Borer. *FAC* ¶¶ 158–167. As noted above, the Court dismissed the § 15 claims against Rubin and Borer. *Sept. 5, 2012 Order* at 8.

3       The Court recognizes that Plaintiffs have raised § 11 and § 12(a)(2) claims against Rodman & Renshaw. However, all proceedings against Rodman & Renshaw have been stayed due to the company's bankruptcy. *See* Dkt. # 191.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2013)**

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 15 of 101 PageID #:3680

2013 WL 12284524
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

IN RE GROUPON, INC.
SECURITIES LITIGATION,

This Document Relates to: all Cases.

Master File No. 12 CV 2450
|
Signed 09/18/2013

**ORDER**

CHARLES RONALD NORGLE, Judge

**\*1** The Groupon Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint [131] is denied. The Underwriter Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [134] is denied.

**STATEMENT**

This is a securities fraud action, which arises from events surrounding Groupon, Inc.'s ("Groupon") initial public offering ("IPO") on November 4, 2011. Before the Court are the Groupon Defendants and the Underwriter Defendants' (collectively, "Defendants") motions to dismiss Plaintiff's putative Consolidated Amended Class Action Complaint. For the following reasons, the motions are denied.

Under Federal Rule of Civil Procedure 8, a complaint must contain a "short plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and "simple, concise, and direct" allegations, id. at 8(d)(1). Rule 8 does not require " 'detailed factual allegations,' " but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). This short and plain statement must provide the defendants with fair notice of the claim and the grounds for relief. Twombly, 550 U.S. at 555 (citation omitted). The allegations must provide "enough facts to state a claim to relief that is plausible on its face." Id. at 570. In other words, a plaintiff's complaint "must actually

*suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (internal quotation marks and citation omitted). "[T]o survive a motion to dismiss in a complex case, a complaint must sufficiently plead allegations to allow a judgment that the claim has the possible merit that justifies the time and expense required in litigating the case." AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011) (citing Stark Trading v. Falconbridge Ltd., 552 F.3d 568, 574 (7th Cir. 2009)). Additionally, under Rule 9(b), Plaintiffs have "to state with particularity the circumstances constituting fraud. This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." Id. at 615 (quoting Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441-442 (7th Cir. 2011)).

First, both Defendants argue that Plaintiff's claims pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, should be dismissed because Plaintiff fails to allege any material misrepresentations in the Registration Statement and Offering Documents. In addition, the Underwriter Defendants argue that Plaintiff's claims pursuant to § 12 of the Securities Act, 15 U.S.C. § 77l, should be dismissed for failure to allege a material misrepresentation in the Prospectus. The Underwriter Defendants also argue that Plaintiff lacks standing to assert a § 12 claim because Lead Plaintiff Michael Carter Cohn ("Lead Plaintiff") did not purchase shares directly from the IPO. To establish a claim under § 11 and § 12 of the Securities Act, "plaintiffs need only show that they purchased the security and that there was a material misrepresentation or omission. Scienter is not required. Liability of the issuer of a materially misleading registration statement is 'virtually absolute,' even for innocent misstatements." In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig., 604 F. Supp. 2d 1188, 1192 (N.D. Ill. 2009) (quoting In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 314-315 (8th Cir. 1997)). Further, the heightened pleading standard of Rule 9 does not apply to § 11 and § 12 Securities Act claims. Id. at 1193.

**\*2** Plaintiff alleges that the 2011 financial statements contained in the Registration Statement and Prospectus contained materially inflated revenue in violation of Generally Accepted Accounting Principles ("GAAP") and that the Registration Statement and Prospectus contained materially false and/or misleading statements with respect

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 16 of 101 PageID #:3681

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2013)

to Groupon's revenue recognition and refund practices. The Court finds that these allegations present plausible violations of § 11 and § 12 of the Securities Act. At this early stage in the litigation and without the benefit of extensive discovery, Plaintiff need not plead the specific amounts by which he alleges Defendants inflated revenue. As to Plaintiff's standing pursuant to § 12, Lead Plaintiff admits that he did not purchase shares directly from the IPO, and therefore, he would not personally be entitled to relief under § 12(a)(2). However, Plaintiff argues that Lead Plaintiff is merely the current representative for a putative class—a class which contains plaintiffs who purchased shares directly from the IPO— and therefore the issue of standing can properly be resolved at the class certification stage, when another plaintiff with standing will be proffered. The Court agrees. SeeFriedman v. Rayovac Corp., 295 F. Supp. 2d 957, 976-977 (W.D. Wis. 2003) (reserving the question of § 12 standing for the class certification stage pursuant to Rule 23). Accordingly, the issue of Plaintiff's standing to bring a § 12 claim will be resolved, if necessary, at the class certification stage of the litigation.

Next, the Groupon Defendants argue that Plaintiff's claims pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), should be dismissed because the allegations in the complaint fail to give rise to a strong inference of scienter under the Private Securities Litigation Reform Act ("PSLRA"). Under § 10(b) it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "The elements of a section 10(b) Securities Exchange Act claim are: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." AnchorBank, FSB, 649 F.3d at 617 (citations omitted). Section 10(b) claims are also subject to the pleading standards of the PSLRA, which requires that "securities fraud complaints must be able to: (1) specify each misleading statement; (2) set forth the facts on which a belief that a statement is misleading is formed; (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter; and (4) prove loss causation."Id. (citations omitted). Scienter requires "proof that [defendants] either knew the statement was false or [were] reckless in disregarding a substantial risk that it was false." Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 704 (7th Cir. 2008) (citation omitted). "The inference

that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (internal quotation marks and citations omitted). "Yet the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Id.

Plaintiff alleges that the Groupon Defendants violated § 10(b) by, *inter alia*, reporting false financial results in their February 8, 2012 Press Release. In the February 8, 2012 Press Release, Groupon released its fourth quarter 2011 financial results and therefore, the total financial results for 2011. However, on March 30, 2012, Groupon issued a statement revising its fourth quarter 2011 results, and thereby its total 2011 results. The Groupon Defendants argue that "plaintiffs allegation that Groupon initially disclosed a reserve estimate for 2011 that it subsequently revised less than two months later suggests merely that Groupon made a mistake, which it promptly corrected, not that Groupon made the mistake intentionally." Mem. of Law in Supp. of the Groupon Defs.' Mot. to Dismis Consol. Am. Class Action Compl. 3. Plaintiff contends that the statements made in the February 8, 2012 Press Release

**\*3** were false and misleading, *inter alia*, because they misrepresented Groupon's revenue and operating results, predicated their aggressive revenue recognition on an unreliable and unreasonable assumption of refund rates in violation of accounting standards they knew and understood to be authoritative, omitted that Groupon had material weakness in its process for assuming future refund rates and calculating financial results, and omitted that Groupon's financial reporting violated GAAP.

Consol. Am. Class Action Compl. ¶ 170. Plaintiff further alleges:

[b]y virtue of their positions at Groupon, information and access to records ... Defendants ... either had actual knowledge of the materially false and misleading nature of the Class Period representations ... or, in the alternative, acted with reckless disregard for the truth in that they ignored information readily available to them indicating the materially false and misleading nature of the statements made.

Id. ¶ 171. Based on the allegations contained in Plaintiff's seventy-four page complaint, the Court finds that Plaintiff sufficiently pleads scienter. Accordingly, the Groupon Defendants' motion to dismiss claims pursuant to § 10 is denied.

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 17 of 101 PageID #:3682

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2013)

Lastly, the Groupon Defendants argue for dismissal of Plaintiff's claims pursuant to § 15 of the Securities Act, 15 U.S.C. § 77*o*, and § 20 of the Exchange Act, 15 U.S.C. § 78t(a). "Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and Section 15 of the 1933 Act, 15 U.S.C. § 77*o*, both set out 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." Donohoe v. Consol. Operating & Prod. Corp., 30 F.3d 907, 911 (7th Cir. 1994). The Seventh Circuit has established a two-prong test for determining control person liability. "First, the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." Id. at 911-912. For purposes of notice pleading under Rule 8, Plaintiffs complaint sufficiently alleges that the individual Groupon Defendants, by virtue of their various positions and duties thereunder, exercised control over the allegedly false or misleading statements or omissions as alleged in Plaintiff's § 11 and § 10(b) claims. Accordingly, the motion to dismiss the claims pursuant to § 15 and § 20 is denied.

For the foregoing reasons, the Groupon Defendants and the Underwriter Defendants' motions to dismiss are denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12284524

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5245387

2014 WL 5245387
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

IN RE GROUPON, INC.
SECURITIES LITIGATION,

This Document Relates To: All Cases.

Master File No. 12 CV 2450
|
Signed September 23, 2014

### ORDER

CHARLES RONALD NORGLE, Judge, United States District Court

**\*1** Lead Plaintiff Michael Carter Cohn's Motion for Class Certification [159] [187] pursuant to Fed.R.Civ.P. 23 is granted.

### STATEMENT

This is a putative securities fraud class action arising from events surrounding Groupon, Inc.'s ("Groupon") initial public offering ("IPO") on November 4, 2011. Lead Plaintiff Michael Carter Cohn ("Lead Plaintiff), on behalf of himself and others similarly situated, sues Groupon, Jason Child, Joseph M. Del Preto, Kevin Efrusy, Eric P. Lefkofsky, Theodore J. Leonsis, Andrew D. Mason, Howard Schultz, Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Credit Suisse Securities (USA) LLC (collectively, "Defendants"), alleging violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934. Before the Court is Lead Plaintiff's motion for class certification. For the following reasons, the motion is granted.

With regard to Defendants' alleged violations of the Securities Act of 1933, Counts I and III, Lead Plaintiff moves to certify:

All persons or entities who purchased or acquired shares of Groupon, Inc. ("Groupon") Class A common stock in or traceable to Groupon's initial public offering ("IPO") between November 4, 2011 and March 30, 2012, both dates inclusive ("the Class Period"), and were damaged thereby. Excluded from the Class are: (1) Defendants and their immediate families; (2) any entity in which Defendants have or had a controlling interest; (3) Officers and Directors of Groupon, Inc.; and 4) the legal representatives, heirs, successors, or assigns of any excluded party.

Mem. of Law in Supp. of Lead Pls.' Am. Mot. for Class Certification 1. In Counts IV and V, Lead Plaintiff alleges that Defendants violated the Securities and Exchange Act of 1934, and now moves to certify a sub-class including:

All such persons or entities who purchased or acquired Groupon Class A common stock between February 9, 2012 and March 30, 2012, both dates inclusive, and were damaged thereby.

*Id.*

Class certification is more than a "mere pleading standard." *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011)). Lead Plaintiff "must not only 'be prepared to prove that there are *in* fact sufficiently numerous parties, common questions of law and fact,' typicality of claims or defenses, and adequacy of representation. [Lead Plaintiff] must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)" *Id.*; *see also* Fed.R.Civ.P. 23(a)-(b). Here, Defendants do not and cannot contest that this class action meets the first three prerequisites of Rule 23(a). Rather, Defendants contest whether Lead Plaintiff can adequately represent the class. As discussed below, the perquisites of Rule 23(a) are satisfied.

There are sufficiently numerous parties because 40.25 million shares of Groupon common stock were sold and outstanding during the class period. Feinstein Decl. ¶ 22; *see also Teachers' Ret. Sys. of Lousiana v. ACLN Ltd.,* Case No. 01 Civ. 11814(LAP), 2004 WL 2997957 at *3 (S.D.N.Y. Dec. 27, 2004) (numerosity satisfied when class involved approximately fourteen million shares). Additionally, 343 record holders existed on March 27, 2012, which likely represent thousands of individual shareholders of Groupon common stock. Groupon Inc., FORM 10–K ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 34 (March 30, 2012), available at http://www.sec.gov/Archives/edgar/data/1490281/000144530512000922/grouponl0–k.htm; *see also Roth v. Aon Corp.,* 238 F.R.D. 603, 605 (N.D.Ill.2006) (280 record holders satisfied the numerosity requirement). Next, there are common questions of law and fact that exist among the class, because at the heart of Lead Plaintiff's claims, and common to the class, are whether Defendants materially misrepresented or omitted financial and compliance information in Groupon's Registration

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 19 of 101 PageID #:3684

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2014)
2014 WL 5245387

Statement, press releases and conference calls. Consolidated Am. Class Action Comp. ¶ 134. Lead Plaintiff has surmounted the "low hurdle" of commonality. *Roth.,* 238 F.R.D. at 606. Also, Lead Plaintiff's claims are the same type as other class members—all purchased Groupon common stock shares during the class period and all were affected by the materially false and misleading statements alleged by Lead Plaintiff. Consolidated Am. Class Action Comp. ¶¶ 1, 20. It is apparent that "named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983).

**\*2** To satisfy the final element of Rule 23(a), Lead Plaintiff must demonstrate his ability to "fairly and adequately protect the interests of the class" and not "have antagonistic or conflicting claims." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Lead Plaintiff has already begun participating in discovery and has retained counsel who is highly experienced in securities class action litigation. Defendants attack Lead Plaintiff's honesty and integrity, however, because he filed for personal bankruptcy in July of 2000. Lead Plaintiff's bankruptcy filing occurred more than a decade ago and it is far removed from the relevancy of this suit. There is simply no evidence that Lead Plaintiff has any disabling conflicts of interests with the class. Accordingly, there is no need to discuss Defendants' doubts about secondary class representative Eric Durdov's adequacy to represent the class. The prerequisites under Rule 23(a) are satisfied.

Next, Lead Plaintiff seeks certification under Rule 23(b)(3). Pursuant to Rule 23(b), Lead Plaintiff must show by a preponderance of evidence: "(1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012) (citing Fed.R.Civ.P. 23(b)(3)). The Court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (citation omitted). However, "[i]n conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner,* 669 F.3d at 811 (citations omitted).

In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones. *See Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988); *see also Schleicher v. Wendt,* 618 F.3d 679, 682 (7th Cir.2010). Under the fraud-on-the-market doctrine, the "price of a well-founded and frequently traded stock reflects the public information available about a company" and "since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information." *Schleicher,* 618 F.3d at 682. Evidence from a plaintiff's expert verifying that the company's stock's price "changed rapidly ... in response to new information" will suffice to certify the class because "certification is largely independent of the merits" of the case. *Id.* at 684–85.

Here, Groupon's stock was traded on the NASDAQ, and so it is undeniably a frequently traded stock in an efficient market. *Lumen v. Anderson,* 280 F.R.D. 451, 459 (W.D.Mo.2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market...."). Lead Plaintiff's expert verified that Groupon's stock price dropped rapidly in response to new information about Groupon's financial reporting controls. Feinstein Decl. ¶¶ 105–11. Lead Plaintiff has met the burden required at this stage of the litigation to show that common issues of law or fact predominate over the sub-class for its Exchange Act claims. Lead Plaintiff's Securities Act claims focus on false or misleading statements that Defendants made solely in Groupon's Registration Statement; likewise, common questions predominate for those claims. The Court rejects Defendants' arguments based on *Comcast,* 133 S.Ct. 1426. *Comcast* was an antitrust class action brought by subscribers against the cable company and is inapposite in a securities fraud class action such as this.

Given the sheer size of this class, certifying the class will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor,* 521 U.S. 591, 615 (1997) (internal quotation and citation omitted). Thus, class certification is superior to individual lawsuits.

**\*3** Finally, the accomplishments of Pomerantz LLP and the counsel associated with this case are noteworthy, which Defendants do not dispute. Therefore, the Court finds class counsel qualified to represent the class under Fed.R.Civ.P. 23(g).

2014 WL 5245387

For the foregoing reasons, Lead Plaintiff's motion for class certification is granted.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 5245387

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3711470

2021 WL 3711470
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE LYFT INC.
SECURITIES LITIGATION

Case No. 19-cv-02690-HSG
|
Signed 08/20/2021

**ORDER GRANTING MOTION FOR CLASS
CERTIFICATION**

Re: Dkt. No. 98

HAYWOOD S. GILLIAM, JR., United States District Judge

**\*1** Pending before the Court is the motion for class
certification filed by Lead Plaintiff Rick Keiner. *See* Dkt. No.
98 ("Mot."); Dkt. No. 117 ("Opp."); Dkt. No. 127 ("Reply").
The Court held a hearing on the motion on March 11, 2021.
*See* Dkt. No. 147. Having carefully considered the parties'
arguments, the Court **GRANTS** the motion.

**I. BACKGROUND**
On April 16, 2021, Plaintiff filed the operative consolidated
complaint against Defendant Lyft Inc. ("Lyft"), Logan Green,
Co-Founder, Chief Executive Officer, and Director on Lyft's
board of directors (the "Board"), John Zimmer, Co-Founder,
President and Vice Chairman of the Board, Brian Roberts,
Chief Financial Officer, Prashant (Sean) Aggarwal, Chairman
of the Board, Board Members Ben Horowitz, Valerie Jarrett,
David Lawee, Hiroshi Mikitani, Ann Miura-Ko, and Mary
Agnes (Maggie) Wilderotter ("Individual Defendants," and
collectively with Lyft, "Defendants").[1] *See* Dkt. No. 74
("CCAC").

Lyft is a rideshare company that "sought to revolutionize
transportation by launching its peer-to-peer marketplace for
on-demand ridesharing." CCAC at ¶ 4. Lyft registered its
issuance of common stock "under the Securities Act of 1933,
as amended, pursuant to Lyft's registration statement on Form
S-1 (File No. 333-229996) declared effective on March 28,
2019." *Id.* at ¶ 3. Lyft offered 32.5 million shares to the

public through an initial public offering ("IPO") at a price of
$72.00 per share, generating total proceeds of $2.34 billion.
*Id.* at ¶ 5. According to Plaintiff, Lyft made representations
in the IPO Registration Statement and Prospectus filed in
connection with the IPO that "were materially misleading,
omitted information necessary in order to make the statements
not misleading, and omitted material facts required to be
stated therein." *Id.* ¶ 6.

On March 4, 2020, the Court appointed Rick Keiner as
Lead Plaintiff. Dkt. No. 64. On May 14, 2020, Defendants
moved to dismiss Plaintiff's consolidated amended class
action complaint. Dkt. No. 78. On September 8, 2020, the
Court granted in part and denied in part Defendants' motion.
Dkt. No. 96. On September 25, 2020, Plaintiff filed the instant
motion seeking to certify the following class:

> All persons and entities who purchased or otherwise
> acquired the common stock of Lyft issued and traceable to
> the IPO Registration Statement. Excluded from the Class
> are defendants and their families, the officers, directors
> and affiliates of defendants, at all relevant times, members
> of their immediate families and their legal representatives,
> heir, successors or assigns, any entity in which defendants
> have or had a controlling interest and any entity that
> underwrote the Lyft IPO including any officer, director or
> affiliate of any Lyft IPO underwriter.

Mot. at 1. Plaintiff also requests that the Court appoint him as
Class Representative and appoint Block & Leviton as Class
Counsel. *Id.*

**II. LEGAL STANDARD**
**\*2** Federal Rule of Civil Procedure 23 governs class actions,
including the issue of class certification. Class certification is
a two-step process. To warrant class certification, a plaintiff
"bears the burden of demonstrating that she has met each of
the four requirements of Rule 23(a) and at least one of the
requirements of Rule 23(b)." *Zinser v. Accufix Research Inst.,
Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on
denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-
Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("A party
seeking class certification must affirmatively demonstrate
[her] compliance with the Rule.").

Rule 23(a) provides that a district court may certify a class
only if: "(1) the class is so numerous that joinder of all
members is impracticable; (2) there are questions of law or
fact common to the class; (3) the claims or defenses of the
representative parties are typical of the claims or defenses

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1

2021 WL 3711470

of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs assert that they meet the requirements of Rule 23(b)(3). *See* Dkt. No. 98. Rule 23(b)(3) applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). To determine whether a putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. 350–51). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194–95; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements."). The issue to be decided on a certification motion is whether the case should be "conducted by and on behalf of the individual named parties only" or as a class. *See Dukes*, 564 U.S. at 348.

## III. DISCUSSION

**\*3** As noted, Plaintiff moves to certify the following class:

> All persons and entities who purchased or otherwise acquired the common stock of Lyft issued and traceable to the IPO Registration Statement. Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heir, successors or assigns, any entity in which defendants have or had a controlling interest and any entity that underwrote the Lyft IPO including any officer, director or affiliate of any Lyft IPO underwriter.

Mot. at 1. Defendants assert that Plaintiff fails to the meet the requirements of Federal Rule of Civil Procedure 23(b) and that the class definition should be modified.[2] *See generally* Opp.

### A. Rule 23(a)

#### i. Numerosity

Rule 23(a) requires that the putative class be "so numerous that joinder of all members is impracticable." *See* Fed R. Civ. P. 23(a)(1). "[C]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014) (citation omitted). Although Plaintiff does not provide a clear estimate of how many putative class members there are, he details that "Lyft sold 32.5 million shares of its common stock pursuant to the IPO Registration Statement." Mot. at 5. Given the number of shares traded during the class period, the Court is satisfied that the putative class members are sufficiently numerous to make joinder impracticable. *See Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226 YGR, 2016 WL 1042502, at \*4 (N.D. Cal. Mar. 16, 2016) (citation omitted) ("The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year.").

#### ii. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A contention is sufficiently common

where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (citation omitted) (emphasis omitted).

Plaintiff argues, and Defendants do not contest, that Plaintiff's claims share various common questions. Mot. at 6. Common questions include whether the IPO Registration Statement contained untrue statements of material fact or omitted to disclose material facts, whether public sources of information could have revealed the purportedly untrue statements or omissions, and whether Defendants violated the Securities Act of 1933. The Court finds these questions are sufficient to satisfy the commonality requirement.

### iii. Typicality

 **\*4** Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, & n.13 (1982). However, typicality—like adequacy—looks at whether Plaintiffs are proper parties to proceed with the suit. *Id.*

Plaintiff contends, and Defendants do not dispute, that his claims are typical of the claims of all members of the proposed class. Mot. at 7. As pled, all putative class members purchased shares traceable to the IPO Registration Statement and have the same legal claims under the Securities Act relating to the same purported misstatements and omissions. Because the asserted claims are reasonably co-extensive with those of absent class members, the Court finds the typicality requirement is met.

### iv. Adequacy of Representation

Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining adequacy, the Court must address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other putative class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the proposed class. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). This inquiry too "tend[s] to merge" with the commonality and typicality criteria. *See Falcon*, 457 U.S. at 158, n.13.

The Court is unaware of any conflicts of interest in this matter, and no evidence in the record suggests that either Plaintiff or proposed class counsel have a conflict with other class members. Defendants do not challenge the adequacy of Plaintiff's legal counsel, nor is the Court aware of any reason why they should. *See* Dkt. No. 64 at 11 (finding "Block & Leviton LLP has extensive experience as counsel in securities class actions"). And the Court finds that proposed class counsel and Plaintiff have vigorously prosecuted this action on behalf of the class to date. Accordingly, the adequacy of representation requirement is satisfied.

### B. Rule 23(b)(3)

Plaintiff seeks certification under Rule 23(b)(3), which requires Plaintiff to show predominance and superiority. Defendants assert that Plaintiff fails to meet either requirement because individual inquiries are required to determine whether investors had actual knowledge of the allegedly omitted facts. As detailed below, the Court finds that Plaintiff has met both requirements.

In re Lyft Inc. Securities Litigation, Slip Copy (2021)

2021 WL 3711470

### i. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted). The Supreme Court has defined an individual question as "one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (citation and internal quotation marks omitted; brackets in original). This "inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (citation and internal quotation marks omitted). The Supreme Court has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

**\*5** Here, the Court is satisfied that common questions predominate. To allege a Section 11 claim, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)). Whether Lyft's Registration statement contained untrue statements or omissions, and whether any such misrepresentations or omissions were material, are common questions that can be proven through evidence common to the class.

Defendants argue that individual issues concerning its affirmative knowledge defense defeat predominance. Opp. at 16–25. Courts may consider whether affirmative defenses defeat predominance only for defenses "actually advanced and for which [the defendant] has presented evidence," rather than those a defendant "might advance or for which it has presented no evidence." *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). And for any defenses advanced, courts should consider whether the "supporting evidence may be sufficiently similar or overlapping to allow [plaintiff] to satisfy the predominance

requirement of Rule 23(b)(3) with respect to those defenses." *Id.*

As relevant here, recovery is available under Section 11 to "any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission)." 15 U.S.C. § 77k(a). Defendants contend that the allegedly omitted information was not "selectively or uniformly disclosed to a discrete group of investors," and that the purportedly omitted information was publicly available, so as to require individual inquiries into investor knowledge. Opp. at 17–18. Defendants attach an expert declaration of Michael Kwak, who assessed the information publicly available prior to Lyft's IPO regarding the existence of sexual assault allegations and the extent of service and repair issues.[3] Dkt. No. 119, Declaration of Michael Kwak ("Kwak Decl.") ¶ 8. Mr. Kwak asserts he identified twenty unique stories concerning sexual assault allegations and seven unique stories related to service and repair issues. *Id.* at ¶ 11.[4] Defendants also submit declarations from various portfolio managers who purchased shares in Lyft's IPO. *See* Dkt. No. 116-7, Ex. 1 (Investor Declarations); Dkt. No. 134-3 Ex. 24 (Supplemental Investor Declarations). Defendants contend that their proffered evidence shows that information regarding the purportedly omitted facts was publicly available, and that some investors knew of those facts.

The Court finds that Defendant's challenges do not defeat predominance. Plaintiff's remaining claims include allegations that

- "Lyft failed to disclose pervasive sexual assault and safety issues in the Registration Statement";

- "Lyft saw an increase in the number of sexual assaults its drivers committed," but the "Registration statement fails to even mention sexual assaults at all";

**\*6** • "the Company faced serious reputational damage and legal liability" from these incidents;

- "thousands of the bikes in Lyft's rideshare program suffered from safety and maintenance issues that jeopardized the growth" of that program, which "was experiencing severe and pervasive safety issues" by the time of the IPO; and

- "as a result of the braking issue," Lyft "pulled its entire fleet of thousands of electric bikes" in certain cities on April 14, 2019.

CCAC ¶¶ 12–13, 110, 131, 133, 170, 175–77. Crucially, Defendants' arguments are not based on the relevant misrepresentations and omissions alleged in the complaint, but instead on more general information relating to the existence of "sexual assault allegations and lawsuits" and bike "repair and maintenance issues." *See* Opp. at 18–19. This does not show that all (or any) putative class members had knowledge of the alleged omissions concerning the magnitude of the sex assault issue or the particular brake issue in Lyft's bike fleet that led to a recall.

With respect to the limited number of articles Defendants proffer concerning bike repair and maintenance issues, those articles do not describe the specific brake problem at issue.[5] *See Katz v. China Century Dragon Media, Inc.*, 287 F.R.D. 575, 587 (C.D. Cal. 2012) (rejecting defendants' argument that individualized issues of knowledge defeated predominance because they "presented no evidence that any class member had any knowledge that the specific, alleged misrepresentations ... were false"). They instead discuss "frustrating keypads," "missing or stolen" bikes, "damaged handlebars" leading Citi Bikes to "remove[ ] a part of [their] fleet from service" in 2018, limited availability of electric bikes due to "immense popularity and low supply," riders noting "seats that won't stay up," bikes that "need 45 minutes to recharge," "trouble checking a bike out and returning it," and two fires caused by experimenting with batteries in Citi Bike's facilities. *See* Kwak Decl., Ex. 4. And the declarations discussing Lyft's bike business reflect only a general awareness of past repair and maintenance issues and the potential need for service in the future. Knowledge that bikes have required and may require maintenance, however, does not meaningfully address Plaintiff's theory.

Similarly, the declarations concerning the sexual assault issue reflect a general awareness that Lyft was subject to some allegations of sexual assault, rather than any knowledge about the alleged magnitude of the problem. And relatedly, with respect to Defendants' cited articles about sexual assault allegations, Plaintiff contends that he has "uncovered evidence" of "at least 103 such incidents, only a fraction of which had been reported in the media at the time of the IPO." Reply at 3; *see also* Dkt. No. 128, Declaration of Whitney E. Street ("Street Decl.") ¶¶ 3–8 (lead counsel has found "information on at least forty-two (42) incidents of sexual assault committed by Lyft drivers prior to Lyft's IPO that are in addition to the fifty-three (53) incidents cited in CAC ¶ 111"). This representation is in tension with Defendants' suggestion that all (or most) pre-IPO sexual assaults were

necessarily publicly reported before the IPO. *See* Opp. at 4 ("[W]hile serious safety incidents such as claims of sexual assault are thankfully quite rare, these claims are and have been publicly reported."); *see also id.* at 19 ("The *only* information that was not yet publicly reported at the time of the IPO ... is information that had *not yet occurred.*") (emphasis in original). If the extent and magnitude of the issue had not been fully reported, it would cast doubt on any declarant's ability to conclusively assert full knowledge of the relevant issues.

**\*7** At bottom, none of the evidence shows that any putative class member knew of the purported omissions. And given that Defendants maintain that no class members received selective disclosures, the Court finds that there are common facts and questions as to the content of publicly available sources, including the news articles cited by Defendants. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 348 (S.D.N.Y. 2015) ("For every individual question of whether each investor had actual knowledge stemming from these reports, there are scores of common facts and questions about the content of each and every media report."). Defendants' assertion that investors had actual knowledge of the alleged misrepresentations and omissions based on these media reports also can be resolved on a class-wide basis. *See id.* ("[W]hether any investor ... gained relevant actual knowledge from media reports precluding their claim presents another common question as to whether the relevant media reports conveyed all of the truth Plaintiffs allege was misstated or omitted."); *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 239 (S.D.N.Y. 2012) (finding that articles and complaints in lawsuits cited by defendants to show "knowledge or notice" were publicly available and would be "subject to generalized proof").[6] Whether or not Plaintiff prevails on the merits, the answers to these questions are common to all class members. *Amgen Inc.*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."). Accordingly, Defendant has not shown that any individualized issues of investor knowledge will predominate over common issues.

### ii. Superiority

The superiority requirement tests whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court considers four non-exclusive factors: (1) the

2021 WL 3711470

interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id.* "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d. 1227, 1234–35 (9th Cir. 1996).

Defendants contend that "required individual inquiries into knowledge" would necessitate "mini-trials" for every investor. Opp. at 25. At this stage, the Court is satisfied that Plaintiff has met the superiority requirement. Defendants maintain that the purported omitted information was publicly available, but as Plaintiff notes, they must show that the publicly available information could have conveyed the truth of the allegedly omitted information. Defendants' affirmative knowledge defense thus depends on common proof concerning the extent of publicly available information and the extent of the actual problem in proportion to publicly available information. The Court finds that resolving these issues in a single proceeding is more efficient than doing so in hundreds or thousands of individual actions. If these predicate issues are resolved in Plaintiff's favor, there will be no need for individualized inquiries into knowledge. And as Plaintiff acknowledges, the Court may revisit class certification at any time should class treatment become unduly inefficient or unmanageable. *See* Fed. R. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").[7]

 **\*8** * * *

Because the Court finds that Plaintiffs have met the Rule 23(a) and 23(b)(3) requirements for, the Court **GRANTS** Plaintiffs' motion for class certification.[8]

## IV. CONCLUSION

The Court **GRANTS** Plaintiffs' motion to certify the Class. Accordingly, the Court certifies the following class:

> All persons and entities who purchased or otherwise acquired the common stock of Lyft issued and traceable to the IPO Registration Statement. Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heir, successors or assigns, any entity in which defendants have or had a controlling interest and any entity that underwrote the Lyft IPO including any officer, director or affiliate of any Lyft IPO underwriter.

The Court appoints Plaintiff Keiner as Class Representative and appoints Block and Leviton LLP as Class Counsel. The Court **SETS** a telephonic case management conference for August 31, 2021, at 2:00 p.m. The Court **DIRECTS** the parties to submit a joint case management statement by August 26, 2021. All counsel shall use the following dial-in information to access the call:

> Dial-In: 888-808-6929;

> Passcode: 6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3711470

## Footnotes

1   On October 14, 2020, the parties stipulated to the voluntary dismissal of Former Board Member Jonathan Christodoro, "who resigned from the Board prior to signing Lyft's registration statement." Dkt. No. 103.

2   Defendants also contend that the class period must end on August 19, 2019, the date the lock-up period expired. Opp. at 26. Plaintiff does not oppose ending the class period at the end of the lock-up period. Reply at 22. The Court thus holds that the class period ends on August 19, 2019.

3     Mr. Kwak also reviewed articles concerning "Lyft's April 14, 2019 brake related removal of electric bikes," and found that these articles were "publicly disseminated by at least April 15, 2019." Kwak Decl. ¶¶ 8, 26.

4     Plaintiff disputes that the cited articles reflect twenty unique stories concerning sexual assault allegations. Reply at 14 n.19. According to Plaintiff, three of these articles "concern the exact same incident" and another three "do not concern actual Lyft drivers assaulting passengers at all." *Id.*

5     The Court notes that no evidence has been presented as to the reputation or breadth of readership of any of the cited news sources, at least one of which appears to be a college student newspaper. *See* Kwak Decl., Ex. 1 at 54.

6     Defendants' reliance on *Vignola v. Fat Brands, Inc.*, No. CV187469PSGPLAX, 2020 WL 1934976, at *3 (C.D. Cal. Mar. 13, 2020), does not change the Court's conclusion. In *Vignola*, the defendant argued that allegedly omitted information regarding a company's bankruptcy filings, delisting, and ownership had been "widely reported" over several years "from sources with varying readership and reputation," making investors' actual knowledge an individualized issue. *Id.* at *4. In that case, there was no dispute that those sources contained articles concretely describing the purportedly omitted information.

7     Plaintiff acknowledges that another class action in its initial phases in California State Court asserts similar claims, but the Court does not find this relevant to the class certification determination. *See* Mot. at 9–10.

8     Defendants argue that "the class definition should be modified to include only investors who purchased before April 15, 2019," the date that "substantially similar claims were first filed in state court on behalf of the same purported class." Opp. at 26–28. Though the state filing may be relevant to the question of damages, the Court is not persuaded that it matters in defining the class. During the hearing, Plaintiff's counsel contended that Defendants' argument presents a question of damages appropriately decided at the summary judgment stage rather than the class certification stage. Tr. 23:24-25:16. And defense counsel acknowledged that he was not aware of any authority addressing this issue in the context of defining a class. *Id.* at 27:23-28:6. Absent any relevant authority to the contrary, the Court concludes that it need not address Defendants' argument at this stage.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2019 WL 4752268

2019 WL 4752268
Only the Westlaw citation is currently available.
United States District Court, W.D. Oklahoma.

IN RE SANDRIDGE ENERGY,
INC. SECURITIES LITIGATION

Case No. CIV-12-1341-G
|
Signed 09/30/2019

**ORDER**

CHARLES B. GOODWIN, United States District Judge

**\*1** In December 2012, Lead Plaintiffs[1] filed this lawsuit alleging that Defendants SandRidge Energy, Inc. ("SandRidge") and its senior executives Tom L. Ward, James D. Bennett, and Matthew K. Grubb had violated the federal securities laws in 2011 and 2012. Following dismissal of various claims, there remain pending allegations of violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78j(a), as amended, and the Securities and Exchange Commission's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[2]

Now before the Court is Lead Plaintiffs' Motion for Class Certification, in which Lead Plaintiffs request certification of a class "consisting of all purchasers of SandRidge common stock between February 24, 2011 and November 8, 2012, inclusive," "who were damaged thereby."[3] Lead Pls.' Mot. (Doc. No. 268) at 7; *see also* Lead Pls.' Decl. (Doc. No. 269); Third Am. Compl. ¶¶ 1, 33 (Doc. No. 225). Defendants have responded, *see* Doc. Nos. 329, 330, 331, 332, and Lead Plaintiffs have replied, *see* Doc. Nos. 340, 341, 342, 343, 344, 345, 346. In addition, the Court heard argument at a hearing on the Motion on September 6, 2019. *See* Doc. No. 448.

Upon review of the relevant record, and for the reasons outlined below, the Court hereby GRANTS Lead Plaintiffs' Motion, subject to one modification to the named Class Representatives.

*I. Background*
As previously outlined by the Court,

SandRidge is an oil and gas exploration company, *see* [Third Am. Compl.] ¶ 2, and this lawsuit focuses on "one of SandRidge's core holdings referred to as the Mississippian play," *id.*, "a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas." *Id.* at 21, ¶ 53.

**\*2** The Lead Plaintiffs have contended that during the Class Period, co-defendant Tom L. Ward, SandRidge's founder and then chief executive officer and Chairman of its Board of Directors ("Board"), *see id.* at 15, ¶ 29, together with Bennett, then SandRidge's chief financial officer and a senior vice president, *see id.* at 16, ¶ 30, and Grubb, then SandRidge's president and chief operating officer, *see id.* ¶ 31, made certain materially false and misleading statements and failed to disclose certain material information about SandRidge's business and its activities in the Mississippian formation.

*In re SandRidge*, 2017 WL 3309758, at \*2-3 (footnote omitted).

In their remaining claim, Lead Plaintiffs allege that

although Ward, Grubb and Bennett "told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area,' " [Third Am. Compl.] at 7, ¶ 4; *e.g.*, *id.* at 62, ¶ 152, these "statements misrepresented the nature of the Mississippian properties," *id.* at 7, ¶ 4[.]

*Id.* at \*4 (alteration omitted). Specifically, Lead Plaintiffs allege that Defendants misrepresented the economic value of the Mississippian formation to investors by (i) understating the amount of gas relative to oil (the "GOR") in the formation; and (ii) overstating the amount of oil recoverable from a typical horizontal well—i.e., the estimated ultimate recovery (the "EUR")—in the formation. *Id.* at \*4 n.10; *see also* Third Am. Compl. ¶¶ 47, 51, 132, 141-148, 152, 153(d), 155-156.

*II. Class Certification Standard*
" 'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)). Federal Rule of Civil Procedure 23 prescribes the requirements for class certification.

Rule 23(a) requires the party seeking certification to demonstrate that: (1) the class is so numerous that joinder

2019 WL 4752268

of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).

*Id.*

The class also must satisfy one of the three requirements listed in Rule 23(b). In this case, Lead Plaintiffs rely on Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. The Court "has an independent obligation to conduct a rigorous analysis before concluding that Rule 23's requirements have been satisfied." *Roderick*, 725 F.3d at 1217 (internal quotation marks omitted). "Granting or denying class certification is a highly fact-intensive matter of practicality." *Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 2004).

### III. Discussion

#### A. Rule 23(a)

Before analyzing the Rule 23(a) factors, the Court must determine whether the suit has been brought by "[o]ne or more members of [the] class." Fed. R. Civ. P. 23(a); *Paton v. N.M. Highlands Univ.*, 275 F.3d 1274, 1278 (10th Cir. 2002); *see also Dukes*, 564 U.S. at 348 (noting that "a class representative must be part of the class" (internal quotation marks omitted)).

**\*3** As defined above, the putative class consists of "all *purchasers* of SandRidge common stock between February 24, 2011 and November 8, 2012, inclusive," "who were damaged thereby." Lead Pls.' Mot. at 7 (emphasis added). The parties' argument and evidence reflect that the SandRidge stock relevant to Vladimir and Angelica Galkin, who are husband and wife, was purchased during the class period

through an individual brokerage account owned and held by Angelica Galkin only. *See* Defs.' Resp. (Doc. No. 332) at 32-33; *id.* Ex. 12, V. Galkin Dep. 38:19-40:6 (Doc. No. 331-4); *id.* Ex. 21 (Doc. No. 331-7) at 22-100; *id.* Ex. 21 (Doc. No. 331-8) at 2-60; Hr'g Tr. 55:19-56:18 (Doc. No. 449). As a result, regardless of how the law in the Galkins' state of residence might characterize the posttrade ownership of the stock, Vladimir Galkin was not a "purchaser" of SandRidge stock during the class period.[4] It follows that Mr. Galkin is not a member of the proposed class and may not "sue ... as [a] representative part[y] on behalf of all members" of that class. Fed. R. Civ. P. 23(a); *see Dukes*, 564 U.S. at 348; *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007) ("Section 10(b) ... affords a right of action to *purchasers* or sellers of securities injured by its violation." (emphasis added)).[5]

#### 1. Numerosity

To satisfy the element of numerosity, Lead Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This element, which is "rarely disputed in securities fraud class actions," is not contested by Defendants and is clearly met here. *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015); *see* Third Am. Compl. ¶ 35 (alleging that SandRidge is a publicly traded company with approximately 415.4 million shares outstanding in February 2012).

#### 2. Commonality

To establish commonality, Lead Plaintiffs need only demonstrate a "single" "question[ ] of law or fact common to the class." *Dukes*, 564 U.S. at 359; Fed. R. Civ. P. 23(a)(2). Here, Lead Plaintiffs' claims all "depend upon" at least one "common contention"—i.e., that Defendants made material misrepresentations as to the makeup of the Mississippian formation—that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350; *see also* Third Am. Compl. ¶ 39. Defendants do not contest that this element has been met and the Court likewise finds it so.

2019 WL 4752268

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Defendants contend that two Lead Plaintiffs cannot make this showing due to varying defenses between them and the remainder of the class. *See* Defs.' Resp. at 31, 33-36 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (noting decisions holding that "class certification is inappropriate where a putative class representative is subject to unique defenses [that] threaten to become the focus of the litigation" (internal quotation marks omitted))).

#### a. Angelica Galkin

The record reflects that Angelica Galkin, through her brokerage account, purchased more than two million shares of Sandridge stock after the allegedly fraudulent nature of Defendants' statements was revealed on November 8, 2012. *See* V. Galkin Dep. 55:24-60:6; Defs.' Resp. Ex. 21 (Doc. No. 331-8) at 53-95. Defendants cite cases to support their argument that these post-class-period purchases support Defendants raising a unique defense against Ms. Galkin and thereby render Ms. Galkin atypical. Defs.' Resp. at 33-24 (citing *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (finding that a plaintiff who made "numerous post-class purchases" of stock " 'after revelation of an alleged fraud involving that security" was subject to potential unique defenses and therefore atypical of the rest of the proposed class)). But other decisions have found that such post-disclosure purchases do not "automatically" make those plaintiffs unique and do not "automatically defeat typicality." *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Ca. 2009). In *In re Connetics*, the court discussed the contrasting views and found that "the weight of authority appears to favor the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement." *Id.*; *accord Antonson v. Robertson*, 141 F.R.D. 501, 508 (D. Kan. 1991). Here, Defendants "do not explain why the timing of [Ms. Galkin's] purchases automatically make[s] it unique—other class members may also have purchased [SandRidge common] stock after partial adverse disclosures by the company." *In re Connetics*, 257 F.R.D. at 576-77. And even if Ms. Galkin "is revealed to be the only class member that bought additional stocks after the disclosures," Defendants have not shown that this issue

"threatens to become the focus of the litigation" or that she "was not relying on the integrity of the market" in the later purchases of the stock. *Id.* at 577; *see also Feder v. Elec. Data. Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005) ("Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market.").

**\*4** Next, Defendants argue that Ms. Galkin is atypical because she "ceded all authority over investment decisions" to Mr. Galkin. Defs.' Resp. at 34. But while Mr. Galkin stated that he "made all the decisions" on his wife's brokerage account, V. Galkin Dep. 38:2-5, Ms. Galkin testified that her husband and she "invest together." A. Galkin Dep. 33:12 (Doc. No. 345). Further, the cases do not uniformly indicate that such a spousal arrangement renders the accountholder atypical for purposes of Rule 23(a)(3). *Compare In re Caremark Int'l, Inc. Sec. Litig.*, No. 94-C-4751, 1996 WL 351182, at \*6 (N.D. Ill. June 24, 1996), *with In re Consumer Powers Co. Sec. Litig.*, 105 F.R.D. 583, 605 (E.D. Mich. 1985).

#### b. St. Louis Trust

St. Louis Trust has participated in eleven securities class actions since 2005, including ten where it was represented by current counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") or a predecessor, and it sought to be appointed as a lead plaintiff in each. Defendants argue that this litigation history and the fund's longstanding relationship with its counsel will require St. Louis Trust to meet unique defenses and therefore St. Louis Trust should be found atypical. *See* Defs.' Resp. at 35-36.

Lead Plaintiffs correctly point out, however, that Defendants rely on authority that predates the 1995 Private Securities Litigation Reform Act ("PSLRA") for this contention. The now-enacted PSLRA "was designed to increase the likelihood that institutional investors will serve as lead plaintiffs." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (internal quotation marks omitted). The Court finds persuasive a fellow district court's lack of undue concern over a plaintiff's continued relationship with a particular law firm. *See In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2007 WL 927745, at \*5 (W.D. Mo. Mar. 26, 2007) ("The existence of a prior relationship between Lead Plaintiff and Class Counsel is not a problem[.]"); *id.* at \*5 n.4 ("The PSLRA does not require a prospective lead plaintiff

In re SandRidge Energy, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 4752268

to reconsider the issue of representation anew; it was proper for Lead Plaintiff to rely on Class Counsel's past successes in deciding to [use] those services again in this case.").

*c. Conclusion*

In sum, the cited factual distinctions and potential defenses "do not defeat typicality" here, as "the claims of the class representative[s] and class members are based on the same legal ... theory" and establishment of the class representatives' claims will "establish the bulk of the elements of each class member's claim." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 652 (W.D. Okla. Mar. 30, 2012); *see also In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 578 (D. Colo. 2001) ("[T]he typicality requirement is satisfied because the claims brought by the Lead Plaintiffs arise out of the same course of conduct by Defendants and rest on exactly the same legal theory, securities fraud, as those of the potential class members."); *In re Williams Sec. Litig.*, No. 02-CV-72-H(M), 2002 WL 32153476, at *6 (N.D. Okla. July 8, 2002) ("[T]he existence of minor distinctions will not preclude the typicality requirement from being met.").

*4. Fair and Adequate Representation*

Defendants additionally argue that Lead Plaintiffs will not "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4). The Tenth Circuit has identified two questions whose resolution determines the adequacy inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (internal quotation marks omitted).

**\*5** Defendants assert that Lead Plaintiffs are inadequate representatives because they lack sufficient knowledge and understanding of this lawsuit and "have repeatedly abdicated all responsibility for litigation to their counsel." Defs.' Resp. at 27; *see Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990) (finding putative class plaintiffs inadequate "because of their almost total lack of familiarity with the case"); *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 553 (D. Colo. 1998)

(noting that a finding of adequacy of representation includes a finding "that the plaintiffs are knowledgeable as to the status and underlying legal basis of the action" (internal quotation marks omitted)). Specifically, Defendants contend that representatives from Northern Nevada and St. Louis Trust, as well as Ms. Galkin, lack sufficient awareness of the claims of this lawsuit and have delegated all responsibility to Robbins Geller. Defendants argue that this "abdication" of authority to Robbins Geller has resulted in Lead Plaintiffs' complete ignorance of a potential conflict of interest advanced by that law firm. *See* Defs.' Resp. at 26-30.

Having reviewed the relevant record, the Court does not find evidence to support the contention that Lead Plaintiffs have abandoned their responsibilities or given improper control to their law firm as a "*de facto* plaintiff." *Kelley*, 139 F.R.D. at 409. Although the relevant individuals are fuzzy on some details on the litigation, their depositions reflect that they do possess reasonable understanding of this lawsuit and their expected role in it, including their monitoring responsibilities. *See, e.g.*, Pls.' Reply Ex. 5, J. Mace Dep. 65:15-20, 75:12-18, 79:22-81:14, 82:21-84:5, 87:22-88:10, 90:17-93:13, 123:24-124:5 (Doc. No. 342-5); Pls.' Reply Ex. 6, D. Willey Dep. 20:19-21:20, 25:18-25, 26:4-9, 66:18-67:10, 72:9-20, 80:22-83:2, 127:11-133:23 (Doc. No. 342-6); A. Galkin Dep. 65:2-67:15, 71:22-24, 72:25-73:2, 77:1-80:25, 82:24-83:24, 90:15-94:3, 182:18-185:20.

> The adequacy requirement does not require class representatives to initiate legal proceedings[;] nor does it mandate that representatives have intricate knowledge of complex legal claims..... Particularly in complex cases, "the qualifications of class counsel are generally more important in determining adequacy than those of the class representatives." [*Harris v. Koenig*, 271 F.R.D. 383, 392 (D.D.C. 2010)] (quoting *In re Avon Secs. Litig.*, No. 91-cv-2287, 1998 WL 834366, at *9 (S.D.N.Y. Nov. 30, 1998)). Indeed, courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case.

*Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 135 (D.D.C. 2017) (alteration, citation, and internal quotation marks omitted).

Both of the institutional investors retain counsel independent of Robbins Geller to assist with this lawsuit and others. Lead

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 32 of 101 PageID #:3697

In re SandRidge Energy, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 4752268

Plaintiffs present a persuasive reply that Defendants' conflict-of-interest argument is moot and that even if the supposed conflict had arisen, it could have been remedied procedurally by the Court. *See* Pls.' Reply (Doc. No. 340) at 22-23. As alluded to above, courts have refused to find that the presence of monitoring agreements precludes the proper certification and maintenance of class actions. *See, e.g.*, *In re Am. Italian Pasta Co.*, 2007 WL 927745, at *5 ("[G]iven the extensive investments inherent in the operation of a pension fund, the Court is not surprised Lead Plaintiff has arranged for a law firm to keep it apprised of events (including lawsuits) that might be of interest. Arguably, a pension fund's failure to take steps to be aware of existing or prospective litigation that affects its investments would be an abdication of duty."). And Defendants' omission of any direct challenge to the appointment of Robbins Geller as Class Counsel under Rule 23(g) undermines its challenge to adequate representation. *See Rutter & Wilbanks Corp.*, 314 F.3d at 1187-88; *cf. Schwartz*, 178 F.R.D. at 553 ("Defendants pose no objection to the experience and commitment of Plaintiffs' counsel. This in itself goes a long way to negating their argument that the class will be inadequately represented.").

### B. Rule 23(b)(3)

 **\*6** Because the requirements of Rule 23(a) have been met, the Court must determine whether Lead Plaintiffs have shown that "the questions of law or fact common to class members predominate over any questions affecting only individual class members" and that "a class actions is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making these findings, the Court may consider:

   (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

   (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

   (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

   (D) the likely difficulties in managing a class action.
*Id.* R. 23(b)(3)(A)-(D).

For Lead Plaintiffs to meet their burden under Rule 23(b)(3), they must

"show that common question[s] subject to generalized, classwide proof *predominate* over individual questions." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). " 'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' " *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622-23 (1997)). "Put differently, the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " *Id.* (quoting 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195-96 (5th ed. 2012)). *Naylor Farms, Inc. v. Chaparral Energy, LLC*, No. CIV-11-634-HE, 2017 WL 187542, at *7 (W.D. Okla. Jan. 17, 2017).

### 1. Lead Plaintiffs' Damages Model

As part of their certification request, Lead Plaintiffs have presented the expert report and damages calculations of Bjorn Steinholt. *See* Lead Pls.' Mot. Ex. 4, Steinholt R. (Doc. No. 269-4). Defendants argue that Lead Plaintiffs have failed to show predominance under Rule 23(b)(3) because they have not proposed a method to measure damages on a classwide basis consistent with their theory of liability. *See* Defs.' Resp. at 37 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). According to Defendants, Mr. Steinholt's proposed damages model, an event-study framework, suffers from two deficiencies that render it "inadequate." First, they argue, Mr. Steinholt's model cannot separate any damages attributable to the allegedly unlawful misrepresentations and omissions from those shareholder losses attributable to other unrelated events. Second, they assert that the model "inaccurately assume[s] that any purported inflation in SandRidge's share price remained constant throughout the proposed class period despite numerous changes that would have impacted the amount of price inflation under Plaintiffs' theory of liability." *Id.* at 37-39.

These may be tenable objections in the context of a *Daubert* challenge[6] or a summary-judgment motion. For current purposes, however, the alleged flaws in Mr. Steinholt's damages model do not demonstrate that his model is entirely nonviable or that there would be "material differences" between each class member's damages determination that would "require individualized inquiries." *Roderick*, 725 F.3d

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 33 of 101 PageID #:3698

In re SandRidge Energy, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 4752268

at 1220. If Mr. Steinholt's model improperly fails to consider certain other losses or to account for inflation changes during the class period, it would seemingly be flawed in this manner as to every member of the class. "[T]he focus of the 23(b)(3) class certification inquiry—predominance—is not whether the plaintiffs will fail or succeed, but whether they will fail or succeed *together.*" *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *7 (S.D. Tex. May 20, 2014) (internal quotation marks omitted). Defendants' attack on the damages model does not persuade the Court against finding predominance. *See id.* (rejecting argument that treating certain disclosures as corrective events was fatal under Rule 23(b)(3) as the plaintiffs' "alleged failure of proof" was "a classwide failure amenable to a classwide solution"); *see also Naylor Farms*, 2017 WL 187542, at *8; *cf. Hill v. Kaiser-Francis Oil Co.*, No. CIV-09-7-R, 2010 WL 2474051, at *6 (W.D. Okla. June 9, 2010) (finding that predominance was not met for fraud claims where "determinations of when each putative class member discovered or should have discovered the alleged misrepresentations and omission on his or her check stub," which would affect that class member's damages, were "individual questions, not subject to common proof").

### 2. Issues of Investor Knowledge

**\*7** For every "securities-fraud claim," " 'the complaint shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.' " *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1096 (10th Cir. 2003) (alteration omitted) (quoting 15 U.S.C. § 78u-4(b)(1)). And "when allegations are made on information and belief the complaint 'shall state with particularity all facts on which that belief is formed.' " *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). In the Third Amended Complaint, Lead Plaintiffs set forth various factual allegations to substantiate their allegations that Defendants misrepresented the characteristics of the Mississippian formation. These supporting facts include Lead Plaintiffs' analysis of "public data related to SandRidge's well production performance, including production data provided to the Oklahoma Tax Commission by SandRidge." Third Am. Compl. ¶ 18; *see also id.* ¶¶ 6, 7, 135, 137, 143, 145, 152, 153, 292, 293. Lead Plaintiffs also allege:

> Plaintiffs' counsel, with the assistance of an independent petroleum engineering consulting firm, analyzed the production data of SandRidge's wells available at the time of Defendants' statements about those wells during the

Class Period and obtained and reviewed a statistically significant and unbiased selection of data concerning SandRidge wells in its most active areas of drilling. Data was obtained for individual wells producing in the most active counties for SandRidge in the Mississippian play. Much of the data was provided by SandRidge to governmental authorities. The underlying data and analysis of that data performed by Plaintiffs were not readily available to [the] public.

*Id.* ¶ 20.

Defendants first argue that if such production data was publicly available, Lead Plaintiffs' claims must fail because that data would have been reflected in the price of the SandRidge stock, precluding a claim that the market was misled by the alleged misrepresentations. *See* Defs.' Resp. at 40. Lead Plaintiffs accurately argue that this amounts to Defendants raising a truth-on-the-market defense, which "is inappropriate on a motion for class certification" and more properly a matter for summary judgment or trial. *In re Virtus Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017) (citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013)).

Defendants alternatively contend that if such production data was publicly available, but not "readily" available and so not reflected in the stock price, the Court will be required to conduct individualized inquiries to gauge each investor's knowledge of this information and that the predominance requirement therefore cannot be met. *See* Defs.' Resp. at 40-41 (citing *Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011)); *cf. Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (noting that the truth-on-the-market defense is only available when the withheld or misrepresented information had been "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance" the insiders' statements (internal quotation marks omitted)). The possibility that some investors had knowledge of this data, however, does not direct a finding that common issues do not prevail over those issues "subject only to individualized proof." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008). Defendants' cited authorities do not persuade the Court otherwise.[7]

**\*8** Importantly, Lead Plaintiffs allege that Defendants affirmatively refuted findings based upon the public data. *See* Third Am. Compl. ¶¶ 152, 155; Lead Pls.' Reply Ex. 10, BNP Paribas R. (Doc. No. 342-10). Further, with

2019 WL 4752268

respect to the elements Lead Plaintiffs in this action must prove, any "individualized investor knowledge" of the public data would be most relevant to whether that knowledge precluded a particular investor from relying upon the alleged misrepresentation or omission in purchasing SandRidge Stock. *See Amgen*, 568 U.S. at 460-61 (explaining that a section 10(b) plaintiff must prove, *inter alia*, "reliance upon the misrepresentation or omission" made by the defendant); *cf. Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to the class predominate' begins, of course, with the elements of the underlying cause of action."). Defendants, however, have not challenged Lead Plaintiffs' entitlement to a presumption of reliance under *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

### 3. Conclusion

Here, the record before the Court, including the allegations regarding data transmitted by SandRidge to the Oklahoma Tax Commission, does not support a finding that individual questions predominate over common ones or are "more prevalent or important" than the "common, aggregation-enabling issues in the case." *CGC Holding Co.*, 773 F.3d at 1087 (internal quotation marks omitted). Having considered the arguments and the record, the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Court further finds that a class action is the superior method for the adjudication of the claims raised in this case. *Id.*

### C. Commencement of Class Period

In conjunction with their objections to certification, Defendants assert that the proposed class-period starting date of February 24, 2011, "begins more than a year too early" and that any certification should open the class period no earlier than May 2012. According to Defendants, the remaining claims in this action do not allege any scienter on the part of Defendants prior to May 2012, and so the class period should not commence prior to that date. Defs.' Resp. at 7-8, 21-25; *see Tellabs*, 551 U.S. at 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." (internal quotation marks omitted)).

The Court rejects Defendants' attempt to have the Court dissect the claims in a manner inconsistent with the directives of *Amgen* or to revisit its Rule 12(b)(6) and Rule 9(b) rulings as to those underlying claims, as neither is a proper focus in determination of the class-certification issue. *See* Defs.' Resp. at 21-23 (relying on *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), which was an appeal of a dismissal rather than of a class-certification determination); *Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."); *In re SandRidge*, 2017 WL 3309758, at *4 n.10 (noting that the misstatements of GOR were alleged to have been made during 2011 and 2012); *In re SandRidge*, 2017 WL 3317862, at *4 n.10 (same). Whether Lead Plaintiffs will ultimately be able to *prove* scienter as to statements made early during the class period, and thereby prevail on their legal claims, is a matter for another day. *Cf. Amgen*, 568 U.S. at 464 (noting that the section 10(b) class was certified "on behalf of all investors who purchased Amgen stock between the date of the first alleged misrepresentation and the date of the last alleged corrective disclosure").[8]

### IV. Appointment of Class Counsel

**\*9** In connection with their request for class certification, Lead Plaintiffs seek to have Robbins Geller appointed as their class counsel under Federal Rule of Civil Procedure 23(g). Beyond raising their challenges to the adequacy of representation (which the Court rejected above), Defendants do not offer any objections to this request.

Before appointing this firm as class counsel, the Court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g). The Court also may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* R. 23(g)(1)(B). And

In re SandRidge Energy, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 4752268

"[c]lass counsel must fairly and adequately represent the interests of the class." *Id.* R. 23(g)(4).

The Court's review of the work performed in this litigation, as well as the evidence in the record, shows that the attorneys of Robbins Geller are experienced class-action litigators and are sufficiently committed to this litigation. *See, e.g.*, Lead Pls.' Mot. Ex. 5, Robbins Geller Firm Resume (Doc. No. 269-5). The Court finds that Robbins Geller can and should be appointed Class Counsel in this matter pursuant to Federal Rule of Civil Procedure 23(g).

CONCLUSION

For all the reasons outlined above, Lead Plaintiffs' Motion for Class Certification (Doc. No. 268) is GRANTED. Lead Plaintiffs' proposed class is hereby certified under Federal Rule of Civil Procedure 23(a) and (b)(3) to pursue the pending securities-fraud claims. With the exception of Vladimir Galkin, the Lead Plaintiffs—Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, and Angelica Galkin—shall continue as Class Representatives. Robbins Geller Rudman & Dowd LLP is hereby appointed as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

IT IS SO ORDERED this 30th day of September, 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4752268

Footnotes

1      Laborers Pension Trust Fund for Northern Nevada ("Northern Nevada"), Construction Laborers Pension Trust of Greater St. Louis ("Greater St. Louis"), Vladimir Galkin, and Angelica Galkin.

2      Specifically, Lead Plaintiffs claim violation of section 10(b) and Rule 10b-5 by Defendants SandRidge, Grubb, and Ward, and violation of section 20(a) by Defendants Grubb, Ward, and Bennett. *See In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2017 WL 3309758, at *20 (W.D. Okla. Aug. 1, 2017) (Doc. No. 239); *In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2017 WL 3317862, at *11-12 (W.D. Okla. Aug. 1, 2017) (Doc. No. 240). Although the parties' papers focus upon the section 10(b) claims, the Court finds that certification of the class is likewise proper as to the section 20(a) claims, which are "essentially derivative of other securities claims." *Lane v. Page*, 581 F. Supp. 2d 1094, 1112 (D.N.M. 2008).

3      Excluded from the putative class are: "Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party." Lead Pls.' Mot. at 7 n.1.

4      Lead Plaintiffs rely on *In re Lehman Bros. Securities & ERISA Litigation*, where the district court rejected the argument that two individuals whose spouses had purchased the securities were atypical or inadequate class representatives. *See In re Lehman Bros.*, No. 09-MD-2017(LAK), 2013 WL 440622, at *2 (S.D.N.Y. Jan. 23, 2013). The Court is not persuaded by that decision, however, as the relevant class was not pursuing section 10(b) claims and was more broadly defined than in the instant case. *See id.* at *1, *5.

5      The Court therefore need not address Defendants' argument that Mr. Galkin's presence as a class representative defeats the typicality of the class under Rule 23(a)(3).

6      No such *Daubert* or Rule 702 challenge has been made, although the Supreme Court has indicated that those standards may be invoked at this stage. *See Dukes*, 564 U.S. at 354.

7      In *New Jersey Carpenters Health Fund*, a non-section 10(b) case, the court focused upon a statutory actual-knowledge defense that does not appear in section 10(b), as well as evidence reflecting many of the class members were sophisticated investors. *See N.J. Carpenters Health Fund*, 272 F.R.D. at 168, 170. *Zimmerman* predates both the PLRSA and *Basic* and was addressing investors' knowledge of "omitted information" that had been "extensively" covered by the

2019 WL 4752268

media, rather than information that had been contradicted by the defendants and was not "readily available" to the public. *Zimmerman*, 800 F.2d at 390.

8       This finding moots Defendants' argument that Northern Nevada is not a member of or destroys the typicality of the proposed class due to its having purchased stock only in 2011.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 635142, 102 Fed. R. Evid. Serv. 892

2017 WL 635142
United States District Court, N.D. Illinois, Eastern Division.

IN RE: STERICYCLE, INC.,
Steri-Safe Contract Litigation

Case No. 13 C 5795
|
MDL No. 2455
|
Signed 02/16/2017

## MEMORANDUM OPINION AND ORDER

Milton I. Shadur, Senior United States District Judge

**\*1** Several facilities have brought actions around the country alleging fraudulent behavior by defendant Stericycle, Inc. ("Stericycle") in connection with their contracts for medical waste disposal. All of those actions have come to this Court's calendar under the auspices of the Panel on Multidistrict Litigation ("MDL Panel"), and a consolidated Complaint has been filed by the interim class counsel under the 13 C 5795 case number shown in the caption.[1] In that Complaint plaintiffs seek an order certifying the action to be maintained as a class action, together with relief comprising restitution, compensatory damages, punitive damages, attorneys' fees, costs of the suit, pre– and post-judgment interest and any other relief that this Court may deem necessary or proper. Plaintiffs seek certification of two classes, a "Damages Class" and an "Injunctive Relief Class," differing solely on the type of relief sought.

This memorandum opinion and order will deal primarily, though not exclusively, with the class certification issue. In supporting their argument for class certification plaintiffs have relied in substantial part on the opinions of the highly qualified Patrick Kilbourne ("Kilbourne")—more on the subject of his qualifications later. In response Stericycle has asked that this Court strike Kilbourne's testimony as unqualified witness testimony, looking in material part to the testimony of witness Jeremy Boiles ("Boiles"). Unsurprisingly plaintiffs respond by asking that this Court strike Boiles' testimony as inadmissible opinion witness testimony. Because the admissibility of the two witnesses' testimony bears heavily on the question of class certification, this opinion will deal first with the motions to strike Kilbourne and Boiles as witnesses and will then conclude with a class certification decision.

## Factual Background

Stericycle is a large medical waste disposal company that provides medical waste collection and disposal services for medical clinics, veterinary clinics, medical labs, municipal jails and other businesses that generate regulated medical waste across the country (Complaint ¶ 3). Seven such businesses initiated this action against Stericycle on behalf of hundreds of thousands of its customers charging fraudulent conduct by Stericycle. Specifically these plaintiffs claim breaches of contract, breaches of the covenant of good faith, unjust enrichment and violations of consumer fraud and uniform deceptive trade practices acts under Illinois law (as well as under several other state laws). Plaintiffs claim that Stericycle violated consumer contracts by using an "automated price increase" ("API") to increase charges arbitrarily to "small-quantity" customers[2] without any notice or explanation. Plaintiffs also claim that Stericycle charged them for several "Undisclosed Fees" that were hidden increases buried in invoices. Kilbourne calculated damages for the class members at $608 million, comprising $481 million for APIs and $146 million for surcharges, less a $19 million reduction related to credits (P. Class Cert. Mem. 14). Stericycle admits that it has employed APIs and has charged other extra fees, and it has acknowledged that at least some of the contracts with plaintiffs forbid APIs without notice and justification, but it argues that class certification is inappropriate because of the wide variance in contract language and client treatment.

**\*2** To support class certification plaintiffs assert that Stericycle's misconduct amounts to a common nucleus of operative facts vis-a-vis the class members. They claim (1) that each class member was invoiced for an API that was neither calculated using dollar amounts of costs incurred nor authorized by contract, (2) that Stericycle engaged in a common scheme and practice of offering false and misleading information to induce customers to enter into contracts and (3) that Stericycle then engaged in further fraudulent conduct to conceal price increases with false and misleading information as well as illusory price reductions. In calculating the damages on both a class-wide and an individual-class-member basis, plaintiffs hired Kilbourne to submit a report based on Stericycle's own data.

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 635142, 102 Fed. R. Evid. Serv. 892

## Opinion Witness Qualification Standards

Plaintiffs offer Kilbourne's opinion testimony pursuant to Fed. R. Evid. ("Rule") 702. For his testimony to be admissible under that Rule it must satisfy the two-part test first set out in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and later extended to fields of nonscientific expertise in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). As reflected both in Kumho and in the essentially contemporaneous amendment to Rule 702 with its accompanying Committee Note,[3] the Supreme Court eliminated any then-existing question as to whether the district courts' gatekeeping function enunciation applied to all expert testimony, not just testimony based on science.

In brief, that previously-debated question was answered with an unconditional "yes." And that made it irrelevant which of the various sources of expertise listed in Rule 702 informed a designated expert's opinions, although the standards for testing the opinion may differ. For example, on the one hand most disciplines do not implicate peer review, which Daubert, 509 U.S. at 593 had specified as one relevant standard in the area of "scientific" knowledge, while on the other hand aspects of the scientific method may well be employed (or may indeed be required) to reach valid opinions in fields not labeled as demanding "scientific" knowledge.

What remains as the common core for any Rule 702 opinion under Daubert-Kumho is that the opinion be both reliable and relevant (Daubert, 509 U.S. at 590-91, 597; Kumho, 526 U.S. at 547). And whatever pigeonhole Kilbourne might be considered as occupying for purposes of various aspects of his proffered opinion, this opinion must of course necessarily look to those dual requirements. But because Stericycle's motion to exclude challenges the admissibility of Kilbourne's opinions solely on reliability grounds, this opinion needs to discuss only that branch of the analysis. As to that reliability prong our Court of Appeals uses two evaluative criteria: "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable" (Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002)).

 **\*3** Most challenges to expert qualifications come up in the context of a trial in motions in limine. Litigants must surmount a much higher bar to disqualify a witness at the stage of class certification—as In re Visa Check/ MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir. 2001) teaches:

> The question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.

And to inform its decision on class certification this Court must of course decide the appropriate relative weight to afford opinion testimony—on that score, as In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 323 (3d Cir. 2009) has put it:

> Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.

As a caveat, however, it is worth noting that even though that weight is clearly relevant for the class certification decision, it will not necessarily dictate how much weight the same testimony is to be given at later stages of the proceedings (id. at 324).

## Kilbourne's Qualifications

As for Kilbourne's qualifications, Rule 702 permits an expert to be qualified through "knowledge, skill, experience, training or education." That proposition is really a two-sided coin: Abstract academic credentials (no matter how impressive) should not be overvalued if not apropos to the zone of expertise involved, while at the same time relevant practical experience should not be undervalued if pertinent (Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000)).

Kilbourne's resume provides a snapshot of some of his relevant qualifications. He is the managing director at a leading global expert services and consulting firm, with over 22 years of experience in public accounting and consulting. Among his credentials in those fields, he is a certified public and management accountant (CPA and CMA), a fraud examiner (CFE) and a chartered global management accountant (CGMA), and he is also certified in financial forensics (CFF) and accredited in business valuation (ABV) by the American Institute of Certified Public Accountants ("AICPA"), all relevant qualifications for this analysis.

Apart from that impressive alphabet soup array, his educational credentials also cannot be questioned, with a masters of accountancy degree from Brigham Young and an MBA from the University of Pennsylvania Wharton School

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 635142, 102 Fed. R. Evid. Serv. 892

of Business. In practical terms he has much experience conducting forensic accounting investigations and financial analyses, and there is no doubt that he is fully qualified to provide a professional opinion on this matter.

But the basic determination that Kilbourne is highly qualified to give an expert opinion here is not enough: For such an opinion to be admissible it must also satisfy the independent requirement of reliability based on the methodology used to reach a witness' conclusions (Bourelle v. Crown Equip. Corp., 220 F.3d 532, 537 n.11 (7th Cir. 2000)). Because the accreditation of Kilbourne's conclusions poses a factual issue to be considered at trial, the Daubert-Kumho assessment of his opinions' reliability must focus exclusively on that methodology and not on his ultimate conclusions (Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002); Smith, 215 F.3d at 718). And to that end the most significant reliability factor is whether a particular proposed expert (whether or not classified as a "scientist" as such) has used the scientific method to arrive at his or her conclusions and opinions (Chapman, 297 F.3d at 688).

 **\*4** Kilbourne cites reliable methods for conducting his analysis and repeatedly cites to Stericycle documents. But this Court would shirk its gatekeeper role if it were to accept his conclusory declaration without examining whether Kilbourne's actions really comport with the standard of reliability envisioned by the scientific method requirement (see Kumho, 526 U.S. at 141; Smith, 215 F.3d at 719).

After analyzing Stericycle's computerized financial data, Kilbourne concluded that reliable empirical methods, common to the class, existed to identify Stericycle customers who were charged APIs during the class period. In that respect he identified 256,405 customers as class members subjected to a total of 1,945,530 price changes, among which changes 87.6% were identified by Stericycle as APIs. Kilbourne used his accounting experience to compare the price increases with cost increases on Stericycle's end and found that they were not correlated. For that purpose he used detailed statistical analyses in conducting his calculations on both how much each customer was paying and how much Stericycle profited over the years.

In its arguments challenging Kilbourne's proposed testimony, Stericycle simply ignores all of Kilbourne's qualifications and experience—a wholly understandable silence, for there is certainly nothing to attack on that front. Instead it seeks to focus on his math itself, pointing out several claimed flaws. To that end Stericycle has criticized Kilbourne for not reviewing every original contract, for making assumptions about the presence and prohibitions of APIs and for lacking a sufficient factual basis for essential assumptions under Kumho. Stericycle also went on to argue that there is no way in its SteriWorks system to track historical contracts and that the contracts have numerous differences, undermining many of Kilbourne's assumptions.

Stericycle's contentions rely largely on attacking the data that Kilbourne used and the assumptions that he made, while barely criticizing the actual method and calculations that he used (more typical challenges to an opinion witness at this stage). In fact, many of the arguments emanating from Stericycle sound more like challenges related to class certification or to the merits of the case than Daubert-Kumho arguments. In the few places where Kilbourne's methodologies have been questioned, he thoroughly addressed them in his later testimony.

In sum, it is a nearly impossible hill for Stericycle to climb in its urging that this Court should exclude Kilbourne's testimony—after all, that contention flies in the face of his having relied completely on Stericycle's own database and his having used methodologies accepted as reliable by Stericycle. Its motion to exclude his testimony must therefore be denied. That rejection does not, however, preclude Stericycle from re-raising possible flaws with Kilbourne's conclusions when it comes to weighing his testimony in the context of the class certification question (In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323).

**Boiles' Statement**

In contrast to the just-analyzed disagreement over whether Kilbourne was qualified to testify as an opinion witness, no such disagreement exists as to Boiles, for his qualifications were never presented for opinion witness classification. Instead, the core of the litigants' dispute as to the Boiles statement is centered on whether it is improper opinion testimony (as plaintiffs contend) or whether it is acceptable lay testimony (as Stericycle contends). On that score plaintiffs advance a near barrage of arguments, urging that the Boiles statement, which was submitted in the reply memorandum seeking the dismissal of Kilbourne as a witness, is more than an average random adult could provide, is improper rebuttal evidence not addressing new arguments from the plaintiffs' responsive memorandum defending Kilbourne's testimony

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 635142, 102 Fed. R. Evid. Serv. 892

and, moreover, that it contradicts other Stericycle witnesses, lacks foundation and is rife with hearsay.

 **\*5** Stericycle correctly counters by pointing out that a lay witness may testify under Rule 701 both as to relevant facts (like any other witness) and also as to opinions reasonably linked to those facts by "his or her range of generalized knowledge, experience, and perception" (United States v. Espino, 317 F.3d 788, 797 (8h Cir. 2003)). In that respect the Boiles testimony manages to avoid any opinions based on scientific, technical or other specialized knowledge that would require opinion witness qualification. As explained in the excellent extended discussion in Federal Rules of Evidence Manual at 701-12 through 701-22 (10th ed. 2011),[4] lay person opinions may be given if they result from "a process of reasoning familiar in everyday life." Due to his position as Vice President of IT Application and Delivery Maintenance, Boiles directly observed the phenomena he discusses. Knowing the contents of a system that he worked on did not "result[ ] from "a process of reasoning which can be mastered only by specialists in the field" (id. at 701-18, quoting the Advisory Committee Note)—instead it resulted from simple observation of a system with which Boiles was familiar based on his years of experience.

Because Boiles' observations and conclusions amount to lay testimony from a Stericycle employee, they will be accorded appropriately little weight in the class certification decision, but they cannot be completely stricken for any of the reasons advanced by plaintiffs. As with the earlier-reached Kilbourne decision, this witness qualification decision as to Boiles applies solely to the issue of class certification and does not have further implications when it comes to his ability or inability to testify at trial.

### Class Certification Standards

Amidst a troubling disagreement over basic facts such as the existence of contracts, this opinion must now sift through all of the arguments and settle on a Rule 23(c) class certification determination. Certification of a class under Rule 23(c) is appropriate only if it satisfies all four prerequisites of Rule 23(a)—in common parlance numerosity, commonality, typicality and adequacy of representation—and at least one of the criteria of Rule 23(b).

Here plaintiffs are seeking certification under both Rule 23(b)(2) (to the extent that they seek injunctive relief) and Rule 23(b)(3) (to the extent that they seek damages). They have the burden of showing by a preponderance of the evidence that they have met each required element of the Rule (Messner v. Northshore Univ. HealthSys., 669 F.3d 802, 811 (7th Cir. 2012)). What follows will go down the line of those Rule 23 prerequisites in order, setting out specific facts and legal standards as necessary.

### Rule 23(a)(1): Numerosity

Under Rule 23(a)(1) a class can be certified only if "the class is so numerous that joinder of all members is impracticable." Even though Stericycle debates specific inclusions to Kilbourne's proposed class, there are clearly insufficient objections to defeat numerosity when that class contains 256,405 different customers.

### Rule 23(a)(2): Commonality

Rule 23(a)(2) requires plaintiff to show that "there are questions of law or fact common to the class." As Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011) (internal citation and quotation marks omitted) teaches:

> Commonality requires the plaintiff to demonstrate the class members have suffered the same injury.... Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

 **\*6** Plaintiffs assert that all of the customers in the proposed class were injured in precisely the same way, being deceived by Stericycle into paying more than they should have contractually for medical waste services. Each class member had similar contract language forbidding arbitrary unnoticed price increases, and each was subject to the same type of API that was allegedly instituted arbitrarily without proper notice or explanation. Stericycle claims that plaintiffs err in their assertion that Stericycle uses boilerplate contract language, arguing that its contracts vary greatly, but the language in the Subparagraph 2(b) provision, which is part of the standard fine print "Terms and Conditions" of such a huge number of Stericycle contracts with class members, puts the lie to that contention. Any differences among some of its contracts to which Stericycle points either are inconsequential or are outliers that will eliminate some individual members from the class. Any argument that those smaller customers all negotiate

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 41 of 101 PageID #:3706

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 635142, 102 Fed. R. Evid. Serv. 892

contracts that result in significant differences goes against the weight of the evidence.

For further evidence of commonality, the putative class consists entirely of small quantity customers, as Stericycle recognizes. Plaintiffs additionally provide evidence of unaccounted-for environmental and regulatory, fuel and energy surcharges routinely applied to class members. Stericycle's uniform way of responding to and dealing with complaints also suggests that there was a common scheme in defrauding. While Stericycle points to several differences, it ultimately does not defeat Kilbourne's conclusion that the APIs in no way lined up with the increase in Stericycle's costs.

In short, based on plaintiffs' pleadings there is enough to establish a uniform scheme by Stericycle with common addressable questions applicable to the entire class. Even if APIs do not apply equally to every class member and even if not every member has exactly the same Subparagraph 2(b) provision as Stericycle argues, there is still enough evidence of a likely common scheme to defraud. In light of all of the commonalities, there is plainly enough to establish common conduct resulting in a common injury, capable of class resolution.

### Rule 23(a)(3): Typicality

What is known as "typicality" reflects the Rule 23(a)(3) requirement that "the claims or defenses of the representative parties [be] typical of the claims or defense of the class." As Oshana v. Coca-Cola Co., 472 F.3d 506, 514 (7th Cir. 2006) (citations and internal quotation marks and ellipsis omitted) has explained the requirement:

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory. Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large.

Hence class representatives have been found not typical of the class when they had to rely on a legal theory different from that applicable to other class members (see, e.g., Muro v. Target Corp., 580 F.3d 485, 492-93 (7th Cir. 2009)).

In this instance all of the proposed class representatives base their claims on the same legal theory of fraudulent behavior by Stericycle in its API establishment. Plaintiffs assert that because the customers were all injured in the same way, typicality is easily achieved. That is persuasive, for the class representatives are all assertedly victims of the same APIs that allegedly violate the Subparagraph 2(b) provisions in their contracts, as well as having had to pay extra fuel and environmental surcharges (with five of the seven representatives also charged for an energy surcharge). And relatedly the same legal theories are in play as to both the representatives and the class members, with the only differences being the amount of damages (and types of surcharges).

In an effort to counter typicality, Stericycle attempts to point to several differences in how class representatives negotiated their contracts and price caps. But the exact series of events that led to different contracts and the amount at which each class member's API is capped does not play a role in the class injuries that plaintiffs allege, outside of an individualized calculation of damages. Legitimate affirmative defenses may be effective in striking class members or in lowering damages for individual class members, but they cannot be the sole grounds for defeating class certification based on a lack of typicality, as they do not go to the merits of the case (see Koos v. First Nat'l Bank of Peoria, 496 F.2d 1162, 1164 (7th Cir. 1974)).

### Rule 23(a)(4): Adequacy

**\*7** Rule 23(a)'s final requirement is that "the representative will fairly and adequately protect the interests of the class" (Rule 23(a)(4)). As Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992) has taught in a brief but oft-quoted formulation:

> A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.

While potential but as-yet-unrealized conflicts will render a proposed class representative inadequate (see Randall v. Rolls-Royce Corp., 637 F.3d 818, 824 (7th Cir. 2011)), purely speculative conflicts or mere differences in entitlement to relief will not affect a proposed representative's adequacy (Johnson v. Meriter Health Servs. Employee Ret. Plan, 702 F.3d 364, 372 (7th Cir. 2012)).

Because the class representatives assert precisely the same claims and seek the same relief as the class members, the representatives have common interests with the proposed class and the adequacy requirement is met. Stericycle does not point to a single conflict of interest, real or potential, that would impair the ability of any of the individual plaintiffs to represent the interests of the class fairly and adequately.

2017 WL 635142, 102 Fed. R. Evid. Serv. 892

Kilbourne helps to provide a conflict-free way of calculating damages, and plaintiffs' counsel, the Hagens Berman Sobol Shapiro LLP ("Hagens Berman") law firm, has more than ample experience to help represent the interests of the entire class without conflict. Individual plaintiffs are therefore adequate representatives of the class.

Thus plaintiffs have met all of the requirements of Rule 23(a). But to have their proposed class certified, they must also meet the requirements of at least one provision in Rule 23(b). And in this instance plaintiffs meet the requirements of not one but two such provisions: Rule 23(b)(2) and 23(b)(3).

**Rule 23(b)(2)**

Rule 23(b)(2) provides that a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Wal-Mart, 564 U.S. at 360-61 (internal citation and quotation marks omitted, emphasis in original) has explained the Rule:

> [A]t a minimum, claims for individualized relief ... do not satisfy the Rule. The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

But that last sentence does not mean that any case involving money damages is unsuited for certification under Rule 23(b)(2). While Wal-Mart found individualized awards of backpay improper in a pure Rule 23(b)(2) class action, our Court of Appeals has held that injunctive relief and damages can be sought in separate phases of a single class action—the court can simply order a "divided certification" that invokes either Rule 23(b)(2) or 23(b)(3) as to appropriate phases of the trial (Johnson, 702 F.3d at 371)—which is precisely what plaintiffs seek here.

**\*8** Plaintiffs look for equitable relief in the form of (1) a declaration that Stericycle's API policy was unlawful and was a breach of standard Subparagraph 2(b) pricing language, rendering such agreements voidable, as well as (2) an injunction (a) that prohibits Stericycle from continuing its unlawful pricing practices or (b) that requires it to disclose its practices accurately in future contracts. They argue that the injunctive relief class should be certified because Stericycle acted on grounds that apply to the entire class, making any declaratory and injunctive relief appropriate for the class as a whole.

In that regard the API policy affected all class members, and whether it conflicted with Stericycle's standard price-change terms will apply equally to the class. Plaintiffs argue further that Stericycle's common conduct means that it can be enjoined or declared unlawful only as to all class members or as to none of them. Those arguments are legitimate, so that the injunctive relief class can be certified. Even though the plaintiffs seek individualized damages as Stericycle says, their Complaint clearly also has the goal of ensuring that Stericycle stops defrauding customers, an injunctive relief goal worthy of satisfying Rule 23(b)(2).

**Rule 23(b)(3)**

Although the just-completed discussion fulfills the analytical requirements for class certification, in the interest of completeness (in the sense called for in a good many situations) this opinion turns to a comparable look at the alternative (or often complementary) terms of Rule 23(b)(3). That Rule provides that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts regularly refer to those two requirements by the shorthand terms "predominance" and "superiority."

Rule 23(b)(3)'s "predominance criterion is far more demanding" than the Rule 23(a) commonality requirement (Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)). While the latter requirement is met by merely showing the existence of a single question common to class members' claims, predominance requires that those common questions "can be resolved for all members of a class in a single adjudication" (Messner, 669 F.3d at 815, quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011) (internal punctuation marks omitted)). That means that while individual questions must not outweigh the common ones, "individual questions need not be absent" either (id.).

2017 WL 635142, 102 Fed. R. Evid. Serv. 892

Here common issues predominate in both the breach of contract claims and the Illinois Consumer Fraud Act claims, each of which stems from Stericycle's common practice of regularly increasing customers' prices in violation of their contracts through the use of software programming. If Stericycle is found to have violated the law when it comes to one Subparagraph 2(b) provision, it will have violated the law to varying degrees in relation to all of the provisions. Individual proof will be necessary only if Stericycle's liability is first established as to contract violations. As for their fraud claim, plaintiffs have shown a standardized pattern of misrepresentations (over and above the verifiable contract breaches), listing several legal questions that will apply to the whole class. They have also demonstrated that based on Kilbourne's testimony class members' damages can be calculated using a common, reliable formula after resolving the liability questions. Those factors provide ample evidence of a common factual link and a uniform Stericycle policy (even if that policy may not be carried out identically when it comes to each class member), so that the predominance requirement has been satisfied. Even if Kilbourne's formula were to turn out to need fine tuning or if his data were to need updating by looking at contracts manually, his research provides satisfactory evidence that damages can be calculated with a common formula applied to the entire class.

**\*9** Plaintiffs go on to argue that class treatment is superior to other available methods for adjudicating the controversy fairly and efficiently because (1) no class member has an interest in prosecuting Stericycle individually, (2) there are no pending related cases against Stericycle on behalf of class members except those consolidated into this one and the tagalong cases referred to earlier, (3) it is expedient to concentrate the litigation before this Court (where Stericycle is located) and (4) there are no likely difficulties in managing a class action here, given the overwhelming predominance of common issues. This Court also recognizes the sheer inconvenience to the justice system (not to mention to both parties) of having to deal potentially with a quarter million different lawsuits. Thus the criterion of superiority in addition to predominance has been met as well as the other prerequisites for class certification.

#### Damages Calculations

One oft-reiterated claim from Stericycle is that Kilbourne's conclusions are incorrect and that the class should not be certified because there is insufficient data to analyze contracts over time and calculate damages. That contention is advanced despite the fact that Kilbourne used only Stericycle's data for

his calculations. According to Stericycle, its database does not adequately keep track of contracts over time for customers, so that manual review of each customer file would be necessary. But no precedent suggests that poor bookkeeping should shield a company from potential liability, so that this Court rejects any argument that depends on Stericycle not adequately tracking its customer contracts. Even if that process proves to be laborious, plaintiffs must have a way to view the contracts of class members, although not every one of them may be included in Stericycle's electronic database. There was a time when computers did not exist, yet class actions did, and if Stericycle has chosen to keep poor records of its contracts digitally that is not enough to bar class certification (see Weeks v. Bareco Oil Co., 125 F.2d 84 (7th Cir. 1941)).

This Court recognizes that Kilbourne's exact calculations may be slightly off due to the asserted holes in Stericycle's system. But it would be more than troubling to deny class certification because of a lack of organization on Stericycle's end. As recognized in Carrera v. Bayer Corp., 727 F.3d 300 (3d Cir. 2013), when a defendant's records are not an adequate means of finding all members of a class, the class can still be certified if the members can be identified by alternative means. It may indeed be necessary for Stericycle to provide individual contracts as to all potential class members, but that is an issue for a later date. For now there is ample reason to certify this class in light of the records that are available, and if individual contracts prove not to fit the class definition those class members can later be removed from the group.

#### Class Definition

Of course certifying a class is not enough—this Court must also confirm a class definition. Plaintiffs ask that the class be defined in these terms:

> All persons and entities that, between March 8, 2003 through the date of trial resided in the United States (except Washington and Alaska), were identified by Stericycle as "Small Quantity" or "SQ" customer, and were charged and paid more than their contractually-agreed price for Stericycle's medical waste disposal goods and services pursuant to Stericycle's automated price increase policy. Governmental entities whose claims were asserted in United States ex rel. Perez v. Stericycle Inc. shall be excluded from the class.

This Court finds that definition adequate for the class. It encompasses all members who were subject to arbitrary

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 44 of 101 PageID #:3709

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 635142, 102 Fed. R. Evid. Serv. 892

price increases, which brings into play several common questions that are effective in adjudicating the action as outlined earlier. It also manages to exclude plaintiffs who have already been compensated for their injuries and also to take account of customers ineligible for class inclusion, such as those in Washington and Alaska as well as those who do not have contracts (for by definition they would not have a contractually-agreed-upon price).

 **\*10** Stericycle argues that the class is not ascertainable based on objective criteria. It claims that such is the case because plaintiff's definition is too vague and imprecise, impermissibly contains a "fail safe" class and is overly broad, relying on the assertedly flawed methodology of Kilbourne.

But plaintiffs' definition is perfectly precise and clear, for it outlines exactly what type of customer is included in the class. And plaintiffs have also not designated a "fail-safe" class, because the class is not defined by liability. It is defined instead by the receipt of an API and by having a provision like Subparagraph 2(b) in a contract, with it still being possible that Stericycle's profit increases are lawfully matched up with the APIs or that there is insufficient evidence of deceptive trade practices under state law. And the definition is not overbroad, for it is perfectly legitimate for classes to include some customers who have suffered no injury (Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 757 (7th Cir. 2014)).

### Class Counsel

One step that must be taken in conjunction with having certified a class is to appoint class counsel officially. For all of the reasons that this Court stated in its initial decision to appoint Hagens Berman as interim class counsel in its October 11, 2013 memorandum order (and in accordance with plaintiffs' current request), it hereby appoints Hagens Berman as the official class counsel. Hagens Berman has done highly responsible work for plaintiffs up to this point, and there is no doubt that it will continue to represent the interests of the class fairly and adequately hereafter.

### Conclusion

In sum, both motions to exclude witnesses (Dkt. Nos. 210 and 248) are denied, the motion for class certification (Dkt. No. 133) is granted under both Rule 23(b)(2) and 23(b)(3), and class counsel is appointed officially. This action is set for a status hearing at 9:30 a.m. on February 27, 2017 to discuss further proceedings in the case.

### All Citations

Not Reported in Fed. Supp., 2017 WL 635142, 102 Fed. R. Evid. Serv. 892

Footnotes

1   As is typical in MDL cases, since then the MDL Panel has transferred a number of tagalong cases from other districts to this Court's calendar to be dealt with under the same judicial umbrella.

2   They claim that Stericycle focused on small-quantity customers because larger and more sophisticated companies (as well as government customers) were harder to take advantage of, especially in light of rulings by several governmental authorities that the APIs were improper.

3   As a then member of the Judicial Conference's Advisory Committee on the Rules of Evidence, this Court chaired the subcommittee in charge of drafting the proposed amendments to Rules 701, 702 and 703 and the Committee Note to those amendments. On that score the principal draftsman was the truly outstanding reporter to the Committee, Fordham Law School Professor Daniel Capra (talk about expert!), while this Court had the privilege of working with him most closely in that drafting task. In an instance of particular serendipity, the resulting work product had been approved by the Advisory Committee and the Judicial Conference's Standing Committee and was out for public comment just at the time when Kumho came before the Supreme Court—and the Supreme Court then cited the Committee Note approvingly in the course of its opinion (526 U.S. at 156-57). As a result the Committee Note was in turn revised to reflect the Kumho decision, and the final product then cleared the Standing Committee, the Judicial Conference and the Supreme Court so as to become effective on December 1, 2000. And as a parenthetical matter of personal pride, this Court was honored to be named as the Chairman of the Advisory Committee during the course of those events.

In re Stericycle, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 635142, 102 Fed. R. Evid. Serv. 892

4       In this Court's judgment that treatise is by all odds the best work available to anyone seeking to understand, and seeking to understand the reasons underpinning, the Federal Rules of Evidence. It is the work of a trilogy of truly expert authors ("editors" would be an inadequate label): Professor Dan Capra, already referred to in n.3, George Washington University Law School Professor Steve Saltzburg, who was also this Court's valued colleague during its tenure on the Advisory Committee and Professor Michael Martin, a Fordham Law School colleague of Professor Capra. Both from its style and from its content, the portion of that treatise cited in the text appears to bear the hallmarks of Professor Capra's authorship.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Systems Software Associates, Inc. Securities Litigation, Not Reported in F.Supp.2d...
2000 WL 1810085, Fed. Sec. L. Rep. P 91,288

2000 WL 1810085
United States District Court, N.D. Illinois, Eastern Division.

In re: SYSTEMS SOFTWARE ASSOCIATES,
INC. SECURITIES LITIGATION

No. 97 C 177.
|
Dec. 8, 2000.

*MEMORANDUM OPINION AND ORDER*

DARRAH, J.

**\*1** Plaintiffs bring this action against defendants, System Software Associates, Inc. (SSA) and certain of its officers, Roger E. Covey, Terence H. Osborne, Terry E. Notari, Josepf Skadra, and Larry F. Ford, for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t. Currently before the Court is plaintiffs' Motion for Class Certification.

On March 8, 2000, the Court entered an Memorandum Opinion and Order, granting in part and denying in part defendant's Motion to Dismiss (*In re Software Associates, Inc., Sec. Litig.,* No. 97 C 177, 2000 WL 283099 (N.D.Ill. Mar. 8, 2000) (*Software Associates I*) ). The factual background for the instant Opinion and Order is set out at pages 1-8 of the March 8, 2000 opinion and need not be reiterated herein. In *Software Associates I,* previous plaintiffs consisting of purchasers of SSA stock between November 21, 1994 and January 7, 1997 who still held that stock on January 7, 1997, were dismissed from the case based on the defense of *res judicata* arising out of a previously resolved state class action.

I. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs here seek class certification under Rule 23(b)(3) of: "All purchasers of SSA stock during the period of August 22, 1994 through and including November 20, 1994 [Early Class] and all purchasers during the period between November 21, 1994 through and including January 7, 1997 who sold their stock prior to January 7, 1997 [In and Out Purchasers]."[1] Defendants argue class certification should be denied because

the plaintiffs have failed to establish the Rule 23 requirements as set out below.

II. ANALYSIS

Allegations made in support of class certification are considered true (*Hardin v. Harshbarger,* 814 F.Supp. 703, 706 (N.D.Ill.1993)); and, as a general matter, this Court does not examine the merits of the case (*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir.1993)). However, a court "may look beyond the pleadings to determine whether the requirements of Rule 23 have been satisfied." *Dhamer v. Bristol-Myers Squibb Co.,* 183 F.R.D. 520, 529-30 (N.D. Ill 1998), citing *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). "A court must understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues." *Dhamer,* 183 F.R.D. at 530.

To receive class certification, plaintiffs must satisfy all four elements of Rule 23(a), which include: numerosity, commonality, typicality, and adequacy of representation. Fed.R.Civ.P. 23(a). Plaintiff must also satisfy at least one of the three provisions under Rule 23(b).

A. Rule 23(a) Requirements

*Numerosity and Commonality*
Rule 23(a)(1) requires that the class be so numerous that joinder of all the members is impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiff need not demonstrate the exact number of class members so long as a conclusion is apparent from good faith estimates (*Peterson v. H & R Block Tax Servs.,* 174 F.R.D. 78, 81 (N.D.Ill.1997)) and the court is entitled to make "common sense assumptions" in order to support a finding of numerosity (*Grossman v. Waste Management, Inc.,* 100 F.R.D. 781, 785 (N.D.Ill.1984)). Furthermore, in securities fraud suits involving nationally traded securities, numerosity may be assumed. See *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1039 (5th Cir1981); *Fry v. UAL Corp.,* 136 F.R.D. 626, 630 (N.D.Ill.1991) (applying *Zeidman* presumption in nationally traded security).

**\*2** Defendants argue the possibility of further exclusion of some plaintiffs based on *res judicata* demonstrates that plaintiffs have not met the numerosity requirement. Plaintiffs allege approximately 42.3 million shares of SSA common stock outstanding held by thousands of

2000 WL 1810085, Fed. Sec. L. Rep. P 91,288

shareholders of record. Plaintiffs have met the numerosity requirement. Defendant does not challenge certification based on commonality. Therefore, the Court need not address this requirement and finds it has been established by the plaintiffs.

*Typicality*

The typicality requirement of Rule 23(a)(3) is closely related to the commonality requirement of Rule 23(a)(2). *Ruiz v. Stewart Associates, Inc.,* 171 F.R.D. 238, 242 (N.D.Ill.1997). A plaintiff's claim is typical if it arises from the same event or practice or course of action that gives rise to the claims of other class members and if his or her claims are based on the same legal theory. *Rosario,* 963 F.2d at 1018. Defenses that are peculiar to named plaintiffs or a subset of the plaintiff class may destroy the typicality of the class as well as bring into question the adequacy of the named plaintiffs' representation. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7 [th] Cir.1980). However, a unique defense is merely a factor that informs the court's decision on class certification and need not destroy typicality. *Williams v. Gill,* 572 F.Supp. 509, 518 (N.D.Ill.1983). Typicality is only destroyed where the defenses against named plaintiffs are likely to consume a significant portion of the litigant's time and energy and where there is a danger that preoccupation with defenses unique to the representatives will cause absent class members to suffer. *In re CBC Companies, Inc.,* 181 F .R.D. 380, 385 (N.D.Ill.1998).

Defendants argue that the class is atypical because nine of the thirteen named plaintiffs have been dismissed from the suit or released defendants from the claims asserted in this action, and these unique defenses will detract attention from the claims of absent class members. Although defendant's defenses may ultimately impact nine of the named plaintiffs' ability to recover, based on the defenses and the required proofs of each, they should not require a significant amount of time to resolve or detract attention from absent class members' claims. See *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 58 (N.D.Ill.1996) (defenses of release, tender of laches unique to some class members did not prohibit finding of typicality).

Defendants also argue the remaining four named plaintiffs' claims and injuries are not typical of the proposed class because they purchased their stocks during a short period of time (May, June, July of 1996) of the proposed class period, including August 22, 1994 through November 20, 1994, which would include both In and Out Purchasers and Purchasers and Holders (the "Early Class"). This argument

is not convincing. First, the representative plaintiffs need not be identical in order to be typical. Second, the putative class members' claims would all arise from the same basic course of conduct by defendant and are based on the same legal theory, irregardless of when an individual class representative purchased shares. See *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975 (upholding class certification where alleged securities fraud involved 45 documents issued over a course of 27 months); *In re General Instrument Corp.,* at [*] 5 (finding typicality for class period beginning March 21, 1995, although class representatives first purchased stock on June 20, 1995). The typicality requirement is met.

*Adequacy of Representation*

**\*3** The class representatives must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In determining adequacy of class representation, the court considers whether (1) any conflicts of interest exist between the named plaintiffs and the class members and (2) the named plaintiffs' counsel will adequately protect the interests of the class. *Gaspar,* 167 F.R.D. at 58.

Defendants first argue that the named plaintiffs do not have a direct interest in proving claims of all absent class members because of their limited purchases. The defendants' argument is not convincing. "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie,* 524 f.2d at 902.

In a related argument, defendants allege that the named plaintiffs have interests that are antagonistic to those of absent class members because of the different time and price at which plaintiffs purchased their stocks. Defendants' argument and the seminal case cited by defendants (*In re Seagate Technology II,* 843 F.Supp. 1341 (N.D.Cal.1994) have been rejected by the courts. See *e.g., Blackie,* 524 F.2d at 908; *In re General Instrument,* at [*] 4; *In re Gamming Lottery Sec Litig.,* 58 F .Supp.2d 62, 69 (S.D.N.Y.1999); *Freedman v. Louisiana Pacific Corp .,* 922 F.Supp. 377, 401 (D.Ore.1996). The courts acknowledge that a conflict of interest between early and late purchasers is theoretically possible; however, the theoretical conflict is outweighed by the practical considerations of securities litigation. See *Blackie,* 524 F.2d at 908; *In re*

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 48 of 101 PageID #:3713

In re Systems Software Associates, Inc. Securities Litigation, Not Reported in F.Supp.2d...
2000 WL 1810085, Fed. Sec. L. Rep. P 91,288

*general Instrument,*[*] 4 ("the only way to completely avoid the potential for conflict would be to certify different classes for each day of the class period"); *see also Ziemack v. Centel Corp.,* 164 F.R.D. 477, 483 (N.D.Ill.1995) ("Some antagonism of interests within a plaintiff class is tolerable and inevitable.").

Defendants also argue plaintiffs' counsel neglected to investigate the alleged defenses against nine of the thirteen named plaintiffs demonstrating they are inadequate representatives to the instant litigation. The Court finds defendants' argument unpersuasive. Plaintiffs' counsel are experienced in federal securities class action litigation and presently represent some of the same plaintiffs of this case in a related class action suit in which plaintiffs' motion for class certification was granted (*Retsky v. Price Waterhouse,* No. 97 C 7694, 1999 WL 543209 (N.D.Ill. July 23, 1999)).

B. Rule 23(b)(3) Requirements

Plaintiffs seek class certification under Rule 23(b)(3). Rule 23(b)(3) provides that a class action may be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to the available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

**\*4** Defendants argue common issues do not predominate because of the length of the class period and the multiple (27) separate alleged misstatements involve numerous events at varying times and a class action is not a superior method of adjudication.

The Court finds that the requirements of Rule 23(b)(3) are met. The principal issues of law and fact relate to defendants' alleged misrepresentations. These issues are common to the members of the class and predominate over any questions affecting only individual members. Furthermore, a class action is superior to any other method of adjudication for the fair and efficient adjudication of this controversy. There is a "strong policy favoring class actions in securities fraud actions." *Grossman v. Waste Management Inc.,* 100 F.R.D. 781, 784 (N.D.Ill.1984), citing *King v. Kansas City Southern Industries, Inc.,* 519 F.2d 20, 26 (7th Cir.1975). "In a securities fraud action, 'any error, if there is one, should be committed in favor of allowing a class action." ' *In re General Instrument Corp.,* 1999 WL 1072507 (N.D.Ill. Nov. 18, 1999), quoting *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3rd Cir.1985).

IT IS THEREFORE ORDERED:

A. The Plaintiffs' Motion for Class Certification is granted.

B. The certified class shall be defined as:

All persons who purchased the common stock of System Software Associates, Inc., during the period of August 22, 1994 through and including November 20, 1994 and those who purchased common stock during the period of November 21, 1994 through and including January 7, 1997 who sold their stock prior to January 7, 1997 and who suffered damages as a result. Excluded from the class are the defendants (Systems Software Associates, Inc. and related entities Roger E. Covey, Terence H. Osborne, Terry E. Notari, Joseph Skarda, and Larry F. Ford); members of the individual defendant's families; any entity in which any defendant has a controlling interest or which is a parent or subsidiary of or is controlled by System Software Associates, Inc.; and officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of any excluded person or entity.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1810085, Fed. Sec. L. Rep. P 91,288

---

Footnotes

1    The designation of "Early Class", "In and Out Purchasers", and "Purchasers and Holders" are taken from *Software Associates I.*

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6572660
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Matt KARINSKI

v.

STAMPS.COM, INC., et al.

Case No. CV 19-1828-MWF (SKx)
|
Filed 11/09/2020

**Attorneys and Law Firms**

Jennifer Pafiti, Pomerantz LLP, Los Angeles, CA, for Matt Karinski.

Christina Lucen Costley, Paul Satoshi Yong, Richard H. Zelichov, Katten Muchin Rosenman LLP, Los Angeles, CA, Jonathan Rotenberg, Pro Hac Vice, Katten Muchin Rosenman LLP, New York, NY, for Stamps.com, Inc., et al.

**Proceedings (In Chambers):** ORDER GRANTING MOTION FOR CLASS CERTIFICATION [119]

The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

 **\*1** Before the Court is Lead Plaintiff Indiana Public Retirement System's ("Lead Plaintiff" or "Plaintiff") Motion for Class Certification (the "Motion"), filed on June 29, 2020. (Docket No. 119). Defendants Stamps.com, Inc. ("Stamps" or the "Company"), Kenneth McBride, Kyle Huebner, and Jeff Carberry (collectively, "Individual Defendants") filed an opposition on August 31, 2020. (Docket No. 157). Lead Plaintiff filed a reply on October 15, 2020. (Docket No. 161).

The Court has read and considered the papers filed in connection with the motions and held a telephonic hearing on November 2, 2020, pursuant to General Order 20-09 arising from the COVID-19 pandemic.

The Motion is **GRANTED**. The proposed Class satisfies all requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) for certification. Rule 23(g) supports appointment of Robbin Geller as Class Counsel. Defendants cobbled together technical arguments based on nonbinding caselaw and their

expert's conclusions. The Court approached the Motion in that light and addressed these arguments. It is important, however, to step back from these arguments, as Plaintiff's counsel did at the hearing. Plaintiff's counsel correctly argued that, given the interrelationship of Stamps and the Postal Service, common sense dictates that this Motion must be granted.

**I. BACKGROUND**
The facts and procedural history are well known to all parties. Therefore, the Court limits its recitation of facts to those necessary for context in ruling on the motions.

On March 13, 2019, Plaintiff Matt Karinski commenced this action. (*See generally* Complaint (Docket No. 1)). On June 5, 2019, the Court appointed Indiana Public Retirement System as Lead Plaintiff. (Docket No. 62). On August 5, 2019, Lead Plaintiff filed a Consolidated Complaint ("Complaint"). (Docket No. 71). Lead Plaintiff brings a securities fraud class action on behalf of all persons who purchased the common stock of Stamps.com between May 3, 2017, and May 8, 2019, (the "Class Period") and were harmed thereby (the "Class"). (Complaint ¶¶ 1, 135).

The Complaint alleges that Stamps exploited its contractual relationships with the USPS by providing customers unauthorized-discounted USPS shipping under what was known as the "reseller program." (*Id.* ¶ 2). Although Stamps publicly represented throughout the Class Period that its strong operating performance was the result of the Company's healthy partnership with the USPS, the Complaint alleges that a majority of Stamps' reported revenue and earnings growth during the Class Period was the product of undisclosed, improper, and unsustainable business practices. (*Id.* ¶¶ 4, 5). The Complaint alleges that Defendants made a number of material misrepresentations and omissions. (*Id.* ¶¶ 65-97). Specifically, the Complaint alleges that Defendants made the following misrepresentations:

• On May 3, 2017, Defendant McBride told investors and analysts on the Company's first quarter 2017 conference call that they had a "great partnership" with the USPS, and that the "USPS is very happy with the approach they've taken and business model. They're very happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there. So we're happy and they're happy." (*Id.* ¶¶ 68-70);

 **\*2** • On the Company's August 1, 2018 conference call, McBride dismissed market concerns about the

**Karinski v. Stamps.com, Inc., Slip Copy (2020)**

2020 WL 6572660

investigation, assuring analysts that based on the Company's conversations, "the [Task Force] report will come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS." (*Id.* ¶ 89);

• On August 2, 2017, Defendants issued a release stating: "We continue to enjoy a great partnership with the Postal Service and feel that we have created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and ecommerce and online postage more generally." (*Id.* ¶ 74);

• On October 31, 2018, McBride stated that the Company "expect[s] that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business." (*Id.* ¶ 92).

On May 8, 2019, Stamps announced it was lowering its earnings guidance because of potential unfavorable negotiations and terminations of certain contracts between the USPS and the Company's reseller partners. (*Id.* ¶ 12). As a result of the news, the Company's stock price dropped another $46 per share on record trading volume of 16.8 million shares, a decline of over 56%. (*Id.*). This drop, combined with the steep decline on February 21, 2019, amounted to a 76% loss in value in less than three months, as the truth regarding Stamps' deteriorating relationship with the USPS was revealed. (*Id.*).

The Complaint asserts three claims: (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17

C.F.R. § 240.10b-5 (against all Defendants); (2) violations of § 20(a) of the 1934 Act (against Individual Defendants); and (3) violations of the § 20(a) of the 1934 Act (against Defendant McBride only). (*Id.* ¶¶ 141-169).

On January 17, 2020, the Court issued an Order denying Defendants' motion to dismiss ("MTD Order"). (Docket No. 89). In the MTD Order, the Court noted that the alleged misrepresentation or omission in Plaintiff's Complaint center around three theories: "(1) Stamps' alleged abuse of the USPS reseller program; (2) Defendants' representations that its partnership with the USPS was 'strong'; and (3) Defendants' historical results and growth estimates." (*See id.* at 18).

The Court determined that Plaintiff sufficiently alleged one of these theories. Specifically, Plaintiff sufficiently alleged that "Defendants' representation that it had a strong relationship

with USPS or that USPS was 'very happy' with Plaintiff's business practice was [allegedly] misleading." (*Id.* at 25). However, the Court determined that Plaintiff failed to demonstrate the two other theories that: (1) Defendants omitted material information about Stamps' alleged abuse of the USPS reseller program; and (2) "Stamps' discussion of, and positive statements about, its past and future financial results were misleading." (*Id.* at 19, 26).

## II. DISCUSSION

Lead Plaintiff seeks to certify a class consisting of:

All persons who purchased or otherwise acquired Stamps.com, Inc. ("Stamps.com" or the "Company") common stock between May 3, 2017, and May 8, 2019, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

**\*3** (Motion at 7).

Federal Rule of Civil Procedure 23(a) requires the putative class to meet four threshold requirements: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). In addition, the proposed class must satisfy Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable ...." Fed. R. Civ. P. 23(a)(1). Plaintiff presents evidence that, on average, over 2.3 million shares of Stamps stock were exchanged on a weekly basis during the Class Period. (Declaration of Eric Niehaus ("Niehaus Decl."), Ex. 2, Expert Report of Zachary Nye, Ph.D. ("Nye Rpt.") ¶ 25 (Docket No. 122-2)). Defendants do not dispute numerosity. Given the weekly trading volume of 2.3 million shares, the Court determines that the numerosity requirement is satisfied. *Maiman v. Talbott*, SACV 09-00012 AG (ANx), 2011 WL 13065750, at *3 (C.D. Cal. Aug. 29,

2020 WL 6572660

2011) (Given the weekly trading volume of 1.32 million shares, "common sense dictates that the proposed class is surely sufficiently large to make joinder impracticable.") (citation omitted).

### B. Commonality

Rule 23(a)(2) requires that the case present "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), clarified that to demonstrate commonality, the putative class must show that their claims "depend upon a common contention ... that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. That requirement is met here, as each member of the proposed Class would seek resolution of the same legal and factual issues at trial, whether: (1) Defendants violated the Exchange Act; (2) Defendants misrepresented and/or omitted material facts; (3) Defendants knowingly or recklessly disregarded that their statements were misleading; (4) the price of Stamps common stock was artificially inflated as a result of Defendants' allegedly misleading statements; (5) Defendant McBride engaged in illicit insider trading of Stamps stock. (Motion at 10).

### C. Typicality

Rule 23(a)(3) requires the putative class to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The claims of the representative parties need not be identical to those of the other putative class members; "[i]t is enough if their situations share a 'common issue of law or fact,' and are 'sufficiently parallel to insure a vigorous and full presentation of all claims for relief.' " *California Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (internal citations omitted).

**\*4** In cases alleging violations of the Exchange Act, "so long as a putative class representative can show that he purchased the stock at the market price and did not consider any unique, *e.g.* insider, information in deciding to purchase it, the putative class representative's claims will likely be typical of the class." *Todd v. STAAR Surgical Corp.*, CV 14-05263-MWF (RZx), 2017 WL 821662 (C.D. Cal. Jan. 5, 2017), at \*4. Typicality is satisfied even if a class representative's "damages differ from the damages of some class members." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017).

Defendants argue that Lead Plaintiff and its investment advisor's unique trading patterns of Stamps stock render Lead Plaintiff atypical. (Opposition at 8). This argument is unpersuasive because it relies on Lead Plaintiff's holding in Stamps stock as of June 5, 2020, more than a year after the Class Period ends. *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, No. C 01-20418 JW, 2004 WL 5326262, at \*3 (N.D. Cal. May 27, 2004) ("post-class period purchases do not defeat typicality").

Defendants next argue that Lead Plaintiff cannot satisfy typicality because Lead Plaintiff bought 71% its stock after the alleged corrective disclosures on February 21, 2019, and May 8, 2019. (Opposition at 8) (citing *Erickson v. Snap, Inc.*, 2017 U.S. Dist. LEXIS 221050, at \*8-9, 2017 WL 11568163 (C.D. Cal. Sep. 18, 2017) (holding that a plaintiff was atypical because it purchased 60% of its shares post-disclosure). Again, Defendants' argument is misleading because Defendants' calculations improperly include shares purchased after the Class Period ended. Plaintiff purchased 12,773 shares after the first alleged partial corrective disclosure, representing 31% of the total shares that Lead Plaintiff purchased during the Class Period. (*See* Schedule of Securities Transactions (Docket No. 76)). The Court determines that Lead Plaintiff's post-disclosure purchases do not defeat typicality because they are not disproportionate to its prior purchases or indicative of non-reliance on the alleged misstatements. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 284 (N.D. Cal. 2020) ("Plaintiff's post-disclosure purchases during the remainder of the class period are neither disproportionate to its prior purchases, nor indicative of the purported fact that plaintiff did not rely on the market to value the shares following the [alleged corrective] disclosure."); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 347-48 (C.D. Cal. 2015) ("many district courts in the Ninth Circuit have held that post-disclosure or even post-class period purchases do not necessarily defeat typicality"). Lead Plaintiff has presented evidence demonstrating that Lead Plaintiff's investment managers relied on the alleged misrepresentations and the integrity of the market price just like all other members of the Class. (*See* Declarations of Nicholas Hansen, Rob Nicoski, and Frederick Martin ("DGI Decls.") ¶¶ 4, 7 (Docket No. 159-3)).

Defendants also argue that Lead Plaintiff cannot satisfy typicality because its investment advisors were "net sellers" for most of the putative class period, potentially subjecting Lead Plaintiff to unique defenses. (Opposition at 9). Whether

a plaintiff was a net seller is not a relevant consideration at the class certification stage. *See Plumbers & Pipefitters Loc. 572 Pension Fund v. Cisco Sys., Inc.*, 2004 WL 5326262, at *3 (N.D. Cal. May 27, 2004) (rejecting argument that proposed class representative was atypical because "under [t]he FIFO accounting method, the notion of 'net seller' would appear to be largely irrelevant" and "post-class period purchases do not defeat typicality"). Even if being a net seller were a relevant consideration, Lead Plaintiff was not a net seller during the Class Period. (Schedule of Securities Transactions (Docket No. 76)).

**\*5** Finally, Defendants argue that one of Lead Plaintiff's investment advisors had individual meetings with Stamps that give rise to unique defenses. (Opposition at 9). Because Defendant has not argued that Lead Plaintiff's investment advisor obtained material, non-public information from these meetings, the Court determines that these meetings do not defeat typicality. *Beach v. Healthways, Inc.*, No. 3:08–0569, 2010 WL 1408791 (M.D. Tenn. Apr. 2, 2010) ("Mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information.").

Lead Plaintiff purchased Stamps securities at market prices during the Class Period and was injured by the same type of allegedly materially misleading statements that injured all proposed Class members. (*See* Schedule of Securities Transactions; DGI Decls. ¶¶ 4, 7). Lead Plaintiff's claims are premised on the same facts and legal theories as the other Class members. (*See* Motion at 11). Accordingly, the typicality requirement is satisfied.

### D. **Adequacy**

Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?' " *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Additionally, "the honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (citation omitted).

As to the first prong, the Court perceives no obvious conflicts between Lead Plaintiff and the other Class members. As to the second prong, the Court is satisfied that Lead Plaintiff and its counsel have vigorously prosecuted this action, Plaintiff's counsel have substantial experience litigating similar types of class actions, and there is no reason to believe that Plaintiffs and their counsel would not vigorously pursue this action on behalf of the Class. The adequacy requirement is satisfied.

All of the requirements imposed by Rule 23(a) are therefore satisfied. The Court next considers whether the additional requirements of Rule 23(b)(3) are met.

### E. **Predominance**

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). That is, "an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id.* (quoting *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

With respect to the putative Class's § 10(b) claim, Defendants argue that reliance on the alleged misrepresentations cannot be proved through common evidence. Plaintiff's reliance argument relies on the fraud-on-the-market theory, which asserts a plaintiff can show indirect reliance on misrepresentations by establishing reliance on stock price:

**\*6** The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements .... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 242-43 (1988) (citing *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

2020 WL 6572660

The Supreme Court in *Basic* applied a rebuttable presumption of reliance based in part on the fraud-on-the-market theory. *See id.* at 247. The *Basic* presumption allows a plaintiff to substitute reliance on a company's stock price for actual reliance on a company's false statement so long as a company's stock trades in an efficient market. *Id.* at 246-47. The presumption is premised on the fact that "the market price of shares traded on well-developed markets reflects all publicly available information" and that investors in such markets transact "in reliance on the integrity of that price." *Id.* Application of the *Basic* presumption dispenses with the requirement that each Class member prove individual reliance on Defendants' alleged misstatements or omissions. *See id.* at 241-42.

Defendants do not contest that Plaintiff has satisfied the elements necessary to invoke the *Basic* presumption. (Opposition at 10). Instead, Defendants seek to rebut the *Basic* presumption by demonstrating by a preponderance of the evidence that the alleged misrepresentations did not have any impact on the price of Stamps stock. (Opposition at 10-11) (citing *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) ("If a defendant shows that an 'alleged misrepresentation did not, for whatever reason, actually affect the market price' of defendant's stock, 'there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price.' ") (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264, 283 (2014)).

Plaintiff has produced ample evidence that the alleged misrepresentations impacted Stamps' share price. Specifically, Plaintiff's expert, Dr. Zachary Nye, conducted a robust event study and determined that there were statistically significant share price declines following the alleged corrective disclosures on February 21, 2019, and May 8, 2019. (*See* Nye Rpt. at 10) (finding that the 57.77% share price decline on February 22, 2019 was statistically significant at the 95% confidence level); (*id.* at 11) (finding that the 55.75% share price decline on May 9, 2019 was statistically significant at the 95% confidence level).

Defendants attempt to rebut the *Basic* presumption by showing that the stock price failed to rise after the May 3, 2017 and August 2, 2017 statements. (*See* Consolidated Complaint ¶¶ 66-70, 72-76; Declaration of Richard Zelichov ("Zelichov Decl."), Ex. 1 (Rebuttal Report of Paul Zurek,

Ph.D. ("Zurek Rpt.")) ¶ 45 (Docket No. 157-2) ("there is no economic evidence that information released on Stamps.com's May 3, 2017, conference call caused its stock price to increase")). At the hearing, Defendants emphasized Dr. Paul Zurek's opinion that the stock price did not change because the "alleged misstatements did not convey new and value relevant information to the market about the probabilities of an adverse outcome to the economics of Stamps.com's relationship with the USPS." (*See* Zurek Rpt. ¶ 6).

**\*7** These arguments are not persuasive because Lead Plaintiff has pled a "price maintenance" theory of loss causation, asserting that the alleged misrepresentation prolonged the artificial inflation of the stock price, ***preventing the decline*** in stock price that would have occurred had the truth been disclosed. *See Hatamian*, 2016 WL 1042502, at \*7 ("[L]ack of a statistically significant price increase does not necessarily equate to lack of price impact.... It is ... possible that 'a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further.' "). Defendants argued at the hearing that Plaintiff's price maintenance theory was raised for the first time in its Reply brief. The Court disagrees. Plaintiff's price maintenance theory is made clear in the Complaint, which alleges that the Defendants "falsely assured the market that the Company's strong revenue and profit growth was based on its mutually-beneficial and stable relationship with the USPS," and that these assurances allowed Defendants to "sell the vast majority of their Stamps shares at artificially inflated prices before the truth about defendants' misconduct was revealed." (*See* Complaint ¶¶ 8, 26).

Defendants next challenge the materiality of the alleged misrepresentations, arguing that there could be no "corrective" disclosure with respect to the May 3, 2017 and August 2, 2017 statements because market commentators had already published negative information about the relationship. (*See* Opposition at 12). This argument amounts to a truth-on-the-market defense and is not properly considered at the class certification stage because materiality is assumed. *See Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475, 482 (2013) ("the potential immateriality of Amgen's alleged misrepresentations and omissions is no barrier to finding that common questions predominate"); *In re Stec Inc. Sec. Litig.*, SACV 09-01304-JVS (MLGx), 2012 WL 6965372, at \*12 (C.D. Cal. Mar. 7, 2012) ("[T]he Court cannot properly consider Defendants' truth-on-the-market defense at the class certification stage because this defense

is a 'method of refuting an alleged misrepresentation's **materiality**,' and 'a plaintiff need not prove materiality at the class certification stage to invoke the [*Basic*] presumption.' ") (citation omitted).

At the hearing, Defendants argued that their challenge to the materiality of the May 3, 2017 and August 2, 2017 statements does not amount to a truth-on-the-market defense because they have presented evidence that the statements did not convey new information and did not affect stock price. (*See* Zurek Rpt. ¶ 6). "The truth-on-the-market defense requires a showing that the market "was already aware of the truth behind the defendant's supposed falsehoods and thus those falsehoods did not affect the market price." *In re Stec Inc. Sec. Litig.*, 2012 WL 6965372, at *12 (citation omitted). Even if the Court did not view Defendants' arguments as a truth-on-the-market defense — which it does — these arguments do not defeat predominance because "arguments about whether particular statements were actually disclosures, like arguments about loss causation and that the market already was aware of [the] allegations, are common questions that can be adjudicated on a class-wide basis." *In re Centurylink Sales Pracs. & Sec. Litig.*, 2020 WL 5517483, at *13 (D. Minn. Sept. 14, 2020).

Defendants next argue that the Class Period must be shortened, either to December 4, 2018 (when the Task Force Report that was purportedly the subject of certain of the alleged misstatements was issued), or to February 21, 2019 (when Stamps disclosed that its negotiations with the USPS regarding renewal of its PBIA failed). (Opposition at 17-19). Defendants reiterated these arguments at the hearing.

The Court declines to shorten the class period because the Court is not convinced that the issuance of the Task Force Report or the disclosure of the failed PBIA negotiations (a) revealed the full extent to which Stamps's relationship with USPS had deteriorated or (b) removed the alleged artificial inflation in Stamps stock price. (*See* Niehaus Decl., Ex. 2, Expert Reply Report of Zachary Nye, Ph.D., ("Nye Rebuttal") ¶¶ 35-37) (Docket No. 162-2) ("When the Task Force Report was released on December 4, 2018, it by no means revealed the alleged true state of the Company's relationship with the USPS and its resellers during the Class Period."). Furthermore, any inquiry as to "precisely when the truth was fully disclosed to the market is best reserved for resolution on the merits," and should not result in a narrowing of the class period at class certification unless the defendant unequivocally disclosed the alleged prior misrepresentation.

*See In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 225 (C.D. Cal. 2019); *In re Centurylink*, 2020 WL 5517483, at *15 ("[A]t the class certification stage, the Court will not shorten the Class Period.").

 **\*8** The Court is satisfied that reliance can be proved through common evidence because Plaintiff has produced ample evidence that the alleged misrepresentations impacted Stamps' share price and Defendants have failed to rebut the *Basic* presumption.

Finally, Defendants argue that Plaintiff has not provided a class-wide damages model as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). However, courts in the Ninth Circuit read *Comcast* "to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.' " *Hatamian*, 2016 WL 1042502, at *8 (quoting *Levya*, 716 F.3d at 514). Here, Lead Plaintiff has demonstrated that damages can be calculated using a common, widely-accepted methodology for all Class members. (*See* Nye Rpt. ¶¶ 60-63). Dr. Nye's damages methodology has been routinely accepted by courts examining these same issues at class certification. *See Cooper v. Thoratec Corp.*, No. 14-CV-0360 CW, 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018) (approving Dr. Nye's event study method for calculating per-share damages); *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018) (same); *Todd*, 2017 WL 821662, at *11 (" '[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation' ") (citation omitted).

Accordingly, the predominance requirement is satisfied.

### F. Superiority

Rule 23(b)(3) sets out four factors that together indicate that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy."

2020 WL 6572660

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1779 at 174 (3d ed. 2005)).

***First***, the Court determines that individual Class members would likely have little interest in prosecuting separate actions. Each putative class member's claim is likely too small to justify the cost or risk of litigation. Thus, a class action is a more efficient means for each individual class member to pursue his or her claims. *See Wolin*, 617 F.3d at 1175 ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.").

***Second***, there does not appear to be any other litigation currently or previously pending concerning similar claims to those at issue in this action.

***Third***, concentrating the litigation in this Court would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system. *Todd*, 2017 WL 821662, at *11 (" 'Concentrating litigation in one forum is desirable where a company was listed on a national exchange, and no one has identified a meaningful difficulty in managing this class action.' ").

**\*9** ***Fourth***, the Court does not foresee any management difficulties that will preclude this action from being maintained as a class action.

Accordingly, the superiority requirement is satisfied.

### G. Class Counsel

Lead Plaintiff requests that the Court appoint Robbins Geller as Class Counsel. In appointing class counsel, the Court considers: (1) the work done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1).

Considering these factors, the Court concludes that Robbins Geller will "fairly and adequately represent the interests of the class." *See* Fed. R. Civ. P. 23(g)(4). The Court is satisfied that Robbins Geller has vigorously prosecuted this action and has substantial experience litigating similar types of class actions.

Accordingly, the Court grants Lead Plaintiff's unopposed request to appoint Robbins Geller as Class Counsel.

### III. CONCLUSION

The Motion is **GRANTED**. The proposed Class satisfies all requirements of Rule 23(a) and Rule 23(b)(3) for certification. Rule 23(g) supports appointment of Robbin Geller as Class Counsel.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 6572660

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 1720047

2003 WL 1720047
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Thomas LEVITAN, Janice Fredo, and Blaine
Richardson, individually and on behalf
of all others similarly situated Plaintiffs,
v.
John B. MCCOY, Jr., Richard J.
Lehmann, Michael J. McMennamin
and Bank One Corp., Defendants.

No. 00 C 5096.
|
March 31, 2003.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

 **\*1** Lead Plaintiffs, Thomas Levitan, Janice Fredo, and William Syll, Jr., bring this putative class action on behalf of themselves and those similarly situated against Defendants, Bank One Corporation ("Bank One"), John B. McCoy, Richard J. Lehmann, and Michael J. McMennamin (collectively, the "Defendants"). Plaintiffs now move for class certification pursuant to Fed.R.Civ.P. 23. Defendants oppose Plaintiffs' motion on the basis that the proposed class representatives do not satisfy the requirements of Fed.R.Civ.P. 23(a), lead counsel has an alleged conflict with the class, and the proposed class definition is too broad. For the following reasons, we grant Plaintiffs' motion for class certification, although we will exclude from the class those persons who sold their stock prior to August 24, 1999.

*BACKGROUND*

Lead Plaintiffs bring this case on their own behalf and on behalf of persons who exchanged their shares of First Commerce Corporation ("First Commerce") common stock for shares of Old Banc One common stock in connection with the merger of the two companies and pursuant to the Registration Statement and Merger Proxy/Prospectus

launching that merger. In that merger, Lead Plaintiffs and all other First Commerce stockholders received 1.408 shares of Old Banc One common stock in exchange for each share of First Commerce common stock held by them. The merger was consummated on June 12, 1998. In connection with that merger, plaintiffs allege the following.

Prior to, and at the time of the merger, Old Banc One represented that one of the major strengths of its operations was the tremendous growth reported at its credit card division, First USA Bank, N.A. ("First USA"), which was the third largest credit card issuer in the country at the time. This enormous growth was reflected in Old Banc One's financial statements, which were included in the Registration Statement.

The growth reported by Old Banc One at First USA, however, allegedly was achieved, in large part, through undisclosed illegal practices, including, improper billing procedures and charging excessive late fees and interest to its credit card customers. These practices allegedly violated the Federal Truth In Lending Act ("TILA") and also rendered Old Banc One's financial statements false and misleading in that they did not comply with Generally Accepted Accounting Principles ("GAAP") or otherwise present Old Banc One's financial condition fairly. On July 31, 1998, Old Banc One merged with First Chicago NBD and the new entity is known as Bank One Corporation. ("Bank One").

On August 24, 1999, Bank One issued a press release announcing a reduction to its projected earnings estimates for 1999. On November 10, 1999, Bank One announced a further reduction in its earnings expectations for 1999. Following these announcements, the price of Bank One's common stock dropped. A series of lawsuits were filed challenging Bank One's reporting of historical earnings.

 **\*2** A class action has been certified on behalf of First Chicago shareholders in the consolidated First Chicago Sharcholder Actions (# 00 C 767) and on behalf of Old Banc One shareholders in the Old Banc One Shareholder Action (00 C 2100). The Complaint in this case (hereinafter referred to as the "First Commerce case") is virtually identical to the consolidated complaint in the First Chicago and Old Banc One shareholder actions. The First Commerce Complaint alleges that the Registration Statement and Proxy/Prospectus issued in connection with First Commerce's merger with Old Banc One, as well as the 1997 Form 10K and first quarter 1998 Form 10Q incorporated into those documents, contain

Levitan v. McCoy, Not Reported in F.Supp.2d (2003)

2003 WL 1720047

false and misleading statements and omissions. The alleged misrepresentations all focus on First USA. The Complaint alleges that First USA's payment processing and charging of late fees violated TILA and that Old Banc One's financial statements regarding actual earnings were artificially inflated by the alleged TILA violations. The Complaint alleges claims against Defendants under Sections 11 and 12(a)(2) of the Securities Act, the same statutes at issue in the First Chicago and Old Banc One Litigation.

Prior to the reassignment of this case to this Court from the docket of Judge Coar, Judge Coar appointed the following persons to serve as Lead Plaintiffs as required by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(a) et seq.: Thomas Levitan, William H. Syll, Jr., Anna P Caradonna and Janice C. Fredo, as Joint Tenants with Right of Survivorship, and Blaine Richardson. Mrs. Caradonna died after the appointment and Mr. Richardson has determined that he no longer wishes to represent the class in the case. Lead Plaintiffs all were shareholders of First Commerce, and they have all signed Plaintiff Certification affidavits.

Plaintiffs now bring a motion to certify a class of former First Commerce shareholders and ask this Court to appoint Fredo, Levitan, and Syll as representatives of the class and to appoint Edwin Mills of Stull, Stull & Brody and Joseph Weiss of Weiss & Yourman as Co–Lead Counsel. In addition, Plaintiffs request that Robert Allison of Robert D. Allison & Associates be appointed as Liaison Counsel for the class.

*DISCUSSION*

I. *Class Certification Is Particularly Appropriate In Securities Cases*
The Seventh Circuit Court of Appeals has liberally construed Rule 23 in shareholder suits. *See King v. Kansas City Southern Industries, Inc.,* 519 F.2d 20, 25–26 (7th Cir.1975). Courts in this district recognize that:

> securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing.

*Gilbert v. First Alert, Inc.,* 904 F.Supp. 714, 719 (N.D.Ill.1982). A class action is often the most fair and practicable means to address claims in securities cases. *Brosious v. Children Place Retail Stores,* 189 F.R.D. 138,

147 (D.N.J.1999) ("[c]lass actions are often the most fair and practical vehicle for plaintiffs' claims in securities suits because 'those who have been injured are in a poor position to seek legal redress' ... because individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation"). *See also Endo v. Albertine,* 147 F.R.D. 164 (ND.Ill.1993) (certifying plaintiff class under § 11 of the 1933 Act).

II. *The Proposed Class Meets the Prerequisites of Rule 23(a).*
 **\*3** A suit may be maintained as a class action if it satisfies the four prerequisites of Rule 23(a) and, in addition, meets the conditions of one of the subsections of Rule 23(b). *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993); *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992), *cert. denied, Livaditis v. Rosario,* 506 U.S. 1051 (1993).

Rule 23(a) provides:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

In this case, Defendants do not challenge whether this action satisfies the numerosity and commonality requirements of Rule 23(a). Nevertheless, we will proceed to analyze each sub-part of Rule 23(a) to determine whether class certification is appropriate.

A. *The Numerosity Requirement is Satisfied.*
In determining whether a class meets the numerosity requirement, a court can apply common sense to the facts available. *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 184 (N.D.Ill.1992). Although "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members," *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir.1981), there is no magic number needed to establish numerosity. *Chandler v. Southwest Jeep–Eagle, Inc.,* 162 F.R.D. 302, 307 (N.D.Ill.1995).

In this case, the Company issued, pursuant to the Registration Statement, approximately 62,599,680 shares of Old Banc

Levitan v. McCoy, Not Reported in F.Supp.2d (2003)

2003 WL 1720047

One common stock to First Commerce shareholders in connection with the merger. In addition, First Commerce shareholders surrendered approximately 44, 460,000 shares of First Commerce stock in connection with the merger. Courts in this district have granted class certification to groups smaller than 30. *See, e.g., Riordan v. Smith Barney,* 113 F.R.D. 60 (N.D.Ill.1986); *Zeidman,* 651 F.2d at 1038 (class with as few as 25 or 30 members certified in securities action); *Manning v. Consumer Discount Co.,* 390 F.Supp. 320 (E.D.Pa.1975), *aff'd,* 533 F.2d 102 (3d Cir.1976), *cert. denied,* 429 U.S. 865 (class of 14 certified). Therefore, the class in this case clearly satisfies the numerosity requirement.

In addition, Rule 23(a)(1) provides that a class action may be maintained only if "joinder of all members is impracticable." To demonstrate that joinder is impracticable, the class representatives "only need to show that it is extremely difficult or inconvenient to join all members of the class." C.A. Wright, A. Miller & N. Kane, Federal Practice and Procedure, § 1762 at 159 (2d ed.1986). In this case, it would be extremely difficult to join the thousands of members of the class. Therefore, we find that the requirements of Rule 23(a)(1) have been met because the class is so numerous that joinder of all members is impracticable.

### B. *Common Questions Of Law Or Fact Are Present.*

**\*4** Fed.R.Civ.P. 23(a)(2) requires that there be a common question of law or fact among class members. The commonality requirement has been characterized as a "low hurdle, easily surmounted." *Scholes,* 143 F.R.D. at 185. Common questions exist when, despite the existence of individual issues among class members, there is a common nucleus of operative facts. *Rosario,* 963 F.2d at 1017–18; *Beale v. Edgemark Financial Corp.,* 164 F.R.D. 649, 654 (N.D.Ill.1995). This element is satisfied when each class member's claim hinges on the same conduct by the defendants. *Beale,* 164 F.R.D. at 658.

The present case involves several common questions that relate to Defendants' conduct including, but not limited to:

(a) whether Defendants' actions alleged herein violate Sections 11, 12(2) & 15 of the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.; and

(b) whether Defendants' Registration Statement containing the Merger Proxy/Prospectus contained materially false and misleading statements of fact.

Courts have repeatedly held that cases like this one, which proceed primarily under Section 11 of the 1933 Act, are particularly well-suited to class treatment and satisfy the commonality requirement of Rule 23(a)(2). *See, e.g., Brosious v. Children's Place Retail Stores,* 189 F.R.D. 138, 147 (D.N.J.1999); *Zinberg,* 138 F. R.D. at 410. This is so because Section 11 claims require only a material misstatement or omission in a Registration Statement to prove liability. *Endo v. Albertine,* 1995 WL 170030 (N.D.Ill.) (" 'Section 11 of the Securities Act ... provides an express cause of action for damages to a person acquiring securities pursuant to a registration statement that misstates or omits a material fact" '). In Section 11 cases, typically the only individual issue is a calculation of the damages which each individual class member suffered.

For these reasons, we find that the commonality requirement of Rule 23(a)(2) has been met.

### C. *Typicality Is Present.*

The typicality requirement of Fed.R.Civ.P. 23(a)(3) requires the Court to determine whether the representative plaintiffs' claims have the same essential characteristics as the claims of the class at large. *De la Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). *See also Beale,* 164 F.R.D. at 654. A finding that commonality exists generally results in a finding that typicality also exists. *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 664 (N.D.Ill.1996). The Rule does not require that each member of a class suffer exactly the same injury as the named class representative. *Tidwell v. Schweiker,* 677 F.2d 560, 586 (7th Cir.1982), *cert. denied,* 461 U.S. 905 (1983). Even when factual differences exist, similarity of legal theory satisfies the requirement. *De la Fuente,* 713 F.2d at 232–33.

This case satisfies the typicality requirement because Plaintiffs allege that Defendants committed the same unlawful acts affecting the entire class. *Rosario,* 963 F.2d at 1018; *Scholes,* 143 F.R.D. at 185–86. Indeed, Plaintiffs and members of the class were provided with the same allegedly false Registration Statement and Merger Proxy/ Prospectus and will use the same evidence to prove their case. The essential issue of the Plaintiffs' case–whether the Registration Statement contained material misstatements of fact or omissions – is typical of the class members' claims. No more is required to satisfy the typicality requirement. *See, e.g., Scholes,* 143 F.R.D. at 186; *Brosious,* 189 F.R.D. at 146; *Hoxworth v. Binder, Robinson & Co.,* 980 F.2d 912, 923 (3rd Cir.1992) (plaintiffs' claim meets the typicality requirement

Levitan v. McCoy, Not Reported in F.Supp.2d (2003)

2003 WL 1720047

if the claim "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and ... [are] based on the same legal theory").

**\*5** For these reasons, we find that Plaintiffs have met the typicality requirement of Rule 23(a)(3).

D. *Plaintiffs Will Adequately Represent the Class.*

To satisfy the adequacy of representation requirement, Plaintiffs must show that: (1) the proposed representatives do not have "antagonistic or conflicting claims with other members of the class;" (2) the proposed representatives have "sufficient interest in the outcome of the case to ensure vigorous advocacy;" and (3) their counsel is "competent, qualified, experienced and able to vigorously conduct the litigation." *Sebo,* 188 F.R.D. at 316 (citation omitted). "Basic consideration[s] of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representative at all stages of the litigation where absent members will be bound by the court's judgment." *Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 89–90 (7th Cir.1977). "[A] court must in the broadest sense be satisfied that the fiduciary duties and responsibilities of the class representative and class counsel will be conscientiously, fairly, and justly discharged in order to protect the interests of the class." *Ballan, 159* F.R.D. at 479.

Here, the adequacy requirement is satisfied. Plaintiffs have retained counsel who are very well qualified, experienced, and able to conduct the proposed litigation. Plaintiffs' counsel have extensive experience in securities class action litigation and have successfully prosecuted class actions throughout the country. *See In re Glassine and Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306 (E.D. Pa 1980) (when plaintiffs are represented by experienced, able counsel familiar with class litigation, "there is no ground for supposing that plaintiffs will not adequately represent the class").

Defendants argue that the proposed class counsel, Edwin Mills, of Stull, Stull & Brody has a conflict with the class because he is representing an individual shareholder in the First Chicago litigation. The Stull law firm filed a complaint in the First Chicago litigation on behalf of Max Grill, a former First Chicago shareholder who sought to represent the class. While this Court appointed a different lawyer from a different law firm as lead counsel in that case, Mr. Mills is still the counsel of record representing Max Grill in the First Chicago case.

Defendants argue, and we agree, that the representation of plaintiffs in both the First Chicago case and this case could create a conflict of interest. In the First Chicago case, plaintiffs claim that First Chicago shareholders were injured by the merger with Old Banc One due to the alleged improprieties at First USA. Plaintiffs in this case claim that First Commerce/Old Banc One shareholders were injured by the merger with First Chicago due to the same alleged improprieties. If plaintiffs in the First Chicago case succeed, then the First Commerce/Old Banc One shareholders could not have been injured because if one side of the merger received more value than its contribution to the combined company warranted, then the other side received less value than it was entitled to. As a result of these competing claims, the First Commerce/Old Banc One and First Chicago shareholders have a conflict of interest.

**\*6** As a consequence, we find that a conflict could exist as a result of Mr. Mills' representation of a plaintiff in the First Chicago case and the proposed class in this case. However, Mr. Mills and the Stull firm have agreed to withdraw their representation of Max Grill in the First Chicago litigation. Therefore, we foresee no problem with Mr. Mills and the Stull law firm adequately representing the class in this case. Because we find Counsel to be competent, experienced, and able and free of conflict, we find that Counsel will adequately represent the class. We also find that the Lead Plaintiffs Levitan, Fredo, and Syll will adequately represent the class. They have no interests with respect to this litigation that conflict with, or are antagonistic to, the interests of absent class members. Moreover, Lead Plaintiffs Levitan, Fredo, and Syll and all Class members allegedly were injured by the identical alleged wrongful conduct of Defendants and it is in Plaintiffs' interest to vigorously prosecute this action on behalf of the Class. The Lead Plaintiffs have all sworn that they are prepared to appear for trial and deposition, and their testimony at their depositions indicates that they are committed to the litigation of this case. The Lead Plaintiffs have all testified at their depositions that they understand the nature of the case and their role as class representatives. Therefore, we find that Lead Plaintiffs will adequately represent the class.

III. *The Proposed Class Satisfies the Requirements of Rule 23(b)(3).*

The proposed Class also satisfies the requirements of Rule 23(b)(3) which provides:

Levitan v. McCoy, Not Reported in F.Supp.2d (2003)
2003 WL 1720047

that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Each of the requirements is met in this case.

A. *Common Questions Predominate.*

While common questions of law or fact must predominate, they need not be exclusive. *Scholes v. Moore,* 150 F.R.D. 133, 138 (N.D.Ill.1993). To determine whether common questions predominate, courts look to whether there is a "common nucleus of operative facts." *Ziemack,* 163 F.R.D. at 535 (citing *Rosario,* 963 F.2d at 1018). A court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate. *Beale,* 164 F.R.D. at 658.

Defendants' alleged misstatements and omissions of material fact to members of the Class are at the core of the Complaint. The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue. Therefore, we find that common questions of law and fact predominate. *Id. See also Scholes,* 150 F.R.D. at 138 (finding predominance of common issues notwithstanding variance in material information); *Rosario* at 1018 ("[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement") (citing *Franklin v. City of Chicago,* 102 F.R.D. 944, 949–50 (N.D.Ill.1984)).

B. *A Class Action is Superior.*

**\*7** A class action in this case is superior to other means of adjudication for several reasons. First, there is a common core of law and fact pertaining to Defendants' alleged misrepresentations and omissions in connection with the merger of First Commerce and Old Banc One. Accordingly, class treatment is a more efficient means of adjudicating this matter than the myriad individual suits that potentially could be filed in the absence of class certification. *See Basile,* 105 F.R.D. at 508. *See also Research Corp. v. Pfister Associated Growers, Inc.,* 301 F.Supp. 497, 503 (N.D.Ill.1969). Indeed, any alternative to this class action could create duplication of actions, the very "evil that Rule 23 was designed to prevent." *Califano v. Yamasaki,* 442 U.S. 682, 690 (1979). Such "[s]eparate actions by each of the class members would be repetitive, wasteful and an extraordinary burden

on the courts." *Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir.1983).

Second, Class members will benefit from class treatment because litigation costs are high and it is, therefore, unlikely that shareholders will prosecute individual claims. *See Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1164–65 (7th Cir.1974). A class action is a superior means to adjudicate claims of class members who would be overwhelmed by Defendants' enormous resources if they attempted to prosecute their individual claims. *Chandler,* 162 F.R.D. at 310; *Alexander,* 124 F.R.D. at 185.

Third, principles of judicial economy and efficiency favor trying this case in one action rather than forcing Class members to litigate identical claims individually. *Scholes,* 143 F.R.D. at 189 ("judicial economy and efficiency, as well as consistent judgments, are achieved by certifying the class"). Under these circumstances, class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essentially identical questions of law and fact.

Finally, this matter does not present significant management problems. Rule 23 was designed for this exact type of case. In this case, there is no realistic alternative to class action treatment. For all of these reasons, we find that the requirements of Rule 23(a) and (b)(3) have been met. Therefore, this action is suitable to maintain as a class action.

IV. *The Proposed Class Definition Is Too Broad*

The final issue to be addressed is the definition of the Class. Plaintiffs request the certification of a class including *all* former First Commerce shareholders who exchanged their shares for Old Bane One stock. This proposed class, however, includes shareholders who suffered no injury from the Defendants' alleged wrongdoings. Based upon the statutory calculation of damages, former First Commerce shareholders who sold their stock prior to August 24, 1999, suffered no injury and should be excluded from the class.

**\*8** Sections 11 and 12(a)(2) define the limits of a plaintiff's recovery for the alleged wrong. If the purchaser has sold his or her stock prior to the filing of the suit, section 11 provides that his or her damage "shall represent the difference between the amount paid for the security.., and the price at which such security shall have been disposed of in the market before suit." 15 U.S.C. § 77k(e). Under section 12(a)(2), "a

plaintiff who has sold his securities computes damages by taking the consideration paid for the security, reduced by the amount received for the security upon its sale and any income received." *Nielson v. Greenwood,* No. 91 C 6537, 1996 WL 563539, *8(N.D.Ill. Oct. 1, 1996). Under both provisions, if the plaintiff sells her stock for an amount greater than the purchase/acquisition price, she has suffered no damages. *PPM America, Inc. v. Marriott Corp.,* 853 F.Supp. 860, 876 (D.Md.1994). If a former First Commerce shareholder earned a profit on his or her stock, he or she cannot now seek damages under Section 11 or 12. Such shareholders must be excluded from the class.

Old Banc One stock closed at $ 57.3125 per share on June 12, 1998, the effective date of the merger. For significant periods of time between June 12, 1998 and August 18, 2000, the date this Complaint was filed, Old Banc One and then Bank One stock traded or closed above $ 57.3125. Moreover, during the same period of time, Old Banc One and Bank One paid dividends totaling $ 3.28 per share.

The theory set forth in the Complaint is that the market was unaware of the alleged misrepresentations and omissions about First USA's earnings until the August 24 and November 10, 1998 press releases. If true, this means that the price of Bank One stock continued to be artificially inflated by the alleged misrepresentations and omissions until the press releases. If a former First Commerce shareholder sold prior to August 24, 1999, she received-according to the Complaint's theory-an artificially inflated price for her stock. If the price inflation at the time of the sale is equal to the inflation at the time of purchase/acquisition, the shareholder has suffered no damage. *See in re Seagate Technology II Sec. Litig.,* 843 F.Supp. 1341, 1349 (N.D.Cal.1994). Thus, former First Commerce shareholders who sold their Bank One stock for a profit cannot be included in the class. Therefore, all former First Commerce shareholders who sold their stock prior to August 24, 1999 are excluded from the proposed class.

V. *No Conflict Between Class Members Who Sold Stock And Those Who Retained It*
Defendants next argue that the Lead Plaintiffs, who all retained their stock, have a potential conflict of interest with the class members who sold their stock. Defendants argue that there is a conflict between persons who still own stock of the Defendant corporation and who would theoretically be harmed by a judgment against that corporation, and those who have sold their shares of the Defendant corporation and thus would not be adversely affected by a judgment against the corporation. This is an argument often raised by defendants in opposing class certification in securities cases.

 **\*9** We find that this alleged conflict is too speculative and theoretical at this point to serve as a basis for denying class certification or limiting the scope of the class. If the successful prosecution of this case results in a settlement or judgment paid entirely by Bank One's insurers, that result would not adversely affect present shareholders. Moreover, it is possible that a judgment paid by Bank One might not affect Bank One's financial position in a material way. Thus, we find that the conflict suggested by Defendants is too speculative, at this point, to defeat class certification or alter the class definition. *See, e.g., McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 421–22 (7th Cir.1977).

*CONCLUSION*

For the foregoing reasons, Lead Plaintiffs, Thomas Levitan, Janice Fredo, and William Syll, Jr., are hereby appointed as the representatives of the class. Edwin Mills of Stull, Stull & Brody and Joseph Weiss of Weiss & Yourman are appointed as Co–Lead Counsel and Robert Allison of Robert D. Allison & Associates is appointed as Liaison Counsel for the Class. We grant Plaintiffs' motion for class certification (# 40–1) with the modification that the class shall exclude all shareholders who sold their stock prior to August 24, 1999. Therefore, we hereby certify the following class:

> All persons and entities who exchanged their First Commerce common stock for shares of Banc One common stock, pursuant to the Registration Statement and Merger Proxy/Prospectus issued in connection with the June 12, 1998 merger of First Commerce with, and into, Banc One. Excluded from the Class are: a) all persons who sold their stock prior to August 24, 1999; b) Defendants; c) any entity in which a Defendant has a controlling interest or is a part or subsidiary of, or is controlled by Bank One Corp.; and d) the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the Defendants.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1720047

**Levitan v. McCoy, Not Reported in F.Supp.2d (2003)**

2003 WL 1720047

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 919249
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI, Individually and
on Behalf of All Similarly Situated, Plaintiff,
v.
TREEHOUSE FOODS,
INC., et al., Defendants.

Case No. 16-cv-10632
|
Signed 02/26/2020

**Attorneys and Law Firms**

Elizabeth Camper Lyons, St. Louis, MO, John Scott Monical, Mitchell Benjamin Goldberg, Peter E. Cooper, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for Plaintiff Annemarie Tarara.

John Scott Monical, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for Plaintiff Ivan Barenbaum.

Matthew Insley-Pruitt, Pro Hac Vice, Chet B. Waldman, Robert C. Finkel, Pro Hac Vice, Wolf Popper LLP, New York, NY, Alan Francis Curley, C. Philip Curley, Robinson Curley P.C., Chicago, IL, for Plaintiff Public Employees' Retirement System of Mississippi.

Dan K. Webb, Brian Joseph Nisbet, Matthew Robert Carter, Samuel Mack Zuidema, Elizabeth Sheila Deshaies, Winston & Strawn LLP, Chicago, IL, James P. Smith, III, Pro Hac Vice, Winston & Strawn LLP, New York, NY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

**\*1** Before the Court is lead Plaintiff's motion for class certification [125]. For the reasons set forth below, the motion is granted. Plaintiff is appointed class representative and Wolf Popper LLP and Robinson Curley P.C. are appointed lead and liaison counsel. The case is set for further status on March 10, 2020 at 9:00 a.m.

**I. Background**
Defendant TreeHouse Foods may be the biggest company you have never heard of. It produces packaged foods for stores' "private labels"—that is, it makes grocery stores' off-brand products. Lead Plaintiff Public Employees' Retirement System of Mississippi ("MSPERS") is an institutional investor that purchased TreeHouse common stock ("stock").

As is relevant for the present motion, TreeHouse purchased several smaller food-production companies between 2006 and 2014. In late 2014, TreeHouse purchased Flagstone (another food company), and in 2015, it moved to purchase its largest competitor, Private Brands, from ConAgra. The sale of Private Brands closed in February 2016. During and following the closing on Private Brands, TreeHouse and its officers made a series of statements regarding the integration of Private Brands into the TreeHouse supply and production chain and future growth opportunities. On November 3, 2016, TreeHouse reported that its earnings had fallen below forecasts and that its president, Defendant Christopher Sliva would resign. As a result of these disclosures, the stock price fell $16.87 (nearly 20%). Later that day, after the markets closed, Treehouse acknowledged that Flagstone was underperforming as well, but it is unclear whether the market further fell as a result of that news.

Plaintiff alleges that Treehouse's statements painting a rosy picture of the various acquisitions were fraudulent, and therefore violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5. See also 15 U.S.C. § 78t(a) (imposing individual liability under § 20(a) of the Securities Exchange Act). Plaintiff now moves [125] to certify "a plaintiff class consisting of all persons and entities who purchased TreeHouse Foods, Inc. ("TreeHouse") common stock on the open market between January 20, 2016, and November 2, 2016, inclusive (the "Class Period"), and who were damaged thereby (the "Class")."[1] [125 at 1]. MSPERS also seeks to be appointed Class Representative and to have Wolf Popper LLP and Robinson Curley P.C. appointed as Lead and Liason Counsel for the certified class. In support of its motion, MSPERS has attached an expert report from Chad Coffman [126-3] opining on the efficiency of the market for TreeHouse stock and the feasibility of computing damages on a class-wide basis. Defendants have attached a report [129-7] from their own expert, Dr. Paul Zurek, who opined exclusively on the feasibility of determining damages on a class-wide basis.

2020 WL 919249

## II. Legal Standard

**\*2** To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). "[A] proposed class must always meet the Rule 23(a) requirements." *Messner*, 669 F.3d at 811. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn \* \* \* to Rule 23(b) after [the court is] certain that all of Rule 23(a)'s requirements had been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

Rule 23(b) sets forth four circumstances under which a class action may be maintained; here Plaintiff rely on Rule 23(b)(3). Rule 23(b)(3) permits class certification if: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Finally, the class must also meet Rule 23's "implicit requirement of 'ascertainability,' " meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citation omitted). The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## III. Analysis

Here, MSPERS seek to certify as a Rule 23(b)(3) class. Defendants object on the following grounds: (1) MSPERS is atypical and inadequate because it is subject to unique defenses; (2) MSPERS is otherwise inadequate; and (3) MSPERS's proposed damages model cannot be used to show that class issues predominate. Nonetheless, in the interest of completeness, the Court considers all of the Rule 23 factors.

### A. Rule 23(a) Factors

### 1. Numerosity

Defendant does not contest that the putative class meets Rule 23(a)(1)'s requirement that it be "so numerous that joinder of all members is impracticable." See Fed. R. Civ. P. 23(a)(1). In any event, the putative class meets this standard. "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Ringswald v. County of DuPage*, 196 F.R.D. 509, 512 (N.D. Ill. 2000) (citations omitted). Further, "a plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog & Cat Food Co., Inc.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009). Here, Plaintiff has submitted evidence that the average weekly trading volume of Treehouse shares was 4.02 million, representing over 7% of more than 50 million outstanding shares. That is more than enough to meet the numerosity requirement in a case such as this. *E.g. In re Groupon, Inc. Securities Litigation*, 2014 WL 5245387, at \*1 (N.D. Ill. Sept. 23, 2014) (*Groupon I*) (holding that a putative class was sufficiently numerous when 40.25 million shares of stock were outstanding).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 919249

## 2. Commonality

**\*3** Defendants do not contest that there are common questions of law or fact to the class. See Fed. R. Civ. P. 23(a)(2). In any event, commonality is a "low hurdle" that is easily surmounted in securities fraud cases such as this. See *Groupon I*, 2014 WL 5245387, at \*1 (quoting *Roth v. Aon Corp.*, 238 F.R.D. 603, 606 (N.D. Ill. 2006)). Indeed, each class member's claim hinges on common factual and legal questions, such as "whether defendants made material misrepresentations or omitted material facts, whether defendants acted with the requisite scienter, and whether defendant's conduct inflated the price of [the] stock." *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 785–86 (N.D. Ill. 1984).

## 3. Typicality and Adequacy

"The typicality and adequacy requirements tend to merge, and they 'serve as guideposts' for determining whether 'the named plaintiff's claims and the class claims are so interrelated that the interests of the class will be fairly and adequately protected in their absence.' " *In re Northfield Laboratories, Inc. Securities Litigation*, 267 F.R.D. 536, 541 (N.D. Ill. 2010) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)). Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Claims of class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595. "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Typicality is meant to ensure that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citation and internal quotation marks omitted). "[T]here must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). For the adequacy requirement to be satisfied, the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent. *Retired Chicago Police Ass'n*, 7 F.3d at 598 (7th Cir. 1993).

" 'The presence of even an arguable defense peculiar to the named plaintiff \* \* \* may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation,' " because the plaintiff would be "likely to devote too much attention to rebutting an individual defense." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (quoting *J. H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980)). Importantly, the Court need not reach the merits of the defense, for a defendant can defeat class certification motion by showing that it can pose a "[s]erious challenge[ ] to typicality and adequacy." *Id.* at 728 (suggesting that there must "exist[ ] admissible evidence so severely undermining" of typicality and adequacy).

Here Defendants question MSPERS's typicality and adequacy on the grounds that it is subject to unique defenses, which Defendants claim will bog the case down in individualized questions. Additionally, Defendants question whether MSPERS, a frequent litigant with cozy ties to counsel, is sufficiently invested in the outcome of the case to adequately represent the absent class members.

### a. MSPERS's claim is not subject to unique defenses

**\*4** "To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) (*Halliburton II*) (quotation marks and citations omitted). MSPERS brings this securities fraud class action under a "fraud-on-the-market" theory. Briefly:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business[ ]. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[ ]. The causal connection

between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988) (citations and quotation marks omitted). In other words, if the security in question was part of "an open and developed [ ] market," the stock price definitionally incorporated all public information, including any untruths promulgated by the company or its officers. *Id.* Thus, if a plaintiff can show that the market for a given stock functioned efficiently, it creates a rebuttable presumption that it relied on a fraudulent statement, even if it was not directly aware of the fraud. *Id.* at 250. "The *Basic* presumption is a strong one," *Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408, 429 (7th Cir. 2015), but "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248; see also *Halliburton II*, 573 U.S. at 269 ("So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply.")

First, Defendants do not dispute that Plaintiffs are entitled to the rebuttable *Basic* presumption. Regardless, Plaintiffs have demonstrated that they meet each of the five factors supporting market efficiency outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).[2] The *Cammer* factors include: "(1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an [SEC] S–3 Registration Statement; and (5) whether empirical facts demonstrate a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Groupon II*, 2015 WL 1043321, at *3 (citing *Cammer*, 711 F. Supp. at 1285–87). Here, Plaintiffs have demonstrated that the market for TreeHouse's stock is efficient, because: (1) the average weekly trading volume for TreeHouse stock was 7.38% of outstanding shares, well above the average for the New York Stock Exchange, see [126-3, ¶¶ 25–29]; *Cammer*, 711 F. Supp. at 1293 (citation omitted); (2) sixteen analysts wrote 97 reports about TreeHouse during the class period, see [126-3, ¶¶ 30–35], *Cammer*, 711 F. Supp. at 1286; (3) there were over 100 market makers, and, in any event, TreeHouse stock

is traded on the NYSE, see [126-3, ¶¶ 40]; *Cammer*, 711 F. Supp. at 1293; (4) TreeHouse was eligible to file an S–3 Registration Statement, and in fact did so before and after the Class Period, see [126-3, ¶¶ 41–43]; *Groupon II*, 2015 WL 1043321, at *4; and (5) the market for TreeHouse stock responded immediately to unexpected news, see [126-3, ¶¶ 44–63]; *In re Northfield Laboratories*, 267 F.R.D. at 548–49.[3] The Court need not address the additional factors discussed in MSPERS's expert's report, given that it has satisfied the baseline test for market efficiency, and Defendants do not contest as much.

**\*5** Defendant argues, however, that notwithstanding the efficiency of the market for TreeHouse's stock, MSPERS is subject to unique defenses related to its reliance on the market price. First, Defendants argue that MSPERS's deferral to its outside investment manager Wedgewood severed the link between the misrepresentation and price paid. Second, Defendants argue that Wedgewood's purchase of stock following the corrective statement shows that it did not rely on the market price.

First, MSPERS's reliance on a third party does not subject it to unique defenses. As one of Defendants' own cases explained, "Reliance on a broker does not necessarily constitute a unique defense. In fact, it is quite likely that other class members relied on a broker, friend, or family member in deciding to make their purchases." *Epstein v. American Reserve Corp.*, 1988 WL 40500, at *3 (N.D. Ill. April 21, 1988); see also [129 at 10 (citing *id.* at *4 for the proposition that "MSPERS will be subject to unique defenses with respect to reliance, materiality, and causation" because it relied on Wedgewood) ]. That is, a class representative is not atypical or inadequate for relying on an outside broker, manager, or expert unless that third party itself would be subject to unique defenses.[4] *Epstein*, 1988 WL 40500, at *4; see also *In re Diamond Foods, Inc., Securities Litigation*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (holding that MSPERS's reliance on a different third-party investment manager in a different case did not render it atypical or inadequate). Thus, Defendants' cases are inapposite, because in each of them the broker or adviser explicitly disclaimed reliance on the market price. *Epstein*, 1988 WL 40500, at *4 (broker subject to unique defenses when he admitted to "speculation" and may have acted on insider information); *Cohen v. E.F. Hutton & Co., Inc.*, 1988 WL 89437, at *2 (N.D. Ill. Aug. 22, 1988) (subject to unique defense when the only advice he solicited about the stock concerned the tax benefits of investment).

Second, relatedly, Plaintiff's purchase of additional TreeHouse stock following the November 3, 2016 corrective disclosure does not render it atypical or inadequate. The majority approach holds that purchasing stock after a corrective disclosure does not, on its own, subject a Plaintiff to a unique defense. See, e.g., *Menaldi v. Och-Ziff Capital Management Group, LLC*, 328 F.R.D. 86, 93 (S.D.N.Y. 2018) (collecting cases); *In re Montage Technology Group Limited Securities Litigation*, 2016 WL 1598666, at *4 (N.D. Cal. April 21, 2016) (collecting more cases); *Fry v. UAL Corp.*, 136 F.R.D. 626, 632 (N.D. Ill. 1991) ("[S]ubsequent purchases by the plaintiffs are irrelevant to the liability of [defendant] with regard to alleged misrepresentations effecting the earlier sales of securities * * *"); see also *In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. 291, 298–99. (D. Del. 2003) (suggesting that subsequent purchases are never "unique" to the named plaintiff); but see *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (citing to minority approach cases).

As above, many of the cases that Defendants cite are inapposite because they found that post-disclosure purchases defeated typicality and adequacy when combined with a trading strategy that disclaimed reliance on the market price. See *In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003) (plaintiff was a day-trader, who purchased and sold based on minute, relative changes in the market that had nothing to do with cardinal price; post-disclosure purchases were further evidence of this strategy); *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F.Supp.2d 88, 100-102 (SDNY 2013) (plaintiff had separate valuation algorithm that had nothing to do with stock price and did not factor in fraudulent statements; substantial post-disclosure purchases underscored non-reliance on publicly-available information). Because there is no evidence that MSPERS (and its broker Wedgewood) employed a trading strategy independent of market price, the Court will follow the majority rule and conclude that MSPERS's subsequent purchase of TreeHouse stock does not render it subject to a unique defense.

**\*6** Defendants' further arguments on this point are unconvincing. Defendants essentially argue that Wedgewood disclaimed reliance on the alleged misrepresentations when it explained its *post*-disclosure purchase strategy. But Wedgewood's letter came following the November 3, 2016 disclosure, and is therefore "irrelevant * * * with regard to alleged misrepresentations effecting the earlier sale of securities." *Fry*, 136 F.R.D. at 632. Rather, the Wedgewood statements explained that they thought that the market

overreacted to the news—which, as a matter of logic and economic theory, is the same thing as buying the stock in the first place. See *In re Diamond Foods*, 295 F.R.D. at 251 (citation omitted). Defendants also point to language in the Wedgewood explanation that suggests that Wedgewood did not believe that there had been a fraud in the first place— that is, Wedgewood "believed TreeHouse." [129 at 12.] But Defendants do not explain how Wedgewood's (a) knowledge of the statements in question and (b) belief therein would "sever the link between the alleged misrepresentation and [ ] the price * * * paid[ ] by the plaintiff." *Basic*, 485 U.S. at 248. If anything, Wedgewood's post-disclosure letter strengthens the link between the alleged misrepresentation and price paid. It does not appear that Defendants will be able to mount a "serious challenge" to MSPERS's typicality by subjecting it to a unique defense. *CE Design*, 637 F.3d at 728. Rather, MSPERS's claim, based on its presumptive reliance on market price, is typical in that it shares the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n*, 7 F.3d at 596.

### b. MSPERS is an adequate class representative

Next, Defendant argues that MSPERS's cozy relationship with class counsel and supposed lapses in case management render it inadequate as lead plaintiff. MSPERS counters that it has ample experience as lead plaintiff, is invested in the litigation, and cannot be punished for the common practice of working closely with outside counsel to identify potential securities frauds.

First, the Court will not deny certification because of MSPERS's relationship with counsel. Some courts are skeptical of these arrangements, at least insofar as they lead to frivolous litigation or are indicative of inherent conflicts of interest or unwillingness to manage counsel. *In re Kosmos Energy Ltd. Securities Litigation*, 299 F.R.D. 133, 149 (N.D. Tex. 2014); *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F.Supp.2d 461, 464 (S.D.N.Y. 2009) (criticizing portfolio monitoring, but appointing MSPERS lead counsel, because its portfolio monitoring program mitigated the possibility of frivolous litigation; Mississippi Special Assistant Attorney General George W. Neville "plainly had a sophisticated knowledge of" securities litigation; and the proposed lead counsel had not been the one to propose the litigation); but see *In re General Elec. Securities Litigation*, 2009 WL 2259502, at *6 (S.D.N.Y. July 29, 2009) (expressing

skepticism that "monitoring by law firms truly presents a conflict of interest"). Others have brushed aside those concerns, especially considering that funds are the "exact type of sophisticated institutional investor that Congress intended to lead securities class actions under the PSLRA." *Milbeck v. TruCar, Inc.*, 2019 WL 2353010, at *3 (C.D. Cal. May 24, 2019) (finding institutional investor adequate although it maintained portfolio monitoring agreements with nine law firms; was indemnified by its counsel; and was a serial litigant) (citations and quotation marks omitted); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *5 (M.D. Tenn. June 26, 2017) (collecting cases); *In re Neopharm, Inc. Securities Litigation*, 225 F.R.D. 563, 568 (N.D. Ill. 2004) (reasoning that lead plaintiff's portfolio monitoring relationship with a law firm was evidence in favor of adequacy because it "illustrate[d] involvement in and awareness of the financial affairs at issue"); see also *Berg v. Guthart*, 2014 WL 3749780, at *4 (criticizing *In re Kosmos* and collecting cases that have "rejected the notion that the existence of a portfolio monitoring agreement with counsel renders a plaintiff unsuitable to represent the interests of a class"). Because (a) MSPERS is an institutional investor; (b) it maintains non-exclusive agreements with several law firms; and (c) it retains independence as to whether to sue and which counsel to retain, [138-1 at 33–34], MSPERS's portfolio management arrangement does not render it inadequate. *Milbeck*, 2019 WL 2353010, at *3; *Iron Workers Local*, 616 F.Supp.2d at 464; see also generally Michael J. Kaufman & John M. Wunderlich, *The Bromberg Balance: Proper Portfolio-Monitoring Agreements in Securities Class Actions*, 68 SMU L. Rev. 771 (2015) (reviewing case law and suggesting that non-exclusive portfolio monitoring agreements that provide for investors' independent decision-making do not render plaintiffs inadequate).

**\*7** Second, Defendants argue that MSPERS is inadequate because its Chief Investment Officer, Lori Tingle, was insufficiently up-to-speed on the details of this case. Defendants also obliquely criticize Special Assistant Attorney General George W. Neville (the Mississippi state employee charged with overseeing this litigation), because he was unsure of whether the motion for class certification had been filed before his deposition.

"It is hornbook law * * * that [i]n a complex lawsuit, * * * the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (quotation marks and citation omitted); see

also 32B Am. Jur. 2d Federal Courts § 1533 (2020) (same). "An adequate class representative must maintain only an 'understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery.' " *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, at *6 (N.D. Ill., Oct. 1, 2007) (quoting *Wahl v. Midland Credit Management, Inc.*, 243 F.R.D. 291, 298 (N.D. Ill. 2007)). Indeed, an investor who "was unaware of what types of securities were traded by the money managers and did not know what criteria the managers followed in making investment decisions" and "did not have any input in the decision to buy or sell" may still be adequate if he or she was not "completely unaware of the relevant financial affairs and the purchase in the stock at issue." *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, 1999 WL 543209, at *5–6 (N.D. Ill. July 23, 1999); cf. *Ocampo v. GC Services Limited Partnership*, 2018 WL 6198464, at *9–10 (explaining that demonstrating adequacy is "not difficult," but denying class certification when named plaintiff could not articulate, even in basic terms, what the lawsuit was about or what a class action is); *In re AEP ERISA Litig.*, 2008 WL 4210352, at *3–4 (S.D. Ohio Sept. 8, 2008) (denying class certification because lead plaintiff "had almost no involvement with his case whatsoever" "except for his deposition," and refused to read the complaint because " 'I ain't got time. I'm too old to do much more than look at the first two or three pages.' "); but see *In re Kosmos*, 299 F.R.D. at 147 (imposing higher floor on lead plaintiff's knowledge); *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 588–89 (W.D. Tex. 2002) (same).[5]

MSPERS's supposed lapses in case management do not render it inadequate. Here, Tingle did not know exactly when MSPERS first purchased TreeHouse stock and was not aware of post-disclosure purchases.[6] And Neville seemed confused about when the motion for class certification had been filed. Regarding Tingle's admissions, she was not "completely unaware of the relevant financial affairs and the purchase in the stock at issue." *Retsky*, 1999 WL 543209, at *5. Indeed, she clearly understood the basics of the lawsuit and was willing to participate in discovery (as evinced by her deposition). *Walker*, 2007 WL 2903180 at *6. Any contrary conclusion requiring securities fraud plaintiffs to perfectly withstand hours of deposition-Double-Jeopardy about their portfolios "would be in conflict with the PSLRA's purpose to 'increase the likelihood that institutional investors will serve as lead plaintiffs.' " *In re Neopharm*, 225 F.R.D. at 567 (quoting *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003)). And, to the extent that

2020 WL 919249

Defendants argue that MSPERS is inadequate because of Neville's confusion regarding the class certification motion, he has done more than enough to satisfy the relatively low bar for demonstrating his adequacy. He testified in detail about the specifics of the alleged fraud and his investment in this case. [138-1 at 60–65; 93–95].

**\*8** As a final note, the Court concludes that class counsel is adequate. In assessing the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)). After considering counsel's work on the case to date and its record in securities litigation, see generally [35-4]; [35-5], the Court concludes that counsel is "experienced and competent." *Retired Chicago Police Ass'n*, 7 F.3d at 598 (7th Cir. 1993).

**B. Rule 23(b) Factors**

In order for a class to be certified under Rule 23(b)(3), class issues must predominate over individual ones, the class action mechanism must be superior to alternatives, and the class members must be ascertainable.[7] Although related to the commonality requirement, "the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 624. It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that " 'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.' " *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Messner*, 669 F.3d at 815 (quoting *Amchem*, 521 U.S. at 625); see also *Schleicher*, 618 F.3d at 686 (explaining that "[f]alsehood and materiality affect investors alike" and therefore certification of a securities fraud class under Rule 23(b)(3) was appropriate). That said, the Court must conduct "a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.' " *Suchanek v. Sturm*

*Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). At the very least, "[t]hat requires matching the theory of liability to the theory of damages." *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014) (explaining that plaintiffs may proceed on one of two damages theories); see also *Comcast*, 521 U.S. at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.*") (quotation marks and citation omitted). However, it would put "the cart before the horse to insist" that plaintiffs demonstrate that the proposed method will precisely and accurately prove their damages "before any class can be certified." *Schleicher*, 618, F.3d at 687. Thus, "plaintiffs are not required to prove" all of the elements of a Rule 10b-5 claim "at the class-certification stage," they need only show "that common questions '*predominate* over any questions affecting only individual [class] members.' " *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 468–69 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

**\*9** Here, Defendants dispute whether the proposed damages model matches the theory of liability. MSPERS's expert, Chad Coffman, proposes using the " 'out-of-pocket' method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale." [126-3, ¶ 77.] Coffman proposed using an "event study" examining investors' reactions to disclosures to determine the degree of inflation; individual damages "could then be calculated formulaically." [*Id.* at ¶ 78.] Defendants argue that Coffman's damages model (1) fails to account for confounding news on November 3, 2016, and (2) improperly assumes that the price of TreeHouse stock was invariantly inflated throughout the Class Period. MSPERS counters that it need only show that it *could* develop a model that accounts for these limitations.

First, Defendants argue that Coffman's proposed event study cannot disaggregate the news regarding the failed integration of Private Brands from the possibly unrelated news of the CEO's departure. Relatedly, Defendants insinuate that Coffman will be unable to disaggregate any drops in stock prices related to Flagstone and Private Brands. But, of course, all the putative class members' claims will live or die by their ability to disaggregate potentially confounding news, making the question "common" to all of the members. See, *e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at \*9 (N.D. Cal. March 16, 2016) (explaining that "an attack [on] the 'fit' between an alleged corrective

disclosure and a prior alleged fraudulent statement [ ] is nothing more than an attack on loss causation."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (*Halliburton I*) ("The Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification."); see also *Schleicher*, 618 F.3d at 685 ("Under the current rule, certification is largely independent of the merits * * *, and a certified class can go down in flames on the merits.").

Moreover, Defendants complain that Coffman has proposed "the same nonspecific theory [ ] at least five times in the past four years," but do not cite a single case where this this nonspecific theory was rejected. See [129 at 2]. MSPERS, in contrast, has included an appendix including dozens of cases in which Coffman's expert opinions have supported the certification of a class. [138-5 at 35–38]. And using an event study to determine out of pocket losses due to inflation is "widely considered an accepted method for the evaluation of [ ] damages to a class of stockholders in a defendant corporation," even in the face of confounding information. *In re Intuitive Surgical Securities Litigation*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016) (holding that common issues predominate notwithstanding defendants' challenge to Coffman's proposed "out-of-pocket" method); see also, *e.g.*, *Weiner v. Tivity Health, Inc.*, —— F.R.D. ——, 2020 WL 467783, at *11 (M.D. Tenn. Jan. 29, 2020) (collecting cases and concluding that Coffman's out-of-pocket method will not let individual questions predominate), appeal docketed No. 20-501 (6th Cir. Feb. 13, 2020); *In re SanDisk LLC Securities Litigation*, 2018 WL 4293336, at *2 (N.D. Cal. Sept 4, 2018) ("The admittedly short portion of the Coffman report addressing this damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide damages can be determined without excessive difficulty and attributed to [the plaintiffs'] theory of liability.") (citation and quotation marks omitted); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (holding that plaintiffs' damages model "survive[d] the minimal scrutiny required" at the certification stage although the expert had not yet "adjust[ed] for any confounding news"); cf. *Baker v. SeaWorld Entertainment, Inc.*, —— F. Supp. 3d ——, 2019 WL 6118448, at * 11–13 (S.D. Cal. Nov. 18, 2019) (reviewing a *Daubert* motion, well after the class had been certified, and concluding that "Coffman's disaggregation opinions are admissible"); [138-5, ¶ 32].[8] All of this indicates that the theory of liability matches the theory of damages. *Comcast*, 569 U.S. at 35.

**\*10** Defendants' related point about Flagstone remains opaque. As Defendants implicitly note, their objections regarding the Flagstone acquisition and disclosure are flavors of their broader disaggregation argument; for the reasons set forth above, common questions predominate about how to deal with Flagstone notwithstanding this methodological critique. See *Vrakas v. United States Steel Corporation*, 2019 WL 7372041, at *8–9 (W.D. Penn. Dec. 31, 2019).

Second, Defendants argue that Coffman's event study framework is necessarily inadequate to address all the complexities attendant in determining each investor's actual losses. All kinds of factors affect a stock's price on any given day—the effect of any misrepresentation therefore fluctuates over time as investors incorporate that information with the myriad other inputs that go into buy-sell-hold decisions. And, specifically, it is likely that investors identified *some* risk in the Private Brands venture, even if TreeHouse publicly understated that risk. Defendants, however, do not cite a single case where class certification was denied because of limitations in the proposed inflation formula.[9] Indeed, using inflation to determine plaintiffs' out-of-pocket losses is a common methodology in securities fraud cases such as this, and the limitations Defendants identify are not unique to this case and need not be resolved before the class is certified. *E.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019); *In re Silver Wheaton Corp. Securities Litigation*, 2017 WL 2039171, at *15 (C.D. Cal. May 11, 2017); *In re Intuitive Surgical*, 2016 WL 7425926 at *17; *Hatamian*, 2016 WL 1042502, at *9–10; see also [138-5, ¶¶ 18–25, 35 ("In virtually every securities fraud case, there is expert analysis and dispute regarding whether and to what extent the artificial inflation may have evolved over the class period.") ] And the mere fact that the plaintiffs may ultimately offer ambiguous or unconvincing evidence is not reason to deny certification. *Schleicher*, 618 F.3d at 687. Thus, the issues regarding inflation do not preclude certification.

### IV. Conclusion

For the reasons set forth above, MSPERS's motion for class certification [125] is granted. The case is set for further status on March 10, 2020 at 9:00 a.m.

### All Citations

Slip Copy, 2020 WL 919249

Public Employees' Retirement System of Mississippi v. TreeHouse..., Slip Copy (2020)

2020 WL 919249

Footnotes

1 The proposed class excludes Defendants, officers and directors of TreeHouse, their families, and their legal representative, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2 *Cammer* has not been explicitly adopted by the Seventh Circuit, but it is frequently used to determine whether a market for a given security is efficient. *E.g.*, *In re Groupon, Inc. Securities Litigation*, 2015 WL 1043321, at *3 (N.D. Ill. March 5, 2015) (*Groupon II*), objections overruled, 2015 WL 13628131 (N.D. Ill. May 12, 2015); *In re Northfield Laboratories,* 267 F.R.D. at 545–46; see also *Schleicher v. Wendt*, 2009 WL 761157, at *5–10 (S.D. Ind. March 20, 2009), aff'd 618 F.3d 679 (7th Cir. 2010) (applying *Cammer* factors and granting class certification).

3 Although Defendants (and their expert) dispute Coffman's use of an event study, Defendants' expert did not address whether the event study demonstrated market efficiency. See [129-7 at 4 n.1]. Dr. Zurek's discussion of the event study goes to predominance, which is discussed below.

4 As discussed below, in some instances a lead plaintiff may be inadequate if it was "completely unaware" of its broker's trading strategy. See *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, 1999 WL 543209, at *5–6 (N.D. Ill. July 23, 1999).

5 Defendants' reliance on *In re Kosmos*, is misplaced. *In re Kosmos* relied on the Fifth Circuit's idiosyncratic adequacy standards. See, *e.g.*, *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741, 744 (7th Cir. 2011) (explaining that "named plaintiffs are usually cat's paws of the class lawyers," and approvingly citing the Ninth Circuit's rejection of heightened adequacy standards, *In re Cavanaugh*, 306 F.3d 726, 737–38 (9th Cir. 2002)).

6 Tingle also did not know why certain investment managers considered TreeHouse large cap, while others considered it small cap, and admitted that she had not personally read or relied on TreeHouses's statements. First, it is unclear how this cap confusion renders MSPERS an inadequate plaintiff—MSPERS maintains a large portfolio, and its employment of multiple managers who may use different investing criteria does not suggest that it is "completely unaware" of its investments. Indeed, in this case, Tingle testified that she maintains at least some oversight of managers. [129-2 at 70–78.] Second, MSPERS is seeking to certification on a fraud-on-the-market theory, which does not require plaintiffs to be aware of the misrepresentations.

7 Defendants do not contest that a class mechanism is superior to individual suits or that the implicit ascertainability requirement is satisfied. Regardless, the Court must consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, all of the four factors weigh heavily in favor of certification: it is unlikely that class members would want to individually control the prosecution of these claims given the small amount of money at stake for most of the individual plaintiffs; MSPERS has represented that it knows of no other individual case based on these facts; the putative class members are presumably dispersed throughout the country and TreeHouse is based in Illinois; and this case seems unlikely to pose any management difficulties greater than innumerable individual actions. Indeed, the superiority of the class mechanism to individual suits in securities fraud cases such as this is generally taken as a given. *E.g.*, *Washtenaw County Employees' Retirement System v. Walgreen Co.*, 2018 WL 1535156, at *5 (N.D. Ill. March 29, 2018) (citing *Roth*, 238 F.R.D. at 608; *In re AVEA Pharmaceuticals, Inc. Securities Litigation,* 2017 WL 5484672, at *7 (D. Mass. Nov. 14, 2017)). Similarly, the class is defined clearly and objectively, with boundaries set both temporally and as to an identified type of security (common stock of TreeHouse purchased on the open market), thereby allaying any ascertainability concerns.

8 Defendants cite several cases for the proposition that the Court should deny class certification because Coffman's descriptions are too sketchy. These cases are inapposite. In *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014), the plaintiff's expert determined that the market for the security was illiquid during much of the class period, and thus presented unique individualized difficulties concerning the congruence between liability and damages calculation. *Id.* at 141–142. Moreover, that case's application of *Comcast* was at odds with that of the Seventh Circuit. Compare *id.* at 141, with *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799–801 (7th Cir. 2013). In *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, 2018 WL 3861840 (N.D.

2020 WL 919249

Ohio Aug 14, 2018), the court excluded the expert's testimony and struck the report because parts of it were "entirely improper." *Id.* at *7. And, in any event, the court also held that the plaintiffs' liability theory did not hold together—little wonder that the court went on to hold that there was no congruence between the inadequate liability theory and sketchy theory of damages. *Id.* at *17–20. *Smilovits v. First Solar Incorporated*, 119 F. Supp. 3d 978 (D. Ariz. 2015) is off base in that it concerned a motion for summary judgment, not class certification. *Id.* at 981; see also *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 427 (D. Ariz. 2013) (granting motion for class certification). And, in any event, it is factually far afield in that it rested its holding on the fact that the press release announcing the CEO's departure "that caused the stock price to drop did not include any information about the company's financial performance," or any other issue potentially relevant to the alleged misrepresentations; here, however, the press release mentioned both. See *Smilovits*, 119 F. Supp. 3d at 997. Finally, *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. 2014), *decertified* a class after the plaintiff's expert submitted a damages report that did not even attempt to disaggregate confounding information. *Id.* at *9–10. If anything, *Werdebaugh* counsels a flexible, iterative approach whereby the Court grants certification and revisits that decision if Coffman fails to make good on his promises. See *id.* at *9; see also *In re Snap Inc. Securities Litigation*, —— F.R.D. ——, 2019 WL 6270291, at *5 (C.D. Cal. Nov. 20, 2019), appeal docketed 19-80157 (9th Cir. Dec. 4, 2019) (distinguishing *Werdebaugh* on other grounds).

9    Instead, Defendants rely on their expert's report. But Dr. Zurek's opinions are more of an attack on the Supreme Court's *Basic* decision than Coffman's proposed methods: "The absence of such a methodology to calculate inflation does not necessarily mean that damages cannot be calculated at all, just that class-wide damages based on inflation cannot be. For example, it is possible to require every purchaser to establish that they relied on the alleged misstatements at the time of purchase * * *." [129-7 at 8 n.10.] Of course, the fraud-on-the-market theory does not require purchasers to establish reliance on anything other than the market price. If Defendants have a problem with that, they will need to take it up with the Supreme Court.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1410035

2021 WL 1410035
Only the Westlaw citation is currently available.
United States District Court, E.D.
Tennessee, Southern Division,
at Chattanooga.

Lewis STEIN, Individually and on Behalf of
All Others Similarly Situated, et al., Plaintiffs,

v.

U.S. XPRESS ENTERPRISES,
INC., et al., Defendants.

Case No. 1:19-cv-98
|
Filed 02/12/2021

**Attorneys and Law Firms**

David Wilson Garrison, Jerry E. Martin, Pro Hac Vice, Jerry E. Martin, Barrett, Johnston, Martin & Garrison, LLC, Robert Preston Bramlett, Paul K. Bramlett, Bramlett Law Office, Nashville, TN, J. Alexander Hood, II, Pro Hac Vice, Jeremy A. Lieberman, Pro Hac Vice, Jonathan David Lindenfeld, Pomerantz LLP, New York, NY, Nancy A. Kulsea, Pro Hac Vice, Shannon L. Hopkins, Levi & Korsinsky, LLP, Stamford, CT, Patrick V. Dahlstrom, Pro Hac Vice, Pomerantz LLP, Chicago, IL, Kevin S. Sciarani, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Willow E. Radcliffe, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiff Lewis Stein.

Christopher Martin Wood, Robbins Geller Rudman & Dowd LLP, David Wilson Garrison, Barrett, Johnston, Martin & Garrison, LLC, Nashville, TN, Hadiya K. Deshmukh, Pro Hac Vice, Willow E. Radcliffe, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Sebastian Tornatore, Pro Hac Vice, Shannon L. Hopkins, Levi & Korsinsky, LLP, Stamford, CT, Debashish Bakshi, Pro Hac Vice, Kevin S. Sciarani, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Jack Reise, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for Plaintiff Deirdre Terry.

Hadiya K. Deshmukh, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Marion C. Passmore, Pro Hac Vice, William Scott Holleman, Bragar Eagel & Squire, P.C., New York, NY, Jack Reise, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, Christopher Martin Wood,

Robbins Geller Rudman & Dowd LLP, Nashville, TN, for Plaintiffs Charles Clowdis, Bryan K. Robbins.

Logan R. Hobson, Pro Hac Vice, Brandon R. Keel, Pro Hac Vice, Jessica P. Corley, Pro Hac Vice, King & Spalding, LLP, Atlanta, GA, Philip B. Whitaker, Jr., K. Stephen Powers, Baker, Donelson, Bearman, Caldwell & Berkowitz, Chattanooga, TN, Lisa R. Bugni, King and Spalding LLP, San Francisco, CA, for Defendants U.S. Xpress Enterprises, Inc., Eric Fuller, Eric Peterson, Jason Grear, Max Fuller, Lisa Quinn Pate.

C. Crews Townsend, Meredith Corey Lee, Miller & Martin, PLLC, Chattanooga, TN, Jonathan Rosenberg, Pro Hac Vice, Redwan Saleh, Pro Hac Vice, William Sushon, Pro Hac Vice, O'Melveny & Myers LLP, New York, NY, for Defendant Morgan Stanley & Co. LLC.

C. Crews Townsend, Meredith Corey Lee, Miller & Martin, PLLC, Chattanooga, TN, Jonathan Rosenberg, Pro Hac Vice, William Sushon, Pro Hac Vice, O'Melveny & Myers LLP, New York, NY, for Defendants WR Securities, LLC, J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Securities, LLC, Stephens Inc.

C. Crews Townsend, Miller & Martin, Chattanooga, TN, Jonathan Rosenberg, Pro Hac Vice, William Sushon, Pro Hac Vice, O'Melveny & Myers LLP, New York, NY, for Defendant Stifel, Nicolaus & Company, Incorporated.

**MEMORANDUM OPINION**

TRAVIS R. MCDONOUGH, UNITED STATES DISTRICT JUDGE

 **\*1** Before the Court is a motion for class certification (Doc. 104) filed by Plaintiffs Deirdre Terry, Charles Clowdis, and Bryan Robbins. Plaintiffs seek an order certifying a class under Federal Rule of Civil Procedure 23(a) and (b)(3) consisting of:

 All persons or entities who purchased or otherwise acquired Class A common stock of USX pursuant to and/or traceable to the Offering Documents filed with the United States Securities and Exchange Commission ("SEC") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(*Id.*) Plaintiffs also ask the Court to appoint them as class representatives and appoint their counsel as class counsel. (*Id.*) For the reasons set forth below, the motion will be **GRANTED**.

## I. BACKGROUND

U.S. Xpress Enterprises, Inc. ("USX") is a publicly traded trucking company headquartered in Chattanooga, Tennessee. (Doc. 91, at 1.)[1] On June 14, 2018, USX began an initial public offering ("IPO") of 16,668,000 shares of Class A common stock at a price of $16 per share. (*Id.* at 3.) Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Wells Fargo Securities, LLC, Stephens, Inc., WR Securities LLC, and Stifel Nicolaus & Company, Inc. served as underwriters. (*Id.*) The IPO yielded $245.2 million in net proceeds after underwriting discounts, commissions, and offering expenses. (*Id.*)

On June 15, 2018, named Plaintiff Bryan Robbins purchased 50 shares of USX common stock at a price of $16.392 per share. (Doc. 106-3, at 3.) On June 19, 2018,[2] named Plaintiff Charles Clowdis purchased 100 shares of USX common stock at a price of $16.51 per share. (Doc. 106-2, at 2.)

On August 2, 2018, USX filed a form 8-K with the Securities and Exchange Commission ("SEC"), which notified the SEC and shareholders that USX had "issued a press release announcing its financial and operating results for the second quarter ended June 30, 2018." (Doc. 122-1, at 3.) USX submitted the press release with its form 8-K. (*Id.*) The press release explained, among other things, that drivers from USX's over-the-road division ("OTR") were being used to support its dedicated routes,[3] and that this "negatively impacted [OTR] utilization by approximately 150 basis points." (*Id.* at 8.)

 **\*2** Lead Plaintiff Deirdre Terry, along with accounts controlled by or assigned (for litigation purposes) to her, purchased shares of USX common stock in a series of transactions beginning on August 6, 2018, and then sold them in a series of transactions ending April 23, 2019. (Doc. 106-1, at 7–8.)

According to Plaintiffs, the amended registration statement and final prospectus (the "Offering Documents") that Defendants prepared for the IPO misrepresented or omitted several categories of material information. (Doc. 91, at 4.) This lawsuit commenced in April 2019, asserting that Defendants' alleged misrepresentations and omissions violated federal securities law. (*See* Doc. 1.) Plaintiffs' operative pleading (Doc. 57) asserts claims under § 11 of the Securities Act of 1933 (the "Securities Act"), § 15 of the Securities Act, § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5, and § 20(a) of the Exchange Act.

The Court dismissed Plaintiffs' Exchange Act claims and most of their Securities Act claims. (*See generally* Doc. 91.) The Court allowed the following Securities Act claims to proceed: (1) a misrepresentation claim regarding USX's statement that it would "[c]apitalize on" the then "favorable truckload environment" by "[s]trategically expand[ing] our fleet based on expected profitability, including through our company-sponsored independent contractor lease program," because, in fact, USX did not even have enough drivers to meet its dedicated customers' then-present needs and was "cannibalizing" high-margin OTR drivers to cover lower-margin dedicated contracts; (2) a misrepresentation claim regarding the statement that "[i]f we are unable to continue to attract and retain a sufficient number of drivers," then USX would face growth and profitability problems, because, in fact, USX did not at that time have a sufficient number of drivers and consequently was sacrificing OTR profitability despite the ostensible conditionality of the projection; and (3) an omission claim regarding the cannibalization of OTR drivers. (Doc. 91, at 31–34, 45–46.) At bottom, Plaintiffs are proceeding on the theory that USX misrepresented and/or failed to disclose that it lacked the drivers necessary to serve its dedicated customers and cannibalized OTR drivers to ameliorate the problem, and that this cannibalization was especially costly because the OTR market was in an upswing at the time of the IPO.

Plaintiffs now move to certify a class comprised of "[a]ll persons or entities who purchased or otherwise acquired Class A common stock of USX pursuant to and/or traceable to the Offering Documents ... and who were damaged thereby," but excluding "Defendants and their immediate families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a

controlling interest." (Doc. 104.) Defendants have responded in opposition (Doc. 122), and the motion is ready for adjudication.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 allows "members of a class" to sue or be sued "on behalf of all members" of the class. Fed. R. Civ. P. 23(a); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.") (citation and internal quotation marks omitted)) [hereinafter *Dukes*]. To proceed as a class under Rule 23, the parties seeking class certification must show that:

**\*3** (1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Dukes*, 564 U.S. at 349 (describing these requirements as "numerosity, commonality, typicality, and adequate representation").

After satisfying Rule 23(a), the parties seeking certification must also take one of three paths under Rule 23(b). Class certification under Rule 23(b)(3) requires (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members"—predominance—and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"—superiority. Fed. R. Civ. P. 23(b)(3). In determining whether the named plaintiffs have satisfied the predominance and superiority requirements, the Court should consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350–52. Rather, the burden is on the party seeking certification to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* Often, the "rigorous analysis" required of courts at the class-certification stage "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. However, Rule 23 does not give courts "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citing *Dukes*, 564 U.S. at 351 n.6). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Dukes*, 564 U.S. at 351 n.6).

## III. ANALYSIS

### A. Class Definition

The proposed class is comprised of:

All persons or entities who purchased or otherwise acquired Class A common stock of USX pursuant to and/or traceable to the Offering Documents filed with the United States Securities and Exchange Commission ("SEC") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

**\*4** (Doc. 104, at 2.)

### B. Rule 23(a) Requirements

#### i. Numerosity

To be entitled to class certification, the plaintiff must first show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The number of prospective class member required to satisfy the numerosity requirement is case-specific and requires

examination of the underlying facts. *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980). The requirement imposes no "absolute limitations" on class size. *Id.*; *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) ("[T]here is no strict numerical test[.]"). The requirement is generally satisfied by "substantial" numbers. *Daffin*, 458 F.3d at 552. Furthermore, to establish numerosity, "impracticability of joinder must be positively shown, and cannot be speculative." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005)).

While the exact number of proposed class members is unknown, Plaintiffs argue that the volume of USX shares offered—more than 16.6 million—during an IPO on a national exchange leads to the common-sense inference that the number of purchasers was in the thousands or more and that joinder would therefore be impracticable. (Doc. 105, at 15–16); *see, e.g., Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 501 (M.D. Tenn. 2019) (" '[T]he exact number of class members need not be pleaded or proved' for a class to be certified, as long as the class representatives can show that joinder would be impracticable." (quoting *Golden*, 404 F.3d at 965–66)); *Schuh v. HCA Holdings, Inc.*, No. 3:11-1033, 2014 WL 4716231, at *13 (M.D. Tenn. Sept. 22, 2014), *interlocutory review of class certification denied sub nom. In re HCA Holdings, Inc.*, No. 14-511, 2015 WL 10575861 (6th Cir. Feb. 26, 2015) (finding numerosity established where the case "involved millions of stock, and [the p]laintiff estimates that the number of purchasers is likely to be 'in the thousands' and that those purchasers reside in many states"). Indeed, despite opposing certification, Defendants do not contest this issue. (*See generally* Doc. 122.) Accordingly, numerosity is satisfied.

### ii. Commonality

Plaintiffs must next demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requires more than simply showing that all putative class members have "suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350. Commonality demands that members of a prospective class "have suffered the same injury" and that "[t]heir claims ... depend upon a common contention ... that is capable of classwide resolution." *Id.* A common contention is capable of such resolution if the "determination of its truth or falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke." *Id.*

What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

**\*5** *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Section 11 of the Securities Act states, in pertinent part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [persons or entities specified in § 77k(a)(1)–(5).]

15 U.S.C. § 77k(a). Section 11 liability requires that:

(1) [the plaintiff] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under [§] 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

*Local 295/Local 281 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010)); *see also J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008) (explaining that an omission may be actionable in face of duty to disclose). If a material misstatement or omission can be established, " '[l]iability ... is virtually absolute, even for innocent misstatements' " because § 11 does not require proof "that the defendant acted with scienter." *Local 295*, 731 F. Supp. 2d at 704 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382–83 (1983)). Section 15 claims derive from § 11 claims. *See id.* at 714–15 (stating that § 15 claim requires "(1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual

participation (i.e., exercise of control) in the operations of the primary violator in general").

Plaintiffs argue that the proposed class members' claims involve the following common questions of law and fact: (1) whether Defendants violated the Securities Act; (2) whether the Offering Documents were negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and (3) to what extent the proposed class members have sustained damages and the proper measure of damages. (Doc. 105, at 17.) Defendants do not argue that the proposed class lacks questions of fact or law susceptible of common resolution; they only assert that those questions do not predominate over individual questions. (*See generally* Doc. 122.) The Court will address that issue in the predominance analysis, and otherwise finds that the proposed class members' §§ 11 and 15 claims relating to the Offering Documents are comprised of common contentions that are capable of class-wide resolution and suited to drive class-wide litigation. *Cf. Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2019 WL 1450546, at *16 (M.D. Tenn. Mar. 29, 2019) ("If those misstatements and omissions violated federal law, they violated federal law as to all potential class members. Therefore, answering those questions will generate common, class-wide answers concerning liability.").

### iii. Typicality

 **\*6**  The named plaintiffs must also show that their claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* The typicality requirement, like the commonality requirement, helps to determine "whether

under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 350 n.5 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)).

The Securities Act claims of named Plaintiffs Terry, Clowdis, and Robbins are driven by the same factual underpinnings as the Securities Act claims of the proposed class because they derive from the same alleged misrepresentations and/ or omissions in the Offering Documents. Defendants argue, however, the August 2, 2018 form 8-K filing and press release —which explicitly disclosed the cannibalization of OTR drivers and related costs—support an affirmative defense against proposed class members who purchased USX shares after August 2, 2018, which includes Plaintiff Terry. *See In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 58 (S.D.N.Y. 2013) ("Where 'the plaintiff knew of the untruth or omissions at the time of his or her acquisition of the security,' ... the plaintiff may not maintain a section 11 ... claim." (quoting *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007)).

Defendant's intention to assert an affirmative defense based upon investor knowledge does not render the proposed representatives problematically atypical. *See, e.g., Schuh*, 2014 WL 4716231, at *12 ("While there might not be cases that hold a class representative who is subject to a 'unique knowledge defense' is typical for purposes of a Section 11 or 12 case, there are cases that hold the mere fact that the representative may possess knowledge that other putative class members do not does not make that representative atypical or inadequate."). What Plaintiff Terry knew about USX and when has not yet been investigated. While Defendants invite the Court to presume that the form 8-K establishes a knowledge defense, (*see* Doc. 122, at 11 ("Courts have repeatedly recognized that SEC filings tend to demonstrate widespread public knowledge.")), they have offered no proof of any particular party's knowledge beyond the form 8-K itself and subsequent public analyst reports. (*Id.* at 12 (noting publicly available reports on August 3, 2018, by a Bank of America Merrill Lynch analyst and J.P. Morgan analyst which "acknowledged [USX's] August 2nd disclosures").) In other words, Defendants may well have a viable knowledge defense against individuals who purchased USX shares after August 2, 2018. But, even if Plaintiff Terry's claims may ultimately succumb to a knowledge defense, the *possible* existence of that defense does not render her

otherwise typical claims atypical for purposes of the Rule 23 analysis. *See Schuh*, 2014 WL 4716231, at *12. Moreover, the possible defense is not even facially applicable to Plaintiffs Clowdis and Robbins, who both purchased USX shares in the days following the IPO. Accordingly, typicality is satisfied.

### iv. Adequate Representation

**\*7** The adequate-representation requirement is two-pronged. It requires both that (1) "the representative ... have common interests with unnamed members of the class," and (2) "it ... appear[s] that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young*, 693 F.3d at 543 (quoting *Am. Med. Sys.*, 75 F.3d at 1083). The requirement will only be satisfied if the proposed class representatives are "part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). Thus, the requirement generally precludes the use of the class-action vehicle "where there is a conflict of interest between the named plaintiff and the members of the putative class." *Gen. Tel.*, 446 U.S. at 331.

As a general matter, Plaintiffs Terry, Clowdis, and Robbins possess common interests with the class and have already expended personal time and energy pursuing this litigation. (*See* Docs. 106-1, 106-2, 106-3.) Defendants, however, argue that Plaintiff Terry would be inadequate because (1) the possible knowledge defense would distract her, and (2) she submitted two false statements to the Court when seeking certification to serve as lead plaintiff. (*See* Doc. 22-2.) First, while a knowledge defense *might* apply to Plaintiff Terry, Defendants have submitted no evidence showing that it *does* apply to her. The Court cannot conclude that a proposed representative is inadequate only because a defense *might* apply. Indeed, to the extent that the defense might also apply to other class members, Terry's interest in defeating it very likely aligns with their interests, depending upon how she attempts to do so.

Next, the "false" statements that Defendants identify are essentially clerical, not substantive misrepresentations that could reasonably be interpreted as an attempt to mislead the Court. Both "false" statements derive from Plaintiff Terry's May 10, 2019 motion seeking appointment as lead plaintiff pursuant to the Private Securities Litigation Reform Act. (*See*

Doc. 19.) In an attached certification, Plaintiff Terry swore "under penalty of perjury" in a document dated March 13, 2019, that "[m]y transaction(s) in U.S. Xpress Enterprises, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto." (Doc. 22-2, at 2.) The "chart attached hereto" listed transactions ranging from August 6, 2018, to April 23, 2019. (*Id.* at 3.) Though Terry testified that she "didn't know" how transactions that occurred after March 13, 2019, appeared on the schedule (Doc. 122-7, at 3), a supplemental affidavit explains that she provided an updated schedule of transactions after March 13, 2019, and before May 10, 2019, in order to "ensure [that the schedule] was up-to-date and current at the time" of filing the motion for appointment as lead plaintiff, and that she authorized her lawyers to file the updated schedule with her first certification even though it was dated March 13, 2019. (Doc. 121-1, at 3.) While clarity would have been served by updating the certification document, the Court cannot conclude that this is the kind of "false" statement that would show that Plaintiff Terry is dishonest and cannot be trusted to adequately represent the class. Indeed, the updated transaction schedule enhanced the accuracy of the record before the Court, clerical errors notwithstanding. Second, the certification swore that the attached schedule contained "[m]y transactions," but only one of the seven accounts was personally held by Plaintiff Terry while the other six were owned by various family members and entities co-owned with family members. (Doc. 122-7, at 3–13.) The litigation rights for the USX transactions for the accounts listed in the schedule, however, were assigned to Plaintiff Terry on May 3, 2019. (Doc. 122-10, at 2–4.) As before, simply updating the certification would have resolved the issue. Indeed, the statement "[m]y transactions"—though slightly imprecise—was not the kind of "false" statement that suggests an intent to mislead the Court. And, while Defendants suggest that these errors could alternatively betray a lack of diligence on Plaintiff Terry's part, the errors neither truly misled the Court nor jeopardized the case. While diligence is important, clerical errors and imprecisions are a reality of life and not a basis for finding Plaintiff Terry inadequate to represent the class.

**\*8** As for Plaintiffs Clowdis and Robbins, Defendants argue that their depositions show that they do not grasp this case well enough to represent the class adequately. For example, Clowdis at one point testified that he would "leave [ ] up to the attorneys" precisely which portions of the registration statement were false and misleading. (Doc. 122-11, at 9.) At another, Defense counsel asked if he "accuse[d] [Defendants]

of committing fraud"—which the operative pleading (Doc. 57) does claims—to which Clowdis responded, "No. Fraud is a – that – I'm careful with that word[.]" (*Id.* at 24.) At other points in his deposition, however, Clowdis displayed a reasonable, if less-than-lawyerly, grasp of the alleged facts and claims at issue. (*See, e.g., id.* at 8 (Clowdis testifying about USX's stated plans to "expand" in areas including "dedicated contract carriage"); *id.* at 10 (Clowdis testifying that he believed USX misrepresented "that dedicated was a target of growth" because "[a]s it turns out, they really weren't" "positioned to do that"); Doc. 131-3, at 111 (Clowdis testifying that he does not know the legal definition of fraud).) Similarly, Robbins testified that he did not review the operative pleading until after it was filed (Doc. 122-12, at 5), did not know Deirdre Terry (*Id.* at 10), did not know how the named Plaintiffs would make joint decisions other than by deferring to their attorneys (*Id.* at 11–12), and believed he had not filed any other lawsuits against USX (*Id.* at 6), although he apparently did file and then voluntarily dismiss a state-court case against USX.[4] On the other hand, Robbins also displayed a grasp of the alleged facts and claims in this case (Doc. 128-4, at 16), stated that he has read the claim file and court rulings (*Id.* at 19), noted that he has been in contact with his attorneys by phone and email while preparing for the case (*Id.* at 44), and explained that he seeks to "represent[ ] other people like me that may be in [ ] similar circumstances" and "ensure that the case is heard" (*Id.* at 59–60). On balance, the Court concludes that Clowdis and Robbins sufficiently grasp the facts and claims in this case, intend to prosecute it vigorously, and are adequate to serve as class representatives. This is a large and complex case (even if it has been simplified, in many respects, by the Court's ruling on the motions to dismiss). Plaintiffs, as laypersons, cannot reasonably be expected to understand the deeper legal intricacies of this matter. But they plainly understand that they are suing because the Offering Documents allegedly contained misrepresented or omitted material information. They also plainly intend to see Defendants' alleged wrongs righted and have already expended considerable time and energy in service of that end. Rule 23 requires no more. Accordingly, the proposed class representatives are adequate.

Additionally, in determining whether the plaintiffs have established adequate representation, the Court considers whether the proposed class counsel are "qualified, experienced and generally able to conduct the litigation.' " *Young*, 693 F.3d at 543 (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)). Proposed class counsel—Robbins Geller Rudman & Dowd LLP and Levi & Korsinsky, LLP—

have extensive experience litigating securities class actions, and Defendants do not argue that they are inadequate. (Docs. 106-4, 106-5.) Accordingly, the proposed class counsel are adequate.

## C. Rule 23(b)(3) Requirements

### i. Predominance

To obtain class certification, Plaintiffs must also show that common questions of fact or law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citations omitted). To show predominance, "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). Predominance, however, does not require that each element of the plaintiffs' claims be evidenced by class-wide proof or that all common questions necessarily have common answers. *Amgen*, 568 U.S. at 469. Rather, Rule 23(b)(3) requires only that common questions "predominate" over individual ones. *Id.*; *see* Fed. R. Civ. P. 23(b)(3).

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a)(2). *Amchem*, 521 U.S. at 623–24; *see Young*, 693 F.3d at 544 ("While the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will predominate over individual ones."). Nevertheless, "the fact that a defense may arise and may affect different class members differently" is not dispositive. *Young*, 693 F.3d at 544 (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007)).

Plaintiffs assert that common questions predominate because (1) liability to all proposed class members turns on whether the Offering Documents contained material misrepresentations and omissions, (2) the method for calculating damages is statutorily prescribed, and (3) even if

damages or affirmative defenses differ among class members, class-wide questions still outweigh individualized inquiries. (Doc. 105, at 12–13); *see* 15 U.S.C. § 77k(e) (prescribing damages calculation for § 11 violations); *Schuh*, 2014 WL 4716231, at *7 (holding that predominance was satisfied in Securities Act case regarding alleged misrepresentations and omissions related to an IPO); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) (holding that predominance was satisfied in Securities Act case despite the defendant's assertion that damages differed because § 11 "provides a statutory formula for damages," meaning "the individual damages questions are sufficiently reduced that predominance of the common questions, answers, and facts remains"). Defendants argue that Plaintiffs "cannot show that common issues will predominate over individualized issues ... for a class extending beyond August 2, 2018" because of USX's form 8-K disclosure on that date. (Doc. 122, at 16.)

 **\*9** The availability of a knowledge defense based upon the August 2, 2018 disclosure and subsequent reporting is insufficient to defeat predominance. *See, e.g., Gaynor v. Miller*, No. 3:15-cv-545, 2018 WL 3751606, at *15 (E.D. Tenn. Aug. 6, 2018) (explaining that predominance was met for Securities Act claim despite a potential "affirmative defense of knowledge" and noting "publicly available news articles ... [were] insufficient to show that certain class members had differing levels of knowledge regarding the alleged misleading statements or omissions"). Plaintiffs' case boils down to their claim that the Offering Documents contained material misrepresentations and omissions, and resolving the factual and legal questions attendant to that claim for one class member will resolve it for all class members. Indeed, even if Defendants intend to assert a knowledge defense as to some individual class members, the potential applicability of a knowledge defense to some class members simply does not predominate over the core allegations in this case, which are comprised of common questions with common answers. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. at 349 (concluding that the "many common questions, answers, and facts" in a Securities Act case "predominate[d] over the individualized issue of knowledge"). Accordingly, predominance is satisfied.

*ii. Superiority*

Finally, Plaintiffs must demonstrate that a class action is the superior method of adjudicating this case. Fed. R. Civ. P. 23(b)(3). "In considering whether the superiority requirement of Rule 23(b)(3) is satisfied, courts consider 'the difficulties likely to be encountered in the management of a class action.' " *Young*, 693 F.3d at 545 (quoting *Beattie*, 511 F.3d at 567). "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Id.* (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)). "[C]ases alleging a single course of wrongful conduct are particularly well-suited to class certification," and "where a threshold issue is common to all class members, class litigation is greatly preferred." *Id.* (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) and citing *Daffin*, 458 F.3d at 554). On the other hand, "[w]here many individual inquiries are necessary, a class action is not a superior form of adjudication." *Id.* (citations omitted).

Plaintiffs argue that the large number of dispersed investors alleging a singular course of wrongful conduct makes this case well-suited to class adjudication. (Doc. 105, at 22–23.) Indeed, class adjudication of this matter is undeniably superior to thousands of dispersed, small actions relating to the same Offering Documents, and no foreseeable management difficulties otherwise militate against a class action under these conditions. Moreover, Defendants do not oppose certification on superiority grounds. (*See generally* Doc. 122.) Accordingly, superiority is satisfied.

 **IV. CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for class certification (Doc. 104) is **GRANTED**. Plaintiffs Deirdre Terry, Charles Clowdis, and Bryan Robbins are **APPOINTED** as class representatives. Robbins Geller Rudman & Dowd LLP and Levi & Korsinsky, LLP are **APPOINTED** as class counsel.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1410035

2021 WL 1410035

Footnotes

1    The general factual background underlying this case is mostly undisputed. The Court therefore draws general background from its order on Defendants' motions to dismiss. (*See* Doc. 91.)

2    Although the declaration says "June 19, 2028," the Court reasonably surmises that this was almost certainly a typographical error and was intended to mean "June 19, 2018." In another filing, however, Clowdis provided the date of June 18, 2018. (*See* Doc. 106-2, at 7.)

3    "Dedicated" contracts are multi-year contracts that are shielded from market volatility, while OTR involves short-term contracts or one-time, spot-market transactions, meaning OTR revenue is unpredictable but tends to entail higher profit margins, especially during market upswings. (Doc. 91, at 2, 27.)

4    Defendants assert this in their brief but provide no citation regarding Robbins's participation in a state-court case.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Sudunagunta v. NantKwest, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3917865

2018 WL 3917865
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Sunil SUDUNAGUNTA

v.

NANTKWEST, INC., et al.

Case No. CV-16-1947-MWF (JEMx)
|
Filed 08/13/2018

**Attorneys and Law Firms**

Brian Schall, Goldberg Law PC, Los Angeles, CA, J. Alexander Hood, III, Pro Hac Vice, Jeremy A. Lieberman, Pro Hac Vice, Pomerantz LLP, New York, NY, Michael M. Goldberg, Goldberg Law PC, Manhattan Beach, CA, Joshua B. Silverman, Pro Hac Vice, Omar Jafri, Pro Hac Vice, Patrick V. Dahlstrom, Pro Hac Vice, Pomerantz LLP, Chicago, IL, Jennifer Pafiti, Pomerantz LLP, Beverly Hills, CA, for Sunil Sudunagunta.

Boris Feldman, Cynthia Ann Dy, Michael R. Petrocelli, Cali D. Tran, Wilson Sonsini Goodrich and Rosati LLP, Palo Alto, CA, Gideon A. Schor, Pro Hac Vice, Sheryl S. Bassin, Pro Hac Vice, Wilson Sonsini Goodrich and Rosati PC, New York, NY, Olivia M. Kim, Wilson Sonsini Goodrich and Rosati PC, Los Angeles, CA, for Nantkwest, Inc., et al.

**Proceedings (In Chambers):** ORDER RE: MOTION TO CERTIFY CLASS [140]; MOTION TO STRIKE EXCHANGE ACT CLAIMS FROM THIRD AMENDED COMPLAINT [143]

MICHAEL W. FITZGERALD, U.S. District Judge

**\*1** Before the Court is Lead Plaintiffs Donald Hu and Brayton Li's Motion to Certify Class (the "Certification Motion"), filed April 2, 2018. (Docket No. 141). The Defendants collectively referred to as the "NantKwest Defendants" filed an Opposition on May 30, 2018. ("Certification Opposition" (Docket No. 152) ). The Defendants collectively referred to as the "Underwriter Defendants" joined in the Opposition. (Docket No. 153). Lead Plaintiffs filed a Reply on July 2, 2018. ("Certification Reply" (Docket No. 155) ).

Also before the Court is Lead Plaintiffs' Motion to Strike Exchange Act Claims from Third Amended Complaint. ("Strike Motion" (Docket No. 144) ). The NantKwest Defendants filed a Response to the Strike Motion (the "Strike Response") on April 9, 2018. (Docket No. 146). Lead Plaintiffs filed a Reply (the "Strike Reply") on April 10, 2018. (Docket No. 147).

The Court has read and considered the papers filed on the Motions and held a hearing on **August 6, 2018**.

For the reasons set forth below, the Strike Motion is **GRANTED**.

The Certification Motion is also **GRANTED**. Lead Plaintiffs have presented sufficient evidence to meet the requirements of Federal Rule of Civil Procedure 23(a) and (b). The primary dispute concerns the traceability of Lead Plaintiffs' shares to the IPO. Lead Plaintiffs have presented enough evidence to demonstrate to a near certainty that their shares are traceable to the IPO, and were purchased under the allegedly defective Registration Statement. At the very least, it is undisputed by both parties that Lead Plaintiff Li purchased 800 shares directly traceable to the IPO.

**I. BACKGROUND**

This security class action was initiated on March 22, 2016. (*See* Complaint (Docket No. 1). In June 2016, the action was consolidated with several related actions, Donald Hu and Brayton Li were appointed to serve as Lead Plaintiffs, and Lead Plaintiffs' selection of counsel was approved. (Docket Nos. 33, 34). The Consolidated Third Amended Complaint ("CTAC") was filed on July 10, 2017. (Docket No. 112). Defendants' Answers were filed on October 16, 2017. (Docket Nos. 125, 126).

On a motion for class certification, "a court must accept the substantive allegations in the complaint as true ...." *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 568 (C.D. Cal. 2012). The following allegations are drawn from the CTAC:

NantKwest (the "Company") is a development-stage immunotherapy company that attempts to harness "natural killer" cells generated by the human immune system to treat cancer, infectious diseases, and inflammatory disease. (CTAC ¶ 2). In December 2014, an investment vehicle owned by Defendant Dr. Patrick Soon-Shiong bought a majority

Sudunagunta v. NantKwest, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3917865

stake in NantKwest, and another pharmaceutical company controlled by Dr. Soon-Shiong bought additional shares. (*Id.* ¶¶ 53, 55). Dr. Soon-Shiong was then appointed Director, Co-Chairman, and Chief Medical Officer, and his business partner, Defendant Henry Ji, was made a Director. (*Id.* ¶¶ 54-56).

**\*2** On March 24, 2015, NantKwest's Board appointed Dr. Soon-Shiong CEO, and passed a resolution authorizing the Company to issue options to Dr. Soon-Shiong to purchase 1,851,500 shares at $2 per share (split-adjusted), and warrants to purchase 17,589,250 shares for $2 per share (split-adjusted). The warrant terms were modified on May 8, 2015. Under the modified terms, warrants for 8,331,750 shares would vest when a large pharmaceutical or biotech company (a "Strategic Partner") invested at least $20 million in NantKwest at a minimum valuation of $1.5 billion. (*Id.* ¶ 60). At the time they agreed to this condition, Dr. Soon-Shiong and other NantKwest Defendants allegedly already knew that the biotech company Celgene, in which Dr. Soon-Shiong was the largest individual investor, was likely to make a Strategic Partner investment in NantKwest such that the warrants would vest. (*Id.* ¶¶ 46-51). As of May 8, 2015, those 8,331,750 warrant shares were valued at $13.75 apiece, constituting compensation to Dr. Soon-Shiong of $114,561,562. (*Id.* ¶¶ 9, 15).

On July 28, 2015, NantKwest conducted its IPO, offering 9,531,200 shares of its common stock at $25.00 per share. (*Id.* ¶ 7). In connection with the IPO, NantKwest filed a Registration Statement, including a Prospectus, with the Securities Exchange Commission. (*Id.*). The IPO raised over $225 million. (*Id.* ¶ 98).

Because the Strategic Partner warrant condition was probable as of the grant date of May 8, 2015, NantKwest should have recorded $114,561,562 in executive compensation expense in the second quarter of 2015. However, the Registration Statement did not mention it. (*Id.* ¶¶ 83-98).

Lead Plaintiffs likewise allege that the Registration Statement omitted any mention of a related-party lease agreement between NantKwest and NantWorks, another Soon-Shiong entity, for which NantKwest assumed millions of dollars of liability prior to the IPO. (*Id.* ¶ 65). The Registration Statement also misrepresented the extent of material weaknesses in NantKwest's internal controls. (*Id.* ¶¶ 95-97).

Defendants point out that the Registration Statement did state that, prior to the IPO, some shares were already held by early investors and company insiders (the "Non-IPO Shares"). Those shares were subject to a 180-day lockup period. However, certain of the Non-IPO Shares were not subject to the 180-day lockup period. (Cert. Opp. at 3-4 (citing Declaration of Sheryl Shapiro Bassin ("Bassin Decl."), Exs. A, B (Docket No. 152-2) ) ). A few days after the IPO, Cohen & Grigsby, P.C., sold 240,663 Non-IPO Shares into the market over the course of several days (August 7, 10, 11, 12, 13, 14, 17, and 18). (*Id.* at 4 (citing Declaration of David J. Kalson ¶¶ 13-20 (Docket No. 152-3) ) ).

## II. <u>MOTION TO STRIKE</u>

By the Strike Motion, brought pursuant to Rule 15(a), Lead Plaintiffs seek to strike from the CTAC the Third and Fourth Claims for Relief, which are brought under the Securities Exchange Act of 1934 (the "Exchange Act"), and paragraphs 99-127, 134-36, and 153-70, which pertain exclusively to the Exchange Act claims. (Strike Mot. at 1).

The basis for the Strike Motion is that, having conducted discovery, Lead Plaintiffs have concluded that they will be unable to meet the evidentiary burden necessary to establish class certification with respect to Exchange Act claims. (*Id.*). Specifically, they will be unable to establish a presumption of reliance, which is necessary to certify Exchange Act claims for class treatment, because they will be unable to prove market efficiency. (*Id.* at 1-2).

The NantKwest Defendants take no position on Lead Plaintiffs' request to withdraw the Exchange Act claims, but question whether a "motion to strike" is the appropriate vehicle, and instead suggest Lead Plaintiffs should seek leave to amend pursuant to Rule 15(a)(2). (Strike Response at 1). The Court agrees. As the Court indicated at the hearing, a motion to strike is not the appropriate vehicle by which to withdraw these claims and allegations. The Court therefore construes the Strike Motion as an unopposed motion for leave to amend the CTAC to withdraw the Exchange Act claims and allegations that pertain to them.

**\*3** Having shown good cause to amend, the Strike Motion is therefore **GRANTED**. With the understanding that only the identified claims and relevant allegations will be deleted, Lead Plaintiffs should file a Fourth Amended Complaint by **August 24, 2018**. Defendants should answer the Fourth Amended Complaint by **September 7, 2018**. As discussed at the hearing, the Court sees no basis for a motion to dismiss

2018 WL 3917865

the Fourth Amended Complaint. If Defendants wish to file a motion to dismiss, they must first seek leave of the Court via an ex parte application of no more than two pages.

### III. MOTION TO CERTIFY CLASS

The Court now turns to the Certification Motion. By the Certification Motion, Lead Plaintiffs seek to certify the following class:

> All persons who purchased or otherwise acquired NantKwest, Inc. ("NantKwest" or the "Company") common stock in or traceable to NantKwest's July 27, 2015 initial public offering ("IPO"). Excluded from the Class are anyone named as a defendant in this litigation, the present and former officers and directors of NantKwest and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant (or combination of defendants) have or had a controlling interest.

(Proposed Order (Docket No. 140-1) ).

The Rule 23(a) requirements that are disputed are typicality and adequacy. It is not disputed that the Rule 23(b) requirements are met.

"As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.' " *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995) ). Especially in the case of a class action alleging securities fraud, then, "[a]ny doubts a court has about class certification should be resolved in favor of certification." *Gable v. Land Rover N. Am., Inc.*, No. SACV 07-0376-AG (RNBx), 2011 WL 3563097, at *3 (C.D. Cal. July 25, 2011). *See also In re Netsol Techs., Inc. Sec. Litig.*, No. CV 14-5787-PA (PJWx), 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016) ("[T]he Court is mindful that the law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." (citations omitted) ).

#### A. Requirements of Rule 23(a)

Lead Plaintiffs contend that the requirements of numerosity, commonality, typicality, and adequacy are met. (Cert. Mot. at 8-10). Lead Plaintiffs have established numerosity and commonality, and Defendants sensibly do not oppose the contention that those requirements are met.

However, Defendants do argue that Lead Plaintiffs fail to meet the requirements of typicality and adequacy. (Cert. Opp. at 8-22).

#### 1. Typicality

The typicality requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "typicality" requirement is a permissive standard. *See Hanlon*, 150 F.3d at 1020. "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id*. "[T]he court should look at whether the class members have similar injuries, whether the wrongful activity is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct." *Cooper*, 254 F.R.D. at 635 (quoting *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 129-30 (S.D. Cal. 1996) ).

**\*4** Lead Plaintiffs contend that their claims are typical of the claims of absent class members because they all "purchased shares pursuant to or traceable to NantKwest's IPO, and therefore have the exact same legal claims under sections 11 and 15 of the Securities Act, and the exact same interest in demonstrating that the Registration Statement contained material misrepresentations." (Cert. Mot. at 9-10).

Defendants contend that Lead Plaintiffs' claims are not typical because they are subject to unique defenses. Indeed, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ). However, "most securities class actions avoid [problems of unique defenses] because of the nature of securities claims. These claims tend to be fraud claims with central elements." 7 William B. Rubenstein, *Newberg on Class Actions*, § 22:72 (5th ed. 2018).

***Statutory Standing:*** Defendants first argue that Lead Plaintiffs lack statutory standing to assert Section 11 claims because their purchases of NantKwest shares cannot be traced to the allegedly misleading Registration Statement. Section 11(a) provides that where a material fact is misstated or omitted from a registration statement accompanying a stock

Sudunagunta v. NantKwest, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3917865

filing with the Securities and Exchange Commission, "any person acquiring such security" may bring an action for losses caused by the misstatement or omission. 15 U.S.C. § 77k(a). "Clearly, this limitation only means that the person must have purchased a security issued under that, rather than some other, registration statement." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). The Ninth Circuit explained that, "While it might present a problem of proof in a case in which stock was issued under more than one registration statement," where the only stock ever sold to the public was pursuant to the allegedly misleading registration statement at issue, as long as the plaintiff is suing regarding that security, "he is 'any person purchasing such security,' regardless of whether he bought in the initial offering, a week later, or a month after that." *Id.*

"Plaintiffs need not have purchased shares in the offering made under the misleading registration statement; those who purchased shares in the aftermarket have standing to sue *provided they can trace their shares back to the relevant offering*." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) (emphasis added). "[T]his 'tracing' requirement generally poses no obstacle" when the company's shares were all issued under the same registration statement. *Id.*; *cf. In re Wells Fargo Morg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 964 (N.D. Cal. 2010) (distinguishing circumstances in which offerings all stemmed from one registration statement from those in which each offering associated with separate prospectus); *Welgus v. TriNet Grp., Inc.*, No. CV 15-3625-BLF, 2017 WL 167708, at *14 (N.D. Cal. Jan. 17, 2017) (distinguishing circumstances in which at time of purchase in question there had been only one offering from those in which there had already been two offerings). The standard for proving this traceability requirement is the preponderance of the evidence standard. *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 379 (D. Mass. 1987) (proof of traceability may include direct and circumstantial evidence, including statistical data).

**\*5** Here, it is undisputed that at the time that Lead Plaintiffs purchased their NantKwest shares, there had only been one offering - the IPO - pursuant to one Registration Statement. Indeed, at least some of Li's shares were purchased even before Cohen & Grigsby's shares entered the market, when only IPO-registered shares were available. (*See* Reply at 18). Defendants essentially argue that, because Cohen & Grigsby sold 240,663 Non-IPO Shares on certain days during the lock-up period following the IPO, it is possible that Lead Plaintiffs bought Non-IPO Shares rather than IPO-registered shares.

Defendants do not identify any other Non-IPO Shares that were sold during the lock-up period other than those sold by Cohen & Grigsby.

As Lead Plaintiffs argue, it is ***highly*** unlikely that the shares Lead Plaintiffs purchased were Non-IPO Shares. Over 9.5 million shares were sold in the IPO itself. Cohen & Grigsby sold only 240,663 shares. Over 99.5% of the lock-up period trading volume related to IPO-registered shares rather than the Non-IPO Shares. Only two of the days on which Cohen & Grigsby sold Non-IPO Shares were also days on which Lead Plaintiffs purchased shares. (Reply at 8, 12-15). Indeed, many of the cases on which Defendants rely involve circumstances in which multiple offerings had occurred, resulting in problems of proof not present here. *See, e.g.*, *Century Aluminum*, 729 F.3d 1104 (addressing traceability problem of traceability to secondary offering where number of shares offered in secondary offering was much smaller than number of shares already in the market); *Wells Fargo Mortg.-Backed Certificates*, 712 F. Supp. 2d 958 (54 offerings); *Welgus*, 2017 WL 167708 (two offerings).

As Lead Plaintiffs indicate, many of the district courts assessing traceability look to the whether the market was dominated by shares from the offering in question or pre-existing shares. *See, e.g.*, *Welgus*, 2017 WL 167708, at *15 ("Plaintiff cannot plausibly trace his shares to the secondary offering, in which 14 million shares were sold, because at the time he purchased the shares, there were 17.25 million shares on the market from the IPO."); *Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 874 (N.D. Cal. 1986) (finding plaintiff failed to prove traceability to offering in question where that offering added only 2 million shares of common stock to 9 million shares previously outstanding); *In re Exodus Communications, Inc. Sec. Litig.*, No. CV 01-2661-MMC, 2006 WL 1530081, at *3 (N.D. Cal. 2006) (finding plaintiff failed to prove traceability to offering in question where "there were more than 550 million Exodus shares outstanding immediately after the February 6, 2001 offering, only 13 million of which shares were issued in the February 6, 2001 offering in question."); *In re LendingClub*, 282 F. Supp. 3d at 1179 (no dispute regarding traceability where shares were purchased after IPO offered 67 million shares and before 295 million outstanding shares entered the market).

Here, Defendants point to only 240,663 Non-IPO Shares that were in the market during the lock-up period, compared to the over 9.5 million IPO-registered shares. It is undisputed that at least a portion of Li's shares were purchased before the Non-

Sudunagunta v. NantKwest, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3917865

IPO Shares even entered the market, and are therefore directly traceable to the IPO. Contrary to Defendants' argument, Lead Plaintiffs have done more than show that their shares "***might*** have been issued in the relevant offering." *See Abbey*, 634 F. Supp. at 875 (emphasis added).

At the hearing, Defendants argued that the Court's approach to the traceability issue has been addressed and rejected by courts in this District. Specifically, Defendants pointed to *In re Quarterdeck Office Sys., Inc. Securities Litig.*, No. CV 92-3970-DWW (GHKx), 1993 WL 623310 (C.D. Cal. Sept. 30, 1993). In that case, the district court rejected the "plaintiffs['] attempt to use statistical analysis to show that their shares 'might' have been registered shares." *Id.* at *3. The district court reasoned that the plaintiffs' "speculative basis for standing, without more, is insufficient for purposes of § 11." *Id.* The lead plaintiffs' claims were therefore not typical of the claims alleged by the proposed class. *Id.* The Court relied primarily on *Abbey*, which "addressed a fact pattern that is virtually identical" to the fact pattern in *Quarterdeck*. *Id.* In *Abbey*, "the plaintiff purchased 9,000 shares one week after the offering that formed the basis of his § 11 claim. The company offered 2 million shares of common stock, adding to the 9 million shares of common stock already outstanding." *Id.* (citing *Abbey*, 634 F. Supp. at 874).

 **\*6** The Court does not find *Quarterdeck*, or the authority on which it relied, to be inconsistent with the Court's conclusion here. Here, the Court concludes that Lead Plaintiffs have shown ***more*** than that their shares "might" have been issued in the IPO. There is far more than a "speculative basis" for statutory standing here. To the extent that Defendants suggest *Quarterdeck* ***is*** inconsistent with the Court's decision here in that it rejects any possibility of a probability-based traceability conclusion - and the Court does not read it to do so - the Court notes that, as Lead Plaintiffs pointed out at the hearing, both *Quarterdeck* and *Abbey* predate the Ninth Circuit's treatment of the issue in *Century Aluminum.*

In *Century Aluminum*, the Court did not adopt such a rule. In *Century Aluminum*, the Ninth Circuit distinguished between circumstances in which "all of a company's shares have been issued in a single offering under the same registration statement," in which case the tracing requirement "generally poses no obstacle," and situations in which a "company has issued shares under more than one registration statement," in which case "the plaintiff must prove that her shares were issued under the allegedly false or misleading registration

statement, rather than some other registration statement." 729 F.3d at 1106.

At the very least, there is no dispute at all that 800 of Li's shares are directly traceable to the IPO itself. At the hearing, Defendants argued that those shares represent only 1.8% of the total number of shares Li and Hu claimed they acquired during the class period. As Lead Plaintiffs pointed out, that 1.8% represents over $25,000. Defendants cite to no authority demonstrating that $25,000 confers an insufficient stake in the litigation.

Moreover, regardless of whether the shares Lead Plaintiffs were purchased were Non-IPO Shares or IPO shares, they were purchased in the IPO aftermarket, when only one Registration Statement had been issued because there had only been one public offering. Lead Plaintiffs' allegations that they were misled by the statements and omissions in the Registration Statement are therefore typical of the claims of absent class members. As Lead Plaintiffs argue, to the extent Defendants intend to assert a defense based upon the date of purchase, such a defense will not be unique to Lead Plaintiffs; the tracing argument can be made as to any class member who made purchases during the lock-up period after Cohen & Grigsby's shares entered the market. (Opp. at 18).

Lead Plaintiffs have met their burden with respect to traceability, and Defendants' argument that Lead Plaintiffs lack statutory standing and are therefore subject to unique defenses that render them atypical is unpersuasive.

***Actual Knowledge:*** Defendants next argue that Lead Plaintiff Hu is subject to a unique defense and therefore does not meet the typicality requirement because he purchased his shares of NantKwest with knowledge of information that is alleged to have been misrepresented or omitted from the Registration Statement. (Cert. Opp. at 9-16). Recovery is available under Section 11 to "any person acquiring such security (***unless it is proved that at the time of such acquisition he knew of such untruth or omission***). 15 U.S.C. § 77k(a) (emphasis added). A defense based on actual knowledge requires "competent evidence that the named Plaintiffs actually knew" the truth behind what was allegedly misrepresented or omitted in the Registration Statement. *In re Wash. Mut. Mortg.-Backed Sec. Litig.*, 276 F.R.D. 658, 666 (W.D. Wash. 2011) (on motion for class certification, rejecting argument that named plaintiffs were atypical because they had actual knowledge).

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 87 of 101 PageID #:3752

Sudunagunta v. NantKwest, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3917865

**\*7** Here, Defendants argue that NantKwest's Form 10-Q for 2Q2015 was filed on September 9, 2015, before Hu ever purchased any shares. (Cert. Opp. at 14 (citing CTAC ¶ 10) ). That 10-Q disclosed that NantKwest had incurred $71.2 million in compensation expense due to the achievement of a performance milestone, which triggered the vesting of warrant shares to Dr. Soon-Shiong. (*Id.*). Hu testified in deposition that he probably did review the 10-Q before purchasing NantKwest shares. (Bassin Decl., Ex. D at 134L24-135-14). However, Lead Plaintiffs point out in the Reply that the 10-Q is alleged to have continued to conceal the vast majority of the executive compensation paid to Dr. Soon-Shiong, the related-party lease liability, as well as the alleged defects in internal controls. (Reply at 24). In other words, even if Hu did read the 10-Q, it would not have provided him with knowledge of the untruths or omissions alleged to be present in the Registration Statement.

The Court cannot conclude that Hu is subject the unique defense of actual knowledge such that his claims are no longer "reasonably co-extensive with those of absent class members." *See Hanlon*, 150 F.3d at 1020.

**2. Adequacy**

The requirement of adequacy ensures that a class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, the named plaintiffs must appear able to prosecute the action vigorously through qualified counsel, and the named plaintiff must not have antagonistic or conflicting interests with the unnamed class members. *In re SFPP Right-of-Way Claims*, No. SACV 15-718-JVS (DFMx), 2017 WL 2378363, at \*12 (C.D. Cal. May 23, 2017) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) ).

Defendants do not contest Lead Plaintiff's contention that they have engaged qualified, experienced, and capable attorneys who are highly qualified in securities fraud class action litigation. (*See* Cert. Mot. at 10). Rather, Defendants contend that Lead Plaintiffs Hu and Li are inadequate because they are subject to unique defenses and because they have failed to diligently control and monitor the case. (Cert. Opp. at 15, 18). To the extent Defendants' adequacy argument is based on the allegedly unique defenses applicable to Lead Plaintiffs, the argument fails for the reasons set forth above. For the reasons set forth below, Defendants' argument also fails to

the extent it is based on Lead Plaintiffs' alleged failure to diligently control and monitor the case.

Defendants cite portions of Lead Plaintiffs' deposition testimony to suggest that they are unfamiliar with the action and have not followed the progress of the case. For example, Li may have testified that he did not know what had transpired in the action since he was designated Lead Plaintiff (Bassin Decl., Ex. C at 169:18-170:1), but he also testified to producing documents to his attorneys, knowledge that he would be proposed as a class representative but that the Court had not yet approved his appointment, knowledge that settlement talks had occurred, and knowledge that a decision had been made to withdraw the Exchange Act claims. (Declaration of Omar Jafri ("Jafri Decl."), Ex. B at 47:18-22; 175:5-14; 177:13-23 (Docket No. 156) ). Overall, Li's deposition testimony demonstrates a general understanding of the theory of the case and his responsibilities as a class representative.

Likewise, Hu testified that he understood he had a responsibility as a Lead Plaintiff to "step up" to help prepare any documents, provide records, and sit for depositions. (Jafri Decl., Ex. B at 174:24-185:7). His testimony also demonstrated an understanding of the theory of the case. (*Id.* at 183:2-184:20). He testified to discussing the decision to withdraw the Exchange Act claims with his lawyer. (*Id.* at 204:7-18). That Lead Plaintiffs "are familiar with the basis for the suit and their responsibilities as [representative] plaintiffs is sufficient to establish their adequacy." *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531 (N.D. Cal. 2010).

**\*8** At the hearing, Defendants focused heavily on the fact that Lead Plaintiffs' counsel did not ***ask*** Lead Plaintiffs about withdrawing the Exchange Act claims. In light of the fact that Lead Plaintiffs appear to be aware of what's going on in this action and of their responsibilities with respect to the action, and because both parties appear to view withdrawal of the Exchange Act claims as an uncontroversial, necessary decision, the Court cannot conclude that the fact that Lead Plaintiffs did not advise their counsel on the withdrawal demonstrates any inadequacy on their part.

That Hu acknowledged relying on his counsel to make decisions does not undermine his adequacy as a class representative. *See Johnson v. Hartford Cas. Ins. Co.*, No.CV 15-4138-WHO, 2017 WL 2224828, at \*14 (N.D. Cal. May 22, 2017) (recognizing that "clients necessarily look to

2018 WL 3917865

counsel to understand the factual and legal intricacies" of class actions (citations omitted) ); *In re Facebook Biometric Info. Privacy Litig.*, No. CV 15-3747-JD, 2018 WL 1794295, at *4 (N.D. Cal. Apr. 16, 2018) ("Even if the named plaintiffs have relied heavily on the advice of attorneys and others, it is hardly a badge of inadequacy to seek help from those with relevant expertise.").

Similarly, the Court declines to find that Lead Plaintiffs' failure to negotiate a more favorable fee with counsel undermines Lead Plaintiffs' adequacy. Defendants suggest that Lead Plaintiffs should have done more research and driven a harder bargain with counsel before selecting them. (Cert. Opp. at 22-23). The Ninth Circuit recognizes lead plaintiffs' "authority and responsibility to select counsel", but it specifically declines to "[m]ak[e] the Rule 23 adequacy determination turn on who the court believes negotiated the best fee schedule." *In re Cavanaugh*, 306 F.3d 726, 734 (9th Cir. 2002).

Accordingly, the requirements of Rule 23(a) are met.

### B. Requirements of Rule 23(b)(3)

Lead Plaintiffs contend that Rule 23(b)(3) is satisfied (*see* Cert. Mot. at 10-13), and Defendants do not argue otherwise in the Certification Opposition.

Rule 23(b)(3) requires that "questions of law or fact common to the class 'predominate' over questions affecting the individual members and, on balance, a class action is superior to the other methods available for adjudicating the controversy." *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 721 (C.D. Cal. 2002).

Lead Plaintiffs argue that because they allege a "common course of conduct" consisting of misrepresentations and omissions that affect all members of the class in the same manner, common questions predominate. (Cert. Mot. at 11 (quoting *Blackie v. Barrack*, 524 F.2d 891, 905-08 (9th Cir. 1974) ) ). They point to the common questions on which liability turns under the Securities Act claims: whether the Registration Statement omitted material information about NantKwest's executive compensation expenses; whether the Registration Statement omitted material information about liability for a related-party lease; and whether the Registration Statement materially misrepresented the extent of material weaknesses in NantKwest's internal controls. (*Id.* at 11-12). To the extent individual damages calculations are necessary - though the parties apparently agree that damages under

Section 11 are statutory and mechanical (*see id.* at 12) - "the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (analyzing predominance under Rule 23(b)(3) ).

Lead Plaintiffs further argue that a class action is superior here because each of the factors listed in Rule 23(b)(3) are met, and courts have recognized that "class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." (Cert. Mot. at 12 (quoting *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 284 (N.D. Ala. 2009) ) ).

**\*9** Defendants do not argue that the requirements of Rule 23(b)(3) are not met, and the Court agrees with Lead Plaintiffs that Rule 23(b)(3) is satisfied here.

### C. Defendants' Proposed Limits on Class Definition

Defendants argue that, if a class is certified, it cannot be the overbroad one proposed by Lead Plaintiffs. Specifically, Defendants argue that the class must be limited to purchasers who bought NantKwest stock before Cohen & Grigsby began selling its 240,663 Non-IPO Shares on August 7, 2018. Absent such a limitation, Defendants argue, adjudication of the class claims will require individualized assessments of class members' ability to trace their post-August 7, 2015 NantKwest shares to the Registration Statement. (Cert. Opp. at 24).

The Court declines to impose such a limitation. The definition of the proposed class already addresses traceability. To the extent traceability poses a problem, as the Court indicated at the hearing, it is a common factual problem. When, as here, "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity −[an alleged] failure of proof as to an element of the plaintiffs' cause of action−courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016) (citation omitted).

Defendants also argue that the class should exclude all purchasers of NantKwest shares who sold their shares for more than the IPO price of $25, because those purchasers would not have suffered damages and therefore lack standing. (*Id.* at 25). Again, the Court is disinclined to impose such a limitation. *See Vaquero*, 824 F.3d at 1155 ("the need for individual damages calculations does not, alone, defeat class

certification"). As Lead Plaintiffs argued at the hearing, this issue may be resolved at the claims process stage.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff's Motion is **GRANTED.** The Court certifies the proposed class, appoints Lead Plaintiffs Brayton Li and Donald Hu as class representatives, and appoints Pomeratnz LLP and Bragar Eagel & Squire, P.C. as Co-Class Counsel and Glancy Prongay & Murray LLP as Liaison Counsel.

Plaintiffs shall file a Fourth Amended Complaint deleting the Exchange Act claims and relevant allegations on or before **August 24, 2018**. Defendants must answer the Fourth Amended Complaint by **September 7, 2018**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3917865

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 21372471

2003 WL 21372471
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

George TATZ, individually and on behalf
of all others similarly situated, Plaintiff,
v.
NANOPHASE TECHNOLOGIES
CORPORATION, Joseph Cross,
Jess Jankowski, Daniel S. Bilicki,
and Gina Kritchevsky, Defendants.

No. 01 C 8440.
|
June 13, 2003.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, J.

 **\*1** Plaintiff, George Tatz, brings this putative class action on behalf of himself and those similarly situated against Defendants Nanophase Technologies Corp., Joseph Cross, Jess Jankowski, Daniel Bilicki, and Gina Kritchevsky. Plaintiff now moves for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3). For the following reasons, Tatz's motion for class certification is granted.

BACKGROUND

The following factual history is taken from our prior opinion in this case denying the defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995. *See Tatz v. Nanophase Technologies Corp.,* 2002 WL 31269485, at \*1–3 (N.D.Ill. Oct. 9, 2002).

Defendant Nanophase Technologies Corporation (hereinafter "Nanophase") is a Delaware Corporation, with headquarters in Romeoville, Illinois, that develops, manufacturers, and sells nanocrystalline materials for commercial use. Nanophase uses its extensive proprietary technology to engineer and produce nanocrystalline materials for specific applications, including environmental catalysts. Defendant Joseph Cross was at all relevant times the Chief Executive Officer, president, and a director of Nanophase. The other individual defendants were, at all relevant times, senior executive officers of Nanophase.

On January 21, 2001, Cross told the *Wall Street Journal* that Nanophase had met each of the goals for the year 2000 and announced that the company's 2001 targets included "tripling revenues again." He stressed that Nanophase needed to "increase the revenue stream as quickly as possible," not only to become profitable but also to show that customers perceive that the company's technology has value. Shortly thereafter, Nanophase was notified by BASF, its largest customer, of an "unexpected delivery rescheduling for sunscreen materials." Under the new schedule, the company would ship product to BASF primarily in the third and fourth quarters, reducing shipments by 50% in the first quarter and 30% in the second quarter. According to the complaint, because Nanophase had already reduced its 2001 revenue forecast in February 2001, the defendants needed to find some way to replace the deferred BASF revenues.

Just before the close of the first quarter, on March 28, 2001, Nanophase issued a press release stating that Nanophase "received an order for approximately $400,000 for a new environmental catalyst application to be filled in the first quarter of 2001." While the company anticipated "significant" revenue in 2001 from this customer, quantities and timing would not be known for a few months. Also, for "competitive reasons," the customer was not named. As a result of this deal, Nanophase's release of first quarter results was positive. On April 5, 2001, Nanophase reported a 73% rise in revenues from the prior year and "robust" business development, "as evidenced by our recent announcement of a new customer for environmental catalyst."

 **\*2** Apparently as a result of shareholder confusion concerning the recording of the revenue from the new environmental catalyst sale, defendant Jankowski, the company's acting Chief Financial Officer, explained at the beginning of the April 26, 2001 conference call how the company was able to record the revenue in the first quarter. He stated:

 "... $400,000 of first quarter 2001 product revenue related to the catalyst order that we discussed in our March 28 press release. We had positive negotiations with that customer for some time prior to finalizing arrangements and were ready to fill the order immediately upon coming to terms.

Tatz v. Nanophase Technologies Corp., Not Reported in F.Supp.2d (2003)

2003 WL 21372471

The timing of this revenue seems to have been a point of confusion to some of our shareholders."

Aside from accruing the revenue in the first quarter, which could only occur, according to the company's stated policy, if shipment had made been made, other defendants also suggested that the product had already been shipped. Specifically, Dan Bilicki, Vice President of Sales and Marketing, stated: "The nanocrystalline material *provided* will be used for large-scale tests." Similarly, Cross added, "[F]or the catalyst order ..., we *also have deliveries scheduled* for the second quarter."

Based in large part on these announcements, Nanophase's stock price rose from $6.44 to $11.81 on May 18, 2001. That day, and again on May 22 and May 24, when the closing price ranged from $10.60 to $11.81, defendants Bilicki, Jankowski, and Gina Kritchevsky, Vice President of Technology and Engineering, sold 53,228 shares of stock, 33.3% of all shares traded on those days.

One week later, Nanophase terminated its exclusive relationship with the unnamed customer of the environmental catalyst, based upon "concerns that the customer is not currently adequately capitalized to fulfill its remaining obligations." The company lowered expected second quarter revenues by $500,000 and 2001 projections by $2–2.5 million. However, the company never disclosed that it had not been paid for the first quarter sale. Nevertheless, this partial disclosure caused the stock price to drop $2.06, or 17.44%, on the next trading day (June 4, 2001), on the third highest trading day volume in the purported class period.

According to the amended complaint, shareholders' suspicions were again aroused by this announcement, especially as it came just days after three executives sold 53,000 shares of stock. During a July 26, 2001 conference call, defendants again explained their actions. Cross stated during the conference call that:

"As many of you are aware, three Officers and one Director sold some stock this past quarter ... [S]tock options are a form of compensation in this company. In each case, the Officers involved had personal reasons for their decisions, as is their right to manage their own compensation. While the timing turned out to be awkward, related to our decision to exit the relationship with the European customer, all the factors that led to that decision were not known until literally hours before the press release."

**\*3** Regarding the termination of the agreement, Cross said that, although a memorandum of understanding had been executed setting forth quantities and delivery dates, the customer did not sign a "legal agreement" because it was "undercapitalized." Again, four months after the first quarter order had been filled, defendants still had not disclosed that the customer had not yet paid Nanophase. This partial disclosure still caused a price drop of 15%, from $7.74 on July 25 to $6.60 on July 26.

On October 25, 2001, Nanophase reversed the first quarter sale, reducing third quarter revenues from $1.1 million to $700,000. Revealing the customer's identity, Nanophase explained that not only had Celox failed to pay for the order, but Celox never gave shipping instructions to Nanophase, although it had been required to do so by July. Thus, even though Nanophase had "exit[ed] the relationship" with an "undercapitalized" Celox on June 1, 2001 and had never sent Celox any product, defendants claimed that only on October 16, 2001 was "significant uncertainty" first raised as to whether Celox would "ever pay for the product it bought," and for which revenue was accrued seven months earlier. Consequently, the stock's price fell 13.5% the next day, from $6.20 to $5.36.

On March 8, 2002, the plaintiff filed an amended two count complaint against the defendants alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Code of Federal Regulations. By order dated January 29, 2002, Tatz was appointed Lead Plaintiff and his counsel, Glancy & Binkow LLP, was appointed Lead Counsel for the class. In the instant motion, the plaintiff requests that we certify a class defined as follows:

All persons or entities who purchased or acquired Nanophase Technologies Corporation ("Nanophase" or "Corporation") common stock during the period from April 5, 2001, through and including October 24, 2001 (the "Class Period"), and were damaged thereby. Excluded from the class are the defendants, their affiliates and any officers or directors of Nanophase or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class").

DISCUSSION

I. Class Certification is Particularly Appropriate in Securities Cases

The Seventh Circuit Court of Appeals has liberally construed Rule 23 in shareholder suits. *See King v. Kansas City Southern*

Tatz v. Nanophase Technologies Corp., Not Reported in F.Supp.2d (2003)

2003 WL 21372471

*Industries, Inc.,* 519 F.2d 20, 25–26 (7th Cir.1975). Courts in this district recognize that:

> securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing.

*Gilbert v. First Alert, Inc.,* 904 F.Supp. 714, 719 (N.D.Ill.1995) (quoting *Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas.) Ltd.,* 94 F.R.D. 147, 150 (N.D.Ill.1982)), *opinion amended on other grounds,* 165 F.R.D. 81 (1996). A class action is often the most fair and practicable means to address claims in securities cases. *Brosious v. Children Place Retail Stores,* 189 F.R.D. 138, 147 (D.N.J.1999) ("[c]lass actions are often the most fair and practical vehicle for plaintiffs' claims in securities suits because 'those who have been injured are in a poor position to seek legal redress' ... because individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation") (quoting *Zinberg v. Washington Bancorp. Inc.,* 138 F.R.D. 397, 410 (D.N.J.1990)). *See also Endo v. Albertine,* 147 F.R.D. 164 (N.D.Ill.1993) (certifying plaintiff class under § 11 of the 1933 Act).

II. The Requirements of Rule 23(a)

**\*4** A party seeking to represent a class of similarly situated individuals has the burden of establishing that class certification is proper under Federal Rule of Civil Procedure 23. *Retired Chicago Police Assoc. v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). The Court must determine the propriety of class certification with reference to the requirements of Rule 23 and not to whether the plaintiff will ultimately prevail on the merits of his claim. "[N]othing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140 (1974). However, the Court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met. *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 677 (7th Cir.2001). The Court must "understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues." *Dhamer v. BristolMyers Squibb Co.,* 183 F.R.D. 520, 530 (N.D.Ill.1998).

In determining whether class certification is proper under Rule 23, the Court must undertake a two-step analysis. The Court must first determine whether the initial requisites for class certification delineated in Rule 23(a) are satisfied: (1) that the class is so numerous that joinder of all members is impracticable (numerosity); (2) that there are questions of law or fact common to the class (commonality); (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) that the representative parties will fairly and adequately protect the interests of the class (adequacy of representation). Second, the Court must determine whether the proposed class satisfies one of the sub-parts of Rule 23(b). In this case, Tatz seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). With these principles in mind, we turn to whether Tatz has satisfied the requirements under Rule 23 for class certification.

A. The Effect of Defendants' Offer of Judgment

In its opposition to the motion for class certification, the defendants argue that the motion should be denied because Tatz's claims are moot because of an offer of judgment. The substance of this argument is that since the defendants offered, in a Rule 68 offer of judgment, the full amount of damages Tatz could recover if he prevails on the merits, all of Tatz's claims as a putative class representative are moot. Thus, according to the defendants, the class certification motion should be denied. We disagree.

**\*5** The relevant portions of Rule 68 provide that "[a]n offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs." Fed.R.Civ.P. 68. It is clear from the text of this rule that its terms are not self-executing. It is within the discretion of the party to whom the offer of judgment is made to accept the offer or not within 10 days. The record in this case is clear that Tatz did not respond to the offer of judgment within the requisite time period. Thus, Tatz's claims technically are not moot because no offer has been accepted and recorded with the Clerk of this Court.

Further, the Seventh Circuit has addressed the impact of an offer of judgment on class certification in cases such as this. In *Greisz v. Household Bank (Illinois), N.A.,* 176 F.3d 1012, 1015 (7th Cir.1999), the court found that an

2003 WL 21372471

offer of judgment made before a class is certified is not sufficient to moot the class representative's claim because "an offer to one is not an offer of the *entire* relief sought by the suit...." (Emphasis in original) (citing *Deposit Guaranty National Bank v. Roper,* 445 U .S. 326, 341, 100 S.Ct. 1166 (1980); *Alpern v. Utilicorp United, Inc.,* 84 F.3d 1525, 1539 (8th Cir.1996)). The court also noted that an offer of judgment *may* moot a plaintiff's claim if it was made prior to a motion for class certification and "before the existence of other potential plaintiffs has been announced." *Id.* (citing *Holstein v. City of Chicago,* 29 F.3d 1145, 1147 (7th Cir.1994)). While it is true that the defendants made the offer of judgment to Tatz two months before the instant motion for class certification was filed, it cannot be denied that "the existence of other potential plaintiffs" had been announced. *Id.* Plaintiff's counsel performed this function by not only filing a class action complaint which specifically contemplated the existence of hundreds of plaintiffs but also by persuading this Court to enter an order appointing Tatz as lead class plaintiff—a clear message to those interested in such things that a class certification motion would be filed forthwith. Thus, we find that the offer of judgment has not mooted Tatz's claims.

**B. Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all class members is impracticable." Fed.R.Civ.P. 23(a)(1). Because there is no mystical number at which the numerosity requirement is established, courts have found this element satisfied when the putative class consists of as few as 10 to 40 members. *See Markham v. White,* 171 F.R.D. 217, 221 (N.D.Ill.1997) (35–40 class members); *Hendricks– Robinson v. Excel Corp .,* 164 F.R.D. 667, 671 (C.D.Ill.1996) (38 class members); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1983) (29 class members). Although the plaintiff need not allege the exact number or identity of the class members, the plaintiff ordinarily "must show some evidence or reasonable estimate of the number of class members." *Long v. Thornton Township High Sch. Dist.,* 82 F .R.D. 186, 189 (N.D.Ill.1979). The Court is permitted to "make common sense assumptions in order to find support for numerosity." *Cannon v. Nationwide Acceptance Corp.,* 1997 WL 139472, at *2 (N.D.Ill. March 25, 1997) (quoting *Evans v. United States Pipe & Foundry,* 696 F.2d 925, 930 (11th Cir.1983)).

**\*6** Here, the putative class contains hundreds of potential persons or entities. Some 13,000,000 shares of Nanophase's common stock were publicly traded on the NASDAQ National Market during the Class Period. It is reasonable to conclude, and no one seriously contends otherwise, that these 13,000,000 shares were likely owned by hundreds of persons or entities throughout the United States. Thus, the numerosity requirement is satisfied.

In addition, Rule 23(a)(1) provides that a class action may be maintained only if "joinder of all members is impracticable." To demonstrate that joinder is impracticable, the class representatives "only need to show that it is extremely difficult or inconvenient to join all members of the class." C.A. Wright, A. Miller & N. Kane, Federal Practice and Procedure, § 1762 at 159 (2d ed.1986). In this case, it would be extremely difficult to join the hundreds of members of the class.

**C. Commonality**

Rule 23(a)(2) requires that there be a common question of law or fact among class members. This Court has characterized the commonality requirement as a "low hurdle, easily surmounted." *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N.D.Ill.1992)(citing *Wesley v. General Motors Acceptance Corp.,* 1992 WL 57948, at *3 (N.D.Ill.1992)). Common questions exist when, despite the existence of individual issues among class members, there is a common nucleus of operative facts. *Rosario v. Livaditis,* 963 F.2d 1013, 1017–18 (7th Cir.1992); *Beale v. Edgemark Financial Corp.,* 164 F.R.D. 649, 654 (N.D.Ill.1995). This element is satisfied when each class member's claim hinges on the same conduct by the defendants. *Beale,* 164 F.R.D. at 658.

The present case involves several common questions that relate to the defendants' conduct including, but not limited to: 1) whether the federal securities law were violated by the defendants' acts and omissions; 2) whether the defendants participated in and pursued the common course of conduct; 3) whether financial statements, audit reports, press releases, and other statements disseminated to the investing public and Nanophase's shareholders omitted to state and/or misrepresented material facts about the business, products, financial condition, and business prospects of Nanophase; 4) whether the defendants acted willfully, knowingly, or recklessly; and 5) whether the market price of Nanophase's common stock was artificially inflated due to the alleged conduct by the defendants. Therefore, the commonality requirement of Rule 23(a)(2) is satisfied.

**D. Typicality**

Tatz v. Nanophase Technologies Corp., Not Reported in F.Supp.2d (2003)

2003 WL 21372471

The typicality requirement of Rule 23(a)(3) requires the Court to determine whether the representative plaintiff's claims have the same essential characteristics as the claims of the class at large. *De la Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). *See also Beale,* 164 F.R.D. at 654. A finding that commonality exists generally results in a finding that typicality also exists. *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 664 (N.D.Ill.1996). The Rule does not require that each member of a class suffer exactly the same injury as the named class representative. *Tidwell v. Schweiker,* 677 F.2d 560, 586 (7th Cir.1982). Even when factual differences exist, similarity of legal theory satisfies the requirement. *See De la Fuente,* 713 F.2d at 232–33.

**\*7** In their opposition to the class certification motion, the defendants have argued that this Rule 23(a) requirement has not been met because Tatz is subject to unique defenses which make him serving as class representative inappropriate. Specifically, the defendants contend that Tatz cannot prove that he individually relied on the allegedly fraudulent misrepresentations of the defendants. Obviously, Tatz disagrees with this argument and he contends that he need not prove individual reliance in this case because he is entitled to the "fraud on the market" presumption.

To state a claim under Section 10(b) or Rule 10b–5, a plaintiff must ordinarily show that he relied on a material misstatement or omission in purchasing a security. *See In re HealthCare Compare Corp. Sec. Lit.,* 75 F.3d 276, 280 (7th Cir.1996). However, the "fraud on the market" theory of reliance permits a plaintiff to pursue a Section 10(b)/Rule 10b–5 claim without showing direct reliance on the misstatement or omission; indirect reliance may be presumed. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978 (1988). The theory holds that efficient trading markets automatically establish a causal link between material misstatements or omissions and a stock purchaser's injury, and manifest that link in the stock's price. *See Eckstein v. Balcor Film Investors,* 8 F .3d 1121, 1129 (7th Cir.1993).

The defendants argue that the "fraud on the market" presumption should not apply because shares of Nanophase were not sold in an open, developed, and efficient securities market. While the Seventh Circuit has not formally done so, numerous courts have adopted the following five factors (the so-called *Cammer* factors) to aid in the determination of market efficiency: 1) whether the stock trades at a high weekly volume; 2) whether securities analysts follow and

report on the stock; 3) whether the stock has market makers and arbitrageurs; 4) whether the company is eligible to file SEC registration form S–3, as opposed to form S–1 or S–2; and 5) whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *See, e.g., Binder v. Gillespie,* 184 F.3d 1059, 1065 (9th Cir.1999); *Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir.1992); *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989).

In this case, the plaintiff has submitted a declaration as part of his class certification motion which, in our estimation, establishes that the market for Nanophase's share was open and efficient. Specifically, the declaration states that: 1) during the Class Period, Nanophase stock had a trading volume of nearly nine million share with a total dollar trading volume of $72.08 million; 2) Nanophase stock was addressed in written reports by securities analyst Robinson Humphrey and conference calls during the Class Period were monitored by sell-side analysts from, at least, Robinson Humphrey, Merrill Lynch, Morgan Stanley, Tucker Anthony and CIBC World Markets, and by buy-side analysts from, at least, Target Capital Management and NWQ Investment Management; 3) 11% to 13% of the total outstanding common stock of Nanophase was held by numerous large institutional investors during the Class Period, including mutual funds, insurance companies, pension plans, banks, and other professional investors who manage equity portfolios in excess of $100 million; 4) Nanophase was eligible to file a Form S–3 during the Class Period and did later file a Form S–3 on June 12, 2002, and an amended Form S–3/a on September 6, 2002; and 5) the market did react to unexpected news released during the course of and just after the Class Period (i.e. statistically significant price changes to Nanophase's stock price on at least April 5, 2001, June 4, 2001, June 25, 2001, July 26, 2001, October 3, 2001, and October 25, 2001). (Declaration of Michael Marek, at ¶¶ 24–26, 30–31, 33, 41, 46–57.) Based on this declaration, we conclude that the market for Nanophase stock was open and efficient. Accordingly, we find that the "fraud on the market" presumption is appropriate in this case.

**\*8** In addition to their market efficiency argument, the defendants also attack the typicality requirement by suggesting that Tatz's securities trading practices have left him open to unique reliance defenses. We disagree. As a general matter, we must remind the defendants that a plaintiff's claim is typical under Rule 23(a)(3) "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based

on the same legal theory." *Rosario,* 963 F.2d at 1018; *De La Fuente,* 713 F.3d at 232. Tatz's Section 10(b) claims are typical of those of the class because he has alleged that he, like the class he purports to represent, relied to his detriment on the defendants' misrepresentations concerning Nanophase's business relationship with Celox. The fact that Tatz "may have used somewhat distinctive buying strategies does not render him atypical with respect to this claim of overarching fraud." *Danis v. USN Communications, Inc.,* 189 F.R.D. 391, 397 (N.D.Ill.1999); *see also Gilbert,* 904 F.Supp. at 720; *Ridings,* 94 F.R.D. at 152. Therefore, we find that Rule 23(a)(3) has been satisfied.

### E. Adequacy of the Representation

To satisfy the adequacy of representation requirement, a plaintiff must show that: 1) the proposed representative does not have "antagonistic or conflicting claims with other members of the class;" 2) the proposed representative has "sufficient interest in the outcome of the case to ensure vigorous advocacy;" and 3) its counsel is "competent, qualified, experienced and able to vigorously conduct the litigation." *Sebo v. Rubenstein,* 188 F.R .D. 310, 316 (N.D.Ill.1999) (citation omitted). "Basic consideration[s] of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representative at all stages of the litigation where absent members will be bound by the court's judgment." *Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 89–90 (7th Cir.1977). "[A] court must in the broadest sense be satisfied that the fiduciary duties and responsibilities of the class representative and class counsel will be conscientiously, fairly, and justly discharged in order to protect the interests of the class ." *Ballan v. Upjohn Co.,* 159 F.R.D. 473, 479 (W.D.Mich.1994).

In their opposition to the motion for class certification, the defendants have primarily argued that the adequacy of representation requirement has not been satisfied through a variety of *ad hominem* attacks on Tatz. Specifically, the defendants contend that Tatz is not an adequate class representative because he supposedly lacks even basic knowledge and understanding of the case, he is only a sop for his class action attorneys, and he lacks the personal credibility necessary to properly represent the class. We disagree with the defendants' characterization of Tatz's potential representation of this putative class.

**\*9** It is clear from the transcript of Tatz's deposition that he is fully aware and in control of this litigation. He indicated that he understood that he was bringing the suit on behalf of individuals like himself who allegedly were harmed when they relied on the purported misstatements and omissions of the defendants regarding the financial condition of Nanophase. He also established during his deposition that he was the individual who was primarily responsible for overseeing not only the progress of the lawsuit but also the actions of class counsel. Based on what we have seen in the pleadings, we are confident that Tatz has no interests with respect to this litigation that conflict with, or are antagonistic to, the interests of absent class members and that he will vigorously prosecute this action on behalf of the class. With respect to the defendants' somewhat spurious argument that Tatz lacks the necessary credibility to represent the class, we trust that the plaintiff is an upstanding individual who will do his best to make sure the best interests of the class are properly represented and protected.

### III. The Requirements of Rule 23(b)(3)

The proposed class also satisfies the requirements of Rule 23(b)(3) which provides:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Each of these requirements is met in this case.

### A. Common Questions Predominate

While common questions of law or fact must predominate, they need not be exclusive. *Scholes v. Moore,* 150 F.R.D. 133, 138 (N.D.Ill.1993). To determine whether common questions predominate, courts look to whether there is a "common nucleus of operative facts." *Ziemack v. Centel Corp.,* 163 F.R.D. 530, 535 (N.D.Ill.1995) (citing *Rosario,* 963 F.2d at 1018). A court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate. *See Beale,* 164 F.R.D. at 658.

The defendants' alleged misstatements and omissions of material fact to members of the class are at the core of the complaint. The issues of law and fact that flow from the defendants' alleged misstatements and omissions predominate over any individual issue. Because the many common issues will unquestionably dominate this Court's attention, common questions of law and fact predominate. *Id.*

*See also Rosario,* 963 F.2d at 1018 ("[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement") (citing *Franklin v. City of Chicago,* 102 F.R.D. 944, 949–50 (N.D.Ill.1984)); *Scholes,* 150 F.R.D. at 138 (finding predominance of common issues notwithstanding variance in material information)

### B. A Class Action is Superior

A class action in this case is superior to other means of adjudication for several reasons. First, there is a common core of law and fact pertaining to the defendants' alleged misstatements and omissions in connection with its allegedly improper accounting of the Celox sale. Accordingly, class treatment is a more efficient means of adjudicating this matter than the myriad individual suits that potentially could be filed in the absence of class certification. *See Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 105 F.R.D. 506, 508 (S.D.Ohio 1985). *See also Research Corp. v. Pfister Associated Growers, Inc.,* 301 F.Supp. 497, 503 (N.D.Ill.1969). Indeed, any alternative to this class action could create duplication of actions, the very "evil that Rule 23 was designed to prevent." *Califano v. Yamasaki,* 442 U.S. 682, 690, 99 S.Ct. 2545 (1979). Such "[s]eparate actions by each of the class members would be repetitive, wasteful and an extraordinary burden on the courts." *Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir.1983).

**\*10** Second, class members will benefit from class treatment because litigation costs are high and it is, therefore, unlikely shareholders will prosecute individual claims. *See Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1164–65 (7th Cir.1974). A class action is a superior means to adjudicate claims of class members who would be overwhelmed by the defendants' resources if they attempted to prosecute their individual claims. *See Chandler v. Southwest Jeep–Eagle, Inc.,* 162 F.R.D. 302, 310 (N.D.Ill.1995); *Alexander v. Centrafarm Group, N.V.,* 124 F.R.D. 178, 185 (N.D.Ill.1988).

Third, principles of judicial economy and efficiency favor trying this case in one action rather than forcing class members to litigate identical claims individually. *See Scholes,* 143 F.R.D. at 189 ("judicial economy and efficiency, as well as consistent judgments, are achieved by certifying the class"). Under these circumstances, class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essentially identical questions of law and fact.

Finally, this matter does not present significant management problems. Rule 23 was designed for this exact type of case. In this case, there is no realistic alternative to class action treatment.

CONCLUSION

For the foregoing reasons, the plaintiff's motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) is granted. Mr. George Tatz is hereby appointed as class representative. The following class is certified:

> All persons or entities who purchased or acquired Nanophase Technologies Corporation ("Nanophase" or "Corporation") common stock during the period from April 5, 2001, through and including October 24, 2001 (the "Class Period"), and were damaged thereby. Excluded from the class are the defendants, their affiliates and any officers or directors of Nanophase or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class).

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21372471

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 97 of 101 PageID #:3762

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2018 WL 1535156

2018 WL 1535156
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

WASHTENAW COUNTY
EMPLOYEES' RETIREMENT SYSTEM,
Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,
v.
WALGREEN CO., Gregory D. Wasson,
and Wade Miquelon, Defendants.

Case No. 15-cv-3187
|
Signed 03/29/2018

**Attorneys and Law Firms**

Frank Anthony Richter, James E. Barz, Robbins Geller Rudman & Dowd LLP, Chicago, IL, for Plaintiffs.

Thomas B. Quinn, Eli Joseph Litoff, Riley Safer Holmes & Cancila LLP, Laurence Harvey Levine, Chicago, IL, Caz Hashemi, Kelley M. Kinney, Evan L. Seite, Jessica L. Snorgrass, Stephen B. Strain, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Defendants.

Kristen R. Seeger, Amy Curtner Andrews, Elizabeth Y. Austin, John M. Skakun, III, Jacqueline Marie Pruitt, and James Wallace Ducayet, Sidley Austin LLP, Chicago, IL, for Walgreens.

**MEMORANDUM OPINION AND ORDER**

SHARON JOHNSON COLEMAN, United States District Court Judge

**\*1** Industriens Pensionforsikring A/S, acting as lead plaintiff on behalf of itself and all others similarly situated, brings this class action against defendants Walgreen Co. ("Walgreens"), former Walgreens CEO Gregory D. Wasson, and former Walgreens CFO Wade Miquelon, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The plaintiffs now move for class certification. For the reasons set forth herein, that motion [114] is granted.

**Background**

The following is a general overview of those allegations relevant to the present motion. A more complete description of the allegations contained in the amended complaint may be found in this Court's September 30, 2016, ruling on the defendants' motions to dismiss.

Walgreens is a retail drugstore chain that sells prescription and non-prescription drugs. Prescription drugs represent Walgreens' largest class of products and are the lead driver of its revenue and profit. At the times relevant here Gregory D. Wasson was Walgreens' CEO and a director on the company's Board of Directors and Wade Miquelon was Walgreens' CFO.

The substantial majority of prescription drugs that Walgreens sold were generic drug versions of branded drugs, which generated a higher profit margin than branded drugs due to their lower production costs. That profit margin, however, was dependent on the difference between the cost to procure the generic drug and the reimbursement rate that Walgreens received for supplying a customer with the drug. Historically, generic drug prices had followed a deflationary trend, but in 2014 that trend reversed. Walgreens' contracts with several major Pharmacy Benefit Managers ("PBMs") provided for fixed maximum rates of reimbursement for each drug over the term of the contract, based on the assumption that generic drug prices would continue to decline. If those prices instead rose, Walgreens would be forced to absorb the additional cost of those drugs beyond the contractually-capped rate of reimbursement.

In June 2012, Walgreens announced that it was entering into a strategic transaction with Alliance Boots GmbH ("Alliance"). As part of this process, Walgreens announced a set of goals for FY 2016 reflecting the expected benefits of the new partnership, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"). The EBIT goal was especially important to investors because it was the only metric gauging the potential profitability of the combined companies.

In late 2013, Walgreens' internal long range planning process revealed that the EBIT goal was tracking at under $8.5 billion.[1] Miquelon, in a verified complaint filed in a separate action ("the Miquelon complaint"), admitted that by the end of 2013 the company had identified the sources of that deficit as (1) the unprecedented level of generic drug

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 98 of 101 PageID #:3763

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2018 WL 1535156

price inflation that the industry was experiencing and (2) reimbursement contracts that failed to provide meaningful inflationary relief. Nonetheless, Walgreens restated the EBIT goal when it reported its first quarter results for 2014. During the conference call announcing the quarterly results, Miquelon admitted that Walgreens was tracking "a bit below" the EBIT goal, but asserted that the company was prepared to mitigate the risks to achieving the goal and that it had the right tools at its disposal to meet the target. During that call, Miquelon also reassured analysts that "[q]uarter by quarter we look at [the FY2016 goals], and say are these still realistic based upon all the risk and opportunities we have internally. If we ever feel that's not the case, we'll certainly tell you." By March 2014, the EBIT goal was tracking around $7.5 billion dollars, $2 billion less than the high end of the EBIT goal.

**\*2** The class period, which runs from March to August 2014, encompasses the announcement of Walgreens second quarter results and third quarter results and public statements made in the interim. During that time, the defendants continued to issue statements that allegedly downplayed the risk to the EBIT goal and failed to acknowledge the impact of systematic generic drug price inflation.

On June 24, 2014, Walgreens issued its third quarter report and withdrew its FY 2016 earnings targets, attributing the decision to "Step 2 considerations" and "current business performance." Walgreens also made reference to experiencing generic drug price inflation and reimbursement pressures, although its statements could be taken as downplaying the actual significance of those trends. On August 6, 2014, Walgreens disclosed the extent of the resulting EBIT shortfall, attributing it primarily to "rapid and pronounced generic drug cost inflation" and unfavorable contract terms. The August 6th disclosures caused Walgreens stock to plummet over 14% in a single day and gave rise to the present litigation.

Although the plaintiffs initially sought to pursue a number of claims, their claims were narrowed by a motion to dismiss and now concern a period from March 25 to August 6, 2014, during which the defendants purportedly concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. Following the Court's ruling on the motion to dismiss, the Court bifurcated discovery on the defendants' motion, and the present motion for class certification followed.[2]

**Legal Standard**

In order to be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives set forth in Rule 23(b). *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires that a proposed class meet requirements of numerosity, typicality, commonality, and adequacy of representation. *Id.* When certification is sought under Rule 23(b)(3), the proponents of the class must also show that questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members and, relatedly, that a class action is superior to other available methods of resolving the controversy. *Id.*

Rule 23 does not set forth a "mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). When factual disputes bear on matters vital to certification, the Court must receive evidence and resolve those disputes prior to certifying the class. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Certification is proper only if, after rigorous analysis, the Court is satisfied that Rule 23's prerequisites have been met. *Comcast Corp.*, 569 U.S. at 33. The Seventh Circuit, however, has repeatedly reiterated that the focus of class certification must be on Rule 23 and that class certification proceedings cannot be allowed to turn into a preemptive determination of the merits. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). Rule 23's requirements, moreover, have historically been liberally construed in favor of maintaining securities fraud class actions. *See generally King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25–26 (7th Cir. 1975).

**Discussion**

**\*3** The plaintiffs have elected to seek class certification under Rule 23(b)(3). In order for this Court to find that class certification is appropriate under rule 23(b)(3), the plaintiffs must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The defendants contend that the plaintiffs cannot satisfy Rule 23(b)(3) because they have not shown that damages can be calculated on a class wide basis consistent with the theory of liability. This is the case, the defendants argue, both because they fully disclosed the truth in the middle of the class period

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 99 of 101 PageID #:3764

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2018 WL 1535156

on June 24, 2014, and because any variation in stock price on August 6, 2014, resulted from confounding information which was also disclosed on that date. Thus, applying *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), the defendants contend that the plaintiffs cannot establish that class certification is appropriate.

*Comcast* requires that a plaintiff seeking class certification must be able to establish that damages can be reliably measured in a manner that is consistent with the plaintiff's theory of liability. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("[T]he method of determining damages must match the plaintiff's theory of liability and be sufficiently reliable."); *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 WL 1613022, at *5 (N.D. Ill. Apr. 22, 2014) (Kennelly, J.) (quoting *Comcast*, 569 U.S. at 35) (internal quotation marks omitted) ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged [theory of loss causation]."); *but see In re Groupon, Inc. Sec. Litig.*, No. 12 CV 2450, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (Norgle, J.) ("recognizing *Comcast* to be "inapposite in a securities fraud class action."). Here, the plaintiffs have proposed, albeit succinctly, to calculate damages using the out-of-pocket method, a commonly used method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale. *Cf. Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 934–35 (N.D. Ill. 2010) (Guzman, J.) (discussing the application of this method of damages calculation). This method of calculating damages is consistent with the plaintiffs' theory of liability (i.e. that false representations artificially inflated the value of Walgreens' shares, and that when the truth was revealed on August 6 the stock lost value, causing harm to the plaintiffs) and is generally regarded as reliable. *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013) (holding that the proposed use of an event study to calculate damages is sufficient to establish that common questions of damages predominate).

The defendants appear to contend that in order to attain class certification the plaintiffs must establish that their damages calculation will fully account for the impact of other intermediate disclosures and confounding information. The defendants, however, have failed to identify any legal authority requiring this burdensome showing at this stage in the proceeding. Indeed, although the defendants attempt to paint their questions regarding potential confounding or ameliorative statements as one of damages, in actuality those are questions of loss causation or materiality. Loss causation describes the causal connection between the material representation and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344–45, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In order to establish loss causation, a plaintiff must prove that the alleged misstatement was a substantial cause of the plaintiff's loss. *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015). Loss causation, however, need not be proved at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015). The questions of loss causation raised here, moreover, are common to the class and therefore capable of common resolution. *Ludlow*, 800 F.3d at 687 (citing *Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 470, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013)). As the Seventh Circuit has previously observed, "It is possible to certify a class under Rule 23(b)(3) even though all statements turn out to have only trivial effects on stock prices. Certification is appropriate, but the class will lose on the merits." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

**\*4** Defendants' arguments to the contrary notwithstanding, *Comcast* does not provide that damages must be measurable in a way that measures only those changes in value attributable to the plaintiffs' theory of liability. Instead, it requires only that the commonality of the damages calculation be considered in conducting the predominance inquiry.[3] *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407–408 (2d Cir. 2015); *see also Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (recognizing that in order to certify a class, the damages methodology must be sound and produce commonality of damages). Here, the defendants argue that there is not sufficient detail about how damages will be calculated in light of potentially confounding information disclosed during the class period. The impact of the additional information disclosed during the class period, however, is common to the class, and therefore does not call into question whether damages can be calculated on a class wide basis. *Fox*, 2014 WL 1613022 at *5; *see also Ludlow v. BP, p.l.c.*, 800 F.2d 674, 683 (5th Cir. 2015) ("In short, in order to certify a class [after Comcast], the damages methodology must be 'sound' and must 'produce commonality of damages.' "). This Court therefore concludes that the plaintiffs have established the commonality of the proposed damages calculation and that it does not improperly depend on dismissed theories of liability.

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....
2018 WL 1535156

The defendants further contend that the plaintiffs cannot satisfy Rule 23(b)(3) because they cannot show that common questions of reliance predominate throughout the proposed class period. The Supreme Court has recognized that a class-wide rebuttable presumption of reliance may be based on the "fraud-on-the-market" theory, which assumes that, because the market price of shares traded on well-developed markets reflects all publically available information, an investor relies on public misstatements whenever she buys or sells stock at the market price. *Basic Inc. v. Levinson*, 485 U.S. 224, 244, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In order to establish the applicability of the fraud on the market theory, four prerequisites must be proven: (1) the alleged misrepresentations must be publically known; (2) they must have been material; (3) the stock must have traded in an efficient market; and (4) the plaintiffs must have traded the stock between when the misrepresentation was made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412–14, 189 L.Ed.2d 339 (2014). The Supreme Court has explicitly stated that, with the exception of materiality, these prerequisites must be established prior to class certification. *Id.* at 2412; *see also Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 473, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (recognizing the requirement that the fraud-on-the-market theory's trade-timing predicate be established before class certification). The Supreme Court, however, has also expressly recognized that a defendant's argument that the fraud-on-the-market presumption should not apply beyond a certain date because the truth was revealed to the market on that date is a question of the merits that could not be resolved at class certification. *Amgen*, 568 U.S. at 482. Numerous courts have agreed that a "truth on the market" defense cannot be used to rebut the presumption of reliance at the class-certification stage. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 595 (N.D. Ill. 2009) (St. Eve, J.) (holding that arguments that an intermediate statement revealed the truth and undermined the presumption of reliance after that date was a question on the merits that did not impact the predominance inquiry); *see also In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 12-cv-1737 JM (JLB), 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015) (citing *Conn. Ret. Plans and Trust Funds v. Amgen, Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd* 568 U.S. at 480) ("[A] truth-on-the-market defense cannot be used to rebut the presumption of reliance at the class-certification stage because the defense 'is a method of refuting an alleged representation's materiality,' and it is well established that 'a plaintiff need not prove materiality at the class certification

stage to invoke the presumption.' "); *In re Virtus Investment Partners, Inc. Sec. Litig.*, No. 15 CV 1249, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017) (recognizing that truth-on-the-market defenses are "inappropriate on a motion for class certification."). Accordingly, this Court interprets the trade-timing prerequisite as requiring only that a plaintiff establish that they traded between the alleged misleading statements and the alleged corrective disclosures. Here, it is undisputed that the plaintiff class did so. The defendants' arguments, although relevant to rebutting the fraud-on-the-market presumption when this case is heard on its merits, therefore cannot be decided at this juncture.[4] Accordingly, this Court concludes that common questions of law and fact predominate in this action.

**\*5** In order for Rule 23(b)(3) to be satisfied, the Court must also consider whether a class action is superior to other available methods of resolving the controversy. In doing so, the Court may consider the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation that has already begun; the desirability of concentrating the litigation in a particular forum, and the difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, it is undisputed that the class action mechanism is superior to available alternatives and, in light of the nature of the plaintiffs' claims, the class action mechanism is clearly the fairest and most efficient means by which the plaintiffs' claims against the defendants can be adjudicated. *See Roth v. Aon Corp.*, 238 F.R.D. 603, 608 (N.D. Ill. 2006) (Norgle, J.) (quoting *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 147 (D.N.J. 1999)) (recognizing that class actions are often the superior way to resolve securities fraud suits in light of the difficulty in prosecuting such claims on an individual basis). Accordingly, the Court concludes that the plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 23(b)(3).

Although the defendants concede that the plaintiffs satisfy the numerosity and commonality requirements of Rule 23(a), they further contend that the plaintiffs cannot satisfy Rule 23(a)'s requirements because Industriens is not a typical or adequate class representative. Under Rule 23(a)(3), a class representative's claim must by typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). A class representative's injuries need not be identical to those of the class, but they must arise from the same common events, practices, or conduct and must be based on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Typicality is based on the plaintiff's legal theory

Case: 1:20-cv-05593 Document #: 165-1 Filed: 09/23/22 Page 101 of 101 PageID #:3766

Washtenaw County Employees' Retirement System v...., Not Reported in Fed....

2018 WL 1535156

and the defendant's conduct, and does not depend on the particularized defenses that the defendant may have against certain class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). Rule 23(a)(4) further requires that the lead plaintiff and class counsel's representation of the class must be adequate to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). In order to establish this, class representatives must show that (1) their claims are not antagonistic to or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represent them. *Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 173 (N.D. Ill. 2009) (St. Eve, J.).

Here, the defendants assert that, because Industriens cannot establish trade timing, it cannot establish the typicality of its claims or the adequacy of its representation of the class. As previously noted, *Amgen* recognizes that arguments challenging trade-timing are relevant to the typicality and adequacy inquiries required by Rule 23(a). *Amgen*, however, requires only an initial showing of trade-timing, and this Court has determined that such a showing has been made. Although the defendants' arguments regarding trade-timing raise a valid concern which will likely need to be revisited once the merits of that issue are decided, this Court perceives no evidence presently before it capable of establishing that Industriens does not satisfy the typicality or adequacy requirements. The Court accordingly holds that the plaintiffs have demonstrated that class certification is warranted under Federal Rule of Civil Procedure 23.

**Conclusion**

For the foregoing reasons, the plaintiffs' motion for class certification [114] is granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1535156

Footnotes

1    Each year, Walgreens conducts a long range plan encompassing the next three fiscal years. The process of developing the long range plan begins in March and extends through the end of June, at which point the final results are submitted for the Board of Directors' approval at the annual board meeting. (Dkt. 47-1, ¶ 61).

2    The Court notes that, in support of bifurcating discovery, the defendants argued that the merits were not relevant to class-certification and that statements made after June 24 were not relevant to class certification. The defendants' arguments call the accuracy of both of these arguments into question and a raise a serious question whether, if the present motion is denied, it would be appropriate to reopen merits-based discovery so that the plaintiffs may be adequately prepared to respond to the defendants' arguments.

3    In *Comcast*, the plaintiffs had originally alleged four separate theories of anti-trust harm, three of which were dismissed from the case. At class certification, the plaintiffs' method of calculating damages included all four theories of potential liability, with the relative impact of each theory of liability varying geographically. In light of the size and geographic scope of the class, the Court concluded that damages could not be calculated class-wide and that the proposed class could not be certified under Rule 23(b)(3).

4    To the extent the Court has reviewed the defendants' limited evidence regarding this merits-related issue, the Court has found it to be unpersuasive.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.