# EXHIBIT 1

As filed with the Securities and Exchange Commission on July 8, 2020

Registration No. 333-239287

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Amendment No. 2
# to
# FORM S-1
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# GoHealth, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 6411 | 85-0563805 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**214 West Huron St.**
**Chicago, Illinois 60654**
**Telephone: (312) 386-8200**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Bradley Burd, Esq.**
**General Counsel**
**214 West Huron St.**
**Chicago, Illinois 60654**
**Telephone: (312) 386-8200**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| **Ian D. Schuman, Esq.** | **Brian Farley, Esq.** | **Samir A. Gandhi, Esq.** |
| **Stelios G. Saffos, Esq.** | **Chief Legal Officer and Corporate Secretary** | **David Ni, Esq.** |
| **Ryan K. deFord, Esq.** | **GoHealth, Inc.** | **Sidley Austin LLP** |
| **Latham & Watkins LLP** | **214 West Huron St.** | **787 7th Avenue** |
| **885 Third Avenue** | **Chicago, Illinois 60654** | **New York, New York 10019** |
| **New York, New York 10022** | **Telephone: (312) 386-8200** | **Telephone: (212) 839-5300** |
| **Telephone: (212) 906-1200** | | **Fax: (212) 839-5599** |
| **Fax: (212) 751-4864** | | |

**APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC: AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT IS DECLARED EFFECTIVE.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee(3) |
|---|---|---|
| Class A common stock, $0.0001 par value per share | $908,500,000.00 | $117,923.30 |

(1)	Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended.
(2)	Includes the offering price of shares of Class A common stock that may be sold if the option to purchase additional shares of Class A common stock granted by the Registrant to the underwriters is executed.
(3)	The Registrant previously paid $12,980.00 in connection with a prior filing of this Registration Statement.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**Subject to completion, dated July 8, 2020.**

# 39,500,000 Shares

# GoHealth, Inc.

## Class A Common Stock

This is an initial public offering of shares of Class A common stock of GoHealth, Inc. We are selling 39,500,000 shares of Class A common stock.

Prior to this offering, there has been no public market for the Class A common stock. It is currently estimated that the initial public offering price per share of Class A common stock will be between $18.00 and $20.00. We have applied to list our Class A common stock on The Nasdaq Global Market under the symbol "GOCO."

We will have two classes of common stock outstanding after this offering: Class A common stock and Class B common stock. Each share of our Class A common stock entitles its holder to one vote per share and each share of our Class B common stock entitles its holder to one vote per share on all matters presented to our stockholders generally. Immediately following the consummation of this offering, all of the outstanding shares of our Class B common stock will be held directly or indirectly by the Continuing Equity Owners (as defined below), which will represent in the aggregate approximately 74.2% of the voting power of our outstanding common stock after this offering (or approximately 72.6% if the underwriters exercise in full their option to purchase additional shares).

We will be a holding company, and upon consummation of this offering and the application of proceeds therefrom, our principal asset will consist of LLC Interests (as defined below) we acquire directly from GoHealth Holdings, LLC and indirectly from certain of the Continuing Equity Owners and the Blocker Shareholders with the proceeds from this offering, collectively representing an aggregate 25.8% economic interest in GoHealth Holdings, LLC. Of the remaining 74.2% economic interest in GoHealth Holdings, LLC, 31.4% will be beneficially owned by the Founders (as defined below) through their ownership of LLC Interests, 26.2% will be beneficially owned by Centerbridge (as defined below) through their ownership of LLC Interests and 16.6% will be beneficially owned by the Continuing Equity Owners (other than the Founders and Centerbridge) through their ownership of LLC Interests. Centerbridge's ownership of LLC Interests and Class A common stock (through the Blocker Shareholders) will collectively represent an aggregate 39.4% economic interest in GoHealth Holdings, LLC, and Centerbridge's ownership of Class A common stock (through the Blocker Shareholders) and Class B common stock will represent in the aggregate approximately 39.4% of the voting power of our outstanding common stock after this offering.

GoHealth, Inc. will be the sole managing member of GoHealth Holdings, LLC. We will operate and control all of the business and affairs of GoHealth Holdings, LLC and its direct and indirect subsidiaries and, through GoHealth Holdings, LLC and its direct and indirect subsidiaries, conduct our business.

Following this offering, we will be a "controlled company" within the meaning of the Nasdaq rules. See "Our Organizational Structure" and "Management—Controlled Company Exception."

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, and will be subject to reduced disclosure and public reporting requirements. This prospectus complies with the requirements that apply to an issuer that is an emerging growth company.

**See "Risk Factors" beginning on page 33 to read about factors you should consider before buying shares of our Class A common stock.**

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount(1) | $ | $ |
| Proceeds, before expenses, to GoHealth, Inc. | $ | $ |

(1)     We have agreed to reimburse the underwriters for certain expenses in connection with this offering. See "Underwriting."

The underwriters have the option to purchase up to an additional 5,925,000 shares of Class A common stock from us at the initial price to public less the underwriting discount within 30 days of the date of this prospectus.

The underwriters expect to deliver the shares of Class A common stock against payment in New York, New York on          , 2020.

**Goldman Sachs & Co. LLC**                **BofA Securities**                **Morgan Stanley**

**Barclays**          **Credit Suisse**          **Evercore ISI**          **RBC Capital Markets**          **William Blair**

**Cantor**                **SunTrust Robinson Humphrey**                **Loop Capital Markets**

Prospectus dated          , 2020.

**Table of Contents**



OUR MISSION IS CLEAR:

To improve access to healthcare in America.



Table of Contents



Table of Contents

# GoHealth 2019
## by the Numbers:

**$540M**

Pro Forma Net Revenues

**380,000+**

Medicare Commissionable Approved Submissions

**139%**

Pro Forma Net Revenues Growth (2018-2019)

**32%**

Pro Forma Adj. EBITDA Margin[1]

**$28B**

Total addressable market for Medicare Advantage and Medicare Supplement products

**3.9x**

LTV / CAC[2] Medicare—Internal Segment

(1)    See "Prospectus Summary—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

(2)    See "Basis of Presentation—Key Terms and Performance Indicators Used in this Prospectus; Non-GAAP Financial Measures" for a definition of LTV/CAC.

**TABLE OF CONTENTS**

| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 33 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 79 |
| OUR ORGANIZATIONAL STRUCTURE | 80 |
| USE OF PROCEEDS | 84 |
| CAPITALIZATION | 85 |
| DIVIDEND POLICY | 87 |
| DILUTION | 88 |
| SELECTED HISTORICAL CONDENSED CONSOLIDATED FINANCIAL DATA | 91 |
| UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION | 93 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 106 |
| BUSINESS | 137 |
| MANAGEMENT | 156 |
| EXECUTIVE COMPENSATION | 164 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 180 |
| PRINCIPAL STOCKHOLDERS | 194 |
| DESCRIPTION OF CAPITAL STOCK | 198 |
| DESCRIPTION OF INDEBTEDNESS | 204 |
| SHARES ELIGIBLE FOR FUTURE SALE | 207 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS TO NON-U.S. HOLDERS OF CLASS A COMMON STOCK | 210 |
| UNDERWRITING | 214 |
| LEGAL MATTERS | 222 |
| EXPERTS | 222 |
| WHERE YOU CAN FIND MORE INFORMATION | 222 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

You should rely only on the information contained in this prospectus and any free writing prospectus prepared by or on behalf of us or to which we have referred you. No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this prospectus or in any free writing prospectus that we file with the Securities and Exchange Commission. We and the underwriters have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any related free writing prospectuses. We and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. You must not rely on any unauthorized information or representations. This prospectus is an offer to sell only the shares offered by this prospectus, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date regardless of the time of delivery of this prospectus or of any sale of our Class A common stock. Our business, financial condition, results of operations and prospects may have changed since that date.

**Through and including            , 2020 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.**

For investors outside the United States: We have not, and the underwriters have not, done anything that would permit this offering or the possession or distribution of this prospectus or any free writing prospectus we may provide to you in connection with this offering in any jurisdiction where action for purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of Class A common stock and the distribution of this prospectus outside the United States. See "Underwriting."

**Table of Contents**

**BASIS OF PRESENTATION**

**Organizational Structure**

In connection with the closing of this offering, we will undertake certain organizational transactions to reorganize our corporate structure. Unless otherwise stated or the context otherwise requires, all information in this prospectus reflects the consummation of the organizational transactions described in the section titled "Our Organizational Structure" and this offering, and the application of the proceeds therefrom, which we refer to collectively as the "Transactions."

See "Our Organizational Structure" for a diagram depicting our organizational structure after giving effect to the Transactions, including this offering.

**Certain Definitions**

As used in this prospectus, unless the context otherwise requires:

- *"we," "us," "our,"* the *"Company," "GoHealth"* and similar references refer: (1) following the consummation of the Transactions, including this offering, to GoHealth, Inc., and, unless otherwise stated, all of its direct and indirect subsidiaries, including GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC), and (2) prior to the completion of the Transactions, including this offering, to GoHealth Holdings, LLC and, unless otherwise stated, all of its direct and indirect subsidiaries, or, as applicable, the Predecessor.

- *"Blocker Company"* refers to an entity affiliated with Centerbridge that is an indirect owner of LLC Interests in GoHealth Holdings, LLC prior to the Transactions and is taxable as a corporation for U.S. federal income tax purposes.

- *"Blocker Shareholders"* refer to entities affiliated with Centerbridge, the owners of the Blocker Company prior to the Transactions, who will exchange their interests in the Blocker Company for shares of our Class A common stock and cash in connection with the consummation of the Transactions.

- *"Centerbridge"* refers to Centerbridge Capital Partners III, L.P., our sponsor and a Delaware limited partnership, certain funds affiliated with Centerbridge Capital Partners III, L.P. and other entities over which Centerbridge Capital Partners III, L.P. has voting control (including any such fund or entity formed to hold shares of Class A common stock for the Blocker Shareholders).

- *"Continuing Equity Owners"* refer collectively to direct or indirect holders of LLC Interests and our Class B common stock immediately following consummation of the Transactions, including Centerbridge, Norwest, NVX Holdings, our Founders, the Former Profits Unit Holders and certain executive officers, employees and other minority investors and their respective permitted transferees who may, following the consummation of this offering, exchange at each of their respective options (subject in certain circumstances to time-based vesting requirements and certain other restrictions), in whole or in part from time to time, their LLC Interests (along with an equal number of shares of Class B common stock (and such shares shall be immediately cancelled)) for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), cash or newly-issued shares of our Class A common stock as described in "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions."

- *"Founders"* refer to Brandon M. Cruz, our Co-Founder and Chief Strategy Officer and Special Advisor to the Executive Team, and Clinton P. Jones, our Co-Founder and Chief Executive Officer.

- *"Former Profits Unit Holders"* refers collectively to certain of our directors and certain current and former officers and employees, in each case, who directly or indirectly hold existing vested and unvested profits units, which are comprised of profits units that have time-based vesting conditions and

ii

Table of Contents

profits units that have performance-based vesting conditions, of GoHealth Holdings, LLC pursuant to GoHealth Holdings, LLC's existing profits unit plan and who will receive LLC Interests in exchange for their profits units in connection with the Transactions. LLC Interests received in exchange for unvested profits units will remain subject to their existing time-based vesting requirements, but will not be subject to the performance-based vesting conditions as such conditions will be met in connection with this offering.

- *"GoHealth Holdings, LLC Agreement"* refers to GoHealth Holdings, LLC's amended and restated limited liability company agreement, which will become effective substantially concurrently with or prior to the consummation of this offering.

- *"LLC Interests"* refer to the common units of GoHealth Holdings, LLC, including those that we purchase with a portion of the net proceeds from this offering.

- "*Norwest*" refers to Norwest Equity Partners and certain funds affiliated with Norwest Equity Partners.

- *"Norvax" or "Predecessor"* refers to Norvax, LLC, a Delaware limited liability company and a subsidiary of GoHealth Holdings, LLC.

- *"NVX Holdings"* refers to NVX Holdings, Inc., a Delaware corporation that is controlled by the Founders.

- *"Original Equity Owners"* refer to the owners of LLC Interests in GoHealth Holdings, LLC prior to the consummation of the Transactions, collectively, which include Centerbridge, Norwest, our Founders and certain executive officers, employees and other minority investors.

- *"Transactions"* refer to the organizational transactions and this offering, and the application of the net proceeds therefrom.

GoHealth, Inc. will be a holding company and the sole managing member of GoHealth Holdings, LLC, and upon consummation of the Transactions, its principal asset will consist of LLC Interests.

**Presentation of Financial Information**

GoHealth Holdings, LLC is the accounting predecessor of GoHealth, Inc. for financial reporting purposes. GoHealth, Inc. will be the audited financial reporting entity following this offering. Accordingly, this prospectus contains the following historical financial statements:

- **GoHealth, Inc.** Other than the inception balance sheet, dated as of March 27, 2020, the historical financial information of GoHealth, Inc. has not been included in this prospectus as it is a newly incorporated entity, has no business transactions or activities to date and had no assets or liabilities during the periods presented in this prospectus.

- **GoHealth Holdings, LLC.** Because GoHealth, Inc. will have no interest in any operations other than those of GoHealth Holdings, LLC and its subsidiaries, the historical consolidated financial information included in this prospectus is that of GoHealth Holdings, LLC and its subsidiaries.

On September 13, 2019, Centerbridge, indirectly through a subsidiary of GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC), an entity formed in contemplation of the acquisition, acquired a 100% interest in Norvax. We refer to this transaction as the "Centerbridge Acquisition." As a result of the Centerbridge Acquisition, this prospectus presents certain financial information for two periods, the Predecessor and Successor periods, which relate to the period preceding the Centerbridge Acquisition on September 13, 2019 and the period succeeding the Centerbridge Acquisition, respectively. References to the "Successor 2019 Period" refer to the period from September 13, 2019 through December 31, 2019, and references to the "Predecessor 2019 Period" refer to the period from January 1, 2019 through September 12, 2019. Financial information in the Predecessor 2019 Period principally relates to Norvax and its subsidiaries.

iii

**Table of Contents**

Except as noted in this prospectus, the unaudited pro forma financial information of GoHealth, Inc. presented in this prospectus has been derived from the application of pro forma adjustments to the historical consolidated financial statements of GoHealth Holdings, LLC and its subsidiaries included elsewhere in this prospectus. These pro forma adjustments give effect to the Centerbridge Acquisition and the Transactions as described in "Our Organizational Structure," including the consummation of this offering, as if all such transactions had occurred on January 1, 2019 in the case of the unaudited pro forma condensed consolidated statements of operations data, and as of March 31, 2020 in the case of the unaudited pro forma condensed consolidated balance sheet data. See "Unaudited Pro Forma Condensed Consolidated Financial Information" for a complete description of the adjustments and assumptions underlying the pro forma financial information included in this prospectus. References to the "Pro Forma Fiscal Year 2019" refer to the pro forma financial information derived from or presented in the "Unaudited Pro Forma Condensed Consolidated Financial Information" for the year ended December 31, 2019 and references to the "Pro Forma First Quarter 2020" refer to the pro forma financial information derived from or presented in the "Unaudited Pro Forma Condensed Consolidated Financial Information" for the three months ended March 31, 2020.

Certain monetary amounts, percentages and other figures included in this prospectus have been subject to rounding adjustments. Percentage amounts included in this prospectus have not in all cases been calculated on the basis of such rounded figures, but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this prospectus may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements included elsewhere in this prospectus. Certain other amounts that appear in this prospectus may not sum due to rounding.

**Key Terms and Performance Indicators Used in this Prospectus; Non-GAAP Financial Measures**

Throughout this prospectus, we use a number of key terms and provide a number of key performance indicators used by management. These key performance indicators are discussed in more detail in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Operating Metrics by Segment." We define these terms and key performance indicators as follows:

- "*Approved Submissions*" refer to Submitted Policies approved by carriers for the identified product during the indicated period.

- "*Adjusted EBITDA*" represents, as applicable for the period, EBITDA as further adjusted for share-based compensation, change in fair value of contingent consideration liability, Centerbridge Acquisition costs, severance costs and incremental organizational costs in connection with this offering.

- "*Adjusted EBITDA margin*" refers to Adjusted EBITDA divided by net revenues.

- "*Consumer interactions*" refer to the number of times a consumer calls us or visits us online.

- "*Consumer lead*" refers to a consumer for which we have collected some personally identifiable information related to health insurance.

- "*EBITDA*" represents net income (loss) before interest expense, income tax expense (benefit) and depreciation and amortization expense.

- "*Impressions*" refer to the number of times our advertisement is shown to consumers through any medium, regardless of whether such consumers have viewed, clicked through or otherwise interacted with the advertisement.

- "*LTV Per Approved Submission*" refers to the Lifetime Value of Commissions per Approved Submission, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, divided by (ii) the number of commissionable Approved Submissions for such period.

iv

Table of Contents

- "*LTV/CAC*" refers to the Lifetime Value of Commissions per Consumer Acquisition Cost, which we define as (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a prospect into a customer less other non-commission carrier revenue for such period, or CAC. CAC is comprised of cost of revenue, marketing and advertising expenses and customer care and enrollment expenses less other revenue and is presented on a per commissionable Approved Submission basis.

- "*Qualified prospect*" refers to a consumer that has confirmed an interest to us in shopping for health insurance over the phone, online or via live transfer to our agents, both through the internal and external channels.

- "*Submitted Policies*" refer to completed applications that, with respect to each such application, the consumer has authorized us to submit to the carrier.

We use non-GAAP financial measures, such as EBITDA, Adjusted EBITDA and Adjusted EBITDA margin, to supplement financial information presented in accordance with generally accepted accounting principles in the United States, or GAAP. We believe that excluding certain items from our GAAP results allows management to better understand our consolidated financial performance from period to period and better project our future consolidated financial performance as forecasts are developed at a level of detail different from that used to prepare GAAP-based financial measures. Moreover, we believe these non-GAAP financial measures provide our stakeholders with useful information to help them evaluate our operating results by facilitating an enhanced understanding of our operating performance and enabling them to make more meaningful period to period comparisons. There are limitations to the use of the non-GAAP financial measures presented in this prospectus. For example, our non-GAAP financial measures may not be comparable to similarly titled measures of other companies. Other companies, including companies in our industry, may calculate non-GAAP financial measures differently than we do, limiting the usefulness of those measures for comparative purposes. See "Prospectus Summary—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## TRADEMARKS

This prospectus includes our trademarks and trade names which are protected under applicable intellectual property laws and are our property. This prospectus also contains trademarks, trade names and service marks of other companies, which are the property of their respective owners. Solely for convenience, trademarks, trade names and service marks referred to in this prospectus may appear without the ®, ™ or SM symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent permitted under applicable law, our rights or the right of the applicable licensor to these trademarks, trade names and service marks. We do not intend our use or display of other parties' trademarks, trade names or service marks to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of us by, these other parties.

## MARKET AND INDUSTRY DATA

Unless otherwise indicated, information contained in this prospectus concerning our industry, competitive position and the markets in which we operate is based on information from independent industry and research organizations, other third-party sources and management estimates. Management estimates are derived from publicly available information released by independent industry analysts and other third-party sources, as well as data from our internal research, and are based on assumptions made by us upon reviewing such data, and our experience in, and knowledge of, such industry and markets, which we believe to be reasonable. In addition,

v

**Table of Contents**

projections, assumptions and estimates of the future performance of the industry in which we operate and our future performance are necessarily subject to uncertainty and risk due to a variety of factors, including those described in "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements." These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

vi

**PROSPECTUS SUMMARY**

*This summary highlights selected information included elsewhere in this prospectus. This summary does not contain all of the information that you should consider before deciding to invest in our Class A common stock. You should read the entire prospectus carefully, including the "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Some of the statements in this prospectus constitute forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements."*

**Overview**

We are a leading health insurance marketplace whose mission is to improve access to healthcare in America. Our proprietary technology platform leverages modern machine-learning algorithms powered by nearly two decades of insurance behavioral data to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs. Our differentiated combination of a vertically-integrated consumer acquisition platform and highly skilled and trained licensed agents has enabled us to enroll millions of people in Medicare and individual and family plans since our inception. With over 10,000 Americans turning 65 years old every day and GoHealth's track record of significant growth in net revenues in the Medicare space in the past five years, we believe we will continue to be one of the top choices for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make.

Since our inception, we have consistently invested in our technology, data science and business processes to enroll millions of people in health insurance plans while helping carriers scale their product and plan offerings. Our platform utilizes proprietary technology, machine-learning capabilities, data, efficient business processes, and highly skilled and trained licensed agents, or agents, to connect consumers with health insurance carriers, or carriers, through multiple channels. Through our platform, we offer a wide array of health insurance policies, including, but not limited to, Medicare Advantage, Medicare Supplement, prescription drug plans, and individual and family plans, and allow consumers to choose how to purchase these plans, either with the assistance of our agents or directly online.

For many consumers, choosing a health insurance plan is confusing and difficult, and seemingly small differences between health insurance plans can lead to significant out-of-pocket costs or lack of access to critical medicines or providers. We simplify the difficult and confusing process by offering a large selection of health insurance plan choices, unbiased advice informed by consumers' specific needs, transparency of health insurance plan benefits and fit, assistance accessing available government subsidies and a high-touch TeleCare team. The TeleCare team is focused on increasing consumer engagement with the GoHealth brand, selling new products and services to our consumers that help meet their healthcare needs, and helping consumers maximize their health insurance plan benefits to support long-term health and wellness. Carriers also benefit from our platform, especially those looking to access the large and fast-growing Medicare-eligible population. We believe carriers utilize our large-scale data and technology as well as our efficient marketing and conversion processes to reduce their CAC, compared to carrier-employed agent workforces. In fact, we believe GoHealth is the largest external partner for Medicare Advantage enrollments for many carriers.

We have a 19-year history of consistent revenue growth and entering new market segments of insurance products. We add significant value to consumers and carriers, which is evidenced by our high growth rate and strong customer engagement dynamics. Specifically, net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020

1

compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018. Net income was $1.4 million for the Pro Forma First Quarter 2020 compared to net income of $5.0 million for the three months ended March 31, 2019, and net income was $30.5 million for the Pro Forma Fiscal Year 2019 compared to net income of $28.1 million for the year ended December 31, 2018. See "—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

Over the last four years, we have increasingly shifted our focus towards Medicare products and deemphasized individual and family health insurance products. This shift in focus has enabled us to capitalize on (1) strong demographic trends, with Medicare enrollment expected to grow from approximately 61 million individuals in 2019 to approximately 77 million individuals by 2028, (2) the increasing proportion of the Medicare-eligible population that is choosing commercial insurance solutions, with 38% of Medicare beneficiaries, or approximately 23 million people, enrolled in Medicare Advantage plans in 2019, an increase of approximately 1.5 million people from 2018 to 2019, and (3) an antiquated traditional field agent driven sales process lacking in transparency, choice and convenience and ripe for disruption by digitally-enabled and technology-driven marketplaces like our platform. Today, we estimate a total addressable market of $28 billion for Medicare Advantage and Medicare Supplement products, which is based on third-party estimates of total expected Medicare enrollees for 2020, publicly available industry data for Medicare agents' first-year compensation and our recent historical policy revenue experience. We believe that these trends will drive a larger market in the coming years that, when taken together with our other product and plan offerings, will result in an even larger addressable market. We also believe that we are poised to benefit from market share gains in what has traditionally been a highly fragmented market.

Consumers first engage through our platform either online or telephonically in response to our data-driven, omni-channel marketing efforts. We then use LeadScore, one of our proprietary machine-learning technologies, to evaluate consumer leads in real-time. In 2019, we generated over 42.2 million consumer interactions. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. We also scored over 4 million consumer leads in 2019, which informs us of the potential profitability and conversion probability of the consumer lead and helps us optimize routing of consumer leads to agents. Our proprietary technology and business processes then route qualified prospects online or via live transfer to our agents, both through the internal and external channel. Our technology and workflow allow these agents to work in our Benefits Center, where our sales operations are located, or to work remotely at home. In 2019, we employed an average of 931 agents, reaching a high of 1,453 agents during the three months ended December 31, 2019. Based on consumers' specific needs and our comprehensive data, our agents use our proprietary technology platform, Marketplace, to identify the optimal health insurance plan options from our vast inventory of insurance products. Marketplace then facilitates seamless quoting and enrollment of the consumer-selected health insurance plan using proprietary and third-party data and direct application program interfaces, or API, connections with carriers. As a result of our Marketplace technology and increasingly robust data and insights, our qualified prospect to Submitted Policy conversion rate increased from 20.7% for the three months ended March 31, 2019 to 24.3% for the three months ended March 31, 2020, and from 20.6% in 2018 to 23.2% in 2019 for the multi-carrier sales outlet of the Medicare—Internal segment. An increase in the conversion rate of qualified prospects to Submitted Policies generally results in greater commissionable Approved Submissions.

Using our proprietary data, we identify consumers who would benefit from proactive engagement and education on their health insurance plan design and guidance on how they can maximize their plan benefits. We believe that using our data-driven targeted consumer outreach and our highly skilled agents and proprietary technology to properly select health insurance plans to meet a consumer's particular needs results in higher customer

2

satisfaction. As we enroll more qualified prospects through our Marketplace, the power of our data improves our marketing, technology, and agent performance. Our platform is engineered for rapid scalability, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms, and technology driven compliance with HIPAA, TCPA and state insurance regulations, and the Centers for Medicare and Medicaid Services, or CMS, regulations.



Consumers do not pay any fees for access to our platform or for our enrollment, education or other services. Generally, we are paid an initial commission by carriers when consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. The commission structure encourages collaboration between us and carriers to increase customer satisfaction by choosing health insurance products that best fit customers' needs, which drives better outcomes for carriers, customers, our agents, and employees. We use advanced statistical models that are built on observable commissions received rather than solely historic cohorts. Our advanced statistical models consider consumer demographic attributes, health insurance plan characteristics and temporal data to value these future commission streams from which we determine an expected LTV of the commission streams associated with each consumer enrolled in each specific plan product. Total commissions receivable, which represents such expected future commission streams, was $388.8 million as of March 31, 2020, an increase of 223.4% compared to March 31, 2019. In addition to commissions, some of our carriers have historically partnered with us to generate consumer leads and have paid us for marketing services. We do not insure customers and assume no underwriting or medical loss risk associated with placement of customers in our carriers' products.

The differentiated value of our data science-driven, fully-integrated platform has facilitated our rapid growth. Net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020 compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018. Net income was $1.4 million for the Pro Forma First Quarter 2020 compared to net income of $5.0 million for the three months ended March 31, 2019, and net income was $30.5 million for the

3

Table of Contents

Pro Forma Fiscal Year 2019 compared to net income of $28.1 million for the year ended December 31, 2018. Our focus on Medicare has also contributed significantly to our growth. Total revenues generated in the Medicare segments grew to $124.2 million for the three months ended March 31, 2020 from $41.2 million for the three months ended March 31, 2019, representing a 201.5% increase, and to $432.7 million for the Pro Forma Fiscal Year 2019 from $112.2 million for the year ended December 31, 2018, representing a 285.7% increase. In the Medicare segments, our total Submitted Policies grew to over 132,000 Medicare policies for the three months ended March 31, 2020, as compared to over 43,200 Medicare policies the three months ended March 31, 2019 and over 427,000 Medicare policies for the year ended December 31, 2019, as compared to over 118,000 Medicare policies for the year ended December 31, 2018. See "—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

**Our Business Model**

*Our Platform*

Our platform utilizes proprietary technology, machine-learning capabilities, data, efficient business processes, and highly skilled and trained licensed agents to generate a stable, visible revenue stream that benefits from favorable demographic trends. The key components of our platform are:

- *Data-Driven, Omni-Channel Marketing*. Based on predictive consumer lead targeting and a high cadence of multivariate testing on consumer lead generation properties, our data-driven, omni-channel marketing drives increased impressions and qualified prospects with a target return on marketing spend.

- *Proprietary LeadScore Technology*. LeadScore, one of our proprietary machine-learning technologies, is built on large-scale, end-to-end sales data, predicts the LTV and conversion probability of consumer leads, and is utilized to optimize routing of the consumer leads in real-time regardless of their source.

- *Sophisticated Matching Technology*. Our proprietary qualified prospect distribution, routing, and priority queuing technology based on LeadScore and agent performance data models help us to optimally match qualified prospects to those agents most likely to convert the qualified prospect to a customer.

- *The Marketplace*. Our proprietary Marketplace technology features decision support tools and seamlessly integrates with carrier enterprise systems, empowering our highly skilled and trained agents to quickly and efficiently select the right health insurance plan for each consumer based on their specific needs and enroll them in those plans.

- *TeleCare Team*. Our high-touch TeleCare team is focused on increasing consumer engagement with the GoHealth brand, selling new products and services to our consumers that help meet their healthcare needs, and helping consumers maximize their health insurance plan benefits to support long-term health and wellness.

- *Scalable and Compliant Infrastructure*. Our cloud infrastructure and compliance-by-design technology ensures scalability and compliance across our platform.

*Our Value Proposition*

We believe the key components of our platform are difficult to replicate for field-based agents, carrier-employed agents, and other digital or telesales competitors, making us increasingly valuable to carriers and consumers. As we increase the number of Submitted Policies, our data on qualified prospect, agent, and carrier performance

4

becomes richer, feeding into our machine-learning and data science-enabled feedback loops, making our marketing and technology even smarter. This differentiates us from other channels and competitors, allowing us to generate more consumer leads, convert those consumer leads to customers at a higher rate, serve our customers over a longer period of time, and reduce our CAC.

We believe that LTV/CAC provides the best metric on a per commissionable Approved Submission basis into the efficiency and performance of our integrated platform. We focus on strengthening the key drivers of LTV/CAC, including marketing costs, the consumer lead to customer conversion rate and customer satisfaction. While we offer both do-it-yourself and agent-assisted channels to accommodate consumers' preferences, we believe that for most qualified Medicare prospects, an agent-assisted model maximizes LTV/CAC. As we continue to scale our platform, we improve our key drivers through specialization and optimization using our proprietary data and machine-learning.

### *Our Products*

We operate our business in four segments: (i) Medicare—Internal, (ii) Medicare—External, (iii) Individual and Family Plans, or IFP and Other—Internal and (iv) IFP and Other—External. The Medicare segments focus on sales of Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare Special Needs Plans, or SNPs, for multiple carriers. The Medicare segments are organized by distribution channel, as further described below:

- *Internal*. The internal segments primarily consist of sales of products and plans by GoHealth-employed agents offering qualified prospects plans from multiple carriers, GoHealth-employed agents offering qualified prospects plans on a carrier-specific basis, or sales of products and plans through our online platform without the assistance of our agents, which we refer to as DIY.

- *External*. The external segments represent sales of products and plans under GoHealth's carrier contracts using an independent, national network of agents, or external agencies, which are not employed by GoHealth. These agents utilize our technology and platform to enroll consumers in health insurance plans and provide a means to earn a return on consumer leads that otherwise may have not been addressed.

The Medicare—Internal segment is the largest segment by revenue and a primary contributor to our growth and margin expansion. Over the last two years, we grew the Medicare—Internal segment multi-carrier channel agent count and prioritized the placement of qualified prospects into the Medicare—Internal segment. Going forward, we intend to continue our focus on growth and placing qualified prospects within this segment. The Medicare—Internal segment also provides significant benefits to the broader business. For example, carriers that partner with us through one or more of our internal segment businesses will often supplement our marketing and technology investments. Additionally, the external segments can be used when the number of consumer leads in our marketplace is higher than we can address in a timely fashion using our internal channel.

The IFP and Other segments focus on sales of individual and family plans (which include fixed indemnity and major medical plans), dental plans, vision plans and other ancillary plans to individuals that are not Medicare-eligible. The IFP and Other segments are also organized by distribution channel, internal and external. The IFP and Other segments represent a valuable source of diversification of products, carriers, consumers and revenue that are not tied solely to Medicare. Many of the products in the IFP and Other segments have a policy life under a single year, and we are paid approximately 90% of our commission streams in these segments in the first year.

For the three months ended March 31, 2020, the Medicare segments represented 88.1% of total revenues compared to 59.7% of total revenues for the three months ended March 31, 2019 and the IFP and Other segments represented 11.9% of total revenues for the three months ended March 31, 2020 compared to 40.3% of total

5

Table of Contents

revenues for the three months ended March 31, 2019. For the Pro Forma Fiscal Year 2019, the Medicare segments represented 80.2% of total revenues compared to 49.6% of total revenues for the year ended December 31, 2018 and the IFP and Other segments represented 19.8% of total revenues for the Pro Forma Fiscal Year 2019 compared to 50.4% of total revenues for the year ended December 31, 2018.

**Our Strengths**

*Fully Integrated End-to-End Insurance Marketplace*

Our platform connects insurance consumers with carriers. The strength of our platform is our innovation in enhancing the education of, and transparency and choice for, consumers, which has dramatically changed how consumers purchase health insurance and displaced incumbent market leaders in insurance distribution. The insurance distribution incumbents, such as field-based and carrier-employed agents, offered neither the broad choice of health insurance plans we are able to offer nor the unbiased support in health insurance plan selection based on the years of consumer shopping data we have gathered and the sophisticated models we have developed to match health insurance plans to consumers. We apply our proprietary, machine-learning technology, LeadScore, to target, assess, and prioritize all of our consumer leads (over 4 million in 2019) in real-time. Incumbent insurance distributors do not have access to equivalent technology, and we believe this difference in capabilities allows us to benefit from lower CAC. Our technology is difficult to replicate because acquiring the data underlying our models at our scale (over 10 years of insurance data) and scope, as well as refining those models to the performance we have obtained would be time-consuming, expensive and complicated for newer entrants in this market. Our technology and business processes route qualified consumer leads online or via live transfer to agents across our multiple channels ensuring that few qualified prospects leave our marketplace without an interaction and maximizing each consumer interaction to ensure a higher likelihood of consumer acquisition and higher margin contribution. We use a combination of proprietary and third-party data, direct API connections to many carriers, and our proprietary technology platform, Marketplace, to educate, quote and enroll consumers in real-time to the health insurance plan best suited to meet their specific needs, which enhances long-term customer satisfaction. The resulting increase in the expected LTV of consumers obtained at a lower CAC has made our innovative distribution model more appealing to carriers and has altered their own approach to strategic marketing and consumer acquisition. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. We engineered our marketplace for rapid scalability, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms and complies with HIPAA, TCPA and DOI and CMS regulations. We had over 132,000 Submitted Policies in the Medicare segments for the three months ended March 31, 2020 and over 427,000 Submitted Policies in the Medicare segments for the year ended December 31, 2019, which we believe makes us one of the largest health insurance marketplaces based on publicly available information about our competitors and our carriers and our general knowledge of the industry acquired over our 19-year operating history. The data generated through the sales process by these consumers helps us increase LTV/CAC through machine-learning enabled feedback loops, and allows us to improve and deepen our relationships with carriers.

6



(1)  2019 AEP Sales/Agent/Day is presented for the multi-carrier sales outlet of the Medicare—Internal segment.

(2)  Average policy retention is presented as of January 1, 2019 for selected carriers that we believe are generally representative of our customer base for Medicare Advantage products.

*Data-driven, Omni-channel Marketing*

We generate over 42.2 million unique consumer interactions per year across an omni-channel diversified portfolio of sources. These sources include digital methods, such as search engine marketing, impulse-marketing and social-media, and non-digital methods, including television, mailers and radio. We use our real-time consumer lead to customer conversion data from various marketing sources to rapidly and cost-efficiently adjust and scale our marketing sources to maximize LTV/CAC and cost per qualified prospect. We also use our database of over 85 million consumer lead records to build machine-learning models that create complex lookalike audiences to enable us to efficiently target consumer leads that are more likely to convert to customers. Using our rapid test-and-learn approach, in 2019 alone, we tested over 30,000 advertisements and more than 100 site variations, which drove an increase in the website visitor to consumer lead conversion rate to 17.2% in January 2020, an increase of approximately 124% from a rate of 7.7% in January 2019. For the multi-carrier sales outlet of the Medicare—Internal segment, we were able to increase qualified prospects from approximately 237,000 in 2018 to approximately 930,000 in 2019, an increase of 292.4%, while also increasing the rate of qualified prospect to Submitted Policy conversions during the three months ended December 31, 2019 for this channel to 27% from 24% during the same period in 2018. We have grown in both number and quality of our consumer interactions while also generating more internal consumer leads, reducing our dependence on acquiring consumer leads from third-party sources. For the three months ended December 31, 2019, the multi-carrier sales outlet of the Medicare—Internal segment had 70% of consumer leads internally generated, compared to 58% for the same period in 2018.

7

*Deep, Tenured and Expanding Relationships with Top Carriers*

Our carrier relationships allow us to offer a wide variety of products and plans across our platform and offer solutions tailored to consumers' healthcare needs. We are a critical partner to our top carriers, for which we use our data and direct API connections to help inform their plan and network design and assist with budgeting. Our carrier relationships are stable, as evidenced by the fact that our relationships with each of our five largest carriers, measured by 2019 submission volume, exceeds five years. Over the past five years, we have expanded those relationships from initially covering individual and family products to covering Medicare Advantage products at all five of these carriers. We are licensed in all 50 states and the District of Columbia, which combined with our data-driven, omni-channel marketing and effective and scalable marketplace, makes us a partner of choice for the leading Medicare Advantage plans nationally and in each state. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. We believe that consumers increasingly want greater choice and are looking for quality health insurance plans as measured by CMS STAR ratings. We believe that by offering more health insurance plans in each county and more higher-rated health insurance plans, we can increase the rate of consumer lead to customer conversions and customer satisfaction rates.

*Best-in-Class Medicare LTV/CAC Ratio Driven by Proprietary Technology, Business Processes, Data and Highly Skilled Agents*

Our integrated technology platform, business processes, data and highly skilled and trained agents enable us to rapidly scale while improving our unit economics, as measured by LTV/CAC. As we scale our business, our machine-learning data combined with our omni-channel marketing allows us to become progressively better at acquiring consumer leads with favorable engagement potential and to do so at lower cost. In doing so, we increase the lifetime commissions generated by the consumer leads we convert, which increases LTV per Approved Submission, and we reduce the cost of acquiring consumer leads, lowering CAC per commissionable Approved Submission. With increasing scale, our proprietary LeadScore and CallRouter technologies become better at assessing the profile and predicted value of each incoming consumer lead and routing the consumer lead to the agent most likely to convert the consumer, further lowering CAC per commissionable Approved Submission. The CallRouter platform also utilizes data-driven agent clustering to enable us to train and specialize our agents on specific customer segments to optimize our results. We dynamically route qualified prospects across all of our channels with a focus on converting our highest value qualified prospects in our most profitable channels and enhancing the consumer experience across our platform. Our Marketplace technology quickly compares health insurance plans that most closely match the consumer's specific needs, which increases the potential conversion and engagement of the consumer to the health insurance plan, increasing the LTV per Approved Submission, while also decreasing agent plan selection time, thus decreasing CAC per commissionable Approved Submission. Finally, our management team has extensive leadership experience managing customer service centers and scaling new sales offices. Our agent recruiting, training, development programs, and technology decision support with our Marketplace technology allow us to improve agent productivity, while also enhancing our consumer experience. We believe our LTV/CAC ratios for the Medicare segments are superior to those achieved by other digital marketplaces, carriers, and field-based agents.

*History of Continuous Growth and Innovation and Proven Ability to Add Products*

Our Founders and management team have a consistent track record of growth and entry into new market opportunities for our business. Since our founding in 2001, we evolved from a company selling quoting and enrollment technology to independent brokers to the fully integrated end-to-end insurance marketplace we are

8

**Table of Contents**

today. We have diversified our product mix to add individual and family plans, dental and vision plans, prescription drug plans, and most recently, Medicare plans. This has enabled us to serve more consumers and to prioritize different products depending on regulatory and political environments, carriers' priorities and consumers' preferences. Our data assets, technology, and compliance infrastructure have scaled efficiently with each consumer interaction and health insurance plan submission through our platform, and as we have invested in the next generation of our proprietary technology. We believe our management team, entrepreneurial spirit, and data and technology position us well for continuous growth in the future in our current product segments and other insurance products segments we may enter.

**Our Growth Strategies**

*Expand Our Carrier Relationships and Health Insurance Plan Options to Grow the Medicare Segments*

We believe we are a partner of choice for the top carriers in the Medicare marketplace because of our scale, efficiency and ability to integrate with carriers using direct API connections to exchange data and insights. Given our growth in Approved Submissions in the Medicare segments and the integrated data and technology of our platform, Medicare carriers have shown increased interest in working with us, including those who have not traditionally used digitally-enabled models. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. This allows us to benefit from enhanced return of scale, more efficient marketing in these geographies, increased agent conversion rates of qualified prospects to customers, and improved customer satisfaction rates as we meet the needs of our customers. In addition, we are increasingly adding SNPs into our marketplace from both existing and new carrier relationships. Unlike Medicare Advantage products, which can largely be sold only during the Medicare annual enrollment period and open enrollment period, SNPs can generally be sold throughout the special enrollment period. As a result, we are able to maximize the value of our consumer interactions and marketing spend during the special enrollment period and prioritize agent growth year round. As we add more Medicare products and expand SNP offerings, we allocate more of our existing agent seat count to the Medicare—Internal segment from other less profitable channels, reducing the need to open new facilities. Additionally, we have implemented work from home options to increase agent efficiency and capacity without a significant increase in fixed costs.

*Continue to Increase Our Profitability By Using our Data to Improve our Technology, Business Processes, and Agent Performance*

We are implementing a number of initiatives to help improve our LTV/CAC, which is a key measure of our unit economics and overall business profitability, by using our data to improve our platform and predictive capabilities, business processes, and agent performance.

- *Upgraded Marketplace Technology*. In October 2019, we launched an upgrade to our proprietary Marketplace technology to increase agent productivity by improving the flow of data across our platform, advancing our decision support capabilities, and improving the qualified prospect to Submitted Policy conversion rates of our overall agent population to a level closer to that of our most productive agents.

- *Improving LeadScore and Call Routing Technologies*. We are improving our LeadScore and call-routing technologies, and expanding our business intelligence and analytics staffing to direct qualified prospects to agents or DIY channels that are most likely to result in such qualified prospects enrolling in the health insurance plan that best meets their needs while remaining economically attractive for us.

9

Table of Contents

We are also increasingly using our data to identify the best agent clusters to enroll an individual qualified prospect based on our Marketplace engine's determination of their likely optimal plan design, carrier, and demographic match based on the information we have about that qualified prospect. Additionally, we are investing in technology that will allow us to use our data to direct our marketing spend into growing our flow of qualified prospects in the highest-value marketing channels and enhancing our proprietary LeadScore technology to assess and iterate, in real-time, the performance of those marketing channels throughout the year.

- **Improving Recruiting and Training of Agents.** We are improving the recruiting and training of our agents to match the profiles of our highest performing agents. The opportunity to reduce the variability in our agent performance is significant, as our top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment on average were 61% more productive than the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment, based on conversion rates of qualified prospects to Submitted Policies for the three months ended March 31, 2020. We have analyzed our most productive agents and revised our recruiting, training and onboarding of the number of licenses and appointments to most closely match the skills and experiences of our most productive agents.

### Build Identification with the GoHealth Brand

We believe we can solidify our position as the largest Medicare marketplace and brand for consumers' health insurance needs. As the Medicare markets continue to grow and the Medicare Advantage sector continues to gain market share, carriers are and will continue differentiating their health insurance plans by offering additional products and services. This differentiation creates the need for more education, transparency and choice, and the need for a "Trusted Advisor" role that we believe the GoHealth brand can own. By helping customers make this choice, they can more readily identify the GoHealth brand, which we believe differentiates us from our competitors. This allows us to improve customer satisfaction even when their underlying carrier or plan product changes.

We are using technology and data increasingly to build the GoHealth brand and our digital marketing campaigns, which significantly improved impressions in 2019 with over 1.1 billion impressions generated, compared to 225 million impressions generated in 2018. We have launched our new plan comparison tool and are launching a new website that we will consolidate into one consumer website in 2020, which we believe will enhance conversion in our DIY channel.

### Provide Additional Products and Services to our Qualified Medicare Prospects, Existing Customers and Carriers

In 2019, we interacted with approximately 930,000 qualified prospects through the multi-carrier sales outlet of the Medicare—Internal segment. While we have focused historically on educating and enrolling those qualified prospects in Medicare products, we have not historically prioritized offering qualified prospects or existing customers additional products, such as life, dental, hearing, or vision plans if their Medicare product does not offer coverage for these services. We have a significant opportunity to sell additional products to our qualified Medicare prospects and existing Medicare customers going forward.

We currently enroll a sizable percentage of Medicare customers for our largest carriers, but there is still significant opportunity to grow our share of enrollments for existing carriers even while we add new carriers to our marketplace. We are using our data to help our largest carriers inform the benefit design of their health insurance plans and product competitiveness in given regions, which is a value added service that traditional field-agents and carrier internal channels cannot offer. We are also focused on increasing offerings of additional

10

Table of Contents

revenue generating services that are valuable to our Medicare carriers and enhance the health of our customers, including by helping new Medicare enrollees sign up for a health-risk assessment, which helps calibrate the Medicare Advantage premium paid by Medicare to the private plan. Additionally, we are exploring opportunities to (1) provide screening of customers for social determinants of health factors, such as loneliness, or food or housing insecurity, that could lead to higher medical costs if not addressed, and (2) promote the benefits of value-based care through referrals of consumers looking to change or add a primary care physician. By offering more services to our Medicare carriers, we can improve the depth of our carrier relationships, open new revenue streams and build customer loyalty.

*Provide Additional Products and Services Through Our Marketplace Technology*

Our Founders and management team built our Marketplace technology over a 19-year period of continuous investment and growth. We have developed relationships with over 80 carriers and offer a wide variety of products and plans, including individual and family plans, dental, vision, prescription drug and Medicare plans. Our Marketplace technology allows us to efficiently generate meaningful numbers of consumer submissions for health insurance plans, generate commission revenue streams based on Approved Submissions, and maximize the contribution margin of these commissions through efficiencies in CAC. Over the last two years, Medicare had the highest LTV/CAC of the health insurance plan products that we distribute through our Marketplace technology.

We have the technology, carrier, customer relationships and management team to broaden or shift our focus to other products if we think there is a revenue opportunity, and we have demonstrated this capability to add products historically. For example, after the enactment of the Affordable Care Act in 2010, or the ACA, we significantly grew the IFP and Other segments revenue in a relatively short period of time, which we believe made us a leader in the ACA web-broker space.

**Our Market and Trends Impacting the Industry**

Demographic, consumer preference and regulatory factors are driving growth in the individual health insurance market. We service this market through the Medicare segments and the IFP and Other segments.

*Medicare*

Medicare enrollment is expected to grow significantly over the next 10 years as 10,000+ individuals turn 65 each day and become Medicare-eligible. The proportion of the population that is age 65 and older increased from 13% in 2010 to 15% in 2016 and is expected to reach 17% by 2020, according to the United States Census Bureau. As a result, Medicare enrollment is growing steadily, with the number of Medicare enrollees expected to grow from 59.9 million in 2018, to approximately 68.4 million in 2023 and 76.7 million by 2028. This growth in Medicare enrollment will increase the numbers of qualified prospects for our marketing efforts. Internet usage by individuals age 65 and older is also increasing, with 73% using the Internet in 2019 compared to 40% in 2009 according to the Pew Research Center. Seniors are also transacting more online, with 55% of people age 65 and older making online purchases monthly according to SheerID, and 63% of people age 65 and older obtained health information from a website, according to the 2018 BMC Health Services Research.

In addition to the growth in Medicare-eligible beneficiaries and higher online usage, the interest in Medicare-eligible individuals in private Medicare plans is expected to continue to increase. In 2019, 38% of all Medicare beneficiaries were enrolled in Medicare Advantage plans and between 2018 and 2019, total Medicare Advantage enrollment grew by about 1.5 million individuals or 7%. LEK Consulting estimated that Medicare Advantage penetration is likely to reach 50% penetration for all Medicare-eligible individuals by 2025 and could reach as high as 60% to 70% between 2030 and 2040. Compared to original Medicare, Medicare Advantage has lower

11

annual healthcare costs and access to greater benefits, according to a 2019 Milliman report. In addition, we expect the increase in Medicare Advantage penetration to accelerate due to the COVID-19 pandemic because of increasing consumer preference for online and telephonic insurance enrollment as opposed to face-to-face consultations. The number of beneficiaries in SNPs also increased significantly in the last 10 years from 900,000 in 2009 to 2.5 million in 2019 providing additional opportunity for year-round sales outside of the open enrollment period and annual enrollment period. We believe the increased penetration of Medicare Advantage, as well as the growth of the number of Medicare-eligible individuals, will lead to increased submissions for marketplaces, such as ours in the future. Consumers choose Medicare Advantage plans around a specific criteria set which includes premium, total expected costs out of pocket, provider network composition, formulary coverage and supplemental benefits, which we believe are more efficiently addressed through a non-field-based distribution channel.

The growth in Medicare-eligible seniors and growing interest in private Medicare plans has led to an increase in plan choices. Nationwide, 3,148 Medicare Advantage plans will be available in 2020, an increase of 414 plans since 2019. The average beneficiary will be able to choose from among 28 health insurance plans in 2020, up from 18, five years ago. In addition to the increase in plan choices, the differences between health insurance plans has increased significantly. For 2019, CMS eliminated the meaningful difference requirement to improve competition, innovation and available benefit offerings and provide beneficiaries with affordable health insurance plans that are tailored to a consumer's specific healthcare needs and financial situation. The types of supplemental benefits that health insurance plans cover increased in 2018, 2019 and 2020 and now cover transportation assistance, meal benefits, in-home support, telemonitoring, and caregivers support, among others. This growth in plan choices made education and assistance with plan selection more important for consumers and allows carriers to target specific Medicare Advantage plans with packages of benefits designed to be attractive to different segments of Medicare consumers. Marketplaces such as ours help educate consumers, and assist them in making informed plan choices. In addition, we specifically micro-target our marketing to precise populations to allow carriers to grow increasingly differentiated health insurance plans. This precise marketing is more difficult for traditional radio or television-based marketing channels.

12



Source: CSG Actuarial (2019) and U.S. Department of Health and Human Services (2019).

*Individual and Family Plans*

After the passage of the ACA, the individual health insurance market grew from 10.6 million enrollees in 2013 to 17.4 million enrollees in 2015. Such increase was driven by (1) the requirement to purchase health insurance, or the individual mandate, (2) the requirement that carriers not consider pre-existing medical conditions in coverage decisions and (3) premium subsidies for middle and lower income individuals that were also contained in that legislation. With the repeal of the individual mandate in 2017 and broader economic trends, such as gains in employment, which increased the number of people having job-based coverage, the individual market has declined. Despite the decline, the individual market was composed of 13.8 million members in 2018, a meaningful increase from 2011 levels and in 2019, the market size stabilized with 13.7 million members enrolled. This market stabilization was driven by lower premium increases in 2019, as compared to 2018 and 2017 for individual insurance plans; an increase in individuals who do not receive job-based insurance due to the rise of the "gig economy;" and, expanded plan options in the individual market from carriers. According to a Kaiser Family Foundation report published in 2020, in 2019, the average gross margin per member per month for carriers in the individual market was $122.83, as compared to $14.36 in 2016 shortly after the repeal of the individual mandate. This increased profitability for insurers is expected to have a positive impact on the individual market going forward. In addition, the number of individuals eligible for the individual market is growing. Forbes estimated that 57 million U.S. workers, approximately 36% of employees, are in the "gig economy" and many of these individuals will not receive health insurance through their jobs. We believe that growth in the individual market will benefit the Company in the future.

13

Table of Contents

**Recent Developments**

*Preliminary Results for the Three Months Ended June 30, 2020*

Our results for the three months ended June 30, 2020 are not yet available. Below we have presented preliminary estimated ranges of certain of our financial results for the three months ended June 30, 2020, based solely on preliminary information currently available to management. We have not yet completed our closing procedures for the three months ended June 30, 2020. The preliminary estimated ranges of certain of our financial results set forth below have been prepared by, and are the responsibility of, management and are based on a number of assumptions. Our independent registered public accounting firm has not audited, reviewed, compiled, or performed any procedures with respect to our results for the three months ended June 30, 2020 and 2019. Our actual results may differ materially from these estimates due to the completion of our financial closing procedures, final adjustments and other developments that may arise between now and the time the financial results for our interim period are finalized. You should not place undue reliance on these preliminary estimates. In addition, the preliminary estimated financial results set forth below are not necessarily indicative of results we may achieve in any future period. See "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Cautionary Note Regarding Forward-Looking Statements" for additional information regarding factors that could result in differences between the preliminary estimated ranges of certain of our financial results that are presented below and the actual financial results we will report.

The following are our preliminary estimates for the three months ended June 30, 2020:

- Net revenues are expected to be between $118.0 million and $130.0 million, an increase of 66.4% at the midpoint of this range, as compared to $74.5 million for the three months ended June 30, 2019. The estimated increase in net revenues compared to the corresponding period in 2019 is primarily due to an increase in net revenues in the Medicare—Internal segment driven by higher Medicare-Internal commissionable Approved Submissions for Medicare Advantage products due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents.

- Total segment profit is expected to be between $30.0 million and $36.0 million, an increase of 65.0% at the midpoint of this range, as compared to total segment profit of $20.0 million for the three months ended June 30, 2019. The estimated increase in total segment profit compared to the corresponding period in 2019 is primarily due to the increase in Medicare-Internal commissionable Approved Submissions for Medicare Advantage products for the same reasons mentioned above.

- Net loss is expected to be between $20.0 million and $26.0 million, as compared to net income of $15.3 million for the three months ended June 30, 2019. The estimated decrease in net income compared to the corresponding period in 2019 is primarily due to the change in fair value of the contingent consideration liability, amortization of intangible assets, an increase in interest expense, and the incurrence of incremental organizational costs in connection with this offering.

- Commissionable Approved Submissions for the Medicare segments are expected to be between 95,000 and 105,000, an increase of 86.7% at the midpoint of this range, as compared to Commissionable Approved Submissions for the Medicare segments of 53,556 for the three months ended June 30, 2019. The estimated increase in Commissionable Approved Submissions for the Medicare segments compared to the corresponding period in 2019 is primarily due to an increase in internal agent headcount in the Medicare segments compared to the prior period.

- Adjusted EBITDA is expected to be between $24.0 million and $28.0 million, an increase of 51.2% at the midpoint of this range, as compared to $17.2 million for the three months ended June 30, 2019. The estimated increase in Adjusted EBITDA compared to the corresponding period in 2019 is primarily due to an increase in segment profit driven by the Medicare—Internal segment and the change in the fair

14

value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition which liability will be terminated in connection with the offering.

See below for a reconciliation of Adjusted EBITDA to the most directly comparable measure calculated in accordance with GAAP, net income (loss).

| | Three Months Ended June 30, | | |
| | 2019 Actual (Predecessor Period) | 2020 Estimated (Successor Period) | |
| | | Low | High |
| | | (in millions) | |
| Net income (loss) | $ 15.3 | $(26.0) | $(20.0) |
| Interest expense | 0.1 | 9.0 | 8.0 |
| Income tax expense (benefit) | 0.0 | 0.0 | 0.0 |
| Depreciation and amortization expense | 1.5 | 24.5 | 23.5 |
| EBITDA | 16.9 | 7.5 | 11.5 |
| Share-based compensation[a] | — | 0.5 | 0.5 |
| Change in fair value of contingent consideration liability[b] | — | 15.5 | 15.5 |
| Centerbridge Acquisition costs[c] | 0.3 | — | — |
| IPO transaction costs[d] | — | 0.5 | 0.5 |
| Adjusted EBITDA | $ 17.2 | $ 24.0 | $ 28.0 |

(a)  Represents non-cash share-based compensation expense in connection with profits interests and incentive share units.

(b)  Represents the change in the fair value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition, which such liability will be settled in connection with this offering. See footnote 4 to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information."

(c)  Represents legal, accounting, consulting, and other costs related to the Centerbridge Acquisition.

(d)  Represents legal, accounting, consulting, and other indirect costs associated with this offering.

We include Adjusted EBITDA in this prospectus for the reasons as described in the section titled "Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data." Adjusted EBITDA has certain limitations in that it does not reflect all expense items that affect our results. These and other limitations are described in "Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data." We encourage you to review our financial information in its entirety and not rely on a single financial measure.

We have provided a range for the preliminary results described above primarily because our financial closing procedures for the three months ended June 30, 2020 are not yet complete. As a result, there is a possibility that our final results will vary materially from these preliminary estimates. We currently expect that our final results will be within the ranges described above. It is possible, however, that our final results will not be within the ranges we currently estimate. We undertake no obligation to update or supplement the information provided above until we release our results of operation for the three months ended June 30, 2020 and 2019. Ernst & Young LLP has not audited, reviewed, compiled or performed any procedures with respect to this financial data. Accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto.

**Centerbridge**

On September 13, 2019, Centerbridge, indirectly through a subsidiary of GoHealth Holdings, LLC, acquired a 100% interest in Norvax, the predecessor company. Centerbridge is a global private investment firm with over $25 billion in assets under management and offices in New York and London. The firm manages capital through varied investment funds and special purpose partnerships. For additional information regarding Centerbridge's ownership in us before and after the Transactions, see "—Summary of the Transactions" and "Principal Stockholders."

**Summary Risk Factors**

Participating in this offering involves substantial risk. Our ability to execute our strategy is also subject to certain risks. The risks described under the heading "Risk Factors" included elsewhere in this prospectus may cause us not to realize the full benefits of our strengths or may cause us to be unable to successfully execute all or part of our strategy. Some of the most significant challenges and risks we face include the following:

- our ability to comply with the numerous, complex and frequently changing laws regulating the marketing and sale of Medicare plans;

- the potential for an adverse change in our relationships with carriers, including a loss of carrier relationships;

- failure to grow our customer base or retain our existing customers;

- carriers' ability to reduce commissions paid to us and adversely change their underwriting practices;

- significant consolidation in the healthcare industry that could adversely alter our relationships with carriers;

- information technology system failures or capacity constraints interrupting our operations;

- factors that adversely impact our estimate of LTV;

- our dependence on agents to sell insurance plans;

- changes in the health insurance system and laws and regulation governing health insurance markets;

- inability to effectively advertise our products; and

- the significant influence the Founders and Centerbridge will have over us after the Transactions, including control over decisions that require the approval of stockholders.

Before you invest in our Class A common stock, you should carefully consider all the information in this prospectus, including matters set forth under the heading "Risk Factors."

**Summary of the Transactions**

GoHealth, Inc., a Delaware corporation, was formed on March 27, 2020 and is the issuer of the Class A common stock offered by this prospectus. Prior to this offering and the Transactions, all of our business operations have been conducted through GoHealth Holdings, LLC and its direct and indirect subsidiaries, and there has been only one holder of common stock of GoHealth, Inc. We will consummate the following organizational transactions in connection with this offering:

- we will amend and restate the existing limited liability company agreement of GoHealth Holdings, LLC, which will become effective substantially concurrently with or prior to the consummation of this offering, to, among other things, (1) recapitalize all existing ownership interests in GoHealth Holdings, LLC (including profits units awarded under the existing limited liability company agreement of GoHealth Holdings, LLC) and (2) appoint GoHealth, Inc. as the sole managing member of GoHealth Holdings, LLC upon its acquisition of LLC Interests in connection with this offering;

- we will amend and restate GoHealth, Inc.'s certificate of incorporation to, among other things, provide for (1) the recapitalization of our outstanding shares of existing common stock into one share of Class A common stock, (2) Class A common stock, with each share of our Class A common stock entitling its holder to one vote per share on all matters presented to our stockholders generally and (3) Class B common stock, with each share of our Class B common stock entitling its holder to one vote per share on all matters presented to our stockholders generally, and that shares of our Class B common stock may only be held by the Continuing Equity Owners and their respective permitted transferees as described in "Description of Capital Stock—Common Stock—Class B Common Stock;"

16

Table of Contents

- we will issue 232,383,011 shares of our Class B common stock to the Continuing Equity Owners, which is equal to the number of LLC Interests held directly or indirectly by such Continuing Equity Owners immediately following the Transactions, for nominal consideration;

- we will acquire, by means of one or more mergers, the Blocker Company (the "Blocker Merger") and will issue to the Blocker Shareholders 41,316,989 shares of our Class A common stock and, upon consummation of this offering, $75.5 million (based on the midpoint of the estimated price range set forth on the cover page of this prospectus) in cash to Blocker Shareholders as partial consideration in the Blocker Merger;

- we will issue 39,500,000 shares of our Class A common stock to the purchasers in this offering (or 45,425,000 shares if the underwriters exercise in full their option to purchase additional shares of Class A common stock) in exchange for net proceeds of approximately $704.7 million (or approximately $811.6 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock) based upon an assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), less the underwriting discount and estimated offering expenses payable by us;

- we will use the net proceeds from this offering to (i) purchase 35,316,264 newly-issued LLC Interests (or 40,298,731 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us and (ii) pay $75.5 million in cash to the Blocker Shareholders as partial consideration in the Blocker Merger;

- GoHealth Holdings, LLC intends to use the net proceeds from the sale of LLC Interests to GoHealth, Inc. (i) to pay $399.2 million in cash to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, (ii) to satisfy in full $100.0 million in aggregate face amount of an existing equity instrument in connection with the Transactions (see footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information") and (iii) for general corporate purposes to support the growth of the business, in each case, as described under "Use of Proceeds;" and

- GoHealth, Inc. will enter into (1) the Stockholders Agreement with Centerbridge and NVX Holdings, (2) the Registration Rights Agreement with certain of the Continuing Equity Owners and (3) the Tax Receivable Agreement with GoHealth Holdings, LLC, the Continuing Equity Owners and the Blocker Shareholders. For a description of the terms of the Stockholders Agreement, the Registration Rights Agreement and the Tax Receivable Agreement, see "Certain Relationships and Related Party Transactions."

Immediately following the consummation of the Transactions (including this offering):

- GoHealth, Inc. will be a holding company and its principal asset will consist of LLC Interests it acquires directly from GoHealth Holdings, LLC and indirectly from certain of the Continuing Equity Owners (including the Blocker Shareholders);

- GoHealth, Inc. will be the sole managing member of GoHealth Holdings, LLC and will control the business and affairs of GoHealth Holdings, LLC and its direct and indirect subsidiaries;

- GoHealth, Inc. will own, directly or indirectly, 80,816,989 LLC Interests of GoHealth Holdings, LLC, representing approximately 25.8% of the economic interest in GoHealth Holdings, LLC (or 85,799,456 LLC Interests, representing approximately 27.4% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the Founders will own (1) 98,224,564 LLC Interests of GoHealth Holdings, LLC (excluding 2,026,226 LLC Interests subject to time-based vesting requirements), representing approximately 31.4% of the

17

economic interest in GoHealth Holdings, LLC (or 96,076,286 LLC Interests, representing approximately 30.7% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (2) 98,224,564 shares of Class B common stock of GoHealth, Inc., representing approximately 31.4% of the combined voting power of all of GoHealth, Inc.'s common stock (or 96,076,286 shares of Class B common stock of GoHealth, Inc., representing approximately 30.7% if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- Centerbridge (through the Blocker Shareholders) will own (1) 41,316,989 shares of Class A common stock of GoHealth, Inc. (or 40,374,456 shares of Class A common stock of GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 13.2% of the combined voting power of all of GoHealth, Inc.'s common stock and approximately 51.1% of the economic interest in GoHealth, Inc. (or approximately 12.9% of the combined voting power and approximately 47.1% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock), (2) directly through Centerbridge's ownership of LLC Interests and indirectly through GoHealth, Inc.'s ownership of LLC Interests, approximately 39.4% of the economic interest in GoHealth Holdings, LLC (or approximately 38.5% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (3) 82,058,717 shares of Class B common stock of GoHealth, Inc., representing approximately 26.2% (and, together with the shares of Class A common stock, 39.4%) of the combined voting power of all of GoHealth, Inc.'s common stock (or 80,186,773 shares of Class B common stock of GoHealth, Inc., representing approximately 25.6% (and, together with the shares of Class A common stock, 38.5%) if the underwriters exercise in full their option to purchase additional shares of Class A common stock); and

- the purchasers in this offering will own (1) 39,500,000 shares of Class A common stock of GoHealth, Inc. (or 45,425,000 shares of Class A common stock of GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 12.6% of the combined voting power of all of GoHealth, Inc.'s common stock and approximately 48.9% of the economic interest in GoHealth, Inc. (or approximately 14.5% of the combined voting power and approximately 52.9% of the economic interest in GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), and (2) through GoHealth, Inc.'s ownership of LLC Interests, indirectly will hold approximately 12.6% of the economic interest in GoHealth Holdings, LLC (or approximately 14.5% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock).

As the sole managing member of GoHealth Holdings, LLC, we will operate and control all of the business and affairs of GoHealth Holdings, LLC and, through GoHealth Holdings, LLC and its direct and indirect subsidiaries, conduct our business. Following the Transactions, including this offering, GoHealth, Inc. will have the majority economic interest in GoHealth Holdings, LLC, and will control the management of GoHealth Holdings, LLC as its sole managing member. As a result, GoHealth, Inc. will consolidate GoHealth Holdings, LLC and record a significant non-controlling interest in a consolidated entity in GoHealth, Inc.'s consolidated financial statements for the economic interest in GoHealth Holdings, LLC held directly or indirectly by the Continuing Equity Owners.

Unless otherwise indicated, this prospectus assumes the shares of Class A common stock are offered at $19.00 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). Pursuant to the terms of the Existing LLC Agreement, the split between the number of LLC Interests will vary depending on the initial public offering price in this offering. The initial public offering price will also impact the relative allocation of LLC Interests issued in the Transactions among the Original Equity Owners and, in turn, the shares of Class A common stock and Class B common stock issued to the Original Equity Owners in the Transactions. Additionally, while the number of shares of Class A common stock being offered hereby to the public will not change, any increase or decrease in the number of shares of Class A common stock sold by GoHealth, Inc. in this offering due to a change in the initial public offering price will result in a corresponding increase or decrease in

18

the number of LLC Interests purchased by GoHealth, Inc. directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering. Therefore, the indirect economic interest in GoHealth Holdings, LLC represented by the shares of Class A common stock sold in this offering will be largely unaffected by the initial public offering price. For more information regarding the impact of the initial offering price on the share information included throughout this prospectus, see "—The Offering."

For more information regarding the Transactions and our structure, see "Our Organizational Structure."

19

**Ownership Structure**

The diagram below depicts our organizational structure after giving effect to the Transactions, including this offering, assuming no exercise by the underwriters of their option to purchase additional shares of Class A common stock.



(1)   Investors in this offering will hold approximately 12.6% of the combined voting power of GoHealth, Inc. (or approximately 14.5% of the combined voting power if the underwriters exercise in full their option to purchase additional shares of Class A common stock).

Table of Contents

GoHealth, Inc., the issuer of the Class A common stock in this offering, was incorporated as a Delaware corporation on March 27, 2020. Our corporate headquarters are located at 214 West Huron Street, Chicago, Illinois 60654. Our telephone number is (312) 386-8200. Our principal website address is *www.gohealth.com*. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

After giving effect to the Transactions, including this offering, GoHealth, Inc. will be a holding company whose principal asset will consist of 25.8% of the outstanding LLC Interests of GoHealth Holdings, LLC (or 27.4% if the underwriters exercise in full their option to purchase additional shares of our Class A common stock).

**Implications of Being an Emerging Growth Company**

We qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of certain reduced reporting and other requirements that are otherwise generally applicable to public companies. As a result:

- we are required to have only two years of audited financial statements and only two years of related selected financial data and management's discussion and analysis of financial condition and results of operations disclosure;

- we are not required to engage an auditor to report on our internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act;

- we are not required to comply with the requirement of the Public Company Accounting Oversight Board, or PCAOB, regarding the communication of critical audit matters in the auditor's report on the financial statements;

- we are not required to submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay," "say-on-frequency" and "say-on-golden parachutes;" and

- we are not required to comply with certain disclosure requirements related to executive compensation, such as the requirement to present a comparison of our Chief Executive Officer's compensation to our median employee compensation.

We may take advantage of these reduced reporting and other requirements until the last day of our fiscal year following the fifth anniversary of the completion of this offering, or such earlier time that we are no longer an emerging growth company, including if we have more than $1.07 billion in annual revenue, have more than $700 million in market value of our Class A common stock held by non-affiliates, or issue more than $1.0 billion of non-convertible debt over a three-year period. We may choose to take advantage of some but not all of these reduced burdens. We have elected to adopt the reduced requirements with respect to our financial statements and the related selected financial data and "Management's Discussion and Analysis of Financial Condition and Results of Operations" disclosure, including in this prospectus.

In addition, the JOBS Act permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to use this extended transition period. As a result, the information that we provide to stockholders may be different than the information you may receive from other public companies in which you hold equity.

Table of Contents

**The Offering**

| | |
|---|---|
| Issuer | GoHealth, Inc. |
| Shares of Class A common stock offered by us | 39,500,000 shares (or 45,425,000 shares if the underwriters exercise in full their option to purchase additional shares). |
| Underwriters' option to purchase additional shares of Class A common stock from us | 5,925,000 shares. |
| Shares of Class A common stock to be outstanding immediately after this offering | 80,816,989 shares, representing approximately 25.8% of the combined voting power of all of GoHealth, Inc.'s common stock (or 85,799,456 shares, representing approximately 27.4% of the combined voting power of all of GoHealth, Inc.'s common stock if the underwriters exercise in full their option to purchase additional shares of Class A common stock), 100% of the economic interest in GoHealth, Inc. and 25.8% of the indirect economic interest in GoHealth Holdings, LLC. |
| Shares of Class B common stock to be outstanding immediately after this offering | 232,383,011 shares, representing approximately 74.2% of the combined voting power of all of GoHealth, Inc.'s common stock (or 227,400,544 shares, representing approximately 72.6% of the combined voting power of all of GoHealth, Inc.'s common stock if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and no economic interest in GoHealth, Inc. |
| Shares of Class A common stock to be held by Centerbridge (through the Blocker Shareholders) immediately after this offering | 41,316,989 shares, representing approximately 51.1% of the economic interest in GoHealth, Inc. (or 40,374,456 shares, representing approximately 47.1% of the economic interest in GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| LLC Interests to be held by us immediately after this offering | 80,816,989 LLC Interests, representing approximately 25.8% of the economic interest in GoHealth Holdings, LLC (or 85,799,456 LLC Interests, representing approximately 27.4% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| LLC Interests to be held directly or indirectly by the Founders immediately after this offering | 98,224,564 LLC Interests, representing approximately 31.4% of the economic interest in GoHealth Holdings, LLC (or 96,076,286 LLC Interests, representing approximately 30.7% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| LLC Interests to be held by Centerbridge immediately after this offering | 82,058,717 LLC Interests, representing approximately 26.2% of the economic interest in GoHealth Holdings, LLC (or 80,186,773 LLC Interests, representing approximately 25.6% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their |

22

Table of Contents

| | |
|---|---|
| | option to purchase additional shares of Class A common stock). Centerbridge's ownership of LLC Interests and Class A common stock (through the Blocker Shareholders) will collectively represent an aggregate 39.4% economic interest in GoHealth Holdings, LLC (or 38.5% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| Ratio of shares of Class A common stock to LLC Interests | Our amended and restated certificate of incorporation and the GoHealth Holdings, LLC Agreement will require that we and GoHealth Holdings, LLC at all times maintain a one-to-one ratio between the number of shares of Class A common stock issued by us and the number of LLC Interests owned by us, except as otherwise determined by us. |
| Ratio of shares of Class B common stock to LLC Interests | Our amended and restated certificate of incorporation and the GoHealth Holdings, LLC Agreement will require that we and GoHealth Holdings, LLC at all times maintain a one-to-one ratio between the number of shares of Class B common stock owned by the Continuing Equity Owners and their respective permitted transferees and the number of LLC Interests owned by the Continuing Equity Owners and their respective permitted transferees, except as otherwise determined by us. Immediately after the Transactions, the Continuing Equity Owners will together own 100% of the outstanding shares of our Class B common stock. |
| Permitted holders of shares of Class B common stock | Only the Continuing Equity Owners and the permitted transferees of Class B common stock as described in this prospectus will be permitted to hold shares of our Class B common stock. Shares of Class B common stock are transferable for shares of Class A common stock only together with an equal number of LLC Interests. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement— Agreement in Effect Upon Consummation of the Transactions." |
| Voting rights | Holders of shares of our Class A common stock and our Class B common stock will vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by law or our amended and restated certificate of incorporation. Each share of our Class A common stock entitles its holders to one vote per share and each share of our Class B common stock entitles its holders to one vote per share on all matters presented to our stockholders generally. See "Description of Capital Stock." |
| Redemption rights of holders of LLC Interests | The Continuing Equity Owners may, subject to certain exceptions, from time to time at each of their options require GoHealth Holdings, LLC to redeem all or a portion of their LLC Interests in exchange for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one |

23

|  |  |
|---|---|
|  | basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of our Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the GoHealth Holdings, LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), we may effect a direct exchange by GoHealth, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Continuing Equity Owners may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions." Simultaneously with the payment of cash or shares of Class A common stock, as applicable, in connection with a redemption or exchange of LLC Interests pursuant to the terms of the GoHealth Holdings, LLC Agreement, a number of shares of our Class B common stock registered in the name of the redeeming or exchanging Continuing Equity Owner will be transferred to the Company and will be cancelled for no consideration on a one-for-one basis with the number of LLC Interests so redeemed or exchanged. |
| Use of proceeds | We estimate, based upon an assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), that we will receive net proceeds from this offering of approximately $704.7 million (or $811.6 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock), after deducting the underwriting discount and estimated offering expenses payable by us. We intend to use the net proceeds from this offering to (i) purchase 35,316,264 newly-issued LLC Interests (or 40,298,731 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us and (ii) pay $75.5 million in cash to the Blocker Shareholders as partial consideration in the Blocker Merger. GoHealth Holdings, LLC intends to use the net proceeds from the sale of LLC Interests to GoHealth, Inc. (i) to pay $399.2 million in cash to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, (ii) to satisfy in full $100.0 million in aggregate face amount of an existing equity instrument in connection with the Transactions (see footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information") and (iii) for general corporate purposes to support the growth of the business. GoHealth Holdings, LLC will bear or reimburse GoHealth, Inc. for all of the expenses of this offering. See "Use of Proceeds." |

| | |
|---|---|
| Dividend policy | We currently intend to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness, and therefore, we do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. Holders of our Class B common stock are not entitled to participate in any dividends declared by our board of directors. Because we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from GoHealth Holdings, LLC and, through GoHealth Holdings, LLC, cash distributions and dividends from our other direct and indirect subsidiaries. Our ability to pay any cash dividends on our Class A common stock is limited by restrictions on the ability of GoHealth Holdings, LLC and our other direct and indirect subsidiaries to pay dividends or make distributions under the terms of our Credit Facilities. Any future determination as to the declaration and payment of dividends, if any, will be at the discretion of our board of directors, subject to compliance with contractual restrictions and covenants in the agreements governing our current and future indebtedness. Any such determination will also depend upon our business prospects, results of operations, financial condition, cash requirements and availability, industry trends and other factors that our board of directors may deem relevant. See "Dividend Policy." |
| Controlled company exception | After the consummation of the Transactions, we will be considered a "controlled company" within the meaning of the listing rules of The Nasdaq Global Market, or the Nasdaq rules, as NVX Holdings and Centerbridge will have more than 50% of the voting power for the election of directors. See "Principal Stockholders." As a "controlled company," we will not be subject to certain corporate governance requirements, including that: (1) a majority of our board of directors consists of "independent directors," as defined under the Nasdaq rules; (2) we have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; (3) we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and (4) we perform annual performance evaluations of the nominating and corporate governance and compensation committees. As a result, we may not have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or perform annual performance evaluations of the nominating and corporate governance and compensation committees unless and until such time as we are required to do so. |
| Tax receivable agreement | We will enter into a Tax Receivable Agreement with GoHealth Holdings, LLC, the Continuing Equity Owners and the Blocker Shareholders that will provide for the payment by GoHealth, Inc. to the Continuing Equity Owners and the Blocker Shareholders of 85% |

25

|  | of the amount of tax benefits, if any, that GoHealth, Inc. actually realizes (or in some circumstances is deemed to realize) as a result of (1) GoHealth, Inc.'s allocable share of existing tax basis acquired in connection with the Transactions (including the Blocker Company's share of existing tax basis) and increases to such allocable share of existing tax basis; (2) increases in tax basis resulting from (a) GoHealth, Inc.'s purchase of LLC Interests directly from GoHealth Holdings, LLC and the partial redemption of LLC Interests by GoHealth Holdings, LLC, as described under "Use of Proceeds," (b) future redemptions or exchanges (or deemed exchanges in certain circumstances) of LLC Interests for Class A common stock or cash as described above under "—Redemption rights of holders of LLC Interests" and (c) certain distributions (or deemed distributions) by GoHealth Holdings, LLC; and (3) certain additional tax benefits arising from payments made under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement" for a discussion of the Tax Receivable Agreement. |
|---|---|
| Registration rights agreement | Pursuant to the Registration Rights Agreement, we will, subject to the terms and conditions thereof, agree to register the resale of the shares of our Class A common stock that are issuable to certain of the Continuing Equity Owners in connection with the Transactions. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement" for a discussion of the Registration Rights Agreement. |
| Risk factors | See "Risk Factors" beginning on page 33 and other information included in this prospectus for a discussion of factors you should carefully consider before deciding to invest in shares of our Class A common stock. |
| Trading symbol | We have applied to list our Class A common stock on The Nasdaq Global Market under the symbol "GOCO." |
| Reserved share program | At our request, the underwriters have reserved for sale, at the initial public offering price, up to 5% of the Class A common stock offered by this prospectus for sale to some of our directors, officers and employees through a reserved share program, or Reserved Share Program. If these persons purchase reserved shares, it will reduce the number of shares of Class A common stock available for sale to the general public. Any reserved shares of Class A common stock that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of Class A common stock offered by this prospectus. See "Underwriting—Reserved Share Program." |

Unless we indicate otherwise or the context otherwise requires, all information in this prospectus:

- gives effect to the amendment and restatement of the GoHealth Holdings, LLC Agreement that converts all existing ownership interests in GoHealth Holdings, LLC into 300,000,000 LLC Interests (excluding LLC Interests to be held directly or indirectly by certain Former Profits Unit Holders that are subject to time-based vesting requirements), as well as the filing of our amended and restated certificate of incorporation;

26

- gives effect to the other Transactions, including the consummation of this offering;

- excludes 6,465,359 shares of Class A common stock reserved for issuance under our 2020 Incentive Award Plan, or 2020 Plan, including approximately 2,672,234 shares of Class A common stock issuable pursuant to stock options and approximately 338,159 shares of Class A common stock issuable pursuant to restricted share units, in each case which we intend to grant to certain of our directors, executive officers and other employees in connection with this offering as described under the caption "Executive Compensation—New Incentive Plans;"

- assumes an initial public offering price of $19.00 per share of Class A common stock, which is the midpoint of the estimated price range set forth on the cover page of this prospectus;

- gives effect to the vesting of 13,971,151 LLC Interests held directly or indirectly by certain Former Profits Unit Holders that are expected to vest upon the consummation of this offering based upon the satisfaction of performance-vesting targets at the assumed initial public offering price of $19.00 per share of Class A common stock, which is the midpoint of the estimated price range set forth on the cover page of this prospectus;

- assumes no exercise by the underwriters of their option to purchase 5,925,000 additional shares of Class A common stock from us; and

- excludes 7,408,386 LLC Interests to be held directly or indirectly by certain Former Profits Unit Holders that are subject to time-based vesting requirements.

For illustrative purposes, the below table shows the number of LLC Interests subject to time-based vesting requirements that will be outstanding at various initial public offering prices.

| | LLC Interests subject to Time-Based Vesting held by Former Profits Unit Holders |
|---|---|
| $18.00 | 7,290,147 |
| $19.00 | 7,408,386 |
| $20.00 | 7,514,837 |
| $21.00 | 7,611,109 |

Unless otherwise indicated, this prospectus assumes the shares of Class A common stock are offered at $19.00 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). Pursuant to the terms of the Existing LLC Agreement, the split between the number of LLC Interests will vary depending on the initial public offering price in this offering. The initial public offering price will also impact the relative allocation of LLC Interests issued in the Transactions among the Original Equity Owners and, in turn, the shares of Class A common stock and Class B common stock issued to the Original Equity Owners in the Transactions. Additionally, while the number of shares of Class A common stock being offered hereby to the public will not change, any increase or decrease in the number of shares of Class A common stock sold by GoHealth, Inc. in this offering due to a change in the initial public offering price will result in a corresponding increase or decrease in the number of LLC Interests purchased by GoHealth, Inc. directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering. Therefore, the indirect economic interest in GoHealth Holdings, LLC represented by the shares of Class A common stock sold in this offering will be largely unaffected by the initial public offering price. For more information regarding the impact of the initial offering price on the share information included throughout this prospectus, see "—The Offering."

27

**Table of Contents**

**Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data**

The following tables present the summary historical consolidated financial and other data for GoHealth Holdings, LLC and its subsidiaries and the summary pro forma condensed consolidated financial and other data for GoHealth, Inc. GoHealth Holdings, LLC is the predecessor of GoHealth, Inc. for financial reporting purposes. The summary consolidated statements of operations data and statements of cash flows data for the period from September 13, 2019 through December 31, 2019 (Successor), the period from January 1, 2019 through September 12, 2019 (Predecessor) and the year ended December 31, 2018 (Predecessor), and the summary consolidated balance sheet data as of December 31, 2019 are derived from the audited consolidated financial statements of GoHealth Holdings, LLC included elsewhere in this prospectus. The summary condensed consolidated statements of operations data and statements of cash flows data for the three months ended March 31, 2020 and 2019, and the summary condensed consolidated balance sheet data as of March 31, 2020, are derived from the unaudited condensed consolidated financial statements of GoHealth Holdings, LLC included elsewhere in this prospectus. The results of operations for the periods presented below are not necessarily indicative of the results to be expected for any future period. The information set forth below should be read together with the "Selected Historical Condensed Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the accompanying notes included elsewhere in this prospectus.

The summary unaudited pro forma condensed consolidated financial data of GoHealth, Inc. presented below have been derived from our unaudited pro forma condensed consolidated financial information included elsewhere in this prospectus. The summary unaudited pro forma condensed consolidated financial information as of and for the three months ended March 31, 2020, and for the Successor 2019 Period and Predecessor 2019 Period gives effect to the Centerbridge Acquisition and the Transactions, including the consummation of this offering and the use of proceeds therefrom, as described in "Our Organizational Structure" and "Use of Proceeds," as if all such transactions had occurred on January 1, 2019 in the case of the unaudited pro forma condensed consolidated statements of operations data, and as of March 31, 2020, in the case of the unaudited pro forma condensed consolidated balance sheet data. The unaudited pro forma condensed consolidated financial information includes various estimates which are subject to material change and may not be indicative of what our operations or financial position would have been had this offering and related transactions taken place on the dates indicated, or that may be expected to occur in the future. See "Unaudited Pro Forma Condensed Consolidated Financial Information" for a complete description of the adjustments and assumptions underlying the summary unaudited pro forma condensed consolidated financial information.

28

Table of Contents

The summary historical consolidated financial and other data of GoHealth, Inc. has not been presented because GoHealth, Inc. is a newly incorporated entity, has had no business transactions or activities to date and had no assets or liabilities during the periods presented in this section.

| (in thousands, except share and per share data) | Pro Forma GoHealth, Inc. Three Months Ended March 31, 2020 | Pro Forma GoHealth, Inc. Year Ended December 31, 2019 | Historical GoHealth Holdings, LLC Three Months Ended March 31, 2020 (Successor) | Historical GoHealth Holdings, LLC Three Months Ended March 31, 2019 (Predecessor) | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|---|
| **Consolidated Statement of Operations:** | | | | | | | |
| Net revenues: | | | | | | | |
| Commission | $ 112,510 | $ 419,181 | $ 112,510 | $ 51,215 | $ 243,347 | $ 175,834 | $ 144,378 |
| Other | 28,500 | 120,320 | 28,500 | 17,874 | 65,144 | 55,176 | 81,827 |
| Net revenues | 141,010 | 539,501 | 141,010 | 69,089 | 308,491 | 231,010 | 226,205 |
| Operating expenses: | | | | | | | |
| Cost of revenue | 42,134 | 169,553 | 42,134 | 27,552 | 90,384 | 79,169 | 79,582 |
| Marketing and advertising | 26,073 | 61,071 | 26,073 | 11,411 | 24,811 | 37,769 | 28,129 |
| Customer care and enrollment | 24,602 | 96,065 | 23,978 | 13,939 | 44,356 | 49,149 | 46,076 |
| Technology | 4,685 | 19,838 | 4,593 | 4,155 | 6,006 | 40,312 | 16,197 |
| General and administrative | 11,864 | 41,189 | 10,491 | 6,990 | 13,674 | 79,219 | 27,458 |
| Change in fair value of contingent consideration liability | — | — | 4,400 | — | 70,700 | — | — |
| Amortization of intangible assets | 23,514 | 94,057 | 23,514 | — | 28,217 | — | — |
| Transaction costs | — | — | — | — | 6,245 | 2,267 | — |
| Total operating expenses | 132,873 | 481,774 | 135,183 | 64,047 | 284,393 | 287,885 | 197,442 |
| Income (loss) from operations | 8,137 | 57,727 | 5,827 | 5,042 | 24,098 | (56,875) | 28,763 |
| Interest expense | 6,756 | 27,172 | 6,756 | 28 | 8,076 | 140 | 224 |
| Other income (expense) | (10) | (97) | (10) | (10) | 17 | (114) | (379) |
| Income (loss) before income taxes | 1,371 | 30,458 | (939) | 5,004 | 16,039 | (57,129) | 28,160 |
| Income tax expense (benefit) | (1) | (6) | (2) | 2 | 44 | (66) | 46 |
| Net income (loss) | $ 1,372 | $ 30,464 | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,114 |
| Less: Net loss attributable to non-controlling interests | 1,018 | 22,603 | — | — | — | — | (3) |
| Net income (loss) attributable to GoHealth Holdings, LLC and subsidiaries | $ 354 | $ 7,861 | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,117 |
| **Pro Forma per Share Data:** | | | | | | | |
| Pro forma weighted average shares of Class A common stock outstanding: | | | | | | | |
| Basic | 80,816,989 | 80,816,989 | | | | | |
| Diluted | 313,343,669 | 313,339,540 | | | | | |
| Pro forma net income available to Class A common stock per share: | | | | | | | |
| Basic | $ 0.00 | $ 0.10 | | | | | |
| Diluted | $ 0.00 | $ 0.10 | | | | | |
| **Consolidated Statement of Cash Flows Data:** | | | | | | | |
| Net cash (used in) provided by operating activities | | | $ 23,587 | $ 1,222 | $ (9,284) | $ 9,281 | $ 5,443 |
| Net cash used in investing activities | | | (3,522) | (1,944) | (810,010) | (5,597) | (6,170) |
| Net cash provided by (used in) financing activities | | | 120,167 | 1,147 | 830,879 | (3,449) | 63 |

29

| (in thousands) | Pro Forma GoHealth, Inc. March 31, 2020 | Historical GoHealth Holdings, LLC March 31, 2020 (Successor) | December 31, 2019 (Predecessor) |
|---|---|---|---|
| **Consolidated Balance Sheet:** | | | |
| Cash and cash equivalents | $ 282,163 | $152,423 | $ 12,276 |
| Total assets | 1,839,389 | 29,964 | 1,602,295 |
| Total liabilities | 592,947 | 840,047 | 742,151 |
| Total shareholders'/members' equity | 1,246,444 | 869,602 | 860,144 |

| (in thousands, except percentages) | Pro Forma GoHealth, Inc. Three Months Ended March 31, 2020 | Year Ended December 31, 2019 | Three Months Ended March 31, 2020 (Successor) | 2019 (Predecessor) | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|---|
| **Selected Non-GAAP Financial Data:** | | | | | | | |
| EBITDA[1] | $ 32,274 | $ 156,455 | $ 29,964 | $ 6,570 | $ 52,853 | $ (52,742) | $ 34,544 |
| Adjusted EBITDA[1] | $ 35,248 | $ 169,994 | $ 34,920 | $ 7,136 | $ 130,465 | $ 39,973 | $ 34,863 |
| Adjusted EBITDA margin[1] | 25.0% | 31.5% | 24.8% | 10.3% | 42.3% | 17.3% | 15.4% |

| | Three Months Ended March 31, 2020 | 2019 | Year Ended December 31, 2019 | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|
| **Other Operating Data(2):** | | | | | | |
| LTV/CAC (Medicare—Internal segment) | 2.7x | 1.7x | 3.9x | 5.1x | 2.7x | 2.7x |
| Cost per Qualified Prospect (Medicare—Internal segment) | $ 57 | $ 87 | $ 63 | $ 53 | $ 77 | $ 48 |
| Total Medicare Submitted Policies | 132,014 | 43,283 | 427,697 | 268,882 | 158,815 | 118,376 |
| Medicare—Internal Commissionable Approved Submissions | 86,604 | 22,114 | 265,584 | 170,764 | 94,820 | 57,744 |
| Medicare—External Commissionable Approved Submissions | 34,326 | 20,319 | 120,676 | 62,673 | 58,003 | 57,947 |
| LTV Per Approved Submission—Medicare Advantage (Medicare segments) | $ 857 | $ 860 | $ 978 | $ 1,024 | $ 906 | $ 936 |
| LTV Per Approved Submission—Medicare Supplement (Medicare segments) | $ 920 | $ 926 | $ 957 | $ 944 | $ 964 | $ 798 |
| LTV Per Approved Submission—Prescription Drug Plans (Medicare segments) | $ 215 | $ 191 | $ 206 | $ 213 | $ 194 | $ 190 |
| Total Submitted Policies (IFP and Other segments) | 38,002 | 53,886 | 296,772 | 146,228 | 150,544 | 207,695 |

(1) We use supplemental measures of our performance that are derived from our consolidated financial information, but which are not presented in our consolidated financial statements prepared in accordance with GAAP. These non-GAAP financial measures include net income (loss) before interest expense, income tax expense (benefit) and depreciation and amortization expense, or EBITDA; Adjusted EBITDA and Adjusted EBITDA margin. Adjusted EBITDA is the primary financial performance measure used by management to evaluate its business and monitor its results of operations.

Adjusted EBITDA represents EBITDA as further adjusted for share-based compensation, change in fair value of earnout liability, Centerbridge Acquisition costs, severance costs and incremental organizational costs in connection with this offering.

Adjusted EBITDA margin represents Adjusted EBITDA divided by net revenues.

We use non-GAAP financial measures to supplement financial information presented on a GAAP basis. We believe that excluding certain items from our GAAP results allows management to better understand our consolidated financial performance from period to period and better project our future consolidated financial performance as forecasts are developed at a level of detail different from that used to prepare GAAP-based financial measures. Moreover, we believe these non-GAAP financial measures provide our stakeholders with useful information to help them evaluate our operating results by facilitating an enhanced understanding of our operating performance and enabling them to make more meaningful period to period comparisons. There are limitations to the use of the non-GAAP financial measures presented in this prospectus. For example, our non-GAAP financial measures may not be comparable to similarly titled measures of other companies. Other companies, including companies in our industry, may calculate non-GAAP financial measures differently than we do, limiting the usefulness of those measures for comparative purposes.

The non-GAAP financial measures are not meant to be considered as indicators of performance in isolation from or as a substitute for net income (loss) prepared in accordance with GAAP, and should be read only in conjunction with financial information presented on a GAAP basis. Reconciliations of each of EBITDA and Adjusted EBITDA to its most directly comparable GAAP financial measure, net income (loss), are presented below. We encourage you to review the reconciliations in conjunction with the presentation of the non-GAAP financial measures for each of the periods presented. In future periods, we may exclude similar items, may incur income and expenses similar to these excluded items and include other expenses, costs and non-recurring items. The table below provides reconciliations of EBITDA and Adjusted EBITDA to net income (loss) on a consolidated basis for the periods indicated.

**EBITDA and Adjusted EBITDA:**

| (in thousands) | Pro Forma GoHealth, Inc. Three Months Ended March 31, 2020 | Year Ended December 31, 2019 | Three Months Ended March 31, 2020 (Successor) | 2019 (Predecessor) | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|---|
| Net income (loss) | $ 1,372 | $ 30,464 | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,114 |
| Interest expense | 6,756 | 27,172 | 6,756 | 28 | 8,076 | 140 | 224 |
| Income tax expense (benefit) | (1) | (6) | (2) | 2 | 44 | (66) | 46 |
| Depreciation and amortization expense | 24,147 | 98,825 | 24,147 | 1,538 | 28,738 | 4,247 | 6,160 |
| EBITDA | 32,274 | 156,455 | 29,964 | 6,570 | 52,853 | (52,742) | 34,544 |
| Share-based compensation[a] | 2,897 | 12,573 | 479 | — | 448 | 87,060 | — |
| Change in fair value of contingent consideration liability[b] | — | — | 4,400 | — | 70,700 | — | — |
| Centerbridge Acquisition costs[c] | — | — | — | — | 6,245 | 4,908 | — |
| Severance costs[d] | 77 | 966 | 77 | 566 | 219 | 747 | 319 |
| Adjusted EBITDA | $ 35,248 | $ 169,994 | $ 34,920 | $ 7,136 | $ 130,465 | $ 39,973 | $ 34,863 |

(a)    Represents non-cash share-based compensation expense in connection with profits interests and incentive share units, except with respect to the Pro Forma Fiscal Year 2019 and Pro Forma First Quarter 2020 periods, where share-based compensation expense is attributable to stock options and

31

Table of Contents

restricted stock units to be granted to our directors and employees in connection with this offering. Share-based compensation expense for the Predecessor 2019 Period is fully attributable to the automatic acceleration of legacy profits interests and legacy incentive share units in connection with the Centerbridge Acquisition and is allocated to the marketing and advertising, technology and general and administrative line items in the income statement based on the department of the individual who received the compensation.

(b)    Represents the change in fair value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition, which such liability will be settled in connection with this offering. See footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information."

(c)    Represents legal, accounting, consulting, and other costs related to the Centerbridge Acquisition.

(d)    Represents costs associated with the termination of employment.

(2)    For definitions and further information about how we calculate other operating data, please see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Operating Metrics by Segment."

32

**RISK FACTORS**

*Investing in our Class A common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, including our consolidated financial statements and the related notes, before deciding to invest in our Class A common stock. The occurrence of any of the events described below could harm our business, operating results and financial condition. In such an event, the market price of our Class A common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business. See "Cautionary Note Regarding Forward-Looking Statements."*

**Risks Related to Our Business**

***The marketing and sale of Medicare plans are subject to numerous, complex and frequently changing laws, regulations and guidelines, and non-compliance with or changes in laws, regulations and guidelines could harm our business, operating results and financial condition.***

Our business and operating results are heavily dependent on marketing and selling Medicare plans. The marketing and sale of Medicare Advantage and Medicare Part D prescription drug plans are principally regulated by CMS, but are also subject to state laws. The marketing and sale of Medicare Supplement plans are principally regulated on a state-by-state basis by state departments of insurance or equivalent state departments. The laws and regulations applicable to the marketing and sale of Medicare plans are numerous, ambiguous and complex, and, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans are frequently changing. We have and will continue to take steps to ensure compliance with laws, regulations and guidelines applicable to the sale and marketing of Medicare plans. For example, we have tailored our websites and sales processes for Medicare plans to comply with several requirements that are solely applicable to the sale and marketing of Medicare-related health insurance plans. Many aspects of our online platforms and our marketing material and processes, as well as changes to these platforms, materials and processes, including call center scripts, must be filed with CMS and reviewed and approved by carriers in light of CMS requirements. In addition, certain aspects of our Medicare plan marketing partner relationships have been in the past, and will be in the future, subjected to CMS review and carrier review. Changes to the laws, regulations and guidelines relating to the sale and marketing of Medicare plans, their interpretation or the manner in which they are enforced could be incompatible with these relationships, the manner in which we conduct our business, our platforms or our sale of Medicare plans, which could harm our business, operating results and financial condition.

CMS scrutinizes Medicare carriers and Medicare carriers may be held responsible for actions that we and our agents take. As a result, carriers may terminate their relationship with us or take other corrective action against us if our Medicare product sales, marketing or operations are not in compliance with Medicare or other requirements or give rise to too many complaints. See "—Our business may be harmed if we lose our relationship with carriers or if our relationships with carriers change, particularly if we or our contracted carriers temporarily or permanently lose the ability to market and sell Medicare plans."

Due to potential changes in CMS guidance, enforcement, interpretation or, in light of the COVID-19 pandemic, waivers, of existing laws, regulations and guidance applicable to our marketing and sale of Medicare products, or as a result of new laws, regulations and guidelines, CMS, state departments of insurance or carriers may object to or not approve aspects of our online platforms or marketing materials and processes and determine that certain existing aspects of our Medicare-related business are not in compliance with the applicable laws, regulations and guidance. As a result, the progress of our Medicare operations could be slowed or we could be prevented from operating aspects of our Medicare revenue generating activities altogether, which would harm our business, operating results and financial condition, particularly if it occurred during the Medicare annual enrollment period.

33

Table of Contents

***Our business may be harmed if we lose our relationship with carriers or if our relationships with carriers change, particularly if we or our contracted carriers temporarily or permanently lose the ability to market and sell Medicare plans.***

Our contractual relationships with carriers, including those with whom we have carrier-branded sales arrangements, are typically non-exclusive and terminable on short notice by either party for any reason. Carriers may be unwilling to allow us to sell their insurance products for a variety of reasons, including competitive or regulatory reasons, dissatisfaction with the insureds that we place with them or because they do not want to be associated with our brand. Additionally, in the future, an increasing number of carriers may decide to rely on their own internal distribution channels, including traditional in-house agents and their own websites, to sell their own products, which could limit or prohibit us from distributing their products. Also, because we do not have exclusive relationships with carriers, carriers can and do use our competitors to sell their products.

If a carrier is not satisfied with our services, it could cause us to incur additional costs and impact our profitability. For example, a carrier could terminate our services, decrease our commissions going forward or restrict our ability to market their products. Moreover, if we fail to meet our contractual obligations to any of our carriers, we could be subject to legal liability or lose our carrier relationships. In addition, these claims against us may produce negative publicity that could hurt our reputation and business and adversely affect our ability to retain business, find new consumers to sell products to or secure new business with other carriers.

In addition, with respect to the plans we sell in the IFP and Other segments and Medicare Supplement plans, carriers periodically change the criteria they use for determining whether they are willing to insure individuals. Future changes in carrier underwriting criteria could negatively impact sales of, or the renewal or approval rates of, insurance policies on our platform, which could negatively impact our revenue.

We may decide to terminate our relationship with a carrier for a number of reasons and the termination of our relationship with a carrier could reduce the variety of insurance products we distribute. In connection with such a termination, we would lose a source of commissions for future sales, and, in a limited number of cases, future commissions for past sales. Our business could also be harmed if we fail to develop new carrier relationships or offer customers a wide variety of insurance products.

We may also lose the ability to market and sell Medicare plans for one or more Medicare carriers. The regulations for selling Medicare health insurance are complex and can change frequently and may change in response to the COVID-19 pandemic. If we, our agents, or a carrier violate any of the requirements imposed by CMS, or federal or state laws or regulations, a carrier may terminate our relationship, or CMS may penalize a carrier by suspending, limiting, or terminating that carrier's ability to market and sell Medicare plans. Moreover, if any of our carriers terminate its relationship with us for cause, we may have to disclose such termination to other carriers, which may result in termination of additional carrier relationships. Because the Medicare products we sell are sourced from a relatively small number of carriers, if we lose the ability to market one of those carrier's Medicare plans, even temporarily, or if one of those carriers loses its Medicare product membership, our business, operating results and financial condition could be harmed.

***Our failure to grow our customer base or retain our existing customers could adversely impact our business, operating results and financial condition.***

We receive commissions from carriers for health insurance plans sold through us. When one of these plans is canceled, or if we otherwise do not remain the agent on the plan, we no longer receive the related commission payment and do not receive any commissions from renewals. Our customers may choose to discontinue their health insurance plans for a variety of reasons. Any decrease in the amount of time we retain our customers could adversely impact the estimated LTV we use for purposes of recognizing revenue. See "—Our operating results may be adversely impacted by factors that impact our estimate of LTV." Moreover, if we are not able to successfully retain existing customers and limit health insurance plan turnover, our cash flows from operations will be adversely impacted and our business, operating results and financial condition would be harmed.

34

Table of Contents

In addition, in certain circumstances, the Medicare-related commission rates that we receive may be higher in the first calendar year of a plan if the plan is the first Medicare Advantage plan issued to the customer. Similarly, the individual and family plans commission rates that we receive are typically higher in the first twelve months of a policy. After the first twelve months, they generally decline significantly. As a result, if we do not add a sufficient number of customers to new plans, our business, operating results and financial condition would be harmed.

Our business primarily generates revenue through the sale of Medicare Advantage plans. In some instances, traditional Medicare may be more attractive than Medicare Advantage because, for example, potential provider network restrictions imposed by Medicare Advantage plans do not exist in traditional Medicare, allowing patients with traditional Medicare to visit any doctor that accepts Medicare. In those instances, consumers may opt not to purchase a Medicare Advantage plan from us.

In general, the growth in our customer base is highly dependent upon our success in attracting new customers during the Medicare annual enrollment period. In 2019, approximately 61% of our Medicare Advantage and Medicare Supplement policies were submitted during the three months ended December 31, 2019. If our ability to market and sell Medicare-related health insurance and individual and family plans is constrained during an enrollment period for any reason, such as technology failures, reduced allocation of resources, any inability to timely employ, license, train, certify and retain our employees and our contractors and their agents to sell plans, interruptions in the operation of our website or systems, disruptions caused by other external factors, such as the COVID-19 pandemic, or issues with government-run health insurance exchanges, we could acquire fewer customers or suffer a reduction in our existing customer base and our business, operating results and financial condition could be harmed.

***Carriers may reduce the commissions paid to us and change their underwriting practices in ways that reduce the number of, or impact the renewal or approval rates of, insurance policies sold through our platform, which could harm our business, operating results and financial condition.***

Our commission rates from carriers are either set by each carrier or negotiated between us and each carrier. The commission rates we are paid are, for any given plan for a given customer, based on a number factors, including the carriers offering those plans, the state of residence of customers, the laws and regulations in the jurisdictions where the customer is located, and the customer's previous Medicare enrollment history (if any). Carriers have the right to alter these commission rates with relatively short notice and have altered, and may in the future alter, the contractual relationships we have with them, including, in certain instances by unilateral amendment of our contracts relating to commission rates or otherwise. For example, CMS could reduce the amount paid by CMS to Medicare Advantage plans or change the regulations and/or timelines applicable to the Medicare Advantage program, particularly in response to the COVID-19 pandemic, which could result in decreased commission rates or reduce carrier participation in the Medicare Advantage program. Changes of this nature could result in reduced commissions, or could impact our relationship with such carriers and potentially lead to contract termination. Because revenue in the Medicare segments is concentrated in a relatively small number of carriers, we are particularly vulnerable to changes in commission rates and changes in the competitiveness of our carriers' Medicare products.

***Significant consolidation in the health insurance industry could adversely alter our relationships with carriers and harm our business, operating results and financial condition.***

The health insurance industry in the United States has experienced a substantial amount of consolidation, resulting in a decrease in the number of carriers. Consolidation in the health insurance industry, particularly involving one of our key carriers, could cause a loss of, or changes in, our relationship with that carrier and may reduce our commission or other revenue from that carrier. In the future, due to this consolidation, we may be forced to offer health insurance from a reduced number of carriers or to derive a greater portion of our revenue from a more concentrated number of carriers as our business and the health insurance industry evolve.

35

Table of Contents

Additionally, mergers among carriers or an acquisition of one carrier by another carrier may trigger changes to our agreements with such carriers. For example, carriers may unilaterally amend or terminate our agreements on short notice, which could adversely impact or terminate the commission payments that we receive from these carriers. Our revenue could be adversely impacted if we are unable to maintain currently existing levels of business with any of our significant carriers if we are unable to offset any loss of business with alternative carriers. We expect that a small number of carriers will account for a significant portion of our revenue for the foreseeable future and any impairment of our relationship with, or the material financial impairment of, these carriers could adversely affect our business, operating results and financial condition. See "—We currently depend on a small group of carriers for a substantial portion of our revenue."

### *Information technology system failures could interrupt our operations and have a material adverse effect on our business, financial condition and results of operations.*

Our ability to sell insurance is dependent upon our information technology systems. In connection with sales of Medicare plans, CMS rules require that our health insurance agent employees utilize CMS-approved scripts and that we record and maintain the recording of telephonic interactions. We rely on telephone, call recording, customer relationship management and other systems and technology in our sales operations to sell Medicare plans, and we are dependent upon third parties for some of these systems and technologies, including our telephone services, which are provided by Five9, call recording systems and other communications systems. Carriers often audit these recordings for compliance purposes and listen to them in connection with investigating complaints. We have had in the past, and may in the future, experience failures of certain of our systems, including our telephone and call recording systems. For example, we have experienced failures of our systems due to power outages, which have negatively impacted our ability to sell plans. The effectiveness and stability of our systems and technology are critical to our ability to sell Medicare plans, particularly during the Medicare enrollment periods and the failure or interruption of any of these systems and technologies or any inability to handle increased business volume may have a material adverse effect on our business, operating results and financial condition and subject us to litigation or to actions by regulatory authorities.

### *Our operating results may be adversely impacted by factors that impact our estimate of LTV.*

As a result of the adoption of Accounting Standards Codification, or ASC, 606, *Revenue from Contracts with Customers*, we recognize revenue at the time a Submitted Policy becomes an Approved Policy by applying the latest estimated LTV for that product. We estimate commission revenue for each product by using a portfolio approach to a group of approved customers that are organized based on a variety of attributes, which we refer to as "cohorts." We estimate the cash commissions we expect to collect for each approved customer cohort by evaluating various factors, including, but not limited to, commission rates, carriers, estimated average plan duration, the regulatory environment, and historic cancellations of health insurance plans offered by carriers with which we have a relationship. On a quarterly basis, we recompute LTV at a cohort level for all outstanding cohorts, review and monitor changes in the data used to estimate LTV as well as the cash received for each cohort as compared to our original estimates. The fluctuations of cash received for each cohort and LTV may be significant and may or may not be indicative of the need to adjust LTVs for prior period cohorts. Management analyzes these fluctuations and, to the extent we see changes in our estimates of the cash commission collections that we believe are indicative of an increase or decrease to prior period LTVs, we will adjust LTVs for the affected cohorts at the time such determination is made. Changes in LTV may result in an increase or a decrease to revenue and a corresponding increase or decrease to commissions receivable, accordingly. We refer to the net commission revenue from customers approved in prior periods as "adjustment revenue" and our revenue can fluctuate significantly from period to period as a result of adjustment revenue.

As we continue to evaluate our LTV estimation models, we may in the future make further changes based on a number of factors and such changes could result in significant increases or decreases in revenue. LTVs are estimates and are based on a number of assumptions, which include, but are not limited to, estimates of the conversion rates of commissionable Approved Submissions into customers, forecasted average plan duration and

36

Table of Contents

forecasted commission rates we expect to receive per approved customer's plan. These assumptions are based on historical trends and require significant judgment by our management in interpreting those trends. Changes in our historical trends will result in changes to our LTV estimates in future periods and, therefore, could adversely affect our revenue and financial results in those future periods. As a result, negative changes in the factors upon which we estimate LTVs, such as reduced conversion of commissionable Approved Submissions to customers, increased health insurance plan termination or a reduction in the lifetime commission amounts we expect to receive for selling the plan to a customer or other changes could harm our business, operating results and financial condition. In addition, if we ultimately receive commission payments that are less than the amount we estimated when we recognized commission revenues, we would need to write off the remaining commissions receivable balance, which could materially adversely impact our operating results and financial condition.

The forecasted average plan duration is another important factor in our estimation of LTV. We receive commissions from carriers for policies sold through us that go on to become customers of those carriers. When one of these plans is canceled, or if we otherwise do not remain the agent on the policy, we no longer receive the related commission payment. Our forecasted average plan duration and health insurance plan termination rates are calculated based on our historical data by plan type and for certain products, such as our Medicare Advantage products which constitute the majority of our revenue, and if we are unable to produce an accurate forecasted average plan duration, our business, operating results and financial condition may be adversely impacted.

Additionally, from time to time, carriers may stop offering products in a geographic area. While in many cases, carriers will still support existing customers in those geographic areas, because they are no longer offering new plans, the retention of those customers may be adversely impacted, thereby impacting our expected LTV.

Commission rates are also a factor in estimating our LTVs, which are impacted by a variety of factors, including the particular health insurance plans chosen by our customers, the carriers offering those plans, our customers' states of residence, the laws and regulations in those jurisdictions, the average premiums of plans purchased through us and healthcare reform. Any reduction in our average commission revenue per customer could harm our business, operating results and financial condition.

***System failures or capacity constraints could harm our business, financial condition and operating results.***

The performance, reliability and availability of our technology platform and underlying network infrastructures are critical to our financial results, our brand and our relationship with customers, marketing partners and carriers. Although we regularly attempt to enhance our technology platform and system infrastructure, system failures and interruptions may occur if we are unsuccessful in these efforts, if we are unable to accurately project the rate or timing of increases in our website traffic or inbound call volume or for other reasons, some of which are completely outside our control. Additionally, we are also reliant on the systems of our carriers to submit plan enrollment applications from potential customers. We have in the past, and could in the future, experience significant failures and interruptions of our systems and the systems of our carriers, which would harm our business, operating results and financial condition. If these failures or interruptions occurred during the Medicare annual enrollment period or during the open enrollment period under healthcare reform, the negative impact on us would be particularly pronounced.

We rely in part upon third-party vendors, including data center and bandwidth providers, to operate our technology platform. We cannot predict whether additional network capacity will be available from these vendors as we need it, and our network or our suppliers' networks might be unable to achieve or maintain a sufficiently high capacity of data transmission to allow us to process health insurance applications in a timely manner or effectively download data, especially if our website traffic increases. For example, a rapid expansion of our business could affect the service levels at our data centers or cause such data centers and systems to fail. Any system failure or service level reduction that causes an interruption to, or decreases the responsiveness of, our services would impair our revenue-generating capabilities and damage our reputation. In addition, any loss of data could result in loss of customers and subject us to potential liability. Our databases and systems are

37

Table of Contents

vulnerable to damage or interruption from human error, fire, floods, power loss, telecommunications failures, physical or electronic break-ins, computer viruses, acts of terrorism, other attempts to harm our systems and similar events. In addition, our operations are vulnerable to earthquakes, fires, severe weather, pandemics and other natural disasters in Illinois, North Carolina, Utah, Honduras, Slovakia and other parts of the world where we, our agents and vendors operate.

The owners of our data center facilities and our other third-party vendors have no obligation to renew their agreements with us on commercially reasonable terms, or at all. If we are unable to renew these agreements on commercially reasonable terms, or if one of our data center operators is acquired, we may be required to transfer our servers and other infrastructure to new data center facilities, and we may incur significant costs and possible service interruption in connection with doing so. Problems faced by our third-party data center locations with the telecommunications network providers with whom we or they contract, or with the systems by which our telecommunications providers allocate capacity among their clients, including us, could adversely affect the experience of our clients and consumers. Our third-party data center operators could decide to close their facilities without adequate notice. In addition, any financial difficulties, such as bankruptcy faced by our third-party data centers, operators or any of the service providers with whom we or they contract may have negative effects on our business, the nature and extent of which are difficult to predict.

### *Our ability to sell Medicare-related health insurance plans is largely dependent on our licensed health insurance agents.*

The success of our operations is largely dependent on our licensed health insurance agents, upon whom we rely to sell insurance. In order to sell Medicare-related health insurance plans, agents must be licensed by the states in which they are selling plans and certified and appointed with the carrier that offers the plans in each applicable state. Because a significant number of Medicare plans are sold in the fourth quarter each year during the Medicare annual enrollment period, we retain and train a significant number of additional employees in a limited period of time. We must also ensure that our agents are timely licensed in a significant number of states and certified and appointed with the carriers whose products we sell. We depend upon our employees, state departments of insurance and carriers for the licensing, certification and appointment of our agents. We may not be successful in timely hiring or sourcing a sufficient number of additional agents or other employees needed to operate our business. Even if we are successful in hiring or sourcing a sufficient number of agents, we may experience temporary shortages of agents due to illness, poor weather conditions or other natural disasters, personal emergencies and other events outside our control. See "—The extent to which the COVID-19 outbreak and measures taken in response thereto impact our business, results of operations and financial condition will depend on future developments, which are highly uncertain and cannot be predicted."

We have recently implemented a work from home program for our agents, partly in response to the effects from the COVID-19 pandemic. It may be more difficult for us to manage and monitor our agents in remote settings and we may have to expend more management time and incur more costs to do so. Agents may also face additional distractions working from home that may prevent them from efficiently selling plans. If our agents are not able to effectively work from home, we may not be able to sell as many plans, which would negatively impact our business, financial condition and results of operations.

Our success in recruiting highly skilled and qualified agents can depend on factors outside of our control, including the strength of the general economy and local employment markets and the availability of alternative forms of employment. During periods when we are unable to recruit high-performing agents, we tend to experience higher turnover rates. The productivity of our agents is influenced by their average tenure. Without qualified individuals to serve in customer facing roles, we may produce less commission revenue, which could have a material adverse effect on our business, operating results and financial condition.

Table of Contents

***Changes and developments in the health insurance system and laws and regulations governing the health insurance markets in the United States could materially adversely affect our business, operating results, financial condition and qualified prospects.***

Our business depends upon the public and private sector of the U.S. insurance system, which is subject to a changing regulatory environment. Accordingly, the future financial performance of our business will depend in part on our ability to adapt to regulatory developments, including changes in laws and regulations or changes to interpretations of such laws or regulations, especially laws and regulations governing Medicare. For example, in March 2010, the ACA became law. The ACA substantially changed the way healthcare is financed by both commercial and government payers and contains a number of provisions that impact our business and operations, including the expansion of Medicaid eligibility to additional categories of individuals. Since its enactment, there have been judicial and Congressional challenges to certain aspects of the ACA, and we expect there will be additional challenges and amendments to the ACA in the future. On December 14, 2018, a Texas U.S. District Court Judge ruled that the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Cuts and Jobs Act. On December 18, 2019, the U.S. Court of Appeals for the 5th Circuit ruled that the individual mandate was unconstitutional and remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. On March 2, 2020, the U.S. Supreme Court granted the petitions for writs of certiorari to review the case, although it is unclear when a decision will be made or how the Supreme Court will rule.

Additionally, ongoing health reform efforts and measures may expand the role of government-sponsored coverage, including single payer or so called "Medicare-for-All" proposals, which could have far-reaching implications for the insurance industry if enacted. Some proposals would seek to eliminate the private marketplace, whereas others would expand a government-sponsored option to a larger population. We are unable to predict the full impact of healthcare reform initiatives on our operations in light of the uncertainty of whether initiatives will be successful and the uncertainty regarding the terms and timing of any provisions enacted and the impact of any of those provisions on various healthcare and insurance industry participants. In particular, because our platform provides customers with a venue to shop for insurance policies from a curated panel of the nation's leading carriers, the expansion of government-sponsored coverage through "Medicare-for-All" or the implantation of a single payer system may materially and adversely impact our business, operating results, financial condition and prospects. We expect there will be continuing efforts to challenge, repeal, or replace the ACA, which may have a material impact on our business by eliminating Medicaid eligibility for certain patients and reducing the size of the SNP-eligible population.

Changes in laws, regulations and guidelines governing health insurance may also be incompatible with various aspects of our business and require that we make significant modifications to our existing technology or practices, which may be costly and time-consuming to implement and could also harm our business, operating results and financial condition.

We have received, and may in the future receive, inquiries from regulators regarding our marketing and business practices and compliance with laws and regulations. We may be required to modify our practices in connection with the inquiries. Failure to adequately respond to such inquiries could result in adverse regulatory action that could harm our business, operating results and financial condition. See "—The marketing and sale of Medicare plans are subject to numerous, complex and frequently changing laws, regulations and guidelines, and non-compliance with or changes in laws, regulations and guidelines could harm our business, operating results and financial condition."

Additionally, some carriers provide us with marketing development funds, consistent with CMS regulations. If regulatory developments limit or remove the ability for carriers to compensate us through these funds, or the government determines that our arrangements do not meet the regulatory requirements, the compensation we receive from carriers would decline, which would materially and adversely impact our business, operating results and financial condition.

Table of Contents

Various aspects of healthcare reform could also cause carriers to discontinue certain health insurance products or prohibit us from distributing certain health insurance products in particular jurisdictions. Our business, operating results, financial condition and prospects may be materially and adversely affected if we are unable to adapt to developments in healthcare reform in the United States.

***Our business could be harmed if we are unable to effectively advertise our products on a cost-effective basis or market the availability of our products through specific channels.***

We use the Internet, television, radio, mail, e-mail and the telephone, among other channels, to market our services and to communicate with qualified prospects or our existing customers. Some of our competitors have greater financial resources, which enable them to purchase significantly more advertising than we are able to purchase. Further, the cost of marketing and advertising may fluctuate significantly based on demand. If the cost of marketing and advertising increases for any reason, we may not be able to purchase as many advertisements as we typically would or would have to incur greater costs to do so. For example, we expect a significant increase in the demand for television and radio advertisements as we approach the U.S. presidential election in November 2020. The election coincides with the Medicare annual enrollment period, which is a period of heightened television and radio advertising for our business. As a result of this increase in demand and costs, we may not be able to purchase all of the television and radio advertising we typically purchase during a Medicare annual enrollment period or we may have to pay more to purchase television and radio advertisements, which could materially and adversely impact our business, financial condition and results of operations.

Additionally, we derive a significant portion of our website traffic from consumers who search for health insurance through Internet search engines and through social media. A critical factor in attracting consumers to our website is whether we are prominently displayed in response to an Internet search relating to health insurance or on a social media platform. Search engines typically provide two types of search results, algorithmic listings and paid advertisements. We rely primarily on paid advertisements to attract consumers to our websites and otherwise generate demand for our services. To the extent the competition for advertising is high, we may experience increases in the cost of paid Internet search advertising and social media advertising. Further, the competition for search engine placement and social media presence increases substantially during the enrollment periods for Medicare-related health insurance and for individual and family health insurance. If paid search advertising costs or social media advertising costs increase or become cost prohibitive, whether as a result of competition, algorithm changes or otherwise, our advertising expenses could rise significantly or we could reduce or discontinue our paid search advertisements or social media advertisements, in either case which would harm our business, operating results and financial condition.

Our ability to advertise is also dependent on the laws and regulations governing the advertising and marketing of health insurance products and our other products or services, which continue to evolve and carry significant penalties for violations of law. Changes in technology, the marketplace or consumer preferences may lead to the adoption of additional laws or regulations or changes in interpretation of existing laws or regulations. If new laws or regulations are adopted, or existing laws and regulations are interpreted or enforced, to impose additional restrictions on our ability to advertise to our customers or qualified prospects, we may not be able to communicate with them in a cost-effective manner.

For example, Internet service providers, e-mail service providers and others attempt to block the transmission of unsolicited e-mail, commonly known as "spam." Many Internet and e-mail service providers have relationships with organizations whose purpose it is to detect and notify the Internet and e-mail service providers of entities that the organization believes are sending unsolicited e-mail. If an Internet or e-mail service provider identifies e-mail from us as "spam" as a result of reports from these organizations or otherwise, we can be placed on a restricted list that will block our e-mail to customers or qualified prospects. Further, we are subject to the CAN-SPAM Act, which regulates commercial e-mail messages and specifies penalties for the transmission of commercial e-mail messages that do not comply with certain requirements, such as providing an opt-out mechanism for stopping future e-mails from senders.

40

Table of Contents

We also use telephones to communicate with and market to customers and prospective customers and some of these communications may be subject to the Telephone Consumer Protection Act, or TCPA, and other telemarketing laws. The TCPA and other laws, including state laws, relating to telemarketing restrict our ability to market and engage in other communications using the telephone in certain respects. For instance, the TCPA prohibits us from using an automatic telephone dialing system to make certain telephone calls or transmit text messages to wireless telephone numbers without prior express consent or without consulting the FTC's national "Do Not Call" registry. We have policies and technical controls in place to comply with the TCPA and other telemarketing laws, including processes and procedures to consult the "Do Not Call" registry and to ensure that automated telephone calls are not performed without obtaining prior consent. However, despite our legal compliance, we have in the past and may in the future become subject to claims that we have violated the TCPA and/or other telemarketing laws. See "—From time to time we are subject to various legal proceedings which could adversely affect our business, financial condition or results of operations." The TCPA provides for private rights of action and potential statutory damages for each violation and additional penalties for each willful violation, and other telemarketing laws may entail additional remedies. In the event that we are found to have violated the TCPA and/or other telemarketing laws, our business, operating results and financial condition could be harmed and liability incurred. In addition, telephone carriers may block or put customer warnings on calls originating from call centers. Customers increasingly screen their incoming e-mails, telephone calls, and text messages, including by using screening tools and warnings, and, therefore, our customers or qualified prospects may not reliably receive our communications. If we are unable to communicate effectively by e-mail or telephone with our customers and qualified prospects as a result of legislation, blockage, screening technologies or otherwise, our business, operating results and financial condition would be harmed.

### *We currently depend on a small group of carriers for a substantial portion of our revenue.*

We derive a large portion of our revenue from a limited number of carriers. Carriers owned by Humana and Anthem accounted for (i) approximately 42% and 32%, respectively, of net revenues for the three months ended March 31, 2020 and 28% and 15%, respectively, of net revenues for the three months ended March 31, 2019, approximately 40% and 20%, respectively, of net revenues for the Pro Forma Fiscal Year 2019 and 25% and 8%, respectively, of net revenues for the year ended December 31, 2018; (ii) approximately 47% and 38%, respectively, of Medicare—Internal segment revenue for the three months ended March 31, 2020, and 60% and 22%, respectively, of Medicare—Internal segment revenue for the three months ended March 31, 2019, approximately 51% and 23%, respectively, of Medicare—Internal segment revenue for the Pro Forma Fiscal Year 2019, and 63% and 15%, respectively, of Medicare—Internal segment revenue for the year ended December 31, 2018; and (iii) approximately 55% and 31%, respectively, of Medicare—External segment revenue for the three months ended March 31, 2020 and 36% and 27%, respectively, of Medicare—External segment revenue for the three months ended March 31, 2019, approximately 46% and 32%, respectively, of Medicare—External segment revenue for the Pro Forma Fiscal Year 2019, and 41% and 18%, respectively, of Medicare—External segment revenue for the year ended December 31, 2018. In addition, carriers owned by UnitedHealth Group represented approximately 37% and 29% of IFP and Other—Internal segment revenue for the three months ended March 31, 2020 and for the three months ended March 31, 2019, respectively, approximately 27% and 11% of IFP and Other—Internal segment revenue for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, respectively, and 55% and 37% of IFP and Other—External segment revenue for the three months ended March 31, 2020 and 2019, respectively, and 41% and 19% of IFP and Other—External segment revenue for the Pro Forma Fiscal Year 2019 and year ended December 31, 2018, respectively.

Our agreements with carriers to sell policies are typically terminable by our carriers without cause. Should we become dependent on fewer carrier relationships (whether as a result of the termination of carrier relationships, carrier consolidation or otherwise), we may become more vulnerable to adverse changes in our relationships with carriers, particularly in states where we distribute insurance from a relatively smaller number of carriers or where a small number of carriers dominate the market, and our business, operating results and financial condition could be harmed.

41

Table of Contents

***If investments we make in enrollment periods do not result in a significant number of Approved Submissions, our business, operating results and financial condition would be harmed.***

In an attempt to attract and enroll a large number of individuals during the Medicare annual enrollment period and the healthcare reform open enrollment period, we may invest in areas of our business, including technology and content, customer care and enrollment, and marketing and advertising. We have in the past made investments in areas of our business in advance of enrollment periods that have not yielded the results we expected when making those investments. Any investment we make in any enrollment period may not result in a significant number of Approved Submissions to offset the investments we make. To the extent our investment does not yield a significant number of Approved Submissions, our business, operating results and financial condition would be harmed.

***We rely on carriers to prepare accurate commission reports and send them to us in a timely manner.***

Our carriers typically pay us a specified percentage of the premium amount collected by the carrier or a flat rate per policy during the period that a consumer maintains coverage under a policy. We rely on carriers to report the amount of commissions we earn accurately and on time. We use carriers' commission reports to calculate our revenue, prepare our financial reports, projections, and budgets and direct our marketing and other operating efforts. It is often difficult for us to independently determine whether carriers are reporting all commissions due to us, primarily because the majority of the purchasers of our insurance products who terminate their policies do so by discontinuing their premium payments to the carrier instead of informing us of the cancellation. For example, there have been instances where we have determined that policy cancellation data reported to us by a carrier has not been accurate. To the extent that carriers inaccurately or belatedly report the amount of commissions due to us, we may not be able to collect and recognize revenue to which we are entitled, which would harm our business, operating results and financial condition. In addition, the technological connections of our systems with the carriers' systems that provide us up-to-date information about coverage and commissions could fail or carriers could cease providing us with access to this information, which could impede our ability to compile our operating results in a timely manner.

***Changes in the health insurance market or in the variety, quality and affordability of the insurance products offered by carriers could harm our business, operating results and financial condition.***

The demand for our agency services is impacted by the variety, quality and price of the insurance products we distribute. If insurance carriers do not continue to provide us with a variety of insurance products, or if as a result of consolidation in the insurance industry or for any other reason the choices of carrier products that we are able to offer are limited, our sales may decrease and our business, operating results and financial condition could be harmed.

***Our quarterly results of operations may fluctuate significantly due to seasonality.***

The Medicare annual enrollment period occurs from October 15th to December 7th each year. As a result, we experience an increase in the number of submitted Medicare-related applications during the fourth quarter and an increase in expense related to the Medicare segments during the third and fourth quarters. Additionally, as a result of the annual Medicare Advantage open enrollment period that occurs from January 1st to March 31st, commission revenue is typically second-highest in our first quarter. The individual and family health insurance open enrollment period runs from November 1st through December 15th of each year for most states, and we expect the number of approved applications for individual and family health insurance to be higher in the fourth quarter compared to other quarters of the year as a result. A significant portion of our marketing and advertising expenses is driven by the number of health insurance applications submitted through us. Marketing and advertising expenses are generally higher in the fourth quarter during the Medicare annual enrollment period, but because commissions from approved customers are paid to us over time, our operating cash flows could be adversely impacted by a substantial increase in marketing and advertising expense as a result of a higher volume of applications submitted during the fourth quarter or positively impacted by a substantial decline in marketing and advertising expenses as a result of lower volume of applications submitted during the fourth quarter.

42

Table of Contents

The seasonality of our business could change in the future due to other factors, including as a result of changes in timing of the Medicare or individual and family health plan enrollment periods and changes in the laws and regulations that govern the sale of health insurance. We may not be able to timely adjust to changes in the seasonality of our business. If the timing of the enrollment periods for Medicare-related health insurance or individual and family health insurance changes, we may not be able to timely adapt to changes in customer demand. If we are not successful in responding to changes in the seasonality of our business, our business, operating results and financial condition could be harmed.

### Pressure from existing and new competitors may adversely affect our business, operating results and financial condition.

Our competitors provide services designed to help customers shop for insurance. Some of these competitors include:

- companies that operate insurance search websites or websites that provide quote information or the opportunity to purchase insurance products online, including aggregators and lead generators;

- companies that advertise primarily through the television;

- individual insurance carriers, including through the operation of their own websites, physical storefront operations and broker arrangements;

- traditional insurance agents or brokers; and

- field marketing organizations.

New competitors may enter the market for the distribution of insurance products with competing insurance platforms, which could have an adverse effect on our business, operating results and financial condition. Our competitors could significantly impede our ability to maintain or increase the number of policies sold through our platform and may develop and market new technologies that render our platform less competitive or obsolete. In addition, if our competitors develop platforms with similar or superior functionality to ours and we are not able to produce certain volumes for our carriers, we may see a reduction in our production bonuses or marketing payments and our revenue would likely be reduced and our business, operating results and financial condition would be adversely affected.

### If we do not successfully compete with government-run health insurance exchanges, our business may be harmed.

Our business competes with government-run health insurance exchanges with respect to our sale of Medicare-related health insurance and individual and family plans. Consumers can shop for and purchase Medicare Advantage and Medicare Part D Prescription Drug plans through a website operated by the federal government and can also obtain plan selection assistance from the federal government in connection with their purchase of a Medicare Advantage and Medicare Part D Prescription Drug plan. Competition from government-run health insurance exchanges could increase our marketing costs, reduce our revenue and could otherwise harm our business, operating results and financial condition.

### If we fail to comply with certain healthcare laws, including fraud and abuse laws, we could face substantial penalties and our business, results of operations and financial condition could be adversely affected.

Our arrangements with carriers, particularly those that contract with federal healthcare care programs, are highly regulated and subject us to broadly applicable federal and state fraud and abuse and other federal and state healthcare laws and regulations. These laws may constrain the business or financial arrangements and relationships through which we conduct our operations, including the following:

- the federal Anti-Kickback Statute, which prohibits, among other things, persons or entities from knowingly and willfully soliciting, offering, receiving or providing any remuneration (including any

43

Table of Contents

kickback, bribe or certain rebates), directly or indirectly, overtly or covertly, in cash or in kind, in return for, either the referral of an individual or the purchase, lease, or order, or arranging for or recommending the purchase, lease, or order of any good, facility, item or service, for which payment may be made, in whole or in part, under a federal healthcare program such as Medicare and Medicaid. The term remuneration has been interpreted broadly to include anything of value. The federal Anti-Kickback Statute has been interpreted to apply to, among others, financial arrangements between entities that have the ability to refer and generate business that is subject to reimbursement under federal healthcare programs. There are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution. The exceptions and safe harbors are drawn narrowly and practices that involve remuneration that may be alleged to be intended to induce prescribing, purchasing, ordering, or recommending may be subject to scrutiny if they do not qualify for an exception or safe harbor. Failure to meet all of the requirements of an applicable statutory exception or regulatory safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not in all cases meet all of the criteria for protection under a statutory exception or regulatory safe harbor. A person or entity does not need to have actual knowledge of the federal Anti-Kickback Statute or specific intent to violate it in order to have committed a violation, and a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act (described immediately below);

- the federal false claims, including the civil False Claims Act, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making or causing to be made a false statement to avoid, decrease or conceal an obligation to pay money to the federal government. The False Claims Act can be enforced by private citizens through civil qui tam actions. A claim includes "any request or demand" for money or property presented to the U.S. government;

- the federal beneficiary inducement civil monetary laws, which generally prohibit giving something of value to an individual if the remuneration is likely to influence that beneficiary's choice of a particular provider, supplier or practitioner for services covered by applicable federal healthcare programs. There are a number of exceptions, such as, remuneration that "promotes access to care and poses a low risk of harm to patients and federal healthcare programs." A violation of this statute includes fines or exclusion from federal healthcare programs;

- HIPAA, which created additional federal criminal statutes that prohibit, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud or to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property owned by, or under the control or custody of, any healthcare benefit program, including private third-party payers, willingly obstructing a criminal investigation of a healthcare offense, and knowingly and willfully falsifying, concealing or covering up by trick, scheme or device, a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, a person or entity need not have actual knowledge of the statute or specific intent to violate it in order to have committed a violation; and

- analogous state and foreign laws and regulations, such as state anti-kickback and false claims laws, which may be more restrictive and may apply to healthcare items or services reimbursed by non-governmental third-party payors, including private insurers, or by the patients themselves.

Ensuring business arrangements with third parties comply with applicable healthcare laws and regulations is a costly endeavor. If our operations are found to be in violation of any of the federal and state healthcare laws described above or any other current or future governmental regulations that apply to us, we may be subject to

44

Table of Contents

penalties, including without limitation, civil, criminal and/or administrative penalties, damages, fines, disgorgement, individual imprisonment, exclusion from participation in government programs, such as Medicare and Medicaid, injunctions, private "qui tam" actions brought by individual whistleblowers in the name of the government, or refusal to allow us to enter into government contracts, contractual damages, reputational harm, administrative burdens, diminished profits and future earnings, additional reporting obligations and oversight if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***We operate in a complex state regulatory environment that is constantly changing. If we fail to comply with the numerous state laws and regulations that are applicable to the sale of health insurance, our business, operating results and financial condition could be harmed.***

The offer, sale and purchase of health insurance is heavily regulated by various states and the regulatory landscape is constantly changing. States have adopted and will continue to adopt new laws and regulations, including in response to healthcare reform legislation and it is difficult to predict how these new laws and regulations will impact our business. In some cases such laws and regulations could amplify the adverse impacts of healthcare reform to our business, or states may adopt new requirements that adversely impact our business, operating results and financial condition. For example, certain states have adopted or are contemplating rules and regulations that would either ban the sale of individual and family plans that do not qualify as minimum essential coverage under the ACA (such as short-term health insurance), limit the duration and renewability of those plans, or apply certain aspects of the ACA to those plans, such as the essential health benefits or requiring that such plans cover pre-existing conditions. Rules and regulations, such as these could adversely impact our sale of individual and family plans for several reasons, including because carriers may exit the market of selling such plans due to regulatory concerns, determine it is not profitable to sell the plans or increase plan premiums to a degree that reduces customer demand for them.

Additionally, a long-standing provision in almost all states' laws provides that once health insurance premiums are set by the carrier and approved by state regulators, they are fixed and not generally subject to negotiation or discounting by insurance companies or agents. Additionally, state regulations generally prohibit carriers, agents and brokers from providing financial incentives, such as rebates, to their customers in connection with the sale of health insurance. As a result, we do not currently compete with carriers or other agents and brokers on the price of the health insurance plans offered on our website. If these regulations change, we could be forced to reduce prices or provide rebates or other incentives for the health insurance plans sold through our technology platform, which would harm our business, operating results and financial condition. Although commissions do not currently have to be disclosed to the public, if commissions become more regulated and commissions paid to us have to be disclosed, it is possible that carriers may lower our commission rates, which could reduce our revenue.

We rely heavily on SNPs during the special enrollment periods, which allows us to utilize our agents throughout the year. If states adopt new laws and regulations or modify the existing laws and regulations governing Medicaid, such changes could decrease the number of individuals eligible for D-SNP, which could have a material adverse impact on our business, operating results and financial condition.

State regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to that state. We must maintain our health insurance licenses to continue selling plans and to continue to receive commissions from carriers. In addition, each employee who transacts health insurance business on our behalf must maintain a valid license in one or more states. Because we do business in all 50 states and the District of Columbia, compliance with health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business. Each jurisdiction's insurance department typically has the power, among other things, to:

- grant and revoke licenses to transact insurance business;

45

Table of Contents

- conduct inquiries into the insurance-related activities and conduct of agents and agencies;

- require and regulate disclosure in connection with the sale and solicitation of health insurance;

- authorize how, by which personnel and under what circumstances insurance premiums can be quoted and published and an insurance policy sold;

- approve which entities can be paid commissions from carriers and the circumstances under which they may be paid;

- regulate the content of insurance-related advertisements, including web pages, and other marketing practices;

- approve policy forms, require specific benefits and benefit levels and regulate premium rates;

- impose fines and other penalties; and

- impose continuing education requirements.

In addition, we must ensure that our agents have received all licenses, appointments and certifications required by state authorities and our carriers in order to transact business. If the relevant state authorities or our carriers experience shutdowns or continued business disruptions due to the COVID-19 pandemic, we may be unable to secure these required licenses, appointments and certifications for our agents in a timely manner, or at all.

Due to the complexity, periodic modification and differing interpretations of state insurance laws and regulations, we may not have always been, and we may not always be, in compliance with them. New state insurance laws, regulations and guidelines also may not be compatible with the sale of health insurance over the Internet or with various aspects of our platform or manner of marketing or selling health insurance plans. Failure to comply with insurance laws, regulations and guidelines or other laws and regulations applicable to our business could result in significant liability, additional department of insurance licensing requirements, required modification of our advertising and business practices, the revocation of our licenses in a particular jurisdiction, termination of our relationship with carriers, loss of commissions and/or our inability to sell health insurance plans, which could significantly increase our operating expenses, result in the loss of carrier relationships and our commission revenue and otherwise harm our business, operating results and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status, business or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm consumer, marketing partner or carrier confidence in us, which could significantly damage our brand.

*If we are not successful in cost-effectively converting consumer leads into customers for which we receive commissions, our business, operating results and financial condition would be harmed.*

Obtaining quality consumer leads is important to our business, but our ability to convert these consumer leads to customers is also a key to our success. Our growth depends in large part upon growth in Approved Submissions in a given period. The rate at which we grow our Approved Submissions directly impacts our revenue. In addition, the rate at which Submitted Policies turn into commissionable Approved Submissions impacts the expected LTV of our customers, which impacts the revenue that we are able to recognize. A number of factors have influenced, and could in the future influence, these conversion rates for any given period, some of which are outside of our control. These factors include:

- changes in customer shopping behavior due to circumstances outside of our control, such as economic conditions, customers' ability or willingness to pay for health insurance, adverse weather conditions or natural disasters, the effects of pandemics, such as COVID-19, availability of unemployment benefits or proposed or enacted legislative or regulatory changes impacting our business, including healthcare reform;

46

Table of Contents

- the quality of, and changes to, the customer experience on our platform;

- regulatory requirements, including those that make the experience on our platform cumbersome or difficult to navigate or reduce the ability of customers to purchase plans outside of enrollment periods;

- the variety, competitiveness and affordability of the health insurance plans that we offer;

- system failures or interruptions in the operation of our technology platform or call center operations;

- changes in the mix of customers who are referred to us through our direct, marketing partner and online advertising customer acquisition channels;

- carriers offering health insurance plans for which customers have expressed interest, and the degree to which our technology is integrated with those carriers;

- carrier guidelines applicable to applications submitted by customers, the amount of time a carrier takes to make a decision on that application and the percentage of submitted applications approved by carriers;

- the effectiveness of agents in assisting customers; and

- our ability to enroll subsidy-eligible individuals in qualified health plans through government-run health insurance exchanges and the efficacy of the process we are required to use to do so.

Our conversion rates can be impacted by changes in the mix of customers referred to us through our customer acquisition channels. We may make changes to our technology platform in response to regulatory requirements or undertake other initiatives in an attempt to improve the customer experience or for other reasons. These changes have in the past, and may in the future have the unintended consequence of adversely impacting our conversion rates. A decline in the percentage of consumers who submit health insurance applications on our platform and are converted into approved customers could cause an increase in our CAC and impact our revenue in any given period. To the extent our conversion rate suffers, our customer base may decline, which would harm our business, operating results and financial condition.

*We receive commission payments from carriers over time, but incur significant upfront expenses to enroll customers.*

The enrollment of consumers on our platform requires significant upfront expenses, including marketing and advertising expenses and customer care and enrollment expenses, in order to generate qualified prospects, educate and enroll those consumers in our products and plans, and submit completed applications to carriers. However, the resulting commissions are generally paid to us over time, with the first payments often several weeks or months after we submit completed applications to our carriers. These factors cause us to require significant cash to fund our working capital needs, and our operating cash flows could be adversely impacted by a substantial increase in the volume of applications submitted by us.

*If we are unable to maintain effective relationships with our existing third-party marketing companies or if we do not establish successful relationships with new marketing companies our business, operating results and financial condition could be harmed.*

We frequently enter into contractual marketing relationships with online and offline businesses that help us acquire consumer leads. These marketing partners include television advertisers, online advertising companies, call referral programs, and other marketing vendors. We compensate some marketing companies on a fee-per-service model and some on a submitted health insurance application basis. The success of our relationship with each marketing company is dependent on a number of factors, including but not limited to: the continued positive market presence, reputation and growth of the marketing company, the effectiveness of the marketing company's advertisements, the compliance of each marketing company with applicable laws, regulations and guidelines and the contractual terms we negotiate with the marketing company, including the marketing fees we agree to pay.

47

Table of Contents

While we have relationships with a large number of marketing companies, we depend upon services and/or referrals from only a limited number for a significant portion of the submitted applications we receive. Given our reliance on various marketing companies, our business operating results and financial condition would be harmed if (i) we are unable to maintain successful relationships with these companies; (ii) we fail to establish successful relationships with new marketing companies; (iii) we experience competition in our provision of services from key marketing companies; and (iv) if we are required to pay increased amounts to these marketing companies.

Competition for referrals from third-party lead referral companies has increased particularly during the enrollment periods for Medicare-related health insurance and individual and family health insurance. We may lose referrals if our competitors pay these companies more than we do or be forced to pay increased fees, which could harm our business, operating results and financial condition. In addition, the promulgation of laws, regulations or guidelines, or the interpretation of existing laws, regulations and guidelines, by state departments of insurance or by CMS, could cause our relationships with third-party referral companies to be in non-compliance with those laws, regulations and guidelines. If CMS or state departments of insurance were to change existing laws, regulations or guidelines, or interpret existing laws, regulations or guidelines, to prohibit these arrangements, we could experience a significant decline in the number of Medicare-eligible individuals who are referred to our platforms and Benefits Center, which would harm our business, operating results and financial condition.

### *If we lose key management or fail to meet our need for qualified employees, our business, financial condition and results of operations could be materially adversely affected.*

We rely, in part, upon the accumulated knowledge, skills and experience of our executive officers. Our Chief Executive Officer has been with us for more than 19 years and our executive officers have a combined total of 63 years of experience in the health insurance industry. The loss of the services of any of our executive officers could have a material adverse effect on our business, financial condition and results of operations, as we may not be able to find suitable individuals to replace such officers on a timely basis or without incurring increased costs, or at all. We currently do not have any key man insurance covering our Chief Executive Officer. If our executive officers were to leave us or become incapacitated, it might negatively impact our planning and execution of business strategy and operations. We believe that our future success will depend on our continued ability to attract and retain highly skilled and qualified executive personnel for all areas of our organization, for which there is a high level of competition for such personnel in our industry. Our inability to meet our executive staffing requirements in the future could have a material adverse effect on our business, financial condition and results of operations.

Our future success is also dependent upon our ability to attract, retain and effectively deploy qualified employees. We may need to offer higher compensation and other benefits in order to attract and retain key personnel in the future. To attract top talent, we must offer competitive compensation packages before we have the opportunity to validate the productivity and effectiveness of new employees. Additionally, we may not be able to hire new employees quickly enough, we may not have adequate resources to meet our hiring needs, and we may not effectively deploy our workforce in order to efficiently allocate our internal resources. If we fail to meet our hiring needs, successfully integrate our new hires or effectively deploy our existing personnel, our efficiency and ability to meet our forecasts, our ability to successfully execute on our strategic plan to return to revenue growth and our employee morale, productivity and retention could all suffer. Any of these factors could materially adversely affect our business, operating results and financial condition.

### *We are subject to privacy and data protection laws governing the transmission, security and privacy of personal information, particularly individually identifiable health information, which may impose restrictions on the manner in which we process such information and subject us to enforcement and penalties if we are unable to fully comply with such laws.*

Numerous federal, state and international laws and regulations govern the collection, use, disclosure, storage, processing, transmission and destruction of personal information, including individually identifiable health

48

information. These laws and regulations, including their interpretation by governmental agencies and regulators, are subject to frequent change. These regulations could have a negative impact on our business, for example:

- HIPAA and its implementing regulations were enacted to ensure that employees can retain and at times transfer their health insurance when they change jobs, and to simplify healthcare administrative processes. The enactment of HIPAA also expanded protection of the privacy and security of protected health information and required the adoption of standards for the exchange of electronic health information. Among the standards that the Department of Health and Human Services has adopted pursuant to HIPAA are standards for electronic transactions and code sets, unique identifiers for providers, employers, health plans and individuals, security, electronic signatures, privacy and enforcement. Failure to comply with HIPAA could result in enforcement activity, fines, penalties and litigation that could have a material adverse effect on us;

- The HITECH Act sets forth health information security breach notification requirements and increased penalties for violation of HIPAA. The HITECH Act requires individual notification for all breaches, media notification of breaches of over 500 individuals and at least annual reporting of all breaches to the Department of Health and Human Services. The HITECH Act also replaced the prior penalty system of one tier of penalties of $100 per violation and an annual maximum of $25,000 with a four-tier system of sanctions for breaches ranging from the original $100 per violation and an annual maximum of $25,000 for the first tier to a fourth-tier minimum of $50,000 per violation and an annual maximum of $1.5 million per violation category. These penalties are required to be adjusted for inflation. Failure to comply with the HITECH Act could result in enforcement activity, fines, penalties and litigation that could have a material adverse effect on us;

- Other federal and state laws restricting the use and protecting the privacy and security of individually identifiable information may apply, many of which are not preempted by HIPAA; and

- Federal and state consumer protection laws are increasingly being applied by the FTC, and states' attorneys general to regulate the collection, use, processing, destruction, storage and disclosure of individually identifiable information, through websites or otherwise, and to regulate the presentation of website content.

We are required to comply with federal and state laws governing the transmission, security and privacy of personal information that we may obtain or have access to in connection with the provision of our services. Despite the security measures that we have in place to ensure compliance with privacy and data protection laws, our facilities and systems, and those of our third-party vendors and subcontractors, are vulnerable to security breaches, acts of vandalism or theft, computer viruses, malware, ransomware, denial-of-service attacks, misplaced or lost data, programming and human errors or other similar events. Due to the enactment of the HITECH Act, we are not able to predict the extent of the impact such incidents may have on our business. Our failure to comply may result in criminal and civil liability especially because the potential for enforcement action against business associates is now greater. Enforcement actions against us could be costly and could interrupt regular operations or the availability of data, which may adversely affect our business. While we have received inquiries relating to our compliance with various privacy acts, including inquiries originating from allegations of a potential breach, to date none have been found or determined to be actual violations by the Company.

Under the HITECH Act, as a business associate we may also be directly or independently liable for privacy and security breaches and failures of our subcontractors. Even though we provide for appropriate protections through our agreements with our subcontractors and exercise appropriate oversight of such subcontractors, we still have limited control over their actions and practices. A breach of privacy or security of individually identifiable health information by a subcontractor or other entity operating on our behalf may result in an enforcement action, including criminal and civil liability, against us or litigation by a covered entity with whom we have a contractual relationship. In addition, numerous other federal and state laws protect the confidentiality of individually identifiable information as well as employee personal information, including state medical privacy laws, state social security number protection laws, and federal and state consumer protection laws. These various laws in

49

Table of Contents

many cases are not preempted by HIPAA and may be subject to varying interpretations by the courts and government agencies, creating complex compliance issues for us and our customers and potentially exposing us to additional expense, adverse publicity and liability, any of which could adversely affect our business, operating results and financial condition.

State and federal laws may apply to our collection, use, handling, processing, destruction, disclosure, and storage as well. For example, the California Consumer Privacy Act of 2018, or the CCPA, effective as of January 1, 2020, affords consumers expanded privacy protections and control over the collection, use and sharing of their personal information. The CCPA was recently amended, and it is possible it will be amended again by other pending legislative initiatives or by popular referendum. The Attorney General of California is promulgating implementing CCPA regulations which are undergoing successive rounds of public comment and revision. The potential effects of this legislation, including whether and how the law will be applied to the consumer health-related data we collect through our service, are far-reaching and may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply. The CCPA gives California residents expanded rights to access and require deletion of their personal information, opt out of certain personal information sharing and receive detailed information about how their personal information is used. The CCPA also provides for civil penalties for violations, as well as a private right of action for data breaches that may increase data breach litigation. The CCPA does contain an exemption for medical information governed by the California Confidentiality of Medical Information Act (CMIA), and for protected health information collected by a covered entity or business associate governed by the privacy, security and breach notification rule established pursuant to HIPAA and HITECH, but the precise application and scope of this exemption as well as how it would apply to our business is not yet clear.

With laws and regulations such as HIPAA and the CCPA imposing relatively burdensome obligations, and with substantial uncertainty over the interpretation and application of these and other laws and regulations to our business, we may face challenges in addressing their requirements and making necessary changes to our policies and practices, and may incur significant costs and expenses in an effort to do so. For example, the increased consumer control over the sharing of their personal information under the CCPA may affect our customers' ability to share such personal information with us or may require us to delete or remove consumer information from our records or data sets, which may create considerable costs or loss of revenue for our organization.

In addition, any failure or perceived failure by us to maintain posted privacy policies which are accurate, comprehensive and fully implemented, and any violation or perceived violation of our privacy-, data protection- or information security-related obligations to customers, users or other third parties or any of our other legal obligations relating to privacy, data protection or information security may result in governmental investigations or enforcement actions, litigation, claims or public statements against us by consumer advocacy groups or others, and could result in significant liability, loss of relationships with key third parties including carriers, social media networks and other data providers, or cause our consumers to lose trust in us, which could have material impacts on our revenue and operations.

***We may not be able to maintain compliance with all current and potentially applicable U.S. federal and state or foreign laws and regulations relating to privacy and cybersecurity, and actions by regulatory authorities or changes in legislation and regulation in the jurisdictions in which we operate could have a material adverse effect on our business.***

We are subject to a variety of laws and regulations that involve user privacy and the collection, processing, storing, sharing, disclosing, using, transfer and protecting of personal information and other data. These laws and regulations constantly evolve and remain subject to significant change. In addition, the application and interpretation of these laws and regulations are often uncertain. Because we store, process and use data, some of which contain personal information, we are subject to complex and evolving federal, state and local laws and regulations regarding privacy, data protection and other matters. Many of these laws and regulations are subject to change and uncertain interpretation. The U.S. federal and state governments and agencies may in the future

50

Table of Contents

enact new legislation and promulgate new regulations governing collection, use, disclosure, storage, processing, transmission and destruction of personal information and other data. New privacy laws add additional complexity, requirements, restrictions and potential legal risk, require additional investment in resources to compliance programs, and could impact trading strategies and availability of previously useful data.

The New York Department of Financial Services, or NYDFS, Cybersecurity Regulation for financial services companies, including insurance entities under NYDFS jurisdiction, requires entities to establish and maintain a cybersecurity program designed to protect private consumer data, and implement a risk assessment designed to perform core cybersecurity functions. The regulation specifically provides for: (i) controls relating to the governance framework for a cybersecurity program; (ii) risk-based minimum standards for technology systems for data protection; (iii) minimum standards for cyber breach responses, including notice to the NYDFS, of material events; and (iv) identification and documentation of material deficiencies, remediation plans and annual certification of regulatory compliance with the NYDFS. The Cybersecurity Regulation also requires implementation of continuous monitoring of information technology systems or periodic penetration testing and vulnerability assessments. Similarly, the Massachusetts data protection law and the New York Stop Hacks and Improve Data Security Act, or SHIELD Act, both require companies to implement a written information security program that contains appropriate administrative, technical, and physical safeguards as defined in the respective statute.

In October 2017, the National Association of Insurance Commissioners, or NAIC, adopted the Insurance Data Security Model Law, or the Cybersecurity Model Law, which is intended to establish the standards for data security and for the investigation and notification of data breaches applicable to insurance licensees in states adopting such law. To date, the Cybersecurity Model Law has been adopted by Alabama, Connecticut, Delaware, Michigan, Mississippi, New Hampshire, Ohio and South Carolina, with several other states expected to adopt in the near future. The Cybersecurity Model Law could impose significant new regulatory burdens intended to protect the confidentiality, integrity and availability of information systems. The NAIC model law is functionally similar to the NYDFS rule.

In addition, the California legislature enacted the CCPA in September 2018, which entered into effect in January 2020, and has encouraged "copycat" legislative proposals in other states across the country such as Nevada, Virginia, New Hampshire, Illinois and Nebraska. These legislative proposals may add additional complexity, variation in requirements, restrictions and potential legal risk, require additional investment in resources to compliance programs, and could impact strategies and availability of previously useful data.

Compliance with existing and emerging privacy and cybersecurity laws and regulations could result in increased compliance costs and/or lead to changes in business practices and policies, and any failure to protect the confidentiality of client information could adversely affect our reputation, lend to private litigation against us, and require additional investment in resources, impact strategies and availability of previously useful data any of which could materially and adversely affect our business, operating results and financial condition.

### *Risks from third-party products could adversely affect our businesses.*

We offer third-party health insurance products. Insurance involves a transfer of risk and our reputation may be harmed and we may become a target for litigation if risk is not transferred in the way expected by customers and carriers. In addition, if these insurance products do not generate competitive risk-adjusted returns that satisfy our carriers, it may be difficult to maintain existing business with, and attract new business from, them. Significant declines in the performance of these third-party products could subject us to reputational damage and litigation risk.

### *Our ability to match consumers to insurance products that suit their needs is dependent upon their provision of accurate information during the insurance shopping process.*

Our business depends on consumers' provision of accurate information during the insurance shopping process. To the extent consumers provide us with inaccurate information, the quality of their insurance shopping

51

Table of Contents

experience may suffer and we may be unable to match them with insurance products that suit their needs. Our inability to suggest suitable insurance products to consumers could lead to an increase in the number of policies we submit to carriers that are ultimately rejected or an increase in plans that are cancelled earlier than expected or otherwise terminated, which could materially and adversely affect our business, operating results and financial condition.

***Our international operations subject us to additional risks which could have an adverse effect on our business, operating results and financial condition.***

We have attempted to control our operating expenses by utilizing lower cost labor in foreign countries such as Slovakia and Honduras and we may in the future expand our reliance on offshore labor to other countries. As of March 31, 2020, 47 of our employees were based in Slovakia. Our employees in Slovakia help develop, test and maintain our Marketplace technology. Additionally, we outsource certain of our call center operations to a company in Honduras. Countries outside of the United States may be subject to relatively higher degrees of political and social instability and may lack the infrastructure to withstand political unrest or natural disasters. The occurrence of natural disasters, pandemics, such as COVID-19, or political or economic instability in these countries could interfere with work performed by these labor sources, or could result in our having to replace or reduce these labor sources. Our vendors in other countries could potentially shut down suddenly for any reason, including financial problems or personnel issues. Such disruptions could decrease efficiency, increase our costs and have an adverse effect on our business or results of operations.

The practice of utilizing labor based in foreign countries has come under increased scrutiny in the United States. Governmental authorities, including CMS, could seek to impose financial costs or restrictions on foreign companies providing services to customers or companies in the United States. Governmental authorities may attempt to prohibit or otherwise discourage us from sourcing services from offshore labor. In addition, carriers may require us to use labor based in the United States for regulatory or other reasons. To the extent that we are required to use labor based in the United States, we may face increased costs as a result of higher-priced United States-based labor.

The FCPA and other applicable anti-corruption laws and regulations prohibit certain types of payments by our employees, vendors and agents. Any violation of the applicable anti-corruption laws or regulations by us, our subsidiaries or our local agents could expose us to significant penalties, fines, settlements, costs and consent orders that may curtail or restrict our business as it is currently conducted and could have an adverse effect on our business, financial condition or results of operations.

Weakness of the United States dollar in relation to the currencies used in these foreign countries may also reduce the savings achievable through this strategy and could have an adverse effect on our business, financial condition and results of operations.

***If we are not able to maintain and enhance our brand, our business and operating results will be harmed. Damage to our reputation and negative publicity could have a material adverse effect on our business, financial condition and results of operations.***

We believe that maintaining and enhancing our brand identity is critical to our relationships with our existing carriers and to our ability to attract new customers, marketing partners and carriers. We also intend to grow our brand awareness among consumers, marketing partners and carriers in order to further expand our marketplace and attract new consumers, marketing partners and carriers. The promotion of our brand in these and other ways may require us to make substantial investments and we anticipate that, as our market becomes increasingly competitive, these branding initiatives may become increasingly difficult and expensive. Our brand promotion activities may not be successful or yield increased revenue, and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur and our operating results could be harmed. If we do not successfully maintain and enhance our brand, our business may not grow and we could lose our

52

relationships with carriers, marketing partners or customers, which would harm our business, operating results and financial condition.

We may be adversely affected by negative publicity relating to brand and activities. For instance, if our brand receives negative publicity, the number of customers visiting our platforms or Benefits Center could decrease, and our cost of acquiring customers could increase as a result of a reduction in the number of consumers coming from our direct customer acquisition channel. Additionally, there is at least one other third party business which uses the "GoHealth" name, but is not affiliated with our business. While we agreed with the third party that our "GoHealth" marks can coexist with the third party's use of "GoHealth" in their business without creating a likelihood of consumer confusion, we entered into a co-existence agreement with the third-party that, among other things, places certain restrictions on both their use of "GoHealth," as well as ours, in order to further mitigate any risk of confusion. Nevertheless, if despite these measures, our business is mistakenly confused with their business or another business, the value of our brand could be adversely impacted, which could harm our business, operating results and financial condition.

### *Any legal liability, regulatory penalties, or negative publicity for the information on our website or that we otherwise provide could harm our business, operating results and financial condition.*

We provide information on our website, through our Benefits Center, in our marketing materials and in other ways regarding health insurance in general and the health insurance plans we market and sell, including information relating to insurance premiums, coverage, benefits, provider networks, exclusions, limitations, availability, plan comparisons and insurance company ratings. A significant amount of both automated and manual effort is required to maintain the considerable amount of insurance plan information on our website. If the information we provide on our website, through our Benefits Center, in our marketing materials or otherwise is not accurate or is construed as misleading, or if we do not properly assist individuals and businesses in purchasing health insurance, customers, carriers and others could attempt to hold us liable for damages, our relationships with carriers could be terminated or impaired and regulators could attempt to subject us to penalties, revoke our licenses to transact health insurance business in a particular jurisdiction, and/or compromise the status of our licenses to transact health insurance business in other jurisdictions, which could result in our loss of our commission revenue. In the ordinary course of operating our business, we have received complaints that the information we provided was not accurate or was misleading. Although in the past we have resolved these complaints without significant financial cost or impact to our brand or reputation, we cannot guarantee that we will be able to do so in the future. Our sales of individual and family plans that do not qualify as minimum essential coverage, thereby lacking the same benefits as major medical health insurance plans, may increase the risk that we receive complaints regarding our marketing and business practices due to the potential for customer confusion between such plans and major medical health insurance. In addition, these types of claims could be time-consuming and expensive to defend, could divert our management's attention and other resources, and could cause a loss of confidence in our services. As a result, whether or not we are able to successfully resolve these claims, they could harm our business, operating results and financial condition.

In the ordinary course of our business, we have received and may continue to receive inquiries from state regulators relating to various matters. We also have become, and may in the future become, involved in litigation or claims in the ordinary course of our business, including with respect to employment-related claims such as workplace discrimination or harassment. We have and may in the future, face claims of violations of other local, state, and federal labor or employment laws, laws and regulations relating to marketing and laws and regulations relating to the sale of insurance. If we are found to have violated laws or regulations, we could lose our relationship with carriers and be subject to various fines and penalties, including revocation of our licenses to sell insurance which would cause us to lose our commission revenue, and our business, operating results and financial condition would be materially harmed. In addition, if regulators believe our websites or marketing material are not compliant with applicable laws or regulations, we could be forced to stop using our websites, marketing material or certain aspects of them, which would harm our business, operating results and financial condition.

Table of Contents

***The extent to which the COVID-19 outbreak and measures taken in response thereto impact our business, results of operations and financial condition will depend on future developments, which are highly uncertain and cannot be predicted.***

In late 2019, a novel strain of coronavirus, SARS-CoV-2, surfaced in China, which has now spread to the United States and almost every country in the world. SARS-CoV-2 causes a clinical illness known as COVID-19. Global health concerns relating to the outbreak of COVID-19 have been weighing on the macroeconomic environment, and the outbreak has significantly increased economic uncertainty. The outbreak has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders, and business shutdowns. These measures have not only negatively impacted consumer spending and business spending habits, they have adversely impacted and may further impact our workforce and operations and the operations of carriers, consumers and our business partners. Although certain of these measures are beginning to ease in some geographic regions, overall measures to contain the COVID-19 outbreak may remain in place for a significant period of time and may adversely affect our business, results of operations and financial condition.

The spread of COVID-19 has caused us to modify our business practices (including employee travel, employee work locations, and cancellation of physical participation in meetings, events and conferences), and we may take further actions as may be required by government authorities or that we determine are in the best interests of our employees, customers and business partners. For example, we have implemented work from home measures, which have required us to provide technical support to our agents to enable them to connect to our technology platform from their homes, including by purchasing laptops for our agents and upgrading their Internet connections. In addition to an investment of financial resources, implementing work from home measures to respond to COVID-19 has diverted management's time and attention. If our agents are not able to effectively work from home, or if our agents contract COVID-19 or another contagious disease, we may not be able to sell as many plans, which would negatively impact our business, financial condition and results of operations. There is also no certainty that the measures we have taken to mitigate the impact of COVID-19 on our business will be sufficient or otherwise be satisfactory to government authorities.

Further, because most of our employees are working remotely in connection with the COVID-19 pandemic, we may experience an increase the risk of security breaches, loss of data, and other disruptions as a result of accessing sensitive information from remote locations. Correspondingly, it remains unclear how the third-party firms or organizations who have independently audited our information security program against specific standards will assess and evaluate the sufficiency of the security measures we have taken to mitigate work-from-home related information security risks. Failure to meet these standards could impact our ability to service customers in the healthcare industry, which could have a material adverse impact on our business, financial condition and results of operations.

Additionally, our carriers and vendors have similarly adjusted their operations in light of the COVID-19 pandemic. If our carriers or vendors experience shutdowns or continued business disruptions, our ability to conduct our business operations as planned could be materially and negatively affected. For example, our carriers may experience delays in the underwriting process, and those delays could affect our ability to timely bind and sell policies. Furthermore, our business, operating results and financial condition could be adversely affected if, as a result of the macro-economic effects of the COVID-19 pandemic, demand for the products we sell on behalf of carriers declines, our carriers seek to renegotiate their commission arrangements with us or the policyholders to whom we have sold policies stop making their premium payments.

The full extent to which the outbreak of COVID-19 impacts our business, results of operations and financial condition is still unknown and will depend on future developments, which are highly uncertain and cannot be predicted, including, but not limited to, the duration and spread of the outbreak, its severity, the actions to contain the virus or treat its impact, and how quickly and to what extent normal economic and operating conditions can resume. Even after the outbreak of COVID-19 has subsided, we may continue to experience materially adverse

54

**Table of Contents**

impacts to our business as a result of its global economic impact, including any recession that has occurred or may occur in the future.

While governmental and non-governmental organizations are engaging in efforts to combat the spread and severity of the COVID-19 pandemic and related public health issues, these measures may not be effective. We also cannot predict how legal and regulatory responses to concerns about the COVID-19 pandemic and related public health issues will impact our business. Such events or conditions could result in additional regulation or restrictions affecting the conduct of our business in the future.

There are no comparable recent events which may provide guidance as to the effect of the spread of COVID-19 and a global pandemic, and, as a result, the ultimate impact of the COVID-19 outbreak or a similar health epidemic is highly uncertain and subject to change. We do not yet know the full extent of the impacts on our business, our operations or the global economy as a whole. However, the effects could have a material impact on our results of operations.

To the extent the COVID-19 pandemic adversely affects our business, operating results and financial condition, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section, such as those relating to our level of indebtedness, our need to generate sufficient cash flows to service our indebtedness and our ability to comply with the covenants contained in our Credit Facilities.

***We rely upon third parties to operate our Marketplace technology and any disruption of or interference with our use of such third-party providers would adversely affect our business, results of operations and financial condition.***

We outsource our hosting infrastructure to Amazon Web Services and Rackspace (together, "Hosting Providers"), which host our Marketplace technology. Consumers and agents must have the ability to access our Marketplace technology at any time, without interruption or degradation of performance. Our Hosting Providers run their own infrastructure upon which our Marketplace technology and products depend, and we are, therefore, vulnerable to service interruptions at each Hosting Provider. Though very rare, we have experienced, and expect that in the future we may experience interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, application hosting disruptions and capacity constraints. Capacity constraints could be due to a number of potential causes including technical failures, natural disasters, fraud or security attacks. In addition, if our security, or that of one of our Hosting Providers, is compromised, our platform or products are unavailable or our users are unable to use our products within a reasonable amount of time or at all, then our business, results of operations and financial condition could be adversely affected. We note that our ability to conduct security audits on our Hosting Providers is limited, therefore, we rely heavily on third-party security reviews, such as SSAE 16 assessments. Our contracts do not contain strong indemnification terms in our favor. In some instances, we may not be able to identify and/or remedy the cause or causes of these performance problems within a period of time acceptable to our customers. It may become increasingly difficult to maintain and improve our marketplace platform performance, especially during peak usage times, as our marketplace platform becomes more complex and the usage of the platform increases. To the extent we do not effectively address capacity constraints, either through our Hosting Providers or alternative providers of cloud infrastructure, our business, results of operations and financial condition may be adversely affected. In addition, any changes in service levels from our Hosting Providers may adversely affect our ability to meet our customers' requirements.

The substantial majority of the services we use from our Hosting Providers are for cloud-based server capacity and managed colocation services. We access our Hosting Providers' infrastructure through standard Internet connectivity. Our Hosting Providers provide us with computing and storage capacity, network capacity, managed colocation space, and leased computing hardware pursuant to agreements that continue until terminated by either party. If any of the data centers become unavailable to us without sufficient advance notice, we would likely experience delays in delivering our platform and products until we could migrate to an alternate data center

55

provider. Our disaster recovery program contemplates transitioning our platform and products to our backup center in the event of a catastrophe, but we have not yet fully tested the procedure, and our platform and products may be unavailable, in whole or in part, during any transition procedure. Although we expect that we could receive similar services from other third parties, if any of our arrangements with our Hosting Providers are terminated, we could experience interruptions on our platform and in our ability to make our products available to customers, as well as delays and additional expenses (including research and development expenses) in arranging alternative cloud infrastructure services.

Any of the above circumstances or events may cause outages where we are unable to generate revenue, harm our reputation, cause customers to stop using our products, impair our ability to attract new customers and increase revenue from customers, subject us to financial penalties and liabilities under our service level agreements and otherwise harm our revenue, business, results of operations and financial condition.

### *If individuals or carriers opt for more traditional or alternative channels for the purchase and sale of health insurance, our business could be harmed.*

Our success depends, in part, upon continued growth in the use of the Internet as a source of research on health insurance products and pricing, as well as willingness for individuals to use the Internet to request further information or contact the distributors directly or indirectly that sell the products we offer. Individuals and carriers may choose to depend more on traditional sources, such as individual agents, or alternative sources may develop, including as a result of healthcare reform. Our future growth, if any, will depend in part upon:

- the growth of the Internet as a market for individual health insurance plans and services;
- individuals' willingness and ability to conduct their own health insurance research;
- our ability to make the process of purchasing health insurance online an attractive alternative to traditional and new means of purchasing health insurance;
- our ability to successfully and cost-effectively market our services as superior to traditional or alternative sources for health insurance to a sufficiently large number of individuals; and
- carriers' willingness to use us and the Internet as a distribution channel for health insurance products and plans.

If individuals and carriers determine that other sources of health insurance and health insurance applications are superior, our business will not grow, and our business, operating results and financial condition could be harmed.

### *From time to time we are subject to various legal proceedings which could adversely affect our business, financial condition or results of operations.*

We are involved in various litigation matters from time to time. Such matters can be time-consuming, divert management's attention and resources and cause us to incur significant expenses. Our insurance and indemnities may not cover all claims that may be asserted against us, and any claims asserted against us, regardless of merit or eventual outcome, may harm our reputation. If we are unsuccessful in our defense in these litigation matters, or any other legal proceeding, we may be forced to pay damages or fines, enter into consent decrees or change our business practices, any of which could adversely affect our business, financial condition or results of operations.

### *Our balance sheet includes significant amounts of goodwill and intangible assets. The impairment of a significant portion of these assets would negatively affect our financial condition or results of operations.*

A significant portion of our total assets consists of goodwill and intangible assets. Goodwill and intangible assets, net, together accounted for approximately 66.9% of total assets on our balance sheet as of March 31, 2020. We

56

Table of Contents

evaluate goodwill and intangible assets for impairment annually at in the fourth quarter and whenever events or circumstances make it more likely than not that impairment may have occurred. Under current accounting rules, any determination that impairment has occurred would require us to record an impairment charge, which would adversely affect our earnings. An impairment of a significant portion of goodwill or intangible assets could adversely affect our operating results and financial condition.

***Changes in lease accounting standards may materially and adversely affect us.***

Beginning on January 1, 2022, the Financial Accounting Standards Board, or FASB, rules will require that we account for our office space leases as assets and liabilities on our balance sheet. We previously accounted for such leases on an "off-balance sheet" basis. As a result of these changes to the FASB rules, we will be required to record lease-related assets and liabilities on our balance sheet, and the way in which we record and classify our lease-related expenses may change as well. Though these changes will not have any direct effect on our overall financial condition, they will cause the total amount of assets and liabilities we report to increase.

***Operating and growing our business may require additional capital, and if capital is not available to us, our business, operating results and financial condition may suffer.***

Operating and growing our business is expected to require further investments in our business. We may be presented with opportunities that we want to pursue, and unforeseen challenges may present themselves, any of which could cause us to require additional capital. Our business model does not require us to hold a significant amount of cash and cash equivalents at any given time and if our cash needs exceed our expectations or we experience rapid growth, we could experience strain in our cash flow, which could adversely affect our operations in the event we were unable to obtain other sources of liquidity. If we seek to raise funds through equity or debt financing, those funds may prove to be unavailable, may only be available on terms that are not acceptable to us or may result in significant dilution to you or higher levels of leverage. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to pursue our business objectives and to respond to business opportunities, challenges or unforeseen circumstances could be significantly limited, and our business, operating results and financial condition could be materially and adversely affected.

***If we fail to manage future growth effectively, our business, operating results and financial condition would be harmed.***

We have expanded our operations significantly and anticipate that further expansion will be required in order for us to grow our business. Our growth has placed and will continue to place increasing and significant demands on our management, our operational and financial systems and infrastructure and our other resources. If we do not effectively manage our growth, the quality of our services could suffer, which could harm our business, operating results and financial condition. In order to manage future growth, we will need to hire, integrate and retain highly skilled and motivated employees. We may not be able to hire new employees quickly enough to meet our needs. If we fail to effectively manage our hiring needs and successfully integrate our new hires, our efficiency and ability to meet our forecasts and our employee morale, productivity and retention could suffer, and our business, operating results and financial condition could be harmed. We will also be required to continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements may require significant capital expenditures and will place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully implement improvements in these areas, our business, operating results and financial condition will be harmed.

***If we are unable to maintain a high level of service, our business, operating results and financial condition may be harmed.***

One of the key attributes of our business is providing high quality service to our carriers and customers. We may be unable to sustain these levels of service, which would harm our reputation and our business. Alternatively, we

may only be able to sustain high levels of service by significantly increasing our operating costs, which would materially and adversely affect our operating results. The level of service we are able to provide depends on our personnel to a significant extent. Our personnel must be well-trained in our processes and able to handle customer calls effectively and efficiently. Any inability of our personnel to meet our demand, whether due to absenteeism, training, turnover, disruptions at our facilities, including due to the effects of the COVID-19 pandemic, bad weather, power outages or other reasons, could adversely impact our business. If we are unable to maintain high levels of service performance, our reputation could suffer and our business, operating results and financial condition would be harmed.

***Economic sanction laws in the United States and other jurisdictions may prohibit us and our affiliates from transacting with certain countries, individuals and companies, which could negatively impact our business, operating results and financial condition.***

The Foreign Corrupt Practices Act, or the FCPA, and other anti-corruption laws and regulations, as well as anti-boycott regulations, may apply to and restrict our activities, including our software development operations in Slovakia. If we were to violate any such laws or regulations, we may face significant legal and monetary penalties. The U.S. government has indicated that it is focused on FCPA enforcement, which may increase the risk that we become the subject of such actual or threatened enforcement. As such, a violation of the FCPA or other applicable regulations could have a material adverse effect on our business.

***Global economic conditions could materially and adversely affect our revenue and results of operations.***

Our business has been and may continue to be affected by a number of factors that are beyond our control, such as general geopolitical, economic and business conditions, and conditions in the financial markets. A severe or prolonged economic downturn could adversely affect consumers' financial condition and the demand for insurance products.

We are also exposed to risks associated with the potential financial instability of our carriers and customers, many of whom may be adversely affected by volatile conditions in the financial markets or an economic slowdown. As a result of uncertainties with respect to financial institutions and the global credit markets and other macroeconomic challenges currently or potentially affecting the economy of the U.S. and other parts of the world, customers may experience serious cash flow problems and other financial difficulties, decreasing demand for the products of our carriers. In addition, events in the U.S. or foreign markets, such as the U.K.'s exit from the European Union, the worldwide effects from the spread of COVID-19 and political and social unrest in various countries around the world, can impact the global economy and capital markets. Our carriers may modify, delay, or cancel plans to offer new products or may make changes in the mix of products purchased that are unfavorable to us. Additionally, if carriers are not successful in generating sufficient revenue or are precluded from securing financing, their businesses will suffer, which may materially and adversely affect our business, operating results and financial condition.

In addition, we are susceptible to risks associated with the potential financial instability of the vendors on which we rely to provide services or to whom we delegate certain functions. The same conditions that may affect carriers and customers also could adversely affect our vendors, causing them to significantly and quickly increase their prices or reduce their output. Our business depends on our ability to perform, in an efficient and uninterrupted fashion, our necessary business functions, and any interruption in the services provided by third parties could also adversely affect our business, operating results and financial condition. See "—The extent to which the COVID-19 outbreak and measures taken in response thereto impact our business, results of operations and financial condition will depend on future developments, which are highly uncertain and cannot be predicted."

58

**Table of Contents**

*Acquisitions of other businesses or technologies could disrupt and harm our business, operating results and financial condition.*

We have in the past acquired businesses and in the future may decide to acquire other businesses, products and technologies. Our ability as an organization to successfully make and integrate acquisitions is unproven. Acquisitions could require significant capital infusions and could involve many risks, including the following:

- an acquisition may negatively impact our results of operations because it will require us to incur transaction expenses, and after the transaction, may require us to incur charges and substantial debt or liabilities, may require the amortization, write down or impairment of amounts related to deferred compensation, goodwill and other intangible assets, or may cause adverse tax consequences, substantial depreciation or deferred compensation charges;

- an acquisition undertaken for strategic business purposes may negatively impact our results of operations;

- we may encounter difficulties in assimilating and integrating the business, technologies, products, personnel or operations of companies that we acquire, particularly if key personnel of the acquired company decide not to work for us;

- an acquisition may disrupt our ongoing business, divert resources, increase our expenses and distract our management;

- we may be required to implement or improve internal controls, procedures and policies appropriate for a public company at a business that prior to the acquisition lacked these controls, procedures and policies;

- the acquired businesses may have unexpected liabilities that we will be forced to assume;

- the acquired businesses, products or technologies may not generate sufficient revenue to offset acquisition costs or to maintain our financial results; and

- acquisitions may involve the entry into geographic or business markets in which we have little or no prior experience, such as our acquisition of Creatix which had operations in Slovakia.

We cannot assure you that we will be able to identify or consummate any future acquisition on favorable terms, or at all. If we do pursue an acquisition, it is possible that we may not realize the anticipated benefits from the acquisition or that the financial markets or investors will negatively view the acquisition. Even if we successfully complete an acquisition, it could harm our business, operating results and financial condition.

*Our business may not grow if consumers are not informed about the availability and accessibility of affordable health insurance.*

Numerous health insurance products are available to consumers in any given market. Most of these products vary by price, benefits and other policy features. Health insurance terminology and provisions are often confusing and difficult to understand. As a result, researching, selecting and purchasing health insurance can be a complex process. We believe that this complexity has contributed to a perception held by many consumers that individual health insurance is prohibitively expensive and difficult to obtain. If consumers are not informed about the availability and accessibility of affordable health insurance, our business may not grow and our business, operating results and financial condition would be harmed.

*Changes in our provision for income taxes or adverse outcomes resulting from examination of our income or other tax returns or changes in tax legislation could adversely affect our business, operating results and financial condition.*

Our provision for income taxes is subject to volatility and could be adversely affected by a number of factors, including earnings differing materially from our projections, changes in the valuation of our deferred tax assets

59

Table of Contents

and liabilities, expected timing and amount of the release of any tax valuation allowances, tax effects of share-based compensation, outcomes as a result of tax examinations or by changes in tax laws, regulations, accounting principles, including accounting for uncertain tax positions, or interpretations thereof.

To the extent that our provision for income taxes is subject to volatility or adverse outcomes as a result of tax examinations, our operating results could be harmed. Significant judgment is required to determine the recognition and measurement attribute prescribed in U.S. GAAP relating to accounting for income taxes. In addition, we are subject to examinations of our income tax returns by the Internal Revenue Service, or IRS, and other tax authorities. We assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes. There may be exposure that the outcomes from these examinations will have an adverse effect on our business, operating results and financial condition.

On March 27, 2020, in response to the COVID-19 pandemic, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was signed into law. The CARES Act, among other things, includes provisions relating to refundable payroll tax credits, deferment of employer side social security payments, net operating loss carryback periods, alternative minimum tax credit refunds, modifications to the net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property. We continue to evaluate the applicability of the CARES Act to us; however, we believe that the CARES Act will not have a material impact on our business.

**Risks Related to Our Intellectual Property and Technology**

*We rely on data provided to us by customers, carriers and third-party lead suppliers to improve our technology and service offerings, and if we are unable to maintain or grow such data, we may be unable to provide customers with an insurance shopping experience that is relevant, efficient and effective, which could adversely affect our business.*

Our business relies on the data provided to us by customers, carriers and third-party lead suppliers. The large amount of data that we use in operating our marketplace platform, and the accuracy of such data, is critical to our ability to provide a relevant, efficient and effective insurance shopping experience for customers. For example, if the data provided to us by our customers during the insurance shopping process is not accurate, our ability to match our customers with relevant and suitable insurance products would be impaired, which could lead to an increase in rejections of policies that we submit to carriers. Further, if we are unable to maintain or effectively utilize the data provided to us, the value that we provide to customers and carriers may be limited as well. If we do not obtain accurate data from our consumers or if we are unable to maintain or effectively utilize the data provided to us, consumers who use our platform could have a negative shopping experience, which could materially and adversely affect our business, operating results and financial condition.

Although we have made substantial investments into our technology systems, we cannot assure you that we will be able to continually collect and retain sufficient data, or improve our data technologies to satisfy our operating needs. Failure to do so could materially and adversely affect our business, operating results and financial condition.

*Our business is subject to security risks and, if we are subject to cyber-attacks, security breaches or otherwise unable to safeguard the security and privacy of confidential data, including personal health information, our business will be harmed.*

Our services involve the collection and storage of confidential and personal information of consumers and employees, including protected health information subject to HIPAA and other individually identifiable health information, and the transmission of this information to their chosen carriers and to government. For example, in our online lead generation business, we collect and disclose names, contact information, date of birth, and sensitive information regarding the medical history of consumers. Information security risks have generally

60

Table of Contents

increased in recent years because of the proliferation of new technologies and the increased sophistication and activities of perpetrators of cyber-attacks. Hackers and data thieves are increasingly sophisticated and operating large-scale and complex automated attacks, including on companies within the healthcare industry. As cyber threats continue to evolve, we may be required to expend additional resources to further enhance our information security measures, develop additional protocols and/or to investigate and remediate any information security vulnerabilities.

Because our services involve the collection, processing, use, storage and transmission of confidential and personal information of consumers and employees, including protected health information subject to HIPAA and other individually identifiable health information, we are subject to various laws, regulations, industry standards and contractual requirements regarding the collection, maintenance, protection, use, transmission, disclosure and disposal of personal information. We also hold a significant amount of personal information relating to our current and former employees. We cannot guarantee that our facilities and systems, and those of our third-party service providers, will be free of security breaches, cyber-attacks, acts of vandalism, computer viruses, malware, ransomware, denial-of-service attacks, misplaced or lost data, programming and/or human errors or other similar events. Compliance with privacy and security laws, requirements and regulations may result in cost increases due to new constraints on our business, the development of new processes, the effects of potential non-compliance by us or third-party service providers, and enforcement actions. We may be required to expend significant amounts and other resources to protect against security breaches or to alleviate problems caused by security breaches and other threats to our information technology systems. Despite our implementation of security measures, techniques used to obtain unauthorized access or to sabotage systems change frequently. As a result, we may be unable to anticipate these techniques or to implement adequate preventative measures. Additionally, our third-party service providers who process information on our behalf may cause security breaches for which we are responsible.

Any compromise or perceived compromise of the security of our systems or the systems of one or more of our vendors or service providers could damage our reputation, cause the termination of relationships with government-run health insurance exchanges, carriers, and/or our customers, result in disruption or interruption to our business operations, marketing partners and carriers, reduce demand for our services and subject us to significant liability and expense as well as regulatory action and lawsuits, which would harm our business, operating results and financial condition. The CCPA, in particular, includes a private right of action for California consumers whose CCPA-covered personal information is impacted by a data security incident resulting from a company's failure to maintain reasonable security procedures, and hence may result in civil litigation in the event of a data breach impacting such information. Although we maintain insurance covering certain security and privacy damages and claim expenses, we may not carry insurance or maintain coverage sufficient to compensate for all liability and in any event, insurance coverage would not address the reputational damage that could result from a security incident or any regulatory actions or litigation that may result. In addition, in the event that additional data security laws are implemented, or our carrier or other partners determine to impose additional requirements on us relating to data security, we may not be able to timely comply with such requirements or such requirements may not be compatible with our current processes. For example, legislators and regulators in the U.S. have enacted and are proposing new and more robust privacy and cybersecurity laws and regulations in response to increasing broad-based cyberattacks, including the CCPA and the New York SHIELD Act. New data security laws add additional complexity, requirements, restrictions and potential legal risk and compliance programs may require additional investment in resources, and could impact strategies and availability of previously useful data. Changing our processes to comply with new laws or new requirements imposed by our carriers could be time consuming and expensive, and failure to timely implement required changes could result in our inability to sell health insurance plans in a particular jurisdiction or for a particular carrier or subject us to liability for non-compliance, any of which would damage our business, operating results and financial condition. For instance, carriers may require us to be compliant with the Payment Card Industry Data Security Standard, or PCI DSS, security standards in order to accept credit card information from customers or require us to comply with privacy and security standards to do business with us at all. PCI DSS compliance and compliance with other privacy and security standards are regularly assessed, and the

61

Table of Contents

possibility exists that we may not always be compliant with the standards. If we are not in compliance, we may not be able to accept credit card information from customers to the extent needed, or conduct health insurance business, and our relationship with carriers could be adversely impacted or terminated, which would harm our business, operating results and financial condition.

***We may not be able to adequately protect our intellectual property, which could harm our business and operating results.***

We believe that our intellectual property is an essential asset of our business and that our technology currently gives us a competitive advantage in the distribution of Medicare-related, individual and family health insurance. We rely on a combination of copyright, trademark and trade secret laws as well as confidentiality procedures and contractual provisions to establish and protect our intellectual property rights in the United States. The efforts we have taken to protect our intellectual property may not be sufficient or effective. In addition, monitoring unauthorized uses of our intellectual property and unauthorized disclosures of our trade secrets and other confidential or proprietary information can be difficult, and even if we do detect violations, litigation may be necessary to enforce our intellectual property rights. Any enforcement efforts we undertake, including litigation, could be time-consuming and expensive, could divert our management's attention and may result in a court determining that our intellectual property or other proprietary rights are unenforceable. If we are not successful in cost-effectively protecting our confidential information, trade secrets and other intellectual property rights, our business, operating results and financial condition could be harmed. Further, if a competitor lawfully obtains or independently develops the technology that we maintain as a trade secret, we would have no right to prevent such competitor from using that technology or proprietary information to compete with us, which could harm our competitive position.

In addition, we use open source software in connection with our proprietary software and expect to continue to use open source software in the future. Some open-source licenses, commonly referred to as "copyleft" licenses, require licensors to provide source code to licensees upon request, or prohibit licensors from charging a fee to licensees. We try to insulate our proprietary code from the effects of such "copyleft" provisions. While we have policies in place to avoid usage of software from "copyleft" licenses, and while we conduct audits and have other procedures in place in an effort to ensure these policies are followed, we cannot guarantee that these efforts will be successful. Accordingly, we may face claims from others claiming ownership of, or seeking to enforce the license terms applicable to such open source software, including by demanding release of the open source software, derivative works or our proprietary source code that was developed or distributed with such software. These claims could also result in litigation, require us to purchase a costly license or require us to devote additional research and development resources to change our software, any of which would have a negative effect on our business and results of operations. In addition, if the license terms for the open source software change, we may be forced to re-engineer our software or incur additional costs. We cannot assure you that we have not incorporated open source software into our proprietary software in a manner that may subject our proprietary software to an open source license that requires disclosure, to customers or the public, of the source code to such proprietary software. Any such disclosure would have a negative effect on our business and the value of our proprietary software.

***We may become subject to intellectual property disputes, which are costly and may subject us to significant liability and increased costs of doing business.***

Third parties may be able to successfully challenge, oppose, invalidate, render unenforceable, dilute, misappropriate or circumvent our trademarks, copyrights and other intellectual property rights. Our success depends, in part, on our ability to develop and commercialize our products and services without infringing, misappropriating or otherwise violating the intellectual property rights of third parties. However, we may not be aware that our products or services are infringing, misappropriating or otherwise violating third-party intellectual property rights and such third parties may bring claims alleging such infringement, misappropriation or violation.

62

Table of Contents

Actions we may take to enforce our intellectual property rights may be expensive and divert management's attention away from the ordinary operation of our business, and our inability to secure and protect our intellectual property rights could materially and adversely affect our brand and business, operating results and financial condition. Furthermore, such enforcement actions, even if successful, may not result in an adequate remedy. In addition, many companies have the capability to dedicate greater resources to enforce their intellectual property rights and to defend claims that may be brought against them. If a third-party is able to obtain an injunction preventing us from accessing such third-party intellectual property rights, or if we cannot license or develop alternative technology for any infringing aspect of our business, we would be forced to limit or stop sales of our products and platform capabilities or cease business activities related to such intellectual property.

Although we carry general liability insurance, our insurance may not cover potential claims of this type and may not be adequate to indemnify us for all liability that may be imposed. We cannot predict the outcome of lawsuits and cannot ensure that the results of any such actions will not have an adverse effect on our business, financial condition or results of operations. Such claims could subject us to significant liability for damages and could result in our having to stop using technology found to be in violation of a third party's rights. Further, we might be required to seek a license for third-party intellectual property, which may not be available on reasonable royalty or other terms. Alternatively, we could be required to develop alternative non-infringing technology, which could require significant effort and expense. If we cannot license or develop technology for any infringing aspect of our business, we would be forced to limit our services, which could affect our ability to compete effectively. Any of these results would harm our business, operating results and financial condition.

**Risks Related to Our Indebtedness**

***Our debt obligations contain restrictions that impact our business and expose us to risks that could materially adversely affect our liquidity and financial condition.***

The total principal amount of debt outstanding under our Credit Facilities, excluding unamortized debt discount and deferred issuance costs, as of March 31, 2020 was $415.5 million, consisting of $298.5 million and $117.0 million outstanding under our Term Loan Facility and Incremental Term Loan Facility, respectively. Our indebtedness could have significant effects on our business, such as:

- limiting our ability to borrow additional amounts to fund capital expenditures, acquisitions, debt service requirements, execution of our growth strategy and other purposes;

- limiting our ability to make investments, including acquisitions, loans and advances, and to sell, transfer or otherwise dispose of assets;

- requiring us to dedicate a substantial portion of our cash flow from operations to pay principal and interest on our borrowings, which would reduce availability of our cash flow to fund working capital, capital expenditures, acquisitions, execution of our growth strategy and other general corporate purposes;

- making us more vulnerable to adverse changes in general economic, industry and competitive conditions, in government regulation and in our business by limiting our ability to plan for and react to changing conditions;

- placing us at a competitive disadvantage compared with our competitors that have less debt; and

- exposing us to risks inherent in interest rate fluctuations because our borrowings are at variable rates of interest, which could result in higher interest expense in the event of increases in interest rates.

In addition, we may not be able to generate sufficient cash flow from our operations to repay our indebtedness when it becomes due and to meet our other cash needs. If we are not able to pay our borrowings as they become due, we will be required to pursue one or more alternative strategies, such as selling assets, refinancing or restructuring our indebtedness or selling additional debt or equity securities. We may not be able to refinance our debt or sell additional debt or equity securities or our assets on favorable terms, if at all, and if we must sell our assets, it may negatively affect our business, financial condition and results of operations.

63

Table of Contents

*Restrictions imposed by our Credit Facilities may materially limit our ability to operate our business and finance our future operations or capital needs.*

The terms of our Credit Facilities restrict us and our restricted subsidiaries from engaging in specified types of transactions. These covenants restrict our ability, and that of our restricted subsidiaries, to, among other things:

- incur indebtedness;

- incur certain liens;

- consolidate, merge or sell or otherwise dispose of assets;

- make investments, loans, advances, guarantees and acquisitions;

- pay dividends or make other distributions on equity interests, or redeem, repurchase or retire equity interests;

- enter into transactions with affiliates;

- alter the business conducted by us and our subsidiaries;

- change their fiscal year; and

- amend or modify governing documents.

A breach of any of these covenants, or any other covenant in the documents governing our Credit Facilities, could result in a default or event of default under our Credit Facilities. In the event of any event of default under our Credit Facilities, the applicable lenders or agents could elect to terminate borrowing commitments and declare all borrowings and loans outstanding thereunder, together with accrued and unpaid interest and any fees and other obligations, to be immediately due and payable. In addition, or in the alternative, the applicable lenders or agents could exercise their rights under the security documents entered into in connection with our Credit Facilities. We have pledged substantially all of our assets as collateral securing our Credit Facilities and any such exercise of remedies on any material portion of such collateral would likely materially adversely affect our business, financial condition or results of operations.

If we were unable to repay or otherwise refinance these borrowings and loans when due, and the applicable lenders proceeded against the collateral granted to them to secure that indebtedness, we may be forced into bankruptcy or liquidation. In the event the applicable lenders accelerate the repayment of our borrowings, we may not have sufficient assets to repay that indebtedness. Any acceleration of amounts due under our Credit Facilities or other outstanding indebtedness would also likely have a material adverse effect on us.

Pursuant to our Credit Agreement, we are required to maintain, on a consolidated basis, a maximum ratio of consolidated total net debt to consolidated EBITDA (with certain adjustments as set forth in the Credit Agreement), tested as of the last day of the most recently completed four consecutive fiscal quarters. Our ability to borrow under our Credit Agreement depends on our compliance with this financial covenant. Events beyond our control, including changes in general economic and business conditions, may affect our ability to satisfy the financial covenant. We cannot assure you that we will satisfy the financial covenant in the future, or that our lenders will waive any failure to satisfy the financial covenant.

*Developments with respect to LIBOR may affect our borrowings under our Credit Facilities.*

Regulators and law enforcement agencies in the U.K. and elsewhere are conducting civil and criminal investigations into whether the banks that contribute to the British Bankers' Association ("BBA") in connection with the calculation of daily LIBOR may have been under-reporting or otherwise manipulating or attempting to manipulate LIBOR. A number of BBA member banks have entered into settlements with their regulators and law enforcement agencies with respect to this alleged manipulation of LIBOR. Actions by the BBA, regulators or law enforcement agencies may result in changes to the manner in which LIBOR is determined or the establishment of alternative reference rates. For example, on July 27, 2017, the U.K. Financial Conduct Authority announced that it intends to stop persuading or compelling banks to submit LIBOR quotes after 2021.

64

Table of Contents

Our Credit Agreement provides that interest may be based on LIBOR and for the use of an alternate rate to LIBOR in the event LIBOR is phased-out; however, uncertainty remains as to any such replacement rate and any such replacement rate may be higher or lower than LIBOR may have been. The establishment of alternative reference rates or implementation of any other potential changes may materially and adversely affect our business, operating results and financial condition.

**Risks Related to Our Organizational Structure**

***Our principal asset after the completion of this offering will be our interest in GoHealth Holdings, LLC, and, as a result, we will depend on distributions from GoHealth Holdings, LLC to pay our taxes and expenses, including payments under the Tax Receivable Agreement. GoHealth Holdings, LLC's ability to make such distributions may be subject to various limitations and restrictions.***

Upon the consummation of this offering and the Transactions, we will be a holding company and will have no material assets other than our ownership of LLC Interests. As such, we will have no independent means of generating revenue or cash flow, and our ability to pay our taxes and operating expenses or declare and pay dividends in the future, if any, will be dependent upon the financial results and cash flows of GoHealth Holdings, LLC and its subsidiaries and distributions we receive from GoHealth Holdings, LLC. There can be no assurance that GoHealth Holdings, LLC and its subsidiaries will generate sufficient cash flow to distribute funds to us or that applicable state law and contractual restrictions, including negative covenants in our debt instruments, will permit such distributions. Although GoHealth Holdings, LLC is not currently subject to any debt instruments or other agreements that would restrict its ability to make distributions to us, the terms of our Credit Facilities and other outstanding indebtedness restrict the ability of our subsidiaries to pay dividends to GoHealth Holdings, LLC.

GoHealth Holdings, LLC will continue to be treated as a partnership for U.S. federal income tax purposes and, as such, generally will not be subject to any entity-level U.S. federal income tax. Instead, any taxable income of GoHealth Holdings, LLC will be allocated to holders of LLC Interests, including us. Accordingly, we will incur income taxes on our allocable share of any net taxable income of GoHealth Holdings, LLC. Under the terms of the GoHealth Holdings, LLC Agreement, GoHealth Holdings, LLC will be obligated, subject to various limitations and restrictions, including with respect to our debt agreements, to make tax distributions to holders of LLC Interests, including us. In addition to tax expenses, we will also incur expenses related to our operations, including payments under the Tax Receivable Agreement, which we expect could be significant. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." We intend, as its managing member, to cause GoHealth Holdings, LLC to make cash distributions to the holders of LLC Interests in an amount sufficient to (1) fund all or part of their tax obligations in respect of taxable income allocated to them and (2) cover our operating expenses, including payments under the Tax Receivable Agreement. However, GoHealth Holdings, LLC's ability to make such distributions may be subject to various limitations and restrictions, such as restrictions on distributions that would either violate any contract or agreement to which GoHealth Holdings, LLC is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering GoHealth Holdings, LLC insolvent. If we do not have sufficient funds to pay tax or other liabilities, or to fund our operations (including, if applicable, as a result of an acceleration of our obligations under the Tax Receivable Agreement), we may have to borrow funds, which could materially and adversely affect our liquidity and financial condition, and subject us to various restrictions imposed by any lenders of such funds. To the extent we are unable to make timely payments under the Tax Receivable Agreement for any reason, such payments generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement" and "Certain Relationships and Related Party Transactions— GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions—Distributions." In addition, if GoHealth Holdings, LLC does not have sufficient funds to make distributions, our ability to declare and pay cash dividends will also be restricted or impaired. See "—Risks Related to the Offering and Ownership of our Class A Common Stock" and "Dividend Policy."

**Table of Contents**

Under the GoHealth Holdings, LLC Agreement, we intend to cause GoHealth Holdings, LLC, from time to time, to make distributions in cash to its equityholders (including us) in amounts sufficient to cover the taxes imposed on their allocable share of taxable income of GoHealth Holdings, LLC. As a result of (1) potential differences in the amount of net taxable income allocable to us and to GoHealth Holdings, LLC's other equityholders, (2) the lower tax rate applicable to corporations as opposed to individuals, and (3) certain tax benefits that we anticipate from (a) future purchases or redemptions of LLC Interests from the Continuing Equity Owners, (b) payments under the Tax Receivable Agreement and (c) any acquisition of interests in GoHealth Holdings, LLC from other equityholders in connection with the consummation of the Transactions, these tax distributions may be in amounts that exceed our tax liabilities. Our board of directors will determine the appropriate uses for any excess cash so accumulated, which may include, among other uses, the payment of obligations under the Tax Receivable Agreement and the payment of other expenses. We will have no obligation to distribute such cash (or other available cash) to our stockholders. No adjustments to the exchange ratio for LLC Interests and corresponding shares of Class A common stock will be made as a result of any cash distribution by us or any retention of cash by us. To the extent we do not distribute such excess cash as dividends on our Class A common stock we may take other actions with respect to such excess cash, for example, holding such excess cash, or lending it (or a portion thereof) to GoHealth Holdings, LLC, which may result in shares of our Class A common stock increasing in value relative to the value of LLC Interests. The holders of LLC Interests may benefit from any value attributable to such cash balances if they acquire shares of Class A common stock in exchange for their LLC Interests, notwithstanding that such holders may have participated previously as holders of LLC Interests in distributions that resulted in such excess cash balances.

***The Tax Receivable Agreement with the Continuing Equity Owners requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that such payments will be substantial.***

In connection with the consummation of this offering, we will enter into a Tax Receivable Agreement with GoHealth Holdings, LLC and each of the Continuing Equity Owners and Blocker Shareholders. Under the Tax Receivable Agreement, we will be required to make cash payments to the Continuing Equity Owners and the Blocker Shareholders equal to 85% of the tax benefits, if any, that we actually realize, or in certain circumstances are deemed to realize, as a result of (1) GoHealth, Inc.'s allocable share of existing tax basis acquired in connection with the Transactions (including the Blocker Company's share of existing tax basis) and increases to such allocable share of existing tax basis; (2) the increases in our share of the tax basis of assets of GoHealth Holdings, LLC resulting from (a) the purchase of LLC Interests directly from GoHealth Holdings, LLC and the partial redemption of LLC Interests by GoHealth Holdings, LLC as described under "Use of Proceeds," (b) any future redemptions or exchanges of LLC Interests from the Continuing Equity Owners as described under "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement— Agreement in Effect Upon Consummation of the Transactions—Common Unit Redemption Right," and (c) certain distributions (or deemed distributions) by GoHealth Holdings, LLC; and (3) certain other tax benefits arising from payments under the Tax Receivable Agreement. We expect that the amount of the cash payments we will be required to make under the Tax Receivable Agreement will be substantial. Any payments made by us to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement will not be available for reinvestment in our business and will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make timely payments under the Tax Receivable Agreement for any reason, the unpaid amounts will be deferred and will accrue interest until paid by us. Payments under the Tax Receivable Agreement are not conditioned upon one or more of the Continuing Equity Owners maintaining a continued ownership interest in GoHealth Holdings, LLC. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that are the subject of the Tax Receivable Agreement. For more information, see "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." The existing tax basis acquired in connection with the Transactions, the actual increase in tax basis, and the actual utilization of any resulting tax benefits, as well as the amount and timing of any payments under the Tax Receivable Agreement, will vary depending upon a number of factors:

Table of Contents

including the timing of redemptions by the Continuing Equity Owners; the price of shares of our Class A common stock at the time of the exchange; the extent to which such exchanges are taxable; the amount of gain recognized by such Continuing Equity Owners; the amount and timing of the taxable income allocated to us or otherwise generated by us in the future; the portion of our payments under the Tax Receivable Agreement constituting imputed interest; and the federal and state tax rates then applicable.

***Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the Continuing Equity Owners that will not benefit holders of our Class A common stock to the same extent that it will benefit the Continuing Equity Owners.***

Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the Continuing Equity Owners that will not benefit the holders of our Class A common stock to the same extent that it will benefit the Continuing Equity Owners. We will enter into the Tax Receivable Agreement with GoHealth Holdings, LLC and the Continuing Equity Owners and the Blocker Shareholders in connection with the completion of this offering and the Transactions, which will provide for the payment by us to the Continuing Equity Owners and the Blocker Shareholders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) GoHealth, Inc.'s allocable share of existing tax basis acquired in connection with the Transactions (including the Blocker Company's share of existing tax basis) and increases to such allocable share of existing tax basis; (2) the increases in our share of the tax basis of assets of GoHealth Holdings, LLC resulting from (a) the purchase of LLC Interests directly from GoHealth Holdings, LLC and, the partial redemption of LLC Interests by GoHealth Holdings, LLC as described under "Use of Proceeds," (b) any future redemptions or exchanges of LLC Interests from the Continuing Equity Owners as described under "Certain Relationships and Related Party Transactions— GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions— Common Unit Redemption Right" and (c) certain distributions (or deemed distributions) by GoHealth Holdings, LLC; and (3) certain other tax benefits arising from payments under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." Although we will retain 15% of the amount of such tax benefits, this and other aspects of our organizational structure may adversely impact the future trading market for the Class A common stock.

***In certain cases, payments under the Tax Receivable Agreement to the Continuing Equity Owners and the Blocker Shareholders may be accelerated or significantly exceed any actual benefits we realize in respect of the tax attributes subject to the Tax Receivable Agreement.***

The Tax Receivable Agreement will provide that if (1) we materially breach any of our material obligations under the Tax Receivable Agreement, (2) certain mergers, asset sales, other forms of business combinations or other changes of control were to occur after the consummation of this offering, or (3) we elect an early termination of the Tax Receivable Agreement, then our obligations, or our successor's obligations, under the Tax Receivable Agreement to make payments would be based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement.

As a result of the foregoing, we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, based on certain assumptions, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. We could also be required to make cash payments to the Continuing Equity Owners and the Blocker Shareholders that are greater than the specified percentage of any actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combinations or other changes of control. There can be no assurance that we will be able to fund or finance our obligations under the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable

67

Table of Contents

Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

***We will not be reimbursed for any payments made to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, and the U.S. Internal Revenue Service, or the IRS, or another tax authority, may challenge all or part of the tax basis increases or other tax benefits we claim, as well as other related tax positions we take, and a court could sustain such challenge. If the outcome of any such challenge would reasonably be expected to materially and adversely affect a recipient's payments under the Tax Receivable Agreement, then we will not be permitted to settle or fail to contest such challenge without the consent (not to be unreasonably withheld or delayed) of Centerbridge and NVX Holdings. The interests of Centerbridge or NVX Holdings in any such challenge may differ from or conflict with our interests and your interests, and Centerbridge or NVX Holdings may exercise their consent rights relating to any such challenge in a manner adverse to our interests and your interests. We will not be reimbursed for any cash payments previously made to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement in the event that any tax benefits initially claimed by us and for which payment has been made to a Continuing Equity Owner or a Blocker Shareholder are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to a Continuing Equity Owner and/or a Blocker Shareholder, as applicable, will be netted against any future cash payments we might otherwise be required to make to such Continuing Equity Owner and/or such Blocker Shareholder, under the terms of the Tax Receivable Agreement. However, we might not determine that we have effectively made an excess cash payment to a Continuing Equity Owner and/or a Blocker Shareholder, as applicable, for a number of years following the initial time of such payment and, if any of our tax reporting positions are challenged by a taxing authority, we will not be permitted to reduce any future cash payments under the Tax Receivable Agreement until any such challenge is finally settled or determined. Moreover, the excess cash payments we made previously under the Tax Receivable Agreement could be greater than the amount of future cash payments against which we would otherwise be permitted to net such excess. The applicable U.S. federal income tax rules for determining applicable tax benefits we may claim are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, payments could be made under the Tax Receivable Agreement significantly in excess of any actual cash tax savings that we realize in respect of the tax attributes with respect to a Continuing Equity Owner and/or a Blocker Shareholder that are the subject of the Tax Receivable Agreement.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our results of operations and financial condition.***

We are subject to taxes by the U.S. federal, state, local and foreign tax authorities. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- allocation of expenses to and among different jurisdictions;

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, tax treaties, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

68

In addition, we may be subject to audits of our income, sales and other taxes by U.S. federal, state, and local and foreign taxing authorities. Outcomes from these audits could have an adverse effect on our operating results and financial condition.

***If we were deemed to be an investment company under the Investment Company Act of 1940, as amended, or the 1940 Act, including as a result of our ownership of GoHealth Holdings, LLC, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.***

Under Sections 3(a)(1)(A) and (C) of the 1940 Act, a company generally will be deemed to be an "investment company" for purposes of the 1940 Act if (1) it is, or holds itself out as being, engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities, or (2) it engages, or proposes to engage, in the business of investing, reinvesting, owning, holding or trading in securities and it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We do not believe that we are an "investment company," as such term is defined in either of those sections of the 1940 Act.

We and GoHealth Holdings, LLC intend to conduct our operations so that we will not be deemed an investment company. As the sole managing member of GoHealth Holdings, LLC, we will control and operate GoHealth Holdings, LLC. On that basis, we believe that our interest in GoHealth Holdings, LLC is not an "investment security" as that term is used in the 1940 Act. However, if we were to cease participation in the management of GoHealth Holdings, LLC, or if GoHealth Holdings, LLC itself becomes an investment company, our interest in GoHealth Holdings, LLC could be deemed an "investment security" for purposes of the 1940 Act.

If it were established that we were an unregistered investment company, there would be a risk that we would be subject to monetary penalties and injunctive relief in an action brought by the SEC, that we would be unable to enforce contracts with third parties and that third parties could seek to obtain rescission of transactions undertaken during the period it was established that we were an unregistered investment company. If we were required to register as an investment company, restrictions imposed by the 1940 Act, including limitations on our capital structure and our ability to transact with affiliates, could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.

**Risks Related to the Offering and Ownership of our Class A Common Stock**

***The Founders and Centerbridge will continue to have significant influence over us after this offering, including control over decisions that require the approval of stockholders.***

Upon consummation of this offering, the Founders and Centerbridge will control, in the aggregate, approximately 70.8% of the voting power represented by all our outstanding classes of stock. As a result, the Founders and Centerbridge will continue to exercise significant influence over all matters requiring stockholder approval, including the election and removal of directors and the size of our board, any amendment of our amended and restated certificate of incorporation or bylaws and any approval of significant corporate transactions (including a sale of all or substantially all of our assets), and will continue to have significant control over our business, affairs and policies, including the appointment of our management. The directors that the Founders and Centerbridge elect have the authority to vote to authorize the Company to incur additional debt, issue or repurchase stock, declare dividends and make other decisions that could be detrimental to stockholders.

We expect that members of our board will continue to be appointed by and/or affiliated with the Founders and Centerbridge who will have the ability to appoint the majority of directors. The Founders and Centerbridge can take actions that have the effect of delaying or preventing a change of control of us or discouraging others from making tender offers for our shares, which could prevent stockholders from receiving a premium for their shares. These actions may be taken even if other stockholders oppose them. The concentration of voting power

69

Table of Contents

with the Founders and Centerbridge may have an adverse effect on the price of our Class A common stock. The Founders and Centerbridge may have interests that are different from yours and may vote in a way with which you disagree and that may be adverse to your interests.

Further, our amended and restated certificate of incorporation, which will be in effect upon the consummation of the Transactions, will provide that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries. See "—Our amended and restated certificate of incorporation provides that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries."

Centerbridge and its affiliates engage in a broad spectrum of activities. In the ordinary course of its business activities, Centerbridge and its affiliates may engage in activities where their interests conflict with our interests or those of our other stockholders. Centerbridge or one of its affiliates may also pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. In addition, Centerbridge may have an interest in us pursuing acquisitions, divestitures and other transactions that, in its judgment, could enhance its investment, even though such transactions might involve risks to you. See "Description of Capital Stock—Corporate Opportunity Doctrine."

### *We cannot predict the effect our dual class structure may have on the market price of our Class A common stock.*

We cannot predict whether our dual class structure will result in a lower or more volatile market price of our Class A common stock, in adverse publicity, or other adverse consequences. For example, certain index providers have announced restrictions on including companies with multiple-class share structures in certain of their indices. In July 2017, FTSE Russell announced that it plans to require new constituents of its indices to have greater than 5% of the company's voting rights in the hands of public stockholders, and S&P Dow Jones announced that it will no longer admit companies with multiple-class share structures to certain of its indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400, and S&P SmallCap 600, which together make up the S&P Composite 1500. Also in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices and in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. Under such announced policies, the dual class structure of our stock would make us ineligible for inclusion in certain indices and, as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to track those indices would not invest in our Class A common stock. These policies are relatively new and it is unclear what effect, if any, they will have on the valuations of publicly-traded companies excluded from such indices, but it is possible they may depress valuations, compared to similar companies that are included. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from certain stock indices would likely preclude investment by many of these funds and could make our Class A common stock less attractive to other investors. As a result, the market price of our Class A common stock could be adversely affected.

### *We are a "controlled company" within the meaning of the Nasdaq rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You may not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements.*

After the consummation of the Transactions, NVX Holdings and Centerbridge will have more than 50% of the voting power for the election of directors, and, as a result, we will be considered a "controlled company" within the meaning of the Nasdaq rules. As such, we will qualify for, and intend to rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or to perform annual performance evaluations of the nominating and corporate governance and compensation committees.

70

Table of Contents

The corporate governance requirements and, specifically, the independence standards are intended to ensure directors who are considered independent are free of any conflicting interest that could influence their actions as directors. Following this offering, we intend to utilize certain exemptions afforded to a "controlled company." As a result, we will not be subject to certain corporate governance requirements, including that a majority of our board of directors consists of "independent directors," as defined under the Nasdaq rules. In addition, we will not be required to have a nominating and corporate governance committee or compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, or to conduct annual performance evaluations of the nominating and corporate governance and compensation committees.

Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the Nasdaq rules. Our status as a controlled company could make our Class A common stock less attractive to some investors or otherwise harm our stock price.

***Certain provisions of Delaware law and antitakeover provisions in our organizational documents could delay or prevent a change of control.***

Certain provisions of Delaware law and our amended and restated certificate of incorporation and amended and restated bylaws may have an antitakeover effect and may delay, defer, or prevent a merger, acquisition, tender offer, takeover attempt or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by our stockholders. These provisions provide for, among other things:

- a classified board of directors with staggered three-year terms;

- the ability of our board of directors to issue one or more series of preferred stock;

- advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;

- certain limitations on convening special stockholder meetings;

- no cumulative voting in the election of directors;

- subject to the rights of the holders of any preferred stock and the terms of the Stockholders Agreement, the number of directors shall be determined exclusively by the a majority of the whole board or directors;

- the removal of directors only for cause and only upon the affirmative vote of the holders of at least $66^{2}/_{3}\%$ of the voting power represented by our then-outstanding common stock (other than directors appointed pursuant to the Stockholders Agreement, who may be removed with or without cause in accordance with the terms of the Stockholders Agreement);

- at any time when Centerbridge beneficially owns, in the aggregate, less than 40% of the voting power entitled to vote generally in the election our directors, that stockholders may not act by written consent; and

- at any time when Centerbridge beneficially owns, in the aggregate, less than 40% of the voting power entitled to vote generally in the election our directors, that certain provisions of amended and restated certificate of incorporation may be amended only by the affirmative vote of at least $66^{2}/_{3}\%$ of the voting power represented by our then-outstanding common stock.

These antitakeover provisions could make it more difficult for a third party to acquire us, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares.

In addition, we have opted out of Section 203 of the General Corporation Law of the State of Delaware, which we refer to as the DGCL, but our amended and restated certificate of incorporation will provide that engaging in any of a broad range of business combinations with any "interested" stockholder (any stockholder with 15% or

71

Table of Contents

more of our voting stock) for a period of three years following the date on which the stockholder became an "interested" stockholder is prohibited, provided, however, that, under our amended and restated certificate of incorporation, Centerbridge and NVX Holdings and any of their respective affiliates will not be deemed to be interested stockholders regardless of the percentage of our outstanding voting stock owned by them, and accordingly will not be subject to such restrictions. See "Description of Capital Stock."

***The JOBS Act will allow us to postpone the date by which we must comply with certain laws and regulations intended to protect investors and to reduce the amount of information we provide in our reports filed with the SEC. We cannot be certain if this reduced disclosure will make our Class A common stock less attractive to investors.***

The JOBS Act is intended to reduce the regulatory burden on "emerging growth companies." As defined in the JOBS Act, a public company whose initial public offering of common equity securities occurs after December 8, 2011, and whose annual net revenues are less than $1.07 billion will, in general, qualify as an "emerging growth company" until the earliest of:

- the last day of its fiscal year following the fifth anniversary of the date of its initial public offering of common equity securities;

- the last day of its fiscal year in which it has annual gross revenue of $1.07 billion or more;

- the date on which it has, during the previous three-year period, issued more than $1.07 billion in nonconvertible debt; and

- the date on which it is deemed to be a "large accelerated filer, " which will occur at such time as the company (1) has an aggregate worldwide market value of common equity securities held by non-affiliates of $700 million or more as of the last business day of its most recently completed second fiscal quarter, (2) has been required to file annual and quarterly reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, for a period of at least 12 months, and (3) has filed at least one annual report pursuant to the Exchange Act.

Under this definition, we will be an "emerging growth company" upon completion of this offering and could remain an "emerging growth company" until as late as the fifth anniversary of the completion of this offering. For so long as we are an "emerging growth company," we will, among other things:

- not be required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act;

- not be required to hold a nonbinding advisory stockholder vote on executive compensation pursuant to Section 14A(a) of the Exchange Act;

- not be required to seek stockholder approval of any golden parachute payments not previously approved pursuant to Section 14A(b) of the Exchange Act;

- be exempt from the requirement of the Public Company Accounting Oversight Board, or PCAOB, regarding the communication of critical audit matters in the auditor's report on the financial statements; and

- be subject to reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements.

In addition, Section 107 of the JOBS Act provides that an emerging growth company can use the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This permits an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to use this extended transition period and, as a result, our consolidated financial statements may not be comparable to the financial statements of issuers who are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies.

Table of Contents

We cannot predict if investors will find our Class A common stock less attractive as a result of our decision to take advantage of some or all of the reduced disclosure requirements above. If some investors find our Class A common stock less attractive as a result, there may be a less active trading market for our Class A common stock and our stock price may be more volatile.

***Our management team will have immediate and broad discretion over the use of the net proceeds from this offering and may not use them effectively.***

We currently intend to use a portion of the net proceeds of this offering for general corporate purposes to support the growth of the business. See "Use of Proceeds." Our management will have broad discretion in the application of the net proceeds. Our shareholders may not agree with how our management chooses to allocate the net proceeds from this offering. The failure by our management to apply these funds effectively could have a material adverse effect on our business, financial condition, and results of operations. Pending their use, we may invest the net proceeds from this offering in a manner that does not produce income. The decisions made by our management may not result in positive returns on your investment and you will not have an opportunity to evaluate the economic, financial, or other information upon which our management bases its decisions.

***Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it.***

We do not anticipate paying any regular cash dividends on our Class A common stock following this offering. Any decision to declare and pay dividends in the future will be made at the discretion of our board of directors and will depend on, among other things, general and economic conditions, our results of operations and financial condition, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions, and such other factors that our board of directors may deem relevant. In addition, our ability to pay dividends is, and may be, limited by covenants of existing and any future outstanding indebtedness we or our subsidiaries incur, including under our Credit Facilities. Therefore, any return on investment in our Class A common stock is solely dependent upon the appreciation of the price of our Class A common stock on the open market, which may not occur. See "Dividend Policy" for more detail.

***No market currently exists for our Class A common stock, and an active, liquid trading market for our Class A common stock may not develop, which may cause our Class A common stock to trade at a discount from the initial offering price and make it difficult for you to sell the Class A common stock you purchase.***

Prior to this offering, there has not been a public market for our Class A common stock. We cannot predict the extent to which investor interest in us will lead to the development of a trading market or how active and liquid that market may become. If an active and liquid trading market does not develop or continue, you may have difficulty selling any of our Class A common stock that you purchase at a price above the price you purchase it or at all. The initial public offering price for the shares was determined by negotiations between us and the underwriters and may not be indicative of prices that will prevail in the open market following this offering. The failure of an active and liquid trading market to develop and continue would likely have a material adverse effect on the value of our Class A common stock. The market price of our Class A common stock may decline below the initial offering price, and you may not be able to sell your shares of our Class A common stock at or above the price you paid in this offering, or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

73

Table of Contents

***Our amended and restated certificate of incorporation will provide that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters and the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.***

Our amended and restated certificate of incorporation will provide (A) (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws (as either may be amended or restated) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware or (iv) any action asserting a claim governed by the internal affairs doctrine of the law of the State of Delaware shall, to the fullest extent permitted by law, be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware; and (B) the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. Notwithstanding the foregoing, the exclusive forum provision shall not apply to claims seeking to enforce any liability or duty created by the Exchange Act. The choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage such lawsuits against us and our directors, officers, and other employees, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. Alternatively, if a court were to find the choice of forum provision contained in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, results of operations, and financial condition. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and consented to the forum provisions in our amended and restated certificate of incorporation.

***Our amended and restated certificate of incorporation provides that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries.***

The doctrine of corporate opportunity generally provides that a corporate fiduciary may not develop an opportunity using corporate resources, acquire an interest adverse to that of the corporation or acquire property that is reasonably incident to the present or prospective business of the corporation or in which the corporation has a present or expectancy interest, unless that opportunity is first presented to the corporation and the corporation chooses not to pursue that opportunity. The doctrine of corporate opportunity is intended to preclude officers or directors or other fiduciaries from personally benefiting from opportunities that belong to the corporation. Our amended and restated certificate of incorporation, which will be in effect upon the consummation of the Transactions, will provide that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries. Any director or stockholder who is not employed by us or our subsidiaries will, therefore, have no duty to communicate or present corporate opportunities to us, and will have the right to either hold any corporate opportunity for their (and their affiliates') own account and benefit or to recommend, assign or otherwise transfer such corporate opportunity to persons other than us, including to any director or stockholder who is not employed by us or our subsidiaries.

As a result, certain of our stockholders, directors and their respective affiliates will not be prohibited from operating or investing in competing businesses. We, therefore, may find ourselves in competition with certain of our stockholders, directors or their respective affiliates, and we may not have knowledge of, or be able to pursue, transactions that could potentially be beneficial to us. Accordingly, we may lose a corporate opportunity or suffer competitive harm, which could negatively impact our business, operating results and financial condition.

74

Table of Contents

***If securities analysts do not publish research or reports about our business or if they downgrade our stock or our sector, or if there is any fluctuation in our credit rating, our stock price and trading volume could decline.***

The trading market for our Class A common stock will rely in part on the research and reports that industry or financial analysts publish about us or our business. We do not control these analysts. Securities and industry analysts do not currently, and may never, publish research on our company. If no securities or industry analysts commence coverage of us, the trading price of our shares would likely be negatively impacted. Furthermore, if one or more of the analysts who do cover us downgrade our stock or our industry, or the stock of any of our competitors, or publish inaccurate or unfavorable research about our business, the price of our stock could decline. If one or more of these analysts stops covering us or fails to publish reports on us regularly, we could lose visibility in the market, which, in turn, could cause our stock price or trading volume to decline.

Additionally, any fluctuation in the credit rating of us or our subsidiaries may impact our ability to access debt markets in the future or increase our cost of future debt, which could have a material adverse effect on our operations and financial condition, which in return may adversely affect the trading price of shares of our Class A common stock.

***As a public reporting company, we will be subject to the Nasdaq rules and the rules and regulations established from time to time by the SEC regarding our internal control over financial reporting. If we fail to establish and maintain effective internal control over financial reporting and disclosure controls and procedures, we may not be able to accurately report our financial results, or report them in a timely manner.***

Upon completion of this offering, we will become a public reporting company subject to the Nasdaq rules and the rules and regulations established from time to time by the SEC. These rules and regulations will require, among other things, that we establish and periodically evaluate procedures with respect to our internal control over financial reporting. Reporting obligations as a public company are likely to place a considerable strain on our financial and management systems, processes and controls, as well as on our personnel.

In addition, as a public company we will be required to document and test our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act so that our management can certify as to the effectiveness of our internal control over financial reporting by the time our second annual report is filed with the SEC and thereafter, which will require us to document and make significant changes to our internal control over financial reporting. Likewise, our independent registered public accounting firm will be required to provide an attestation report on the effectiveness of our internal control over financial reporting at such time as we cease to be an "emerging growth company," as defined in the JOBS Act, and we become an accelerated or large accelerated filer. As described above, we could potentially qualify as an "emerging growth company" until as late as the fifth anniversary of the completion of this offering.

We expect to incur costs related to implementing an internal audit and compliance function in the upcoming years to further improve our internal control environment. If we identify future deficiencies in our internal control over financial reporting or if we are unable to comply with the demands that will be placed upon us as a public company, including the requirements of Section 404 of the Sarbanes-Oxley Act, in a timely manner, we may be unable to accurately report our financial results, or report them within the timeframes required by the SEC. We also could become subject to sanctions or investigations by the SEC or other regulatory authorities. In addition, if we are unable to assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, when required, investors may lose confidence in the accuracy and completeness of our financial reports, we may face restricted access to the capital markets and our stock price may be adversely affected.

**Table of Contents**

***We will incur significant costs as a result of operating as a public company.***

Prior to this offering, we operated on a private basis. After this offering, we will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of
the Nasdaq and other applicable securities laws and regulations. The expenses incurred by public companies generally for reporting and corporate governance purposes have been increasing. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more difficult, time-consuming and costly, although we are currently unable to estimate these costs with any degree of certainty. We also expect that being a public company and being subject to new rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These laws and regulations could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, our board committees or as our executive officers. Furthermore, if we are unable to satisfy our obligations as a public company, we could be subject to delisting of our Class A common stock, fines, sanctions and other regulatory action and potentially civil litigation. These factors may, therefore, strain our resources, divert management's attention and affect our ability to attract and retain qualified board members.

***Future sales, or the perception of future sales, by us or our existing stockholders in the public market following this offering could cause the market price for our Class A common stock to decline.***

After this offering, the sale of shares of our Class A common stock in the public market, or the perception that such sales could occur, could harm the prevailing market price of shares of our Class A common stock. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

Upon consummation of the Transactions, we will have outstanding a total of 80,816,989 shares of Class A common stock. Of the outstanding shares, the 39,500,000 shares sold in this offering (or 45,425,000 shares if the underwriters exercise in full their option to purchase additional shares) will be freely tradable without restriction or further registration under the Securities Act, other than any shares held by our affiliates. In addition, the shares of Class A common stock issued to the Blocker Shareholders in the Transactions will be eligible for resale pursuant to Rule 144 without restriction or further registration under the Securities Act, other than affiliate restrictions under Rule 144. Any shares of Class A common stock held by our affiliates will be eligible for resale pursuant to Rule 144 under the Securities Act, subject to the volume, manner of sale, holding period and other limitations of Rule 144.

Our directors and executive officers, and substantially all of our stockholders have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, subject to certain exceptions, for a period of 180 days after the date of this prospectus, may not, without the prior written consent of any two of Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC, (1) offer, sell, contract to sell, pledge, grant any option to purchase, lend or otherwise dispose of any shares of our Class A common stock, or any options or warrants to purchase any shares of our Class A common stock, or any securities convertible into or exchangeable for or that represent the right to receive shares of our Class A common stock (including, without limitation, common stock or such other securities which may be deemed to be beneficially owned by such directors, executive officers, managers and members in accordance with the rules and regulations of the SEC and securities which may be issued upon exercise of a stock option or warrant); (2) engage in any hedging or other transaction or arrangement (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) which is designed to, or which reasonably could be expected to lead to, or result in, a sale, loan, pledge or other disposition of shares of our Class A common stock or such other securities, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Class A common stock or such other securities, in cash or otherwise; or (3) make any demand for or exercise any right with respect to the registration of any

Table of Contents

shares of our Class A common stock or any security convertible into or exercisable or exchangeable for our common stock. See "Underwriting."

In addition, certain of our employees who hold Performance Units, including certain of our executive officers, have entered into lock-up agreements in substantially the same form as the lock-up agreements with the underwriters as further described in the section titled "Executive Compensation—Share-Based Compensation."

In addition, we have reserved shares of Class A common stock equal to 8.0% of the total number of outstanding Class A common stock following this offering for issuance under the 2020 Plan. Any Class A common stock that we issue under the 2020 Plan or other equity incentive plans that we may adopt in the future would dilute the percentage ownership held by the investors who purchase Class A common stock in this offering.

As restrictions on resale end or if these stockholders exercise their registration rights, the market price of our shares of Class A common stock could drop significantly if the holders of these shares sell them or are perceived by the market as intending to sell them. These factors could also make it more difficult for us to raise additional funds through future offerings of our shares of Class A common stock or other securities.

In the future, we may also issue securities in connection with investments, acquisitions or capital raising activities. In particular, the number of shares of our Class A common stock issued in connection with an investment or acquisition, or to raise additional equity capital, could constitute a material portion of our then-outstanding shares of our Class A common stock. Any such issuance of additional securities in the future may result in additional dilution to you, or may adversely impact the price of our Class A common stock.

***Our stock price may change significantly following the offering, and you may not be able to resell shares of our Class A common stock at or above the price you paid or at all, and you could lose all or part of your investment as a result.***

The initial public offering price for the shares was determined by negotiations between us and the underwriters. You may not be able to resell your shares at or above the initial public offering price due to a number of factors included herein, including the following:

- results of operations that vary from the expectations of securities analysts and investors;

- results of operations that vary from those of our competitors;

- changes in expectations as to our future financial performance, including financial estimates and investment recommendations by securities analysts and investors;

- technology changes, changes in consumer behavior or changes in merchant relationships in our industry;

- security breaches related to our systems or those of our merchants, affiliates or strategic partners;

- changes in economic conditions for companies in our industry;

- changes in market valuations of, or earnings and other announcements by, companies in our industry;

- declines in the market prices of stocks generally, particularly those of global payment companies;

- strategic actions by us or our competitors;

- announcements by us, our competitors or our strategic partners of significant contracts, new products, acquisitions, joint marketing relationships, joint ventures, other strategic relationships, or capital commitments;

- changes in general economic or market conditions or trends in our industry or the economy as a whole and, in particular, in the consumer spending environment;

77

Table of Contents

- changes in business or regulatory conditions;

- future sales of our Class A common stock or other securities;

- investor perceptions of the investment opportunity associated with our Class A common stock relative to other investment alternatives;

- the public's response to press releases or other public announcements by us or third parties, including our filings with the SEC;

- announcements relating to litigation or governmental investigations;

- guidance, if any, that we provide to the public, any changes in this guidance, or our failure to meet this guidance;

- the development and sustainability of an active trading market for our stock;

- changes in accounting principles; and

- other events or factors, including those resulting from system failures and disruptions, natural disasters, war, acts of terrorism, an outbreak of highly infectious or contagious diseases, such as COVID-19, or responses to these events.

Furthermore, the stock market may experience extreme volatility that, in some cases, may be unrelated or disproportionate to the operating performance of particular companies. These broad market and industry fluctuations may adversely affect the market price of our Class A common stock, regardless of our actual operating performance. In addition, price volatility may be greater if the public float and trading volume of our Class A common stock is low.

In the past, following periods of market volatility, stockholders have instituted securities class action litigation. If we were involved in securities litigation, it could have a substantial cost and divert resources and the attention of management from our business regardless of the outcome of such litigation.

***If you purchase shares of Class A common stock in this offering, you will suffer immediate and substantial dilution of your investment.***

The initial public offering price of our Class A common stock is substantially higher than the pro forma net tangible book value per share of our Class A common stock. Therefore, if you purchase shares of our Class A common stock in this offering, you will pay a price per share that substantially exceeds our pro forma net tangible book value per share after this offering. You will experience immediate dilution of $18.68 per share, representing the difference between our pro forma net tangible book value per share after giving effect to this offering and the initial public offering price. In addition, investors who purchase Class A common stock from us in this offering will have contributed 100% of the aggregate price paid by all purchasers of our outstanding equity but will own only approximately 12.6% of our outstanding equity after this offering. See "Dilution" for more detail, including the calculation of the pro forma net tangible book value per share of our Class A common stock.

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements. All statements other than statements of historical facts contained in this prospectus may be forward-looking statements. Statements regarding our future results of operations and financial position, business strategy and plans and objectives of management for future operations, including, among others, statements regarding the Transactions, including the consummation of this offering, expected growth, future capital expenditures and debt service obligations, are forward-looking statements. In some cases, you can identify forward-looking statements by terms, such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Accordingly, we caution you that any such forward-looking statements are not guarantees of future performance and are subject to risks, assumptions and uncertainties that are difficult to predict. Although we believe that the expectations reflected in these forward-looking statements are reasonable as of the date made, actual results may prove to be materially different from the results expressed or implied by the forward-looking statements.

There are or will be important factors that could cause our actual results to differ materially from those indicated in these forward-looking statements, including, but are not limited to, the following:

- our ability to comply with the numerous, complex and frequently changing laws regulating the marketing and sale of Medicare plans;

- the potential for an adverse change in our relationships with carriers, including a loss of carrier relationships;

- failure to grow our customer base or retain our existing customers;

- carriers' ability to reduce commissions paid to us and adversely change their underwriting practices;

- significant consolidation in the healthcare industry that could adversely alter our relationships with carriers;

- information technology systems failures or capacity constraints interrupting our operations;

- factors that adversely impact our estimate of LTV;

- our dependence on agents to sell insurance plans;

- changes in the health insurance system and laws and regulation governing health insurance markets;

- inability to effectively advertise our products; and

- the significant influence that the Founders and Centerbridge will have over us after the Transactions, including control over decisions that require the approval of stockholders.

The foregoing factors should not be construed as exhaustive and should be read together with the other cautionary statements included in this prospectus. If one or more events related to these or other risks or uncertainties materialize, or if our underlying assumptions prove to be incorrect, actual results may differ materially from what we anticipate. Many of the important factors that will determine these results are beyond our ability to control or predict. Accordingly, you should not place undue reliance on any such forward-looking statements. Any forward-looking statement speaks only as of the date on which it is made, and, except as otherwise required by law, we do not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise. New factors emerge from time to time, and it is not possible for us to predict which will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

79

## OUR ORGANIZATIONAL STRUCTURE

GoHealth, Inc., a Delaware corporation, was formed on March 27, 2020 and is the issuer of the Class A common stock offered by this prospectus. Prior to this offering and the Transactions (as defined below), all of our business operations have been conducted through GoHealth Holdings, LLC and its direct and indirect subsidiaries and the Original Equity Owners are the only owners of GoHealth Holdings, LLC. We will consummate the Transactions, excluding this offering, substantially concurrently with or prior to the consummation of this offering.

### Existing Organization

GoHealth Holdings, LLC is treated as a partnership for U.S. federal income tax purposes and, as such is generally not subject to any U.S. federal entity-level income taxes. Taxable income or loss of GoHealth Holdings, LLC is included in the U.S. federal income tax returns of GoHealth Holdings, LLC's members. Prior to the consummation of this offering, the Original Equity Owners were the only members of GoHealth Holdings, LLC.

### Transactions

Prior to the Transactions, there will be only one holder of common stock of GoHealth, Inc. We will consummate the following organizational transactions in connection with this offering:

- we will amend and restate the existing limited liability company agreement of GoHealth Holdings, LLC, which will become effective substantially concurrently with or prior to the consummation of this offering, to, among other things, (1) recapitalize all existing ownership interests in GoHealth Holdings, LLC (including profits units awarded under the existing limited liability company agreement of GoHealth Holdings, LLC) and (2) appoint GoHealth, Inc. as the sole managing member of GoHealth Holdings, LLC upon its acquisition of LLC Interests in connection with this offering;

- we will amend and restate GoHealth, Inc.'s certificate of incorporation to, among other things, provide for (1) the recapitalization of our outstanding shares of existing common stock into one share of Class A common stock, (2) Class A common stock, with each share of our Class A common stock entitling its holder to one vote per share on all matters presented to our stockholders generally and (3) Class B common stock, with each share of our Class B common stock entitling its holder to one vote per share on all matters presented to our stockholders generally, and that shares of our Class B common stock may only be held by the Continuing Equity Owners and their respective permitted transferees as described in "Description of Capital Stock—Common Stock—Class B Common Stock;"

- we will issue 232,383,011 shares of our Class B common stock to the Continuing Equity Owners, which is equal to the number of LLC Interests held directly or indirectly by such Continuing Equity Owners immediately following the Transactions, for nominal consideration;

- we will acquire, by means of one or more mergers, the Blocker Company (the "Blocker Merger") and will issue to the Blocker Shareholders 41,316,989 shares of our Class A common stock and, upon consummation of this offering, $75.5 million (based on the midpoint of the estimated price range set forth on the cover page of this prospectus) in cash to Blocker Shareholders as partial consideration in the Blocker Merger;

- we will issue 39,500,000 shares of our Class A common stock to the purchasers in this offering (or 45,425,000 shares if the underwriters exercise in full their option to purchase additional shares of Class A common stock) in exchange for net proceeds of approximately $704.7 million (or approximately $811.6 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock) based upon an assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), less the underwriting discount and estimated offering expenses payable by us;

- we will use the net proceeds from this offering to (i) purchase 35,316,264 newly-issued LLC Interests (or 40,298,731 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount

80

Table of Contents

and estimated offering expenses payable by us and (ii) pay $75.5 million in cash to the Blocker Shareholders as partial consideration in the Blocker Merger;

- GoHealth Holdings, LLC intends to use the net proceeds from the sale of LLC Interests to GoHealth, Inc. (i) to pay $399.2 million in cash to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, (ii) to satisfy in full $100.0 million in aggregate face amount of an existing equity instrument in connection with the Transactions (see footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information") and (iii) for general corporate purposes to support the growth of the business, in each case, as described under "Use of Proceeds;" and

- GoHealth, Inc. will enter into (1) the Stockholders Agreement with Centerbridge and NVX Holdings, (2) the Registration Rights Agreement with certain of the Continuing Equity Owners and (3) the Tax Receivable Agreement with GoHealth Holdings, LLC, the Continuing Equity Owners and the Blocker Shareholders. For a description of the terms of the Stockholders Agreement, the Registration Rights Agreement and the Tax Receivable Agreement, see "Certain Relationships and Related Party Transactions."

**Organizational Structure Following the Transactions**

- GoHealth, Inc. will be a holding company and its principal asset will consist of LLC Interests it acquires directly from GoHealth Holdings, LLC and indirectly from certain of the Continuing Equity Owners (including the Blocker Shareholders);

- GoHealth, Inc. will be the sole managing member of GoHealth Holdings, LLC and will control the business and affairs of GoHealth Holdings, LLC and its direct and indirect subsidiaries;

- GoHealth, Inc. will own, directly or indirectly, 80,816,989 LLC Interests of GoHealth Holdings, LLC, representing approximately 25.8% of the economic interest in GoHealth Holdings, LLC (or 85,799,456 LLC Interests, representing approximately 27.4% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the Founders will own (1) 98,224,456 LLC Interests of GoHealth Holdings, LLC (excluding 2,026,226 LLC Interests subject to time-based vesting requirements), representing approximately 31.4% of the economic interest in GoHealth Holdings, LLC (or 96,076,286 LLC Interests, representing approximately 30.7% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (2) 98,224,564 shares of Class B common stock of GoHealth, Inc., representing approximately 31.4% of the combined voting power of all of GoHealth, Inc.'s common stock (or 96,076,286 shares of Class B common stock of GoHealth, Inc., representing approximately 30.7% if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- Centerbridge (through the Blocker Shareholders) will own (1) 41,316,989 shares of Class A common stock of GoHealth, Inc. (or 40,374,456 shares of Class A common stock of GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 13.2% of the combined voting power of all of GoHealth, Inc.'s common stock and approximately 51.1% of the economic interest in GoHealth, Inc. (or approximately 12.9% of the combined voting power and approximately 47.1% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock), (2) directly through Centerbridge's ownership of LLC Interests and indirectly through GoHealth, Inc.'s ownership of LLC Interests, approximately 39.4% of the economic interest in GoHealth Holdings, LLC (or approximately 38.5% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (3) 82,058,717 shares of Class B common stock of GoHealth, Inc., representing approximately 26.2% (and, together with the shares of Class A common stock, 39.4%) of the combined voting power of all of GoHealth, Inc.'s common stock (or 80,186,773 shares of Class B common stock of GoHealth, Inc., representing approximately 25.6% (and, together with the shares of Class A common stock, 38.5%) if the underwriters exercise in full their option to purchase additional shares of Class A common stock); and

- the purchasers in this offering will own (1) 39,500,000 shares of Class A common stock of GoHealth, Inc. (or 45,425,000 shares of Class A common stock of GoHealth, Inc. if the underwriters exercise in full their

81

Table of Contents

option to purchase additional shares of Class A common stock), representing approximately 12.6% of the combined voting power of all of GoHealth, Inc.'s common stock and approximately 48.9% of the economic interest in GoHealth, Inc. (or approximately 14.5% of the combined voting power and approximately 52.9% of the economic interest in GoHealth, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), and (2) through GoHealth, Inc.'s ownership of LLC Interests, indirectly will hold approximately 12.6% of the economic interest in GoHealth Holdings, LLC (or approximately 14.5% of the economic interest in GoHealth Holdings, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock).

The diagram below depicts our organizational structure after giving effect to the Transactions, including this offering, assuming no exercise by the underwriters of their option to purchase additional shares of Class A common stock.



82

(1)     Investors in this offering will hold approximately 12.6% of the combined voting power of GoHealth, Inc. (or approximately 14.5% of the combined voting power if the underwriters exercise in full their option to purchase additional shares of Class A common stock).

As the sole managing member of GoHealth Holdings, LLC, we will operate and control all of the business and affairs of GoHealth Holdings, LLC and, through GoHealth Holdings, LLC and its direct and indirect subsidiaries, conduct our business. Following the Transactions, including this offering, GoHealth, Inc. will have the majority economic interest in GoHealth Holdings, LLC, and will control the management of GoHealth Holdings, LLC as its sole managing member. As a result, GoHealth, Inc. will consolidate GoHealth Holdings, LLC and record a significant non-controlling interest in a consolidated entity in GoHealth, Inc.'s consolidated financial statements for the economic interest in GoHealth Holdings, LLC held directly or indirectly by the Continuing Equity Owners.

Unless otherwise indicated, this prospectus assumes the shares of Class A common stock are offered at $19.00 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). Pursuant to the terms of the Existing LLC Agreement, the split between the number of LLC Interests among the Original Equity Owners will vary depending on the initial public offering price in this offering. The initial public offering price will also impact the relative allocation of LLC Interests issued in the Transactions among the Original Equity Owners and, in turn, the shares of Class A common stock and Class B common stock issued to the Original Equity Owners in the Transactions. Additionally, while the number of shares of Class A common stock being offered hereby to the public will not change, any increase or decrease in the number of shares of Class A common stock sold by GoHealth, Inc. in this offering due to a change in the initial public offering price will result in a corresponding increase or decrease in the number of LLC Interests purchased by GoHealth, Inc. directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering. Therefore, the indirect economic interest in GoHealth Holdings, LLC represented by the shares of Class A common stock sold in this offering will be largely unaffected by the initial public offering price.

**Incorporation of GoHealth, Inc.**

GoHealth, Inc., the issuer of the Class A common stock offered by this prospectus, was incorporated as a Delaware corporation on March 27, 2020. GoHealth, Inc. has not engaged in any material business or other activities except in connection with its formation and the Transactions. The amended and restated certificate of incorporation of GoHealth, Inc. that will become effective immediately prior to the consummation of this offering will, among other things, (i) recapitalize our outstanding shares of existing common stock into one share of Class A common stock and (ii) authorize two classes of common stock, Class A common stock and Class B common stock, each having the terms described in "Description of Capital Stock."

**Reclassification and Amendment and Restatement of the GoHealth Holdings, LLC Agreement**

Prior to or substantially concurrently with the consummation of this offering, the existing limited liability company agreement of GoHealth Holdings, LLC will be amended and restated to, among other things, recapitalize its capital structure by creating a single new class of units that we refer to as "common units" and provide for a right of redemption of common units (subject in certain circumstances to time-based vesting requirements and certain other restrictions) in exchange for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules), who are disinterested), shares of our Class A common stock or cash. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement."

Table of Contents

## USE OF PROCEEDS

We estimate, based upon an assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), that we will receive net proceeds from this offering of approximately $704.7 million (or $811.6 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock), after deducting the underwriting discount and estimated offering expenses payable by us.

We intend to use the net proceeds from this offering to (i) purchase 35,316,264 newly-issued LLC Interests (or 40,298,731 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us and (ii) pay $75.5 million in cash to the Blocker Shareholders as partial consideration in the Blocker Merger.

GoHealth Holdings, LLC intends to use the net proceeds from the sale of LLC Interests to GoHealth, Inc. (i) to pay $399.2 million in cash to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, (ii) to satisfy in full $100.0 million in aggregate face amount of an existing equity instrument in connection with the Transactions (see footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information") and (iii) for general corporate purposes to support the growth of the business.

Assuming no exercise of the underwriters' option to purchase additional shares of Class A common stock, each $1.00 increase (decrease) in the assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus) would increase (decrease) the net proceeds to us from this offering by approximately $12.5 million and, in turn, the net proceeds received by GoHealth Holdings, LLC from the sale of LLC Interests to GoHealth, Inc. by 12.5 million, assuming the number of shares offered, as set forth on the cover page of this prospectus, remains the same, and after deducting the underwriting discount and estimated offering expenses payable by us.

Each 1,000,000 share increase (decrease) in the number of shares offered by us in this offering would increase (decrease) the net proceeds to us from this offering by approximately $18.0 million and, in turn, the net proceeds received by GoHealth Holdings, LLC from the sale of LLC Interests to GoHealth, Inc. by $18.0 million, assuming that the price per share for the offering remains at $19.00 (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), and after deducting the underwriting discount and estimated offering expenses payable by us.

GoHealth Holdings, LLC will bear or reimburse GoHealth, Inc. for all of the expenses incurred in connection with the Transactions, including this offering.

84

## CAPITALIZATION

The following table sets forth the cash and capitalization as of March 31, 2020, as follows:

- of GoHealth Holdings, LLC and its subsidiaries on a historical basis;

- of GoHealth, Inc. and its subsidiaries on a pro forma basis to give effect to the Transactions, excluding this offering; and

- of GoHealth, Inc. and its subsidiaries on a pro forma as adjusted basis to give effect to the Transactions, including the sale of the shares of Class A common stock in this offering at an assumed initial public offering price of $19.00 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), after deducting the underwriting discount and estimated offering expenses payable by us, and the application of the net proceeds therefrom as described under "Use of Proceeds."

For more information, please see "Our Organizational Structure," "Use of Proceeds" and "Unaudited Pro Forma Condensed Consolidated Financial Information" included elsewhere in this prospectus. You should read this information in conjunction with our consolidated financial statements and the related notes included elsewhere in this prospectus and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and other financial information contained in this prospectus.

| | As of March 31, 2020 | | |
| --- | --- | --- | --- |
| *(in thousands, except per share and share amounts)* | GoHealth Holdings, LLC Historical | GoHealth, Inc. Pro Forma | GoHealth, Inc. Pro Forma As Adjusted |
| Cash and cash equivalents | $ 152,423 | $ 152,423 | $ 282,163 |
| Long-term debt (including current portion)[1]: | | | |
| Term Loan Facility[2] | $ 290,834 | $ 290,834 | $ 290,834 |
| Incremental Term Loan Facility[2] | 110,988 | 110,988 | 110,988 |
| Total long-term debt | $ 401,822 | $ 401,822 | $ 401,822 |
| Members'/stockholders' equity (deficit): | | | |
| Member's equity: | | | |
| Preferred units | 546,972 | — | — |
| Class A common units | 219,139 | — | — |
| Class B common units | 103,593 | — | — |
| Accumulated other comprehensive (loss) income | (102) | (102) | (102) |
| Stockholders' equity: | | | |
| Class A common stock, par value $0.0001 per share; 1,100,000,000 shares authorized, 41,316,989 shares issued and outstanding, pro forma; and 1,100,000,000 shares authorized, 80,816,989 shares issued and outstanding, pro forma as adjusted | — | 5 | 9 |
| Class B common stock, par value $0.0001 per share; 690,000,000 shares authorized, 254,499,275 shares issued and outstanding, pro forma; and 690,000,000 shares authorized, 232,383,011 shares issued and outstanding, pro forma as adjusted | — | 25 | 23 |
| Additional paid in capital[3] | — | 224,461 | 373,780 |
| Retained earnings (deficit) | — | — | (52,397) |
| Total members'/stockholders' equity (deficit) | 869,602 | 224,389 | 321,313 |
| Noncontrolling interests | — | 645,213 | 925,130 |
| Total capitalization | $ 1,271,424 | $ 1,271,424 | $ 1,648,265 |

(1)  See "Description of Indebtedness" for a description of our currently outstanding indebtedness.

**Table of Contents**

(2)    Net of $8 million and $6 million of original issue discount and debt issuance costs related to the Term Loan Facility and Incremental Term Loan Facility, respectively.

(3)    Net of $45.6 million in equity issuance costs.

Each $1.00 increase (decrease) in the assumed public offering price of $19.00 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus, would increase (decrease) cash, additional paid-in capital and total members' / stockholders' equity on a pro forma as adjusted basis by approximately $12.5 million, assuming that the price per share for the offering remains at $19.00 (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), and after deducting the underwriting discount and estimated offering expenses payable by us.

Each 1,000,000 share increase or decrease in the number of shares offered in this offering by us would increase or decrease each of total indebtedness, additional paid-in capital and total members' / stockholders' equity on a pro forma as adjusted basis by approximately $18.1 million, assuming that the price per share for the offering remains at $19.00 (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), and after deducting the underwriting discount and estimated offering expenses payable by us.

86

**Table of Contents**

## DIVIDEND POLICY

We currently intend to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness, and therefore we do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. Holders of our Class B common stock are not entitled to participate in any dividends declared by our board of directors. Furthermore, because we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from GoHealth Holdings, LLC and, through GoHealth Holdings, LLC, cash distributions and dividends from our other direct and indirect subsidiaries. Our ability to pay dividends may be restricted by the terms of any future credit agreement or any future debt or preferred equity securities of us or our subsidiaries. See "Description of Capital Stock," "Description of Indebtedness" and "Management's Discussion and Analysis of Financial Condition and Results of Operation—Liquidity and Capital Resources." Any future determination as to the declaration and payment of dividends, if any, will be at the discretion of our board of directors, subject to compliance with contractual restrictions and covenants in the agreements governing our current and future indebtedness. Any such determination will also depend upon our business prospects, results of operations, financial condition, cash requirements and availability and other factors that our board of directors may deem relevant.

Accordingly, you may need to sell your shares of our Class A common stock to realize a return on your investment, and you may not be able to sell your shares at or above the price you paid for them. See "Risk Factors—Risks Related to the Offering and Ownership of our Class A Common Stock—Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it."

Immediately following this offering, we will be a holding company, and our principal asset will be the LLC Interests we purchase from GoHealth Holdings, LLC. If we decide to pay a dividend in the future, we would need to cause GoHealth Holdings, LLC to make distributions to us in an amount sufficient to cover such dividend. If GoHealth Holdings, LLC makes such distributions to us, the other holders of LLC Interests will be entitled to receive pro rata distributions. See "Risk Factors—Risks Related to Our Organizational Structure—Our principal asset after the completion of this offering will be our interest in GoHealth Holdings, LLC, and, as a result, we will depend on distributions from GoHealth Holdings, LLC to pay our taxes and expenses, including payments under the Tax Receivable Agreement. GoHealth Holdings, LLC's ability to make such distributions may be subject to various limitations and restrictions."

## DILUTION

The Continuing Equity Owners will own LLC Interests after the Transactions. Because the Continuing Equity Owners do not own any Class A common stock or have any right to receive distributions from GoHealth, Inc., we have presented dilution in pro forma net tangible book value per share both before and after this offering assuming that all of the holders of LLC Interests (other than GoHealth, Inc.) had their LLC Interests redeemed or exchanged for newly-issued shares of Class A common stock on a one-for-one basis (rather than for cash) and the transfer to the Company and cancellation for no consideration of all of their shares of Class B common stock (which are not entitled to receive distributions or dividends, whether cash or stock from GoHealth, Inc.) in order to more meaningfully present the dilutive impact on the investors in this offering. We refer to the assumed redemption or exchange of all LLC Interests for shares of Class A common stock as described in the previous sentence as the Assumed Redemption.

Dilution is the amount by which the offering price paid by the purchasers of the Class A common stock in this offering exceeds the pro forma net tangible book value per share of Class A common stock after the offering. GoHealth Holdings, LLC's pro forma net tangible book value as of March 31, 2020 prior to this offering and after giving effect to the other Transactions and the Assumed Redemption was a deficit of $277.0 million. Pro forma net tangible book value per share prior to this offering is determined by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of Class A common stock deemed to be outstanding after giving effect to the Assumed Redemption.

If you invest in our Class A common stock in this offering, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share and the pro forma net tangible book value per share of our Class A common stock after this offering.

Pro forma net tangible book value per share after this offering is determined by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of Class A common stock deemed to be outstanding, after giving effect to the Transactions, including this offering and the application of the proceeds from this offering as described in "Use of Proceeds," and the Assumed Redemption. Our pro forma net tangible book value as of March 31, 2020, after giving effect to this offering would have been approximately $99.9 million, or $0.32 per share of Class A common stock. This amount represents an immediate increase in pro forma net tangible book value of $1.51 per share to our existing stockholders and an immediate dilution in pro forma net tangible book value of approximately $18.68 per share to new investors purchasing shares of Class A common stock in this offering. We determine dilution by subtracting the pro forma net tangible book value per share after this offering from the amount of cash that a new investor paid for a share of Class A common stock. The following table illustrates this dilution:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $19.00 |
| Pro forma net tangible book value (deficit) per share as of March 31, 2020 before this offering | $(1.19) | |
| Increase per share attributable to new investors in this offering | 1.51 | |
| Pro forma net tangible book value (deficit) per share after this offering | | 0.32 |
| Dilution per share to new Class A common stock investors in this offering | | $18.68 |

A $1.00 increase (decrease) in the assumed initial public offering price of $19.00 per share, which is the midpoint of the estimated price range set forth on the cover page of this prospectus, would increase the pro forma net tangible book value (deficit) per share after this offering by approximately $0.12, and dilution in pro forma net tangible book value (deficit) per share to new investors by approximately $0.88 assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting the underwriting discount and estimated offering expenses payable by us.

88

Table of Contents

If the underwriters exercise in full their option to purchase additional shares of Class A common stock, the pro forma net tangible book value (deficit) after the offering would be $0.65 per share, the increase in pro forma net tangible book value per share to existing stockholders would be $0.33 per share and the dilution in pro forma net tangible book value to new investors would be $18.35 per share, in each case assuming an initial public offering price of $19.00 per share, which is the midpoint of the estimated price range set forth on the cover page of this prospectus.

The following table summarizes, as of March 31, 2020, after giving effect to the Transactions (including this offering) and the Assumed Redemption, the number of shares of Class A common stock purchased from us, the total consideration paid, or to be paid, to us and the average price per share paid, or to be paid, by existing owners and by the new investors. The calculation below is based on an assumed initial public offering price of $19.00 per share, which is the midpoint of the estimated price range set forth on the cover page of this prospectus, before deducting the underwriting discount and estimated offering expenses payable by us.

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Original Equity Owners | 273,700,000 | 87.4% | $ 27,370 | — | — |
| New investors | 39,500,000 | 12.6% | 750,500,000 | 100.0% | 19.00 |
| Total | 313,200,000 | 100.0% | $750,527,370 | 100.0% | $ 2.40 |

Each $1.00 increase (decrease) in the assumed initial public offering price of $19.00 per share would increase (decrease) the total consideration paid by new investors and the total consideration paid by all stockholders by $37.5 million, assuming the number of shares offered by us remains the same and after deducting the underwriting discount but before estimated offering expenses.

Except as otherwise indicated, the discussion and the tables above assume no exercise of the underwriters' option to purchase additional shares of Class A common stock. In addition, the discussion and tables above exclude shares of Class B common stock, because holders of the Class B common stock are not entitled to distributions or dividends, whether cash or stock, from GoHealth, Inc. The number of shares of our Class A common stock outstanding after this offering as shown in the tables above is based on the number of shares outstanding as of March 31, 2020, after giving effect to the Transactions and the Assumed Redemption, and (i) excludes 6,465,359 shares of Class A common stock reserved for issuance under our 2020 Incentive Award Plan, or 2020 Plan, including approximately 2,672,234 shares of Class A common stock issuable pursuant to stock options and approximately 338,159 shares of Class A common stock issuable pursuant to restricted share units, in each case which we intend to grant to certain of our directors, executive officers and other employees in connection with this offering as described under the caption "Executive Compensation—New Incentive Plans"; (ii) excludes 7,408,386 LLC Interests to be held directly or indirectly by certain Former Profits Unit Holders that are subject to time-based vesting requirements; and (iii) gives effect to the vesting of 13,971,151 LLC Interests held directly or indirectly by certain Former Profits Unit Holders that are expected to vest upon the consummation of this offering based upon the satisfaction of performance-vesting targets at the assumed initial public offering price of $19.00 per share of Class A common stock, which is the midpoint of the estimated price range set forth on the cover page of this prospectus.

To the extent any of these outstanding options are exercised, there will be further dilution to new investors. To the extent all of such outstanding options had been exercised as of March 31, 2020 the pro forma net tangible book value per share after this offering would be $0.30, and total dilution per share to new investors would be $18.70.

89

**Table of Contents**

If the underwriters exercise in full their option to purchase additional shares of Class A common stock:

- the percentage of shares of Class A common stock held by the Blocker Shareholders will decrease to approximately 85.8% of the total number of shares of our Class A common stock outstanding after this offering; and

- the number of shares held by new investors will increase to 45,425,000, or approximately 14.2% of the total number of shares of our Class A common stock outstanding after this offering.

**SELECTED HISTORICAL CONDENSED CONSOLIDATED FINANCIAL DATA**

The following table presents the selected historical condensed consolidated financial data for GoHealth Holdings, LLC and its subsidiaries. GoHealth Holdings, LLC is the predecessor of the issuer, GoHealth, Inc., for financial reporting purposes. The selected consolidated statements of operations data and statements of cash flows data for the period from September 13, 2019 through December 31, 2019 (Successor), the period from January 1, 2019 through September 12, 2019 (Predecessor) and the year ended December 31, 2018 (Predecessor), and the selected consolidated balance sheet data as of December 31, 2019 and 2018 are derived from the audited consolidated financial statements of GoHealth Holdings, LLC included elsewhere in this prospectus. The selected condensed consolidated statements of operations and statements of cash flows data for the three months ended March 31, 2020 and 2019, and the summary condensed consolidated balance sheet data as of March 31, 2020, are derived from the unaudited condensed consolidated financial statements of GoHealth Holdings, LLC included elsewhere in this prospectus. The results of operations for the periods presented below are not necessarily indicative of the results to be expected for any future period. The information set forth below should be read together with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and the consolidated financial statements and the accompanying notes included elsewhere in this prospectus.

The selected historical financial data of GoHealth, Inc. has not been presented because GoHealth, Inc. is a newly incorporated entity, has had no business transactions or activities to date and had no assets or liabilities during the periods presented in this section.

| (in thousands) | Three Months Ended March 31, | | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|
| | 2020 (Successor) | 2019 (Predecessor) | | | |
| **Consolidated Statement of Operations:** | | | | | |
| Net revenues: | | | | | |
| Commission | $ 112,510 | $ 51,215 | $ 243,347 | $ 175,834 | $ 144,378 |
| Other | 28,500 | 17,874 | 65,144 | 55,176 | 81,827 |
| Net revenues | 141,010 | 69,089 | 308,491 | 231,010 | 226,205 |
| Operating expenses: | | | | | |
| Cost of revenue | 42,134 | 27,552 | 90,384 | 79,169 | 79,582 |
| Marketing and advertising | 26,073 | 11,411 | 24,811 | 37,769 | 28,129 |
| Customer care and enrollment | 23,978 | 13,939 | 44,356 | 49,149 | 46,076 |
| Technology | 4,593 | 4,155 | 6,006 | 40,312 | 16,197 |
| General and administrative | 10,491 | 6,990 | 13,674 | 79,219 | 27,458 |
| Change in fair value of contingent consideration liability | 4,400 | — | 70,700 | — | — |
| Amortization of intangible assets | 23,514 | — | 28,217 | — | — |
| Transaction costs | — | — | 6,245 | 2,267 | — |
| Total operating expenses | 135,183 | 64,047 | 284,393 | 287,885 | 197,442 |
| Income (loss) from operations | 5,827 | 5,042 | 24,098 | (56,875) | 28,763 |
| Interest expense | 6,756 | 28 | 8,076 | 140 | 224 |
| Other income (expense) | (10) | (10) | 17 | (114) | (379) |
| Income (loss) before income taxes | (939) | 5,004 | 16,039 | (57,129) | 28,160 |
| Income tax expense (benefit) | (2) | 2 | 44 | (66) | 46 |
| Net income (loss) | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,114 |
| Less: Net loss attributable to non-controlling interests | — | — | — | — | (3) |

91

**Table of Contents**

| (in thousands) | Three Months Ended March 31, | | | | Year Ended December 31, 2018 |
| | 2020 (Successor) | 2019 (Predecessor) | Successor 2019 Period | Predecessor 2019 Period | (Predecessor) |
|---|---|---|---|---|---|
| Net income (loss) attributable to GoHealth Holdings, LLC and subsidiaries | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,117 |
| **Consolidated Statement of Cash Flows:** | | | | | |
| Net cash (used in) provided by operating activities | $ 23,587 | $ 1,222 | $ (9,284) | $ 9,281 | $ 5,443 |
| Net cash used in investing activities | (3,522) | (1,944) | (810,010) | (5,597) | (6,170) |
| Net cash provided by (used in) financing activities | 120,167 | 1,147 | 830,879 | (3,449) | 63 |

| (in thousands) | As of March 31, 2020 (Successor) | As of December 31, 2019 (Successor) | As of December 31, 2018 (Predecessor) |
|---|---|---|---|
| **Consolidated Balance Sheet:** | | | |
| Cash and cash equivalents | $ 152,423 | $ 12,276 | $ 505 |
| Total assets | 1,709,649 | 1,602,295 | 142,837 |
| Total liabilities | 840,047 | 742,151 | 83,490 |
| Total members' equity (deficit) | 869,602 | 860,144 | (186,653) |

92

**Table of Contents**

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION**

The following unaudited pro forma condensed consolidated financial information reflects (i) the Centerbridge Acquisition and (ii) the impact of this offering, after giving effect to the Transactions discussed in "Our Organizational Structure." Following the completion of the Transactions, GoHealth, Inc. will be a holding company whose principal asset will consist of 25.8% of the outstanding LLC Interests (or 27.4% of LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) that it acquires directly from GoHealth Holdings, LLC and indirectly from certain of the Continuing Equity Owners and the Blocker Shareholders in connection with this offering. The remaining LLC Interests will be held directly or indirectly by the Continuing Equity Owners. GoHealth, Inc. will act as the sole managing member of GoHealth Holdings, LLC, will operate and control the business and affairs of GoHealth Holdings, LLC and its direct and indirect subsidiaries and, through GoHealth Holdings, LLC and its direct and indirect subsidiaries, conduct its business.

The following unaudited pro forma condensed consolidated statements of operations for the year ended December 31, 2019 and the three months ended March 31, 2020 give effect to the Centerbridge Acquisition and the Transactions, including this offering, as if the same had occurred on January 1, 2019. The unaudited pro forma condensed consolidated balance sheet as of March 31, 2020 presents our unaudited pro forma balance sheet giving effect to the Transactions, including this offering, as if they had occurred as of March 31, 2020.

We have derived the unaudited pro forma condensed consolidated statement of operations and unaudited pro forma condensed consolidated balance sheet from the consolidated financial statements of GoHealth Holdings, LLC and its subsidiaries as of March 31, 2020 and for the Successor 2019 Period and Predecessor 2019 Period included elsewhere in this prospectus. The historical consolidated financial information of GoHealth Holdings, LLC has been adjusted in this unaudited pro forma condensed consolidated financial information to give effect to events that are directly attributable to the Centerbridge Acquisition and the Transactions, are factually supportable and, with respect to the condensed consolidated statement of operations, are expected to have a continuing impact on GoHealth, Inc. The unaudited pro forma condensed consolidated financial information reflects adjustments that are described in the accompanying notes and are based on available information and certain assumptions we believe are reasonable, but are subject to change.

We refer to the adjustments related to the Centerbridge Acquisition, excluding the adjustments related to the Offering, as the "Pro Forma Centerbridge Acquisition Adjustments." We refer to the adjustments related to the Transactions, including the impact of the Transactions described in "Our Organizational Structure," but excluding the adjustments related to the Offering, as the Pro Forma Transaction Adjustments.

The adjustments related to this offering, which we refer to as the Pro Forma Offering Adjustments, are described in the notes to the unaudited pro forma condensed consolidated financial information, and principally include the following:

- the amendment and restatement of the limited liability company agreement of GoHealth Holdings, LLC to, among other things, appoint GoHealth, Inc. as the sole managing member of GoHealth Holdings, LLC and provide certain redemption rights to the Continuing Equity Owners;

- the issuance of 39,500,000 shares of our Class A common stock to the investors in this offering in exchange for net proceeds of approximately $713.0 million (based on an assumed initial public offering price of $19.00 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus), after deducting the underwriting discount but before estimated offering expenses payable by us;

- the payment of fees and expenses related to this offering and the application of the net proceeds from the sale of Class A common stock in this offering to purchase LLC Interests directly from GoHealth Holdings, LLC, at a purchase price per LLC Interest equal to the initial public offering price per share of Class A common stock less the underwriting discount and estimated offering expenses payable by us, with such LLC Interests representing 25.8% of the outstanding LLC Interests;

- the settlement of the 2019 and 2020 contingent earnout liabilities associated with the Centerbridge Acquisition as further described in footnote (4) herein; and

93

- the application by GoHealth Holdings, LLC of the proceeds from the sale of LLC Interests to us as described under "Use of Proceeds."

Except as otherwise indicated, the unaudited pro forma condensed consolidated financial information presented assumes no exercise by the underwriters of their option to purchase additional shares of Class A common stock in the offering.

As a public company, we will be implementing additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. We expect to incur additional annual expenses related to these additional procedures and processes and, among other things, additional directors' and officers' liability insurance, director fees, additional expenses associated with complying with the reporting requirements of the SEC, transfer agent fees, costs relating to additional accounting, legal and administrative personnel, increased auditing, tax and legal fees, stock exchange listing fees and other public company expenses. We have not included any pro forma adjustments relating to these costs in the information below.

The unaudited pro forma condensed consolidated financial information is included for informational purposes only. The unaudited pro forma condensed consolidated financial information should not be relied upon as being indicative of our results of operations or financial condition had the Centerbridge Acquisition and the Transactions, including this offering, occurred on the dates assumed. The unaudited pro forma condensed consolidated financial information also does not project our results of operations or financial position for any future period or date. The unaudited pro forma condensed consolidated statement of operations and balance sheet should be read in conjunction with the "Risk Factors," "Prospectus Summary—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data," "Selected Historical Condensed Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

## GoHealth, Inc. and subsidiaries

### Unaudited pro forma condensed consolidated balance sheet as of March 31, 2020

| (in thousands, except share and per share amounts) | Successor GoHealth Holdings, LLC Historical | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 152,423 | — | $ 152,423 | $ 129,740(3)(4) | $ 282,163 |
| Accounts receivable, net of allowance for doubtful accounts of $651 in 2020 | 6,422 | — | 6,422 | — | 6,422 |
| Commissions receivable—current | 58,173 | — | 58,173 | — | 58,173 |
| Prepaid expenses and other current assets | 6,010 | — | 6,010 | — | 6,010 |
| Total current assets | 223,028 | — | 223,028 | 129,740 | 352,768 |
| Commissions receivable—non-current | 330,617 | — | 330,617 | — | 330,617 |
| Property, equipment, and capitalized software, net | 9,228 | — | 9,228 | — | 9,228 |
| Intangible assets, net | 759,269 | — | 759,269 | — | 759,269 |
| Goodwill | 386,553 | — | 386,553 | — | 386,553 |
| Other long-term assets | 954 | — | 954 | — | 954 |
| Total assets | $ 1,709,649 | — | $ 1,709,649 | $ 129,740 | $1,839,389 |

94

| (in thousands, except share and per share amounts) | Successor GoHealth Holdings, LLC Historical | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|
| **Liabilities and members' equity** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 12,718 | — | $ 12,718 | — | $ 12,718 |
| Accrued liabilities | 11,740 | — | 11,740 | — | 11,740 |
| Commissions payable—current | 34,536 | — | 34,536 | — | 34,536 |
| Deferred revenue | 14,867 | — | 14,867 | — | 14,867 |
| Current portion of debt | 4,170 | — | 4,170 | — | 4,170 |
| Other current liabilities | 3,178 | — | 3,178 | — | 3,178 |
| Total current liabilities | 81,209 | — | 81,209 | — | 81,209 |
| Non-current liabilities: | | | | | |
| Commissions payable—non-current | 113,516 | — | 113,516 | — | 113,516 |
| Long-term debt, net of current portion | 397,652 | — | 397,652 | — | 397,652 |
| Contingent consideration | 247,100 | — | 247,100 | (247,100)[4] | — |
| Capital lease obligations, less current portion | 345 | — | 345 | — | 345 |
| Deferred tax liability[6] | 225 | — | 225 | — | 225 |
| Total non-current liabilities | $ 758,838 | — | $ 758,838 | $ (247,100) | $511,738 |
| **Members' equity** | | | | | |
| Preferred Units – $1.00 par value; 541,263,042 units authorized, issued and outstanding at March 31, 2020 | 546,972 | (546,972)[1] | — | — | — |
| Class A Common units – $1.00 par value; 237,938,682 units authorized, issued and outstanding at March 31, 2020 | 219,139 | (219,139)[1] | — | — | — |
| Class B Common units – $1.00 par value; 108,727,667 units authorized, issued and outstanding at March 31, 2020 | 103,593 | (103,593)[1] | — | — | — |
| Senior Preferred Earnout Units – no par value; none authorized, issued, and outstanding at March 31, 2020 | — | — | — | — | — |
| Profits Units – no par value; 97,918,116 units authorized at March 31, 2020; 78,398,133 units issued at March 31, 2020; and none outstanding as of March 31, 2020 | — | — | — | — | — |

95

| (in thousands, except share and per share amounts) | Successor GoHealth Holdings, LLC Historical | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|
| Class A common stock – $0.0001 par value per share, 1,100,000,000 shares authorized on a pro forma basis, 80,816,989 shares issued and outstanding on a pro forma basis | | 5[1] | 5 | 4[3] | 9 |
| Class B common stock – $0.0001 par value per share, 690,000,000 shares authorized on a pro forma basis, 232,383,011 shares issued and outstanding on a pro forma basis | | 25[1] | 25 | (2)[3] | 23 |
| Accumulated other comprehensive (loss) income | (102) | — | (102) | — | (102) |
| Additional paid in capital | — | 224,461[1][2] | 224,461 | 149,319[3][4][5] | 373,780 |
| Retained earnings (deficit) | — | — | — | (52,397)[5] | (52,397) |
| Total members'/stockholders' equity attributable to GoHealth Holdings, LLC/GoHealth, Inc.[a] | 869,602 | (645,213) | 224,389 | 96,924 | 321,313 |
| | | | | | |
| Non-controlling interest | — | 645,213[2] | 645,213 | 279,917[2] | 925,130 |
| Total members'/stockholders' equity | 869,602 | — | 869,608 | 376,841 | 1,246,443 |
| Total liabilities and equity | $ 1,709,649 | — | $ 1,709,655 | $ 129,742 | $1,839,390 |

(a) For historical amounts, represents total members' deficit attributable to GoHealth Holdings, LLC. For Pro Forma amounts, represents total members'/stockholders' equity attributable to GoHealth, Inc.

**GoHealth, Inc. and subsidiaries**

*Notes to unaudited pro forma condensed consolidated balance sheet*

(1) Reflects the exchange of GoHealth Holdings, LLC common units held by the Continuing Equity Owners for shares of our Class B common stock, equal to the number of GoHealth Holdings, LLC common units retained by each, for nominal consideration, and the issuance of our Class A common stock to the Blocker Shareholders in connection with the Blocker Merger.

(2) Upon completion of the Transactions, we will become the sole managing member of GoHealth Holdings, LLC. Although we will have a minority economic interest in GoHealth Holdings, LLC, we will have the sole voting interest in, and control of the management of, GoHealth Holdings, LLC. As a result, we will consolidate the financial results of GoHealth Holdings, LLC and will report a noncontrolling interest related to the interests in GoHealth Holdings, LLC held by the Continuing Equity Owners on our consolidated balance sheet. Immediately following the Transactions, the economic interests held by the noncontrolling interest will be approximately 74.2%. If the underwriters were to exercise their option to purchase additional shares of our Class A common stock in full, the economic interests held by the noncontrolling interest would be approximately 72.6%.

(3) Reflects the net effect on cash of the receipt of gross offering proceeds to us of $750.5 million, based on the assumed sale of 39,500,000 Class A common stock at an assumed initial public offering of $19.00 per share (the midpoint of the estimated price range set forth on the cover page

96

of this prospectus), after deducting the underwriting discount and estimated offering expenses payable by us aggregating $45.6 million and assuming the underwriters' option to purchase additional shares of Class A common stock is not exercised. We intend to use the net proceeds from this offering to (i) purchase 35,316,264 newly-issued LLC Interests (or 40,298,731 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us and (ii) pay $75.5 million in cash to the Blocker Shareholders as partial consideration in the Blocker Merger. GoHealth Holdings, LLC intends to use the net proceeds from the sale of LLC Interests to GoHealth, Inc. (i) to pay $399.2 million in cash to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, (ii) to satisfy in full $100.0 million in aggregate face amount of an existing equity instrument in connection with the Transactions and (iii) for general corporate purposes to support the growth of the business. See "Use of Proceeds."

(4)     Reflects the settlement of the 2019 and 2020 contingent earnout liabilities associated with the Centerbridge Acquisition. The full amount available relative to the 2019 earnout target of $200 million was earned and accrued as of December 31, 2019. On May 15, 2020, the contingent consideration related to the 2019 target of $200 million was settled with the issuance of $100.0 million in aggregate of GoHealth Holdings, LLC Class A common units and Class B common units, and $100.0 million in aggregate principal amount of senior preferred earnout units.

GoHealth Holdings, LLC intends to satisfy in full the $100.0 million of the senior preferred earnout units issued in connection with the 2019 earnout through the use of proceeds of this offering. In addition, in connection with the Transactions, the Class A common units and Class B common units in GoHealth Holdings, LLC issued in connection with the 2019 earnout will be converted to LLC Interests, with corresponding shares of Class B common stock issued on a one-to-one basis with such LLC Interests. Also, upon consummation of this offering and in connection with the Transactions, Centerbridge will assume any earnout liability associated with the Centerbridge Acquisition related to the 2020 performance period. Accordingly, the pro forma adjustments reflect the removal of the recorded 2020 earnout liability by GoHealth Holdings, LLC and a corresponding adjustment to additional paid-in-capital for the fair value of the earnout in the amount of $47.1 million. After completion of this offering, the full amount of GoHealth Holdings, LLC's liabilities with respect to the 2019 and 2020 earnouts accrued in connection with the Centerbridge Acquisition will be settled.

(5)     Represents $52.0 million of compensation expense we expect to record for approximately 14 million of performance-based vesting profits interests held by management that will automatically vest upon the completion of this offering. Pursuant to FASB ASC 718, performance-vesting profit units contain market conditions and an implied performance condition, which results in compensation cost being recognized when the performance condition is considered probable of being satisfied. Performance-vesting profit units vest upon the achievement of a contingent exit event that is defined as a transaction in which the ultimate parent disposes of all or substantially all of its investment in the Company. Such an exit event is not considered probable until it consummates. The completion of this offering will satisfy the performance condition and will trigger an accelerated vesting of these profits interests. We will record the related compensation expense with a corresponding increase to additional paid-in capital.

(6)     In connection with the merger of the Blocker Company with and into GoHealth, Inc., we will acquire various LLC interests of GoHealth Holdings, LLC and will succeed to their aggregate historical tax basis. The total tax benefit from such historical tax basis, including any increases thereto as a result of the Transactions, will be amortized over 15 years pursuant to Section 197 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"). It is not more likely than not that we will realize the tax benefit of any deferred tax assets resulting from the Transactions and

97

therefore, we have recorded a full valuation allowance. As a result, the pro forma consolidated balance sheet does not reflect an adjustment for deferred taxes. In addition, as part of the merger, we will enter into a Tax Receivable Agreement with the Continuing Equity Owners and the Blocker Shareholders to pay them 85% of the tax savings realized. Amounts payable under the Tax Receivable Agreement are contingent upon, among other things, generation of sufficient future taxable income during the term of the Tax Receivable Agreement. As such, we determined there is no resulting liability related to the Tax Receivable Agreement arising from the Transactions as the associated deferred tax assets are fully offset by a valuation allowance.

Following the completion of the Transactions, GoHealth, Inc. will be a holding company whose principal asset will consist of 26% of the outstanding LLC Interests that it acquires directly from GoHealth Holdings, LLC and indirectly from certain Continuing Equity Owners and Blocker Shareholders in connection with this offering. As such, the unaudited pro forma consolidated financial information assumes that a 26% exchange of LLC Interests has occurred. However, if all of the Continuing Equity Owners were to exchange or redeem their LLC Interests, we would recognize a deferred tax asset of approximately $1,627 million and a related liability for payments under the Tax Receivable Agreement of approximately $1,383 million, assuming, among other factors, (i) all exchanges occurred on the same day; (ii) a price of $19.00 per share of Class A common stock (the midpoint of the estimated offering price set forth on the cover of this prospectus); (iii) a constant corporate tax rate of 23.7%; (iv) we will have sufficient taxable income to fully utilize the tax benefits; (v) GoHealth Holdings, LLC is able to fully depreciate or amortize its assets; and (vi) no material changes in applicable tax law. For each 5% increase (decrease) in the amount of LLC Interests exchanged by the Continuing Equity Owners, our deferred tax asset would increase (decrease) by approximately $92 million and the related liability for payments under the Tax Receivable Agreement would increase (decrease) by approximately $78 million, assuming that the price per share of the Class A common stock at the time of the exchange and corporate tax rate remain the same. These amounts are estimates and have been prepared for informational purposes only. The actual amount of deferred tax assets and related liabilities that we will recognize will differ based on, among other things, the timing of the redemptions or exchanges, the price of our shares of Class A common stock at the time of the redemptions or exchanges, availability of sufficient taxable income and the tax rates then in effect.

We may elect to terminate the Tax Receivable Agreement early by making an immediate cash payment equal to the present value of the anticipated future tax benefits that would be required to be paid by us to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement. The calculation of such cash payment would be based on certain assumptions, including, among others (i) that any Continuing Equity Owners' LLC Interests that have not been exchanged are deemed exchanged, in general, for the fair market value of our Class A common stock that would be received by such Continuing Equity Owner if such LLC Interests had been exchanged at the time of termination; (ii) we will have sufficient taxable income in each future taxable year to fully realize all potential tax savings; (iii) the federal tax rates for future years will be those specified in the law as in effect at the time of termination and the combined state and local tax rates will be an assumed tax rate; and (iv) certain nonamortizable assets are deemed disposed of within specified time periods. In addition, the present value of such tax benefit payments are discounted at a rate equal to 1.16% per annum, compounded annually. Assuming that the fair market value of our Class A common stock were to be equal to $19.00, the midpoint of the estimated offering price set forth on the cover of this prospectus and that the relevant LIBO Rate were to be 0.16%, we estimate that the aggregate amount of these termination payments would be approximately $1,246 million if we were to exercise our termination right immediately following this offering.

Table of Contents

**GoHealth, Inc. and subsidiaries**

*Unaudited pro forma condensed consolidated statement of operations for the three months ended March 31, 2020*

| (in thousands, except share and per share amounts) | GoHealth Holdings, LLC Historical | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|
| Net revenues: | | | | | |
|    Commission | $ 112,510 | — | $ 112,510 | — | $ 112,510 |
|    Other | 28,500 | — | 28,500 | — | 28,500 |
| Net revenues | 141,010 | — | 141,010 | — | 141,010 |
| Operating expenses: | | | | | |
|    Cost of revenue | 42,134 | — | 42,134 | — | 42,134 |
|    Marketing and advertising | 26,073 | — | 26,073 | — | 26,073 |
|    Customer care and enrollment | 23,978 | — | 23,978 | 624[8] | 24,602 |
|    Technology | 4,593 | — | 4,593 | 92[8] | 4,685 |
|    General and administrative | 10,491 | — | 10,491 | 1,373[8][10] | 11,864 |
|    Change in fair value of contingent consideration liability | 4,400 | — | 4,400 | (4,400)[9] | — |
|    Amortization of intangible assets | 23,514 | — | 23,514 | — | 23,514 |
|    Total operating expenses | 135,183 | — | 135,183 | (2,311) | 132,872 |
| Income (loss) from operations | 5,827 | — | 5,827 | 2,311 | 8,138 |
| Interest expense | 6,756 | — | 6,756 | — | 6,756 |
| Other income (expense) | (10) | — | (10) | — | (10) |
| Income (loss) before income taxes | (939) | — | (939) | 2,311 | 1,372 |
| Income tax expense (benefit) | (2) | 1[6] | (1) | — | (1) |
| Net income (loss) | (937) | (1) | (938) | 2,311 | 1,373 |
| Net income attributable to noncontrolling interests | — | (696)[7] | (696) | 1,714[7] | 1,018 |
| Net income attributable to GoHealth, Inc. | $ (937) | $ 695 | $ (242) | $ 597 | $ 355 |
| **Pro Forma Per Share Data:** | | | | | |
| Pro forma net income per share[11] | | | | | |
|    Basic | | | | | $ 0.00 |
|    Diluted | | | | | $ 0.00 |
| Pro forma weighted-average shares used to compute pro forma net income per share | | | | | |
|    Basic | | | | | 80,816,989 |
|    Diluted | | | | | 313,343,669 |

99

Table of Contents

*Unaudited pro forma condensed consolidated statement of operations for the Successor 2019 Period and Predecessor 2019 Period*

| (in thousands, except share and per share amounts) | Predecessor 2019 Period GoHealth Holdings, LLC Historical | Successor 2019 Period Successor GoHealth Holdings, LLC Historical | Pro Forma Centerbridge Acquisition Adjustments | As Adjusted for Pro Forma Centerbridge Acquisition Adjustments | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|---|---|---|
| Net revenues: | | | | | | | | |
| Commission | $ 175,834 | $ 243,347 | — | $ 419,181 | — | $ 419,181 | — | $ 419,181 |
| Other | 55,176 | 65,144 | — | 120,320 | — | 120,320 | — | 120,320 |
| Net revenues | 231,010 | 308,491 | — | 539,501 | — | 539,501 | — | 539,501 |
| Operating expenses: | | | | | | | | |
| Cost of revenue | 79,169 | 90,384 | — | 169,553 | — | 169,553 | — | 169,553 |
| Marketing and advertising | 37,769 | 24,811 | (1,509)(5) | 61,071 | — | 61,071 | — | 61,071 |
| Customer care and enrollment | 49,149 | 44,356 | 62(5) | 93,567 | — | 93,567 | 2,498(8) | 96,065 |
| Technology | 40,312 | 6,006 | (26,848)(5) | 19,470 | — | 19,470 | 368(8) | 19,838 |
| General and administrative | 79,219 | 13,674 | (59,557)(1)(5) | 33,336 | — | 33,336 | 7,853(8) | 41,189 |
| Change in fair value of contingent consideration liability | — | 70,700 | — | 70,700 | — | 70,700 | (70,700)(9) | — |
| Amortization of intangible assets | — | 28,217 | 65,840(2) | 94,057 | — | 94,057 | — | 94,057 |
| Transaction costs | 2,267 | 6,245 | (8,512)(3) | — | — | — | — | — |
| Total operating expenses | 287,885 | 284,393 | (30,523) | 541,754 | — | 541,754 | (59,981) | 481,773 |
| Income (loss) from operations | (56,875) | 24,098 | 30,523 | (2,253) | — | (2,253) | 59,981 | 57,728 |
| Interest expense | 140 | 8,076 | 18,956(4) | 27,172 | — | 27,172 | — | 27,172 |
| Other income (expense) | (114) | 17 | — | (97) | — | (97) | — | (97) |
| Income (loss) before income taxes | (57,129) | 16,039 | 11,567 | (29,522) | — | (29,522) | 59,981 | 30,459 |
| Income tax expense (benefit) | (66) | 44 | — | (22) | 16(6) | (6) | — | (6) |
| Net income (loss) | (57,063) | 15,995 | 11,567 | (29,501) | (16) | (29,516) | 59,981 | 30,465 |
| Net income attributable to noncontrolling interests | — | — | — | — | (21,901)(7) | (21,901) | 44,504(7) | 22,603 |
| Net income attributable to GoHealth, Inc. | $ (57,063) | $ 15,995 | $ 11,567 | $ (29,501) | $ 21,885 | $ (7,617) | $ 15,477 | $ 7,862 |
| **Pro Forma Per Share Data:** | | | | | | | | |
| Pro forma net income per share(11) | | | | | | | | |
| Basic | | | | | | | | $ 0.10 |
| Diluted | | | | | | | | $ 0.10 |

100

Table of Contents

| (in thousands, except share and per share amounts) | Predecessor 2019 Period GoHealth Holdings, LLC Historical | Successor 2019 Period GoHealth Holdings, LLC Historical | Pro Forma Centerbridge Acquisition Adjustments | As Adjusted for Pro Forma Centerbridge Acquisition Adjustments | Pro Forma Transactions Adjustments | As Further Adjusted for Pro Forma Transactions | Pro Forma Offering Adjustments | GoHealth, Inc. Pro Forma |
|---|---|---|---|---|---|---|---|---|
| Pro forma weighted-average shares used to compute pro forma net income per share | | | | | | | | |
| Basic | | | | | | | | 80,816,989 |
| Diluted | | | | | | | | 313,339,540 |

**GoHealth, Inc. and subsidiaries**

*Notes to unaudited pro forma condensed consolidated statement of operations*

(1) Represents (i) the elimination of transaction-related bonuses paid to certain executive officers and employees incurred in connection with the Centerbridge Acquisition, which are not expected to have a continuing impact on the results of operations and (ii) a non-cash adjustment to rent expense associated with the resetting of deferred rent and the removal of leasehold improvement obligations through purchase accounting in connection with the Centerbridge Acquisition. The following table represents the pro forma adjustment to general and administrative expense for the year ended December 31, 2019:

| (in thousands) | Year Ended December 31, 2019 |
|---|---|
| Non-recurring transaction bonuses | $ (2,641) |
| Non-cash adjustments to rent expense made through purchase accounting | 444 |
| Pro forma adjustment for general and administrative expense attributable to bonuses and rent expense | $ (2,197) |

(2) Represents the incremental amortization expense related to certain definite-lived intangible assets, reflected in the purchase price allocation at the date of the Centerbridge Acquisition, as if those certain definite-lived intangible assets were put into place on January 1, 2019. The following table represents the pro forma adjustment to estimated amortization expense for the year ended December 31, 2019:

| (in thousands) | Estimated Fair Value at Acquisition | Estimated Useful Life | Year Ended December 31, 2019 |
|---|---|---|---|
| Developed Technology | $ 496,000 | 7 years | $ 70,857 |
| Customer Relationships | 232,000 | 10 years | 23,200 |
| Annual pro forma amortization expense | | | $ 94,057 |
| Less amount recorded | | | 28,217 |
| Pro forma adjustment for estimated amortization expense | | | $ 65,840 |

(3) Represents the elimination of direct and incremental transaction costs incurred in connection with the Centerbridge Acquisition, which are not expected to have a continuing impact on the results of operations.

(4)   Represents (i) the elimination of interest expense related to our financing in place during the Predecessor 2019 Period, which was repaid in conjunction with the Centerbridge Acquisition and (ii) the incremental interest expense, accretion of debt discount, and amortization of debt issuance costs associated with our Credit Facilities incurred as part of the Centerbridge Acquisition. The following table represents the pro forma adjustment to interest expense for the year ended December 31, 2019:

| (in thousands) | Year Ended December 31, 2019 |
| --- | ---: |
| Interest on credit agreement | $   25,598 |
| Accretion of debt discount | 1,259 |
| Amortization of debt issuance costs | 317 |
| Annual pro forma interest expense | 27,174 |
| Less expense recorded | 8,216 |
| Pro forma adjustment for interest expense | $   18,956 |

A $\frac{1}{8}$% increase or decrease in interest rates would result in a change in interest expense of approximately $94 thousand for the three months ended March 31, 2020 and approximately $379 thousand for the year ended December 31, 2019. See "Description of Indebtedness" for a description of the Credit Facilities.

(5)   Represents a non-cash adjustment to remove equity incentive compensation expense triggered as part of the Centerbridge Acquisition due to change in control provision which accelerated vesting, and includes the incremental share-based compensation expense related to the equity incentive compensation plan put in place in connection with the Centerbridge Acquisition, as if that plan had been in place since January 1, 2019. This adjustment was allocated to line items on the income statement based on the department the individual is in who received the compensation. The following tables represent the pro forma adjustments to each of the marketing and advertising, technology, general and administrative and customer care and enrollment expenses.

Marketing and Advertising

| (in thousands) | Year Ended December 31, 2019 |
| --- | ---: |
| Equity incentive compensation triggered by Centerbridge Acquisition | $   (1,674) |
| Incremental share-based compensation expense | 166 |
| Pro forma adjustment for marketing and advertising expense | $   (1,509) |

Technology

| (in thousands) | Year Ended December 31, 2019 |
| --- | ---: |
| Equity incentive compensation triggered by Centerbridge Acquisition | $   (27,058) |
| Incremental share-based compensation expense | 211 |
| Pro forma adjustment for technology expense | $   (26,848) |

102

General and Administrative

| (in thousands) | Year Ended December 31, 2019 |
|---|---|
| Equity incentive compensation triggered by Centerbridge Acquisition | $ (58,327) |
| Incremental share-based compensation expense | 967 |
| Pro forma adjustment for general and administrative expense | $ (57,360) |

Customer Care and Enrollment

| (in thousands) | Year Ended December 31, 2019 |
|---|---|
| Equity incentive compensation triggered by Centerbridge Acquisition | $ — |
| Incremental share-based compensation expense | 62 |
| Pro forma adjustment for customer care and enrollment | $ 62 |

(6) Following the Transactions, we will be subject to United States federal income taxes, in addition to applicable state and local taxes, with respect to our allocable share of any net taxable income of GoHealth Holdings, LLC. We have determined it is more-likely-than-not that the tax benefits associated with the deferred tax assets arising from the Transactions and this offering will not be realized. As a result, the unaudited pro forma consolidated statement of operations does not reflect an adjustment for deferred tax benefits.

(7) After the Transactions, we will become the managing member of GoHealth Holdings, LLC. We will own 25.8% of the economic interest in GoHealth Holdings, LLC and have 25.8% of the voting power, but will control the management of GoHealth Holdings, LLC. The Continuing Equity Owners will own the remaining 74.2% of the economic interest in GoHealth Holdings, LLC, which will be accounted for as a noncontrolling interest in our future consolidated financial results.

103

Table of Contents

(8)   Reflects the increase in share-based compensation expense we expect to incur following the completion of this offering. We expect to grant 2,672,334 stock options and 338,159 restricted stock units to our directors and employees in connection with this offering. The options that will be granted to our directors will vest over one year. The options that will be granted to our employees will vest over either three or four years and the restricted stock units that will be granted to our employees will vest over four years. The share-based compensation expense was calculated assuming the stock options were granted on January 1, 2019, at an exercise price equal to $19.00 per share, based on the midpoint of the estimated price range set forth on the cover of the prospectus. The grant date fair value of stock options was determined using the Black-Scholes valuation model using the following assumptions:

| | |
|---|---|
| **Three Year Vesting Awards:** | |
| Expected volatility | 51.6% |
| Expected dividend yield | — |
| Expected term (in years) | 6.0 |
| Risk free interest rate | 0.39% |
| **Four Year Vesting Awards:** | |
| Expected volatility | 52.5% |
| Expected dividend yield | — |
| Expected term (in years) | 6.25 |
| Risk free interest rate | 0.42% |

(9)   In connection with this offering, we will fully settle the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition, resulting in the elimination of the change in the fair value of the earnout liability on a go-forward basis.

(10)  Represents costs incurred associated with this offering, including certain legal, accounting, and other services.

(11)  Pro forma basic net income per share is computed by dividing the net income available to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Pro forma diluted net income per share is computed by adjusting the net income available to Class A common stockholders and the weighted-average shares of Class A common stock outstanding to give effect to potentially dilutive securities.

104

Table of Contents

Shares of our Class B common stock are not entitled to receive any distributions or dividends other than in connection with a liquidation and have no rights to convert into Class A common stock, separate from an exchange or redemption of the LLC Interests corresponding to such shares of Class B common stock. When a common unit is exchanged for, at our election, cash or Class A common stock by a Continuing Equity Owner who holds shares of our Class B common stock, such Continuing Equity Owner will be required to surrender a share of Class B common stock, which we will cancel for no consideration. The following table sets forth a reconciliation of the numerators and denominators used to compute pro forma basic and diluted net income per share (in thousands, except per share data):

| | Year ended December 31, 2019 | | Three month period ended March 31, 2020 | |
|---|---|---|---|---|
| **Pro forma basic and diluted earnings per share** | | | | |
| *Numerator:* | | | | |
| Pro forma net income | $ | 30,464 | $ | 1,372 |
| Pro forma net income attibutable to noncontrolling interests | | (22,603) | | (1,018) |
| Pro forma net income attibutable to GoHealth, Inc —basic | $ | 7,861 | $ | 354 |
| Reallocation of noncontrolling interest after the assumed exchange of LLC Units for Class A Common Stock | | 22,603 | | 1,018 |
| Pro forma net income attributable to GoHealth, Inc. —diluted | $ | 30,464 | $ | 1,372 |
| *Denominator* | | | | |
| Weighted average of Class A Common Stock outstanding—basic[1] | | 80,816,989 | | 80,816,989 |
| Dilutive effects of: | | | | |
| LLC Units that are exchangable for Class A Common Stock | | 232,417,419 | | 232,438,275 |
| Restricted stock units that are exchangable for Class A Common Stock | | 105,132 | | 88,405 |
| Weighted average of Class A Common Stock outstanding—diluted | | 313,339,540 | | 313,343,669 |
| **Basic pro forma net income per share** | $ | 0.10 | $ | 0.00 |
| **Diluted pro forma net income per share** | $ | 0.10 | $ | 0.00 |

(1) Consists of the following:

| | Year ended December 31, 2019 | Three month period ended March 31, 2020 |
|---|---|---|
| Class A common stock issued as a result of this offering | 39,500,000 | 39,500,000 |
| Class A common stock held by the Blocker Shareholders | 41,316,989 | 41,316,989 |
| Weighted average of Class A Common Stock outstanding—basic | 80,816,989 | 80,816,989 |

105

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*This section presents management's perspective on our financial condition and results of operations. The following discussion and analysis is intended to highlight and supplement data and information presented elsewhere in this prospectus, including the consolidated financial statements and related notes, and should be read in conjunction with the accompanying tables and our annual audited financial statements. To the extent that this discussion describes prior performance, the descriptions relate only to the periods listed, which may not be indicative of our future financial outcomes. In addition to historical information, this discussion contains forward-looking statements that involve risks, uncertainties and assumptions that could cause results to differ materially from management's expectations. Factors that could cause such differences are discussed in the sections titled "Cautionary Note Regarding Forward-Looking Statements," "Risk Factors" and "Unaudited Pro Forma Condensed Consolidated Financial Information." We assume no obligation to update any of these forward-looking statements.*

### Overview

We are a leading health insurance marketplace whose mission is to improve access to healthcare in America. Our proprietary technology platform leverages modern machine-learning algorithms powered by nearly two decades of insurance behavioral data to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs. Our differentiated combination of a vertically-integrated consumer acquisition platform and highly skilled and trained licensed agents, or agents, has enabled us to enroll millions of people in Medicare and individual and family plans since our inception. With over 10,000 Americans turning 65 years old every day and GoHealth's track record of significant growth in net revenues in the Medicare space in the past five years, we believe we will continue to be one of the top choices for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make.

We have a 19-year history of consistent revenue growth and entering new market segments of insurance products. We add significant value to consumers and carriers, which is evidenced by our high growth rate and strong customer engagement dynamics. Specifically, net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020 compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018. Net income was $1.4 million for the Pro Forma First Quarter 2020 compared to net income of $5.0 million for the three months ended March 31, 2019, and net income was $30.5 million for the Pro Forma Fiscal Year 2019 compared to net income of $28.1 million for the year ended December 31, 2018. See "—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

### Business Segments

We have four reportable segments: (i) Medicare—Internal, (ii) Medicare—External, (iii) Individual and Family Plans, or IFP and Other—Internal and (iv) IFP and Other—External. We organize the segments by product type, Medicare and IFP and Other, as well as by distribution channel, internal and external, as further described below. In addition, we separately report other expenses (classified as "Corporate" in our financial statements), the primary components of which are corporate overhead expenses and shared service expenses that have not been allocated to the reportable segments. The segment results provided herein may not be comparable to other companies. We refer to the Medicare—Internal and Medicare—External segments collectively as the "Medicare

106

segments" and the IFP and Other—Internal and IFP and Other—External segments as the "IFP and Other segments."

- ***Medicare—Internal***. The Medicare—Internal segment relates to sales of products and plans by GoHealth-employed agents offering qualified prospects plans from multiple carriers, GoHealth-employed agents offering qualified prospects plans on a carrier-specific basis, or sales of products and plans through our online platform without the assistance of our agents, which we refer to as DIY. In this segment, we sell Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare Special Needs Plans, or SNPs. We earn revenue in this segment through commissions paid by carriers based on sales we generate, as well as enrollment fees, hourly fees and other fees for services performed for specific carriers and other partners. For the three months ended March 31, 2020 and 2019, the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, this segment generated 67.6%, 30.3%, 58.9% and 23.6%, respectively, of total revenue and 98.4%, 46.8%, 88.5% and 52.8%, respectively, of total profit.

- ***Medicare—External***. The Medicare—External segment relates to sales of products and plans under GoHealth's carrier contracts using an independent, national network of agents, or external agencies, agents of which are not employed by GoHealth. These agents utilize our technology and platform to enroll consumers in health insurance plans and provide a means to earn a return on leads that otherwise may have not been addressed. In this segment, we sell Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and SNPs. We earn revenue in this segment through commissions paid by carriers as a result of policy sales, as well as sales of consumer leads to external agencies. For the three months ended March 31, 2020 and 2019, the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, this segment generated 20.5%, 29.4%, 21.3% and 26.0%, respectively, of total revenue and (0.8)%, 32.5%, 8.2% and 19.7%, respectively, of total profit.

- ***IFP and Other—Internal***. The IFP and Other—Internal segment relates to sales of products and plans by GoHealth-employed agents offering qualified prospects plans from multiple carriers, GoHealth-employed agents offering qualified prospects plans on a carrier-specific basis, or DIY. In this segment, we sell individual and family plans, dental plans, vision plans and other ancillary plans to individuals that are not Medicare-eligible. We earn revenue in this segment through commissions paid by carriers based on sales we generate, as well as enrollment fees, and hourly fees and other fees for services performed for specific carriers and other partners. For the three months ended March 31, 2020 and 2019, the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, this segment generated 6.1%, 20.9%, 10.9% and 27.9%, respectively, of total revenue and 1.1%, 8.5%, 2.0% and 21.2% respectively, of total profit.

- ***IFP and Other—External***. The IFP and Other—External segment relates to sales of products and plans under GoHealth's carrier contracts using external agencies, who use agents that are not employed by GoHealth. These agents utilize our technology and platform to enroll consumers in health insurance plans. We also sell consumer leads generated by us to external agencies. In this segment, we sell individual and family plans, dental plans, vision plans and other ancillary plans to individuals that are not Medicare-eligible. We earn revenue in this segment through commissions paid by carriers as a result of policy sales, as well as sales of consumer leads to external agencies. For the three months ended March 31, 2020 and 2019, the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, this segment generated 5.8%, 19.4%, 8.9% and 22.5%, respectively, of total revenue and 1.2%, 12.2%, 1.2% and 6.2%, respectively, of total profit.

**Industry Trends**

The Medicare segments benefit from strong demographic trends. Medicare enrollment is expected to grow from approximately 61 million individuals in 2019 to approximately 77 million individuals by 2028. An increasing proportion of the Medicare-eligible population is choosing commercial insurance solutions, with 38% of Medicare beneficiaries, or approximately 23 million people, enrolled in Medicare Advantage plans in 2019, an

107

increase of approximately 1.5 million people from 2018 to 2019. As a result of these trends, today, we estimate a total addressable market of $28 billion for Medicare Advantage and Medicare Supplement products, which is based on third-party estimates of total expected Medicare enrollees for 2020, publicly available industry data for Medicare agents' first-year compensation and our recent historical policy revenue experience. We believe that these trends will help us continue to grow revenue.

In the IFP and Other segments, the individual health insurance market grew from 10.6 million enrollees in 2013 to 17.4 million enrollees in 2015. Such increase was driven by the passage of the ACA, namely (1) the requirement to purchase health insurance, or the individual mandate, (2) the requirement that carriers not consider pre-existing medical conditions in coverage decisions and (3) premium subsidies for middle and lower income individuals that were also contained in that legislation. With the repeal of the individual mandate in 2017 and broader economic trends, such as gains in employment, which increased the number of people having job-based coverage, the individual market has declined. Despite the decline, the individual market was composed of 13.8 million members in 2018, a meaningful increase from 2011 levels and in 2019, the market size stabilized with 13.7 million members enrolled. This market stabilization was driven by lower premium increases in 2019, as compared to 2018 and 2017 for individual insurance plans; an increase in individuals who do not receive job-based insurance due to the rise of the "gig economy;" and, expanded plan options in the individual market from carriers. According to a Kaiser Family Foundation report published in 2020, in 2019, the average gross margin per member per month for carriers in the individual market was $122.83, as compared to $14.36 in 2016 shortly after the repeal of the individual mandate. This increased profitability for insurers is expected to have a positive impact on the individual market going forward. In addition, the number of individuals eligible for the individual market is growing. Forbes estimated that 57 million U.S. workers, approximately 36% of employees, are in the "gig economy" and many of these individuals will not receive health insurance through their jobs. We believe that growth in the individual market will benefit the Company's revenue growth in the future.

**Reorganization Transactions**

The historical results of operations discussed in this section are those of GoHealth Holdings, LLC prior to the completion of the Transactions, including this offering, and do not reflect certain items that we expect will affect our results of operations and financial condition after giving effect to the Transactions and the use of proceeds from this offering.

Following the completion of the Transactions, GoHealth, Inc. will become the sole managing member of GoHealth Holdings, LLC. Although we will have a minority economic interest in GoHealth Holdings, LLC, we will have the sole voting interest in, and control of the business and affairs of, GoHealth Holdings, LLC and its direct and indirect subsidiaries. As a result, GoHealth, Inc. will consolidate GoHealth Holdings, LLC and record a significant non-controlling interest in a consolidated entity in GoHealth, Inc.'s consolidated financial statements for the economic interest in GoHealth Holdings, LLC held directly or indirectly by the Continuing Equity Owners. Immediately after the Transactions, investors in this offering will collectively own 48.9% of our outstanding Class A common stock, consisting of 39,500,000 shares (or 45,425,000 shares if the underwriters exercise in full their option to purchase additional shares of Class A common stock), GoHealth, Inc. will own 80,816,989 LLC Interests (or 85,799,456 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing 25.8% of the LLC Interests (or 27.4% if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and the Founders will collectively own 98,224,564 LLC Interests, representing 31.4% of the LLC Interests (or 30.7% if the underwriters exercise in full their option to purchase additional shares of Class A common stock). Accordingly, net income (loss) attributable to non-controlling interests will represent 74.2% of the income (loss) before income tax benefit (expense) of GoHealth, Inc. (or 72.6% if the underwriters exercise in full their option to purchase additional shares of Class A common stock). GoHealth, Inc. is a holding company that conducts no operations and, as of the consummation of this offering, its principal asset will be LLC Interests we purchase from GoHealth Holdings, LLC.

After consummation of this offering, GoHealth, Inc. will become subject to U.S. federal, state and local income taxes with respect to our allocable share of any taxable income of GoHealth Holdings, LLC and will be taxed at

Table of Contents

the prevailing corporate tax rates. In addition to tax expenses, we also will incur expenses related to our status as a public company, plus payment obligations under the Tax Receivable Agreement, which we expect to be significant. We intend to cause GoHealth Holdings, LLC to make distributions to us in an amount sufficient to allow us to pay these expenses and fund any payments due under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions—Distributions."

**Factors Affecting Our Results of Operations**

Our financial condition and results of operations have been, and will continue to be affected by, a number of important factors, including:

- *Ability to Attract New Carriers and Expand Relationships with Existing Carriers*. We generate revenue primarily from commissions earned through policy sales utilizing our platform. Carriers and other partners also pay us enrollment fees, hourly fees and other fees for services performed for specific carriers. Attracting new carriers and expanding relationships with our existing carriers to offer more products and plans is critical to the growth of our business, particularly in the Medicare segments, which drive the highest LTV/CAC of the products and plans we offer. We are strategically adding carriers in the Medicare segments in order to offer top-rated plans and multiple plan choices in each of the U.S. counties in which we operate. This also allows us to market more efficiently in these geographies, increase conversion rates on consumer leads, and improve customer satisfaction rates as we are better able to meet consumers' specific needs, which drives revenue growth. In order to strengthen the relationships with existing and prospective Medicare carriers, we are offering more services to them, such as (i) helping new Medicare enrollees sign up for a health-risk assessment, which helps calibrate the Medicare Advantage premium paid by Medicare to the private plan, and (ii) using our data to help our largest carriers inform the benefit design of their health insurance plans and competitiveness of their products in given regions. If we are unsuccessful in adding new carriers and expanding existing relationships with carriers to offer more products and plans, it may become more difficult to compete against competitors with more diverse product and plan offerings.

- *Data and Technology*. Our ability to harness our data and proprietary technology is a significant contributor to improving LTV/CAC and driving profitability. In 2019, we upgraded our Marketplace technology to improve the flow of data across our platform and advance decision support capabilities. We are also improving our LeadScore and call-routing technologies, as well as expanding our business intelligence and analytics staffing, to direct qualified prospects to agents or DIY channels that are most likely to result in such qualified prospects enrolling in the plan that best meets their needs while remaining economically attractive for us, as described further below. Additionally, we are investing in technology that will allow us to use our data to direct our marketing spend into growing the number of qualified prospects in the highest-value marketing channels and enhancing our proprietary LeadScore technology to assess and improve, in real time, the performance of those marketing channels throughout the year. If we are not able to harness our data to improve our technology, our LTV/CAC may remain stagnant or decline.

- *Agent Productivity, Training, Recruiting and Retention*. Our success largely depends on the productivity of our agents, as well as our ability to recruit and retain quality agents to sell products and plans. The productivity of our agents is primarily supported by our technology, which helps increase agent efficiency. For example, the improvements to our LeadScore and call-routing technologies allow us to assess the profile and predicted value of each incoming consumer lead and to route the consumer lead to the agent most likely to enroll them. Our technology considers the incoming consumer lead's potential needs and the agent's ability to deliver a suitable policy and, in doing so, increases our LTV per Approved Submission and decreases the amount of time it takes for an agent to select plans for the consumer, thus decreasing CAC per commissionable Approved Submission. Our call-routing technology also utilizes data-driven agent clustering to enable us to train and specialize our agents on

109

specific customer segments to optimize our results. Additionally, we are retooling our recruiting and training programs to better attract agent candidates whose profiles align with those of current, high performing agents we employ. The opportunity to reduce the variability in our agent performance is significant, as our top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment on average were 61% more productive than the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment, based on conversion rates of qualified prospects to Submitted Policies for the three months ended March 31, 2020. These top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment achieved a 34% conversion rate of qualified prospects to Submitted Policies over the same three month period as compared to 21% conversion rate for the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment over the same period. Our ability to sell more products and plans is dependent on the number of qualified, licensed agents we have that are able to sell those products and plans. Therefore, recruiting and retaining quality agents is also a key driver of our business. If we are unable to recruit and retain agents, we may be limited in the number of products and plans we can sell for a carrier or in a particular geography and we may have difficulty in quickly and efficiently managing the volume of qualified prospects that we generate.

- *Customer Engagement.* Increasing customer engagement is a key driver of our business and results of operations. Our ability to improve long-term customer satisfaction is dependent on the level of engagement we have with our customers. We are able to improve our long-term customer satisfaction by ensuring that we are successfully matching products and plans to consumers at the point of enrollment and having continued customer interactions throughout the life of the policy, both digitally and telephonically. We have a TeleCare team that is tasked with improving outreach efforts to our customers after their enrollment, which has allowed us to (1) educate customers on how to utilize these supplemental benefits, (2) educate customers on how to ensure that their physicians and medications are within their plan benefits, and (3) through more frequent interactions, identify if there are changes in a customer's health, financial or other circumstances that make another plan a better choice for their specific needs. As a marketplace that represents a multitude of both plans and carriers, we can educate customers even as their underlying plan or carrier changes if we proactively engage with them.

- *Seasonality of Our Revenue*. We derive a substantial portion of our commission revenue in the fourth quarter because the annual Medicare annual enrollment period occurs from October 15th to December 7th. Additionally, as a result of the annual Medicare Advantage open enrollment period that occurs from January 1st to March 31st, commission revenue is typically second-highest in our first quarter. Although we are able to generate revenue throughout the year, including through selling products and plans to individuals who turn 65 or qualify for a Medicare special enrollment period, as well as offering additional services and ancillary products and plans throughout the year, our success is substantially dependent on selling products and plans during the Medicare annual enrollment period and the Medicare Advantage open enrollment period.

**Response to COVID-19**

With social distancing measures having been implemented to curtail the spread of COVID-19, we successfully transitioned our agents and other employees to a work from home working environment. We believe the investments we have made in our technology infrastructure have allowed for a seamless transition to a remote working environment without any material impacts to our business, highlighting the resilience of our business. We believe that a business like ours is well-suited to navigate the current environment in which consumers are particularly focused on healthcare issues and mortality and social distancing requirements push consumers to conduct business remotely, while the underlying demand dynamics for our core products remain unchanged. Additionally, because of our remote agent platform, we believe agents will continue to be attracted to our commission-based agent compensation model and the stable and attractive source of income it can provide, thereby allowing us to continue to retain and recruit agents. Further, as consumers become more comfortable

Table of Contents

with conducting business remotely, we believe consumer adoption of distribution models such as ours may continue to accelerate long after the COVID-19 pandemic ends.

As a result of the COVID-19 pandemic, we transitioned over 99% of our agents to work from home over an approximately 72-hour period in March 2020. Our agents have remained efficient during this work from home period, with daily sales per agent seat in the multi-carrier sales outlet of the Medicare—Internal segment of 2.3, 2.6, 2.2 and 2.4 for February, March, April and May 2020, respectively, compared to 2.0, 2.1, 1.5 and 1.8 daily sales per agent seat for the same four months in 2019. In addition, we had 23,609, 25,777, 20,851 and 21,423 Total Submitted Policies in the multi-carrier sales outlet of the Medicare—Internal segment for February, March, April and May 2020, respectively, compared to 5,047, 6,384, 6,699 and 9,081 Total Submitted Policies for the same four months in 2019.

There are no comparable recent events which may provide guidance as to the effect of the spread of COVID-19 and a global pandemic, and, as a result, the ultimate impact of the COVID-19 outbreak or a similar health epidemic is highly uncertain and subject to change. We do not yet know the full extent of the impacts on our business, our operations or the global economy as a whole. However, the effects could have a material impact on our results of operations. See "Risk Factors—Risks Related to Our Business—The extent to which the COVID-19 outbreak and measures taken in response thereto impact our business, results of operations and financial condition will depend on future developments, which are highly uncertain and cannot be predicted."

**Key Business and Operating Metrics by Segment**

In addition to traditional financial metrics, we rely upon certain business and operating metrics to evaluate our business performance and facilitate our operations. Below are the most relevant business and operating metrics for each segment, except for EBITDA and Adjusted EBITDA, which are not presented on a segment basis.

*Medicare Segments*

*Lifetime Value of Commissions per Consumer Acquisition Cost*

Lifetime value of commissions per consumer acquisition cost, or LTV/CAC, represents (i) aggregate commissions estimated to be collected over the estimated life of all commissionable Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, or LTV, divided by (ii) the cost to convert a qualified prospect into a Submitted Policy (comprised of cost of revenue, marketing and advertising expenses and customer care and enrollment expenses) less other non-commission carrier revenue for such period, or CAC. CAC is comprised of cost of revenue, marketing and advertising expenses and customer care and enrollment expenses less other revenue and is presented on a per commissionable Approved Submission basis. The estimate of the future renewal commissions is determined by using the contracted renewal commission rates constrained by a persistency-adjusted renewal period. The persistency-adjusted renewal period is determined based on our historical experience and available industry and insurance carrier historical data. Persistency-adjustments allow us to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur. These factors may result in varying values from period to period. See "Risk Factors—Risks Related to Our Business—Our operating results may be adversely impacted by factors that impact our estimate of LTV."

The LTV/CAC for the Medicare—Internal segment increased to 2.7x (with a CAC of $26.7 million) for the three months ended March 31, 2020 compared to 1.7x (with a CAC of $10.5 million) for the three months ended March 31, 2019. The increase in LTV/CAC from March 31, 2019 to March 31, 2020 is attributable to the same factors as contributed to the increase from 2018 to 2019, as described below. The LTV/CAC for the Medicare—Internal segment decreased to 6.0x (with a CAC of 26.4 million) for the three months ended December 31, 2019 compared to 6.8x (with a CAC of 4.3 million) for the three months ended December 31, 2018. The decrease in LTV/CAC from December 31, 2018 to December 31, 2019 is the direct result of the Company scaling up its production to drive roughly 5.4x revenue growth period over the same period.

**Table of Contents**

The LTV/CAC for the Medicare—Internal segment was 3.9x (with a CAC of $63.2 million) for the year ended December 31, 2019, 5.1x (with a CAC of $32.5 million) for the Successor 2019 Period and 2.7x (with a CAC of $30.7 million) for the Predecessor 2019 Period compared to 2.7x (with a CAC of $17.3 million) for the year ended December 31, 2018. The increase in LTV/CAC from 2018 to 2019 was primarily attributable to a decrease in CAC due to improvements in our LeadScore and call-routing technologies allowing our agents to successfully convert more qualified prospects into Submitted Policies. Additionally, improved marketing efficiencies driven by our rapid test-and-learn approach across our marketing channels, as well as an expansion of the diversity and breadth of our omni-channel marketing efforts also contributed to an increase in LTV/CAC by enabling the acquisition of higher quality prospects at a lower effective cost per submission.

*Cost Per Qualified Prospect*

Cost per qualified prospect represents all variable marketing costs to generate qualified prospects, including direct media expenses, merchant service fees and Advocate expenses, divided by the number of qualified prospects.

The following table shows cost per qualified prospect for the Medicare—Internal segment:

| | Three Months Ended March 31, | | Year Ended December 31, 2019 | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|
| | 2020 (Successor) | 2019 (Predecessor) | | | | |
| Cost per Qualified Prospect (Medicare—Internal segment) | $ 57 | $ 87 | $ 63 | $ 53 | $ 77 | $ 48 |

Cost per qualified prospect decreased by 34.5% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019. The decrease is primarily attributable to a shift of lead production to rely more on internally generated leads rather than externally generated leads. Costs for new consumer lead sources in 2019 were reduced through a robust test-and-learn approach to marketing efforts throughout 2019 and early 2020.

Cost per qualified prospect was $63 for the year ended December 31, 2019, $53 for the Successor 2019 Period and $77 for the Predecessor 2019 Period compared to $48 for the year ended December 31, 2018. The increase of 31.3% from 2018 to 2019 was primarily attributable to increased volume of consumer lead sources over the same period. New consumer lead sources initially resulted in increased costs compared to more mature consumer lead sources in early 2019. However, costs associated with new consumer lead sources decreased over the course of 2019 as we optimized new and existing sources through our rapid test-and-learn approach.

*Submitted Policies*

Submitted Policies represent completed applications that, with respect to each such application, the consumer has authorized us to submit to the carrier. The applicant may need to take additional actions, including providing subsequent information before the application is reviewed by the carrier.

112

Table of Contents

The following table shows the number of Submitted Policies by product for the Medicare segments for the periods presented, split between those submissions that are commissionable (compensated through commissions received from carriers), compared to those that are non-commissionable (compensated via hourly fees and enrollment fees):

| | Three Months Ended March 31, | | Year Ended December 31, 2019 | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
| | 2020 (Successor) | 2019 (Predecessor) | | | | |
|---|---|---|---|---|---|---|
| Medicare Advantage | 117,312 | 36,056 | 356,772 | 222,599 | 134,173 | 91,314 |
| Medicare Supplement | 2,671 | 3,854 | 18,649 | 7,444 | 11,205 | 11,606 |
| Prescription Drug Plans | 2,494 | 2,692 | 21,513 | 13,838 | 7,675 | 12,617 |
| Total Medicare—Commissionable | 122,477 | 42,602 | 396,934 | 243,881 | 153,053 | 115,537 |
| Medicare Advantage | 6,927 | 498 | 22,015 | 17,775 | 4,240 | 1,172 |
| Medicare Supplement | 1,812 | 156 | 5,236 | 4,185 | 1,051 | 1,340 |
| Prescription Drug Plans | 798 | 27 | 3,512 | 3,041 | 471 | 327 |
| Total Medicare—Non Commissionable | 9,537 | 681 | 30,763 | 25,001 | 5,762 | 2,839 |
| Total Medicare Submitted Policies | 132,014 | 43,283 | 427,697 | 268,882 | 158,815 | 118,376 |

Total Medicare Submitted Policies increased by 205.3% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019. The increase is attributable to the same factors that contributed to the increase from 2018 to 2019, as described below.

Total Medicare Submitted Policies was 427,697 for the year ended December 31, 2019, 268,882 for the Successor 2019 Period and 158,815 for the Predecessor 2019 Period compared to 118,376 for the year ended December 31, 2018. The increase of 261.3% from 2018 to 2019 in Total Medicare Submitted Policies was primarily attributable to improved multichannel marketing strategies that allowed us to generate a greater number of high quality prospects, along with increased efficiency of our agents. Agent efficiency increased due to the implementation of more efficient marketing strategies and improvements in our LeadScore and call-routing technologies, which allowed our agents to increase the number of qualified prospects they are able to talk to and improve the rate at which a qualified prospect converts to a Submitted Policy. Additionally, the expansion of our facilities to accommodate additional agents and the hiring of additional agents also contributed to the increase in Submitted Policies in the Medicare—Internal segment. During the 2019 Medicare annual enrollment period, the Medicare—Internal segment had at its peak roughly 1,040 full time equivalent agents, compared to roughly 230 in the comparable period of 2018. For the Medicare—External segment, the increase in total Submitted Policies was due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

_Approved Submissions_

Approved Submissions represent Submitted Policies approved by carriers for the identified product during the indicated period. Not all Approved Submissions will go in force, as some individuals we enroll may not ultimately pay their insurance premiums or may switch out of a policy within the disenrollment period during the first 90 days of the policy. In general, the relationship between Submitted Policies and Approved Submissions has been steady over time. Therefore, factors impacting the number of Submitted Policies also impact the number of Approved Submissions.

The following table shows the number of Approved Submissions relating to commissionable policies for each of the Medicare segments for the periods presented. Only commissionable policies are used to calculate our LTV.

113

Table of Contents

*Medicare—Internal*

| | Three Months Ended March 31, | | Year Ended December 31, 2019 | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | | | | |
| Medicare Advantage | 83,608 | 19,460 | 246,513 | 159,969 | 86,544 | 45,876 |
| Medicare Supplement | 822 | 1,069 | 5,050 | 1,852 | 3,198 | 3,753 |
| Prescription Drug Plans | 2,174 | 1,585 | 14,021 | 8,943 | 5,078 | 8,115 |
| Medicare—Internal Commissionable Approved Submissions | 86,604 | 22,114 | 265,584 | 170,764 | 94,820 | 57,744 |

Medicare—Internal commissionable Approved Submissions increased by 291.6% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019. The growth in Medicare—Internal commissionable Approved Submissions was attributable to the same drivers that increased Medicare—Internal commissionable Approved Submissions for the year ended December 31, 2019, as described below.

Medicare—Internal commissionable Approved Submissions were 265,584 for the year ended December 31, 2019, 170,764 for the Successor 2019 Period and 94,820 for the Predecessor 2019 Period compared to 57,744 for the year ended December 31, 2018. The growth of 359.9% from 2018 to 2019 in Medicare—Internal commissionable Approved Submissions was primarily attributable to the hiring of additional agents (including the expansion of our facilities to accommodate additional agents), the increased efficiency of our agents due to technology improvements and improved multichannel marketing strategies that allowed us to generate a greater number of high quality prospects.

*Medicare—External*

| | Three Months Ended March 31, | | Year Ended December 31, 2019 | Successor 2019 Period | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | | | | |
| Medicare Advantage | 32,287 | 16,614 | 102,193 | 53,852 | 48,341 | 45,397 |
| Medicare Supplement | 1,558 | 2,598 | 10,991 | 3,926 | 7,065 | 8,048 |
| Prescription Drug Plans | 481 | 1,107 | 7,492 | 4,895 | 2,597 | 4,502 |
| Medicare—External Commissionable Approved Submissions | 34,326 | 20,319 | 120,676 | 62,673 | 58,003 | 57,947 |

Medicare—External commissionable Approved Submissions increased by 68.9% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019. The growth in Medicare—External commissionable Approved Submissions was attributable to the same drivers that increased Medicare—External commissionable Approved Submissions for the year ended December 31, 2019, as described below.

Medicare—External commissionable Approved Submissions were 120,676 for the year ended December 31, 2019, 62,673 for the Successor 2019 Period and 58,003 for the Predecessor 2019 Period compared to 57,947 for the year ended December 31, 2018. The growth of 108.3% from 2018 to 2019 in Medicare—External commissionable Approved Submissions was primarily attributable to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans.

*Lifetime Value of Commissions per Approved Submission*

Lifetime value of commissions per commissionable Approved Submission, or LTV per Approved Submission, represents (i) aggregate commissions estimated to be collected over the estimated life of all commissionable

114

Table of Contents

Approved Submissions for the relevant period based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints, divided by (ii) the number of commissionable Approved Submissions for such period. LTV per Approved Submission is equal to the sum of the commission revenue due upon the initial sale of a policy, and when applicable, an estimate of future renewal commissions per commissionable Approved Submissions. The estimate of the future renewal commissions is determined by using the contracted renewal commission rates constrained by a persistency-adjusted renewal period. The persistency-adjusted renewal period is determined based on our historical experience and available industry and carrier historical data. Persistency-adjustments allow us to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur. These factors may result in varying values from period to period. LTV per Approved Submission represents commissions only from policies sold during the period, but excludes policies originally submitted in prior periods.

The following table shows the LTV per Approved Submission for the Medicare segments for the periods presented:

| | Three Months Ended March 31, | | Year Ended December 31, 2019 | Successor 2019 Period | | Predecessor 2019 Period | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|---|
| | 2020 (Successor) | 2019 (Predecessor) | | | | | |
| Medicare Advantage | $ 857 | $ 860 | $ 978 | $ 1,024 | | $ 906 | $ 936 |
| Medicare Supplement | $ 920 | $ 926 | $ 957 | $ 944 | | $ 964 | $ 798 |
| Prescription Drug Plans | $ 215 | $ 191 | $ 206 | $ 213 | | $ 194 | $ 190 |

LTV per Approved Submission for Medicare Advantage remained approximately flat for the three months ended March 31, 2020 compared to the three months ended March 31, 2019 as commission rates slightly increased but were offset by a variance in carrier mix and slight changes in policy effectuation and churn during this time period. LTV per Approved Submission for Medicare Supplement remained approximately flat for the three months ended March 31, 2020 compared to the three months ended March 31, 2019 as changes in carrier mix were offset by decreases in the estimates of plan persistency. LTV per Approved Submission for prescription drug plans increased by 12.4% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019 primarily due to improved persistency rates and carrier mix shifts.

LTV per Approved Submission for Medicare Advantage was $978 for the year ended December 31, 2019, $1,024 for the Successor 2019 Period and $906 for the Predecessor 2019 Period compared to $936 for the year ended December 31, 2018. The increase of 4.5% from 2018 to 2019 was primarily due to an increase in CMS-approved commission rates and a more diverse carrier base allowing us to offer more products and plans that could satisfy a diverse range of needs contributing to more long-term customer satisfaction with their policy, partially offset by the effect of our seasonality, given the greater mix of our volumes in 2019 was generated outside of the Medicare annual enrollment period when LTV per Approved Submission is generally lower. LTV per Approved Submission for Medicare Supplement was $957 for the year ended December 31, 2019, $944 for the Successor 2019 Period and $964 for the Predecessor 2019 Period compared to $798 for the year ended December 31, 2018. The increase of 19.9% from 2018 to 2019 was primarily due to improved persistency rates and carrier mix shifts. LTV per Approved Submission for prescription drug plans was $206 for the year ended December 31, 2019, $213 for the Successor 2019 Period and $194 for the Predecessor 2019 Period compared to $190 for the year ended December 31, 2018. The increase of 8.4% from 2018 to 2019 was primarily due to improved persistency rates and carrier mix shifts.

*IFP and Other Segments*

*Submitted Policies*

Submitted Policies represent the number of completed applications that, with respect to each such application, the consumer has authorized us to submit to the carrier. The applicant may need to take additional actions, including providing subsequent information before the application is reviewed by the carrier.

Total Submitted Policies for the IFP and Other segments decreased by 29.5% to 38,002 for the three months ended March 31, 2020 compared to 53,886 for the three months ended March 31, 2019 due to a change in strategy to prioritize agents and marketing and advertising spend in the Medicare segments instead of IFP and Other.

Total Submitted Policies for the IFP and Other segments was 296,772 for the year ended December 31, 2019, 146,228 for the Successor 2019 Period and 150,544 for the Predecessor 2019 Period compared to 207,695 for the year ended December 31, 2018. The increase of 42.9% from 2018 to 2019 was driven by the growth of our single carrier partnerships.

*EBITDA, Adjusted EBITDA and Adjusted EBITDA Margin*

| (in thousands) | Pro Forma GoHealth, Inc. | | Three Months Ended March 31, | | | | Year Ended December 31, 2018 (Predecessor) |
|---|---|---|---|---|---|---|---|
| | Three Months Ended March 31, 2020 | Year Ended December 31, 2019 | 2020 (Successor) | 2019 (Predecessor) | Successor 2019 Period | Predecessor 2019 Period | |
| Net income (loss) | $ 1,372 | $ 30,464 | $ (937) | $ 5,002 | $ 15,995 | $ (57,063) | $ 28,114 |
| Interest expense | 6,756 | 27,172 | 6,756 | 28 | 8,076 | 140 | 224 |
| Income tax expense (benefit) | (1) | (6) | (2) | 2 | 44 | (66) | 46 |
| Depreciation and amortization expense | 24,147 | 98,825 | 24,147 | 1,538 | 28,738 | 4,247 | 6,160 |
| EBITDA | 32,274 | 156,455 | 29,964 | 6,570 | 52,853 | (52,742) | 34,544 |
| Share-based compensation(1) | 2,897 | 12,573 | 479 | — | 448 | 87,060 | — |
| Change in fair value of contingent consideration liability(2) | — | — | 4,400 | — | 70,700 | — | — |
| Centerbridge Acquisition costs(3) | — | — | — | — | 6,245 | 4,908 | — |
| Severance costs(4) | 77 | 966 | 77 | 566 | 219 | 747 | 319 |
| Adjusted EBITDA | $ 35,248 | $ 169,994 | $ 34,920 | $ 7,136 | $ 130,465 | $ 39,973 | $ 34,863 |

(1)  Represents non-cash share-based compensation expense in connection with profits interests and incentive share units, except with respect to the Pro Forma Fiscal Year 2019 and Pro Forma First Quarter 2020 periods, where share-based compensation expense is attributable to stock options and restricted stock units to be granted to our directors and employees in connection with this offering. Share-based compensation expense for the Predecessor 2019 Period is fully attributable to the automatic acceleration of legacy profits interests and legacy incentive share units in connection with the Centerbridge Acquisition and is allocated to the marketing and advertising, technology and general and administrative line items in the income statement based on the department of the individual who received the compensation.

116

Table of Contents

(2)     Represents the change in fair value of the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition, which such liability will be settled in connection with this offering. See footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information."

(3)     Represents legal, accounting, consulting, and other costs related to the Centerbridge Acquisition.

(4)     Represents costs associated with the termination of employment.

See "Prospectus Summary—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of EBITDA, Adjusted EBITDA and Adjusted EBITDA margin, each a non-GAAP financial measure.

**Key Components of Results of Operations**

*Net Revenues*

We primarily generate revenues from commissions received from carriers for the multiple types of insurance products and plans sold by us on behalf of carriers. Commission revenues represent the consideration paid to us by carriers in the form of commissions, which primarily are calculated as a percentage of the premium amount collected by the carrier during the period the customer is enrolled in the insurance plan or product. The maximum allowable commission rates carriers are allowed to pay to independent agents and brokers, such as ourselves, for Medicare products are determined on an annual basis by CMS and CMS generally increases the commission rates allowed to be paid each year. The value we bring to carriers in the Medicare space typically enables us to negotiate for the maximum allowable commission rates, and we expect to continue to be able to do so. However, the commission rates that ultimately are paid to us are based on a variety of factors and the commission rates we receive could change. See "Risk Factors— Risks Related to Our Business—Carriers may reduce the commissions paid to us and change their underwriting practices in ways that reduce the number of, or impact the renewal or approval rates of, insurance policies sold through our platform, which could harm our business, operating results and financial condition." We generally continue to receive commission payments from the relevant carrier until the plan or product is canceled. Our contracts with carriers contain a single-performance obligation satisfied by carrier acceptance of a submission, at which point we recognize the full transaction price of the policy sold as revenue in that period.

We also generate revenues from providing marketing, enrollment and other services to third parties, primarily carriers. Typically, we are paid enrollment fees and hourly fees to staff for services performed for specific carriers and other partners, which we recognize as the services are performed under a contractual arrangement. In addition, these agreements generally include performance-based fees based on specified performance criteria, such as volume, efficiency and certain other service-level agreements. We also generate revenue from referring customers to carriers and other third-party partners. Additionally, we provide technology services through our Marketplace technology to carriers.

*Operating Expenses*

<u>Cost of Revenue</u>

Cost of revenue represents payments related to policies sold to customers who were enrolled by partners with whom we have commissions revenue-sharing arrangements. In order to enter into a revenue-sharing arrangement, partners must be licensed to sell health insurance plans in the state where the policy is sold. Costs related to revenue-sharing arrangements are expensed as the related revenue is recognized.

<u>Marketing and Advertising</u>

Marketing expense consists primarily of expenses associated with our direct, online advertising, and marketing partner channels, in addition to compensation (including share-based compensation expense) and other expenses related to marketing personnel who manage campaigns and optimize consumer activity. Marketing costs are

117

Table of Contents

expensed as incurred. Our direct channel expenses primarily consist of costs for e-mail marketing and direct mail marketing. Online advertising expenses primarily consist of paid keyword search advertising on search engines. Marketing partner channel expenses primarily consist of fees paid to marketing partners and affiliates. Advertising expenses consist of costs incurred to acquire consumers through online, television, and direct mail advertisements. We also have arrangements with certain carriers that allow us to increase marketing efforts, including through direct mail, television, and online advertising for various insurance products that are being offered by these carriers. We record the amounts received as a reduction of the marketing costs incurred. Generally, our marketing and advertising expenses increase during annual enrollment period and open enrollment so that we may generate more leads during these high-volume periods.

### *Customer Care and Enrollment*

Customer care and enrollment expense consists primarily of expenses associated with compensation (including share-based compensation expense) and benefits costs for agents and other personnel who assist consumers during the policy application process, along with management and support personnel.

### *Technology*

Technology expense consists primarily of compensation (including share-based compensation expense) and benefits costs for personnel associated with developing and enhancing our technology platform, data analytics and business intelligence, as well as maintaining our online presence and integrations with carrier and federal marketplaces. Technology expense also includes costs for contracted services and supplies, and amortization expense to capitalized software. We plan to increase our investment in this area as we continue to enhance our platform.

### *General and Administrative*

General and administrative expense consists of compensation (including share-based compensation expense) and benefits costs for staff working with our executive, finance, legal, human resources, facilities and internal operations departments. These expenses also include facilities costs and fees paid for outside professional services, including audit, tax, legal and governmental affairs.

### *Change in Fair Value of Contingent Consideration Liability*

Change in fair value of contingent consideration liability relates to the earnout liability incurred in connection with the Centerbridge Acquisition, in which we agreed to pay additional consideration in additional common and senior preferred units if Adjusted EBITDA (as defined in the agreement entered into in connection with the Centerbridge Acquisition) exceeds certain thresholds for the year ended December 31, 2019 and 2020. See Note 4 of each of the audited consolidated financial statements and interim condensed consolidated financial statements included elsewhere in this prospectus for fair value estimates recorded at March 31, 2020 and December 31, 2019.

### *Amortization of Intangible Assets*

Amortization of intangible assets represents amortization of developed technology and customer relationships over the estimated useful lives of such assets which was reflected in the purchase price allocation attributable to the Centerbridge Acquisition.

### *Transaction Costs*

Transaction costs consist of legal, accounting, consulting and other costs incurred in connection with the Centerbridge Acquisition.

118

Table of Contents

**Interest Expense**

Interest expense consists primarily of interest expense on our outstanding debt.

**Basis of Presentation**

The Centerbridge Acquisition took place on September 13, 2019. Accordingly, the accompanying consolidated financial statements presented elsewhere in this prospectus for the year ended December 31, 2018 reflect the period prior to the Centerbridge Acquisition. The consolidated financial statements for December 31, 2019 are presented separately for the Predecessor period from January 1, 2019 through September 12, 2019 (the "Predecessor 2019 Period") and the Successor period from September 13, 2019 through December 31, 2019 (the "Successor 2019 Period"). The financial position and results of the Successor reflect the application of purchase accounting in accordance with ASC 805.

The financial information presented for the unaudited pro forma condensed consolidated financial information included elsewhere in this prospectus for the year ended December 31, 2019 (the "Pro Forma Fiscal Year 2019") gives effect to the Centerbridge Acquisition and the Transactions. The unaudited pro forma consolidated statement of operations for the Pro Forma Fiscal Year 2019 presented elsewhere in this prospectus and the pro forma adjustments are not audited and have been derived from our audited consolidated financial statements included elsewhere in this prospectus.

We believe that the discussion of the results of operations comparing the Predecessor 2019 Period, the Successor 2019 Period and the consolidated financial statements of the Predecessor for the year ended December 31, 2018 is not meaningful on a standalone basis as the Centerbridge Acquisition was accounted for as a business combination in accordance with ASC 805, and the resulting new basis of accounting is reflected in our consolidated financial statements for all periods beginning on or after September 13, 2019, and therefore, the two periods are not comparable. In particular, pro forma adjustments for general and administrative expense, amortization of intangible assets, transaction costs and interest expense significantly impacted the comparability of our results, among other adjustments. We believe that the comparison of the Pro Forma Fiscal Year 2019 to the year ended December 31, 2018 provides a more meaningful discussion of our 2019 and 2018 results of operations for potential investors.

119

**Results of Operations**

***Three Months Ended March 31, 2020 Compared to Three Months Ended March 31, 2019***

The following table sets forth the components of our results of operations for the periods indicated:

| (in thousands) | Three Months Ended March 31, 2020 (Successor) | | Three Months Ended March 31, 2019 (Predecessor) | | $ Change | % Change |
|---|---|---|---|---|---|---|
| | Dollars | % of Net Revenues | Dollars | % of Net Revenues | | |
| Net revenues: | | | | | | |
| Commission | $112,510 | 79.8% | $51,215 | 74.1% | $61,295 | 119.7% |
| Other | 28,500 | 20.2% | 17,874 | 25.9% | 10,625 | 59.4% |
| Net revenues | 141,010 | 100.0% | 69,089 | 100.0% | 71,921 | 104.1% |
| Operating expenses: | | | | | | |
| Cost of revenue | 42,134 | 29.9% | 27,552 | 39.9% | 14,582 | 52.9% |
| Marketing and advertising | 26,073 | 18.5% | 11,411 | 16.5% | 14,662 | 128.5% |
| Customer care and enrollment | 23,978 | 17.0% | 13,939 | 20.2% | 10,039 | 72.0% |
| Technology | 4,593 | 3.3% | 4,155 | 6.0% | 437 | 10.5% |
| General and administrative | 10,491 | 7.4% | 6,990 | 10.1% | 3,501 | 50.0% |
| Change in fair value of contingent consideration liability | 4,400 | 3.1% | — | — | 4,400 | NM |
| Amortization of intangible assets | 23,514 | 16.7% | — | — | 23,514 | NM |
| Total operating expenses | 135,183 | 95.9% | 64,047 | 92.7% | 71,315 | 111.1% |
| Income from operations | 5,827 | 4.1% | 5,042 | 7.3% | 785 | 15.6% |
| Interest expense | 6,756 | 4.8% | 28 | — | 6,729 | NM |
| Other expense | 10 | — | 10 | — | — | — |
| Income (loss) before income tax expense (benefit) | (939) | (0.7)% | 5,004 | 7.2% | (5,943) | (118.8)% |
| Income tax expense (benefit) | (2) | — | 2 | — | (4) | (173.0)% |
| Net income (loss) | $ (937) | (0.7)% | $ 5,002 | 7.2% | $ (5,939) | (118.7)% |

\* NM indicates that the percentage is not meaningful.

<u>Net Revenues</u>

*Commission Revenues*

Commission revenues were $112.5 million for the three months ended March 31, 2020 compared to $51.2 million for the three months ended March 31, 2019, an increase of 119.7%, which was primarily attributable to increases in commission revenues from (i) the Medicare—Internal segment of $74.4 million driven by a 291.6% increase in Medicare commissionable Approved Submissions due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents and (ii) the Medicare—External segment of $8.6 million driven by a 68.9% increase in Medicare commissionable Approved Submissions due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

*Other Revenues*

Other revenues were $28.5 million for the three months ended March 31, 2020 compared to $17.9 million for the three months ended March 31, 2019, an increase of 59.4%. The increase was primarily attributable to an increase in Medicare—Internal other revenues of $20.0 million due to the expansion of carrier-specific sponsorships and

120

**Table of Contents**

programs. The increase was partially offset by declines in the IFP and Other segments and the Medicare—External segment other revenues of $6.6 million in aggregate due to a decrease in consumer lead sales to external third parties as we strategically shifted to generating consumer leads in the internal channel.

See further analysis in "—Segment Information" below.

*Operating Expenses*

*Cost of Revenue*

Cost of revenue was $42.1 million for the three months ended March 31, 2020 compared to $27.5 million for the three months ended March 31, 2019, an increase of 52.9%. The increase was primarily due to a 68.9% increase in commissionable Approved Submissions in the Medicare—External segment, which increased the amount of expense we recognized pursuant to our revenue-sharing agreements with external agencies and other partners.

*Marketing and Advertising*

Marketing and advertising expense was $26.0 million for the three months ended March 31, 2020 compared to $11.4 million for the three months ended March 31, 2019, an increase of 128.5%. The increase was primarily due to an increase in our advertising costs for the Medicare—Internal segment to generate more qualified prospects, which contributed to a 291.6% increase in commissionable Approved Submissions in the Medicare—Internal segment.

*Customer Care and Enrollment*

Customer care and enrollment expense was $24.0 million for the three months ended March 31, 2020 compared to $13.9 million for the three months ended March 31, 2019, an increase of 72.0%. The increase was primarily attributable to the hiring of additional agents in the Medicare—Internal segment in order to drive the conversion of a greater number of qualified prospects into commissionable Approved Submissions. As of March 31, 2020, we had 781 full time equivalent agents compared to 529 full time equivalent agents as of March 31, 2019.

*Technology*

Technology expense was $4.6 million for the three months ended March 31, 2020 compared to $4.2 million for the three months ended March 31, 2019, an increase of 10.5%. The increase was primarily due to the hiring of additional employees in our technology and data science teams, which drove improvements to our LeadScore and call-routing technologies and expansion of our business intelligence and analytics staffing in order to support the growth of the Medicare-Internal segment.

*General and Administrative*

General and administrative expense was $10.5 million for the three months ended March 31, 2020 compared to $7.0 million for the three months ended March 31, 2019, an increase of 50.0%. The increase was primarily due to investments in corporate infrastructure, such as legal, human resources, and finance, to support the growth of the business.

*Amortization of Intangible Assets*

Amortization of intangible assets expense was $23.5 million for the three months ended March 31, 2020 compared to none for the three months ended March 31, 2019. Amortization expense for the three months ended March 31, 2020 relates to the amortization of definite-lived intangible assets that was reflected in the purchase price allocation at the date of the Centerbridge Acquisition.

Table of Contents

*Interest Expense*

Interest expense was $6.8 million for the three months ended March 31, 2020 compared to $28 thousand for the three months ended March 31, 2019. The increase was due to the incurrence of additional debt under the Credit Facilities in connection with the Centerbridge Acquisition.

***Period from Successor 2019 Period and Predecessor 2019 Period Compared to Fiscal Year Ended December 31, 2018 (Predecessor)***

The results of operations discussion below compares the Successor 2019 Period, the Predecessor 2019 Period and the year ended December 31, 2018. Due to the application of purchasing accounting at September 12, 2019, we believe that the comparison of the Pro Forma Fiscal Year 2019 to the year ended December 31, 2018, presented below, provides the most meaningful supplemental discussion of our 2019 and 2018 results of operations for potential investors. Due to, in part, the seasonality of our business, the results of operations for the Successor 2019 Period compared to the Predecessor 2019 Period are not comparable. See "—Seasonality."

The following table sets forth the components of our results of operations for the periods indicated:

| (in thousands) | Successor 2019 Period | | Predecessor 2019 Period | | Year Ended December 31, 2018 (Predecessor) | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dollars | % of Net Revenues | Dollars | % of Net Revenues | Dollars | % of Net Revenues |
| Net revenues: | | | | | | |
| Commission | $ 243,347 | 78.9% | $ 175,834 | 76.1% | $144,378 | 63.8% |
| Other | 65,144 | 21.1% | 55,176 | 23.9% | 81,827 | 36.2% |
| Net revenues | 308,491 | 100.0% | 231,010 | 100.0% | 226,205 | 100.0% |
| Operating expenses: | | | | | | |
| Cost of revenue | 90,384 | 29.3% | 79,169 | 34.3% | 79,582 | 35.2% |
| Marketing and advertising | 24,811 | 8.0% | 37,769 | 16.3% | 28,129 | 12.4% |
| Customer care and enrollment | 44,356 | 14.4% | 49,149 | 21.3% | 46,076 | 20.4% |
| Technology | 6,006 | 1.9% | 40,312 | 17.5% | 16,197 | 7.2% |
| General and administrative | 13,674 | 4.4% | 79,219 | 34.3% | 27,458 | 12.1% |
| Change in fair value of contingent consideration liability | 70,700 | 22.9% | — | — | — | — |
| Amortization of intangible assets | 28,217 | 9.1% | — | — | — | — |
| Transaction costs | 6,245 | 2.0% | 2,267 | 0.9% | — | — |
| Total operating expenses | 284,393 | 92.2% | 287,885 | 124.6% | 197,442 | 87.3% |
| Income (loss) from operations | 24,098 | 7.8% | (56,875) | (24.6)% | 28,763 | 12.7% |
| Interest expense | 8,076 | 2.6% | 140 | 0.1% | 224 | 0.1% |
| Other income (expense) | 17 | — | (114) | — | (379) | (0.2)% |
| Income (loss) before income taxes | 16,039 | 5.2% | (57,129) | (24.7)% | 28,160 | 12.4% |
| Income tax expense (benefit) | 44 | — | (66) | — | 46 | — |
| Net income (loss) | $ 15,995 | 5.2% | $ (57,063) | (24.7)% | $ 28,114 | 12.4% |

*Net Revenues*

*Commission Revenues*

Commission revenues were $243.3 million for the Successor 2019 Period and $175.8 million for the Predecessor 2019 Period compared to $144.4 million for the year ended December 31, 2018 which was primarily attributable to increases in commission revenue from (i) the Medicare—Internal segment driven by a 359.9% increase in

122

Table of Contents

Medicare commissionable Approved Submissions due the hiring of additional agents (in 2019, at our peak, we had approximately 1,700 full time equivalent agents during the annual enrollment period, compared to approximately 1,200 full time equivalent agents at our peak in 2018 during the annual enrollment period), the increased utilization and efficiency of our agents and the implementation of new marketing strategies to generate a greater number of qualified prospects. and (ii) the Medicare—External segment driven by a 108.3% increase in commissionable Approved Submissions due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

*Other Revenues*

Other revenues were $65.1 million for the Successor 2019 Period and $55.2 million for the Predecessor 2019 Period compared to $81.8 million for the year ended December 31, 2018. The increase was primarily attributable to an increase in Medicare—Internal other revenues of $62.3 million due to the expansion of carrier-specific sponsorships and programs. The increase was partially offset by declines in the IFP and Other segments and the Medicare—External segment of $23.4 million in aggregate due to a decrease in consumer lead sales to external third parties as we strategically shifted to generating consumer leads in the internal channel.

See further analysis in "—Segment Information" below.

*Operating Expenses*

*Cost of Revenue*

Cost of revenue was $90.4 million for the Successor 2019 Period and $79.2 million for the Predecessor 2019 Period compared to $79.6 million for the year ended December 31, 2018. The increase was primarily due to a 108.3% increase in commissionable Approved Submissions in the Medicare—External segment, which increased the amount of expense we recognized pursuant to our revenue-sharing agreements with external agencies and other partners.

*Marketing and Advertising*

Marketing and advertising expense was $24.8 million for the Successor 2019 Period and $37.8 million for the Predecessor 2019 Period compared to $28.1 million for the year ended December 31, 2018. The increase was primarily due to an increase in our advertising costs, particularly in the Predecessor 2019 Period, for the Medicare—Internal segment to generate more qualified prospects, which contributed to a 359.9% increase in Medicare—Internal Approved Submissions from 2019 compared to 2018. Additionally, marketing and advertising expense also increased as compared to 2018 due to share-based compensation expense of $1.6 million in the Predecessor 2019 Period in connection with the accelerated vesting of certain legacy profits interests and legacy incentive share units granted prior to the Centerbridge Acquisition.

*Customer Care and Enrollment*

Customer care and enrollment expense was $44.4 million for the Successor 2019 Period and $49.1 million for the Predecessor 2019 Period compared to $46.1 million for the year ended December 31, 2018. The increase was primarily attributable to the hiring of additional agents in the Medicare—Internal channel in order to drive the conversion of a greater number of qualified prospects into Approved Submissions. In 2019, at our peak, we had roughly 1,700 full time equivalent agents during the Medicare annual enrollment period, compared to roughly 1,200 full time equivalent agents at our peak in 2018 during the Medicare annual enrollment period.

*Technology*

Technology expense was $6.0 million for the Successor 2019 Period and $40.3 million for the Predecessor 2019 Period compared to $16.2 million for the year ended December 31, 2018. The increase was primarily due to

123

Table of Contents

share-based compensation expense of $27.1 million in the Predecessor 2019 Period in connection with the accelerated vesting of certain legacy profits interests and legacy incentive share units granted prior to the Centerbridge Acquisition. Additionally, the increase was also attributable to the hiring of additional employees in our technology and data science teams totaling $3.1 million which drove improvements to our LeadScore and call-routing technologies and expansion of our business intelligence and analytics staffing in order to support the growth of the Internal Medicare segments.

*General and Administrative*

General and administrative expense was $13.7 million for the Successor 2019 Period and $79.2 million for the Predecessor 2019 Period compared to $27.5 million for the year ended December 31, 2018. The increase was primarily due to share-based compensation expense of $58.3 million in the Predecessor 2019 Period in connection with the accelerated vesting of certain legacy profits interests and legacy incentive share units granted prior to the Centerbridge Acquisition. Additionally, the increase was also attributable to investments of $6.1 million in corporate infrastructure, such as legal, human resources, and finance, to support the growth of the business.

*Change in Fair Value of Contingent Consideration Liability*

Change in fair value of contingent consideration liability was $70.7 million for the Successor 2019 Period, which we incurred in connection with the Centerbridge Acquisition. We had no earnout liability in the prior periods.

*Amortization of Intangible Assets*

Amortization of intangible assets expense was $28.2 million for the Successor 2019 Period. We had no amortization of intangible assets in the prior periods. Amortization expense for the Successor 2019 Period relates to the amortization of definite-lived intangible assets which was reflected in the purchase price allocation at the date of the Centerbridge Acquisition.

*Transaction Costs*

Transaction costs were $6.2 million for the Successor 2019 Period and $2.3 million for the Predecessor 2019 Period compared to none for the year ended December 31, 2018. Transaction costs in 2019 were due to the Centerbridge Acquisition, for which we incurred legal, accounting, consulting and other costs.

<u>*Interest Expense*</u>

Interest expense was $8.1 million for the Successor 2019 Period and $140.0 thousand for the Predecessor 2019 Period compared to $224.0 thousand for the year ended December 31, 2018. The increase from 2018 to 2019 was due to the incurrence of additional debt under the Credit Facilities in connection with the Centerbridge Acquisition.

***Unaudited Pro Forma Fiscal Year 2019 Compared to Fiscal Year Ended December 31, 2018 (Predecessor)***

The following table sets forth the operating results and the related percentage of net revenues for the periods indicated:

| (in thousands) | Pro Forma Fiscal Year 2019(1) | | Year Ended December 31, 2018 (Predecessor) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dollars | % of Net Revenues | Dollars | % of Net Revenues | $ Change | % Change |
| Net revenues: | | | | | | |
| Commission | $ 419,181 | 77.7% | $ 144,378 | 63.8% | $ 274,803 | 190.3% |
| Other | 120,320 | 22.3% | 81,827 | 36.2% | 38,493 | 47.0% |

124

| (in thousands) | Pro Forma Fiscal Year 2019(1) | | Year Ended December 31, 2018 (Predecessor) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dollars | % of Net Revenues | Dollars | % of Net Revenues | $ Change | % Change |
| Net revenues | 539,501 | 100.0% | 226,205 | 100.0% | 313,296 | 138.5% |
| Operating expenses: | | | | | | |
| Cost of revenue | 169,553 | 31.4% | 79,582 | 35.2% | 89,971 | 113.1% |
| Marketing and advertising | 61,071 | 11.3% | 28,129 | 12.4% | 32,942 | 117.1% |
| Customer care and enrollment | 96,065 | 17.8% | 46,076 | 20.4% | 49,989 | 108.5% |
| Technology | 19,838 | 3.7% | 16,197 | 7.2% | 3,641 | 22.5% |
| General and administrative | 41,189 | 7.6% | 27,458 | 12.1% | 13,731 | 50.0% |
| Amortization of intangible assets | 94,057 | 17.4% | — | — | 94,057 | — |
| Total operating expenses | 481,774 | 89.3% | 197,442 | 87.3% | 284,332 | 144.0% |
| Income (loss) from operations | 57,727 | 10.7% | 28,763 | 12.7% | 28,964 | 100.7% |
| Interest expense | 27,172 | 5.0% | 224 | 0.1% | 26,948 | NM |
| Other income (loss) | (97) | — | (379) | (0.2)% | 282 | (74.41)% |
| Income (loss) before income tax expense (benefit) | 30,458 | 5.6% | 28,160 | 12.4% | 2,298 | 8.2% |
| Income tax expense (benefit) | (6) | — | 46 | — | (52) | (113.0)% |
| Net income (loss) | $ 30,464 | 5.6% | $ 28,114 | 12.4% | $ 2,350 | 8.4% |

* NM indicates that the percentage is not meaningful.

(1) For a discussion of the Successor 2019 Period and the Predecessor 2019 Period compared to the year ended December 31, 2018, see "—Period from Successor 2019 Period and Predecessor 2019 Period Compared to Fiscal Year Ended December 31, 2018 (Predecessor)."

_Net Revenues_

_Commission Revenues_

Commission revenues were $419.2 million for the Pro Forma Fiscal Year 2019 compared to $144.4 million for the year ended December 31, 2018, an increase of 190.3%, which was primarily attributable to increases in commission revenue from (i) the Medicare—Internal segment of $201.5 million driven by a 359.9% increase in Medicare commissionable Approved Submissions due the hiring of additional agents (in 2019, at our peak, we had approximately 1,700 full time equivalent agents during the annual enrollment period, compared to approximately 1,200 full time equivalent agents at our peak in 2018 during the annual enrollment period), the increased utilization and efficiency of our agents and the implementation of new marketing strategies to generate a greater number of qualified prospects and (ii) the Medicare—External segment of $57.5 million driven by a 108.3% increase in commissionable Approved Submissions in the Medicare—External segment due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

_Other Revenues_

Other revenues were $120.3 million for the Pro Forma Fiscal Year 2019 compared to $81.8 million for the year ended December 31, 2018, an increase of 47.0%. The increase was primarily attributable to an increase in Medicare—Internal other revenues of $62.3 million due to the expansion of carrier-specific sponsorships and programs. The increase was partially offset by declines in the IFP and Other segments and the Medicare—External segment of $23.4 million in aggregate due to a decrease in consumer lead sales to external third parties as we strategically shifted to generating consumer leads in our internal channels.

See further analysis in "—Segment Information" below.

125

*Operating Expenses*

*Cost of Revenue*

Cost of revenue was $169.6 million for the Pro Forma Fiscal Year 2019 compared to $79.6 million for the year ended December 31, 2018, an increase of 113.1%. The increase was primarily due to a 108.3% increase in commissionable Approved Submissions in the Medicare—External segment, which increased the amount of expense we recognized pursuant to our revenue-sharing agreements with external agencies and other partners.

*Marketing and Advertising*

Marketing and advertising expense was $61.1 million for the Pro Forma Fiscal Year 2019 compared to $28.1 million for the year ended December 31, 2018, an increase of 117.1%. The increase was primarily due to an increase in our advertising costs for the Medicare—Internal segment to generate more qualified prospects, which contributed to a 359.9% increase in Medicare—Internal Approved Submissions from 2019 compared to 2018.

*Customer Care and Enrollment*

Customer care and enrollment expense was $96.1 million for the Pro Forma Fiscal Year 2019 compared to $46.1 million for the year ended December 31, 2018, an increase of 108.5%. The increase was primarily attributable to the hiring of additional agents in the Medicare—Internal channel in order to drive the conversion of a greater number of qualified prospects into Approved Submissions. In 2019, at our peak, we had roughly 1,700 full time equivalent agents during the Medicare annual enrollment period, compared to roughly 1,200 full time equivalent agents at our peak in 2018 during the Medicare annual enrollment period.

*Technology*

Technology expense was $19.8 million for the Pro Forma Fiscal Year 2019 compared to $16.2 million for the year ended December 31, 2018, an increase of 22.5%. The increase was primarily due to our hiring of additional employees in our technology and data science teams totaling $3.1 million which drove improvements to our LeadScore and call-routing technologies and expansion of our business intelligence and analytics staffing in order to support the growth of the Internal Medicare segments.

*General and Administrative*

General and administrative expense was $41.2 million for the Pro Forma Fiscal Year 2019 compared to $27.5 million for the year ended December 31, 2018, an increase of 50.0%. The increase was primarily due to investments in corporate infrastructure, such as legal, human resources, and finance, to support the growth of the business.

*Amortization of Intangible Assets*

Amortization of intangible assets expense was $94.1 million for the Pro Forma Fiscal Year 2019 compared to none for the year ended December 31, 2018. Amortization expense for Pro Forma Fiscal Year 2019 relates to the amortization of certain definite-lived intangible assets that was reflected in the purchase price allocation at the date of the Centerbridge Acquisition.

*Interest Expense*

Interest expense was $27.2 million for the Pro Forma Fiscal Year 2019 compared to $0.2 million for the year ended December 31, 2018. The increase from 2018 to 2019 was due to the incurrence of additional debt under the Credit Facilities in connection with the Centerbridge Acquisition.

126

**Segment Information**

Our reportable segments have been determined in accordance with Accounting Standards Codification, or ASC, 280, *Segment Reporting*. Currently, we have four reportable segments: Medicare—Internal, Medicare—External, IFP and Other—Internal, and IFP and Other—External. In addition, we separately report other expenses (classified as "Corporate" in the following table), the primary components of which are corporate overhead expenses and shared service expenses that have not been allocated to the reportable segments, as they are not the responsibility of segment operating management.

The segment measurements provided to and evaluated by the chief operating decision maker are described in the notes to the audited consolidated financial statements and the interim condensed consolidated financial statements included elsewhere in this prospectus. These results should be considered in addition to, not as a substitute for, results reported in accordance with GAAP.

*Three Months Ended March 31, 2020 Compared to Three Months Ended March 31, 2019*

| (in thousands) | Three Months Ended March 31, 2020 (Successor) | | Three Months Ended March 31, 2019 (Predecessor) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dollars | % of Total Revenues | Dollars | % of Total Revenues | $ Change | % Change |
| Net revenues: | | | | | | |
| Medicare—Internal | $ 95,287 | 67.6% | $20,911 | 30.3% | $74,376 | 355.7% |
| Medicare—External | 28,945 | 20.5% | 20,335 | 29.4% | 8,610 | 42.3% |
| IFP and Other—Internal | 8,632 | 6.1% | 14,440 | 20.9% | (5,808) | (40.2)% |
| IFP and Other—External | 8,146 | 5.8% | 13,403 | 19.4% | (5,257) | (39.2)% |
| Total revenues | 141,010 | 100.0% | 69,089 | 100.0% | 71,921 | 104.1% |
| Segment profit: | | | | | | |
| Medicare—Internal segment profit | 41,735 | 29.6% | 4,864 | 7.0% | 36,871 | 758.0% |
| Medicare—External segment profit | (322) | (0.2)% | 3,380 | 4.9% | (3,702) | (109.5)% |
| IFP and Other—Internal segment profit | 481 | 0.3% | 881 | 1.3% | (400) | (45.4)% |
| IFP and Other—External segment profit | 512 | 0.4% | 1,263 | 1.8% | (751) | (59.5)% |
| Total segment profit | 42,406 | 30.1% | 10,388 | 15.0% | 32,018 | 308.2% |
| Corporate | 8,665 | 6.1% | 5,346 | 7.7% | 3,319 | 62.1% |
| Change in fair value of contingent consideration liability | 4,400 | 3.1% | — | — | 4,400 | NM |
| Amortization of intangible assets | 23,514 | 16.7% | — | — | 23,514 | NM |
| Interest expense | 6,756 | 4.8% | 28 | 0.0% | 6,729 | NM |
| Other expense | 10 | 0.0% | 10 | 0.0% | — | 0.0% |
| Income (loss) before income taxes | $ (939) | (0.7)% | $ 5,004 | 7.2% | $ (5,943) | (118.8)% |

\*  NM indicates that the percentage is not meaningful.

*Net Revenues*

Net revenues for the Medicare—Internal segment were $95.3 million for the three months ended March 31, 2020 compared to $20.9 million for the three months ended March 31, 2019, which was primarily driven by the hiring of additional agents and the increased utilization and efficiency of our agents, which contributed to a 291.6% increase in commissionable Approved Submissions. As of March 31, 2020, we had 781 full time equivalent agents compared to 529 full time equivalent agents as of March 31, 2019. In addition to increasing our agent

127

Table of Contents

count, we were able to increase the efficiency of our agents due to improvements in our technology. We were also able to utilize more agents on a year-round basis instead of during enrollment periods due to the addition of SNPs into our marketplace which are able to be sold at any time of year. Net revenues also increased in this segment due to the implementation of new marketing strategies to generate a greater number of qualified prospects and due to an increase in non-commission revenues. Net revenues for the Medicare—External segment were $28.9 million for the three months ended March 31, 2020 compared to $20.3 million for the three months ended March 31, 2019, which was primarily driven by a 68.9% increase in Medicare commissionable Approved Submissions due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

Net revenues for the IFP and Other—Internal segment were $8.6 million for the three months ended March 31, 2020 compared to $14.4 million for the three months ended March 31, 2019. Net revenues for the IFP and Other—External segment were $8.1 million for the three months ended March 31, 2020 compared to $13.4 million for the three months ended March 31, 2019. For each of the IFP and Other segments, the decreases were primarily driven by a change in product mix sold within the IFP and Other segments.

### Segment Profit

*Segment profit is calculated as total revenue for the applicable segment less direct and allocated cost of revenue, marketing and advertising, customer care and enrollment, technology and general and administrative operating expenses, excluding change in fair value of contingent consideration liability, amortization of intangibles assets, share-based compensation, transaction costs, interest expense, and other income (loss).*

Segment profit for the Medicare—Internal segment was $41.7 million for the three months ended March 31, 2020 compared to $4.9 million for the three months ended March 31, 2019. The increase was driven by the increase of Medicare commissionable Approved Submissions and an increase in our LTV/CAC ratio to 2.7x for the three months ended March 31, 2020 compared to 1.7x for the three months ended March 31, 2019. The increase of Medicare commissionable Approved Submissions was primarily attributable to (i) improvements in our LeadScore and call-routing technologies allowing our agents to successfully convert more consumer leads into customers and (ii) an expansion of the diversity and breadth of our omni-channel marketing efforts, which enabled the acquisition of higher quality prospects. The increase in LTV/CAC was primarily attributable to improved marketing efficiencies driven by our rapid test-and-learn approach across our marketing channels.

Segment loss for the Medicare—External segment was $0.3 million for the three months ended March 31, 2020 compared to segment profit of $3.4 million for the three months ended March 31, 2019. The decrease was primarily driven by a 68.9% increase in commissionable Approved Submissions in the Medicare—External segment, which increased the amount of expense we recognized pursuant to our revenue-sharing agreements with external agencies and other partners.

Segment profit for the IFP and Other—Internal segment was $0.5 million for the three months ended March 31, 2020 compared to $0.8 million for the three months ended March 31, 2019. The decrease was primarily driven by a change in product mix sold by agents for IFP and Other plans.

Segment profit for the IFP and Other—External segment was $0.5 million for the three months ended March 31, 2020 compared to $1.3 million for the three months ended March 31, 2019. The decrease was driven by a change in product mix sold by external agencies.

128

Table of Contents

*Unaudited Pro Forma Fiscal Year 2019 Compared to Fiscal Year Ended December 31, 2018 (Predecessor)*

| (in thousands) | Successor 2019 Period Dollars | % of Total Revenues | Predecessor 2019 Period Dollars | % of Total Revenues | Pro Forma Fiscal Year 2019 Dollars | % of Total Revenues | Year Ended December 31, 2018 (Predecessor) Dollars | % of Total Revenues |
|---|---|---|---|---|---|---|---|---|
| Net revenues: | | | | | | | | |
| Medicare—Internal | $215,322 | 69.8% | $102,196 | 44.2% | $317,518 | 58.9% | $ 53,365 | 23.6% |
| Medicare—External | 59,152 | 19.2% | 55,981 | 24.2% | 115,133 | 21.3% | 58,834 | 26.0% |
| IFP and Other—Internal | 20,850 | 6.8% | 37,909 | 16.4% | 58,759 | 10.9% | 63,009 | 27.9% |
| IFP and Other—External | 13,167 | 4.3% | 34,924 | 15.1% | 48,091 | 8.9% | 50,997 | 22.5% |
| Total revenues | 308,491 | 100.0% | 231,010 | 100.0% | 539,501 | 100.0% | 226,205 | 100.0% |
| Segment profit: | | | | | | | | |
| Medicare—Internal segment profit | 126,210 | 40.9% | 40,024 | 17.3% | 161,309 | 29.9% | 24,183 | 10.7% |
| Medicare—External segment profit | 10,584 | 3.4% | 4,893 | 2.1% | 15,106 | 2.8% | 9,034 | 4.0% |
| IFP and Other—Internal segment profit | 1,650 | 0.5% | 2,195 | 1.0% | 2,816 | 0.5% | 9,707 | 4.3% |
| IFP and Other—External segment profit | 584 | 0.2% | 1,748 | 0.8% | 2,139 | 0.5% | 2,848 | 1.3% |
| Total segment profit | 139,027 | 45.1% | 48,860 | 21.2% | 181,370 | 33.6% | 45,773 | 20.2% |
| Corporate | 9,767 | 3.2% | 103,469 | 44.8% | 29,587 | 5.5% | 17,009 | 7.5% |
| Change in fair value of contingent consideration liability | 70,700 | 22.9% | — | — | — | — | — | — |
| Amortization of intangible assets | 28,217 | 9.1% | — | — | 94,057 | 17.4% | — | — |
| Transaction costs | 6,245 | 2.0% | 2,267 | 0.9% | — | —% | — | — |
| Interest expense | 8,076 | 2.6% | 140 | 0.1% | 27,172 | 5.0% | 224 | 0.1% |
| Other income (expense) | 17 | — | (114) | — | (97) | — | (379) | (0.2)% |
| Income (loss) before income taxes | $ 16,039 | 5.2% | $ (57,129) | (24.7)% | $ (30,459) | (5.6)% | $ 28,160 | 12.4% |

*Net Revenues*

Net revenues for the Medicare—Internal segment were $317.5 million for Pro Forma Fiscal Year 2019 compared to $53.4 million for the year ended December 31, 2018, which was primarily driven by the hiring of additional agents and the increased utilization and efficiency of our agents, which contributed to a 359.9% increase in commissionable Approved Submissions. In 2019, at our peak, we had approximately 1,700 full time equivalent agents during the Medicare annual enrollment period, compared to approximately 1,200 full time equivalent agents at our peak in 2018 during the Medicare annual enrollment period. In addition to increasing our agent count, we were able to increase the efficiency of our agents due to improvements in our technology. We were also able to utilize more agents on a year-round basis instead of during enrollment periods due to the addition of SNPs into our marketplace which are able to be sold at any time of year. Net revenues also increased in this segment due to the implementation of new marketing strategies to generate a greater number of qualified prospects and due to an increase in non-commission revenues. Revenues for the Medicare—External segment

129

**Table of Contents**

were $115.1 million for the Pro Forma Fiscal Year 2019 compared to $58.8 million for the year ended December 31, 2018, which was primarily driven by a 108.3% increase in commissionable Approved Submissions in the Medicare—External segment due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

Net revenues for the IFP and Other—Internal segment were $58.8 million for Pro Forma Fiscal Year 2019 compared to $63.0 million for the year ended December 31, 2018. Net revenues for the IFP and Other—External segment were $48.1 million for Pro Forma Fiscal Year 2019 compared to $51.0 million for the year ended December 31, 2018. For each of the IFP and Other segments, the decreases were primarily driven by a change in product mix sold within the IFP and Other segments.

*Segment Profit*

Segment profit for the Medicare—Internal segment was $161.3 million for Pro Forma Fiscal Year 2019 compared to $24.2 million for the year ended December 31, 2018. The increase was driven by the increase of Medicare commissionable Approved Submissions and an increase in our LTV/CAC ratio to 3.9x for the year ended December 31, 2019 compared to 2.7x for the year ended December 31, 2018. The increase in LTV/CAC was primarily attributable to a decrease in CAC due to (i) improvements in our LeadScore and call-routing technologies allowing our agents to successfully convert more qualified prospects into Submitted Policies and (ii) improved marketing efficiencies driven by our rapid test-and-learn approach across our marketing channels, as well as an expansion of the diversity and breadth of our omni-channel marketing efforts, which together enabled the acquisition of higher quality prospects at a lower effective cost per submission.

Segment profit for the Medicare—External segment was $15.1 million for Pro Forma Fiscal Year 2019 compared to $9.0 million for the year ended December 31, 2018. The increase was primarily driven by the increase in commissionable Approved Submissions.

Segment profit for the IFP and Other—Internal segment was $2.8 million for Pro Forma Fiscal Year 2019 compared to $9.7 million for the year ended December 31, 2018. The decrease was primarily driven by a change in product mix sold for IFP and Other plans, combined with higher marketing and advertising costs to acquire customers in 2019.

Segment profit for the IFP and Other—External segment was $2.1 million for Pro Forma Fiscal Year 2019 compared to $2.8 million for the year ended December 31, 2018. The decrease was driven by a change in product mix sold by external agencies.

**Liquidity and Capital Resources**

*Overview*

Our liquidity needs primarily include working capital and debt service requirements. As of March 31, 2020 and December 31, 2019, cash and cash equivalents totaled $152.4 million and $12.3 million, respectively. We believe that our current sources of liquidity, which include cash and funds available under the Credit Facilities, along with the proceeds of this offering, will be sufficient to meet our projected operating and debt service requirements for at least the next 12 months. Short-term liquidity needs will primarily be funded through the Revolving Credit Facility portion of the Credit Facilities. As of March 31, 2020, our capacity under the Revolving Credit Facility was $30.0 million, with $30.0 million available for additional borrowings. Additionally, on May 7, 2020, we entered into an amendment to the Credit Agreement, which provides $20.0 million of additional revolving commitment under the Credit Facilities. To the extent that our current liquidity is insufficient to fund future activities, we may need to raise additional funds. In the future, we may attempt to raise additional capital through the sale of equity securities or through debt financing arrangements. If we raise additional funds by issuing equity securities, the ownership of our existing stockholders will be diluted. The incurrence of additional debt financing would result in debt service obligations, and any future instruments governing such debt could provide for operating and financing covenants that could restrict our operations.

130

The following table presents a summary of cash flows for the periods presented:

| (in thousands) | Three Months Ended March 31, | | Successor 2019 Period | Successor 2018 Period | Year Ended December 31, 2018 |
| --- | --- | --- | --- | --- | --- |
| | 2020 (Successor) | 2019 (Predecessor) | | | |
| Net cash (used in) provided by operating activities | $ 23,587 | $ 1,222 | $ (9,284) | $ 9,281 | $ 5,443 |
| Net cash used in investing activities | (3,522) | (1,944) | (810,010) | (5,597) | (6,170) |
| Net cash provided by (used in) financing activities | 120,167 | 1,147 | 830,879 | (3,449) | 63 |

*Operating Activities*

Cash provided by operating activities primarily consists of net income (loss) adjusted for certain non-cash items including share-based compensation; depreciation and amortization; amortization of intangible assets and internally developed software and the effect of changes in working capital and other activities.

Collection of commissions receivable depends upon the timing of the receipt of commission payments and associated commission statements from carriers. If there were to be a delay in receiving a commission payment from a carrier within a quarter, the operating cash flows for that quarter could be adversely impacted.

A significant portion of marketing and advertising expense is driven by the number of qualified prospects required to generate the insurance applications submitted to carriers. Marketing and advertising costs are expensed and generally paid as incurred and since commission revenue is recognized upon approval of a submission but commission payments are paid to us over time, there are working capital requirements to fund the upfront cost of acquiring new policies.

Net cash provided by operating activities was $23.6 million for the three months ended March 31, 2020, which consisted of $937 thousand in net loss and adjustments for non-cash items of $29.1 million, offset by the effect of changes in operating assets and liabilities representing a $4.6 million use of cash. The change in operating assets and liabilities was primarily driven by a decrease in accounts receivable of $18.4 million partially offset by an increase in commissions receivable of $5.9 million and decreases in accrued liabilities and commissions payable of $10.8 million and $5.4 million, respectively.

Net cash provided by operating activities was $1.2 million for the three months ended March 31, 2019, which consisted of $5.0 million in net income and adjustments for non-cash items of $2.2 million, offset by the effect of changes in operating assets and liabilities representing a $6.0 million use of cash. The change in operating assets and liabilities was primarily driven by increases in commissions receivable and commissions payable of $4.7 million and $1.1 million, respectively, and a decrease in accrued liabilities of $2.1 million.

Net cash used in operating activities was $9.3 million for the Successor 2019 Period, which consisted of $16.0 million in net income and adjustments for non-cash items of $100.8 million, offset by the effect of changes in operating assets and liabilities representing a $126.1 million use of cash. The change in operating assets and liabilities was primarily driven by an increase in commissions receivable of $204.0 million partially offset by an increase in commissions payables of $80.8 million, which were each driven by an increase in Medicare commissionable Approved Submissions.

Net cash provided by operating activities was $9.3 million for the Predecessor 2019 Period and primarily consisted of $57.1 million in net loss and adjustments for non-cash items of $91.5 million, offset by the effect of

131

changes in operating assets and liabilities representing a $25.1 million use of cash. The change in operating assets and liabilities was primarily driven by commissions receivable of $63.4 million, offset by increases in commissions payables of $19.2 million, which were each driven by increases in Medicare commissionable Approved Submissions.

Net cash provided by operating activities was $5.4 million for the year ended December 31, 2018, which consisted of $28.1 million of net income and adjustments for non-cash items of $7.0 million, offset by the effect of changes in operating assets and liabilities representing a $29.6 million. The change in operating assets and liabilities was primarily driven by increases in commissions receivable of $65.4 million partially offset by increases in commissions payable of $30.9 million.

### Investing Activities

Investing activities primarily consist of the Centerbridge Acquisition and purchases of property, equipment and software.

Net cash used in investing activities of $3.5 million for the three months ended March 31, 2020 was primarily attributable to both capitalized internal-use software related to new technology, software, and systems and purchases of property and equipment.

Net cash used in investing activities of $1.9 million for the three months ended March 31, 2019 was primarily attributable to capitalized internal-use software related to new technology, software, and systems.

Net cash used in investing activities of $810.0 million for the Successor 2019 Period was primarily attributable to the Centerbridge Acquisition, which comprised $807.6 million of net cash used in investing activities.

Net cash used in investing activities of $5.6 million for the Predecessor 2019 Period was primarily attributable to capitalized internal-use software related to new technology, software, and systems.

Net cash used in investing activities of $6.2 million in 2018 was primarily attributable to capitalized internal-use software related to new technology, software, and systems.

### Financing Activities

Financing activities primarily consist of borrowings under the Term Loan Facility and the issuance of preferred and common units.

Net cash provided by financing activities of $120.2 million for the three months ended March 31, 2020 was due to borrowings under the Incremental Term Loan Facility, which comprised $117.0 million of net cash provided by financing activities and the issuance of common units, which comprised $10.0 million of net cash provided by financing activities, and was partially offset by payments of existing debt and debt issuance costs associated with the Incremental Term Loan Facility.

Net cash provided by financing activities of $1.1 million for the three months ended March 31, 2019 was due to net borrowings under our predecessor revolving credit facility of $1.2 million, partially offset by capital lease obligations payments of $16.0 thousand associated with computer equipment and furniture acquired under capital leases.

Net cash provided by financing activities of $830.9 million for the Successor 2019 Period was primarily attributable to the issuance of preferred units in connection with the Centerbridge Acquisition, which comprised $541.3 million of net cash provided by financing activities and borrowings under the Term Loan Facility, which compromised $300.0 million of net cash provided by financing activities, and was partially offset by payments of existing debt, capital lease obligations and debt issuance costs.

Net cash used in financing activities of $3.4 million for the Predecessor 2019 Period was due to borrowings under our predecessor revolving credit facility of $56.5 million, which was offset by the repayment of such borrowings (and related expenses in relation thereto) in the amount of $59.9 million, as well as payments of our capital lease obligations.

Net cash provided by financing activities of $63.0 thousand in 2018 was due to borrowings under our predecessor revolving credit facility of $82.6 million, which was offset by the repayment of such borrowings in the amount of $82.3 million, as well as principal payments under our capital lease obligations and member distributions to non-controlling interests.

*Credit Facilities*

On September 13, 2019, in connection with the Centerbridge Acquisition, Norvax entered into a first lien credit agreement, or the Credit Agreement, which provides for a (i) $300.0 million aggregate principal amount senior secured term loan facility, or the Term Loan Facility and (ii) $30.0 million aggregate principal amount senior secured revolving credit facility, or the Revolving Credit Facility.

On March 20, 2020, the Borrower entered into an amendment to the Credit Agreement, which provides $117.0 million of incremental term loans, or the Incremental Term Loan Facility. On May 7, 2020, the Borrower entered into an additional amendment to the Credit Agreement, which provides $20.0 million of additional revolving commitments.

As of March 31, 2020, we had $415.5 million outstanding on the Term Loan Facility (including the Incremental Term Loan Facility). The Revolving Credit Facility had remaining capacity of $30.0 million as of March 31, 2020.

See "Description of Indebtedness" for further information about the terms of the Credit Facilities.

**Contractual Obligations**

The following tables summarize our contractual obligations as of December 31, 2019. The principal commitments consisted of obligations under outstanding operating leases for office facilities, capital leases related to copy machines and our long-term debt. The amount of the obligations presented in the table summarizes the commitments to settle contractual obligations in cash as of the dates presented.

| | Payments Due by Period(2)(3) | | | | |
|---|---|---|---|---|---|
| (in thousands) | Total | Less than 1 Year | 1-3 Years | 4-5 Years | More Than 5 Years |
| Operating lease obligations | $ 37,261 | $ 5,921 | $ 12,272 | $ 11,489 | $ 7,220 |
| Capital lease obligations | 768 | 328 | 440 | — | — |
| Long-term debt obligations(1) | 441,872 | 28,420 | 56,072 | 55,049 | 302,330 |
| **Total contractual obligations** | $ 479,901 | $ 34,669 | $ 68,784 | $ 66,538 | $ 309,550 |

(1) Includes borrowings under the Term Loan Facility and assumes interest payments of $142.6 million through stated maturity of the Credit Facilities by applying the interest rate of 8.4% in effect as of December 31, 2019 under our Term Loan Facility. Payments herein are subject to change, as payments for variable rate debt have been estimated. As of December 31, 2019, the total principal amount of debt outstanding under our Credit Facilities, excluding unamortized debt discount and deferred issuance costs, was $299.3 million. See "Description of Indebtedness."

(2) The payments that we may be required to make under the Tax Receivable Agreement to the Continuing Equity Owners and the Blocker Shareholders may be significant and are not reflected in the contractual obligations tables set forth above as they are dependent upon future taxable income. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement."

(3) In connection with this offering, we will fully settle the earnout liability due to the predecessor owners of the Company arising from the Centerbridge Acquisition. See footnote (4) to the section titled "Unaudited Pro Forma Condensed Consolidated Financial Information" for further information.

133

Table of Contents

Subsequent to December 31, 2019, on March 20, 2020, the Borrower entered into an amendment to the Credit Agreement, which, among other things, provides $117.0 million of incremental term loans. Additionally, on May 7, 2020, the Borrower entered into an amendment to the Credit Agreement, which provides $20.0 million of additional revolving commitment under the Credit Facilities, or the Incremental Revolving Loan Facility.

## Off-Balance Sheet Arrangements

We have not entered into any off-balance sheet arrangements, as defined in Regulation S-K.

## Recent Accounting Pronouncements

For a discussion of new accounting pronouncements recently adopted and not yet adopted, see the notes to the audited consolidated financial statements included elsewhere in this prospectus.

## Quantitative and Qualitative Disclosures about Market Risk

In the normal course of business, we are subject to market risks. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Financial instruments that are exposed to concentrations of credit risk primarily consist of accounts and commissions receivable. We do not require collateral or other security for receivables, but believe the potential for collection issues with any customers was minimal as of March 31, 2020, based on the lack of collection issues in the past and the high financial standards we require of customers. As of March 31, 2020, four carriers accounted for 27%, 17%, 14% and 14% of total accounts receivable. As of December 31, 2019, five carriers accounted for 17%, 16%, 16%, 16% and 15% of total accounts receivable and as of December 31, 2018, three carriers accounted for 24%, 14% and 11% of total accounts receivable.

## Interest Rate Risk

As of March 31, 2020, we had cash of $152.4 million deposited in non-interest bearing accounts at a major bank with limited to no-interest rate risk. We do not enter into investments for trading or speculative purposes and have not used any derivative financial instruments to manage interest rate risk exposure.

See "Risk Factors—Risks Related to Our Indebtedness—Developments with respect to LIBOR may affect our borrowings under our Credit Facilities" for additional information.

## Seasonality

The Medicare annual enrollment period occurs from October 15th to December 7th. As a result, we experience an increase in the number of submitted Medicare-related applications during the fourth quarter and an increase in expense related to the Medicare segments during the third and fourth quarters. Additionally, as a result of the annual Medicare Advantage open enrollment period that occurs from January 1st to March 31st, commission revenue is typically second-highest in our first quarter. The individual and family health insurance open enrollment period runs from November 1st through December 15th of each year for most states, and we expect the number of approved applications for individual and family health insurance to be higher in the fourth quarter compared to other quarters of the year as a result. A significant portion of our marketing and advertising expenses is driven by the number of health insurance applications submitted through us. Marketing and advertising expenses are generally higher in the fourth quarter during the Medicare annual enrollment period, but because commissions from approved customers are paid to us over time, our operating cash flows could be adversely impacted by a substantial increase in marketing and advertising expenses as a result of a higher volume of applications submitted during the fourth quarter or positively impacted by a substantial decline in marketing and advertising expenses as a result of lower volume of applications submitted during the fourth quarter.

Table of Contents

**Critical Accounting Policies and Estimates**

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of revenues, expenses, assets, and liabilities and disclosure of contingent assets and liabilities in our financial statements. We regularly assess these estimates; however, actual amounts could differ from those estimates. The most significant items involving management's estimates include estimates of revenue recognition, commissions receivable, and commissions payable. The impact of changes in estimates is recorded in the period in which they become known.

An accounting policy is considered to be critical if the nature of the estimates or assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change, and the effect of the estimates and assumptions on financial condition or operating performance. The accounting policies we believe to reflect our more significant estimates, judgments and assumptions that are most critical to understanding and evaluating our reported financial results are: revenue recognition, commissions receivable, and commissions payable.

*Revenue Recognition and Commissions Receivable*

In accordance with ASC 606, revenue is recognized when a customer obtains control of promised goods or services and is recognized in an amount that reflects the consideration that an entity expects to receive in exchange for those goods or services. We apply the following five-step model in order to determine this amount: (i) identification of the promised goods in the contract; (ii) determination of whether the promised goods are performance obligations, including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) we satisfy each performance obligation.

Significant management judgments and estimates must be made in connection with determination of the revenue to be recognized in any accounting period. If we made different judgments or utilized different estimates for any period, material differences in the amount and timing of revenue recognized could result. The accounting estimates and judgments related to the recognition of revenue require us to make assumptions about numerous factors, such as the determination of performance obligations and determination of the transaction price. The estimates of renewal commissions and production bonuses are considered variable consideration in the transaction price and require significant judgment including determining the number of periods in which a renewal will occur and the value of those renewal commissions to be received if renewed. We utilize the expected value approach to do this, incorporating a combination of historical lapse and premium increase data, available industry and carrier experience data, historical payment data by segment and carrier, as well as current forecast data to estimate forecasted renewal consideration and production bonuses and then to constrain revenue recognized to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur. Before the adoption of ASC 606, we were already using a similar method to calculate the lifetime revenue value of a contract for internal forecasting purposes so we believe we have the ability to make reasonable estimates for these items and have the appropriate accounting policies and controls in place to do so. The uncertainty associated with the variable consideration is subsequently resolved when the policy renews, and any adjustments in variable consideration are recognized in the period incurred.

Commissions receivable represents the variable consideration for policies that have not renewed yet, and therefore, are subject to the same assumptions, judgments and estimates used when recognizing revenue as noted above.

*Income Taxes*

We account for income taxes using an asset and liability approach. Deferred income tax assets and liabilities result from temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements that will result in taxable or deductible amounts in future years. Valuation allowances are provided when necessary to reduce deferred tax assets to the amount expected to be realized.

135

Table of Contents

The determination of our provision for income taxes requires management's judgment in the use of estimates and the interpretation and application of complex tax laws. Judgment is also required in assessing the timing and amounts of deductible and taxable items. We establish liabilities for material, known tax exposures relating to deductions, transactions and other matters involving some uncertainty as to the proper tax treatment of the item. Our liabilities reflect our judgment as to the resolution of the issues involved if subject to judicial review. When facts and circumstances change (including a resolution of an issue or statute of limitations expiration), these liabilities are adjusted through the provision for income taxes in the period of change.

**JOBS Act**

We qualify as an "emerging growth company" pursuant to the provisions of the JOBS Act, enacted on April 5, 2012. Section 102 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our consolidated financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

We are in the process of evaluating the benefits of relying on other exemptions and reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if as an emerging growth company we choose to rely on such exemptions, we may not be required to, among other things, (1) provide an auditor's attestation report on our systems of internal controls over financial reporting pursuant to Section 404, (2) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Act, (3) comply with the requirement of the PCAOB regarding the communication of critical audit matters in the auditor's report on the financial statements, and (4) disclose certain executive compensation-related items, such as the correlation between executive compensation and performance and comparisons of the Chief Executive Officer's compensation to median employee compensation. These exemptions will apply until we no longer meet the requirements of being an emerging growth company. We will remain an emerging growth company until the earlier of (a) the last day of the fiscal year (i) following the fifth anniversary of the completion of our initial public offering, (ii) in which we have total annual gross revenue of at least $1.07 billion or (iii) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700.0 million as of the last business day of our prior second fiscal quarter, and (b) the date on which we have issued more than $1.07 billion in non-convertible debt during the prior three-year period.

136

Table of Contents

**BUSINESS**

**Overview**

We are a leading health insurance marketplace whose mission is to improve access to healthcare in America. Our proprietary technology platform leverages modern machine-learning algorithms powered by nearly two decades of insurance behavioral data to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs. Our differentiated combination of a vertically-integrated consumer acquisition platform and highly skilled and trained licensed agents has enabled us to enroll millions of people in Medicare and individual and family plans since our inception. With over 10,000 Americans turning 65 years old every day and GoHealth's track record of significant growth in net revenues in the Medicare space in the past five years, we believe we will continue to be one of the top choices for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make.

Since our inception, we have consistently invested in our technology, data science and business processes to enroll millions of people in health insurance plans while helping carriers scale their product and plan offerings. Our platform utilizes proprietary technology, machine-learning capabilities, data, efficient business processes, and highly skilled and trained licensed agents, or agents, to connect consumers with health insurance carriers, or carriers, through multiple channels. Through our platform, we offer a wide array of health insurance policies, including, but not limited to, Medicare Advantage, Medicare Supplement, prescription drug plans, and individual and family plans, and allow consumers to choose how to purchase these plans, either with the assistance of our agents or directly online.

For many consumers, choosing a health insurance plan is confusing and difficult, and seemingly small differences between health insurance plans can lead to significant out-of-pocket costs or lack of access to critical medicines or providers. We simplify the difficult and confusing process by offering a large selection of health insurance plan choices, unbiased advice informed by consumers' specific needs, transparency of health insurance plan benefits and fit, assistance accessing available government subsidies and a high-touch TeleCare team. The TeleCare team is focused on increasing consumer engagement with the GoHealth brand, selling new products and services to our consumers that help meet their healthcare needs, and helping consumers maximize their health insurance plan benefits to support long-term health and wellness. Carriers also benefit from our platform, especially those looking to access the large and fast-growing Medicare-eligible population. We believe carriers utilize our large-scale data and technology as well as our efficient marketing and conversion processes to reduce their CAC, compared to carrier-employed agent workforces. In fact, we believe GoHealth is the largest external partner for Medicare Advantage enrollments for many carriers.

We have a 19-year history of consistent revenue growth and entering new market segments of insurance products. We add significant value to consumers and carriers, which is evidenced by our high growth rate and strong customer engagement dynamics. Specifically, net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020 compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018. Net income was $1.4 million for the Pro Forma First Quarter 2020 compared to net income of $5.0 million for the three months ended March 31, 2019, and net income was $30.5 million for the Pro Forma Fiscal Year 2019 compared to net income of $28.1 million for the year ended December 31, 2018. See "—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

Over the last four years, we have increasingly shifted our focus towards Medicare products and deemphasized individual and family health insurance products. This shift in focus has enabled us to capitalize on (1) strong

137

Table of Contents

demographic trends, with Medicare enrollment expected to grow from approximately 61 million individuals in 2019 to approximately 77 million individuals by 2028, (2) the increasing proportion of the Medicare-eligible population that is choosing commercial insurance solutions, with 38% of Medicare beneficiaries, or approximately 23 million people, enrolled in Medicare Advantage plans in 2019, an increase of approximately 1.5 million people from 2018 to 2019, and (3) an antiquated traditional field agent driven sales process lacking in transparency, choice and convenience and ripe for disruption by digitally-enabled and technology-driven marketplaces like our platform. Today, we estimate a total addressable market of $28 billion for Medicare Advantage and Medicare Supplement products, which is based on third-party estimates of total expected Medicare enrollees for 2020, publicly available industry data for Medicare agents' first-year compensation and our recent historical policy revenue experience. We believe that these trends will drive a larger market in the coming years that, when taken together with our other product and plan offerings, will result in an even larger addressable market. We also believe that we are poised to benefit from market share gains in what has traditionally been a highly fragmented market.

Consumers first engage through our platform either online or telephonically in response to our data-driven, omni-channel marketing efforts. We then use LeadScore, one of our proprietary machine-learning technologies, to evaluate consumer leads in real-time. In 2019, we generated over 42.2 million consumer interactions. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. We also scored over 4 million consumer leads in 2019, which informs us of the potential profitability and conversion probability of the consumer lead and helps us optimize routing of consumer leads to agents. Our proprietary technology and business processes then route qualified prospects online or via live transfer to our agents, both through the internal and external channel. Our technology and workflow allow these agents to work in our Benefits Center, where our sales operations are located, or to work remotely at home. In 2019, we employed an average of 931 agents, reaching a high of 1,453 agents during the three months ended December 31, 2019. Based on consumers' specific needs and our comprehensive data, our agents use our proprietary technology platform, Marketplace, to identify the optimal health insurance plan options from our vast inventory of insurance products. Marketplace then facilitates seamless quoting and enrollment of the consumer-selected health insurance plan using proprietary and third-party data and direct application program interfaces, or API, connections with carriers. As a result of our Marketplace technology and increasingly robust data and insights, our qualified prospect to Submitted Policy conversion rate increased from 20.7% for the three months ended March 31, 2019 to 24.3% for the three months ended March 31, 2020, and from 20.6% in 2018 to 23.2% in 2019 for the multi-carrier sales outlet of the Medicare—Internal segment. An increase in the conversion rate of qualified prospects to Submitted Policies generally results in greater commissionable Approved Submissions.

Using our proprietary data, we identify consumers who would benefit from proactive engagement and education on their health insurance plan design and guidance on how they can maximize their plan benefits. We believe that using our data-driven targeted consumer outreach and our highly skilled agents and proprietary technology to properly select health insurance plans to meet a consumer's particular needs results in higher customer satisfaction. As we enroll more qualified prospects through our Marketplace, the power of our data improves our marketing, technology, and agent performance. Our platform is engineered for rapid scalability, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms, and technology driven compliance with HIPAA, TCPA and state insurance regulations, and the Centers for Medicare and Medicaid Services, or CMS, regulations.

Table of Contents



Consumers do not pay any fees for access to our platform or for our enrollment, education or other services. Generally, we are paid an initial commission by carriers when consumers enroll in their products and become customers, and additional recurring commissions as long as those customers retain their health insurance plans. The commission structure encourages collaboration between us and carriers to increase customer satisfaction by choosing health insurance products that best fit customers' needs, which drives better outcomes for carriers, customers, our agents, and employees. We use advanced statistical models that are built on observable commissions received rather than solely historic cohorts. Our advanced statistical models consider consumer demographic attributes, health insurance plan characteristics and temporal data to value these future commission streams from which we determine an expected LTV of the commission streams associated with each consumer enrolled in each specific plan product. Total commissions receivable, which represents such expected future commission streams, was $388.8 million as of March 31, 2020, an increase of 223.4% compared to March 31, 2019. In addition to commissions, some of our carriers have historically partnered with us to generate consumer leads and have paid us for marketing services. We do not insure customers and assume no underwriting or medical loss risk associated with placement of customers in our carriers' products.

The differentiated value of our data science-driven, fully-integrated platform has facilitated our rapid growth. Net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020 compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018. Net income was $1.4 million for the Pro Forma First Quarter 2020 compared to net income of $5.0 million for the three months ended March 31, 2019, and net income was $30.5 million for the Pro Forma Fiscal Year 2019 compared to net income of $28.1 million for the year ended December 31, 2018. Our focus on Medicare has also contributed significantly to our growth. Total revenues generated in the Medicare segments grew to $124.2 million for the three months ended March 31, 2020 from $41.2 million for the three months ended March 31, 2019, representing a 201.5% increase, and to $432.7 million for the Pro Forma Fiscal Year 2019 from $112.2 million for the year ended December 31, 2018, representing a 285.7% increase. In the Medicare segments, our total Submitted Policies grew to over 132,000 Medicare policies for the three months ended March 31, 2020, as compared to over 43,200 Medicare policies the three months ended March 31, 2019 and over 427,000 Medicare policies for the year ended December 31, 2019, as compared to over 118,000

139

Table of Contents

Medicare policies for the year ended December 31, 2018. See "—Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data" for information regarding our use of Adjusted EBITDA, a non-GAAP financial measure, and a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with GAAP.

**Our Business Model**

*Our Platform*

Our platform utilizes proprietary technology, machine-learning capabilities, data, efficient business processes, and highly skilled and trained licensed agents to generate a stable, visible revenue stream that benefits from favorable demographic trends. The key components of our platform are:

- *Data-Driven, Omni-Channel Marketing*. Based on predictive consumer lead targeting and a high cadence of multivariate testing on consumer lead generation properties, our data-driven, omni-channel marketing drives increased impressions and qualified prospects with a target return on marketing spend.

- *Proprietary LeadScore Technology*. LeadScore, one of our proprietary machine-learning technologies, is built on large-scale, end-to-end sales data, predicts the LTV and conversion probability of consumer leads, and is utilized to optimize routing of the consumer leads in real-time regardless of their source.

- *Sophisticated Matching Technology*. Our proprietary qualified prospect distribution, routing, and priority queuing technology based on LeadScore and agent performance data models help us to optimally match qualified prospects to those agents most likely to convert the qualified prospect to a customer.

- *The Marketplace*. Our proprietary Marketplace technology features decision support tools and seamlessly integrates with carrier enterprise systems, empowering our highly skilled and trained agents to quickly and efficiently select the right health insurance plan for each consumer based on their specific needs and enroll them in those plans.

- *TeleCare Team*. Our high-touch TeleCare team is focused on increasing consumer engagement with the GoHealth brand, selling new products and services to our consumers that help meet their healthcare needs, and helping consumers maximize their health insurance plan benefits to support long-term health and wellness.

- *Scalable and Compliant Infrastructure*. Our cloud infrastructure and compliance-by-design technology ensures scalability and compliance across our platform.

*Our Value Proposition*

We believe the key components of our platform are difficult to replicate for field-based agents, carrier-employed agents, and other digital or telesales competitors, making us increasingly valuable to carriers and consumers. As we increase the number of Submitted Policies, our data on qualified prospect, agent, and carrier performance becomes richer, feeding into our machine-learning and data science-enabled feedback loops, making our marketing and technology even smarter. This differentiates us from other channels and competitors, allowing us to generate more consumer leads, convert those consumer leads to customers at a higher rate, serve our customers over a longer period of time, and reduce our CAC.

We believe that LTV/CAC provides the best metric on a per commissionable Approved Submission basis into the efficiency and performance of our integrated platform. We focus on strengthening the key drivers of LTV/CAC, including marketing costs, the consumer lead to customer conversion rate and customer satisfaction. While we offer both do-it-yourself and agent-assisted channels to accommodate consumers' preferences, we believe that for most qualified Medicare prospects, an agent-assisted model maximizes LTV/CAC. As we continue to scale our platform, we improve our key drivers through specialization and optimization using our proprietary data and machine-learning.

140

Table of Contents

### *Our Products*

We operate our business in four segments: (i) Medicare—Internal, (ii) Medicare—External, (iii) Individual and Family Plans, or IFP and Other—Internal and (iv) IFP and Other—External. The Medicare segments focus on sales of Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare Special Needs Plans, or SNPs, for multiple carriers. The Medicare segments are organized by distribution channel, as further described below:

- *Internal*. The internal segments primarily consist of sales of products and plans by GoHealth-employed agents offering qualified prospects plans from multiple carriers, GoHealth-employed agents offering qualified prospects plans on a carrier-specific basis, or sales of products and plans through our online platform without the assistance of our agents, which we refer to as DIY.

- *External*. The external segments represent sales of products and plans under GoHealth's carrier contracts using an independent, national network of agents, or external agencies, which are not employed by GoHealth. These agents utilize our technology and platform to enroll consumers in health insurance plans and provide a means to earn a return on consumer leads that otherwise may have not been addressed.

The Medicare—Internal segment is the largest segment by revenue and a primary contributor to our growth and margin expansion. Medicare Advantage products generate the majority of net revenues in the Medicare—Internal segment. Medicare Advantage plans accounted for (i) approximately 70.4% and 44.9%, respectively, of net revenues for the three months ended March 31, 2020 and 2019 and approximately 62.6% and 37.2%, respectively, of net revenues for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018; (ii) approximately 75.4% and 81.0%, respectively, of Medicare—Internal segment revenue for the three months ended March 31, 2020 and 2019 and approximately 75.8% and 80.2%, respectively, of Medicare—Internal segment revenue for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018; and (iii) approximately 94.8% and 69.3%, respectively, of Medicare—External segment revenue for the three months ended March 31, 2020 and 2019 and approximately 84.1% and 70.4%, respectively, of Medicare—External segment revenue for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018. No other products in the Medicare segments contribute more than 10% of net revenues for either of the Medicare segments or total net revenues for the financial statement periods presented in this prospectus. Over the last two years, we grew the Medicare—Internal segment multi-carrier channel agent count and prioritized the placement of qualified prospects into the Medicare—Internal segment. Going forward, we intend to continue our focus on growth and placing qualified prospects within this segment. The Medicare—Internal segment also provides significant benefits to the broader business. For example, carriers that partner with us through one or more of our internal segment businesses will often supplement our marketing and technology investments. Additionally, the external segments can be used when the number of consumer leads in our marketplace is higher than we can address in a timely fashion using our internal channel.

The IFP and Other segments focus on sales of individual and family plans (which include fixed indemnity and major medical plans), dental plans, vision plans and other ancillary plans to individuals that are not Medicare-eligible. The IFP and Other segments are also organized by distribution channel, internal and external. The IFP and Other segments represent a valuable source of diversification of products, carriers, consumers and revenue that are not tied solely to Medicare. Many of the products in the IFP and Other segments have a policy life under a single year, and we are paid approximately 90% of our commission streams in these segments in the first year. Fixed Indemnity plans accounted for (i) approximately 22.0% of net revenues for the three months ended March 31, 2019 and 15.0% of net revenues for the year ended December 31, 2018; (ii) approximately 12.5% and 50.4%, respectively, of IFP-Internal segment revenue for the three months ended March 31, 2020 and 2019 and approximately 36.7% and 22.1%, respectively, of IFP—Internal segment revenue for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018; and (iii) approximately 38.2% and 59.2%, respectively, of IFP—External segment revenue for the three months ended March 31, 2020 and 2019 and approximately 53.7% and 39.1%, respectively, of IFP—External segment revenue for the Pro Forma Fiscal Year 2019 and for the year

141

ended December 31, 2018. No other products in the IFP and Other segments contribute more than 10% of net revenues for either of the IFP segments or to total net revenues for the financial statement periods presented in this prospectus.

For the three months ended March 31, 2020, the Medicare segments represented 88.1% of total revenues compared to 59.7% of total revenues for the three months ended March 31, 2019 and the IFP and Other segments represented 11.9% of total revenues for the three months ended March 31, 2020 compared to 40.3% of total revenues for the three months ended March 31, 2019. For the Pro Forma Fiscal Year 2019, the Medicare segments represented 80.2% of total revenues compared to 49.6% of total revenues for the year ended December 31, 2018 and the IFP and Other segments represented 19.8% of total revenues for the Pro Forma Fiscal Year 2019 compared to 50.4% of total revenues for the year ended December 31, 2018.

**Our Strengths**

*Fully Integrated End-to-End Insurance Marketplace*

Our platform connects insurance consumers with carriers. The strength of our platform is our innovation in enhancing the education of, and transparency and choice for, consumers, which has dramatically changed how consumers purchase health insurance and displaced incumbent market leaders in insurance distribution. The insurance distribution incumbents, such as field-based and carrier-employed agents, offered neither the broad choice of health insurance plans we are able to offer nor the unbiased support in health insurance plan selection based on the years of consumer shopping data we have gathered and the sophisticated models we have developed to match health insurance plans to consumers. We apply our proprietary, machine-learning technology, LeadScore, to target, assess, and prioritize all of our consumer leads (over 4 million in 2019) in real-time.

Incumbent insurance distributors do not have access to equivalent technology, and we believe this difference in capabilities allows us to benefit from lower CAC. Our technology is difficult to replicate because acquiring the data underlying our models at our scale (over 10 years of insurance data) and scope, as well as refining those models to the performance we have obtained would be time-consuming, expensive and complicated for newer entrants in this market. Our technology and business processes route qualified consumer leads online or via live transfer to agents across our multiple channels ensuring that few qualified prospects leave our marketplace without an interaction and maximizing each consumer interaction to ensure a higher likelihood of consumer acquisition and higher margin contribution. We use a combination of proprietary and third-party data, direct API connections to many carriers, and our proprietary technology platform, Marketplace, to educate, quote and enroll consumers in real-time to the health insurance plan best suited to meet their specific needs, which enhances long-term customer satisfaction. The resulting increase in the expected LTV of consumers obtained at a lower CAC has made our innovative distribution model more appealing to carriers and has altered their own approach to strategic marketing and consumer acquisition. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. We engineered our marketplace for rapid scalability, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms and complies with HIPAA, TCPA and DOI and CMS regulations. We had over 132,000 Submitted Policies in the Medicare segments for the three months ended March 31, 2020 and over 427,000 Submitted Policies in the Medicare segments for the year ended December 31, 2019, which we believe makes us one of the largest health insurance marketplaces based on publicly available information about our competitors and our carriers and our general knowledge of the industry acquired over our 19-year operating history. The data generated through the sales process by these consumers helps us increase LTV/CAC through machine-learning enabled feedback loops, and allows us to improve and deepen our relationships with carriers.

142

Table of Contents



(1)    2019 AEP Sales/Agent/Day is presented for the multi-carrier sales outlet of the Medicare—Internal segment.
(2)    Average policy retention is presented as of January 1, 2019 for selected carriers that we believe are generally representative of our customer base for Medicare Advantage products.

*Data-driven, Omni-channel Marketing*

We generate over 42.2 million unique consumer interactions per year across an omni-channel diversified portfolio of sources. These sources include digital methods, such as search engine marketing, impulse-marketing and social-media, and non-digital methods, including television, mailers and radio. We use our real-time consumer lead to customer conversion data from various marketing sources to rapidly and cost-efficiently adjust and scale our marketing sources to maximize LTV/CAC and cost per qualified prospect. We also use our database of over 85 million consumer lead records to build machine-learning models that create complex lookalike audiences to enable us to efficiently target consumer leads that are more likely to convert to customers. Using our rapid test-and-learn approach, in 2019 alone, we tested over 30,000 advertisements and more than 100 site variations, which drove an increase in the website visitor to consumer lead conversion rate to 17.2% in January 2020, an increase of approximately 124% from a rate of 7.7% in January 2019. For the multi-carrier sales outlet of the Medicare—Internal segment, we were able to increase qualified prospects from approximately 237,000 in 2018 to approximately 930,000 in 2019, an increase of 292.4%, while also increasing the rate of qualified prospect to Submitted Policy conversions during the three months ended December 31, 2019 for this channel to 27% from 24% during the same period in 2018. We have grown in both number and quality of our consumer interactions while also generating more internal consumer leads, reducing our dependence on acquiring consumer leads from third-party sources. For the three months ended December 31, 2019, the multi-carrier sales outlet of the Medicare—Internal segment had 70% of consumer leads internally generated, compared to 58% for the same period in 2018.

*Deep, Tenured and Expanding Relationships with Top Carriers*

Our carrier relationships allow us to offer a wide variety of products and plans across our platform and offer solutions tailored to consumers' healthcare needs. We are a critical partner to our top carriers, for which we use

143

**Table of Contents**

our data and direct API connections to help inform their plan and network design and assist with budgeting. Our carrier relationships are stable, as evidenced by the fact that our relationships with each of our five largest carriers, measured by 2019 submission volume, exceeds five years. Over the past five years, we have expanded those relationships from initially covering individual and family products to covering Medicare Advantage products at all five of these carriers. We are licensed in all 50 states and the District of Columbia, which combined with our data-driven, omni-channel marketing and effective and scalable marketplace, makes us a partner of choice for the leading Medicare Advantage plans nationally and in each state. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. We believe that consumers increasingly want greater choice and are looking for quality health insurance plans as measured by CMS STAR ratings. We believe that by offering more health insurance plans in each county and more higher-rated health insurance plans, we can increase the rate of consumer lead to customer conversions and customer satisfaction rates.

### *Best-in-Class Medicare LTV/CAC Ratio Driven by Proprietary Technology, Business Processes, Data and Highly Skilled Agents*

Our integrated technology platform, business processes, data and highly skilled and trained agents enable us to rapidly scale while improving our unit economics, as measured by LTV/CAC. As we scale our business, our machine-learning data combined with our omni-channel marketing allows us to become progressively better at acquiring consumer leads with favorable engagement potential and to do so at lower cost. In doing so, we increase the lifetime commissions generated by the consumer leads we convert, which increases LTV per Approved Submission, and we reduce the cost of acquiring consumer leads, lowering CAC per commissionable Approved Submission. With increasing scale, our proprietary LeadScore and CallRouter technologies become better at assessing the profile and predicted value of each incoming consumer lead and routing the consumer lead to the agent most likely to convert the consumer, further lowering CAC per commissionable Approved Submission. The CallRouter platform also utilizes data-driven agent clustering to enable us to train and specialize our agents on specific customer segments to optimize our results. We dynamically route qualified prospects across all of our channels with a focus on converting our highest value qualified prospects in our most profitable channels and enhancing the consumer experience across our platform. Our Marketplace technology quickly compares health insurance plans that most closely match the consumer's specific needs, which increases the potential conversion and engagement of the consumer to the health insurance plan, increasing the LTV per Approved Submission, while also decreasing agent plan selection time, thus decreasing CAC per commissionable Approved Submission. Finally, our management team has extensive leadership experience managing customer service centers and scaling new sales offices. Our agent recruiting, training, development programs, and technology decision support with our Marketplace technology allow us to improve agent productivity, while also enhancing our consumer experience. We believe our LTV/CAC ratios for the Medicare segments are superior to those achieved by other digital marketplaces, carriers, and field-based agents.

### *History of Continuous Growth and Innovation and Proven Ability to Add Products*

Our Founders and management team have a consistent track record of growth and entry into new market opportunities for our business. Since our founding in 2001, we evolved from a company selling quoting and enrollment technology to independent brokers to the fully integrated end-to-end insurance marketplace we are today. We have diversified our product mix to add individual and family plans, dental and vision plans, prescription drug plans, and most recently, Medicare plans. This has enabled us to serve more consumers and to prioritize different products depending on regulatory and political environments, carriers' priorities and consumers' preferences. Our data assets, technology, and compliance infrastructure have scaled efficiently with each consumer interaction and health insurance plan submission through our platform, and as we have invested in the next generation of our proprietary technology. We believe our management team, entrepreneurial spirit, and

144

**Table of Contents**

data and technology position us well for continuous growth in the future in our current product segments and other insurance products segments we may enter.

**Our Growth Strategies**

*Expand Our Carrier Relationships and Health Insurance Plan Options to Grow the Medicare Segments*

We believe we are a partner of choice for the top carriers in the Medicare marketplace because of our scale, efficiency and ability to integrate with carriers using direct API connections to exchange data and insights. Given our growth in Approved Submissions in the Medicare segments and the integrated data and technology of our platform, Medicare carriers have shown increased interest in working with us, including those who have not traditionally used digitally-enabled models. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. This allows us to benefit from enhanced return of scale, more efficient marketing in these geographies, increased agent conversion rates of qualified prospects to customers, and improved customer satisfaction rates as we meet the needs of our customers. In addition, we are increasingly adding SNPs into our marketplace from both existing and new carrier relationships. Unlike Medicare Advantage products, which can largely be sold only during the Medicare annual enrollment period and open enrollment period, SNPs can generally be sold throughout the special enrollment period. As a result, we are able to maximize the value of our consumer interactions and marketing spend during the special enrollment period and prioritize agent growth year round. As we add more Medicare products and expand SNP offerings, we allocate more of our existing agent seat count to the Medicare—Internal segment from other less profitable channels, reducing the need to open new facilities. Additionally, we have implemented work from home options to increase agent efficiency and capacity without a significant increase in fixed costs.

*Continue to Increase Our Profitability By Using our Data to Improve our Technology, Business Processes, and Agent Performance*

We are implementing a number of initiatives to help improve our LTV/CAC, which is a key measure of our unit economics and overall business profitability, by using our data to improve our platform and predictive capabilities, business processes, and agent performance.

- *Upgraded Marketplace Technology*. In October 2019, we launched an upgrade to our proprietary Marketplace technology to increase agent productivity by improving the flow of data across our platform, advancing our decision support capabilities, and improving the qualified prospect to Submitted Policy conversion rates of our overall agent population to a level closer to that of our most productive agents.

- *Improving LeadScore and Call Routing Technologies*. We are improving our LeadScore and call-routing technologies, and expanding our business intelligence and analytics staffing to direct qualified prospects to agents or DIY channels that are most likely to result in such qualified prospects enrolling in the health insurance plan that best meets their needs while remaining economically attractive for us. We are also increasingly using our data to identify the best agent clusters to enroll an individual qualified prospect based on our Marketplace engine's determination of their likely optimal plan design, carrier, and demographic match based on the information we have about that qualified prospect. Additionally, we are investing in technology that will allow us to use our data to direct our marketing spend into growing our flow of qualified prospects in the highest-value marketing channels and enhancing our proprietary LeadScore technology to assess and iterate, in real-time, the performance of those marketing channels throughout the year.

- *Improving Recruiting and Training of Agents*. We are improving the recruiting and training of our agents to match the profiles of our highest performing agents. The opportunity to reduce the variability

145

in our agent performance is significant, as our top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment on average were 61% more productive than the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment, based on conversion rates of qualified prospects to Submitted Policies for the three months ended March 31, 2020. We have analyzed our most productive agents and revised our recruiting, training and onboarding of the number of licenses and appointments to most closely match the skills and experiences of our most productive agents.

### Build Identification with the GoHealth Brand

We believe we can solidify our position as the largest Medicare marketplace and brand for consumers' health insurance needs. As the Medicare markets continue to grow and the Medicare Advantage sector continues to gain market share, carriers are and will continue differentiating their health insurance plans by offering additional products and services. This differentiation creates the need for more education, transparency and choice, and the need for a "Trusted Advisor" role that we believe the GoHealth brand can own. By helping customers make this choice, they can more readily identify the GoHealth brand, which we believe differentiates us from our competitors. This allows us to improve customer satisfaction even when their underlying carrier or plan product changes.

We are using technology and data increasingly to build the GoHealth brand and our digital marketing campaigns, which significantly improved impressions in 2019 with over 1.1 billion impressions generated, compared to 225 million impressions generated in 2018. We have launched our new plan comparison tool and are launching a new website that we will consolidate into one consumer website in 2020, which we believe will enhance conversion in our DIY channel.

### Provide Additional Products and Services to our Qualified Medicare Prospects, Existing Customers and Carriers

In 2019, we interacted with approximately 930,000 qualified prospects through the multi-carrier sales outlet of the Medicare—Internal segment. While we have focused historically on educating and enrolling those qualified prospects in Medicare products, we have not historically prioritized offering qualified prospects or existing customers additional products, such as life, dental, hearing, or vision plans if their Medicare product does not offer coverage for these services. We have a significant opportunity to sell additional products to our qualified Medicare prospects and existing Medicare customers going forward.

We currently enroll a sizable percentage of Medicare customers for our largest carriers, but there is still significant opportunity to grow our share of enrollments for existing carriers even while we add new carriers to our marketplace. We are using our data to help our largest carriers inform the benefit design of their health insurance plans and product competitiveness in given regions, which is a value added service that traditional field-agents and carrier internal channels cannot offer. We are also focused on increasing offerings of additional revenue generating services that are valuable to our Medicare carriers and enhance the health of our customers, including by helping new Medicare enrollees sign up for a health-risk assessment, which helps calibrate the Medicare Advantage premium paid by Medicare to the private plan. Additionally, we are exploring opportunities to (1) provide screening of customers for social determinants of health factors, such as loneliness, or food or housing insecurity, that could lead to higher medical costs if not addressed, and (2) promote the benefits of value-based care through referrals of consumers looking to change or add a primary care physician. By offering more services to our Medicare carriers, we can improve the depth of our carrier relationships, open new revenue streams and build customer loyalty.

### Provide Additional Products and Services Through Our Marketplace Technology

Our Founders and management team built our Marketplace technology over a 19-year period of continuous investment and growth. We have developed relationships with over 80 carriers and offer a wide variety of

146

**Table of Contents**

products and plans, including individual and family plans, dental, vision, prescription drug and Medicare plans. Our Marketplace technology allows us to efficiently generate meaningful numbers of consumer submissions for health insurance plans, generate commission revenue streams based on Approved Submissions, and maximize the contribution margin of these commissions through efficiencies in CAC. Over the last two years, Medicare had the highest LTV/CAC of the health insurance plan products that we distribute through our Marketplace technology.

We have the technology, carrier, customer relationships and management team to broaden or shift our focus to other products if we think there is a revenue opportunity, and we have demonstrated this capability to add products historically. For example, after the enactment of the Affordable Care Act in 2010, or the ACA, we significantly grew the IFP and Other segments revenue in a relatively short period of time, which we believe made us a leader in the ACA web-broker space.

**Our Market and Trends Impacting the Industry**

Demographic, consumer preference and regulatory factors are driving growth in the individual health insurance market. We service this market through the Medicare segments and the IFP and Other segments.

*Medicare*

Medicare enrollment is expected to grow significantly over the next 10 years as 10,000+ individuals turn 65 each day and become Medicare-eligible. The proportion of the population that is age 65 and older increased from 13% in 2010 to 15% in 2016 and is expected to reach 17% by 2020, according to the United States Census Bureau. As a result, Medicare enrollment is growing steadily, with the number of Medicare enrollees expected to grow from 59.9 million in 2018, to approximately 68.4 million in 2023 and 76.7 million by 2028. This growth in Medicare enrollment will increase the numbers of qualified prospects for our marketing efforts. Internet usage by individuals age 65 and older is also increasing, with 73% using the Internet in 2019 compared to 40% in 2009 according to the Pew Research Center. Seniors are also transacting more online, with 55% of people age 65 and older making online purchases monthly according to SheerID, and 63% of people age 65 and older obtained health information from a website, according to the 2018 BMC Health Services Research.

In addition to the growth in Medicare-eligible beneficiaries and higher online usage, the interest in Medicare-eligible individuals in private Medicare plans is expected to continue to increase. In 2019, 38% of all Medicare beneficiaries were enrolled in Medicare Advantage plans and between 2018 and 2019, total Medicare Advantage enrollment grew by about 1.5 million individuals or 7%. LEK Consulting estimated that Medicare Advantage penetration is likely to reach 50% penetration for all Medicare-eligible individuals by 2025 and could reach as high as 60% to 70% between 2030 and 2040. Compared to original Medicare, Medicare Advantage has lower annual healthcare costs and access to greater benefits, according to a 2019 Milliman report. In addition, we expect the increase in Medicare Advantage penetration to accelerate due to the COVID-19 pandemic because of increasing consumer preference for online and telephonic insurance enrollment as opposed to face-to-face consultations. The number of beneficiaries in SNPs also increased significantly in the last 10 years from 900,000 in 2009 to 2.5 million in 2019 providing additional opportunity for year-round sales outside of the open enrollment period and annual enrollment period. We believe the increased penetration of Medicare Advantage, as well as the growth of the number of Medicare-eligible individuals, will lead to increased submissions for marketplaces, such as ours in the future. Consumers choose Medicare Advantage plans around a specific criteria set which includes premium, total expected costs out of pocket, provider network composition, formulary coverage and supplemental benefits, which we believe are more efficiently addressed through a non-field-based distribution channel.

The growth in Medicare-eligible seniors and growing interest in private Medicare plans has led to an increase in plan choices. Nationwide, 3,148 Medicare Advantage plans will be available in 2020, an increase of 414 plans since 2019. The average beneficiary will be able to choose from among 28 health insurance plans in 2020, up

147

from 18, five years ago. In addition to the increase in plan choices, the differences between health insurance plans has increased significantly. For 2019, CMS eliminated the meaningful difference requirement to improve competition, innovation and available benefit offerings and provide beneficiaries with affordable health insurance plans that are tailored to a consumer's specific healthcare needs and financial situation. The types of supplemental benefits that health insurance plans cover increased in 2018, 2019 and 2020 and now cover transportation assistance, meal benefits, in-home support, telemonitoring, and caregivers support, among others. This growth in plan choices made education and assistance with plan selection more important for consumers and allows carriers to target specific Medicare Advantage plans with packages of benefits designed to be attractive to different segments of Medicare consumers. Marketplaces such as ours help educate consumers, and assist them in making informed plan choices. In addition, we specifically micro-target our marketing to precise populations to allow carriers to grow increasingly differentiated health insurance plans. This precise marketing is more difficult for traditional radio or television-based marketing channels.



Source: CSG Actuarial (2019) and U.S. Department of Health and Human Services (2019).

*Individual and Family Plans*

After the passage of the ACA, the individual health insurance market grew from 10.6 million enrollees in 2013 to 17.4 million enrollees in 2015. Such increase was driven by (1) the requirement to purchase health insurance, or the individual mandate, (2) the requirement that carriers not consider pre-existing medical conditions in coverage decisions and (3) premium subsidies for middle and lower income individuals that were also contained in that legislation. With the repeal of the individual mandate in 2017 and broader economic trends, such as gains in employment, which increased the number of people having job-based coverage, the individual market has declined. Despite the decline, the individual market was composed of 13.8 million members in 2018, a meaningful increase from 2011 levels and in 2019, the market size stabilized with 13.7 million members enrolled. This market stabilization was driven by lower premium increases in 2019, as compared to 2018 and 2017 for individual insurance plans; an increase in individuals who do not receive job-based insurance due to the rise of the "gig economy;" and, expanded plan options in the individual market from carriers. According to a

148

Table of Contents

Kaiser Family Foundation report published in 2020, in 2019, the average gross margin per member per month for carriers in the individual market was $122.83, as compared to $14.36 in 2016 shortly after the repeal of the individual mandate. This increased profitability for insurers is expected to have a positive impact on the individual market going forward. In addition, the number of individuals eligible for the individual market is growing. Forbes estimated that 57 million U.S. workers, approximately 36% of employees, are in the "gig economy" and many of these individuals will not receive health insurance through their jobs. We believe that growth in the individual market will benefit the Company in the future.

**Carriers**

We maintain longstanding, deeply integrated relationships with leading carriers in the United States, who have some of the industry's most widely recognizable brands. For the year ended December 31, 2019 and the three month period ended March 31, 2020, the primary carriers that we served in the Medicare segments were carriers owned by Humana and Anthem, the primary carriers that we served in the IFP and Other segments were carriers owned by UnitedHealth Group. These high-quality relationships have resulted in strong carrier retention rates; since our inception, we have never had a carrier terminate for performance. We typically enter into contractual agency relationships with carriers that are non-exclusive and terminable on short notice by either party for any reason. Carriers often have the ability to terminate or amend our agreements unilaterally on short notice, including provisions in our agreements relating to our commission rates.

We believe carriers see our method of acquiring consumers as scalable and efficient and, ultimately, as cost-advantageous compared to their own models, and provide us, in some cases, with marketing development. The carriers are responsible for paying our commissions and, for these purposes, act as our customers. We do not currently generate revenues directly from the consumers to whom we sell insurance policies on behalf of carriers.

A core element of our value proposition to carriers relates to our ability to reliably place policies in compliance with applicable regulations and carrier-specific requirements. As such, we work closely with carriers to develop approved scripts and to undertake regular audits of our compliance with carrier requirements. In addition, our agents operate under compensation structures established to fully align their incentives with our compliance objectives.

Carriers owned by Humana and Anthem accounted for (i) approximately 40% and 20%, respectively, of net revenues for the Pro Forma Fiscal Year 2019 and 25% and 8%, respectively, of net revenues for the year ended December 31, 2018; (ii) approximately 51% and 23%, respectively, of Medicare—Internal segment revenue for the Pro Forma Fiscal Year 2019, and 63% and 15%, respectively, of Medicare—Internal segment revenue for the year ended December 31, 2018; and (iii) approximately 46% and 32%, respectively, of Medicare—External segment revenue for the Pro Forma Fiscal Year 2019, and 41% and 18%, respectively, of Medicare—External segment revenue for the year ended December 31, 2018. In addition, carriers owned by UnitedHealth Group represented approximately 27% and 11% of IFP and Other—Internal segment revenue for the Pro Forma Fiscal Year 2019 and for the year ended December 31, 2018, respectively, and 41% and 19% of IFP and Other—External segment revenue for the Pro Forma Fiscal Year 2019 and year ended December 31, 2018, respectively. See "Risk Factors—Risks Related to Our Business—We currently depend on a small group of carriers for a substantial portion of our revenue."

We continue to focus on building out our carrier footprint in order to provide our consumers with a greater choice of health insurance plans. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments.

149

Table of Contents

**Technology**

We have a technology culture that incentivizes the relentless improvement of every measurable point of the consumer experience. We harness our data, in unison with a deep investment in data expertise, to power key decision engines that scrutinize every step of the consumer journey and identify areas where technology and process-improvement investment will most impact our unit economics, including driving improvements in LTV/CAC. We operate dozens of proprietary technology systems, which support a data-driven consumer acquisition, service, and retention lifecycle within the health insurance market.

- *Consumer Lead Acquisition*. We acquire consumer leads through many channels, including paid Internet searches, television advertising, direct mail, affiliate sources, organic traffic from GoHealth.com and other channels. We use our streaming data systems to monitor CAC, the attributes and volume of consumer leads, the efficiency of the sales process, and historical performance benchmarks on a real-time basis. These systems allow our marketing team and automated marketing systems to make informed consumer lead acquisition decisions, resulting in lower CAC. Further, we have engineered our online lead generation forms that capture consumer leads to conduct high-volume testing of our consumer lead systems. Finally, our Consent Manager system ensures the capture of verifiable consent to call or text each consumer lead in compliance with the TCPA.

- *Lead Scoring*. When consumers engage with us through the telephone or our website, our data systems capture attributes about the consumer, including the specific advertisement and channel that precipitated the consumer's engagement. Our proprietary LeadScore technology applies a machine-learning model to years of historical consumer lead data we have gathered and their measured long-term outcomes to predict the expected LTV of all incoming consumer leads from the moment they connect with us. We use LeadScore to make several decisions throughout the sales process about how to optimize the routing of the consumer lead and what agents or agencies are best suited to serve each consumer.

- *Contact Queuing*. We utilize our SPLICE system, a proprietary contact queue prioritized by LTV and throttled by an integrated monitor of agent capacity, to optimize outreach to our most valuable online consumer leads at a point in time when they can be connected to our agents with minimal wait time.

- *Outbound Contact and Qualification*. Following SPLICE's automated decision for consumer outreach, our automatic telephony system contacts the consumer and immediately places them on the phone with an agent, who gathers information to personalize the consumer's sales experience, who we refer to as an Advocate. We also use the data gathered by our Advocates to improve the sales process by experimenting with the questions our Advocates ask and building data models of how consumers' answers affect agent-consumer fit, consumer-product fit, CAC, LTV, and long-term customer satisfaction.

- *Lead Distribution*. At the conclusion of the information-gathering process, and while the consumer is still on the phone, we use our proprietary lead auction system to make a health insurance market for the lead. External agencies participate in the auction along with our internal agency and programs, and present a pricing bid based on the consumer lead's profile. We compete in the auction, winning the lead in the vast majority of cases, as our unit economics make typical consumer leads far more profitable for us to service than to distribute to external agencies. Our Assisted Live Transfer technology connects the call to the winner, via either warm (attended) transfer or cold (blind) transfer, dynamically chosen based on the availability of Advocates.

- *Optimized Call Routing*. If the consumer lead is distributed from an Advocate further into our internal sales process, our CallRouter technology partitions the consumer leads into clusters based on lead and agent attributes. Each cluster is serviced by insurance agents with specialized licensing, training, experience, and performance characteristics tailored to that cluster. An agent can be assigned to one or more clusters, and each agent has a rank within each cluster to express the agent's relative proficiency for servicing consumer leads in the cluster. Agent, consumer lead, and cluster performance data are

150

Table of Contents

continuously gathered and regularly analyzed by machine-learning experts and sales managers alike to ensure optimal call-routing.

- *Consumer Lead Management*. As consumer leads are assigned and connected to agents, our BrokerOffice technology provides guidance to the agents on the most appealing value proposition to the consumer based on the information previously collected about the consumer.

- *Marketplace*. After reviewing the consumer's profile in BrokerOffice, the agent launches our Marketplace technology. Our Marketplace technology provides comparative shopping capabilities for all products available to the consumer in their geography and across carriers. It also ensures that while the agent has access to, and is able to compare, all products in the market, they only sell products for which they are appointed and licensed. The Marketplace has a growing set of decision support capabilities to guide the agent to the consumer's ideal plan. For example, agents have the ability to look up each consumer's providers and prescription drugs to compare their coverage inclusion and cost across plans. When the agent is ready to apply for a specific plan with the consumer, they may do so directly through the Marketplace. If the consumer requires time to consider the plan, the agent can send a personalized plan proposal either by email or SMS text message. Consumers can review proposals and enroll on their own directly from their phone, tablet, or computer.

- *Electronic Applications*. We utilize proprietary domain-specific language for the rapid development and deployment of compliant electronic insurance applications. We ensure that insurance applications can be built and validated using standard, reusable modules wherever appropriate, while still being able to seamlessly integrate custom components as necessary. Completed applications are delivered directly to the corresponding carrier through custom integration partnerships.

- *Consumer Lifecycle Management*. We receive application submission, commission, and book of business data regularly from each integrated carrier. We integrate this data with the other consumer data gathered throughout the consumer lifecycle to build a Retention Model using our machine-learning technology, which identifies consumers in need of engagement. Similar to many of our other systems, the Retention Model is continuously tested to increase performance and capability. We also use post-sale data from carriers to model how retention outcomes relate to consumer, marketing, and customer journey attributes so that every piece of our technology can be further optimized to maximize customer satisfaction and improve the sales process.

- *Monitoring*. We have also developed several enabling and monitoring technologies to detect and automatically address anomalies and inefficiencies in our operations based on deviations from baseline norms, and to ensure that our operations are fully compliant. Agent calls are continuously monitored so that we automatically redact PCI from compliant call recordings in real time. Various network and agent performance metrics are tracked so that we can exert control over our advertising and sales operations.

**Agents**

Since our inception, our highly skilled and trained licensed agents have enabled us to enroll millions of people in Medicare and individual and family plans. In 2019, we employed on average over 931 agents, reaching a high of 1,453 agents employed during the three months ended December 31, 2019. Our technology, lead distribution, and workflow allow agents to work in our Benefits Center or to work remotely at home, providing us with a sustainable avenue for growth.

Our agents benefit from a rigorous training program consisting of 6-8 weeks of classroom and interactive instruction prior to engaging with consumers. Our training courses cover insurance licensing, compliance requirements, customer service interactions, live role playing, and systems use. Most importantly, our trainings emphasize the GoHealth Way by prioritizing the trust and wellbeing of our customers above all else. We provide additional training on a regular basis to ensure our agents have the most up-to-date information regarding plan

Table of Contents

benefits, changing regulations, and best practices. We are continuously updating and improving agent training to drive increased agent efficiency. We have analyzed our most productive agents and revised our recruiting, training and onboarding processes to most closely match the skills and experiences of our most successful agents. The opportunity to reduce the variability in our agent performance is significant, as our top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment on average are 61% more productive than the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment, based on conversion rates of qualified prospects to Submitted Policies for the three months ended March 31, 2020. These top 25% of agents for the multi-carrier sales outlet of the Medicare—Internal segment achieved a 34% conversion rate of qualified prospects to Submitted Policies over the same three month period as compared to 21% conversion rate for the remaining 75% of our agents for the multi-carrier sales outlet of the Medicare—Internal segment over the same period.

We competitively compensate agents to incentivize their productivity, increase member retention, and improve customer satisfaction. In addition to paying each agent an hourly wage, we also compensate our agents through a structured bonus program. Our bonus program is designed to compensate agents based on the customer experience and plan lifetime. Customer experience is measured through a customer satisfaction survey. Plan lifetime is measured through policy issuance and retention.

**Marketing**

We employ data-driven, omni-channel marketing efforts to increase consumer phone calls and visits to our website and convert those calls and visits into customers. Our marketing initiatives include:

- *Offline Media Marketing*. Our offline media channel consists of branded advertisements run on television (both linear and over-the-top) and radio, as well as targeted direct mail campaigns.

- *Digital (Online) Media*. Our digital media channel consists of branded advertisements run on paid search, display, native and social media platforms. These paid media efforts are supported by unpaid email and organic search campaigns. Our online advertising programs are delivered across all Internet-enabled devices, including desktop computers, tablet computers and smart phones.

- *Marketing Partners*. Our marketing partner consumer acquisition channel consists of a network comprised of hundreds of partners that drive consumers to our e-commerce platform and Benefits Center. These partners include healthcare industry participants, such as insurance carriers, financial and online services partners in industries, such as banking and insurance, as well as affiliate organizations.

**Government Regulation and Compliance**

The marketing and sale of insurance products and plans is a heavily regulated industry. Various aspects of our business are, may become, or may be viewed by regulators from time to time as subject, directly or indirectly, to U.S. federal, state and foreign laws and regulations. We are affected by laws and regulations that apply to businesses in general, the healthcare industry, and the insurance industry, as well as to businesses operating on the internet. This includes a continually expanding and evolving range of laws, regulations and standards that address financial services, information security, data protection, privacy and data collection and destruction, marketing of Medicare Advantage and other Medicare plans, healthcare compliance and fraud and abuse, among other things. We are also subject to laws governing marketing and advertising activities conducted by telephone, email, mobile devices and the internet. In addition, we are a licensed insurance producer in all 50 U.S. states and the District of Columbia. Insurance is highly regulated by the states in which we do business, and we are required to comply with and maintain various licenses and approvals. Regulatory authorities often have the discretion to grant, renew and revoke the various licenses and approvals we need to conduct our activities and, should we fail to retain our licenses, our business and results of operations could be adversely affected.

The Medicare segments are subject to regulations and guidelines issued by CMS that place a number of requirements on carriers, agents and brokers in connection with the marketing and sale of Medicare Advantage

152

Table of Contents

and Medicare Part D prescription drug plans. State insurance departments also regulate the marketing and sale of Medicare Supplement plans. CMS and state insurance department regulations and guidelines include a number of prohibitions regarding the ability to contact Medicare-eligible individuals and place many restrictions on the marketing of Medicare-related plans. For example, our carriers are required to file with CMS and state departments of insurance certain of our platforms, our call center scripts and other marketing materials we use to market Medicare-related plans. In some instances, CMS or state departments of insurance must approve the material before we use it. In addition, the laws and regulations applicable to the marketing and sale of Medicare-related plans are ambiguous, complex and, with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently, and may do so as a result of the effects of the COVID-19 pandemic.

There are also numerous state and federal laws and regulations related to the privacy and security of health information. Laws in all 50 states require businesses to provide notices to affected individuals whose personal information has been disclosed as a result of a data breach, and certain states require notifications for data breaches involving individually identifiable health information. Most states require holders of personal information to maintain safeguards and take certain actions in response to a data breach, such as maintaining reasonable security measures and providing prompt notification of the breach to affected individuals and the state's attorney general. In particular, regulations promulgated pursuant to the Health Insurance Portability and Accountability Act, or HIPAA, require us to maintain the privacy of individually-identifiable health information that we collect on behalf of carriers, implement measures to safeguard such information and provide notification in the event of a breach in the privacy or confidentiality of such information. If we were to be found to have breached our obligations under HIPAA, we could be subject to enforcement actions by the U.S. Department of Health and Human Services Office for Civil Rights ("OCR") and state health regulators and lawsuits, including class action law suits, by private plaintiffs. In addition, OCR performs compliance audits in order to proactively enforce the HIPAA privacy and security standards. OCR has become an increasingly active regulator and has signaled its intention to continue this trend. OCR has the discretion to impose penalties without being required to attempt to resolve violations through informal means; further OCR may require companies to enter into resolution agreements and corrective action plans which impose ongoing compliance requirements. OCR enforcement activity can result in financial liability and reputational harm, and responses to such enforcement activity can consume significant internal resources. In addition to enforcement by OCR, state attorneys general are authorized to bring civil actions under either HIPAA or relevant state laws seeking either injunctions or damages in response to violations that threaten the privacy of state residents. Although we have implemented and maintained policies, processes and a compliance program infrastructure to assist us in complying with these laws and regulations and our contractual obligations, we cannot provide assurance regarding how these laws and regulations will be interpreted, enforced or applied to our operations. In addition to the risks associated with enforcement activities and potential contractual liabilities, our ongoing efforts to comply with evolving laws and regulations at the federal and state levels also might require us to make costly system purchases and/or modifications or otherwise divert significant resources to HIPAA compliance initiatives from time to time.

In addition, we have entered into contracts with carriers and others regarding the collection, maintenance, protection, use, transmission, disclosure or disposal of sensitive personal information. The use and disclosure of certain data that we collect from consumers are also regulated in some instances by other federal laws, including the Gramm-Leach-Bliley Act, or GLBA, and state statutes implementing GLBA, which generally require brokers to provide customers with notice regarding how their non-public personal health and financial information is used and the opportunity to "opt out" of certain disclosures before sharing such information with a third party, and which generally require safeguards for the protection of personal information. We regularly assess our compliance with privacy and security requirements.

These requirements are evolving, and states are beginning to adopt additional requirements, including California, where the CCPA took effect beginning January 1, 2020. The CCPA gives California residents expanded rights to access and delete their personal information, opt out of certain personal information sharing, and receive detailed information about how their personal information is used. The CCPA provides for civil penalties for violations,

153

**Table of Contents**

as well as a private right of action for data breaches that is expected to increase data breach litigation. In addition to government action, health insurance carrier expectations relating to privacy and security protections are increasing and evolving. We have incurred significant costs to develop new processes and procedures and to adopt new technology in an effort to comply with privacy and security laws and regulations and carrier expectations and to protect against cybersecurity risks and security breaches. We expect to continue to do so in the future. Violations of federal and state privacy and security laws and other contractual requirements may result in significant liability and expense, damage to our reputation or termination of relationship with government-run health insurance exchanges and our members, marketing partners and carriers.

Federal and state consumer protection laws are being applied increasingly by the Federal Trade Commission, or FTC, Federal Communications Commission, or FCC, and states' attorneys general to regulate the collection, use, storage and disclosure of personal or health information, through websites or otherwise, and to regulate the presentation of website content. Courts may also adopt the standards for fair information practices promulgated by the FTC, which concern consumer notice, choice, security and access. Consumer protection laws require us to publish statements to our members that describe how we handle personal information and choices members may have about the way we handle personal information. If such information that we publish is considered untrue, we may be subject to government claims of unfair or deceptive trade practices, which could lead to significant liabilities and consequences.

New York's cybersecurity regulation for financial services companies requires entities under the jurisdiction of NYDFS, including insurance entities, to establish and maintain a cybersecurity program designed to protect private consumer data. The Cybersecurity Model Law adopted by the NAIC is functionally similar to the NYDFS rule and is intended to establish the standards for data security and for the investigation and notification of data breaches applicable to insurance licensees in states adopting the law.

In addition, the United States regulates marketing and certain other communications by telephone and email, and individual states also impose restrictions on telephone marketing. The laws and regulations governing the use of emails and telephone calls for such purposes continue to evolve, and changes in technology, the marketplace or consumer preferences may lead to the adoption of additional laws or regulations or changes in interpretation of existing laws or regulations. The Telephone Consumer Protection Act and other federal and state laws prohibit companies from making telemarketing calls to numbers listed in the Federal Do-Not-Call Registry and impose other obligations and limitations on making phone calls and sending text messages to consumers. The CAN-SPAM Act regulates commercial email messages and specifies penalties for the transmission of commercial email messages that do not comply with certain requirements, such as providing an opt-out mechanism for stopping future emails from senders. We are required to comply with these and similar laws, rules and regulations.

**Competition**

The market for the distribution of health insurance products and plans is highly competitive, fragmented and evolving as purchasing behavior shifts from traditional field-based agent models towards digital and telephonic platforms. Our competition leverages a variety of channels including government-run health insurance exchanges, carrier-employed agents, field based independent agents and brokers, or platforms that distribute directly to the consumer digitally or telephonically. We aim to differentiate our products and services on the basis of our ability to match consumers with the insurance products that best match their needs by leveraging our carrier relationships, proprietary technology, machine-learning capabilities and extensive data, efficient business processes, and highly skilled and trained agents.

*Government.* We compete with the federal government's original Medicare program in marketing Medicare insurance plans. CMS also offers Medicare-plan online enrollment, information and comparison tools, and has established call centers for the sale of Medicare Advantage and Medicare Part D prescription drug plans (collectively Medicare Plans). CMS has regulatory authority over Medicare Plans and can influence the

154

Table of Contents

competitiveness of Medicare Plans compared to the original Medicare program, as well as the compensation that health insurance carriers are allowed to pay to us.

*Carrier-employed agents.* Some health insurance carriers directly market and sell their plans to consumers through their own agents, call centers and websites. Although we offer health insurance plans for many of these carriers, they also compete with us by offering their plans directly to consumers. Most of these carriers have brand recognition, significant financial resources, and have become experienced in marketing their products to consumers through traditional and emerging channels.

*Independent agents and brokers.* We compete with thousands of local insurance agents and brokers across the United States who sell insurance products in their communities. While many of these agents offer health insurance products without significant utilization of advanced technology or the Internet, a number have embraced telesales or established websites providing an online shopping experience for consumers.

*Internet marketers and telesales distribution platforms.* There are many marketing companies and distribution platforms that use the Internet or telesales models to find consumers interested in purchasing health insurance and are compensated for referring those consumers to agents and carriers. We compete with these companies using similar business models to ours, such as eHealth, Inc. and SelectQuote Inc., for qualified prospects, sales, and carrier relationships.

## Patents, Trademarks and Other Intellectual Property

We rely on a combination of copyright, trademark and trade secret laws as well as confidentiality procedures and contractual provisions to protect our proprietary software, including Marketplace, and our brands. We have registered or applied to register certain of our trademarks in the United States and several other countries. We also license intellectual property from third parties, including software that is incorporated in or bundled with our proprietary software applications. We generally control access to and use of our proprietary software and other confidential information through the use of internal and external controls, including entering into non-disclosure and confidentiality agreements with both our employees and third parties.

## Employees

As of March 31, 2020, we employed 1,857 full-time employees, including 781 full time equivalent agents, and no part-time employees. We employed 1,810 people in the United States and 47 in Slovakia. During the Medicare annual enrollment period, we typically hire additional full time employees. None of our employees are represented by a labor union or are party to a collective bargaining agreement, and we have had no labor-related work stoppages. We believe that we have good relationships with our employees.

## Facilities

Our principal executive offices are located in Chicago, Illinois. In addition to our principal executive offices, we operate from one additional office located in Chicago, Illinois and from offices located in Charlotte, North Carolina; Lindon, Utah; and Slovakia. We lease each of our offices.

For leases that are scheduled to expire during the next 12 months, we may negotiate new lease agreements, renew existing lease agreements or use alternate facilities. We believe that our facilities are adequate for our needs and believe that we should be able to renew any of our leases or secure similar property without an adverse impact on our operations.

## Legal Proceedings

We are, from time to time, party to various claims and legal proceedings arising out of our ordinary course of business, but we do not believe that any of these claims or proceedings will have a material effect on our business, consolidated financial condition or results of operations.

**MANAGEMENT**

The following table provides information regarding our executive officers and members of our board of directors as of the date of this prospectus:

| Name | Age | Position(s) |
| --- | --- | --- |
| Clinton P. Jones | 43 | Co-Founder, Chief Executive Officer and Co-Chair of the Board of Directors |
| Brandon M. Cruz | 42 | Co-Founder, Chief Strategy Officer, Special Advisor to the Executive Team and Co-Chair of the Board of Directors |
| Shane E. Cruz | 40 | Chief Operating Officer |
| Brian Farley | 50 | Chief Legal Officer and Corporate Secretary |
| Travis J. Matthiesen | 36 | Chief Financial Officer |
| James A. Sharman | 61 | President |
| Rahm Emanuel | 60 | Director |
| Joseph G. Flanagan | 49 | Director |
| Helene D. Gayle | 64 | Director |
| Jeremy W. Gelber | 44 | Director |
| Anita V. Pramoda | 45 | Director |
| Miriam A. Tawil | 35 | Director |
| Alexander E. Timm | 32 | Director |

**Executive Officers**

*Clinton P. Jones* is the co-founder of GoHealth and has served as GoHealth's Chief Executive Officer since GoHealth's founding in 2001. He has also been a member of GoHealth, Inc.'s board of directors since 2020 and a member of GoHealth Holdings, LLC's board of managers since 2019, as well as serving on the board of managers of GoHealth's predecessor since its founding in 2001. He also serves as member of the board of directors of Bridge Legal. From June 2000 to January 2001, Mr. Jones served as Intranet Market Manager for Holt Value, a former division of Credit Suisse. Mr. Jones speaks regularly at industry events and conferences. He is also active in insurance regulatory forums. In 2013, Mr. Jones was recognized by Ernst & Young as the Midwest Entrepreneur of the Year and was also named to the annual Chicago leadership list, Crain's 40 under 40. Mr. Jones holds Bachelor of Science degrees in both Marketing and Management Information Systems from Miami University.

We believe Mr. Jones is qualified to serve on GoHealth, Inc.'s board of directors due to his extensive experience in the insurance industry and his knowledge of our business in particular, gained through his services as our co-founder and Chief Executive Officer.

*Brandon M. Cruz* is the co-founder of GoHealth and has served as GoHealth's Chief Strategy Officer and Special Advisor to the Executive Team since 2020. Prior to this role, he served as President of GoHealth since its founding in 2001. He has also been a member of GoHealth, Inc.'s board of directors since 2020 and a member of GoHealth Holdings, LLC's board of managers since 2019, as well as serving on the board of managers of GoHealth's predecessor since its founding. From 1999 to 2000, Mr. Cruz worked at Lante Corp. as a systems developer. Mr. Cruz is recognized throughout the technology industry as an influential thought leader, and speaks regularly on topics related to technology, health insurance and business operations. He is a board member of the Young Presidents' Organization and serves on the board of Homecare Holdings, HealthJoy, and Imerman Angels. Mr. Cruz has also served as a member of the board of directors of Creatix, Inc., our subsidiary, from 2016 to 2019. In 2013, Mr. Cruz was recognized by Ernst & Young as the Midwest Entrepreneur of the Year and was also named to the annual Chicago leadership list, Crain's 40 under 40. Mr. Cruz holds a Bachelor of Science degree in Management Information Systems from Miami University, and is a member of the Miami University Business Advisory Council.

156

Table of Contents

We believe Mr. Cruz is qualified to serve on GoHealth, Inc.'s board of directors due to his extensive experience in the insurance industry and his knowledge of our business in particular, gained through his services as our co-founder and Chief Strategy Officer and Special Advisor to the Executive Team.

*Shane E. Cruz* has served as GoHealth's Chief Operating Officer since 2020 and prior to that, was the Chief Technology Officer of GoHealth since 2014. Previously, Mr. Cruz served as GoHealth's Senior Vice President of Technology from 2012 to 2014 and as Vice President of Technology from 2006 to 2012. Mr. Cruz also served as a member of the board of directors of HealthJoy, our affiliate, from 2014 to 2019 and as a member of the board of directors of Creatix, Inc., our subsidiary, from 2015 to 2019. Mr. Cruz holds Bachelor of Science degrees in Computer Science and Engineering and a Master of Engineering in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology.

*Brian Farley* has served as GoHealth's Chief Legal Officer and Corporate Secretary since 2020. Previously, Mr. Farley served in various roles at Allscripts Healthcare Solutions, Inc., including most recently as Executive Vice President, General Counsel and Chief Administrative Officer from 2013 to 2020. He also served in various positions, including as Corporate Vice President and General Counsel, at Motorola Mobility LLC, a provider of mobile communication devices and video and data delivery solutions, from 2005 to 2013. Mr. Farley holds a Bachelor of Arts in Political Economics from Colorado College, a Juris Doctor from The George Washington University National Law Center and an Executive Master's in Business Administration from University of Colorado.

*Travis J. Matthiesen* has served as GoHealth's Chief Financial Officer since 2018. Prior to serving as Chief Financial Officer, he served as GoHealth's Vice President of Finance and Marketplace Operations from 2017 to 2018 and as GoHealth's Corporate Controller from 2010 to 2017. He also served as a member of the board of directors of Creatix, Inc., our subsidiary, from 2018 to 2019. From 2006 to 2010, Mr. Matthiesen worked at the Assurance and Advisory Services Department of Ernst & Young LLP. Mr. Matthiesen holds a Master of Business Administration from the University of Notre Dame and a Bachelor of Science degree in Accounting from Cedarville University.

*James A. Sharman* has served as GoHealth's President since 2020 and prior to that, was the Chief Operating Officer of GoHealth since 2018. Mr. Sharman was also appointed as a director of Spartan Motors Inc., which specializes in vehicle manufacturing and assembly for the commercial and retail vehicle industries, in February 2016 and has served as its Chairman since 2018. From 2015 through 2018, Mr. Sharman served as Chief Operating Officer of Coyote Logistics, a freight broker and logistics services provider and a wholly-owned subsidiary of United Parcel Service, Inc. From 2006 through 2014, Mr. Sharman served as Managing Partner of Truecast Capital, LLC, an investment firm. His work history includes President and Chief Executive Officer of World Kitchen, Inc. and Rubicon Technology, Inc. He was Senior Vice President of Global Supply Chain for CNH as well as Vice President and General Manager, Latin America, for the Case Corporation. He served as the Commanding Officer of an Engineering Company in the United States Army and was an Assistant Professor at the United States Military Academy at West Point. Mr. Sharman holds a Master of Business Administration from Duke University and Bachelor of Science degree in Engineering from the United States Military Academy at West Point.

## Directors

*Rahm Emanuel* has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2020. Mr. Emanuel has been Senior Counselor at Centerview Partners since 2019, served as Mayor of Chicago from 2011 to 2019, as White House Chief of Staff from 2009 to 2010, as Chairman of the House Democratic Caucus from 2007 to 2009 and as a member of the United States House of Representatives from Illinois's 5th District from 2003 to 2009. From 2005 to 2007, Mr. Emanuel was the Chairman of the Democratic Congressional Campaign Committee. Mr. Emanuel worked at the investment bank Wasserstein Parella & Co. from 1998 to 2000 and served as a member of the board of

157

**Table of Contents**

directors of Freddie Mac from 2000 to 2001 and a member of the board of directors of the Chicago Mercantile Exchange from 1999 to 2001. Under President Clinton's administration, Mr. Emanuel served as Senior Advisor to the President from 1992 to 1998. Mr. Emanuel holds a Bachelor of Arts degree from Sarah Lawrence College and a Master of Arts degree from Northwestern University.

We believe Mr. Emanuel is qualified to serve on GoHealth, Inc.'s board of directors due to his financial expertise and many years of leadership experience.

*Joseph G. Flanagan* has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2020. Mr. Flanagan has also served as the President and Chief Executive Officer and as a member of the board of directors of R1 RCM Inc. ("R1"), a healthcare revenue cycle management company, since May 2016, after having served as R1's President and Chief Operating Officer since April 2016. Mr. Flanagan joined R1 as Chief Operating Officer in April 2013 after serving as Senior Vice President of worldwide operations and supply chain at Applied Materials, Inc., a supplier of equipment, services and software for the manufacture of semiconductor chips for electronics, from 2010 to 2013, and as President of Nortel Business Services for Nortel Networks from 2009 to 2010. From 1993 to 2006, Mr. Flanagan worked for General Electric, holding leadership positions in many divisions. Mr. Flanagan holds a Bachelor of Science degree in Engineering from the United States Merchant Marine Academy.

We believe Mr. Flanagan is qualified to serve on GoHealth, Inc.'s board of directors due to his knowledge of the healthcare industry and extensive board experience.

*Helene D. Gayle* has served as a member of GoHealth, Inc.'s board of directors since 2020. Dr. Gayle has been the Chief Executive Officer of The Chicago Community Trust since 2017. Prior to joining The Chicago Community Trust, from 2015 to 2017, Dr. Gayle served as the Chief Executive Officer at the McKinsey Social Initiative, a nonprofit organization launched by McKinsey & Company that implements programs that bring together varied stakeholders to address complex global social challenges. From 2006 to 2015, Dr. Gayle served as President and Chief Executive Officer of CARE USA, a leading international humanitarian organization. For twenty years, from 1984 to 2004, Dr. Gayle worked for the Centers for Disease Control, with a variety of different assignments and retired as a Rear Admiral in the Public Health Service and an Assistant Surgeon General. From 2001 to 2006, she also worked at the Bill & Melinda Gates Foundation directing programs on HIV/AIDS and other global health issues. Dr. Gayle serves as a member of the board of directors of The Coca-Cola Company, Colgate-Palmolive Company, the Federal Reserve Bank of Chicago, the Brookings Institution, the Center for Strategic and International Studies, the New America and the ONE Campaign. She is a member of the America Academy of Arts and Sciences, Council on Foreign Relations, the American Public Health Association, the National Academy of Medicine, and the American Academy of Pediatrics. Dr. Gayle was named one of Forbes' "100 Most Powerful Women," and she has authored numerous articles on global and domestic public health issues, poverty alleviation, gender equality, and social justice. She has also received eighteen honorary degrees and holds faculty appointments at the University of Washington and Emory University. Dr. Gayle holds a Bachelor of Arts in Psychology from Barnard College of Columbia University, a Doctor of Medicine degree from the University of Pennsylvania and a Master of Public Health degree from Johns Hopkins University.

We believe Dr. Gayle is qualified to serve on GoHealth, Inc.'s board of directors due to her extensive knowledge of the healthcare industry, extensive board experience and many years of leadership experience.

*Jeremy W. Gelber* has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2019. Mr. Gelber has been a Senior Managing Director of Centerbridge since 2018, where he focuses on investments in the healthcare sector, and has also served as a member of the board of directors of American Renal Associates Holdings, Inc. since 2020, Civitas Solutions, Inc. since 2019 and Remedi SeniorCare Holding Corporation since 2019. Prior to joining Centerbridge, Mr. Gelber was a Partner at Pamplona Capital, a private equity firm, and also served as Executive Director in the Healthcare

158

**Table of Contents**

Investment Banking Division at Morgan Stanley. Mr. Gelber holds a Bachelor of Science degree from Dartmouth College and a Doctor of Medicine degree from Jefferson Medical College.

We believe Mr. Gelber is qualified to serve on GoHealth, Inc.'s board of directors due to his knowledge of the healthcare industry, broad financial expertise and many years of leadership experience.

*Anita V. Pramoda* has served as a member of GoHealth, Inc.'s board of directors since 2020. Ms. Pramoda also serves as a member of the board of directors of the Federal Reserve Bank of San Francisco (Los Angeles) and Health Catalyst, Inc., a provider of data and analytics technology and services to healthcare organizations. Ms. Pramoda is a Venture Partner and Executive Advisor at the Technology Crossover Ventures. Previously, Ms. Pramoda served as a member of the board of directors of Dignity Health Foundation, from 2013 to 2017, Allscripts Healthcare, LLC, from 2013 to 2016 and as Chief Financial Officer at Epic Systems Corporation, from 2009 to 2012. Ms. Pramoda holds a Master in Business Administration degree from the University of Pennsylvania - The Wharton School.

We believe Ms. Pramoda is qualified to serve on GoHealth, Inc.'s board of directors due to her extensive knowledge of the healthcare industry, extensive board experience and many years of leadership experience.

*Miriam A. Tawil* has served as a member of GoHealth, Inc.'s board of directors since 2020. Ms. Tawil has been a Managing Director of Centerbridge since 2012, where she focuses on investments in the healthcare and financial services sectors. Ms. Tawil also serves as a member of the board of directors of Civitas Solutions, Inc., Duo Bank of Canada and Remedi SeniorCare Holding Corporation. Prior to joining Centerbridge, Ms. Tawil was an associate at TPG Capital from 2008 to 2010 and an analyst in the Mergers and Acquisitions Group of The Blackstone Group L.P. from 2006 to 2008. Ms. Tawil holds a Bachelor of Arts from Harvard College and a Master in Business Administration degree from Harvard Business School.

We believe Ms. Tawil is qualified to serve on GoHealth, Inc.'s board of directors due to her extensive knowledge of the healthcare industry, broad financial expertise and years of leadership experience.

*Alexander E. Timm* has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2020. Mr. Timm is also the Chief Executive Officer of Root Insurance Company, which he co-founded in 2015. Additionally, from 2011 to 2015, Mr. Timm worked at Nationwide Insurance as a senior consultant in corporate strategy. Mr. Timm holds a Bachelor of Science degree in Business Administration and a Bachelor of Arts degree in Actuarial Studies, Accounting and Mathematics from Drake University.

We believe Mr. Timm is qualified to serve on GoHealth, Inc.'s board of directors due to his extensive insurance industry experience, as well as his success in the entrepreneurial, tech, and data science industries.

### Family Relationships

Brandon M. Cruz, our Co-Founder, Chief Strategy Officer and Special Advisor to the Executive Team and Director is the brother of Shane E. Cruz, our Chief Operating Officer. Otherwise, there are no family relationships among any of our executive officers or directors.

### Composition of our Board of Directors

Our business and affairs are managed under the direction of our board of directors, which will consist of nine members upon consummation of the Transactions. Our amended and restated certificate of incorporation will provide that, subject to the rights of the holders of preferred stock, the number of directors on our board of directors shall be fixed exclusively by resolution adopted by our board of directors (provided that such number shall not be less than the aggregate number of directors that the parties to the Stockholders Agreement are

159

**Table of Contents**

entitled to designate from time to time). Our amended and restated certificate of incorporation and our amended and restated bylaws will provide that our board of directors will be divided into three classes, as nearly equal in number as possible, with the directors in each class serving for a three-year term, and one class being elected each year by our stockholders.

When considering whether directors have the experience, qualifications, attributes or skills, taken as a whole, to enable our board of directors to satisfy its oversight responsibilities effectively in light of our business and structure, the board of directors focuses primarily on each person's background and experience as reflected in the information discussed in each of the directors' individual biographies set forth above. We believe that our directors provide an appropriate mix of experience and skills relevant to the size and nature of our business.

Prior to the consummation of the Transactions, we will enter into the Stockholders Agreement with Centerbridge and NVX Holdings, pursuant to which each party thereto will agree to vote, or cause to be voted, all of their outstanding shares of our Class A common stock and Class B common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the Centerbridge Directors, Centerbridge-Designated Independent Directors, Founders Directors and Founders-Designated Independent Directors. Immediately following the consummation of the Transactions, Centerbridge will own 82,058,717 shares of Class B common stock of GoHealth, Inc., which represents approximately 26.2% of the combined voting power of all of GoHealth, Inc.'s common stock. Our Founders will own 98,224,564 shares of Class B common stock of GoHealth, Inc., which represents approximately 31.4% of the combined voting power of all of GoHealth, Inc.'s common stock. For a description of the terms of the Stockholders Agreement, see "Certain Relationships and Related Party Transactions—Stockholders Agreement."

In accordance with our amended and restated certificate of incorporation and amended and restated bylaws, each of which will be in effect immediately prior to the consummation of the Transactions, our board of directors will be divided into three classes with staggered three year terms. At each annual meeting of stockholders after the initial classification, the successors to the directors whose terms will then expire will be elected to serve from the time of election and qualification until the third annual meeting following their election. Our directors will be divided among the three classes as follows:

- the Class I directors will be Rahm Emanuel, Helene D. Gayle and Alexander E. Timm, and their terms will expire at the annual meeting of stockholders to be held in 2021;

- the Class II directors will be Brandon M. Cruz, Joseph G. Flanagan and Miriam A. Tawil, and their terms will expire at the annual meeting of stockholders to be held in 2022; and

- the Class III directors will be Clinton P. Jones, Jeremy W. Gelber and Anita V. Pramoda, and their terms will expire at the annual meeting of stockholders to be held in 2023.

Any increase or decrease in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. This classification of our board of directors may have the effect of delaying or preventing changes in control of the Company. See "Description of Capital Stock—Anti-Takeover Provisions."

**Director Independence**

Prior to the consummation of the Transactions, our board of directors undertook a review of the independence of our directors and considered whether any director has a relationship with us that could compromise that director's ability to exercise independent judgment in carrying out that director's responsibilities. Our board of directors has affirmatively determined that Rahm Emanuel, Joseph G. Flanagan, Helene D. Gayle, Jeremy W. Gelber, Anita V. Pramoda, Miriam A. Tawil and Alexander E. Timm are each an "independent director," as defined under the Nasdaq rules. In making these determinations, our board of directors considered the current and prior relationships that each director has with the Company and all other facts and circumstances our board of directors deemed relevant in determining his or her independence, including the beneficial ownership of our capital stock by each director, and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions."

160

Table of Contents

**Controlled Company Exception**

After the consummation of the Transactions, NVX Holdings and Centerbridge will have more than 50% of the combined voting power of our common stock. As a result, we will be a "controlled company" within the meaning of the corporate governance standards of the Nasdaq rules and intend to elect not to comply with certain corporate governance standards, including that: (1) a majority of our board of directors consists of "independent directors," as defined under the Nasdaq rules; (2) we have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; (3) we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and (4) we perform annual performance evaluations of the nominating and corporate governance and compensation committees. We intend to rely on the foregoing exemptions provided to controlled companies under the Nasdaq rules. Therefore, immediately following the consummation of the Transactions, we may not have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or perform annual performance evaluations of the nominating and corporate governance and compensation committees unless and until such time as we are required to do so. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of these corporate governance requirements. In the event that we cease to be a "controlled company" and our shares continue to be listed on the Nasdaq, we will be required to comply with these provisions within the applicable transition periods. See "Risk Factors—Risks Related to the Offering and Ownership of our Class A Common Stock—We are a "controlled company" within the meaning of the Nasdaq rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You may not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements."

**Committees of Our Board of Directors**

Our board of directors directs the management of our business and affairs, as provided by Delaware law, and conducts its business through meetings of the board of directors and its standing committees. We will have a standing audit committee, nominating and corporate governance committee and compensation committee. In addition, from time to time, special committees may be established under the direction of the board of directors when necessary to address specific issues.

*Audit Committee*

Our audit committee will be responsible for, among other things:

- appointing, approving the fees of, retaining and overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm their independence from management;

- discussing with our independent registered public accounting firm any audit problems or difficulties and management's response;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing our policies on risk assessment and risk management;

- reviewing related person transactions; and

161

**Table of Contents**

- establishing procedures for the confidential anonymous submission of complaints regarding questionable accounting, internal controls or auditing matters.

Upon the consummation of the Transactions, our audit committee will consist of Joseph G. Flanagan, Anita V. Pramoda and Alexander E. Timm, with Anita V. Pramoda serving as chair. Rule 10A-3 of the Exchange Act and the Nasdaq rules require that our audit committee have at least one independent member upon the listing of our Class A common stock, have a majority of independent members within 90 days of the date of this prospectus and be composed entirely of independent members within one year of the date of this prospectus. Our board of directors has affirmatively determined that Joseph G. Flanagan, Anita V. Pramoda and Alexander E. Timm each meet the definition of "independent director" for purposes of serving on the audit committee under the Nasdaq rules and the independence standards under Rule 10A-3 of the Exchange Act and the Nasdaq rules. Each member of our audit committee meets the financial literacy requirements of the Nasdaq rules. In addition, our board of directors has determined that Anita V. Pramoda will qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our board of directors will adopt a written charter for the audit committee, which will be available on our principal corporate website at *www.gohealth.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee will be responsible for, among other things:

- identifying individuals qualified to become members of our board of directors, consistent with criteria approved by our board of directors as set forth in our corporate governance guidelines and in accordance with the terms of the Stockholders Agreement;

- annually reviewing the committee structure of the board of directors and recommending to the board of the directors the directors to serve as members of each committee; and

- developing and recommending to our board of directors a set of corporate governance guidelines.

Upon the consummation of the Transactions, our nominating and corporate governance committee will consist of Clinton P. Jones, Rahm Emanuel, Joseph G. Flanagan, Helene D. Gayle and Jeremy W. Gelber, with Rahm Emanuel serving as chair. We intend to avail ourselves of the "controlled company" exception under the Nasdaq rules, which exempts us from the requirement that we have a nominating and corporate governance committee composed entirely of independent directors. Clinton P. Jones and Brandon M. Cruz do not qualify as "independent directors" under the Nasdaq rules. Our board of directors will adopt a written charter for the nominating and corporate governance committee, which will be available on our principal corporate website at *www.gohealth.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

### *Compensation Committee*

Our compensation committee will be responsible for, among other things:

- reviewing and approving, or recommending that the board of directors approve, the compensation of our Chief Executive Officer and other executive officers;

- making recommendations to the board of directors regarding director compensation; and

- reviewing and approving incentive compensation and equity-based plans and arrangements and making grants of cash-based and equity-based awards under such plans.

**Table of Contents**

Upon the consummation of the Transactions, our compensation committee will consist of Brandon M. Cruz, Rahm Emanuel and Jeremy W. Gelber, with Brandon M. Cruz serving as chair. We intend to avail ourselves of the "controlled company" exception under the Nasdaq rules, which exempts us from the requirement that we have a compensation committee composed entirely of independent directors. Clinton P. Jones, Brandon M. Cruz, Jeremy W. Gelber and Miriam A. Tawil do not qualify as "independent directors" under the Nasdaq rules. Our board of directors will adopt a written charter for the compensation committee, which will be available on our principal corporate website at *www.gohealth.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

### Risk Oversight

Our board of directors is responsible for overseeing our risk management process. Our board of directors focuses on our general risk management policies and strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. Our board of directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

### Compensation Committee Interlocks and Insider Participation

Brandon M. Cruz, a member of our compensation committee, is an officer and employee of the Company. Other than Mr. Cruz, no other members of our compensation committee is or has been an officer or employee of the Company. None of our executive officers serves as a member of the board of directors or compensation committee (or other committee performing equivalent functions) of any entity that has one or more executive officers serving on our board of directors or compensation committee.

### Code of Business Conduct and Ethics

Prior to the completion of the Transactions, we will adopt a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code will be posted on our website, *www.gohealth.com*. In addition, we intend to post on our website all disclosures that are required by law or the Nasdaq rules concerning any amendments to, or waivers from, any provision of the code. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

## EXECUTIVE COMPENSATION

This section discusses the material components of the executive compensation program for our executive officers who are named in the "2019 Summary Compensation Table" below. For the year ended December 31, 2019, our "named executive officers" and their positions were as follows:

- Brandon M. Cruz, President (together with Clinton P. Jones, the co-principal executive officer);

- Clinton P. Jones, Chief Executive Officer (together with Brandon M. Cruz, the co-principal executive officer);

- Shane E. Cruz, Chief Technology Officer; and

- James A. Sharman, Chief Operating Officer.

This discussion may contain forward-looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt following the completion of the IPO may differ materially from the currently planned programs summarized in this discussion. As an "emerging growth company" as defined in the JOBS Act, we are not required to include a Compensation Discussion and Analysis section and have elected to comply with the scaled disclosure requirements applicable to emerging growth companies.

### 2019 Summary Compensation Table

The following table sets forth information concerning the compensation of our named executive officers for the year ended December 31, 2019.

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) (2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Brandon M. Cruz President | 2019 | 325,000 | 3,989,833 | 350,000 | 5,893 (3) | 4,670,726 |
| Clinton P. Jones Chief Executive Officer | 2019 | 325,000 | 3,989,833 | 350,000 | 5,893 (3) | 4,670,726 |
| Shane E. Cruz Chief Technology Officer | 2019 | 300,000 | 1,595,933 | 350,000 | 8,657,748 (4) | 10,903,681 |
| James A. Sharman Chief Operating Officer | 2019 | 400,000 | 1,595,933 | 700,000 | 15,136,805 (5) | 17,832,738 |

(1) Amounts reflect the aggregate grant date fair value of profits interests granted during the year ended December 31, 2019 computed in accordance with FASB ASC Topic 718, Compensation—Stock Compensation. See Note 8 of the audited consolidated financial statements included elsewhere in this prospectus for a discussion of the relevant assumptions used in calculating these amounts. The amounts reported in this column reflect the aggregate grant date fair value for the profits interests as determined for financial accounting purposes and do not correspond to the actual economic value that may be received by the named executive officers from these awards. With respect to all performance-vesting awards granted in the year ended December 31, 2019, the value was calculated using a Monte-Carlo simulation model. Under ASC 718, performance-vesting profit units contain market conditions and an implied performance condition, which results in compensation cost being recognized when the performance condition is considered probable of being satisfied. Performance-vesting profit units vest upon the achievement of a contingent exit event that is defined as a transaction in which the ultimate parent disposes of all or substantially all of its investment in the Company. Such an exit event is not considered probable until it consummates.

(2) Amounts reflect annual cash performance-based bonuses earned during the year ended December 31, 2019. For additional information about the annual cash performance-based bonuses, please see the section titled "2019 Bonuses" below.

Table of Contents

(3)    Amount reflects (i) $293 in life and accidental death and dismemberment, or AD&D, insurance premiums; and (ii) $5,600 in matching contributions under the Company's 401(k) plan.

(4)    Amount reflects (i) $270 in life and AD&D insurance premiums; (ii) $5,600 in matching contributions under the Company's 401(k) plan; (iii) a $716,725 distribution payment made to Mr. Cruz in connection with the Centerbridge Acquisition in respect of NVX Holdings phantom stock held by Mr. Cruz at the time of the distribution payment, and which Mr. Cruz continued to hold thereafter, and (iv) a $7,935,153 change in control payment made to Mr. Cruz in exchange for (and as the result of a modification of) his Norvax, LLC Class C Units in connection with the Centerbridge Acquisition.

(5)    Amount reflects (i) $293 in life and AD&D insurance premiums and (ii) a $15,136,512 change in control payment made to Mr. Sharman in exchange for (and as the result of a modification of) his Norvax, LLC Class C Units in connection with the Centerbridge Acquisition.

**2019 Salaries**

The named executive officers receive a base salary to compensate them for services rendered to the Company. The base salary payable to each named executive officer is intended to provide a fixed component of compensation reflecting the executive's skill set, experience, role and responsibilities. Base salaries were not changed for the year ended December 31, 2019.

In connection with this offering, we expect that our executive compensation program will evolve to reflect our status as a newly publicly-traded company, while still supporting our overall business and compensation objectives. In connection with this offering, management has retained Pearl Meyer, an independent executive compensation consultant, to help advise on our post-offering executive compensation program.

**2019 Bonuses**

The Company provides annual incentive cash bonuses, which we refer to as "Annual Bonuses," to its named executive officers under its 2019 Executive Compensation and Bonus Plan, which we refer to as the "Annual Bonus Plan." Under the Annual Bonus Plan, Annual Bonuses are determined based on achievement of Company revenue and EBITDA targets. Company targets are generally established by the board of directors in its discretion during the first quarter of the fiscal year.

Annual Bonuses are generally paid after the end of the fiscal year in which they were earned, with any payments occurring prior to the completion of our annual audit reconciled after the completion of the annual audit. In the event Company revenue or EBITDA falls below 80% of the pre-established target in any given year, no Annual Bonus is paid in respect of that target. For the fiscal year ended December 31, 2019, 60% of each named executive officer's Annual Bonus was based on the Company's EBITDA performance and 40% of each named executive officer's Annual Bonus was based on the Company's revenue performance.

Annual Bonus amounts are based on individualized target amounts for the applicable year, with ultimate payouts ranging from 20% to 200% of these individualized targets. For the fiscal year ended December 31, 2019, the target Annual Bonus amounts for Brandon M. Cruz, Clinton P. Jones, and Shane E. Cruz were $175,000 and the target Annual Bonus amount for James A. Sharman was $350,000. For the fiscal year ended December 31, 2019, Annual Bonuses were paid out at 200% of target, resulting in Annual Bonuses of $350,000 each for Brandon M. Cruz, Clinton P. Jones, and Shane E. Cruz and $700,000 for James A. Sharman.

**Share-Based Compensation**

Our named executive officers currently hold profits interests in Blizzard Management Feeder, LLC. We refer to these profits interests as "Incentive Units." Specifically, in the fiscal year ended December 31, 2019, Brandon M. Cruz and Clinton P. Jones were each granted 12,239,764 Incentive Units and Shane E. Cruz and James A. Sharman were each granted 4,895,906 Incentive Units, as set forth below. The Incentive Units are divided approximately one-third and two-thirds between Service Units, which generally vest in equal annual installments over five years, and Performance Units, which generally vest subject to satisfaction of performance-vesting targets, respectively.

165

Table of Contents

In connection with this offering, we intend to amend the agreements pursuant to which the Incentive Units were granted to our executive officers to provide that satisfaction of the performance-vesting targets will be measured against the deemed return on investment to Centerbridge based on the initial public offering price of this offering, as adjusted to account for Centerbridge liabilities, and that the Performance Units will vest upon the effectiveness of this offering to the extent such performance-vesting targets have been satisfied. The amendment will provide that one-third (1/3) of the vested Performance Units, if any, will be subject to lock-up terms with similar restrictions to the lock-up agreement described under "Shares Eligible for Future Sale—Lock-Up Agreements," which terms are currently contemplated to end 180 days after the effective date of this prospectus, and the remaining two-thirds (2/3) of the vested Performance Units, if any, will be subject to lock-up terms with similar restrictions to the lock-up agreement described under "Shares Eligible for Future Sale—Lock-Up Agreements," but which terms will end eighteen (18) months after the consummation of this offering. These amendments, as well as an amendment to Brandon Cruz's agreement, dated as of April 16, 2020, also provide for accelerated vesting of the Service Units upon an executive's termination of employment by the Company without Cause (as such term is defined in the Incentive Unit plan document) or by the executive with Good Reason (to the extent such term is defined in the named executive officer's services agreement with the Company, which agreements are described under the section titled "—Executive Compensation Arrangements" below); provided that Shane Cruz will only be entitled to such acceleration of vesting if such termination of his employment occurs within the twelve (12) month period beginning on the date of the consummation of this offering.

Further, in connection with this offering, we intend to exchange each Incentive Unit for common units of Blizzard Management Feeder, LLC, which we refer to as "Management Common Units," on a "value-for-value" basis based on the fair market value of the Incentive Units at the time of the offering and the common stock price in the offering. Following this conversion, the Management Common Units which are Service Units will be subject to the same vesting conditions as well as all other terms and conditions applicable to the Incentive Units which are Service Units under the existing Incentive Unit award agreements, as amended. Following this conversion, the Management Common Units which are Performance Units will be subject to the amended vesting conditions described above and any Management Common Units which are Performance Units that do not vest according to the amended vesting conditions described above in connection with this offering will be forfeited for no consideration. For additional information about the profits units to which the Incentive Units correspond, please see the section titled "—Parent Unit Plan" below.

Under the documentation of the Incentive Units in effect as of December 31, 2019, the vesting of all Service Units is generally subject to acceleration upon the occurrence of certain corporate transactions or the holder's death or disability, and a pro-rata portion of the Service Units are generally subject to acceleration upon the holder's termination of employment by the Company without Cause (as such term is defined in the Incentive Unit plan document) or by the holder with Good Reason (to the extent such term is defined in the named executive officer's services agreement with the Company, which agreements are described under the section titled "—Executive Compensation Arrangements" below), and the vesting of the Performance Units is based on achieving specified multiples of invested capital by Centerbridge, subject to the named executive officer's continuous employment through the applicable vesting date. Additionally, in the event a named executive officer is terminated without Cause or as a result of death or disability or resigns for Good Reason, and any event occurs during the six-month period following the date of such termination that would have otherwise caused any unvested Incentive Units to become vested if the named executive officer had remained employed through the date of such event, then such unvested Incentive Units that would have become vested in connection with such event shall vest as though the named executive officer had remained employed during such period. The Compensation Committee of GoHealth Holdings, LLC, as the administrator of the Incentive Unit plan, has the discretion to accelerate the vesting of any Incentive Units, all Incentive Units, or any class of Incentive Units at any time and from time to time.

The Incentive Unit plan document assigns to "Cause" the definition in the applicable participant's employment or services agreement with the Company, or, in the absence of such an employment or services agreement, the meaning set forth in the Company's operating agreement, which defines "Cause" as (i)(A) the willful failure or

166

refusal to perform material responsibilities that have been reasonably requested by the board of directors; (B) dishonesty to the board of directors with respect to any material matter; or (C) misappropriation of funds or property of the Company or any of its subsidiaries or affiliates other than the occasional, customary and *de minimis* use of Company property for personal purposes; provided, in the case of each of clause (i)(A)-(C), that, where the Company has determined reasonably and in good faith that such act can reasonably be cured, the Company has provided 30 days' prior written notice of such conduct and such conduct is not cured within such 30 day period; (ii) the arrest or charging for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud; (iii) the engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its subsidiaries' written code of ethics or company policies, and which is materially detrimental to the Company and its subsidiaries (including material reputational harm); or (iv) a breach of a non-competition covenant set forth in an employment agreement or restrictive covenants agreement.

The following table sets forth the Incentive Units granted to our named executive officers in the fiscal year ended December 31, 2019.

| Named Executive Officer | 2019 Incentive Units Granted |
|---|---|
| Brandon M. Cruz | 12,239,764 |
| Clinton P. Jones | 12,239,764 |
| Shane E. Cruz | 4,895,906 |
| James A. Sharman | 4,895,906 |

We intend to adopt a 2020 Incentive Award Plan in order to facilitate the grant of cash and equity incentives to directors, employees (including our named executive officers) and consultants of our company and certain of its affiliates and to enable our company and certain of its affiliates to obtain and retain services of these individuals, which we believe is essential to our long-term success. We expect that the 2020 Incentive Award Plan will be effective prior to the effectiveness of this offering. For additional information about the 2020 Incentive Award Plan, please see the section titled "—New Incentive Plans" below.

**Other Elements of Compensation**

*Retirement Plans*

We maintain a 401(k) retirement savings plan for our employees, including our named executive officers, who satisfy certain eligibility requirements. The Internal Revenue Code of 1986, as amended (the "Code"), allows eligible employees to defer a portion of their compensation, within prescribed limits, on a pre-tax basis through contributions to the 401(k) plan. Currently, we match 50% of contributions made by participants in the 401(k) plan up to 4% of participant compensation (for a maximum match of 2% of participant compensation), and these matching contributions vest in equal annual installments over four years. We also may make non-elective contributions to the 401(k) plan, which, if made, vest 20% after two years and 20% annually thereafter. We believe that providing a vehicle for tax-deferred retirement savings though our 401(k) plan, and making matching and non-elective contributions, adds to the overall desirability of our executive compensation package and further incentivizes our employees, including our named executive officers, in accordance with our compensation policies.

*Employee Benefits and Perquisites*

*Health/Welfare Plans.* All of our full-time employees, including our named executive officers, are eligible to participate in our health and welfare plans, including:

- medical, dental and vision benefits;

- medical and dependent care flexible spending accounts;

- short-term and long-term disability insurance;

- life insurance;

- commuter benefits; and

- an employee assistance program.

We believe the benefits described above are necessary and appropriate to provide a competitive compensation package to our employees, including our named executive officers. Brandon Cruz and Clinton Jones are also entitled to reimbursement for up to 100 hours of personal private airplane use per year, so long as such reimbursed costs are commercially reasonable and do not include hangar costs, catering, insurance, or personal property taxes. Neither Brandon Cruz nor Clinton Jones is entitled to any tax gross-up payment in connection with the reimbursement of these expenses. Neither Brandon Cruz nor Clinton Jones received any such airplane reimbursements for the year ended December 31, 2019 and, during the year ended December 31, 2019, we did not provide any other perquisites to our employees.

### *No Tax Gross-Ups*

We do not make gross-up payments to cover our named executive officers' personal income taxes that may pertain to any of the compensation or benefits paid or provided by our Company.

### Outstanding Equity Awards at 2019 Fiscal Year-End

The following table summarizes the number of Incentive Units underlying outstanding equity incentive plan awards for each named executive officer as of December 31, 2019.

| | | Incentive Unit Awards | | | |
| | | | | | |
| Name | Grant Date | Number of Service Incentive Units That Have Not Vested (#) (1) | Market Value of Service Incentive Units That Have Not Vested ($) (2) | Number of Unearned Performance Incentive Units That Have Not Vested (#) (3) | Market Value of Unearned Performance Incentive Units That Have Not Vested ($) (2) |
|---|---|---|---|---|---|
| Brandon M. Cruz | October 3, 2019 | 4,039,122 | 1,446,814 | 8,200,642 | 2,543,019 |
| Clinton P. Jones | October 3, 2019 | 4,039,122 | 1,446,814 | 8,200,642 | 2,543,019 |
| Shane E. Cruz | October 3, 2019 | 1,615,649 | 578,725 | 3,280,257 | 1,017,208 |
| James A. Sharman | October 3, 2019 | 1,615,649 | 578,725 | 3,280,257 | 1,017,208 |

(1) Represents Service Units that vest in five equal annual installments on each of the first through fifth anniversaries of September 13, 2019, subject to the named executive officer's continuous employment through the applicable vesting date. The vesting of all Service Units is generally subject to acceleration upon the occurrence of certain corporate transactions or the holder's death or disability, and a pro-rata portion of the Service Units are generally subject to acceleration upon the holder's termination of employment by the Company without Cause (as such term is defined in the Incentive Unit plan document) or by the holder with Good Reason (as such term is defined in the applicable participant's services agreement with the Company). As described above, pursuant to the amendments entered into in connection with this offering, all unvested Service Units will be eligible to vest upon a termination without Cause or for Good Reason following this offering.

(2) The profits interests are not publicly traded and, therefore, there was no ascertainable public market value for the profits interests as of December 31, 2019. Therefore, the profits interests have been valued on the basis set forth in Footnote 1 of the 2019 Summary Compensation Table, above.

(3) Represents Performance Units that vest subject to satisfaction of performance-vesting targets. As described above, pursuant to the amendments entered into in connection with this offering, the performance-vesting targets will be measured, and the Performance Units will be eligible to vest to the extent they are deemed to be achieved in connection with this offering.

168

**Executive Compensation Arrangements**

Our named executive officers' employment and non-compete agreements in effect as of December 31, 2019 are described below. Additionally, in connection with this offering, we intend to enter into new employment agreements with each of our named executive officers, the material terms of which are described below in the section titled "—New Employment Agreements and Incentive Plans."

*Brandon M. Cruz Non-Compete Agreement*

Mr. Cruz entered into a Non-Disclosure, Invention Assignment, Non-Competition and Non-Solicitation Agreement with the Company, which we refer to as a "Non-Competition Agreement," prior to commencing employment, under which he is subject to a covenant not to compete with the Company and a covenant not to solicit employees or customers of the Company, in each case for two years after the termination of Mr. Cruz's employment with the Company. The Non-Competition Agreement also includes an invention assignment covenant and a covenant not to disclose any confidential information of the Company or any of its affiliates at all times following a termination of Mr. Cruz's employment for any reason.

Mr. Cruz's Incentive Units are subject to accelerated vesting as described in the section titled "—Share-based Compensation," above. Mr. Cruz was not subject to any compensation arrangement entitling him to severance benefits upon a termination of employment or change in control occurring as of December 31, 2019.

*Clinton P. Jones Non-Compete Agreement*

Mr. Jones entered into a Non-Competition Agreement with the Company prior to commencing employment, under which he is subject to a covenant not to compete with the Company and a covenant not to solicit employees or customers of the Company, in each case for two years after the termination of Mr. Jones' employment with the Company. The Non-Competition Agreement also includes an invention assignment covenant and a covenant not to disclose any confidential information of the Company or any of its affiliates at all times following a termination of Mr. Jones' employment for any reason.

Mr. Jones' Incentive Units are subject to accelerated vesting as described in the section titled "—Share-based Compensation," above. Mr. Jones was not subject to any compensation arrangement entitling him to severance benefits upon a termination of employment or change in control occurring as of December 31, 2019.

*Shane E. Cruz Offer Letter*

On June 7, 2012, Mr. Cruz commenced employment with the Company under an employment offer letter entered into in connection with his hiring as the Company's Vice President of Technology, as amended on April 3, 2018 and which continued to govern his employment as the Company's Chief Technology Officer for the year ended December 31, 2019. Mr. Cruz's offer letter provides for a base salary, eligibility to participate in the Annual Bonus Plan, and participation in the Company's standard benefit plans. Mr. Cruz's offer letter has no fixed term.

Pursuant to the terms of his offer letter, if Mr. Cruz's employment had been terminated by the Company without cause, Mr. Cruz would have been entitled to receive from the Company four months' severance pay based on his base salary on the date of such termination.

Pursuant to the terms of his offer letter, Mr. Cruz also entered into a Non-Competition Agreement with the Company prior to commencing employment, under which he is subject to a covenant not to compete with the Company and a covenant not to solicit employees or customers of the Company, in each case for two years after the termination of Mr. Cruz's employment with the Company. The Non-Competition Agreement also includes an invention assignment covenant and a covenant not to disclose any confidential information of the Company or any of its affiliates at all times following a termination of Mr. Cruz's employment for any reason.

169

**Table of Contents**

Mr. Cruz's Incentive Units are subject to accelerated vesting as described in the section titled "—Share-based Compensation," above.

### *James A. Sharman Offer Letter*

On February 5, 2018, Mr. Sharman commenced employment with the Company under an employment offer letter dated December 21, 2017 entered into in connection with his hiring as the Company's Chief Operating Officer, which continued to govern his employment for the year ended December 31, 2019. Mr. Sharman's offer letter provides for a base salary, eligibility to participate in the Annual Bonus Plan, eligibility to receive a profits interest grant, and participation in the Company's standard benefit plans. Mr. Sharman's offer letter has no fixed term.

Pursuant to the terms of his offer letter, if Mr. Sharman's employment had been terminated by the Company without Cause or by Mr. Sharman for Good Reason, Mr. Sharman would have been entitled to receive from the Company (i) six months' severance pay based on his base salary rate on the date of such termination, to be paid in accordance with normal payroll practices beginning on the first payroll date after the 60th day following such termination and (ii) a pro-rata Annual Bonus based on the number of days during the calendar year in which Mr. Sharman is employed with the Company, in each case subject to Mr. Sharman's execution of a release of claims in favor of the Company and his compliance with the covenants and restrictions in his Non-Compete Agreement, described below. Additionally, upon Mr. Sharman's death or disability, Mr. Sharman would have been entitled to receive from the Company the pro-rated Annual Bonus described above.

Pursuant to the terms of his offer letter, Mr. Sharman also entered into a Non-Competition Agreement with the Company prior to commencing employment, under which he is subject to a covenant not to compete with the Company and a covenant not to solicit employees or customers of the Company, each for two years after the termination of Mr. Sharman's employment with the Company. The Non-Competition Agreement also includes an invention assignment covenant and a covenant to not disclose any confidential information of the Company or any of its affiliates at all times following a termination of Mr. Sharman's employment for any reason.

Mr. Sharman's offer letter defines "Cause" as (i) Mr. Sharman's gross negligence in the performance of his duties and responsibilities to the Company or any of its affiliates, or refusal or failure to follow or carry out any reasonable, written direction of the board of directors of the Company; (ii) a material breach by Mr. Sharman of any provision of his offer letter or Non-Competition Agreement that, if capable of cure, is not cured within 30 days of written notice of such breach by the Company to Mr. Sharman, provided, that the Company will not have to provide more than one notice and opportunity to cure with respect to any multiple, repeated, related or substantially similar events or circumstances; (iii) the commission of fraud, embezzlement, theft or other material dishonesty by Mr. Sharman; (iv) the commission by Mr. Sharman of, or plea by the executive of *nolo contendere* to, any felony or any other crime involving dishonesty or moral turpitude; or (v) any other conduct by Mr. Sharman that involves a material breach of fiduciary obligations on his part or otherwise could reasonably be expected to have a significant adverse effect upon the business, interests or reputation of the Company or any of its affiliates.

Mr. Sharman's offer letter defines, "Good Reason" as, without Mr. Sharman's written consent, (i) a material reduction in Mr. Sharman's salary which is not cured within 90 days following the Company's receipt of written notice thereof from Mr. Sharman; (ii) a change in Mr. Sharman's principal place of employment to outside of a 50 mile radius of Chicago, Illinois; (iii) a material adverse change in Mr. Sharman's title, authority, duties, or responsibilities which is not cured within 90 days following the Company's receipt of written notice thereof from Mr. Sharman; or (iv) any breach by the Company of any other material provision of Mr. Sharman's offer letter, which breach is not cured within 30 days following Company's receipt of written notice thereof from Mr. Sharman.

Mr. Sharman's Incentive Units are subject to accelerated vesting as described in the section titled "—Share-based Compensation," above.

170

**Table of Contents**

**2019 Director Compensation**

None of our non-employee directors received any compensation for his or her service as a non-employee director during the year ended December 31, 2019 and none of our non-employee directors held Incentive Units (vested or unvested) as of December 31, 2019.

Non-employee directors Rahm Emanuel, Alexander E. Timm and Joseph G. Flanagan currently hold profits interests in GoHealth Holdings, LLC, which were granted to them on February 17, 2020. We refer to these profits interests as "Director Units." The Director Units generally vest in equal annual installments over five years, subject to the director's continuous service with us through each applicable vesting date.

In connection with this offering, we have approved and intend to implement a compensation policy that, effective upon the closing of this offering, will be applicable to all of our non-employee directors other than any non-employee director who is an employee of Centerbridge. Under this compensation policy, each such non-employee director will receive an annual cash retainer of $250,000. In addition, each such non-employee director who does not serve as a chairperson or co-chairperson of the board of directors or a committee of the board of directors or as the lead director of the board of directors (each, a "Non-Chair Director") will receive an annual restricted stock unit award with a grant date value of $150,000 and each such non-employee director who serves as a chairperson or co-chairperson of the board of directors or a committee of the board of directors or as the lead director of the board of directors (each, a "Chair Director") will receive an annual restricted stock unit award with a grant date value of $250,000, with all such restricted stock unit awards vesting in four equal installments on each of the first four quarterly anniversaries following the grant date of the award (or immediately prior to the date of the annual shareholder meeting immediately following the date of grant, if sooner), subject to such non-employee director continuing in service through such date (and any such non-employee director who commences service on a date other than the date of the annual shareholder meeting will receive a pro-rata restricted stock unit award for such initial year of service). In addition, in connection with any initial public offering (including this offering), each such Non-Chair Director will receive a restricted stock unit award with a grant date value of $150,000 and each such Chair Director will receive a restricted stock unit award with a grant date value of $250,000, with all such restricted stock unit awards vesting in four equal installments on each of the first four quarterly anniversaries following the grant date of the award. The vesting of all restricted stock unit awards under the policy will accelerate and vest in full upon a change in control (as defined in the 2020 Plan, described below). In addition, each non-employee director will be reimbursed for out-of-pocket expenses in connection with his or her services.

Additionally, in connection with this offering, all outstanding Director Units will be amended to provide that, in the event a director is required to leave the board of directors due to a conflict of interest or similar constraint involving public service, any unvested Director Units will accelerate and vest in full in connection with the director's termination of service (provided that, if any such acceleration occurs prior to the eighteen (18) month anniversary of the consummation of this offering, then such accelerated Director Units will be subject to lock-up terms with similar restrictions to the lock-up agreement described under "Shares Eligible for Future Sale—Lock-Up Agreements," but which terms will end eighteen (18) months after the consummation of this offering).

Further, in connection with this offering, we intend to exchange each Director Unit for common units of GoHealth Holdings, LLC, which we refer to as "Director Common Units," on a "value-for-value" basis based on the fair market value of the Director Units at the time of the offering and the common stock price in the offering. Following this conversion, the Director Common Units will be subject to the same vesting conditions as well as all other terms and conditions applicable to the Director Units under the existing Director Unit award agreements, as amended.

Under the documentation of the Director Units in effect as of February 17, 2020, the vesting of all Director Units is generally subject to acceleration upon the occurrence of certain corporate transactions or the holder's death or disability, and a pro-rata portion of the Director Units are generally subject to acceleration upon the holder's

termination of service by the Company without Cause (as such term is defined in the Parent Unit Plan document). The Compensation Committee of GoHealth Holdings, LLC, as the administrator of the Parent Unit Plan (as described below), has the discretion to accelerate the vesting of any or all Director Units at any time and from time to time.

The Parent Unit Plan document assigns to "Cause" the definition in the applicable participant's employment or services agreement with the Company, or, in the absence of such an employment or services agreement, the meaning set forth in the Company's operating agreement, which defines "Cause" as (i)(A) the willful failure or refusal to perform material responsibilities that have been reasonably requested by the board of directors; (B) dishonesty to the board of directors with respect to any material matter; or (C) misappropriation of funds or property of the Company or any of its subsidiaries or affiliates other than the occasional, customary and *de minimis* use of Company property for personal purposes; provided, in the case of each of clause (i) (A)-(C), that, where the Company has determined reasonably and in good faith that such act can reasonably be cured, the Company has provided 30 days' prior written notice of such conduct and such conduct is not cured within such 30 day period; (ii) the arrest or charging for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud; (iii) the engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its subsidiaries' written code of ethics or company policies, and which is materially detrimental to the Company and its subsidiaries (including material reputational harm); or (iv) a breach of a non-competition covenant set forth in an employment agreement or restrictive covenants agreement.

**Parent Unit Plan**

The Incentive Units held by our named executive officers correspond to profits units issued under the GoHealth Holdings, LLC Profits Unit Plan, which we refer to as the "Parent Unit Plan," to Blizzard Management Feeder, LLC. We refer to such units issued under the Parent Unit Plan as "Parent Units." Parent Units and corresponding Incentive Units are issued under the same grant agreements, are subject to the same vesting conditions, and any changes to Parent Units flow through to the corresponding Incentive Units. Under the Parent Unit Plan, any acceleration of Parent Units upon a termination of employment is governed by the applicable award agreement. Additionally, GoHealth Holdings, LLC may make modifications to the Parent Unit Plan and any outstanding Parent Units as it determines to be necessary or appropriate in connection with an initial public offering. In connection with this offering, GoHealth Holdings, LLC intends to use its discretion to convert each outstanding Parent Unit into a common unit of GoHealth Holdings, LLC, which will cause a corresponding conversion of all outstanding Incentive Units into common units of Blizzard Management Feeder, LLC, as described in the section titled "—Share-Based Compensation" above.

**New Employment Agreements and Incentive Plans**

*New Employment Agreements*

In connection with this offering, we have entered into employment agreements with each of our named executive officers, which we refer to as "New Employment Agreements." The New Employment Agreements for Clinton P. Jones, James A. Sharman, and Shane E. Cruz will become effective as of the date of this offering and the New Employment Agreement for Brandon M. Cruz became effective on April 16, 2020 with an amendment and restatement of such agreement intended to be effective as of the date of this offering. The material terms of the New Employment Agreements are summarized below:

*Employment Term and Position*

The term of employment for each of Clinton P. Jones, James A. Sharman, and Shane E. Cruz is three years from the date of this offering and the term of employment for Brandon M. Cruz is four years from the effective date of his agreement, each subject to automatic one-year extensions provided that neither party provides written notice

172

of non-extension within ninety days of the expiration of the then-current term. During their respective terms of employment, Clinton Jones will serve as Chief Executive Officer of the Company and GoHealth Holdings, LLC (although his role may be changed by mutual agreement of the parties after expiration of the initial employment term), Brandon M. Cruz will serve as Chief Strategy Officer and Special Advisor to the Executive Team of the Company and GoHealth Holdings, LLC, James A. Sharman will serve as President of the Company and GoHealth Holdings, LLC (although his role may be changed by mutual agreement of the parties after the first twelve (12) months of the employment term), and Shane E. Cruz will serve as Chief Operating Officer of the Company and GoHealth Holdings, LLC.

*Base Salary and Annual Bonus*

Pursuant to their New Employment Agreements, Clinton P. Jones and Brandon M. Cruz will each be entitled to base salaries of $325,000, James A. Sharman will be entitled to a base salary of $400,000 and Shane E. Cruz will be entitled to a base salary of $350,000.

In addition, each of the named executive officers will be eligible to receive annual performance-based cash bonuses upon the attainment of individual and Company performance goals established by our board of directors in its sole discretion. Under his New Employment Agreement, Brandon M. Cruz's annual performance-based cash bonus for calendar year 2020 will have a target amount equal to $175,000 and such annual bonus will be no less than the annual bonus paid to the Chief Executive Officer each calendar year during the employment term.

The New Employment Agreements for Brandon M. Cruz and Clinton P. Jones also provide that they will continue to be entitled to reimbursement for up to 100 hours of personal private airplane use per year, so long as such reimbursed costs are commercially reasonable and do not include hangar costs, catering, insurance, or personal property taxes. Neither Brandon M. Cruz nor Clinton P. Jones is entitled to any tax gross-up payment in connection with the reimbursement of these expenses.

*Severance*

Brandon M. Cruz's New Employment Agreement provides for severance upon the Company's non-extension of his term or upon his resignation for Good Reason, as defined therein. Such severance will consist of (a) continued base salary through the second anniversary of the termination of his employment, (b) any earned but unpaid annual bonus, and (c) two times his pro-rated annual bonus for the year in which the termination of employment occurs. The Company will also continue to pay the employer portion of applicable insurance premium payments for Brandon M. Cruz's COBRA coverage under the Company's group health plans for twelve months following his termination of employment for any reason.

Clinton P. Jones' New Employment Agreement provides for severance upon the Company's termination of his employment without Cause or upon his resignation for Good Reason, each as defined therein. Such severance will consist of (a) continued base salary through the second anniversary of the termination of his employment, (b) any earned but unpaid annual bonus, (c) two times his pro-rated annual bonus for the year in which the termination of employment occurs, and (d) continued payment of the employer portion of his applicable insurance premium payments for COBRA coverage under the Company's group health plans for two years.

James A. Sharman's and Shane E. Cruz's New Employment Agreements provide for severance upon a termination of employment by the Company without Cause or upon a resignation by the named executive officer with Good Reason, each as defined therein. If such termination of employment does not occur during the 12-month period following a Change of Control (as defined in the 2020 Plan) of the Company, such severance will consist of (a) continued base salary through the first anniversary of the termination of employment, (b) any earned but unpaid annual bonus, (c) a pro-rated annual bonus for the year in which the termination of employment occurs, and (d) in the case of Shane E. Cruz, continued payment of the employer portion of his applicable insurance premium payments for COBRA coverage under the Company's group health plans for one year and, in the case of James A.

173

Table of Contents

Sharman, continued participation in the Company's group health plan for one year under the same terms and conditions that existed for him at the time of his termination of employment and, at the end of such coverage and to the extent permitted by the Company's group health plan and applicable law, continued COBRA coverage under the Company's group health plans until he reaches age 65, with such COBRA premiums paid at his own expense. In the event James A. Sharman or Shane E. Cruz incurs such a termination of employment within the 12 month period beginning on a Change of Control of the Company, these severance amounts will increase to (a) continued base salary through the second anniversary of the termination of employment, (b) any earned but unpaid annual bonus, (c) two times a pro-rated annual bonus for the year in which the termination of employment occurs, and (d) for Shane E. Cruz, two years of continued payments of the employer portion of COBRA premiums and, for James A. Sharman two years of continued group health plan participation followed, to the extent permitted by the Company's group health plan and applicable law, by COBRA coverage under the Company's group health plans at his own expense until he reaches age 65.

In each case, the severance amounts provided under the New Employment Agreements are subject to the execution and non-revocation of a waiver and release of claims by the named executive officer in question.

Each of the named executive officers has entered a restrictive covenants agreement in connection with his New Employment Agreement, under which each named executive officer is subject to perpetual confidentiality and non-disparagement covenants and non-competition and non-solicitation covenants. The restriction period of the non-competition and non-solicitation covenants is (a) two years for Brandon M. Cruz and Clinton P. Jones in all cases and for James A. Sharman and Shane E. Cruz where their termination of employment occurs within the 12 month period beginning on a Change of Control of the Company and (b) one year for James A. Sharman and Shane E. Cruz in all other cases.

### 2020 Incentive Award Plan

We have adopted and our shareholders have approved the 2020 Incentive Award Plan, or the 2020 Plan, under which we may grant cash and equity incentive awards to eligible employees and other service providers in order to attract, motivate and retain the talent for which we compete. The material terms of the 2020 Plan are summarized below. The 2020 Plan will be filed as an exhibit to the registration statement of which this prospectus is a part.

*Eligibility and Administration.* Our employees, consultants and directors, and the employees and consultants of our parents and affiliates, will be eligible to receive awards under the 2020 Plan. Following our initial public offering, the 2020 Plan will be administered by our board of directors with respect to awards to non-employee directors and by our compensation committee with respect to other participants, each of which may delegate its duties and responsibilities to committees of our directors and/or officers (referred to collectively as the "plan administrator" below), subject to certain limitations that may be imposed under the 2020 Plan, Section 16 of the Exchange Act, and/or stock exchange rules, as applicable. The plan administrator will have the authority to make all determinations and interpretations under, prescribe all forms for use with, and adopt rules for the administration of, the 2020 Plan, subject to its express terms and conditions. The plan administrator will also set the terms and conditions of all awards under the 2020 Plan, including any vesting and vesting acceleration conditions.

*Limitation on Awards and Shares Available.* A total of 6,465,359 shares of our Class A common stock will initially be available for issuance under the 2020 Plan. The number of shares initially available for issuance will be increased by an annual increase on January 1 of each calendar year beginning in 2021 and ending in and including 2030, equal to the lesser of (A) 5% of the shares of our Class A common stock outstanding on the final day of the immediately preceding calendar year and (B) a smaller number of shares as determined by our board of directors. No more than 6,465,359 shares of Class A common stock may be issued under the 2020 Plan upon the exercise of incentive stock options. Shares available under the 2020 Plan may be authorized but unissued shares, shares purchased on the open market or treasury shares.

174

**Table of Contents**

If any shares subject to an award under the 2020 Plan are forfeited, expire, are converted to shares of another entity in connection with certain corporate event, are surrendered pursuant to an "exchange program" (as described below) or if such award is settled for cash, any shares subject to such award may, to the extent of such forfeiture, expiration or cash settlement, be used again for new grants under the 2020 Plan. However, the following shares may not be used again for grant under the 2020 Plan: (i) shares tendered or withheld to satisfy the exercise price or tax withholding obligations associated with an award; (ii) shares subject to a stock appreciation right, or SAR, or other stock-settled award that are not issued in connection with the stock settlement of the SAR or other stock-settled award on its exercise; and (iii) shares purchased on the open market with the cash proceeds from the exercise of options.

Awards granted under the 2020 Plan upon the assumption of, or in substitution for, outstanding equity awards previously granted by an entity in connection with a corporate transaction, such as a merger, combination, consolidation or acquisition of property or stock, will not reduce the shares available for grant under the 2020 Plan.

The 2020 Plan will provide that the sum of any cash compensation and the aggregate grant date fair value (determined as of the date of the grant under ASC 718 or any successor thereto) of all awards granted to a non-employee director pursuant to the 2020 Plan as compensation for services as a non-employee director during any calendar year shall not exceed the amount equal to $500,000 (with such amount increased to $750,000 for the calendar year of a non-employee director's initial service). The plan administrator may make exceptions to this limit for individual non-employee directors in extraordinary circumstances, as the plan administrator may determine in its discretion, provided that the non-employee director receiving such additional compensation may not participate in the decision to award such compensation or in other contemporaneous compensation decisions involving non-employee directors.

*Awards*. The 2020 Plan provides for the grant of stock options, including incentive stock options, or ISOs, and nonqualified stock options, or NSOs, restricted stock, dividend equivalents, restricted stock units, or RSUs, other stock-based awards, SARs, and cash awards. No determination has been made as to the types or amounts of awards that will be granted to specific individuals pursuant to the 2020 Plan. Certain awards under the 2020 Plan may constitute or provide for a deferral of compensation, subject to Section 409A of the Code, which may impose additional requirements on the terms and conditions of such awards. All awards under the 2020 Plan will be set forth in award agreements, which will detail all terms and conditions of the awards, including any applicable vesting and payment terms and post-termination exercise limitations. Awards other than cash awards generally will be settled in shares of our Class A common stock, but the plan administrator may provide for cash settlement of any award. A brief description of each award type follows.

- *Stock Options*. Stock options provide for the purchase of shares of our Class A common stock in the future at an exercise price set on the grant date. ISOs, by contrast to NSOs, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Code are satisfied. The exercise price of a stock option may not be less than 100% of the fair market value of the underlying share on the date of grant (or 110% in the case of ISOs granted to certain significant stockholders), except with respect to certain substitute options granted in connection with a corporate transaction. The term of a stock option may not be longer than ten years (or five years in the case of ISOs granted to certain significant stockholders). Vesting conditions determined by the plan administrator may apply to stock options and may include continued service, performance and/or other conditions.

- *SARs*. SARs entitle their holder, upon exercise, to receive from us an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The exercise price of a SAR may not be less than 100% of the fair market value of the underlying share on the date of grant (except with respect to certain substitute SARs granted in connection with a corporate transaction) and the term of a SAR may not be longer than ten years. Vesting conditions determined by the plan administrator may apply to SARs and may include continued service, performance and/or other conditions.

175

Table of Contents

- *Restricted Stock and RSUs.* Restricted stock is an award of nontransferable shares of our Class A common stock that remain forfeitable unless and until specified conditions are met, and which may be subject to a purchase price. RSUs are contractual promises to deliver shares of our Class A common stock in the future, which may also remain forfeitable unless and until specified conditions are met. Delivery of the shares underlying RSUs may be deferred under the terms of the award or at the election of the participant, if the plan administrator permits such a deferral. Conditions applicable to restricted stock and RSUs may be based on continuing service, the attainment of performance goals and/or such other conditions as the plan administrator may determine. Holders of restricted stock generally have all of the rights of a stockholder upon the issuance of restricted stock, but dividends paid with respect to a share of restricted stock prior to such share vesting shall be paid to the holder only to the extent such share subsequently vests. RSU holders have no rights of a stockholder with respect to shares subject to RSUs unless and until such shares are delivered in settlement of the RSUs. In the sole discretion of the plan administrator, RSUs may also be settled for an amount of cash equal to the fair market value of the shares underlying the RSU on the RSU's maturity date, or a combination of cash and shares.

- *Other Stock or Cash-Based Awards.* Other stock or cash-based awards are awards of cash, fully vested shares of our Class A common stock and other awards denominated in, linked to, or derived from shares of our common stock or value metrics related to our shares. Other stock or cash-based awards may be granted to participants and may also be available as a payment form in the settlement of other awards, as standalone payments and as payment in lieu of base salary, bonus, fees or other cash compensation otherwise payable to any individual who is eligible to receive awards. Conditions applicable to other stock or cash-based awards may be based on continuing service, the attainment of performance goals and/or such other conditions as the plan administrator may determine.

- *Dividend Equivalents.* Dividend equivalents represent the right to receive the equivalent value of dividends paid on shares of our Class A common stock and may be granted alone or in tandem with awards other than stock options or SARs. Dividend equivalents are credited as of dividend record dates during the period between the date an award is granted and the date such award terminates or expires, as determined by the plan administrator. Dividend equivalents paid with respect to an award that are based on dividends paid prior to the vesting of such award shall only be paid out to the extent the vesting conditions of the award are satisfied and the award vests.

*Performance Awards.* Performance awards include any of the foregoing awards that are granted subject to vesting and/or payment based on the attainment of specified performance goals or other criteria the plan administrator may determine, which may or may not be objectively determinable. Performance criteria upon which performance goals are established by the plan administrator may include but are not limited to: (i) net earnings or losses (either before or after one or more of the following: (A) interest, (B) taxes, (C) depreciation, (D) amortization and (E) non-cash equity-based compensation expense); (ii) gross or net sales or revenue or sales or revenue growth; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit (either before or after taxes); (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital (or invested capital) and cost of capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs, reductions in costs and cost control measures; (xiv) expenses; (xv) working capital; (xvi) earnings or loss per share; (xvii) adjusted earnings or loss per share; (xviii) price per share or dividends per share (or appreciation in and/or maintenance of such price or dividends); (xix) regulatory achievements or compliance (including, without limitation, regulatory body approval for commercialization of a product); (xx) implementation or completion of critical projects; (xxi) market share; (xxii) economic value; (xxiii) individual employee performance; or (xxiv) any combination of the foregoing, any of which may be measured either in absolute terms for us or any operating unit of our company or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices.

*Certain Transactions and Adjustments.* The plan administrator will have broad discretion to take action under the 2020 Plan, as well as make adjustments to the terms and conditions of existing and future awards, to prevent the

176

Table of Contents

dilution or enlargement of intended benefits and facilitate necessary or desirable changes in the event of certain transactions and events affecting our common stock, such as stock dividends, stock splits, mergers, acquisitions, consolidations and other corporate transactions. In addition, in the event of certain non-reciprocal transactions with our stockholders known as "equity restructurings," the plan administrator will make equitable adjustments to the 2020 Plan and outstanding awards. In the event of a "change in control" of our company (as defined in the 2020 Plan), to the extent that the surviving entity declines to continue, convert, assume or replace outstanding awards, the plan administrator may terminate any or all such awards in exchange for cash, rights or other property or may cause any or all such awards to become fully exercisable immediately prior to the transaction and all applicable forfeiture restrictions to lapse. In the case of any award so exercisable in lieu of assumption or substitution, the plan administrator shall provide notice that such awards will remain fully exercisable for fifteen (15) days after the date the plan administrator provides such notice (contingent upon the occurrence of the change in control) and that such awards shall terminate at the end of such period. In the event an outstanding award is assumed or substituted for an equivalent award in connection with a change in control and the holder of such award terminates employment without "cause" (as such term is defined in the sole discretion of the plan administrator or as set forth in the award agreement relating to such award) within the 12 months following the change in control, then such award will become fully vested and exercisable upon such termination of employment. Individual award agreements may provide for additional accelerated vesting and payment provisions. In addition, the plan administrator has discretion to institute and determine the terms and conditions of an exchange program, which is a program under which outstanding awards may be surrendered or cancelled in exchange for awards of the same type (which may have higher or lower exercise prices and different terms), awards of a different type, and/or cash, under which participants have the opportunity to transfer outstanding awards to a financial institution or other person or entity selected by the plan administrator, or under which the exercise price of an outstanding award may be reduced or increased.

*Foreign Participants, Claw-Back Provisions, Transferability, and Participant Payments*. The plan administrator may modify award terms, establish subplans and/or adjust other terms and conditions of awards, subject to the share limits described above, in order to facilitate grants of awards subject to the laws and/or stock exchange rules of countries outside of the United States. All awards will be subject to the provisions of any claw-back policy implemented by our company to the extent set forth in such claw-back policy and/or in the applicable award agreement. With limited exceptions for estate planning, domestic relations orders, certain beneficiary designations and the laws of descent and distribution, awards under the 2020 Plan are generally non-transferable, and are exercisable only by the participant. With regard to tax withholding, exercise price and purchase price obligations arising in connection with awards under the 2020 Plan, the plan administrator may, in its discretion, accept cash or check, provide for net withholding of shares, allow shares of our Class A common stock that meet specified conditions to be repurchased, allow a "market sell order" or such other consideration as it deems suitable.

*Plan Amendment and Termination*. Our board of directors may amend or terminate the 2020 Plan at any time; however, except in connection with certain changes in our capital structure, stockholder approval will be required for any amendment that increases the number of shares available under the 2020 Plan. No award may be granted pursuant to the 2020 Plan after the tenth anniversary of the date on which our board of directors adopts the 2020 Plan.

### 2020 Employee Stock Purchase Plan

In connection with the offering, we have adopted, and our shareholders have approved, the 2020 Employee Stock Purchase Plan, or ESPP. The material terms of the ESPP are summarized below. The ESPP will be filed as an exhibit to the registration statement of which this prospectus is a part.

The ESPP will be comprised of two distinct components in order to provide increased flexibility to grant options to purchase shares under the ESPP. Specifically, the ESPP will authorize (1) the grant of options to employees that are intended to qualify for favorable U.S. federal tax treatment under Section 423 of the Code (the "Section

Table of Contents

423 Component"), and (2) the grant of options that are not intended to be tax-qualified under Section 423 of the Code to facilitate participation for employees who are not eligible to benefit from favorable U.S. federal tax treatment and, to the extent applicable, to provide flexibility to comply with non-U.S. laws and other considerations (the "Non-Section 423 Component"). The Non-Section 423 Component will generally be operated and administered on terms and conditions similar to the Section 423 Component, except as otherwise required by applicable law, rule or regulation.

*Shares Available; Administration*. A total of 808,170 shares of our Class A common stock will be initially reserved for issuance under our ESPP. In addition, the number of shares available for issuance under the ESPP will be annually increased on January 1 of each calendar year beginning in 2021 and ending in 2030, by an amount equal to the lesser of: (i) 1% of the aggregate number of shares of our Class A common stock outstanding on the final day of the immediately preceding calendar year and (ii) such smaller number of shares as is determined by our board of directors. Subject to adjustment upon certain changes in our capitalization, no more than 4,849,019 shares of our Class A common stock will be available for issuance under the Section 423 Component.

The compensation committee of our board of directors will be the plan administrator of the ESPP and will have authority to interpret the terms of the ESPP and determine eligibility of participants.

*Eligibility*. The plan administrator may designate certain of our subsidiaries as participating "designated subsidiaries" in the ESPP and may change these designations from time to time. Employees of our company and our designated subsidiaries are eligible to participate in the ESPP if they meet the eligibility requirements under the ESPP established from time to time by the plan administrator. However, an employee may not be granted rights to purchase stock under the ESPP if such employee, immediately after the grant, would own (directly or through attribution) stock possessing 5% or more of the total combined voting power or value of all classes of our Class A common or other class of stock.

If the grant of a purchase right under the ESPP to any eligible employee who is a citizen or resident of a foreign jurisdiction would be prohibited under the laws of such foreign jurisdiction or the grant of a purchase right to such employee in compliance with the laws of such foreign jurisdiction would cause the ESPP to violate the requirements of Section 423 of the Code, as determined by the plan administrator in its sole discretion, such employee will not be permitted to participate in the Section 423 Component.

Eligible employees become participants in the ESPP by enrolling and authorizing payroll deductions by the deadline established by the plan administrator prior to the relevant offering date. Directors who are not employees, as well as consultants, are not eligible to participate in the ESPP. Employees who choose not to participate, or are not eligible to participate at the start of an offering period but who become eligible thereafter, may enroll in any subsequent offering period.

*Participation in an Offering*. Stock will be offered under the ESPP during offering periods. The length of offering periods under the ESPP will be determined by the plan administrator and may be up to 27 months long. Employee payroll deductions will be used to purchase shares on the last day of each offering period (or such other date as set forth in the offering document). Offering periods under the ESPP will commence when determined by the plan administrator. The plan administrator may, in its discretion, modify the terms of future offering periods. To the extent applicable, in non-U.S. jurisdictions where participation in the ESPP through payroll deductions is prohibited, the plan administrator may provide that an eligible employee may elect to participate through contributions to the participant's account under the ESPP in a form acceptable to the plan administrator in lieu of or in addition to payroll deductions.

The ESPP will permit participants to purchase our Class A common stock through payroll deductions of up to 40% of their eligible compensation, which will include a participant's gross base compensation for services to us. The maximum number of shares that may be purchased by a participant during any offering period or purchase

178

Table of Contents

period is 10,000 shares. In addition, no employee will be permitted to accrue the right to purchase stock under the Section 423 Component at a rate in excess of $25,000 worth of shares during any calendar year during which such a purchase right is outstanding (based on the fair market value per share of our Class A common stock as of the first day of the offering period).

On the first trading day of each offering period, each participant automatically will be granted an option to purchase shares of our Class A common stock. The option will be exercised on the applicable purchase date(s) during the offering period, to the extent of the payroll deductions accumulated during the applicable purchase period. The purchase price of the shares, in the absence of a contrary determination by the plan administrator, will be 85% of the lower of the fair market value of our Class A common stock on the first trading day of the offering period or on the applicable purchase date, which will be the final trading day of the applicable purchase period.

Participants may voluntarily end their participation in the ESPP at any time at least one week prior to the end of the applicable offering period (or such longer or shorter period specified by the plan administrator), and will be paid their accrued payroll deductions that have not yet been used to purchase shares of Class A common stock. Participation ends automatically upon a participant's termination of employment.

*Transferability*. A participant may not transfer rights granted under the ESPP other than by will, the laws of descent and distribution or as otherwise provided in the ESPP.

*Certain Transactions*. In the event of certain transactions or events affecting our Class A common stock, such as any stock dividend or other distribution, change in control, reorganization, merger, consolidation or other corporate transaction, the plan administrator will make equitable adjustments to the ESPP and outstanding rights. In addition, in the event of the foregoing transactions or events or certain significant transactions, including a change in control, the plan administrator may provide for (i) either the replacement of outstanding rights with other rights or property or termination of outstanding rights in exchange for cash, (ii) the assumption or substitution of outstanding rights by the successor or survivor corporation or parent or subsidiary thereof, (iii) the adjustment in the number and type of shares of stock subject to outstanding rights, (iv) the use of participants' accumulated payroll deductions to purchase stock on a new purchase date prior to the next scheduled purchase date and termination of any rights under ongoing offering periods or (v) the termination of all outstanding rights.

*Plan Amendment; Termination*. The plan administrator may amend, suspend or terminate the ESPP at any time. However, stockholder approval of any amendment to the ESPP must be obtained for any amendment which increases the aggregate number or changes the type of shares that may be sold pursuant to rights under the ESPP or changes the corporations or classes of corporations whose employees are eligible to participate in the ESPP.

179

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

The following are summaries of certain transactions and relationships with our directors, executive officers and stockholders and certain provisions of our related party agreements and are qualified in their entirety by reference to all of the provisions of such agreements. Because these descriptions are only summaries of the applicable agreements, they do not necessarily contain all of the information that you may find useful. We, therefore, urge you to review the agreements in their entirety. Copies of the forms of the agreements have been filed as exhibits to the registration statement of which this prospectus is a part, and are available electronically on the website of the SEC at *www.sec.gov*.

### Related Party Agreements in Effect Prior to the Transactions

#### Expense Reimbursement Agreement

On September 13, 2019, in connection with the Centerbridge Acquisition, GoHealth Holdings, LLC, Norvax, LLC and an affiliate of the Sponsor entered into an expense reimbursement and indemnification agreement pursuant to which, GoHealth Holdings, LLC and Norvax, LLC agreed to indemnify and reimburse the Sponsor for up to $500,000 of certain out-of-pocket costs, fees and expenses incurred by or on behalf of the Sponsors in connection with the Centerbridge Acquisition and certain services provided to us by the Sponsor. To date, we have made payments totaling less than $60,000 pursuant to this agreement.

#### Agreements Involving our Founders

We have entered into various lease agreements (as amended and restated, the "RPT Leases") with Wilson Tech 5, LLC, 214 W Huron LLC, 220 W Huron Street Holdings LLC and 215 W Superior LLC, each of which are controlled by our Founders, to lease our corporate offices at 214 West Huron Street, Chicago, Illinois, 220 West Huron Street, Chicago, Illinois, 215 West Superior Street, Chicago, Illinois, and a proposed site in Linden, Utah, beginning in 2022. Our lease agreement with Wilson Tech 5, LLC expires on May 11, 2030; our lease agreement with 214 W Huron LLC expires on July 31, 2024; our lease agreements with 220 W Huron Street Holdings LLC expire on May 31, 2024 and July 31, 2024; and our lease agreement with 215 W Superior LLC expires on December 31, 2030. In addition to the lease payments, we are also required to pay operating expenses, maintenance and utilities under the terms of the RPT Leases. For the three months ended March 31, 2020, the Successor 2019 Period, Predecessor 2019 Period and for the year ended December 31, 2018, we made aggregate lease payments of $321,000, $298,000, $758,000 and $1,025,000, respectively under the RPT Leases. Assuming none of the RPT Leases are terminated early, the remaining amounts due under the RPT Leases in aggregate is expected to be $6.9 million.

On January 1, 2020, we entered into a non-exclusive aircraft dry lease agreement with N157BC, LLC, an entity wholly-owned and controlled by our Founders, which we amended and restated on May 29, 2020. The agreement allows us to use an aircraft owned by N157BC, LLC for our business and on an as-needed basis. The agreement has no set term and is terminable without cause by either party upon 30 days' prior written notice. Under the agreement, we are required to pay $6,036.94 per flight hour for use of the aircraft.

On March 2, 2018, we entered into an agreement with Rank Me Media, LLC, an entity wholly-owned and controlled by Patrick Cruz, brother to each of Brandon M. Cruz, our Chief Strategy Officer and Special Advisor to the Executive Team and a member of our board directors, and Shane E. Cruz, our Chief Operating Officer, to provide search engine optimization consulting services. This agreement had an initial term of 6 months and after the expiration of such period, automatically renews 1 month each month unless terminated by either party with a 30-day prior written notice. Under the agreement, we are required to pay a monthly flat fee retainer of $6,000 per month. For the three months ended March 31, 2020, the Successor 2019 Period, Predecessor 2019 Period and for the year ended December 31, 2018, we made aggregate payments of $18,000, $18,000, $57,000 and $42,000, respectively under this agreement.

**The Transactions**

In connection with the Transactions, we will engage in certain transactions with certain of our directors, executive officers and other persons and entities which are or will become holders of 5% or more of our voting securities upon the consummation of the Transactions. These transactions are described in "Our Organizational Structure."

We intend to use the net proceeds from this offering (including any net proceeds from any exercise of the underwriters' option to purchase additional shares of Class A common stock) to purchase 80,816,989 LLC Interests (or 85,799,456 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from GoHealth Holdings, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us and to pay cash to the Blocker Shareholders as partial consideration in the Blocker Merger.

**Tax Receivable Agreement**

As described in "Our Organizational Structure," we intend to use the net proceeds from this offering to purchase newly-issued LLC Interests directly from GoHealth Holdings, LLC and to pay cash to the Blocker Shareholders as partial consideration in the Blocker Merger. In addition, GoHealth Holdings, LLC intends to use the net proceeds it receives from the sale of LLC Interests to us to partially redeem certain of the LLC Interests held directly or indirectly by the Continuing Equity Owners, which is intended to be treated as a taxable sale of LLC Interests for U.S. federal income tax purposes. We expect to obtain an increase in our share of the tax basis of the assets of GoHealth Holdings, LLC in connection with the purchase of LLC Interests directly from GoHealth Holdings, LLC, the partial redemption of LLC Interests by GoHealth Holdings and the Blocker Merger. We will also acquire an allocable share of the existing tax basis in GoHealth Holdings, LLC's assets in connection with the Transactions, including the Blocker Company's share of existing tax basis, and we may obtain an increase to such allocable share of existing tax basis in connection with the consummation of the Transactions and in the future. In addition, we may obtain an increase in our share of the tax basis of the assets of GoHealth Holdings, LLC in the future, when (as described below under "—GoHealth Holdings, LLC Agreement—Agreement in Effect Upon Consummation of the Transactions—Common Unit Redemption Right") a Continuing Equity Owner receives Class A common stock or, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), cash, as applicable, from us in connection with an exercise of such Continuing Equity Owner's right to have LLC Interests held directly or indirectly by such Continuing Equity Owner redeemed (subject in certain circumstances to time-based vesting requirements) by GoHealth Holdings, LLC or, at our election, exchanged or when GoHealth Holdings, LLC makes, or is deemed to make, certain distributions to the Continuing Equity Owners. We intend to treat such redemptions or exchanges as our direct purchase of LLC Interests from such Continuing Equity Owner for U.S. federal income and other applicable tax purposes, regardless of whether such LLC Interests are surrendered by a Continuing Equity Owner to GoHealth Holdings, LLC for redemption or sold to us upon the exercise of our election to acquire such LLC Interests directly (any resulting basis increases, together with the basis increases arising from (a) the purchase of newly-issued LLC Interests directly from GoHealth Holdings, LLC and the partial redemption of LLC Interests by GoHealth Holdings, LLC, as described under "Use of Proceeds," and (b) certain distributions (or deemed distributions) from GoHealth Holdings, LLC, the "Basis Adjustments"). Any Basis Adjustment and our allocable share of the existing tax basis in GoHealth Holdings, LLC's assets, including the Blocker Company's share of existing tax basis (and increases to such allocable share of existing tax basis), may have the effect of reducing the amounts that we would otherwise pay in the future to various tax authorities. The Basis Adjustments and such existing tax basis (and increases to such allocable share of existing tax basis) may also decrease gains (or increase losses) on future dispositions of certain assets to the extent tax basis is allocated to those assets.

In connection with the transactions described above, we will enter into a Tax Receivable Agreement with GoHealth Holdings, LLC, Continuing Equity Owners and the Blocker Shareholders that will provide for the

181

Table of Contents

payment by GoHealth, Inc. to the Continuing Equity Owners and the Blocker Shareholders of 85% of the amount of certain tax benefits, if any, that GoHealth, Inc. actually realizes, or in some circumstances is deemed to realize as a result of the transactions described above, including the acquisition of GoHealth, Inc.'s allocable share of the existing tax basis in GoHealth Holdings, LLC's assets in connection with the Transactions (including the Blocker Company's share of existing tax basis), increases to such allocable share of existing tax basis, the Basis Adjustments and certain other tax benefits arising from payments made under the Tax Receivable Agreement. GoHealth Holdings, LLC will have in effect an election under Section 754 of the Code effective for each taxable year in which a redemption or exchange (including deemed exchange, and including for this purpose the purchase of LLC Interests directly from certain Continuing Equity Owners described above) of LLC Interests for Class A common stock or cash occurs or when GoHealth Holdings, LLC makes (or is deemed to make) certain distributions. These Tax Receivable Agreement payments are not conditioned upon one or more of the Continuing Equity Owners maintaining a continued ownership interest in GoHealth Holdings, LLC. If a Continuing Equity Owner transfers LLC Interests but does not assign to the transferee of such units its rights under the Tax Receivable Agreement, such Continuing Equity Owner generally will continue to be entitled to receive payments under the Tax Receivable Agreement arising in respect of a subsequent exchange of such LLC Interests. In general, the Continuing Equity Owners' and Blocker Shareholders' rights under the Tax Receivable Agreement may not be assigned, sold, pledged or otherwise alienated to any person, other than certain permitted transferees, without such person becoming a party to the Tax Receivable Agreement and agreeing to succeed to the applicable Continuing Equity Owner's or Blocker Shareholders' interest therein.

The actual Basis Adjustments, as well as any amounts paid to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement will vary depending on a number of factors, including:

- *the timing of any future redemptions or exchanges*—for instance, the increase in any tax deductions will vary depending on the fair value, which may fluctuate over time, of the depreciable or amortizable assets of GoHealth Holdings, LLC at the time of each redemption, exchange or distribution (or deemed distribution) as well as the amount of remaining existing tax basis at the time of such redemption, exchange or distribution (or deemed distribution);

- *the price of shares of our Class A common stock at the time of the purchases from the Continuing Equity Owners in connection with this offering and any applicable redemptions or exchanges*—the Basis Adjustments, as well as any related increase in any tax deductions, are directly related to the price of shares of our Class A common stock at the time of such purchases or future redemptions or exchanges;

- *the extent to which such redemptions or exchanges are taxable*—if a redemption or exchange is not taxable for any reason, increased tax deductions will not be available; and

- *the amount and timing of our income*—the Tax Receivable Agreement generally will require us to pay 85% of the tax benefits as and when those benefits are treated as realized under the terms of the Tax Receivable Agreement. If we do not have sufficient taxable income to realize any of the applicable tax benefits, we generally will not be required (absent a material breach of a material obligation under the Tax Receivable Agreement, change of control or other circumstances requiring an early termination payment and treating any outstanding LLC Interests held directly or indirectly by Continuing Equity Owners as having been exchanged for Class A common stock for purposes of determining such early termination payment) to make payments under the Tax Receivable Agreement for that taxable year because no tax benefits will have been actually realized. However, any tax benefits that do not result in realized tax benefits in a given taxable year may generate tax attributes that may be utilized to generate tax benefits in previous or future taxable years. The utilization of any such tax attributes will result in payments under the Tax Receivable Agreement.

Table of Contents

For purposes of the Tax Receivable Agreement, cash savings in income tax will be computed by comparing our actual income tax liability to the amount of such taxes that we would have been required to pay had there been no existing basis in GoHealth Holdings, LLC's assets, had there been no increases to such allocable share of existing tax basis, had there been no Basis Adjustments, had the Tax Receivable Agreement not been entered into and had there been no tax benefits to us as a result of any payments made under the Tax Receivable Agreement; provided that, for purposes of determining cash savings with respect to state and local income taxes we will use an assumed tax rate. The Tax Receivable Agreement will generally apply to each of our taxable years, beginning with the first taxable year ending after the consummation of the Transactions. There is no maximum term for the Tax Receivable Agreement; however, the Tax Receivable Agreement may be terminated by us pursuant to an early termination procedure that requires us to pay the Continuing Equity Owners an agreed-upon amount equal to the estimated present value of the remaining payments to be made under the agreement (calculated with certain assumptions, including regarding tax rates and utilization of the Basis Adjustments).

The payment obligations under the Tax Receivable Agreement are obligations of GoHealth, Inc. and not of GoHealth Holdings, LLC. Although the actual timing and amount of any payments that may be made under the Tax Receivable Agreement will vary, we expect that the payments that we may be required to make to the Continuing Equity Owners and the Blocker Shareholders could be substantial. Any payments made by us to the Continuing Equity Owners and the Blocker Shareholders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us or to GoHealth Holdings, LLC and, to the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, the unpaid amounts will be deferred and will accrue interest until paid by us; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and, therefore, may accelerate payments due under the Tax Receivable Agreement. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under our Credit Facilities or any future debt agreements. See "Unaudited Pro Forma Condensed Consolidated Financial Information." Decisions made by us in the course of running our business, such as with respect to mergers, asset sales, other forms of business combinations or other changes in control, may influence the timing and amount of payments that are received by a redeeming Continuing Equity Owner or a Blocker Shareholder under the Tax Receivable Agreement. For example, the earlier disposition of assets following an exchange or acquisition transaction will generally accelerate payments under the Tax Receivable Agreement and increase the present value of such payments.

The Tax Receivable Agreement provides that if certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, if we materially breach any of our material obligations under the Tax Receivable Agreement or if, at any time, we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, under the Tax Receivable Agreement would accelerate and become due and payable, based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. In those circumstances, Continuing Equity Owners would be deemed to exchange any remaining outstanding LLC Interests for Class A common stock and would generally be entitled to payments under the Tax Receivable Agreement resulting from such deemed exchanges.

We may elect to completely terminate the Tax Receivable Agreement early only with the written approval of each of a majority of GoHealth, Inc.'s "independent directors" (within the meaning of Rule 10A-3 promulgated under the Exchange Act and the Nasdaq rules).

As a result of the foregoing, we could be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. We also could be required to make cash payments to the Continuing Equity Owners and the Blocker Shareholders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement. In these situations, our obligations under the Tax Receivable

183

Table of Contents

Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

Payments under the Tax Receivable Agreement will generally be based on the tax reporting positions that we determine. We will not be reimbursed for any cash payments previously made to the Continuing Equity Owners and the Blocker Shareholders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and ultimately disallowed. Instead, any excess cash payments made by us to a Continuing Equity Owner or a Blocker Shareholder will be netted against any future cash payments we might otherwise be required to make under the terms of the Tax Receivable Agreement to such Continuing Equity Owner or such Blocker Shareholder, as applicable. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments we might otherwise be required to make under the terms of the Tax Receivable Agreement and, as a result, there might not be future cash payments from which to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings. If we determine that a tax reserve or contingent liability must be established by us for generally accepted accounting principles in respect of an issue that would affect payments under the Tax Receivable Agreement, we may withhold payments to the Continuing Equity Owners and/or the Blocker Shareholders, as applicable, under the Tax Receivable Agreement and place them in an interest-bearing escrow account until the reserve or contingent liability is resolved.

We will have full responsibility for, and sole discretion over, all GoHealth, Inc. tax matters, including the filing and amendment of all tax returns and claims for refund and defense of all tax contests, subject to certain participation and approval rights held by Centerbridge and NVX Holdings. If the outcome of any challenge to all or part of the Basis Adjustments or other tax benefits we claim, including as a result of acquiring our allocable share of the existing tax basis in GoHealth Holdings, LLC's assets and increases to such allocable share of existing tax basis, would reasonably be expected to materially and adversely affect the payments to Continuing Equity Owners' from us under the Tax Receivable Agreement, then we will not be permitted to settle or fail to contest such challenge without the consent (not to be unreasonably withheld or delayed) of Centerbridge and NVX Holdings. The interests of Centerbridge or NVX Holdings in any such challenge may differ from or conflict with our interests and your interests, and Centerbridge or NVX Holdings may exercise their consent rights relating to any such challenge in a manner adverse to our interests.

Under the Tax Receivable Agreement, we are required to provide the Continuing Equity Owners and Blocker Shareholders that hold an interest in the Tax Receivable Agreement with a schedule showing the calculation of payments that are due under the Tax Receivable Agreement with respect to each taxable year with respect to which a payment obligation arises within 90 days after filing our U.S. federal income tax return for such taxable year. This calculation will be based upon the advice of our tax advisors. Payments under the Tax Receivable Agreement will generally be made to the Continuing Equity Owners and the Blocker Shareholders within three business days after this schedule becomes final pursuant to the procedures set forth in the Tax Receivable Agreement, although interest on such payments will begin to accrue at a rate of LIBOR plus 100 basis points from the due date (without extensions) of such tax return. Any late payments that may be made under the Tax Receivable Agreement will continue to accrue interest at a rate equal to LIBOR plus 500 basis points, until such payments are made, generally including any late payments that we may subsequently make because we did not have enough available cash to satisfy our payment obligations at the time at which they originally arose.

184

Table of Contents

**GoHealth Holdings, LLC Agreement**

*Agreement in Effect Before Consummation of the Transactions*

GoHealth Holdings, LLC and the Original Equity Owners are parties to the Amended and Restated Limited Liability Company Agreement of GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC), dated as of September 13, 2019, which governs the business operations of GoHealth Holdings, LLC and defines the relative rights and privileges associated with the existing units of GoHealth Holdings, LLC. We refer to this agreement as the Existing LLC Agreement. Under the Existing LLC Agreement, the board of managers of GoHealth Holdings, LLC has the full, exclusive and complete right, authority and discretion to manage and control the business and affairs of GoHealth Holdings, LLC, to interpret the provisions of the Existing LLC Agreement, to make all decisions affecting the business and affairs of GoHealth Holdings, LLC, to take all such actions as it deems necessary or appropriate to accomplish the purpose of the Company, and the day-to-day business operations of GoHealth Holdings, LLC are overseen and implemented by officers of GoHealth Holdings, LLC. Each Original Equity Owner's rights under the Existing LLC Agreement continue until the effective time of the new GoHealth Holdings, LLC operating agreement to be adopted in connection with the Transactions, as described below, at which time the Continuing Equity Owners will continue as members that hold LLC Interests with the respective rights thereunder.

*Agreement in Effect Upon Consummation of the Transactions*

In connection with the consummation of the Transactions, we and the Continuing Equity Owners will enter into GoHealth Holdings, LLC's Second Amended and Restated Limited Liability Company Agreement, which we refer to as the GoHealth Holdings, LLC Agreement.

- *Appointment as Managing Member*. Under the GoHealth Holdings, LLC Agreement, we will become a member and the sole manager of GoHealth Holdings, LLC. As the sole manager, we will be able to control all of the day-to-day business affairs and decision-making of GoHealth Holdings, LLC without the approval of any other member. As such, we, through our officers and directors, will be responsible for all operational and administrative decisions of GoHealth Holdings, LLC and daily management of GoHealth Holdings, LLC's business. Pursuant to the terms of the GoHealth Holdings, LLC Agreement, we cannot be removed or replaced as the sole manager of GoHealth Holdings, LLC except by our resignation, which may be given at any time by written notice to the members.

- *Compensation, Fees and Expenses*. We will not be entitled to compensation for our services as the manager of GoHealth Holdings, LLC. We will be entitled to reimbursement by GoHealth Holdings, LLC for reasonable fees and expenses incurred on behalf of GoHealth Holdings, LLC, including all expenses associated with the Transactions, any subsequent offering of our Class A common stock, being a public company and maintaining our corporate existence.

- *Distributions*. The GoHealth Holdings, LLC Agreement will require "tax distributions," as that term is used in the agreement to be made by GoHealth Holdings, LLC to its members on a pro rata basis, except to the extent such distributions would render GoHealth Holdings, LLC insolvent or are otherwise prohibited by law, our Credit Facilities or any of our future debt agreements. Tax distributions will be made on a quarterly basis, to each member of GoHealth Holdings, LLC, including us, based on such member's allocable share of the taxable income of GoHealth Holdings, LLC and an assumed tax rate that will be determined by us, as described below. For this purpose, GoHealth, Inc.'s allocable share of GoHealth Holdings, LLC's taxable income shall be net of its share of taxable losses of GoHealth Holdings, LLC and shall be determined without regard to any Basis Adjustments (as described above under "—Tax Receivable Agreement"). The assumed tax rate for purposes of determining tax distributions from GoHealth Holdings, LLC to its members will be the highest combined federal, state, and local tax rate that may potentially apply to any one of GoHealth Holdings, LLC's members, regardless of the actual final tax liability of any such member. The GoHealth

185

**Table of Contents**

Holdings, LLC Agreement will also allow for cash distributions to be made by GoHealth Holdings, LLC (subject to our sole discretion as the sole manager of GoHealth Holdings, LLC) to its members on a pro rata basis out of "distributable cash," as that term is defined in the agreement. We expect GoHealth Holdings, LLC may make distributions out of distributable cash periodically and as necessary to enable us to cover our operating expenses and other obligations, including our tax liability and obligations under the Tax Receivable Agreement, except to the extent such distributions would render GoHealth Holdings, LLC insolvent or are otherwise prohibited by law, our Credit Facilities or any of our future debt agreements.

- *Transfer Restrictions*. The GoHealth Holdings, LLC Agreement generally does not permit transfers of LLC Interests by members, except for transfers to permitted transferees, transfers pursuant to the participation right described below and other limited exceptions. The GoHealth Holdings, LLC Agreement may impose additional restrictions on transfers (including redemptions described below with respect to each common unit) that are necessary or advisable so that GoHealth Holdings, LLC is not treated as a "publicly-traded partnership" for U.S. federal income tax purposes. In the event of a permitted transfer under the GoHealth Holdings, LLC Agreement, such member will be required to simultaneously transfer shares of Class B common stock to such transferee equal to the number of LLC Interests that were transferred to such transferee in such permitted transfer.

  The GoHealth Holdings, LLC Agreement provides that, in the event that a tender offer, share exchange offer, issuer bid, take-over bid, recapitalization or similar transaction with respect to our Class A common stock, each of which we refer to as a Pubco Offer, is approved by our board of directors or otherwise effected or to be effected with the consent or approval of our board of directors, each holder of LLC Interests shall be permitted to participate in such Pubco Offer by delivering a redemption notice, which shall be effective immediately prior to, and contingent upon, the consummation of such Pubco Offer. If a Pubco Offer is proposed by GoHealth, Inc., then GoHealth, Inc. is required to use its reasonable best efforts expeditiously and in good faith to take all such actions and do all such things as are necessary or desirable to enable and permit the holders of such LLC Interests to participate in such Pubco Offer to the same extent as or on an economically equivalent basis with the holders of shares of Class A common stock, provided that in no event shall any holder of LLC Interests be entitled to receive aggregate consideration for each common unit that is greater than the consideration payable in respect of each share of Class A common stock pursuant to the Pubco Offer.

  Except for certain exceptions, any transferee of LLC Interests must assume, by operation of law or executing a joinder to the GoHealth Holdings, LLC Agreement, all of the obligations of a transferring member with respect to the transferred units, and such transferee shall be bound by any limitations and obligations under the GoHealth Holdings, LLC Agreement even if the transferee is not admitted as a member of GoHealth Holdings, LLC. A member shall remain as a member with all rights and obligations until the transferee is accepted as substitute member in accordance with GoHealth Holdings, LLC Agreement.

- *Recapitalization*. The GoHealth Holdings, LLC Agreement will recapitalize the units currently held by the existing members of GoHealth Holdings, LLC into a new single class of LLC Interests. The GoHealth Holdings, LLC Agreement will also reflect a split of LLC Interests such that one common unit can be acquired with the net proceeds received in the initial offering from the sale of one share of our Class A common stock, after the deduction of the underwriting discount and estimated offering expenses payable by us. Each common unit generally will entitle the holder to a pro-rata share of the net profits and net losses and distributions of GoHealth Holdings, LLC.

- *Maintenance of One-to-one Ratio between Shares of Class A Common Stock and LLC Interests Owned by the Company, and One-to-one Ratio between Shares of Class B Common Stock and LLC Interests Owned by Centerbridge and NVX Holdings*. Except as otherwise determined by us, the

186

**Table of Contents**

GoHealth Holdings, LLC Agreement requires GoHealth Holdings, LLC to take all actions with respect to its LLC Interests, including issuances, reclassifications, distributions, divisions or recapitalizations, such that (1) we at all times maintain a ratio of one common unit owned by us, directly or indirectly, for each share of Class A common stock issued and outstanding, and (2) GoHealth Holdings, LLC at all times maintains (a) a one-to-one ratio between the number of shares of Class A common stock issued and outstanding and the number of LLC Interests owned by us and (b) a one-to-one ratio between the number of shares of Class B common stock issued and outstanding and the number of LLC Interests owned by Centerbridge, our Founders and their permitted transferees, collectively. This ratio requirement disregards (1) shares of our Class A common stock under unvested options issued by us, (2) treasury stock, and (3) preferred stock or other debt or equity securities (including warrants, options or rights) issued by us that are convertible into or exercisable or exchangeable for shares of Class A common stock, except to the extent we have contributed the net proceeds from such other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, to the equity capital of GoHealth Holdings, LLC. In addition, the Class A common stock ratio requirement disregards all LLC Interests at any time held by any other person, including the Continuing Equity Owners and the holders of options over LLC Interests. If we issue, transfer or deliver from treasury stock or repurchase shares of Class A common stock in a transaction not contemplated by the GoHealth Holdings, LLC Agreement, we as manager of GoHealth Holdings, LLC have the authority to take all actions such that, after giving effect to all such issuances, transfers, deliveries or repurchases, the number of outstanding LLC Interests we own equals, on a one-for-one basis, the number of outstanding shares of Class A common stock. If we issue, transfer or deliver from treasury stock or repurchase or redeem any of our preferred stock in a transaction not contemplated by the GoHealth Holdings, LLC Agreement, we as manager have the authority to take all actions such that, after giving effect to all such issuances, transfers, deliveries repurchases or redemptions, we hold (in the case of any issuance, transfer or delivery) or cease to hold (in the case of any repurchase or redemption) equity interests in GoHealth Holdings, LLC which (in our good faith determination) are in the aggregate substantially equivalent to our preferred stock so issued, transferred, delivered, repurchased or redeemed. GoHealth Holdings, LLC is prohibited from undertaking any subdivision (by any split of units, distribution of units, reclassification, recapitalization or similar event) or combination (by reverse split of units, reclassification, recapitalization or similar event) of the LLC Interests that is not accompanied by an identical subdivision or combination of (1) our Class A common stock to maintain at all times a one-to-one ratio between the number of LLC Interests owned by us and the number of outstanding shares of our Class A common stock and (2) our Class B common stock to maintain at all times a one-to-one ratio between the number of LLC Interests owned by Centerbridge and our Founders and their permitted transferees, collectively, and the number of outstanding shares of our Class B common stock, as applicable, in each case, subject to exceptions.

- *Issuance of LLC Interests upon Exercise of Options or Issuance of Other Equity Compensation*. Upon the exercise of options issued by us (as opposed to options issued by GoHealth Holdings, LLC), or the issuance of other types of equity compensation by us (such as the issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock), we will have the right to acquire from GoHealth Holdings, LLC a number of LLC Interests equal to the number of our shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation. When we issue shares of Class A common stock in settlement of stock options granted to persons that are not officers or employees of GoHealth Holdings, LLC or its subsidiaries, we will make, or be deemed to make, a capital contribution in GoHealth Holdings, LLC equal to the aggregate value of such shares of Class A common stock and GoHealth Holdings, LLC will issue to us a number of LLC Interests equal to the number of shares we issued. When we issue shares of Class A common stock in settlement of stock options granted to persons that are officers or employees of GoHealth Holdings, LLC or its subsidiaries, then we will be deemed to have sold directly to the person exercising such award a portion of the value of each share of Class A common stock equal to the exercise price per share, and we will be deemed to have sold

187

**Table of Contents**

directly to GoHealth Holdings, LLC (or the applicable subsidiary of GoHealth Holdings, LLC) the difference between the exercise price and market price per share for each such share of Class A common stock. In cases where we grant other types of equity compensation to employees of GoHealth Holdings, LLC or its subsidiaries, on each applicable vesting date we will be deemed to have sold to GoHealth Holdings, LLC (or such subsidiary) the number of vested shares at a price equal to the market price per share, GoHealth Holdings, LLC (or such subsidiary) will deliver the shares to the applicable person, and we will be deemed to have made a capital contribution in GoHealth Holdings, LLC equal to the purchase price for such shares in exchange for an equal number of LLC Interests.

- *Dissolution*. The GoHealth Holdings, LLC Agreement will provide that the consent of GoHealth, Inc. as the managing member of GoHealth Holdings, LLC and members holding a majority of the voting units will be required to voluntarily dissolve GoHealth Holdings, LLC. In addition to a voluntary dissolution, GoHealth Holdings, LLC will be dissolved upon the entry of a decree of judicial dissolution or other circumstances in accordance with Delaware law. Upon a dissolution event, the proceeds of a liquidation will be distributed in the following order: (1) first, to pay the expenses of winding up GoHealth Holdings, LLC; (2) second, to pay debts and liabilities owed to creditors of GoHealth Holdings, LLC, other than members; and (3) third, to the members pro-rata in accordance with their respective percentage ownership interests in GoHealth Holdings, LLC (as determined based on the number of LLC Interests held by a member relative to the aggregate number of all outstanding LLC Interests).

- *Confidentiality*. We, as manager, and each member agree to maintain the confidentiality of GoHealth Holdings, LLC's confidential information. This obligation excludes information independently obtained or developed by the members, information that is in the public domain or otherwise disclosed to a member, in either such case not in violation of a confidentiality obligation of the GoHealth Holdings, LLC Agreement or approved for release by written authorization of the Chief Executive Officer, the Chief Financial Officer or the General Counsel of either GoHealth, Inc. or GoHealth Holdings, LLC.

- *Indemnification*. The GoHealth Holdings, LLC Agreement will provide for indemnification of the manager, members and officers of GoHealth Holdings, LLC and their respective subsidiaries or affiliates.

- *Common Unit Redemption Right*. The GoHealth Holdings, LLC Agreement will provide a redemption right to the Continuing Equity Owners which will entitle them to have their LLC Interests redeemed (subject in certain circumstances to time-based vesting requirements) for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC interest so redeemed, in each case in accordance with the terms of the GoHealth Holdings, LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), we may effect a direct exchange by GoHealth, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Continuing Equity Owners may exercise such redemption right, subject to certain exceptions, for as long as their LLC Interests remain outstanding. In connection with the exercise of the redemption or exchange of LLC Interests (1) the Continuing Equity Owners will be required to surrender a number of shares of our Class B common stock registered in the name of such redeeming or exchanging Continuing Equity Owner, and therefore, will be transferred to the Company and will be canceled for no consideration on a one-for-one basis with the number of LLC Interests so redeemed or exchanged and (2) all redeeming members will surrender LLC Interests to GoHealth Holdings, LLC for cancellation.

  Each Continuing Equity Owner's redemption rights will be subject to certain customary limitations, including the expiration of any contractual lock-up period relating to the shares of our Class A common

188

stock that may be applicable to such Continuing Equity Owner and the absence of any liens or encumbrances on such LLC Interests redeemed. Additionally, in the case we elect a cash settlement, such Continuing Equity Owner may rescind its redemption request within a specified period of time. Moreover, in the case of a settlement in Class A common stock, such redemption may be conditioned on the closing of an underwritten distribution of the shares of Class A common stock that may be issued in connection with such proposed redemption. In the case of a settlement in Class A common stock, such Continuing Equity Owner may also revoke or delay its redemption request if the following conditions exist: (1) any registration statement pursuant to which the resale of the Class A common stock to be registered for such Continuing Equity Owner at or immediately following the consummation of the redemption shall have ceased to be effective pursuant to any action or inaction by the SEC or no such resale registration statement has yet become effective; (2) we failed to cause any related prospectus to be supplemented by any required prospectus supplement necessary to effect such redemption; (3) we exercised our right to defer, delay or suspend the filing or effectiveness of a registration statement and such deferral, delay or suspension shall affect the ability of such Continuing Equity Owner to have its Class A common stock registered at or immediately following the consummation of the redemption; (4) such Continuing Equity Owner is in possession of any material non-public information concerning us, the receipt of which results in such Continuing Equity Owner being prohibited or restricted from selling Class A common stock at or immediately following the redemption without disclosure of such information (and we do not permit disclosure); (5) any stop order relating to the registration statement pursuant to which the Class A common stock was to be registered by such Continuing Equity Owner at or immediately following the redemption shall have been issued by the SEC; (6) there shall have occurred a material disruption in the securities markets generally or in the market or markets in which the Class A common stock is then traded; (7) there shall be in effect an injunction, a restraining order or a decree of any nature of any governmental entity that restrains or prohibits the redemption; (8) we shall have failed to comply in all material respects with our obligations under the Registration Rights Agreement, and such failure shall have affected the ability of such Continuing Equity Owner to consummate the resale of the Class A common stock to be received upon such redemption pursuant to an effective registration statement; or (9) the redemption date would occur three business days or less prior to, or during, a black-out period.

Moreover, 7,408,386 LLC Interests received in exchange for unvested profits units in connection with the Transactions will remain subject to their existing time-based vesting requirements. As such, the Former Profits Unit Holders who directly or indirectly hold these LLC Interests will not be able to exercise their redemption rights until the applicable vesting date.

The GoHealth Holdings, LLC Agreement will require that in the case of a redemption by a Continuing Equity Owner we contribute cash or shares of our Class A common stock, as applicable, to GoHealth Holdings, LLC in exchange for an amount of newly-issued LLC Interests that will be issued to us equal to the number of LLC Interests redeemed from the Continuing Equity Owner. GoHealth Holdings, LLC will then distribute the cash or shares of our Class A common stock, as applicable, to such Continuing Equity Owner to complete the redemption. In the event of an election by a Continuing Equity Owner, we may, at our option, effect a direct exchange by GoHealth, Inc. of cash or our Class A common stock, as applicable, for such LLC Interests in lieu of such a redemption. Whether by redemption or exchange, we are obligated to ensure that at all times the number of LLC Interests that we own equals the number of our outstanding shares of Class A common stock (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities).

- *Amendments*. In addition to certain other requirements, our consent, as manager, and the consent of members holding a majority of the LLC Interests then outstanding and entitled to vote (excluding LLC Interests held directly or indirectly by us) will generally be required to amend or modify the GoHealth Holdings, LLC Agreement.

189

*Stockholders Agreement*

Pursuant to the Stockholders Agreement, (i) Centerbridge will have the right to designate that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Centerbridge Director (as defined below) not standing for election in such election, would result in there being two Directors, or the "Centerbridge Directors," who will be Centerbridge Directors for as long as Centerbridge directly or indirectly, beneficially owns, in the aggregate, at least 10% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), and (ii) if at any time, Centerbridge directly or indirectly, beneficially owns, in the aggregate, less than 10% but at least 5% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), Centerbridge will have the right to designate for nomination that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Centerbridge Director not standing for election in such election, would result in there being one Centerbridge Director. In addition, (i) Centerbridge will have the right to designate that number of individuals who satisfy the independence requirements specified in the Stockholders Agreement, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Centerbridge-Designated Independent Director (as defined below) not standing for election in such election, would result in there being two Directors, or the "Centerbridge-Designated Independent Directors," who will be Centerbridge-Designated Independent Directors for as long as Centerbridge directly or indirectly, beneficially owns, in the aggregate, at least 20% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), and (ii) if at any time, Centerbridge directly or indirectly, beneficially owns, in the aggregate, less than 20% but at least 15% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), Centerbridge will have the right to designate for nomination that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Centerbridge-Designated Independent Director not standing for election in such election, would result in there being one Centerbridge-Designated Independent Director.

Pursuant to the Stockholders Agreement, (i) NVX Holdings shall have the right designate that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Founders Director (as defined below) not standing for election in such election, would result in there being two Directors, or the "Founders Directors," who will be the Founders Directors for as long as NVX Holdings directly or indirectly, beneficially owns, in the aggregate, 10% or more of our Class A common stock (assuming that all outstanding LLC Interests are redeemed for newly-issued shares of our class A common stock on a one-for-one basis), and (ii) if at any time, NVX Holdings directly or indirectly, beneficially owns, in the aggregate less than 10% but at least 5% of our Class A common stock (assuming that all outstanding LLC Interests are redeemed for newly-issued shares of our class A common stock on a one-for-one basis), NVX Holdings will have the right to designate for nomination that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Founders Directors not standing for election in such election, would result in there being one Founders Director. In addition, (i) NVX Holdings will have the right to designate that number of individuals who satisfy the independence requirements specified in the Stockholders Agreement, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Founders-Designated Independent Director (as defined below) not standing for election in such election, would result in there being two Directors, or the "Founders-Designated Independent Directors," who will be Founders-Designated Independent Directors for as long as NVX Holdings directly or indirectly, beneficially owns, in the aggregate, at least 20% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), and (ii) if at any time, NVX Holdings directly or indirectly, beneficially owns, in the aggregate, less than 20% but at least 15% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares

190

Table of Contents

of our Class A common stock on a one-for-one basis), NVX Holdings will have the right to designate for nomination that number of individuals, which, assuming all such individuals are successfully elected as Directors, when taken together with any incumbent Founders-Designated Independent Director not standing for election in such election, would result in there being one Founder-Designated Independent Director.

Additionally, pursuant to the Stockholders Agreement, each of Centerbridge and NVX Holdings will have the right to appoint one board observer so long as Centerbridge or NVX Holdings, respectively, beneficially own, directly or indirectly, at least 5% of our Class A common stock (assuming that all outstanding LLC Interests in GoHealth Holdings, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis).

Each of Centerbridge and NVX Holdings will also agree to vote, or cause to vote, all of their outstanding shares of our Class A common stock and Class B common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the Centerbridge Directors, the Centerbridge-Designated Independent Directors, the Founders Directors and the Founders-Designated Independent Directors. Additionally, pursuant to the Stockholders Agreement, we shall take all commercially reasonable actions to cause (1) the board of directors to be comprised of at least nine directors or such other number of directors as our board of directors may determine; (2) the individuals designated in accordance with the terms of the Stockholders Agreement to be included in the slate of nominees to be elected at the next annual or special meeting of our stockholders at which directors are to be elected and at each annual meeting of our stockholders thereafter at which a director's term expires; and (3) the individuals designated in accordance with the terms of the Stockholders Agreement to fill the applicable vacancies on the board of directors. The Stockholders Agreement allows for the board of directors to reject the nomination, appointment or election of a particular director if such nomination, appointment or election would constitute a breach of the board of directors' fiduciary duties to our stockholders or does not otherwise comply with any requirements of our amended and restated certificate of incorporation or our amended and restated bylaws or the charter for, or related guidelines of, the board of directors' nominating and corporate governance committee. See "Management—Composition of our Board of Directors."

In addition, the Stockholders Agreement provides that for as long as Centerbridge or NVX Holdings, respectively, beneficially owns, directly or indirectly, in the aggregate, 15% or more of all issued and outstanding shares of our Class A common stock (assuming that all outstanding LLC Interests are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), we will not take, and will cause our subsidiaries not to take, certain actions (whether by merger, consolidation or otherwise) without the prior written approval of Centerbridge or NVX Holdings, respectively, including:

- any transaction or series of related transactions, in which any "person" or "group" acquires, directly or indirectly, in excess of fifty percent (50%) of then outstanding shares of capital stock of the Company, GoHealth Holdings, LLC or any of their respective subsidiaries or has the direct or indirect power to elect a majority of the members of our Board;

- the sale, lease or exchange of all or substantially all of the property and assets of the Company and its subsidiaries, taken as a whole;

- any acquisition or disposition by the Company or any of its subsidiaries of assets, persons, equity interests or businesses, or entry into any join venture by the Company, where the aggregate consideration is greater than $50.0 million in any single transaction or series of related transactions;

- the creation of a new class or series of capital stock or equity securities of the Company, GoHealth Holdings, LLC or any of their respective subsidiaries;

- any issuance of additional shares of Class A Common Stock, Class B Stock, Class C Stock, Preferred Stock or other equity securities of the Company, GoHealth Holdings, LLC or any of their respective subsidiaries;

- any amendment or modification of the organizational documents of the Company, GoHealth Holdings, LLC or any of their respective subsidiaries;

191

- other than as contemplated by the LLC Agreement, any repurchase, redemption or other acquisition of any equity interests or other securities of, or other ownership interests in the Company or any of its subsidiaries;

- any incurrence of new indebtedness or refinancing of existing indebtedness by us, any guarantee made by the Company or any of its subsidiaries or any grant of any security interest in any of the assets of the Company or any of its subsidiaries, in each case with a value in excess of $25.0 million;

- settlement of any material litigation or similar action to which the Company or any subsidiary is a party or could otherwise be bound;

- any engagement of, or change to, our independent auditor;

- the hiring or termination (other than a termination for cause) of our Chief Executive Officer; provided, with respect to the hiring of the Chief Executive Officer, such approval shall not be unreasonably withheld if the candidate for Chief Executive Officer has been approved by the Board;

- (i) any increase, decrease or change in compensation (including equity compensation or other employment terms) with respect to our Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer or Chief Strategy Officer or (ii) any approval, authorization or implementation of, or any change, amendment or modification to, any employee equity incentive plan, agreement or arrangement of the Company or any of its Subsidiaries; and

- any agreement, authorization or commitment to do any of the foregoing.

In addition, the Stockholders Agreement provides that for as long as Centerbridge or NVX Holdings, respectively, beneficially owns, directly or indirectly, in the aggregate, 5% or more of all issued and outstanding shares of our Class A common stock (assuming that all outstanding LLC Interests are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), we will not take, and will cause our subsidiaries not to take, certain actions (whether by merger, consolidation or otherwise) without the prior written approval of Centerbridge or NVX Holdings, respectively, including:

- the reorganization, recapitalization, voluntary bankruptcy, liquidation, dissolution or winding-up of the Company, GoHealth Holdings, LLC or any of their respective subsidiaries;

- the (i) resignation, replacement or removal of the Company as the sole manager of GoHealth Holdings, LLC or (ii) appointment of any additional person as a manager of GoHealth Holdings, LLC;

- any increase or decrease of the size of our Board;

- any material change to the primary nature of the Company and its subsidiaries' business; and

- any transaction with any affiliate, director or officer of the Company or any of its subsidiaries (other than employment arrangements with any such director or officer) involving an amount in excess of $3.0 million.

The Stockholders Agreement will terminate upon the earlier to occur of (i) each of Centerbridge and NVX Holdings cease to own any of our Class A common stock or Class B common stock or (ii) by unanimous consent of us, Centerbridge and NVX Holdings.

**Registration Rights Agreement**

We intend to enter into a Registration Rights Agreement with certain of the Continuing Equity Owners in connection with this offering. The Registration Rights Agreement will provide certain of the Continuing Equity Owners with "demand" registration rights whereby, following our initial public offering and the expiration or waiver of any related lock-up period, such Continuing Equity Owners can require us to register under the Securities Act the offer and sale of shares of Class A common stock issuable to them, upon redemption or exchange of their LLC Interests. The Registration Rights Agreement will also provide for customary "piggyback" registration rights for all parties to the agreement.

192

Table of Contents

### Employment Agreements

We intend to enter into an employment agreement with certain of our named executive officers in connection with this offering. See "Executive Compensation."

### Reserved Share Program

At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the initial public offering price, up to 5% of the Class A common stock offered by this prospectus for sale to certain of our directors, officers and employees through a directed share program. See "Underwriting—Reserved Share Program" for more information.

### Director and Officer Indemnification and Insurance

Prior to the consummation of this offering, we intend to enter into separate indemnification agreements with each of our directors and executive officers. We have also purchased directors' and officers' liability insurance. See "Description of Capital Stock—Limitations on Liability and Indemnification of Officers and Directors."

### Our Policy Regarding Related Party Transactions

Our board of directors will adopt a written related person transaction policy, to be effective upon the closing of this offering, setting forth the policies and procedures for the review and approval or ratification by our audit committee of related person transactions. This policy will cover, with certain exceptions set forth in Item 404 of Regulation S-K under the Securities Act, any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships, in which we were or are to be a participant, where the amount involved exceeds $120,000 in any fiscal year and a related person had, has or will have a direct or indirect material interest, including without limitation, purchases of goods or services by or from the related person or entities in which the related person has a material interest, indebtedness, guarantees of indebtedness and employment by us of a related person. In reviewing and approving any such transactions, our audit committee is tasked to consider all relevant facts and circumstances, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in an arm's length transaction and the extent of the related person's interest in the transaction. All of the transactions described in this section occurred prior to the adoption of this policy.

Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth information with respect to the beneficial ownership of our Class A common stock and Class B common stock (1) immediately following the consummation of the Transactions (excluding this offering), as described in "Our Organizational Structure" and (2) as adjusted to give effect to this offering, for:

- each person known by us to beneficially own more than 5% of our Class A common stock or our Class B common stock;

- each of our directors;

- each of our named executive officers; and

- all of our executive officers and directors as a group.

As described in "Our Organizational Structure" and "Certain Relationships and Related Party Transactions," each LLC Interest (other than LLC Interests held by us) is redeemable from time to time at each holder's option (subject in certain circumstances to time-based vesting requirements) for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the GoHealth Holdings, LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), we may effect a direct exchange by GoHealth, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Continuing Equity Owners may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement." In connection with this offering, we will issue to each Continuing Equity Owner, for nominal consideration, one share of Class B common stock for each LLC Interest such Continuing Equity Owner will own. As a result, the number of shares of Class B common stock listed in the table below correlates to the number of LLC Interests Centerbridge and our Founders will own immediately after the Transactions. Although the number of shares of Class A common stock being offered hereby to the public will remain fixed regardless of the initial public offering price in this offering, the number of LLC Interests (and associated shares of Class B common stock) held by the beneficial owners set forth in the table below after the consummation of the Transactions will vary, depending on the initial public offering price in this offering. The table below assumes the shares of Class A common stock are offered at $19.00 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). See "Our Organizational Structure."

The number of shares beneficially owned by each stockholder as described in this prospectus is determined under rules issued by the SEC. Under these rules, beneficial ownership includes any shares as to which the individual or entity has sole or shared voting power or investment power. In computing the number of shares beneficially owned by an individual or entity and the percentage ownership of that person, shares of common stock subject to options, or other rights, including the redemption right described above with respect to each LLC Interest, held by such person that are currently exercisable or will become exercisable within 60 days of June 30, 2020, are considered outstanding, although these shares are not considered outstanding for purposes of computing the percentage ownership of any other person. The percentage ownership of each individual or entity after giving effect to the Transactions and before this offering is computed on the basis of 41,316,989 shares of our Class A common stock outstanding and 254,499,275 shares of our Class B common stock outstanding. The percentage ownership of each individual or entity after the Transactions and after this offering is computed on the basis of 80,816,989 shares of our Class A common stock outstanding and 232,383,011 shares of our Class B common stock outstanding. The table does not reflect any shares of our Class A common stock that may be purchased in this offering by directors, executive officers or beneficial holders of more than 5% of our outstanding common stock, through our Reserved Share Program described in "Underwriting—Reserved Share Program." Unless otherwise indicated, the address of all listed stockholders is 214 West Huron Street, Chicago, Illinois 60654.

194

Each of the stockholders listed has sole voting and investment power with respect to the shares beneficially owned by the stockholder unless noted otherwise, subject to community property laws where applicable.

| Name of beneficial owner | Class A Common Stock Beneficially Owned(1) — After Giving Effect to the Transactions and Before this Offering Number | % | After Giving Effect to the Transactions and this Offering (No Exercise Option) Number | % | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) Number | % | Class B Common Stock Beneficially Owned — After Giving Effect to the Transactions and Before this Offering Number | % | After Giving Effect to the Transactions and this Offering (No Exercise Option) Number | % | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) Number | % | Combined Voting Power(2) — After Giving Effect to the Transactions and this Offering (No Exercise Option) % | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *5% Stockholders* | | | | | | | | | | | | | | |
| Centerbridge(3) | 131,684,926 | 100.0% | 123,375,706 | 75.7% | 120,561,229 | 72.6% | 90,367,937 | 35.5% | 82,058,717 | 35.3% | 80,186,773 | 35.3% | 39.4% | 38.5% |
| NVX Holdings(4) | 103,658,920 | 71.5% | 94,127,610 | 53.8% | 91,980,347 | 51.7% | 103,658,920 | 40.7% | 94,127,610 | 40.5% | 91,980,347 | 40.4% | 30.1% | 29.4% |
| Blizzard Management Feeder, LLC(5)(6) | 25,141,150 | 37.8% | 24,114,083 | 23.0% | 23,882,701 | 21.8% | 25,141,150 | 9.9% | 24,114,083 | 10.4% | 23,882,701 | 10.5% | 7.7% | 7.6% |
| Norwest(7) | 32,689,495 | 44.2% | 29,683,736 | 26.9% | 29,006,580 | 25.3% | 32,689,495 | 12.8% | 29,683,736 | 12.8% | 29,006,580 | 12.8% | 9.5% | 9.3% |
| *Named Executive Officers and Directors* | | | | | | | | | | | | | | |
| Clinton P. Jones(4)(6)(8)(9) | 105,734,154 | 71.9% | 96,198,338 | 54.3% | 94,050,060 | 52.3% | 105,734,154 | 41.5% | 96,198,338 | 41.4% | 94,050,060 | 41.4% | 30.7% | 30.0% |
| Brandon M. Cruz(4)(6)(8)(10) | 105,734,154 | 71.9% | 96,198,338 | 54.3% | 94,050,060 | 52.3% | 105,734,154 | 41.5% | 96,198,338 | 41.4% | 94,050,060 | 41.4% | 30.7% | 30.0% |
| Shane E. Cruz(6)(11) | 2,731,300 | 6.2% | 2,554,684 | 3.1% | 2,514,895 | 2.8% | 2,731,300 | 1.1% | 2,554,684 | 1.1% | 2,514,895 | 1.1% | 0.8% | 0.8% |
| James A. Sharman(6)(12) | 4,512,617 | 9.8% | 4,172,211 | 4.9% | 4,095,523 | 4.6% | 4,512,617 | 1.8% | 4,172,211 | 1.8% | 4,095,523 | 1.8% | 1.3% | 1.3% |
| Rahm Emanuel | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Joseph G. Flanagan | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Helene D. Gayle | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Jeremy W. Gelber | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Anita V. Pramoda | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Miriam A. Tawil | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Alexander E. Timm | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| All directors and executive officers as a group (13 persons)(13) | 116,059,962 | 90.8% | 105,984,581 | 64.1% | 103,714,747 | 61.4% | 116,059,962 | 45.6% | 105,984,581 | 45.6% | 103,714,747 | 45.6% | 33.8% | 33.1% |

\*   Represents beneficial ownership of less than 1%.

(1)   Each LLC Interest (other than LLC Interests held by us and 7,408,386 LLC Interests held by certain of the Former Profits Unit Holders that are initially subject to time-based vesting requirements) is redeemable from time to time at each holder's option for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the GoHealth Holdings, LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), we may effect a direct exchange by GoHealth, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Continuing Equity Owners may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement." In this table, beneficial ownership of LLC Interests has been reflected as beneficial ownership of shares of our Class A common stock for which such LLC Interests may be exchanged. When an LLC Interest is exchanged by a Continuing Equity Holder, a corresponding share of Class B common stock will be cancelled.

(2)   Represents the percentage of voting power of our Class A common stock and Class B common stock voting as a single class. Each share of Class A common stock entitles the registered holder to one vote per share and each share of Class B common stock entitles the registered holder thereof to one vote per share on all matters presented to stockholders for a vote generally, including the election of directors. The Class A common stock and Class B common stock will vote as a single class on all matters except as required by law or our amended and restated certificate of incorporation.

(3)   Consists of (i) 23,488,795 shares of Class A common stock that will be issued in connection with the Transactions to CCP III AIV VII Holdings, L.P., (ii) 17,828,194 shares of Class A common stock that will be issued in connection with the Transactions to CB Blizzard Co-Invest Holdings, L.P. and (iii) 90,367,937 LLC Interests (and associated shares of Class B common stock) that will be issued in connection with the Transactions to Blizzard Aggregator, LLC. Centerbridge Associates

195

III, L.P. is the general partner of each of CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P. CCP III Cayman GP Ltd., the general partner of Centerbridge Associates III, L.P., is the sole manager of Blizzard Aggregator, LLC. Each of Jeffrey H. Aronson and Mark T. Gallogly, as the directors of CCP III Cayman GP Ltd., may be deemed to share voting and dispositive power with respect to the shares held by each of CCP III AIV VII Holdings L.P., CB Blizzard Co-Invest Holdings, L.P. and Blizzard Aggregator, LLC. Such persons and entities disclaim beneficial ownership of the shares held by each of CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P. and Blizzard Aggregator, LLC, except to the extent of any proportionate pecuniary interest therein. The business address of each of the foregoing entities and individuals is c/o Centerbridge Partners, L.P., 375 Park Avenue, 11th Floor, New York, New York 10152.

(4) Consists of 103,658,920 LLC Interests (and associated shares of Class B common stock) that will be issued in connection with the Transactions to NVX Holdings, Inc. Clinton P. Jones and Brandon M. Cruz are the Chief Executive Officer and President of NVX Holdings, Inc., respectively, and share voting and investment control over the shares held by NVX Holdings, Inc. The business address of NVX Holdings, Inc. is c/o NVX Holdings, Inc., 214 West Huron Street, Chicago, Illinois 60654.

(5) Consists of 25,141,150 LLC Interests (and associated shares of Class B common stock), 13,971,151 of which will vest upon the consummation of this offering, that will be issued in connection with the Transactions to Blizzard Management Feeder, LLC ("Feeder") and directly held by Feeder for the benefit of Feeder's members.

(6) Following the completion of the Transactions, each of the members of Feeder will directly hold common units of Feeder that correspond to the LLC Interests (and associated shares of Class B common stock) directly held by Feeder for each such member's benefit and will be entitled to (subject to time-based vesting requirements) direct Feeder to (i) initiate a redemption of the LLC Interests held by Feeder for such member's benefit for newly-issued shares of our Class A common stock on a one-for-one basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the GoHealth Holdings, LLC Agreement and (ii) vote the associated shares of Class B common stock held by Feeder for such member's benefit on all matters presented to stockholders for a vote generally, including the election of directors.

(7) Consists of 32,689,495 LLC Interests (and associated shares of Class B common stock) that will be issued in connection with the Transactions to Norwest Equity Partners IX, LP ("NEP IX"). Itasca Partners IX, LLC is the general partner of NEP IX and may be deemed to have sole voting and dispositive power over the shares held by NEP IX. Norwest Venture Capital Management, Inc., the managing member of Itasca Partners IX, LLC, and Timothy C. DeVries, as Chief Executive Officer of Norwest Venture Capital Management, Inc., and members of the general partner, may be deemed to share voting and dispositive power over the shares held by NEP IX. Such persons and entities disclaim beneficial ownership of the shares held by NEP IX, except to the extent of any proportionate pecuniary interest therein. The address for these entities is 80 South Eighth Street, Suite 3600 IDS Center, Minneapolis, MN 55402.

(8) Consists of 49,008 LLC Interests (and associated shares of Class B common stock) that will be issued in connection with the Transactions to BCCJ, LLC. As the members of the Board of Managers of BCCJ, LLC, Messrs. Jones and Cruz share voting and investment power with respect to such shares.

(9) Consists of 2,026,226 LLC Interests (and associated shares of Class B common stock), all of which will vest upon the consummation of this offering, that will be issued in connection with the Transactions to Feeder and directly held by Feeder for the benefit of Mr. Jones. The business address of Mr. Jones is 1703 North Dayton Street, Chicago, Illinois 60614.

(10) Consists of 2,026,226 LLC Interests (and associated shares of Class B common stock), all of which will vest upon the consummation of this offering, that will be issued in connection with the Transactions to Feeder and directly held by Feeder for the benefit of Mr. Cruz. The business address of Mr. Cruz is 2015 North Dayton Street, Chicago, Illinois 60614.

(11) Consists of 2,731,300 LLC Interests (and associated shares of Class B common stock), 810,491 of which will vest upon the consummation of this offering, that will be issued in connection with the Transactions to Feeder and directly held by Feeder for the benefit of Mr. Cruz.

196

**Table of Contents**

(12)  Consists of 4,512,617 LLC Interests (and associated shares of Class B common stock), 810,491 of which will vest upon the consummation of this offering, that will be issued in connection with the Transactions to Feeder and directly held by Feeder for the benefit of James A. Sharman Gift Trust, of which Mr. Sharman is trustee.

(13)  Consists of 116,059,962 LLC Interests (and associated shares of Class B common stock), 6,483,925 of which will vest upon the consummation of this offering, directly or indirectly held by all our current directors and executive officers as a group.

197

## DESCRIPTION OF CAPITAL STOCK

### General

Prior to the consummation of this offering, we will file an amended and restated certificate of incorporation and we will adopt our amended and restated bylaws. Our amended and restated certificate of incorporation will authorize capital stock consisting of:

- 1,100,000,000 shares of Class A common stock, par value $0.0001 per share;

- 690,000,000 shares of Class B common stock, par value $0.0001 per share; and

- 20,000,000 shares of preferred stock, par value $0.0001 per share.

We are selling 39,500,000 shares of Class A common stock in this offering (45,425,000 shares if the underwriters exercise in full their option to purchase additional shares of our Class A common stock). All shares of our Class A common stock outstanding upon consummation of this offering will be fully paid and non-assessable. We are issuing 232,383,011 shares of Class B common stock to the Continuing Equity Owners in connection with the Transactions for nominal consideration.

The following summary describes the material provisions of our capital stock. We urge you to read our amended and restated certificate of incorporation and our amended and restated bylaws, which are included as exhibits to the registration statement of which this prospectus forms a part.

Certain provisions of our amended and restated certificate of incorporation and our amended and restated bylaws summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of common stock.

### Common Stock

#### *Class A Common Stock*

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our board of directors out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock and Class B common stock will be entitled to receive ratable portions of our remaining assets available for distribution; provided, that the holders of shares of Class B common stock shall not be entitled to receive more than $0.0001 per share of Class B common stock and upon receiving such amount, shall not be entitled to receive any of our other assets or funds with respect to such shares of Class B common stock.

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption, or conversion rights with respect to such share of Class A common stock. There will be no redemption or sinking fund provisions applicable to the Class A common stock.

#### *Class B Common Stock*

Each share of our Class B common stock entitles its holders to one vote per share on all matters presented to our stockholders generally.

198

Table of Contents

Shares of Class B common stock will be issued in the future only to the extent necessary to maintain a one-to-one ratio between the number of LLC Interests held by the Continuing Equity Owners and the number of shares of Class B common stock issued to the Continuing Equity Owners. Shares of Class B common stock are transferable only together with an equal number of LLC Interests. Only permitted transferees of LLC Interests held by the Continuing Equity Owners will be permitted transferees of Class B common stock. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement."

Holders of shares of our Class B common stock will vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our amended and restated certificate of incorporation described below or as otherwise required by applicable law or the amended and restated certificate of incorporation.

Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation other than the right to receive $0.0001 per share of Class B common stock. Additionally, holders of shares of our Class B common stock do not have preemptive, subscription, redemption, or conversion rights with respect to such shares of Class B common stock. There will be no redemption or sinking fund provisions applicable to the Class B common stock. Any amendment of our amended and restated certificate of incorporation that gives holders of our Class B common stock (1) any rights to receive dividends or any other kind of distribution other than in connection with a dissolution or liquidation, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Upon the consummation of the Transactions, the Continuing Equity Owners will own, in the aggregate, 150,324,294 shares of our Class B common stock.

### *Preferred Stock*

Upon the consummation of the Transactions and the effectiveness of our amended and restated certificate of incorporation that will become effective immediately prior to the consummation of the Transactions, the total of our authorized shares of preferred stock will be 20,000,000 shares. Upon the consummation of the Transactions, we will have no shares of preferred stock outstanding.

Under the terms of our amended and restated certificate of incorporation that will become effective immediately prior to the consummation of the Transactions, our board of directors is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our board of directors has the discretion to determine the rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our board of directors to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

### Registration Rights

We intend to enter into a Registration Rights Agreement with certain of the Continuing Equity Owners in connection with this offering pursuant to which such parties will have specified rights to require us to register all or a portion of their shares under the Securities Act. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

**Forum Selection**

Our amended and restated certificate of incorporation will provide (A) (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws (as either may be amended or restated) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware or (iv) any action asserting a claim governed by the internal affairs doctrine of the law of the State of Delaware shall, to the fullest extent permitted by law, be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware; and (B) the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. Notwithstanding the foregoing, the exclusive forum provision shall not apply to claims seeking to enforce any liability or duty created by the Exchange Act. Our amended and restated certificate of incorporation will also provide that, to the fullest extent permitted by law, any person or entity purchasing or otherwise acquiring or holding any interest in shares of our capital stock shall be deemed to have notice of and consented to the foregoing. By agreeing to this provision, however, stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder.

**Dividends**

Declaration and payment of any dividend will be subject to the discretion of our board of directors. The time and amount of dividends will be dependent upon our business prospects, results of operations, financial condition, cash requirements and availability, debt repayment obligations, capital expenditure needs, contractual restrictions, covenants in the agreements governing our current and future indebtedness, industry trends, the provisions of Delaware law affecting the payment of distributions to stockholders and any other factors our board of directors may consider relevant. We currently intend to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness, and therefore, do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. See "Dividend Policy" and "Risk Factors—Risks Related to the Offering and Ownership of our Class A Common Stock—Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it."

**Anti-Takeover Provisions**

Our amended and restated certificate of incorporation and amended and restated bylaws, as they will be in effect immediately prior to the consummation of the Transactions, will contain provisions that may delay, defer or discourage another party from acquiring control of us. We expect that these provisions, which are summarized below, will discourage coercive takeover practices or inadequate takeover bids. These provisions are also designed to encourage persons seeking to acquire control of us to first negotiate with our board of directors, which we believe may result in an improvement of the terms of any such acquisition in favor of our stockholders. However, they also give our board of directors the power to discourage acquisitions that some stockholders may favor.

**Authorized but Unissued Shares**

The authorized but unissued shares of our common stock and our preferred stock are available for future issuance without stockholder approval, subject to any limitations imposed by the Nasdaq rules. These additional shares may be used for a variety of corporate finance transactions, acquisitions and employee benefit plans and, as described under "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement—

Table of Contents

Agreement in Effect Upon Consummation of the Transactions—Common Unit Redemption Right," funding of redemptions of LLC Interests. The existence of authorized but unissued and unreserved common stock and preferred stock could make more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Classified Board of Directors**

Our amended and restated certificate of incorporation will provide that our board of directors will be divided into three classes, with the classes as nearly equal in number as possible and each class serving three-year staggered terms. Our amended and restated certificate of incorporation will also provide that subject to the rights of the holders of any series of preferred stock then outstanding, for as long as the amended and restated certificate of incorporation provides for a classified board of directors, any director, or the entire board of directors, may otherwise be removed only for cause by an affirmative vote of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of all the outstanding shares of stock entitled to vote generally in the election of directors, at a meeting duly called for that purpose; provided, however, that the directors appointed pursuant to the Stockholders Agreement may be removed with or without cause in accordance with the terms thereof and the requirements of the DGCL. See "Management— Composition of our Board of Directors." These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control of us or our management.

**Stockholder Action by Written Consent**

Our amended and restated certificate of incorporation will provide that at any time when Centerbridge beneficially owns, in the aggregate, at least forty percent (40%) in voting power of the corporation entitled to vote generally in the election of directors, any action required or permitted to be taken by our stockholders at an annual meeting or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a written consent, setting forth the action so taken, is signed by the holders of our outstanding shares of common stock representing not less than the minimum number of votes that would be necessary to authorize such action at a meeting at which all outstanding shares of common stock entitled to vote thereon were present and voted and such consent is delivered to us in accordance with applicable law. However, at any time when Centerbridge beneficially owns, in the aggregate, less than forty percent (40%) in voting power of the corporation entitled to vote generally in the election of directors, any action required or permitted to be taken at any annual or special meeting of stockholders must be effected at a duly called annual or special meeting of such holders and may not be effected by written consent in lieu of a meeting; provided, however, that any action required or permitted to be taken by the holders of preferred stock, voting separately as a series or separately as a class with one or more other such series, may be taken without a meeting, without prior notice and without a vote, to the extent expressly so provided by the applicable preferred stock designation.

**Special Meetings of Stockholders**

Our amended and restated bylaws will provide that only the chairperson of our board of directors or a majority of our whole board of directors may call special meetings of our stockholders.

**Advance Notice Requirements for Stockholder Proposals and Director Nominations**

In addition, our amended and restated bylaws will establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of stockholders, including proposed nominations of candidates for election to our board of directors; provided, however, that so long as Centerbridge is entitled to nominate a director pursuant to the Stockholders Agreement, such advance notice provisions will not apply to Centerbridge in connection with the nomination of directors. In order for any matter to be "properly brought" before a meeting, a stockholder will have to comply with advance notice and duration of ownership requirements and provide us with certain information. Stockholders at an annual meeting may only consider proposals or nominations

201

Table of Contents

specified in the notice of meeting or brought before the meeting by or at the direction of our board of directors or by a qualified stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has delivered timely written notice in proper form to our secretary of the stockholder's intention to bring such business before the meeting. These provisions could have the effect of delaying stockholder actions that are favored by the holders of a majority of our outstanding voting securities until the next stockholder meeting.

## Amendment of Certificate of Incorporation or Bylaws

The Delaware General Corporation Law provides generally that the affirmative vote of a majority of the shares entitled to vote on any matter is required to amend a corporation's certificate of incorporation or bylaws, unless a corporation's certificate of incorporation or bylaws, as the case may be, requires a greater percentage. Upon consummation of the Transactions, our bylaws may be amended or repealed by (i) a majority vote of our board of directors or (ii) at any time when Centerbridge beneficially owns, in the aggregate, less than forty percent (40%) in voting power of the corporation entitled to vote generally in the election of directors, by the affirmative vote of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of all outstanding voting stock of the corporation entitled to vote, voting together as a single class.

## Section 203 of the DGCL

Our amended and restated certificate of incorporation will contain a provision opting out of Section 203 of the DGCL. However, our amended and restated certificate of incorporation will contain provisions that are similar to Section 203. Specifically, our amended and restated certificate of incorporation will provide that, subject to certain exceptions, we will not be able to engage in a "business combination" with any "interested stockholder" for three years following the date that the person became an interested stockholder, unless the interested stockholder attained such status with the approval of our board of directors or unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger or consolidation involving us and the "interested stockholder" and the sale of more than 10% of our assets. In general, an "interested stockholder" is any entity or person beneficially owning 15% or more of our outstanding voting stock and any entity or person affiliated with or controlling or controlled by such entity or person.

However, under our amended and restated certificate of incorporation, Centerbridge and NVX Holdings and any of their respective affiliates will not be deemed to be interested stockholders regardless of the percentage of our outstanding voting stock owned by them, and accordingly will not be subject to such restrictions.

## Limitations on Liability and Indemnification of Officers and Directors

Our amended and restated certificate of incorporation and amended and restated bylaws provide indemnification for our directors and officers to the fullest extent permitted by the DGCL. Prior to the consummation of the Transactions, we intend to enter into indemnification agreements with each of our directors and executive officers that may, in some cases, be broader than the specific indemnification provisions contained under Delaware law. In addition, as permitted by Delaware law, our amended and restated certificate of incorporation includes provisions that eliminate the personal liability of our directors for monetary damages resulting from breaches of certain fiduciary duties as a director. The effect of this provision is to restrict our rights and the rights of our stockholders in derivative suits to recover monetary damages against a director for breach of fiduciary duties as a director.

These provisions may be held not to be enforceable for violations of the federal securities laws of the United States.

## Corporate Opportunity Doctrine

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our amended and

202

Table of Contents

restated certificate of incorporation will, to the fullest extent permitted from time to time by Delaware law, we renounce any interest or expectancy that we otherwise would have in, all rights to be offered an opportunity to participate in, any business opportunity that are from time to time may be presented to Centerbridge or its affiliates (other than us and our subsidiaries), and any of its or their respective principals, members, directors, partners, stockholders, officers, employees or other representatives (other than any such person who is also our employee or an employee of our subsidiaries subsidiaries), or any director or stockholder who is not employed by us or our subsidiaries (each such person, an "exempt person"). Our amended and restated certificate of incorporation will provide that, to the fullest extent permitted by law, no exempt person will have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our subsidiaries now engage or propose to engage or (2) otherwise competing with us or our subsidiaries. In addition, to the fullest extent permitted by law, if an exempt person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our subsidiaries, such exempt person will have no duty to communicate or offer such transaction or business opportunity to us or any of our subsidiaries and such exempt person may take any such opportunity for themselves or offer it to another person or entity. The forgoing provisions shall not apply to an opportunity that was expressly offered to an exempt person solely in their capacity as a director, executive officer or employee of us or our subsidiaries. To the fullest extent permitted by Delaware law, no potential transaction or business opportunity may be deemed to be a corporate opportunity of the corporation or its subsidiaries unless (1) we or our subsidiaries would be permitted to undertake such transaction or opportunity in accordance with the amended and restated certificate of incorporation, (2) we or our subsidiaries, at such time have sufficient financial resources to undertake such transaction or opportunity, (3) we or our subsidiaries have an interest or expectancy in such transaction or opportunity, and (4) such transaction or opportunity would be in the same or similar line of our or our subsidiaries' business in which we or our subsidiaries are engaged or a line of business that is reasonably related to, or a reasonable extension of, such line of business.

**Dissenters' Rights of Appraisal and Payment**

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of GoHealth, Inc. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

**Stockholders' Derivative Actions**

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is American Stock Transfer & Trust Company, LLC.

**Trading Symbol and Market**

We have applied to list our Class A common stock on The Nasdaq Global Market under the symbol "GOCO."

**DESCRIPTION OF INDEBTEDNESS**

**Credit Facilities**

*General*

On September 13, 2019, in connection with the Centerbridge Acquisition, Norvax, LLC, or the Borrower, entered into a first lien credit agreement, or the Credit Agreement, which provides for the following:

- a $300.0 million aggregate principal amount senior secured term loan facility, or the Term Loan Facility; and

- a $30.0 million aggregate principal amount senior secured revolving credit facility, or the Revolving Credit Facility.

On March 20, 2020, the Borrower entered into an amendment to the Credit Agreement, which provides $117.0 million of incremental term loans, or the Incremental Term Loan Facility.

As of March 31, 2020, we had $298.5 million and $117.0 million outstanding under the Term Loan Facility and the Incremental Term Loan Facility, respectively. As of March 31, 2020, our capacity under the Revolving Credit Facility was $30.0 million, with $30.0 million available for additional borrowings.

Additionally, on May 7, 2020, the Borrower entered into an amendment to the Credit Agreement, which provides $20.0 million of additional revolving commitment under the Credit Facilities, or the Incremental Revolving Loan Facility.

We collectively refer to the Term Loan Facility, the Revolving Credit Facility, the Incremental Term Loan Facility and the Incremental Revolving Loan Facility as the Credit Facilities.

*Interest Rates and Fees*

Borrowings under the Credit Facilities are, at the option of the Borrower, either alternate base rate, or ABR, loans or LIBO Rate loans. Term loans, incremental term loans and revolving loans comprising each ABR borrowing under the Credit Facilities accrue interest at the ABR plus an applicable rate equal to 5.50% per annum. Term loans, incremental term loans and revolving loans comprising each LIBO Rate borrowing bear interest at the LIBO Rate plus an applicable rate equal to 6.50% per annum.

In addition to paying interest on the principal amounts outstanding under the Credit Facilities, the Borrower is required to pay a commitment fee of 0.50% per annum under the Revolving Credit Facility in respect of the unutilized commitments thereunder. The Borrower is also subject to customary letter of credit and agency fees.

*Mandatory Prepayments*

The Credit Agreement requires that the Borrower, following the end of each fiscal year, commencing with the fiscal year ending December 31, 2020, repay the outstanding principal amount of all term loans under the Credit Facilities in an aggregate amount equal to (A) 50% of the excess cash flow of the Borrower and its restricted subsidiaries for such fiscal year if the Total Net Cash Leverage Ratio (as defined in the Credit Agreement) is greater than 4.50:1.00, which percentage is reduced to 25% if the Total Net Cash Leverage Ratio is less than or equal to 4.50:1.00 and greater than 4.00:1.00, which percentage is further reduced to 0% if the Total Net Cash Leverage Ratio is less than or equal to 4.00:1.00, minus (B) at the option of the Borrower, (x) the aggregate amount of certain voluntary prepayments of term loans under the Credit Agreement during such fiscal year or after year-end and prior to the time such Excess Cash Flow prepayment is due, (y) the aggregate principal amount of any voluntary prepayments of indebtedness under *pari passu* incremental facilities, incremental equivalent debt and/or certain refinancing indebtedness, made during such fiscal year or after such fiscal year and prior to the time such prepayment is due.

204

The Credit Agreement requires the Borrower to repay amounts equal to 100% of the net cash proceeds of certain asset sales or other dispositions of property (including insurance and condemnation proceeds ); provided, that, in the case of any prepayment events required in connection with certain dispositions and casualty events, if the net proceeds therefrom are invested (or committed to be invested) within 12 months after the receipt of such net proceeds, then no prepayment shall be required except to the extent such net proceeds have not been so invested (or committed to be invested) by the end of such 12-month period.

The Credit Agreement requires 100% of the net proceeds from the issuance or incurrence of certain indebtedness to be applied to prepay the term loans under the Term Loan Facility and the Incremental Term Loan Facility, except to the extent the indebtedness constitutes refinancing indebtedness.

### *Voluntary Prepayment*

The Borrower may voluntarily prepay outstanding borrowings under the Credit Facilities at any time in whole or in part without premium or penalty; provided, that, with respect to voluntary prepayments of the Term Loan Facility and the Incremental Term Loan Facility and in certain other circumstances, the Borrower may have to pay a prepayment premium.

### *Amortization and Final Maturity*

The Term Loan Facility is payable in quarterly installments (commencing on December 31, 2019) in the principal amount of 0.25% of the original principal amount of the Term Loan Facility. The remaining unpaid balance on the Term Loan Facility, together with all accrued and unpaid interest thereon, is due and payable on or prior to September 13, 2025. The Incremental Term Loan Facility is payable in quarterly installments (commencing on June 30, 2020) in the principal amount of 0.25% of the original principal amount of the Incremental Term Loan Facility. The remaining unpaid balance on the Term Loan Facility and the Incremental Term Loan Facility, together with all accrued and unpaid interest thereon, is due and payable on or prior to September 13, 2025. Outstanding borrowings under the Revolving Credit Facility do not amortize and are due and payable on September 13, 2024.

### *Guarantees and Security*

The Borrower's obligations under the Credit Facilities are guaranteed by Blizzard Midco, LLC and certain of the Borrower's subsidiaries. All obligations under the Credit Agreement are secured by a first priority lien on substantially all of the assets of the Borrower, including a pledge of all of the equity interests of its subsidiaries.

### Covenants and Other Matters

The Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict the Borrower's and its restricted subsidiaries' ability to:

- incur indebtedness;

- incur certain liens;

- consolidate, merge or sell or otherwise dispose of assets;

- make investments, loans, advances, guarantees and acquisitions;

- pay dividends or make other distributions on equity interests, or redeem, repurchase or retire equity interests;

- enter into transactions with affiliates;

- alter the business conducted by us and our subsidiaries;

205

- change their fiscal year; and

- amend or modify governing documents.

In addition, the Credit Agreement contains financial covenants with respect to each of the Total Net Leverage Ratio, LTV Ratio and Liquidity, as detailed below.

- If the Borrower's Total Net Cash Leverage Ratio is greater than 5.50:1.00, the Total Leverage Covenant requires the Borrower to maintain a Total Net Leverage Ratio no greater than (i) for the fiscal quarter ending on March 31, 2020 to and including the fiscal quarter ending on June 30, 2020, 4.50:1.00, (ii) for the fiscal quarter ending on September 30, 2020 to and including the fiscal quarter ending on December 31, 2020, 4.00:1.00, (iii) for the fiscal quarter ending on March 31, 2021 to and including the fiscal quarter ending on December 31, 2021, 3.50:1.00 and (iv) for the fiscal quarter ending on March 31, 2022 and each fiscal quarter ending thereafter, 3.00:1.00, tested as of the last day of each fiscal quarter and determined on the basis of the four consecutive most recently ended fiscal quarters of the Borrower for which financial statements have been delivered pursuant to the Credit Agreement.

- If the Borrower's Total Net Cash Leverage Ratio is greater than 5.50:1.00, the LTV Covenant requires the Borrower to maintain a LTV Ratio no greater than (i) for the fiscal quarter ending on March 31, 2020 to and including the fiscal quarter ending on June 30, 2020, 2.50:1.00, (ii) for the fiscal quarter ending on September 30, 2020 to and including the fiscal quarter ending on December 31, 2020, 2.00:1.00, (iii) for the fiscal quarter ending on March 31, 2021, 1.50:1.00, (iv) for the fiscal quarter ending on June 30, 2021 to and including the fiscal quarter ending on December 31, 2021, 1.25:1.00 and (v) for the fiscal quarter ending on March 31, 2022 and each fiscal quarter ending thereafter, 1.00:1.00, tested as of the last day of each fiscal quarter and determined on the basis of the four consecutive most recently ended fiscal quarters of the Borrower for which financial statements have been delivered pursuant to the Credit Agreement.

- At all times, the Minimum Liquidity Covenant requires the Borrower to maintain Liquidity of no less than $10 million.

The Company is in compliance with all covenants as of March 31, 2020.

The Credit Agreement also contains certain customary representations and warranties and affirmative covenants, and certain reporting obligations. In addition, the lenders under the Credit Facilities will be permitted to accelerate all outstanding borrowings and other obligations, terminate outstanding commitments and exercise other specified remedies upon the occurrence of certain events of default (subject to certain grace periods and exceptions), which include, among other things, payment defaults, breaches of representations and warranties, covenant defaults, certain cross-defaults and cross-accelerations to other indebtedness, certain events of bankruptcy and insolvency, certain judgments and changes of control.

The foregoing summary describes the material provisions of the Credit Agreement, but may not contain all information that is important to you. We urge you to read the provisions of the Credit Agreement, which has been filed as an exhibit to the registration statement of which this prospectus forms a part.

Table of Contents

**SHARES ELIGIBLE FOR FUTURE SALE**

Immediately prior to this offering, there was no public market for our Class A common stock. Future sales of substantial amounts of Class A common stock in the public market (including shares of Class A common stock issuable upon redemption or exchange of LLC Interests of our Continuing Equity Owners), or the perception that such sales may occur, could adversely affect the market price of our Class A common stock. Although we have applied to have our Class A common stock listed on The Nasdaq Global Market, we cannot assure you that there will be an active public market for our Class A common stock.

Upon the closing of this offering, we will have outstanding an aggregate of 80,816,989 shares of Class A common stock, assuming the issuance of 39,500,000 shares of Class A common stock offered by us in this offering and the issuance of 41,316,989 shares of Class A common stock to the Blocker Shareholders in the Transactions. Of these shares, all shares sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by our "affiliates," as that term is defined in Rule 144 under the Securities Act, whose sales would be subject to the Rule 144 resale restrictions described below, other than the holding period requirement, and any Class A common stock purchased by our directors, officers and employees pursuant to our Reserved Share Program shall be subject to the lock-up agreements as described below under "—Lock-Up Agreements."

The remaining 41,316,989 shares of Class A common stock will be "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if they are registered under the Securities Act or if they qualify for an exemption from registration under the Securities Act, including Rules 144 or 701 under the Securities Act, which are summarized below.

In addition, each LLC Interest held directly or indirectly by our Continuing Equity Owners will be redeemable, at the election of each Continuing Equity Owner (subject in certain circumstances to time-based vesting requirements), for, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or, to the extent there is cash available from a secondary offering, a cash payment equal to a volume weighted average market price of one share of Class A common stock for LLC Interest so redeemed, in each case, in accordance with the terms of the GoHealth Holdings, LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the Nasdaq rules) who are disinterested), we may effect a direct exchange by GoHealth, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Continuing Equity Owners may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—GoHealth Holdings, LLC Agreement." Upon consummation of the Transactions, our Continuing Equity Owners will hold 232,383,011 LLC Interests (excluding 7,408,386 LLC Interests to be held directly or indirectly by certain Profits Unit Holders that are subject to time-based vesting requirements), all of which will be exchangeable for shares of our Class A common stock. The shares of Class A common stock we issue upon such exchanges would be "restricted securities" as defined in Rule 144 unless we register such issuances. However, we will enter into a Registration Rights Agreement with certain of the Original Equity Owners that will require us, subject to customary conditions, to register under the Securities Act these shares of Class A common stock. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

**Lock-Up Agreements**

We, our officers and directors and substantially all of our stockholders have agreed that, without the prior written consent of any two of Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC, we and they will not, subject to certain exceptions, during the period ending 180 days after the date of this prospectus:

- offer, sell, contract to sell, pledge, grant any option to purchase, lend or otherwise dispose of any shares of our common stock, or any options or warrants to purchase any shares of our common stock, or any securities convertible into, or exchangeable for, or that represent the right to receive, shares of our common stock;

207

Table of Contents

- engage in any hedging or other transaction or arrangement (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) which is designed to, or which reasonably could be expected to lead to, or result in, a sale, loan, pledge or other disposition of shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock,

whether any transaction described above is to be settled by delivery of our common stock or such other securities, in cash or otherwise;

- otherwise publicly announce any intention to engage in or engage in or cause any action or activity described above or transaction or arrangement described above; or

- make any demand for, or exercise any right with respect to, the registration of any shares of common stock or any security convertible into or exercisable or exchangeable for shares of common stock.

Any two of Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC, in their sole discretion as representatives, may release the common stock and other securities subject to the lock-up agreements described above in whole or in part at any time. In certain circumstances, the release of shares of common stock from the lock-up restrictions described above will trigger a pro rata release of shares of common stock held by certain other holders. These agreements are subject to certain exceptions. See "Underwriting."

In addition, certain of our employees who hold Performance Units, including certain of our executive officers, have entered into lock-up agreements in substantially the same form as the lock-up agreements with the underwriters as further described in the section titled "Executive Compensation—Share-Based Compensation."

Upon the expiration of the applicable lock-up periods, substantially all of the shares subject to such lock-up restrictions will become eligible for sale, subject to the limitations discussed above.

## Rule 144

In general, a person who has beneficially owned our Class A common stock that are restricted shares for at least six months would be entitled to sell such securities, provided that (1) such person is not deemed to have been one of our affiliates at the time of, or at any time during the 90 days preceding, a sale and (2) we are subject to the Exchange Act periodic reporting requirements for at least 90 days before the sale. Persons who have beneficially owned our Class A common stock that are restricted shares for at least six months but who are our affiliates at the time of, or any time during the 90 days preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three month period only a number of securities that does not exceed the greater of either of the following:

- 1% of the number of our Class A common stock then outstanding; or

- the average weekly trading volume of our Class A common stock on the Nasdaq during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale; provided, in each case, that we are subject to the Exchange Act periodic reporting requirements for at least 90 days before the sale. Such sales both by affiliates and by non-affiliates must also comply with the manner of sale, current public information and notice provisions of Rule 144 to the extent applicable.

## Rule 701

In general, under Rule 701, any of our employees, directors, officers, consultants or advisors who purchases shares from us in connection with a compensatory stock or option plan or other written agreement before the effective date of the registration statement of which this prospectus forms a part is entitled to sell such shares 90

Table of Contents

days after such effective date in reliance on Rule 144. Our affiliates can resell shares in reliance on Rule 144 without having to comply with the holding period requirement, and non-affiliates of the issuer can resell shares in reliance on Rule 144 without having to comply with the current public information and holding period requirements.

The SEC has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act, along with the shares acquired upon exercise of such options, including exercises after an issuer becomes subject to the reporting requirements of the Exchange Act.

**Equity Plans**

We intend to file one or more registration statements on Form S-8 under the Securities Act to register the offer and sale of all shares of Class A common stock subject to outstanding stock options and Class A common stock issued or issuable under our 2020 Plan. After consummation of this offering, 2,672,234 shares of Class A common stock issuable pursuant to stock options and approximately 338,159 shares of Class A common stock issuable pursuant to restricted share units, in each case, are intended to be granted to certain of our directors, executive officers and other employees.

We expect to file the registration statement covering shares offered pursuant to our 2020 Plan shortly after the date of this prospectus, permitting the resale of such shares by nonaffiliates in the public market without restriction under the Securities Act and the sale by affiliates in the public market subject to compliance with the resale provisions of Rule 144.

**Registration Rights**

See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

209

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS
## TO NON-U.S. HOLDERS OF CLASS A COMMON STOCK

The following discussion is a summary of the material U.S. federal income tax consequences to Non-U.S. Holders (as defined below) of the purchase, ownership and disposition of our Class A common stock issued pursuant to this offering, but does not purport to be a complete analysis of all potential tax effects. The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or non-U.S. tax laws are not discussed. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "IRS"), in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect a Non-U.S. Holder of our Class A common stock. We have not sought and will not seek any rulings from the IRS regarding the matters discussed below. There can be no assurance the IRS or a court will not take a contrary position to that discussed below regarding the tax consequences of the purchase, ownership and disposition of our Class A common stock.

This discussion is limited to Non-U.S. Holders that hold our Class A common stock as a "capital asset" within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all U.S. federal income tax consequences relevant to a Non-U.S. Holder's particular circumstances, including the impact of the Medicare contribution tax on net investment income. In addition, it does not address consequences relevant to Non-U.S. Holders subject to special rules, including, without limitation:

- U.S. expatriates and former citizens or long-term residents of the United States;

- persons subject to the alternative minimum tax;

- persons holding our Class A common stock as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- banks, insurance companies, and other financial institutions;

- brokers, dealers or traders in securities;

- "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax;

- partnerships or other entities or arrangements treated as partnerships for U.S. federal income tax purposes (and investors therein);

- tax-exempt organizations or governmental organizations;

- persons deemed to sell our Class A common stock under the constructive sale provisions of the Code;

- persons who hold or receive our Class A common stock pursuant to the exercise of any employee stock option or otherwise as compensation;

- tax-qualified retirement plans;

- "qualified foreign pension funds" as defined in Section 897(l)(2) of the Code and entities all of the interests of which are held by qualified foreign pension funds; and

- persons subject to special tax accounting rules as a result of any item of gross income with respect to the stock being taken into account in an applicable financial statement.

If an entity treated as a partnership for U.S. federal income tax purposes holds our Class A common stock, the tax treatment of an owner in such an entity will depend on the status of the owner, the activities of such entity and certain determinations made at the owner level. Accordingly, entities treated as partnerships for U.S. federal income tax purposes holding our Class A common stock and the owners in such entities should consult their tax advisors regarding the U.S. federal income tax consequences to them.

210

**Table of Contents**

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF OUR CLASS A COMMON STOCK ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.**

**Definition of a Non-U.S. Holder**

For purposes of this discussion, a "Non-U.S. Holder" is any beneficial owner of our Class A common stock that is neither a "U.S. person" nor an entity treated as a partnership for U.S. federal income tax purposes. A U.S. person is any person that, for U.S. federal income tax purposes, is or is treated as any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

**Distributions**

As described in the section entitled "Dividend Policy," we do not anticipate declaring or paying dividends to holders of our Class A common stock in the foreseeable future. However, if we do make distributions of cash or property on our Class A common stock, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Amounts not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a Non-U.S. Holder's adjusted tax basis in its Class A common stock, but not below zero. Any excess will be treated as capital gain and will be treated as described below under "—Sale or Other Taxable Disposition."

Subject to the discussion below on effectively connected income, dividends paid to a Non-U.S. Holder of our Class A common stock will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividends (or such lower rate specified by an applicable income tax treaty, provided the Non-U.S. Holder furnishes a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate). A Non-U.S. Holder that does not timely furnish the required documentation, but that qualifies for a reduced treaty rate, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

If dividends paid to a Non-U.S. Holder are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such dividends are attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above. To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.

Any such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a

211

Table of Contents

rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected dividends, as adjusted for certain items. Non-U.S. Holders should consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

**Sale or Other Taxable Disposition**

A Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale or other taxable disposition of our Class A common stock unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable);

- the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met; or

- our common stock constitutes a U.S. real property interest ("USRPI") by reason of our status as a U.S. real property holding corporation ("USRPHC") for U.S. federal income tax purposes.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty), which may be offset by U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, we believe we currently are not, and do not anticipate becoming, a USRPHC. Because the determination of whether we are a USRPHC depends, however, on the fair market value of our USRPIs relative to the fair market value of our non-U.S. real property interests and our other business assets, there can be no assurance we currently are not a USRPHC or will not become one in the future. Even if we are or were to become a USRPHC, gain arising from the sale or other taxable disposition by a Non-U.S. Holder of our common stock will not be subject to U.S. federal income tax if our common stock is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such Non-U.S. Holder owned, actually and constructively, 5% or less of our Class A common stock throughout the shorter of the five-year period ending on the date of the sale or other taxable disposition or the Non-U.S. Holder's holding period.

Non-U.S. Holders should consult their tax advisors regarding potentially applicable income tax treaties that may provide for different rules.

**Information Reporting and Backup Withholding**

Payments of dividends on our Class A common stock will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder either certifies its non-U.S. status, such as by furnishing a valid IRS Form W-8BEN, W-8BEN-E or W-8ECI, or otherwise establishes an exemption. However, information returns are required to be filed with the IRS in connection with any distributions on our Class A common stock paid to the Non-U.S. Holder, regardless of whether such distributions constitute dividends or whether any tax was actually withheld. In addition, proceeds of the sale or other taxable disposition of our Class A common stock within the United States or conducted through certain U.S.-related brokers generally will not be subject to backup withholding or

212

information reporting, if the applicable withholding agent receives the certification described above and does not have actual knowledge or reason to know that such holder is a United States person, or the holder otherwise establishes an exemption. Proceeds of a disposition of our Class A common stock conducted through a non-U.S. office of a non-U.S. broker generally will not be subject to backup withholding or information reporting.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Additional Withholding Tax on Payments Made to Foreign Accounts**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends on, or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale or other disposition of, our Class A common stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our Class A common stock. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

Prospective investors should consult their tax advisors regarding the potential application of withholding under FATCA to their investment in our common stock.

213

## UNDERWRITING

We, GoHealth Holdings, LLC and Goldman Sachs & Co. LLC, BofA Securities, Inc., and Morgan Stanley & Co. LLC, acting as representatives of the underwriters named below, have entered into an underwriting agreement with respect to the shares of Class A common stock being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of shares of Class A common stock indicated in the following table.

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | |
| BofA Securities, Inc. | |
| Morgan Stanley & Co. LLC | |
| Barclays Capital Inc. | |
| Credit Suisse Securities (USA) LLC | |
| Evercore Group L.L.C. | |
| RBC Capital Markets, LLC | |
| William Blair & Company, L.L.C. | |
| Cantor Fitzgerald & Co. | |
| SunTrust Robinson Humphrey, Inc. | |
| Loop Capital Markets LLC | |
| Total | 39,500,000 |

The underwriters are committed to take and pay for all of the shares of Class A common stock being offered, if any are taken, other than the shares of Class A common stock covered by the option described below unless and until this option is exercised.

The underwriters have an option to buy up to an additional 5,925,000 shares of Class A common stock from us to cover sales by the underwriters of a greater number of shares of Class A common stock than the total number set forth in the table above. They may exercise that option for 30 days. If any shares of Class A common stock are purchased pursuant to this option, the underwriters will severally purchase shares of Class A common stock in approximately the same proportion as set forth in the table above.

The following tables show the per share and total underwriting discount to be paid to the underwriters by us. Such amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase 5,925,500 additional shares of Class A common stock.

| | No Exercise | Full Exercise |
|---|---|---|
| Per Share | $ | $ |
| Total | $ | $ |

Shares of Class A common stock sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any shares of Class A common stock sold by the underwriters to securities dealers may be sold at a discount of up to $          per share of Class A common stock from the initial public offering price. After the initial offering of the shares of Class A common stock, the representatives may change the offering price and the other selling terms. The offering of the shares of Class A common stock by the underwriters is subject to receipt and acceptance and subject to the underwriters' right to reject any order in whole or in part.

We, our officers and directors and substantially all of our stockholders have agreed that, without the prior written consent of any two of Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC, we and they will not, subject to certain exceptions, during the period ending 180 days after the date of this prospectus:

• offer, sell, contract to sell, pledge, grant any option to purchase, lend or otherwise dispose of any shares of our common stock, or any options or warrants to purchase any shares of our common stock, or any

214

securities convertible into, or exchangeable for, or that represent the right to receive, shares of our common stock;

- engage in any hedging or other transaction or arrangement (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) which is designed to, or which reasonably could be expected to lead to, or result in, a sale, loan, pledge or other disposition of shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock, whether any transaction described above is to be settled by delivery of our common stock or such other securities, in cash or otherwise;

- otherwise publicly announce any intention to engage in or cause any action or activity described above or transaction or arrangement described above; or

- make any demand for, or exercise any right with respect to, the registration of any shares of common stock or any security convertible into or exercisable or exchangeable for shares of common stock.

The restrictions described in the immediately preceding paragraph do not apply to:

- the sale of the shares to the underwriters or any transfer or disposition in connection with the Transactions;

- any shares of Class A common stock acquired in the open market after completion of this offering;

- any transfer as a bona fide gift, provided that such done or donees agree to be bound by the lock-up restrictions;

- any transfer to any beneficiary pursuant to a will, other testamentary document or intestate succession, provided that such beneficiary agrees to be bound by the lock-up restrictions;

- any shares transferred to any trust, partnership, limited liability company or other entity for the direct or indirect benefit of the holder or any immediate family, or if the holder is a trust, to any beneficiary (including such beneficiary's estate) of the holder, provided that the trustee of the trust or the applicable entity or beneficiary agrees to be bound in writing by the lock-up restrictions;

- any transfer or disposition pursuant to an order of a court or regulatory agency or to comply with any regulations related to ownership of the shares;

- any transfer pursuant to a bona fide third party pursuant to a tender or exchange offer for securities of the Company or other transaction, including, without limitation, a merger, consolidation or other business combination, involving a change of control of the Company that, in each case, has been approved by the Company's board of directors, provided that any securities subject to the lock-up restrictions that are not so transferred remain subject to the lock-up restrictions;

- any shares transferred to us upon death, disability or termination of employment;

- grants of awards or any securities pursuant to the terms of an employee equity-based compensation plan, incentive plan, stock plan, dividend reinvestment plan or otherwise in any equity compensation arrangements in effect on the date hereof and described herein; provided that each newly appointed director or executive officer that is a recipient executes a lock-up agreement with respect to the remaining portion of the applicable restricted period;

- transfers of shares or other securities upon a vesting or settlement event or upon the exercise of options to purchase securities on a "cashless" or "net exercise" basis to the extent permitted by the instruments representing such options so long as such securities or options were granted under plans described in this prospectus and certain other conditions are met;

- any transfer of shares to us in connection with the repurchase of shares or other securities granted under any stock incentive plan, stock purchase plan or other equity award plan descried in this prospectus,

215

provided that the underlying shares or other securities shall continue to be subject to the lock-up restrictions;

- transfers to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate of the holder, or to any investment fund or other entity controlled or managed by the holder or its affiliates, in each case without consideration, or as part of a distribution, transfer or disposition without consideration by the holder to its stockholders, partners, members, beneficiaries or other equity holders; provided, however, that the transferee execute executes a lock-up agreement;

- the filing of any registration statement on Form S-8 relating to securities granted or to be granted pursuant to any plan in effect on the date hereof and described herein or any assumed benefit plan contemplated below;

- the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of common stock, provided that (i) such plan does not provide for the transfer of common stock during the applicable restricted period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by the Company regarding the establishment or amendment of such plan, such announcement or filing shall include a statement to the effect that no transfer of common stock may be made; or

- the issuance by the Company of up to 5% of the outstanding shares of Class A common stock in connection with the acquisition of the assets of, or a majority or controlling portion of the equity of, or a joint venture with another entity in connection with its acquisition by the Company or any of its subsidiaries of such entity, provided that the recipient executes a lock-up agreement with respect to the remaining portion of the applicable restricted period.

Any two of Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC, in their sole discretion as representatives, may release the common stock and other securities subject to the lock up agreements described above in whole or in part at any time. In certain circumstances, the release of shares of common stock from the lock-up restrictions described above will trigger a pro rata release of shares of common stock held by certain other holders.

Prior to the offering, there has been no public market for the shares of Class A common stock. The initial public offering price has been negotiated among us and the representatives. Among the factors to be considered in determining the initial public offering price of the shares of Class A common stock, in addition to prevailing market conditions, will be our historical performance, estimates our business potential and earnings prospects, an assessment of our management and the consideration of the above factors in relation to market valuation of companies in related businesses.

We have applied to list our Class A common stock on The Nasdaq Global Market under the symbol "GOCO."

In connection with the offering, the underwriters may purchase and sell shares of Class A common stock in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of shares of Class A common stock than they are required to purchase in the offering, and a short position represents the amount of such sales that have not been covered by subsequent purchases. A "covered short position" is a short position that is not greater than the amount of additional shares of Class A common stock for which the underwriters' option described above may be exercised. The underwriters may cover any covered short position by either exercising their option to purchase additional shares of Class A common stock or purchasing shares of Class A common stock in the open market. In determining the source of shares of Class A common stock to cover the covered short position, the underwriters will consider, among other things, the price of shares of Class A common stock available for purchase in the open market as compared to the price at which they may purchase additional shares of Class A common stock pursuant to the option described above. "Naked" short sales are any short sales that create a short position greater than the amount of additional shares of Class A common stock for which the option described above may be exercised. The underwriters

216

must cover any such naked short position by purchasing shares of Class A common stock in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of common stock made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares of Class A common stock sold by or for the account of such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the Class A common stock, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the Class A common stock. As a result, the price of the Class A common stock may be higher than the price that otherwise might exist in the open market. The underwriters are not required to engage in these activities and may end any of these activities at any time. These transactions may be effected on the Nasdaq Global Market, in the over-the-counter market or otherwise.

*Reserved Share Program*

At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the initial public offering price, up to 5% of the Class A common stock offered by this prospectus for sale to certain of our directors, officers and employees through a reserved share program, or Reserved Share Program. If these persons purchase reserved shares of Class A common stock, it will reduce the number of shares of Class A common stock available for sale to the general public. Any reserved shares of Class A common stock that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of Class A common stock offered by this prospectus. Any shares sold in the Reserved Share Program to a party who has entered into a lock-up agreement shall be subject to the provisions of such lock-up agreement.

*European Economic Area and the United Kingdom*

This prospectus is not a prospectus for the purposes of the Prospectus Regulation (as defined below). This prospectus and any offer if made subsequently is directed only at persons in Member States of the European Economic Area (the "EEA") or in the United Kingdom (each, a "Relevant State") who are "qualified investors" within the meaning of Article 2(e) of the Prospectus Regulation. This prospectus has been prepared on the basis that any offer of shares of Class A common stock in any Relevant State will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of shares of Class A common stock. Accordingly any person making or intending to make an offer in that Relevant State of shares of Class A common stock which are the subject of the offering contemplated in this prospectus may only do so in circumstances in which no obligation arises for us or the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Regulation in relation to such offer. Neither us nor the underwriters have authorized, nor do they authorize, the making of any offer of shares of Class A common stock in circumstances in which an obligation arises for us or the underwriters to publish a prospectus for such offer.

In relation to each Relevant State, no offer of shares of Class A common stock which are the subject of the offering contemplated by this prospectus to the public may be made in that Relevant State other than:

    (a)    to any legal entity which is a qualified investor as defined in the Prospectus Regulation;

    (b)    to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Regulation), subject to obtaining the prior consent of the representatives for any such offer; or

    (c)    in any other circumstances falling within Article 1(4) of the Prospectus Regulation,

provided that no such offer of shares of Class A common stock shall require us or any representative to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

217

**Table of Contents**

For the purposes of this provision, the expression an "offer to the public" in relation to any shares of Class A common stock in any Relevant State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares of Class A common stock to be offered so as to enable an investor to decide to purchase or subscribe for any shares of Class A common stock, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

*United Kingdom*

This prospectus may not be distributed or circulated to any person in the United Kingdom other than to (i) persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order"); and (ii) high net worth entities falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). This prospectus is directed only at relevant persons. Other persons should not act on this prospectus or any of its contents. This prospectus is confidential and is being supplied to you solely for your information and may not be reproduced, redistributed or passed on to any other person or published, in whole or in part, for any other purpose.

Any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) in connection with the issue or sale of the shares of Class A common stock may only be communicated or caused to be communicated in circumstances in which Section 21(1) of the FSMA does not apply to us.

All applicable provisions of the FSMA must be complied with in respect to anything done by any person in relation to the shares of Class A common stock in, from or otherwise involving the United Kingdom.

*Canada*

The securities may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions, and Ongoing Registrant Obligations. Any resale of the securities must be made in accordance with an exemption form, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

*Hong Kong*

The shares of Class A common stock have not been and will not be offered or sold in Hong Kong by means of any document other than (i) to "professional investors" within the meaning of the Securities and Futures Ordinance of Hong Kong (Cap. 571, Laws of Hong Kong) (the "SFO") and any rules made thereunder, or (ii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance of Hong Kong (Cap. 32, Laws of Hong

218

Kong) (the "C(WUMP)O") or which do not constitute an offer to the public within the meaning of the C(WUMP)O; and no advertisement, invitation or document relating to the shares of Class A common stock have been or will be issued or have been or will be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to the shares of Class A common stock which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the SFO and any rules made thereunder.

*Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares of Class A common stock may not be circulated or distributed, nor may the shares of Class A common stock be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor (as defined under Section 4A of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA")) under Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA and (where applicable) Regulation 3 of the Securities and Futures (Classes of Investors) Regulations 2018 or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to conditions set forth in the SFA.

Where the shares of Class A common stock are subscribed or purchased under Section 275 of the SFA by a relevant person which is a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor, the securities or securities-based derivatives (each as defined in Section 2(1) of the SFA) of that corporation shall not be transferable for 6 months after that corporation has acquired the shares of Class A common stock under Section 275 of the SFA except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person (as defined in Section 275(2) of the SFA), (2) where such transfer arises from an offer in that corporation's securities or securities-based derivatives pursuant to Section 275(1A) of the SFA, (3) where no consideration is or will be given for the transfer, (4) where the transfer is by operation of law, (5) as specified in Section 276(7) of the SFA, or (6) as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Shares and Securities-based Derivatives Contracts) Regulations 2018 of Singapore ("Regulation 37A").

Where the shares of Class A common stock are subscribed or purchased under Section 275 of the SFA by a relevant person which is a trust (where the trustee is not an accredited investor (as defined in Section 4A of the SFA)) whose sole purpose is to hold investments and each beneficiary of the trust is an accredited investor, the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferable for 6 months after that trust has acquired the shares of Class A common stock under Section 275 of the SFA except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person (as defined in Section 275(2) of the SFA), (2) where such transfer arises from an offer that is made on terms that such rights or interest are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction (whether such amount is to be paid for in cash or by exchange of securities or securities-based derivatives or other assets), (3) where no consideration is or will be given for the transfer, (4) where the transfer is by operation of law, (5) as specified in Section 276(7) of the SFA, or (6) as specified in Regulation 37A.

*Japan*

The shares of Class A common stock have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended), or the FIEA. The shares of Class A common stock

Table of Contents

have not been and will not be offered or sold, directly or indirectly, in Japan or to or for the account or benefit of any resident of Japan (including any person resident in Japan or any corporation or other entity organized under the laws of Japan) or to, or for the account or benefit of, others for reoffering or resale, directly or indirectly, in Japan or to or for the account or benefit of any resident of Japan, except pursuant to an exemption from the registration requirements of the FIEA and otherwise in compliance with any relevant laws and regulations of Japan.

*Switzerland*

The shares of Class A common stock may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange ("SIX") or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the shares of Class A common stock or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the Company, or the shares of Class A common stock have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares of Class A common stock will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of shares of Class A common stock has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes ("CISA"). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of shares.

*Dubai International Financial Centre*

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority ("DFSA"). This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The shares to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the shares offered should conduct their own due diligence on the shares. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

*Australia*

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission ("ASIC"), in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

Any offer in Australia of the shares of Class A common stock may only be made to persons (the "Exempt Investors") who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the shares without disclosure to investors under Chapter 6D of the Corporations Act.

The shares applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors

220

Table of Contents

under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring shares must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

We estimate that our share of the total expenses of the offering, excluding the underwriting discount, will be approximately $8,275,000. We have agreed to reimburse the underwriters for expenses relating to clearance of this offering with the Financial Industry Regulatory Authority of up to $35,000.

We and GoHealth Holdings, LLC have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act.

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services. Certain of the underwriters and their respective affiliates have provided, and may in the future provide, a variety of these services to the issuer and to persons and entities with relationships with the issuer, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the underwriters and their respective affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively traded securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the issuer (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the issuer. The underwriters and their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

221

Table of Contents

## LEGAL MATTERS

The validity of the shares of Class A common stock offered hereby will be passed upon for us by Latham & Watkins LLP, New York, New York. Sidley Austin LLP, New York, New York, has acted as counsel for the underwriters in connection with certain legal matters related to this offering.

## EXPERTS

The consolidated financial statements of GoHealth Holdings, LLC and its subsidiaries at December 31, 2019 (Successor period) and 2018 (Predecessor period), and for the period from September 13, 2019 to December 31, 2019 (Successor period), the period from January 1, 2019 to September 12, 2019 and the year ended December 31, 2018 (Predecessor period), appearing in this prospectus and registration statement have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The financial statement of GoHealth, Inc. as of March 27, 2020, appearing in this prospectus and registration statement has been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the Securities and Exchange Commission a registration statement on Form S-1 under the Securities Act with respect to the shares of Class A common stock offered hereby. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed with the registration statement. For further information about us and the Class A common stock offered hereby, we refer you to the registration statement and the exhibits filed with the registration statement. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement.

Upon the closing of this offering, we will be required to file periodic reports, proxy statements, and other information with the SEC pursuant to the Exchange Act. The SEC also maintains an internet website that contains reports, proxy statements and other information about registrants, like us, that file electronically with the SEC. The address of that site is *www.sec.gov*. We also maintain a website at *www.gohealth.com*, through which you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| **Audited Consolidated Financial Statements** | **Page** |
|---|---|
| **GoHealth, Inc.** | |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Balance sheet as of March 27, 2020 | F-2 |
| Notes to balance sheet | F-3 |
| | |
| **GoHealth Holdings, LLC and subsidiaries** | |
| Report of Independent Registered Public Accounting Firm | F-4 |
| Consolidated statements of income (loss) for the Successor 2019 Period, the Predecessor 2019 Period and the year ended December 31, 2018 | F-5 |
| Consolidated statements of comprehensive income (loss) for the Successor 2019 Period, the Predecessor 2019 Period and the year ended December 31, 2018 | F-6 |
| Consolidated balance sheets as of December 31, 2019 and 2018 | F-7 |
| Consolidated statements of changes in members' equity as of Successor 2019 Period, Predecessor 2019 Period and the year ended December 31, 2018 | F-8 |
| Consolidated statements of cash flows for the Successor 2019 Period, the Predecessor 2019 Period and the year ended December 31, 2018 | F-9 |
| Notes to consolidated financial statements | F-10 |
| **Unaudited Condensed Consolidated Financial Statements** | |
| **GoHealth Holdings, LLC and subsidiaries** | |
| Condensed consolidated statements of income (loss) for the three months ended March 31, 2020 and 2019 | F-42 |
| Condensed consolidated statements of comprehensive income (loss) for the three months ended March 31, 2020 and 2019 | F-43 |
| Condensed consolidated balance sheets as of March 31, 2020 and December 31, 2019 | F-44 |
| Condensed consolidated statements of changes in members' equity as of March 31, 2020 and 2019 | F-45 |
| Condensed consolidated statements of cash flows for the three months ended March 31, 2020 and 2019 | F-46 |
| Notes to condensed consolidated financial statements | F-47 |

Table of Contents

**Report of Independent Registered Public Accounting Firm**

**To the Shareholder and Board of Directors of GoHealth, Inc.**

*Opinion on the Financial Statement*

We have audited the accompanying balance sheet of GoHealth, Inc. (the "Company") as of March 27, 2020, and the related notes (collectively referred to as the "financial statement"). In our opinion, the financial statement presents fairly, in all material respects, the financial position of GoHealth, Inc. at March 27, 2020, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

The financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statement based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statement, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statement. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statement. We believe that our audit provides a reasonable basis for our opinion.

/s/ Ernst & Young LLP
We have served as the Company's auditor since 2013.

Chicago, Illinois
May 8, 2020

Table of Contents

GoHealth, Inc.
Balance Sheet
(dollars in actuals)

| | As of March 27, 2020 |
|---|---|
| **Assets** | |
| **Current assets:** | |
| Cash | $ 1 |
| **Total assets** | $ 1 |
| **Commitments and contingencies** | |
| **Stockholder's equity:** | |
| Common stock, $0.001 par value, 1,000 shares authorized, issued and outstanding | 1 |
| **Total stockholder's equity** | $ 1 |

See accompanying notes to balance sheet.

F-2

GoHealth, Inc.
Notes to Balance Sheet

**Note 1: Nature of Business and Basis of Presentation**

**Nature of Business**

GoHealth, Inc. (the "Company") was incorporated in Delaware on March 27, 2020. Pursuant to a reorganization into a holding company structure, the Company will be a holding company and its principal asset will be a controlling equity interest in GoHealth Holdings, LLC ("GHH, LLC"), formerly known as Blizzard Parent, LLC. As the sole managing member of GHH, LLC, the Company will operate and control all of the business and affairs of GHH, LLC, and through GHH, LLC and its subsidiaries, conduct its business.

**Basis of Presentation**

The balance sheet is presented in accordance with accounting principles generally accepted in the United States. Separate statements of income, comprehensive income, changes in stockholder's equity, and cash flows have not been presented because the Company has not engaged in any activities except in connection with its formation.

**Note 2: Summary of Significant Accounting Policies**

**Cash**

All cash as of the balance sheet date was cash on hand held in deposit, and is carried at fair value, which approximates carrying value.

**Income Taxes**

The Company is treated as a subchapter C corporation, and therefore, is subject to both federal and state income taxes. GHH, LLC continues to be recognized as a limited liability company, a pass-through entity for income tax purposes.

**Note 3: Stockholder's Equity**

On March 27, 2020, the Company was authorized to issue 1,000 shares of common stock, $0.001 par value. On March 27, 2020, the Company issued 1,000 shares of common stock for $1, all of which were owned by GHH, LLC.

**Note 4: Subsequent Events**

The Company has evaluated subsequent events through May 8, 2020, the date on which the balance sheet was available for issuance, and is not aware of any subsequent events that would require recognition or disclosure in the financial statement.

F-3

**Report of Independent Registered Public Accounting Firm**

**To the Members and Board of Directors of GoHealth Holdings, LLC and Subsidiaries**

*Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of GoHealth Holdings, LLC and subsidiaries (Successor) (the "Company") as of December 31, 2019 (Successor period) and 2018 (Predecessor period), the related consolidated statements of income (loss), comprehensive income (loss), changes in members' equity and cash flows for the period from September 13, 2019 to December 31, 2019 (Successor period), the period from January 1, 2019 to September 12, 2019 and the year ended December 31, 2018 (Predecessor period), and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 (Successor period) and 2018 (Predecessor period), and the results of its operations and its cash flows for the period from September 13, 2019 to December 31, 2019 (Successor period), the period from January 1, 2019 to September 12, 2019 and the year ended December 31, 2018 (Predecessor period), in conformity with U.S. generally accepted accounting principles.

*Adoption of New Accounting Standard*

As discussed in Note 1 to the consolidated financial statements, the Company changed its method of accounting for revenue as a result of the full retrospective adoption of Accounting Standards Update ("ASU") No. 2014-09 "*Revenue from Contracts with Customers (Topic 606),*" as amended.

*Basis for Opinion*

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP
We have served as the Company's auditor since 2013.

Chicago, Illinois
May 8, 2020

F-4

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Consolidated Statements of Income (Loss)
(dollars in thousands)

| | Successor | Predecessor | |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
|---|---|---|---|
| Net revenues: | | | |
| Commission | $ 243,347 | $ 175,834 | $ 144,378 |
| Other | 65,144 | 55,176 | 81,827 |
| Net revenues | 308,491 | 231,010 | 226,205 |
| Operating expenses: | | | |
| Cost of revenue | 90,384 | 79,169 | 79,582 |
| Marketing and advertising | 24,811 | 37,769 | 28,129 |
| Customer care and enrollment | 44,356 | 49,149 | 46,076 |
| Technology | 6,006 | 40,312 | 16,197 |
| General and administrative | 13,674 | 79,219 | 27,458 |
| Change in fair value of contingent consideration liability | 70,700 | — | — |
| Amortization of intangible assets | 28,217 | — | — |
| Transaction costs | 6,245 | 2,267 | — |
| Total operating expenses | 284,393 | 287,885 | 197,442 |
| Income (loss) from operations | 24,098 | (56,875) | 28,763 |
| Interest expense | 8,076 | 140 | 224 |
| Other income (expense) | 17 | (114) | (379) |
| Income (loss) before income taxes | 16,039 | (57,129) | 28,160 |
| Income tax expense (benefit) | 44 | (66) | 46 |
| Net income (loss) | 15,995 | (57,063) | 28,114 |
| Less: Net loss attributable to non-controlling interests | — | — | (3) |
| Net income (loss) attributable to GoHealth Holdings, LLC and Subsidiaries | $ 15,995 | $ (57,063) | $ 28,117 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-5

GoHealth Holdings, LLC and Subsidiaries
Consolidated Statements of Comprehensive Income (Loss)
(dollars in thousands)

| | Successor | Predecessor | |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
|---|---|---|---|
| Net income (loss) | $ 15,995 | $ (57,063) | $ 28,114 |
| Other comprehensive loss: | | | |
| Foreign currency translation adjustments | (17) | (32) | (8) |
| Other comprehensive loss | (17) | (32) | (8) |
| Total comprehensive income (loss) | $ 15,978 | $ (57,095) | $ 28,106 |
| Less: Net comprehensive loss attributable to non-controlling interests | — | — | (3) |
| Net comprehensive income (loss) attributable to GoHealth Holdings, LLC and Subsidiaries | $ 15,978 | $ (57,095) | $ 28,109 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-6

GoHealth Holdings, LLC and Subsidiaries
Consolidated Balance Sheets
(dollars in thousands, except share and per share data)

| | Successor December 31, 2019 | Predecessor December 31, 2018 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,276 | $ 505 |
| Accounts receivable, net of allowance for doubtful accounts of $904 in 2019 and $835 in 2018 | 24,461 | 9,855 |
| Commissions receivable – current | 101,078 | 38,685 |
| Prepaid expenses and other current assets | 5,954 | 4,983 |
| Total current assets | 143,769 | 54,028 |
| Commissions receivable – non-current | 281,853 | 76,842 |
| Property, equipment, and capitalized software, net | 6,339 | 11,782 |
| Intangible assets, net | 782,783 | — |
| Goodwill | 386,553 | — |
| Other long-term assets | 998 | 185 |
| Total assets | $ 1,602,295 | $ 142,837 |
| **Liabilities and members' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 13,582 | $ 10,534 |
| Accrued liabilities | 22,568 | 9,720 |
| Commissions payable – current | 56,003 | 18,336 |
| Deferred revenue | 15,218 | 1,357 |
| Current portion of debt | 3,000 | 4,856 |
| Other current liabilities | 2,694 | 3,181 |
| Total current liabilities | 113,065 | 47,984 |
| Non-current liabilities: | | |
| Commissions payable – non-current | 97,489 | 35,100 |
| Long-term debt, net of current portion | 288,233 | — |
| Contingent consideration | 242,700 | — |
| Capital lease obligations, less current portion | 421 | 152 |
| Incentive share liability | — | 28 |
| Deferred tax liability | 243 | 226 |
| Total non-current liabilities | 629,086 | 35,506 |
| Commitments and contingencies (Note 10) | | |
| Redeemable Class B units – $10.00 par value; 4,930,000 issued and outstanding as of December 31, 2018 | | 246,000 |
| Members' Equity: | | |
| Preferred units – $1.00 par value; 541,263,042 units authorized, issued and outstanding at December 31, 2019 | 547,542 | |
| Class A Common units – $1.00 par value; 237,938,682 units authorized, issued and outstanding at December 31, 2019 | 218,911 | |
| Class B Common units – $1.00 par value; 102,061,318 units authorized, issued and outstanding at December 31, 2019 | 93,708 | |
| Senior Preferred Earnout Units – no par value; none authorized, issued, and outstanding at December 31, 2019 | — | — |
| Profits Units – no par value; 97,918,116 units authorized; 78,398,133 units issued; and none outstanding as of December 31, 2019 | — | — |
| Class A units – $10.00 par value; 8,365,000 units issued and outstanding as of December 31, 2018 | — | 235 |
| Class B units – $10.00 par value; 220,000 units issued and outstanding as of December 31, 2018 | — | 2,200 |
| Accumulated other comprehensive (loss) income | (17) | 14 |
| Retained earnings (deficit) | — | (189,102) |
| Total members' equity (deficit) | 860,144 | (186,653) |
| Total liabilities, Redeemable Class B units and members' equity | $ 1,602,295 | $ 142,837 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-7

GoHealth Holdings, LLC and Subsidiaries
Consolidated Statements of Changes in Members' Equity
(dollars and units in thousands)

| | Preferred Units | | Class A Common Units | | Class B Common Units | | Class A Units | | Class B Units | | Retained Earnings (Deficit) | Non-Controlling Interests | Accumulated Other Comprehensive (Loss) Income | Members' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | | | | |
| **Predecessor:** | | | | | | | | | | | | | | |
| Balance at January 1, 2018, before the cumulative effect of adoption of ASC 606 | | | | | | | 8,365 | $ 235 | | | $ (49,238) | $ 194 | 22 | $ (48,787) |
| Cumulative effect of adoption of ASC 606 | | | | | | | | | | | 28,607 | | | 28,607 |
| Balance at January 1, 2018, after the cumulative effect of adoption of ASC 606 | | | | | | | 8,365 | $ 235 | | | $ (20,631) | $ 194 | 22 | $ (20,180) |
| Redeemable Class B unit accretion | | | | | | | | | | | (196,700) | | | (196,700) |
| Reclassification of Redeemable Class B to Class B Units | | | | | | | | | 220 | $ 2,200 | | | | 2,200 |
| Member distributions non-controlling interests | | | | | | | | | | | | (79) | | (79) |
| Foreign currency translation adjustment | | | | | | | | | | | | | (8) | (8) |
| Acquisition of non-controlling interests | | | | | | | | | | | 112 | (112) | | — |
| Net income (loss) | | | | | | | | | | | 28,117 | (3) | | 28,114 |
| Balance at December 31, 2018 | | | | | | | 8,365 | $ 235 | 220 | $ 2,200 | $(189,102) | $ — | $ 14 | $ (186,653) |
| Redeemable Class B unit accretion | | | | | | | | | | | (138,404) | | | (138,404) |
| Conversion of Redeemable Class B Units and Class B Units to Class A Units | | | | | | | 5,150 | $386,604 | (220) | $ (2,200) | | | | 384,404 |
| Foreign currency translation adjustment | | | | | | | | | | | | | (32) | (32) |
| Net loss | | | | | | | | | | | (57,063) | | | (57,063) |
| Balance at September 12, 2019 | | | | | | | 13,515 | $386,839 | — | $ — | $(384,569) | $ — | $ (18) | $ 2,252 |
| **Successor:** | | | | | | | | | | | | | | |
| Balance at September 13, 2019 | 541,263 | $541,263 | 237,939 | $214,145 | 102,061 | $ 91,855 | | | | | | | | $ 847,263 |
| Other | | (3,545) | | | | | | | | | | | | (3,545) |
| Share-based compensation expense | | | | 448 | | | | | | | | | | 448 |
| Foreign currency translation adjustment | | | | | | | | | | | | | (17) | (17) |
| Net income | | 9,824 | | 4,318 | | 1,853 | | | | | | | | 15,995 |
| Balance at December 31, 2019 | 541,263 | $547,542 | 237,939 | $218,911 | 102,061 | $ 93,708 | | | | | $ — | $ — | $ (17) | $ 860,144 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-8

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Consolidated Statements of Cash Flows
(dollars in thousands)

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
| **Operating activities** | | | |
| Net income (loss) | $ 15,995 | $ (57,063) | $ 28,114 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | |
| Share-based compensation | 448 | 87,060 | — |
| Depreciation and amortization | 521 | 4,247 | 6,160 |
| Amortization of intangible assets | 28,217 | — | — |
| Accretion of discount on long-term debt | 428 | — | — |
| Amortization of debt issuance costs | 44 | — | — |
| Change in fair value of contingent consideration | 70,700 | — | — |
| Other non-cash items | 417 | 150 | 791 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (15,113) | (108) | 736 |
| Commissions receivable | (203,956) | (63,448) | (65,445) |
| Prepaid expenses and other assets | (2,316) | 1,325 | (1,712) |
| Accounts payable | 5,031 | (1,981) | 3,108 |
| Accrued liabilities | 31 | 17,860 | 2,891 |
| Deferred revenue | 11,935 | 1,926 | 126 |
| Commissions payable | 80,828 | 19,228 | 30,896 |
| Other liabilities | (2,494) | 85 | (222) |
| Net cash (used in) provided by operating activities | (9,284) | 9,281 | 5,443 |
| **Investing activities** | | | |
| Acquisition of business | (807,591) | — | — |
| Purchases of property, equipment and software | (2,419) | (5,597) | (6,170) |
| Net cash used in investing activities | (810,010) | (5,597) | (6,170) |
| **Financing activities** | | | |
| Borrowings under term loans | 300,000 | — | — |
| Principal payments under term loans | (750) | — | — |
| Principal payments under capital lease obligations | (351) | (68) | (93) |
| Borrowings under revolving credit facilities | — | 56,534 | 82,555 |
| Payments under revolving credit facilities | — | (59,915) | (82,320) |
| Debt issuance cost payments | (9,283) | — | — |
| Proceeds received upon issuance of preferred units | 541,263 | — | — |
| Member distributions to non-controlling interests | — | — | (79) |
| Net cash provided by (used in) financing activities | 830,879 | (3,449) | 63 |
| Effect of exchange rate changes on cash | (17) | (32) | (3) |
| Increase (decrease) in cash and cash equivalents | 11,568 | 203 | (667) |
| Cash and cash equivalents at beginning of period | 708 | 505 | 1,172 |
| Cash and cash equivalents at end of period | $ 12,276 | $ 708 | $ 505 |
| Interest paid | $ 5,437 | $ 140 | $ 219 |
| Taxes paid | $ 55 | $ 122 | $ 32 |

*The accompanying notes are an integral part of the consolidated financial statements.*

F-9

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements

Period from September 13, 2019 through December 31, 2019 (Successor),
Period from January 1, 2019 through September 12, 2019 (Predecessor)
and Year Ended December 31, 2018 (Predecessor)
(dollars in thousands)

## 1. SUMMARY OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

**Description of Business**

GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC), a Delaware limited liability company, and its wholly owned subsidiaries (collectively, the "Company") is a leading health insurance marketplace whose mission is to improve healthcare in America. The Company works with insurance carriers to provide solutions to efficiently enroll individuals in health insurance plans. The Company's proprietary technology platform leverages modern machine-learning algorithms powered by nearly two decades of insurance purchasing behavior to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs. The Company's insurance agents leverage the power of its vertically integrated customer acquisition platform to enroll members in Medicare and individual and family plans. Certain of the Company's operations do business as GoHealth, LLC ("GoHealth"), a wholly owned subsidiary of the Company that was founded in 2001.

**Basis of Presentation and Principles of Consolidation**

GoHealth Holdings, LLC is a holding company with no operating assets or operations and was formed to acquire a 100% equity interest in Norvax, LLC ("Norvax"). On May 6, 2020, Blizzard Parent, LLC changed its name to GoHealth Holdings, LLC. GoHealth Holdings, LLC owns 100% of Blizzard Midco, LLC, which owns 100% of Norvax. For all of the periods reported in these consolidated financial statements, GoHealth Holdings, LLC has not and does not have any material operations on a standalone basis, and all of the operations of the Company are carried out by Norvax. On August 15, 2019, GoHealth Holdings, LLC entered a series of arrangements to acquire 100% of the equity interest in Norvax. On September 13, 2019, Blizzard Merger Sub LLC, a transitory merger company of Blizzard Midco, LLC, merged into Norvax, with Norvax continuing as the surviving limited liability company and the Company's operating entity (the "Acquisition").

As a result of the Acquisition, which is discussed further in *Note 2 – Acquisition*, Norvax was determined to be the accounting acquirer and Norvax's historical assets and liabilities are reflected at fair value as of the acquisition date. The financial information for the period after September 13, 2019, represents the consolidated financial information of the "Successor" company. Prior to September 13, 2019, the consolidated financial statements include the accounts of the "Predecessor" company. References to the "Successor 2019 Period" refer to the period from September 13, 2019 through December 31, 2019. References to the "Predecessor 2019 Period" refer to the period from January 1, 2019 through September 12, 2019, prior to the Acquisition. Due to the change in the basis of accounting, resulting from the application of the acquisition method of accounting, the Predecessor's consolidated financial statements and the Successor's consolidated financial statements are not necessarily comparable.

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. The consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). All intercompany balances and transactions are eliminated in consolidation.

**Adoption of New Accounting Standard**

Effective January 1, 2019, the Company adopted the requirements of Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* ("ASC 606"), using the full retrospective method, which

F-10

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

requires adjusting prior periods as if ASC 606 had been in effect as of the beginning of the earliest period presented. Thus, the accompanying consolidated predecessor balance sheet of Norvax as of December 31, 2018, as well as the accompanying consolidated statements of income (loss), comprehensive income (loss), changes in members' equity, and cash flows for the year then ended, have been adjusted to reflect the adoption of ASC 606, as have all related disclosures. The adoption had a material impact on the Company's consolidated financial statements. See "Revenue Recognition" below for additional information on ASC 606 and *Note 13 – Adoption Impact of New Revenue Standard* for further discussion of the adoption and the impact on the Company's previously reported historical results.

**Use of Estimates**

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting periods. The Company bases its estimates on historical experience and on various other assumptions that management believes are reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Actual results could differ from those estimates.

**Cash and Cash Equivalents**

We consider all investments with an original maturity of 90 days or less from the date of purchase to be cash equivalents. Cash includes all deposits in banks. The Company maintains its cash balances at financial institutions in the United States and Europe.

Cash accounts in the United States are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000. As of December 31, 2019, and 2018, the Company's cash balances in the United States exceeded the FDIC-insured limits by $12,026 and $255, respectively. The Company also has an immaterial amount of cash held in Europe to fund its Slovakian operations. The Company does not believe it is exposed to any significant risk with respect to cash balances.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash, accounts receivable, and commissions receivable. The maximum exposure risk of these accounts is equal to the amounts stated on the Company's Consolidated Balance Sheets. The Company places its cash with high-credit-quality financial institutions and, at times, such deposits may be in excess of federally insured limits. To date, the Company has not experienced any losses on its cash balances and periodic evaluations of the relative credit standing of the financial institutions are performed.

Accounts receivable and commissions receivable are primarily derived from customers located in North America. The Company performs ongoing credit evaluations of customers' financial condition and requires no collateral from customers. The Company maintains an allowance for doubtful accounts receivable based upon the expected collectability of accounts receivable balances.

The Company does not require collateral or other security in granting credit. As of December 31, 2019, five customers each represented 10% or more of the Company's total accounts receivable and, in aggregate, represented 87%, or $21,220, of the Company's total accounts receivable. As of December 31, 2018, three customers each represented 10% or more of the Company's total accounts receivable and, in aggregate, represented 58%, or $5,681, of the Company's total accounts receivable. No other customers represented 10% or more of the Company's total accounts receivable at December 31, 2019 and 2018.

F-11

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Foreign Currency**

The Company is exposed to currency fluctuations from certain vendors and customers that transact business in Euros. Assets and liabilities of the Company's foreign affiliate in Slovakia, which uses the local currency as its functional currency, are translated at period-end exchange rates, and income and expense items are translated at a rate that approximates the weighted-average exchange rate for the period. Translation adjustments are included as a component of accumulated other comprehensive (loss) income. Gains and losses from foreign currency transactions are included in other income (expense) and are immaterial for all periods presented.

**Accounts Receivable and Allowance for Doubtful Accounts**

Accounts receivable are recorded at the invoiced amount and typically do not bear interest. The Company provides allowances for doubtful accounts related to accounts receivable for estimated losses resulting from the inability of its customers to make required payments. The Company takes into consideration the overall quality of the receivables portfolio, along with specifically identified customer risks in establishing allowances. Accounts receivable are charged off against the allowance for doubtful accounts when it is determined the receivable is uncollectible.

**Commissions Receivable**

Commissions receivable are contract assets that represent estimated variable consideration for renewal commissions to be received from insurance carriers for performance obligations that have been satisfied. The current portion of commissions receivable are future renewal commissions expected to be received within one year, while the non-current portion of commissions receivable are expected to be received beyond one year. The Company assesses impairment for uncollectible consideration when information available indicates it is probable that an asset has been impaired. There were no impairments recorded during the years ended December 31, 2019 or 2018.

**Commissions Payable**

Commissions payable represent the estimated share of policy renewal commissions earned by the Company's external channel agents. The current portion of commissions payable are future renewal commissions expected to be paid within one year, while the non-current portion of commissions payable are expected to be paid beyond one year.

**Property, Equipment, and Capitalized Software, net**

Property and equipment are stated at cost, less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives as follows:

| Asset Description | Estimated Useful Life |
| --- | --- |
| Computer equipment and software | 3 years |
| Office equipment and furniture | 7 years |
| Leasehold improvements | Lesser of useful life (typically 5 years) or remaining lease term |

Expenditures for major renewals and improvements that extend the useful life of property and equipment are capitalized. Expenditure of maintenance and repairs are charged to expense as incurred.

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

The Company accounts for costs incurred to develop and maintain source code software and other internally developed software applications, primarily consisting of employee-related and third-party contractor costs, pursuant to ASC Topic 350-40, *Internal Use Software*. Costs incurred during the planning and post-implementation phases of software development are expensed. During the application development phase, costs incurred are capitalized. Capitalized software development costs are amortized over the estimated useful life, which is generally three years. These capitalized costs are recorded within property, equipment, and capitalized software, net, on the Company's Consolidated Balance Sheets and the amortization is charged to technology expense in the Consolidated Statements of Income (Loss).

**Business Combinations**

The Company allocates the fair value of the purchase consideration of its acquired businesses to the tangible assets, liabilities assumed, and intangible assets acquired based on the estimated fair values at the acquisition date. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. Transaction costs are recognized separately from the business combination and are expensed as incurred.

**Goodwill and Intangible Assets**

The Company tests goodwill for impairment on an annual basis in the fourth quarter of each year or whenever events or changes in circumstances indicate that the goodwill may be impaired.

An intangible asset determined to have an indefinite useful life is not amortized until its useful life is determined to no longer be indefinite. Indefinite-lived intangible assets are evaluated each reporting period to determine whether events and circumstances continue to support an indefinite useful life. Indefinite-lived intangible assets are tested for impairment annually, or more frequently if events or changes in circumstances indicate that the asset might be impaired, such as a significant decline in the observable market value of an asset, a significant change in the extent or manner in which an asset is used, or any other significant, adverse change that would indicate that the carrying amount of an asset or group of assets may not be recoverable. If the carrying amount of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess.

Significant judgment is applied when goodwill and indefinite-lived intangible assets are assessed for impairment. This judgment may include an assessment of qualitative or quantitative factors, such as developing cash flow projections and selecting appropriate royalty and discount rates.

The Company amortizes the cost of definite-lived intangible assets over the respective estimated useful lives on a straight-line basis. Significant judgment is applied when evaluating if an intangible asset has a definite useful life. Intangible assets subject to amortization are also evaluated for impairment when indicators of impairment are determined to exist. Definite-lived intangible assets could become impaired in the future as a result of declines in profitability due to changes in volume, market pricing, cost, manner in which an asset is used, laws and regulations, or the business environment.

**Fair Value of Financial Instruments**

The Company applies the accounting guidance related to fair value measurements and discloses information on all financial instruments reported at fair value that enables an assessment of the inputs used in determining the reported fair values. See *Note 4 – Fair Value Measurements* for further discussion around fair value determinations.

F-13

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASC 606, requiring an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company adopted ASC 606 using the full retrospective method and, accordingly, its historical financial statements and related disclosures have been recast herein to reflect the adoption of ASC 606 for all periods presented.

The Company is compensated by the receipt of commission payments from health insurance carriers whose health insurance policies are purchased through the Company's ecommerce platforms or customer care centers. The Company also generates revenue from non-commission revenue sources, which include providing dedicated insurance agent resources for carrier-specific programs, sales of insurance leads to other marketing agencies and carriers, and the implementation and use of the Company's platform. The Company accounts for payments made under certain carrier-specific arrangements as deductions to revenue.

The core principle of ASC 606 is to recognize revenue upon the transfer of promised goods or services to customers in an amount that reflects the consideration the entity expects to be entitled to in exchange for those goods or services. Accordingly, the Company recognizes revenue for its services in accordance with the following five steps outlined in ASC 606:

- Identification of the contract, or contracts, with a customer. A contract with a customer exists when (i) the Company enters into an enforceable contract with a customer that defines each party's rights regarding the goods or services to be transferred and identifies the payment terms related to these goods or services, (ii) the contract has commercial substance and, (iii) the Company determines that collection of substantially all consideration for goods or services that are transferred is probable based on the customer's intent and ability to pay the promised consideration. Payment of commissions typically commences within 60 days from the effective date. Payment terms from non-commission revenue are typically 30 days from the invoice date.

- Identification of the performance obligations in the contract. Performance obligations promised in a contract are identified based on the goods or services that will be transferred to the customer that are both capable of being distinct, whereby the customer can benefit from the goods or services either on their own or together with other resources that are readily available from third parties or from the Company, and are distinct in the context of the contract, whereby the transfer of the goods or services is separately identifiable from other promises in the contract.

- Determination of the transaction price. The transaction price is determined based on the consideration to which the Company will be entitled in exchange for transferring goods or services to the customer.

- Allocation of the transaction price to the performance obligations in the contract. If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price to each performance obligation based on a relative standalone selling price ("SSP") basis.

- Recognition of revenue when, or as, the Company satisfies a performance obligation. The Company satisfies performance obligations either over time or at a point in time, as discussed in further detail below. Revenue is recognized at the time the related performance obligation is satisfied by transferring the promised good or service to the customer.

F-14

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Commission Revenue**

The Company recognizes commission revenue from the sale of insurance products at the point when carriers approve an insurance application produced by the Company. As a result of the implementation of ASC 606, the Company records as commission revenue the expected amount of commissions received from the insurance carriers and any renewal commissions to be paid on such placement as long as the policyholder remains with the same insurance product. The Company defines its customer to be the health insurance carrier.

The Company typically enters contractual agency relationships with health insurance carriers that are non-exclusive and terminable on short notice by either party for any reason. In addition, health insurance carriers often can terminate or amend agreements unilaterally on short notice, including provisions in agreements relating to the commission rates paid to the Company by the health insurance carriers. The amendment or termination of an agreement the Company has with a health insurance carrier may adversely impact the commissions it is paid on health insurance plans purchased from the carrier.

Compensation in the form of commissions is received from insurance carriers for the multiple types of insurance products sold by the Company on behalf of the carriers. For Medicare and non-Medicare eligible products, commission revenue generally represents a percentage of the premium amount expected to be collected by the carrier while the policyholder is enrolled in the insurance product, including renewal periods. The Company's performance obligation is complete when a carrier has received and approved an insurance application. As such, the Company recognizes revenue at this point in time, which represents the total estimated lifetime commissions it expects to receive for selling the product after the carrier approves an application, net of an estimated constraint. The Company's consideration is variable based on the amount of time it estimates a policy will remain in force. The Company estimates the amount of variable consideration that it expects to receive based on historical experience or carrier experience to the extent available, industry data, and expectations as to future retention rates. Additionally, the Company considers application of the constraint and only recognizes the amount of variable consideration that it believes is probable that it will be entitled to receive and will not be subject to a significant revenue reversal in the future. The Company monitors and updates this estimate at each reporting date. The Company does not have any remaining performance obligations in its contracts with customers.

The Company utilizes a practical expedient to estimate commission revenue for each insurance product by applying the use of a portfolio approach to group approved members by the effective month of the relevant policy (referred to as a "cohort"). This allows the Company to estimate the commissions it expects to collect for each cohort by evaluating various factors, including but not limited to, contracted commission rates, carrier mix, and expected member churn.

The Company's variable consideration includes estimated and constrained lifetime values as the "constrained LTV" for the plans. The Company's estimate of commission revenue for each product line is based on a number of assumptions, which include, but are not limited to, estimating conversion of an approved applicant to a paying policyholder, forecasting persistency and forecasting the commission amounts likely to be received per policyholder. These assumptions are based on historical trends and incorporate management's judgment in interpreting those trends and in applying constraints. To the extent the Company makes changes to the assumptions, it will recognize any impact of the changes to commission revenue in the reporting period in which the change is made, including revisions of estimated lifetime commissions either below or in excess of previously estimated constrained LTV recognized as revenue.

F-15

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Other Revenue**

Within the Company's Medicare and IFP and Other segments, the Company provides trained licensed agents dedicated to carrier programs that assist in producing health insurance policies, typically prior to and during the annual enrollment period. The Company is compensated for the hours incurred on the carrier program at the time hours are incurred as well as performance-based enrollment fees relating to the Company enrolling individuals into health insurance plans. The Company recognizes revenue as control transfers over the term of the contract.

The Company recognizes revenue at a point in time resulting from the sale of leads to third parties and independent agents. The Company generates this revenue through the sale of leads sourced through its marketing efforts.

The Company provides certain customers access to its technology platform, where it charges for the implementation and monthly access to the software. This application allows carriers the use of the Company's e-commerce platform to offer their own health insurance policies on their websites and agents to utilize the Company's technology to power their online quoting, content and application submission processes. Typically, the Company is paid a one-time implementation fee, which it recognizes as control is transferred on a straight-line basis over the estimated term of the customer relationship (generally the initial term of the agreement), commencing once the technology is available for use by the third party.

Additionally, the Company earns development funds, based on delivering call volumes to certain insurance carriers. The Company recognizes revenue as control transfers over the term of the contract.

**Deferred Revenue**

Deferred revenue includes deferred technology licensing implementation fees and amounts collected from development funds or technology licensing customers in advance of the Company satisfying its performance obligations for such customers. The Company expects to recognize revenue associated with these remaining performance obligations in the next 12 months.

F-16

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Disaggregation of Revenue**

The table below depicts the disaggregation of revenue by product, and is consistent with how the Company evaluates its financial performance:

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
| Commission revenue: | | | |
| Medicare | | | |
| Medicare Advantage | $ 217,763 | $ 119,828 | $ 84,218 |
| Medicare Supplement | 5,407 | 9,354 | 9,610 |
| Medicare Part D | 2,942 | 1,486 | 2,396 |
| Total Medicare | 226,112 | 130,668 | 96,224 |
| Individual and Family Plan: | | | |
| Fixed Indemnity | 12,080 | 35,320 | 33,861 |
| Short Term | 2,272 | 2,906 | 2,895 |
| Major Medical | 1,057 | 412 | 2,763 |
| Total Individual and Family Plan | 15,409 | 38,638 | 39,519 |
| Ancillary | 1,428 | 5,483 | 7,511 |
| Small Group | 398 | 1,045 | 1,124 |
| Total Commission Revenue | 243,347 | 175,834 | 144,378 |
| Other Revenue | 65,144 | 55,176 | 81,827 |
| Net Revenues | $ 308,491 | $ 231,010 | $ 226,205 |

**Incremental Costs to Obtain a Contract**

The Company reviewed its sales compensation plans, which are directed at converting leads into carrier approved submissions, and concluded that they are fulfillment costs and not costs to obtain a contract with a health insurance carrier, which the Company defines as its customer. Additionally, the Company reviewed compensation plans related to personnel responsible for identifying new health insurance carriers as well as entering into contracts with new health insurance carriers and concluded that no incremental costs are incurred to obtain such contracts.

**Cost of Revenue**

Cost of revenue represents payments related to health insurance policies sold to members who were enrolled by partners with whom the Company has commissions revenue-sharing arrangements. In order to enter into a revenue-sharing arrangement, partners must be licensed to sell health insurance in the state where the policy is sold. Costs related to revenue-sharing arrangements are expensed as the related revenue is recognized.

**Marketing and Advertising**

Marketing expense consists primarily of expenses associated with the Company's direct, online advertising, and marketing partner channels, in addition to compensation (including share-based compensation expense) and other expenses related to marketing personnel who manage campaigns and optimize consumer activity. The Company's direct channel expenses primarily consist of costs for e-mail marketing and direct mail marketing. Online advertising expenses primarily consist of paid. keyword search advertising on search engines. Marketing partner channel expenses primarily consist of fees paid to marketing partners and affiliates. Marketing costs are expensed as incurred.

F-17

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

Advertising expenses consist of costs incurred to acquire consumers through online, television, and direct mail advertisements. Advertising costs incurred in the Successor 2019 Period, Predecessor 2019 Period, and in the year ended December 31, 2018, totaled $18,844, $29,308, and $25,613, respectively.

The Company also has arrangements with certain carriers that allow the Company to increase marketing efforts, including through direct mail, television advertisements, and online advertising for various insurance products that are being offered by these carriers. The Company records the amounts received as a reduction of the marketing costs incurred.

**Customer Care and Enrollment**

Customer care and enrollment expenses primarily consist of compensation (including share-based compensation expense) and benefits costs for enrollment personnel who assist consumers during the insurance policy application process, along with management and support personnel.

**Technology**

Technology expense consists primarily of compensation (including share-based compensation expense) and benefits costs for personnel associated with developing and enhancing the Company's technology platform, data analytics and business intelligence, as well as maintaining the Company's online presence and integrations with carrier and federal marketplaces. Technology expense also includes costs for contracted services and supplies, and amortization expense to capitalized software.

**General and Administrative Expenses**

General and administrative expenses include compensation and benefits costs for staff working in the Company's executive, finance, legal, human resources, and facilities departments. These expenses also include facilities costs and fees paid for outside professional services, including audit, tax, legal, and governmental affairs.

**Share-Based Compensation Expense**

The Company grants time-vesting units and performance-vesting profit units. Compensation expense for time-vesting units is recognized on a straight-line basis over the requisite service period. Performance-vesting profit units contain market conditions and an implied performance condition, which results in compensation cost being recognized when the performance condition is considered probable of being satisfied. Performance-vesting profit units vest upon the achievement of a contingent exit event that is defined as a transaction in which the ultimate parent disposes of all or substantially all of its investment in the Company. Such an exit event is not considered probable until it consummates. The estimated grant date fair value of the Company's profit interests is determined using a Monte Carlo simulation and Level 3 inputs.

Assumptions utilized in the model for valuing the awards include expected volatility, dividend yield and risk-free interest rate. Additionally, forfeitures are accounted for as they occur.

**401(k) Plan**

The Company maintains a tax-qualified 401(k) retirement plan (the Plan) that provides eligible employees with an opportunity to save for retirement on a tax-advantaged basis. Eligible employees may defer compensation

F-18

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

subject to applicable annual Internal Revenue Code (Code) limits. The Plan permits participants to make both pretax and after-tax deferral contributions. These contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employees are fully vested immediately in their contributions. The Plan is qualified under Section 401(a) of the Code and the related trust is tax-exempt under Section 501(a) of the Code.

The Company contributes 50% of the first 4% of compensation a participant contributes to the Plan. These matching contributions are expensed as incurred. The Company recognized expense of $150, $346 and $392 for the Successor 2019 Period, the Predecessor 2019 Period, and the year ended December 31, 2018, respectively, related to these matching contributions. The Company also may make non-elective contributions to the 401(k) plan, which, if made, vest 20% after two years and 20% annually thereafter.

**Contingencies**

The Company analyzes whether it is probable that an asset has been impaired, or a liability has been incurred, and whether the amount of loss can be reasonably estimated. If the loss contingency is both probable and reasonably estimable, the Company records the loss at management's best estimate of the loss, or when a best estimate cannot be made, a minimum loss contingency amount is recorded. Legal fees are expensed as incurred. If no accrual is made but the loss contingency is reasonably possible, the nature of the contingency and the corresponding estimated loss, if such an estimate can be made, is disclosed. Loss contingencies include, but are not limited to, possible losses related to legal proceedings and regulatory compliance matters.

**Income Taxes**

The Company accounts for income taxes under the liability method in accordance with ASC Topic 740, *Income Taxes*. Accordingly, deferred income taxes are provided for the future tax consequences attributable to differences between the carrying amounts of assets and liabilities for financial reporting and income tax purposes. Deferred tax assets and liabilities are measured using tax rates in effect for the year in which those temporary differences are expected to be recovered or settled.

The Company is a limited liability company and is treated as a partnership for income tax purposes. The Company is not directly liable for income taxes for federal purposes.

On a consolidated basis, income from the Company's Slovakian subsidiary is taxed at a blended U.S. Federal and state statutory rate as it is a C-Corporation for tax purposes. The Slovakian subsidiary records taxes on its income at the Slovakian statutory rate and records tax on its worldwide income at the applicable blended U.S. Federal and state statutory rate, net of the foreign tax credit associated with foreign taxes.

At December 31, 2019 and 2018, there is no liability for uncertain tax positions recorded on the accompanying Consolidated Balance Sheets.

**Seasonality**

A greater number of the Company's Medicare-related health insurance plans are sold in its fourth quarter during the Medicare annual enrollment period when Medicare-eligible individuals are permitted to change their Medicare Advantage and Medicare Part D prescription drug coverage for the following year. As a result, the Company's Medicare plan-related commission revenue is highest in the Company's fourth quarter.

The majority of the Company's individual and family health insurance plans are sold in the fourth quarter during the annual open enrollment period as defined under the federal Patient Protection and Affordable Care Act and

F-19

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

related amendments in the Health Care and Education Reconciliation Act. Individuals and families generally are not able to purchase individual and family health insurance outside of these open enrollment periods, unless they qualify for a special enrollment period as a result of certain qualifying events, such as losing employer-sponsored health insurance or moving to another state.

**Recent Accounting Pronouncements**

In January 2017, the FASB issued ASU No. 2017-04, *Simplifying the Test for Goodwill Impairment* (Topic 350). Under the new standard, goodwill impairment is measured as the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying value of goodwill. This ASU eliminates existing guidance that requires an entity to determine goodwill impairment by calculating the implied fair value of goodwill by hypothetically assigning the fair value of a reporting unit to all of its assets and liabilities as if that reporting unit had been acquired in a business combination. This ASU is applied on a prospective basis and is effective for the Company on January 1, 2021, however, early adoption is permitted. The Company adopted this standard in 2019 and the adoption did not significantly impact the consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). The guidance specifies that lessees will need to recognize a right-of-use asset and a lease liability for virtually all their leases except those which meet the definition of a short-term lease. For income statement purposes, the FASB retained a dual model, requiring leases to be classified as either operating or financing. Classification will be based on criteria that are similar to those applied in current lease accounting, but without explicit bright lines. Per ASU 2019-10, *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates*, issued November 2019, the guidance in ASU 2016-02, as amended, is effective for fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. Early adoption is permitted. The Company is currently evaluating the new guidance to determine the impact it will have on its consolidated financial statements.

In June 2018, the FASB issued ASU 2018-07, *Stock Compensation – Improvements to Nonemployee Share-Based Payment Accounting (*Topic 718). This guidance expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. Per ASU 2019-08, issued November 2019, the guidance is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted, but no earlier than an entity's adoption date of Topic 606. The Company is currently evaluating the new guidance to determine the impact it will have on its consolidated financial statements.

In November 2019, the FASB issued ASU 2019-11, *Financial Instruments — Credit Losses* (Topic 326), which amends the guidance for accounting for assets that are potentially subject to credit risk. The amendments affect contract assets, loans, debt securities, trade receivables, net investments in leases, off-balance-sheet credit exposures, reinsurance receivables, and any other financial assets not excluded from the scope that have the contractual right to receive cash. Per ASU 2019-10, issued November 2019, the guidance is effective for annual and interim periods beginning after December 15, 2022. Early adoption is permitted. The Company is currently evaluating the new guidance to determine the impact it will have on its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measuremen*t (Topic 820), which amended the disclosure requirements under ASC 820. This update clarifies and unifies the disclosure of Level 3 fair value instruments. This guidance is effective for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, although early adoption is permitted for either the entire standard or only the provisions that eliminate or modify the requirements. The Company plans to adopt this standard on January 1, 2020, and does not expect the adoption to have a material effect on our consolidated financial statements.

F-20

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

## 2. ACQUISITION

### Acquisition of Norvax, LLC

On September 13, 2019, the Company acquired a 100% interest in Norvax, for $807,591 in cash and $306,000 in equity. In connection with the Acquisition, the Company also agreed to pay additional consideration of up to $275,000 in additional Common and Senior Preferred Earnout Units, if Adjusted EBITDA, as defined in the terms of the acquisition agreement, exceeds certain thresholds for the period September 13, 2019 to December 31, 2019 and the year ended December 31, 2020 ("Earnout" or "contingent consideration").

Transaction costs incurred by the Company were $6,245 and $2,267 for the Successor 2019 Period and the Predecessor 2019 Period, respectively, and are recorded within transaction costs in the Consolidated Statements of Income (Loss). The elements of the purchase consideration are as follows:

| | | |
|---|---|---:|
| Cash paid | $ | 807,591 |
| Fair value of Class A and B common units issued | | 306,000 |
| Fair value of Earnout | | 172,000 |
| Total consideration | $ | 1,285,591 |

### Contingent Consideration

The contingent consideration represents the fair value of the Earnout payments to Norvax's selling shareholders and will be adjusted to fair value at each reporting date until settled. The contingent consideration will be settled in Common and Senior Preferred Earnout Units within 60 days of the issuance of the 2019 and 2020 audited financial statements. The Senior Preferred Earnout Units earn an annual coupon of 10.3% that provides for the accrual of additional units. Changes in fair value of the contingent consideration are recognized in income (loss) from operations. The full amount available relative to the 2019 target was earned as of December 31, 2019, and, as a result, the Company recorded a $75,000 fair value adjustment to the contingent consideration liability for achieving the 2019 target. The Company recorded a fair value adjustment of $4,300 to reduce the contingent consideration liability related to the 2020 target due to changes in forecasts.

### Allocation of Preliminary Purchase Price

The preliminary allocation of the purchase price is based on the fair value of assets acquired and liabilities assumed as of the acquisition date. The components of the preliminary purchase price allocation are as follows:

| | | |
|---|---|---:|
| Net working capital | $ | 18,787 |
| Commission receivable – non-current | | 113,565 |
| Property and equipment | | 4,442 |
| Other noncurrent assets | | 218 |
| Other noncurrent liabilities | | (963) |
| Trade names | | 83,000 |
| Developed technology | | 496,000 |
| Customer relationships | | 232,000 |
| Goodwill | | 386,553 |
| Deferred revenue | | (3,283) |
| Commissions payable – non-current | | (44,728) |
| Total consideration transferred | $ | 1,285,591 |

F-21

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

Goodwill represents the excess of the consideration paid over the estimated fair value of assets acquired and liabilities assumed in a business combination and is primarily attributable to future growth and the assembled workforce.

The Acquisition was accounted for using the acquisition method of accounting. The Company's consolidated financial statements reflect the preliminary allocation of the purchase price to the assets and liabilities assumed based on fair value as of the date of the acquisition.

Had the Acquisition been completed on January 1, 2018, net revenues would be unchanged and the net loss would be approximately $29,500 and $95,380 for the years ended December 31, 2019 and December 31, 2018, respectively. This unaudited pro forma financial information is presented for illustrative purposes only and is not necessarily indicative of what the operating results actually would have been if the Acquisition had taken place on January 1, 2018, nor is it indicative of future operating results. The pro forma amounts include the historical operating results of the Company prior to the acquisition, with adjustments factually supportable and directly attributable to the Acquisition, primarily related to transaction costs, the amortization of intangible assets, and interest expense. Share-based compensation and transaction bonuses and costs totaling $98,213 for the year ended December 31, 2019 are non-recurring pro forma adjustments.

### 3. BALANCE SHEET ACCOUNTS

**Commissions Receivable**

Commissions receivable activity is summarized as follows:

| | Successor | Predecessor | |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
|---|---|---|---|
| Beginning balance | $ 178,975 | $ 115,527 | $ 50,082 |
| Commission revenue | 243,347 | 175,834 | 144,378 |
| Cash receipts | (39,391) | (112,386) | (78,933) |
| **Ending balance** | **382,931** | **178,975** | **115,527** |
| Less: Commissions receivable – current | 101,078 | 65,410 | 38,685 |
| Commissions receivable – non-current | $ 281,853 | $ 113,565 | $ 76,842 |

The commissions receivable balance as of December 31, 2019 and 2018, primarily relates to Medicare Advantage Plans sold during the fourth quarters of 2019 and 2018 with effective dates in 2020 and 2019, respectively.

F-22

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Property, Equipment, and Capitalized Software, net**

Property, equipment, and capitalized software, net, consist of the following:

| | Successor December 31, 2019 | Predecessor December 31, 2018 |
|---|---|---|
| Computer equipment | $ 3,163 | $ 7,055 |
| Leasehold improvements | 1,046 | 4,110 |
| Office equipment and furniture | 689 | 1,658 |
| Property and equipment | 4,898 | 12,823 |
| Capitalized software | 1,962 | 18,981 |
| Less: accumulated depreciation and amortization | (521) | (20,022) |
| **Property, equipment, and capitalized software, net** | **$ 6,339** | **$ 11,782** |

Depreciation expense for the Successor 2019 Period, the Predecessor 2019 Period, and the year ended December 31, 2018, was $421, $1,262 and $1,547, respectively. These amounts include $91 in the Successor 2019 Period, $73 in the Predecessor 2019 Period and $96 in 2018 of depreciation of assets recorded under capital leases.

Amortization expense related to capitalized software was $100, $2,985 and $4,613 for the period from September 13, 2019 through December 31, 2019, the period from January 1, 2019 through September 12, 2019 and the year ended December 31, 2018, respectively.

**Accrued Liabilities**

Accrued liabilities consist of the following:

| | Successor December 31, 2019 | Predecessor December 31, 2018 |
|---|---|---|
| Bonuses and commissions | $ 12,292 | $ 5,372 |
| Marketing costs | 2,384 | 1,975 |
| Interest expense | 2,167 | — |
| Other accrued expenses | 5,725 | 2,373 |
| **Accrued liabilities** | **$ 22,568** | **$ 9,720** |

F-23

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**4. FAIR VALUE MEASUREMENTS**

The Company defines fair value as the price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques the Company uses to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The Company classifies the inputs used to measure fair value into the following hierarchy:

| | |
|---|---|
| Level 1 | Unadjusted quoted prices in active markets for identical assets or liabilities. |
| Level 2 | Unadjusted quoted prices in active markets for similar assets or liabilities; unadjusted quoted prices for identical or similar assets or liabilities in markets that are not active; inputs other than quoted prices that are observable for the asset or liability. |
| Level 3 | Unobservable inputs for the asset or liability. |

*Fair Value Measurements*

The fair value of the acquired developed technology has been estimated using the multi-period excess earnings model. This method discounts the amount of excess cash flows generated by the asset. The fair value of the acquired trade names was estimated using the relief from-royalty method which required that the Company estimate hypothetical royalty payments that would be required over the economic life of the asset as if it were to be licensed instead of purchased. These payments were then discounted to their present value. Both developed technology and trade names represent a Level 3 measurement within the fair value hierarchy.

The fair value of the acquired customer relationships was estimated using the distributor method under the income approach, which included Level 3 inputs such as revenue, attrition, margin and contributory asset charges.

The fair value of the contingent consideration was measured using a Monte Carlo simulation and is discounted using a rate that appropriately captures the risk associated with the obligation. The contingent consideration was part of the acquisition consideration and will be adjusted to fair value at each reporting date until settled. The following table sets forth the fair value and a summary of the changes to fair value of the contingent consideration:

| | |
|---|---|
| Balance at September 13, 2019 | $172,000 |
| Successor 2019 Period earnout fair value adjustment | 75,000 |
| 2020 earnout fair value adjustment | (4,300) |
| Balance at December 31, 2019 | **$242,700** |

The carrying amount of certain financial instruments, including cash, accounts receivable, commissions receivable, accounts payable, accrued expenses, and commissions payable approximate fair value due to the short maturity of these instruments. Commissions receivable are recorded at constrained lifetime values.

F-24

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**5. GOODWILL AND INTANGIBLE ASSETS, NET**

The carrying amounts, accumulated amortization, net carrying value and weighted average remaining life of the Company's definite-lived amortizable intangible assets, as well as its definite-lived intangible trademarks, are presented in the table below (weighted-average useful life is as of December 31, 2019):

| | December 31, 2019 (Successor) | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net carrying amount | Weighted average useful life |
| Developed technology | $496,000 | $ 21,257 | $ 474,743 | 7 |
| Customer relationships | 232,000 | 6,960 | 225,040 | 10 |
| **Total intangible assets subject to amortization** | **$728,000** | **$ 28,217** | **$ 699,783** | |
| Indefinite-lived trademarks | | | 83,000 | |
| **Intangible Assets** | | | **$ 782,783** | |

There were no intangible assets or goodwill in the Predecessor 2019 Period or at December 31, 2018.

As of December 31, 2019, expected amortization expense related to intangible assets in future periods is as follows:

| Years Ending December 31, | Developed Technology | Customer Relationships | Total |
| --- | --- | --- | --- |
| 2020 | $ 70,857 | $ 23,200 | $ 94,057 |
| 2021 | 70,857 | 23,200 | 94,057 |
| 2022 | 70,857 | 23,200 | 94,057 |
| 2023 | 70,857 | 23,200 | 94,057 |
| 2024 | 70,857 | 23,200 | 94,057 |
| Thereafter | 120,458 | 109,040 | 229,498 |
| **Total** | **$ 474,743** | **$ 225,040** | **$699,783** |

The Company allocated $380,327 and $6,226 of the goodwill recognized in connection with the Acquisition to its Medicare—Internal segment and Medicare—External segment, respectively, based on an estimate of the relative fair value of each segment. There was no impairment of goodwill or intangible assets for the Successor 2019 Period.

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**6. LONG TERM DEBT**

The Company's long-term debt consisted of the following:

| | Interest rate | Successor December 31, 2019 | Predecessor December 31, 2018 |
|---|---|---|---|
| Predecessor Credit Facility | | $ — | $ 4,856 |
| Total debt | | $ — | $ 4,856 |
| Credit Facility | 8.29% - 8.55% | $ 299,250 | $ — |
| Less: unamortized debt discount and capitalized issuance costs | | (8,017) | — |
| Total debt | | 291,233 | $ 4,856 |
| Less: current portion | | (3,000) | 4,856 |
| **Total long-term debt** | | $ **288,233** | $ **—** |

Maturities of long-term debt for each of the next five years and thereafter are as follows:

| | |
|---|---|
| 2020 | 3,000 |
| 2021 | 3,000 |
| 2022 | 3,000 |
| 2023 | 3,000 |
| 2024 | 3,000 |
| Thereafter | 284,250 |
| **Total** | **299,250** |

**Successor**

*General*

On September 13, 2019, in connection with the Acquisition, Norvax, or the Borrower, entered into a first lien credit agreement (the "Credit Agreement") which provides for the following:

- $300,000 aggregate principal amount senior secured term loan facility, or the Term Loan Facility; and

- $30,000 aggregate principal amount senior secured revolving credit facility, or the Revolving Credit Facility.

On March 20, 2020, the Company entered into an amendment to the Credit Agreement, which provided $117 million of incremental term loans, or the "Incremental Term Loan Facility". The Company collectively refers to the Term Loan Facility, the Revolving Credit Facility, and the Incremental Term Loan Facility as the "Credit Facilities".

The Company incurred $9,283 of debt issuance costs associated with the Credit Facility, which is being amortized over the life of the debt under the effective interest rate method to interest expense.

As of December 31, 2019, the Company had a principal amount of $299,250 outstanding on the Term Loan Facility and no amounts outstanding on the Revolving Credit Facility. The Revolving Credit Facility had remaining capacity of $30,000 as of December 31, 2019.

F-26

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

*Interest Rates and Fees*

Borrowings under the Credit Facilities are, at the option of the Borrower, either alternate base rate ("ABR") loans or LIBOR loans. Term loans and revolving loans comprising each ABR borrowing under the Term Loan Facility accrue interest at the ABR plus an applicable rate. The current applicable rate for ABR term loans and revolving loans is 5.50% per annum and ranges from 4.75% to 5.50% per annum, in each case, based upon specified leverage ratios. Term loans and revolving loans comprising each LIBOR borrowing bear interest at the LIBOR plus an applicable rate. The current applicable rate for LIBOR term loans and revolving loans is 6.50% per annum and ranges from 5.75% to 6.50% per annum, in each case, based upon specified leverage ratios.

In addition to paying interest on the principal amounts outstanding under the Credit Facilities, the Borrower is required to pay a commitment fee of 0.50% per annum under the Revolving Credit Facility in respect of the unutilized commitments thereunder. The Borrower is also subject to customary letter of credit and agency fees.

*Mandatory Prepayments*

The Credit Agreement requires that the Borrower, following the end of each fiscal year, commencing with the fiscal year ending December 31, 2020, repay the outstanding principal amount of all term loans under the Credit Facilities in an aggregate amount equal to (A) 50.0% of the excess cash flow of the Borrower and its restricted subsidiaries for such fiscal year if the Total Net Leverage Ratio (as defined in the Credit Agreement) is greater than 4.50:1.00, which percentage is reduced to 25% if the Total Net Leverage Ratio is less than or equal to 4.50:1.00 and greater than 4.00:1.00, which percentage is further reduced to 0% if the Total Net Leverage Ratio is less than or equal to 4.00:1.00, minus (B) at the option of the Borrower, (x) the aggregate amount of certain voluntary prepayments of term loans under the Credit Agreement during such fiscal year or after year-end and prior to the time such Excess Cash Flow prepayment is due, (y) the aggregate principal amount of any voluntary prepayments of indebtedness under pari passu incremental facilities, incremental equivalent debt and/or certain refinancing indebtedness, made during such fiscal year or after such fiscal year and prior to the time such prepayment is due.

The Credit Agreement requires the Borrower to repay amounts equal to 100% of the net cash proceeds of certain asset sales or other dispositions of property (including insurance and condemnation proceeds); provided, that, in the case of any prepayment events required in connection with certain dispositions and casualty events, if the net proceeds therefrom are invested (or committed to be invested) within 12 months after the receipt of such net proceeds, then no prepayment shall be required except to the extent such net proceeds have not been so invested (or committed to be invested) by the end of such 12-month period.

The Credit Agreement requires 100% of the net proceeds from the issuance or incurrence of certain indebtedness to be applied to prepay the term loans under the Term Loan Facility, except to the extent the indebtedness constitutes refinancing indebtedness.

*Voluntary Prepayment*

The Borrower may voluntarily prepay outstanding borrowings under the Credit Facilities at any time in whole or in part without premium or penalty; provided, that, with respect to voluntary prepayments of the Term Loan Facility and in certain other circumstances, the Borrower may have to pay a prepayment premium.

F-27

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

*Amortization and Final Maturity*

The Term Loan Facility is payable in quarterly installments (commencing on December 31, 2019) in the principal amount of 0.25% of the original principal amount. The remaining unpaid balance on the Term Loan Facility, together with all accrued and unpaid interest thereon, is due and payable on or prior to September 13, 2025. Outstanding borrowings under the Revolving Credit Facility do not amortize and are due and payable on September 13, 2024.

*Guarantees and Security*

The Borrower's obligations under the Credit Facilities are guaranteed by Blizzard Midco, LLC and certain of the Borrower's subsidiaries. All obligations under the Credit Agreement are secured by a first priority lien on substantially all of the assets of the Borrower, including a pledge of all of the equity interests of its subsidiaries.

*Covenants and Other Matters*

The Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict the Borrower's and its restricted subsidiaries' ability to:

- incur indebtedness;
- incur certain liens;
- consolidate, merge or sell or otherwise dispose of assets;
- make investments, loans, advances, guarantees and acquisitions;
- pay dividends or make other distributions on equity interests, or redeem, repurchase or retire equity interests;
- enter into transactions with affiliates;
- alter the business conducted by the Company and subsidiaries;
- change their fiscal year; and
- amend or modify governing documents.

In addition, the Credit Agreement contains financial and non-financial covenants. The Company is in compliance with all covenants as of December 31, 2019.

The Credit Agreement also contains certain customary representations and warranties and affirmative covenants, and certain reporting obligations. In addition, the lenders under the Credit Facilities will be permitted to accelerate all outstanding borrowings and other obligations, terminate outstanding commitments and exercise other specified remedies upon the occurrence of certain events of default (subject to certain grace periods and exceptions), which include, among other things, payment defaults, breaches of representations and warranties, covenant defaults, certain cross-defaults and cross-accelerations to other indebtedness, certain events of bankruptcy and insolvency, certain judgments and changes of control. Subject to certain limited exceptions, substantially all of the Company's assets are restricted from distribution.

**Predecessor**

During 2019, Norvax had a senior secured revolving credit facility (the "Predecessor Credit Facility") with The Huntington National Bank (formerly FirstMerit Bank N.A.). In connection with the Acquisition, this facility was paid off and retired.

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

During 2018, Norvax amended its credit facility to increase the Predecessor Credit Facility from a maximum borrowing of $10,000 to $12,000 and again from $12,000 to $16,000. The Predecessor Credit Facility provided for borrowings up to a maximum of $16,000 based upon 80% of eligible trade accounts receivable, plus 40% of certain earned enrollment/commission fees. Norvax paid a variable interest rate on borrowings equal to, at Norvax's discretion, Prime minus 50 basis points or LIBOR plus 250 basis points. Proceeds from borrowings were used to finance working capital and other general corporate purposes. The Predecessor Credit Facility was collateralized by substantially all the assets of Norvax and was subject to certain financial covenants. These covenants included maintaining a minimum fixed charge coverage ratio and not exceeding a maximum funded debt to earnings before interest, taxes, depreciation and amortization ratio (as defined in the credit agreement). The Predecessor Credit Facility originally matured in August 2019 and Norvax and The Huntington National Bank agreed to extend the maturity to November 2019.

## 7. MEMBERS' EQUITY

**Successor**

The GoHealth Holdings, LLC operating agreement ("Operating Agreement") provides for the classes of units, allocation of profits and losses, and other member rights. The Operating Agreement allows for equity Preferred units (the "Preferred") and Common units (the "Common"). Preferred units are divided into two classes: Senior Preferred Earnout Units, which are non-voting, and Preferred Units ("Preferred Unit"), which have voting rights. Common units are divided into two classes: Class A Common units ("Class A"), which have voting rights and Class B Common units ("Class B"), which are non-voting. Members of management will be issued profits interests (the "Profit Units", and together with the Preferred units and the Common units, the "Units") from an equity pool with an aggregate value equal to 10% of the Company's fully diluted equity.

*Voting Rights*

Each Preferred Unit and Class A unit has equal voting rights. The Preferred Unit and Class A unit holders also elect the members of the board of managers of the Company based on the percentage of units held by such investor.

*Liquidation Preference*

Upon a liquidity event defined as: (a) sale or disposition of all or substantially all of the assets of the Company; or (b) the liquidation, dissolution or winding up of the Company; first, in connection with refinancing or repayment of debt, Senior Preferred Earnout Units, the ceiling of which is the face amount of the Senior Preferred Earnout Units; second, Preferred Unit holders up to 150% of their invested capital; third, to Common holders, up to 150% of their invested capital; fourth, to the Profit Unit holders, pro rata, with the residual to the Common holders, pro rata, up to 150% of their invested capital, inclusive of prior distributions; fifth, to the Profit Unit holders, pro rata, with the residual to all members until each has received an aggregate amount of additional capital contributions, less amounts previously distributed; sixth, to Preferred Unit, Common and Profit Unit holders until Preferred Unit holders have received a cumulative amount equal to 250% of their invested capital; seventh, to Common holders equal to $75,000; eighth, pro rata, 100% Common, 100% Profit units, and 90% Preferred Unit/10% Common until Preferred Unit holders have received 300% of their invested capital; ninth, Common holders equal to $75,000; tenth, pro rata, 100% Common, 100% Profit units, 85% Preferred Unit/15% Common until Preferred Unit holders receive 400% of their invested capital; and, eleventh, pro rata, 100% Common, 100% Profit units and 80% Preferred Unit/20% Common.

F-29

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

*Right of First Offer*

Following the fifth anniversary of the Closing, Common units will be freely transferable, subject to customary "prohibited transfer" restrictions and a right of first offer for the benefit of the Company, first, and any non-transferring Investors, second.

**Predecessor**

The Norvax operating agreement ("Norvax Operating Agreement") provided for classes of units, allocation of profits and losses, distribution rights, and other member rights. The Norvax Operating Agreement allowed for equity units (Class A units and Class B units) and profits interests units (Class C units). Class A and Class B units had voting rights. Except for board of manager composition, any action taken by the Class A and Class B members required a majority of members holding the outstanding Class A and Class B units, voting together as a single class. Class C units were nonvoting and represented profit interests' units and entailed no initial capital contribution. Members were limited in their liability to their capital contributions. Immediately prior to the Acquisition described in *Note 2 – Acquisition*, all Class B units converted to Class A units.

*Distribution Rights*

Class A and Class B unit holders were entitled to distributions on a pro-rata basis, as approved by the board of managers. To the extent that Norvax had available cash, it distributed to each Class A and Class B unit holder a tax distribution in an amount equal to the product of the aggregate total of all taxable income allocable to the members multiplied by the tax rate. The tax rate is 45% as set forth in the Norvax Operating Agreement.

*Voting Rights*

Each Class A and Class B unit had equal voting rights and preferences, except Norwest Equity partners ("NEP") was granted authority to approve certain actions. The Class A and Class B unit holders also elected the members of the board of managers of Norvax.

*Antidilution Rights*

Class B units contained an antidilution feature that required an adjustment to the conversion ratio in the event of subsequent issuances of securities by Norvax at a price below the conversion price in effect immediately prior to each such issuance. The Class B conversion ratio could be adjusted in the event that grants of options or changes in option prices or conversion rates on convertible securities resulted in prices below the conversion price in effect immediately prior to each such grant or change.

*Liquidation Preference*

Upon a liquidity event defined as: (a) sale or disposition of all or substantially all of the assets of Norvax; (b) the liquidation, dissolution or winding up of Norvax; or (c) any consolidation or merger of Norvax in which the Class A and Class B unit holders owned less than 50% of the voting power of the outstanding securities immediately after the consolidation or merger, the Class B units are first to be paid proceeds at a liquidation amount of $10.00 per unit, and from time to time, was decreased by subtracting distributions (other than tax distributions) made in respect to Class B units.

Upon the occurrence of a Dissolution Event, Norvax continued solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and members. A Dissolution

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

Event is an event by the order of a court pursuant to Section 18-802 of the Delaware Code or by action of the members with NEP's approval. Net income, net losses, and other items of Norvax's income, gain, loss, or deduction was to continue to be allocated in the manner provided in the Norvax Operating Agreement. In a Dissolution Event, Class B units received the liquidation preference specified above.

*Involuntary Transfer Rights*

Upon any involuntary transfer, Norvax had the first option, and the purchase option unit holders had the subsequent options, to purchase all or any portion of the units subject to the involuntary transfer.

*Right of First Refusal*

A unit holder could transfer, sell, or assign any Class A or Class B units in a permitted transfer, given that Norvax first had the option to purchase the units being transferred.

*Class B Put Option*

Class B units are classified as temporary equity as they were redeemable upon exercise of the Class B put option, which was outside of Norvax's control, for cash at a put price equal to the greater of the Class B unit fair value or their original cost. Because the Class B units were redeemable, the Company was accreting the change up to the maximum redemption amount. The Company recorded accretion of $196,700 in the year ended December 31, 2018. These amounts appear as Class B unit accretion on the Consolidated Statements of Changes in Members' Equity.

Immediately prior to the Acquisition described in *Note 2 – Acquisition*, Norvax recorded accretion of $138,404 to adjust NEP's Redeemable Class B units to their full redemption amounts and were then converted to Class A units.

## 8. SHARE-BASED COMPENSATION PLANS

The following table summarizes the share-based compensation expense by operating function for the following periods:

|  | Successor | Predecessor | |
|---|---|---|---|
|  | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019[1] | Year Ended December 31, 2018 |
| Marking and advertising | $ 53 | $ 1,674 | $ — |
| Customer care and enrollment | 20 | — | — |
| Technology | 66 | 27,059 | — |
| General and administrative | 309 | 58,327 | — |
| **Total share-based compensation expense** | $ 448 | $ 87,060 | $ — |

1    Includes Class C incentive plan and incentive share plan

**Successor**

Effective September 13, 2019 and in conjunction with the Acquisition, the Company authorized the grants of non-voting Profit Units. The Profits Units are issued by Blizzard Management Feeder, LLC, to employees on

F-31

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

behalf of the Company. One-third of the Profit Units granted to each employee ("Time-Vesting Units") will vest in five (5) equal installments on the first through fifth anniversaries of the date of grant, so long as the employee remains employed by the Company through the applicable vesting date. Two-thirds of the Profit Units granted to each individual will vest upon a liquidity event based on the extent to which the distributions received by the Preferred and the Common exceed their investment in the Company ("Performance-Vesting Units").

Compensation expense for the Time-Vesting Units is recognized on a straight-line basis over the five-year requisite service period. Performance-Vesting Units contain market conditions and an implied performance condition, which results in compensation cost being recognized when the performance condition is considered probable of being satisfied. Performance-Vesting Units vest upon the achievement of a contingent exit event that is defined as a transaction in which the ultimate parent disposes of all or substantially all of its investment in the Company. Such an exit event is not considered probable until it consummates.

The number of Profit Units eligible for issuance will equal, in the aggregate, approximately 10% of the fully diluted equity of the Company at the closing of the Acquisition. All Profit Units (i.e., issued at closing of the Acquisition or issued thereafter) will have the economic rights and entitlements in relation to other equity interests in the Company under the waterfall described in the Operating Agreement.

A summary of the share-based compensation awards issued to employees of the Company by Blizzard Management Feeder, LLC, is as follows:

| | Time Vesting Units | Weighted Average Fair Value at Date of Grant per Unit | | Performance Vesting Units | Weighted Average Fair Value at Date of Grant per Unit | |
|---|---|---|---|---|---|---|
| Unvested units at September 13, 2019 | — | | | — | | |
| Granted | 25,871,374 | $ | 0.36 | 52,526,759 | $ | 0.31 |
| Vested | — | | | — | | |
| **Unvested units at December 31, 2019** | **25,871,374** | | | **52,526,759** | | |

The fair value of the Profit Units is determined using a Monte Carlo simulation and the following assumptions:

| | Period from September 13, 2019 through December 31, 2019 |
|---|---|
| Risk free interest rate | 1.73% |
| Expected volatility | 50% |
| Expected life (years) | 5.0 |
| Expected dividend yield | 0.0% |

The expected life is based on estimates of the likely timing of a liquidity event. Volatility was determined based on an analysis of publicly traded peers.

As of December 31, 2019, there was $8,819 of unamortized share-based compensation expense related to the Time-Vesting Units and these costs are expected to be recognized over a remaining weighted average period of 4.8 years. There was $16,284 of unrecognized share-based compensation expense related to the Performance-Vesting Units. The Company will recognize these costs upon the achievement of a contingent exit event.

The Company granted an additional 6,001,788 of Profits Units in 2020, of which 1,980,580 and 4,021,208 were Time-Vesting Units and Performance-Vesting Units, respectively.

F-32

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**Predecessor**

*Class C Incentive Plan*

Norvax had a Class C Incentive Plan (the "Class C Plan"), which Norvax accounted for as a liability award. Class C units granted under the plan represented profit interests' units and entailed no initial capital contribution. Class C units had no voting rights.

On September 13, 2019, GoHealth Holdings, LLC acquired a 100% interest in Norvax. Per the Class C Plan, all eligible unvested units became vested and the Company recorded $73,938 of compensation expense in the Predecessor 2019 Period.

*Incentive Share Plan*

Norvax had an Incentive Share Plan, which Norvax accounted for as a liability award. The plan consisted of incentive share grants made to employees that provided for cash payments to participants upon the occurrence of a triggering event. Triggering events included a change in control or an employee's involuntary termination without cause. In the event of a change in control, the triggering event value per share was the average per share purchase price of the common stock giving rise to such change in control. Cash payments were based on the difference between the triggering event value per share and the value per share on the grant date. In the event of an involuntary termination without cause, cash payments were calculated as the positive difference between the book value per share of Norvax's stock on the date of the triggering event and the value per share on the grant date for each incentive share then triggered, as defined in the Incentive Share Plan.

On September 13, 2019, GoHealth Holdings, LLC acquired a 100% interest in Norvax. Per the Incentive Share Plan, a change in control triggering event occurred and employees granted incentive shares under this plan became eligible for cash payments and as a result, the Company recorded $13,122 in incentive share expense in the Predecessor 2019 Period.

F-33

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

## 9. INCOME TAXES

The Company's provision for income taxes consists of the following for the Predecessor 2019 Period, the Successor 2019 Period, and the year ended December 31, 2018:

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
| Income (loss) before provision for income taxes: | | | |
| U.S. | $ 15,514 | $ (57,227) | 28,166 |
| Foreign | 525 | 98 | (6) |
| Total | 16,039 | (57,129) | 28,160 |
| Provision (benefit) from income taxes: | | | |
| Current: | | | |
| U.S. Federal | (3) | — | 38 |
| State and Local | (1) | 57 | 12 |
| Foreign | 110 | 21 | — |
| Total current | 106 | 78 | 50 |
| Deferred: | | | |
| U.S. Federal | (75) | (114) | (3) |
| State and Local | 13 | (30) | (1) |
| Foreign | — | — | — |
| Total deferred | (62) | (144) | (4) |
| **Total provision (benefit) for income taxes** | $ 44 | $ (66) | 46 |

As of both December 31, 2019 and 2018, the Company had no state tax net operating loss carryforwards or state tax credit carryforwards.

## 10. COMMITMENTS AND CONTINGENCIES

**Leases**

As of December 31, 2019, the Company had $821 of assets acquired under capital leases, for which the net book value was $725. The Company has capital lease arrangements to obtain computer equipment and furniture for the Company's operations.

The Company entered into various non-cancelable operating lease agreements for certain of the Company's offices and data centers with lease periods expiring in 2030. Certain of these arrangements have free rent periods or escalating rent payment provisions, and the Company recognizes rent expense under such arrangements on a straight-line basis. The Company recognized rent expense of $1,979, $3,102 and $2,795 for the Successor 2019 Period, the Predecessor 2019 Period, and year ended December 31, 2018, respectively.

F-34

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

Future minimum lease payments required under non-cancelable capital and operating leases as of December 31, 2019 were as follows:

|  | Capital Leases | Operating Leases |
|---|---|---|
| 2020 | $ 328 | $ 5,921 |
| 2021 | 335 | 6,063 |
| 2022 | 105 | 6,209 |
| 2023 | — | 6,360 |
| 2024 and thereafter | — | 12,708 |
| **Total minimum lease payments** | **$ 768** | **$ 37,261** |
| Less: amounts representing interest and taxes | (55) | |
| Less: current portion of the present value of minimum lease payments | (292) | |
| **Non-current liabilities, net of current portion** | **$ 421** | |

**Legal Proceedings**

From time to time, the Company is party to various litigation matters incidental to the conduct of its business. The Company is not presently party to any legal proceedings the resolution of which it believes would have a material adverse effect on its business, prospects, financial condition, liquidity, results of operation, cash flows or capital levels.

**11. RELATED-PARTY TRANSACTIONS**

The Company has entered into various lease agreements with 214 W Huron LLC, 220 W Huron Street Holdings LLC, and 215 W Superior LLC, each of which are controlled by significant shareholders, to lease its corporate offices in Chicago, Illinois. The Company pays rent, operating expenses, maintenance, and utilities under the terms of the leases. For the period from September 13, 2019 through December 31, 2019, the period from January 1, 2019 through September 12, 2019 and the year ended December 31, 2018, the Company made aggregate lease payments of $298, $758, and $1,025, respectively, under these leases. In November 2019, the Company entered into an agreement with 215 W Superior LLC, to lease additional office space beginning in January 2020 and expiring on December 31, 2030. The lease's first year annual rent is $145, with annual increases of $0.50 per square foot thereafter.

On January 1, 2020, the Company entered into a non-exclusive aircraft dry lease agreement with an entity wholly-owned and controlled by significant shareholders. The agreement allows the Company to use an aircraft owned by this entity for business and on an as-needed basis. The agreement has no set term and is terminable without cause by either party upon 30 days' prior written notice. Under the agreement, the Company is required to pay $7,855.94 per flight hour for use of the aircraft.

**12. OPERATING SEGMENTS AND SIGNIFICANT CUSTOMERS**

**Operating Segments**

The Company reports segment information based on how the Company's chief operating decision maker ("CODM"), regularly reviews operating results, allocates resources and makes decisions regarding business operations. The performance measures of the segments include total revenue and profit (loss). For segment

F-35

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

reporting purposes in accordance with ASC 280-10, *Segment Reporting*, the Company's business structure is comprised of four operating and reportable segments:

- **Medicare Internal and External:** The Medicare internal and external segments consist primarily of revenues earned from sales of Medicare Advantage, Medicare Supplement, Prescription Drug Plans, and Medicare Special Needs Plans (or "SNPs"), for multiple carriers.

- **Individual and Family Plan and Other ("IFP and Other") Internal and External:** The IFP and Other internal and external segments consist primarily of revenues earned from sales of individual and family plans, dental plans, vision plans and other ancillary plans to individuals that are not Medicare-eligible.

The Internal and External segments relative to both Medicare and IFP are defined as follows:

- *Internal:* The two internal segments primarily consist of sales of products and plans by Company-employed agents offering qualified prospects plans from multiple carriers, Company-employed agents offering qualified prospects plans on a carrier-specific basis, or sales of products and plans through our online platform without the assistance of our agents (do-it-yourself or "DIY"). The Company earns revenue in this channel through commissions paid by carriers based on sales the Company generates, as well as enrollment fees, hourly fees and other fees for services performed for specific carriers and other partners

- *External*: The two external segments represent sales of products and plans under the Company's carrier contracts using an independent, national network of agents who are not employed by Company. These agents utilize the Company's technology and platform to enroll consumers in health insurance plans and provide a means to earn a return on leads that otherwise may have not been addressed. The Company also sells insurance prospects (or "leads") to agencies within this channel. The Company earns revenue in this channel through commissions paid by carriers as a result of policy sales, as well as sales of leads to external agencies.

F-36

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

The following table presents summary results of the Company's operating segments for the following periods:

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | **Period from September 13, 2019 through December 31, 2019** | **Period from January 1, 2019 through September 12, 2019** | **Year Ended December 31, 2018** |
| Revenues: | | | |
| Medicare: | | | |
| Internal channel | $ 215,322 | $ 102,196 | $ 53,365 |
| External channel | 59,152 | 55,981 | 58,834 |
| Total Medicare | 274,474 | 158,177 | 112,199 |
| Individual and Family Plan and Other: | | | |
| Internal channel | 20,850 | 37,909 | 63,009 |
| External channel | 13,167 | 34,924 | 50,997 |
| Total Individual and Family Plan and Other | 34,017 | 72,833 | 114,006 |
| Total revenues | 308,491 | 231,010 | 226,205 |
| Segment profit: | | | |
| Medicare: | | | |
| Internal channel | 126,210 | 40,024 | 24,183 |
| External channel | 10,584 | 4,893 | 9,034 |
| Total Medicare segment profit | 136,794 | 44,917 | 33,217 |
| Individual and Family Plan and Other: | | | |
| Internal channel | 1,650 | 2,195 | 9,707 |
| External channel | 584 | 1,748 | 2,848 |
| Total Individual and Family Plan and Other segment profit | 2,234 | 3,943 | 12,555 |
| Total segment profit | 139,027 | 48,860 | 45,773 |
| Corporate | 9,767 | 103,469[1] | 17,009 |
| Change in fair value of contingent consideration liability | 70,700 | — | — |
| Amortization of intangible assets | 28,217 | — | — |
| Transaction costs | 6,245 | 2,267 | — |
| Interest expense | 8,076 | 140 | 224 |
| Other income (expense) | 17 | (114) | (379) |
| Income (loss) before income taxes | $ 16,039 | $ (57,129) | $ 28,160 |

Operating expenses that are directly attributable to a segment are reported within the applicable segment. Indirect marketing and advertising, customer care and enrollment and technology operating expenses are allocated to each segment based on various measures, including headcount and policy submissions. Other indirect general and administrative operating expenses are managed in a corporate shared services environment and, since these expenses are not the responsibility of segment operating management, are not allocated to the operating segments and are presented as a reconciling item to the Company's consolidated financial results within a line item designated as "Corporate".

---

[1]    Includes the Class C share-based compensation and incentive share plan expense recorded in connection with the Acquisition

F-37

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

Segment profit is calculated as total revenue for the applicable segment less direct and allocated cost of revenue, marketing and advertising, customer care and enrollment, technology and general and administrative operating expenses, excluding change in fair value of contingent consideration liability, amortization of intangibles assets, share-based compensation, transaction costs, interest expense, and other income (loss).

There are no internal revenue transactions between the Company's operating segments. The Company's CODM does not separately evaluate assets by segment, and therefore assets by segment are not presented. The Company's assets are primarily located in the United States.

**Significant Customers**

Substantially all revenue for the years ended December 31, 2019 and 2018 was generated from customers located in the United States. Carriers representing 10% or more of the Company's total revenue for the following periods are presented in the table below:

| | Successor | Predecessor | |
| | Period from September 13, 2019 through December 31, 2019 | Period from January 1, 2019 through September 12, 2019 | Year Ended December 31, 2018 |
|---|---|---|---|
| Humana | 46% | 31% | 25% |
| Anthem | 22% | 18% | 8% |

**13. ADOPTION IMPACT OF NEW REVENUE STANDARD**

As discussed in *Note 1 - Summary of Business and Significant Accounting Policies*, the FASB issued ASU 2014-09 in 2014, which, as amended, created ASC 606. The core principle of ASC 606 is that an entity shall recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard also contains significant new disclosure requirements regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The Company adopted ASC 606 effective January 1, 2019, on a full retrospective basis, and recorded a cumulative effect adjustment of $28,607 to increase retained earnings (deficit) as of January 1, 2018. The Company has applied the standard to all contracts.

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

The following tables present the impact of the adoption of ASC 606 on the Company's previously reported historical results for the periods presented:

**2018 Balance Sheet Impact**

| | Predecessor December 31, 2018 | | |
| --- | --- | --- | --- |
| | As Reported | ASC 606 Adoption Adjustment | As Adjusted |
| **Assets** | | | |
| Current assets: | | | |
| Cash | $ 505 | $ — | $ 505 |
| Accounts receivable, net | 19,331 | (9,477) | 9,855 |
| Commissions receivable – current | — | 38,685 | 38,685 |
| Prepaid expenses and other current assets | 8,653 | (3,669) | 4,983 |
| Total current assets | 28,489 | 25,539 | 54,028 |
| Commissions receivable – non-current | — | 76,842 | 76,842 |
| Property, equipment, and capitalized software, net | 11,782 | — | 11,782 |
| Other long-term assets | 185 | — | 185 |
| Total assets | $ 40,456 | $ 102,381 | $ 142,837 |
| **Liabilities and members' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 10,534 | $ — | $ 10,534 |
| Accrued liabilities | 13,223 | (3,503) | 9,720 |
| Commission payable – current | — | 18,336 | 18,336 |
| Deferred revenue | 6,619 | (5,262) | 1,357 |
| Current portion of debt | 4,856 | — | 4,856 |
| Other current liabilities | 3,181 | — | 3,181 |
| Total current liabilities | 38,413 | 9,571 | 47,984 |
| Non-current liabilities: | | | |
| Commission payable – non-current | — | 35,100 | 35,100 |
| Capital lease obligations, less current portion | 152 | — | 152 |
| Incentive share liability | 28 | — | 28 |
| Deferred tax liability | 226 | — | 226 |
| Total non-current liabilities | 406 | 35,100 | 35,506 |
| Redeemable Class B units – $10.00 par value; 4,930,000 issued and outstanding as of December 31, 2018 | 246,000 | — | 246,000 |
| Members' Equity: | | | |
| Class A units – $10.00 par value; 8,365,000 issued and outstanding as of December 31, 2018 | 235 | — | 235 |
| Class B units – $10.00 par value; 220,000 issued and outstanding as of December 31, 2018 | 2,200 | — | 2,200 |
| Accumulated other comprehensive income | 14 | — | 14 |
| Retained earnings (deficit) | (246,812) | 57,710 | (189,102) |
| Total members' equity (deficit) | (244,363) | 57,710 | (186,653) |
| Total liabilities, Redeemable Class B units and members' equity | $ 40,456 | $ 102,381 | $ 142,837 |

F-39

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**2018 Income Statement Impact**

| | Predecessor December 31, 2018 | | |
| --- | --- | --- | --- |
| | As Reported | ASC 606 Adoption Adjustment | As Adjusted |
| Net revenues | $167,260 | $ 58,945 | $226,205 |
| | | | |
| Operating expenses: | | | |
| Cost of revenue | 51,308 | 28,274 | 79,582 |
| Marketing and advertising | 28,129 | — | 28,129 |
| Customer care and enrollment | 44,509 | 1,567 | 46,076 |
| Technology | 16,197 | — | 16,197 |
| General and administrative | 27,458 | — | 27,458 |
| Total operating expenses | 167,601 | 29,841 | 197,442 |
| Income (loss) from operations | (341) | 29,103 | 28,763 |
| | | | |
| Interest expense | 224 | — | 224 |
| Other income (expense) | (379) | — | (379) |
| Income (loss) before income taxes | (944) | 29,103 | 28,160 |
| | | | |
| Income tax expense (benefit) | 46 | — | 46 |
| Net income (loss) | (989) | 29,103 | 28,114 |
| | | | |
| Less: Net loss attributable to non-controlling interests | (3) | — | (3) |
| Net income (loss) attributable to GoHealth Holdings, LLC | $ (986) | $ 29,103 | $ 28,117 |

**2018 Cash Flow Impact – Operating Activities**

| | Predecessor December 31, 2018 | | |
| --- | --- | --- | --- |
| | As Reported | ASC 606 Adoption Adjustment | As Adjusted |
| **Operating activities** | | | |
| Net income (loss) | $ (989) | $ 29,103 | $ 28,114 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | |
| Depreciation and amortization | 6,160 | — | 6,160 |
| Other non-cash items | 791 | — | 791 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (8,023) | 8,759 | 736 |
| Commissions receivable | — | (65,445) | (65,445) |
| Prepaid expenses and other assets | (2,172) | 460 | (1,712) |
| Accounts payable | 3,108 | — | 3,108 |
| Accrued expenses | 5,291 | (2,400) | 2,891 |
| Deferred revenue | 1,499 | (1,373) | 126 |
| Commissions payable | — | 30,896 | 30,896 |
| Other liabilities | (222) | — | (222) |
| Net cash provided by operating activities | $ 5,443 | $ — | $ 5,443 |

F-40

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Consolidated Financial Statements (continued)

**14. SUBSEQUENT EVENTS**

Management has reviewed its December 31, 2019, consolidated financial statements for subsequent events through May 8, 2020, the date the financial statements were available to be issued. Other than the subsequent events described in *Note 6 – Long Term Debt, Note 8 – Share-Based Compensation Plans,* and *Note 11 – Related-Party Transactions*, the Company is not aware of any subsequent events that would require recognition or disclosure in the consolidated financial statements.

F-41

GoHealth Holdings, LLC and Subsidiaries
Condensed Consolidated Statements of Income (Loss)
(dollars in thousands, unaudited)

| | Successor Three Months Ended March 31, 2020 | Predecessor Three Months Ended March 31, 2019 |
|---|---|---|
| Net revenues: | | |
| Commission | $ 112,510 | $ 51,215 |
| Other | 28,500 | 17,874 |
| Net revenues | 141,010 | 69,089 |
| Operating expenses: | | |
| Cost of revenue | 42,134 | 27,552 |
| Marketing and advertising | 26,073 | 11,411 |
| Customer care and enrollment | 23,978 | 13,939 |
| Technology | 4,593 | 4,155 |
| General and administrative | 10,491 | 6,990 |
| Change in fair value of contingent consideration liability | 4,400 | — |
| Amortization of intangible assets | 23,514 | — |
| Total operating expenses | 135,183 | 64,047 |
| Income from operations | 5,827 | 5,042 |
| Interest expense | 6,756 | 28 |
| Other expense | 10 | 10 |
| Income (loss) before income taxes | (939) | 5,004 |
| Income tax expense (benefit) | (2) | 2 |
| Net income (loss) | $ (937) | $ 5,002 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

F-42

GoHealth Holdings, LLC and Subsidiaries
Condensed Consolidated Statements of Comprehensive Income (Loss)
(dollars in thousands, unaudited)

| | Successor Three Months Ended March 31, 2020 | Predecessor Three Months Ended March 31, 2019 |
|---|---|---|
| Net income (loss) | $ (937) | $ 5,002 |
| Other comprehensive loss: | | |
| Foreign currency translation adjustments | (85) | (46) |
| Other comprehensive loss | (85) | (46) |
| Total comprehensive income (loss) | $ (1,022) | $ 4,956 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

F-43

GoHealth Holdings, LLC and Subsidiaries
Condensed Consolidated Balance Sheets
(dollars in thousands, except share and per share data)

| | Successor March 31, 2020 (Unaudited) | Successor December 31, 2019 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 152,423 | $ 12,276 |
| Accounts receivable, net of allowance for doubtful accounts of $651 in 2020 and $904 in 2019 | 6,422 | 24,461 |
| Commissions receivable – current | 58,173 | 101,078 |
| Prepaid expenses and other current assets | 6,010 | 5,954 |
| Total current assets | 223,028 | 143,769 |
| Commissions receivable – non-current | 330,617 | 281,853 |
| Property, equipment, and capitalized software, net | 9,228 | 6,339 |
| Intangible assets, net | 759,269 | 782,783 |
| Goodwill | 386,553 | 386,553 |
| Other long-term assets | 954 | 998 |
| Total assets | $ 1,709,649 | $ 1,602,295 |
| **Liabilities and members' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 12,718 | $ 13,582 |
| Accrued liabilities | 11,740 | 22,568 |
| Commissions payable – current | 34,536 | 56,003 |
| Deferred revenue | 14,867 | 15,218 |
| Current portion of debt | 4,170 | 3,000 |
| Other current liabilities | 3,178 | 2,694 |
| Total current liabilities | 81,209 | 113,065 |
| Non-current liabilities: | | |
| Commissions payable – non-current | 113,516 | 97,489 |
| Long-term debt, net of current portion | 397,652 | 288,233 |
| Contingent consideration | 247,100 | 242,700 |
| Capital lease obligations, less current portion | 345 | 421 |
| Incentive share liability | — | — |
| Deferred tax liability | 225 | 243 |
| Total non-current liabilities | 758,838 | 629,086 |
| Commitments and contingencies (Note 10) | | |
| Members' Equity: | | |
| Preferred units – $1.00 par value; 541,263,042 units authorized, issued and outstanding at March 31, 2020 and December 31, 2019 | 546,972 | 547,542 |
| Class A Common units – $1.00 par value; 237,938,682 units authorized, issued and outstanding at March 31, 2020 and December 31, 2019 | 219,139 | 218,911 |
| Class B Common units – $1.00 par value; 108,727,667 and 102,061,318 units authorized, issued and outstanding at March 31, 2020 and December 31, 2019, respectively | 103,593 | 93,708 |
| Senior Preferred Earnout Units – no par value; none authorized, issued, and outstanding at March 31, 2020 or December 31, 2019 | — | — |
| Profits Units – no par value; 97,918,116 units authorized at March 31, 2020 and December 31, 2019; 84,399,921 and 78,398,133 units issued at March 31, 2020 and December 31, 2019, respectively; and none outstanding at March 31, 2020 and December 31, 2019 | — | — |
| Accumulated other comprehensive (loss) income | (102) | (17) |
| Total members' equity | 869,602 | 860,144 |
| Total liabilities, Redeemable Class B units and members' equity | $ 1,709,649 | $ 1,602,295 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

F-44

GoHealth Holdings, LLC and Subsidiaries
Condensed Consolidated Statements of Changes in Members' Equity
(dollars and units in thousands, unaudited)

**Three Months Ended March 31, 2020**

| | Preferred Units | | Class A Common Units | | Class B Common Units | | Class A Units | | Class B Units | | Retained Earnings (Deficit) | Accumulated Other Comprehensive (Loss) Income | Members' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | | | |
| **Successor:** | | | | | | | | | | | | | |
| Balance at January 1, 2020 | 541,263 | $547,542 | 237,939 | $218,911 | 102,061 | $ 93,708 | | | | | $ — | (17) | $ 860,144 |
| Foreign currency translation adjustment | | | | | | | | | | | | (85) | (85) |
| Issuance of common units | | | | | 6,667 | 10,000 | | | | | | | 10,000 |
| Share-based compensation expense | | | | 479 | | | | | | | | | 479 |
| Net loss | | (570) | | (251) | | (115) | | | | | | | (937) |
| Balance at March 31, 2020 | 541,263 | $546,972 | 237,939 | $219,139 | 108,728 | $103,593 | | | | | $ — | $ (102) | $ 869,602 |

**Three Months Ended March 31, 2019**

| | Preferred Units | | Class A Common Units | | Class B Common Units | | Class A Units | | Class B Units | | Retained Earnings (Deficit) | Accumulated Other Comprehensive (Loss) Income | Members' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | | | |
| **Predecessor:** | | | | | | | | | | | | | |
| Balance at January 1, 2019 | | | | | | | 8,365 | $ 235 | 220 | $ 2,200 | $(189,102) | $ 14 | $(186,653) |
| Redeemable Class B unit accretion | | | | | | | | | | | (115,000) | | (115,000) |
| Foreign currency translation adjustment | | | | | | | | | | | | (46) | (46) |
| Net income | | | | | | | | | | | 5,002 | | 5,002 |
| Balance at March 31, 2019 | | | | | | | 8,365 | $ 235 | 220 | $ 2,200 | $(299,100) | $ (32) | $(296,697) |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

F-45

GoHealth Holdings, LLC and Subsidiaries
Condensed Consolidated Statements of Cash Flows
(dollars in thousands, unaudited)

| | Successor Three Months Ended March 31, 2020 | Predecessor Three Months Ended March 31, 2019 |
|---|---|---|
| **Operating activities** | | |
| Net income (loss) | $ (937) | $ 5,002 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Share-based compensation | 479 | — |
| Depreciation and amortization | 633 | 1,538 |
| Amortization of intangible assets | 23,514 | — |
| Accretion of discount on long-term debt | 315 | — |
| Amortization of debt issuance costs | 79 | — |
| Change in fair value of contingent consideration | 4,400 | — |
| Other non-cash items | (341) | 614 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 18,365 | (640) |
| Commissions receivable | (5,859) | (4,685) |
| Prepaid expenses and other assets | (56) | 63 |
| Accounts payable | (864) | (567) |
| Accrued liabilities | (10,828) | (2,137) |
| Deferred revenue | (351) | 24 |
| Commissions payable | (5,441) | 1,099 |
| Other liabilities | 479 | 911 |
| Net cash provided by operating activities | 23,587 | 1,222 |
| **Investing activities** | | |
| Purchases of property, equipment and software | (3,522) | (1,944) |
| Net cash used in investing activities | (3,522) | (1,944) |
| **Financing activities** | | |
| Borrowings under term loans | 117,000 | — |
| Principal payments under term loans | (750) | — |
| Principal payments under capital lease obligations | (72) | (16) |
| Borrowings under revolving credit facilities, net of payments | — | 1,163 |
| Debt issuance cost payments | (6,011) | — |
| Proceeds received upon issuance of common units | 10,000 | — |
| Net cash provided by financing activities | 120,167 | 1,147 |
| Effect of exchange rate changes on cash | (85) | (46) |
| Increase in cash and cash equivalents | 140,147 | 379 |
| Cash and cash equivalents at beginning of period | 12,276 | 505 |
| Cash and cash equivalents at end of period | $ 152,423 | $ 884 |
| Interest paid | $ 6,362 | $ 28 |
| Taxes paid | $ 15 | $ 25 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

F-46

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements

Three Month Period Ended March 31, 2020 (Successor)
and Three Month Period Ended March 31, 2019 (Predecessor)
(dollars in thousands, unaudited)

## 1. SUMMARY OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

**Description of Business**

GoHealth Holdings, LLC (formerly known as Blizzard Parent, LLC), a Delaware limited liability company, and its wholly owned subsidiaries (collectively, the "Company") is a leading health insurance marketplace whose mission is to improve healthcare in America. The Company works with insurance carriers to provide solutions to efficiently enroll individuals in health insurance plans. The Company's proprietary technology platform leverages modern machine-learning algorithms powered by nearly two decades of insurance purchasing behavior to reimagine the optimal process for helping individuals find the best health insurance plan for their specific needs. The Company's insurance agents leverage the power of its vertically integrated customer acquisition platform to enroll members in Medicare and individual and family plans. Certain of the Company's operations do business as GoHealth, LLC ("GoHealth"), a wholly owned subsidiary of the Company that was founded in 2001.

**Basis of Presentation and Principles of Consolidation**

GoHealth Holdings, LLC is a holding company with no operating assets or operations and was formed to acquire a 100% equity interest in Norvax, LLC ("Norvax"). On May 6, 2020, Blizzard Parent, LLC changed its name to GoHealth Holdings, LLC. GoHealth Holdings, LLC owns 100% of Blizzard Midco, LLC, which owns 100% of Norvax. For all of the periods reported in these condensed consolidated financial statements, GoHealth Holdings, LLC has not and does not have any material operations on a standalone basis, and all of the operations of the Company are carried out by Norvax. On August 15, 2019, GoHealth Holdings, LLC entered a series of arrangements to acquire 100% of the equity interest in Norvax. On September 13, 2019, Blizzard Merger Sub LLC, a transitory merger company of Blizzard Midco, LLC, merged into Norvax, with Norvax continuing as the surviving limited liability company and the Company's operating entity (the "Acquisition").

As a result of the Acquisition, which is discussed further in *Note 2 – Acquisition*, Norvax was determined to be the accounting acquirer and Norvax's historical assets and liabilities are reflected at fair value as of the acquisition date. The financial information for the period after September 13, 2019, represents the condensed consolidated financial information of the "Successor" company. Prior to September 13, 2019, the condensed consolidated financial statements include the accounts of the "Predecessor" company. Due to the change in the basis of accounting resulting from the application of the acquisition method of accounting, the Predecessor's condensed consolidated financial statements and the Successor's condensed consolidated financial statements are not necessarily comparable.

The accompanying condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") for interim financial information, but do not include all information and footnote disclosures required under U.S. GAAP for annual financial statements. In the opinion of management, the interim condensed consolidated financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for the fair presentation of the Company's financial position, results of operations and cash flows as of the dates and for the periods presented. All intercompany transactions and balances are eliminated in consolidation.

These interim financial statements should be read in conjunction with the Company's audited consolidated financial statements and notes thereto as of and for the year ended December 31, 2019, which are included elsewhere in this Registration Statement on Form S-1. Interim results are not necessarily indicative of results for the full fiscal year due to seasonality and other factors.

F-47

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

**Use of Estimates**

The preparation of the condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities at the date of the condensed consolidated financial statements, and the reported amounts of revenues and expenses during the reporting periods. The Company bases its estimates on historical experience and on various other assumptions that management believes are reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Actual results could differ from those estimates. There have been no material changes to the Company's significant accounting policies as discussed in the notes to the Company's audited consolidated financial statements as of and for the year ended December 31, 2019.

**Cash and Cash Equivalents**

We consider all investments with an original maturity of 90 days or less from the date of purchase to be cash equivalents. Cash includes all deposits in banks. The Company maintains its cash balances at financial institutions in the United States and Europe.

Cash accounts in the United States are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000. As of March 31, 2020 and December 31, 2019, the Company's cash balances in the United States exceeded the FDIC-insured limits by $151,904 and $11,936, respectively. The Company also has an immaterial amount of cash held in Europe to fund its Slovakian operations. The Company does not believe it is exposed to any significant risk with respect to cash balances.

**Concentration of Credit Risk**

The Company does not require collateral or other security in granting credit. As of March 31, 2020, three customers each represented 10% or more of the Company's total accounts receivable and, in aggregate, represented 66%, or $4,268, of the Company's total accounts receivable. As of December 31, 2019, five customers each represented 10% or more of the Company's total accounts receivable and, in aggregate, represented 87%, or $21,220, of the Company's total accounts receivable. No other customers represented 10% or more of the Company's total accounts receivable at March 31, 2020 and December 31, 2019.

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASC 606, requiring an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services.

The Company is compensated by the receipt of commission payments from health insurance carriers whose health insurance policies are purchased through the Company's ecommerce platforms or customer care centers. The Company also generates revenue from non-commission revenue sources, which include providing dedicated insurance agent resources for carrier-specific programs, sales of insurance leads to other marketing agencies and carriers, and the implementation and use of the Company's platform. The Company accounts for payments made under certain carrier-specific arrangements as deductions to revenue.

The core principle of ASC 606 is to recognize revenue upon the transfer of promised goods or services to customers in an amount that reflects the consideration the entity expects to be entitled to in exchange for those

F-48

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

goods or services. Accordingly, the Company recognizes revenue for its services in accordance with the following five steps outlined in ASC 606:

- Identification of the contract, or contracts, with a customer. A contract with a customer exists when (i) the Company enters into an enforceable contract with a customer that defines each party's rights regarding the goods or services to be transferred and identifies the payment terms related to these goods or services, (ii) the contract has commercial substance and, (iii) the Company determines that collection of substantially all consideration for goods or services that are transferred is probable based on the customer's intent and ability to pay the promised consideration. Payment of commissions typically commences within 60 days from the effective date. Payment terms from non-commission revenue are typically 30 days from the invoice date.

- Identification of the performance obligations in the contract. Performance obligations promised in a contract are identified based on the goods or services that will be transferred to the customer that are both capable of being distinct, whereby the customer can benefit from the goods or services either on their own or together with other resources that are readily available from third parties or from the Company, and are distinct in the context of the contract, whereby the transfer of the goods or services is separately identifiable from other promises in the contract.

- Determination of the transaction price. The transaction price is determined based on the consideration to which the Company will be entitled in exchange for transferring goods or services to the customer.

- Allocation of the transaction price to the performance obligations in the contract. If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price to each performance obligation based on a relative standalone selling price ("SSP") basis.

- Recognition of revenue when, or as, the Company satisfies a performance obligation. The Company satisfies performance obligations either over time or at a point in time, as discussed in further detail below. Revenue is recognized at the time the related performance obligation is satisfied by transferring the promised good or service to the customer.

**Commission Revenue**

The Company recognizes commission revenue from the sale of insurance products at the point when carriers approve an insurance application produced by the Company. The Company records as commission revenue the expected amount of commissions received from the insurance carriers and any renewal commissions to be paid on such placement as long as the policyholder remains with the same insurance product. The Company defines its customer to be the health insurance carrier.

The Company typically enters contractual agency relationships with health insurance carriers that are non-exclusive and terminable on short notice by either party for any reason. In addition, health insurance carriers often can terminate or amend agreements unilaterally on short notice, including provisions in agreements relating to the commission rates paid to the Company by the health insurance carriers. The amendment or termination of an agreement the Company has with a health insurance carrier may adversely impact the commissions it is paid on health insurance plans purchased from the carrier.

Compensation in the form of commissions is received from insurance carriers for the multiple types of insurance products sold by the Company on behalf of the carriers. For Medicare and non-Medicare eligible products, commission revenue generally represents a percentage of the premium amount expected to be collected by the

F-49

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

carrier while the policyholder is enrolled in the insurance product, including renewal periods. The Company's performance obligation is complete when a carrier has received and approved an insurance application. As such, the Company recognizes revenue at this point in time, which represents the total estimated lifetime commissions it expects to receive for selling the product after the carrier approves an application, net of an estimated constraint. The Company's consideration is variable based on the amount of time it estimates a policy will remain in force. The Company estimates the amount of variable consideration that it expects to receive based on historical experience or carrier experience to the extent available, industry data, and expectations as to future retention rates. Additionally, the Company considers application of the constraint and only recognizes the amount of variable consideration that it believes is probable that it will be entitled to receive and will not be subject to a significant revenue reversal in the future. The Company monitors and updates this estimate at each reporting date. The Company does not have any remaining performance obligations in its contracts with customers.

The Company utilizes a practical expedient to estimate commission revenue for each insurance product by applying the use of a portfolio approach to group approved members by the effective month of the relevant policy (referred to as a "cohort"). This allows the Company to estimate the commissions it expects to collect for each cohort by evaluating various factors, including but not limited to, contracted commission rates, carrier mix, and expected member churn.

The Company's variable consideration includes estimated and constrained lifetime values as the "constrained LTV" for the plans. The Company's estimate of commission revenue for each product line is based on a number of assumptions, which include, but are not limited to, estimating conversion of an approved applicant to a paying policyholder, forecasting persistency and forecasting the commission amounts likely to be received per policyholder. These assumptions are based on historical trends and incorporate management's judgment in interpreting those trends and in applying constraints. To the extent the Company makes changes to the assumptions, it will recognize any impact of the changes to commission revenue in the reporting period in which the change is made, including revisions of estimated lifetime commissions either below or in excess of previously estimated constrained LTV recognized as revenue.

**Other Revenue**

Within the Company's Medicare and IFP and Other segments, the Company provides trained licensed agents dedicated to carrier programs that assist in producing health insurance policies, typically prior to and during the annual enrollment period. The Company is compensated for the hours incurred on the carrier program at the time hours are incurred as well as performance-based enrollment fees relating to the Company enrolling individuals into health insurance plans. The Company recognizes revenue as control transfers over the term of the contract.

The Company recognizes revenue at a point in time resulting from the sale of leads to third parties and independent agents. The Company generates this revenue through the sale of leads sourced through its marketing efforts.

The Company provides certain customers access to its technology platform, where it charges for the implementation and monthly access to the software. This application allows carriers the use of the Company's e-commerce platform to offer their own health insurance policies on their websites and agents to utilize the Company's technology to power their online quoting, content and application submission processes. Typically, the Company is paid a one-time implementation fee, which it recognizes as control is transferred on a straight-line basis over the estimated term of the customer relationship (generally the initial term of the agreement), commencing once the technology is available for use by the third party.

F-50

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

Additionally, the Company earns development funds, based on delivering call volumes to certain insurance carriers. The Company recognizes revenue as control transfers over the term of the contract.

**Disaggregation of Revenue**

The table below depicts the disaggregation of revenue by product, and is consistent with how the Company evaluates its financial performance:

| | Successor Three Months Ended March 31, 2020 | | Predecessor Three Months Ended March 31, 2019 | |
|---|---|---|---|---|
| Commission revenue: | | | | |
| Medicare | | | | |
| Medicare Advantage | $ | 99,291 | $ | 31,029 |
| Medicare Supplement | | 2,189 | | 3,394 |
| Medicare Part D | | 571 | | 515 |
| Total Medicare | | 102,051 | | 34,938 |
| Individual and Family Plan: | | | | |
| Fixed Indemnity | | 6,779 | | 12,638 |
| Short Term | | 1,778 | | 1,054 |
| Major Medical | | 186 | | 160 |
| Total Individual and Family Plan | | 8,743 | | 13,852 |
| Ancillary | | 1,266 | | 2,020 |
| Small Group | | 450 | | 405 |
| Total Commission Revenue | | 112,510 | | 51,215 |
| Other Revenue | | 28,500 | | 17,874 |
| **Net Revenues** | $ | **141,010** | $ | **69,089** |

**Seasonality**

A greater number of the Company's Medicare-related health insurance plans are sold in its fourth quarter during the Medicare annual enrollment period when Medicare-eligible individuals are permitted to change their Medicare Advantage and Medicare Part D prescription drug coverage for the following year. As a result, the Company's Medicare plan-related commission revenue is highest in the Company's fourth quarter.

The majority of the Company's individual and family health insurance plans are sold in the fourth quarter during the annual open enrollment period as defined under the federal Patient Protection and Affordable Care Act and related amendments in the Health Care and Education Reconciliation Act. Individuals and families generally are not able to purchase individual and family health insurance outside of these open enrollment periods, unless they qualify for a special enrollment period as a result of certain qualifying events, such as losing employer-sponsored health insurance or moving to another state.

**Recent Accounting Pronouncements**

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measuremen*t (Topic 820), which amended the disclosure requirements under ASC 820. This update clarifies and unifies the disclosure of Level 3 fair value instruments.

F-51

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

This guidance is effective for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, although early adoption is permitted for either the entire standard or only the provisions that eliminate or modify the requirements. The Company adopted this standard on January 1, 2020, and the adoption did not have a material effect on our condensed consolidated financial statements.

In June 2018, the FASB issued ASU 2018-07, *Stock Compensation – Improvements to Nonemployee Share-Based Payment Accounting (*Topic 718). This guidance expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. Per ASU 2019-08, issued November 2019, the guidance is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted, but no earlier than an entity's adoption date of Topic 606. The Company adopted this standard on January 1, 2020, and the adoption did not have a material effect on our condensed consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). The guidance specifies that lessees will need to recognize a right-of-use asset and a lease liability for virtually all their leases except those which meet the definition of a short-term lease. For income statement purposes, the FASB retained a dual model, requiring leases to be classified as either operating or financing. Classification will be based on criteria that are similar to those applied in current lease accounting, but without explicit bright lines. Per ASU 2020-05, *Revenue from Contracts with Customers (Topic 606) and Leases (Topic 842): Effective Dates for Certain Entities*, issued June 2020, the guidance in ASU 2016-02, as amended, is effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. Early adoption is permitted. The Company is currently evaluating the new guidance to determine the impact it will have on its condensed consolidated financial statements.

In November 2019, the FASB issued ASU 2019-11, *Financial Instruments – Credit Losses* (Topic 326), which amends the guidance for accounting for assets that are potentially subject to credit risk. The amendments affect contract assets, loans, debt securities, trade receivables, net investments in leases, off-balance-sheet credit exposures, reinsurance receivables, and any other financial assets not excluded from the scope that have the contractual right to receive cash. Per ASU 2019-10, issued November 2019, the guidance is effective for annual and interim periods beginning after December 15, 2022. Early adoption is permitted. The Company is currently evaluating the new guidance to determine the impact it will have on its condensed consolidated financial statements.

## 2. ACQUISITION

**Acquisition of Norvax, LLC**

On September 13, 2019, the Company acquired a 100% interest in Norvax, for $807,591 in cash and $306,000 in equity. In connection with the Acquisition, the Company also agreed to pay additional consideration of up to $275,000 in additional Common and Senior Preferred Earnout Units, if Adjusted EBITDA, as defined in the terms of the acquisition agreement, exceeds certain thresholds for the period September 13, 2019 to December 31, 2019 and the year ended December 31, 2020 ("Earnout" or "contingent consideration").

The elements of the purchase consideration are as follows:

| | |
|---|---:|
| Cash paid | $ 807,591 |
| Fair value of Class A and B Common units issued | 306,000 |
| Fair value of Earnout | 172,000 |
| Total consideration | **$ 1,285,591** |

F-52

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

*Contingent Consideration*

The contingent consideration represents the fair value of the Earnout payments to Norvax's selling shareholders and will be adjusted to fair value at each reporting date until settled. The contingent consideration will be settled in Common and Senior Preferred Earnout Units within 60 days of the issuance of the 2019 and 2020 audited financial statements. The Senior Preferred Earnout Units earn an annual coupon of 10.3% that provides for the accrual of additional units. Changes in fair value of the contingent consideration are recognized in income from operations.

The full amount available relative to the 2019 target was earned as of December 31, 2019. On May 15, 2020, the contingent consideration related to the 2019 target of $200,000 was settled with the issuance of 113,407,000 Class A Common units, 48,644,750 Class B Common units, and 100,000,000 Senior Preferred Earnout Units.

*Allocation of Preliminary Purchase Price*

The preliminary allocation of the purchase price is based on the fair value of assets acquired and liabilities assumed as of the acquisition date. The components of the preliminary purchase price allocation are as follows:

| | | |
|---|---|---:|
| Net working capital | $ | 18,787 |
| Commission receivable – non-current | | 113,565 |
| Property and equipment | | 4,442 |
| Other noncurrent assets | | 218 |
| Other noncurrent liabilities | | (963) |
| Trade names | | 83,000 |
| Developed technology | | 496,000 |
| Customer relationships | | 232,000 |
| Goodwill | | 386,553 |
| Deferred revenue | | (3,283) |
| Commissions payable – non-current | | (44,728) |
| Total consideration transferred | **$** | **1,285,591** |

Goodwill represents the excess of the consideration paid over the estimated fair value of assets acquired and liabilities assumed in a business combination and is primarily attributable to future growth and the assembled workforce.

## 3. BALANCE SHEET ACCOUNTS

**Commissions Receivable**

Commissions receivable activity is summarized as follows:

| | | Successor<br>Three Months Ended<br>March 31, 2020 |
|---|---|---:|
| Beginning balance | $ | 382,931 |
| Commission revenue | | 112,510 |
| Cash receipts | | (106,651) |
| **Ending balance** | | **388,790** |
| Less: Commissions receivable – current | | 58,173 |
| Commissions receivable – non-current | $ | 330,617 |

F-53

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

For the three months ended March 31, 2020, the Company recognized $14,577 of revenue that was deferred as of December 31, 2019.

## 4. FAIR VALUE MEASUREMENTS

The Company defines fair value as the price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques the Company uses to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The Company classifies the inputs used to measure fair value into the following hierarchy:

| | |
|---|---|
| Level 1 | Unadjusted quoted prices in active markets for identical assets or liabilities. |
| Level 2 | Unadjusted quoted prices in active markets for similar assets or liabilities; unadjusted quoted prices for identical or similar assets or liabilities in markets that are not active; inputs other than quoted prices that are observable for the asset or liability. |
| Level 3 | Unobservable inputs for the asset or liability. |

*Fair Value Measurements*

The fair value of the acquired developed technology has been estimated using the multi-period excess earnings model. This method discounts the amount of excess cash flows generated by the asset. The fair value of the acquired trade names was estimated using the relief from-royalty method which required that the Company estimate hypothetical royalty payments that would be required over the economic life of the asset as if it were to be licensed instead of purchased. These payments were then discounted to their present value. Both developed technology and trade names represent a Level 3 measurement within the fair value hierarchy.

The fair value of the acquired customer relationships was estimated using the distributor method under the income approach, which included Level 3 inputs such as revenue, attrition, margin and contributory asset charges.

The fair value of the contingent consideration was measured using a Monte Carlo simulation and is discounted using a rate that appropriately captures the risk associated with the obligation. The weighted average discount rate used to value the contingent consideration as of March 31, 2020, was approximately 13% and was based on an analysis of publicly traded peers. Expected volatility was estimated to be 45%, based on an analysis of publicly traded peers that ranged from approximately 40% to 117%. The contingent consideration was part of the acquisition consideration and will be adjusted to fair value at each reporting date until settled. The following table sets forth the fair value and a summary of the changes to fair value of the contingent consideration:

| | |
|---|---|
| Balance at December 31, 2019 | $242,700 |
| 2020 earnout fair value adjustment | 4,400 |
| Balance at March 31, 2020 | $247,100 |

The carrying amount of certain financial instruments, including cash and cash equivalents, accounts receivable, commissions receivable, accounts payable, accrued expenses, and commissions payable approximate fair value due to the short maturity of these instruments. Commissions receivable are recorded at constrained lifetime values. The carrying value of debt approximates fair value due to the variable nature of interest rates.

F-54

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

## 5. GOODWILL AND INTANGIBLE ASSETS, NET

The carrying amounts, accumulated amortization, and net carrying value of the Company's definite-lived amortizable intangible assets, as well as its definite-lived intangible trademarks, are presented in the tables below:

| | March 31, 2020 (Successor) | | |
| --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net carrying amount |
| Developed technology | $496,000 | $ 38,971 | $ 457,029 |
| Customer relationships | 232,000 | 12,760 | 219,240 |
| **Total intangible assets subject to amortization** | **$728,000** | **$ 51,731** | **$ 676,269** |
| Indefinite-lived trademarks | | | 83,000 |
| **Intangible Assets** | | | **$ 759,269** |

| | December 31, 2019 (Successor) | | |
| --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net carrying amount |
| Developed technology | $496,000 | $ 21,257 | $ 474,743 |
| Customer relationships | 232,000 | 6,960 | 225,040 |
| **Total intangible assets subject to amortization** | **$728,000** | **$ 28,217** | **$ 699,783** |
| Indefinite-lived trademarks | | | 83,000 |
| **Intangible Assets** | | | **$ 782,783** |

There was no impairment of goodwill or intangible assets for the three months ended March 31, 2020.

## 6. LONG TERM DEBT

The Company's long-term debt consisted of the following:

| | Interest rate | Successor March 31, 2020 | Successor December 31, 2019 |
| --- | --- | --- | --- |
| Credit Facility | 8.11% - 8.41% | $ 415,500 | $ 299,250 |
| Less: unamortized debt discount and issuance costs | | (13,678) | (8,017) |
| Total debt | | 401,822 | $ 291,233 |
| Less: current portion | | (4,170) | (3,000) |
| **Total long-term debt** | | **$ 397,652** | **$ 288,233** |

**Successor**

*General*

On September 13, 2019, in connection with the Acquisition, Norvax, or the Borrower, entered into a first lien credit agreement (the "Credit Agreement") which provides for the following:

- $300,000 aggregate principal amount senior secured term loan facility, or the Term Loan Facility; and

- $30,000 aggregate principal amount senior secured revolving credit facility, or the Revolving Credit Facility.

F-55

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

On March 20, 2020, the Company entered into an amendment to the Credit Agreement, which provided $117,000 of incremental term loans, or the "Incremental Term Loan Facility". On March 23, 2020, the Company issued 6,666,667 Class B Common units to a lender that is party to the Company's Credit Agreement for $10,000 in proceeds.

On May 7, 2020, the Company entered into a second amendment to the Credit Agreement, which provided $20,000 of incremental revolving credit, or the "Incremental Revolving Credit Facility". The Company collectively refers to the Term Loan Facility, the Revolving Credit Facility, the Incremental Term Loan Facility, and the Incremental Revolving Credit Facility as the "Credit Facilities".

The Company incurred $9,283 and $6,011 of debt issuance costs associated with the Term Loan Facility and the Incremental Term Loan Facility, respectively, which are being amortized over the life of the debt under the effective interest rate method to interest expense.

As of March 31, 2020, the Company had a principal amount of $298,500 and $117,000 outstanding on the Term Loan Facility and Incremental Term Loan Facility, respectively. The Company had no amounts outstanding on the Revolving Credit Facility, which had remaining capacity of $30,000 as of March 31, 2020.

*Interest Rates and Fees*

Borrowings under the Credit Facilities are, at the option of the Borrower, either alternate base rate ("ABR") loans or LIBOR loans. Term loans and revolving loans comprising each ABR borrowing under the Term Loan Facility accrue interest at the ABR plus an applicable rate of 5.50% per annum. Term loans and revolving loans comprising each LIBOR borrowing bear interest at the LIBOR plus an applicable rate of 6.50% per annum.

In addition to paying interest on the principal amounts outstanding under the Credit Facilities, the Borrower is required to pay a commitment fee of 0.50% per annum under the Revolving Credit Facility and the Incremental Revolving Credit Facility in respect of the unutilized commitments thereunder. The Borrower is also subject to customary letter of credit and agency fees.

*Mandatory Prepayments*

The Credit Agreement requires that the Borrower, following the end of each fiscal year, commencing with the fiscal year ending December 31, 2020, repay the outstanding principal amount of all term loans under the Credit Facilities in an aggregate amount equal to (A) 50.0% of the excess cash flow of the Borrower and its restricted subsidiaries for such fiscal year if the Total Net Leverage Ratio (as defined in the Credit Agreement) is greater than 4.50:1.00, which percentage is reduced to 25% if the Total Net Leverage Ratio is less than or equal to 4.50:1.00 and greater than 4.00:1.00, which percentage is further reduced to 0% if the Total Net Leverage Ratio is less than or equal to 4.00:1.00, minus (B) at the option of the Borrower, (x) the aggregate amount of certain voluntary prepayments of term loans under the Credit Agreement during such fiscal year or after year-end and prior to the time such Excess Cash Flow prepayment is due, (y) the aggregate principal amount of any voluntary prepayments of indebtedness under pari passu incremental facilities, incremental equivalent debt and/or certain refinancing indebtedness, made during such fiscal year or after such fiscal year and prior to the time such prepayment is due.

The Credit Agreement requires the Borrower to repay amounts equal to 100% of the net cash proceeds of certain asset sales or other dispositions of property (including insurance and condemnation proceeds); provided, that, in the case of any prepayment events required in connection with certain dispositions and casualty events, if the net proceeds therefrom are invested (or committed to be invested) within 12 months after the receipt of such net proceeds, then no prepayment shall be required except to the extent such net proceeds have not been so invested (or committed to be invested) by the end of such 12-month period.

The Credit Agreement requires 100% of the net proceeds from the issuance or incurrence of certain indebtedness to be applied to prepay the term loans under the Term Loan Facility and the Incremental Term Loan Facility, except to the extent the indebtedness constitutes refinancing indebtedness.

F-56

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

*Voluntary Prepayment*

The Borrower may voluntarily prepay outstanding borrowings under the Credit Facilities at any time in whole or in part without premium or penalty; provided, that, with respect to voluntary prepayments of the Term Loan Facility and the Incremental Term Loan Facility and in certain other circumstances, the Borrower may have to pay a prepayment premium.

*Amortization and Final Maturity*

The Term Loan Facility and Incremental Term Loan Facility are payable in quarterly installments in the principal amount of 0.25% of the original principal amount. The remaining unpaid balance on the Term Loan Facility and Incremental Term Loan Facility, together with all accrued and unpaid interest thereon, is due and payable on or prior to September 13, 2025. Outstanding borrowings under the Revolving Credit Facility and the Incremental Revolving Credit Facility do not amortize and are due and payable on September 13, 2024.

*Guarantees and Security*

The Borrower's obligations under the Credit Facilities are guaranteed by Blizzard Midco, LLC and certain of the Borrower's subsidiaries. All obligations under the Credit Agreement are secured by a first priority lien on substantially all of the assets of the Borrower, including a pledge of all of the equity interests of its subsidiaries.

*Covenants and Other Matters*

The Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict the Borrower's and its restricted subsidiaries' ability to:

- incur indebtedness;
- incur certain liens;
- consolidate, merge or sell or otherwise dispose of assets;
- make investments, loans, advances, guarantees and acquisitions;
- pay dividends or make other distributions on equity interests, or redeem, repurchase or retire equity interests;
- enter into transactions with affiliates;
- alter the business conducted by the Company and subsidiaries;
- change their fiscal year; and
- amend or modify governing documents.

In addition, the Credit Agreement contains financial and non-financial covenants. The Company is in compliance with all covenants as of March 31, 2020.

The Credit Agreement also contains certain customary representations and warranties and affirmative covenants, and certain reporting obligations. In addition, the lenders under the Credit Facilities will be permitted to accelerate all outstanding borrowings and other obligations, terminate outstanding commitments and exercise other specified remedies upon the occurrence of certain events of default (subject to certain grace periods and exceptions), which include, among other things, payment defaults, breaches of representations and warranties, covenant defaults, certain cross-defaults and cross-accelerations to other indebtedness, certain events of bankruptcy and insolvency, certain judgments and changes of control. Subject to certain limited exceptions, substantially all of the Company's assets are restricted from distribution.

F-57

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

**Predecessor**

During 2019, Norvax had a senior secured revolving credit facility (the "Predecessor Credit Facility") with The Huntington National Bank (formerly FirstMerit Bank N.A.). In connection with the Acquisition, this facility was paid off and retired.

During 2018, Norvax amended its credit facility to increase the Predecessor Credit Facility from a maximum borrowing of $10,000 to $12,000 and again from $12,000 to $16,000. The Predecessor Credit Facility provided for borrowings up to a maximum of $16,000 based upon 80% of eligible trade accounts receivable, plus 40% of certain earned enrollment/commission fees. Norvax paid a variable interest rate on borrowings equal to, at Norvax's discretion, Prime minus 50 basis points or LIBOR plus 250 basis points. Proceeds from borrowings were used to finance working capital and other general corporate purposes. The Predecessor Credit Facility was collateralized by substantially all the assets of Norvax and was subject to certain financial covenants. These covenants included maintaining a minimum fixed charge coverage ratio and not exceeding a maximum funded debt to earnings before interest, taxes, depreciation and amortization ratio (as defined in the credit agreement). The Predecessor Credit Facility originally matured in August 2019 and Norvax and The Huntington National Bank agreed to extend the maturity to November 2019.

## 7. MEMBERS' EQUITY

**Successor**

The GoHealth Holdings, LLC operating agreement ("Operating Agreement") provides for the classes of units, allocation of profits and losses, and other member rights. The Operating Agreement allows for equity Preferred units (the "Preferred") and Common units (the "Common"). Preferred units are divided into two classes: Senior Preferred Earnout Units, which are non-voting, and Preferred Units ("Preferred Unit"), which have voting rights. Common units are divided into two classes: Class A Common units ("Class A"), which have voting rights and Class B Common units ("Class B"), which are non-voting. Members of management will be issued profits interests (the "Profit Units," and together with the Preferred units and the Common units, the "Units") from an equity pool with an aggregate value equal to 10% of the Company's fully diluted equity.

*Voting Rights*

Each Preferred Unit and Class A unit has equal voting rights. The Preferred Unit and Class A unit holders also elect the members of the board of managers of the Company based on the percentage of units held by such investor.

*Liquidation Preference*

Upon a liquidity event defined as: (a) sale or disposition of all or substantially all of the assets of the Company; or (b) the liquidation, dissolution or winding up of the Company; first, in connection with refinancing or repayment of debt, Senior Preferred Earnout Units, the ceiling of which is the face amount of the Senior Preferred Earnout Units; second, Preferred Unit holders up to 150% of their invested capital; third, to Common holders, up to 150% of their invested capital; fourth, to the Profit Unit holders, pro rata, with the residual to the Common holders, pro rata, up to 150% of their invested capital, inclusive of prior distributions; fifth, to the Profit Unit holders, pro rata, with the residual to all members until each has received an aggregate amount of additional capital contributions, less amounts previously distributed; sixth, to Preferred Unit, Common and Profit Unit holders until Preferred Unit holders have received a cumulative amount equal to 250% of their invested capital; seventh, to Common holders equal to $75,000; eighth, pro rata, 100% Common, 100% Profit units, and 90% Preferred Unit/10% Common until Preferred Unit holders have received 300% of their invested capital; ninth,

F-58

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

Common holders equal to $75,000; tenth, pro rata, 100% Common, 100% Profit units, 85% Preferred Unit/15% Common until Preferred Unit holders receive 400% of their invested capital; and, eleventh, pro rata, 100% Common, 100% Profit units and 80% Preferred Unit/20% Common.

*Right of First Offer*

Following the fifth anniversary of the Closing, Common units will be freely transferable, subject to customary "prohibited transfer" restrictions and a right of first offer for the benefit of the Company, first, and any non-transferring Investors, second.

**Predecessor**

The Norvax operating agreement ("Norvax Operating Agreement") provided for classes of units, allocation of profits and losses, distribution rights, and other member rights. The Norvax Operating Agreement allowed for equity units (Class A units and Class B units) and profits interests units (Class C units). Class A and Class B units had voting rights. Except for board of manager composition, any action taken by the Class A and Class B members required a majority of members holding the outstanding Class A and Class B units, voting together as a single class. Class C units were nonvoting and represented profit interests' units and entailed no initial capital contribution. Members were limited in their liability to their capital contributions. Immediately prior to the Acquisition described in *Note 2 – Acquisition*, all Class B units converted to Class A units.

*Distribution Rights*

Class A and Class B unit holders were entitled to distributions on a pro-rata basis, as approved by the board of managers. To the extent that Norvax had available cash, it distributed to each Class A and Class B unit holder a tax distribution in an amount equal to the product of the aggregate total of all taxable income allocable to the members multiplied by the tax rate. The tax rate is 45% as set forth in the Norvax Operating Agreement.

*Voting Rights*

Each Class A and Class B unit had equal voting rights and preferences, except Norwest Equity partners ("NEP") was granted authority to approve certain actions. The Class A and Class B unit holders also elected the members of the board of managers of Norvax.

*Antidilution Rights*

Class B units contained an antidilution feature that required an adjustment to the conversion ratio in the event of subsequent issuances of securities by Norvax at a price below the conversion price in effect immediately prior to each such issuance. The Class B conversion ratio could be adjusted in the event that grants of options or changes in option prices or conversion rates on convertible securities resulted in prices below the conversion price in effect immediately prior to each such grant or change.

*Liquidation Preference*

Upon a liquidity event defined as: (a) sale or disposition of all or substantially all of the assets of Norvax; (b) the liquidation, dissolution or winding up of Norvax; or (c) any consolidation or merger of Norvax in which the Class A and Class B unit holders owned less than 50% of the voting power of the outstanding securities immediately after the consolidation or merger, the Class B units are first to be paid proceeds at a liquidation amount of $10.00 per unit, and from time to time, was decreased by subtracting distributions (other than tax distributions) made in respect to Class B units.

F-59

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

Upon the occurrence of a Dissolution Event, Norvax continued solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and members. A Dissolution Event is an event by the order of a court pursuant to Section 18-802 of the Delaware Code or by action of the members with NEP's approval. Net income, net losses, and other items of Norvax's income, gain, loss, or deduction was to continue to be allocated in the manner provided in the Norvax Operating Agreement. In a Dissolution Event, Class B units received the liquidation preference specified above.

*Involuntary Transfer Rights*

Upon any involuntary transfer, Norvax had the first option, and the purchase option unit holders had the subsequent options, to purchase all or any portion of the units subject to the involuntary transfer.

*Right of First Refusal*

A unit holder could transfer, sell, or assign any Class A or Class B units in a permitted transfer, given that Norvax first had the option to purchase the units being transferred.

*Class B Put Option*

Class B units are classified as temporary equity as they were redeemable upon exercise of the Class B put option, which was outside of Norvax's control, for cash at a put price equal to the greater of the Class B unit fair value or their original cost. Because the Class B units were redeemable, the Company was accreting the change up to the maximum redemption amount. The Company recorded accretion of $115,000 in the three months ended March 31, 2019. These amounts appear as Redeemable Class B unit accretion on the condensed consolidated statements of changes in members' equity.

Immediately prior to the Acquisition described in *Note 2 – Acquisition*, Norvax adjusted NEP's Redeemable Class B units to their full redemption amounts and were then converted to Class A units.

## 8. SHARE-BASED COMPENSATION PLANS

The following table summarizes the share-based compensation expense by operating function for the three months ended March 31, 2020:

|  | Successor Three Months Ended March 31, 2020 |
|---|---|
| Marking and advertising | $ 57 |
| Customer care and enrollment | 24 |
| Technology | 73 |
| General and administrative | 325 |
| **Total share-based compensation expense** | $ 479 |

**Successor**

Effective September 13, 2019 and in conjunction with the Acquisition, the Company authorized the grants of non-voting Profit Units. The Profits Units are issued by Blizzard Management Feeder, LLC, to employees on behalf of the Company. One-third of the Profit Units granted to each employee ("Time-Vesting Units") will vest in five (5) equal installments on the first through fifth anniversaries of the date of grant, so long as the employee remains employed by the Company through the applicable vesting date. Two-thirds of the Profit Units granted to

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

each individual will vest upon a liquidity event based on the extent to which the distributions received by the Preferred and the Common exceed their investment in the Company ("Performance-Vesting Units").

Compensation expense for the Time-Vesting Units is recognized on a straight-line basis over the five-year requisite service period. Performance-Vesting Units contain market conditions and an implied performance condition, which results in compensation cost being recognized when the performance condition is considered probable of being satisfied. Performance-Vesting Units vest upon the achievement of a contingent exit event that is defined as a transaction in which the ultimate parent disposes of all or substantially all of its investment in the Company. Such an exit event is not considered probable until it consummates.

The number of Profit Units eligible for issuance will equal, in the aggregate, approximately 10% of the fully diluted equity of the Company at the closing of the Acquisition. All Profit Units (i.e., issued at closing of the Acquisition or issued thereafter) will have the economic rights and entitlements in relation to other equity interests in the Company under the waterfall described in the Operating Agreement.

The Company granted 6,001,788 of Profits Units in the three months ended March 31, 2020, of which 1,980,580 and 4,021,208 were Time-Vesting Units and Performance-Vesting Units, respectively.

**Predecessor**

*Class C Incentive Plan*

Norvax had a Class C Incentive Plan (the "Class C Plan"), which Norvax accounted for as a liability award. Class C units granted under the plan represented profit interests' units and entailed no initial capital contribution. Class C units had no voting rights.

*Incentive Share Plan*

Norvax had an Incentive Share Plan, which Norvax accounted for as a liability award. The plan consisted of incentive share grants made to employees that provided for cash payments to participants upon the occurrence of a triggering event. Triggering events included a change in control or an employee's involuntary termination without cause. In the event of a change in control, the triggering event value per share was the average per share purchase price of the common stock giving rise to such change in control. Cash payments were based on the difference between the triggering event value per share and the value per share on the grant date. In the event of an involuntary termination without cause, cash payments were calculated as the positive difference between the book value per share of Norvax's stock on the date of the triggering event and the value per share on the grant date for each incentive share then triggered, as defined in the Incentive Share Plan.

**9. INCOME TAXES**

The Company's effective tax rate for the first quarter of 2020 and 2019 was 0.14% and 0.05%, respectively. The effective tax rate for each period is lower than the statutory tax rate primarily due to the effect of tax-exempt entity status.

**10. COMMITMENTS AND CONTINGENCIES**

**Leases**

The Company entered into various non-cancelable operating lease agreements for certain of the Company's offices and data centers with lease periods expiring in 2030. Certain of these arrangements have free rent periods or escalating rent payment provisions, and the Company recognizes rent expense under such arrangements on a straight-line basis.

**Table of Contents**

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

**Legal Proceedings**

From time to time, the Company is party to various litigation matters incidental to the conduct of its business. The Company is not presently party to any legal proceedings the resolution of which it believes would have a material adverse effect on its business, prospects, financial condition, liquidity, results of operation, cash flows or capital levels.

**11. RELATED-PARTY TRANSACTIONS**

The Company has entered into various lease agreements with 214 W Huron LLC, 220 W Huron Street Holdings LLC, and 215 W Superior LLC, each of which are controlled by significant shareholders, to lease its corporate offices in Chicago, Illinois. The Company pays rent, operating expenses, maintenance, and utilities under the terms of the leases. For the three months ended March 31, 2020 and 2019, the Company made aggregate lease payments of $321 and $245, respectively, under these leases.

On January 1, 2020, the Company entered into a non-exclusive aircraft dry lease agreement with an entity wholly-owned and controlled by significant shareholders. The agreement allows the Company to use an aircraft owned by this entity for business and on an as-needed basis. The agreement has no set term and is terminable without cause by either party upon 30 days' prior written notice. Under the agreement, the Company is required to pay $6,036.94 per flight hour for use of the aircraft. For the three months ended March 31, 2020, the Company recorded expense of $747 under this lease, all of which was unpaid and recorded as accounts payable in the condensed consolidated balance sheet as of March 31, 2020.

On May 12, 2020, the Company entered into a lease agreement with Wilson Tech 5, which is controlled by significant shareholders, for a proposed site in Linden, Utah, beginning in 2022. This lease agreement expires on May 11, 2030.

**12. OPERATING SEGMENTS AND SIGNIFICANT CUSTOMERS**

**Operating Segments**

The Company reports segment information based on how the Company's chief operating decision maker ("CODM"), regularly reviews operating results, allocates resources and makes decisions regarding business operations. The performance measures of the segments include total revenue and profit (loss). The Company's business structure is comprised of four operating and reportable segments: Medicare Internal, Medicare External, Individual and Family Plan and Other ("IFP and Other") Internal, and IFP External.

F-62

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

The following table presents summary results of the Company's operating segments for the following periods:

| | Successor Three Months Ended March 31, 2020 | Predecessor Three Months Ended March 31, 2019 |
|---|---|---|
| Revenues: | | |
| Medicare: | | |
| Internal channel | $ 95,287 | $ 20,911 |
| External channel | 28,945 | 20,335 |
| Total Medicare | 124,232 | 41,246 |
| Individual and Family Plan and Other: | | |
| Internal channel | 8,632 | 14,440 |
| External channel | 8,146 | 13,403 |
| Total Individual and Family Plan and Other | 16,778 | 27,843 |
| Total revenues | 141,010 | 69,089 |
| Segment profit (loss): | | |
| Medicare: | | |
| Internal channel | 41,735 | 4,864 |
| External channel | (322) | 3,380 |
| Total Medicare segment profit | 41,413 | 8,244 |
| Individual and Family Plan and Other: | | |
| Internal channel | 481 | 881 |
| External channel | 512 | 1,263 |
| Total Individual and Family Plan and Other segment profit | 993 | 2,144 |
| Total segment profit | 42,406 | 10,388 |
| Corporate | 8,665 | 5,346 |
| Change in fair value of contingent consideration liability | 4,400 | — |
| Amortization of intangible assets | 23,514 | — |
| Interest expense | 6,756 | 28 |
| Other expense | 10 | 10 |
| Income (loss) before income taxes | $ (939) | $ 5,004 |

There are no internal revenue transactions between the Company's operating segments. The Company's CODM does not separately evaluate assets by segment, and therefore assets by segment are not presented. The Company's assets are primarily located in the United States.

**Significant Customers**

Substantially all revenue for the three months ended March 31, 2020 and 2019 was generated from customers located in the United States. Carriers representing 10% or more of the Company's total revenue for the following periods are presented in the table below:

| | Successor March 31, 2020 | Predecessor March 31, 2019 |
|---|---|---|
| Humana | 42% | 28% |
| Anthem | 32% | 15% |

F-63

Table of Contents

GoHealth Holdings, LLC and Subsidiaries
Notes to Condensed Consolidated Financial Statements (continued)

**13. SUBSEQUENT EVENTS**

Management has reviewed its March 31, 2020, condensed consolidated financial statements for subsequent events through June 15, 2020, the date the financial statements were available to be issued. Other than the subsequent events described in *Note 1 – Summary of Business and Significant Accounting Policies, Note 2 – Acquisition, Note 6 – Long Term Debt,* and *Note 11 – Related-Party Transactions*, the Company is not aware of any subsequent events that would require recognition or disclosure in the consolidated financial statements.

F-64

**39,500,000 Shares**

# GoHealth, Inc.

**Class A Common Stock**

---

**PROSPECTUS**

---

**Goldman Sachs & Co. LLC**

**BofA Securities**

**Morgan Stanley**

**Barclays**

**Credit Suisse**

**Evercore ISI**

**RBC Capital Markets**

**William Blair**

**Cantor**

**SunTrust Robinson Humphrey**

**Loop Capital Markets**

 

**, 2020**

**PART II**

**INFORMATION NOT REQUIRED IN THE PROSPECTUS**

*Item 13. Other expenses of issuance and distribution.*

The following table sets forth all fees and expenses, other than the underwriting discount payable solely by GoHealth, Inc. in connection with the offer and sale of the securities being registered. All amounts shown are estimated except for the SEC registration fee, the Financial Industry Regulatory Authority, Inc., or FINRA, filing fee and the Nasdaq listing fee.

| | |
|---|---:|
| SEC registration fee | $ 117,923 |
| FINRA filing fee | 136,775 |
| Nasdaq listing fee | 295,000 |
| Printing and engraving expenses | 338,000 |
| Legal fees and expenses | 5,200,000 |
| Accounting fees and expenses | 2,000,000 |
| Blue sky qualification fees and expenses | 35,000 |
| Transfer agent fees and expenses | 4,000 |
| Miscellaneous fees and expenses | 148,302 |
| Total | $ 8,275,000 |

*Item 14. Indemnification of directors and officers.*

Section 102 of the General Corporation Law of the State of Delaware permits a corporation to eliminate the personal liability of directors of a corporation to the corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director, except where the director breached his duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase or redemption in violation of Delaware corporate law or obtained an improper personal benefit. Our amended and restated certificate of incorporation provides that no director of GoHealth, Inc. shall be personally liable to it or its stockholders for monetary damages for any breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability, except to the extent that the General Corporation Law of the State of Delaware prohibits the elimination or limitation of liability of directors for breaches of fiduciary duty.

Section 145 of the General Corporation Law of the State of Delaware provides that a corporation has the power to indemnify a director, officer, employee, or agent of the corporation, or a person serving at the request of the corporation for another corporation, partnership, joint venture, trust or other enterprise in related capacities against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with an action, suit or proceeding to which he was or is a party or is threatened to be made a party to any threatened, ending or completed action, suit or proceeding by reason of such position, if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, in any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, except that, in the case of actions brought by or in the right of the corporation, no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or other adjudicating court determines that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Table of Contents

Upon consummation of the Transactions, our amended and restated certificate of incorporation and amended and restated bylaws will provide indemnification for our directors and officers to the fullest extent permitted by the General Corporation Law of the State of Delaware. We will indemnify each person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of us) by reason of the fact that he or she is or was, or has agreed to become, a director or officer, or is or was serving, or has agreed to serve, at our request as a director, officer, partner, employee or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to as an "Indemnitee"), or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding and any appeal therefrom, if such Indemnitee acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, our best interests, and, with respect to any criminal action or proceeding, he or she had no reasonable cause to believe his or her conduct was unlawful. Our amended and restated certificate of incorporation and amended and restated bylaws will provide that we will indemnify any Indemnitee who was or is a party to an action or suit by or in the right of us to procure a judgment in our favor by reason of the fact that the Indemnitee is or was, or has agreed to become, a director or officer, or is or was serving, or has agreed to serve, at our request as a director, officer, partner, employee or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees) and, to the extent permitted by law, amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding, and any appeal therefrom, if the Indemnitee acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, our best interests, except that no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to us, unless a court determines that, despite such adjudication but in view of all of the circumstances, he or she is entitled to indemnification of such expenses. Notwithstanding the foregoing, to the extent that any Indemnitee has been successful, on the merits or otherwise, he or she will be indemnified by us against all expenses (including attorneys' fees) actually and reasonably incurred in connection therewith. Expenses must be advanced to an Indemnitee under certain circumstances.

Prior to the consummation of this offering, we intend to enter into separate indemnification agreements with each of our directors and executive officers. Each indemnification agreement will provide, among other things, for indemnification to the fullest extent permitted by law against any and all expenses, judgments, fines, penalties and amounts paid in settlement of any claim. The indemnification agreements will provide for the advancement or payment of all expenses to the indemnitee and for the reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation and amended and restated bylaws.

We maintain a general liability insurance policy that covers certain liabilities of directors and officers of our corporation arising out of claims based on acts or omissions in their capacities as directors or officers.

In any underwriting agreement we enter into in connection with the sale of Class A common stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act, against certain liabilities.

### Item 15. *Recent sales of unregistered securities.*

On March 27, 2020, GoHealth, Inc. issued 1,000 shares of common stock, par value $0.001 per share to an officer of GoHealth, Inc. in exchange for $1.00, which shares, upon the filing of our amended and restated certificate of incorporation, will be converted into one share of Class A common stock, and such share of Class A common stock shall be cancelled for no consideration upon the consummation of the Transactions. The issuance was exempt from registration under Section 4(a)(2) of the Securities Act, as a transaction by an issuer not involving any public offering.

II-2

***Item 16. Exhibits and financial statements.***

(a)    Exhibits

The following documents are filed as exhibits to this registration statement.

| Exhibit No. | |
|---|---|
| 1.1** | Form of Underwriting Agreement. |
| 3.1** | Certificate of Incorporation of GoHealth, Inc., as in effect prior to the consummation of the Transactions. |
| 3.2** | Form of Amended and Restated Certificate of Incorporation of GoHealth, Inc., to be in effect upon the consummation of the Transactions. |
| 3.3** | Bylaws of GoHealth, Inc., as in effect prior to the consummation of the Transactions. |
| 3.4** | Form of Amended and Restated Bylaws of GoHealth, Inc., to be in effect upon the consummation of the Transactions. |
| 4.1** | Specimen Stock Certificate evidencing the shares of Class A common stock. |
| 5.1 | Opinion of Latham & Watkins LLP. |
| 10.1** | Form of Tax Receivable Agreement, to be effective upon the consummation of the Transactions. |
| 10.2† | Form of Second Amended and Restated LLC Agreement of GoHealth Holdings, LLC, to be effective upon the consummation of the Transactions. |
| 10.3** | Form of Stockholders Agreement, to be effective upon the consummation of the Transactions. |
| 10.4** | Form of Registration Rights Agreement, to be effective upon the consummation of the Transactions. |
| 10.5⁺†** | Incremental Facility Agreement and Technical Amendment No. 2 to Credit Agreement, dated as of May 7, 2020, among Norvax, LLC, as borrower, Blizzard Midco, LLC, as a guarantor, the other guarantors party thereto, Owl Rock Capital Corporation, as administrative agent, collateral agent and swingline lender and the other lenders from time to time party thereto. |
| 10.6# | GoHealth, Inc. 2020 Incentive Award Plan. |
| 10.7# | GoHealth, Inc. 2020 Employee Stock Purchase Plan. |
| 10.8†** | Form of Indemnification and Advancement Agreement between GoHealth, Inc. and its directors and officers. |
| 10.9#** | GoHealth Holdings, LLC Profits Unit Plan. |
| 10.10†#** | Form of Executive Common Unit and Profits Unit Agreement. |
| 10.11# | Form of Amendment No. 1 to Executive Common Unit and Profits Unit Agreement. |
| 10.12†# | Amended and Restated Employment Agreement, dated July 7, 2020, by and among Norvax, LLC, GoHealth, Inc., GoHealth Holdings, LLC, and Brandon M. Cruz. |
| 10.13†# | Employment Agreement, dated July 7, 2020, by and among GoHealth, Inc., GoHealth Holdings, LLC, and Clinton P. Jones. |
| 10.14†# | Employment Agreement, dated July 7, 2020, by and among GoHealth, Inc., GoHealth Holdings, LLC, and Shane E. Cruz. |
| 10.15†# | Employment Agreement, dated July 7, 2020, by and among GoHealth, Inc., GoHealth Holdings, LLC, and James A. Sharman. |
| 10.16# | GoHealth, Inc. Non-Employee Director Compensation Policy. |
| 10.17# | Form Director Profits Unit Agreement. |

II-3

**Table of Contents**

| Exhibit No. | |
|---|---|
| 10.18# | Form Amendment No. 1 to Director Profits Unit Agreement. |
| 10.19# | Form of Stock Option Award Grant Notice and Stock Option Agreement. |
| 10.20# | Form of Restricted Stock Unit Award Grant Notice and Restricted Stock Unit Agreement. |
| 21.1** | List of Subsidiaries of GoHealth, Inc. |
| 23.1 | Consent of Ernst & Young LLP, as to GoHealth, Inc. |
| 23.2 | Consent of Ernst & Young LLP, as to GoHealth Holdings, LLC. |
| 23.3 | Consent of Latham & Watkins LLP (contained in its opinion filed as Exhibit 5.1 hereto). |
| 24.1 | Power of Attorney (included on signature page). |

\*\*  Previously filed.

\#  Indicates management contract or compensatory plan.

\+  Certain of the schedules and attachments to this exhibit have been omitted pursuant to Regulation S-K, Item 601(a)(5). The registrant hereby undertakes to provide further information regarding such omitted materials to the Commission upon request.

†  Certain portions of this exhibit (indicated by "####") have been omitted pursuant to Regulation S-K, Item 601(a)(6).

*Item 17. Undertakings.*

(a)  The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(b)  Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of GoHealth, Inc. pursuant to the foregoing provisions, or otherwise, GoHealth, Inc. has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by GoHealth, Inc. of expenses incurred or paid by a director, officer or controlling person of GoHealth, Inc. in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, GoHealth, Inc. will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction, the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c)  The undersigned hereby further undertakes that:

(1)  For purposes of determining any liability under the Securities Act the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by GoHealth, Inc. pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)  For the purpose of determining any liability under the Securities Act each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, GoHealth, Inc. has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of Chicago, state of Illinois, on this 8th day of July, 2020.

GoHealth, Inc.

By: /s/ Clinton P. Jones
Clinton P. Jones
Chief Executive Officer

## POWER OF ATTORNEY

Each of the undersigned officers and directors of GoHealth, Inc. hereby constitutes and appoints Clinton P. Jones and Travis J. Matthiesen, and each of them any of whom may act without joinder of the other, the individual's true and lawful attorneys-in-fact and agents, each with full power of substitution and resubstitution, for the person and in his or her name, place and stead, in any and all capacities, to sign this registration statement of GoHealth, Inc. on Form S-1, and any other registration statement relating to the same offering (including any registration statement, or amendment thereto, that is to become effective upon filing pursuant to Rule 462(b) under the Securities Act of 1933, as amended), and any and all amendments thereto (including post-effective amendments to the registration statement), and to file the same, with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement on Form S-1 has been signed by the following persons in the capacities set forth opposite their names and on the date indicated above.

| Signature | Title | Date |
|---|---|---|
| /s/ Clinton P. Jones<br>Clinton P. Jones | Chief Executive Officer and Director (Principal Executive Officer) | July 8, 2020 |
| /s/ Travis J. Matthiesen<br>Travis J. Matthiesen | Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | July 8, 2020 |
| /s/ Brandon M. Cruz<br>Brandon M. Cruz | Director | July 8, 2020 |
| /s/ Rahm Emanuel<br>Rahm Emanuel | Director | July 8, 2020 |
| /s/ Joseph G. Flanagan<br>Joseph G. Flanagan | Director | July 8, 2020 |
| /s/ Helene D. Gayle<br>Helene D. Gayle | Director | July 8, 2020 |
| /s/ Jeremy W. Gelber<br>Jeremy W. Gelber | Director | July 8, 2020 |

II-5

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ Anita V. Pramoda <br> Anita V. Pramoda | Director | July 8, 2020 |
| /s/ Miriam A. Tawil <br> Miriam A. Tawil | Director | July 8, 2020 |
| /s/ Alexander E. Timm <br> Alexander E. Timm | Director | July 8, 2020 |

II-6

**Exhibit 5.1**

53rd at Third
885 Third Avenue
New York, New York 10022-4834
Tel: +1.212.906.1200 Fax: +1.212.751.4864
www.lw.com

## LATHAM&WATKINS LLP

FIRM /AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

July 8th, 2020

GoHealth, Inc.
214 West Huron St.
Chicago, Illinois 60654

Re:    Registration Statement No. 333-239287;
       45,425,000 shares of Class A common stock, par value $0.0001 per share

Ladies and Gentlemen:

       We have acted as special counsel to GoHealth, Inc., a Delaware corporation (the "*Company*"), in connection with the proposed issuance of up to 45,425,000 shares of Class A common stock, $0.0001 par value per share, which are being offered by the Company (the "*Shares*"). The Shares are included in a registration statement on Form S–1 under the Securities Act of 1933, as amended (the "*Act*"), initially filed with the Securities and Exchange Commission (the "*Commission*") on June 19, 2020 (Registration No. 333–239287, as amended, the "*Registration Statement*"). The term "Shares" shall include any additional shares of common stock registered by the Company pursuant to Rule 462(b) under the Act in connection with the offering contemplated by the Registration Statement. This opinion is being furnished in connection with the requirements of Item 601(b)(5) of Regulation S-K under the Act, and no opinion is expressed herein as to any matter pertaining to the contents of the Registration Statement or related Prospectus, other than as expressly stated herein with respect to the issue of the Shares.

       As such counsel, we have examined such matters of fact and questions of law as we have considered appropriate for purposes of this letter. With your consent, we have relied upon certificates and other assurances of officers of the Company and others as to factual matters without having independently verified such factual matters. We are opining herein as to General Corporation Law of the State of Delaware, and we express no opinion with respect to any other laws.

       Subject to the foregoing and the other matters set forth herein, it is our opinion that, as of the date hereof, upon the proper filing of the amended and restated certificate of incorporation of the Company, substantially in the form most recently filed as an exhibit to the Registration Statement, with the Secretary of State of Delaware and when such Shares shall have been duly registered on the books of the transfer agent and registrar therefor in the name or on behalf of the purchasers and have been issued by the Company against payment therefor (not less than par

**LATHAM&WATKINS**LLP

value) in the circumstances contemplated by the form of underwriting agreement most recently filed as an exhibit to the Registration Statement, the issue and sale of the Shares will have been duly authorized by all necessary corporate action of the Company, and the Shares will be validly issued, fully paid and nonassessable. In rendering the foregoing opinion, we have assumed that the Company will comply with all applicable notice requirements regarding uncertificated shares provided in the General Corporation Law of the State of Delaware.

This opinion is for your benefit in connection with the Registration Statement and may be relied upon by you and by persons entitled to rely upon it pursuant to the applicable provisions of the Act. We consent to your filing this opinion as an exhibit to the Registration Statement and to the reference to our firm in the Prospectus under the heading "Legal Matters." We further consent to the incorporation by reference of this letter and consent into any registration statement filed pursuant to Rule 462(b) with respect to the Shares. In giving such consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission thereunder.

Very truly yours,

/s/ Latham & Watkins LLP

**Exhibit 10.2**

**GOHEALTH HOLDINGS, LLC**

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

Dated as of July [●], 2020

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

|  |  | Page |
|---|---|---:|
| Article I. DEFINITIONS |  | 2 |
| Article II. ORGANIZATIONAL MATTERS |  | 13 |
| Section 2.01 | Formation of Company | 13 |
| Section 2.02 | Second Amended and Restated Limited Liability Company Agreement | 13 |
| Section 2.03 | Name | 14 |
| Section 2.04 | Purpose; Powers | 14 |
| Section 2.05 | Principal Office; Registered Office | 14 |
| Section 2.06 | Term | 14 |
| Section 2.07 | No State-Law Partnership | 14 |
| Article III. MEMBERS; UNITS; CAPITALIZATION |  | 14 |
| Section 3.01 | Members | 14 |
| Section 3.02 | Units | 15 |
| Section 3.03 | Recapitalization; the Corporation's Capital Contribution; the Corporation's Purchase of Common Units | 16 |
| Section 3.04 | Authorization and Issuance of Additional Units | 16 |
| Section 3.05 | Repurchase or Redemption of shares of Class A Common Stock | 18 |
| Section 3.06 | Certificates Representing Units; Lost, Stolen or Destroyed Certificates; Registration and Transfer of Units | 18 |
| Section 3.07 | Negative Capital Accounts | 19 |
| Section 3.08 | No Withdrawal | 19 |
| Section 3.09 | Loans From Members | 19 |
| Section 3.10 | Corporate Stock Option Plans and Equity Plans | 19 |
| Section 3.11 | Dividend Reinvestment Plan, Cash Option Purchase Plan, Stock Incentive Plan or Other Plan | 21 |
| Article IV. DISTRIBUTIONS |  | 21 |
| Section 4.01 | Distributions | 21 |
| Article V. CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS |  | 23 |
| Section 5.01 | Capital Accounts | 23 |
| Section 5.02 | Allocations | 24 |
| Section 5.03 | Regulatory Allocations | 24 |
| Section 5.04 | Final Allocations | 26 |
| Section 5.05 | Tax Allocations | 26 |
| Section 5.06 | Indemnification and Reimbursement for Payments on Behalf of a Member | 27 |

Article VI. MANAGEMENT                                                                                    28

    Section 6.01    Authority of Manager                                                              28
    Section 6.02    Actions of the Manager                                                           28
    Section 6.03    Resignation; No Removal                                                          29
    Section 6.04    Vacancies                                                                        29
    Section 6.05    Transactions Between the Company and the Manager                                  29
    Section 6.06    Reimbursement for Expenses                                                       29
    Section 6.07    Delegation of Authority                                                          30
    Section 6.08    Limitation of Liability of Manager                                               30
    Section 6.09    Investment Company Act                                                           31

Article VII. RIGHTS AND OBLIGATIONS OF MEMBERS AND MANAGER                                                31

    Section 7.01    Limitation of Liability and Duties of Members                                    31
    Section 7.02    Lack of Authority                                                                32
    Section 7.03    No Right of Partition                                                            32
    Section 7.04    Indemnification                                                                  32
    Section 7.05    Inspection Rights                                                                34

Article VIII. BOOKS, RECORDS, ACCOUNTING AND REPORTS, AFFIRMATIVE COVENANTS                               34

    Section 8.01    Records and Accounting                                                           34
    Section 8.02    Fiscal Year                                                                      34

Article IX. TAX MATTERS                                                                                   34

    Section 9.01    Preparation of Tax Returns                                                       34
    Section 9.02    Tax Elections                                                                    34
    Section 9.03    Tax Controversies                                                                35

Article X. RESTRICTIONS ON TRANSFER OF UNITS; CERTAIN TRANSACTIONS                                        35

    Section 10.01    Transfers by Members                                                            35
    Section 10.02    Permitted Transfers                                                             37
    Section 10.03    Restricted Units Legend                                                         37
    Section 10.04    Transfer                                                                        37
    Section 10.05    Assignee's Rights                                                               38
    Section 10.06    Assignor's Rights and Obligations                                               38
    Section 10.07    Overriding Provisions                                                           38
    Section 10.08    Spousal Consent                                                                 39
    Section 10.09    Certain Transactions with respect to the Corporation                            40
    Section 10.10    Unvested Common Units                                                           41

Article XI. REDEMPTION AND DIRECT EXCHANGE RIGHTS                                                         41

    Section 11.01    Redemption Right of a Member                                                    41
    Section 11.02    Election and Contribution of the Corporation                                    45

| | | |
|---|---|---|
| Section 11.03 | Direct Exchange Right of the Corporation | 45 |
| Section 11.04 | Reservation of shares of Class A Common Stock; Listing; Certificate of the Corporation | 46 |
| Section 11.05 | Effect of Exercise of Redemption or Direct Exchange | 47 |
| Section 11.06 | Tax Treatment | 47 |

Article XII. ADMISSION OF MEMBERS — 47

| | | |
|---|---|---|
| Section 12.01 | Substituted Members | 47 |

Article XIII. WITHDRAWAL AND RESIGNATION; TERMINATION OF RIGHTS — 48

| | | |
|---|---|---|
| Section 13.01 | Withdrawal and Resignation of Members | 48 |

Article XIV. DISSOLUTION AND LIQUIDATION — 48

| | | |
|---|---|---|
| Section 14.01 | Dissolution | 48 |
| Section 14.02 | Winding up | 49 |
| Section 14.03 | Deferment; Distribution in Kind | 50 |
| Section 14.04 | Cancellation of Certificate | 50 |
| Section 14.05 | Reasonable Time for Winding Up | 50 |
| Section 14.06 | Return of Capital | 50 |

Article XV. GENERAL PROVISIONS — 50

| | | |
|---|---|---|
| Section 15.01 | Power of Attorney | 50 |
| Section 15.02 | Confidentiality | 51 |
| Section 15.03 | Amendments | 52 |
| Section 15.04 | Title to Company Assets | 53 |
| Section 15.05 | Addresses and Notices | 53 |
| Section 15.06 | Binding Effect; Intended Beneficiaries | 54 |
| Section 15.07 | Creditors | 54 |
| Section 15.08 | Waiver | 54 |
| Section 15.09 | Counterparts | 54 |
| Section 15.10 | Applicable Law | 54 |
| Section 15.11 | Severability | 55 |
| Section 15.12 | Further Action | 55 |
| Section 15.13 | Execution and Delivery by Electronic Signature and Electronic Transmission | 55 |
| Section 15.14 | Right of Offset | 55 |
| Section 15.15 | Entire Agreement | 55 |
| Section 15.16 | Remedies | 56 |
| Section 15.17 | Descriptive Headings; Interpretation | 56 |

**<u>Schedules</u>**

Schedule 1 – Schedule of Pre-IPO Members
Schedule 2 – Schedule of Members

**<u>Exhibits</u>**

Exhibit A – Form of Joinder Agreement
Exhibit B-1 – Form of Agreement and Consent of Spouse
Exhibit B-2 – Form of Spouse's Confirmation of Separate Property

v

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "*Agreement*") of GoHealth Holdings, LLC a Delaware limited liability company (the "*Company*"), dated as of July [ ● ], 2020 (the "*Effective Date*"), is entered into by and among the Company, GoHealth, Inc., a Delaware corporation (the "*Corporation*"), as the managing member of the Company, and each of the other Members (as defined herein).

**RECITALS**

WHEREAS, unless the context otherwise requires, capitalized terms used herein have the respective meaning ascribed to them in Article I;

WHEREAS, the Company was formed as a limited liability company with the name "Blizzard Parent, LLC", pursuant to and in accordance with the Delaware Act by the filing of the Certificate with the Secretary of State of the State of Delaware pursuant to Section 18-201 of the Delaware Act on July 11, 2019;

WHEREAS, prior to the IPO (as defined below), the Company was governed by that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of September 13, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, together with all schedules, exhibits and annexes thereto, the "*Initial LLC Agreement*"), which the parties listed on Schedule 1 hereto executed in their capacity as members (including pursuant to consents and joinders thereto) (collectively, the "*Pre-IPO Members*");

WHEREAS, in connection with the IPO, the Company was a party to a series of reorganization transactions with the Corporation and various other parties pursuant to which, among other matters, the Corporation was admitted as a Pre-IPO Member;

WHEREAS, in connection with the IPO, the Company, the Corporation and the Pre-IPO Members desire to convert all of the Original Units (as defined below) into Common Units (as defined below), or, with respect to the Senior Preferred Earnout Units (as defined in Section 4.1 of the Initial LLC Agreement) issued in May 2020, the right to receive cash at the closing of the IPO (collectively, the "*Recapitalization*") as provided herein;

WHEREAS, except for the Over-Allotment Option (as defined below), the Corporation will sell shares of its Class A Common Stock to public investors in the IPO and will use the net proceeds received from the IPO (the "*IPO Net Proceeds*") to purchase newly issued Common Units from the Company pursuant to the IPO Common Unit Subscription Agreement;

WHEREAS, immediately following the consummation of the purchase contemplated by the IPO Common Unit Subscription Agreement, the Company shall use a portion of the IPO Net Proceeds to redeem certain Common Units held by the Members (the "*IPO Unit Redemption*");

WHEREAS, the Corporation may issue additional shares of Class A Common Stock in connection with the IPO as a result of the exercise by the underwriters of their over-allotment option (the "*Over-Allotment Option*") and, if the Over-Allotment Option is exercised in whole or in part, any additional net proceeds (the "*Over-Allotment Option Net Proceeds*") shall be used by the Corporation to purchase additional newly issued Common Units from the Company pursuant to the IPO Common Unit Subscription Agreement; and

WHEREAS, in connection with the foregoing matters, the Company and the Members desire to continue the Company without dissolution and amend and restate the Initial LLC Agreement in its entirety as of the Effective Date to reflect, among other things, (a) the Recapitalization, (b) the addition of the Corporation as a Member and its designation as sole Manager of the Company and (c) the other rights and obligations of the Members, the Company, the Manager and the Corporation, in each case, as provided and agreed upon in the terms of this Agreement as of the Effective Date, at which time the Initial LLC Agreement shall be superseded entirely by this Agreement and shall be of no further force or effect.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial LLC Agreement is hereby amended and restated in its entirety and the Company, the Corporation and the other Members, each intending to be legally bound, each hereby agrees as follows:

## ARTICLE I.
## DEFINITIONS

The following definitions shall be applied to the terms used in this Agreement for all purposes, unless otherwise clearly indicated to the contrary.

"*Additional Member*" has the meaning set forth in <u>Section 12.02</u>.

"*Adjusted Capital Account Deficit*" means, with respect to the Capital Account of any Member as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Member's Capital Account balance shall be:

(a)     reduced for any items described in Treasury Regulation Section 1.704- 1(b)(2)(ii)(d)(4), (5), and (6); and

(b)     increased for any amount such Member is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to minimum gain).

"*Admission Date*" has the meaning set forth in <u>Section 10.06</u>.

2

"*Affiliate*" (and, with a correlative meaning, "*Affiliated*") means, with respect to a specified Person, each other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of voting securities or by contract or other agreement).

"*Agreement*" has the meaning set forth in the Preamble.

"*Assignee*" means a Person to whom a Unit has been transferred but who has not become a Member pursuant to Article XII.

"*Assumed Tax Liability*" means, with respect to any Member, an amount equal to the excess of (i) the product of (A) the Distribution Tax Rate *multiplied by* (B) the estimated or actual cumulative taxable income or gain of the Company, as determined for federal income tax purposes, allocated to such Member for full or partial Fiscal Years commencing on or after January 1, 2020, *less* prior losses of the Company allocated to such Member for full or partial Fiscal Years commencing on or after January 1, 2020, in each case, as determined by the Manager and to the extent such prior losses are available to reduce such income *over* (ii) the sum of (A) the cumulative Tax Distributions made to such Member after the closing date of the IPO pursuant to Sections 4.01(b)(i), 4.01(b)(ii) and 4.01(b)(iii) and (B) distributions made to such Member (or such Member's predecessor) pursuant to Section 5.3 of the Initial LLC Agreement with respect to taxable income or gain of the Company allocated for the Fiscal Year, or portion thereof, commencing on January 1, 2020, including such distributions made pursuant to Section 4.01(b)(v); *provided* that, in the case of the Corporation, such Assumed Tax Liability (x) shall be computed without regard to any increases to the tax basis of the Company's property pursuant to Sections 734(b) or 743(b) of the Code and (y) to the extent permitted under the Credit Agreements, shall in no event be less than an amount that will enable the Corporation to meet both its tax obligations and its obligations pursuant to the Tax Receivable Agreement for the relevant Taxable Year; *provided further* that, in the case of each Member, and for the avoidance of doubt, such Assumed Tax Liability shall take into account any Code Section 704(c) allocations (including "reverse" 704(c) allocations) to the Member.

"*Base Rate*" means, on any date, a variable rate per annum equal to the rate of interest most recently published by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"*Black-Out Period*" means any "black-out" or similar period under the Corporation's policies covering trading in the Corporation's securities to which the applicable Redeeming Member is subject (or will be subject at such time as it owns Class A Common Stock), which period restricts the ability of such Redeeming Member to immediately resell shares of Class A Common Stock to be delivered to such Redeeming Member in connection with a Share Settlement. For the avoidance of doubt, such policies shall not impose restrictions on trading by passive institutional investors.

3

"***Book Value***" means, with respect to any property of the Company, the Company's adjusted basis for U.S. federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g).

"***Business Day***" means any day other than a Saturday, Sunday or day on which banks located in New York City, New York are authorized or required by Law to close.

"***Capital Account***" means the capital account maintained for a Member in accordance with Section 5.01.

"***Capital Contribution***" means, with respect to any Member, the amount of any cash, cash equivalents, promissory obligations or the Fair Market Value of other property that such Member (or such Member's predecessor) contributes (or is deemed to contribute) to the Company pursuant to Article III hereof.

"***Cash Settlement***" means immediately available funds in U.S. dollars which are proceeds received pursuant to a Secondary Offering in an amount equal to the Redeemed Units Equivalent.

"***Certificate***" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware, as amended or amended and restated from time to time.

"***Change of Control***" means the occurrence of any of the following events:

(1) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Transferees) becomes the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares of Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of the Corporation (if any) representing in the aggregate more than fifty percent (50%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote;

(2) the stockholders of the Corporation approve a plan of complete liquidation or dissolution of the Corporation or there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by the Corporation of all or substantially all of the Corporation's assets (including a sale of all or substantially all of the assets of the Company);

(3) there is consummated a merger or consolidation of the Corporation with any other corporation or entity, and, immediately after the consummation of such merger or consolidation, the voting securities of the Corporation immediately prior to such merger or consolidation do not continue to represent, or are not converted into, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof; or

4

(a) the Corporation ceases to be the sole Manager of the Company;

Notwithstanding the foregoing, a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the beneficial holders of the Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of the Corporation immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in and voting control over, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of the Corporation immediately following such transaction or series of transactions.

"*Change of Control Date*" has the meaning set forth in Section 10.09(a).

"*Change of Control Transaction*" means any Change of Control that was approved by the Corporate Board prior to such Change of Control.

"*Class A Common Stock*" means the shares of Class A common stock, par value $0.0001 per share, of the Corporation.

"*Class B Common Stock*" means the shares of Class B Common Stock, par value $0.0001 per share, of the Corporation.

"*Code*" means the United States Internal Revenue Code of 1986, as amended. Unless the context requires otherwise, any reference herein to a specific section of the Code shall be deemed to include any corresponding provisions of future Law as in effect for the relevant taxable period.

"*Common Unit*" means a Unit designated as a "Common Unit" and having the rights and obligations specified with respect to the Common Units in this Agreement.

"*Common Unit Redemption Price*" means, with respect to any Redemption, the arithmetic average of the volume weighted average prices for a share of Class A Common Stock (or any class of stock into which it has been converted) on the Stock Exchange, or any other exchange or automated or electronic quotation system on which the Class A Common Stock trades, as reported by Bloomberg, L.P., or its successor, for each of the twenty (20) consecutive full Trading Days ending on and including the last full Trading Day immediately prior to the applicable Redemption Date, subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. If the Class A Common Stock no longer trades on the Stock Exchange or any other securities exchange or automated or electronic quotation system as of any particular Redemption Date, then the Manager (through a majority of its independent directors (within the meaning of the rules of the Stock Exchange) that are disinterested) shall determine the Common Unit Redemption Price in good faith.

"*Common Unitholder*" means a Member who is the registered holder of Common Units.

"*Company*" has the meaning set forth in the preamble to this Agreement.

"*Confidential Information*" has the meaning set forth in Section 15.02(a).

5

"*Corporate Board*" means the Board of Directors of the Corporation.

"*Corporate Incentive Award Plan*" means the Incentive Award Plan of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Corporation*" has the meaning set forth in the recitals to this Agreement, together with its successors and assigns.

"*Corresponding Rights*" means any rights issued with respect to a share of Class A Common Stock or Class B Common Stock pursuant to a "poison pill" or similar stockholder rights plan approved by the Corporate Board.

"*Credit Agreements*" means any promissory note, mortgage, loan agreement, indenture or similar instrument or agreement to which the Company or any of its Subsidiaries is or becomes a borrower, as such instruments or agreements may be amended, restated, supplemented or otherwise modified from time to time and including any one or more refinancing or replacements thereof, in whole or in part, with any other debt facility or debt obligation, for as long as the payee or creditor to whom the Company or any of its Subsidiaries owes such obligation is not an Affiliate of the Company.

"*Delaware Act*" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.*, as it may be amended from time to time, and any successor thereto.

"*Direct Exchange*" has the meaning set forth in <u>Section 11.03(a)</u>.

"*Discount*" has the meaning set forth in <u>Section 6.06</u>.

"*Distributable Cash*" means, as of any relevant date on which a determination is being made by the Manager regarding a potential distribution pursuant to <u>Section 4.01(a)</u>, the amount of cash that could be distributed by the Company for such purposes in accordance with the Credit Agreements (and without otherwise violating any applicable provisions of any of the Credit Agreements).

"*Distribution*" (and, with a correlative meaning, "*Distribute*") means each distribution made by the Company to a Member with respect to such Member's Units, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided, however*, that none of the following shall be a Distribution: (a) any recapitalization that does not result in the distribution of cash or property to Members or any exchange of securities of the Company, and any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units or (b) any other payment made by the Company to a Member that is not properly treated as a "distribution" for purposes of Sections 731, 732, or 733 or other applicable provisions of the Code.

"*Distribution Tax Rate*" means a rate equal to the highest effective marginal combined federal, state and local income tax rate for a Fiscal Year applicable to corporate or individual taxpayers (whichever is higher) that may potentially apply to any Member for such Fiscal Year, taking into account the character of the relevant tax items (*e.g.*, ordinary or capital) and the deductibility of state and local income taxes for federal income tax purposes (but only to the extent such taxes are deductible under the Code), as reasonably determined by the Manager.

"*Effective Date*" has the meaning set forth in the Preamble.

"*Election Notice*" has the meaning set forth in <u>Section 11.01(b)</u>.

"*Equity Plan*" means any stock or equity purchase plan, restricted stock or equity plan or other similar equity compensation plan now or hereafter adopted by the Company or the Corporation.

"*Equity Securities*" means (a) Units or other equity interests in the Company or any Subsidiary of the Company (including other classes or groups thereof having such relative rights, powers and duties as may from time to time be established by the Manager pursuant to the provisions of this Agreement, including rights, powers and/or duties senior to existing classes and groups of Units and other equity interests in the Company or any Subsidiary of the Company), (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other equity interests in the Company or any Subsidiary of the Company, and (c) warrants, options or other rights to purchase or otherwise acquire Units or other equity interests in the Company or any Subsidiary of the Company.

"*Event of Withdrawal*" means the bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company. "Event of Withdrawal" shall not include an event that (a) terminates the existence of a Member for income tax purposes (including, without limitation, (i) a change in entity classification of a Member under Treasury Regulations Section 301.7701-3, (ii) a sale of assets by, or liquidation of, a Member pursuant to an election under Code Sections 336 or 338, or (iii) merger, severance, or allocation within a trust or among sub-trusts of a trust that is a Member) but that (b) does not terminate the existence of such Member under applicable state law (or, in the case of a trust that is a Member, does not terminate the trusteeship of the fiduciaries under such trust with respect to all the Units of such trust that is a Member).

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, and any applicable rules and regulations promulgated thereunder, and any successor to such statute, rules or regulations.

"*Exchange Election Notice*" has the meaning set forth in <u>Section 11.03(b)</u>.

"*Fair Market Value*" of a specific asset of the Company will mean the amount which the Company would receive in an all-cash sale of such asset in an arms-length transaction with a willing unaffiliated third party, with neither party having any compulsion to buy or sell, consummated on the day immediately preceding the date on which the event occurred which necessitated the determination of the Fair Market Value (and after giving effect to any transfer taxes payable in connection with such sale), as such amount is determined by the Manager (or, if pursuant to <u>Section 14.02</u>, the Liquidators) in its good faith judgment using all factors, information and data it deems to be pertinent.

7

"*Fiscal Period*" means any one-off accounting period within a Taxable Year established by the Manager and which is permitted or required by Section 706 of the Code.

"*Fiscal Year*" means the Company's annual accounting period established pursuant to Section 8.02.

"*Governmental Entity*" means (a) the United States of America, (b) any other sovereign nation, (c) any state, province, district, territory or other political subdivision of (a) or (b) of this definition, including, but not limited to, any county, municipal or other local subdivision of the foregoing, or (d) any agency, arbitrator or arbitral body, authority, board, body, bureau, commission, court, department, entity, instrumentality, organization or tribunal exercising executive, legislative, judicial, regulatory or administrative functions of government on behalf of (a), (b) or (c) of this definition.

"*Indemnified Person*" has the meaning set forth in Section 7.04(a).

"*Initial LLC Agreement*" has the meaning set forth in the Recitals.

"*Investment Company Act*" means the U.S. Investment Company Act of 1940, as amended from time to time.

"*IPO*" means the initial underwritten public offering of shares of the Corporation's Class A Common Stock.

"*IPO Common Unit Subscription*" has the meaning set forth in Section 3.03(b).

"*IPO Common Unit Subscription Agreement*" means that certain Common Unit Subscription Agreement, dated as of the Effective Date, by and between the Corporation and the Company.

"*IPO Net Proceeds*" has the meaning set forth in the Recitals.

"*IPO Unit Redemption*" has the meaning set forth in the Recitals.

"*Joinder*" means a joinder to this Agreement, in form and substance substantially similar to Exhibit A to this Agreement.

"*Law*" means all laws, statutes, ordinances, rules and regulations of any Governmental Entity.

"*Liquidator*" has the meaning set forth in Section 14.02.

"*LLC Employee*" means an employee of, or other service provider (including, without limitation, any management member whether or not treated as an employee for the purposes of U.S. federal income tax) to, the Company or any of its Subsidiaries, in each case acting in such capacity.

8

"*Losses*" means Items of loss or deduction of the Company determined according to Section 10.01(b).

"*Manager*" has the meaning set forth in Section 6.01.

"*Management Feeder*" means Blizzard Management Feeder, LLC, a Delaware limited liability company.

"*Management Feeder LLC Agreement*" means the Amended and Restated Limited Liability Company Agreement of Management Feeder, dated as of the date hereof, as amended, restated, supplemented or modified from time to time.

"*Management Feeder Member*" means a member of Management Feeder.

"*Market Price*" means, with respect to a share of Class A Common Stock as of a specified date, the last sale price per share of Class A Common Stock, regular way, or if no such sale took place on such day, the average of the closing bid and asked prices per share of Class A Common Stock, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the Stock Exchange or, if the Class A Common Stock is not listed or admitted to trading on the Stock Exchange, as reported on the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the Class A Common Stock is listed or admitted to trading or, if the Class A Common Stock is not listed or admitted to trading on any national securities exchange, the last quoted price, or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or, if such system is no longer in use, the principal other automated quotation system that may then be in use or, if the Class A Common Stock is not quoted by any such system, the average of the closing bid and asked prices as furnished by a professional market maker making a market in shares of Class A Common Stock selected by the Corporate Board or, in the event that no trading price is available for the shares of Class A Common Stock, the fair market value of a share of Class A Common Stock, as determined in good faith by the Corporate Board.

"*Member*" means, as of any date of determination, (a) each of the members named on the Schedule of Members and (b) any Person admitted to the Company as a Substituted Member or Additional Member in accordance with Article XII, but in each case only so long as such Person is shown on the Company's books and records as the owner of one or more Units, each in its capacity as a member of the Company.

"*Minimum Gain*" means "partnership minimum gain" determined pursuant to Treasury Regulation Section 1.704-2(d).

"*Net Loss*" means, with respect to a Fiscal Year, the excess if any, of Losses for such Fiscal Year over Profits for such Fiscal Year (excluding Profits and Losses specially allocated pursuant to Section 5.03 and Section 5.04).

9

"*Net Profit*" means, with respect to a Fiscal Year, the excess of any, if any, of Profits over and Losses for such Fiscal Year (excluding Profits and Losses specially allocated pursuant to Section 5.03 and Section 5.04).

"*NVX Holdings*" means NVX Holdings, Inc., a Delaware corporation.

"*Officer*" has the meaning set forth in Section 6.01(b).

"*Optionee*" means a Person to whom a stock option is granted under any Stock Option Plan.

"*Original Units*" means the Senior Preferred Earnout Units, Preferred Units, Class A Common Units, Class B Common Units and Profits Units (each as defined in Section 4.1 of the Initial LLC Agreement) of the Company.

"*Other Agreements*" has the meaning set forth in Section 10.04.

"*Over-Allotment Contribution*" has the meaning set forth in Section 3.03(b).

"*Over-Allotment Option*" has the meaning set forth in the Recitals.

"*Over-Allotment Option Net Proceeds*" has the meaning set forth in the Recitals.

"*Partnership Representative*" has the meaning set forth in Section 9.03.

"*Percentage Interest*" means, as among an individual class of Units and with respect to a Member at a particular time, such Member's percentage interest in the Company determined by dividing the number of such Member's Units of such class by the total number of Units of all Members of such class at such time. The Percentage Interest of each Member shall be calculated to the fourth decimal place.

"*Permitted Transfer*" has the meaning set forth in Section 10.02.

"*Permitted Transferee*" has the meaning set forth in Section 10.02.

"*Person*" means an individual or any corporation, partnership, limited liability company, trust, unincorporated organization, association, joint venture or any other organization or entity, whether or not a legal entity.

"*Pre-IPO Members*" has the meaning set forth in the recitals to this Agreement.

"*Pro rata*," "*pro rata portion*," "*according to their interests*," "*ratably*," "*proportionately*," "*proportional*," "*in proportion to*," "*based on the number of Units held*," "*based upon the percentage of Units held*," "*based upon the number of Units outstanding*," and other terms with similar meanings, when used in the context of a number of Units of the Company relative to other Units, means as amongst an individual class of Units, pro rata based upon the number of such Units within such class of Units.

10

"***Profits***" means items of income and gain of the Company determined according to Section 6.03(b).

"***Pubco Offer***" has the meaning set forth in Section 10.09(b).

"***Quarterly Tax Distribution***" has the meaning set forth in Section 4.01(b)(i).

"***Recapitalization***" has the meaning set forth in the Recitals.

"***Redeemed Units***" has the meaning set forth in Section 11.01(a).

"***Redeemed Units Equivalent***" means the product of (a) the applicable number of Redeemed Units, *multiplied by* (b) the Common Unit Redemption Price.

"***Redeeming Member***" has the meaning set forth in Section 11.01(a).

"***Redemption***" has the meaning set forth in Section 11.01(a).

"***Redemption Date***" has the meaning set forth in Section 11.01(a).

"***Redemption Notice***" has the meaning set forth in Section 11.01(a).

"***Redemption Right***" has the meaning set forth in Section 11.01(a).

"***Registration Rights Agreement***" means that certain Registration Rights Agreement, dated as of the Effective Date, by and among the Corporation, certain of the Members as of the Effective Date and certain other Persons whose signatures are affixed thereto (together with any joinder thereto from time to time by any successor or assign to any party to such agreement) (as it may be amended from time to time in accordance with its terms).

"***Retraction Notice***" has the meaning set forth in Section 11.01(c).

"***Revised Partnership Audit Provisions***" means Section 1101 of Title XI (Revenue Provisions Related to Tax Compliance) of the Bipartisan Budget Act of 2015, H.R. 1314, Public Law Number 114-74.

"***Schedule of Members***" has the meaning set forth in Section 3.01(b).

"***SEC***" means the U.S. Securities and Exchange Commission, including any governmental body or agency succeeding to the functions thereof.

"***Secondary Offering***" means a follow-on or secondary public offering of shares of Class A Common Stock by the Corporation following the IPO.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future Law.

"***Share Settlement***" means a number of shares of Class A Common Stock (together with any Corresponding Rights) equal to the number of Redeemed Units.

11

"*Stock Option Plan*" means any stock option plan now or hereafter adopted by the Company or by the Corporation, including the Corporate Incentive Award Plan.

"*Stockholders Agreement*" means that certain stockholders agreement, dated as of the Effective Date, by and among the Corporation and the other Persons party thereto (as it may be amended from time to time in accordance with its terms).

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the voting interests thereof are at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, references to a "Subsidiary" of the Company shall be given effect only at such times that the Company has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"*Substituted Member*" means a Person that is admitted as a Member to the Company pursuant to Section 12.01.

"*Tax Distributions*" has the meaning set forth in Section 4.01(b)(i).

"*Tax Receivable Agreement*" means that certain Tax Receivable Agreement, dated as the date of the Effective Date, by and among the Corporation and the Company, on the one hand, and the TRA Holders (as such term is defined in the Tax Receivable Agreement) party thereto, on the other hand (together with any joinder thereto from time to time by any successor or assign to any party to such agreement) (as it may be amended from time to time in accordance with its terms).

"*Taxable Year*" means the Company's accounting period for U.S. federal income tax purposes determined pursuant to Section 9.02.

"*Trading Day*" means a day on which the Stock Exchange or such other principal United States securities exchange on which the Class A Common Stock is listed or admitted to trading is open for the transaction of business (unless such trading shall have been suspended for the entire day).

"*Transfer*" (and, with a correlative meaning, "*Transferring*") means any sale, transfer, assignment, redemption, pledge, encumbrance or other disposition of (whether directly or indirectly, whether with or without consideration and whether voluntarily or involuntarily or by operation of Law) (a) any interest (legal or beneficial) in any Equity Securities or (b) any equity or other interest (legal or beneficial) in any Member if substantially all of the assets of such Member consist solely of Units.

12

"***Treasury Regulations***" means the final, temporary and, to the extent they can be relied upon, proposed regulations under the Code, as promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"***Underwriting Agreement***" means the Underwriting Agreement, dated as of [ ● ], 2020, by and among the Corporation, the Company, Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC.

"***Unit***" means the fractional interest of a Member in Profits, Losses and Distributions of the Company, and otherwise having the rights and obligations specified with respect to "Units" in this Agreement; *provided, however*, that any class or group of Units issued shall have the relative rights, powers and duties set forth in this Agreement applicable to such class or group of Units.

"***Unvested Corporate Shares***" means shares of Class A Common Stock issuable pursuant to awards granted under the Corporate Incentive Award Plan that are not Vested Corporate Shares.

"***Value***" means (a) for any Stock Option Plan, the Market Price for the Trading Day immediately preceding the date of exercise of a stock option under such Stock Option Plan and (b) for any Equity Plan other than a Stock Option Plan, the Market Price for the Trading Day immediately preceding the Vesting Date.

"***Vested Corporate Shares***" means the shares of Class A Common Stock issued pursuant to awards granted under the Corporate Incentive Award Plan that are vested pursuant to the terms thereof or any award or similar agreement relating thereto.

"***Vesting Date***" has the meaning set forth in Section 3.10(c)(ii).

ARTICLE II.
ORGANIZATIONAL MATTERS

Section 2.01 Formation of Company. The Company was formed on July 11, 2019 pursuant to the provisions of the Delaware Act. The filing of the Certificate of Formation of the Company, and the Certificate of Amendment, with the Secretary of State of the State of Delaware are hereby ratified and confirmed in all respects.

Section 2.02 Second Amended and Restated Limited Liability Company Agreement. The Members hereby execute this Agreement for the purpose of amending, restating and superseding the Initial Agreement in its entirety and otherwise establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Delaware Act. The Members hereby agree that during the term of the Company set forth in Section 2.06 the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and the Delaware Act. No provision of this Agreement shall be in violation of the Delaware Act and to the extent any provision of this Agreement is in violation of the Delaware Act, such provision shall be void and of no effect to the extent of such violation without affecting the validity of the other provisions of this Agreement. Neither any Member nor the Manager nor any other Person shall have appraisal rights with respect to any Units.

13

Section 2.03 Name. The name of the Company is "GN Health Holdings, LLC." The Manager in its sole discretion may change the name of the Company at any time and from time to time. Notification of any such change shall be given to all of the Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Manager.

Section 2.04 Purpose; Powers. The primary business and purpose of the Company shall be to engage in such activities as are permitted under the Delaware Act and determined from time to time by the Manager in accordance with the terms and conditions of this Agreement. The Company shall have the power and authority to take (directly or indirectly through its Subsidiaries) any and all actions and engage in any and all activities necessary, appropriate, desirable, advisable, ancillary or incidental to accomplish the foregoing purpose.

Section 2.05 Principal Office; Registered Office. The principal office of the Company shall be located at such place or places as the Manager may from time to time designate, each of which may be within or outside the State of Delaware. The address of the registered office of the Company in the State of Delaware shall be c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808, and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be Corporation Service Company. The Manager may from time to time change the Company's registered agent and registered office in the State of Delaware.

Section 2.06 Term. The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in perpetuity unless dissolved in accordance with the provisions of Article XIV.

Section 2.07 No State-Law Partnership. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.07, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise. The Members intend that the Company shall be treated as a partnership for U.S. federal and, if applicable, state or local income tax purposes, and that each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

# ARTICLE III.
## MEMBERS; UNITS; CAPITALIZATION

Section 3.01 Members.

(a) (i) In connection with the reorganization transactions (as described in the Recitals), the Corporation acquired Original Units (which will be converted into Common Units pursuant to the Recapitalization in accordance with Section 3.03) and was admitted as a Member and (ii) the Corporation will acquire additional Common Units pursuant to the IPO Common Unit Subscription Agreement.

14

(b) The Company shall maintain a schedule setting forth (i) the name and address of each Member and (ii) the aggregate number of outstanding Units and the number and class of Units held by each Member (such schedule, the "***Schedule of Members***"). The applicable Schedule of Members in effect as of the Effective Date and after giving effect to the Recapitalization is set forth as Schedule 2 to this Agreement. The Company shall also maintain a record of (1) the aggregate amount of cash Capital Contributions that has been made by the Members with respect to their Units and (2) the Fair Market Value of any property other than cash contributed by the Members with respect to their Units (including, if applicable, a description and the amount of any liability assumed by the Company or to which contributed property is subject) in its books and records. The Schedule of Members may be updated by the Manager in the Company's books and records from time to time, and as so updated, it shall be the definitive record of ownership of each Unit of the Company and all relevant information with respect to each Member. The Company shall be entitled to recognize the exclusive right of a Person registered on its records as the owner of Units for all purposes and shall not be bound to recognize any equitable or other claim to or interest in Units on the part of any other Person, whether or not it shall have express or other notice thereof, except as otherwise provided by the Delaware Act.

(c) No Member shall be required or, except as approved by the Manager pursuant to Section 6.01 and in accordance with the other provisions of this Agreement, permitted to (i) loan any money or property to the Company, (ii) borrow any money or property from the Company or (iii) make any additional Capital Contributions.

Section 3.02 Units.

(a) Interests in the Company shall be represented by Units, or such other securities of the Company, in each case as the Manager may establish in its discretion in accordance with the terms and subject to the restrictions hereof. At the Effective Date, the Units will be comprised of a single class of Common Units.

(b) Subject to Section 3.04(a), the Manager may (i) issue additional Common Units at any time in its sole discretion and (ii) create one or more classes or series of Units or preferred Units solely to the extent such new class or series of Units or preferred Units are substantially economically equivalent to a class of common or other stock of the Corporation or class or series of preferred stock of the Corporation, respectively; *provided,* that as long as there are any Members (other than the Corporation and its Subsidiaries) (i) no such new class or series of Units may deprive such Members of, or dilute or reduce, the allocations and distributions they would have received, and the other rights and benefits to which they would have been entitled, in respect of their Units if such new class or series of Units had not been created and (ii) no such new class or series of Units may be issued, in each case, except to the extent (and solely to the extent) the Company actually receives cash in an aggregate amount, or other property with a Fair Market Value in an aggregate amount, equal to the aggregate distributions that would be made in respect of such new class or series of Units if the Company were liquidated immediately after the issuance of such new class or series of Units.

(c) Subject to Sections 15.03(b) and Section 15.03(c), the Manager may amend this Agreement, without the consent of any Member or any other Person, in connection with the creation and issuance of such classes or series of Units, pursuant to Sections 3.02(b), 3.04(a) or 3.10.

15

Section 3.03 Recapitalization; the Corporation's Capital Contribution; the Corporation's Purchase of Common Units; the IPO Unit Redemption.

(a) In order to effect the Recapitalization, the number of Original Units that were issued and outstanding and held by the Pre-IPO Members prior to the Effective Date as set forth opposite the respective Pre-IPO Member in Schedule 1 are hereby converted, as of the Effective Date, and after giving effect to such conversion and the other transactions related to the Recapitalization, into the number of Common Units, or with respect to Senior Preferred Earnout Units issued in May 2020, the right to receive the amount of cash at the closing of the IPO, as applicable, set forth opposite the name of the respective Member on the Schedule of Members attached hereto as Schedule 2 (provided, for the avoidance of doubt, that the number of Common Units set forth on Schedule 2 shall include the Common Units issued to the Corporation pursuant to the IPO Common Unit Subscription Agreement and should be net of any Common Units redeemed pursuant to the IPO Unit Redemption), and such Common Units are hereby issued and outstanding as of the Effective Date and the holders of such Common Units are Members hereunder.

(b) Following the Recapitalization, the Company shall issue to the Corporation, and the Corporation will acquire [ • ] newly issued Common Units in exchange for a portion of the IPO Net Proceeds payable to the Company upon consummation of the IPO pursuant to the IPO Common Unit Subscription Agreement (the "***IPO Common Unit Subscription***"). In addition, to the extent the underwriters in the IPO exercise the Over-Allotment Option in whole or in part, upon the exercise of the Over-Allotment Option, the Corporation will contribute a portion of the Over-Allotment Option Net Proceeds to the Company in exchange for newly issued Common Units pursuant to the IPO Common Unit Subscription Agreement, and such issuance of additional Common Units shall be reflected on the Schedule of Members (the "***Over-Allotment Contribution***"). The number of Common Units issued in the Over-Allotment Contribution, in the aggregate, shall be equal to the number of shares of Class A Common Stock issued by the Corporation in such exercise of the Over-Allotment Option. Immediately following the consummation of the IPO Common Unit Subscription, the Company shall use a portion of the IPO Net Proceeds received pursuant to the IPO Common Unit Subscription Agreement to effect the IPO Unit Redemption. For the avoidance of doubt, the Corporation shall be admitted as a Member with respect to all Common Units it holds from time to time.

Section 3.04 Authorization and Issuance of Additional Units.

(a) Except as otherwise determined by the Manager in connection with a contribution of cash or other assets by the Corporation to the Company, the Company and the Corporation shall undertake all actions, including, without limitation, an issuance, reclassification, distribution, division or recapitalization, with respect to the Common Units and the Class A Common Stock or Class B Common Stock, as applicable, to maintain at all times (i) a one-to-one ratio between the number of Common Units owned by the Corporation, directly or indirectly, and the number of outstanding shares of Class A Common Stock and (ii) a one-to-one ratio between the number of Common Units owned by Members (other than the Corporation and its Subsidiaries), directly or indirectly, and the number of outstanding shares of Class B Common Stock owned by such Members, directly or indirectly, in each case, disregarding, for purposes of maintaining the one-to-one ratio, (A) Unvested Corporate Shares, (B) treasury stock or (C) preferred stock or other debt or equity securities (including, without limitation, warrants, options or rights) issued by the

16

Corporation that are convertible into or exercisable or exchangeable for Class A Common Stock or Class B Common Stock, except to the extent the net proceeds from such other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, has been contributed by the Corporation to the equity capital of the Company). Except as otherwise determined by the Manager in connection with a contribution of cash or other assets by the Corporation to the Company, in the event the Corporation issues, transfers or delivers from treasury stock or repurchases Class A Common Stock in a transaction not contemplated in this Agreement, the Manager and the Corporation shall take all actions such that, after giving effect to all such issuances, transfers, deliveries or repurchases, the number of outstanding Common Units owned, directly or indirectly, by the Corporation will equal on a one-for-one basis the number of outstanding shares of Class A Common Stock. Except as otherwise determined by the Manager in connection with a contribution of cash or other assets by the Corporation to the Company, in the event the Corporation issues, transfers or delivers from treasury stock or repurchases or redeems the Corporation's preferred stock in a transaction not contemplated in this Agreement, the Manager and the Corporation shall take all actions such that, after giving effect to all such issuances, transfers, deliveries, repurchases or redemptions, the Corporation, directly or indirectly, holds (in the case of any issuance, transfer or delivery) or ceases to hold (in the case of any repurchase or redemption) equity interests in the Company which (in the good faith determination by the Manager) are in the aggregate substantially economically equivalent to the outstanding preferred stock of the Corporation so issued, transferred, delivered, repurchased or redeemed. Except as otherwise determined by the Manager in its reasonable discretion, the Company and the Corporation shall not undertake any subdivision (by any Common Unit split, stock split, Common Unit distribution, stock distribution, reclassification, division, recapitalization or similar event) or combination (by reverse Common Unit split, reverse stock split, reclassification, division, recapitalization or similar event) of the Common Units, Class A Common Stock or Class B Common Stock, as applicable, that is not accompanied by an identical subdivision or combination of Class A Common Stock, Class B Common Stock or Common Units, respectively, to maintain at all times (x) a one-to-one ratio between the number of Common Units owned, directly or indirectly, by the Corporation and the number of outstanding shares of Class A Common Stock or (y) a one-to-one ratio between the number of Common Units owned by Members (other than the Corporation and its Subsidiaries) and the number of outstanding shares of Class B Common Stock, in each case, unless such action is necessary to maintain at all times a one-to-one ratio between either the number of Common Units owned, directly or indirectly, by the Corporation and the number of outstanding shares of Class A Common Stock or the number of Common Units owned by Members (other than the Corporation and its Subsidiaries) and the number of outstanding shares of Class B Common Stock as contemplated by the first sentence of this Section 3.04(a).

(b) The Company shall only be permitted to issue additional Common Units, and/or establish other classes or series of Units or other Equity Securities in the Company to the Persons and on the terms and conditions provided for in Section 3.02, this Section 3.04, Section 3.10 and Section 3.11. Subject to the foregoing, the Manager may cause the Company to issue additional Common Units authorized under this Agreement and/or establish other classes or series of Units or other Equity Securities in the Company at such times and upon such terms as the Manager shall determine and the Manager shall amend this Agreement as necessary in connection with the issuance of additional Common Units and admission of additional Members under this Section 3.04 without the requirement of any consent or acknowledgement of any other Member.

17

Section 3.05 Repurchase or Redemption of Shares of Class A Common Stock. Except as otherwise determined by the Manager in connection with the use of cash or other assets held by the Corporation, if at any time, any shares of Class A Common Stock are repurchased or redeemed (whether by exercise of a put or call, automatically or by means of another arrangement) by the Corporation for cash, then the Manager shall cause the Company, immediately prior to such repurchase or redemption of Class A Common Stock, to redeem a corresponding number of Common Units held (directly or indirectly) by the Corporation, at an aggregate redemption price equal to the aggregate purchase or redemption price of the shares of Class A Common Stock being repurchased or redeemed by the Corporation (plus any expenses related thereto) and upon such other terms as are the same for the shares of Class A Common Stock being repurchased or redeemed by the Corporation; *provided*, if the Corporation uses funds received from distributions from the Company or the net proceeds from an issuance of Class A Common Stock to fund such repurchase or redemption, then the Company shall cancel a corresponding number of Common Units held (directly or indirectly) by the Corporation for no consideration. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any repurchase or redemption if such repurchase or redemption would violate any applicable Law.

Section 3.06 Certificates Representing Units; Lost, Stolen or Destroyed Certificates; Registration and Transfer of Units.

(a) Units shall not be certificated unless otherwise determined by the Manager. If the Manager determines that one or more Units shall be certificated, each such certificate shall be signed by or in the name of the Company, by the Chief Executive Officer, Chief Financial Officer, General Counsel, Secretary or any other officer designated by the Manager, representing the number of Units held by such holder. Such certificate shall be in such form (and shall contain such legends) as the Manager may determine. Any or all of such signatures on any certificate representing one or more Units may be a facsimile, engraved or printed, to the extent permitted by applicable Law. No Units shall be treated as a "security" within the meaning of Article 8 of the Uniform Commercial Code unless all Units then outstanding are certificated; notwithstanding anything to the contrary herein, including Section 15.03, the Manager is authorized to amend this Agreement in order for the Company to opt-in to the provisions of Article 8 of the Uniform Commercial Code without the consent or approval of any Member of any other Person.

(b) If Units are certificated, the Manager may direct that a new certificate representing one or more Units be issued in place of any certificate theretofore issued by the Company alleged to have been lost, stolen or destroyed, upon delivery to the Manager of an affidavit of the owner or owners of such certificate, setting forth such allegation. The Manager may require the owner of such lost, stolen or destroyed certificate, or such owner's legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

(c) To the extent Units are certificated, upon surrender to the Company or the transfer agent of the Company, if any, of a certificate for one or more Units, duly endorsed or accompanied by appropriate evidence of succession, assignment or authority to transfer, in compliance with the provisions hereof, the Company shall issue a new certificate representing one or more Units to the Person entitled thereto, cancel the old certificate and record the transaction upon its books. Subject to the provisions of this Agreement, the Manager may prescribe such additional rules and regulations as it may deem appropriate relating to the issue, Transfer and registration of Units.

18

Section 3.07. Negative Capital Accounts. No Member shall be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

Section 3.08 No Withdrawal. No Person shall be entitled to withdraw any part of such Person's Capital Contribution or Capital Account or to receive any Distribution from the Company, except as expressly provided in this Agreement.

Section 3.09 Loans From Members. Loans by Members to the Company shall not be considered Capital Contributions. Subject to the provisions of Section 3.01(c), the amount of any such advances shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such advances are made.

Section 3.10 Corporate Stock Option Plans and Equity Plans.

(a) *Options Granted to Persons other than LLC Employees*. If at any time or from time to time, in connection with any Stock Option Plan, a stock option granted over shares of Class A Common Stock to a Person other than an LLC Employee is duly exercised:

(i) The Corporation shall, as soon as practicable after such exercise, make a Capital Contribution to the Company in an amount equal to the exercise price paid to the Corporation by such exercising Person in connection with the exercise of such stock option.

(ii) Notwithstanding the amount of the Capital Contribution actually made pursuant to Section 3.10(a)(i), the Corporation shall be deemed to have contributed to the Company as a Capital Contribution, in lieu of the Capital Contribution actually made and in consideration of additional Common Units, an amount equal to the Value of a share of Class A Common Stock as of the date of such exercise multiplied by the number of shares of Class A Common Stock then being issued by the Corporation in connection with the exercise of such stock option.

(iii) The Corporation shall receive in exchange for such Capital Contributions (as deemed made under Section 3.10(a)(ii)), a number of Common Units equal to the number of shares of Class A Common Stock for which such option was exercised.

(b) *Options Granted to LLC Employees*. If at any time or from time to time, in connection with any Stock Option Plan, a stock option granted over shares of Class A Common Stock to an LLC Employee is duly exercised:

(i) The Corporation shall sell to the Optionee, and the Optionee shall purchase from the Corporation, for a cash price per share equal to the Value of a share of Class A Common Stock at the time of the exercise, the number of shares of Class A Common Stock equal to the quotient of (x) the exercise price payable by the Optionee in connection with the exercise of such stock option divided by (y) the Value of a share of Class A Common Stock at the time of such exercise.

19

(a) the Corporation shall sell to the Company (or if the Optionee is an employee of, or other service provider to, a Subsidiary, the Corporation shall sell to such Subsidiary), and the Company (or such Subsidiary, as applicable) shall purchase from the Corporation, a number of shares of Class A Common Stock equal to the difference between (x) the number of shares of Class A Common Stock as to which such stock option is being exercised minus (y) the number of shares of Class A Common Stock sold pursuant to Section 3.10(b)(i) hereof. The purchase price per share of Class A Common Stock for such sale of shares of Class A Common Stock to the Company (or such Subsidiary) shall be the Value of a share of Class A Common Stock as of the date of exercise of such stock option.

(iii) The Company shall transfer to the Optionee (or if the Optionee is an employee of, or other service provider to, a Subsidiary, the Subsidiary shall transfer to the Optionee) at no additional cost to such LLC Employee and as additional compensation (and not a distribution) to such LLC Employee, the number of shares of Class A Common Stock described in Section 3.10(b)(ii).

(iv) The Corporation shall, as soon as practicable after such exercise, make a Capital Contribution to the Company in an amount equal to all proceeds received (from whatever source, but excluding any payment in respect of payroll taxes or other withholdings) by the Corporation in connection with the exercise of such stock option. The Corporation shall receive for such Capital Contribution, a number of Common Units equal to the number of shares of Class A Common Stock for which such option was exercised.

(c) *Restricted Stock Granted to LLC Employees*. If at any time or from time to time, in connection with any Equity Plan (other than a Stock Option Plan), any shares of Class A Common Stock are issued to an LLC Employee (including any shares of Class A Common Stock that are subject to forfeiture in the event such LLC Employee terminates his or her employment with the Company or any Subsidiary) in consideration for services performed for the Company or any Subsidiary:

(i) The Corporation shall issue such number of shares of Class A Common Stock as are to be issued to such LLC Employee in accordance with the Equity Plan;

(ii) On the date (such date, the "***Vesting Date***") that the Value of such shares is includible in taxable income of such LLC Employee, the following events will be deemed to have occurred: (1) the Corporation shall be deemed to have sold such shares of Class A Common Stock to the Company (or if such LLC Employee is an employee of, or other service provider to, a Subsidiary, to such Subsidiary) for a purchase price equal to the Value of such shares of Class A Common Stock, (2) the Company (or such Subsidiary) shall be deemed to have delivered such shares of Class A Common Stock to such LLC Employee, (3) the Corporation shall be deemed to have contributed the purchase price for such shares of Class A Common Stock to the Company as a Capital Contribution, and (4) in the case where such LLC Employee is an employee of a Subsidiary, the Company shall be deemed to have contributed such amount to the capital of the Subsidiary; and

20

(c) the Company shall issue to the Corporation on the Vesting Date a number of Common Units equal to the number of shares of Class A Common Stock issued under <u>Section 3.10(c)(i)</u> in consideration for a Capital Contribution that the Corporation is deemed to make to the Company pursuant to clause (3) of <u>Section 3.10(c)(ii)</u> above.

(d) *Future Stock Incentive Plans*. Nothing in this Agreement shall be construed or applied to preclude or restrain the Corporation from adopting, modifying or terminating stock incentive plans for the benefit of employees, directors or other business associates of the Corporation, the Company or any of their respective Affiliates. The Members acknowledge and agree that, in the event that any such plan is adopted, modified or terminated by the Corporation, amendments to this <u>Section 3.10</u> may become necessary or advisable and that any approval or consent to any such amendments requested by the Corporation shall be deemed granted by the Manager and the Members, as applicable, without the requirement of any further consent or acknowledgement of any other Member.

(e) *Anti-dilution adjustments.* For all purposes of this <u>Section 3.10</u>, the number of shares of Class A Common Stock and the corresponding number of Common Units shall be determined after giving effect to all anti-dilution or similar adjustments that are applicable, as of the date of exercise or vesting, to the option, warrant, restricted stock or other equity interest that is being exercised or becomes vested under the applicable Stock Option Plan or other Equity Plan and applicable award or grant documentation.

<u>Section 3.11</u> <u>Dividend Reinvestment Plan</u>, Cash Option Purchase Plan, Stock Incentive Plan or Other Plan. Except as may otherwise be provided in this <u>Article III</u>, all amounts received or deemed received by the Corporation in respect of any dividend reinvestment plan, cash option purchase plan, stock incentive or other stock or subscription plan or agreement, either (a) shall be utilized by the Corporation to effect open market purchases of shares of Class A Common Stock, or (b) if the Corporation elects instead to issue new shares of Class A Common Stock with respect to such amounts, shall be contributed by the Corporation to the Company in exchange for additional Common Units. Upon such contribution, the Company will issue to the Corporation a number of Common Units equal to the number of new shares of Class A Common Stock so issued.

ARTICLE IV.
DISTRIBUTIONS

<u>Section 4.01</u> <u>Distributions</u>.

(a) *Distributable Cash; Other Distributions*. To the extent permitted by applicable Law and hereunder, Distributions to Members may be declared by the Manager out of Distributable Cash or other funds or property legally available therefor in such amounts, at such time and on such terms (including the payment dates of such Distributions) as the Manager in its sole discretion shall determine using such record date as the Manager may designate. All Distributions made under this <u>Section 4.01</u> shall be made to the Members as of the close of business on such record date on a *pro rata* basis in accordance with each Member's Percentage Interest (other than, for the avoidance of doubt, any distributions made pursuant to <u>Section 4.01(b)</u> (<u>v</u>)) as of the close of business on such record date; *provided*, *however*, that the Manager shall have the obligation to make Distributions as set forth in <u>Sections 4.01(b)</u> and <u>14.02</u>; *provided*, *further*, that notwithstanding any other provision herein to the contrary, no Distributions shall be made to any Member to the extent such Distribution would render the Company insolvent or violate the

21

Delaware Law. For purposes of the foregoing sentence, insolvency means the inability of the Company to meet its payment obligations when due. In furtherance of the foregoing, it is intended that the Manager shall, to the extent permitted by applicable Law and hereunder, have the right in its sole discretion to make Distributions of Distributable Cash to the Members pursuant to this Section 4.01(a) in such amounts as shall enable the Corporation to meet its obligations, including its obligations pursuant to the Tax Receivable Agreement (to the extent such obligations are not otherwise able to be satisfied as a result of Tax Distributions required to be made pursuant to Section 4.01(b)). Notwithstanding anything to the contrary in this Section 4.01(a), (i) the Company shall not make a distribution (other than Tax Distributions under Section 4.01(b)) to any Member in respect of any Common Units which remain subject to vesting conditions in accordance with any applicable equity plan or individual award agreement and (ii) with respect to any amounts that would otherwise have been distributed to a Member but for the preceding clause (i), such amount shall be held in trust by the Company for the benefit of such Member unless and until such time as such Common Units have vested in accordance with the applicable equity plan or individual award agreement, and within five (5) Business Days of such time, the Company shall distribute such amounts to such Member.

(b) *Tax Distributions*.

(i) With respect to each Fiscal Year, the Company shall, to the extent permitted by applicable Law, make cash distributions ("***Tax Distributions***") to each Member in accordance with, and to the extent of, such Member's Assumed Tax Liability. Tax Distributions pursuant to this Section 4.01(b)(i) shall be estimated by the Company on a quarterly basis and, to the extent feasible, shall be distributed to the Members (together with a statement showing the calculation of such Tax Distribution and an estimate of the Company's net taxable income allocable to each Member for such period) on a quarterly basis on April 15th, June 15th, September 15th and January 15th (of the succeeding year) (or such other dates for which individuals are required to make quarterly estimated tax payments for U.S. federal income tax purposes) (each, a "***Quarterly Tax Distribution***"); *provided*, that the foregoing shall not restrict the Company from making a Tax Distribution on any other date. Quarterly Tax Distributions shall take into account the estimated taxable income or loss of the Company for the Fiscal Year through the end of the relevant quarterly period. A final accounting for Tax Distributions shall be made for each Fiscal Year after the allocation of the Company's actual net taxable income or loss has been determined and any shortfall in the amount of Tax Distributions a Member received for such Fiscal Year based on such final accounting shall promptly be distributed to such Member. For the avoidance of doubt, any excess Tax Distributions a Member receives with respect to any Fiscal Year shall reduce future Tax Distributions otherwise required to be made to such Member with respect to any subsequent Fiscal Year.

(ii) To the extent a Member otherwise would be entitled to receive less than its Percentage Interest of the aggregate Tax Distributions to be paid pursuant to this Section 4.01(b) (other than any distributions made pursuant to Section 4.01(b)(v)) on any given date, the Tax Distributions to such Member shall be increased to ensure that all Distributions made pursuant to this Section 4.01(b) are made *pro rata* in accordance with the Members' respective Percentage Interests. If, on the date of a Tax Distribution, there are insufficient funds on hand to distribute to the Members the full amount of the Tax Distributions to which such Members are otherwise entitled, Distributions pursuant to this Section 4.01(b) shall be made to the Members to the extent of available funds in accordance with their Percentage Interests and the Company shall make future Tax Distributions as soon as funds become available sufficient to pay the remaining portion of the Tax Distributions to which such Members are otherwise entitled.

22

(iii) In the event of any audit by, or similar event with, a taxing authority that affects the calculation of any Member's Assumed Tax Liability for any Taxable Year (other than an audit conducted pursuant to the Revised Partnership Audit Provisions for which no election is made pursuant to Section 6226 thereof and the Treasury Regulations promulgated thereunder), or in the event the Company files an amended tax return, each Member's Assumed Tax Liability with respect to such year shall be recalculated by giving effect to such event (for the avoidance of doubt, taking into account interest or penalties). Any shortfall in the amount of Tax Distributions the Members and former Members received for the relevant Taxable Years based on such recalculated Assumed Tax Liability promptly shall be distributed to such Members and the successors of such former Members, except, for the avoidance of doubt, to the extent Distributions were made to such Members and former Members pursuant to Section 4.01(a) and this Section 4.01(b) in the relevant Taxable Years sufficient to cover such shortfall.

(iv) Notwithstanding the foregoing, Tax Distributions pursuant to this Section 4.01(b) (other than, for the avoidance of doubt, any distributions made pursuant to Section 4.01(b)(v)), if any, shall be made to a Member only to the extent all previous Tax Distributions to such Member pursuant to Section 4.01(b) with respect to the Fiscal Year are less than the Tax Distributions such Member otherwise would have been entitled to receive with respect to such Fiscal Year pursuant to this Section 4.01(b).

(v) Notwithstanding the foregoing and anything to the contrary in this Agreement, a final accounting for distributions under Section 5.3 of the Initial LLC Agreement in respect of the taxable income of the Company for the portion of the Fiscal Year of the Company that ends on the closing date of the IPO shall be made by the Company following the closing date of the IPO and, based on such final accounting, the Company shall make a distribution to the Pre-IPO Members (or in the case of any Pre-IPO Member that no longer exists, the successor of such Pre-IPO Member) in accordance with the applicable terms of the Initial LLC Agreement to the extent of any shortfall in the amount of distributions the Pre-IPO Members received prior to the closing date of the IPO under Section 5.3 of the Initial LLC Agreement with respect to taxable income of the Company for such portion of such Fiscal Year that will be allocated to the Pre-IPO Members pursuant to Section 706 of the Code. For the avoidance of doubt, the amount of distributions to be made pursuant to this Section 4.01(b)(v) shall be calculated pursuant to Section 5.3 of the Initial LLC Agreement.

ARTICLE V.
CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS

Section 5.01 Capital Accounts.

(a) The Company shall maintain a separate Capital Account for each Member according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). For this purpose, the Company may (in the discretion of the Manager), upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such Treasury Regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of the Company's property.

23

(b) For purposes of computing the amount of any item of income, gain, loss or deduction with respect to the Company to be allocated pursuant to this <u>Article V</u> and to be reflected in the Capital Accounts of the Members, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for U.S. federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); *provided, however*, that:

(i) The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(l)(B) or Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includible in gross income or are not deductible for U.S. federal income tax purposes.

(ii) If the Book Value of any property of the Company is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii) Items of income, gain, loss or deduction attributable to the disposition of property of the Company having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Book Value of such property.

(iv) Items of depreciation, amortization and other cost recovery deductions with respect to property of the Company having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

(v) To the extent an adjustment to the adjusted tax basis of any asset of the Company pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

Section 5.02 <u>Allocations</u>. Except as otherwise provided in <u>Section 5.03</u> and <u>Section 5.04</u>, Net Profits and Net Losses for any Fiscal Year or Fiscal Period shall be allocated among the Capital Accounts of the Members pro rata in accordance with their respective Percentage Interests, assuming that any Common Units which are subject to vesting conditions in accordance with any applicable equity plan or individual award agreement are fully vested.

Section 5.03 <u>Regulatory Allocations</u>.

(a) Losses attributable to partner nonrecourse debt (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i). If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)), Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Members in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(i)(4).

24

(b) Nonrecourse deductions, as determined according to Treasury Regulation Section 1.704-2(c), for any Taxable Year shall be allocated pro rata among the Members in accordance with their Percentage Interests. Except as otherwise provided in Section 5.03(a), if there is a net decrease in the Minimum Gain during any Taxable Year, each Member shall be allocated Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(f). This Section 5.03(b) is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c) If any Member that unexpectedly receives an adjustment, allocation or Distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Sections 5.03(a) and 5.03(b) but before the application of any other provision of this Article V, then Profits for such Taxable Year shall be allocated to such Member in proportion to, and to the extent of, such Adjusted Capital Account Deficit. This Section 5.03(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d) If the allocation of Net Losses to a Member as provided in Section 5.02 would create or increase an Adjusted Capital Account Deficit, there shall be allocated to such Member only that amount of Losses as will not create or increase an Adjusted Capital Account Deficit. The Net Losses that would, absent the application of the preceding sentence, otherwise be allocated to such Member shall be allocated to the other Members in accordance with their relative Percentage Interests, subject to this Section 5.03(d).

(e) Profits and Losses described in Section 5.01(b)(v) shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(j), (k) and (m).

(f) The allocations set forth in Section 5.03(a) through and including Section 5.03(e) (the "*Regulatory Allocations*") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Profit and Loss of the Company or make Distributions. Accordingly, notwithstanding the other provisions of this Article V, but subject to the Regulatory Allocations, income, gain, deduction and loss with respect to the Company shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero. In addition, if in any Fiscal Year or Fiscal Period there is a decrease in partnership minimum gain, or in partner nonrecourse debt minimum gain, and application of the minimum gain chargeback requirements set forth in Section 5.03(a) or Section 5.03(b) would cause a distortion in the economic arrangement among the Members, the Members may, if they do not expect that the Company will have sufficient other income to correct such distortion, request the Internal Revenue Service to waive either or both of such minimum gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirement.

25

Section 5.04 Final Allocations.

(a) Notwithstanding any contrary provision in this Agreement except Section 5.03, the Manager shall make appropriate adjustments to allocations of Profits and Losses to (or, if necessary, allocate items of gross income, gain, loss or deduction of the Company among) the Members upon the liquidation of the Company (within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations), the transfer of substantially all the Units (whether by sale or exchange or merger) or sale of all or substantially all the assets of the Company, such that, to the maximum extent possible, the Capital Accounts of the Members are proportionate to their Percentage Interests. In each case, such adjustments or allocations shall occur, to the maximum extent possible, in the Fiscal Year of the event requiring such adjustments or allocations.

(b) If any holder of Common Units which are subject to vesting conditions forfeits (or the Company has repurchased at less than fair market value) all or a portion of such holder's unvested Common Units, the Company shall make forfeiture allocations in respect of such unvested Common Units in the manner and to the extent required by Proposed Treasury Regulations Section 1.704-1(b)(4)(xii) (as such Proposed Treasury Regulations may be amended or modified, including upon the issuance of temporary or final Treasury Regulations).

Section 5.05 Tax Allocations.

(a) The income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; *provided* that if any such allocation is not permitted by the Code or other applicable Law, the Company's subsequent income, gains, losses, deductions and credits will be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of taxable income, gain, loss and deduction of the Company with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value using the traditional method set forth in Treasury Regulations Section 1.704-3(b).

(c) If the Book Value of any asset of the Company is adjusted pursuant to Section 5.01(b), including adjustments to the Book Value of any asset of the Company in connection with the execution of this Agreement, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using the traditional method set forth in Treasury Regulations Section 1.704-3(b).

(d) Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members as determined by the Manager taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(e) For purposes of determining a Member's share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), each Member's interest in income and gain shall be determined pursuant to any proper method, as reasonably determined by the Manager; *provided*, that each year the Manager shall use its reasonable best efforts (using in all instances any proper method, including without limitation the "additional method" described in Treasury Regulation Section 1.752-3(a)(3)) to allocate a sufficient amount of the excess nonrecourse liabilities to those Members who would have at the end of the applicable Taxable Year, but for such allocation, taxable income due to the deemed distribution of money to such Member pursuant to Section 752(b) of the Code that is in excess of such Member's adjusted tax basis in its Units.

26

(f) Allocations pursuant to this Section 5.05 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Distributions or other items of the Company pursuant to any provision of this Agreement.

Section 5.06 <u>Indemnification and Reimbursement for Payments on Behalf of a Member</u>. If the Company is obligated to pay any amount to a Governmental Entity (or otherwise makes a payment to a Governmental Entity) that is specifically attributable to a Member or a Member's status as such (including federal income taxes, additions to tax, interest and penalties as a result of obligations of the Company pursuant to the Revised Partnership Audit Provisions, federal withholding taxes, state personal property taxes and state unincorporated business taxes, but excluding payments such as payroll taxes, withholding taxes, benefits or professional association fees and the like required to be made or made voluntarily by the Company on behalf of any Member based upon such Member's status as an employee of the Company), then such Member shall indemnify the Company in full for the entire amount paid (including interest, penalties and related expenses). The Manager may offset Distributions to which a Member is otherwise entitled under this Agreement against such Member's obligation to indemnify the Company under this <u>Section 5.06</u>. In addition, notwithstanding anything to the contrary, each Member agrees that any Cash Settlement such Member is entitled to receive pursuant to <u>Article XI</u> may be offset by an amount equal to such Member's obligation to indemnify the Company under this <u>Section 5.06</u> and that such Member shall be treated as receiving the full amount of such Cash Settlement and paying to the Company an amount equal to such obligation. A Member's obligation to make payments to the Company under this <u>Section 5.06</u> shall survive the transfer or termination of any Member's interest in any Units of the Company, the termination of this Agreement and the dissolution, liquidation, winding up and termination of the Company. In the event that the Company has been terminated prior to the date such payment is due, such Member shall make such payment to the Manager (or its designee), which shall distribute such funds in accordance with this Agreement. The Company may pursue and enforce all rights and remedies it may have against each Member under this <u>Section 5.06</u>, including instituting a lawsuit to collect such contribution with interest calculated at a rate per annum equal to the sum of the Base Rate plus 300 basis points (but not in excess of the highest rate per annum permitted by Law). Each Member hereby agrees to furnish to the Company such information and forms as required or reasonably requested in order to comply with any Laws and regulations governing withholding of tax or in order to claim any reduced rate of, or exemption from, withholding to which the Member is legally entitled. The Company may withhold any amount that it determines is required to be withheld from any amount otherwise payable to any Member hereunder, and any such withheld amount shall be deemed to have been paid to such Member for purposes of this Agreement.

27

Section 6.01 Authority of Manager; Officer Delegation.

(a) Except for situations in which the approval of any Member(s) is specifically required by this Agreement, (i) all management powers over the business and affairs of the Company shall be exclusively vested in the Corporation, as the sole managing member of the Company (the Corporation, in such capacity, the "*Manager*"), (ii) the Manager shall conduct, direct and exercise full control over all activities of the Company and (iii) no other Member shall have any right, authority or power to vote, consent or approve any matter, whether under the Delaware Act, this Agreement or otherwise. The Manager shall be the "manager" of the Company for the purposes of the Delaware Act. Except as otherwise expressly provided for herein and subject to the other provisions of this Agreement, the Members hereby consent to the exercise by the Manager of all such powers and rights conferred on the Members by the Delaware Act with respect to the management and control of the Company. Any vacancies in the position of Manager shall be filled in accordance with Section 6.04.

(b) Without limiting the authority of the Manager to act on behalf of the Company, the day-to-day business and operations of the Company shall be overseen and implemented by officers of the Company (each, an "*Officer*" and collectively, the "*Officers*"), subject to the limitations imposed by the Manager. An Officer may, but need not, be a Member. Each Officer shall be appointed by the Manager and shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. Any one Person may hold more than one office. Subject to the other provisions of this Agreement (including in Section 6.07 below), the salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Manager. The authority and responsibility of the Officers shall be limited to such duties as the Manager may, from time to time, delegate to them. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. All Officers shall be, and shall be deemed to be, officers and employees of the Company. An Officer may also perform one or more roles as an officer of the Manager. Any Officer may be removed at any time, with or without cause, by the Manager.

(c) Subject to the other provisions of this Agreement, the Manager shall have the power and authority to effectuate the sale, lease, transfer, exchange or other disposition of any, all or substantially all of the assets of the Company (including the exercise or grant of any conversion, option, privilege or subscription right or any other right available in connection with any assets at any time held by the Company) or the merger, consolidation, conversion, division, reorganization or other combination of the Company with or into another entity, for the avoidance of doubt, without the prior consent of any Member or any other Person being required.

Section 6.02 Actions of the Manager. The Manager may act through any Officer or through any other Person or Persons to whom authority and duties have been delegated pursuant to Section 6.07.

28

Section 6.03 Resignation; No Removal. The Manager may resign at any time by giving written notice to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the Members, and the acceptance of the resignation shall not be necessary to make it effective. For the avoidance of doubt, the Members have no right under this Agreement to remove or replace the Manager.

Section 6.04 Vacancies. Vacancies in the position of Manager occurring for any reason shall be filled by the Corporation (or, if the Corporation has ceased to exist without any successor or assign, then by the holders of a majority in interest of the voting capital stock of the Corporation immediately prior to such cessation). For the avoidance of doubt, the Members (other than the Corporation) have no right under this Agreement to fill any vacancy in the position of Manager.

Section 6.05 Transactions Between the Company and the Manager. The Manager may cause the Company to contract and deal with the Manager, or any Affiliate of the Manager, *provided*, that such contracts and dealings (other than contracts and dealings between the Company and its Subsidiaries) are on terms comparable to and competitive with those available to the Company from others dealing at arm's length or are approved by the Members and otherwise are permitted by the Credit Agreements; *provided* that the foregoing shall in no way limit the Manager's rights under Sections 3.02, 3.04, 3.05 or 3.10. The Members hereby approve each of the contracts or agreements between or among the Manager, the Company and their respective Affiliates entered into on or prior to the date of this Agreement in accordance with the Initial LLC Agreement or that the board of managers of the Company or the Corporate Board has approved in connection with the Recapitalization or the IPO as of the date of this Agreement, including, but not limited to, the IPO Common Unit Subscription Agreement.

Section 6.06 Reimbursement for Expenses. The Manager shall not be compensated for its services as Manager of the Company except as expressly provided in this Agreement. The Members acknowledge and agree that, upon consummation of the IPO, the Manager's Class A Common Stock will be publicly traded and, therefore, the Manager will have access to the public capital markets and that such status and the services performed by the Manager will inure to the benefit of the Company and all Members; therefore, the Manager shall be reimbursed by the Company for any reasonable out-of-pocket expenses incurred on behalf of the Company, including without limitation all fees, expenses and costs associated with the IPO and all fees, expenses and costs of being a public company (including without limitation public reporting obligations, proxy statements, stockholder meetings, Stock Exchange fees, transfer agent fees, legal fees, SEC and FINRA filing fees and offering expenses) and maintaining its corporate existence. In the event that shares of Class A Common Stock are sold to underwriters in the IPO (or in any subsequent public offering) at a price per share that is lower than the price per share for which such shares of Class A Common Stock are sold to the public in the IPO (or in such subsequent public offering, as applicable) after taking into account underwriters' discounts or commissions and brokers' fees or commissions (such difference, the "*Discount*") (i) the Manager shall be deemed to have contributed to the Company in exchange for newly issued Common Units the full amount for which such shares of Class A Common Stock were sold to the public and (ii) the Company shall be deemed to have paid the Discount as an expense. To the extent practicable, expenses incurred by the Manager on behalf of or for the benefit of the Company shall be billed directly to and paid by the Company and, if and to the extent any reimbursements to the Manager or any of its Affiliates by the Company pursuant to this Section 6.06 constitute gross income to such Person (as opposed

29

to the repayment of advances made by such Director on behalf of the Company), such amounts shall be treated as "guaranteed payments" within the meaning of Code Section 707(c) and shall not be treated as distributions for purposes of computing the Members' Capital Accounts. Notwithstanding the foregoing, the Company shall not bear any income tax obligations of the Manager or any payments made pursuant to the Tax Receivable Agreement.

Section 6.07 <u>Delegation of Authority</u>. The Manager (a) may, from time to time, delegate to one or more Persons such authority and duties as the Manager may deem advisable, and (b) may assign titles (including, without limitation, chief executive officer, president, chief financial officer, chief operating officer, general counsel, senior vice president, vice president, secretary, assistant secretary, treasurer or assistant treasurer) and delegate certain authority and duties to such Persons which may be amended, restated or otherwise modified from time to time. Any number of titles may be held by the same individual. The salaries or other compensation, if any, of such agents of the Company shall be fixed from time to time by the Manager, subject to the other provisions in this Agreement.

Section 6.08 <u>Limitation of Liability of Manager</u>.

(a) Except as otherwise provided herein or in an agreement entered into by such Person and the Company, neither the Manager nor any of the Manager's Affiliates or Manager's officers, employees or other agents shall be liable to the Company, to any Member that is not the Manager or to any other Person bound by this Agreement for any act or omission performed or omitted by the Manager in its capacity as the sole managing member of the Company pursuant to authority granted to the Manager by this Agreement; *provided, however*, that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to the Manager's willful misconduct or knowing violation of Law or for any present or future material breaches of any representations, warranties or covenants by the Manager or its Affiliates contained herein or in the Other Agreements with the Company. The Manager may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and shall not be responsible for any misconduct or negligence on the part of any such agent (so long as such agent was selected in good faith and with reasonable care). The Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Manager in good faith reliance on such advice shall in no event subject the Manager to liability to the Company or any Member that is not the Manager.

(b) To the fullest extent permitted by applicable Law, whenever this Agreement or any other agreement contemplated herein provides that the Manager shall act in a manner which is, or provide terms which are, "fair and reasonable" to the Company or any Member that is not the Manager, the Manager shall determine such appropriate action or provide such terms considering, in each case, the relative interests of each party to such agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable United States generally accepted accounting practices or principles, notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of Law or equity or otherwise.

(c) To the fullest extent permitted by applicable Law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of Law or equity or otherwise, whenever in this Agreement or any other agreement contemplated herein, the Manager is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company, other Members or any other Person.

(d) To the fullest extent permitted by applicable Law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to take any action or to make a decision in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein, notwithstanding any provision of this Agreement or duty otherwise, existing at Law or in equity, and, notwithstanding anything contained herein to the contrary, so long as the Manager acts in good faith or in accordance with such other express standard, the resolution, action or terms so made, taken or provided by the Manager shall not constitute a breach of this Agreement or impose liability upon the Manager or any of the Manager's Affiliates and shall be deemed approved by all Members.

Section 6.09 Investment Company Act. The Manager shall use its best efforts to ensure that the Company shall not be subject to registration as an investment company pursuant to the Investment Company Act.

ARTICLE VII.
RIGHTS AND OBLIGATIONS OF MEMBERS AND MANAGER

Section 7.01 Limitation of Liability and Duties of Members.

(a) Except as provided in this Agreement or in the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and no Member or Manager shall be obligated personally for any such debts, obligations, contracts or liabilities of the Company solely by reason of being a Member or the Manager (except to the extent and under the circumstances set forth in any non-waivable provision of the Delaware Act). Notwithstanding anything contained herein to the contrary, to the fullest extent permitted by applicable Law, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

(b) In accordance with the Delaware Act and the laws of the State of Delaware, a Member may, under certain circumstances, be required to return amounts previously distributed to such Member. It is the intent of the Members that no Distribution to any Member pursuant to Articles IV or XIV shall be deemed a return of money or other property paid or distributed in violation of the Delaware Act. The payment of any such money or Distribution of any such

31

property to a Member shall be deemed to be a compromise within the meaning of Section 18-502(b) of the Delaware Act, and to the fullest extent permitted by Law, any Member receiving any such money or property shall not be required to return any such money or property to the Company or any other Person, unless such distribution was made by the Company to its Members in clerical error. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of any other Member.

(c) To the fullest extent permitted by applicable Law, including Section 18-1101(c) of the Delaware Act, and notwithstanding any other provision of this Agreement (but subject, and without limitation, to Section 6.08 with respect to the Manager) or in any agreement contemplated herein or applicable provisions of Law or equity or otherwise, the parties hereto hereby agree that to the extent that any Member (other than the Manager in its capacity as such) (or any Member's Affiliate or any manager, managing member, general partner, director, officer, employee, agent, fiduciary or trustee of any Member or of any Affiliate of a Member) has duties (including fiduciary duties) to the Company, to the Manager, to another Member, to any Person who acquires an interest in a Unit or to any other Person bound by this Agreement, all such duties (including fiduciary duties) are hereby eliminated, to the fullest extent permitted by law, and replaced with the duties or standards expressly set forth herein, if any; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. The elimination of duties (including fiduciary duties) to the Company, the Manager, each of the Members, each other Person who acquires an interest in a Unit and each other Person bound by this Agreement and replacement thereof with the duties or standards expressly set forth herein, if any, are approved by the Company, the Manager, each of the Members, each other Person who acquires an interest in a Unit and each other Person bound by this Agreement.

Section 7.02 Lack of Authority. No Member, other than the Manager or a duly appointed Officer, in each case in its capacity as such, has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditure on behalf of the Company. The Members hereby consent to the exercise by the Manager of the powers conferred on them by Law and this Agreement.

Section 7.03 No Right of Partition. No Member, other than the Manager, shall have the right to seek or obtain partition by court decree or operation of Law of any property of the Company, or the right to own or use particular or individual assets of the Company.

Section 7.04 Indemnification.

(a) Subject to Section 5.06, the Company hereby agrees to indemnify and hold harmless any Person (each an "***Indemnified Person***") to the fullest extent permitted under applicable Law, as the same now exists or may hereafter be amended, substituted or replaced (but, to the fullest extent permitted by law, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Member or

32

an Affiliate thereof (other than as a result of an ownership interest in the Corporation), or is or was serving as the Manager or a director, officer, employee or other agent of the Manager, or a director, manager, Officer, employee or other agent of the Company or is or was serving at the request of the Company as a manager, officer, director, principal, member, employee or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise; *provided, however*, that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' willful misconduct or knowing violation of Law or for any present or future breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates contained herein or in Other Agreements with the Company. Reasonable expenses, including out-of-pocket attorneys' fees, incurred by any such Indemnified Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

(b) The right to indemnification and the advancement of expenses conferred in this Section 7.04 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, bylaw, action by the Manager or otherwise.

(c) The Company shall maintain directors' and officers' liability insurance, or substantially equivalent insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in Section 7.04(a) whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 7.04. The Company shall use its commercially reasonable efforts to purchase and maintain property, casualty and liability insurance in types and at levels customary for companies of similar size engaged in similar lines of business, as determined in good faith by the Manager, and Company shall use its commercially reasonable efforts to purchase directors' and officers' liability insurance (including employment practices coverage) with a carrier and in an amount determined necessary or desirable as determined in good faith by the Manager.

(d) The indemnification and advancement of expenses provided for in this Section 7.04 shall be provided out of and to the extent of Company assets only. No Member (unless such Member otherwise agrees in writing or is found in a non-appealable decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company. The Company (i) shall be the primary indemnitor of first resort for such Indemnified Person pursuant to this Section 7.04 and (ii) shall be fully responsible for the advancement of all expenses and the payment of all damages or liabilities with respect to such Indemnified Person which are addressed by this Section 7.04.

(e) If this Section 7.04 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 7.04 to the fullest extent permitted by any applicable portion of this Section 7.04 that shall not have been invalidated and to the fullest extent permitted by applicable Law.

33

Section 8.05 Inspection Rights. The Company shall permit each Member and each of its designated representatives at such Member's sole cost and expense to examine the books and records of the Company or any of its Subsidiaries at the principal office of the Company or such other location as the Manager shall reasonably approve during normal business hours and upon reasonable notice for any purpose reasonably related to such Member's Units.

## ARTICLE VIII.
## BOOKS, RECORDS, ACCOUNTING AND REPORTS, AFFIRMATIVE COVENANTS

Section 8.01 Records and Accounting. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable Laws. All matters concerning (a) the determination of the relative amount of allocations and Distributions among the Members pursuant to Articles IV and V and (b) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members absent manifest clerical error.

Section 8.02 Fiscal Year. The Fiscal Year of the Company shall end on December 31 of each year or such other date as may be established by the Manager.

## ARTICLE IX.
## TAX MATTERS

Section 9.01 Preparation of Tax Returns. The Manager shall arrange for the preparation and timely filing of all tax returns required to be filed by the Company. The Manager shall use reasonable efforts to furnish, within one hundred and eighty (180) days of the close of each Taxable Year, to each Member a completed IRS Schedule K-1 (and any comparable state income tax form) and such other information as is reasonably requested by such Member relating to the Company that is necessary for such Member to comply with its tax reporting obligations. Subject to the terms and conditions of this Agreement and except as otherwise provided in this Agreement, in its capacity as Partnership Representative, the Corporation shall have the authority to prepare the tax returns of the Company using such permissible methods and elections as it determines in its reasonable discretion, including without limitation the use of any permissible method under Section 706 of the Code for purposes of determining the varying Units of its Members.

Section 9.02 Tax Elections. The Taxable Year shall be the Fiscal Year set forth in Section 8.02, unless otherwise required by Section 706 of the Code. The Manager shall cause the Company and each of its Subsidiaries that is treated as a partnership for U.S. federal income tax purposes to have in effect an election pursuant to Section 754 of the Code (or any similar provisions of applicable state, local or foreign tax Law) for each Taxable Year. The Manager shall take commercially reasonable efforts to cause each Person in which the Company owns a direct or indirect equity interest (other than a Subsidiary) that is so treated as a partnership to have in effect any such election for each Taxable Year. Each Member will upon request supply any information reasonably necessary to give proper effect to any such elections.

34

Section 9.03 Tax Controversies. The Manager shall cause the Company to take all necessary actions required by Law to designate the Corporation as the "tax matters partner" of the Company within the meaning of Section 6231 of the Code (as in effect prior to repeal of such section pursuant to the Revised Partnership Audit Provisions) with respect any Taxable Year beginning on or before December 31, 2017. The Manager shall further cause the Company to take all necessary actions required by Law to designate the Corporation as the "partnership representative" of the Company as provided in Section 6223(a) of the Code with respect to any Taxable Year of the Company beginning after December 31, 2017, and if the "partnership representative" is an entity, the Corporation is hereby authorized to designate an individual to be the sole individual through which such entity "partnership representative" will act (in such capacities, collectively, the *Partnership Representative*"). The Company and the Members shall cooperate fully with each other and shall use reasonable best efforts to cause the Corporation (or its designated individual, as applicable) to become the Partnership Representative with respect to any taxable period of the Company with respect to which the statute of limitations has not yet expired (and causing any tax matters partner, partnership representative or designated individual designated prior to the Effective Date to resign, be revoked or replaced, as applicable), including (as applicable) by filing certifications pursuant to Treasury Regulations Section 301.6231(a)(7)-1(d) and completing IRS Form 8970 or any other form or certificate required pursuant to Treasury Regulation Section 301.6223-1(e)(1). The Partnership Representative shall have the right and obligation to take all actions authorized and required, by the Code for the Partnership Representative and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including any resulting administrative and judicial proceedings, and to expend Company funds for professional services reasonably incurred in connection therewith. Each Member agrees to cooperate with the Company and the Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Company or the Partnership Representative with respect to the conduct of such proceedings. Without limiting the generality of the foregoing, with respect to any audit or other proceeding, the Partnership Representative shall be entitled to cause the Company (and any of its Subsidiaries) to make any available elections pursuant to Section 6226 of the Code (and similar provisions of state, local and other Law), and the Members shall cooperate to the extent reasonably requested by the Company in connection therewith. The Company shall reimburse the Partnership Representative for all reasonable out-of-pocket expenses incurred by the Partnership Representative, including reasonable fees of any professional attorneys, in carrying out its duties as the Partnership Representative. The provisions of this Section 9.03 shall survive the transfer or termination of any Member's interest in any Units of the Company, the termination of this Agreement and the termination of the Company, and shall remain binding on each Member for the period of time necessary to resolve all tax matters relating to the Company, and shall be subject to the provisions of the Tax Receivable Agreement, as applicable.

ARTICLE X.
RESTRICTIONS ON TRANSFER OF UNITS; CERTAIN TRANSACTIONS

Section 10.01 Transfers by Members. No holder of Units shall Transfer any interest in any Units, except Transfers (a) pursuant to and in accordance with Sections 10.02 and 10.09 or (b) approved in advance and in writing by the Manager, in the case of Transfers by any Member other than the Manager, or (c) in the case of Transfers by the Manager, to any Person who succeeds to the Manager in accordance with Section 6.04. Notwithstanding the foregoing, "Transfer" shall

35

not include (i) the event that terminates the existence of a Member for income tax purposes (including, without limitation, a change in entity classification of a Member under Treasury Regulations Section 301.7701-3, a sale of assets by, or liquidation of, a Member pursuant to an election under Code Sections 336 or 338, or merger, severance, or allocation within a trust or among sub-trusts of a trust that is a Member), but that does not terminate the existence of such Member under applicable state Law (or, in the case of a trust that is a Member, does not terminate the trusteeship of the fiduciaries under such trust with respect to all the Units of such trust that is a Member) or (ii) any indirect Transfer of Units held by the Manager by virtue of any Transfer of Equity Securities in the Corporation.

Permitted Transfers. The restrictions contained in Section 10.01 shall not apply to any of the following Transfers (each, a "*Permitted Transfer*" and each transferee, a "*Permitted Transferee*"): (i)(A) a Transfer pursuant to a Redemption or Direct Exchange in accordance with Article XI hereof or (B) a Transfer by a Member to the Corporation or any of its Subsidiaries, (ii) a Transfer to an Affiliate of such Member; *provided*, *however*, that (x) the restrictions contained in this Agreement will continue to apply to Units after any Permitted Transfer of such Units, and (y) in the case of the foregoing clause (ii), the Permitted Transferees of the Units so Transferred shall agree in writing to be bound by the provisions of this Agreement, and prior to such Transfer the transferor will deliver a written notice to the Company and the Members, which notice will disclose in reasonable detail the identity of the proposed Permitted Transferee, (iii) in the case of Management Feeder, (A) an indirect Transfer by virtue of a Management Feeder Member Transferring any of its equity interests in Management Feeder to a Family Trust (as defined in the Management Feeder LLC Agreement) pursuant to and in accordance with Section 23 of the Management Feeder LLC Agreement and (B) a distribution of Units to a Management Feeder Member with respect to such Management Feeder Member's interests in Management Feeder corresponding to such Units, but only if such Management Feeder Member has notified Management Feeder in writing under Section 20 of the Management Feeder LLC Agreement that it desires to have Management Feeder initiate the Redemption or Direct Exchange provisions of Article XI hereof with respect to such Units, and provided that, in the case of this clause (iii), any such distribution shall (1) occur on the date of, and immediately prior to, the applicable Redemption or Direct Exchange, (2) be accompanied by a distribution by Management Feeder to the applicable Management Feeder Member of a number of shares of Class B Common Stock equal to the number of Units so distributed and (3) be conditioned on the Management Feeder Member's immediate Transfer of (a) such distributed Units to the Company or the Corporation (whichever is required by the Redemption or Direct Exchange, as applicable) and (b) of such distributed shares of Class B Common Stock to the Corporation, in each case, in accordance with Article XI hereof (and if the applicable Management Feeder Member fails to effect any such immediate Transfer of such Units or shares of Class B Common Stock, the distribution of such Units and shares of Class B Common Stock to such Management Feeder Member shall be deemed null and void and shall have no effect), or (iv) in the case of NVX Holdings, a distribution of Units to any stockholder of NVX Holdings provided that, in the case of this clause (iv), any such distribution shall (A) be accompanied by a distribution to any such stockholder of NVX Holdings of a number of shares of Class B Common Stock equal to the number of Units so distributed and (B) be conditioned on any such stockholder of NVX Holdings immediately initiating the Redemption or Direct Exchange provisions of Article XI hereof with respect to such Units and immediately thereafter Transferring (1) such distributed Units to the Company or the Corporation (whichever is required by the Redemption or Direct Exchange, as

36

Section 10.02 Applicable) and (9) such distributed shares of Class B Common Stock to the Corporation, in each case in accordance with Article XI hereof (and if the applicable stockholder of NVX Holdings fails to effect any such immediate Transfer of such Units or shares of Class B Common Stock, the distribution of such Units and shares of Class B Common Stock to any such stockholder of NVX Holdings shall be deemed null and void and shall have no effect). In the case of a Permitted Transfer of any Common Units by any Member that is authorized to hold Class B Common Stock in accordance with the Corporation's certificate of incorporation to a Permitted Transferee in accordance with this Section 10.02, such Member (or any subsequent Permitted Transferee of such Member) shall also transfer a number of shares of Class B Common Stock equal to the number of Common Units that were transferred by such Member (or subsequent Permitted Transferee) in the transaction to such Permitted Transferee. All Permitted Transfers are subject to the additional limitations set forth in Section 10.07(b).

Section 10.03 Restricted Units Legend. The Units have not been registered under the Securities Act and, therefore, in addition to the other restrictions on Transfer contained in this Agreement, cannot be sold unless subsequently registered under the Securities Act or if an exemption from such registration is then available with respect to such sale. To the extent such Units have been certificated, each certificate evidencing Units and each certificate issued in exchange for or upon the Transfer of any Units shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ISSUED ON [ ● ], 2020, AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THE SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF GOHEALTH HOLDINGS, LLC, AS IT MAY BE AMENDED, RESTATED, AMENDED AND RESTATED, OR OTHERWISE MODIFIED FROM TIME TO TIME, AND GOHEALTH HOLDINGS, LLC RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO ANY TRANSFER. A COPY OF SUCH CONDITIONS SHALL BE FURNISHED BY GOHEALTH HOLDINGS, LLC TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

The Company shall imprint such legend on certificates (if any) evidencing Units. The legend set forth above shall be removed from the certificates (if any) evidencing any Units which cease to be Units in accordance with the definition thereof.

Section 10.04 Transfer. Prior to Transferring any Units, the Transferring holder of Units shall cause the prospective Permitted Transferee to be bound by this Agreement and any other agreements executed by the holders of Units and relating to such Units in the aggregate to which the transferor was a party, including without limitation the Stockholders Agreement (collectively, the "*Other Agreements*") by executing and delivering to the Company counterparts of this Agreement and any applicable Other Agreements.

37

(a) The Transfer of a Unit in accordance with this Agreement shall be effective as of the date of such Transfer (assuming compliance with all of the conditions to such Transfer set forth herein), and such Transfer shall be shown on the books and records of the Company. Profits, Losses and other items of the Company shall be allocated between the transferor and the transferee according to Code Section 706, using any permissible method as determined in the reasonable discretion of the Manager. Distributions made before the effective date of such Transfer shall be paid to the transferor, and Distributions made on or after such date shall be paid to the Assignee.

(b) Unless and until an Assignee becomes a Member pursuant to Article XII, the Assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable Law, other than the rights granted specifically to Assignees pursuant to this Agreement; *provided, however*, that, without relieving the Transferring Member from any such limitations or obligations as more fully described in Section 10.06, such Assignee shall be bound by any limitations and obligations of a Member contained herein by which a Member would be bound on account of the Assignee's Units (including the obligation to make Capital Contributions on account of such Units).

Section 10.06 Assignor's Rights and Obligations. Any Member who shall Transfer any Unit in a manner in accordance with this Agreement shall cease to be a Member with respect to such Units and shall no longer have any rights or privileges, or, except as set forth in this Section 10.06, duties, liabilities or obligations, of a Member with respect to such Units or other interest (it being understood, however, that the applicable provisions of Sections 6.08 and 7.04 shall continue to inure to such Person's benefit), except that unless and until the Assignee (if not already a Member) is admitted as a Substituted Member in accordance with the provisions of Article XII (the "***Admission Date***"), (i) such Transferring Member shall retain all of the duties, liabilities and obligations of a Member with respect to such Units, and (ii) the Manager may, in its sole discretion, reinstate all or any portion of the rights and privileges of such Member with respect to such Units for any period of time prior to the Admission Date. Nothing contained herein shall relieve any Member who Transfers any Units in the Company from any liability of such Member to the Company with respect to such Units that may exist as of the Admission Date or that is otherwise specified in the Delaware Act or for any liability to the Company or any other Person for any materially false statement made by such Member (in its capacity as such) or for any present or future breaches of any representations, warranties or covenants by such Member (in its capacity as such) contained herein or in the Other Agreements with the Company.

Section 10.07 Overriding Provisions.

(a) Any Transfer or attempted Transfer of any Units in violation of this Agreement (including any prohibited indirect Transfers) shall be, to the fullest extent permitted by applicable law, null and void *ab initio*, and the provisions of Sections 10.05 and 10.06 shall not apply to any such Transfers. For the avoidance of doubt, any Person to whom a Transfer is made or attempted in violation of this Agreement shall not become a Member and shall not have any other rights in or with respect to any rights of a Member of the Company with respect to the applicable Units. The approval of any Transfer in any one or more instances shall not limit or waive the requirement for such approval in any other or future instance. The Manager shall promptly amend the Schedule of Members to reflect any Permitted Transfer pursuant to this Article X.

38

Case: 1:20-cv-05593 Document #: 166-1 Filed: 09/23/22 Page 353 of 547 PageID #:4122

(b) Notwithstanding anything contained herein to the contrary (including, for the avoidance of doubt, the provisions of Section 10.01 and Article XI and Article XII), in no event shall any Member Transfer any Units to the extent such Transfer would:

(i) result in the violation of the Securities Act, or any other applicable federal, state or foreign Laws;

(ii) cause an assignment under the Investment Company Act;

(iii) in the reasonable determination of the Manager, be a violation of or a default (or an event that, with notice or the lapse of time or both, would constitute a default) under, or result in an acceleration of any obligation under any Credit Agreement to which the Company or the Manager is a party; *provided* that the payee or creditor to whom the Company or the Manager owes such obligation is not an Affiliate of the Company or the Manager;

(iv) be a Transfer to a Person who is not legally competent or who has not achieved his or her majority of age under applicable Law (excluding trusts for the benefit of minors);

(v) cause the Company to be treated as a "publicly traded partnership" or to be taxed as a corporation pursuant to Section 7704 of the Code or any successor provision thereto under the Code; or

(vi) result in the Company having more than one hundred (100) partners, within the meaning of Treasury Regulations Section 1.7704-1(h)(1) (determined pursuant to the rules of Treasury Regulations Section 1.7704-1(h)(3)).

(c) Notwithstanding anything contained herein to the contrary, in no event shall any Member that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code Transfer any Units, unless such Member and the transferee have delivered to the Company, in respect of the relevant Transfer, written evidence that all required withholding under Section 1446(f) of the Code will have been done and duly remitted to the applicable taxing authority or duly executed certifications (prepared in accordance with the applicable Treasury Regulations or other authorities) of an exemption from such withholding.

Section 10.08 Spousal Consent. In connection with the execution and delivery of this Agreement, any Member who is a natural person will deliver to the Company an executed consent from such Member's spouse (if any) in the form of Exhibit B-1 attached hereto or a Member's spouse confirmation of separate property in the form of Exhibit B-2 attached hereto. If, at any time subsequent to the date of this Agreement such Member becomes legally married (whether in the first instance or to a different spouse), such Member shall cause his or her spouse to execute and deliver to the Company a consent in the form of Exhibit B-1 or Exhibit B-2 attached hereto. Such Member's non-delivery to the Company of an executed consent in the form of Exhibit B-1 or Exhibit B-2 at any time shall constitute such Member's continuing representation and warranty that such Member is not legally married as of such date.

Section 10.09 Certain Transactions with respect to the Corporation.

(a) In connection with a Change of Control Transaction, the Manager shall have the right, in its sole discretion, to require each Member to effect a Redemption of all or a portion of such Member's Units together with an equal number of shares of Class B Common Stock, pursuant to which such Units and such shares of Class B Common Stock will be exchanged for shares of Class A Common Stock (or economically equivalent cash or securities of a successor entity), *mutatis mutandis*, in accordance with the Redemption provisions of Article XI (applied for this purpose as if the Corporation had delivered an Election Notice that specified a Share Settlement with respect to such Redemption) and otherwise in accordance with this Section 10.09(a). Any such Redemption pursuant to this Section 10.09(a) shall be effective immediately prior to the consummation of such Change of Control Transaction (and, for the avoidance of doubt, shall be contingent upon the consummation of such Change of Control Transaction and shall not be effective if such Change of Control Transaction is not consummated) (the date of such Redemption pursuant to this Section 10.09(a), the "***Change of Control Date***"). From and after the Change of Control Date, (i) the Units and any shares of Class B Common Stock subject to such Redemption shall be deemed to be transferred to the Corporation on the Change of Control Date and (ii) each such Member shall cease to have any rights with respect to the Units and any shares of Class B Common Stock subject to such Redemption (other than the right to receive shares of Class A Common Stock (or economically equivalent cash or equity securities in a successor entity) pursuant to such Redemption). In the event the Manager desires to initiate the provisions of this Section 10.09, the Manager shall provide written notice of an expected Change of Control Transaction to all Members within the earlier of (x) five (5) Business Days following the execution of an agreement with respect to such Change of Control Transaction and (y) ten (10) Business Days before the proposed date upon which the contemplated Change of Control Transaction is to be effected, including in such notice such information as may reasonably describe the Change of Control Transaction, subject to Law, including the date of execution of such agreement or such proposed effective date, as applicable, the amount and types of consideration to be paid for shares of Class A Common Stock in the Change of Control Transaction and any election with respect to types of consideration that a holder of shares of Class A Common Stock, as applicable, shall be entitled to make in connection with a Change of Control Transaction (which election shall be available to each Member on the same terms as holders of shares of Class A Common Stock). Following delivery of such notice and on or prior to the Change of Control Date, the Members shall take all actions reasonably requested by the Corporation to effect such Redemption in accordance with the terms of Article XI, including taking any action and delivering any document required pursuant to this Section 10.09(a) to effect such Redemption. Notwithstanding the foregoing, in the event the Manager requires the Members to exchange less than all of their outstanding Units (and to surrender a corresponding number of shares of Class B Common Stock for cancellation), each Member's participation in the Change of Control Transaction shall be reduced *pro rata.*

40

(b) In the event that a tender offer, share exchange offer, issuer bid, takeover bid, recapitalization, or similar transaction with respect to Class A Common Stock (a "**Pubco Offer**") is proposed by the Corporation or is proposed to the Corporation or its stockholders and approved by the Corporate Board or is otherwise effected or to be effected with the consent or approval of the Corporate Board, the Manager shall provide written notice of the Pubco Offer to all Members within the earlier of (i) five (5) Business Days following the execution of an agreement (if applicable) with respect to, or the commencement of (if applicable), such Pubco Offer and (ii) ten (10) Business Days before the proposed date upon which the Pubco Offer is to be effected, including in such notice such information as may reasonably describe the Pubco Offer, subject to Law, including the date of execution of such agreement (if applicable) or of such commencement (if applicable), the material terms of such Pubco Offer, including the amount and types of consideration to be received by holders of shares of Class A Common Stock in the Pubco Offer, any election with respect to types of consideration that a holder of shares of Class A Common Stock, as applicable, shall be entitled to make in connection with such Pubco Offer, and the number of Units (and the corresponding shares of Class B Common Stock) held by such Member that is applicable to such Pubco Offer. The Members (other than the Manager) shall be permitted to participate in such Pubco Offer by delivering a written notice of participation that is effective immediately prior to the consummation of such Pubco Offer (and that is contingent upon consummation of such offer), and shall include such information necessary for consummation of such offer as requested by the Corporation. In the case of any Pubco Offer that was initially proposed by the Corporation, the Corporation shall use reasonable best efforts to enable and permit the Members (other than the Manager) to participate in such transaction to the same extent or on an economically equivalent basis as the holders of shares of Class A Common Stock, and to enable such Members to participate in such transaction without being required to exchange Units or shares of Class B Common Stock prior to the consummation of such transaction. For the avoidance of doubt, in no event shall Common Unitholders be entitled to receive in such Pubco Offer aggregate consideration for each Common Unit that is greater than the consideration payable in respect of each share of Class A Common Stock in connection with a Pubco Offer (it being understood that payments under or in respect of the Tax Receivable Agreement shall not be considered part of any such consideration).

(c) In the event that a transaction or proposed transaction constitutes both a Change of Control Transaction and a Pubco Offer, the provisions of Section 10.09(a) shall take precedence over the provisions of Section 10.09(b) with respect to such transaction, and the provisions of Section 10.09(b) shall be subordinate to provisions of Section 10.09(a), and may only be triggered if the Manager elects to waive the provisions of Section 10.09(a).

Section 10.10 Unvested Common Units. With Respect To Any Shares Of Class B Common Stock Corresponding To Common Units Which Remain Subject To Vesting Conditions In Accordance With Any Applicable Equity Plan Or Individual Award Agreement, The Member Holding Such Shares Of Class B Common Stock Shall Abstain From Voting Any Such Shares Of Class B Common Stock With Respect To Any Matter To Be Voted On Or Considered By The Stockholders Of The Corporation At Any Annual Or Special Meeting Of The Stockholders Of The Corporation Or Action By Written Consent Of The Stockholders Of The Corporation Unless And Until Such Time As Such Common Units Have Vested In Accordance With The Applicable Equity Plan Or Individual Award Agreement.

ARTICLE XI.
REDEMPTION AND DIRECT EXCHANGE RIGHTS

Section 11.01 Redemption Right of a Member.

(a) Each Member (other than the Corporation and its Subsidiaries) shall be entitled to cause the Company to redeem (a "**Redemption**") all or any portion of its Common Units (excluding, for the avoidance of doubt, any Common Units that are subject to vesting conditions or the Transfer of which is prohibited pursuant to Sections 10.07(b) or (c) of this Agreement) in whole or in part (the "**Redemption Right**") at any time and from time to time following the waiver or expiration of any contractual lock-up period relating to the shares of the Corporation that may be applicable to such Member; *provided*, *however*, that Management Feeder shall not be entitled to cause a Redemption pursuant to this Article XI unless acting pursuant to a Redemption Request

41

Notice (as defined in the Management Fee LLC Agreement). A Member desiring to exercise its Redemption Right (each, a "*Redeeming Member*") shall exercise such right by giving written notice (the "*Redemption Notice*") to the Company with a copy to the Corporation. The Redemption Notice shall specify the number of Common Units (the "*Redeemed Units*") that the Redeeming Member intends to have the Company redeem and a date, not less than three (3) Business Days nor more than ten (10) Business Days after delivery of such Redemption Notice (unless and to the extent that the Manager in its sole discretion agrees in writing to waive such time periods), on which exercise of the Redemption Right shall be completed (the "*Redemption Date*"); *provided*, that the Company, the Corporation and the Redeeming Member may change the number of Redeemed Units and/or the Redemption Date specified in such Redemption Notice to another number and/or date by mutual agreement signed in writing by each of them; *provided*, *further*, that in the event the Corporation elects a Share Settlement, the Redemption may be conditioned (including as to timing) by the Redeeming Member on the closing of an underwritten distribution of the shares of Class A Common Stock that may be issued in connection with such proposed Redemption. Subject to Section 11.03 and unless the Redeeming Member timely has delivered a Retraction Notice as provided in Section 11.01(c) or has revoked or delayed a Redemption as provided in Section 11.01(d), on the Redemption Date (to be effective immediately prior to the close of business on the Redemption Date):

(i) the Redeeming Member shall Transfer and surrender, free and clear of all liens and encumbrances (x) the Redeemed Units to the Company (including any certificates representing the Redeemed Units if they are certificated), and (y) a number of shares of Class B Common Stock (together with any Corresponding Rights) equal to the number of Redeemed Units to the Corporation, to the extent applicable;

(ii) the Company shall (x) cancel the Redeemed Units, (y) transfer to the Redeeming Member the consideration to which the Redeeming Member is entitled under Section 11.01(b), and (z) if the Units are certificated, issue to the Redeeming Member a certificate for a number of Common Units equal to the difference (if any) between the number of Common Units evidenced by the certificate surrendered by the Redeeming Member pursuant to clause (i) of this Section 11.01(a) and the Redeemed Units; and

(iii) the Corporation shall cancel and retire for no consideration the shares of Class B Common Stock (together with any Corresponding Rights) that were Transferred to the Corporation pursuant to Section 11.01(a)(i)(y) above.

(b) The Corporation shall have the option (as determined solely by a majority of its independent directors (within the meaning of the rules of the Stock Exchange) who are disinterested) as provided in Section 11.02 to elect to have the Redeemed Units be redeemed in consideration for either a Share Settlement or a Cash Settlement**; *provided***, for the avoidance of doubt, that the Corporation may elect to have the Redeemed Units be redeemed in consideration for a Cash Settlement only to the extent that the Corporation has cash available in an amount equal to at least the Redeemed Units Equivalent which was received pursuant to a Secondary Offering. The Corporation shall give written notice (the "*Election Notice*") to the Company (with a copy to the applicable Redeeming Member) of such election within two (2) Business Days of receiving the Redemption Notice; *provided*, that if the Corporation does not timely deliver an Election Notice, the Corporation shall be deemed to have elected the Share Settlement method. If the Corporation elects a Share Settlement (including in connection with a Direct Exchange pursuant to Section 11.03), the Corporation shall deliver or cause to be delivered the number of shares of Class A Common Stock deliverable upon such Share Settlement as promptly as practicable (but not later than three (3) Business Days) after the

Redemption Date, at the offices of the then Acting registrar and transfer agent of the shares of Class A Common Stock (or, if there is no then acting registrar and transfer agent of Class A Common Stock, at the principal executive offices of the Corporation), registered in the name of the relevant Redeeming Member (or in such other name as is requested in writing by the Redeeming Member), in certificated or uncertificated form, as determined by the Corporation; provided, that to the extent the shares of Class A Common Stock are settled through the facilities of The Depository Trust Company, upon the written instruction of the Redeeming Member set forth in the Redemption Notice, the Corporation shall use its commercially reasonable efforts to deliver the shares of Class A Common Stock deliverable to such Redeeming Member through the facilities of The Depository Trust Company, to the account of the participant of The Depository Trust Company designated by such Redeeming Member by no later than the close of business on the Business Day immediately following the Redemption Date.

(c) In the event the Corporation elects the Cash Settlement in connection with a Redemption, the Redeeming Member may retract its Redemption Notice by giving written notice (the "**Retraction Notice**") to the Company (with a copy to the Corporation) within three (3) Business Days of delivery of the Election Notice. The timely delivery of a Retraction Notice shall terminate all of the Redeeming Member's, the Company's and the Corporation's rights and obligations under this Section 11.01 arising from the Redemption Notice.

(d) In the event the Corporation elects a Share Settlement in connection with a Redemption, a Redeeming Member shall be entitled to revoke its Redemption Notice or delay the consummation of a Redemption if any of the following conditions exists:

(i) any registration statement pursuant to which the resale of the Class A Common Stock to be registered for such Redeeming Member at or immediately following the consummation of the Redemption shall have ceased to be effective pursuant to any action or inaction by the SEC or no such resale registration statement has yet become effective;

(ii) the Corporation shall have failed to cause any related prospectus to be supplemented by any required prospectus supplement necessary to effect such Redemption;

(iii) the Corporation shall have exercised its right to defer, delay or suspend the filing or effectiveness of a registration statement and such deferral, delay or suspension shall affect the ability of such Redeeming Member to have its Class A Common Stock registered at or immediately following the consummation of the Redemption;

(iv) the Redeeming Member is in possession of any material non-public information concerning the Corporation, the receipt of which results in such Redeeming Member being prohibited or restricted from selling Class A Common Stock at or immediately following the Redemption without disclosure of such information (and the Corporation does not permit disclosure of such information);

43

(v) any stop order relating to the registration statement pursuant to which the Class A Common Stock was to be registered by such Redeeming Member at or immediately following the Redemption shall have been issued by the SEC;

(vi) there shall have occurred a material disruption in the securities markets generally or in the market or markets in which the Class A Common Stock is then traded;

(vii) there shall be in effect an injunction, a restraining order or a decree of any nature of any Governmental Entity that restrains or prohibits the Redemption;

(viii) the Corporation shall have failed to comply in all material respects with its obligations under the Registration Rights Agreement, and such failure shall have affected the ability of such Redeeming Member to consummate the resale of Class A Common Stock to be received upon such Redemption pursuant to an effective registration statement; or

(ix) the Redemption Date would occur three (3) Business Days or less prior to, or during, a Black-Out Period.

If a Redeeming Member delays the consummation of a Redemption pursuant to this Section 11.01(d), the Redemption Date shall occur on the fifth (5th) Business Day following the date on which the condition(s) giving rise to such delay cease to exist (or such earlier day as the Corporation, the Company and such Redeeming Member may agree in writing).

(e) The number of shares of Class A Common Stock (or Redeemed Units Equivalent, if applicable) (together with any Corresponding Rights) applicable to any Share Settlement or Cash Settlement shall not be adjusted on account of any Distributions previously made with respect to the Redeemed Units or dividends previously paid with respect to Class A Common Stock; *provided, however*, that if a Redeeming Member causes the Company to redeem Redeemed Units and the Redemption Date occurs subsequent to the record date for any Distribution with respect to the Redeemed Units but prior to payment of such Distribution, the Redeeming Member shall be entitled to receive such Distribution with respect to the Redeemed Units on the date that it is made notwithstanding that the Redeeming Member Transferred and surrendered the Redeemed Units to the Company prior to such date; *provided, further, however*, that a Redeeming Member shall be entitled to receive any and all Tax Distributions that such Redeeming Member otherwise would have received in respect of income allocated to such Member for the portion of any Fiscal Year irrespective of whether such Tax Distribution(s) are declared or made after the Redemption Date.

(f) In the case of a Share Settlement, in the event a reclassification or other similar transaction occurs following delivery of a Redemption Notice, but prior to the Redemption Date, as a result of which shares of Class A Common Stock are converted into another security, then a Redeeming Member shall be entitled to receive the amount of such other security (and, if applicable, any Corresponding Rights) that the Redeeming Member would have received if such Redemption Right had been exercised and the Redemption Date had occurred immediately prior to the record date of such reclassification or other similar transaction.

(g) Notwithstanding anything to the contrary contained herein, neither the Company nor the Corporation shall be obligated to effectuate a Redemption if such Redemption could (as determined in the sole discretion of the Manager) cause the Company to be treated as a "publicly traded partnership" or to be taxed as a corporation pursuant to Section 7704 of the Code or successor provisions of the Code.

44

Section 11.02 Election and Contribution of the Corporation. Unless the Redeeming Member has timely delivered a Retraction Notice as provided in Section 11.01(c), or has revoked or delayed a Redemption as provided in Section 11.01(d), subject to Section 11.03 on the Redemption Date (to be effective immediately prior to the close of business on the Redemption Date) (i) the Corporation shall make a Capital Contribution to the Company (in the form of the Share Settlement or the Cash Settlement, as determined by the Corporation in accordance with Section 11.01(b)), and (ii) in the event of a Share Settlement, the Company shall issue to the Corporation a number of Common Units equal to the number of Redeemed Units surrendered by the Redeeming Member. Notwithstanding any other provisions of this Agreement to the contrary, but subject to Section 11.03, in the event that the Corporation elects a Cash Settlement, the Corporation shall only be obligated to contribute to the Company an amount in respect of such Cash Settlement equal to the Redeemed Units Equivalent with respect to such Cash Settlement, which in no event shall exceed the amount actually paid by the Company to the Redeeming Member as the Cash Settlement. The timely delivery of a Retraction Notice shall terminate all of the Company's and the Corporation's rights and obligations under this Section 11.02 arising from the Redemption Notice.

Section 11.03 Direct Exchange Right of the Corporation.

(a) Notwithstanding anything to the contrary in this Article XI (save for the limitations set forth in Section 11.01(b) regarding the Corporation's option to select the Share Settlement or the Cash Settlement, and without limitation to the rights of the Members under Section 11.01, including the right to revoke a Redemption Notice), the Corporation may, in its sole and absolute discretion (as determined solely by a majority of its independent directors (within the meaning of the rules of the Stock Exchange) who are disinterested) (subject to the timing limitations set forth on such discretion in Section 11.01(b)), elect to effect on the Redemption Date the exchange of Redeemed Units for the Share Settlement or the Cash Settlement, as the case may be, through a direct exchange of such Redeemed Units and the Share Settlement or the Cash Settlement, as applicable, between the Redeeming Member and the Corporation (a "*Direct Exchange*") (rather than contributing the Share Settlement or the Cash Settlement, as the case may be, to the Company in accordance with Section 11.02 for purposes of the Company redeeming the Redeemed Units from the Redeeming Member in consideration of the Share Settlement or the Cash Settlement, as applicable). Upon such Direct Exchange pursuant to this Section 11.03, the Corporation shall acquire the Redeemed Units and shall be treated for all purposes of this Agreement as the owner of such Units.

(b) The Corporation may, at any time prior to a Redemption Date (including after delivery of an Election Notice pursuant to Section 11.01(b)), deliver written notice (an "*Exchange Election Notice*") to the Company and the Redeeming Member setting forth its election to exercise its right to consummate a Direct Exchange; *provided*, that such election is subject to the limitations set forth in Section 11.01(b) and does not unreasonably prejudice the ability of the parties to consummate a Redemption or Direct Exchange on the Redemption Date. An Exchange Election Notice may be revoked by the Corporation at any time; *provided*, that any such revocation does

45

not unreasonably prejudice the ability of the parties to consummate a Redemption or Direct Exchange or the Redemption or the right to consummate a Direct Exchange in all events shall be exercisable for all of the Redeemed Units that would have otherwise been subject to a Redemption.

(c) Except as otherwise provided by this <u>Section 11.03</u>, a Direct Exchange shall be consummated pursuant to the same timeframe as the relevant Redemption would have been consummated if the Corporation had not delivered an Exchange Election Notice and as follows:

(i) the Redeeming Member shall transfer and surrender, free and clear of all liens and encumbrances (x) the Redeemed Units and (y) a number of shares of Class B Common Stock (together with any Corresponding Rights) equal to the number of Redeemed Units, to the extent applicable, in each case, to the Corporation;

(ii) the Corporation shall (x) pay to the Redeeming Member the Share Settlement or the Cash Settlement, as applicable, and (y) cancel and retire for no consideration the shares of Class B Common Stock (together with any Corresponding Rights) that were Transferred to the Corporation pursuant to <u>Section 11.03(c)(i)(y)</u> above; and

(iii) the Company shall (x) register the Corporation as the owner of the Redeemed Units and (y) if the Units are certificated, issue to the Redeeming Member a certificate for a number of Common Units equal to the difference (if any) between the number of Common Units evidenced by the certificate surrendered by the Redeeming Member pursuant to <u>Section 11.03(c)(i)(x)</u> and the Redeemed Units, and issue to the Corporation a certificate for the number of Redeemed Units.

<u>Section 11.04 Reservation of shares of Class A Common Stock; Listing; Certificate of the Corporation</u>.

(a) At all times the Corporation shall reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon a Share Settlement in connection with a Redemption or Direct Exchange, such number of shares of Class A Common Stock as shall be issuable upon any such Share Settlement pursuant to a Redemption or Direct Exchange; *provided* that nothing contained herein shall be construed to preclude the Corporation from satisfying its obligations in respect of any such Share Settlement pursuant to a Redemption or Direct Exchange by delivery of purchased Class A Common Stock (which may or may not be held in the treasury of the Corporation) or by way of Cash Settlement. The Corporation shall deliver Class A Common Stock that has been registered under the Securities Act with respect to any Share Settlement pursuant to a Redemption or Direct Exchange to the extent a registration statement is effective and available with respect to such shares; *provided*, all such unregistered shares of Class A Common Stock (if any) shall be entitled to the registration rights set forth in the Registration Rights Agreement if the holders thereof are party to the Registration Rights Agreement and have such rights thereunder. The Corporation shall use its commercially reasonable efforts to list the Class A Common Stock required to be delivered upon any such Share Settlement pursuant to a Redemption or Direct Exchange prior to such delivery upon each national securities exchange upon which the outstanding shares of Class A Common Stock are listed at the

46

time of such Share Settlement pursuant to a Redemption or Direct Exchange (it being understood that any such Shares may be subject to transfer restrictions under applicable securities Laws). The Corporation covenants that all shares of Class A Common Stock issued in connection with a Share Settlement pursuant to a Redemption or Direct Exchange will, upon issuance, be validly issued, fully paid and non-assessable. The provisions of this Article XI shall be interpreted and applied in a manner consistent with any corresponding provisions of the Corporation's certificate of incorporation (if any).

(b) Prior to any Redemption or Direct Exchange effected pursuant to this Agreement, the Corporation shall take all such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and to be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions from, or dispositions to, the Corporation of equity securities of Corporation (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of the Corporation for such purposes that result from the transactions contemplated by this Agreement, by each officer or director of the Corporation, including any director by deputization. The authorizing resolutions shall be approved by either the Corporate Board or a committee thereof composed solely of two or more Non-Employee Directors (as defined in Rule 16b-3) of the Corporation (with the authorizing resolutions specifying the name of each such director whose acquisition or disposition of securities is to be exempted and the number of securities that may be acquired and disposed of by each such Person pursuant to this Agreement.

Section 11.05 Effect of Exercise of Redemption or Direct Exchange. This Agreement shall continue notwithstanding the consummation of a Redemption or Direct Exchange by a Member and all rights set forth herein shall continue in effect with respect to the remaining Members and, to the extent the Redeeming Member has a remaining Unit following such Redemption or Direct Exchange, the Redeeming Member. No Redemption or Direct Exchange shall relieve a Redeeming Member, the Company or the Corporation of any prior breach of this Agreement by such Redeeming Member, the Company or the Corporation.

Section 11.06 Tax Treatment. Unless otherwise required by applicable Law, the parties hereto acknowledge and agree that a Redemption or a Direct Exchange, as the case may be, shall be treated as a direct exchange between the Corporation and the Redeeming Member for U.S. federal and applicable state and local income tax purposes.

ARTICLE XII.
ADMISSION OF MEMBERS

Section 12.01 Substituted Members. Subject to the provisions of Article X hereof, in connection with the Permitted Transfer of a Unit hereunder, the Permitted Transferee shall become a Substituted Member on the effective date of such Transfer, which effective date shall not be earlier than the date of compliance with the conditions to such Transfer, and such admission shall be shown on the books and records of the Company, including the Schedule of Members.

47

Additional Members. Subject to the provisions of Article X hereof, any Person that is not a Member as of the Effective Date may be admitted tothe Company as an additional Member (any such Person, an "*Additional Member*") only upon furnishing to the Manager (a) duly executed Joinder and counterparts to any applicable Other Agreements and (b) such other documents or instruments as may be reasonably necessary or appropriate to effect such Person's admission as a Member (including entering into such documents as may reasonably be requested by the Manager). Such admission shall become effective on the date on which the Manager determines in its sole discretion that such conditions have been satisfied and when any such admission is shown on the books and records of the Company, including the Schedule of Members.

## ARTICLE XIII.
## WITHDRAWAL AND RESIGNATION; TERMINATION OF RIGHTS

Section 13.01 Withdrawal and Resignation of Members. Except in the event of Transfers pursuant to Section 10.06 and the Manager's right to resign pursuant to Section 6.03, no Member shall have the power or right to withdraw or otherwise resign as a Member from the Company prior to the dissolution and winding up of the Company pursuant to Article XIV. Any Member, however, that attempts to withdraw or otherwise resign as a Member from the Company without the prior written consent of the Manager upon or following the dissolution and winding up of the Company pursuant to Article XIV, but prior to such Member receiving the full amount of Distributions from the Company to which such Member is entitled pursuant to Article XIV, shall be liable to the Company for all damages (including all lost profits and special, indirect and consequential damages) directly or indirectly caused by the withdrawal or resignation of such Member. Upon a Transfer of all of a Member's Units in a Transfer permitted by this Agreement, subject to the provisions of Section 10.06, such Member shall cease to be a Member.

## ARTICLE XIV.
## DISSOLUTION AND LIQUIDATION

Section 14.01 Dissolution. The Company shall not be dissolved by the admission of Additional Members or Substituted Members or the attempted withdrawal, removal, dissolution, bankruptcy or resignation of a Member. The Company shall dissolve, and its affairs shall be wound up, upon:

(a) the decision of the Manager together with the written approval of the Common Unitholders holding a majority of the Common Units to dissolve the Company (excluding for purposes of such calculation the Corporation and all Common Units held directly or indirectly by it);

(b) a dissolution of the Company under Section 18-801(4) of the Delaware Act, unless the Company is continued without dissolution pursuant thereto; or

(c) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XIV, the Company is intended to have perpetual existence. An Event of Withdrawal shall not in and of itself cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

Section 14.02 Winding Up. Subject to Section 14.05, on dissolution of the Company, the Manager shall act as liquidating trustee or may appoint one or more Persons as liquidating trustee (each such Person, a "*Liquidator*"). The Liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Delaware Act. The costs of liquidation shall be borne as an expense of the Company. Until final distribution, the Liquidators shall, to the fullest extent permitted by applicable Law, continue to operate the properties of the Company with all of the power and authority of the Manager. The steps to be accomplished by the Liquidators are as follows:

as promptly as possible after dissolution and again after final liquidation, the Liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) the Liquidators shall pay, satisfy or discharge from the Company's funds, or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent, conditional and unmatured liabilities in such amount and for such term as the liquidators may reasonably determine) the following: first, all of the debts, liabilities and obligations of the Company owed to creditors other than the Members in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof), including all expenses incurred in connection with the liquidations; and second, all of the debts, liabilities and obligations of the Company owed to the Members (other than any payments or distributions owed to such Members in their capacity as Members pursuant to this Agreement); and

(c) following any payments pursuant to the foregoing Section 14.02(b), all remaining assets of the Company shall be distributed to the Members in accordance with Section 4.01(a) by the end of the Taxable Year during which the liquidation of the Company occurs (or, if later, by ninety (90) days after the date of the liquidation).

The distribution of cash and/or property to the Members in accordance with the provisions of this Section 14.02 and Section 14.03 below shall constitute a complete return to the Members of their Capital Contributions, a complete distribution to the Members of their interest in the Company and all of the Company's property and shall constitute a compromise to which all Members have consented within the meaning of the Delaware Act. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

Deferment; Distribution in Kind. Notwithstanding the provisions of Section 14.02, but subject to the order of priorities set forth therein, if upon dissolution of the Company the Liquidators determine that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss (or would otherwise not be beneficial) to the Members, the Liquidators may, in their sole discretion and the fullest extent permitted by applicable Law, defer for a reasonable time the liquidation of any assets except those necessary to satisfy the Company's liabilities (other than loans to the Company by any Member(s)) and reserves. Subject to the order of priorities set forth in Section 14.02, the Liquidators may, in their sole discretion, distribute to the Members, in lieu of cash, either (a) all or any portion of such remaining assets in-kind of the Company in accordance with the provisions of Section 14.02(c), (b) as tenants in common and in

49

Section 14.03 in accordance with the provisions of Section 14.02(c), undivided interests in all or any portion of such assets of the Company, or (iii) a combination of the foregoing. Any such Distributions in-kind shall be subject to (y) such conditions relating to the disposition and management of such assets as the Liquidators deem reasonable and equitable and (z) the terms and conditions of any agreements governing such assets (or the operation thereof or the holders thereof) at such time. Any assets of the Company distributed in kind will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Article V. The Liquidators shall determine the Fair Market Value of any property distributed.

Section 14.04 Cancellation of Certificate. On completion of the winding up of the Company as provided herein, the Manager (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation of the Certificate with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that should be canceled and take such other actions as may be necessary to terminate the existence of the Company. The Company shall continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 14.04.

Section 14.05 Reasonable Time for Winding Up. A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Sections 14.02 and 14.03 in order to minimize any losses otherwise attendant upon such winding up.

Section 14.06 Return of Capital. The Liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from assets of the Company).

ARTICLE XV.
GENERAL PROVISIONS

Section 15.01 Power of Attorney.

(a) Each Member hereby constitutes and appoints the Manager (or the Liquidator, if applicable) with full power of substitution, as his or her true and lawful agent and attorney-in-fact, with full power and authority in his, her or its name, place and stead, to:

(i) execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (A) this Agreement, all certificates and other instruments and all amendments thereof which the Manager deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property; (B) all instruments which the Manager deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (C) all conveyances and other instruments or documents which the Manager deems appropriate or necessary to reflect the dissolution, winding up and termination of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (D) all instruments relating to the admission, substitution or resignation of any Member pursuant to Article XII or XIII; and

50

(ii) Case: 1:20-cv-05593 Document #: 166-1 Filed: 09/23/22 Page 365 of 547 PageID #:4134 sign, execute, swear to and acknowledge all ballots, consents, approvals, waivers, certificates and other instruments appropriate or necessary, in the reasonable judgment of the Manager, to evidence, confirm or ratify any vote, consent, approval, agreement or other action which is made or given by the Members hereunder or is consistent with the terms of this Agreement, in the reasonable judgment of the Manager, to effectuate the terms of this Agreement.

(b) The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the transfer of all or any portion of his, her or its Units and shall extend to such Member's heirs, successors, assigns and personal representatives.

Section 15.02 Confidentiality.

Each of the Members (other than the Corporation) agrees to hold the Company's Confidential Information in confidence and may not disclose or use such information except as otherwise authorized separately in writing by the Manager. "*Confidential Information*" as used herein includes all non-public information concerning the Company or its Subsidiaries including, but not limited to, ideas, financial product structuring, business strategies, innovations and materials, all aspects of the Company's business plan, proposed operation and products, corporate structure, financial and organizational information, analyses, proposed partners, software code and system and product designs, employees and their identities, equity ownership, the methods and means by which the Company plans to conduct its business, all trade secrets, trademarks, tradenames and all intellectual property associated with the Company's business. With respect to each Member, Confidential Information does not include information or material that:

(a) is rightfully in the possession of such Member at the time of disclosure by the Company; (b) before or after it has been disclosed to such Member by the Company, becomes part of public knowledge, not as a result of any action or inaction of such Member in violation of this Agreement; (c) is approved for release by written authorization of the Chief Executive Officer, Chief Financial Officer or General Counsel of the Company or of the Corporation, or any other officer designated by the Manager; (d) is disclosed to such Member or their representatives by a third party not, to the knowledge of such Member, in violation of any obligation of confidentiality owed to the Company with respect to such information; or (e) is or becomes independently developed by such Member or their respective representatives without use of or reference to the Confidential Information.

(b) Solely to the extent it is reasonably necessary or appropriate to fulfill its obligations or to exercise its rights under this Agreement, each of the Members may disclose Confidential Information to its Subsidiaries, Affiliates, partners, directors, officers, employees, counsel, advisers, consultants, outside contractors and other agents, on the condition that such Persons keep the Confidential Information confidential to the same extent as such Member is required to keep the Confidential Information confidential; *provided*, that such Member shall remain liable with respect to any breach of this Section 15.02 by any such Subsidiaries, Affiliates, partners, directors, officers, employees, counsel, advisers, consultants, outside contractors and other agents (as if such Persons were party to this Agreement for purposes of this Section 15.02).

51

(c) Notwithstanding Sections 15.02(a) or Section 15.02(b), each of the Members may disclose Confidential Information (i) to the extent that such Member is required by Law (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, (ii) for purposes of reporting to its stockholders and direct and indirect equity holders (each of whom are bound by customary confidentiality obligations) the performance of the Company and its Subsidiaries and for purposes of including applicable information in its financial statements to the extent required by applicable Law or applicable accounting standards; or (iii) to any *bona fide* prospective purchaser of the equity or assets of a Member, or the Common Units held by such Member (provided, in each case, that such Member determines in good faith that such prospective purchaser would be a Permitted Transferee), or a prospective merger partner of such Member (*provided*, that (i) such Persons will be informed by such Member of the confidential nature of such information and shall agree in writing to keep such information confidential in accordance with the contents of this Agreement and (ii) each Member will be liable for any breaches of this Section 15.02 by any such Persons (as if such Persons were party to this Agreement for purposes of this Section 15.02)). Notwithstanding any of the foregoing, nothing in this Section 15.02 will restrict in any manner the ability of the Corporation to comply with its disclosure obligations under Law, and the extent to which any Confidential Information is necessary or desirable to disclose.

Section 15.03 Amendments. Except as otherwise contemplated by this Agreement, this Agreement may be amended or modified upon the written consent of the Manager, together with the written consent of the holders of a majority of the Common Units then outstanding (excluding all Common Units held directly or indirectly by the Corporation). Notwithstanding the foregoing, no amendment or modification:

(a) to this Section 15.03 may be made without the prior written consent of the Manager and each of the Members;

(b) to any of the terms and conditions of this Agreement which terms and conditions expressly require the approval or action of certain Persons may be made without obtaining the consent of the requisite number or specified percentage of such Persons who are entitled to approve or take action on such matter; and

(c) to any of the terms and conditions of this Agreement which would (A) reduce the amounts distributable to a Member pursuant to Articles IV and XIV in a manner that is not *pro rata* with respect to all Members, (B) increase the liabilities of such Member hereunder, (C) otherwise materially and adversely affect a holder of Units (with respect to such Units) in a manner materially disproportionate to any other holder of Units of the same class or series (with respect to such Units) (other than amendments, modifications and waivers necessary to implement the provisions of Article XII) or (D) materially and adversely affect the rights of any Member under Section 3.04, Section 3.05, Section 7.01, Section 7.04, Article X or Article XI, shall be effective against such affected Member or holder of Units, as the case may be, without the prior written consent of such Member or holder of Units, as the case may be.

Notwithstanding any of the foregoing, the Manager may make any amendment (i) of an administrative nature that is necessary in order to implement the substantive provisions hereof, without the consent of any other Member; *provided*, that any such amendment does not adversely change the rights of the Members hereunder in any respect, or (ii) to reflect any changes to the Class A Common Stock or Class B Common Stock or the issuance of any other capital stock of the Corporation.

52

Section 15.04 Title to Company Assets. Company assets shall be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such assets of the Company or any portion thereof. The Company shall hold title to all of its property in the name of the Company and not in the name of any Member. All assets of the Company shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such assets is held. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of any Member.

Section 15.05 Addresses and Notices. All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service, or when received in the form of an electronic transmission (receipt confirmation requested), and shall be directed to the address set forth, or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the Company or the sending party.

To the Company:

GoHealth Holdings, LLC
c/o GoHealth, Inc.
214 West Huron St.
Chicago, Illinois 60654
Attn: Brian Farley; Brad Burd
Email: ####@gohealth.com; ####@gohealth.com

with a copy (which copy shall not constitute notice) to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: Ian D. Schuman, Stelios Saffos, Jonathan Solomon
Facsimile: (212) 751-4864
E-mail: ####@lw.com; ####@lw.com; ####@lw.com

To the Corporation:

GoHealth, Inc.
214 West Huron St.
Chicago, Illinois 60654
Attn: Brian Farley; Brad Burd
Email: ####@gohealth.com; ####@gohealth.com

with a copy (which copy shall not constitute notice) to:

Latham & Watkins LLP

53

885 Third Avenue
New York, New York 10022
Attn: Ian D. Schuman, Stelios Saffos, Jonathan Solomon
Facsimile: (212) 751-4864
E-mail: ####@lw.com; ####@lw.com; ####@lw.com

To the Members, as set forth on Schedule 2.

Section 15.06 Binding Effect; Intended Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

Section 15.07 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Profits, Losses, Distributions, capital or property of the Company other than as a secured creditor.

Section 15.08 Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 15.09 Counterparts. This Agreement may be executed in separate counterparts, each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

Section 15.10 Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any suit, dispute, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall be heard in the state or federal courts of the State of Delaware, and the parties hereby consent to the exclusive jurisdiction of such court (and of the appropriate appellate courts) in any such suit, action or proceeding and waives any objection to venue laid therein. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE SERVED ON ANY PARTY ANYWHERE IN THE WORLD, WHETHER WITHIN OR WITHOUT THE JURISDICTION OF ANY SUCH COURT (INCLUDING BY PREPAID CERTIFIED MAIL WITH A VALIDATED PROOF OF MAILING RECEIPT) AND SHALL HAVE THE SAME LEGAL FORCE AND EFFECT AS IF SERVED UPON SUCH PARTY PERSONALLY WITHIN THE STATE OF DELAWARE. WITHOUT LIMITING THE FOREGOING, TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT SERVICE OF PROCESS UPON SUCH PARTY AT THE ADDRESS REFERRED TO IN SECTION 15.05 (INCLUDING BY PREPAID CERTIFIED MAIL WITH A VALIDATED PROOF OF MAILING RECEIPT), TOGETHER WITH WRITTEN NOTICE OF SUCH SERVICE TO SUCH PARTY, SHALL BE DEEMED EFFECTIVE SERVICE OF PROCESS UPON SUCH PARTY.

54

Section 15.11 Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 15.12 Further Action. The parties shall execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 15.13 Execution and Delivery by Electronic Signature and Electronic Transmission. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby or entered into by the Company in accordance herewith, and any amendments hereto or thereto, to the extent signed and delivered by means of an electronic signature and/or electronic transmission, including by a facsimile machine or via email, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of electronic signature or electronic transmission to execute and/or deliver a document or the fact that any signature or agreement or instrument was transmitted or communicated through such electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

Section 15.14 Right of Offset. Whenever the Company or the Corporation is to pay any sum (other than pursuant to Article IV) to any Member, any amounts that such Member owes to the Company or the Corporation which are not the subject of a good faith dispute may be deducted from that sum before payment. For the avoidance of doubt, the distribution of Units to the Corporation shall not be subject to this Section 15.14.

Section 15.15 Entire Agreement. This Agreement, those documents expressly referred to herein (including the Stockholders Agreement, the Registration Rights Agreement and the Tax Receivable Agreement), any indemnity agreements entered into in connection with the Initial LLC Agreement with any member of the board of directors at that time and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. For the avoidance of doubt, the Initial LLC Agreement is superseded by this Agreement as of the Effective Date and shall be of no further force and effect thereafter.

55

Section 15.16 Remedies. Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any Law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law.

Section 15.17 Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Without limiting the generality of the immediately preceding sentence, no amendment or other modification to any agreement, document or instrument that requires the consent of any Person pursuant to the terms of this Agreement or any other agreement will be given effect hereunder unless such Person has consented in writing to such amendment or modification. Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

56

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Second Amended and Restated Limited Liability Company Agreement as of the date first written above.

**COMPANY:**

**GOHEALTH HOLDINGS, LLC**

By: _____
Name:
Title:

**MEMBERS:**

[●]

By: _____
Name:
Title:

[●]

By: _____
Name:
Title:
[●]

_____
Name:
Title:

[●]

_____
Name:
Title:

*[Signature Page to Second Amended and Restated Limited Liability Company Agreement]*

SCHEDULE 9

**SCHEDULE OF PRE-IPO MEMBERS**

| Member | Senior Preferred Earnout Units | Preferred Units | Class A Common Units | Class B Common Units | Profits Units |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**SCHEDULE OF PRE-IPO MEMBERS**

| Member | Senior Preferred Earnout Units | Preferred Units | Class A Common Units | Class B Common Units | Profits Units |
|---|---|---|---|---|---|

SCHEDULE 1.2

**SCHEDULE OF MEMBERS**

| Member | Common Units | Cash Received in the Recapitalization | Contact Information for Notice |
|---|---|---|---|
| 1. GoHealth, Inc. | | | |
| 2. Blizzard Aggregator, LLC | | | |
| 3. NVX Holdings, Inc. | | | |
| 4. Norwest Equity Partners IX, LP | | | |
| 5. BCCJ, LLC | | | |
| 6. Greiner Investments, LLC | | | |
| 7. Blizzard Management Feeder, LLC | | | |
| 8. OR GH I LLC | | | |
| 9. OR GH II LLC | | | |
| 10. Rahm Emanuel | | | |
| 11. Alexander E. Timm | | | |
| 12. Joseph G. Flanagan | | | |
| **Total** | | | |

* This Schedule of Members shall be updated from time to time to reflect any adjustment with respect to any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Common Units, or to reflect any additional issuances of Common Units pursuant to this Agreement.

**Exhibit A**

## FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT, dated as of _____, 20__ (this "Joinder"), is delivered pursuant to that certain Second Amended and Restated Limited Liability Company Agreement, dated as of [ ● ], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "LLC Agreement") of GoHealth Holdings, LLC, a Delaware limited liability company (the "Company"), by and among the Company, GoHealth, Inc., a Delaware corporation and the managing member of the Company (the "Corporation"), and each of the Members from time to time party thereto. Capitalized terms used but not otherwise defined herein have the respective meanings set forth in the LLC Agreement.

1. Joinder to the LLC Agreement. Upon the execution of this Joinder by the undersigned and delivery hereof to the Corporation, the undersigned hereby is admitted as and hereafter will be a Member under the LLC Agreement and a party thereto, with all the rights, privileges and responsibilities of a Member thereunder. The undersigned hereby agrees that it shall comply with and be fully bound by the terms of the LLC Agreement as if it had been a signatory thereto as of the date thereof.

2. Incorporation by Reference. All terms and conditions of the LLC Agreement are hereby incorporated by reference in this Joinder as if set forth herein in full.

3. Address. All notices under the LLC Agreement to the undersigned shall be direct to:

> [Name]
> [Address]
> [City, State, Zip Code]
> Attn:
> Facsimile:
> E-mail:

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Joinder as of the day and year first above written.

**[NAME OF NEW MEMBER]**

By: _____
Name:
Title:

Acknowledged and agreed as of the date first set forth above:

**GOHEALTH HOLDINGS, LLC**

By: GOHEALTH, INC., its Managing Member

By: _____
Name:
Title:

**Exhibit B-1**

## FORM OF AGREEMENT AND CONSENT OF SPOUSE

The undersigned spouse of _____ (the "Member"), a party to that certain Second Amended and Restated Limited Liability Company Agreement, dated as of [ ● ], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Agreement") of GoHealth Holdings, LLC, a Delaware limited liability company (the "Company"), by and among the Company, GoHealth, Inc., a Delaware corporation and the managing member of the Company, and each of the Members from time to time party thereto (capitalized terms used but not otherwise defined herein have the respective meanings set forth in the Agreement), acknowledges on his or her own behalf that:

I have read the Agreement and understand its contents. I acknowledge and understand that under the Agreement, any interest I may have, community property or otherwise, in the Units owned by the Member is subject to the terms of the Agreement which include certain restrictions on Transfer.

I hereby consent to and approve the Agreement. I agree that said Units and any interest I may have, community property or otherwise, in such Units are subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement on said Units or any interest I may have, community property or otherwise, in said Units.

I hereby acknowledge that the meaning and legal consequences of the Agreement have been explained fully to me and are understood by me, and that I am signing this Agreement and consent without any duress and of free will.

Dated: _____

**[NAME OF SPOUSE]**

By: _____

Name:

**FORM OF SPOUSE'S CONFIRMATION OF SEPARATE PROPERTY**

I, the undersigned, the spouse of _____ (the "<u>Member</u>"), who is a party to that certain Second Amended and Restated Limited Liability Company Agreement, dated as of [ ● ], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Agreement</u>") of GoHealth Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>"), by and among the Company, GoHealth, Inc., a Delaware corporation and the managing member of the Company, and each of the Members from time to time party thereto (capitalized terms used but not otherwise defined herein have the respective meanings set forth in the Agreement), acknowledge and confirm on that the Units owned by said Member are the sole and separate property of said Member, and I hereby disclaim any interest in same.

I hereby acknowledge that the meaning and legal consequences of this Member's spouse's confirmation of separate property have been fully explained to me and are understood by me, and that I am signing this Member's spouse's confirmation of separate property without any duress and of free will.

Dated: _____

**[NAME OF SPOUSE]**

By: _____

Name:

**Exhibit 10.6**

**GOHEALTH, INC.**
**2020 INCENTIVE AWARD PLAN**

## ARTICLE 1.

### PURPOSE

The purpose of the GoHealth, Inc. 2020 Incentive Award Plan (as it may be amended or restated from time to time, the "Plan") is to promote the success and enhance the value of GoHealth, Inc. (the "Company") by linking the individual interests of Directors, Employees, and Consultants to those of Company stockholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to Company stockholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract, and retain the services of Directors, Employees, and Consultants upon whose judgment, interest, and special effort the successful conduct of the Company's operation is largely dependent.

## ARTICLE 2.

### DEFINITIONS AND CONSTRUCTION

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1 "Administrator" shall mean the Board or a Committee to the extent that the Board's powers or authority under the Plan have been delegated to such Committee.

2.2 "Affiliate" shall mean (a) any Subsidiary; and (b) any domestic eligible entity that is disregarded, under Treasury Regulation Section 301.7701-3, as an entity separate from either (i) the Company or (ii) any Subsidiary.

2.3 "Applicable Accounting Standards" shall mean Generally Accepted Accounting Principles in the United States, International Financial Reporting Standards or such other accounting principles or standards as may apply to the Company's financial statements under United States federal securities laws from time to time.

2.4 "Applicable Law" shall mean any applicable law, including, without limitation: (a) provisions of the Code, the Securities Act, the Exchange Act and any rules or regulations thereunder; (b) corporate, securities, tax or other laws, statutes, rules, requirements or regulations, whether federal, state, local or foreign; and (c) rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded.

2.5 "Award" shall mean an Option, a Stock Appreciation Right, a Restricted Stock award, a Restricted Stock Unit award, an Other Stock or Cash Based Award or a Dividend Equivalent award, which may be awarded or granted under the Plan.

1

2.6 "Award Agreement" shall mean any written notice, agreement, terms and conditions, contract or other instrument or document evidencing an Award, including through electronic medium, which shall contain such terms and conditions with respect to an Award as the Administrator shall determine consistent with the Plan.

2.7 "Board" shall mean the Board of Directors of the Company.

2.8 "Change in Control" shall mean and includes each of the following:

(a) A transaction or series of transactions (other than an offering of Common Stock to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) directly or indirectly acquires beneficial ownership (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of securities of the Company possessing more than 50% of the total combined voting power of the Company's securities outstanding immediately after such acquisition; provided, however, that the following acquisitions shall not constitute a Change in Control: (i) any acquisition by the Company or any of its Subsidiaries; (ii) any acquisition by an employee benefit plan maintained by the Company or any of its Subsidiaries, (iii) any acquisition which complies with Sections 2.8(c)(i), 2.8(c)(ii) or 2.8(c)(iii); or (iv) in respect of an Award held by a particular Holder, any acquisition by the Holder or any group of persons including the Holder (or any entity controlled by the Holder or any group of persons including the Holder); or

(b) The Incumbent Directors cease for any reason to constitute a majority of the Board;

(c) The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination, (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case other than a transaction:

(i) which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "Successor Entity")) directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(ii) after which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; provided, however, that no person or group shall be treated for purposes of this Section 2.8(c)(ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction; and

2

(ii) after which as a majority of the members of the board of directors (or the analogous governing body) of the Successor Entity were Board members at the time of the Board's approval of the execution of the initial agreement providing for such transaction; or

(d) The date specified by the Board following approval by the Company's stockholders of a plan of complete liquidation or dissolution of the Company.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award (or any portion of an Award) that provides for the deferral of compensation that is subject to Section 409A, to the extent required to avoid the imposition of additional taxes under Section 409A, the transaction or event described in subsection (a), (b), (c) or (d) with respect to such Award (or portion thereof) shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation Section 1.409A-3(i)(5).

The Administrator shall have full and final authority, which shall be exercised in its sole discretion, to determine conclusively whether a Change in Control has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto; provided that any exercise of authority in conjunction with a determination of whether a Change in Control is a "change in control event" as defined in Treasury Regulation Section 1.409A-3(i)(5) shall be consistent with such regulation.

2.9 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, together with the regulations and official guidance promulgated thereunder, whether issued prior or subsequent to the grant of any Award.

2.10 "Committee" shall mean the Compensation Committee of the Board, or another committee or subcommittee of the Board which may be comprised of one or more Directors and/or executive officers of the Company as appointed by the Board, to the extent permitted in accordance with Applicable Law.

2.11 "Common Stock" shall mean the Class A common stock of the Company.

2.12 "Company" shall have the meaning set forth in Article 1.

2.13 "Consultant" shall mean any consultant or adviser engaged to provide services to the Company or any parent of the Company or Affiliate who qualifies as a consultant or advisor under the applicable rules of the Securities and Exchange Commission for registration of shares on a Form S-8 Registration Statement.

2.14 "Director" shall mean a member of the Board, as constituted from time to time.

2.15 "Director Limit" shall have the meaning set forth in Section 4.6.

3

Case: 1:20-cv-05593 Document #: 166-1 Filed: 09/23/22 Page 381 of 547 PageID #:4150

2.16 "Dividend Equivalent" shall mean a right to receive the equivalent value (in cash or Shares) of dividends paid on Shares, awarded under Section 9.2.

2.17 "DRO" shall mean a "domestic relations order" as defined by the Code or Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time, or the rules thereunder.

2.18 "Effective Date" shall mean the day prior to the Public Trading Date.

2.19 "Eligible Individual" shall mean any person who is an Employee, a Consultant or a Non-Employee Director, as determined by the Administrator.

2.20 "Employee" shall mean any officer or other employee (as determined in accordance with Section 3401(c) of the Code and the Treasury Regulations thereunder) of the Company or of any parent of the Company or Affiliate.

2.21 "Equity Restructuring" shall mean a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off, rights offering or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of Shares (or other securities of the Company) or the share price of Common Stock (or other securities) and causes a change in the per-share value of the Common Stock underlying outstanding Awards.

2.22 "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

2.23 "Exchange Program" shall mean a Program under which (i) outstanding Awards are surrendered or cancelled in exchange for Awards of the same type (which may have higher or lower exercise prices and different terms), Awards of a different type, and/or cash, (ii) Participants would have the opportunity to transfer any outstanding Awards to a financial institution or other person or entity selected by the Administrator, and/or (iii) the exercise price of an outstanding Award is reduced or increased. The Administrator will determine the terms and conditions of any Exchange Program in its sole discretion.

2.24 "Expiration Date" shall have the meaning given to such term in Section 12.1(c).

2.25 "Fair Market Value" shall mean, as of any given date, the value of a Share determined as follows:

(a) If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange, the Nasdaq Capital Market, the Nasdaq Global Market and the Nasdaq Global Select Market), (ii) listed on any national market system or (iii) quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a Share as quoted on such exchange or system for such date or, if there is no closing sales price for a Share on the date in question, the closing sales price for a Share on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

4

(b) If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a Share on such date, the high bid and low asked prices for a Share on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c) If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in its discretion.

Notwithstanding the foregoing, with respect to any Award granted on the pricing date of the Company's initial public offering, the Fair Market Value shall mean the initial public offering price of a Share as set forth in the Company's final prospectus relating to its initial public offering filed with the Securities and Exchange Commission.

2.26 "Greater Than 10% Stockholder" shall mean an individual then owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any subsidiary corporation (as defined in Section 424(f) of the Code) or parent corporation thereof (as defined in Section 424(e) of the Code).

2.27 "Holder" shall mean a person who has been granted an Award.

2.28 "Incentive Stock Option" shall mean an Option that is intended to qualify as an incentive stock option and conforms to the applicable provisions of Section 422 of the Code.

2.29 "Incumbent Directors" shall mean for any period of 12 consecutive months, individuals who, at the beginning of such period, constitute the Board together with any new Director(s) (other than a Director designated by a person who shall have entered into an agreement with the Company to effect a transaction described in Section 2.8(a) or 2.8(c)) whose election or nomination for election to the Board was approved by a vote of at least a majority (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for Director without objection to such nomination) of the Directors then still in office who either were Directors at the beginning of the 12-month period or whose election or nomination for election was previously so approved. No individual initially elected or nominated as a director of the Company as a result of an actual or threatened election contest with respect to Directors or as a result of any other actual or threatened solicitation of proxies by or on behalf of any person other than the Board shall be an Incumbent Director.

2.30 "Non-Employee Director" shall mean a Director of the Company who is not an Employee.

2.31 "Non-Qualified Stock Option" shall mean an Option that is not an Incentive Stock Option or which is designated as an Incentive Stock Option but does not meet the applicable requirements of Section 422 of the Code.

5

2.32 "Option" shall mean a right to purchase Shares at a specified exercise price, granted under Article 5. An Option shall be either a Non-Qualified Stock Option or an Incentive Stock Option; provided, however, that Options granted to Non-Employee Directors and Consultants shall only be Non-Qualified Stock Options.

2.33 "Option Term" shall have the meaning set forth in Section 5.4.

2.34 "Organizational Documents" shall mean, collectively, (a) the Company's articles of incorporation, certificate of incorporation, bylaws or other similar organizational documents relating to the creation and governance of the Company, and (b) the Committee's charter or other similar organizational documentation relating to the creation and governance of the Committee.

2.35 "Other Stock or Cash Based Award" shall mean a cash payment, cash bonus award, stock payment, stock bonus award, performance award or incentive award that is paid in cash, Shares or a combination of both, awarded under Section 9.1, which may include, without limitation, deferred stock, deferred stock units, performance awards, retainers, committee fees, and meeting-based fees.

2.36 "Permitted Transferee" shall mean, with respect to a Holder, any "family member" of the Holder, as defined in the General Instructions to Form S-8 Registration Statement under the Securities Act (or any successor form thereto), or any other transferee specifically approved by the Administrator after taking into account Applicable Law.

2.37 "Performance Criteria" shall mean the criteria (and adjustments) that the Administrator selects for an Award for purposes of establishing the Performance Goal or Performance Goals for a Performance Period. The Performance Criteria that may be used to establish Performance Goals include, but are not limited to, the following: (i) net earnings or losses (either before or after one or more of the following: (A) interest, (B) taxes, (C) depreciation, (D) amortization and (E) non-cash equity-based compensation expense); (ii) gross or net sales or revenue or sales or revenue growth; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit (either before or after taxes); (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital (or invested capital) and cost of capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs, reductions in costs and cost control measures; (xiv) expenses; (xv) working capital; (xvi) earnings or loss per share; (xvii) adjusted earnings or loss per share; (xviii) price per share or dividends per share (or appreciation in and/or maintenance of such price or dividends); (xix) regulatory achievements or compliance (including, without limitation, regulatory body approval for commercialization of a product); (xx) implementation or completion of critical projects; (xxi) market share; (xxii) economic value; and (xxiii) individual employee performance, any of which may be measured either in absolute terms or as compared to any incremental increase or decrease or as compared to results of a peer group or other employees or to market performance indicators or indices.

2.38 "Performance Goals" shall mean, for a Performance Period, one or more goals established in writing by the Administrator for the Performance Period based upon one or more Performance Criteria. Depending on the Performance Criteria used to establish such Performance

6

Goals, the Performance Goals may be expressed in terms of overall Company performance or the performance of an Affiliate, division, business unit, or an individual. The achievement of each Performance Goal shall be determined with reference to Applicable Accounting Standards or other methodology as determined appropriate by the Administrator.

2.39 "Performance Period" shall mean one or more periods of time, which may be of varying and overlapping durations, as the Administrator may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Holder's right to, vesting of, and/or the payment in respect of, an Award.

2.40 "Plan" shall have the meaning set forth in Article 1.

2.41 "Program" shall mean any program adopted by the Administrator pursuant to the Plan containing the terms and conditions intended to govern a specified type of Award granted under the Plan and pursuant to which such type of Award may be granted under the Plan.

2.42 "Public Trading Date" shall mean the first date upon which Common Stock is listed (or approved for listing) upon notice of issuance on any securities exchange or designated (or approved for designation) upon notice of issuance as a national market security on an interdealer quotation system.

2.43 "Restricted Stock" shall mean Common Stock awarded under Article 7 that is subject to certain restrictions and may be subject to risk of forfeiture or repurchase.

2.44 "Restricted Stock Units" shall mean the right to receive Shares awarded under Article 8.

2.45 "SAR Term" shall have the meaning set forth in Section 5.4.

2.46 "Section 409A" shall mean Section 409A of the Code and the Department of Treasury regulations and other interpretive guidance issued thereunder, including, without limitation, any such regulations or other guidance that may be issued after the Effective Date.

2.47 "Securities Act" shall mean the Securities Act of 1933, as amended.

2.48 "Shares" shall mean shares of Common Stock.

2.49 "Stock Appreciation Right" shall mean an Award entitling the Holder (or other person entitled to exercise pursuant to the Plan) to exercise all or a specified portion thereof (to the extent then exercisable pursuant to its terms) and to receive from the Company an amount determined by multiplying (i) the difference obtained by subtracting (x) the exercise price per share of such Award from (y) the Fair Market Value on the date of exercise of such Award by (ii) the number of Shares with respect to which such Award shall have been exercised, subject to any limitations the Administrator may impose.

2.50 "Subsidiary" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing at least fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.51 "Substitute Award" shall mean an Award granted under the Plan in connection with a corporate transaction, such as a merger, combination, consolidation or acquisition of property or stock, in any case, upon the assumption of, or in substitution for, outstanding equity awards previously granted by a company or other entity; provided, however, that in no event shall the term "Substitute Award" be construed to refer to an award made in connection with the cancellation and repricing of an Option or Stock Appreciation Right.

2.52 "Termination of Service" shall mean the date the Holder ceases to be an Eligible Individual. The Administrator, in its sole discretion, shall determine the effect of all matters and questions relating to any Termination of Service, including, without limitation, whether a Termination of Service has occurred, whether a Termination of Service resulted from a discharge for cause and all questions of whether particular leaves of absence constitute a Termination of Service; provided, however, that, with respect to Incentive Stock Options, unless the Administrator otherwise provides in the terms of any Program, Award Agreement or otherwise, or as otherwise required by Applicable Law, a leave of absence, change in status from an employee to an independent contractor or other change in the employee-employer relationship shall constitute a Termination of Service only if, and to the extent that, such leave of absence, change in status or other change interrupts employment for the purposes of Section 422(a)(2) of the Code and the then-applicable regulations and revenue rulings under said Section. For purposes of the Plan, a Holder's employee-employer relationship or consultancy relations shall be deemed to be terminated in the event that the Affiliate employing or contracting with such Holder ceases to remain an Affiliate following any merger, sale of stock or other corporate transaction or event (including, without limitation, a spin-off).

# ARTICLE 3.

## SHARES SUBJECT TO THE PLAN

3.1 Number of Shares.

(a) Subject to Sections 3.1(b) and 12.2, Awards may be made under the Plan covering an aggregate number of Shares equal to the sum of: (i) 6,465,359 and (ii) an annual increase on the first day of each calendar year beginning on January 1, 2021 and ending on and including January 1, 2030, equal to the lesser of (A) 5% of the Shares outstanding (on an as-converted basis) on the last day of the immediately preceding fiscal year and (B) such smaller number of Shares as determined by the Board; provided, however, no more than 6,465,359 Shares may be issued upon the exercise of Incentive Stock Options. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Common Stock, treasury Common Stock or Common Stock purchased on the open market.

(b) If any Shares subject to an Award are forfeited or expire, are converted to shares of another person in connection with a recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, exchange of shares or other similar event, are surrendered pursuant to an Exchange Program, or such Award is settled for cash (in whole or in

8

part) (including Shares repurchased by the Company under Section 7.4 at the same price paid by the Holder), the Shares subject to such Award shall, to the extent of such forfeiture, expiration or cash settlement, again be available for future grants of Awards under the Plan. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added to the Shares authorized for grant under Section 3.1(a) and shall not be available for future grants of Awards: (i) Shares tendered by a Holder or withheld by the Company in payment of the exercise price of an Option; (ii) Shares tendered by the Holder or withheld by the Company to satisfy any tax withholding obligation with respect to an Award; (iii) Shares subject to a Stock Appreciation Right or other stock-settled Award (including Awards that may be settled in cash or stock) that are not issued in connection with the settlement or exercise, as applicable, of the Stock Appreciation Right or other stock-settled Award; and (iv) Shares purchased on the open market by the Company with the cash proceeds received from the exercise of Options. Any Shares repurchased by the Company under Section 7.4 at the same price paid by the Holder so that such Shares are returned to the Company shall again be available for Awards. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards shall not be counted against the Shares available for issuance under the Plan. Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Stock Option to fail to qualify as an incentive stock option under Section 422 of the Code.

(c) Substitute Awards may be granted on such terms as the Administrator deems appropriate, notwithstanding limitations on Awards in the Plan. Substitute Awards shall not reduce the Shares authorized for grant under the Plan, except as may be required by reason of Section 422 of the Code, and Shares subject to such Substitute Awards shall not be added to the Shares available for Awards under the Plan as provided in Section 3.1(b) above. Additionally, in the event that a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines has shares available under a pre-existing plan approved by its stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may, subject to Applicable Law, be used for Awards under the Plan and shall not reduce the Shares authorized for grant under the Plan (and Shares subject to such Awards shall not be added to the Shares available for Awards under the Plan as provided in Section 3.1(b) above); provided that Awards using such available Shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employed by or providing services to the Company or its Affiliates immediately prior to such acquisition or combination.

# ARTICLE 4.

## GRANTING OF AWARDS

4.1 <u>Participation</u>. The Administrator may, from time to time, select from among all Eligible Individuals those to whom an Award shall be granted and shall determine the nature and amount of each Award, which shall not be inconsistent with the requirements of the Plan. Except for any Non-Employee Director's right to Awards that may be required pursuant to any non-

9

employee or director compensation policy adopted by the Board, no Eligible Individual or other person shall have any right to be granted an Award pursuant to the Plan and neither the Company nor the Administrator is obligated to treat Eligible Individuals, Holders or any other persons uniformly. Participation by each Holder in the Plan shall be voluntary and nothing in the Plan or any Program shall be construed as mandating that any Eligible Individual or other person shall participate in the Plan.

4.2 <u>Award Agreement</u>. Each Award shall be evidenced by an Award Agreement that sets forth the terms, conditions and limitations for such Award as determined by the Administrator in its sole discretion (consistent with the requirements of the Plan and any applicable Program). Award Agreements evidencing Incentive Stock Options shall contain such terms and conditions as may be necessary to meet the applicable provisions of Section 422 of the Code. The Administrator, in its sole discretion, may grant Awards to Eligible Individuals that are based on one or more Performance Criteria or achievement of one or more Performance Goals or any such other criteria or goals as the Administrator shall establish.

4.3 <u>Limitations Applicable to Section 16 Persons</u>. Notwithstanding any other provision of the Plan, the Plan, and any Award granted or awarded to any individual who is then subject to Section 16 of the Exchange Act, shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3 of the Exchange Act and any amendments thereto) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

4.4 <u>At-Will Service</u>. Nothing in the Plan or in any Program or Award Agreement hereunder shall confer upon any Holder any right to continue in the employ of, or as a Director or Consultant for, the Company or any Affiliate, or shall interfere with or restrict in any way the rights of the Company and any Affiliate, which rights are hereby expressly reserved, to discharge any Holder at any time for any reason whatsoever, with or without cause, and with or without notice, or to terminate or change all other terms and conditions of employment or engagement, except to the extent expressly provided otherwise in a written agreement between the Holder and the Company or any Affiliate.

4.5 <u>Foreign Holders</u>. Notwithstanding any provision of the Plan or applicable Program to the contrary, in order to comply with the laws in countries other than the United States in which the Company and its Affiliates operate or have Employees, Non-Employee Directors or Consultants, or in order to comply with the requirements of any foreign securities exchange or other Applicable Law, the Administrator, in its sole discretion, shall have the power and authority to: (a) determine which Affiliates shall be covered by the Plan; (b) determine which Eligible Individuals outside the United States are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Eligible Individuals outside the United States to comply with Applicable Law (including, without limitation, applicable foreign laws or listing requirements of any foreign securities exchange); (d) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable; <u>provided</u>, <u>however</u>, that no such subplans and/or modifications shall increase the share limitation contained in Section 3.1 or the Director Limit; and (e) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local governmental regulatory exemptions or approvals or listing requirements of any foreign securities exchange.

10

4.6 Non-Employee Director Awards. Notwithstanding any provision to the contrary in the Plan or in any Non-Employee Director compensation policy adopted by the Board, the sum of the amount of any cash-based Awards or other fees and the value (determined as of the grant date in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718, or any successor thereto) of equity-based Awards granted to a Non-Employee Director as compensation for services as a Non-Employee Director during any calendar year following the Public Trading Date shall not exceed $500,000, increased to $750,000 with respect to the calendar year of a Non-Employee Director's initial service as a Non-Employee Director (the applicable amount, the "Director Limit"). The Administrator may make exceptions to this limit for individual Non-Employee Directors in extraordinary circumstances, as the Administrator may determine in its discretion, provided that the Non-Employee Director receiving such additional compensation may not participate in the decision to award such compensation or in other contemporaneous compensation decisions involving Non-Employee Directors.

## ARTICLE 5.

### GRANTING OF OPTIONS AND STOCK APPRECIATION RIGHTS

5.1 Granting of Options and Stock Appreciation Rights to Eligible Individuals. The Administrator is authorized to grant Options and Stock Appreciation Rights to Eligible Individuals from time to time, in sole discretion, on such terms and conditions as it may determine, which shall not be inconsistent with the Plan, including any limitations in the Plan that apply to Incentive Stock Options.

5.2 Qualification of Incentive Stock Options. The Administrator may grant Options intended to qualify as Incentive Stock Options only to employees of the Company, any of the Company's present or future "parent corporations" or "subsidiary corporations" as defined in Sections 424(e) or (f) of the Code, respectively, and any other entities the employees of which are eligible to receive Incentive Stock Options under the Code. No person who qualifies as a Greater Than 10% Stockholder may be granted an Incentive Stock Option unless such Incentive Stock Option conforms to the applicable provisions of Section 422 of the Code. To the extent that the aggregate fair market value of stock with respect to which "incentive stock options" (within the meaning of Section 422 of the Code, but without regard to Section 422(d) of the Code) are exercisable for the first time by a Holder during any calendar year under the Plan, and all other plans of the Company and any parent corporation or subsidiary corporation thereof (as defined in Section 424(e) and 424(f) of the Code, respectively), exceeds $100,000, the Options shall be treated as Non-Qualified Stock Options to the extent required by Section 422 of the Code. The rule set forth in the immediately preceding sentence shall be applied by taking Options and other "incentive stock options" into account in the order in which they were granted and the fair market value of stock shall be determined as of the time the respective options were granted. Any interpretations and rules under the Plan with respect to Incentive Stock Options shall be consistent with the provisions of Section 422 of the Code. Neither the Company nor the Administrator shall have any liability to a Holder, or any other person, (a) if an Option (or any part thereof) which is intended to qualify as an Incentive Stock Option fails to qualify as an Incentive Stock Option or

11

(b) for any action or omission by the Company or the Administrator that causes an Option not to qualify as an Incentive Stock Option, including, without limitation, the conversion of an Incentive Stock Option to a Non-Qualified Stock Option or the grant of an Option intended as an Incentive Stock Option that fails to satisfy the requirements under the Code applicable to an Incentive Stock Option.

5.3 <u>Option and Stock Appreciation Right Exercise Price</u>. The exercise price per Share subject to each Option and Stock Appreciation Right shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value of a Share on the date the Option or Stock Appreciation Right, as applicable, is granted (or, as to Incentive Stock Options, on the date the Option is modified, extended or renewed for purposes of Section 424(h) of the Code). In addition, in the case of Incentive Stock Options granted to a Greater Than 10% Stockholder, such price shall not be less than 110% of the Fair Market Value of a Share on the date the Option is granted (or the date the Option is modified, extended or renewed for purposes of Section 424(h) of the Code). Notwithstanding the foregoing, in the case of an Option or Stock Appreciation Right that is a Substitute Award, the exercise price per share of the Shares subject to such Option or Stock Appreciation Right, as applicable, may be less than the Fair Market Value per share on the date of grant; <u>provided</u> that the exercise price of any Substitute Award shall be determined in accordance with the applicable requirements of Section 424 and 409A of the Code.

5.4 <u>Option and SAR Term</u>. The term of each Option (the "<u>Option Term</u>") and the term of each Stock Appreciation Right (the "<u>SAR Term</u>") shall be set by the Administrator in its sole discretion; <u>provided</u>, <u>however</u>, that the Option Term or SAR Term, as applicable, shall not be more than (a) ten (10) years from the date the Option or Stock Appreciation Right, as applicable, is granted to an Eligible Individual (other than a Greater Than 10% Stockholder), or (b) five (5) years from the date an Incentive Stock Option is granted to a Greater Than 10% Stockholder. Except as limited by the requirements of Section 409A or Section 422 of the Code and regulations and rulings thereunder or the first sentence of this Section 5.4 and without limiting the Company's rights under Section 10.7, the Administrator may extend the Option Term of any outstanding Option or the SAR Term of any outstanding Stock Appreciation Right, and may extend the time period during which vested Options or Stock Appreciation Rights may be exercised, in connection with any Termination of Service of the Holder or otherwise, and may amend, subject to Section 10.7 and 12.1, any other term or condition of such Option or Stock Appreciation Right relating to such Termination of Service of the Holder or otherwise.

5.5 <u>Option and SAR Vesting</u>. The period during which the right to exercise, in whole or in part, an Option or Stock Appreciation Right vests in the Holder shall be set by the Administrator and set forth in the applicable Award Agreement. Notwithstanding the foregoing and unless determined otherwise by the Company, in the event that on the last business day of the term of an Option or Stock Appreciation Right (other than an Incentive Stock Option) (a) the exercise of the Option or Stock Appreciation Right is prohibited by Applicable Law, as determined by the Company, or (b) Shares may not be purchased or sold by the applicable Participant due to any Company insider trading policy (including blackout periods) or a "lock-up" agreement undertaken in connection with an issuance of securities by the Company, the term of the Option or Stock Appreciation Right shall be extended until the date that is thirty (30) days after the end of the legal prohibition, black-out period or lock-up agreement, as determined by the Company; provided, however, in no event shall the extension last beyond the ten year term of the applicable

12

Option or Stock Appreciation Right unless otherwise determined by the Administrator in the Award Agreement, the applicable Program or by action of the Administrator following the grant of the Option or Stock Appreciation Right, (i) no portion of an Option or Stock Appreciation Right which is unexercisable at a Holder's Termination of Service shall thereafter become exercisable and (ii) the portion of an Option or Stock Appreciation Right that is unexercisable at a Holder's Termination of Service shall automatically expire thirty (30) days following such Termination of Service.

## ARTICLE 6.

## EXERCISE OF OPTIONS AND STOCK APPRECIATION RIGHTS

6.1 <u>Exercise and Payment</u>. An exercisable Option or Stock Appreciation Right may be exercised in whole or in part. However, unless the Administrator otherwise determines, an Option or Stock Appreciation Right shall not be exercisable with respect to fractional Shares and the Administrator may require that, by the terms of the Option or Stock Appreciation Right, a partial exercise must be with respect to a minimum number of Shares. Payment of the amounts payable with respect to Stock Appreciation Rights pursuant to this Article 6 shall be in cash, Shares (based on its Fair Market Value as of the date the Stock Appreciation Right is exercised), or a combination of both, as determined by the Administrator.

6.2 <u>Manner of Exercise</u>. All or a portion of an exercisable Option or Stock Appreciation Right shall be deemed exercised upon delivery of all of the following to the Secretary of the Company, the stock plan administrator of the Company or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written notice of exercise in a form the Administrator approves (which may be electronic) complying with the applicable rules established by the Administrator. The notice shall be signed or otherwise acknowledge electronically by the Holder or other person then entitled to exercise the Option or Stock Appreciation Right or such portion thereof;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with Applicable Law.

(c) In the event that the Option shall be exercised pursuant to Section 10.3 by any person or persons other than the Holder, appropriate proof of the right of such person or persons to exercise the Option or Stock Appreciation Right, as determined in the sole discretion of the Administrator; and

(d) Full payment of the exercise price and applicable withholding taxes for the Shares with respect to which the Option or Stock Appreciation Right, or portion thereof, is exercised, in a manner permitted by the Administrator in accordance with Sections 10.1 and 10.2.

6.3 <u>Notification Regarding Disposition</u>. The Holder shall give the Company prompt written or electronic notice of any disposition or other transfers (other than in connection with a Change in Control) of Shares acquired by exercise of an Incentive Stock Option which occurs within (a) two years from the date of granting (including the date the Option is modified, extended

13

or renewed for purposes of Section 424(h) of the Code) such Option to such Holder, or (b) one year after the date of transfer of such Shares to such Holder. Such notice shall specify the date of such disposition or other transfer and the amount realized, in cash, other property, assumption of indebtedness or other consideration, by the Holder in such disposition or other transfer.

## ARTICLE 7.

### AWARD OF RESTRICTED STOCK

7.1 <u>Award of Restricted Stock</u>. The Administrator is authorized to grant Restricted Stock, or the right to purchase Restricted Stock, to Eligible Individuals, and shall determine the terms and conditions, including the restrictions applicable to each award of Restricted Stock, which terms and conditions shall not be inconsistent with the Plan or any applicable Program, and may impose such conditions on the issuance of such Restricted Stock as it deems appropriate. At the time of grant, the Administrator shall specify the date or dates on which the Restricted Stock shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate, including, without limitation, vesting based upon the Holder's duration of service to the Company or any Affiliate, one or more Performance Goals or other specific criteria, in each case on a specified date or dates or over any period or periods, as determined by the Administrator. The Administrator shall establish the purchase price, if any, and form of payment for Restricted Stock; <u>provided</u>, <u>however</u>, that if a purchase price is charged, such purchase price shall be no less than the par value, if any, of the Shares to be purchased, unless otherwise permitted by Applicable Law. In all cases, legal consideration shall be required for each issuance of Restricted Stock to the extent required by Applicable Law.

7.2 <u>Rights as Stockholders</u>. Subject to Section 7.4, upon issuance of Restricted Stock, the Holder shall have, unless otherwise provided by the Administrator, all of the rights of a stockholder with respect to said Shares, subject to the restrictions in the Plan, any applicable Program and/or the applicable Award Agreement, including the right to receive all dividends and other distributions paid or made with respect to the Shares to the extent such dividends and other distributions have a record date that is on or after the date on which the Holder to whom such Restricted Stock are granted becomes the record holder of such Restricted Stock; <u>provided</u>, <u>however</u>, that, in the sole discretion of the Administrator, any extraordinary dividends or distributions with respect to the Shares may be subject to the restrictions set forth in Section 7.3. In addition, notwithstanding anything to the contrary herein, with respect to a share of Restricted Stock, dividends which are paid prior to vesting shall only be paid out to the Holder to the extent that the share of Restricted Stock vests.

7.3 <u>Restrictions</u>. All shares of Restricted Stock (including any shares received by Holders thereof with respect to shares of Restricted Stock as a result of stock dividends, stock splits or any other form of recapitalization) and, unless the Administrator provides otherwise, any property (other than cash) transferred to Holders in connection with an extraordinary dividend or distribution shall be subject to such restrictions and vesting requirements as the Administrator shall provide in the applicable Program or Award Agreement.

14

7.4 <u>Repurchase or Forfeiture of Restricted Stock</u>. Except as otherwise determined by the Administrator or as otherwise provided in an Award Agreement, if no price was paid by the Holder for the Restricted Stock, upon a Termination of Service during the applicable restriction period, the Holder's rights in unvested Restricted Stock then subject to restrictions shall lapse, and such Restricted Stock shall be surrendered to the Company and cancelled without consideration on the date of such Termination of Service. If a price was paid by the Holder for the Restricted Stock, upon a Termination of Service during the applicable restriction period, the Company shall have the right to repurchase from the Holder the unvested Restricted Stock then subject to restrictions at a cash price per share equal to the price paid by the Holder for such Restricted Stock or such other amount as may be specified in the applicable Program or Award Agreement.

7.5 <u>Section 83(b) Election</u>. If a Holder makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which the Holder would otherwise be taxable under Section 83(a) of the Code, the Holder shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service along with proof of the timely filing thereof with the Internal Revenue Service.

# ARTICLE 8.

## AWARD OF RESTRICTED STOCK UNITS

8.1 <u>Grant of Restricted Stock Units</u>. The Administrator is authorized to grant Awards of Restricted Stock Units to any Eligible Individual selected by the Administrator in such amounts and subject to such terms and conditions as determined by the Administrator. A Holder will have no rights of a stockholder with respect to Shares subject to any Restricted Stock Unit unless and until the Shares are delivered in settlement of the Restricted Stock Unit.

8.2 <u>Vesting of Restricted Stock Units</u>. At the time of grant, the Administrator shall specify the date or dates on which the Restricted Stock Units shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate, including, without limitation, vesting based upon the Holder's duration of service to the Company or any Affiliate, one or more Performance Goals or other specific criteria, in each case on a specified date or dates or over any period or periods, as determined by the Administrator. An Award of Restricted Stock Units shall only be eligible to vest while the Holder is an Employee, a Consultant or a Director, as applicable; <u>provided</u>, <u>however</u>, that the Administrator, in its sole discretion, may provide (in an Award Agreement or otherwise) that a Restricted Stock Unit award may become vested subsequent to a Termination of Service in the event of the occurrence of certain events, including a Change in Control, the Holder's death, retirement or disability or any other specified Termination of Service, subject to Section 11.7.

8.3 <u>Maturity and Payment</u>. At the time of grant, the Administrator shall specify the maturity date applicable to each grant of Restricted Stock Units, which shall be no earlier than the vesting date or dates of the Award and may be determined at the election of the Holder (if permitted by the applicable Award Agreement); <u>provided</u> that, except as otherwise determined by the Administrator, and subject to compliance with Section 409A, in no event shall the maturity date relating to each Restricted Stock Unit occur following the later of (a) the 15th day of the third month following the end of the calendar year in which the applicable portion of the

15

Restricted Stock Unit vests, and (b) the 15th day of the third month following the end of the Company's fiscal year in which the applicable portion of the Restricted Stock Unit vests. On the maturity date, the Company shall, in accordance with the applicable Award Agreement and subject to Section 10.4(f), transfer to the Holder one unrestricted, fully transferable Share for each Restricted Stock Unit scheduled to be paid out on such date and not previously forfeited, or in the sole discretion of the Administrator, an amount in cash equal to the Fair Market Value of such Shares on the maturity date or a combination of cash and Common Stock as determined by the Administrator.

## ARTICLE 9.

### AWARD OF OTHER STOCK OR CASH BASED AWARDS AND DIVIDEND EQUIVALENTS

9.1 <u>Other Stock or Cash Based Awards</u>. The Administrator is authorized to grant Other Stock or Cash Based Awards, including awards entitling a Holder to receive Shares or cash to be delivered immediately or in the future, to any Eligible Individual. Subject to the provisions of the Plan and any applicable Program, the Administrator shall determine the terms and conditions of each Other Stock or Cash Based Award, including the term of the Award, any exercise or purchase price, Performance Criteria and Performance Goals, transfer restrictions, vesting conditions and other terms and conditions applicable thereto, which shall be set forth in the applicable Award Agreement. Other Stock or Cash Based Awards may be paid in cash, Shares, or a combination of cash and Shares, as determined by the Administrator, and may be available as a form of payment in the settlement of other Awards granted under the Plan, as stand-alone payments, as a part of a bonus, deferred bonus, deferred compensation or other arrangement, and/or as payment in lieu of compensation to which an Eligible Individual is otherwise entitled.

9.2 <u>Dividend Equivalents</u>. Dividend Equivalents may be granted by the Administrator, either alone or in tandem with another Award, based on dividends declared on the Common Stock, to be credited as of dividend payment dates during the period between the date the Dividend Equivalents are granted to a Holder and the date such Dividend Equivalents terminate or expire, as determined by the Administrator. Such Dividend Equivalents shall be converted to cash or additional Shares by such formula and at such time and subject to such restrictions and limitations as may be determined by the Administrator. In addition, Dividend Equivalents with respect to an Award that are based on dividends paid prior to the vesting of such Award shall only be paid out to the Holder to the extent that the vesting conditions are subsequently satisfied and the Award vests. Notwithstanding the foregoing, no Dividend Equivalents shall be payable with respect to Options or Stock Appreciation Rights.

## ARTICLE 10.

### ADDITIONAL TERMS OF AWARDS

10.1 <u>Payment</u>. The Administrator shall determine the method or methods by which payments by any Holder with respect to any Awards granted under the Plan shall be made, including, without limitation: (a) cash, wire transfer of immediately available funds or check, (b)

16

Shares (including, in the case of payment of the exercise price of an Award, Shares issuable pursuant to the exercise of the Award) or Shares held for such minimum period of time as may be established by the Administrator, in each case, having a Fair Market Value on the date of delivery equal to the aggregate payments required, (c) delivery of a written or electronic notice that the Holder has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable upon exercise or vesting of an Award, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the aggregate payments required; provided that payment of such proceeds is then made to the Company upon settlement of such sale, (d) other form of legal consideration acceptable to the Administrator in its sole discretion, or (e) any combination of the above permitted forms of payment. Notwithstanding any other provision of the Plan to the contrary, no Holder who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment, with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

10.2 Tax Withholding. The Company or any Affiliate shall have the authority and the right to deduct or withhold, or require a Holder to remit to the Company, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Holder's FICA, employment tax or other social security contribution obligation) required by law to be withheld with respect to any taxable event concerning a Holder arising as a result of the Plan or any Award. The Administrator may, in its sole discretion and in satisfaction of the foregoing requirement, or in satisfaction of such additional withholding obligations as a Holder may have elected, allow a Holder to satisfy such obligations by any payment means described in Section 10.1 hereof, including without limitation, by allowing such Holder to elect to have the Company or any Affiliate withhold Shares otherwise issuable under an Award (or allow the surrender of Shares). The number of Shares that may be so withheld or surrendered shall be limited to the number of Shares that have a Fair Market Value on the date of withholding or repurchase no greater than the aggregate amount of such liabilities based on the maximum statutory withholding rates in such Holder's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income. The Administrator shall determine the fair market value of the Shares, consistent with applicable provisions of the Code, for tax withholding obligations due in connection with a broker-assisted cashless Option or Stock Appreciation Right exercise involving the sale of Shares to pay the Option or Stock Appreciation Right exercise price or any tax withholding obligation.

10.3 Transferability of Awards.

(a) Except as otherwise provided in Sections 10.3(b) and 10.3(c):

(i) No Award under the Plan may be sold, pledged, assigned or transferred in any manner other than (A) by will or the laws of descent and distribution or (B) subject to the consent of the Administrator, pursuant to a DRO, unless and until such Award has been exercised or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed;

17

(ii) No Award or interest or right therein shall be liable for or otherwise subject to the debts, contracts or engagements of the Holder or the Holder's successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, hypothecation, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy) unless and until such Award has been exercised, or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed, and any attempted disposition of an Award prior to satisfaction of these conditions shall be null and void and of no effect, except to the extent that such disposition is permitted by Section 10.3(a)(i); and

(iii) During the lifetime of the Holder, only the Holder may exercise any exercisable portion of an Award granted to such Holder under the Plan, unless it has been disposed of pursuant to a DRO. After the death of the Holder, any exercisable portion of an Award may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Program or Award Agreement, be exercised by the Holder's personal representative or by any person empowered to do so under the deceased Holder's will or under the then-applicable laws of descent and distribution.

(b) Notwithstanding Section 10.3(a), the Administrator, in its sole discretion, may determine to permit a Holder or a Permitted Transferee of such Holder to transfer an Award other than an Incentive Stock Option (unless such Incentive Stock Option is intended to become a Nonqualified Stock Option) to any one or more Permitted Transferees of such Holder, subject to the following terms and conditions: (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee other than (A) to another Permitted Transferee of the applicable Holder or (B) by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO; (ii) an Award transferred to a Permitted Transferee shall continue to be subject to all the terms and conditions of the Award as applicable to the original Holder (other than the ability to further transfer the Award to any person other than another Permitted Transferee of the applicable Holder); (iii) the Holder (or transferring Permitted Transferee) and the receiving Permitted Transferee shall execute any and all documents requested by the Administrator, including, without limitation documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under Applicable Law and (C) evidence the transfer; and (iv) the transfer of an Award to a Permitted Transferee shall be without consideration. In addition, and further notwithstanding Section 10.3(a), hereof, the Administrator, in its sole discretion, may determine to permit a Holder to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and other Applicable Law, the Holder is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

(c) Notwithstanding Section 10.3(a), a Holder may, in the manner determined by the Administrator, designate a beneficiary to exercise the rights of the Holder and to receive any distribution with respect to any Award upon the Holder's death. A beneficiary, legal guardian, legal representative, or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Program or Award Agreement applicable to the Holder and any additional restrictions deemed necessary or appropriate by the Administrator. If the Holder is married or a domestic partner in a domestic partnership qualified under Applicable Law and resides

18

in a community property state, a designation of a person other than the Holder's spouse or domestic partner, as applicable, as the Holder's beneficiary with respect to more than 50% of the Holder's interest in the Award shall not be effective without the prior written or electronic consent of the Holder's spouse or domestic partner. If no beneficiary has been designated or survives the Holder, payment shall be made to the person entitled thereto pursuant to the Holder's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Holder at any time; provided that the change or revocation is delivered in writing to the Administrator prior to the Holder's death.

10.4 Conditions to Issuance of Shares.

(a) The Administrator shall determine the methods by which Shares shall be delivered or deemed to be delivered to Holders. Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates or make any book entries evidencing Shares pursuant to the exercise of any Award, unless and until the Administrator has determined that the issuance of such Shares is in compliance with Applicable Law and the Shares are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Administrator may require that a Holder make such reasonable covenants, agreements and representations as the Administrator, in its sole discretion, deems advisable in order to comply with Applicable Law.

(b) All share certificates delivered pursuant to the Plan and all Shares issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to comply with Applicable Law. The Administrator may place legends on any share certificate or book entry to reference restrictions applicable to the Shares (including, without limitation, restrictions applicable to Restricted Stock).

(c) The Administrator shall have the right to require any Holder to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Award, including a window-period limitation, as may be imposed in the sole discretion of the Administrator.

(d) Unless the Administrator otherwise determines, no fractional Shares shall be issued and the Administrator, in its sole discretion, shall determine whether cash shall be given in lieu of fractional Shares or whether such fractional Shares shall be eliminated by rounding down.

(e) The Company, in its sole discretion, may (i) retain physical possession of any stock certificate evidencing Shares until any restrictions thereon shall have lapsed and/or (ii) require that the stock certificates evidencing such Shares be held in custody by a designated escrow agent (which may but need not be the Company) until the restrictions thereon shall have lapsed, and that the Holder deliver a stock power, endorsed in blank, relating to such Shares.

(f) Notwithstanding any other provision of the Plan, unless otherwise determined by the Administrator or required by Applicable Law, the Company shall not deliver to any Holder certificates evidencing Shares issued in connection with any Award and instead such Shares shall be recorded in the books of the Company (or, as applicable, its transfer agent or stock plan administrator).

19

10.5 Forfeiture and Claw-Back Provisions. All Awards (including any proceeds, gains or other economic benefit actually or constructively received by a Holder upon any receipt or exercise of any Award or upon the receipt or resale of any Shares underlying the Award and any payments of a portion of an incentive-based bonus pool allocated to a Holder) shall be subject to the provisions of any claw-back policy implemented by the Company, including, without limitation, any claw-back policy adopted to comply with the requirements of Applicable Law, including, without limitation, the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations promulgated thereunder, whether or not such claw-back policy was in place at the time of grant of an Award, to the extent set forth in such claw-back policy and/or in the applicable Award Agreement.

10.6 Amendment of Awards. Subject to Applicable Law, the Administrator may amend, modify or terminate any outstanding Award, including but not limited to, substituting therefor another Award of the same or a different type, changing the date of exercise or settlement, and converting an Incentive Stock Option to a Non-Qualified Stock Option. The Holder's consent to such action shall be required unless (a) the Administrator determines that the action, taking into account any related action, would not materially and adversely affect the Holder, or (b) the change is otherwise permitted under the Plan (including, without limitation, under Section 10.6, 12.2 or 12.10).

10.7 Lock-Up Period. The Company may, in connection with registering the offering of any Company securities under the Securities Act, prohibit Holders from, directly or indirectly, selling or otherwise transferring any Shares or other Company securities during a period of up to one hundred eighty days following the effective date of a Company registration statement filed under the Securities Act, or such longer period as determined by the underwriter. In order to enforce the foregoing, the Company shall have the right to place restrictive legends on the certificates of any securities of the Company held by the Holder and to impose stop transfer instructions with the Company's transfer agent with respect to any securities of the Company held by the Holder until the end of such period.

10.8 Data Privacy. As a condition of receipt of any Award, each Holder explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Section 10.8 by and among, as applicable, the Company and its Affiliates for the exclusive purpose of implementing, administering and managing the Holder's participation in the Plan. The Company and its Affiliates may hold certain personal information about a Holder, including but not limited to, the Holder's name, home address and telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), any shares of stock held in the Company or any of its Affiliates, details of all Awards, in each case, for the purpose of implementing, managing and administering the Plan and Awards (the "Data"). The Company and its Affiliates may transfer the Data amongst themselves as necessary for the purpose of implementation, administration and management of a Holder's participation in the Plan, and the Company and its Affiliates may each further transfer the Data to any third parties assisting the Company and its Affiliates in the implementation, administration and management of the Plan. These recipients may be located in the Holder's country, or elsewhere, and the Holder's country may have different data privacy laws and protections than the recipients' country. Through acceptance of an Award, each Holder authorizes such recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and

20

managing the Holder's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or any of its Affiliates or the Holder may elect to deposit any Shares. The Data related to a Holder will be held only as long as is necessary to implement, administer, and manage the Holder's participation in the Plan. A Holder may, at any time, view the Data held by the Company with respect to such Holder, request additional information about the storage and processing of the Data with respect to such Holder, recommend any necessary corrections to the Data with respect to the Holder or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel the Holder's ability to participate in the Plan and, in the Administrator's discretion, the Holder may forfeit any outstanding Awards if the Holder refuses or withdraws his or her consents as described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Holders may contact their local human resources representative.

## ARTICLE 11.

### ADMINISTRATION

11.1 <u>Administrator</u>. The Committee shall administer the Plan (except as otherwise permitted herein). To the extent required to comply with the provisions of Rule 16b-3, it is intended that each member of the Committee will be, at the time the Committee takes any action with respect to an Award that is subject to Rule 16b-3, a "non-employee director" within the meaning of Rule 16b-3. Additionally, to the extent required by Applicable Law, each of the individuals constituting the Committee shall be an "independent director" under the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. Notwithstanding the foregoing, any action taken by the Committee shall be valid and effective, whether or not members of the Committee at the time of such action are later determined not to have satisfied the requirements for membership set forth in this Section 11.1 or the Organizational Documents. Except as may otherwise be provided in the Organizational Documents or as otherwise required by Applicable Law, (a) appointment of Committee members shall be effective upon acceptance of appointment, (b) Committee members may resign at any time by delivering written or electronic notice to the Board and (c) vacancies in the Committee may only be filled by the Board. Notwithstanding the foregoing, (i) the full Board, acting by a majority of its members in office, shall conduct the general administration of the Plan with respect to Awards granted to Non-Employee Directors and, with respect to such Awards, the term "Administrator" as used in the Plan shall be deemed to refer to the Board and (ii) the Board or Committee may delegate its authority hereunder to the extent permitted by Section 11.6.

11.2 <u>Duties and Powers of Administrator</u>. It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan, all Programs (including Exchange Programs) and Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan and any Program as are not inconsistent with the Plan, to interpret, amend or revoke any such rules and to amend the Plan or any Program or Award Agreement; <u>provided</u> that the rights or obligations of the Holder of the Award that is the subject of any such Program or Award Agreement are not materially and adversely affected by such amendment, unless the consent of the Holder is obtained or such amendment is otherwise permitted under Section 10.7 or Section

21

12.10. In its sole discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee in its capacity as the Administrator under the Plan except with respect to matters which under Rule 16b-3 under the Exchange Act or any successor rule, or any regulations or rules issued thereunder, or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded are required to be determined in the sole discretion of the Committee.

11.3 <u>Action by the Administrator</u>. Unless otherwise established by the Board, set forth in any Organizational Documents or as required by Applicable Law, a majority of the Administrator shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by all members of the Administrator in lieu of a meeting, shall be deemed the acts of the Administrator. Each member of the Administrator is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Affiliate, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan. Neither the Administrator nor any member or delegate thereof shall have any liability to any person (including any Holder) for any action taken or omitted to be taken or any determination made in good faith with respect to the Plan or any Award.

11.4 <u>Authority of Administrator</u>. Subject to the Organizational Documents, any specific designation in the Plan and Applicable Law, the Administrator has the exclusive power, authority and sole discretion to:

(a) Designate Eligible Individuals to receive Awards;

(b) Determine the type or types of Awards to be granted to each Eligible Individual (including, without limitation, any Awards granted in tandem with another Award granted pursuant to the Plan);

(c) Determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d) Determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price, purchase price, any Performance Criteria and/or Performance Goals, any restrictions or limitations on the Award, any schedule for vesting, lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, and any provisions related to non-competition and claw-back and recapture of gain on an Award, based in each case on such considerations as the Administrator in its sole discretion determines;

(e) Determine whether, to what extent, and under what circumstances an Award may be settled in, or the exercise price of an Award may be paid in cash, Shares, other Awards, or other property, or an Award may be canceled, forfeited, or surrendered;

(f) Prescribe the form of each Award Agreement, which need not be identical for each Holder;

22

(g) Decide all other matters that must be determined in connection with an Award;

(h) Institute and determine the terms and conditions of an Exchange Program;

(i) Establish, adopt, or revise any Programs, rules and regulations as it may deem necessary or advisable to administer the Plan;

(j) Interpret the terms of, and any matter arising pursuant to, the Plan, any Program or any Award Agreement; and

(k) Make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan.

11.5 <u>Decisions Binding</u>. The Administrator's interpretation of the Plan, any Awards granted pursuant to the Plan, any Program or any Award Agreement and all decisions and determinations by the Administrator with respect to the Plan are final, binding and conclusive on all persons.

11.6 <u>Delegation of Authority</u>. The Board or Committee may from time to time delegate to a committee of one or more Directors or one or more officers of the Company the authority to grant or amend Awards or to take other administrative actions pursuant to this Article 11; <u>provided</u>, <u>however</u>, that in no event shall an officer of the Company be delegated the authority to grant Awards to, or amend Awards held by, the following individuals: (a) individuals who are subject to Section 16 of the Exchange Act, or (b) officers of the Company (or Directors) to whom authority to grant or amend Awards has been delegated hereunder; <u>provided</u>, <u>further</u>, that any delegation of administrative authority shall only be permitted to the extent it is permissible under any Organizational Documents and Applicable Law. Any delegation hereunder shall be subject to the restrictions and limits that the Board or Committee specifies at the time of such delegation or that are otherwise included in the applicable Organizational Documents, and the Board or Committee, as applicable, may at any time rescind the authority so delegated or appoint a new delegatee. At all times, the delegatee appointed under this Section 11.6 shall serve in such capacity at the pleasure of the Board or the Committee, as applicable, and the Board or the Committee may abolish any committee at any time and re-vest in itself any previously delegated authority.

11.7 <u>Acceleration</u>. Subject to the Organizational Documents, any specific designation in the Plan and Applicable Law, the Administrator has the exclusive power, authority and sole discretion to accelerate, wholly or partially, the vesting or lapse of restrictions (and, if applicable, the Company shall cease to have a right of repurchase) of any Award or portion thereof at any time after the grant of an Award.

23

**ARTICLE 12**

**MISCELLANEOUS PROVISIONS**

12.1 <u>Amendment, Suspension or Termination of the Plan</u>.

(a) Except as otherwise provided in Section 12.1(b), the Plan may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Board; <u>provided</u> that, except as provided in Section 10.7 and Section 12.10, no amendment, suspension or termination of the Plan shall, without the consent of the Holder, materially and adversely affect any rights or obligations under any Award theretofore granted or awarded, unless the Award itself otherwise expressly so provides.

(b) Notwithstanding Section 12.1(a), the Board may not, except as provided in Section 12.2, increase the limit imposed in Section 3.1 on the maximum number of Shares which may be issued under the Plan without approval of the Company's stockholders given within twelve (12) months before or after such increase.

(c) No Awards may be granted or awarded during any period of suspension or after termination of the Plan, and notwithstanding anything herein to the contrary, in no event may any Award be granted under the Plan after the tenth (10th) anniversary of the earlier of (i) the date on which the Plan was adopted by the Board or (ii) the date the Plan was approved by the Company's stockholders (such anniversary, the "<u>Expiration Date</u>"). Any Awards that are outstanding on the Expiration Date shall remain in force according to the terms of the Plan, the applicable Program and the applicable Award Agreement.

12.2 <u>Changes in Common Stock or Assets of the Company, Acquisition or Liquidation of the Company and Other Corporate Events</u>.

(a) In the event of any stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of the Company's stock or the share price of the Company's stock other than an Equity Restructuring, the Administrator may make equitable adjustments to reflect such change with respect to: (i) the aggregate number and kind of Shares that may be issued under the Plan (including, but not limited to, adjustments of the limitations in Section 3.1 on the maximum number and kind of Shares which may be issued under the Plan); (ii) the number and kind of Shares (or other securities or property) subject to outstanding Awards; (iii) the terms and conditions of any outstanding Awards (including, without limitation, any applicable Performance Criteria and Performance Goals with respect thereto); (iv) the grant or exercise price per share for any outstanding Awards under the Plan; and (v) the number and kind of Shares (or other securities or property) for which automatic grants are subsequently to be made to new and continuing Non-Employee Directors pursuant to any non-employee director compensation policy adopted by the Board.

(b) In the event of any transaction or event described in Section 12.2(a) or any unusual or nonrecurring transactions or events affecting the Company, any Affiliate of the Company, or the financial statements of the Company or any Affiliate, or of changes in Applicable Law or Applicable Accounting Standards, the Administrator, in its sole discretion, and on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any Award under the Plan, to facilitate such transactions or events or to give effect to such changes in Applicable Law or Applicable Accounting Standards:

24

(i) To provide for the termination of any such Award in exchange for an amount of cash and/or other property with a value equal to the amount that would have been attained upon the exercise of such Award or realization of the Holder's rights (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction or event described in this Section 12.2 the Administrator determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Holder's rights, then such Award may be terminated by the Company without payment);

(ii) To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar options, rights or awards covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and applicable exercise or purchase price, in all cases, as determined by the Administrator;

(iii) To make adjustments in the number and type of Shares of the Company's stock (or other securities or property) subject to outstanding Awards, and/or in the terms and conditions of (including the grant or exercise price), and the criteria included in, outstanding Awards and Awards which may be granted in the future;

(iv) To provide that such Award shall be exercisable or payable or fully vested with respect to all Shares covered thereby, notwithstanding anything to the contrary in the Plan or the applicable Program or Award Agreement;

(v) To replace such Award with other rights or property selected by the Administrator; and/or

(vi) To provide that the Award cannot vest, be exercised or become payable after such event.

(c) In connection with the occurrence of any Equity Restructuring, and notwithstanding anything to the contrary in Sections 12.2(a) and 12.2(b):

(i) The number and type of securities subject to each outstanding Award and the exercise price or grant price thereof, if applicable, shall be equitably adjusted (and the adjustments provided under this Section 12.2(c)(i) shall be nondiscretionary and shall be final and binding on the affected Holder and the Company); and/or

(ii) The Administrator shall make such equitable adjustments, if any, as the Administrator, in its sole discretion, may deem appropriate to reflect such Equity Restructuring with respect to the aggregate number and kind of Shares that may be issued under the Plan (including, but not limited to, adjustments of the limitation in Section 3.1 on the maximum number and kind of Shares which may be issued under the Plan).

25

(8) Notwithstanding any other provision of the Plan, in the event of a Change in Control, unless the Administrator elects to (i) terminate an Award in exchange for cash, rights or property, or (ii) cause an Award to become fully exercisable and no longer subject to any forfeiture restrictions prior to the consummation of a Change in Control, pursuant to Section 12.2, (A) such Award (other than any portion subject to performance-based vesting) shall continue in effect or be assumed or an equivalent Award (which may include, without limitation, an Award settled in cash) substituted by the successor corporation or a parent or subsidiary of the successor corporation and (B) the portion of such Award subject to performance-based vesting shall be subject to the terms and conditions of the applicable Award Agreement and, in the absence of applicable terms and conditions, the Administrator's discretion. In the event an Award continues in effect or is assumed or an equivalent Award substituted, and a Holder incurs a Termination of Service without "cause" (as such term is defined in the sole discretion of the Administrator, or as set forth in the Award Agreement relating to such Award) upon or within twelve (12) months following the Change in Control, then such Holder shall be fully vested in such continued, assumed or substituted Award.

(e) In the event that the successor corporation in a Change in Control refuses to assume or substitute for an Award, the Administrator may cause (i) any or all of such Award (or portion thereof) to terminate in exchange for cash, rights or other property pursuant to Section 12.2(b)(i) or (ii) any or all of such Award (or portion thereof) to become fully exercisable immediately prior to the consummation of such transaction and all forfeiture restrictions on any or all of such Award to lapse. If any such Award is exercisable in lieu of assumption or substitution in the event of a Change in Control, the Administrator shall notify the Holder that such Award shall be fully exercisable for a period of fifteen (15) days from the date of such notice, contingent upon the occurrence of the Change in Control, and such Award shall terminate upon the expiration of such period.

(f) For the purposes of this Section 12.2, an Award shall be considered assumed if, following the Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) received in the Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change in Control was not solely common stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Award, for each Share subject to an Award, to be solely common stock of the successor corporation or its parent equal in fair market value to the per-share consideration received by holders of Common Stock in the Change in Control.

(g) The Administrator, in its sole discretion, may include such further provisions and limitations in any Award, agreement or certificate, as it may deem equitable and in the best interests of the Company that are not inconsistent with the provisions of the Plan.

(h) Unless otherwise determined by the Administrator, no adjustment or action described in this Section 12.2 or in any other provision of the Plan shall be authorized to the extent it would (i) cause the Plan to violate Section 422(b)(1) of the Code, (ii) result in short-swing profits liability under Section 16 of the Exchange Act or violate the exemptive conditions of Rule 16b-3 of the Exchange Act, or (iii) cause an Award to fail to be exempt from or comply with Section 409A.

26

(i) The existence of the Plan, any Program, any Award Agreement and/or the Awards granted hereunder shall not affect or restrict in any way the right or power of the Company or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants or rights to purchase stock or of bonds, debentures, preferred or prior preference stocks whose rights are superior to or affect the Common Stock or the rights thereof or which are convertible into or exchangeable for Common Stock, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(j) In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the Shares or the share price of the Common Stock including any Equity Restructuring, for reasons of administrative convenience, the Administrator, in its sole discretion, may refuse to permit the exercise of any Award during a period of up to thirty (30) days prior to the consummation of any such transaction.

12.3 <u>Approval of Plan by Stockholders</u>. The Plan shall be submitted for the approval of the Company's stockholders within twelve (12) months after the date of the Board's initial adoption of the Plan. Awards may be granted or awarded prior to such stockholder approval; <u>provided</u> that such Awards shall not be exercisable, shall not vest and the restrictions thereon shall not lapse and no Shares shall be issued pursuant thereto prior to the time when the Plan is approved by the Company's stockholders; and <u>provided</u>, <u>further</u>, that if such approval has not been obtained at the end of said twelve (12) month period, all Awards previously granted or awarded under the Plan shall thereupon be canceled and become null and void.

12.4 <u>No Stockholders Rights</u>. Except as otherwise provided herein or in an applicable Program or Award Agreement, a Holder shall have none of the rights of a stockholder with respect to Shares covered by any Award until the Holder becomes the record owner of such Shares.

12.5 <u>Paperless Administration</u>. In the event that the Company establishes, for itself or using the services of a third party, an automated system for the documentation, granting or exercise of Awards, such as a system using an internet website or interactive voice response, then the paperless documentation, granting or exercise of Awards by a Holder may be permitted through the use of such an automated system.

12.6 <u>Effect of Plan upon Other Compensation Plans</u>. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for the Company or any Affiliate. Nothing in the Plan shall be construed to limit the right of the Company or any Affiliate: (a) to establish any other forms of incentives or compensation for Employees, Directors or Consultants of the Company or any Affiliate, or (b) to grant or assume options or other rights or awards otherwise than under the Plan in connection with any proper corporate purpose including without limitation, the grant or assumption of options in connection with the acquisition by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, partnership, limited liability company, firm or association.

27

12.7 <u>Compliance with Laws</u>. The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of Shares and the payment of money under the Plan or under Awards granted or awarded hereunder are subject to compliance with all Applicable Law (including but not limited to state, federal and foreign securities law and margin requirements), and to such approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all Applicable Law. The Administrator, in its sole discretion, may take whatever actions it deems necessary or appropriate to effect compliance with Applicable Law, including, without limitation, placing legends on share certificates and issuing stop-transfer notices to agents and registrars. Notwithstanding anything to the contrary herein, the Administrator may not take any actions hereunder, and no Awards shall be granted, that would violate Applicable Law. To the extent permitted by Applicable Law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to Applicable Law.

12.8 <u>Titles and Headings, References to Sections of the Code or Exchange Act</u>. The titles and headings of the Sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. References to sections of the Code or the Exchange Act shall include any amendment or successor thereto.

12.9 <u>Governing Law</u>. The Plan and any Programs and Award Agreements hereunder shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of laws thereof or of any other jurisdiction.

12.10 <u>Section 409A</u>. To the extent that the Administrator determines that any Award granted under the Plan is subject to Section 409A, the Plan, the Program pursuant to which such Award is granted and the Award Agreement evidencing such Award shall incorporate the terms and conditions required by Section 409A. In that regard, to the extent any Award under the Plan or any other compensatory plan or arrangement of the Company or any of its Affiliates is subject to Section 409A, and such Award or other amount is payable on account of a Holder's Termination of Service (or any similarly defined term), then (a) such Award or amount shall only be paid to the extent such Termination of Service qualifies as a "separation from service" as defined in Section 409A, and (b) if such Award or amount is payable to a "specified employee" as defined in Section 409A then to the extent required in order to avoid a prohibited distribution under Section 409A, such Award or other compensatory payment shall not be payable prior to the earlier of (i) the expiration of the six-month period measured from the date of the Holder's Termination of Service, or (ii) the date of the Holder's death. To the extent applicable, the Plan, the Program and any Award Agreements shall be interpreted in accordance with Section 409A. Notwithstanding any provision of the Plan to the contrary, in the event that following the Effective Date the Administrator determines that any Award may be subject to Section 409A, the Administrator may (but is not obligated to), without a Holder's consent, adopt such amendments to the Plan and the

28

applicable Program and Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to (A) exempt the Award from Section 409A and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (B) comply with the requirements of Section 409A and thereby avoid the application of any penalty taxes under Section 409A. The Company makes no representations or warranties as to the tax treatment of any Award under Section 409A or otherwise. The Company shall have no obligation under this Section 12.10 or otherwise to take any action (whether or not described herein) to avoid the imposition of taxes, penalties or interest under Section 409A with respect to any Award and shall have no liability to any Holder or any other person if any Award, compensation or other benefits under the Plan are determined to constitute non-compliant, "nonqualified deferred compensation" subject to the imposition of taxes, penalties and/or interest under Section 409A.

12.11 <u>Unfunded Status of Awards</u>. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Holder pursuant to an Award, nothing contained in the Plan or any Program or Award Agreement shall give the Holder any rights that are greater than those of a general creditor of the Company or any Affiliate.

12.12 <u>Indemnification</u>. To the extent permitted under Applicable Law and the Organizational Documents, each member of the Administrator (and each delegate thereof pursuant to Section 11.6) shall be indemnified and held harmless by the Company from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action or failure to act pursuant to the Plan or any Award Agreement and against and from any and all amounts paid by him or her, with the Board's approval, in satisfaction of judgment in such action, suit, or proceeding against him or her; <u>provided</u> he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf and, once the Company gives notice of its intent to assume such defense, the Company shall have sole control over such defense with counsel of the Company's choosing. The foregoing right of indemnification shall not be available to the extent that a court of competent jurisdiction in a final judgment or other final adjudication, in either case not subject to further appeal, determines that the acts or omissions of the person seeking indemnity giving rise to the indemnification claim resulted from such person's bad faith, fraud or willful criminal act or omission. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Organizational Documents, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

12.13 <u>Relationship to Other Benefits</u>. No payment pursuant to the Plan shall be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

12.14 <u>Expenses</u>. The expenses of administering the Plan shall be borne by the Company and its Affiliates.

\* \* \* \* \*

29

I hereby certify that the foregoing Plan was duly adopted by the Board of Directors of GoHealth, Inc. on _____, 2020.

\* \* \* \* \*

I hereby certify that the foregoing Plan was approved by the stockholders of GoHealth, Inc. on _____, 2020.

Executed on this ____ day of _____, 2020.

_____

Corporate Secretary

30

Exhibit 10.7

> **GOHEALTH, INC.**
> **2020 EMPLOYEE STOCK PURCHASE PLAN**

## ARTICLE I.
## PURPOSE

The purpose of this Plan is to assist Eligible Employees of the Company and its Designated Subsidiaries in acquiring a stock ownership interest in the Company.

The Plan consists of two components: (i) the Section 423 Component and (ii) the Non-Section 423 Component. The Section 423 Component is intended to qualify as an "employee stock purchase plan" under Section 423 of the Code and shall be administered, interpreted and construed in a manner consistent with the requirements of Section 423 of the Code. The Non-Section 423 Component authorizes the grant of rights which need not qualify as rights granted pursuant to an "employee stock purchase plan" under Section 423 of the Code. Rights granted under the Non-Section 423 Component shall be granted pursuant to separate Offerings containing such sub-plans, appendices, rules or procedures as may be adopted by the Administrator and designed to achieve tax, securities laws or other objectives for Eligible Employees and Designated Subsidiaries but shall not be intended to qualify as an "employee stock purchase plan" under Section 423 of the Code. Except as otherwise determined by the Administrator or provided herein, the Non-Section 423 Component will operate and be administered in the same manner as the Section 423 Component. Offerings intended to be made under the Non-Section 423 Component will be designated as such by the Administrator at or prior to the time of such Offering.

For purposes of this Plan, the Administrator may designate separate Offerings under the Plan in which Eligible Employees will participate. The terms of these Offerings need not be identical, even if the dates of the applicable Offering Period(s) in each such Offering are identical, provided that the terms of participation are the same within each separate Offering under the Section 423 Component (as determined under Section 423 of the Code). Solely by way of example and without limiting the foregoing, the Company could, but shall not be required to, provide for simultaneous Offerings under the Section 423 Component and the Non-Section 423 Component of the Plan.

## ARTICLE II.
## DEFINITIONS AND CONSTRUCTION

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise.

2.1 "***Administrator***" means the entity that conducts the general administration of the Plan as provided in Article XI.

2.2 "***Agent***" means the brokerage firm, bank or other financial institution, entity or person(s), if any, engaged, retained, appointed or authorized to act as the agent of the Company or an Employee with regard to the Plan.

2.3 "***Applicable Law***" means the requirements relating to the administration of equity incentive plans under U.S. federal and state securities, tax and other applicable laws, rules and regulations, the applicable rules of any stock exchange or quotation system on which Shares are listed or quoted and the applicable laws and rules of any foreign country or other jurisdiction where rights under this Plan are granted.

2.4 "***Board***" means the Board of Directors of the Company.

2.5 "*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

2.6 "*Common Stock*" means the Class A common stock of the Company and such other securities of the Company that may be substituted therefore.

2.7 "*Company*" means GoHealth, Inc., a Delaware corporation, or any successor.

2.8 "*Compensation*" of an Eligible Employee means, unless otherwise determined by the Administrator, the gross base compensation received by such Eligible Employee as compensation for services to the Company or any Designated Subsidiary.

2.9 "*Designated Subsidiary*" means any Subsidiary designated by the Administrator in accordance with Section 11.2(b), such designation to specify whether such participation is in the Section 423 Component or Non-Section 423 Component. A Designated Subsidiary may participate in either the Section 423 Component or Non-Section 423 Component, but not both; provided that a Subsidiary that, for U.S. tax purposes, is disregarded from the Company or any Subsidiary that participates in the Section 423 Component shall automatically constitute a Designated Subsidiary that participates in the Section 423 Component.

2.10 "*Effectiv*e *Date*" means the date the Plan is adopted by the Board.

2.11 "*Eligible Employee*" means:

(a) an Employee who does not, immediately after any rights under this Plan are granted, own (directly or through attribution) stock possessing 5% or more of the total combined voting power or value of all classes of Shares and other securities of the Company, a Parent or a Subsidiary (as determined under Section 423(b)(3) of the Code). For purposes of the foregoing, the rules of Section 424(d) of the Code with regard to the attribution of stock ownership shall apply in determining the stock ownership of an individual, and stock that an Employee may purchase under outstanding options shall be treated as stock owned by the Employee.

(b) Notwithstanding the foregoing, the Administrator may provide in an Offering Document that an Employee shall not be eligible to participate in an Offering Period under the Section 423 Component if: (i) such Employee is a highly compensated employee within the meaning of Section 423(b)(4)(D) of the Code; (ii) such Employee has not met a service requirement designated by the Administrator pursuant to Section 423(b)(4) (A) of the Code (which service requirement may not exceed two years); (iii) such Employee's customary employment is for twenty hours per week or less; (iv) such Employee's customary employment is for less than five months in any calendar year; and/or (v) such Employee is a citizen or resident of a foreign jurisdiction and the grant of a right to purchase Shares under the Plan to such Employee would be prohibited under the laws of such foreign jurisdiction or the grant of a right to purchase Shares under the Plan to such Employee in compliance with the laws of such foreign jurisdiction would cause the Plan to violate the requirements of Section 423 of the Code, as determined by the Administrator in its sole discretion; provided, further, that any exclusion in clauses (i), (ii), (iii), (iv) or (v) shall be applied in an identical manner under each Offering Period to all Employees, in accordance with Treasury Regulation Section 1.423-2(e).

(c) Further notwithstanding the foregoing, with respect to the Non-Section 423 Component, the first sentence in this definition shall apply in determining who is an "Eligible Employee," except (i) the Administrator may limit eligibility further within the Company or a Designated Subsidiary so as to only designate some Employees of the Company or a Designated Subsidiary as Eligible Employees, and (ii) to the extent the restrictions in the first sentence in this definition are not consistent with applicable local laws, the applicable local laws shall control.

2.12 "**Employee**" means any individual who renders services to the Company or any Designated Subsidiary in the status of an employee, and, with respect to the Section 423 Component, a person who is an employee within the meaning of Section 3401(c) of the Code. For purposes of an individual's participation in, or other rights under the Plan, all determinations by the Company shall be final, binding and conclusive, notwithstanding that any court of law or governmental agency subsequently makes a contrary determination. For purposes of the Plan, the employment relationship shall be treated as continuing intact while the individual is on sick leave or other leave of absence approved by the Company or Designated Subsidiary and meeting the requirements of Treasury Regulation Section 1.421-1(h)(2). Where the period of leave exceeds three (3) months and the individual's right to reemployment is not guaranteed either by statute or by contract, the employment relationship shall be deemed to have terminated on the first day immediately following such three (3)-month period.

2.13 "**Enrollment Date**" means the first Trading Day of each Offering Period.

2.14 "**Fair Market Value**" means, as of any given date, the value of a Share determined as follows:

(a) If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange, the Nasdaq Capital Market, the Nasdaq Global Market and the Nasdaq Global Select Market), (ii) listed on any national market system or (iii) quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a Share as quoted on such exchange or system for such date or, if there is no closing sales price for a Share on the date in question, the closing sales price for a Share on the last preceding date for which such quotation exists, as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

(b) If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a Share on such date, the high bid and low asked prices for a Share on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c) If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in its discretion.

2.15 "**Non-Section 423 Component**" means those Offerings under the Plan, together with the sub-plans, appendices, rules or procedures, if any, adopted by the Administrator as a part of this Plan, in each case, pursuant to which rights to purchase Shares during an Offering Period may be granted to Eligible Employees that need not satisfy the requirements for rights to purchase Shares granted pursuant to an "employee stock purchase plan" that are set forth under Section 423 of the Code.

2.16 "**Offering**" means an offer under the Plan of a right to purchase Shares that may be exercised during an Offering Period as further described in Article IV hereof. Unless otherwise specified by the Administrator, each Offering to the Eligible Employees of the Company or a Designated Subsidiary shall be deemed a separate Offering, even if the dates and other terms of the applicable Offering Periods of each such Offering are identical, and the provisions of the Plan will separately apply to each Offering. To the extent permitted by Treas. Reg. § 1.423-2(a)(1), the terms of each separate Offering under the Section 423 Component need not be identical, provided that the terms of the Section 423 Component and an Offering thereunder together satisfy Treas. Reg. § 1.423-2(a)(2) and (a)(3).

3

2.17 "*Offering Document*" has the meaning given to such term in Section 4.1.

2.18 "*Offering Period*" has the meaning given to such term in Section 4.1.

2.19 "*Parent*" means any corporation, other than the Company, in an unbroken chain of corporations ending with the Company if, at the time of the determination, each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

2.20 "*Participant*" means any Eligible Employee who has executed a subscription agreement and been granted rights to purchase Shares pursuant to the Plan.

2.21 "*Payday*" means the regular and recurring established day for payment of Compensation to an Employee of the Company or any Designated Subsidiary.

2.22 "*Plan*" means this 2020 Employee Stock Purchase Plan, including both the Section 423 Component and Non-Section 423 Component and any other sub-plans or appendices hereto, as amended from time to time.

2.23 "*Purchase Date*" means the last Trading Day of each Offering Period or such other date as determined by the Administrator and set forth in the Offering Document.

2.24 "*Purchase Price*" means the purchase price designated by the Administrator in the applicable Offering Document (which purchase price, for purposes of the Section 423 Component, shall not be less than 85% of the Fair Market Value of a Share on the Enrollment Date or on the Purchase Date, whichever is lower); provided, however, that, in the event no purchase price is designated by the Administrator in the applicable Offering Document, the purchase price for the Offering Periods covered by such Offering Document shall be 85% of the Fair Market Value of a Share on the Enrollment Date or on the Purchase Date, whichever is lower; provided, further, that the Purchase Price may be adjusted by the Administrator pursuant to Article VIII and shall not be less than the par value of a Share.

2.25 "*Section 423 Component*" means those Offerings under the Plan, together with the sub-plans, appendices, rules or procedures, if any, adopted by the Administrator as a part of this Plan, in each case, pursuant to which rights to purchase Shares during an Offering Period may be granted to Eligible Employees that are intended to satisfy the requirements for rights to purchase Shares granted pursuant to an "employee stock purchase plan" that are set forth under Section 423 of the Code.

2.26 "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

2.27 "*Share*" means a share of Common Stock.

2.28 "*Subsidiary*" means any corporation, other than the Company, in an unbroken chain of corporations beginning with the Company if, at the time of the determination, each of the corporations other than the last corporation in an unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain; provided, however, that a limited liability company or partnership may be treated as a Subsidiary to the extent either (a) such entity is treated as a disregarded entity under Treasury Regulation Section 301.7701-3(a) by reason of the Company or any other Subsidiary that is a corporation being the sole owner of such entity, or (b) such entity

4

elects to be classified as a corporation under Treasury Regulation Section 301.7701-3(a) and such entity would otherwise qualify as a Subsidiary. In addition, with respect to the Non-Section 423 Component, Subsidiary shall include any corporate or non-corporate entity in which the Company has a direct or indirect equity interest or significant business relationship.

2.29 "***Trading Day***" means a day on which national stock exchanges in the United States are open for trading.

2.30 "***Treas. Reg.***" means U.S. Department of the Treasury regulations.

## ARTICLE III.
## SHARES SUBJECT TO THE PLAN

3.1 <u>Number of Shares</u>. Subject to Article VIII, the aggregate number of Shares that may be issued pursuant to rights granted under the Plan shall be 808,170 Shares. In addition to the foregoing, subject to Article VIII, on the first day of each calendar year beginning on January 1, 2021 and ending on and including January 1, 2030, the number of Shares available for issuance under the Plan shall be increased by that number of Shares equal to the lesser of (a) 1% of the Shares outstanding on the final day of the immediately preceding calendar year and (b) such smaller number of Shares as determined by the Board. If any right granted under the Plan shall for any reason terminate without having been exercised, the Shares not purchased under such right shall again become available for issuance under the Plan. Notwithstanding anything in this Section 3.1 to the contrary, the number of Shares that may be issued or transferred pursuant to the rights granted under the Section 423 Component of the Plan shall not exceed an aggregate of 4,849,019 Shares, subject to Article VIII.

3.2 <u>Shares Distributed</u>. Any Shares distributed pursuant to the Plan may consist, in whole or in part, of authorized and unissued Shares, treasury shares or Shares purchased on the open market.

## ARTICLE IV.
## OFFERING PERIODS; OFFERING DOCUMENTS; PURCHASE DATES

4.1 <u>Offering Periods</u>. The Administrator may from time to time grant or provide for the grant of rights to purchase Shares under the Plan to Eligible Employees during one or more periods (each, an "***Offering Period***") selected by the Administrator. The terms and conditions applicable to each Offering Period shall be set forth in an "***Offering Document***" adopted by the Administrator, which Offering Document shall be in such form and shall contain such terms and conditions as the Administrator shall deem appropriate and shall be incorporated by reference into and made part of the Plan and shall be attached hereto as part of the Plan. The provisions of separate Offerings or Offering Periods under the Plan need not be identical.

4.2 <u>Offering Documents</u>. Each Offering Document with respect to an Offering Period shall specify (through incorporation of the provisions of this Plan by reference or otherwise):

(a) the length of the Offering Period, which period shall not exceed twenty-seven months;

(b) the maximum number of Shares that may be purchased by any Eligible Employee during such Offering Period, which, in the absence of a contrary designation by the Administrator, shall be 10,000 Shares; and

5

(8) Such other provisions as the Administrator determines are appropriate, subject to the Plan.

## ARTICLE V.
## ELIGIBILITY AND PARTICIPATION

5.1 <u>Eligibility</u>. Any Eligible Employee who shall be employed by the Company or a Designated Subsidiary on a given Enrollment Date for an Offering Period shall be eligible to participate in the Plan during such Offering Period, subject to the requirements of this Article V and, for the Section 423 Component, the limitations imposed by Section 423(b) of the Code.

5.2 <u>Enrollment in Plan</u>.

(a) Except as otherwise set forth in an Offering Document or determined by the Administrator, an Eligible Employee may become a Participant in the Plan for an Offering Period by delivering a subscription agreement to the Company by such time prior to the Enrollment Date for such Offering Period (or such other date specified in the Offering Document) designated by the Administrator and in such form as the Company provides.

(b) Each subscription agreement shall designate a whole percentage or fixed dollar amount of such Eligible Employee's Compensation to be withheld by the Company or the Designated Subsidiary employing such Eligible Employee on each Payday during the Offering Period as payroll deductions under the Plan. The percentage of Compensation designated by an Eligible Employee may not be less than 1% and may not be more than the maximum percentage specified by the Administrator in the applicable Offering Document (which percentage shall be 40% in the absence of any such designation) as payroll deductions. The payroll deductions made for each Participant shall be credited to an account for such Participant under the Plan and shall be deposited with the general funds of the Company.

(c) A Participant may increase or decrease the percentage of Compensation designated in his or her subscription agreement, subject to the limits of this Section 5.2, or may suspend his or her payroll deductions, at any time during an Offering Period; <u>provided</u>, <u>however</u>, that the Administrator may limit the number of changes a Participant may make to his or her payroll deduction elections during each Offering Period in the applicable Offering Document (and in the absence of any specific designation by the Administrator, a Participant shall be allowed to decrease (but not increase) his or her payroll deduction elections one time during each Offering Period). Any such change or suspension of payroll deductions shall be effective with the first full payroll period following five business days after the Company's receipt of the new subscription agreement (or such shorter or longer period as may be specified by the Administrator in the applicable Offering Document). In the event a Participant suspends his or her payroll deductions, such Participant's cumulative payroll deductions prior to the suspension shall remain in his or her account and shall be applied to the purchase of Shares on the next occurring Purchase Date and shall not be paid to such Participant unless he or she withdraws from participation in the Plan pursuant to Article VII.

(d) Except as otherwise set forth in an Offering Document or determined by the Administrator, a Participant may participate in the Plan only by means of payroll deduction and may not make contributions by lump sum payment for any Offering Period.

5.3 <u>Payroll Deductions</u>. Except as otherwise provided in the applicable Offering Document, payroll deductions for a Participant shall commence on the first Payday following the Enrollment Date and shall end on the last Payday in the Offering Period to which the Participant's authorization is applicable, unless sooner terminated by the Participant as provided in Article VII or suspended by the Participant or the Administrator as provided in Section 5.2 and Section 5.6, respectively. Notwithstanding any other

6

provisions of the Plan to the contrary, in non-U.S. jurisdictions where participation in the Plan through payroll deductions is prohibited, the Administrator may provide that an Eligible Employee may elect to participate through contributions to the Participant's account under the Plan in a form acceptable to the Administrator in lieu of or in addition to payroll deductions; provided, however, that, for any Offering under the Section 423 Component, the Administrator shall take into consideration any limitations under Section 423 of the Code when applying an alternative method of contribution.

5.4 <u>Effect of Enrollment</u>. A Participant's completion of a subscription agreement will enroll such Participant in the Plan for each subsequent Offering Period on the terms contained therein until the Participant either submits a new subscription agreement, withdraws from participation under the Plan as provided in Article VII or otherwise becomes ineligible to participate in the Plan.

5.5 <u>Limitation on Purchase of Shares</u>. An Eligible Employee may be granted rights under the Section 423 Component only if such rights, together with any other rights granted to such Eligible Employee under "employee stock purchase plans" of the Company, any Parent or any Subsidiary, as specified by Section 423(b)(8) of the Code, do not permit such employee's rights to purchase stock of the Company or any Parent or Subsidiary to accrue at a rate that exceeds $25,000 of the fair market value of such stock (determined as of the first day of the Offering Period during which such rights are granted) for each calendar year in which such rights are outstanding at any time. This limitation shall be applied in accordance with Section 423(b)(8) of the Code.

5.6 <u>Suspension of Payroll Deductions</u>. Notwithstanding the foregoing, to the extent necessary to comply with Section 423(b)(8) of the Code and Section 5.5 (with respect to the Section 423 Component) or the other limitations set forth in this Plan, a Participant's payroll deductions may be suspended by the Administrator at any time during an Offering Period. The balance of the amount credited to the account of each Participant that has not been applied to the purchase of Shares by reason of Section 423(b)(8) of the Code, Section 5.5 or the other limitations set forth in this Plan shall be paid to such Participant in one lump sum in cash as soon as reasonably practicable after the Purchase Date.

5.7 <u>Foreign Employees</u>. In order to facilitate participation in the Plan, the Administrator may provide for such special terms applicable to Participants who are citizens or residents of a foreign jurisdiction, or who are employed by a Designated Subsidiary outside of the United States, as the Administrator may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. Except as permitted by Section 423 of the Code, with respect to the Section 423 Component, such special terms may not be more favorable than the terms of rights granted under the Section 423 Component to Eligible Employees who are residents of the United States. Such special terms may be set forth in an addendum to the Plan in the form of an appendix or sub-plan (which appendix or sub-plan may be designed to govern Offerings under the Section 423 Component or the Non-Section 423 Component, as determined by the Administrator). To the extent that the terms and conditions set forth in an appendix or sub-plan conflict with any provisions of the Plan, the provisions of the appendix or sub-plan shall govern. The adoption of any such appendix or sub-plan shall be pursuant to Section 11.2(f). Without limiting the foregoing, the Administrator is specifically authorized to adopt rules and procedures, with respect to Participants who are foreign nationals or employed in non-U.S. jurisdictions, regarding the exclusion of particular Subsidiaries from participation in the Plan, eligibility to participate, the definition of Compensation, handling of payroll deductions or other contributions by Participants, payment of interest, conversion of local currency, data privacy security, payroll tax, withholding procedures, establishment of bank or trust accounts to hold payroll deductions or contributions.

5.8 Leaves of Absence. During leaves of absence approved by the Company and meeting the requirements of Treasury Regulation Section 1.421-1(h)(2) under the Code, a Participant may continue participation in the Plan by making cash payments to the Company on his or her normal Payday equal to the Participant's authorized payroll deduction.

## ARTICLE VI.
## GRANT AND EXERCISE OF RIGHTS

6.1 Grant of Rights. On the Enrollment Date of each Offering Period, each Eligible Employee participating in such Offering Period shall be granted a right to purchase the maximum number of Shares specified under Section 4.2, subject to the limits in Section 5.5, and shall have the right to buy, on each Purchase Date during such Offering Period (at the applicable Purchase Price), such number of whole Shares as is determined by dividing (a) such Participant's payroll deductions accumulated prior to such Purchase Date and retained in the Participant's account as of the Purchase Date, by (b) the applicable Purchase Price (rounded down to the nearest Share). The right shall expire on the last day of the Offering Period.

6.2 Exercise of Rights. On each Purchase Date, each Participant's accumulated payroll deductions and any other additional payments specifically provided for in the applicable Offering Document will be applied to the purchase of whole Shares, up to the maximum number of Shares permitted pursuant to the terms of the Plan and the applicable Offering Document, at the Purchase Price. No fractional Shares shall be issued upon the exercise of rights granted under the Plan, unless the Offering Document specifically provides otherwise. Any cash in lieu of fractional Shares remaining after the purchase of whole Shares upon exercise of a purchase right will be credited to a Participant's account and carried forward and applied toward the purchase of whole Shares for the next following Offering Period. Shares issued pursuant to the Plan may be evidenced in such manner as the Administrator may determine and may be issued in certificated form or issued pursuant to book-entry procedures.

6.3 Pro Rata Allocation of Shares. If the Administrator determines that, on a given Purchase Date, the number of Shares with respect to which rights are to be exercised may exceed (a) the number of Shares that were available for issuance under the Plan on the Enrollment Date of the applicable Offering Period, or (b) the number of Shares available for issuance under the Plan on such Purchase Date, the Administrator may in its sole discretion provide that the Company shall make a pro rata allocation of the Shares available for purchase on such Enrollment Date or Purchase Date, as applicable, in as uniform a manner as shall be practicable and as it shall determine in its sole discretion to be equitable among all Participants for whom rights to purchase Shares are to be exercised pursuant to this Article VI on such Purchase Date, and shall either (i) continue all Offering Periods then in effect, or (ii) terminate any or all Offering Periods then in effect pursuant to Article IX. The Company may make pro rata allocation of the Shares available on the Enrollment Date of any applicable Offering Period pursuant to the preceding sentence, notwithstanding any authorization of additional Shares for issuance under the Plan by the Company's stockholders subsequent to such Enrollment Date. The balance of the amount credited to the account of each Participant that has not been applied to the purchase of Shares shall be paid to such Participant in one lump sum in cash as soon as reasonably practicable after the Purchase Date or such earlier date as determined by the Administrator.

6.4 Withholding. At the time a Participant's rights under the Plan are exercised, in whole or in part, or at the time some or all of the Shares issued under the Plan is disposed of, the Participant must make adequate provision for the Company's federal, state, or other tax withholding obligations, if any, that arise upon the exercise of the right or the disposition of the Shares. At any time, the Company may, but shall not be obligated to, withhold from the Participant's compensation or Shares received pursuant to the Plan the amount necessary for the Company to meet applicable withholding obligations, including any withholding required to make available to the Company any tax deductions or benefits attributable to sale or early disposition of Shares by the Participant.

6.5 Conditions to Issuance of Shares. The Company shall not be required to issue or deliver any certificate or certificates for, or make any book entries evidencing, Shares purchased upon the exercise of rights under the Plan prior to fulfillment of all of the following conditions: (a) the admission of such Shares to listing on all stock exchanges, if any, on which the Shares are then listed; (b) the completion of any registration or other qualification of such Shares under any state or federal law or under the rulings or regulations of the Securities and Exchange Commission or any other governmental regulatory body, that the Administrator shall, in its absolute discretion, deem necessary or advisable; (c) the obtaining of any approval or other clearance from any state or federal governmental agency that the Administrator shall, in its absolute discretion, determine to be necessary or advisable; (d) the payment to the Company of all amounts that it is required to withhold under federal, state or local law upon exercise of the rights, if any; and (e) the lapse of such reasonable period of time following the exercise of the rights as the Administrator may from time to time establish for reasons of administrative convenience.

## ARTICLE VII.
## WITHDRAWAL; CESSATION OF ELIGIBILITY

7.1 Withdrawal. A Participant may withdraw all but not less than all of the payroll deductions credited to his or her account and not yet used to exercise his or her rights under the Plan at any time by giving written notice to the Company in a form acceptable to the Company no later than one week prior to the end of the Offering Period. All of the Participant's payroll deductions credited to his or her account during an Offering Period shall be paid to such Participant as soon as reasonably practicable after receipt of notice of withdrawal and such Participant's rights for the Offering Period shall be automatically terminated, and no further payroll deductions for the purchase of Shares shall be made for such Offering Period. If a Participant withdraws from an Offering Period, payroll deductions shall not resume at the beginning of the next Offering Period unless the Participant timely delivers to the Company a new subscription agreement.

7.2 Future Participation. A Participant's withdrawal from an Offering Period shall not have any effect upon his or her eligibility to participate in any similar plan that may hereafter be adopted by the Company or a Designated Subsidiary or in subsequent Offering Periods that commence after the termination of the Offering Period from which the Participant withdraws.

7.3 Cessation of Eligibility. Upon a Participant's ceasing to be an Eligible Employee for any reason, he or she shall be deemed to have elected to withdraw from the Plan pursuant to this Article VII and the payroll deductions credited to such Participant's account during the Offering Period shall be paid to such Participant or, in the case of his or her death, to the person or persons entitled thereto under Section 12.4, as soon as reasonably practicable, and such Participant's rights for the Offering Period shall be automatically terminated. If a Participant transfers employment from the Company or any Designated Subsidiary participating in the Section 423 Component to any Designated Subsidiary participating in the Non-Section 423 Component, such transfer shall not be treated as a termination of employment, but the Participant shall immediately cease to participate in the Section 423 Component; however, any contributions made for the Offering Period in which such transfer occurs shall be transferred to the Non-Section 423 Component, and such Participant shall immediately join the then-current Offering under the Non-Section 423 Component upon the same terms and conditions in effect for the Participant's participation in the Section 423 Component, except for such modifications otherwise applicable for Participants in such Offering. A Participant who transfers employment from any Designated Subsidiary participating in the Non-Section 423 Component to the Company or any Designated Subsidiary participating in the Section 423 Component shall not be treated as terminating the Participant's employment and shall remain a Participant in the Non-Section 423 Component until the earlier of (i) the end of the current Offering Period under the Non-Section 423 Component or (ii) the Enrollment Date of the first Offering Period in which the Participant is eligible to participate following such transfer. Notwithstanding the foregoing, the Administrator may establish different rules to govern transfers of employment between entities participating in the Section 423 Component and the Non-Section 423 Component, consistent with the applicable requirements of Section 423 of the Code.

9

**ARTICLE VIII.**
**ADJUSTMENTS UPON CHANGES IN SHARES**

8.1 Changes in Capitalization. Subject to Section 8.3, in the event that the Administrator determines that any dividend or other distribution (whether in the form of cash, Shares, other securities, or other property), change in control, reorganization, merger, amalgamation, consolidation, combination, repurchase, redemption, recapitalization, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of the Company, or sale or exchange of Shares or other securities of the Company, issuance of warrants or other rights to purchase Shares or other securities of the Company, or other similar corporate transaction or event, as determined by the Administrator, affects the Shares such that an adjustment is determined by the Administrator to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available under the Plan or with respect to any outstanding purchase rights under the Plan, the Administrator shall make equitable adjustments, if any, to reflect such change with respect to (a) the aggregate number and type of Shares (or other securities or property) that may be issued under the Plan (including, but not limited to, adjustments of the limitations in Section 3.1 and the limitations established in each Offering Document pursuant to Section 4.2 on the maximum number of Shares that may be purchased); (b) the class(es) and number of Shares and price per Share subject to outstanding rights; and (c) the Purchase Price with respect to any outstanding rights.

8.2 Other Adjustments. Subject to Section 8.3, in the event of any transaction or event described in Section 8.1 or any unusual or nonrecurring transactions or events affecting the Company, any affiliate of the Company, or the financial statements of the Company or any affiliate, or of changes in Applicable Law or accounting principles, the Administrator, in its discretion, and on such terms and conditions as it deems appropriate, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent the dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any right under the Plan, to facilitate such transactions or events or to give effect to such changes in laws, regulations or principles:

(a) To provide for either (i) termination of any outstanding right in exchange for an amount of cash, if any, equal to the amount that would have been obtained upon the exercise of such right had such right been currently exercisable or (ii) the replacement of such outstanding right with other rights or property selected by the Administrator in its sole discretion;

(b) To provide that the outstanding rights under the Plan shall be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar rights covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and prices;

(c) To make adjustments in the number and type of Shares (or other securities or property) subject to outstanding rights under the Plan and/or in the terms and conditions of outstanding rights and rights that may be granted in the future;

(d) To provide that Participants' accumulated payroll deductions may be used to purchase Shares prior to the next occurring Purchase Date on such date as the Administrator determines in its sole discretion and the Participants' rights under the ongoing Offering Period(s) shall be terminated; and

10

(b) To provide that all outstanding rights shall terminate without being exercised.

8.3 <u>No Adjustment Under Certain Circumstances</u>. Unless determined otherwise by the Administrator, no adjustment or action described in this Article VIII or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause the Section 423 Component of the Plan to fail to satisfy the requirements of Section 423 of the Code.

8.4 <u>No Other Rights</u>. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger, or consolidation of the Company or any other corporation. Except as expressly provided in the Plan or pursuant to action of the Administrator under the Plan, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to outstanding rights under the Plan or the Purchase Price with respect to any outstanding rights.

**ARTICLE IX.**
**AMENDMENT, MODIFICATION AND TERMINATION**

9.1 <u>Amendment, Modification and Termination</u>. The Administrator may amend, suspend or terminate the Plan at any time and from time to time; <u>provided</u>, <u>however</u>, that approval of the Company's stockholders shall be required to amend the Plan to: (a) increase the aggregate number, or change the type, of shares that may be sold pursuant to rights under the Plan under Section 3.1 (other than an adjustment as provided by Article VIII), (b) change the corporations or classes of corporations whose employees may be granted rights under the Plan or (c) as otherwise required under Section 423 of the Code with respect to the Section 423 Component.

9.2 <u>Certain Changes to Plan</u>. Without stockholder consent and without regard to whether any Participant rights may be considered to have been adversely affected (and, with respect to the Section 423 Component of the Plan, after taking into account Section 423 of the Code), the Administrator shall be entitled to change the Offering Periods, limit the frequency and/or number of changes in the amount withheld from Compensation during an Offering Period, establish the exchange ratio applicable to amounts withheld in a currency other than U.S. dollars, permit payroll withholding in excess of the amount designated by a Participant in order to adjust for delays or mistakes in the Company's processing of withholding elections, establish reasonable waiting and adjustment periods and/or accounting and crediting procedures to ensure that amounts applied toward the purchase of Shares for each Participant properly correspond with amounts withheld from the Participant's Compensation, and establish such other limitations or procedures as the Administrator determines in its sole discretion to be advisable that are consistent with the Plan.

9.3 <u>Actions In the Event of Unfavorable Financial Accounting Consequences</u>. In the event the Administrator determines that the ongoing operation of the Plan may result in unfavorable financial accounting consequences, the Administrator may, in its discretion and, to the extent necessary or desirable, modify or amend the Plan to reduce or eliminate such accounting consequence including, but not limited to:

(a) altering the Purchase Price for any Offering Period including an Offering Period underway at the time of the change in Purchase Price;

(b) shortening any Offering Period so that the Offering Period ends on a new Purchase Date, including an Offering Period underway at the time of the Administrator action; and

11

(5) allocating Shares

Such modifications or amendments shall not require stockholder approval or the consent of any Participant.

9.4 <u>Payments Upon Termination of Plan</u>. Upon termination of the Plan, the balance in each Participant's Plan account shall be refunded as soon as practicable after such termination, without any interest thereon, or the Offering Period may be shortened so that the purchase of Shares occurs prior to the termination of the Plan.

## ARTICLE X.
## TERM OF PLAN

The Plan shall become effective on the Effective Date. The effectiveness of the Plan shall be subject to approval of the Plan by the Company's stockholders within twelve months following the date the Plan is first approved by the Board. No right may be granted under the Plan prior to such stockholder approval. No rights may be granted under the Plan during any period of suspension of the Plan or after termination of the Plan.

## ARTICLE XI.
## ADMINISTRATION

11.1 <u>Administrator</u>. Unless otherwise determined by the Board, the Administrator of the Plan shall be the Compensation Committee of the Board (or another committee or a subcommittee of the Board to which the Board delegates administration of the Plan). The Board may at any time vest in the Board any authority or duties for administration of the Plan. The Administrator may delegate administrative tasks under the Plan to the services of an Agent or Employees to assist in the administration of the Plan, including establishing and maintaining an individual securities account under the Plan for each Participant.

11.2 <u>Authority of Administrator</u>. The Administrator shall have the power, subject to, and within the limitations of, the express provisions of the Plan:

(a) To determine when and how rights to purchase Shares shall be granted and the provisions of each offering of such rights (which need not be identical).

(b) To designate from time to time which Subsidiaries of the Company shall be Designated Subsidiaries, which designation may be made without the approval of the stockholders of the Company.

(c) To impose a mandatory holding period pursuant to which Employees may not dispose of or transfer Shares purchased under the Plan for a period of time determined by the Administrator in its discretion.

(d) To construe and interpret the Plan and rights granted under it, and to establish, amend and revoke rules and regulations for its administration. The Administrator, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan, in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

(e) To amend, suspend or terminate the Plan as provided in Article IX.

12

(f) Generally, to exercise such powers and to perform such acts as the Administrator deems necessary or expedient to promote the best interests of the Company and its Subsidiaries and to carry out the intent that the Plan be treated as an "employee stock purchase plan" within the meaning of Section 423 of the Code for the Section 423 Component.

(g) The Administrator may adopt sub-plans applicable to particular Designated Subsidiaries or locations, which sub-plans may be designed to be outside the scope of Section 423 of the Code. The rules of such sub-plans may take precedence over other provisions of this Plan, with the exception of Section 3.1 hereof, but unless otherwise superseded by the terms of such sub-plan, the provisions of this Plan shall govern the operation of such sub-plan.

11.3 Decisions Binding. The Administrator's interpretation of the Plan, any rights granted pursuant to the Plan, any subscription agreement and all decisions and determinations by the Administrator with respect to the Plan are final, binding, and conclusive on all parties.

## ARTICLE XII.
## MISCELLANEOUS

12.1 Restriction upon Assignment. A right granted under the Plan shall not be transferable other than by will or the applicable laws of descent and distribution, and is exercisable during the Participant's lifetime only by the Participant. Except as provided in Section 12.4 hereof, a right under the Plan may not be exercised to any extent except by the Participant. The Company shall not recognize and shall be under no duty to recognize any assignment or alienation of the Participant's interest in the Plan, the Participant's rights under the Plan or any rights thereunder.

12.2 Rights as a Stockholder. With respect to Shares subject to a right granted under the Plan, a Participant shall not be deemed to be a stockholder of the Company, and the Participant shall not have any of the rights or privileges of a stockholder, until such Shares have been issued to the Participant or his or her nominee following exercise of the Participant's rights under the Plan. No adjustments shall be made for dividends (ordinary or extraordinary, whether in cash securities, or other property) or distribution or other rights for which the record date occurs prior to the date of such issuance, except as otherwise expressly provided herein or as determined by the Administrator.

12.3 Interest. No interest shall accrue on the payroll deductions or contributions of a Participant under the Plan.

12.4 Designation of Beneficiary.

(a) A Participant may, in the manner determined by the Administrator, file a written designation of a beneficiary who is to receive any Shares and/or cash, if any, from the Participant's account under the Plan in the event of such Participant's death subsequent to a Purchase Date on which the Participant's rights are exercised but prior to delivery to such Participant of such Shares and cash. In addition, a Participant may file a written designation of a beneficiary who is to receive any cash from the Participant's account under the Plan in the event of such Participant's death prior to exercise of the Participant's rights under the Plan. If the Participant is married and resides in a community property state, a designation of a person other than the Participant's spouse as his or her beneficiary shall not be effective without the prior written consent of the Participant's spouse.

(b) Such designation of beneficiary may be changed by the Participant at any time by written notice to the Company. In the event of the death of a Participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such Participant's death, the Company shall

13

deliver such Shares and/or cash to be executed or administrator of the estate of the Participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such Shares and/or cash to the spouse or to any one or more dependents or relatives of the Participant, or if no spouse, dependent or relative is known to the Company, then to such other person as the Company may designate.

12.5 <u>Notices</u>. All notices or other communications by a Participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

12.6 <u>Equal Rights and Privileges</u>. Subject to Section 5.7, all Eligible Employees will have equal rights and privileges under the Section 423 Component so that the Section 423 Component of this Plan qualifies as an "employee stock purchase plan" within the meaning of Section 423 of the Code. Subject to Section 5.7, any provision of the Section 423 Component that is inconsistent with Section 423 of the Code will, without further act or amendment by the Company, the Board or the Administrator, be reformed to comply with the equal rights and privileges requirement of Section 423 of the Code. Eligible Employees participating in the Non-Section 423 Component need not have the same rights and privileges as other Eligible Employees participating in the Non-Section 423 Component or as Eligible Employees participating in the Section 423 Component.

12.7 <u>Use of Funds</u>. All payroll deductions received or held by the Company under the Plan may be used by the Company for any corporate purpose, and the Company shall not be obligated to segregate such payroll deductions.

12.8 <u>Reports</u>. Statements of account shall be given to Participants at least annually, which statements shall set forth the amounts of payroll deductions, the Purchase Price, the number of Shares purchased and the remaining cash balance, if any.

12.9 <u>No Employment Rights</u>. Nothing in the Plan shall be construed to give any person (including any Eligible Employee or Participant) the right to remain in the employ of the Company or any Parent or Subsidiary or affect the right of the Company or any Parent or Subsidiary to terminate the employment of any person (including any Eligible Employee or Participant) at any time, with or without cause.

12.10 <u>Notice of Disposition of Shares</u>. Each Participant shall give prompt notice to the Company of any disposition or other transfer of any Shares purchased upon exercise of a right under the Section 423 Component of the Plan if such disposition or transfer is made: (a) within two years from the Enrollment Date of the Offering Period in which the Shares were purchased or (b) within one year after the Purchase Date on which such Shares were purchased. Such notice shall specify the date of such disposition or other transfer and the amount realized, in cash, other property, assumption of indebtedness or other consideration, by the Participant in such disposition or other transfer.

12.11 <u>Governing Law</u>. The Plan and any agreements hereunder shall be administered, interpreted and enforced in accordance with the laws of the State of Delaware, disregarding any state's choice of law principles requiring the application of a jurisdiction's laws other than the State of Delaware.

12.12 <u>Electronic Forms</u>. To the extent permitted by Applicable Law and in the discretion of the Administrator, an Eligible Employee may submit any form or notice as set forth herein by means of an electronic form approved by the Administrator. Before the commencement of an Offering Period, the Administrator shall prescribe the time limits within which any such electronic form shall be submitted to the Administrator with respect to such Offering Period in order to be a valid election.

* * * * *

14

Exhibit 10.11

**AMENDMENT NO. 1**
**TO**
**EXECUTIVE COMMON UNIT AND PROFITS INTEREST AGREEMENT**

This Amendment No. 1 (the "**Amendment**") to the Executive Common Unit and Profits Unit Agreement by and among GoHealth Holdings, LLC, a Delaware limited liability company (the "**Company**"), Blizzard Management Feeder, LLC, a Delaware limited liability company ("**Management LLC**"), and **[_____]** (the "**Executive**"), dated **[_____]** (the "**Profits Unit Agreement**") is entered into, and agreed to, as of [_____] by the Company, Management LLC, the Executive, and Blizzard Aggregator, LLC, a Delaware limited liability company (the "**CBP Member**").

R E C I T A L S

**WHEREAS**, pursuant to the Profits Unit Agreement, the Company indirectly granted to the Executive **[__]** Profits Units of the Company, to be held indirectly as provided therein, subject to the Profits Unit Agreement, the Blizzard Parent, LLC Profits Unit Plan, dated September 13, 2019 (the "**Plan**"), the Company Operating Agreement, and the Management LLC Agreement;

**WHEREAS**, GoHealth, Inc., a Delaware corporation ("**GoHealth**"), the parent entity of the Company, is contemplating an initial underwritten public offering of shares of its Class A Common Stock (the "**IPO**");

**WHEREAS**, in connection with the IPO, the Executive, GoHealth and the Company are entering into that certain Employment Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**Employment Agreement**"), under which the Executive is accepting the role of **[_____]** of the Company, effective as of the date of the consummation of the IPO (the "**Effective Time**"); and

**WHEREAS**, in connection with, conditioned upon, and as consideration for the execution of the Employment Agreement, the Company, Management LLC, and the Executive desire to amend the terms of the Profits Unit Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Effective Time. This Amendment shall become effective as of the Effective Time. In the event the consummation of the IPO does not occur, this Amendment shall not go into effect and shall be void *ab initio*.

2. Definitions. Unless otherwise defined herein, words and terms shall have the meanings assigned in the Profits Unit Agreement.

3. Addition of Defined Terms. The following definitions are hereby added to Section 8 of the Profits Unit Agreement to read as follows:

"CBP Group" means (i) Blizzard Aggregator, LLC, a Delaware limited liability company, (ii) CB Blizzard Co-Invest Holdings, L.P., a Delaware limited partnership, (iii) CCP III AIV VII Holdings L.P., a Delaware limited partnership, (iv) CB Blizzard Co-Invest, L.P., a Delaware limited partnership, (v) CCP III AIV VII L.P., a Delaware limited partnership, and (vi) Centerbridge Capital Partners, SBS III, L.P., a Delaware limited partnership, in each case together with any Affiliate or successor entity thereto.

"Earnout Note" shall have the meaning provided in that certain Purchase and Sale Agreement by and among Blizzard Aggregator, LLC, CCP III Blizzard Feeder, LLC, NVX Holdings, Inc., Norwest Equity Partners IX, LP, Greiner Investments, LLC, Blizzard Management Feeder, LLC, and Brandon M. Cruz to be entered into in connection with the GoHealth IPO, as amended, restated, supplemented or otherwise modified from time to time.

"GoHealth" means GoHealth, Inc, a Delaware corporation (and any successor entity thereto).

"GoHealth IPO" means the IPO of GoHealth.

Note Liability Amount" means the sum of (x) $15,626,300.00 and (y) the aggregate amount that would be paid in respect of the Promote Note to the Payees (as defined in the Promote Note) if the Centerbridge Parties (as defined in the Promote Note) were to transfer, sell, assign or dispose of all of the direct and indirect equity interests of the Company held by the Centerbridge Parties (as defined in the Promote Note) immediately prior to the GoHealth IPO in exchange for cash proceeds equal to the Fair Market Value of such equity interests as of the consummation of the Transactions (as determined by reference to the initial public offering price per share of Class A common stock of GoHealth set forth in the final prospectus filed with the Securities Exchange Commission in connection with the GoHealth IPO).

"Promote Note" shall have the meaning provided in that certain Purchase and Sale Agreement by and among Blizzard Aggregator, LLC, CCP III Blizzard Feeder, LLC, NVX Holdings, Inc., Norwest Equity Partners IX, LP, Greiner Investments, LLC, BCCJ, LLC, and Blizzard Management Feeder, LLC to be entered into in connection with the GoHealth IPO, as amended, restated, supplemented or otherwise modified from time to time.

"Transactions" means "Transactions" as defined in the final prospectus filed with the Securities and Exchange Commission in connection with the GoHealth IPO.

4. Amendment to the Defined Term "Centerbridge Exit". The definition of "Centerbridge Exit" contained in Section 8 of the Profits Unit Agreement is hereby amended and restated in its entirety to read as follows:

"Centerbridge Exit" means a transaction in which the CBP Group disposes of seventy-five percent (75%) or more of the direct or indirect equity interests of the Company held by the CBP Group (and any transferee thereof) determined as of immediately following the consummation of GoHealth IPO (excluding, for the avoidance of doubt, the effect of any redemption or secondary transaction occurring in connection with the Transactions and any conversion or exchange of any direct interests in the Company into any indirect interests in the Company). Neither an IPO nor a business combination in which the CBP Member or an Affiliate of the CBP Member controls the resulting combined entity shall constitute a Centerbridge Exit. In the event of a Centerbridge Exit other than a transaction in which the sole consideration paid to the Members is cash, any non-cash consideration for which an observable market price or third party valuations are not readily available shall be valued by a valuation process (including an appropriate illiquidity discount) that is determined by the Administrator. For the avoidance of doubt, a transfer of equity interests between members of the CBP Group does not constitute a disposition for purposes of determining a Centerbridge Exit.

5. Amendment to the Defined Term "Centerbridge MOIC". The definition of "Centerbridge MOIC" contained in Section 8 of the Profits Unit Agreement is hereby amended and restated in its entirety to read as follows:

"Centerbridge MOIC" means the quotient of (x) the total of (1) the Fair Market Value of all equity interests of the Company held directly or indirectly by the CBP Group (and any transferee thereof) immediately following the consummation of the Transactions (as determined with reference to the initial public offering price per share of Class A common stock of GoHealth set forth in the final prospectus filed with the Securities Exchange Commission in connection with the GoHealth IPO), plus (2) without duplication, the amount of any cash received by the CBP Group (and any transferee thereof) in respect of its direct or indirect equity investment in the Company on or prior to (or otherwise in connection with) the consummation of the Transactions (for the avoidance of doubt, net of any underwriting discounts), plus (3) without duplication, the fair market value of any shares of Class A common stock of GoHealth received by the CBP Group (and any transferee thereof) in connection with the Transactions (as determined with reference to the initial public offering price per share of Class A common stock of GoHealth set forth in the final prospectus filed with the Securities Exchange Commission in connection with the GoHealth IPO), minus (4) the Note Liability Amount, divided by (y) $541,263,042.16. For the avoidance of doubt, Centerbridge MOIC shall be determined immediately following the GoHealth IPO and giving effect to the Transactions.

6. Amendment to Section 3(b). Section 3(b) of the Profits Unit Agreement is hereby amended and restated in its entirety to read as follows:

Performance Vesting. Except as otherwise provided in Section 3(c) or Section 3(d) of this Agreement or as agreed in writing between the Company and Executive, the Performance Units of the Company and the corresponding Profits Units of Management LLC, each in an amount specified on the page immediately following the signature page hereof, shall be subject to vesting based on the following criteria, and, in the case of each of clauses (i) through (iv), subject to the continuous employment of the Executive through the applicable vesting date:

(i)  No portion (0%) of the Performance Units shall become vested if the Centerbridge MOIC determined immediately following the GoHealth IPO and giving effect to the Transactions is less than two (2);

(ii)  One-third (33.33%) of the Performance Units shall become vested if the Centerbridge MOIC determined immediately following the GoHealth IPO and giving effect to the Transactions is two (2) or greater but less than two and one-half (2.5);

(iii)  An additional one-third (33.33%) of Performance Units shall become vested if the Centerbridge MOIC determined immediately following the GoHealth IPO and giving effect to the Transactions is two and one-half (2.5) or greater but less than three (3);

(iv)  The final one-third (33.33%) of the Performance Units shall become vested if the Centerbridge MOIC determined immediately following the GoHealth IPO and giving effect to the Transactions is three (3) or greater.

If the Centerbridge MOIC determined immediately following the GoHealth IPO and giving effect to the Transactions is at least two (2) and less than three (3), then vesting between the express thresholds above will be determined by the Administrator by linear interpolation.

Notwithstanding anything to the contrary in this Agreement, immediately following the GoHealth IPO, (x) the Performance Units and corresponding Profits Units of Management LLC that do not vest in connection with the GoHealth IPO (as described in Section 3(b)), if any, shall be forfeited for no consideration and (y) any Performance Units and corresponding Profits Units of Management LLC that vest in connection with the GoHealth IPO (as described in Section 3(b)) shall be subject to a lockup period upon exchange into common shares of GoHealth (as described in Section 11(a)) in accordance with the following rules:

(x)  One-third (33.33%) of such vested Performance Units and corresponding Profits Units of Management LLC that become Converted Profits Units (as defined in Section 11(a)) shall be subject to the terms prescribed in Exhibit 6 attached hereto (the "Lock-Up Terms") for one hundred eighty (180) days following the date of the final prospectus related to the GoHealth IPO; and

(y)  The remaining two-thirds (66.67%) of such vested Performance Units and corresponding Profits Units of Management LLC that become Converted Profits Units (as defined in Section 11(a)) shall be subject to the Lock-Up Terms for the period beginning on the date of the consummation of the GoHealth IPO and ending on the eighteen (18) month anniversary thereof.

7.  [Amendment to Section 3(d)(ii). Section 3(d)(ii) of the Profits Unit Agreement is hereby amended and restated in its entirety to read as follows:

Without Cause or with Good Reason. Subject to Section 3(d)(iv), if the Executive's employment terminates and such termination is (x) by the Company without Cause (excluding death or Disability), or (y) if applicable to the Executive, by Executive with "good reason" (as expressly defined in a written services agreement to which the Company or a Subsidiary and the Executive are parties), subject to the Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form, all of the Executive's unvested Service Units shall become fully and immediately vested upon such termination of employment.][1]

---

[1]  NTD: This language to be used for the CEO and President of the Company.

7. New Section 3(d)(v). A new Section 3(d)(v) of the Profits Unit Agreement is hereby inserted as follows:

(v)   Without Cause or with Good Reason Upon the GoHealth IPO. Notwithstanding Section 3(d)(ii) and subject to Section 3(d)(iv), if, within the twelve (12) month period beginning on the date of the GoHealth IPO, the Executive's employment terminates and such termination is (x) by the Company without Cause (excluding death or Disability), or (y) if applicable to the Executive, by Executive with "good reason" (as expressly defined in a written services agreement to which the Company or a Subsidiary and the Executive are parties), subject to the Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form, all of the Executive's unvested Service Units shall become fully and immediately vested upon such termination of employment.]2

8. New Section 11. A new Section 11 is added to the Profits Unit Agreement to read as follows:

Section 11. GoHealth IPO. Notwithstanding anything else to the contrary in this Agreement:

(a)   In connection with the GoHealth IPO, the Profits Units granted under this Agreement may convert into Common Units of the Company or Management LLC, as applicable (the "Conversion Common Units"), and/or be converted into, or redeemed for, Class A Common Stock of GoHealth (the "Conversion Common Stock" and, collectively with the Conversion Common Units, the "Converted Profits Units"), with such conversion, redemption or exchange to be effected pursuant to terms determined by the Company, and in accordance with the terms of the Company LLC Agreement and the Management LLC Agreement.

(b)   For purposes of this Agreement, following the GoHealth IPO, the term "Profits Unit" shall include and necessarily refer to any associated Converted Profits Units and, except as otherwise provided in this Agreement, such Converted Profits Units shall continue to be subject to this Agreement and, without limiting the generality of the foregoing, will continue to vest in accordance with the terms of this Agreement.

9. New Exhibit 6. A new Exhibit 6 is added to the Profits Unit Agreement in the form of Exhibit A attached to this Amendment.

10. Repurchase Rights on Termination of Employment. Notwithstanding anything in the Profits Unit Agreement, the Plan, the Management LLC Agreement, and the Company Operating Agreement, in the event Executive's employment is terminated by the Company without Cause (excluding death or Disability) or by the Executive with Good Reason, the Company and the CBP Member forever waive, and shall not otherwise exercise, any right to repurchase the Profits Units granted to the Executive, including but not limited to such repurchase rights set forth in Article V of the Plan; provided, however, that such waiver and promise not to otherwise exercise such rights shall not apply or prevent such exercise of rights if the Administrator determines in good faith at any time that the Executive has breached any restrictive covenant set forth in any agreement to which the Executive and the Company or an Affiliate of the Company are or hereafter become parties.

11. Continued Validity of the Profits Unit Agreement. Except as specifically amended hereby, the Profits Unit Agreement shall continue in full force and effect as originally constituted.

12. Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Amendment shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.

13. Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Delaware.

14. Counterparts. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[signature page follows]

---

2   NTD: This language to be used for all other employees of the Company.

IN WITNESS WHEREOF, the Executive, the Company, Management LLC and the BH Member have executed this Agreement as of the date and year above first written.

**GOHEALTH HOLDINGS, LLC**

By:   Blizzard Aggregator, LLC
Its:   Managing Member

By:   CCP III Cayman GP Ltd.
Its:   Manager

By:   _____
Name:  Jeremy Gelber
Title:   Authorized Signatory

**BLIZZARD MANAGEMENT FEEDER, LLC**

By:   CCP III Cayman GP Ltd.
Its:   Manager

By:   _____
Name:  Jeremy Gelber
Title:   Authorized Signatory

**THE EXECUTIVE**

By:   _____
Name: **[_____]**

**BLIZZARD AGGREGATOR, LLC**

By:   CCP III Cayman GP Ltd.
Its:   Manager

By:   _____
Name:  Jeremy Gelber
Title:   Authorized Signatory

Exhibit A

**LOCK-UP TERMS**

Capitalized terms used but not otherwise defined in this Exhibit shall have the meanings assigned to such terms in the Executive Common Unit and Profits Interest Agreement to which this Exhibit is attached (as amended, the "Profits Unit Agreement").

During the Applicable Lock-Up Period (as defined below), Executive shall not, and shall not cause or direct any of the Executive's affiliates to, without the prior written consent of the Company (i) offer, sell, contract to sell, pledge, grant any option to purchase, lend or otherwise dispose of any shares of Class A Common Stock, par value $0.0001 per share, of the Company ("Common Stock") acquired in connection with the conversion of the Performance Units with respect to which the Applicable Lock-Up Period applies (the "Applicable Shares"), (ii) engage in any hedging or other transaction or arrangement (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) which is designed to, or which reasonably could be expected to lead to, or result in, a sale, loan, pledge or other disposition (whether by the Executive or someone other than the Executive), or transfer of any of the economic consequences of ownership, in whole or in part, directly or indirectly, of the Applicable Shares, whether any such transaction or arrangement (or instrument provided for thereunder) would be settled by delivery of shares of Common Stock or other securities, in cash or otherwise (any such sale, loan, pledge or other disposition, or transfer of economic consequences, a "Transfer") or (iii) otherwise publicly announce any intention to engage in or cause any action or activity described in clause (i) above or transaction or arrangement described in clause (ii) above. The Executive represents and warrants that the Executive is not, and has not caused or directed any of the Executive's affiliates to be or become, currently a party to any agreement or arrangement that provides for, is designed to or which reasonably could be expected to lead to or result in any Transfer of Applicable Shares during the Applicable Lock-Up Period. For the avoidance of doubt, these Lock-Up Terms only apply to the Applicable Shares and do not apply to any shares of Class A Common Stock acquired by the Executive in the open market after the completion of the GoHealth IPO (though such shares may be subject to an underwriter lock-up or other lock-up).

For purposes of these Lock-Up Terms, "Applicable Lock-Up Period" shall mean (A) with respect to the Performance Units described in Section 3(b)(x) of the Profits Unit Agreement, the 180 day period following the date of the final prospectus related to the GoHealth IPO, and (B) with respect to the Performance Units described in Section 3(b)(y) of the Profits Unit Agreement, the period beginning on the date of the consummation of the GoHealth IPO and ending on the 18-month anniversary thereof.

If the Executive is an officer or director of GoHealth, (i) the Company agrees that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of shares of Common Stock, the Company will notify GoHealth of the impending release or waiver, and (ii) GoHealth has agreed in the underwriting agreement of the GoHealth IPO (the "Underwriting Agreement") to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by the Company hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration and (b) the transferee has agreed in writing to be bound by the same terms described in these Lock-Up Terms to the extent and for the duration that such terms remain in effect at the time of the transfer.

The foregoing restrictions shall not apply to:

i. any of the Applicable Shares transferred as a bona fide gift or gifts, provided that the donee or donees thereof agree to be bound in writing by the restrictions set forth herein;

ii. any of the Applicable Shares transferred to any beneficiary of the Executive pursuant to a will, other testamentary document or intestate succession to the legal representatives, heirs, beneficiary or immediate family member of the Executive, provided that the donee or donees, beneficiary or beneficiaries, heir or heirs or legal representatives thereof agree to be bound in writing by the restrictions set forth herein;

iii. any of the Applicable Shares transferred to any trust, partnership, limited liability company or other entity for the direct or indirect benefit of the Executive or the immediate family of the Executive, or if the Executive is a trust, to any beneficiary (including such beneficiary's estate) of the Executive, provided that the trustee of the trust or the partnership, limited liability company or other entity or beneficiary agrees to be bound in writing by the restrictions set forth herein;

iv. any of the Applicable Shares transferred or disposed of pursuant to an order of a court or regulatory agency or to comply with any regulations related to the Applicable ownership of the Applicable Shares;

v. any of the Applicable Shares transferred to GoHealth or the Company upon death, disability or termination of employment, in each case, of the Executive;

vi. any transfer of the Applicable Shares to GoHealth or the Company in connection with the repurchase of shares of Common Stock or other securities granted under any stock incentive plan, stock purchase plan or other equity award plan of GoHealth or the Company, which plan is described in the GoHealth IPO Documents, provided that the underlying shares or other securities shall continue to be subject to the restrictions on transfer set forth in these Lock-Up Terms;

vii. any disposition or transfer to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible in connection with the foregoing clauses (i) through (vi) as applicable; provided that such nominee or custodian agree to be bound in writing by the restrictions set forth herein if required by the applicable foregoing clause;

viii. the establishment of a trading plan pursuant to Rule 10b5-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); provided that (i) no transfers occur under such plan during the Applicable Lock-Up Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the Executive or GoHealth regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of the Applicable Shares may be made under such plan during the Applicable Lock-Up Period; or

ix. transfers, sales, tenders or other dispositions of the Applicable Shares to a bona fide third party pursuant to a tender or exchange offer for securities of GoHealth or other transaction, including, without limitation, a merger, consolidation or other business combination, involving a change of control of GoHealth that, in each case, has been approved by GoHealth's board of directors (including, without limitation, entering into any lock-up, voting or similar agreement pursuant to which the Executive may agree to transfer, sell, tender or otherwise dispose of the Applicable Shares in connection with any such transaction, or vote any of the Applicable Shares in favor of any such transaction), provided that all of the Applicable Shares subject to these Lock-Up Terms that are not so transferred, sold, tendered or otherwise disposed of remain subject to these Lock-Up Terms; and provided, further, that it shall be a condition of transfer, sale, tender or other disposition that if such tender offer or other transaction is not completed, any of the Applicable Shares subject to these Lock-Up Terms shall remain subject to the restrictions herein;

provided, that (1) in connection with any transfer pursuant to clauses (i) through (iv) and (vii) above, no filing under Section 16(a) of the Exchange Act, reporting a reduction in beneficial ownership of the Applicable Shares shall be required during the Applicable Lock-Up Period (other (A) than on Form 5 if such Form 5 is filed after the expiration of the Applicable Lock-Up Period) unless such filing indicates in the footnotes thereto that the filing relates to the circumstances described in the applicable clause above and that no shares of Common Stock were sold to the public by the Executive and, where applicable, the shares remain subject to a lock-up agreement (provided that in the case of clause (iv), no such statement in the footnotes of the filing shall be included to the extent it would be prohibited by any applicable law, regulation, or order of a court or regulatory authority) nor shall a public announcement be voluntarily made by the Executive or the transferee during the Applicable Lock-Up Period; and (2) in connection with any transfer pursuant to clauses (iii) and (viii), any such transfer shall not involve a disposition for value. Notwithstanding the foregoing and for the avoidance of doubt, the Applicable Shares shall remain subject to the terms and conditions of the Profits Unit Agreement, which may impose transfer restrictions above and beyond or separate from the restrictions imposed herein.

For purposes of these Lock-Up Terms, "immediate family" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin and "change of control" shall mean the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter pursuant to the GoHealth IPO, Centerbridge Capital Partners III, L.P. or any affiliates of Centerbridge Capital Partners III, L.P.), of GoHealth's voting securities if, after such transfer, such person or group of affiliated persons would hold more than 50% of the outstanding voting power of GoHealth (or the surviving entity).

The Executive agrees that, without the prior written consent of the Company, it will not, during the Applicable Lock-Up Period, make any demand for or exercise any right with respect to, the registration of any of the Applicable Shares. These Lock-Up Terms and any claim, controversy or dispute arising under or related to these Lock-Up Terms shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

The Executive understands that GoHealth and the Company are relying upon these Lock-Up Terms. The Executive further understands that these Lock-Up Terms are irrevocable and shall be binding upon the Applicable heirs, legal representatives, successors, and assigns. For the avoidance of doubt, any waiver, modification or release of the Applicable Shares pursuant to these Lock-up Terms only requires the consent of the Company.

**Exhibit 10.12**

### <u>AMENDED & RESTATED EMPLOYMENT AGREEMENT</u>

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT (the "<u>Agreement</u>") dated as of July 7th, 2020 (the "<u>Effective Date</u>") is made by and between Norvax, LLC ("<u>Norvax</u>"), GoHealth, Inc. ("<u>GoHealth</u>"), GoHealth Holdings, LLC (the "<u>Partnership</u>" and, together with GoHealth and any of the Affiliates of GoHealth and the Partnership as may employ the Executive from time to time, and any successor(s) thereto, the "<u>Company</u>"), and Brandon Cruz (the "<u>Executive</u>").

WHEREAS, the Executive previously entered into that certain Employment Agreement dated April 16, 2020 with Norvax (the "<u>Original Agreement</u>");

WHEREAS, the Executive previously entered into that certain Executive Common Unit and Profits Unit Agreement (the "<u>Profits Unit Agreement</u>") dated October 3, 2019 with the Partnership and Blizzard Management Feeder, LLC ("<u>Management LLC</u>") and that certain Amendment No. 1 to the Profits Unit Agreement with the Partnership and Management LLC dated April 16, 2020 (the "<u>Amendment</u>");

WHEREAS, GoHealth is contemplating an initial public offering of its common stock (the "<u>IPO</u>");

WHEREAS, in connection with the IPO, the Company desires to assure itself of the continued services of the Executive by amending and restating the Original Agreement to be by and between the Executive and the Company.

NOW, THEREFORE, in consideration of the promises and mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by both parties, the parties hereby agree as follows:

1.  **<u>Employment.</u>** The Company hereby continues to employ the Executive and the Executive hereby accepts such continued employment upon and subject to the terms and conditions of this Agreement from April 16, 2020 until the fourth (4th) anniversary thereof, unless the Executive's employment is earlier terminated in accordance with Section 4 below (such initial period of employment referred to as the "<u>Initial Employment Period</u>"). The Initial Employment Period shall automatically be extended for successive one year periods (each, an "<u>Extension Employment Period</u>" and, collectively, the "<u>Employment Period</u>"), unless either party hereto gives notice of non-extension of the Employment Period to the other no later than ninety (90) days prior to the expiration of the then applicable Employment Period; <u>provided</u>, <u>however</u>, that any such notice provided by the Company to the Executive shall be considered a termination of the Executive's employment without Cause, effective as of the Executive's termination of employment on the last day of the Employment Period. The Executive represents and warrants that Executive is free to enter into this Agreement and is not otherwise prohibited from doing so, or from performing his duties hereunder, by any contract or covenant with any person, company, or other entity. Executive represents that he is not bound by any agreement which imposes any restriction upon his employment by the Company. The principal place of Executive's employment with the Company shall be the Company's office located in Chicago, Illinois; <u>provided</u> <u>that</u>, the Executive will be expected to conduct reasonable travel for business purposes. A requirement to relocate outside of the Chicago area will be subject to approval by the Executive.

2.  **<u>Position, Duties and Responsibilities</u>**. The Company shall employ the Executive during the Employment Period as its Chief Strategy Officer and Special Advisor to the Executive Team. During the Employment Period: (a) the Executive's duties and responsibilities shall include providing strategic advice to the Company regarding growth opportunities, other similar key areas, and such other similar duties commensurate with such position as the Company may from time-to-time assign, subject in each case to the direction of the Company's Board of Managers (the "<u>Board</u>") and duly constituted committees of the Board, and the Executive shall have authority and responsibility with respect to the management and operation of the Company as authorized by the Board; (b) the Executive shall report to the Board; (c) the Executive shall at all times comply with all policies and procedures of the Company as in effect or as amended from time to time; and (d) the Executive shall perform the duties assigned to him hereunder faithfully, with the utmost loyalty, to the best of his abilities and in the best interests of the Company.

3.  **<u>Compensation and Benefits.</u>**

    a.  <u>Base Salary</u>. During the Employment Period, the Company shall pay to the Executive a base salary at a gross annualized rate of $325,000 (the "<u>Base Salary</u>"), payable in installments in accordance with the Company's payroll policy. The Base Salary shall be reviewed annually, and shall be subject to such annual increases, if any, as determined by the Board in its discretion; <u>provided</u>, <u>however</u>, that Executive's Base Salary shall be subject to annual percentage increases no less than the annual percentage increase received by the Chief Executive Officer of the Company ("<u>CEO</u>").

Bonus. Subject to Section 4, with respect to each Company fiscal year that ends during the Employment Period, including for calendar year 2020, the Executive will be eligible to receive a cash bonus with a target amount equal to $175,000 for such fiscal year (the "Annual Bonus"), which shall be payable based upon the attainment of individual and Company performance goals established by the Board in its sole discretion; provided, however, that the Annual Bonus paid to Executive shall be no less than the annual bonus paid to the CEO. No Annual Bonus shall be payable with respect to any fiscal year unless the executive remains continuously employed with the Company during the period beginning on the Effective Date and ending on the applicable Annual Bonus payment date.

c. Employee Benefits. During the Employment Period, the Executive shall be eligible to participate in such employee benefit plans, and to receive such other fringe benefits, as the Company may in its discretion make available to its other executives, subject to all present and future terms and conditions of such benefit plans and other fringe benefits; provided, however, that Executive will be eligible to participate in the same employee benefit plans and receive such other fringe benefits as the CEO.

d. Expense Reimbursement. During the Employment Period, the Company shall reimburse the Executive for all reasonable and necessary business expenses (as determined by the Company) incurred by the Executive in connection with the Executive's duties hereunder in accordance with the Company's business expense reimbursement policies, as in effect or amended from time to time. Notwithstanding the foregoing, nothing in this Agreement will affect the Executive's Airplane Reimbursement Arrangement (as defined under the Profits Unit Agreement), which shall remain in effect to the extent provided by the terms of the Profits Unit Agreement.

e. Withholding; Compliance with IRS Code Section 409A.

i. All amounts and benefits payable under this Agreement shall be reduced by any and all required or authorized withholding and deductions.

ii. This Agreement shall be interpreted and construed in a manner that avoids the imposition of taxes and other penalties under Section 409A of the Internal Revenue Code of 1986, as amended (such code referred to as the "Code," and such taxes and other penalties referred to collectively as "409A Penalties"). In the event that the terms of this Agreement would subject the Executive to 409A Penalties, the Company and the Executive shall cooperate diligently to amend the terms of this Agreement to avoid such 409A Penalties, to the extent possible. All references in this Agreement to the Executive's termination of employment and to the end of the Employment Period shall mean a separation from service within the meaning of Section 409A of the Code. Each payment under this Agreement as a result of the separation of the Executive's service shall be considered a separate payment for purposes of Section 409A of the Code. Any reimbursement (including any advancement) payable to the Executive pursuant to this Agreement shall be conditioned on compliance with the Company's business expense reimbursement policies, as in effect or amended from time to time. Any amount of expenses eligible for reimbursement or in-kind benefit provided during a calendar year shall not affect the amount of expenses eligible for reimbursement or in-kind benefit to be provided during any other calendar year. The right to reimbursement or to an in-kind benefit pursuant to this Agreement shall not be subject to liquidation or exchange for any other benefit. Notwithstanding any other provision in this Agreement, if on the date of the Executive's separation from service (as defined in Section 409A of the Code) (i) the Company is a publicly traded corporation and (ii) the Executive is a "specified employee," as defined in Section 409A of the Code, then to the extent any amount payable under this Agreement upon the Executive's separation from service constitutes the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code, that under the terms of this Agreement would be payable prior to the six (6) month anniversary of the Executive's separation from service, such payment shall be delayed until the earlier to occur of (x) the first day of the seventh month following the Executive's separation from service or (y) the date of the Executive's death. Notwithstanding any of the foregoing provisions of this Section 3(h)(ii), under no circumstances shall the Company be responsible for any taxes, penalties, interest or other losses or expenses incurred by the Executive due to any failure to comply with Section 409A of the Code.

f. D&O Insurance. During the Employment Period, the Company shall cause the Executive to be listed as a named insured, or otherwise covered as an insured person, under such generally applicable directors and officers insurance coverage as it may elect to maintain from time to time. The Company shall use commercially reasonable efforts to cause the Executive to continue to be listed as a named insured, or otherwise covered as an insured person, under such generally applicable directors and officers insurance coverage as it may elect to maintain from time to time for a reasonable period (which shall in no event exceed six (6) years) after the Employment Period, provided that such coverage for the Executive is reasonably available from the Company's then-existing insurance compan(ies) and is reasonably priced, in each case as determined by the Company in its good faith discretion. Nothing herein prohibits the Company from suspending, amending or discontinuing its directors and officers insurance or from changing insurance carriers at any time for any or no reason with or without notice, as long as any such actions are applicable to Company executives generally.

4.  Termination.

    a.  Notwithstanding anything to the contrary in this Agreement or any other agreement, the Executive's employment and the Employment Period may only be terminated as provided in this Section 4:

        i.  Subject to the remainder of this Section 4, the Company may only terminate the Executive's employment and the Employment Period if the Executive engages in conduct during the Employment Period that constitutes Cause (as defined herein) and only after written notice to the Executive (and the Company may not terminate the Executive's employment and the Employment Period without Cause).

        ii.  Subject to the remainder of this Section 4, the Executive may for any or no reason terminate his employment and the Employment Period upon sixty (60) days written notice to the Company.

        iii.  Subject to the remainder of this Section 4, the Company may terminate the Executive's employment and the Employment Period due to Disability (as defined herein) effective upon sixty (60) days written notice to the Executive.

        iv.  Subject to the remainder of this Section 4, the Executive's employment and the Employment Period shall automatically terminate upon the Executive's death.

    b.  In the event of termination, the Executive shall cooperate fully with the Company in transitioning the Executive's duties, responsibilities and client relationships as directed by the Company, and in providing input and assistance on matters that relate to the Executive's employment (provided that the Company will reimburse the Executive for the reasonable out-of-pocket costs of any such cooperation after his employment terminates).

    c.  Upon a termination of the Executive's employment for any reason, (i) the Executive (or the Executive's estate) shall be entitled to receive: (A) any portion of the Executive's Base Salary through the Date of Termination (as defined herein) not theretofore paid, (B) any expenses owed to the Executive under Section 3(d), (C) any accrued but unused vacation pay owed to the Executive pursuant to applicable law, and (D) any amount arising from the Executive's participation in, or benefits under, any employee benefit plans, programs or arrangements under Section 3(c), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements, and (ii) if the Executive timely elects to receive continued coverage under the Company's group health care plan pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the Company will continue to pay the employer portion of applicable premium payments for the Executive's and his eligible dependents' continued COBRA coverage under such plan (as in effect or amended from time to time) (the "COBRA Subsidy") until the earlier of: (I) twelve (12) months following the Date of Termination, or (II) the date upon which the Executive obtains or becomes eligible for other health care coverage from a new employer or otherwise (such period referred to as the "COBRA Subsidy Period"). The Executive shall promptly inform the Company in writing when he obtains or becomes eligible for any such other health care coverage. The Executive shall be responsible for paying a share of such COBRA premiums during the COBRA Subsidy Period at active employee rates as in effect from time to time, and shall be responsible for the full unsubsidized costs of such COBRA coverage thereafter. The Executive will be deemed to receive income attributable to the COBRA Subsidy and shall be responsible for any and all applicable tax liability arising from such benefit. Notwithstanding the foregoing, the COBRA Subsidy will be subject to the Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form (a "Release") and will not be provided in the event of Executive's termination of employment for Cause.

    d.  In the event of the Executive's termination of employment by the Executive for Good Reason or as a result of a non-extension of the Employment Period by the Company, in addition to the payments and benefits described in Section 4(c) above, the Company shall, subject to Section 5 and subject to Executive's execution and non-revocation of a Release:

        i.  Continue to pay Executive's Base Salary during the period beginning on the Date of Termination and ending on the two (2) year anniversary of the Date of Termination in accordance with the Company's regular payroll practice as of the Date of Termination; and

        ii.  Pay (A) the Annual Bonus for any completed fiscal year as of the Date of Termination that has not yet been paid as of the Date of Termination, if any, and (B) the product of (I) two (2), *multiplied by* (II) a pro-rated portion of the Annual Bonus for the year in which the Date of Termination occurs, with such proration being based on the number of full months for which the Executive was employed during such year prior to such Date of Termination. The bonuses described in this Section 4(d)(ii) shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates.

Notwithstanding any other provision of this Agreement, no payment shall be made or benefit provided pursuant to Section 4(d) following the date Executive first violates the Restrictive Covenant Agreement and, in the event of such a violation, Executive shall repay to the Company any benefit provided pursuant to Section 4(d) within ninety (90) days of such violation.

     f.   The provisions of this Section 4 shall supersede in their entirety any severance payment or benefit obligations to the Executive pursuant to the provisions in any severance plan, policy, program or other arrangement maintained by the Company.

**5.   Restrictive Covenant Agreement**. Executive acknowledges that Executive, concurrently with the execution of the Original Agreement, entered into an agreement with the Company containing confidentiality, non-solicitation, non-competition, intellectual property assignment, and other protective covenants (the "Restrictive Covenant Agreement") and that the Executive shall be bound by the terms and conditions of the Restrictive Covenant Agreement during and following the Employment Period.

**6.   Definitions**. As used in this Agreement:

     a.   "Affiliate" shall have the meaning given in the Profits Unit Plan.

     b.   "Cause" means (i) (A) the willful failure or refusal of the Executive to perform material responsibilities set forth herein (including Executive's failure to devote time and attention to his duties hereunder or failure to regularly attend Board or office meetings); (B) the Executive's willful failure to carry out, or comply with, in any material respect any lawful directive of the Board; (C) dishonesty by the Executive to the Board with respect to any material matter; (D) misappropriation of funds or property of the Company or any of its Subsidiaries or Affiliates by the Executive other than the occasional, customary and *de minimis* use of Company property for personal purposes; or (E) a breach by the Executive of this Agreement or other agreement with the Company (including, without limitation, the Restrictive Covenants Agreement); provided, in the case of each of clause (i)(A)-(E), if the Board (excluding any Manager as to whom Cause is alleged to have occurred) determines reasonably and in good faith that such act can reasonably be cured, that the Company has provided 30 days' prior written notice to the Executive of such conduct and the Executive has failed to cure such conduct within such 30 day period in the manner identified by the Board; (ii) the arrest or charging of the Executive for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud, and which is materially detrimental to the Company and its Subsidiaries and Affiliates (including material reputational harm); or (iii) the Executive's engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its Subsidiaries' or Affiliates' written code of ethics or Company policies, and which is materially detrimental to the Company and its Subsidiaries and Affiliates (including material reputational harm).

     c.   "Date of Termination" shall mean (i) if the Executive's employment is terminated due to the Executive's death, the date of the Executive's death; (ii) if the Executive's employment is terminated due to the Executive's Disability, the date determined pursuant to Section 4(a)(iii); (iii) if the Executive's employment is terminated pursuant to Section 4(a)(i), the date notice of such termination for Cause is delivered to the Executive (or the date of the expiration of any applicable cure period, if later); or (iv) if the Executive's employment is terminated pursuant to Section 4(a)(ii), at the end of such sixty (60) day notice period (or any such earlier date agreed to in writing by the Company).

     d.   "Disability" shall have the meaning given in the Profits Unit Plan.

     e.   "Good Reason" means the continued occurrence of any of the following without the Executive's consent, subject to the notice and cure conditions set forth below: (A) a material adverse change in the Executive's title, reporting relationship, or authority; (B) a material adverse change in the Executive's duties and responsibilities as of the Effective Date; (C) a reduction in the Executive's Base Salary not otherwise made on a substantially similar basis for senior Company executives generally; (D) a material breach of any other provision of this Agreement; (E) the requirement that the Executive relocate on a permanent basis (except for required business travel) to a location more than 30 miles from the Chicago, Illinois metropolitan area, or (F) the failure of any acquirer who purchases all or substantially all of the assets or business of the Company to assume and agree to be bound by this Agreement. Executive's employment with the Company may be terminated for Good Reason only if (1) Executive provides written notice to the Company of the occurrence of the Good Reason event (as described above) within 30 days after the Executive knows or reasonably should have known of the circumstances constituting Good Reason, (2) the Company fails to cure the circumstances constituting "Good Reason" within 30 days after such notice, and (3) Executive resigns within 30 days after the expiration of such 30-day cure period. For the avoidance of doubt, an initial public offering of common stock of the Company or any parent (direct or indirect) or other Affiliate of the Company shall not constitute Good Reason for purposes of this Agreement.

     f.   "Profits Unit Plan" shall mean the Blizzard Parent, LLC Profits Unit Plan.

     g.   "Subsidiary(ies)" shall have the meaning given in the Profits Unit Plan.

7. **Notices.** Any notice, request, or other communication required or permitted to be given hereunder shall be made to the following addresses or to any other address designated by either of the parties hereto by notice similarly given: (a) if to the Company, to Brad Burd, ####@gohealth.com, 214 W. Huron St., Chicago, Illinois 60654; and (b) if to the Executive, to Brandon Cruz, ####@gmail.com, ####.

All such notices, requests, or other communications shall be sufficient if made in writing either (i) by personal delivery to the party entitled thereto, (ii) by facsimile with confirmation of receipt, (iii) by certified mail, return receipt requested, (iv) by express courier service, and shall be effective upon personal delivery, upon confirmation of receipt of facsimile transmission, upon the fourth calendar day after mailing by certified mail, or upon the second calendar day after sending by express courier service, or (v) by email with confirmation of receipt, and shall be effective upon receipt by the sending party of such confirmation of receipt.

8. **Assignment.** This Agreement is enforceable by the Company and its Subsidiaries and Affiliates and may be assigned or transferred by the Company to, and shall inure to the benefit of, any Subsidiary or Affiliate of the Company or any person which at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets, stock or business of the Company or of any discrete portion thereof. Any such assignment or transfer shall not constitute a termination of the Executive's employment for purposes of this Agreement. The Executive may not assign any of his rights or obligations under this Agreement.

9. **No Interference.** Nothing in this Agreement prohibits the Executive from filing a charge with, or reporting possible violations of federal law or regulation to any governmental agency or regulatory entity, including but not limited to the U.S. Equal Opportunity Commission, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. The Executive does not need the prior authorizaing of the Company to make any such reports or disclosures and is not required to notify the Company that he/she has made such reports or disclosures.

10. **Amendment and Waiver.** This Agreement may not be amended orally and may only be amended by a written agreement signed by both parties (subject to Section 15 herein). A waiver by either party hereto of any of its rights or remedies under this Agreement on any occasion shall not be a bar to the exercise of the same right or remedy on any subsequent occasion or of any other right or remedy at any time.

11. **Governing Law; Jurisdiction; Venue.** This Agreement shall be governed by the internal laws of the state of Illinois, without regard to its conflict of laws rules. The parties hereby irrevocably consent to, and agree not to object or assert any defense or challenge to, the exclusive jurisdiction and exclusive venue of the state and federal courts located in Chicago, Illinois, and agree that any claim which may be brought in a court of law or equity shall be brought exclusively in any such Chicago, Illinois court.

12. **Headings.** The Section headings used herein are for convenience of reference only and are not to be considered in construction of the provisions of this Agreement.

13. **Entire Agreement; Survival; Payments to Beneficiaries.** Except for the Profits Unit Agreement, the Amendment, and the Restrictive Covenant Agreement, this Agreement contains the entire agreement between the parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous negotiations, understandings or agreements between the parties, whether written or oral, with respect to such subject matter. Sections 4 through 17 herein shall survive and continue in full force and effect in accordance with their respective terms, notwithstanding any termination of the Employment Period or the Executive's employment. If the Executive dies before receiving any amounts to which the Executive is entitled under this Agreement, such amounts shall be paid in accordance with the terms of this Agreement to the beneficiary designated in writing by the Executive, or if none is so designated, to the Executive's estate.

14. **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

15. **Counterparts.** This Agreement may be executed in two counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

16. **Condition Precedent to Effectiveness**. This Agreement and the Executive's employment hereunder will not be effective unless and until the Amendment and the Restrictive Covenant Agreement are validly executed and of full force and effect, and this Agreement shall be null and void and shall be of no force and effect in the event that either the Amendment or the Restrictive Covenant Agreement is not executed and of full force and effect for any reason.

Case 1:20-cv-05593 Document #: 166-1 Filed: 09/23/22 Page 435 of 547 PageID #:4204

**THE PARTIES ACKNOWLEDGE BY SIGNING BELOW THAT THEY HAVE READ AND UNDERSTAND THE ABOVE AND INTEND TO BE BOUND THEREBY:**

Brandon Cruz

/s/ Brandon Cruz
Date: July 7, 2020

Norvax, LLC

By:          /s/ Jeremy W. Gelber
Name:       Jeremy W. Gelber
Position:    Authorized Signatory
Date:        July 7, 2020

GoHealth, Inc.

By:          /s/ Clinton P. Jones
Name:       Clinton P. Jones
Position:    Chief Executive Officer
Date:        July 7, 2020

GoHealth Holdings, LLC

By:          /s/ Clinton P. Jones
Name:       Clinton P. Jones
Position:    Chief Executive Officer
Date:        July 7, 2020

Exhibit 10.13

**EXECUTION VERSION**

### Employment Agreement

This Employment Agreement (the "<u>Agreement</u>"), entered into as of July 7, 2020, is made by and between Clint Jones (the "<u>Executive</u>"), GoHealth, Inc., a Delaware corporation ("<u>GoHealth</u>"), and GoHealth Holdings, LLC, a Delaware limited liability company (the "<u>Partnership</u>" and, together with GoHealth and any of the Affiliates of GoHealth and the Partnership as may employ the Executive from time to time, and any successor(s) thereto, the "<u>Company</u>").

### RECITALS

**WHEREAS**, the Executive is currently employed by Norvax, LLC, a subsidiary of the Company ("<u>Norvax</u>"), as the Chief Executive Officer of Norvax;

**WHEREAS**, GoHealth is contemplating an initial public offering of its common stock (the "<u>IPO</u>");

**WHEREAS**, in connection with the IPO, the Company desires to assure itself of the continued services of the Executive by engaging the Executive to perform services under the terms hereof;

**WHEREAS**, the Executive desires to provide services to the Company on the terms herein provided; and

**WHEREAS**, the Company and the Executive desire to have the Agreement become effective as of the date of the consummation of the IPO (the "<u>Effective Date</u>").

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, including the respective covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, effective as of the Effective Date, as follows:

**1. <u>Certain Definitions</u>**

(a) "<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act of 1933, as amended from time to time.

(b) "<u>Agreement</u>" shall have the meaning set forth in the preamble hereto.

(c) "<u>Annual Base Salary</u>" shall have the meaning set forth in <u>Section 3(a</u>).

(d) "<u>Annual Bonus</u>" shall have the meaning set forth in <u>Section 3(b</u>).

1

(e) "<u>Board</u>" shall mean the Board of Directors of GoHealth, Inc., a Delaware corporation.

(f) The Company shall have "<u>Cause</u>" to terminate the Executive's employment hereunder upon: (i)(A) the willful failure or refusal of the Executive to perform material responsibilities set forth herein (including Executive's failure to devote time and attention to his duties hereunder or failure to regularly attend Board or office meetings); (B) the Executive's willful failure to carry out, or comply with, in any material respect any lawful directive of the Board; (C) dishonesty by the Executive to the Board with respect to any material matter; (D) misappropriation of funds or property of the Company or any of its Affiliates by the Executive other than the occasional, customary and *de minimis* use of Company property for personal purposes; or (E) a breach by the Executive of this Agreement or other agreement with the Company (including, without limitation, the Restrictive Covenants Agreement); <u>provided</u>, in the case of each of clause (i)(A)-(E), if the Board (excluding any Board member as to whom Cause is alleged to have occurred) determines reasonably and in good faith that such act can reasonably be cured, that the Company has provided 30 days' prior written notice to the Executive of such conduct and the Executive has failed to cure such conduct within such 30 day period in the manner identified by the Board; (ii) the arrest or charging of the Executive for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud, and which is materially detrimental to the Company and its Affiliates (including material reputational harm); or (iii) the Executive's engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its Affiliates' written code of ethics or Company policies, and which is materially detrimental to the Company and its Affiliates (including material reputational harm).

(g) "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

(h) "<u>Company</u>" shall have the meaning set forth in the preamble hereto.

(i) "<u>Date of Termination</u>" shall mean (i) if the Executive's employment is terminated due to the Executive's death, the date of the Executive's death; (ii) if the Executive's employment is terminated due to the Executive's Disability, the date determined pursuant to Section 4(a)(ii); or (iii) if the Executive's employment is terminated pursuant to <u>Section 4(a) (iii)-(vi)</u> either the date indicated in the Notice of Termination or the date specified by the Company pursuant to <u>Section 4(b)</u>, whichever is earlier.

(j) "<u>Disability</u>" shall mean the Executive's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that can be expected to last for a continuous period of not less than twelve (12) months.

(k) "<u>Effective Date</u>" shall have the meaning set forth in the recitals hereto.

(l) "<u>Executive</u>" shall have the meaning set forth in the preamble hereto.

(m) "<u>Extension Term</u>" shall have the meaning set forth in <u>Section 2(b)</u>.

2

(n) The Executive shall have "<u>Good Reason</u>" to terminate the Executive's employment hereunder after the occurrence of one or more of the following conditions without the Executive's consent: (A) a material adverse change in the Executive's authority or duties and responsibilities as of the Effective Date (provided that, for the avoidance of doubt, any change in the Executive's authority or duties and responsibilities made in connection with the IPO shall not be considered a material adverse change for purposes hereof); (B) a material reduction in the Executive's Annual Base Salary or Annual Bonus opportunity, in either case not otherwise made on a substantially similar basis for senior Company executives generally; or (C) the requirement that the Executive relocate on a permanent basis (except for required business travel) to a location more than 50 miles from the Chicago, Illinois metropolitan area. Executive's employment with the Company may be terminated for Good Reason only if (1) Executive provides written notice to the Company of the occurrence of the Good Reason event (as described above) within 30 days after the Executive knows or reasonably should have known of the circumstances constituting Good Reason, (2) the Company fails to cure the circumstances constituting "Good Reason" within 30 days after such notice, and (3) Executive resigns within 30 days after the expiration of such 30-day cure period. For the avoidance of doubt, an initial public offering of common stock of the Company or any parent (direct or indirect) or other Affiliate of the Company shall not constitute Good Reason for purposes of this Agreement.

(o) "<u>Initial Term</u>" shall have the meaning set forth in <u>Section 2(b)</u>.

(p) "<u>IPO</u>" shall have the meaning set forth in the recitals hereto.

(q) "<u>Notice of Termination</u>" shall have the meaning set forth in <u>Section 4(b)</u>.

(r) "<u>Person</u>" shall mean any individual, natural person, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), incorporated or unincorporated association, governmental authority, firm, society or other enterprise, organization or other entity of any nature.

(s) "<u>Release</u>" shall have the meaning set forth in <u>Section 5(b)</u>.

(t) "<u>Release Expiration Date</u>" shall have the meaning set forth in <u>Section 21(c)</u>.

(u) "<u>Restrictive Covenant Agreement</u>" shall have the meaning set forth in <u>Section 6</u>.

(v) "<u>Section 409A</u>" shall mean Section 409A of the Code and the Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date.

(w) "<u>Severance Period</u>" shall have the meaning set forth in <u>Section 5(b)</u>.

(x) "<u>Term</u>" shall have the meaning set forth in <u>Section 2(b)</u>.

(y) "<u>Transitional Role</u>" shall have the meaning set forth in <u>Section 2(c)</u>.

3

**2. Employment**

    (a) <u>In General</u>. Effective as of the Effective Date, the Company shall employ the Executive under this Agreement and the Executive shall remain in the employ of the Company under this Agreement, for the period set forth in <u>Section 2(b)</u>, in the position set forth in <u>Section 2(c)</u>, and upon the other terms and conditions herein provided.

    (b) <u>Term of Employment</u>. The initial term of employment under this Agreement (the "<u>Initial</u> <u>Term</u>") shall be for the period beginning on the Effective Date and ending on the third anniversary thereof, unless earlier terminated as provided in <u>Section 4</u>. The Initial Term shall automatically be extended for successive one year periods (each, an "<u>Extension Term</u>" and, collectively with the Initial Term, the "<u>Term</u>"), unless either party hereto gives notice of non-extension of the Term to the other no later than ninety (90) days prior to the expiration of the then-applicable Term. For the avoidance of doubt, notice by the Executive of non-extension of the Term, without stated Good Reason and compliance with the notice, cure, and resignation requirements of the definition thereof, shall not constitute a resignation for Good Reason under <u>Section 4(a)(v)</u>. For the further avoidance of doubt, notice by the Company of non-extension of the Term, without stated Cause and compliance with the notice and cure requirements of the definition thereof and subject to <u>Section 4(b)</u>, shall constitute a termination without Cause under <u>Section 4(a)(iv)</u>.

    (c) <u>Position and Duties</u>. During the Initial Term, the Executive: (i) shall serve as Chief Executive Officer of the Company, with responsibilities, duties and authority customary for such position, subject to direction by the Board; (ii) shall report directly to the Board; (iii) shall devote substantially all the Executive's working time and efforts to the business and affairs of the Company and its Affiliates; (iv) agrees to observe and comply with the Company's rules and policies as adopted by the Company from time to time. In addition, as of the Effective Date, the Company shall cause the Executive to be appointed to the Board and as Co-Chairperson of the Board, and, during the Term, the Board shall propose the Executive for re-election to the Board and, as long as Executive serves as Chief Executive Officer of the Company, as Chairperson of the Board. The parties acknowledge and agree that Executive's duties, responsibilities and authority may include services for one or more Affiliates of the Company. After the Initial Term, as mutually agreed by the parties at the time, Executive's role may change to a role other than Chief Executive Officer (the "<u>Transitional Role</u>") for the remainder of the Term. For the avoidance of doubt, in the event that the Executive's role changes to a Transitional Role: (A) unless amended by mutual agreement of the parties hereto, the terms and conditions of this Agreement will remain in effect for the remainder of the Term, except as set forth in <u>Section 3(a) and (b)</u> and a change in title, as mutually agreed by the parties at the time of such transition; (B) Executive shall continue to be eligible to participate in the Company's group health plan, employee benefit plans, programs and arrangements; and (C) such Transitional Role shall not begin the Severance Period.

4

**3. Compensation and Related Matters**

(a) Annual Base Salary. During the period of the Term during which the Executive's position is Chief Executive Officer of the Company, the Executive shall receive a base salary at a rate of $325,000 per annum, which shall be paid in accordance with the customary payroll practices of the Company, subject to review by the Board in its sole discretion (the "Annual Base Salary"). Should Executive's position change to a Transitional Role, the parties may reach a mutually agreeable change in the Annual Base Salary; provided, however, that any change in Executive's Annual Base Salary resulting from Executive's position changing to a Transitional Role shall not be considered a material reduction in the Executive's Annual Base Salary for purposes of the definition of "Good Reason" under Section 1(n).

(b) Annual Bonus. With respect to each Company fiscal year during the Term, the Executive will be eligible to receive a cash bonus (the "Annual Bonus"), which shall be payable based upon the attainment of individual and Company performance goals established by the Board in its sole discretion. Each such Annual Bonus shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates. Notwithstanding any other provision of this Section 3(b) and subject to Section 5(b), no bonus shall be payable with respect to any fiscal year unless the Executive remains continuously employed with the Company during the period beginning on the Effective Date and ending on the applicable bonus payment date. Should Executive's position change to a Transitional Role, the parties may reach a mutually agreeable change in the structure of the Annual Bonus; provided, however, that any change in Executive's Annual Bonus resulting from Executive's position changing to a Transitional Role shall not be considered a material reduction in the Executive's Annual Bonus opportunity for purposes of the definition of "Good Reason" under Section 1(n).

(c) Benefits. During the Term, the Executive shall be eligible to participate in employee benefit plans, programs and arrangements of the Company in accordance with their terms, as in effect from time to time, and as are generally provided by the Company to its senior executive officers.

(d) Business Expenses. During the Term, the Company shall reimburse the Executive for all reasonable, documented, out-of-pocket travel and other business expenses incurred by the Executive in the performance of the Executive's duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures. Notwithstanding the foregoing, nothing in this Agreement will affect the Executive's Airplane Reimbursement Arrangement (as defined in the Executive Common Unit and Profits Unit Agreement by and between the Partnership, Blizzard Management Feeder, LLC, and the Executive dated October 3, 2019 (the "Profits Unit Agreement")), which shall remain in effect to the extent provided by the terms of the Profits Unit Agreement.

(e) Indemnification. During the Term and for so long thereafter as liability exists with regard to the Executive's activities during the Term on behalf of the Company, the Company shall defend and indemnify the Executive (other than in connection with the Executive's gross negligence or willful misconduct) in accordance with the Company's customary indemnification policies and procedures which are applicable to the Company's officers and directors.

**4. <u>Termination</u>.** The Executive's employment hereunder may be terminated by the Company or the Executive, as applicable, without any breach of this Agreement only under the following circumstances:

(a) <u>Circumstances</u>

(i) <u>Death</u>. The Executive's employment hereunder shall terminate upon the Executive's death.

(ii) <u>Disability</u>. If the Executive incurs a Disability, the Company may give the Executive written notice of its intention to terminate the Executive's employment. In that event, the Executive's employment with the Company shall terminate, effective on the later of the thirtieth (30th) day after receipt of such notice by the Executive or the date specified in such notice; <u>provided</u> that within the thirty (30) day period following receipt of such notice, the Executive shall not have returned to full-time performance of the Executive's duties hereunder.

(iii) <u>Termination for Cause</u>. The Company may terminate the Executive's employment for Cause.

(iv) <u>Termination without Cause</u>. The Company may terminate the Executive's employment without Cause.

(v) <u>Resignation for Good Reason</u>. The Executive may resign from the Executive's employment for Good Reason.

(vi) <u>Resignation without Good Reason</u>. The Executive may resign from the Executive's employment without Good Reason.

(b) <u>Notice of Termination</u>. Any termination of the Executive's employment by the Company or by the Executive under this <u>Section 4</u> (other than a termination pursuant to <u>Section 4(a)(i)</u> above) shall be communicated by a written notice to the other party hereto (a "<u>Notice of Termination</u>"): (i) indicating the specific termination provision in this Agreement relied upon, and (ii) specifying a Date of Termination which, if submitted by the Executive, shall be at least thirty (30) days following the date of such notice; <u>provided</u>, <u>however</u>, that a Notice of Termination delivered by the Company pursuant to <u>Section 4(a)(ii)</u> shall not be required to specify a Date of Termination, in which case the Date of Termination shall be determined pursuant to <u>Section 4(a)(ii)</u>; and <u>provided</u>, <u>further</u>, that in the event that the Executive delivers a Notice of Termination to the Company, the Company may, in its sole discretion, accelerate the Date of Termination to any date that occurs following the date of Company's receipt of such Notice of Termination (even if such date is prior to the date specified in such Notice of Termination). A Notice of Termination submitted by the Company (other than a Notice of Termination under <u>Section 4(a)(ii)</u>) may provide for a Date of Termination on the date the Executive receives the Notice of Termination, or any date thereafter elected by the Company in its sole discretion. The failure by the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Cause shall not preclude the Company from asserting such fact or circumstance in enforcing the Company's rights hereunder in connection with such Termination for Cause. Notwithstanding the foregoing, a termination pursuant to <u>Section 4(a)(iii)</u> shall be deemed to occur if following Executive's termination of employment for any reason the Company determines that circumstances existing prior to such termination would have entitled the Company to terminate Executive's employment pursuant to <u>Section 4(a)(iii)</u> (disregarding any applicable cure period).

**5. Company Obligations Upon Termination of Employment**

(a) In General. Upon a termination of the Executive's employment for any reason, the Executive (or the Executive's estate) shall be entitled to receive: (i) any portion of the Executive's Annual Base Salary through the Date of Termination not theretofore paid, (ii) any expenses owed to the Executive under Section 3(d), (iii) any accrued but unused vacation pay owed to the Executive in accordance with applicable law, and (iv) any amount arising from the Executive's participation in, or benefits under, any employee benefit plans, programs or arrangements under Section 3(c), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements. Except as otherwise set forth in Section 5(b) below, the payments and benefits described in this Section 5(a) shall be the only payments and benefits payable in the event of the Executive's termination of employment for any reason.

(b) Severance Payments. In the event of the Executive's termination of employment by the Company without Cause pursuant to Section 4(a)(iv) or by the Executive for Good Reason pursuant to Section 4(a)(v), in addition to the payments and benefits described in Section 5(a) above, the Company shall, subject to Section 21 and Section 5(c) and subject to Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form (a "Release"), as of the Release Expiration Date, in accordance with Section 21(c):

(i) Continue to pay Executive's Annual Base Salary during the period beginning on the Date of Termination and ending on the two (2) year anniversary of the Date of Termination (the "Severance Period") in accordance with the Company's regular payroll practice as of the Date of Termination; and

(ii) Pay (A) the Annual Bonus for any completed fiscal year as of the Date of Termination that has not yet been paid as of the Date of Termination, if any, and (B) the product of (I) two (2), *multiplied by* (II) a pro-rated portion of the Annual Bonus for the year in which the Date of Termination occurs, with such proration being based on the number of full months for which the Executive was employed during such year prior to such Date of Termination. The bonuses described in this Section 5(b)(ii) shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates, as set forth in Section 3(b).

(iii) During the Severance Period, if the Executive elects to continue coverage under the Company's group health plan in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), continue coverage for the Executive and any eligible dependents under the Company group health benefit plans in which the Executive and any dependents were entitled to participate immediately prior to the Date of Termination. In the event Executive elects to continue with COBRA coverage, provided, that Employee timely submits to the Company evidence of Executive's payments made to the COBRA administrator, the Company will reimburse Executive for the Company's share of the premiums associated therewith in an amount equal to what the Company pays for the health insurance premiums of other executive level employees at the Company. The COBRA health continuation period under Section 4980B of the Code shall run concurrently with the period of continued coverage set forth in this Section 5(b)(ii); provided, however, that in the event Employee obtains other employment that offers group health benefits, such continuation of COBRA coverage by the Company under this Section 5(b)(ii) shall immediately cease.

7

(c) <u>Breach of Restrictive Covenant Agreement</u>. Notwithstanding any other provision of this Agreement, no payment shall be made or benefit provided pursuant to <u>Section 5(b)</u> following the date Executive first violates the Restrictive Covenant Agreement and, in the event of such a violation, Executive shall repay to the Company any benefit provided pursuant to <u>Section 5(b)</u> within ninety (90) days of such violation.

(d) <u>Complete Severance</u>. The provisions of this <u>Section 5</u> shall supersede in their entirety any severance payment or benefit obligations to the Executive pursuant to the provisions in any severance plan, policy, program or other arrangement maintained by the Company.

6. **<u>Restrictive Covenant Agreement</u>.** The Executive acknowledges that Executive is, concurrently with the execution of this Agreement, entering into an agreement with the Company containing confidentiality, non-solicitation, non-competition, intellectual property assignment, and other protective covenants (the "<u>Restrictive Covenant Agreement</u>," attached hereto as <u>Exhibit A</u> to this Agreement") and that the Executive shall be bound by the terms and conditions of the Restrictive Covenant Agreement.

7. **<u>Injunctive Relief</u>.** The Executive recognizes and acknowledges that a breach of the covenants contained in the Restrictive Covenant Agreement will cause irreparable damage to the Company and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, the Executive agrees that, in the event of a breach of any of the covenants contained in the Restrictive Covenant Agreement, in addition to any other remedy which may be available at law or in equity, the Company will be entitled to specific performance and injunctive relief.

8. **<u>Assignment and Successors</u>.** The Company may assign its rights and obligations under this Agreement to any entity, including any successor to all or substantially all the assets of the Company, by merger or otherwise, and may assign or encumber this Agreement and its rights hereunder as security for indebtedness of the Company and its Affiliates. The Executive may not assign the Executive's rights or obligations under this Agreement to any individual or entity. This Agreement shall be binding upon and inure to the benefit of the Company, the Executive and their respective successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable.

9. **<u>Governing Law ; Venue</u>.** This Agreement shall be governed, construed, interpreted and enforced in accordance with the substantive laws of the State of Delaware, without giving effect to any principles of conflicts of law, whether of the State of Delaware or any other jurisdiction, and where applicable, the laws of the United States, that would result in the application of the laws of any other jurisdiction. Each of the parties hereto agrees that any legal action or proceeding with respect to this Agreement shall be brought exclusively in the Chancery Court of

8

New Castle County, Delaware or the federal courts of the United States of America for the District of Delaware, unless the parties to any such action or dispute mutually agree to waive this provision. By execution and delivery of this Agreement, each of the parties hereto irrevocably consents to service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized express carrier or delivery service, to the applicable party at his, her or its address referred to herein. Each of the parties hereto irrevocably waives any objection which he, she or it may now or hereafter have to the laying of venue of any of the aforementioned actions or proceedings arising out of or in connection with this Agreement, or any related agreement, certificate or instrument referred to above, brought in the courts referred to above and hereby further irrevocably waives and agrees, to the fullest extent permitted by applicable law, not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in any inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

**10. Validity.** The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**11. Notices.** Any notice, request, claim, demand, document and other communication hereunder to any party hereto shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by telex, telecopy, or certified or registered mail, postage prepaid, to the following address (or at any other address as any party hereto shall have specified by notice in writing to the other party hereto):

    (a) If to the Company:

        GoHealth Holdings, LLC
        214 West Huron Street
        Chicago, Illinois 60654
        Attention: Chief Legal Officer or General Counsel

        Copy to:

        Latham & Watkins LLP
        885 Third Avenue
        New York, New York 10022-4802
        Attn: Bradd L. Williamson
        Facsimile: (212) 751-4864

    (b) If to the Executive, at the address set forth on the signature page hereto.

**12. Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

9

**13. Entire Agreement**. The terms of this Agreement (together with any other agreements and instruments contemplated hereby or referred to herein, including, without limitation, the Restrictive Covenant Agreement attached hereto as Exhibit A) is intended by the parties hereto to be the final expression of their agreement with respect to the employment of the Executive by the Company and may not be contradicted by evidence of any prior or contemporaneous agreement (including, without limitation, any other term sheet or offer letter). The parties hereto further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

**14. Amendments; Waivers.** This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by the Executive and a duly authorized officer of GoHealth and approved by the Board, which expressly identifies the amended provision of this Agreement. By an instrument in writing similarly executed and approved by the Board, the Executive or a duly authorized officer of GoHealth may waive compliance by the other party or parties hereto with any provision of this Agreement that such other party was or is obligated to comply with or perform; provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure to comply or perform. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

**15. No Inconsistent Actions.** The parties hereto shall not voluntarily undertake or fail to undertake any action or course of action inconsistent with the provisions or essential intent of this Agreement. Furthermore, it is the intent of the parties hereto to act in a fair and reasonable manner with respect to the interpretation and application of the provisions of this Agreement.

**16. Construction.** This Agreement shall be deemed drafted equally by both of the parties hereto. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any party hereto shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Also, unless the context clearly indicates to the contrary, (a) the plural includes the singular and the singular includes the plural; (b) "and" and "or" are each used both conjunctively and disjunctively; (c) "any," "all," "each," or "every" means "any and all," and "each and every"; (d) "includes" and "including" are each "without limitation"; (e) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (f) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Persons referred to may require.

10

**17. Enforcement.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

**18. Withholding.** The Company and its Affiliates shall be entitled to withhold from any amounts payable under this Agreement, any federal, state, local or foreign withholding or other taxes or charges which the Company or any of its Affiliates is required to withhold. The Company and its Affiliates shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

**19. Absence of Conflicts; Executive Acknowledgement; Confidentiality.** The Executive hereby represents that from and after the Effective Date the performance of the Executive's duties hereunder will not breach any other agreement to which the Executive is a party. The Executive acknowledges that the Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company or any of its Affiliates other than those contained in writing herein, and has entered into this Agreement freely based on the Executive's own judgment. The Executive agrees not to disclose the terms or existence of this Agreement to any Person unless the Company agrees to such disclosure in advance and in writing; provided that the Executive may, without such permission, make such disclosures as are required by applicable law, including disclosures to taxing agencies, and disclose the terms of this Agreement to the Executive's attorney(s), accountant(s), tax advisor(s), and other professional service provider(s), and to members of the Executive's immediate family, as reasonably necessary; provided, further, that the Executive instructs such Person(s) that the terms of this Agreement are strictly confidential and are not to be revealed to anyone else except as required by applicable law.

**20. Survival.** The expiration or termination of the Term shall not impair the rights or obligations of any party hereto which shall have accrued prior to such expiration or termination (including, without limitation, pursuant to the provisions of the Restrictive Covenant Agreement attached hereto as Exhibit A).

**21. Section 409A.**

(a) General. The parties hereto acknowledge and agree that, to the extent applicable, this Agreement shall be interpreted in accordance with, and incorporate the terms and conditions required by, Section 409A. Notwithstanding any provision of this Agreement to the contrary, in the event that the Company determines that any amounts payable hereunder will be immediately taxable to Executive under Section 409A, the Company reserves the right (without any obligation to do so or to indemnify Executive for failure to do so) to (i) adopt such amendments to this Agreement and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Company determines to be necessary or appropriate to preserve the

11

intended tax treatment of the benefits provided by this Agreement, to preserve the economic benefits of this Agreement and to avoid less favorable accounting or tax consequences for the Company and/or (ii) take such other actions as the Company determines to be necessary or appropriate to exempt the amounts payable hereunder from Section 409A or to comply with the requirements of Section 409A and thereby avoid the application of penalty taxes thereunder. No provision of this Agreement shall be interpreted or construed to transfer any liability for failure to comply with the requirements of Section 409A from Executive or any other individual to the Company or any of its Affiliates, employees or agents.

(b) Separation from Service under Section 409A. Notwithstanding any provision to the contrary in this Agreement: (i) no amount shall be payable pursuant to Section 5(b) unless the termination of Executive's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations; (ii) for purposes of Section 409A, Executive's right to receive installment payments pursuant to Section 5(b) shall be treated as a right to receive a series of separate and distinct payments; and (iii) to the extent that any reimbursement of expenses or in-kind benefits constitutes "deferred compensation" under Section 409A, such reimbursement or benefit shall be provided no later than December 31 of the year following the year in which the expense was incurred. The amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year. The amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year. Notwithstanding any provision to the contrary in this Agreement, if the Executive is deemed at the time of his separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent delayed commencement of any portion of the termination benefits to which the Executive is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, such portion of the Executive's termination benefits shall not be provided to the Executive prior to the earlier of (x) the expiration of the six-month period measured from the date of the Executive's "separation from service" with the Company (as such term is defined in the Treasury Regulations issued under Section 409A of the Code) or (y) the date of the Executive's death; upon the earlier of such dates, all payments deferred pursuant to this sentence shall be paid in a lump sum to the Executive, and any remaining payments due under the Agreement shall be paid as otherwise provided herein.

(c) Release. Notwithstanding anything to the contrary in this Agreement, to the extent that any payments of "nonqualified deferred compensation" (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are subject to Executive's execution and delivery of a Release, (i) the Release shall be reasonable and drafted in good faith (ii) the Company shall deliver the Release to Executive within ten (10) business days following the Date of Termination, and the Company's failure to deliver a Release prior to the expiration of such ten (10) business day period shall constitute a waiver of any requirement to execute a Release, (iii) if Executive fails to execute the Release on or prior to the Release Expiration Date (as defined below) or timely revokes his acceptance of the Release thereafter, Executive shall not be entitled to any payments or benefits otherwise conditioned on the Release, and (iv) in any case where the Date of Termination and the Release Expiration Date fall in two separate taxable years, any payments required to be made to Executive that are conditioned on the Release and are treated as nonqualified deferred compensation for purposes of Section 409A shall

12

be made in the later taxable year. For purposes of this Section 21(c), "Release Expiration Date" shall mean the date that is twenty-one (21) days following the date upon which the Company timely delivers the Release to Executive, or, in the event that Executive's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date. To the extent that any payments of nonqualified deferred compensation (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are delayed pursuant to Section 5(b) and this Section 21(c), such amounts shall be paid in a lump sum on the first payroll date following the date that Executive executes and does not revoke the Release (and the applicable revocation period has expired) or, in the case of any payments subject to Section 21(c)(iv), on the first payroll period to occur in the subsequent taxable year, if later.

22. **Compensation Recovery Policy**. The Executive acknowledges and agrees that, to the extent the Company adopts any clawback or similar policy pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or otherwise, and any rules and regulations promulgated thereunder, he shall take all action necessary or appropriate to comply with such policy (including, without limitation, entering into any further agreements, amendments or policies necessary or appropriate to implement and/or enforce such policy).

23. **Whistleblower Protection and Trade Secrets.** Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Executive from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (a) Executive shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (i) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (ii) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney, and may use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

*[Signature pages follow]*

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date and year first above written.

**GOHEALTH**

GOHEALTH, INC.

By:   /s/ Travis J. Matthiesen
Name: Travis J. Matthiesen
Title:  Chief Financial Officer

**PARTNERSHIP**

GOHEALTH HOLDINGS, LLC

By:   Blizzard Aggregator, LLC
Its:   Managing Member

By:   CCP III Cayman GP Ltd.
Its:   Manager

By:   /s/ Jeremy W. Gelber
Name: Jeremy W. Gelber
Title:  Authorized Signatory

By:  /s/ Clint Jones

Clint Jones

Residence Address:

####

Exhibit C to Employment Agreement

**RESTRICTIVE COVENANTS AGREEMENT**

THIS RESTRICTIVE COVENANTS AGREEMENT ("Agreement"), dated as of the 7th day of July, 2020, is made between GoHealth, Inc. ("GoHealth"), GoHealth Holdings, LLC, a Delaware limited liability company (the "Partnership" and, together with GoHealth and any subsidiaries, parent companies or affiliates of GoHealth or the Partnership, the "Company"), and Clint Jones (the "Executive"), a resident of the State of Illinois.

**RECITALS**

A. The Company and the Executive have entered into that certain Employment Agreement dated the date hereof (the "Employment Agreement").

B. The Executive possesses extensive knowledge and experience regarding the business of the Company and shall benefit from the Employment Agreement.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, which includes the Company's agreement to employ or continue to employ Executive under the Employment Agreement and all payments and benefits available to Executive under the Employment Agreement, and in specific consideration for the Company's agreement to provide the bonus payments set forth in the Employment Agreement, which Executive acknowledges and agrees is valid and sufficient consideration for the following covenants in this Agreement, the parties hereto agree as follows:

1. Confidential Information; Non-Disclosure.

a. Non-Use and Non-Disclosure of Confidential Information. Executive acknowledges that Executive currently holds and has access to proprietary and confidential information of the Company and its subsidiaries. Executive hereby covenants and agrees that neither Executive nor any of Executive's Affiliates (as hereinafter defined) will, at any time, divulge, furnish or make accessible to anyone or use in any way other than in the ordinary course of the business of the Company or its subsidiaries, any confidential, proprietary or secret knowledge or information of the Company that Executive has acquired or shall acquire about the Company or its subsidiaries, whether developed by Executive or by others, including, without limitation, knowledge or information concerning (i) any trade secrets, (ii) any confidential, proprietary or secret designs, programs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of the Company or its subsidiaries, (iii) any customer or supplier lists, (iv) any confidential, proprietary or secret development or research work, (v) any strategic or other business, marketing or sales plans, (vi) any financial data or plans, or (vii) any other confidential or proprietary information or secret aspects of the business of the Company or its subsidiaries. Executive acknowledges that the above-described knowledge and information constitutes a unique and valuable asset of the Company and its subsidiaries and represents a substantial investment of time and expense by the

Company and its subsidiaries, and that any disclosure or other use of such knowledge or information other than for the sole benefit of the Company or its subsidiaries would be wrongful and may cause irreparable harm to the Company and its subsidiaries ("Confidential Information"). Executive shall take reasonable steps to protect the confidentiality of all Confidential Information. The foregoing obligations of confidentiality shall not apply to any knowledge or information that (i) is now or subsequently becomes generally publicly known, other than as a result of the breach of this Agreement, (ii) is independently made available to Executive in good faith by a third party who has not violated a confidential relationship with the Company or any of its subsidiaries, or (iii) is required to be disclosed by law or legal process. Executive understands and agrees that his obligations under this Agreement to maintain the confidentiality of the Company's and its subsidiaries' Confidential Information are in addition to any obligations of Executive under applicable statutory or common law. For purposes of this Agreement, "Affiliate" shall mean any person or entity directly or indirectly controlled by the Executive.

b. Company Property. As between the Company and Executive, all Confidential Information will remain the exclusive property of the Company, including, but not limited to, all financial, commercial, operational, technical or business information or data received, obtained, or prepared by Executive in connection with Executive's employment or engagement and concerning the Company's business, and all copies and abstracts thereof. Upon the termination of Executive's employment or engagement with the Company for any reason, Executive will not retain, take, remove, or copy any such property of the Company or any materials containing any Confidential Information whatsoever, and Executive will promptly return all such property and materials to the Company no later than Executive's termination date or earlier upon the Company's request.

c. Exceptions; Notice of Legal Obligation to Disclose. Nothing in this Agreement prohibits Executive from filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or otherwise cooperating with any governmental agency or from making other disclosures that are protected under the whistleblower provisions of applicable law or regulation. Further, nothing herein prevents Executive from disclosing Confidential Information if and to the extent required pursuant to any valid subpoena, court order, or other legal obligation; provided, however, Executive agrees to provide prompt written notice of any such subpoena, court order, or other legal obligation prior to disclosing any Confidential Information (unless such notice to the Company is prohibited by applicable law), enclosing a copy of the subpoena, court order or other documents describing the legal obligation. In the event that the Company objects to the disclosure of Confidential Information, by way of a motion to quash or otherwise, Executive agrees to not disclose any Confidential Information while any such objection is pending.

d. Defend Trade Secrets Act Disclaimer. In compliance with the requirements of the Defend Trade Secrets Act, Executive understands that: (i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, (ii) Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit

or other proceeding, if such filing is made under seal and: (ii) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

2. <u>Noncompetition and Nonsolicitation Covenants</u>.

a. <u>Agreement Not to Compete</u>. Except for Executive's direct and indirect ownership of the Company, for a period starting as of the date hereof and ending on such date which is two (2) years after Executive's Date of Termination (as defined in the Employment Agreement) with the Company or any subsidiary of the Company (the "<u>Restricted Period</u>"), Executive shall not, directly or indirectly, own, invest in, lend money to, acquire or hold any interest in, render services to, act as agent for, or otherwise engage in any business, in the United States or in any other location in which the Company is then doing business, that is competitive with any business conducted by or under active consideration by the Company or its subsidiaries at any time during the period that the Executive is an employee, director or direct or indirect shareholder of the Company or any of its subsidiaries (the "<u>Protected Business</u>"), it being acknowledged by Executive that the Protected Business includes the design, sale, marketing, or distribution of the Company's and its subsidiaries' products and services. Ownership by Executive, as a passive investment, of less than two percent (2%) of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this <u>Section 2(a)</u>.

b. <u>Agreement Not to Solicit Employees</u>. Executive represents and warrants that Executive has not, directly or indirectly, solicited for employment for any entity or person (other than for the Company) any current employee, consultant or other independent contractor of the Company. For the Restricted Period, Executive shall not, directly or indirectly, hire, engage, solicit or attempt to solicit any person who is then an employee, consultant or independent contractor of the Company or any subsidiary of the Company.

c. <u>Agreement Not to Solicit Others</u>. Executive represents and warrants that Executive has not, directly or indirectly, solicited any customer, supplier, distributor or other business contact referred to below for the purposes set forth below (other than on behalf of the Company). For the Restricted Period, Executive shall not, directly or indirectly, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise, (x) solicit or attempt to solicit any person or entity who was a customer of the Company during the last twelve (12) months immediately preceding the date hereof or is a customer of the Company or any subsidiary of the Company during the Restricted Period, for the purposes of selling, marketing or distributing products or services similar to the products or services designed, sold, marketed or distributed by the Company or any of its subsidiaries, and (y) solicit, request, advise or induce any supplier, distributor or other business contact of the Company or any subsidiary to cancel, curtail or otherwise adversely change its relationship with the Company or its subsidiaries as it relates, directly or indirectly, to the Protected Business.

d. Acknowledgment. Executive hereby acknowledges that the provisions of this Section 2 are reasonable and necessary to protect the legitimate interests of the Company and that any violation of this Section 2 by Executive may cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.

e. Assistance is Prohibited. Executive further agrees that Executive will not, directly or indirectly, assist or encourage any other person in carrying out, directly or indirectly, any activity that would be prohibited by the above provisions of this Section 2 if such activity were carried out by Executive, directly or indirectly, or induce any employee, or former employee of the Company to carry out, directly or indirectly, any such activity.

f. Blue Pencil Doctrine. If the duration of, the scope of or any business activity covered by any provision of this Section 2 is in excess of what is determined to be valid and enforceable under applicable law, such provision shall be construed to cover only that duration, scope or activity that is determined to be valid and enforceable. Executive hereby acknowledges that this Section 2 shall be given the construction which renders its provisions valid and enforceable to the maximum extent, snot exceeding its express terms, possible under applicable law.

3. Non-Disparagement. The Executive agrees not to disparage the Company, any of its products, services, or practices, or any of its directors, officers, agents, representatives, partners, members, equity holders, or affiliates, either orally or in writing, at any time; provided, that the Executive may confer in confidence with the Executive's legal representatives and make truthful statements as required by law.

4. Ownership of Inventions.

a. Inventions. Subject to the limitations in Section 4(c) below, the Company will own all rights, title and interest in and to (i) any invention, innovation, manufacturing process, trade secret, design, idea or improvement related, directly or indirectly, to the Company's business, or any part thereof, and (ii) all copyrights, patents, trademarks and trade names which Executive develops or creates, in whole or in part in the course of Executive's employment or engagement with the Company (referred to as "Inventions"). Subject to the limitations in Section 4(c) below, Executive will, and hereby does, assign to the Company, without requirement of further writing and without royalty or any other further consideration, my entire right, title and interest throughout the world in and to all Inventions created, conceived, made, developed, and/or reduced to practice by Executive in the course of Executive's employment or engagement with the Company and all intellectual property rights therein. Executive will promptly tell the Company about and give the Company all information relating to any such Inventions. Executive acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) within the scope of Executive's employment or engagement with the Company and which are eligible for copyright protection are "works made for hire" as that term is defined in the United States Copyright Act (17 U.S.C., Section 101). Executive hereby waives, and agrees to waive, any moral rights Executive may have in any copyrightable work Executive creates or has created on behalf of the Company. Executive will make and maintain adequate and current written records of all Inventions covered by this Section 4(a). These records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, notebooks and any other format. These records shall be and remain the property of the Company at all times and shall be made available to the Company at all times.

1. _Cooperation_. Executive will cooperate with the Company in obtaining, maintaining, and enforcing copyright, patent, trademark or other relevant protections for Inventions covered by <u>Section 4(a)</u>, including executing such documents as the Company may request as necessary for such protection.

c. <u>Executive Inventions</u>. Executive acknowledges that the Company will not own, and the assignment of Inventions set forth in <u>Section 4(a)</u> above does not apply to, Inventions for which no equipment, supplies, facility, or trade secret information of Company were used and which was developed entirely on Executive's own time ("<u>Executive Inventions</u>"), unless (i) the Invention relates (a) to the Company's business or (b) to the Company's actual or demonstrably anticipated research or development, or (ii) the Invention results from any work performed by Executive for the Company. If Executive believes an Invention qualifies as an Executive Invention, Executive will provide the Company at the time of creation written evidence to substantiate such belief. If Executive incorporates any Executive Inventions or portions thereof into any Inventions created or developed for the Company, Executive hereby grants the Company a perpetual, irrevocable, royalty-free, transferable license to copy, modify, prepare derivative works of, use, perform, and display such Executive Invention solely in connection with the Invention.

5. <u>Enforcement</u>. Executive hereby specifically acknowledges and agrees that the scope of the restrictions set forth in this Agreement is reasonable and necessary to ensure that the Company receives the value of the Employment Agreement and that violation of this Agreement will harm the Company to such an extent that monetary damages alone would be an inadequate remedy. Therefore, in the event of any violation by Executive or any Affiliate:

a. the Company (in addition to all other remedies the Company may have) shall be entitled to a temporary restraining order, injunction and other equitable relief (without posting any bond or other security) restraining the violator from committing or continuing such violation,

b. in the case of any violation of <u>Section 2</u> hereof, as determined by a final judgment of court of competent jurisdiction, the duration of the non-compete period referred to therein shall be extended beyond its then-scheduled termination date for a period equal to the duration of the violation, and

c. in the event that the Company must enforce this Agreement pursuant to this <u>Section 5</u>, the Company shall be entitled to recover from Executive its reasonable costs associated therewith, including all reasonable attorneys' and court fees.

6. <u>Use of Name</u>. Neither Executive nor any Affiliate shall use the name "GoHealth," any variants thereof, or any confusingly similar name, in any business (other than the Company) in which any of them is associated as shareholder, investor, lender, partner, co-venturer, co-marketer, sole proprietor, director, officer, employee, agent, consultant, independent contractor or in any other capacity.

7. No Violation of Other Agreements. Executive hereby represents and agrees that neither (a) Executive's entering into this Agreement nor (b) Executive's carrying out the provisions of this Agreement, will violate any other agreement (oral, written or other) to which Executive is a party or by which Executive is bound.

8. At-Will Employment; No Contract of Employment. Nothing herein shall be deemed to create a contract of employment for any term. Executive acknowledges and agrees that Executive's employment with the Company is and shall remain at all times at will, unless otherwise specified by the Employment Agreement.

9. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Executive, the Company and their respective heirs, personal representatives, successors and assigns (including without limitation any assignee of substantially all of the assets of the Company); provided, however, that this Agreement may not be assigned by Executive.

10. Complete Agreement. This Agreement contains the complete agreement between the parties hereto with respect to the matters covered herein, and supersedes all prior agreements and understandings between the parties hereto with respect to such matters. This Agreement may be amended, terminated or superseded only by an agreement in writing executed by both parties hereto.

11. Partial Invalidity. If any covenant or other provision of this Agreement is deemed invalid, illegal or incapable of being enforced by reason of any rule of law or of any public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect and no covenant or provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

12. No Waiver. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel to enforce any provision of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

13. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall constitute but one instrument.

14. Headings. The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

15. Notices. All notices, requests, demands and other communications provided for in this Agreement shall be in writing delivered personally or sent by registered or certified mail, postage prepaid, as follows:

If to the Company:            Go Health Holdings, LLC
214 West Huron Street
Chicago, IL 60654

with a copy to:            Centerbridge Partners, L.P.
375 Park Ave., 11th Floor
New York, NY 10152

If to Executive:            To the address set forth on the Executive's signature page of the Employment Agreement

with a copy to:            Croke Fairchild Morgan & Beres
180 N. LaSalle St., Ste. 2750
Chicago, IL 60601
Attn: Patrick E. Croke

16. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule, whether of the State of Delaware or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Delaware.

17. <u>Action of Affiliates</u>. Executive shall cause his Affiliates not to take any action that is prohibited to be taken by such Affiliates under the terms of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

GOHEALTH, INC.

By: /s/ Travis J. Matthiesen

Name: Travis J. Matthiesen

Title: Chief Financial Officer

GOHEALTH HOLDINGS, LLC

By: Blizzard Aggregator, LLC

Its: Managing Member

By: CCP III Cayman GP Ltd.

Its: Manager

By: /s/ Jeremy W. Gelber

Name: Jeremy W. Gelber

Title: Authorized Signatory

EXECUTIVE

/s/ Clint Jones

Clint Jones

Exhibit 10.14

**Employment Agreement**

This Employment Agreement (the "Agreement"), entered into as of July 7, 2020, is made by and between Shane Cruz (the "Executive"), GoHealth, Inc., a Delaware corporation ("GoHealth"), and GoHealth Holdings, LLC, a Delaware limited liability company (the "Partnership" and, together with GoHealth and any of the Affiliates of GoHealth and the Partnership as may employ the Executive from time to time, and any successor(s) thereto, the "Company").

**RECITALS**

**WHEREAS**, the Executive is currently employed by Norvax, LLC, a subsidiary of the Company ("Norvax"), as the Chief Operating Officer of Norvax under that certain offer letter by and between the Executive and Norvax dated June 7, 2012 (the "Prior Agreement");

**WHEREAS**, GoHealth is contemplating an initial public offering of its common stock (the "IPO");

**WHEREAS**, in connection with the IPO, the Company desires to assure itself of the continued services of the Executive by engaging the Executive to perform services under the terms hereof;

**WHEREAS**, the Executive desires to provide services to the Company on the terms herein provided; and

**WHEREAS**, the Company and the Executive desire to have the Agreement become effective, and supersede the Prior Agreement, as of the date of the consummation of the IPO (the "Effective Date").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, including the respective covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, effective as of the Effective Date, as follows:

1. **Certain Definitions**

    (a)  "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act of 1933, as amended from time to time.

    (b)  "Agreement" shall have the meaning set forth in the preamble hereto.

1

(c)    "Annual Base Salary" shall have the meaning set forth in Section 3(a).

(d)    "Annual Bonus" shall have the meaning set forth in Section 3(b).

(e)    "Board" shall mean the Board of Directors of GoHealth, Inc., a Delaware corporation.

(f)    The Company shall have "Cause" to terminate the Executive's employment hereunder upon: (i)(A) the willful failure or refusal of the Executive to perform material responsibilities set forth herein (including Executive's failure to devote time and attention to his duties hereunder or failure to regularly attend Board or office meetings); (B) the Executive's willful failure to carry out, or comply with, in any material respect any lawful directive of the Board; (C) dishonesty by the Executive to the Board with respect to any material matter; (D) misappropriation of funds or property of the Company or any of its Affiliates by the Executive other than the occasional, customary and *de minimis* use of Company property for personal purposes; or (E) a breach by the Executive of this Agreement or other agreement with the Company (including, without limitation, the Restrictive Covenants Agreement); provided, in the case of each of the foregoing clauses (A)-(E), if the Board (excluding any Board member as to whom Cause is alleged to have occurred) determines reasonably and in good faith that such act can reasonably be cured, that the Company has provided 30 days' prior written notice to the Executive of such conduct and the Executive has failed to cure such conduct within such 30 day period in the manner identified by the Board; (ii) the arrest or charging of the Executive for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud, and which is materially detrimental to the Company and its Affiliates (including material reputational harm); or (iii) the Executive's engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its Affiliates' written code of ethics or Company policies, and which is materially detrimental to the Company and its Affiliates (including material reputational harm).

(g)    "Change of Control" shall have the meaning set forth in the 2020 Incentive Award Plan of the Company.

(h)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(i)    "Company" shall have the meaning set forth in the preamble hereto.

(j)    "Date of Termination" shall mean (i) if the Executive's employment is terminated due to the Executive's death, the date of the Executive's death; (ii) if the Executive's employment is terminated due to the Executive's Disability, the date determined pursuant to Section 4(a)(ii); or (iii) if the Executive's employment is terminated pursuant to Section 4(a)(iii)-(vi) either the date indicated in the Notice of Termination or the date specified by the Company pursuant to Section 4(b), whichever is earlier.

(k)    "Disability" shall mean the Executive's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that can be expected to last for a continuous period of not less than twelve (12) months.

2

(m)    "Executive" shall have the meaning set forth in the preamble hereto.

(n)    "Extension Term" shall have the meaning set forth in Section 2(b).

(o)    The Executive shall have "Good Reason" to terminate the Executive's employment hereunder after the occurrence of one or more of the following conditions without the Executive's consent: (A) a material adverse change in the Executive's title, reporting relationship, authority or duties and responsibilities as of the Effective Date (provided that, for the avoidance of doubt, any change in the Executive's authority or duties and responsibilities made in connection with the IPO shall not be considered a material adverse change for purposes hereof) or an elimination of the Executive's position; (B) a material reduction in the Executive's Base Salary or Annual Bonus opportunity, in either case not otherwise made on a substantially similar basis for senior Company executives generally; or (C) the requirement that the Executive relocate on a permanent basis (except for required business travel) to a location more than 50 miles from the Chicago, Illinois metropolitan area. Executive's employment with the Company may be terminated for Good Reason only if (1) Executive provides written notice to the Company of the occurrence of the Good Reason event (as described above) within 30 days after the Executive knows or reasonably should have known of the circumstances constituting Good Reason, (2) the Company fails to cure the circumstances constituting "Good Reason" within 30 days after such notice, and (3) Executive resigns within 30 days after the expiration of such 30-day cure period. For the avoidance of doubt, an initial public offering of common stock of the Company or any parent (direct or indirect) or other Affiliate of the Company shall not constitute Good Reason for purposes of this Agreement.

(p)    "Initial Term" shall have the meaning set forth in Section 2(b).

(q)    "IPO" shall have the meaning set forth in the recitals hereto.

(r)    "Notice of Termination" shall have the meaning set forth in Section 4(b).

(s)    "Person" shall mean any individual, natural person, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), incorporated or unincorporated association, governmental authority, firm, society or other enterprise, organization or other entity of any nature.

(t)    "Release" shall have the meaning set forth in Section 5(b).

(u)    "Release Expiration Date" shall have the meaning set forth in Section 21(c).

(v)    "Restrictive Covenant Agreement" shall have the meaning set forth in Section 6.

(w)    "Section 409A" shall mean Section 409A of the Code and the Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date.

3

(x) "Severance Period" shall have the meaning set forth in Section 4(b).

(y) "Term" shall have the meaning set forth in Section 2(b).

## 2. Employment

(a) <u>In General</u>. Effective as of the Effective Date, the Company shall employ the Executive under this Agreement and the Executive shall remain in the employ of the Company under this Agreement, for the period set forth in Section 2(b), in the position set forth in Section 2(c), and upon the other terms and conditions herein provided.

(b) <u>Term of Employment</u>. The initial term of employment under this Agreement (the "Initial Term") shall be for the period beginning on the Effective Date and ending on the third anniversary thereof, unless earlier terminated as provided in Section 4. The Initial Term shall automatically be extended for successive one year periods (each, an "Extension Term" and, collectively with the Initial Term, the "Term"), unless either party hereto gives notice of non-extension of the Term to the other no later than ninety (90) days prior to the expiration of the then-applicable Term. For the avoidance of doubt, notice by the Executive of non-extension of the Term, without stated Good Reason and compliance with the notice, cure, and resignation requirements of the definition thereof, shall not constitute a resignation for Good Reason under Section 4(a)(v). For the further avoidance of doubt, notice by the Company of non-extension of the Term, without stated Cause and compliance with the notice and cure requirements of the definition thereof and subject to Section 4(b), shall constitute a termination without Cause under Section 4(a)(iv).

(c) <u>Position and Duties</u>. During the Term, the Executive: (i) shall serve as Chief Operating Officer of the Company, with responsibilities, duties and authority customary for such position, subject to direction by the President of the Company; (ii) shall report directly to the President of the Company; (iii) shall devote substantially all the Executive's working time and efforts to the business and affairs of the Company and its Affiliates; (iv) agrees to observe and comply with the Company's rules and policies as adopted by the Company from time to time. The parties acknowledge and agree that Executive's duties, responsibilities and authority may include services for one or more Affiliates of the Company.

## 3. Compensation and Related Matters

(a) <u>Annual Base Salary</u>. During the Term, the Executive shall receive a base salary at a rate of $350,000 per annum, which shall be paid in accordance with the customary payroll practices of the Company, subject to review by the Board in its sole discretion (the "Annual Base Salary").

(b) <u>Annual Bonus</u>. With respect to each Company fiscal year that ends during the Term, the Executive will be eligible to receive a cash bonus (the "Annual Bonus"), which shall be payable based upon the attainment of individual and Company performance goals established by the Board in its sole discretion. Each such Annual Bonus shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates. Notwithstanding any other provision of this Section 3(b)

4

and subject to Section 2(b), no bonus shall be payable with respect to any fiscal year unless the Executive remains continuously employed with the Company during the period beginning on the Effective Date and ending on the applicable bonus payment date.

(c)  Benefits. During the Term, the Executive shall be eligible to participate in employee benefit plans, programs and arrangements of the Company in accordance with their terms, as in effect from time to time, and as are generally provided by the Company to its senior executive officers.

(d)  Business Expenses. During the Term, the Company shall reimburse the Executive for all reasonable, documented, out-of-pocket travel and other business expenses incurred by the Executive in the performance of the Executive's duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures.

(e)  Indemnification. During the Term and for so long thereafter as liability exists with regard to the Executive's activities during the Term on behalf of the Company, the Company shall indemnify the Executive (other than in connection with the Executive's gross negligence or willful misconduct) in accordance with the Company's customary indemnification policies and procedures which are applicable to the Company's officers and directors.

**4.**  Termination**.** The Executive's employment hereunder may be terminated by the Company or the Executive, as applicable, without any breach of this Agreement only under the following circumstances:

(a)  Circumstances

(i)  Death. The Executive's employment hereunder shall terminate upon the Executive's death.

(ii)  Disability. If the Executive incurs a Disability, the Company may give the Executive written notice of its intention to terminate the Executive's employment. In that event, the Executive's employment with the Company shall terminate, effective on the later of the thirtieth (30th) day after receipt of such notice by the Executive or the date specified in such notice; provided that within the thirty (30) day period following receipt of such notice, the Executive shall not have returned to full-time performance of the Executive's duties hereunder.

(iii)  Termination for Cause. The Company may terminate the Executive's employment for Cause.

(iv)  Termination without Cause. The Company may terminate the Executive's employment without Cause.

(v)  Resignation for Good Reason. The Executive may resign from the Executive's employment for Good Reason.

(vi)  Resignation without Good Reason. The Executive may resign from the Executive's employment without Good Reason.

5

(5) *Notice of Termination*. Any termination of the Executive's employment by the Company or by the Executive under this Section 4 (other than a termination pursuant to Section 4(a)(i) above) shall be communicated by a written notice to the other party hereto (a "Notice of Termination"): (i) indicating the specific termination provision in this Agreement relied upon, and (ii) specifying a Date of Termination which, if submitted by the Executive, shall be at least thirty (30) days following the date of such notice; provided, however, that a Notice of Termination delivered by the Company pursuant to Section 4(a)(ii) shall not be required to specify a Date of Termination, in which case the Date of Termination shall be determined pursuant to Section 4(a)(ii); and provided, further, that in the event that the Executive delivers a Notice of Termination to the Company, the Company may, in its sole discretion, accelerate the Date of Termination to any date that occurs following the date of Company's receipt of such Notice of Termination (even if such date is prior to the date specified in such Notice of Termination). A Notice of Termination submitted by the Company (other than a Notice of Termination under Section 4(a)(ii)) may provide for a Date of Termination on the date the Executive receives the Notice of Termination, or any date thereafter elected by the Company in its sole discretion. The failure by the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Cause shall not waive any right of the Company hereunder or preclude the Company from asserting such fact or circumstance in enforcing the Company's rights hereunder. Notwithstanding the foregoing, a termination pursuant to Section 4(a)(iii) shall be deemed to occur if following Executive's termination of employment for any reason the Company determines that circumstances existing prior to such termination would have entitled to the Company to terminate Executive's employment pursuant to Section 4(a)(iii) (disregarding any applicable cure period).

**5. Company Obligations Upon Termination of Employment**

(a) In General. Upon a termination of the Executive's employment for any reason, the Executive (or the Executive's estate) shall be entitled to receive: (i) any portion of the Executive's Annual Base Salary through the Date of Termination not theretofore paid, (ii) any expenses owed to the Executive under Section 3(d), (iii) any accrued but unused vacation pay owed to the Executive in accordance with applicable law, and (iv) any amount arising from the Executive's participation in, or benefits under, any employee benefit plans, programs or arrangements under Section 3(c), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements. Except as otherwise set forth in Section 5(b) below, the payments and benefits described in this Section 5(a) shall be the only payments and benefits payable in the event of the Executive's termination of employment for any reason.

(b) Severance Payments. In the event of the Executive's termination of employment by the Company without Cause pursuant to Section 4(a)(iv) or by the Executive for Good Reason pursuant to Section 4(a)(v), in addition to the payments and benefits described in Section 5(a) above, the Company shall, subject to Section 21 and Section 5(c) and subject to Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form (a "Release"), as of the Release Expiration Date, in accordance with Section 21(c):

(i) Continue to pay the Executive's Annual Base Salary during the period beginning on the Date of Termination and ending on the one (1) year anniversary

6

of the Date of Termination (the "Severance Period") in accordance with the Company's regular payroll practice as of the Date of Termination. Notwithstanding the foregoing, in the event that within twelve (12) months of a Change of Control of the Company, the Executive is terminated by the Company without Cause pursuant to Section 4(a)(iv) or by the Executive for Good Reason pursuant to Section 4(a)(v) (a "Change of Control Termination"), then the Company shall continue to pay the Executive's Annual Base Salary during the period beginning on the Date of Termination and ending on the two (2) year anniversary of the Date of Termination (the "Change of Control Severance Period"); and

(ii)    Pay (A) the Annual Bonus for any completed fiscal year as of the Date of Termination that has not yet been paid as of the Date of Termination (the "Prior Year Bonus"), if any, and (B) a pro-rated portion of the Annual Bonus for the year in which the Date of Termination occurs, with such proration being based on the number of full months for which the Executive was employed during such year prior to such Date of Termination (such pro-rated bonus, the "Pro-Rated Bonus" and, collectively with the Prior Year Bonus, the "Bonus Severance Payment"). Notwithstanding the foregoing, upon a Change of Control Termination, the Bonus Severance Payment shall instead be equal to the sum of (X) the Prior Year Bonus, if any, and (Y) the product of (I) two (2), multiplied by (II) the Pro-Rated Bonus The bonuses described in this Section 5(b)(ii) shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates, as set forth in Section 3(b).

(iii)    During the Severance Period or the Change of Control Severance Period, as applicable, if the Executive elects to continue coverage under the Company's group health plan in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), continue coverage for the Executive and any eligible dependents under the Company group health benefit plans in which the Executive and any dependents were entitled to participate immediately prior to the Date of Termination. In the event Executive elects to continue with COBRA coverage, provided, that Employee timely submits to the Company evidence of Executive's payments made to the COBRA administrator, the Company will reimburse Executive for the Company's share of the premiums associated therewith in an amount equal to what the Company pays for the health insurance premiums of other executive level employees at the Company. The COBRA health continuation period under Section 4980B of the Code shall run concurrently with the period of continued coverage set forth in this Section 5(b)(ii); provided, however, that in the event Employee obtains other employment that offers group health benefits, such continuation of COBRA coverage by the Company under this Section 5(b)(ii) shall immediately cease.

(c)    Breach of Restrictive Covenant Agreement. Notwithstanding any other provision of this Agreement, no payment shall be made or benefit provided pursuant to Section 5(b) following the date Executive first violates the Restrictive Covenant Agreement and, in the event of such a violation, Executive shall repay to the Company any benefit provided pursuant to Section 5(b) within ninety (90) days of such violation.

7

(8) Complete Severance. The provisions of this Section 5 shall supersede in their entirety any severance payment or benefit obligations to the Executive pursuant to the provisions in any severance plan, policy, program or other arrangement maintained by the Company.

**6.** <u>**Restrictive Covenant Agreement.**</u> The Executive acknowledges that Executive is, concurrently with the execution of this Agreement, entering into an agreement with the Company containing confidentiality, non-solicitation, non-competition, intellectual property assignment, and other protective covenants (the "<u>Restrictive Covenant Agreement</u>" attached hereto as <u>Exhibit A</u>) and that the Executive shall be bound by the terms and conditions of the Restrictive Covenant Agreement.

**7.** <u>**Injunctive Relief.**</u> The Executive recognizes and acknowledges that a breach of the covenants contained in the Restrictive Covenant Agreement will cause irreparable damage to the Company and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, the Executive agrees that, in the event of a breach of any of the covenants contained in the Restrictive Covenant Agreement, in addition to any other remedy which may be available at law or in equity, the Company will be entitled to specific performance and injunctive relief.

**8.** <u>**Assignment and Successors.**</u> The Company may assign its rights and obligations under this Agreement to any entity, including any successor to all or substantially all the assets of the Company, by merger or otherwise, and may assign or encumber this Agreement and its rights hereunder as security for indebtedness of the Company and its Affiliates. The Executive may not assign the Executive's rights or obligations under this Agreement to any individual or entity. This Agreement shall be binding upon and inure to the benefit of the Company, the Executive and their respective successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable.

**9.** <u>**Governing Law; Venue.**</u> This Agreement shall be governed, construed, interpreted and enforced in accordance with the substantive laws of the State of Delaware, without giving effect to any principles of conflicts of law, whether of the State of Delaware or any other jurisdiction, and where applicable, the laws of the United States, that would result in the application of the laws of any other jurisdiction. Each of the parties hereto agrees that any legal action or proceeding with respect to this Agreement shall be brought exclusively in the Chancery Court of New Castle County, Delaware or the federal courts of the United States of America for the District of Delaware, unless the parties to any such action or dispute mutually agree to waive this provision. By execution and delivery of this Agreement, each of the parties hereto irrevocably consents to service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized express carrier or delivery service, to the applicable party at his, her or its address referred to herein. Each of the parties hereto irrevocably waives any objection which he, she or it may now or hereafter have to the laying of venue of any of the aforementioned actions or proceedings arising out of or in connection with this Agreement, or any related agreement, certificate or instrument referred to above, brought in the courts referred to above and hereby further irrevocably waives and agrees, to the fullest extent permitted by applicable law, not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in any inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

8

**10.** **Validity.** The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**11.** **Notices.** Any notice, request, claim, demand, document and other communication hereunder to any party hereto shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by telex, telecopy, or certified or registered mail, postage prepaid, to the following address (or at any other address as any party hereto shall have specified by notice in writing to the other party hereto):

    (a)  If to the Company:

        GoHealth Holdings, LLC
        214 West Huron Street
        Chicago, Illinois 60654
        Attention: Chief Legal Officer or General Counsel

        Copy to:

        Latham & Watkins LLP
        885 Third Avenue
        New York, New York 10022-4802
        Attn: Bradd L. Williamson
        Facsimile: (212) 751-4864

    (b)  If to the Executive, at the address set forth on the signature page hereto.

**12.** **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**13.** **Entire Agreement.** The terms of this Agreement (together with any other agreements and instruments contemplated hereby or referred to herein, including, without limitation, the Restrictive Covenant Agreement attached hereto as Exhibit A) is intended by the parties hereto to be the final expression of their agreement with respect to the employment of the Executive by the Company and may not be contradicted by evidence of any prior or contemporaneous agreement (including, without limitation, the Prior Agreement (which is superseded by this Agreement, effective as of the Effective Date) or any other term sheet or offer letter). The parties hereto further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

**14.** **Amendments; Waivers.** This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by the Executive and a duly authorized

9

officer of GoHealth and approved by the Board, which expressly identifies the amended provision of this Agreement by amendment in writing similarly executed and approved by the Board, the Executive or a duly authorized officer of GoHealth may waive compliance by the other party or parties hereto with any provision of this Agreement that such other party was or is obligated to comply with or perform; provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure to comply or perform. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

15. **No Inconsistent Actions.** The parties hereto shall not voluntarily undertake or fail to undertake any action or course of action inconsistent with the provisions or essential intent of this Agreement. Furthermore, it is the intent of the parties hereto to act in a fair and reasonable manner with respect to the interpretation and application of the provisions of this Agreement.

16. **Construction.** This Agreement shall be deemed drafted equally by both of the parties hereto. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any party hereto shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Also, unless the context clearly indicates to the contrary, (a) the plural includes the singular and the singular includes the plural; (b) "and" and "or" are each used both conjunctively and disjunctively; (c) "any," "all," "each," or "every" means "any and all," and "each and every"; (d) "includes" and "including" are each "without limitation"; (e) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (f) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Persons referred to may require.

17. **Enforcement.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

18. **Withholding.** The Company and its Affiliates shall be entitled to withhold from any amounts payable under this Agreement, any federal, state, local or foreign withholding or other taxes or charges which the Company or any of its Affiliates is required to withhold. The Company and its Affiliates shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

19. **Absence of Conflicts; Executive Acknowledgement; Confidentiality.** The Executive hereby represents that from and after the Effective Date the performance of the

10

Executive causes, hereunder will not breach any other agreement to which the Executive is a party. The Executive acknowledges that the Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company or any of its Affiliates other than those contained in writing herein, and has entered into this Agreement freely based on the Executive's own judgment. The Executive agrees not to disclose the terms or existence of this Agreement to any Person unless the Company agrees to such disclosure in advance and in writing; provided that the Executive may, without such permission, make such disclosures as are required by applicable law, including disclosures to taxing agencies, and disclose the terms of this Agreement to the Executive's attorney(s), accountant(s), tax advisor(s), and other professional service provider(s), and to members of the Executive's immediate family, as reasonably necessary; provided, further, that the Executive instructs such Person(s) that the terms of this Agreement are strictly confidential and are not to be revealed to anyone else except as required by applicable law.

20. **Survival.** The expiration or termination of the Term shall not impair the rights or obligations of any party hereto which shall have accrued prior to such expiration or termination (including, without limitation, pursuant to the provisions of the Restrictive Covenant Agreement attached hereto as Exhibit A).

21. Section 409A.

(a) General. The parties hereto acknowledge and agree that, to the extent applicable, this Agreement shall be interpreted in accordance with, and incorporate the terms and conditions required by, Section 409A. Notwithstanding any provision of this Agreement to the contrary, in the event that the Company determines that any amounts payable hereunder will be immediately taxable to Executive under Section 409A, the Company reserves the right (without any obligation to do so or to indemnify Executive for failure to do so) to (i) adopt such amendments to this Agreement and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Company determines to be necessary or appropriate to preserve the intended tax treatment of the benefits provided by this Agreement, to preserve the economic benefits of this Agreement and to avoid less favorable accounting or tax consequences for the Company and/or (ii) take such other actions as the Company determines to be necessary or appropriate to exempt the amounts payable hereunder from Section 409A or to comply with the requirements of Section 409A and thereby avoid the application of penalty taxes thereunder. No provision of this Agreement shall be interpreted or construed to transfer any liability for failure to comply with the requirements of Section 409A from Executive or any other individual to the Company or any of its Affiliates, employees or agents.

(b) Separation from Service under Section 409A. Notwithstanding any provision to the contrary in this Agreement: (i) no amount shall be payable pursuant to Section 5(b) unless the termination of Executive's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations; (ii) for purposes of Section 409A, Executive's right to receive installment payments pursuant to Section 5(b) shall be treated as a right to receive a series of separate and distinct payments; and (iii) to the extent that any reimbursement of expenses or in-kind benefits constitutes "deferred compensation" under Section 409A, such reimbursement or benefit shall be provided no later than December 31 of the year following the year in which the expense was incurred. The amount of expenses

11

reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year. The amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year. Notwithstanding any provision to the contrary in this Agreement, if the Executive is deemed at the time of his separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent delayed commencement of any portion of the termination benefits to which the Executive is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, such portion of the Executive's termination benefits shall not be provided to the Executive prior to the earlier of (x) the expiration of the six-month period measured from the date of the Executive's "separation from service" with the Company (as such term is defined in the Treasury Regulations issued under Section 409A of the Code) or (y) the date of the Executive's death; upon the earlier of such dates, all payments deferred pursuant to this sentence shall be paid in a lump sum to the Executive, and any remaining payments due under the Agreement shall be paid as otherwise provided herein.

(c)    Release. Notwithstanding anything to the contrary in this Agreement, to the extent that any payments of "nonqualified deferred compensation" (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are subject to Executive's execution and delivery of a Release, (i) the Release shall be reasonable and drafted in good faith, (ii) the Company shall deliver the Release to Executive within ten (10) business days following the Date of Termination, and the Company's failure to deliver a Release prior to the expiration of such ten (10) business day period shall constitute a waiver of any requirement to execute a Release, (iii) if Executive fails to execute the Release on or prior to the Release Expiration Date (as defined below) or timely revokes his acceptance of the Release thereafter, Executive shall not be entitled to any payments or benefits otherwise conditioned on the Release, and (iv) in any case where the Date of Termination and the Release Expiration Date fall in two separate taxable years, any payments required to be made to Executive that are conditioned on the Release and are treated as nonqualified deferred compensation for purposes of Section 409A shall be made in the later taxable year. For purposes of this Section 21(c), "Release Expiration Date" shall mean the date that is twenty-one (21) days following the date upon which the Company timely delivers the Release to Executive, or, in the event that Executive's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date. To the extent that any payments of nonqualified deferred compensation (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are delayed pursuant to Section 5(b) and this Section 21(c), such amounts shall be paid in a lump sum on the first payroll date following the date that Executive executes and does not revoke the Release (and the applicable revocation period has expired) or, in the case of any payments subject to Section 21(c)(iv), on the first payroll period to occur in the subsequent taxable year, if later.

22.    **Compensation Recovery Policy**. The Executive acknowledges and agrees that, to the extent the Company adopts any clawback or similar policy pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or otherwise, and any rules and regulations promulgated thereunder, he shall take all action necessary or appropriate to comply with such policy (including, without limitation, entering into any further agreements, amendments or policies necessary or appropriate to implement and/or enforce such policy).

12

**23. Whistleblower Protection and Trade Secrets.** Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Executive from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (a) Executive shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (i) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (ii) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney, and may use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

*[Signature pages follow]*

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**GOHEALTH**

GOHEALTH, INC.

By: /s/ Travis. J. Matthiesen

Name: Travis. J. Matthiesen
Title: Cheif Financial Officer

**PARTNERSHIP**

GOHEALTH HOLDINGS, LLC

By: Blizzard Aggregator, LLC
Its: Managing Member

By: CCP III Cayman GP Ltd.
Its: Manager

By: /s/ Jeremy W. Gelber

Name: Jeremy W. Gelber
Title: Authorized Signatory

*Signature Page to the*
*Employment Agreement for Shane Cruz*

By: /s/ Shane E. Cruz
  Shane E. Cruz

  Residence Address:
  ####

*Signature Page to the*
*Employment Agreement for Shane Cruz*

Exhibit A

**RESTRICTIVE COVENANTS AGREEMENT**

THIS RESTRICTIVE COVENANTS AGREEMENT ("Agreement"), dated as of the 7th day of July, 2020, is made between GoHealth, Inc. ("GoHealth"), GoHealth Holdings, LLC, a Delaware limited liability company (the "Partnership" and, together with GoHealth and any subsidiaries, parent companies or affiliates of GoHealth or the Partnership, the "Company"), and Shane Cruz (the "Executive"), a resident of the State of Illinois.

**RECITALS**

A. The Company and the Executive have entered into that certain Employment Agreement dated the date hereof (the "Employment Agreement").

B. The Executive possesses extensive knowledge and experience regarding the business of the Company and shall benefit from the Employment Agreement.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, which includes the Company's agreement to employ or continue to employ Executive under the Employment Agreement and all payments and benefits available to Executive under the Employment Agreement, and in specific consideration for the Company's agreement to provide the bonus payments set forth in the Employment Agreement, which Executive acknowledges and agrees is valid and sufficient consideration for the following covenants in this Agreement, the parties hereto agree as follows:

1.  Confidential Information; Non-Disclosure.

    a.  Non-Use and Non-Disclosure of Confidential Information. Executive acknowledges that Executive currently holds and has access to proprietary and confidential information of the Company and its subsidiaries. Executive hereby covenants and agrees that neither Executive nor any of Executive's Affiliates (as hereinafter defined) will, at any time, divulge, furnish or make accessible to anyone or use in any way other than in the ordinary course of the business of the Company or its subsidiaries, any confidential, proprietary or secret knowledge or information of the Company that Executive has acquired or shall acquire about the Company or its subsidiaries, whether developed by Executive or by others, including, without limitation, knowledge or information concerning (i) any trade secrets, (ii) any confidential, proprietary or secret designs, programs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of the Company or its subsidiaries, (iii) any customer or supplier lists, (iv) any confidential, proprietary or secret development or research work, (v) any strategic or other business, marketing or sales plans, (vi) any financial data or plans, or (vii) any other confidential or proprietary information or secret aspects of the business of the Company or its subsidiaries. Executive acknowledges that the above-described knowledge and information constitutes a unique and valuable asset of the Company and its subsidiaries and represents a substantial investment of time and expense by the

Company and its subsidiaries, and that any disclosure or other use of such knowledge and information other than for the sole benefit of the Company or its subsidiaries would be wrongful and may cause irreparable harm to the Company and its subsidiaries ("Confidential Information"). Executive shall take reasonable steps to protect the confidentiality of all Confidential Information. The foregoing obligations of confidentiality shall not apply to any knowledge or information that (i) is now or subsequently becomes generally publicly known, other than as a result of the breach of this Agreement, (ii) is independently made available to Executive in good faith by a third party who has not violated a confidential relationship with the Company or any of its subsidiaries, or (iii) is required to be disclosed by law or legal process. Executive understands and agrees that his obligations under this Agreement to maintain the confidentiality of the Company's and its subsidiaries' Confidential Information are in addition to any obligations of Executive under applicable statutory or common law. For purposes of this Agreement, "Affiliate" shall mean any person or entity directly or indirectly controlled by the Executive.

b. <u>Company Property</u>. As between the Company and Executive, all Confidential Information will remain the exclusive property of the Company, including, but not limited to, all financial, commercial, operational, technical or business information or data received, obtained, or prepared by Executive in connection with Executive's employment or engagement and concerning the Company's business, and all copies and abstracts thereof. Upon the termination of Executive's employment or engagement with the Company for any reason, Executive will not retain, take, remove, or copy any such property of the Company or any materials containing any Confidential Information whatsoever, and Executive will promptly return all such property and materials to the Company no later than Executive's termination date or earlier upon the Company's request.

c. <u>Exceptions; Notice of Legal Obligation to Disclose</u>. Nothing in this Agreement prohibits Executive from filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or otherwise cooperating with any governmental agency or from making other disclosures that are protected under the whistleblower provisions of applicable law or regulation. Further, nothing herein prevents Executive from disclosing Confidential Information if and to the extent required pursuant to any valid subpoena, court order, or other legal obligation; provided, however, Executive agrees to provide prompt written notice of any such subpoena, court order, or other legal obligation prior to disclosing any Confidential Information (unless such notice to the Company is prohibited by applicable law), enclosing a copy of the subpoena, court order or other documents describing the legal obligation. In the event that the Company objects to the disclosure of Confidential Information, by way of a motion to quash or otherwise, Executive agrees to not disclose any Confidential Information while any such objection is pending.

d. <u>Defend Trade Secrets Act Disclaimer</u>. In compliance with the requirements of the Defend Trade Secrets Act, Executive understands that: (i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, (ii)

Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and (iii) if Executive files a lawsuit for retaliation by Company for reporting a suspected violation of law, Executive may disclose trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

2.      Noncompetition and Nonsolicitation Covenants.

a.      Agreement Not to Compete. Except for Executive's direct and indirect ownership of the Company, for a period starting as of the date hereof and ending on such date which is one (1) year after Executive's Date of Termination (as defined in the Employment Agreement) or, in the event of a Change of Control Termination (as defined in the Employment Agreement), such date which is two (2) years after Executive's Date of Termination (the "Restricted Period"), Executive shall not, directly or indirectly, own, invest in, lend money to, acquire or hold any interest in, render services to, act as agent for, or otherwise engage in any business, in the United States or in any other location in which the Company is then doing business, that is competitive with any business conducted by or under active consideration by the Company or its subsidiaries at any time during the period that the Executive is an employee, director or direct or indirect shareholder of the Company or any of its subsidiaries (the "Protected Business"), it being acknowledged by Executive that the Protected Business includes the design, sale, marketing, or distribution of the Company's and its subsidiaries' products and services. Ownership by Executive, as a passive investment, of less than two percent (2%) of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this Section 2(a).

b.      Agreement Not to Solicit Employees. Executive represents and warrants that Executive has not, directly or indirectly, solicited for employment for any entity or person (other than for the Company) any current employee, consultant or other independent contractor of the Company. For the Restricted Period, Executive shall not, directly or indirectly, hire, engage, solicit or attempt to solicit any person who is then an employee, consultant or independent contractor of the Company or any subsidiary of the Company.

c.      Agreement Not to Solicit Others. Executive represents and warrants that Executive has not, directly or indirectly, solicited any customer, supplier, distributor or other business contact referred to below for the purposes set forth below (other than on behalf of the Company). For the Restricted Period, Executive shall not, directly or indirectly, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise, (x) solicit or attempt to solicit any person or entity who was a customer of the Company during the last twelve (12) months immediately preceding the date hereof or is a customer of the Company or any subsidiary of the Company during the Restricted Period, for the purposes of selling, marketing or distributing products or services similar to the products or services designed, sold, marketed or distributed by the Company or any of its subsidiaries, and (y) solicit, request, advise or induce any supplier,

distributor or other business contacts of the Company or any subsidiary to cancel, curtail or otherwise adversely change its relationship with the Company or its subsidiaries as it relates, directly or indirectly, to the Protected Business.

        d.   <u>Acknowledgment</u>. Executive hereby acknowledges that the provisions of this <u>Section 2</u> are reasonable and necessary to protect the legitimate interests of the Company and that any violation of this <u>Section 2</u> by Executive may cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.

        e.   <u>Assistance is Prohibited</u>. Executive further agrees that Executive will not, directly or indirectly, assist or encourage any other person in carrying out, directly or indirectly, any activity that would be prohibited by the above provisions of this <u>Section 2</u> if such activity were carried out by Executive, directly or indirectly, or induce any employee, or former employee of the Company to carry out, directly or indirectly, any such activity.

        f.   <u>Blue Pencil Doctrine</u>. If the duration of, the scope of or any business activity covered by any provision of this <u>Section 2</u> is in excess of what is determined to be valid and enforceable under applicable law, such provision shall be construed to cover only that duration, scope or activity that is determined to be valid and enforceable. Executive hereby acknowledges that this Section 2 shall be given the construction which renders its provisions valid and enforceable to the maximum extent, snot exceeding its express terms, possible under applicable law.

        3.   <u>Non-Disparagement</u>. The Executive agrees not to disparage the Company, any of its products, services, or practices, or any of its directors, officers, agents, representatives, partners, members, equity holders, or affiliates, either orally or in writing, at any time; <u>provided</u>, that the Executive may confer in confidence with the Executive's legal representatives and make truthful statements as required by law.

        4.   <u>Ownership of Inventions</u>.

        a.   <u>Inventions</u>. Subject to the limitations in <u>Section 4(c)</u> below, the Company will own all rights, title and interest in and to (i) any invention, innovation, manufacturing process, trade secret, design, idea or improvement related, directly or indirectly, to the Company's business, or any part thereof, and (ii) all copyrights, patents, trademarks and trade names which Executive develops or creates, in whole or in part in the course of Executive's employment or engagement with the Company (referred to as "<u>Inventions</u>"). Subject to the limitations in <u>Section 4(c)</u> below, Executive will, and hereby does, assign to the Company, without requirement of further writing and without royalty or any other further consideration, my entire right, title and interest throughout the world in and to all Inventions created, conceived, made, developed, and/or reduced to practice by Executive in the course of Executive's employment or engagement with the Company and all intellectual property rights therein. Executive will promptly tell the Company about and give the Company all information relating to any such Inventions. Executive acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) within the scope of Executive's employment or engagement with the

Company and which are original and copyright protectable. "Works made for hire" as the term is defined in the United States Copyright Act (17 U.S.C., Section 101). Executive hereby waives, and agrees to waive, any moral rights Executive may have in any copyrightable work Executive creates or has created on behalf of the Company. Executive will make and maintain adequate and current written records of all Inventions covered by this Section 4(a). These records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, notebooks and any other format. These records shall be and remain the property of the Company at all times and shall be made available to the Company at all times.

      b.   Cooperation. Executive will cooperate with the Company in obtaining, maintaining and enforcing copyright, patent, trademark or other relevant protections for Inventions covered by Section 4(a), including executing such documents as the Company may request as necessary for such protection.

      c.   Executive Inventions. Executive acknowledges that the Company will not own, and the assignment of Inventions set forth in Section 4(a) above does not apply to, Inventions for which no equipment, supplies, facility, or trade secret information of Company were used and which was developed entirely on Executive's own time ("Executive Inventions"), unless (i) the Invention relates (a) to the Company's business or (b) to the Company's actual or demonstrably anticipated research or development, or (ii) the Invention results from any work performed by Executive for the Company. If Executive believes an Invention qualifies as an Executive Invention, Executive will provide the Company at the time of creation written evidence to substantiate such belief. If Executive incorporates any Executive Inventions or portions thereof into any Inventions created or developed for the Company, Executive hereby grants the Company a perpetual, irrevocable, royalty-free, transferable license to copy, modify, prepare derivative works of, use, perform, and display such Executive Invention solely in connection with the Invention.

      5.   Enforcement. Executive hereby specifically acknowledges and agrees that the scope of the restrictions set forth in this Agreement is reasonable and necessary to ensure that the Company receives the value of the Employment Agreement and that violation of this Agreement will harm the Company to such an extent that monetary damages alone would be an inadequate remedy. Therefore, in the event of any violation by Executive or any Affiliate:

      a.   the Company (in addition to all other remedies the Company may have) shall be entitled to a temporary restraining order, injunction and other equitable relief (without posting any bond or other security) restraining the violator from committing or continuing such violation,

      b.   in the case of any violation of Section 2 hereof, as determined by a final judgment of court of competent jurisdiction, the duration of the non-compete period referred to therein shall be extended beyond its then-scheduled termination date for a period equal to the duration of the violation, and

In the event that the Company must enforce this Agreement pursuant to the directions, the Company shall be entitled to recover from Executive its reasonable costs associated therewith, including all reasonable attorneys' and court fees.

6. <u>Use of Name</u>. Neither Executive nor any Affiliate shall use the name "GoHealth," any variants thereof, or any confusingly similar name, in any business (other than the Company) in which any of them is associated as shareholder, investor, lender, partner, co-venturer, co-marketer, sole proprietor, director, officer, employee, agent, consultant, independent contractor or in any other capacity.

7. <u>No Violation of Other Agreements</u>. Executive hereby represents and agrees that neither (a) Executive's entering into this Agreement nor (b) Executive's carrying out the provisions of this Agreement, will violate any other agreement (oral, written or other) to which Executive is a party or by which Executive is bound.

8. <u>At-Will Employment; No Contract of Employment</u>. Nothing herein shall be deemed to create a contract of employment for any term. Executive acknowledges and agrees that Executive's employment with the Company is and shall remain at all times at will, unless otherwise specified by the Employment Agreement.

9. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of Executive, the Company and their respective heirs, personal representatives, successors and assigns (including without limitation any assignee of substantially all of the assets of the Company); provided, however, that this Agreement may not be assigned by Executive.

10. <u>Complete Agreement</u>. This Agreement contains the complete agreement between the parties hereto with respect to the matters covered herein, and supersedes all prior agreements and understandings between the parties hereto with respect to such matters. This Agreement may be amended, terminated or superseded only by an agreement in writing executed by both parties hereto.

11. <u>Partial Invalidity</u>. If any covenant or other provision of this Agreement is deemed invalid, illegal or incapable of being enforced by reason of any rule of law or of any public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect and no covenant or provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

12. <u>No Waiver</u>. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel to enforce any provision of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

13. <u>Counterparts</u>. This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall constitute but one instrument.

14.   Headings. The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

15.   Notices. All notices, requests, demands and other communications provided for in this Agreement shall be in writing delivered personally or sent by registered or certified mail, postage prepaid, as follows:

| | |
|---|---|
| If to the Company: | GoHealth Holdings, LLC<br>214 West Huron Street<br>Chicago, IL 60654 |
| with a copy to: | Centerbridge Partners, L.P.<br>375 Park Ave., 11th Floor<br>New York, NY 10152 |
| If to Executive: | To the address set forth on the Executive's signature<br>page of the Employment Agreement |
| with a copy to: | Croke Fairchild Morgan & Beres<br>180 N. LaSalle St., Ste. 2750<br>Chicago, IL 60601<br>Attn: Patrick E. Croke |

16.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule, whether of the State of Delaware or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Delaware.

17.   Action of Affiliates. Executive shall cause his Affiliates not to take any action that is prohibited to be taken by such Affiliates under the terms of this Agreement.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

GOHEALTH, INC.

By:    /s/ Travis J. Matthiesen

Name:  Travis J. Matthiesen

Its:    Chief Financial Officer

GOHEALTH HOLDINGS, LLC

By:    Blizzard Aggregator, LLC

Its:    Managing Member

By:    CCP III Cayman GP Ltd.

Its:    Manager

By:    /s/ Jeremy W. Gelber

Name:  Jeremy W. Gelber

Its:    Authorized Signatory

EXECUTIVE

/s/ Shane E. Cruz

Shane E. Cruz

Exhibit 10.15

**EXECUTION VERSION**

**Employment Agreement**

This Employment Agreement (the "<u>Agreement</u>"), entered into as of July 7, 2020, is made by and between James Sharman (the "<u>Executive</u>"), GoHealth, Inc., a Delaware corporation ("<u>GoHealth</u>"), and GoHealth Holdings, LLC, a Delaware limited liability company (the "<u>Partnership</u>" and, together with GoHealth and any of the Affiliates of GoHealth and the Partnership as may employ the Executive from time to time, and any successor(s) thereto, the "<u>Company</u>").

**RECITALS**

**WHEREAS**, the Executive is currently employed by Norvax, LLC, a subsidiary of the Company ("<u>Norvax</u>"), as the President of Norvax under that certain offer letter by and between the Executive and Norvax dated December 21, 2017 (the "<u>Prior Agreement</u>");

**WHEREAS**, GoHealth is contemplating an initial public offering of its common stock (the "<u>IPO</u>");

**WHEREAS**, in connection with the IPO, the Company desires to assure itself of the continued services of the Executive by engaging the Executive to perform services under the terms hereof;

**WHEREAS**, the Executive desires to provide services to the Company on the terms herein provided; and

**WHEREAS**, the Company and the Executive desire to have the Agreement become effective, and supersede the Prior Agreement, as of the date of the consummation of the IPO (the "<u>Effective Date</u>").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, including the respective covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, effective as of the Effective Date, as follows:

1. <u>Certain Definitions</u>

(a) "<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act of 1933, as amended from time to time.

(b) "<u>Agreement</u>" shall have the meaning set forth in the preamble hereto.

(c) "<u>Annual Base Salary</u>" shall have the meaning set forth in <u>Section 3</u>(<u>a</u>).

1

(d) "Annual Bonus" shall have the meaning set forth in Section 3(b).

(e) "Board" shall mean the Board of Directors of GoHealth, Inc., a Delaware corporation.

(f) The Company shall have "Cause" to terminate the Executive's employment hereunder upon: (i)(A) the willful failure or refusal of the Executive to perform material responsibilities set forth herein (including Executive's failure to devote time and attention to his duties hereunder or failure to regularly attend Board or office meetings); (B) the Executive's willful failure to carry out, or comply with, in any material respect any lawful directive of the Board; (C) dishonesty by the Executive to the Board with respect to any material matter; (D) misappropriation of funds or property of the Company or any of its Affiliates by the Executive other than the occasional, customary and *de minimis* use of Company property for personal purposes; or (E) a breach by the Executive of this Agreement or other agreement with the Company (including, without limitation, the Restrictive Covenants Agreement); provided, in the case of each of clause (i)(A)-(E), if the Board (excluding any Board member as to whom Cause is alleged to have occurred) determines reasonably and in good faith that such act can reasonably be cured, that the Company has provided 30 days' prior written notice to the Executive of such conduct and the Executive has failed to cure such conduct within such 30 day period in the manner identified by the Board; (ii) the arrest or charging of the Executive for (A) any felony or (B) a misdemeanor involving moral turpitude, deceit, dishonesty or fraud, and which is materially detrimental to the Company and its Affiliates (including material reputational harm); or (iii) the Executive's engagement in on-the-job conduct that consists either of gross misconduct or a material violation of the Company or any of its Affiliates' written code of ethics or Company policies, and which is materially detrimental to the Company and its Affiliates (including material reputational harm).

(g) "Change of Control" shall have the meaning set forth in the 2020 Incentive Award Plan of the Company.

(h) "Code" shall mean the Internal Revenue Code of 1986, as amended.

(i) "Company" shall have the meaning set forth in the preamble hereto.

(j) "Date of Termination" shall mean (i) if the Executive's employment is terminated due to the Executive's death, the date of the Executive's death; (ii) if the Executive's employment is terminated due to the Executive's Disability, the date determined pursuant to Section 4(a)(ii); or (iii) if the Executive's employment is terminated pursuant to Section 4(a)(iii) -(vi), either the date indicated in the Notice of Termination or the date specified by the Company pursuant to Section 4(b), whichever is earlier.

(k) "Disability" shall mean the Executive's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that can be expected to last for a continuous period of not less than twelve (12) months.

(l) "Effective Date" shall have the meaning set forth in the recitals hereto.

2

(m) "Executive" shall have the meaning set forth in the preamble hereto.

(n) "Extension Term" shall have the meaning set forth in Section 2(b).

(o) The Executive shall have "Good Reason" to terminate the Executive's employment hereunder after the occurrence of one or more of the following conditions without the Executive's consent: (A) a material adverse change in the Executive's authority or duties and responsibilities as of the Effective Date (provided that, for the avoidance of doubt, any change in the Executive's authority or duties and responsibilities made in connection with the IPO shall not be considered a material adverse change for purposes hereof); (B) a material reduction in the Executive's Annual Base Salary or Annual Bonus opportunity, in either case not otherwise made on a substantially similar basis for senior Company executives generally; or (C) the requirement that the Executive relocate on a permanent basis (except for required business travel) to a location more than 50 miles from the Chicago, Illinois metropolitan area. Executive's employment with the Company may be terminated for Good Reason only if (1) Executive provides written notice to the Company of the occurrence of the Good Reason event (as described above) within 30 days after the Executive knows or reasonably should have known of the circumstances constituting Good Reason, (2) the Company fails to cure the circumstances constituting "Good Reason" within 30 days after such notice, and (3) Executive resigns within 30 days after the expiration of such 30-day cure period. For the avoidance of doubt, an initial public offering of common stock of the Company or any parent (direct or indirect) or other Affiliate of the Company shall not constitute Good Reason for purposes of this Agreement.

(p) "Initial Term" shall have the meaning set forth in Section 2(b).

(q) "IPO" shall have the meaning set forth in the recitals hereto.

(r) "Notice of Termination" shall have the meaning set forth in Section 4(b).

(s) "Person" shall mean any individual, natural person, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), incorporated or unincorporated association, governmental authority, firm, society or other enterprise, organization or other entity of any nature.

(t) "Release" shall have the meaning set forth in Section 5(b).

(u) "Release Expiration Date" shall have the meaning set forth in Section 21(c).

(v) "Restrictive Covenant Agreement" shall have the meaning set forth in Section 6.

(w) "Section 409A" shall mean Section 409A of the Code and the Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date.

(x) "Severance Period" shall have the meaning set forth in Section 5(b).

3

(y) "Term" shall have the meaning set forth in Section 2(b).

(z) "Transitional Role" shall have the meaning set forth in Section 2(c).

**2. Employment**

(a) In General. Effective as of the Effective Date, the Company shall employ the Executive under this Agreement and the Executive shall remain in the employ of the Company under this Agreement, for the period set forth in Section 2(b), in the position set forth in Section 2(c), and upon the other terms and conditions herein provided.

(b) Term of Employment. The initial term of employment under this Agreement (the "Initial Term") shall be for the period beginning on the Effective Date and ending on the third anniversary thereof, unless earlier terminated as provided in Section 4. The Initial Term shall automatically be extended for successive one year periods (each, an "Extension Term" and, collectively with the Initial Term, the "Term"), unless either party hereto gives notice of non-extension of the Term to the other no later than ninety (90) days prior to the expiration of the then-applicable Term. For the avoidance of doubt, notice by the Executive of non-extension of the Term, without stated Good Reason and compliance with the notice, cure, and resignation requirements of the definition thereof, shall not constitute a resignation for Good Reason under Section 4(a)(v). For the further avoidance of doubt, notice by the Company of non-extension of the Term, without stated Cause and compliance with the notice and cure requirements of the definition thereof and subject to Section 4(b), shall constitute a termination without Cause under Section 4(a)(iv).

(c) Position and Duties. During the initial twelve (12) months of the Initial Term, the Executive: (i) shall serve as President of the Company, with responsibilities, duties and authority customary for such position, subject to direction by the Chief Executive Officer of the Company; (ii) shall report directly to the Chief Executive Officer of the Company; (iii) shall devote substantially all the Executive's working time and efforts to the business and affairs of the Company and its Affiliates; (iv) agrees to observe and comply with the Company's rules and policies as adopted by the Company from time to time. The parties acknowledge and agree that Executive's duties, responsibilities and authority may include services for one or more Affiliates of the Company. No earlier than the twelve (12) month anniversary of the Effective Date, as mutually agreed by the parties at the time, the Executive's role may change to a role other than President (the "Transitional Role") for the remainder of the Term. For the avoidance of doubt, in the event that the Executive's role changes to a Transitional Role: (A) unless amended by mutual agreement of the parties hereto, the terms and conditions of this Agreement will remain in effect for the remainder of the Term, except as set forth in Section 3(a) and (b) and a change in title, as mutually agreed by the parties at the time of such transition; (B) Executive shall continue to be eligible to participate in the Company's group health plan, employee benefit plans, programs and arrangements; and (C) such Transitional Role shall not begin the Severance Period.

4

**3. Compensation and Related Matters**

(a) <u>Annual Base Salary</u>. During the period of the Term in which the Executive's position is President of the Company, the Executive shall receive a base salary at a rate of $400,000 per annum, which shall be paid in accordance with the customary payroll practices of the Company, subject to review by the Board in its sole discretion (the "<u>Annual Base Salary</u>"). Should Executive's position change to a Transitional Role, the parties may reach a mutually agreeable change in the Annual Base Salary; <u>provided</u>, <u>however</u>, that any change in Executive's Annual Base Salary resulting from Executive's position changing to a Transitional Role shall not be considered a material reduction in the Executive's Annual Base Salary for purposes of the definition of "Good Reason" under <u>Section 1(n)</u>.

(b) <u>Annual Bonus</u>. With respect to each Company fiscal year during the Term, the Executive will be eligible to receive a cash bonus (the "<u>Annual Bonus</u>"), which shall be payable based upon the attainment of individual and Company performance goals established by the Board in its sole discretion. Each such Annual Bonus shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates. Notwithstanding any other provision of this <u>Section 3(b)</u> and subject to <u>Section 5(b)</u>, no bonus shall be payable with respect to any fiscal year unless the Executive remains continuously employed with the Company during the period beginning on the Effective Date and ending on the applicable bonus payment date. Should Executive's position change to a Transitional Role, the parties may reach a mutually agreeable change in the structure of the Annual Bonus; <u>provided</u>, <u>however</u>, that any change in Executive's Annual Bonus resulting from Executive's position changing to a Transitional Role shall not be considered a material reduction in the Executive's Annual Bonus opportunity for purposes of the definition of "Good Reason" under <u>Section 1(n)</u>.

(c) <u>Benefits</u>. During the Term, the Executive shall be eligible to participate in employee benefit plans, programs and arrangements of the Company in accordance with their terms, as in effect from time to time, and as are generally provided by the Company to its senior executive officers.

(d) <u>Business Expenses</u>. During the Term, the Company shall reimburse the Executive for all reasonable, documented, out-of-pocket travel and other business expenses incurred by the Executive in the performance of the Executive's duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures.

(e) <u>Indemnification</u>. During the Term and for so long thereafter as liability exists with regard to the Executive's activities during the Term on behalf of the Company, the Company shall defend and indemnify the Executive (other than in connection with the Executive's gross negligence or willful misconduct) in accordance with the Company's customary indemnification policies and procedures which are applicable to the Company's officers and directors.

5

**4. Termination.** The Executive's employment hereunder may be terminated by the Company or the Executive, as applicable, without any breach of this Agreement only under the following circumstances:

(a) <u>Circumstances</u>

(i) <u>Death</u>. The Executive's employment hereunder shall terminate upon the Executive's death.

(ii) <u>Disability</u>. If the Executive incurs a Disability, the Company may give the Executive written notice of its intention to terminate the Executive's employment. In that event, the Executive's employment with the Company shall terminate, effective on the later of the thirtieth (30th) day after receipt of such notice by the Executive or the date specified in such notice; <u>provided</u> that within the thirty (30) day period following receipt of such notice, the Executive shall not have returned to full-time performance of the Executive's duties hereunder.

(iii) <u>Termination for Cause</u>. The Company may terminate the Executive's employment for Cause.

(iv) <u>Termination without Cause</u>. The Company may terminate the Executive's employment without Cause.

(v) <u>Resignation for Good Reason</u>. The Executive may resign from the Executive's employment for Good Reason.

(vi) <u>Resignation without Good Reason</u>. The Executive may resign from the Executive's employment without Good Reason.

(b) <u>Notice of Termination</u>. Any termination of the Executive's employment by the Company or by the Executive under this <u>Section 4</u> (other than a termination pursuant to <u>Section 4(a)(i)</u> above) shall be communicated by a written notice to the other party hereto (a "<u>Notice of Termination</u>"): (i) indicating the specific termination provision in this Agreement relied upon, and (ii) specifying a Date of Termination which, if submitted by the Executive, shall be at least thirty (30) days following the date of such notice; <u>provided</u>, <u>however</u>, that a Notice of Termination delivered by the Company pursuant to <u>Section 4(a)(ii)</u> shall not be required to specify a Date of Termination, in which case the Date of Termination shall be determined pursuant to <u>Section 4(a)(ii)</u>; and <u>provided</u>, <u>further</u>, that in the event that the Executive delivers a Notice of Termination to the Company, the Company may, in its sole discretion, accelerate the Date of Termination to any date that occurs following the date of Company's receipt of such Notice of Termination (even if such date is prior to the date specified in such Notice of Termination). A Notice of Termination submitted by the Company (other than a Notice of Termination under <u>Section 4(a)(ii)</u>) may provide for a Date of Termination on the date the Executive receives the Notice of Termination, or any date thereafter elected by the Company in its sole discretion. The failure by the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Cause shall not preclude the Company from asserting such fact or circumstance in enforcing the Company's rights hereunder in connection with such Termination for Cause. Notwithstanding the foregoing, a termination pursuant to <u>Section 4(a)(iii)</u> shall be deemed to occur if following Executive's termination of employment for any reason the Company determines that circumstances existing prior to such termination would have entitled the Company to terminate Executive's employment pursuant to <u>Section 4(a)(iii)</u> (disregarding any applicable cure period).

6

5. **Company Obligations Upon Termination of Employment**

(a) In General. Upon a termination of the Executive's employment for any reason, the Executive (or the Executive's estate) shall be entitled to receive: (i) any portion of the Executive's Annual Base Salary through the Date of Termination not theretofore paid, (ii) any expenses owed to the Executive under Section 3(d), (iii) any accrued but unused vacation pay owed to the Executive in accordance with applicable law, and (iv) any amount arising from the Executive's participation in, or benefits under, any employee benefit plans, programs or arrangements under Section 3(c), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements. Except as otherwise set forth in Section 5(b) below, the payments and benefits described in this Section 5(a) shall be the only payments and benefits payable in the event of the Executive's termination of employment for any reason.

(b) Severance Payments. In the event of the Executive's termination of employment by the Company without Cause pursuant to Section 4(a)(iv) or by the Executive for Good Reason pursuant to Section 4(a)(v), in addition to the payments and benefits described in Section 5(a) above, the Company shall, subject to Section 21 and Section 5(c) and subject to Executive's execution and non-revocation of a waiver and release of claims agreement in the Company's customary form (a "Release"), as of the Release Expiration Date, in accordance with Section 21(c):

(i) Continue to pay Executive's Annual Base Salary during the period beginning on the Date of Termination and ending on the one (1) year anniversary of the Date of Termination (the "Severance Period") in accordance with the Company's regular payroll practice as of the Date of Termination. Notwithstanding the foregoing, in the event that within twelve (12) months of a Change of Control of the Company, the Executive is terminated by the Company without Cause pursuant to Section 4(a)(iv) or by the Executive for Good Reason pursuant to Section 4(a)(v) (a "Change of Control Termination"), then the Company shall continue to pay the Executive's Annual Base Salary during the period beginning on the Date of Termination and ending on the two (2) year anniversary of the Date of Termination (the "Change of Control Severance Period"); and

(ii) Pay (A) the Annual Bonus for any completed fiscal year as of the Date of Termination that has not yet been paid as of the Date of Termination (the "Prior Year Bonus"), if any, and (B) a pro-rated portion of the Annual Bonus for the year in which the Date of Termination occurs, with such proration being based on the number of full months for which the Executive was employed during such year prior to such Date of Termination (such pro-rated bonus, the "Pro-Rated Bonus" and, collectively with the Prior Year Bonus, the "Bonus Severance Payment"). Notwithstanding the foregoing, upon a Change of Control Termination, the Bonus Severance Payment shall instead be equal to the sum of (X) the Prior Year Bonus, if any, and (Y) the product of (I) two (2), *multiplied by* (II) the Pro-Rated Bonus The bonuses described in this Section 5(b)(ii) shall be payable, to the extent earned, on, or at such date as is determined by the Board within 120 days following, the last day of the fiscal year with respect to which it relates, as set forth in Section 3(b).

7

EXECUTION VERSION

(iii) During the Severance Period, or the Change of Control Severance Period, as applicable, the Company will continue all the Employee's coverage under the Company's group health plan under the same terms and conditions that existed for the term of employment until the end of the Severance Period, or the Change of Control Severance Period, as applicable. After the Severance Period or the Change of Control Severance Period, as applicable, the Company will, until the Executive reaches age 65 and to the extent permitted by the Company's group health plan and applicable law, continue all the Employee's coverage under the Company's group health plan if the Executive elects to continue coverage under the Company's group health plan in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"). In the event Executive elects to continue with COBRA coverage, such coverage will be at the sole expense of the Executive. In the event Employee obtains other employment that offers group health benefits, such continuation of COBRA coverage by the Company under this Section 5(b)(iii) shall immediately cease.

(c) Breach of Restrictive Covenant Agreement. Notwithstanding any other provision of this Agreement, no payment shall be made or benefit provided pursuant to Section 5(b) following the date Executive first violates the Restrictive Covenant Agreement and, in the event of such a violation, Executive shall repay to the Company any benefit provided pursuant to Section 5(b) within ninety (90) days of such violation.

(d) Complete Severance. The provisions of this Section 5 shall supersede in their entirety any severance payment or benefit obligations to the Executive pursuant to the provisions in any severance plan, policy, program or other arrangement maintained by the Company.

**6. Restrictive Covenant Agreement.** The Executive acknowledges that Executive is, concurrently with the execution of this Agreement, entering into an agreement with the Company containing confidentiality, non-solicitation, non-competition, intellectual property assignment, and other protective covenants (the "Restrictive Covenant Agreement," attached hereto as Exhibit A to this Agreement") and that the Executive shall be bound by the terms and conditions of the Restrictive Covenant Agreement.

**7. Injunctive Relief.** The Executive recognizes and acknowledges that a breach of the covenants contained in the Restrictive Covenant Agreement will cause irreparable damage to the Company and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, the Executive agrees that, in the event of a breach of any of the covenants contained in the Restrictive Covenant Agreement, in addition to any other remedy which may be available at law or in equity, the Company will be entitled to specific performance and injunctive relief.

**8. Assignment and Successors.** The Company may assign its rights and obligations under this Agreement to any entity, including any successor to all or substantially all the assets of the Company, by merger or otherwise, and may assign or encumber this Agreement and its rights hereunder as security for indebtedness of the Company and its Affiliates. The Executive may not assign the Executive's rights or obligations under this Agreement to any individual or entity. This Agreement shall be binding upon and inure to the benefit of the Company, the Executive and their respective successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable.

8

EXECUTION VERSION

**9. <u>Governing Law; Venue</u>.** This Agreement shall be governed, construed, interpreted and enforced in accordance with the substantive laws of the State of Delaware, without giving effect to any principles of conflicts of law, whether of the State of Delaware or any other jurisdiction, and where applicable, the laws of the United States, that would result in the application of the laws of any other jurisdiction. Each of the parties hereto agrees that any legal action or proceeding with respect to this Agreement shall be brought exclusively in the Chancery Court of New Castle County, Delaware or the federal courts of the United States of America for the District of Delaware, unless the parties to any such action or dispute mutually agree to waive this provision. By execution and delivery of this Agreement, each of the parties hereto irrevocably consents to service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized express carrier or delivery service, to the applicable party at his, her or its address referred to herein. Each of the parties hereto irrevocably waives any objection which he, she or it may now or hereafter have to the laying of venue of any of the aforementioned actions or proceedings arising out of or in connection with this Agreement, or any related agreement, certificate or instrument referred to above, brought in the courts referred to above and hereby further irrevocably waives and agrees, to the fullest extent permitted by applicable law, not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in any inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

**10. <u>Validity</u>.** The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**11. <u>Notices</u>.** Any notice, request, claim, demand, document and other communication hereunder to any party hereto shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by telex, telecopy, or certified or registered mail, postage prepaid, to the following address (or at any other address as any party hereto shall have specified by notice in writing to the other party hereto):

(a)　If to the Company:

GoHealth Holdings, LLC
214 West Huron Street
Chicago, Illinois 60654
Attention: Chief Legal Officer or General Counsel

Copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4802
Attn: Bradd L. Williamson
Facsimile: (212) 751-4864

9

(b)     If to the Executive, at the address set forth on the signature page hereto.

**12. <u>Counterparts</u>.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**13. <u>Entire Agreement</u>.** The terms of this Agreement (together with any other agreements and instruments contemplated hereby or referred to herein, including, without limitation, the Restrictive Covenant Agreement attached hereto as Exhibit A) is intended by the parties hereto to be the final expression of their agreement with respect to the employment of the Executive by the Company and may not be contradicted by evidence of any prior or contemporaneous agreement (including, without limitation, the Prior Agreement (which is superseded by this Agreement, effective as of the Effective Date) or any other term sheet or offer letter). The parties hereto further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

**14. <u>Amendments; Waivers</u>.** This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by the Executive and a duly authorized officer of GoHealth and approved by the Board, which expressly identifies the amended provision of this Agreement. By an instrument in writing similarly executed and approved by the Board, the Executive or a duly authorized officer of GoHealth may waive compliance by the other party or parties hereto with any provision of this Agreement that such other party was or is obligated to comply with or perform; <u>provided</u>, <u>however</u>, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure to comply or perform. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

**15. <u>No Inconsistent Actions</u>.** The parties hereto shall not voluntarily undertake or fail to undertake any action or course of action inconsistent with the provisions or essential intent of this Agreement. Furthermore, it is the intent of the parties hereto to act in a fair and reasonable manner with respect to the interpretation and application of the provisions of this Agreement.

**16. <u>Construction</u>.** This Agreement shall be deemed drafted equally by both of the parties hereto. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any party hereto shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Also, unless the context clearly indicates to the contrary, (a) the plural includes the singular and the singular includes the plural; (b) "and" and "or" are each used both conjunctively and disjunctively; (c) "any," "all," "each," or "every" means "any and all," and "each and every"; (d) "includes" and "including" are each "without limitation"; (e) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (f) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Persons referred to may require.

10

**17. Enforcement.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

**18. Withholding.** The Company and its Affiliates shall be entitled to withhold from any amounts payable under this Agreement, any federal, state, local or foreign withholding or other taxes or charges which the Company or any of its Affiliates is required to withhold. The Company and its Affiliates shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

**19. Absence of Conflicts; Executive Acknowledgement; Confidentiality.** The Executive hereby represents that from and after the Effective Date the performance of the Executive's duties hereunder will not breach any other agreement to which the Executive is a party. The Executive acknowledges that the Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company or any of its Affiliates other than those contained in writing herein, and has entered into this Agreement freely based on the Executive's own judgment. The Executive agrees not to disclose the terms or existence of this Agreement to any Person unless the Company agrees to such disclosure in advance and in writing; provided that the Executive may, without such permission, make such disclosures as are required by applicable law, including disclosures to taxing agencies, and disclose the terms of this Agreement to the Executive's attorney(s), accountant(s), tax advisor(s), and other professional service provider(s), and to members of the Executive's immediate family, as reasonably necessary; provided, further, that the Executive instructs such Person(s) that the terms of this Agreement are strictly confidential and are not to be revealed to anyone else except as required by applicable law.

**20. Survival.** The expiration or termination of the Term shall not impair the rights or obligations of any party hereto which shall have accrued prior to such expiration or termination (including, without limitation, pursuant to the provisions of the Restrictive Covenant Agreement attached hereto as Exhibit A).

**21. Section 409A.**

(a) General. The parties hereto acknowledge and agree that, to the extent applicable, this Agreement shall be interpreted in accordance with, and incorporate the terms and conditions required by, Section 409A. Notwithstanding any provision of this Agreement to the contrary, in the event that the Company determines that any amounts payable hereunder will be immediately taxable to Executive under Section 409A, the Company reserves the right (without

11

any obligation to do so or to indemnify Executive for failure to do so) to (i) adopt such amendments to this Agreement and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Company determines to be necessary or appropriate to preserve the intended tax treatment of the benefits provided by this Agreement, to preserve the economic benefits of this Agreement and to avoid less favorable accounting or tax consequences for the Company and/or (ii) take such other actions as the Company determines to be necessary or appropriate to exempt the amounts payable hereunder from Section 409A or to comply with the requirements of Section 409A and thereby avoid the application of penalty taxes thereunder. No provision of this Agreement shall be interpreted or construed to transfer any liability for failure to comply with the requirements of Section 409A from Executive or any other individual to the Company or any of its Affiliates, employees or agents.

(b) <u>Separation from Service under Section 409A</u>. Notwithstanding any provision to the contrary in this Agreement: (i) no amount shall be payable pursuant to <u>Section 5(b)</u> unless the termination of Executive's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations; (ii) for purposes of Section 409A, Executive's right to receive installment payments pursuant to <u>Section 5(b)</u> shall be treated as a right to receive a series of separate and distinct payments; and (iii) to the extent that any reimbursement of expenses or in-kind benefits constitutes "deferred compensation" under Section 409A, such reimbursement or benefit shall be provided no later than December 31 of the year following the year in which the expense was incurred. The amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year. The amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year. Notwithstanding any provision to the contrary in this Agreement, if the Executive is deemed at the time of his separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent delayed commencement of any portion of the termination benefits to which the Executive is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, such portion of the Executive's termination benefits shall not be provided to the Executive prior to the earlier of (x) the expiration of the six-month period measured from the date of the Executive's "separation from service" with the Company (as such term is defined in the Treasury Regulations issued under Section 409A of the Code) or (y) the date of the Executive's death; upon the earlier of such dates, all payments deferred pursuant to this sentence shall be paid in a lump sum to the Executive, and any remaining payments due under the Agreement shall be paid as otherwise provided herein.

(c) <u>Release</u>. Notwithstanding anything to the contrary in this Agreement, to the extent that any payments of "nonqualified deferred compensation" (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are subject to Executive's execution and delivery of a Release, (i) the Release shall be reasonable and drafted in good faith (ii) the Company shall deliver the Release to Executive within ten (10) business days following the Date of Termination, and the Company's failure to deliver a Release prior to the expiration of such ten (10) business day period shall constitute a waiver of any requirement to execute a Release, (iii) if Executive fails to execute the Release on or prior to the Release Expiration Date (as defined below) or timely revokes his acceptance of the Release thereafter, Executive shall not be entitled to any payments or benefits otherwise conditioned on the Release,

12

and (iv) in any case where the Date of Termination and the Release Expiration Date fall in two separate taxable years, any payments required to be made to Executive that are conditioned on the Release and are treated as nonqualified deferred compensation for purposes of Section 409A shall be made in the later taxable year. For purposes of this <u>Section 21(c)</u>, "<u>Release Expiration Date</u>" shall mean the date that is twenty-one (21) days following the date upon which the Company timely delivers the Release to Executive, or, in the event that Executive's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date. To the extent that any payments of nonqualified deferred compensation (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are delayed pursuant to <u>Section 5(b)</u> and this <u>Section 21(c)</u>, such amounts shall be paid in a lump sum on the first payroll date following the date that Executive executes and does not revoke the Release (and the applicable revocation period has expired) or, in the case of any payments subject to <u>Section 21(c)(iv)</u>, on the first payroll period to occur in the subsequent taxable year, if later.

22. **<u>Compensation Recovery Policy</u>**. The Executive acknowledges and agrees that, to the extent the Company adopts any clawback or similar policy pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or otherwise, and any rules and regulations promulgated thereunder, he shall take all action necessary or appropriate to comply with such policy (including, without limitation, entering into any further agreements, amendments or policies necessary or appropriate to implement and/or enforce such policy).

23. **<u>Whistleblower Protection and Trade Secrets</u>.** Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Executive from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (a) Executive shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (i) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (ii) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney, and may use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

*[Signature pages follow]*

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date and year first above written.

**GOHEALTH**

GOHEALTH, INC.

By:    /s/ Travis J. Matthiesen

Name:  Travis J. Matthiesen
Title:   Chief Financial Officer

**PARTNERSHIP**

GOHEALTH HOLDINGS, LLC

By:    Blizzard Aggregator, LLC
Its:    Managing Member
By:    CCP III Cayman GP Ltd.
Its:    Manager

By:    /s/ Jeremy W. Gelber

Name:  Jeremy W. Gelber
Title:   Authorized Signatory

By: /s/ James Sharman
_____
James Sharman

Residence Address:
####
_____

_____

Exhibit C to Employment Agreement

**RESTRICTIVE COVENANTS AGREEMENT**

THIS RESTRICTIVE COVENANTS AGREEMENT ("Agreement"), dated as of the 7th day of July, 2020, is made between GoHealth, Inc. ("GoHealth"), GoHealth Holdings, LLC, a Delaware limited liability company (the "Partnership" and, together with GoHealth and any subsidiaries, parent companies or affiliates of GoHealth or the Partnership, the "Company"), and James Sharman (the "Executive"), a resident of the State of Illinois.

**RECITALS**

A. The Company and the Executive have entered into that certain Employment Agreement dated the date hereof (the "Employment Agreement").

B. The Executive possesses extensive knowledge and experience regarding the business of the Company and shall benefit from the Employment Agreement.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, which includes the Company's agreement to employ or continue to employ Executive under the Employment Agreement and all payments and benefits available to Executive under the Employment Agreement, and in specific consideration for the Company's agreement to provide the bonus payments set forth in the Employment Agreement, which Executive acknowledges and agrees is valid and sufficient consideration for the following covenants in this Agreement, the parties hereto agree as follows:

1. Confidential Information; Non-Disclosure.

a. Non-Use and Non-Disclosure of Confidential Information. Executive acknowledges that Executive currently holds and has access to proprietary and confidential information of the Company and its subsidiaries. Executive hereby covenants and agrees that neither Executive nor any of Executive's Affiliates (as hereinafter defined) will, at any time, divulge, furnish or make accessible to anyone or use in any way other than in the ordinary course of the business of the Company or its subsidiaries, any confidential, proprietary or secret knowledge or information of the Company that Executive has acquired or shall acquire about the Company or its subsidiaries, whether developed by Executive or by others, including, without limitation, knowledge or information concerning (i) any trade secrets, (ii) any confidential, proprietary or secret designs, programs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of the Company or its subsidiaries, (iii) any customer or supplier lists, (iv) any confidential, proprietary or secret development or research work, (v) any strategic or other business, marketing or sales plans, (vi) any financial data or plans, or (vii) any other confidential or proprietary information or secret aspects of the business of the Company or its subsidiaries. Executive acknowledges that the above-described knowledge and information constitutes a unique and valuable asset of the Company and its subsidiaries and represents a substantial investment of time and expense by the

Company and its subsidiaries, and that any disclosure or other use of such knowledge or information other than for the sole benefit of the Company or its subsidiaries would be wrongful and may cause irreparable harm to the Company and its subsidiaries ("Confidential Information"). Executive shall take reasonable steps to protect the confidentiality of all Confidential Information. The foregoing obligations of confidentiality shall not apply to any knowledge or information that (i) is now or subsequently becomes generally publicly known, other than as a result of the breach of this Agreement, (ii) is independently made available to Executive in good faith by a third party who has not violated a confidential relationship with the Company or any of its subsidiaries, or (iii) is required to be disclosed by law or legal process. Executive understands and agrees that his obligations under this Agreement to maintain the confidentiality of the Company's and its subsidiaries' Confidential Information are in addition to any obligations of Executive under applicable statutory or common law. For purposes of this Agreement, "Affiliate" shall mean any person or entity directly or indirectly controlled by the Executive.

b. Company Property. As between the Company and Executive, all Confidential Information will remain the exclusive property of the Company, including, but not limited to, all financial, commercial, operational, technical or business information or data received, obtained, or prepared by Executive in connection with Executive's employment or engagement and concerning the Company's business, and all copies and abstracts thereof. Upon the termination of Executive's employment or engagement with the Company for any reason, Executive will not retain, take, remove, or copy any such property of the Company or any materials containing any Confidential Information whatsoever, and Executive will promptly return all such property and materials to the Company no later than Executive's termination date or earlier upon the Company's request.

c. Exceptions; Notice of Legal Obligation to Disclose. Nothing in this Agreement prohibits Executive from filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or otherwise cooperating with any governmental agency or from making other disclosures that are protected under the whistleblower provisions of applicable law or regulation. Further, nothing herein prevents Executive from disclosing Confidential Information if and to the extent required pursuant to any valid subpoena, court order, or other legal obligation; provided, however, Executive agrees to provide prompt written notice of any such subpoena, court order, or other legal obligation prior to disclosing any Confidential Information (unless such notice to the Company is prohibited by applicable law), enclosing a copy of the subpoena, court order or other documents describing the legal obligation. In the event that the Company objects to the disclosure of Confidential Information, by way of a motion to quash or otherwise, Executive agrees to not disclose any Confidential Information while any such objection is pending.

d. Defend Trade Secrets Act Disclaimer. In compliance with the requirements of the Defend Trade Secrets Act, Executive understands that: (i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, (ii) Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit

or other proceeding, if such filing is made under seal and (iii) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

    2. <u>Noncompetition and Nonsolicitation Covenants</u>.

    a. <u>Agreement Not to Compete</u>. Except for Executive's direct and indirect ownership of the Company, for a period starting as of the date hereof and ending on such date which is one (1) year after Executive's Date of Termination (as defined in the Employment Agreement) or, in the event of a Change of Control Termination (as defined in the Employment Agreement), such date which is two (2) years after Executive's Date of Termination (the "<u>Restricted Period</u>"), Executive shall not, directly or indirectly, own, invest in, lend money to, acquire or hold any interest in, render services to, act as agent for, or otherwise engage in any business, in the United States or in any other location in which the Company is then doing business, that is competitive with any business conducted by or under active consideration by the Company or its subsidiaries at any time during the period that the Executive is an employee, director or direct or indirect shareholder of the Company or any of its subsidiaries (the "<u>Protected Business</u>"), it being acknowledged by Executive that the Protected Business includes the design, sale, marketing, or distribution of the Company's and its subsidiaries' products and services. Ownership by Executive, as a passive investment, of less than two percent (2%) of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this <u>Section 2</u>(a).

    b. <u>Agreement Not to Solicit Employees</u>. Executive represents and warrants that Executive has not, directly or indirectly, solicited for employment for any entity or person (other than for the Company) any current employee, consultant or other independent contractor of the Company. For the Restricted Period, Executive shall not, directly or indirectly, hire, engage, solicit or attempt to solicit any person who is then an employee, consultant or independent contractor of the Company or any subsidiary of the Company.

    c. <u>Agreement Not to Solicit Others</u>. Executive represents and warrants that Executive has not, directly or indirectly, solicited any customer, supplier, distributor or other business contact referred to below for the purposes set forth below (other than on behalf of the Company). For the Restricted Period, Executive shall not, directly or indirectly, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise, (x) solicit or attempt to solicit any person or entity who was a customer of the Company during the last twelve (12) months immediately preceding the date hereof or is a customer of the Company or any subsidiary of the Company during the Restricted Period, for the purposes of selling, marketing or distributing products or services similar to the products or services designed, sold, marketed or distributed by the Company or any of its subsidiaries, and (y) solicit, request, advise or induce any supplier, distributor or other business contact of the Company or any subsidiary to cancel, curtail or otherwise adversely change its relationship with the Company or its subsidiaries as it relates, directly or indirectly, to the Protected Business.

d. Acknowledgment. Executive hereby acknowledges that the provisions of this Section 2 are reasonable and necessary to protect the legitimate interests of the Company and that any violation of this Section 2 by Executive may cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.

e. Assistance is Prohibited. Executive further agrees that Executive will not, directly or indirectly, assist or encourage any other person in carrying out, directly or indirectly, any activity that would be prohibited by the above provisions of this Section 2 if such activity were carried out by Executive, directly or indirectly, or induce any employee, or former employee of the Company to carry out, directly or indirectly, any such activity.

f. Blue Pencil Doctrine. If the duration of, the scope of or any business activity covered by any provision of this Section 2 is in excess of what is determined to be valid and enforceable under applicable law, such provision shall be construed to cover only that duration, scope or activity that is determined to be valid and enforceable. Executive hereby acknowledges that this Section 2 shall be given the construction which renders its provisions valid and enforceable to the maximum extent, snot exceeding its express terms, possible under applicable law.

3. Non-Disparagement. The Executive agrees not to disparage the Company, any of its products, services, or practices, or any of its directors, officers, agents, representatives, partners, members, equity holders, or affiliates, either orally or in writing, at any time; provided, that the Executive may confer in confidence with the Executive's legal representatives and make truthful statements as required by law.

4. Ownership of Inventions.

a. Inventions. Subject to the limitations in Section 4(c) below, the Company will own all rights, title and interest in and to (i) any invention, innovation, manufacturing process, trade secret, design, idea or improvement related, directly or indirectly, to the Company's business, or any part thereof, and (ii) all copyrights, patents, trademarks and trade names which Executive develops or creates, in whole or in part in the course of Executive's employment or engagement with the Company (referred to as "Inventions"). Subject to the limitations in Section 4(c) below, Executive will, and hereby does, assign to the Company, without requirement of further writing and without royalty or any other further consideration, my entire right, title and interest throughout the world in and to all Inventions created, conceived, made, developed, and/or reduced to practice by Executive in the course of Executive's employment or engagement with the Company and all intellectual property rights therein. Executive will promptly tell the Company about and give the Company all information relating to any such Inventions. Executive acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) within the scope of Executive's employment or engagement with the Company and which are eligible for copyright protection are "works made for hire" as that term is defined in the United States Copyright Act (17 U.S.C., Section 101). Executive hereby waives, and agrees to waive, any moral rights Executive may have in any copyrightable work Executive creates or has created on behalf of the Company. Executive will make and maintain adequate and

current written records of all Inventions covered by this Section 4(a). These records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, notebooks and any other format. These records shall be and remain the property of the Company at all times and shall be made available to the Company at all times.

b. Cooperation. Executive will cooperate with the Company in obtaining, maintaining and enforcing copyright, patent, trademark or other relevant protections for Inventions covered by Section 4(a), including executing such documents as the Company may request as necessary for such protection.

c. Executive Inventions. Executive acknowledges that the Company will not own, and the assignment of Inventions set forth in Section 4(a) above does not apply to, Inventions for which no equipment, supplies, facility, or trade secret information of Company were used and which was developed entirely on Executive's own time ("Executive Inventions"), unless (i) the Invention relates (a) to the Company's business or (b) to the Company's actual or demonstrably anticipated research or development, or (ii) the Invention results from any work performed by Executive for the Company. If Executive believes an Invention qualifies as an Executive Invention, Executive will provide the Company at the time of creation written evidence to substantiate such belief. If Executive incorporates any Executive Inventions or portions thereof into any Inventions created or developed for the Company, Executive hereby grants the Company a perpetual, irrevocable, royalty-free, transferable license to copy, modify, prepare derivative works of, use, perform, and display such Executive Invention solely in connection with the Invention.

5. Enforcement. Executive hereby specifically acknowledges and agrees that the scope of the restrictions set forth in this Agreement is reasonable and necessary to ensure that the Company receives the value of the Employment Agreement and that violation of this Agreement will harm the Company to such an extent that monetary damages alone would be an inadequate remedy. Therefore, in the event of any violation by Executive or any Affiliate:

a. the Company (in addition to all other remedies the Company may have) shall be entitled to a temporary restraining order, injunction and other equitable relief (without posting any bond or other security) restraining the violator from committing or continuing such violation,

b. in the case of any violation of Section 2 hereof, as determined by a final judgment of court of competent jurisdiction, the duration of the non-compete period referred to therein shall be extended beyond its then-scheduled termination date for a period equal to the duration of the violation, and

c. in the event that the Company must enforce this Agreement pursuant to this Section 5, the Company shall be entitled to recover from Executive its reasonable costs associated therewith, including all reasonable attorneys' and court fees.

6. Use of Name. Neither Executive nor any Affiliate shall use the name "GoHealth," any variants thereof, or any confusingly similar name, in any business (other than the Company) in which any of them is associated as shareholder, investor, lender, partner, co-venturer, co-marketer, sole proprietor, director, officer, employee, agent, consultant, independent contractor or in any other capacity.

7. No Violation of Other Agreements. Executive hereby represents and agrees that neither (a) Executive's entering into this Agreement nor (b) Executive's carrying out the provisions of this Agreement, will violate any other agreement (oral, written or other) to which Executive is a party or by which Executive is bound.

8. At-Will Employment; No Contract of Employment. Nothing herein shall be deemed to create a contract of employment for any term. Executive acknowledges and agrees that Executive's employment with the Company is and shall remain at all times at will, unless otherwise specified by the Employment Agreement.

9. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Executive, the Company and their respective heirs, personal representatives, successors and assigns (including without limitation any assignee of substantially all of the assets of the Company); provided, however, that this Agreement may not be assigned by Executive.

10. Complete Agreement. This Agreement contains the complete agreement between the parties hereto with respect to the matters covered herein, and supersedes all prior agreements and understandings between the parties hereto with respect to such matters. This Agreement may be amended, terminated or superseded only by an agreement in writing executed by both parties hereto.

11. Partial Invalidity. If any covenant or other provision of this Agreement is deemed invalid, illegal or incapable of being enforced by reason of any rule of law or of any public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect and no covenant or provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

12. No Waiver. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel to enforce any provision of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

13. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall constitute but one instrument.

14. Headings. The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

15. Notices. All notices, requests, demands and other communications provided for in this Agreement shall be in writing delivered personally or sent by registered or certified mail, postage prepaid, as follows:

If to the Company:                                    Golden Z Holdings, LLC
                                                      214 West Huron Street
                                                      Chicago, IL 60654

with a copy to:                                       Centerbridge Partners, L.P.
                                                      375 Park Ave., 11th Floor
                                                      New York, NY 10152

If to Executive:                                      To the address set forth on the Executive's signature page of the
                                                      Employment Agreement

with a copy to:                                       Croke Fairchild Morgan & Beres
                                                      180 N. LaSalle St., Ste. 2750
                                                      Chicago, IL 60601
                                                      Attn: Patrick E. Croke

16. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule, whether of the State of Delaware or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Delaware.

17. <u>Action of Affiliates</u>. Executive shall cause his Affiliates not to take any action that is prohibited to be taken by such Affiliates under the terms of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

GOHEALTH, INC.

By: /s/ Travis J. Matthiesen

Name: Travis J. Matthiesen
Title: Chief Financial Officer

GOHEALTH HOLDINGS, LLC

By: Blizzard Aggregator, LLC
Its: Managing Member
By: CCP III Cayman GP Ltd.
Its: Manager

By: /s/ Jeremy W. Gelber

Name: Jeremy W. Gelber
Title: Authorized Signatory

EXECUTIVE

/s/ James Sharman

James Sharman

Exhibit 10.16

**GoHealth, Inc.**
**Non-Employee Director Compensation Policy**

Non-employee members of the board of directors (the "**Board**") of GoHealth, Inc. (the "**Company**") shall be eligible to receive cash and equity compensation as set forth in this Non-Employee Director Compensation Policy (this "**Policy**"). The cash and equity compensation described in this Policy shall be paid or be made, as applicable, automatically and without further action of the Board, to each member of the Board who is not an employee of the Company or any parent or subsidiary of the Company (each, a "**Non-Employee Director**") who may be eligible to receive such cash or equity compensation, unless such Non-Employee Director declines the receipt of such cash or equity compensation by written notice to the Company. This Policy shall become effective after the effectiveness of the Company's initial public offering (the "**IPO**") and shall remain in effect until it is revised or rescinded by further action of the Board. This Policy may be amended, modified or terminated by the Board at any time in its sole discretion. The terms and conditions of this Policy shall supersede any prior cash and/or equity compensation arrangements for service as a member of the Board between the Company and any of its Non-Employee Directors and between any subsidiary of the Company and any of its non-employee directors. Notwithstanding the foregoing, any member of the Board who is an employee of Centerbridge Partners L.P. is not eligible for and shall not receive any compensation under this Policy.

1. Cash Compensation.

(a) Annual Retainers. Each Non-Employee Director shall receive an annual retainer of $150,000 for service on the Board.

(b) Payment of Retainers. The annual retainers described in Section 1(a) shall be earned on a quarterly basis based on a calendar quarter and shall be paid by the Company in arrears not later than the fifteenth day following the end of each calendar quarter. In the event a Non-Employee Director does not serve as a Non-Employee Director for an entire calendar quarter, such Non-Employee Director shall receive a prorated portion of the retainer otherwise payable to such Non-Employee Director for such calendar quarter pursuant to Section 1(a), with such prorated portion determined by multiplying such otherwise payable retainer by a fraction, the numerator of which is the number of days during which the Non-Employee Director serves as a Non-Employee Director during the applicable calendar quarter and the denominator of which is the number of days in the applicable calendar quarter.

2. Equity Compensation. Non-Employee Directors shall be granted the equity awards described below. The awards described below shall be granted under and shall be subject to the terms and provisions of the Company's 2020 Incentive Award Plan or any other applicable Company equity incentive plan then-maintained by the Company (such plan, as may be amended from time to time, the "**Equity Plan**") and shall be granted subject to the execution and delivery of award agreements, including attached exhibits, in substantially the forms approved by the Board. All applicable terms of the Equity Plan apply to this Policy as if fully set forth herein, and all equity grants hereunder are subject in all respects to the terms of the Equity Plan.

(a) IPO Awards. Each Non-Employee Director who (i) serves on the Board as of the date the IPO price of the shares of the Company's common stock (the "*IPO Price*") is established in connection with the Company's IPO (the "*Pricing Date*") and (ii) will continue to serve as a Non-Employee Director immediately following the Pricing Date shall be automatically granted, on the Pricing Date, an award of restricted stock units that have an aggregate fair value on the date of grant of $150,000 for each Non-Employee Director who does not serve as Chairperson or Co-Chairperson of the Board or of any committee of the Board or as the Lead Director of the Board (a "*Non-Chairperson Director*") and $250,000 for each Non-Employee Director who serves as the Chairperson or Co-Chairperson of the Board or of any committee of the Board or as the Lead Director of the Board (in each case, a "*Chairperson Director*") (as determined in accordance with FASB Accounting Codification Topic 718 ("*ASC 718*") and subject to adjustment as provided in the Equity Plan in each case). The awards described in this Section 2(a) shall be referred to herein as the "*IPO Awards*").

(b) Annual Awards. Each Non-Employee Director who (i) serves on the Board as of the date of any annual meeting of the Company's stockholders (an "*Annual Meeting*") after the Pricing Date and (ii) will continue to serve as a Non-Employee Director immediately following such Annual Meeting shall be automatically granted, on the date of such Annual Meeting, an award of restricted stock units that have an aggregate fair value on the date of grant of $150,000 for Non-Chairperson Directors and $250,000 for Chairperson Directors (as determined in accordance with ASC 718 and subject to adjustment as provided in the Equity Plan); *provided*, *however*, that the Annual Awards (as defined in this Section 2(b)) granted under this Policy at the first and second Annual Meetings following the adoption of this Policy shall have the number of restricted stock units awarded on their respective date of grant determined using the IPO Price (rather than the fair value of a share of the Company's common stock as of such date of grant), subject to any restrictions imposed by the Director Limit (as such term is defined in the Equity Plan). The awards described in this Section 2(b) shall be referred to as the "*Annual Awards*." For the avoidance of doubt, a Non-Employee Director elected for the first time to the Board at an Annual Meeting shall receive only an Annual Award in connection with such election, and shall not receive any Initial Award on the date of such Annual Meeting as well.

(c) Initial Awards. Except as otherwise determined by the Board, each Non-Employee Director who is initially elected or appointed to the Board after the Pricing Date on any date other than the date of an Annual Meeting shall be automatically granted, on the date of such Non-Employee Director's initial election or appointment (such Non-Employee Director's "*Start Date*"), an award of restricted stock units that have an aggregate fair value on such Non-Employee Director's Start Date equal to the product of (i) $150,000 for Non-Chairperson Directors and $250,000 for Chairperson Directors (as determined in accordance with ASC 718) and (ii) a fraction, the numerator of which is (x) 365 minus (y) the number of days in the period beginning on the date of the Annual Meeting immediately preceding such Non-Employee Director's Start Date (or, if no such Annual Meeting has occurred, the effective date of the Company's IPO) and ending on such Non-Employee Director's Start Date and the denominator of which is 365 (with the number of shares of common stock underlying each such award subject to adjustment as provided in the Equity Plan); *provided*, *however*, that the Initial Awards (as defined in this Section 2(c)) granted under this Policy prior to the second Annual Meeting following the adoption of this Policy shall have the number of restricted stock units awarded on their respective date of grant determined using the IPO Price (rather than the fair value of a share of the Company's common stock as of such date of grant), subject to any restrictions imposed by the Director Limit (as such term is defined in the Equity Plan). The awards described in this Section 2(c) shall be referred to as "*Initial Awards*." For the avoidance of doubt, no Non-Employee Director shall be granted more than one Initial Award.

2

(8) Termination of Employment of Employee Directors. Members of the Board who are employees of the Company or any parent or subsidiary of the Company who subsequently terminate their employment with the Company and any parent or subsidiary of the Company and remain on the Board will not receive an Initial Award pursuant to Section 2(c) above, but to the extent that they are otherwise eligible, will be eligible to receive, after termination from employment with the Company and any parent or subsidiary of the Company, Annual Awards as described in Section 2(b) above.

(e) Vesting of Awards Granted to Non-Employee Directors. Each IPO Award shall vest and become exercisable in four equal installments on the first four quarterly anniversaries of the date of grant, subject to the Non-Employee Director continuing in service on the Board through the applicable vesting date, and each Annual Award and Initial Award shall vest and become exercisable in four equal installments on the first four quarterly anniversaries of the date of grant, subject to the Non-Employee Director continuing in service on the Board through the applicable vesting date; *provided*, *however*, that, notwithstanding the foregoing, each Annual Award and Initial Award shall vest and become exercisable in its entirety on the day immediately preceding the date of the first Annual Meeting following the date of grant, subject to the Non-Employee Director continuing in service on the Board through such date. No portion of an IPO Award, Annual Award or Initial Award that is unvested or unexercisable at the time of a Non-Employee Director's termination of service on the Board shall become vested and exercisable thereafter. All of a Non-Employee Director's IPO Awards, Annual Awards and Initial Awards shall vest in full immediately prior to the occurrence of a Change in Control (as defined in the Equity Plan), to the extent outstanding at such time.

3. Expenses

The Company will reimburse each Non-Employee Director for ordinary, necessary and reasonable out-of-pocket travel expenses to cover in-person attendance at and participation in Board meetings and meetings of any committee of the Board; *provided*, that the Non-Employee Director timely submit to the Company appropriate documentation substantiating such expenses in accordance with the Company's travel and expense policy applicable to directors, as in effect from time to time. To the extent that any taxable reimbursements are provided to any Non-Employee Director, they will be provided in accordance with Section 409A of the Internal Revenue Code of 1986, as amended, including, but not limited to, the following provisions: (i) the amount of any such expenses eligible for reimbursement during such individual's taxable year may not affect the expenses eligible for reimbursement in any other taxable year; (ii) the reimbursement of an eligible expense must be made no later than the last day of such individual's taxable year that immediately follows the taxable year in which the expense was incurred; and (iii) the right to any reimbursement may not be subject to liquidation or exchange for another benefit.

* * * * *

**Exhibit 10.17**

**Director Profits Unit Agreement**

This Director Profits Unit Agreement, dated as of the date set forth on the page immediately following the signature page hereof, is entered into by and between Blizzard Parent, LLC, a Delaware limited liability company (the "Company") and the Director whose name appears on the signature page hereof (the "Director"), pursuant to, and subject to the terms of, the Blizzard Parent, LLC Profits Unit Plan. The meaning of each capitalized term may be found in Section 8.

The Company and the Director hereby agree as follows:

Section 1. Grant of Profits Units.

(a) In General. Subject to all the terms of this Agreement, as of the Closing, the Company has elected to grant to the Director the number of Profits Units of the Company specified on the page immediately following the signature page hereof. This grant of Profits Units is being made, and the terms of the Profits Units are subject to, this Agreement, the Profits Unit Plan and the Company Operating Agreement.

(b) Section 83(b) Election. As a condition to the grant of Profits Units of the Company, the Director shall complete and return to the Company the election under Section 83(b) of the Code with respect to such Profits Units in the form attached hereto as Appendix C on or prior to the due date specified therefor.

(c) Hurdle Amount. To the extent necessary for a Profits Unit to be a partnership profits interest for U.S. federal tax purposes, such Profits Unit shall have a Hurdle Amount maintained in the records of the Company, which shall be in addition to the Benchmark Amount as specified in the Company Operating Agreement

(d) Restrictive Covenants. The Director, in consideration of the grant of Profits Units and the receipt of certain confidential information and trade secrets of the Company and its Affiliates, agrees to be bound by the covenants set forth in Appendix A to this Agreement. These covenants shall be in addition to, and shall not supersede, the covenants set forth in any other agreement to which the Director and the Company or an Affiliate of the Company are or hereafter become parties. In agreeing and accepting these covenants, the Director acknowledges having reviewed them and agrees that these covenants are reasonable in time and scope and do not pose an undue hardship on the Director. The Director further acknowledges and agrees that the Company would not have entered into this Agreement and issued Profits Units under this Agreement if the Director did not agree to these covenants.

1

Section 2. The Closing; Grant of Profits Units.

(a) <u>Time and Place</u>. The grant of the Profits Units pursuant to Section 1 (the "<u>Closing</u>") shall take place at a time and place selected by the Company or within five (5) business days following the date on which the Closing requirements of the Director and the Company as set forth in Section 2(b) and 2(c) have been completed.

(b) <u>Delivery by the Director</u>. At or prior to the Closing, the Director shall deliver to the Company, (<u>1</u>) a counterpart signature to this Agreement and (<u>2</u>) a joinder to the Company Operating Agreement in the form attached hereto as Appendix B.

(c) <u>Delivery by the Company</u>. At or prior to the Closing, the Company shall evidence the Director's ownership of the Profits Units of the Company in its customary manner.

(d) <u>Status as an "Other Member"</u>. The Director hereby acknowledges and agrees that the Director, as a member of the Company, shall have the same rights and be subject to the same obligations as an "Other Member" under the Company Operating Agreement.

Section 3. <u>Vesting and Forfeiture of Profits Units; Effect of Termination of Services on Profits Units</u>.

(a) <u>Service Vesting</u>. Except as otherwise provided in Section 3(b) or Section 3(c) of this Agreement or as agreed in writing between the Company and the Director, the Profits Units shall become vested in five (5) equal annual installments on each of the first (1st) through fifth (5th) anniversaries of the Vesting Commencement Date, subject to the continuous service of the Director with the Company until the applicable vesting date; <u>provided</u> that, in the event of a Centerbridge Exit, subject to the Director's continued service with the Company until the Centerbridge Exit, any Profits Units which are then unvested and outstanding shall automatically become vested upon the occurrence of the Centerbridge Exit.

(b) <u>General Principles Applicable to Vesting of the Profits Units</u>

(i) <u>Discretionary Acceleration</u>. The Administrator, in its sole discretion, may accelerate the vesting of all or a portion of the Profits Units at any time and from time to time.

(ii) <u>No Other Accelerated Vesting</u>. The vesting provisions set forth in this Section 4, or expressly set forth in the Profits Unit Plan, shall be the exclusive vesting provisions applicable to the Profits Units and shall supersede any other provisions relating to vesting, unless such other provision expressly refers to the Profits Unit Plan by name and this Agreement by name and date.

(c) <u>Effect of Termination of Service</u>

(i) <u>By Reason of Death or Disability</u>. Subject to Section 3(c)(iii), if the Director's service terminates as a result of the Director's death or Disability, all of the Director's unvested Units shall become fully and immediately vested upon such termination of service.

(ii) <u>Without Cause</u>. Subject to Section 3(c)(iii), if the Director's service terminates and such termination is by or at the request of the Board without Cause (excluding death or Disability), then (<u>A</u>) a *pro rata* portion of the Profits Units scheduled to vest on the next following anniversary of the Vesting Commencement Date (or Grant Date, if applicable) shall vest, with such prorated amount to be determined by multiplying such number of Profits Units by a fraction , the numerator of which is number of whole and partial months elapsed since the most recent anniversary of the Vesting Commencement Date (or Grant Date, if applicable), and the denominator of which is twelve (12), and (<u>B</u>) all unvested Profits Units shall automatically be forfeited.

(iii) <u>By Resignation or With Cause</u>. If the Director's service terminates and such termination is by the Director, then all of the Director's unvested Profits Units shall automatically be forfeited. If the Director's service terminates and such termination is by the Company with Cause, then all of the Director's Profits Units, whether vested or unvested, will automatically be forfeited.

2

Section 4. Director's Representations and Warranties. In connection with the transactions contemplated by this Agreement, the Director hereby provides the Company with the representations, warranties and covenants set forth in Section 11 of the Company Operating Agreement.

Section 5. Restriction on Transfer of Profits Units.

(a) Profits Units. Profits Units may not be Transferred except to the extent approved by the Administrator or as otherwise permitted by the Profits Units Plan, and subject to such conditions and limitations as may be determined by the Administrator.

(a) *Expiration Upon a Qualified IPO*. The provisions of this Section 5 shall terminate upon the consummation of a Qualified IPO with respect to any security received by the Director that is of the same class of securities as those registered under the Securities Act in connection with such Qualified IPO, subject to any lockup or holdback agreement (including pursuant to the Plan or otherwise in connection with any underwritten offering).

Section 6. <u>Repurchase Rights on Termination of Service</u>. By entering into this Agreement and accepting the award of Profits Units, the Director accepts and agrees to the repurchase rights applicable to Units set forth in Article V of the Profits Unit Plan.

Section 7. <u>Cooperation related to an IPO</u>. The Director shall reasonably cooperate with the Company and take such actions as may be reasonably requested by the Administrator in order to effectuate an IPO Restructuring and an IPO undertaken in accordance with the terms of the Company Operating Agreement.

Section 8. <u>Certain Definitions</u>. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Administrator</u>" has the meaning given in the Profits Unit Plan.

"<u>Affiliate</u>" has the meaning given in the Company Operating Agreement.

"<u>Agreement</u>" means this Director Profits Unit Agreement, as amended from time to time in accordance with the terms hereof.

"<u>Benchmark Amount</u>" has the meaning given in the Company Operating Agreement.

"<u>Board</u>" means the Board of Directors of the Company.

"<u>Cause</u>" has the meaning given in the Profits Unit Plan.

"<u>CBP Member</u>" has the meaning given in the Profits Unit Plan.

"<u>Centerbridge Exit</u>" means a transaction in which the CBP Member disposes of all or substantially all of its investment in the Company. Neither an IPO nor a business combination in which the CBP Member or an Affiliate of the CBP Member controls the resulting combined entity shall constitute a Centerbridge Exit.

"<u>Closing</u>" has the meaning given in Section 2(a).

"<u>Code</u>" has the meaning given in the Profits Unit Plan.

4

"Company" means Blizzard Parent, LLC, a Delaware limited liability company.

"Company Operating Agreement" has the meaning given in the Profits Unit Plan.

"Director" has the meaning given in the preamble to this Agreement.

"Disability" has the meaning given in the Profits Unit Plan.

"Effective Date" has the meaning given in the Profits Unit Plan.

"Hurdle Amount" has the meaning given in the Company Operating Agreement.

"Fair Market Value" has the meaning given in the Profits Unit Plan.

"Grant Date" means the date on which the Closing of the grant of Profits Units occurs.

"IPO" has the meaning given in the Profits Unit Plan.

"IPO Restructuring" has the meaning given in the Company Operating Agreement.

"Person" has the meaning given in the Profits Unit Plan.

"Profits Unit" has the meaning given in the Profits Unit Plan.

"Profits Unit Plan" means the Blizzard Parent, LLC Profits Unit Plan adopted by the Board, as amended from time to time.

"Qualified IPO" has the meaning given in the Company Operating Agreement.

"Rule 144" means Rule 144 under the Securities Act (or any successor provision thereto).

"Securities Act" has the meaning given in the Company Operating Agreement.

"Subsidiary" has the meaning given in the Company Operating Agreement.

"Transfer" has the meaning given in the Company Operating Agreement.

"Vesting Commencement Date" means the date set forth on the page immediately following the signature page hereof.

5

(a) <u>Authorization to Use Personal Data</u>. The Director authorizes any Affiliate of the Company that has or lawfully obtains personal data relating to the Director to divulge or transfer such personal data to the Company or to a third party, in each case in any jurisdiction, if and to the extent required by law; provided, however, that the Company or its Affiliate, as applicable, shall provide the Director with prior written notice thereof if and to the extent required by law.

(b) <u>Notices</u>. All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given if delivered personally or sent by certified or express mail, return receipt requested, postage prepaid, or by any recognized international equivalent of such delivery, or when received in the form of a facsimile, electronic mail or other electronic transmission (receipt confirmation requested), to the Company, the CBP Member or the Director, as the case may be, at the following addresses or to such other address as the Company, the CBP Member or the Director, as the case may be, shall specify by notice to the others:

(i) if to the Company, to it as provided in the Company Operating Agreement;

(ii) if to the Director, to the Director at the Director's most recent address as shown on the books and records of the; and

(iii) if to the CBP Member, to it as provided in the Company Operating Agreement;

with a copy (which shall not by itself constitute notice hereunder) to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Fax: (212) 909-6836
Attention:      Andrew L. Bab or Jonathan F. Lewis
Email:    ####@debevoise.com or
      ####@debevoise.com

All such notices and communications shall be deemed to have been received on the date of delivery if delivered personally or by electronic mail, or on the third business day if delivered by regular mail. Copies of any notice or other communication given under this Agreement shall also be given to the CBP Member pursuant to clause (iii) above.

6

(a) Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d) Waiver; Amendment.

(i) Waiver. No action taken pursuant to this Agreement, including, but not limited to, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any preceding or succeeding breach and no failure by a party to exercise any right or privilege hereunder shall be deemed a waiver of such party's rights or privileges hereunder or shall be deemed a waiver of such party's rights to exercise the same at any subsequent time or times hereunder.

(ii) Amendment. This Agreement may be amended, modified or supplemented only by a written instrument executed by the Director, the Company and the Company; provided, further, that any amendment adversely affecting the rights or economic benefits of the CBP Member hereunder must be consented to by the CBP Member.

(e) Assignability. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by the Company or the Director without the prior written consent of the other parties.

(f) Applicable Law. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware regardless of the application of rules of conflict of law that would apply the laws of any other jurisdiction.

(g) Waiver of Jury Trial. Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding arising out of this Agreement or any transaction contemplated hereby. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties have been induced to enter into the Agreement by, among other things, the mutual waivers and certifications in this Section 8(g).

7

(a) <u>Consent to Electronic Delivery</u>. The Director hereby consents to the delivery of information (including, without limitation, information required to be delivered to the Director pursuant to the Company Operating Agreement or applicable securities laws) regarding the Company, this Agreement and the Units via electronic delivery, including electronic mail.

(i) <u>Section and Other Headings, etc</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(j) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

(k) <u>Interpretive Rule</u>. In the event of any ambiguity regarding the interpretation of this Agreement, this Agreement shall be interpreted by the Administrator to effect the same result, as nearly as practicable, as if the Director had been granted Profits Units of the Company directly.

(l) <u>Third Party Beneficiary</u>. This Agreement is not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision thereof except for the CBP Member, which is an express third party beneficiary of this Agreement (other than <u>Appendix A</u> hereof) and entitled to enforce its terms and provisions (other than <u>Appendix A</u> hereof).

(m) <u>No Right to Continued Service</u>. Nothing in the Company Operating Agreement or this Agreement shall confer upon the Director any right to continue in the service of the Company or shall interfere with or restrict the right of any member of the Company to terminate the Director's services to the Company at any time for any reason whatsoever.

[*Signature Page Follows*]

8

Case: 1:20-cv-05593 Document #: 166-1 Filed: 09/23/22 Page 516 of 547 PageID #:4285

IN WITNESS WHEREOF, the Director and the Company have executed this Agreement as of the date set forth on the page immediately following the signature page hereof.

THE EXECUTIVE

By: 
    Name: [            ]

BLIZZARD PARENT, LLC

By: _____
    Name: Clint Jones
    Title: CEO

9

Name: [_____]

Address: [_____]

Email address: [_____]

\* \* \*

<u>Date of Agreement:</u>          [_____]

<u>Profits Units</u>

   Total Number of Profits Units Granted:      [_____]

      Hurdle Amount:      [_____]

   Vesting Commencement Date:      [_____]

10

Appendix A
Restrictive Covenants

The Director acknowledges that the Director has gained and will gain access to certain confidential information, trade secrets, and proprietary methods and processes relating to the operations, strategy and financial initiatives of the Company, and that the Company has a legitimate business interest in protecting such information, trade secrets, methods, and processes. In consideration for access to this confidential information, trade secrets, methods and processes, the Director agrees to abide by the covenants and restrictions contained in this Appendix A.

(a) Noncompetition. Unless otherwise approved by the Company, the Director shall not, during the Noncompetition Restricted Period (as defined below) and in the Restricted Area (as defined below), be engaged, directly or indirectly (other than as the passive owner of not in excess of 5% of the outstanding equity interests of any entity), whether as a principal, partner, member, employee, independent contractor, consultant, shareholder or otherwise in (i) a business or endeavor which is competitive with or substantially similar to any business of the Company or any of its Subsidiaries conducted during the twelve (12) months preceding the date the Director ceases to be in service of the Company or its Subsidiaries, or (ii) any potential business (A) which has been submitted to the Board for consideration and is under active consideration by the Board, and (B) of which the Director was aware as evidenced by contemporaneous documentation, in each case, during the twelve (12) months preceding the date the Director ceases to provide services to the Company or its Subsidiaries.

(b) (i) Confidentiality. All Confidential Information shall be kept confidential and shall not be disclosed to any third party except: (i) information which is or becomes publicly available (other than as a result of disclosure by the Director in violation hereof or a third party's violation of such third party's contractual, legal or fiduciary obligation to any Person); (ii) information which is independently developed, discovered or arrived at by the Director without use of Confidential Information; (iii) in order to comply with any law, rule, regulation or order applicable to the Director, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to such recipient in the course of any litigation, investigation or administrative proceeding; (iv) information that was or becomes available to the Director on a non-confidential basis from a source other than the Company or any Subsidiary which source is not under a contractual, legal or fiduciary duty of confidentiality with respect to such information; (v) information that is approved for disclosure by the Company or any of its Subsidiaries or Affiliates in writing; or (vi) disclosures under clause (b)(ii) below. In the event that the Director or any representative thereof becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information, the disclosing party shall, unless legally prohibited, provide the Company with prompt prior written notice of such requirement and cooperate with the Company, at the Company's expense, to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including

11

interposing all available objections thereto, including objections based on settlement privilege. In the event that such protective order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such Confidential Information that has been legally compelled to be furnished. The Director shall, during such service, disclose Confidential Information only for the benefit of the Company and in accordance with any restrictions placed on its disclosure in this paragraph (b). For purposes of this Agreement, "Confidential Information" means non-public information that has value in or to the business of the Company or any of its Subsidiaries, whether or not labeled or identified as proprietary or confidential and that is obtained by the Director, or to which the Director had access, in the scope of the Director's service. Confidential Information includes without limitation any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company or any Subsidiary or Affiliate or to the technical data, trade secrets or know-how of any such Person, including without limitation research, product plans or other information regarding the products or services and markets, customer lists and customers (which may include but is not limited to customers on which the Director called or with whom the Director may have become acquainted while in the service of the Company), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company or any Subsidiary or Affiliate either directly or indirectly in writing or orally.

(ii) Permitted Disclosures. Nothing in this Agreement or any other agreement or policies of the Company or any of its Subsidiaries prohibits or restricts the Director or the Director's attorneys from: (a) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding as required by law or legal process, including with respect to possible violations of law; (b) participating, cooperating, or testifying in any action, investigation, or proceeding with, or providing information to, any governmental agency or legislative body, any regulatory or supervisory authority, and/or pursuant to the Sarbanes-Oxley Act; (c) accepting any U.S. Securities and Exchange Commission awards; or (d) filing a charge with, initiating communications with, providing documents or other disclosures to, or responding to any inquiry from, any governmental agency, legislative body, or any regulatory or supervisory authority regarding any good-faith concerns about possible violations of law including, without limitation, the U.S. Equal Employment Opportunity Commission and the National Labor Relations Board. Pursuant to 18 U.S.C. § 1833(b), the Director will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret of the Company or any of its Subsidiaries that (i) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to such Person's attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If the Director files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Director

12

may disclose a trade secret to disclose an attorney and use the trade secret information in the court proceeding, provided that the Director files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement or any other agreement or policy of the Company or its Subsidiaries is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are permitted by such statute.

(c) <u>Nonsolicitation of Employees</u>. Unless otherwise approved by the Company, during the Nonsolicitation Restricted Period, the Director shall not directly or indirectly (i) solicit any employee of the Company or any of its Subsidiaries, or induce such employee to terminate employment with such entity, and (ii) either individually or as owner, agent, employee, consultant or otherwise, employ or offer employment to any person who is, or who within the six (6) months preceding such action was, employed by the Company or such Subsidiary, in the case of each of clause (i) and (ii), other than an Excluded Employee; <u>provided</u>, that nothing in this clause (c) shall preclude the Director from placing advertisements during the Nonsolicitation Restricted Period in periodicals of general circulation or on non-industry specific online recruiting sites and forums soliciting persons for employment. For purposes of this clause (c), an "<u>Excluded Employee</u>" means (<u>1</u>) administrative assistants and (<u>2</u>) non-managerial call center employees of the Company or any of its Subsidiaries.

(d) <u>Nonsolicitation of Customers, Clients and Distributors</u>. Unless otherwise approved by the Company, during the Noncompetition Restricted Period, the Director shall not directly or indirectly solicit or otherwise attempt to establish for himself or any other Person any competing business relationship with any Person which is, or during the six (6) month period preceding any date of determination was, a customer, client or distributor (including any marketing, brokerage, or insurance carrier partner) of the Company or any of its Subsidiaries and as to which the Director (<u>x</u>) conducted business on behalf of the Company or any of its Subsidiaries or (<u>y</u>) has access to Confidential Information relating thereto.

(e) <u>Injunctive Relief with Respect to Covenants</u>. The Director acknowledges and agrees that the covenants and obligations of the Director with respect to noncompetition, nonsolicitation and confidentiality, as the case may be, set forth herein relate to special, unique and extraordinary matters and that a violation or threatened violation of any of the terms of such covenants or obligations will cause the Company irreparable injury for which adequate remedies are not available at law. Therefore, the Director agrees, to the fullest extent permitted by applicable law, that the Company shall be entitled to an injunction, restraining order or such other equitable relief restraining the Director from committing any violation of the covenants or obligations contained in this <u>Appendix A</u>. These injunctive remedies are cumulative and are in addition to any other rights and remedies the Company may have at law or in equity. In connection with the provisions of this <u>Appendix A</u>, the Director acknowledges that the Director is agreeing to these provisions in connection with the receipt of the Profits Units, which have provided and are intended in the future to provide the Director with material economic benefits.

13

(f) Unenforceable Restriction. It is expressly understood and agreed that although the Director and the Company consider the restrictions contained in this Appendix A to be reasonable, if a final determination is made by a court of competent jurisdiction that any restriction contained in this Appendix A is an unenforceable restriction against the Director, the provisions of this Appendix A shall not be rendered void but shall be reformed to apply as to such maximum time and to such maximum extent as such court may determine to be enforceable. Alternatively, if such court finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be reformed so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

For purposes of this Appendix A:

**"Noncompetition Restricted Period"** means the period beginning on the date that the Director's service with the Company or any Subsidiary terminates (whether initiated by the Director or by the Company or such Subsidiary) and ending on the first (1st) anniversary of the date thereof (unless the Director and the Company mutually agree to a longer period).

**"Nonsolicitation Restricted Period"** means the period beginning on the date that the Director's service with the Company or any Subsidiary terminates (whether initiated by the Director or by the Company or such Subsidiary) and ending on the second (2nd) anniversary of the date thereof (unless the Director and the Company mutually agree to a longer period).

**"Restricted Area"** means, as of any date of determination, those counties and states within the United States and, if applicable, those comparable political subdivisions of other countries in which the Company or any of its Subsidiaries directly or indirectly (x) conducts its business activities as of such date or (y) has regularly conducted or is actively planning to conduct its business activities on such date or at any time during the twelve months prior to such date. The Restricted Area with respect to an employee whose services do not otherwise relate to a specific geographic region shall be determined on the basis of the Company and its Subsidiaries conducting its business in locations without having any physical presence (such as leased property, equipment or employees) in such location, including but not limited to any counties and states in which the Company or its Subsidiaries market, broker or sell insurance policies or related products and services.

14

**JOINDER AGREEMENT**

_____, 20__

Reference is made to that certain Amended and Restated Limited Liability Company Agreement of Blizzard Parent, LLC ("Parent LLC", and such agreement, the "Parent LLC Agreement"). The undersigned acknowledges receipt of the Parent LLC Agreement, as in effect on the date hereof.

The undersigned signatory, in order to become the owner or holder of Profits Units of Parent LLC, hereby agrees that by the undersigned's execution hereof, the undersigned is a party to the Parent LLC Agreement and shall be a Member of Parent LLC with respect to the Profits Units, held by the undersigned, in all cases subject to all of the rights, restrictions, conditions and obligations applicable to the Members in respect of such Profits Units, as applicable, set forth in the Parent LLC Agreement. For purposes of this Joinder Agreement, the terms "Member", and "Profits Units" shall be as defined in the Parent LLC Agreement. This Joinder Agreement shall take effect and shall become a part of the Parent LLC Agreement as of the date first written above (or, if earlier, the effective date of the relevant issuance and/or transfer of Profits Units to the undersigned).

Pls. Print Name:     [                    ]

ACCEPTED:

BLIZZARD PARENT, LLC

By:     _____
Name:   Clint Jones
Title:   CEO

15

Appendix O

**SECTION 83(B) ELECTION FORM**

**[attached]**

**Information Relating to Section 83(b) Election**

Below you will find instructions for completing and filing a tax form in connection with your receipt of Profits Units representing a partnership interest of Blizzard Parent, LLC.

Pursuant to the terms governing the Profits Units, you **must** file an election under Section 83(b) of the Internal Revenue Code of 1986, as amended, **within 30 days of the issuance to you of the Profits Units.** The consequences of making an 83(b) election are complex and depend on individual circumstances and expectations. We recommend that you consult your own tax advisor regarding your receipt of Profits Units and the tax treatment of Profits Units.

For your convenience, attached is an 83(b) election form for you to complete, which the Company's Chief Legal Officer or General Counsel will then file with the Internal Revenue Service on your behalf. To complete the form, enter your social security number, sign and date the form. A copy of the completed form must be returned to #### by email at ####@gohealth.com **no later than [DATE].**

Should you have any questions, please feel free to contact #### via email at ####@gohealth.com or by phone at ####.

16

Exhibit 10.18

**GOHEALTH HOLDINGS, LLC**

**AMENDMENT NO. 1 TO DIRECTOR PROFITS UNIT AGREEMENT**

Name: [_____]

Date of Amendment: [          ], 20[    ]

The Board of Managers of GoHealth Holdings, LLC (the "***Company***") has approved an amendment to the vesting provisions set forth in the Director Profits Unit Agreement between you and the Company dated February 17, 2020 (the "***Profits Unit Agreement***"), effective as of the date of the initial public offering of GoHealth, Inc. (the "***IPO***"). This letter serves as an amendment (the "***Amendment***") to the Profits Unit Agreement. All capitalized terms in this Amendment, to the extent not defined herein, shall have the meanings provided in the Profits Unit Agreement.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, you and the Company hereby agree to the following amended terms:

1.  <u>Effect of Termination of Service</u>. Notwithstanding anything to the contrary in the Profits Unit Agreement, in the event that, following the IPO, you are required to terminate your position on the Board due to a conflict of interest or similar constraint involving public service, the unvested Profits Units granted under the Profits Unit Agreement will accelerate and vest in full in connection with your termination of service; provided that, if such an acceleration of vesting occurs prior to the eighteen (18) month anniversary of the IPO, any GoHealth, Inc. Class A common stock received by you in exchange for any such Profits Units shall be subject to a lock-up through such eighteen (18) month anniversary on terms substantially similar to the terms applicable to senior executives of the Company who held Profits Units in Blizzard Management Feeder, LLC immediately prior to the IPO.

2.  <u>No Further Amendments</u>. Except as specifically set forth above, all of the remaining terms of the Profits Unit Agreement shall remain unchanged and in full force and effect.

3.  **Miscellaneous. This letter may be delivered via facsimile and may be executed in counterparts, each of which shall be deemed an original and all of which shall be constitute document.** This letter shall be governed by and construed and enforced in accordance with Delaware law without regard to the conflict of laws provisions thereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this letter to be executed as of the date first written above.

GOHEALTH HOLDINGS, LLC

By: _____

Name: _____

Title: _____

The undersigned hereby accepts and agrees to all the

terms and provisions of this letter:

_____

[_____]

Exhibit 10.19

**GOHEALTH, INC.**
**2020 INCENTIVE AWARD PLAN**

**NOTICE OF STOCK OPTION GRANT**

**Name of Participant:**

**Address:**

**Date of Grant:**

**Exercise Price per Share:** $

**Total Number of Shares Subject to Option Granted:**

**Type of Option:** _____ Incentive Stock Option

_____ Nonstatutory Stock Option

**Expiration Date:**

**Vesting Commencement Date:**

**Vesting Schedule:** This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

[_____]

The Company and the Participant acknowledge receipt of this Notice of Stock Option Grant and agree to the terms and conditions of the Stock Option Agreement attached hereto and incorporated by reference herein, the Company's 2020 Incentive Award Plan and the terms of this Notice of Stock Option Grant as set forth above.

**GOHEALTH, INC.**                                                **PARTICIPANT**

By: _____                      By: _____
Name:   [_____]                                                     Name:   [_____]
Title:     [_____]

STOCK OPTION AGREEMENT – INCORPORATED TERMS AND CONDITIONS

A. *Grant of Option*. GoHealth, Inc. (the "**Company**") hereby grants to the Participant ("**Participant**") named in the Notice of Stock Option Grant (the "**Notice of Stock Option Grant**"), in consideration of the Participant's past and/or continued employment with or service to the Company or any of its Subsidiaries, an option (the "**Option**") to purchase the number of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "**Exercise Price**"), effective as of the date of grant set forth in the Notice of Stock Option Grant (the "**Date of Grant**") and subject to the terms and conditions of the Company's 2020 Incentive Award Plan (the "**Plan**"), which is incorporated herein by reference, and this Option Agreement. Subject to Sections 10.6 and 12.1 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Stock Option Grant as an Incentive Stock Option ("**ISO**"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that the Fair Market Value of the Shares subject to this Option (determined as of the time this Option is granted) together with any other ISOs previously granted, are exercisable for the first time by the Participant during any calendar year exceeds $100,000, then this Option will as to some or all of the Shares be treated as a Nonstatutory Stock Option ("**NSO**"). Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such non-qualification, such Option (or portion thereof) shall be regarded as an NSO granted under the Plan. Participant further acknowledges that the rules set forth in the preceding two sentences shall be applied by taking the Option and other stock options into account in the order in which they were granted, as determined under Section 422(d) of the Code and the Treasury Regulations thereunder. The Participant also acknowledges that an ISO exercised more than three (3) months after Participant's Termination of Service, other than by reason of death or Disability, will be taxed as an NSO. In no event shall the Administrator, the Company or any Affiliate or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

Unless otherwise defined herein or in the Notice of Stock Option Grant, the terms defined in the Plan shall have the same defined meanings in this Stock Option Agreement (the "**Option Agreement**").

B. *Termination Period.*

This Option shall be exercisable for three (3) months after Participant's Termination of Service, unless such termination is due to Participant's death or Disability, in which case this Option shall be exercisable for twelve (12) months after Participant's Termination of Service, or such termination is by the Company for Cause, in which case the Option shall cease to be exercisable on the date of such Termination of Service. Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Expiration Date as set forth in the Notice of Stock Option Grant and this Option may be subject to earlier termination as provided in Section 10.6 of the Plan.

(1) <u>Right to Exercise</u>. This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Stock Option Grant and with the applicable provisions of the Plan and this Option Agreement.

(2) <u>Duration of Exercisability</u>. Unless otherwise determined by the Administrator, any portion of this Option that has not become vested and exercisable on or prior to the date of Participant's Termination of Service (including, without limitation, pursuant to any employment or similar agreement by and between Participant and the Company) shall be forfeited on such date of Participant's Termination of Service and shall not thereafter become vested or exercisable.

(3) <u>Method of Exercise</u>. This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "**Exercise Notice**") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "**Exercised Shares**"), and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding. In the event this Option shall be exercised pursuant to the terms of the Plan by any person or persons other than Participant, appropriate proof of the right of such person or persons to exercise this Option shall also be required, as determined in the sole discretion of the Administrator. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Option is exercised with respect to such Shares.

D. **Method of Payment**. Payment of the Exercise Price shall be by any of the following, or a combination thereof, at the election of the Participant:

(1) cash;

(2) check;

(3) consideration received by the Company under a formal cashless exercise program adopted by the Company (whether through a broker or otherwise);

(3) with the consent of the Administrator, surrender of other Shares which (i) shall be valued at their Fair Market Value on the date of exercise, which Fair Market Value must be equal to the aggregate exercise price of the Shares as to which this Option will be exercised and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company;

(5) with the consent of the Administrator, by net exercise of vested Shares otherwise issuable upon exercise of this Option; or

(6) with the consent of the Administrator, any other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

E. *Non-Transferability of Option*. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution or, subject to the consent of the Administrator, pursuant to a DRO, unless and until the Shares underlying this Option have been issued, and all restrictions applicable to such Shares have lapsed. This Option may be exercised during the lifetime of Participant only by Participant. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Participant. Neither this Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by this Section (E). Notwithstanding the foregoing, with the consent of the Administrator, if the Option is an NSO **(or an ISO that is intended to become a NSO)**, it may be transferred pursuant to Participant's Permitted Transferees pursuant to any conditions and procedures the Administrator may require.

F. *Term of Option*. This Option may be exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement. Once this Option becomes unexercisable under this Option Agreement, it shall be forfeited immediately.

G. *Tax Obligations*.

(1) Tax Withholding. The Company (or the Affiliate employing or retaining Participant) has the authority to deduct or withhold, or require Participant to remit to the applicable employing entity, an amount sufficient to satisfy any applicable Federal, state, local and foreign income and employment tax withholding requirements (including the employee portion of any FICA obligation) applicable to the exercise of this Option or with respect to any taxable event arising pursuant to this Option Agreement. The Company (or its Affiliate) may withhold or Participant may make such payment in one or more of the following forms:

(i) by cash or check;

(ii) with the consent of the Administrator, by electing to have withheld the net number of vested Shares otherwise issuable upon the exercise of this Option having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company (or its Affiliate) based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(iii) with the consent of the Administrator, by tendering to the Company vested Shares held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences and having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company (or its Affiliate) based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income; or

(iv) with the consent of the Administrator, by selling a sufficient number of Shares otherwise deliverable to Participant through such means as the Administrator may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to satisfy such withholding taxes.

Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares issuable upon exercise of this Option if such withholding amounts are not delivered in full at the time of exercise.

(2) Notice of Disqualifying Disposition of ISO Shares. If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date that is two (2) years after the Date of Grant, or (ii) the date that is one (1) year after the date of the transfer of such Shares to Participant, Participant shall if requested by the Company, notify the Company in writing of such disposition and the amount realized, in cash, other property, assumption of indebtedness or other consideration, by Participant in such disposition or other transfer.

(3) Code Section 409A. This Option is not intended to constitute "nonqualified deferred compensation" within the meaning of Code Section 409A. However, notwithstanding any other provision of the Plan or this Option Agreement, if at any time the Administrator determines that this Option (or any portion thereof) may be subject to Code Section 409A, the Administrator shall have the right in its sole discretion (without any obligation to do so or to indemnify Participant or any other Person for failure to do so) to adopt such amendments to the Plan or this Option Agreement, or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, as the Administrator determines are necessary or appropriate for this Option either to be exempt from the application of Code Section 409A or to comply with the requirements of Code Section 409A.

(s) *Liability*. Participant is ultimately liable and responsible for all taxes owed in connection with this Option, regardless of any action the Company or any of its Affiliates takes with respect to any tax withholding obligations that arise in connection with this Option. Neither the Company nor any of its Affiliates makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or exercise of this Option or the subsequent sale of Shares. The Company and its Affiliates do not commit and are under no obligation to structure the Option to reduce or eliminate Participant's tax liability.

H. *Restrictive Covenants; Forfeiture*. Notwithstanding anything contained in this Agreement to the contrary, in the event the Participant breaches any restrictive covenant set forth in the Non-Disclosure, Invention Assignment, Non-Competition Agreement and Non-Solicitation Agreement or the Confidentiality, Non-Competition, and Non-Solicitation Agreement, as applicable, or any other written agreement between the Participant and the Company or any Affiliate of the Company, in addition to any other damages available at law or in equity, then (i) any portion of this Option that has not been exercised prior to the date of such breach shall thereupon be forfeited and (ii) the Participant shall be required to pay to the Company the amount of all Option Gain (as defined below). "*Option Gain*" with respect to any specified period of time shall mean the product of (i) the number of shares of Common Stock purchased upon the exercise of this Option during such period and (ii) the excess of (A) the Fair Market Value per share of Common Stock as of the date of such exercise over (B) the exercise price per share of Common Stock subject to such Options.

I. *Entire Agreement; Governing Law*. The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant or as is otherwise permitted under the Plan. This Option Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

J. *No Guarantee of Continued Service*. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE AFFILIATE EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE AFFILIATE EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

K. *Administration*. The Administrator shall have the power to interpret the Plan and this Option Agreement, and to adopt such rules for the administration, interpretation and application of the Plan and this Option Agreement, as are consistent therewith and to interpret, amend or revoke any such rules. All actions taken and all interpretations and determinations made by the Administrator will be final and binding upon Participant, the Company and all other interested Persons. To the extent allowable pursuant to Applicable Law, no member of the Committee or the Board will be personally liable for any action, determination or interpretation made with respect to the Plan or this Option Agreement.

L. *Adjustments*. The Administrator may accelerate the vesting of all or a portion of this Option in such circumstances as it, in its sole discretion, may determine. Participant acknowledges that this Option is subject to adjustment, modification and termination in certain events as provided in this Option Agreement and the Plan, including Section 12.2 of the Plan.

M. *Notices*. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of the Secretary of the Company at the Company's principal office, and any notice to be given to Participant shall be addressed to Participant at Participant's address set forth below. By a notice given pursuant to this Section (L), either party may hereafter designate a different address for notices to be given to that party. Any notice shall be deemed duly given when sent via email or when sent by certified mail (return receipt requested) and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service. Any notice which is required to be given to Participant shall, if Participant is then deceased, be given to the person entitled to exercise his or her Option by written notice under this Section L. Subject to the limitations set forth in Section 232(e) of the General Corporation Law of the State of Delaware (the "DGCL"), Participant consents to the delivery of any notice to Participant given by the Company under the DGCL or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number for Participant in the Company's records, (ii) electronic mail to the electronic mail address for Participant in the Company's records, (iii) posting on an electronic network together with separate notice to Participant of such specific posting or (iv) any other form of electronic transmission (as defined in the DGCL) directed to Participant. This consent may be revoked by Participant by written notice to the Company and may be deemed revoked in the circumstances specified in Section 232 of the DGCL.

N. *Conformity to Securities Laws*. Participant acknowledges that the Plan and this Option Agreement are intended to conform to the extent necessary with all provisions of the Securities Act and the Exchange Act and any and all Applicable Law and regulations and rules promulgated by the Securities and Exchange Commission thereunder, and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and this Option is granted and may be exercised, only in such a manner as to conform to such Applicable Law.

O. *Limitations Applicable to Section 16 Persons*. Notwithstanding any other provision of the Plan or this Option Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, this Option and this Option Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act

(including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule) to the extent permitted by applicable law, this Option Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

P. ***Successors and Assigns***. The Company may assign any of its rights under this Option Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in <u>Section (E)</u> and the Plan, this Option Agreement shall be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

Q. ***Limitation on Participant's Rights***. Participation in the Plan confers no rights or interests other than as herein provided. This Option Agreement creates only a contractual obligation on the part of the Company as to amounts payable and shall not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant shall have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to this Option.

R. ***Rights as Stockholder***. Neither Participant nor any Person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder upon exercise of this Option unless and until certificates representing such Shares (which may be in book-entry form) will have been issued and recorded on the records of the Company or its transfer agents or registrars and delivered to Participant (including through electronic delivery to a brokerage account). Except as otherwise provided herein, after such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company.

S. ***Lock-up Period.*** Participant shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Shares (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares (or other securities) of the Company held by Participant (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed 180 days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions).

Exhibit A

**2020 INCENTIVE AWARD PLAN EXERCISE NOTICE**

GoHealth, Inc.
[           ]
[           ]

Attention: Corporate Secretary

     1. **Exercise of Option**. Effective as of today,_____,____ , the undersigned ("**Participant**") hereby elects to exercise Participant's option (the "**Option**") to purchase _____ shares of the Common Stock (the "**Shares**") of GoHealth, Inc. (the "**Company**") under and pursuant to the 2020 Incentive Award Plan (the "**Plan**") and the Stock Option Agreement dated _____ (the "**Option Agreement**"). The Option is an [Incentive Stock Option][Nonstatutory Stock Option].

     2. **Delivery of Payment**. Participant herewith delivers to the Company the total exercise price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

     3. **Representations of Participant**. Participant acknowledges that Participant has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

     4. **Rights as Stockholder**. Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Common Stock subject to an Award, notwithstanding the exercise of the Option. The Shares shall be issued to Participant as soon as practicable after the Option is exercised in accordance with the Option Agreement. No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 12.2 of the Plan.

     5. **Tax Consultation**. Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares. Participant represents that Participant has consulted with any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

     6. **Successors and Assigns**. The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Participant and his or her heirs, executors, administrators, successors and assigns.

7. **Interpretation**. Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Participant or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting. The resolution of such a dispute by the Administrator shall be final and binding on all parties.

8. **Governing Law; Severability**. This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of Delaware. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

9. **Entire Agreement**. The Plan and Option Agreement are incorporated herein by reference. This Exercise Notice, the Plan and the Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.

Submitted by:                                          Accepted by:

PARTICIPANT                                            GOHEALTH, INC.

_____                               _____
Signature                                             By

_____                               _____
Print Name                                            Print Name

Address:                                              _____
                                                      Title

_____                               Address:
_____                               [          ]
                                                      [          ]

                                                      _____
                                                      Date Received:

**Exhibit 10.20**

*IPO Award*

**GOHEALTH, INC.**
**2020 INCENTIVE AWARD PLAN**

**RESTRICTED STOCK UNIT AWARD GRANT NOTICE AND RESTRICTED STOCK UNIT AGREEMENT**

**IPO AWARD**

GoHealth, Inc., a Delaware corporation (the "Company"), pursuant to its 2020 Incentive Award Plan, as amended from time to time (the "Plan"), in connection with its initial public offering, hereby grants to the holder listed below ("Participant") the number of Restricted Stock Units set forth below (the "RSUs"). The RSUs are subject to the terms and conditions set forth in this Restricted Stock Unit Grant Notice (the "Grant Notice"), the Restricted Stock Unit Agreement attached hereto as Exhibit A (the "Agreement") and the Plan, each of which is incorporated herein by reference. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in the Grant Notice and the Agreement.

| | |
|---|---|
| **Participant:** | _____ |
| **Grant Date:** | _____ |
| **Vesting Start Date:** | _____ |
| **Number of RSUs:** | [_____] |
| **Type of Shares Issuable:** | Class A Common Stock |
| **Vesting Schedule:** | [_____] |

**[Withholding Tax Election:** By accepting this Award electronically through the Plan service provider's online grant acceptance policy, the Participant understands and agrees that as a condition of the grant of the RSUs hereunder, the Participant is required to, and hereby affirmatively elects to (the "Sell to Cover Election"), (1) sell that number of Shares determined in accordance with Section 2.5 of the Agreement as may be necessary to satisfy all applicable withholding obligations with respect to any taxable event arising in connection with the RSUs and similarly sell such number of Shares as may be necessary to satisfy all applicable withholding obligations with respect to any other awards of restricted stock units granted to the Participant under the Plan or any other equity incentive plans of the Company or its predecessor, and (2) to allow the Agent (as defined in the Agreement) to remit the cash proceeds of such sale(s) to the Company. Furthermore, the Participant directs the Company to make a cash payment equal to the required tax withholding from the cash proceeds of such sale(s) directly to the appropriate taxing authorities. **The Participant has carefully reviewed Section 2.5 of the Agreement and the Participant hereby represents and warrants that on the date hereof he or she is not aware of any material, nonpublic information with respect to the Company or any securities of the Company, is not subject to any legal, regulatory or contractual restriction that would prevent the Agent from conducting sales, does not have, and will not attempt to exercise, authority, influence or control over any sales of Shares effected by the Agent pursuant to the Agreement, and is entering into the Agreement and this election to "sell to cover" in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1 (regarding trading of the Company's securities on the basis of material nonpublic information) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). It is the Participant's intent that this election to "sell to cover" comply with the requirements of Rule 10b5-1(c)(1)(i)(B) under the Exchange Act and be interpreted to comply with the requirements of Rule 10b5-1(c) under the Exchange Act.]**

*TPO Award*

By accepting this Award electronically through the Plan service provider's online grant acceptance policy, Participant agrees to be bound by the terms and conditions of the Plan, the Agreement and the Grant Notice. Participant has reviewed the Agreement, the Plan and the Grant Notice in their entirety, has had an opportunity to obtain the advice of counsel prior to executing the Grant Notice and fully understands all provisions of the Grant Notice, the Agreement, and the Plan. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan, the Grant Notice or the Agreement.

**EXHIBIT A**
**TO RESTRICTED STOCK UNIT AWARD Grant Notice**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

Pursuant to the Grant Notice to which this Agreement is attached, the Company has granted to Participant the number of RSUs set forth in the Grant Notice.

**ARTICLE I.**

**GENERAL**

Section 1.1 Defined Terms. Capitalized terms not specifically defined herein shall have the meanings specified in the Plan or the Grant Notice. For purposes of this Agreement,

(a) "Affiliate" means any Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such entity. The term "Control" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

(b) "Cause" shall mean, unless such term or an equivalent term is otherwise defined by any employment agreement or offer letter between a Participant and a Participating Company, any of the following: (i) Participant's material breach or substantial failure to perform any of the duties, responsibilities, representation, warranties, covenants or obligations under this Agreement (other than as a result of Participant's death or disability), which failure continues unremedied and uncured for a period of thirty (30) days after written notice from the Company requesting such remedy or cure by Participant, (ii) Participant's conviction for, or plea of guilty or no contest to, or confession of guilt of, any felony or gross misdemeanor (excluding minor traffic violations or similar offenses), (iii) Participant's commission of any act of fraud, misappropriation, embezzlement, theft or gross malfeasance with respect to the Company or any of its affiliates or any of their assets.

(c) "Cessation Date" shall mean the date of Participant's Termination of Service (regardless of the reason for such termination).

(e) "Participating Company" shall mean the Company or any of its Affiliates.

(f) "Person" means an individual, corporation, joint venture, partnership, limited liability company, association, joint stock or other company, business trust, trust or other entity or organization, including any national, federal, state, territorial agency, local or foreign judicial, legislative, regulatory or administrative authority, commission, court, tribunal, any political or other subdivision, department or branch of any of the foregoing, and any self-regulatory organization or arbitrator.

Section 1.2 Incorporation of Terms of Plan. The RSUs and the shares of Class A Common Stock issued to Participant hereunder ("Shares") are subject to the terms and conditions set forth in this Agreement and the Plan, which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall control.

**ARTICLE II.**
**AWARD OF RESTRICTED STOCK UNITS**

Section 2.1 <u>Award of RSUs</u>

(a) In consideration of Participant's past and/or continued employment with or service to a Participating Company and for other good and valuable consideration, effective as of the grant date set forth in the Grant Notice (the "<u>Grant Date</u>"), the Company has granted to Participant the number of RSUs set forth in the Grant Notice, upon the terms and conditions set forth in the Grant Notice, the Plan and this Agreement, subject to adjustment as provided in Section 12.2 of the Plan. Each RSU represents the right to receive one Share at the times and subject to the conditions set forth herein. However, unless and until the RSUs have vested, Participant will have no right to the payment of any Shares subject thereto. Prior to the actual delivery of any Shares, the RSUs will represent an unsecured obligation of the Company, payable only from the general assets of the Company.

Section 2.2 <u>Vesting of RSUs</u>.

(a) Subject to Participant's continued employment with or service to a Participating Company on each applicable vesting date and subject to the terms of this Agreement, including, without limitation, <u>Section 2.2(d)</u>, the RSUs shall vest in such amounts and at such times as are set forth in the Grant Notice.

(b) In the event Participant incurs a Termination of Service, except as may be otherwise provided herein or in the Plan or by the Administrator or as set forth in a written agreement between Participant and the Company, Participant shall immediately forfeit any and all RSUs granted under this Agreement that have not vested or do not vest on or prior to the date on which such Termination of Service occurs, and Participant's rights in any such RSUs that are not so vested shall lapse and expire.

(c) Notwithstanding the Grant Notice or the provisions of <u>Section 2.2(a)</u> and <u>Section 2.2(b)</u>, in the event Participant incurs a Termination of Service for Cause, except as may be otherwise provided by the Administrator or as set forth in a written agreement between Participant and the Company, Participant shall immediately forfeit any and all RSUs granted under this Agreement (whether or not vested), and Participant's rights in any such RSUs shall lapse and expire.

Section 2.3

(a) <u>Distribution or Payment of RSUs</u>. Participant's RSUs shall be distributed in Shares (either in book-entry form or otherwise) on or within two business days following each applicable vesting date. Notwithstanding the foregoing, the Company may delay a distribution or payment in settlement of RSUs if it reasonably determines that such payment or distribution will violate federal securities laws or any other Applicable Law, *provided* that such distribution or payment shall be made at the earliest date at which the Company reasonably determines that the making of such distribution or payment will not cause such violation, as required by Treasury Regulation Section 1.409A-2(b)(7)(ii), and *provided further* that no payment or distribution shall be delayed under this <u>Section 2.3(a)</u> if such delay will result in a violation of Section 409A.

(b) All distributions shall be made by the Company in the form of whole Shares, and any fractional share shall be distributed in cash in an amount equal to the value of such fractional share determined based on the Fair Market Value as of the date immediately preceding the date of such distribution.

Section 2.4 <u>Conditions to Issuance of Certificates</u>. The Company shall not be required to issue or deliver any certificate or certificates for any Shares or to cause any Shares to be held in book-entry form prior to the fulfillment of all of the following conditions: (a) the admission of the Shares to listing on all stock exchanges on which such Shares are then listed, (b) the completion of any registration or other qualification of the Shares under any state or federal law or under rulings or regulations of the Securities and Exchange Commission or other governmental regulatory body, which the Administrator shall, in its absolute discretion, deem necessary or advisable, (c) the obtaining of any approval or other clearance from any state or federal governmental agency that the Administrator shall, in its absolute discretion, determine to be necessary or advisable, (d) the receipt by the Company of full payment for such Shares, which may be in one or more of the forms of consideration permitted under <u>Section 2.5</u>, and (e) the receipt of full payment of any applicable withholding tax in accordance with <u>Section 2.5</u> by the Participating Company with respect to which the applicable withholding obligation arises.

Section 2.5 <u>Tax Withholding</u>. Notwithstanding any other provision of this Agreement:

(a) As set forth in Section 10.2 of the Plan, the Company shall have the authority and the right to deduct or withhold, or to require the Participant to remit to the Company, an amount sufficient to satisfy all applicable federal, state and local taxes required by law to be withheld with respect to any taxable event arising in connection with the Restricted Stock Units. [In satisfaction of such tax withholding obligations and in accordance with the Sell to Cover Election included in the Grant Notice, the Participant has irrevocably elected to sell the portion of the Shares to be delivered under the Restricted Stock Units necessary so as to satisfy the tax withholding obligations and shall execute any letter of instruction or agreement required by the Company's transfer agent (together with any other party the Company determines necessary to execute the Sell to Cover Election, the "<u>Agent</u>") to cause the Agent to irrevocably commit to forward the proceeds necessary to satisfy the tax withholding obligations directly to the Company and/or its Affiliates. In accordance with Participant's Sell to Cover Election pursuant to the Grant Notice, the Participant hereby acknowledges and agrees:

(i) The Participant hereby appoints the Agent as the Participant's agent and authorizes the Agent to (1) sell on the open market at the then prevailing market price(s), on the Participant's behalf, as soon as practicable on or after the Shares are issued upon the vesting of the Restricted Stock Units, that number (rounded up to the next whole number) of the Shares so issued necessary to generate proceeds to cover (x) any tax withholding obligations incurred with respect to such vesting or issuance and (y) all applicable fees and commissions due to, or required to be collected by, the Agent with respect thereto and (2) apply any remaining funds to the Participant's federal tax withholding.

(ii) The Participant hereby authorizes the Company and the Agent to cooperate and communicate with one another to determine the number of Shares that must be sold pursuant to subsection (i) above.

(iii) The Participant understands that the Agent may effect sales as provided in subsection (i) above in one or more sales and that the average price for executions resulting from bunched orders will be assigned to the Participant's account. In addition, the Participant acknowledges that it may not be possible to sell Shares as provided by subsection (i) above due to (1) a legal or contractual restriction applicable to the Participant or the Agent, (2) a market disruption, or (3) rules governing order execution priority on the national exchange where the Shares may be traded. The Participant further agrees and acknowledges that in the event the sale of Shares would result in material adverse harm to the Company, as determined by the Company in its sole discretion, the Company may instruct the Agent not to sell Shares as provided by subsection (i) above. In the event of the Agent's inability to sell Shares, the Participant will continue to be responsible for the timely payment to the Company and/or its Affiliates of all federal, state, local and foreign taxes that are required by applicable laws and regulations to be withheld, including but not limited to those amounts specified in subsection (i) above.

(iv) The Participant acknowledges that regardless of any other term or condition of this Section 2.5(a), the Agent will not be liable to the Participant for (1) special, indirect, punitive, exemplary, or consequential damages, or incidental losses or damages of any kind, or (2) any failure to perform or for any delay in performance that results from a cause or circumstance that is beyond its reasonable control.

(v) The Participant hereby agrees to execute and deliver to the Agent any other agreements or documents as the Agent reasonably deems necessary or appropriate to carry out the purposes and intent of this Section 2.5(a). The Agent is a third-party beneficiary of this Section 2.5(a).

(vi) This Section 2.5(a) shall terminate not later than the date on which all tax withholding obligations arising in connection with the vesting of the Award have been satisfied.]

(b) The Company shall not be obligated to deliver any certificate representing Shares issuable with respect to the RSUs to, or to cause any such Shares to be held in book-entry form by, Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the RSUs or any other taxable event related to the RSUs.

(c) Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action the Company or any other Participating Company takes with respect to any tax withholding obligations that arise in connection with the RSUs. No Participating Company makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or payment of the RSUs or the subsequent sale of Shares. The Participating Companies do not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax liability.

Section 2.6 <u>Rights as Stockholder</u>. Neither Participant nor any Person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares (which may be in book-entry form) will have been issued and recorded on the records of the Company or its transfer agents or registrars and delivered to Participant (including through electronic delivery to a brokerage account). Except as otherwise provided herein, after such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to such Shares, including, without limitation, the right to receipt of dividends and distributions on such Shares.

Section 2.7 <u>Restrictive Covenants; Forfeiture</u>. Notwithstanding anything contained in this Agreement to the contrary, in the event the Participant breaches any restrictive covenant set forth in the Non-Disclosure, Invention Assignment, Non-Competition Agreement and Non-Solicitation Agreement or the Confidentiality, Non-Competition, and Non-Solicitation Agreement, as applicable, or any other written agreement between the Participant and any Participating Company, in addition to any other damages available at law or in equity, then, (i) any portion of the Award that has not been distributed to the Participant prior to the date of such violation shall thereupon be forfeited and (ii) the Participant shall be required to pay to the Company the amount of all RSU Gain (as defined below). "***RSU Gain***" shall mean an amount equal to the product of (i) the number of shares of Common Stock that are distributed pursuant to this RSU Award and (ii) the Fair Market Value per share of Common Stock on the date of such distribution.

**ARTICLE III.**
**OTHER PROVISIONS**

Section 3.1 <u>Administration</u>. The Administrator shall have the power to interpret the Plan, the Grant Notice and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan, the Grant Notice and this Agreement as are consistent therewith and to interpret, amend or revoke any such rules. All actions taken and all interpretations and determinations made by the Administrator will be final and binding upon Participant, the Company and all other interested Persons. To the extent allowable pursuant to Applicable Law, no member of the Committee or the Board will be personally liable for any action, determination or interpretation made with respect to the Plan, the Grant Notice or this Agreement.

Section 3.2 <u>RSUs Not Transferable</u>. The RSUs may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the RSUs have been issued, and all restrictions applicable to such Shares have lapsed. No RSUs or any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence. Notwithstanding the foregoing, with the consent of the Administrator, the RSUs may be transferred to Permitted Transferees, pursuant to any such conditions and procedures the Administrator may require.

Section 3.3 <u>Adjustments</u>. The Administrator may accelerate the vesting of all or a portion of the RSUs in such circumstances as it, in its sole discretion, may determine. Participant acknowledges that the RSUs and the Shares subject to the RSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan, including Section 12.2 of the Plan.

Section 3.4 <u>Notices</u>. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of the Secretary of the Company at the Company's principal office, and any notice to be given to Participant shall be addressed to Participant at Participant's last address reflected on the Company's records. By a notice given pursuant to this <u>Section 3.4</u>, either party may hereafter designate a different address for notices to be given to that party. Any notice shall be deemed duly given when sent via email or when sent by certified mail (return receipt requested) and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service or similar foreign entity.

Section 3.5 <u>Titles</u>. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

Section 3.6 <u>Governing Law</u>. The laws of the State of Delaware shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 3.7 <u>Conformity to Securities Laws</u>. Participant acknowledges that the Plan, the Grant Notice and this Agreement, are intended to conform to the extent necessary with all Applicable Laws, including, without limitation, the provisions of the Securities Act and the Exchange Act, and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission, and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the RSUs are granted, only in such a manner as to conform to Applicable Law. To the extent permitted by Applicable Law, the Plan, the Grant Notice and this Agreement, shall be deemed amended to the extent necessary to conform to Applicable Law.

Section 3.8 <u>Amendment, Suspension and Termination</u>. To the extent permitted by the Plan, this Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Administrator or the Board, *provided* that, except as may otherwise be provided by the Plan, no amendment, modification, suspension or termination of this Agreement shall adversely affect the RSUs in any material way without the prior written consent of Participant.

Section 3.9 <u>Successors and Assigns</u>. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in <u>Section 3.2</u> and the Plan, this Agreement shall be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

Section 3.10 <u>Limitations Applicable to Section 16 Persons</u>. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the RSUs, the Grant Notice and this Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, this Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

Section 3.11 <u>Not a Contract of Employment</u>. Nothing in this Agreement or in the Plan shall confer upon Participant any right to continue to serve as an employee or other service provider of any Participating Company or shall interfere with or restrict in any way the rights of any Participating Company, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without cause, except to the extent (i) expressly provided otherwise in a written agreement between a Participating Company and Participant or (ii) where such provisions are not consistent with applicable foreign or local laws, in which case such applicable foreign or local laws shall control.

Section 3.12 <u>Entire Agreement</u>. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

Section 3.13 <u>Section 409A</u>. The intent of the parties is that the payments and benefits under this Agreement comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively, "<u>Section 409A</u>") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

Section 3.14 <u>Agreement Severable</u>. In the event that any provision of the Grant Notice or this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of the Grant Notice or this Agreement.

Section 3.15 <u>Limitation on Participant's Rights</u>. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and shall not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant shall have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to the RSUs.

Section 3.16 <u>Counterparts</u>. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which shall be deemed an original and all of which together shall constitute one instrument.

\* \* \* \* \*

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated May 8, 2020, in Amendment No. 2 to the Registration Statement (Form S-1 No. 333-239287) and related Prospectus of GoHealth, Inc. for the registration of shares of its common stock.

/s/ Ernst & Young LLP

Chicago, Illinois
July 8, 2020

Exhibit 23.2

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated May 8, 2020 with respect to the consolidated financial statements of GoHealth Holdings, LLC and Subsidiaries, included in Amendment No. 2 to the Registration Statement (Form S-1 No. 333-239287) and related Prospectus of GoHealth, Inc. for the registration of shares of its common stock.

/s/ Ernst & Young LLP

Chicago, Illinois
July 8, 2020